**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Jimmy Fokas

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>FRANK J. AVELLINO, individually, and as Trustee for FRANK J. AVELLINO REVOCABLE TRUST NUMBER ONE AS AMENDED AND RESTATED JANUARY 26, 1990, AS AMENDED; FRANK J. AVELLINO GRANTOR RETAINED ANNUITY TRUST UNDER AGREEMENT DATED JUNE 24, 1992; FRANK | Adv. Pro. No. 10-05421 (SMB) |

J. AVELLINO GRANTOR RETAINED
ANNUITY TRUST AGREEMENT NUMBER 2
UNDER AGREEMENT DATED JUNE 24, 1992;
FRANK J. AVELLINO REVOCABLE TRUST
NUMBER ONE UNDER THE DECLARATION
OF TRUST NUMBER ONE DATED JUNE 10,
1988, AS AMENDED; RACHEL ANNE
ROSENTHAL TRUST U/A DATED JUNE 29,
1990; RACHEL ANNE ROSENTHAL TRUST #3;
HEATHER CARROLL LOWLES TRUST U/A
DATED JUNE 29, 1990; TIFFANY JOY
LOWLES TRUST U/A DATED JUNE 29, 1990;
MELANIE ANN LOWLES TRUST U/A DATED
JUNE 29, 1990; TAYLOR ASHLEY MCEVOY
TRUST U/A DATED JUNE 24, 1992; MADISON
ALYSSA MCEVOY TRUST U/A DATED JUNE
29, 1990; S.A. GRANTOR RETAINED
ANNUITY TRUST; AVELLINO FAMILY
TRUST; AVELLINO & BIENES PENSION
PLAN & TRUST;

MICHAEL S. BIENES, individually, and as
Trustee for AVELLINO & BIENES PENSION
PLAN & TRUST;

NANCY C. AVELLINO, individually, and as
Trustee for NANCY CARROLL AVELLINO
REVOCABLE TRUST UNDER THE TRUST
AGREEMENT DATED MAY 18, 1992; RACHEL
ANNE ROSENTHAL TRUST U/A DATED JUNE
29, 1990; RACHEL ANNE ROSENTHAL TRUST
#3; HEATHER CARROLL LOWLES TRUST U/A
DATED JUNE 29, 1990; TIFFANY JOY
LOWLES TRUST U/A DATED JUNE 29, 1990;
MELANIE ANN LOWLES TRUST U/A DATED
JUNE 29, 1990; TAYLOR ASHLEY MCEVOY
TRUST U/A DATED JUNE 24, 1992; MADISON
ALYSSA MCEVOY TRUST U/A DATED JUNE
29, 1990;

DIANNE K. BIENES;

THOMAS G. AVELLINO;

AVELLINO & BIENES; AVELLINO FAMILY
TRUST; AVELLINO & BIENES PENSION
PLAN & TRUST; GROSVENOR PARTNERS,

LTD.; MAYFAIR VENTURES, G.P.; ASTER
ASSOCIATES; ST. JAMES ASSOCIATES;
STRATTHAM PARTNERS; KENN JORDAN
ASSOCIATES; ASCENT, INC.; MAYFAIR
BOOKKEEPING SERVICES, INC.; 27 CLIFF,
LLC; THE AVELLINO FAMILY FOUNDATION,
INC.;

RACHEL A. ROSENTHAL; HEATHER C.
LOWLES; MELANIE A. LOWLES; A MINOR
WITH THE INITIALS S.A.; FRANK J.
AVELLINO REVOCABLE TRUST NUMBER
ONE AS AMENDED AND RESTATED
JANUARY 26, 1990, AS AMENDED; FRANK J.
AVELLINO GRANTOR RETAINED ANNUITY
TRUST UNDER AGREEMENT DATED JUNE
24, 1992; FRANK J. AVELLINO GRANTOR
RETAINED ANNUITY TRUST AGREEMENT
NUMBER 2 UNDER AGREEMENT DATED
JUNE 24, 1992, AS AMENDED; FRANK J.
AVELLINO REVOCABLE TRUST NUMBER
ONE UNDER THE DECLARATION OF TRUST
NUMBER ONE DATED JUNE 10, 1988, AS
AMENDED; NANCY CARROLL AVELLINO
REVOCABLE TRUST UNDER THE TRUST
AGREEMENT DATED MAY 18, 1992; RACHEL
ANNE ROSENTHAL TRUST U/A DATED JUNE
29, 1990; RACHEL ANNE ROSENTHAL TRUST
#3; HEATHER CARROLL LOWLES TRUST U/A
DATED JUNE 29, 1990; TIFFANY JOY
LOWLES TRUST U/A DATED JUNE 29, 1990;
MELANIE ANN LOWLES TRUST U/A DATED
JUNE 29, 1990; TAYLOR ASHLEY MCEVOY
TRUST U/A DATED JUNE 24, 1992; MADISON
ALYSSA MCEVOY TRUST U/A DATED JUNE
29, 1990; S.A. GRANTOR RETAINED
ANNUITY TRUST,

Defendants.

# TABLE OF CONTENTS

**Page**

NATURE OF THE PROCEEDING ............................................................................1

JURISDICTION AND VENUE ...............................................................................8

THE DEFENDANTS..............................................................................................9

    Individual Defendants (the "Individual Defendants") .......................................9

    Entity Defendants (the "Entity Defendants") ..................................................19

    Other Subsequent Transferee Defendants.......................................................24

BACKGROUND, THE TRUSTEE, AND STANDING................................................32

THE PONZI SCHEME............................................................................................35

AVELLINO, LATER JOINED BY BIENES, OPERATED THE FIRST
    MADOFF FEEDER FUND TO EXPLOIT THE CONSISTENT
    RETURNS MADOFF PROMISED ..................................................................38

AVELLINO AND BIENES LIED TO THE SEC TO COVER UP MADOFF'S
    FRAUD AND THE PHONY IA ACCOUNT BLMIS CREATED TO
    CONCEAL A SHORTAGE OF FUNDS OWED TO A&B'S
    INVESTORS...................................................................................................41

AVELLINO AND BIENES RETURNED THEIR ORIGINAL ACCOUNT
    STATEMENTS TO MADOFF SO THAT BLMIS COULD ALTER
    THEM FOR PRODUCTION TO THE SEC AND THE RECEIVER .............................48

THE SEC OBTAINED AN INJUNCTION AGAINST AVELLINO, BIENES,
    AND A&B ......................................................................................................53

IN THE WAKE OF THE SEC INJUNCTION, AVELLINO AND BIENES
    FAILED TO FIND "FRONT MEN" AND INSTEAD NEGOTIATED
    WITH OTHERS TO RECEIVE MONEY FOR REFERRING
    INVESTORS TO BLMIS ................................................................................54

DESPITE THE SEC INJUNCTION, AVELLINO, BIENES, AND THEIR
    FAMILIES CREATED A WEB OF INTER-CONNECTED ENTITIES
    TO CONTINUE TO FUNNEL MONEY INTO BLMIS AND
    KNOWINGLY PROFIT FROM A FRAUD ......................................................55

AVELLINO AND BIENES NEGOTIATED WITH MADOFF TO RECEIVE
    GUARANTEED RATES OF RETURN AND FRAUDULENT SIDE
    PAYMENTS FOR FUNDS FORMER A&B INVESTORS
    REINVESTED WITH BLMIS ........................................................................63

# TABLE OF CONTENTS

(continued)

**Page**

AVELLINO, BIENES, AND THEIR FAMILIES KNEW THEIR RECEIPT OF
FRAUDULENT SIDE PAYMENTS THROUGH BLMIS'S "SCHUPT"
PROCESS WAS FURTHER PROOF OF FRAUD AT BLMIS ......................................68

AVELLINO, BIENES, AND THOMAS AVELLINO KNEW OF OR WERE
WILLFULLY BLIND TO OTHER FACTS SUGGESTING FRAUD AT
BLMIS ......................................................................................................................74

Avellino, Bienes, and Thomas Avellino Knew of, or Were Willfully Blind to,
Impossibly Consistent Annual Rates of Return Madoff Promised and
Delivered In the Post-1992 IA Accounts ................................................75

Avellino, Bienes, and Thomas Avellino Knew of, or Were Willfully Blind to,
Trading Impossibilities In the Post-1992 IA Accounts.........................76

Avellino, Bienes, and Thomas Avellino Knew of, or Were Willfully Blind
to, Impossible Options Trading Volume in the Post-1992 IA
Accounts ....................................................................................77

Avellino, Bienes, and Thomas Avellino Knew of, or Were Willfully Blind
to, Impossible Transactions Priced Outside the Daily Range in the
Post-1992 IA Accounts ..............................................................78

AS EARLY AS 1978, AVELLINO AND BIENES KNEW OF OR WERE
WILLFULLY BLIND TO FACTS SUGGESTING FRAUD AT BLMIS ......................79

Avellino and Bienes Knew the Guaranteed Rates of Return Madoff Promised and
Delivered In the Original A&B IA Accounts Were Impossibly Consistent..........80

Avellino and Bienes Knew of, or Were Willfully Blind to, Myriad Trading
Impossibilities Reflected on the Original A&B IA Account Statements .............81

Avellino and Bienes Knew of, or Were Willfully Blind to, Backdated Trades On
the Original A&B IA Account Statements ............................................83

As Early as 1985, Avellino Knew the Identity of Madoff's Auditor, and Avellino
and Bienes Knew—As CPAs Themselves—It Was Neither Qualified Nor
Capable Of Auditing BLMIS.................................................................84

AVELLINO, BIENES, AND THEIR FAMILIES ROUTINELY AND
IMPROPERLY DISREGARDED THE FORM OF THE INTER-
CONNECTED ENTITIES THEY CREATED SOLELY TO INVEST IN
BLMIS ......................................................................................................................86

## TABLE OF CONTENTS
(continued)

**Page**

AFTER REVELATION OF MADOFF'S FRAUD, BIENES LIED IN A
     TELEVISION INTERVIEW AND BIENES, AVELLINO, MRS.
     BIENES, AND THOMAS AVELLINO ASSERTED THEIR FIFTH
     AMENDMENT RIGHTS AGAINST SELF-INCRIMINATION ..................................90

IMPUTATION OF KNOWLEDGE AND LIABILITY.................................................95

     Imputation and Liability as to Entity Defendants A&B and A&B Pension Plan ..............96

     Imputation and Liability as to the Post-1992 Entity Defendants.......................................98

     Imputation and Liability as to Mrs. Avellino and Mrs. Bienes .....................................106

     Imputation and Liability as to the Remaining Defendants .............................................108

THE TRANSFERS ...........................................................................................................111

     The Initial Transfers.......................................................................................................112

     The Subsequent Transfers...............................................................................................117

COUNT ONE: FRAUDULENT TRANSFER − 11 U.S.C. §§ 105(a), 502(d),
     548(a)(1)(A), 550(a), AND 551......................................................................................121

COUNT TWO: FRAUDULENT TRANSFER − 11 U.S.C. §§ 105(a), 502(d),
     548(a)(1)(B), 550(a), AND 551 ......................................................................................123

COUNT THREE: FRAUDULENT TRANSFER − NEW YORK DEBTOR AND
     CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§
     105(a), 502(d), 544(b), 550(a), AND 551.......................................................................124

COUNT FOUR: FRAUDULENT TRANSFER − NEW YORK DEBTOR AND
     CREDITOR LAW §§ 273, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a),
     502(d), 544(b), 550(a), AND 551 ...................................................................................126

COUNT FIVE: FRAUDULENT TRANSFER − NEW YORK DEBTOR AND
     CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a),
     502(d), 544(b), 550(a), AND 551 ...................................................................................127

COUNT SIX: FRAUDULENT TRANSFER − NEW YORK DEBTOR AND
     CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a),
     502(d), 544(b), 550(a), AND 551 ...................................................................................128

**TABLE OF CONTENTS**

(continued)

**Page**

COUNT SEVEN: RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW
    YORK CIVIL PRACTICE LAW AND RULES 203(g) AND 213(8),
    NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278,
    AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND
    551.......................................................................................................................129

COUNT EIGHT: PREFERENTIAL TRANSFERS – 11 U.S.C. §§ 105(a), 502(d),
    547(b), 550, AND 551 ........................................................................................131

COUNT NINE: RECOVERY OF SUBSEQUENT TRANSFERS –  NEW YORK
    DEBTOR AND CREDITOR LAW §§ 276-a AND 278, 11 U.S.C. §§
    105(a) AND 550(a), AND SIPA § 78fff-2(c)(3) ............................................132

COUNT TEN: OBJECTION TO AND DISALLOWANCE OF CUSTOMER
    CLAIMS ..............................................................................................................134

COUNT ELEVEN: EQUITABLE DISALLOWANCE OF CLAIMS.......................................135

COUNT TWELVE: EQUITABLE SUBORDINATION OF CUSTOMER
    CLAIMS ..............................................................................................................136

COUNT THIRTEEN: GENERAL PARTNER LIABILITY ....................................................137

## AMENDED COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities, LLC ("BLMIS"), under the Securities Investor Protection Act

("SIPA"), 15 U.S.C. §§ 78aaa, *et seq*., and the substantively consolidated estate of Bernard L.

Madoff (individually, "Madoff" and collectively with BLMIS, the "Debtors"), by and through

his undersigned counsel, for his Amended Complaint, states as follows:

## NATURE OF THE PROCEEDING

1.        This adversary proceeding arises from the massive Ponzi scheme masterminded

by Madoff and executed through BLMIS.  Over the course of the decades-long scheme, there

were more than 8,000 client accounts at BLMIS.  In early December 2008, just before the Ponzi

scheme's ultimate collapse, BLMIS generated client account statements for its approximately

4,900 open client accounts, with these statements indicating the supposed value of each of these

client accounts.  When added together, these statements showed that BLMIS's clients had

approximately $65 billion purportedly invested with BLMIS.  In reality, BLMIS had assets on

hand worth a small fraction of that amount.  On March 12, 2009, Madoff admitted to the

fraudulent scheme and pleaded guilty to 11 felony counts.  On June 29, 2009, he was sentenced

to 150 years in prison.

2.        Frank J. Avellino ("Avellino"), Michael S. Bienes ("Bienes"), their family

members, and various entities that Avellino and Bienes dominated and controlled, perpetuated

and benefited from the successful operation of Madoff's Ponzi scheme for decades.  Although

Avellino and Bienes—both former licensed Certified Public Accountants ("CPAs")—now claim

to be victims of this scheme, their denial flies in the face of facts uncovered by the Trustee.

Avellino and Bienes were no ordinary customers of BLMIS.  More than thirty years prior to the

collapse of the fraud, they operated BLMIS's first "feeder fund," a partnership ultimately known

as Avellino & Bienes ("A&B"), which fueled the growth of the Ponzi scheme for decades.

Throughout those many years, A&B, Avellino, Bienes, Avellino's wife, Nancy C. Avellino

("Mrs. Avellino"), and Bienes's wife, Dianne K. Bienes ("Mrs. Bienes"), lined their pockets with

millions of dollars of other people's money and enabled the Ponzi scheme to prosper by

providing it with a consistent source of money.  Prior to its forced liquidation by the Securities

and Exchange Commission (the "SEC") in 1992, A&B was BLMIS's source for hundreds of

millions of dollars of investor funds.  Even after the SEC shut down A&B through a federal court

injunction, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and Avellino's son, Thomas G.

Avellino ("Thomas Avellino"), continued to enrich themselves with the fruits of Madoff's fraud

by funneling millions of dollars into and out of BLMIS through a web of inter-connected entities

they created for the sole purpose of investing with BLMIS.

3.       Avellino, Bienes, their wives, and Thomas Avellino depended on Madoff and the

fraudulent transfers they received from the Ponzi scheme to fund their lavish lifestyles.  For

example, Avellino and Mrs. Avellino currently own or have owned multi-million dollar homes in

exclusive areas of Manhattan, Palm Beach, and Nantucket, some of which were adorned with

valuable artwork from famous artists, such as Pablo Picasso, Edgar Degas, and Giacomo Manzu.

The Bieneses own or have owned homes in California, New York, Florida, and London.  Their

more than 6,000-square-foot Florida mansion included a separate 10,000-square-foot party

pavilion and a cold storage compartment to store Mrs. Bienes's furs.  Thomas Avellino, who had

no significant employment history and little or no experience as an investment professional,

received millions of dollars for directing investors' money to BLMIS.  He owned a Florida

penthouse and currently owns a million-dollar home in Monmouth County, New Jersey.

4.      Avellino and Bienes pretended for years not to know that Madoff was operating a fraud from which they received hundreds of millions of dollars in fictitious profits.  They falsely represented to investors that their money was safely invested with a legitimate investment professional.  Even after the public collapse of BLMIS in December 2008, Bienes proclaimed on national television, in an interview with the Public Broadcasting Service's *Frontline*, that he and Mrs. Bienes believed they had profited exorbitantly from BLMIS because "God gave us this." Bienes further falsely denied having any warning that anything was amiss at BLMIS, stating: "[a]s God as my only judge, on my mother's grave, not an inkling, not a tickle, nothing.  May [H]e strike me dead."

5.      In reality, however, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and Thomas Avellino knew that Madoff was operating a fraudulent investment advisory business and that they, as well as the entities and trusts they created, dominated, and/or controlled, were benefiting from BLMIS's fraudulent scheme.  As described in greater detail below, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and Thomas Avellino knew that BLMIS was manufacturing fictitious trading activity on their account statements and falsifying its books and records.

6.      By June 1992, while embroiled in an SEC investigation related to their operation of A&B as an unregistered investment fund whose sole purpose was to feed investors into BLMIS, Avellino and Bienes knew that BLMIS had created out of thin air a phony customer account with backdated account statements detailing fabricated trades.  BLMIS generated the backdated account statements for this phony account to create over $66 million in fictitious value.  The purpose of the phony account was to conceal a shortfall between the money Avellino and Bienes represented to the SEC A&B owed to its underlying investors and the total amount of

3

purported value reflected on A&B's BLMIS account statements. This allowed Avellino, Bienes, and Madoff to deceive government investigators and conceal the fraud.

7.      The creation of the phony account was not the only way Madoff, Avellino, and Bienes worked together to deceive the SEC. During the investigation, Avellino and Bienes—in both sworn testimony and on paper—made various other representations about the amounts they owed to their investors from December 1989 through June 1992, the purported value of their BLMIS accounts over that same period, and the conservative nature of their BLMIS investments. While Madoff, Avellino, and Bienes used the phony account to deceive the SEC into thinking that A&B had enough funds, plus a cushion, to pay its investors immediately, the trio still faced the dilemma of how to address the many inconsistencies between what Avellino and Bienes represented to the SEC and what appeared on the face of A&B's BLMIS account statements.

8.      To achieve consistency and conceal other indicia of fraud reflected on the face of A&B's BLMIS account statements, Avellino and Bienes returned their original BLMIS account statements to Madoff so that BLMIS could generate an entirely new set of fabricated account statements for production to the SEC and the receiver appointed by the court to liquidate A&B. The altered statements concealed the inconsistencies and anomalies that could have revealed BLMIS and Madoff were operating a fraud.

9.      One blatant example of the fabricated transactions BLMIS reflected on the altered set of account statements was the addition of 86 million U.S. Treasury notes—worth over $40 million—to the holdings of one particular A&B account. The addition of the 86 million U.S. Treasury notes not only made investments in this account appear more conservative but it also, like the phony account, helped plug a shortfall between the purported value reflected on A&B's

4

original BLMIS account statements and representations Avellino and Bienes made to the SEC
about the amounts they owed to their investors.

10.     As a result of their actual knowledge that BLMIS created a fake account out of
thin air and generated an entirely new set of altered account statements with additional backdated
and fictitious transactions, Avellino and Bienes also had actual knowledge that Madoff was
committing fraud, manipulating records, and reporting securities transactions on their account
statements that never occurred.  Far from being unwitting victims of the fraud, Avellino and
Bienes chose to participate and assist Madoff by lying under oath in their SEC testimony and by
returning their account statements to BLMIS so that they could be altered and used to conceal the
fraud.

11.     Avellino and Bienes also chose to work with Madoff so they could continue to
enrich themselves, their entities, and their families at the expense of others and continue living
the lavish lifestyle they had come to expect.

12.     After lying to the SEC and working together with Madoff to conceal their illegal
conduct, A&B was subsequently liquidated in November 1992, and Avellino and Bienes were
forced to find a new way to funnel money into BLMIS.  In order to continue to profit
handsomely from a business they knew was a fraud, their solution was to create a web of inter-
connected entities they dominated and controlled that existed for the sole and wrongful purpose
of investing money into, and reaping the benefits of, BLMIS's fraud.

13.     Avellino and Bienes opened BLMIS investment advisory ("IA") accounts in the
names of these entities for the benefit of themselves, their family members, including Thomas
Avellino, and others.  Upon information and belief, Avellino and Bienes opened these IA

accounts to conceal from the government their continued investments with BLMIS and close ties with Madoff.

14.     After the liquidation of A&B, Madoff evidently wanted to retain A&B's former customers and their capital so that his Ponzi scheme could continue.  Avellino and Bienes assisted Madoff by having former A&B customers open direct accounts with BLMIS.  In return, Avellino and Bienes negotiated with Madoff for, and subsequently received, fraudulent side payments from BLMIS based upon amounts that former A&B investors had reinvested directly with BLMIS, as well as guaranteed annual rates of return as high as 17% for the IA accounts they opened after the SEC investigation concluded.

15.     The fraudulent side payments occurred year after year in fixed amounts based on the cash A&B investors reinvested into Madoff's scheme as of March 1993 and bore no relationship to the performance of these investors' IA accounts.  The fraudulent side payments were also used to meet the guaranteed rates of return Madoff promised.

16.     The fraudulent side payments began in 1994 and continued for almost 15 years until the discovery of BLMIS's fraud.  From 1994 through 2007, BLMIS provided at least $59 million in fraudulent side payments to the IA accounts in the name of entities Avellino, Bienes, their wives, Thomas Avellino, and others owned and controlled, or in which they otherwise held interests.  The fraudulent side payments often elevated the annual rates of return in these IA accounts well beyond their guaranteed percentages, and, in some instances, to annual rates of return as high as 94%.

17.     Madoff did not provide Avellino and Bienes with these fraudulent side payments by conventional means, such as checks or credits to an account.  Rather, BLMIS furnished Avellino and Bienes with the fraudulent side payments at the end of the year by inserting

fictitious, highly profitable, non-hedged options transactions into certain of the IA accounts. These non-hedged options transactions approximated the value of the promised side payments and, in some instances, the amount necessary for a given IA account to receive its guaranteed annual rate of return.  Avellino and Bienes knew the non-hedged options placed in their IA accounts were not the result of actual trading activity.

18.     Mrs. Avellino and Mrs. Bienes knew of the facts and transactions described above and that they were profiting from a fraud through their roles as general partners of A&B and/or the other entities that received the fraudulent side payments and guaranteed annual rates of return.

19.     Thomas Avellino knew of the guaranteed rates of return and fraudulent side payments because the IA account he controlled was also the beneficiary of these illicit forms of compensation.

20.     Despite their knowledge that Madoff was operating a fraud, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and Thomas Avellino pretended to outsiders that nothing untoward was occurring at BLMIS.

21.     The charade is over, and they can pretend no longer.  When compelled in the fall of 2010 to explain their actions to the Trustee in investigative examinations pursuant to Federal Rule of Bankruptcy Procedure 2004, Avellino, Bienes, Mrs. Bienes, and Thomas Avellino all asserted their Fifth Amendment right against self-incrimination and refused to answer any questions about Madoff, BLMIS, or their many IA accounts.

22.     Avellino and Bienes spent the vast majority of their professional careers investing and funneling money to Madoff so they could profit for decades from implausibly high guaranteed returns and fraudulent side payments from BLMIS.  Avellino, Bienes, Mrs. Avellino,

Mrs. Bienes, Thomas Avellino, and the entities they created, dominated and/or controlled knew that the uninterrupted returns and flow of funds they enjoyed for decades and the blatantly fictitious trades reflected in their IA accounts were the product of fraud.

23.     Frank DiPascali, Madoff's right-hand man who assisted in the Ponzi scheme, testified under oath at a criminal trial to the fraud perpetrated in connection with the IA accounts owned and controlled by Avellino and Bienes, and corroborated many of the facts contained herein related to Avellino's and Bienes's participation in Madoff's fraud, including the roles they played in deceiving the government and others.

24.     As of the date of this Amended Complaint, the Trustee has identified at least $904,515,688 of BLMIS customer funds collectively received, directly or indirectly, by the Defendants.

25.     The Trustee seeks to avoid such transfers and preserve and recover the property for the benefit of the BLMIS estate and BLMIS's defrauded customers.  To the extent any allegations herein are inconsistent, they are deemed pled in the alternative.

## JURISDICTION AND VENUE

26.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities and Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

27.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent

of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

28.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

29.     This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 547, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 *et seq.* (McKinney 2001)), the New York Civil Practice Law and Rules (McKinney 2003) ("N.Y. C.P.L.R."), and other applicable law.[1]

## THE DEFENDANTS

### Individual Defendants (the "Individual Defendants")

*Frank J. Avellino* (defined earlier as "Avellino")

30.     Avellino, age 78, resides in Palm Beach, Florida.  He was a CPA and partner of A&B, which at one time operated as an accounting firm before focusing solely on feeding investors to BLMIS.  Avellino began his career at the accounting firm of Alpern & Heller in or around 1958.  Saul Alpern, one of the two named partners at the firm, was Madoff's father-in-law.  In or around the 1960s, Avellino became a partner of this accounting firm, and it was renamed Alpern & Avellino.  In or around 1975, sometime after Bienes joined the firm and upon the retirement of Saul Alpern, the accounting firm became known as Avellino & Bienes.  Upon information and belief, Avellino began investing with Madoff in or around 1962, and thereafter spent the majority of his professional career investing with BLMIS and funneling other people's money into Madoff's Ponzi scheme.

---

[1] To preserve all claims until a final determination on appeal, including the separate appeal concerning the applicability of section 546(e) of the Bankruptcy Code to the Trustee's avoidance claims, now pending, *see Picard v. Ida Fishman Revocable Trust et al.*, No. 12-2557 (2d Cir. docketed Sept. 10, 2012), the Trustee asserts avoidance claims arising under sections 547, 548(a)(1)(B), and 544(b)(1) of the Bankruptcy Code in this proceeding, and objections to claims under section 502(a) and (b)(1), and on equitable grounds.

31.    In his over four-decade relationship with Madoff, Avellino benefited from his ownership and control of IA accounts held in the following names: A&B (multiple accounts, as detailed below); Avellino & Bienes Pension Plan & Trust c/o Frank Avellino (1A0046); Grosvenor Partners Ltd c/o Frank Avellino (1ZB046); Mayfair Ventures c/o Frank Avellino (1ZB032); Aster Associates - Frank  Avellino, Nancy Carroll Avellino General Partners (1ZB509); Kenn Jordan Associates c/o Frank Avellino (1ZA879); and Mayfair Bookkeeping Serv Inc Mayfair Pension Plan c/o Frank Avellino (1ZB249).

32.    With Bienes's knowledge, consent, and participation, Avellino handled day-to-day transactions and communications with BLMIS related to the aforementioned accounts, which included opening the accounts, depositing funds into the accounts, receiving and reviewing account statements, and instructing withdrawals from IA accounts and inter-IA account transfers among these accounts.

33.    Avellino profited exorbitantly through withdrawals from various IA accounts, the payment of management and professional fees, and other payments from BLMIS through certain Entity Defendants (defined below) that he owned, dominated, and controlled.  Avellino's involvement with the Entity Defendants includes the following:

a.    With Bienes, and the later involvement of Mrs. Bienes, Avellino created, dominated, controlled, and was a general partner and agent of A&B;

b.    Upon information and belief, with Bienes, Avellino created, dominated, controlled, and was a trustee, agent, and beneficiary of A&B Pension Plan & Trust ("A&B Pension Plan");

c.    With Bienes, Mrs. Avellino, and Mrs. Bienes, Avellino (either individually and/or through one or more trusts for which he was the beneficiary, settlor, grantor,

10

and/or trustee, including, but not limited to, the Frank Avellino Trusts, defined below) created, dominated, controlled, and was a general partner, control person, agent, and limited partner of Grosvenor Partners, Ltd. ("Grosvenor Partners");

d.      With Bienes, Mrs. Avellino, and Mrs. Bienes, Avellino (either individually and/or through one or more trusts for which he was the beneficiary, settlor, grantor, and/or trustee) created, dominated, controlled, and was a general partner, co-managing partner, and agent of Mayfair Ventures, G.P. ("Mayfair Ventures"), a general partner of Grosvenor Partners;

e.      With Mrs. Avellino, Avellino created, dominated, controlled, and was a general partner and agent of Aster Associates ("Aster");

f.      From at least 1998 forward, Avellino controlled, dominated, and was a general partner and principal of Kenn Jordan Associates ("KJA"), and, prior to 1998, Avellino acted as an agent of KJA in connection with its BLMIS investments; and

g.      With Bienes, Avellino created, dominated, controlled, and was a director, the president, and an agent of Mayfair Bookkeeping Services, Inc. ("Mayfair Bookkeeping"), the sponsor of the Mayfair Pension Plan ("Mayfair Pension Plan"), of which Avellino was a beneficiary.

