**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani
Robert S. Loigman
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Telecopier:  (212) 849-7100

*Counsel to Joint Liquidators of Kingate Global*
*Fund Ltd. and Kingate Euro Fund Ltd.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | (Substantively Consolidated) |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 09-1161 (SMB) |
| v. | |
| FEDERICO CERETTI, *et al.* | |
| Defendants. | |

### KINGATE GLOBAL FUND LTD. AND KINGATE EURO FUND LTD.'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...............................................................................................................................3

I.    COUNTS I AND III-VIII MUST BE DISMISSED BECAUSE THE SECTION 546(e) SAFE HARBORS APPLY ...................................................................................3

    A.    *Cohmad* Requires The Trustee To Plead With Particularity That The Funds Actually Knew That BLMIS Was A Ponzi Scheme ...................................4

    B.    The Trustee Has Not Pled Actual Knowledge ........................................................5

        1.    The Trustee Alleges a Typical Relationship Between the Funds' Managers and BLMIS...................................................................................5

        2.    The Trustee Alleges that the Kingate Funds' Managers Failed to Discern Fraud from the Same Information Available to Other Customers ..................................................................................................6

        3.    The Trustee Alleges that the Funds' Managers Believed BLMIS Was Trading Securities.................................................................................7

    C.    The Totality of Allegations Belies The Assertion That The Kingate Funds Actually Knew That BLMIS Was Not Trading Securities ....................................8

II.    SECTION 548(c) BARS THE TRUSTEE'S SECTION 548(a)(1)(A) CLAIM ................9

    A.    The Trustee Has Not Pled That The Kingate Funds Believed There Was A High Probability That BLMIS Was Operating A Fraud..........................................9

    B.    The Trustee Has Not Pled That The Kingate Funds Took Deliberate Actions To Avoid Learning That BLMIS Was A Ponzi Scheme .........................12

III.    THERE IS NO BASIS FOR EQUITABLY SUBORDINATING THE KINGATE FUNDS' CLAIMS.................................................................................................13

    A.    The Trustee Has Not Alleged Inequitable Conduct...............................................13

    B.    The Trustee Has Not Alleged Harm To Other Creditors......................................14

    C.    The Equitable Subordination Claim Targets The Wrong Parties ..........................15

IV.    THE MANAGERS' KNOWLEDGE CANNOT BE IMPUTED TO THE FUNDS THAT THEY FURTHER VICTIMIZED.........................................................................16

V.    THE TRUSTEE'S CLAIMS FOR EQUITABLE DISALLOWANCE FAIL AS A
       MATTER OF LAW ........................................................................................................19

CONCLUSION .........................................................................................................................20

# TABLE OF AUTHORITIES

**Page**

## Cases

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
169 B.R. 832 (Bankr. S.D.N.Y. 1994) ............................................................................13, 14

*Aniero Concrete Co., Inc. v. New York City Constr. Auth.*,
No. 94 Civ. 3506 (CSH), 2000 WL 863208 (S.D.N.Y. June 27, 2000) ................................7

*Ctr. v. Hampton Affiliates, Inc.*,
66 N.Y.2d 782 (1985) .........................................................................................................17

*First Bank of Whiting v. Kham & Nate's Shoes, No. 2, Inc.*,
104 B.R. 909 (N.D. Ill. 1989) .............................................................................................13

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011) ..........................................................................................................9

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*,
453 B.R. 499 (Bankr. S.D.N.Y. 2011) ................................................................................13

*Granite Partners L.P. v. Bear Stearns & Co., Inc.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998)....................................................................................16

*Harbinger Capital Partners LLC v. Ergen (In re LightSquared )*,
504 B.R. 321 (Bankr. S.D.N.Y. 2013) ................................................................................19

*Kirschner v. KPMG LLP*,
15 N.Y.3d 446 (2010) .........................................................................................................18

*In re Bernard L. Madoff Inv. Sec. LLC*,
No. 08-99000 (SMB), 2014 WL 5106909
(Bankr. S.D.N.Y. Oct. 10, 2014) ..........................................................................................3

*In re Maxwell Newspapers, Inc.*,
164 B.R. 858 (Bankr. S.D.N.Y. 1994)..................................................................................17

*In re Morpheus Lights, Inc.*,
228 B.R. 449 (Bankr. N.D. Cal. 1998) .................................................................................15

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
703 F. Supp. 2d 362 (S.D.N.Y. 2010)..................................................................................11

*O'Connell v. Arthur Andersen LLP
(In re AlphaStar Ins. Group Ltd.)*,
383 B.R. 231 (Bankr. S.D.N.Y. 2008)..................................................................................13

*O'Connell v. Penson Financial Services, Inc.
(In re Arbco Capital Management, LLP)*,
498 B.R. 32 (Bankr. S.D.N.Y. 2013)......................................................................................4

*Off. Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P.*
   *(In re Fedders N. Am., Inc.),*
   405 B.R. 527 (Bankr. D. Del. 2009) ......................................................................13

*Official Comm. Of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen*
   *(In re Hydrogen, L.L.C.),*
   431 B.R. 337 (Bankr. S.D.N.Y. 2010) ...................................................................13

*Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.*
   *(In re Sunbeam  Corp.),*
   284 B.R. 355 (Bankr. S.D.N.Y. 2002) ...................................................................13

*Picard v. JPMorgan Chase & Co.,*
   721 F.3d 54 (2d Cir. 2013) .....................................................................................15

*Picard v. Katz,*
   462 B.R. 447 (S.D.N.Y. 2011) ......................................................................4, 6, 13

*Picard v. Merkin,*
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................ *passim*

*Saltz v. First Frontier, LP,*
   782 F. Supp. 2d 61 (S.D.N.Y. 2010) ......................................................................11

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC,*
   No. 12-MC-115 (JSR), 2014 WL 1651952 (S.D.N.Y. Apr. 27, 2014)....................9

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC,*
   517 B.R. 437 (S.D.N.Y. 2014) ...............................................................................19

