# EXHIBIT 1

[DRAFT]

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
dsheehan@bakerlaw.com
Timothy S. Pfeifer
tpfeifer@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC and the
Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | No. 08-01789 (SMB) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05411 (SMB) |
| Plaintiff, | **THIRD AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SONJA KOHN, INFOVALEUR, INC., and TECNO DEVELOPMENT & RESEARCH LTD., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NATURE OF THE PROCEEDINGS ........................................................................................1

JURISDICTION AND VENUE .............................................................................................2

BACKGROUND, THE TRUSTEE, AND STANDING .............................................................3

THE PONZI SCHEME .........................................................................................................5

THE DEFENDANTS.............................................................................................................9

    Sonja Kohn...................................................................................................................9

    Infovaleur, Inc. ("Infovaleur")...............................................................................10

    Tecno Development & Research Ltd. ("Tecno Gibraltar").................................11

    Kohn's Other Entities .............................................................................................11

THE TRANSFEREE DEFENDANTS OPERATED AS KOHN'S ALTER EGOS....................13

    Kohn Dominated and Controlled Infovaleur .....................................................13

    Kohn Dominated and Controlled Tecno Gibraltar............................................14

KOHN ACTIVELY CONCEALED HER RECEIPT OF MADOFF COMMISSIONS ..............15

    Kohn Invoiced Madoff for Services That the Transferee Defendants Did Not Perform...15

    Kohn and Madoff Misrepresented the Kohn Payments to Third Parties ...........16

KOHN HAD CLOSE ACCESS TO THE IA BUSINESS FOR TWENTY YEARS ..................17

THE RESEARCH INVOICES ...........................................................................................20

INFOVALEUR RESEARCH ..............................................................................................21

TECNO GIBRALTAR RESEARCH ....................................................................................23

THE TRANSFERS ............................................................................................................24

CAUSES OF ACTION ......................................................................................................26

    COUNT ONE:  FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551 ................................................................................................................26

    COUNT TWO:  FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551 ................................................................................................................27

C:\Users\Obitman\Desktop\Avoidance Actions\Adv. Pro Filings\Adv. Filing of 11_26_14\Kohn - Draft Third Amended Complaint (Final).DOCX

## TABLE OF CONTENTS

### (continued)

**Page**

COUNT THREE:  FRAUDULENT TRANSFER – N.Y. DCL §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551 ................................................29

COUNT FOUR:  FRAUDULENT TRANSFER – N.Y. DCL §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551 ................................................30

COUNT FIVE:  FRAUDULENT TRANSFER – N.Y. DCL §§ 274, 278, AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551 ................................................31

COUNT SIX:  FRAUDULENT TRANSFER – N.Y. DCL §§ 275, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551 ........................................32

COUNT SEVEN:  RECOVERY OF ALL FRAUDULENT TRANSFERS – N.Y. CPLR 203(g), 213(8), N.Y. DCL §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§544, 550(a), AND 551 ................................................33

DEMAND FOR RELIEF....................................................................................34

DEMAND FOR JURY TRIAL .........................................................................37

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), and the estate of Bernard L.

Madoff ("Madoff") (BLMIS and Madoff, the "Debtors"), by the Trustee's undersigned counsel,

for his Third Amended Complaint against Sonja Kohn ("Kohn"), Infovaleur, Inc. ("Infovaleur"),

and Tecno Development & Research Ltd. ("Tecno Gibraltar") (Tecno Gibraltar and Infovaleur,

the "Transferee Defendants" and with Kohn, the "Defendants"), states:

### NATURE OF THE PROCEEDINGS

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff.  Over the course of the scheme, BLMIS maintained over 8,000 client accounts.  In early

December 2008, BLMIS generated client account statements for its approximately 4,900 open

client accounts.  When added together, these statements purport that clients of BLMIS had

approximately $65 billion invested with BLMIS.  In reality, BLMIS had assets on hand worth a

small fraction of that amount.

2.      Madoff's Ponzi scheme required investors.  For over twenty years, Kohn secured

investors for BLMIS.  BLMIS made payments to Kohn (the "Kohn Payments") for her

solicitation of investors to BLMIS.

3.      Kohn created the Transferee Defendants to receive the Kohn Payments.  She

dominated and controlled the Transferee Defendants.

4.      The Trustee seeks to recover $35,484,360 in Kohn Payments made to the

Transferee Defendants by BLMIS between July 15, 1998 and August 8, 2008.

5.      The Transferee Defendants sent BLMIS invoices for "research" and "consulting"

services they purported to provide Madoff.

1

6.      The research provided to Madoff by the Transferee Defendants was generally plagiarized from publicly-available sources.

7.      Although the Kohn Payments were disguised as payments for research services, the payments made to the Transferee Defendants were in fact commissions for the $9.1 billion in investment capital that Kohn introduced to BLMIS.

8.      The Kohn Payments were made to further the Ponzi scheme by compensating Kohn for introducing investors to BLMIS.  BLMIS did not use the research provided by Kohn and/or the Transferee Defendants.  BLMIS received no corresponding benefit or value in exchange for the Kohn Payments.

9.      The statutory predicates for the relief sought herein include SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 544, 547, 548, 550 and 551 of title 11 of the United States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York Debtor Creditor Law §§ 270 *et seq.* (McKinney 2001) ("N.Y. DCL")), and the New York Civil Practice Law and Rules §§ 203(g) and 213(8) ("N.Y. CPLR").

## JURISDICTION AND VENUE

10.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1) and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

11.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

12.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

13.    This adversary proceeding is brought under SIPA §§ 78fff(b), 78fff-1(a), and

78fff-2(c)(3), sections 544, 547, 548, 550 and 551 of the Bankruptcy Code, N.Y. DCL §§ 270 *et*

*seq.*, and N.Y. CPLR §§ 203(g) and 213(8).

### BACKGROUND, THE TRUSTEE, AND STANDING

14.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding.

15.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

16.    Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order under SIPA, which, in pertinent part:  (i) appointed the Trustee for the

liquidation of the business of BLMIS under SIPA § 78eee(b)(3); (ii) appointed Baker &

Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and (iii) removed the

case to this Court under SIPA § 78eee(b)(4).

17.    By orders dated December 23, 2008 and February 4, 2009, respectively, this

Court approved the Trustee's bond and found that the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

18.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

19.    At a plea hearing on March 12, 2009, in the case captioned United States v. Madoff, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

20.    At a plea hearing on August 11, 2009, in the case captioned United States v. DiPascali, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

21.    At a plea hearing on November 21, 2011, in the case captioned United States v. Kugel, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

22.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

23.     As the Trustee appointed under SIPA, the Trustee is charged with assessing

claims, recovering and distributing customer property to BLMIS's customers holding allowed

customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its

creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and

recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and

others to the detriment of defrauded, innocent customers whose money was consumed by the

Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the

claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

24.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy

Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

25.     The Trustee has standing to bring the avoidance and recovery claims under SIPA

§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b),

544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover

transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-

1(a) and 78fff-2(c)(3).

