Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   CASE NO. 08-01789-smb

4   - - - - - - - - - - - - - - - x

5   SECURITIES INVESTOR PROTECTION

6   CORPORATION

7   v.

8   BERNARD L. MADOFF INVESTMENT

9   SECURITIES, LLC, et al,

10          Debtors.

11  - - - - - - - - - - - - - - - x

12                      U.S. Bankruptcy Court

13                      One Bowling Green

14                      New York, New York

15

16                      September 17, 2014

17                      1:32 PM

18

19

20

21  B E F O R E :

22  HON. STUART M. BERNSTEIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  K. HARRIS

Page 2

1    HEARING Matter:  Status Conference re Affect Dist. Ct.

2    Extraterritoriality Order

3

4    HEARING Matter:  Becker & Poliakoff LLP Motions to Dismiss

5    and Motions to Dismiss Listed on Appendix A to the Trustees

6    February 20 Letter to the Court, as amended

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms and Dawn South

Page 3

```
 1   A P P E A R A N C E S :

 2   BAKER HOSTETLER

 3        Attorneys for BLMIS and Trustee Irving Picard

 4        45 Rockefeller Plaza

 5        New York, NY  10111

 6

 7   BY:  NICHOLAS J. CREMONA, ESQ.

 8        REGINA L. GRIFFIN, ESQ.

 9        THOMAS L. LONG, ESQ.

10        DAVID J. SHEEHAN, ESQ.

11

12   WINDELS, MARX, LANE & MITTENDORF, LLP

13        Attorney for Windels Marx

14        156 W. 56th Street

15        New York, NY  10019

16

17   BY:  HOWARD L. SIMON, ESQ.

18        KIM M. LONGO, ESQ.

19

20   MILBERG LLP

21        Attorneys for (Not Identified)

22        One Pennsylvania Plaza

23        New York, NY  10119

24

25   BY:  MATTHEW A. KUPILLAS, ESQ.
```

Page 4

```
 1   BECKER & POLIAKOFF

 2         Attorneys for (Not Identified)

 3         45 Broadway

 4         8th Floor

 5         New York, NY  10006

 6

 7   BY:  HELEN DAVID CHAITMAN, ESQ.

 8

 9   PRYOR CASHMAN, LLP

10         Attorneys for (Not Identified)

11         7 Times Square

12         New York, NY  10036

13

14   BY:  RICHARD LEVY, JR., ESQ.

15

16   CLEARY GOTTLIEB STEEN & HAMILTON LLP

17         Attorneys for HSBC Defendants

18         One Liberty Plaza

19         New York, NY  10006

20

21   BY:  LAWRENCE B. FRIEDMAN, ESQ.

22         THOMAS J. MOLONEY, ESQ.

23

24

25
```

1   DEBEVOISE & PLIMPTON LLP

2         Attorneys for (Not readable)

3         919 Third Avenue

4         New York, NY  10022

5

6   BY:  MICHAEL E. WILES, ESQ.

7

8   YOUNG CONAWAY STARGATT & TAYLOR LLP

9         Attorneys for Trustee

10        Rodney Square

11        1000 North King Street

12        Wilmington, DE  19801

13

14   BY:  MATTHEW B. LUNN, ESQ.

15

16   FRESHFIELDS BRUCKHAUS DERINGER US LLP

17        Attorneys for (Not readable)

18        601 Lexington Avenue

19        31st Floor

20        New York, NY  10022

21

22   BY:  DAVID Y. LIVSHIZ, ESQ.

23

24

25

Page 6

```
 1   SULLIVAN & CROMWELL LLP

 2        Attorneys for (Not Readable)

 3        125 Broad Street

 4        New York, NY  10004

 5

 6   BY:  ROBINSON B. LACY, ESQ.

 7

 8   BAKER & MCKENZIE LLP

 9        Attorneys for Cathay Life Insurance Co. Ltd.

10        2300 Trammell Crow Center

11        2001 Ross Ave.

12        Dallas, TX  75201

13

14   BY:  DAVID W. PARHAM, ESQ.

15

16   PAUL HASTINGS LLP

17        Attorneys for (Not identified)

18        75 East 55th Street

19        New York, NY  10022

20

21   BY:  MOR WETZLER, ESQ.

22

23

24

25
```

Page 7

1    WILMER CUTLER PICKERING HALE AND DORR LLP

2         Attorneys for Nancy Marks and Sidney Marks

3         60 State Street

4         Boston, MA   02109

5

6    BY:  GEORGE W. SHUSTER, JR., ESQ.

7

8    DENTONS US LLP

9         Attorneys for (Not identified)

10        1221 Avenue of the Americas

11        New York, NY   10020

12

13   BY:  CAROLE NEVILLE, ESQ.

14

15   BECKER GLYNN MUFFLY CHASSIN & HOSINKI LLP

16        Attorneys for Prospect Capital, Lexington Capital,

17        Weithern Capital

18        299 Park Avenue

19        New York, NY   10171

20

21   BY:  CHESTER B. SALOMON, ESQ.

22

23

24

25

Page 8

```
 1   BERNFELD DEMATLEO LLP

 2         Attorneys for (Not identified)

 3         600 Third Avenue

 4         15th Floor

 5         New York, NY  10016

 6

 7   BY:  JEFFREY BERNFELD, ESQ.

 8

 9   TELEPHONIC APPEARANCES:

10

11   MICHAEL GOLDBERG, AKERMAN LLP FOR VARIOUS CREDITORS

12   BRYAN KRAKAUER, SIDLEY AUSTIN LLP

13   JASON B. SANJANA, REORG RESEARCH

14   ERIN VALENTINE, CHAFFETZ LINDSEY

15   KEVIN H. BELL, SIPC

16   CARLOS J. CANINO, STEARNS & WEAVER

17   DREW DILLWORTH, STEARNS & WEAVER

18   JAMES A. COPELAND, DENTONS US LLP

19   KIRAN PATEL, DENTONS US LLP

20   MARGARITA Y. GINZBURG, DAY PITNEY LLP

21   BENJAMIN D. LIEBOWITZ, GARVEY SCHUBERT BARER

22   CHRISTA C. TURNER, BAKER & HOSTETLER LLP

23   JUDITH WALLACE, CARTER LEDYARD & MILBURN LLP

24   ROBERT MCCLAY, MCCLAY-ALTON PLLP

25
```

Page 9

```
 1                   P R O C E E D I N G S

 2              THE COURT:  Please be seated.  Good afternoon.

 3   Madoff.

 4              UNIDENTIFIED:  Yes, Your Honor.

 5              MR. LACY:  Good morning, Your Honor, I'm Rob Lacy

 6   from Sullivan & Cromwell, and we're here for a conference

 7   that I requested about a month ago.

 8              We're talking about a lot of proceedings at once,

 9   and I have a chart which I have distributed already --

10              THE COURT:  Yes.

11              MR. LACY:  -- and I'd like to hand it out.

12              THE COURT:  Thank you.

13              MR. LACY:  Let me at the same time hand up a

14   second chart, and I will explain what these two things are.

15              THE COURT:  Thank you.

16              MR. LACY:  I'm told Ms. Griffin and Mr. Long did

17   not get this until two hours ago, and I would make clear

18   that they were not expected to be able to comment on the

19   accuracy at this point.

20              THE COURT:  Well, I only got it a minute ago.

21              MR. LACY:  It's described as a draft, and I mean

22   it to be a draft for the time being.

23              The figure chart, the one that says Consolidated

24   Extraterritoriality Motion is --

25              THE COURT:  Excuse me, do you have an extra chart
```

Page 10

1    for my clerks?  Thank you.

2             MR. LACY:  Lots.

3             THE COURT:  I don't want them to feel left out.

4             MR. LACY:  Okay.

5             THE COURT:  Thank you.

6             MR. LACY:  The chart that says Consolidated

7    Extraterritoriality Motion is our effort to list the claims

8    that would be dismissed if you take Judge Rakoff's order to

9    mean that you have to dismiss any claim involving a transfer

10   between a foreign transferor and a foreign subsequent

11   transferee.

12            THE COURT:  How many adversary proceedings are --

13            MR. LACY:  They're listed, Your Honor.  If you

14   look at the last page, you'll see that there's 74 on this

15   chart.

16            THE COURT:  Okay.

17            MR. LACY:  And you will also see that there are

18   hundreds of defendants.

19            If you look at page 14 -- we did this by order of

20   docket number, and that means the oldest and most

21   complicated cases are first, but if you look at page 14,

22   between pages 14 and 19, there is a rapid fire list of 41

23   proceedings, in which we think all of the claims would be

24   dismissed under an application of Judge Rakoff's ruling.

25            And then there are four or five others scattered

1    through the rest of the chart.  The 74 proceedings on this

2    chart includes 66 of the proceedings in which the trustee is

3    moving to amend the complaint.

4              Your Honor, the --

5              THE COURT:  Go ahead.

6              MR. LACY:  The other smaller chart, which is

7    called Additional Extraterritoriality Defendants, these are

8    defendants that did not move to withdraw based on

9    extraterritoriality, and so they were not covered by Judge

10   Rakoff's consolidated briefing and decision.

11             But they believe and we believe that they are in

12   the same situation, so that if you applied a rule and a

13   transfer from an -- from a foreign transferor to a foreign

14   subsequent transferee can't be recovered, all of these

15   claims would get dismissed.

16             This chart has 15 proceedings that are not on the

17   first chart, so you're up to a total of 89 proceedings in

18   all.  There are also a few claims here in four proceedings

19   that are in the first chart, so you have some duplication in

20   captions.

21             And the second chart includes eight more

22   proceedings that are subject to the trustee's motion to

23   amend.  So if you take the two charts together, they list 49

24   of the 66 proceedings that are subject to the trustee's

25   motion.

Page 12

1          Now, as you know, Judge Rakoff entered an order

2     for consolidated briefing and argument of a motion to

3     dismiss on the basis that Section -- among other things, of

4     Section 558 of the Bankruptcy Code does not apply to

5     transactions outside the United States.  The order said the

6     procedures established by this order, or by further order of

7     this Court shall constitute sole and exclusive procedures

8     for determination of the extraterritoriality issue in the

9     adversary proceedings.  And what he meant by adversary

10    proceedings there were the proceedings on the list attached

11    to the order.

12          We propose to continue on that consolidated basis.

13    That will maintain the efficiency of consolidated treatment,

14    you'll be able to get fools like me to spend days working on

15    charts like this, and it will make it unnecessary for the

16    defendants to obtain new orders, saying that they can make a

17    motion on one defense, without waiving other defenses, or

18    waiving the right to make motions to dismiss, based on other

19    defenses.  Judge Rakoff's order included all of that

20    language.

21          The way we propose to proceed is, that we shall

22    take a couple of weeks to finalize this chart in

23    consultation with the trustee's counsel.  They will have

24    time to look at it, spot what they consider to be mistakes,

25    we will talk to them about what they consider to be

Page 13

1    mistakes, we'll try and work out things like that.  And we

2    will get as close as we can to a stipulated schedule, that

3    will provide some basis for moving forward.

4           At the end of that time, and I haven't talked to

5    the trustee's counsel about exactly how long he'll need for

6    that, but say two weeks.  At the end of the time, we'll put

7    in the revised chart, and we will put in a ten paged brief,

8    explaining why we think Judge Rakoff's order requires the

9    dismissal of all of the claims on here.

10          At that point, the trustee will be able to

11   respond, and we submit that there are three things the

12   trustee can do.  First of all, if there's still

13   disagreements about the chart, we can point out what we

14   don't want on the chart.

15          The second thing is, that he can say that there

16   are things in the existing complaints, which for some reason

17   should make Judge Rakoff's ruling inapplicable to the claims

18   on this list.  We don't think there are any, but it's up to

19   the trustee's counsel to have a chance to say that.

20          The third thing, which would be perfectly

21   conventional in a motion to dismiss, is that the trustee

22   could say, we would like to be able to amend the complaints,

23   to make the following specific allegations.  So these would

24   be specific allegations to be added to specific complaints,

25   and he'll say, we think that if we are able to add these,

Page 14

1    then we would escape the force of Judge Rakoff's ruling, and

2    we wouldn't want to dismiss this.

3              In our reply papers, we'll then do what at that

4    point will be partially a motion to amend, we'll say,

5    there's no point letting him amend now, because amendment

6    would be futile, it wouldn't change the outcome.

7              We may say, by the way that Judge Rakoff had

8    already provided with an opportunity to amend, he's missed

9    the opportunity to amend, it's too late.  Any arguments that

10   go to whether there should be an amendment would all be done

11   in the opposition to this motion and the supplemental

12   briefing, and in our reply.

13             This would make the trustee's motion that was

14   filed a couple of weeks ago unnecessary insofar as it seeks

15   permission to amend to deal with extraterritoriality.  The

16   trustee's motion is not seeking discovery with respect to

17   extraterritoriality, and I'll just point out that the motion

18   that the trustee filed is not actually a procedurally

19   adequate motion to amend, because he hasn't told us how he

20   would amend the complaints.

21             And the district court has held over and over

22   again under Rules 7 and 15, both of which apply to adversary

23   proceedings in this court, that in order to make a motion to

24   amend, you have to be specific about what amendment you're

25   going to make.

Page 15

1          You have to be specific because the defendant is

2     entitled to oppose a motion like that by saying, that the

3     amendment would be futile, and you can't have that

4     litigation, unless you know exactly what the amendments are

5     going to be.

6          So the thing that is styled a motion to amend, an

7     omnibus motion to amend under the rules enforced in both the

8     district court and this court is actually procedurally

9     inadequate.  It ought to be held in abeyance in any event.

10         Your Honor, because so many of the proceedings

11    that are subject to the trustee's motion are covered by

12    these charts -- oh, I should add, that we would like to

13    propose, if no one objects, to simply wrap the defendants

14    and the claims on the additional chart into the consolidated

15    exercise.  They are not subject to Judge Rakoff's order now,

16    but they raise the same issue, the issue's going to be

17    litigated at some point.  It seems to me that it would be

18    convenient for everybody to simply add these people in, and

19    treat them as if they were subject to Judge Rakoff's order

20    going forward.

21         THE COURT:  Is that on the theory that I wouldn't

22    reach a different conclusion than Judge Rakoff?

23         MR. LACY:  I'm sorry?

24         THE COURT:  Is that on the theory that I wouldn't

25    reach a different conclusion than Judge Rakoff with respect

Page 16

1    to those proceedings that were not barred of the

2    consolidated briefing?  You're essentially saying it's

3    binding precedent, even if they weren't parties.

4              MR. LACY:  It seems to me it's binding precedent,

5    we've got a decision in 74 cases in this bankruptcy

6    proceeding.

7              THE COURT:  I'm not suggesting I would reach a

8    different opinion than Judge Rakoff.

9              MR. LACY:  And they're all going to go back to

10   Judge Rakoff.

11             THE COURT:  Well.

12             MR. LACY:  All right.  The final thing I'd like to

13   say is that insofar as the trustee's motion is asking for

14   discovery concerning good faith, it is not fair to the vast

15   majority of the defendants who have prima facie good motions

16   to dismiss on extraterritoriality, to subject them to that

17   exercise.

18             The trustee waited for about four months before

19   making that motion.  The good faith decision came down in

20   April.  The trustee waited until the end of August to make

21   that motion.  There can't be any urgency about it, so we

22   would submit that the heart of the trustee's motion that is

23   addressed to good faith issues, both the request for

24   discovery and the request to amend just be deferred until we

25   get past the extraterritoriality issue.

Page 17

1          There's one little procedural item I'd just like

2   to tag at the end.  The trustee has taken the position that

3   the motions before Judge Rakoff did not suspend the time for

4   people to answer under Rule 12.  It seems to me that that's

5   wrong, but, in fact, there is a pleura of e-mails and

6   telephone calls every couple of months, in which people get

7   new stipulations from the trustee extending their time to

8   answer.  And I would like to propose that the defendants

9   that are subject to this consolidated motion not have to

10  answer until the motion is decided, which is the way I read

11  12.

12          Any questions, Your Honor?

13          THE COURT:  No.  Let me hear from the trustee.

14          MS. GRIFFIN:  Good afternoon, Your Honor, Regina

15  Griffin, Baker Hostetler, counsel for the trustee.

16          Your Honor, I'm going to refrain from arguing our

17  motion, and that's why we're not here.  Obviously the

18  trustee and counsel for the defendants have different views

19  of how Judge Rakoff's decision, how final it is, and how

20  dispositive it is.

21          THE COURT:  I guess it's interlocutory because you

22  haven't appealed it, right?

23          MS. GRIFFIN:  That's correct, Your Honor.  It

24  certainly -- it expressly directs the case back to Your

25  Honor for disposition pursuant to the guidance that is

Page 18

1    contained in it, but it's the trustee's position that the

2    guidance contained in there, while it may contain rulings

3    about what constitutes a foreign transfer, it certainly

4    doesn't definitively say that what in addition to a foreign

5    transferor and a foreign transferee might be sufficient to

6    allege a domestic transfer.

7           And, Your Honor, there are many, many facts, many

8    of which are in the complaints, many of which are not,

9    because those complaints were filed such a long time ago

10   before these standards were changed, and now these new facts

11   have become relevant that would, I think, be pertinent.

12          And, you know, certainly Mr. Lacy's chart about

13   where the parties may be located might be partially

14   accurate, but there are things such as the fact that there

15   are transferors such as Fairfield that are residents in two

16   places, they may be in the BVI as a matter of where they

17   were formed.  But their principal place of business was here

18   in New York.  That is something that we think there are many

19   facts that you may want to take into consideration about

20   whether or not Fairfield is considered a foreign transferor.

21          There are situations where they are registered to

22   do business here.  There are subsequent transferees who are

23   also resident here.  Parties can be in more than one place.

24   There are bank accounts, not correspondent bank accounts,

25   which Judge Rakoff did find would not be enough to make a

1    foreign transferor more than -- anything more than foreign.

2    But there are defendants who executed subscription

3    agreements who agreed to New York jurisdiction, to New York

4    choice of law.

5              There are situations where defendants have filed

6    proofs of claim.  There are parties who actually solicited

7    counsel in the U.S. about whether or not U.S. Bankruptcy

8    Code and SIPA would provide coverage.  And these are facts,

9    Your Honor, that obviously it's about a futility argument,

10   it's about -- I agree with counsel that we definitely

11   disagree.

12             It's how we proceed hereon for efficiencies

13   purpose.

14             THE COURT:  I haven't.  Let me interrupt you.  I

15   haven't looked at the motion for leave to amend, but I'm

16   being told that you didn't attach proposed amended

17   complaints to that motion.

18             MS. GRIFFIN:  We didn't, Your Honor.  It's --

19             THE COURT:  I don't know how I would decide it

20   though.

21             MS. GRIFFIN:  Pardon me?

22             THE COURT:  How would I decide the issue of

23   futility if I couldn't see the allegations?

24             MS. GRIFFIN:  Your Honor, we're trying to do it on

25   the basis of efficiency, and the fact that the one common

Page 20

1   factor that exists across all of these cases is that the law

2   has changed, and that the -- in many instances, the trustee

3   still has the lead to replead as a matter of right.

4           And so we were merely trying to get in front of --

5   there's going to be chaos in a situation where you have so

6   many cases, so many defendants, and so many different

7   issues.  And what we're trying to do is start a dialogue

8   about how we can proceed on all of these very fact intensive

9   and fact specific inquiries.

10          In a situation where the defendants are looking at

11  it from the prism of only the extraterritoriality issue,

12  what's in front of the Court are cases that deal with the

13  good faith issue, they deal with the extraterritorial issue,

14  many of them overlap, and others deal with personal

15  jurisdiction issues.  But what they all share in common is

16  the procedural state that we're in.

17          The reason, Your Honor, we had -- we were prepared

18  to file the motion earlier with regard to the good faith

19  proceeding, but then the extraterritoriality decision came

20  down.  And we are merely trying to reach a place, Your Honor

21  -- I'm sorry, I'm not sure if the Court can still hear me.

22          THE COURT:  I can hear you, but I still come back

23  to the question, how do I decide your motion if I don't see

24  a proposed amended complaint.  Because I assume whatever

25  you're going to allege they're going to argue it's

Page 21

1    foreclosed by Judge Rakoff's decision.

2              MS. GRIFFIN:  It may, Your Honor, but what we were

3    hoping to do is to allege -- is to amend all at once.

4              THE COURT:  Why don't you amend one complaint, and

5    put that up for the motion, and then they can argue whether

6    or not it's futile.

7              MS. GRIFFIN:  Are we limiting it to just an

8    extraterritoriality issue, Your Honor?  Because in every

9    case --

10             THE COURT:  Well, I haven't seen your motion --

11             MS. GRIFFIN:  Okay.

12             THE COURT:  -- so I'm not deciding it.  All I'm

13   saying is, if you haven't provided a proposed amended

14   complaint, I don't know how I can decide your motion.

15             MS. GRIFFIN:  Because, Your Honor, the fact is, is

16   that every case is different, and because of the fact

17   intensive nature about what each case involves, it's -- we

18   would have to do that in every case.  And we can proceed

19   that way, and we're happy to do that, Your Honor.  We were

20   simply trying to find a way that we could be efficient, and

21   do this in a way where the parties making motions aimed at

22   complaints that didn't have all the facts in them, that's

23   really what we were trying to accomplish.

24             THE COURT:  I understand that.  I still come back

25   to the problem I have with the way you're proceeding.  I

Page 22

1  understand the burden, but I don't know what else to say.

2          MS. GRIFFIN:  Okay.

3          THE COURT:  Except to pick a representative case

4  and try that.

5          MS. GRIFFIN:  It's --

6          THE COURT:  I recognize the facts and

7  circumstances are different --

8          MS. GRIFFIN:  Each --

9          THE COURT:  -- but you have, I guess, a lot of

10  cases with Fairfield --

11          MS. GRIFFIN:  Yes, Your Honor.  The -- well, Your

12  Honor, what's going to happen is, is either -- when you get

13  into this issue deeper, and you read the recent decisions

14  that come out of the Second Circuit, Park Central being one

15  of them, you'll see that every subsequent transferee may

16  have different circumstances.  Fairfield may be the same, as

17  the transferor that's involved, but then there are going to

18  be subsequent transferees who may have filed a proof of

19  claim.  They may be resident here in a branch office on Main

20  Street.

21          So taking for us, and each time you rule, you're

22  going to be charting a new territory, factors that may or

23  may not be.

24          THE COURT:  But how do I deal with the argument

25  that the amendment is futile, if I can't see the amendment?

1          MS. GRIFFIN:  I guess, Your Honor, that it's a

2     very good point, we have to, I guess, in each case present

3     to you -- what we were trying to do though is amend as to

4     every issue.  So if you want us to put forward, perhaps we -

5     -

6          THE COURT:  I don't want you to do anything.

7          MS. GRIFFIN:  Sure.

8          THE COURT:  All I'm telling you is, you've made a

9     motion for leave to amend, which is not before me today, I

10    don't have the complaints, one of the arguments that can be

11    made in opposition to the motion, and they're clearly

12    opposing the motion, is that the amendment is futile, and I

13    don't know I decide that.

14         MS. GRIFFIN:  Your Honor, perhaps what we can do

15    is on a case-by-case basis then put forward facts in our

16    opposition that we would put into an amended complaint.

17         THE COURT:  Why don't you just put them into an

18    amended complaint.

19         MS. GRIFFIN:  We can do that, too, Your Honor.

20         THE COURT:  Okay.

21         MS. GRIFFIN:  We can.  Again, it's an efficiency

22    basis.  Do we also amend all at once to deal with the good

23    faith issue, that's the complicating issue.  And there are

24    people who raise personal jurisdictional issues.  Are we

25    really just going to brief the extraterritoriality issue on

Page 24

1    futility first, and not deal with --

2              THE COURT:  Well, what is your motion to amend

3    directed at?

4              MS. GRIFFIN:  It was directed at giving us leave

5    to replead in light of the change in standards, and it also

6    sought discovery, and a certain number of identified cases

7    where the trustee had received no documents whatsoever.

8              MR. LACY:  Your Honor, I think Ms. Griffin and I

9    actually got to an agreement there a moment ago.  She said,

10   we can say in response to the motion what we would allege in

11   each particular complaint.

12             It is correct that there is no representative

13   complaint that could be amended.  There is no representative

14   amended complaint.  The circumstances are different for each

15   complaint.  The only way to proceed is for them to tell us

16   at some point how they would amend with respect to each

17   complaint.

18             But the normal procedure for doing that, and

19   surely the fastest way to get through this, is to do that as

20   part of their opposition to the ongoing motion to dismiss.

21   That way, they will have had our views concerning what Judge

22   Rakoff's decision means, they won't be shooting in the dark.

23   They will have every opportunity to be proposing amendments

24   that will undercut our arguments.  They'll know just what

25   we're after, just as anyone else would be in this position,

Page 25

1    trying to amend out of a motion to dismiss.  Then we --

2              THE COURT:  So let me understand, you're proposing

3    to make a motion to dismiss the complaints?

4              MR. LACY:  There is a motion to dismiss.  We're

5    proposing to continue the existing motion to dismiss by

6    supplementing it with a chart, which we'll try to agree on

7    as much as possible, and a ten paged brief, and we propose

8    that they respond to that with what is likely to be a fairly

9    long opposition.

10             THE COURT:  Basically a kind of a chart where they

11   list the facts that they would allege.

12             MR. LACY:  That would be -- if they can get it

13   into a chart, it'd be wonderful for all of us.

14             THE COURT:  Uh-huh.

15             MR. LACY:  I -- the rule concerning specificity in

16   amending complaints, some judges say you've got to give me a

17   blackline in the complaint, but others say just tell me

18   precisely what you're going to change.  It seems to me that

19   the second is just as good of way of doing it.  If they want

20   to give it to us as a chart, that would be fine, and then we

21   will put in a reply paper where we will say with respect to

22   each of the, whatever 74 proceedings, this is going -- this

23   is true.  Or we might concede on one or two that it's not.

