UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : |
| Plaintiff, | : |
| | : |
| – against – | : |
| | : |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : |
| Defendant. | : |

Adv. Pro. No. 08-01789 (SMB)
SIPA LIQUIDATION
(Substantively Consolidated)

------------------------------------------------------------X

In re:                                                      :
                                                            :
    BERNARD L. MADOFF,                                      :
                                                            :
                                 Debtor.                    :

------------------------------------------------------------X

**MEMORANDUM DECISION AFFIRMING APPLICATION
OF THE TRUSTEE'S INTER-ACCOUNT METHOD TO THE
DETERMINATION OF TRANSFERS BETWEEN BLMIS ACCOUNTS**

**A P P E A R A N C E S :**

(See Appendix A)

**STUART M. BERNSTEIN
United States Bankruptcy Judge:**

The motion before the Court (the "*Motion*") concerns the appropriate methodology for

computing the "net equity" in a customer account maintained at Bernard L. Madoff Investment

Securities LLC ("BLMIS") where the balance in the account depends, to some extent, on

amounts previously "transferred" into that account from another BLMIS account.[1]  Applying the

Net Investment Method approved by the Second Circuit Court of Appeals, *see In re BLMIS*, 654

---

[1]      The terms "transfer," "transferor" and "transferee" in this decision are used for convenience and are not intended to imply that a transfer took place between the transferor and transferee within the meaning of 11 U.S.C. § 101(54).

F.3d 229 (2d Cir. 2011) ("*Net Equity Decision*"), *cert. denied*, 133 S.Ct. 24 (2012), Irving H.

Picard, as trustee ("Trustee") for the substantively consolidated liquidation of BLMIS under the

Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), and Bernard L. Madoff,

went back to the transferor account, disregarded the fictitious profits (including values ascribed

to imaginary securities positions), recomputed the balance at the time of the transfer based on

actual cash deposits and withdrawals, and credited the transfer up to the amount of the

recomputed balance (the "Inter-Account Method").  The Trustee's *Motion* seeks an order

affirming his methodology, and the Securities Investor Protection Corporation ("SIPC") supports

the *Motion*.

Numerous BLMIS account holders that were parties to inter-account transfers oppose the

methodology for a variety of reasons detailed below.  These objecting customers may themselves

be victims of Madoff's fraud and hold substantial net equity claims without regard to the inter-

account transfers at issue.  Nevertheless, increasing their net equity claims by giving them credit

for the fictitious profits "transferred" into their accounts contravenes the *Net Equity Decision*.

Accordingly, the *Motion* is granted.

## BACKGROUND

The facts surrounding Madoff's Ponzi scheme have been the subject of numerous

decisions in this Court, the District Court and the Second Circuit Court of Appeals.  *See, e.g.*,

*Picard v. JPMorgan Chase & Co. (In re BLMIS)*, 721 F.3d 54, 58-59 (2d Cir. 2013); *Net Equity*

*Decision*, 654 F.3d at 231-33; *Picard v. Greiff (In re BLMIS)*, 476 B.R. 715, 718 (S.D.N.Y.

2012); *SIPC v. BLMIS (In re BLMIS)*, 424 B.R. 122, 125-32 (Bankr. S.D.N.Y. 2010).  I assume

2

familiarity with those decisions and limit the discussion, principally derived from the *Net Equity Decision*, to the facts required for the disposition of the *Motion*.

Madoff induced investors to open discretionary trading accounts with BLMIS and entrust their funds to him. He claimed to invest the funds pursuant to his "split-strike conversion strategy" which supposedly produced consistently high rates of return. The "strategy" involved buying a basket of stocks listed on the Standard and Poor's 100 Index and hedging through the use of options.

Madoff never invested any of the funds, and instead, used funds taken from later investors to pay earlier investors. To keep the scheme going, he generated fictitious paper account statements and trading records that purported to list securities transactions that never actually took place. The fictional customer statements were based on after-the-fact stock "trades" using already-published trading data to pick advantageous historical prices. The final monthly statements sent in November 2008 just before Madoff was arrested falsely recorded an aggregate of $64.8 billion in mostly non-existent securities and cash holdings. In fact, the only accurate entries in the BLMIS records reflected the actual cash deposits and withdrawals in each account.

The conflict between the last monthly statements and the actual value of the customers' accounts computed on a cash in/cash out basis was resolved by the *Net Equity Decision*. The dispute in the *Net Equity Decision*, discussed more fully below, centered on the correct method for calculating a BLMIS customer's "net equity" under SIPA § 78*lll*(11). The Trustee calculated each customer's net equity solely with reference to the customer's cash deposits and withdrawals ignoring the fictitious profits depicted in the statements (the Net Investment Method). The

3

customers argued that their net equity should be calculated based on the net equity portrayed, albeit fictitiously, in their last statements (the Last Statement Method). In the *Net Equity Decision*, the Second Circuit agreed with the Trustee that the Net Investment Method was the appropriate method to determine a customer's net equity in the BLMIS SIPA liquidation. *Net Equity Decision*, 654 F.3d at 238-239.

The *Net Equity Decision* did not directly address the treatment of inter-account transfers. During his review of BLMIS customer claims, however, the Trustee found numerous instances involving a transfer from one BLMIS customer account to another BLMIS customer account. The customer claim asserted by the transferee required the Trustee to determine the amount or value of the transfer in order to fix the amount of the net equity in the transferee account. Using the Inter-Account Method, the Trustee first recomputed the amount in the transferor account at the time of the transfer under the Net Investment Method. He then credited the transferee account in an amount up to the recomputed balance in the transferor account.

The following three examples illustrate how the Inter-Account Method worked:

1.    Assume customer A's statement indicated a balance of $5 million, but the customer's actual net investment was only $2 million (the remaining $3 million consisting of fictitious profits). If customer A attempted to transfer the entire $5 million to customer B, customer B received credit for only $2 million – the net investment in customer A's account – leaving customer A's account with a $0 balance.

2.    Assume, instead, that the same customer A transferred $1 million to customer B. Since customer A had an account balance of $2 million computed under the Net Investment Method – enough to cover the entire transfer – customer B received credit for the full $1 million, and customer A still had an account with a $1 million balance.

3.    Lastly, assume that customer A's account statement indicated a balance of $5 million, but consisted entirely of fictitious profits. Customer B would not receive any benefit from an attempted transfer because customer A had

4

$0 balance in his account under the Net Investment Method at the time of the transfer.

The Trustee's decision to disallow some or all of a customer's claim based on the Inter-Account Method elicited objections from over 400 customer claimants. (*See Declaration of Bik Cheema in Support of the Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated Mar. 31, 2014 ("*Cheema Declaration*"), at ¶¶ 5-7 (ECF Doc. # 6086)[2].)[3]  The Trustee moved to streamline the resolution of these objections by scheduling a hearing to affirm his application of the Inter-Account Method to the inter-account transfers. (*See Motion for Order Scheduling Hearing on Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated Feb. 27, 2014 (ECF Doc. # 5728).)  The Court subsequently entered an order setting a briefing schedule which specified that the "sole purpose" of the motion "shall be to resolve the legal issue raised by objections to the methodology used to calculate the amount transferred between BLMIS accounts in connection with customer claims." (*See Scheduling Order*, dated Mar. 27, 2014 ("*Scheduling Order*"), at 2 (ECF Doc. # 6049).)

The Trustee subsequently filed the *Motion*. (*Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated

---

[2]    "ECF Doc. # __" refers to documents filed in the BLMIS SIPA liquidation proceeding, captioned *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (SMB).

[3]    Exhibit 1 to the *Cheema Declaration* lists the objecting claimants who argue that the Trustee improperly adjusted the amount of the inter-account transfer to reflect the amount in the transferor's account at the time of the transfer. (*Cheema Declaration* at ¶¶ 5-6.)  Exhibit 2 to the *Cheema Declaration* lists the objecting claimants whose inter-account transfers were not adjusted. (*Id.* at ¶ 7.)

