# EXHIBIT A

12-2557-bk(L)
*In re: Bernard L. Madoff Investment Securities LLC*

# In the
# United States Court of Appeals
# For the Second Circuit

————

August Term, 2013

————

Nos. 12-2557-bk(L), 12-2497-bk(con), 12-2500-bk(con),
12-2616-bk(con), 12-3422-bk(con), 12-3440-bk(con),
12-3582-bk(con), 12-3585-bk(con)

————

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,
*Debtor.*

————

IRVING H. PICARD, Trustee for the Liquidation of Bernard L.
Madoff Investment Securities LLC,
*Plaintiff-Appellant,*

SECURITIES INVESTOR PROTECTION CORPORATION, Statutory Intervenor
pursuant to Securities Investor Protection Act, 15 U.S.C. § 78eee(d),
*Intervenor-Appellant,*

*v.*

IDA FISHMAN REVOCABLE TRUST, PAUL S. SHURMAN, in his capacity as
co-trustee of the Ida Fishman Revocable Trust, WILLIAM SHURMAN, in
his capacity as co-trustee of the Ida Fishman Revocable Trust and as
Executor of the estate of Ida Fishman,
*Defendants-Appellees.*

————

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 2 of 24

Appeal from the United States District Court
for the Southern District of New York.
Nos. 11-bk-7603, 12-mc-0115 — Jed S. Rakoff, *Judge*.

————

Argued: March 5, 2014
Decided: December 8, 2014

————

Before: PARKER, LYNCH, and DRONEY, *Circuit Judges*.

————

Appeal from judgments of the United States District Court for
the Southern District of New York (Rakoff, *J.*).  Irving H. Picard, as
trustee for debtor Bernard L. Madoff Securities LLC, sued to avoid
fictitious profits paid by the debtor to hundreds of customers over
the life of the Ponzi scheme operated by Madoff.  The defendant
customers moved to dismiss certain of these avoidance claims
pursuant to 11 U.S.C. § 546(e), which shields from recovery
securities-related payments made by a stockbroker.  The district
court agreed that § 546(e) barred the claims, dismissed them, and
certified the dismissal as a final judgment.  The trustee appealed.

Affirmed.

————

DAVID J. SHEEHAN (Oren J. Warshavsky, Tracy L.
Cole, Seanna R. Brown; Howard L. Simon,
Windels Marx Lane & Mittendorf LLP; Matthew
B. Lunn, Young Conaway Stargatt & Taylor LLP,
*on the brief*), Baker Hostetler LLP, New York, NY,
*for Plaintiff-Appellant Irving H. Picard, Trustee for*

3                                         No. 12-2557-bk(L)

*the Liquidation of Bernard L. Madoff Investment Securities LLC.*

JOSEPHINE WANG, General Counsel (Kevin H. Bell, Lauren T. Attard, *on the brief*), Securities Investor Protection Corporation, Washington, D.C., *for Intervenor-Appellant Securities Investor Protection Corporation, Statutory Intervenor pursuant to Securities Investor Protection Act, 15 U.S.C. § 78eee(d).*

RICHARD LEVY, JR. (David C. Rose, *on the brief*), Pryor Cashman LLP, New York, NY, *for Defendants-Appellees Kara Fishbein Goldman, Steven Goldman, et al.*

P. GREGORY SCHWED (Walter H. Curchack, Daniel B. Besikof, Michael Barnett, *on the brief*), Loeb & Loeb LLP, New York, NY, *for Defendants-Appellees Jonathan M. Aufzien, Lisa Aufzien, et al.*

HELEN DAVIS CHAITMAN, Becker & Poliakoff, LLP, New York, NY, *for Defendants-Appellees David Abel, James Greiff, et al.*

Deborah A. Skakel, Shaya M. Berger, Dickstein Shapiro LLP, New York, NY, *for Defendant-Appellee PetCareRx, Inc.*

Carole Neville, Dentons US LLP, New York, NY, *for Defendants-Appellees Harold J. Hein, Kelman Partners Limited Partnership, et al.*

Jennifer L. Young, Matthew A. Kupillas, Millberg LLP, New York, NY; Parvin K. Aminolroaya,

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 4 of 24

SeegerWeiss LLP, New York, NY, *for Defendants-Appellees Gerald Blumenthal, Harold A. Thau, et al.*

David Parker, Matthew J. Gold, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York, NY, *for Defendants-Appellees Kenneth Hubbard, Lawrence Elins, et al.*

Parvin K. Aminolroaya, SeegerWeiss LLP, New York, NY *for Defendants-Appellees David J. Bershad, Bershad Investment Group LP, et al.*

