**Baker & Hostetler LLP**

45 Rockefeller Plaza

New York, New York 10111

Telephone: (212) 589-4200

Facsimile: (212) 589-4201

David J. Sheehan

Email: dsheehan@bakerlaw.com

Seanna R. Brown

Email: sbrown@bakerlaw.com

Heather R. Wlodek

Email: hwlodek@bakerlaw.com

Hearing Date: January 15, 2015

Hearing Time: 10:00 A.M. (EST)

Objection Deadline: January 8, 2015

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>             Plaintiff-Applicant,<br><br>      v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>             Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>             Debtor. | |

**MOTION FOR AN ORDER APPROVING FIFTH ALLOCATION OF PROPERTY TO**
**THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING FIFTH INTERIM**
**DISTRIBUTION TO CUSTOMERS**

# TABLE OF CONTENTS

**Page**

I.     EXECUTIVE SUMMARY ..................................................................................1

II.    THE LIQUIDATION PROCEEDING ...............................................................8

III.   ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA ............9

       A.     Allocation of Property....................................................................9

       B.     Distributions Under SIPA .............................................................11

       C.     Allocation Of Assets To The Customer Fund And Related Reserves .................12

              i.      Assets In Trustee's Possession As Of November 30, 2014 .....................15

              ii.     Blumenfeld..........................................................................15

              iii.    Herald/Primeo ....................................................................16

              iv.     Senator Fund ......................................................................16

              v.      Other Recoveries To The BLMIS Estate Since The Fourth
                      Allocation and Fourth Interim Distribution ...............................17

              vi.     Disputed Recoveries ...........................................................17

              vii.    Summary Of Requested Allocation .......................................18

       D.     Determination Of Allowable Net Equity Claims & Related Reserves .................20

IV.    CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR FIFTH
       ALLOCATION AND FIFTH INTERIM DISTRIBUTION ...........................................21

       A.     No Interim Distribution Of General Estate...........................................25

V.     MISCELLANEOUS ...........................................................................................26

       A.     Notice ...................................................................................26

       B.     Record Date ...........................................................................26

VI.    CONCLUSION...................................................................................................27

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this motion (the "Motion")

pursuant to SIPA §§ 78*lll*(4), 78fff(a)(1)(B), 78fff-2(b), and 78fff-2(c)(1), and Rule 9013 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an order (1)

approving the fifth allocation of property ("Fifth Allocation") to the fund of customer property

("Customer Fund"); and (2) authorizing a fifth pro rata interim distribution ("Fifth Interim

Distribution") to customers whose claims for customer protection under SIPA have been allowed

for amounts exceeding the SIPA statutory advance limits and which have not already been

satisfied by the first, second, third and fourth pro rata interim distributions.  This Court has

jurisdiction over this Motion pursuant to SIPA §§ 78eee(b)(2), 78eee(b)(4), 28 U.S.C. §§ 157

and 1334, and Bankruptcy Rule 5005.  This Motion is based upon the law set forth below as well

as the facts set forth in the affidavit of Vineet Sehgal ("Sehgal Aff."), filed herewith.  In support

of this Motion, the Trustee alleges and represents as follows:

## I.   **EXECUTIVE SUMMARY**

1.    In order to protect customers of an insolvent broker-dealer such as BLMIS,

Congress established a statutory framework pursuant to which customers of a debtor in a SIPA

liquidation are entitled to preferential treatment in the distribution of assets from a debtor's

estate.  The mechanism by which customers receive preferred treatment is through the creation

of a fund of "customer property" as defined in SIPA § 78*lll*(4), which is distinct from a debtor's

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

general estate.  Customers holding allowable claims are entitled to share pro rata in the Customer

Fund based on each customer's "net equity" as of the filing date, to the exclusion of general

creditors.  SIPA § 78fff-2(c).

2.      In order to make distributions from the Customer Fund, the Trustee must

determine or be able to sufficiently estimate: (a) the total value of customer property available

for distribution, or the "numerator" (including reserves for disputed recoveries), and (b) the total

net equity of all allowed claims, or the "denominator" (including reserves for disputed claims).

The Trustee calculates reserve amounts on a "worst-case" basis, such that the ultimate resolution

of disputed amounts will not adversely affect any customers' allowed or disputed net equity

distributions.

3.      In this case, for purposes of determining each customer's "net equity," the Trustee

credited the amount of cash deposited by the customer into his BLMIS account, less any amounts

already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the

"Trustee's Net Investment Method").  Some claimants argued that the Trustee was required to

allow customer claims in the amounts shown on the November 30, 2008 customer statements

(the "Last Statement Method," creating the "Net Equity Dispute").  Litigation over the Net

Equity Dispute has now proceeded through this Court,[2] the Second Circuit,[3] and the Supreme

Court of the United States.[4]  The Trustee's Net Investment Method was upheld.

---

[2] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

[3] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision").

[4] Two petitions for writ of certiorari were denied by the Supreme Court of the United States on June 25, 2012.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC) (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Ryan v. Picard*, 133 S.Ct. 24 (2012); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (In re Bernard L. Madoff Inv. Sec., LLC), 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Velvel v. Picard*, 133 S.Ct. 25 (2012).  A third petition

4.      On May 4, 2011, the Trustee moved for an initial allocation and pro rata interim distribution of the Customer Fund ("First Allocation" and "First Interim Distribution").  (ECF No. 4048).   On July 12, 2011, this Court ordered the First Allocation and First Interim Distribution, in which the Trustee allocated approximately $2.618 billion to the Customer Fund and distributed approximately $605.023 million on allowed claims relating to 1,328 accounts, or 4.602% of each customer's allowed claim, unless the claim was fully satisfied.  Because the Net Equity Dispute was outstanding at the time of the First Allocation Motion, the Trustee, with the Court's approval, set a reserve for that issue.

5.      On July 26, 2012, the Trustee moved for a second allocation and pro rata interim distribution of the Customer Fund ("Second Allocation" and "Second Interim Distribution"). (ECF No. 4930).   On August 22, 2012, this Court ordered the Second Allocation and Second Interim Distribution, in which the Trustee allocated approximately $5.501 billion to the Customer Fund and distributed approximately $4.393 billion on allowed claims relating to 1,314 accounts, or 33.556% of each customer's allowed claim, unless the claim was fully satisfied.

