**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**AFFIDAVIT OF VINEET SEHGAL IN SUPPORT OF THE TRUSTEE'S MOTION FOR AN ORDER APPROVING THE FIFTH ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING FIFTH INTERIM DISTRIBUTION TO CUSTOMERS**

CITY OF NEW YORK         )
                                              )  ss:
STATE OF NEW YORK       )

Vineet Sehgal, being duly sworn, deposes and says:

1.      I am a Managing Director of AlixPartners LLP ("AlixPartners"). I make this affidavit to transmit to the Court information relevant to the motion by Irving H. Picard, trustee (the "Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), for an Order Approving the Trustee's Fifth Allocation of Property to the

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

Fund of Customer Property and Authorizing Fifth Interim Distribution to Customers (the "Motion").

2.  AlixPartners has served as the Trustee's Claims Agent and as the accountant for the BLMIS estate since December of 2008 pursuant to SIPA § 78fff-1(a)(1).  As the Claims Agent, AlixPartners was responsible for both mailing the notice of the liquidation and claim forms to potential claimants and causing the notice of the liquidation to be published.  AlixPartners has also been responsible for processing all claims submitted to the Trustee and assisting the Trustee in reviewing each customer claim filed to determine whether the asserted claim amount agrees with the "net equity" for that account.  In addition, as the accountants for the BLMIS estate, AlixPartners has assisted and continues to assist the Trustee in accounting for the assets of the BLMIS estate, including the cash and cash equivalents available to the Trustee.

3.  I have been actively involved in the liquidation of BLMIS and the claims process since December 2008 and have personal knowledge of the matters set forth herein.

### The Claims Process

4.  To date, the Trustee has received 16,519 customer claims.  To date, the Trustee has determined 16,393 of those claims (the other 126 claims are discussed in Paragraph 5 below).  The Trustee allowed 2,547 claims and committed to pay approximately $822.545 million in funds advanced to him by SIPC.  To date, the allowed claims total approximately $13.333 billion.  The Trustee denied 13,125 claims that were purported to be customer claims.  Twelve claims were filed that asserted no claim.  Another 709 claims have been withdrawn.

5.  One hundred twenty-six claims are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants.

6.  As of December 22, 2014, the Trustee has received 427 timely and 22 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately

2

$1.743 billion. These 449 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims. Of these 449 claims, 94 are general creditor claims and 49 are broker-dealer claims, which together total approximately $264.975 million of the $1.743 billion.

7.  2,208 docketed objections have been filed to the Trustee's claims determinations relating to 3,837 claims, which will be noticed for hearing, as necessary. These 2,208 docketed objections relate to 1,118 BLMIS accounts.

## Recoveries by the Trustee

8.  The total recoveries, distributions, reserves and other related figures herein and in the accompanying Motion incorporate certain settlements that have been approved by this Court but are not yet effective due to the appeal period. In the event an appeal is filed, these figures will need to be adjusted.[2]

9.  In the Motion filed on May 4, 2011 for the initial pro rata interim distribution ("First Interim Distribution"), the Trustee allocated $2,617,974,430.26 to the fund of customer property ("Customer Fund"). In the Motion filed on July 26, 2012 for the second pro rata interim distribution ("Second Interim Distribution"), the Trustee allocated $5,501,375,994.66 to the Customer Fund. In the Motion filed on February 13, 2013 for the third pro rata interim distribution ("Third Interim Distribution"), the Trustee allocated $1,198,067,071.04 to the Customer Fund. In the Motion filed on March 25, 2014 for the fourth pro rata interim distribution ("Fourth Interim Distribution"), the Trustee allocated $477,503,824.33 to the Customer Fund. The Trustee seeks the Court's approval to allocate an additional

---

[2] Settlements approved by this Court that are not yet effective due to the appeal period include Blumenfeld, Herald/Primeo, and Senator Fund. *Picard v. Edward Blumenfeld, et al.,* Adv. Pro. No. 10-04730 (Bankr. S.D.N.Y.) (SMB) (ECF No. 45); *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 349); and *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 350).

