# EXHIBIT A

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Marc E. Hirschfield
Richard J. Bernard
Geraldine E. Ponto
Marc Skapof

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-_____ (BRL) |
| v. | |
| NTC & Co. LLP, as former custodian of an Individual Retirement Account for the benefit of David Ivan Lustig; and DAVID IVAN LUSTIG, | |
| Defendants. | |

10-04354-smb   Doc 88   Filed 12/01/10   Entered 12/03/10 08:07:41   Main Document
Pg 2 of 30

## COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard
L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act,
15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L.
Madoff individually ("Madoff"), by and through his undersigned counsel, for his complaint (the
"Complaint"), states as follows:

## NATURE OF PROCEEDING

1.    This adversary proceeding arises from the massive Ponzi scheme perpetrated by
Madoff.  Over the course of the scheme, there were more than 8,000 client accounts at BLMIS.
In early December 2008, BLMIS generated client account statements for its approximately 4,900
open client accounts.  When added together, these statements purport that clients of BLMIS had
approximately $65 billion invested with BLMIS.  In reality, BLMIS had assets on hand worth a
small fraction of that amount.  On March 12, 2009, Madoff admitted to the fraudulent scheme
and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison.

2.    Defendant NTC & Co. LLP, as former custodian of the Individual Retirement
Account for the benefit of David Ivan Lustig ("Defendant NTC") is either an initial transferee of
the avoidable Transfers (as defined below) or a conduit of such Transfers for the benefit of
Defendant David Ivan Lustig ("FBO Defendant").  If Defendant NTC is the initial transferee,
then FBO Defendant is the subsequent transferee of the Transfers for purposes of this Complaint.
To the extent Defendant NTC served as a conduit for the funds withdrawn for the benefit of FBO
Defendant, FBO Defendant is an initial transferee of the Transfers for whose benefit such

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

Transfers were made for purposes of this Complaint. The within defendants, Defendant NTC and/or FBO Defendant, received avoidable transfer(s) from BLMIS.

3.      Defendant NTC and/or FBO Defendant were beneficiaries of this Ponzi scheme. Since December 11, 2002, Defendant NTC and/or FBO Defendant received the amount of $2,000,000 from BLMIS. The Trustee's investigation has revealed that $1,863,225 of this amount represented fictitious profits from the Ponzi scheme, in that Defendant NTC and/or FBO Defendant withdrew more than was invested in the BLMIS account of Defendant NTC and/or FBO Defendant. Accordingly, Defendant NTC and/or FBO Defendant have received $1,863,225 of other people's money. This action is brought to recover the fictitious profit amount so that this customer property can be equitably distributed among all of the victims of BLMIS.

4.      This adversary proceeding is brought pursuant to sections 78fff(b), 78fff-1(a) and 78fff-2(c)(3) of SIPA, sections 105(a), 544, 548(a), 550(a) and 551 of title 11 of the United States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York Debtor and Creditor Law § 270 et seq. (McKinney 2001) ("DCL")) and other applicable law, for avoidance of fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of Defendant NTC and/or FBO Defendant. The Trustee seeks to set aside such transfers and preserve and recover the property for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

5.      This is an adversary proceeding commenced before the same Court before whom the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has

been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

6.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and (O).

7.      Venue in this district is proper under 28 U.S.C. § 1409.

## DEFENDANTS

8.      Defendant NTC is a limited liability partnership that was formed under the laws of the state of Colorado. Its principal place of business is located at 717 17th Street, Suite 2100, Denver, Colorado 80202.

9.      Upon information and belief, FBO Defendant maintains an address in Pescadero, California. FBO Defendant holds a BLMIS account in the name, "NTC & Co. FBO David Ivan Lustig (xxxxx)," with the account address reported in Pescadero, California.

## BACKGROUND, THE TRUSTEE AND STANDING

10.     On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." 15 U.S.C. § 78*lll*(7)(B). Thus, even though the application for a protective decree was filed on December 15, 2008, the Filing Date in this action is December 11, 2008.

11.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

12.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

13.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

a.      appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

b.      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

c.      removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

14.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

15.     At a Plea Hearing on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorneys' Office for the Southern District of New York.

At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment

advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, *United States v.*

*Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Additionally,

Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed

criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

16.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating in and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11,

2009 in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled

guilty to a ten-count criminal information. Among other things, DiPascali admitted that the

fictitious scheme had begun at BLMIS since at least the 1980s. Plea Allocution of Frank

DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009)

(Docket No. 11).

17.     As the Trustee appointed under SIPA, the Trustee is charged with recovering and

paying out customer property to BLMIS' customers, assessing claims, and liquidating any other

assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of

marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway. However,

such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars

that they invested with BLMIS over the years. Consequently, the Trustee must use his authority

under SIPA and the Bankruptcy Code to pursue recovery from customers who received

preferences and/or payouts of fictitious profits to the detriment of other defrauded customers

whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the

10-04354-smb   Doc 88   Filed 12/04/12   Entered 12/04/12 23:01:07   Main Document
Pg 30

Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

18.     Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA section 78fff(b).   Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA.

19.     Pursuant to sections 78fff(b) and 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

20.     The Trustee has standing to bring these claims pursuant to section 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a.     Defendant NTC and/or FBO Defendant received "Customer Property" as defined in 15 U.S.C. §78*lll*(4);

b.     BLMIS incurred losses as a result of the claims set forth herein;

c.     BLMIS' customers were injured as a result of the conduct detailed herein;

d.     SIPC has not reimbursed, and statutorily cannot fully reimburse, all customers for all of their losses;

e.     the Trustee will not be able to fully satisfy all claims;

f.     the Trustee, as bailee of customer property, can sue on behalf of the customer bailors;

g.      The Trustee is the assignee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers,

collectively, "Accountholders").  As of the date hereof, the Trustee has received multiple express

unconditional assignments of the applicable Accountholders' causes of action, which actions

could have been asserted against Defendant NTC and/or FBO Defendant.  As assignee, the

Trustee stands in the shoes of persons who have suffered injury in fact and a distinct and

palpable loss for which the Trustee is entitled to reimbursement in the form of monetary

damages.  The Trustee brings this action on behalf of, among others, those defrauded customers

of BLMIS who invested more money in BLMIS than they withdrew; and

h.      SIPC is the subrogee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon

the Trustee enforcement of its rights of subrogation with respect to payments it has made and is

making to customers of BLMIS from SIPC funds.

## THE FRAUDULENT PONZI SCHEME

21.      Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and

later, effective January 2001, formed as a New York limited liability company wholly owned by

Madoff.  Since in or about 1986, BLMIS operated from its principal place of business at 885

Third Avenue, New York, New York.  Madoff, as founder, proprietor, chairman, and chief

executive officer, ran BLMIS together with several family members and a number of additional

employees.  BLMIS was registered with the SEC as a securities broker-dealer under section

15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78$o$(b).  By that registration, BLMIS

is a member of SIPC.  BLMIS had three business units: investment advisory (the "IA Business"),

market making and proprietary trading.

22. For certain accounts in the IA Business, BLMIS purported to participate in a capital appreciation/depreciation strategy, depending on whether the customer sought to generate gains or losses. For example, the strategy was executed by either purporting to purchase small groups of securities near lows and then purporting to sell those same securities at highs, or by purporting to short-sell securities near highs and then purporting to repurchase those securities near lows.

23. For other accounts, Madoff described the IA Business' strategy as a "split-strike conversion" strategy. Madoff promised these clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S. publicly traded companies. The basket of stocks would be intended to mimic the movement of the S&P 100 Index. Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the clients' funds would intermittently be out of the market, at which times they would purportedly be invested in U.S. issued securities and money market funds. The second part of the split-strike conversion strategy was the hedge of such purchases with option contracts. Madoff purported to purchase and sell S&P 100 Index option contracts that closely corresponded with the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

24. Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication. The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious. At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he

claimed to have purchased for customer accounts. *See* Plea Allocution of Bernard L. Madoff at

3, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50).

Indeed, based on the Trustee's investigation to date and with the exception of isolated individual

trades for certain clients other than Defendant NTC and/or FBO Defendant, there is no record of

BLMIS having cleared any purchase or sale of securities on behalf of the IA Business at the

Depository Trust & Clearing Corporation, the clearing house for such transactions.

25.     Prior to his arrest, Madoff assured clients and regulators that he conducted all

trades on the over-the-counter market after hours.  To bolster that lie, Madoff periodically wired

tens of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a

London based entity substantially owned by Madoff and his family.  There are no records that

MSIL ever used the wired funds to purchase securities for the accounts of the IA Business

clients.

26.     Additionally, based on the Trustee's investigation to date, there is no evidence

that BLMIS ever purchased or sold any of the options that Madoff claimed on customer

statements to have purchased and sold.

27.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme

and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay or

defraud other current and prospective customers of BLMIS.  The money received from investors

was not set aside to buy securities as purported, but instead was primarily used to make the

distributions to – or payments on behalf of – other investors.  The money sent to BLMIS for

investment, in short, was simply used to keep the scheme going and to enrich Madoff, his

associates and others, including Defendant NTC and/or FBO Defendant, until such time as the

requests for redemptions in December 2008 overwhelmed the flow of new investments and
caused the inevitable collapse of the Ponzi scheme.

28. The payments to investors constituted an intentional misrepresentation of fact
regarding the underlying accounts and were an integral and essential part of the fraud. The
payments were necessary to validate the false account statements, and were made to avoid
detection of the fraud, to retain existing investors and to lure other investors into the Ponzi
scheme.

29. During the scheme, certain investors requested and received distributions of the
so-called "profits" listed for their accounts which were nothing more than fictitious profits.
Other investors, from time to time, redeemed or closed their accounts, or removed portions of
purportedly available funds, and were paid consistently with the statements they had been
receiving. Some of those investors later re-invested part or all of those withdrawn payments with
BLMIS.

30. When payments were made to or on behalf of these investors, including
Defendant NTC and/or FBO Defendant, the falsified monthly statements of accounts reported
that the accounts of such investors included substantial gains. In reality, BLMIS had not
invested the investors' principal as reflected in customer statements. In an attempt to conceal the
ongoing fraud and thereby hinder, delay or defraud other current and prospective investors,
BLMIS paid to or on behalf of certain investors the inflated amounts reflected in the falsified
financial statements, including principal and/or fictitious profits.

31. BLMIS used the funds deposited from new investments to continue operations
and pay redemption proceeds to or on behalf of other investors and to make other transfers. Due
to the siphoning and diversion of new investments to fund redemptions requested by other

investors, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

32.     In an effort to hinder, delay or defraud authorities from detecting the fraud, BLMIS did not register as an Investment Advisor until September 2006.

33.     In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration.  The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.  In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $65 billion under management.

34.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York.  Of the two accountants at the firm, one was semi-retired and living in Florida for many years prior to the Filing Date.

35.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS.  At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## THE TRANSFERS

36.     According to BLMIS' records, Defendant NTC and/or FBO Defendant maintained an account (No. 1ZR297) with BLMIS, as set forth on Exhibit A (the "Account"). Upon information and belief, for the Account, FBO Defendant executed a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements"), and delivered such documents

-12-

to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.  At all times relevant hereto, Defendant NTC was the custodian of FBO Defendant's Account.

37.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Account was held in New York, New York, and Defendant NTC and/or FBO Defendant sent funds to BLMIS and/or to BLMIS' account at JPMorgan Chase & Co., Account #xxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Account and the purported conducting of trading activities.  Between the date the Account was opened and the Filing Date, Defendant NTC and/or FBO Defendant made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or received inter-account transfers from other BLMIS accounts.

38.    During the six years prior to the Filing Date, BLMIS made transfers (collectively, the "Transfers") to Defendant NTC and/or FBO Defendant totaling at least $1,863,225 in fictitious profits from the Ponzi scheme.  The Transfers received by Defendant NTC and/or FBO Defendant constitute non-existent profits supposedly earned in the Account, but, in reality, they were other people's money.  The Transfers were made to or for the benefit of Defendant NTC and/or FBO Defendant and are set forth in Columns 10 and 11 on Exhibit B annexed hereto.

39.    The Transfers that are avoidable and recoverable under sections 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3) total at least $1,863,225 and are referred to hereafter as the "Two Year Transfers." See Exhibit B, Column 10.  The Transfers that are avoidable and recoverable under sections 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) (McKinney 2001)

10-04354-smb Doc 88 Filed 12/01/10 Entered 12/01/10 16:33:07 Main Document Pg 15 of 95

and DCL sections 273 – 279 (McKinney 2001) total at least $1,863,225 and are referred to hereafter as the "Six Year Transfers." See Exhibit B, Column 11.

40. On information and belief, all of the Transfers were subsequently transferred by Defendant NTC to FBO Defendant (collectively, the "Subsequent Transfers").

41. The Subsequent Transfers, or the value thereof, are recoverable from FBO Defendant pursuant to §550(a) of the Bankruptcy Code.

42. The Trustee's investigation is ongoing and the Trustee reserves the right to (i) supplement the information regarding the Transfers, Subsequent Transfers, and any additional transfers and (ii) seek recovery of such additional transfers.

43. To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## CUSTOMER CLAIMS

44. On or about June 30, 2009, FBO Defendant filed a customer claim with the Trustee which the Trustee has designated as Claim # 013425 (the "Customer Claim").

45. On or about October 19, 2009, the Trustee issued a Notice of Trustee's Determination of Claim to FBO Defendant (the "Determination") with respect to the Customer Claim. A copy of the Determination is attached hereto as Exhibit C.

46. On or about December 17, 2009, FBO Defendant filed an objection to the Determination with the Court (the "Claims Objection").

47. On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. The

Trustee intends to resolve the Customer Claim and the Claims Objection to the Trustee's determination of such claim through a separate hearing as contemplated by the Claims Procedures Order.

## COUNT ONE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a) AND 551

48.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

49.     Each of the Two Year Transfers was made on or within two years before the Filing Date.

50.     Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

51.     Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS' then existing and/or future creditors.

52.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Defendant NTC and/or FBO Defendant pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

53.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS.

## COUNT TWO
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a) AND 551

54.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

55.     Each of the Two Year Transfers was made on or within two years before the Filing Date.

56.     Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

57.     BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers.

58.     At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers.

59.     At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with BLMIS was an unreasonably small capital.

60.     At the time BLMIS made each of the Two Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

61.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendant NTC and/or FBO Defendant pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

-16-

62.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of
the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment
against Defendant NTC and/or FBO Defendant: (a) avoiding and preserving the Two Year
Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two
Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit
of the estate of BLMIS.

## COUNT THREE
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

63.     To the extent applicable, the Trustee incorporates by reference the allegations
contained in the previous paragraphs of this Complaint as if fully rewritten herein.

64.     At all times relevant to the Six Year Transfers, there have been and are one or
more creditors who have held and still hold matured or unmatured unsecured claims against
BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and
are not allowable only under section 502(e) of the Bankruptcy Code.

65.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined
under DCL section 270.

66.     Each of the Six Year Transfers was made by BLMIS with the actual intent to
hinder, delay or defraud the creditors of BLMIS.  BLMIS made each of the Six Year Transfers to
or for the benefit of Defendant NTC and/or FBO Defendant in furtherance of a fraudulent
investment scheme.

