**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD M. GLANTZ, individually, as trustee of the Richard M. Glantz 1991 Living Trust, the Edward R. Glantz Living Trust, the Thelma Glantz Living Trust, the Glantz-Ostrin Trust I, and the Glantz-Ostrin Trust II, and as personal representative of the Estate of Edward R. Glantz, and as administrator of the Estate of Thelma Glantz;<br><br>EJS ASSOCIATES, L.P.; | Adv. Pro. No. 10-05394 (SMB)<br><br>**AMENDED COMPLAINT** |

JELRIS & ASSOCIATES, L.P.;

GRACE & COMPANY;

THE RICHARD M. GLANTZ 1991 LIVING TRUST;

THE GLANTZ FAMILY FOUNDATION, INC.;

THE EDWARD R. GLANTZ LIVING TRUST;

THE ESTATE OF EDWARD R. GLANTZ;

LAKEVIEW INVESTMENT, LP;

VISTA MANAGEMENT CO.;

ELAINE OSTRIN, individually and as trustee of the
Edward R. Glantz Living Trust;

THE THELMA GLANTZ LIVING TRUST;

THE ESTATE OF THELMA GLANTZ;

THE GLANTZ-OSTRIN TRUST I;

THE GLANTZ-OSTRIN TRUST II;

AUSTIN BOSARGE;

MERLIN & ASSOCIATES, LTD.; and

ENHANCEMENT GROUP,

     Defendants.

# TABLE OF CONTENTS

**Page**

I.      NATURE OF PROCEEDING ............................................................................1

II.     JURISDICTION AND VENUE ........................................................................5

III.    DEFENDANTS .................................................................................................5

IV.     BACKGROUND, THE TRUSTEE AND STANDING.....................................10

V.      THE PONZI SCHEME.....................................................................................13

VI.     GLANTZ AND EDWARD GLANTZ WERE SOPHISTICATED
        PROFESSIONALS AND INVESTORS WITH LONGSTANDING, CLOSE
        TIES TO MADOFF ...........................................................................................16

VII.    GLANTZ AND EDWARD GLANTZ CREATED A&B SUB-FEEDERS TO
        BLMIS THAT DELIVERED GUARANTEED DOUBLE-DIGIT ANNUAL
        RETURNS ........................................................................................................19

        A.      Glantz's and Edward Glantz's A&B Sub-Feeders................................. 19

        B.      Glantz's and Edward Glantz's A&B Sub-Feeders Received Guaranteed
                Profits ................................................................................................... 21

        C.      The SEC Shut Down Glantz's and Edward Glantz's A&B Sub-Feeders,
                with Court-Imposed Injunctions and Fines for Violating the Securities
                Laws ...................................................................................................... 23

VIII.   AFTER THE SHUTDOWN OF THEIR SUB-FEEDERS, GLANTZ AND
        EDWARD GLANTZ OPENED, MANAGED AND MONITORED MULTIPLE
        BLMIS ACCOUNTS.........................................................................................27

IX.     GLANTZ AND EDWARD GLANTZ RECEIVED ANNUAL FRAUDULENT
        SIDE PAYMENTS FROM BLMIS THAT TOTALED MILLIONS OF
        DOLLARS AND MADE CLEAR THAT BLMIS WAS A FRAUDULENT
        OPERATION .....................................................................................................31

        A.      Madoff Provided Glantz and Edward Glantz Fraudulent Side Payments in
                Connection with Reinvestments with BLMIS by Merlin, Enhancement,
                and Telfran Investors ............................................................................. 31

        B.      Madoff's Fraudulent Side Payments to Glantz and Edward Glantz Were
                Fraudulent on Their Face ....................................................................... 32

        C.      Glantz Received Over $2.2 Million in Fraudulent Side Payments in His
                BLMIS Accounts ................................................................................... 36

        D.      Edward Glantz Received Over $2.5 Million in Fraudulent Side Payments
                in His BLMIS Accounts.......................................................................... 37

## TABLE OF CONTENTS
### (continued)

**Page**

X.      GLANTZ'S AND EDWARD GLANTZ'S KNOWLEDGE OF ADDITIONAL
        FACTS MADE THEM AWARE THAT BLMIS WAS A FRAUDULENT
        OPERATION .................................................................................................39

        A.      Glantz's and Edward Glantz's Accounts Received Guaranteed and
                Consistently Positive Double-Digit Annual Returns ............................................ 40

                1.      Promissory Notes Issued by OFA Demonstrate Glantz's Knowledge of
                        Fraudulently Guaranteed Returns ............................................................ 41

                2.      Glantz's and Edward Glantz's Accounts Received  Impossibly Consistent
                        Positive Double-Digit Annual Returns ..................................................... 43

        B.      BLMIS Provided Glantz and Edward Glantz Cash Payments in the
                Hundreds of Thousands of Dollars, from Accounts with Much Less
                Available Cash, Without Charging Margin Interest ............................................. 45

        C.      Glantz and Edward Glantz Knew that BLMIS's Unqualified Auditor Was
                a Badge of Fraud ................................................................................................ 49

XI.     STARTING IN 2004, GLANTZ CREATED NEW ENTITIES AND
        RECRUITED NEW INVESTORS TO REAP ADDITIONAL PROFIT FROM
        BLMIS ...........................................................................................................50

        A.      Fern Creek and Ostrin Family Partnership .......................................... 52

        B.      Lakeview ................................................................................................. 53

        C.      Glantz Family Partners ......................................................................... 55

XII.    GLANTZ HELPED FURTHER MADOFF'S FRAUD BY SHIELDING
        BLMIS'S OPERATIONS FROM SCRUTINY ..............................................56

XIII.   GLANTZ ASSERTED HIS FIFTH AMENDMENT RIGHTS AGAINST SELF-
        INCRIMINATION WHEN EXAMINED BY THE TRUSTEE'S COUNSEL ...............59

XIV.    GLANTZ'S KNOWLEDGE OF MADOFF'S FRAUD SHOULD BE IMPUTED
        TO CERTAIN OTHER DEFENDANTS ...........................................................59

        A.      Imputation as to Merlin and Enhancement ........................................ 60

        B.      Imputation as to Grace, EJS and Jelris ............................................... 60

        C.      Imputation as to Glantz Family Foundation (GFF) ............................ 61

        D.      Imputation as to Vista and Lakeview .................................................. 61

        E.      Imputation as to Trusts and ERG Estate ............................................ 62

        F.      Imputation as to Elaine Ostrin .......................................................... 63

XV.     THE ACCOUNT AGREEMENTS ..................................................................63

## TABLE OF CONTENTS
### (continued)

**Page**

XVI.  THE TRANSFERS ......................................................................................64

    A.    Initial Transfers ................................................................. 64

    B.    Subsequent Transfers ........................................................ 69

        COUNT ONE FRAUDULENT TRANSFERS– 11 U.S.C. §§
        105(a), 548(a)(1)(A), 550(a) AND 551 .................................. 70

        COUNT TWO FRAUDULENT TRANSFERS– 11 U.S.C. §§
        105(a), 548(a)(1)(B), 550(a) AND 551.................................. 72

        COUNT THREE FRAUDULENT TRANSFERS–  NEW YORK
        DEBTOR AND CREDITOR LAW §§ 276,
        276-a,  278 AND/OR 279, AND 11 U.S.C. §§
        105(a), 544(b), 550(a) AND 551 .......................................... 73

        COUNT FOUR FRAUDULENT TRANSFERS–  NEW YORK
        DEBTOR AND CREDITOR LAW §§ 273
        AND 278 AND/OR 279, AND 11 U.S.C. §§
        105(a), 544(b), 550(a) AND 551 .......................................... 75

        COUNT FIVE FRAUDULENT TRANSFER – NEW YORK
        DEBTOR AND CREDITOR LAW §§ 274, 278
        AND/OR 279, AND 11 U.S.C. §§ 105(a),
        544(b), 550(a) AND 551......................................................... 76

        COUNT SIX FRAUDULENT TRANSFERS  NEW YORK
        DEBTOR AND CREDITOR LAW §§ 275, 278
        AND/OR 279, AND 11 U.S.C. §§ 105(a),
        544(b), 550(a) AND 551......................................................... 77

        COUNT SEVEN RECOVERY OF ALL FRAUDULENT
        TRANSFERS – NEW YORK CIVIL
        PROCEDURE LAW AND RULES §§ 203(**g**)
        AND 213(8), NEW YORK DEBTOR AND
        CREDITOR LAW §§ 276, 276-a, 278 AND/OR
        279, AND 11 U.S.C. §§ 105(a), 544(b), 550(a),
        AND 551 ............................................................................... 78

        COUNT EIGHT RECOVERY OF SUBSEQUENT TRANSFERS
        – NEW YORK DEBTOR AND CREDITOR
        LAW §§ 276-a AND 278 AND 11 U.S.C. §§
        544, 548, AND 550(a) .......................................................... 80

        COUNT NINE GENERAL PARTNER LIABILITY.......................................... 81

## AMENDED COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA")[1] and the consolidated estate of Bernard L. Madoff (individually "Madoff," and, collectively with BLMIS, the "Debtors"), by and through the Trustee's undersigned counsel, for his Amended Complaint, states as follows:

## I.    NATURE OF PROCEEDING

1.     This adversary proceeding arises from the massive Ponzi scheme masterminded by Madoff and executed through BLMIS.  Over the course of the decades-long scheme, there were more than 8,000 client accounts at BLMIS.  In early December 2008, just before the Ponzi scheme collapsed, BLMIS generated client account statements for its approximately 4,900 open client accounts, with these statements indicating the supposed value of each of these client accounts.  When added together, these statements showed that BLMIS's clients had approximately $65 billion purportedly invested with BLMIS.  In reality, BLMIS had assets on hand worth a small fraction of that amount.  On March 12, 2009, Madoff admitted to the fraudulent scheme and pleaded guilty to 11 felony counts.  On June 29, 2009, he was sentenced to 150 years in prison.

2.     Richard M. Glantz ("Glantz"), his late father, Edward R. Glantz ("Edward Glantz"), various entities they created, controlled, and managed, and the other defendants herein (collectively, "Defendants") participated in and benefited from Madoff's fraud for decades as feeders of capital from others to BLMIS, as well as investors themselves with BLMIS.  For more than thirty years, Glantz and Edward Glantz operated entities that directed money to BLMIS,

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

first in coordination with longtime Madoff feeders Frank Avellino ("Avellino") and Michael

Bienes ("Bienes"), and then on their own.

3.      Glantz and Edward Glantz exploited their access to Madoff to reap tremendous

profits from his scheme, including compensation that Madoff awarded them annually as a reward

based on the reinvestment into BLMIS by investors who had invested with BLMIS through

Glantz's and Edward Glantz's early feeder funds, and then had their investment money returned

to them after these early feeder funds were shut down by the Securities and Exchange

Commission ("SEC").  These special premiums came in the form of patently fictitious option

transactions recorded in their BLMIS accounts to artificially inflate the accounts' values.

Collectively, Defendants withdrew more than $113 million from BLMIS (the "Transfers"),

including more than $40 million in fictitious profits.

4.      Glantz's and Edward Glantz's sophisticated backgrounds enhanced their ability to

profit from their access to Madoff.  Glantz is an attorney who spent part of his career working for

the SEC, and Edward Glantz was a Certified Public Accountant with ties to Madoff's earliest

operations.

5.      Glantz and Edward Glantz participated in BLMIS's fraud knowing that (i) Madoff

compensated them for steering investors into BLMIS by concocting fictitious option trades in

accounts they controlled – trades that consistently yielded a positive return in a predetermined

amount every December from 1996 to 2007; (ii) accounts they controlled received guaranteed

rates of return irreconcilable both with the nature of investment accounts engaged in actual

securities trading in the marketplace, and with Madoff's purported investment strategy; and (iii)

they frequently requested and received cash withdrawals from their BLMIS accounts that far

exceeded the amount of cash purportedly available in the accounts, including withdrawals of as much as $400,000 and $500,000 when the cash purportedly available was $1,000 or less.

6.    Glantz and Edward Glantz knew that the Transfers were not the result of the trading Madoff purported to engage in and were fraudulent.  At a minimum, Glantz and Edward Glantz knew of numerous facts suggesting a high probability that BLMIS was a fraudulent operation, and deliberately blinded themselves to the fraud.

7.    Glantz and Edward Glantz created various means to participate with and profit through Madoff's scheme.  From the 1970s through the early 1990s, Glantz and Edward Glantz formed, managed, and profited from entities that raised investor money in the form of purported loans and directed that money to a BLMIS feeder fund that provided guaranteed double-digit annual returns.  After that scheme was shut down by the SEC in 1992, and despite court-imposed injunctions and civil penalties, Glantz and Edward Glantz found a new way to profit from BLMIS, by facilitating the *re*investment of much of their investors' money back into BLMIS.  In return, BLMIS made substantial funds available to Glantz and Edward Glantz, totaling more than $4.7 million between 1994 and 2007, in the guise of annual increases in the value of their BLMIS accounts, accomplished through the fictitious option transactions ("Fraudulent Side Payments").  The fraudulent nature of these transactions was apparent on the face of Glantz's and Edward Glantz's account statements, because the transactions were impossible to reconcile with actual trading activity in the marketplace, much less Madoff's purported strategy.  Starting in 1996, and continuing through 2007, these Fraudulent Side Payments appeared like clockwork every December, always in a predetermined amount.

8.    Glantz and Edward Glantz also profited from BLMIS through guaranteed rates of return in their BLMIS accounts.  Glantz and Edward Glantz knew that, from at least 1996

3

through 2007, their accounts were being manipulated to deliver guaranteed rates of return – initially 17% – which could not have been the result of actual trading.

9.    To enhance his prospects for profit from the BLMIS scheme, Glantz created additional BLMIS investment vehicles.  Glantz founded Vista Management Co. in 2004 and Lakeview Investment, LP ("Lakeview") in 2006, and used these entities to direct more money to BLMIS.  Through Vista Management Co., Glantz reaped substantial "management" fees for directing investors' funds to Lakeview and other vehicles funneling money to Madoff.

10.    Glantz did what he could to prolong Madoff's fraudulent operation and his ability to profit from BLMIS by shielding BLMIS from scrutiny.  For example, Glantz refused to identify to at least one investor that Madoff was the investment manager for his money.  In another example, Glantz blocked efforts by ABN AMRO, an international banking conglomerate, in early 2007 to perform due diligence on BLMIS after Madoff himself purportedly told Glantz that Madoff would not permit any such scrutiny.  In another instance, in late 2007, Glantz told an investment fund manager that – under "the rules imposed by Bernie" – anyone who raised money for investment with Madoff was prohibited from disclosing to investors in writing that money raised would be invested with Madoff.  Glantz himself adhered to these "rules," sending correspondence and offering materials over the years that avoided naming Madoff or BLMIS.

11.    By this proceeding, the Trustee seeks to recover all "customer property," within the meaning of SIPA § 78*lll*(4), that Defendants received in the form of redemptions, fees, and/or compensation, and the disgorgement of all funds that enriched Defendants by diminishing the fund of customer property that, but for Defendants' conduct, would have been available to pay allowed customer claims.

## II.    JURISDICTION AND VENUE

12.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities and Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

13.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

14.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

15.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 544(b), 548(a), 550(a) and 551, the New York Fraudulent Conveyance Act (N.Y. Debt & Cred. § 270 *et seq.* (McKinney 2001)), the New York Civil Practice Law and Rules (McKinney 2003) ("N.Y. C.P.L.R."), and other applicable law.[2]

## III.    DEFENDANTS

16.    **Richard Glantz** (as previously defined, "Glantz") at all relevant times has been: a general partner of EJS Associates, L.P. ("EJS"), Jelris & Associates, L.P. ("Jelris"), and Grace & Company ("Grace"); a trustee of the Richard M. Glantz 1991 Living Trust ("RMG Trust"), the Edward R. Glantz Living Trust ("ERG Trust"), the Glantz-Ostrin Trust I ("G-O Trust I"), the

---

[2] To preserve all claims until a final determination on appeal, the Trustee asserts avoidance claims arising under sections 547, 548(a)(1)(B) and 544(b)(1) of the Bankruptcy Code in this proceeding.

