

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 09-01161-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    IRVING H. PICARD,

7              Plaintiff,

8    v.

9    KINGATE GLOBAL FUND, LTD., ET AL,

10             Defendants,

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   Case No. 09-01364-smb

13   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF B,

14             Plaintiff,

15   v.

16   ALPHA PRIME FUND LIMITED, ET AL,

17             Defendants.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19   Case No. 10-05418-smb

20   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF B,

21             Plaintiff,

22   v.

23   ROBERT L. SILVERMAN, ET AL,

24             Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Page 2

1    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

2    Case No. 14-02408-smb

3    CAPITAL GROWTH COMPANY, DECISIONS, INC., ET AL,

4              Plaintiffs,

5    v.

6    PAMELA GOLDMAN, ET AL,

7              Defendants.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10

11              United States Bankruptcy Court

12              One Bowling Green

13              New York, New York

14

15              December 17, 2014

16              10:02 a.m.

17

18

19   B E F O R E :

20   HON STUART M. BERNSTEIN

21   U.S. BANKRUPTCY JUDGE

22

23

24

25

Page 3

1    Motion to Dismiss

2

3    Motion for Entry of Order Pursuant to Section 105(a) of the

4    Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules

5    of Bankruptcy Procedure Approving a Settlement Agreement by

6    and between the Trustee, on the one hand, and Primeo Fund

7    and Herald Fund SPC on the other hand

8

9    Motion for Entry of Order Pursuant to Section 105(a) of the

10   Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules

11   of Bankruptcy Procedure Approving a Settlement Agreement by

12   and between the Trustee and Senator Fund SPC

13

14   Motion for Entry of Order Pursuant to Section 105(a) of the

15   Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules

16   of Bankruptcy Procedure Approving a Settlement by and

17   between the Trustee and Westport National Bank, a Division

18   of Connecticut Community Bank, N.A.

19

20   Motion to Consolidate Adversary Proceedings

21

22

23

24

25   Transcribed by:  Sherri L. Breach

```
 1    A P P E A R A N C E S :

 2    BAKER HOSTETLER

 3         Attorneys for Trustee, Irving Picard

 4         45 Rockefeller Plaza

 5         New York, New York 10111

 6

 7    BY:  IRVING H. PICARD, ESQ.

 8         KEITH R. MURPHY, ESQ.

 9         DAVID J. SHEEHAN, ESQ.

10         GERALDINE E. PONTO, ESQ.

11

12    SCHULTE, ROTH & ZABEL, LLP

13         Attorneys for Picower Parties

14         919 Third Avenue

15         New York, New York 10022

16

17    BY:  MICHAEL KWON, ESQ.

18         JENNIFER M. OPHEIM, ESQ.

19         MARCY PESSLER HARRIS, ESQ.

20

21

22

23

24

25
```

Page 5

1    SECURITIES INVESTOR PROTECTION CORPORATION

2         Attorneys for SIPC

3         805 15th Street NW, Suite 800

4         Washington, D.C. 20005

5

6    BY:  KEVIN H. BELL, ESQ.

7

8    QUINN EMANUEL URQUHART & SULLIVAN, LLP

9         Attorneys for

10        31 Madison Avenue

11        22nd Floor

12        New York, New York 10010

13

14   BY:  ROBERT S. LOIGMAN, ESQ.

15        SUSHEEL KIRPALANI, ESQ.

16        KOCHITL S. STROHBEHN, ESQ.

17

18   KIRKLAND & ELLIS, LLP

19        Attorneys for not specified

20        601 Lexington Avenue

21        New York, New York 10022

22

23   BY:  DAVID S. FLUGMAN, ESQ.

24

25

Page 6

1    DUFFY AMEDEO, LLP

2         Attorneys for not specified

3         275 Seventh Avenue

4         7th Floor

5         New York, New York 10001

6

7    BY:  T. DUFFY, ESQ.

8

9    HERRICK FEINSTEIN

10        Attorneys for Goldman defendants

11        2 Park Avenue

12        New York, New York 10016

13

14   BY:  HANH HUYNH, ESQ.

15

16   ALSO APPEARING:

17   KIERSTEN FLETCHER

18   OREN WARSHAVSKY

19

20

21

22

23

24

25

Page 7

```
 1                       P R O C E E D I N G S

 2              THE CLERK:  Please be seated.

 3              THE COURT:  Good morning.

 4              Madoff.  Anyone here on Madoff?

 5         (Laughter)

 6              MR. MURPHY:  One or two, Your Honor.

 7              THE COURT:  Okay.  Why don't we start with the

 8    settlements.

 9              MR. MURPHY:  Fine, Your Honor.

10         (Pause)

11              MR. MURPHY:  Good morning, Your Honor.  How are

12    you?

13              THE COURT:  Good morning.

14              MR. MURPHY:  Good morning, Your Honor.

15              THE COURT:  Good morning.

16              MR. MURPHY:  Keith Murphy, Baker & Hostetler for

17    the trustee.

18              This motion, Your Honor, is pursuant to Bankruptcy

19    Rule 9019 and Section 105(a) of the Bankruptcy Code for

20    approval of a settlement between the trustee and Westport

21    National Bank.

22              The trustee brought an avoidance action to recover

23    transfers from BLMIS to Westport's account.  The account was

24    an omnibus account for the benefit of Westport's clients,

25    200 of the bank's clients.  The clients were directed to the
```

Page 8

1    bank by the other defendants in this case, Robert Silverman

2    and his PCSS Services Companies.

3            The banks clients were retirees and pensioners and

4    they periodically redeemed money through the Westport

5    account to cover living and retirement expenses.  The

6    clients' redemptions through the Westport account, along

7    with payments of fees to Westport and the other providers,

8    basically exceeded all their subscriptions.  So this pattern

9    continued throughout the life of the account.

10           Based on BLMIS's books and records, Westport

11    withdrew a total of $28.2 million during the six-year

12    period.  From that amount Westport and the other defendants

13    in the case received fees.  With respect to Westport, those

14    fees were approximately 2.1 million in the six-year period

15    and $660,000 in the two-year period.

16           During the course of the case and settlement

17    discussions the trustee conducted due diligence with respect

18    to Westport's investment in BLMIS, the Westport account

19    itself, and the dealings between Westport, bank clients and

20    Mr. Silverman and his companies.  We reviewed transaction

21    histories, correspondence, third party documents, and other

22    records and documents available to the trustee.

23           Westport, along the course, scooted liability.

24    They argued that they didn't provide any investment advice

25    or guidance in connection with their clients' decisions to

Page 9

1   invest with BLMIS.  They also had a custodial agreement with

2   its clients which acknowledged that the bank had no

3   authority or ability to direct or influence or oversee in

4   any manner the investments made by BLMIS.  The agreement

5   also provided that they were acting solely in a ministerial

6   capacity.  And as further evidence of that they indicated

7   that their fee, their custodial fee was only six-tenths of

8   one percent for this task.

9           The parties engaged Peter Borowitz (ph) as a

10  mediator and the settlement negotiations took place, and as

11  a result of those negotiations and the trustee's

12  investigation and, frankly, after thorough consideration of

13  the uncertainty, the delay, the cost and risks associated

14  with the adversary proceeding the parties determined to

15  settle the matter.

16          The terms are set forth on Exhibit A to the

17  motion, Your Honor, which is the settlement agreement.  A

18  couple of the more salient points, the settlement calls for

19  a payment of 1.3 million to the trustee within 15 days after

20  entry of an order by the Court approving the settlement.  It

21  will also result in the withdrawal of the claim that was

22  filed by Westport.  It includes mutual releases and

23  ultimately a dismissal of the adversary proceeding.

24          The trustee submits that the settlement falls well

25  within the range of reasonableness for a settlement.  The

1    agreement actually will resolve all claims raised by the

2    trustee against Westport and avoid certainly what would be a

3    lengthy and contentious litigation regarding the trustee's

4    avoidance claims, Your Honor.

5         The settlement will bring significant funds into

6    the estate and will benefit the customer property fund and,

7    furthermore, it would also complete this chapter of the

8    Madoff story.  After the settlement with Westport the other

9    defendants in the case, during the course of the case,

10   sought bankruptcy relief and obtained it.  And the trustee

11   was able to obtain partial satisfaction through an allowed

12   claim in Mr. Silverman's bankruptcy which was paid -- it was

13   a modest cash payment along with a lien on real property.

14        This closure of this case would result in the

15   adversary proceeding being fully resolved, and I note that

16   there were no objections to the settlement, Your Honor.

17        THE COURT:  Is there anyone that wants to be heard

18   in connection with the --

19        MR. BELL:  Yes, Your Honor.

20        THE COURT:  -- application --

21        MR. BELL:  Kevin Bell from Securities Investment

22   Protection Corporation.  SiPC has been involved with Baker,

23   the trustee's counsel.  SiPC supports this settlement which

24   results not only in a payment, but clarity on Westport's

25   claim in the customer proceeding.  The current payment will

Page 11

1    result in a payment to allowed customer claims of the

2    results of the trustee's recovery once there is an entry of

3    the order.

4              THE COURT:  Okay.

5              MR. BELL:  Thank you, Your Honor.

6              THE COURT:  I'll approve the settlement.  It's

7    certainly well within the lowest point in the range of

8    reasonableness.  I guess the question is whether the bank

9    was a customer in that winter and, if so, how much it might

10   be liable to for the estate.  But it appears that it served

11   in a ministerial capacity.  And I'll note that the payment

12   is twice what they received within the two years.

13             So the application is approved.

14             MR. MURPHY:  Thank you, Your Honor.  We'll --

15             THE COURT:  You can submit an order.

16             MR. MURPHY:  We'll email an order.  Thank you,

17   Your Honor.

18             THE COURT:  Okay.

19             MR. BELL:  Thank you, Your Honor.

20             THE COURT:  Thank you.

21        (Pause)

22             THE COURT:  Just --

23             MR. WARSHAVSKY:  Good morning, Your Honor.  Oren

24   Warshavsky of Baker Hostetler.  I'm here first to talk about

25   the settlement with Herald and Primeo Funds.  These are two

Page 12

1    of what we called feeder funds that invested with BLMIS.

2            In the six years prior to the Madoff's

3    liquidation, Primeo withdrew $139 million.  Primeo was not a

4    customer at the time of BLMIS's insolvency.  Instead, it

5    actually had withdrawn its money and put most of it into the

6    Herald Fund.  In the six years prior to the liquidation the

7    Herald Fund withdrew $567 million, Your Honor.

8            One of the issues that came up during this -- the

9    course of our settlement negotiations was how much to credit

10   to the withdrawal by JPMorgan.  By way of background, I know

11   Your Honor presided over that agreement, but JPMorgan

12   withdrew significant money from the Herald Fund, 154

13   million.  JPMorgan had paid back a lump sum to the trustee

14   for a variety of claims brought by the trustee.

15           The parties engaged -- also engaged Peter Borowitz

16   as it happens as a mediator and reached an agreement whereby

17   the trustee is giving Herald -- has credited to Herald Fund

18   approximately $100 million out of the payment from JPMorgan.

19   Herald Fund will pay four -- to the trustee $467 million and

20   Primeo Fund will pay to the trustee $29 million.  All of

21   that will be taken out of the credit given to Herald Fund

22   and -- with its customer claim.

23           And I -- I don't know if Your Honor has any other

24   questions, but the trustee is getting the full six-year

25   amount from Herald Fund, more than the two-year amount from

1     the Primeo Fund.  There's no claim to the Primeo Fund.  It's

2     a total of close to $490 million, Your Honor.

3               THE COURT:  Is the claim -- the net equity claim

4     of Herald what it would be if you just determined it under

5     the net equity of or the net investment method?

6               MR. WARSHAVSKY:  No.  We are -- it is -- it's what

7     it would be if we were crediting, but we are adding in the

8     $467 million --

9               THE COURT:  I -- I'm not saying that.

10              MR. WARSHAVSKY:  Okay.

11              THE COURT:  Before you start subtracting from it,

12    the net --

13              MR. WARSHAVSKY:  Yes.

14              THE COURT:  -- equity claim, is that the claim

15    that you were -- that would normally be under the --

16              MR. WARSHAVSKY:  Yes, Your Honor.

17              THE COURT:  -- net equity?  All right.  So they're

18    basically paying you the money and they're getting their net

19    equity claim?

20              MR. WARSHAVSKY:  Correct, Your Honor.

21              THE COURT:  All right.

22              MR. WARSHAVSKY:  So --

23              THE COURT:  Okay.  Does anyone want to --

24              MR. WARSHAVSKY:  -- that's all.

25              THE COURT:  -- be heard?

1              MR. BELL:  SiPC was informed by the trustee and

2      participated in the mediation.  We support the settlement

3      which not only results in a payment to the trustee in a

4      significant sum of money, but it provides clarity as the

5      Court has noted on a very significant dollar amount in the

6      net equity claim of Herald and upon the Court's approval

7      will -- will result in the allowed claims jumping by 1.6

8      million -- billion dollars which, when you look at the $20

9      billion world of net equity is a significant amount.

10             And the -- this payment will result soon in a

11     payment of recovery amounts that will allow other allowed

12     customer claims once the Court enters an order.  We would

13     suggest that such an entry of an order is an appropriate

14     action by the Court.

15             THE COURT:  All right.  I'll approve this

16     settlement that sounds to me like what the -- putting aside

17     the question of the credit from the JPMorgan payment that

18     they're basically repaying more than they got within two

19     years and they're getting -- at least Herald is getting the

20     net equity claim that it would be entitled to and the 502(h)

21     claim that it would be entitled to.

22             So -- and given that SiPC supports it, it's a

23     result of mediation, it certainly falls well within the

24     lowest range -- well within the lowest point in the range of

25     reasonableness.

1          So it's approved and you can submit an order.

2          Thank you.

3          MR. WARSHAVSKY:  Thank you, Your Honor.

4     (Pause)

5          MR. MURPHY:  Your Honor, the final settlement I'll

6     talk to you about is with the Senator Fund and I should

7     start, Your Honor, by noting that we were here about nine

8     months ago with a --

9          THE COURT:  I remember that.

10         MR. MURPHY:  -- motion to go to mediation and I --

11         THE COURT:  And you didn't want to go to

12    mediation.

13         MR. MURPHY:  -- was vociferously -- that's right.

14         THE COURT:  And what do you know, you settlement

15    -- you settled it.

16    (Laughter)

17         MR. MURPHY:  Well, I guess that shows why you're

18    the one wearing the black robes and it was a good decision.

19    (Laughter)

20         THE COURT:  It just explains why you had to go to

21    mediation.

22         MR. MURPHY:  That's right.

23         THE COURT:  Well, I'm glad it worked out.

24         MR. MURPHY:  And once again, Your Honor, this is a

25    -- one of the parties to that mediation is the Senator Fund.

Page 16

1    The Senator Fund had life to date withdrawals.  It's also

2    the same as the two-year withdrawals of $95 million.

3             Senator Fund is -- has agreed to pay that money

4    back in out of its net equity claim.  It will be credited

5    for 90 percent of the money that it is putting in.  The

6    Senator Fund also has agreed to share with the trustee on a

7    50/50 basis its claims against its service provider, HSBC.

8             Once again, Your Honor, we think, given that it's

9    100 percent of the trustee's two-year claim and in return

10   we're allowing most of the net equity claim we believe this

11   to fall well within the zone of reasonableness, and I'm here

12   to answer any questions Your Honor might have.  Otherwise

13   I'll defer.

14             THE COURT:  Is there anyone else who wants to be

15   heard?

16             MR. BELL:  Again, SiPC participated.  Kevin Bell

17   on behalf of SiPC.

