BECKER & POLIAKOFF LLP
Helen Davis Chaitman (4266)
45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@bplegal.com

*Attorneys for Claimants set forth*
*On Exhibit A to the Chaitman Declaration*

Hearing Date: February 25, 2015
Hearing Time: 10 AM (EST)
Objection Deadline: January 23, 2015[1]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>SECURITIES INVESTOR PROTECTION CORPORATION,<br>    Plaintiff-Applicant,<br>    v.<br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>    Defendant. | Adv. Pro. No. 08-01789 (BRL)<br>SIPA Liquidation<br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br>    Debtor. | |

**MEMORANDUM OF LAW IN OPPOSITION
TO THE TRUSTEE'S MOTION TO AFFIRM HIS DETERMINATIONS
DENYING CLAIMS OF CLAIMANTS HOLDINGS INTERESTS IN
S&P OR P&S ASSOCIATES, GENERAL PARTNERSHIPS**

---

[1] The parties agreed to a brief extension of the Customers' time to submit their objection to the Motion through January 26, 2015.

{N0067057 4 }

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ii

STATEMENT OF FACTS AND PROCEDURAL HISTORY ............................................... 1

ARGUMENT........................................................................................................................ 2

    THERE IS NO BASIS IN LAW TO DISALLOW THE PARTNERS' CLAIMS ................ 2

    A.   The SIPA Definition of "Customer" Compels the Trustee to Allow
         the Partners' Claims ................................................................................................ 3

    B.   *Morgan, Kennedy* Does Not Bar the Partners' Claims .......................................... 7

    C.   The "Customer Decisions" Do Not Support the Trustee's Treatment of the
         Partners' Claims ..................................................................................................... 10

CONCLUSION .................................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)..........................................................13

*Dreyfuss v. Dreyfuss*, 70 So.2d 437, 439 (Fl. 3d DCA 197)................................................6

*Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir. 1999) ....................................................13

*In re New Times Securities Services Inc.*, 371 F. 3d 68 (2d Cir. 2004) ........................ 3, 4

*In re Ross*, 122 B.R. 462 (Bankr. M.D. Fla. 1990) ..............................................................6

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F. 3d 63 (2d Cir. 2000) ................................................................................................................................ 4

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011) *aff'd sub nom. In re Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012) *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013).................... 4, 10

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 515 B.R. 161(Bankr. S.D.N.Y. 2014) .....................................10, 13

*Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, Nos. 12 Civ. 1039(DLC), 12 Civ. 1139(DLC), 2012 WL 3042986 (S.D.N.Y. July 25, 2012) .....................................................................................................................10, 12

*SIPC v. Morgan, Kennedy Co.*, 533 F.2d 1314 (2d Cir. 1976) ................................. passim

*Tcherepin v. Knight*, 389 U.S. 332 (1967) .........................................................................4

*Williams v. Obstfeld*, 314 F.3d 1270 (11 Cir. 2002) ..........................................................6

**Statutes & Rules**

15 U.S.C. § 78fff-3(a)(5) .......................................................................................................3

15 U.S.C. § 78lll(2)................................................................................................................3

Fla. Stat. § 620.68 (1) (Westlaw 1995)................................................................................7

Fla. Stat. § 620.8502 ............................................................................................................6

Florida Revised Uniform Partnership Act, Fla. Stat. § 620.8202(1)............................ 6, 7

Florida Uniform Partnership Act, Fla. Stat. § 620.675 (Westlaw 1995) ........................ 6, 7

**Other Authorities**

8B Fla. Jur 2d Business Relationships § 537 ...................................................................... 6

H.R. 13308, 91st Cong. § 7(d) (Aug. 4, 1969) ..................................................................... 4

S. 2348, 91st Cong. § 7(d) (June 9, 1969) ........................................................................... 4

General Partners of S&P and P&S Associates, General Partnerships (the "Partners") identified on Exhibit A to the accompanying declaration of Helen Davis Chaitman Esq. (the "Chaitman Decl.") respectfully submit this memorandum of law in opposition to the Trustee's motion to disallow their claims (the "Motion").

