# **EXHIBIT D**

# BakerHostetler

Baker&Hostetler LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

Gonzalo S. Zeballos
direct dial: 212.589.4656
gzeballos@bakerlaw.com

August 25, 2014

**VIA ELECTRONIC MAIL**

Jodi A. Kleinick, Esq.
Paul Hastings LLP
75 East 55th Street
New York, NY 10022

Re:   *Picard v. Ceretti, et al.* (United States Bankruptcy Court, Southern District of New York Adversary Proceedings No. 09-1161

Dear Ms. Kleinick:

This letter responds to your draft motion for sanctions, which is largely grounded on your contention that the Trustee is engaged in an improper effort "to make an end-run around the Extraterritoriality Decision,[1] or to try to keep the case alive against the FIM Defendants in an effort to force the FIM Defendants into unwarranted discovery." That position is baseless. The factual allegation of which you complain predates the Extraterritoriality Decision by more than three years. It could not have been alleged by the Trustee in an effort to circumvent a non-existent judgment.

In your May 5, 2014 letter, you further contend the Fourth Amended Complaint "contains several factual allegations that are objectively false." Our timely response rejecting your allegations was sent the next day. Your assertion that our prompt response is evidence "that counsel did not even bother to investigate the veracity of the allegations in his pleading in light of the unequivocal statements made by the FIM defendants" is as unsubstantiated as it is incorrect. Our response followed our immediate review of not only the very serious allegations contained in your letter, but also another thorough review of the support for each and every allegation in the Fourth Amended Complaint.

You now cling to but one fact—despite the totality of the allegations in the complaint—as support for sanctions, specifically, that your clients made "unequivocal statements" that our client's allegation is false. If such an assertion could form a solid foundation for a sanctions motion, every denial of an asserted fact in a complaint would give rise to a sanctions hearing. Your May 5th letter demanded a withdrawal of the Trustee's allegation if, as you asserted, the

---

[1] Capitalized terms are used herein as defined in the draft motion attached to your August 21, 2014 letter unless otherwise indicated.

Atlanta    Chicago    Cincinnati    Cleveland    Columbus    Costa Mesa    Denver
Houston    Los Angeles    New York    Orlando    Philadelphia    Seattle    Washington, DC

Jodi A. Kleinick, Esq.
August 25, 2014
Page 2

Trustee had no support for it. The Trustee's allegation regarding the Brown Brothers Harriman & Co. ("BBH") account was made in good faith, on the basis of documentary evidence referring to the transfer of assets from Kingate Management Limited to BBH "in favour of FIM Limited." We could not accept your client's *ipse dixit* as evidence that FIM Limited held no such account.

Your reference to a wholly unrelated judgment by Mr. Justice Popplewell, made in a foreign proceeding involving different parties and causes of action, does not lend support to your meritless contentions. Tellingly, you do not cite to the English courts' findings about your clients. Mr. Justice Kitchin, adjudicating a disclosure request brought by the Trustee against your clients in the United Kingdom, concluded as follows:

> Mr. Ceretti and Mr. Grosso were also closely involved with the activities of BLMIS and Mr. Madoff from the outset, having first met Mrs. Manzke in 1993 or 1994 and through her, Mr. Madoff, and subsequently they had communications with Mr. Madoff by telephone and face-to-face to a degree that the trustee considers unusual. These matters, the consultancy and distribution agreements and the payments of fees to Kingate Management, FIM Limited and FIM Advisers, <u>all suggest that Kingate Management, FIM Limited and FIM Advisers played an important role in the recruitment of new investment and the management of their funds and so ensured a flow of funds to the Kingate Funds and on to BLMIS which helped to support and promote the fraud until December 2008. In light of all these matters it comes as no surprise to me that the trustee considers the Kingate Funds must either have known that the business of BLMIS was inherently fraudulent or that they should have known that to be the case and further that payments made to the Kingate Funds' investors, as well as the management and consulting fees paid to Kingate Management and indirectly to FIM Limited and FIM Advisers, as very likely to have been derived from preferential payments or fraudulent transfers received from BLMIS.</u>

*Picard v. FIM Advisers LLP & Ors.* [2010] EWHC 1299 at ¶ 39 (emphasis added) (attached hereto as Exhibit A).

