UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (SMB) |
| | SIPA LIQUIDATION |
| Plaintiff-Applicant, | (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, | |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| | Adv. Pro. No. 09-01364 (SMB) |
| Plaintiff, | |
| - against - | |
| HSBC BANK PLC, *et al*., | |
| Defendants. | |

**MEMORANDUM OF LAW IN RESPONSE AND OBJECTION TO CROSS-CLAIM PLAINTIFFS ALPHA PRIME FUND LIMTED AND SENATOR FUND SPC TO THE <u>HSBC DEFENDANTS' MOTION TO DISMISS THE AMENDED CROSS-CLAIMS</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ................................................................................. 2

I.    The Origins of the Funds ............................................................. 2

      A.   Alpha Prime Fund ................................................................ 2

      B.   Senator Fund ...................................................................... 4

II.   Banking Facilities, Swap Agreements, Financial Dealings with BoB and HSBC ............... 5

III.  SOURCES OF HSBC ADMINISTRATION OF THE FUNDS ......................... 7

IV.   The Amended Complaint and The Funds' Cross Claims ............................... 9

ARGUMENT ................................................................................... 10

I.    The Court Has Subject Matter Jurisdiction Over the Cross Claims .................... 10

      A.   This Court has "Related To" Jurisdiction Over the Cross Claims .............. 10

      B.   "Related To" Jurisdiction Applies in SIPA Proceedings ...................... 11

      C.   The Court Has Subject Matter Jurisdiction Over the Cross Claims ............ 13

      D.   The Court Also Has Supplemental Jurisdiction ............................... 16

      E.   Post-Settlement, the Court Retains Jurisdiction over Senator Fund's Cross
           Claims ............................................................................. 20

      F.   No Basis Exists for Abstention ............................................... 22

II.   ALPHA PRIME'S AND SENATOR'S CHOICE OF NEW YORK FORUM IS
      APPROPRIATE ......................................................................... 23

      A.   Alpha Prime's and Senator's Choice of New York Forum is Entitled to
           Deference. ......................................................................... 25

      B.   HSBC Fails to Show that Luxembourg is a More Convenient Alternate  Forum .. 27

      C.   Private and Public Factors .................................................... 30

III.  HSBC HAS HAD AMPLE CONTACTS WITH THE UNITED STATES TO CONFER
      SPECIFIC PERSONAL JURISDICTION, THE EXERCISE OF WHICH IS
      REASONABLE. ......................................................................... 35

      A.   Jurisdiction Under 302(a)(1) .................................................. 35

## TABLE OF AUTHORITIES

## CASES

*Achtman v. Kirby, McInerney & Squire*, LLP, 464 F. 3d 328 (2d Cir. 2006) ................. 17, 18, 19

*Aurecchione v. Schoolman Transp. Sys. Inc.*, 426 F.3d 635 (2d Cir. 2005) ................................. 10

*Baena v. Woori Bank,* No. 05 Civ. 7018 (PKC), 2006 U.S. Dist. Lexis 74549 (S.D.N.Y. Oct. 11, 2006) ......................................................................................................... 30

*Balzotti v. RAD Invs.*, 273 B.R. 327 (D.N.H. 2002) ............................................................. 21, 22

*Bigio v. Coca-Cola, Co.,* 448 F.3d 176 (2d Cir. 2006) ........................................................ 25, 31

*Bodner v. Banque Paribas*, 114 F. Supp 2d 117 (E.D. N.Y. 2000) ............................................. 32

*Calavo Growers of Cal. V. Genrali Belgium,* 632 F.2d 963 (2d Cir. 1980) ................................ 32

*Clopay Plastic Prods. Co. v. Excelsior Packaging Group, Inc.*, case no. 12-cv-5262 (JPO), 2014 U.S. Dist. Lexis 128011 (S.D.N.Y. September 11, 2014) ........................................ 35

*Cromer Fin. Ltd. v. Berger*, 158 F. Supp 2d 347 (S.D.N.Y. 2001) ............................................ 33

*E.R. Squibb & Sons, Inc. v. Accident and Casualty Ins. Co.*, 160 F.3d 925 (2d Cir. 1998) ......... 22

*Erausquin v. Notz, Stucki Mgmt. (Berm.)*, 806 F. Supp. 2d 712  (S.D.N.Y. 2011) ..................... 25

*Estate of Bruce v. Middletown,* 781 F. Supp. 1013 (S.D.N.Y. 1992) .......................................... 16

*Fubon Ins. Co. v. OHL Int'l,* 2014 U.S. Dist. Lexis 49893, Case No. 12 Civ 5035  (S.D.N.Y. March 31, 2014) ............................................................................................... 29

*Garcia v. Teitler*, 443 F.2d 202 (2d Cir. 2006) ......................................................................... 17

*Gowan v. HSBC Mortg. Corp. (USA)*, 2012 Bankr. Lexis 4799  (Bankr. S.D.N.Y. 2012) .......... 34

*Haywin Textile Prods., Inc. v. Int'l Fin. Inv.,* 137 F. Supp. 2d 431 (S.D.N.Y. 2001) ................. 31

*Hough v. Margulies*, 476 B.R. 393 (Bankr. S.D.N.Y. 2012) ....................................................... 10

*In re Cuyahoga Equip. Corp.*, 980 F.2d 110 (2d Cir. 1992) ....................................................... 15

*In re Dow Corning*, 86 F.3d 482 (6th Cir. 1996) ........................................................... 16

*In re Dreier, LLP* , 2012 Bankr. LEXIS 4799 (Bankr. S.D.N.Y. 2012) ......................................... 23

*In re Rationis Enters., Inc. of Pan.,* 1999 U.S. Dist. Lexis 34  (S.D.N.Y.  Jan. 7, 1999) ............. 28

*In re Turner*, 724 F.2d 338  (2d Cir. 1983) .................................................................. 15

*In re WorldCom Secs. Lit.*, 293 B.R. 308, 317 (S.D.N.Y. 2003) ............................................. 15, 16

*Iragorri v. United Technologies Corp.,* 274 F.3d 65 (2d Cir. 2001) ................................ 23, 24, 26

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442 (2d Cir. 1998).......... 16, 20

*J.S. v. Attica Cent. Schs.*, 386 F. 3d 107 (2d Cir. 2004)................................................. 10

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ............................... 17

*Lesser v. Chevalier*, 138 F.Supp. 330 (S.D.N.Y. 1956)................................................. 26

*Lydonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697  (2d Cir. 2000)............................... 18

*M/s Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1 (1972)............................................... 29

*Mirror Group Newspapers, plc. V. Maxwell Newspapers (In re Maxwell Newspapers)*, 164 B.R.

858 (Bankr. S.D.N.Y. 1994) .................................................................................. 19

*Nelly De Vuyst, USA, Inc. v. European Cosmetiques, Inc.,* 2012 U.S. Dist. Lexis 12981

(S.D.N.Y. Jan. 6, 2012) .................................................................................... 31

*Norex Petr. Ltd. v. Access Indus., Inc.,* 416 F.3d 146 (2d Cir. 2005)...................................... 24, 25

*Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984) ................................................... 15

*Phillips v. Audio Active, Ltd.,* 494 F.3d 378 (2d Cir. 2007) ........................................... 29

*Picard v. Estate (Succession) of Igoin*, Adversary Proceeding No. 08-01789 (SMB), 2015 Bankr.

Lexis 478 (Bankr. S.D.N.Y. February 13, 2015)....................................................... 27, 30, 38

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)............................................................ 23, 24

*Pollux Holding, Ltd. v. Chase Manhattan Bank,* 329 F.3d 64 (2d Cir. 2003). ............................ 26

*Porina v. Marward Shipping Co., Ltd.,* 521 F.3d 122 (2d Cir. 2008) ........................................... 35

*Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251  (2d Cir. 1991).............................. 17

*PT United Can Co., Ltd. v. Crown Cork & Seal  Co., Inc.*, 138 F.3d 65  (2d Cir. 1998)....... 23, 30

*R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164 (2d Cir. 1991)......................................... 24

*Rahl v. Bande*, 328 B.R. 387  (S.D.N.Y. 2005) ........................................................................ 32

*Ramirez de Arellano v. Starwood Hotels & Resorts Worldwide*, Inc., 448 F. Supp. 2d 520

   (S.D.N.Y. 2006) ................................................................................................. 25, 31

*Ronix Corp. v. Philadelphia*, 82 B.R. 19  (E.D. Pa. 1988) ......................................................... 23

*Savage & Assocs., P.C. v. Mandt (In re Teligent, Inc.)*, 459 B.R. 190

   (Bankr. S.D.N.Y. 2011) ................................................................................................. 20, 21

*Thorsen v. Sons of Norway,* 996 F.Supp. 2d 143 (E.D.N.Y. 2014) ......................................... 38,39

*USHA Holdings, LLC v. Franchise India Holdings, Ltd.*, 11 F.Supp. 3d 244

   (S.D.N.Y. 2014) ................................................................................................. 35, 39

## **STATUTES**

11 U.S.C. 548(c) ............................................................................................................... 14

15 U.S.C. § 78eee(b)(A)(iii) .............................................................................................. 11, 12

15 U.S.C. § 78fff (b) ......................................................................................................... 11, 12

28 U.S.C.  § 1334 (b) ....................................................................................................... 10

28 U.S.C. §1367(a) .......................................................................................................... 16

N.Y. CPLR § 302(a)(1)..................................................................................................... 35, 36, 37

Cross Claim plaintiffs Alpha Prime Fund Limited ("Alpha Prime") and Senator Fund SPC ("Senator", and together with Alpha Prime, the "Cross Claimants" or the "Funds") submit this memorandum of law in response and opposition to the HSBC Defendants'[1] Motion to Dismiss the Amended Cross Claims of Alpha Prime Fund Limited and Senator Fund SPC (the "Motion"); and respectfully represent:

## PRELIMINARY STATEMENT

The Funds' Cross Claims arise from the same nucleus of facts as the Trustee's Amended Complaint.  The HSBC Defendants' argument that the Funds are engaged in forum shopping is, therefore, simply absurd.  Indeed, the Funds will immediately seek to dismiss their protective litigations in Luxembourg and Bermuda[2] upon entry of a final order denying the Motion.  The Cross Claims must be litigated in this proceeding because the calculation of damages against HSBC cannot be confirmed until this Court rules on the validity of the Alpha Prime Claim, a prerequisite that the HSBC Defendants already conceded when they argued to the Luxembourg Court that Alpha Prime's Luxembourg lawsuit was untimely until this proceeding is resolved and the extent of Alpha Prime's damages determined by this Court.

