# EXHIBIT A

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4            v.                        10 Cr. 228 (LTS)

 5   DANIEL BONVENTRE,
     JEROME O'HARA,
 6   GEORGE PEREZ,
     ANNETTE BONGIORNO,
 7   JOANN CRUPI,
                                        Jury Trial
 8            Defendants.

 9   ------------------------------x
                                        New York, N.Y.
10                                      January 8, 2014
                                        9:00 a.m.
11
     Before:
12
               HON. LAURA TAYLOR SWAIN
13
                                        District Judge
14

15
          APPEARANCES
16

17   PREET BHARARA
          United States Attorney for the
18        Southern District of New York
     MATTHEW L. SCHWARTZ
19   RANDALL W. JACKSON
     JOHN T. ZACH
20        Assistant United States Attorneys

21

     GORDON MEHLER
22   SARAH LUM
          Attorneys for Defendant O'Hara
23

24   LARRY H. KRANTZ
     KIMBERLY A. YUHAS
25        Attorneys for Defendant Perez
```

```
 1              We are going to have a little switch up in the

 2    evidence to accommodate schedules.  So this morning we'll be

 3    hearing from a new witness before we resume with the

 4    cross-examination of Mr. DiPascali.  So the government may call

 5    the next witness.

 6              MR. ZACH:  Thank you, your Honor.  The government

 7    calls Christine Coe.

 8              (Witness called)

 9              THE COURT:  Good morning, Ms. Co.  Please step up into

10    the witness stand, and then remain standing and face the

11    courtroom deputy, who will administer the oath.  Thank you.

12     CHRISTINE COE,

13         called as a witness by the Government,

14         having been duly sworn, testified as follows:

15              THE COURT:  Thank you.  Ms. Co, please be seated and

16    be sure to speak into the microphone in giving your testimony.