34.      Avellino also profited exorbitantly through other, personal IA accounts he owned and controlled, which included those in the name of Avellino Family Trust c/o Frank Avellino (100126); Avellino Group c/o Frank Avellino (100127); and Frank J Avellino Trustee (1A0051) (collectively, the "Avellino Personal IA Accounts").  Upon information and belief, Avellino controlled and handled day-to-day transactions and communications with BLMIS related to the Avellino Personal IA Accounts, which included opening the accounts, depositing funds into the

11

accounts, receiving and reviewing account statements, and instructing withdrawals from and inter-IA account transfers among various IA accounts.

35.    Avellino was the trustee, sole beneficiary, equitable owner, settlor, and/or grantor of the following trusts named as Defendants herein: (1) Avellino Family Trust; (2) Frank J. Avellino Revocable Trust Number One as amended and restated January 26, 1990, as amended; (3) Frank J. Avellino Grantor Retained Annuity Trust under Agreement dated June 24, 1992; (4) Frank J. Avellino Grantor Retained Annuity Trust Agreement Number 2 under Agreement dated June 24, 1992; (5) Frank J. Avellino Revocable Trust Number One under the Declaration of Trust Number One dated June 10, 1988, as amended; and (6) Nancy Carroll Avellino Revocable Trust under the Trust Agreement dated May 18, 1992 (collectively, the "Frank Avellino Trusts"). Upon information and belief, Avellino dominated and controlled the Frank Avellino Trusts, and he and the Frank Avellino Trusts are one and the same.  Upon further information and belief, Avellino created the Frank Avellino Trusts to benefit from Madoff's fraud, avoid tax payments, and/or shield assets from creditors.

36.    Avellino was also the trustee of the following trusts named as Defendants herein: (1) Rachel Anne Rosenthal Trust U/A dated June 29, 1990; (2) Rachel Anne Rosenthal Trust #3 (upon information and belief, also known as the Rachel Anne Rosenthal Trust Number 2 U/A dated June 24, 1992); (3) Heather Carroll Lowles Trust U/A dated June 29, 1990; (4) Tiffany Joy Lowles Trust U/A dated June 29, 1990; (5) Melanie Ann Lowles Trust U/A dated June 29, 1990; (6) Taylor Ashley McEvoy Trust U/A dated June 24, 1992; (7) Madison Alyssa McEvoy Trust U/A dated June 29, 1990; and (8) upon information and belief, S.A. Grantor Retained Annuity Trust.

37.     As described below, Avellino acted as the agent of these trusts, as well as the Avellino Family Foundation, in connection with their investments and interests in certain Entity Defendants that were created solely to invest with BLMIS.

**Michael S. Bienes** (defined earlier as "Bienes")

38.     Bienes, age 78, resides in Fort Lauderdale, Florida.  Bienes was a CPA who joined the accounting firm of Alpern & Avellino in 1968.  In or around the early 1970s, Bienes became a junior partner in the firm and it became known as Alpern, Avellino & Bienes.  In or around 1975, upon the retirement of Saul Alpern, the firm was renamed Avellino & Bienes.  Bienes spent the majority of his professional career investing with BLMIS and funneling other people's money into Madoff's Ponzi scheme.

39.     In his decades-long relationship with Madoff, Bienes benefited from his ownership and control of IA accounts held in the following names: A&B; Avellino & Bienes Pension Plan & Trust c/o Frank Avellino; Diane [*sic*] K Bienes; Grosvenor Partners Ltd c/o Frank Avellino; Mayfair Ventures c/o Frank Avellino; St James Associates - Michael Bienes, Diane [*sic*] Bienes General Partners; and Mayfair Bookkeeping Serv Inc Mayfair Pension Plan c/o Frank Avellino.

40.     Specifically, Bienes profited exorbitantly from BLMIS through withdrawals from IA accounts and other payments from BLMIS made through certain Entity Defendants that he owned, dominated, and controlled.  Bienes's involvement with these Entity Defendants includes the following:

        a.     With Avellino, and the later involvement of Mrs. Bienes, Bienes created, dominated, controlled, and was a general partner and agent of A&B;

13

b.      Upon information and belief, with Avellino, Bienes created, dominated, controlled, and was a trustee, agent, and beneficiary of A&B Pension Plan;

c.      With Avellino, Mrs. Avellino, and Mrs. Bienes, Bienes created, dominated, controlled, and was a general partner, control person, agent, and limited partner of Grosvenor Partners;

d.      With Avellino, Mrs. Avellino, and Mrs. Bienes, Bienes created, dominated, controlled, and was a general partner and agent of Mayfair Ventures, the general partner of Grosvenor Partners;

e.      With Mrs. Bienes, Bienes created, dominated, controlled, and was a general partner and agent of St. James Associates ("St. James"); and

f.      With Avellino, Bienes created, dominated, controlled, and was a director, secretary, treasurer, and agent of Mayfair Bookkeeping, the sponsor of Mayfair Pension Plan, of which Bienes was a beneficiary.

41.     Bienes, together with Mrs. Bienes, also profited exorbitantly through the personal IA account he owned and controlled with his wife in the name of Diane [*sic*] K Bienes (1B0018) (the "Bienes Personal IA Account").

***Nancy C. Avellino*** (defined earlier as "Mrs. Avellino")

42.     Mrs. Avellino, age 68, resides in Palm Beach, Florida, and is Avellino's wife. She profited exorbitantly from BLMIS through Avellino and A&B's investments with BLMIS, her and Avellino's referrals of investors' money into BLMIS, and withdrawals from IA accounts held by Entity Defendants she and/or Avellino controlled and/or in which she was a general partner.

14

43.     Mrs. Avellino benefited from her and/or her husband's ownership and control of

IA accounts held in the following names: Grosvenor Partners Ltd c/o Frank Avellino; Mayfair

Ventures c/o Frank Avellino; Aster Associates - Frank Avellino, Nancy Carroll Avellino General

Partners; Kenn Jordan Associates c/o Frank Avellino; and Mayfair Bookkeeping Serv Inc

Mayfair Pension Plan c/o Frank Avellino.  Upon information and belief, Mrs. Avellino also

benefited from her and/or her husband's ownership and control of the IA accounts held in the

names of A&B; Avellino Family Trust c/o Frank Avellino; Avellino Group c/o Frank Avellino;

Avellino & Bienes Pension Plan & Trust c/o Frank Avellino; and Frank J Avellino Trustee.

44.     Avellino acted as Mrs. Avellino's agent in connection with her BLMIS

investments by handling communications with Madoff and BLMIS and the day-to-day activities

related to the accounts in which she held interests, including depositing funds into and

instructing withdrawals from BLMIS and tracking the purported equity in those accounts.

45.     Mrs. Avellino's involvement with certain Entity Defendants includes the

following:

a.     With Avellino, Bienes, and Mrs. Bienes, Mrs. Avellino (either

individually and/or through one or more trusts for which she was the beneficiary, settlor, grantor,

and/or trustee, including, but not limited to, the Frank Avellino Trusts) created and was a general

partner and limited partner of Grosvenor Partners;

b.     With Avellino, Bienes, and Mrs. Bienes, Mrs. Avellino (either

individually and/or through one or more trusts for which she was the beneficiary, settlor, grantor,

and/or trustee, including, but not limited to, the Frank Avellino Trusts) created and was a general

partner of Mayfair Ventures, the general partner of Grosvenor Partners;

c.      With Avellino, Mrs. Avellino created and was a general partner of Aster; and

d.      Mrs. Avellino was a beneficiary of Mayfair Pension Plan.

46.      Upon information and belief, Mrs. Avellino solicited investors to invest with BLMIS through Entity Defendants that she, Avellino, Bienes, and/or Mrs. Bienes created and controlled, and assisted Avellino in the administration of certain Entity Defendants' IA accounts.

47.      Mrs. Avellino was also the trustee of the following trusts named as Defendants herein: (1) Nancy Carroll Avellino Revocable Trust under the Trust Agreement dated May 18, 1992; (2) Rachel Anne Rosenthal Trust U/A dated June 29, 1990; (3) Rachel Anne Rosenthal Trust #3 (upon information and belief, also known as the Rachel Anne Rosenthal Trust Number 2 U/A dated June 24, 1992); (4) Heather Carroll Lowles Trust U/A dated June 29, 1990; (5) Tiffany Joy Lowles Trust U/A dated June 29, 1990; (6) Melanie Ann Lowles Trust U/A dated June 29, 1990; (7) Taylor Ashley McEvoy Trust U/A dated June 24, 1992; and (8) Madison Alyssa McEvoy Trust U/A dated June 29, 1990.

**Dianne K. Bienes** (defined earlier as "Mrs. Bienes")

48.      Mrs. Bienes, age 72, resides in Fort Lauderdale, Florida, and is Bienes's wife. Mrs. Bienes profited exorbitantly from BLMIS through her and Bienes's investments with BLMIS, her and Bienes's referrals of investors' money into BLMIS, and withdrawals from both her personal IA account and those held by Entity Defendants she and/or Bienes controlled and/or in which she was a general partner.

49.      Mrs. Bienes benefited from her and/or her husband's ownership and control of IA accounts held in the following names: A&B; Avellino & Bienes Pension Plan & Trust c/o Frank Avellino; Diane [*sic*] K Bienes; Grosvenor Partners Ltd c/o Frank Avellino; Mayfair Ventures

c/o Frank Avellino; St James Associates - Michael Bienes, Diane [*sic*] Bienes General Partners; and Mayfair Bookkeeping Serv Inc Mayfair Pension Plan c/o Frank Avellino.

50.      Bienes, and at times Avellino, acted as Mrs. Bienes's agent in connection with her BLMIS investments by handling communications with Madoff and BLMIS and the day-to-day activities related to the accounts in which she held interests, including depositing funds into and instructing withdrawals from BLMIS and tracking the purported equity in those accounts.

51.      Mrs. Bienes's involvement with certain Entity Defendants includes the following:

a.      With Avellino and Bienes, since at least January 1988, Mrs. Bienes was a general partner of A&B;

b.      With Avellino, Bienes, and Mrs. Avellino, Mrs. Bienes created, and was a general partner and limited partner of, Grosvenor Partners;

c.      With Avellino, Bienes, and Mrs. Avellino, Mrs. Bienes created, and was a general partner and the co-managing partner of, Mayfair Ventures, the general partner of Grosvenor Partners;

d.      With Bienes, Mrs. Bienes created, dominated, controlled, and was a general partner of St. James; and

e.      Mrs. Bienes was a beneficiary of Mayfair Pension Plan.

52.      Upon information and belief, Mrs. Bienes solicited investors to invest with BLMIS through Entity Defendants she, Avellino, Bienes, and/or Mrs. Avellino created and controlled, and assisted Bienes in the administration of certain Entity Defendants' IA accounts.

53.      With Bienes's knowledge, consent, and participation, Mrs. Bienes from time to time handled day-to-day transactions and communications with BLMIS related to the IA account

17

held in the name of St. James, including depositing funds into and instructing withdrawals from the IA account in St. James's name.

**_Thomas G. Avellino_** (defined earlier as "Thomas Avellino")

54.     Thomas Avellino, age 49, resides in Holmdel, New Jersey, and is Avellino's son. Like his father, Thomas Avellino spent the majority of his professional career referring money to Madoff's Ponzi scheme and profiting exorbitantly from these efforts through withdrawals from various IA accounts and the payment by Strattham of bogus management fees to Ascent, Inc. ("Ascent"), an entity he, upon information and belief, dominated and controlled.

55.     Thomas Avellino benefited from his ownership and control of the IA account held in the name of Strattham c/o Thomas G. Avellino.  He also benefited from the IA accounts held in the names of Grosvenor Partners Ltd c/o Frank Avellino and Aster Associates - Frank Avellino, Nancy Carroll Avellino General Partners.

56.     Thomas Avellino's involvement with certain Entity Defendants includes the following:

        a.     Thomas Avellino created, dominated, controlled, and was a general partner of Strattham Partners ("Strattham");

        b.     Thomas Avellino was the president and sole director of Ascent (a general partner and the managing partner of Strattham), which, upon information and belief, he dominated and controlled;

        c.     Thomas Avellino was a limited partner of Grosvenor Partners; and

        d.     Thomas Avellino was a general partner of Aster.

57.     Thomas Avellino is the guardian of a minor with the initials S.A.

18

**Entity Defendants (the "Entity Defendants")**

58.     **Avellino & Bienes** (defined earlier as "A&B") was a general partnership

registered under the laws of the State of Florida.  Until in or about 1984, A&B functioned as both

an accounting firm and an entity that raised money from investors in order to pool these funds

for investment with BLMIS.  By 1984, A&B ceased operating as an accounting firm to focus

exclusively on profiting from its business of funneling money into BLMIS.  From in or around

1975, Avellino, Bienes, and later Mrs. Bienes, were the general partners of A&B.  In the

alternative, as discussed herein, Avellino and Bienes so dominated and controlled A&B that they

are one and the same and no veil should be maintained between them.

59.     Avellino, Bienes, and Mrs. Bienes used A&B for the wrongful purpose of

profiting from BLMIS, which they knew was a fraud.  A&B was liquidated in 1992 as the result

of an enforcement action brought by the SEC concerning its investments with BLMIS.  During

its existence, Avellino and Bienes maintained at least six IA accounts at BLMIS in A&B's name

from which at least $445,916,508 in fictitious profits was withdrawn from April 1981 through

January 1993.  These IA accounts included Avellino & Bienes c/o Frank Avellino (1A0045);

Avellino & Bienes Special c/o Frank Avellino (1A0047); Avellino & Bienes #2 c/o Frank

Avellino (1A0048); Avellino & Bienes #3 c/o Frank Avellino (1A0049); Avellino & Bienes #4

c/o Frank Avellino (1A0050); and Avellino & Bienes #5 c/o Frank Avellino (1A0053), an

account which was fraudulently created with backdated account statements during the SEC's

investigation.  Avellino and Bienes equitably owned and controlled these six IA accounts in the

name of A&B.

60.     **Avellino Family Trust** was, upon information and belief, a trust with an address

in Palm Beach, Florida.  IA account number 100126 was in the name of "Avellino Family Trust

c/o Frank Avellino."  Avellino equitably owned and controlled the IA account in the name of

19

Avellino Family Trust.  Upon information and belief, Avellino was the trustee of Avellino

Family Trust, and Avellino Family Trust and/or Avellino received avoidable transfers from IA

account 100126.  Upon further information and belief, Avellino so dominated and controlled

Avellino Family Trust that they are one and the same and no veil should be maintained between

them.

61.    **Avellino & Bienes Pension Plan & Trust** (defined earlier as "A&B Pension

Plan") was, upon information and belief, a pension plan created by Avellino and Bienes with an

address in Palm Beach, Florida.  Upon further information and belief, Avellino and Bienes so

dominated and controlled A&B Pension Plan that they are one and the same and no veil should

be maintained between them.  Upon further information and belief, Avellino and Bienes were the

trustees of A&B Pension Plan, which was the predecessor of both the Avellino & Bienes Profit

Sharing Plan and Trust and Mayfair Pension Plan, profit sharing and/or pension plans established

for the benefit of Avellino, Bienes, Mrs. Bienes, and later Mrs. Avellino.  IA account number

1A0046 was in the name of "Avellino & Bienes Pension Plan & Trust c/o Frank Avellino," with

the account address reported in Fort Lauderdale, Florida.  A&B Pension Plan, upon information

and belief, received avoidable transfers from IA account 1A0046.  Avellino and Bienes

controlled the assets of A&B Pension Plan and equitably owned and controlled the IA account in

the name of A&B Pension Plan.

62.    **Grosvenor Partners, Ltd.** (defined earlier as "Grosvenor Partners") was a *de

facto* general partnership in which Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes were its

general partners or, in the alternative, a limited partnership formed under the laws of the State of

Florida, with its principal place of business in Palm Beach, Florida.  Avellino, Bienes, Mrs.

Avellino, and Mrs. Bienes created Grosvenor Partners for the sole purpose of investing with

BLMIS, which they knew was a fraud.  Mayfair Ventures (of which Avellino, Bienes, Mrs.

Avellino, and Mrs. Bienes were general partners) was a general partner of Grosvenor Partners.

Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes were general partners and/or limited partners

of Grosvenor Partners.  To the extent Grosvenor Partners was not a general partnership, in the

alternative and, as discussed herein, Avellino and Bienes so dominated and controlled Grosvenor

Partners that they are one and the same and no veil should be maintained between them.  IA

account number 1ZB046 was in the name of "Grosvenor Partners Ltd c/o Frank Avellino," with

the account address reported in Palm Beach, Florida.  This account was opened on or about

February 25, 1993.  In addition to receiving avoidable transfers from IA account 1ZB046,

Grosvenor Partners received subsequent transfers of avoidable transfers from BLMIS, as set

forth herein.  Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes equitably owned and controlled

the IA account in the name of Grosvenor Partners.

63.    **Mayfair Ventures, G.P.** (defined earlier as "Mayfair Ventures") was a general

partnership formed under the laws of the State of Florida, with its principal place of business in

Palm Beach, Florida.  Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes were Mayfair

Ventures's general partners.  To the extent Mayfair Ventures was not a general partnership, in

the alternative and, as discussed herein, Avellino and Bienes so dominated and controlled

Mayfair Ventures that they are one and the same and no veil should be maintained between

them.  Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes created Mayfair Ventures for the sole

purpose of investing with BLMIS, which they knew was a fraud.  IA account number 1ZB032

was in the name of "Mayfair Ventures c/o Frank Avellino," with the account address reported in

Palm Beach, Florida.  This account was opened on or about February 11, 1993.  Mayfair

Ventures was the general partner of Grosvenor Partners.  In addition to receiving avoidable

transfers from IA account 1ZB032, Mayfair Ventures received subsequent transfers of avoidable transfers from BLMIS, as set forth herein. Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes equitably owned and controlled the IA account in the name of Mayfair Ventures.

64. **Aster Associates** (defined earlier as "Aster") was a general partnership formed under the laws of the State of Florida, with its principal place of business in Palm Beach, Florida. Avellino, Mrs. Avellino, Thomas Avellino, and other Defendants named herein were Aster's general partners. To the extent Aster was not a general partnership, in the alternative and as discussed herein, Avellino so dominated and controlled Aster that they are one and the same and no veil should be maintained between them. Avellino and Mrs. Avellino created Aster for the sole purpose of investing with BLMIS, which they knew was a fraud. IA account number 1ZB509 was in the name of "Aster Associates - Frank Avellino, Nancy Carroll Avellino General Partners," with the account address reported in Palm Beach, Florida. This account was opened in or around June 23, 2004, with a transfer of $5 million from IA account 1ZB046 (Grosvenor Partners). In addition to receiving avoidable transfers from IA account 1ZB509, Aster received subsequent transfers of avoidable transfers from BLMIS, as set forth herein. Avellino and Mrs. Avellino equitably owned and controlled the IA account in the name of Aster.

65. **St. James Associates** (defined earlier as "St. James") was a general partnership formed under the laws of the State of Florida, with its principal place of business in Fort Lauderdale, Florida. Bienes and Mrs. Bienes were St. James's general partners. To the extent St. James was not a general partnership, in the alternative and as discussed herein, Bienes and Mrs. Bienes so dominated and controlled St. James that they are one and the same and no veil should be maintained between them. Bienes and Mrs. Bienes created St. James for the sole purpose of investing with BLMIS, which they knew was a fraud. IA account number 1ZB510

was in the name of "St James Associates Michael Bienes, Diane [*sic*] Bienes General Partners,"
with the account address reported in Fort Lauderdale, Florida.  This account was opened by
Avellino at the direction and on behalf of Bienes and Mrs. Bienes on or about June 23, 2004,
with a transfer of $5 million from IA account 1ZB046 (Grosvenor Partners).  In addition to
receiving avoidable transfers from IA account 1ZB510, St. James received subsequent transfers
of avoidable transfers from BLMIS, as set forth herein.  Bienes and Mrs. Bienes equitably owned
and controlled the IA account in the name of St. James.

66.    **Strattham Partners** (defined earlier as "Strattham") was a general partnership
formed under the laws of the State of Florida, with its principal place of business in Miami,
Florida.  Thomas Avellino was a general partner of Strattham and created Strattham for the sole
purpose of investing with BLMIS, which he knew was a fraud.  To the extent Strattham was not
a general partnership, in the alternative and as discussed herein, Thomas Avellino so dominated
and controlled Strattham that they are one and the same and no veil should be maintained
between them.  IA account number 1ZB262 was in the name of "Strattham, c/o Thomas G.
Avellino," with the account address reported in Miami, Florida.  Avellino acted as Strattham's
agent in connection with its investments with BLMIS, including when it opened Strattham's IA
account on Thomas Avellino's behalf on or about August 15, 1995.  In addition to receiving
avoidable transfers from IA account 1ZB262, Strattham received subsequent transfers of
avoidable transfers from BLMIS, as set forth herein.  Thomas Avellino equitably owned and
controlled the IA account in the name of Strattham.  Strattham filed a customer claim (No.
005410) ("Strattham's Customer Claim").

67.    **Kenn Jordan Associates** (defined earlier as "KJA") was a general partnership
formed under the laws of the State of Florida with its principal place of business in Palm Beach,

Florida.  From at least January 1998, Avellino was a general partner, principal, and agent of

KJA.  To the extent KJA was not a general partnership, in the alternative and as discussed herein,

Avellino so dominated and controlled KJA that they are one and the same and no veil should be

maintained between them.  Prior to 1998, Avellino acted as KJA's agent in connection with its

BLMIS investments.  KJA was created for the sole purpose of investing with BLMIS, which

Avellino knew was a fraud.  KJA held IA account number 1ZA879 in the name of "Kenn Jordan

Associates c/o Frank Avellino," with the account address reported in Palm Beach, Florida.  This

account was opened on or about February 10, 1993.  In addition to receiving avoidable transfers

from IA account 1ZA879, KJA received subsequent transfers of avoidable transfers from

BLMIS, as set forth herein.  Avellino equitably owned and controlled the IA account in the name

of KJA.  KJA filed a customer claim (No. 012840) ("KJA's Customer Claim").

**Other Subsequent Transferee Defendants**

68.    **Ascent, Inc.** (defined earlier as "Ascent") was a corporation organized under the

laws of the State of Florida, with its principal place of business in Miami, Florida.  Ascent was a

general partner and the managing partner of Strattham.  Thomas Avellino was Ascent's president

and sole director.  Upon information and belief, Thomas Avellino dominated and controlled

Ascent, and created it for the wrongful purpose of profiting from BLMIS, which he and Avellino

knew was a fraud.  Ascent received subsequent transfers of avoidable transfers from BLMIS, as

set forth herein.  Upon information and belief, Thomas Avellino so dominated and controlled

Ascent that they are one and the same and no corporate veil should be maintained between them.

69.    **Mayfair Bookkeeping Services, Inc.** (defined earlier as "Mayfair Bookkeeping")

was a corporation formed under the laws of the State of Florida, with its principal place of

business in Palm Beach, Florida.  Prior to changing its name to Mayfair Bookkeeping Services,

Inc., Mayfair Bookkeeping was known as Avellino & Bienes Accounting Services, Inc. ("A&B

Accounting Services"). Upon information and belief, Mayfair Bookkeeping was the sponsor for

the defunct Mayfair Pension Plan, a profit sharing plan originally known as the Avellino &

Bienes Profit Sharing Plan and Trust, which was established for the benefit of Avellino, Bienes,

Mrs. Avellino, and Mrs. Bienes. As discussed herein, Avellino and Bienes created, dominated,

controlled, and were trustees, officers, and directors of Mayfair Bookkeeping and its predecessor,

A&B Accounting Services. Avellino and Bienes used Mayfair Bookkeeping for the wrongful

purpose of profiting from BLMIS, which they knew was a fraud. IA account number 1ZB249

was in the name of "Mayfair Bookkeeping Serv Inc Mayfair Pension Plan c/o Frank Avellino,"

with the account address reported in Palm Beach, Florida. Avellino and Bienes were the

equitable owners of the IA account in Mayfair Bookkeeping's name. In addition, Mayfair

Bookkeeping and its predecessor, A&B Accounting Services, received subsequent transfers of

avoidable transfers from BLMIS, as set forth herein. Mayfair Bookkeeping filed a customer

claim (No. 012824) ("Mayfair Bookkeeping's Customer Claim").

70. **Frank J. Avellino Revocable Trust Number One as amended and restated
January 26, 1990, as amended,** also known as Frank J. Avellino Declaration of Trust Number

One as amended and restated January 26, 1990, as amended ("FJA Revocable Trust Number One

1990") was a trust created by Avellino with an address, upon information and belief, in Palm

Beach, Florida. Avellino was the trustee and sole beneficiary, settlor, and/or grantor of FJA

Revocable Trust Number One 1990. FJA Revocable Trust Number One 1990 was a general

partner of Mayfair Ventures. Upon information and belief, Avellino dominated and controlled

FJA Revocable Trust Number One 1990. Upon further information and belief, FJA Revocable

Trust Number One 1990 received subsequent transfers of avoidable transfers from BLMIS, as set

forth herein.

71.    **Frank J. Avellino Grantor Retained Annuity Trust under Agreement dated June 24, 1992** ("FJA GRAT 1992") was a trust with an address, upon information and belief, in Palm Beach, Florida.  Avellino was the trustee of FJA GRAT 1992.  FJA GRAT 1992 was a general partner of Mayfair Ventures.  Upon information and belief, Avellino created, dominated, and controlled, and was the sole beneficiary, settlor, and/or grantor of FJA GRAT 1992.  Upon further information and belief, FJA GRAT 1992 received subsequent transfers of avoidable transfers from BLMIS, as set forth herein.

72.    **Frank J. Avellino Grantor Retained Annuity Trust Agreement Number 2 under Agreement dated June 24, 1992** ("FJA GRAT Two 1992") was a trust with an address, upon information and belief, in Palm Beach, Florida.  Avellino was the trustee of FJA GRAT Two 1992.  FJA GRAT Two 1992 was a general partner of Mayfair Ventures.  Upon information and belief, Avellino created, dominated, and controlled, and was the sole beneficiary, settlor, and/or grantor of FJA GRAT Two 1992.  Upon further information and belief, FJA GRAT Two 1992 received subsequent transfers of avoidable transfers from BLMIS, as set forth herein.

73.    **Frank J. Avellino Revocable Trust Number One under the Declaration of Trust Number One dated June 10, 1988, as amended** ("FJA Revocable Trust Number One 1988") was a trust created by Avellino with an address in Palm Beach, Florida.  Avellino was the trustee and sole beneficiary, settlor, and/or grantor of FJA Revocable Trust Number One 1988.  Upon information and belief, Avellino dominated and controlled FJA Revocable Trust Number One 1988.  Upon further information and belief, FJA Revocable Trust Number One 1988 received subsequent transfers of avoidable transfers from BLMIS, as set forth herein.

74.    **Nancy Carroll Avellino Revocable Trust under the Trust Agreement dated May 18, 1992** ("Nancy Avellino Revocable Trust") was a trust with the same address as Frank

and Nancy Avellino in Palm Beach, Florida.  Mrs. Avellino was the trustee for Nancy Avellino

Revocable Trust.  Upon information and belief, Avellino created, dominated, and controlled

Nancy Avellino Revocable Trust.  Upon further information and belief, Avellino and Mrs.

Avellino were the sole beneficiaries, settlors, and/or grantors of Nancy Avellino Revocable

Trust, and Nancy Avellino Revocable Trust received subsequent transfers of avoidable transfers

from BLMIS, as set forth herein.

75.    **27 Cliff, LLC** ("27 Cliff") was a limited liability company formed under the laws

of the State of Florida, with its principal place of business in Palm Beach, Florida, and was a

general partner of Aster.  The managers of 27 Cliff were Avellino and Mrs. Avellino.  Upon

information and belief, Avellino controlled and was the equitable owner of 27 Cliff.  Upon

further information and belief, 27 Cliff received avoidable transfers made initially from IA

accounts 1ZA873 and 1ZA874, in the names of P&S Associates ("P&S") and S&P Associates

("S&P"), respectively, to compensate Avellino for investors he referred to P&S and S&P.

Accordingly, upon information and belief, 27 Cliff received subsequent transfers of avoidable

transfers from BLMIS, as set forth herein.

76.    **The Avellino Family Foundation, Inc.** ("AFF") was a corporation organized

under the laws of the State of Florida, with its principal place of business in Palm Beach, Florida.

The officers of AFF were Avellino, Mrs. Avellino, Thomas Avellino, and Rachel Rosenthal.

AFF was a limited partner of Grosvenor Partners and received subsequent transfers of avoidable

transfers from BLMIS, as set forth herein.  Avellino acted as an agent on behalf of AFF in

connection with its BLMIS investments through Grosvenor Partners and Aster, which were

entities created solely to invest with BLMIS.