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
   No. 12 MC-115, 2013 WL 1609145 (S.D.N.Y. Apr. 15, 2013) ..................... *passim*

*Shearson Lehman Hutton, Inc. v. Wagoner,*
   944 F.2d 114 (2d Cir. 1991)....................................................................................16

## Statutes and Rules

Federal Rule of Bankruptcy Procedure 7012.................................................................1

Federal Rule of Civil Procedure 12(b)(6) ....................................................................1

The Joint Liquidators for defendants Kingate Global Fund Limited ("Kingate Global")

and Kingate Euro Fund Limited ("Kingate Euro" and, together with Kingate Global, the

"Kingate Funds" or "Funds") respectfully submit this reply memorandum of law in further

support of their motion, pursuant to Federal Rule of Civil Procedure 12(b)(6) as incorporated in

this proceeding by Federal Rule of Bankruptcy Procedure 7012, to dismiss with prejudice the

Fourth Amended Complaint (the "Fourth Amended Complaint" or "4th Am. Compl.") filed by

plaintiff Irving H. Picard (the "Trustee") (Docket Nos. 111-12) (the "Motion"), and in response

to the Trustee's Memorandum of Law in Opposition to the Motion (Docket No. 126) (the

"Opposition" or "Opp'n"), and respectfully state as follows:

## PRELIMINARY STATEMENT

The Kingate Funds lost $800 million by investing in Madoff's fraud; money that they

could have withdrawn from their accounts at BLMIS, but never did.  They lost hundreds of

millions more by paying management fees—fees that were based on Madoff's imaginary

values—to their investment managers.  They were *net losers* from the first day they invested

through the collapse of Madoff's Ponzi scheme.  Since 2009, they have been in insolvency

proceedings being administered by court-appointed liquidators.  These are facts that are

undisputed; facts that are a matter of public record and reflected in the allegations of the

Trustee's Fourth Amended Complaint.

Nonetheless, through this action, the Trustee seeks to amplify the Kingate Funds'

losses—and thus the losses being suffered by their many innocent investors—by clawing back

the portion of their investments that the Kingate Funds actually redeemed over the years, and by

blocking the Funds from recovering on their substantial customer claims.  The Trustee attempts

to achieve this deprivation based on the assertion that the Funds' managers—the same parties

that the Funds are suing for return of management fees—should have sussed out Madoff's fraud.

1

The Trustee's invocation of remedies such as equitable subordination is ironic given the decidedly inequitable result the Trustee aims to achieve.

As set forth in the Motion, the Trustee fails to allege facts supporting the drastic result he seeks. The Trustee does not, because he cannot, allege that the Kingate Funds actually knew that BLMIS was not trading securities. Nor does he allege facts sufficient to find that the Kingate Funds willfully blinded themselves to such fraud. Rather, his claims depend on imputing the arguably negligent conduct of the third-party managers that the Kingate Funds engaged to invest their money. There is simply no basis to tag the Kingate Funds with any knowledge that those managers may have had. If the managers knew of the fraud, they were victimizing the Funds and their investors, just as Bernard Madoff did. But even if the Trustee could impute the managers' knowledge to the Funds, the Trustee's allegations fall short of willful blindness, and stand in stark contrast to the much more pointed and specific allegations made against defendants in the *Cohmad* and *Merkin* cases.

By asserting the claims in this action, the Trustee departs in two important respects from his treatment of other, direct investors in BLMIS. First, the Trustee is ignoring his own chosen methodology—the "net investment method"—for resolving the Kingate Funds' substantial claims. As the Trustee's methodology recognizes, the Kingate Funds already have suffered at the hands of Madoff; *their money* has been used to line Madoff's pockets and to make payouts to net winners. Nonetheless, the Trustee insists that the Kingate Funds' net investment losses will not be allowed as customer claims unless the court-appointed liquidators go back to the investors in the Funds, come up with some basis to claw back their redemptions from the Funds, and then surrender those monies to BLMIS. In other words, contrary to the net investment method,

investors who invested through the Kingate Funds must "gross up" and lose *all* of their money before being allowed to share in BLMIS recoveries.

Second, by targeting the Kingate Funds with equitable subordination and disallowance claims, the Trustee attempts to deprive the Funds' innocent investors of any recovery on their $800 million net loss, even if they return to BLMIS *all* of the withdrawals they ever made. The Trustee reaches this result only by ignoring established law of the case that *customers*, like the Kingate Funds and like the many direct investors whose claims already have been allowed, have no duty to investigate their brokers. What the Trustee seeks is nothing short of a complete deprivation of the Funds' investors' rights to a return of the money that was stolen from them.

For the reasons set forth in the moving papers and below, the Trustee's complaint against the Kingate Funds (his fifth iteration of the pleading) should be dismissed with prejudice, and the Funds, on behalf of their investors, should finally be afforded access to the distributions already enjoyed by scores of other victimized BLMIS customers.

## ARGUMENT

### I.    COUNTS I AND III-VIII MUST BE DISMISSED BECAUSE THE SECTION 546(e) SAFE HARBORS APPLY

Because the Trustee has failed his burden of pleading with particularity that the Kingate Funds actually knew that BLMIS did not trade any securities, the Kingate Funds are protected by the safe harbors of section 546(e). In *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Cohmad*"), No. 12 MC 115, 2013 WL 1609154, at *3-4 (S.D.N.Y. Apr. 15, 2013), Judge Rakoff held that the section 546(e) safe harbors apply *in this case* unless the Trustee pleads with particularity that a transferee actually knew that BLMIS was not trading securities. This Court applied the *Cohmad* standard in *Picard v. Merkin*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin*"). *See also In re Bernard L. Madoff Inv. Sec. LLC*, No. 08-99000 (SMB), 2014 WL

5106909, at *7 n.11 (Bankr. S.D.N.Y. Oct. 10, 2014) (recognizing that "the District Court has

ruled that Bankruptcy Code § 546(e) limits the Trustee to recovering intentional fraudulent

transfers made within two years of the Filing Date unless the Trustee alleges that the transferee

had actual knowledge of the BLMIS fraud").  As set forth below, the Trustee has not pled

particularized facts demonstrating that the Kingate Funds had such knowledge.