26.     One or more creditors hold claims that arose at the time of or prior to the earliest

transfers relevant to this dispute including customers with unsatisfied net equity claims, vendors,

taxing authorities and employees.

**THE PONZI SCHEME**

27.     Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1,

2001, Madoff continued BLMIS as a sole member limited liability company under the laws of

the State of New York.  BLMIS's ownership and control did not change since its formation in

1960.  During that time, BLMIS had been continually registered with the SEC, and remained a

SIPC member since its formation in late 1970.  For most of its existence, BLMIS operated from

its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder,

sole owner, chairman, and chief executive officer, operated BLMIS with several family members

and other employees, including DiPascali and David Kugel, who pleaded guilty to helping

Madoff carry out the fraudulent scheme.

28.      During the early 1970s through the early 1990s, Madoff claimed to invest

customer funds using a "convertible arbitrage investment strategy," by which investors would

gain profits from a change in the expectations for the stock or convertible security over time.

29.      Beginning in the 1990s, Madoff outwardly ascribed the consistent investment

success of BLMIS's IA Business to the "split-strike conversion" ("SSC") investment strategy.

Madoff claimed his strategy would produce steady returns without the volatility in the stock

market or other high return investment strategies. Madoff generally indicated that investors'

funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index

("S&P 100 Index"), which is a collection of the 100 largest publicly traded companies, as

determined by Standard & Poor's Index Committee.  The basket of stocks was designed to

correlate to the movement of the S&P 100 Index.  The second part of the SSC strategy involved

purporting to sell call options and buy put options on the S&P 100 Index; this is commonly

referred to as a "collar."  Madoff purported to purchase and sell option contracts to control the

downside risk of price changes in the basket of stocks correlated to the performance of the S&P

100 Index.  All options relating to the companies within the S&P 100 Index, including options

based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").

The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

30.      BLMIS commingled all of the funds received from IA Business investors in a single BLMIS account maintained at JPMorgan Chase Bank.

31.      Because Madoff claimed that he would carefully time purchases and sales to maximize value, customer funds would intermittently be out of the market.  During those times, Madoff claimed that the funds were invested in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.  There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

32.      At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements.

33.      Madoff operated the IA Business as a Ponzi scheme.  The money received from IA Business customers was used primarily to make distributions to, or payments for, other customers.  The falsified trades reflected in monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments.  The Ponzi scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow of new investments with BLMIS's IA Business.

34.      Since at least the 1970s, BLMIS fraudulently claimed to engage in securities trades for IA Business customers that did not occur.  Basic market data reveals that those purported trades did not, and could not, have taken place as reported on BLMIS customer

7

statements.  For example, there are many instances where the total number of securities

purportedly traded by BLMIS significantly exceeded the entire reported market volume for that

particular security on that particular day.  Even where BLMIS purportedly traded securities

within normal market volumes, there are many instances where the prices of those trades were

outside the daily market price range for that security.  In many other examples, BLMIS account

statements reported trades of a particular security when actual market reports show that

particular security simply did not change hands in the market on that reported date.

35.    Since at least 1983, BLMIS financial reports filed with the SEC fraudulently

omitted the existence of the billions of dollars of customer funds held by BLMIS.

36.    BLMIS did not register as an investment adviser with the SEC until August 2006.

At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment

Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts

and assets under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually

with the SEC, the latest of which was filed in January 2008.  It represented that BLMIS had 23

customer accounts with assets under management of $17.1 billion.  In fact, at that time BLMIS

had over 4,900 active customer accounts with a purported value of approximately $68 billion

under management.

37.    Contrary to standard practice in the investment advisory industry, BLMIS did not

charge the IA Business customers a fee for investment advisory services.  Madoff knew others

that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged

hundreds of millions of dollars for investment advisory services attributed to BLMIS.  Instead of

investment advisory fees, BLMIS purported to accept commissions for the purported trades, as

reflected in the fraudulent IA Business customer statements.

38.     BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling &

Horowitz"), a three-person accounting firm in Rockland County, New York.  Of the three

employees at the firm, one employee was an administrative assistant and one was a semi-retired

accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole

proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and

filing false tax returns for Madoff and others.

39.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

40.     Madoff created Madoff International Securities Ltd., ("MSIL"), a foreign

company in London, England at 12 Berkeley, Mayfair, London W1J 8, U.K., as BLMIS's

London affiliate.

## THE DEFENDANTS

### Sonja Kohn

41.     Kohn is a citizen of Austria and resided in New York from 1983 to 1994.  She and

her family purchased a home in Monsey, New York in or around 1984.  On information and

belief, Kohn traveled to New York in 2008.  Although Kohn's daughter and grandchildren live

near New York City, Kohn has remained outside the United States since Madoff confessed.

42.     This Court has personal jurisdiction over Kohn, who has both resided in and

regularly conducted business in New York during the relevant period.

43.     In 1985, Kohn began working at Merrill Lynch & Co. ("Merrill") in New York as

a retail stock broker.

44.     In or around 1985, Kohn met Madoff.  Kohn was introduced to Madoff through

Maurice (Sonny) Cohn ("Cohn").  Cohn and Madoff jointly created Cohmad Securities Corp.

("Cohmad"), a partnership between Cohn and Madoff that focused on soliciting investors for the IA Business.

45.     Kohn began soliciting investors for Madoff in the late 1980s.

46.     Over the years, Kohn and Madoff became close.  Kohn has testified that she "developed a business relationship with Mr. Madoff and became one of the relatively few people who had good access to him."

47.     Kohn met with Madoff at his office in New York and arranged with his assistant to pick up the Infovaleur checks from BLMIS's offices.

48.     Documents from BLMIS and other sources reflect that Kohn arranged meetings, phone calls, and other communications among Madoff, his family, his investors, his employees, and various investors.

### Infovaleur, Inc. ("Infovaleur")

49.     Kohn incorporated Infovaleur in New York on February 22, 1996.  Infovaleur was dissolved on January 26, 2011.

50.     At all relevant times, Kohn or her husband owned 100% of Infovaleur.

51.     Infovaleur's only full-time employee was Robert Reuss ("Reuss").  It employed at least two part-time interns.

52.     Infovaleur maintained accounts at JPMorgan Chase Bank in New York.

53.     As a New York corporation, this Court has personal jurisdiction over Infovaleur.

54.     At all times, Kohn acted through Infovaleur to provide purported research services to BLMIS although BLMIS's payments to Infovaleur were for commissions.