24             Your Honor, finally just to make clear, they are

25   not asking for any discovery with respect to

Page 26

1   extraterritoriality.  So there's no reason to go through the

2   issue --

3              THE COURT:  I got that.

4              MR. LACY:  -- before doing those amendments.

5              THE COURT:  So, Ms. Griffin, what about the

6   procedure that's just been proposed?

7              MS. GRIFFIN:  Your Honor --

8              THE COURT:  They'll make a ten paged motion to

9   dismiss, and then you'll give me a chart explaining what

10  additional allegations with respect to each complaint, or

11  additional facts really I guess with respect to each

12  complaint would allege.

13             MS. GRIFFIN:  We can do that, Your Honor, we can't

14  do it in a two week time period with respect to 74

15  complaints.

16             THE COURT:  This case has been going on six years.

17             MS. GRIFFIN:  Your Honor, regrettably the

18  timetable --

19             THE COURT:  I'm not suggesting you're at fault,

20  but it's going on for six years, whether it takes two weeks

21  or four weeks, it really doesn't matter at this point.

22             MR. LACY:  I was only proposing two weeks as a

23  time to try and work out the accuracy of this chart.

24             MS. GRIFFIN:  Right.

25             MR. LACY:  Then we would put in our brief, they

Page 27

```
1    can then have a month or whatever they want to respond to

2    that.

3              MS. GRIFFIN:  Your Honor, if I could propose,

4    we'll speak with Mr. Lacy again.  This is part of the

5    dialogue to move forward as efficiently and as fairly as we

6    can under the circumstances.

7              THE COURT:  Okay.

8              MS. GRIFFIN:  So we can consult with Mr. Lacy,

9    talk about how we move forward, how the briefing would look

10   with the chart or facts would look like.  We can do that.

11             THE COURT:  All right.  That sounds like it makes

12   the most sense.  Is there anyone else who wants to be heard

13   in connection with this issue?

14        (No response)

15             THE COURT:  The record should reflect there's no

16   response.

17             So the general framework is that the defendants in

18   the consolidated proceeding, and you didn't follow to the

19   suggestion to just combine the charts, but we can deal with

20   that separately.  The defendants will make a short motion to

21   dismiss, and then you'll respond explaining what additional

22   extraterritoriality allegations you would make in the

23   complaint, in a chart form which is simple enough, where

24   just can be done narratively, as long as the separate

25   adversary proceedings (indiscernible).
```

1           MS. GRIFFIN:  We will do our best, Your Honor.

2           MR. LACY:  Your Honor, I do want to emphasize that

3    I think we should keep the existing motion going, so we

4    don't have to go through this exercise of writing a new

5    order that saying, that moving on extraterritoriality is not

6    going to foreclose people for making motions to dismiss

7    based on other grounds.

8           THE COURT:  Any objection to that?

9           MS. GRIFFIN:  No, Your Honor.  I guess what I need

10   to understand from Mr. Lacy is what motion to dismiss do you

11   consider is still open, is it just the extraterritoriality,

12   is it the good faith, I guess I want to know what we're

13   dealing with.

14          THE COURT:  Are these -- is this good faith issue

15   for the subsequent transferees under 550?

16          MS. GRIFFIN:  You know what, Your Honor, I don't

17   waste the time doing semantics.  We can work it out between

18   ourselves.  It's -- I'm hearing things about what they're

19   considering still be open for the first time.  And so when -

20   - if we're dealing with just extraterritoriality, we're

21   going to be coming back again and again and that's one of

22   our efficiency concerns.  But I think this is something we

23   can probably work out with counsel.

24          THE COURT:  All right.  What do you propose we do

25   today in terms of the conference?  When is your motion to

Page 29

1    amend the complaint scheduled for?

2              MS. GRIFFIN:  It is scheduled -- I think counsel's

3    opposition is due on October 10th.  The hearing was on the

4    22nd.

5              THE COURT:  Of October?

6              MS. GRIFFIN:  Yes.

7              THE COURT:  Any objection to just adjourning this

8    conference to October 22nd?

9              MR. LACY:  Well, could we adjourn that motion as

10   well, please?

11             MS. GRIFFIN:  I think that makes sense, Your

12   Honor, we're going to need time.

13             THE COURT:  All right.  How long an adjournment do

14   you think makes sense in terms of adjourning all these

15   matters?

16             MR. LACY:  Well, I'm sure we can talk -- we can

17   get talking done by the 22nd of October.

18             THE COURT:  Do you want to speak and then write a

19   letter to the Court and post it on the docket when you think

20   it makes sense to be --

21             MS. GRIFFIN:  Yes, Your Honor.

22             THE COURT:  -- adjourned?

23             Okay.  Why don't we do that.  Thank you.

24             We'll take a brief recess and then we'll start the

25   2 o'clock calendar.

1           (Recessed at 1:57 p.m.; reconvened at 2:22 p.m.)

2                THE CLERK:  All rise.

3                THE COURT:  Please be seated.  I apologize for the

4      delay, but we had some communication problem with the

5      overflow room.

6                All right.

7                MR. CREMONA:  Your Honor, if I may, Nick Cremona

8      on behalf of Irving Picard as --

9                THE COURT:  You didn't stand up fast enough, Mr.

10     Levy.

11               MR. CREMONA:  -- trustee.  I wanted to raise a

12     threshold matter with Your Honor before we got started.

13               THE COURT:  Yes.

14               MR. CREMONA:  Just to be clear, I received an e-

15     mail from Mr. Kirby on behalf of the interveners at 11:24

16     today, and they indicated that they wanted to be heard on

17     these proceedings.  To my knowledge, that -- their motion

18     for intervention has not been granted by Your Honor.

19               THE COURT:  That is correct.

20               MR. CREMONA:  We renew and maintain our objection

21     to having them be heard, given the fact that they're not

22     joined to these proceedings and their cases are not appended

23     to the notices of hearing for today.  But I, of course,

24     defer to Your Honor.

25               THE COURT:  All right.  Mr. Levy.

Page 31

1              MR. LEVY:  Thank you.

2              THE COURT:  Let me just ask you, how you intend to

3     proceed.  You're going to argue a specific issue.

4              MR. LEVY:  Yes, Your Honor, the defendants are

5     going to split up the argument among various different

6     issues.

7              THE COURT:  Have you discussed with the trustee

8     whether it makes sense for the defendants to make all of the

9     arguments, and have the trustee respond or do it argument-

10    by-argument?

11             MR. LEVY:  We have not had that conversation, Your

12    Honor.

13             THE COURT:  So what do you think makes sense?

14             MR. LEVY:  I'm getting a signal from our side,

15    Your Honor, that that suggestion is, is that we do

16    particular issues separately.  The problem that I'm going to

17    suggest to Your Honor is that the issues I'm going to

18    address at the beginning actually have considerable overlap,

19    but may make sense for obligations in the antecedent debt to

20    be considered as a package.

21             THE COURT:  Would that modification, do you have

22    any objection to that procedure?

23             MR. CREMONA:  I apologize, can you repeat that?

24             MR. LEVY:  The argument that I'm going to present

25    on the two points allocated to me, obligations and the

Page 32

1   antecedent debt have a certain amount of overlap to the

2   argument I'm going to make.  My suggestion is that we treat

3   them as a package.

4           MR. CREMONA:  I had intended to do the same.

5           THE COURT:  And then -- okay.  So they'll argue

6   their issue or their overlapping issues, then you'll

7   respond, then we'll move on to another issue --

8           MR. CREMONA:  Sure.

9           THE COURT:  -- we'll just be -- go ahead.

10          MR. LEVY:  One other housekeeping matter, Your

11  Honor.  On the particular arguments that may be made, I

12  understand that several of my colleagues may have

13  supplemental points to make in addition to what I present to

14  the Court this afternoon.  So when I finish my presentation,

15  I will yield to them.

16          THE COURT:  As long as they're telling me

17  something that you don't tell me.

18          MR. LEVY:  Good afternoon, Your Honor, may it

19  please the Court, Richard Levy of Pryor Cashman on behalf of

20  the defendants.  My firm represents 11 actions, which have

21  motions pending before Your Honor today.  I make arguments

22  that are also common to a good number of the cases that are

23  before Your Honor this afternoon.

24          And, in particular, I'm going to deal with the

25  question of whether or not SIPA allows the trustee to reach

Page 33

1    the avoidance of obligations, whether obligations provide a

2    defense under Section 548, and whether there is an

3    antecedent debt defense that Your Honor should be

4    considering.

5              Some of these motions have been pending since as

6    early the spring of 2013.  These were cases that first came

7    down from Judge Rakoff, after having been considered on

8    withdrawal of the reference.  Motions were then made, and a

9    good number of those 85 cases that comprised the decision in

10   Greiff.  Other defendants have since made additional

11   arguments and made additional motions, all of which are

12   before the Court today.

13             The defendants that I represent are the targets of

14   amended complaints that were filed by the trustee during the

15   proceedings before Judge Rakoff.  The complaint as

16   originally filed asserted that my client or clients as

17   customers of Madoff or subsequent transferees of customers

18   received transfers constituting, in the trustee's parlance,

19   profits, excess over principal, something to which they were

20   not entitled, and which was recoverable under the SIPA

21   statute.  They did not in the original complaint assert any

22   argument based on obligations.

23             While we were before Judge Rakoff, the question

24   came up by way of the trustee's amendment of the complaints

25   to assert that there were, in fact, avoidance arguments to

Page 34

1    be presented by the trustee to avoid obligations.

2    Unfortunately, most of those obligations are not specified

3    in the complaint so we have a pleading issue, but

4    nevertheless, the legal issue was presented.

5         Judge Rakoff didn't decide the obligations

6    (indiscernible).  We made oral argument to him in the spring

7    of two thousand -- in January of 2012 to February of 2012.

8    He never reached the issue, and in a decision recently made

9    by Judge Rakoff, I think in the Most (ph) case, the Court

10   indicated that the obligations argument was not to be

11   decided by him, was rather going to be referred to Your

12   Honor for decision, which makes it ripe for decision today.

13        So I'm going to lead off and deal with the

14   obligations and antecedent debt arguments.  As I'm going to

15   discuss, obligations has not yet been decided by any -- the

16   avoidability of obligations in the context of this SIPA

17   proceeding has not been decided by any other court, who has

18   yet heard argument in the case.

19        As to the antecedent debt issue, it's my intention

20   to address some important developments in the law, that bear

21   upon these motions since the time of their filing.

22        THE COURT:  Can I ask you a question?

23        MR. LEVY:  Yes, Your Honor.

24        THE COURT:  On the antecedent debt issue which

25   Judge Rakoff did decide --

1          MR. LEVY:  Yes.  He decided it in two pieces, and

2     for two distinctly different groups of customers.

3          THE COURT:  Okay.  But essentially as I understand

4     it, he decided that you couldn't allege the satisfaction of

5     estate or federal securities fraud claim constituted value

6     for the purposes of Section 548-6.

7          MR. LEVY:  That is one way to frame it, Your

8     Honor.  The way I would frame it is that he held that the

9     customers may well have claims under those laws, but that

10     they don't rise to the level of an antecedent debt --

11          THE COURT:  Okay.

12          MR. LEVY:  -- by reason of value or some --

13          THE COURT:  Do you represent any clients who are

14     parties to that decision?

15          MR. LEVY:  Yes, Your Honor, I do.

16          THE COURT:  Judge Rakoff withdrew the reference of

17     that issue.  Do I have any authority to consider that issue,

18     at least as to the clients that were parties to the decision

19     before Judge Rakoff?  He never referred it back to me.

20          MR. LEVY:  I believe Your Honor does have the

21     ability to reconsider, revisit which whatever objective you

22     wish to use --

23          THE COURT:  What's my jurisdiction though if he

24     withdrew the reference?

25          MR. LEVY:  But he no longer has the reference.

1            THE COURT:  But he didn't send -- he sent me back

2    -- sent back the cases to administer in accordance with his

3    decision, but he never referred the issue back to me.

4            MR. LEVY:  I think on obligations he did, number

5    one --

6            THE COURT:  Well, obligations I understand.

7            MR. LEVY:  On the antecedent debt, there were

8    other defendants who have made the motions, I'm making the

9    argument, in effect, on their behalf this morning -- this

10   afternoon.

11           THE COURT:  I understand the defendants who were

12   not parties to that, I'm not sure who they are, but I

13   understand the argument, and as to them, the question is

14   whether that is binding or persuasive authority, or at least

15   persuasive authority in those cases.

16           But as to those defendants that were parties to

17   that, just seems to me I don't even have jurisdiction to

18   consider that issue.

19           MR. LEVY:  I think Your Honor has -- I think the

20   way the law reads, the way I interpret the law, is Your

21   Honor is obligated certainly to pay considerable weight to

22   the precedent decision by Judge Rakoff.  It hasn't been

23   considered by an appellate court, so I don't even know that

24   it's law of the case.

25           There are --

1          THE COURT:  Even in the cases he decided that were

2     parties to the withdrawal of the reference?

3          MR. LEVY:  Perhaps to that extent, Your Honor, but

4     not to the extent of binding the entire universe of

5     defendants, number one.

6          Number two, I think by reason of the change in

7     circumstances and the applicable law, Your Honor sitting as

8     in effect the bankruptcy --

9          THE COURT:  The appellate court to Judge Rakoff

10    now?

11         MR. LEVY:  I wouldn't frame it that way, Your

12    Honor.  But sitting as the exercise -- the Court exercising

13    the bankruptcy jurisdiction, the bankruptcy power, which is

14    what Judge Rakoff effectively was deciding, when he had --

15    exercising when he took the cases upstairs.

16         You're in a position now as if that -- the

17    bankruptcy decision had been rendered at the first level.

18    Your Honor has the ability -- the Court has the ability

19    certainly to revisit prior decisions made in the case.

20         In addition, Your Honor, the change in

21    circumstances and change in applicable law, we believe are

22    circumstances that warrant Your Honor seriously considering

23    whether or not the prior decision has any continuing

24    vitality, and that's the point I'm going to make not only

25    for my clients, but certainly for the clients who are not

1    parties to those -- to the earlier decisions by Judge

2    Rakoff, either on the statutory obligations issue, the

3    statutory rights issue, the contract issue, or the tort

4    claims.

5             THE COURT:  Okay.  Go ahead.

6             MR. LEVY:  But, Your Honor, after I'm done,

7    obviously Mr. Kupillas is going to follow with a variety of

8    arguments that he's responsible for, Ms. Neville, they'll

9    both supplement my comments as well.

10            The other point I want to make, Your Honor, as a

11   predicate, these are cases all that are -- involve

12   defendants who are innocents or good faiths.  There is no

13   allegation of any bad faith or culpability on the part of

14   any of these defendants.  That's particularly important as

15   we'll see in a little bit when we talk about the state law

16   adherence -- the state law elements of the defenses, the

17   debts, the claims that are available to our clients, and the

18   fact that one has to look at the good faith of the client

19   that's not in doubt, in determining whether or not --

20            THE COURT:  It's a value issue, it's not a good

21   faith issue, in terms of talking about the defense.

22            MR. LEVY:  I understand that, Your Honor, but I

23   want to make clear that we are dealing with parties who are

24   not alleged to have engaged in any wrongdoing.

25            THE COURT:  I understand.

1          MR. LEVY:  That does become important, for

2    example, in considering whether public policy considerations

3    can supervene what the language of the statutes is.

4          So, Your Honor, turning to the specific questions

5    of obligations and the antecedent debt, there are some

6    common threads as you'll see.

7          I don't intend to spend any time on the basics of

8    the antecedent debt argument.  I think Your Honor

9    understands well the parameters of the 548(c) defense.  I

10   want to concentrate on first, the statutory issue involving

11   obligations, and the, what we believe to be the significant

12   change in the law on antecedent debt.

13         So I explained to Your Honor how obligations came

14   to be involved in these cases.  It's still here to the

15   extent that it's been asserted in amended complaints against

16   my clients, amended complaints against other clients, which

17   have not yet been addressed by any court.

18         The question that first arises is does SIPA even

19   give Your Honor the obligation to entertain a claim to avoid

20   an obligation.

21         THE COURT:  The obligation?

22         MR. LEVY:  Excuse me?

23         THE COURT:  Go ahead.

24         MR. LEVY:  I'm sorry, Your Honor, I --

25         THE COURT:  Go ahead.  You used the word

Page 40

1    obligation twice in that sentence.

2              MR. LEVY:  I did.  I'm sorry, Your Honor.

3              The first question is whether Your Honor even has

4    the ability to entertain a claim for the avoidance of

5    obligations under the SIPA statute.

6              THE COURT:  But Mr. Piccard has all the powers of

7    a trustee.

8              MR. LEVY:  That may be, Your Honor, but there's a

9    specific provision which overrides the general.

10             THE COURT:  Isn't that -- I know what you're

11   talking about, but that's a provision that expands his

12   authority beyond what a trustee normally has.  You're

13   talking about the provision that lets him recapture customer

14   property as if it was property of the estate?

15             MR. LEVY:  Yes.

16             THE COURT:  That grants him greater authority than

17   a trustee has, not lesser authority.

18             MR. LEVY:  Your Honor, I would argue that that

19   provision actually modifies the power of the bankruptcy

20   trustee because it is --

21             THE COURT:  Well, let me ask you --

22             MR. LEVY:  -- the specific statute which overrides

23   the general.

24             THE COURT:  -- suppose that Madoff Securities

25   fraudulent incurred an obligation, having nothing to do with

Page 41

1    customer property, just fraudulently incurred an obligation

2    that would be a general obligation of the estate.  You're

3    telling me that the trustee would have no power under the

4    Bankruptcy Code to avoid that obligation?

5             MR. LEVY:  I'm not suggesting that, Your Honor.

6    I'm suggesting with respect to the customers, there is no

7    ability to avoid obligations.

8             THE COURT:  Okay.  Well, what if they're not

9    obligations not in the capacity as customers, but in a

10   capacity as general unsecured creditors?

11            MR. LEVY:  I'm not making that argument, Your

12   Honor.  I don't have -- that's not an issue that involves my

13   clients at all.  I'm dealing with the question of whether or

14   not a trustee can obtain from a customer, can avoid from a

15   customer an obligation owed to the customer, obligation

16   incurred to the customer.

17            THE COURT:  Aren't these the same obligations,

18   though, that you're asserting in essence as a defense to the

19   transfer?

20            MR. LEVY:  Yes, Your Honor, they are.  We are

21   asserting that whether as matters of contract or statute, or

22   common law, there are either claims or chose as an action,

23   or rights to payment.

24            The statutes create statutory duties and

25   obligations.  They create mandatory requirements that the

Page 42

1    broker has to adhere to.  Those are obligations.  They may

2    give rise to a right of payment, but they are obligations.

3              In Asia Global Crossing, Your Honor ruled that a

4    contract right, such as a guarantee creates a chosen action.

5    That creates a right to payment.

6              In the common law claim area, that creates a right

7    of action, which in turn leads to a right to payment, if

8    those claims are valid and exist.  If the obligations exist

9    and are not avoidable, a payment on account of that

10   obligation is good value, is fair value and is not

11   avoidable.  In the case --

12             THE COURT:  Unless it's a Ponzi scheme, right?

13             MR. LEVY:  Your Honor --

14             THE COURT:  That's what the law is up until now.

15             MR. LEVY:  The Ponzi scheme cases go in a

16   different direction.  They say that we have to protect the

17   rights of the customers whose other money has -- whose own

18   money --

19             THE COURT:  This rule isn't limited to SIPA cases.

20             MR. LEVY:  Your Honor --

21             THE COURT:  It's not limited to SIPA cases.  It

22   usually comes up with a payment of interest, but the

23   underlying rationale is that you don't give value except to

24   the extent of the money you've deposited into the scheme.

25             MR. LEVY:  I understand that, Your Honor.  My

Page 43

1    argument, Your Honor, is those cases are creating a public

2    policy argument that we have to reward the injured victims

3    whose money was left in.  Judge Rakoff says, you can't use

4    an antecedent debt defense unless that antecedent debt would

5    be a customer claim.

6         The public policy arguments in the district and

7    circuit courts who say, we have to limit the recovery to

8    real value are not taking a hard look at whether or not the

9    antecedent debt defense measured from the customer

10   standpoint under applicable non-bankruptcy law, is valid.

11        So, for example, we don't use public policy to

12   limit tort claims.  We use in pari delicto perhaps, but that

13   requires the defendant to have engaged in bad conduct.

14        We don't use public policy to invalidate contract

15   rights unless the party seeking to enforce the contract

16   engaged in illegal conduct.  That's the law of the State of

17   New York on whether or not you can avoid a contract as being

18   contrary to public policy.

19        THE COURT:  What's the relevance of New York

20   public policy to this case?  We have victims from all over

21   the world and the country, and the issue is whether they

22   provide a value under 548(c) which is a federal statute.

23        MR. LEVY:  I'm suggesting, Your Honor, as the

24   Court well knows, that the elements of a defense under the

25   antecedent debt or obligations provisions that we are

Page 44

```
1    invoking here are defined by state law, non-bankruptcy law,

2    which establishes for example --

3              THE COURT:  I understand --

4              MR. LEVY:  -- the Article 8 rights.

5              THE COURT:  I don't think -- I don't read Judge

6    Rakoff's decision to say you don't have claims.  I read him

7    to say that in essence, you can't set off those claims

8    against the trustee's claim for customer property against

9    your client.

10             So you may well have claims and presumably every

11   investor has a fraud claim, certainly investors who have

12   lost have fraud claims.  I'm not sure -- I don't know if

13   Matt Winters had, but -- so you have a fraud claim.  But

14   Judge Rakoff said you can't set that off for the reasons he

15   said in his opinion.

16             MR. LEVY:  And we think that's wrong, Your Honor.

17   We particularly think that the Fairfield Greenwich decision

18   rendered by the Second Circuit less than two months ago

19   makes that very clear.

20             THE COURT:  But that case just dealt with what was

21   property of the estate, and said that SIPA didn't change

22   that.  SIPA obviously changed the estate's right to acquire

23   or the trustee's ability to acquire customer property.  So

24   there are changes in SIPA that do affect fraudulent transfer

25   actions, as you pointed out.
```

Page 45

1            MR. LEVY:  Your Honor, that decision -- I don't

2    think Your Honor can properly read that decision as simply

3    limited to what is property of the estate.  That decision

4    makes clear that SIPA establishes a set of rules, it borrows

5    a bankruptcy avoidance statute, but it doesn't include any

6    language within that borrowing statute that says, oh, and by

7    the way, the 548 defense is limited to some basis -- a

8    comparison of priority as to what the claim would've been

9    now, and what the claim would be in the SIPA case.

10            THE COURT:  Well, putting aside the priority

11    discussion in non-SIPA cases, Courts have ruled that in

12    Ponzi scheme cases, you don't give value beyond what you've

13    contributed to the scheme, for the purposes of a defense,

14    haven't they?

15            MR. LEVY:  Yes, they have, Your Honor.

16            THE COURT:  So those are non-SIPA decisions.

17            MR. LEVY:  Yes, they are, Your Honor.

18            THE COURT:  All right.

19            MR. LEVY:  I'm saying that in the context of the

20    SIPA case, if you have a statute that doesn't -- you have a

21    statute which says nothing in SIPA, nothing in SIPA gives

22    the trustee some special power to completely disregard the

23    state laws.

24            And I'm suggesting that the state laws,

25    particularly those that affect the regulation of a broker

Page 46

```
 1    dealer in a highly regulated industry where obligations are

 2    created is matters of statute.

 3            The reason why obligations aren't recovered,

 4    aren't recoverable from the customer is designed to protect

 5    the customer's expectancy.

 6            THE COURT:  Are you talking about the branch of

 7    your argument about avoiding obligations, or the branch of

 8    your argument saying that the satisfaction of these

 9    obligations is an antecedent debt?

10            MR. LEVY:  Your Honor, I think there's a -- again,

11    as I said, there is an overlap, maybe a blur.  The question

12    is whether or not obligations are avoidable, even if they're

13    not -- even if they may be subject to avoidance, they create

14    themselves a right to payment which protects the payments

15    that are made afterward.

16            THE COURT:  But if they're avoided, or they're

17    avoidable, how can they protect the payment?  Once you avoid

18    the obligation, you can recover the payment, can't you?

19            MR. LEVY:  If they're avoidable.  I'm suggesting

20    to Your Honor that the text of the statute doesn't provide

21    any claim for the trustee to recover obligations from

22    customers under Section --

23            THE COURT:  Well, you don't recover obligations,

24    you just avoid them.

25            MR. LEVY:  But it leads to the question whether or
```

Page 47

1    not you can recover payments that ensue under or on account

2    of the obligation.  So I'm suggesting to Your Honor that

3    Section 8(c)(3) of SIPA does not contemplate the allowance,

4    the avoidance of obligations.

5            In fact, the lack of any reference, any use of the

6    word obligation in that statute suggests that obligation

7    should be a defense.

8            THE COURT:  But -- well, okay.

9            MR. LEVY:  So, Your Honor, our point is, is that

10   Fairfield Greenwich has changed the playing field.  We do

11   think that it is made very clear that the rules that Judge

12   Rakoff intended to impose here were not based on fair

13   reading of SIPA.

14           In addition, Your Honor, I think the language of

15   8(c)(3) has a clause in it that's important for us to keep

16   in mind, which seems not to have found its way into any of

17   the decisions.

18           The cases in front of Judge Rakoff and others have

19   focused on the provision in Section 8(c)(3) which says, and

20   I'm going to paraphrase, the trustee has the ability to

21   avoid a transfer of property to a customer, using the

22   fiction that it is not customer property, "to the extent

23   void or voidable under Title 11."