Mar. 31, 2014 (ECF Doc. #6084).)[4]  The Trustee relies on the Second Circuit's *Net Equity Decision* and a decision by the District Court in *SIPC v. BLMIS (In re BLMIS)*, 499 B.R. 416 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*"), *certification for interlocutory appeal denied*, 987 F. Supp. 2d 309 (S.D.N.Y. 2013), described below.  According to the Trustee, using the Inter-Account Method to calculate the amount of the inter-account transfers is the only method consistent with the *Net Equity Decision* and *Antecedent Debt Decision*.  (*Trustee Memo* at 17-20.)  The Trustee further argues that netting cash deposits against cash withdrawn prior to the two-year statutory reach-back period governing the avoidance of fraudulent transfers is consistent with the *Antecedent Debt Decision*.  (*Id.* at 20-22.)  Finally, the customer bears the burden of proving his "customer" status under SIPA.  (*Id.* at 22-23.)  SIPC filed a *Memorandum of Law of the Securities Investor Protection Corporation in Support of the Trustee's Determinations Regarding Inter-Account Transfers*, dated Mar. 31, 2014 ("*SIPC Memo*") (ECF Doc. # 6079), in which it adopted many of the Trustee's arguments, and added that the use of the Inter-Account Method furthers SIPA's objective of deterring securities law violations.  (*SIPC Memo* at 11-12.)

Many former customers filed objections to the *Motion* (collectively, the "Objecting Claimants")[5] raising numerous arguments that are discussed in the body of this opinion under

---

[4]        *See also Memorandum of Law in Support of Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated Mar. 31, 2014 ("*Trustee Memo*") (ECF Doc. # 6085).

[5]        The objections of the Objecting Claimants are as follows: (1) *Samdia Family, LP's Memorandum of Law in Opposition to the Trustee's Inter-Account Transfer Motion*, dated May 13, 2014 ("*Samdia Objection*") (ECF Doc. # 6640); (2) *Memorandum of Law in Opposition to Inter-Account Transfer Motion*, dated May 15, 2014 ("*Most Objection*") (ECF Doc. # 6670); (3) *Objection of Edward A. Zraick, Jr., Nancy Zraick, Patricia Deluca, and Karen Rich to Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts (Claim Nos. 002107 and 002108)*, dated May 16, 2014 ("*Zraick Objection*") (ECF Doc. #

6

separate headings.  The Trustee and SIPC thereafter filed replies in further support of the *Motion*.

(*See Reply Memorandum of Law in Support of Trustee's Motion Affirming Application of Net Investment to Determination of Customer Transfers Between BLMIS Accounts*, dated June 6, 2014 ("*Trustee Reply*") (ECF Doc. # 6926) *and Reply Memorandum of Law of the Securities Investor Protection Corporation in Support of the Trustee's Determinations Regarding Inter-Account Transfers*, dated June 6, 2014 ("*SIPC Reply*") (ECF Doc. # 6927).)

---

6687); (4) *Joinder of Interested Party, the Mittlemann Family Foundation, in Samdia Family, LP's Memorandum of Law in Opposition to the Trustee's Inter-Account Transfer Motion and All Other Objections to the Trustee's Inter-Account Transfer Motion*, dated May 16, 2014 ("*Mittlemann Objection*") (ECF Doc. # 6706); (5) *Objection and Joinder of Brian Ross to Arguments Presented in connection with the Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated May 16, 2014 ("*Ross Objection*") (ECF Doc. # 6702); (6) *Objection of Lawrence Elins to Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between Accounts*, dated May 16, 2014 ("*Elins Objection*") (ECF Doc. # 6707); (7) *Customers' Memorandum of Law in Opposition to the Trustee's Method for Valuing Inter-Account Transfers*, dated May 16, 2014 ("*B&P Objection*") (ECF Doc. # 6708); (8) *Marion Apple's Memorandum of Law in Opposition to the Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated May 16, 2014 ("*Apple Objection*") (ECF Doc. # 6713); (9) *Declaration of Jeffrey L. Bernfeld*, dated May 16, 2014 ("*Bernfeld Objection*") (ECF Doc. # 6714); (10) *The Kostin Company's Opposition to the "Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts,"* dated May 16, 2014 ("*Kostin Objection*") (ECF Doc. # 6727); (11) *Westport National Bank's Joinder in Claimants' Omnibus Opposition to the Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated May 16, 2014 ("*Westport Objection*") (ECF Doc. # 6731); (12) *Claimants' Omnibus Opposition to the Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated May 16, 2014 ("*Milberg Objection*") (ECF Doc. # 6732); (13) *Customers' Joinder in Claimants' Omnibus Opposition to the Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated May 16, 2014 ("*Lax Objection*") (ECF Doc. # 6732); (14) *The Diana Melton Trust, Dated 12/05/05 Opposition to the Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts*, dated May 21, 2014 ("*Melton Objection*") (ECF Doc. # 6792); and (15) *Elliot G. Sagor Memorandum of Law in Opposition to the Trustee's One Size Fits All Method for Valuing Inter-Account Transfers Which Inequitably and Harshly Does Not Always Credit a Customer's Principal Investment or Cash in*, dated June 2, 2014 ("*Sagor Objection*") (ECF Doc. # 6900).

**DISCUSSION**

**A.    The Net Equity Decision**

SIPA defines "net equity" as:

the dollar amount of the account or accounts of a customer, to be determined by –

(A)    calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus

(B)    any indebtedness of such customer to the debtor on the filing date. . . .

SIPA § 78*lll*(11).  In the *Net Equity Decision*, the Court observed that SIPA imposes on the Trustee the duty to reimburse net equity claims "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee."  *Net Equity Decision*, 654 F.3d at 237 (quoting 15 U.S.C. § 78fff–2(b)(2).)  To perform this duty, he must be satisfied that the method he selects will enable him to deduce the amounts he must pay to the claimants, *id.* at 238, and the method he chooses is entitled to deference if it is not "clearly inferior" to other possible methods under consideration.  *Id.* at 238 n. 7.  In the case of BLMIS, the Trustee properly selected the Net Investment Method to calculate net equity because it effectuates the principal purposes of SIPA to protect investors against financial losses arising from their broker's insolvency and protect the securities markets as a whole.  *Id.* at 235, 239; *accord Stafford v. Giddens (In re New Times Sec. Servs., Inc.),* 463 F.3d 125, 127 (2d Cir.2006); *see Sec. Inv. Prot. Corp. v. Barbour*, 421 U.S. 412, 415 (1975).

The alternative, the Last Statement Method, would perpetuate Madoff's fraud, *id.* at 235, and diminish the amount of customer property available to other investors who had not recouped even their initial investments.  *Id.* at 240.  The last statements were "after-the-fact constructs that were based on stock movements that had already taken place, were rigged to reflect a steady and

8

upward trajectory in good times and bad, and were arbitrarily and unequally distributed among

customers." *Id.* at 238.[6] Permitting customers to collect based on their last statement would

limit the customer fund and lead to the inequitable result "that those who had already withdrawn

cash deriving from imaginary profits in excess of their initial investment would derive additional

benefit at the expense of those customers who had not withdrawn funds before the fraud was

exposed." *Id.*

> The statutory definition of "net equity" does not require the Trustee to
> aggravate the injuries caused by Madoff's fraud. Use of the Last Statement
> Method in this case would have the absurd effect of treating fictitious and
> arbitrarily assigned paper profits as real and would give legal effect to Madoff's
> machinations.

*Id.* at 235.

## B.    The Antecedent Debt Decision

The *Net Equity Decision* did not expressly address the treatment of inter-account

transfers, but the *Antecedent Debt Decision* did. There, the Trustee commenced adversary

proceedings against numerous defendants to avoid and recover fraudulent transfers under

Bankruptcy Code § 548(a)(1)(A).[7] Following the withdrawal of the reference, the defendants

moved to dismiss the complaints arguing that they had received the transfers in good faith and

provided value within the meaning of 11 U.S.C. § 548(c).

---

[6]    The Court recognized that the that "a customer's last account statement will likely be the most appropriate
means of calculating 'net equity' in more conventional cases." *Net Equity Decision*, 654 F.3d at 238.