Richard A. Kirby, Laura L. Clinton, Martha Rodriguez-Lopez, K&L Gates LLP, Washington D.C., *for Defendants-Appellees Chesed Congregations of America, Linda Berger, et al.*

Philip Bentley, Elise S. Frejka, Kramer Levin Naftalis & Frankel LLP, New York, NY, *for Defendants-Appellees 1096-1100 River Road Associates LLC, Fred A. Daibes LLC, et al.*

Marcy Ressler Harris, Jennifer M. Opheim, Mark D. Richardson, Schulte Roth & Zabel LLP, New York, NY, *for Defendants-Appellees Thomas H. Lee, HHI Investment Trust #2, et al.*

William P. Weintraub, Gregory W. Fox, Stutman, Treister & Glatt, PC, New York, NY, *for Defendants-Appellees Jeffrey Hinte, Robert Nystrom, et al.*

Paul Steven Singerman, Ilyse M. Homer, Isaac Marcushamer, Berger Singerman LLP, *for Amicus Curiae National Association of Bankruptcy Trustees.*

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 5 of 24

Philip D. Anker, Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY; Craig Goldblatt, Danielle Spinelli, Shivaprasad Nagaraj, Allison Hester-Haddad, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., *for Amicus Curiae Securities Industry and Financial Markets Association.*

Thomas J. Moloney, David E. Brodsky, Lawrence B. Friedman, Carmine D. Boccuzzi, Jr., Breon S. Peace, Charles J. Keeley, Shira A. B. Kaufman, Cleary Gottlieb Steen & Hamilton LLP, NewYork, NY, *for Amici Curiae HSBC Bank plc, HSBC Holdings plc, et al.*

Marco E. Schnabl, Susan L. Saltzstein, Jeremy A. Berman, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for Amicus Curiae UniCredit S.p.A.*

Franklin B. Velie, Jonathan G. Kortmansky, Mitchell C. Stein, Sullivan & Worcester LLP, New York, NY, *for Amicus Curiae UniCredit Bank Austria AG.*

Michael Feldberg, Allen & Overy LLP, *for Amicus Curiae ABN Amro Bank N.V. (presently known as the Royal Bank of Scotland N.V.).*

Joseph Cioffi, James R. Serritella, Davis & Gilbert LLP, New York, NY, *for Amici Curiae Natixis S.A., Natixis Financial Products LLC, et al.*

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 6 of 24

Fran M. Jacobs, Duane Morris LLP, *for Amicus Curiae East Star SICAV.*

Marshall R. King, Gibson, Dunn & Crutcher LLP, New York, NY, *for Amici Curiae UBS AG and UBS (Luxembourg) S.A.*

Marc J. Gottridge, Andrew M. Behrman, Hogan Lovells US LLP, New York, NY, *for Amici Curiae Barclays Bank (Suisse) S.A., Barclays Bank S.A., and Barclays Private Bank & Trust Limited.*

Thomas B. Kinzler, Daniel Schimmel, Kelley Drye & Warren LLP, New York, NY, *for Amici Curiae Caceis Bank France and Caceis Bank Luxembourg.*

Jodi Kleinick, Barry Sher, Mor Wetzler, Paul Hastings LLP, *for Amici Curiae FIM Limited and FIM Advisors LLP.*

Eric Fishman, Kerry A. Brennan, Brandon Johnson, Pillsbury Winthrop Shaw Pittman LLP, New York, NY, *for Amicus Curiae Falcon Private Bank Ltd.*

Richard L. Spinogatti, Proskauer Rose LLP, New York, NY, *for Amici Curiae Grosvenor Investment Management Ltd., Grosvenor Private Reserve Fund Limited, et al.*

William J. Sushon, Shiva Eftekhari, O'Melveny & Myers LLP, New York, NY, *for Amici Curiae Credit Suisse AG, Credit Suisse AG, Nassau Branch, et al.*

David J. Onorato, Jessica R. Simonoff, Susan A. Higginsshra, Freshfields Bruckhaus Deringer US LLP, New York, NY, *for Amicus Curiae Tensyr Limited.*

Brian H. Polovoy, Christopher R. Fenton, Andrew Z. Lipson, Shearman & Sterling LLP, *for Amicus Curiae Nomura International plc.*

John Westerman, Mickee Hennessy, Westerman Ball Ederer Miller & Sharfstein, LLP, Uniondale, NY, *for Amici Curiae DOS BFS Family Partnership II, L.P. and Donald and Bette Stein Family Trust.*

––––––––

BARRINGTON D. PARKER, *Circuit Judge*:

Bernard L. Madoff orchestrated a massive Ponzi scheme through the investment advisory unit of Bernard L. Madoff Investment Securities LLC ("BLMIS"). After the scheme collapsed, Irving H. Picard (the "Trustee") was appointed trustee for BLMIS pursuant to the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"). Under SIPA, a trustee is empowered to "recover" (or claw back) money paid out by the debtor, as long as the money "would have been customer property" had the payment not occurred, and the transfers could be avoided under the Bankruptcy Code. *Id.* § 78fff-2(c)(3).