6.      At the time of the Second Allocation Motion, a final, nonappealable order had been entered on the Net Equity Dispute, upholding the Trustee's Net Investment Method.  As a result of that ruling, a separate but related question of whether claimants are entitled to an increase of their claims based on the time that elapsed while their monies were deposited with BLMIS ("Time-Based Damages") was relevant to the Second Allocation Motion.  In its order approving the Second Allocation Motion (ECF No. 4997), the Court required the Trustee to maintain a reserve for the Time-Based Damages Dispute at not less than 3% ("the 3% Reserve").

---

for writ of certiorari was dismissed.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. dismissed sub nom. Sterling Equities Assocs. v. Picard*, 132 S.Ct. 2712 (2012).

On September 10, 2013, Judge Lifland held a hearing on the Time-Based Damages Dispute and granted the Trustee's motion, finding that claimants were not entitled to Time-Based Damages as part of their net equity claims against the fund of customer property (the "Time-Based Damages Decision"). *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 496 B.R. 744 (Bankr. S.D.N.Y. 2013). On September 24, 2013, the Court certified the Time-Based Damages Decision for a direct appeal to the Second Circuit, (ECF No. 5514), which was accepted on January 22, 2014. *In re Bernard L. Madoff Inv. Sec. LLC*, No. 14-97(L) (2d Cir. Jan. 22, 2014). Briefing has been completed before the Second Circuit, and oral argument took place on October 14, 2014. The matter is *sub judice*.

7.      On February 13, 2013, the Trustee moved for a third allocation and pro rata interim distribution of the Customer Fund ("Third Allocation" and "Third Interim Distribution"). (ECF No. 5230). On March 13, 2013, this Court ordered the Third Allocation and Third Interim Distribution, in which the Trustee allocated approximately $1.198 billion to the Customer Fund and distributed approximately $614.029 million on allowed claims relating to 1,128 accounts, or 4.721% of each customer's allowed claim, unless the claim was fully satisfied.

8.      On March 25, 2014, the Trustee moved for a fourth allocation and pro rata interim distribution of the Customer Fund ("Fourth Allocation" and "Fourth Interim Distribution"). (ECF No. 6024). On April 17, 2014, this Court ordered the Fourth Allocation and Fourth Interim Distribution, in which the Trustee allocated approximately $477.504 million to the Customer Fund and distributed approximately $412.830 million on allowed claims relating to 1,096 accounts, or 3.180% of each customer's allowed claim, unless the claim was fully satisfied.

9.      On November 19, 2014, this Court approved a $32.75 million settlement between the Trustee and the Blumenfeld Defendants,[5] together with an assignment to the Trustee of certain of the Blumenfeld Defendants' allowed customer claims in the aggregate amount of $29,348,309.09 (the "Blumenfeld Defendant Allowed Customer Claims"). *Picard v. Edward Blumenfeld, et al.,* Adv. Pro. No. 10-04730 (Bankr. S.D.N.Y.) (SMB) (ECF No. 45). Under the settlement, the Blumenfeld Defendants paid $32.75 million to the Trustee and assigned the Blumenfeld Defendant Allowed Customer Claims to the Trustee.

10.      On December 17, 2014, this Court approved a $467,701,943 settlement between the Trustee and Herald Fund SPC (In Official Liquidation) ("Herald"), and a $29,142,345 settlement between the Trustee and Primeo Fund (In Official Liquidation) ("Primeo"). *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 349).

---

[5] The "Blumenfeld Defendants" are Edward Blumenfeld, individually, and as Trustee for Susan Blumenfeld GST Trust, Trust F/B/O Susan Blumenfeld, Trust F/B/O David Blumenfeld, and Trust F/B/O Brad Blumenfeld; Susan Blumenfeld, individually, and as Trustee for Trust F/B/O Susan Blumenfeld, Trust F/B/O David Blumenfeld, Trust F/B/O Brad Blumenfeld, David Blumenfeld Farmingdale Trust, Brad Blumenfeld Farmingdale Trust, Boxwood Realty Group, and Dogwood Realty Group; David Blumenfeld, individually, and as Trustee for Susan Blumenfeld GST Trust, The David Blumenfeld Family Trust, Trust F/B/O David Blumenfeld, Boxwood Realty Group, and Dogwood Realty Group; Brad Blumenfeld, individually, and as Trustee for Susan Blumenfeld GST Trust, The David Blumenfeld Family Trust, Trust F/B/O Brad Blumenfeld, Boxwood Realty Group, and Dogwood Realty Group; Harvey Cohen, individually, and as Trustee for Edward Blumenfeld and Susan Blumenfeld Charitable Lead Trust, Edward and Susan Blumenfeld 2007 Charitable Lead Trust, and Brad Blumenfeld Charitable Lead Trust; Blumenfeld Development Group, LTD.; Edward and Susan Blumenfeld Charitable Lead Trust; Edward Blumenfeld & Susan Blumenfeld 2007 Charitable Lead Trust; Trust F/B/O David Blumenfeld; Susan Blumenfeld GST Trust; Trust F/B/O David Blumenfeld; Edward Blumenfeld & Susan Blumenfeld, Guardians for David Blumenfeld NY UGMA; Brad Blumenfeld Charitable Lead Trust; Trust F/B/O Brad Blumenfeld; Edward Blumenfeld & Susan Blumenfeld, Guardians for Brad Blumenfeld NY UGMA; The Brad Blumenfeld Family Foundation; The Edward and Susan Blumenfeld Foundation; Bull Market Fund; Edward Blumenfeld Et Al II; DWD Associates, LLC; BDG DWD Associates, LLC; EDB Capital, LLC; Double B Squared, LLC; Edward Blumenfeld Gerald Y Mordfin Et Al; Dogwood Realty Group; Edward Blumenfeld Et Al; LaGuardia Corporate Center Associates, L.P.; LaGuardia Corporate Center Associates, LLC; Boxwood Realty Group; South Sea Holdings, L.P.; BDG Piscataway, LLC; BDG Kingsbridge, LLC; BWI (A/K/A Blumenfeld Weinstein Inc.); Susan Blumenfeld Interiors, LTD.; BDG Construction Corp.; David Blumenfeld Farmingdale Trust; The David Blumenfeld Family Trust; Brad Blumenfeld Farmingdale Trust; 45 South Service Road, LLC; BCC II, LLC; BDG Commack, LLC; BDG Deer Park Associates, LLC; BDG Lake Grove I, LLC; BDG Larkfield Associates, LLC; Charleston Enterprises, LLC; Daniel Land Co., LLC; BDG Daniel Street, LLC; Gotham Plaza Associates, LLC; BDG 125th Street, LLC; 10 Michael Drive Associates, L.P.; 500 Bi-County Associates, L.P.; ARC-BDG Setauket Enterprise; Blumco Setauket, LLC; Coblum Setauket, LLC; BDG 1.15 Broadhollow, L.P.; Maxrob, L.P.; B-4 Partnership; 125 Bethpage Associates; and BDG Yaphank, LLC.