3

300345593.1

$704,395,951.58 to the Customer Fund. These funds were received primarily from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market accounts. Of the total $10,499,317,271.87 that will be allocated to the Customer Fund (including the allocations for the First, Second, Third and Fourth Interim Distributions), $605,023,411.51 was distributed to customers with allowed claims as part of the First Interim Distribution, $4,393,199,104.40 was distributed to customers with allowed claims as part of the Second Interim Distribution, $614,029,350.54 was distributed to customers with allowed claims as part of the Third Interim Distribution, and $412,829,627.42 was distributed to customers with allowed claims as part of the Fourth Interim Distribution. In connection with the First Interim Distribution, an additional $222,307,573.62 was reserved for accounts in litigation, and $8,581,135.88 of SIPC subrogation was deferred. In connection with the Second Interim Distribution, an additional $1,620,980,647.71 was reserved for accounts in litigation, and $80,794,156.22 of SIPC subrogation was deferred. In connection with the Third Interim Distribution, an additional $228,056,074.53 was reserved for accounts in litigation, and $15,420,548.84 of SIPC subrogation was deferred. In connection with the Fourth Interim Distribution, an additional $153,615,402.93 was reserved for accounts in litigation, and $11,159,078.22 of SIPC subrogation was deferred.[3] Therefore, the total amount available for the Fifth Interim Distribution will be $2,133,321,160.05. Of this amount, $236,653,320.42 must be held in

---

[3] The total SIPC subrogation for allowed accounts from the First, Second, Third, and Fourth Interim Distributions is $115,954,919.16. On March 29, 2013, a SIPC subrogation payment was made in the amount of $102,805,012.23. On May 5, 2014, a SIPC subrogation payment was made in the amount of $11,299,366.89. The remaining $1,850,540.04 is associated with accounts that have not returned the necessary paperwork required to receive their SIPC advance and accounts where the SIPC advance was provided after the payment to SIPC. The $1,850,540.04 is currently held in reserve.

4

reserve for the non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements, leaving a total of $1,896,667,839.63 available for distribution. Further, the reserve for the Time-Based Damages issue for the First, Second, Third, and Fourth Interim Distributions is $1,372,478,190.93, resulting in the numerator of $524,189,648.70.

10. In the First Allocation Motion, the Trustee reported total recoveries of $2,617,974,430.26. In the Second Allocation Motion, the Trustee reported total additional recoveries of $5,501,375,994.66. In the Third Allocation Motion, the Trustee reported total additional recoveries of $1,198,067,071.04. In the Fourth Allocation Motion, the Trustee reported total recoveries of $477,503,824.330. The total amount allocated in these four Motions was $9,794,921,320.29. The Trustee has recovered additional funds for the estate totaling $704,395,951.58 from multiple parties and sources since that time.

11. On November 19, 2014, this Court approved a $32.75 million settlement between the Trustee and the Blumenfeld Defendants,[4] together with an assignment to the Trustee of

---

[4] The "Blumenfeld Defendants" are Edward Blumenfeld, individually, and as Trustee for Susan Blumenfeld GST Trust, Trust F/B/O Susan Blumenfeld, Trust F/B/O David Blumenfeld, and Trust F/B/O Brad Blumenfeld; Susan Blumenfeld, individually, and as Trustee for Trust F/B/O Susan Blumenfeld, Trust F/B/O David Blumenfeld, Trust F/B/O Brad Blumenfeld, David Blumenfeld Farmingdale Trust, Brad Blumenfeld Farmingdale Trust, Boxwood Realty Group, and Dogwood Realty Group; David Blumenfeld, individually, and as Trustee for Susan Blumenfeld GST Trust, The David Blumenfeld Family Trust, Trust F/B/O David Blumenfeld, Boxwood Realty Group, and Dogwood Realty Group; Brad Blumenfeld, individually, and as Trustee for Susan Blumenfeld GST Trust, The David Blumenfeld Family Trust, Trust F/B/O Brad Blumenfeld, Boxwood Realty Group, and Dogwood Realty Group; Harvey Cohen, individually, and as Trustee for Edward Blumenfeld and Susan Blumenfeld Charitable Lead Trust, Edward and Susan Blumenfeld 2007 Charitable Lead Trust, and Brad Blumenfeld Charitable Lead Trust; Blumenfeld Development Group, LTD.; Edward and Susan Blumenfeld Charitable Lead Trust; Edward Blumenfeld & Susan Blumenfeld 2007 Charitable Lead Trust; Trust F/B/O Susan Blumenfeld; Susan Blumenfeld GST Trust; Trust F/B/O David Blumenfeld; Edward Blumenfeld & Susan Blumenfeld, Guardians for David Blumenfeld NY UGMA; Brad Blumenfeld Charitable Lead Trust; Trust F/B/O Brad Blumenfeld; Edward Blumenfeld & Susan Blumenfeld, Guardians for Brad Blumenfeld NY UGMA; The Brad Blumenfeld Family Foundation; The Edward and Susan Blumenfeld Foundation; Bull Market Fund; Edward Blumenfeld Et Al II; DWD Associates, LLC; BDG DWD Associates, LLC; EDB Capital, LLC; Double B Squared, LLC; Edward Blumenfeld Gerald Y Mordfin Et Al; Dogwood Realty Group; Edward Blumenfeld Et Al; LaGuardia Corporate Center Associates, L.P.; LaGuardia Corporate Center Associates, LLC; Boxwood Realty Group; South Sea Holdings, L.P.; BDG Piscataway, LLC; BDG Kingsbridge, LLC; BWI (A/K/A Blumenfeld Weinstein Inc.); Susan Blumenfeld Interiors, LTD.; BDG Construction Corp.; David Blumenfeld Farmingdale Trust; The David Blumenfeld Family Trust; Brad Blumenfeld