67.     As a result of the foregoing, pursuant to DCL sections 276, 278 and/or 279,
sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the
Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding
and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and

(c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFER --NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

68.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

69.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

70.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

71.    BLMIS did not receive fair consideration for any of the Six Year Transfers.

72.    BLMIS was insolvent, or became insolvent as a result of the Six Year Transfers.

73.    As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFER—NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551

74.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

75.     At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

76.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

77.     BLMIS did not receive fair consideration for any of the Six Year Transfers.

78.     At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

79.     As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS.

## COUNT SIX
### FRAUDULENT TRANSFER-NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551

80.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

81.     At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

82.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined
under DCL section 270.

83.    BLMIS did not receive fair consideration for any of the Six Year Transfers.

84.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred,
was intending to incur, or believed that it would incur debts beyond its ability to pay them as the
debts matured.

85.    As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279 and
sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the
Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding
and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and
(c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO
Defendant for the benefit of the estate of BLMIS.

**COUNT SEVEN**
**RECOVERY OF SUBSEQUENT TRANSFER - NEW YORK DEBTOR AND CREDITOR**
**LAW §§ 278 AND/OR 279 AND 11 U.S.C. §§ 544, 548, 550(a) AND 551**

86.    To the extent applicable, the Trustee incorporates by reference the allegations
contained in the previous paragraphs of this Complaint as if fully rewritten herein.

87.    Each of the Transfers is avoidable under sections 544 and 548 of the Bankruptcy
Code, DCL sections 273, 274, 275 and/or 276 and section 78fff-2(c)(3) of SIPA.

88.    On information and belief, the Subsequent Transfers were transferred by
Defendant NTC to FBO Defendant.

89.    Each of the Subsequent Transfers was made directly or indirectly to FBO
Defendant.

90.    FBO Defendant is an immediate or mediate transferee of the Subsequent
Transfers from Defendant NTC.

91. As a result of the foregoing and the avoidance of the within Transfers, pursuant to DCL sections 278 and/or 279, sections 544(b), 548(a), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against FBO Defendant: (a) avoiding and preserving the Subsequent Transfers, (b) directing that the Subsequent Transfers be set aside, and (c) recovering the Subsequent Transfers, or the value thereof, from FBO Defendant for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendant NTC and/or FBO Defendant as follows:

i.     On the First Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS;

ii.    On the Second Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS;

iii.   On the Third Claim for Relief, pursuant to DCL sections 276, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS;

iv.     On the Fourth Claim for Relief, pursuant to DCL sections 273, 278 and/or 279,
sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA:
(a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be
set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC
and/or FBO Defendant for the benefit of the estate of BLMIS;

v.     On the Fifth Claim for Relief, pursuant to DCL sections 274, 278 and/or 279,
sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA:
(a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set
aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC
and/or FBO Defendant for the benefit of the estate of BLMIS;

vi.     On the  Sixth Claim for Relief, pursuant to DCL sections 275, 278 and/or 279,
sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA:
(a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be
set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC
and/or FBO Defendant for the benefit of the estate of BLMIS;

vii.     On the Seventh Claim for Relief as a result of the avoidance of the within
Transfers, pursuant to DCL section 278 and/or 279, sections 544(b), 548, 550(a) and 551 of the
Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Subsequent
Transfers; (b) directing that the Subsequent Transfers be set aside; and (c) recovering the
Subsequent Transfers, or the value thereof, from FBO Defendant for the benefit of the estate of
BLMIS;

viii.    On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001 and 5004 awarding the Trustee prejudgment interest from the date on which the Transfers were received;

ix.    On all Claims for Relief, establishment of a constructive trust over the proceeds of the Transfers in favor of the Trustee for the benefit of BLMIS' estate;

x.    On all Claims for Relief, assignment of income tax refunds of Defendant NTC and/or FBO Defendant from the United States, state and local governments paid on fictitious profits during the course of the scheme;

xi.    On all Claims for Relief, awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xii.    On all Claims for Relief, granting Plaintiff such other, further, and different relief as the Court deems just, proper and equitable.

Date:  November 12, 2010
New York, New York

Of Counsel:

**BAKER & HOSTETLER LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002-5018
Telephone: (713)751-1600
Facsimile: (713)751-1717
Dean D. Hunt
Email: dhunt@bakerlaw.com
Tonya A. Jacobs
Email: tjacobs@bakerlaw.com
Pamela G. Johnson
Email: pjohnson@bakerlaw.com
Robyn R. Goldstein
Email: rgoldstein@bakerlaw.com

By: _/s/ Marc E. Hirschfield_
    _/s/ Richard J. Bernard_
    _/s/ Geraldine E. Ponto_
    _/s/ Marc Skapof_
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Marc E. Hirschfield
Email:  mhirschfield@bakerlaw.com
Richard J. Bernard
Email: rbernard@bakerlaw.com
Geraldine E. Ponto
Email: gponto@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*

10-04354-smg Doc 1 Filed 12/01/10 Entered 12/01/10 03:07:11 Main Document
Pg 30 of 30

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| NTC & CO. FBO DAVID IVAN LUSTIG   **REDACTED** | 1ZR297 |

Exhibit B

BLMIS ACCOUNT NO. 1ZR297 - NTC & CO. fbo DAVID IVAN LUSTIG       REDACTED

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |
| 5/30/2000 | CHECK | 56,265 | 56,265 | - | - | - | 56,265 | | | |
| 5/31/2000 | TRANS FROM 1ZA31430 | 1,225,426 [1] | - | - | - | - | 56,265 | - | - | - |
| 8/16/2000 | TRANS FROM 1ZA31430 | 536 [1] | - | - | - | - | 56,265 | - | - | - |
| 12/18/2001 | CHECK | 28,638 | 28,638 | - | - | - | 84,903 | - | - | - |
| 5/12/2003 | CHECK | 51,872 | 51,872 | - | - | - | 136,775 | - | - | - |
| 7/25/2007 | CHECK WIRE | (2,000,000) | - | (2,000,000) | - | - | (1,863,225) | - | (1,863,225) | (1,863,225) |
| | Total: | | $ 136,775 | $ (2,000,000) | $ - | $ - | $ (1,863,225) | $ - | $ (1,863,225) | $ (1,863,225) |

[1] Although BLMIS statements reflect that funds were transferred into this account on this date, these funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date. Accordingly, the account balance has remained unchanged.

MADC0624_00000002

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

### NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

October 19, 2009

NTC & Co. FBO David Ivan Lustig (IRA)
**REDACTED**
Pescadero CA 94060

Dear NTC & Co. FBO David Ivan Lustig (IRA):

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1ZR297 designated as Claim Number 013425:

Your claim for a credit balance of $3,985.00 and for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $2,000,000.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

300034804.1

of $136,774.75). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($1,863,225.25) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after October 19, 2009, the date on which the Trustee mailed this notice.

300034804.1

2

MADC0624_00000004

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:  Austin G. Bosarge
     Turning Point Law
          REDACTED
     San Rafael, California 94903

     NTC & Co. FBO David Ivan Lustig
          REDACTED
     Denver, Colorado 80217

MADC0624_00000005

| - Table 1 - | | | |
|---|---|---|---|
| **DEPOSITS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 5/30/2000 | CHECK | $56,264.79 | $56,264.79 |
| 5/31/2000 | TRANS FROM 1ZA31430 | $1,225,426.25 | $0.00 |
| 8/16/2000 | TRANS FROM 1ZA31430 | $536.03 | $0.00 |
| 12/18/2001 | CHECK | $28,638.31 | $28,638.31 |
| 5/12/2003 | CHECK | $51,871.65 | $51,871.65 |
| **Total Deposits:** | | $1,362,737.03 | $136,774.75 |
| | | | |
| **WITHDRAWALS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 7/25/2007 | CHECK WIRE | ($2,000,000.00) | ($2,000,000.00) |
| **Total Withdrawals:** | | ($2,000,000.00) | ($2,000,000.00) |
| | | | |
| **Total deposits less withdrawals:** | | ($637,262.97) | ($1,863,225.25) |

300034804.1

4

MADC0624_00000006

EXHIBIT B

# The Madoff Recovery Initiative

SUBSTANTIVELY CONSOLIDATED SIPA LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC & BERNARD L. MADOFF

**CLAIMS STATUS**

**As of December 12, 2014:**

**TOTAL RECEIVED CLAIMS**

16,519

**DETERMINED CLAIMS**

16,519

**ALLOWED CLAIMS**

2,528

**DENIED CLAIMS**

2,701

**DENIED CLAIMS (THIRD PARTY)**

10,424

**WITHDRAWN CLAIMS**

709

**DETERMINED (NO CLAIM)**

12

**DEEMED DETERMINED PENDING LITIGATION**

145

**TOTAL VALUE OF ALLOWED CLAIMS**

$11.424 Billion

**SIPC COMMITTED FUNDS SUBJECT TO SUBROGATION\***

$702.1 Million

*All amounts approximate*

**SIPA LIQUIDATION CLAIMS PROCESS**

The Securities Investor Protection Act (SIPA) Trustee and his counsel are governed by SIPA process, which includes:

- Establishing a fund of customer property: All customer-related assets are put into a co-mingled fund of customer property. Allocation of property to the fund of customer property is based on a motion made by the SIPA Trustee subject to approval by the United States Bankruptcy Court for the Southern District of New York.

- Completing determinations of claims, the value of customer property and total net equity prior to distributions: The SIPA Trustee must first determine the number of allowed claimants and the amount and value of the property under the SIPA Trustee's control. Distributions to pay allowed customer claims will be made when there is clarity for reasonable estimates that can be made of both the amount of customer property available for distribution and the total net equity of all allowed customer claims.

- Providing cash advances from the Securities Investor Protection Corporation (SIPC), a membership organization funded by the securities industry: Advances from SIPC are available to the court-appointed SIPA Trustee to distribute to customers with allowed claims, as a way to speed financial relief to these customers, up to the maximum amount of $500,000. As of November 20, 2014, SIPC has committed approximately $816.2 million to the Bernard L. Madoff Investment Securities LLC (BLMIS) liquidation for this purpose. SIPC committed advances will continue to increase as additional claims that have been deemed determined become allowed over time.

- According to the provisions of SIPA, under which SIPC was created, SIPC is entitled to be reimbursed for cash advanced to customers once respective customer claims have been fully satisfied. As of the fourth pro rata interim distribution in the BLMIS liquidation proceeding, SIPC received $114.1 million in reimbursement from the Customer Fund for advances paid on accounts now fully satisfied, leaving $702.1 million in SIPC advances outstanding.

- Making advances for administrative costs: The SIPA Trustee and SIPC have agreed that, at this time, they have no reasonable expectation that the General Estate will be sufficient to pay the administrative expenses of the BLMIS liquidation. Accordingly, any fees and expenses allowed by the United States Bankruptcy Court for the Southern District of New York will be paid from advances by SIPC, a membership organization funded by the securities industry.

- Distributing customer property pro rata based on net equity: Each verified allowed claimant is entitled to a pro rata share, or a percentage of the fund of customer property, based on a calculation related to the customer's individual "net equity." Distributions may be in stages.

**BLMIS LIQUIDATION CLAIMS PROCEDURES AND CHRONOLOGY**

- Claims Procedures Order
- Claims Determinations
- Objections
- Claims Trading
- General Creditor Claims
- Net Equity Methodology
- Time-Based Damages

**Claims Procedures Order**

On December 23, 2008, the United States Bankruptcy Court for the Southern District of New York entered the Claims Procedures Order that specified the procedures for the filing, determination and adjudication of customer claims in the Securities Investor Protection Act (SIPA) liquidation of Bernard L. Madoff Investment Securities LLC (BLMIS). This order specified that BLMIS customers would share pro rata in customer property, based on their net equity.

The last date for filing customer claims under SIPA and the Claims Procedure Order was July 2, 2009. The SIPA Trustee published notices to BLMIS customers in all major newspapers regarding the liquidation, mailed thousands of customer claim forms to those who requested them and made request forms available for download via this website.

**Claims Determinations**

Once a claim is determined, a letter of determination is sent to the claimant by the SIPA Trustee. Every six months, the SIPA Trustee files a detailed interim report on the status of claims. In addition, claims numbers are updated weekly on this website.

**Objections**

If a claimant disputes the SIPA Trustee's determination, the claimant may object and request a hearing before the United States Bankruptcy Court for the Southern District of New York. This must be done within 30 days of the date of the determination letter unless the time is extended. If the claimant fails to request a hearing within those 30 days or fails to appear at the scheduled hearing, the SIPA Trustee's determination is final.

**Claims Trading**

Customer claims may be transferred in full in the BLMIS liquidation proceeding. On November 10, 2010, the Court entered an order approving certain uniform procedures and forms with respect to the trading of claims. Notice of a claim transfer must be provided in accordance with those procedures.

The SIPA Trustee does not take a position with regard to claims trading.

**General Creditor Claims**

All "good faith" BLMIS customers were defrauded. Regardless of whether their claims for distributions from the Customer Fund are denied or approved, their claims are also deemed to be general creditor claims against the General Estate. Other creditors in the liquidation, such as service providers and vendors, also have claims against the BLMIS General Estate. Once the SIPA Trustee fully satisfies the net equity claims of BLMIS customers, the next step in the BLMIS liquidation is to distribute customer property in accordance with the other priorities in SIPA. After customer net equity claims, the next priority is to distribute customer property to SIPC as subrogee. Thereafter, any customer property remaining becomes part of the General Estate.

Once those priorities are satisfied, the next step is to allocate recoveries to the General Estate and to distribute those recoveries pro rata to general creditors in the order of priority established in the Bankruptcy Code.

**Net Equity Methodology**

The SIPA Trustee determined that he would calculate a customer's net equity based on the real assets that customers lost to Madoff's scheme: the cash deposited, less any amount withdrawn (the "net investment" or "cash in/cash out" method).

Certain claimants disagreed with the SIPA Trustee as to the definition of "net equity" in the Madoff fraud and how that term should be applied to determine the amount of the valid customer claim of each claimant. They argued that the SIPA Trustee should have calculated their net equity – which determines their percentage of recovered customer property – based on the amounts shown on the final customer statements issued by BLMIS in November 2008 (the "last statement method").

The SIPA Trustee rejected that method, as those statements were fiction.

**United States Bankruptcy Court for the Southern District of New York**

After the filing of a number of objections, the SIPA Trustee filed a motion with the United States Bankruptcy Court for the Southern District of New York seeking an order affirming his use of the Net Investment Method in calculating "net equity."

Both SIPC and the SEC submitted briefs supporting the SIPA Trustee's motion.

A hearing was held at the United States Bankruptcy Court for the Southern District of New York on February 2, 2010.

On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York granted the SIPA Trustee's motion for an order denying customer claims for amounts listed on the BLMIS last customer statement and affirming the SIPA Trustee's determination of net equity and entered a memorandum decision. On March 8, 2010, the United States Bankruptcy Court for the Southern District of New York entered an order implementing that decision.

The memorandum by the Honorable Judge Burton R. Lifland noted that "[a]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested." Further, the order noted that those claimants who withdrew funds from their BLMIS accounts that exceeded their initial investments "would receive more favorable treatment by profiting from the principal investments of [those claimants who have withdrawn less money than they deposited], yielding an inequitable result."