Glantz-Ostrin Trust II ("G-O Trust II"), and, upon information and belief, the Thelma Glantz Living Trust ("TG Trust"); an administrator of the Estate of Thelma Glantz ("TG Estate"); upon information and belief, a personal representative of the Estate of Edward R. Glantz ("ERG Estate"); a director and president of the corporation Glantz Family Foundation, Inc.  ("GFF"); president and sole owner of the corporations The Merlin Group ("Merlin Group") and Merlin & Associates, Ltd. ("Merlin & Associates"); part or sole owner and president of the corporation Enhancement Group ("Enhancement"); and sole owner and president of the corporation Vista Management Co. ("Vista"), which, in turn, was the general partner of Lakeview.

17.     Glantz resides in Richmond, California.

18.     **EJS Associates, L.P.** (as previously defined, "EJS") is a limited partnership.  It was originally formed as a general partnership, which was memorialized in a partnership agreement dated as of October 15, 1993.  EJS was reorganized as a limited partnership under the laws of the State of Delaware, effective January 1, 1998.

19.     Glantz and close relatives of his invested with BLMIS through EJS.

20.     While EJS was a general partnership, its general partners included, among others, Glantz, Elaine Ostrin, RMG Trust, ERG Trust and TG Trust.

21.     While EJS has been a limited partnership, Glantz has been EJS's sole general partner.

22.     EJS maintains its principal place of business in San Rafael, California.

23.     **Jelris & Associates, L.P.** (as previously defined, "Jelris") is a limited partnership. It was originally formed as a general partnership as of October 15, 1993.  Jelris was reorganized as a limited partnership under the laws of the State of Delaware, effective March 28, 1995.

24.     Glantz and close relatives of his invested with BLMIS through Jelris.

6

25.     While Jelris was a general partnership, its general partners included, among others, Glantz, Elaine Ostrin, RMG Trust, ERG Trust and TG Trust.

26.     While Jelris has been a limited partnership, Glantz has been Jelris's sole general partner.

27.     Jelris maintains its principal place of business in San Rafael, California.

28.     **Grace & Company** (as previously defined, "Grace") opened its BLMIS account in November 1992 as a general partnership.

29.     Glantz used Grace as an investment vehicle with BLMIS primarily for money from Taj Inayat, who was married to Glantz from 1988 to 2004, and her close relatives.

30.     Grace maintains its principal place of business in San Rafael, California.

31.     **The Richard M. Glantz 1991 Living Trust** (as previously defined, "RMG Trust") is a trust formed under the laws of the State of California. Glantz was the settlor and throughout its existence has been trustee of RMG Trust.

32.     RMG Trust maintains its principal place of business in San Rafael, California.

33.     **The Glantz Family Foundation, Inc.** (as previously defined, "GFF") was incorporated in 1986 under the laws of the State of Florida. Glantz and Elaine Ostrin have been directors and officers of GFF at all relevant times. Edward Glantz was president of GFF from at least 1993 until his death in February 2007, and Glantz has been president thereafter. GFF maintains its principal place of business in San Rafael, California.

34.     **The Edward R. Glantz Living Trust** (as previously defined, "ERG Trust") is a trust formed in 1993 under the laws of the State of Florida. ERG Trust was formed through a trust agreement dated June 6, 1993, which was subsequently amended on May 18, 1995, October

11, 1996, and August 7, 2006.  Edward Glantz was the settlor of ERG Trust.  Edward Glantz, Glantz, Thelma Glantz, and Elaine Ostrin have all been trustees of ERG Trust.

35.    **The Estate of Edward R. Glantz** (as previously defined, "ERG Estate") was created upon the death of Edward Glantz, which occurred on or about February 9, 2007.  Upon information and belief, Glantz was a personal representative of ERG Estate.

36.    **Lakeview Investment, LP** (as previously defined, "Lakeview") is a limited partnership formed in 2006 under the laws of the State of Delaware.  At all relevant times, Vista has been Lakeview's sole general partner.

37.    Lakeview maintains its principal place of business in San Rafael, California.

38.    **Vista Management Co.** (as previously defined, "Vista") was incorporated in 2004 under the laws of the State of California.  Throughout its existence, Glantz has been the sole owner and president of Vista.

39.    Vista maintains its principal place of business in San Rafael, California.

40.    **Elaine Ostrin** is Glantz's sister and the daughter of Edward and Thelma Glantz. She has been a general partner and a limited partner of EJS and Jelris, a trustee of ERG Trust, a co-administrator of TG Estate, and a director and officer of GFF.

41.    Elaine Ostrin resides in San Francisco, California.

42.    **The Thelma Glantz Living Trust** (as previously defined, "TG Trust") is a trust formed in 1993, upon information and belief under the laws of the State of Florida.  TG Trust was formed through a trust agreement dated June 3, 1993.  Upon information and belief, Thelma Glantz (Edward Glantz's wife and Glantz's and Elaine Ostrin's mother) was the settlor of TG Trust.

43.     **The Estate of Thelma Glantz** (as previously defined, "TG Estate") is an estate that was created upon the death of Thelma Glantz, which occurred on or about July 23, 2010, in Santa Clara County, California.   By order of the Superior Court of California, Santa Clara County, entered August 8, 2012, Glantz, Elaine Ostrin, and Jerald Ostrin were appointed co-administrators of TG Estate.   By order of the same court, entered August 25, 2014, the resignations of Elaine Ostrin and Jerald Ostrin as co-administrators of TG Estate were accepted, leaving Glantz as the sole administrator of TG Estate.

44.     **The Glantz-Ostrin Trust I** (as previously defined, "G-O Trust I") is a trust formed under the laws of the State of California.  Glantz has been trustee of G-O Trust I.  G-O Trust I maintains its principal place of business in San Rafael, California.

45.     **The Glantz-Ostrin Trust II** (as previously defined, "G-O Trust II") is a trust formed under the laws of the State of California.  Glantz has been trustee of G-O Trust II.  G-O Trust II maintains its principal place of business in San Rafael, California.

46.     **Austin Bosarge** ("Bosarge") resides in Petaluma, California.   He received a subsequent transfer from Jelris.

47.     **Merlin & Associates, Ltd.** (as previously defined, "Merlin & Associates") was incorporated in 1989 under the laws of the State of California.   Merlin & Associates was the successor to Merlin Group, which was incorporated in 1984 under the laws of the State of Nevada.  Merlin & Associates and Merlin Group are collectively referred to herein as "Merlin." Throughout Merlin's existence, Glantz was the sole owner, officer, and director of Merlin.

48.     **Enhancement Group** (as previously defined, "Enhancement") was incorporated in 1986 under the laws of the State of California.  Throughout Enhancement's existence, Glantz

was its part or sole owner, a director, its president, and the only officer with an active role in its operations.

49.    Glantz has held an individual retirement account (the "Glantz IRA"), which he has controlled and managed throughout its existence.    Glantz and/or the RMG Trust (collectively, "Glantz IRA Beneficiaries") have been the beneficiaries of the Glantz IRA.

50.    Edward Glantz held an individual retirement account (the "Edward Glantz IRA"), which he controlled and managed at all relevant times until his death.    After Edward Glantz's death, Thelma Glantz controlled and managed the Edward Glantz IRA.    After Thelma Glantz's death, Glantz controlled and managed the Edward Glantz IRA.    Edward Glantz, ERG Estate and its personal representative(s), ERG Trust and its trustees, Thelma Glantz, TG Estate and its co-administrators, and/or TG Trust and its trustees (collectively, "Edward Glantz IRA Beneficiaries") have been the beneficiaries of the Edward Glantz IRA.

## IV.    BACKGROUND, THE TRUSTEE AND STANDING

51.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.    Contemporaneously, the SEC commenced the District Court Proceeding.

52.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application of the Securities Investor Protection Corporation ("SIPC").    Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

53.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

10

(i)      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(ii)      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(iii)      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

54.      By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

55.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

56.      At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

57.      At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali ("DiPascali"), a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

58.      At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the

11

records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

59.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

60.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

61.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, and 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

62.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and §§ 78fff-1(a) and 78fff-2(c)(3) of SIPA.

## V.    THE PONZI SCHEME

63.    Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1, 2001, Madoff continued BLMIS as a sole member limited liability company under the laws of the State of New York.  BLMIS's ownership and control did not change since its formation in 1960.  During that time, BLMIS had been continually registered with the SEC, and remained a SIPC member since SIPC's formation in late 1970.  For most of its existence, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, sole owner, chairman, and chief executive officer, operated BLMIS with several family members and other employees, including DiPascali and David Kugel, who pleaded guilty to helping Madoff carry out the fraudulent scheme.

64.    During the early 1970s through the early 1990s, Madoff claimed to invest customer funds using a "convertible arbitrage investment strategy," by which investors would gain profits from a change in the expectations for the stock or convertible security over time.

65.    Beginning in the 1990s, Madoff outwardly ascribed the consistent investment success of BLMIS's IA Business to a different strategy, the "split-strike conversion" ("SSC") investment strategy.  Madoff claimed this strategy would produce steady returns without the volatility of the stock market or other high-return investment strategies.  Madoff generally indicated that investors' funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100 Index"), which is a collection of the 100 largest publicly traded companies, as determined by Standard & Poor's Index Committee.  The basket of stocks was designed to correlate to the movement of the S&P 100 Index.  The second part of the SSC strategy involved purporting to sell call options and buy put options on the S&P 100 Index; this is commonly referred to as a "collar."  Madoff purported to purchase and sell option contracts to control the downside risk of price changes in the basket of stocks correlated to the

13

performance of the S&P 100 Index. All options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, cleared through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

66.     BLMIS commingled all of the funds received from IA Business investors in a single BLMIS account maintained at JPMorgan Chase Bank.

67.     Madoff claimed that he would carefully time purchases and sales to maximize value. He also claimed that customer funds would intermittently be out of the market, during which times the funds were invested in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

68.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements.

69.     Madoff operated the IA Business as a Ponzi scheme. The money received from IA Business customers was used primarily to make distributions to, or payments for, other customers. The falsified trades reflected in monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments. The Ponzi scheme collapsed in December 2008, when requests for redemptions overwhelmed the flow of new investments with BLMIS's IA Business.

70.    Since at least the 1970s, BLMIS fraudulently claimed to engage in securities trades for IA Business customers that did not occur.  Basic market data reveals that those purported trades did not take place, and could not have taken place, as reported on BLMIS customer statements.  For example, there are many instances in which the total number of securities purportedly traded by BLMIS significantly exceeded the entire reported market volume for that particular security on that particular day.  Even when BLMIS purportedly traded securities within reported market volumes, there are many instances when the prices of those trades were outside the daily market price range for that security.  In many other examples, BLMIS account statements reported trades of a particular security when actual market reports show that that particular security was not traded in the market on that reported date.

71.    Since at least 1983, BLMIS financial reports filed with the SEC fraudulently omitted the existence of the billions of dollars of customer funds held by BLMIS.

72.    BLMIS did not register as an investment adviser with the SEC until August 2006.  At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts and assets under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually with the SEC, the latest of which was filed in January 2008.  It represented that BLMIS had 23 customer accounts with assets under management of $17.1 billion.  In fact, at that time BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion under management.

73.    Contrary to standard practice in the investment advisory industry, BLMIS did not charge the IA Business customers a fee for investment advisory services.  Madoff knew that others that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts,

charged hundreds of millions of dollars for investment advisory services attributed to BLMIS.

Instead of investment advisory fees, BLMIS purported to charge commissions for the purported

trades, as reflected in the fraudulent IA Business customer statements.

74.    BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling &

Horowitz"), a three-person accounting firm in Rockland County, New York.    Of the three

employees at the firm, one employee was an administrative assistant and one was a semi-retired

accountant living in Florida.    On or about November 3, 2009, David Friehling, the sole

proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and

filing false tax returns for Madoff and others.

75.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VI.    GLANTZ AND EDWARD GLANTZ WERE SOPHISTICATED PROFESSIONALS AND INVESTORS WITH LONGSTANDING, CLOSE TIES TO MADOFF

76.    Glantz, a practicing attorney since 1970, has a background and experience in law,

securities-related matters, and accounting.    After earning his Bachelor of Arts degree in

accounting and his Juris Doctor degree, Glantz began his legal career as an attorney at the SEC

in the Division of Corporation Finance, advising with regard to securities offerings.    He was

admitted to the State Bar of California in 1972.

77.    Edward Glantz was a Certified Public Accountant and a principal of the

accounting firm Glantz & Levey, P.C. for over 40 years.

78.    Glantz's and Edward Glantz's relationships with Madoff grew from their

respective associations with the accounting firm Alpern & Heller, which was founded by

Madoff's father-in-law, Saul Alpern ("Alpern").

16

79.    When Madoff founded BLMIS in or about 1960, he operated the business from the offices of Alpern & Heller, where Frank Avellino (as previously defined, "Avellino") worked as an accountant.  Upon information and belief, Alpern assisted his son-in-law's business by encouraging people to entrust funds with Madoff for investment, which continued even after Madoff moved BLMIS out of Alpern & Heller's offices in or about 1961.

80.    In addition to operating an accounting business, Alpern & Avellino (the successor to Alpern & Heller) began operating the first BLMIS "feeder fund" in approximately the 1960s, which pooled their customers' capital and provided it to Madoff for purported discretionary investment by BLMIS in securities.  In the early 1970s, Michael Bienes (as previously defined, "Bienes"), an employee of Alpern & Avellino since the late 1960s, became a partner in Alpern & Avellino.  Upon the retirement of Alpern in or around 1975, the accounting firm was renamed Avellino & Bienes ("A&B"), and the feeder fund was thereafter operated under this name.

81.    Edward Glantz's involvement with Avellino and Madoff began as early as the early- or mid-1960s, when Glantz & Levey, P.C. shared office space with Alpern & Heller.

82.    Upon information and belief, Glantz's involvement with Avellino and Madoff grew from his own employment as a summer intern accountant at Alpern & Heller in the mid-1960s.

83.    By the late 1960s and early 1970s, respectively, Glantz and Edward Glantz had used their connections to Avellino and Madoff to begin placing their own money and their families' money with BLMIS through A&B.

84.    Glantz held himself out as having a relationship with, and special access to, Madoff.  Madoff's personal phone book contained handwritten entries for the telephone numbers of both Glantz and Edward Glantz.  In addition, on February 15, 2007, Glantz sent an email to an

individual concerning a potential transaction involving Glantz and BLMIS. Glantz wrote in this email that another individual involved in the potential transaction had indicated that the deal would work because of Glantz's extraordinary access to Madoff.

85.     Glantz also was sophisticated with regard to financial and investment matters. By the time BLMIS collapsed in December 2008, Glantz had over 30 years' experience establishing investment partnerships and corporations, structuring complex transactions, and communicating and transacting with investors and major financial institutions.

86.     Over the course of his decades-long involvement with Madoff, Glantz managed various Madoff investment vehicles, including as sole general partner of EJS and Jelris, as a general partner of Grace, and as an officer, sole director and sole shareholder of Vista, which itself was general partner of other investment vehicles including Lakeview and Fern Creek Limited Partnership ("Fern Creek").

87.     Through his roles as the general partner of or as control person of the general partner of BLMIS investment vehicles, Glantz served as a fiduciary to individuals and entities that invested through the vehicles. Glantz understood, acknowledged and represented his fiduciary duties to these investors, including the duties to be informed about, monitor, and perform due diligence on, prospective and ongoing investments with BLMIS.

88.     In connection with these roles, Glantz monitored and performed due diligence on BLMIS.

## VII.    GLANTZ AND EDWARD GLANTZ CREATED A&B SUB-FEEDERS TO BLMIS THAT DELIVERED GUARANTEED DOUBLE-DIGIT ANNUAL RETURNS

### A.    Glantz's and Edward Glantz's A&B Sub-Feeders

89.    For more than a decade, until their operations were shut down in 1992 by the SEC, Glantz and Edward Glantz participated in Madoff's fraud through entities they created to serve as sub-feeders to A&B.

90.    From the 1970s through 1992, A&B raised hundreds of millions of dollars for investment with BLMIS.  To keep the money flowing and the Ponzi scheme operating, Madoff provided guaranteed annual returns to A&B, which in turn allowed A&B to guarantee annual rates of return to its investors of up to 18%.  A&B retained as profits the difference between the returns guaranteed and received from Madoff, which in certain periods were 20%, and the returns they guaranteed their underlying investors.