18             SiPC participated in the mediation.  It finds that

19   it supports the settlement which results in the recovery to

20   the trustee with -- for the benefit of all the other

21   remaining unpaid net equity claimholders of allowed claims,

22   and it provides clarity on Senator's net equity claim which

23   will increase the allowed amount that has been paid to

24   customers once this Court enters the order.

25             THE COURT:  I'll approve this settlement.  Senator

Page 17

1    is paying 100 percent of the two-year transfers and getting

2    less than 100 percent of its net equity claim in exchange

3    and there seems to be a kicker at the end, which may or not

4    -- may not bring more money into the estate.

5             So that settlement is approved.  You can submit an

6    order.

7             MR. MURPHY:  Thank you, Your Honor.

8             THE COURT:  Let's do the consolidation motion

9    next.

10        (Pause)

11            MS. HARRIS:  Good morning, Your Honor.  Marcy

12   Harris on behalf of the Picower parties, and with me Michael

13   Kwon of Schulte, Roth & Zabel --

14            THE COURT:  How do you do?

15            MR. KWON:  Morning, Your Honor.

16            MS. HARRIS:  -- and Jennifer Opheim.

17            MR. HUYNH:  Good morning, Your Honor.  Hanh Huynh,

18   Herrick Feinstein, on behalf of the Goldman defendants.

19            THE COURT:  Okay.

20            MS. HARRIS:  Your Honor, the Picower parties filed

21   an enforcement action to enforce the permanent injunction

22   which bars the Goldman plaintiffs from litigating the claims

23   in what we call Goldman 3, their third attempt to file a

24   non-derivative claim against the Picower parties.

25            At the same time, in mid-November the trustees

1   filed an enforcement motion and course of action as well.

2   We consolidated -- we sought to consolidate the two actions

3   together at the time of filing.  The trustee consented to

4   that consolidation so that the two actions which raised the

5   same legal issues and concern the same facts could go

6   forward together in an efficient matter.

7           We reached out at that time to the Goldman counsel

8   to ask whether they, too, would agree to consolidate and

9   they wanted to wait and see the papers before they reached a

10  determination.

11          We now ask again for the Court to consolidate the

12  two actions and also to stay them in this court because in

13  response to the trustee's filing the Goldmans have sought to

14  withdraw the -- made a motion to withdraw the reference to

15  the District Court.  That motion will be heard by Judge

16  Kotel (ph).

17          THE COURT:  Is there a date for that?

18          MS. HARRIS:  I don't believe there is.

19          MR. HUYNH:  There's no date, Your Honor.

20          THE COURT:  Okay.

21          MS. HARRIS:  And in addition the deadline for

22  responding to the enforcement actions in this court was

23  earlier this week.  The Goldmans responded to the trustees

24  and not to the Picower parties substantively.  Instead, they

25  --

1              THE COURT:  Did they put it in the same brief?

2              MS. HARRIS:  No.  They put in a very short, but a

3    brief brief that is basically a preview of coming

4    attractions.  They plan to file a motion to dismiss next

5    week.  They have another motion for summary judgment that

6    they plan to make thereafter.  And this would set the two

7    actions on very different schedules.

8              THE COURT:  Okay.

9              MS. HARRIS:  Consolidation is appropriate here in

10   the Court's discretion where the legal issues are the same

11   and the factual issues are similar or the same.  And here

12   both the trustee's action and the Picower action seek the

13   same thing, to have the Court determine whether the claims

14   in Goldman 3 that were claimed are derivative of the

15   trustee's claims or not.  The same allegation -- it's the

16   same complaint that's being addressed, and the facts in that

17   complaint would have to be addressed by both the parties,

18   the trustee and the Picower parties.

19             It makes no sense to have the two cases heard

20   separately by this Court or by two different courts.  That

21   would be inefficient.  It would be burdensome to the courts

22   and the parties, costly, and would raise the risk of

23   inconsistent outcomes.

24             So we are asking for consolidation of the two

25   actions.  Stay the proceedings here until there is a

Page 20

1    resolution, a determination on the withdrawal motion, and

2    then if the -- if the trustee's action is withdrawn post-

3    consolidation, the two actions can go together in District

4    Court.

5            If the motion is denied, I would ask for a case

6    management conference here so that there can be coordination

7    and the actions can be -- proceed here together on the same

8    schedule.

9            And I would point out also that the Goldmans

10   previously have recognized the benefits of consolidation

11   with respect to challenges to the permanent injunction

12   because in related actions in Florida between the Goldman

13   parties and related parties, Fox Marshall, the Goldmans

14   sought to consolidate their action down in Florida with the

15   Fox Marshall action because both actions required

16   determination whether the permanent injunction barred an

17   earlier version of their complaints and the same facts were

18   at issue.  And in the interest of judicial economy and

19   efficiency they agreed it made sense to hear the actions

20   together.

21           So for the identical reasons we seek consolidation

22   of the Goldman 3 -- of the two enforcement actions with

23   respect to Goldman 3 claims.

24           THE COURT:  Thank you.

25           MS. HARRIS:  Thank you.

Page 21

1          MR. HUYNH:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. HUYNH:  First, as a preliminary matter, with

4    respect to the suggestion that there be a stay pending the

5    decision on the motion to withdraw the reference, I don't

6    think that's before the Court today.  It's just the

7    consolidation.  We absolutely do not agree to that.

8          THE COURT:  Well, as a --

9          MS. HARRIS:  It's --

10          THE COURT:  -- practical matter, though, if Judge

11    Kotel were going to decide the same issue I wouldn't be

12    spending time deciding it.  That doesn't seem to be --

13          MR. HUYNH:  That's --

14          THE COURT:  -- a good use of judicial resources.

15          MR. HUYNH:  That's correct, Your Honor.  But we

16    don't know when that's going to happen.  It goes to our only

17    concern in this case which is that there be no delay with

18    respect to a disposition of the trustee's preliminary

19    injunction motion.  And the reason we seek that is because

20    contrary to what counsel is saying here, the relief is not

21    the same.  They're seeking an entirely different relief, one

22    which would bar the Goldman plaintiffs from pursuing any

23    future litigation against any of those parties arising from

24    the Madoff Ponzi scheme.

25          THE COURT:  Well, that's like asking -- seeking a

Page 22

1    denial of leave to re-plead.  That's all.

2              MR. HUYNH:  It's different relief, Your Honor, and

3    that's -- and the basis for their relief also is the subject

4    to a motion to dismiss which we don't believe the trustee's

5    complaint is.  So that's -- because they -- we -- in our

6    view they lack standing.  And Securities' counsel is better

7    able to articulate that --

8              THE COURT:  Okay.

9              MR. HUYNH:  -- and that brief is forthcoming on

10   the 22nd, Your Honor.  So for that reason we think it

11   actually -- the judicial economy would be better served if

12   we kept this adversary proceeding here until we could decide

13   whether there is an adversary proceeding at all with respect

14   to the standing issue.

15             THE COURT:  What's the basis of the motion to

16   dismiss?

17             MR. HUYNH:  The lack of standing, Your Honor.

18   That the --

19             THE COURT:  Why do they lack standing?

20             MR. HUYNH:  That the -- in our view the Picower

21   defendants are not the direct beneficiaries of the order

22   entered --

23             THE COURT:  Can I ask you a question?  I looked at

24   the settlement agreement last night and the trustee agreed

25   to use its best efforts to get the Bankruptcy Court to

1    approve this settlement and to include an injunction that

2    protected the Picower parties.  Do you think that was at the

3    trustee's insistence or the Picower parties' insistence?

4              MR. HUYNH:  I wasn't party to negotiations, but --

5              THE COURT:  What do you think?

6              MR. HUYNH:  -- I think it would be --

7              THE COURT:  Well, I wasn't either, but what do you

8    think?

9              MR. HUYNH:  -- at the Picowers' -- I think --

10             THE COURT:  All right.  So --

11             MR. HUYNH:  -- it would be at the Picowers'

12   insistence.

13             THE COURT:  So you think that was intended to

14   benefit the Picowers?

15             MR. HUYNH:  I do believe it was intended to

16   benefit the Picowers, but the order that entered approving

17   the settlement agreement was for the benefit of the

18   plaintiffs' estates and --

19             THE COURT:  No, it wasn't.

20             MR. HUYNH:  -- not for the Picower defendants.

21             THE COURT:  No.  That's not true.  I believe it's

22   paragraph 8 -- I'm sorry, the third -- the -- everybody is

23   permanently enjoined from asserting any claim against the

24   Picower accounts and the Picower releasees.  So they're

25   clearly covered by the order.

1           But let's -- let's move off this because I don't

2      have a motion to dismiss for lack of standing.  What's the

3      problem with consolidating the actions and just making the

4      motion either before me or Judge Kotel, depending on what

5      the result of the motion to withdraw is?

6           MR. HUYNH:  We have no problem with that as long

7      as it doesn't disrupt the current schedule we have with

8      respect to the trustee's preliminary motion.  That's been

9      briefed.  We're only waiting for --

10          THE COURT:  The trustee's -- isn't that the one

11     that you have moved to withdraw the reference on?

12          MR. HUYNH:  That's correct, Your Honor.

13          THE COURT:  So you've delayed it.

14          MR. HUYNH:  But --

15          THE COURT:  If you didn't move -- make that

16     motion, I would have decided it sooner.

17          MR. HUYNH:  That motion's been made.  We will

18     consider withdrawing that motion to withdraw the reference.

19     The issue there is, as we said, if the motion to withdraw

20     the reference had been disposed of quickly, then we would be

21     in front of Judge Kotel.  We just don't want to wait because

22     in the event that that motion sits there in the District

23     Court for some time, we've effectively undermined our intent

24     when we -- when the parties all agreed back in November or

25     back in September to -- that the Goldman plaintiffs would,

Page 25

1    without motion practice in the Southern District of Florida,

2    allow the -- that action to be stayed because we thought

3    there would be a quick, efficient disposition of the trustee

4    motion here in the Bankruptcy Court.

5              THE COURT:  Well, there might have been, but you

6    made a motion to withdraw the reference.

7              MR. HUYNH:  We -- we will -- we'll consider

8    withdrawing that motion, Your Honor.

9              THE COURT:  All right.

10             MR. HUYNH:  Hindsight, Your Honor.

11             THE COURT:  Okay.  I'm going to grant the motion

12   to consolidate the two actions.  They are -- both actions

13   involve the same -- same issue involving the same Goldman 3

14   complaint and the same injunction entered by the Bankruptcy

15   Court.  I know that Mr. Picard's action also implicates the

16   automatic stay, but I didn't even have to reach the

17   automatic stay and I think it's really co-extensive with the

18   settlement injunction which bars derivative claims.

19             And those two issues have to be decided before you

20   get to the issue of whether a permanent injunction or a non-

21   permanent injunction is appropriate, or any injunction is

22   appropriate for that matter.

23             So there are certainly common issues of law.  Both

24   courts are going to have to sit down and compare the

25   allegations of the Goldman 3 complaint to the language in

Page 26

1    the permanent injunction as well as the prior decisions that

2    have interpreted it.

3             And for that reason I'm going to grant the motion.

4    You can submit an order.  Thank you.

5             MR. HUYNH:  Thank you, Your Honor.

6             THE COURT:  Thank you.

7             MS. HARRIS:  Thank you.

8             THE COURT:  I'll hear the Kingate motion to

9    dismiss now.

10        (Pause)

11            THE COURT:  Go ahead.

12            MR. LOIGMAN:  Good morning, Your Honor.  Robert

13   Loigman of Quinn Emanuel for the joint liquidators of the

14   Kingate Euro Fund and the Kingate Global Fund.

15            Before we get to the trustee's claims this

16   morning, Your Honor, I would like to start by reminding the

17   Court who the Kingate funds are.  And the Kingate funds are

18   net losers and they have been net losers since the day that

19   they started investing with Madoff 14 years before the

20   collapse of BLMIS.  Collectively, the two funds lost $800

21   million.  They could have withdrawn this amount and more as

22   scores of other investors did, but they didn't.

23            The Kingate funds invested solely with Madoff and,

24   as a result, are insolvent today.  The funds are now subject

25   to formal insolvency proceedings and are being administered

Page 27

1    by court-appointed liquidators, the liquidators that I

2    represent here today for the benefit of their innocent

3    investors.  This is similar to Mr. Picard administering

4    BLMIS for the benefit of Madoff customers.

5              THE COURT:  I thought those customers of the funds

6    have claims against the funds or the funds' management for

7    failure to do due diligence and things -- things like that?

8              MR. LOIGMAN:  Absolutely, Your Honor.  And I'll

9    come to that in due course.

10             THE COURT:  I'm not sure it's relevant.

11             MR. LOIGMAN:  All right.

12             THE COURT:  I'm just --

13             MR. LOIGMAN:  I think it is relevant.  In fact, I

14   think it's helpful to our argument here today and I'll set

15   forth why.

16             But that goes to what the Kingate funds are made

17   up of, which is innocent investors.  And these investors

18   pooled their money and through the Kingate funds invested in

19   Madoff and now they are victims of Madoff as recognized, for

20   example, by the Department of Justice.

21             I'll also remind the Court what the Kingate funds

22   are not and what the trustee does not allege them to be.

23             First of all, they're not parties that were

24   intricately involved in carrying out Madoff's fraud.  You

25   saw allegations of that in the Comad (ph) action in

Page 28

1    contrast.

2         The Kingate funds and their managers, okay, are

3    not close friends with or confidants of Madoff as was the

4    case with Ezra Merkin (ph).

5         And the Kingate funds are not parties that

6    received information from Madoff that was any different from

7    or any more extensive than what all other BLMIS investors

8    received.

9         And, finally, the Kingate funds -- and I'll

10   explain this in more detail a little bit later Your Honor --

11   is they're not the same as their investment managers.  The

12   funds are pooled money of individual innocent investors.

13   And as Your Honor pointed out, in fact they are suing their

14   managers for return of management fees.

15         THE COURT:  Okay.  But that was true in Merkin

16   also and it's true in all of these fund -- you know, these

17   cases of feeder funds.

18         MR. LOIGMAN:  Your Honor, I can jump ahead in my

19   argument to that point because you asked about it.

20         What we'll be talking about today and all of the

21   allegations in the complaint are really allegations about

22   the investment managers, not allegations about the funds.

23         THE COURT:  Well, the funds are entities that --

24   they can only acquire knowledge through someone.  And are

25   you saying that even if the people that the trustee says

Page 29

1    knew were willfully blinded themselves to the Ponzi scheme

2    actually knew or willfully blinded themselves that that's

3    not attributed to the fund?

4              MR. LOIGMAN:  I am saying that, Your Honor.

5              THE COURT:  Were they agents of these people?

6              MR. LOIGMAN:  They were agents with respect to

7    investing their principal.  And I can explain why, Your

8    Honor, their knowledge, if they had knowledge -- and we

9    challenge that obviously -- would not be imputed to the

10   funds.

11             If the managers knew, as the trustee is now

12   arguing, that Madoff was a fraud or if they were willfully

13   blind to that fact, then the only reason, the only reason

14   why they would direct the Kingate funds to invest in Madoff

15   would be to generate management fees for themselves.  In

16   other words --

17             THE COURT:  But there's also a benefit to the fund

18   because the funds stay alive and the aura of profitability

19   attracts additional investors.  Isn't that what the case law

20   says?

21             MR. LOIGMAN:  Actually, Your Honor, there is no

22   benefit to the funds at all.  By staying alive, by

23   continuing their corporate existence, there's no benefit to

24   the funds.  I realize that in the Merkin case, for example,

25   Your Honor held that Merkin's conduct would be imputed to

1    the funds.  But this case is very different than that for an

2    important reason.