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

S&P Associates ("S&P") or P & S Associates ("P&S") (together, the "Partnerships") are general partnerships formed under Florida law. (Declaration of Bik Cheema (the "Cheema Decl.") [ECF No. 8737] Exs. 9 and 10, § 1.01.) S&P and P&S were both organized as Florida General Partnerships pursuant to Partnership Agreements dated December 11, 1992, as amended on December 21, 1994. The Partnership Agreements for S&P and P&S, as restated, are identical in all material respects. As set forth in the Partnership Agreements, the Partnerships were formed for the purpose of investing the Partners' funds. (Cheema Decl. Exs. 9 and 10, § 2.02.). S&P and P&S both held accounts at BLMIS for the benefit of the Partners.

Most of the Partners are direct partners of either S&P, P&S, or both. (Cheema Decl. Ex. 4, P&S Response to Request for Admission ("RFA") No. 12; Chaitman Decl. Ex. B, S&P Response to RFA No. 12.) Some of the Partners are equity participants in an entity which, itself, is a Partner of S&P or P&S. (*Id.*) The Partners joined the Partnerships with the purpose of having their funds deposited with BLMIS through the accounts maintained by the Partnerships at BLMIS. (*Id.*) The Partners are allowed to withdraw from the Partnerships consistent with the terms of the Partnership Agreements. (Cheema Decl. Exs. 9 and 10, § 9.03.) Therefore, at all times, the Partners retained control over whether to keep or withdraw the money that was invested in BLMIS. (Cheema

{N0067057 4}                                         1

Decl. Ex. 4, P&S Response to RFA No. 12; Chaitman Decl. Ex. B, S&P Response to RFA No. 12.)

The managing partner of the Partnerships informed BLMIS that S&P and P&S were Florida general partnerships and that each Partner became a Partner of the Partnerships in order to invest his/her/its funds in BLMIS. Thus, BLMIS knew, from inception, that the Partnerships were investing money that belonged to each of the Partners. (Cheema Decl. Ex. 4, P&S Response to RFA No. 11; Chaitman Decl. Ex. B, S&P Response to RFA No. 11.)

Under the Partnership Agreements, the day-to-day operations of the Partnerships and the maintenance of the Partnerships' property were managed by the Partnerships' managing general partners, <u>unless otherwise provided in the Partnership Agreements</u>. (Cheema Decl. Exs. 9 and 10, § 8.01.) The Partnership Agreements explicitly stated that the Partners retained complete control over the decisions regarding the investment of their own assets. (Cheema Decl. Exs. 9 and 10, § 2.02.)

The Partners filed proofs of claim, which were denied by the Trustee because the Partners did not maintain accounts at BLMIS in their own names. The Partners timely filed objections to the Trustee's determination of claims. On December 2, 2013, the Partners responded to the Trustee's requests for admissions, interrogatories, and first set of document demands. (Cheema Decl. Exs 4 and 5; Chaitman Decl. Ex. B an C.) On that same day, Partners also produced to the Trustee documents responsive to his demands.

## ARGUMENT

### THERE IS NO BASIS IN LAW TO DISALLOW THE PARTNERS' CLAIMS

{N0067057 4 }                                                  2

### A. The SIPA Definition of "Customer" Compels the Trustee to Allow the Partners' Claims

Each Partner is a "customer" under the definition of "customer" in SIPA. *See* 15 U.S.C. § 78*lll*(2) ("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities."). There is no requirement in SIPA that a "customer" be an account holder and, clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder."

Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a)(5) to make clear that customers of a bank or broker that invest in Madoff are all customers under SIPA. ("no advance shall be made by SIPC to the Trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor") (emphasis added). This provision makes clear that Congress intended for SIPA's protection to be afforded to participants in an account in an entity's name and that a broker's customers would include people of whose identity he had no knowledge.

As the Second Circuit explained in *In re New Times Securities Services Inc.,* 371 F. 3d 68, 84 (2d Cir. 2004), SIPA is remedial legislation that must be broadly construed to effectuate its purposes to provide financial relief to aggrieved investors consistent with their reasonable expectations and to foster confidence in our capital markets:

{N0067057 4}                                          3

> Congress enacted SIPA in 1970, in response to 'a rash of failures among securities broker-dealers in the late 1960's' that had resulted in 'significant losses to customers whose assets either were unrecoverable or became tied up in the broker-dealers' bankruptcy proceedings' The statute 'was designed to effect two aims.' First, the legislation immediately established 'a substantial reserve fund… [to] provide protection to customers of broker-dealers… to reinforce the confidence that investors have in the U.S. securities markets.' Second, SIPA 'strengthened … the financial responsibilities of broker-dealers.' Later amendments to the statute have reiterated this emphasis on investor protection.