In stark contrast to your citation to Mr. Justice Popplewell, Mr. Justice Kitchin's statements relate directly to your clients and their relationship to Madoff and BLMIS. Further, Mr. Justice Kitchin's statements go to the heart of the Trustee's claims against your clients.

The draft motion also lacks a basis in law. Not one case cited in your motion supports it. Each of the cases you cite involves egregious conduct relating to elements central to the relevant allegations in those cases. The Trustee's complaint against your clients is based on causes of action arising under the U.S. Bankruptcy Code. The validity of the Trustee's claims against your clients does not turn solely on the existence of a bank account held in New York by one of them.

The fact that you first complained that FIM Limited had no New York-based bank account three years after that allegation was made in court strongly suggests its purely tactical motivation now that the litigation against your clients is proceeding. The proper course of action would be to deny any allegation your clients contend is false or await the resolution of your promised motion to dismiss the Trustee's complaint. As you are no doubt aware, frivolous sanctions motions are themselves subject to sanction. Your draft motion is baseless and improper. In light of Mr. Justice Kitchin's findings regarding your clients' conduct, if you considered that attempting to

Jodi A. Kleinick, Esq.
August 25, 2014
Page 3

cast the Trustee in a negative light in advance of a motion to dismiss would distract attention from your clients' alleged bona fides, it was unprofessional and misguided. The Trustee reserves all rights in that regard.

Sincerely,

Gonzalo S. Zeballos

Enclosures

# EXHIBIT A



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales High Court (Chancery Division) Decisions

**You are here:** BAILII >> Databases >> England and Wales High Court (Chancery Division) Decisions >> Picard (The Foreign Representative of Bernard L. Madoff Investment Securities Llc) v Fim Advisers Llp [2010] EWHC 1299 (Ch) (27 May 2010)
URL: *http://www.bailii.org/ew/cases/EWHC/Ch/2010/1299.html*
Cite as: [2010] EWHC 1299 (Ch)

[New search] [Printable RTF version] [Help]

**Neutral Citation Number: [2010] EWHC 1299 (Ch)**
Case No: 11283 OF 2009

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
COMPANIES COURT
IN THE MATTER OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC
AND IN THE MATTER OF THE CROSS-BORDER INSOLVENCY REGULATIONS 2006

Royal Courts of Justice
Strand, London, WC2A 2LL
27 May 2010

Before:

**THE HONOURABLE MR. JUSTICE KITCHIN**

Between:

**IRVING H PICARD
(THE FOREIGN REPRESENTATIVE OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC)**    Applicant

- and -

**(1) FIM ADVISERS LLP**

Respondent

(Transcript of
WordWave International Limited
A Merrill Communications Company
190 Fleet Street, London EC4A 2AG
Tel No: 020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

**Mr Robin Dicker QC & Mr Steven Robins (instructed by Hogan Lovells International LLP) for the Applicant**
**Mr Antony Zacaroli QC & Miss Georgina Peters (instructed by Simmons & Simmons) for the Respondent**

### HTML VERSION OF JUDGMENT

Crown Copyright ©

**MR JUSTICE KITCHIN:**

### Introduction

1. I have before me an application by Mr Picard ("the Trustee"), the trustee for the liquidation of the business of Bernard L Madoff Investment Securities LLC ("BLMIS"), for an order under Article 21 of Schedule 1 to the Cross-Border Insolvency Regulations 2006 ("CBIR") requiring the respondent, FIM Advisers LLP ("FIM Advisers"), to produce documents concerning the assets, affairs, rights, obligations and liabilities of BLMIS.

2. BLMIS is a New York limited liability company wholly owned by Mr Madoff who was its founder, chairman and chief executive officer. It operated an investment advisory business with approximately 8,000 customers. Many of these were so-called feeder funds or other intermediaries investing money on behalf of their own clients. In many cases Mr Madoff was able to attract these feeder funds through the help of colleagues, one being Ms Sandra Manzke who founded two groups of companies known as the Tremont and Maxam groups which were themselves major feeder funds to BLMIS.