The HSBC Defendants' new argument that this Court lacks subject matter jurisdiction lacks any merit because the relationship between the HSBC Defendants and the Funds concerned servicing of New York BLMIS accounts from New York.  HSBC delegated its obligations to perform these services to BLMIS (as its agent) in New York pursuant to contracts entered into in New York.  That is undisputed.  Further, a substantial portion of HSBC's relationship with the Funds was based in New York, including: (i) substantial currency hedging; (ii) the extension of

---

[1] Unless otherwise indicated, terms that are not defined herein have the meanings ascribed to them in the memorandum of law submitted by HSBC on the Motion ("HSBC Memor.").

[2] On or about November 30, 2015, Alpha Prime Fund Limited filed a Writ of Execution against the HSBC Defendants in Bermuda as a place holder to preserve the statute of limitations which would have expired on December 8, 2015.  In order to perfect the filing, Alpha Prime would need to file a full complaint on or before November 30, 2016.

lines of credit; and (iii) providing investor financing services <u>entirely</u> in New York using New York-based HSBC personnel.  Moreover, the main situs of the alleged misrepresentations was New York.

HSBC's *forum non conveniens* argument is equally hollow, because the Trustee will litigate against Alpha Prime and HSBC regardless of whether the Cross Claims are litigated here or in Luxembourg, because the Cross-Claims are premised upon the same facts as Alpha Prime's defenses against the Trustee.  While HSBC has stated that it will consent to jurisdiction in Luxembourg, it does not state that it will abandon its motion to dismiss the Luxembourg proceeding because HSBC Bank Bermuda Ltd. is not a party to the action.  Thus, the Motion must be denied.

## BACKGROUND
### I.    The Origins of the Funds

#### A.    Alpha Prime Fund

The Fund was set up upon the request of a German institutional investor who wanted to invest into a Fund having Madoff as a broker.  After several meetings with Bank of Bermuda (Luxembourg) ("Bob Lux") to discuss the structure of the proposed fund, BoB Lux proposed that Alpha Prime be incorporated in Bermuda and that BoB Lux serve as the new fund's administrator and custodian, based upon its experience with Primeo and its existing relationship with the famously selective BLMIS and its gatekeeper, Madoff.  Cross Claims at ¶ 17; *see also* Declaration of Peter Fischer dated April 8, 2015 in Support of Response and Opposition of Alpha Prime Fund Limited and Senator Fund SPC to the HSBC Defendants' Motion to Dismiss the Amended Cross Claims ("Fischer Declar.") at ¶ 2.

BoB Lux's proposals were accepted, along with its advice that Bermuda be selected as the fund's domicile. In fact, BoB Lux took the lead in having all the relevant documentation for

the formation drawn up through its Bermuda counsel. Fischer Declar. at ¶ 3.  On March 12, 2003, Alpha Prime was formed and Nigel Fielding, head of BoB Global Fund Services, Luxembourg became one of its four founding directors.  Cross Claims at ¶¶ 18, 19; Fischer Declar. at ¶ 3.

Alpha Prime and Bank of Bermuda Ltd. ("BoB") entered into two contracts on March 12, 2003.  The first, a custodian agreement (the "Alpha Prime Custodian Agreement"), under which BoB would provide Alpha Prime with a full range of custodial services relating to the safeguarding and segregation of money and securities relating to BLMIS. The second, an administration and registrar agreement (the "Alpha Prime Administration Agreement"), was entered into with BoB's nominee, Management International (Bermuda) Ltd. ("Management International") and involved a miscellaneous range of services that Alpha Prime, which lacked any employees, could not do for itself.  Cross Claims at ¶ 27, 29; Fischer Declar. at ¶ 4,6.

Simultaneously therewith, BoB entered into a Sub-Custodian Agreement appointing BoB Lux as sub-custodian and an agreement to appoint it sub-administrator to undertake the contractual tasks of Management International.  Cross Claims at ¶ 28; Fischer Declar. at ¶ 6.

Both the Alpha Prime Custodian and Registrar Agreements contained a provision denominated "Proper Law" that stated the "Agreement shall be governed by and construed in accordance with the laws of Bermuda and the non-exclusive jurisdiction of the Bermuda courts". Alpha Prime Custodian Agreement at 27, Alpha Prime Administration Agreement at 20.

Throughout the process of the creation of Alpha Prime and the entering into the agreements and sub-agreements, Alpha Prime dealt primarily with Fielding, Germain Birgen, a Managing Director of BoB, and "Bank of Bermuda" with no working differentiation among the

3

three BoB entities.  Indeed, the same signatory executed the agreements on behalf of all three BoB entities.

In or about February 2004, HSBC acquired BoB and undertook the contractual duties of BoB.  HSBC did not enter into a formal novation agreement until January 2007 (the "Alpha Prime Custodian Novation Agreement") which expressly novated BoB's duties as custodian to Alpha Prime to HSBC Institutional Trust Services (Bermuda) Ltd ("HITSB").  Fischer Declar. at ¶ 7.  A copy of the Alpha Prime Custodian Novation Agreement is annexed hereto as <u>Exhibit A</u> to the Fischer Declar.  Upon the same date, a virtually identical novation agreement was executed relating to the Alpha Prime Administration Agreement (the "Alpha Prime Administration Novation Agreement").  Fischer Declar. at ¶ 8 (attached as <u>Exhibit B</u>).

Under the terms of both novation agreements, HITSB had the ability to disclose information about Alpha Prime, its securities invested with BLMIS, or "any services provided by the Custodian" to "members of the HSBC Group…where necessary to perform the Custodian's obligations under this Agreement."  Alpha Prime Custodian Novation Agreement at 20X(1).  As detailed below, the Funds dealt with "the HSBC Group" on a regular basis, more than with segregated entities like HITSB.

### B.    <u>Senator Fund</u>

In early 2006, HSBC agreed to assist in the creation and structure of Senator Fund, with Grand Caymans as the domicile and an investment fund with a strong US shareholder base as seed investor/promoter of Senator Fund.  Fischer Declar. at ¶ 9.  On or about August 4, 2006, Senator Fund and HSSL entered into a custody agreement (the "Senator Custody Agreement") under which HSSL agreed to provide Senator Fund with the same full range of custodial services

4

HSSL provided to Alpha Prime relating to the safeguarding and segregation of Senator Fund's money and securities invested with BLMIS.  Cross Claims at ¶ 36; Fischer Declar. at ¶ 10.

On the same date, Senator Fund and HSSL entered into an administration agreement (the "Senator Administration Agreement") under which HSSL agreed to provide Senator Fund with a miscellaneous range of services that Senator Fund, which lacked any employees, could not do for itself.   Cross Claims at ¶ 36; Fischer Declar. at ¶ 11.   The Senator Fund Custody and Administration Agreements both contained an identical provision agreeing to Luxembourg as the choice of venue and law.  Senator Fund Custody Agreement at 35; Senator Fund Administration Agreement at 26.

HSBC plc sought to be an investor in Senator Fund, and arranged that loan, overdraft, and currency hedging facilities be made available to Senator Fund and its investors through its Structured Products division in New York ("Hedging and Loan Services").  Fischer Declar. at ¶ 12.  Upon information and belief, HSBC earned substantial fees related to its leverage facilities made available to Senator Fund investors through its Structured Products division in New York as well as Loan Services provided for Alpha Prime Fund.

As with Alpha Prime, the investors in Senator Fund were largely an international mix of institutional clients, including American investors.  Senator Fund had no Luxembourg investors, and Alpha Prime had only one, the Luxembourg subsidiary of a non-Luxembourg bank.  Fischer Declar. at ¶ 13.

**II.    Banking Facilities, Swap Agreements, Financial Dealings with BoB and HSBC**

From inception, all activity for investors of the Funds were transactions to be administered as part of the services to be performed by BoB, and later, HSBC.  See BoB Fee Schedule, Exhibit C, Fischer Declar.  Because this activity necessarily involved transferring

5

money to BLMIS, or instructing BLMIS to sell securities on behalf of the Funds and forward the redemption funds to the administrator, that activity was envisioned to take place in New York, and in fact, took place in New York.  At the outset, BoB maintained a branch office in New York for that purpose. *See* Fee Schedule, November 21, 2003 cover letter. After 2004, these transactions were run by HSSL through a HSBC plc New York account maintained at HSBC USA. *See* Exhibit D, Fischer Declar.  The redemptions through the HSBC plc account were the "transfers" that form the basis of the Trustee's Two Year Transfers and Six Year Transfer claims against the Funds.

In the course of their relationship, the Funds and HSBC entered into a number of agreements relating to banking services, including a foreign exchange facility with HSBC plc and HSSL, an overdraft facility with HSBC plc and HSSL, a currency swap agreement with HSBC plc, various amendments to those agreements, and security agreements with HSBC plc, pledging the securities on account at BLMIS in New York to HSBC plc.  *See e.g.*, Exhibit E, Fischer Declar.  According to the Trustee's Amended Complaint, the HSBC Defendants provided similar banking and financing services to other Madoff Feeder Funds and also provided financing to investors to participate in Madoff Feeder Funds. Amended Complaint at ¶¶ 245-280.

On February 2, 2006, HSBC plc and HSSL entered into an agency agreement with Alpha Prime concerning electronic remote access of Alpha Prime to HSBC propriety data concerning BLMIS broker statements, fees, cash-charts, statements of net assets, statement of realized gains and losses, position appraisal reports, securities sales and purchases, and dividends ("HSBC Web-Portal").  Cross Claims at ¶ 10.  This arrangement was later extended to Senator. *Id.*  The HSBC Web-Portal was a primary means by which HSBC communicated with the Funds.

Fischer Declar. at 18.    Accordingly, it was a primary and ubiquitous source of HSBC's

misrepresentations that created the illusion of transactions by BLMIS in actual securities.