17    Thank you.  Mr. Zach.

18              MR. ZACH:  Thank you, your Honor.

19    DIRECT EXAMINATION

20    BY MR. ZACH:

21    Q.  Good morning, Ms. Coe.

22    A.  Good morning.

23    Q.  Can you pull the microphone just a little bit closer?

24    A.  Okay.  Is that okay?

25    Q.  That's perfect.  Thank you.  Ms. Coe, where did you grow
```

1   up?

2   A.   I grew up in England.

3   Q.   Are you from England?

4   A.   I am English; that is correct.

5   Q.   And where do you work now?

6   A.   I have recently left HSBC.  I'm still doing some contract

7   work for them and some freelance work within the financial

8   services industry.

9   Q.   But did you spend a lot of your career at HSBC?

10  A.   I did.

11  Q.   What is HSBC?

12  A.   HSBC is a major global bank.  I spent the whole of my

13  working life there.  I started when I was 16, and I've worked

14  all over the world with them.

15  Q.   Okay.  And HSBC has offices all over the world?

16  A.   It has offices all over the world.

17  Q.   And could you describe for us a bit about the various

18  positions you held at HSBC over the course of your career

19  there?

20  A.   Yes, I can.  I have -- I started work in a branch,

21  literally, being a cashier, and then I migrated into risk

22  management.  And I worked in a specialism called credit and

23  risk.  So I would look at people's loan applications, and I did

24  that across ordinary applications for people who just wanted a

25  loan for, say, a car or a mortgage.  And then I moved into more

1   commercial lending and, latterly, into looking at loans for

2   major financial institutions such as asset managers, mutual

3   funds and hedge funds.

4   Q.  So what year did you start at HSBC?

5   A.  I started in 1971.

6   Q.  Okay.  And when you say you were a cashier, would that be

7   similar to what's called a bank teller?

8   A.  That is correct.

9   Q.  And was it called HSBC when you started?

10  A.  No.  I was actually started at Midland Bank, and HSBC

11  bought Midland Bank.

12  Q.  And you worked your way, over the years, into risk

13  management, and at the end, what was your title right before

14  you went part time or left the bank?

15  A.  My title was the Global Head for Funds, and I had global

16  responsibility for all funds that we had as customers.

17  Q.  So through the course of your career, you worked your way

18  from being sort of entry level cashier, all the way to being

19  the Global Head of risk management?

20  A.  That's correct.

21  Q.  All right.  Now, let me ask you another question.  What

22  does -- what do the letters for HSBC stand for?

23  A.  Well, today, HSBC stands for HSBC, but its origins were the

24  Hong Kong and Shanghai Bank Corporation.

25  Q.  So the HSBC was the first letter of the Hong Kong Shanghai

1    Bank Corporation?

2    A.   That's correct.

3    Q.   Could you tell us a little bit about what risk management

4    is?

5    A.   Yes, of course.  There were several parts to it.  They're

6    predominantly looking at making sure the bank doesn't lose

7    money, and that can be through customers not paying back loans

8    that they have granted, or it could be because the operational

9    support that is given to manage those loans is defective in

10   some way.  And my job through the years was to make sure all of

11   that worked.

12   Q.   Okay.  Just one favor to ask of you, and it's for the court

13   reporter.  When you answer, would you go a little bit slower?

14   A.   I'm sorry.

15   Q.   It's all right.  It's all right.  I do that all the time as

16   well.

17         Now, when just talking about risk management for a

18   moment, so taking a loan as an example, what sorts of -- just

19   generally, what sorts of risks would a bank look at if they

20   were going to loan to someone; so we get a look at the types of

21   risks that are managed by a bank?

22   A.   Well, we would look at the customer that was applying for

23   the loan to see whether they had any previous borrowing

24   experience and whether they had paid back previous loans, what

25   the purpose of the loan was for, whether that loan was secured

1  in some way, what the legal contracts would be that supported

2  the lending, and the term that the customer wanted to repay

3  that loan over.

4  Q.  And when you talk about a loan being secured, what do you

5  mean by securing a loan?

6  A.  Well, it would be, we would lend the money and then we

7  would take some security interest, like a mortgage, or in the

8  case of funds, we would take an interest in the investments

9  that the fund had made.  So those investments would have a

10  security charge over them in order to repay the loan if the

11  customer could not repay by any other means.

12  Q.  Now, Ms. Coe, I'd like to fast forward to the 2000s.  What,

13  as the 2000s began, around the mid-2000s, let's say, what was

14  your position at the bank?

15  A.  In early 2000, I was the head of risk for the global

16  custody business of HSBC; so that business looked after

17  institutions' assets.  So say a mutual fund would invest in

18  lots of equities, it could be HSBC's global custody

19  responsibility to make sure that those equities were looked

20  after.

21  Q.  When you say looked after, what do you mean by that?

22  A.  Safekeeping, in the sense that we would maintain all of the

23  records of those equities that that fund had invested into.  So

24  that those records would give the legal record of what that

25  mutual fund owns.

 1              So all of the transactions, when they bought and sold

 2      an equity, would go through those records, and HSBC would hold

 3      them to prove that that fund actually had those investments as

 4      part of its portfolio.

 5      Q.  And where in the world were you located during this time

 6      period?

 7      A.  I was located in London, but we operated custody in 90

 8      countries across the world.

 9      Q.  So your home base was in London, but you had

10      responsibilities all across the globe?

11      A.  That's correct.

12      Q.  Now, during the 2000s, did HSBC take over another bank

13      called Bank of Bermuda?

14      A.  That's correct.

15      Q.  This may be a silly question, but where was the Bank of

16      Bermuda located?

17      A.  It's head office was in Bermuda.

18      Q.  And about what year did HSBC take over the Bank of Bermuda?

19      A.  It was taken over in February of 2004.

20      Q.  And about how big was the Bank of Bermuda?

21      A.  It was relatively tiny.  In revenue terms, the -- it was

22      making about $35 million a year.

23      Q.  When you -- when HSBC took over Bank of Bermuda, did that

24      cause you to do any more work, or did you have any involvement

25      in the -- with the Bank of Bermuda after it was taken over?

1    A.   As soon as we purchased the Bank of Bermuda, all of the

2    clients which were fund clients became my responsibility, from

3    a risk perspective.  What happened was immediately after the

4    purchase, we didn't change anything.  So any loans that were

5    made by the Bank of Bermuda stayed in place, but as those loans

6    came up for review, which would happen once a year, they would

7    come to me and my team to look at -- to see whether those loans

8    met the HSBC criteria for lending money.

9    Q.   So let's break that down for a second, but before we do

10   that, I want to ask you, when HSBC took over the Bank of

11   Bermuda, did you come to learn that the Bank of Bermuda had

12   been having business with a series of investment funds?

13   A.   With a series of investment?

14   Q.   Funds.

15   A.   Yes, I did.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

1   Q.   What were the names of some of those funds?

2   A.   There were a number of funds, like Thema, Optimal, Herald,

3   Kingate.  There were many, a wide variety of different fund

4   types.

5   Q.   When we are talking about funds, can we agree that we are

6   talking about businesses that invest other people's money to

7   try and make more money?

8   A.   That's correct.

9   Q.   What relationships generally did the Bank of Bermuda have

10  with these funds like Thema and Optimal and Kingate and the

11  ones you described?

12  A.   They would have two or three different types of relation-

13  ships.  They would be custodian, which means they would be

14  safekeeping those investments that those funds had made.

15       They could be what is called an administrator, which

16  is basically processing all of the transactions on behalf of

17  the fund.  If an investor wanted to put his money into that

18  fund, they would send the money to the administrator, and then

19  the administrator would send it to wherever the fund was

20  investing at the time, and they would maintain all of the

21  records relating to who were the investors of that fund and

22  process the various transactions.  In addition to that, they

23  would lend the money.

24  Q.   Generally, talking about these funds, did you come to learn

25  what types of investors were involved in these funds?

1   A.   The investigated range of investors in the funds that I

2   have mentioned, they would generally be individuals.  There

3   would be a range of individuals from the very wealthy.  But in

4   a fund like Thema, the structure of that fund was very similar

5   to a mutual fund in the U.S., which meant that the ordinary man

6   in the street could invest into that fund.  So there would be

7   people who would just put small amounts of money as well as the

8   more wealthy that could put up much larger amounts of money.

9   Q.   What I understand you to be describing is there was a range

10  from sort of ordinary folks that might invest in a mutual fund

11  all the way through the wealthy individuals.

12  A.   Wealthy individuals, and even institutions as well, that's

13  correct.

14  Q.   Now let me ask you this question.  Why would a bank like

15  Bank of Bermuda or HSBC need to lend money to these investment

16  funds like Thema or Optimal?

17  A.   The way that it works is an investor will give money to a

18  fund manager, who will then invest in various strategies.  If

19  an investor wants to get his money out, it may be that he will

20  not want to wait for the place that that money has been

21  invested into to give that money back.  So, a fund will have a

22  line of credit so that they can pay back their investors when

23  they are asked to rather than wait for the investments that

24  have been made to actually be sort of liquidated within the

25  market.  It is a timing issue to make sure that the investors

 1   get their money back when they expect to get their money back

 2   rather than have to wait for underlying investments to be sold.

 3   Q.  When HSBC took over Bank of Bermuda, what sorts of things

 4   did you look at with respect to these funds that had been doing

 5   business with Bank of Bermuda?  Let me pause.  By business, I

 6   think you said that they were giving them loans, that they had

 7   some administrative responsibilities, and that they custodied

 8   assets for them.

 9   A.  That's correct.  In terms of looking at the loans, we would

10   go through looking at the sort of things that I mentioned

11   before:  Who were the funds that we were lending to, what type

12   of investments those funds were making in the market, whether

13   that loan was secured by a security charge over those

14   investments, what the experience at Bank of Bermuda had been,

15   and what type of investors were involved.

16   Q.  I want to step back for one second.  Before you became

17   involved in looking at these Bank of Bermuda businesses, had

18   you been dealing with investment funds and hedge funds during

19   the course of your career?

20   A.  I had been dealing with it for about ten years before I

21   started looking at the Bank of Bermuda.

22   Q.  These funds, were they in the United States and all over

23   the world?

24   A.  Global funds, that's correct.

25   Q.  In the course of looking at these funds that were doing

1  business with the Bank of Bermuda, did you come to learn about

2  an entity called Bernard L. Madoff Investment Securities?

3  A.  Yes, I did.

4  Q.  Had you ever heard of Bernie Madoff before you came across

5  him in connection with reviewing these funds that were dealing

6  with Bank of Bermuda?

7  A.  No, I had not.

8  Q.  We are going to call that "Madoff Securities," by the way.

9  How did you come to learn about Madoff Securities in doing your

10  review of these funds that were doing business with the Bank of

11  Bermuda?

12  A.  In a number of the credit review applications that were

13  submitted to me, there was reference to the Madoff strategy and

14  the fact that these funds were investing into that strategy.

15  Also that the overdraft line of credit was secured by a

16  security charge over the investments that were being made into

17  Madoff Securities.

18  Q.  Stepping back for a minute, these funds like Optimal and

19  Thema, they had investors of their own, right?

20  A.  Correct.

21  Q.  Those funds, in turn, were investing some of that money

22  with Madoff Securities, is that fair?

23  A.  That's correct.

24  Q.  At the time Bank of Bermuda, later HSBC, would extend these

25  lines of credit to Thema and Optimal in case their investors

1   wanted to get in or out of the fund?

2   A.   That's correct.

3   Q.   Over the course of your review, did you gain an

4   understanding of where Madoff Securities was located?

5   A.   My understanding is that they were located in New York.

6   Q.   As you looked at them in connection with looking at these

7   funds from Bank of Bermuda, did you get an understanding of how

8   Madoff was performing its trading?

9   A.   Yes, I did.

10   Q.   What was that understanding that you got?

11   A.   My understanding was essentially the money would come from

12   an investor, it would go to a fund like Thema fund, Thema would

13   invest in the Madoff strategy.  Then, in funds like Thema, all

14   of that money would be put together in a big amount, would be

15   traded with Madoff Securities, the broker-dealer, and then that

16   broker-dealer would trade into the market to buy things like

17   equities on the S&P index.  If the equities weren't doing well,

18   then they would potentially buy government securities.

19   Q.   When you say "equities," are you referring to generally

20   stock?

21   A.   General stock, yes.

22   Q.   When we talk about government securities, would that be

23   like a U.S. Treasury bill?

24   A.   U.S. Treasury, that's correct.

25   Q.   As you performed the review of these funds, did you gain an

1  understanding of the custodial arrangement that Bank of Bermuda

2  had with Madoff Securities?

3  A.  Yes, I did.

4  Q.  Could you describe for the jury what that custodial

5  arrangement was.

6  A.  Yes.  Essentially, once the money had come from investors

7  to the fund like Thema, Bank of Bermuda was the custodian for a

8  fund like Thema, so it would know how much money had come from

9  all Thema's investors, it would know what money had been sent

10  to Madoff Securities.  Then, once Madoff Securities had

11  undertaken all of the trading, it would notify back to Bank of

12  Bermuda those trades that had been made and how they had been

13  allocated across funds that Bank of Bermuda had been custodian

14  for.  That would allow Bank of Bermuda to mark in its books and

15  records how much had been allocated to each fund.

16      For example, if Thema had $100 invested and Optimal

17  had $100 invested, it would expect Madoff Securities to notify

18  that they had bought $100 worth of general stock and would

19  allocate that to each of those funds.  Similarly, in the books

20  and records of Bernard Madoff, because he was taking all of

21  that money and putting it into the market in one big amount,

22  $200 in the example I gave, he would have to maintain his books

23  and records to show that allocation of $100 to each of those

24  funds.  It is that books and records allocation which gives

25  legal certainty to people that they actually own those shares

1   that have been bought on their behalf.

2   Q.  These books and records are just a way of keeping track of

3   who owns what?

4   A.  It's a way of keeping track, but it is also the legal

5   document which proves who owns what.

6   Q.  In terms of the assets that Madoff was investing in, what

7   was your understanding of who maintained custody of those

8   assets?

9   A.  The first line of custody was Bank of Bermuda/HSBC, and

10  then Bernard Madoff maintained the records, which would have

11  tallied with the DTC.

12  Q.  What is the DTC?

13  A.  The DTC is Depository Trust Company, which is the

14  organization within the U.S. that maintains all of the records

15  relating to all general stock that can be sold, settled, and

16  cleared for U.S. general stock.

17  Q.  It is your understanding that DTC is the place where all

18  stock, all United States securities are sort of kept track of

19  and custodied?

20  A.  Except for U.S. government securities, that's correct.

21  Q.  Except for like treasury bills?

22  A.  Correct.

23  Q.  But if we are talking about stock, if it is a U.S. stock,

24  it is going to be at DTC?

25  A.  It's going to be at DTC.

 1   Q.  As part of this review, did you come to learn that there

 2   was a subcustodial relationship between Bank of Bermuda and

 3   Bernie Madoff?

 4   A.  Yes, I did.

 5   Q.  Can you describe for the jury what you discovered about

 6   this subcustodial relationship.

 7   A.  As part of looking at the credit applications, I discovered

 8   that the Bank of Bermuda had effectively allowed Bernard Madoff

 9   Securities to do the custody of those underlying purchases for

10   the various stock, which was unusual because it seemed that the

11   funds themselves had asked for that to happen.  Usually, what

12   would happen in something like an HSBC is we would have other

13   big banks doing that sort of custody for us.

14           The reason that is important is because we have to

15   make sure that the person looking after those investments is

16   fit and proper to do the job.  At the end of the day, it's

17   someone else's money, so we are very careful about who we would

18   allow to look after those investments on behalf of any of our

19   clients.

20   Q.  We are still at this time period when you are getting up to

21   speed on the relationships of the Bank of Bermuda and these

22   funds held by Bernie Madoff.  At that time did you have an

23   understanding of how Bernie Madoff did the actual trading?

24   A.  My understanding was that he would place all of the money

25   that came from the various funds in one amount and then Madoff

 1   Securities would trade that in the market as one amount.