77.    **Rachel A. Rosenthal** ("Rachel Rosenthal"), also known as Rachel Liersch, is associated with an address in Palm Beach, Florida.  Rachel Rosenthal is Mrs. Avellino's daughter from a previous marriage.  She was a limited partner of Grosvenor Partners, a general partner of Aster, and an officer of AFF.  Rachel Rosenthal received subsequent transfers of avoidable transfers from at least IA accounts 1ZB046 (Grosvenor Partners) and 1ZB509 (Aster).  Upon information and belief, Rachel Rosenthal was also a beneficiary of the Rachel Anne Rosenthal Trust U/A dated June 29, 1990 and the Rachel Rosenthal Trust #3 (defined below) and was the beneficiary of subsequent transfers of avoidable transfers from BLMIS, as set forth herein.  Avellino acted as an agent on behalf of Rachel Rosenthal in connection with her BLMIS investments through Grosvenor Partners and Aster, which were entities created solely to invest with BLMIS.

78.    **Rachel Anne Rosenthal Trust U/A dated June 29, 1990**, also known as the Rachel Anne Rosenthal Trust ("Rachel Rosenthal Trust"), was a trust with the same address as Frank and Nancy Avellino in Palm Beach, Florida.  The trustees for Rachel Rosenthal Trust were Avellino and Mrs. Avellino.  Rachel Rosenthal Trust held a limited partnership interest in Grosvenor Partners, was a general partner of Aster, and received subsequent transfers of avoidable transfers from BLMIS, as set forth herein.  Avellino acted as an agent on behalf of Rachel Rosenthal Trust in connection with its BLMIS investments through Grosvenor Partners and Aster, which were entities created solely to invest with BLMIS.

79.    **Rachel Anne Rosenthal Trust #3**, also known as the Rachel Anne Rosenthal Trust Number 2 U/A dated June 24, 1992 ("Rachel Rosenthal Trust #3"), was a trust with the same address as Frank and Nancy Avellino in Palm Beach, Florida.  The trustees for Rachel Rosenthal Trust #3 were Avellino and Mrs. Avellino.  Rachel Rosenthal Trust #3 held a limited

partnership interest in Grosvenor Partners, was a general partner of Aster, and received subsequent transfers of avoidable transfers from BLMIS, as set forth herein. Avellino acted as an agent on behalf of Rachel Rosenthal Trust #3 in connection with its BLMIS investments through Grosvenor Partners and Aster, which were entities created solely to invest with BLMIS.

80. **Heather C. Lowles** ("Heather Lowles"), upon information and belief, resides in San Jose, California, and is Mrs. Avellino's niece. Heather Lowles was a limited partner of Grosvenor Partners and a general partner of Aster. Upon information and belief, Heather Lowles was the beneficiary of the Heather Carroll Lowles Trust U/A dated June 29, 1990 and received and was the beneficiary of subsequent transfers of avoidable transfers from BLMIS, as set forth herein. Avellino acted as an agent on behalf of Heather Lowles in connection with her BLMIS investments through Grosvenor Partners and Aster, which were entities created solely to invest with BLMIS.

81. **Heather Carroll Lowles Trust U/A dated June 29, 1990**, also known as the Heather Lowles Trust ("Heather Lowles Trust"), was a trust with the same address as Frank and Nancy Avellino in Palm Beach, Florida. The trustees for Heather Lowles Trust were Avellino and Mrs. Avellino. Heather Lowles Trust held a limited partnership interest in Grosvenor Partners, was a general partner of Aster, and received subsequent transfers of avoidable transfers from BLMIS, as set forth herein. Avellino acted as an agent on behalf of Heather Lowles Trust in connection with its BLMIS investments through Grosvenor Partners and Aster, which were entities created solely to invest with BLMIS.

82. **Tiffany Joy Lowles Trust U/A dated June 29, 1990**, also known as the Tiffany Lowles Trust ("Tiffany Lowles Trust"), was a trust with the same address as Frank and Nancy Avellino in Palm Beach, Florida. The Trustees for Tiffany Lowles Trust were Avellino and Mrs.

Avellino.  Tiffany Lowles Trust held a limited partnership interest in Grosvenor Partners, was a general partner of Aster, and received subsequent transfers of avoidable transfers from BLMIS, as set forth herein.  Avellino acted as an agent on behalf of Tiffany Lowles Trust in connection with its BLMIS investments through Grosvenor Partners and Aster, which were entities created solely to invest with BLMIS.

83.    **Melanie A. Lowles** ("Melanie Lowles"), also known as Melanie Flowers, upon information and belief, resides in Wake Forest, North Carolina and is Mrs. Avellino's niece.  Upon information and belief, Melanie Lowles was the beneficiary of the Melanie Lowles Trust (defined below) and received and was the beneficiary of subsequent transfers of avoidable transfers from BLMIS, as set forth herein.  Avellino acted as an agent on behalf of Melanie Lowles in connection with her BLMIS investments through Grosvenor Partners and Aster, which were entities created solely to invest with BLMIS.

84.    **Melanie Ann Lowles Trust U/A dated June 29, 1990**, also known as the Melanie Lowles Trust ("Melanie Lowles Trust"), was a trust with the same address as Frank and Nancy Avellino in Palm Beach, Florida.  The Trustees for Melanie Lowles Trust were Avellino and Mrs. Avellino.  Melanie Lowles Trust held a limited partnership interest in Grosvenor Partners, was a general partner of Aster, and received subsequent transfers of avoidable transfers from BLMIS, as set forth herein.  Avellino acted as an agent on behalf of Melanie Lowles Trust in connection with its BLMIS investments through Grosvenor Partners and Aster, which were entities created solely to invest with BLMIS.

85.    **Taylor Ashley McEvoy Trust U/A dated June 24, 1992**, also known as the Taylor McEvoy Trust ("Taylor McEvoy Trust"), was a trust with the same address as Frank and Nancy Avellino in Palm Beach, Florida.  The trustees for Taylor McEvoy Trust were Avellino

30

and Mrs. Avellino.  The Taylor McEvoy Trust held a limited partnership interest in Grosvenor

Partners, was a general partner of Aster, and received subsequent transfers of avoidable transfers

from BLMIS, as set forth herein.  Avellino acted as an agent on behalf of Taylor McEvoy Trust

in connection with its BLMIS investments through Grosvenor Partners and Aster, which were

entities created solely to invest with BLMIS.

86.     **Madison Alyssa McEvoy Trust U/A dated June 29, 1990**, also known as the

Madison McEvoy Trust ("Madison McEvoy Trust"), was a trust with the same address as Frank

and Nancy Avellino in Palm Beach, Florida.  The Trustees for Madison McEvoy Trust were

Avellino and Mrs. Avellino.  Madison McEvoy Trust held a limited partnership interest in

Grosvenor Partners, was a general partner of Aster, and received subsequent transfers of

avoidable transfers from BLMIS, as set forth herein.  Avellino acted as an agent on behalf of

Madison McEvoy Trust in connection with its BLMIS investments through Grosvenor Partners

and Aster, which were entities created solely to invest with BLMIS.

87.     **A minor with the initials S. A.** ("S. A.") resides in Holmdel, New Jersey, and is

Thomas Avellino's son, and Avellino and Mrs. Avellino's grandson.  Upon information and

belief, S. A. was the beneficiary of the S. A. Grantor Retained Annuity Trust and was the

beneficiary of subsequent transfers of avoidable transfers from BLMIS, as set forth herein.  S.A.

had a partnership interest in Strattham.  Avellino acted as an agent on behalf of S.A. in

connection with his BLMIS investments through Strattham, which was an entity created solely to

invest with BLMIS.

88.     **S. A. Grantor Retained Annuity Trust**, also known as the S.A. Trust ("S. A.

GRAT") was a trust with the same address as Frank and Nancy Avellino in Palm Beach, Florida.

Upon information and belief, the trustee for S. A. GRAT was Avellino.  S. A. GRAT held a

limited partnership interest in Grosvenor Partners, was a general partner of Aster, and received subsequent transfers of avoidable transfers from BLMIS, as set forth herein. Avellino acted as an agent on behalf of S.A. GRAT in connection with its BLMIS investments through Grosvenor Partners and Aster, which were entities created solely to invest with BLMIS.

## BACKGROUND, THE TRUSTEE, AND STANDING

89.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC commenced the District Court Proceeding.

90.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

91.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

c.    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

92.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

32

93. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court entered an order substantively consolidating the chapter 7 estate of Madoff into the SIPA Proceeding.

94. At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

95. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali ("DiPascali"), a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

96. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

97. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

98.     As the Trustee appointed under SIPA, the Trustee is charged with assessing

claims, recovering and distributing customer property to BLMIS's customers holding allowed

customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its

creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and

recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and

others to the detriment of defrauded, innocent customers whose money was consumed by the

Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the

claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

99.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy

Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

100.     The Trustee has standing to bring the avoidance and recovery claims under SIPA

§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b),

544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover

transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-

1(a) and 78fff-2(c)(3).

101.     The Trustee has standing to object to customer and creditor claims under SIPA

§§ 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and

authority to discharge obligations to a customer to the extent they are established to the

satisfaction of the Trustee under SIPA §§ 78*lll*(2) and 78fff-2(b).  By his objection, the Trustee

seeks disallowance of any customer and general creditor claims that are unenforceable against

the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not been

established to his satisfaction; (ii) SIPA § 78*lll*(2), because such claims are not entitled to a

distribution *pari passu* with other customers;  and (iii) 11 U.S.C. § 502(b)(1), because such

claims are otherwise unenforceable under applicable law.

## THE PONZI SCHEME

102.    Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1,

2001, Madoff continued BLMIS as a sole member limited liability company under the laws of the

State of New York.  BLMIS's ownership and control did not change since its formation in 1960.

During that time, BLMIS had been continually registered with the SEC and remained a SIPC

member since its formation in late 1970.  For most of its existence, BLMIS operated from its

principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, sole

owner, chairman, and chief executive officer, operated BLMIS with several family members and

other employees, including DiPascali and David Kugel, who pleaded guilty to helping Madoff carry

out the fraudulent scheme.

103.    During the early 1970s through the early 1990s, Madoff claimed to invest customer

funds, including those invested through the IA accounts held in A&B's name, using a "convertible

arbitrage investment strategy," by which investors would gain profits from a change in the

expectations for the stock or convertible security over time.

104.    Beginning in the 1990s, Madoff outwardly ascribed the consistent investment success

of BLMIS's IA Business to the "split-strike conversion" investment strategy (the "SSC Strategy").

Madoff claimed his strategy would produce steady returns without the volatility in the stock market

or other high return investment strategies.  Madoff generally indicated that investors' funds would be

invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100 Index"),

which is a collection of the 100 largest publicly traded companies, as determined by Standard &

Poor's Index Committee.  The basket of stocks was designed to correlate to the movement of the

S&P 100 Index.  The second part of the SSC Strategy involved purporting to sell call options and buy put options on the S&P 100 Index; this is commonly referred to as a "collar."  Madoff purported to purchase and sell option contracts to control the downside risk of price changes in the basket of stocks correlated to the performance of the S&P 100 Index.  All options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

105.    BLMIS commingled all of the funds received from IA Business investors in a single BLMIS account maintained at JPMorgan Chase Bank.

106.    Because Madoff claimed that he would carefully time purchases and sales to maximize value, customer funds would intermittently be out of the market.  During those times, Madoff claimed that the funds were invested in U.S. Treasury securities or mutual funds invested in Treasury securities.  There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

107.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements.

108.    Madoff operated the IA Business as a Ponzi scheme. The money received from IA Business customers was used primarily to make distributions to, or payments for, other customers.  The falsified trades reflected in monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments.  The Ponzi scheme

36

collapsed in December 2008, when the requests for redemptions overwhelmed the flow of new

investments with BLMIS's IA Business.

109.    Since at least the 1970s, BLMIS fraudulently claimed to engage in securities trades

for IA Business customers that did not occur.  Basic market data reveals that those purported trades

did not, and could not, have taken place as reported on BLMIS customer statements.  For example,

there are many instances where the total number of securities purportedly traded by BLMIS

significantly exceeded the entire reported market volume for that particular security on that particular

day.  Even where BLMIS purportedly traded securities within normal market volumes, there are

many instances where the prices of those trades were outside the daily market price range for that

security.  In many other examples, IA account statements reported trades of a particular security

when actual market reports show that particular security simply did not change hands in the market

on that reported date.

110.    Since at least 1983, BLMIS financial reports filed with the SEC fraudulently

omitted the existence of the billions of dollars of customer funds held by BLMIS.

111.    BLMIS did not register as an investment adviser with the SEC until August 2006.  At

that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser

Registration) representing, among other things, that BLMIS had 23 customer accounts and assets

under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually with the SEC,

the latest of which was filed in January 2008.  It represented that BLMIS had 23 customer accounts

with assets under management of $17.1 billion.  In fact, at that time BLMIS had over 4,900 active

customer accounts with a purported value of approximately $68 billion under management.

112.    Contrary to standard practice in the investment advisory industry, BLMIS did not

charge the IA Business customers a fee for investment advisory services.  Madoff knew others

that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged

hundreds of millions of dollars for investment advisory services attributed to BLMIS. Instead of investment advisory fees, BLMIS purported to accept commissions for the purported trades, as reflected in the fraudulent IA Business customer statements.

113. BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York. Of the three employees at the firm, one employee was an administrative assistant and one was a semi-retired accountant living in Florida. On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

114. At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## AVELLINO, LATER JOINED BY BIENES, OPERATED THE FIRST MADOFF FEEDER FUND TO EXPLOIT THE CONSISTENT RETURNS MADOFF PROMISED

115. In or about 1960, Madoff began operating a brokerage firm named "Bernard L. Madoff" from the offices of his father-in-law Saul Alpern's accounting firm, Alpern & Heller, where Avellino worked as an accountant. Upon information and belief, in order to assist his son-in-law's business, Alpern encouraged people to entrust funds with Madoff for purported investment. In or about 1961, Madoff moved his brokerage business out of Alpern & Heller, but Alpern continued to encourage people to invest funds with Madoff.

116. In or around the 1960s, in addition to operating an accounting business, Alpern & Avellino (the successor to Alpern & Heller) began operating BLMIS's first "feeder fund," pooling their customers' capital and providing it to Madoff for purported discretionary investment in securities. Alpern and Avellino operated this "feeder fund" to profit from the

investment of other people's money, as well as their own money, with BLMIS. This "feeder fund" initially operated under the name of their firm, Alpern & Avellino. In the early 1970s, Bienes, after being an employee of Alpern & Avellino since the late 1960s, became a partner in the accounting firm. Upon the retirement of Alpern in or around 1975, the accounting firm was renamed Avellino & Bienes (previously defined as "A&B"), and Avellino and Bienes operated the firm and the Madoff "feeder fund" as general partners.

117.    For decades, Avellino and Bienes utilized A&B to raise hundreds of millions of dollars of funds for investment with BLMIS, while retaining tens of millions of dollars as profits for pooling and investing other people's money in BLMIS's Ponzi scheme. The profits from the Ponzi scheme became the primary source of income for Avellino, Bienes, and their families and allowed them to amass significant wealth and status.

118.    To attract new investors, Avellino and Bienes—and upon information and belief, with their wives' assistance—collected money from individuals and entities by promising an annual guaranteed rate of return that generally ranged from approximately 13%–18% of the original investment. In an attempt to avoid scrutiny from securities regulators, Avellino and Bienes termed these investments "loans" and issued letters to investors that specified the rate of return for each purported "loan."

119.    As the operators of one of Madoff's first and oldest sources of funds for his Ponzi scheme, Avellino, Bienes, and their wives enjoyed special, direct access to Madoff and his employees, as well as privileges not available to other BLMIS investors. Madoff guaranteed significant annual returns to Avellino, Bienes, their wives, and A&B to, upon information and belief, keep the money flowing and the Ponzi scheme operating. In turn, A&B retained the difference between the returns promised by Madoff and the returns they had guaranteed to their

underlying investors.  By 1984, the profits from A&B's feeding of money into BLMIS had far

eclipsed any revenue from its accounting practice, which ceased operating at that time so

Avellino and Bienes could focus exclusively on profiting from the recruitment of funds to be

invested with BLMIS.

120.    A&B investor money included, among other investors, money pooled together by

entities known as Telfran Associates, Ltd., Merlin & Associates, Ltd., and Enhancement Group.

Telfran Associates was owned and controlled by Stephen Mendelow, Edward Glantz, and Aaron

Levey, while Merlin & Associates, Ltd. and Enhancement Group were owned and controlled by

Richard Glantz (collectively, the "A&B Business Associates").  The sole purpose of these

entities was to pool investor money for investment with A&B and ultimately with BLMIS.

121.    The A&B Business Associates were friends of Avellino and Bienes.  Upon

information and belief, Avellino and Bienes encouraged them to collect money for pooled

investments in A&B.  A&B paid the A&B Business Associates a guaranteed rate of annual

return slightly less than it was receiving from its IA accounts, retaining the difference as profit

for themselves.  The A&B Business Associates utilized the same model Avellino and Bienes

followed, providing a slightly lower annual return to their individual investors than the annual

rate of return guaranteed to them, in order to retain the difference as profits for themselves.

122.    A&B and its predecessors operated uninterrupted as a significant feeder fund for

BLMIS from the early 1960s until 1992, when the SEC commenced an investigation of A&B,

Avellino, Bienes, and the A&B Business Associates, which ultimately led to A&B's liquidation.

123.    At the time of the SEC's investigation of A&B in 1992, despite billing itself as an

exclusive opportunity limited to "relatives, friends and former clients," A&B had obtained

hundreds of millions of dollars from at least a thousand individuals and entities throughout the

United States and deposited those funds with BLMIS.

124.    Prior to A&B's liquidation in 1992, Avellino, Bienes, Mrs. Avellino, and Mrs.

Bienes also utilized personal IA accounts—which were separate and apart from the A&B IA

accounts that received A&B investor funds—to reap additional profits from BLMIS's fraudulent

scheme.  For example, Bienes and his wife utilized IA account number 1B0018, which was in

the name of Mrs. Bienes, to extract fictitious profits from BLMIS.  Avellino similarly used the

Avellino Personal IA Accounts (defined previously) to withdraw millions of dollars of fictitious

profits from BLMIS.

125.    In addition, Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes each benefited from

A&B account number 1A0046, which was established as a purported A&B pension plan account

that withdrew fictitious profits from BLMIS.

### AVELLINO AND BIENES LIED TO THE SEC TO COVER UP MADOFF'S FRAUD AND THE PHONY IA ACCOUNT BLMIS CREATED TO CONCEAL A SHORTAGE OF FUNDS OWED TO A&B'S INVESTORS

126.    In or before June 1992, the SEC commenced an inquiry into whether A&B,

Avellino, Bienes, and the A&B Business Associates were unlawfully selling unregistered

securities to the public and acting as unregistered investment advisers in connection with the

hundreds of millions of dollars they had received from more than a thousand investors

throughout the United States.  The investigation concerned investor funds that were ultimately

invested with BLMIS by Avellino, Bienes, and A&B.

127.    At the time, A&B maintained IA accounts with the following six account

numbers: 1A0045, 1A0046, 1A0047, 1A0048, 1A0049, and 1A0050 (the "Original A&B IA

Accounts").  A&B used all but one of these accounts to invest money it had collected and pooled

from its investors (the 1A0046 account was in the name of the A&B Pension Plan and was solely

for the benefit of Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes).  In addition, A&B used an account or accounts at Chemical Bank (the "Chemical Bank Account") to facilitate the pooling of funds for investment in the Original A&B IA Accounts and to make payments to underlying investors who requested withdrawals.  A&B investor money was exclusively invested in the Original A&B IA Accounts.

128.    A&B account number 1A0053 (the "Phony A&B IA Account") did not exist until after it was fraudulently created by BLMIS—with Avellino's, Bienes's, and their wives' knowledge—on or after June 23, 1992, as described in greater detail below.

129.    At all relevant times, Avellino and Bienes closely monitored and controlled the Original A&B IA Accounts, the Chemical Bank Account, and the deposits and withdrawals made therefrom.

130.    Avellino and Bienes represented in separate documents produced to the SEC that A&B owed its investors $399,819,455, as of June 18, 1992, and $413,611,640, as of June 30, 1992, based on the total value of the "loans" A&B owed to its underlying investors and all of which Avellino and Bienes claimed was invested with BLMIS.

131.    As of June 30, 1992, however, BLMIS's records and account statements reflected that the Original A&B IA Accounts had a total purported value of approximately $364 million. The collective total value in the Original A&B IA Accounts was approximately $49.6 million less than what Avellino and Bienes had represented to the SEC they owed to their underlying investors as of June 30, 1992.

132.    Avellino and Bienes jointly testified under oath before the SEC on July 7, 1992. Prior to their testimony, Madoff arranged for a lawyer to represent Avellino and Bienes during the SEC investigation.

42

133.    At the time of their testimony, Avellino and Bienes knew from the account statements for the Original A&B IA Accounts they received from BLMIS that the Original A&B IA Accounts had a purported aggregate value of only $364 million, approximately $49.6 million less than what A&B's records showed A&B owed to its underlying investors.  Indeed, Avellino and Bienes touted to the SEC the meticulous review and reconciliation they would perform on their IA account statements to ensure the purported equity in their IA accounts matched their internal records.  Therefore, they knew that the purported equity balances of the Original A&B IA Accounts were far less than what they should have been.

134.    Avellino and Bienes also knew that cash held in the Chemical Bank Account was, in itself, inadequate to close this shortfall.  During his SEC testimony, Avellino testified that A&B utilized the Chemical Bank Account to handle A&B investor funds and that this account typically maintained an average balance of $2 million to $3 million and never maintained a balance of more than $6 million.  Accordingly, even assuming the Chemical Bank Account had a maximum balance of $6 million as of the date Avellino and Bienes testified before the SEC, Avellino and Bienes knew that there was, at minimum, a shortfall of approximately $43.6 million ($49.6 million minus $6 million) between what A&B owed to its investors and the balances A&B maintained at BLMIS in the Original A&B IA Accounts and in the Chemical Bank Account.

135.    The existence of this shortfall was inconsistent with false assurances Avellino gave to the SEC during his sworn testimony on July 7, 1992, that:

> [W]e examine [the account statements] and do our due diligence on a monthly basis, we look at our fair market value of all of these securities that are being held at Bernard L. Madoff on behalf of Avellino & Bienes.  We determine the fair market value at the end of each month and we make sure, and this is where we are very positive, we make sure that that value is always in *excess* of the loans payable. (emphasis added).

136.    Avellino also testified:

If you look at the $400 million that we owe to lenders and you looked at my portfolio and, by the way, all of the $400 million plus is with Bernard L. Madoff, every single dollar, it is invested in long-term Fortune 500 securities, it is, to use the word 'protected' with hedges of Standard & Poor's index. . . . And I could honestly say over and over again that we always have a cushion or, by experience, have always had a cushion of about 20 percent . . .

137.    Bienes also testified to the SEC that the money invested with Madoff was protected by a 20% "cushion" and that the total amount invested with BLMIS was therefore valued at approximately $440 million.  This amount consisted of purported gains made on the amounts invested on behalf of A&B and personal funds Avellino and Bienes had invested with Madoff:

We owe, say, 400 million.  The value of our investment with the broker [Madoff] is 440-some-odd million.  We always have approximately 20 percent more with the broker than what we owe, it could be even bigger than that.

138.    When confronted with the obvious fact that $40 million was not a 20% cushion for the $400 million owed to investors, Bienes explained:

Well, no.  I'll tell you why.  A lot of it is in Treasuries right now.  It's not in the market.  That's why we have the – about close to 100 million is in Treasuries, so even with any loss, we would still have approximately 20 percent above and beyond what we owe, which is part of our capital. We usually always will be covered by 20 percent more than what we owe lenders.  In addition to that, we have our own personal funds which are also invested in the same type of discretionary account with the same broker.

139.    As Avellino admitted in his SEC testimony, he and Bienes carefully reviewed their account statements to "determine the fair market value at the end of each month."

140.    Avellino also admitted in a separate sworn affidavit filed in connection with the liquidation of A&B that he "personally oversaw [A&B's] books and records."

141.    At the time of their SEC testimony, Avellino and Bienes knew that the aggregate balance reported in the Original A&B IA Accounts did not correspond to the amount of money

44

A&B owed to its investors. Avellino and Bienes also knew that the account statements for the
Original A&B IA Accounts did not reflect the extra $40 million cushion they claimed they had in
excess of this amount.

142.    Avellino and Bienes felt confident making the above misrepresentations under
oath because they knew in late June 1992, just prior to their testimony, that BLMIS had created
the Phony A&B IA Account to account for the approximate $43.6 million shortfall (as well as
similar shortfalls in other months), and they had arranged with BLMIS to create corresponding
account statements, books and records, and other associated documents for at least a three-year
period, from 1989 to 1992. Avellino and Bienes certainly knew by this point the IA business
was a fraud.

143.    Avellino even confirmed the existence of the Phony A&B IA Account during
additional sworn testimony given in connection with A&B's liquidation.

144.    The sole purpose for creating the Phony A&B IA Account was to mislead the
regulators and conceal the fraud in which A&B were participating by creating the appearance
that A&B accounts at BLMIS held securities and cash positions sufficient to cover the amounts
owed to A&B investors plus the imaginary "cushion" Avellino and Bienes referred to in their
SEC testimony. Upon information and belief, Avellino and Bienes knew that if the SEC learned
of the shortfall in their IA accounts, the investigation would widen to include BLMIS and
Madoff, increasing the likelihood that the fraud would be revealed.

145.    The creation of the Phony A&B IA Account increased the purported total value of
the A&B IA accounts to an amount sufficient to conceal the $43.6 million shortfall as of June 30,
1992. The Phony A&B IA Account was also used to plug similar shortfalls in other months

between the amount A&B represented to the SEC it owed to its investors and the purported total value reflected on the IA account statements for the Original A&B IA Accounts.

146.    With Avellino's and Bienes's knowledge, Madoff directed his employees at BLMIS to manufacture and record fictitious and backdated holdings on the account statements for the newly created Phony A&B IA Account for at least a three-year period spanning December 1989 to June 1992.  BLMIS filled these fraudulent account statements with dozens of fictitious transactions designed to show realized and unrealized gains from securities and options transactions totaling approximately $66 million, the amount necessary to hide the shortfall and provide a cushion.

147.    For example, some of the backdated statements for the Phony A&B IA Account contained the following fictitious transactions:

a.    the backdated January 1991 statement reflects the purchase of 5,950 "S&P 100 Index - April 335 Call" contracts that were thereafter reported on the April 1991 statement to have been sold for an approximate gain of $18,019,575;

b.    the backdated December 1991 statement reflects purchases on December 12, 1991, of  3,500 "S&P 100 Index - January 355 Call" contracts and 3,000 "S&P 100 Index - January 360 Call" contracts.  The January 1992 statement reflected the purported sale of these same call contracts for approximate gains of $10,480,750 and $8,458,500 respectively; and

c.    the backdated December 1991 statement also reflected the purchase of 550,000 shares of Ford stock, all on margin for approximately $13,181,250.  On June 30, 1992, the 550,000 shares had a fair market value of $25,231,250 translating into an unrealized gain of $12,050,000.

148.    Significantly, a version of the June 30, 1992 Phony A&B IA Account statement recovered from BLMIS reflects that each of the transactions described above were entered for the first time into the BLMIS systems that generated these phony statements on or about June 23, 1992, long after the dates on which the transactions purportedly occurred.

149.    Other documents recovered from BLMIS corroborate that unlike the Original A&B IA Accounts that had been in existence for several years, the Phony A&B IA Account was created on or after June 23, 1992, no more than two weeks prior to Avellino's and Bienes's testimony before the SEC.

150.    Avellino and Bienes knew that they had neither opened nor contributed a dime of their own or A&B investor money to fund the Phony A&B IA Account prior to June 1992. Because the Phony A&B IA Account was not created until June 1992, Avellino and Bienes did not and could not have received contemporaneous monthly statements for the account from at least December 1989 through May 1992.

151.    When the SEC eventually received the backdated customer account statements for the Phony A&B IA Account (after Avellino's and Bienes's SEC testimony), Avellino and Bienes knew that BLMIS had fraudulently created them to reflect transactions that never occurred and an account balance that did not exist. Avellino and Bienes, complicit in BLMIS's creation of the backdated account statements to reflect more than $66 million of equity out of thin air, knew that Madoff and BLMIS were engaging in a fraud and manufacturing fictitious securities transactions. Instead of alerting regulators and their investors, Avellino and Bienes testified falsely to the SEC so they could continue to profit from Madoff's fraud.

## AVELLINO AND BIENES RETURNED THEIR ORIGINAL ACCOUNT STATEMENTS TO MADOFF SO THAT BLMIS COULD ALTER THEM FOR PRODUCTION TO THE SEC AND THE RECEIVER

152.    As the SEC investigation progressed, in addition to concerns stemming from the shortfall in the Original A&B IA Accounts, which were dealt with through the creation of the Phony A&B IA Account, Madoff, Avellino, and Bienes became concerned about what might happen if BLMIS and/or A&B were compelled to produce the historical account statements for the Original A&B IA Accounts.