### A.    *Cohmad* Requires The Trustee To Plead With Particularity That The Funds Actually Knew That BLMIS Was A Ponzi Scheme

The exception articulated in *Cohmad* is a narrow one:  "it is not enough to satisfy this

exception to Section 546(e)'s safe harbor for the Trustee simply to allege that a transferee was

willfully blind or did not take in 'good faith.'"[1]  *Cohmad*, 2013 WL 1609154 at *4.  The Trustee

must allege "not mere suspicions, but actual knowledge of Madoff's scheme . . . ."  *Cohmad*,

2013 WL 1609154 at *3.  "'Actual knowledge' is 'direct and clear knowledge, as distinguished

from constructive knowledge.'  Thus, 'actual knowledge' implies a high level of certainty and

absence of any substantial doubt regarding the existence of a fact."  *Merkin*, 515 B.R. at 140.

*Cohmad* also requires the Trustee to plead with particularity that the Funds actually knew of the

specific fraud at issue—that BLMIS was a Ponzi scheme that was not trading securities.

---

[1]   The Trustee did not appeal the *Cohmad* decision.  In a motion filed to appeal application of the standard in *Merkin*, the Trustee conceded that willful blindness does not satisfy *Cohmad*:  "The District Court further held that the Trustee may not show actual knowledge by evidence of willful blindness or conscious disregard."  Trustee Merkin 54(b) Mem. (Docket No. 227, Adv. Pro. No. 09-01182-smb) at 2. Nonetheless, the Trustee now cites to footnote 2 of the *Cohmad* decision and *O'Connell v. Penson Financial Services, Inc.* (*In re Arbco Capital Management, LLP*), 498 B.R. 32, 44 (Bankr. S.D.N.Y. 2013), to claim that willful blindness is sufficient.  *See* Opp'n at 15 n.55, 16-17.  The Trustee's reliance on this authority is misplaced.  *Cohmad* established the standard that applies in *this* case, and footnote 2 does not alter that standard.  To the contrary, footnote 2 expressly states that "[w]hile in some contexts 'willful blindness' is sufficient to substitute for actual knowledge, this is not such a context, for, as noted in *Katz,* a securities customer has no duty to inquire as to his broker's *bona fides*."  *Cohmad*, 2013 WL 1609154 at *4 n.2.  In *Arbco*, Judge Chapman applied a willful blindness standard to a clearing broker (i.e., a non-customer) that was accused of aiding a Ponzi scheme.  *Arbco*, 498 B.R. at 37-38, 44.  The Trustee does not, and cannot possibly, make similar allegations against the Funds, which were BLMIS *customers*.

*Cohmad*, 2013 WL 1609154 at \*4 ("the Trustee must show, at a minimum, that the transferee had actual knowledge that there were no actual securities transactions being conducted").

## B.        The Trustee Has Not Pled Actual Knowledge

The Trustee alleges facts showing that (1) the Kingate Funds' managers' relationship with BLMIS was typical for a large investor, (2) the Funds' managers failed to discern a fraud from the same information available to nearly all BLMIS investors, and (3) the Funds' managers believed that BLMIS *was* trading securities.  These allegations do not satisfy *Cohmad*.

### 1.        The Trustee Alleges a Typical Relationship Between the Funds' Managers and BLMIS

The Trustee's allegations about interactions between the Kingate Funds' managers with Madoff do not demonstrate any knowledge of Madoff's fraud.  The Trustee alleges that, during the Funds' 14 years of investing with BLMIS, their managers had meetings or calls with Madoff, one Cohmad employee, and BLMIS employees. Opp'n at 17-18.  The Trustee argues, for example, that "Grosso met with Madoff in New York or London at least two times a year, 4th Am. Compl. ¶ 99, and that [d]uring those meetings, and the frequent telephone conversations that occurred in between, Grosso and Madoff discussed various matters, including the performance of BLMIS and the Funds." *Id*. at 17.  Significantly, nowhere does the Trustee allege that Madoff disclosed his fraud to Grosso (or to the Kingate Funds), nor does he have any facts to support such an allegation.  The Trustee also alleges that the Funds' managers spoke to other BLMIS customers, and discussed concerns about BLMIS with them.  *Id*. at 18.

These allegations do not demonstrate actual knowledge of any fraud.  Rather, at most, they show that the Funds' managers periodically inquired about the Funds' investments.  Investors often meet with and speak to their brokers.  Similarly, it is not unusual for an investor to discuss concerns about risks with others.  Alleging that such discussions and meetings

occurred does not establish that the Kingate Funds had "direct and clear knowledge" or a "high level of certainty and absence of any substantial doubt" that BLMIS was a fraud.  *Merkin*, 515 B.R. at 139.  Indeed, such allegations provide no evidence whatsoever of knowledge of fraud.

**2.    The Trustee Alleges that the Kingate Funds' Managers Failed to Discern Fraud from the Same Information Available to Other Customers**

Most of the Trustee's allegations consist of claims that the Kingate Funds' managers failed to detect signs of impossible trading activity at BLMIS and other purported badges of fraud based on widely available information about BLMIS and its supposed investments.  *See, e.g.*, Opp'n at 18-20.  But as Judge Rakoff held in *Cohmad*, customers do not have any obligation to perform due diligence on their brokers.  2013 WL 1609154 at *4 n.2; *see also Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011).  In this respect, the Trustee seems to forget that he is asserting claims against BLMIS *customers*.  The Trustee is *not* in the position of a Kingate investor suing the Funds' managers for insufficient diligence.  The managers of the Kingate Funds may have had duties to the Funds and their investors—true victims of Madoff's fraud—but they decidedly did *not* owe any such duties to BLMIS.