55.     From 2000 to 2008, Infovaleur was BLMIS's third highest paid "vendor."

56.     Infovaleur provided nothing of value to BLMIS.

### Tecno Development & Research Ltd. ("Tecno Gibraltar")

57.     Kohn incorporated Tecno Development & Research Ltd. ("Tecno Gibraltar") on January 3, 2007 in Gibraltar.

58.     Kohn controls Tecno Gibraltar.  Kohn and her family are beneficial owners of Tecno Gibraltar, whose shares are held in a Gibraltarian family trust.

59.     On information and belief, Tecno Gibraltar had one part-time employee, Shlomo (Momy) Amselem ("Amselem").

60.     Tecno Gibraltar derived substantial revenue from interstate or foreign commerce.

61.     This Court has jurisdiction over Tecno Gibraltar.  Tecno Gibraltar conducted business with BLMIS in New York and sent invoices to BLMIS's offices in New York.  Tecno Gibraltar also received payments from the 703 Account.

62.     Tecno Gibraltar's purported business was providing research services to BLMIS and MSIL.  On information and belief, Tecno Gibraltar did not provide research services to any other business or individual.

63.     At all times, Tecno Gibraltar acted through Kohn.

64.     Tecno Gibraltar provided nothing of value to BLMIS.

### Kohn's Other Entities

65.     In addition to the Transferee Defendants, Kohn also established at least two other entities to invoice and receive payments from Madoff, including Erko, Inc. ("Erko") and Tecno Development & Research S.r.l. ("Tecno Italy").  These entities invoiced Madoff through MSIL in London and are not defendants in this action.

66.     Kohn incorporated Erko on April 15, 1987 in New York and was its sole shareholder.  Kohn controlled Erko.  Similar to the Transferee Defendants, Erko sent quarterly invoices for research and consulting services it purported to provide Madoff.  Madoff paid Erko

through MSIL.  At all times, however, these payments were commissions for the investment

capital that Kohn introduced to BLMIS.

67.    The New York Secretary of State dissolved Erko in 1998.  Erko continued to

invoice Madoff until 2001 using Kohn's mother's home address in Vienna.  Erko received

approximately $11 million from MSIL.

68.    Kohn created Tecno Italy in 2001 in Milan, Italy.  Kohn and her family owned

Tecno Italy through a family trust.  Similar to the Transferee Defendants and Erko, Tecno Italy

sent Madoff quarterly invoices for "market researches," [sic] and "strategic consulting," services

it purported to provide Madoff.

69.    At all times, however, these payments were commissions for the $9.1 billion in

investment capital that Kohn introduced to BLMIS.  In total, Tecno Italy received $14,601,000

from MSIL.

70.    Kohn also created the self-described "investment boutique" Eurovaleur Inc.

("Eurovaleur") on March 20, 1990.  Eurovaleur was a New York company through which she

referred investors to Madoff's IA Business.  Reuss, who worked for Infovaleur, also worked for

Eurovaleur.

71.    Kohn also created Windsor IBC, Inc. ("Windsor") in 1987.  Windsor is a New

York company that Kohn used to introduce investors to the IA Business.

72.    Kohn also partnered with UniCredit Bank Austria AG ("Bank Austria") to create

Bank Medici AG ("Bank Medici), a Vienna-based investment bank, in 1994.  Bank Medici

acquired a banking license in Austria in 2003.  Kohn owned 75% of Bank Medici and Bank

Austria owned 25%.  Kohn served on Bank Medici's supervisory board at all times.  Roughly

80% of Bank Medici's business was to manage and distribute various BLMIS feeder funds, such

as Primeo Fund Ltd. ("Primeo"), Herald Fund SPC ("Herald Fund"), Thema International Fund

Plc ("Thema International"), and Herald (Luxembourg) SICAV ("Herald Lux").

## THE TRANSFEREE DEFENDANTS OPERATED AS KOHN'S ALTER EGOS

### Kohn Dominated and Controlled Infovaleur

73.     At all relevant times, Kohn dominated and controlled Infovaleur and had all

decision-making authority.  Kohn owned all shares of Infovaleur and was its sole CEO at all

relevant times.

74.     Kohn used her personal funds to pay Infovaleur's debts.

75.     Kohn transferred Infovaleur's funds for her personal use and for the benefit of her

family.  Kohn signed and endorsed certain of these checks drawn on Infovaleur's account.

76.     Kohn used Infovaleur money to finance her family's house in Monsey, New

York.  Infovaleur also used the Monsey family home as a business address on certain of its

banking records.

77.     Kohn directed Infovaleur to pay the liabilities of Bank Medici, an entity that Kohn

also owned and controlled.  Specifically, Infovaleur made payments to at least eight Bank Medici

employees based in Vienna.  These individuals did not provide services to Infovaleur in

consideration for these payments.

78.     Infovaleur paid hundreds of thousands of dollars to Absolute Portfolio

Management, Ltd., a company that sold shares of BLMIS feeder funds that Kohn personally

directed and/or managed through investment management companies she owned and controlled.

79.     Kohn signed Infovaleur checks totaling $660,000 to pay a swimming pool

company and to buy $115,500 worth of Dotzauer Viennese crystal.

80.    Infovaleur transferred $48,000 to Tecno Italy.  The two companies had no discernable business relationship other than the fact that they were both controlled by Kohn and both used to invoice payments to Madoff.

81.    Likewise, Infovaleur transferred $26,000 to Tecno Gibraltar, although the two companies had no discernable business relationship other than the fact that they were both controlled by Kohn and both used to invoice payments to Madoff.

82.    Kohn operated Infovaleur and Eurovaleur as one business even though they were two separately incorporated entities.  Infovaleur and Eurovaleur shared one office in Midtown Manhattan.  Infovaleur and Eurovaleur shared one part-time employee that employee was not aware that Infovaleur carried on any business.

**Kohn Dominated and Controlled Tecno Gibraltar**

83.    At all times, Kohn dominated and controlled Tecno Gibraltar and had all decision-making authority.

84.    From April 2007 until July 5, 2007, Kohn, through Tecno Gibraltar, sent invoices to MSIL for "research," "strategic alliances," and "consultancy" services.

85.    On November 1, 2007, the E.U. Markets in Financial Instruments Directive 2004/39/EC ("MiFID") implemented new and extensive reporting requirements for European countries that required MSIL to disclose its agreements, including any written agreement between Tecno Gibraltar and MSIL that described the business relationship and the payments.

86.    There was no written agreement between Tecno Gibraltar and MSIL.

87.    Beginning in January 2008, Tecno Gibraltar ceased invoicing MSIL.  Instead, Tecno Gibraltar invoiced BLMIS for its purported services and received payments from BLMIS, which was not subject to MiFID.