24           To the extent, that's the limitation, the

25   constraint on the trustee's remedy.  But there's another

Page 48

1       clause that follows the provision -- that particular

2       provision.

3              The end of the statute says, that a customer who

4       has received the transfer shall be deemed to have been a

5       creditor, the laws of any state notwithstanding.

6              That obviously is designed to confer upon the

7       creditor all of the rights and defenses that are available

8       in responding to a trustee.  And I submit, Your Honor, that

9       that not only contemplates that the creditor/defendant has a

10      claim, but the fact that, for example, the statute doesn't

11      have any reference to the word obligations, there's no

12      reason why the creditor can invoke an obligation in full

13      defense and it's not avoidable, because there's no other

14      affirmative provision in 8(c)(3) that says the trustee can

15      go after the obligations.

16             Your Honor, I think we -- I'm not going to belabor

17      the point on Fairfield Greenwich.  I think our letter of

18      February 4th amply makes out the point as to why the law has

19      changed.  We also invoked in our briefs the recent decisions

20      by the Supreme Court that make very clear, and this is where

21      I have some problem frankly with the Ponzi scheme cases, and

22      I'll be very honest about that.

23             My problem with the Ponzi scheme cases is that the

24      Supreme Court says on the one hand, we take bankruptcy

25      statutes, codified statutes, we interpret them according to

Page 49

1    their plain language.  Then you have a decision like Janvy

2    (ph) released the other day, which the Court says, well, you

3    know, we have Ponzi schemes, we have to protect the innocent

4    victims whose money was left in at the expense of those who

5    dealt with the broker, or the Ponzi schemer in good faith,

6    and gave what they believe to be what was value, or gave

7    what was value, or received what was value, but we invoke a

8    public policy approach in order to protect them.

9           You know, I think Your Honor has seen that in

10   every actual fraudulent case, somebody's money is being

11   taken, somebody's expectations are being frustrated.  This

12   is really no different from a garden variety actual fraud

13   case.

14          THE COURT:  Well, except in all other cases, it's

15   the money of the estate, the general estate that's being

16   transferred.  And here it's the money of individual --

17   really the property of individuals or investors, not

18   necessarily individuals.

19          MR. LEVY:  But, Your Honor, the Ponzi scheme cases

20   all involve general estates as well.  I don't think that

21   that distinction necessarily -- necessary carries all that

22   much weight.

23          The notion that we're going to allow public policy

24   to override the plain language of statutes is what I have a

25   problem with.  I think the Janvy decision is a perfect

Page 50

1    example of where a court went too far.

2             And the point I was making earlier about New York

3    State public policy and the role it plays in the antecedent

4    debt defense, if you have a contract claim based on your

5    dealings with the miscreant broker, who's absconded with

6    your money, given it to somebody else, leaving some people

7    completely at a loss, other people who have received some

8    money.

9             They had a contract.  New York law says, that's a

10   contract that unless it's otherwise void against public

11   policy, we enforce.  Now, where do you test the voidness for

12   public policy?  Not from the standpoint of the innocent

13   customer who's seeking to assert his contractual rights to

14   recovery.  It would only be set aside for -- as a void

15   against public policy unless Mr. Madoff was asserting it

16   against his customer.

17            The antecedent debt defense in this instance would

18   honor the contract in favor of the customer.  Not a question

19   of public policy, rather a question -- not a question of

20   voiding for public policy, you don't void for -- I didn't

21   say that right.

22            THE COURT:  But what about the public policy of

23   paying net equity claims to customers, which is clearly the

24   policy of SIPA?

25            MR. LEVY:  They get whatever is in the customer

1    property pool that the trustee can recover quote, to the

2    extent avoidable under the Bankruptcy Code, close quote.

3    This is with respect to the avoidance remedy to be exercised

4    by the trustee.  It is not an unlimited right.

5              Your Honor, may I have one moment?  I may be done

6    with my --

7              THE COURT:  Yes.

8              MR. LEVY:  -- comments.

9         (Pause)

10             MR. LEVY:  Your Honor, I'm going to yield to Ms.

11   Neville for a minute, and then I'm going to take the podium

12   just to sum up on the argument.

13             THE COURT:  Okay.

14             MS. NEVILLE:  Good afternoon, Your Honor --

15             THE COURT:  Good afternoon.

16             MS. NEVILLE:  -- Carole Neville from Dentons.  I

17   have some of the 85 cases that were sent back to you without

18   a decision on antecedent debt.  I think the three of us have

19   the 85 cases.

20             I wanted to point out that Judge Rakoff's decision

21   turns on the idea that the claims that we do have, which he

22   says are valid, don't rise to the same level as the customer

23   claim because there are cases, and one of them is Fitness

24   Holdings International, where a subordinated claim, this was

25   a claim of an insider, and at the time it was -- that's at

Page 52

1     714 F.3d 1141.

2              THE COURT:  Yeah, I read the case.

3              MS. NEVILLE:  Yeah.

4              THE COURT:  That dealt with constructive fraud

5     provisions and reasonably equivalent value under 528(a)(2),

6     which is not what we're talking about.

7              MS. NEVILLE:  Well, no, but it does deal with

8     reasonably equivalent value and value, and basically what it

9     says, unless you had a recharacterization of the claim of

10    the insider to equity, it would've been a subordinated -- a

11    510 claim, and that would have been at least considered

12    value under state law.

13             The case is really about whether or not it's

14    recharacterization or equitable subordination.  But my point

15    is that had it been a subordinated claim, it could have been

16    asserted as value.  It's only if it was recharacterized as

17    equity that they would not consider it as reasonably

18    equivalent value.

19             So you have something that's really not on the

20    same priority, but the Code actually would allow an offset.

21    And you've raised at an early time what I was going to raise

22    later, which is this Ponzi scheme presumption.

23             I'm one of those people who have objected to the

24    label of Ponzi scheme by Madoff.

25             THE COURT:  You don't think he was running a Ponzi

Page 53

1    scheme?

2             MS. NEVILLE:  No.

3             THE COURT:  Okay.

4             MS. NEVILLE:  You know, a mass -- not every fraud,

5    not every massive fraud is a Ponzi scheme.  And I think -- I

6    lived through the Bayou (ph) case, where we actually managed

7    to convince Judge Harden that it wasn't a Ponzi scheme, it

8    was a fraud, but it wasn't a Ponzi scheme.

9             And the differences are they're not that enormous

10   on some of the presumptions, but what happens with the Ponzi

11   scheme label, is that a whole new area of what they call

12   Ponzi scheme jurisprudence which has no basis in the Code

13   gets swept in.  And one of the things that happened is that

14   every defense, and every aspect of 548 is really basically

15   swept under the rug.

16            So I'm absolutely willing to admit this was a

17   massive fraud, it went on with 30 years with the Chairman of

18   NASDAQ providing over it, for 30 years, it didn't have any

19   of the classic criteria of a Ponzi scheme.

20            THE COURT:  I thought he was paying old investors

21   with new investor money.

22            MS. NEVILLE:  No, you could go in and out, I have

23   clients who were early investors who lost all their money,

24   and clients who were late investors, who came in and lost

25   everything.  You could go in and out it wasn't --

1            THE COURT:  But when you went out, you were paid,

2      right?

3            MS. NEVILLE:  You were paid, but you could've bene

4      paid with your own money.

5            THE COURT:  And what would --

6            MS. NEVILLE:  Because people went back in.

7            THE COURT:  No, somebody else was paid with your

8      money, right?

9            MS. NEVILLE:  Well, somebody else was paid with

10     your own money because people went in and out, they came in

11     and out of it.  It was used as a bank account, as a

12     brokerage account, but not the kind of thing that you would

13     expect from a Ponzi scheme where really you --

14           THE COURT:  So you're arguing that the trustee has

15     failed to allege a legally sufficient Ponzi scheme.

16           MS. NEVILLE:  That's right.

17           THE COURT:  Okay.

18           MS. NEVILLE:  And I've seen this before, and we

19     argued in Bayou.  What happens is, there's an allocution

20     which has some of the elements of a Ponzi scheme in it, the

21     poor defendant admits to them to some extent, and then all

22     of a sudden a label is there.  And once the label is there,

23     every presumption comes out, and obviously the pleading --

24     the relaxed pleadings, some of those issues would be common

25     to an actual fraud as well, but not the entire juris

1    prudence on fraudulent conveyance.

2              So I'm asking you to just pull back a little bit

3    and listen to some of these defenses, which have been swept

4    under the rug and wiped away by the Ponzi scheme label.

5              THE COURT:  Thank you.

6              MR. LEVY:  Your Honor, I want to build on one

7    point that Ms. Neville just made, and that is in dealing

8    with Judge Rakoff's construction of an antecedent debt or

9    antecedent obligation, and the viability of that claim is

10   turning on its priority, the priority it would hold as to

11   whether or not it is a customer claim at some point in the

12   future.

13             I think that's flipping the whole concept of

14   subordination, the whole concept of equitable disallowance.

15   Those provisions would apply in the customer claim area, in

16   claims against the estate, and there are Code provisions

17   that say, a claim can be subordinated for equitable or

18   contractual reasons.

19             There's nothing in the juris prudence, there is

20   nothing in the case law, there is nothing in SIPA which says

21   that a 510(b) subordinated (indiscernible) concept applies

22   to the treatment of an avoidance claim, and the treatment of

23   a defense to the avoidance claim.

24             I think Your Honor should be cognizant of the

25   plain language of the statute in considering positions that

Page 56

1    we assert today.

2            So, Your Honor, I suggest that the change in the

3    applicable law since Judge Rakoff's rulings gives you a

4    perfect basis under the Color Tile (ph) case to go ahead and

5    reconsider where we are, and consider whether or not the

6    defenses, as asserted in this motion are valid.

7            I suggest that the language of the statute

8    dictates that there is no avoidance obligation, there is no

9    obligation avoidance power in the trustee.  A defense to

10   avoidance based on the satisfaction of obligations, chose as

11   an actions, pre-existing debts, whether arising under

12   contract, tort or statute are not constrained in the terms

13   of the 548(c) defense by the language of SIPA or by public

14   policy, because it is determined by the elements of the

15   governing state law at the time of the transfer, not as if

16   the claim had existed some years hence when a SIPA case was

17   commenced.

18           The defendant transferees' ability to raise those

19   defenses is predicated on obligations and the antecedent

20   debts themselves not limited by SIPA language or by any

21   priority scheme.

22           In light of the statutory caveat that needs to be

23   kept in mind, avoidance to the extent avoidable under Title

24   11 without any reference to any prioritization of claims,

25   that necessarily means that the Court has to consider the

1    value defense in an entirely different light from that that

2    it was suggested by Judge Rakoff.  And we believe the recent

3    juris prudence under Fairfield and the dictates of the

4    Supreme Court for strict construction of codified bankruptcy

5    statutes requires that the obligations and debts at the time

6    of the transfer be deemed to give rise to a defense that

7    will defeat the trustee's avoidance claims.

8              I have nothing further, Your Honor, unless you

9    have any questions.

10             THE COURT:  No.  Let me just ask, before you stand

11   up, is there anyone else who wants to be heard on the issue

12   of obligations or antecedent debt?

13             MS. CHAITMAN:  I do, Your Honor, just very

14   briefly, Helen Davis Chaitman of Becker and Poliakoff.  I

15   represent the defendants in about 150 cases.

16             On the issue of whether this is a Ponzi scheme --

17             THE COURT:  I -- in that issue as well I guess

18   since it was raised.

19             MS. CHAITMAN:  Yeah, because I think it's

20   important.  That's the basis on which Your Honor is

21   suggesting that the trustee's claims make sense.

22             BLMIS employed approximately 200 people.  Of those

23   200 people, 188 were involved in what the trustee has always

24   claimed was a legitimate trading business.  BLMIS was the

25   single largest trading operation in the world.  For many

Page 58

1    years, it did trades equal to ten percent of the daily

2    volume on the New York Stock Exchange.  Its customers were

3    Bear Stearns, Fidelity, Schwab, the major financial

4    institutions.

5            The trustee has never suggested that those 188

6    people were involved in a Ponzi scheme.  The trustee has

7    never sought to recover the payments that were made to the

8    customers who were the customers that the 188 people worked

9    with.

10           BLMIS the very same entity had 12 of 200 employees

11   who handled this fraudulent investment advisory business.

12   The trustee's own expert had admitted, Mr. Luby (ph) in the

13   certification he prepared with respect to the net equity

14   litigation.  He has admitted that funds were intermingled,

15   that money from the investment advisory accounts was used to

16   purchase securities that were utilized in the trading

17   operations.

18           THE COURT:  You know, you're really going outside

19   the four corners of the complaint.  Remember, this is a

20   motion to dismiss.  So tell me why the trustee hasn't

21   adequately pleaded that this is a Ponzi scheme, and entitled

22   to the Ponzi scheme presumption.  You may ultimately be

23   right, I'm not saying you are or you aren't, but we're --

24   this is a motion to dismiss, and we're limited to the four

25   corners of the complaint plus the other documents I can

Page 59

1    consider on a motion to dismiss.

2             MS. CHAITMAN:  Right.  I think, Your Honor, that

3    the law that has developed with respect to Ponzi schemes has

4    not been clearly thought out by a lot of the judges who have

5    issued decisions.

6             THE COURT:  Including me.

7             MS. CHAITMAN:  No, no, no, I'm not talking about

8    you at all.  I'm sure you're going to do it right.

9             The -- if you look at the cases in my humble

10   opinion, the cases that are properly decided are cases that

11   label a Ponzi scheme a non-existent business where equity

12   investors have received a return and the trustee in

13   bankruptcy is entitled to recover the equity return because

14   there was no business.

15            THE COURT:  So you're saying it doesn't apply to

16   debt for instance, debt schemes?

17            MS. CHAITMAN:  I believe that it does not apply

18   when you have an operating business which is a legitimate

19   business as we do here.

20            THE COURT:  But the Investment Advisory Act, the

21   business was not a legitimate business.

22            MS. CHAITMAN:  Well --

23            THE COURT:  And in any event, aren't we going

24   beyond the pleading is my point.

25            MS. CHAITMAN:  No, because I think that the -- you

Page 60

```
1    could say that General Motors was a Ponzi scheme, because it

2    was living from hand to mouth and it needed to borrow money

3    in order to --

4              THE COURT:  I hear you.

5              MS. CHAITMAN:  Yeah.

6              THE COURT:  All I'm saying is, and we're spending

7    time on this, this is a motion to dismiss a complaint, and

8    I'm limited to the allegations in the complaint.  Just tell

9    me why the complaint does not allege that Madoff Securities

10   was not a Ponzi scheme.  You're telling me additional facts

11   that aren't in the complaint but I -- can I consider those?

12             MS. CHAITMAN:  My answer would be, Your Honor,

13   with respect to the SIPA liquidation that a SIPA liquidation

14   is a liquidation of a registered SEC regulated broker

15   dealer, who has real customers, runs a real business, and if

16   the man is a fraud and doesn't buy the securities that are

17   listed on the statements, it's still a real business, and it

18   doesn't come within a Ponzi scheme presumption.

19             THE COURT:  All right.  Okay.

20             MS. CHAITMAN:  Thank you.

21             MS. NEVILLE:  Your Honor, may I be heard on your

22   question about the motion to dismiss?

23             THE COURT:  You know, if everybody keeps popping

24   up --

25             MS. NEVILLE:  I know.
```

1          THE COURT:  -- it's just not going to work.  What

2    -- briefly, what is it?

3          MS. NEVILLE:  On a motion to dismiss, you don't

4    take the facts as true if they're contradicted by the

5    record.

6          THE COURT:  Well, I've looked at the allocution,

7    why isn't the allocution sufficient --

8          MS. NEVILLE:  Because --

9          THE COURT:  -- to survive or to prove a Ponzi

10   scheme?

11         MS. NEVILLE:  Well, the Luby declaration is also

12   part of the complaint.

13         THE COURT:  Who?

14         MS. NEVILLE:  Luby, who was the trustee's

15   investigator.  And that was -- the facts that Ms. Chaitman

16   was telling you that --

17         THE COURT:  Well, if it's part of the complaint I

18   can consider it --

19         MS. NEVILLE:  Yeah.

20         THE COURT:  -- if it's attached to the complaint,

21   or referred to in the complaint.

22         MS. NEVILLE:  It's referred to in the complaint.

23         THE COURT:  All right.

24         MS. NEVILLE:  And it's part of the record of the

25   case below, so her facts are admissible.

Page 62

1              THE COURT:  All right.

2              MR. CREMONA:  Thank you, Your Honor, Nichole

3    Cremona, Baker and Hostetler on behalf of the trustee.

4              If I may, Your Honor, I'd like to just address two

5    things first, a threshold matter, just to put these matters

6    into procedural context before I get to the merits that many

7    of my colleagues just addressed.

8              I think despite being six years into this case,

9    Your Honor, and nearly four years into these adversary

10   proceedings, my colleagues that have gotten up here thus far

11   today are writing as if and arguing as if they're writing on

12   a clean slate.  That's simply not the case, Your Honor.

13             There are multiple decisions within this action

14   that haven't been referenced.  We're looking to other cases

15   that may or may not be relevant, but we're not looking at

16   the cases that are applicable and most particularly, the

17   Greiff case which the gang of fours I'll get into were a

18   party to, and as Your Honor pointed out, involved 84 cases.

19   And I would get to this -- I will get to this, that's

20   dispositive of the issues that it decided, and we can go

21   through those issues.

22             But, you know, I'd just like to say, Your Honor,

23   that you know, four years after the commencement of this

24   case, over three years after the net -- the Second Circuit

25   to net equity decision, and over two years after the

Page 63

1    district court issued its decision in the Greiff cases is

2    what judges refer to, and almost a year after the antecedent

3    debt decision, we're still here today, Your Honor, talking

4    about whether these defendants can provide value to BLMIS

5    for the receipt of fictitious profits.  That's the sole

6    issue in this case.  And I would submit to Your Honor that

7    it's been decided multiple times already, but yet, here we

8    are four years into this case still arguing about it.

9            I just heard some of my colleagues bring up the

10   Ponzi presumption, and now we're in 2014, six years into

11   this case, and we're really still talking about whether

12   we've established the presumption that there's a Ponzi

13   scheme here on a motion to dismiss.  It's very unfortunate,

14   in my view, that we're here doing that today.

15           And that's because I want -- I don't want to lose

16   sight of one thing.  There are 780 innocent investor cases

17   pending right now by the trustee.  The aggregate demand

18   amount in those cases is roughly $3.2 billion.  That's

19   unfortunate because that's $3.2 billion that the defendants

20   in these cases are wrongfully withholding, and they're

21   wrongfully withholding it after being on notice, after six

22   years, that they got other people's money.  And that's

23   tremendously unfortunate.

24           It's also unfortunate because as Ponzi schemes, as

25   Your Honor is well aware, every dollar that they retain is a

Page 64

1      dollar that doesn't get the net loser victims here.  It's

2      also unfortunate because by way of background, as Your Honor

3      is painfully aware, the trustee's recovery efforts have been

4      stalled and stymied through, I would -- over three years of

5      procedural litigation in the district court, which we would

6      all permit has been a procedural morass which has led to a

7      lot of confusion, which I hope to clarify here today,

8      especially with respect to the Greiff matter.

9              But after all of that, after all of the decisions

10     that have been issued, we're still talking about the only

11     issue in this case is whether fictitious profits can

12     constitute value within 548(c).  Notwithstanding the fact

13     that it was first decided two and a half years ago in the

14     Greiff case, and then it was decided again by the district

15     court.  And relying heavily on the Greiff case, which

16     impacts and dispositive of 84 cases that these movants are

17     arguing about.

18              So, I mean, I would just say, you know,

19     dissatisfied with the results in the Greiff and antecedent

20     case, these movants continue to recast, rename, reassert

21     value arguments, and you know, no matter how many different

22     ways they phrase the question and raise the issue, the

23     answer is still a resounding no.

24              You cannot get -- you cannot give value for

25     fictitious profits in a Ponzi scheme case.  And I think as

Page 65

1    Your Honor recently noted, the law here has changed quite a

2    bit and is somewhat crystallized on this issue.  When we

3    were down here a month or so ago on the Doris Igoin (ph)

4    matter, Your Honor noted another innocent investor case,

5    Your Honor asked defense counsel, this is a fictitious

6    profits case, what defenses are there.  It's a strict

7    liability case.

8            I mean, that's what these cases are, Your Honor.

9    There are no other issues, no matter how we try to dress

10   them up, that is the issue.  And I would say that these --

11   that issue has been completely disposed of by Greiff and

12   again by antecedent debt.  And we -- all of these issues

13   have been informed by the net equity decision which came

14   down over three years ago.

15           We have all these guiding principles in this case,

16   and yet we're looking to an injunction case that has no

17   relevance whatsoever.  I just -- I find that very

18   unfortunate.

19           But before getting to the antecedent debt issue,

20   Your Honor, I wanted to get to the procedural matter.  As

21   Your Honor pointed out, just to be clear, you had Mr. Levy

22   who represented Goldman in Greiff, the Gang of Four, so to

23   speak, it's Pryor Cashman represented Goldman, Ms. Neville

24   represented Hyme (ph), Ms. Chaitman represented Greiff, and

25   Mr. Kupillas represented --

Page 66

```
 1              UNIDENTIFIED:  Bloomenthal.

 2              MR. CREMONA:  -- Bloomenthal.  Those are the four

 3    cases that were the lead cases in the Greiff decision.

 4    Those -- these firms then joined every one of their other

 5    cases that they had clients in, and then we -- that Greiff

 6    decision was dispositive of all 84 cases.

 7              And as Your Honor pointed out, the district court

 8    withdrew discreet issues and decided them and then sent the

 9    balance of the case back, okay.  Let's be clear on what

10    Greiff decided, okay.  The -- and I can quote from Greiff,

11    "That those transfers from Madoff Securities to defendants

12    that exceed defendant's principal, i.e., fictitious profits,

13    were not for value within the meaning of 548(c)."

14              That was issued in April of 2012, and counsel is

15    here today arguing about antecedent debt, and whether or not

16    fictitious profits can constitute value.  I submit, Your

17    Honor, that they are bound by that decision, and they should

18    be precluded from raising any further arguments, because

19    that case is binding on this.

20              And also in that case, we just talked about

21    whether or not the obligations issue was decided, and in

22    Greiff, or excuse me, in antecedent debt, Judge Rakoff said

23    in footnote 4, "similarly, the Court rejects defendants'

24    contention that Madoff Securities pre-reach back period

25    account statements constitute binding obligations of Madoff
```

Page 67

1    Securities to its customers that the trustee must avoid."

2             This argument was effectively rejected in Greiff,

3    where the Court found that account statements were not

4    merely avoidable, but were, in fact, invalid and thus

5    entirely unenforceable.

6             THE COURT:  Other than the obligations which may

7    arise from the account statement, are there any other

8    obligations you're trying to avoid?

9             MR. CREMONA:  I think that's right, Your Honor, I

10   mean --

11            THE COURT:  No, I'm asking you.  Because when I

12   read the complaints I didn't know what you were talking

13   about.

14            MR. CREMONA:  Well, I think it's the obligation as

15   I understand it, the point is almost moot.

16            THE COURT:  Well, for example, if they have an --

17   if they have a claim based on fraud, are you trying to

18   invalidate that?

19            MR. CREMONA:  We would, yes, Your Honor, and I

20   think there's an obligation that is within that -- that

21   arose within the two year period, but --

22            THE COURT:  If they're going to attack the

23   obligations, this is an actual fraudulent obligation case,

24   just as it's an actual fraudulent transfer case, and the

25   complaints I looked at didn't identify the obligations

Page 68

1    you're trying to avoid.

2              MR. CREMONA:  We generally identified the

3    obligations that could arise within a two year period.  I

4    agree, Your Honor, that we would -- those -- I guess let me

5    put it this way, the only obligations that could arise would

6    arise from those fictitious account statements.

7              THE COURT:  Well, what about the fraud, the fraud

8    claim?  Those people who got all their money back may not be

9    damaged --

10             MR. CREMONA:  Uh-huh.

11             THE COURT:  -- but it's arguably an obligation.

12             MR. CREMONA:  It would be an obligation --

13             THE COURT:  Of Madoff Securities.  They were

14   defrauded.

15             MR. CREMONA:  Assuming they assert a claim.

16             THE COURT:  Well, they have asserted it.  Well,

17   that's true.  Okay.

18             MR. CREMONA:  They haven't asserted a claim so I -

19   -

20             THE COURT:  So why are you trying to avoid the

21   obligations if --

22             MR. CREMONA:  We weren't trying to avoid the --

23             THE COURT:  -- they haven't asserted a claim?

24             MR. CREMONA:  -- obligation to the extent that the

25   fictitious account statement created an obligation, that's

Page 69

1   what we're seeking to avoid.

2           THE COURT:  Okay.  But that's not clear from your

3   complaint.  And there's a difference I think between having

4   an enforceable obligation under state or federal law and

5   having an avoidable obligation.

6           MR. CREMONA:  I understand this, Your Honor, I --

7   the notion is that the -- well, I guess to put it

8   differently --

9           THE COURT:  Why don't you move on to the argument

10  that whatever they have --

11          MR. CREMONA:  Sure.

12          THE COURT:  -- they can't assert it as value under

13  548(c), which is really what they're arguing.

14          MR. CREMONA:  And that's my point, Your Honor.  I

15  think it's almost moot -- well, it is, in fact, moot because

16  Judge Rakoff has already held in Greiff that these

17  fictitious and fraudulent account statements cannot give

18  rise either to an antecedent debt or an obligation.

19          So we maintain our account to avoid obligations,

20  but I don't believe based on what I just read to Your Honor

21  that a totally unenforceable and voidable account statements

22  give rise to any obligation on behalf of the debtor to these

23  defendants.