[7]    The District Court assumed that the defendants, all net winners who had withdrawn more than they had
deposited with BLMIS, *Antecedent Debt Decision*, 499 B.R. at 419, were good faith transferees. *See id.* at 418 n. 2.
Under prior decisions of the District Court, they were entitled to invoke the safe harbor under 11 U.S.C. § 546(e),
and limit the Trustee's avoidance claims to intentional fraudulent transfers under 11 U.S.C. § 548(a)(1)(A). *See
Antecedent Debt Decision*, 499 B.R. at 418 n.1; *see also Greiff*, 476 B.R. at 722.

Several of the defendants had received transfers from other BLMIS accounts.  The
Trustee proposed to treat inter-account transfers in excess of principal deposited in the transferor
account as fictitious profits.  *Antecedent Debt Decision*, 499 B.R. at 428.  The defendant
transferees argued that inter-account transfers occurring prior to the two-year statutory reach-
back period should be treated as principal, and therefore, constituted "value" for purposes of
Code § 548(c) defense.  *Id.*  According to the defendants, the inter-account transfers should be
viewed as two separate transactions – a withdrawal by the transferor and a subsequent deposit by
the transferee.  *Id.*  "In this hypothetical scenario, the sender's withdrawal would not be subject
to avoidance because it occurred before the reach-back period, and the recipient's investment
would be treated as principal in the recipient's account (and thus would be credited against any
withdrawals)."  *Id.*  The defendants further argued that the Trustee's use of what we now call the
Inter-Account Method would provide different treatment to economically equivalent
transactions, and was unfair.  *Id.*

> The District Court rejected the defendants' position:
>
> Although defendants contend that the Trustee's method elevates form over
> substance, the true substance of transfers of fictitious profits from one account to
> another remains the same: The funds at issue are still other people's money, and
> shifting them among accounts, whether those accounts are owned by the same
> person or entity or, for example, transfers among family members, does not
> morph those funds into actual new principal. . . . . In other words, no new value
> was created by moving these funds between different accounts.

*Id.* at 428-29.

The District Court found support for its conclusion in the Bankruptcy and District Court
decisions pertaining to an analogous issue in the *Bayou Group* bankruptcy case.  *Bayou* also
involved a Ponzi scheme.  The defendants had invested in the Bayou Fund, and subsequently

10

rolled over their investments into Bayou hedge funds. *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P* (*In re Bayou Group, LLC*), 396 B.R. 810, 884 (Bankr. S.D.N.Y. 2008), *aff'd in part & rev'd in part*, 439 B.R. 284 (S.D.N.Y. 2010). Their Bayou Fund account statements – the transferor accounts – included fictitious profits. *Id.* They argued that in calculating their fraudulent transfer liability for redemption payments received from the Bayou hedge funds – the transferee accounts – their deposits into the Bayou hedge funds should be deemed to be the amounts reflected in the inflated Bayou Fund statements that included fictitious profits. *Id.*

The Bankruptcy Court disagreed. The defendants' argument ignored the fact that their actual investments in the Bayou hedge funds were less than the amounts reflected in their Bayou Fund account statements, and their purported investments in the Bayou hedge funds were inflated to the same extent. *Id.* The Court concluded: "in no event is it appropriate to pile fiction on fiction by deeming these investors' final Bayou Fund account statements, including fictitious profits, to be the value of their investments contributed to the Bayou hedge funds." *Id.* at 885. The District Court affirmed quoting the Bankruptcy Court's conclusion. *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re Bayou Group, LLC*), 439 B.R. 284, 338-39 (S.D.N.Y. 2010).

The *Antecedent Debt Decision* also rejected the argument that the failure to treat the pre-reach-back period transfers as principal allowed the Trustee to indirectly avoid transfers that were beyond the statute of limitations. There is no time limit on what constituted value under 11 U.S.C. § 548(c), and an inter-account transfer of fictitious profits did not become value just because it occurred long ago and beyond the statute of limitations. *Antecedent Debt Decision*,

11

499 B.R. at 429. Moreover, inter-account transfers of fictitious profits represented transfers of

funds that never belonged to the sender or recipient or a hypothetical withdrawal and investment

that never occurred. *Id.*

> At heart, the substance of these transactions was merely to perpetuate a cycle of
> artificial profits and further investments; where there was no investment of new
> principal, even those pre-reach-back-period transfers establishing new accounts
> failed to provide any new value.

*Id.* at 430.

## C.    The Inter-Account Method

The Trustee selected the Inter-Account Method because it allows him to perform his

statutory duty of computing net equity to his satisfaction in reliance on the non-fraudulent entries

in BLMIS' books and records. Like the Net Investment Method on which it is based, it nets all

cash deposits to and withdrawals from the transferor's account, ignores the imaginary, fictitious

profits that Madoff arbitrarily conferred on the transferors, and conserves the limited customer

pool available to pay net equity claims on an equitable basis. It is not "clearly inferior," and

indeed, is superior to the alternative championed by the Objecting Claimants. For these reasons,

his chosen method is entitled to deference.

Crediting the Objecting Claimants with the fictitious profits reflected in the transferors'

account statements essentially applies the Last Statement Method to the transferors' accounts,

and suffers from the same shortcomings noted in the *Net Equity Decision*. It turns Madoff's

fiction into a fact. Computing the balance in the transferor's account bloated by fictitious profits

increases the transferee's claim to the customer property pool allocable to all Madoff victims by

artificially increasing the transferee's net equity. This result aggravates the injury to those net

12

losers who did not receive transfers of fictitious profits by diminishing the amount available for distribution from the limited pool of customer property.

**D.    The Objecting Claimants' Arguments**

**1.    *The Inter-Account Method Violates the Two-Year Statute of Limitations for Fraudulent Transfer Actions Under Bankruptcy Code § 548(a)(1)(A)***

A pervasive theme in the objections is that the application of the Inter-Account Method to transfers occurring more than two-years prior to the BLMIS SIPA liquidation proceeding (before December 11, 2006) violates the statutory two-year reach-back period for fraudulent transfers set forth in Code § 548(a)(1).  (*See Samdia Objection* at 8-9; *Zraick Objection* at ¶¶ 31-32; *B&P Objection* at 10-12; *Bernfeld Objection* at ¶¶ 3-4.)  The Trustee could not avoid an inter-account transfer of fictitious profits that occurred prior to the reach-back period.  The argument goes that the Inter-Account Method permits the Trustee to reach the same result simply by disregarding the fictitious profits and crediting the transferee account in a reduced amount.

A customer can't transfer what he doesn't have. The Inter-Account Method does not disturb or avoid the transfer; it merely determines the value of what was transferred based on the net investment in the transferor's account.  The Net Investment Method approved by the Second Circuit is aimed at computing each customer's net equity by disregarding fictitious profits cooked up by Madoff and allocated arbitrarily.  The Inter-Account Method ascribes the same zero value to the fictitious profits in the transferor's account that the Net Investment Method ascribes to those fictitious profits in the transferee's accounts.  Although the Court of Appeals did not address any statute of limitations issues, it did not suggest that the Trustee's disregard of

13

fictitious profits in determining net equity under the Net Investment Method resulted in transfer of BLMIS' property or was restricted by any statute of limitations. [8]

A similar argument was made and rejected in the *Antecedent Debt Decision*.  There, the defendants contended that the Trustee violated the statutory reach back period by netting fresh deposits against pre-reach-back withdrawals in determining the amount Trustee can avoid under Code § 548(a)(1)(A).  *Antecedent Debt Decision* , 499 B.R. at 426-27.  The District Court rejected the defendants' arguments explaining that "[j]ust as defendants are entitled to net-equity claims for amounts of principal invested before the reach-back period that they never withdrew, so too must withdrawals before the reach-back period be considered to determine whether a given transfer in fact compensated a given defendant for a claim it would otherwise have had." *Id*. at 427.  Here, too, the transferees received credit to their net equity claims based on deposits made into the transferor's account regardless of when they occurred, and their net equity claims must be reduced by any withdrawals the transferor took no matter when he took them.