Section 546(e) of the Bankruptcy Code, in turn, establishes an important exception to a trustee's clawback powers. *See* 11 U.S.C. § 546(e). Section 546(e) provides generally that certain securities-related payments, such as transfers made by a stockbroker "in

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page  8 of 24

connection with a securities contract," or  "settlement payment[s]" cannot be avoided in bankruptcy.

Invoking his clawback powers, the Trustee sued hundreds of BLMIS customers who withdrew more from their accounts than they had invested and, as a result, profited (whether knowingly or not) from Madoff's scheme.  The Trustee contends that, if BLMIS had not preferentially paid these customers, the money would have been customer property available to be distributed ratably to all customers, including those who, over time, had withdrawn less than they had invested.

Several defendants moved to dismiss the actions on the ground that the payments received by BLMIS customers were securities-related payments that cannot be avoided under § 546(e). The dispositive issue presented by this appeal is whether the payments that BLMIS made to its customers are the type of securities-related payments that are shielded by § 546(e) from clawback.

The United States District Court for the Southern District of New York (Rakoff, *J.*) concluded that the payments were shielded by § 546(e) and dismissed the relevant claims under Federal Rule of Civil Procedure 12(b)(6).  We agree and therefore we affirm.

## BACKGROUND

Because this appeal is from dismissals under Rule 12(b)(6), we assume the truth of all well pleaded facts in the underlying complaints and draw all reasonable inferences in favor of the Trustee.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).[1]

_____

[1] According to the Trustee, the hundreds of complaints in this case are substantially identical with respect to the issues raised in this appeal. Trustee's Br. 9 n.4. As a result, when we refer to the Trustee's allegations, we cite the complaint in *Picard v. Greiff*, Adv. Pro. No. 10-4357

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 9 of 24

## I

BLMIS purported to execute a "split strike conversion strategy" for customers of its investment advisory unit. This strategy, had it actually been executed, would have consisted of timing the market to purchase a basket of stocks on the S&P 100 Index, and then hedging those purchases with related options contracts. *See SIPC v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L. Madoff Inv. Secs. LLC)*, 424 B.R. 122, 129-30 (Bankr. S.D.N.Y. 2010) ("*SIPC v. BLMIS*").

In reality, however, BLMIS's investment advisory business conducted no actual securities or options trading on behalf of its customers. Instead, BLMIS deposited customer investments into a single commingled checking account and, for years, fabricated customer statements to show fictitious securities trading activity and returns ranging between 10 and 17 percent annually. When customers sought to withdraw money from their accounts, including withdrawals of the fictitious profits that BLMIS had attributed to them, BLMIS sent them cash from the commingled checking account. The Trustee seeks to claw back funds from customers who, over time, were able to take out more money than they had invested with BLMIS.

## II

In December 2008, the Madoff scheme was exposed and liquidation proceedings began in the district court. As a SIPA trustee, Picard was obligated to collect and set aside a fund of "customer property" specifically earmarked to repay BLMIS customers ratably in proportion to each customer's "net equity." *See* 15 U.S.C. §§ 78*lll*(4), 78fff-2(c); *see also In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 233 (2d Cir. 2011) ("*In re BLMIS*"). Where, as here, the customer property fund is not sufficient to pay customers in full,

---

(Bankr. S.D.N.Y. Nov. 30, 2010), J.A. 594-623.

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 10 of 24

SIPA empowers a trustee to claw back any transferred funds "which, except for such transfer[s], would have been customer property." 15 U.S.C. § 78fff-2(c)(3). But a trustee can only claw back those transferred funds "if and to the extent that [they are] voidable or void under the provisions of" the Bankruptcy Code. *Id.*

The Trustee invokes two different theories under the Bankruptcy Code to avoid transfers of fictitious profits to customers. The Trustee's first theory is that certain transfers are voidable as "fraudulent transfers" under 11 U.S.C. §§ 548(a)(1)(A) and (B). Section 548(a)(1)(A) applies to transfers made "with actual intent to hinder, delay, or defraud" creditors (often referred to as "actual fraud"). Section 548(a)(1)(B) applies to transfers made without "a reasonably equivalent value in exchange for such transfer" under certain circumstances. This provision is aimed at "constructive fraud," and does not require proof of fraudulent intent. Importantly, a trustee can invoke these provisions to recover payments only if the payments were "made . . . within 2 years before the date of the filing of the petition." *Id*. § 548(a)(1).