Under the settlement, Herald received an allowed claim in the amount of $1,639,896,943 and is therefore entitled to a catch-up distribution in the amount of $755,320,132.98 (distributions one through four totaling 46.059% of the allowed claim). Herald will satisfy both the Herald and Primeo settlements by assigning to the Trustee: (i) the funds to be advanced by SIPC in the amount of $500,000 under Herald's allowed customer claim, and (ii) $496,344,288 of the $755,320,132.98 catch-up distribution owed to Herald under its allowed customer claim.

11.    On December 17, 2014, this Court approved a $95 million settlement between the Trustee and Senator Fund SPC ("Senator"). *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 350). Under the settlement, Senator received an allowed claim in the amount of $238,753,482 and is therefore entitled to a catch-up distribution in the amount of $109,967,466.28 (distributions one through four totaling 46.059% of the allowed claim). Senator will pay $95 million by assigning to the Trustee: (i) the funds to be advanced by SIPC in the amount of $500,000 under Senator's allowed customer claim, and (ii) $94.5 million of the $109,967,466.28 catch-up distribution owed to Senator under its allowed customer claim.

12.    With these and other additional funds, the Trustee now stands ready to make a fifth significant distribution to customers with allowed claims. The practical effect of this determination is to permit a fifth interim distribution to customers whose claims have not been fully satisfied because the net equity of their respective accounts as of the Filing Date[6] exceeded the statutory SIPA protection limit of $500,000 and were not satisfied by the First, Second, Third or Fourth Interim Distributions.

---

[6] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm. *See* SIPA § 78*lll*(7)(B).

13.     Thus, by way of this Motion, the Trustee seeks to distribute, after maintaining the 3% Reserve, approximately $322.460 million (with an additional $120.139 million available for distribution to certain "net loser" accounts in litigation, if the claims relating to their accounts become allowed prior to the time the distribution is made, or reserved, if not allowed).[7]   The Fifth Interim Distribution, when combined with the First, Second, Third and Fourth Interim Distributions, will provide all claimants that have an allowed claim 48.546% of the customer's allowed claim amount, plus the SIPC advance of up to as much as $500,000.   The proposed distribution will be paid on claims relating to 1,075 BLMIS accounts.   The average payment amount to those 1,075 BLMIS accounts will be $299,962.86.   Twenty-three payments will go to claimants who qualified for hardship status under the Trustee's claims hardship program.   If approved, and when combined with the SIPC payment, the amounts from the First Interim Distribution, the Second Interim Distribution, the Third Interim Distribution and the Fourth Interim Distribution, claims relating to 1,154 accounts will be fully satisfied.

14.     The proposed Fifth Allocation and Fifth Interim Distribution are interim in nature. The Trustee anticipates recovering additional assets through litigation and settlements.   Final resolution of certain disputes will permit the Trustee to reduce the reserves he is required to maintain, which will allow him to make additional distributions to customers in the future.   The Trustee will seek authorization for these further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.[8]

---

[7] If all of these "net loser" accounts were allowed prior to the distribution, the total distribution to claimants would be approximately $442.314 million ($442,314,447.52), based on the net equity amount for deemed determined accounts.

[8] The Trustee seeks permission to include in the Fifth Interim Distribution those claims that are allowed between the time an order is entered on this Motion and the date of the Fifth Interim Distribution.

## II.    THE LIQUIDATION PROCEEDING

15.    Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11" to the extent these provisions are consistent with SIPA.

16.    SIPA affords special protection to "customers," as defined in SIPA § 78*lll*(2), who receive preferential treatment by having their claims satisfied ahead of general creditors. *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (recognizing that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment").  The amounts owed to each customer are determined by valuing his or her "net equity," defined in SIPA § 78*lll*(11), as of the Filing Date.

17.    To date, the Trustee has received 16,519 customer claims.  (Sehgal Aff. ¶ 4).  To date, the Trustee has determined 16,393 of those claims.  (*Id.* ¶ 4).  The other 126 claims are discussed in Paragraph 18 below.  The Trustee allowed 2,547 claims and committed to pay approximately $822.545 million in funds advanced to him by SIPC.  (*Id.*).  To date, the allowed claims total approximately $13.333 billion.  (*Id.*).  The Trustee denied 13,125 claims that were purported to be customer claims.  Twelve other claims were filed that asserted no claim.  Another 709 claims have been withdrawn.  *(Id.*).

18.    One hundred twenty-six claims are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants.  (*Id.* ¶ 5). The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under section 502(d) of the Bankruptcy Code.  Accordingly,

such claims will not be allowed until the avoidance action is resolved by settlement or otherwise and any judgment rendered against the claimant in the avoidance action is satisfied.

19.    As of December 22, 2014, the Trustee has received 427 timely and 22 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.743 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 449 claims, 94 are general creditor claims and 49 are broker-dealer claims, which together total approximately $264.975 million of the $1.743 billion.[9]  (*Id.* ¶ 6).

20.    2,208 docketed objections have been filed to the Trustee's claims determinations relating to 3,837 claims, which will be noticed for hearing as necessary.  (*Id.* ¶ 7).  These 2,208 objections relate to 1,118 BLMIS accounts.  (*Id.*).  The objections raise various issues, including the proper interpretation of "net equity" (now resolved), the right to interest or time value of money (now on appeal), and whether the Trustee's calculation of allowed claims amounts are correct.