5

certain of the Blumenfeld Defendants' allowed customer claims in the aggregate amount of $29,348,309.09 (the "Blumenfeld Defendant Allowed Customer Claims"). *Picard v. Edward Blumenfeld, et al.,* Adv. Pro. No. 10-04730 (Bankr. S.D.N.Y.) (SMB) (ECF No. 45). Under the settlement, the Blumenfeld Defendants paid $32.75 million to the Trustee and assigned the Blumenfeld Defendant Allowed Customer Claims to the Trustee.

12. On December 17, 2014, this Court approved a $467,701,943 settlement between the Trustee and Herald Fund SPC (In Official Liquidation) ("Herald"), and a $29,142,345 settlement between the Trustee and Primeo Fund (In Official Liquidation) ("Primeo"). *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 349). Under the settlement, Herald received an allowed claim in the amount of $1,639,896,943 and is therefore entitled to a catch-up distribution in the amount of $755,320,132.98 (distributions one through four totaling 46.059% of the allowed claim). Herald will satisfy both the Herald and Primeo settlements by assigning to the Trustee: (i) the funds to be advanced by SIPC in the amount of $500,000 under Herald's allowed customer claim, and (ii) the $496,344,288 of the $755,320,132.98 catch-up distribution owed to Herald under its allowed customer claim.

13. On December 17, 2014, this Court approved a $95 million settlement between the Trustee and Senator Fund SPC ("Senator"). *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 350). Under the settlement, Senator received an allowed claim in the amount of $238,753,482 and is therefore entitled to a catch-up distribution in the amount of $109,967,466.28 (distributions one through four totaling 46.059% of the

---

Farmingdale Trust; 45 South Service Road, LLC; BCC II, LLC; BDG Commack, LLC; BDG Deer Park Associates, LLC; BDG Lake Grove I, LLC; BDG Larkfield Associates, LLC; Charleston Enterprises, LLC; Daniel Land Co., LLC; BDG Daniel Street, LLC; Gotham Plaza Associates, LLC; BDG 125th Street, LLC; 10 Michael Drive Associates, L.P.; 500 Bi-County Associates, L.P.; ARC-BDG Setauket Enterprise; Blumco Setauket, LLC; Coblum Setauket, LLC; BDG 1.15 Broadhollow, L.P.; Maxrob, L.P.; B-4 Partnership; 125 Bethpage Associates; and BDG Yaphank, LLC.

6

300345593.1

allowed claim). Senator will pay $95 million by assigning to the Trustee: (i) the funds to be advanced by SIPC in the amount of $500,000 under Senator's allowed customer claim, and (ii) $94.5 million of the $109,967,466.28 catch-up distribution owed to Senator under its allowed customer claim.

14. The Trustee has recovered $704,395,951.58 since the Fourth Allocation Motion as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries. The $704,395,951.58 is available for allocation at this time.

15. For purposes of determining each customer's "net equity," as that term is defined under SIPA, the Trustee credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method"). Some claimants argued that the Trustee was required to allow customer claims in the amounts shown on the November 30, 2008 customer statements (the "Last Statement Method," creating the "Net Equity Dispute"). Litigation over the Net Equity Dispute has now proceeded through this Court, the Second Circuit, and the Supreme Court of the United States.

16. On June 25, 2012, the Supreme Court denied two petitions for a writ of certiorari to the Second Circuit; a third petition was withdrawn. Thus, a final, nonappealable order has been entered on the Net Equity Dispute, upholding the Trustee's Net Investment Method and making those funds that had previously been held in reserve for this issue available for distribution, contingent upon other reserves.