Finally, the memorandum noted that the Net Investment Method, unlike the Last Statement Method, allowed The SIPA Trustee to "unwind, rather than legitimiz[e], the fraudulent scheme."

**Appeal to the United States Court of Appeals Certified**

Certain claimants elected to appeal the decision. The appeal was certified directly to the United States Court of Appeals.

On September 20, 2010, both the SIPA Trustee and the Securities Investor Protection Corporation (SIPC) filed briefs in support of the "cash-in, cash out" net equity methodology.

On September 21, 2010, the SEC filed an amicus brief that supported the SIPA Trustee's Net Investment Method, asserting that it is required by SIPA and is consistent with precedent.

Oral arguments were held on March 3, 2011 before a panel of three Justices of the United States Court of Appeals for the Second Circuit.

On August 16, 2011, the United States Court of Appeals for the Second Circuit issued an order affirming the decision of United States Bankruptcy Court for the Southern District of New York as "legally sound," noting that "Use of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations."

**Petition for Panel Rehearing, or, in the Alternative, Rehearing en banc Filed**

A petition was filed with the United States Court of Appeals for the Second Circuit for a panel rehearing, or, in the alternative, for rehearing en banc.

**Panel Rehearing or Rehearing en banc Denied**

On November 8, 2011, the petition was denied.

**Petitions for Writs of Certiorari Filed with Supreme Court of the United States**

Three petitions for writs of certiorari were filed with the Supreme Court of the United States seeking review of the United States Court of Appeals decision. The SIPA Trustee submitted briefs in opposition on March 9, 2012. SIPC submitted briefs in opposition on March 9, 2012, and the SEC submitted a brief in opposition on May 24, 2012. On June 4, 2012, one of the writs of certiorari was withdrawn, a result of settlement with the SIPA Trustee.

**Petitions for Writs of Certiorari Denied – Net Equity Upheld**

On June 25, 2012, the Supreme Court entered an order that it refused to grant the petitions, thereby upholding the net equity methodology, ending the appeals process and resolving the matter.

**Time-Based Damages**

On August 22, 2012, the SIPA Trustee's July 26, 2012 motion for a second pro rata interim distribution was approved by the Honorable Burton R. Lifland of the United States Bankruptcy Court for the Southern District of New York. The second pro rata interim distribution, which totals approximately $3.753 billion to date, commenced on September 19, 2012 with a record date of September 12, 2012.

The amount of the distribution was dependent on several issues, including the issue of whether BLMIS claimants are entitled to "time-based damages" or payments based on the time elapsed while customer monies were deposited with BLMIS. More than 1,200 objections have been filed based on the issue of time-based damages, with some claimants seeking as much as 9 percent interest. In its order, the Court instructed the SIPA Trustee to reserve 3 percent for the time-based damages issue.

On September 10, 2013, the United States Bankruptcy Court for the Southern District of New York approved the SIPA Trustee's motion to deny time-based damages adjustments to customer claims. That decision was appealed by objecting parties on September 24, 2013 and on the same day an order was filed by the Bankruptcy Court certifying the order of September 10, 2013 for immediate appeal to the United States Court of Appeals. The immediate appeal was accepted by the Second Circuit on January 22, 2014, and oral arguments were heard on Tuesday, October 14, 2014.

EXHIBIT C

Building the Customer Fund                                    Page 1 of 2
08-01789-cgm    Doc 8870-1    Filed 12/22/14    Entered 12/22/14 18:11:22    Exhibit A -
F to Ha Declaration    Pg 37 of 95

# The Madoff Recovery Initiative

SUBSTANTIVELY CONSOLIDATED SIPA LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC & BERNARD L. MADOFF

# Building the Customer Fund

Recoveries & Settlement
Agreements Reported
as of *November 20, 2014*:

$10.493 Billion



NOVEMBER 20, 2014  Edward Blumenfeld, et al.  **$50.4 Million**

NOVEMBER 18, 2014  Senator Fund SPC  **$95 Million**

NOVEMBER 17, 2014  Herald Fund SPC and Primeo Fund  **$497 Million**

OCTOBER 31, 2014  Additional Recoveries  **$7.5 Million**

SEPTEMBER 30, 2014  Additional Recoveries  **$3.5 Million**

AUGUST 31, 2014  Additional Recoveries  **$1.9 Million**

JULY 31, 2014  Additional Recoveries  **$12.5 Million**

JUNE 30, 2014  Additional Recoveries  **$3.3 Million**

MAY 31, 2014  Additional Recoveries  **$13 Million**

MAY 05, 2014  Saul Katz, et al.  **$81.3 Million**

APRIL 30, 2014  Additional Recoveries  **$3.7 Million**

MARCH 31, 2014  Additional Recoveries  **$4.7 Million**

FEBRUARY 28, 2014  Additional Recoveries  **$1.2 Million**

FEBRUARY 04, 2014  JPMorgan Chase, et al.  **$275 Million**

JANUARY 31, 2014  Additional Recoveries  **$3.3 Million**

DECEMBER 31, 2013  Additional Recoveries  **$6.6 Million**

NOVEMBER 30, 2013  Additional Recoveries  **$776 Thousand**

OCTOBER 31, 2013  Additional Recoveries  **$4.8 Million**

SEPTEMBER 30, 2013  Additional Recoveries  **$2 Million**

SEPTEMBER 17, 2013  Maxam Absolute Return Fund L.P.  **$97.8 Million**

AUGUST 31, 2013  Additional Recoveries  **$440 Thousand**

AUGUST 08, 2013  Additional Union Bancaire Privée (UBP)  **$49 Million**

JULY 31, 2013  Additional Recoveries  **$4.7 Million**

JUNE 30, 2013  Additional Recoveries  **$1.6 Million**

MAY 31, 2013  Additional Recoveries  **$2.9 Million**

APRIL 30, 2013  Additional Recoveries  **$10.8 Million**

MARCH 31, 2013  Additional Recoveries  **$5.7 Million**

FEBRUARY 28, 2013  Additional Recoveries  **$2.4 Million**

DECEMBER 31, 2012  Additional Recoveries  **$13.7 Million**

DECEMBER 04, 2012  Beacon & Andover  **$24 Million**

NOVEMBER 28, 2012  Additional Fairfield Fund  **$46 Million**

SEPTEMBER 30, 2012  Additional Recoveries  **$19.2 Million**

JULY 31, 2012  Additional Recoveries  **$2.9 Million**

JUNE 30, 2012  Additional Recoveries  **$11.5 Million**

MAY 15, 2012  Trotanoy Investment Company, Ltd.  **$28.96 Million**

MARCH 31, 2012  Additional Recoveries  **$36 Million**

DECEMBER 21, 2011  IRS  **$326 Million**

OCTOBER 04, 2011  Mount Capital  **$43.5 Million**

SEPTEMBER 30, 2011  Additional Recoveries  **$51.1 Million**

SEPTEMBER 22, 2011  Tremont Group  **$1.025 Billion**

JUNE 07, 2011  Fairfield Funds  **$16 Million**

MAY 18, 2011  Greenwich Funds  **$212 Million**

MARCH 31, 2011  Additional Recoveries  **$390.8 Million**

MARCH 10, 2011  Hadassah  **$45 Million**

JANUARY 13, 2011  Estate of Jeffry Picower  **$5 Billion**

JANUARY 06, 2011  Union Bancaire Privée (UBP)  **$470 Million**

DECEMBER 21, 2010  Carl J. Shapiro, et al.  **$550 Million**

SEPTEMBER 30, 2010  Additional Recoveries  **$17.9 Million**

FEBRUARY 28, 2010  Additional Recoveries  **$5.5 Million**

FEBRUARY 18, 2010  Norman F. Levy, et al.  **$220 Million**

OCTOBER 31, 2009  Additional Recoveries  **$23.9 Million**

JUNE 16, 2009  Optimal  **$235.4 Million**

MAY 31, 2009  Initial Recoveries  **$647.8 Million**

EXHIBIT D

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Deborah R. Renner
Keith R. Murphy
Seanna R. Brown

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Estate of Bernard L. Madoff*

Hearing Date: February 4, 2014, 10:00 a.m. (EST)
Objection Deadline: January 28, 2014, 4:00 p.m.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                    Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>                    Plaintiff,<br><br>          v.<br><br>JPMORGAN CHASE CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD.,<br><br>                    Defendants. | Adv. Pro. No. 10-4932 (BRL) |

**TRUSTEE'S MOTION FOR ENTRY OF ORDER PURSUANT TO SECTION 105(a) OF
THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES
OF BANKRUPTCY PROCEDURE APPROVING SETTLEMENT OF COMMON LAW
CLAIMS BY AND BETWEEN THE TRUSTEE, THE CLASS REPRESENTATIVES,
AND JPMORGAN**

TO:    THE HONORABLE BURTON R. LIFLAND,
       UNITED STATES BANKRUPTCY JUDGE

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L.

Madoff ("Madoff," and together with BLMIS, the "Debtors"), by and through the Trustee's

undersigned counsel, submits this motion and memorandum (the "Motion") seeking entry of an

order, pursuant to section 105(a) of title 11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code") and Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), approving a settlement ("Settlement"), the terms and

conditions of which are set forth in the Settlement Agreement (the "Agreement")[1] dated January

6, 2014 by and among the Trustee; Paul Shapiro, and Stephen and Leyla Hill (the "Class

Representatives"); and JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan

Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMorgan" or "Defendants")

(each of the Trustee, the Class Representatives, and Defendants a "Party" and collectively, the

"Parties").  In support of the Motion, the Trustee respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.    This settlement resolves the substantial Common Law Claims (as defined below

in paragraph 10) asserted by the Trustee and the Class Representatives against JPMorgan.   It is

---

[1] The Agreement is annexed hereto as Exhibit A. To the extent there is any discrepancy between
this Motion and the Agreement, the Agreement controls. Capitalized terms not defined herein
shall have the meaning set forth in the Agreement.

by no means clear that the Trustee or the Class Representatives would prevail in litigation against JPMorgan on these claims.  In fact, litigation is pending in the United States Supreme Court that may determine the ability of either the Trustee or the Class Representatives to successfully pursue the Common Law Claims.  But after the Parties' successful negotiations, and after thorough and deliberate consideration of the uncertainty, costs, and risks inherent in this litigation, the Parties determined it was appropriate to reach a business resolution on the Common Law Claims in light of all the facts and circumstances.

2.     JPMorgan has agreed to settle the Common Law Claims brought by the Trustee and the Class Representatives in the amount of $218 million, which will flow to "net loser" BLMIS customers through a class settlement fund, as more fully described herein.

3.     In addition, contemporaneous settlements were entered into between the Trustee and JPMorgan on the Trustee's Avoidance Claims (as defined below in paragraph 10) and between JPMorgan and the Government relating to the Government's investigation.  When those settlements are combined with the Settlement provided for herein, approximately $2.243 billion will flow to "net loser" victims of Madoff's fraud.

4.     The Agreement represents the culmination of the Trustee's investigation of JPMorgan's potential liability on the Common Law Claims and a partnership with the Class Representatives to reach a consensual, cost-efficient resolution with JPMorgan for the benefit of BLMIS customers.

5.     The Agreement represents a good faith, complete, and final Settlement among the Trustee, the Class Representatives, and JPMorgan as to the Common Law Claims on the terms and conditions as set forth in the Agreement.  Resolution of the Trustee's Avoidance Claims is

provided for in a separate agreement. For all of the reasons in this Motion, the Trustee believes

that the Agreement is fair and in the best interests of BLMIS customers and the Estate.

### BACKGROUND AND RELEVANT PROCEDURAL HISTORY

6.      On December 11, 2008 (the "Filing Date"), the Securities & Exchange

Commission ("SEC") filed a complaint in the United States District Court for the Southern

District of New York (the "District Court") against the Debtors (Case No. 08 CV 10791).  The

complaint alleged that the Debtors engaged in fraud through the investment advisor activities of

BLMIS.

7.      On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC

consented to a combination of its own action with an application of the Securities Investor

Protection Corporation ("SIPC").  Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC

filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protection afforded by SIPA.

8.      On that date, the District Court entered the Protective Decree, to which BLMIS

consented, which, in pertinent part:

  (i)     appointed the Trustee for the liquidation of the business of BLMIS
          pursuant to section 78eee(b)(3) of SIPA;

  (ii)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
          section 78eee(b)(3) of SIPA; and

  (iii)   removed the case to the United States Bankruptcy Court ("Bankruptcy
          Court") pursuant to section 78eee(b)(4) of SIPA.

9.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff.

On June 9, 2009, the Bankruptcy Court entered an order substantively consolidating the chapter

7 estate of Madoff into BLMIS's estate in the SIPA liquidation proceeding (the consolidated

Madoff and BLMIS estates collectively are referred to as the "Estate").

10.    On December 2, 2010, the Trustee filed a complaint (the "Complaint")

commencing an adversary proceeding captioned *Picard v. JPMorgan Chase & Co, et al.*, No.

10-4932 (BRL) (the "JPMorgan Adversary Proceeding") against JPMorgan seeking to avoid and

recover under 11 U.S.C. §§ 544(b), 547, 548 and 550 and the New York Uniform Fraudulent

Conveyance Act (New York Debtor and Creditor Law §§ 270-281) (collectively, the "Avoidance

Claims") approximately $425 million of transfers or other payments (the "Transfers") received

by JPMorgan prior to the collapse of BLMIS, along with interest.  The Trustee also asserted

common law claims (the "Common Law Claims") against JPMorgan, including aiding and

abetting fraud, aiding and abetting breach of fiduciary duty, conversion, unjust enrichment, and

contribution.

11.    On February 8, 2011, JPMorgan moved to withdraw the reference from the

Bankruptcy Court, which was granted by the District Court (McMahon, J.) on May 23, 2011.

12.    On June 3, 2011, JPMorgan moved to dismiss the Common Law Claims and

certain of the Avoidance Claims in the Complaint.  On June 24, 2011, the Trustee filed an

amended complaint (the "Amended Complaint").  On August 1, 2011, JPMorgan moved to

dismiss the Common Law Claims and certain of the Avoidance Claims in the Amended

Complaint.  The Trustee opposed.  On November 1, 2011, the District Court granted JPMorgan's

motion to dismiss the Trustee's Common Law Claims and returned all the Avoidance Claims to

the Bankruptcy Court for further proceedings.  *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84

(S.D.N.Y. 2011).

13.    The Trustee appealed to the United States Court of Appeals for the Second Circuit

(the "Second Circuit"), which affirmed the District Court's ruling on June 20, 2013.  *Picard* v.

*JPMorgan Chase & Co. (In re Bernard L. Madoff Investment Securities LLC)*, 721 F.3d 54 (2d

Cir. 2013).

14.    The Trustee sought review of the Second Circuit's decision by the United States

Supreme Court by filing a petition for a writ of certiorari on October 9, 2013.  The Trustee's

petition is pending.

15.    Shortly after the District Court dismissed the Trustee's Common Law Claims, two

class action complaints were filed in the District Court against JPMorgan in the names of the

customer representatives, Stephen and Leyla Hill, *Hill v. JPMorgan Chase & Co.*, 11 Civ.