91.    A&B retained tens of millions of dollars in profits for their role in assisting Madoff's Ponzi scheme.  A&B attracted investors by promising an annual guaranteed rate of return.  Avellino and Bienes termed these investments "loans" and issued letters to investors that specified the rate of return for each purported "loan."

92.    Glantz and Edward Glantz created entities that pooled their customers' capital and provided it to A&B, which in turn provided it to Madoff for purported discretionary investment by BLMIS in securities.  Glantz's and Edward Glantz's entities thus served as "sub-feeders" to feeder funds operated by A&B.

93.    Glantz formed the first of his BLMIS sub-feeders, a partnership he called Frodo, in 1976, approximately five years after he left the SEC.  Glantz was the founder and managing general partner of Frodo.  Glantz operated Frodo as a means to pool money from investors and direct that money to BLMIS through A&B.

19

94.     In late 1984 or early 1985, Glantz dissolved Frodo and incorporated Merlin as a new BLMIS sub-feeder.

95.     Glantz was the founder and the sole owner, president, and manager of Merlin. Glantz operated Merlin continuously from its founding until 1992.

96.     In 1986, Glantz expanded his participation with BLMIS through a third sub-feeder, a corporation he called Enhancement.   Glantz was the founder and, throughout its existence, a part or sole owner and the president and manager of Enhancement.

97.     Glantz operated Enhancement from 1986 to 1992.

98.     Glantz used Frodo, Merlin, and Enhancement for the same purpose: to pool money from family members, friends, and/or business associates, and direct that money to BLMIS through A&B.

99.     For each of Frodo, Merlin, and Enhancement, Glantz was both the primary or sole decision maker and the manager of day-to-day operations.   Among other activities, Glantz communicated with investors regarding their investments and withdrawals, determined the interest that investors would receive on their investments, tracked investments and withdrawals, and communicated with investors to address their inquiries.  Glantz also negotiated the terms of the entities' investments with A&B, placed investors' money with A&B, and relayed investors' redemption requests to A&B.

100.     Glantz ceased operating Merlin and Enhancement in approximately November 1992, after the SEC began investigating A&B and its sub-feeders.

101.     Edward Glantz formed his BLMIS sub-feeder, Telfran Associates Corp. ("Telfran Corp."), in 1982, together with his longtime accounting colleagues Steven Mendelow ("Mendelow") and Aaron Levey.

102.    Edward Glantz, Mendelow, and Aaron Levey used Telfran for the same purpose as Glantz used his entities: to pool money and direct that money to BLMIS, through A&B.

103.    In 1989, Edward Glantz, Mendelow, Aaron Levey, and Aaron Levey's son, Joel Levey, restructured Telfran by forming the limited partnership Telfran Associates Ltd. ("Telfran Ltd."), and establishing Telfran Corp. as Telfran Ltd.'s general partner (Telfran Corp. and Telfran Ltd. are collectively referred to herein as "Telfran.").

104.    Edward Glantz, Mendelow, Aaron Levey and/or Joel Levey were the owners, officers, and directors of Telfran.  When Aaron Levey, the secretary-treasurer of Telfran Corp., died in November 1992, Edward Glantz assumed that position as well.

105.    Edward Glantz, Mendelow, and Aaron Levey ceased operating Telfran in approximately November 1992, after the SEC began investigating A&B and its sub-feeders.

**B.    Glantz's and Edward Glantz's A&B Sub-Feeders Received Guaranteed Profits**

106.    A&B paid Frodo, Merlin, Enhancement, and Telfran a guaranteed rate of return lower than the guaranteed rate of return that A&B received from its BLMIS accounts.  Glantz and Edward Glantz used the A&B model, receiving purported loans from investors and paying those investors a lower rate of return than the rate of return guaranteed to Merlin, Enhancement, and Telfran by A&B.  Glantz and Edward Glantz, through their entities, profited by retaining the difference between the returns their sub-feeders received from A&B and the returns they provided to their investors.

107.    Throughout their existence, A&B paid Merlin and Enhancement purported interest on their customer deposits at annual rates within the range of 15% to 21%.

108.    Merlin and Enhancement paid their investors purported interest at lower annual rates, within the range of 12% to 19%.

21

109.    Glantz thereby ensured a guaranteed profit for himself, through Merlin and Enhancement, on customer money that he sent to A&B for investment with BLMIS.

110.    From 1985 through 1992, through Merlin and Enhancement, Glantz raised approximately $30 million from approximately 345 individuals and entities that was ultimately invested with BLMIS.  By 1992, the aggregate balance of all purported loans from investors to Merlin and Enhancement, including both money from investors (net of withdrawals) and undistributed purported interest, was approximately $35 million.  In addition, from 1976 to 1985, Glantz raised funds through Frodo for investment into BLMIS.

111.    As sole owner of Frodo and Merlin, and part or sole owner of Enhancement, Glantz profited from money these sub-feeders obtained from investors and placed with A&B for investment with BLMIS.

112.    Telfran similarly received a higher purported interest rate on money deposited with A&B than the purported interest rate that Telfran paid to its investors.  For example, from 1989 through September 1992, A&B provided Telfran purported interest on invested money at an annual rate of approximately 19%.

113.    In contrast, from 1989 through September 1992, Telfran provided purported interest to its investors at the annual rate of approximately 14% to 15%.

114.    Like Merlin and Enhancement, Telfran profited by retaining the difference between the purported interest it received from A&B and the purported interest it provided to its investors.

115.    Edward Glantz thereby ensured a guaranteed profit for himself, through Telfran, on customer money that Telfran sent to A&B for investment with BLMIS.

116.    From 1982 through 1992, Telfran raised many millions of dollars from over 800 individuals and entities that were ultimately invested with BLMIS.  By 1992, the aggregate balance of all purported loans from investors to Telfran, including both money from investors (net of withdrawals) and undistributed purported interest, was approximately $89 million.

117.    As part owner of Telfran, Edward Glantz profited from money Telfran obtained from investors that it placed with A&B for investment with BLMIS.

118.    From 1976 to 1992, Glantz and Edward Glantz through their sub-feeders cumulatively received, at a minimum, several hundred thousand dollars in profits for funneling money into BLMIS through A&B.

**C.    The SEC Shut Down Glantz's and Edward Glantz's A&B Sub-Feeders, with Court-Imposed Injunctions and Fines for Violating the Securities Laws**

119.    In 1992, the SEC began a series of investigations into A&B's feeder fund and the Glantz and Edward Glantz sub-feeders.  These investigations led to enforcement actions filed by the SEC in federal court.

120.    The SEC's enforcement actions were based on multiple federal securities law registration violations by Glantz, Edward Glantz, their sub-feeders, and others, including A&B.

121.    Through its investigations, the SEC determined that, from at least 1985 to 1992, Glantz, Merlin, and Enhancement violated the Securities Act of 1933 (the "Securities Act") by offering to sell and by selling unregistered securities in connection with their raising of money from investors.

122.    Through its investigations, the SEC also determined that, from at least 1989 to 1992, Edward Glantz and Telfran violated the Securities Act by offering to sell and by selling unregistered securities in connection with their raising of money from investors.

123.    The SEC found that the documents that Glantz, Edward Glantz, and their sub-feeders issued to investors in exchange for purported loans constituted notes, and that these notes were securities subject to the federal securities laws.

124.    Through its investigations, the SEC further determined that Merlin, Enhancement, and Telfran violated the Investment Company Act of 1940 (the "Investment Company Act"), by operating as investment companies without having registered as such with the SEC, and that Glantz and Edward Glantz aided and abetted these violations.

125.    The SEC commenced the first of this group of enforcement actions on or about November 18, 1992, when it filed a complaint in the District Court against A&B and its principals, Avellino and Bienes (the "SEC A&B Defendants").

126.    On or about November 25, 1992, the SEC brought a similar action in the District Court against Telfran, Mendelow, and Edward Glantz (the "SEC Telfran Defendants").

127.    A year later, on or about November 29, 1993, the SEC brought a similar action in the United States District Court for the Central District of California against Glantz, Merlin, and Enhancement (the "SEC Glantz Defendants").

128.    The SEC alleged in its complaints against the SEC Glantz Defendants and SEC Telfran Defendants that, by offering to sell and by selling unregistered securities, Glantz, Edward Glantz, Merlin, Enhancement, and Telfran had violated §§ 5(a) and 5(c) of the Securities Act of 1933; that, by operating as investment companies within the meaning of §§ 3(a)(1) and 3(a)(3) of the Investment Company Act of 1940, without registering as such with the SEC, Merlin, Enhancement, and Telfran violated § 7(a) of the Investment Company Act; that Glantz aided and abetted the Investment Company Act violations of Merlin and Enhancement; and that Edward Glantz aided and abetted the Investment Company Act violations of Telfran.

129.    Glantz and Edward Glantz had in fact committed each of the violations alleged in the SEC complaints.    Moreover, at the time of their respective involvements with Merlin, Enhancement, and Telfran, Glantz and Edward Glantz were aware that they and their entities were engaged in the sale of securities in the form of notes that were unregistered, and that their entities were operating as investment companies without being registered as such.

130.    Glantz, Edward Glantz, and the other defendants in the three enforcement actions settled the SEC's charges, without any admissions of wrongdoing but agreeing to consent judgments imposing injunctions and monetary penalties on each of the defendants.

131.    Pursuant to the final consent judgments, which were entered in 1993, the SEC A&B Defendants, SEC Telfran Defendants, and SEC Glantz Defendants were all permanently enjoined from further violations of the federal securities laws.

132.    Pursuant to the consent judgment in these actions, among other fines imposed, Telfran was ordered to pay a $250,000 fine, Merlin and Enhancement were each ordered to pay $125,000, and Edward Glantz and Glantz were each ordered to pay $50,000.

133.    These SEC investigations and actions resulted in the closing of the A&B BLMIS feeder fund operation, including Merlin, Enhancement, and Telfran, and the return of hundreds of millions of dollars that had been invested with A&B and the Glantz and Edward Glantz entities.

134.    Prior to the entry of the final consent judgment against the SEC A&B Defendants, the District Court entered a preliminary injunction, also on consent of the SEC A&B Defendants, appointing a trustee to oversee the redemption of all outstanding notes issued by A&B.    The preliminary injunction empowered and directed the trustee, among other things, to take control

of the brokerage accounts under A&B's control – *i.e.*, A&B's accounts at BLMIS – and distribute the proceeds in the accounts to A&B's investors.

135.    The court-appointed trustee oversaw the distribution of approximately $329 million to individuals and entities that had invested funds with A&B.  Upon information and belief, the distributed funds represented the aggregate balance of all purported loans from investors to A&B, including both money from investors (net of withdrawals) and undistributed purported interest.

136.    In November 1992, Glantz opened the first BLMIS accounts in the name of Merlin (Acct. No. 1M0057) and Enhancement (Acct. No. 1E0128).  These entities previously had invested with BLMIS only indirectly, through A&B.  These BLMIS accounts were opened not as vehicles for investment with BLMIS, but to facilitate the distribution of money back to Merlin and Enhancement investors.

137.    Accordingly, in November 1992, $27 million was deposited into Merlin's BLMIS account, and $3.2 million was deposited into Enhancement's BLMIS account.  On or about November 20, 1992, Merlin and Enhancement withdrew virtually all this money from BLMIS, for distribution to their respective investors.

138.    By the end of December 1992, BLMIS and/or A&B distributed approximately $124 million to Merlin, Enhancement, and Telfran (approximately $35 million to Merlin and Enhancement and approximately $89 million to Telfran).  Merlin, Enhancement, and Telfran, in turn, distributed these funds to individuals and entities that had invested funds with Merlin, Enhancement, and Telfran.

**VIII.  AFTER THE SHUTDOWN OF THEIR SUB-FEEDERS, GLANTZ AND EDWARD GLANTZ OPENED, MANAGED AND MONITORED MULTIPLE BLMIS ACCOUNTS**

139.    After the closing of A&B's feeder fund as a result of the SEC's 1992 and 1993 actions, A&B was no longer able to provide managers of sub-feeders, like Glantz, Edward Glantz, and their entities, a guaranteed profit for having brought investors to BLMIS.  Instead, BLMIS itself began providing managers such as Glantz and Edward Glantz compensation in the form of artificial boosts in the account values of designated BLMIS accounts.  As detailed in section IX below, Glantz and Edward Glantz received these "Fraudulent Side Payments" in BLMIS accounts they opened beginning in 1992.

140.    In November 1992, Glantz opened BLMIS account 1T0026 in the name of "Taj Family," a general partnership of which Glantz was a general partner.  In December 1993, Glantz changed the name of the partnership and of the account to "Grace & Company," which was a reference to Glantz's then-mother-in-law, Grace Buckmaster.

141.    Throughout the existence of Grace's BLMIS account, Glantz, who was a general partner of Grace, received and reviewed monthly account statements and trade confirmations for Grace from BLMIS, and corresponded with BLMIS on behalf of Grace.

142.    Through the Grace account, Glantz pooled and funneled money from the immediate family of Glantz's then-wife, Taj Inayat (née Carolyn Buckmaster), to BLMIS.

143.    In November 1992, Edward Glantz and Elaine Ostrin opened BLMIS account 1ZA192 in the name of EJS.

144.    On February 18, 1993, Glantz wrote to BLMIS, requesting that all account information for EJS be sent to him.

145.    Throughout the existence of EJS's BLMIS account, Glantz was a general partner of EJS.  From at least February 1993 forward, throughout the existence of the EJS account,

Glantz received and reviewed monthly account statements and trade confirmations for EJS from BLMIS, and corresponded with BLMIS on behalf of EJS.

146.    Edward Glantz was a trustee of ERG Trust, which at various times was either a general partner or a limited partner of EJS.  From at least December 1995 until his death, Edward Glantz received and reviewed duplicate monthly account statements for EJS from BLMIS and corresponded with BLMIS on behalf of EJS.

147.    Through the EJS account, Glantz and Edward Glantz pooled their own money and money from Elaine Ostrin, her sons Jerald and Scott Ostrin, and others, and funneled it to BLMIS.

148.    In December 1992, Glantz and Taj Inayat (née Carolyn Buckmaster) opened BLMIS account 1ZA169 in the name of "Carolyn Buckmaster Separate Property."  In July 1993, Glantz and Taj Inayat transferred ownership of the account to Glantz, and the account's name changed to "Richard M. Glantz 1991 Trust."

149.    From at least July 1993 forward, throughout the existence of the RMG Trust account, Glantz received and reviewed monthly account statements and trade confirmations for the account from BLMIS, and corresponded with BLMIS on behalf of RMG Trust.

150.    In December 1992, Glantz opened BLMIS account 1ZR010 for the Glantz IRA through Retirement Accounts, Inc. (later NTC & Co.).

151.    From at least December 1995 forward, throughout the existence of the Glantz IRA account, Glantz received and reviewed monthly account statements and trade confirmations for the Glantz IRA from BLMIS and corresponded with BLMIS with respect to the Glantz IRA.

152.    In February 1993, Edward Glantz opened BLMIS account 1ZR176 for the Edward Glantz IRA through Retirement Accounts, Inc. (later NTC & Co.).  From at least

December 1995 until his death, Edward Glantz received and reviewed monthly account statements for the Edward Glantz IRA from BLMIS and corresponded with BLMIS with respect to the Edward Glantz IRA.

153.    Following Edward Glantz's death in 2007, Glantz received and reviewed monthly account statements and trade confirmations for the Edward Glantz IRA and corresponded with BLMIS with respect to the Edward Glantz IRA.

154.    In February or March 1993, Edward Glantz opened account 1ZB010 in the name of The Glantz Family Foundation, Inc. (as previously defined, "GFF").  From the inception of the GFF account until his death, Edward Glantz received and reviewed monthly account statements and trade confirmations for GFF from BLMIS and corresponded with BLMIS on behalf of GFF.

155.    Edward Glantz, as president of GFF, wrote to BLMIS requesting that duplicate monthly account statements be sent to Glantz, who at the time was GFF's vice president.  At least from December 1995 forward, throughout the existence of the GFF account, Glantz received and reviewed monthly account statements and trade confirmations for GFF from BLMIS and corresponded with BLMIS on behalf of GFF.