3          In Merkin, the funds at issue invested not only in

4    BLMIS, but in other legitimate investments.  So as a result

5    when they showed positive returns from Madoff, they got

6    additional investors, new investors.  They brought in more

7    money, and they made real and legitimate returns from these

8    other investments.

9          As Your Honor pointed out in the Merkin decision,

10   Gabriel and Arial invested between 23 and 25 percent in

11   BLMIS and the third fund, Ascot, had at times up to nine

12   percent of assets invested elsewhere.  And as Your Honor

13   explained in that decision, because of these legitimate

14   investments elsewhere the Court concluded that there were

15   sufficient allegations that the fund benefited from

16   investments with BLMIS prior to discovery of Madoff's fraud.

17         THE COURT:  But there was another part of the

18   decision that talked about the benefits based on the aura of

19   profitability.

20         MR. LOIGMAN:  Okay.  But the aura of

21   profitability, Your Honor, is not a benefit to the funds.

22   The -- and I'll point Your Honor's attention to what I think

23   is the leading case in New York on imputation, which is the

24   Kershner v. KPMG case from the New York Court of Appeals.

25         And what the Kershner case makes clear is that you

Page 31

1    need to distinguish between what is called conduct that

2    defrauds the corporation and conduct that defrauds others

3    for the corporation's benefit.  And think about what

4    happened in that case.

5           In that case the Refco insiders cooked the books

6    and the reason they did that was to raise more money from

7    Refco from outside lenders.  That was real money, legitimate

8    money that came in to fund Refco's brokerage operations and

9    other things they did and also so that they could sell their

10   stock at inflated prices to third parties.

11          And as the District Court in Refco held, and this

12   was language that was repeated by the New York Court of

13   Appeals, under the trustee's allegations in that case the

14   Refco insiders stole for Refco, not from it.

15          But exactly what's happening here is that if the

16   managers -- and, again, that's a big if, right, if the

17   managers were willfully blind to the fraud or knew about the

18   fraud of Madoff, then they are stealing money from the

19   Kingate funds themselves.  The only -- the Kingate funds

20   don't benefit.  And the trustee recognizes this in the

21   complaint.

22          The Kingate funds were the ones that paid the

23   management fees to their managers.  By continuing their

24   corporate existence, more money coming in, it doesn't

25   increase the NID of the funds in any way.  It doesn't

Page 32

```
 1    increase the amount that they have available to distribute

 2    to their investors.  Merely continuing the corporate

 3    existence doesn't benefit the funds.

 4            Maybe I can give Your Honor an example that might

 5    drive this home a little bit more clearly.

 6            Assume that you have three different investors,

 7    okay.  Investor A hands his money to Madoff -- hands his

 8    money directly to Madoff and says, I'm giving this to you to

 9    invest in your discretion at BLMIS.  This is what the

10    trustee has termed a direct investor.

11            That investor today, of course, has a claim

12    against BLMIS.  The trustee doesn't impute Madoff's

13    knowledge to that investor even though the investor, the

14    customer gave money to --

15            THE COURT:  Impute Madoff's knowledge?

16            MR. LOIGMAN:  Exactly.

17            THE COURT:  Why would -- I don't think the

18    trustee's arguing that he's imputing Madoff's knowledge to

19    the agents of the funds.  He's arguing that the agents of

20    the funds acquired knowledge and that's imputed to the

21    funds.

22            MR. LOIGMAN:  Exactly, Your Honor.

23            THE COURT:  Right.

24            MR. LOIGMAN:  And he's not arguing that if I give

25    my money to Madoff --
```

1           THE COURT:  So why --

2           MR. LOIGMAN:  -- for Madoff to manage --

3           THE COURT:  -- why are you telling me this if

4    nobody's arguing it?

5           MR. LOIGMAN:  I'm telling you this, Your Honor,

6    because in our case the Kingate funds gave their money to

7    investment managers to be managed for them, to be invested

8    at the manager's discretion.  And now the trustee is

9    alleging that those managers knew or willfully blinded

10   themselves to the fraud of Madoff.  And then he's asking

11   that those managers, their knowledge be imputed to the funds

12   that gave them their money to manage.

13          This is no different than giving your money to the

14   --

15          THE COURT:  But the investors in the funds gave

16   the funds the money, but the investors are not the customers

17   here or the transferees.

18          MR. LOIGMAN:  No.

19          THE COURT:  They may be subsequent transferees and

20   that's a different issue.

21          MR. LOIGMAN:  No.  The funds are the customers.  I

22   recognize that, Your Honor.  But the funds gave their money

23   to the managers.  The funds and the manager -- the managers

24   are not the funds themselves.  The --

25          THE COURT:  No.

1              MR. LOIGMAN:  -- funds have a contractual

2      relationship with the managers.  They give the managers the

3      money to manage on behalf of the funds for the benefit of

4      the funds.  The same way that if I were an individual

5      customer and I went to a broker, say JPMorgan, and gave them

6      my money to manage, if they managed that money by investing

7      it in BLMIS, I still have a claim against BLMIS whether that

8      broker knew or not of fraud at Madoff.  And I still have my

9      -- a claim against BLMIS even if I handed my money directly

10     to Madoff, the admitted fraudster --

11             THE COURT:  But you have different kinds of

12     claims.  You may have a general unsecured claim based on a

13     Madoff fraud of the other claim and the victim's fund, but

14     you wouldn't have the customer or BLMIS --

15             MR. LOIGMAN:  Actually, Your Honor, it's the same

16     claim.  In each one of these instances I'm talking about a

17     customer of BLMIS.  The person who hands his money directly

18     to Madoff is a customer of BLMIS.

19             THE COURT:  Right.

20             MR. LOIGMAN:  The person who goes to the broker,

21     gives his money to the broker and says, invest my money and

22     the broker takes that person's money and invests it in

23     BLMIS, that person is a customer --

24             THE COURT:  Assuming there's an account in that

25     person's name.

1            MR. LOIGMAN:  Right.   And the Kingate funds,

2      which did have an account at BLMIS in their names, they are

3      a customer of BLMIS.

4            THE COURT:  Right.

5            MR. LOIGMAN:  They gave their money to the manager

6      to be managed for their benefit.  And the manager, if they

7      knew about the fraud, wasn't managing it for their benefit

8      at all.  It was doing it solely for the purpose of getting

9      increased management fees from the funds.  The funds are

10     suing the managers for those fees.

11           THE COURT:  I have your argument on the adverse

12     interest exception.  You can -- why don't you move on to

13     something else?

14           MR. LOIGMAN:  Okay.

15           Your Honor, I would like to turn back then to the

16     trustee's first set of claims.  These are the claims for

17     six-year fraudulent transfer under New York State law as

18     well as the preference and constructive fraudulent transfer

19     claims under the Bankruptcy Code.  These are in Counts I,

20     III, IV, V, VI, VII and VIII of the fourth amended

21     complaint.

22           And these claims all fail because they are barred

23     by the safe harbor in Section 546(e).  Just last week, as

24     Your Honor knows, the Second Circuit affirmed Judge Rakoff's

25     holding that Section 546(e) applies in this SIPA case and

Page 36

1    the only way to circumvent application of 546(e) is to plead

2    with particularity facts demonstrating that the Kingate

3    funds actually knew that Madoff was not trading securities.

4           Now Judge Rakoff made this standard clear in the

5    Comad decision which is law of this case because this

6    adversary proceeding was one of the actions that was

7    consolidated and withdrawn by Judge Rakoff for adjudication

8    of the 546(e) issue.

9           As Judge Rakoff said, the trustee must show at a

10   minimum that the transferee had actual knowledge that there

11   were no actual securities transactions being conducted.

12          Now that language could not be any clearer and the

13   trustee has not come even close to alleging that the Kingate

14   funds had actual knowledge that Madoff was not trading

15   securities.  And we just went through, Your Honor, why we

16   believe the Kingate funds investment managers who were

17   acting adversely to the funds, their knowledge shouldn't be

18   imputed.

19          But for purposes of this discussion we'll assume

20   that their knowledge is imputed, which I think is incorrect.

21   The trustee's allegations don't show that they were aware he

22   wasn't trading securities.  They show just the opposite;

23   that the managers believed Madoff was trading securities.

24          THE COURT:  Are you talking about those front-

25   running allegations?

Page 37

1                    MR. LOIGMAN:  Yeah.  I mean, the first --

2                    THE COURT:  I mean, you can read that and say

3      that's what they're telling the people, but they didn't

4      necessarily believe it.

5                    MR. LOIGMAN:  That's not what the trustee alleges

6      in this complaint, Your Honor.

7                    THE COURT:  I read those allegations --

8                    MR. LOIGMAN:  But --

9                    THE COURT:  -- and he's alleging that this is what

10     they told the people --

11                   MR. LOIGMAN:  He --

12                   THE COURT:  -- or at least this is the answers

13     that they were --

14                   MR. LOIGMAN:  In the complaint, Your Honor, I

15     believe the trustee alleges that they believed that Madoff

16     was engaged in --

17                   THE COURT:  Where --

18                   MR. LOIGMAN:  -- the front running --

19                   THE COURT:  Where does it -- where do they allege

20     that?

21                   MR. LOIGMAN:  I believe it's in paragraph 140.  I

22     guess you're right, Your Honor, that he says, he answered

23     the question.

24                   THE COURT:  Yeah.

25                   MR. LOIGMAN:  But he -- they have that in

Page 38

```
 1   paragraph 139.  They have that in paragraph 140.  They're

 2   attributing Madoff's returns to what they call --

 3             THE COURT:  It certainly --

 4             MR. LOIGMAN:  -- front running.

 5             THE COURT:  It certainly implies -- one

 6   implication is that they believe that Madoff was actually

 7   engaged in securities transactions.  Another implication,

 8   though, is that this is what they're telling the people --

 9             MR. LOIGMAN:  I would --

10             THE COURT:  -- or knew the opposite -- but they

11   knew the --

12             MR. LOIGMAN:  I would point out two things about

13   that, Your Honor.

14             One is to the extent that they were saying he saw

15   the flows anyway, it doesn't -- it doesn't mean front

16   running anyway.  That's not what --

17             THE COURT:  I --

18             MR. LOIGMAN:  -- front running is.  Front running

19   is when a broker invests ahead of their customers.  It

20   wouldn't be front running at all.  If -- it does show, of

21   course, that they thought -- at least they were telling

22   people that Madoff was investing actual -- in actual

23   securities.

24             The other point with respect to that is this new

25   concept that comes up in the -- in their opposition brief
```

1    that that's just what they were telling people even though

2    they didn't believe that, that's not -- that's a new

3    argument.  It's not alleged in the complaint anywhere.  And,

4    most importantly, there's nothing that supports that.  They

5    don't point to anything that supports that they didn't

6    believe that that was right what they were telling their

7    investors.  They -- it's just an assumption in their brief.

8            Secondly, Your Honor, the trustee alleges that the

9    investment managers had a close relationship with Madoff.

10   It talks about hundreds of phone calls over the years.

11   That's about two per week during the time frame that they

12   alleged.  They said they met with Madoff twice a year.  They

13   say this -- that one of the managers once met Madoff and had

14   a tour of the 17th floor.

15           This all sounds like typical stuff, Your Honor,

16   for managers who invested nearly $2 billion with Madoff.

17   It's a far cry from what was alleged with respect to Merkin

18   in terms of his relationship with Madoff.

19           And most importantly about that is that none of

20   these allegations say that anybody at BLMIS ever gave any

21   information to the Kingate funds managers that was any

22   different from what was being disseminated to all investors.

23   So they didn't have any more reason to believe that Madoff

24   was operating a Ponzi scheme.

25           THE COURT:  Tell me -- tell me why Kingate funds

Page 40

1    didn't willfully blind themselves in light of red flags

2    which they were obviously aware of since they came up with

3    these answers to questions which were the red flags

4    themselves.

5            MR. LOIGMAN:  I'll -- let me start by answering

6    that question directly and them comparing it to the Merkin

7    decision where they held that they did allege willful

8    blindness.

9            First of all, the questions that they answered

10   from the investors in which they gave these answers to where

11   they explained why Madoff was achieving the returns that he

12   was achieving and why he did things, all of their answers

13   indicate the reasons why they believed Madoff was achieving

14   those returns.

15           So the mere fact -- and we'll use for example

16   because the most obvious is the fact that he achieved

17   consistent returns over the years is one of the principal

18   questions that was addressed there.  They explained they

19   don't -- their belief of why he is receiving consistent

20   returns over the year.

21           The fact that he did that, one, was known to the

22   entire market, right?  That's not something that's

23   particular to them that not everybody else in the world did.

24   And unless everybody in the world willfully blinded

25   themselves, that's not evidence of willful blindness.

1            In fact, the -- Your Honor, I apologize that I --

2    we didn't cite it, but it's because it's a decision that was

3    just released yesterday by the Second Circuit in the Elendow

4    Fund versus Ryan Investment Management.

5            THE COURT:  How do you spell that?

6            MR. LOIGMAN:  It's Elendow, E-L-E-N-D-O-W, and we

7    do have copies that we can hand up to the Court.

8            THE COURT:  Okay.

9            MR. LOIGMAN:  It is a summary order of the Second

10   Circuit and that was a class action or it was an action

11   against one of the managers of the Tremont Capital.  And it

12   -- in that Judge -- okay.  May I hand it up?

13           THE COURT:  Thank you.

14           MR. LOIGMAN:  Thank you.

15       (Pause)

16           MR. SHEEHAN:  Can we make -- do I get one, Your

17   Honor?

18           THE COURT:  I'm sure if you ask him -- I'm not

19   reading it now.  But I'm sure if you ask him he'll give you

20   one or he can just run it off.

21           MR. LOIGMAN:  Yeah.  Your Honor, for the record,

22   we just handed one to Mr. Sheehan.

23           MR. SHEEHAN:  Thank you.

24           MR. LOIGMAN:  And, Your Honor, in this case what

25   the Second Circuit was acknowledging was that these kinds of

Page 42

1    allegations they agreed with the District Court that they

2    don't fail -- they fail to plead (indiscernible) under the

3    securities law.  They don't --

4              THE COURT:  Let me ask you a question.  What's

5    your difference between (indiscernible) under the securities

6    law and willful blindness for what we're talking about?

7              MR. LOIGMAN:  Your Honor, I believe that conscious

8    disregard is the -- I'm sorry -- conscious recklessness,

9    okay, is --

10             THE COURT:  Recklessness is different, I think,

11   from willful blindness.

12             MR. LOIGMAN:  Then willful blindness.  I think it

13   is and, in fact, Your Honor, I think willful blindness,

14   which some courts as you know have equated with actual

15   knowledge -- Judge Rakoff draws a distinction -- is a higher

16   --

17             THE COURT:  Well, it's certainly not enough for an

18   aiding and abetting claim which is actual knowledge claim

19   and courts have drawn that distinction.

20             MR. LOIGMAN:  That's right, although I believe in

21   the Beacon Hill case there was an equation of actual

22   knowledge with willful blindness.  But for purposes of this

23   case it's clear that those things are different as Judge

24   Rakoff has held.

25             But the willful blindness standard is a very high

Page 43

1    standard.  Under willful blindness you have to show a

2    subjective belief, subjective belief on the part of the

3    defendant that they thought there was a high probability of

4    fraud.  And then they have to take actions to avoid learning

5    of that fraud which they effectively already know about.

6               THE COURT:  But what's the difference between that

7    and these securities cases?  I know that there are a lot of

8    (indiscernible) securities cases involving Madoff --

9               MR. LOIGMAN:  Right.

10              THE COURT:  -- in District Court and the Circuit

11   Court.  I'm just curious what you think the difference is in

12   the standard.