*New Times Securities Services, Inc,* 371 F.3d 68 at 84, *quoting, Sec. Investor Prot. Corp.* v. *BDO Seidman, LLP*, 222 F. 3d 63, 66 (2d Cir. 2000) and citing legislative history.

Thus, even if there were an ambiguity in the statute, which there is not, the Court would be required to broadly construe the provisions of SIPA to protect customers. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. § 7(d) (June 9, 1969); H.R. 13308, 91st Cong. § 7(d) (Aug. 4, 1969). **The final bill dropped this restriction** and, indeed, there is nothing in SIPA which requires brokers to inform SIPC of the number of customers each broker had.

Thus, any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Partners because SIPA is a remedial statute and "[t]hus should be construed broadly to effectuate its purposes." *Tcherepin v. Knight,* 389 U.S. 332 (1967); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454

{N0067057 4 }                                                  4

B.R. 285, 305 (Bankr. S.D.N.Y. 2011) *aff'd sub nom. In re Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012) *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013) (noting importance of preserving "SIPA's remedial character.").

In considering this issue, it is essential for the Court to appreciate the fact that SIPC insurance is funded by the brokerage firms and **it is not calculated based upon actuarial data**. Under SIPA, each broker's required annual contribution is not based upon the number of customer accounts that broker has. Indeed, for the entire period from 1996 – 2008, SIPC charged every brokerage firm a flat fee for SIPC insurance, regardless of the number of customers that firm had. Thus, Merrill Lynch paid the same fee to insure all of its customers that a one-person brokerage firm paid. And the fee that SIPC charged, from 1996 – 2008 was $150 per year. Yes, that is correct. Merrill Lynch, Goldman Sachs, and Charles Schwab: each firm made out one check to SIPC each year in the amount of $150 and for that $150 per year each brokerage firm – no matter how many customers it had – was able to assure those customers that their accounts were insured by SIPC up to $500,000 based upon the customer's last statement. (Chaitman Decl. Ex. D.)

Thus, there can be no argument that brokers calculated the cost of SIPC insurance based upon the number of accounts they had and there can be no rational basis to limit SIPC insurance to people who had accounts in their own name.

The determination of "customer" status should turn on *whether*, not *how*, customers deposited cash with BLMIS for the purpose of trading or investing in securities. Here, it is clear that the Partners entrusted *their* cash to BLMIS for the purpose of purchasing securities because, as a matter of law, the Partners, as general partners (or equi-

{N0067057 4}                                           5

ty participants in a general partner) of the accountholders, *i.e.,* the Partnerships, each own a specific interest of the partnership property. Therefore, it necessarily follows that they had an ownership interest in the funds that were entrusted to BLMIS on their behalves.

Under Florida law, a partner is an owner of the partnership. *See* Florida Revised Uniform Partnership Act ("RUPA"), Fla. Stat. § 620.8202(1) ("[A]n association of two or more persons to carry on as co-owners a business for profit forms a partnership[.]") "A general partner's interest in the partnership is characterized as personal property."8B Fla. Jur 2d Business Relationships § 537 (citing Fla. Stat. § 620.8502)). A partnership interest, includes a partner's right to share in the profits and losses of the partnership and the partner's right to receive distribution. *See id.* (citing *id.*); *see also Williams v. Obstfeld*, 314 F.3d 1270, 1275 (11 Cir. 2002) (citing *Dreyfuss v. Dreyfuss*, 70 So.2d 437, 439 (Fl. 3d DCA 197) (A Florida partnership is created where the parties (*i.e.*, the general partners) "have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business."). As an owner of a partnership, the law imposes on a general partner personal liability for all the debts of a partnership. *See In re Ross*, 122 B.R. 462, 464 (Bankr. M.D. Fla. 1990). It follows then, that if the burdens of partnership fall upon the partner, the benefits of partnership also belong to the partner.