3. The business of BLMIS appeared to be extraordinarily successful. It purported to generate consistent annual returns of around 12% regardless of the underlying performance of the stock market and, unusually, it charged no fees beyond the transaction cost incurred in respect of individual trades. Mr Madoff and BLMIS represented this success as being attributable to a trading strategy which involved investing in securities but at the same time selling call options and purchasing put options.

4. The apparent success of BLMIS and its minimal charges made it very attractive to feeder funds and their associates because it left them with considerable scope to charge sizeable annual fees for very little effort while still providing clients with a substantial return on their investments.

5. In truth, the investment business of BLMIS was, at least from the early 1990s, a fraud or, in popular terminology, a Ponzi scheme. The trades reported to customers were a complete fabrication and never took place and the profits said to have been generated were entirely fictitious. New investments received from investors were used to fund distributions to, or payments on behalf of, other investors. Meanwhile Mr Madoff and others enriched themselves by receiving payments out of BLMIS.

6. In order for the fraud to continue, BLMIS required an ever increasing supply of new money from investors, but eventually, in December 2008, BLMIS received requests from customers for redemptions totalling some US $7 billion that it was unable to meet. Mr Madoff was arrested for fraud and the scheme collapsed. At a hearing on 29 June 2009, Mr Madoff was sentenced to 150 years imprisonment and ordered to forfeit US $170 billion in assets.

7. On 15 December 2008, the Securities and Investor Protection Corporation ("SIPC") filed an application in the US District Court for the Southern District of New York seeking a decree that the customers of BLMIS were in need of protection under the Securities Investor Protection Act 1970 ("SIPA") and the Trustee was appointed as trustee for the liquidation of the business of BLMIS with all the duties and powers of a trustee as prescribed in SIPA. At the same time the proceedings were removed to the United States Bankruptcy Court of the Southern District of New York ("the Bankruptcy Court") where they are now pending.

8. Under SIPA the Trustee has a statutory duty, among other things, to (1) investigate the conduct, property,

liabilities and financial condition of BLMIS, the operation of its business and any other matter to the extent relevant to the SIPA liquidation and report thereon to the Bankruptcy Court; and (2) report to the Bankruptcy Court any facts ascertained by him with respect to fraud, misconduct, mismanagement and irregularities, and to any causes of action available to the estate.

9. In his first affidavit made in support of this application dated 26 January 2010, the Trustee explains that the documents he is now seeking from FIM Advisers are essential for the purposes of his investigations into BLMIS' assets, affairs, rights and obligations and, therefore, the discharge of his responsibilities as trustee. Those responsibilities include recovering customer property for equitable distribution to BLMIS' customers, assessing claims, liquidating any other BLMIS assets (primarily for the benefit of its customers and creditors) and reporting to the Bankruptcy Court on what he has learnt through the course of his investigations.

**The relationship between BLMIS, FIM Advisers and the Kingate companies**

10. I must now explain a little more about the relationship between BLMIS and FIM Advisers. FIM Advisers has two principals: Mr Grosso and Mr Ceretti, both of whom are Italian citizens living in London. In late 1993 or early 1994 FIM Limited, the predecessor of FIM Advisers, and the shares in which were registered in the names of Mr Grosso and Mr Ceretti, contacted Tremont Advisers, a company in the Tremont group, to assist it in establishing a fund of hedge funds to offer to its clients. For this purpose Mr Grosso and Mr Ceretti dealt with Ms Manzke. In a deposition dated 7 July 2009 Ms Manzke says that she introduced Mr Grosso and Mr Ceretti to Mr Madoff at about this time.

11. Mr Grosso has explained in an affidavit dated 23 April 2010 that, on 11 February 1994, an open-ended investment company called Kingate Global Fund Limited ("Kingate Global") was incorporated under the laws of the British Virgin Islands. Shares in Kingate Global were sold to investors and the vast majority of the monies so derived were invested with BLMIS. By 1996, Kingate Global had collected about US $100 million.