## III.    SOURCES OF HSBC ADMINISTRATION OF THE FUNDS

In her testimony in the criminal prosecution of several BLMIS employees, Christine Coe

testified that she was Global Head of Risk Management for Funds at HSBC plc, with "global

responsibility" for "all funds" that HSBC had as customers.    Testimony of Christine Coe, Trial

Transcript, *United States v. Bonventre, et al.,* 10 Cr. 228 (LTS), ECF Dkt. No. 880, January 9,

2014 ("Coe Test") at 21:15-16.    A copy of the transcript of the Coe Testimony is annexed as

Exhibit A to the Declaration of Todd E. Duffy dated April 8, 2015 ("Duffy Declar.").    Coe was

based in London, during the applicable period 2000-2008 of the Amended Complaint. *Id.* at 21-

24.    When HSBC took over BoB in 2004, "all of the clients which were fund clients became my

responsibility, from a risk prospective."    *Id.* at 25:1-3.    Coe went on to testify that HSBC

provided administrative, custodial and financing services to these funds, and she mentions

Thema, Optimal, Herald, Kingate, all Madoff Feeder Funds named in the Trustee's Amended

Complaint. Id. at 25-27.    In reviewing the BoB agreements with the Madoff Feeder Funds, Coe

was surprised.  She testified:

> I discovered that the Bank of Bermuda had effectively allowed Bernard Madoff
> Securities to do the custody of those underlying purchases of the various stock,
> which was unusual because it seemed that the fund themselves had asked for that
> to happen. Usually, what would happen in something like an HSBC is we would
> have other big banks doing that sort of custody for us. The reason that is
> important is because we have to make sure that the person looking after those
> investments is fit and proper to do the job. At the end of the day, it's someone
> else's money, so we are very careful about who we would allow to look after
> those investments on behalf of any of our clients. *Id.* at 33:7-15.

The Funds did not authorize the use of BLMIS as their custodian.  In response to this

"unusual" situation, Coe sent Brian Pettit to New York.  However, prior to sending Pettitt, she

sought information about the Madoff relationship by "talk[ing] to folks in New York from

HSBC." *Id.* at 35:15-16. Coe did not mention Luxembourg HSBC employees in relation to Madoff at any point in her testimony. While Coe does not identify with whom she spoke in New York, she later identified Paul Smith, a former "Bank of Bermuda senior manager" as "the head of the [HSBC] business division that managed all of those fund clients that were previously Bank of Bermuda clients." *Id.* at 73:5-8. A letter dated March 15, 2006, from Paul H. Smith to Bernard Madoff, identifies Smith as "Global Head of Alternative Funds Services" and gives Smith's business address as New York City ("Smith Letter"). A copy of the Smith Letter is annexed as <u>Exhibit B</u>, Duffy Declar. Coe later sent Pettitt to New York on additional occasions to visit BLMIS, and it was Coe who conceived the notion of HSBC retaining accountants to review "controls" at BLMIS relating to the Madoff Feeder Funds. *Id* at 37-55. Coe engaged KPMG London to cover what she labelled "a London and U.S. operation." *Id.* at 37:24-25. After the completion of the first KPMG review, Smith, in New York, was the HSBC officer who communicated with Madoff as to KPMG's findings and recommendations. *See* Smith Letter, Exhibit B, Duffy Declar.

As the Coe Testimony and Smith Letter reflect, HSBC's "heads" for decision-making relating to the Madoff Feeder Funds—Coe (Risk Management), Pettitt (Custodian) and Smith (Business Division)—were located in either London or New York. The head of HSBC Structured Fund Products, Brian Nash, provided a range of financial services to the Funds, which included currency hedging, along with HSBC Vice Presidents, Julie Y. Mei and Jennifer Skokan, all of them resident in New York. Fischer Declar. at 19. In addition, HSBC banking services were supplied in New York for fund investments and redemptions, by HSSL through a HSBC plc account maintained at HSBC USA. *See* Fischer Decl. at Exhibit D for examples of account transaction notifications sent.

8

The Funds also received regular communications from HSSL administrative employees in Luxembourg, generally concerning tasks like calculating NAV, which was calculated utilizing BLMIS-supplied numbers, or coordinating with New York counterparts, including on subscriptions and redemptions, involving also US clients. Fischer Declar. at 20. The e-mail attached as Exhibit F, Fischer Declar., is a typical example of the e-mail communications the Funds received reflecting the coordination between HSBC personnel in Luxembourg and New York. By e-mail dated October 3, 2007, Brian Nash instructed his HSSL counterpart to add HSBC New York personnel to "all future correspondence." *See* Exhibit G, Fischer Declar.

## IV.    **The Amended Complaint and The Funds' Cross Claims**

The following counts remain pending against Alpha Prime Fund:

- **90 day Preferential transfers claims** (Count 1) premised upon a ninety day look back period pursuant to sections 547, 550, and 551 of the Bankruptcy Code.
- **2 Year Fraudulent transfers claims (Counts 3 and 4)** premised upon a two-year look back period pursuant to Sections 548, 550 and 551 of the Bankruptcy Code (the "Two Year Transfers"); and
- **6 Year Fraudulent transfer claims (Counts 5, 6, 7, 8, and 9)** premised upon a six-year look back period pursuant to New York Debtor and Creditor Law Sections 273, 274, 278, and/or 279 and Sections 544, 550 and 551 of the Bankruptcy Code (the "Six Year Transfers"); and
- **Equitable Subordination (Count 12)** pursuant to Section 510 of the Bankruptcy Code.

The Funds' Cross Claims against the HSBC Defendants are as follows:

- *1. "Fraud-based Torts"* (Fraud, Fraudulent Concealment, Negligent Misrepresentation, Breach of fiduciary duty, unjust enrichment, aiding and abetting fraud, aiding and abetting breach of fiduciary duty) (Counterclaim Counts 1, 2, 3, 4, 11, 12);
- 2. *"Negligence Torts"* (Negligence, Gross Negligence) (Counterclaim Counts 6 & 7);
- 3. *"Contract Claims"* (Breach of Contract)(Count 5);
- 4. *"Statutory Claims"* (Counts 9 & 10). The statutory claims are plead only against HSSL (Lux) and allege (i) impermissible delegation of custodial duties to BLMIS pursuant to Art 85 para 1 lit e of Luxembourg Law dated 20.12.2002; and (ii) failure to monitor sub-custodian, BLMIS, pursuant to the Sub-Custodian Agreement and Luxembourg Regulations Annual Statement of Compliance, Sec. C.4.

**ARGUMENT**

I.     <u>The Court Has Subject Matter Jurisdiction Over the Cross Claims</u>

      A.     **This Court has "Related To" Jurisdiction Over the Cross Claims**

When considering a motion that seeks dismissal for lack of subject matter jurisdiction under Rule 12(b)(1), the court "must accept as true all material factual allegations in the complaint, but [the Court] is not to draw inferences from the complaint favorable to plaintiffs." *J.S. v. Attica Cent. Schs.*, 386 F. 3d 107, 110 (2d Cir. 2004). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys. Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). However, where the court "relies solely on the pleadings and supporting affidavits, the plaintiff need only make a *prima facie* showing of jurisdiction." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).

"Consideration of the bankruptcy court's jurisdiction begins with 28 U.S.C. § 1334." *Hough v. Margulies*, 476 B.R. 393 (Bankr. S.D.N.Y. 2012). That statute provides in relevant part that, "[N]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings *arising under title 11*, or *arising in* or *related to* cases under title 11." 28 U.S.C. § 1334 (b) [emphasis added].

Accordingly, the statute creates three bases of possible jurisdiction over a claim if: (1) the claim "arises under" Title 11 ("<u>Arising under" jurisdiction</u>); (2) the claim "arises in" in a case under Title 11 ("<u>Arising in" jurisdiction"</u>); or (3) the claim is "related to" a case under Title 11 ("Related to" jurisdiction") *Secs. Investor Prot. Corp. v. Cheshier & Fuller L.L.P.*, 262 B.R. 384 (Bankr. E.D. Texas 2001).

Claims falling within any of the three categories, gives the district court subject matter jurisdiction over the claim. The district court may thereafter refer the claim to the bankruptcy court pursuant to 28 U.S.C. § 157 (a). While the distinctions between the three categories blend together in this case, as explained below, the Funds' claims against the HSBC Defendants at a minimum satisfy the requirements of "related to" jurisdiction.

### B.    "Related To" Jurisdiction Applies in SIPA Proceedings

The HSBC Defendants initially assert that "related to" jurisdiction does not exist because "a SIPA proceeding is not a case 'under Title 11 [of the U.S.C.]' because SIPA cases arise under Title 15." HSBC Memor. at 9[3]. However, the Third Circuit, the only Court of Appeals to examine this issue, dismissed this argument finding  "related to" jurisdiction under 28 U.S.C. § 1334 (b) in SIPA cases. *Peloro v. United States*, 488 F.3d 163, 172 n. 8 (3d Cir. 2007).

In *Peloro*, the Third Circuit based its holding upon the express language of 15 U.S.C. § 78eee(b)(A)(iii), which provides, under the heading "<u>Exclusive Jurisdiction</u>," that, upon filing of the SIPA proceeding, the court "<u>except as inconsistent with the provisions of this Act, shall have the jurisdiction, powers, and duties conferred upon a court of the United States having jurisdiction over cases under title 11 of the United States Code.</u>" 15 U.S.C. § 78eee(b)(A)(iii) [emphasis added]. 15 U.S.C. § 78eee(b)(A)(iii) is not alone in directing statutory parallelism with a liquidation under Title 11. The very structure of the SIPA statutory scheme supports this parallelism. 15 U.S.C. § 78fff(a) sets forth the purposes of a liquidation proceeding under the SIPA and then § 78fff (b) immediately thereafter directs that:

> To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11.

---

[3] While confined by HSBC to "related to" jurisdiction, HSBC's assertion applies equally to "arising under" or "arising in" jurisdiction, since 28 U.S.C. § 1334 states that <u>both relate to Title 11</u>. Effectively, HSBC's statement asserts this Court has no jurisdiction whatsoever over a Title 15 SIPA proceeding.

15 U.S.C. § 78fff (b).

In interpreting 15 U.S.C. § 78fff (b), the court in *Keller v. Blinder,* 162 B.R. 555, 559 (D. Colo. 1994) stated, "This provision indicates that Congress intended SIPA liquidation proceedings to be treated, in most important respects, *identical to a traditional bankruptcy case under title 11.*" [emphasis added]. Other courts in this Circuit have applied "related to" jurisdiction to SIPA proceedings. *See e.g., Federal Ins. Co. v. Sheldon*, 167 B.R. 15 (Bankr. S.D.N.Y. 1994). This Court has also applied "related to" jurisdiction in this SIPA proceeding. *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011).