 2   Q.  Did you have an understanding that he would do that through

 3   his --

 4   A.  Broker-dealer.

 5   Q.  The broker-dealer part of his business?

 6   A.  Right.

 7   Q.  After you conducted this initial review, did you have

 8   concerns about the relationship as it then existed between Bank

 9   of Bermuda, which HSBC had just bought, and Madoff Securities?

10   A.  Yes, I did.

11   Q.  Could you tell us what some of those concerns were.

12   A.  My principal concern was that I had never heard of Bernie

13   Madoff.  The way that we would do business would be to use, as

14   I said, one of these big banks to do the custody.  I needed to

15   make sure that Bernie Madoff and Madoff Securities were a fit

16   and proper organization to look after my clients' money.

17   Q.  What initial steps did you start to take to find out more

18   about Madoff Securities and understand this relationship?

19   A.  The first thing that we did was to look at what public

20   information was available and to talk to our colleagues in New

21   York to see what they knew about Madoff Securities and Bernie

22   Madoff.  Then I instructed the head of something called our

23   network management team, which looked after all of the

24   subcustodians that HSBC had, to undertake a visit to Bernie

25   Madoff, but before doing so to actually get as much as

 1    information as we had within Bank of Bermuda offices to see

 2    what investigations they had undertaken before agreeing to that

 3    appointment.

 4    Q.  Who was the individual that you sent to go visit Madoff

 5    Securities?

 6    A.  It was a gentleman called Brian Pettitt.

 7    Q.  You said that he worked, I think, in network --

 8    A.  Network management.

 9    Q.  Network management.  That was network management for HSBC,

10    right?

11    A.  That's correct.

12    Q.  He wasn't a guy that had come over from Bank of Bermuda; he

13    is someone that had worked at HSBC prior to it being acquired?

14    A.  That's correct.

15    Q.  After you looked at the public record, talked to folks in

16    New York from HSBC, and sent Mr. Pettitt to speak with Madoff

17    Securities, did you continue to have concerns about the

18    relationship with Madoff Securities?

19    A.  Yes, I did.

20    Q.  At the time were you trying to examine whether or not to

21    continue extending credit to some of these funds that were also

22    investing in Madoff Securities?

23    A.  Yes, I was.

24    Q.  Was that credit, those lines of credit that were being

25    offered to these funds, was that secured in any way?

 1  A.  Yes.  The lines of credit were all secured on the

 2  underlying investments that were being made by Madoff.

 3  Q.  Stepping back for a minute, HSBC was looking at continuing

 4  to loan money to these funds, right?

 5  A.  We were considering whether we should continue, that is

 6  correct.

 7  Q.  Those loans that were being made to those funds needed to

 8  be secured, meaning you had to go get the money, you needed to

 9  make sure there were assets to back it up, right?

10  A.  Yes, because if we couldn't get the money back from the

11  fund, then we would have to get it back from those underlying

12  securities.

13  Q.  After your initial review of the relationship with Madoff

14  Securities, your understanding was that it was Bernie Madoff

15  and his business that actually held those securities?

16          MR. MEHLER:  Objection to form.

17          THE COURT:  Do you want to reformulate or consult?

18          (Counsel conferred.)

19          THE COURT:  Please turn away from the jury and go into

20  the corner if you need to have discussion.  Go to your right.

21          (Counsel conferred.)

22  Q.  Was it your understanding that Bernie Madoff had custody of

23  the assets?

24  A.  It was.

25  Q.  If you needed to get money or collect on that loan, that's

1   where those assets that were securing it were located?

2   A.  That's correct.

3   Q.  Did you have any concerns about the nature of the

4   subcustodial relationship as well?

5   A.  Yes, I did.  I was very concerned that from the information

6   that had been given to me, essentially Bernie Madoff had

7   control of all the component parts.  He would receive the money

8   from the funds.  He would then have the decision as to what to

9   do with that money.  He would also have control of the custody.

10  Further, he would have control through the broker-dealer of the

11  trading within the market.  That was an uncomfortable position

12  for me because we would normally expect to see all of those

13  things done by different people.

14  Q.  Having gathered those concerns, did you take any steps to

15  further look at Madoff Securities?

16  A.  Yes, I did.  I decided to engage a firm of external

17  accountants to do a more thorough review of his operation.

18  Q.  Who were the accountants that you engaged?

19  A.  I engaged KPMG.

20  Q.  Could you describe to us generally what KPMG is.

21  A.  Yes.  There were a number of accounting firms who operate

22  globally, and KPMG were one of those organizations.  They

23  operate in the U.S. as well as in Europe.  I felt that they

24  would be suitable to undertake something which was covering

25  effectively a London and a U.S. operation.

 1   Q.   KPMG has offices all over the world, right?

 2   A.   Correct.

 3   Q.   What offices did you go to to engage?

 4   A.   I went to the London office because that is where I was

 5   situated.  I was directed to two individuals who had had

 6   broader experience across the globe but also the comfort that

 7   they had the contacts within New York as well.

 8   Q.   When you say contacts within New York, that they had folks

 9   in New York that they could talk to?

10   A.   That is correct.

11   Q.   What were the names of the folks at KPMG that you were

12   directed to?

13   A.   David Yim and David, I normally call him David L.  I think

14   it is Luijerink, L-U-I-J-E-R-I-N-K.

15   Q.   Thank you for spelling that.  We will continue to call him

16   David L.  Is that fair?

17   A.   Thank you.

18   Q.   What was your understanding of Mr. Yim's background and

19   experience?

20   A.   David Yim was recommended to me because he had experience

21   with doing internal control reviews of funds and custodians.

22   He had operated both in the UK and in Europe doing reviews

23   which technically are called a SAS 21 -- sorry SAS 70 or FAC

24   21, which is an internal control review of people like fund

25   managers and custodians.  David L's experience, he was a

1  forensic accountant, which means that instead of just looking

2  at numbers, he would look at the whole control procedure to see

3  that it had integrity and was not fraudulent.

4  Q.  Was Mr. Yim British?

5  A.  He is British.

6  Q.  Did you have a series of meetings with them after they were

7  engaged?

8  A.  Yes, I did.

9  Q.  In those meetings did you discuss your concerns about

10  Madoff Securities based on the review that you and Mr. Pettitt

11  had done?

12  A.  Yes, I did.

13  Q.  What concerns did you describe to Mr. Yim and David L?

14  A.  My main concern was to make sure that the trades were real

15  and that the money that the investors were placing into Madoff

16  Securities was being used to make investments.

17  Q.  Could you describe generally how that would look to your

18  mind.

19  A.  Very simply, the cash comes in from the investor to someone

20  like a Thema.  That money then goes into Madoff Securities.

21  What happens next?  What I wanted them to do was to follow that

22  money trail through to see how it was put together with funds

23  from other funds, how it was then given to the broker-dealer,

24  what happened in terms of that broker-dealer going to the DTC

25  to buy the stocks, and what records of that trade were coming

1  back and being put in the books and records of Madoff, and then

2  what records were being sent back to HSBC, so that the whole

3  trade was followed through so I could be comfortable that it

4  was a real trade and it was going to the DTC, stocks were being

5  bought and were being allocated to my clients.

6  Q.  Did you have discussions when you instructed them to take a

7  look at Madoff's books and records?

8  A.  I was very specific with them, yes.

9  Q.  Did you want them to look at how the DTC was involved?

10 A.  I needed them to look at what records came back from the

11 DTC, that is correct.

12 Q.  What was your understanding at this time as to whether or

13 not KPMG itself could go look at the actual DTC account?

14 A.  My understanding was that unless you are a member of the

15 DTC, you cannot go to the DTC to get the records of anyone.

16 Neither HSBC nor KPMG are direct members of the DTC, so we were

17 wholly reliant on the records that we were able to get at

18 Bernie Madoff Securities to show that those trades were

19 actually happening.

20 Q.  Did you instruct Mr. Yim and David L to look at the books

21 and records of Madoff Securities as best they could to make

22 sure that the stock was at DTC?

23 A.  I did.

24 Q.  About how many meetings did you have with these guys prior

25 to them embarking on their review?

1   A.   We probably had about half a dozen physical meetings

2   between myself and them.   In addition to that, Brian Pettitt

3   worked very closely with them to ensure that they had all of

4   the information that we had internally.

5   Q.   Did you send them on their way to go to New York and look

6   at Madoff Securities?

7   A.   I sent them on their way, yes, eventually.

8   Q.   Were you aware of the time when they were in New York as it

9   was happening?

10  A.   Yes, I was.

11  Q.   Was there some communication back and forth between you and

12  the KPMG folks while they were at Madoff Securities?

13  A.   There was, yes.

14  Q.   That communication, what was it, generally?

15  A.   There was two forms.   There was email traffic directly to

16  me and there was also telephone calls.

17  Q.   When did they go to visit Madoff Securities?

18  A.   They were on-site on the 7th of November 2005.

19  Q.   November of 2005?

20  A.   Correct.

21  Q.   They were based in London, so they would have to travel to

22  New York, was that your understanding?

23  A.   That is correct.

24  Q.   Do you have a sense of approximately how long they were at

25  Madoff Securities?

1   A.  About three or four days.

2   Q.  After they visited Madoff Securities, did you meet with

3   them again in London?

4   A.  Yes, I did.

5   Q.  Do you remember where you met?  Did you meet at HSBC's

6   offices or did you go over to KPMG?

7   A.  They came to my offices.

8   Q.  Where in London are your offices located?

9   A.  Canary Wharf.

10  Q.  At that meeting did you ask them whether or not they

11  followed up on the instructions you gave them?

12  A.  I did indeed.

13  Q.  Could you tell us, at a high level, what they reported back

14  to you about what they found.

15          MR. MEHLER:  Objection.

16          MR. FRISCH:  Objection.

17          THE COURT:  Please consult.

18          (Counsel conferred.)

19          MR. KRANTZ:  Apologies, your Honor, but I think we

20  need a ruling.

21          THE COURT:  Please sit quietly here while I consult

22  with counsel.

23          (Continued on next page)

24

25

1                    (In the robing room).

2          MR. KRANTZ:  Your Honor, we were obviously at the

3    point of your Honor's ruling yesterday.  I think there is a

4    little lack of clarity as to how far exactly Mr. Zach can go or

5    not go here.  We suggested that he ask a leading question at

6    this point:  Did they report back to you that they followed a

7    trade through from beginning to end? yes; and were you

8    satisfied with that? yes.  A suggestion along those lines.  I

9    think Mr. Zach wants to do it more open-ended.  I'll leave it

10   to him.

11         MR. ZACH:  Sorry we're back here.  I understood the

12   Court's ruling to ask to have her give a high-level response to

13   what they said, so I asked that very question.  At the side bar

14   they want to make it leading, they want to make it narrow.

15   They are trying to sort of force their own questions on the

16   witness, which they can ask on cross-examination.

17             I thought my question was perfectly appropriate.

18   That's why I, frankly, wasn't giving in to their suggestions.

19   I asked her to give us a high-level overview, and I think she

20   was going to give that to us.  I think the question is

21   appropriate and what the Court instructed us yesterday.

22         MR. KRANTZ:  The problem is that we have no control

23   over the answer.  We don't know if the answer is going to

24   comport with your Honor's rulings.

25         MR. MEHLER:  I don't recall, having read the

08-01789-smb Doc 9784-1 Filed 04/08/15 Entered 04/08/15 20:19:21 Exhibit A Pg 28 of 73
Case 1:10-cv-00228-TS Document 380 Filed 04/09/14 Page 24 of 34
Coe Transcript

 1    transcript, that the word high-level was in it.

 2            THE COURT:  Conceptually I did suggest to Mr. Zach

 3    that I expected he would keep any discussion of the reporting

 4    back to a high conceptual level.  Do you expect that Ms. Coe,

 5    Brit that she is, will understand the nomenclature there and

 6    respond to the request for high level with an overview type

 7    response?

 8            MR. ZACH:  I think so.  I said to this them at the

 9    side bar, your Honor.  When we went back early yesterday, I met

10    with Ms. Coe, saying I'll see you tomorrow.  One of the issues

11    that came up was this issue of how they reported back.  I said,

12    I'm going to ask you to give a very high level general answer

13    of what they told you back.  So I think she can answer the

14    question intelligently.

15            MR. MEHLER:  What is her answer going to be?  Mr. Zach

16    prepared her.

17            MR. ZACH:  I don't tell her what the answer is going

18    to be, Mr. Mehler.

19            MR. MEHLER:  But you heard it.

20            MR. RIOPELLE:  Your Honor, I have the transcript in my

21    hand, and I'm reading the direction that your Honor gave us

22    yesterday.  It seems to me this whole issue can be solved with

23    a simple leading question, which is:  Ms. Coe, did you

24    understand, based on your discussions with Mr. Kim and David L,

25    that KPMG had carried out your instructions?  Answer, yes.  I

 1   think that should be her answer.  Based on that, what did you

 2   do?

 3          That's what your Honor said the government should do.

 4   I think that is the safest way to do it, with that leading

 5   question.  It avoids the possibility of her giving details as

 6   to what the report to her was that KPMG had done, which is the

 7   place where we are uncomfortable and feel our ox would be

 8   gored.  With that leading question, I think Mr. Zach will get

 9   what he needs.  He has gotten in the record what the

10   instructions were already.

11          THE COURT:  That would certainly avoid completely the

12   sorts of problems that the defense were concerned about

13   yesterday.  May I see the transcript.

14          MR. RIOPELLE:  Sure.

15          THE COURT:  I said that getting that sort of high-

16   level, general answer is something that I will permit.  But I

17   also said, on the request of the defense, I will give an

18   instruction that any testimony that does come out that KPMG

19   said that it did a proper audit isn't offered for the truth and

20   is not probative of the propriety of the audit.

21          I will give that instruction if necessary.  That

22   indicated and was meant to indicate that I was not limiting the

23   government to strictly "did you understand that they did what

24   you told them to do? yes."  The government may make an inquiry

25   that invites a general overview.

                    683

1        My hope and expectation is that that general overview

2   is they said they went to New York, they followed the paper

3   trail, they looked for this, they saw books and records, and

4   everything looked fine.  To the extent the response starts to

5   go into deep, deep detail of someone told me about a

6   conversation, I am asking Mr. Zach to cut the witness off.  If

7   the defense, after that testimony is elicited, feels that it is

8   too much of rah-rah KPMG did exactly the right thing, we will

9   talk about an instruction.

10       MR. MEHLER:  Your Honor, Mr. Zach is going to

11  specifically ask about DTC, which will involve what Mr. Yim,

12  who is not here, saw and did and his conversations with Frank

13  DiPascali.  This is not going to be a high-level generality.

14  It is going to be a specific.

15       THE COURT:  Mr. Zach is shaking his head side to side.

16       MR. ZACH:  My question was not what did you generally

17  do.  You objected to that question.  She is going to give an

18  overview.  She is not going to get into certainly any

19  conversations that she heard or reported back to her like David

20  Yim talked to Frank DiPascali.  I don't expect any of that to

21  come in, because she never said anything like that when I met

22  with her.  I think it is going to be of the nature of the

23  answer that you sort of described in what you are hoping to

24  get.

25       MS. LUM:  I have an objection to the form of the

1    question.  While we understand what "high-level" means, I think

2    perhaps the witness and the jury is going to understand to it

3    mean something else.  Could you perhaps say "an overview" or

4    "general" instead of using the word "high-level"?  I think that

5    is ambiguous.

6              THE COURT:  Ask her a high-level overview.

7              MR. KRANTZ:  Your Honor, to save having to come back

8    on the instruction, I would ask that the instruction be that it

9    is not coming in for the truth of what KPMG actually did at the

10   time, because that is the hearsay component.  It is being

11   offered -- I'm not sure how to say what it is being offered

12   for -- to explain what she did next.

13             MR. ZACH:  I can do that part of it.  You don't want

14   the hearsay part of it.  It is being offered for the witness's

15   understanding of what KPMG did.

16             MR. KRANTZ:  That's fine.  No problem with that.

17             MR. ZACH:  And how she subsequently acted.

18             MR. KRANTZ:  That's fine.

19             MR. BRESLIN:  The impact on her.

20             MR. ZACH:  And its impact on her.

21             MR. KRANTZ:  That's fine.

22             THE COURT:  Something to the effect of Ms. Coe's

23   testimony regarding KPMG is offered as evidence of Ms. Coe's

24   understanding of what KPMG did and what action was taken by

25   HSBC, not as evidence of what KPMG actually did?

Case 1:10-cr-00228-LTS Document 580 Filed 04/09/14 Page 43 of 194 685