153.    Because of this concern, BLMIS—with Avellino's and Bienes's knowledge, complicity, and participation—began an additional effort in or about June 1992 to alter certain previously issued account statements for the Original A&B IA Accounts.  These altered statements made up for similar shortfalls in prior years between the amount Avellino and Bienes represented to the SEC they owed to A&B's investors and the purported value reflected on the Original A&B IA Account statements they received from BLMIS.  The altered statements also ensured that the transactions they reflected were consistent with Avellino's and Bienes's testimony concerning Madoff's strategy and the purportedly conservative nature of his investments.  Madoff could not have pulled off this subterfuge without notifying Avellino and Bienes of his intentions and securing their consent and assistance to return the original statements so that they would not—and could not—be provided to the SEC.

154.    To conceal these alterations from the SEC and the receiver appointed by the court to liquidate A&B (the "Receiver"), Avellino—with Bienes's knowledge and consent—returned to BLMIS the account statements they previously had received for the Original A&B IA Accounts.

155.    An internal BLMIS file containing a hand-written cover note states: "These were returned."  Immediately following this note are account statements for several A&B-related

accounts, including 1-02008 (the predecessor to IA account 1A0051) and 1-00125 (the

predecessor to Original A&B IA Account 1A0045). These account statements—which have

hand-written "X's" across them—differ considerably from those that were eventually produced

to the SEC.

156.    On July 30, 1992, Avellino faxed to BLMIS account statements for December

1989 for Original A&B IA Accounts 1-00125 and 1-00133 (the predecessor to Original A&B IA

Account 1A0046). Upon information and belief, Avellino faxed these documents to BLMIS so

that Madoff and his employees could alter them and conceal the original statements from the

SEC.

157.    By returning these original account statements to BLMIS, Avellino and Bienes

knew that BLMIS was altering them to ensure they were consistent with the false information

A&B and Madoff previously provided to the SEC and, ultimately, to conceal the fraud taking

place at BLMIS. Avellino and Bienes also knew BLMIS was generating new account statements

for the Original A&B IA Accounts for production to the SEC and/or the Receiver that reflected

securities transactions that did not actually take place.

158.    Avellino and Bienes also provided BLMIS with various internal A&B documents,

including general accounting ledgers tracking the Original A&B IA Account balances, as well as

bank account records. Upon information and belief, Avellino and Bienes provided these

materials to BLMIS to make certain the altered account statements provided to the SEC were

consistent with A&B's internal records, which had also been produced to the SEC.

159.    With Avellino's and Bienes's knowledge and assistance, BLMIS created an

entirely new set of account statements for the Original A&B IA Accounts for production to the

SEC and/or the Receiver, which eliminated certain transactions and replaced them with other

fictitious transactions more consistent with the false testimony and representations Avellino and Bienes made to the SEC.

160.   For example, Avellino and Bienes represented to the SEC that A&B owed its investors $245,067,378 as of December 31, 1989, and $299,760,401 as of December 31, 1990. The holdings reflected on the original account statements for the Original A&B IA Accounts totaled a purported value of only approximately $213 million as of month-end December 1989, and $267 million as of month-end December 1990—values that were approximately $32 million less than the amount Avellino and Bienes represented to the SEC it owed to its investors for these periods.

161.   To conceal this inconsistency, BLMIS added 86 million U.S. Treasury notes to the holdings reflected on the altered account statements for Original A&B IA Account 1-00125 (the "1-00125 Account") from December 1989 through December 1990.  Of course, there was no actual purchase of U.S. Treasury notes or any other securities.  Like all the other phony transactions, this entry was created out of thin air to make it appear as if the account held these securities.

162.   Just as the Phony A&B IA Account plugged a similar shortfall that existed for month-end June 1992, BLMIS's addition of the phony 86 million U.S. Treasury notes completely plugged the $32 million shortfall that existed for month-end December 1989 and month-end December 1990.  This blatant chicanery also gave the appearance that the 1-00125 Account was conservatively invested in U.S. Treasurys, as Bienes touted in his SEC testimony.

163.   The 86 million U.S. Treasury notes were not included on the original monthly BLMIS statements for the 1-00125 Account that were received by A&B in or around December 1989 and December 1990 and later returned to BLMIS by Avellino.  The 86 million U.S.

50

Treasury notes did appear on the altered December 1989 and December 1990 1-00125 Account statements produced to the SEC.

164.     BLMIS also created entirely new sub-accounts for the Original A&B IA Accounts to ensure consistency with Avellino's and Bienes's SEC testimony touting their IA accounts' positive cash balances.  For example, as of December 31, 1989, the Original A&B IA Account statements reflected a negative cash balance of approximately $131 million.  To remedy this— well after the fact—BLMIS created out of thin air an entirely new sub-account for Original A&B IA Account 1-00125 (the "1-00125-7 Account") to house a fictitious backdated transaction that generated over $134 million in cash and eliminated A&B's negative cash balance completely.  A month-end December 1989 statement for the 1-00125-7 Account was produced to the SEC even though such account did not exist as of December 31, 1989.

165.     With Avellino's and Bienes's knowledge, other BLMIS statements for the Original A&B IA Accounts were altered to ensure they would not reveal inconsistencies with Madoff's own representations and prompt questions from the SEC that Madoff did not want to answer, such as the number of BLMIS IA customers.  For example, BLMIS altered the December 1989 statement for the 1-00125 Account to eliminate an entry that reflected a December 14, 1989 transfer of $145,318.34 from an IA account held in the name of "Alpern & Avellino," with account number 1-00124-1.  Madoff did not want the SEC questioning him on the identity of Alpern, thereby calling into question his representations that his client base was very small.  To conceal this alteration but retain the fictitious value this transaction created, BLMIS also altered the November 1989 statement for the 1-00125 Account to add an entry that indicated the account had instead received a dividend payment from General Motors in the

amount of $145,318.34, the exact amount that had been removed from the original December 1989 statement.

166.    Notwithstanding their knowledge that the Phony A&B IA Account was a complete fabrication and the BLMIS statements for the Original A&B IA Accounts had been further altered to reflect transactions that never occurred, Avellino and Bienes were complicit in BLMIS's fraud and cooperated with Madoff so the falsified account statements produced to the SEC and the Receiver would appear legitimate, thereby concealing the shortfall and the fraud.

167.    In connection with the SEC's liquidation of A&B, the Receiver sought to audit A&B's books and records for an eight-year period, from 1984 to 1992, as required by a court order to which Avellino and Bienes consented.  Yet Avellino and Bienes apparently could only produce limited accounting records and documents to the Receiver's auditor for a much shorter period: 1989 through 1992—the precise period of the altered account statements BLMIS worked feverishly to re-create.  Avellino told the auditor that A&B "did not maintain detailed financial records" and, not surprisingly, directed the auditor to conduct its audit using documents provided by Madoff, which Avellino and Bienes knew would allow Madoff to control the deceitful narrative being told to the Receiver through the altered IA account statements.  The Receiver's auditor even noted in its audit report and accompanying affidavit that A&B's accounting records were poorly maintained and, according to Avellino, all A&B accounting records up to and including 1988 had apparently been discarded.

168.    In addition to altering previously issued A&B account statements, BLMIS, Avellino, and Bienes made after-the-fact efforts to "paper" the files for the Original A&B IA Accounts.  Despite having IA accounts for many years at BLMIS, on or about July 17, 1992, after Avellino and Bienes testified to the SEC, a BLMIS employee faxed blank partnership

account agreements, trading authorizations, customer agreements, margin agreements, option

agreements and other account opening documents to Avellino for signature. On the same day,

BLMIS similarly provided Bienes and Mrs. Bienes with blank account forms for signature.

Avellino, Bienes, and Mrs. Bienes thereafter each signed the forms leaving the remainder blank,

and sent them back to BLMIS so that it would appear that the proper account documentation

existed for the accounts in the event the SEC reviewed these materials as part of its investigation.

169.     By participating in the falsification of documents together with Avellino and

Bienes, Mrs. Bienes knew of BLMIS's overall effort to "paper" the files to deceive government

regulators and to conceal the fraud.

## THE SEC OBTAINED AN INJUNCTION AGAINST AVELLINO, BIENES, AND A&B

170.     On November 17, 1992, the SEC filed a Complaint for Preliminary and

Permanent Injunctive and Other Equitable Relief against A&B, Avellino, and Bienes alleging

that from 1962 until at least July 1992, Avellino and Bienes had unlawfully operated A&B as an

unregistered investment company and engaged in the unlawful sale of unregistered securities

through the loans they offered to their investors.

171.     On November 18, 1992, the District Court entered a Preliminary Injunction and

appointed the Receiver to oversee the liquidation of A&B. The Preliminary Injunction ordered

that Avellino, Bienes, and A&B not commit any additional violations of the securities laws and

required the Receiver to perform a liquidation of A&B in which all owed funds would be

returned to A&B investors by November 24, 1992. Employees at BLMIS scrambled to secure

sufficient funds to meet the court ordered redemption. In order to provide funds for this purpose,

in or about November 1992, Madoff obtained securities and cash from other IA customers and

used those securities as collateral for loans. Some of the loan proceeds were transferred to

BLMIS's bank accounts and were used to pay off a portion of the balance due to the A&B investors.

172.    On or about November 18 to November 24, 1992, redemptions totaling approximately $329 million were made to A&B investors.  Almost a quarter of a billion dollars of these proceeds appear as fraudulent entries in the Phony A&B IA Account.  This distribution was in addition to the distribution of funds totaling $113 million that A&B had made previously in November 1992.

173.    On September 7, 1993, the U.S. District Court issued a Final Judgment of Permanent Injunction and Other Equitable Relief By Consent Against A&B, Avellino, and Bienes ordering, among other things, that they be enjoined from violating section 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c), by selling unregistered securities and section 7 of the Investment Company Act of 1940, 15 U.S.C. § 80a-7, by operating an unregistered investment advisory company.

## IN THE WAKE OF THE SEC INJUNCTION, AVELLINO AND BIENES FAILED TO FIND "FRONT MEN" AND INSTEAD NEGOTIATED WITH OTHERS TO RECEIVE MONEY FOR REFERRING INVESTORS TO BLMIS

174.    Avellino and Bienes did not let the restrictions of the preliminary and permanent injunction or the ongoing litigation with the SEC get in the way of their insatiable thirst for continued profits from Madoff's Ponzi scheme.

175.    In or about late 1992 or early 1993, despite the requirements of the injunction, the ongoing litigation with the SEC, and their clear knowledge of, and participation in, Madoff's fraud, Avellino and Bienes attempted to find people willing to act as "front men" to create and operate new BLMIS investment vehicles.  If successful, Avellino and Bienes could continue to recruit investors, including those formerly in A&B, and funnel money into BLMIS, while avoiding regulatory scrutiny.

176.    Specifically, Avellino and Bienes met with certain individuals and requested that they operate such investment vehicles for the benefit of Avellino and Bienes.  When these individuals refused to act as "front men," Avellino and Bienes instead negotiated an arrangement with Michael Sullivan and Greg Powell, who created the partnerships S&P and P&S.  Avellino and Bienes agreed to and did refer investors to S&P and P&S, which would then place those investors' funds with BLMIS.  In return, S&P and P&S agreed to and did pay Avellino and Bienes 10% of the annual returns received by their referrals.

177.    The arrangement Avellino and Bienes made with S&P and P&S allowed them to continue to profit significantly from referring investors, now indirectly, to BLMIS.  For example, upon information and belief, P&S and S&P paid approximately $112,500 for the benefit of Avellino and Bienes for the years 2000–2002.  In addition, upon information and belief, for the years 2003–2007, P&S and S&P paid approximately $599,190 for the benefit of Avellino and Bienes.

## DESPITE THE SEC INJUNCTION, AVELLINO, BIENES, AND THEIR FAMILIES CREATED A WEB OF INTER-CONNECTED ENTITIES TO CONTINUE TO FUNNEL MONEY INTO BLMIS AND KNOWINGLY PROFIT FROM A FRAUD

178.    In order to continue to profit from the fraud, but disguise their continuing relationship with BLMIS from government regulators, Avellino, Bienes, their wives, and, later, Thomas Avellino, created, dominated, and controlled a web of inter-connected entities, each of which lacked employees, any semblance of a corporate form, and any legitimate or independent business purpose.  These entities, which existed for no other purpose than investing in and profiting from the fraud, included:  Grosvenor Partners, Mayfair Ventures, Aster, St. James, and Strattham (together with KJA, the "Post-1992 Entities").  KJA became part of this web in January 1998 at the latest, when Avellino gained control over the entity and its IA account.

179.     Avellino and Bienes opened the following inter-connected IA accounts at BLMIS in the name of the Post-1992 Entities that they, their wives, and later Thomas Avellino controlled and/or equitably owned: Grosvenor Partners Ltd c/o Frank Avellino (1ZB046); Mayfair Ventures c/o Frank Avellino (1ZB032); Aster Associates Frank Avellino, Nancy Carroll Avellino General Partners (1ZB509); St James Associates Michael Bienes, Diane [*sic*] Bienes General Partners; Strattham c/o Thomas G Avellino (1ZB262); and Kenn Jordan Associates c/o Frank Avellino (1ZA879) (collectively, the "Post-1992 IA Accounts").

180.     Upon information and belief, Avellino, Bienes, their wives and Thomas Avellino opened the Post-1992 IA Accounts in the names of Grosvenor Partners, Mayfair Ventures, Aster, St. James, and Strattham—rather than in their own names—for the wrongful purpose of concealing their continued involvement in the fraud at BLMIS and to avoid further scrutiny by regulators.  They also sought to shield from regulators and their creditors the fictitious profits and other fraudulent transfers they received from BLMIS that they knew were the product of a fraud.

181.     The Post-1992 Entities and Post-1992 IA Accounts shared common addresses and overlapping control persons.  For example, Grosvenor Partners, Mayfair Ventures, Aster, and KJA all shared Avellino's and Mrs. Avellino's home address, as reflected on corporate documentation, and IA account documentation and correspondence.

182.     As detailed more fully herein, Avellino, Bienes, their wives, and, later, Thomas Avellino, commingled funds among their personal bank accounts, bank accounts held in the names of the Post-1992 Entities that they controlled, and the Post-1992 IA Accounts to ensure a steady stream of profits for themselves, to maintain minimum levels of liquidity for the Post-

1992 Entities, and to avoid angering Madoff by making too many withdrawals from their Post-1992 IA Accounts.

183.    In February 1993, a little more than two months after the issuance of the Preliminary Injunction against them and during ongoing litigation with the SEC, Avellino, Bienes, and their wives created Grosvenor Partners, and established an IA account in its name. Avellino, Bienes, and their wives used the IA account in Grosvenor Partners's name to funnel their money and money collected from friends and family into BLMIS so they could continue to profit from the Ponzi scheme.

184.    Avellino and Bienes were also the owners of other entities, such as Mayfair Ventures, that received fees for ostensibly "managing" or providing "services" to Grosvenor Partners, thereby extracting additional and substantial profits from Madoff's Ponzi scheme.  For example, a Mayfair Ventures tax return reflects that in 1996 Grosvenor Partners paid a "management fee" of $776,188 to Mayfair Ventures.

185.    While these records reflect purported "management" fees, neither Avellino nor Bienes provided any service of value to any of the Post-1992 Entities, including Mayfair Ventures; they simply funneled money directly into BLMIS through the Post-1992 IA Accounts.

186.    Accounting records for Grosvenor Partners for the period 1999 through 2006 also reflect that it paid approximately $225,000 in "accounting fees" to A&B Accounting Services. A&B Accounting Services, which later became Mayfair Bookkeeping, was also an entity owned and controlled by Avellino and Bienes and created for the benefit of them and their wives.  Upon information and belief, while these records reflect purported "accounting fees," A&B Accounting Services and Mayfair Bookkeeping did not provide any service of value to Grosvenor Partners.

187.     Grosvenor Partners withdrew at least $58.2 million more from BLMIS than it invested over the life of its IA account.  These withdrawals were to or for the benefit of Avellino, Bienes, their wives, and the entities they owned and controlled.

188.     In February 1993, also only months after the Preliminary Injunction, Avellino and Bienes established an IA account at BLMIS in the name of Mayfair Ventures so they could continue to profit from Madoff's Ponzi scheme.  During the lifetime of the Mayfair Ventures account, Mayfair Ventures withdrew at least $4.3 million more from BLMIS than it had invested, for the benefit of Avellino, Bienes, and their wives.

189.     On or about January 27, 1995, Avellino and Bienes established yet another IA account at BLMIS so they could profit from Madoff's Ponzi scheme, this time in the name of Mayfair Bookkeeping, for Mayfair Pension Plan.  This account was also utilized to receive a portion of the fraudulent side payments from BLMIS as discussed below.

190.     In or about February 1993, just after the issuance of the Preliminary Injunction, Avellino and Kenneth Jordan, a close friend of Avellino and also a former A&B investor, established an IA account at BLMIS in the name of KJA.  The KJA IA account was utilized to invest funds with BLMIS that had been pooled from numerous investors.  At all relevant times, Avellino acted as the agent of KJA in handling its BLMIS investments.  Shortly after the KJA IA account was created, Avellino wrote a letter to BLMIS stating that Kenneth Jordan wanted Avellino to "be his spokesperson between himself and BLM."  In or about January 1998, Avellino also became a general partner of KJA and, by July 1999 (at the latest), solely controlled KJA and its IA account.

191.     From January 1998 forward, Avellino received management fees of approximately 20% of KJA's total investments.  For example, in March 1999, KJA paid

Avellino $37,000 for "professional fees." Under Avellino's control, KJA also made payments for the benefit of Thomas Avellino. From 2000–2004, KJA paid Thomas Avellino's company Ascent "professional fees" fees totaling $102,000. Upon information and belief, while these records reflect purported "professional fees," Ascent did not provide any service of value to KJA.

192.    In or about June 2004, Avellino and Mrs. Avellino created Aster and established an IA account at BLMIS in its name so they could continue to profit from Madoff's Ponzi scheme, as well as administer investments by family members and friends with BLMIS that were transferred from the Grosvenor Partners IA account. Avellino directed BLMIS to open the Aster IA account with transfers of approximately $21.4 million from Grosvenor Partners's IA account. During the lifetime of the Aster IA account, Aster withdrew at least $7 million more than it invested with BLMIS.

193.    In or about June 2004, Bienes and Mrs. Bienes created St. James and established an IA account at BLMIS in its name so they could continue to profit from Madoff's Ponzi scheme. With Bienes and Mrs. Bienes's knowledge and consent, Avellino directed BLMIS to open the St. James IA account with funds transferred directly from Grosvenor Partners's IA account. The St. James IA account was primarily funded with tens of millions of dollars in transfers from Grosvenor Partners's IA account. During the lifetime of the St. James IA account, St. James withdrew in excess of $17.4 million more than it invested with BLMIS. Upon information and belief, all of the withdrawals were for the benefit of Bienes, Mrs. Bienes, and their family members.

194.    In or around 1995, Thomas Avellino took up the family mantle and created Strattham so he too could reap significant personal profits from Madoff's Ponzi scheme.

195.    Thomas Avellino was a general partner of Strattham and purported to operate Strattham through Ascent, its managing partner.  Thomas Avellino was Ascent's president and sole director.

196.    Upon information and belief, Avellino informed Thomas Avellino that Strattham's IA account would benefit from the consistent annual rates of return and fraudulent side payments Madoff promised to him and Bienes.

197.    Thomas Avellino used Strattham to raise tens of millions of dollars from unwitting clients to invest through the Strattham IA account at BLMIS.  Thomas Avellino also profited from exorbitant management fees that Strattham charged the underlying investors for the opportunity to place their money into the BLMIS fraud.  During the course of its existence, Thomas Avellino and Strattham succeeded in raising funds from at least 39 investors.

198.    Thomas Avellino structured Strattham such that Ascent would receive an annual 20% management fee for "managing" Strattham, which of course inured to his own personal benefit.  Indeed, Thomas Avellino frequently prepared and signed checks in the name of Strattham to pay himself.

199.    Thomas Avellino and Ascent received these management fees despite having little or no professional experience, training, or education in investing or the securities business. Neither Ascent nor Thomas Avellino expended effort to manage the partnership funds commensurate with the excessive management fees they received.  Rather, Thomas Avellino and Ascent merely funneled money raised by Strattham into BLMIS to profit from the receipt of other people's money.

200.    At certain times, Avellino acted as Thomas Avellino and Strattham's agents in connection with their BLMIS investments.  On behalf of Thomas Avellino and Strattham,

Avellino instructed BLMIS to open an IA account in the name of Strattham for the benefit of his

son.  Thereafter, Avellino directed some inter-IA account transfers from certain of the Post-1992

IA Accounts to the Strattham IA account, which upon information and belief was for the purpose

of assisting Thomas Avellino with funding the account.  Avellino also negotiated with BLMIS

on behalf of Thomas Avellino and Strattham for Strattham's IA account to receive guaranteed

rates of annual return payable through the fraudulent side payments, which generated additional

fictitious profits for Strattham and Thomas Avellino.

201.    While Avellino provided Thomas Avellino with this assistance, Thomas Avellino

at all times had decision making authority over Strattham and managed whatever limited

day-to-day activities it had.

202.    Upon information and belief, Thomas Avellino made phony entries in the

Strattham internal accounting records in order to improperly realize additional returns from the

partnership for himself and to cheat the other partners in Strattham.

203.    For example, Thomas Avellino added an entry to the internal Strattham

accounting records that falsely reflected that he had deposited $2,000,000 of capital into the

Strattham partnership account on January 1, 2005.  The bank account statements for Strattham

reflect no such deposit by or from Thomas Avellino.  The fraudulent $2,000,000 entry allowed

Thomas Avellino to earn returns on this additional phantom capital contribution into the

partnership.  Thomas Avellino benefited from this additional fraudulent deposit by withdrawing

$175,000 from his partnership capital account in 2005, which amounted to $100,000 more than

he actually contributed to the partnership account in that year.  To cover the prior fraudulent

entry, Thomas Avellino placed a false entry into the partnership accounting records reflecting

that he withdrew exactly $2,000,000 from the partnership on December 31, 2005.  This withdrawal was also not consistent with the bank records of Strattham.

204.    Continuing his scheme to cheat the other partners in Strattham, Thomas Avellino added an entry to the internal Strattham accounting records that falsely reflected that he had deposited $1,380,000 in capital to the Strattham partnership account on January 1, 2006.  The bank account statements for Strattham reflect no such deposit from Thomas Avellino.  The fraudulent $1,380,000 entry allowed Thomas Avellino to earn returns on this additional phantom capital contribution into the partnership.  Thomas Avellino benefited from this additional fraudulent return by withdrawing $185,000 from his account during 2006.  To cover the prior fraudulent $1,380,000 entry, Thomas Avellino placed a false entry into the partnership accounting records reflecting that he withdrew exactly $1,380,000 from the partnership on January 1, 2007.  This withdrawal was also not consistent with the bank records of Strattham.

205.    In addition to withdrawals he made from Strattham's IA account, Thomas Avellino also benefited from the withdrawal of more than $2.58 million in purported management fees from Ascent.  Upon information and belief, these withdrawals were subsequent transfers of initial transfers initiated by Thomas Avellino from Strattham's IA Account and for his personal benefit.

206.    Avellino, Bienes, Mrs. Bienes, Mrs. Avellino, and Thomas Avellino were the equitable and/or beneficial owners of the Post-1992 Entities and the Post-1992 IA Accounts. Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and Thomas Avellino not only formed, funded, directed, and/or controlled the Post-1992 Entities, they also retained the beneficial use over the funds and assets of those entities, including their IA accounts and directed and determined how and to whom funds could be disbursed.

207.    Upon information and belief, any actions Avellino, Bienes, Mrs. Avellino, Mrs.

Bienes, and Thomas Avellino took with respect to the Post-1992 IA Accounts were taken

primarily for the benefit of themselves, and their families, entities, and trusts.

**AVELLINO AND BIENES NEGOTIATED WITH MADOFF TO RECEIVE
GUARANTEED RATES OF RETURN AND FRAUDULENT SIDE
PAYMENTS FOR FUNDS FORMER A&B INVESTORS REINVESTED WITH BLMIS**

208.    In or about 1992 and 1993, Madoff agreed to provide Avellino, Bienes, and

certain A&B Business Associates with financial incentives evidently to encourage former A&B

investors to reinvest the funds they received from the forced liquidation of A&B in BLMIS.

Upon information and belief, Madoff also offered these financial incentives to Avellino and

Bienes because he did not want them to reveal to regulators what they knew regarding the

backdated statements, the alteration of the original statements for the Original 1992 A&B IA

Accounts, or the creation of the Phony A&B IA Account.

209.    With Bienes's knowledge, Avellino met with Madoff in or around the winter of

1993 to plot how he, Bienes, and their families would continue to receive the fictitious gains

from BLMIS that they had enjoyed for decades and how they would assist Madoff with, and

further profit from, the return of the former A&B investors and their cash to BLMIS.  During this

meeting, in return for encouraging and assisting former A&B investors to open direct IA

accounts with BLMIS, Avellino negotiated with Madoff—on behalf of himself, Bienes, their

families, and certain A&B Business Associates—for the new IA accounts under their control,

including some or all of the Post-1992 IA Accounts, to receive guaranteed annual rates of return

of 17% and fraudulent side payments based on a percentage of the amount that former A&B

investors reinvested directly with BLMIS after A&B's liquidation.

210.    Specifically, Madoff, Avellino, and Bienes agreed that the fraudulent side

payments would be based on the amount of cash the underlying investors in both A&B and the

entities controlled by the A&B Business Associates reinvested with BLMIS as of March 31,

1993—approximately $372 million—decreased by the approximately $36 million in personal

funds Avellino, Bienes, and their families reinvested with BLMIS through Grosvenor Partners

and Mayfair Ventures.  Pursuant to their agreement, BLMIS would pay Avellino and Bienes an

annual payment equal to 2% of approximately $336 million, less the amount in fraudulent side

payments that were to be made to the A&B Business Associates.  The fraudulent side payments

received by the A&B Business Associates were based on the $72 million that had been

reinvested directly into BLMIS by their former customers.

211.    Although Madoff, Avellino, and Bienes agreed that Avellino and Bienes would

receive a fraudulent side payment for the year 1993, the payments did not begin until 1994, and

the agreed upon amounts were not always timely paid on an annual basis.  As set forth below, the

payments were often based upon rounded numbers instead of exact calculations.  As a result,

BLMIS frequently made "after the fact" payments in later years to correct underpayments from

earlier years.  There were other adjustments to the fraudulent side payment calculation made

during those later years.  For example, upon information and belief, for the years 1993 through

1997, the calculated amounts of the fraudulent side payments were adjusted downward for

instances where the Post-1992 IA Accounts received purported rates of return from fictitious

trading activity in excess of the promised 17%.  Similarly, in years when the Post-1992 IA

Accounts fell short of the agreed upon guaranteed rate of return during the months of January

through November, BLMIS employees increased the fraudulent side payments generally in

December to make up the difference and deliver the promised returns.

212.    In 2000, BLMIS slightly altered the manner of calculating the fraudulent side

payments to the Post-1992 IA Accounts.  BLMIS began using a base figure of $264 million,

which did not include the $72 million that had been reinvested by former customers of the A&B Business Associates.  This allowed BLMIS to avoid making any additional adjustments for the fraudulent side payments made to the A&B Business Associates.

213.    Upon information and belief, as the pressure to make redemptions increased during the last few years of the Ponzi scheme, Madoff unilaterally made periodic reductions to the multiplier used to calculate the fraudulent side payments and also to the guaranteed rates of return, which are reflected in the chart below:

| Year | Multiplier | Guaranteed Rate of Return |
|------|-----------|---------------------------|
| 1993–2001 | 2% | 17% |
| 2002 | 1% | 14% |
| 2003 | 1% | 11% |
| 2004–2007 | .5% | 11% |

214.    Beginning in 2004, upon information and belief, as a compromise for reducing the multiplier to .5%, Madoff agreed to calculate the fraudulent side payments owed to Avellino and Bienes using a base figure of $336 million (as opposed to $264 million) thereby limiting the reduction to the fraudulent side payments.

215.    Upon information and belief, Avellino informed Thomas Avellino that Madoff had promised to pay guaranteed rates of return and fraudulent side payments, and that Strattham's IA Account would receive the same treatment.

216.    BLMIS did not pay the annual fraudulent side payments to Avellino, Bienes, their wives, and Thomas Avellino by conventional means such as checks or credits to their accounts. Rather, BLMIS provided the fraudulent side payments by crediting the Post-1992 IA Accounts with blatantly fictitious and highly profitable, non-hedged options transactions.  On the face of specific Post-1992 IA Account statements, BLMIS would purportedly purchase an option (typically an index-option), without any corresponding hedge, and then later sell it for a "profit," thus increasing the value of the accounts and making real cash available for immediate

65

withdrawal.  In reality, these options trades were never executed by BLMIS and there were never any real profits.

217.    BLMIS's delivery of the fraudulent side payments through purported non-hedged options transactions resulting in a specific, on-demand gain is impossible under any circumstance, much less under the SSC Strategy Madoff purportedly followed.

218.    In fact, Avellino knew that any non-hedged option activity, which was obvious from the face of the Post-1992 IA Account statements, was inconsistent with his expressed understanding of Madoff's investment strategy.