In *Merkin*, this Court concluded that allegations that Ezra Merkin actually knew and appreciated the significance of various red flags and suspected that BLMIS was a Ponzi scheme did not rise to a "high level of certainty and absence of any substantial doubt regarding the existence of a fact."  *Merkin*, 515 B.R. at 139-42.  The Trustee has alleged far less here.  The Trustee has not alleged facts demonstrating that the Kingate Funds or the Funds' managers were suspicious of BLMIS's fraud.  The Trustee has not alleged that the Funds or their managers recorded or discussed problems with BLMIS.  At most, he has alleged that the Funds' managers failed to properly conduct the due diligence they were hired *by the Funds* to undertake.  The

Funds' managers' negligence does not establish that the Kingate Funds knew that BLMIS was a Ponzi scheme.

### 3.   The Trustee Alleges that the Funds' Managers Believed BLMIS Was Trading Securities

The Trustee's allegations that the Funds' managers believed that BLMIS may have been engaged in front running, Opp'n at 21-22; 4th Am. Compl. ¶¶ 139-40, are fatal to the Trustee's attempt to satisfy *Cohmad*.  Even if such allegations were true—which they cannot be because the conduct alleged by the Trustee does not constitute front running—knowledge of other unlawful conduct is not relevant.  *Cohmad* requires actual knowledge that BLMIS was a Ponzi scheme.  *Cohmad*, 2013 WL 16019145 at *3-4.  If the Funds' managers actually were suspicious of front running at BLMIS, that would reflect their belief that Madoff *was* trading securities.[2] Such allegations, accordingly, flatly contradict the Trustee's assertion that the Funds had actual knowledge of the BLMIS fraud.

Implicitly acknowledging this flaw in reasoning, the Trustee asserts for the first time in his Opposition, and without any factual support, that the front running "'explanation' to shareholders was a pretext for Madoff's performance."  Opp'n at 21.  Even if this newly minted allegation were properly before the Court,[3] it rests only on the Trustee's speculation that the Kingate Funds "knew all along that front-running could not have produced BLMIS's impossible

---

[2]   The Trustee's own definition of front-running demonstrates that such conduct requires actual trading.  *See* Opp'n at 21 n.72 ("[f]ront-running occurs when a stockbroker *trades* ahead of its customers . . . .") (emphasis added).  *See also* Front running: CNBC Explains, *available at* http://www.cnbc.com/id/101549039# (last visited October 29, 2014) ("In conventional terms, front running is something that happens within a firm:  A trader gets word that a customer is interested in purchasing a big block of a company's shares, and that trader will purchase shares for his individual account before executing the customer's order.  When the customer's purchase gets executed, the price rises and the trader pockets the difference between the new price and what he paid.").

[3]   Allegations raised for the first time in an opposition brief cannot be considered.  *See, e.g.*, *Aniero Concrete Co., Inc. v. New York City Constr. Auth.*, No. 94 Civ. 3506 (CSH), 2000 WL 863208, at *31 (S.D.N.Y. June 27, 2000) (excluding new facts in opposition brief as extra-pleading matters on motion to dismiss; limiting consideration of the sufficiency of claim to the "four corners of the pleading").

trading results." Opp'n at 21.  Such speculation does not meet the *Cohmad* standard.  *Merkin*,

515 B.R. at 140 (analyzing only non-conclusory allegations to evaluate actual knowledge).

### C.    The Totality of Allegations Belies The Assertion That The Kingate Funds Actually Knew That BLMIS Was Not Trading Securities

The Trustee contends that the totality of allegations militates in favor of holding that the

Kingate Funds actually knew BLMIS was not trading securities.  Opp'n at 17.  That is

backwards; the totality of allegations suggests just the opposite.  The allegations, accepted as true,

make clear that (a) the Kingate Funds were massive net losers that suffered losses of $800

million as the result of Madoff's fraud, and (b) the only evidence of "improper" conduct was a

failure by the Funds' managers—whose duty was to work for the benefit of the Kingate Funds—

to discern Madoff's fraud from the very same information available to scores of other investors.

The Trustee contends that the Kingate Funds' status as net losers is not relevant.  That, of

course, is incorrect.  Why would the Kingate Funds knowingly throw away their own money if

they *knew* Madoff was operating a Ponzi scheme?  The simple answer is that they would not.

And the Trustee's suggestion that the Funds somehow benefited from withdrawing only a

portion of *their own money* cannot possibly support a finding of actual knowledge.  If the

Kingate Funds knew that Madoff was not trading securities, they would have—like scores of net

winners did—withdrawn the entirety of the balances on their account statements.  Instead, from

day one through the very end, the Kingate Funds were net losers that failed to withdraw billions

of dollars purportedly sitting in their accounts.  This conduct, which is reflected in the allegations

of the Fourth Amended Complaint, not only fails to demonstrate actual knowledge of fraud, but

is wholly inconsistent with such knowledge.[4]

---

[4]   Similarly, the Trustee's claims that the Kingate Funds benefited from paying hundreds of millions of dollars to their managers, *see* Opp'n at 24, make no sense.  These payments constituted further harm—not benefit—to the Funds, thus the aggregate amount of their losses exceeds one billion dollars.

The Trustee's allegations—whether reviewed one-by-one or in their entirety—establish that the Trustee has not pled that the Funds actually knew of the BLMIS fraud.  This Court should dismiss Counts I and III-VIII.

## II.    SECTION 548(c) BARS THE TRUSTEE'S SECTION 548(a)(1)(A) CLAIM

"Without particularized allegations that the defendants here either knew of Madoff Securities' fraud or willfully blinded themselves to it, the Trustee's complaints here cannot make out a plausible claim that he is entitled to recover the monies defendants received from their securities accounts."  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC ("Good Faith Ruling")*, No. 12-MC-115 (JSR), 2014 WL 1651952, at *5 (S.D.N.Y. Apr. 27, 2014); *Merkin*, 515 B.R. at 138.  The Trustee has not met his burden.