14

88.     Tecno Gibraltar sent each invoice to BLMIS in New York.  The 703 Account statements noted "TECNOKOHN" as a reference to the purpose for these payments.

89.     The January 14, 2008 invoice from Tecno Gibraltar is marked "BLM Special," as were certain invoices from Infovaleur to BLMIS.  "BLM Special" was a designation for payments by BLMIS that had nothing to do with its purported business.  Other payments that were designated "BLM Special" included gifts to Madoff's family members, forgiven loans to Madoff's friends, payment of personal expenses, and charitable contributions.

90.     Kohn transferred Tecno Gibraltar's funds for her personal use and for the benefit of her family.  For example, Kohn directed Tecno Gibraltar to pay $100,000 to her son, Robert Kohn.

91.     Kohn also transferred Tecno Gibraltar's funds to companies she owned that had no relationship with BLMIS or the purported services that Tecno Gibraltar purportedly provided to BLMIS.  For example, Kohn directed Tecno Gibraltar to send $250,000 to Privatlife AG ("Privatlife") on July 27, 2008.  Kohn owned Privatlife, a purported insurance company incorporated in Liechtenstein.

**KOHN ACTIVELY CONCEALED HER RECEIPT OF MADOFF COMMISSIONS**

**Kohn Invoiced Madoff for Services That the Transferee Defendants Did Not Perform**

92.     No written contract existed between Kohn and the Transferee Defendants and Madoff.  Substantially all of the invoices Kohn submitted through the Transferee Defendants to BLMIS indicated that the Kohn Payments were for "research" or in some cases "strategies and strategic alliances."  The invoices do not indicate that the sums due were for commissions or payments for introductions to potential investors.

93.     Kohn and Madoff agreed and understood, however, that he paid her commissions for bringing investors to the IA Business.

94.    Madoff paid no other person or entity commissions based upon invoices to BLMIS for "research."

95.    Initially, Kohn and Madoff agreed that Kohn would be paid an amount equal to approximately 1% of the value of accounts Kohn brought into BLMIS.  Eventually, Madoff reduced this amount to 0.5% of the value of accounts Kohn brought to BLMIS.  Then, in or about 2000, Madoff fixed Kohn's payments at a flat fee totaling 0.5% of the investment capital that Kohn had introduced to BLMIS as of that date ($1.3 billion), or roughly $6.6 million annually.

96.    Kohn invoiced Madoff for these amounts.  Kohn submitted invoices from the Transferee Defendants to BLMIS for the fees.  Kohn also submitted invoices from Erko and Tecno Italy to MSIL.  The quarterly invoices submitted by Kohn through her various entities indicated that BLMIS or MSIL was being billed for purported research services.  They did not indicate that she was received commissions for the investment capital that Kohn brought to BLMIS.

**Kohn and Madoff Misrepresented the Kohn Payments to Third Parties**

97.    Kohn and Madoff kept the commission payments secret from governmental authorities.  Madoff instructed MSIL directors to state to U.K. regulators that the payments to Kohn were for research and consultancy services.  Kohn offered to send the MSIL directors more research reports in the event that anyone inquired about the basis for the payments to her.

98.    Kohn told the Austrian criminal authorities in 2009—just months after Madoff's confession—that neither she, nor any companies she owned or controlled, received any commissions from Madoff or his companies.  She further wrote in an April 7, 2009 letter to the Vienna Office of the Public Prosecutor that neither she nor her companies ever received commissions from Madoff.

16

99.     Two weeks later, during an interview with the Vienna Office of the Public
Prosecutor, Kohn stated that she received no commissions from Madoff for introducing investors
to BLMIS.  She insisted any payments received by her or her companies from Madoff were
solely for "research" services she provided to Madoff.

100.     In 2010, an internal BLMIS record became public.  This document calculated the
commission payments made by Madoff to Kohn.

101.     In 2013, Kohn admitted, under oath in foreign proceedings, that the Kohn
Payments were for introducing investment capital to BLMIS's IA Business.  She maintained,
however, that she did not receive any payments from Madoff, personally or otherwise, before
December 1992.

102.     These now-public internal records were created by Madoff's secretary, who was
tasked with processing the Kohn Payments.  Madoff directed this employee to:  (i) tell no one
inside or outside of BLMIS that Madoff was paying Kohn; and (ii) leave no documentation
relating to Kohn unattended.  Madoff also directed this employee to never mail BLMIS's checks
to Kohn.  Rather, Kohn or her employees would personally pick up the checks in New York.

**KOHN HAD CLOSE ACCESS TO THE IA BUSINESS FOR TWENTY YEARS**

103.     The first known IA Business account that Kohn solicited for Madoff was BLMIS
Account No. 1G0067, which belonged to Howard Gottlieb ("Gottlieb").  It was capitalized by a
$3,000,000 transfer from Gottlieb.

104.     On November 14, 1989, Gottlieb wrote a letter to BLMIS requesting that BLMIS
send copies of his account statements to Kohn at her New York company Windsor as an
"interested party."

105.     Kohn received a commission for this $3 million referral.

106.    In 1990, Gottlieb severed his business and personal relationships with Kohn. Gottlieb closed his BLMIS account on June 24, 1993.

107.    After Madoff confessed, the Chicago Tribune interviewed Gottlieb.  He stated that he figured out that Madoff was a fraud years ago:  "[o]n close examination of the returns, the purported trading and all the rest of it, it didn't add up as being a legitimate investment."  Kohn had access to Gottlieb's account statements and its rate of return.

108.    Kohn had an extensive network of wealthy contacts throughout the world that she used to facilitate introductions to Madoff.  Kohn held herself out to potential investors with BLMIS as Madoff's close friend.

109.    By 1993, Kohn partnered with Austria's largest bank, Bank Austria, to create Primeo, an investment vehicle that invested solely through BLMIS's IA Business.  Kohn's company, Eurovaleur, acted as a sub-advisor to Primeo and received 20% of the management fees generated by the fund.

110.    Kohn created, managed, and/or marketed at least four other investment vehicles that invested exclusively through BLMIS's IA Business:  Herald Fund, Thema International, Alpha Prime Fund Ltd., and Herald Lux (the "Kohn Feeder Funds").  The Trustee has sued the Kohn Feeder Funds in a separate action.

111.    In addition to individual investors, Kohn, individually and through Windsor and Eurovaleur, introduced large institutional investors to BLMIS's IA Business, including Optimal Multiadvisors Ltd. ("Optimal"), Lagoon Investment Ltd., Harley International Fund Ltd., and Plaza Investments International.

112.    Kohn, through certain companies she owned, collected management fees from the Kohn Feeder Funds relating to their BLMIS investments.