24          And just to move on then, I do think -- I would

25  close by saying I maintain that -- and oh, there's one other

Page 70

1    issue, Your Honor, that was disposed of by Greiff.  I

2    understand Ms. Neville is going to raise the Internal

3    Revenue Code issue, and whether or not mandatory withdrawals

4    from an IRA account can be avoided, as well as a New York

5    CPLR issue under Rule 5205.

6              THE COURT:  That's a judgment enforcement issue,

7    though.

8              MR. CREMONA:  I understand that.

9              THE COURT:  That's an exemption from a judgment

10   enforcement, it has nothing to do with stating a claim.

11             MR. CREMONA:  I agree, Your Honor.

12             THE COURT:  All right.

13             MR. CREMONA:  My point is only that that issue was

14   also disposed of by Greiff, it's referenced in footnote 13.

15   I mean, Your Honor, just to be clear --

16             THE COURT:  Well, the argument is though, that

17   Judge Rakoff didn't focus on all of the language in the

18   statute which talked about additions which themselves were

19   fraudulent transfers under New York State law, and the

20   argument is, you don't have a New York State law claim here

21   at least, that's what their argument is.

22             MR. CREMONA:  But, Your Honor -- okay, well then

23   that gets to what constitutes antecedent debt, and we can

24   get to that.

25             THE COURT:  Well, my only point is that, that that

1    is a statute that relates to judgment enforcement, it has

2    nothing to do with stating a claim.  There may be other

3    assets, for instance, but the --

4              MR. CREMONA:  I understand.

5              THE COURT:  We're a long way from there.

6              MR. CREMONA:  What's that?

7              THE COURT:  We're a long way from considering --

8              MR. CREMONA:  I understand that.  I guess just to

9    close the loop on the Internal Revenue issue, also Greiff

10   said, and I quote, "Having rejected the claim that Madoff

11   Securities owed to defendants, the profits it transferred to

12   them, the Court declines to conclude that Hein and

13   Bloomenthal (ph) may now keep their profits because they

14   feared that the Internal Revenue Code would deprive them of

15   half the benefit, to which they had no legal entitlement.

16             And that's where I was going with the next piece

17   of it.  As Your Honor may have noticed in the Gen V v Brown

18   (ph) case, the end of that decision talked about a similar

19   provision under Texas law, and there was no such exemption

20   given because the defendant there, like the defendant here,

21   had no legal entitlement to the proceeds because they were

22   fraudulent.  So that's just to close that thought, Your

23   Honor.

24             And I would submit that in those 84 cases, those

25   issues that I just described are binding on my colleagues,

Page 72

1    and they should not be permitted to make any further

2    arguments because the cases were sent back by Greiff, and

3    the last paragraph in that decision says, "sent back to the

4    bankruptcy court to be adjudicated, consistent with my

5    ruling."

6              As Your Honor pointed out, whether you have

7    jurisdiction to reconsider that, I would submit that you

8    don't at this point.  I think what they're doing here is an

9    improper reconsideration of the decision that was issued two

10   and a half years ago, and that was a threshold matter I

11   wanted to address.

12             To move forward, on antecedent debt, I disagree

13   with my colleague, Mr. Levy.  I do think that in the first

14   instance the issue was decided in Greiff.  I do think as I

15   pointed out, the issue of whether an obligation could arise

16   was also addressed in Greiff.

17             But I do want to focus a little bit on exactly

18   what Judge Rakoff said in his antecedent debt decision if

19   Your Honor would like, because I think it's somewhat

20   different than how it was phrased here.

21             All of the antecedent debt arguments that I heard

22   are predicated on false statements, and whether or not they

23   give rise to an antecedent debt, or whether or not the

24   defendant has a claim based on that false statement.

25             In order to enforce that frankly, they're asking

Page 73

1    Your Honor to further the fraud and give credit to a

2    fraudulent statement.  But putting that aside, Judge Rakoff

3    went through the analysis, he looked at 548(c) and whether

4    or not there was an antecedent debt.  And then one would

5    look then to what constitutes an antecedent debt, the right

6    to a payment on a claim.  And then you would say, well,

7    that's -- most often determined by state law, except where

8    there's a federal countervailing interest that prevails and

9    dictates otherwise, such as SIPA here.

10          And I think Judge Rakoff held that those claims

11   that Mr. Levy talked about 10(b)(5), Article 8, fraud

12   rescission, et cetera, breach of fiduciary duty, they can

13   never constitute value in this case, because we have to deal

14   with this case, not some other case, this case.  And that

15   they can never, based on that ruling, because they -- the

16   definition of customer property is that which can be

17   determined based on looking at the debtor's books and

18   records.

19          And here, and Judge Rakoff said, those such claims

20   could never be valued, because one would never determine

21   them by looking at the debtor's books and records.  So it's

22   quite clear.  And in order to elevate that general unsecured

23   claim, which they may have, to a priority claim that

24   violates SIPA, and frankly it's contrary to the very notion

25   of bankruptcy would be akin to taking on a secured claim and

Page 74

1    offsetting it against an administrative claim.  It's very

2    similar, Your Honor, and I would submit -- I submit that

3    it's completely inappropriate, and complete contrary to

4    governing law in this case.  And that's what we have to deal

5    with.  We can't deal with some other case, we have to look

6    at the cases we have.

7            And I would submit that it's quite clear what can

8    and cannot constitute antecedent debt here.  The issue has

9    been decided twice now for these folks, twice.  And I think

10   that's enough.

11           I'm happy to move on to the Ponzi scheme

12   presumption issue.

13           THE COURT:  Go ahead.

14           MR. CREMONA:  I think it's, as Your Honor noted,

15   we are here on a motion to dismiss.  We're entitled to

16   presumption.  Our complaint's more than adequately detailed

17   of the fraud, you know, and although I don't want to go

18   beyond the pleadings as my colleague did, it's quite clear

19   based on the criminal prosecutions, we just had eight

20   additional people convicted --

21           THE COURT:  I don't think I can consider that.

22           MR. CREMONA:  I understand, Your Honor.

23           THE COURT:  I can consider the allocution you

24   referred to in the complaint.

25           MR. CREMONA:  Exactly.  And it's referred to in

Page 75

1    every complaint, and I think we more than adequately pled

2    and more than adequately entitled to the Ponzi presumption.

3            And I think it's also worth pointing out that at

4    every step of the way, every single decision I referenced,

5    it was specifically noted that this is the most notorious

6    Ponzi scheme in history.  It's just worth pointing out.

7            THE COURT:  Okay.  Thank you.

8            MR. CREMONA:  Thank you, Your Honor.

9            THE COURT:  Anyone else want to be heard in reply?

10           Yes, sir?  I'm sorry, SIPC, I'm sorry.  You were

11   sitting behind the monitor, I couldn't see you.

12           MR. KELLY:  Good afternoon, Your Honor, my name is

13   Nathaniel Kelly, I'm with the Securities Investor Protection

14   Corporation.  I actually don't have much to add to Mr.

15   Cremona's arguments.

16           I just want to point out that the section of SIPA

17   that the defendants referenced, 78 FFF-2(c)(3), they

18   referenced a particular provision at the end, which says

19   that "customers will be treated as creditors for the

20   purposes of recovery."

21           I just want to point out that as the Fairfield

22   decision says, that's a legal fiction just to bring the

23   recovery actions within state law, that it doesn't modify

24   what constitutes value to the estate of customer property.

25           Also notably that defendants arguing -- to the

Page 76

1    extent that the defendants are arguing that Fairfield

2    supersedes Judge Rakoff's decisions, Judge Fairfield (sic)

3    focused on that provision of 8(c)(3), Rakoff -- Judge Rakoff

4    never quoted it, never cited it, never relied upon it.

5              THE COURT:  Thank you.

6              MR. KELLY:  Thank you.

7              MR. LEVY:  Your Honor, Mr. Cremona begins by

8    saying or predicates his position by saying that everything

9    has been decided, everything is final, there's nothing else

10   to decide, and it binds everybody who's represented in this

11   room today.  We know that's not the case.

12             We know that --

13             THE COURT:  Does it bind your clients?

14             MR. LEVY:  Excuse me?

15             THE COURT:  Does it bind your clients?

16             MR. LEVY:  It bind my clients to the extent that

17   they were parties to the prior decision, and Your Honor is

18   obligated to grant considerable weight to the prior

19   decision.  I don't believe it binds my clients to the extent

20   that supervening developments in the law change the

21   rationale of that decision, and whether or not it remains a

22   valid basis to invoke the --

23             THE COURT:  I've heard that.  I still --

24             MR. LEVY:  -- trustee's remedies against my

25   clients.

1           THE COURT:  -- have a question, a jurisdictional

2    question about my reconsidering a district court decision

3    after the district court has withdrawn the reference to

4    decide that issue.

5           MR. LEVY:  The district court was sitting as a

6    bankruptcy court.

7           THE COURT:  But it also withdrew the reference,

8    which to me means that I don't have jurisdiction.  I agree

9    with you he was sitting as a bankruptcy court in the first

10   instance, but the district court could have withdrawn the

11   reference of the entire case, it would still be sitting as a

12   bankruptcy court, but I wouldn't have jurisdiction then.

13          MR. LEVY:  Your Honor, we could ask the Court to

14   withdraw the reference.  The Judge has sent obligations back

15   down to you, that's an issue you clearly have, and that's an

16   issue that clearly hasn't been decided.

17          For example, that plays into the antecedent

18   defense, as well as the scope of the trustee's affirmative

19   remedy.  With respect to the antecedent debt issue as

20   withdrawn by my -- for my clients, the question of whether

21   or not, for example, the securities laws or the state laws

22   provided an antecedent debt.

23          The Judge I don't believe properly addressed that

24   issue under the rubric of an obligation.  He --

25          THE COURT:  I don't think he felt that he had to

1    decide that, because his ultimate conclusion was that you

2    couldn't assert whatever those claims were as value in

3    exchange for the payments.

4            MR. LEVY:  That's obviously an issue that Your

5    Honor will have to deal with.

6            THE COURT:  That's how I read his -- that's how I

7    interpret what he did.

8            MR. LEVY:  I don't think it's fair to say that

9    these cases -- I don't think it's fair to say that these

10   cases are fully decided.

11           THE COURT:  I'm sorry what?

12           MR. LEVY:  That these cases are fully -- excuse

13   me, that these cases fully bind everybody in this room.  We

14   know if you look at the chronology in these cases, that lots

15   of motions by lots of defendants, including parties in

16   addition to the 84 cases of Greiff filed motions long after

17   Judge Rakoff had decided the Greiff decision in April of

18   2012.

19           We know that more motions came in after Judge

20   Rakoff decided antecedent debt in October 2013.  Those are

21   all fair game.  Those parties are not bound, they were not

22   parties, and I haven't heard enough, and an offense of

23   collateral estoppel type of argument which wouldn't apply

24   anyway, because they weren't defendants in the original

25   proceedings before Judge Rakoff.

1              I think we have issues that are squarely before

2     Your Honor, and within the scope of Your Honor's competency

3     to decide as a matter of bankruptcy law and SIPA.  The

4     notion that my clients and other clients are wrongfully

5     withholding money that they are not entitled to, I don't

6     credit that, Your Honor, because we have a defense.  The

7     trustee doesn't --

8              THE COURT:  Why don't you move on to your next

9     point.

10             MR. LEVY:  Of course, Your Honor.

11             The question of whether or not the obligations,

12    whether or not the debts are enforceable, whether or not the

13    claims provide an antecedent debt.  I rest our argument in

14    large measure on the fact that we don't believe the language

15    of SIPA contemplates what Judge Rakoff suggested or what

16    contemplates, in any respect, the notion of shifting

17    priorities.

18             The analogy that Mr. Cremona gave you just now are

19    offsetting an administrative claim and an unsecured claim.

20             THE COURT:  Well, there's a lack of mutuality

21    there.

22             MR. LEVY:  Well, it's not only a lack of

23    mutuality, Judge, you're dealing with two claims that are

24    filed against the estate after the liquidation proceeding

25    began.  There's either -- there's a general unsecured claim

1    that existed at the time that the bankruptcy case was filed.

2    There's an administrative case that arises after.  They get

3    paid from the estate.  That's completely different with an

4    avoidance claim that may have involved a transfer some years

5    prior to the case, which was not a general unsecured claim.

6    It was not an administrative claim.  It was a payment to the

7    customer who now asserts a defense, based on value and good

8    faith.  That's not the same, that's not treated at all in

9    the law the same as a claim against the estate.

10          There's nothing that equates the customer's

11   entitlement to receive and retain his files, as value, for

12   value in good faith with a claim he or she may be able to

13   assert on some other basis.  It doesn't make that transfer

14   claim into anything other than -- it doesn't -- there's

15   nothing that says that the transfer is to be treated as if

16   it was a claim against the estate.  They are two different

17   things, and that's why the net equity decision doesn't bind

18   here, Judge.

19          The net equity decision only says, how do you

20   calculate a claim that shares in the customer property pool.

21   It says nothing about the scope of the defenses, it says

22   nothing about how far the trustee can or cannot go with his

23   remedies.  It says nothing about the nature of the defense,

24   that the avoidance defendants have.

25          Your Honor, I submit that on the arguments today

Page 81

1    and briefs that we've submitted, we've amply demonstrated

2    that there is reason for Your Honor to grant the motions and

3    reject the trustee's avoidance remedies on the bases that

4    I've argued today.

5              THE COURT:  Thank you very much.  Is this the next

6    issue?

7              MR. KUPILLAS:  Yes, Your Honor.

8              THE COURT:  Okay.  What are you going to argue?

9              MR. KUPILLAS:  Yes, Your Honor, Matthew Kupillas

10   from Milberg LLP on behalf of numerous defendants.

11             I want to focus my argument today on three areas

12   where the trustee's complaint suffer from basic fundamental

13   fatal pleading deficiencies.  It's the pleading of

14   subsequent transfer claims, it's the pleading of claims in

15   cases involving multiple defendants, and it's the pleading

16   of claims involving inter account transfers.

17             Now, there is substantial overlap to my arguments,

18   so I'm happy to present them all, and then allow the

19   trustee's counsel to respond, or we can do it piecemeal if

20   Your Honor thinks.

21             THE COURT:  No, go ahead.

22             MR. KUPILLAS:  Okay.  Before I get into that, Your

23   Honor, just as a preliminary matter, I don't believe the

24   trustee should be heard to argue that the defendants here

25   are improperly stalling these cases.  My firm filed many of

Page 82

1    these motions at issue today in March 2013.  The trustee

2    took no action to respond to them at all until March 2014,

3    after Your Honor ordered them to do so.  So I'd just like to

4    --

5              THE COURT:  I think they volunteered to do so.

6              MR. KUPILLAS:  That's one characteristic, yes,

7    Your Honor.

8              THE COURT:  Plus with that, I would've heard Ms.

9    Chaitman's motions in March, but go ahead.

10             MR. KUPILLAS:  With regard to the claims I'd like

11   to address today, the factual allegations in the complaints

12   are insufficient to meet the test for Rule 8 pleading, that

13   the Supreme Court has set out in Iqbal and Twombly.

14             Rule 8 does not require extensive pleading of

15   facts, but the trustee is required to plead sufficient facts

16   to allow the Court to draw the reasonable inference that the

17   defendants is liable for the misconduct alleged.

18             And the Supreme Court has made it clear that

19   threadbare recitals of elements of a cause of action

20   supported by mere conclusory statements do not suffice.

21             And the first area I'd like to touch on is claims

22   involving subsequent transfers, Your Honor.  In the

23   complaints against my clients, and against the other good

24   faith defendants --

25             THE COURT:  Are all of the allegations of

1    subsequent transfers the same in all the complaints?

2              MR. KUPILLAS:  Yes, Your Honor.

3              THE COURT:  What, upon information and belief they

4    were transferred to the subsequent transferees?

5              MR. KUPILLAS:  In general, the exact text is, on

6    information and belief, all or a portion of the initial

7    transfers were subsequently transferred by the initial

8    transferee to the subsequent transferee defendant.  That's

9    typically the complete sum and substance of the allegations,

10   nothing more.

11             These were exactly the type of threadbare recitals

12   of an elements of a cause of action and mere conclusory

13   statements that the Supreme Court says are insufficient.

14   The trustee's complaints don't identify the amounts of

15   subsequent transfers.  They don't identify the dates of any

16   subsequent transfers.  They don't identify how these

17   subsequent transfers purportedly took place, and they don't

18   link sufficient initial transfers to specific substantive

19   transfers.

20             THE COURT:  Did they have to do all that in a

21   complaint?

22             MR. KUPILLAS:  They don't necessarily have to do

23   all of that, Your Honor, but they have to do some of it.

24             THE COURT:  So what do they have to do?

25             MR. KUPILLAS:  Well, the case law says that in

Page 84

1     cases such as this, where facts concerning subsequent

2     transfers are within the possession of the defendants, that

3     the pleading rules are relaxed, the trustee doesn't have to

4     give a dollar-for-dollar account.

5               While the pleading rules may be relaxed, they're

6     not completely thrown out the window, Your Honor.  Here, the

7     trustee has done the polar opposite of giving a dollar-for-

8     dollar accounting.  He's given absolutely zero facts

9     concerning the substantive transfers at issue, nothing

10    whatsoever.

11              As a result, my clients have no idea whether

12    they're being sued for $1 in subsequent transfers, for a

13    million dollars, or for $10 million.  They have no idea if

14    the trustee is suing for subsequent transfers that took

15    place in 2008 or 2002.  They have no way to defend against

16    these claims.

17              And the trustee's failure to plead these facts

18    underlying its claims is highly prejudicial, Your Honor.  As

19    a result of the trustee's failure to identify the specific

20    initial transfers that were purportedly transferred to my

21    clients, my clients have no idea if those underlying initial

22    transfers are --

23              THE COURT:  Didn't Judge Lifland, though, decide

24    this already in the family transfer case?

25              MR. KUPILLAS:  He did, Your Honor.  In fact, he

Page 85

1    decided it, and he dismissed the claims.  The claims in that

2    case were essentially identical to the claims against my

3    client, and he found -- Judge Lifland tossed those claims

4    out.  It wasn't a close call, Your Honor.  He made clear

5    that those were clearly insufficient even under the relaxed

6    pleading standard that the trustee is granted.

7              Now, for whatever reason, the trustee did not even

8    address the Madoff family case in his opposition.  I think

9    that speaks volumes.  Instead he raised the Merkin and Chase

10   (ph) decisions by Judge Lifland from 2011.

11             THE COURT:  Well, the Merkin complaint was very

12   differnet.  That just dealt with that.

13             MR. KUPILLAS:  That's absolutely --

14             THE COURT:  Or at least the third amended

15   complaint, I don't know about the second amended complaint.

16             MR. KUPILLAS:  The complaint that Judge Lifland

17   looked at was also very detailed, Your Honor.  In fact, in

18   the family action, he used the Merkin and Chase cases as

19   examples of well pled complaints, and contrasted them

20   against the claims in the family action, which again are

21   identical to the claims here.

22             Most recently Your Honor addressed subsequent

23   transfer claims in the Merkin action that -- from the

24   decision that you issued on August 12th.  And as you say,

25   the claims in that case also provide a good contrast against

Page 86

1    the claims asserted by the trustee against my clients.  So

2    as you know, the trustee identified specific amounts that

3    were transferred, specific initial transferees, specific

4    subsequent transferees, he identified the dates of the

5    transfers, and he provided evidence linking the initial

6    transfers to certain subsequent transfers.  Those are

7    exactly the types of factual details that are completely

8    absent here, Your Honor.

9            And again, I want to get back to the point,

10   because the trustee has failed to identify the initial

11   transfers that were purportedly transferred to my clients,

12   my clients have no idea whether there are any actionable

13   claims against them right now.  For all they know, the

14   initial transfers that they're being sued for, and

15   subsequently receiving, took place in 2003, well outside the

16   look-back period.  So all my clients know, the complaints

17   asserted against them should be tossed out right now, and

18   they're essentially defending against claims that have

19   already been dismissed.  That type of pleading should not be

20   allowed to stand, Your Honor.

21           Now, the next area I'd like to get to, actually

22   before I moved on to multiple cases involving multiple

23   defendants, additionally, in his subsequent transfer claims,

24   the trustee tries to plead in the alternative that the

25   subsequent transferee defendants may instead be liable under

Page 87

1    Section 548, as intended beneficiaries of the initial

2    transfers.

3             In each of the claim -- in each of the complaints

4    where he asserts subsequent transfer claims, he inserts an

5    additional paragraph where he says, "To the extent funds

6    transferred from BLMIS were for the benefit of the

7    subsequent transferee defendant, subsequent transferee

8    defendants is the initial transferee is subject to transfers

9    and is included in the definition defendants."  And that's

10   where he asserts the 548 claims against them.

11            However, the trustee fails to set forth any facts

12   underlying his allegation that my clients or any of the

13   other subsequent transferee defendants, in fact, were the

14   intended beneficiaries.  He asserts no facts whatsoever

15   underlying that claim.

16            In fact, the trustee's use of the phrase to the

17   extent that in his allegation, appears to be a concession

18   that he does not have any facts underlying his claim, and

19   that he's simply looking to acquire those facts in

20   discovery.

21            Now, we know that's not a proper form of pleading,

22   Your Honor.  If he wants to plead a claim under 548 against

23   these clients of mine, these defendants, he should have some

24   kind of factual underpinning to do so.

25            The same issue was addressed by this Court in the

1    Dryer LLP liquidation, in the Gowan v Novertore Credit

2    Management (ph) case, Judge Glenn dismissed the trustee's

3    claims that an alleged subsequent transferee may have

4    instead been liable under 548 as the initial -- as the

5    intended beneficiary of the initial transfers.

6            Judge Glenn found that the complaint "does not

7    contain any nonconclusory allegations of any financial

8    benefit."  And then in a related decision, Judge Glenn threw

9    out the trustee's intended beneficiary claims against the

10   different defendant, Amerynth LLC (ph) holding that

11   "incidental unquantifiable or remote allegations of benefit

12   are not sufficient."

13           The trustee's conclusory allegations against my

14   clients, Your Honor, have even less factual support than the

15   claims in the Dryer case, and they should be dismissed for

16   the same reasons.

17           In his opposition brief, the trustee argues that

18   he should be allowed to plead in the alternative.  And

19   certainly, plaintiffs are allowed to plead in the

20   alternative, but pleading in the alternative, Your Honor, is

21   not a license to plead insufficient for unsupported claims.

22           Now, the third area that I'd like to -- the next

23   area I'd like to address, Your Honor, is the trustee's

24   inadequate pleading of avoidance claims, initial avoidance

25   claims in cases involving multiple defendants.

1              The trustee's claims in these cases are

2    inadequately pled because the complaints don't include

3    sufficient details put each defendant on notice of the

4    specific transfers that they're being sued for.

5              THE COURT:  All of the complaints I looked at had

6    charts by defendant, which identified all of the deposits

7    and withdrawals in the account, presumably from day one.

8    What more does he have to allege?

9              MR. KUPILLAS:  He has to specify in his claims

10   which transfers and which specific accounts he's suing each

11   individual defendant.

12             THE COURT:  He's suing for every transfer within

13   two years and within six years.

14             MR. KUPILLAS:  Well, just to give you an example,

15   Your Honor.  In one of the --

16             THE COURT:  You don't think that's what he's

17   doing?

18             MR. KUPILLAS:  -- complaints against one of my

19   clients -- he is, but take an example.  In the case against

20   one of my clients, he has sued three other entities as

21   initial transferees, the trustee's complaint identifies over

22   a hundred initial transfers from four different Madoff

23   accounts that he's seeking to avoid and recover.

24             THE COURT:  But don't the attachments show which

25   accounts received which transfers?

Page 90

1        MR. KUPILLAS:  The trustee does not specify that

2    he's only seeking to recover those transfers from that

3    specific defendant's Madoff account.  And, in fact, if the

4    trustee is willing to stipulate to that today, I would be

5    very surprised, because I happen to think that he's looking

6    to go beyond that.

7        In any case, it's not noted in his pleadings.  He

8    does not state the specific transfers that he's seeking to

9    recover in the counts at the end of each complaint, he says

10   that defendants -- he is suing defendants to avoid and

11   recover the transfers without any specification along --

12       THE COURT:  In defining them, isn't there a

13   reference to the chart?

14       MR. KUPILLAS:  He --

15       THE COURT:  What's the number of one of the cases

16   that you're talking about?

17       MR. KUPILLAS:  I'm talking about 10-04966.

18       THE COURT:  0 --

19       MR. KUPILLAS:  4966.

20       THE COURT:  Go ahead.

21       MR. KUPILLAS:  And in that case, he attaches

22   lengthy charts at the end relating to four accounts.  And if

23   the trustee had properly pled his complaint, he could have

24   said, I'm suing Defendant A for all of the transfers he

25   received from his Madoff account, but the trustee does not

Page 91

1    do that, Your Honor.

2            He simply defines transfers, that's all transfers,

3    and he says, I'm suing defendants for the avoidance and

4    recovery of transfers without any specification, any

5    delineation.

6            As a result, the complaint doesn't provide any way

7    for my client to know which of these over a hundred

8    avoidable transfers, allegedly avoidable transfers he's

9    being sued for, as far as recovery.  And again, because they

10   don't identify the specific transfers like common --

11           THE COURT:  But isn't the answer that the

12   complaint is sufficiently alleged, to the extent he

13   identifies specific transfers to a specific defendant?

14           MR. KUPILLAS:  It identifies specific transfers to

15   specific defendants, Your Honor, but it does not say in any

16   instance that he is limiting his claims for recovery of

17   those -- of any transfers to the defendant who was the

18   initial transferee.

19           THE COURT:  Then how else can he sue somebody?

20           MR. KUPILLAS:  He could be suing as an intended

21   beneficiary under 548.  He could be suing as somebody as a

22   principal of one of the defendant entities.  It's entirely

23   unclear, Your Honor, and that's why the trustee's complaints

24   are insufficient.