## 2.    *The Inter-Account Method Leads to Arbitrary Results*

Some Objecting Claimants argue that the Inter-Account Method is arbitrary and unfair because it treats economically identical transactions differently.  They point out that under the Trustee's methodology, if customer A's account consisted entirely of $1 million in fictitious profits and customer A transferred $100,000 to customer B's account, customer B would receive no credit for the transfer.  But if customer A, instead, withdrew $100,000 (during the pre-reach-

---

[8]     Certain Objecting claimants argue that refusing to credit inter-account transfers of fictitious profits pre-date the two-year reach back period violates their due process rights under the United States Constitution because it allows the Trustee to avoid transfers even though this avoidance claims are time-barred.  (*B&P Objection* at 10-12.) This contention elevates a faulty statutory argument to the level of an equally faulty Constitutional claim for the reasons discussed in the text.

back period), paid the $100,000 to customer B, and customer B deposited the $100,000 into his

BLMIS account, customer B would receive credit for a $100,000 deposit. (*B&P Objection* at 22-

23; *Apple Objection* at ¶¶ 2-15;[9] *Bernfeld Objection* at ¶ 5; *Milberg Objection* at 8-11.)  These

Objecting Claimants argue that the Inter-Account Method exalts form over substance and results

in arbitrary and unjust disparities based solely on the means that customers chose to convey their

funds to other customers.

This objection calls to mind the adage "where you stand depends on where you sit."  The

Objecting Claimants think it fair to increase their net equity claims and their share of the

customer property pool based on the transfer of fictitious profits.  Notions of fairness, however,

tend to be subjective.  Those victims who did not receive fictitious profits or whose investments

actually funded the excess withdrawals from the transferor accounts would, I suspect, view

fairness differently.  In any event, the *Net Equity Decision* concluded that the Net Investment

Method is fairer than the Last Statement Method under the circumstances of this case, and hence,

the use of the Inter-Account Method is fairer than the Last Statement Method in computing the

net investment in the transferor's account.  *See Antecedent Debt Decision*, 499 B.R. at 428-29

(shifting the transferor's fictitious profits to the transferee's account did not morph the fictitious

profits into principal).  That the transferor might have selected a different method to transfer

fictitious profits that would have escaped the reach of the Trustee's avoiding powers is hardly a

compelling argument for giving legal effect to a Madoff fraud that the Trustee has the means to

rectify.

---

[9]      This claimant also alludes to her payment of taxes on account of the "gains" realized in her BLMIS account (*Apple Objection* at ¶ 14), but payment of taxes does not factor into the computation of fictitious profits.  *See Donell v. Kowell*, 533 F.3d 762, 778-79 (9th Cir.), *cert. denied*, 555 U.S. 1047 (2008).

15

Certain Objecting Claimants also argue that the transferors were actually the initial transferees of BLMIS, and the transferees were, therefore, subsequent transferees. (*Milberg Objection* at 17.)  They contend that when the customer directed BLMIS to transfer funds between two BLMIS accounts, it exercised dominion and control over the amounts transferred making it the "initial transferee," and conclude that the transaction should be treated the same as where a customer makes a cash withdrawal and conveys that sum directly to a third party.  (*Id.*) (citing *Hooker Atlanta Corp. v. Hocker*, 155 B.R. 332 (Bankr. S.D.N.Y. 1993) and *Salomon v. Nedlloyd, Inc.*(*In re Black & Geddes, Inc.*), 59 B.R. 873 (Bankr. S.D.N.Y. 1986).)

The Inter-Account Method is not concerned with avoiding transfers, and hence, the distinction between initial and subsequent transferees is irrelevant.  Instead, it is intended to compute the claimant's net equity by stripping the fictitious profits from the calculation of the balance in the transferor's account.  Furthermore, the Objecting Claimants' principal authorities are distinguishable, and do not support the argument that the transferor account was actually an initial transferee of BLMIS.

In *Hooker*, the debtor had purchased an option to buy real estate and paid $500,000 into escrow.  The parties agreed that upon consummation of the sale, the escrow agent would pay the broker from the escrow in satisfaction of the seller's obligation.  The transaction closed, and the escrow agent paid the broker.  After bankruptcy, the debtor sued the broker, among others, charging that the payment by the escrow agent was a fraudulent transfer of the debtor's property.

The court granted the broker's motion for summary judgment.  It explained that under escrow law, the transfer occurred when the debtor deposited the funds into escrow.  At that point, the debtor retained only a contingent interest in the escrowed funds, and surrendered dominion

16

and control.  155 B.R. at 339-40.  Once the transaction closed, the seller became entitled to the

escrow, and the seller effectively transferred a portion of the escrow to the broker by authorizing

the escrow agent to pay the broker directly.  *Id.* at 340-41.  Hence, the broker was, at most, the

subsequent transferee from the seller.  *Id.* at 341.

The Objecting Claimants did not deposit money with BLMIS pursuant to an escrow

arrangement, and did not surrender "dominion and control" over their funds.  Although BLMIS

had discretionary trading authority, every investor had the right to withdraw his funds, or, as

these proceedings show, direct BLMIS to transfer the funds to another account.  In fact, this

entire case centers on Madoff's improper exercise of dominion and control over their

investments.  Analogies to escrow arrangements are, therefore, inapt; BLMIS did not "transfer"

anything to the transferor account and the transferor did not become an "initial transferee" when

the transferor instructed BLMIS to make an inter-account transfer.

In *Black & Geddes*, the debtor, a freight forwarder, paid $21,785.13 to the defendant as

agent for a disclosed principal.  The defendant transferred the funds to its principal but retained

the portion corresponding to the amount of its commission.  The trustee brought a preference

action, and in the footnote cited by the Objecting Claimants, the court stated that there was no

preference because the debtor did not owe an antecedent debt to the defendant; the debt was

owed by the principal, the principal was entitled to receive the entire payment and the set off

exercised by the agent through the deduction and retention of the commission simplified the

transaction by eliminating the need of the principal to pay the agent directly.  59 B.R. at 874 n. 2.

In addition, the defendant was a mere conduit, and hence, could not be an initial transferee.  *Id.*

at 875.

17

The relevance of *Black & Geddes* is not apparent.  The Objecting Claimants are not arguing that any party in the transaction was a conduit.  Furthermore, even if a transfer occurred between the transferor and the transferee, no transfer occurred between BLMIS and the transferor when the latter instructed BLMIS to make an inter-account transfer.

### 3.     The Inter-Account Method Improperly Combines Accounts and Violates the Federal Securities Laws

Citing SIPA, SIPC Series 100 Rules, and SEC regulations, several Objecting Claimants argue that the Inter-Account Method improperly combines the transferee and transferor accounts.[10]  (*See Samdia Objection* at 2-7; *B&P Objection* at 17-20; *Milberg Objection* at 6-8; *Melton Objection* at 4-5.)  The objection is wrong.  Under the Inter-Account Method, the Trustee calculates the net equity in the transferor account using the Net Investment Method and credits the transfer up to that amount in the transferee account.  The transferor and transferee accounts remain separate, and their balances are computed separately.  For example, where the transferor withdrew more than he deposited and his account balance is actually negative, the negative balance does not transfer to the transferee account.  Instead, the value of the transfer is zero.

Certain Objecting Claimants also assert that "opening of a new account constitutes the purchase of a security," (*B&P Objection* at 21-22) (quoting *Savino v. E.F. Hutton & Co., Inc.,*

---

[10]     Specifically, these claimants cite, among other statutes, (1) SIPA § 78fff-3(a)(2) ("a customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity . . . ."); (2) SIPA § 78*lll*(11) (". . . In determining net equity under [SIPA § 78*lll*(11)], accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers."); (3) 17 C.F.R. § 300.100(b) ("[a]ccounts held by a customer in different capacities, as specified by these rules, shall be deemed to be accounts of "separate" customers."); and (4) 17 C.F.R. § 300.103 (a "corporation, partnership, or unincorporated association holding an account with a member shall be deemed to be a separate customer distinct from the person or persons owning such corporation or comprising such partnership or unincorporated association if on the filing date it existed for a purpose other than primarily to obtain or increase protection under the Act.").