Because § 544(b) of the Bankruptcy Code permits a trustee to avoid any transfers that an unsecured creditor could avoid under applicable state law, the Trustee's second theory is that the transfers may be clawed back pursuant to New York's fraudulent conveyance law. *See* N.Y. Debt. & Cred. L. §§ 273-76. These state law provisions allow a creditor to avoid a debtor's improper transfer of property, including many of the same kinds of actually and constructively fraudulent transfers covered by §§ 548(a)(1)(A) and (B). But unlike the Bankruptcy Code, New York's fraudulent conveyance law has a six-year statute of limitations. *See* N.Y. C.P.L.R. § 213.

Many clawback defendants moved to dismiss the Trustee's claims as barred by § 546(e) of the Bankruptcy Code, which prevents a bankruptcy trustee from avoiding certain securities-related payments made by a stockbroker, including payments made in

connection with a securities contract and settlement payments. Section 546(e) is a very broadly-worded safe-harbor provision that was enacted to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.)*, 651 F.3d 329, 334 (2d Cir. 2011) (quoting H. R. Rep. No. 97-420, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583). The theory underlying this section is that, "[i]f a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk." *Id.* Because § 546(e) is expressly inapplicable to claims of actual fraud brought under § 548(a)(1)(A), the clawback defendants invoked § 546(e) to dismiss only the constructive-fraud claims under § 548(a)(1)(B) and all New York state law claims.

The clawback defendants first litigated the applicability of § 546(e) in two cases before the bankruptcy court. The bankruptcy court (Lifland, *Bankr. J.*) declined to reach the issue, concluding that the question of whether § 546(e) applies to the transfers at issue should not be determined at the pleading stage of the litigation. *Picard v. Merkin*, 440 B.R. 243, 266-67 (Bankr. S.D.N.Y. 2010); *Picard v. Madoff*, 458 B.R. 87, 115-16 (Bankr. S.D.N.Y. 2011).

Following the bankruptcy court's decisions, the district court withdrew the bankruptcy reference in one clawback action—the *Katz* case. After reexamining the issue, Judge Rakoff held that § 546(e) applied because BLMIS was a stockbroker, the account documents executed by the defendant customers were securities contracts, and the various payments BLMIS made to those customers were in connection with securities contracts, or were settlement payments. Accordingly, Judge Rakoff dismissed all of the clawback claims, except claims for actual fraud invoking § 548(a)(1)(A). *Picard v. Katz*,

462 B.R. 447, 452 (S.D.N.Y. 2011).  After the district court refused to certify the case for interlocutory appeal, *Picard v. Katz*, 466 B.R. 208 (S.D.N.Y. 2012), the parties settled and stipulated to dismiss the remaining claims with prejudice, *Picard v. Katz*, No. 11-cv-3605-JSR, Doc. Nos. 192-93 (S.D.N.Y. June 1, 2012).

Judge Rakoff's decision in *Katz* represented the first successful assertion of the § 546(e) defense by any of the clawback defendants. After the district court issued the *Katz* opinion, hundreds of other clawback defendants moved to withdraw the bankruptcy references and, invoking *Katz*, sought in the district court to dismiss the clawback suits on § 546(e) grounds.

In *SIPC v. BLMIS*, Judge Rakoff granted the motions to withdraw the bankruptcy reference in 84 additional clawback cases. 476 B.R. 715 (S.D.N.Y. 2012).  For substantially the same reasons articulated in *Katz*, the district court held that the payments that BLMIS made to the clawback defendants were in connection with securities contracts, or were settlement payments, and were therefore shielded by § 546(e).  *SIPC v. BLMIS*, 476 B.R. at 718-19. The district court then dismissed the clawback claims in these 84 suits, again with the exception of actual-fraud claims invoking § 548(a)(1)(A).  *SIPC v. BLMIS*, 476 B.R. at 723-24.

To streamline this Court's review, the Trustee agreed to a limited consolidation of all pending actions brought by the Trustee raising the § 546(e) issue.  *See* Consent Order, *SIPC v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff Secs.)*, No. 12-MC-0115, Doc. No. 13 (S.D.N.Y. May 16, 2012).  The district court certified its dismissals as final judgments, *see* Fed. R. Civ. P. 54(b), and the Trustee appealed.