## III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA

### A.    Allocation of Property

21.    SIPA sets forth a bipartite statutory framework that gives customers priority over general creditors of the broker-dealer.  Pursuant to SIPA § 78fff-2(c)(1)(B), all customers with allowed claims share ratably in the fund of customer property.  Pursuant to SIPA § 78fff-2(c), general creditors and customers, to the extent of their respective unsatisfied net equities, share in

---

[9] The 449 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims.  (Sehgal Aff. ¶ 6).  They do not include "customer" claims, even though each "customer" claim—both those allowed and denied—has a "general creditor" component.  All BLMIS creditors, including customers whose claims were allowed, customers whose claims were denied, and general creditors, may have claims as general creditors against BLMIS for misrepresentation, fraud, and breach of contract (assuming they filed claims).  Customers who filed customer claims need not have specifically filed claims as general creditors to protect such rights.

any general estate.  Estate property not allocable to the fund of customer property is distributed in the order of priority established in section 726 of the Bankruptcy Code.  SIPA § 78fff(e).  Any property allocated to the fund of customer property that is not necessary to satisfy customer and other priority claims will become part of the general estate.  SIPA § 78fff-2(c).

22.    According to SIPA § 78lll(4), "customer property" consists of "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

23.    Among the assets that comprise "customer property" are "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . ."  SIPA § 78*lll*(4)(D).  Under SIPA § 78*lll*(4)(D), a trustee is permitted to look to the property of the debtor to rectify the actions taken by the debtor that resulted in a shortfall in customer property.  *See Ferris, Baker, Watts v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 132 (Bankr. D. Minn. 2002) ("Application of the plain meaning of 15 U.S.C. § 78lll(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall. . . . Thus, if the debtor failed to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78lll(4)(D) would require the trustee to correct the debtor's error.").

24.    Thus, if the trustee determines that there is a shortfall in assets such that customer property is insufficient to satisfy net equity claims, then he may look to other assets of the debtor and allocate property to the fund of customer property.

25.    SIPA liquidations generally take a broad and inclusive customer-related approach to the allocation of property.  For example, in *In re Park South Securities, LLC*, 99% of the

debtor's estate was allocated to customer property. See Order, No. 03-08024A (Bankr. S.D.N.Y. Oct. 30, 2008) (ECF No. 201).[10] Consistent with prior liquidations, the Trustee expects to allocate the vast majority of the BLMIS estate to the Customer Fund, inasmuch as here, recovered property either belonged to customers or was derived from the misuse of customer property.

### B.    Distributions Under SIPA

26.    The SIPA distribution scheme, while complex, can be distilled to a simple equation. Each customer is entitled to his or her pro rata share of customer property. To determine the percentage that each allowed customer will receive from the fund of customer property in an interim distribution, the aggregate amount collected to date by the Trustee and allocated to customer property is divided by the aggregate amount of net equity claims allowed by the Trustee. The percentage result is then to be applied to each net equity claim to determine a customer's pro rata share. The equation is as follows:

$$\frac{\text{Fund of Customer Property (``Numerator'')}}{\text{Allowable Customer Net Equity Claims (``Denominator'')}} = \text{Customer Pro Rata Share}$$

27.    SIPA § 78fff-2(c)(1) establishes the order of distribution of customer property. The second and third priorities of distribution are relevant here. The second priority is to distribute customer property among customers based on their filing date net equities. SIPA

---

[10] *Accord SIPC v. Lehman Brothers, Inc.*, Adv. Pro. No. 08-01420, Motion for Order Approving Allocation of Property of the Estate at 27-28, n.33 (Bankr. S.D.N.Y. Oct. 5, 2009) (ECF No. 1866) (allocating "most" of debtor's assets to customer property); *In re Vision Inv. Grp., Inc.*, Adv. Pro. No. 97-1035B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); *In re Klein Maus & Shire, Inc.*, Adv. Pro. No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); *In re MJK Clearing*, 286 B.R. at 132 (allocating 100% the debtor's assets as customer property); *In re A.R. Baron & Co., Inc.*, Order Approving Final Report and Account and Related Relief, Adv. Pro. No. 96-8831A (Bankr. S.D.N.Y. Feb. 10, 2004) (allocating 99% of the debtor's assets to customer property); *In re Hanover, Sterling & Co.*, Adv. Pro. No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

§ 78fff-2(c)(1)(B).  The third priority is to distribute customer property to SIPC as subrogee.  SIPA § 78fff-2(c)(1)(C).  Thereafter, any customer property remaining becomes part of the general estate.

28.    The amount advanced by SIPC to the Trustee in full or partial satisfaction of a customer claim is based on the difference between the customer's net equity and his share of customer property, subject to the $500,000 limit of SIPA's statutory protection.  The SIPC advance does not reduce the customer's net equity or his claim against customer property.  If the sum of the amount of a customer's SIPC advance and any subsequent distribution of customer property exceeds the customer's net equity, SIPC has the right to recoup its advance from the excess.  In effect, SIPC becomes subrogated to the claims of customers to the extent it has made advances but cannot seek recovery from customer property as to any individual customer until the customer has been fully satisfied.  SIPA §§ 78fff-3(a), 78fff-2(c)(1).

## C.    Allocation Of Assets To The Customer Fund And Related Reserves

29.    As this Court previously found in its Net Equity Decision, and as numerous courts in civil and criminal proceedings have also found, Madoff did not engage in securities trading on behalf of BLMIS customers.  Madoff used customer funds to support operations and fulfill requests for redemptions to perpetuate a Ponzi scheme.  Thus, payment of "profits" to any one customer in fact came from another customer's deposit of funds.  In essence, all of the funds withdrawn by BLMIS customers were simply other people's money.

30.    BLMIS had an obligation to set aside sufficient assets to cover its statutory obligations to customers.  *See* Securities Exchange Act Rule 15c3-3; 17 C.F.R. § 240.15c3-3.[11]  The assets of BLMIS and Madoff are insufficient to cover those obligations.