17. As of November 30, 2014, the Trustee had recovered $9,856,998,365.03 as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries. In addition to this $9,856,998,365.03, recoveries related to

settlements approved by this Court that are not yet effective due to the appeals period will bring $642,318,906.84 in additional recoveries to the estate. Together, the actual recoveries and projected recoveries related to these approved settlements total $10,499,317,271.87. Of the total amount recovered, $236,653,320.42 must be held in reserve for the non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements. Part of the funds held in reserve remain subject to a final ruling as to how net equity claims are to be determined. Although the Second Circuit's Net Equity Decision on the Net Investment Method is now final, the Objecting Claimants argue that any time-based damages should be part of their net equity claims. Thus, the Trustee will hold such funds in reserve pending the outcome of the appeal of the Time-Based Damages Motion to the Second Circuit (the "Time-Based Damages Motion"). Therefore, the Trustee seeks approval to allocate the full amount of these preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries that were not previously allocated to the Customer Fund; however, $236,653,320.42 will not be available for distribution at this time.

18.     In sum, the Trustee seeks to allocate an additional $704,395,951.58 to the Customer Fund. When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the $5,501,375,994.66 that was allocated to the Customer Fund in connection with the Second Allocation, the $1,198,067,071.04 that was allocated to the Customer Fund in connection with the Third Allocation, and the $477,503,824.33 that was allocated to the Customer Fund in connection with the Fourth Allocation, the total amount allocated will be $10,499,317,271.87. Of this amount, $605,023,411.51 was distributed to customers with allowed claims as part of the First Interim Distribution, $4,393,199,104.40 was distributed to customers with allowed claims as part of the

8

300345593.1

Second Interim Distribution, $614,029,350.54 was distributed to customers with allowed claims as part of the Third Interim Distribution, and $412,829,627.42 was distributed to customers with allowed claims as part of the Fourth Interim Distribution. In connection with the First Interim Distribution, an additional $222,307,573.62 was reserved for accounts in litigation, and $8,581,135.88 of SIPC subrogation was deferred. In connection with the Second Interim Distribution, an additional $1,620,980,647.71 was reserved for accounts in litigation, and $80,794,156.22 of SIPC subrogation was deferred. In connection with the Third Interim Distribution, an additional $228,056,074.53 was reserved for accounts in litigation, and $15,420,548.84 of SIPC subrogation was deferred. In connection with the Fourth Interim Distribution, an additional $153,615,402.93 was reserved for accounts in litigation, and $11,159,078.22 of SIPC subrogation was deferred.[5] Therefore, the total amount available for the Fifth Interim Distribution will be $2,133,321,160.05. Of this amount, $236,653,320.42 must be held in reserve for the non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements, leaving a total of $1,896,667,839.63 available for distribution. Further, the reserve for the Time-Based Damages issue for the First, Second, Third, and Fourth Interim Distributions is $1,372,478,190.93, resulting in the numerator of $524,189,648.70.

19.     Of the $524,189,648.70 numerator, $322,460,071.98 will be distributed as part of the Fifth Interim Distribution to allowed accounts and SIPC subrogation for allowed accounts in

---

[5] The total SIPC for allowed accounts subrogation from the First, Second, Third, and Fourth Interim Distributions is $115,954,919.16. On March 29, 2013, a SIPC subrogation payment was made in the amount of $102,805,012.23. On May 5, 2014, a SIPC subrogation payment was made in the amount of $11,299,366.89. The remaining $1,850,540.04 is associated with accounts that have not returned the necessary paperwork required to receive their SIPC advance and accounts where the SIPC advance was provided after the payment to SIPC. The $1,850,540.04 is currently held in reserve.

300345593.1

the amount of $9,083,353.61[6] will released to SIPC. For deemed determined accounts, $120,138,838.67 will be reserved. In addition to the deemed determined reserve, the Trustee will also reserve $72,459,642.69 for Time-Based Damages related to the Fifth Interim Distribution, bringing the total Time-Based Damages reserve through the Fifth Interim Distribution to $1,444,937,833.62 .