7961(CM); and Paul Shapiro, *Shapiro v. JPMorgan Chase & Co.*, 11 Civ. 8331(CM) (together,

the "Customer Representatives").  These complaints asserted various claims against JPMorgan

on behalf of BLMIS customers who were "net losers" as of the Filing Date arising out of the

same facts and circumstances as those giving rise to the Common Law Claims previously

brought by the Trustee.

16.    On December 5, 2011, the District Court consolidated the matters into the

Consolidated Class Action.  On January 20, 2012, a consolidated class action complaint was

filed against JPMorgan (the "Consolidated Class Action Complaint"), again asserting on behalf

of the same proposed class (i.e., BLMIS customers who were "net losers" as of the Filing Date)

various claims against JPMorgan relating to Madoff (the claims set forth in the Consolidated

Class Action Complaint together with the dismissed Common Law Claims are collectively

referred to hereafter as the "Class Claims").

17.    On March 9, 2012, JPMorgan filed a motion to dismiss the Consolidated Class

Action Complaint, which was opposed by the Customer Representatives.  The Trustee filed a

motion seeking limited intervention pursuant to Fed. R. Civ. P. 24(a)(2) in the Consolidated

Class Action, which was granted by the District Court on October 16, 2012.  On September 26,

2013, the District Court placed the Consolidated Class Action on the suspense calendar pending

a decision from the United States Supreme Court in *Roland v. Green*, 675 F.3d 503 (5th Cir.

2012), *cert. granted sub nom. Chadbourne & Parke LLP v. Troice*, 133 S. Ct. 977 (U.S. Jan. 18,

2013) (No. 12-79).  The parties submitted various letter briefs regarding *Chadbourne* and related

issues with the result that the matter remains on the suspense calendar.

## THE COMMON LAW CLAIMS AGAINST JPMORGAN

18.    To fulfill his statutory obligations under 15 U.S.C. § 78fff -1(d), the Trustee,

assisted by his counsel and consultants, investigated the relationship between BLMIS and

JPMorgan.  That investigation included, without limitation, the review and analysis of the "703"

account and other banking accounts held by BLMIS at JPMorgan, correspondence and other

records and documents available to the Trustee, including third-party records and documents;

interviews with third-parties; and documents and testimony provided by JPMorgan under

Bankruptcy Rule 2004.

19.    Counsel for the Class Representatives also commenced an investigation into

BLMIS and Madoff.

20.    The Trustee and the Class Representatives assert that JPMorgan is liable for the

Class Claims, including aiding and abetting fraud, aiding and abetting breach of fiduciary duty,

conversion, unjust enrichment, and contribution.

21.    JPMorgan disputes any liability under all counts alleged in the Trustee's

Amended Complaint and the Consolidated Class Action Complaint.

22.     JPMorgan commenced negotiations to resolve all claims relating to Madoff, including those brought by the Trustee, the Customer Representatives, and the Government.  The Parties have met face-to-face on numerous occasions and conducted frequent settlement negotiations by telephone.

23.     After extensive negotiations, the Trustee, the Class Representatives, and JPMorgan reached a compromise of the Class Claims.  The Agreement, including all exhibits attached thereto and incorporated therein, is the definitive document that reflects all of the terms and conditions of the Settlement between the Trustee, the Class Representatives, and JPMorgan on the Class Claims.  *See* Exhibit A.

24.     As a result of the investigation by the Trustee and the Class Representatives, and the Parties' successful negotiations, and after thorough and deliberate consideration of the uncertainty, costs, and risks inherent in all litigation, the Trustee, in the exercise of his business judgment, determined that it was appropriate to reach a business resolution in light of all the facts and circumstances.

25.     A separate compromise was entered into to settle the Trustee's Avoidance Claims.  That compromise was negotiated in tandem with the settlement of the Class Claims but is subject to a separate agreement.

## OVERVIEW OF THE AGREEMENT

26.     Certain salient terms and conditions of the Agreement are briefly summarized below.  The Agreement should be reviewed for a complete account of other important terms, including with respect to mutual releases and the representations and warranties of the Parties.  *See* Exhibit A.

27.     The Agreement provides:

(a)    On or around the same date as this Motion seeking an order approving the Agreement pursuant to Bankruptcy Rules 2002(a)(3) and 9019(a) (the "Common Law 9019 Order"), the Customer Representatives shall submit to the District Court a motion for preliminary approval of the Settlement, including entry of a preliminary approval order (the "Preliminary Approval Order").  If the Settlement is finally approved by the District Court following a settlement hearing, then the Customer Representatives shall request that the District Court enter a judgment (the "Judgment").

(b)    The Settlement will become effective upon the occurrence of all of the following events (the "Effective Date"): (a) the entry of a final and non-appealable Common Law 9019 Order approving the Agreement (the "Final Common Law 9019 Order"); (b) the entry of a final and non-appealable Judgment (the "Final Judgment"); and (c) JPMorgan has not exercised its right to terminate the Settlement.

(c)    After entry by this Court of the Common Law 9019 Order and entry by the District Court of the Preliminary Approval Order, JPMorgan shall within fourteen days deposit $218 million (the "Class Settlement Amount") into an escrow account (the "Escrow Account") maintained at Citi National Bank (the "Escrow Agent") pursuant to an escrow agreement (the "Escrow Agreement") executed by and among JPMorgan, the Customer Representatives, and the Trustee.

(d)    The Class Settlement Amount, together with any interest earned thereon (less any applicable taxes paid or required to be paid), shall be referred to as the "Class Settlement Fund."  Fees paid to Class Counsel are not paid out of the Class Settlement Fund.

(e)    The Customer Representatives will move before the District Court for the: (a) appointment of the Customer Representatives as class representatives for the Settlement

Class; (b) appointment of Entwistle & Cappucci LLP and Hagens Berman Sobol Shapiro LLP as

Class Counsel for the Settlement Class; and (c) certification of the Settlement Class pursuant to

Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

(f)     If approved by the District Court, the Settlement Class will consist of

BLMIS customers, including their successors, transferees, or assignees, who directly had capital

invested with BLMIS as of the Filing Date and thus, under the net investment method upheld by

the United States Court of Appeals for the Second Circuit, had net losses ("Net Losses") as of the

Filing Date ("Net Losers"), regardless of whether they filed a claim in the SIPA proceeding.

(g)     The Settlement Class includes all Net Losers, including those that did not

file claims in the SIPA proceeding, and is intended to be coterminous with all BLMIS customers

who have a positive net equity claim in the SIPA proceeding or who would have had a positive

net equity claim in the SIPA proceeding had they filed a timely customer claim in that

proceeding.  The Settlement Class does not include:  (i) BLMIS insiders and their families; (ii)

defendants in any criminal Madoff-related proceeding; (iii) BLMIS accountholders whose claims

against the BLMIS estate were extinguished by virtue of three separate settlements with the

Trustee, namely the estate of Jeffry Picower, *Picard v. Picower*, 09-1197 (BRL) (Bankr.

S.D.N.Y.) (ECF No. 43), the Carl Shapiro Family, *SIPC v. BLMIS*, 08-1789 (Bankr. S.D.N.Y.)

(ECF No. 3551), and Jeanne Levy-Church and Francis N. Levy, *SIPC v. BLMIS*, 08-1789

(Bankr. S.D.N.Y.) (ECF No. 1964); or (iv) any persons or entities that exclude themselves from

the Settlement Class by filing a request for exclusion that is accepted by the District Court.

(h)     If approved by the District Court, AlixPartners LLP will be appointed

distribution agent for the Class Settlement Fund.  AlixPartners LLP serves as the Trustee's

claims agent in the SIPA proceeding and, as such, has access to the Trustee's books and records,

which reflect the Net Losers and the amount of their losses as of December 11, 2008.

AlixPartners LLP maintains contact information for all former BLMIS customers such that direct

notice of the Settlement can be made to all potential members of the Settlement Class regardless

of whether they previously filed a claim in the SIPA proceeding.  AlixPartners LLP also

maintains lists of all transfers or assignments of customer claims in the SIPA proceeding and so

notice of the Settlement can also be made directly to all transferees or assignees of such claims.

AlixPartners LLP will process all claims relating to the Class Settlement Fund and make

distributions in consultation with the Trustee and Class Counsel.  The costs and expenses of

AlixPartners LLP incurred in fulfilling its duties as distribution agent in connection with this

Agreement shall be paid from the Class Settlement Fund.

       (i)      After the Effective Date, the Escrow Agent will, pursuant to the Escrow

Agreement, release to AlixPartners LLP the Class Settlement Fund following receipt of written

notice provided jointly by the Trustee, the Customer Representatives, and JPMorgan, with copies

of the Final Common Law 9019 Order and the Final Judgment attached, which notice shall be

provided only after the Trustee and Class Counsel have certified that AlixPartners LLP has

completed all relevant pre-distribution claims-related work.

       (j)      The Parties agree that, subject to any additional requirements of Federal

Rule of Civil Procedure 23 (or any requirements that may be imposed by either this Court or the

District Court in connection with the approval process), the Class Settlement Fund will be

distributed to the Settlement Class after the Effective Date.  For purposes of distributions from

the Class Settlement Fund, a claim filed with the Trustee in the SIPA proceeding will be deemed

a claim against the Class Settlement Fund.  If a Settlement Class member did not file a claim in

the SIPA proceeding, that class member will need to file a claim against the Class Settlement

Fund.  Members of the Settlement Class, including those Net Losers that are defendants in
avoidance actions by the Trustee, shall receive their *pro rata* shares of the Class Settlement Fund
based on their Net Losses as of the Filing Date.

(k)     It is anticipated that direct Notice will be given to the Settlement Class
through this SIPA proceeding as well as through the Trustee's and Class Counsel's websites and
publication of a short-form notice on Bloomberg.  Any costs related to noticing outside of the
SIPA proceeding will be paid from the Class Settlement Fund.  Settlement Class members that
have already submitted claims to the Trustee in the SIPA proceeding will not need to file a claim
against the Class Settlement Fund.  For those Settlement Class members that did not file claims
with the Trustee in the SIPA proceeding, there will be a new claims period during which they
may file a claim against the Class Settlement Fund.  For those claims filed with the Trustee in the
SIPA proceeding that have been transferred, direct notice will be provided to the transferor and
transferee.  The forms of notice will be presented to the District Court in connection with the
motion for preliminary approval of the Settlement.

(l)     Within six (6) business days of the Effective Date, the Trustee will file a
Notice of Dismissal dismissing the Common Law Claims asserted in the JPMorgan Adversary
Proceeding with prejudice and without costs to any of the Parties and will withdraw the petition
for certiorari with respect to such claims as it pertains to JPMorgan.  From the date of the
Agreement through the filing of a Notice of Dismissal, with exception of any proceeding in
connection with the petition for certiorari referenced in the preceding sentence, the Adversary
Proceeding shall be stayed and no further actions may be taken by any of the Parties thereto.
The Parties have agreed to refrain from making disparaging statements with respect to each other
or the Settlement.

(m)     The Parties are executing a supplemental confidential agreement which gives JPMorgan the right, but not the obligation, to terminate the Settlement in the event that a certain portion of the Settlement Class delivers timely and valid requests for exclusion from the Settlement Class (the "Opt-Out Contingency Agreement").  The Opt-Out Contingency Agreement will be identified to, but not filed with, this Court and the District Court, except that the substantive contents of the Opt-Out Contingency Agreement may be disclosed to either Court, in camera, if so requested or as otherwise ordered to do so.  The Parties will keep the terms of the Opt-Out Contingency Agreement confidential, except if compelled by judicial process to disclose them.

## RELIEF REQUESTED

28.     By this Motion, the Trustee respectfully requests that the Court enter an order, substantially in the form of the proposed order annexed to this Motion as Exhibit B approving the Settlement as memorialized in the Agreement.

## LEGAL DISCUSSION

29.     Bankruptcy Rule 9019(a) states, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Courts have held that in order to approve a settlement or compromise under Bankruptcy Rule 9019(a), the court should find that the compromise proposed is fair and equitable, reasonable, and in the best interests of a debtor's estate.  *Air Line Pilots Assoc., Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.*), 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968)).

30.     The Second Circuit has stated that in determining whether to approve a compromise, the court should not decide the numerous questions of law and fact raised by the

compromise, but rather should "canvass the issues and see whether the settlement 'fall[s] below
the lowest point in the range of reasonableness.'"  *Cosoff v. Rodman (In re W T. Grant Co.),* 699
F.2d 599, 608 (2d Cir.), *cert. denied Cosoff v. Romon,* 464 U.S. 822 (1983) (quoting *Newman v.
Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied* 409 U.S. 1039 (1972)); *see also In re Chemtura,*
439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010).   "[T]he court need not conduct a 'mini-trial' to
determine the merits of the underlying litigation."  *In re Purified Down Prods. Corp.,* 150 B.R.
519, 522 (S.D.N.Y. 1993).

31.    The factors that courts in the Second Circuit consider when approving bankruptcy
settlements are well established.  These interrelated factors are:

> (1) the balance between the litigation's possibility of success and
> the settlement's future benefits; (2) the likelihood of complex and
> protracted litigation, with its attendant expense, inconvenience, and
> delay, including the difficulty in collecting on the judgment; (3)
> the paramount interests of the creditors, including each affected
> class's relative benefits and the degree to which creditors either do
> not object to or affirmatively support the proposed settlement; (4)
> whether other parties in interest support the settlement; (5) the
> competency and experience of counsel supporting, and [t]he
> experience and knowledge of the bankruptcy court judge
> reviewing, the settlement; (6) the nature and breadth of releases to
> be obtained by officers and directors; and (7) the extent to which
> the settlement is the product of arm's length bargaining.

*Fox v. Picard (In re Madoff)*, No. 10 Civ. 4652 (JGK), 2012 WL 990829, at *15 (S.D.N.Y.
March 26, 2012) (quoting *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re
Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal quotation marks and
citations omitted)).

32.    Even though the Court has discretion to approve settlements and must
independently evaluate the reasonableness of the settlement, *In re Rosenberg*, 419 B.R. 532, 536
(Bankr. E.D.N.Y. 2009), the business judgment of the trustee and his counsel should be
considered in determining whether a settlement is fair and equitable.  *In re Chemtura Corp.*, 439

B.R. at 594.  The competency and experience of counsel supporting the settlement may also be
considered.  *Nellis*, 165 B.R. at 122.  Finally, the Court should be mindful of the principle that
"the law favors compromise." *Vaughn v. Drexel Burnham Lambert Group, Inc. ( In re Drexel
Burnham Lambert Group, Inc.),* 134 B.R at 499, 505 (quoting *In re Blair,* 538 F.2d 849, 851 (9th
Cir. 1976)).