156.    In May 1993, Elaine Ostrin opened account 1ZB125 in the name of Ostrin Family Account ("OFA"), a general partnership.  When opening this account, Elaine Ostrin requested that all account information for OFA be sent to Glantz, and that duplicate OFA account statements be sent to Edward Glantz.

157.    Throughout the existence of the OFA account, Glantz, who was a general partner of OFA, received and reviewed monthly account statements and trade confirmations for OFA from BLMIS, and corresponded with BLMIS on behalf of OFA.

158.    Through the OFA account, Glantz pooled money from various investors and funneled it to BLMIS.

159.    In October 1993, Elaine Ostrin opened account 1ZB143 in the name of Jelris.

160.    Throughout the existence of the Jelris account, Glantz, who was a general partner of Jelris, received and reviewed monthly account statements and trade confirmations for Jelris from BLMIS, and corresponded with BLMIS on behalf of Jelris.   In correspondence with BLMIS, Glantz identified himself as the "managing partner" of Jelris.

161.    Edward Glantz was a trustee of ERG Trust, which was at various times either a general partner or a limited partner of Jelris.   From at least December 1995 until his death, Edward Glantz received and reviewed duplicate monthly account statements for Jelris from BLMIS and corresponded with BLMIS on behalf of Jelris.

162.    Through the Jelris account, Glantz pooled his own money and money from Elaine Ostrin, her sons Jerald and Scott Ostrin, and others, and funneled it to BLMIS.

163.    For all the accounts discussed above, as well as the Ostrin Family Partnership ("OFP") and Glantz Family Partners ("GFP") accounts described below, Glantz and those under his supervision tracked and monitored account performance.   This activity included reviewing monthly account statements received from BLMIS, corresponding with BLMIS regarding deposits and withdrawals, preparing books and records to account for and allocate purported gains among investors, calculating investors' quarterly returns, and issuing end-of-year tax statements to investors.

164.    Glantz and those under his supervision thoroughly reviewed account performance, as evidenced by numerous instances of marking individual line items on the monthly account statements, calculating expected and purported returns, monitoring purported account

transactions, commenting on purported account balances, and identifying apparent discrepancies contained in statements.

165.    Glantz and those under his supervision routinely annotated monthly account statements received from BLMIS with check marks or statements of "ok" next to purported transactions or balances, as well as handwritten calculations verifying or double-checking purported monthly ending balances.

## IX.    GLANTZ AND EDWARD GLANTZ RECEIVED ANNUAL FRAUDULENT SIDE PAYMENTS FROM BLMIS THAT TOTALED MILLIONS OF DOLLARS AND MADE CLEAR THAT BLMIS WAS A FRAUDULENT OPERATION

### A.    Madoff Provided Glantz and Edward Glantz Fraudulent Side Payments in Connection with Reinvestments with BLMIS by Merlin, Enhancement, and Telfran Investors

166.    Even after the SEC investigations and enforcement actions discussed above, Glantz and Edward Glantz continued to participate in and profit from Madoff's fraud.  Among other things, they received Fraudulent Side Payments, which BLMIS credited to accounts that Glantz and Edward Glantz owned or controlled.

167.    Following the closing of A&B's feeder fund as a result of the SEC's 1992 and 1993 actions, A&B no longer provided managers of sub-feeders, like Glantz, Edward Glantz, and their entities, a guaranteed profit for having brought investors to BLMIS.  Instead, BLMIS itself rewarded the operators of those sub-feeders, among others, using an extensive system of annual Fraudulent Side Payments.

168.    The Fraudulent Side Payments were artificial boosts in the account value of designated accounts.  To make the Fraudulent Side Payments, BLMIS employees wrote fictitious buy and sell order tickets and recorded fictitious option transactions in designated accounts owned or controlled by the individuals to be rewarded.

169.    BLMIS issued account statements reflecting these purported transactions and the fictitious gains they purported to generate.  The fraudulently inflated balances of these accounts, including the Fraudulent Side Payments, were then available for withdrawal by the accountholders.

170.    To identify, track, and reconcile the accounts of the various BLMIS customers who were to receive Fraudulent Side Payments, BLMIS employees created handwritten schedules indicating the amounts of money to be awarded through the Fraudulent Side Payments and the number of option contracts that purportedly would be purchased or sold to create those predetermined gains.  These schedules were referred to internally at BLMIS by names including "Shtup" or "Schupt."

171.    The amounts of the Fraudulent Side Payments for Glantz and Edward Glantz were determined primarily based on the amount of reinvestment by their customers, *i.e.*, how much of the money that previously had been invested with A&B through the Glantz and Edward Glantz sub-feeders was reinvested with BLMIS after the funds were shut down.

172.    Glantz helped facilitate the reinvestment of money back into BLMIS.  For example, at about the time that investors through Merlin and Enhancement received their money back from these entities, Glantz told certain investors that they could open direct investment accounts at BLMIS.  Glantz also provided investors the names and contact information for BLMIS employees to assist them in opening accounts.

**B.    Madoff's Fraudulent Side Payments to Glantz and Edward Glantz Were Fraudulent on Their Face**

173.    BLMIS's annual practice of entering fictitious option transactions into the records of accounts owned or controlled by Glantz and Edward Glantz, for the purpose of rewarding Glantz and Edward Glantz for their solicitation and pooling of funds for BLMIS, was fraudulent.

Glantz and Edward Glantz knew that the BLMIS account statements were falsified and that BLMIS was engaged in a fraud.

174.    Glantz and Edward Glantz knew that the Fraudulent Side Payments were fictitious transactions that were intended to reward them for their roles in soliciting and pooling investor money for BLMIS, rather than the result of actual securities transactions executed as part of Madoff's strategy.  Indeed, Edward Glantz explicitly stated as much in conversations with Joel Levey, who was one of Telfran's owners and the son of Edward Glantz's former accounting partner, Aaron Levey.

175.    Specifically, in approximately late 1992, Edward Glantz told Joel Levey that, if Joel Levey opened a BLMIS account, Joel Levey would receive, in addition to whatever return he would otherwise receive, an extra payment equal to $155,000 each year, based on the amount that former Telfran investors reinvested with BLMIS.

176.    Years later, in 2001, Edward Glantz told Joel Levey that these annual payments would be cut in half.  Starting in 2002, they were cut in half.

177.    Yet even though these Fraudulent Side Payments were in the nature of a commission or referral fee of a pre-determined specific amount, they were not credited to Glantz's and Edward Glantz's accounts by a BLMIS deposit or check.  Instead, BLMIS provided the Fraudulent Side Payments by entering fictitious option transactions in the accounts that purported to generate the predetermined amount.  This is not a method consistent with normal business practices for payments of commissions or referral fees.

178.    For BLMIS to be able to make the Fraudulent Side Payments, Glantz and Edward Glantz – either directly or through Avellino – had to instruct BLMIS personnel which of their accounts were to receive the Fraudulent Side Payments.  These instructions were recorded in

correspondence recovered from the files of BLMIS.  In particular, a letter dated February 3, 1994 informed Madoff that Glantz's Fraudulent Side Payments were to be provided to either the Grace account or the Glantz IRA account, and that Edward Glantz's Fraudulent Side Payments were to be provided to either the EJS account or the Jelris account.

179.    The purported speculative option transactions, by which the Fraudulent Side Payments were made, were consistently and hugely profitable.

180.    These fictitious speculative option transactions purported to create gains each year that virtually matched the predetermined amounts of the Fraudulent Side Payments to be credited to Glantz and Edward Glantz.

181.    The fraudulent character of the purported option transactions by which BLMIS made the Fraudulent Side Payments to Glantz and Edward Glantz was particularly apparent because, from 1996 through 2007, BLMIS always recorded those transactions in the month of December.  Thus, no matter the market conditions, BLMIS purported to be able to reach the predetermined amount on demand at a specific time.

182.    Moreover, as a result, each December, the statements for the accounts that received the Fraudulent Side Payments for Glantz and Edward Glantz showed greater percentage gains than the statements for other BLMIS accounts managed by Glantz and Edward Glantz. This purported outperformance by certain accounts each December starkly contrasted with the virtually uniform performance across all the accounts managed by Glantz and Edward Glantz for each of the other 11 months of each year.

183.    The fictitious nature of the option transactions was emphasized by the fact that they were inconsistent with Madoff's purported strategy and noticeably different from the option transactions typically represented as occurring in Glantz's and Edward Glantz's BLMIS

accounts.  As described above, beginning in the 1990s, Madoff purported to use an SSC strategy, involving the purchase and sale of option contracts as a hedge, to control the downside risk of price changes in the basket of stocks purchased for the same accounts.

184.    Madoff's purported use of an SSC strategy was widely known.  For example, in a December 1992 *Wall Street Journal* article regarding the SEC's action against Edward Glantz, Madoff was quoted as saying, "The basic strategy was to be long a broad-based portfolio of S&P securities and <u>hedged</u> with derivatives" (emphasis added).

185.    Glantz was well aware of Madoff's purported use of options solely for hedging purposes, having distributed materials discussing that purported strategy in detail.  For example, in 2004, Glantz distributed a Confidential Offering Circular (the "Fern Creek Circular") for Fern Creek (an entity which is described below).   The Fern Creek Circular described Madoff's purported trading strategy, including his use of options for hedging purposes (emphasis added):

> The Manager currently uses a "forward conversion" investment strategy that involves purchasing a group of Securities that mimics, but does not precisely mirror, the S&P 100 Index, and establishing <u>offsetting positions in put and call options</u> and other derivative instruments with respect to the S&P 100 Index.  The Manager then seeks to close out one or more of these positions when market movements create profit opportunities.

186.    In contrast, the option transactions that purportedly occurred in the accounts controlled by Glantz and Edward Glantz to yield the Fraudulent Side Payments did not offset existing positions in stocks in those accounts.  These fictitious option transactions did not purport to operate as a hedge to control the downside risk of price changes in stocks, but instead stood apart as option transactions purportedly designed for speculation.   These fictitious option transactions were therefore inconsistent with Madoff's purported SSC strategy.

187.    In short, Glantz and Edward Glantz knew that the purported transactions by which the Fraudulent Side Payments were paid were entirely fictitious.  They knew that, in connection

with these purported transactions, no securities were actually being traded. They knew that the Fraudulent Side Payments, and the manner in which they were provided, were irreconcilable with legitimate brokerage operations, and that BLMIS was a fraudulent operation.

188.    At a minimum, with regard to the Fraudulent Side Payments, Glantz and Edward Glantz were willfully blind to these facts suggesting a high probability of fraud.

### C.    **Glantz Received Over $2.2 Million in Fraudulent Side Payments in His BLMIS Accounts**

189.    Between November 1992 and March 1993, investors whom BLMIS attributed to Glantz, consisting primarily or entirely of former Merlin and Enhancement investors, invested approximately $10 million with BLMIS.

190.    BLMIS calculated annual Fraudulent Side Payments to Glantz based on this $10 million figure.

191.    From 1996 to 2001, BLMIS made annual Fraudulent Side Payments to Glantz in an amount approximating 2% of this $10 million figure. Based on this calculation, Glantz received from BLMIS approximately $196,000 per year in Fraudulent Side Payments from BLMIS.

192.    Beginning in 2002, the percentage for determining Glantz's annual Fraudulent Side Payment was cut in half, from 2% to 1%. As a result, from 2002 to 2007, Glantz received an annual Fraudulent Side Payment from BLMIS of approximately $98,000 per year.

193.    Glantz also received Fraudulent Side Payments in 1994 and 1995, in the amounts set forth below.

194.    Glantz's Fraudulent Side Payments from 1994 to 2007 totaled approximately $2,233,506.

195.    Glantz received his annual Fraudulent Side Payments in two designated BLMIS accounts he controlled or completely or partially beneficially owned.

196.    In 1994 and 1995, Glantz's Fraudulent Side Payments were credited to the BLMIS account held by Grace, a general partnership of which Glantz was a general partner.

197.    From 1996 through 2007, Glantz's Fraudulent Side Payments were credited to the BLMIS account held by the Glantz IRA.

198.    Upon information and belief, Glantz directly or indirectly informed BLMIS that the Grace and Glantz IRA accounts were the accounts that should receive his Fraudulent Side Payments.

199.    The specific amounts of Glantz's Fraudulent Side Payments were as follows:

Fraudulent Side Payments credited to Glantz in Grace's BLMIS account:

- $ 252,770 in 1994
- $ 211,488 in 1995

Fraudulent Side Payments credited to Glantz in the Glantz IRA's BLMIS account:

- $ 199,500 in 1996
- $ 194,850 in 1997
- $ 198,500 in 1998
- $ 194,432 in 1999
- $ 196,078 in 2000
- $ 196,350 in 2001
- $   98,196 in 2002
- $   98,392 in 2003
- $   98,328 in 2004
- $   97,776 in 2005
- $   98,042 in 2006
- $   98,804 in 2007

**D.    Edward Glantz Received Over $2.5 Million in Fraudulent Side Payments in His BLMIS Accounts**

200.    Between November 1992 and March 1993, investors whom BLMIS attributed to Edward Glantz and his former Telfran colleagues, consisting primarily or entirely of former Telfran investors, invested approximately $62 million with BLMIS.

201.    BLMIS calculated annual Fraudulent Side Payments to Edward Glantz based on this $62 million figure.

202.    From 1996 to 2001, BLMIS made annual Fraudulent Side Payments to Edward Glantz and his Telfran colleagues in an amount approximating 1% of this $62 million figure.  As part owner of Telfran, Edward Glantz received a 37.5% share of these annual Fraudulent Side Payments.  Edward Glantz thus received from BLMIS approximately $232,500 in annual Fraudulent Side Payments.

203.    Beginning in 2002, the percentage for determining Edward Glantz's annual Fraudulent Side Payment was cut in half.  As a result, from 2002 to 2007, Edward Glantz received from BLMIS an annual Fraudulent Side Payment from BLMIS of approximately $116,250.

204.    Edward Glantz also received Fraudulent Side Payments in 1994 and 1995, in the amounts set forth below.

205.    Edward Glantz's Fraudulent Side Payments from 1994 to 2007 totaled approximately $2,539,778.

206.    Edward Glantz received his annual Fraudulent Side Payments in two designated BLMIS accounts he controlled or completely or partially beneficially owned.

207.    In 1994 and 1995, Edward Glantz's Fraudulent Side Payments were credited to the BLMIS account held by EJS.  In this period, ERG Trust, which Edward Glantz controlled, was a general partner of EJS.

208.    From 1996 through 2007, Edward Glantz's Fraudulent Side Payments were credited to the BLMIS account held by Jelris.  In this period, ERG Trust was a limited partner of Jelris.

38

209.    Upon information and belief, Edward Glantz directly or indirectly informed BLMIS that the EJS and Jelris accounts should receive his Fraudulent Side Payments.

210.    The specific amounts of Edward Glantz's Fraudulent Side Payments were as follows:

Fraudulent Side Payments received by Edward Glantz in EJS's BLMIS account:

- $  365,400 in 1994
- $    90,638 in 1995

Fraudulent Side Payments received by Edward Glantz in Jelris's BLMIS account:

- $  231,420 in 1996
- $  231,872 in 1997
- $  230,260 in 1998
- $  230,144 in 1999
- $  233,682 in 2000
- $  229,500 in 2001
- $  116,232 in 2002
- $  116,464 in 2003
- $  115,680 in 2004
- $  115,430 in 2005
- $  116,816 in 2006
- $  116,240 in 2007

211.    Cumulatively, from 1994 to 2007, Glantz and Edward Glantz received approximately $4,773,284 in Fraudulent Side Payments.

## X.    GLANTZ'S AND EDWARD GLANTZ'S KNOWLEDGE OF ADDITIONAL FACTS MADE THEM AWARE THAT BLMIS WAS A FRAUDULENT OPERATION

212.    Apart from the Fraudulent Side Payments, Glantz and Edward Glantz knew of additional facts that made them aware of the fraud at BLMIS including, but not limited to (a) guaranteed and consistently positive double-digit annual returns that were too good to be true and were not correlated to the performance of the S&P 100 Index; (b) repeated instances in which BLMIS provided Glantz and Edward Glantz substantially more cash than was purportedly available in their accounts, without charging margin interest; and (c) BLMIS's purported use of

an auditing firm that lacked the resources to audit an organization of the size and scope of BLMIS.