13              MR. LOIGMAN:  You know, it's hard to articulate

14   the difference, Your Honor, because the language of the two

15   standards --

16              THE COURT:  Right.  But you're giving me a

17   securities fraud case.

18              MR. LOIGMAN:  Right.  But I think that the answer

19   is that the willful blindness is actually a more difficult

20   standard to fulfill because whereas recklessness is

21   sufficient in the securities cases, here we're not talking

22   about just recklessness.  We're talking about the person

23   believed there was a high probability of fraud.  That, I

24   think, goes beyond recklessness.

25              It -- the other thing that's interesting, of

Page 44

1    course, about the Elendow decision is that it recognizes

2    that the fund itself was injured by Madoff's conduct.

3            But I'll give you an example, Your Honor, of what

4    willful blindness is and maybe that will answer the

5    question.

6            In the Merkin case, as Your Honor held, there was

7    evidence that he had a subjective belief -- again, it's a

8    subjective belief that he believed, okay, that there was a

9    high probability of fraud.  And some of the evidence of that

10   that was relied upon in the Merkin case was that he himself

11   used the language of Ponzi schemes in describing Madoff

12   before Madoff collapsed.  This was while Madoff was still up

13   and running, and that's when he said that Madoff scheme was

14   bigger than Ponzi and one day Charles Ponzi would lose out

15   because it would be called a Madoff scheme.

16           And there were allegations that one of the

17   portfolio managers told Merkin -- again, while BLMIS was up

18   and running -- that its trading was impossible and could be

19   a Ponzi scheme.  And Merkin then spoke to this research

20   company and identified various different red flags and said

21   to them, because of these I would never go long in a big

22   way.

23           And then with all of this in front of him Merkin

24   says, I don't really care what Bernie Madoff is investing

25   in.  I've made my peace with Bernie.  And that, Your Honor,

Page 45

1   is an example of exactly what willful blindness is.  You

2   have all of these facts in front of you. You acknowledge --

3   you have a subjective belief that there's a high probability

4   of fraud and then you say, I don't care.  I've made my peace

5   with Bernie.  I'm a manager.  I'll make whatever money I

6   make.  I don't care what he's actually doing.

7            And that's what wholly absent in the Kingate funds

8   complaint.  There's no allegation that the managers of the

9   Kingate funds -- and, again, we're focused on the managers -

10  - had a subjective belief that there was a high probability

11  of fraud.

12           So they may have looked at some of these same

13  facts out there that Merkin thought were red flags, things

14  like consistent returns that the entire market knew about;

15  things like using a small auditor that the entire market

16  knew about though they used PWC as their auditor; and they

17  didn't have a subjective belief in a high probability of

18  fraud.  There's no allegation that supports that, Your

19  Honor.

20           And the other allegations in the complaint about

21  knowledge that go beyond these sort of generally widely

22  recognized things in the market talked about calculations,

23  determinations, analyses that the trustee has done post-

24  collapse with the assistance of Alex Partners that there was

25  no reason for the Kingate funds managers to engage in and,

Page 46

1    importantly, no obligation of the Kingate funds to do those

2    types of analyses.

3            THE COURT:  Well, I thought the -- part of the

4    allegations are if you looked at the statements that they

5    were doing you would see some of these things.  I realize

6    that some of the things the trustee alleges would require

7    you to prepare statements to other sources of information.

8    But some of the allegations do go to the very documents they

9    were receiving from Madoff and they are looking at, but not

10   the average investor.

11           MR. LOIGMAN:  Well, Your Honor, let me address

12   that -- both of those points.

13           In terms of looking right at the account

14   statements themselves, some of the things that they

15   purportedly should have discovered by looking at the account

16   statements were, for example, that a certain percentage of

17   the time Madoff was buying in the lower half of the downward

18   trading range and then some portion of the time --

19           THE COURT:  Okay.  Now that I admit --

20           MR. LOIGMAN:  -- in the top range.

21           THE COURT:  -- you would have to look at an

22   external source.  But --

23           MR. LOIGMAN:  Yeah.

24           THE COURT:  -- other things, there were no ticker

25   symbols, I think, on the statements.  The over the counter

Page 47

1    trades didn't list counter parties when you got the count

2    confirmations.

3            MR. LOIGMAN:  Right.

4            THE COURT:  And -- and the option trade issue.

5            MR. LOIGMAN:  Sure.  And as to those types of

6    allegations, for example, they say trading outside the daily

7    price range, again, you would have to know what the daily

8    price range was.

9            They say that sometimes there was a negative

10   balance so there would have been margin trading that wasn't

11   -- the actual -- only way to determine that, Your Honor, is

12   if you look at these account statements there are hundreds

13   or thousands of trades on each account statement.  It

14   doesn't show a running balance.  They have a plus balance

15   and a minus balance.  It's not like you look at the

16   statement and it says, you now have a negative balance.

17   You're trading on margin.  You have to go through each one.

18   You have to determine how your balance is affected by each

19   one of the trades and then see where you're at.  And that's

20   something that they didn't effectively do, needless to say,

21   because they didn't discover these things.  And other people

22   in the market didn't do.

23           And in terms of like the ticker symbol, the QSIP

24   symbol that showed which exchange it was traded on, there's

25   no allegation that these guys knew that; that --

Page 48

1            THE COURT:  Well, isn't that something you would

2     know looking at these monthly statements?  They were getting

3     monthly statements.  They had hundreds of millions of

4     dollars invested.

5            MR. LOIGMAN:  I -- but there's no reason to

6     believe that's something they would know.  Again, that's

7     something that nobody in the entire market knew.  People

8     much more sophisticated than even them didn't catch that

9     these were examples of any misconduct at BLMIS.

10           The trick with these types of allegations of red

11    flags is no matter how many red flags there are, I mean,

12    these managers, we can't assume that they would be able to

13    discern all of these things that nobody else discerned.

14    They made mistakes.  Scotland Yard could make a mistake in

15    doing an investigation.  You can't assume that they're going

16    to discover everything, and there's nothing alleged here

17    that shows that, one, they saw these things; two, they

18    appreciated them for what they were; and that, three, as a

19    result they formed a subjective belief of a high probability

20    of fraud at BLMIS.

21           And that's what's key is that if you have to

22    allege as the Second Circuit says in Salts (ph) v. Frontier,

23    not just that the red flags are out there,  but that the

24    defendant was aware of these red flags.  And then --

25           THE COURT:  But those are security -- and I come

Page 49

1   back to the same question.  Those are securities fraud

2   cases, aren't they, where you have to show a strong

3   inference of (indiscernible), and I'm not sure that willful

4   blindness is the same standard.  I'm asking, I'm not telling

5   you.

6           MR. LOIGMAN:  And I think that's a very fair

7   question, Your Honor, and as I said before, and I do believe

8   it, I believe willful blindness is a higher standard because

9   the way that it's been articulated in the courts --

10          THE COURT:  Than (indiscernible) in a securities

11  case?

12          MR. LOIGMAN:  I think if you're going to compare

13  the two, I think --

14          THE COURT:  Well, you have to have a --

15          MR. LOIGMAN:  -- willful blindness --

16          THE COURT:  -- a strong inference of

17  (indiscernible)?

18          MR. LOIGMAN:  You have to have a strong inference

19  of (indiscernible).  And with respect to willful blindness

20  you have to plead with particularity  --

21          THE COURT:  Well, that's true in a securities

22  fraud case also.

23          MR. LOIGMAN:  That they had a subjective belief,

24  so now you're looking inside the mind of the defendant,

25  right, that there was a high probability of fraud.

Page 50

1              And I think that is just astringent as any

2     securities standard that would apply, Your Honor.  And

3     that's why some courts, not this Court and not Judge Rakoff

4     in these cases have equated that with actual knowledge.

5              So --

6              THE COURT:  Well, it's obviously less than actual

7     knowledge.

8              MR. LOIGMAN:  It is, but --

9              THE COURT:  If it was actual knowledge we wouldn't

10    be having this discussion.

11             MR. LOIGMAN:  Right.  And I'm saying for purposes

12    of this case it is less than actual knowledge.

13             The other claim that I would really like to focus

14    Your Honor's attention on is the equitable subordination

15    claim because with respect to equitable subordination it's

16    an odd claim to assert against the party that has lost $800

17    million by investing with BLMIS.

18             THE COURT:  But it's only -- equitable

19    subordination is only asserted against people who have

20    claims.

21             MR. LOIGMAN:  Well, exactly, Your Honor.  So --

22             THE COURT:  So there are -- so everybody has lost

23    money.  Every defendant in an equitable subordination case

24    is a loser.

25             MR. LOIGMAN:  Not really, Your Honor, because in

Page 51

1    this case they have lost $800 million and they have a claim.

2    If you apply it to -- the way that it's being applied in

3    this case is that it's actually punishing the Kingate funds,

4    right, for not withdrawing all of their money.  All right.

5    If they had withdrawn all of their money, as plenty of other

6    investors did, as Your Honor points out, they would have no

7    claim.  There would be no equitable subordination.

8            And then even if the trustee were to say, well,

9    they were bad guys and we should claw back everything that

10   they ever withdrew -- and for the reasons that we're

11   discussing I don't believe the trustee would have a valid

12   claim to that, all right -- then the funds would get a

13   corresponding 502(h) claim for anything that they paid back.

14   Even in that case they would be better off.

15           And there's nothing equitable about punishing a

16   customer for keeping its money invested in BLMIS.  And that

17   is what equitable subordination would achieve here.  It's

18   punishing them for keeping money invested.  It's making them

19   worse off.

20           THE COURT:  But they -- but -- or the customer in

21   this case is the Kingate funds, not the investors in

22   Kingate.

23           MR. LOIGMAN:  The customer is the Kingate funds,

24   right, and the customer is the one that left their money in

25   the Kingate -- in BLMIS.  They could have withdrawn it at

Page 52

1    any time as plenty of other people did and they didn't.

2            And an important point with respect to that, Your

3    Honor, is that there are two elements, of course, to

4    equitable subordination.  One is to show this egregious

5    conduct that's tantamount to fraud or misrepresentation.

6    And the second is to show harm to other customers.

7            With respect to the egregious misconduct element,

8    again, we've been through some of these points.  They rely

9    on the same points at they did with respect to the

10   fraudulent transfer claims.  Those allegations, I submit,

11   come nowhere close to alleging the type of egregious

12   misconduct that's tantamount to fraud because there's

13   nothing wrong with an investor withdrawing his own money.

14   And that -- plenty of investors withdrew all of their own

15   money --

16           THE COURT:  If I were to conclude that the claim

17   adequately pleaded willful blindness, tell me why equitable

18   subordination might not be an alternative remedy, in other

19   words survive the motion to dismiss.

20           MR. LOIGMAN:  Okay.  Your Honor, there's a very

21   important reason because there are two elements of equitable

22   subordination.  One is that the egregious misconduct, and if

23   we assume for now that willful blindness would be egregious

24   misconduct, even assuming that, the second element is that

25   there has to be harm to the other customers.  And the

Page 53

1    trustee hasn't alleged harm to BLMIS customers here.  And

2    I'll walk you through that.  There's --

3               THE COURT:  What is the difference between this

4    and Merkin?

5               MR. LOIGMAN:  Okay.  Your Honor, there's two kinds

6    of claims, two kinds of harm, right, that the trustee is

7    alleging here and in Merkin, right?

8               First, he says that by investing in BLMIS the

9    Kingate funds gave Madoff this air of credibility so other

10   people invested with him, sort of propped it up.  They kept

11   it going because they were putting money in.

12              That, I would submit, is backwards because under

13   that logic all the net losers are responsible for Madoff's

14   fraud.  They're the ones who are funding the fraud and

15   continuing it, and they're actually the principal victims in

16   the fraud because they're net losers.

17              THE COURT:  But all of the net -- all of the net

18   losers didn't engage in inequitable conduct according to the

19   trustee.  They were just innocent -- basically innocent

20   victims.

21              MR. LOIGMAN:  But that's the -- that's the --

22   that's talking about not the inequitable conduct side.

23   That's talking about --

24              THE COURT:  Right.

25              MR. LOIGMAN:  -- whether there's harm to other

1    customers.

2              THE COURT:  But you're implying that all of the

3    net losers would be equitably subordinated and all I'm

4    saying is that that's only part of the equation.

5              MR. LOIGMAN:  I'm just implying what the trustee

6    said, which is that they kept it alive, they kept the -- it

7    going by investing.

8              THE COURT:  All right.  But whatever the funds

9    withdrew, though, if they hadn't withdrawn it, that would

10   have been money available to the estate.

11             MR. LOIGMAN:  Exactly.  That's the second form of

12   harm that the trustee alleges and that's an important one

13   that I would like to address because, Your Honor, that only

14   looks at half the picture.

15             The Kingate funds invested nearly $2 billion with

16   BLMIS and they withdrew only half of that amount.  So as a

17   result of the Kingate funds investments there was $800

18   million more in cash in BLMIS than there would have been if

19   they hadn't invested.  And the trustee is divorcing the

20   deposits from the withdrawals and there's no basis for doing

21   that because --

22             THE COURT:  But the trustee -- the trustee is

23   arguing that you -- that Kingate wasn't entitled to withdraw

24   anything and that every dollar it withdrew harmed the other

25   customers.  That's essentially what the argument is.

Page 55

1          MR. LOIGMAN:  But, again, that's looking at half

2     the picture.  The one thing that's beyond dispute -- I don't

3     think the trustee can dispute it.  I don't think anybody can

4     dispute it, is that because the Kingate funds were

5     investors, when BLMIS stopped operating it should have had

6     $800 million more in cash to distribute to everybody, not

7     less.  The other customers were not harmed by the fact that

8     the Kingate funds invested in Madoff.

9          And if you say they were harmed by the fact that

10    they withdrew money, that's -- again, it's looking at only

11    half the picture.  You have to look at what the Kingate

12    funds total conduct was.  It was investing, infusing $1.7

13    billion.  The transfer of the money out is not the relevant

14    conduct.  It's whether their investment hurt other

15    customers.  And it clearly didn't hurt other customers.  In

16    fact, the overall investment benefited other customers.

17          THE COURT:  Why don't you wrap it up so I can hear

18    from --

19          MR. LOIGMAN:  Sure.  I'll wrap it up, Your Honor.

20    Let me just touch very, very briefly on the disallowance

21    claims that --

22          THE COURT:  I've -- I've dealt with those already.

23          MR. LOIGMAN:  Okay.  Your Honor, then, if I could

24    ask for the ability to respond to anything.

25          THE COURT:  Briefly.

Page 56

1          MR. LOIGMAN:  Thank you, Your Honor.

2          MR. SHEEHAN:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. SHEEHAN:  You would probably be very shocked

5    to hear that there's something I'm totally in agreement with

6    with Mr. Loigman, and that is that Ezra Merkin is --

7          THE COURT:  What, that it's still morning?

8          MR. SHEEHAN:  No.  That Ezra Merkin was willfully

9    blind.

10         THE COURT:  Well --

11         MR. SHEEHAN:  All right.

12         THE COURT:  -- I don't think his opinion counts.

13      (Laughter)

14         MR. SHEEHAN:  You seemed to suggest that.

15         If Your Honor --

16         THE COURT:  Why don't you move on to your next

17   argument?

18         MR. SHEEHAN:  Yeah.  Let me move on.

19         Let me actually, if I may, impose upon Your Honor

20   for a little bit of history here because I think it's

21   necessary, now that we have the benefit of Your Honor's

22   decision in Merkin, to look at this a little bit because I

23   think it does inform a good deal of how we should test the

24   elements of what are actual knowledge, which I think is a

25   really interesting question here not really dealt with,

Page 57

1    although some would suggest otherwise, by Judge Rakoff

2    leaving it content to Your Honor.