Therefore, a partner owns a specific interest in all partnership assets. Indeed, in 1992, when the Partnerships were formed, Florida general partnerships were governed by the Uniform Partnership Act (the "FUPA"), a predecessor of the RUFTA. FUPA explicitly recognized that a partner had property rights not only in his interest in the partnership and the right to its management, but also in the *partnership property itself*. Fla. Stat. § 620.675 (Westlaw 1995). Partners were tenants in a partnership and each

{N0067057 4 }                                                      6

partner was a co-owner with the other partners of an undivided interest in specific partnership property. *See* Fla. Stat. § 620.68 (1) (Westlaw 1995) ("A partner is co-owner with his partners of specific partnership property holding as a tenant in partnership"). Therefore, under FUPA, the Partners had an ownership interest in the specific property of the Partnerships, including the funds that the Partnerships used to invest with BLMIS on the Customers' behalves. Although the concept of "co-ownership" of specific partnership property was abandoned in the RUPA, the RUPA preserves a partner's entitlement to an interest in the partnership, which necessarily includes an ownership interest in the partnership assets.

Therefore, the Partners fit within the definition of "customer" under SIPA.

**B.    *Morgan, Kennedy* Does Not Bar the Partners' Claims**

The Trustee argues that the Partners do not meet the requirements for "customer" status outlined by the Second Circuit in *SIPC v. Morgan, Kennedy Co.*, 533 F.2d 1314 (2d Cir. 1976). (Tr. Br. at 16-17.) The Customers disagree. The issue in *Morgan, Kennedy* was whether participants in an employer-funded profit-sharing plan managed by three trustees were entitled to "customer" status under SIPA. After discussing the legislative history, which makes clear that the "primary purpose" of SIPA is to protect investors, the Court ruled that the employees were not "customers" because: (1) the employees "were neither investors nor traders," (2) their employer contributed the funds that were invested, (3) the trustees made "the decision to entrust those funds with the debtor," (4) "the account itself was in the name of the trustees," and (5) the trustees had the power to "purchase and trade securities in the account as they saw fit." *Id.* at 1318. The Trustee's reliance on *Morgan, Kennedy* (Tr. Br. at 16) is misplaced because the Partners are in an entirely different position.

{N0067057 4}                                                                  7

First, the Trustee claims that the Partners are similarly situated to the claimants in *Morgan, Kennedy* because the Partners did not have accounts in their own name. (Tr. Br. at 16.) However, unlike the claimants in *Morgan, Kennedy* who, as the Trustee concedes, were unknown to the broker, BLMIS knew about the Partners. The managing partner of the Partnerships informed BLMIS that the Partnerships were Florida general partnerships and that each Partner made a decision to entrust his funds in BLMIS for the purpose of purchasing securities. (Cheema Decl. Ex. 4, P&S Response to RFA No. 11; Chaitman Decl. Ex. B, S&P Response to RFA No. 11.)

Second, the Trustee argues that the Partners are analogous to the claimants in *Morgan, Kennedy* because the Partners had no property rights in the assets of the Partnerships. This is untrue. Each Partner owns an interest in the Partnerships assets, including the funds in the BLMIS accounts, based on his partnership share. Cheema Decl. Ex. 4, P&S Response to RFA No. 14; Chaitman Decl. Ex. B, S&P Response to RFA No. 14.). Indeed, upon the termination of the Partnership, assets of the Partnership are used to make payments to the Partners based on their Partnership interests. Cheema Decl. Exs. 9 and 10, §12.02 (providing that upon termination, distribution of property assets to partners will be based on their partnership interests); *see also* 8 Florida Jur Forms Legal & Bus. § 30:175 ("In the event any partner . . . withdraws from the partnership, any interest of that partner in any real property previously acquired by the partnership will be assigned to the withdrawing partner, and the withdrawing partner will be paid his or her pro rata share of the book value of all other assets belonging to the partnership. . . .").

Third, unlike the claimants in *Morgan, Kennedy*, who gave the trustees "the exclusive power to entrust the assets to the debtor, to invest and reinvest, and to purchase

{N0067057 4 }                                              8

and trade securities in the account *as they saw fit*[,]" 533 F.2d at 1318 (emphasis added),the Partners had the exclusive power over the investment decision-making for the Partnerships. (Cheema Decl. Exs. 9 and 10, § 2.02.) The Trustee, relying on a provision in the Partnership Agreements that gives managing partners managerial authority over day-to-day operations of the Partnerships, argues that "the managing partners exclusively controlled the assets" and that "S&P and P&S alone had the right to direct the investment of . . . [the] assets entrusted to BLMIS[.]" (Tr. Br. at 22.) The Trustee's reliance on that provision is misplaced because the Trustee overlooks a narrow, specific provision in the Partnership Agreements that limits the managing partners' discretion on investment decisions:

> **The Partnership shall have the right to allow OR TERMINATE a specific broker, or brokers. as selected by fifty-one (51) Percent in interest, not in numbers, of the Partners, and allow such broker, or brokers, AS SELECTED BY FIFTY-ONE PERCENT (51%) IN INTEREST, Nar IN NUMBERS, OF THB PARTNERS, to have discretionary investment powers with the investment funds of the Partnership**.

(Cheema Decl. Exs. 9 and 10, § 2.02.) (emphasis added).

Clearly, unlike the trustees in in *Morgan, Kennedy*, who had unfettered discretion to make investment decisions on behalf of the claimants, the Partners withheld such discretion from the managing general partners. A vote of the majority of the Partners was required to hire or fire a broker who had discretionary investment power over the partnerships' assets and, obviously, if a particular Partner disliked the will of the majority, he had the right to withdraw his funds entirely.

Lastly, in *Morgan, Kennedy* the court was reluctant to find that the claimants were "customers" in part based on the court's concern that the individual participants'

{N0067057 4 }                                                              9

claims could not be reduced to a specific monetary sum because, at the time of the liquidation of *Morgan, Kennedy,* the account held no property belonging to individual employees. The participant's interest in the plan did not vest until the participant earned a specified amount of service credit under the plan, and the employees only became entitled to benefits upon retirement based on the participant's age, years of service and final compensation at the point of retirement. *See Morgan, Kennedy*, 533 F.2d at 1318. That concern is not present here. On the contrary, each Partner's interest in the funds entrusted to BLMIS is easily ascertainable based on the percentage of each Partner's general partnership interest, which is readily available from the Partnerships' records. (Cheema Decl. Ex. 5, Response to Interrogatory No. 17.)

Therefore, the analysis that led the Second Circuit to deny "customer" status to the claimants in *Morgan, Kennedy,* warrants the Court's recognition of the Partners' SIPA claims here.

C.   **The "Customer Decisions" Do Not Support the Trustee's Treatment of the Partners' Claims**

The Trustee relies heavily on previous decisions holding, on the specific facts of those cases, that the customers were not "customers" under SIPA.[2] Although some of those holdings are instructive on providing the framework for the Court's analysis, certainly none of them dictates the result here. In fact, none addressed the specific issue

---

[2] Tr. Br. at 4-8 (citing *Investor Protec. Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank Ltd. v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 480 B.R. 117 (S.D.N.Y. 2012), *aff'd sub nom. Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC),* 708 F.3d 422 (2d Cir. 2013) (the "*Initial Feeder Fund Decisions*")); *Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, Nos. 12 Civ. 1039(DLC), 12 Civ. 1139(DLC), 2012 WL 3042986 *3 (S.D.N.Y. July 25, 2012) (the "*ERISA Decision*"); Bench Memorandum Granting Trustee's Second Motion to Affirm Trustee's Determinations Denying Claims of Claimants Who Invested in Certain Feeder Funds and Did Not Have BLMIS Accounts in Their Names (ECF No. 5450) (the "*Second Feeder Fund Decision*") (together with the *Initial Feeder Fund Decisions,* the "*Feeder Fund Decisions*"); and *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 515 B.R. 161(Bankr. S.D.N.Y. 2014) (the "*Daprex Decision*") (collectively, the "Customer Decisions").

presented here: whether partners of a general partnership, whose existence was known to BLMIS, and who joined the partnership for the purpose of depositing their funds with BLMIS for the purpose of purchasing securities and who jointly retained control over the investment decisions of the partnership's assets are "customers" under SIPA.