12. On 19 April 2000 another open-ended investment company called Kingate Euro Fund Limited ("Kingate Euro") was incorporated under the laws of the British Virgin Islands and this engaged in a similar investment strategy. In this judgment I shall refer to Kingate Global and Kingate Euro collectively as the Kingate Funds.

13. The Kingate Funds paid 1.5% of the net value of their funds annually to Kingate Management Limited ("Kingate Management"), a company incorporated in Bermuda, purportedly for management services. The net value was calculated upon the basis of the false statements of accounts prepared by BLMIS. Over the years this practice enabled Kingate Management to reap tens of millions of US dollars in fees. Kingate Management in turn paid fees to FIM Limited and subsequently FIM Advisers, pursuant to one or more consulting services and distribution agreements.

14. The Trustee has strong grounds for believing that Mr Grosso and Mr Ceretti are the owners of and control Kingate Management and were responsible for the establishment and investment strategy of the Kingate Funds. Specifically Ms Manzke suggested in her deposition that Mr Grosso and Mr Ceretti founded the Kingate Funds for the purpose of investing in BLMIS. This accords with the perception of investment professionals at the time, as reflected in a report by Reuters dated 9 April 2009.

15. More substantively, the consultancy agreements between Kingate Management and FIM Limited, recently disclosed by Mr Grosso, reveal FIM Limited was responsible for, inter alia, (a) "reviewing the [Kingate Funds'] structure and operating procedure"; (b) "preparing ... such analyses and reports as may be required for use by [Kingate Management]"; (c) providing [Kingate Management] with assistance and support ... relating to investors' relations"; (d) "liaising directly with [Kingate Management] in respect of the investment program"; and (e) "in general, providing advice to and assisting [Kingate Management] on such aspects of the [Kingate Funds'] operational, administrative, accounting and legal matters as may be required by [Kingate Management] and the [Kingate Funds]".

16. Similarly, distribution agreements between Kingate Management and FIM Limited reveal FIM Limited was appointed as a distributor for the sale of shares (defined as "the Shares")in the Kingate Funds and that the

distributor services provided by FIM Limited included: (a) "the identification and solicitation of prospective investors to purchase the Shares"; (b) "the introduction of such prospective investors to [Kingate Management]"; (c) "the maintenance of regular contact with investors introduced to [Kingate Management] to keep them informed of investment results and other information with regard to the [Kingate Funds]"; (d) "the preparation of marketing and other material"; (e) "the supervision of distribution lists used by Kingate Management to keep prospective and existing investors informed of developments with regard to the [Kingate Funds]"; and (f) "generally, the provision of such services as may be required by [Kingate Management] to enable it to fulfil its duties with regard to the placement of the Shares".

17. The Trustee has explained in his second affidavit in support of this application that it is apparent to him that the responsibilities and functions of FIM Advisers, as successors to the business of FIM Limited, listed in the consultancy agreements and distribution agreements were very wide ranging indeed. The responsibilities of FIM Advisers ranged from reviewing the funds' structure and operating procedure; providing advice regarding the funds' investment programme; providing assistance and support on investor relations; providing advice regarding hedging activities; providing assistance on operational, administrative, accounting and legal matters; and identifying and soliciting investors, preparing marketing material and maintaining investor distribution lists.

18. He concludes, not unreasonably in my judgment, that it is hard to imagine what, if any, services remained for Kingate Management to provide. It seems to him that FIM Advisers and its predecessor FIM Limited had a role of fundamental importance and he therefore requires the underlying documents to form a view as to the precise nature and extent of the involvement of FIM Advisers and FIM Limited in these matters and to assist with his investigations more generally into the affairs of BLMIS and the inner workings of the fraud.