The only reported decision to provide an in-depth analysis of the issue of "related-to" jurisdiction in a SIPA proceeding is *Secs. Investor Prot. Corp. v. Cheshier & Fuller L.L.P.*, 262 B.R. 384 (Bankr. E.D. Texas 2001). Based upon the clear language of 15 U.S.C. § 78eee(b)(A)(iii) and 15 U.S.C. § 78fff (b) quoted above, the *Cheshier* court concluded that unless the exercise of jurisdiction was shown to be "inconsistent with the provisions of [the SIPA chapter]"(echoing the language of both statutes), a bankruptcy court "could properly exercise subject matter jurisdiction over [the] adversary proceeding [as if it] had been brought in connection with a case pending under title 11[.]" *Cheshier,* 262 B.R. at 395. In short, "a SIPA liquidation is essentially a bankruptcy liquidation tailored to achieve the special purposes of SIPA." *In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 269 (Bankr. S.D.N.Y. 1996).

The HSBC Defendants cite only to *In re Fairfield Sentry Ltd.*, 458 B.R. 665 (S.D.N.Y. 2011), where, in a footnote, the court stated, "The SIPA litigation is not a title 11 case and, thus, 28 U.S.C. § 1334 confers no jurisdiction over a case 'related to' that litigation." *Id.* at 689 n. 15. The *Fairfield Sentry* court fails to mention any of the jurisdiction provisions of SIPA.

12

*Fairfield Sentry* is not binding precedent upon this Court.  Rather, the Court is bound to follow the plain language of the SIPA statute, which provides the Court with the same subject matter jurisdiction of a court adjudicating a liquidation under Title 11, unless the exercise of such subject matter jurisdiction is shown to be "inconsistent with the provisions of [the SIPA chapter]".  *Cheshier,* 262 B.R. at 395.  HSBC has shown no such inconsistency.

### C.    The Court Has Subject Matter Jurisdiction Over the Cross Claims

The factual allegations supporting the Trustee's Avoidance Claims and Equitable Subordination Claim are essentially the same. The Funds are alleged to have been "willfully blind" to certain "red flags" that indicated the existence of Madoff's Ponzi scheme. Amended Complaint ¶¶ 144-224.  The Funds' primary defenses, set forth in their Answer, are legally premised upon, in the case of the Two-Year Transfer Claim, the "good faith" defense under Section 548(c) of the Bankruptcy Code, and for the Equitable Subordination Claim, the case law developed under Section 510(c)(1) of the Bankruptcy Code (the "Funds' Defenses").

Accordingly, both the Trustee's Two-Year Transfer and Equitable Subordination Claims, and the Funds' Defenses to those claims, can be heard by this Court pursuant to its "Arising Under" jurisdiction, because the matters arise from provisions of Title 11 and its attendant case law.   Crucially, however, in order to adjudicate those matters that clearly "arise under" Title 11, this Court will by necessity have to decide the HSBC Defendants' liability to the Funds on the Cross Claims, for <u>the Cross Claims are no more than the facts asserted in the Funds' Defenses asserted offensively</u>.  Specifically, the Funds Defenses would assert "good faith" under 548(c) and an absence of inequitable conduct under Section 510(c)(1) because:

> The HSBC entities misrepresented to the Funds that "they had always performed and would continue to perform 'regular due diligence procedure on Madoff" (Cross Claims ¶24), "that no day to day operational issues with Madoff had ever been found in existence as a result of past due diligence" (*Id.*), that HSBC was "duplicating 'broker account Madoff' in its Fund bookkeeping system in order to

13

be able to audit and verify all activities of Madoff for the Fund on a monthly basis through this 'parallel bookkeeping'" (Cross Claims, ¶ 57), that the KPMG audits of Madoff commissioned by HSBC resulted in a determination that "everything was fine" at BLMIS (Cross Claims, ¶ 61), that a senior HSBC manager assured a director of Alpha Prime by email that "control procedures were in place regarding all Madoff transactions, corporate actions, pricing and offers and that HSBC had confirmed this through 'an official document prepared by KPMG'" (Cross Claims, ¶ 64), that "'[BLMIS] purchases the stock in bulk through their trading side and settle them into their DTC proprietary account and then transfer them to their client account at DTC which ensures segregation of client and proprietary assets'" (Cross Claims, ¶ 67).

These various misrepresentations show reasonable reliance of the Funds upon HSBC as well as good faith, and lack of inequitable behavior on the part of the Funds as would be required to assert a defense to the Trustee's allegations. See, *e.g.,* 11 U.S.C. 548(c). These same misrepresentations form the basis of HSBC's liability under the Funds' fraud, breach of fiduciary duty, and negligence counterclaims. *See* Cross Claims First, Second, Third, Fourth, Sixth, Seventh, Eleventh, and Twelfth.

The same analysis applies to the Funds' contract and statutory claims. The Funds demonstrated good faith and lack of inequitable conduct because they contracted with HSBC:

To have it serve as custodian of the physical securities and maintain exclusive control over the administration of the purchase, transfer and redemption of the shares, which HSBC improperly transferred to BLMIS (Cross Claims, ¶¶ 32, 33, 34, 39); to provide services to the Funds, including the "replication of BLMIS trades on its own systems" (Cross Claims, ¶ 40); "to properly supervise the trading of the securities for the account of the fund, making sure that such trading was in line with applicable safeguards put in place" (Cross Claims, ¶ 42); "to confirm all transactions on the account prior to the settlement date" (Cross Claims, ¶ 43): "to cross check reports and receipts provided by BLMIS (Cross Claims, ¶ 45).

The Funds contracted and paid millions of dollars in fees to HSBC for these services that were not performed. The fact that the HSBC failed to provide these services as contracted supports the view that the Funds were lulled into a false, albeit justified, sense of security. At the same time, these same facts comprise the factual allegations supporting the Funds' contract and

14

statutory claims against the HSBC Defendants—Cross Claims Fifth, Ninth and Tenth—and the substantiation of the Funds Defenses relating to these allegations under the Court's "Arising under' jurisdiction would invariably and materially substantiate the bases of liability against the HSBC Defendants asserted in the Cross Claims.

This is inevitably true despite the fact that the Funds' tort, contractual, and statutory claims against the HSBC Defendants do not arise under Title 11, but are largely premised on the state law of New York, Bermuda Law, and Luxembourg law.

Whether an action is "related to" a bankruptcy case depends on whether there is "a significant connection" between the action and the underlying bankruptcy. *In re Turner*, 724 F.2d 338, 341 (2d Cir. 1983). The "proceeding need not necessarily be against the debtor or the debtor's property." *Buena Vista TV v. Adelphia Comm Corp.*, 307 B.R. 404, 414 (Bankr. S.D.N.Y. 2004). In any ordinary sense, the "significant connection" between the Funds' claims against the HSBC Defendants and the Funds' Defenses to the Trustee's claims is obvious: they involve the "same nucleus of operative facts" and, more than that, are largely the same facts used alternatively as shield and sword. The outcome of any determination *elsewhere*—while not technically *res judicata* against the Trustee—will effectively decide the Funds' defenses against the Trustee on the good faith and equitable subordination issues, the heart of the Trustee's remaining claims against the Funds. Accordingly, that outcome "'could alter the debtor's rights, liabilities, options or freedom of action" and affect 'the handling and administration of the bankrupt estate.'" *In re WorldCom, Inc. Sec. Litig*, 293 B.R. 308, 317 (S.D.N.Y. 2003). In fact, since the Trustee's claim against Alpha Prime for the Two-Year Transfer is approximately $75 million, and for equitable subordination is approximately $330 million, the affect could be considerable.

15

It is unquestionable that the outcome of the determination of the Funds' Claims against the HSBC Defendants "could" affect the Trustee, and "could" is sufficient to invoke the "related to" jurisdiction. *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992)(*quoting Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) ("related to" jurisdiction exists if a litigation has a "significant connection with a pending bankruptcy proceeding" and the outcome "*might have any 'conceivable effect'* on the bankruptcy estate.") [emphasis added]. As the courts have recognized, "A key word in the [Pacor] test is 'conceivable'. Certainty, or even likelihood, is not required. Bankruptcy jurisdiction will exist so long as it is possible" that the claims may affect "the debtor's rights, liabilities, options or freedom of action" or 'the handling and administration of the bankrupt estate." *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991); *In re WorldCom*, 293 B.R. at 317.

That the Funds' Defenses and the Cross Claims align substantively and therefore affect each other was admitted by counsel for HSSL in the Luxembourg Proceeding. In arguing against the current existence of an Alpha Prime claim against HSSL, HSSL argued that the existence of damages depends upon the outcome of the Trustee's claims in this case, and that "[c]onsequently, Alpha Prime cannot claim damages and interest, as the alleged loss is not certain and still cannot be proven as of this day." Certified Translation, HSSL Pleadings, December 17, 2013, Tribunal d'Arrondissement de Luxembourg, <u>Exhibit C</u>, Duffy Declar. ("HSSL Pleading) at ¶¶ 133-139. Accordingly, subject matter jurisdiction lies with this Court.

### D.    The Court Also Has Supplemental Jurisdiction

28 U.S.C. §1367 provides that "the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a). Supplemental, also known as ancillary, jurisdiction is an

additional and independent basis for the Court's exercise of jurisdiction over the Cross Claims. *See Estate of Bruce v. Middletown,* 781 F. Supp. 1013, 1014 (S.D.N.Y. 1992)("[E]ven where no independent basis for federal jurisdiction exists, a court may exercise subject-matter jurisdiction over state claims when those claims are part of the same case or controversy that includes a federal claim.").

The exercise of supplemental jurisdiction is mandatory. *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 447 (2d Cir. 1998). The Court's ability to decline supplemental jurisdiction of a claim that is part of the same case or controversy is limited to the "enumerated circumstances [of] subsection 1367(c)." *Id.*

In their Motion, the HSBC Defendants do not assert any of the enumerated circumstances under subsection 1367(c), and focus solely upon the preliminary requirement that the claim must be the "same case or controversy". Specifically, they assert "Alpha Prime's and Senator's allegations arise from an entirely independent set of facts relating to their private contractual agreements with certain HSBC Defendants—namely whether those HSBC Defendants adequately fulfilled their contractual or foreign statutory duties under the agreements between the parties." Motion at 12. As noted, HSBC's persistently mischaracterizes the Cross Claims as limited to competing interpretations of "foreign" contracts and laws and ignores that the damages the Funds seek are largely premised on fraud allegations for which New York law is applied.

In *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379-380 (1994), the United States Supreme Court stated, "We have asserted ancillary jurisdiction…for two separate, though sometimes related purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, *factually interdependent*; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its

decrees." [emphasis added]. While *Kokkonen* did not refer to Section 1367 specifically, the Second Circuit has applied its quoted formulation under Section 1367 case law. *See Garcia v. Teitler*, 443 F.2d 202, 207 (2d Cir. 2006).