```
 1                MR. KRANTZ:  That is satisfactory.

 2                MR. MEHLER:  Yes.

 3                MR. ZACH:  That is totally fine.  Just so we don't

 4     have to come back again, obviously there is KPMG 2.  I'm going

 5     to ask the same question as rephrased here.  I am just raising

 6     that so we don't have another later.

 7                MR. KRANTZ:  We would ask for the same instruction

 8     when we get to 2008.  Are you referring to the 2008 KPMG audit?

 9                MR. ZACH:  Yes.

10                MR. KRANTZ:  It's the same issue.

11                THE COURT:  I don't want to jump in with it too early.

12     When you get to the end of that phase, would you turn to me and

13     say this is an appropriate time for the instruction.

14                MR. ZACH:  Sure.  Thank you, your Honor.

15                THE COURT:  Thank you.

16                (Continued on next page)

17

18

19

20

21

22

23

24

25
```

1                    (In open court)

2     BY MR. ZACH:

3     Q.  Ms. Coe, when you had the meeting with KPMG in London after

4     the visit to Madoff Securities in New York, could you please

5     give us a high-level overview about what they reported back to

6     you about what had happened.

7     A.  They reported back that they had followed through a number

8     of trades from the money that was being sent from the firms

9     through to Bernie Madoff, through to the records that they saw,

10    which confirmed the trades had gone from Madoff Securities to

11    the DTC and those stocks had been purchased and were allocated

12    to the various fund clients.

13    Q.  After you heard that, how did you react to that?

14    A.  It gave me complete reassurance.

15            MR. ZACH:  Your Honor, this is probably an appropriate

16    time for the instruction.

17            THE COURT:  Ladies and gentlemen, Ms. Coe's testimony

18    regarding KPMG is offered as evidence of Ms. Coe's

19    understanding of what KPMG did and what action was taken by

20    HSBC, not as evidence of what KPMG actually did.

21            MR. ZACH:  Thank you, your Honor.

22    BY MR. ZACH:

23    Q.  After you got that report back, what decisions did HSBC

24    make in terms of continuing to extend credit to some of these

25    funds that were themselves investing with Madoff Securities?

 1   A.   We agreed to continue to lend them money.

 2   Q.   At this point did you have any expectation of revisiting

 3   Madoff Securities down the road to keep track of the

 4   relationship it had with these funds that HSBC was lending

 5   money to?

 6   A.   Yes, I did.

 7   Q.   That was in that first KPMG visit was in November 2005,

 8   right?

 9   A.   That's correct.

10   Q.   Were these meetings right after that or were they in 2006?

11   A.   The initial meeting when they came back was in November

12   2005.   I allowed for the credit lines to be continued before

13   the end of November 2005.   But we continued to have meetings to

14   look at how we could improve things like the documentation and

15   the controls throughout early 2006.

16   Q.   I want to fast-forward a little bit, Ms. Coe, into 2008.

17   A.   OK.

18   Q.   What did the financial world look like in 2008?

19   A.   The financial world was starting to implode in 2008.   The

20   general global availability of cash, of liquidity, was starting

21   to dry up.   This was affecting a number of organizations.   It

22   was quite evident that there were cash pressures and cash flow

23   pressures on many of these organizations which potentially

24   could cause them to do things which in ordinary market

25   conditions they wouldn't do.

1   Q.  In 2008 were you still involved in risk management?

2   A.  Yes, I was.

3   Q.  As a risk manager, did the financial turmoil signal more or

4   less work for you?

5   A.  Much more work.

6   Q.  As part of that, what sorts of reexaminations of HSBC

7   business did you embark upon?

8   A.  There was a complete review of all credit lines.  And that

9   wasn't just about taking lines away.  It was also about trying

10  to help people to survive, which meant potentially it could

11  mean lending more money.  But that was having to happen across

12  a range of financial organizations, particularly broker-

13  dealers, who were exceptionally vulnerable to changes in the

14  way cash moved around the world.

15  Q.  Why were broker-dealers more vulnerable to that?

16  A.  They were more vulnerable because of the way they generate

17  cash and liquidity and use other people's assets to do that.

18  That means they are potentially more vulnerable to any change

19  or to any bank wanting more security than they were used to

20  giving.

21  Q.  Stepping back to 2005 briefly, at that time what was your

22  understanding of the amount of investments that the funds doing

23  business with both HSBC and Madoff Securities had with Madoff

24  Securities?

25  A.  In early 2005 the amount of money which had been invested

1   into Madoff by funds that were now HSBC clients was about

2   $3 billion.

3   Q.  As we step forward in 2008, had that amount gone up or

4   down?

5   A.  It had gone up significantly.

6   Q.  When we hit 2008 and there is this sort of financial

7   problem, HSBC's clients have even more money with Madoff

8   Securities?

9   A.  That's correct.

10  Q.  During this reexamination of various lines of credit in

11  2008, did your attention turn to Madoff Securities again?

12  A.  It turned to Madoff Securities and a number of others.

13  Q.  What were your specific concerns about Madoff Securities in

14  2008?

15  A.  Because of the way that cash was no longer as freely

16  available as it had been, I was concerned that he may be

17  tempted to use the money to do other things in the event that

18  many of the funds asked for their money back.  I needed to make

19  sure that I could protect my clients and their investors from

20  money which they had given to Madoff for one purpose being used

21  for another purpose.

22  Q.  What steps did you take in 2008 to again address these

23  concerns that were popping up in your mind?

24  A.  I had already asked KPMG to do a second review.  It is not

25  that we didn't do anything between 2005 and 2008.  There were

 1   the regular contacts with Madoff Securities.  Brian Pettitt did

 2   a further on-site review.  But I asked KPMG at the end of 2007

 3   to do another visit to make sure that the trades were being

 4   placed into the DTC as I had expected.

 5   Q.  Did you go back to the same folks at KPMG had done that

 6   audit and review back in 2005?

 7   A.  I did.

 8   Q.  This is Mr. Yim and David L?

 9   A.  That is correct.

10   Q.  Did you meet with them before sending them off to New York?

11   A.  Yes, I did.

12   Q.  In those meetings did you again give them instructions

13   about what you wanted them to do?

14   A.  Yes, I did.

15   Q.  To be clear, you had to pay KPMG to do this, right?

16   A.  Yes.

17   Q.  How much did KPMG charge, roughly?

18   A.  Roughly about $150,000.

19   Q.  In 2008 what did you tell Mr. Yim and David L that you

20   wanted them to look at in Madoff Securities?

21   A.  I told them exactly the same as I told them in 2005:  To

22   follow the cash through to the DTC and get as much documentary

23   evidence as they could to ensure that those trades were real.

24   Q.  Did you send them off to New York again?

25   A.  I sent them off to New York again.

1   Q.  At this time were you in communication with them while they

2   were at Madoff Securities?

3   A.  Yes.  They were there for a longer period of time, and

4   David L contacted me on a number of occasions by telephone.

5   Q.  When they came back to London, did you again sit down and

6   meet with them?

7   A.  Yes, I did.

8   Q.  Again, we want to get your understanding of what was done.

9   I'm going to ask you, can you give us a high-level overview of

10  what KPMG reported back to you after the second review.

11  A.  Yes.  They reported back that they had followed a number of

12  trades which was cash coming in from the funds that were at

13  HSBC clients, they had followed those through to be put

14  together with other money into Madoff Securities and to the

15  DTC, and the records from the DTC were examined back to the

16  books and records that were kept by Madoff as custodian for

17  those trades allocated to HSBC's clients.

18              MR. ZACH:  This is a good time, your Honor.

19              THE COURT:  Ladies and gentlemen, once again, this

20  testimony regarding what KPMG said it did is offered in

21  connection with Ms. Coe's understanding of what KPMG did and

22  what action was taken by HSBC based on that information.  It is

23  not evidence of what KPMG actually did.

24              MR. ZACH:  Thank you, your Honor.

25  Q.  Ms. Coe, how did you react to getting this information back

08-01789-smb Doc 9784-1 Filed 04/08/15 Entered 04/08/15 20:19:21 Exhibit A Pg 39 of 73
Case 1:10-cv-09228-TLS Document 380 Filed 04/09/14 Page 35 of 38
Coe Transcript   Pg 39 of 73

 1   from KPMG?

 2   A.  I was once again comforted by what they had told me.

 3   Q.  When, approximately, in 2008 did this happen?

 4   A.  Their on-site visit was April 2008, so we had the meeting

 5   late April-early May 2008.

 6   Q.  How did the rest of 2008, between April and let's say

 7   November, play out in terms of the financial world?

 8   A.  Things started to heat up very quickly from that point

 9   onwards.  My position within the bank meant that I had access

10   to a lot of information about a lot of clients and about a lot

11   of what was going on in the financial markets at that time.  It

12   was very clear that the concerns about cash and people's access

13   to cash was getting more intense and more difficult.

14          Therefore, we were needing to take a lot of more

15   control steps to make sure that that cash was not being used by

16   many customers for purposes which it was not originally

17   intended.  Madoff, amongst other parties that we were dealing

18   with, became subject to a higher level of scrutiny and a

19   requirement for more intense controls.

20   Q.  When you say more intense controls, you're saying those are

21   controls that HSBC was going to impose on its customers in

22   their dealings with Madoff Securities?

23   A.  That is correct.

24   Q.  As things got worse in 2008, what sorts of new controls did

25   you want to impose on that relationship between HSBC's clients

 1  and Madoff Securities?

 2  A.  I wanted to ensure that my clients' cash was kept away from

 3  other clients of Madoff's cash was not able to be used for any

 4  other purpose.  I was looking for a way of having that kept

 5  separate, and not only within Madoff's accounts but also at the

 6  DTC.

 7  Q.  Did you convey these instructions to Madoff Securities?

 8  A.  Brian Pettitt went to see Bernie Madoff on my behalf to

 9  instruct him that this was the only basis on which we would be

10  able to continue to deal with clients who wished to invest

11  within Madoff.

12  Q.  When approximately did you have Mr. Pettitt go visit Mr.

13  Madoff?

14  A.  Approximately October 2008.

15  Q.  Were these new controls ever put in place?

16  A.  They were never put in place.

17  Q.  What happened?

18  A.  Madoff was arrested for fraud.

19  Q.  When did you learn that Mr. Madoff was arrested?

20  A.  On the morning of the 12th of December 2008.

21  Q.  Where were you?

22  A.  I was actually in bed at home.  I had just gone on core

23  leave.

24  Q.  What is that again?

25  A.  Within a financial organization you have to have two weeks'