219.    In total, BLMIS recorded these fictitious options trades to provide Avellino, Bienes, their wives, and later Thomas Avellino with at least $59 million of additional fictitious gains that were immediately available for withdrawal from their IA accounts.  In reality, these fictitious gains, when withdrawn, were nothing more than customer property stolen from other investors and are recoverable as fraudulent transfers as otherwise set forth herein.

220.    Avellino closely monitored the IA accounts for which he, Bienes, their wives, and families were equitable and/or beneficial owners, including the Post-1992 IA Accounts, and directed Madoff and others at BLMIS to place these fictitious, non-hedged options transactions in specific accounts on an annual basis.

221.    As set forth below, BLMIS recorded these fictitious, non-hedged options transactions in the following accounts controlled by Avellino, Bienes, their wives, and/or Thomas Avellino:

| Year | Mayfair Ventures | Grosvenor Partners | Mayfair Bookkeeping | Aster | St. James | Strattham | KJA | Total |
|---|---|---|---|---|---|---|---|---|
| 1993 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1994 | $2,297,700 | $1,357,575 | 0 | 0 | 0 | 0 | 0 | $3,655,275 |
| 1995 | $486,500 | $164,400 | 0 | 0 | 0 | 0 | 0 | $650,900 |
| 1996 | 0 | $5,577,228 | 0 | 0 | 0 | 0 | 0 | $5,577,228 |
| 1997 | $428,670 | $1,948,500 | $2,922,750 | 0 | 0 | 0 | 0 | $5,299,920 |
| 1998 | $500,220 | $6,272,600 | $1,198,940 | 0 | 0 | 0 | 0 | $7,971,760 |
| 1999 | $1,005,875 | $2,011,750 | $2,518,120 | 0 | 0 | 0 | 0 | $5,535,745 |
| 2000 | $5,372,000 | $1,074,400 | $537,200 | 0 | 0 | 0 | 0 | $6,983,600 |
| 2001 | $8,172,800 | 0 | 0 | 0 | 0 | 0 | 0 | $8,172,800 |
| 2002 | $2,164,320 | $1,743,480 | 0 | 0 | 0 | 0 | 0 | $3,907,800 |
| 2003 | $3,202,760 | 0 | 0 | 0 | 0 | 0 | 0 | $3,202,760 |
| 2004 | $1,785,810 | $66,516 | $270,402 | $41,934 | $41,934 | $26,028 | $20,244 | $2,252,868 |
| 2005 | $108,640 | $2,266,242 | $146,664 | $353,080 | $282,464 | $179,256 | $57,036 | $3,393,382 |
| 2006 | $1,679,230 | 0 | 0 | 0 | 0 | 0 | 0 | $1,679,230 |
| 2007 | $1,685,480 | 0 | 0 | 0 | 0 | 0 | 0 | $1,685,480 |
| Total | $28,890,005 | $22,482,691 | $7,594,076 | $395,014 | $324,398 | $205,284 | $77,280 | $59,968,748 |

222.    Payment of the fraudulent side payments to Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, Thomas Avellino, Mayfair Bookkeeping, and the Post-1992 Entities they dominated and controlled in the manner described hereto was yet another blatant example that each of these Defendants knew Madoff was operating a fraud.

223.    The fraudulent side payments also inflated the annual rates of return in Post-1992 IA Accounts well beyond their guaranteed percentage and, in several instances, to annual rates of return greater than 80%.  For example, in 2000 and 2001, Mayfair Ventures's fraudulent side payments elevated its annual rate of return to more than 94% and 80%, respectively.  Avellino and Bienes, who scrutinized their monthly account statements from BLMIS and the purported values of their IA accounts, knew that these rates of return were not possible and the fraudulent side payments were the product of a fraud.

224.    Similarly, Avellino, Bienes, their wives, Thomas Avellino, Mayfair Bookkeeping, and the Post-1992 Entities knew that it was not possible for Madoff to guarantee and consistently deliver a predetermined rate of return if he was actually transacting in securities.  These Defendants also knew that the fictitious non-hedged options trades were not the result of actual

trading activity.  These Defendants knew of the fraud at BLMIS for years, and nevertheless continued to direct desired profits and payments for their benefit and to ignore the clear evidence of fraudulent conduct.

### AVELLINO, BIENES, AND THEIR FAMILIES KNEW THEIR RECEIPT OF FRAUDULENT SIDE PAYMENTS THROUGH BLMIS'S "SCHUPT" PROCESS WAS FURTHER PROOF OF FRAUD AT BLMIS

225.    Because Madoff promised guaranteed rates of return and made fraudulent side payments to dozens of favored customers, including Avellino, Bienes, their wives, and Thomas Avellino, BLMIS employees created an internal process to identify, track, and reconcile accounts whose performance did not meet the guaranteed rate of return or that were due to be paid the fraudulent side payments.  This process relied upon handwritten reconciliations to determine the amount of non-hedged options trades that would need to appear on account statements to compensate these investors.

226.    The process for determining the amounts owed to these customers was referred to internally at BLMIS as calculating either the "Shupt" or "Schupt" number (hereinafter, "Schupt").  Upon information and belief, the term Schupt was intended to be the word "Schtup," a derogatory Yiddish term.  Payments made pursuant to this process were referred to internally at BLMIS as Schupt payments.

227.    Once the amount owed to a particular specially favored customer was determined, the money was paid to specific IA accounts through the fictitious purchase and sale of options engineered to deliver the predetermined dollar amount needed to pay the guaranteed rate of return and/or the fraudulent side payment.

228.    In addition to calculating the amount owed, the handwritten Schupt schedules also indicated the type and amount of options contracts that would be "executed" to make up the total payment.  These numbers were arrived at with the benefit of hindsight by selecting specifically

priced historical option contracts that would create a particular gain and dividing that gain by the dollar amount owed to each account to determine the number of contracts to be purchased for each account. An account statement was then generated to reflect the purported transactions and the proceeds generated therefrom. The balance within these accounts was then available for immediate withdrawal by the accountholder.

229. The Schupt schedules and non-hedged options transactions reflected on the December 2002 account statements for IA accounts in the names of Mayfair Ventures and Grosvenor Partners demonstrate how the Schupt process typically worked.

230. In or around December 2002, the handwritten Schupt schedules prepared by BLMIS employees contained entries for IA accounts held by Mayfair Ventures and Grosvenor Partners indicating that these accounts were owed $2.6 million for the fraudulent side payments and $1,296,000 to meet the guaranteed rate of return of 14% then in effect, for a total payment of $3,896,000. Of the $1,296,000 of fictitious gains owed, $1,231,000 was owed to Grosvenor Partners's IA account to bring that account's return to 14%. Specifically, a Schupt schedule indicated "Brings to 14% 1231" for Grosvenor Partners per the "WHY" column on the schedule.

231. Avellino, with Bienes's knowledge, directed that the Grosvenor Partners account be allocated $500,000 of the $2.6 million fraudulent side payment for a total Schupt payment of $1,731,000 ($1,231,000 in additional returns plus $500,000 for the fraudulent side payment). The Mayfair Ventures account was owed $65,000 to bring the account's performance to 14% and was allocated, upon information and belief, at the direction of Avellino, with the knowledge of Bienes, $2.1 million, which represented the remaining portion of the fraudulent side payment, for a total payment of $2,165,000.

232.    The December 2002 account statement for the Grosvenor Partners IA account

reflects the purchase and sale of 870 "S&P 100 Index - December 465 Put" and 1,740 "S&P 100

Index - December 460 Put" option contracts generating $1,743,480 in gains, slightly more than

what the Schupt schedule indicated was owed for the fraudulent side payment and guaranteed

return to this account.  Likewise, the December 2002 account statement for the Mayfair

Ventures's IA account reflects the purchase and sale of 1,080 "S&P 100 Index - December 465

Put" and 2,160 "S&P 100 Index - December 460 Put" option contracts.  As intended, these

transactions generated $2,164,320 in gains, slightly less than what the Schupt schedule indicated

was owed for the side payment and guaranteed return.

233.    The Aster, St. James, and Strattham IA accounts were also recipients of blatantly

fictitious options transactions engineered to deliver the predetermined dollar amount needed to

pay the guaranteed rate of return Madoff had promised.  Similar to the Mayfair Ventures and

Grosvenor Partners accounts detailed above, the Schupt schedules also indicated the number of

options contracts that would be "executed" to provide the fictitious gains in the Aster, St. James,

and Strattham IA accounts.  These numbers were arrived at with the benefit of hindsight by

selecting pricing for option contracts that created a particular gain and dividing that gain by the

dollar amount owed to each account to determine the number of contracts to be "purchased" in

each account.

234.    For example, in or around December 2004, a Schupt schedule contains entries for

IA accounts held by Aster, St. James, and Strattham, indicating that Aster and St. James were

each owed $42,000 and Strattham was owed $26,000 in fictitious gains to bring the accounts to

the promised rate of return of 11% then in effect.  Specifically, the Schupt schedule indicated

that the "$ NEEDED" for Aster and St. James was "42,000" each, and both were to have "29

Unit[s]" executed in their respective IA accounts; for Strattham, the "$ NEEDED" was "$26,000" with "18 Unit[s]" executed in its IA account. The term "Unit" represented one executed option contract or a pair of options that were purchased and sold. The December 2004 account statement for the Aster IA account reflects the "purchase" and "sale" of 29 "S&P 100 Index—January 575 Call" and 29 "S&P 100 Index - January 565 Put" option contracts generating $41,934, slightly less than what the Schupt schedule indicated was owed for the guaranteed return. The December 2004 account statement for the St. James IA account also reflects the "purchase" and "sale" of 29 "S&P 100 Index - January 575 Call" and 29 "S&P 100 Index - January 565 Put" option contracts generating $41,934, also slightly less than what the Schupt schedule indicated was owed for the guaranteed return. The December 2004 account statement for the Strattham IA account similarly reflects the "purchase" and "sale" of 18 "S&P 100 Index January 575 Call" and 18 "S&P 100 Index - January 565 Put" option contracts, generating $26,028, slightly more than the amount the Schupt schedule indicated was owed for the guaranteed return.

235.    The Schupt schedule created in or around December 2005 indicates that IA accounts held by Aster, St. James, and Strattham were owed $356,000, $284,000, and $180,000, respectively, in fictitious gains to bring the accounts to the promised rate of return of 11% then in effect. Once again, Madoff and his employees performed the impossible, all under the watchful eyes of Avellino, Bienes, and Thomas Avellino, who knew these gains were the product of fraud. Specifically, the Schupt schedule indicated that the "$ NEED[ED]" for Aster, St. James, and Strattham was "356," "284," and "180," respectively, and that there should be "260 Units," "208 Units," and "132 Units" executed in their respective IA accounts. The December 2005 account statement for the Aster IA account reflects the "purchase" and "sale" of 260 "S&P 100 Index -

January 565 Call," 520 "S&P 100 Index - January 585 Call," and 780 "S&P 100 Index - January

565 Put" option contracts generating $353,080, slightly less than what the Schupt schedule

indicated was owed for the guaranteed return. The December 2005 account statement for the St.

James IA account reflects the purchase and sale of 208 "S&P 100 Index - January 565 Call," 416

"S&P 100 Index - January 585 Call," and 624 "S&P 100 Index - January 565 Put" option

contracts generating $282,464, also slightly less than what the Schupt schedule indicated was

owed for the guaranteed return. The December 2005 account statement for the Strattham IA

account reflects the purchase and sale of 132 "S&P 100 Index - January 565 Call," 396 "S&P

100 Index - January 565 Put," 48 "S&P 100 Index - December 570 Call," and 264 "S&P 100

Index - January 585 Call" options contracts generating $179,256, also slightly less than what the

Schupt schedule indicated was owed to Strattham for the guaranteed return.

236.    The Schupt process was regularly followed so that the fraudulent side payments

were made via highly profitable, wholly fictitious, non-hedged options trades to IA accounts

controlled by Avellino, Bienes, their wives, and Thomas Avellino from 1994 through 2007. It

was only the exposure of Madoff's Ponzi scheme in early December 2008 that prevented the

execution of the Schupt process for 2008. These Defendants withdrew real cash from those IA

accounts that received the fraudulent side payments, which was nothing more than money stolen

from other IA customers.

237.    These purported options transactions never occurred, and could not have occurred

in the amounts necessary to achieve the precise Schupt number without the benefit of hindsight,

backdating, and fraud. Avellino, Bienes, and Thomas Avellino were aware of these phony non-

hedged options transactions from their account statements and knew they were the product of

fraud.

238.    Avellino and Bienes closely monitored their IA accounts to ensure that the performance reflected therein was equal to the guaranteed rates of return and the full amounts of the fraudulent side payments.  On at least an annual basis, Avellino—upon information and belief, on behalf of Bienes and with his knowledge—performed reconciliations of the various IA accounts they controlled to determine if the rate of return equaled what Madoff had promised.  If the account showed a rate of return less than the promised rate, Avellino, upon information and belief, with Bienes's knowledge, communicated this to Madoff and DiPascali.  Madoff and DiPascali would then manufacture whatever fictitious trades were necessary in Avellino's and Bienes's IA accounts to make up the difference.  Avellino, upon information and belief, with Bienes's knowledge, would also direct into which IA accounts the fraudulent side payments were to be paid.

239.    For example, in May 1996, Avellino sent a letter to DiPascali with a detailed spreadsheet responding to DiPascali's calculation of the fraudulent side payment and guaranteed rate of return that was owed to accounts controlled by Avellino and Bienes.  Avellino's spreadsheet set forth in detail the amount of money owed for the guaranteed rates of return and the fraudulent side payments for the years 1993 through 1995.  Avellino's spreadsheet analysis and the letter attached thereto, in which he wrote the following, confirms that he carefully tracked the activity in his IA accounts and closely monitored the rate of return and amount of fraudulent side payments owed:

> I checked the information you sent me.  The only correction I have is the adjustment for the distribution of $1,216,000 for 1993 and $1,016,000 for 1994 and thereafter for [the] "OTHERS."[2]  The net affect on the computation shows a difference of $434,000 in my favor.

---

[2] The term "others" refers to the A&B Business Associates.

240.     Similarly, in December 1998, Avellino sent a letter to DiPascali that further
demonstrated his participation in the annual process of ensuring the fraudulent side payments
were provided through fictitious "trades" in accounts that he and, upon information and belief,
Bienes designated.  In this letter Avellino wrote:

> ***Yes, it's that time of year again.***  Just a note to touch base about the accounts.
> Please make necessary trades in <u>all</u> of the accounts:  (1) Grosvenor Partners, Ltd.
> (2) Mayfair Ventures and (3) Mayfair Ventures Pension Plan.  I believe the total
> base of the three accounts will be enough to even-up the balance due.   My
> calculations show that BLM was **short** (for 12/31/97) approx. <u>$2,500,000</u>.  Please
> send me a copy of the calcs you have for 1997 and 1998.  (bold emphasis added).

241.     As a result of Avellino's letter, fictitious option trades were reflected on the
December 1998 account statements for the IA accounts for Mayfair Ventures, Grosvenor
Partners, and Mayfair Pension Plan totaling approximately $7.9 million.  This amount
represented the amount necessary to make the fraudulent side payment and meet the guaranteed
rate of return.  Yet again, Avellino and Bienes knew that there were no "trades" made in their
accounts and that the transactions reflected on the account statements they carefully scrutinized
did not occur and were the product of fraud.

242.     Year in and year out, Madoff waved his magic wand and fictitious gains found
their way into the Post-1992 IA Accounts, ultimately lining Avellino's, Bienes's, and their
families' pockets.  Avellino, Bienes, their wives, Thomas Avellino, Mayfair Bookkeeping, and
the Post-1992 Entities they owned and controlled knew that the purported trading reflected on
their account statements could not have taken place and that BLMIS's IA business was a fraud.

## AVELLINO, BIENES, AND THOMAS AVELLINO KNEW OF OR WERE WILLFULLY BLIND TO OTHER FACTS SUGGESTING FRAUD AT BLMIS

243.     Aside from their participation in BLMIS's fraud during the SEC investigation of
A&B, Avellino and Bienes also had access to information from BLMIS, including account
statements and trade confirmations, which demonstrated BLMIS was a fraudulent operation and

was reporting securities transactions that never took place.  Thomas Avellino had similar access

to information demonstrating fraud at BLMIS, which supplemented his knowledge that he was

receiving fraudulent side payments from BLMIS through Strattham's IA account.

**Avellino, Bienes, and Thomas Avellino Knew of, or Were Willfully Blind to, Impossibly Consistent Annual Rates of Return Madoff Promised and Delivered In the Post-1992 IA Accounts**

244.    As described above, the Post-1992 IA Accounts received improbable guaranteed

annual rates of return of 17% from 1993-2001, 14% in 2002, and 11% from 2003 through

revelation of the fraud in 2008.

245.    The non-hedged option transactions through which certain Post-1992 IA

Accounts received the fraudulent side payments increased these overall guaranteed returns to

astronomical levels.

246.    For example, from 1997 through 2001, the fraudulent side payments made to

Mayfair Ventures's IA Account (number 1ZB032) through the fictitious non-hedged option

transactions inflated the overall annual rate of return each year to levels greater than 34%.  In

2002, when the guaranteed annual rate of return Madoff promised to Avellino and Bienes was

14%, the fraudulent side payments made through the fictitious non-hedged options transactions

reflected on Mayfair Ventures's account statements inflated the annual rate of return to 26%.

247.    The most glaring example of implausible annual rates of return occurred in 2000

and 2001 in the Mayfair Ventures's IA Account when the fraudulent side payments paid into this

account inflated its overall annual rate of return to more than 94% and 80%, respectively.

248.    Avellino, Bienes, Thomas Avellino, and their families received these completely

implausible rates of return during events that caused financial markets, including the S&P 100

Index (the same index Madoff's post-1992 trading strategy purported to emulate), to plunge,

such as the burst of the "dot com" bubble in 2000 and the 2000-2002 bear market, including the

disastrous market impact of the attacks of September 11, 2001. For example, in 2000 and 2001, when the Mayfair Ventures's IA Account received an annual rate of return of greater than 94% and 80%, respectively, the S&P Index fell drastically, with returns of -13.4% and -14.9%, respectively.

249.    In the 155 total months between January 1996 and November 2008, the Post-1992 IA Accounts in the name of KJA, Mayfair Ventures, Grosvenor Partners, and Strattham experienced—at most—six months of negative monthly returns. During this same period, the S&P 100 Index experienced 65 months of negative returns. In the 54 total months between June 2004 and November 2008, the Post-1992 IA Accounts in the name of Aster and St. James only experienced two months of negative monthly returns. During this same period, the S&P 100 Index experienced 23 months of negative returns.

250.    Avellino, Bienes, Thomas Avellino, and their Post-1992 IA Accounts received impossibly consistent and positive rates of return for decades. Avellino, Bienes, and Thomas Avellino continued to withdraw the fictitious profits those returns generated with impunity, all the while they knew or were willfully blind to the fact that such results were impossible, inconsistent with the strategy Madoff purported to follow, and indicative of fraud.

**Avellino, Bienes, and Thomas Avellino Knew of, or Were Willfully Blind to, Trading Impossibilities In the Post-1992 IA Accounts**

251.    The Post-1992 IA Accounts were purportedly invested in the SSC Strategy that Madoff began in the 1990s. As described above, one aspect of the SSC Strategy involved the purported sale of call options and purchase of put options on the S&P 100 Index, commonly referred to as a "collar." The Post-1992 IA Account documentation from BLMIS—which Avellino, Bienes, and, upon information and belief, Thomas Avellino, carefully reviewed—

revealed numerous instances of trading impossibilities in connection with Madoff's purported

execution of the SSC Strategy that were indicative of fraud at BLMIS.

### *Avellino, Bienes, and Thomas Avellino Knew of, or Were Willfully Blind to, Impossible Options Trading Volume in the Post-1992 IA Accounts*

252.    Post-1992 IA Account statements and trade confirmations from January 2000

through November 2008 reflected hundreds of instances of S&P 100 Index option contracts,

known as OEX options, that were quantitatively impossible because they were traded at volumes

that exceeded the total market volume of identical OEX options being traded that day on the

Chicago Board Options Exchange ("CBOE"), the only exchange that traded in OEX options.

253.    For example, from November 2004 through November 2008, at least 50 OEX

options in the St. James IA account were impossibly traded at volumes that exceeded the total

market volume of puts and calls being traded that day on the CBOE.  Similarly, from October

2001 through November 2008, at least 50 OEX options in the Strattham IA account were

impossibly traded at volumes that exceeded the total market volume of identical OEX options

being traded that day on the CBOE.

254.    The Post-1992 IA Accounts from October 2000 through November 2008 had

approximately 40 separate OEX options transactions purportedly executed by BLMIS at a

volume that exceeded the total market volume that day by more than 1000%.  Even more

egregious, two of those put and call option transactions were purportedly executed by BLMIS at

volumes that exceeded the total volume traded in the market those days by over 10,000%,

including a December 14, 2001 transaction in Mayfair Ventures's IA account that was

purportedly executed by BLMIS at a volume that exceeded the total volume traded in the market

that day by over 21,000%.

255.    Avellino, Bienes, and Thomas Avellino—who had invested with BLMIS for decades—knew that even one instance of a trade in excess of the total volume for that security on a given day was clear evidence of fraud.  They knew of, or deliberately disregarded, these blatant indicia of fraud, yet continued to enrich themselves.

### *Avellino, Bienes, and Thomas Avellino Knew of, or Were Willfully Blind to, Impossible Transactions Priced Outside the Daily Range in the Post-1992 IA Accounts*

256.    From February 1998 through September 2007, Post-1992 IA Account statements and trade confirmations reflected both equity and option transactions that impossibly occurred at prices outside of the daily range for that day.

257.    Every Post-1992 IA Account had out-of-range equity trades reported on their account statements and trade confirmations from February 1998 to February 2006.

258.    For example, the IA account statements and trade confirmations for KJA and Mayfair Ventures reflect a sale of Boeing Co. stock for $76.30 on September 12, 2006, but on that day, shares of Boeing Co. stock traded at a high of $74.38 and a low of $73.61.  Thus, these IA account statements reported transactions that were $1.92 out of the range that stock traded that day.  It is impossible to sell higher than the market high.

259.    Further, between February 1998 and September 2007, every Post-1992 IA Account had several out-of-range options trades reflected on their account statements and trade confirmations.

260.    For example, Grosvenor Partners's and Mayfair Ventures's account statements and trade confirmations reflected a purchase of an OEX option on October 18, 2001,with an October expiration and 525 strike price at $26.00 per contract, when options with the same expiration and strike price traded that day at a low of $28.00 per contract and high of $30.00 per contract; thus, these transactions were reported on both Grosvenor Partners's and Mayfair

Ventures's account statements at a price that was $2.00 out of the range traded that day. Similarly, both Grosvenor Partners's and Mayfair Ventures's account statements reflected a sale of an OEX option on April 17, 2002, with an April expiration and 585 strike price at $25.27 per contract, when put options with the same expiration and strike price traded that day at a low and high of $23.00; thus, these transactions were reported on both Grosvenor Partners's and Mayfair Ventures's account statements at a price that was $2.27 out of the range traded that day. Once again, Avellino, Bienes, and Thomas Avellino knew it was impossible to buy lower than the market low, or to sell higher than the market high.

261.    Upon information and belief, Avellino and Bienes had the ability to look up price information of securities on any given day. In fact, such effort was required of them in order to calculate the purported equity in the Original A&B IA Accounts, a task they represented to the SEC they performed regularly.

262.    Avellino and Bienes, who meticulously reviewed their account statements, knew of or deliberately disregarded these impossible out-of-range trades, which were blatant examples of fraud at BLMIS. Thomas Avellino, who received and, upon information and belief, reviewed the Strattham IA account statements, knew of, or deliberately disregarded, similarly impossible out-of range trades in Strattham's IA account.

## AS EARLY AS 1978, AVELLINO AND BIENES KNEW OF OR WERE WILLFULLY BLIND TO FACTS SUGGESTING FRAUD AT BLMIS

263.    As set forth above, Avellino and Bienes knew of—and were complicit in—fraud at BLMIS, and that they, their families, and the entities they dominated and controlled were benefiting from a fraud and fictitious activity in their IA accounts.

264.    But even prior to their participation in BLMIS's fraud during the 1992 SEC investigation of A&B, Avellino and Bienes knew of, or were willfully blind to, fraud at BLMIS.

265.    Avellino and Bienes—through A&B—held themselves out as investment managers and were entrusted with the funds they collected from A&B's underlying investors to invest with BLMIS.  In this capacity, Avellino and Bienes had a duty to the underlying A&B investors to avoid investing in a fraud, a duty that they violated when they learned of facts suggesting fraud at BLMIS.

266.    Indeed, Avellino and Bienes understood and appreciated, or were willfully blind to, these facts suggesting fraud at BLMIS due to their experience in the accounting and auditing industry.  Avellino and Bienes were Certified Public Accountants ("CPAs") for decades who had a long history of conducting "hundreds of audits on behalf of clients," including those of public companies.  Avellino highlighted this experience in an affidavit submitted in connection with the SEC's 1992 investigation.

**Avellino and Bienes Knew the Guaranteed Rates of Return Madoff Promised and Delivered In the Original A&B IA Accounts Were Impossibly Consistent**

267.    In analyzing and monitoring their IA accounts—and from direct conversations with Madoff who promised them a fixed and guaranteed return for decades—Avellino and Bienes knew as early as 1978, if not sooner, that they were receiving implausibly consistent, positive rates of return.

268.    As set forth herein, Madoff guaranteed Avellino and Bienes annual rates of return for the Original A&B IA Accounts[3] in return for A&B's investment of cash.  The guaranteed returns Madoff promised and delivered year after year were greater than the 13-18% annual returns Avellino and Bienes promised to the underlying A&B investors.  Avellino and Bienes had actual knowledge of the implausible rates of return Madoff promised because they used

---

[3] Solely for the purposes of the allegations in this section of the Amended Complaint (paragraphs 268 through 286), the defined term "Original A&B IA Accounts" also includes the 1A0051 ("Frank J Avellino Trustee") and 1B0018 ("Diane [*sic*] K Bienes") IA Accounts.

those figures to determine the annual rates of return they would, in turn, promise to A&B

investors to ensure they would yield a sufficient profit for themselves and their families.

Avellino and Bienes also knew it was not possible for Madoff to guarantee annual rates of return

on the Original A&B IA Accounts for decades on end; however, they ignored this reality so they

could continue to line their pockets with proceeds of the fraud.

269.    Avellino and Bienes readily admitted that the Original A&B IA Accounts, some

of which had been open since 1978 (or earlier), never reflected any annual losses.

270.    In fact, in his July 1992 testimony to the SEC, Frank Avellino went further and

stated:

> I could honestly say, and you could check any record that you want with me from
> 1962 to today, in thousands of transactions, of what I call arbitrage, which is bona
> fide convertible buying and selling, **there has never been a loss**. (emphasis
> added).

271.    Avellino and Bienes knew these implausibly steady returns, which then continued

for decades, suggested fraud at BLMIS and that no securities were actually being transacted.

**Avellino and Bienes Knew of, or Were Willfully Blind to, Myriad Trading Impossibilities
Reflected on the Original A&B IA Account Statements**

272.    For at least three decades, Avellino and Bienes received IA account

documentation, including account statements and trade confirmations, which they claimed to

review carefully.  Yet, as alleged herein, this same IA account documentation revealed purported

trading activity that was impossible, indicating BLMIS was not conducting actual securities

transactions and was a fraud.

273.    In addition to the examples highlighted for the Post-1992 IA Accounts, as early as

1978, Avellino and Bienes knew of, or were willfully blind to, the following trading

impossibilities at BLMIS, yet they deliberately ignored them and looked the other way so that

they could continue to profit from the fraud.

274.    During the 1970s through the early 1990s, BLMIS purportedly invested customer funds using a "convertible arbitrage investment strategy," by which investors would gain profits from a change in the expectations for the stock or convertible security over time.  A convertible arbitrage investment strategy aims to generate profits by taking advantage of the pricing mismatches that can occur between the equity and convertible instruments.

275.    From around November 1978 through July 1992, the Original A&B IA Account documentation received by Avellino and Bienes from BLMIS reflected numerous impossibilities in BLMIS's apparent execution of this convertible arbitrage strategy.

276.    For example, of the hundreds of convertible securities trades purportedly in the Original A&B IA Accounts from November 1978 through July 1992, over 90% exceeded the total daily reported volume by at least *thirty* times for the specific transaction day.  It was not possible for BLMIS to execute trades in an amount greater than the total daily reported volume.

277.    Further, approximately 44% of the convertible securities trades purportedly made in the Original A&B IA Accounts from November 1978 through July 1992 occurred on days when there was no reported volume at all in the particular security.  For example, on January 9, 1985, the statement for Original A&B IA Account 1A0045 reported that $1,411,000 of Macmillan subordinated debt was traded at $138 par value.  On that day, however, there was no reported trading of this security on the open market.

278.    At least 10% of the purported convertible securities trades made in the Original A&B IA Accounts from November 1978 through July 1992 exceeded the volume of the particular security traded that day by more than *fifty* times.  In one instance, the volume in a particular security reported by BLMIS on one of the Original A&B IA Account statements was

over *five-hundred* times the total volume reported in the entire market that day for that security. These results are not only improbable but flatly impossible.