As explained in the previous section, the Trustee has not adequately alleged that the Kingate Funds had actual knowledge of Madoff's Ponzi scheme.  Nor has the Trustee pled that the Funds willfully blinded themselves to such fraud.  "'Willful blindness' . . . involves two elements:  '(1) the defendant must subjectively believe that there is a *high probability* that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.'"  *Merkin*, 515 B.R. at 139 (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)) (emphasis in original).  The Trustee has not adequately alleged either of the elements of willful blindness, and thus Count II should be dismissed.

### A.    The Trustee Has Not Pled That The Kingate Funds Believed There Was A High Probability That BLMIS Was Operating A Fraud

In *Merkin*, this Court based its conclusion that the Trustee pled willful blindness on allegations wholly different from those in the present complaint.  *Merkin*, 515 B.R. at 141-146.  For example, as described by this Court, the allegations in Merkin included:

- "Merkin told Research Company A in June 2003 that Madoff's scheme was bigger than Ponzi, and 'Charles Ponze [sic] would lose out because it would be called the Madoff Scheme.' (¶ 95.)"  *Id*. at 129.

- "Victor Teicher, a money manager, managed parts of the Ariel and Gabriel portfolios between 1988 to 1994 and between 1998 to 2000. (¶¶ 102, 104.)  He told Merkin, in the presence of Jack Mayer, an employee under Teicher, that BLMIS' trading was impossible and could be a Ponzi scheme.  (¶¶ 102–03, 105.)"  *Id*. at 129.

- "When asked by Ivy about BLMIS' consistent returns, Merkin replied, '[U]nderstanding Madoff is like finding Pluto . . . you can't really see it . . . you do it through inference, its effect on other objects.' (¶ 100.)"  *Id*. at 129.

- "When [Merkin] asked Madoff which assets BLMIS managed, Madoff refused to answer, and Merkin did not press him, stating, 'I don't really care, because I've made my peace with Bernie.' (¶ 156.)"  *Id*. at 131.

The allegations in the Fourth Amended Complaint are nothing like these, and fail even to suggest that the Kingate Funds subjectively believed that there was a *high probability* that Madoff was operating a fraud.  As explained in the Motion, and as noted above, the Trustee's claims against the Kingate Funds rely on speculation, hindsight analysis of widely disseminated information, and criticisms of inadequate due diligence performed by the Funds' managers, who had no duty (from the Trustee's perspective) to conduct *any* analysis of BLMIS.  Even the Trustee's most notable allegations of purported knowledge come nowhere close to indicating a subjective belief of highly probable fraud.  To wit:

- The Trustee alleges that Grosso was given a tour of BLMIS's offices, which included a stop at the 17th floor, where BLMIS allegedly conducted its trades on antiquated systems that were not connected to the Internet.  4th Am. Compl. ¶ 100.  In other words, Grosso saw that BLMIS had a trading floor.  He saw that the traders had computers.  How he was to intuit that those computers were not connected to the Internet or an internal network (assuming that is true) is a complete mystery.

- The Trustee alleges that FIM once recommended liquidating an investment—in a fund wholly unrelated to Madoff—because that fund manager was reluctant to meet with investors.  4th Am. Compl. ¶ 120.  The allegation has nothing to do with knowledge of fraud, either within BLMIS or in the irrelevant other fund.

10

- The Trustee alleges that FIM recognized that it could not do complete due diligence on BLMIS.  4th Am. Compl. ¶¶ 128-134.  The inability to completely examine the operations of a private fund hardly amounts to a belief that the fund is a fraud, especially when it is one of the largest funds in the world.

- In his Opposition, the Trustee incorrectly asserts that Ceretti "order[ed] employees" to "keep . . . away" a potential investor that questioned Madoff's dual role as broker and manager.  Opp'n at 28.  The argument is baseless.  As the Trustee knows, Ceretti requested the Fund's *administrator* to keep away *another investment firm* that was looking to set up a competing fund in Bermuda.  His instruction to the Funds' administrator had nothing to do with Madoff's method of operations or a potential investor.  Indeed, the Trustee's own allegation makes clear that it was the administrator, not someone marketing the Kingate Funds, that spoke to the third party.  4th Am. Compl. ¶ 219.

- The Trustee points to a self-serving e-mail sent by an FIM employee *after* Madoff's scheme collapsed and was publicly known, claiming it constitutes evidence of awareness of the "scam" at some unidentified time *before* the collapse.  4th Am. Compl. ¶ 134.  The Trustee does not identify *any* communication sent prior to BLMIS's collapse that included these assertions.

The Trustee's remaining allegations all concern information that, the Trustee alleges, could have been obtained by analyzing documents—including SEC filings—that were made available to a wide array of BLMIS customers.  Opp'n at 18-20.  The Trustee's conclusions about what the Funds' managers *could* have discovered, had they conducted the same detailed investigation undertaken by the Trustee after everyone learned that Madoff was a criminal, do not even suggest that the Funds suspected that BLMIS was operating a Ponzi scheme, let alone that the Funds believed there was a high probability that Madoff was engaged in such a fraud.

As this Court explained in *Merkin*, "the 'red flag' theory of *scienter* in the securities fraud context will be rejected where the complaint fails to allege specific facts indicating that the defendant was aware of the red flags.'"  *Merkin*, 515 B.R. at 144 (citations omitted); *Saltz v. First Frontier, LP*, 782 F.Supp.2d 61, 72 (S.D.N.Y. 2010), *aff'd* 485 Fed. Appx. 461 (2d Cir. 2012); *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F.Supp.2d 362, 371 (S.D.N.Y. 2010).  Here, the Trustee's "red flag theory of scienter" is based on allegations that the Funds'

managers, had they been sufficiently diligent, should have rooted out Madoff's fraud. Such

allegations are insufficient to establish the required level of belief for an assertion of willful

blindness.