113.     Kohn corresponded with investors regarding the rates of return reported to other feeder funds invested in BLMIS.  At least one investor believed that Kohn could influence the rates of return that Madoff fabricated.

114.     Charles Fix ("Fix") was an investor in Herald Fund.  In 2005, Fix complained that "the underperformance continues" of Herald Fund, when compared to the reported returns of Kingate Global Fund ("Kingate Global") and Optimal.

115.     Specifically, Fix stated that he had "not yet received [Kohn's] confirmation that [she had] solved the problem and that the returns of Herald Fund will be (beginning April 1st) in line with those of Optimal and Kingate Global.  Urgently need your confirmation to be able to keep remaining investors, and find new investors."

116.     Kohn continued to solicit investors, invoice Madoff for purported research, and receive the Kohn Payments in exchange for the value of the accounts she brought into BLMIS.

117.     In total, Madoff credited Kohn for bringing in at least thirty (30) investment accounts to BLMIS's IA Business, totaling over $9.1 billion in investment capital.  A full list is below:

| BLMIS IA BUSINESS INFLOW ATTRIBUTABLE TO KOHN | | | |
|---|---|---|---|
| **BLMIS ACCOUNT** | **ACCOUNT NUMBER** | **OPENING DATE** | **TOTAL DEPOSITS** |
| Howard Gottlieb | 1G0067 | April 18, 1989 | $3,000,000 |
| Mayfair Corporation | 1FN026 | March 23, 1992 | 1,000,054 |
| Lagoon Investment Ltd. | 1FN021 | May 1, 1992 | 134,624,947 |
| RIP Investments LP | 1CM222 | May 12, 1993 | 3,000,000 |
| Primeo Fund | 1FN060 | December 30, 1993 | 1,210,000 |
| Investments Alanis SA | 1FN064 | August 26, 1994 | 5,399,950 |
| Lagoon Investment Ltd. | 1FN066 | December 29, 1994 | 2,100,000 |
| Paolo Dini | 1FN072 | January 23, 1995 | 1,005,545 |
| GeoCurrencies Ltd. S.A. | 1FN079 | June 8, 1995 | 5,054,863 |
| Bank Austria AG | 1FN082 | August 15, 1995 | 1,500,000 |
| Zin Investments Ltd. | 1FN085 | December 7, 1995 | 3,249,985 |

| | | | |
|---|---|---|---|
| Optimal Multiadvisors Ltd. | 1FN091 | February 29, 1996 | 90,049,985 |
| Primeo Fund (Class B) | 1FN092 | March 1, 1996 | 370,483,000 |
| Harley International Fund Ltd. | 1FN094 | April 24, 1996 | 2,351,341,277 |
| Thema International Fund | 1FN095 | July 1, 1996 | 1,043,697,424 |
| Lagoon Investment Ltd. | 1FN096 | July 26, 1996 | 500,000 |
| Plaza Investments Int'l | 1FR002 | November 25, 1996 | 534,069,268 |
| Leisure Enterprises Inc. | 1FR007 | January 24, 1997 | 3,500,000 |
| Optimal Multiadvisors Ltd. | 1FR008 | January 28, 1997 | 1,667,445,900 |
| FC Investment Holdings Ltd. | 1FR011 | March 7, 1997 | 2,674,988 |
| Lagoon Investment Ltd. | 1FR015 | April 29, 1997 | 49,862,000 |
| Lagoon Investment Ltd. | 1FR016 | April 29, 1997 | 422,908,000 |
| Iron Reserves Ltd. | 1FR022 | June 2, 1997 | 3,999,980 |
| Triangle Diversified Investments | 1FR042 | June 22, 1998 | 1,000,000 |
| Lexus Worldwide Ltd. | 1FR064 | November 1, 1999 | - |
| Alpha Prime Fund | 1FR097 | June 13, 2003 | 399,941,000 |
| Herald Fund SPC | 1FR109 | April 1, 2004 | 1,533,741,975 |
| Mayfair Corporation | 1M0206 | August 11, 2004 | - |
| Senator Fund | 1FR128 | September 6, 2006 | 247,499,980 |
| Herald (Lux) | 1FR135 | March 17, 2008 | 255,600,000 |
| **TOTAL INTO BLMIS** | | | **$9,139,460,121** |

## THE RESEARCH INVOICES

118.    Rather than indicating on the invoices that the payments were commissions for Kohn's introductions to investors, Kohn, through the Transferee Defendants, submitted invoices to BLMIS that referenced "research," "strategic alliances," and "consultancy" services.  These invoices were sent to and paid by BLMIS or MSIL upon receipt.  Only those invoices paid by BLMIS are the subject of this action.

119.    Kohn has no formal training or education specific to the research services that she purportedly provided to Madoff.

120.    The purported research that the Defendants provided BLMIS was valueless.

121.    The payments from BLMIS were not for the "research," "strategic alliances," and "consultancy" services that Kohn, through the Transferee Defendants (and other Kohn entities), purported to provide.  Rather, these invoices and reports masked the purpose of the Kohn

20

Payments.  Madoff's internal records indicate that BLMIS paid Kohn solely for the investment capital she solicited for BLMIS.

122.    The Transferee Defendants created no meaningful research or analysis, contrary to the services listed on the invoices.  The Transferee Defendants either compiled publicly available information from the Internet or re-submitted research reports that Kohn sent to Madoff under the cover of her other companies with no citation to the original source.

123.    Out of over forty-eight invoices that Kohn sent to BLMIS between 1998-2008, not a single one indicated that the payments were commissions for Kohn's introduction of investment capital to the IA Business.

124.    The Transferee Defendants took the Kohn Payments with a lack of good faith because Kohn invoiced BLMIS for research services the Transferee Defendants did not perform. The Kohn Payments to the Transferee Defendants were commissions paid to Kohn for introducing significant investors to the Ponzi scheme.

## INFOVALEUR RESEARCH

125.    Infovaleur compiled "research" from publicly available sources and sent it to BLMIS in New York.

126.    At the same time, the sole employee of Tecno Gibraltar, at Kohn's direction, copied Infovaleur's "research" and sent it to MSIL in London under a different cover.

127.    Kohn directed Tecno Gibraltar to send MSIL at least eighty BLMIS research packets that Infovaleur had already previously sent to BLMIS.

128.    Kohn invoiced both MSIL and BLMIS for this purported research.  MSIL director Leon Flax identified the research received by MSIL as being very similar to the BLMIS research.

129.    Kohn directed her U.S.-based staff (at Infovaleur and/or Eurovaleur) to directly download publicly available information from the Internet and then provide that material to BLMIS.

130.    These "researchers" were paid $8 per hour and had no training in the subject matter covered by the "research," such as finance and economics.