25           Again, because the complaints don't identify the

Page 92

1    specific transfers, my clients don't know if the trustee is

2    seeking to recover transfers that are unavoidable because

3    they took place prior to the two year look-back.

4           THE COURT:  But you can tell that from looking at

5    the chart.

6           MR. KUPILLAS:  You can tell that there were

7    transfers within the two years, yes, Your Honor, but again,

8    the trustee does not limit his claims to -- against my

9    clients to only those initial transfers from their Madoff

10   accounts, he does not do that.  And that's why his claims

11   are inadequate.

12          Now, the trustee didn't respond to our argument in

13   his opposition brief.  Again, instead he argued that he

14   shouldn't be required to file a separate action for each

15   defendant or for each Madoff account, and that's not what

16   we're arguing, Your Honor.  Of course, the trustee is free

17   to file cases involving multiple defendants.

18          What we're saying is that when he does so, his

19   complaints have to identify the specific transfers that he's

20   seeking to recover from each specific defendant.  The

21   trustee's complaints against my clients fail to do so, and

22   as a result, those claims should be dismissed.

23          Now, the last area I'd like to address, Your

24   Honor, is the trustee's inadequate pleading of claims

25   involving inter account transfers.

1          Now, Your Honor has heard argument concerning

2    inter account transfers before, so I don't want to get into

3    the entire -- the trustee's entire methodology.  To

4    summarize, the trustee doesn't consistently give full claim

5    to transfers between Madoff accounts.  Instead, he looks at

6    the transferor account, he runs his net investment

7    methodology, it's money in, he sees that there was

8    sufficient at equity at the time of the inter account

9    transfer to fund that transfer.  And if he says that if

10   there wasn't sufficient net equity in the transferor

11   accounts at the time, he doesn't give full credit to the

12   transferee accounts, in his calculation of principal balance

13   or net equity.

14          The problem with his complaints, Your Honor, is

15   the trustee doesn't contain -- the complaints don't contain

16   any information about the transferor account, other than the

17   --

18          THE COURT:  Except the final number.

19          MR. KUPILLAS:  Except the final number.  He does

20   not give any facts concerning the deposits and withdrawals

21   into those transferor accounts.  He doesn't identify the

22   customer, the owner of those accounts --

23          THE COURT:  But why does he have to do that as a

24   matter of pleading?  Someday maybe the trustee will have to

25   show how he calculated the transferor's net equity, for lack

1    of a better phrase, but for pleading purposes, isn't his

2    complaint really saying, I reviewed the accounts of the

3    transferor, I subtracted the withdrawals from the deposits,

4    and here's the number I got.

5            What you're saying is, that's not enough, but why

6    not for pleading purposes?

7            MR. KUPILLAS:  Yes, Your Honor, I'm saying he has

8    to give the backup, because without the backup --

9            THE COURT:  Why?

10           MR. KUPILLAS:  -- there's no way of knowing

11   whether, in fact, those claims have a plausible basis.

12           THE COURT:  But that's -- isn't that what

13   discovery is for?  He'd pled a fact that at the date of the

14   transfer, the net equity in the account was X.  That's a

15   fact.  He doesn't have to plead the evidence that leads him

16   to that fact.

17           MR. KUPILLAS:  I can see that this is a close

18   call, Your Honor, and you know, it may be that you think

19   given the final balance is sufficient.  I would posit that

20   if the trustee has this information in his possession and he

21   could've provided it, I simply don't understand why he

22   didn't --

23           THE COURT:  Because you made a motion to dismiss,

24   why should he provide you with discovery?

25           MR. KUPILLAS:  No, initially when he --

1          THE COURT:  So if he gives you that information,

2     are you going to withdraw your motion?

3          MR. KUPILLAS:  I haven't asked for discovery, Your

4     Honor.

5          THE COURT:  Okay.

6          MR. KUPILLAS:  What I'm saying is that he

7     should've pled the -- if he has the information, if he has

8     the detail about the deposits and withdrawals in the

9     transferor's accounts, he should've pled it in his

10    complaints, he doesn't.  And that's -- those are my

11    arguments on that, Your Honor.

12         THE COURT:  Okay.  Thank you.  Anyone else want to

13    be heard on these particular issues?  Okay.  Go ahead, Mr.

14    Cremona.

15         MR. CREMONA:  Thank you, Your Honor.

16         As I think Your Honor noted and as Mr. Kupillas

17    pointed out himself, the trustee here is a stranger to the

18    transaction, is entitled to deference and has a lesser

19    burden.

20         THE COURT:  Yeah, but the Court -- on the

21    subsequent transfers, Judge Lifland had ruled that it's not

22    enough to say upon information and belief the transfers were

23    made to the subsequent transfers and for their benefit.

24         MR. CREMONA:  I understand that, but also Judge

25    Lifland said in the Chase case, that the Court has relaxed

Page 96

1    the tracing burden, and has relaxed what needs to be

2    demonstrated.

3              THE COURT:  You know, I've seen a lot of cases

4    where the kind of pleading that they're complaining about,

5    the subsequent transfers just isn't enough.

6              MR. CREMONA:  I understand that, Your Honor, but

7    as you pointed out, every one of our complaints has a

8    detailed Exhibit B to it.  It identifies every single

9    transfer, the date of the transfer --

10             THE COURT:  I'm not talking about the individual -

11   - of the initial transfers, I'm talking about the subsequent

12   transfers.

13             MR. CREMONA:  Right, but again, Your Honor, the

14   defendants in the case are identified, they are referred to

15   the transfers on the exhibit, they're on notice.  I believe

16   that we've met our pleading standard to put them on notice

17   of our claim.

18             As Your Honor pointed out, we've identified

19   transfers that are presumed to be true on the date that they

20   say we occurred, and we're entitled to that presumption.

21             THE COURT:  I don't recall you identifying any

22   subsequent transfers.

23             MR. CREMONA:  I believe we --

24             THE COURT:  You're just saying I think that the

25   money was transferred to the subsequent transferees.

Page 97

1            MR. CREMONA:  Well, I think we're saying that in

2    these cases, we have small groups, we have partnerships, we

3    have trusts.  It's evident from the face of the complaint

4    where the transfers may or may not have gone.  We've pled in

5    the alternative to preserve our claims both against someone

6    that may have been an initial and/or a subsequent, I think

7    we're entitled to do that.  I think we've done so, and done

8    so in a way that puts everybody on notice.  And I think that

9    that does meet the Rule 8 standard that we're subject to.

10           And as far as the inter account transfer issue,

11   again, I think similarly as Your Honor noted, every account

12   is referenced, the account number is there, the parties are

13   on notice, I don't think we're arguing the net equity --

14   excuse me -- yeah, the net investment method or how it was

15   applied in the inter account transfers, but as far as the

16   exhibits to the complaint, again we've more than adequately

17   pled and put parties on notice of our claims as to what

18   accounts they're related to, and what transfers, as to --

19   and to whom.  Thank you, Your Honor.

20           THE COURT:  Anyone want to reply on this

21   particular issue?

22           MR. KUPILLAS:  Yes, Your Honor, just very briefly.

23           I don't want to belabor the point about Judge

24   Lifland's prior decisions.  I think --

25           THE COURT:  I'm aware of them.

1          MR. KUPILLAS:  -- Your Honor is familiar with

2     them.

3          Now, Mr. Cremona in his argument just mentioned

4     that the complaints do, in fact, identify some subsequent

5     transfers.  I'm not -- I believe that's not the case in any

6     complaints against my clients, I haven't seen any.

7          MR. CREMONA:  Just to be clear, Your Honor, I

8     don't think that's what I said.  I said that all the

9     transfers are identified on the exhibit, and all the

10    defendants are confined in the complaint, referred to the

11    exhibit.

12         MR. KUPILLAS:  Okay.  Well, I'm sorry about

13    mistaking that, Your Honor, but if that's the case, then

14    there's no indication, no representation from the trustee

15    that any subsequent transfers have been identified in the

16    complaints.

17         And Mr. Cremona says it's evidence in some cases

18    that certain initial transfers were subsequently transferred

19    to certain defendants.  But, in fact, that was the trustee's

20    basis from the Madoff family action.  It was a case where he

21    believed it was evident that Bernie Madoff had transferred

22    some money to some of his kids, and what Judge Lifland said

23    is that that's mere speculation.  You have no evidence of

24    that, and absent any evidence, your claims have to be

25    dismissed.

1          THE COURT:  Thank you.  Why don't we take a five

2     minute recess and then we'll move on to the next set of

3     issues.

4          (Recessed at 3:42 p.m.; reconvened at 3:52 p.m.)

5          THE COURT:  Please be seated.  Let's continue.

6          MS. NEVILLE:  Good afternoon again, Your Honor,

7     Carole Neville, the gang leader probably.

8          I'm here to address another one of Judge Rakoff's

9     decisions relegated to the footnote, which is the protected

10    retirement accounts.

11         THE COURT:  Okay.

12         MS. NEVILLE:  And as a threshold matter, I'd like

13    to say that these statutes protecting retirement accounts

14    reflect a policy that competes importantly and well with the

15    policy of the trustee's equitable distribution, making it

16    ripe for the victims.

17         THE COURT:  Is this the CPLR argument or --

18         MS. NEVILLE:  Yeah, it's the CPLR.

19         THE COURT:  But this is 5205?

20         MS. NEVILLE:  Yeah.

21         THE COURT:  But isn't that only relevant if the

22    trustee gets a judgment and tries to enforce it?  How does

23    it bear on whether he states a claim?

24         MS. NEVILLE:  Because I think it like -- it is

25    effectively an affirmative defense, if you can't get a

Page 100

1    judgment against a protected account, it is -- there's no

2    point in bringing the action.  I mean, the only thing that

3    he's suing here, IRS and Keyhose (ph) and Spencer Trust (ph)

4    that are -- he can't get a judgment against or can't execute

5    against.

6            And my point to here, Your Honor, is that these

7    reflect a policy of protecting retirement income against the

8    claims of creditors that is -- it's both a national policy

9    and a state policy.  I mean, social security benefits are

10   protected, ERISA has an anti-alienation provision, and 45

11   states have enacted statutes just like 5205.

12           THE COURT:  But I come back to these are exemption

13   statutes.

14           MS. NEVILLE:  No, these are not --

15           THE COURT:  There's no statute that says you can't

16   sue an IRA, is it?

17           MS. NEVILLE:  You can't -- there is no statute

18   that says that, but the way these cases generally arise is

19   on motion to dismiss, because you can't get a judgment, and

20   somebody's either seeking to -- before they actually have a

21   judgment to restrain an account, and they can't actually do

22   that.

23           The anti-alienation provision protects these

24   accounts in a number of --

25           THE COURT:  Well, 5205 refers to -- as an

Page 101

1    exception to the exemption if the transfer was a fraudulent

2    transfer under New York law.

3              MS. NEVILLE:  Right.  I --

4              THE COURT:  And I raised this before, if you have

5    a copy of it.

6              MS. NEVILLE:  Yeah, I do.  I actually --

7              THE COURT:  And does the trustee actually have to

8    get a judgment under New York law, or is it sufficient if

9    the transfer entity account that he's getting to was a

10   fraudulent transfer under New York law?

11             MS. NEVILLE:  Say that again.

12             THE COURT:  In other words, it's conceivable that

13   although he can't assert a claim under New York law,

14   whatever was put into that account fits all the elements of

15   a New York fraudulent transfer, even without the judgment,

16   but with a judgment, let's say for breach of contract claim,

17   could he go in and seek to recover those funds, because they

18   were put into the account in violation of the New York

19   Debtor/Creditor Law?

20             MS. NEVILLE:  That's an interesting --

21             THE COURT:  Or is exemption --

22             MS. NEVILLE:  I don't think so, no.

23             THE COURT:  -- limited to enforcing a judgment

24   that he gets under Article 10 of the Debtor and Creditor

25   Law?

Page 102

```
 1              MS. NEVILLE:  That's what I think the statute
 2     says.
 3              THE COURT:  Is there any --
 4              MS. NEVILLE:  There are two exceptions.
 5              THE COURT:  -- cases that interpret that?
 6              MS. NEVILLE:  That particular one, you know, the
 7     way -- if I can just go through it a little bit, because the
 8     way this statute works is, it's bereft of pronouns, so you
 9     don't really know who's doing what to whom.  But basically
10     it is about a judgment debtor which would be comparable,
11     basically to my client, my client's holding accounts.
12              And they make a transfer to a protected entity,
13     and then the exemption kicks in.  If it's made with an
14     intent to hinder, delay, or defraud his or her creditors, my
15     client's creditors, not the trustee's creditors.
16              The trustee in this case is acting as if it is the
17     judgment debtor, which is not the entity that the exemption
18     applies to.
19              THE COURT:  I thought you were trying to protect
20     this account from collection efforts by the trustee,
21     assuming he wins.
22              MS. NEVILLE:  Correct.
23              THE COURT:  And isn't that what this statute is
24     for, to protect the judgment debtor, possibly your client
25     against efforts to collect from the account?
```

Page 103

1           MS. NEVILLE:  Well then, it could be a matrimonial

2      or a contract claim misuse as you said.  It's not the kind

3      of fraudulent conveyance action that is intended by this

4      statute.  This statute covers my client's transfer to a

5      protected account to evade its creditors.  That's what the

6      statute covers.  For all the --

7           THE COURT:  Well, it says a fraudulent transfer

8      under New York law, it's not just an intentional fraudulent

9      transfer.

10           MS. NEVILLE:  No, well, it could be, you know, a

11      constructive one that rendered my client insolvent too, but

12      it's about us, it's about our clients holding these

13      accounts.  The fact that the trustee has alleged a

14      fraudulent conveyance, he could, and to stretch it a little

15      bit, there's another exemption for matrimonial spousal

16      maintenance claims, so he could have a spousal claim and

17      then have an equal claim against my client on some other

18      thing, and say that he's exempt because he has a judgment

19      for matrimonial.

20           The fraudulent conveyance claim the trustee has is

21      not the fraudulent transfer conveyance that's covered by

22      this statute.  It's my client's effort to evade its

23      creditors.

24           THE COURT:  It's referring to the additions to the

25      account.  And I think he's alleging, or seems to be alleging

Page 104

1    that in the case of the clients you're asserting this for,

2    got transfers from Madoff Securities and put the money in

3    the account, and that's the addition, and that addition was

4    a fraudulent transfer for all the reasons he's alleged in

5    the complaint.

6              MS. NEVILLE:  Well, this -- what I'm trying to say

7    is this statute covers the intent would be my client's

8    intent to hinder and delay its creditors, not his.

9              THE COURT:  Oh, I see what you're saying.

10             MS. NEVILLE:  And so it's -- unfortunately, it's

11   not particularly clear when it says additions to, it doesn't

12   say the judgment debtors additions to, it's just additions.

13             The same thing is true with the marital exemption.

14   It doesn't say who has the claim, and who's claiming it

15   against who.  So this is actually covering -- what the

16   trustee is alleging is a fraudulent transfer to my client,

17   not a fraudulent transfer by my client.

18             THE COURT:  I understand the distinction you're

19   making.

20             MS. NEVILLE:  The second part of that, though, is

21   that this refers to fraudulent conveyances under Article 10

22   of the Debtor and Creditor Law.  And where this statute

23   wanted to refer to the Bankruptcy Code, it does expressly,

24   if you look at the bottom of page 1, the section that

25   defines the accounts refers to the federal exemption, and it

Page 105

1    says, the federal exemptions under --

2            THE COURT:  Where are you reading from?

3            MS. NEVILLE:  -- 100 -- this is paragraph 3, it's

4    yellow highlighted at the bottom of page 1.  Do you have a

5    yellow highlighted one?

6            THE COURT:  Yes, I do.  Well, this just says it

7    applies in bankruptcy cases.

8            MS. NEVILLE:  I know.  But my point is, that if it

9    wants to refer to the Bankruptcy Code, it refers to the

10   Bankruptcy Code, and here it's referring to Debtor and

11   Creditor Law.  And, you know, I've researched this case up,

12   down and around the clock, all of the cases are cases where

13   a debtor who is either about to go to trial or has a

14   judgment against him, or is in trial, transfers property to

15   an exempt account, a trust, an IRA.

16           There's one case where a couple transferred a

17   condominium to a trust.  And only one of the parties was a

18   defendant, and the case says, you can only go after the

19   fraudulent conveyance of the party who had the claim pending

20   against him at the time from the couple.

21           So I think for two reasons that exception to the

22   exemptions doesn't apply.  And the policy of protecting

23   retirement income which is near and dear to my heart for a

24   lot of reasons, is really clear in the provision D which

25   goes on to really exempt the withdrawals, a hundred percent

Page 106

1    of the withdrawals are exempt, and there's no exclusion for

2    fraudulent conveyance there.

3           So what Judge Rakoff said basically was, he read

4    that you had to have -- you had to be exempt under provision

5    C for the income to be exempt.  But if the exception doesn't

6    apply, then the principal is exempt, the interest is exempt,

7    and the withdrawals are exempt.

8           I think there -- I just want to summarize that

9    that's a very strong public policy here.  For most of these

10   people, these retirement accounts are their last money.

11   They lost it.  Whatever was left in those accounts are gone.

12   Some of them I know very well, and they're living on social

13   security now.  Fortunately, social security is protected

14   from the trustee's claims.

15          So basically there is a policy here that competes

16   with taking care of the victims, and there is absolute law

17   that says, you can't touch these accounts.

18          THE COURT:  But are you saying that for pleading

19   purposes, if the trustee is suing an account that comes

20   within this exemption, he has to allege that his defendant

21   put the money into the custodial account with fraudulent

22   intent?  Have you got a case that supports that?

23          MS. NEVILLE:  No, because I can just show you that

24   every case is about that party putting money in to evade its

25   creditors.

Page 107

1          THE COURT:  I'm talking about a pleading standard

2     now, because this is --

3          MS. NEVILLE:  Oh, under pleading standards.

4          THE COURT:  -- as I said when we started, this was

5     a -- this is a judgment enforcement issue.

6          MS. NEVILLE:  I just -- I think I have that.  We

7     raised that issue with Judge Rakoff.  We actually raised

8     with Judge Rakoff the question of whether or not the

9     mandatory withdrawals under tax law conflicted with the

10    SIPA, and he threw that out.  And this was kind of an aside,

11    it was relegated to a footnote.

12          But I think that affirmative defenses are

13    available on a pleading, at the pleading stage when they're

14    clear on the face.  And all of these accounts, and the

15    trustee's not really disputing that these accounts are

16    protected accounts are -- we raise it on the pleading level,

17    and it can be dismissed at that level.

18          THE COURT:  Okay.  Thank you.

19          MR. CREMONA:  Your Honor, I think as Ms. Neville

20    pointed out, this issue was decided in two different ways by

21    the Greiff decision, which again I believe is binding on her

22    and her clients.

23          First, the issue of whether mandatory withdrawals

24    are insulated from avoidance was determined in Greiff and

25    Judge Rakoff focused on the fact that even though the

1    account is a retirement account, similar to this other

2    provision, you need to have a legal entitlement to the

3    proceeds in that account, which the defendants here do not,

4    because those proceeds are fictitious profits.

5              THE COURT:  What Ms. Neville is arguing, and let's

6    take this out of the realm of a motion to dismiss for the

7    moment.

8              MR. CREMONA:  Uh-huh.

9              THE COURT:  You get a judgment, in order for you

10   to invade that account, or collect your judgment from that

11   account, you would have to show presumably in a special

12   proceeding that that money was fraudulently transferred into

13   that account.  That's what she's arguing.  That your

14   transferee made a fraudulent transfer of that money under

15   Article 10 of the Debtor and Creditor Law into that account.

16   That's what she's arguing.

17             MR. CREMONA:  Okay.  But I think on -- in the

18   first instance, whether she has -- that sounds to me almost

19   like a judgment proof type of argument, that it exempts

20   assets.  That's not a defense to an avoidance issue.

21             THE COURT:  That I think I agree with you.

22             MR. CREMONA:  So whether she's judgment proof or

23   not has nothing to do with the viability of our avoidance

24   action.  So -- but I also think Judge Rakoff looked at it

25   and focused on the fact that any additions to that account

Page 109

1    could be deemed to be fraudulent, because the proceeds are,

2    in fact, derived from a fraudulent transfer.  And those

3    additions are, in fact, fraudulent.

4            But putting that aside, I think as Your Honor

5    already pointed out, that's a down the line issue, and

6    whether she has a defense does -- has no -- well, a defense

7    to a judgment, has no bearing on the viability of our

8    avoidance action.

9            I would also just point out, I'm not sure where we

10   are with the IRA argument, if it's abandoned or not.  Is it?

11           THE COURT:  Which argument is that?

12           MS. NEVILLE:  No, I'm not arguing about mandatory

13   withdrawals.

14           MR. CREMONA:  Okay.  Then based on -- unless Your

15   Honor has any other questions, I think we can resolve that

16   issue.

17           THE COURT:  Thank you.

18           MR. CREMONA:  Thank you.

19           THE COURT:  Next?

20           MS. CHAITMAN:  Next.  Helen Davis Chaitman of

21   Becker and Poliakoff, Your Honor.  I'm going to focus on two

22   arguments among the numerous arguments that I've asserted.

23           The first argument I want to address is that the

24   claw back suits violate the defendant's right to due process

25   of law.  And I cite in my brief a long and unchallenged line

Page 110

1    of United States Supreme Court decisions which deal with a

2    law enforcement figure, a governmental official, a quasi-

3    governmental official having an economic interest in a --

4            THE COURT:  You know I read those cases.  That's

5    where the decision-maker of the dispute has an economic

6    interest.

7            MS. CHAITMAN:  No.

8            THE COURT:  Are you saying I have an economic

9    interest in this?

10           MS. CHAITMAN:  No, no, no.  No, no, no.  Where the

11   person who determines -- if a prosecutor determines to

12   prosecute a case, he's not the decision-maker, but he brings

13   the indictment --

14           THE COURT:  Right.

15           MS. CHAITMAN:  -- if that person has an economic

16   interest in bringing that indictment, it's a violation of

17   due process, that's what those cases say.  And we have here

18   the admission by the trustee that he gets a percentage of

19   the fees paid to his law firm.  The --

20           THE COURT:  But every trustee, putting aside this

21   case decides whether to bring avoidance actions or

22   preference actions or any actions, and ultimately gets a

23   commission based on the amount of money he or she

24   distributes, which is money they bring into the case.

25           MS. CHAITMAN:  Yes, but this is --

1           THE COURT:  So you're saying that's all

2    unconstitutional?

3           MS. CHAITMAN:  This is -- no, this is quite

4    different.  And if -- Mr. Picard gets paid regardless of

5    whether he brings money into the estate.  He filed over a

6    thousand avoidance actions, I don't know the exact number

7    that have been dismissed, but he was seeking originally $100

8    billion, about 97 billion of that has been dismissed by the

9    Second Circuit and by the district court.

10          So he gets paid even though he didn't recover in

11   those cases.  And Mr. Cremona just said it, whether the

12   defendant is judgment proof in Ms. Neville's cases, is

13   irrelevant to the viability of the complaint.

14          THE COURT:  Well, as a legal matter that's

15   probably correct.

16          MS. CHAITMAN:  Yes, but that demonstrates the

17   precise conflict of interest that the trustee has.  He gets

18   paid, even if he asserts a claim upon which the estate

19   cannot possibly recover, and that's precisely the example

20   that Ms. Neville gave.

21          So we have here precisely that situation.  He's a

22   quasi-governmental official, he denies it, but in fact, he

23   himself asserted that as an objection to producing documents

24   in the Merkin case.

25          And the trustee now says, well, that was a long

1    time ago, but if Your Honor wants to have an evidentiary

2    hearing on it, I believe I can establish that the trustee

3    never withdrew that objection in the Merkin case.  He has a

4    Rule 11 obligation not to assert grounds for refusing to

5    produce documents, if he doesn't have a good faith basis for

6    it.  So he, himself admitted he was a quasi-governmental

7    official.  And, in fact, I annex as an exhibit to my

8    declaration a statement that was made by the U.S. Attorney

9    that Mr. Picard was appointed an official to distribute

10   funds that were collected by the government.

11               THE COURT:  Is that the victim's fund you're

12   talking about?

13               MS. CHAITMAN:  Yes.  And he --

14               THE COURT:  How long was he in charge of the

15   victim's fund?

16               MS. CHAITMAN:  Well, he was in charge of the

17   victim's fund during the precise period of time when these

18   complaints were filed.

19               So, you know, the fact that he's no longer -- I

20   don't know precisely why he's no longer in charge of that

21   fund, but we asserted his inability to proceed with these

22   cases, and it's very possible that he decided after we

23   asserted the -- this argument, that he shouldn't be a

24   governmental official.  But, in fact, he cites the Adler-

25   Coleman case when he doesn't want to produce documents in

Page 113

1    the Merkin case, he cites the Adler-Coleman case with the

2    proposition that he is a quasi-governmental official.

3            So I think that there's a fundamental defect in

4    his standing to sue.  And I think you can distinguish a

5    situation where a trustee gets paid a percentage of a

6    recovery, that's entirely different from what's going on

7    here, because this trustee gets paid regardless of whether

8    there's a recovery, regardless of whether there's a viable

9    claim.

10           THE COURT:  But wouldn't he still have the same

11   economic interest if he got paid based on a recovery?  He

12   still has an economic interest in the outcome of the

13   litigation.  He might have more of an economic interest, but

14   he still has an economic interest.

15           MS. CHAITMAN:  I think he -- what we're focusing

16   on, Your Honor, is the decision, it's the prosecutorial

17   decision is the decision to sue.  He has an economic

18   interest in deciding to sue all of our clients, regardless

19   of whether he has a bona fide claim, because he benefits

20   either way.  And I think that that's the due process

21   violation.