18

507 F. Supp. 1225, 1239-40 (S.D.N.Y. 1981) (internal quotation marks and citation omitted), and reason that transferring fictitious profits between BLMIS accounts is equivalent to opening a new account for the purpose of purchasing securities. (*Id.* at 22.)  It is not clear why the Inter-Account Method violates the federal securities laws as these Objecting Claimants contend, but their argument suffers from a more fundamental problem.  The Objecting Claimants ignored the remainder of the *Savino* quote that limits the rule to instances "where the [opened] account is an investment contract." *Savino*, 507 F. Supp. at 1240.  SIPA's definition of "security" includes investment contracts, but only "if such investment contract . . . is the subject of a registration statement with the [SEC] pursuant to the provisions of the Securities Act of 1933." SIPA § 78*lll*(14).  The Objecting Claimants do not contend that their BLMIS accounts were registered with the SEC.

### 4.    *Public Policy Favors Finality in Business Transactions*

Relying primarily on *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189 (N.Y. 1991) and *CFTC v. Walsh*, 951 N.E.2d 369 (N.Y. 2011), some Objecting Claimants argue that the Inter-Account Method violates a public policy favoring the finality of business transactions. (*B&P Objection* at 12-14; *Milberg Objection* at 11-16.)  *Banque Worms* involved a mistaken wire transfer that nonetheless discharged a valid debt.  Expressing a concern for the finality of business transactions, the Court of Appeals adopted the "discharge for value" rule for wire transfers.  The rule provides that if a beneficiary who "receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation." *Id.* at 196.

19

In *Walsh*, the Court applied the finality doctrine to a matrimonial settlement involving the transfer of fraudulently obtained property to an innocent spouse. The CFTC and the SEC sought to follow the property into the hands of the innocent spouse and froze her funds. Answering questions certified by the Second Circuit, the New York Court of Appeals initially concluded that assets acquired through fraud during the marriage can nonetheless constitute "marital property" under New York Domestic relations Law. 951 N.E.2d at 375. Turning next to New York's "concern for finality in business transactions," (*id.* (quoting *Banque Worms*), the Court explained:

> Ex-spouses have a reasonable expectation that, once their marriage has been dissolved and their property divided, they will be free to move on with their lives. To hold that the proceeds of fraud acquired by one spouse unbeknownst to the other cannot be subject to equitable distribution or conveyed through a settlement agreement as marital property would undermine one of the fundamental policies underlying the equitable distribution process, namely finality. The exception proposed by the Agencies would effectively undo court orders and settlement agreements for an indeterminate time after the "winding up of the parties' economic affairs" **. . .** and "subvert the policy of upholding settled domestic relations ... in divorce cases."

*Id.* at 375-76 (citations omitted.)[11]

The Inter-Account Method does not implicate New York's public policy regarding the finality of transactions, mistaken or otherwise, or domestic relations settlements. Instead, it concerns the Trustee's duty under SIPA to compute net equity based on BLMIS' books and records. Those records contain fraudulent bookkeeping entries which, if ignored, will inflate a large number of net equity claims at the expense of an equally large or larger number of victims whose net equity claims do not include any fictitious profits. Moreover, concerns for finality in

---

[11]    The Court noted that victims of fraud could follow the property where the transferee acted in bad faith or did not give fair consideration under N.Y. Debtor and Creditor Law § 272. *Walsh*, 951 N.E.2d at 378.

general and the discharge for value rule in particular must yield to the supremacy of federal law.

SIPA directs how net equity should be computed.  To the extent SIPA upsets the finality of a

bookkeeping entry crediting fictitious profits, federal law trumps any state law or doctrine.  *See,*

*e.g.*, *First Fed. Sav. & Loan Ass'n of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill,*

*Bresler & Schulman, Inc.)*, 59 B.R. 353, 378 (D.N.J. 186) (SIPA preempts state law under

Supremacy Clause), *appeal dismissed*, 802 F.2d 445 (3d Cir. 1986).

The Objecting Claimants' argument is similar to the argument made to the Second

Circuit that the use of the Last Statement Method to compute net equity was necessary to protect

the "legitimate expectations" of the customers.  *See Net Equity Decision*, 654 F.3d at 236.  The

Court rejected the argument "'because treating the fictitious paper profits as within the ambit of

the customers' 'legitimate expectations' would lead to the absurdity of 'duped' investors reaping

windfalls as a result of fraudulent promises made on fake securities.'"  *Id.* at 241 (quoting *In re*

*New Times Sec. Servs., Inc.*, 463 F.3d at 130 (in turn quoting *In re New Times Sec. Servs., Inc.*,

371 F.3d 68, 87-88 (2d Cir. 2004))).  Similarly, recognizing the transfer of fictitious profits in the

interest of finality would allow the Objecting Claimants to reap a windfall at the expense of the

other victims of Madoff's fraud.

**5.      *The Inter-Account Method Violates ERISA***

Some Objecting Claimants contend that the Inter-Account Method violates ERISA as it

pertains to inter-account transfers involving BLMIS IRA accounts.  The claimants point to the

provision in ERISA stating that the benefits under pension plans "may not be assigned or

21

alienated." (*See Most Objection* at 6-7;[12] *B&P Objection* at 14-17 citing 29 U.S.C. §

1056(d)(1).) This argument fails. Initially, except as described in 29 C.F.R. § 2510.3-2(d),[13]

ERISA does not generally apply to IRA accounts, including those that were rolled-over from

ERISA-regulated plans. *See In re Francisco*, 204 B.R. 799, 801 (Bankr. M.D. Fla. 1996)

("There is nothing in the Congressional Record or in the language of the legislation dealing with

ERISA, to indicate that ERISA was designed to include IRAs within the definition of "employee

benefit program or a plan."").

Furthermore, ERISA contains an express provision subordinating ERISA to other federal

statutes. *See* 29 U.S.C. § 1144(d) ("Nothing in this subchapter shall be construed to alter,

amend, modify, invalidate, impair, or supersede any law of the United States . . . ."); *see also*

*SIPC v. Jacqueline Green Rollover Account*, No. 12 Civ. 1139 (DLC), 2012 WL 3042986, at *8

n.4 (S.D.N.Y. Jul 25, 2012) (noting ERISA's subordination provision). These claimants have

not explained how ERISA's anti-alienation provision trumps SIPA's net equity calculation or

distribution procedures other than to say it does. In short, SIPA's net equity calculation as

---

[12]    One claimant rolled over his pension plan into his existing BLMIS IRA account, and argues that the
rollover does not constitute an inter-account transfer. Instead, it represents a pension plan distribution that he could
have taken in cash. (*Most Objection* at 4-6.) This is a variation of the argument made by other Objecting Claimants
that the Inter-Account Method is arbitrary because it treats economically equivalent transactions (rollover versus
withdrawal and deposit) differently. For the reasons stated in the text, *supra*, the result is not arbitrary or unfair.

[13]    29 C.F.R. § 2510.3-2(d) states that "the terms "employee pension benefit plan" and "pension plan" shall
not include an individual retirement account . . . provided that (i) no contributions are made by the employer or
employee association; (ii) participation is completely voluntary for employees or members; (iii) the sole
involvement of the employer or employee organization is without endorsement to permit the sponsor to publicize the
program to employees or members, to collect contributions through payroll deductions or dues checkoffs and to
remit them to the sponsor; and (iv) the employer or employee organization receives no consideration in the form of
cash or otherwise, other than reasonable compensation for services actually rendered in connection with payroll
deductions or dues checkoffs." 29 C.F.R. § 2510.3-2(d).

approved in the Second Circuit's *Net Equity Decision* trumps any affect ERISA might have on the net equity calculation.

The citation to § 5205(d)(1) of New York's Civil Practice Law and Rules is also inapposite. (*B&P Objection* at 17.) Section 5205(d)(1) exempts certain trust income from judgment execution where the trust property is exempt from execution under CPLR § 5205(c).[14] Here, the Trustee is not seeking to enforce a judgment against a trust or trust income. Rather, the Objecting Claimants are seeking to enforce their claims against the pool of customer property. The Trustee's calculation of net equity using the Inter-Account Method does not violate New York's exemptions relating to trusts and trust income.