## DISCUSSION

Section 546(e) of the Bankruptcy Code provides that a bankruptcy trustee

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 13 of 24

> may not avoid a transfer that is a . . . settlement payment, as defined in section . . . 741 of this title, made by [a] . . . stockbroker . . . , or that is a transfer made by [a] . . . stockbroker . . . in connection with a securities contract, as defined in section 741(7), . . . except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e). It is not disputed that BLMIS was a "stockbroker" for the purposes of § 546(e). Consequently, this appeal turns on whether the transfers either were "made in connection with a securities contract" or were "settlement payment[s]." *Id.*

The Trustee argues that § 546(e) should not apply because BLMIS never initiated, executed, completed, or settled the securities transactions contemplated by the customer agreements. He also contends that the transfers were not "made in connection with a securities contract" or "settlement payment[s]" as those terms are defined in § 741. Finally, the Trustee maintains that permitting the application of § 546(e) in this case would be tantamount to giving legal effect to Madoff's fraud. *See In re BLMIS*, 654 F.3d 229, 235 (2d Cir. 2011). For the following reasons, we reject these arguments, which flow from the premise that § 546(e) would only apply if Madoff had actually completed the securities transactions he purported to effectuate. Instead, we conclude that § 546(e) shields these transfers from avoidance because they were "made in connection with a securities contract," and were also "settlement payment[s]."

## I

Section 741(7) of the Bankruptcy Code, to which § 546(e) refers, defines "securities contract" with extraordinary breadth to include:

> (i) a contract for the purchase, sale or loan of a security
> . . . or . . . option to purchase or sell any such security
> . . . ; [or]
>
> . . .
>
> (vii) any other agreement or transaction that is similar
> to an agreement or transaction referred to in this
> subparagraph . . . . [or]
>
> . . .
>
> (x) a master agreement that provides for an agreement
> or transaction referred to in clause (i) [or] . . . (vii) . . . ,
> except that such master agreement shall be considered
> to be a securities contract under this paragraph only
> with respect to each agreement or transaction under
> such master agreement that is referred to in [clauses (i)
> through (ix)]; or
>
> (xi) any security agreement or arrangement . . . related
> to any agreement or transaction referred to in this
> subparagraph, including any guarantee or
> reimbursement obligation by or to a stockbroker . . . .

11 U.S.C. §§ 741(7)(A)(i),(vii),(x), (xi).

Thus, the term "securities contract" expansively includes contracts
for the purchase or sale of securities, as well as any agreements that
are *similar* or *related* to contracts for the purchase or sale of securities.
*Id.*  This concept is broadened even farther because § 546(e) also
protects a transfer that is "in connection" with a securities contract.

While neither the Bankruptcy Code nor SIPA defines purchase
or sale, the Securities Exchange Act of 1934 – of which SIPA is a part
– defines the terms to "include *any* contract to buy, purchase, or

otherwise acquire . . . [or] to sell or otherwise dispose of" a security. 15 U.S.C. § 78c(a)(13)-(14) (emphasis added). For the reasons that follow, we conclude that BLMIS and its customers entered into agreements that satisfy the broad definition of "securities contracts" under § 741(7)(A).

The clawback defendants argue that a "securities contract" was created by three of the documents that BLMIS customers were required to execute when opening their accounts. In the first, a "Customer Agreement," each customer authorized BLMIS to "open[] or maintain[] one or more accounts" for his benefit. J.A. 1257. In a second document, a "Trading Authorization," each customer appointed BLMIS to be the customer's "agent and attorney in fact to buy, sell and trade in stocks, bonds, and any other securities in accordance with [BLMIS's] terms and conditions for the [customer's] account." J.A. 1264. And in a third document, an "Option Agreement," each customer authorized BLMIS to engage in options trading for the customer's account. J.A. 1261-62. The defendants contend that these three account opening documents (together, the "Account Documents") authorized BLMIS to engage in securities transactions on behalf of its customers, although they did not expressly require BLMIS to conduct any such transactions, and consequently established a "securities contract."

We agree. On their face, the Account Documents are agreements by which BLMIS will "acquire or dispose of securities" on behalf of its customers. The Customer Agreement established the broker-customer relationship, and the Trading Authorization authorized BLMIS to trade in securities for the customer's account. A-2147-49, A-2144. These documents also specify the terms by which BLMIS will acquire and dispose of securities for the customer. Were it not for the Account Documents, there would be no basis for a customer to make deposits or request withdrawals. Thus, the

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 16 of 24

transfers at issue originated with, and could not have been possible but for, the relationship created by the Account Documents. Accordingly, we conclude that they fall within the statute's broad definition of "securities contract." *See* § 741(7)(A)(i).