---

[11] SIPA's definitional paragraphs were amended in 1978 to incorporate in the "customer property" definition any other property of the debtor's estate which, upon compliance with applicable laws, rules, and regulations, would

31.   For these reasons, and because it is not uncommon for almost all property available to a broker-dealer to be deemed "customer property," the Trustee seeks the Court's approval to allocate to the Customer Fund virtually all cash and cash equivalents currently in his possession that was not previously allocated -- $704,395,951.58.  (Sehgal Aff. ¶ 8).  *See First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 362-66 (D.N.J. 1986) (describing and approving SIPA allocation and distribution scheme similar to that proposed by Trustee).

32.   When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the $5,501,375,994.66 that was allocated to the Customer Fund in connection with the Second Allocation, the $1,198,067,071.04 that was allocated to the Customer Fund in connection with the Third Allocation, and the $477,503,824.33 that was allocated to the Customer Fund in connection with the Fourth Allocation, the total amount allocated will be $10,499,317,271.87.   Of this amount, $605,023,411.51 was distributed to customers with allowed claims as part of the First Interim Distribution, $4,393,199,104.40 was distributed to customers with allowed claims as part of the Second Interim Distribution, $614,029,350.54 was distributed to customers with allowed claims as part of the Third Interim Distribution, and $412,829,627.42 was distributed to customers with allowed claims as part of the Fourth Interim Distribution.  In connection with the First Interim Distribution, an additional $222,307,573.62 was reserved for accounts in litigation, and $8,581,135.88 of SIPC subrogation was deferred.   In connection with the Second Interim

---

have been set aside or held for the benefit of customers.  Thus, to the extent that prior to the Filing Date BLMIS failed to maintain cash and securities in compliance with the Net Capital Rule issued by the SEC (Rule 15c3-1), as affected by the Customer Protection Rule (Rule 15c3-3) (both issued pursuant to the Exchange Act, 15 U.S.C. § 78*o*(c)(3)(A)), the Trustee is required to allocate property as necessary to remedy such non-compliance.  The Customer Protection Rule effectively requires that a broker-dealer maintain control of all property that would have to be delivered to customers in the event of a liquidation: either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.

Distribution, an additional $1,620,980,647.71 was reserved for accounts in litigation, and $80,794,156.22 of SIPC subrogation was deferred.  In connection with the Third Interim Distribution, an additional $228,056,074.53 was reserved for accounts in litigation, and $15,420,548.84 of SIPC subrogation was deferred.  In connection with the Fourth Interim Distribution, an additional $153,615,402.93 was reserved for accounts in litigation, and $11,159,078.22 of SIPC subrogation was deferred.[12]  Therefore, the total amount available for the Fifth Interim Distribution will be $2,133,321,160.05.  Of this amount, $236,653,320.42 must be held in reserve for the non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements, leaving a total of $1,896,667,839.63 available for distribution.  Further, the reserve for the Time-Based Damages issue for the First, Second, Third and Fourth Interim Distributions is $1,372,478,190.93, resulting in the numerator of $524,189,648.70.

33.    Of the $524,189,648.70 numerator, $322,460,071.98 will be distributed as part of the Fifth Interim Distribution to allowed accounts, and SIPC subrogation for allowed accounts in the amount of $9,083,353.61[13] will be released to SIPC.  For deemed determined accounts, $120,138,838.67 will be reserved.  In addition to the deemed determined reserve, the Trustee will also reserve $72,459,642.69 for Time-Based Damages related to the Fifth Interim Distribution, bringing the total Time-Based Damages reserve through the Fifth Interim Distribution to $1,444,937,833.62.

---

[12] The total SIPC subrogation for allowed accounts from the First, Second, Third and Fourth Interim Distributions is $115.955 million.  On March 29, 2013, a SIPC subrogation payment was made in the amount of $102,805,012.23.  On May 5, 2014, a SIPC subrogation payment was made in the amount of $11,299,366.89.  The remaining $1,850,540.04 is associated with accounts that have not returned the necessary paperwork required to receive their SIPC advance and accounts where the SIPC advance was provided after the payment to SIPC.  The $1,850,540.04 currently is held in reserve.

[13] An additional $47,741.75 of SIPC subrogation associated with the Fifth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

### i.    Assets In Trustee's Possession As Of November 30, 2014

34.    The Form SIPC 17 completed by the Trustee each month lists all of the recoveries and assets in the Trustee's possession.  In the Trustee's Form SIPC 17 for the period ending on November 30, 2014 ("November 30 SIPC 17 Form"), attached hereto as Exhibit A, the Trustee reports that he has recovered approximately $9.857 billion.[14]  These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market accounts.

35.    To the extent additional settlements are reached and/or become final prior to the entry of an order on this Motion, the Trustee will allocate and distribute those recoveries in accordance with the formula set forth herein.

### ii.    Blumenfeld

36.    On November 19, 2014, this Court approved a $32.75 million settlement between the Trustee and the Blumenfeld Defendants, together with an assignment to the Trustee of certain of the Blumenfeld Defendants' allowed customer claims in the aggregate amount of $29,348,309.09 (the "Blumenfeld Defendant Allowed Customer Claims").  *Picard v. Edward Blumenfeld, et al.,* Adv. Pro. No. 10-04730 (Bankr. S.D.N.Y.) (SMB) (ECF No. 45).  Under the settlement, the Blumenfeld Defendants paid $32.75 million to the Trustee and assigned the Blumenfeld Defendant Allowed Customer Claims to the Trustee in settlement of the Trustee's avoidance claims against the Blumenfeld Defendants.  Of the $29,348,309.09 total allowed claim amount assigned to the Trustee, the total SIPC advances and interim distributions one through

---

[14] In addition, the Trustee has in his possession a *de minimis* amount of unliquidated assets.

four for each of the Blumenfeld accounts totals $17,724,618.84. The Trustee seeks approval to allocate the $17,724,618.84 first dollar assignment recovery related to the SIPC advances and distributions one through four to the Customer Fund.