20.     The table below summarizes this calculation.

| Category | Amount |
|---|---|
| | |
| **SIPC 17 Receipts (November 30)** | **$10,499,317,271.87** |
| | |
| First, Second, Third, and Fourth Interim Distribution Deductions | |
| | |
| Allowed Accounts | $6,025,081,493.87 |
| Deemed Determined Accounts | $2,224,959,698.79 |
| SIPC Subrogation | $115,954,919.16 |
| | |
| **Amount Available for Fifth Interim Distribution** | **$2,133,321,160.05** |
| | |
| Current Reserves | |
| Settlements containing the net equity clause, as well as certain other settlements | $236,653,320.42 |
| | |
| **Amount Available for Fifth Interim Distribution After Reserves** | **$1,896,667,839.63** |
| | |
| Time-Based Damages Reserve | $1,372,478,190.93 |
| | |
| **Amount Available for Fifth Interim Distribution After Time-Based Damages Reserve** | **$524,189,648.70** |

### The Net Investment Method Denominator

21.     The Trustee's Net Investment Method Denominator is the allowed amount of all accounts that have an allowed claim plus the net cash balance for all accounts into which more

---

[6] An additional $47,741.75 of SIPC subrogation associated with the Fifth Interim Distribution for accounts that have

funds were deposited than withdrawn for which a claim has been filed, but not yet allowed. As of November 30, 2014, the Trustee's Net Investment Method denominator is $18,163,651,211.17. This number is subject to change as additional accounts are determined.

### The "Time-Based Damages" 3% Reserve Denominator

22. As stated above, the Net Investment Method denominator is $18,163,651,211.17. When Time-Based Damages at a 3% rate are added to the Time-Based Damages balances for allowed and deemed determined accounts, the denominator increases from $18,163,651,211.17 to $21,074,686,427.81 (the "3% Time-Based Damages Reserve Denominator").[7]

### Interim Calculation of *Pro Rata* Share
### Distribution of Customer Fund

23. As set forth above, the total amount available for the Fifth Interim Distribution will be $2,133,321,160.05. Of that amount, $524,189,648.70 is available for distribution (the "Net Customer Fund"). The difference between those amounts—$1,609,131,511.35—represents the reserves related to the net equity clause, as well as certain other settlements, and the outcome of the appeal of the Time-Based Damages Motion.

24. The 3% Time-Based Damages Reserve Denominator is $21,074,686,427.81. To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the 3% Time-Based Damages Reserve Denominator, resulting in the following percentage (the "3% Scenario"):

---

not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

[7] The 3% Time-Based Damages Reserve Denominator has increased from $20,698,518,012.19 to $21,074,686,427.81 since the Fourth Allocation due to settlements that occurred after the Fourth Allocation.

$$\frac{\$524{,}189{,}648.70 \text{ (Net Customer Fund)}}{\$21{,}074{,}686{,}427.81 \text{ (3\% Time-Based Damages Reserve Denominator)}} = 2.487\%$$

25.     Under this scenario, a total of 1,075 accounts will receive a distribution of 2.487% of their net equity claims. Of these 1,075 accounts, 17 will become fully satisfied, bringing the total of fully satisfied account holders to 1,154 (1,058 accounts will remain partially satisfied and will be entitled to participate in future distributions).

26.     An additional 85 accounts that are currently "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Thirty-six of the 85 accounts would be fully satisfied by the SIPC advance. The remaining 49 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion and his earlier distribution motions. Six of the remaining 49 accounts would be fully satisfied by the First, Second, Third, Fourth, and Fifth Interim Distributions.

300345593.1

27. At this time, each customer's ratable share of the Net Customer Fund should be no less than 48.546% of the customer's net equity claim, which includes the 4.602% customers received subject to the First Allocation and First Interim Distribution, the 33.556% customers received subject to the Second Allocation and Second Interim Distribution, the 4.721% customers received subject to the Third Allocation and Third Interim Distribution, the 3.180% customers received subject to the Fourth Allocation and Fourth Interim Distribution, and the proposed 2.487% Fifth Allocation and Fifth Interim Distribution.[8]

By: */s/ Vineet Sehgal*
Vineet Sehgal

City of New York
State of New York

Subscribed and sworn to me (or affirmed) before me, Sharyn P. Doyle, Notary Public, on this 22nd day of December, 2014 by Vineet Sehgal, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

WITNESS my hand and official seal.

*/s/ Sharyn P. Doyle*
Sharyn P. Doyle, Notary Public
Qualified in State of New York
*Commission Expires: November 13, 2017*

---

[8] Each customer's ratable share may be less than 48.546% for those BLMIS accounts that are fully satisfied.

13

300345593.1