33.     The Settlement is fair and equitable and in the best interests of the BLMIS
customers and the Estate.  *See* Affidavit of Irving H. Picard in Support of the Motion (the
"Picard Aff.") ¶ 8, a true and accurate copy of which is annexed to this Motion as Exhibit C.
The Agreement resolves all issues regarding the Trustee's Common Law Claims against
JPMorgan without the need for protracted, costly, and uncertain litigation.  Overall, the terms of
the Agreement fall well above the lowest point in the range of reasonableness and all of the
following considerations influenced the Trustee's decision to settle:

(a)     <u>Benefit to BLMIS Customers</u>.  Although the Class Settlement Amount is
being distributed through the Class Settlement Fund, rather than through the SIPA proceeding,
BLMIS customers will benefit from distributions from the Class Settlement Fund.  The
Settlement Class includes only Net Losers, which is coterminous with those customers that
receive distributions from the fund of customer property – *i.e.*, BLMIS customers with allowed
claims.  *Id.* ¶ 5.  Moreover, when the Class Settlement Amount is combined with the related
Avoidance Settlement and the settlement of the Government investigation, over $2.243 billion
will flow to "net loser" victims of Madoff's fraud.  *Id.* ¶ 6.  Thus, the Settlement not only makes
good financial sense for the Estate and the victims of Madoff's fraud, it represents efforts to
work cooperatively with other parties to achieve unparalleled results for Madoff victims. For this
reason, the Settlement is in the best interest of BLMIS customers.  *Id.* ¶¶ 6, 8.

15

(b)    <u>Nature of Claims</u>.  The Trustee's Common Law Claims have been
dismissed by the District Court, the dismissal of which was upheld by the Second Circuit.  Given
that the Trustee's ability to pursue these claims remains in doubt, and given JPMorgan's
potential defenses to the claims if litigated, the Trustee determined it is in the best interests of
BLMIS customers and the Estate to settle these claims now.  *Id.* ¶¶ 4, 8.

(c)    <u>Avoidance of the Cost and Delay of Further Litigation</u>.  The Agreement
eliminates the expense, delay and uncertainty of litigation with JPMorgan.  The Agreement also
eliminates the inevitable delay caused by future likely appeals in this proceeding, which benefits
BLMIS customers and the Estate.  *Id.* ¶ 4.

(d)    <u>Finality</u>.  The Agreement puts an end to the Trustee's litigation of the
Common Law Claims against JPMorgan.  *Id.*

(e)    <u>Experienced Counsel</u>.  The Parties are represented by sophisticated and
experienced professionals.  The Parties and their professionals understand the difficulties of a
SIPA liquidation of this size and complexity and are aware of the harm to customers and
creditors if the Agreement is not consummated.

(f)    <u>Product of Arms-Length Negotiation</u>.  The settlement is the product of
arm's length and good faith negotiations between the Trustee, the Class Representatives, and
JPMorgan.  *Id.* ¶ 7.

34.    For all of the reasons discussed above, the Agreement is well within the "range of
reasonableness," *In re W.T. Grant Co*., 699 F.2d at 608 (quoting *Newman v. Stein*, 464 F.2d at
693), and confers a substantial benefit on BLMIS customers and the Estate.  The Trustee
respectfully requests that the Court approve the Agreement.  *Id.* ¶¶ 4, 8.

## NOTICE

35.    In accordance with Bankruptcy Rules 2002 and 9019, and the Order Establishing Notice Procedures and Limiting Notice entered on December 5, 2011 ("Order Limiting Notice"), Bankr. ECF. No. 4560, notice of this Motion has been given to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York, 10019; and (vi) Entwistle & Cappucci LLP, 280 Park Avenue, 26th Floor West, New York, New York 10017.  Also in accordance with the Order Limiting Notice, the Trustee has provided notice by e-mail to interested parties in the SIPA liquidation proceeding of the following:  the Motion; the date and time scheduled for the hearing at which this Court will consider the Motion; the date by which objections, if any, must be filed with this Court, and the name and address of the persons to be served with a copy of any objections.

WHEREFORE, the Trustee respectfully requests entry of an order substantially in the form of Exhibit B granting the relief requested in the Motion.

Respectfully submitted,

Dated: January 7, 2014
      New York, New York

/s/ David J. Sheehan

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Deborah R. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and the Estate of Bernard L. Madoff*

# EXHIBIT A

08-01789-cgm    Doc 8270-1    Filed 11/12/14    Entered 11/12/14 13:40:05    Exhibit A -
F to Ha Declaration 42    Pg 59 of 95
10-04383-smb    Doc 20-8    Filed 01/17/14    Entered 01/17/14 13:01:22    Exhibit A -
Part 2 of 2    Pg 59 of 95

## AGREEMENT TO SETTLE COMMON LAW CLAIMS

This AGREEMENT ("Agreement" or "Settlement"), dated as of January 6, 2014, is made by and among (i) PAUL SHAPIRO, and STEPHEN HILL and LEYLA HILL, acting at all times by and through their attorneys Entwistle & Cappucci LLP and Hagens Berman Sobol Shapiro LLP (the "Customer Representatives"), putative representatives of the proposed class of former customers of Bernard L. Madoff Investment Securities LLC ("BLMIS") (the "Settlement Class," as defined further below) in the consolidated class actions (the "Consolidated Class Action"), on behalf of themselves and the Settlement Class, (ii) IRVING H. PICARD, in his capacity as trustee ("Trustee") for the liquidation of the business of BLMIS under the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa et seq., as amended ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff ("Madoff") (together, the "Estate"), and (iii) JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD. (collectively, "JPMorgan") (collectively, with the Trustee and JPMorgan, the "Parties," or singularly, "Party").

## BACKGROUND

A.    BLMIS and its predecessor was a registered broker-dealer and a member of the Securities Investor Protection Corporation ("SIPC").

B.    On December 11, 2008, Madoff was arrested by federal agents for criminal securities laws violations including securities fraud, investment adviser fraud, and mail and wire fraud.  On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission (the "Commission") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against, among others, BLMIS and Madoff, captioned SEC v. BLMIS, et al., No. 08-CV-10791(LLS).

C.    On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the Commission consented to a combination of its own action with an application of SIPC. Thereafter, SIPC filed an application in the District Court under section 78eee(a)(3) of SIPA alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On December 15, 2008, the District Court granted the SIPC application and entered an order under SIPA, which, in pertinent part, appointed the Trustee for the liquidation of the business of BLMIS under section 78eee(b)(3) of SIPA and removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under section 78eee(b)(4) of SIPA, where it is currently pending as SIPC v. BLMIS, No. 08-01789 (BRL) (the "SIPA proceeding").  The Trustee is duly qualified to serve and act on behalf of the Estate.  Separate investigations by the Trustee and the Customer Representatives' counsel into BLMIS and Madoff commenced shortly thereafter.

D.    On December 2, 2010, the Trustee filed a complaint (the "Complaint") commencing an adversary proceeding captioned Picard v. JPMorgan Chase & Co, et al., No. 10-4932 (BRL) (the "JPMorgan Adversary Proceeding") against JPMorgan seeking to avoid and recover under 11 U.S.C. §§ 544(b), 547, 548 and 550 and the New York Uniform Fraudulent Conveyance Act (New York Debtor and Creditor Law §§ 270-281) (collectively, the "Avoidance

Claims") approximately $425 million of transfers or other payments (the "Transfers") received by JPMorgan prior to the collapse of BLMIS. The Trustee also asserted common law claims (the "Common Law Claims") against JPMorgan, including aiding and abetting fraud, aiding and abetting breach of fiduciary duty, conversion, unjust enrichment, and contribution. In addition to closely following these developments, the Customer Representatives continued to investigate BLMIS and Madoff during this period.

       E.     On February 8, 2011, JPMorgan moved to withdraw the reference from the Bankruptcy Court, which was granted by the District Court (McMahon, J.) on May 23, 2011.

       F.     On June 3, 2011, JPMorgan moved to dismiss the Common Law Claims and certain of the Avoidance Claims in the Complaint. On June 24, 2011, the Trustee filed an amended complaint (the "Amended Complaint"). On August 1, 2011, JPMorgan moved to dismiss the Common Law Claims and certain of the Avoidance Claims in the Amended Complaint. The Trustee opposed. On November 1, 2011, the District Court granted JPMorgan's motion to dismiss the Trustee's Common Law Claims and returned all the Avoidance Claims to the Bankruptcy Court for further proceedings. *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84 (S.D.N.Y. 2011).

       G.     The Trustee appealed to the United States Court of Appeals for the Second Circuit (the "Second Circuit"), which affirmed the District Court's ruling on June 20, 2013. *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Investment Securities LLC)*, 721 F.3d 54 (2d Cir. 2013).

       H.     The Trustee sought review of the Second Circuit's decision by the United States Supreme Court by filing a petition for a writ of certiorari on October 9, 2013. The Trustee's petition is pending.

       I.     Shortly after the District Court dismissed the Trustee's Common Law Claims, two class action complaints were filed in the District Court against JPMorgan in the names of the Customer Representatives, Stephen and Leyla Hill, *Hill v. JPMorgan Chase & Co.*, 11 Civ. 7961(CM); and Paul Shapiro, *Shapiro v. JPMorgan Chase & Co.*, 11 Civ. 8331(CM), based upon their ongoing investigation and that of the Trustee. These complaints asserted various claims against JPMorgan on behalf of BLMIS customers who directly had capital invested with BLMIS as of the Filing Date, *i.e.*, BLMIS customers who were Net Losers (as defined below). On December 5, 2011, the District Court consolidated the matters into the Consolidated Class Action. On January 20, 2012, a consolidated class action complaint was filed against JPMorgan (the "Consolidated Class Action Complaint" or "CAC"), again asserting on behalf of the proposed class (*i.e.*, BLMIS customers who were "net losers" as of the Filing Date) various claims against JPMorgan arising out of its relationship to Madoff (the claims set forth in the CAC together with the dismissed Common Law Claims are collectively referred to hereafter as the "Class Claims").

       J.     On March 9, 2012, JPMorgan filed a motion to dismiss the Consolidated Class Action Complaint. The motion to dismiss was opposed by the Customer Representatives. The Trustee filed a motion seeking limited intervention pursuant to Fed. R. Civ. P. 24(a)(2) in the Consolidated Class Action, which was granted by the District Court on October 16, 2012.

Throughout this period, counsel for the Customer Representatives continued their investigation of the claims asserted and continued to prosecute other Madoff-related litigations.

K.     On September 26, 2013, the District Court placed the Consolidated Class Action on the suspense calendar pending a decision from the United States Supreme Court in *Roland v. Green*, 675 F.3d 503 (5th Cir. 2012), *cert. granted sub nom. Chadbourne & Parke LLP v. Troice*, 133 S. Ct. 977 (U.S. Jan. 18, 2013) (No. 12-79).  The parties submitted various letter briefs regarding *Chadbourne* and related issues with the result that the matter remains on the suspense calendar.  Counsel for the Customer Representatives continued to investigate the claims here, including the review of JPMorgan documents and interviews in this and other proceedings, the review and analysis of trial testimony in Madoff-related proceedings, work with experts on damages and Madoff-related liability including but not limited to Madoff-related banking activity and defenses raised by JPMorgan in its various motions to dismiss the Consolidated Class Action Complaint.

L.     Counsel for the Customer Representatives initiated a series of meetings and conference calls, both individually and collectively, with counsel for JPMorgan and counsel for the Trustee that took place on a regular basis over several months to arrange for the production and review of documents and other materials previously produced to the Trustee pursuant to the Bankruptcy Rule 2004 discovery process and to the Government.  These discussions also considered the potential for a global resolution of the Class Claims and the related Avoidance Claims that would maximize the total recovery for the Class.  During the same period, JPMorgan was also in discussions to resolve an investigation by the United States Attorneys' Office for the Southern District of New York (the "Government") related to Madoff.  In seeking to achieve a global resolution of these matters, including the Government investigation, JPMorgan took into consideration the Class Claims and the Customer Representatives' position that the global resolution should result in an appropriate total recovery for the Class.

M.     As a result of complex and protracted discussions, contemporaneous proposed settlements were agreed to:  (i) among JPMorgan, the Customer Representatives, and the Trustee resolving the Class Claims; (ii) between JPMorgan and the Trustee resolving the Avoidance Claims; and (iii) between JPMorgan and the Government resolving the Government's investigation. Resolution of the Class Claims is provided for in this Agreement.  Resolution of the Avoidance Claims and the Government's investigation are provided for in separate agreements with the Trustee (the "Avoidance Settlement") and the Government (the "Government Settlement"), respectively.  It is anticipated that the proceeds of all three settlements will flow to victims of Madoff's fraud, whether through the Class Settlement Fund (as defined below in paragraph 3), the Trustee's fund administered under SIPA, or the Madoff Victim Fund administered by the United States Department of Justice.

N.     The Customer Representatives and the Trustee believe that one or both of them will prevail in recovering damages from JPMorgan on the Class Claims.  JPMorgan denies any fault, liability, or wrongdoing whatsoever in connection with the Class Claims asserted by the Customer Representatives and the Trustee and does not believe it is liable for any damages. The Parties wish to settle their disputes regarding the Class Claims without the expense, delay, and uncertainty of litigation.

O.    The Parties reached agreement to settle the Class Claims for a total payment by JPMorgan of $218,000,000.00 to the Settlement Class (the "Class Settlement Amount"), following Class Counsel's review of the terms of the Avoidance Settlement and the Government Settlement to ensure that the total relief provided by JPMorgan is appropriate and sufficient.

P.    In order to preserve as much of the settlement payment as possible for the Settlement Class, after the Parties reached an agreement in principle on the Class Settlement Amount, the Parties entered into subsequent, arms-length negotiations as to the separate amount JPMorgan would pay to Class Counsel in lieu of attorneys' fees and expenses (which would otherwise be awardable out of the Class Settlement Fund, as defined below) (the "Attorneys' Fees Payment").  As a result of those subsequent negotiations, the Parties agreed that JPMorgan would make an Attorneys' Fees Payment to Class Counsel in the amount of $18 million, subject in all respects to Paragraph 11 below, in exchange for which counsel for the Customer Representatives agreed that they would not make an application to the District Court seeking fees and expenses in excess of that amount from JPMorgan or from the corpus of the Class Settlement Fund.

NOW, THEREFORE, in consideration of the foregoing, of the mutual covenants, promises and undertakings set forth herein, and for good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the Customer Representatives, the Trustee, and JPMorgan agree as follows:

## AGREEMENT

1.    <u>Bankruptcy Court Approval of Settlement</u>.  Promptly after execution and delivery of this Agreement, and on or around the same date as the motion referenced in paragraph 2, the Trustee shall submit to the Bankruptcy Court a motion for approval of the Settlement pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure, including entry of an order substantially in the form attached hereto as Exhibit A (the "Common Law 9019 Order"), after consulting in good faith with JPMorgan and the Customer Representatives as to the language of the motion.  The Customer Representatives will join in support of the approval motion.

2.    <u>District Court Approval of Consolidated Class Action Settlement</u>.  Promptly after execution and delivery of this Agreement, and on or around the same date as the motion referenced in paragraph 1, the Customer Representatives shall submit to the District Court a motion for preliminary approval of the Settlement, including entry of a preliminary approval order substantially in the form attached hereto as Exhibit B (the "Preliminary Approval Order"), after consulting in good faith with JPMorgan and the Trustee as to the language of the motion. The Trustee will join in support of the approval motion.  If the Settlement contemplated by this Agreement is finally approved by the District Court following a settlement hearing, then the Customer Representatives shall request that the court enter a judgment substantially in the form attached hereto as Exhibit C (the "Judgment").