A.    **Glantz's and Edward Glantz's Accounts Received Guaranteed and Consistently Positive Double-Digit Annual Returns**

213.    Certain investors' BLMIS accounts were favored to receive, in addition to the Fraudulent Side Payments, a second benefit, *i.e.*, guaranteed annual rates of return.

214.    BLMIS accounts owned or controlled by Glantz and Edward Glantz were among the BLMIS accounts that were promised and received guaranteed rates of return.  As detailed below, by 1995, accounts owned or controlled by Glantz and Edward Glantz initially received a guarantee of annual gains of at least approximately 17%.  Over the ensuing years, the guarantee for these accounts was reduced a number of times, also as detailed below.

215.    Glantz knew that BLMIS accounts under his and his father's control were promised and received these guaranteed rates of return.  Indeed, Glantz had relied on guaranteed rates of return to profit from the A&B sub-feeder funds for decades.  Glantz's knowledge of the guaranteed rates of return is evidenced by his own creation and issuance of promissory notes guaranteeing rates of return to his investors, with regard to one of these accounts, the account maintained by the Glantz-controlled entity Ostrin Family Account (as defined above, "OFA").  Glantz's knowledge is also evidenced by the impossibly consistent positive double-digit annual returns reflected in the account statements for these accounts.

216.    Yet, as Glantz knew, guaranteed rates of return are irreconcilable with the nature of an investment advisory account invested in the securities markets.  In particular, Glantz understood that, from the 1990s forward, Madoff purported to use the SSC strategy for the IA Accounts.  As detailed below, while the SSC strategy would, if actually employed, tend to limit

volatility, it would not eliminate it or enable an investment advisory account to achieve a guaranteed level of performance.

### 1. Promissory Notes Issued by OFA Demonstrate Glantz's Knowledge of Fraudulently Guaranteed Returns

217.    After the shutdown of Merlin and Enhancement, and the related court-imposed injunctions and fines, Glantz nevertheless engaged in similar activity by issuing promissory notes on behalf of OFA.  The promissory notes and other assurances that Glantz provided on behalf of OFA guaranteed his investors a specific rate of return, evidencing his knowledge of BLMIS's fraudulently guaranteed rates of return.

218.    OFA held BLMIS account 1ZB125, from at least May 1993 to July 2004.  This BLMIS account was OFA's sole investment.

219.    In exchange for certain investors' investments into OFA, Glantz, as "Managing Partner" of OFA, executed and delivered promissory notes promising to pay interest at a fixed annual rate for the following year.

220.    Specifically, from 1999 through 2004, Glantz issued and executed at least twenty-eight promissory notes on OFA's behalf to at least thirteen different investors.

221.    Each of these promissory notes obligated OFA to pay to the investor, on December 31 following the date of issuance of the promissory note, the investor's principal plus interest at a fixed annual interest rate.  For instance, on January 1, 1999, Glantz executed promissory notes on behalf of OFA that obligated it to pay interest on the investors' principal at the rate of 17% for the following year, payable on December 31, 1999.

222.    Over time, consistent with the decreased guaranteed rates of return paid by BLMIS to the BLMIS accounts managed by Glantz, Glantz lowered the interest rates promised in OFA promissory notes.  Specifically, promissory notes issued by OFA in 1999 and 2000

41

promised interest of 17%; promissory notes issued by OFA in 2001 and 2002 promised interest of 12% to 13%; and promissory notes issued by OFA in 2003 and 2004 promised interest of 10% to 11%.

223.    Other investors in OFA did not receive promissory notes promising a fixed interest rate to be paid on their investments. Instead, this group of investors in OFA received assurances from Glantz and those operating under his supervision as to a specified range of "interest" they would receive on their invested money.

224.    For example, in a letter dated August 31, 2000, Katherine Washburn, identified in the letter as "Assistant to Richard Glantz," wrote to one OFA investor: "[E]nclosed is a statement of your account to date showing 17% interest earned. This percentage may change. Generally, it is a little higher than that."

225.    The following year, Ms. Washburn sent a letter dated July 31, 2001 to a different OFA investor. In this letter, Ms. Washburn was identified with the title "Account Manager." Ms. Washburn assured this investor that "the annual rate of return can vary from 13% to 20%."

226.    As OFA's sole investment was its BLMIS account, OFA's returns were completely dependent on the performance of its BLMIS account.

227.    Glantz's issuance of these promissory notes, and these other assurances provided to investors, demonstrate Glantz's knowledge that OFA's BLMIS account was assured of receiving guaranteed rates of return from BLMIS. Otherwise, Glantz could not have guaranteed returns in this manner to OFA's investors. However, as Glantz knew, these guaranteed rates of return were irreconcilable both with the nature of investment accounts engaged in actual securities trading in the marketplace, and with Madoff's purported investment strategy.

228.    Glantz thus knew that BLMIS was not conducting, and could not possibly be conducting, the securities transactions it purported.  Rather, these guaranteed rates of return demonstrated to Glantz that BLMIS was engaged in a fraud.

229.    At a minimum, with regard to these guaranteed rates of return, Glantz was willfully blind to these facts suggesting a high probability of fraud.

### 2.    Glantz's and Edward Glantz's Accounts Received Impossibly Consistent Positive Double-Digit Annual Returns

230.    Glantz's knowledge that Madoff had guaranteed specified rates of return in the BLMIS accounts managed by Glantz is also evidenced by impossibly consistent positive double-digit annual returns reflected in the account statements for accounts controlled by Glantz and Edward Glantz.

231.    As Glantz knew, the SSC strategy was a "collared" investment strategy that was supposed to track the S&P 100 and also temper investors' exposure to volatility in that market. A guaranteed year-in, year-out consistent profit was not possible under the SSC strategy.  At best, this strategy would have reduced the effect of market peaks and valleys but could not have eliminated volatility.

232.    The returns in investment accounts that actually followed the SSC strategy would be closely correlated to the S&P 100, but without any sharp down- or up-swings.  The options collars attached to stock purchases would ensure that when the S&P 100 dropped, the investors' accounts would not drop quite as far.  Collapses in stock price would be hedged by put contracts.

233.    At the same time, when the S&P 100 went up, SSC customer gains would be tempered by the sale of call contracts to fund the purchase of put options.

234.    It would be impossible for SSC investors to obtain gains on their investment when the S&P 100 was significantly down.  This is because downswings were purportedly hedged by

put options.  The exercise of put options would not have turned losses into gains; it would simply have put a floor on losses.

235.    Similarly, it would be impossible for SSC investors to outperform the S&P 100 during a major upswing, as the call options that were sold would have been exercised during a significant market upswing, putting a ceiling on gains.

236.    The 13 years from 1995 through 2007 included many periods of market volatility, including such events as the Asian financial crisis of 1997, the bursting of the "dot.com bubble" beginning in 2000, and the September 11, 2001 terrorist attacks.  During this time, the S&P 100 Index experienced many periods of losses, including years with double-digit losses.

237.    In contrast, from 1995 through 2007 (the last year for which complete figures are available), BLMIS accounts controlled and overseen by Glantz and Edward Glantz – specifically, EJS, Jelris, Grace, GFF, the Glantz IRA and the Edward Glantz IRA – purported to generate consistent, double-digit positive annual returns, regardless of general market fluctuations.

238.    Specifically, in the 13 years from 1995 through 2007, the S&P 100 Index recorded an annual gain in nine years, but an annual loss in four years.  In three of those years, the annual loss in the S&P 100 Index exceeded 10%.

239.    In contrast, in the same 13 years, the BLMIS accounts held by EJS, Jelris, Grace, GFF, the Glantz IRA and the Edward Glantz IRA reflected purported positive returns of no less than approximately 10% every single year.

240.    Further, the purported annual returns in these accounts reflect a periodic reduction of the guaranteed returns applicable to these accounts, as follows:  From 1995 through 1999, these accounts received guaranteed rates of return of at least approximately 17%; from 2000

44

through 2002, these accounts received guaranteed rates of return of at least approximately 14%; and from 2003 through 2007, these accounts received guaranteed rates of return of at least approximately 10%.

241.   Through his management and oversight of these accounts, including review of BLMIS account statements, Glantz was aware that these accounts posted purported annual results that were impossibly consistent and irreconcilable with actual securities trading in the marketplace consistent with the SSC strategy in which BLMIS purported to engage.

242.   Glantz thus knew that BLMIS was not conducting the securities transactions it purported.  Rather, these consistently positive double-digit annual rates of return demonstrated to Glantz that BLMIS was engaged in a fraud.

243.   At a minimum, with regard to these consistently positive double-digit annual rates of return, Glantz was willfully blind to these facts suggesting a high probability of fraud.

**B.      BLMIS Provided Glantz and Edward Glantz Cash Payments in the Hundreds of Thousands of Dollars, from Accounts with Much Less Available Cash, Without Charging Margin Interest**

244.   Between December 1995 and December 2008, Glantz and Edward Glantz frequently requested withdrawals of cash that exceeded the amount of cash purportedly available in the accounts under their control, as set forth in BLMIS account statements they received and reviewed.

245.   Between December 1995 and December 2008, there were at least 153 instances of cash withdrawals that exceeded the amounts of cash purportedly available in the accounts of Grace, EJS, GFF, Jelris, the Glantz IRA, the Edward Glantz IRA, OFA and OFP.

246.    These withdrawals were spread among these eight BLMIS accounts as follows:

| Account | Number of Withdrawals That Exceeded Cash Purportedly Available |
|---|---|
| Grace | 33 |
| EJS | 29 |
| GFF | 24 |
| Jelris | 23 |
| Glantz IRA | 4 |
| Edward Glantz IRA | 12 |
| OFA | 18 |
| OFP | 10 |

247.    In each of these 153 instances, BLMIS provided the cash withdrawal as requested, despite the fact that the respective account statements indicated a lack of sufficient cash to fund the withdrawal.

248.    In each of these 153 instances, BLMIS provided the cash withdrawal without purporting to liquidate securities held in these accounts to provide sufficient cash to fund the withdrawal.

249.    Further, in each of these 153 instances, BLMIS did not charge the account any margin interest for the unfunded cash payment.  BLMIS thus purported to provide the accounts controlled by Glantz and Edward Glantz with interest-free loans lasting until the accounts were returned to a positive cash balance.

250.    For example, in early June 1999, one of Glantz's assistants, on behalf of Glantz, sent a letter to BLMIS requesting a $400,000 withdrawal from EJS's BLMIS account.

251.    In response, BLMIS issued EJS a $400,000 check on June 9, 1999.

252.    However, EJS's BLMIS account statements indicate that, as of June 9, 1999, before accounting for the $400,000 withdrawal, the account had a reported cash balance of only approximately $1,000.

46

253.    As a result, the $400,000 withdrawal amounted to an unfunded payment of approximately $399,000 from BLMIS to EJS.

254.    EJS's account statements indicate that no cash deposits or purported securities sales sufficient to fund the $400,000 withdrawal took place until at least June 16, 1999.

255.    EJS's account statements reflect that BLMIS did not charge EJS any interest for this cash payment.

256.    As another example, on March 29, 2005, Glantz, or an individual under his supervision, sent a fax to BLMIS requesting a $500,000 withdrawal from Grace's BLMIS account.

257.    In response, on or about April 1, 2005, BLMIS issued Grace a $500,000 wire transfer.

258.    However, Grace's account statements indicate that, as of April 1, 2005, before accounting for the $500,000 withdrawal, the account had a purported cash balance of less than one dollar.

259.    As a result, the $500,000 withdrawal amounted to an unfunded payment of almost $500,000 from BLMIS to Grace.

260.    Grace's account statements reflect that no cash deposits or purported securities sales sufficient to fund the $500,000 withdrawal took place until at least April 5, 2005.

261.    Grace's account statements reflect that BLMIS did not charge Grace any interest for this cash payment.

262.    Edward Glantz frequently requested cash withdrawals on behalf of GFF that exceeded the amount of cash purportedly available in the GFF BLMIS account.

263.    As examples, Edward Glantz wrote handwritten letters to BLMIS dated April 7, 1998, August 3, 1999, April 7, 2003, and August 1, 2005, requesting withdrawals from GFF's BLMIS account of $35,000, $20,000, $40,000 and $30,000, respectively.

264.    GFF's account statements indicate that BLMIS issued withdrawal checks in the amounts requested shortly after the dates of each of these letters.

265.    However, GFF's BLMIS account statements indicate that, as of the dates the withdrawal checks were issued, in each of these instances the account had a purported cash balance of less than $600.  In one of these instances, the account had a purported cash balance of less than one dollar.  As a result, each of these withdrawals amounted to an unfunded payment from BLMIS to GFF.

266.    GFF's account statements reflect that no cash deposits or purported securities sales sufficient to fund these withdrawals took place until at least six days after the withdrawal checks were issued.

267.    GFF's account statements reflect that BLMIS did not charge GFF any interest for these cash payments.

268.    Glantz and Edward Glantz were aware of these unfunded cash payments by BLMIS and knew they were fraudulent.  They knew that no legitimate, investment manager or broker-dealer would repeatedly advance cash payments to a customer without charging interest.

269.    In addition, the fact that BLMIS provided cash in these instances to Glantz and Edward Glantz upon request and without any cost further indicated to Glantz and Edward Glantz that the account statements for these accounts were fraudulent, in that the accounts were not, as represented in the statements, fully or almost fully invested in securities.  This is further evidence

that Glantz and Edward Glantz knew that BLMIS was not engaging in the securities transactions that were represented on the account statements.

270.    At a minimum, with regard to these unfunded cash payments, Glantz and Edward Glantz were willfully blind to these facts suggesting a high probability of fraud.

### C.    Glantz and Edward Glantz Knew that BLMIS's Unqualified Auditor Was a Badge of Fraud

271.    Glantz and Edward Glantz knew facts showing that BLMIS's purported auditor was not reasonably capable of performing the required auditing functions for BLMIS.

272.    BLMIS purported to have tens of billions of dollars under management.  Yet Glantz and Edward Glantz knew that BLMIS purported to be audited by Friehling & Horowitz. As alleged above, Friehling & Horowitz had only three employees, one of whom was an administrative assistant and one of whom was semi-retired.  BLMIS had disclosed that its auditor was Friehling & Horowitz on publicly available SEC forms.  Glantz's own files contained the annual audited report for BLMIS for the year ended October 31, 2000, which indicated Friehling & Horowitz as the auditor.

273.    Glantz and Edward Glantz had substantial knowledge about public accounting and the resources needed to conduct audits of organizations of the size and scope of BLMIS.  As alleged above, Edward Glantz was a Certified Public Accountant and principal of an accounting firm for over four decades.  Glantz earned his Bachelors of Arts degree in accounting and for a time worked for the accounting firm Alpern & Heller, the predecessor to A&B.

274.    Glantz and Edward Glantz knew that Friehling & Horowitz was clearly incapable of providing large-scale domestic and international auditing services to BLMIS and the large amounts of money it purported to have under management.

275.    Further, as a Certified Public Accountant, Edward Glantz knew that all accounting firms that perform audit work must enroll in the peer review program of the American Institute of Certified Public Accountants ("AICPA"). This program involves having experienced auditors assess a firm's audit quality each year. The results of these peer reviews are on public file with the AICPA. Friehling & Horowitz never appeared on the public peer review list because Friehling had notified the AICPA that he did not perform audits.

276.    Glantz's and Edward Glantz's knowledge regarding BLMIS's unqualified auditor demonstrate their actual knowledge of fraud at BLMIS. At a minimum, with regard to BLMIS's unqualified auditor, Glantz and Edward Glantz were willfully blind to these facts suggesting a high probability of fraud.

## XI.    STARTING IN 2004, GLANTZ CREATED NEW ENTITIES AND RECRUITED NEW INVESTORS TO REAP ADDITIONAL PROFIT FROM BLMIS

277.    Starting in approximately 2004, Glantz again expanded his participation in the fraud at BLMIS by forming a number of new entities through which he could further profit from the fraud being perpetrated at BLMIS.

278.    In recruiting investors, and thus raising funds to support the BLMIS operation, Glantz capitalized on social connections, such as personal friends and family, friends of friends, and former legal colleagues. Glantz also tapped fellow members of spiritual, educational, and philanthropic organizations such as an environmental non-profit organization for which he served as an attorney and board member and a spiritual school with which he worked.