3              And so I want to go back in time because -- and

4    I'll be very brief, I promise -- to go through this very,

5    very quickly how does it all start.

6              We start in July of 2011 with the Picard, you

7    know, withdrawal of the reference.  And in that particular

8    instance, but what's most important is this, is that what he

9    is saying in there -- and I'm not going to quote the cases.

10   Your Honor can read them.  But what's clear with what he's

11   saying is, is that unless we can show that these guys didn't

12   have a legitimate expectation -- key word here throughout

13   all of this is legitimate.  They have to have a legitimate

14   expectation that, in fact, there was a fraud -- you know,

15   that there was a trading taking place.  They were entitled

16   to believe in that.  As a result of being entitled to

17   believe in that, they were entitled to have a safe harbor.

18   All of that is what gives them that protection.

19             And in that particular instance we're talking

20   about who he thought -- it's clear if you read all of it --

21   were unsophisticated people:  A man on a baseball team, he

22   might have a lot of financial interest in real estate, but

23   they really weren't sophisticated.

24             And, by the way, securities law doesn't require

25   you to make inquiry with regard to your broker.  It's just

Page 58

1    not part of the game.  That's all there.

2              So we then -- so he finds, therefore, that they

3    get the protection of safe harbor and now if we're going to

4    go after them at all we can only go for the two-year period,

5    and in that two-year period we've got to prove they're

6    willfully blind.  And now that, on that we were sustained

7    with regard to them being willfully blind.  They did not

8    only move to dismiss, they moved for summary judgment and

9    lost on both of them.

10             Why is that important?  It's important because

11   when we fast-forward later, and I'll get to it in a moment

12   to Comad, you have to start realizing that that's only an

13   exemplar.  It doesn't mean that you're not Comad.  You're

14   not what we find here.  You don't have actual knowledge.

15             THE COURT:  I understand that.

16             MR. SHEEHAN:  I know you do, Your Honor.  But I

17   think our adversary sometimes suggests otherwise.

18             Here's the important part.  So now we get to the

19   next part and we say to them, wait a minute.  This is all

20   predicated, you -- you're saying that you take this account

21   opening documents and the other agreements there.  You have

22   a legitimate expectation that there was trading and,

23   therefore, legitimately you're entitled to get the safe

24   harbor.

25             We say, well, wait a minute.  What if you didn't

1    have a legitimate expectation?  Should you be entitled to

2    the safe harbor?  Should you be able to get that?  And he

3    goes, huh, you've got something there.  Let's brief that.

4    And we do an MTWR on that, and the next thing you know we

5    have an opinion from him with regard to whether or not you

6    can expect to get the protection of safe harbor.

7           And if you'll bear with me, Your Honor, I think

8    it's important to do this.  I don't usually read very much

9    here, Your Honor, but I want to read at least from the

10   opinion, which is the opinion of the Court on the actual

11   knowledge.  And this is where he starts at the beginning of

12   the case.  And if you'll remember what Judge Rakoff was

13   doing in many of our cases where he would issue a bottom

14   line order, two pages, and then later on submit a one that

15   -- and this is the opinion that expands upon that bottom

16   line order.

17          And he says here in the bottom line order:

18          "Where the trustee has sought to recover transfers

19   made to a subsequent transferee, the avoidance of which

20   would otherwise be barred by Section 546(e)" -- oops.  Am I

21   in the right opinion here?  Nope.  I got the wrong one.

22   I'll get it for you, Your Honor.

23       (Pause)

24          MR. SHEEHAN:  No.  I got the right one.

25          THE COURT:  Which opinion are you reading from?

Page 60

1          MR. SHEEHAN:  I'm reading the Securities -- it's

2     -- the cite to this is -- well, in fact, I pulled out the

3     Westlaw cite.  It's 213 Westlaw 1609154, Southern District

4     of New York.  It's the third in the trilogy of the opinions,

5     the first one being Picard, second being Greif, and this

6     being the third one.

7          In the bottom line order -- let me -- let me read

8     both.  It's just easier.

9          "Where the trustee has sought to avoid transfers

10    to an initial transferee, the avoidance of which would

11    otherwise be barred by Section 546(e), under the Court's

12    ruling in Katz and Greif, the original transferee will not

13    be able to prevail on a motion to dismiss some or all of the

14    trustee's avoidance action claims simply on the basis of

15    Section 546(e) safe harbor if the trustee has alleged that

16    the initial transferee had actual knowledge of the Madoff

17    fraud.

18          "Two:  Where the trustee has sought to recover

19    transfers made to a subsequent transferee, the avoidance of

20    which would otherwise be barred by 546(e) to the initial

21    transferee, the subsequent transferee would not be able to

22    prevail on a motion to dismiss on some or all of the

23    trustee's avoidance claims simply on the basis of Section

24    546(e) safe harbor if the trustee has alleged that the

25    subsequent transferee has actual knowledge of Madoff's

Page 61

1    securities fraud."

2           What does he not say there?  He does not say there

3    are Ponzi schemes.  He couldn't have meant that.  It doesn't

4    make any sense.  I realize he says that later in the

5    opinion.  I realize he says -- he says a lot of things.  He

6    says Madoff's fraud.  He says absence of trading.  He says

7    Ponzi scheme.  They're all exemplars of what, no legitimate

8    expectation.  It's exactly what that case stands for, not

9    that if you don't know it's a Ponzi scheme you get a free

10   ride.

11          Just as -- Your Honor,  may I drift over to Judge

12   Schwain's (ph) courtroom for 30 seconds here?  This is just

13   the other day.  She's sentencing judge -- Ms. Crupe (ph) to

14   six years in prison --

15          THE COURT:  Judge Schwain (ph).

16          MR. SHEEHAN:  Judge Schwain.  And she says:  "As

17   the jury was instructed, knowledge that the operation was a

18   Ponzi scheme is not necessary for culpability."  That means

19   you go to jail for six years.  Well, we're not supposed to

20   be able to sue somebody because they say I didn't know it

21   was a Ponzi scheme.  That is not what Judge Rakoff said.

22          THE COURT:  Why --

23          MR. SHEEHAN:  That would be illogical for him to

24   go there.

25          THE COURT:  Tell me how you pled that the Kingate

Page 62

1    funds had actual knowledge of the Ponzi scheme --

2              MR. SHEEHAN:  Here, I'll give you --

3              THE COURT:  -- or actual knowledge of the -- or

4    actual knowledge of whatever you think they would have had

5    to have actual knowledge of.

6              MR. SHEEHAN:  All right.  Can I add one thing?  I

7    --

8              THE COURT:  Yeah.

9              MR. SHEEHAN:  -- let me answer it and then I'll --

10   it's better just to answer it.

11             Take, for example, the options trading and the

12   fact that they would look at that, all right.  If you looked

13   at the options trading it wasn't that there -- that's part

14   of it and that's part of the story, et cetera, but the fact

15   is, is that there were options traded supposedly on their

16   statements for their accounts that exceeded the entire

17   options on the entire market for the day.

18             THE COURT:  Wouldn't you have to -- you could only

19   figure that out by then going somewhere else to determine

20   what the option trading was.

21             MR. SHEEHAN:  And why did they -- and you know

22   what that is?  You know what makes it different?  They're

23   not Katz.  They're not Wilpon (ph).  They're selling the

24   duty.  They got paid $370 million for what, to do nothing,

25   to sit on their hands.  I don't think so.  They got $370

1    million because they said, you give me your money, other

2    people's money, not the Katz Wilpon money, other people's

3    money and I'm going to invest it for you.

4            And you know what I'm going to do, I'm going to

5    watch it.  I'm going to use, as everybody else in the

6    industry does, we're going to watch it.  That's what feeder

7    funds do.  That's why you give your money to a feeder fund

8    because they're going to do net asset valuations.  They're

9    going to use the sharp ratio, the check out volatility.

10   They all do it.  They all do it every day.

11           THE COURT:  But then aren't --

12           MR. SHEEHAN:  They --

13           THE COURT:  -- aren't -- are you really arguing

14   that their negligence performance of the duty to

15   investigate, which they owe to their own investors, not to

16   BLMIS, is grounds for founding that they were willfully

17   blind?

18           MR. SHEEHAN:  Yes, because at the end of the day

19   --

20           THE COURT:  But willful blindness and negligence

21   are different standards.

22           MR. SHEEHAN:  I understand.  But it's -- it's not

23   just negligence.  They looked.  They said they looked.  They

24   saw it.  They said they saw it.  They -- there's documents

25   that say --

1          THE COURT:  They said they saw what?

2          MR. SHEEHAN:  They saw the -- they compared these

3    things.  They looked at them.

4          THE COURT:  Okay.  So where is that pleading --

5          MR. SHEEHAN:  I think they --

6          THE COURT:  -- that they saw that the options

7    traded --

8          MR. SHEEHAN:  The --

9          THE COURT:  -- had exceeded the daily volume.

10         MR. SHEEHAN:  Pardon?

11         UNIDENTIFIED SPEAKER:  Account statements --

12         MR. SHEEHAN:  Yeah.  We have -- all right.

13         THE COURT:  All right.  They looked at the account

14   statements.  I understand that.

15         MR. SHEEHAN:  Right.

16         THE COURT:  But where does it allege that they

17   looked at the account statements --

18         MR. SHEEHAN:  Okay.

19         THE COURT:  -- and they saw that the options

20   exceeded all of the -- the options trading exceeded all of

21   the options --

22         MR. SHEEHAN:  Because if you look at it and you

23   compare it to something else that they should have, they

24   would have.  All right.  That's not --

25         THE COURT:  When you say --

Page 65

1              MR. SHEEHAN:  -- just negligence here --

2              THE COURT:  When you say should have and would

3     have, that starts to sound like a negligence standard.

4              MR. SHEEHAN:  But here's the --

5              THE COURT:  I'm having a lot of difficulty in my

6     own mind separating negligent inquiry from willful blindness

7     from actual knowledge.  That's --

8              MR. SHEEHAN:  So what were they supposed to do?

9     They did nothing.  They just looked at the statement.  They

10    got paid $370 million.  Your Honor's saying that's

11    negligence.  No.  What I'm saying is they looked.  And, by

12    the way, we're at a motion to dismiss here.  I've got a

13    plausible argument, not probable, plausible that these guys

14    got paid $370 million.  They got all these statements.  They

15    went out and they did their job.  They found out that these

16    things were impossible, not not probable, impossible.

17    Therefore, those trades never happened.  They couldn't have

18    happened, not possible to happen.

19              I have absolutely plausibly pled that that's what

20    happened here.  I haven't taken one deposition because we're

21    that far down the road and yet haven't had any real

22    discovery in this case.  These are all pulled together based

23    on documents we got from FIM over in Europe through the UK,

24    not through any discovery here in this case.

25              So once we get started I think we've got a

Page 66

1    plausible argument here that if you look at all those

2    statements and they're taking $370 million in fees and they

3    did what they said they were going to do, in other words

4    Your Honor would have to accept the fact they didn't do what

5    they said they were going to do; that they weren't going to

6    go out and check.  They weren't going to take those fees

7    because they were going to look.   And that when they went

8    and they looked and they saw it was impossible, they turned

9    a blind eye because they had actual knowledge that no

10   trading was taking place.

11           So to suggest here today that they should somehow

12   walk makes no sense whatsoever.  It -- let me add one other

13   element to that if I can, Your Honor, and it's troublesome.

14           They say this about front runner.  All right.

15   Let's just -- I read what they said as sort of a classy way

16   of saying they're front running.  They said, you know, look,

17   the guy's got the market making.  He can get in front of the

18   trade.  They didn't call it front running, but that's

19   essentially what they describe.  One could argue whether --

20   let's assume that that's what they're saying.  All right.

21   That's criminal.  That's a criminal act.  All right.

22           So they're saying, yeah, but it's okay because --

23           THE COURT:  What's a criminal act?

24           MR. SHEEHAN:  Front running is criminal.  You're

25   not allowed to do that.

1          THE COURT:  But that's not --

2          MR. SHEEHAN:  You can go to jail for that.

3          THE COURT:  But that's not what you alleged.

4          MR. SHEEHAN:  No.  What we alleged is they told

5     their people that the way he was able to get the consistent

6     returns is he had access to the market because of his

7     market-making operation.  He could stay in front of the

8     trades.  That's front running.  That's what that is.

9          They say, well, that means there must have been

10    trading.  So if there must have been trading we get the

11    benefit of safe harbor.  How the -- how does that work?

12         You can say that what you're doing is criminal

13    and, therefore, you have a legitimate expectation that

14    entitles you to safe harbor.

15         THE COURT:  I don't think that's quite what you're

16    alleging in the complaint.

17         MR. SHEEHAN:  Well, it's certainly a plausible

18    argument from what we have alleged in the complaint.  We've

19    alleged in the complaint that they reached out to their

20    people because they couldn't explain the consistent returns.

21    There is no way to explain it utilizing a split strike

22    conversion strategy.  They knew that.  They didn't even try.

23    All right.

24         So what we're saying is, is that they went out and

25    they came up and concocted some basis for suggesting that;

Page 68

1     that if you read it and the clear reading of it is that

2     they're telling their customers they're engaging in front

3     running, right, at the end of the day -- which our

4     adversaries have argued here.  They've said, oh, the trustee

5     said it was front running.  Therefore, it's okay because

6     there must have been trading so that's okay with Judge

7     Rakoff's decision when, in fact, that can't be what Judge

8     Rakoff was saying.

9           Judge Rakoff couldn't have been saying that you

10    can engage in an illegitimate activity on a daily basis and

11    as long as you don't know it's a Ponzi scheme you can take a

12    walk.  That can't be what he was saying.

13          And what we have here is through our complaint,

14    well plead plausible pleading is two guys getting together,

15    Suredi (ph) and Grosso, creating instrumentalities of fraud

16    starting with these two funds and utilizing those

17    instrumentalities including Kingate Management, Ltd, a

18    perverted FIM that started out legit and then perverted them

19    into an illegitimate operation and used all of those, why,

20    to get $370 million into their pockets.

21          And by the way, with regard to -- I don't intend

22    to go into a lot of the arguments raised here this morning

23    by my adversary.  I do believe on the issues of imputations

24    and others and equitable subordination that your decision in

25    Merkin called it right and we have that same situation here.

Page 69

1    I don't see any difference between the two, quite frankly.

2              So at the end of the day what I'm suggesting to

3    Your Honor is, is that at this stage of the case, on a

4    motion to dismiss, when we've had all those pleadings that

5    we had that detail literally dozens and dozens of instances

6    where they had the opportunity and had the duty -- think

7    about this.  They sold the duty.  I'm not asking Your Honor

8    to impose a duty.  They went out and sold it for $370

9    million and said, we'll take care of you.  We're going to do

10   all this checking.  We're going to make sure it's all okay.

11             That's pled.  They -- we plead that they didn't do

12   it.  All right.  And, therefore, they ended up being

13   willfully blind and had actual knowledge based upon all

14   that.

15             Here's the point, Your Honor, is at the end of the

16   day they're not Katz Wilpon.  They're not unsophisticated

17   investors.  These are guys who were in the industry on a

18   daily basis making a buck off of investing other people's

19   money.  That alone should give them the duty to do something

20   and have a -- it's not whether or not they had any

21   obligation to investigate the broker independently for their

22   own investments.  It's whether they had a duty because they

23   took other people's money and said they would invest it, and

24   they should do something with it other than just invest it

25   and do nothing.