The Trustee's reliance on the *Initial Feeder Fund Decisions* is misplaced. There, the Second Circuit affirmed denial of customer status to BLMIS investors who purchased limited partnership interests in the feeder funds, not in the Madoff account, and who handed over exclusive control over the investment decisions to the funds. *See* 703 F.3d at 425 ("The record demonstrates that none of the appellants remaining . . . invested directly with BLMIS. Rather, they invested in two limited partnerships . . ., which in turn invested in two hedge funds . . . . [T]he Feeder Funds advised investors who purchased interests in the funds that the investors yielded exclusive control over investment decisions to the funds.") The court found that the claimants: (1) had no direct financial relationship with BLMIS, (2) had no property interest in the assets that the Feeder Funds invested with BLMIS, (3) had no securities accounts with BLMIS, (4) lacked control over the Feeder Funds' investments with BLMIS, and (5) were not identified or otherwise reflected in BLMIS's books and records." *Id*. at 426-27. Thus, the Court found that, like the *Morgan, Kennedy* claimants, the feeder fund investors were not customers under SIPA.

The Second Circuit's holding in the *Initial Feeder Fund Decision* was based primarily on the claimants' inability to distinguish themselves from the *Morgan, Kennedy* claimants in two respects. <u>First,</u> they conferred exclusive control over the investment decisions to the feeder funds. <u>Second,</u> they had no ownership interest in the money that was invested in BLMIS. *See id.* at 427; *id.* at 428. This case presents an entirely differ-

{N0067057 4}                                            11

ent situation. In *Initial Feeder Fund Decision*, unlike here, the explanatory material for the feeder funds provided ample support that the claimants relinquished their exclusive control to the feeder fund. *Id.* at 427. For example, the Second Circuit emphasized that the explanatory material established, among other things, that "'[t]he General Partner has . . . the sole right to hire or terminate the . . . Investment Advisors'" (*id.* at 427 (quoting the feeder fund's Amended & Restated Confidential Private Placement Memorandum) and "that decisions regarding partnership's investment objective and process are made by General Partner[.]" *Id.* Here, on the other hand, the Partners had a direct relationship with BLMIS as general partners of the Partnerships; they had control over the choice to entrust their funds to BLMIS; they had a property interest in the Partnerships account at BLMIS; and they had the right to terminate their investment at any time.

Thus, the *Feeder Fund Decisions* are irrelevant to the Court's determination in this case.

The Trustee also relies upon the *ERISA Decision*. However, that decision did not deal with the particular facts at issue here. Indeed, the court expressly noted that it was not dealing with any factual defenses unrelated to ERISA:

> . . . the supplemental briefings submitted by the Reynolds Plan and the Greens on May 25 and June 15, respectively, purport to present evidence that these claimants had contact with BLMIS, that BLMIS traded in securities for their accounts, or that they were known to BLMIS. They do not present any arguments based on ERISA, or cite to any ERISA provision or accompanying regulation. These arguments are therefore beyond the scope of the ERISA Motion and will not be addressed in this Opinion.

{N0067057 4}                                    12

2012 WL 3042986 at *3; *id.* ("The scope of this Opinion is therefore limited to the question of whether ERISA has any bearing on the ERISA Claimants' "customer" status under SIPA.")

To the extent the district court held that "customer" means something other than how Congress defined "customer" in SIPA, the decision is incorrectly decided. Again, if Congress had intended to limit customers to account holders, Congress could easily have done so. It chose not to, and a district court lacks the power to re-write the legislation. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (internal citations omitted); *see also Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation . . . and that judicial review must end at the statute's unambiguous terms.").

Finally, the Trustee relies on the *Daprex Decision*, which also did not deal with the precise facts at issue. *Daprex* involved participants in an ERISA profit sharing plan, whose assets were legally owned and managed by the ERISA plan trustee. Here, however, the Partners controlled their investment decisions and owned the Partnerships' accounts. While the Court in *Daprex* concluded that the fact that customers "affirmatively steered their investment . . . to BLMIS" standing alone is insufficient to confer "customer status," here, the Partners not only controlled the investment in the sense that they retained the ability to withdraw from the Partnerships at any time but the Partners, with the other partners, also retained control over where their funds were invested. Accordingly, the *Daprex Decision* is irrelevant.

{N0067057 4 }                                                    13

## **CONCLUSION**

For the reasons set forth above, we respectfully ask the Court to deny the Motion and allow the Partners' claims.

Dated: New York, New York
January 26, 2015

Respectfully submitted,

*/s/ Helen Davis Chaitman*
BECKER & POLIAKOFF LLP
45 Broadway
New York, New York 10006
(212) 599-3322
hchaitman@bplegal.com

*Attorneys for Customers set forth on Exhibit A to the Chaitman Declaration*

{N0067057 4 }                              14