19. The close relationship between Kingate Management and FIM Advisers is further supported by the fact that the directors of Kingate Management included a Mrs Shazieh Salahuddin who is described in documents issued by the Kingate Funds as "a senior employee of the FIM group of companies for whom she has worked since 1996 in a variety of roles including fund administration operations, client relations and marketing". The Trustee has asked Mr Grosso how and why a senior employee of the FIM group of companies came to be employed as a director of Kingate Management but no substantive answer has been forthcoming. Moreover, over the years, FIM Advisers and its predecessor FIM Limited had frequent contact with Mr Madoff, and Mr Grosso had a number of face-to-face meetings and regular telephone calls with Mr Madoff each year. This degree of personal contact was, in the opinion of the Trustee, unusual because Mr Madoff tended to limit contact with investors as much as possible.

20. It is clear that the activities of the Kingate group of companies, FIM Limited and subsequently FIM Advisers in recruiting investors were very successful. The Kingate Funds transferred a total sum in excess of US $1.6 billion to BLMIS.

**The jurisdiction under Article 21 of Schedule 1 to the CBIR**

21. Article 21 of schedule 1 to the CBIR reads:

    "(1) Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the Court may, at the request of the foreign representative, grant any appropriate relief including-

    ....

    (d) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities."

22. In addition I must have regard to Article 22 which provides that in granting or denying relief the court must be satisfied that the interests of interested persons are adequately protected. Interested persons include the person against whom an order for delivery of information is sought.

23. It is apparent that Article 21(1)(d) has both a jurisdictional and a discretionary component. The court must

be satisfied that the information sought concerns the debtor's assets, affairs, rights, obligations or liabilities. If it is so satisfied then it has a discretion to order the delivery of that information. In exercising that discretion it must have regard to all relevant circumstances and ensure that the interests of the person against whom the order is sought are adequately protected.

24. Both parties before me were also agreed that it is appropriate for the court to have regard to the principles upon which the court will exercise its powers under section 236 and section 366 of the Insolvency Act 1986. The relevant principles for present purposes are, I think, these.

25. First, the power is conferred to enable the office holder to discover the true facts concerning the affairs of the company so that he may be able as quickly, effectively and with as little expense as possible to complete his duties.

26. Second, even an honest person who finds himself to have been involved in a major fraud which has had a catastrophic effect for thousands of investors must be expected to cooperate with the office holder.

27. Third, nevertheless, the court must avoid making any order which is unnecessary or unreasonable or which is oppressive to the respondent.

28. Fourth, one of the factors which weighs against making an order or limiting its scope in some way is the disruption, stress and expense likely to be caused to the respondent.

29. Fifth, in assessing what order to make the court will attach considerable weight to the views of the office holder.

### A measure of agreement

30. The application was issued at the end of January 2010. It originally sought disclosure of 25 categories of documents, most identified by reference to a topic. Since that time the solicitors acting for the parties have sought to narrow the issues in dispute and have done so with some success. In particular, no order is now sought against Mr Grosso and Mr Ceretti (who were originally joined as respondents to the application) on the basis of (1) witness statements stating that they held no documents personally and that all relevant documents were held by FIM Advisers; (2) an undertaking by FIM Advisers that all documents in its possession relating to Mr Grosso or Mr Ceretti personally, and which fall within the scope of any order this court may make, will be disclosed by FIM Advisers.

31. Further, FIM Advisers has confirmed it has custody of all the records and books of FIM Limited. Moreover, and subject to certain limited categories which I must address in due course, FIM Advisers has accepted that the categories of documents sought by the Trustee do concern the assets, affairs, rights, obligations or liabilities of BLMIS.

32. For his part, the Trustee recognises that many, if not most, of FIM Advisers' documents are held electronically because it operates what it is described as a paperless office. For such documents the parties have therefore agreed that FIM Advisers should conduct searches of its electronic records by using key words and have agreed a list of key words for that purpose. Documents recovered on such searches will then be reviewed by FIM Advisers to determine if they do indeed fall within one of the categories of documents which it is required to disclose.

33. The parties do, however, continue to disagree on a number of issues. The principal disagreements concern the date range for the search and the locations to be searched. As I have indicated, there is also a disagreement in relation to a limited number of categories of documents and, specifically, documents relating to the ownership and organisation of Kingate Management, the Kingate Funds and FIM Advisers.