Pursuant to the terms of § 1367 specifically, the Second Circuit has "held that disputes are part of the "same case or controversy' within § 1367 when they 'derive from a common nucleus of operative facts.'" *Achtman v. Kirby, McInerney & Squire*, LLP, 464 F.3d 328, 334 (2d Cir. 2006)(*quoting Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 254 (2d Cir. 1991)). "In determining whether two disputes arise from a 'common nucleus of operative facts', we have traditionally asked whether 'the facts underlying the federal and state claims substantially overlapped…or the federal claim necessarily brought the facts underlying the state claim before the court.'" *Id.* at 334-335, *quoting Lydonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000) [emphasis added]. The *Achtman* Court added, "This is so even if the state law claim is asserted against a party different from the one named in the federal claim." *Id.* at 335 [quotations omitted].

Accordingly, under the Supreme Court's analysis in *Kokkonen* (which the Second Circuit applied to § 1367 in *dow*) and the Second Circuit's "traditional" test under § 1367, "the same case or controversy" exists for supplemental jurisdiction purposes, if: the claims are "factually interdependent", "substantially overlap", *or* the federal claim necessarily brings the facts underlying the state claim before the court.

The Cross Claims reflect substantial overlap with the Trustee's claims. The HSBC Defendants were instrumental in organizing the Funds at their inception. Cross Claims ¶¶ 17,-20, 62-65. Nigel Fielding, the Global Head of BoB Lux served as an initial director of Alpha Prime. Cross Claims ¶ 19. Fielding's knowledge and information may, accordingly, be used by

18

the Trustee to show "willful blindness" or inequitable conduct on the part of Alpha Prime. The HSBC Defendants served as custodians and administrators of the Funds. The HSBC Defendants considered BLMIS to be their agent. In those roles, the Trustee is likely to seek to have them deemed agents of the Funds and seek to have their knowledge and Madoff's knowledge imputed to the Funds. HSBC plc was a shareholder of Senator Fund. It was the only shareholder of Senator Fund to redeem the bulk of its investment prior to Madoff's arrest. As noted, the defenses of the Funds consist of the same facts asserted offensively in the Cross Claims. Thus the facts underlying the state claims are "interdependent" and "the federal claim[s] [of the Trustee] necessarily bring[] the facts underlying the state claim before the court."

In attempting to rule out a common nucleus, the HSBC Defendants harp on the divergence of the legal theories, which is irrelevant, rather than the "common nucleus of operative *facts*" which is the touchstone. The Second Circuit's decision in *Achtman* not only makes that clear, but provides an instructive example. In *Achtman,* plaintiffs were shareholders of Bennett Funding Group ("BFG") who successfully sued a variety of defendants on federal securities claims, and in that action were represented by the defendant, Kirby, McInerney & Squire, LLP ("Kirby"). Later, the plaintiffs sought to bring a state legal malpractice action against Kirby for failing to include certain additional defendants in the BFG securities action. Despite the lack of legal "overlap" between the securities law and New York malpractice law, the Second Circuit found supplemental jurisdiction based on the common nucleus of facts. Achtman, 464 F.3d at 336. While the Court acknowledged "there would surely be some facts at issue in the malpractice action not directly implicated in the BFG securities action," nonetheless, as a result of its experience in the facts of the securities action, "the district court was well-placed to consider the issues that would arise in the malpractice action." *Id.* 426 F.3d 335-336.

19

This Court is similarly "well-placed" since the facts behind the Cross Claims will be heard necessarily as the Funds' defenses to the federal claims, even if the Cross Claims had never been brought. *See generally, Mirror Group Newspapers, plc. V. Maxwell Newspapers (In re Maxwell Newspapers)*, 164 B.R. 858, 866 (Bankr. S.D.N.Y. 1994)("[T]he acts and knowledge of an agent acting within the scope of his agency are imputed to the agent's principal.  Under the 'adverse interest exception' when an agent's motive and conduct demonstrate that he has totally abandoned his principal's interest and is acting to defraud his principal...his knowledge and conduct will not be imputed to his principal").  Accordingly, to establish its defenses, Alpha Prime must show (1) that HSBC did not act as its agent (an argument largely premised on interpretation of its contracts and contract performance); and (2) that even if deemed Alpha Prime's agent, HSBC was unfaithful (an argument largely premised upon the tort claims, chiefly those alleging fraud).

As noted, where there is the "same case or controversy" supplemental jurisdiction under Section §1367(a) is mandatory, unless there exists one of the enumerated bases found under Section §1367(c). *Itar-Tass*, 140 F.3d at 447. The HSBC Defendants do not assert any—and there are none.

The HSBC Defendants do digress into assertions here and elsewhere about judicial efficiency, fairness, etc. Motion, 12-13.  But "concerns of judicial economy, convenience, fairness" are irrelevant to supplemental jurisdiction—as the Second Circuit has expressly held—because those concerns are not "founded upon an enumerated category of subsection 1367 (c)." *Id*. 140 F.3d at 448.   Accordingly, supplemental jurisdiction lies with this Court.

**E.    Post-Settlement, the Court Retains Jurisdiction over Senator Fund's Cross Claims**
As discussed above, when the Cross Claims were filed and thereafter, the Court had "related to" and supplemental subject matter jurisdiction as to the Cross Claims for both Alpha

Prime and Senator Fund.  On December 17, 2014, this Court approved a settlement between the Trustee and Senator Fund. Senator Fund was subsequently dismissed from this action as a defendant.  Part of the consideration paid to the Trustee was a recovery-sharing arrangement, by which the Trustee is to receive 50% of the monetary value of any recovery Senator Fund is awarded. [Dkt. No.350].

Despite the dismissal of Senator Fund as a defendant, the Court retains both "related to" and supplemental jurisdiction over Senator Fund's Counterclaim. The salient analysis was provided by this Court in *Savage & Assocs., P.C. v. Mandt (In re Teligent, Inc.)*, 459 B.R. 190 (Bankr. S.D.N.Y. 2011).  In that case, Savage & Assocs., P.C. ("Savage") was appointed Estate Representative of the Chapter 11 debtor, Teligent, and in that capacity sued Mandt for repayment of a $15 million loan.  At trial, Mandt lost, and hired new counsel to conduct an appeal. *Id.* at 192. His new counsel came to the conclusion that the prior counsel had committed malpractice and sought to overturn the verdict based upon new evidence. *Id.*  Thereafter, Savage and Mandt reached a settlement.  As part of the settlement, Mandt agreed to commence a malpractice action against his former counsel and to pay the estate 50% of the net recovery of the malpractice claim. *Id.*  As in the present case, the estate assumed no role in the prosecution of the malpractice case. *Id.*  Also, as in the present case, approval of the settlement was sought under Rule 9019 of the Federal Rules of Bankruptcy Procedure, and this Court approved the settlement. *Id.*

In a subsequent challenge to this Court's jurisdiction over the malpractice action, the Court held, "The estate's right to receive 50% of the net proceeds recovered by Mandl…is undoubtedly property of the estate."  *Id.* at 196.  Here, the Court quoted the language of section 541(a)(7) of the Bankruptcy Code, "Property of the estate includes '[a]ny interest in property that the estate acquires after the commencement of the case.'" *Id.*  The Court concluded, "This

interest confers 'related to" subject matter jurisdiction in this Court over Mandl's malpractice action." *Id. See also, Balzotti v. RAD Invs.*, 273 B.R. 327 (D.N.H. 2002)(same).

In response, the HSBC Defendants term the Trustee's 50% interest in Senator's "speculative", "remote" and having only an "incidental effect on the estate." These are unsupported conclusions. As to "incidental effect", Senator is suing HSBC for losses in excess of $100 million, of which the Trustee is to receive 50%. Even in the context of the Madoff proceeding, more than $50 million added to the estate still deserves the title of "a lot of money."

Finally, the HSBC Defendants assert that "it is well-established that the parties may not by agreement manufacture the subject matter jurisdiction of this Court." Motion at 11 n. 6. They quote the Second Circuit's opinion in *E.R. Squibb & Sons, Inc. v. Accident and Casualty Ins. Co.*: "[N]o amount of agreement by the parties can create jurisdiction where none exists." *E.R. Squibb & Sons, Inc. v. Accident and Casualty Ins. Co.*, 160 F.3d 925, 929 (2d Cir. 1998). The objection is inapposite. As noted, both "related to" and supplemental jurisdiction existed upon the filing of the Cross Claims. The settlement did not create but continued these bases for subject matter jurisdiction. In addition, the settlement resulted in the payment of millions of dollars into the estate, and permitted Senator a claim in the SIPA distribution of millions of dollars. The existence of present value in a settlement obviates the allegation that an agreement was done to manufacture jurisdiction. *Balzotti*, 273 B.R at 331 (no collusive joinder found where "the court determined that the trustee obtained the assignment [of the defendant's claim] by offering …valuable concessions concerning the timing of the hearing on the confirmed Plan.")

## F.    No Basis Exists for Abstention

The entire basis HSBC asserts for permissive abstention is, "The Crossclaims raise complex issues under Luxembourg and Bermuda law that are best left for a court of either of these jurisdictions to adjudicate." HSBC Memo. at 14. Since HSBC elsewhere advocates the

benefits of consolidation of the Cross Claims for adjudication in Luxembourg, it is unclear why "complex issues" under the law of Bermuda—that has an English language, common-law legal system—is best left to the courts of Luxembourg, which has a non-English language, civil law legal system, rather than to this Court.

HSBC entirely fails to show any issues under Luxembourg or Bermuda law that should be characterized as novel, difficult, or unsettled. "Permissive abstention is not to be undertaken merely because the matter in question requires the resolution of state law issues. Instead, permissive abstention is appropriate only if the resolution of the [state law] issues involves matters of substantial public import, and if there exists no state precedent that will enable the court to predict with reasonable certainty the result that the state courts would reach were the issues before them." *Ronix Corp. v. Philadelphia*, 82 B.R. 19, 20 (E.D. Pa. 1988)(citations omitted).   The HSBC Defendants fail to cite a single law that would potentially place an adjudicative strain on this Court, and make no mention of any unsettled law.