```
 1    leave when you are away from the office.  It's mandatory.  I

 2    had just taken my leave.

 3    Q.  You had just started your leave and you were in bed and you

 4    learned what?

 5    A.  That Madoff had been arrested.

 6    Q.  How did you react?

 7    A.  I was shocked, and then I went to work.

 8              MR. ZACH:  Thank you, Ms. Coe.  No further questions.

 9              THE COURT:  Thank you.

10              Mr. Frisch.

11              MR. FRISCH:  Thank you, your Honor.

12              Ladies and gentlemen, good morning.

13    CROSS-EXAMINATION

14    BY MR. FRISCH:

15    Q.  Ms. Coe, Good morning.

16    A.  Good morning.

17              THE COURT:  Please speak up, Mr. Frisch.

18              MR. FRISCH:  I will.

19              THE COURT:  Thank you.

20    Q.  Ms. Coe, my name is Andy Frisch.  I represent one of the

21    defendants in this case, whose name is Dan Bonventre.  We are

22    speaking right now for the first time, is that correct?

23    A.  That is correct.

24    Q.  Are you familiar with things called MLATs, that is, mutual

25    legal assistance treaties, between various countries so that
```

1  someone from one country can come testify at a trial in another

2  country?  Are you familiar with such a thing?

3  A.  No, I am not.

4  Q.  Are you here pursuant to any kind of formal request made by

5  the prosecutors in this case to the government of your country?

6  A.  I'm not aware of that, no.

7  Q.  You are here simply because the prosecutors asked you to be

8  here, is that right?

9  A.  That is correct.

10  Q.  Is it your understanding, though, that even United States

11  prosecutors cannot compel a citizen of another country to

12  testify at an American trial, they have to go through channels?

13          MR. ZACH:  Objection.

14          THE COURT:  Please consult.

15          (Counsel conferred.)

16  Q.  Let me ask you the question this way.  Is it your

17  understanding that your testimony here cannot be compelled

18  unless the United States prosecutors go through proper

19  channels?

20  A.  I wouldn't expect so.

21  Q.  In any event, you are here voluntarily?

22  A.  Absolutely.

23  Q.  As I understand it, you became aware of Madoff Securities

24  for the first time after HSBC acquired or merged with the Bank

25  of Bermuda, is that right?

1   A.   That's correct.

2   Q.   Bank of Bermuda had clients, including one of them called

3   the Thema Fund, that had investments with Madoff Securities, is

4   that right?

5   A.   That is correct.

6             (Continued on next page)

1    Q.  And Thema, is T-h-e-m-a; is that right?

2    A.  That is correct.

3    Q.  And at some point, the Thema Fund was applying for a loan

4    for which HSBC would ultimately be the lender, correct?

5    A.  Correct.

6    Q.  And the purported collateral were assets in the purported

7    custody of Mr. Madoff; is that right?

8    A.  That's correct.

9    Q.  And, in substance, you wanted to make sure that the

10    collateral would be there in case the Thema Fund, for example,

11    failed to repay the loan or defaulted, as we say; is that

12    right?

13    A.  Yes.

14    Q.  Now, am I correct that one of the things that principally

15    concerned you about Madoff Securities was that he had

16    end-to-end control of everything relevant to this collateral;

17    is that so?

18    A.  Yes.

19    Q.  In the United States, I don't know if you use this term in

20    the United Kingdom, but he was a sole proprietor.  Do you know

21    what I mean by that?

22    A.  I know what you mean by that, yes.

23    Q.  That's a term for which you have an equivalent in the

24    United Kingdom, I assume?

25    A.  Yes, we do.

1    Q.  But in any event, you understood he was the guy in control?

2    A.  Yes.

3    Q.  It was his business?

4    A.  It was his business.

5    Q.  Unlike other corporate entities, there were no

6    shareholders, right?

7    A.  As far as the activity for securities, yes, but as far as

8    the broker-dealer is concerned, my understanding is that was a

9    corporation.

10   Q.  As far as?  I missed your answer.

11   A.  The broker-dealer was concerned.

12   Q.  Oh, I see, a broker-dealer.

13   A.  Was concerned.

14          THE COURT:  Ms. Coe, would you just bring the

15   microphone a little closer to you?

16          THE WITNESS:  I'm sorry.

17          THE COURT:  Thank you.

18   BY MR. FRISCH:

19   Q.  If you know, do you know whether or not Madoff Securities

20   had a board of directors, either any part of Madoff Securities,

21   if you know?

22   A.  My recollection is that it did.

23   Q.  You believe that it did?

24   A.  In the matter of securities.

25   Q.  In any event, you know that Mr. Madoff controlled any

 1  instructions regarding this collateral, correct?

 2  A.  Yes.

 3  Q.  He controlled any deliveries regarding this collateral,

 4  right?

 5  A.  He controlled the investment strategy.

 6  Q.  And certainly, the disposition of the collateral he would

 7  also control, correct?

 8          And let me ask the question a better way.  He

 9  controlled what HSBC would get if Thema defaulted subject to

10  his agreement with you, correct?

11  A.  He would control the processes that were underpinning that,

12  yes.

13  Q.  All right.  Now, am I correct that the directors of the

14  Thema Fund included two brothers named Alberto and Stefan

15  Benbassat; is that right?

16  A.  Yes, it is.

17  Q.  And that's B-e-n-b-a-s-s-e-t?

18  A.  It may be a-t at the end.  I can't recall.

19  Q.  And there came a time when you had lunch with these two

20  brothers; is that correct?

21  A.  I had lunch with one of them.

22  Q.  And were they, themselves, high-net-worth investors, or did

23  they simply help manage the Thema Fund for other investors?

24  A.  They were the principals behind the Thema Fund.

25  Q.  So they were, themselves, the high-net-worth individuals?

1   A.  I had no cause to know what their personal net worth was.

2   Q.  Were they the investors themselves?  That's my point.  Were

3   they the investors or the managers?

4   A.  They were the managers.

5   Q.  Got it.  And so they were involved in making or

6   recommending the investment decisions with regard to Madoff

7   Securities on behalf of the Thema Fund; is that right?

8   A.  They were responsible for making the investment decisions

9   of the Thema Fund, yes.

10  Q.  Okay.  And one of the investments of the Thema Fund was

11  Madoff Securities --

12  A.  That's correct.

13  Q.  -- correct?  And fair to say your meeting with this one

14  brother was uneventful?

15  A.  Completely.

16  Q.  Certainly nothing about it gave you what we call a red

17  flag, correct?

18  A.  Not at all.

19  Q.  Now, one of the ways that HSBC sought to address its

20  concerns was through an HSBC employee, whose name you've

21  mentioned, Brian Pettitt; is that correct?

22  A.  That's correct.

23  Q.  And he met with Mr. Madoff in New York on at least one

24  occasion; is that right?

25  A.  That's correct.

08-01789-smb  Doc 9784-1  Filed 04/08/15  Entered 04/08/15 20:19:21  Exhibit A
Case 1:10-cv-00228-TS  Document 380  Filed 04/09/14  Page 64 of 84

Coe Transcript   Pg 48 of 73

1  Q.  And then in the fall of 2005, HSBC decided to engage KPMG

2  to conduct a review of Madoff Securities; is that right?

3  A.  In early 2005.  I actually sent them over in late 2005.

4  Q.  You made the decision much earlier than late 2005 --

5  A.  That is correct.

6  Q.  -- when they went over?

7  A.  Correct.

8  Q.  Now, HSBC had no particular reason to believe that anything

9  was wrong at Madoff Securities, it was simply appropriate for

10  Madoff to be reviewed under the circumstances about which

11  you've testified; is that right?

12  A.  As risk manager, I had concerns that I wanted to be fully

13  investigated.

14  Q.  Not because you had any particular reason to believe

15  anything was going on wrong at Madoff Securities, but based on

16  the kind of appropriate concerns you would have, given your

17  responsibilities at HSBC?

18  A.  I had no evidence that anything was going wrong.  What I

19  wanted to do was to make sure that it was as had been reported.

20  Q.  Understood.  Now, before the KPMG review of Madoff

21  Securities, you learned that Mr. Madoff was reluctant to allow

22  HSBC to come in and review Madoff Securities directly because

23  Mr. Madoff reportedly wanted to protect the integrity of his

24  so-called black box technology; is that correct?

25  A.  That's what I was told, yes.

 1   Q.  And what is black box technology, if you know?

 2   A.   It is essentially a mathematical formula which is

 3   proprietary to either an individual or a number of individuals

 4   which makes investment choices through the mathematical

 5   formula.

 6   Q.  So it's a term of art in the industry; it's nothing

 7   peculiar to Madoff Securities, right?

 8   A.   It's nothing peculiar to Madoff Securities, no.

 9   Q.   It's basically sort of use of a computerized model to make

10   trades quickly based on market activity; is that a fair way of

11   describing it?

12   A.   It's to make trades, the speed of which would be one of the

13   components.

14   Q.   And the idea is if you can use computers and make it

15   quickly, you have a better chance of profitability; at least

16   that's the goal?

17   A.   The art would be to optimize when you buy and when you

18   sell.

19   Q.   For the purpose of profitability?

20   A.   Correct.

21   Q.   Now, your understanding was that Mr. Madoff didn't want the

22   purported secrets of his investment strategy to become widely

23   known; is that right?

24   A.   That is correct.

25   Q.   And that, to you, at the time, wasn't unusual?