279.    The purchase prices reflected on the Original A&B IA Account statements also frequently fell outside the actual trading range for that day.  Of the approximately 1,000 securities with unique prices purportedly traded in the Original A&B IA Accounts from November 1978 through July 1992, approximately 75% of them were reported by BLMIS at prices outside the actual reported daily market price range.  For example, on December 11, 1979, BLMIS purportedly traded 6,116 shares of Rockwell International Corporation convertible securities at a per share price of $39.375 in Original A&B IA Account 1A0045.  However, only 200 shares were traded on the open market that day, with the daily low of $107 per share.  This impossible transaction was completely outside the daily range for both price *and* volume.

280.    These trading impossibilities provided Avellino and Bienes with clear evidence— which they knew and/or deliberately ignored—that BLMIS was not engaged in actual securities transactions and operating a fraud.

**Avellino and Bienes Knew of, or Were Willfully Blind to, Backdated Trades On the Original A&B IA Account Statements**

281.    As early as 1978, if not sooner, Avellino and Bienes knew of various instances of backdated trades obvious from the face of their IA account statements.  Specifically, some of the Original A&B IA Account statements reported trades that were executed in prior months— sometimes stretching back more than five months—but those trades were never recorded on any prior month's statement.

282.    From at least December 1978 through November 1986, Avellino and Bienes received Original A&B IA Account statements from BLMIS that reported numerous backdated trades.

83

283.    For example, the September 1979 BLMIS statement for the 1A0045 account showed six transactions that purportedly occurred two months earlier, in July 1979.  These transactions did not appear on the 1A0045 IA account's statements for July or August 1979.  One month later, the October 1979 BLMIS statement for the 1A0048 account showed fourteen transactions that occurred in prior months: ten in August 1979 and four in September 1979.  These transactions did not appear on the 1A0048 IA account's statements for August or September 1979.

284.    It is industry practice for legitimate businesses conducting investment advisory services to record executed trades on customer account statements in the months in which they occurred.

285.    If each of these backdated trades had actually occurred and settled on its stated date, it would have appeared on that respective monthly statement (*i.e.*, a transaction in July 1979 would have appeared on the July 1979 customer statement).  Each of these trades did not appear on the statement corresponding to the month in which it purportedly occurred and settled.

286.    The numerous instances of backdated trades in the Original A&B IA Accounts provided Avellino and Bienes with evidence suggesting fraud at BLMIS and that the securities transactions listed on their IA account statements were fictitious.

**As Early as 1985, Avellino Knew the Identity of Madoff's Auditor, and Avellino and Bienes Knew—As CPAs Themselves—It Was Neither Qualified Nor Capable Of Auditing BLMIS**

287.    BLMIS, which reputedly ran the world's largest hedge fund and had tens of billions of dollars under management, was purportedly audited by Friehling & Horowitz, a three-person accounting firm located in a strip mall in Rockland County, New York.  Of the three employees at the firm, one was an administrative assistant and one was semi-retired and living in Florida for many years prior to the Filing Date.

288.    As CPAs themselves who conducted numerous audits during their accounting careers, Avellino and Bienes knew, or were willfully blind to the fact that, Friehling & Horowitz was incapable of providing large-scale domestic and international auditing services to BLMIS and the billions of dollars it had under management.

289.    As of November 1985, Avellino knew that Jerome Horowitz (half of what eventually became Friehling & Horowitz) was BLMIS's auditor because Avellino signed an audit confirmation identifying Horowitz as such.

290.    All accounting firms that perform audit work must enroll in the peer review program of the American Institute of Certified Public Accountants ("AICPA"), and those that do are listed on the public area of the AICPA website.  As CPAs who performed audit work, Avellino and Bienes knew of the AICPA's peer review program.  Although Friehling & Horowitz held itself out as a member of AICPA, it had avoided peer review since 1993 by representing that it did not perform any audit work and, therefore, it was not listed on the AICPA website.

291.    With billions of dollars in assets under management, BLMIS's use of a small, ill-equipped auditor like Friehling & Horowitz made it more likely the fraud would go undetected. Avellino and Bienes, as CPAs themselves, knew that Friehling & Horowitz were not equipped to perform audits of BLMIS and, rather than inquire, they chose to look the other way because they knew BLMIS was a fraud.  Avellino and Bienes also looked the other way because they knew they could demand guaranteed rates of return and fraudulent side payments from Madoff, and Friehling & Horowitz was unlikely to notice or inquire.

85

## AVELLINO, BIENES, AND THEIR FAMILIES ROUTINELY AND IMPROPERLY DISREGARDED THE FORM OF THE INTER-CONNECTED ENTITIES THEY CREATED SOLELY TO INVEST IN BLMIS

292.    Avellino, Bienes, their wives, and Thomas Avellino routinely and completely disregarded the corporate form of the Post-1992 Entities and Mayfair Bookkeeping to the extent any such corporate form existed for any of the Post-1992 Entities and Mayfair Bookkeeping.

293.    Avellino, Bienes, their wives, and Thomas Avellino improperly commingled the assets of each Post-1992 Entity and Mayfair Bookkeeping with their personal assets and the assets of other Post-1992 Entities.

294.    Avellino, Bienes, their wives, and Thomas Avellino freely transferred funds between the Post-1992 IA Accounts and among bank accounts they equitably owned and controlled in the names of the Post-1992 Entities and Mayfair Bookkeeping.

295.    This commingling and manipulation of moneys in and between the Post-1992 IA Accounts and the bank accounts held in the names of the Post-1992 Entities and Mayfair Bookkeeping allowed Avellino, Bienes, their wives, and Thomas Avellino to use these collective assets for their own personal benefit and convenience and to maximize their financial windfall from BLMIS, which they knew was a fraud where no securities transactions were actually taking place.

296.    Indeed, in a separate litigation against Avellino brought by investors in KJA, Avellino filed an affidavit whereby he admitted to the routine commingling of funds among his personal bank account and those in the name of the Post-1992 Entities.  Specifically, he stated:

> [W]hen a KJA partner requested a distribution that was either for a small amount or that was needed on short notice, I would move cash from my personal account in another entity to KJA to distribute to such partner. This resulted in the movement of cash among various entities. . . .

297.    Avellino also admitted under oath in another litigation that he would withdraw funds from various Post-1992 Entities, including Aster, Grosvenor Partners, and Mayfair Ventures, "[a]s needed" for personal expenses without any apparent regard for formality.

298.    Avellino, Bienes, their wives, and/or Thomas Avellino directed inter-account transfers among the bank accounts they equitably owned and controlled in the names of the Post-1992 Entities and Mayfair Bookkeeping.  Books and records maintained by Avellino and Bienes reflect transfers of moneys between the bank accounts in the names of the respective Post-1992 Entities and Mayfair Bookkeeping of at least $12,310,000.

299.    Specifically, Avellino, Bienes, their wives, and/or Thomas Avellino transferred at least:  $2,165,000 from Grosvenor Partners to Aster; $95,000 from Grosvenor Partners to Mayfair Bookkeeping; $195,000 from Grosvenor Partners to KJA; $4,330,000 from Grosvenor Partners to Strattham; $60,000 from Aster to Grosvenor Partners; $715,000 from Aster to KJA; $490,000 from KJA to Aster; $350,000 from KJA to Grosvenor Partners; $100,000 from Mayfair Ventures to Aster; $60,000 from Mayfair Ventures to Mayfair Bookkeeping; and $3,750,000 from Strattham to Grosvenor Partners.

300.    Upon information and belief, this commingling of funds was not the result of any legitimate business activity between the Post-1992 Entities or their IA accounts and merely represented the movement of funds without regard to formality for the benefit of Avellino, Bienes, their families, and the other Defendants named herein.

301.    The chart below reflects some of the commingling of funds among the bank accounts held in the names of the Post-1992 Entities and Mayfair Bookkeeping described above:

**_Inter-Bank Account Transfers Among the Post-1992 Entities & Mayfair Bookkeeping_**



302.    Avellino, Bienes, their wives and/or Thomas Avellino also directed inter-account transfers between the Post-1992 IA Accounts.  Specifically, BLMIS records reflect transfers of moneys between the Post-1992 IA Accounts of at least $123.5 million.

303.    Since creating the Post-1992 Entities and opening the Post-1992 IA Accounts, Avellino, Bienes, their wives and/or Thomas Avellino directed transfers of at least: (a) $45.8 million from Grosvenor Partners's IA Account to St. James's IA Account; (b) $40.0 million from Mayfair Ventures's IA Account to Grosvenor Partners's IA Account; (c) $21.4 million from Grosvenor Partners's IA Account to Aster's IA Account; (d) $10.0 million from Grosvenor Partners's IA Account to Strattham's IA Account; (e) $6.0 million from Strattham's IA Account to Grosvenor Partners's IA Account; and (f) $300K from Grosvenor Partners's IA Account to KJA's IA Account.

304.    The inter-IA account transfers by or between the Post-1992 Entities were not the result of any legitimate business activity.

305.    The chart below reflects the flow of funds among the Post-1992 IA Accounts described above:

### *Inter-IA Account Transfers Among The Post-1992 IA Accounts*



306.    The routine commingling of funds between personal bank accounts, bank accounts held in the names of the Post-1992 Entities, and Post-1992 IA Accounts, as well as the overlapping control persons and addresses of the Post-1992 Entities and Post-1992 IA Accounts, confirms that Avellino, Bienes, their wives, and Thomas Avellino were one and the same as the Post-1992 Entities and the corporate form of the Post-1992 Entities—to the extent any existed—should be disregarded.

### AFTER REVELATION OF MADOFF'S FRAUD, BIENES LIED IN A TELEVISION INTERVIEW AND BIENES, AVELLINO, MRS. BIENES, AND THOMAS AVELLINO ASSERTED THEIR FIFTH AMENDMENT RIGHTS AGAINST SELF-INCRIMINATION

307.    Prior to February 6, 2009, Bienes was aware of ongoing investigations by the Federal Bureau of Investigation ("FBI"), U.S. Department of Justice (the "DOJ"), and the SEC into the fraud perpetrated at BLMIS.  Bienes knew that the FBI, the DOJ, and the SEC were actively attempting to identify persons who aided and abetted Madoff and BLMIS in conducting the fraud or who had contemporaneous personal knowledge of Madoff's and others' fraudulent acts prior to December 12, 2008.  Bienes was also aware that the Trustee was conducting his own investigation into the fraud perpetrated at BLMIS to recover assets for the benefit of the estate.

308.    On February 6, 2009, Bienes gave a videotaped interview to a television journalist for the Public Broadcasting Service's *Frontline* television program.  During the interview, Bienes gave numerous false answers knowing that significant portions of the interview would be broadcast on national television.  Bienes knew and understood that individuals working on investigations being conducted by the FBI, the DOJ, the SEC, and the Trustee would likely see portions of his interview.  Upon information and belief, Bienes intentionally gave false answers in the interview in an attempt to obscure his and Avellino's conduct and their actual knowledge of fraud at BLMIS.

309.    For example, notwithstanding Bienes's actual knowledge of the creation of the Phony A&B IA Account, the fraudulent alteration of previously issued IA account statements, his own false testimony to the SEC, and the years of receiving fraudulent side payments and impossible rates of return paid via fictitious options trades, Bienes denied having any "inkling" that fraudulent conduct was occurring at BLMIS:  "As God as my only judge, on my mother's

grave, not an inkling, not a tickle, nothing. May [H]e strike me dead." These statements were false.

310.   At one point during the interview, Bienes was asked whether he ever checked to see that the stock transactions were taking place within the trading range of the stock on the day that those stocks were ostensibly sold. Bienes answered no, and explained why he did not. In his explanation, Bienes falsely stated that, "[n]othing ever jumped out at me." Bienes also added that "[e]verything was in a parameter. And the **gains were small, never big**." (emphasis added). These statements were false.

311.   At the time Bienes falsely represented that "[n]othing ever jumped out to me," he knew that in June 1992 BLMIS had created fraudulent account statements with fictitious backdated trades in order to make it appear to the SEC and others that A&B had assets sufficient to cover funds invested by its underlying investors.

312.   Notwithstanding Bienes's lie that the "gains were small, never big," the account statements for the Phony A&B IA Account included backdated transactions that resulted in massive gains. For example, the backdated January 1991 statement reflects the purchase of 5,950 "S&P 100 Index - April 335 Call" option contracts that were thereafter reported on the April 1991 statement to have been sold for an approximate gain of $18,019,575. Likewise, the December 1991 statement reflects purchases on December 12, 1991, of 3,500 "S&P 100 Index - January 355 Call" option contracts and 3,000 "S&P 100 Index - January 360 Call" option contracts, which are reflected as sold in the January 1992 statement for gains of $10,480,750 and $8,458,500, respectively. Bienes's statement also conveniently ignored the exorbitant annual rates of return he received from BLMIS and the fact that his withdrawals from the Ponzi scheme sustained his and his wife's lavish lifestyle for decades.

313.    When the interviewer asked Bienes what return he made on investments with

BLMIS after he reinvested following the liquidation of A&B in 1992, Bienes falsely stated:

> I said to my partner, Frank, at that time:  "How lucky we are.  Thank God they
> closed us down."  You know what we were getting?  9 and a half, 10 maybe, at
> best.  Bernie said:  "The golden days are over..."

314.    At the time he falsely stated that they only made "9 and a half or 10 [percent] at

best," Bienes knew that following the liquidation of A&B, Madoff had promised and delivered to

accounts that Avellino and Bienes controlled guaranteed rates of return of 17%, which were later

reduced to 14% and then 11%.  Bienes knew that accounts that he and Avellino controlled had

also received the fraudulent side payments, in addition to the guaranteed rates of return, which

provided additional returns and resulted in annual rates of return in several instances of over

80%—far higher than the 9 and a half to 10% he falsely claimed.

315.    During the interview, Bienes also made the following false statement:

> When I left Bernie in '93, and he allowed us to reinvest, I walked away from the
> whole thing . . . I swear to God in all [H]is mercy I left it all behind.  I had no
> clients.  I brought no one to him.  I never mentioned his name. . . .

The interviewer thereafter asked Bienes where the A&B investors went, to which Bienes falsely

responded, "I don't know where they went, and I couldn't care less."

316.    When the interviewer asked whether Bienes advised people to call the principals

of S&P and P&S, Bienes adamantly responded, "[n]o.  Absolutely not.  Never."  When asked

who introduced all the clients that used to invest in A&B to S&P and P&S, Bienes—despite

having received a percentage of the management fees A&B investors paid to P&S Associates

and S&P Associates—falsely answered: "I don't [know] if he had clients who used to go to

Avellino & Bienes."

317.    The interviewer also commented to Bienes that almost all of the A&B investors

went back to Madoff.  Bienes, whose accounts were benefiting from the fraudulent side

payments specifically calculated from the hundreds of millions of dollars reinvested with BLMIS by former A&B investors, falsely stated:  "I don't know if almost all of them did, because I didn't track it.  I didn't care.  I was not interested.  I ran and I hid in the tall grass and licked my wounds."

318.    The interviewer specifically asked Bienes if Avellino had taken any money from anyone and placed it with Madoff post-1992.  Bienes answered, "[a]bsolutely not that I was aware of.  No.  No.  No.  No."  Thereafter, Bienes was asked again whether Avellino was steering people to the principal of P&S and S&P.  Bienes knew that he and Avellino were receiving payments from P&S and S&P for referred investors, but lied and stated:  "I don't know.  I don't know.  I really don't know. . . ."

319.    Bienes, having reaped the benefits of tens of millions of dollars of fictitious profits from the Ponzi scheme, which was other people's money, assured the interviewer:  "And we never were pigs.  That's one thing that kept us going:  We were never pigs.  We were never pigs."

320.    Despite his attempts to minimize his role in the fraud during the interview, Bienes made damning admissions evidencing his actual knowledge of Madoff's fraud, his failure to conduct sufficient inquiry into BLMIS, and his motivation for looking the other way: greed.

321.    When asked specifically whether it was a "red flag" that Madoff used such a small accounting firm, Bienes responded: "To me, I was **always wondering** about it, because. . .[a]uditing is a very labor-intensive business. . . And I was always wondering about Jerry [Horowitz] doing this. . . .But I said to myself, 'You know, it **seems a little strange**.'" (emphasis added).  Despite "always wondering" about Madoff's accountants, recognizing that

their ability to audit Madoff "seem[ed] a little strange," and being a CPA himself, Bienes never

conducted any inquiry of Friehling & Horowitz.

322.    When asked by the interviewer if he "ever ha[d] a down year," Bienes replied:

"**Never.  Not once**." (emphasis added).

323.    When further pressed by the interviewer regarding the implausibility of BLMIS's

annual returns, Bienes stated: "**Bernie was the well.  I just turned the spigot, sent him the fax,**

**the money came.**" (emphasis added).

324.    In response to whether he was making easy money with Madoff, Bienes stated:

"Easy, easy-peasy, **like a money machine**.  I always said I never lifted any heavy weights . . . **I**

**never worked hard** . . ." (emphasis added).

325.    When asked whether he and Avellino ever investigated Madoff and BLMIS,

Bienes admitted that they never conducted any inquiry of BLMIS because they feared it would

threaten their ability to reap the rewards of the fraud.  Specifically, Bienes stated: "I was gonna

walk in and say, 'Bernie, let me see your books?'  He'd show me the door.  **He was my income.**

**He was my life**.  How could I do such a thing?" (emphasis added).

326.    When asked why he heeded Madoff's advice not to "worry about the SEC" and

not to register with the SEC in connection with his role at A&B, Bienes admitted he was

willfully blind to Madoff's fraud due to his own greed:

> Interviewer: **So you were willing to blind yourself to what might have cost you**
> **that money**.
>
> Bienes: **Yes**
>
> Interviewer: **That's greed**.
>
> Bienes: **Yes**.
>
> Interviewer: That's nothing else but greed, right?

Bienes: **Yes.  And fear. Fear of him.**

(emphasis added).

327.    Despite knowledge of, and participation in, the fraudulent conduct as set forth in this Amended Complaint, in response to a question of whether he believed the money Madoff provided was too good and too easy, Bienes attributed his "[being] so fortunate" to divine intervention in that "God wanted us" to receive other people's money.

328.    When compelled to an investigative examination by the Trustee some months later, Bienes reconsidered and decided the safer course was not to answer questions about his role in the fraud or any other questions about Madoff or BLMIS, repeatedly asserting his Fifth Amendment right against self-incrimination.  Mrs. Bienes, Avellino, and Thomas Avellino also refused to testify and asserted their Fifth Amendment privileges against self-incrimination, refusing to answer any questions about Madoff or BLMIS.

## IMPUTATION OF KNOWLEDGE AND LIABILITY

329.    Based upon the allegations set forth herein, Avellino, Bienes, and Thomas Avellino had actual knowledge of fraud at BLMIS.  Avellino, Bienes, and Thomas Avellino also had actual knowledge of, or were willfully blind to, trading impossibilities and other facts suggesting a high probability of fraud at BLMIS.

330.    Avellino's, Bienes's, and Thomas Avellino's actual knowledge of fraud at BLMIS, and willful blindness to trading impossibilities and other facts suggesting a high probability of fraud at BLMIS, are imputed to the other Defendants as set forth below.  To the extent any allegations are inconsistent, they are deemed pled in the alternative.

331.    Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, Thomas Avellino, and the other Defendants listed in Exhibit F, as general partners of certain Entity Defendants, are each jointly

and severally liable for the debts and obligations of those Entity Defendants, including the fraudulent transfers they received from BLMIS, as set forth herein.

332.    Further, Avellino, Bienes, Mrs. Bienes, and Thomas Avellino so dominated and controlled certain Entity Defendants that no corporate veil should be maintained between them. Avellino, Bienes, Mrs. Bienes, and Thomas Avellino are thus liable for the debts and obligations of certain Entity Defendants, including the fraudulent transfers they received from BLMIS, as set forth below.

**Imputation and Liability as to Entity Defendants A&B and A&B Pension Plan**

*A&B*

333.    At all times discussed herein, A&B was a general partnership.  In or around 1984, A&B ceased operating as an accounting firm to focus exclusively on profiting from its business of funneling money into BLMIS.

334.    Avellino, Bienes, and Mrs. Bienes were A&B's general partners.  As general partners, they had ultimate responsibility for the operation, affairs, and management of the partnership, including the authority to make investment decisions, admit new partners, withdraw capital, or terminate the partnership.

335.    At all times discussed herein, Avellino and Bienes dominated, influenced, and controlled A&B and its property, affairs, and investments, including the six IA accounts in A&B's name they equitably owned and controlled.  Avellino and Bienes were the sole decision-makers for A&B, and actively directed and controlled its daily activities, including its dealings with Madoff and BLMIS.  Avellino and Bienes made all decisions relating to A&B's investments with BLMIS in the ordinary course of A&B's business.

336.    As set forth herein, Avellino and Bienes wrongly used A&B and its collective assets as a mere instrumentality to further their own and their families' personal interests and profit from BLMIS, which they knew was a fraud.

337.    As general partners, control persons, agents, and alter egos of A&B, Avellino's and Bienes's knowledge, including their actual knowledge of fraud at BLMIS, is imputed to A&B and its other general partner Mrs. Bienes.

338.    Avellino, Bienes, and Mrs. Bienes, as general partners of A&B, are each jointly and severally liable as a matter of state law for the debts and obligations of A&B, including the fraudulent transfers it received from BLMIS, as set forth herein.

339.    A&B ceased operations in 1992 as a result of an enforcement action brought by the SEC concerning its investments with BLMIS.

340.    In the alternative, as the alter egos of A&B, Avellino and Bienes are each personally liable for the debts and obligations of A&B, including the fraudulent transfers it received from BLMIS, as set forth herein.

### *A&B Pension Plan*

341.    A&B Pension Plan was a pension plan established for the benefit of Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes.

342.    At all times discussed herein, Avellino and Bienes dominated, influenced, and controlled A&B Pension Plan and its property, affairs, and investments, including those made through the IA account in A&B Pension Plan's name.  Avellino and Bienes were the sole decision-makers for A&B Pension Plan and actively directed and controlled its daily activities, including its dealings with Madoff and BLMIS.  Avellino and Bienes made all decisions relating to A&B Pension Plan's investments with BLMIS in the ordinary course of A&B Pension Plan's business.

343.    As set forth herein, Avellino and Bienes wrongly used A&B Pension Plan and its collective assets as a mere instrumentality to further their personal interests and profit from BLMIS, which they knew was a fraud.

344.    As control persons, agents, and alter egos of A&B Pension Plan, Avellino's and Bienes's knowledge, including their actual knowledge of fraud at BLMIS, is imputed to A&B Pension Plan.

345.    As the alter egos of A&B Pension Plan, Avellino and Bienes are each personally liable for the debts and obligations of A&B Pension Plan, including the fraudulent transfers it received from BLMIS, as set forth herein.

**Imputation and Liability as to the Post-1992 Entity Defendants**

*Mayfair Ventures*

346.    At all times discussed herein, Mayfair Ventures was a general partnership created for the sole purpose of investing with BLMIS after the SEC investigation and at a time when Avellino and Bienes knew of the fraud at BLMIS.

347.    Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes were general partners of Mayfair Ventures.  As general partners, they had ultimate responsibility for the operation, affairs, and management of the partnership, including the authority to make investment decisions, admit new partners, withdraw capital, or terminate the partnership.

348.    At all times discussed herein, Avellino and Bienes dominated, influenced, and controlled Mayfair Ventures and its property, affairs, and investments, including those made through the IA account in Mayfair Ventures's name.  Avellino and Bienes were the sole decision-makers for Mayfair Ventures and actively directed and controlled its daily activities, including its dealings with Madoff and BLMIS.  Avellino and Bienes made all decisions relating

to Mayfair Ventures's investments with BLMIS in the ordinary course of Mayfair Ventures's business.

349.    As set forth herein, Avellino and Bienes improperly commingled the business assets of Mayfair Ventures with their own personal assets and the assets of the other Entity Defendants and wrongly used Mayfair Ventures and its collective assets as a mere instrumentality to further their own and their families' personal interests.

350.    As general partners, control persons, agents, and alter egos of Mayfair Ventures, Avellino's and Bienes's knowledge, including their actual knowledge of fraud at BLMIS, is imputed to Mayfair Ventures and its other general partners, Mrs. Avellino and Mrs. Bienes.

351.    Avellino, Bienes, Mrs. Avellino and Mrs. Bienes, as general partners of Mayfair Ventures, are each jointly and severally liable as a matter of state law for the debts and obligations of Mayfair Ventures, including the fraudulent transfers it received from BLMIS, as set forth herein.

352.    Upon information and belief, Mayfair Ventures was rendered insolvent because of its investments with BLMIS.

353.    In the alternative, as the alter egos of Mayfair Ventures, Avellino and Bienes are each personally liable for the debts and obligations of Mayfair Ventures, including the fraudulent transfers it received from BLMIS, as set forth herein.

### *Grosvenor Partners*

354.    At all times discussed herein, Grosvenor Partners operated as a *de facto* general partnership in which Avellino and Bienes acted and should be treated as its general partners.

355.    Avellino and Bienes created Grosvenor Partners for the sole purpose of investing with BLMIS after the SEC investigation and at a time when they knew of the fraud at BLMIS.

356.    Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes were general partners of Mayfair Ventures, Grosvenor Partners's general partner.

357.    As general partners of Mayfair Ventures and/or as *de facto* general partners of Grosvenor Partners, Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes had ultimate responsibility for the operation, affairs, and management of the partnership, including the authority to make investment decisions, admit new partners, withdraw capital, or terminate the partnership.

358.    At all times discussed herein, Avellino and Bienes dominated, influenced, and controlled Grosvenor Partners and its property, affairs, and investments, including those made through the IA account in Grosvenor Partners's name.  Avellino and Bienes were the sole decision-makers for Grosvenor Partners and actively directed and controlled its daily activities, including its dealings with Madoff and BLMIS. Avellino and Bienes made all decisions relating to Grosvenor Partners's investments with BLMIS in the ordinary course of Grosvenor Partners's business.

359.    As set forth herein, Avellino and Bienes improperly commingled the business assets of Grosvenor Partners with their own personal assets and the assets of the other Entity Defendants and wrongly used Grosvenor Partners and its collective assets as a mere instrumentality to further their own and their families' personal interests.

360.    As general partners, control persons, agents, and alter egos of Grosvenor Partners, Avellino's and Bienes's knowledge, including their actual knowledge of fraud at BLMIS, is imputed to Grosvenor Partners and its other general partners, Mrs. Avellino and Mrs. Bienes.

361.    Avellino, Bienes, Mrs. Avellino and Mrs. Bienes, as general partners of Grosvenor Partners and Mayfair Ventures (Grosvenor Partners's general partner), are each

jointly and severally as a matter of state law for the debts and obligations of Grosvenor Partners, including the fraudulent transfers it received from BLMIS, as set forth herein.

362.    Upon information and belief, Grosvenor Partners was rendered insolvent because of its investments with BLMIS.

363.    In the alternative, as the alter egos of Grosvenor Partners, Avellino and Bienes are each personally liable for the debts and obligations of Grosvenor Partners, including the fraudulent transfers it received from BLMIS, as set forth herein.

### *Aster*

364.    At all times discussed herein, Aster was a general partnership created for the sole purpose of investing with BLMIS after the SEC investigation and at a time when Avellino and Bienes knew of fraud at BLMIS.

365.    Avellino, Mrs. Avellino, Thomas Avellino, 27 Cliff, Rachel Rosenthal, Rachel Rosenthal Trust, Rachel Rosenthal Trust #3, Heather Lowles, Heather Lowles Trust, Tiffany Lowles Trust, Melanie Lowles Trust, Taylor McEvoy Trust, Madison McEvoy Trust, and S.A. GRAT were Aster's general partners.  As general partners, they had ultimate responsibility for the operation, affairs, and management of the partnership, including the authority to make investment decisions, admit new partners, withdraw capital, or terminate the partnership.

366.    At all times discussed herein, Avellino dominated, influenced, and controlled Aster and its property, affairs, and investments, including those made through the IA account in Aster's name.  Avellino was the sole decision-maker for Aster, and actively directed and controlled its daily activities, including its dealings with Madoff and BLMIS. Avellino made all decisions relating to Aster's investments with BLMIS in the ordinary course of Aster's business.

367.    As set forth herein, Avellino improperly commingled the business assets of Aster with his own personal assets and the assets of the other Entity Defendants and wrongly used

Aster and its collective assets as a mere instrumentality to further his and his family's personal interests.

368.    As a general partner, control person, agent, and alter ego of Aster, Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to Aster and its other general partners listed in Exhibit F.

369.    Aster's General Partners are each jointly and severally liable as a matter of state law for the debts and obligations of Aster, including the fraudulent transfers it received from BLMIS, as set forth herein.

370.    Upon information and belief, Aster was rendered insolvent because of its investments with BLMIS.

371.    In the alternative, as the alter ego of Aster, Avellino is personally liable for the debts and obligations of Aster, including the fraudulent transfers it received from BLMIS, as set forth herein.

### St. James

372.    At all times discussed herein, St. James was a general partnership created for the sole purpose of investing with BLMIS after the SEC investigation and at a time when Avellino and Bienes knew of fraud at BLMIS.