**B.      The Trustee Has Not Pled That The Kingate Funds Took Deliberate Actions
To Avoid Learning That BLMIS Was A Ponzi Scheme**

As set forth above, the Trustee has not alleged any basis for concluding that the Kingate

Funds "subjectively believe[d]" there was a "high probability" of fraud. And, even if he had, the

Trustee does not allege that the Kingate Funds took any "deliberate actions to avoid learning" of

that fraud. The Trustee concedes that the Kingate Funds (a) retained PriceWaterhouseCoopers, a

Big Four accounting firm, to audit their books and records, (b) hired Citi Hedge (and its

predecessors) to serve as an independent, outside administrator, and (c) engaged KML and

FIM—a firm that "already owned and managed several well-established investment funds"—to

manage their investments. 4th Am. Compl. ¶¶ 73-78, 104, 234. These are not, of course, the

steps that investment funds would take if they intended to hide their heads in the sand.

The Trustee attempts to plead around these admitted facts by pointing to data that, he

says, the Funds' managers could have analyzed to discover Madoff's fraudulent conduct. For

example, the Trustee alleges that scores of trades were allegedly impossible, that BLMIS's buy

and sell prices contradicted public reports, that Madoff's options trades exceeded the amounts

actually traded on the exchange, and similar alleged "red flags." Such allegations do not reflect

deliberate actions undertaken to avoid the truth. They reflect, rather, what the Funds' managers

arguably *could* have learned had they conducted full operational diligence regarding BLMIS's

holdings and trading patterns. Had the managers done so, the Funds—which the Trustee has

defined as the relevant customers—might be better off today. The managers' failure to conduct

extensive diligence is a far cry from the conscious avoidance required for willful blindness. And

it bears repeating that, as BLMIS customers, the Funds owed no duty to Madoff, or Madoff's

other customers, to probe the legitimacy of BLMIS's representations.

## III.    THERE IS NO BASIS FOR EQUITABLY SUBORDINATING THE KINGATE FUNDS' CLAIMS

To state a claim for equitable subordination, the Trustee must plead with particularity[5]

that (1) the Funds engaged in inequitable conduct, and (2) that inequitable conduct caused injury

to other creditors or gave an unfair advantage to the Funds.  *Official Comm. Of Unsecured*

*Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 360 (Bankr.

S.D.N.Y. 2010).  The Trustee has not pled either prong.[6]

### A.    The Trustee Has Not Alleged Inequitable Conduct

The Trustee concedes, as he must, that the Kingate Funds are not insiders.  Opp'n at 28-

29.  Thus, to survive a motion to dismiss, the Trustee must adequately allege "egregious

conduct" that is "tantamount to 'fraud, misrepresentation, overreaching or spoliation [sic].'"  *Off.*

*Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam*

---

[5]   The Trustee argues that non-insider claims for equitable subordination—even those based on fraud—do not implicate Rule 9(b)'s heightened pleading requirements.  Opp'n at 31.  That is incorrect.  Where, as here, claims for equitable subordination are premised on fraud, the heightened pleading requirements of Rule 9(b) must be met.  *See O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group Ltd.)*, 383 B.R. 231, 276-77 (Bankr. S.D.N.Y. 2008) (dismissing fraud based claims for equitable subordination that failed to satisfy Rule 9(b)); *Off. Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009) (noting "these facts [supporting a claim for equitable subordination] must be pled with particularity").

[6]   The Trustee argues that *Merkin* and *Katz* require this Court to sustain his equitable subordination claim so long as the standard for avoiding transfers to the Funds is met (which, as explained above, is not the case here).  Opp'n at 31-32.  Under this theory, any recipient of an avoidable fraudulent transfer is subject to equitable subordination.  Equitable subordination, however, is a harsher remedy that must be subjected to a higher standard.  *See, e.g.*, *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 838-39 (Bankr. S.D.N.Y. 1994); *see also Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 517 (Bankr. S.D.N.Y. 2011) (noting "constructive fraudulent transfers rarely if ever involve gross and egregious conduct" to support claims for equitable subordination).  Lack of good faith allegations are not enough to sustain the Trustee's claim.  *First Bank of Whiting v. Kham & Nate's Shoes, No. 2, Inc.*, 104 B.R. 909, 913 (N.D. Ill. 1989) ("[A non-insider] claimant's conduct must amount to more than 'lack of good faith' in order to warrant equitable subordination of his claim"), *vacated on other grounds*, 908 F.2d 1351 (7th Cir. 1990).

*Corp.)*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002) (citations omitted).  The allegations of the complaint cannot—and do not—meet this standard.

First, the Trustee asserts that the Kingate Funds acted inequitably by investing in what their managers knew to be a fraudulent scheme, thereby "perpetuating BLMIS's fraud."  Opp'n at 28-29.  In essence, the Trustee contends that the Kingate Funds helped keep BLMIS afloat, which enabled Madoff to attract even more customers.  *See* 4th Am. Compl. at ¶ 330.  This argument borders on the absurd.  The Trustee's theory that the Kingate Funds kept the fraud alive by sinking their own money into BLMIS, if accepted, would mean that *net losers were responsible for Madoff's fraud*.  After all, it was net losers that kept BLMIS in business; they were the ones funding the profits pulled out by net winners.  That, of course, makes no sense at all.  Net losers, such as the Kingate Funds, were Madoff's true victims.

Second, the Trustee asserts that the Kingate Funds acted inequitably by receiving transfers of their own principal from BLMIS.  Opp'n at 29.  Once again, the Trustee's attempt to paint innocent conduct in a nefarious light must fail.  There is simply nothing wrong with an investor withdrawing money from its account (particularly where, as here, that money was withdrawn to satisfy redemption requests from the Funds' own investors).  The Funds were legally entitled to all of the withdrawals they made over the 14 years they invested with BLMIS; *not a single penny of the withdrawn amounts was false profits*.  Simply put, the Funds withdrew some—but far from all—of their own money, and there is nothing egregious or inequitable about that.

**B.      The Trustee Has Not Alleged Harm To Other Creditors**

Even if the Trustee had alleged inequitable conduct by the Kingate Funds—which he has not—the complaint fails to allege any harm caused by the purported inequitable conduct.  *See 80 Nassau Assocs.*, 169 B.R. 832 at 840.