131.    Jessica Crewe ("Crewe"), a former Eurovaleur researcher noted that Reuss told her that creating the research reports was "simple" as it only required copying subject matter from the internet.  If the copied subject matter had information that revealed the true source of the research, Kohn directed her and others to "crop" it out.

132.    Kohn and Reuss told Crewe that the purpose of these research reports was to compile information for internal use at Eurovaleur and/or Infovaleur.  Crewe was not informed that these reports were for BLMIS or that BLMIS was the sole source of income for Kohn's companies.  After Crewe compiled the reports, another intern or part-time employee of Infovaleur and/or Eurovaleur, added a new cover page with the notation "For Madoff."

133.    In October 2006, Crewe and Kohn traded e-mails to discuss another "research" project regarding Chinese investors.  Crewe sent a draft to Kohn, including sources for certain of the data included in the report.  Kohn replied, "I would really like not tpo [sic] name the 2 sources and merge them so it looks like original work pls reformat."

134.    Kohn also directed another intern or part-time employee of Eurovaleur and/or Infovaleur to copy the publicly available article "India's Fifty Years of Economic Development" written by Abid Hussain, who had no affiliation with Kohn.  This intern or part-time employee created a draft containing almost the entire text from the article minus any portion that could

reveal the source material.  The intern or part-time employee then bound the draft and inserted an

Infovaleur cover page.  Infovaleur then sent this "research" as original work product to BLMIS.

135.    Of the 300-plus reports from the Transferee Defendants found at BLMIS, most

could have been of no use to BLMIS, even if BLMIS had been conducting legitimate business.

Only about one eighth of these reports covered content dealing with North America.  Most of

these reports focused on other jurisdictions (such as Europe and Asia) and could provide no

value to BLMIS since BLMIS purportedly invested in U.S. securities.

136.    Some of the reports focused on private investment companies that are not

registered with any U.S. exchange.

137.    Certain reports were more akin to a description of a website, rather than the

substance of the title that the report suggested.  At least fourteen of these reports had no real

content—they consisted only of title pages, table of contents pages, or screenshots of a website.

138.    Many of the reports were not related to an investment advisory or market-making

business.  Rather, the reports covered topics such as art and antiques, auctions, gambling, and

space tourism, among others.  Certain of these reports are titled "Vimplecom Telecom-

Cellular/Diversified Russia Report," "Machine Translation:  Concepts of Automated Language

Report," "GM Food Safety Report," and "2001 Agricultural Policies Report."

139.    Many of the Infovaleur reports are undated.

### TECNO GIBRALTAR RESEARCH

140.    The research reports prepared by Tecno Gibraltar suffered from the same defects.

Tecno Gibraltar had only one part-time employee, who either compiled research reports using

publicly available sources or copied entire research reports that Kohn had previously sent to

MSIL for double payment through her other companies.

141.    On April 8, 2007, Tecno Gibraltar's lone, part-time employee, Amselem, wrote Kohn to confirm that he received from her a compact disc containing various research reports that Kohn had previously sent to BLMIS through Infovaleur.  In a reply e-mail, Kohn directed Amselem to "make a completely new cover page with a title that means the same but not identical and different graphic [sic] and substitute the old cover."  On information and belief, Tecno Gibraltar sent this research report to MSIL.

142.    On May 29, 2007, Reuss sent Kohn an e-mail indicating that Infovaleur will provide Amselem with research reports that the company previously compiled for BLMIS. Reuss noted to Kohn that research Infovaleur had copied from Bank Austria's proprietary databases was not suitable for reproduction by Tecno Gibraltar.  Reuss then suggested to Kohn that Infovaleur focus more on creating research reports from public databases so that they can be used by Tecno Gibraltar in its dealings with MSIL.

143.    Many of the Tecno Gibraltar reports are undated.

144.    In January 2008, Tecno Gibraltar began invoicing BLMIS rather than MSIL.

### THE TRANSFERS

145.    From 2000 through 2008, BLMIS paid Kohn $3.5 million annually for her generation of investment capital for the IA Business.  To disguise the true nature of these payments, Kohn and the Transferee Defendants invoiced BLMIS for other services and sent research packets.

146.    The IA Business did not execute trades, and therefore could not have had a legitimate business use for such research.

147.    Because the Kohn Payments were made for the introduction of investment capital to BLMIS and not for the research services listed on the invoices, the invoices for purported research and consultancy were false.

148.    The Defendants did not give value to the Debtors by introducing more investors to the Ponzi scheme.

149.    Prior to the Filing Date, BLMIS transferred approximately $35,484,360 to or for the benefit of the Defendants.  The transfers were made from the 703 Account and from BLMIS's bank account at Bank of New York in New York (the "621 Account").  These transfers comprised stolen customer property.

150.    In total, BLMIS transferred $32,484,360 to Infovaleur, of which $20,125,000 was transferred during the six years preceding the Filing Date, and $6,125,000 was transferred during the two years preceding the Filing Date.

151.    In total, BLMIS transferred $3,000,000 to Tecno Gibraltar, all of which was during the two-year and six-year periods preceding the Filing Date.

152.    At all relevant times, the Debtors were insolvent in that:  (i) their liabilities exceeded the value of their assets by billions of dollars; (ii) they could not meet their obligations as they came due; and (iii) at the time of the Kohn Payments to, or for the benefit of, the Defendants, the Debtors were left with insufficient capital.

153.    All of the Kohn Payments constitute fraudulent transfers under the Bankruptcy Code and New York Debtor and Creditor Law.

154.    The Kohn Payments are customer property within the meaning of SIPA §78*lll*(4) and are avoidable and recoverable by the Trustee under sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, N.Y. DCL §§ 273–279, and N.Y. CPLR 203(g) and 213(8), as alleged fully herein.

155.    BLMIS transferred at least $23,125,000 of the Kohn Payments during the six years preceding the Filing Date (the "Six-Year Transfers").  The Six-Year Transfers included

transfers of approximately $3,000,000 to Tecno Gibraltar and approximately $20,125,000 to

Infovaleur.  See Exhibits A & B.  The Six-Year Transfers were and continue to be Customer

Property and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy

Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and N.Y. DCL §§ 273–

279.

160.    BLMIS transferred at least $9,125,000 of the Six-Year Transfers during the two

years preceding the Filing Date (the "Two-Year Transfers").  The Two-Year Transfers consisted

of approximately $3,000,000 to Tecno Gibraltar and approximately $6,125,000 to Infovaleur.

See Exhibits A & B.  The Two-Year Transfers were and continue to be Customer Property and

are avoidable and recoverable under sections 548, 550, and 551 of the Bankruptcy Code, and

applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

## CAUSES OF ACTION

## COUNT ONE:  FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

157.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

158.    Each of the Two-Year Transfers was made on or within two years before the

Filing Date.