22           My second argument if I can go through both of

23   them, and then have the trustee respond, Your Honor, is that

24   the complaints are deficient under Article 3 of the United

25   States Constitution because the trustee lacks injury in

Page 114

```
1    fact.  And I rely very heavily for this argument on the

2    Second Circuit's decision in the HSBC/JPMorgan Chase case.

3    If Your Honor looks at that decision with this argument in

4    mind, you will see that the Second Circuit cites New York

5    law for the proposition that a trustee who steps into a case

6    where a thief took money from a customer; the thief never

7    took title to the money and the trustee doesn't take title

8    to the money.  The Second Circuit said that in the HSBC

9    case.

10            THE COURT:  But you do have a statute which gives

11   the trustee standing, the fiction that the Second Circuit

12   mentioned.

13            MS. CHAITMAN:  Yes.

14            THE COURT:  Why doesn't that cure whatever

15   difficulties the trustee otherwise has with respect to

16   standing?

17            MS. CHAITMAN:  Because the Supreme Court cases

18   that we cite in our brief, Your Honor, and there's a long

19   line of them, it's never been -- that tradition has never

20   been challenged, that the Supreme Court says, Article 3

21   injury is so fundamental, that Congress can't remedy it, and

22   there are a number of Supreme Court cases where someone who

23   had standing pursuant to a statute was held by the United

24   States Supreme Court to lack standing, because he had no

25   injury in fact, he had no Article 3 injury.
```

Page 115

1              So you can't cure the deficiency with a statute.

2    And that's the only argument that the trustee has made

3    against my argument, that SIPA gives him that standing.

4    Well, that's precisely what the Supreme Court held.  If you

5    haven't suffered an injury in fact, Congress can't give it

6    to you.  It's more fundamental than a congressional act.

7              So I think, Your Honor, if you look at the HSBC

8    case, you will see that the Court held that Mr. Picard did

9    not have standing to pursue in that case common law claims -

10   -

11             THE COURT:  Well, common law claims I understand.

12   There's no statute that gives him the authority to pursue

13   common law claims, and there's Supreme Court case law like

14   Kaplan and some of these other cases which say he can't.

15   But here you have a statute which gives him standing, and

16   what case stands for the proposition that Congress can't

17   give him standing that he otherwise lacks?

18             MS. CHAITMAN:  If you just give me a minute --

19             THE COURT:  Sure.

20             MS. CHAITMAN:  -- and I'll pull out those

21   arguments in my brief.

22             If you look at page 11 of my brief, Your Honor --

23             THE COURT:  It's not exactly accessible, if you'll

24   just give me the citations to the case.

25             MS. CHAITMAN:  Sure, sure.  Well, there are Second

Page 116

1    Circuit -- here's one, GAF Holdings LLC, this is not Supreme

2    Court, versus Rinaldi, 639 F.3d 402, that's Eighth Circuit

3    2011.  And then the Supreme Court cases are Allen versus

4    Wright.

5              THE COURT:  That's the -- one of the principal

6    standing cases that discuss granting statutory standing.  I

7    know the law is --

8              MS. CHAITMAN:  Yeah.

9              THE COURT:  -- I know that the standing principal

10   is you have to have an injury in fact.  The question I've

11   raised is whether, and you apparently say this can't occur,

12   is Congress can't confer standing by statute, as it did in

13   SIPA.

14             MS. CHAITMAN:  Right.

15             THE COURT:  So what cases say that Congress can't

16   do that.

17             MS. CHAITMAN:  Okay.  Hold on just one second, let

18   me find that for you.  You know what, Judge, I don't want to

19   hold you up, if I can just --

20             THE COURT:  I'll find it.  What pages are they?

21   What pages should I review in your brief?

22             MS. CHAITMAN:  I'm sure it's here, I just don't

23   see it.  It starts at page 11, and I'm sure by the time Mr.

24   Cremona finishes, I'll find it for you.

25             THE COURT:  Okay.  Thank you.

Page 117

```
 1              MS. CHAITMAN:  Okay.  Thank you.

 2              THE COURT:  Thank you.  Mr. Cremona.

 3              MR. CREMONA:  Your Honor, as far as the first

 4    argument that Ms. Chaitman made as to whether or not Mr.

 5    Picard is a quasi-governmental actor, I think we've

 6    addressed that a number of ways, based on the letter that we

 7    submitted to Your Honor.  We've gotten guidance from the

 8    Second Circuit as to what SIPC is exactly and SIPC is not a

 9    governmental entity.  It is a non --

10              THE COURT:  Well, the statute says that also.

11              MR. CREMONA:  Right, indeed, and it's a non-profit

12    corporation, and we got that guidance from the Second

13    Circuit in the executive securities case that we referenced

14    in our letter to Your Honor.

15              Also, the net equity decision in this case

16    identifies SIPC as a non-profit corporation.  So by

17    extension, I mean, Irving is certainly not a decision-making

18    -- a decision-maker for SIPC, nor is SIPC a decision-maker

19    for Irving; therefore, by extension, Mr. Picard is not a

20    quasi-governmental actor as Ms. Chaitman asserts.  Moreover

21    --

22              THE COURT:  And they disagreed in Morgan Kennedy,

23    and that one had to go to the circuit.

24              MR. CREMONA:  I'm sorry?

25              THE COURT:  The SIPA trustee and SIPC disagreed in
```

Page 118

1    Morgan Kennedy, and they had to go to the circuit --

2              MR. CREMONA:  Right.

3              THE COURT:  -- to iron that one out.

4              MR. CREMONA:  Exactly, Your Honor.  Clearly at

5    times, they've taken contrary positions, as we have in this

6    case, Your Honor.  So I think it's quite clear then based on

7    the guidance that we've received and the express language of

8    the statute, that Mr. Picard is not a governmental actor in

9    any way, shape, or form.  We've had these discussions with

10   Ms. Chaitman many times before Judge Lifland, and also

11   before Judge Rakoff as we've detailed in our papers.

12             I would leave it at that, unless Your Honor has

13   any questions as to that issue.

14             On the other issue, as to whether or not there's

15   an Article 3 injury here.  I think as Your Honor pointed

16   out, Section 78 triple L 4 of the statute, specifically

17   defines customer property, which includes unlawfully

18   converted property, because I know the argument is that the

19   funds were stolen, and therefore don't constitute customer

20   property, and therefore are not within the purview of the

21   trustee's avoidance or jurisdiction or fiduciary duty to

22   recover that customer property.

23             But clearly they are, and the trustee has a duty

24   to recover customer property and clearly has standing as a

25   result.  We also have a guidance in this case, the Rosen

Page 119

1   family decision by the Second Circuit specifically addressed

2   this issue of whether stolen property becomes property of

3   the customer property fund.

4            We also, Ms. Chaitman and I, I think a couple of

5   years back argued this very issue to Judge Rakoff, albeit in

6   the context of a motion to withdraw the reference, the Judge

7   in his decision, declined to withdraw the reference, but did

8   note that SIPA and the Bankruptcy Code work in tandem to

9   grant the trustee the authority to bring statutory avoidance

10  and recovery claims on behalf of the estate itself, citing

11  to 78 triple F 2(c)(3), and that's Picard v Roman, 2012 West

12  Law 5816849.

13           So I think the issue has been addressed a number

14  of times, Your Honor.  Unless you have any questions, I'll

15  rest, thank you.

16           THE COURT:  Thank you.

17           MS. CHAITMAN:  Two things, Your Honor.  Again, the

18  trustee cannot explain why he asserted that he had a quasi-

19  governmental immunity to producing documents, and it rests

20  not simply on his function as a SIPC trustee, but also on

21  his acceptance of an appointment as an agent of the federal

22  government in distributing funds.  And that was in December

23  of 2010, at the very same time that he was filing all of

24  these complaints.

25           And I did find, it's actually on page 17, Your

Page 120

1    Honor, of my brief, and I'm quoting from Raines versus Byrd,

2    521 U.S. 811 at 820, "It is settled that Congress cannot

3    erase Article 3 standing requirements by statutorily

4    granting the right to sue to a plaintiff who would not

5    otherwise have standing."

6              And then in United --

7              THE COURT:  Actually I have a question for you,

8    though.  If what you're arguing is that provision is

9    unconstitutional, don't you have to give notice to the

10   Attorney General?

11             MS. CHAITMAN:  No, I'm not arguing that the

12   provision --

13             THE COURT:  Well, but the provision that we're

14   talking about (c)(3) gives standing -- Mr. Cremona, please

15   -- gives standing to Mr. Picard in this case to bring these

16   actions.  And as I understand your argument, that is a

17   violation of Article 3 of the Constitution; is that right?

18             MS. CHAITMAN:  It's a violation of -- yes.

19             THE COURT:  And the law is clear that if you're

20   asserting that a provision of a statute of Congress is

21   unconstitutional, you have to give notice to the Attorney

22   General and the U.S. Attorney, so that they can come in and

23   defend the provision.

24             MS. CHAITMAN:  I do not believe that is done in

25   each of the cases that I cite on page 17 of my brief.

Page 121

1           THE COURT:  But that's what the law is.

2           MS. CHAITMAN:  Because -- no, but what -- because

3   it comes up as a challenge to the standing by a private

4   litigant, and --

5           THE COURT:  But he has standing but for the --

6   you're telling me the unconstitutionality of this provision.

7           MS. CHAITMAN:  Well, what I'm saying is, he

8   doesn't have Article 3 injury, and his defense is that he

9   has a statute, and the Supreme Court has made clear, again,

10  quoting another case, "a statute cannot obligate the Article

11  3 minima."  And that's Gladstone Realtors versus Village of

12  Bellwood, 44 U.S. 91.

13          THE COURT:  You should look at 28 U.S.C. 2403(b).

14  I think you have to give notice so that the Attorney General

15  can come in and defend a statute.

16          MS. CHAITMAN:  I'll take a look at that, Your

17  Honor.

18          THE COURT:  Okay.

19          MS. CHAITMAN:  And if necessary, I will do that.

20          THE COURT:  I believe it's also in the Federal

21  Rules of Civil Procedure.

22          MS. CHAITMAN:  Okay.  But what my argument is, I'm

23  not particularly interested in voiding the statute, I'm

24  simply arguing that the --

25          THE COURT:  Well, but --

Page 122

1            MS. CHAITMAN:  -- trustee lacks standing.

2            THE COURT:  But you're saying the trustee lacks

3    standing because the statute is unconstitutional.  The

4    statute clearly gives the trustee standing.  Can we agree on

5    that?

6            MS. CHAITMAN:  The statute does not give the

7    trustee Article 3 injury.  What my argument is that the

8    trustee lacks Article 3 injury and he's --

9            THE COURT:  Can he sue without Article 3 injury

10   under the statute?

11           MS. CHAITMAN:  I do not believe he can.

12           THE COURT:  Because it's a violation of Article 3?

13           MS. CHAITMAN:  It's a violation of Article 3.

14           THE COURT:  So the statute gives him the authority

15   to sue in violation of Article 3.

16           MS. CHAITMAN:  He lacks standing.

17           THE COURT:  Okay.

18           MS. CHAITMAN:  Yeah, he lacks standing under

19   Article 3.  If you feel it's necessary for me to do it --

20           THE COURT:  But I'm just saying --

21           MS. CHAITMAN:  -- in a differnet way, I -- yeah.

22           THE COURT:  -- it sounds to me like you're arguing

23   that the statute's unconstitutional.

24           MS. CHAITMAN:  I don't care about making the

25   statute unconstitutional, if the Supreme Court --

Page 123

1              THE COURT:  Well, if it's valid, he's got

2    standing.  This is becoming circular.

3              MS. CHAITMAN:  No, no, no, because the Supreme

4    Court well recognized it, that's what this line of cases

5    says.

6              THE COURT:  Okay.

7              MS. CHAITMAN:  All right.  Thank you, judge.

8              THE COURT:  Thank you.

9              MR. KELLY:  Good afternoon again, Your Honor,

10   Nathaniel Kelly for SIPC.  I just wanted to make a few

11   points in rebuttal to Mrs. Chaitman.

12             First of all regarding the trustee's role as a

13   special master for the distribution of the government -- the

14   funds.

15             Your Honor, a quasi-governmental -- being found to

16   be a quasi-governmental agent is a case by case

17   determination, very specific to the actions being taken.

18   So, I think we would dispute that -- well, even if the

19   trustee was a quasi-governmental actor in regards to his

20   temporary role as a special master for the distribution of

21   funds that doesn't make him a quasi-governmental actor with

22   regards to --

23             THE COURT:  What does?

24             MR. KELLY:  What's that?

25             THE COURT:  What does?  If he is administering a

Page 124

1    restitution fund created I guess by the Department of

2    Justice what more would it take to be a quasi-governmental

3    actor?

4             MR. KELLY:  Your Honor, I guess I would concede

5    that he may be in that case, but being a quasi-governmental

6    in this case does not make him a quasi-governmental actor in

7    all aspects of his job, and certainly not in aspects of the

8    trustee to the SIPA estate, which maintains separate funds

9    and maintains a separate pool of customer property.

10            I think as Mr. Cremona made clear, just to again

11   state the obvious, SIPC and the trustee are independent of

12   each other, and SIPC itself is a private non-profit, the

13   trustee is not its decision maker, and SIPC is not the

14   trustee's decision maker either.

15            The -- Ms. Chaitman quotes -- quotes -- provides a

16   couple quotes in her briefs trying to assert that the

17   trustee is the decision maker for SIPC, such as she quotes

18   the SEC -- SEC chairwoman who states that the trustee and

19   not the SEC makes the decision to recover false profits.

20   That quote in no way indicates that the trustee is making

21   the decision for SIPC.

22            THE COURT:  It's also well beyond the record.

23            MR. KELLY:  Yes.

24            THE COURT:  It appears so.

25            MR. KELLY:  Let's see.  If you'll give me one

Page 125

1    second, Your Honor, I think that may be all I had.

2         (Pause)

3              MR. KELLY:  That's it, Your Honor.  That's all I

4    had.

5              THE COURT:  Thank you.

6              MR. KELLY:  Thank you.

7              THE COURT:  Are there any other issues?

8              MR. BERNFELD:  Good afternoon, Your Honor --

9              THE COURT:  Good afternoon.

10             MR. BERNFELD:  -- my name is Jeffrey Bernfeld of

11   Bernfeld Dematteo & Bernfeld.

12             I'm going to be arguing three issues, two of which

13   are intertwined, and I would argue first and then let

14   Mr. Cremona address those, and then I'd like to do the third

15   one, which is somewhat separate.

16             THE COURT:  Go ahead.  What are the two issues?

17             MR. BERNFELD:  The first two issues that are

18   intertwined have to do with (a), our contention that these

19   adversary proceedings should have been filed in the district

20   court first in order for any subject matter jurisdiction to

21   attach in this court, and (b), that the summons that were

22   issued on the adversary proceedings are defective for a

23   number of reasons, the first being that this Court hadn't

24   obtained subject matter jurisdiction at the time that they

25   were issued, and (b), that the summons themselves have an

Page 126

1    affirmative misstatement of the law, which goes to the very

2    core of what a summons is.

3              So let me start with the court issue.

4              It is very clear and well settled that the

5    bankruptcy court does not have its own independent subject

6    matter jurisdiction over --

7              THE COURT:  Right, it belongs to the district

8    court.

9              MR. BERNFELD:  -- over these sorts of issues.

10   Right.  And the -- this was crystallized in the Stern case

11   and the related cases too.

12             THE COURT:  The Stern case wasn't a subject matter

13   jurisdiction case, it was an division of labor case.

14             MR. BERNFELD:  Understood, but it's very clear

15   from the statute, and what I really meant to say was that

16   the issue became crystallized.

17             THE COURT:  Okay.  Why don't I have subject matter

18   jurisdiction when we had a standing order of reference under

19   which the district court referred all of its bankruptcy

20   jurisdiction to the bankruptcy court?

21             MR. BERNFELD:  If that standing order of reference

22   was to cover everything then there would be no need for

23   bankruptcy petitions or other items to be first -- or SIPC

24   liquidations for that matter to be first filed in the

25   district court and then referred.

Page 127

1              THE COURT:  Well, first of all, bankruptcy

2      petitions are filed here, and SIPC liquidation proceedings

3      are filed in the district court because that's what SIPA

4      says.

5              MR. BERNFELD:  Understood.

6              THE COURT:  And then they have to be referred by

7      the district court to the bankruptcy court.

8              MR. BERNFELD:  Understood.

9              THE COURT:  So the fact that SIPA is filed in the

10     district court and everything else is filed here it's not

11     dispositive of anything.

12             MR. BERNFELD:  Understood, but what we have here

13     is if you look at the order of reference that referred the

14     liquidation proceeding to this Court it does not mention

15     related adversary proceedings.  The statute says that

16     proceedings that are related to Title 11, that the district

17     court has original jurisdiction on.

18             It's certainly clear that the district court, if

19     it wished to, could retain jurisdiction over adversary

20     proceedings that -- such as the ones we're talking about

21     here, that they're not required to.  There may be a standing

22     order that is a policy of the district court, but the

23     district court is certainly not required to by statute or

24     otherwise.

25             So the point is that the bankruptcy court -- well,

Page 128

1    we argued that absent a specific referral of a proceeding

2    from the district court to the bankruptcy court, that the

3    bankruptcy court does not obtain jurisdiction.

4              THE COURT:  Just in this case or in all cases?

5              MR. BERNFELD:  In all adversary proceedings -- at

6    least this is our argument -- that in all adversary

7    proceedings such as -- in all adversary proceedings that

8    this Court cannot render a final judgment in, it seems very

9    clear to us --

10             THE COURT:  I don't understand that argument, I

11   have to tell you.

12             MR. BERNFELD:  Okay.

13             THE COURT:  Putting aside this case and your

14   reference to the district court's order of reference in this

15   case, which I don't have before me --

16             MR. BERNFELD:  I --

17             THE COURT:  -- the district court has referred all

18   of its jurisdiction in cases and proceedings to this Court,

19   in all matters, in all bankruptcy matters.  So what's --

20   what's the jurisdictional issue?

21             MR. BERNFELD:  The jurisdictional issue is that

22   while there has been an order of reference referring the

23   SIPC liquidation to this Court there has been no order

24   referring these adversary proceedings from the district

25   court to the bankruptcy court --

Page 129

1          THE COURT:  So your argument is that the general

2    order of reference does not apply to the proceedings in this

3    case.

4          MR. BERNFELD:  My argument is the general order of

5    reference does not -- the general order -- the general

6    standing order does not confer jurisdiction over specific

7    adversary proceedings that are related to this SIPC

8    litigation.

9          THE COURT:  But just this SIPC litigation, or are

10   you talking about all bankruptcy cases?

11         MR. BERNFELD:  In this context I'm just talking

12   about SIPC, I'm don't -- I'm not rendering a -- I'm not

13   rendering an opinion in terms of what the other bankruptcy

14   cases are because it really doesn't have to do with this

15   case and it's not what my clients are wrapped up in, so I

16   haven't really given that particular thought or -- or

17   research.

18         But what we have here, and I think again, my

19   argument is that Stern crystallized the issue.

20         Subject matter jurisdiction is generally tied to

21   the ability of a court to render a final judgment.  If you

22   take that together with the --

23         THE COURT:  That's not true though.  That's not a

24   correct statement of the law.

25         MR. BERNFELD:  I --

1           THE COURT:  I have subject matter jurisdiction at

2    a minimum, and putting to one side your argument about the

3    reference, to make finding -- render report and

4    recommendation in every one of these cases.

5           MR. BERNFELD:  Understood, I misspoke.

6           THE COURT:  I just don't have subject matter -- or

7    I don't have the authority to enter a final judgment unless

8    -- unless in certain circumstances.

9           MR. BERNFELD:  Right.  Let me restate that.

10   Independent subject matter jurisdiction does not -- usually

11   will attach to the ability of a court to render a final

12   judgment in a particular case.

13          This Court does not have independent subject

14   matter jurisdiction over these adversary proceedings absent

15   a reference from the district court.

16          And I think the issue is made very, very clear as

17   we look at the summons that were issued, and that sort of

18   again leads into how it's intertwined.

19          The summons that was issued says that the failure

20   to timely answer is an implied consent to the clerk of this

21   court entering a final judgment by this Court by the fall.

22   That is --

23          THE COURT:  The supreme court may decide that

24   that's right.  That's before the supreme court now.

25          MR. BERNFELD:  Well, understood, but as the law

Page 131

1      currently stands given the Stern decision and Rakoff's

2      further decision on it, as things stand right now this Court

3      does not have the power to render -- to do what the summons

4      says it's going to do.

5             THE COURT:  Did your clients -- has a default been

6      entered against your clients by this Court?

7             MR. BERNFELD:  No.

8             THE COURT:  So.

9             MR. BERNFELD:  Well, I -- we're not talking about

10     a --

11            THE COURT:  Whose rights are you asserting then?

12            MR. BERNFELD:  Whose rights am I asserting?  I'm

13     asserting the rights of my clients and any defendant in

14     these proceedings.  Because we're not talking about a minor

15     -- we're not talking about somebody spelled a parties' name

16     wrong, we're not talking about someone accidentally did a

17     typo on the date, we're talking about the core purpose of

18     the summons.

19            The core purpose of the summons, in addition to

20     imparting information, is that a court is telling somebody

21     you come to court or else.

22            And what I'm telling you -- what I'm arguing here

23     is that the or else that these summons say is not an or else

24     that as things stand right now this Court can do.  If, for

25     example, the summons said come to court or make an

Page 132

1    appearance within 30 days or we're going to send people to

2    set your house on fire that would not be a valid summons.

3              THE COURT:  And I would agree with you.

4              MR. BERNFELD:  Okay.  So my argument here is while

5    not as extreme --

6              THE COURT:  Well, it might be a valid summons, but

7    I couldn't do anything about it, just so the record is

8    clear.

9         (Laughter)

10             MR. BERNFELD:  Understood.  But I would argue to

11   you and I would submit to you that a summons that says make

12   an appearance or else and the or else is something that the

13   Court is not empowered to do is not a summons that is a

14   valid summons.

15             THE COURT:  Let me get off this summons --

16             MR. BERNFELD:  Sure.

17             THE COURT:  -- and go back to your reference

18   argument.  I'm looking at the statute -- it's hard to find

19   where these -- the versions begin -- I guess it's 78eee, it

20   looks like subsection (b), subparagraph (4), which says that

21   upon removal of the SIPC proceeding to this Court this

22   Court, quote, "shall there upon have all of the

23   jurisdiction, powers, and duties conferred by this chapter

24   upon the Court to which the application for issuance" -- I

25   note parenthetically the district court -- "of the

Page 133

1    protective decree was made."  So I have all of the authority

2    of the district court.

3              MR. BERNFELD:  But we -- we know that --

4              THE COURT:  And maybe I can't enter a final

5    judgment, but --

6              MR. BERNFELD:  That's an important part of the

7    authority of the district court.

8              THE COURT:  But it's not, it has nothing to do

9    with subject matter jurisdiction.  If I don't have -- as a

10   matter of fact the standing order of reference now provides

11   that if I enter what I think is a final judgment and I

12   didn't have the authority to do it the Court will just treat

13   it as a proposed findings of fact and conclusions of law.

14             MR. BERNFELD:  Understood, Your Honor, but that's

15   not what -- I don't believe that's what the standing order

16   said at the time, and the order of reference --

17             THE COURT:  The standing order -- no, it didn't

18   say it at the time, but that's what it says now.  Are you

19   saying it's not retroactive?

20             MR. BERNFELD:  No, I would argue that a standing

21   order that's talking about what's going to happen going

22   forward would not be retroactive to a time that -- back to

23   2010 when these summons were issued.

24             THE COURT:  Do you have any authority for that

25   proposition?

Page 134

1            MR. BERNFELD:  No, I don't.

2            THE COURT:  Okay.  Good.

3            MR. BERNFELD:  But the point that I'm making is

4    that, you know, under 1334 it's very clear that the

5    bankruptcy court's jurisdiction is derivative.  And even

6    earlier in the arguments --

7            THE COURT:  I'm not arguing with you, and it's --

8    but under I think 28 U.S.C. 157(a) the bankruptcy -- the

9    district court can refer its jurisdiction to the bankruptcy

10   court, which is --

11           MR. BERNFELD:  And I --

12           THE COURT:  -- why 90 jurisdictions have orders of

13   reference for that.

14           MR. BERNFELD:  And I absolutely agree that the

15   district court can do that.  What I'm saying --

16           THE COURT:  And every district court has.

17           MR. BERNFELD:  I agree with you, and if they come

18   up with new district courts they'll have that power too.

19           But what I'm arguing is that the district court

20   has not done that in these adversary proceedings.

21           THE COURT:  What about the statute I just read to

22   you?

23           MR. BERNFELD:  Well, I think that if we look at --

24   again, that's why I said that Stern, while it doesn't speak

25   directly to the issue, crystallized the issue, because that

Page 135

1    statute says that this Court has all of the powers of the

2    district court, and if you look at Stern and what has

3    happened since Stern this Court does not have all the powers

4    of the district court.

5              THE COURT:  Okay.  And if you look at Arkinsin

6    (ph) it said that when the code says I can enter a final

7    judgment that I can't, that means I can render, you know, a

8    recommended findings and conclusions.  So that's all I can

9    do.

10             MR. BERNFELD:  Understood.  Understood.

11             THE COURT:  So what are we talking about?

12             MR. BERNFELD:  What we're talking about is subject

13   matter jurisdiction and when and if it has been conferred

14   upon this Court, and our argument is that the order

15   referring the SIPC liquidation to this Court did not refer

16   subject matter jurisdiction over adversary proceedings that

17   had not yet been brought that are adversary proceedings that

18   in addition this Court doesn't have the power to render

19   final judgments over.

20             THE COURT:  What about the ones that I do?

21             MR. BERNFELD:  The ones that you do, that might be

22   a different story, but again, I'm not -- I haven't moved

23   about those and I'm not arguing about those.