---

[14]    CPLR § 5205(d)(1) provides:

> (d) Income exemptions. The following personal property is exempt from application to the satisfaction of a money judgment, except such part as a court determines to be unnecessary for the reasonable requirements of the judgment debtor and his dependents:

> 1. ninety per cent of the income or other payments from a trust the principal of which is exempt under subdivision (c); provided, however, that with respect to any income or payments made from trusts, custodial accounts, annuities, insurance contracts, monies, assets or interest established as part of an individual retirement account plan or as part of a Keogh (HR-10), retirement or other plan described in paragraph two of subdivision (c) of this section, the exception in this subdivision for such part as a court determines to be unnecessary for the reasonable requirements of the judgment debtor and his dependents shall not apply, and the ninety percent exclusion of this paragraph shall become a one hundred percent exclusion. . . .

> With some exceptions, CPLR § 5205(c)(1) provides that "all property while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor, is exempt from application to the satisfaction of a money judgment," and § 5205(c)(2) states that certain trusts and plans that qualify under the Internal Revenue Code, including IRAs, shall be considered a trust created by someone other than the judgment debtor.

23

6.    *The Bankruptcy Court Lacks Constitutional Authority to Render Final Judgments*

Citing *Stern v. Marshall*, 131 S.Ct. 2594 (2011), one Objecting Claimant asserts that the Court lacks jurisdiction to render a final determination on the merits of any dispute between the Trustee and a Madoff victim.  (*Bernfeld Objection* at ¶ 8.)  The argument is patently wrong.  A creditor who files a proof of claim submits himself to the Court's jurisdiction over the claims allowance process.  *See Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1389 (2d Cir. 1990) (creditor's filed claim "submitted itself to the equitable power of the bankruptcy court to disallow its claim").  The filing of a customer claim in a SIPA proceeding has the same jurisdictional effect.  *Picard v. Stahl*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011) (citing *Keller v. Blinder (In re Blinder Robinson & Co., Inc.),* 135 B.R. 892, 896–97 (D.Col.1991)), *aff'd*, No. 11 Civ. 2392 (AKH), 2011 WL 7975167 (S.D.N.Y. Dec. 15, 2011), *aff'd*, 512 F. App'x. 18 (2d Cir. 2013).  Moreover, the Court has authority to finally determine all issues required to be decided as part of the claims allowance process.  *See Stern*, 131 S.Ct. at 2618 ("Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.").

Here, the Trustee proposes to use the Inter-Account Method to compute the Objecting Claimant's net equity claim, and his computation is directly related to the allowance of that claim.  The Court may enter a final judgment regarding the allowance of the Objecting Claimant's claim, and the decision on the *Motion* is part and parcel of the claims allowance process.

24

**7.**    ***The Trustee Cannot Disallow Transfers that Occurred Prior to 2001***

BLMIS changed from a sole proprietorship to a limited liability company on January 1,

2001.  (*See Declaration of Kevin H. Bell*, dated June 6, 2014 ("*Bell Declaration*"), Ex. B (ECF

Doc. # 6928).)  Certain claimants argue that the Inter-Account Method cannot apply to pre-2001

transfers.  They reason that BLMIS was not a member of SIPC before then, (*B&P Objection* at

9), and it would be "patently improper" "to reduce retroactively a recipient's BLMIS account by

withdrawals and transfers made from a non-BLMIS account and at a time which predated the

very formation of BLMIS."  (*Bernfeld Objection* at ¶ 6.)  They do not make the same argument

for ignoring deposits made before 2001.

Madoff has always been a member of SIPC, and the incorporation of BLMIS as a limited

liability company continued his business without change.  As of January 19, 1960, Bernard L.

Madoff, a sole proprietorship, later known as BLMIS, was registered as a broker-dealer with the

SEC. (*See Bell Declaration*, Ex. A.)  On December 30, 1970, when SIPA was enacted, he

automatically became a member of SIPC.  *See* SIPA § 78ccc(a)(2)(A) (stating that all brokers or

dealers registered under 15 U.S.C. §78o(b) are required to be SIPC members).  The Form BD-

Amendment filed on January 12, 2001, stated that "[e]ffective January 1, 2001, predecessor will

transfer to successor all of predecessor's assets and liabilities related to the predecessor's

business.  The transfer will not result in any change in ownership or control."  (*Bell Declaration*,

Ex. B at 9-10.)  In addition, the amendment checked a "yes" box in answer to a question asking

whether the applicant is "succeeding to the business of a currently registered broker-dealer."

(*Bell Declaration*, Ex. B at 5.)  Thus, nothing has changed since 1960 except for the business

form that Madoff used to conduct his Ponzi scheme.

25

Furthermore, ignoring the change of business form is consistent with the *Net Equity Decision*. Fictitious profits created by Madoff, the individual, are still fictitious profits in an account maintained by BLMIS. Madoff's incorporation did not transmute those fictitious profits into principal.

### 8.    A Transferee's Net Equity Claim Should not be Affected by Withdrawals Made by Other Beneficiaries in a Shared Account

Two Objecting Claimants rolled over investments that had been maintained in accounts that included multiple beneficiaries. (*Ross Objection*; *Sagor Objection*.) As a result of the withdrawals by the other beneficiaries, the accounts were net winners at the time of the rollover, and hence, the transferee received no credit under the Inter-Account Method. Brian Ross had invested in his father's account, and the two maintained separate records of their deposits and withdrawals. In 2004, Ross opened his own BLMIS account and his account received transfers from his father's account. The Trustee discounted the transfers based on his calculation of the net equity in the father's account at the time of the transfers ignoring the fact that Ross was a net loser in the amount of $935,000 *vis-à-vis* his father's account. Similarly, Elliot Sagor was a participant in his law firm's profit sharing plan account maintained at BLMIS and rolled his interest over into a personal BLMIS account. Although he was a net loser as a participant in his law firm's BLMIS account, the firm was a net winner because withdrawals by other participants exceeded the total amount deposited into the account. Hence, the Trustee recalculated the rollover at $0.

Each of these Objecting Claimants essentially contends that their deposits into and withdrawals from the transferor account should be treated separately for the purpose of computing their net equity from all other deposits and withdrawals affecting the transferor

26

account.  This is another way of arguing that they should be treated as separate customers.

Several decisions have addressed the question and denied customer status to investors in a fund

or account that, in turn, invested in BLMIS.  *See, e.g., Kruse v. SIPC* (*In re BLMIS*), 708 F.3d

422, 426-27 (2d Cir. 2013) (investors in feeder funds that invested with BLMIS were not

customers of BLMIS); *SIPC v. Jacqueline Green Rollover Account,* 2012 WL 3042986, at *13

(participants in ERISA-regulated plan that invested with BLMIS were not customers of BLMIS);

*In re BLMIS*, 515 B.R. 161, 169-70 (Bankr. S.D.N.Y. 2014) (same).  Nevertheless, as these

decisions highlight, the question of whether someone is a SIPA customer is a factual one peculiar

to the particular Objecting Claimant.  This issue is beyond the scope of the *Motion* which was

limited to the "legal issue raised by objections to the methodology used to calculate the amount

transferred between BLMIS accounts in connection with customer claims."  (*Scheduling Order*

at 2.)[15]  But absent proof of separate customer status, the foregoing authorities demonstrate that

the net investment is computed by netting all deposits into and withdrawals from the *customer's*

account regardless of the number or the identity of the beneficiaries, or the amount that each

beneficiary deposited or withdrew.

## E.    Issues Outside the Scope of the Motion

Many Objecting Claimants make arguments specific to their claims which are outside the

defined scope of the *Motion*.  (*See, e.g., Most Objection* at 7-8 (requesting discovery regarding

inter-account transfers); *Zraick Objection* at ¶¶ 41-43 (arguing that the *Motion* violates spirit of

---

[15]    Except for their possible status as customers, the Objecting Claimants offer no authority beyond appeals to equity for their arguments that the Trustee must determine the net equity in a customer's shared account on a beneficiary by beneficiary basis.