The function contemplated for the Account Documents also satisfies the definition of "securities contract" in § 741(7)(A)(x), which includes "a master agreement that provides for an agreement or transaction referred to in clause (i) [*i.e.*, 'a contract for the purchase, sale, or loan of a security'])." As the Trustee acknowledges in his brief, "master agreement" is a "term of art in the securities industry" meaning "a contract establishing the mutual undertakings between two counterparties that anticipate executing future securities transactions with each other. . . ." Trustee Br. 43 (citing Paul C. Harding, *Mastering the ISDA Master Agreements (1992 and 2002)* 19-27 (2d ed. 2004)). Taken together, this is precisely what the Account Documents contemplate and accomplish. The Trustee's own complaints further support this conclusion. He alleges that "Madoff *promised* [his] clients that their funds would be invested in a basket of common stocks within the S&P 100 Index," and hedged with corresponding options contracts. J.A. 601 ¶ 21 (emphasis added). Additionally, because the Account Documents obligate BLMIS to reimburse its customers upon a request for withdrawal, they also fit the definition of "securities contract" in § 741(7)(A)(xi), which includes, again quite expansively, "any security agreement or arrangement related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or to a stockbroker."

Yet another indication that Congress intended § 546(e) to sweep broadly is supplied by the text of § 741(7)(A)(vii) which expands the definition of "securities contract" to include "*any* other *agreement* or transaction that is *similar to*" a "contract for the

08-01789-cgm    Doc 8683-1    Filed 12/09/14    Entered 12/09/14 13:24:40    Exhibit A
Pg 18 of 25

purchase, sale or loan of a security[.]"   Few words in the English language are as expansive as "any" and "similar."   *See Deravin v. Kerik*, 335 F.3d 195, 204 (2d Cir. 2003) ("[R]ead naturally, the word "any" has an expansive meaning,' and . . . so long as 'Congress did not add any language limiting the breadth of that word,' the term 'any' must be given literal effect." (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)).  In ordinary usage, the word "similar" means "having characteristics in common," or "alike in substance or essentials."   Webster's 3d New Int'l Dictionary 2120 (1993).  In light of these definitions, we conclude that the relationship between BLMIS and its customers established by the Account Documents involved "agreement[s]" that are "similar to" "contracts for the purchase, sale or loan of a security . . . ." 11 U.S.C. §§ 741(7)(A)(i), (vii).

The Trustee advances several arguments why, in his view, these agreements do not constitute a "securities contract" and the transfers at issue should not be shielded from avoidance.  None are persuasive.  *First*, the Trustee argues that § 546(e) does not apply because BLMIS never initiated, executed, completed or settled the securities transactions it promised to engage in.  Trustee's Br. 25-35. Citing our decision in *Enron*, the Trustee contends that the purpose of § 546(e) is to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries."  *Id*. at 27 (quoting *Enron*, 651 F.3d at 334).   Because "there are no securities transactions to unwind," the Trustee argues that no such disruption would occur, and correspondingly, § 546(e) is inapplicable.  Trustee's Br. 25.

This argument misses the point.  It does not engage with the language Congress chose for  § 741(7) and § 546(e).  Because those provisions do not contain a purchase or sale requirement, whether

or not BLMIS actually transacted in securities is not determinative.[2] Section 546(e) only requires that a covered transfer be broadly related to a "securities contract," not that it be connected to an actual securities transaction.[3]   In other words, whether an agreement satisfies the definition of "securities contract" does not depend on the broker's performance, because a breach of a contract neither changes nor nullifies the nature of the underlying agreement.  The existence  of a securities contract is not vitiated  because a broker fails to make good on his commitment. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 581 (2d Cir. 2006).

Furthermore, the interpretation pressed by the Trustee risks the very sort of significant market disruption that Congress was concerned with.  The magnitude of BLMIS's scheme, which included thousands of customers and billions of dollars under management, is unprecedented.   Permitting the clawback of millions, if not billions, of dollars from BLMIS clients – many of whom are institutional investors and feeder funds – would likely cause the very "displacement" that Congress hoped to minimize in enacting § 546(e).   *See Enron*, 651 F.3d at 339.  The clawback defendants, having every reason to believe that BLMIS was actually engaged in

---

[2] Similarly, the Exchange Act's inclusion of contracts to "otherwise acquire" or "dispose of" securities in its definition of "buy" and "sell" necessarily contemplates  agreements beyond those for a simple sale or purchase.  *See* 15 U.S.C. §§ 78c(a)(13)-(14).