### iii.    Herald/Primeo

37.    On December 17, 2014, this Court approved a $467,701,943 settlement between the Trustee and Herald Fund SPC (In Official Liquidation) ("Herald"), and a $29,142,345 settlement between the Trustee and Primeo Fund (In Official Liquidation) ("Primeo"). *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 349). Under the settlement, Herald received an allowed claim in the amount of $1,639,896,943 and is therefore entitled to a catch-up distribution in the amount of $755,320,132.98 (distributions one through four totaling 46.059% of the allowed claim). Herald will satisfy both the Herald and Primeo settlements by assigning to the Trustee: (i) the funds to be advanced by SIPC in the amount of $500,000 under Herald's allowed customer claim, and (ii) $496,344,288 of the $755,320,132.98 catch-up distribution owed to Herald under its allowed customer claim.

### iv.    Senator Fund

38.    On December 17, 2014, this Court approved a $95 million settlement between the Trustee and Senator Fund SPC ("Senator"). *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 350). Under the settlement, Senator received an allowed claim in the amount of $238,753,482 and is therefore entitled to a catch-up distribution in the amount of $109,967,466.28 (distributions one through four totaling 46.059% of the allowed claim). Senator will pay $95 million by assigning to the Trustee: (i) the funds to be advanced by SIPC in the amount of $500,000 under Senator's allowed customer claim, and (ii) $94.5 million of the $109,967,466.28 catch-up distribution owed to Senator under its allowed customer claim.

### v.    Other Recoveries To The BLMIS Estate Since The Fourth Allocation and Fourth Interim Distribution

39.    In the Motion on the Fourth Allocation and Fourth Interim Distribution submitted to the Court on March 25, 2014, the Trustee reported total recoveries of $477,503,824.33 that were not previously allocated.  When combined with recoveries of $1,198,067,071.04 reported in the Third Allocation and Third Interim Distribution submitted on February 13, 2013, recoveries of $5,501,375,994.66 reported in the Second Allocation and Second Interim Distribution submitted on August 22, 2012, and recoveries of $2,617,974,430.26 reported in the First Allocation and First Interim Distribution submitted on July 12, 2011, the total recoveries as of the Fourth Allocation and Fourth Interim Distribution were $9,794,921,320.29.  The Trustee has recovered additional funds for the estate from multiple parties and sources since that time.

40.    The Trustee has recovered approximately $704,395,951.58 since the Fourth Allocation and Fourth Interim Distribution as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries.  (Sehgal Aff. ¶ 14).  Therefore, the Trustee seeks approval to allocate the full amount of these recoveries to the Customer Fund.

### vi.    Disputed Recoveries

41.    As of November 30, 2014, the Trustee had recovered approximately $9.857 billion as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries.  In addition to this $9.857 billion, recoveries related to settlements approved by this Court that are not yet effective due to the appeals period will bring approximately $642.319 million in additional recoveries to the estate.  Together, the actual recoveries and projected recoveries related to these approved settlements total approximately $10.499 billion.  Of the total amount recovered, $236,653,320.42 must be held in reserve for the

non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements. Part of the funds held in reserve remain subject to a final ruling as to how net equity claims are to be determined. Although the Second Circuit's Net Equity Decision on the Net Investment Method is now final, the Objecting Claimants argue that any time-based damages should be part of their net equity claims. Thus, the Trustee will hold such funds in reserve pending the outcome of the appeal of the Time-Based Damages Motion to the Second Circuit (the "Time-Based Damages Motion"). Therefore, the Trustee seeks approval to allocate the full amount of these preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries that were not previously allocated to the Customer Fund; however, $236,653,320.42 will not be available for distribution at this time. (Sehgal Aff. ¶17).

### vii.    Summary Of Requested Allocation

42.    The Trustee, in this Motion, seeks to allocate an additional $704,395,951.58 to the Customer Fund. When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the $5,501,375,994.66 that was allocated to the Customer Fund in connection with the Second Allocation, the $1,198,067,071.04 that was allocated to the Customer Fund in connection with the Third Allocation, and the $477,503,824.33 that was allocated to the Customer Fund in connection with the Fourth Allocation, the total amount allocated will be $10,499,317,271.87. Of this amount, $605,023,411.51 was distributed to customers with allowed claims as part of the First Interim Distribution, $4,393,199,104.40 was distributed to customers with allowed claims as part of the Second Interim Distribution, $614,029,350.54 was distributed to customers with allowed claims as part of the Third Interim Distribution, and $412,829,627.42 was distributed to customers with allowed claims as part of the Fourth Interim Distribution. In connection with the First Interim

Distribution, an additional $222,307,573.62 was reserved for accounts in litigation, and $8,581,135.88 of SIPC subrogation was deferred. In connection with the Second Interim Distribution, an additional $1,620,980,647.71 was reserved for accounts in litigation, and $80,794,156.22 of SIPC subrogation was deferred. In connection with the Third Interim Distribution, an additional $228,056,074.53 was reserved for accounts in litigation, and $15,420,548.84 of SIPC subrogation was deferred. In connection with the Fourth Interim Distribution, an additional $153,615,402.93 was reserved for accounts in litigation, and $11,159,078.22 of SIPC subrogation was deferred.[15] Therefore, the total amount available for the Fifth Interim Distribution will be $2,133,321,160.05. Of this amount, $236,653,320.42 must be held in reserve for non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements, leaving a total of $1,896,667,839.63 available for distribution. Further, the reserve for the Time-Based Damages issue for the First, Second, Third, and Fourth Interim Distributions is $1,372,478,190.93, resulting in the numerator of $524,189,648.70.

43.    Of the $524,189,648.70 numerator, $322,460,071.98 will be distributed as part of the Fifth Interim Distribution to allowed accounts and SIPC subrogation for allowed accounts in the amount of $9,083,353.61[16] will be released to SIPC. For deemed determined accounts, $120,138,838.67 will be reserved. In addition to the deemed determined reserve, the Trustee will also reserve $72,459,642.69 for Time-Based Damages related to the Fifth Interim

---

[15] The total SIPC subrogation for allowed accounts from the First, Second, Third and Fourth Interim Distributions is $115.955 million. On March 29, 2013, a SIPC subrogation payment was made in the amount of $102,805,012.23. On May 5, 2014, a SIPC subrogation payment was made in the amount of $11,299,366.89. The remaining $1,850,540.04 is associated with accounts that have not returned the necessary paperwork required to receive their SIPC advance and accounts where the SIPC advance was provided after the payment to SIPC. The $1,850,540.04 currently is held in reserve.