3.    <u>Settlement Payments</u>.  No later than fourteen (14) days after both the Bankruptcy Court has entered the Common Law 9019 Order and the District Court has entered the Preliminary Approval Order, JPMorgan shall deposit the Class Settlement Amount into an

escrow account (the "Escrow Account") maintained at Citi National Bank (the "Escrow Agent")
pursuant to an escrow agreement (the "Escrow Agreement") executed by and among JPMorgan,
counsel for the Customer Representatives, and the Trustee.  The Class Settlement Amount,
together with any interest earned thereon (less any applicable taxes paid or required to be paid),
shall be referred to as the "Class Settlement Fund."  Other than the Customer Representative
Attorneys' Fees Payment set forth in paragraph 11, once JPMorgan has fulfilled its obligations
under this Agreement to cause the Class Settlement Amount to be wired into the Escrow
Account, JPMorgan shall have no further payment obligations under this Agreement.  For the
avoidance of doubt, JPMorgan shall have no obligation to pay, or any responsibility or liability
for, any taxes on any income earned by the Class Settlement Fund.  With regard to the Customer
Representative Attorneys' Fees Payment, JPMorgan will, subject to paragraphs 4 and 11 below,
be responsible for payment following entry of an order by the District Court awarding fees and
expenses to Class Counsel.

4.    Effective Date.  The Settlement contemplated by this Agreement shall become
effective upon the occurrence of all of the following events (the "Effective Date"):  (a) the entry
of a final and non-appealable 9019 Order (the "Final Common Law 9019 Order"); (b) the entry
of a final and non-appealable Judgment (the "Final Judgment"); and (c) JPMorgan has not
exercised its right to terminate the Settlement pursuant to paragraph 18 below.  For purposes of
this Agreement, an order shall be considered final and non-appealable when (i) the time to appeal
the order has expired, or (ii) if any appeal has been taken, any and all such appeals have been
fully and finally resolved without material modification of the order.  In the event that the
Settlement is terminated or does not become effective:  (aa) the payments made by JPMorgan
pursuant to this Agreement will be returned to JPMorgan; (bb) this Agreement will not take
effect and will become null and void for all purposes, except for paragraphs 27 and 29, which
will continue to be effective and binding on the Parties; (cc) the stay of the Consolidated Class
Action provided for in paragraph 17 below will be lifted and the Customer Representatives and
JPMorgan will continue to litigate their respective claims and defenses in the Consolidated Class
Action; (dd) the stay of the JPMorgan Adversary Proceeding provided for in paragraph 16 will
be lifted and the Trustee and JPMorgan will continue to litigate their respective claims and
defenses in the JPMorgan Adversary Proceeding (provided, however, that the Trustee and
JPMorgan shall work together in good faith to effectuate modifications to the Case Management
Order applicable to the JPMorgan Adversary Proceeding to the extent a modification to the
schedule is reasonably necessary); and (ee) the Parties shall not use or rely on any statement
herein in the JPMorgan Adversary Proceeding, the Consolidated Class Action, or in any public
statement or other litigation relating to BLMIS or Madoff.

5.    Class Certification.  The Customer Representatives will move before the District
Court for the (a) appointment of the Customer Representatives as class representatives for the
Settlement Class; (b) appointment of Entwistle & Cappucci LLP and Hagens Berman Sobol
Shapiro LLP as Class Counsel for the Settlement Class; and (c) certification of the Settlement
Class pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

6.    Class Definition.  If approved by the District Court, the Settlement Class will
consist of all BLMIS customers, including their successors, transferees, or assignees, who
directly had capital invested with BLMIS as of the Filing Date and thus, under the net investment
method upheld by the United States Court of Appeals for the Second Circuit, had net losses

("Net Losses") as of the Filing Date ("Net Losers"), regardless of whether they filed a claim in the SIPA proceeding. The net investment method credits the amount of cash deposited by a BLMIS customer into his or her BLMIS account, less any amounts withdrawn from it. *See generally In re Bernard L. Madoff Securities LLC*, 654 F.3d 229 (2d Cir. 2011). The Settlement Class includes all Net Losers, including those that did not file claims in the SIPA proceeding, and is intended to be coterminous with all BLMIS customers who have a positive net equity claim in the SIPA proceeding or who would have had a positive net equity claim in the SIPA proceeding had they filed a timely customer claim in that proceeding. The Settlement Class does not include: (i) BLMIS insiders and their families; (ii) defendants in any criminal Madoff-related proceeding; (iii) BLMIS accountholders whose claims against the BLMIS estate were extinguished by virtue of three separate settlements with the Trustee, the estate of Jeffry Picower, *Picard v. Picower*, 09-1197 (BRL) (Bankr. S.D.N.Y.) (ECF No. 43), the Carl Shapiro Family, *SIPC v. BLMIS*, 08-1789 (Bankr. S.D.N.Y.) (ECF No. 3551), and Jeanne Levy-Church and Francis N. Levy, *SIPC v. BLMIS*, 08-1789 (Bankr. S.D.N.Y.) (ECF No. 1964), or (iv) any persons or entities that exclude themselves from the Settlement Class by filing a request for exclusion that is accepted by the District Court.

7.    Appointment of Distribution Agent.    If approved by the District Court, AlixPartners LLP will be appointed distribution agent for the Class Settlement Fund. AlixPartners LLP serves as the Trustee's claims agent in the SIPA proceeding and, as such, has access to the Trustee's books and records, which reflect the Net Losers and the amount of their losses as of December 11, 2008. AlixPartners LLP maintains contact information for all former BLMIS customers such that direct notice of the Settlement can be made to all potential members of the Settlement Class regardless of whether they previously filed a claim in the SIPA proceeding. AlixPartners LLP also maintains lists of all transfers or assignments of customer claims in the SIPA proceeding and so notice of the Settlement can also be made directly to all transferees or assignees of such claims. Counsel for the Customer Representatives has reviewed various administration related materials, including information related to prior claims determinations, met with representatives of AlixPartners LLP to review claims handling procedures and notice requirements and to negotiate an appropriate budget for notice and claims related services for the Class Settlement. AlixPartners LLP will process all claims relating to the Class Settlement Fund and make distributions pursuant to paragraph 9 below in consultation with the Trustee and Class Counsel who will review such determinations and report to the Court as requested. To the extent there is a dispute as to the resolution of any claim against the Class Settlement Fund, the determination of AlixPartners LLP, Class Counsel, and the Trustee — subject to approval by the Court — will be dispositive and none of AlixPartners LLP, Class Counsel, or the Trustee or its counsel will have any liability related to such determinations. The costs and expenses of AlixPartners LLP incurred in fulfilling its duties as distribution agent in connection with this Agreement shall be paid from the Class Settlement Fund.

8.    Release of Escrow Funds.    After the Effective Date, the Escrow Agent will, pursuant to the Escrow Agreement, release to AlixPartners LLP the Class Settlement Fund following receipt of written notice provided jointly by the Trustee, the Customer Representatives, and JPMorgan, with copies of the Final Common Law 9019 Order and the Final Judgment attached, which notice shall be provided only after the Trustee and Class Counsel have certified that AlixPartners LLP has completed all relevant pre-distribution claims-related work.

9.    <u>Distributions</u>.  The Parties agree that, subject to any additional requirements of Federal Rule of Civil Procedure 23 (or any requirements that may be imposed by either the Bankruptcy Court or the District Court in connection with the approval process), the Class Settlement Fund will be distributed to the Settlement Class after the Effective Date, in accordance with and subject to the terms of this paragraph 9.  For purposes of distributions from the Class Settlement Fund, a claim filed with the Trustee in the SIPA proceeding will be deemed a claim against the Class Settlement Fund.  If a Settlement Class member did not file a claim in the SIPA proceeding, that class member will need to file a claim against the Class Settlement Fund.  Members of the Settlement Class, including those Net Losers that are defendants in avoidance actions by the Trustee, shall receive their *pro rata* shares of the Class Settlement Fund based on their Net Losses as of the Filing Date.  Notwithstanding anything to the contrary in this Agreement, no putative member of the Settlement Class that delivers a valid and timely request for exclusion from the Settlement Class shall receive any portion of the Class Settlement Fund.

10.    <u>Notice</u>.  It is anticipated that direct Notice will be given to the Settlement Class through the SIPA proceeding as well as through the Trustee's and Class Counsel's websites and publication of a short-form notice on Bloomberg.  Any costs related to noticing outside of the SIPA proceeding will be paid from the Class Settlement Fund.  Settlement Class members that have already submitted claims to the Trustee in the SIPA proceeding will not need to file a claim against the Class Settlement Fund.  For those Settlement Class members that did not file claims with the Trustee in the SIPA proceeding, there will be a new claims period during which they may file a claim against the Class Settlement Fund.  For those claims filed with the Trustee in the SIPA proceeding that have been transferred, direct notice will be provided to the transferor and transferee.  The forms of notice that will be presented to the District Court in connection with the motion for preliminary approval of the Settlement are attached hereto as Exhibits D (long-form Claim Notice) and E (short-form Summary Notice).

11.    <u>Customer Representatives Attorneys' Fees Payment</u>.  If the District Court approves the Attorneys' Fees Payment negotiated between counsel for the Customer Representatives, JPMorgan, and the Trustee, then JPMorgan will, not later than fourteen (14) days after such order, remit to Class Counsel that amount (in no event to exceed $18 million).  If any portion of the Attorneys' Fees Payment is not approved by the District Court, JPMorgan will have no obligation to pay the unapproved portion.  The application by Class Counsel for fees and expenses is not a condition of the Settlement and is to be considered by the District Court separately from the District Court's consideration of the fairness, reasonableness, and adequacy of the Settlement.  The fee and expense award shall be set forth in an order separate from the Judgment entered by the District Court such that any appeal of either order shall not constitute an appeal of the other.  Any proceedings relating to Class Counsel's fee and expense application will not provide any basis to modify, cancel, or terminate the Settlement, or affect or delay the finality of the Judgment.  In the event that the Settlement does not become effective, then Class Counsel shall refund the Attorneys' Fees Payment (if already paid) to JPMorgan together with any interest earned thereon.  In the event that the Settlement does become effective, but the Attorneys' Fees Payment is subsequently reversed or modified (either by the District Court or on appeal), then Class Counsel shall refund to JPMorgan the portion of the Attorneys' Fees Payment consistent with such reversal or modification, together with any interest thereon, within fourteen (14) days after such reversal or modification has become final.  For the avoidance of doubt, except as expressly set forth in this Agreement, JPMorgan shall have no obligation to pay

or reimburse separately any fees and expenses incurred by or on behalf of the Customer Representatives, any other member of the Settlement Class, the Trustee, any other party, or any of their respective counsel.

12.  <u>Release by the Trustee</u>.  In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, except with respect to any rights arising under this Agreement, upon the Effective Date and without any further action by the Parties, the Trustee, on behalf of himself, his professionals, and the Estate, shall release, remit and forever discharge JPMorgan, its affiliates, and their respective predecessors, successors, assigns, current and former employees, and agents (collectively, "JPMorgan Releasees") from any and all past, present and future claims or causes of action (including any suit, petition, demand, or other claim in law, equity or arbitration) and from any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, in tort, contract, federal or state statutory liability, or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty, unjust enrichment, constructive trust, or otherwise (including attorneys' fees, costs or disbursements), that are, have been, could have been or might in the future be asserted by the Trustee, on behalf of himself, his professionals, and the Estate, against JPMorgan, its affiliates, and their respective predecessors, successors, assigns, current and former employees, and agents that arise out of, are based on, or relate in any way to BLMIS, Madoff, BLMIS or Madoff accounts at JPMorgan, or the JPMorgan Adversary Proceeding; provided, however, that the foregoing release shall not extend to the Avoidance Claims asserted by the Trustee in First through Twentieth Causes of Action in the Amended Complaint (it being understood that the terms and conditions of a release of the Avoidance Claims are provided for separately in the Avoidance Settlement).

13.  <u>Release by the Settlement Class</u>.  In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, except with respect to any rights arising under this Agreement, upon the Effective Date and without any further action by the Parties, the Customer Representatives, on behalf of themselves, each and every member of the Settlement Class, and each of their respective predecessors, successors, affiliates, assigns, purchasers or other transferees, attorneys, heirs, representatives, administrators, executors, devisees, legatees, and estates, hereby releases, remits and forever discharges JPMorgan, its affiliates, and their respective predecessors, successors (including any trustee in bankruptcy), successors-in-interest, assigns, current and former employees, and agents (collectively, "JPMorgan Releasees") from any and all past, present and future claims or causes of action (including any suit, petition, demand, or other claim in law, equity or arbitration) and from any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect (including class, representative or derivative), asserted or unasserted, known or unknown, absolute or contingent, in tort, contract, federal or state statutory liability, or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty, unjust enrichment, constructive trust, or otherwise (including attorneys' fees, costs or disbursements), that are, have been, could have been or might in the future be asserted

against JPMorgan, its affiliates, and their respective predecessors, successors (including any trustee in bankruptcy), successors-in-interest, assigns, current and former employees, and agents that arise out of, are based on, or relate in any way to BLMIS, Madoff, BLMIS or Madoff accounts at JPMorgan, or the Consolidated Class Action (the releases by the Settlement Class contained in this paragraph 13 referred to as the "Released Customer Claims").

14.     <u>Release by JPMorgan</u>.  In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, except with respect to any rights arising under this Agreement, upon the Effective Date and without any further action by the Parties, JPMorgan, its affiliates, and their respective predecessors, successors (including any trustee in bankruptcy), successors-in-interest, assigns and agents, each on behalf of itself and any other person or entity claiming under or through it, including JPMorgan in its capacity as Agent, hereby releases, remits and forever discharges the Trustee, his professionals, and the Estate, and the Customer Representatives and their professionals, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, now existing or arising in the future, arising out of or in any way related to BLMIS; provided, however, that the foregoing release shall not extend to any counterclaims or defenses that JPMorgan has or in the future may have arising out of, related to, or in connection with the Trustee's assertion of the Avoidance Claims (it being understood that a release of such counterclaims and defenses is provided for separately in the Avoidance Settlement).

15.     <u>Unknown Claim Waiver</u>.  The Parties agree that, upon the Effective Date and without further action of the Parties, the Trustee, JPMorgan, and the Customer Representatives shall have expressly waived, and each of the other Settlement Class Members shall be deemed to have waived, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Trustee, JPMorgan, and the Customer Representatives, and JPMorgan acknowledge, and the other Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement of which this release is a part.

16.     <u>Dismissal Of JPMorgan Adversary Proceeding</u>.  Within six (6) business days of the Effective Date, the Trustee will file a Notice of Dismissal dismissing the Common Law Claims asserted in the JPMorgan Adversary Proceeding with prejudice and without costs to any of the Parties and will withdraw the petition for certiorari with respect to such claims as it pertains to JPMorgan.  From the date of this Agreement through the filing of a Notice of Dismissal pursuant to this paragraph, with exception of any proceeding in connection with the

petition for certiorari referenced in the preceding sentence, the Adversary Proceeding shall be stayed and no further actions may be taken by any of the Parties thereto.  For the avoidance of doubt, the Trustee's Avoidance Claims are not covered by this Agreement and the effectiveness of this Agreement is not conditioned on entry or approval of the separate agreement between the Trustee and JPMorgan resolving the Avoidance Claims.