279.    Glantz's expansion of his involvement with BLMIS in the period beginning in 2004 included the founding of a purported management entity, Vista Management Inc. (as previously defined, "Vista").

280.    Glantz formed Vista in 2004 as a California corporation.  Glantz was its sole owner.

281.    Glantz established Vista to be the general partner or unregistered investment adviser to a number of limited partnerships that would each raise money from investors and funnel that money to BLMIS.

282.    Glantz arranged for Vista to take purported "management fees" and other money from certain of these limited partnerships.

283.    These limited partnerships and the flow of money from them to BLMIS are summarized in the following diagram, and detailed below.



284.    In addition to serving as a means by which Glantz received purported management fees in connection with investments with BLMIS, Vista also received substantial subsequent transfers from entities managed by Glantz that received initial transfers from

51

BLMIS.  In particular, on or about November 12, 2008, less than one month before the collapse of BLMIS, EJS transferred $500,000 to Vista and Jelris transferred $475,000 to Vista.  Within approximately two weeks prior to these transfers to Vista, EJS and Jelris had received initial transfers in equal or greater amounts from BLMIS.

### A.    Fern Creek and Ostrin Family Partnership

285.    As discussed above, OFA was opened in 1993 to pool and funnel money from various investors to BLMIS.  OFA held BLMIS account 1ZB125.

286.    In mid-2004, Glantz changed the investment structure for how money would flow from OFA to BLMIS.

287.    At that time, Glantz formed Fern Creek as a Delaware limited partnership, with Vista as its general partner, to serve as a vehicle through which money could be directed to BLMIS.

288.    On June 28, 2004, Glantz wrote to BLMIS requesting the closure of the OFA BLMIS account (1ZB125) and the opening of a new account in the name of Ostrin Family Partnership (as previously defined, "OFP").  In the same correspondence, Glantz requested that the OFA account balance be transferred to the newly opened OFP account.

289.    Glantz then arranged for Fern Creek to invest with BLMIS through the newly opened OFP account, 1ZB511.  In this way, Glantz effectively rolled over the investments of former OFA investors into the newly created Delaware limited partnership, Fern Creek.

290.    Throughout the existence of the OFP account, Glantz received monthly account statements for OFP from BLMIS, and corresponded with BLMIS on behalf of OFP.

291.    Glantz advised prospective investors in Fern Creek via the Fern Creek Circular that Vista, as the general partner of Fern Creek, assumed various fiduciary duties, including the duty to "exercise good faith and integrity in handling partnership affairs."

292.    Glantz also represented to prospective Fern Creek investors in the Fern Creek Circular that (i) Vista was "responsible for selecting, monitoring and evaluating" the brokers, investment advisers or portfolio managers who would manage Fern Creek's assets; and (ii) Fern Creek's success was dependent on "the skill and acumen" of both Vista and the manager that Vista selected to manage Fern Creek's investment portfolio.

293.    Glantz acknowledged in the Fern Creek Circular that only one "manager" was engaged at that time to manage Fern Creek's assets. This was a reference to Madoff and BLMIS, even though Glantz specifically avoided referring to them by name.

294.    In this way, Glantz, through Vista, undertook responsibility for the management, operations, and investment decisions made with respect to Fern Creek and the Fern Creek investors' funds. This included a duty to perform due diligence on Fern Creek's investment performance, opportunities and risks, and in particular on any money managers entrusted with investment decisions regarding Fern Creek's funds.

**B.    Lakeview**

295.    In 2006, Glantz formed Lakeview, another Delaware limited partnership with Vista as its general partner, as an additional vehicle through which money could be invested indirectly with BLMIS.

296.    Glantz arranged for substantially all of the funds deposited into Lakeview to be placed with BLMIS feeder funds and/or BLMIS-related vehicles that were managed by others.

297.    Lakeview's partnership agreement provided that (i) Vista would receive both a monthly "management fee" as "compensation to [Vista] for [Vista]'s services in managing the investments of the Partnership" and a quarterly "special profit allocation"; and (ii) such "management fees" and "special profit allocations" would be deducted from the capital account of each Lakeview limited partner.

298.    As with Fern Creek, Glantz thereby assumed responsibility for the management, operations, and investment decisions made with respect to Lakeview and the Lakeview investors' funds.  This included a duty to perform due diligence on Lakeview's investment performance, opportunities and risks, and in particular on any money managers entrusted with investment decisions regarding Lakeview's funds.

299.    In connection with these duties, Vista was paid or allocated fees from Lakeview.

300.    Specifically, between 2006 and 2008, Vista, and thus Glantz, received in excess of $200,000 in purported "management fees" and/or "special profit allocations" as general partner of Lakeview.

301.    Glantz also furthered his scheme to profit from BLMIS's fraud by transferring his investors' money through multiple entities that he created.

302.    For example, in May 2008, Glantz had Lakeview make two withdrawals from the Rye Select Broad Market Fund totaling $3,550,000.  On approximately June 1, 2008, Glantz had Lakeview transfer $3,100,000 of that money to Grace.  Approximately one month later, on approximately July 2, 2008, Glantz had Grace transfer that $3.1 million back to Lakeview.

303.    Lakeview also received substantial subsequent transfers of initial transfers that entities managed by Glantz received from BLMIS.  In particular, on or about July 27, 2007, EJS transferred $3,500,000 to Lakeview and Jelris transferred $7,000,000 to Lakeview.  And on or about July 2, 2008, EJS transferred $800,000 to Lakeview, Jelris transferred $600,000 to Lakeview, and Grace transferred $3,100,000 to Lakeview.  Each of these transfers to Lakeview occurred within approximately one week after the receipt by EJS, Jelris and Grace, respectively, of initial transfers in equal or greater amounts from BLMIS.

C.    **Glantz Family Partners**

304.    In 2007, Glantz formed Glantz Family Partners (as previously defined, "GFP"), another Delaware limited partnership, as yet another vehicle through which investors unrelated to Glantz could invest with BLMIS.  Despite its name, none of the investors in Glantz Family Partners was a member of the Glantz family.

305.    Glantz arranged for GFP to invest with BLMIS in an account in the name of GFP, BLMIS Account No. 1G0037.

306.    Throughout the existence of the GFP account, Glantz received monthly account statements for GFP from BLMIS, and corresponded with BLMIS on behalf of GFP.

307.    GFP's partnership agreement provided that Vista was the investment adviser to GFP.

308.    GFP's partnership agreement further provided that (i) Vista would receive both a monthly "management fee" as "compensation to [Vista] for [Vista]'s services in managing the investments of the Partnership" and a quarterly "special profit allocation"; and (ii) such "management fees" and "special profit allocations" would be deducted from the capital account of each GFP limited partner.

309.    As with Lakeview, and Fern Creek before it, Glantz again assumed responsibility for the management of GFP investors' funds, including a duty of performing due diligence on money managers to whom those funds were delegated, *i.e.*, BLMIS.

310.    In connection with these duties, Vista was paid or allocated fees from GFP.

311.    Specifically, between 2007 and 2008, Vista, and thus Glantz, received in excess of $55,000 in purported "management fees" and/or "special profit allocations" as the purported investment adviser of GFP.

## XII.   GLANTZ HELPED FURTHER MADOFF'S FRAUD BY SHIELDING BLMIS'S OPERATIONS FROM SCRUTINY

312.   For decades, Glantz rebuffed various requests by prospective and actual investors for information about Madoff or for access that could enable them to engage in some due diligence regarding BLMIS and its operations.   Glantz knew that Madoff refused to allow institutions or other potential new investors access to information that would allow them insight into Madoff's operations or investment methods.

313.   For example, in the 1980s, when investors or potential depositors in Merlin or Enhancement asked Glantz questions about how the money provided to those entities was invested, Glantz frequently responded in letters that did not identify Madoff but instead referred to him as "a wholesale broker."

314.   Similarly, the Fern Creek Circular (quoted above with regard to Madoff's purported trading strategy) did not identify Madoff, but instead referred to him as the "Manager."

315.   At least one investor in Fern Creek repeatedly asked Glantz to identify the investment manager behind Fern Creek.   Glantz refused, instead representing merely that the manager was well known and respected.

316.   In 2007, one of the prospective investors in GFP told Glantz he wanted to conduct due diligence on Madoff.   Glantz responded that if the individual contacted Madoff or performed due diligence, Madoff would not allow the individual to invest with BLMIS.

317.   Separately, ABN AMRO Incorporated, the U.S.-based subsidiary of ABN AMRO (hereinafter collectively defined as "ABN AMRO"), informed Glantz in 2007 that it wanted to conduct direct due diligence on Madoff regarding a potential investment with BLMIS through Lakeview and/or a transaction with Vista.

318.    In a series of emails between Glantz and ABN AMRO, all dated February 15,

2007, Glantz stated that he had spoken directly with Madoff, and that Madoff would not allow

any such due diligence.

319.    This exchange began with an email from a representative of ABN AMRO's

Structured Credit Products group, in which he told Glantz that the ability to undertake due

diligence on BLMIS was "a critical issue for us":

> . . .I have asked [another ABN Amro representative] to contact you
> to follow up on the structure but most importantly, to see how your
> discussions have gone with Madoff with respect to our ability to
> undertake due diligence on them for this transaction.  This is a
> critical issue for us and we would appreciate a response as soon as
> practical.

320.    In Glantz's email response (emphasis added), he wrote that he had spoken with

Madoff and that Madoff would not allow any such due diligence:

> In response to your request as to having access for due diligence
> with Madoff, I spoke to Frank DiPascalli [sic] who is his
> operations chief who referred me directly to Bernie.  Bernie simply
> said no.  He does not do this. . .He said he will not have a direct
> relationship with any bank on any account.
>
> Bernie is in this way difficult and problematic.
>
> AB AMRO [sic] can get copies of all the transactions direct from
> Madoff at the same time I get them.  I will be happy to explore
> ways in which assist AB AMRO [sic] to have sufficient control of
> the account.  If credit needs to meet with Bernie or tour his plant,
> that is not possible now or in the future.

321.    ABN AMRO's representative responded to Glantz with incredulity: "Richard –

how do we invest in this fund if we do not have a direct relationship and the ability to perform

due diligence on Madoff.  We do not need to speak directly to Bernie but what about one of his

subordinates. . .Any help you can provide to get our credit people comfortable would be

appreciated."

322.    Glantz's reply made it plain that he recognized that Madoff would sooner jeopardize this potential investment than permit due diligence that might reveal the truth about his fraud.  Glantz wrote: "The question of access is not open.  Either [ABN AMRO's Structured] Credit [Products group] has enough confidence in Madoff due to its knowledge of the history of his firm or they do not."

323.    In this way, Glantz assisted Madoff in limiting possible scrutiny from ABN AMRO – a third party financial institution.  As this example demonstrates, Glantz knew that Madoff was avoiding scrutiny by institutional investors and industry professionals that might reveal the fraud.

324.    Glantz had a similar e-mail exchange, also on February 15, 2007, with other individuals contemplating a BLMIS-related transaction.  Glantz wrote: "Since I suspect the banks. . .will want access for due diligence with Madoff, I spoke to Frank DiPascalli [sic] who is his operations chief who referred me directly to Bernie.  Bernie simply said no.  He does not do this. . ."

325.    In yet another episode, Glantz emphasized Madoff's insistence on secrecy.  In December 2007, Glantz engaged in communications with the manager of an investment fund regarding the possibility that the fund would invest with BLMIS through Lakeview.  Glantz told the fund manager in an email that Madoff prohibited anyone who raised money for investment with Madoff from disclosing to investors in writing that money raised would be invested with Madoff:

> . . .I will not and I suspect no one ever puts in writing they are in Madoff in any of their documents.  Those are the rules imposed by Bernie.

326.    Glantz himself complied with these "rules imposed by Bernie."

327.    Glantz's knowledge and active support of Madoff's refusal to allow due diligence and Madoff's insistence on secrecy demonstrate Glantz's actual knowledge of, or willful blindness to, fraud at BLMIS.

## XIII.   GLANTZ ASSERTED HIS FIFTH AMENDMENT RIGHTS AGAINST SELF-INCRIMINATION WHEN EXAMINED BY THE TRUSTEE'S COUNSEL

328.    On September 30, 2010, Glantz appeared for questioning under oath by counsel for the Trustee, under a subpoena issued pursuant to Federal Rule of Bankruptcy Procedure 2004. Glantz asserted his Fifth Amendment rights against self-incrimination and refused to answer questions relating to the following topics, among others:

- Whether, in connection with the entities Frodo, Merlin and Enhancement, Glantz had solicited and raised funds that were invested with BLMIS through A&B;

- Whether Glantz engaged in a fund-raising scheme involving the receipt by Glantz's entities of guaranteed rates of return from A&B, and the payment by Glantz's entities of lower guaranteed rates of return to their investors;

- Whether the SEC found that Glantz had violated the federal securities laws, and whether he in fact had violated the federal securities laws, in connection with this raising of investor funds to be invested directly or indirectly with BLMIS;

- Whether, following the SEC's action, Glantz maintained investment management accounts at BLMIS, into which he received hundreds of thousands of dollars in finder's fees in the form of fictitious option trades;

- Whether Glantz's purpose with regard to establishing Fern Creek, Lakeview and Vista was to reap additional profits for himself from Madoff's scheme;

- Whether Madoff's purported returns in managed accounts were unrealistically high and unrealistically consistent; and

- Whether, through these and other red flags, Glantz knew or should have known that Madoff was engaged in a massive scheme or other illegal activity.

## XIV.   GLANTZ'S KNOWLEDGE OF MADOFF'S FRAUD SHOULD BE IMPUTED TO CERTAIN OTHER DEFENDANTS

329.    Glantz's and Edward Glantz's actual knowledge of and/or were willful blindness to fraud at BLMIS are imputed to other defendants, as set forth below.

### A.      **Imputation as to Merlin and Enhancement**

330.     Glantz was the primary decision maker and had ultimate authority over all significant business decisions for Merlin and Enhancement, including those related to investments directly or indirectly with BLMIS.

331.     At all relevant times, Glantz dominated, influenced, and controlled Merlin and Enhancement and their businesses, properties and affairs.   Glantz was the primary decision maker for Merlin and Enhancement and actively directed and controlled their daily activities, including their dealings with BLMIS, which Glantz knew was a fraud.

332.     As the agent and primary decision maker for Merlin and Enhancement, Glantz's knowledge of fraud and/or willful blindness to fraud at BLMIS is imputed to Merlin and Enhancement.

### B.      **Imputation as to Grace, EJS and Jelris**

333.     Glantz was the primary decision maker and had ultimate authority over all significant business decisions for Grace, EJS and Jelris, including those related to investments directly or indirectly with BLMIS.

334.     At all relevant times, Glantz dominated, influenced, and controlled Grace, EJS, and Jelris and their businesses, properties, and affairs.   Glantz was the primary decision maker for Grace, EJS, and Jelris and actively directed and controlled their daily activities, including their dealings with BLMIS, which Glantz knew was a fraud.

335.     As the agent, primary decision maker and general partners of Grace, EJS and Jelris, Glantz's knowledge of fraud and/or willful blindness to fraud at BLMIS is imputed to Grace, EJS, and Jelris.

### C.    Imputation as to Glantz Family Foundation (GFF)

336.    Glantz and Edward Glantz were the primary decision makers and made all significant business decisions for GFF related to investments directly or indirectly with BLMIS.

337.    At all relevant times, Glantz and/or Edward Glantz dominated, influenced, and controlled GFF and its business, property, and affairs related to investments directly or indirectly with BLMIS.  Glantz and Edward Glantz were the primary decision makers and actively directed and controlled its dealings related to investments directly or indirectly with BLMIS, which Glantz and Edward Glantz knew was a fraud.

338.    As the agents and primary decision makers of GFF, Glantz's and Edward Glantz's knowledge of fraud and/or willful blindness to fraud at BLMIS is imputed to GFF.

### D.    Imputation as to Vista and Lakeview

339.    Glantz was the primary decision maker and had ultimate authority over all significant business decisions for Vista and Lakeview, including those related to investments directly or indirectly with BLMIS.