Page 70

1          So at the end of the day, Your Honor, our position

2     is is that our complaint adequately pleads plausible

3     allegations with regard to what we can establish at trial

4     with regard to both actual knowledge predicated upon the

5     impossibility of these trades, all right, that they should

6     and did know about.  And when we take their depositions they

7     will -- we will find that out.  And when we go to trial I

8     think we have enough of it for a fact finder to find that

9     they willfully blinded themselves and actually knew that

10    these trades were impossible and as a result were not

11    entitled to the safe harbor.

12          Thank you.

13          THE COURT:  Thank you.

14          MR. LOIGMAN:  Your Honor, I heard your admonition

15    before and I'll be brief.

16          Mr. Sheehan was very animated in pointing to us --

17          THE COURT:  He's over there.

18          MR. LOIGMAN:  Right.  And saying --

19       (Laughter)

20          MR. LOIGMAN:  -- repeatedly, repeatedly --

21          MR. SHEEHAN:  Thank you, Your Honor.

22          MR. LOIGMAN:  -- repeatedly that we got, that

23    these two funds got $370 million, kept pointing at us and

24    saying, you got $370 million.  You sold a duty.  Well, Mr.

25    Sheehan is completely incorrect about that.  The funds

Page 71

1    didn't get a single dime of that $370 million.   The funds

2    were the ones who paid that $370 million.  They paid it to

3    their investment managers.

4              And what Mr. Sheehan has done is explained exactly

5    what imputation should not apply here because to the extent

6    he's saying they sold a duty that they didn't fulfill, they

7    acted adversely to the very funds who were paying them the

8    amounts, paying them that $370 million for them to perform

9    those duties.

10             And talking about those duties, what Mr. Sheehan

11   alleges -- and then when he goes on to say that they had all

12   of this knowledge, in the complaint he repeatedly alleges

13   that they didn't fulfill those duties.  And Your Honor won't

14   hear me arguing with that.  I wish they had fulfilled those

15   duties and that the Kingate funds hadn't lost all of that

16   money.  But in paragraphs 128, 129, 132, 133, the trustee

17   repeatedly alleges that the investment managers did not

18   fulfill any due diligence obligations they may have had to

19   the funds.  The funds, in contrast, had no obligations to

20   BLMIS to investigate its broker, to study any account

21   statements.  These are obligations that he's trying to

22   create on the part of the funds that don't exist.

23             And an important fact to keep in mind, and one I

24   mentioned before, Your Honor, is that the funds sole

25   investment, their sole investment was in BLMIS.  So when the

Page 72

1    investment managers put their money into BLMIS, the reason

2    why there was imputation of Merkin is because there was some

3    benefit to the funds of investing more in BLMIS.  And in

4    this case there's absolutely no benefit to the funds of

5    investing in BLMIS.  All they did was lose more money.

6    Money would come in.  They lost it to Madoff.  There was no

7    benefit whatsoever.

8                   I think the trustee here and Mr. Sheehan has

9    actually made out a strong argument for why imputation

10   should not apply here.

11                  Very briefly addressing a few other points he

12   raised, he points to Katz Wilpon as an example of where

13   there was willful blindness and says the simple real estate

14   baseball investors in Katz Wilpon are very different than

15   the investors here.

16                  First, I'll remind the Court that Katz Wilpon are

17   net winners.  All right.  They didn't lose money in Madoff.

18   So there's a lot more basis for assuming that they knew

19   something was going on.

20                  Secondly, Katz Wilpon were not the simple people

21   that Mr. Sheehan paints them to be.  I'll remind the Court

22   that they actually set up their own hedge fund, Stomino (ph)

23   Sterling Partners.  You remember their name was Sterling

24   Partners.   And their own hedge fund advised them that they

25   would not invest in Madoff because it wouldn't meet the

Page 73

1    hedge funds due diligence requirements.  These weren't

2    unsophisticated investors by any means.

3              Next, Mr. Sheehan points to the standard that

4    Judge Rakoff set forth in Comad with respect to 546(e).  And

5    I submit the standard couldn't be any clearer.  It says,

6    actual knowledge that they were -- there were no securities

7    transactions being conducted.

8              And what Mr. Sheehan said is, well, if they should

9    have figured out that there was something going wrong there.

10   That's not the standard at all.  Even if they thought there

11   was some reason why Madoff was getting better returns and

12   maybe he was doing something different than other people in

13   the market, an allegation for which there's no basis, but

14   even that doesn't say no securities being transacted.

15   Remember, the 546(e) is tied to whether there's a securities

16   contract.  All right.  It's one of the basis for 546(e).

17             And what Judge Rakoff was saying is that if

18   everybody knew there were no securities being transacted,

19   there would be no underlying securities contract.  But so

20   long as the Kingate funds or their managers in that instance

21   believed that there were securities being transacted, there

22   is that underlying securities contract, 546(e) applies, and

23   the only way to get around it is that actual knowledge.

24             And unless Your Honor has any further questions --

25             THE COURT:  No.

1           MR. LOIGMAN:  -- I have nothing to add.

2           THE COURT:  Thank you.

3           MR. LOIGMAN:  Thank you, Your Honor.

4           THE COURT:  I'll reserve decision.  Thank you.

5           Did you want to --

6           MS. HARRIS:  No.

7           THE COURT:  Oh, I thought I saw you stand.  Okay.

8           Thank you very much.

9      (A chorus of thank you)

10     (Whereupon, these proceedings concluded at 11:19 AM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2                         RULINGS