### The date range

34. FIM Advisers has proposed that the search for electronic and hard copy documents be undertaken for the period 1 August 2005 until 11 December 2008. These, it says, are not arbitrary cut-off dates. 1 August

2005 is the date FIM Advisers took over the business of FIM Limited, and 11 December 2008 is the date on which Mr Madoff was arrested and BLMIS ceased carrying on business. This range is not, however, acceptable to the Trustee who seeks an order requiring FIM Advisers to search for and disclose documents generated at any time after the commencement of the fraud and prior to 31 January 2009.

**Start date**

35. FIM Advisers accepts that the court has jurisdiction to make the orders sought by the Trustee but contends it should not do so in the exercise of its discretion, or at least not at this stage. In short, it is FIM Advisers' belief that there is unlikely to be any material in its databases of electronic documents and emails that will significantly assist the Trustee, and accordingly the scale of the task required by the order sought is not proportionate to the likely benefit. In this regard it points out that FIM Advisers' business is and always has been managing and advising funds of funds and that the Kingate Funds were merely an investment option for that wider business. Accordingly, while there may be a great many documents stored on FIM Advisers' electronic databases which will be caught by, for example, the word "Kingate", the vast majority of these documents will simply refer to the Kingate Funds within the fund of funds business.

36. FIM Advisers says its concern is supported by the experience of the disclosure exercise conducted by its associated company, FIM USA. This resulted in the production of some 880,000 pages of documents which have proved to be of very limited value. In all these circumstances FIM Advisers says its proposal for searching its electronic databases for 3½ years prior to the collapse of BLMIS is a sensible and proportionate solution at this stage. If the documents recovered by that search are of limited assistance to the Trustee then this is likely to show that the burden of searching for an additional 12 years prior to 1 August 2005 or for documents post-dating the discovery of the fraud outweighs the possibility of the Trustee deriving substantial benefit from the task. If, on the other hand, the search produces material of substantial assistance to the Trustee then it is likely that the nature and extent of the documents disclosed will enable a more focused approach to be taken in extending its scope.

37. In assessing these arguments I think the starting point is to have in mind the scale of the fraud perpetrated by BLMIS and Mr Madoff and the public interest in providing the Trustee with all necessary documents to enable him to ascertain the true facts and carry out his duties as quickly and effectively as possible.

38. I also consider it highly relevant that the matters to which I have referred in the course of this judgment suggest that Kingate Global, and subsequently Kingate Europe, fed a very substantial body of funds to BLMIS and did so in the case of Kingate Global from as early as 1994 with the result that over US$ 100 million had been paid to BLMIS by 1996 and ultimately over US$ 1.7 billion in total.

39. Mr Grosso and Mr Ceretti were also closely involved with the activities of BLMIS and Mr Madoff from the outset, having first met Mrs Manzke in 1993 or 1994 and through her, Mr Madoff, and subsequently they had communications with Mr Madoff by telephone and face-to-face to a degree that the Trustee considers unusual. These matters, the consultancy and distribution agreements and the payments of fees to Kingate Management and FIM Limited and FIM Advisers, all suggest that Kingate Management, FIM Limited and FIM Advisers played an important role in the recruitment of new investors and the management of their funds and so ensured a flow of funds to the Kingate Funds and on to BLMIS which helped to support and promote the fraud until December 2008. In the light of all these matters it comes as no surprise to me that the Trustee considers the Kingate Funds must have known that the business of BLMIS was inherently fraudulent or that they should have known that to be the case and further, that payments made to the Kingate Funds' investors, as well as the management and consulting fees paid to Kingate Management and indirectly to FIM Limited and FIM Advisers, are very likely to have been derived from preferential payments or fraudulent transfers received from BLMIS.