The single case cited by HSBC—this Court's decision in *In re Dreier, LLP*—simply emphasizes the deficiencies in their argument.  In *Dreier*, this Court abstained precisely because "a fraudulent transferee's right to contribution or indemnity under New York law is doubtful…[and] neither party has been able to locate any direct authority settling the question." *In re Dreier, LLP* , 2012 Bankr. LEXIS 4799 at *18 (Bankr. S.D.N.Y. 2012).

## II.   ALPHA PRIME'S AND SENATOR'S CHOICE OF NEW YORK FORUM IS APPROPRIATE

Notwithstanding that HSBC has been litigating in this adversary proceeding for six years and has availed itself of all of the benefits of litigating before this Court, it now requests that the Court consider dismissal upon the doctrine of *forum non conviens*.  The purpose of that doctrine "is to ensure that trial is convenient."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981).

"The defendant bears the burden to establish clearly each factor…and to demonstrate that the balance tilts *strongly* in favor of the purported alternative forum." *PT United Can Co., Ltd. v. Crown Cork & Seal  Co., Inc*., 138 F.3d 65, 74 (2d Cir. 1998)[emphasis added].  HSBC fails to carry this heavy burden of demonstrating how litigating in this Court would be "genuinely inconvenient" or that litigating in Luxembourg would be "significantly preferable".  *Iragorri v. United Technologies Corp.,* 274 F.3d 65, 74-75 (2d Cir. 2001).

When deciding a *forum non conviens* motion, the Court should consider the following factors: (1) the degree of deference to the plaintiff's choice of forum; (2) the availability of an adequate forum; and (3) the balance of public and private interests implicated in the choice of forum.  *Norex Petr. Ltd. v. Access Indus., Inc.,* 416 F.3d 146, 153 (2d Cir. 2005).  The Defendant must establish each element.  *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir. 1991).

"A defendant does not carry the day simply by showing the existence of an adequate alternative forum.  The action should be dismissed *only* if the chosen forum is shown to be *genuinely* inconvenient and the selected forum *significantly* preferable." *Iragorri,* 274 F.3d at 74-75 (emphasis added).  Here, the HSBC Defendants has been litigating against the Trustee in this forum for almost seven years, and will continue to do so for an unknown future period, both as defendants and as material witnesses in the defenses of the Madoff Feeder Fund defendants. In that capacity, they have engaged actively in motion practice and have produced thousands of pages of documents to the Trustee.  Cross Claims or not, they are integral to Alpha Prime's defenses, and accordingly they will be deposed and subjected to all the tools of discovery under the Federal Rules of Civil Procedure on the same facts they argue should be tried in Luxembourg.  In short, the forum non conveniens argument is nonsensical here, for unlike the

typical party arguing that doctrine, the HSBC Defendants will not be leaving the forum if their motion is granted, will not even be subject to less discovery here should the relief be granted. Rather, their Motion equates to a request for increased inconvenience for all parties, by requiring multi-track litigation in potentially three forums.

### A. Alpha Prime's and Senator's Choice of New York Forum is Entitled to Deference.

Forum non conveniens analysis presumes that the plaintiff's choice of forum is proper. *Piper Aircraft,* 454 U.S. at 255. While HSBC claims that because neither Alpha Prime nor Senator Fund are U.S. citizens or residents, their choice of a New York forum is entitled to no (or minimal) deference, that is not the law. "A court should be mindful that while a foreign plaintiff's choice of forum is entitled to less deference, the more that choice is based on 'legitimate reasons, the more deference it must be given…'" *Erausquin v. Notz, Stucki Mgmt. (Berm.)*, 806 F. Supp. 2d 712, 724 (S.D.N.Y. 2011)(*quoting Bigio v. Coca-Cola, Co.,* 448 F.3d 176, 179 (2d Cir. 2006)). Rather, cases in this Circuit indicate that the determination of the deference due to the plaintiff should be determined on a "flexible sliding scale" based upon "the totality of the circumstances". *Ramirez de Arellano v. Starwood Hotels & Resorts Worldwide*, Inc., 448 F. Supp. 2d 520, 525 (S.D.N.Y. 2006). As stated by the Second Circuit:

> The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for forum non conveniens…On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum shopping reasons…the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a forum non conveniens motion by showing that convenience would be better served by litigating in another country's courts.
> *Iragorri,* 274 F.3d at 71-72.

Here, Alpha Prime and Senator Fund picked this Court as its forum of choice for a simple reason. As is evidenced by the Court's docket, at the time of the filing of the case in Luxembourg, neither Alpha Prime nor Senator Fund was aware of this adversary proceeding. This is evidenced by the initial default judgment entered against them. Once the Funds learned of the default judgment against them, they negotiated with the Trustee to vacate the default judgment and timely filed their answer and Cross Claims in the Bankruptcy Court. Alpha Prime and Senator Fund had determined that if they were compelled to litigate in New York against the Trustee, it would be more efficient to litigate their entire case in New York. Had Alpha Prime been aware of the possibility of litigating for recovery with the Trustee and against HSBC in this adversary proceeding, it likely would not have commenced the Luxembourg case at all. Given this background, that the forum was chosen by the Trustee, and the Funds filed the Cross Claims because it made no sense to split a trial on the defenses and Cross Claims since they involved a heavy overlaying of the same facts, there is no indicia of forum shopping and Alpha Prime's and Senator's choice of this forum is entitled to deference.

Without some showing on the part of HSBC that Alpha Prime and Senator Fund chose a New York forum "with a view to vex, harass or oppress" HSBC, the mere fact that Alpha Prime and Senator Fund are not U.S. citizens is not enough to dismiss the Cross Claims here. *Lesser v. Chevalier*, 138 F.Supp. 330, 331 (S.D.N.Y. 1956) (stating that mere inconvenience to a non-citizen is not ground for dismissing an action under forum non conveniens).

"[T]he greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Iragorri*, 274 F.3d at 74. Rather than supporting allegations of forum shopping, HSBC relies on *Pollux Holding, Ltd. v. Chase Manhattan Bank,* 329 F.3d 64

26

(2d Cir. 2003) for the proposition that the Court should afford no deference to Alpha Prime or Senator's choice of forum. Memo at 23-24. However, this misstates the standard. Rather, *Pollux* stands for the same proposition as *Iragorri*, which is "[a]bsent ___**proof**___ that plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons, factors relating to convenience or expense generally weigh heavily in favor the plaintiff's choice." *Pollux*, 329 F.3d at 71.

**B.      HSBC Fails to Show that Luxembourg is a More Convenient Alternate Forum**

HSBC asserts that Luxembourg is an adequate alternative forum pursuant to the case law. See Memor. at 21. Even if this is correct under the law, this argument does not go far enough to carry the day for them. Indeed, HSBC must also show that litigating in this Court is "genuinely inconvenient and the selected forum significantly preferable." *See Picard v. Estate (Succession) of Igoin*, Adversary Proceeding No. 08-01789 (SMB), 2015 Bankr. Lexis 478, *40 (Bankr. S.D.N.Y. February 13, 2015) (holding that an action should only be dismissed if the chosen forum is shown to be genuinely inconvenient and significantly preferable).

HSBC makes no effort to show that it would be inconvenient to litigate these issues in this Court because they cannot. Indeed, it is already litigating these very same issues in connection with the Trustee's counts against them and against the Madoff Feeder Fund defendants. Therefore it cannot credibly be said that it is inconvenient to litigate these same issues against Alpha Prime and Senator Fund in this Court. Moreover, HSBC does not allege – nor could it credibly – that the Luxembourg forum is so "significantly preferable as to warrant the transfer." *Id.*

In fact, HSBC's own papers indicate the opposite conclusion. While asserting that Alpha Prime's and Senator's tort claims are of the type that "often turn on witness credibility" [HSBC

Memor. at 26], the declaration of their Luxembourg counsel indicates that neither depositions nor cross-examination of witnesses at trial are permitted in Luxembourg. Kremer Declar. at 10-12.   Accordingly, the standard means to test "witness credibility" will be denied to the parties.

Further the only entity among the parties located in Luxembourg, HSSL, despite the pendency of this litigation, transferred all its assets to HSBC plc last year, while retaining its liabilities and is apparently winding down its Luxembourg operations. *See* Exhibit D, Duffy Declaration.  Accordingly, there is a likelihood that this sole tie among the parties to the country of Luxembourg will disappear.[4]

HSBC also relies on the contractual forum selection clause between HSSL and Senator Fund for the proposition that the Cross Claims asserted by both Senator Fund and Alpha Prime must be transferred to Luxembourg.  They assert this despite the fact that this forum selection clause only appears in the Senator Fund contract and only applies to one of the twelve causes of action described above.  Moreover, because HSBC committed fraud in inducing Senator to enter into the contract in first place, the Court should disregard the forum selection clause.

HSBC is correct when it asserts that forum selection clauses are prima facie valid. However, enforcement is not absolute and courts have held that enforcement of forum selection clauses should not be enforced if doing so would be unreasonable under the circumstances.

Initially, it should be noted that the forum selection clause contained in the Senator Fund Custody and Administration Agreements applies only to those claims governing "a dispute

---

[4] HSBC argues that both the existence of the Luxembourg proceeding and the allegedly advanced state of that proceeding are factors supporting application of the forum non conveniens doctrine. HSBC Memor. at 25. However, 'the pendency of the [foreign] action does not factor into the forum non conveniens decision." *AMEX, LLC v. Towergate Consultants Ltd.,* 2003 U.S. Dist. LEXIS 12464 at *16-17 (S.D.N.Y. 2003), citing *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 148 (2d Cir. 2000)("The existence of related litigation…is not a relevant factor in the forum non conveniens analysis laid out in *Gilbert*.")

relating to the terms of this agreement." Thus, by the plain language of the contract, any claims that do not relate to the terms of the contract fall outside the scope of the forum selection clause.

Moreover, there are extraordinary circumstances here that would merit the Court's disregard of that clause. Indeed, the Second Circuit has held that "a mandatory forum selection clause does not 'oust the jurisdiction' of the court, but rather requires the court to determine whether the party resisting enforcement of the clause has shown the clause to be unreasonable or unfair under the circumstances." *Evolution Online Systems, Inc. v. Koninkleliske PTT Netherlands N.V.*, 145 F.3d 505-510 (2d Cir. 1998). Courts in this circuit have held that where the resisting party makes a sufficiently strong showing that enforcement of the forum selection clause would be unreasonable or unjust or that the clause was invalid for such reasons as fraud or overreaching, the presumption that the forum selection clause is enforceable is successfully rebutted. *Phillips v. Audio Active, Ltd.,* 494 F.3d 378, 383 (2d Cir. 2007) (citing *M/s Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (1972)); *Fubon Ins. Co. v. OHL Int'l,* 2014 U.S. Dist. Lexis 49893, Case No. 12 Civ 5035 *16 (S.D.N.Y. March 31, 2014).