```
 1   A.  It was not unusual for the number of funds that I had

 2   experience of.

 3   Q.  That's something that was somewhat common, to some extent,

 4   with regard to investment strategies of fund managers; is that

 5   right?

 6   A.  Of fund managers that use that type of investment strategy.

 7   Q.  When you say investment strategy, are you referring now to

 8   the so-called black box technology?

 9   A.  Yes, I am.

10   Q.  Now, before the KPMG review of Madoff Securities, you

11   learned that Mr. Madoff himself did not use e-mail; is that

12   right?

13   A.  I did.

14   Q.  And you thought that was quirky but not necessarily

15   strange, correct?

16   A.  I thought it was strange.

17   Q.  Well, give me one moment.  Ms. Coe, do you recall

18   testifying at a deposition on May 19th, 2011, that took place

19   in Germany?

20   A.  Yes, I do.

21   Q.  And do you recall testifying at that deposition, upon being

22   asked that Mr. Madoff himself did not use e-mail, that you

23   thought it was quirky but not necessarily strange?

24   A.  I don't remember those exact words, but I do get your

25   point.  There isn't a lot of difference, in my language, to the
```

 1  two.

 2  Q.  Okay.

 3  A.  Let's say odd.  I thought it was odd.

 4  Q.  Okay.  Fair enough.  Before the KPMG review of Madoff

 5  Securities, you also learned that Mr. Madoff did not send

 6  customers electronic trade confirmations; is that right?

 7  A.  That is correct.

 8  Q.  And that was not unusual to you?

 9  A.  That was not unusual in the type of funds that were being

10  investing into Madoff, correct.

11  Q.  Okay.  You also learned that in the event that Thema failed

12  to repay the loan, Mr. Madoff wanted to pay cash to HSBC rather

13  than give you the actual collateral that underlaid the loan; is

14  that so?

15  A.  That was written in one of the credit applications, yes.

16  Q.  And that also, under the circumstances, was not unusual to

17  you, correct?

18  A.  It was not something I would have objected to.

19  Q.  Well, the reason you didn't object -- the reason you would

20  not have objected to it is because you understood, as I believe

21  you testified on direct examination, that Mr. Madoff made

22  investments for a lot of investors at once, correct?

23  A.  That is correct.

24  Q.  And you understood that if he had to pay back HSBC, he

25  would not want to break up his total investments on behalf of

1   clients, of which the Thema Fund was just one --

2   A.  That's correct.

3   Q.  -- is that fair?  I'm sorry.  We were speaking over each

4   other.

5   A.  I'm sorry.  Yes, that's correct.

6   Q.  So your understanding was that Mr. Madoff wanted to pay

7   cash to HSBC in the event of a default because that way he'd be

8   protecting the investments of other investors, correct?

9   A.  That's correct.

10  Q.  Now, has HSBC done business with KPMG on matters other than

11  Madoff Securities?

12  A.  KPMG are HSBC's or were HSBC's auditors and do a lot of

13  consultancy work for HSBC.

14  Q.  And I think you testified on direct that KPMG is one of the

15  biggest accounting firms in the world, correct?

16  A.  That's correct.

17  Q.  And I think now, or in the recent past, they've been one of

18  the Big Four accounting firms in the world; is that so?

19  A.  Yes.

20  Q.  And they've been around, in one form or another, since the

21  1800s, if you know?

22  A.  I don't know whether it's the 1800s, but certainly a long

23  time.

24  Q.  Now, one of the KPMG executives who was actually in charge

25  of this review was a man named David Yim, and that's Y-i-m; is

 1    that correct?

 2    A.   Yes.

 3    Q.   And had you had occasion to deal with -- withdrawn.

 4         Have you had occasion to deal with Mr. Yim other than

 5    in connection with Madoff Securities?

 6    A.   Not before he -- before Madoff Securities, no.

 7    Q.   You know that he's been with KPMG for many years, correct?

 8    A.   A number of years, yes.

 9    Q.   And I think you testified that one of his specialties or

10    areas of expertise is internal controls and assessing

11    operational risk; is that so?

12    A.   Yes, that's correct.

13    Q.   And your understanding was that he's well versed or was

14    well versed at the time in things like corporate governance and

15    internal controls; is that correct?

16    A.   That was the credentials that were given to me, yes.

17    Q.   Now, am I correct that the offices of HSBC and KPMG in

18    London are very close to one another?  Is that so?

19    A.   They are now, yes.

20    Q.   HSBC is, I think, at 8 Canada Square in Canary Wharf; is

21    that correct?

22    A.   Yes.

23    Q.   And currently, KPMG is at 15 Canada Square?

24    A.   I don't know the exact -- it's the opposite side of the

25    road.

1  Q.  So how long would it take for someone to walk from HSBC to

2  KPMG in London?

3  A.  Not long.

4  Q.  Basically across the street?

5  A.  Yes.

6  Q.  Another of the KPMG executives who worked on the Madoff

7  Securities review was the man we're calling David L, correct?

8  A.  Correct.

9  Q.  I think it's Luijernick or Lujering?

10  A.  I think it turns into a B for pronunciation, but I can't be

11  absolutely certain.

12  Q.  The J becomes a B.  All right.  Am I correct that he now

13  works for KPMG in Sidney, Australia; if you know?

14  A.  I don't know.

15  Q.  Do you know that he is Australian, that his heritage is

16  Australian?

17  A.  My understanding is that he is, yes.

18  Q.  But at the time, of course, in 2005, he was working with

19  KPMG in London; is that correct?

20  A.  I believe he was at the London office, yes.

21  Q.  Are you aware that Mr. -- that David L is the author of a

22  book entitled Corporate and Financial Fraud?

23  A.  No.

24  Q.  Before he worked for KPMG, are you aware that he worked for

25  Australian law enforcement, investigating fraud?

1   A.   No, but he came to me as a forensic expert.

2   Q.   You came to know him as a forensic expert, is that what you

3   said?

4   A.   That's what KPMG recommended as part of his credentials

5   when they recommended him.

6   Q.   I see.  Thank you.  Now, Mr. Madoff's firm was supposedly

7   the custodian of the assets of the collateral for the Thema

8   Fund loan; is that right?

9   A.   That is correct.

10  Q.   And you mentioned something on your direct called the DTC,

11  correct?

12  A.   Yes.

13  Q.   And one of the reasons why HSBC wanted to do this review

14  was because HSBC did not have the means to contact DTC itself

15  and confirm whether DTC held the collateral; is that correct?

16  A.   That is correct.

17  Q.   In fact, neither HSBC nor KPMG were members of DTC,

18  correct?

19  A.   Correct.

20  Q.   And so neither one of them had the power to get information

21  from DTC, as would, for example, a member of the Securities and

22  Exchange Commission in the United States; is that correct?

23  A.   That's correct.

24  Q.   You testified on direct examination that an investment fund

25  can have an interest in borrowing money even though the fund

 1  has assets under management, correct?

 2  A.   Could you repeat that again --

 3  Q.   Sure.

 4  A.   -- to make sure that it's technically correct?  I'm sorry.

 5  Q.   That's okay.  You testified on direct that an investment

 6  fund may have an interest in borrowing money even though the

 7  fund has assets under management, correct?

 8  A.   Yes, that's correct.

 9  Q.   And I think you described it as something of a timing

10  issue?

11  A.   That can be one of the reasons, which it was in this case.

12  Q.   And by a timing issue, one of the ways a timing issue can

13  come up is that a fund may have a need to pay back investors a

14  certain amount of money, but they don't want to interfere with

15  their strategy, and so the best thing to do is just to borrow

16  money; is that fair?

17  A.   It can be one of the reasons, yes.

18  Q.   There could be other reasons why -- well, withdrawn.

19       At least under that circumstance, it makes sense for a

20  fund to borrow money to pay clients even though the fund has

21  assets under management; would you agree with that?

22  A.   Yes.

23  Q.   Okay.  Now, in the fall of 2005, so this would be after you

24  decided to do the review but before it happened, one of your

25  colleagues at HSBC involved in this matter was a man named Paul

08-01789-smb   Doc 9784-1   Filed 04/08/15   Entered 04/08/15 20:19:21   Exhibit A
Case 1:10-cv-00228-TS   Document 580   Filed 04/09/14   Page 73 of 194

Coe Transcript    Pg 57 of 73