373.    Bienes and Mrs. Bienes were St. James's general partners.  As general partners, they had ultimate responsibility for the operation, affairs, and management of the partnership, including the authority to make investment decisions, admit new partners, withdraw capital, or terminate the partnership.

374.    At all times discussed herein, Bienes and Mrs. Bienes dominated, influenced, and controlled St. James and its property, affairs, and investments, including those made through the IA account in St. James's name.  Bienes and Mrs. Bienes were the sole decision-makers for St.

James, and actively directed and controlled its daily activities, including its dealings with Madoff and BLMIS. Bienes and Mrs. Bienes made all decisions relating to St. James's investments with BLMIS in the ordinary course of St. James's business.

375.    As set forth herein, Bienes and Mrs. Bienes improperly commingled the business assets of St. James with their own personal assets and the assets of the other Entity Defendants, and wrongly used St. James and its collective assets as a mere instrumentality to further their personal interests.

376.    As a general partner, control person, agent, and alter ego of St. James, Bienes's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to St. James and its other general partner, Mrs. Bienes.

377.    At certain times set forth herein, Avellino also acted as an agent for St. James, including in negotiations with Madoff for St. James to receive impossible guaranteed rates of return and fraudulent side payments. All knowledge gained by Avellino within the scope of this agency, including his actual knowledge of fraud at BLMIS, is imputed to St. James.

378.    Bienes and Mrs. Bienes, as general partners of St. James, are each jointly and severally liable as a matter of state law for the debts and obligations of St. James, including the fraudulent transfers it received from BLMIS, as set forth herein.

379.    Upon information and belief, St. James was rendered insolvent because of its investments with BLMIS.

380.    In the alternative, as the alter egos of St. James, Bienes and Mrs. Bienes are each personally liable for the debts and obligations of St. James, including the fraudulent transfers it received from BLMIS, as set forth herein.

*KJA*

381.    KJA was a general partnership created for the sole purpose of investing with BLMIS after the SEC investigation and at a time when Avellino knew of fraud at BLMIS.

382.    Prior to January 1998, Avellino was KJA's agent in connection with its BLMIS investments, including those made through the IA account in KJA's name.  Avellino was involved in opening KJA's IA account and later negotiated for that IA account to receive a guaranteed rate of return.

383.    In January 1998, Avellino became a general partner of KJA (and was the sole general partner by July 1999), and had ultimate responsibility for the operation, affairs, and management of the partnership, including the authority to make investment decisions, admit new partners, withdraw capital, or terminate the partnership.

384.    Avellino dominated, influenced, and controlled KJA and its property, affairs, and investments, including those made through the IA account in KJA's name.  After July 1999, Avellino was the sole decision-maker for KJA, and actively directed and controlled its daily activities, including its dealings with Madoff and BLMIS.  Avellino made all decisions relating to KJA's investments with BLMIS in the ordinary course of KJA's business.

385.    As set forth herein, Avellino improperly commingled the business assets of KJA with his own personal assets and the assets of the other Entity Defendants, and wrongly used KJA and its collective assets as a mere instrumentality to further his personal interests.

386.    As a general partner, control person, agent, and alter ego of KJA, Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to KJA.

387.    Avellino, as a general partner, is liable as a matter of state law for the debts and obligations of KJA, including the fraudulent transfers it received from BLMIS, as set forth herein.

388.    Upon information and belief, KJA was rendered insolvent because of its investments with BLMIS.

389.    In the alternative, as the alter ego of KJA, Avellino is personally liable for the debts and obligations of KJA, including the fraudulent transfers it received from BLMIS, as set forth herein.

### Strattham

390.    At all times discussed herein, Strattham was a general partnership created for the sole purpose of investing with BLMIS after the SEC investigation and at a time when Thomas Avellino knew of, or was willfully blind to, fraud at BLMIS.

391.    As a general partner of Strattham, and president and sole director of Strattham's managing partner, Ascent, Thomas Avellino had ultimate responsibility for the operation, affairs, and management of the partnership, including the authority to make investment decisions, admit new partners, withdraw capital, or terminate the partnership.

392.    At all times discussed herein, Thomas Avellino dominated, influenced, and controlled Strattham and its property, affairs, and investments, including those made through the IA account in Strattham's name.  Thomas Avellino was the sole decision-maker for Strattham and actively directed and controlled its daily activities, including its dealings with Madoff and BLMIS.  Thomas Avellino made all decisions relating to Strattham's investments with BLMIS in the ordinary course of Strattham's business.

393.    As set forth herein, Thomas Avellino improperly commingled the business assets of Strattham with his own personal assets and the assets of the other Entity Defendants, and wrongly used Strattham and its collective assets as a mere instrumentality to further his own personal interests.

394.    As a general partner, control person, agent, and alter ego of Strattham, Thomas Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to Strattham.

395.    At certain times set forth herein, Avellino acted as an agent for Strattham, including in assisting in the opening of Strattham's IA account and negotiating with Madoff for Strattham to receive consistent guaranteed rates of return and fraudulent side payments.  All knowledge gained by Avellino within the scope of this agency, including his actual knowledge of fraud at BLMIS, is imputed to Strattham.

396.    As a general partner of Strattham, Thomas Avellino is liable as a matter of state law for the debts and obligations of Strattham, including the fraudulent and preferential transfers it received from BLMIS, as set forth herein.

397.    Upon information and belief, Strattham was rendered insolvent because of its investments with BLMIS.

398.    In the alternative, as the alter ego of Strattham, Thomas Avellino is personally liable for the debts and obligations of Strattham, including the fraudulent and preferential transfers it received from BLMIS, as set forth herein.

**Imputation and Liability as to Mrs. Avellino and Mrs. Bienes**

*Mrs. Avellino*

399.    Avellino's and Bienes's knowledge, including their actual knowledge of fraud at BLMIS, is imputed to Mrs. Avellino, as a general partner—together with Avellino and/or Bienes—of Mayfair Ventures, Grosvenor Partners, and Aster.

400.    At all relevant times, Avellino and Bienes acted as Mrs. Avellino's agents in connection with her investments in BLMIS through the IA accounts in the names of certain Entity Defendants in which she was a general partner and/or held interests and, upon information

106

and belief, the Frank Avellino Personal IA Accounts in which she may have held interests.  All knowledge gained by Avellino and Bienes within the scope of this agency, including their actual knowledge of fraud at BLMIS, is imputed to Mrs. Avellino.

401.    Avellino and, upon information and belief, Mrs. Avellino were the equitable owners of the Avellino Personal IA Accounts.  Avellino handled all communications with BLMIS and made all decisions with respect to the Avellino Personal IA Accounts.

402.    As a general partner of Mayfair Ventures, Grosvenor Partners, and Aster, Mrs. Avellino is jointly and severally liable for each of their debts and obligations, including the fraudulent transfers they received from BLMIS, as set forth herein.

### *Mrs. Bienes*

403.    Avellino's and Bienes's knowledge, including their actual knowledge of fraud at BLMIS, is imputed to Mrs. Bienes, as a general partner—together with Avellino and/or Bienes—of A&B, Mayfair Ventures, Grosvenor Partners, and St. James.

404.    At all relevant times, Avellino and Bienes acted as Mrs. Bienes's agent in connection with her investments with BLMIS through the IA accounts in the names of certain Entity Defendants in which she was a general partner and/or held interests and, upon information and belief, the Bienes Personal IA Account in her name.  All knowledge gained by Avellino and Bienes within the scope of this agency, including their actual knowledge of fraud at BLMIS, is imputed to Mrs. Bienes.

405.    Bienes and Mrs. Bienes were the equitable owners of the Bienes Personal IA Account.

406.    As a general partner of A&B, Mayfair Ventures, Grosvenor Partners, and St. James, Mrs. Bienes is liable for each of their debts and obligations, including the fraudulent transfers they received from BLMIS, as set forth herein.

**Imputation and Liability as to the Remaining Defendants**

### *Frank Avellino Trusts*

407.    Upon information and belief, the Frank Avellino Trusts (defined above) were created, dominated, and controlled by Avellino, such that they are one and the same with Avellino and no veil should be maintained between them.

408.    Avellino was the trustee and sole beneficiary, settlor, and/or grantor of FJA Revocable Trust Number One 1990 and FJA Revocable Trust Number One 1988.  Avellino was also the trustee of FJA GRAT 1992, FJA GRAT Two 1992, and, upon information and belief, Avellino Family Trust.  Upon information and belief, Avellino was also a beneficiary, settlor, and/or grantor of FJA GRAT 1992, FJA GRAT Two 1992, and Nancy Avellino Revocable Trust.

409.    Avellino was the equitable owner of and primary, if not sole, decision-maker for the Avellino Family Trust, including its investments with BLMIS through the IA account in its name.  Upon information and belief, Avellino was the equitable owner of and primary, if not sole, decision maker for the rest of the Frank Avellino Trusts, including their investments in BLMIS through IA accounts in the names of certain Entity Defendants in which the Frank Avellino Trusts held interests.

410.    Avellino facilitated and controlled the investments into and withdrawals from the IA accounts held in the name of Avellino Family Trust and, upon information and belief, the transfer of funds the Frank Avellino Trusts made to Entity Defendants, which he and Bienes then invested with BLMIS.  Avellino, together with Bienes, also facilitated and controlled the withdrawals from the Post-1992 IA Accounts, a portion of which Avellino then directed to certain Frank Avellino Trusts, as detailed below.

411.    As the equitable owner of the IA account in the name of the Avellino Family Trust and, upon information and belief, the alter ego of the Avellino Family Trust, Avellino is liable for the fraudulent transfers the Avellino Family Trust received from BLMIS, as set forth herein.

412.    Upon information and belief, as the alter ego and equitable owner of the remaining Frank Avellino Trusts, Avellino is personally liable for each of their debts and obligations, including the fraudulent transfers they received from BLMIS, as set forth herein.

413.    As the equitable owner, agent, and, upon information and belief, trustee and alter ego of the Avellino Family Trust, Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to the Avellino Family Trust.

414.    As the trustee, sole beneficiary, settlor, and/or grantor, and, upon information and belief, agent, alter ego, and equitable owner of FJA Revocable Trust Number One 1990 and FJA Revocable Trust Number One 1988, Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to FJA Revocable Trust Number One 1990 and FJA Revocable Trust Number One 1988.

415.    As the trustee and, upon information and belief, agent, alter ego, equitable owner, sole beneficiary, settlor, and/or grantor of FJA GRAT 1992 and FJA GRAT, Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to FJA GRAT 1992 and FJA GRAT.

416.    Upon information and belief, as the agent, alter ego, equitable owner, beneficiary, settlor, and/or grantor of Nancy Avellino Revocable Trust, Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to Nancy Avellino Revocable Trust.

### *Other Subsequent Transferee Entity Defendants*

417.    Avellino was a manager and, upon information and belief, control person and equitable owner of 27 Cliff.  Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to 27 Cliff.

418.    Avellino was an officer of AFF, and an agent of AFF in connection with its BLMIS investments through Entity Defendants in which it held interests.  Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to AFF.  Avellino facilitated, directed, and controlled the transfer of funds AFF made to the Entity Defendants, which he and Bienes then subsequently invested with BLMIS.  Avellino, together with Bienes, also facilitated and controlled the withdrawals of funds from the Post-1992 IA Accounts, a portion of which Avellino then directed to AFF, as detailed herein.

419.    As the president, sole director, control person, and, upon information and belief, alter ego of Ascent, Thomas Avellino's knowledge, including his actual knowledge of fraud at BLMIS, is imputed to Ascent.

420.    Avellino and Bienes were officers, directors, control persons, and equitable owners of Mayfair Bookkeeping, including the IA account held in its name.  Avellino and Bienes facilitated, directed, and controlled (i) the investments into the IA account held in the name of Mayfair Bookkeeping; (ii) the transfer of funds from the IA account held in the name of Mayfair Bookkeeping to other IA accounts in which they held interests; (iii) the transfer of funds Mayfair Bookkeeping made to Entity Defendants, which they then invested with BLMIS; and (iv) the withdrawals from the Post-1992 IA Accounts, a portion of which they directed to Mayfair Bookkeeping, as detailed below.  Avellino and Bienes also dominated and controlled Mayfair Bookkeeping, such that no corporate veil should be maintained between them.  As control persons, agents, equitable owners, and alter egos of Mayfair Bookkeeping, Avellino's and

Bienes's knowledge, including their actual knowledge of fraud at BLMIS, is imputed to Mayfair

Bookkeeping.

### *Other Subsequent Transferee Individual Defendants and Trusts*

421.    Avellino acted as an agent of Rachel Rosenthal, Rachel Rosenthal Trust, Rachel

Rosenthal Trust #3, Heather Lowles, Heather Lowles Trust, Tiffany Lowles Trust, Melanie

Lowles, Melanie Lowles Trust, Taylor McEvoy Trust, Madison McEvoy Trust, S.A., and S.A.

GRAT ("Other Subsequent Transferee Individual Defendants and Trusts") in connection with

their BLMIS investments through Entity Defendants in which they held interests.  Avellino

facilitated, directed, and/or controlled the investments the Other Subsequent Transferee

Individual Defendants and Trusts had with the Entity Defendants, which he and Bienes then

subsequently invested with BLMIS.  Avellino, together with Bienes, also facilitated, directed,

and controlled the withdrawals of funds from the Post-1992 IA Accounts, a portion of which

Avellino then directed to the Other Subsequent Transferee Individual Defendants and Trusts, as

detailed below.

422.    Avellino was also the trustee of Rachel Rosenthal Trust, Rachel Rosenthal Trust

#3, Heather Lowles Trust, Melanie Lowles Trust, Tiffany Lowles Trust, Taylor McEvoy Trust,

Madison McEvoy Trust, and, upon information and belief, S.A. GRAT.  These trusts were all

listed as having the same address as Frank and Nancy in Palm Beach, Florida.

423.    As an agent and/or trustee of the Other Subsequent Transferee Individual

Defendants and Trusts, Avellino's knowledge, including his actual knowledge of fraud at

BLMIS, is imputed to the Other Subsequent Transferee Individual Defendants and Trusts.

### **THE TRANSFERS**

424.    According to BLMIS's records, the Defendants detailed herein maintained

accounts with BLMIS in the names of the following, as set forth in Exhibit A: A&B (multiple

accounts), Avellino Family Trust, Avellino Group, A&B Pension Plan, Frank J Avellino Trustee,

Diane [*sic*] K. Bienes, Grosvenor Partners, Mayfair Ventures, Mayfair Bookkeeping Serv. Inc.,

Aster, St. James, Strattham, and KJA (collectively, the "Accounts").

425.    Certain of the Accounts, through or at the direction of the Individual Defendants,

executed a BLMIS Customer Agreement, an Option Agreement, and a Trading Authorization

Limited to Purchases and Sales of Securities and Options (collectively, the "Account

Agreements") and delivered such papers to BLMIS at its headquarters at 885 Third Avenue,

New York, New York.

426.    By their terms, the Account Agreements were deemed entered into in the State of

New York and were to be performed in New York, New York, through alleged securities trading

activities that would take place in New York, New York.  As the Defendants knew, the Accounts

were held in New York, New York, and the Defendants sent funds to BLMIS and/or to BLMIS's

bank accounts, including an account at JPMorgan Chase Bank, Account #xxxxxxxxxxx1703, in

New York, New York, for application to the Accounts and the purported conducting of trading

activities.

**The Initial Transfers**

427.    Based on the Trustee's investigation to date, prior to the Filing Date, BLMIS

made payments or other transfers to, or for the benefit of, A&B, A&B Pension Plan, Avellino,

Mrs. Bienes, Avellino Family Trust, KJA, Mayfair Ventures, Grosvenor Partners, Strattham,

Aster, and St. James (the "Initial Transferees") totaling at least $904,515,688 (the "Initial

Transfers").  The Initial Transfers are detailed and referred to as the "Total Full History

Transfers" in Exhibit A.

428.    All of the Initial Transfers were made in furtherance of the Ponzi scheme.

429.    The Initial Transferees received the Initial Transfers, directly or indirectly, from BLMIS with actual knowledge of, or willful blindness to, the fraud at BLMIS.

430.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, A&B of approximately $672,607,456 from Accounts 1A0045, 1A0047, 1A0048, 1A0049, 1A0050, and 1A0053, the Phony A&B IA Account.  *See* Exhibits A (Column 12) and B-3, B-5, B-6, B-7, B-8, and B-10 (Column 16).

431.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, A&B Pension Plan of approximately $7,166,723 from Account 1A0046.  *See* Exhibits A (Column 12) and B-4 (Column 16).

432.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, Avellino of approximately $8,402,549 from Accounts 100127 and 1A0051.  *See* Exhibits A (Column 12) and B-2 and B-9 (Column 16).

433.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, Mrs. Bienes of $31,120,962 from Account 1B0018.  *See* Exhibits A (Column 12) and B-11 (Column 16).

434.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, Avellino Family Trust of approximately $750,000 from Account 100126.  *See* Exhibits A (Column 12) and B-1 (Column 16).

435.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, KJA of approximately $5,745,000 from Account 1ZA879.  *See* Exhibits A (Column 12) and B-12 (Column 16).

436.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, Mayfair

Ventures of approximately $27,850,000 from Account 1ZB032.  *See* Exhibits A (Column 12)

and B-13 (Column 16).

437.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, Grosvenor

Partners of approximately $101,603,000 from Account 1ZB046.  *See* Exhibits A (Column 12)

and B14 (Column 16).

438.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, Strattham

of approximately $23,820,000 from Account 1ZB262.  *See* Exhibits A (Column 12) and B-16

(Column 16).

439.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, Aster of

approximately $7,000,000 from Account 1ZB509.  *See* Exhibits A (Column 12) and B-17

(Column 16).

440.    Of the Initial Transfers, BLMIS made transfers to, or for the benefit of, St. James

of approximately $18,450,000 from Account 1ZB510.  *See* Exhibits A (Column 12) and B-18

(Column 16).

441.    Of the $904,515,688 in Initial Transfers received by the Initial Transferees,

approximately $571,029,826 constituted Fictitious Profits and approximately $333,485,863

constituted the return of principal.  *See* Exhibit A (Columns 10 and 11).

442.    The Initial Transfers were and continue to be customer property within the

meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 544, 547, 548, 550

and 551 of the Bankruptcy Code, N.Y. Debt. & Cred. Law §§ 273-279, applicable provisions of

SIPA, particularly § 78fff-2(c)(3), and N.Y.C.P.L.R. 203(g) and 213(8).

443.    Of the Initial Transfers, during the six years prior to the Filing Date, BLMIS made transfers to or for the benefit of the Initial Transferees of at least $82,105,000, of which $26,455,000 represented principal and $55,650,000 represented fictitious profits from the Ponzi scheme (collectively, the "Six Year Fraudulent Transfers").  *See* Exhibit A (Columns 7-9).

444.    The Six Year Fraudulent Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the N.Y. Debt. & Cred. Law, and applicable provisions of SIPA, particularly 78fff-2(c)(3).

445.    Of the Six Year Fraudulent Transfers, during the two years prior to the Filing Date, BLMIS made transfers to or for the benefit of the Initial Transferees of at least $35,180,000, of which $17,980,000 represented principal and $17,200,000 represented fictitious profits from the Ponzi scheme (collectively, the "Two Year Fraudulent Transfers").  *See* Exhibit A (Columns 4-6).

446.    The Two Year Fraudulent Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the N.Y. Debt. & Cred. Law, and applicable provisions of SIPA, particularly 78fff-2(c)(3).

447.    Of the Two Year Fraudulent Transfers, during the 90-days prior to the Filing Date, BLMIS made payments of at least $4,250,000 to or for the benefit of Initial Transferee Strattham, all of which represented principal (the "Preference Transfers").  *See* Exhibits A (Column 3) and B-16 (Column 9).

448.    The Preference Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4), and are recoverable under sections 547, 550, and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

449.    As general partners and/or alter egos of the Initial Transferees, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and Thomas Avellino are each individually liable for the Initial Transfers received by the Initial Transferees as detailed in Exhibit C.

450.    As general partner and/or alter ego of A&B, A&B Pension Plan, Avellino Family Trust, KJA, Mayfair Ventures, Grosvenor Partners, and Aster, and as the equitable and beneficial owner of the Frank Avellino Personal Accounts, Avellino is liable for approximately $831,124,728 of Initial Transfers these Initial Transferees received from BLMIS from Accounts 100126, 100127, 1A0045, 1A0046, 1A0047, 1A0048, 1A0049, 1A0050, 1A0051, 1A0053, 1ZA879, 1ZB032, 1ZB046, and 1ZB509.  *See* Exhibits B-1, B-2, B-3, B-4, B-5, B-6, B-7, B-8, B-9, B-10, B-12, B-13, B-14, B-17 (Column 16) and C-1.

451.    As general partner and/or alter ego of A&B, A&B Pension Plan, Mayfair Ventures, Grosvenor Partners, and St. James, and as the equitable and beneficial owner of Account 1B0018, Bienes is liable for approximately $858,798,141 of Initial Transfers these Initial Transferees received from BLMIS from Accounts 1A0045, 1A0046, 1A0047, 1A0048, 1A0049, 1A0050, 1A0053, 1ZB032, 1ZB046, 1B0018, and 1ZB510.  *See* Exhibits B-3, B-4, B-5, B-6, B-7, B-8, B-10, B-11, B-13, B-14, B-18 (Column 16) and C-2.

452.    As general partner of Mayfair Ventures, Grosvenor, and Aster, Mrs. Avellino is liable for approximately $136,453,000 of Initial Transfers these Initial Transferees received from BLMIS from Accounts 1ZB032, 1ZB046, and 1ZB509.  *See* Exhibits B-13, B-14, B-17 (Column 16) and C-3.

453.    As general partner of A&B, Mayfair Ventures, Grosvenor Partners, and St. James, and as the equitable and beneficial owner of Account 1B0018, Mrs. Bienes is liable for approximately $851,631,418 of Initial Transfers these Initial Transferees received from BLMIS from Accounts 1A0045, 1A0047, 1A0048, 1A0049, 1A0050, 1A0053, 1ZB032, 1ZB046, 1B0018 and1ZB510.  *See* Exhibits B-3, B-5, B-6, B-7, B-8, B-10, B-11, B-13, B-14, B-18 (Column 16) and C-4.

454.    As general partner of Aster and Strattham, Thomas Avellino is liable for approximately $30,820,000 of Initial Transfers these Initial Transferees received from BLMIS from Accounts 1ZB509 and 1ZB262.  *See* Exhibits B-16, B-17 (Column 16) and C-5.

455.    As Aster's general partners, 27 Cliff, Rachel Rosenthal, Rachel Rosenthal Trust, Rachel Rosenthal Trust #3, Heather Lowles, Heather Lowles Trust, Tiffany Lowles Trust, Melanie Lowles Trust, Taylor McEvoy Trust, Madison McEvoy Trust, and S.A. GRAT are jointly and severally liable—together with Avellino, Mrs. Avellino, and Thomas Avellino—for approximately $7,000,000 of Initial Transfers received by Aster from BLMIS from Account 1ZB509.  *See* Exhibit B-17 (Column 16).

**The Subsequent Transfers**

456.    Based on the Trustee's investigation to date, prior to the Filing Date, the Initial Transferees subsequently transferred some or all of the Initial Transfers, directly or indirectly, to, or for the benefit of the Defendants listed in Exhibit D (the "Subsequent Transferee Defendants").

457.    The Initial Transfers subsequently transferred to the Subsequent Transferee Defendants include, but are not limited to, the subsequent transfers detailed in Exhibit D (the "Subsequent Transfers").  The Subsequent Transferee Defendants received the Subsequent

Transfers, directly or indirectly, from the Initial Transferees with actual knowledge of, or willful blindness to, the fraud at BLMIS.

458.    To the extent any of the Initial Transfers were made to, or for the benefit of, any Subsequent Transferee Defendants, said Subsequent Transferee Defendants are the initial transferees of such transfers and are included in the definition of the Initial Transferees for purposes of the allegations herein.

459.    The Subsequent Transfers are recoverable from Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code and § 278 of the N.Y. Debt. & Cred. Law.

460.    Based on the Trustee's investigation to date, Avellino received, or was the beneficiary of, Subsequent Transfers of at least $1,025,000 from other Defendants prior to the Filing Date.  *See* Exhibit D-1.

461.    Based on the Trustee's investigation to date, Mrs. Avellino received, or was the beneficiary of, at least $525,000 from other Defendants prior to the Filing Date.  *See* Exhibit D-2.

462.    Based on the Trustee's investigation to date, Avellino and Mrs. Avellino jointly received, or were the beneficiaries of, Subsequent Transfers of at least $34,037,206 from other Defendants prior to the Filing Date.  *See* Exhibit D-3.

463.    Based on the Trustee's investigation to date, Bienes received, or was the beneficiary of, Subsequent Transfers of at least $700,000 from other Defendants prior to the Filing Date.  *See* Exhibit D-4.

464.    Based on the Trustee's investigation to date, Mrs. Bienes received, or was the beneficiary of, Subsequent Transfers of at least $8,211,986 from other Defendants prior to the Filing Date.  *See* Exhibit D-5.

465.    Based on the Trustee's investigation to date, Bienes and Mrs. Bienes jointly received, or were the beneficiaries of, Subsequent Transfers of at least $37,211,203 from other Defendants prior to the Filing Date.  *See* Exhibit D-6.

466.    Based on the Trustee's investigation to date, Thomas Avellino received, or was the beneficiary of, Subsequent Transfers of at least $6,297,507 from other Defendants prior to the Filing Date.  *See* Exhibit D-7.

467.    Based on the Trustee's investigation to date, Grosvenor Partners received, or was the beneficiary of, Subsequent Transfers of at least $4,952,564 from other Defendants prior to the Filing Date.  *See* Exhibit D-8.

468.    Based on the Trustee's investigation to date, Aster received, or was the beneficiary of, Subsequent Transfers of at least $2,755,000 from other Defendants prior to the Filing Date.  *See* Exhibit D-9.

469.    Based on the Trustee's investigation to date, Strattham received, or was the beneficiary of, Subsequent Transfers of at least $4,330,000 from other Defendants prior to the Filing Date.  *See* Exhibit D-10.

470.    Based on the Trustee's investigation to date, KJA received, or was the beneficiary of, Subsequent Transfers of at least $910,000 from other Defendants prior to the Filing Date. *See* Exhibit D-11.

471.    Based on the Trustee's investigation to date, Ascent received, or was the beneficiary of, Subsequent Transfers of at least $2,683,760 from other Defendants prior to the Filing Date.  *See* Exhibit D-12.

472.    Based on the Trustee's investigation to date, Mayfair Bookkeeping received, or was the beneficiary of, Subsequent Transfers of at least $285,000 from other Defendants prior to the Filing Date.  *See* Exhibit D-13.

473.    Based on the Trustee's investigation to date, 27 Cliff received, or was the beneficiary of, Subsequent Transfers of at least $20,000 from other Defendants prior to the Filing Date.  *See* Exhibit D-14.

474.    Based on the Trustee's investigation to date, the AFF received, or was the beneficiary of, Subsequent Transfers of at least $2,640,000 from other Defendants prior to the Filing Date.  *See* Exhibit D-15.

475.    Based on the Trustee's investigation to date, Rachel Rosenthal received, or was the beneficiary through Rachel Rosenthal Trust and Rachel Rosenthal Trust #3, of Subsequent Transfers of at least $1,091,321 from other Defendants prior to the Filing Date.  *See* Exhibit D-16.

476.    Based on the Trustee's investigation to date, Heather Lowles received, or was the beneficiary through Heather Lowles Trust of, Subsequent Transfers of at least $142,386 from other Defendants prior to the Filing Date.  *See* Exhibit D-17.

477.    Based on the Trustee's investigation to date, Tiffany Lowles Trust received, or was the beneficiary of, Subsequent Transfers of at least $94,657 from other Defendants prior to the Filing Date.  *See* Exhibit D-18.

478.    Based on the Trustee's investigation to date, Melanie Lowles received or was the beneficiary through the Melanie Lowles Trust of, Subsequent Transfers of at least $56,849 from other Defendants prior to the Filing Date.  *See* Exhibit D-19.

479.    Based on the Trustee's investigation to date, Taylor McEvoy Trust received, or was the beneficiary of, Subsequent Transfers of at least $61,880 from other Defendants prior to the Filing Date.  *See* Exhibit D-20.

480.    Based on the Trustee's investigation to date, Madison McEvoy Trust received, or was the beneficiary of, Subsequent Transfers of at least $102,483 from other Defendants prior to the Filing Date.  *See* Exhibit D-21.

481.    Based on the Trustee's investigation to date, S.A. received, or was the beneficiary through S.A. GRAT of, Subsequent Transfers of at least $57,417 from other Defendants prior to the Filing Date.  *See* Exhibit D-22.

482.    The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information regarding the Initial Transfers, the Subsequent Transfers, and any other additional transfers; and (ii) seek recovery of such additional transfers.

483.    To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## **COUNT ONE:**
## **FRAUDULENT TRANSFER – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551**

484.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

485.    Each of the Two Year Fraudulent Transfers was made on or within two years before the Filing Date.

486.    Each of the Two Year Fraudulent Transfers constitutes a transfer of an interest of

BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code

and section 78fff-2(c)(3) of SIPA.