14

First, the Trustee has failed to identify even a single creditor that was actually harmed by the Kingate Funds' conduct.  The Trustee asserts that the $900 million withdrawn by the Funds "could have been available to the fund of customer property" for the benefit of other customers. Opp'n at 29.  But surely the fund of customer property is *better off* from the nearly $2 *billion* that the Kingate Funds invested in BLMIS, approximately half of which they never withdrew.  The fact is, creditors were not harmed by the Kingate Funds' conduct; they were helped by it.

Second, the Trustee has not adequately alleged that the full body of creditors was harmed by the Kingate Funds.  Even if some creditors were induced to invest by following in the footsteps of the Kingate Funds—a dubious proposition that would implicate all net losers in Madoff's fraud—there can be no question that many investors were wholly unaffected by the Kingate Funds' investments, including customers that were net winners and those that invested before the Kingate Funds.  Because the Trustee has not alleged—and cannot allege— generalized harms suffered by the entire creditor class, the Trustee lacks standing to assert a claim for equitable subordination.  *Picard v. JPMorgan Chase & Co.*, 721 F.3d 54, 71 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2895 (2014); *see also In re Morpheus Lights, Inc.*, 228 B.R. 449, 453 (Bankr. N.D. Cal. 1998) (noting whether a claim for equitable subordination is properly asserted by a trustee or a creditor "depends on whether the claim is general or particular").[7]

### C.    The Equitable Subordination Claim Targets The Wrong Parties

The Trustee's equitable subordination claim against the Kingate Funds is based entirely on the purported misconduct of the Kingate Funds' managers—ultimately controlled by Grosso and Ceretti—not by the Kingate Funds themselves.  Subordinating the Kingate Funds' claims

---

[7]  The Trustee argues that the Kingate Funds' standing arguments were fully addressed, and rejected, by this Court in *Merkin*.  *See* Opp'n at 33.  But in *Merkin* this Court did not reach the issue of "whether the Trustee also has standing to assert that the defendants induced the investors to invest."  *Merkin*, 515 B.R. at 159 n.27.  Insofar as the Trustee seeks to subordinate the Kingate Funds' claims based on allegations that the Kingate Funds misled BLMIS customers, his claims must be dismissed.

would serve only to deprive the Funds' innocent investors of any meaningful recovery on their collective investment in BLMIS.  Far from equitable, denying any recovery to these investors is the pinnacle of inequity.

There is, of course, a more targeted approach available:  Grosso and Ceretti can be sued directly for aiding and abetting Madoff's fraud.  If the Trustee himself cannot assert such a claim, customers who believe they were harmed are free to do so.  Such a case would provide an avenue to test the Trustee's assertions of knowledge against Grosso and Ceretti, without causing further harm to the Kingate Funds and their investors who already have suffered as the result of Madoff's scheme.[8]

For the foregoing reasons, Count XI should be dismissed.

## IV.    THE MANAGERS' KNOWLEDGE CANNOT BE IMPUTED TO THE FUNDS THAT THEY FURTHER VICTIMIZED

All of the Trustee's efforts to allege knowledge or other misconduct on the part of the Kingate Funds focus not on the Funds themselves, but rather on the managers engaged by the Funds to oversee their investments.  Crediting the Trustee's assertions that these managers knew of, or willfully blinded themselves to, Madoff's fraud—an assertion that is not supported by the allegations of the Fourth Amended Complaint—the managers acted in a manner wholly adverse to the Kingate Funds and their many investors.  If the managers that the Funds entrusted to oversee their assets actually knew that BLMIS was a Ponzi scheme, yet continued to direct the Funds' money into BLMIS, then the Funds were victimized twice:  first, by Bernard Madoff;

---

[8]    The Trustee's claim for equitable subordination should be dismissed for the additional reason that it is barred by the *Wagoner* rule and the doctrine of unclean hands.  *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (finding "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors"); *accord Granite Partners L.P. v. Bear Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 311 (S.D.N.Y. 1998) (dismissing claims for equitable subordination where debtor's wrongful conduct was "intrinsically related to the claims for which the [plaintiff] seeks to recover . . . ."); *see also* Motion at 33-35.

and, second, by the investment managers that stood to profit off the Funds.  Under these circumstances, the managers' knowledge—if sufficient to support the Trustee's claims—cannot be imputed to the Funds.  As the Trustee acknowledges, Opp'n at 8-9, the adverse interest exception applies where "the agent has 'totally abandoned his principal's interests,' and acted 'entirely for his own or another's purposes.'"  *Ctr. v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784-85 (1985); *see also In re Maxwell Newspapers, Inc.*, 164 B.R. 858, 865-70 (Bankr. S.D.N.Y. 1994) (refusing to impute knowledge where agents looted subsequently insolvent corporation for their own benefit).[9]

The Trustee has repeatedly alleged that the Funds paid hundreds of millions of dollars to their managers.  *See, e.g.*, 4th Am. Compl. ¶¶ 8, 107-109, 145, 245-46, 254, 257-58.  Oddly, in the Opposition, the Trustee argues that the Funds *received* these fees, and thus *benefited* from them.  Opp'n at 4-5.  Nothing could be further from the truth.  The Funds lost over $800 million to BLMIS.  From their own money, they paid (and lost) hundreds of millions of dollars to the investment managers, resulting in further damage to the Funds and their investors.  Indeed, the Funds are currently suing those managers in Bermuda, seeking return of the inflated management fees.  The flatly false and misleading nature of the Trustee's new assertion that the Funds "received hundreds of millions of fees" highlights the complete adversity between the managers and the Funds (if, as the Trustee now argues, the managers knew of Madoff's fraud).  If, as the Trustee contends, the managers misdirected the Funds to maximize *their own* management fees,

---

[9]  Curiously, the Trustee asserts that Madoff's indisputable bad acts should not be imputed to him, as the successor-in-interest to BLMIS.  Yet, in the case of the Kingate Funds, the Trustee argues just the opposite:  that the Funds, now being overseen by court-appointed Joint Liquidators, should be burdened by the improper conduct (if any) of the Funds' former managers.  The Trustee himself has asserted that "defenses based upon the debtor's wrongful conduct do not apply" where a trustee is acting on behalf of innocent creditors of a bankrupt estate.  Opp'n at 33.  There can be no question that imputing the managers' alleged misconduct to the Kingate Funds would lead to the inequitable result of depriving the Kingate Funds and their many innocent investors of any recovery on their massive losses.