159.    Each of the Two-Year Transfers constituted a transfer of an interest of BLMIS in

property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and under

SIPA § 78fff-2(c)(3).

160.    Each of the Two-Year Transfers was made by BLMIS with the actual intent to

hinder, delay, or defraud some or all of BLMIS's then-existing or future creditors.  BLMIS made

the Two-Year Transfers to, or for the benefit of the Defendants in furtherance of a fraudulent

investment scheme.

161.    Each of the Two-Year Transfers constitute a fraudulent transfer avoidable by the

Trustee under section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendants

under section 550(a) and SIPA § 78fff-(2)(c)(3).

162.    As a result of the foregoing, the Trustee is entitled to a judgment under sections

548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code [and SIPA § 78fff-2(c)(3)]:  (a) avoiding

and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside;

(c) recovering the Two-Year Transfers, or the value thereof from the Defendants for the benefit

of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to

the Trustee all profits, including any and all compensation and/or remuneration received by the

Defendants related to or arising from, or concerning the Two-Year Transfers from BLMIS to the

Defendants; (e) recovering attorneys' fees and costs from the Defendants; and (f) awarding any

other relief the Court deems appropriate.

## COUNT TWO:  FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

163.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

164.    Each of the Two-Year Transfers was made on or within two years before the

Filing Date.

165.    Each of the Two-Year Transfers constituted a transfer of an interest of BLMIS in

property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and under

SIPA § 78fff-2(c)(3).

27

166.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two-Year Transfers.

167.    At the time of each of the Two-Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two-Year Transfers.

168.    At the time of each of the Two-Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with BLMIS was an unreasonably small capital.

169.    At the time of each of the Two-Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

170.    Each of the Two-Year Transfers constitute a fraudulent transfer avoidable by the Trustee under section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants under section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

171.    As a result of the foregoing, the Trustee is entitled to a judgment under sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code [and SIPA § 78fff-2(c)(3)]:  (a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or the value thereof from the Defendants for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Two-Year Transfers from BLMIS to the Defendants; (e) recovering attorneys' fees and costs from the Defendants; and (f) awarding any other relief the Court deems appropriate.

## COUNT THREE:  FRAUDULENT TRANSFER – N.Y. DCL §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

172.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

173.    At all times relevant to the Six-Year Transfers, there have been one or more creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

174.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

175.    Each of the Six-Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six-Year Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

176.    Each of the Six-Year Transfers was received by the Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six-Year Transfers.

177.    As a result of the foregoing, under N.Y. DCL §§ 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Defendants:  (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six-Year Transfers from BLMIS to the Defendants; (e)

recovering attorneys' fees and costs from the Defendants; and (f) awarding any other relief the Court deems appropriate.

### COUNT FOUR:  FRAUDULENT TRANSFER – N.Y. DCL §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

178.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

179.    At all times relevant to the Six-Year Transfers, there have been one or more creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

180.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

181.    BLMIS did not receive fair consideration for the Six-Year Transfers.

182.    BLMIS was insolvent at the time it made each of the Six-Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six-Year Transfers.

183.    As a result of the foregoing, under N.Y. DCL §§ 273, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Defendants:  (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; and (c) recovering the Six-Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six-Year Transfers from BLMIS to the Defendants; (e)

recovering attorneys' fees and costs from the Defendants; and (f) awarding any other relief the Court deems appropriate.

## COUNT FIVE:  FRAUDULENT TRANSFER – N.Y. DCL §§ 274, 278, AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

184.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

185.    At all times relevant to the Six-Year Transfers, there have been one or more creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

186.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

187.    BLMIS did not receive fair consideration for the Six-Year Transfers.

188.    At the time BLMIS made each of the Six-Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six-Year Transfers was an unreasonably small capital.

189.    As a result of the foregoing, under N.Y. DCL §§ 274, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Defendants:  (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; and (c) recovering the Six-Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six-Year Transfers from BLMIS to the Defendants; (e)

recovering attorneys' fees and costs from the Defendants; and (f) awarding any other relief the

Court deems appropriate.

### COUNT SIX:  FRAUDULENT TRANSFER – N.Y. DCL §§ 275, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

190.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

191.    At all times relevant to the Six-Year Transfers, there have been one or more

creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under

section 502(e) of the Bankruptcy Code.

192.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined

under N.Y. DCL § 270.

193.    BLMIS did not receive fair consideration for the Six-Year Transfers.

194.    At the time BLMIS made each of the Six-Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its ability to pay them as the

debts matured.

195.    As a result of the foregoing, under N.Y. DCL §§ 275, 278 and/or 279,

sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee

is entitled to a judgment against the Defendatns:  (i) avoiding and preserving the Six-Year

Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year

Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d)

directing the Defendants, to the extent allowable by law, to return to the Trustee all profits,

including any and all compensation and/or remuneration received by the Defendants related to or

arising from, or concerning the Six-Year Transfers from BLMIS to the Defendants; (e)

recovering attorneys' fees and costs from the Defendants; and (f) awarding any other relief the

Court deems appropriate.

## COUNT SEVEN:  RECOVERY OF ALL FRAUDULENT TRANSFERS – N.Y. CPLR 203(g), 213(8), N.Y. DCL §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§544, 550(a), AND 551

196.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

197.    At all relevant times, the fraudulent scheme perpetrated by BLMIS was not

reasonably discoverable by at least one unsecured creditor of BLMIS.

198.    At all times relevant to the Fraudulent Transfers, there have been one or more

creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under

section 502(e) of the Bankruptcy Code.

199.    Each of the Fraudulent Transfers constituted a conveyance by BLMIS as defined

under N.Y. DCL § 270.

200.    Each of the Fraudulent Transfers was made by BLMIS with the actual intent to

hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Fraudulent Transfers to or

for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

201.    Each of the Fraudulent Transfers was received by the Defendants with actual

intent to hinder, delay, or defraud creditors of BLMIS existing at the time of each of the

Fraudulent Transfers and/or future creditors of BLMIS.

202.    As a result of the foregoing, under N.Y. CPLR 203(g) and 213(8), sections 276,

276-a, 278 and/or 279 of the N.Y. Debt. & Cred. Law, sections 544, 550, and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the

Defendants:  (i) avoiding and preserving the Fraudulent Transfers; (ii) directing that the

Fraudulent Transfers be set aside; (iii) recovering the Fraudulent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; and (iv) recovering attorneys' fees from the Defendants; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Fraudulent Transfers from BLMIS to the Defendants; (e) recovering attorneys' fees and costs from the Defendants; and (f) awarding any other relief the Court deems appropriate.