24             What I'm arguing about is these specific adversary

25   proceedings, which certainly could have been filed in the

Page 136

1    district court, and if they came before the judge a judge

2    could look at it and say, you know what, I'm not going to

3    refer this.

4                THE COURT:  But why -- but the district court

5    wouldn't have jurisdiction because the jurisdiction has been

6    referred here and the district court would have to withdraw

7    the reference.

8                MR. BERNFELD:  Well, I respectfully disagree the

9    jurisdiction has been conferred here, because all that's

10   been conferred here is jurisdiction over the overall

11   liquidation and not these specific adversary proceedings

12   where --

13               THE COURT:  That's not what the statute says.

14               MR. BERNFELD:  Understood, but as we just -- or as

15   I just asserted any way, that that statute is not completely

16   accurate, particularly when it comes to the rendering of a

17   final judgment.

18               So, I would argue that when we are looking at that

19   more critically, particularly through the lens of what has

20   evolved since Stern, that what we have to look at is what

21   actually has been conferred and when.  And I submit to you

22   that jurisdiction has not yet been conferred over these

23   adversary proceedings, that the trustee should have filed

24   these adversary proceedings in district court where a proper

25   summons, that had a proper statement of the law, and said

Page 137

1    make an appearance or else, and the or else was a valid or

2    else, our -- was necessary first.  I don't believe that --

3    well, I don't get into that.

4              But the order referring the proceeding over here

5    did not at any -- in any one of its lines mention or even

6    hint at the adversary proceedings, it didn't talk about

7    related proceedings, didn't talk about anything, it said I'm

8    referring this liquidation over, and here's the trustee, and

9    here are the stays, and here are the other items, but it did

10   not say and the bankruptcy court shall have jurisdiction to

11   issue summons and conduct adversary proceedings,

12   particularly on adversary proceedings that the bankruptcy

13   court does not have the power to render a final judgment on.

14             With respect to the summons, in addition to the

15   facial misstatement of the law related to my first argument,

16   if this Court didn't have subject matter jurisdiction yet

17   conferred upon it then the issuance of the summons itself is

18   a nullity.

19             The last thing I would like to say is we made this

20   argument both with respect to the reference of the adversary

21   proceedings and the summons, the arguments were -- with

22   respect the exception of a footnote regarding the summons

23   were completely ignored by the trustee and by SIPC, and on

24   that basis alone they've waived any opposition to it.

25             So on that basis alone at a minimum the 11 cases

1    that I have moved on today and all of the other cases that

2    have joined in everybody's issues, it should be granted to

3    that extent, and I submit to you it should be granted on the

4    substance as well.

5              I'm going to come back up on the separate issue

6    after --

7              THE COURT:  What's your separate issue?

8              MR. BERNFELD:  The separate issue has to do with

9    the formation of BLMIS LLC.

10             THE COURT:  Okay.  Mr. Cremona?

11             MR. CREMONA:  Thank you, Your Honor.  Nick Cremona

12   again on behalf of the trustee.  I'll be quick.

13             I think Mr. Bernfeld's argument fails for a number

14   of reasons.

15             In the first instance I can hand up to Your Honor

16   the -- Judge Stanton's order, which I have a copy of.

17             As Your Honor pointed out I'll direct you to

18   paragraph 9 of that order, which specifically refers to

19   section 78eee9b0(4) and says "that this liquidation

20   proceeding is removed to the United States Bankruptcy Court

21   for the Southern District of New York."

22             So this liquidation proceeding pursuant to SIPA,

23   was commenced in the district court as of December 16;

24   however, this order was entered as of December 15, 2008.

25   This Court has subject -- this Court's subject matter

1    jurisdiction emanates from that order.  You have subject

2    matter jurisdiction over this entire liquidation proceeding

3    pursuant to that order and SIPA.

4           Every adversary proceeding in this case that has

5    been commenced, as Your Honor is well aware, was commenced

6    within this liquidation proceeding, and the jurisdiction

7    over those adversary proceedings emanates from the

8    jurisdiction over the entire proceeding.

9           As a second matter the argument fails as Your

10   Honor pointed out.  In the first instance I think it fails

11   to take into account 28 U.S.C. 157(a) and how it operates

12   and how on the automatic referral to the bankruptcy court,

13   that is -- you add to that, as Your Honor pointed out, the

14   amended standing order of reference, which is dated

15   February 1, 2012 and was clarified to address I think we

16   would all agree some Stern issues, but again, that has no

17   bearing on subject matter jurisdiction.

18          I think the argument also fails because in this

19   very case we had a consolidated proceeding that deals with

20   the effects of Stern v. Marshal and its effects on the

21   adversary proceedings herein, and Judge Rakoff concluded

22   that all of the adversary proceedings should be sent back to

23   Your Honor, Your Honor can adjudicate the matters and issue

24   findings and conclusions, but not final determinations

25   except in the certain limited circumstances as Your Honor

Page 140

1    pointed out.  For example, if there was a 502(d) claim.  I

2    think it fails for that reason.

3            Lastly, I think it fails because Mr. Bernfeld

4    filed motions to withdraw the reference in 11 cases, clearly

5    understood that the reference between the courts -- the

6    reference was withdrawn in 11 of his cases, and most

7    recently on August 1st, Judge Rakoff issued an order which

8    candidly was an order out of an abundance of caution to make

9    clear to all parties that every single motion to withdraw

10   the reference that had not been granted was in fact denied,

11   and that order was entered in every single adversary

12   proceeding, and that order specifically says that the cases

13   are sent back before Your Honor.

14           So in those four different ways Your Honor has

15   subject matter jurisdiction and these cases --

16           THE COURT:  What was the date of that order?

17           MR. CREMONA:  August 1, 2014.  And it is still

18   trickling in on dockets, but it is going to be entered in

19   every single adversary proceeding as per our conference with

20   the Court.

21           THE COURT:  Okay.

22           MR. CREMONA:  Thank you, Your Honor.

23           THE COURT:  Thank you.

24           MR. BERNFELD:  If I might just briefly reply to

25   that before I get on to the next issue.

Page 141

1           In the first instance the Court should disregard

2      the arguments because this is opposition to a motion that I

3      haven't had a chance to reply to, and in the alternative I

4      should be given a chance to at least submit a letter

5      addressing the couple of orders that Mr. Cremona mentioned.

6           THE COURT:  Okay.

7           MR. BERNFELD:  Secondly, Mr. Cremona's arguments

8      beg the question.  Either 78eee(b)(4) grants this Court the

9      ability to issue summons on adversary proceedings or it does

10     not.  Either it had been conferred under this order or it

11     was not.

12          I suggest that what we're saying here is under 15

13     U.S.C. 78eee(b)(4) this liquidation proceeding is removed to

14     the United States Bankruptcy Court.  It doesn't say this

15     liquidation proceeding and all related proceedings

16     whereas --

17          THE COURT:  There were no -- but there were no

18     related proceedings at the time.

19          MR. BERNFELD:  And you just made by next point.

20     How can an adversary --

21          THE COURT:  Since I made it why don't you go on to

22     the one after that.

23          MR. BERNFELD:  I'm just going to -- just going

24     clarify for one moment.

25          How can the district court refer an adversary

1    proceeding that had not yet existed at the time that -- of

2    this referral?

3              Now, with respect to my -- my firm and my clients

4    and many, many others availing themselves of the withdrawal

5    of reference statute, first of all it was the only procedure

6    available to us, but second of all it again really is not

7    relevant, because if the -- if what we conclude is that the

8    district court had not referred it and had not conferred

9    subject matter jurisdiction I can't waive that by moving to

10   withdraw the reference or by conceding it.  I can't create

11   subject matter jurisdiction.  So that's it on that.

12             I would move on to the next question, and while we

13   have the order out that's exactly what we're talking about.

14   The order is talking about the liquidation of Bernard L.

15   Madoff Investment Securities LLC and its customers.  Bernard

16   L. Madoff Securities LLC is an entity that came into

17   existence in January of 2001 based on the allegations

18   contained in the trustee's complaint, and you know, I have

19   an example here where they say:

20             "Founded in 1959, BLMIS began operations as a sole

21   proprietorship of Madoff, and later, effective January 2001,

22   formed as a New York limited liability company wholly owned

23   by Madoff."

24             I suggest to the Court that all the trustee has

25   been authorized to deal with is our transactions involving

Page 143

1  -- just to abbreviate it -- BLMIS LLC, not what they have

2  defined as BLMIS, which is everything that Mr. Madoff has

3  done since 1959.

4       THE COURT:  But the trustee is only suing for

5  transfers at this point within two years of the filing date.

6       MR. BERNFELD:  But he's delving past January 2001,

7  and in effect avoiding or netting out accounts from what is

8  a completely separate entity.

9       If Mr. Madoff had been --

10      THE COURT:  Well, how is that different from these

11  inter accounts -- you know, the inter account transfer cases

12  that I have?

13      MR. BERNFELD:  Well, inter account transfers are

14  where I as a customer am sending some of my Madoff money to

15  customer B into their account.  What I'm talking about is

16  not whether or not in that context with two BLMIS LLC

17  accounts that happened post-2001 that you can't look at the

18  net equity there, what I'm saying is that the trustee has no

19  authority to go beyond January 2001 for anything because

20  there did not exist a BLMIS LLC, which is the only thing the

21  trustee has been empowered to liquidate.

22      The trustee has had six years, the trustee could

23  have moved at any time to expand the definition, to amend

24  the order, to do anything he could to go back to 1959.  If

25  Mr. Madoff had been at Merrill --

Page 144

1          THE COURT:  But didn't the second circuit

2     implicitly approve that in the net equity decision?

3          MR. BERNFELD:  I don't believe they did.  I think

4     that what has been said is you can go in and net out your

5     cash in and cash out.

6          What I'm saying is they can't do that past January

7     2001, because BLMIS LLC, the only entity that the trustee

8     has been empowered to liquidate and address, did not exist

9     prior to January 2001.

10          If Mr. Madoff had been at another brokerage firm

11     and was somehow unbeknownst to his employers stealing money

12     from his customers and then he formed BLMIS LLC, would we

13     say that the trustee has the right to go to Merrill or

14     wherever they were -- wherever that broker was working and

15     now undo and avoid transactions that occurred prior to the

16     formation of the entity that they are -- that they are

17     empowered to liquidate?  I submit that the answer is no.

18          The only difference here being that Mr. Madoff

19     didn't come from another brokerage house owned by other

20     people, he came from a brokerage house owned by him and then

21     formed another brokerage house owned by him.

22          Had he -- so, I think that the argument I'm making

23     is -- it may be technical in nature, but this case has

24     revolved around technicalities.  Like what you were just

25     talking about with the account to account transfers, if

Page 145

1    grandma wants to give money out of her Madoff account to two

2    of her grandchildren, if she did it by withdrawing and

3    sending a check to one and transferring to another, the guy

4    who got the check gets to keep his money and the one who got

5    the inter account transfer does not.  That's -- we've argued

6    that that's form over substance and shouldn't happen, the

7    courts have disagreed, but you know, so if we're going to be

8    technical about those sorts of things I think we have to be

9    technical about this.  The order says what it says.

10          You can -- the customers of Bernard L. Madoff

11   Securities LLC are in need of protection, does not give the

12   trustee any authority to go past or to deal with any entity

13   other than Bernard L. Madoff Securities LLC.  It's in their

14   complaints, it's in the order, and nothing has been done to

15   seek to expand or address that.

16          So our argument is -- or my argument is on behalf

17   of my clients and whoever else has joined in the argument,

18   that any transactions, accounts, statements that predate

19   this formation of BLMIS LLC are not the proper subject for

20   this liquidation or the trustee's activities.

21          THE COURT:  Thank you.

22          MR. CREMONA:  Your Honor, I would agree with one

23   thing that Mr. Bernfeld said came to mind, I think it's a

24   hyper technical argument that he's making.

25          The fact of the matter is our complaints allege

Page 146

1    that BLMIS began operating in 1959 and that proposition

2    should be accepted as true for the purposes of a motion to

3    dismiss.

4              THE COURT:  But he's saying it's a different

5    entity than BLMIS LLC, which is the entity that the trustee

6    has been appointed for liquidating.

7              MR. CREMONA:  Uh-huh.

8              THE COURT:  He also said that if fictitious

9    profits had been taken from a Merrill Lynch account under

10   some other sham let's say --

11             MR. CREMONA:  Right.

12             THE COURT:  -- and put into a BLMIS LLC account

13   you couldn't do what you've done in this particular case,

14   and the pre-2001 account is the same as the Merrill Lynch

15   account.

16             MR. CREMONA:  Understood, Your Honor, but the

17   reality is that's not what happened here and that's what we

18   have to deal with, right?  BLMIS the accounts at issue are

19   all the same and they were the same over the life of the

20   company.

21             THE COURT:  Is that alleged in the complaint?

22             MR. CREMONA:  I believe so.  I would have to

23   verify that.

24             But I guess where I was going, Your Honor, is that

25   the trustee is appointed to recover customer property.  The

Page 147

1    customer property is what was in the accounts of the debtor,

2    and those accounts were the same, the customer -- it's based

3    on the business of the debtor entity, and that business

4    remained the same, the bank accounts into which the customer

5    property was deposited, and then ultimately fraudulently

6    transferred remained the same over the life of the entity.

7    So the trustee is in essence recovering customer property.

8              Whether there's a technical name change at a

9    certain point I don't think alters whether that's customer

10   property, and I do think it's a -- it is a hyper technical

11   argument.

12             And really, I think under 78fff(2)(c)(3) the only

13   two relevant issues to determine the trustee's authority to

14   bring these actions are whether the trustee is appointed the

15   estate representative, which he is, and whether the funds

16   the trustee seeks to recover would have been customer

17   property but for the fraudulent transfer, which they are.

18             THE COURT:  But you're netting withdrawals from a

19   pre-2001 account against deposits made into a post-2001

20   account conceivably, right?

21             MR. CREMONA:  Yes, but the account remained the

22   same, presumably, with the same entity dealing with the same

23   business.

24             THE COURT:  Well, I saw that in SIPC's response,

25   but is that alleged in the complaint?  Ask you the same

Page 148

1    questions I've asked the defendants in this case.

2              MR. CREMONA:  I can take a look, Your Honor.

3         (Pause)

4              MR. CREMONA:  I'm sorry, Your Honor, if you could

5    just bear with me.

6         (Pause)

7              MR. CREMONA:  For example, Your Honor, in

8    paragraph 23 of this complaint we state:

9              "Founded in or around 1959 BLMIS began its

10   operations as a sole proprietorship of Madoff, and later

11   effective January 2001 formed a New York limited liability

12   company wholly owned by Madoff."

13             So I do think we reference the prior entity.

14   Since -- "In or about 1986 BLMIS operated from its principal

15   place of business."

16             Again, which Madoff is the founder and sole -- and

17   proprietor, chairman, and chief executive.

18             THE COURT:  What paragraph were you just reading?

19             MR. CREMONA:  I was -- I can give you a copy, Your

20   Honor.  I was reading from paragraph 23, which is the -- of

21   the amended complaint.  Do you want me to hand up a copy?

22             THE COURT:  I can look at it.  I was just -- I'm

23   looking at a different complaint that I happen to have up on

24   the screen.

25             MR. CREMONA:  It's under the title of the

1    fraudulent Ponzi scheme.

2              THE COURT:  Oh, I see.  Okay.  All right.

3              MR. CREMONA:  I also -- I agree with -- Your Honor

4    mentioned, I think it's implicit in looking at the net

5    equity decision and antecedent debt, which both validate the

6    net investment method, which goes back and nets deposits and

7    withdrawals over the life of the account.

8              And specifically as we've discussed previously,

9    Your Honor, in the context of inter account transfer in the

10   Fishman (ph) case, clearly there's no limitation on 546(c)

11   and we're entitled to go back, and that is what the

12   antecedent debt decision provides, which is consistent with

13   the net investment method and the net equity decision.

14             I have nothing further unless Your Honor --

15             THE COURT:  Thank you.  No.

16             MR. BERNFELD:  If I could have a brief minute,

17   Your Honor.

18             THE COURT:  Yes.

19             MR. BERNFELD:  I think Mr. Cremona's argument begs

20   the question.  Over the life of the account, what account

21   are we talking about?  An account of BLMIS LLC, or an

22   account that also was part of BLMIS LLC's predecessor?

23             The -- if we -- you know, he read the same

24   paragraph that I was looking at and let's take it as true.

25   What they define as BLMIS, which I guess is Mr. Madoff's

Page 150

1    professional operations as a securities -- in his securities

2    career, may have begun in 1959, let's accept that as true.

3    But in 2001 the New York limited liability company, that is

4    the only thing mentioned in the order, is what was formed.

5           So we're taking their allegations, we're taking

6    the order as it was, and we're simply saying prior to

7    January 2001 the authority conferred by the order -- there

8    is no authority conferred by the order and there is no order

9    conferring authority by this trustee to go back to deal with

10   the predecessor entity.

11          I assume they could have argued that at the time

12   that there was a predecessor entity that's really one in the

13   same and they would have to meet a certain burden, which

14   they haven't argued and they haven't done.  They haven't

15   really even argued it in the complaint, but regardless, even

16   if one could argue that in the complaint generally here the

17   trustee's authority to act is strictly limited by the order,

18   and the order only refers to that New York LLC, it does not

19   refer to a predecessor entity, and if there had been several

20   predecessor entities, you know, it just does not confer that

21   authority.

22          So, unless you have further questions I have

23   nothing further.

24          THE COURT:  No, thank you.

25          MR. BERNFELD:  Thank you.

Page 151

1           MR. KELLY:  Your Honor, Nathaniel Kelly for SIPC.

2    I just have one quick point to make.

3           SIPA speaks in terms of the debtor and the

4    debtor's books in calculating the net equity based upon the

5    debtor's books and records recovering transfers of the

6    debtor.  It defines the debtor as a SIPC member -- as the

7    SIPC member put into liquidation.  That's 78lll, subsection

8    (5), I believe.

9           In this case BLMIS both as -- whether -- both as a

10   sole proprietorship and as the LLC is the SIPC member.  The

11   change --

12          THE COURT:  How do I know it's the same member?

13          MR. KELLY:  Well that is -- I think it's under --

14   it's in -- as alleged in the complaint there -- the

15   complaint refers to BLMIS as a sole proprietorship of Madoff

16   and later the LLC, and then says BLMIS was -- meaning both

17   of them -- was registered with the SEC, and by that

18   registration BLMIS is a member of SIPC. So since -- since

19   SIPC's foundation in 1970, BLMIS both has been the same SIPC

20   member.  And so the SIPA allowed the calculation of net

21   equity and everything entails based upon the debtor as a

22   SIPC member.

23          THE COURT:  Thank you.

24          MR. BERNFELD:  Thirty seconds, that's --

25          THE COURT:  Just to respond to that.

Page 152

1                    MR. BERNFELD:  Just to respond to that.

2                    The complaint may say BLMIS, as they broadly

3       define it, was registered with the SEC and by that

4       registration BLMIS is a member of SIPC.  The complaint

5       doesn't say when it happened, it doesn't say that the sole

6       proprietorship is the same thing as the LLC, it doesn't say

7       that there was ever a distinction, it doesn't even say if

8       perhaps that happened post-LLC.

9                    So I would submit if they're going to rest on that

10      then their complaint is not sufficiently pled.

11                   THE COURT:  Thank you.

12                   MR. BERNFELD:  Yeah, the introductory paragraph of

13      the complaint admits this completely, "That Irvin Picard, as

14      trustee for the liquidation of the business of Bernard L.

15      Madoff Investment Securities LLC," and defines that as

16      BLMIS.

17                   So when they say BLMIS was registered with the SEC

18      as a securities broker dealer under Section 15 and so forth,

19      and by that registration BLMIS is a member of SIPC, under

20      the allegations of the complaint they're only talking about

21      LLC.

22                   So, unless you have a question I have nothing

23      further.

24                   THE COURT:  No.  Thank you.

25                   Are there any other issues?  Yes, sir?

Page 153

1           MR. KLEINHENDLER:  Thank you, Your Honor.  My name

2    is Howard Kleinhendler from Wachtel Missry, I represent ten

3    actions that are currently pending before Your Honor, and

4    I've got two issues that overlap, and that is I have moved

5    to dismiss under 12(b)(1) for a lack of standing because the

6    trustee has already marshaled enough assets to satisfy all

7    alleged customer claims.

8           THE COURT:  How do you figure that?

9           MR. KLEINHENDLER:  According to the trustee's

10   reports to this Court, which are in my papers, and according

11   to his websites that he's posted, which are in my papers, he

12   alleges as follows.  He has recovered 9.5 billion in cash

13   that he has at the bank, in addition the Madoff victims fund

14   has reported to have 4.43 billion, that --

15          THE COURT:  What's the relevance of the Madoff

16   victim fund?

17          MR. KLEINHENDLER:  Because the Madoff's victims

18   fund has alleged in their literature, and that's also in the

19   -- that a majority of funds will be going to Madoff

20   investors that have -- that are net losers, that no --

21          THE COURT:  But doesn't that include indirect

22   investors also?

23          MR. KLEINHENDLER:  Well -- well --

24          THE COURT:  So, for instance, people who invested

25   in feeder funds?

Page 154

1           MR. KLEINHENDLER:  But we don't -- we don't know

2      yet where that money is going.

3           THE COURT:  So how can I know if there's enough

4      money if I don't know what the size of those claims are?

5           MR. KLEINHENDLER:  Well, that goes to the next

6      point I want to make, which is --

7           THE COURT:  How much are the amount of claims in

8      this case?

9           MR. KLEINHENDLER:  He has asserted that the amount

10     of claims are total of 11.4 billion.

11          THE COURT:  Okay.  So assuming you're right,

12     you're implicitly arguing and that's an issue that I have to

13     decide, whether you look at the time that the SIPC

14     proceeding was filed or the time when the complaints were

15     filed or today, assuming that I have to look at whether the

16     estate is insolvent today, how do you show, based upon the

17     allegations in the complaint or the other documents that I

18     can consider on a motion to dismiss, that the estate is

19     solvent?

20          MR. KLEINHENDLER:  Okay.  Now --

21          THE COURT:  Since the trustee alleges it's

22     insolvent.

23          MR. KLEINHENDLER:  On --

24          THE COURT:  And from what they've just told me it

25     is insolvent.

Page 155

1                 MR. KLEINHENDLER:  Right.  On a 12(b)(1) you're

2        not limited to what's in the complaint.  This is a 12(b)(1)

3        standard.

4                 THE COURT:  Okay.

5                 MR. KLEINHENDLER:  You are -- you are allowed to

6        look at everything I've put before you, and --

7                 THE COURT:  So how much are the claims of the

8        feeder fund investors that share in this victims fund?

9                 MR. KLEINHENDLER:  Well, I have no idea.

10                THE COURT:  So how can I dismiss a complaint --

11                MR. KLEINHENDLER:  He -- well, one second.

12                THE COURT:  -- when there's a -- listen to me --

13       when there's a billion dollar shortfall and I don't know

14       what the share of the customers -- the share of that victims

15       fund the customers are going to get?

16                MR. KLEINHENDLER:  Right.  So that's the second

17       prong of what I'm asking you to do is to stay, and I have to

18       motion -- it's a twin motion.  If you don't want to dismiss

19       because we don't know how much the Madoff victim fund is

20       going to give to customers of this SIPA estate, and I assume

21       there's no dispute that if a customer in the SIPA estate

22       gets money from the Madoff fund they are not going to be

23       able to maintain their claim here to the extent of the money

24       they receive from the Madoff victims fund.

25                So my point is, because the -- and, Your Honor,

Page 156

1   let me just make another point that I want -- in the

2   trustee's motion to approve the JP Morgan settle, which is

3   half of the money that went to the Madoff victims fund, the

4   trustee said to this Court, that the money is going to be

5   used to pay Madoff net losers.

6              THE COURT:  But that includes indirect investors.

7   There's no question that people who got more than they

8   invested --

9              MR. KLEINHENDLER:  True.  True.

10             THE COURT:  -- they're not going get anything from

11  any fund.

12             MR. KLEINHENDLER:  True.

13             THE COURT:  And the victims fund is only going to

14  pay net losers just as Mr. Picard proposes to do.

15             MR. KLEINHENDLER:  Correct.

16             THE COURT:  But the victims fund will also pay net

17  losers who had no claim as customers in this case.

18             MR. KLEINHENDLER:  But we don't know yet.  As we

19  sit here today -- this is what I'm positing to this Court.

20  If -- assume for the moment that all the net -- the net

21  losers, and there's only a $2 billion shortfall right now

22  between --

23             THE COURT:  Pretty soon you're talking about real

24  money, huh?

25             MR. KLEINHENDLER:  There's $2 billion that

Page 157

1    Mr. Picard says he needs to make all of the claims that he's

2    recognized whole.  There's four and a half billion sitting

3    in the Madoff victims fund.  If the Madoff's victims fund

4    decides that we're going first pay all of the net losers in

5    the SIPA estate then Mr. Picard no longer has a basis to

6    bring these adversary proceedings against the innocent net

7    losers -- the innocent net winners.  And what I'm trying to

8    say to the Court is because --

9              THE COURT:  I understand what you're saying.

10             MR. KLEINHENDLER:  -- at a minimum --

11             THE COURT:  You're saying that I look at

12   insolvency today and I should stay this proceeding to see if

13   there's enough money to pay the customers in this case.

14             MR. KLEINHENDLER:  And here's why.  If you look at

15   the analysis that you go through and to consider whether to

16   stay, what are the plaintiffs -- you know, what's -- is

17   there a hardship to the plaintiff, is there a hardship to

18   the defendant, what's judicial economic?  Let's go through

19   those factors.

20             THE COURT:  Well, there's certainly a hardship to

21   people who are awaiting distributions.