Trustee's mediation of their claims); *Elins Objection* at ¶¶ 9-20 (asserting that he was not party
to an inter-account transfer, and instead, closed one BLMIS account and subsequently opened
another account one year later); *Bernfeld Objection* at ¶ 7 (requesting an evidentiary hearing in
connection with claims); *Westport Objection* at 2 (discussing facts surrounding claim); *Melton
Objection* at 3-4 (alleging BLMIS failed to open a separate account as instructed by claimant).)
These objections will be addressed in subsequent proceedings relating to the specific claims.

Finally, the Trustee and SIPC argued that the customers bear the burden of proving the
amount of their claims.  (*Trustee Memo* at 22-23; *SIPC Memo* at 5-7; *Trustee Reply* at 16-20;
*SIPC Reply* at 1-4.)  A few of the Objecting Claimants responded disagreeing with the Trustee's
and SIPC's position.  (*See Zraick Objection* at ¶¶ 33-40; *Milberg Objection* at 24-25.)  The Court
declines to reach this issue at this time for two reasons.  First, it is beyond the scope of the
*Scheduling Order* which was limited to the appropriateness of the Trustee's methodology.
Second, the burden of proof question is not limited to inter-account transfers.  The Court will
deal with this question either pursuant to an omnibus motion that will allow all claimants to
participate or on a case-by-case basis.

In conclusion, the *Motion* is granted, and the Court approves the Inter-Account Method,
to wit, calculating the net equity in a transferor account at the time of an inter-account transfer
under the Net Investment Method and crediting the inter-account transfer up to the amount of the

transferor's recalculated net equity.  The Court has considered all of the objections, and to the

extent not expressly addressed, concludes that they lack merit.  Settle order on notice.


Dated: New York, New York
       December 5, 2014


                                            /s/ *Stuart M. Bernstein*
                                            STUART M. BERNSTEIN
                                            United States Bankruptcy Judge

# APPENDIX A

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111

> David J. Sheehan, Esq.
> Jorian Rose, Esq.
> Amy E. Vanderwal, Esq.
> Seanna R. Brown, Esq.
> Bik Cheema, Esq.
> Nicholas J. Cremona, Esq.
> > Of Counsel

*Attorneys for Irving H. Picard, Trustee for the SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC*

SECURITIES INVESTOR PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, DC 20005

> Josephine Wang, Esq.
> Kevin H. Bell, Esq.
> Lauren T. Attard, Esq.
> > Of Counsel

*Attorneys for Securities Investor Protection Corporation*

LAW OFFICES OF JOEL L. HERZ
3573 E. Sunrise Drive, Suite 215
Tucson, Arizona 85718

> Joel L. Herz, Esq.
> > Of Counsel

*Attorneys for Samdia Family, LP*

STIM & WARMUTH, P.C.
2 Eighth Street
Farmingville, New York 11738

> Paula J. Warmuth, Esq.
> > Of Counsel

*Attorneys for Michael Most*

30

HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166

  Peter S. Partee, Sr., Esq.
  Richard P Norton, Esq.
  Robert A. Rich, Esq.
   Of Counsel

*Attorneys for Edward A. Zraick, Jr., Nancy Zraick, Patricia DeLuca*
 *and Karen Rich*

AKERMAN LLP
666 Fifth Avenue, 20th Floor
New York, New York 10103

  Susan Balaschak, Esq.
  Michael I. Goldberg, Esq.
   Of Counsel

*Attorneys for the Mittlemann Family Foundation*

DUANE MORRIS LLP
1540 Broadway
New York, New York 10036

  Gerard S. Catalanello, Esq.
  Patricia H. Piskorski, Esq.
   Of Counsel

*Attorneys for Brian Ross, Esq.*

KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
551 Fifth Avenue, 18th Floor
New York, New York 10176

  David Parker, Esq.
  Matthew J. Gold, Esq.
   Of Counsel

*Attorneys for Lawrence Elins*

BECKER & POLIAKOFF LLP
45 Broadway, 8th Floor
New York, New York 10006

  Helen Davis Chaitman, Esq.
   Of Counsel

*Attorneys for Aaron Blecker, Adele Shapiro, Angela Tiletnick, Barbara Engel, Barbara Kotlikoff*
*Harman, Ben Heller, Benjamin T. Heller Irrevocable Trust, Beth P. Feldman as Trustee, Beth P.*

31

*Feldman as Trustee Dtd 11/15/82, Bruce N. Palmer, Carol Fisher, Carol Kamenstein, Chalek Associates LLC, David Chalek, Frances Reiss, Isabel Chalek, Jessica Decker, John Tzannes Trust, Mitchel Chalek, Morton Chalek, Peter Tzannes, Richard Mark Chalek, Robin Tzannes, Laura Hallick, as participant in Daprex Profit Sharing Plan and 401K Plan, David Drucker, David Shapiro, Hilda Drucker, Marilyn Komarc, Ptr of David Shapiro Nombrec, Myra M. Levine, Naomi Karp, Elaine Langweiler, Frederick H. Mandel (Partner), Irving M. Sonnenfeld, Deborah Shapiro, Edwin Michalove, Elaine R. Schaffer, Estate of Gabriel Friedman c/o Richard Friedman Executor, Boyer H. Palmer, Fern C. Palmer and Boyer H. Palmer, Ttees Fern C. Palmer Rec Tst, Fern C. Palmer, Frieda Low, Glenn Rechler, Gunther Unflat, Herbert Barbanel & Alice Barbanel NT Wros, Jonathan Schwartz as Trustee FBO Nancy M. Riehm, Keith Schaffer, Kenneth M. Kohl & Myrna Kohl, Kurt C. Palmer, Theresa R. Ryan, Marjorie Forrest, Martin R. Harnick, Steven P. Norton, NTC & Co. FBO Denis Casteli (19988), Manuel O. Jaffe MD, Richard M. Friedman, NTC & Co. FBO Robert Halio (26849), Robert Yaffe, Mishkin Family Trust, NTC & Co. FBO Adele Fox (111257), NTC & Co. FBO Jeffrey Shankman (111752), Marsh Peshkin Ira, NTC & Co. FBO Steven C. Schupak (096898), Blake Palmer, Bret Palmer, Callie A. Ostenson/Murray, Dana Lefavor, Heidi Holmers, Kelly Bunch, Megan Bunch, Oscar Palmer, Palmer Family Trust, Ryan Murray, Sophia Palmer, Pamela K. Marxen, Philip E. Miller, Robert K. Low, Roberta Schwartz, Robin L. Warner & Jon Warner, Rona Mast, Sage Realty c/o Malcolm Sage, Sandy Sandler, Sloan G. Kamenstein, Steven J. Andelman, Susan R. Andelman, Benjamin Rechler Trust c/o Mitchell Rechler, The Gaba Partnership, Willi Rechler Trust c/o Mitchell Rechler, Theresa R. Ryan and Lawrence J. Ryan Trustees, Timothy Shawn Teufel and Valerie Anne Teufel, Tracy D. Kamenstein, WDG Associates Inc Retirement Trust*

GREENE ESPEL PLLP
222 S. Ninth Street, Suite 2200
Minneapolis, Minnesota 55402

      Lawrence M. Shapiro, Esq.
          Of Counsel

*Attorneys for Marion E. Apple*

BERNFELD, DEMATTEO, LLP
600 Third Avenue, 15th Floor
New York, New York 10016

      Jeffrey Bernfeld, Esq.
          Of Counsel

*Attorneys for Alan Winters, Edith Schur, Frederick Konigsberg,*
  *Susan Konigsberg, Harvey L. Werner Revocable Trust U/A/D 8/31/82,*
  *Jeffrey R. Werner 11/1/98 Trust, Manfred Franitza, Margrit Franitza,*
  *Marital Trust No. 1 created under the Harvey L. Werner Revocable*
  *Trust U/A/D 8/31/82 and Werner Foundation*

MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178

Bernard I. Garbutt, III, Esq.
  Of Counsel

*Attorneys for Kostin Company*

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

  Joseph T. Baio, Esq.
  Todd G. Cosenza, Esq.
   Of Counsel

*Attorneys for Westport National Bank, a division of Connecticut*
 *Community Bank, N.A.*

ELLIOT G. SAGOR, ESQ., *Pro Se*
470 Park Avenue South, 10th Floor North
New York, New York 10016

MILBERG LLP
One Pennsylvania Plaza
New York, New York 10119

  Matthew Gluck, Esq.
  Matthew A. Kupillas, Esq.
  Jennifer L. Young, Esq.
  Joshua E. Keller, Esq.
   Of Counsel

*Jointly with Seeger Weiss LLP, attorneys for Jan Marcus Capper, Gary Albert, Jerry Guberman Trust Dated 12/23/93, Harold A. Thau (IRA), John Denver Concerts Inc. Pension Plan Trust, Joseph Sloves (IRA), Laurence E. Leif, Onesco International, Ltd., Potamkin Family Foundation I, Inc., June Pollack T/O/D to Keith L. Pollack and Cary G. Pollack, Linda Berger Howard Berger J/T WROS, Judith Rock Goldman, Anita Karimian, Gary L. Harnick (IRA), William M. Wiessner Family Trust, /Sheila A. Woessner Family Trust TIC, Jonathan Michaeli (IRA), The Adina Michaeli Revocable Trust, Trudy Schlachter, Gerald Blumenthal (IRA), Steven v. Marcus Separate Property Marcus Family Trust, Richard Roth (IRA), Richard Roth, Lynda Roth, Michael Roth, Michael Roth (IRA), Florence Roth, Lester Kolodny (IRA), P. Charles Gabriele (IRA), Delia Gail Rosenberg, Aspen Fine Arts Co., Elizabeth Harris Brown, The Douglas G. Brown Revocable Trust, Do Stay, Inc., Elbert R. Brown, Trustee, Viola Brown, Trustee U/T/D 12/29/88, Lawrence I Brown and Barbara Brown J/T WROS, Lewis R. Frank, Martin Gelman & Michael Dancer JT/WROS, Barbara Harris, Deborah Katz, Jack Kaufman and Phyllis Kaufman J/T WROS, Michael Mathias and Stacey Mathias J/T WROS, Katharine Brown Trust, Barbara Schlossberg, Bernard Seldon, Jonathan Sobin, Leila F. Sobin*

SEEGER WEISS LLP
77 Water Street, 26th Floor
New York, New York 10005

Stephen A. Weiss, Esq.
Parvin K. Aminolroaya, Esq.
        Of Counsel

*Attorneys for Melvyn Weiss and Barbara Weiss JTWROS*

K&L GATES LLP
1601 K Street NW
Washington, DC 20006

Richard A. Kirby, Esq.
Laura K. Clinton, Esq.
        Of Counsel

*Attorneys for Joel A. and Kerry E. Blum, Jt. Owners,*
   *Norman J. Blum Living Trust*

DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020

Carol Neville, Esq.
        Of Counsel

*Attorneys for Davina Greenspan & Lori Friedman, Toby Hobish (IRA),*
   *Alvin Gindel Revocable Trust Agreement, Estate of Helen Shurman,*
   *Lapin Children LLC, Laura Guggenheimer Cole, Norma Shapiro (IRA),*
   *Norma Shapiro Trustee, Norma Shapiro, Barbara Berdon, Epic*
   *Ventures LLC, David R. Markin 2003 Trust, David Markin, Cecile Rudnick*

LAX & NEVILLE LLP
1450 Broadway, 35th Floor
New York, New York 10018

Barry R. Lax, Esq.
Brian J. Neville, Esq.
        Of Counsel

*Attorneys for Mary Albanese IRA, Dominick Albanese Trust Account B, David Belosa & Bari*
*Belosa J/T WROS, Gordon Bennet 1988 Trust, Watershed Foundation, Harriet Bergman,*
*Leonard Bergman Credit Shelter Trust FBO Harriet Bergman, Adriane Biondo, Audrey and*
*Robert Orenbach, Mildred Wang, Shelley Roth, Ira Roth, Alexander Roth, Evan Roth, Jordan*
*Roth, Brow Family Partnership, Carol Bulman (IRA), William Jay Cohen, Trustee, Elinor P.*
*Cohen Trustee Dated 11/14/89 FBO Eleanor P. Cohen, Coronado S A, Jacob Davis and Marilyn*
*Davis, Trustees, Jacob Davis IRA, Marilyn Davis & Jacob Davis* **ttees** *UTA by Marilyn Davis,*
*Karl Drobitsky, Richard Eaton IRA, Fammad LLC, Myron Feuer IRA, Peds Retirement Trust,*
*PJFN Investors LP, Selma Fox IRA, Jerome Fox IRA, Fox Family Partnership LLC, Accu Plan*
*Employees' Profit Sharing Trust, Constance Friedman, Allan Robert Greene, Julia Greene,*
*Allen Robert Greene as custodian, Bruce Hector MD, Jay M. Izes IRA, Dori Kamp, Howard L.*

34

*Kamp, Abe Kleinman IRA, Bonnie Kansler IRA, Dale Kleinman, Marjorie Kleinman, Matthew Kansler, Deborah Kaye, Elliot Kaye, Lawrence Kaye Trustee Evelyn Kaye Trust FBO Judith Knight et al., Lawrence Kaye and Susan Kaye Trustees, Lawrence Kaye IRA, Paul Kaye, Robert Kehlmann Trustee, Trust FBO Ephraim Kehlmann U/A DTD 12/30/72, Robert Kehlmann and Diana Tosto Kehlmann, Robert Kehlmann Trustee Tst UW William Kehlmann 1/23/65, Zipora Wagreich Trustee U/A Dtd 11/6/90, Donald S. Kent, Madeline R. Kent Living Trust, Sheila Kolodny, The Korn Family Limited Partnership, Robert Korn Revocable Trust, Donna Lefkowitz Revocable Trust dtd 12/13/04, Laurence E. Leif IRA, Rose Less, Ruth Mechaneck, The Mechaneck Rev Liv Trust DTD 5/11/94, Harriet K. Meiss Trust, morse Family Foundation Inc., Linda Morese Revocable Trust dated 6/18/93, John Maccabee & Sherry More Maccabee Living Trust Dated 1/24/97, The HO Marital Appointment Trust, Michael Oshry, Suzanne Oshry & Meryl Evans Co-Trustees, White Orchard Investments, Ltd, Harry Pech and Jeffry Pech J/T WROS, Lanny Rose, JIR Enterprises LLC, Kenneth E. Roth, Elaine C. Schlessberg Trust Dated 8/26/2004, Norman Schlessberg Trust/Trustee, Robert L. Schwartz 2004 Revocable Trust Agreement, Anne Squadron IRA, Anne Strickland Squadron, Alana D. Gold, Alexander Squadron, Anna Rothwell, Arthur and Eleanor Squadron, William Squadron and Debra Lagapa, Catherine Shea, Daniel Squadron, Elena Prohaska Glinn, Elizabeth Shea, Eric Grode and Elizabeth Harre, Sarah B. Harre, Swing and David Harre, Jacob Squadron, Justin Shea, Laurel Squadron, Michael and Marcy Squadron, Neill P. Squadron, Pasquale and Marianna Bernardin, Peter and Carol Gold, Richard Squadron and Theodosia Price, Robert Vas Dias and Margaret Butcher, Samuel Squadron, Sarah D. Gold, Seth and Elizabeth Squadron, Vanessa Gang, Angelo Viola, Angelo Viola IRA, Laura Weill, Bette Wilkes, Jennie Wilkes, Sanuel Wilkes, Stephen Wilkes, Alan Goldstein IRA, Stephen Weisser, Barbara L. Larid c/o Roger Williams, Roger Williams and Miriam L. Williams*

KACHROO LEGAL SERVICES P.C.
245 Park Avenue, 39th Floor
New York, New York 10167

      Gaytri D. Kachroo, Esq.
        Of Counsel

*Attorneys for The Diana Melton Trust, Dated 12/05/05*