[3] This conclusion is congruent with the broad interpretation of the "in connection with a purchase or sale of any security" requirement of Rule 10b-5 in the context of federal securities laws.  *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 n.10 (2006) ("[A] broker who accepts payment for securities that he never intends to deliver . . . violates §10(b) and Rule 10b-5.") (citations and quotations omitted); *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (holding that the SEC may bring a public enforcement action against a broker who accepted payment for securities that he never delivered); *see also Grippo v. Perazzo*, 357 F.3d 1218, 1220-24 (11th Cir. 2004) ("A plaintiff does not need to identify a specific security, or demonstrate that his money was actually invested in securities" for purposes of Rule 10b-5).

the business of effecting securities transactions, have every right to avail themselves of all the protections afforded to the clients of stockbrokers, including the protection offered by § 546(e).

*Second*, the Trustee argues that the Account Documents are not securities contracts because they do not specifically "identify any security, issuer, quantity, price, or other terms necessary to describe a security transaction."[4]    *See* Trustee Br. 38.    This argument constructs a requirement that the law does not contain.  The Trading Authorization identifies a specific category of public securities (S&P 100 stocks) to be traded. A-1646 ¶ 21.  Nothing in our reading of § 741(7)(A) indicates that any greater specificity, much less the degree of detail called for by the Trustee, is required.  To the contrary, if Congress intended to mandate securities contracts to identify transactions with the precision the Trustee claims is required, Congress would hardly have  included the reference to "master agreements" in subsection (x) or adopted the broad "similar to" catch-all in subsection (vii) or the "any . . . arrangement . . . related to any agreement . . ." language in subsection (xi).  *See Penn. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990).

*Third*, the Trustee argues that the Account Documents merely authorize BLMIS to conduct securities transactions on behalf of its customers, but never expressly obligate BLMIS to carry out any such transactions.  Trustee's Br. 38-39.  Accordingly, the Trustee contends that even if customers reasonably expected that BLMIS would conduct securities transactions on their behalf, this would establish an obligation sounding in "quasi-contract" at most, but would not constitute a true contractual obligation. *Id.* at 39.  Alternatively, the Trustee argues that the Account Documents establish an "agency"

---

[4] The Securities Investor Protection Corporation ("SIPC"), also an appellant in this case, assumed *arguendo* for the purposes of its brief that the Account Documents are securities contracts. *See* SIPC Br. 2, 14.

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 20 of 24

relationship between BLMIS and its customers, similar to that between a real estate broker and a home buyer, and "are no more contracts for the purchase and sale of a security than a real estate brokerage agreement is a contract for the purchase or sale of a house." *Id*. at 42.

The Trustee might be correct that the record reflects no written contract for the purchase or sale of a specific security between BLMIS and its customers. Further, the Trustee is right that the Account Documents function by authorizing BLMIS to act as an agent for the customer in unspecified expected future securities transactions. The Trustee is also correct that, standing alone, the Account Documents would not effectuate the purchase or sale of any particular security.

But, as we have seen, the statutory definition of a "securities contract" is not limited in the way the Trustee would have us read it, and to the contrary, encompasses the relationship created by the Account Documents. As discussed above, the definition includes "*any other agreement* . . . that is *similar* to" a "contract for the purchase, sale or loan of a security." 11 U.S.C. §§ 741(7)(A)(i), (vii) (emphases added). "An agreement is a manifestation of mutual assent on the part of two or more persons," and it "has in some respects a wider meaning than contract, bargain or promise." Restatement (Second) of Contracts § 3 (1979),  § 3 cmt. a.  The Account Documents established that BLMIS and its customers "manifest[ed] their mutual assent" that BLMIS would conduct securities transactions on the customers' behalf pursuing a specific investment strategy. *See id.* § 3.  This is, in our view, an agreement sufficiently "similar to" a contract for the purchase or sale of a security to fall within the catch-all provision of § 741(7)(A)(vii). Of course, BLMIS secretly intended to violate the agreement by using the deposits to fund the ongoing Ponzi scheme. But this is of no

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 21 of 24

moment, because "[a]n agreement is a manifestation of mutual assent," and "[t]he *conduct* of a party may manifest assent even though he does not *in fact* assent." *Id*. §§ 3, 19(3) (emphasis added).

We similarly have little difficulty concluding that the payments BLMIS made to its customers were made "in connection with" the securities contracts identified above. In the context of § 546(e), a transfer is "in connection with" a securities contract if it is "related to" or "associated with" the securities contract. *See* Webster's 3d New Int'l Dictionary 481 (1993) (defining "connection" as "relationship or association in thought"); *cf. Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983) (interpreting "relates to" to mean "a connection with or reference to"). Here, BLMIS promised its customers that it would transact securities, and BLMIS's customers deposited money relying on that promise. This agreement constitutes a securities contract as defined in the statute and the customers' subsequent withdrawals from their accounts were therefore related to, and associated with, this securities contract.