[16] An additional $47,741.75 of SIPC subrogation associated with the Fifth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

Distribution, bringing the total Time-Based Damages reserve through the Fifth Interim Distribution to $1,444,937,833.62.

44.     The Trustee does not seek to allocate any funds to the General Estate at this time.

**D.      Determination Of Allowable Net Equity Claims & Related Reserves**

45.     For distribution purposes, the Customer Fund numerator is only one half of the equation. In order to calculate each customer's pro rata share of customer property, the Trustee also needs to establish the denominator, or the amount of allowable net equity claims.

46.     If the Trustee had determined all customer claims and his determinations were final either through the passage of time or judicial determination, the denominator would simply equal the amount of allowed claims. Because the Trustee seeks to make a Fifth Interim Distribution prior to a final determination of all customer claims and certain disputes are pending, the Trustee cannot use as the denominator the amount of allowed claims as of this date. Doing so could result in an uneven distribution to customers, in violation of SIPA and the Bankruptcy Code, because there could be insufficient funds to distribute to claimants whose claims are allowed in the future. Instead, the Trustee must project as to the amount of all allowable net equity claims and establish sufficient reserves to ensure that all possibly-eligible claimants receive a pro rata distribution, should their claims be allowed. In order to do so, he must maintain sufficient reserves.

47.     As discussed above, Time-Based Damages is a contingency for which the Trustee must reserve. Per the Court's order (ECF No. 4997), the Trustee has calculated this reserve by applying a 3% interest rate to positive account balances. Thus, for purposes of this Motion, the

Trustee seeks to set the denominator at $21,074,686,427.81[17] (the "3% Time-Based Damages Reserve Denominator"). (Sehgal Aff. ¶ 24).

48.     Certain accountholders decided against filing a claim in this proceeding, even though they may have had allowable net equity claims. The statutory bar date to file claims was July 2, 2009. SIPA § 78fff-2(a)(3). Thus, a failure to file a claim by that date means that there is no distribution that can be made to these accounts. No reserves are maintained for these accounts.

49.     Further, certain accountholders have entered into final settlements not contingent on the Net Equity Dispute. No reserves are maintained for these accounts.

50.     There are no additional reserves required for any future avoidance recoveries by the Trustee because such recoveries will be added to both the numerator and the denominator by operation of section 502(h) of the Bankruptcy Code. Any subsequent recovery coupled with a corresponding claim for the same amount cannot adversely affect the distribution because the addition of any amount to both the numerator and denominator can only result in an increase, not a decrease, of the pro rata distribution to any customer.

## IV.    CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR FIFTH ALLOCATION AND FIFTH INTERIM DISTRIBUTION

51.     SIPA § 78fff-2(c)(1) establishes, in pertinent part, that a customer is to receive his ratable share from the fund of customer property. To the extent the customer's share has been fully satisfied through an advance of funds by SIPC, SIPC steps into the shoes of the customer as subrogee and receives that customer's share of customer property. In that manner, a customer

---

[17]  The 3% Time-Based Damages Reserve Denominator has increased from $20,698,518,012.19 to $21,074,686,427.81 since the Fourth Allocation due to settlements that occurred after the Fourth Allocation.

does not receive a double recovery on his claim that was already fully satisfied by the SIPC advance.

52.    As set forth above and in the Sehgal Affidavit, the Trustee proposes to allocate $704,395,951.58 to the Customer Fund at this time.  When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the $5,501,375,994.66 that was allocated to the Customer Fund in connection with the Second Allocation, the $1,198,067,071.04 that was allocated to the Customer Fund in connection with the Third Allocation, and the $477,503,824.33 that was allocated to the Customer Fund in connection with the Fourth Allocation, the total amount allocated will be $10,499,317,271.87. Of this amount, $605,023,411.51 was distributed to customers with allowed claims as part of the First Interim Distribution, $4,393,199,104.40 was distributed to customers with allowed claims as part of the Second Interim Distribution, $614,029,350.54 was distributed to customers with allowed claims as part of the Third Interim Distribution, and $412,829,627.42 was distributed to customers with allowed claims as part of the Fourth Interim Distribution.  In connection with the First Interim Distribution, an additional $222,307,573.62 was reserved for accounts in litigation, and $8,581,135.88 of SIPC subrogation was deferred.  In connection with the Second Interim Distribution, an additional $1,620,980,647.71 was reserved for accounts in litigation, and $80,794,156.22 of SIPC subrogation was deferred.  In connection with the Third Interim Distribution, an additional $228,056,074.53 was reserved for accounts in litigation, and $15,420,548.84 of SIPC subrogation was deferred.  In connection with the Fourth Interim Distribution, an additional $153,615,402.93 was reserved for accounts in litigation, and $11,159,078.22 of SIPC subrogation was deferred.[18]  Therefore, the total amount available for

---

[18] The total SIPC subrogation for allowed accounts from the First, Second, Third and Fourth Interim Distributions is $115,954,919.16.  On March 29, 2013, a SIPC subrogation payment was made in the amount of $102,805,012.23.

the Fifth Interim Distribution will be $2,133,321,160.05. (Sehgal Aff. ¶ 23). Of that amount,

$524,189,648.70 is available for distribution (the "Net Customer Fund"). (*Id.*). The difference

between those amounts—$1,609,131,511.35—represents the reserve relating to certain other

settlements, and the outcome of the Time-Based Damages Motion. (*Id.*).

53.    Of the $524,189,648.70 numerator, $322,460,071.98 will be distributed as part of

the Fifth Interim Distribution to allowed accounts and SIPC subrogation for allowed accounts in

the amount of $9,083,353.61[19] will be released to SIPC. For deemed determined accounts,

$120,138,838.67 will be reserved. In addition to the deemed determined reserve, the Trustee

will also reserve $72,459,642.69 for Time-Based Damages related to the Fifth Interim

Distribution, bringing the total Time-Based Damages reserve through the Fifth Interim

Distribution to $1,444,937,833.62.