17.    <u>Dismissal Of Consolidated Class Action</u>.  Within six (6) business days of the Effective Date, the Customer Representatives will file a Notice of Dismissal dismissing the Consolidated Class Action with prejudice and without costs to any of the Parties.  From the date of this Agreement through the filing of a Notice of Dismissal pursuant to this paragraph, the Consolidated Class Action shall be stayed and no further actions may be taken by any of the Parties thereto.

18.    <u>Opt-out Contingency Agreement</u>.  Simultaneously herewith, the Parties, by and through their respective counsel, are executing a supplemental confidential agreement, which gives JPMorgan the right, but not the obligation, to terminate the Settlement in the event that a certain portion of the Settlement Class delivers timely and valid requests for exclusion from the Settlement Class (the "Opt-Out Contingency Agreement").  The Opt-Out Contingency Agreement will be identified to, but not filed with, the Bankruptcy Court and the District Court, except that the substantive contents of the Opt-Out Contingency Agreement may be disclosed to either Court, in camera, if so requested or as otherwise ordered to do so.  The Parties will keep the terms of the Opt-Out Contingency Agreement confidential, except if compelled by judicial process to disclose them.

19.    <u>Further Assurances; Representations and Warranties</u>.  The Trustee, the Customer Representatives, and JPMorgan (a) agree to use their best efforts to consummate the Settlement in accordance with the terms of this Agreement, and (b) shall execute and deliver any document or instrument reasonably requested by any of them after the date of this Agreement to effectuate the intent of this Agreement.  The Customer Representatives and Class Counsel represent and warrant that the Customer Representatives are members of the Settlement Class and that neither the Customer Representatives' potential claims against JPMorgan nor any right of the Customer Representatives to receive further distributions in the SIPA proceeding has been assigned, encumbered or in any manner transferred in whole or in part.  The Trustee represents and warrants that the Trustee's release of any claims pursuant to this Agreement operates to release all such claims by either the Trustee or by SIPC, including without limitation any all claims of SIPC as a subrogee for customers.

20.    <u>Exhibits; Entire Agreement</u>.  All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein.  This Agreement, together with the exhibits attached hereto and the Opt-Out Contingency Agreement, constitutes the entire agreement and understanding between and among the Parties hereto and supersedes all prior agreements, representations and understandings concerning the subject matter hereof.

21.    <u>Amendments; Waiver</u>.  Except as otherwise provided herein, this Agreement may not be terminated, amended or modified in any way except in a writing signed by all the Parties. No waiver of any provision of this Agreement shall be deemed to constitute a waiver of any

other provision hereof, whether or not similar, nor shall such waiver constitute a continuing waiver.

22.    <u>Assignability</u>.    No Party hereto may assign its rights under this Agreement without the prior written consent of each of the other Parties hereto.

23.    <u>Successors Bound</u>.  This Agreement shall be binding upon and inure to the benefit of each of the Parties, and their respective successors and permitted assigns.

24.    <u>No Third Party Beneficiary</u>.  The Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties and their respective successors and permitted assigns.

25.    <u>No Admission of Liability or Wrongdoing</u>.  By entering into this Agreement, JPMorgan does not admit any liability to the Trustee or the Customer Representatives.

26.    <u>Applicable Law</u>.  This Settlement and Agreement shall be construed and enforced in accordance with the laws of the State of New York, including but not limited to New York General Obligation Law § 15-108.

27.    <u>Jurisdiction</u>.  The Bankruptcy Court and the District Court, as appropriate, shall retain jurisdiction with respect to the implementation and enforcement of the terms of their respective orders relating to this Agreement.

28.    <u>Captions and Rules of Construction</u>.  The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.  Any reference in this Agreement to a paragraph is to a paragraph of this Agreement.  "Includes" and "including" are not limiting.  This Agreement shall not be construed more strictly against one Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Parties, it being recognized that it is the result of arm's-length negotiations between the Parties, and all Parties have contributed substantially and materially to the preparation of this Agreement and the exhibits incorporated herein.

29.    <u>Confidentiality</u>.  All agreements by, between or among the Parties, their counsel and their other advisors as to confidentiality, including the confidentiality of information exchanged between or among them, shall remain in full force and effect and shall survive the execution of and any termination of this Agreement and the final consummation of the Settlement, if finally consummated, without regard to any of the conditions of the Settlement. The Parties agree to give each other Party the opportunity to review and approve in advance any press release, statements to the media or other public communications regarding the Settlement to be made in connection with the filing of the Settlement Agreement or other pre-filing public disclosure, such approval not to be unreasonably withheld.  The Parties further agree to refrain from making disparaging statements about the other in any press release, statements to the media, or other public communications (including statements made in court filings or in court) relating to the Settlement, including the claims to be released pursuant to the Settlement, including prior to the Effective Date.

30.   <u>Counterparts; Electronic Copy Of Signatures</u>.  This Agreement and exhibits may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document.  The Parties may evidence their execution of this Agreement by delivery to the other Parties of scanned or faxed copies of their signatures, with the same effect as the delivery of an original signature.

31.   <u>Notices</u>.  Any notices under this Agreement shall be in writing, shall be effective when received and may be delivered only by hand, by overnight delivery service, by fax or by electronic transmission to:

| If to the Trustee: | If to JPMorgan: | If to the Customer Representatives: |
|---|---|---|
| David J. Sheehan<br>E: dsheehan@bakerlaw.com<br>Seanna R. Brown<br>E: sbrown@bakerlaw.com<br>Baker & Hostetler LLP<br>45 Rockefeller Plaza<br>New York, NY 10111<br>F: (212) 589-4201 | John F. Savarese<br>E: JFSavarese@wlrk.com<br>Stephen R. DiPrima<br>E: SRDiPrima@wlrk.com<br>Emil A. Kleinhaus<br>E:  EAKleinhaus@wlrk.com<br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>F: (212) 403-2000 | Andrew Entwistle<br>E: aentwistle@entwistle-law.com<br>Arthur Nealon<br>E: anealon@entwistle-law.com<br>Entwistle & Cappucci LLP<br>280 Park Avenue<br>26th Floor West<br>New York, NY 10017<br>F: (212) 894-7200<br><br>Reed Kathrein<br>E: reed@hbsslaw.com<br>Hagens Berman Sobol Shapiro LLP<br>715 Hearst Ave., Suite 202<br>Berkeley, CA  94710<br>F: 510-725-3030 |

[*Signature page follows*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

IRVING H. PICARD, Trustee

As Trustee for the Substantively
Consolidated SIPA Liquidation of
Bernard L. Madoff Investment
Securities and Bernard L. Madoff

ENTWISTLE & CAPPUCCI LLP

BY:

    Andrew J. Entwistle
    Arthur Nealon
    280 Park Avenue, 26th Floor West
    New York, NY 10017

Co-Lead Counsel for the Customer
Representatives and the Proposed Class

HAGENS BERMAN SOBOL SHAPIRO LLP

BY:

    Reed Kathrein
    715 Hearst Ave., Suite 202
    Berkely, CA 94710

Co-Lead Counsel for the Customer
Representatives and the Proposed Class

WACHTELL, LIPTON, ROSEN & KATZ

BY:

    John F. Savarese
    Stephen R. DiPrima
    Emil A. Kleinhaus
    51 West 52nd Street
    New York, NY 10019

Attorneys for JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., J.P. Morgan
Securities LLC, and J.P. Morgan Securities
Ltd.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-4932 (BRL) |
| Plaintiff, | |
| v. | |
| JPMORGAN CHASE CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

**[PROPOSED] ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY
CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE APPROVING SETTLEMENT OF COMMON LAW CLAIMS BY AND
<u>BETWEEN THE TRUSTEE, THE CLASS REPRESENTATIVES, AND JPMORGAN</u>**

Upon the motion (the "Motion")[1] of Irving H. Picard (the "Trustee"), as trustee for the

substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC

("BLMIS") and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, the

"Debtors"), seeking entry of an order, pursuant to section 105(a) of title 11, United States Code,

11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002(a)(3) and 9019(a) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement

("Settlement"), the terms and conditions of which are set forth in the Settlement Agreement (the

"Agreement") by and among the Trustee; Paul Shapiro, and Stephen and Leyla Hill (the "Class

Representatives"); and JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan

Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMorgan" or "Defendants");

and it appearing that due and sufficient notice has been given to all parties in interest as required

by Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy Procedure; and the Court

having considered the Affidavit of Irving H. Picard in support of the Motion; and it further

appearing the relief sought in the Motion is appropriate based upon the record of the hearing held

before this Court to consider the Motion; and it further appearing that this Court has jurisdiction

to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334;

and after due deliberation; and sufficient cause appearing therefor; it is

ORDERED, that the Motion is granted in its entirety; and it is further

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in
the Motion.

10-04383-smb Doc 20-6 Filed 01/17/14 Entered 01/17/14 13:40:03 Exhibit F Pg 87 of 42

ORDERED, that the Agreement between the Trustee, the Class Representatives, and JPMorgan is hereby approved and authorized; and it is further

ORDERED, that the Trustee, the Class Representatives, and JPMorgan shall each comply with and carry out the terms of the Agreement; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated:  New York, New York
           _____, 2014


_____
HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

10-04383-smb   Doc 20-6   Filed 01/17/14   Entered 01/17/14 13:40:05   Exhibit F
Pg 38 of 42

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-4932 (BRL) |
| Plaintiff, | |
| v. | |
| JPMORGAN CHASE CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

**AFFIDAVIT IN SUPPORT OF MOTION FOR ENTRY OF ORDER PURSUANT TO**
**SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002**
**AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**APPROVING SETTLEMENT OF COMMON LAW CLAIMS BY AND BETWEEN**
**THE TRUSTEE, THE CLASS REPRESENTATIVES, AND JPMORGAN**

STATE OF NEW YORK          )
                                              )      ss:
COUNTY OF NEW YORK     )

Irving H. Picard, being duly sworn, hereby attests as follows:

1.     I am the trustee for the liquidation of the business of Bernard L. Madoff

Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L.

Madoff ("Madoff," and together with BLMIS, collectively, the "Debtors").  I am familiar with

the affairs of the Debtors.  I respectfully submit this Affidavit in support of the motion (the

"Motion") seeking entry of an order, pursuant to section 105(a) of title 11, United States Code,

11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002(a)(3) and 9019(a) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement

("Settlement") by and among the Trustee; Paul Shapiro, and Stephen and Leyla Hill (the "Class

Representatives"); and JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan

Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMorgan" or "Defendants")

(each of the Trustee, the Class Representatives, and Defendants a "Party" and collectively, the

"Parties")

2.     I make this Affidavit based upon my own personal knowledge or upon

information that I believe to be true.

3.     All capitalized terms not defined herein have the meaning ascribed to them in the

Motion.

4.     I believe that the terms of the Settlement Agreement fall well above the lowest

point in the range of reasonableness and, accordingly, should be approved by this Court.  The

Settlement Agreement resolves all of the Trustee's Common Law Claims against JPMorgan,

without the need for protracted and uncertain litigation.  I recognize that litigating the Common

Law Claims would undoubtedly require a significant commitment of time by the various

professionals involved and involves significant litigation risk.  Moreover, it is likely that to the

extent litigation on the Common Law Claims is permitted by the Supreme Court, such litigation would result in future appeals, only delaying further the benefits to the BLMIS customers.

5.    Although the Class Settlement Amount is being distributed through the Class Settlement Fund, rather than through the SIPA proceeding, BLMIS customers will benefit from distributions from the Class Settlement Fund.  The Settlement Class includes only Net Losers, which is coterminous with those customers that receive distributions from the fund of customer property – *i.e.*, BLMIS customers with allowed claims.  For this reason, I believe the Settlement is in the best interest of BLMIS customers.

6.    I believe that when the Class Settlement Amount is combined with the related Avoidance Settlement and the settlement of the Government investigation, over $2.243 billion will flow to "net loser" victims of Madoff's fraud.  Thus, I believe the Settlement not only makes good financial sense for the Estate and the victims of Madoff's fraud, it represents efforts to work cooperatively with other parties to achieve unparalleled results for Madoff victims.

7.    The settlement is the product of arm's length and good faith negotiations between the Trustee, the Class Representatives, and JPMorgan.

8.    For all of these reasons, I have determined in my business judgment that the Settlement, as memorialized in the Settlement Agreement, represents a fair, equitable and reasonable compromise of the Common Law Claims and is in the best interests of BLMIS customers and the BLMIS Estate.  I respectfully ask that the Court approve the Settlement as memorialized in the Agreement.

/s/ Irving H. Picard
IRVING H. PICARD

Sworn to before me this 7th
day of January, 2014

/s/ Sonya M. Graham
Notary Public, State of New York
No. 01GR6133214
Qualified in Westchester County
Commission Expires September 12/2017

EXHIBIT E

# PETITION FORM DIR
## Claim filed by Direct Investors

# MADOFF VICTIM FUND
### Distribution Vehicle for Forfeited Assets
on behalf of the



# UNITED STATES DEPARTMENT OF JUSTICE

*All submissions to the Madoff Victim Fund will be considered in support of a claim only
if they are verified under the penalty of perjury pursuant to 28 U.S.C. § 1746.*

# INSTRUCTIONS

This Petition Form DIR is for the use of an investor that is filing a claim with the Madoff Victim Fund ("MVF") who invested with Madoff Securities through an account held directly in its name.

Please review the Frequently Asked Questions section at www.madoffvictimfund.com for further information regarding claim eligibility and the claims process.

Generally, the claims of direct investors eligible to use this Form DIR had "allowed" claims in the Madoff bankruptcy proceedings. However, a victim in MVF must have lost its own money as a result of the fraud. A person or entity who managed money invested in Madoff Securities on behalf of other investors is not generally an eligible victim for purposes of the MVF. You should complete this Form DIR for investments of your own money through direct accounts with Madoff Securities. If you invested money for the benefit of others, you should file claims for the investors' benefit using Form PV.

A Direct Investor includes any individual or organization that maintained an account at Madoff Securities in its name and with its tax identification number that lost its own money as a result of the fraud. Claimants using this Form DIR must be able to show that they suffered a net loss of its own money based on a "cash in, cash out" analysis.

**The United States Department of Justice ("DOJ") will determine all questions
of eligibility to make a claim on MVF in its sole discretion.**

### Victim Status

To qualify for a recovery from the MVF a claimant must have been a "victim" of the crimes that took place involving Bernard Madoff or Madoff Securities. A victim must have suffered a monetary loss on an investment made with Madoff Securities on or before December 11, 2008. Such a qualifying investment can have been made as a direct account holder, or indirectly through another person or entity. However, no person or entity will be an eligible victim if it did not actually lose its own money in the fraud at Madoff Securities.

If you filed a claim with the trustee in the Madoff Securities bankruptcy as a direct account holder investor and have an unsatisfied loss, you will receive this form "pre-populated" with data taken from the bankruptcy claims record. If you use the "pre-populated" form, you must nonetheless review and verify such information for completeness and accuracy.

### Measurement of Losses

A victim's eligible loss for purposes of MVF will be measured as the total amount invested with Madoff Securities, less any amounts withdrawn or obtained from Madoff Securities. Any person or entity that withdrew or otherwise obtained more cash payments from Madoff Securities than its actual cash investments is NOT an eligible victim.