340.    At all relevant times, Glantz dominated, influenced, and controlled Vista and Lakeview and their businesses, properties, and affairs.  Glantz was the primary decision maker for Vista and Lakeview and actively directed and controlled their daily activities, including their dealings with BLMIS, which Glantz knew was a fraud.

341.    As President of Vista, Glantz communicated with Lakeview investors, managed Lakeview's day-to-day operations, and exercised control over Lakeview.

342.    As the agent and primary decision maker of Vista and Lakeview, Glantz's knowledge of fraud and/or willful blindness to fraud at BLMIS is imputed to Vista and Lakeview.

E. **Imputation as to Trusts and ERG Estate**

343.    As trustee of RMG Trust, G-O Trust I, G-O Trust II and ERG Trust; and, upon information and belief, as trustee of TG Trust and personal representative of ERG Estate, Glantz's knowledge of fraud and/or willful blindness to fraud at BLMIS is imputed to these trusts and ERG Estate.

344.    In addition, Glantz was a decision maker and had ultimate authority over all or some significant business decisions for RMG Trust; and, upon information and belief, for G-O Trust I, G-O Trust II, ERG Trust, TG Trust and ERG Estate, including those related to investments directly or indirectly with BLMIS.

345.    At all relevant times, Glantz dominated, influenced, and controlled RMG Trust and its businesses, properties, and affairs; and, upon information and belief, G-O Trust I, G-O Trust II, ERG Trust, TG Trust, ERG Estate, and their respective businesses, properties, and affairs.  Glantz was the primary decision maker for RMG Trust and, upon information and belief, G-O Trust I, G-O Trust II, ERG Trust, TG Trust and ERG Estate and actively directed and controlled their daily activities, including their dealings with BLMIS, which Glantz knew was a fraud.

346.    As the agent and primary decision maker of each of RMG Trust, G-O Trust I, G-O Trust II, ERG Trust, TG Trust and ERG Estate, Glantz's knowledge of fraud and/or willful blindness to fraud at BLMIS is imputed to these trusts and ERG Estate.

347.    Additionally, because RMG Trust, TG Trust and ERG Trust were general partners with Glantz in EJS and Jelris, Glantz's knowledge of fraud and/or willful blindness to fraud at BLMIS is imputed to RMG Trust, TG Trust and ERG Trust.

F.    **Imputation as to Elaine Ostrin**

348.    Because Elaine Ostrin was a general partner with Glantz in EJS and Jelris, Glantz's knowledge of fraud and/or willful blindness to fraud at BLMIS is imputed to Elaine Ostrin.

## XV.    THE ACCOUNT AGREEMENTS

349.    According to BLMIS's records, Defendants maintained accounts with BLMIS (Nos. 1T0026, 1ZA169, 1ZA192, 1ZB010, 1ZB143, 1M0057, 1E0128, 1ZR010, and 1ZR176) (collectively, the "Accounts") in the name of, respectively, Grace, RMG Trust, EJS, GFF, Jelris, Merlin & Associates, Enhancement, the Glantz IRA, and the Edward Glantz IRA (collectively, the "Initial Transferee Defendants"), as set forth on Exhibit A.  Glantz and/or Edward Glantz managed, controlled, and/or oversaw the Accounts.  Upon information and belief, for each of the Accounts, a "Customer Agreement," "Option Agreement," and/or "Trading Authorization Limited to Purchases and Sales of Securities and Options" (collectively, the "Account Agreements") were executed and delivered to BLMIS at its headquarters in New York, New York.  Additionally, there were periodic customer statements, confirmations, and other communications made by BLMIS or Madoff and sent to the Initial Transferee Defendants.

350.    The Account Agreements were to be performed in New York, New York, through securities trading activities that would take place in New York, New York.  The Accounts were held in New York, New York, and the Accountholders sent funds by check or wire transfer for deposit to BLMIS and/or BLMIS's bank accounts, including an account at JPMorgan Chase Bank, Account #xxxxxxxxxxx1703, in New York, New York, for application to the Accounts and the purported conducting of trading activities.

## XVI.  THE TRANSFERS

351.   The Transfers total $113,385,537, of which $40,954,338 constitute Fictitious Profits.  The Transfers include, but are not limited to, the Transfers listed on Exhibit B.

352.   The Transfers are avoidable and recoverable under §§ 544, 548, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) and 213(8) (McKinney 2001) and N.Y. Debt & Cred. Law §§ 273-279 (McKinney 2001).

### A.   Initial Transfers

353.   The Initial Transferee Defendants each received initial transfers from BLMIS.

354.   Prior to the Filing Date, BLMIS made payments to Merlin in the amount of $26,981,338 (the "Merlin Transfers") in connection with the Merlin Account, No. 1M0057.  The Merlin Transfers are set forth on page 3, column 5 on Exhibit B annexed hereto.

355.   Prior to the Filing Date, BLMIS made payments to Enhancement in the amount of $3,197,516 (the "Enhancement Transfers") in connection with the Enhancement Account, No. 1E0128.  The Enhancement Transfers are set forth on page 2, column 5 on Exhibit B annexed hereto.

356.   Prior to the Filing Date, BLMIS made payments to EJS in the total amount of $16,924,380 in connection with EJS's BLMIS account, No. 1ZA192 (the "EJS Transfers").  The EJS Transfers are set forth on pages 7 and 8, column 5 on Exhibit B annexed hereto.  Of the EJS Transfers, $9,947,031 constituted Fictitious Profits.  *See* page 8, column 15 on Exhibit B.

357.   Of the EJS Transfers, BLMIS made payments to EJS of $11,150,000 (the "EJS Six Year Transfers") during the six years prior to the Filing Date, which are avoidable and recoverable under §§ 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and N.Y. Debt & Cred. Law §§ 273-279 (McKinney 2001).

Of the EJS Six Year Transfers, $9,947,031 constituted Fictitious Profits.  *See* page 8, columns 12 and 13 on Exhibit B.

358.    Of the EJS Six Year Transfers, BLMIS made payments to EJS of $7,700,000 (the "EJS Two Year Transfers") during the two years prior to the Filing Date, which are avoidable and recoverable under §§ 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).  All of the EJS Two Year Transfers constituted Fictitious Profits.  *See* page 8, columns 10 and 11 on Exhibit B.

359.    Prior to the Filing Date, BLMIS made payments to Jelris in the total amount of $22,088,220 in connection with Jelris's BLMIS account, No. 1ZB143 (the "Jelris Transfers"). The Jelris Transfers are set forth on page 10, column 5 on Exhibit B annexed hereto.  Of the Jelris Transfers, $16,954,688 constituted Fictitious Profits.   *See* page 10, column 15 on Exhibit B.

360.    Of the Jelris Transfers, BLMIS made payments to Jelris of $15,325,000 (the "Jelris Six Year Transfers") during the six years prior to the Filing Date, which are avoidable and recoverable under §§ 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and N.Y. Debt & Cred. Law §§ 273-279 (McKinney 2001). All of the Jelris Six Year Transfers constituted Fictitious Profits.  *See* page 10, columns 12 and 13 on Exhibit B.

361.    Of the Jelris Six Year Transfers, BLMIS made payments to Jelris of $11,500,000 (the "Jelris Two Year Transfers") during the two years prior to the Filing Date, which are avoidable and recoverable under §§ 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).  All of the Jelris Two Year Transfers constituted Fictitious Profits.  *See* page 10, columns 10 and 11 on Exhibit B.

362.    Prior to the Filing Date, BLMIS made payments to Grace in the total amount of $27,966,431 in connection with Grace's BLMIS account, No. 1T0026 (the "Grace Transfers"). The Grace Transfers are set forth on pages 4 and 5, column 5 on Exhibit B annexed hereto.  Of the Grace Transfers, $7,374,165 constituted Fictitious Profits.  *See* page 5, column 15 on Exhibit B.

363.    Of the Grace Transfers, BLMIS made payments to Grace of $12,720,000 (the "Grace Six Year Transfers") during the six years prior to the Filing Date, which are avoidable and recoverable under §§ 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and N.Y. Debt & Cred. Law §§ 273-279 (McKinney 2001).  Of the Grace Six Year Transfers, $7,374,165 constituted Fictitious Profits. *See* page 10, columns 12 and 13 on Exhibit B.

364.    Of the Grace Six Year Transfers, BLMIS made payments to Grace of $6,750,000 (the "Grace Two Year Transfers") during the two years prior to the Filing Date, which are avoidable and recoverable under §§ 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).  All of the Grace Two Year Transfers constituted Fictitious Profits.  *See* page 5, columns 10 and 11 on Exhibit B.

365.    Prior to the Filing Date, BLMIS made payments to RMG Trust in the total amount of $525,000 in connection with RMG Trust's BLMIS account, No. 1ZA169 (the "RMG Trust Transfers").  The RMG Trust Transfers are set forth on page 6, column 5 on Exhibit B annexed hereto.  Of the RMG Trust Transfers, $25,000 constituted Fictitious Profits.  *See* page 6, column 15 on Exhibit B.

366.    Prior to the Filing Date, BLMIS made payments to GFF in the total amount of $1,527,500 in connection with GFF's BLMIS account, No. 1ZB010 (the "GFF Transfers").  The

GFF Transfers are set forth on page 9, column 5 on Exhibit B annexed hereto. Of the GFF Transfers, $507,500 constituted Fictitious Profits. *See* page 9, column 15 on Exhibit B.

367.    Of the GFF Transfers, BLMIS made payments to GFF of $785,000 (the "GFF Six Year Transfers") during the six years prior to the Filing Date, which are avoidable and recoverable under §§ 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and N.Y. Debt & Cred. Law §§ 273–279 (McKinney 2001). Of the GFF Six Year Transfers, $507,500 constituted Fictitious Profits. *See* page 9, columns 12 and 13 on Exhibit B.

368.    Of the GFF Six Year Transfers, BLMIS made payments to GFF of $385,000 (the "GFF Two Year Transfers") during the two years prior to the Filing Date, which are avoidable and recoverable under §§ 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3). All of the GFF Two Year Transfers constituted Fictitious Profits. *See* page 9, columns 10 and 11 on Exhibit B.

369.    Prior to the Filing Date, BLMIS made payments to Glantz IRA Beneficiaries in the total amount of $9,307,173 in connection with the Glantz IRA's BLMIS account, No. 1ZR010 (the "Glantz IRA Transfers"). The Glantz IRA Transfers are set forth on page 11, column 5 on Exhibit B annexed hereto. Of the Glantz IRA Transfers, $3,327,989 constituted Fictitious Profits. *See* page 11, column 15 on Exhibit B.

370.    Of the Glantz IRA Transfers, BLMIS made payments to Glantz IRA Beneficiaries of $7,100,000 (the "Glantz IRA Six Year Transfers") during the six years prior to the Filing Date, which are avoidable and recoverable under §§ 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and N.Y. Debt & Cred. Law §§

273–279 (McKinney 2001). Of the Glantz IRA Six Year Transfers, $3,327,989 constituted Fictitious Profits. *See* page 11, columns 12 and 13 on Exhibit B.

371.    Of the Glantz IRA Six Year Transfers, BLMIS made payments to Glantz IRA Beneficiaries of $6,000,000 (the "Glantz IRA Two Year Transfers") during the two years prior to the Filing Date, which are avoidable and recoverable under §§ 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3). Of the Glantz IRA Two Year Transfers, $3,327,989 constituted Fictitious Profits. *See* page 11, columns 10 and 11 on Exhibit B.

372.    Prior to the Filing Date, BLMIS made payments to Edward Glantz IRA Beneficiaries in the total amount of $4,867,979 in connection with the Edward Glantz IRA's BLMIS account, No. 1ZR176 (the "Edward Glantz IRA Transfers"). The Edward Glantz IRA Transfers are set forth on page 12, column 5 on Exhibit B annexed hereto. Of the Edward Glantz IRA Transfers, $2,817,965 constituted Fictitious Profits. *See* page 12, column 15 on Exhibit B.

373.    Of the Edward Glantz IRA Transfers, BLMIS made payments to Edward Glantz IRA Beneficiaries of $2,275,000 (the "Edward Glantz IRA Six Year Transfers") during the six years prior to the Filing Date, which are avoidable and recoverable under §§ 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and DCL §§ 273–279 (McKinney 2001). All of the Edward Glantz IRA Six Year Transfers constituted Fictitious Profits. *See* page 12, columns 12 and 13 on Exhibit B.

374.    Of the Edward Glantz IRA Six Year Transfers, BLMIS made payments to Edward Glantz IRA Beneficiaries of $765,000 (the "Edward Glantz IRA Two Year Transfers") during the two years prior to the Filing Date, which are avoidable and recoverable under §§ 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA,

particularly § 78fff-2(c)(3).  All of the Edward Glantz IRA Two Year Transfers constituted Fictitious Profits.  *See* page 12, columns 10 and 11 on Exhibit B.

###   B.    Subsequent Transfers

375.    Upon information and belief, the Initial Transferee Defendants subsequently transferred some or all of the Transfers, directly or indirectly, to Austin Bosarge, EJS, GFF, ERG Estate, ERG Trust, TG Estate, TG Trust, Glantz, RMG Trust, Grace, Jelris, Lakeview,  Elaine Ostrin, G-O Trust I, G-O Trust II, and Vista (collectively, the "Subsequent Transferee Defendants").   Upon information and belief, the money thus transferred (the "Subsequent Transfers") includes, but is not limited to, the subsequent transfers detailed on Exhibit C.

376.    As shown on Exhibit C:

(a)    Austin Bosarge received a subsequent transfer from Jelris on the date and in the amount set forth on Exhibit C.

(b)    EJS received subsequent transfers from GFF, Grace and Jelris on the dates and in the amounts set forth on Exhibit C.

(c)    GFF received a subsequent transfer from EJS on the date and in the amount set forth on Exhibit C.

(d)    ERG Trust and/or ERG Estate received subsequent transfers from EJS and Jelris on the dates and in the amounts set forth on Exhibit C.

(e)    TG Trust and/or TG Estate received subsequent transfers from EJS and Jelris on the dates and in the amounts set forth on Exhibit C.

(f)    Glantz and/or RMG Trust received subsequent transfers from EJS, Grace and Jelris on the dates and in the amounts set forth on Exhibit C.

(g)    Grace received subsequent transfers from EJS and Jelris on the dates and in the amounts set forth on Exhibit C.

(h)    Jelris received subsequent transfers from EJS and Grace on the dates and in the amounts set forth on Exhibit C.

(i)    Lakeview received subsequent transfers from EJS, Grace and Jelris on the dates and in the amounts set forth on Exhibit C.

(j)      Elaine Ostrin received subsequent transfers from EJS and Jelris on the dates and in the amounts set forth on Exhibit C.

(k)      G-O Trust I received subsequent transfers from Jelris on the dates and in the amounts set forth on Exhibit C.

(l)      G-O Trust II received subsequent transfers from Jelris on the dates and in the amounts set forth on Exhibit C.

(m)      Vista received subsequent transfers from EJS and Jelris on the dates and in the amounts set forth on Exhibit C.

377.      The Subsequent Transfers are recoverable from the Subsequent Transferee Defendants pursuant to § 550(a) of the Bankruptcy Code.

378.      To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

379.      The Trustee's discovery and investigation are ongoing, and the Trustee reserves the right to (i) supplement the information regarding the Transfers, obligations incurred therewith, Subsequent Transfers, and any additional transfers or subsequent transfers and (ii) seek avoidance and recovery of such transfers.

**COUNT ONE
FRAUDULENT TRANSFERS–
11 U.S.C. §§ 105(a), 548(a)(1)(A), 550(a) AND 551**

**(EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and
Edward Glantz IRA Beneficiaries)**

380.      The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

381.      Each of the Two Year Transfers was made on or within two years before the Filing Date.

382.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA.

383.    Each of the Two Year Transfers was made or incurred by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Two Year Transfers to or for the benefit of EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries in furtherance of a fraudulent scheme.

384.    Each of the Two Year Transfers constitutes fraudulent transfers avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and recoverable from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries pursuant to § 550(a) of the Bankruptcy Code and § 78fff-(2)(c)(3) of SIPA.

385.    As a result of the foregoing, pursuant to §§ 105(a), 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries for the benefit of the BLMIS estate; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the Two Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate.