 3                                        Page      Line

 4    Motion to Dismiss                    --        --

 5

 6    Motion for Entry of Order Pursuant to

 7    Section 105(a) of the Bankruptcy Code

 8    and Rules 2002 and 9019 of the Federal

 9    Rules of Bankruptcy Procedure Approving

10    a Settlement Agreement by and between

11    the Trustee, on the one hand, and

12    Primeo Fund and Herald Fund SPC on

13    the other hand                        14        16

14

15    Motion for Entry of Order Pursuant to

16    Section 105(a) of the Bankruptcy Code

17    and Rules 2002 and 9019 of the Federal

18    Rules of Bankruptcy Procedure Approving

19    a Settlement Agreement by and between

20    the Trustee and Senator Fund SPC      17         1

21

22

23

24

25
```

Page 76

1                        I N D E X

2                            RULINGS

3                                          Page        Line

4      Motion for Entry of Order Pursuant to

5      Section 105(a) of the Bankruptcy Code

6      and Rules 2002 and 9019 of the Federal

7      Rules of Bankruptcy Procedure Approving

8      a Settlement by and between the Trustee

9      and Westport National Bank, a Division

10     of Connecticut Community Bank, N.A.      11           6

11

12     Motion to Consolidate Adversary

13     Proceedings                             25          12

14

15

16

17

18

19

20

21

22

23

24

25

Page 77

1                    C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7    Sherri L
                    Digitally signed by Sherri L Breach
                    DN: cn=Sherri L Breach, o, ou,
     Breach         email=digital1@veritext.com, c=US
8                   Date: 2014.12.18 15:53:51 -05'00'

9    Sherri L. Breach

10   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

11

12

13   DATE:  December 18, 2014

14

15

16

17

18

19

20

21

22   Veritext

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501

**&**

**&**   4:12 5:8,18 7:16
   17:13 77:10

**0**

**09-01161**   1:3
**09-01364**   1:12

**1**

**1**   75:20
**1.3**   9:19
**1.6**   14:7
**1.7**   55:12
**10-05418**   1:19
**100**   12:18 16:9 17:1
   17:2
**10001**   6:5
**10010**   5:12
**10016**   6:12
**10022**   4:15 5:21
**10111**   4:5
**105**   3:3,9,14 7:19
   75:7,16 76:5
**10:02**   2:16
**11**   76:10
**11501**   77:25
**11:19**   74:10
**12**   76:13
**128**   71:16
**129**   71:16
**132**   71:16
**133**   71:16
**139**   12:3 38:1
**14**   26:19 75:13
**14-02408**   2:2
**140**   37:21 38:1
**15**   9:19
**154**   12:12
**15th**   5:3
**16**   75:13
**1609154**   60:3
**17**   2:15 75:20
**17th**   39:14
**18**   77:13

**2**

**2**   6:11 39:16 54:15

**2.1**   8:14
**20**   14:8
**200**   7:25
**20005**   5:4
**2002**   3:4,10,15 75:8
   75:17 76:6
**2011**   57:6
**2014**   2:15 77:13
**213**   60:3
**22nd**   5:11 22:10
**23**   30:10
**25**   30:10 76:13
**275**   6:3
**28.2**   8:11
**29**   12:20

**3**

**3**   17:23 19:14 20:22
   20:23 25:13,25
**30**   61:12
**300**   77:24
**31**   5:10
**330**   77:23
**370**   62:24,25 65:10
   65:14 66:2 68:20
   69:8 70:23,24 71:1
   71:2,8
**397**   77:3,10

**4**

**45**   4:4
**467**   12:19 13:8
**490**   13:2

**5**

**50/50**   16:7
**502**   14:20 51:13
**546**   35:23,25 36:1,8
   59:20 60:11,15,20
   60:24 73:4,15,16,22
**567**   12:7

**6**

**6**   76:10
**601**   5:20
**660,000**   8:15

**7**

**7th**   6:4

**8**

**8**   23:22
**800**   5:3 26:20 50:16
   51:1 54:17 55:6
**805**   5:3

**9**

**90**   16:5
**9019**   3:4,10,15 7:19
   75:8,17 76:6
**919**   4:14
**95**   16:2

**a**

**a.m.**   2:16
**aaert**   77:10
**abetting**   42:18
**ability**   9:3 55:24
**able**   10:11 22:7
   48:12 59:2 60:13,21
   61:20 67:5
**absence**   61:6
**absent**   45:7
**absolutely**   21:7
   27:8 65:19 72:4
**accept**   66:4
**access**   67:6
**account**   7:23,23,24
   8:5,6,9,18 34:24
   35:2 46:13,15 47:12
   47:13 58:20 64:11
   64:13,17 71:20
**accounts**   23:24
   62:16
**accurate**   77:4
**achieve**   51:17
**achieved**   40:16
**achieving**   40:11,12
   40:13
**acknowledge**   45:2
**acknowledged**   9:2
**acknowledging**
   41:25
**acquire**   28:24

**acquired**   32:20
**act**   66:21,23
**acted**   71:7
**acting**   9:5 36:17
**action**   7:22 14:14
   17:21 18:1 19:12,12
   20:2,14,15 25:2,15
   27:25 41:10,10
   60:14
**actions**   18:2,4,12,22
   19:7,25 20:3,7,12
   20:15,19,22 24:3
   25:12,12 36:6 43:4
**activity**   68:10
**actual**   36:10,11,14
   38:22,22 42:14,18
   42:21 47:11 50:4,6
   50:9,12 56:24 58:14
   59:10 60:16,25 62:1
   62:3,4,5 65:7 66:9
   69:13 70:4 73:6,23
**add**   62:6 66:12 74:1
**adding**   13:7
**addition**   18:21
**additional**   29:19
   30:6
**address**   46:11 54:13
**addressed**   19:16,17
   40:18
**addressing**   72:11
**adequately**   52:17
   70:2
**adjudication**   36:7
**administered**   26:25
**administering**   27:3
**admit**   46:19
**admitted**   34:10
**admonition**   70:14
**adversaries**   68:4
**adversary**   3:20 9:14
   9:23 10:15 22:12,13
   36:6 58:17 68:23
   76:12
**adverse**   35:11
**adversely**   36:17
   71:7

advice  8:24
advised  72:24
affirmed  35:24
agents  29:5,6 32:19
  32:19
ago  15:8
agree  18:8 21:7
agreed  16:3,6 20:19
  22:24 24:24 42:1
agreement  3:5,11
  9:1,4,17 10:1 12:11
  12:16 22:24 23:17
  56:5 75:10,19
agreements  58:21
ahead  26:11 28:18
  38:19
aiding  42:18
air  53:9
al  1:9,16,23 2:3,6
alex  45:24
alive  29:18,22 54:6
allegation  19:15
  45:8,18 47:25 73:13
allegations  25:25
  27:25 28:21,21,22
  30:15 31:13 36:21
  36:25 37:7 39:20
  42:1 44:16 45:20
  46:4,8 47:6 48:10
  52:10 70:3
allege  27:22 37:19
  40:7 48:22 64:16
alleged  39:3,12,17
  48:16 53:1 60:15,24
  67:3,4,18,21
alleges  37:5,15 39:8
  46:6 54:12 71:11,12
  71:17
alleging  33:9 36:13
  37:9 52:11 53:7
  67:16
allow  14:11 25:2
allowed  10:11 11:1
  14:7,11 16:21,23
  66:25
allowing  16:10

alpha  1:16
alternative  52:18
amedeo  6:1
amended  35:20
amount  8:12 12:25
  12:25 14:5,9 16:23
  26:21 32:1 54:16
amounts  14:11 71:8
analyses  45:23 46:2
animated  70:16
answer  16:12 43:18
  44:4 62:9,10
answered  37:22
  40:9
answering  40:5
answers  37:12 40:3
  40:10,12
anybody  39:20 55:3
anyway  38:15,16
apologize  41:1
appeals  30:24 31:13
appearing  6:16
appears  11:10
application  10:20
  11:13 36:1
applied  51:2
applies  35:25 73:22
apply  50:2 51:2
  71:5 72:10
appointed  27:1
appreciated  48:18
appropriate  14:13
  19:9 25:21,22
approval  7:20 14:6
approve  11:6 14:15
  16:25 23:1
approved  11:13
  15:1 17:5
approving  3:5,11
  3:16 9:20 23:16
  75:9,18 76:7
approximately  8:14
  12:18
argue  66:19
argued  8:24 68:4
arguing  29:12
  32:18,19,24 33:4

54:23 63:13 71:14
argument  27:14
  28:19 35:11 39:3
  54:25 56:17 65:13
  66:1 67:18 72:9
arguments  68:22
arial  30:10
arising  21:23
articulate  22:7
  43:13
articulated  49:9
ascot  30:11
aside  14:16
asked  28:19
asking  19:24 21:25
  33:10 49:4 69:7
assert  50:16
asserted  50:19
asserting  23:23
asset  63:8
assets  30:12
assistance  45:24
associated  9:13
assume  32:6 36:19
  48:12,15 52:23
  66:20
assuming  34:24
  52:24 72:18
assumption  39:7
astringent  50:1
attempt  17:23
attention  30:22
  50:14
attorneys  4:3,13 5:2
  5:9,19 6:2,10
attractions  19:4
attracts  29:19
attributed  29:3
attributing  38:2
auditor  45:15,16
aura  29:18 30:18,20
authority  9:3
automatic  25:16,17
available  8:22 32:1
  54:10
avenue  4:14 5:10,20
  6:3,11

average  46:10
avoid  10:2 43:4
  60:9
avoidance  7:22 10:4
  59:19 60:10,14,19
  60:23
aware  36:21 40:2
  48:24

**b**

b  1:13,20 2:19
back  12:13 16:4
  24:24,25 35:15 49:1
  51:9,13 57:3
background  12:10
backwards  53:12
bad  51:9
baker  4:2 7:16
  10:22 11:24
balance  47:10,14,14
  47:15,16,18
bank  3:17,18 7:21
  8:1,19 9:2 11:8
  76:9,10
bank's  7:25
bankruptcy  1:1
  2:11,21 3:4,5,10,11
  3:15,16 7:18,19
  10:10,12 22:25 25:4
  25:14 35:19 75:7,9
  75:16,18 76:5,7
banks  8:3
bar  21:22
barred  20:16 35:22
  59:20 60:11,20
bars  17:22 25:18
baseball  57:21
  72:14
based  8:10 30:18
  34:12 65:22 69:13
basically  8:8 13:18
  14:18 19:3 53:19
basis  16:7 22:3,15
  54:20 60:14,23
  67:25 68:10 69:18
  72:18 73:13,16
beacon  42:21

**bear** 59:7
**beginning** 59:11
**behalf** 16:17 17:12
  17:18 34:3
**belief** 40:19 43:2,2
  44:7,8 45:3,10,17
  48:19 49:23
**believe** 16:10 18:18
  22:4 23:15,21 36:16
  37:4,15,21 38:6
  39:2,6,23 42:7,20
  48:6 49:7,8 51:11
  57:16,17 68:23
**believed** 36:23
  37:15 40:13 43:23
  44:8 73:21
**bell** 5:6 10:19,21,21
  11:5,19 14:1 16:16
  16:16
**beneficiaries** 22:21
**benefit** 7:24 10:6
  16:20 23:14,16,17
  27:2,4 29:17,22,23
  30:21 31:3,20 32:3
  34:3 35:6,7 56:21
  67:11 72:3,4,7
**benefited** 30:15
  55:16
**benefits** 20:10
  30:18
**bernie** 44:24,25
  45:5
**bernstein** 2:20
**best** 22:25
**better** 22:6,11
  51:14 62:10 73:11
**beyond** 43:24 45:21
  55:2
**big** 31:16 44:21
**bigger** 44:14
**billion** 14:8,9 39:16
  54:15 55:13
**bit** 28:10 32:5 56:20
  56:22
**black** 15:18
**blind** 29:13 31:17
  40:1 56:9 58:6,7

63:17 66:9 69:13
**blinded** 29:1,2 33:9
  40:24 70:9
**blindness** 40:8,25
  42:6,11,12,13,22,25
  43:1,19 44:4 45:1
  49:4,8,15,19 52:17
  52:23 63:20 65:6
  72:13
**blmis** 7:23 8:18 9:1
  9:4 12:1 26:20 27:4
  28:7 30:4,11,16
  32:9,12 34:7,7,9,14
  34:17,18,23 35:2,3
  39:20 44:17 48:9,20
  50:17 51:16,25 53:1
  53:8 54:16,18 55:5
  63:16 71:20,25 72:1
  72:3,5
**blmis's** 8:10 12:4
**books** 8:10 31:5
**borowitz** 9:9 12:15
**bottom** 59:13,15,17
  60:7
**bowling** 2:12
**breach** 3:25 77:3,9
**brief** 19:1,3,3 22:9
  38:25 39:7 57:4
  59:3 70:15
**briefed** 24:9
**briefly** 55:20,25
  72:11
**bring** 10:5 17:4
**broker** 34:5,8,20,21
  34:22 38:19 57:25
  69:21 71:20
**brokerage** 31:8
**brought** 7:22 12:14
  30:6
**buck** 69:18
**burdensome** 19:21
**buying** 46:17

**c**

**c** 4:1 7:1 77:1,1
**calculations** 45:22
**call** 17:23 38:2
  66:18

**called** 12:1 31:1
  44:15 68:25
**calls** 9:18 39:10
**capacity** 9:6 11:11
**capital** 2:3 41:11
**care** 44:24 45:4,6
  69:9
**carrying** 27:24
**case** 1:3,12,19 2:2
  8:1,13,16 10:9,9,14
  20:5 21:17 28:4
  29:19,24 30:1,23,24
  30:25 31:4,5,13
  33:6 35:25 36:5
  41:24 42:21,23
  43:17 44:6,10 49:11
  49:22 50:12,23 51:1
  51:3,14,21 59:12
  61:8 65:22,24 69:3
  72:4
**cases** 19:19 28:17
  43:7,8,21 49:2 50:4
  57:9 59:13
**cash** 10:13 54:18
  55:6
**catch** 48:8
**cert** 77:3,10
**certain** 46:16
**certainly** 10:2 11:7
  14:23 25:23 38:3,5
  42:17 67:17
**certified** 77:3,10
**cetera** 62:14
**challenge** 29:9
**challenges** 20:11
**chapter** 10:7
**charles** 44:14
**check** 63:9 66:6
**checking** 69:10
**chorus** 74:9
**circuit** 35:24 41:3
  41:10,25 43:10
  48:22
**circumvent** 36:1
**cite** 41:2 60:2,3
**claim** 9:21 10:12,25
  12:22 13:1,3,3,14

13:14,19 14:6,20,21
  16:4,9,10,22 17:2
  17:24 23:23 32:11
  34:7,9,12,13,16
  42:18,18 50:13,15
  50:16 51:1,7,12,13
  52:16
**claimed** 19:14
**claimholders** 16:21
**claims** 10:1,4 11:1
  12:14 14:7,12 16:7
  16:21 17:22 19:13
  19:15 20:23 25:18
  26:15 27:6 34:12
  35:16,16,19,22
  50:20 52:10 53:6
  55:21 60:14,23
**clarity** 10:24 14:4
  16:22
**class** 41:10
**classy** 66:15
**claw** 51:9
**clear** 30:25 36:4
  42:23 57:10,20 68:1
**clearer** 36:12 73:5
**clearly** 23:25 32:5
  55:15
**clerk** 7:2
**clients** 7:24,25,25
  8:3,6,19,25 9:2
**close** 13:2 28:3
  36:13 39:9 52:11
**closure** 10:14
**code** 3:4,10,15 7:19
  35:19 75:7,16 76:5
**collapse** 26:20
  45:24
**collapsed** 44:12
**collectively** 26:20
**comad** 27:25 36:5
  58:12,13 73:4
**come** 27:9 36:13
  48:25 52:11 72:6
**comes** 38:25
**coming** 19:3 31:24
**common** 25:23

**community** 3:18 76:10
**companies** 8:2,20
**company** 2:3 44:20
**compare** 25:24 49:12 64:23
**compared** 64:2
**comparing** 40:6
**complaint** 19:16,17 22:5 25:14,25 28:21 31:21 35:21 37:6,14 39:3 45:8,20 67:16 67:18,19 68:13 70:2 71:12
**complaints** 20:17
**complete** 10:7
**completely** 70:25
**concept** 38:25
**concern** 18:5 21:17
**conclude** 52:16
**concluded** 30:14 74:10
**concocted** 67:25
**conduct** 29:25 31:1 31:2 44:2 52:5 53:18,22 55:12,14
**conducted** 8:17 36:11 73:7
**conference** 20:6
**confidants** 28:3
**confirmations** 47:2
**connecticut** 3:18 76:10
**connection** 8:25 10:18
**conscious** 42:7,8
**consented** 18:3
**consider** 24:18 25:7
**consideration** 9:12
**consistent** 40:17,19 45:14 67:5,20
**consolidate** 3:20 18:2,8,11 20:14 25:12 76:12
**consolidated** 18:2 36:7

**consolidating** 24:3
**consolidation** 17:8 18:4 19:9,24 20:3 20:10,21 21:7
**constructive** 35:18
**content** 57:2
**contentious** 10:3
**continued** 8:9
**continuing** 29:23 31:23 32:2 53:15
**contract** 73:16,19 73:22
**contractual** 34:1
**contrary** 21:20
**contrast** 28:1 71:19
**conversion** 67:22
**cooked** 31:5
**coordination** 20:6
**copies** 41:7
**corporate** 29:23 31:24 32:2
**corporation** 5:1 10:22 31:2
**corporation's** 31:3
**correct** 13:20 21:15 24:12
**correspondence** 8:21
**corresponding** 51:13
**cost** 9:13
**costly** 19:22
**counsel** 10:23 18:7 21:20 22:6
**count** 47:1
**counter** 46:25 47:1
**country** 77:23
**counts** 35:19 56:12
**couple** 9:18
**course** 8:16,23 10:9 12:9 18:1 27:9 32:11 38:21 44:1 52:3
**court** 1:1 2:11 7:3,7 7:13,15 9:20 10:17 10:20 11:4,6,15,18 11:20,22 13:3,9,11

13:14,17,21,23,25 14:5,12,14,15 15:9 15:11,14,20,23 16:14,24,25 17:8,14 17:19 18:11,12,15 18:17,20,22 19:1,8 19:13,20 20:4,24 21:2,6,8,10,14,25 22:8,15,19,23,25 23:5,7,10,13,19,21 24:10,13,15,23 25:4 25:5,9,11,15 26:6,8 26:11,17 27:1,5,10 27:12,21 28:15,23 29:5,17 30:14,17,24 31:11,12 32:15,17 32:23 33:1,3,15,19 33:25 34:11,19,24 35:4,11 36:24 37:2 37:7,9,12,17,19,24 38:3,5,10,17 39:25 41:5,7,8,13,18 42:1 42:4,10,17 43:6,10 43:10,11,16 46:3,19 46:21,24 47:4 48:1 48:25 49:10,14,16 49:21 50:3,6,9,18 50:22 51:20 52:16 53:3,17,24 54:2,8 54:22 55:17,22,25 56:3,7,10,12,16 58:15 59:10,25 61:15,22,25 62:3,8 62:18 63:11,13,20 64:1,4,6,9,13,16,19 64:25 65:2,5 66:23 67:1,3,15 70:13,17 72:16,21 73:25 74:2 74:4,7