40. Against this background I am wholly unable to accept that the selection of 1 August 2005 as a start date is objectively justifiable on any basis and that is so both in relation to electronic and hard copy documents. It would, in my judgment, inevitably exclude many relevant documents. The transition from FIM Limited to FIM Advisers was apparently seamless and FIM Advisers holds all the documents of both entities. I return to the issue of the locations to be searched later in this judgment and will consider in that context the scale of the task and the suggestion that it is not proportionate and how it should be conducted.

41. In conclusion I reject the imposition of 1 August 2005 as a start date and accept the Trustee's submission

that FIM Advisers should search for documents generated at any time after the commencement of the fraud and which fall within one of the relevant categories.

**The end date**

42. FIM Advisers submits that 11 December 2008 is a natural cut-off date for production of documents to which the Trustee is likely to be entitled because FIM Advisers was not, and is not suggested to have been, involved in any way in BLMIS's affairs. Its only role of any relevance to the Trustee was via the services it provided to the manager (Kingate Management) of the Kingate Funds, which were themselves clients of BLMIS. Any relevant documentation which FIM Advisers is likely to have, therefore, will be limited to documents relating to the dealings between the Kingate Funds and BLMIS, and those dealings came to an end on 11 December 2008 with the arrest of Mr Madoff.

43. I am unable to accept these submissions. For the reasons I have given I am satisfied the Trustee is properly concerned to ascertain the degree of involvement of FIM Advisers and FIM Limited in the affairs of Kingate Management, the Kingate Funds and BLMIS, and what has happened to the investors' funds and to the fees paid to Kingate Management, FIM Limited and FIM Advisers.

44. I also accept the Trustee's submission that the ways in which individuals responded to the discovery of the fraud in the period immediately after 11 December 2008 may be highly relevant to the Trustee's investigations. Such documents dating from the immediate aftermath of the fraud's discovery may shed considerable light on the knowledge and states of mind of the individuals in question. In my judgment the Trustee is right that the end date should be 31 January 2009.

**Locations to be searched**

45. FIM Advisers has electronically stored documents in three principal locations: (1) live mailboxes for all FIM Advisers' personnel. These comprise a total of some 750,000 emails and are not inherently date limited; (2) "personal storage table" archived emails stored on local or network drives. These comprise some 380,000 emails and again are not inherently date limited; (3) FIM shared drives storing FIM's electronic documents, comprising approximately 675,000 files. Mr Grosso says there has never been a policy of deleting documents from these shared drives.

46. In addition, FIM Advisers has archived electronically stored documents in two further locations: (1) an on-line back-up system for emails and documents in FIM Advisers' shared drives which has been in operation since January 2008 and of which the emails have already been restored. This system apparently contains approximately 2.4 million emails; and (2) off-site backup tapes in operation from the late 1990s until 2007, which have not been restored. It is not known how many documents are contained on these tapes but it is thought they are likely to run into many millions based upon the number of emails contained in online back-up storage since January 2008.

47. Currently FIM Advisers is undertaking searches of the live mailboxes, personal storage table archived emails and the FIM shared drives. It does not, however, propose to review or disclose documents outside the window 1 August 2005 to 11 December 2008. For the reasons I have given, I do not believe the disclosure exercise should be so limited and that it should extend from 1 January 1993 to 31 January 2009.

48. Insofar as FIM Advisers may experience difficulties in retrieval of archive material the Trustee has offered to make a team of external IT consultants available to assist. Thereafter the documents recovered must be reviewed but it was explained to me by counsel for FIM Advisers during the course of the hearing that it is anticipated that 1,000 documents could be reviewed per day. I see no reason why disclosure should not be given on a rolling basis following such review.

49. The position in relation to the archived materials in the back-up systems is, in my view, rather different. The on-line backup system for emails and documents in FIM Advisers' shared drives has only been in operation since 2008. It contains a considerable body of documents of which, as I have said, only the emails have been restored. I am satisfied that there is likely to be a significant degree of overlap between the documents contained on this system and those which will be disclosed pursuant to the exercise to be conducted in relation to the live mailboxes, the personal storage table archived emails and the FIM shared

drives.