Here, almost immediately after entering into a similar agreement with Alpha Prime Fund in 2003, HSBC delegated all of its duties under the contract to Madoff without the knowledge or authorization of Alpha Prime. Thus, HSBC knew in 2007 when it entered into almost identical contracts, that it would be performing the same unauthorized transfer. Had Senator known that HSBC would be performing none of the work under the contract, they would never had agreed to sign on to any piece of the contract including the forum selection clause contained therein.

Finally, HSBC's offer to consent to jurisdiction in Luxembourg is disingenuous. As their prior pleadings indicate, HSBC has filed the equivalent motion to dismiss in Luxembourg stating that the Funds have failed to sue BoB. If, as HSBC alleges in its submission to the Luxembourg

court, Alpha Prime's failure to name BoB as a party to the Luxembourg lawsuit is fatal,

Luxembourg can no longer be an alternative forum because Alpha Prime understands that it can

no longer sue BoB in Luxembourg because the statute of limitations has expired.  *See, Calavo*

*Growers of California v. Belgium*, 632 F.2d 963, 967(2d Cir. 1980)("The doctrine of forum non

conveniens presupposes that an alternative forum is available.").  Accordingly, for those reasons,

HSBC has failed to meet its burden of showing that Luxembourg is a convenient and adequate

alternative forum.

### C.    Private and Public Factors

The private interest factors for consideration upon a motion to dismiss for *forum non*

*conveniens* include:

> (1) ease of access to evidence; (2) the availability of compulsory process for the
> attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance;
> (4) if relevant, the possibility of a view of the premises; and (5) all other factors
> that might make the trial quicker or less expensive.

*Igoin*, 2015 Bankr. Lexis 478, *40-41, Adversary Proceeding No. 08-01789 (SMB) (Bankr.

S.D.N.Y. February 13, 2015).

The public interest factors for consideration upon a motion to dismiss for *forum non*

*conveniens* include:

> (1) administrative difficulties flowing from court congestion; (2) the local interest
> in having controversies decided at home; (3) the interest in having a trial in a
> forum that is familiar with the law governing the action; and (4) the avoidance of
> unnecessary problems in conflicts of laws or in the application of foreign law, and
> (5) the unfairness of burdening citizens in an unrelated forum with jury duty.

*Id.* at *47 (internal citations omitted).  These factors need not be weighed equally, nor are all of

the factors relevant in each case.  *Gulf Oil Corp v. Gilbert*, 330 U.S. 501, 508-09 (1947).

Although Defendants "bear the burden to establish clearly each factor … and to demonstrate that

the balance tilts *strongly* in favor of the purported alternative forum," they have failed to do so.

*Baena v. Woori Bank,* No. 05 Civ. 7018 (PKC), 2006 U.S. Dist. Lexis 74549, at *12 (S.D.N.Y.

Oct. 11, 2006) (emphasis added) (*citing PT United Can Co. Ltd v. Crown Cork & Seal Co., Inc.,*

138 F.3d 65, 74 (2d Cir. 1998)).

**(1)      Relevant Private Interests Favor the New York Forum**
**(a)      The Relative Ease of Access to Evidence**

With respect to documentary evidence, this factor weighs against dismissal.    HSBC

makes the following claims: (i) there are likely hundreds of thousands of pages of documents;

(ii) the documents are in French; (iii) likely none of the documents are located in the United

States.    HSBC Memor. at 27-28.    These conclusory statements belie reality and its lack of

specificity cannot satisfy its burden.    In fact, HSBC produced an enormous amount of documents

to the Trustee and to the Securities and Exchange Commission.    Upon information and belief,

documentary evidence from BLMIS relating to the KPMG audit was produced to the United

States Attorney in the *Bonventre* Case. These documents would not be subject to the Bank

Secrecy Laws and are located in the United States.    Indeed, since Alpha Prime and Senator are

the customers the Banking Secrecy Laws would be designed to protect, Alpha Prime and Senator

Fund may waive those restrictions.    The Funds themselves retain thousands of documents

relating to their interactions with HSBC. The HSBC assertion that the relevant documentation is

in French is simply baffling. All communications between HSBC and the Funds were conducted

in English, with a handful of German communications. There is not one single relevant French

document. The agreements between the parties were drafted in English.

**(b)      The Availability of Compulsory Process**

Similarly, HSBC makes conclusory statements about the difficulty of compelling

witnesses, identifies no specific witnesses located anywhere, nor gives any reason why such

witnesses are key to their defense of the Cross Claims.    These conclusory statements "are

insufficient to warrant dismissal."    *Nelly De Vuyst, USA, Inc. v. European Cosmetiques, Inc.,*

2012 U.S. Dist. Lexis 12981 * 9 (S.D.N.Y. Jan. 6, 2012); *Haywin Textile Prods., Inc. v. Int'l Fin.*

*Inv.,* 137 F. Supp. 2d 431,436 (S.D.N.Y. 2001) (specific identification of witnesses is necessary for *forum non conveniens* analysis)..   Even assuming there are witnesses abroad who are unwilling to testify and are "beyond the court's subpoena power, their testimony can be provided by deposition taken pursuant to letters rogatory." *Bigio,* 448 F.3d at 179.  Or, to the extent "both parties have witnesses who are beyond the subpoena powers of either forum, [that] renders that factor 'a wash'" for purposes of the analysis. *Ramirez de Arellano*, 448 F. Supp. 2d at 528.

Annexed as <u>Exhibit E</u> to the Duffy Declaration is a list of witnesses that Alpha Prime and Senator Fund plan to call to substantiate their allegations in the Cross Claims.  A number of these witnesses are located within 100 miles of the Courthouse.  Although others are not located within proximity of the Court, Alpha Prime and Senator do not believe that the remaining witnesses will need to be compelled to attend, since it is unlikely that HSBC's witnesses will not need to be compelled by this Court to come to its defense.

(c)       **The Cost of Procuring Attendance of Witnesses**

HSBC claims that "obtaining the trial testimony of witnesses who are not under HSBC Defendants' control would be far more costly and difficult if the dispute were to stay in New York."  HSBC Memor. at 26.  However, HSBC does not specify if any of these witnesses even exist.  Even if it is true that these unidentified non-party witnesses would have key testimony and would be required to testify – an argument not asserted by HSBC in its Motion – advances in technology have decreased the costs associated with witness travel.  See e.g. *Bodner v. Banque Paribas*, 114 F. Supp 2d 117, 133 (E.D. N.Y. 2000).  It was HSBC's choice to do business with Madoff in New York.  They profited from that Madoff relationship, in part alleged by Alpha Prime and Senator, by committing fraud and misrepresenting work it claimed to be performing. HSBC should not be permitted to avoid the consequences of that decision simply because of travel costs.

32

**(d)      Other Practical Problems**

Here, despite the unsubstantiated representations to the contrary, the factual allegations contained in the Cross Claims derive from the same nucleus of facts presented by the Trustee. This means that the documents produced for both the Amended Complaint claims and the Cross Claims would be similar, as would the depositions and witnesses. Accordingly, adjudicating the Cross Claims here with the claims asserted by the Trustee would be more efficient.

**(2)      Factors in the Public Interest Also Favor New York**
**(a)      Administrative Difficulties Flowing from Court Congestion**

It is well-settled that the Southern District of New York has the resources to adjudicate complex litigation such as this case. *Rahl v. Bande*, 328 B.R. 387, 408 (S.D.N.Y. 2005); *Cromer Fin. Ltd. v. Berger*, 158 F. Supp. 2d 347, 355 (S.D.N.Y. 2001) ("While the docket of the Southern District of New York is an active one, courts in this district have shown themselves more than able to address these issues that arise in complex actions in an expeditious and comprehensive manner").

**(b)      Local interest in having controversies decided at home.**

As stated above, HSBC entered into various agreements with Alpha Prime and Senator Fund that required performance in New York and were purported by HSBC as being performed in New York by BLMIS. Acting in their respective capacities under those agreements, the HSBC Defendants contracted to segregate, register, and safeguard securities in New York purchased through BLMIS on behalf of Alpha Prime and Senator Fund. The financing and currency hedging transactions with HSBC, which exceeded $100 million, all occurred in New York. Fischer Declar. at 23. Both Alpha Prime and Senator Fund have significant American investors. Fischer Declar. at 24. In addition, with respect to Senator Fund, because the Trustee shares in 50% of any recovery, many creditors, including the ones that reside in New York, are financially interested in the outcome of this litigation and may very well benefit from it.

33

On the other hand, Luxembourg has no ties to any of the parties other than HSSL and no financial interests other than a potential judgment against the now asset-less HSSL.

### (c) Familiarity with the Law Governing the Action

While HSBC stresses that Luxembourg law is the overwhelming law to be applied in this case, its analysis is flawed. New York law should control as to the tort claims, since the torts occurred in New York. Bermuda law is the controlling law by agreement of the parties as to the interpretation of Alpha Prime's contracts. Why a civil law judge in Luxembourg is better placed to interpret English-language agreements, half of which are controlled by Bermuda law, as well as the tort law of New York, is not explained by HSBC. As to the two causes of action based upon Luxembourg statutory law, the law is straight-forward on its face and its application equally straight-forward as plead. *See* Cross Claims, ¶¶ 162-173. HSBC's conclusory statements about the law being complex or unsettled does nothing to meet its burden to show specific grounds that prove the law is best left to the expertise of the court in the alternate forum. *See e.g., Gowan v. HSBC Mortg. Corp. (USA)*, 2012 Bankr. Lexis 4799 at ** 17-18 (Bankr. S.D.N.Y. 2012) (dismissing case in favor of New York state court where specific controlling question under New York law was identified and "neither party has been able to locate any direct authority settling the question").

In addition, while arguing the centrality of Luxembourg law in this Court, in Luxembourg, HSBC's counsel have argued the centrality of *American securities law* in seeking to dismiss Alpha Prime's claims against HSSL, and the irrelevance of Luxembourg law. HSSL Luxembourg Pleading at ¶¶ 46-55; 84-89.

In sum, foreign law will be applied to some extent by this Court or the Luxembourg court, and so this factor does not support dismissal, since this Court is better placed to interpret English-language contracts, apply New York tort law, United States Securities Law, and better

34

placed to apply common-law based Bermuda law, while the Luxembourg court has greater expertise only in the area of Luxembourg law.