```
 1   Smith; is that right?

 2   A.   Yes.

 3   Q.   And what was his role in 2005 regarding this project,

 4   regarding Mr. Madoff?

 5   A.   Paul Smith was a Bank of Bermuda senior manager that joined

 6   HSBC when we bought Bank of Bermuda.  He was the head of the

 7   business division that managed all of those fund clients that

 8   were previously Bank of Bermuda clients.

 9   Q.   Now, I think you testified that KPMG review of Madoff

10   Securities took place beginning on November 7th, 2005; is that

11   right?

12   A.   I think they were physically in the offices on that day.

13   The review started much before that; so they could do all of

14   their preliminary work.

15   Q.   Understood and what I should have asked is the on-site part

16   of the review of Madoff Securities took place on or began on

17   November 7th of 2005; is that --

18   A.   I believe it was 7th of November.

19   Q.   And the on-site part of the review, that is when they were

20   actually there, lasted in the neighborhood of three or four

21   business days; is that right?

22   A.   That is my understanding, yes.

23   Q.   Now, do you know who chose the date for the review?

24   A.   I think the date was mutually agreed between the Davids and

25   Bernie Madoff.
```

 1   Q.  They negotiated that the date would be November 7th?

 2   A.  I don't think it was so much of a negotiation.  More of a,

 3   we need to fly over at a particular time.  We need to come to

 4   your offices.

 5   Q.  But certainly this wasn't a surprise visit or a spot visit,

 6   correct?

 7   A.  It wasn't a visit where we just turned up on the doorstep,

 8   no.

 9   Q.  Okay.  Now, I want to show you a two-page letter that I've

10   marked for identification as DB55, and I want to start by

11   apologizing.  The only copy that I have has a lot of

12   handwriting on it.  I'm not going to ask you anything about the

13   handwriting.  I'm going to ask you questions about the text.

14           MR. FRISCH:  May I distribute it, Judge?

15           THE COURT:  Yes, if you just show it to the

16   government.

17           MR. FRISCH:  Of course.  I have multiple copies.

18           THE COURT:  Thank you.

19   Q.  Now, Ms. Coe, you're free to look at the entire thing.

20   It's not a long letter, but I'm going to direct -- my questions

21   are going to be about the second page, but I don't mean to rush

22   you.  Take your time.

23           Is this letter on HSBC letterhead?

24   A.  It is, yes.

25   Q.  And do you see your name on the second page?

 1   A.  I do, yes.

 2   Q.  And this was a letter that was authored by Mr. Smith, about

 3   who you just testified, to Mr. Madoff in advance of the

 4   November 7th visit?

 5   A.  It would appear to be that, yes.

 6   Q.  As far as you know, was this letter written at about the

 7   date indicated, October 17th, 2005?

 8   A.  I've never seen this letter before; so I don't know when it

 9   was written.

10   Q.  Does it appear to be a letter that was maintained by HSBC

11   in HSBC's files?

12            MR. ZACH:  Objection.

13            MR. FRISCH:  Let me confer with Mr. Zach, if I could.

14            THE COURT:  Would you, please.

15            (Counsel conferring)

16            MR. ZACH:  Resolved, your Honor.

17            THE COURT:  Thank you.

18   BY MR. FRISCH:

19   Q.  Ms. Coe, let me ask you this question.  Was it your

20   understanding that Mr. Smith -- withdrawn.

21            Was it your understanding that the review for

22   November 7th could have been rescheduled if it was inconvenient

23   for anyone?

24   A.  That's not my understanding.

25   Q.  Your understanding that it was on November 7th and that was

 1  it, it couldn't be moved; is that correct?

 2  A.  That is my understanding.

 3  Q.  And what's that understanding based on?

 4  A.  I was very specific to the two Davids that I wanted them to

 5  go no later than very early in November because we had had a

 6  considerable delay in actually organizing the review, and I had

 7  withdrawn lines of credit for a number of clients which I was

 8  not prepared to put in place.  And I knew that that would

 9  potentially be damaging to investors and as well as my

10  obligations to the organization.  I also had obligations to

11  those investors.

12        So I was quite determined that that review should not

13  be delayed.  So there may have been an illusion that it was

14  moveable, but the reality was I was quite determined that that

15  should happen at that date.  And I had arranged for Brian

16  Pettitt to be in New York that week, as well; so he would be

17  available to answer questions for -- from the two Davids, if

18  necessary.

19  Q.  As you understood it, did Mr. Smith, Paul Smith, share your

20  understanding about what you've just testified?

21  A.  I have --

22        MR. ZACH:  Objection.

23        THE COURT:  Sustained.

24  Q.  Do you know whether Mr. Smith made any offer to change the

25  date, if necessary; if you know?

 1    A.   I do not know.

 2    Q.   Now, am I correct that you finished your formal schooling

 3    in 1971 or about 1971?

 4    A.   That is correct, yes.

 5    Q.   And you joined HSBC or what's now known as HSBC in 1971 as

 6    a management trainee; is that correct?

 7    A.   That is correct.

 8    Q.   And even though your formal education ended in 1971, you

 9    thereafter received constant internal training from HSBC; is

10    that fair to say?

11    A.   I also took external degrees as well.

12    Q.   And you said external degrees as well?

13    A.   Yes, I did.  I did all my post-school education part time.

14    Q.   And you did that while you were working at HSBC?

15    A.   Yes, I did.

16    Q.   And did you do that during the workday or at night?  How

17    did you juggle that with your --

18    A.   I did it in my own time.

19    Q.   In addition to that, HSBC sent you to outside seminars; is

20    that right?

21    A.   Yes, they did.

22    Q.   And the subject of at least some of those seminars was

23    what's become your area of specialty, which is operational and

24    regulatory risk; is that right?

25    A.   That is correct.

1   Q.  And, in fact, you became so well versed in this, in these

2   subject matters, that there came a time when you, yourself,

3   chaired seminars about that subject; is that right?

4   A.  That is correct.

5   Q.  Now, what's the reason why a company like HSBC provides

6   internal training and makes outside seminars like this

7   available?

8           MR. ZACH:  Objection, scope.

9           THE COURT:  Sustained.

10  Q.  Did your training and your work assist you in helping you

11  understand the way that things were supposed to work?

12  A.  It will have had a benefit, yes, of course.

13  Q.  As did the, what you called your external schooling or

14  external work that you did on your own time, correct?

15  A.  That is correct.

16  Q.  All right.  Now, when was the last time you had any

17  dealings with David L?

18  A.  2008.

19  Q.  You haven't dealt with him since this particular project,

20  correct?

21  A.  No, I haven't.

22  Q.  As far as you know, does he still work for KPMG?

23  A.  To the best of my knowledge.

24  Q.  When was the last time you had any dealings with Mr. Yim?

25  A.  2008.

1   Q.  In connection with this project?

2   A.  That is correct.

3   Q.  And as far as you know, is he still a senior executive at

4   KPMG in London?

5   A.  I believe so.  I have seen him since then, but I've had no

6   professional dealings with him since then.

7   Q.  Understood.  Now, who was it who was in New York to conduct

8   the KPMG review of Madoff Securities, was it Mr. Yim and David

9   L of KPMG or you?

10  A.  The two Davids.

11          THE COURT:  Mr. Frisch, I'm sorry.  Would you find a

12  place in the next five minutes or so to stop for the break?

13          MR. FRISCH:  Your Honor, I will.  I just have a few

14  more minutes and I'll be done.

15          THE COURT:  Very good.  Thank you.

16  Q.  As part of the KPM, to your knowledge, did the two Davids

17  meet with Mr. Madoff when they were in New York in November of

18  2005?

19  A.  That is my understanding.

20  Q.  So as part of the KPMG review of Madoff Securities, it was

21  the two Davids who met with Mr. Madoff and not you, correct?

22  A.  That is correct.

23  Q.  So would you agree with me, Miss Coe, that when it comes to

24  firsthand information about the KPMG review of Madoff

25  Securities, the two Davids have more to tell this jury than do

```
 1    you?

 2              MR. ZACH:  Objection.

 3              THE COURT:  Sustained.

 4    Q.  Let me ask you this.  Is it fair to say you flew from

 5    London to New York to testify at this trial within the last few

 6    days?

 7    A.  That is true.

 8    Q.  Fair to say Mr. Yim was not with you, correct?

 9              MR. ZACH:  Objection.

10              THE COURT:  Sustained.

11    Q.  The last time you saw Mr. Yim was in 2008, right?

12    A.  That is not the last time I saw him.  That's the last time

13    I had any professional dealings with him.

14    Q.  I see.  You've seen him on a non-professional basis since

15    2008?