487.    Each of the Two Year Fraudulent Transfers was made by BLMIS with the actual

intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.

BLMIS made the Two Year Fraudulent Transfers to or for the benefit of the Defendants

identified in Exhibit E in furtherance of a fraudulent investment scheme.

488.    Each of the Two Year Fraudulent Transfers constitutes a fraudulent transfer

avoidable by the Trustee under section 548(a)(1)(A) of the Bankruptcy Code and recoverable

from the Defendants identified in Exhibit E under section 550(a) of the Bankruptcy Code and

section 78fff-2(c)(3) of SIPA.

489.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A),

550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled

to a judgment against the Defendants identified in Exhibit E: (a) avoiding and preserving the

Two Year Fraudulent Transfers, (b) directing that the Two Year Fraudulent Transfers be set

aside, (c) recovering the Two Year Fraudulent Transfers, or the value thereof, from the

Defendants identified in Exhibit E for the benefit of the BLMIS estate, (d) directing the

Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits,

including any and all management fees, incentive fees, accounting fees, professional fees, or

other compensation and/or remuneration received by the Defendants identified in Exhibit E

related to or arising from or concerning the Two Year Fraudulent Transfers from BLMIS to the

Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim against BLMIS

until such time as the Two Year Fraudulent Transfers are repaid to the Trustee, (f) awarding

attorneys' fees and costs from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems just and appropriate.

## COUNT TWO:
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), AND 551

490.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

491.    Each of the Two Year Fraudulent Transfers was made on or within two years before the Filing Date.

492.    Each of the Two Year Fraudulent Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

493.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Fraudulent Transfers.

494.    At the time of each of the Two Year Fraudulent Transfers, BLMIS was insolvent or became insolvent as a result of the Two Year Fraudulent Transfers.

495.    At the time of each of the Two Year Fraudulent Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small amount of capital.

496.    At the time of each of the Two Year Fraudulent Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

497.    Each of the Two Year Fraudulent Transfers constitutes a fraudulent transfer avoidable by the Trustee under section 548(a)(1)(B) of the Bankruptcy Code, which is

recoverable from the Defendants identified in Exhibit E under section 550(a) of the Bankruptcy

Code and section 78fff-(2)(c)(3) of SIPA.

498.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(B),

550(a), and 551 of the Bankruptcy Code and section 78fff-(2)(c)(3) of SIPA, the Trustee is

entitled to a judgment against the Defendants identified in Exhibit E: (a) avoiding and preserving

the Two Year Fraudulent Transfers, (b) directing that the Two Year Fraudulent Transfers be set

aside, (c) recovering the Two Year Fraudulent Transfers, or the value thereof, from the

Defendants identified in Exhibit E for the benefit of the BLMIS estate, (d) directing the

Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits,

including any and all management fees, incentive fees, accounting fees, professional fees, or

other compensation and/or remuneration received by the Defendants identified in Exhibit E

related to or arising from or concerning the Two Year Fraudulent Transfers from BLMIS to the

Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim against BLMIS

until such time as the Two Year Fraudulent Transfers are repaid to the Trustee, (f) awarding

attorneys' fees and costs from the Defendants identified in Exhibit E, and (g) awarding any other

relief the Court deems just and appropriate.

## COUNT THREE:
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

499.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

500.    At all times relevant to the Six Year Fraudulent Transfers, there have been one or

more creditors holding matured or unmatured unsecured claims against BLMIS that are

allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e)

of the Bankruptcy Code.

501.    Each of the Six Year Fraudulent Transfers constitutes a conveyance by BLMIS as defined under section 270 of the N.Y. Debt. & Cred. Law.

502.    Each of the Six Year Fraudulent Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Fraudulent Transfers to or for the benefit of the Defendants identified in Exhibit E in furtherance of a fraudulent investment scheme.

503.    Each of the Six Year Fraudulent Transfers was received by the Defendants identified in Exhibit E with actual intent to hinder, delay, or defraud creditors or future creditors of BLMIS at the time of each of the Six Year Fraudulent Transfers.

504.    As a result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Defendants identified in Exhibit E: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, (c) recovering the Six Year Fraudulent Transfers, or the value thereof, from the Defendants identified in Exhibit E for the benefit of the BLMIS estate, (d) directing the Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits, including any and all management fees, incentive fees, accounting fees, professional fees, or other compensation and/or remuneration received by the Defendants identified in Exhibit E related to or arising from or concerning the Six Year Fraudulent Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim  and KJA's Customer Claim against BLMIS until such time as the Six Year Fraudulent Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs

from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems

just and appropriate.

### COUNT FOUR:
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 273, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

505.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

506.    At all times relevant to the Six Year Fraudulent Transfers, there has been one or

more creditors holding matured or unmatured unsecured claims against BLMIS that are

allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e)

of the Bankruptcy Code.

507.    Each of the Six Year Fraudulent Transfers constitutes a conveyance by BLMIS as

defined under section 270 of the N.Y. Debt. & Cred. Law.

508.    BLMIS did not receive fair consideration for the Six Year Fraudulent Transfers.

509.    BLMIS was insolvent at the time it made each of the Six Year Fraudulent

Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year

Fraudulent Transfers.

510.    As a result of the foregoing, pursuant to sections 273, 278, and/or 279 of the N.Y.

Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code,

and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Defendants

identified in Exhibit E: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b)

directing that the Six Year Fraudulent Transfers be set aside, (c) recovering the Six Year

Fraudulent Transfers, or the value thereof, from the Defendants identified in Exhibit E for the

benefit of the estate of BLMIS, (d) directing the Defendants identified in Exhibit E, to the extent

allowable by law, to disgorge all profits, including any and all management fees, incentive fees,

126

accounting fees, professional fees, or other compensation and/or remuneration received by the

Defendants identified in Exhibit E related to or arising from or concerning the Six Year

Fraudulent Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing

Strattham's Customer Claim and KJA's Customer Claim against BLMIS until such time as the

Six Year Fraudulent Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs

from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems

just and appropriate.

### COUNT FIVE:
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

511.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

512.    At all times relevant to the Six Year Fraudulent Transfers, there has been one or

more creditors holding matured or unmatured unsecured claims against BLMIS that are

allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e)

of the Bankruptcy Code.

513.    Each of the Six Year Fraudulent Transfers constitutes a conveyance by BLMIS as

defined under section 270 of the N.Y. Debt. & Cred. Law.

514.    BLMIS did not receive fair consideration for the Six Year Fraudulent Transfers.

515.    At the time of each of the Six Year Fraudulent Transfers, BLMIS was engaged in

a business or transaction, or was about to engage in a business or transaction, for which the

property remaining in its hands after each of the Six Year Fraudulent Transfers was an

unreasonably small amount of capital.

516.    As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the N.Y.

Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code,

and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Defendants

identified in Exhibit E: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b)

directing that the Six Year Fraudulent Transfers be set aside, (c) recovering the Six Year

Fraudulent Transfers, or the value thereof, from the Defendants identified in Exhibit E for the

benefit of the estate of BLMIS, (d) directing the Defendants identified in Exhibit E, to the extent

allowable by law, to disgorge all profits, including any and all management fees, incentive fees,

accounting fees, professional fees, or other compensation and/or remuneration received by the

Defendants identified in Exhibit E related to or arising from or concerning the Six Year

Fraudulent Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing

Strattham's Customer Claim and KJA's Customer Claim against BLMIS until such time as the

Six Year Fraudulent Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs

from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems

just and appropriate.

## COUNT SIX:
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

517.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

518.    At all times relevant to the Six Year Fraudulent Transfers, there has been one or

more creditors holding matured or unmatured unsecured claims against BLMIS that are

allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e)

of the Bankruptcy Code.

519.    Each of the Six Year Fraudulent Transfers constitutes a conveyance by BLMIS as

defined under section 270 of the N.Y. Debt. & Cred. Law.

520.    BLMIS did not receive fair consideration for the Six Year Fraudulent Transfers.

521.    At the time BLMIS made each of the Six Year Fraudulent Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay as the debts matured.

522.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Defendants identified in Exhibit E: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, (c) recovering the Six Year Fraudulent Transfers, or the value thereof, from the Defendants identified in Exhibit E for the benefit of the estate of BLMIS, (d) directing the Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits, including any and all management fees, incentive fees, accounting fees, professional fees, or other compensation and/or remuneration received by the Defendants identified in Exhibit E related to or arising from or concerning the Six Year Fraudulent Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim and KJA's Customer Claim against BLMIS until such time as the Six Year Fraudulent Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems just and appropriate.

## COUNT SEVEN:
### RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK CIVIL PRACTICE LAW AND RULES 203(g) AND 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

523.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

524.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS holding a matured or unmatured unsecured claim against BLMIS that is allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

525.    At all times relevant to the Initial Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

526.    Each of the Initial Transfers constitutes a conveyance by BLMIS as defined under section 270 of the N.Y. Debt. & Cred. Law.

527.    Each of the Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Initial Transfers to or for the benefit of the Defendants identified in Exhibit E in furtherance of a fraudulent investment scheme.

528.    Each of the Initial Transfers was received by the Defendants identified in Exhibit E with actual intent to hinder, delay, or defraud creditors or future creditors of BLMIS at the time of each of the Initial Transfers.

529.    As a result of the foregoing, pursuant to sections 203(g) and 213(8) of the N.Y. C.P.L.R., sections 276, 276-a, 278 and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Defendants identified in Exhibit E: (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Initial Transfers, or the value thereof, from the Defendants identified in Exhibit E for the benefit of the estate of BLMIS, (d) directing the Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits, including any and all management fees, incentive fees,

accounting fees, professional fees, or other compensation and/or remuneration received by the Defendants identified in Exhibit E related to or arising from or concerning the Initial Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim and KJA's Customer Claim against BLMIS until such time as the Initial Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems just and appropriate.

## COUNT EIGHT:
## PREFERENTIAL TRANSFERS – 11 U.S.C. §§ 105(a), 502(d), 547(b), 550, AND 551

530.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

531.    At the time of each of the Preference Transfers, Strattham was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

532.    Each of the Preference Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

533.    BLMIS made the Preference Transfers to or for the benefit of Strattham.

534.    Each of the Preference Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

535.    Each of the Preference Transfers was made while BLMIS was insolvent.

536.    Each of the Preference Transfers was made within one year of the Filing Date.

537.    Preference Transfers in the amount of $4,250,000 were made within the 90 day preference period under section 547(b)(4).

538.     The Preference Transfers enabled Strattham to receive more than it would have received if: (i) this case were a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) Strattham received payment to the extent provided by the Bankruptcy Code.

539.     The Preference Transfers constitute preferential transfers avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from Strattham, as initial transferee or the entity for whose benefit such transfers were made under section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

540.     As a result of the foregoing, pursuant to sections 105(a), 502(d), 547(b), 550, and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Strattham: (a) avoiding and preserving the Preference Transfers, (b) directing that the Preference Transfers be set aside, (c) recovering the Preference Transfers, or the value thereof, for the benefit of the estate of BLMIS, (d) directing Strattham, to the extent allowable by law, to disgorge all profits, including any and all management fees, incentive fees, accounting fees, professional fees, or other compensation and/or remuneration received by Strattham related to or arising from or concerning the Preference Transfers from BLMIS to Strattham, (e) disallowing Strattham's Customer Claim against BLMIS until such time as the Preference Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from Strattham, and (g) awarding any other relief the Court deems just and appropriate.

## COUNT NINE:
## RECOVERY OF SUBSEQUENT TRANSFERS –
## NEW YORK DEBTOR AND CREDITOR LAW §§ 276-a AND 278, 11 U.S.C. §§ 105(a) AND 550(a), AND SIPA § 78fff-2(c)(3)

541.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

542.    The Initial Transfers are avoidable under applicable provisions of the Bankruptcy

Code, the N.Y. Debt. & Cred. Law, and/or N.Y. C.P.L.R. as alleged herein, and, to the extent the

Initial Transfers were subsequently transferred, are recoverable from the Subsequent Transferee

Defendants identified in Exhibits D and E under sections 105(a) and 550(a) of the Bankruptcy

Code, sections 276 and 278 of the N.Y. Debt. & Cred. Law, and section 78fff-2(c)(3) of SIPA.

543.    The Subsequent Transfers were transferred by the Initial Transferees identified in

Exhibit D to the Subsequent Transferee Defendants identified in Exhibits D and E.

544.    Each of the Subsequent Transfers was made directly or indirectly to, or for the

benefit of, the Subsequent Transferee Defendants identified in Exhibits D and E.

545.    The Subsequent Transferee Defendants identified in Exhibits D and E are

immediate or mediate transferees of the Subsequent Transfers from the Defendants identified in

Exhibit D.

546.    The Subsequent Transferee Defendants identified in Exhibits D and E received

the Subsequent Transfers with knowledge of and/or willful blindness to BLMIS's fraudulent

scheme.

547.    As a result of the foregoing, and pursuant to sections 276-a and 278 of the N.Y.

Debt. & Cred. Law, sections 105(a) and 550(a) of the Bankruptcy Code, and section 78fff-

2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Subsequent Transferee

Defendants identified in Exhibits D and E: (a) recovering the Subsequent Transfers, or the value

thereof, from the Subsequent Transferee Defendants identified in Exhibits D and E for the

benefit of the BLMIS estate, (b) directing the Subsequent Transferee Defendants identified in

Exhibits D and E, to the extent allowable by law, to disgorge to the Trustee all profits, including

any and all management fees, incentive fees, accounting fees, professional fees, or other

133

compensation and/or remuneration received by the Subsequent Transferee Defendants identified

in Exhibits D and E related to or arising from, or concerning the Subsequent Transfers, (c)

disallowing Strattham's Customer Claim, KJA's Customer Claim, and Mayfair Bookkeeping's

Customer Claim against BLMIS until such time as the Subsequent Transfers are repaid to the

Trustee, (d) awarding attorneys' fees and costs from the Subsequent Transferee Defendants

identified in Exhibits D and E, and (e) awarding any other relief the Court deems just and

appropriate.

## COUNT TEN:
## OBJECTION TO AND DISALLOWANCE OF CUSTOMER CLAIMS

548.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

549.    Strattham, KJA, and Mayfair Bookkeeping were not innocent investors at the time

they invested with BLMIS and provided no consideration to the estate.

550.    Strattham, KJA, and Mayfair Bookkeeping acted with actual knowledge of

fraudulent activity at BLMIS at the time Strattham, KJA, and Mayfair Bookkeeping invested

with BLMIS.  By Strattham's, KJA's, and Mayfair Bookkeeping's conduct, at the time they

invested with BLMIS, Strattham, KJA, and Mayfair Bookkeeping enabled Madoff to perpetuate

the fraud at BLMIS.

551.    Alternatively, Strattham, KJA, and Mayfair Bookkeeping were willfully blind to

numerous and serious indications of fraudulent activity at BLMIS, as described in this Amended

Complaint.

552.    As a result of Strattham's, KJA's, and Mayfair Bookkeeping's conduct, they are

not entitled to the protections afforded by SIPA.  Thus, Strattham, KJA, and Mayfair

Bookkeeping do not have a claim enforceable against the BLMIS estate under SIPA or other applicable law.

553.    As a result of Strattham's, KJA's, and Mayfair Bookkeeping's conduct, as described above, pursuant to section 502(a) of the Bankruptcy Code and section 78fff-2 of SIPA, the Trustee objects to any and all claims of Strattham, KJA, and Mayfair Bookkeeping against the BLMIS estate, which should be disallowed, and not entitled to receive a distribution from the estate pursuant to section 502(b)(1) of the Bankruptcy Code.

<u>**COUNT ELEVEN:**</u>
<u>**EQUITABLE DISALLOWANCE OF CLAIMS**</u>

554.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

555.    Strattham, KJA, and Mayfair Bookkeeping engaged in and benefited from inequitable conduct and with knowledge of fraudulent activity at BLMIS, including the conduct described in this Amended Complaint.  By Strattham's, KJA's, and Mayfair Bookkeeping's conduct, they have taken unconscionable advantage of, resulting in injury to, innocent customers and other creditors of the estate.

556.    Based upon Strattham's, KJA's, and Mayfair Bookkeeping's failure to deal fairly and in good faith, as described above, all customers and other creditors of BLMIS have been injured, including by being (a) misled as to the true financial condition of the debtor; (b) induced to invest with BLMIS without knowledge of BLMIS's financial condition; and (c) hindered and delayed in recovering the full amounts due to them.  Strattham's, KJA's, and Mayfair Bookkeeping's conduct further enabled Madoff to continue the Ponzi scheme.

557.    Strattham's, KJA's, and Mayfair Bookkeeping's conduct was so egregious that they should not be allowed to share in any equitable distribution made by the Trustee to innocent customers holding allowed claims against BLMIS and/or Madoff.

558.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by Strattham, KJA, and Mayfair Bookkeeping against the estate, are disallowed.

559.    Equitable disallowance is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT TWELVE:
## EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS

560.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

561.    Strattham, KJA, and Mayfair Bookkeeping engaged in inequitable conduct, including the conduct described in this Amended Complaint.

562.    Based on Strattham's, KJA's, and Mayfair Bookkeeping's inequitable conduct, BLMIS's customers have been misled as to the true financial condition of BLMIS and have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them.

563.    Strattham's, KJA's, and Mayfair Bookkeeping's conduct enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on Strattham, KJA, and Mayfair Bookkeeping.

564.    Prior to the Filing Date, Strattham and KJA benefited from the receipt of at least $29,850,000 in Initial Transfers, and Strattham, KJA and Mayfair Bookkeeping benefited from

the receipt of at least $5,525,000 in Subsequent Transfers.  But for these transfers, there would

have been additional customer property available on the Filing Date for distribution.

565.    The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by

Strattham, KJA, and Mayfair Bookkeeping, directly or indirectly against the estate, and only to

the extent such claims are allowed, are subordinated for distribution purposes pursuant to

sections 510(c) and 105(a) of the Bankruptcy Code to the allowed claims of all other customers

and creditors of BLMIS.

566.    Equitable subordination, as requested herein, is consistent with the provisions and

purposes of the Bankruptcy Code.

## COUNT THIRTEEN:
## GENERAL PARTNER LIABILITY

567.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

568.    At all times relevant to the Initial Transfers and/or the Subsequent Transfers, the

Defendants identified in Exhibit F were general partners of the respective defendant general

partnerships that are identified in Exhibit F.

569.    In the event that any of the Defendant general partnerships identified in Exhibit F

are unable to satisfy any judgment against them, the respective Defendants identified in

Exhibit F, as the general partners, are liable to satisfy any judgment against the Defendant

general partnerships.

570.    As a result of the foregoing, pursuant to applicable state law, the general partner

Defendants identified in Exhibit F are jointly and severally liable for all debts and obligations of

their respective general partnerships identified in Exhibit F, including the Initial Transfers and/or

the Subsequent Transfers to the general partnerships identified in Exhibits A, B, and D, and the

Trustee is entitled to a judgment against the general partner Defendants identified in Exhibit F

recovering the Initial Transfers, including the Two Year Fraudulent Transfers, the Six Year

Fraudulent Transfers, and the Preference Transfers, and the Subsequent Transfers to their

respective general partnerships that are identified in Exhibit F or their value from the general

partner Defendants for the benefit of the BLMIS estate.

     **WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against the Defendants identified in Exhibit E as follows:

     (i)     On the First Claim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(A),

550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and

preserving the Two Year Fraudulent Transfers, (b) directing that the Two Year Fraudulent

Transfers be set aside, (c) recovering the Two Year Fraudulent Transfers, or the value thereof,

from the Defendants identified in Exhibit E for the benefit of the BLMIS estate, (d) directing the

Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits,

including any and all management fees, incentive fees, accounting fees, professional fees, or

other compensation and/or remuneration received by the Defendants identified in Exhibit E

related to or arising from or concerning the Two Year Fraudulent Transfers from BLMIS to the

Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim  against BLMIS

until such time as the Two Year Fraudulent Transfers are repaid to the Trustee, (f) awarding

attorneys' fees and costs from the Defendants identified in Exhibit E, and (g) awarding any other

relief the Court deems just and appropriate;

     (ii)     On the Second Claim for Relief, pursuant to sections 105(a), 502(d),

548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and section 78fff-(2)(c)(3) of SIPA: (a)

avoiding and preserving the Two Year Fraudulent Transfers, (b) directing that the Two Year Fraudulent Transfers be set aside, (c) recovering the Two Year Fraudulent Transfers, or the value thereof, from the Defendants identified in Exhibit E for the benefit of the BLMIS estate, (d) directing the Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits, including any and all management fees, incentive fees, accounting fees, professional fees, or other compensation and/or remuneration received by the Defendants identified in Exhibit E related to or arising from or concerning the Two Year Fraudulent Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim against BLMIS until such time as the Two Year Fraudulent Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems just and appropriate;

(iii)    On the Third Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, (c) recovering the Six Year Fraudulent Transfers, or the value thereof, from the Defendants identified in Exhibit E for the benefit of the BLMIS estate, (d) directing the Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits, including any and all management fees, incentive fees, accounting fees, professional fees, or other compensation and/or remuneration received by the Defendants identified in Exhibit E related to or arising from or concerning the Six Year Fraudulent Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim and KJA's Customer Claim against BLMIS until such time as the Six Year Fraudulent Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs

from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems

just and appropriate;

(iv)    On the Fourth Claim for Relief, pursuant to sections 273, 278, and/or 279 of the

N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy

Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Fraudulent

Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, (c) recovering the Six

Year Fraudulent Transfers, or the value thereof, from the Defendants identified in Exhibit E for

the benefit of the estate of BLMIS, (d) directing the Defendants identified in Exhibit E, to the

extent allowable by law, to disgorge all profits, including any and all management fees, incentive

fees, accounting fees, professional fees, or other compensation and/or remuneration received by

the Defendants identified in Exhibit E related to or arising from or concerning the Six Year

Fraudulent Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing

Strattham's Customer Claim and KJA's Customer Claim against BLMIS until such time as the

Six Year Fraudulent Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs

from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems

just and appropriate;

(v)    On the Fifth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the

N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy

Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Fraudulent

Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, (c) recovering the Six

Year Fraudulent Transfers, or the value thereof, from the Defendants identified in Exhibit E for

the benefit of the estate of BLMIS, (d) directing the Defendants identified in Exhibit E, to the

extent allowable by law, to disgorge all profits, including any and all management fees, incentive

140

fees, accounting fees, professional fees, or other compensation and/or remuneration received by the Defendants identified in Exhibit E related to or arising from or concerning the Six Year Fraudulent Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim and KJA's Customer Claim against BLMIS until such time as the Six Year Fraudulent Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems just and appropriate;

(vi)    On the Sixth Claim for Relief, pursuant to sections 275, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, (c) recovering the Six Year Fraudulent Transfers, or the value thereof, from the Defendants identified in Exhibit E for the benefit of the estate of BLMIS, (d) directing the Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits, including any and all management fees, incentive fees, accounting fees, professional fees, or other compensation and/or remuneration received by the Defendants identified in Exhibit E related to or arising from or concerning the Six Year Fraudulent Transfers from BLMIS to the Defendants identified in Exhibit E, (e) disallowing Strattham's Customer Claim and KJA's Customer Claim against BLMIS until such time as the Six Year Fraudulent Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems just and appropriate;

(vii)    On the Seventh Claim for Relief, pursuant to sections 203(g) and 213(8) of the N.Y. C.P.L.R., sections 276, 276-a, 278 and/or 279 of the N.Y. Debt. & Cred. Law, sections

105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of

SIPA: (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be

set aside, (c) recovering the Initial Transfers, or the value thereof, from the Defendants identified

in Exhibit E for the benefit of the estate of BLMIS, (d) directing the Defendants identified in

Exhibit E, to the extent allowable by law, to disgorge all profits, including any and all

management fees, incentive fees, accounting fees, professional fees, or other compensation

and/or remuneration received by the Defendants identified in Exhibit E related to or arising from

or concerning the Initial Transfers from BLMIS to the Defendants identified in Exhibit E, (e)

disallowing Strattham's Customer Claim and KJA's Customer Claim against BLMIS until such

time as the Initial Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from

the Defendants identified in Exhibit E, and (g) awarding any other relief the Court deems just

and appropriate;

(viii)    On the Eighth Claim for Relief, pursuant to sections 105(a), 502(d), 547(b), 550,

and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving

the Preference Transfers, (b) directing that the Preference Transfers be set aside, (c) recovering

the Preference Transfers, or the value thereof, for the benefit of the estate of BLMIS, (d)

directing Strattham, to the extent allowable by law, to disgorge all profits, including any and all

management fees, incentive fees, accounting fees, professional fees, or other compensation

and/or remuneration received by Strattham related to or arising from or concerning the

Preference Transfers from BLMIS to Strattham, (e) disallowing Strattham's Customer Claim

against BLMIS until such time as the Preference Transfers are repaid to the Trustee, (f) awarding

attorneys' fees and costs from Strattham, and (g) awarding any other relief the Court deems just

and appropriate;

(ix)     On the Ninth Claim for Relief, pursuant to sections 276-a and 278 of the N.Y.

Debt. & Cred. Law, sections 105(a) and 550(a) of the Bankruptcy Code, and section 78fff-

2(c)(3) of SIPA: (a) recovering the Subsequent Transfers, or the value thereof,  from the

Subsequent Transferee Defendants identified in Exhibits D and E for the benefit of the BLMIS

estate, (b) directing the Subsequent Transferee Defendants identified in Exhibits D and E, to the

extent allowable by law, to disgorge to the Trustee all profits, including any and all management

fees, incentive fees, accounting fees, professional fees, or other compensation and/or

remuneration received by the Subsequent Transferee Defendants identified in Exhibits D and E

related to or arising from, or concerning the Subsequent Transfers, (c) disallowing Strattham's

Customer Claim, KJA's Customer Claim, and Mayfair Bookkeeping's Customer Claim against

BLMIS until such time as the Subsequent Transfers are repaid to the Trustee, (d) awarding

attorneys' fees and costs from the Subsequent Transferee Defendants identified in Exhibits D

and E, and (e) awarding any other relief the Court deems just and appropriate.

(x)     On the Tenth Claim for Relief, sustaining the Trustee's objections to Defendants

Strattham's, KJA's, and Mayfair Bookkeeping's claims pursuant to section 502(a) of the

Bankruptcy Code and disallowing such claims pursuant to section 502(b)(1) of the Bankruptcy

Code;

(xi)     On the Eleventh Claim for Relief, pursuant to this Court's equitable power,

disallowing each and every claim that Defendants Strattham, KJA, and Mayfair Bookkeeping

asserts against the Debtors' estate, all of which claims have no lawful existence under principles

of restitution and other applicable state law;

(xii)     On the Twelfth Claim for Relief, subordinating any and all claims of Defendants

Strattham, KJA, and Mayfair Bookkeeping for purposes of distribution to all allowed claims of

BLMIS's customers and creditors due to Defendants Strattham's, KJA's, and Mayfair Bookkeeping's inequitable conduct pursuant to sections 105(a) and 510(c) of the Bankruptcy Code, such that no claim of Defendants Strattham, KJA, or Mayfair Bookkeeping is paid ahead of the allowed claim of any customer or creditor of BLMIS;

(xiii)    On the Thirteenth Claim for Relief, pursuant to applicable state law, judgment that the general partner Defendants identified in Exhibit F are jointly and severally liable for all debts and obligations of their respective general partnerships that are identified in Exhibit F, including the Initial Transfers and the Subsequent Transfers to the general partnerships identified in Exhibits A, B, and D, and recovering the Two Year Fraudulent Transfers, the Six Year Fraudulent Transfers, the Initial Transfers, the Preference Transfers, and/or the Subsequent Transfers to the general partnerships identified in Exhibit F or their value from the general partner Defendants identified in Exhibit F for the benefit of the BLMIS estate;

(xiv)    On the First through Ninth Claims for Relief, directing the Defendants identified in Exhibit E, to the extent allowable by law, to disgorge all profits, including any and all management fees, incentive fees, accounting fees, professional fees, or other compensation and/or remuneration they received related to or arising from or concerning the Initial Transfers, the Subsequent Transfers, and the IA accounts identified on Exhibits A and B;

(xv)    On all Claims for Relief for which the general partnerships identified in Exhibit F are liable, that the Court enter judgment for that same relief against the Defendants identified in Exhibit F as general partners of their respective general partnerships identified in Exhibit F.

(xvi)    On all Claims for Relief, establishing a constructive trust over all Initial Transfers and Subsequent Transfers and their proceeds, product and offspring in favor of the Trustee for the benefit of the estate;

144

(xvii)   On all Claims for Relief, pursuant to federal common law and/or N.Y. C.P.L.R. 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Initial Transfers were received;

(xviii)  On all Claims for Relief, awarding the Trustee's attorneys' fees, all applicable interest, costs, and disbursements incurred in this proceeding; and

(xix)   Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Date:  November 24, 2014
       New York, New York

By: */s/* David J. Sheehan

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com

Jimmy Fokas
Email: jfokas@bakerlaw.com
Kathryn M. Zunno
Email: kzunno@bakerlaw.com
Elizabeth Urda
Email: emccurrach@bakerlaw.com
Joshua B. Rog
Email: jrog@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*

145