then they breached their duties to the Funds, they acted solely adversely to the Funds, and there is no basis for imputing the knowledge of those managers to the Funds themselves.[10]

The Trustee also asserts that the Kingate Funds benefited from their withdrawals from Madoff, and by transferring withdrawals to their investors. This simply is not so. However much they withdrew from BLMIS, it was more than $800 million *less* than what they invested. The Trustee responds that the Funds' net loss "only describes the status of the Funds' customer accounts on the filing date." Opp'n at 23. Again, that is incorrect. The Funds were net losers as measured from day one through the end; they never withdrew more than they invested with BLMIS. The Trustee does not, and cannot, allege otherwise.

The holding in *Merkin* that the adverse interest exception did not apply there because Merkin's funds benefited from Madoff's fraud finds no application here. Merkin's funds used their proceeds from BLMIS to make other investments, and presumably to make money on those investments. 515 B.R. at 148 (explaining that Merkin's funds "used the majority of their fictitious profits to make other investments.") Not so for the Kingate Funds. As the Trustee alleges, the Kingate Funds invested all of their money in BLMIS. 4th Am. Compl. ¶ 89. They never made a dime. As this Court acknowledged in *Merkin*, the adverse interest exception applies "where the fraud is committed against [the principal] rather than on its behalf." 515 B.R. at 147 (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467 (2010)). If the Kingate Funds' managers knew of Madoff's Ponzi scheme, their misconduct was committed precisely against the Kingate Funds.

---

[10]  The Trustee alleges that Ceretti and Grosso were "creators" of the Kingate Fund, and thus "acted as agents" for the Funds. 4th Am. Compl. ¶ 83. Whatever role the investment managers played in setting up the Kingate Funds, the Funds themselves consisted of investments from innocent, third-party investors that are true victims of Madoff's fraud. As illustrated by the Funds' litigation against their managers, it would be erroneous to equate the Funds with their investment managers.

18

The bottom line is simple, and is not contradicted by the allegations of the complaint. The Kingate Funds were defrauded by Madoff. If their investment managers were aware of that fraud, those managers further looted the Funds by stealing hundreds of millions in dollars of fees from them and their investors. To the extent the managers had knowledge of Madoff's fraud— which, again, is not supported by the allegations of the complaint—that knowledge cannot be imputed to the Funds they further victimized.

## V. THE TRUSTEE'S CLAIMS FOR EQUITABLE DISALLOWANCE FAIL AS A MATTER OF LAW

The Trustee's argument that the Kingate Funds' claims should be equitably disallowed is both muddled and incorrect. As this Court previously held in *Merkin*, there is no basis for disallowance, either under section 502(b)(1) or based upon general equitable principles.

The Trustee's assertion that the Kingate Funds can be denied recovery under 502(b)(1) because, under applicable SIPA law, they cannot (in the Trustee's view) establish entitlement to their claim, was properly rejected by this Court in *Merkin*. It is not appropriate, this Court explained, "to deny a person his share of property that he owns because he is a bad person." 515 B.R. at 156. The Court further noted, in a passage especially applicable here, that "equitable disallowance of the Defendant Funds' claims would work a substantial inequity by punishing the very investors" that the complaint contends were defrauded by their managers. *Id*.[11]

The Trustee's attempt to disallow claims based on broad principles of equity was similarly rejected in *Merkin*. 515 B.R. at 157; *see also Harbinger Capital Partners LLC v. Ergen (In re LightSquared )*, 504 B.R. 321, 336, 344 (Bankr. S.D.N.Y. 2013) (finding "equitable

---

[11]  In *Merkin*, this Court specifically rejected the Trustee's argument that SIPA expands the Trustee's powers to disallow claims under section 502(b) for equitable reasons. As the Trustee must know, Judge Rakoff has recognized—at the Trustee's urging—that SIPA adopts the allowance scheme established under section 502. *See Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 517 B.R. 437, 442-43 (S.D.N.Y. 2014).

disallowance is not permitted under the Bankruptcy Code."). As the Court concluded, "it cannot disallow an otherwise valid claim based on general principles of equity." 515 B.R. at 157.

The Trustee attempts to circumvent both of these holdings by arguing that he is seeking to disallow claims against both customer property and general property of the estate. *See* Opp'n at 35. That distinction is meaningless; under the plain language of section 502, the Trustee is not entitled to disallow *any* claim for equitable reasons. *Merkin*, 515 B.R. at 156. Counts X and XII should be dismissed.[12]

## CONCLUSION

For the reasons set forth herein and in the Motion, the Fourth Amended Complaint should be dismissed with prejudice as against the Kingate Funds.

DATED:    New York, New York
           November 25, 2014

                     QUINN EMANUEL URQUHART &
                        SULLIVAN, LLP

                     By: /s/ Robert S. Loigman
                        Susheel Kirpalani
                        Robert S. Loigman

                     51 Madison Avenue, 22nd Floor
                     New York, New York  10010-1601
                     (212) 849-7000

                     *Counsel to Joint Liquidators of Kingate Global Ltd. and Kingate Euro Ltd.*

---

[12]   The Trustee contends that his disallowance claims should survive and proceed to trial because, he says, the Court did not consider a few points in *Merkin*. Opp'n at 38. First, he raises the prospect of piecemeal appeals, but interlocutory appeals are not permitted under federal procedural law. He next asserts that disallowance of a claim under section 502(h) may be permitted if the Court were to construe the statute "harmoniously," but he never explains what is disharmonious about the allowance of a claim upon full repayment of an avoidance action. In fact, that is what section 502(h) requires. Lastly, the Trustee suggests that the comingling of customer property relegates a securities customer to some lower status. If true, then *nobody* would have a customer claim against the BLMIS estate.