**DEMAND FOR RELIEF**

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Kohn, Infovaleur, and Tecno Gibraltar as follows:

(i)     On Count One, under sections 548(a)(1)(A), 550(a), and 551 and SIPA § 78fff-2(c)(3):  (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; (iii) recovering the Two-Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (iv) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Two-Year Transfers from BLMIS to the Defendants; (v) recovering attorneys' fees and costs from the Defendants; and (vi) awarding any other relief the Court deems appropriate.

(ii)     On Count Two, under sections 548(a)(1)(B), 550(a), and 551 and SIPA § 78fff-2(c)(3):  (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; and (iii) recovering the Two-Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (iv) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits or other

34

compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Two-Year Transfers from BLMIS to the Defendants; (v) recovering attorneys' fees and costs from the Defendants; and (vi) awarding any other relief the Court deems appropriate.

(iii)    On Count Three, under N.Y. DCL §§ 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; (iii) recovering the Six-Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (iv) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six-Year Transfers from BLMIS to the Defendants; (v) recovering attorneys' fees and costs from the Defendants; and (vi) awarding any other relief the Court deems appropriate.

(iv)    On Count Four, under N.Y. DCL §§ 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (iv) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six-Year Transfers from BLMIS to the Defendants; (v) recovering attorneys' fees and costs from the Defendants; and (vi) awarding any other relief the Court deems appropriate.

(v)        On Count Five, under N.Y. DCL §§ 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (iv) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six-Year Transfers from BLMIS to the Defendants; (v) recovering attorneys' fees and costs from the Defendants; and (vi) awarding any other relief the Court deems appropriate.

(vi)       On Count Six, under N.Y. DCL §§ 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (iv) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six-Year Transfers from BLMIS to the Defendants; (v) recovering attorneys' fees and costs from the Defendants; and (vi) awarding any other relief the Court deems appropriate.

(vii)      On Count Seven, under N.Y. CPLR 203(g) and 213(8), N.Y. DCL §§ 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3):  (i) avoiding and preserving the Fraudulent Transfers; (ii) directing that the Fraudulent Transfers be set aside; (iii) recovering the Fraudulent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (iv) directing

the Defendants, to the extent allowable by law, to return to the Trustee all profits or other

compensation and/or remuneration received by the Defendants related to or arising from,

or concerning the Six-Year Transfers from BLMIS to the Defendants; (v) recovering

attorneys' fees and costs from the Defendants; and (vi) awarding any other relief the

Court deems appropriate.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, the Trustee demands trial by jury

in this action of all issues so triable.

Dated: November 26, 2014
      New York, New York

                                              */s/ David J. Sheehan*
                                       Baker & Hostetler LLP
                                       45 Rockefeller Plaza
                                       New York, New York 10111
                                       Telephone: (212) 589-4200
                                       Facsimile: (212) 589-4201
                                       David J. Sheehan
                                       dsheehan@bakerlaw.com
                                       Timothy S. Pfeifer
                                       tpfeifer@bakerlaw.com

                                       *Attorneys for Irving H. Picard, Trustee for the*
                                       *Substantively Consolidated SIPA Liquidation*
                                       *of Bernard L. Madoff Investment Securities*
                                       *LLC and the Estate of Bernard L. Madoff*

**Exhibit A**

## TRANSFERS TO INFOVALEUR

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| Date | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 7/15/1998 | - | - | - | 221,000 |
| 11/11/1998 | - | - | - | 398,000 |
| 2/2/1999 | - | - | - | 492,500 |
| 4/20/1999 | - | - | - | 548,500 |
| 8/10/1999 | - | - | - | 401,700 |
| 10/13/1999 | - | - | - | 470,830 |
| 1/6/2000 | - | - | - | 470,830 |
| 4/10/2000 | - | - | - | 450,000 |
| 5/22/2000 | - | - | - | 300,000 |
| 7/12/2000 | - | - | - | 750,000 |
| 10/16/2000 | - | - | - | 750,000 |
| 1/16/2001 | - | - | - | 750,000 |
| 5/1/2001 | - | - | - | 750,000 |
| 7/13/2001 | - | - | - | 750,000 |
| 10/2/2001 | - | - | - | 481,000 |
| 11/15/2001 | - | - | - | 875,000 |
| 2/14/2002 | - | - | - | 875,000 |
| 4/10/2002 | - | - | - | 875,000 |
| 7/3/2002 | - | - | - | 875,000 |
| 10/9/2002 | - | - | - | 875,000 |
| 1/17/2003 | - | - | 875,000 | 875,000 |
| 4/22/2003 | - | - | 875,000 | 875,000 |
| 7/15/2003 | - | - | 875,000 | 875,000 |
| 10/20/2003 | - | - | 875,000 | 875,000 |
| 2/10/2004 | - | - | 875,000 | 875,000 |
| 5/4/2004 | - | - | 875,000 | 875,000 |
| 7/26/2004 | - | - | 875,000 | 875,000 |
| 11/3/2004 | - | - | 875,000 | 875,000 |
| 2/2/2005 | - | - | 875,000 | 875,000 |
| 7/14/2005 | - | - | 875,000 | 875,000 |
| 11/28/2005 | - | - | 875,000 | 875,000 |
| 1/13/2006 | - | - | 875,000 | 875,000 |

**Exhibit A**

**TRANSFERS TO INFOVALEUR**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| Date | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 4/5/2006 | - | - | 875,000 | 875,000 |
| 5/4/2006 | - | - | 875,000 | 875,000 |
| 7/25/2006 | - | - | 875,000 | 875,000 |
| 11/27/2006 | - | - | 875,000 | 875,000 |
| 2/2/2007 | - | 875,000 | 875,000 | 875,000 |
| 4/24/2007 | - | 875,000 | 875,000 | 875,000 |
| 9/5/2007 | - | 875,000 | 875,000 | 875,000 |
| 10/16/2007 | - | 875,000 | 875,000 | 875,000 |
| 5/6/2008 | - | 875,000 | 875,000 | 875,000 |
| 5/19/2008 | - | 875,000 | 875,000 | 875,000 |
| 8/4/2008 | - | 875,000 | 875,000 | 875,000 |
| **Total:** | $ - | $ 6,125,000 | $ 20,125,000 | $ 32,484,360 |

**Exhibit B**

**TRANSFERS TO TECNO GIBRALTAR**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| | **90-Day Preferential Transfers** | | | |
| **Date** | | **2-Year Fraudulent Transfers** | **6-Year Fraudulent Transfers** | **Full History Fraudulent Transfers** |
| 1/18/2008 | - | 750,000 | 750,000 | 750,000 |
| 2/6/2008 | - | 750,000 | 750,000 | 750,000 |
| 6/2/2008 | - | 750,000 | 750,000 | 750,000 |
| 8/8/2008 | - | 750,000 | 750,000 | 750,000 |
| **Total:** | $          - | $      3,000,000 | $      3,000,000 | $      3,000,000 |