22             MR. KLEINHENDLER:  Why would there be a hard --

23   first of all, Mr. Picard is not making any distributions, he

24   hasn't even distributed the nine billion that he has in the

25   bank, so holding off on the distributions from these

1   innocent investors -- these innocent net winners are not

2   going to slow down the payday --

3          THE COURT:  The net winners are not going get any

4   distributions.

5          MR. KLEINHENDLER:  No, no.  What happens is right

6   now I represent ten net winners.  The trustee is coming

7   after my people.  What I'm saying to this Court is what is

8   the rush to disgorge money from my people if at the end of

9   the day there's plenty of money to pay off all the net

10  losers from what Mr. Picard already has in the bank plus

11  half of what's in the net -- of the Madoff victims fund,

12  which has already been stated that one of the key tenants of

13  the Madoff's victim fund is to make whole net losers.

14         Yes, they will make whole or they will try to

15  reimburse other losers, those people that might have

16  invested indirectly, those people that might have slept on

17  their rights and not have made a timely claim in this

18  proceeding.

19         But my point to Your Honor is, what's the rush?

20  How is it -- how is it judicially efficient to prosecute all

21  of these claims, force innocent net winners to pay money for

22  discovery, to incur further legal fees, having to disgorge

23  assets, sell assets.  Many of these people are elderly

24  people, you've heard some of that from the argument today.

25  Why should we do that in a -- today when the horizon for the

Page 159

1    customer rest is already -- may be whole.

2            And so my point is, let's stay these adversary

3    proceedings, there's no -- there's no prejudice to the

4    plaintiff, there's substantial prejudice to the defendants.

5    As far as judicial economy why inundate this Court with all

6    these adversary proceedings when we can focus on larger

7    issues?

8            And, Your Honor, there's another thing that I need

9    to bring to the Court's attention.  Mr. Picard has said in

10   his paper, what's the problem?  We'll go after these net

11   winners, they'll pay in, they'll get on line in the general

12   estate, and if there's money left over we'll just give it to

13   them in the general estate.  Well, there's a big wrinkle

14   there, and that is SIPC has advanced over $900 million to

15   pay Mr. Picard's firm and all the expenses.  They can't

16   recover that from the SIPA estate, but once it becomes a

17   general estate they get on line to recover 900 million

18   before the ultimate net winners can get their money back as

19   general creditors.  And so why should we now incur further

20   legal fees to pursue these adversary proceedings, which may

21   not be needed at all, and incur far more SIPA cost which

22   will ultimately be sought to be recovered?

23            THE COURT:  I got it.  Let me hear from the

24   trustee.

25            MR. KLEINHENDLER:  Uh-huh.

Page 160

1                THE COURT:  Thank you.

2                MR. CREMONA:  Thank you, Your Honor.

3                We discussed this issue a little while back when

4      we were talking about intervention on the very issue of

5      whether Mr. Picard has standing under 78fff(2)(c)(3) and the

6      appropriate time to value the customer property fund.  As I

7      said then and as we said in our papers the appropriate time

8      is the filing date.

9                THE COURT:  Well, let's assume he's right and the

10     appropriate time is today.

11               MR. CREMONA:  Well --

12               THE COURT:  He's arguing there's probably -- there

13     seems to be enough money to pay all the net losers in full,

14     so why not wait until all of these funds are distributed?

15               MR. CREMONA:  Because that's simply not even close

16     to accurate, Your Honor.

17               THE COURT:  Tell me why.

18               MR. CREMONA:  As of right now today the total

19     number of recoveries is roughly 9.8 billion, the total net

20     equity claims for net losers that filed the claim s 17.6

21     billion.  So we are a long way from that.  And I think we

22     need to put aside the fact that there's -- we keep bringing

23     up the victim fund.

24               As Your Honor noted that is a separate fund

25     administered by a separate fiduciary and will deal with

Page 161

1    separate claimants that are not customers within this

2    proceeding, and that's the point as Your Honor said --

3              THE COURT:  But it'll also deal with customers

4    won't it?  In other words, any victim has a right -- is

5    eligible to participate in that fund.

6              MR. CREMONA:  I guess that remains to be

7    determined, but as Your Honor pointed out it is two

8    different bodies -- two entirely different proceeding as we

9    -- as we talked about when we talked to Mr. Ellis here.  I

10   mean his claim is as against the victim fund not here, and

11   Your Honor noted the distinction between the proceedings.

12             So I don't think that at all comes into the

13   equation, and the numbers I just gave you, which by the way

14   I'd like to reserve my right, I do think the appropriate

15   time to value the customer property is on the filing date --

16             THE COURT:  Okay.

17             MR. CREMONA:  -- on the filing date we had

18   $960 million in assets on hand, and, you know, billions in

19   claims.

20             So, I think it's clear, even if what they said was

21   true and the date moves, which it shouldn't, I would also --

22   as I said then, I will say it again now, we had some

23   guidance on this issue from Judge Rakoff in the Flynn

24   decision.  Judge Rakoff looked at it, did not withdraw the

25   reference, candidly it was in a different context, we were

Page 162

1    looking at withdrawal, but in that context cited that once

2    it is so well settled that the valuation of the customer

3    property fund is on the filing date that I don't need to

4    withdraw the reference because it's clear application of the

5    SIPA statute, and I would submit that the result should be

6    no different here, Your Honor.

7              THE COURT:  Thank you.

8              MR. CREMONA:  Thank you.

9              MR. KLEINHENDLER:  Your Honor, if I could respond

10   to --

11             THE COURT:  Briefly to what he -- what he said.

12             MR. KLEINHENDLER:  Exhibit C to my papers, Your

13   Honor, are blow ups of -- or portions of the Madoff website,

14   which Mr. -- which Mr. Picard runs, and it says here

15   clearly, "Total value of allowed claims $11.4 billion."

16   There is deemed determined pending litigation 155 claims,

17   but there is no value asserted to that at all.  Mr. Picard

18   has taken the position that none of these claims are valid.

19             And I cite to you, Your Honor, in my briefs the

20   law that guides your decision here.

21             And by the way, everything that Mr. Cremona said

22   is not in his papers, it's not in the submission before you,

23   so if they want to put in a supplemental papers to talk

24   about this $17 billion number that doesn't appear anywhere

25   we could deal with it.

1           But the motion before you has what I put before

2     you and what they put before you, and those numbers are not

3     before you.

4           But I want to just get to the legal issue, the

5     legal --

6           THE COURT:  You can just reply to what he said,

7     you don't have to repeat an argument you made in your

8     original presentation.  That's not the purpose of a

9     rebuttal.

10          MR. KLEINHENDLER:  He also said that -- that the

11    law that guides you is based on the Flynn decision that

12    Judge Rakoff decided.  Judge Rakoff did not make a decision.

13          THE COURT:  But he decided not to withdraw the

14    reference because the law was well settled.  Why isn't that

15    a decision?

16          MR. KLEINHENDLER:  He did not say the laws were

17    settled, he referred to a New Jersey case.

18          THE COURT:  Bevel.

19          MR. KLEINHENDLER:  But I'm referring to second

20    circuit precedent, that's why I want to just bring your

21    attention to on page 3 of my reply, and that is very clearly

22    that standing must be present during the entire time of a

23    litigation.  Even if there was standing at the beginning of

24    a litigation, if it's lost during the litigation court loses

25    Article 3 standing.

1           The facts that were attendant when Judge Rakoff

2    decided Flynn in 2011 are not the facts we have today that

3    I've presented.  There was no $9.5 billion --

4           THE COURT:  But Judge Rakoff decided that he

5    determines -- well, he decided I thought that you determine

6    standing as of the date -- of the filing date of the SIPC

7    proceeding.

8           MR. KLEINHENDLER:  He said he withdrew -- he said

9    I'm denying the motion because there is some authority that

10   says you can -- a trustee can -- you can look at what the

11   trustee believes to be the liability to the estate at the

12   date of filing.

13          What I'm saying is the second circuit, and there's

14   a long -- that might have been true at the time of filing,

15   but if today there is no more -- there is no more injury

16   because there's enough money in the bank you don't go back

17   to what they said at the beginning of the filing, you

18   sometimes bring a case, but during the course of the case

19   you can lose standing, and that's what the second circuit

20   has said in Altman versus Bedford Central School, 245 F.3d

21   49, Second Circuit '01.

22          The other legal point that I want to stress is --

23   I'm going read to you from another second circuit case, and

24   this is Martin versus SEC, 734 F.3d 169 at 173, Second

25   Circuit 2013.

Page 165

1           In order to have standing he has to make "concrete

2      and particularized and actual or imminent, not conjectural

3      hypothetical damages."

4           The only excess funds that the trustee has claimed

5      might be required beyond what's already in his bank account

6      and the Madoff victims fund is what potentially could become

7      liable from these 155 pending cases, but the trustee has

8      taken the position in this court that those claims are not

9      valid.  He has told this Court that there is no liability to

10     those claims.

11          So again, I -- I am approaching the Court's

12     sensibility and the Court's discretion under 105 of the

13     bankruptcy code, this is the thrust of it.  Do we want to

14     put my ten cases, which include elderly people, through the

15     rivers and expense of discovery and a trial and a judgment

16     and all that when we could just sit back and see how this

17     Madoff's victim fund is distributed, it's already -- all the

18     claims have been in since April, the money is there, let's

19     see if there are any net losers at the end of that

20     distribution, let's see if there really are a substantial

21     amount of additional claims left, and then we can pursue the

22     remaining adversary proceedings.

23          It would also, Your Honor, materially inform any

24     settlement, right?  If we know -- and even from the

25     trustee's perspective -- if he knows that at the end of the

Page 166

1    day there's a very small amount of money that he needs to

2    close out the estate that may affect how he's going to

3    settle cases.  Right now he's not before very generous in

4    settling, but if he doesn't need all that money he may be

5    able to settle better.  That goes to the judicial efficiency

6    argument.

7            It is just more efficient to preside over this

8    case in this manner when all that cash is sitting there

9    rather than incur further fees by the trustee and have this

10   lorass (sic) of 750 adversary proceedings chugging along

11   when at the end of the day it might not be necessary.

12           THE COURT:  Thank you.

13           MR. CREMONA:  Can I just clarify something?  Just

14   to clarify what was said in Flynn.  I'll just read to you

15   what the Court said.

16           "First Greiff argues that the trustee cannot bring

17   avoidance actions under SIPA because that statute permits

18   him to do so only whenever customer property is not

19   sufficient to pay the claims in full.  The grief claims that

20   as a factual matter the trustee has already recovered enough

21   customer property to pay all the claims he has recognized

22   and thus cannot avail himself over the avoidance powers,

23   which SIPA bestows contingently.

24           But it has been long held that the fund of

25   customer property shall be valued for purposes of 15 U.S.C.

Page 167

1     Section 78fff(2)(c)3 as of the filing date," Bevel Bresler

2     (ph).

3          I would just like to quickly address the harm and

4     the prejudice to the trustee if these cases were stayed.

5          As I mentioned, Your Honor, earlier we're six

6     years into these proceedings, net loser victims would

7     certainly take the position that staying these proceedings

8     and preventing them from receiving distributions would be

9     tremendously harmful.

10         Putting that aside I think six years have gone by,

11    records are expiring, discovery is not moving forward, the

12    trustee's claim will be prejudiced if this case is stayed

13    any further.

14         As I started I will finish, we are six years in,

15    we are four years into these adversary proceedings and in

16    many cases in the nation stages, I implore Your Honor to let

17    these cases move forward and prevent any further prejudice

18    to the trustee, and more importantly, to the net loser

19    victims.

20         Thank you, Your Honor.

21         THE COURT:  Thank you.  Are there any other

22    issues?

23         MR. LEVY:  Your Honor, I have just one

24    housekeeping issue.

25         A number of the motions that were made had what I

1     think Your Honor has called one off kinds of issues, some

2     that may be common to a number of issues, some that may be

3     common to individuals, and I'm not sure how Your Honor

4     intended to proceed on that.

5               THE COURT:  Well, are you talking about the

6     objections to personal jurisdiction and --

7               MR. LEVY:  I was just looking at a brief I had.  I

8     had an argument for one client that there was an improper

9     aggregation of an old -- of a pre-2004 customer with a post-

10    2004 customer.  Issues of that nature.

11              THE COURT:  Is that the inter account transfer

12    type of case?

13              MR. LEVY:  It's really what I called aggregation

14    of what I believe to be two separate customers under the

15    rubric of one customer in calculating the alleged avoidance

16    liability.  That's just an example of an issue of that

17    nature.

18              THE COURT:  But there has been an argument that

19    the complaint -- or the complaints improperly aggregate

20    defendants, that argument was made.  Isn't that what you're

21    arguing now?

22              MR. LEVY:  No, Your Honor, I'm not sure I'm

23    arguing aggregation of defendants in that sense.

24              In this particular complaint the complaint is

25    Picard versus X.  The account on which X's liability is

Page 169

1    predicated had company Y as the customer of record from

2    let's say 1995 to 2004.  Then there's a change.  New

3    customer of record, new client number.

4              THE COURT:  Is this Martin that --

5              MR. LEVY:  Yes, Your Honor, it is.

6              THE COURT:  Oh, okay.

7              MR. LEVY:  Exactly.  Exactly.  It's not really an

8    -- it's not really a lumping of different customers

9    together, it's an aggregation of what we believe to be two

10   separate customers under the SIPA --

11             THE COURT:  Well, I thought that the complaint

12   alleged that it was the same customer and there was a name

13   change, that's my recollection looking at that.

14             MR. LEVY:  I don't remember whether it said that,

15   Your Honor, but --

16             THE COURT:  Do you remember --

17             MR. LEVY:  -- the account statements show

18   differences.

19             THE COURT:  It shows the Martin Family Trust --

20             MR. LEVY:  Martin Family Trust, Martin Family

21   Limited Partnership.

22             THE COURT:  I thought it said it was a name

23   change.  I don't --

24             MR. CREMONA:  That sounds accurate, Your Honor, I

25   don't remember specifically, but my understanding was that

1    those types of issues were covered by these proceedings.

2          We had identified -- just to respond to Mr. Levy

3    and for everyone's awareness about eight issues that we felt

4    -- eight cases that we felt had what we refer to as

5    aberrational issues that weren't otherwise covered here

6    pursuant to Your Honor's scheduling order such as personal

7    jurisdiction, non-claim, and the like, and we have

8    separately reached out to counsel.  Some have said they

9    didn't want to participate and don't want a hearing, others

10   on the non-claim statute we are trying to coordinate

11   hearings.  I did not view this issue as one that required a

12   separate hearing.

13         THE COURT:  Well, why don't we do this.  If

14   there's anybody who thinks -- and I'll hear you -- anybody

15   who thinks that they have an issue to argue that's not

16   separated out of today's proceedings I'll hear them now.

17         MR. LEVY:  May I have a moment, Your Honor?

18         THE COURT:  Sure.  I remember the issue to which

19   you were just referring.

20         MR. LEVY:  It's adversary number 10-4348.  I just

21   want to look for a minute, Your Honor, to determine whether

22   I can rest on the papers or whether I want to make an

23   argument.

24         THE COURT:  Okay.

25       (Pause)

1            MR. LEVY:  The only point that I think I would

2    make, Your Honor, is that change of name, it's a change from

3    a trust to a limited partnership.  There's a difference in

4    the nature of the entity, and the SIPC doesn't provide for

5    if difference.

6            THE COURT:  How is it different than an inter

7    account transfer type case where one -- one customer

8    transfers -- the transferor is one customer and the balance

9    in the account or some amount in the account is transferred

10   to the transferee?

11           MR. LEVY:  In this instance, Your Honor --

12           THE COURT:  And what's the -- I'm sorry, what's

13   the number on the --

14           MR. LEVY:  4348.

15           THE COURT:  Go ahead.

16           MR. LEVY:  In this instance, Your Honor, if I

17   recall correctly, the trustee suggests that at 2004 client

18   was already negative to the tune of something like

19   $37 million negative.  There's no -- there's nothing that

20   travels on an inter account transfer to the new customer,

21   it's zero.  So you start effectively from zero for new

22   customer.

23           The liability changes dramatically, it reduces

24   from the overall number that the trustee alleges to be

25   something on the order of $52 million -- $40 million for two

Page 172

1    years or $52 million for six years to a considerably lesser

2    number.

3            If in fact they're two different SIPA customers

4    under the SIPC rules the liability is dramatically

5    different.

6            THE COURT:  So you're saying if the transfer

7    account was negative then the account starts at zero rather

8    than at a positive number.

9            MR. LEVY:  Exactly right.  Because under the --

10   the way the trustee has always done the calculation if there

11   was no equity there was nothing to be transferred.  We're

12   talking about two different customers.

13           THE COURT:  Mr. Cremona?

14           MR. CREMONA:  Your Honor, I view it more as a

15   inter account transfer type issue as you first eluded to.

16           THE COURT:  Well, but maybe with respect to those

17   kind of issues if the account was zero at the time of the

18   purported transfer how can it be anything less than zero?

19           MR. CREMONA:  I'm trying --

20           THE COURT:  You know, I recollect that I looked at

21   complaints or charts to complaints that after you -- in

22   these inter account transfer cases you might start with a

23   negative number because there was no net equity, and

24   Mr. Levy is saying that number should be zero, it shouldn't

25   be zero.  At most it should be zero, right?

1          MR. LEVY:  Your Honor, you can look at the -- you

2    can look at the chart at the back of the complaint, take,

3    for example, a transfer in the predecessor customer's

4    account, January 31, 1997, transfer from account number

5    12345, no value ascribed to it.

6          THE COURT:  Well, if it was zero there's no value

7    ascribed to it.  I thought you were saying --

8          MR. LEVY:  But that's exactly the point I'm

9    saying, it's as if --

10         THE COURT:  -- that there's a negative number

11   ascribed to it.

12         MR. LEVY:  But the transfer isn't of the negative,

13   the transfer is zero because there's no equity that can be

14   transferred.

15         THE COURT:  But here it's not changing the balance

16   in the account, it's treated as a zero.

17         I thought you were saying that if there was a

18   negative number in the transfer -- transferor's account that

19   negative number was then transferred, for lack of a better

20   phrase --

21         MR. LEVY:  No, I'm not suggesting that at all,

22   Your Honor.

23         THE COURT:  Oh, okay.  All right.  So what are you

24   arguing?

25         MR. LEVY:  I'm suggesting, Your Honor, that you

Page 174

1      had customer A as a separate customer for a SIPC rules --

2              THE COURT:  Right.

3              MR. LEVY:  -- which was the Martin Trust who had

4      ins and outs during the pre-2004 period, which resulted in

5      under the trustee's calculation a net $37 million figure.

6      Then you have a new customer, Martin Family Limited

7      Partnership who's now in the account.  If it's an inter

8      account transfer you can't transfer negative

9      $37 million and the trustee never does that, he transfers

10     zero because he says there's no net equity in the

11     predecessor transferor's account.

12             THE COURT:  But under the trustee's calculations

13     what's wrong with that?  That's better than transferring

14     negative 37 million.

15             MR. LEVY:  I start at zero as opposed to negative

16     37 million.

17             THE COURT:  Well, that's what I'm asking.  Are you

18     starting at zero --

19             MR. LEVY:  Yes.

20             THE COURT:  -- a negative 37 million --

21             MR. LEVY:  Yes, I'm a separate customer.

22             THE COURT:  Pardon?

23             MR. LEVY:  My -- the successor -- the second

24     customer of record on the account it should be starting with

25     zero because it's a separate customer.  He gets no benefit,

1    he gets nothing from a negative transfer.

2              THE COURT:  Okay.  That's what I'm trying to

3    understand from your argument.  Are you saying that under

4    the trustee's method you're starting -- the second customer,

5    the transferor is starting with a negative number?

6              MR. LEVY:  I think the trustee is calculating in

7    that way and I'm suggesting that's wrong.

8              THE COURT:  I'm just asking you is the transferor

9    starting with a negative number based upon the insolvency or

10   the insufficiency in the transferor account?

11             MR. LEVY:  The transferor had a negative number --

12             THE COURT:  Right.

13             MR. LEVY:  -- which the trustee -- which the

14   trustee assigns to the --

15             THE COURT:  That same negative number or zero?

16             MR. LEVY:  Yes, same negative number.

17             MR. CREMONA:  That is a net investment method in

18   an inter account transfer situation, Your Honor.  I mean

19   that -- that is us tracking the negative net equity in one

20   account, and this is the specific issue that was

21   addressed --

22             THE COURT:  How can it get less than nothing?  I

23   understand with the same account, but how can you get less

24   than nothing from your transferor?

25             MR. CREMONA:  But if an account has a negative net

Page 176

1    equity and then it's transferred or there's a name change

2    that negative net equity follows the account.  I mean that

3    is exactly what -- that's exactly what --

4            THE COURT:  But if I had a negative net equity of

5    $1 million and I transfer my account to you, are you saying

6    that you then get a negative net equity of $1 million or

7    it's just zero?  Because my transfer has no value to it.

8            MR. CREMONA:  I -- that is a different factual

9    scenario I think than what happened here.  I think this was

10   a family limited partnership where you had a transfer --

11           THE COURT:  Well, let me get back to the inter

12   account transfers, and I'd have to look at the pleadings

13   again, but are you -- when the trustee computed the starting

14   number for the transferee account that an inter account

15   transfer, are those ever negative?

16           MR. CREMONA:  I'm sorry, Your Honor, can you say

17   that again?

18           THE COURT:  When the trustee computed the starting

19   value of the transferee account following an inter account

20   transfer, or the value of the transfer for that matter if

21   it's an existing account, and the transferor had no equity

22   in his account, had a negative number, was that negative

23   number assigned to the transferee account or was the number

24   zero assigned as to the value of the transfer?

25           MR. CREMONA:  I think under that scenario it would

Page 177

1    be zero.  That's not the scenario here though, this is the

2    same account number, it's just a name change on the account.

3              THE COURT:  Okay.  Well, that's what I thought

4    about --

5              MR. LEVY:  It's two --

6              THE COURT:  -- but I was asking a different

7    question.

8              MR. LEVY:  It's two different customers.  It's a

9    trust and it's a family limited partnership.

10             THE COURT:  But it's the same account, and

11   apparently it's just the transferring the account.

12             MR. LEVY:  But if we're treating it as an inter

13   account transfer between one customer and another, Your

14   Honor, then we're not being -- we're not being consistent,

15   and if it was --

16             THE COURT:  I don't see how you suddenly create

17   value by changing the name on an account.  It's one thing if

18   they treated it as zero, but this is the same account, it's

19   not a different account.

20             MR. LEVY:  These are two different customers under

21   the SIPC Part 300 rules, that's the point.

22             THE COURT:  They seem to have the same account.

23             MR. CREMONA:  Your Honor, I would submit that that

24   is precisely what was prescribed by the antecedent debt

25   decision on inter account transfer.  The transfer -- the

Page 178

1    name change cannot transform fictitious profits into

2    principal when it's the same account.

3              THE COURT:  Right.  There's a difference between -

4    - there's a difference between a name change of the same

5    account and a transfer from customer A to customer B.

6              MR. CREMONA:  I agree with that, Your Honor, but

7    that's not what happened here.

8              MR. LEVY:  But, Your Honor, what they're trying to

9    do is attribute the transfers to a predecessor customer to

10   the successor customer.

11             THE COURT:  It's the same account though.

12             MR. LEVY:  It's two different entities.

13             THE COURT:  That's like saying -- that's like

14   saying you can cure all of the deficiencies in a negative

15   account by just changing the name.  That is the same

16   account, but a different customer.

17             MR. LEVY:  All I can say, Your Honor, is under the

18   SIPC rules it's two different customers, and you can't

19   aggregate two different customers.

20             THE COURT:  Well, I understand for the purposes of

21   the $500,000 or whatever it's two different customers.

22             MR. LEVY:  It's how customers are treated, and

23   that's how net equity is being treated here, and that's how

24   customer status is determined under the statute, and if

25   you're going to suggest that we have -- our customer -- our

Page 179

1    property is to be recovered as customer property then there

2    has to be consistency in the application of the definitions

3    here.

4                MR. CREMONA:  Your Honor, I think one of the --

5    and I'll let my colleague from SIPC speak to it -- but the

6    idea is if the account is held in the same capacity that is

7    determinative.  This is the same account.

8                MR. LEVY:  It's not the --

9                THE COURT:  All right.

10               MR. CREMONA:  The capacity doesn't change.

11               THE COURT:  I understand.  I'll have to look at

12   the pleading.  If it pleads it's the same account then it

13   pleads it's the same account and maybe you'll be able to

14   show that it's a different account and the numbers should

15   have been computed differently.

16               All right?  Anybody else have an issue that they

17   believe is -- should be presented today?

18               Hearing none I reserve decision and we're

19   adjourned.

20               Thank you very much.

21   (Proceedings concluded at 5:36 PM)

22                              * * * * *

23

24

25

Page 180

1

CERTIFICATION

2

3          I, Sheila G. Orms and Dawn South, certify that the

4     foregoing is a correct transcript from the official

5     electronic sound recording of the proceedings in the above-

6     entitled matter.

7

8      Date:   September 19, 2014

9      Shari Riemer     Digitally signed by Shari Riemer
                        DN: cn=Shari Riemer, o=Veritext, ou,
10                      email=digital@veritext.com, c=US
                        Date: 2014.09.19 15:24:32 -04'00'

11     Signature of Approved Transcriber

12

13

14     Dawn          Digitally signed by Dawn South
                     DN: cn=Dawn South, o=Veritext,
15     South         ou, email=digital@veritext.com,
                     c=US
16     _____ Date: 2014.09.19 15:24:55 -04'00'

17     Dawn South

18     AAERT Certified Electronic Transcriber CET**D-408

19

20      Veritext

21      330 Old Country Road

22      St. 300

23      Mineola, NY 11501

24

25