SIPC argues that Ponzi scheme payments, by definition, are not "in connection with" a securities contract. SIPC's Br. 16. SIPC contends that in order for the payments to have been made "in connection with" a securities contract, there must necessarily have been some relation or connection between the payment and the contract. *Id.* at 27-28. According to SIPC, although the payments of fictitious profits were purported to have been made in connection with the agreements, they were not in fact made in connection with the agreements because the agreements were either irrelevant or the payments were not authorized by the agreements. *Id.* at 28-30.

We are not persuaded. Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided. Congress could have raised the bar by requiring that the transfer be made "pursuant to," or "in accordance

Case 12-2557, Document 411-1, 12/08/2014, 1386985, Page 22 of 24

with the terms of," or "as required by," the securities contract, but it
did not.  Instead, Congress merely required that the transfer have a
connection to the securities contract, which these payments do.

Certainly SIPC and the Trustee are correct that these transfers
were also made "in connection with" a Ponzi scheme and, as a
result, were fraudulent.  *See id*. at 29.  Indeed, BLMIS's conduct was
in flagrant breach of the agreements it made with its customers.  But
the fact that a payment was made in connection with a Ponzi scheme
does not mean that is was not at the same time made in connection
with a (breached) securities contract.  After all, a transfer can be
connected to, and can be made in relation to, multiple documents or
purposes simultaneously.

## II

We also conclude that the transfers constituted "settlement
payments," which provides another basis to shield the transfers
from avoidance under § 546(e).  As described above, § 546(e)
provides that a trustee "may not avoid a transfer that is a . . .
settlement payment, as defined in . . . this title, made by [a] . . .
stockbroker." Section 741(8) defines "settlement payment" as a
"preliminary settlement payment, a partial settlement payment, an
interim settlement payment, a settlement payment on account, a
final settlement payment, or any other similar payment commonly
used in the securities trade."

The Trustee again contends that these transfers did not
constitute "settlement payment[s]" because BLMIS never engaged in
actual securities trading. But we have held that the statutory
definition should be broadly construed to apply to "the transfer of
cash or securities made to complete [a] securities transaction." *Enron*,
651 F.3d at 334 (citations omitted).  That is what the BLMIS clients
received.   Each time a customer requested a withdrawal from

BLMIS, he or she intended that BLMIS dispose of securities and remit payment to the customer. *See* N.Y.U.C.C. § 8-501(b)(1) & cmt. 2 (broker's written crediting of securities to a customer's account creates an enforceable securities entitlement). The statutory definition and *Enron* compel the conclusion that, for example, if I instruct my broker to sell my shares of ABC Corporation and remit the cash, that payment is a "settlement" even if the broker may have failed to execute the trade and sent me cash stolen from another client. As the district court correctly concluded, because the customer granted BLMIS discretion to liquidate securities in their accounts to the extent necessary to implement their sell orders or withdrawal requests, each transfer in respect of a such an order or request constituted a settlement payment.

## III

Finally, we disagree with the Trustee's contention that affirming the district court's decision would be inconsistent with our decision in *In re BLMIS*, 654 F.3d 229 (2d Cir. 2011). There, we faced the question of how to calculate each BLMIS customer's "net equity," as that term is defined in SIPA. *Id*. at 233. We said that it would be "absurd" to calculate customers' net equity using BLMIS's fictitious account statements, because that would "have the . . . effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." *Id.* at 235. According to the Trustee, this case is similar. The Trustee argues that, to allow customers to retain the fictitious profits Madoff arbitrarily bestowed on them amounts to giving legal effect to his fraud. Trustee's Br. 51-55.

This argument, albeit compelling, is ultimately not convincing. In our earlier decision, we interpreted "net equity" in a manner that would harmonize it with the SIPA statutory framework as a whole. *See In re BLMIS*, 654 F.3d at 237. Section 546(e),

however, is part of the Bankruptcy Code, not SIPA, and was not in issue in *In re BLMIS*. This is important because, in enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality. *See In re Century Brass Prods., Inc.*, 22 F.3d 37, 40 (2d Cir. 1994). For example, a bankruptcy trustee can recover fraudulent transfers under § 548(a)(1) only when the transfers took place within two years of the petition date. And avoidance claims must be brought "two years after the entry of the order for relief" at the latest. 11 U.S.C. § 546(a). These statutes of limitations reflect that, at a certain point, the need for finality is paramount even in light of countervailing equity considerations. Similarly, by enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest in finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers under § 548(a)(1)(A). We are obliged to respect the balance Congress struck among these complex competing considerations.

## CONCLUSION

The judgment of the district court is AFFIRMED.