54.    The 3% Time-Based Damages Reserve Denominator is $21,074,686,427.81 (*Id.* ¶

24). To determine the percentage of each allowed customer net equity claim that can be satisfied

from the Customer Fund, the Net Customer Fund is divided by the 3% Time-Based Damages

Reserve Denominator, resulting in the following percentage (the "3% Scenario"):

$$\frac{\$524,189,648.70 \text{ (Net Customer Fund)}}{\$21,074,686,427.81 \text{ (3\% Time-Based Damages Reserve Denominator)}} = 2.487\%$$

55.    Under this scenario, a total of 1,075 accounts will receive a distribution of 2.487%

of their net equity claims. (Sehgal Aff. ¶ 25). Of these 1,075 accounts, 17 will become fully

---

On May 5, 2014, a SIPC subrogation payment was made in the amount of $11,299,366.89. The remaining
$1,850,540.04 is associated with accounts that have not returned the necessary paperwork required to receive their
SIPC advance and accounts where the SIPC advance was provided after the payment to SIPC. The $1,850,540.04
currently is held in reserve.

[19] An additional $47,741.75 of SIPC subrogation associated with the Fifth Interim Distribution for accounts that
have not returned the necessary paperwork required to receive their SIPC advance was held in reserve.

satisfied, bringing the total of fully satisfied account holders to 1,154 (1,058 accounts will remain partially satisfied and will be entitled to participate in future distributions). (*Id*.).

56.     An additional 85 accounts that are currently "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. (*Id*. ¶ 26).  Thirty-six of the 85 accounts would be fully satisfied by the SIPC advance.  The remaining 49 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion and his Fifth Allocation and Fifth Interim Distribution.  (*Id*.).  Six of the remaining 49 accounts would be fully satisfied by the First, Second, Third, Fourth and Fifth Interim Distributions.  (*Id*.).

57.     SIPC is entitled to receive repayment as to any given customer to the extent the customer's claim was fully repaid by a combination of the SIPC advance and the Trustee's distributions.  *See In re Bell & Beckwith*, 104 B.R. 842, 852-55 (Bankr. N. D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).  SIPC, as subrogee, is entitled to receive partial repayment of its cash advances to the Trustee pursuant to SIPA § 78fff-3(a)(1).  If all of the "net loser" accounts were allowed prior to the distribution, the total SIPC subrogation would be $129,374,872.08.  A SIPC subrogation payment was made on April 1, 2013 in the amount of $102,805,012.33 and on May 5, 2014 in the amount of $11,299,366.89, for a total of $114,104,379.12 in subrogation payments to SIPC, leaving a total SIPC subrogation claim through this Fifth Allocation of approximately $15.270 million ($15,270,492.96).  Based on the "net loser" accounts that have been allowed and have returned a signed Partial Assignment and Release (PAR) through this Fifth Interim Distribution, SIPC's subrogation claim is approximately $10.050 million ($10,049,721.07).  The $10.050 million is comprised of $9.083 million ($9,083,353.61) of SIPC subrogation from the Fifth Interim Distribution and $966,367.46 of SIPC subrogation associated

with the First, Second, Third and Fourth Interim Distributions (this $966,367.46 represents SIPC subrogation for accounts determined after the May 5, 2014 payment was made). This amount will be released to SIPC (this $966,367.46 represents SIPC subrogation for accounts determined after the May 5, 2014 payment was made).

58.     As noted above, the Trustee is making an interim distribution of the undisputed property allocated to the Customer Fund. Unless otherwise noted, the numbers contained herein are based on recoveries and claims allowed as of November 30, 2014. To the extent additional claims are allowed or additional recoveries are made, the Trustee will distribute funds consistent with the formulas set forth in this Motion.

### A.    <u>No Interim Distribution Of General Estate</u>

59.     Under SIPA § 78fff(e), funds from the general estate satisfy the administrative costs and expenses of a Debtor's estate and a liquidation proceeding. To the extent the general estate is insufficient, SIPC makes advances to the Trustee for the payment of such costs and expenses. SIPA § 78fff-3(b)(2). All administrative advances made by SIPC are recoverable from the general estate under section 507(a)(2) of the Bankruptcy Code. SIPA §§ 78eee(b)(5)(E), 78fff(e). The general estate is distributed in accordance with section 726 of the Bankruptcy Code, with section 507(a)(2) expenses receiving second priority.[20] SIPA § 78fff(e).

60.     As noted previously, the Trustee has received 427 timely and 22 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.743 billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. Of these 449, 94 are general creditor claims

---

[20] There are no § 507(a)(1) expenses in this liquidation proceeding.

and 49 are broker-dealer claims which together total approximately $264.975 million of the $1.743 billion.  Inasmuch as the Trustee proposes to allocate no assets to the General Estate, there are no funds in the General Estate from which to make a distribution to general creditors at this time.  Accordingly, "[no] purpose would be served" by the examination of or the institution of actions seeking to disallow such claims.  See 11 U.S.C. § 704(5).

## V.    **MISCELLANEOUS**

### A.    **Notice**

61.    Pursuant to Bankruptcy Rules 2002(a)(6), 2002(f)(8), and 2002(h), the Trustee has given notice of the hearing on the Trustee's Motion by first class mail, postage prepaid, to all claimants that filed a claim.  Pursuant to the Order Establishing Notice Procedures (ECF No. 4650), the Trustee has given notice of the hearing on the Trustee's Motion via email and/or U.S. Mail to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all persons who have filed notices of appearance in the BLMIS proceeding.  The Trustee believes that no further notice need be given of this or any further matter in the proceeding.

### B.    **Record Date**

62.    The Fifth Interim Distribution will be made to all record holders as of January 15, 2015.

## VI.    **CONCLUSION**

63.    This Motion and the relief requested by the Trustee are consistent with the policy and purposes underlying SIPA and are in the best interests of the customers of BLMIS, the Estate, and its creditors.

64.    No prior application for the relief sought herein has been made to this or any other Court.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) approving: (i) the proposed Fifth Allocation of Property to the Customer Fund and to the General Estate; (ii) the proposed Fifth Interim Distribution of the Customer Fund; and (b) granting such other and further relief as may be deemed just and proper.

Dated: December 22, 2014          Respectfully submitted,
     New York, New York

*/s/ David J. Sheehan*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Estate of Bernard L.*
*Madoff*