MVF will aggregate the deposits and withdrawals in multiple accounts of a single investor, and among multiple investors, wherever DOJ determines that there is a "unity of interest" between two or more investors or accounts. Where a unity of interest is determined to exist, these accounts will be consolidated for purposes of determining the combined "net loss." However unless such a "unity of interest" is determined to exist, the measurement of net investment losses or net cash withdrawals will be done on an individual basis, without netting against the deposits or withdrawals of others who invested through the same account.

**Full Disclosure.** A claim on this Form DIR must disclose fully and completely all of an investor's accounts with interests in Madoff Securities, and all investments and withdrawals from all accounts. Failure to provide complete and accurate information will be grounds for disqualifying a Petition.

**Collateral Recoveries.** In processing a claim, all "collateral recoveries" from any source must be deducted from the net investment amount. See the FAQs for a description of collateral recoveries.

### Sale or Transfer of Claims

Only victims can file claims in the MVF. A victim is the person or entity that suffered a pecuniary loss as a direct result of the criminality that gave rise to the forfeiture of assets in this case. If you believe you sold your right to participate in any distribution by DOJ, please consult the Frequently Asked Questions and the Transfer Ratification Process instructions at www.madoffvictimfund.com. In order to commence the ratification process, a claim must first be filed by the victim.

For additional information regarding MVF eligibility requirements,
please refer to our website at www.madoffvictimfund.com.

## Submission Requirements

- This Form DIR must be completed and signed by the **underlying investor** whose funds were invested in the Madoff Securities account. For accounts held jointly, all parties must sign the Petition.

- If submitted on behalf of an underlying investor by an attorney, the Petition must be accompanied by a signed and sworn statement of the underlying investor stating that:

  - the attorney has the authority to represent the underlying investor in connection with the submission of the Petition;

  - the underlying investor has fully reviewed the Petition; and

  - the Form is truthful, complete and accurate in every respect.

- If submitted on behalf of an estate, the Petition must be submitted by a court-appointed executor or administrator of the estate, accompanied by documentary proof of his/her authority to act on behalf of the estate.

- If submitted on behalf of an entity, the person signing the Petition must provide documentary proof of his/her authority to sign the Petition and authority to provide the certification and release contained herein.

- You must disclose all accounts that held investments on your behalf, whether directly or indirectly.

- This Form DIR must be received by MVF before the deadline for submission of claims or within such later period as the DOJ may determine to accept submissions on behalf of victims.

- Losses on investments in swaps or other derivatives whose value was measured by interests in Madoff Securities, but where funds were never actually invested with Madoff Securities, will NOT qualify for purposes of claims on MVF.

**Completion and submission of this Petition does not automatically entitle you to a distribution from MVF. Determination letters regarding the eligibility of claims will be mailed later in the claims process.**

## PETITION FORM DIR

### Submitted by Direct Investors

I   **Direct Investor Information**

*Please type or print using blue or black ink*

**Account Information**

Madoff Securities **Account Number** that your money was invested in

SIPA Claim ID *(if known)*

Name on Madoff Securities Account

**Primary Claimant**

Claimant's (Investor's) Name

Tax ID        *(Check one)*        SSN        EIN        Foreign ID

*(If Foreign ID, provide country)* _____

**Joint Claimant**

Joint Claimant's Name*(if any)*

Tax ID        *(Check one)*        SSN        EIN        Foreign ID

*(If Foreign ID, provide country)* _____

**Investor's Mailing Address**

Attention

Street Address

City, State/Province, Postal Code

Country

**Investor's Contact Information**

Daytime Phone                              Alternate/Cell Phone

Contact Name *(if other than primary claimant)*

E-mail Address or Website

## II   Tax-Deferred Accounts

If the investment in Madoff Securities was through an individual tax-deferred account, such as a 401(k), 403(b) or IRA account, please provide the name, phone number and account number for the institution in which the investor's tax-deferred account is currently held.

Financial Institution _____

Account Number _____  Phone Number _____

## III   Transactions

If you filed a claim in the Madoff Securities bankruptcy proceeding, we have a copy of all documentation you submitted with that claim and you do *NOT* need to resubmit that documentation. However, you will need to confirm under the penalty of perjury that the documentation you provided to the Trustee was correct, and complete as of the date it was submitted. In addition, you must provide any documentation requested below that has not already been submitted to the Trustee. In all cases of doubt, please provide the necessary documentation so we can review your claim.

Please verify or complete the below transaction table. Confirm (if pre-populated) or list every deposit, transfer-in, withdrawal and transfer-out of your own investments in the identified Madoff Securities account. If you filed a claim in the Madoff Securities bankruptcy proceeding, these transactions should match those detailed in the Determination Letter you received from the Trustee. You must attach documentary proof for any transaction that is not identified in, or is different than, those identified in the Determination Letter. Documentary proof of transactional information can include account statements, wire transfer confirmations, cancelled checks, receipts, etc. If you need additional space, please make copies of the table or download additional pages from our website.

If you invested money in your Madoff Securities account for other individuals or entities, list only your own transactions, not the deposits and withdrawals made on behalf of other investors. If the pre-populated transaction table includes the investments of other investors, please cross out those transactions.

*Please submit copies and keep the originals.*

*This is not a determination of the eligible amount of your claim.*
*It is merely a listing of the cash transactions relating to your Madoff Securities investment.*

| Date of Transaction | Transaction Type *Deposit or Withdrawal* | Transaction Description or Note *(if applicable)* | Amount (USD or local currency) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Total Deposits (Cash In):     $ _____

Total Withdrawals (Cash Out):     $ _____

| Did you invest money in more than one Madoff Securities account, either directly or indirectly? |
| :--- |
| ☐  No |
| ☐  Yes - All transactions for all accounts are listed on this claim form (preferred method). |
| ☐  Yes - I am filing a separate claim form for every Madoff account I invested money in. |
| Please list on an attached sheet all Madoff accounts in which you had an investment if more than one. |

## IV    Recoveries

Please report any recoveries you have received for any or all of the losses incurred as a result of your investment in Madoff Securities (e.g., payments from SIPC, distributions from the Madoff Securities bankruptcy trustee, litigation recoveries, insurance recoveries or recoveries from any other source). Please include documentation to support any recovery you have received.

*(Any monies received for the sale or transfer of a claim in the Madoff Securities bankruptcy proceeding or for the purported sale or transfer of a claim against MVF should be recorded on a separate Form T-1, which is available from our website. Please call the Help Desk if you have questions.)*

| Amount | Date | Source |
| :---: | :---: | :---: |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

List any other recoveries you expect to receive **in the future** through litigation, arbitration, insurance or otherwise.

| Amount | Date | Source |
| :---: | :---: | :---: |
|  |  |  |
|  |  |  |

## V    Settlement Agreements

Have you entered into a settlement agreement with the bankruptcy trustee in connection with your Madoff Securities bankruptcy claim?

| | | |
|---|---|---|
| No | ☐ | |
| Yes | ☐ | If yes, please provide a copy of the settlement agreement and all related materials. |

## VI    Payments Made to the Madoff Securities Bankruptcy Trustee

Were you required to pay any funds to the Madoff Securities bankruptcy trustee (e.g.. for a preference transfer or avoidance amount)?

| | | |
|---|---|---|
| No | ☐ | |
| Yes | ☐ | If yes, please provide documentation evidencing the payment details. |

## VII    Sale, Transfer or Assignment of Claim

Did you sell, transfer or assign your bankruptcy and/or remission claim?

| | | |
|---|---|---|
| No | ☐ | |
| Yes | ☐ | If yes, please complete Form T-1, which is available on our website. |

Only victims are eligible to receive a recovery. However, where the actual victim acknowledges that they sold or otherwise transferred their claim for a payment of remission, and ratifies the terms of the transaction in writing, the victim may request that MVF pay any monies that would otherwise go to the victim directly to the purchaser or other transferee. The ratification process must also be completed by all subsequent purchasers or transferees, if applicable. Please refer to our website at www.madoffvictimfund.com or call for additional information regarding the ratification process and related requirements.

## VIII   Disclosure of Fees, Commissions or Other Financial Compensation

Did you receive any fees, commissions or any financial compensation (from any source) for directing any person to make, or otherwise for handling, investments in Madoff Securities?

| | | |
|---|---|---|
| No | ☐ | |
| Yes | ☐ | If yes, you are required to complete Form A, which is available on our website. |

## IX   Certification and Release

**A.** CERTIFICATION.  The undersigned represents and certifies under penalty of perjury that:

**1.** All personal and transactional information, and all disclosures regarding any recovery for the loss resulting from the Madoff fraud, are complete and accurate to the best of the undersigned's knowledge. Information regarding all accounts, whether showing a net investment or net withdrawals, has been provided.

**2.** All accompanying documents in support of this Petition, and documents submitted to the Madoff Securities bankruptcy trustee in support of the bankruptcy claim, are true, correct and complete to the best of the undersigned's knowledge.

**3.** He/she/it is not and/or has not been any of the following.

  **a.** A person who knowingly participated in, benefitted from or acted in a willfully blind manner relating to the fraud, and has not earned fees, commissions or other payments from handling or directing investments in Madoff Securities, except as disclosed in Form A (available on our website).

  **b.** A person who was an officer, director or employee of Madoff Securities at any time during the Madoff fraud through and including December 11, 2008.

  **c.** A member of the Madoff family.

  **d.** A person who forfeited cash or property to the DOJ in connection with the Madoff fraud.

  **e.** A defendant in any state or federal criminal action relating to the Madoff fraud.

  **f.** A person who is otherwise prohibited from receiving payments in the United States, including all prohibited persons under regulations of the Office of Foreign Assets Control (see:  www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx).

  **g.** An affiliate, assign, heir, distributee, parent, spouse, child, or other relative of any of the foregoing, or an entity controlled by, or under common control of, any of such persons.

**B.** He/she/it consents to the use by the U.S. Department of Justice, the MVF and its staff, and any of the Department's agents of any of the information provided herein for any purpose relating to this claims and remission process, including verifying the Petition or the identity of the Petitioner. This information includes, but is not limited to, the Social Security Number (or taxpayer identification number or similar foreign identifying information), address, telephone number and brokerage account information of the persons involved in any claim.

**C. RELEASE.** Each Petitioner hereby recognizes that the distribution of funds that make up the Madoff Victim Fund is not required by law, but that any distribution made shall be in the sole discretion of the Attorney General. Petitioner, whether ultimately determined eligible or ineligible to receive a remission payment from the Madoff Victim Fund, hereby releases and fully discharges, and consents and agrees that it shall make no claim of any kind or nature whatsoever against any person in connection with the administration and distribution of the Madoff Victim Fund, including the U.S. Department of Justice, U.S. Attorney's Office, Special Master and their respective employees and agents.

Each of the undersigned declares under penalty of perjury under the laws of the United States of America (and the applicable laws of any other jurisdiction) on information and belief that the information contained herein, the statements made and the answers given in this Petition are true and correct and that any documents submitted herewith are true and genuine.

Executed on this the _____ day of _____, _____ in

(Month)        (Year)

_____

(City, State, Country)

| Individuals | Corporations, Partnerships, Other Entities |
|---|---|
| _____ | _____ |
| Signature of Petitioner | Authorized Signature |
| _____ | _____ |
| Type or print name of Petitioner | Type/print name |
| _____ | _____ |
| Signature of Joint Petitioner (if any) | Title |
| _____ | _____ |
| Type/print name of Joint Petitioner (if any) | Name of Entity |
| _____ | _____ |
| Capacity of persons signing above *(i.e., Underlying Investor, Executor, POA, etc.)* | Capacity of persons signing above *(i.e., President, Managing Partner, Trustee, etc.)* |

# PETITION FORM CHECKLIST

*Before mailing your Petition Form please read these reminders.*

**1)** The signed Petition Form must be received by the Special Master **on or before** February 28, 2014, or such other date as the Department may later establish, in order to be eligible for consideration.

**2)** Please review, complete and return all pages of the Petition Form.

**3)** Remember to **sign the Certification and Release.** The Certification and Release must be signed by the primary claimant and all joint claimants. If you received any fees, commissions or other payments for handling or directing investments in Madoff Securities, you must disclose any such compensation on Form A, which is available on our website. You must file Form A with this Petition Form.

**4)** Remember to supply your Social Security Number or Tax Identification Number (or the foreign equivalents of such identifying information) and any joint Social Security Number if applicable.

*5)* Remember to attach all supporting documentation if applicable. Do not send originals of any supporting documentation; **send copies.** ***You do not need to resend the supporting documentation previously provided to the Madoff Securities bankruptcy trustee.***

**6)** Do not use a highlighter on the Petition Form or supporting documentation.

**7)** Keep copies of the Petition Form and supporting documentation for your records.

**8)** We will send a postcard confirming receipt of the Petition Form within 30 days after receiving it. If you do not receive a confirmation postcard within 35 days of mailing the Petition Form, please call us at (866) 624-3670. **Please note that the Petition Form is not deemed filed until you receive a confirmation postcard. This postcard only confirms receipt. Therefore, it does not mean that your Petition Form is complete or that you are eligible for a recovery.** Once the petition has been reviewed you may receive correspondence concerning any additional information or documentation needed to make the petition complete.

**9)** You are responsible for notifying us of any changes in the information you file, including changes of address or contact information, or new collateral recoveries received. Please call us at (866) 624-3670, email us at info@madoffvictimfund.com, or mail us your new contact information. Please include the MVF petition number on any correspondence. Our mailing address is:

Madoff Victim Fund
P.O. Box 6310
Syracuse, NY 13217-6310

EXHIBIT F

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>              Plaintiff-Applicant,<br><br>      v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>              Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>              Debtor. | |

**TRUSTEE'S TWELFTH INTERIM REPORT**
**FOR THE PERIOD ENDING SEPTEMBER 30, 2014**

forth the express grounds for disallowance of customer claims under § 502(d) of the Bankruptcy Code. Accordingly, such claims will not be allowed until the avoidance actions are resolved by settlement or otherwise and the judgments rendered against the claimants in the avoidance actions are satisfied.

#### ii.   **General Creditor Claims**

15.     As of September 30, 2014, the Trustee had received 427 timely and 22 untimely filed secured and unsecured priority and non-priority general creditor claims totaling approximately $1.7 billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. Of these 427 claims and $1.7 billion, the Trustee has received 94 general creditor claims and 49 broker-dealer claims totaling approximately $264.9 million. At this time, the BLMIS estate has no funds from which to make distributions to priority/non-priority general creditors and/or broker dealers.

#### iii.   **The Trustee Has Kept Customers Informed Of The Status Of The Claims Process**

16.     Throughout the liquidation proceeding, the Trustee has kept customers, interested parties, and the public informed of his efforts by maintaining the Trustee Website, a toll-free customer hotline, conducting a Bankruptcy Code § 341(a) meeting of creditors on February 20, 2009, and responding to the multitude of phone calls, e-mails, and letters received on a daily basis, from both claimants and their representatives.

17.     The Trustee Website allows the Trustee to share information with claimants, their representatives, and the general public regarding the ongoing recovery efforts and the overall liquidation. In addition to court filings, media statements, and weekly information on claims determinations, the Trustee Website includes up-to-date information on the status of Customer Fund recoveries, an "Ask the Trustee" page where questions of interest are answered and

- 6 -