**COUNT TWO**
**FRAUDULENT TRANSFERS–**
**11 U.S.C. §§ 105(a), 548(a)(1)(B), 550(a) AND 551**

**(EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and**
**Edward Glantz IRA Beneficiaries)**

386.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

387.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

388.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA.

389.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

390.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers.

391.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small amount of capital.

392.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

393.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code, which is recoverable from EJS,

Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, pursuant to § 550(a) of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA.

394.    As a result of the foregoing, pursuant to §§ 105(a), 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries: (a) avoiding and preserving the Two Year Transfers; (b) directing that the transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries for the benefit of the BLMIS estate; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the Two Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate.

### COUNT THREE
### FRAUDULENT TRANSFERS–
### NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a,  278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 544(b), 550(a) AND 551

**(EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and
Edward Glantz IRA Beneficiaries)**

395.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

396.    At all times relevant to the Six Year Transfers, there has been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of the Bankruptcy Code.

73

397.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under § 270 of the N.Y. Debt. & Cred. Law.

398.    Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries in furtherance of a fraudulent investment scheme.

399.    Each of the Six Year Transfers was received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries with the actual intent to hinder, delay, or defraud the creditors or future creditors of BLMIS at the time of each of the Six Year Transfers.

400.    As a result of the foregoing, pursuant to §§ 276, 276-a, 278 and/or 279 of the N.Y. Debt. & Cred. Law, §§ 105(a), 544(b), 550(a) and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries for the benefit of the BLMIS estate; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate.

## COUNT FOUR
## FRAUDULENT TRANSFERS–
## NEW YORK DEBTOR AND CREDITOR LAW
## §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 544(b), 550(a) AND 551

### (EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and
### Edward Glantz IRA Beneficiaries)

401.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

402.    At all times relevant to the Six Year Transfers there has been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of the Bankruptcy Code.

403.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under § 270 of the N.Y. Debt. & Cred. Law.

404.    BLMIS did not receive fair consideration for the Six Year Transfers.

405.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

406.    As a result of the foregoing, pursuant to §§ 273, 278 and/or 279 of the N.Y. Debt. & Cred. Law,  §§ 105(a), 544(b), 550(a) and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries for the benefit of the BLMIS estate; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF,

Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate.

### COUNT FIVE
### FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 544(b), 550(a) AND 551

### (EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and
### Edward Glantz IRA Beneficiaries)

407.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

408.    At all times relevant to the Six Year Transfers, there has been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of the Bankruptcy Code.

409.    Each of the Six Year Transfers constitutes a conveyance by BLMIS as defined under § 270 of the N.Y. Debt. & Cred. Law.

410.    BLMIS did not receive fair consideration for the Six Year Transfers.

411.    At the time of each of the Six Year Transfers, BLMIS engaged in a business or transaction, or was about to engage in a business or transaction, for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small amount of capital.

412.    As a result of the foregoing, pursuant to §§ 274, 278 and/or 279 of the N.Y. Debt. & Cred. Law, §§ 105(a), 544(b), 550, and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries: (a) avoiding and preserving the Six Year

Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year

Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and

Edward Glantz IRA Beneficiaries for the benefit of the BLMIS estate; (d) directing EJS, Jelris,

Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent

allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF,

Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the

Six Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz

IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the

Court deems just and appropriate.

### COUNT SIX
### FRAUDULENT TRANSFERS–
### NEW YORK DEBTOR AND CREDITOR LAW
### §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 544(b), 550(a) AND 551

**(EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and
Edward Glantz IRA Beneficiaries)**

413.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

414.    At all times relevant to the Six Year Transfers, there has been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of the Bankruptcy

Code.

415.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under § 270 of the N.Y. Debt. & Cred. Law.

416.    BLMIS did not receive fair consideration for the Six Year Transfers.

417.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur, debts beyond its ability to pay as the debts matured.

418.    As a result of the foregoing, pursuant to §§ 275, 278 and/or 279 of the N.Y. Debt. & Cred. Law, §§ 105(a), 544(b), 550(a) and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate.

**COUNT SEVEN**
**RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK**
**CIVIL PROCEDURE LAW AND RULES §§ 203(g) AND 213(8), NEW**
**YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279,**
**AND 11 U.S.C. §§ 105(a), 544(b), 550(a), AND 551**

**(EJS, Jelris, Grace, GFF, RMG Trust, Merlin, Enhancement, Glantz IRA**
**Beneficiaries, and Edward Glantz IRA Beneficiaries)**

419.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

420.    At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS holding a

matured or unmatured unsecured claim against BLMIS that is allowable under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of the Bankruptcy Code.

421.    At all times relevant to the Transfers, there has been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of the Bankruptcy Code.

422.    Each of the Transfers constitutes a conveyance by BLMIS as defined under § 270 of the N.Y. Debt. & Cred. Law.

423.    Each of the Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of the Initial Transferee Defendants in furtherance of a fraudulent investment scheme.

424.    Each of the Transfers was received by the Initial Transferee Defendants with the actual intent to hinder, delay or defraud the creditors of BLMIS at the time of each of the Transfers, and/or future creditors of BLMIS.

425.    As a result of the foregoing, pursuant to NY C.P.L.R. §§ 203(g) and 213(8), §§ 276, 276-a, 278 and/or 279 of the N.Y. Debt. & Cred. Law, §§ 105(a), 544(b), 550(a) and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Initial Transferee Defendants: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS; (d) directing the Initial Transferee Defendants, to the extent allowable by law, to disgorge to the Trustee all profits received by the Initial Transferee Defendants related to or arising from the Transfers; (e) awarding attorneys' fees and costs from the Initial Transferee Defendants; and (f) awarding any other relief the Court deems just and appropriate.

**COUNT EIGHT**
**RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR AND**
**CREDITOR LAW §§ 276-a AND 278 AND 11 U.S.C. §§ 544, 548, AND 550(a)**

**(Glantz, Elaine Ostrin, RMG Trust, ERG Estate, ERG Trust, TG Estate, TG**
**Trust, G-O Trust I, G-O Trust II, Austin Bosarge, Grace, EJS, Jelris, GFF,**
**Lakeview and Vista)**

426.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

427.    The Transfers are avoidable under applicable provisions of the Bankruptcy Code,

the N.Y. Debt. & Cred. Law, and/or N.Y. C.P.L.R. as alleged herein, and, to the extent the

Transfers were subsequently transferred, are recoverable from the Subsequent Transferee

Defendants under §§ 105(a) and 550(a) of the Bankruptcy Code, §§ 276 and 278 of the N.Y.

Debt. & Cred. Law, and § 78fff-2(c)(3) of SIPA.

428.    The Subsequent Transfers were transferred by the Initial Transferee Defendants to

the Subsequent Transferee Defendants.

429.    The Subsequent Transferee Defendants are immediate or mediate transferees of

the Transfers.

430.    The Subsequent Transferee Defendants received the Subsequent Transfers with

knowledge of and/or willful blindness to BLMIS's fraudulent scheme.

431.    As a result of the foregoing, pursuant to §§ 276-a and 278 of the N.Y. Debt &

Cred. Law, §§ 105(a) and 550(a) of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the

Trustee is entitled to a judgment against Subsequent Transferee Defendants: (a) recovering the

Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the

benefit of the estate of BLMIS; (b) directing the Subsequent Transferee Defendants, to the extent

allowable by law, to disgorge to the Trustee all profits, including any and all management fees,

incentive fees or other compensation and/or remuneration received by the Subsequent Transferee

Defendants related to or arising from the Subsequent Transfers; (c) awarding attorneys' fees and costs from the Subsequent Transferee Defendants; and (d) awarding any other relief the Court deems just and appropriate.

## COUNT NINE
## GENERAL PARTNER LIABILITY

432.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

433.    At all times relevant to the Transfers and Subsequent Transfers, Glantz was a general partner of EJS.

434.    In the event that EJS is unable to satisfy any judgment against it, Glantz, as a general partner, is liable to satisfy any judgment against EJS.

435.    From its inception until it was reformed as a limited partnership on January 1, 1998, Elaine Ostrin, RMG Trust, TG Trust, and ERG Trust were general partners of EJS.

436.    In the event that EJS is unable to satisfy any judgment against it, Elaine Ostrin, RMG Trust, TG Trust, and ERG Trust, as general partners, are liable to satisfy any judgment against EJS relating to or arising from Transfers or Subsequent Transfers that EJS received prior to January 1, 1998.

437.    At all times relevant to the Transfers and Subsequent Transfers, Glantz was a general partner of Jelris.

438.    In the event that Jelris is unable to satisfy any judgments against it, Glantz, as the general partner, is liable to satisfy any judgment against Jelris.

439.    From its inception until it was reformed as a limited partnership on March 28, 1995, Elaine Ostrin, RMG Trust, TG Trust, and ERG Trust were general partners of Jelris.

440.    In the event that Jelris is unable to satisfy any judgment against it, Elaine Ostrin, RMG Trust, TG Trust, and ERG Trust, as general partners, are liable to satisfy any judgment against Jelris relating to or arising from Transfers or Subsequent Transfers that Jelris received prior to March 28, 1995.

441.    At all times relevant to the Transfers and Subsequent Transfers, Glantz was a general partner of Grace.

442.    In the event that Grace is unable to satisfy any judgments against it, Glantz, as a general partner, is liable to satisfy any judgment against Grace.

443.    At all times relevant to the Subsequent Transfers to Lakeview, Vista was the general partner of Lakeview.

444.    In the event that Lakeview is unable to satisfy any judgment against it, Vista, as the general partner, is liable to satisfy any judgment against Lakeview.

445.    As a result of the foregoing, pursuant to applicable state law, Glantz is jointly and severally liable for all debts and obligations of EJS, Jelris, and Grace, and the Trustee is entitled to a judgment against Glantz recovering the Transfers and Subsequent Transfers to EJS, Jelris and Grace or their value from Glantz for the benefit of the estate of BLMIS.  Additionally, pursuant to applicable state law, Elaine Ostrin, RMG Trust, TG Trust and ERG Trust are jointly and severally liable for all debts and obligations of EJS related to or arising from Transfers or Subsequent Transfers that EJS received prior to January 1, 1998 and all debts and obligations of Jelris related to or arising from Transfers or Subsequent Transfers that Jelris received prior to March 28, 1995.  Furthermore, pursuant to applicable state law, Vista is jointly and severally liable for all debts and obligations of Lakeview, and the Trustee is entitled to a judgment against

Vista recovering the Subsequent Transfers to Lakeview or their value from Vista for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Initial Transferee Defendants and Subsequent Transferee Defendants as follows:

i.      On the First Claim for Relief, pursuant to §§ 105(a), 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries for the benefit of the BLMIS estate; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the Two Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate;

ii.     On the Second Claim for Relief, pursuant to §§ 105(a), 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and

Edward Glantz IRA Beneficiaries related to or arising from the Two Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate;

iii.    On the Third Claim for Relief, pursuant to §§ 276, 276-a, 278 and/or 279 of the N.Y. Debt. & Cred. Law, §§ 105(a), 544(b), 550(a) and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries for the benefit of the BLMIS estate; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate;

iv.    On the Fourth Claim for Relief, pursuant to §§ 273, 278, and/or 279 of the N.Y. Debt. & Cred. Law, §§ 105(a), 544(b), 550 and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related

to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate;

v.    On the Fifth Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the N.Y. Debt. & Cred. Law, §§ 105(a), 544(b), 550 and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries for the benefit of the BLMIS estate; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate;

vi.    On the Sixth Claim for Relief, pursuant to §§ 275, 278 and/or 279 of the N.Y. Debt. & Cred. Law, §§ 105(a), 544(b), 550 and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers; (b) directing the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; (d) directing EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries, to the extent allowable by law, to disgorge to the Trustee all profits received by EJS, Jelris, Grace, GFF, Glantz IRA Beneficiaries, and Edward Glantz IRA Beneficiaries related to or arising from the Six Year Transfers; (e) awarding attorneys' fees and costs from EJS, Jelris, Grace, GFF, Glantz

IRA Beneficiaries, and Edward Glantz IRA Beneficiaries; and (f) awarding any other relief the Court deems just and appropriate;

vii.    On the Seventh Claim for Relief, pursuant to §§ 203(g) and 213(8) of the N.Y. C.P.L.R., §§ 276, 276-a, 278 and/or 279 of the N.Y. Debt. & Cred. Law, §§ 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS; (d) directing the Initial Transferee Defendants, to the extent allowable by law, to disgorge to the Trustee all profits received by the Initial Transferee Defendants related to or arising from the Transfers; (e) awarding attorneys' fees and costs from the Initial Transferee Defendants; and (f) awarding any other relief the Court deems just and appropriate;

viii.    On the Eighth Claim for Relief, pursuant to § 276-a and 278 of the N.Y. Debt. & Cred. Law, §§ 105(a) and 550(a) of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA: (a) recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS; (b) directing the Subsequent Transferee Defendants, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Subsequent Transferee Defendants related to or arising from the Subsequent Transfers; (c) awarding attorneys' fees and costs from the Subsequent Transferee Defendants; and (d) awarding any other relief the Court deems just and appropriate;

ix.    On the Ninth Claim for Relief, pursuant to applicable state law, that Glantz is jointly and severally liable for all debts and obligations of EJS, Jelris, and Grace, and the Trustee is entitled to a judgment against Glantz recovering the Transfers and the Subsequent Transfers to

EJS, Jelris, and Grace or their value from Glantz for the benefit of the estate of BLMIS. Additionally, pursuant to applicable state law, that Elaine Ostrin, RMG Trust, TG Trust, and ERG Trust are jointly and severally liable for all debts and obligations of EJS related to or arising from Transfers or Subsequent Transfers that EJS received prior to January 1, 1998 and all debts and obligations of Jelris related to or arising from Transfers or Subsequent Transfers that Jelris received prior to March 28, 1995, and the Trustee is entitled to a judgment against Elaine Ostrin, RMG Trust, TG Trust, and ERG Trust recovering the Transfers and Subsequent Transfers to EJS prior to January 1, 1998 and the Transfers and Subsequent Transfers to Jelris prior to March 28, 1995, or their value from Elaine Ostrin, RMG Trust, TG Trust, and ERG Trust for the benefit of the estate of BLMIS. Furthermore, pursuant to applicable state law, that Vista is jointly and severally liable for all debts and obligations of Lakeview, and the Trustee is entitled to a judgment against Vista recovering the Subsequent Transfers to Lakeview or their value from Vista for the benefit of the estate of BLMIS;

x.     On all Claims for Relief for which EJS, Jelris, and Grace are liable, that the Court enter judgment for that same relief against Glantz as the general partner of EJS, Jelris, and Grace;

xi.     On all Claims for Relief for which EJS is liable related to or arising from Transfers or Subsequent Transfers that EJS received prior to January 1, 1998 and all Claims for Relief for which Jelris is liable related to or arising from Transfers or Subsequent Transfers that Jelris received prior to March 28, 1995, respectively, that the Court enter judgment against Elaine Ostrin, RMG Trust, ERG Trust, and TG Trust as general partners of EJS until January 1, 1998 and general partners of Jelris until March 28, 1995, respectively.

xii.    On all Claims for Relief for which Lakeview is liable, that the Court enter judgment for that same relief against Vista as the general partner of Lakeview;

xiii.    On all Claims for Relief, establishing a constructive trust over all Transfers and Subsequent Transfers and their proceeds, product and offspring in favor of the Trustee for the benefit of the estate.

xiv.    On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Transfers were received.

xv.    On all Claims for Relief, awarding the Trustee attorneys' fees, all applicable interest, costs, and disbursements incurred in this proceeding; and

xvi.    On all Claims for Relief, granting the Trustee such other, further, and different relief as the Court deems just, proper and equitable.

Date:  January 9, 2015
       New York, New York

By: */s/ David J. Sheehan*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Fernando A. Bohorquez
Email: fbohorquez@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com
Benjamin D. Pergament
Email: bpergament@bakerlaw.com
Andrew W. Reich
Email: areich@bakerlaw.com
Kendall E. Wangsgard
Email: kwangsgard@bakerlaw.com
Joshua B. Rog
Email: jrog@bakerlaw.com

C. Zachary Rosenberg
Email: crosenberg@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the estate of Bernard L. Madoff*