**court's** 14:6 19:10 60:11
**courtroom** 61:12
**courts** 19:20,21 25:24 42:14,19 49:9 50:3
**cover** 8:5

**covered** 23:25
**create** 71:22
**creating** 68:15
**credibility** 53:9
**credit** 12:9,21 14:17
**credited** 12:17 16:4
**crediting** 13:7
**criminal** 66:21,21 66:23,24 67:12
**crupe** 61:13
**cry** 39:17
**culpability** 61:18
**curious** 43:11
**current** 10:25 24:7
**custodial** 9:1,7
**customer** 10:6,25 11:1,9 12:4,22 14:12 32:14 34:5,14 34:17,18,23 35:3 51:16,20,23,24
**customers** 16:24 27:4,5 33:16,21 38:19 52:6,25 53:1 54:1,25 55:7,15,15 55:16 68:2

### d

**d** 7:1 41:6 75:1 76:1 77:3,10
**d.c.** 5:4
**daily** 47:6,7 64:9 68:10 69:18
**date** 16:1 18:17,19 77:13
**david** 4:9 5:23
**day** 26:18 44:14 61:13 62:17 63:10 63:18 68:3 69:2,16 70:1
**days** 9:19
**deadline** 18:21
**deal** 56:23
**dealings** 8:19
**dealt** 55:22 56:25
**december** 2:15 77:13
**decide** 21:11 22:12

| | | | |
|---|---|---|---|
| **decided** 24:16 25:19 | **difficult** 43:19 | 65:23 | **email** 11:16 |
| **deciding** 21:12 | **difficulty** 65:5 | **doing** 35:8 45:6 | **emanuel** 5:8 26:13 |
| **decision** 15:18 21:5 | **diligence** 8:17 27:7 | 46:5 48:15 54:20 | **ended** 69:12 |
| 30:9,13,18 36:5 | 71:18 73:1 | 59:13 67:12 73:12 | **enforce** 17:21 |
| 40:7 41:2 44:1 | **dime** 71:1 | **dollar** 14:5 54:24 | **enforcement** 17:21 |
| 56:22 68:7,24 74:4 | **direct** 9:3 22:21 | **dollars** 14:8 48:4 | 18:1,22 20:22 |
| **decisions** 2:3 8:25 | 29:14 32:10 | **don't** 71:22 | **engage** 45:25 53:18 |
| 26:1 | **directed** 7:25 | **downward** 46:17 | 68:10 |
| **defendant** 43:3 | **directly** 32:8 34:9 | **dozens** 69:5,5 | **engaged** 9:9 12:15 |
| 48:24 49:24 50:23 | 34:17 40:6 | **drawn** 42:19 | 12:15 37:16 38:7 |
| **defendants** 1:10,17 | **disallowance** 55:20 | **draws** 42:15 | **engaging** 68:2 |
| 1:24 2:7 6:10 8:1 | **discern** 48:13 | **drift** 61:11 | **enjoined** 23:23 |
| 8:12 10:9 17:18 | **discerned** 48:13 | **drive** 32:5 | **entered** 22:22 23:16 |
| 22:21 23:20 | **discover** 47:21 | **due** 8:17 27:7,9 | 25:14 |
| **defer** 16:13 | 48:16 | 71:18 73:1 | **enters** 14:12 16:24 |
| **defrauds** 31:2,2 | **discovered** 46:15 | **duffy** 6:1,7 | **entire** 40:22 45:14 |
| **delay** 9:13 21:17 | **discovery** 30:16 | **duties** 71:9,10,13,15 | 45:15 48:7 62:16,17 |
| **delayed** 24:13 | 65:22,24 | **duty** 62:24 63:14 | **entirely** 21:21 |
| **demonstrating** 36:2 | **discretion** 19:10 | 69:6,7,8,19,22 | **entities** 28:23 |
| **denial** 22:1 | 32:9 33:8 | 70:24 71:6 | **entitled** 14:20,21 |
| **denied** 20:5 | **discussing** 51:11 | | 54:23 57:15,16,17 |
| **department** 27:20 | **discussion** 36:19 | **e** | 58:23 59:1 70:11 |
| **depending** 24:4 | 50:10 | **e** 2:19,19 4:1,1,10 | **entitles** 67:14 |
| **deposition** 65:20 | **discussions** 8:17 | 7:1,1 35:23,25 36:1 | **entry** 3:3,9,14 9:20 |
| **depositions** 70:6 | **dismiss** 3:1 19:4 | 36:8 41:6,6 59:20 | 11:2 14:13 75:6,15 |
| **deposits** 54:20 | 22:4,16 24:2 26:9 | 60:11,15,20,24 73:4 | 76:4 |
| **derivative** 17:24 | 52:19 58:8 60:13,22 | 73:15,16,22 75:1 | **equated** 42:14 50:4 |
| 19:14 25:18 | 65:12 69:4 75:4 | 76:1 77:1 | **equation** 42:21 54:4 |
| **describe** 66:19 | **dismissal** 9:23 | **earlier** 18:23 20:17 | **equitable** 50:14,15 |
| **describing** 44:11 | **disposed** 24:20 | **easier** 60:8 | 50:18,23 51:7,15,17 |
| **detail** 28:10 69:5 | **disposition** 21:18 | **economy** 20:18 | 52:4,17,21 68:24 |
| **determination** | 25:3 | 22:11 | **equitably** 54:3 |
| 18:10 20:1,16 | **dispute** 55:2,3,4 | **effectively** 24:23 | **equity** 13:3,5,14,17 |
| **determinations** | **disregard** 42:8 | 43:5 47:20 | 13:19 14:6,9,20 |
| 45:23 | **disrupt** 24:7 | **efficiency** 20:19 | 16:4,10,21,22 17:2 |
| **determine** 19:13 | **disseminated** 39:22 | **efficient** 18:6 25:3 | **esq** 4:7,8,9,10,17,18 |
| 47:11,18 62:19 | **distinction** 42:15,19 | **efforts** 22:25 | 4:19 5:6,14,15,16 |
| **determined** 9:14 | **distinguish** 31:1 | **egregious** 52:4,7,11 | 5:23 6:7,14 |
| 13:4 | **distribute** 32:1 55:6 | 52:22,23 | **essentially** 54:25 |
| **difference** 42:5 43:6 | **district** 1:2 18:15 | **either** 23:7 24:4 | 66:19 |
| 43:11,14 53:3 69:1 | 20:3 24:22 25:1 | **electronic** 77:10 | **establish** 70:3 |
| **different** 19:7,20 | 31:11 42:1 43:10 | **element** 52:7,24 | **estate** 10:6 11:10 |
| 21:21 22:2 28:6 | 60:3 | 66:13 | 17:4 54:10 57:22 |
| 30:1 32:6 33:13,20 | **division** 3:17 76:9 | **elements** 52:3,21 | 72:13 |
| 34:11 39:22 42:10 | **divorcing** 54:19 | 56:24 | **estates** 23:18 |
| 42:23 44:20 62:22 | **documents** 8:21,22 | **elendow** 41:3,6 44:1 | **et** 1:9,16,23 2:3,6 |
| 63:21 72:14 73:12 | 46:8 58:21 63:24 | **ellis** 5:18 | 62:14 |

**euro** 26:14
**europe** 65:23
**event** 24:22
**everybody** 23:22
40:23,24 50:22 55:6
63:5 73:18
**evidence** 9:6 40:25
44:7,9
**exactly** 31:15 32:16
32:22 45:1 50:21
54:11 61:8 71:4
**example** 27:20
29:24 32:4 40:15
44:3 45:1 46:16
47:6 62:11 72:12
**examples** 48:9
**exceeded** 8:8 62:16
64:9,20,20
**exception** 35:12
**exchange** 17:2
47:24
**exemplar** 58:13
**exemplars** 61:7
**exhibit** 9:16
**exist** 71:22
**existence** 29:23
31:24 32:3
**expands** 59:15
**expect** 59:6
**expectation** 57:12
57:14 58:22 59:1
61:8 67:13
**expenses** 8:5
**explain** 28:10 29:7
67:20,21
**explained** 30:13
40:11,18 71:4
**explains** 15:20
**extensive** 25:17
28:7
**extent** 38:14 71:5
**external** 46:22
**eye** 66:9
**ezra** 28:4 56:6,8

**f**

**f** 2:19 77:1
**fact** 27:13 28:13
29:13 40:15,16,21
41:1 42:13 55:7,9
55:16 57:14 60:2
62:12,14 66:4 68:7
70:8 71:23
**facts** 18:5 19:16
20:17 36:2 45:2,13
**factual** 19:11
**fail** 35:22 42:2,2
**failure** 27:7
**fair** 49:6
**fall** 16:11
**falls** 9:24 14:23
**far** 39:17 65:21
**fast** 58:11
**federal** 3:4,10,15
75:8,17 76:6
**fee** 9:7,7
**feeder** 12:1 28:17
63:6,7
**fees** 8:7,13,14 28:14
29:15 31:23 35:9,10
66:2,6
**feinstein** 6:9 17:18
**figure** 62:19
**figured** 73:9
**file** 17:23 19:4
**filed** 9:22 17:20
18:1
**filing** 18:3,13
**fim** 65:23 68:18
**final** 15:5
**finally** 28:9
**financial** 57:22
**find** 58:14 70:7,8
**finder** 70:8
**finds** 16:18 58:2
**fine** 7:9
**first** 11:24 21:3
27:23 35:16 37:1
40:9 53:8 60:5
72:16
**flags** 40:1,3 44:20
45:13 48:11,11,23

48:24
**fletcher** 6:17
**floor** 5:11 6:4 39:14
**florida** 20:12,14
25:1
**flows** 38:15
**flugman** 5:23
**focus** 50:13
**focused** 45:9
**foregoing** 77:4
**form** 54:11
**formal** 26:25
**formed** 48:19
**forth** 9:16 27:15
73:4
**forthcoming** 22:9
**forward** 18:6 58:11
**found** 65:15
**founding** 63:16
**four** 12:19
**fourth** 35:20
**fox** 20:13,15
**frame** 39:11
**frankly** 9:12 69:1
**fraud** 27:24 29:12
30:16 31:17,18
33:10 34:8,13 35:7
43:4,5,17,23 44:9
45:4,11,18 48:20
49:1,22,25 52:5,12
53:14,14,16 57:14
60:17 61:1,6 68:15
**fraudster** 34:10
**fraudulent** 35:17,18
52:10
**free** 61:9
**friends** 28:3
**front** 24:21 36:24
37:18 38:4,15,18,18
38:20 44:23 45:2
66:14,16,17,18,24
67:7,8 68:2,5
**frontier** 48:22
**fulfill** 43:20 71:6,13
71:18
**fulfilled** 71:14

**full** 12:24
**fully** 10:15
**fund** 1:9,16 3:6,7,12
10:6 12:6,7,12,17
12:19,20,21,25 13:1
13:1 15:6,25 16:1,3
16:6 26:14,14 28:16
29:3,17 30:11,15
31:8 34:13 41:4
44:2 63:7 72:22,24
75:12,12,20
**funding** 53:14
**funds** 10:5 11:25
12:1 26:17,17,20,23
26:24 27:5,6,6,16
27:18,21 28:2,5,9
28:12,17,22,23
29:10,14,18,22,24
30:1,3,21 31:19,19
31:22,25 32:3,19,20
32:21 33:6,11,15,16
33:21,22,23,24 34:1
34:3,4 35:1,9,9 36:3
36:14,16,17 39:21
39:25 45:7,9,25
46:1 51:3,12,21,23
53:9 54:8,15,17
68:16 70:23,25 71:1
71:7,15,19,19,22,24
72:3,4 73:1,20
**further** 9:6 73:24
**furthermore** 10:7
**future** 21:23

**g**

**g** 7:1
**gabriel** 30:10
**game** 58:1
**general** 34:12
**generally** 45:21
**generate** 29:15
**geraldine** 4:10
**getting** 12:24 13:18
14:19,19 17:1 35:8
48:2 68:14 73:11
**give** 32:4,24 34:2
41:19 44:3 62:2

63:1,7 69:19
**given**  12:21 14:22
 16:8
**gives**  34:21 57:18
**giving**  12:17 32:8
 33:13 43:16
**glad**  15:23
**global**  1:9 26:14
**go**  15:10,11,20 18:5
 20:3 26:11 44:21
 45:21 46:8 47:17
 57:3,4 58:4,4 61:19
 61:24 66:6 67:2
 68:22 70:7
**goes**  21:16 27:16
 34:20 43:24 59:3
 71:11
**going**  21:11,16
 25:11,24 26:3 48:15
 49:12 53:11 54:7
 57:9 58:3 62:19
 63:3,4,4,5,6,8,9
 66:3,5,5,6,7 69:9,10
 72:19 73:9
**goldman**  2:6 6:10
 17:18,22,23 18:7
 19:14 20:12,22,23
 21:22 24:25 25:13
 25:25
**goldmans**  18:13,23
 20:9,13
**good**  7:3,11,13,14
 7:15 11:23 15:18
 17:11,17 21:1,2,14
 26:12 56:2,3,23
**grant**  25:11 26:3
**green**  2:12
**greif**  60:5,12
**grosso**  68:15
**grounds**  63:16
**growth**  2:3
**guess**  11:8 15:17
 37:22
**guidance**  8:25
**guy's**  66:17
**guys**  47:25 51:9
 57:11 65:13 68:14

69:17

**h**

**h**  1:6,13,20 4:7 5:6
 14:20 51:13
**half**  46:17 54:14,16
 55:1,11
**hand**  3:6,7 41:7,12
 75:11,13
**handed**  34:9 41:22
**hands**  32:7,7 34:17
 62:25
**hanh**  6:14 17:17
**happen**  21:16 65:18
**happened**  31:4
 65:17,18,20
**happening**  31:15
**happens**  12:16
**harbor**  35:23 57:17
 58:3,24 59:2,6
 60:15,24 67:11,14
 70:11
**hard**  43:13
**harm**  52:6,25 53:1
 53:6,25 54:12
**harmed**  54:24 55:7
 55:9
**harris**  4:19 17:11
 17:12,16,20 18:18
 18:21 19:2,9 20:25
 21:9 26:7 74:6
**he'll**  41:19
**hear**  20:19 26:8
 55:17 56:5 71:14
**heard**  10:17 13:25
 16:15 18:15 19:19
 70:14
**hedge**  72:22,24 73:1
**held**  29:25 31:11
 40:7 42:24 44:6
**helpful**  27:14
**herald**  3:7 11:25
 12:6,7,12,17,17,19
 12:21,25 13:4 14:6
 14:19 75:12
**herrick**  6:9 17:18
**high**  42:25 43:3,23
 44:9 45:3,10,17

48:19 49:25
**higher**  42:15 49:8
**hill**  42:21
**hindsight**  25:10
**histories**  8:21
**history**  56:20
**holding**  35:25
**home**  32:5
**hon**  2:20
**honor**  7:6,9,11,14
 7:18 9:17 10:4,16
 10:19 11:5,14,17,19
 11:23 12:7,11,23
 13:2,16,20 15:3,5,7
 15:24 16:8,12 17:7
 17:11,15,17,20
 18:19 21:1,15 22:2
 22:10,17 24:12 25:8
 25:10 26:5,12,16
 27:8 28:10,13,18
 29:4,8,21,25 30:9
 30:12,21 32:4,22
 33:5,22 34:15 35:15
 35:24 36:15 37:6,14
 37:22 38:13 39:8,15
 41:1,17,21,24 42:7
 42:13 43:14 44:3,6
 44:25 45:19 46:11
 47:11 49:7 50:2,21
 50:25 51:6 52:3,20
 53:5 54:13 55:19,23
 56:1,2,15,19 57:2
 57:10 58:16 59:7,9
 59:22 61:11 66:4,13
 69:3,7,15 70:1,14
 70:21 71:13,24
 73:24 74:3
**honor's**  30:22 50:14
 56:21 65:10
**hostetler**  4:2 7:16
 11:24
**hsbc**  16:7
**huh**  59:3
**hundreds**  39:10
 47:12 48:3
**hurt**  55:14,15

**huynh**  6:14 17:17
 17:17 18:19 21:1,3
 21:13,15 22:2,9,17
 22:20 23:4,6,9,11
 23:15,20 24:6,12,14
 24:17 25:7,10 26:5

**i**

**identical**  20:21
**identified**  44:20
**iii**  35:20
**illegitimate**  68:10
 68:19
**illogical**  61:23
**implicates**  25:15
**implication**  38:6,7
**implies**  38:5
**implying**  54:2,5
**important**  30:2
 52:2,21 54:12 57:8
 58:10,10,18 59:8
 71:23
**importantly**  39:4
 39:19 46:1
**impose**  56:19 69:8
**impossibility**  70:5
**impossible**  44:18
 65:16,16 66:8 70:10
**imputation**  30:23
 71:5 72:2,9
**imputations**  68:23
**impute**  32:12,15
**imputed**  29:9,25
 32:20 33:11 36:18
 36:20
**imputing**  32:18
**include**  23:1
**includes**  9:22
**including**  68:17
**inconsistent**  19:23
**incorrect**  36:20
 70:25
**increase**  16:23
 31:25 32:1
**increased**  35:9
**independently**
 69:21

**indicate** 40:13
**indicated** 9:6
**indiscernible** 42:2,5
43:8 49:3,10,17,19
**individual** 28:12
34:4
**industry** 63:6 69:17
**inefficient** 19:21
**inequitable** 53:18
53:22
**inference** 49:3,16
49:18
**inflated** 31:10
**influence** 9:3
**inform** 56:23
**information** 28:6
39:21 46:7
**informed** 14:1
**infusing** 55:12
**initial** 60:10,16,20
**injunction** 17:21
20:11,16 21:19 23:1
25:14,18,20,21,21
26:1
**injured** 44:2
**innocent** 27:2,17
28:12 53:19,19
**inquiry** 57:25 65:6
**inside** 49:24
**insiders** 31:5,14
**insistence** 23:3,3,12
**insolvency** 12:4
26:25
**insolvent** 26:24
**instance** 57:8,19
73:20
**instances** 34:16
69:5
**instructed** 61:17
**instrumentalities**
68:15,17
**intend** 68:21
**intended** 23:13,15
**intent** 24:23
**interest** 20:18 35:12
57:22

**interesting** 43:25
56:25
**interpreted** 26:2
**intricately** 27:24
**invest** 9:1 29:14
32:9 34:21 63:3
69:23,24 72:25
**invested** 12:1 26:23
27:18 30:3,10,12
33:7 39:16 48:4
51:16,18 53:10
54:15,19 55:8
**investigate** 63:15
69:21 71:20
**investigation** 9:12
48:15
**investing** 26:19
29:7 34:6 38:22
44:24 50:17 53:8
54:7 55:12 69:18
72:3,5
**investment** 8:18,24
10:21 13:5 28:11,22
33:7 36:16 39:9
41:4 55:14,16 71:3
71:17,25,25 72:1
**investments** 9:4
30:4,8,14,16 54:17
69:22
**investor** 5:1 32:7,10
32:11,13,13 46:10
52:13
**investors** 26:22
27:3,17,17 28:7,12
29:19 30:6,6 32:2,6
33:15,16 39:7,22
40:10 51:6,21 52:14
55:5 63:15 69:17
72:14,15 73:2
**invests** 34:22 38:19
**involve** 25:13
**involved** 10:22
27:24
**involving** 25:13
43:8
**irving** 1:6,13,20 4:3
4:7

**issue** 20:18 21:11
22:14 24:19 25:13
25:20 30:3 33:20
36:8 47:4 59:13
**issues** 12:8 18:5
19:10,11 25:19,23
68:23
**iv** 35:20

**j**

**j** 4:9
**jail** 61:19 67:2
**jennifer** 4:18 17:16
**job** 65:15
**joint** 26:13
**jpmorgan** 12:10,11
12:13,18 14:17 34:5
**judge** 2:21 18:15
21:10 24:4,21 35:24
36:4,7,9 41:12
42:15,23 50:3 57:1
59:12 61:11,13,15
61:16,21 68:6,7,9
73:4,17
**judgment** 19:5 58:8
**judicial** 20:18 21:14
22:11
**july** 57:6
**jump** 28:18
**jumping** 14:7
**jury** 61:17
**justice** 27:20

**k**

**katz** 60:12 62:23
63:2 69:16 72:12,14
72:16,20
**keep** 71:23
**keeping** 51:16,18
**keith** 4:8 7:16
**kept** 22:12 53:10
54:6,6 70:23
**kershner** 30:24,25
**kevin** 5:6 10:21
16:16
**key** 48:21 57:12
**kicker** 17:3

**kiersten** 6:17
**kinds** 34:11 41:25
53:5,6
**kingate** 1:9 26:8,14
26:14,17,17,23
27:16,18,21 28:2,5
28:9 29:14 31:19,19
31:22 33:6 35:1
36:2,13,16 39:21,25
45:7,9,25 46:1 51:3
51:21,22,23,25 53:9
54:15,17,23 55:4,8
55:11 61:25 68:17
71:15 73:20
**kirkland** 5:18
**kirpalani** 5:15
**knew** 29:1,2,11
31:17 33:9 34:8
35:7 36:3 38:10,11
45:14,16 47:25 48:7
67:22 70:9 72:18
73:18
**know** 12:10,23
15:14 21:16 25:15
28:16 42:14 43:5,7
43:13 47:7 48:2,6
57:7,14 58:16 59:4
61:9,20 62:21,22
63:4 66:16 68:11
70:6
**knowledge** 28:24
29:8,8 32:13,15,18
32:20 33:11 36:10
36:14,17,20 42:15
42:18,22 45:21 50:4
50:7,9,12 56:24
58:14 59:11 60:16
60:25 61:17 62:1,3
62:4,5 65:7 66:9
69:13 70:4 71:12
73:6,23
**known** 40:21
**knows** 35:24
**kochitl** 5:16
**kotel** 18:16 21:11
24:4,21