50. I am not, therefore, prepared to make an order for disclosure of the documents on this on-line back-up system at this stage. I would, however, emphasise that if the ongoing disclosure exercise does prove fruitful and produces documents which the Trustee considers important then I would be sympathetic to a further application or for the restoration of this application for an order for disclosure in relation to them. I would expect FIM Advisers to be in a position to embark on any such disclosure exercise without delay. It should, therefore, proceed with the process of restoring all the documents on this back-up system.

51. The same considerations apply to the offsite back-up tapes. Once again I believe there is likely to be a considerable overlap between the documents recorded on these back-up tapes and those to be disclosed pursuant to the exercise of disclosure and review to be conducted on the live mailboxes, the personal storage table archived emails and the FIM shared drives. Accordingly I am not prepared to make an order for disclosure in relation to them at this stage but I would, again, be sympathetic to an application or the restoration of this application in relation to them depending upon the results of the current search. In the meantime I consider the process of restoration of the documents on these off-site back-up tapes should be completed so that any further order for disclosure can be addressed without delay.

**Specific disclosure - disputed categories**

52. The Trustee has requested but FIM Advisers has refused to disclose two specific categories of documents. I will address them in turn.

53. The first category relates to documents generated on or after 11 December 2008 concerning: (1) any complaints received by Kingate or FIM Advisers concerning any investments in BLMIS; (2) any inquiry or request for documents, subpoena, investigation or litigation by a US or foreign regulatory authority or a law enforcement authority concerning BLMIS or any investment in BLMIS and/or (3) litigation or arbitration by any private party for any reason concerning BLMIS or any investment in BLMIS.

54. FIM Advisers resist the disclosure sought on the basis that it is difficult to see how such documents can be properly said to relate to the affairs of BLMIS. Complaints from investors or inquiries from regulators addressed to FIM Advisers or Kingate Management after BLMIS' fraud was discovered, would, it says, be of marginal assistance at best in revealing details of BLMIS' operations. Further, the burden of reviewing any documents in these categories for the purpose of redacting legally privileged material is likely to be significantly greater than in relation to the other documents of which disclosure is sought.

55. I am unable to accept these submissions. The Trustee has said that such documents, particularly if they refer to events predating 11 December 2008, are likely to be highly relevant to his investigations. I agree; they may well disclose or refer to aspects of the business of BLMIS, its assets, obligations and liabilities of which the Trustee is not yet aware. As for the concern as to privilege, this could be addressed easily, as the Trustee has suggested, by the instruction of independent junior counsel to review the documents and to ensure privileged material is not disclosed.

56. The second category concerns documents showing the organisation of FIM Advisers, the Kingate Funds and Kingate Management including constitutional documents of these entities and documents showing any ownership interest, direct or indirect, in FIM Advisers, Kingate Funds or Kingate Management of Mr Ceretti or Mr Grosso.

57. FIM Advisers again objects to this category on the basis that documents related to the ownership of any of these entities or documents related to their organisation do not concern the assets, affairs, rights, obligations or liabilities of BLMIS.

58. In my judgment, FIM Advisors' objection to this category is not well founded. The Trustee has explained, and I accept, that the issue of ownership and organisation of Kingate Management and FIM Advisers is highly relevant to his investigation into the affairs of BLMIS, as is the role of Kingate Management and the extent of the involvement of FIM Advisers, Mr Ceretti and Mr Grosso in the fraud. The documents sought may shed light on all these matters and also on the whereabouts of the assets of BLMIS and whether it has claims and, if so, against whom. As I have mentioned, the Trustee believes that the Kingate Funds must

have known or should have known that the business of BLMIS was inherently fraudulent and believes the payments made to Kingate Funds' investors and the fees paid to Kingate Management and FIM Advisers are very likely to have been preferential payments or fraudulent transfers. In order properly to investigate these claims, I consider the Trustee reasonably requires a complete understanding of the organisation and ownership of these various entities.

59. I will hear counsel as to the precise terms of the order I should make in the light of this judgment.

BAILII: Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: http://www.bailii.org/ew/cases/EWHC/Ch/2010/1299.html