(d)      Avoidance of unnecessary problems in conflicts of laws or in the application of foreign laws

Since, as described above, no matter what court hears the Cross Claims, matters of foreign law will necessarily be placed into contention.  Accordingly, this factor is a "wash" and does not support dismissal on *forum non convienens grounds*.

(**e**)      Unfairness of burdening citizens in an unrelated forum with jury duty.

This factor may not be relevant, since none of the parties have requested a jury trial. As described above, an American financial interest nexus indisputably exists.

### III.   HSBC HAS HAD AMPLE CONTACTS WITH THE UNITED STATES TO CONFER SPECIFIC PERSONAL JURISDICTION, THE EXERCISE OF WHICH IS REASONABLE.

Where a court relies only on pleadings and affidavits, a plaintiff need only make a prima facie showing of personal jurisdiction over the defendants.  *Porina v. Marward Shipping Co., Ltd.,* 521 F.3d 122, 126 (2d Cir. 2008).  To establish personal jurisdiction under § 302(a)(1) of the New York Civil Practice Law and Rules, <u>a plaintiff need only demonstrate a single transaction</u>, but there must be a "substantial nexus between the business and the cause of action." *Clopay Plastic Prods. Co. v. Excelsior Packaging Group, Inc.,* case no. 12-cv-5262 (JPO), 2014 U.S. Dist. Lexis 128011 at *10 (S.D.N.Y. September 11, 2014).  Here, it is very clear that each of the HSBC Defendants meet this standard.

### A.   Jurisdiction Under 302(a)(1)
#### 1.   The HSBC Defendants Contracted to Perform Services in NY

Under N.Y. CPLR § 302(a)(1), a New York court may exercise personal jurisdiction over a foreign defendant "who in person or through an agent …transacts any business within the state or contracts anywhere to supply goods or services in the state."  N.Y. CPLR § 302(a)(1).  In

determining whether a defendant has transacted business in New York, the NY Court of Appeals

has held "[t]he overriding criterion necessary to establish a transaction of business is some act by

which the defendant purposefully avails itself of the privilege of conducting activities within

[New York]." *USHA Holdings, LLC v. Franchise India Holdings, Ltd.*, 11 F.Supp. 3d 244, 268

(S.D.N.Y. 2014).  Each of the defendants have purposefully availed themselves of the privilege

of conducting activities in New York.

As was stated in the Cross Claims, HSBC contracted with BLMIS to assume the HSBC

Defendants' role as custodian, making BLMIS their agent.  In or around September 2004, BoB

Lux entered into an agreement whereby BLMIS would perform all of the required duties that

BoB Lux agreed to perform under its custodian agreement with Alpha Prime Fund.

### (a) HSBC Bank of Bermuda and HSSL

On March 12, 2003, the Bank of Bermuda entered into a Custodian Agreement with

Alpha Prime.  Pursuant to that agreement, Bank of Bermuda was responsible for, among other

things, maintaining and safeguarding the BLMIS accounts in New York.  Simultaneously

therewith, BoB entered into a sub-custodian Agreement with Bank of Bermuda (Luxembourg)

S.A.  The Sub-Custody Agreement provided that BoB (Lux) would be performing all of the

duties that BoB agreed to perform.  Although misrepresented to Alpha Prime, neither BoB (Lux)

nor BoB performed its duties under the agreement because in September 2004, BoB (Lux)

entered into a Sub-Custody Agreement with BLMIS.  In 2004, HSBC (Bermuda) assumed the

role as custodian of the Alpha Prime's BLMIS accounts in NY.  That agreement remained in

effect until the day Madoff was arrested.

According to HSBC's own attorney, under Bermuda law – the law governing the

Custodian and Sub-Custodian Agreements – the Sub-Custodian Agreement did not serve as a

novation of the Custodian Agreement.  Duffy Declar., Exhibit C.  Accordingly, HSSB, as

successor to BoB entered into a contract to maintain Alpha Prime's NY BLMIS accounts. Whether HSSB's misrepresentations took place inside or outside of New York, is immaterial because Alpha Prime and Senator Fund allege that the injury to Alpha Prime and Senator Fund took place in New York where their BLMIS accounts were located.

Moreover, the fact that HSSB (through its agent HSSL) had an ongoing contractual relationship with BLMIS alone provides sufficient basis for this Court's exercise of personal jurisdiction over HSSB and HSSL. *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir. 1996) (facts that defendant had an on-going contractual relationship with a New York corporation, the contract was negotiated and executed in New York, and the contract subjected non-New York defendants to supervision by the New York company would militate strongly in favor of personal jurisdiction in NY).

### (b) HSBC Institutional Trust Services

On March 12, 2003, Management International (Bermuda) Limited ("MIBL") entered into an Agreement with Alpha Prime to become the Administrator and Registrar for the fund. MIBL also agreed to – among other things – provide share issue and redemption services. As part of that agreement, MIBL agreed to "arrange for the issue, transfer, allotment, conversion, redemption and/or purchase of shares in accordance with the Bye-laws…" Exhibit B of the Amended Complaint lists each redemption made by Alpha Prime over the six years prior to Petition Date. With respect to each one of those "redemptions", MIBL would have had to contact BLMIS in New York to arrange for the proceeds of the redemptions to be transferred to Alpha Prime's HSBC account so that HSBC could then transfer those proceeds to requesting shareholders. By agreement, on January 2, 2007, HITSB replaced MIBL as the administrator of Alpha Prime and agreed to perform the exact same services for Alpha Prime under the prior contract. By virtue of its regular contacts with BLMIS purposefully availed itself of the privilege

of conducting activities within New York. It is the redemptions depicted in the Amended Complaint that are one of the subjects of this lawsuit. Thus, this Court has personal jurisdiction over HSBC Securities Services (Bermuda) Ltd. pursuant to N.Y. C.P.L.R. § 302(a)(1).

### (c) HSBC Institutional Trust Services (Bermuda) Limited

On or about March 12, 2003, BoB entered into a Custodian Agreement with Alpha Prime. The Custodian was to, among other things, make payments from a separate account in the name of Alpha Prime and safeguard the property of Alpha Prime that was held in that account. On March 12, 2003, BoB appointed Bank of Bermuda (Luxembourg) S.A. the sub-custodian over the Alpha Prime account. In or about September 2004, Bank of Bermuda (Luxembourg) S.A. entered into a Sub-Custody Agreement with BLMIS. On or about January 2, 2007, BoB entered into a Novation Agreement appointing HSBC Institutional Trust Services (Bermuda) Limited as the new custodian in place of BoB. Under the terms of the Novation Agreement, HSBC Institutional Trust Services (Bermuda) Limited agreed to perform the responsibilities under the original Custodian Agreement. Instead of performing those obligations, HSBC Institutional Trust Services delegated their custodial obligations to BLMIS. Accordingly, the Court has personal jurisdiction over HSBC Institutional Trust Services (Bermuda) Ltd.

### (d) HSBC Bank, plc

In or about 2006, Alpha Prime entered into a foreign exchange transactions facility with HSBC Bank, plc. That facility was run out of a bank account maintained by (and in the name of) HSBC Bank, plc located at HSBC USA in New York. This allegation alone shows "purposeful availment of New York's dependable and transparent banking system, and the predictable jurisdictional and commercial law of New York and the United States." *Picard v. Estate (Succession) of Igoin*, 2015 Bankr. Lexis 478, * 24 (Bankr. S.D.N.Y. February 13, 2015).

38

Accordingly, because of HSBC, plc's regular use of a U.S. bank account, this Court has proper jurisdiction over HSBC, plc.

### 2. Due Process

The assertion of jurisdiction must also comply with the Due Process Clause of the Fifth Amendment of the U.S. Constitution. To satisfy due process, the defendant must have minimum contacts with the forum jurisdiction and the exercise of that jurisdiction over the defendant must be reasonable. *Thorsen v. Sons of Norway,* 996 F.Supp. 2d 143, 158-59 (E.D.N.Y. 2014). "[T]he minimum contacts inquiry overlaps significantly with the 'transaction of business inquiry under CPLR Section 302(a)(1)." *USHA Holdings, LLC*, 11 F.Supp. 3d at 272 (quoting *Thorsen v. Sons of Norway,* 996 F.Supp. 2d 143, 158 (E.D.N.Y. 2014)).

### (a) Minimum Contacts

"To establish the minimum contacts necessary to comport with the due process clause, the Court must determine that the defendant 'purposefully avail[ed] himself of the privilege of doing business in New York such that the defendant 'should reasonably anticipate being haled into court there." *Id.* at 272..

For substantially the same reasons as outlined above the HSBC Defendants purposefully availed themselves of the privilege of conducting business activities in New York. In both the Custody Agreement and the Administration Agreement, most – if not all – of the significant responsibilities of the HSBC Defendants involved working with someone in New York. With respect to the Custody Agreement, since the responsibilities of that Agreement were essentially delegated to BLMIS, it is undeniable that the HSBC Defendants should have reasonably anticipated being haled into court here.

### (b) Reasonableness

The assertion of jurisdiction must also "comport with traditional notions of fair play and substantial justice that is whether it is reasonable under the circumstances of the particular case."

*Id.* The Second Circuit has set five factors used to determine reasonableness: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

Here, the HSBC Defendants are already litigating in this Court against the Trustee. Thus, the exercise of jurisdiction to adjudicate these Cross Claims will not impose any additional burden. New York has a strong interest in this case because of the many creditors and the shareholders of Alpha Prime and Senator Fund who are New York residents. Moreover, Alpha Prime and Senator Fund have a strong interest in obtaining relief here in this Court to counter the relief sought by the Trustee. Accordingly, the exercise of jurisdiction in this case over the HSBC Defendants would "comport with traditional notions of fair play and substantial justice. *Id.*

**WHEREFORE**, Alpha Prime Fund Limited and Senator Fund SPC respectfully request that the Court deny HSBC's Motion in its entirety, and grant such other and further relief as may be equitable and just.

Dated: New York, New York
      April 8, 2015

Respectfully submitted,
**DUFFYAMEDEO LLP**

       s/ Todd E. Duffy
275 Seventh Avenue, 7th floor
New York, NY 10001
Tel: (212) 729-5832
Todd E. Duffy
Email: tduffy@duffyamedeo.com
Douglas A. Amedeo
Email: damedeo@duffyamedeo.com
*Attorneys for Defendants, Alpha Prime Fund Limited and Senator Fund SPC*