16    A.  Yes.

17    Q.  And the last time you saw David L?

18    A.  2008.

19              MR. FRISCH:  All right.  Give me one second, your

20    Honor.  In fact, rather than take the jury's time, we can break

21    now and I can go over my notes.

22              THE COURT:  Very well then.  We will begin our

23    15-minute morning break now.  Members of the jury, please

24    continue to keep your thoughts to yourselves and be ready in

25    the jury room at 11:45.  All rise.
```

```
 1              Ms. Ng, would you escort the jury out.

 2              (Jury exits)

 3              THE COURT:  Ms. Coe, you are now under

 4    cross-examination, and so you are not to discuss your testimony

 5    or any potential testimony with anyone.  Do you understand?

 6              THE WITNESS:  Thank you, your Honor.  I do.

 7              THE COURT:  Thank you.  You may leave the witness

 8    stand.  We'll see you in 15 minutes.

 9              (Witness temporarily excused)

10              See you all in 15 minutes.

11              (Recess)

12              THE COURT:  Ms. Ng, would you bring the jury in,

13    please.  All rise.

14              (Jury enters)

15              Good morning again, members of the jury.  Please take

16    your seats.  And please be seated, everyone.  Mr. Frisch.

17              MR. FRISCH:  Thank you, Judge.

18    BY MR. FRISCH:

19    Q.  Welcome back, Ms. Coe.

20    A.  Thank you.

21    Q.  Do you know in what month in the year 2008 was the KPMG

22    2008 on-site review of Madoff Securities?

23    A.  My recollection is April 2008.

24    Q.  Was that one a surprise visit or a spot visit?

25    A.  It wasn't a spot visit, no.
```

1    Q.  And so that one was scheduled for a particular day, as far

2    as you know?

3    A.  I'm not sure it was a particular day, but it was certainly

4    scheduled for April 2008.

5    Q.  Meaning neither one of the two KPMG reviews, neither the

6    one in 2005 nor the one in 2008, were surprise or spot visits;

7    is that correct?

8    A.  Neither were a surprise visit, that is correct.

9         MR. FRISCH:  Ms. Coe, thank you very much.  I have

10   nothing further.

11        THE COURT:  Thank you, Mr. Frisch.  Mr. Riopelle?

12        MR. RIOPELLE:  We have no questions of this witness,

13   your Honor.

14        THE COURT:  Thank you, Mr. Riopelle.  Mr. Breslin?

15        MR. BRESLIN:  We have no questions for Ms. Coe, your

16   Honor.

17        THE COURT:  Thank you, Mr. Breslin.  Mr. Krantz?

18        MR. KRANTZ:  Yes.  Thank you, your Honor.

19   CROSS-EXAMINATION

20   BY MR. KRANTZ:

21   Q.  Good morning again, members of the jury.  Good morning,

22   Ms. Coe.

23   A.  Good morning.

24   Q.  My name is Larry Krantz, and I represent George Perez in

25   this trial.  I just have a few minutes of questioning for you

1    this morning.

2          Mr. Zach asked you a little bit about your

3    understanding of how Madoff Securities invested or traded the

4    money that was given to it by its clients; do you recall,

5    generally?

6    A.  Yes, I do.

7    Q.  And you indicated that it was traded, I think your words

8    were, as one amount; do you recall using that expression?

9    A.  Yes, I recall that.

10   Q.  I'm sorry, I didn't hear you?

11   A.  Yes, sorry, I recall that.

12   Q.  I just want to ask you a little bit about your

13   understanding at the time as to how Madoff Securities invested

14   its client's money, okay?

15   A.  Okay.

16   Q.  And, of course, we all know sitting here now that, in fact,

17   there was no real trading being done by Madoff Securities in

18   connection with this aspect of its business; you do know that,

19   correct, at this time?

20   A.  At this time.

21   Q.  But back in 2005 and through 2008, of course, you did not

22   know that fact, true?

23   A.  That is correct.

24   Q.  You believed at the time, prior to the arrest of

25   Mr. Madoff, that the trading was real, true?

 1  A.  That is correct.

 2  Q.  And am I correct that your understanding at the time was

 3  that Madoff Securities purchased equities stocks on behalf of

 4  its clients on a bulk basis?

 5  A.  That is my understanding, yes.

 6  Q.  And it did that as a principal, meaning in the name of

 7  Madoff Securities, correct?

 8  A.  That is correct, yes.

 9  Q.  And was it your understanding at the time that it then

10  internally, within Madoff Securities, allocated those bulk

11  trades to its individual or institutional clients?

12  A.  Effectively.

13  Q.  And was it your understanding that it did that through some

14  sort of computer-generated allocation methodology?

15  A.  I didn't know whether it was computer or manual.  My

16  expectation was there would have been some IT involvement

17  because of the sheer volume that Madoff Securities was

18  potentially trading in the market.

19  Q.  But whether computerized or manually done, there was some

20  sort of internal allocation of the bulk trades, correct?

21  A.  That was my understanding, yes.

22  Q.  And was it also your understanding that it allocated those

23  trades in that way on an average price basis for its different

24  clients?

25  A.  That is my understanding, yes.

1   Q.  And that was your understanding from 2005 until the demise

2   of Madoff in -- Madoff Securities in late 2008, correct?

3   A.  Yes, that's correct.

4   Q.  And that was not a process that you had any objection to at

5   that time, correct?

6   A.  It's quite a common process.

7         MR. KRANTZ:  No further questions.  Thank you very

8   much.

9         THE WITNESS:  Thank you.

10         THE COURT:  Thank you, Mr. Krantz.  Ms. Lum?

11         MS. LUM:  Yes.  Good morning, ladies and gentlemen.

12   CROSS-EXAMINATION

13   BY MS. LUM:

14   Q.  Good morning, Ms. Coe.

15   A.  Good morning.

16   Q.  My name is Sarah Lum.  I'm an attorney representing Jerome

17   O'Hara.  I have just a few questions for you.

18         You testified that you're here voluntarily; is that

19   correct?

20   A.  That is correct.

21   Q.  Are you being paid by anyone to appear at this trial?

22   A.  No.

23   Q.  And your travel expenses here are being paid by --

24   A.  HSBC.

25   Q.  You testified on direct that after you received the KPMG

 1   report in 2006, that you were completely reassured?

 2   A.   That is correct.

 3   Q.   Right?  And in fact, that report indicated that there

 4   were -- that KPMG had identified 19 fraud risks; is that

 5   correct?

 6            MR. ZACH:  Objection.  Hearsay.

 7            MS. LUM:  Is it your understanding --

 8            THE COURT:  There is an objection; so you can consult.

 9            MS. LUM:  Sorry, sure.

10            THE COURT:  If you can't resolve it, I'll speak with

11   you.  Thank you.

12            (Counsel conferring)

13            THE COURT:  Please move further into the corner.

14            (Counsel conferring)

15   BY MS. LUM:

16   Q.   Let me ask you a different question, Miss Coe.  From the

17   time of 2005, the KPMG review in 2005, to 2008 when it did its

18   second review, nothing had changed about the end-to-end process

19   in place at Madoff Securities; is that correct, to your

20   understanding?

21   A.   It is my understanding that nothing had changed.

22   Q.   And that end-to-end process being controlled totally by

23   Bernard Madoff was something that concerned you very much; is

24   that correct?

25            MR. ZACH:  Object to the form.

1          THE COURT:  Will you reformulate or consult?

2          MS. LUM:  Let me see if I can reformulate.

3    Q.  You testified earlier that you were concerned about the

4    fact that Bernie Madoff had total control of the process end to

5    end?

6    A.  That is correct.

7    Q.  And is it also your understanding that that remained in

8    place up until 2008?

9    A.  That is correct.

10   Q.  So is it fair to say that your concerns were -- about the

11   end-to-end process being totally under Bernie Madoff's control

12   never changed?

13   A.  It was also a risk.

14   Q.  And yet, you claim that you were completely reassured by

15   the report even though there was no independent verification of

16   what Bernie Madoff was telling KPMG; is that correct?

17         MR. ZACH:  Objection to the form.

18         THE COURT:  Sustained.

19         MS. LUM:  Okay.  Let me see if I can rephrase that.

20   Q.  Is it true that there was never any independent

21   verification of what Bernie Madoff told KPMG?

22         MR. ZACH:  Objection to the form.

23         THE COURT:  Sustained.

24   Q.  To your understanding?

25         THE COURT:  Sustained.  And if you need to consult,

 1   you can do that.

 2           MS. LUM:  Okay.  Let me move on.

 3   Q.  Isn't it true that the sample of client data that KPMG

 4   reviewed was not statistically significant?

 5           MR. ZACH:  Objection.

 6           THE COURT:  Sustained.  Ms. Lum, there were

 7   discussions before.  If you need me to go in the back room, we

 8   will.

 9           MS. LUM:  Okay.  I'll move on.

10           THE COURT:  Thank you.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   Q.  Ms. Coe, you testified earlier that you were completely

 2   reassured by the 2006 report, correct?

 3   A.  By the KPMG review, the feedback to me, yes.

 4   Q.  But in fact you weren't completely reassured, because you

 5   commissioned a second review in 2008, is that correct?

 6   A.  I commissioned a second review in 2008.  That had no

 7   bearing on the level of reassurance that I had taken from the

 8   first review.  That was mainly a matter of standard routine for

 9   any subcustodian review.

10            MS. LUM:  Thank you, Ms. Coe.  I have no other

11   questions.

12            THE COURT:  Thank you, Ms. Lum.

13            Mr. Zach, any redirect?

14            MR. ZACH:  No, your Honor.

15            THE COURT:  Thank you, Ms. Coe.  Your testimony is

16   concluded.  Safe travels.

17            (Witness excused)

18            THE COURT:  I believe we need to have a pause, is that

19   correct?

20            MR. BRESLIN:  A small pause, your Honor.

21            THE COURT:  If anyone needs to leave the room, come

22   back to your seat quickly.  Otherwise we will just stay here

23   quietly.

24    FRANK DIPASCALI, resumed.

25            THE COURT:  Good afternoon, Mr. DiPascali.  Happy New