# EXHIBIT C



## CERTIFICATE OF ACCURACY

STEVEN M. KAHANER hereby certifies as follows:

1.      I am the Executive Director of Juriscribe, a division of Marste & Co., Inc., which specializes in the translation of legal documents and other textual materials.

2.      The following pages consist of a French-language document identified to us with the file name "Conclusions Arendt Medernach 131217-2.pdf," preceded by a translation of such document into English. I affirm that such translation has been prepared by duly qualified translator(s), who has/have affirmed that such translation is, to the best of their knowledge and belief, a true and accurate translation into English of the corresponding French-language document.

Notwithstanding the foregoing affirmations, no liability is assumed for errors or omissions in the translation of the attached document.  Executed in Pelham, New York on April 4, 2015.

_Steven M. Kahaner_

Steven M. Kahaner

115 Sixth Avenue • Pelham, N.Y. 10803-1609
Phone/Fax: 646-862-0970
www.juriscribe.com

# arendt
arendt & medernach
Avocats à la Cour

*Tribunal d'Arrondissement de Luxembourg*
(Luxembourg District Court)
2nd chamber
Docket no. 125.351
Served on December 17, 2013

Case 13TC
39188/9531798v5

## PLEADINGS

**On behalf of:**

**HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.,** a corporation (*société anonyme*)  formed under Luxembourg law, established and having its head office at L-1160 Luxembourg, 16 boulevard d'Avranches, registered with the Luxembourg Trade and Companies Register under number B 25.531, represented by its current board of directors;

the defendant following service of a summons by substitute judicial officer (*huissier de justice suppléant*) Gilles Hoffmann, replacing Carlos Calvo, resident in Luxembourg, dated October 20, 2009;

appearing through Messr.  François Kremer, *avocat à la Cour* (attorney-at-law), having his office at L-2082 Luxembourg, 14 rue Erasme;

**vs.**

**ALPHA PRIME FUND LIMITED**, a company formed under Bermuda law, established and having its head office at the Bank of Bermuda Building, 6 Front Street, Hamilton HM 11, Bermuda, represented by its current directors;

appearing through Messr.  Didier Schönberger, *avocat à la Cour*, having his office at L-1142 Luxembourg, 10 rue Pierre d'Aspelt;

the plaintiff under the terms of the aforementioned summons served by judicial officer (huissier de justice) Gilles Hoffmann.

---

Considering the summons dated October 20, 2009,
Considering judgment no. 1629/10 dated October 29, 2010,
Considering the pleadings of Messr. François Kremer dated May 22, 2012,
Considering the pleadings of Messr. Didier Schönberger dated October 1, 2012,
Considering the formal notice issued pursuant to Article 311 of the New Code of Civil Procedure,

1



12/17 2013 TUE 17:35  FAX +352 40 78 04  ARENDT & MEDERNACH                    003/022

Considering the pleadings of Messr. Didier Schönberger dated December 12, 2012,
Considering the plea of forgery made to the *Tribunal d'arrondissement* of Luxembourg dated February 14, 2013 in accordance with Article 314 of the New Code of Civil Procedure,
Considering the pleadings of Messr. François Kremer dated February 14 2013,
Considering the summary pleadings of Messr. Didier Schönberger dated April 9, 2013,
Considering the pleadings of Messr. François Kremer dated May 3, 2013,
Considering judgment no. 1383/2013 dated July 5, 2013.

---

## I.    PRELIMINARY COMMENTS

1.    On October 20, 2009, the plaintiff Alpha Prime Fund Limited (referred to below as "Alpha Prime") summoned HSBC SECURITIES SERVICES (LUXEMBOURG) S.A. (referred to below as "HSSL") to appear before the Luxembourg *Tribunal d'arrondissement* (District Court) seeking an order requiring HSSL to **pay damages and interest** in the principal amount of USD 346,351,581.67, *i.e.* EUR 243,401,073.65.

2.    Alpha Prime's claim, as presented in its initial pleadings, seeks to hold HSSL liable in contract or in tort on the grounds that HSSL is liable for the loss of all of Alpha Prime's arising from the fraud carried out by Bernard Madoff, through the company Bernard L. Madoff Investment Securities LLC (BLMIS).

3.    In its most recent pleadings on the merits, served on October 1, 2012, Alpha Prime claims as follows:

*"Whereas there is a contractual relationship between the plaintiff* [Alpha Prime] *and the Bank of Bermuda Limited, by virtue of a Custodian Agreement entered into on March 12, 2003 and governed by Bermuda law;*

*That there is a contractual relationship between the defendant and the Bank of Bermuda Limited, pursuant to a Sub-Custodian Agreement entered into on March 12, 2003 and governed by Bermuda law;*

*(…)*

*That due to the simultaneity of these contracts, there are reasons to suspect that the Bank of Bermuda Limited was a mere fiction in this arrangement, and that it never intended to assume its duties as custodian in any manner whatsoever;*

*(…)*

*That accordingly, the plaintiff's assets were clearly and contractually deposited directly with HSSL, which was responsible for serving as custodian bank for the plaintiff (…) (page 3 of the pleadings dated October 1, 2012)*

2



*"the defendant* [HSSL] *must be recognized as the actual custodian bank for the assets deposited by the plaintiff from day one."* (page 5 of the pleadings dated October 1, 2012)

*"the custodian is discharged from its obligation to return assets by delivering the securities and other financial instruments"* (page 8 of the pleadings dated October 1, 2012)

4.    These arguments reveal Alpha Prime's intent to claim that HSSL was its direct custodian bank and that the Bermuda company, the Bank of Bermuda Limited, was nothing but a fiction.

5.    The Court should find that Alpha Prime's argument flagrantly contradicts its principal claim seeking damages and interest, whereas the plaintiff's summons makes no claim seeking the return of its assets, and makes no claim against The Bank of Bermuda Limited or against HSSL.

6.    We will address each and every argument set forth in the most recent pleadings on the merits served by Messr. Schönberger on October 1, 2012:

-        On the relationships among the various parties (II.)
-        On the absence of liability on the part of HSSL (III.)

7.    We will then revisit the SIPA proceedings in the United States, and the position taken by Alpha Prime in those proceedings (IV).


II.    **ON THE RELATIONSHIPS AMONG THE VARIOUS PARTIES**

    A.    **Framework of the relationship between Alpha Prime and HSSL**

        **1.        HSSL is a sub-custodian for Alpha Prime**

8.    On March 12, 2003, Alpha Prime entered into a Custodian Agreement, governed by Bermuda law, with The Bank of Bermuda Limited, a company formed under Bermuda law (**Arendt & Medernach Exhibit 1**).

9.    Pursuant to a Sub-Custodian Agreement dated March 12, 2003, the Bank of Bermuda Limited appointed HSSL as sub-custodian. This Sub-Custodian Agreement is also governed by Bermuda law (**Arendt & Medernach Exhibit 2**).

10.   HSSL was formerly Bank of Bermuda (Luxembourg) S.A., a company formed under Luxembourg law, which by operation of law became HSBC Securities Services (Luxembourg) S.A. It provides services to foreign

3



(primarily off-shore, as the bank's former name explains from a historical perspective) and Luxembourg investment funds.

11.    In the present case, HSSL is a <u>sub-custodian for Alpha Prime</u>. As discussed below, the Sub-Custodian Agreement dated March 12, 2003 does not constitute a novation and therefore does not create a direct contractual relationship between Alpha Prime and HSSL.

12.    As the opposing party notes, HSSL's role as sub-custodian for Alpha Prime is also mentioned in Alpha Prime's prospectus, entitled *Confidential Private Placement Memorandum*, which was drafted by Alpha Prime (**Arendt & Medernach Exhibit 5**, *Confidential Private Placement Memorandum*, March 2003 and **Arendt & Medernach Exhibit 6**, *Confidential Private Placement Memorandum*, August 2007).

### 2.    On the absence of legal fiction

13.    The plaintiff claims that the simultaneity of the custodian and sub-custodian agreements mentioned above creates an inference that its relationship with its custodian, The Bank of Bermuda Limited, is a legal fiction, such that its assets were <u>contractually</u> deposited <u>directly</u> with HSSL.

14.    However, the plaintiff's arguments are based on simple categorical statements, without any legal evidence or corroborating exhibits. The mere fact that the two contracts were signed on the same date is an insufficient basis to substantiate an alleged fiction.

15.    In addition, by agreeing to enter into the Custodian Agreement with The Bank of Bermuda Limited, Alpha Prime itself became part of this alleged fabrication!

16.    Moreover, a determination of legal existence and the validity of a foreign company's corporate personality is based on criteria drawn from the laws of the State in which the company was formed.[1]

17.    It is well established that The Bank of Bermuda Limited is a company formed under Bermuda law.

18.    If the opposing party intends to deny the existence of The Bank of Bermuda Limited, it must submit evidence thereof under Bermuda law, but it has not done so.

19.    Legal opinions on Bermuda law submitted in this case (**Arendt & Medernach Exhibit 7** and **Exhibit 14 in File II submitted by Messr. Schönberger**) clearly show that Bermuda law, which applies in this case, recognizes the "corporate veil" theory that allows English courts, and those in Bermuda, to "lift" this veil under certain conditions. However, the corporate veil can only be lifted in the case of fraud, or if the corporate structure is a mere façade.

---

[1] J-C Wiwinius, *Le droit international prié au Grand-Duché de Luxembourg,* 3rd edition, no. 234, page 72; TPICE, case no. T-170/94, September 25, 1997, Shangai Bicycle Corp., Rec (1997): this case involved the People's Republic of China.



20.    In the present case, no such circumstances have been established.

21.    The Bank of Bermuda Limited is one of the principal banks in Bermuda, and cannot be considered a shell company, a mere façade (**Arendt & Medernach Exhibits 8 and 9**).

22.    The abovementioned opinions also show that the corporate veil theory only applies under extraordinary circumstances. In Bermuda, there are no decisions in which the corporate veil has actually been lifted.

23.    In this case, The Bank of Bermuda Limited is a company that has always played an active role as custodian for Alpha Prime, as reflected in the e-mail submitted by Messr. Schönberger as Exhibit 5.

24.    This e-mail shows that The Bank of Bermuda <u>provided comments</u> on Alpha Prime's prospectus, entitled *Confidential Private Placement Memorandum,* which was drafted by Alpha Prime. This is common in the investment fund industry.

25.    Furthermore, there is no evidence in the case that establishes a fictitious arrangement, as alleged by the plaintiff:

-    Contrary to the plaintiff's assertions, the letter sent by HSSL to the Austrian market authorities confirming acceptance of its appointment as sub-custodian for Alpha Prime correctly shows that HSSL reported to the oversight authority as sub-custodian, and not as the custodian bank (Exhibit 7 in File II submitted by Messr. Schönberger).

-    The letter signed by ING Capital LLC, HSSL and The Bank of Bermuda Limited also clearly shows that The Bank of Bermuda Limited is the custodian for Alpha Prime, and that specifically, each month Alpha Prime was to send a copy of "BMIS monthly statements" received by Alpha Prime directly to ING. This letter was also signed by Alpha Prime, which cannot now assert that this arrangement was fictitious, an assertion categorically disputed by HSSL (Exhibit 8 in File II submitted by Messr. Schönberger).

    **3.    On the absence of a novation**

26.    With regard to HSSL's relationship with The Bank of Bermuda Limited, we deny that the Sub-Custodian Agreement it signed with The Bank of Bermuda Limited constitutes a novation. It should be noted that that this contract is governed by Bermuda law (**Arendt & Medernach Exhibit 2**).

27.    At the hearing, we submitted the declaration of Andrew Martin, Barrister and Attorney in Bermuda with the firm of MJM Limited, which confirmed that, under Bermuda law, the Sub-Custodian Agreement signed by The Bank of Bermuda and HSSL does not constitute a novation (**Arendt & Medernach Exhibit 3**).



28.    Therefore, the plaintiff mistakenly relies on Article 1275 of the Luxembourg Civil Code (on novation in the event of a "perfect" delegation) which, according to the plaintiff, would enable it to act against HSSL directly.

29.    There is no direct contractual relationship between Alpha Prime and HSSL.

**B.    On the existence of direct contractual relationships between Alpha Prime and BMIS**

1.    **Correction of Alpha Prime's presentation of the facts (on the alleged relationship between HSSL and BMIS)**

30.    Alpha Prime persists in its claim that a contractual relationship exists between HSSL and BMIS by virtue of the Sub-Custody Agreement entered into in September 2004.[2]

31.    It has already been shown that this Sub-Custody Agreement dated "September 2004" is a framework agreement, governed by Luxembourg law, which concerns a variety of investment funds identified in Appendix A.

32.    However, this "sub-custody" arrangement, subject to Luxembourg law, has never been perfected, given that Alpha Prime has never delivered securities or any other financial instruments to its custodian, The Bank of Bermuda Limited, (nor, *a fortiori*, to HSSL) and that consequently, HSSL has never made BMIS sub-custodian of any securities or other financial instruments.

33.    These circumstances are consistent with the framework advanced by Alpha Prime, since Alpha Prime appointed BMIS as its broker and its custodian of securities and other financial instruments that BMIS was to acquire on behalf of Alpha Prime, in its capacity as broker.

34.    In other words, the Sub-Custody Agreement signed by BMIS and HSSL (previously Bank of Bermuda (Luxembourg) was a potential contractual framework to deposit investment fund assets identified in Appendix A with a sub-custodian.

35.    However, this contractual framework was never implemented with respect to Alpha Prime's assets, since a custodial relationship was established directly between Alpha Prime and BMIS, a relationship established under the *Customer Agreement* (**submitted as Arendt & Medernach Exhibit 3**), the *Trading Authorization Directive* and the *Terms and Conditions for Option Hedging Transactions.*

36.    It should be noted that the Custodian Agreement entered into between The Bank of Bermuda Limited and Alpha Prime expressly states that the bank's commitments are contingent on the actual delivery of securities or other financial instruments

---

[2] This is not to be confused with the Sub-Custody Agreement entered into by The Bank of Bermuda Limited and HSSL, signed on March 12, 2003, see §** of these pleadings.



(Securities) "received by it (**Arendt & Medernach Exhibit 1**).

37.    Without the delivery of such securities by Alpha Prime to The Bank of Bermuda Limited's custody, and without any delivery of securities by the Bank of Bermuda Limited to HSSL as sub-custodian, HSSL could not have established a sub-sub-custodial arrangement with BMIS.

38.    In other words, a "sub-custodial" or ("sub-sub-custodial") arrangement subject to Luxembourg law cannot be perfected without the delivery of securities or other financial instruments, consistent with the framework advanced by Alpha Prime, which itself appointed BMIS as <u>broker and direct custodian</u> of the securities and other financial instruments that BMIS was to acquire on behalf of Alpha Prime, in its capacity as broker.

39.    Accordingly, we categorically deny the existence of a sub-custodial (or sub-sub-custodial) relationship between [the defendant] and BMIS with respect to Alpha Prime's assets.

40.    The opposing allegation, whereby HSSL, already being sub-custodian of Alpha Prime, *"would have entered into a sub-sub-custody agreement and not a sub-custodian agreement,"* is further evidence that the alleged Sub-Custody Agreement was never perfected.

41.    **The relationship is not one of a (sub-)sub-custody arrangement between HSSL and BMIS, but rather a direct custodial relationship between Alpha Prime and its broker, BMIS.**

      **2.    On the direct relationship between Alpha Prime and BMIS**

            **2.1    Alpha Prime signed a Customer (or Broker) Agreement directly with BMIS**

42.    Pursuant to a consent resolution (*resolution circulaire*) of its directors (**Arendt & Medernach Exhibit 10**), Alpha Prime opened a Trading Account with BMIS and appointed BMIS as its broker-dealer to execute transactions in the US market on behalf of Alpha Prime. BMIS was to purchase/sell securities and options. This document which opened the account, signed by Alpha Prime and BMIS, established the existence of an account relationship between Alpha Prime and BMIS.

43.    Under the terms of the Customer Agreement which opened the account, Alpha Prime (the "Customer") appointed BMIS as its broker-dealer:

*"In consideration for you (the "Broker) opening or maintaining one or more accounts (the "Customer"), the Customer agrees to the terms and conditions contained in this Agreement."* (**Arendt & Medernach Exhibit 4**)



44.    Under the terms of this contract, and pursuant to the Trading Authorization and the Option Agreement (which will be discussed below), BMIS carried out transactions on securities and options (purchase, sale, etc.) on behalf of Alpha Prime.

45.    It should be emphasized that the undersigned party has submitted only the Customer Agreement signed by Alpha Prime and BMIS in support of its pleadings **(Arendt & Medernach Exhibit 4)**. It is therefore wrong to assert that the Customer Agreement submitted in this case by [the defendant] is "superimposed" onto the one submitted by Messr. Schönberger (the document submitted by Messr. Schönberger is not the Customer Agreement concerning Alpha Prime, but rather concerns another investment fund).

46.    There cannot be two depositor "Customers" for the same assets.

47.    HSSL is not party to the Customer Agreement, under which the broker-dealer BMIS acts on behalf of its client, the Customer, Alpha Prime (Article 7 of the Customer Agreement). By signing the Customer Agreement, Alpha Prime requested that the broker open an account for it on its books (preamble to the Customer Agreement). Thus, it is the client – Alpha Prime – that has the right to ask the broker to return the assets recorded on its books (Article 5 of the Customer Agreement). HSSL plays no role in this contractual relationship.

48.    Moreover, it should be emphasized that under U.S. law, a broker-dealer may also act as custodian of securities.

49.    Courts in the United States have noted that BMIS was acting as a broker-dealer and was also a stockbroker registered with the U.S. Securities and Exchange Commission ("SEC") (*see*, for example, Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities, LLC, --- B.R. ---, 2012 WL 1505349, *3 (S.D. N.Y., April 30, 2012) concluding that BMIS was a "stockbroker" within the meaning of the United States Bankruptcy Code).

50.    Under U.S. law, securities brokers often provide custodial services for their customers.

51.    In general, U.S. laws require that securities brokers hold their customers' assets, given the credit that securities brokers grant to or on behalf of their customers (including for customers engaged in short selling of stocks or who take short positions on options). In the current case, BMIS had to hold the assets directly deposited by Alpha Prime, not only so it could carry out trades, but also to secure its own claims against Alpha Prime that might result from trades made on its behalf. For this reason, an arrangement where HSSL served as (sub-)sub-custodian of Alpha Prime's assets would not be acceptable to BMIS, since the assets held under sub-custody would not have served as security for BMIS' customer/debtor (Alpha Prime), since BMIS would have had an obligation toward HSSL with regard to its obligation to return assets.

52.    Finally, the main objective of the SIPA proceedings, in which BMIS was placed into liquidation, is to protect customers who authorized their broker to hold their cash and securities. *See*, for example, Rosenman Family, LLC v.



Picard, 395 Fed. App'x. 766, 758-69 (2nd Cir. 2010). SIPA grants priority status to customers of a broker or dealer in default who are typically persons having "*a claim on account of securities received, acquired, or held by the [broker-dealer] in the ordinary course of its business as broker or dealer from or for the securities accounts of such person[.]*" 15 U.S.C. §78lll(2)(A). During a liquidation under SIPA, customers receive distributions from the broker's "customer property" ("*cash and securities… at any time received, acquired, or held by or for the account of a [broker-dealer] from or for the securities accounts of a customer*," 15 U.S.C. 78lll(4)), and have the right to receive a maximum of USD 500,000 of funds advanced by SPIC [*sic*] to the extent the customer property does not cover the customer's net equity claim, given the property entrusted to the broker-dealer in liquidation. 15 U.S.C. §§ 78fff-3, 78lll(2)(A).

53.   The paragraphs above confirm HSSL's showing that <u>there was a direct custodial relationship between BMIS and Alpha Prime.</u>

54.   It should again be emphasized that neither Bernard Madoff nor BMIS were chosen or recommended by HSSL. Alpha Prime chose BMIS, as evidenced by the consent resolution of Alpha Prime's directors (**Arendt & Medernach Exhibit 10**).

55.   As more thoroughly discussed below, Alpha Prime also signed contracts directly with BMIS, which were required for BMIS to execute transactions on securities and options, thus establishing a direct relationship:

-        an *Option Agreement*,

-        a *Trading authorization limited to purchases and sales of securities and options*.

### 2.2    Alpha Prime signed the Option Agreement with BMIS

56.   The only Option Agreement entered into with BMIS that concerned the opening of an account to manage Alpha Prime's assets was signed by Alpha Prime (by Mme. Ursula Fano-Lesczynski, one of Alpha Prime's directors) directly with BMIS (**Arendt & Medernach Exhibit 11**).

57.   The Option Agreement provides as follows ("I" refers to Alpha Prime, and "you" to BMIS):

*"OPTION AGREEMENT*

*in order to induce you to carry accounts ("Option Accounts") for me (however designated) for transactions in option contracts (including, without limitations, purchase, sale, transfer, exercise and endorsement) ("Option Transaction"), I hereby warrant, represent and agree with you as set forth below on this Option Agreement.*

*1.        I understand, and am well aware, that option trading may be highly speculative in nature. I am also aware that on certain days, option trading may cease and this could*



*result in a financial loss to me. I agree to hold the company, its other divisions, and its officers, directors and agents harmless for such loss.*

*2.       [...]*

*3.       If I do not satisfy my transaction obligations on a timely basis, you are authorized in your sole discretion and without notification, to take any and all steps you deem necessary to protect yourself (for any reason) in connection with option transactions for my account including the right to buy and/or sell for my account and risk any part or all the shares represented by options handled, purchased, sold for my account, or to buy for my account and risk any option as you may deem necessary or appropriate. Any and all expenses or losses incurred in this connection will be reimbursed by me.*

*4.       [...]*

*5.       This agreement shall apply to all puts or call which you may have executed, purchased, sold or handled for any account of mine and also shall apply' to all puts, or calls which you may hereafter purchase, sail, handle or execute for any account of mine.*

*6.       [...]*

*Dated [...]*
*Alpha Prime Fund Limited*
*Ursula Fano-Lesczynski*
*Director"*

### 2.3    Alpha Primed signed the *Trading Authorization* with BMIS

58.    Alpha Prime signed the *Trading Authorization limited to purchases and sales of securities and options* with BMIS.

59.    The only Trading Authorization entered into with BMIS that concerned the opening of an account to manage Alpha Prime's assets was signed by Alpha Prime (by Mme. Ursula Fano-Lesczynski, one of Alpha Prime's directors) directly with BMIS (**Arendt & Medernach Exhibit 12**).

60.    This Trading Authorization provides:

*"TRADING AUTHORIZATION LIMITED TO PURCHASES AND SALES OF SECURITIES AND OPTIONS*

*The undersigned hereby authorizes Bernard L. Madoff (whose signature appears below) as his agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities In accordance with your terms and conditions for the undersigned's account and risk and in the undersigned's name, or number on your books. [ ...]"*

61.    In view of these provisions, BMIS had to use the cash received to execute trades in stocks, bonds and options,



including purchases and sales *("including, without limitations, purchase, sale, transfer exercise and endorsement", "buy, sell and trade").*

62.    These contractual arrangements between Alpha Prime and the broker therefore provided that BMIS had the right to use and have available the cash transferred by HSSL on Alpha Prime's instructions for the purpose of buying or selling securities and derivatives.

63.    To conduct its business and engage in the trading of securities in its capacity as broker, BMIS asked that its customers' assets (cash and securities) be held in their BMIS accounts. The legal relationship between Alpha Prime and BMIS clearly included a depositor/custodian relationship.

### 2.4    On the exhibits produced by Alpha Prime

64.    Plaintiff claims that the "Trading Authorization Directive," the "Terms and Conditions for Option Hedging Transactions" and the "Customer Agreement" included in its Exhibit 3 are appendices to the Sub-Custody Agreement entered into between Bank of Bermuda (Luxembourg) S.A., now HSSL, and BMIS during September 2004.

65.    This sweeping statement is inaccurate and is categorically denied by [the defendant].

66.    In its judgement no. 1383/2013 dated July 5, 2013, the Court rightly held that "no evidence submitted to the court currently supports a finding that the 4 documents are related, even if they are filed as a single exhibit."

67.    There is no mention of these alleged appendices in the body of the Sub-Custody Agreement, which refers only to an Appendix "A" in the "Whereas" clauses. The abovementioned documents simply appear to have been arbitrarily added to the Sub-Custody Agreement (even if only inadvertently).

68.    With regard to its possession of these exhibits, the plaintiff asserts that these exhibits were sent to it directly by [the defendant] "in this condition".

69.    It is up to the plaintiff to prove its allegations, and more generally, that it possesses these exhibits lawfully, which is in dispute (the documents belong to another of [the defendant's] customers), given that no exhibit corroborates the plaintiff's statements. Indeed, when there is a dispute concerning the legality of possession, the party intending to produce the exhibit must prove that it has lawful possession (R. Mougenot, *La Preuve*, Larcier 1990, p. 147).

70.    Indeed, we do not see what interest HSSL would have in providing its customer with a redacted (and therefore anonymous) document that does not concern it. If the documents in question concerned Alpha Prime, they would not be redacted. There are no circumstances or exhibits that support the plaintiff's allegations.



71.    Accordingly, we ask that these exhibits be rejected, since there is no evidence of their lawful possession.

72.    In any case, no force or credit should be given to redacted exhibits which, we reiterate, do not concern Alpha Prime.

73.    In addition, we have filed the original Sub-Custody Agreement with the clerk of the Luxembourg *Tribunal d'arrondissement, 2nd chamber,* so the adverse party and the Court may review it.

### 3.    On the engagement letters and reports prepared by KPMG

74.    In its pleadings served on October 1, 2012, the plaintiff again referred to two engagement letters and activity reports prepared by KPMG which, according to the plaintiff, showed that the master Sub-Custody Agreement signed in 2004 by the Bank of Bermuda (Luxembourg) SA and BMIS had actually been implemented with regard to Alpha Prime's funds. This is not the case.

75.    The engagement letters as well as the reports prepared by KPMG are documents prepared by a non-party to this case (KPMG), at the request of HSBC Bank plc, which is also a non-party to this case, as part of oversight carried out for HSBC Group of correspondents and sub-custodians with which the group's entities had contact.

76.    While these engagement letters do not mention Alpha Prime, it is equally clear from the language used, as cited by the plaintiff, that HSBC's ability as custodian to invest in BMIS funds in no way concerned all HSBC customers: "*you wish us to assist you in identifying the fraud risks that may arise as a result of HSBC, acting as custodian, placing the funds of up to eight HSBC clients for investment with Madoff in New York.*"

77.    Moreover, the reports prepared by KPMG concern the investment funds listed in Appendix A to the Sub-Custody Agreement which – as was just noted – creates a potential contractual framework for the assets in the investment funds identified in Appendix A, but which was never implemented.

78.    The mere fact that BMIS was named "Sub-Custodian" in the reports prepared by KPMG, or that HSSL employees mentioned BMIS as a "sub-custodian" has no legal consequence with regard to the precise legal classification of the relationships among HSSL, Alpha Prime and BMIS.

79.    In fact, BMIS was not the (sub-)sub-custodian of HSSL, but was a direct custodian for Alpha Prime.



### III.    ON HSSL'S LACK OF LIABILITY

80.    The opposing party's arguments repeatedly cite the old Law of December 20, 2002 on undertakings for collective investment (*loi du 20 décembre 2002 concernant les organismes de placement collectif*) (hereinafter, the "Law of December 20, 2002").

81.    Before examining the unfounded nature of the claim formulated by Alpha Prime, which aims to render HSSL liable in contract, if not in tort, it is first necessary to recall which law is the applicable law in this case.

### A.    Preliminary Remarks on Applicable Law

82.    Both the Custodian Agreement entered into by Alpha Prime and The Bank of Bermuda Limited, and the Sub-custodian Agreement entered into by The Bank of Bermuda Limited and HSSL, <u>are governed by the law of Bermuda</u> (**Arendt & Medernach Exhibits 1 and 2**).

83.    The plaintiff claims the defendant is liable primarily on the basis of the Law of December 20, 2002.

84.    Alpha Prime, however, is neither a Luxembourg undertaking for collective investment ("UCI"), nor a foreign company that would be authorized by the Financial Sector Supervisory Commission (*Commission de Surveillance du Secteur Financier*) to publicly offer its shares for sale in the territory of Luxembourg.  Therefore, it cannot be subject to the Law of December 2002.

85.    Moreover, the provisions of Sections 17 and 18, cited by the plaintiff, are found in the part one of the Law of December 20, 2002, which solely concerns Luxembourg undertakings for collective investment in transferable securities.

86.    Article 2 (1) of the Law of December 20, 2002 also states that "this section applies to all UCITS located in Luxembourg"; a "UCITS" (*OPCVM*) is, moreover, defined under Article 1(22) as "an undertaking for collective investment in transferable securities subject to Directive No. 85/611/EEC."

87.    It is indisputable that Alpha Prime is not a UCITS.  It is also clear that Alpha Prime's registered office is not in Luxembourg, but in Bermuda.  Therefore, Part I of the Law of December 20, 2002 does not apply to it.

88.    Accordingly, the opposing party's claim, which purports to be based on the provisions of the Law of December 20, 2002, must be dismissed.

89.    The rights and obligations incumbent upon a custodian (or sub-custodian), as described by the Law of December 20, 2002, do not apply to HSSL in its relationship with Alpha Prime or with The Bank of Bermuda Limited.



**B.      On HSSL's Lack of Liability in Contract**

90.    In its document instituting the proceeding, served on October 1, 2012, the plaintiff claimed that HSSL had to "*be recognized as the effective custodian bank for the assets entrusted by the plaintiff, and that this was so from day one.*"

91.    It is noted, first, that the defendant was neither a party to the contractual relationship established by the Custodian Agreement, nor to the one established by the Customer Agreement, and therefore the defendant cannot be found liable in contract.

**1.      Absence of Novation**

92.    In its document instituting proceedings, the plaintiff sought to rely on Article 1275 of the Luxembourg Civil Code on novation in the event of perfect delegation (*délégation parfaite*, or tripartite transfer/assignment and assumption) which would, according to the plaintiff, permit it to take direct action against HSSL.

93.    However, on March 12, 2003, Alpha Prime entered into a Custodian Agreement with The Bank of Bermuda Limited, which is governed, according to the terms of Article 27 thereof, by the law of Bermuda (**Arendt & Medernach Exhibit 1**).

94.    Moreover, the Sub-Custodian Agreement, entered into on March 12, 2003 by The Bank of Bermuda Limited and HSSL, is also governed by the law of Bermuda (**Arendt & Medernach Exhibit 2**).

95.    There is no reason that the relationships between Alpha Prime and its custodian, The Bank of Bermuda Limited, or its sub-custodian, HSSL, would be governed by the law of Luxembourg.

96.    Consequently, [we] have submitted for the record the expert statement of Andrew Martin, which confirms that, according to the law of Bermuda, the Sub-Custodian Agreement entered into by The Bank of Bermuda Limited and HSSL does not result in novation. (**Arendt & Medernach Exhibit No. 3**).

97.    It specifically ensues from this opinion that Clause 5, which the opposing party cited in its pleadings served on October 1, 2012, does not bring about novation:

*"11. Under clause 5 of the Sub-Custodian Agreement, BOB as the custodian retains control of the sub-custodian HSSL:*

*In the performance of the duties, obligations and functions delegated to it hereunder, the Sub-Custodian shall at all times be subject to the control of and review by the Bank and shall in all respects observe and comply with (a) the Bye-laws, (b) the provisions of the (Custodian) Agreement (as if all references therein to the Bank were references to the Sub-Custodian) and (c) all orders, directions and regulations of the Bank..."*

*12. The retention of control by BOB supports the fact that liabilities and benefits were not effectively transferred to HSSL and that accordingly there was no novation to HSSL in the Sub-*

14



*Custodian Agreement.*

*Alpha Prime was not a party to the Sub-Custodian Agreement and did not provide its consent to a novation. The directors of Alpha Prime merely consented to the delegation of duties in the recital to the Sub-Custodian Agreement. Delegation of duties does not amount to a novation."*

98.    Otherwise, [we] also refer to Paragraphs 26 to 29 of our arguments, above.


### 2.   Absence of "Implied Contract" under Bermuda Law


99.    The plaintiff submitted to the proceedings the statement of Rod S. Attride-Stirling of the firm Attride-Stirling & Woloniecki ("ASW") (Exhibit No. 14 of Messr. Schönberger's File II), which analyzes, among other things, whether the relationship between Alpha Prime and HSSL could create an implied contract under Bermuda law.

100.   While this statement affirms that such legal formation is certainly possible under Bermuda law, its author nevertheless recognizes that it would be difficult to persuade the judge that it exists in the context of a principal-sub-agent relationship (item 19, page 6 of the ASW statement).  The author further recognizes that he does not possess the facts that would allow him to analyze whether such an "implied contract" would exist under the circumstances of this case.

101.   The statement of Andrew Martin, Barrister and Attorney in Bermuda with the firm MJM Limited (**Arendt & Medernach Exhibit No. 7**) shares this opinion: in principle, Bermuda courts respect the principle of the privity of contracts.  When parties have decided to set down their rights and obligations in a written contract, courts and tribunals do not interfere in their relationship and respect the contractual commitments that were made.  It is, moreover, highly improbable that the courts in Bermuda would step back from traditional theories.

102.   In this particular case, the plaintiff has alleged no fact of the sort that would establish the reasons based on which the Bermuda courts could decide otherwise in this situation.


### 3.   Absence of Fictitious Arrangement


103.   In this respect, [we] refer to paragraphs 13 to 25 of the arguments, above, which show the unfounded nature of this allegation.


### 4.   On Article 6 of the Custodian Agreement


104.   The arguments in this Sub-section 4 are made independently from those preceding it on the absence of novation and the absence of fictitious nature of the "arrangement" criticized by the plaintiff.

15



105.    It should be noted that the plaintiff is attempting to establish liability of HSSL based on Article 6 of the Custodian Agreement entered into by Alpha Prime and The Bank of Bermuda Limited.

106.    This Article 6 sets forth:

> *"(A)    Except as provided in sub-clause (B) hereof, the Custodian shall record and hold in a separate account in its books all Securities **received by it or to its order** from time to time in respect of each Sub-Fund and shall arrange tor all Securities to be deposited in the Custodian's vault or otherwise held by or to the order of the Custodian as It may think proper for the purpose of providing for the safekeeping thereof. Any expenses of whatever nature incurred by the Custodian in providing safe custody (other than in vault of the Custodian) or in the settlement of Securities transactions or the collection of dividends, interest or any other rights attaching to such Securities shall be payable by the Company or the relevant Sub-Fund.*

> *(B)    The Custodian shall upon receipt of Proper Instructions, open accounts with brokers, money managers or other intermediaries in its name on behalf of the Company or any Sub-Fund or in the name of the Company or the relevant Sub-Fund and may make such arrangements concerning the trading authorisations and other forms of authority with respect to such account or accounts as it deems advisable. The Custodian shall not be responsible for the safekeeping of Securities or cash deposited with or remaining in any such account or accounts and will not be liable for any loss occasioned by reason of the liquidation, bankruptcy or insolvency of such broker, money manager or other intermediary."*

107.    However, Alpha Prime never deposited securities for safe-keeping with The Bank of Bermuda, <u>or with HSSL</u>.  Only cash subscriptions from investors were received by the sub-custodian for the purpose of release and deposit on the instructions of Alpha Prime to BMIS.

108.    Consequently, contrary to the plaintiff's declarations, there could have been no deposit with the Bank of Bermuda Limited, nor a sub-deposit with HSSL, nor a sub-sub deposit with BMIS.

109.    No one can contest the common sense rule whereby one can only return that of which one has custody.

110.    Alpha Prime decided to have its American broker, BMIS, hold a portion of its assets, and the assets (cash only, as it happens) which were transferred by the sub-custodian HSSL to the broker BMIS, as instructed by Alpha Prime or its manager, do not form the basis of an obligation to repay borne by The Bank of Bermuda Limited (nor *a fortiori* by HSSL).

111.    In particular, the securities deposited with the third party BMIS do not form the basis of an obligation to repay borne by The Bank of Bermuda Limited.

112.    The custodian Bank of Bermuda Limited (nor *a fortiori* HSSL!) thus cannot be found liable in contract based on an alleged failure to safe-keep assets, the custody of which neither The Bank of Bermuda Limited nor HSSL had received!



113. It is also clear that Alpha Prime never instructed The Bank of Bermuda Limited, nor *a fortiori* HSSL, to open an account with BMIS (rather, Alpha Prime itself opened this account).

114. And even if, by virtue of the afore-cited contractual provisions, The Bank of Bermuda Limited or HSSL had opened, at Alpha Prime's request, an account with a broker, the custodian (as well as the sub-custodian) would be contractually released from any liability upon a failure of the broker entrusted with safekeeping Alpha Prime's assets (Article 6 (B) of the Custodian Agreement). This clause is justified by the fact that the custodian, in this scenario, is not required to take on the risk of safekeeping, and may not be rendered liable for a third party that it did not select.

115. In the present case, the situation again differs from this scenario.

116. It was actually the plaintiff, Alpha Prime, on its own initiative, which decided to use a broker and selected BMIS, as demonstrated by the consent resolution of Alpha Prime's directors deciding to open an account with BMIS (**Arendt & Medernach Exhibit 10**).

117. There is more: it was Alpha Prime that chose and agreed with the broker on their contractual relationships. In fact, it should not be forgotten that the Customer Agreement with BMIS and the transaction/trading agreements (Option Agreement and Trading Authorization for Sales and Purchases) were signed by Alpha Prime, and not by HSSL.

118. In view of these facts, The Bank of Bermuda Limited and – *a fortiori* – HSSL, cannot have committed a wrongdoing that might render them liable.

### C.    On HSSL's Lack of Liability in Tort

119. In this regard, the opposing party's reasoning proves difficult to comprehend.

120. In the pleadings it served on October 1, 2012, the plaintiff stated the ground of HSSL's alleged liability in tort as follows:

    *"Whereas if the defendant cannot be found to have contractual liability, which is not the case here, the defendant was nonetheless bound to safe-keep and return the assets that had been entrusted to its custody by the plaintiff."*

121. Yet, as demonstrated above, HSSL did not have custody of the assets that the plaintiff had placed into BMIS's hands, therefore HSSL had no obligation to safe-keep nor return these assets.

122. Moreover, any tort action brought by a third party, such as Alpha Prime, based on tasks performed by HSSL as service provider for the The Bank of Bermuda, should be declared inadmissible.

123. In this case, HSSL is actually the sub-custodian of The Bank of Bermuda Limited, with which it is contractually bound by a Sub-Custodian Agreement. Alpha Prime is



a non-party to this Sub-Custodian Agreement.  Therefore, only The Bank of Bermuda Limited would be entitled by law to take action against HSSL for any contractual breach, unless the third party (Alpha Prime) could demonstrate the occurrence of wrongdoing other than the purported contractual breach, as well as damages other than those resulting solely from the purported improper performance of the contract.

124.    The defendant, for this purpose, requested an opinion on the subject from Andrew Martin, Barrister and Attorney in Bermuda with the firm MJM Limited.

125.    After having read the statement by Rod S. Attride-Stirling of the firm Attride-Stirling & Woloniecki ("ASW"), submitted by Alpha Prime (Exhibit 14 of Messr. Schönberger's File II), and based on an analysis of Bermuda case law, Andrew Martin concluded that there is no action in tort in the present case:

*"In relation to the points raised by the ASW Declaration:*

*(1)    There is in the present case no room for the application of the principle that a liability in tort may arise where a contractual obligation also exists because:*

*(a)    The House of Lords authority relied upon is not binding on the courts in Bermuda;*

*(b)    The Privy Council, whose decisions are binding on the court in Bermuda, has made a contrary determination of the same point, which has been followed by the Court of Appeal in Bermuda, and which would be binding on any court in Bermuda or on appeal at first instance; and*

*(c)    The extent of any duty in tort could not, in any event, exceed the ambit of the contractual party.*

*(2)    There is no room for the application of the principles referred to in the ASW Declaration with respect to the lifting or piercing of the corporate veil in the absence of any allegation of improbity or fraud on the part of BOB, HSSL or Alpha Prime.*

*(3)    There is no room for the application of general principles of "implied" contract referred to in the ASW Declaration because the Bermuda court will not imply a contract between parties where the parties have themselves set out their respective obligations in specific contracts which are intended to govern their relationships."*

(**Arendt & Medernach Exhibit 7**)

126.    It ensues from this statement that Bermuda courts are not bound by the decisions of the House of Lords.  They are, on the other hand, bound by decisions of the Court of Appeal in Bermuda and the Privy Council in London.

127.    However, these courts apply the principle under which <u>a party may not be rendered liable in tort from the time the scope of that party's obligations have been defined by contract.</u>



128.  There is no choice but to find that Andrew Martin's statement contradicts Rod Attride-Stirling's opinion, which for its part is based on a decision by the House of Lords (Henderson v. Merritt), which, however does not bind Bermuda courts.  As set forth in Andrew Martin's statement, the Bermuda courts rightly adopted a different position on the question and did not allow an action in tort by the principal against the sub-agent, although an action in contract by the principal against the agent is conceivable.

129.  Moreover, even if Luxembourg law were deemed applicable, which on this issue follows the case law of the Belgian *Cour de cassation* (highest appellate-level court of Belgium), set forth in the "de l'*Arrimeur*" decision of December 7, 1973, the fact remains that a contractual relationship would prevent any tort action from being brought by a third contracting party against the executing agent.

130.  Thus, an action by a non-party, such as Alpha Prime, against HSSL, The Bank of Bermuda Limited's executing agent, is inconceivable unless wrongdoing and damages unrelated to breach of contract can be proven.

131.  Alpha Prime has failed to take legal action against its only co-contracting party, The Bank of Bermuda Limited.

132.  Based on the foregoing, HSSL, which performed certain contractual obligations of Alpha Prima and/or Bank of Bermuda Limited, cannot be deemed liable, either in contract or in tort.  The action brought by Alpha Prime should, consequently, be declared inadmissible, if not unfounded.

## IV.  U.S. SIPA PROCEEDING AND THE POSITION TAKEN BY ALPHA PRIME IN THE CONTEXT OF THIS PROCEEDING

133.  There is no choice but to find that the plaintiff has yet to demonstrate whether or not it has asked BMIS, in liquidation, to return its assets (securities and financial instruments).

134.  Consequently, there are grounds for ordering the plaintiff to state whether it has submitted a claim (Customer Claim) in the context of the BMIS liquidation (U.S. SIPA proceeding) and, if so, to produce a copy of that Customer Claim in this proceeding, as well as disclose the decision made by the Trustee in the BMIS liquidation regarding this Claim.

135.  On this point, it is recalled that on December 15, 2008, the United States District Court for the Southern District of New York granted an application by the Securities Investor Protection Corporation ("SIPC") to bring legal proceedings ("SIPA proceeding") against BMIS under the Securities Investor Protection Act of 1970, as amended ("SIPA"), and appointed a trustee for the BMIS liquidation. The liquidation proceeding is currently taking place before the U.S. Bankruptcy Court for the Southern District of New York, according to the SIPA rules and the provisions of the U.S. Bankruptcy Code, to the extent that they are compatible with those of SIPA.



136.    Irving H. Picard, the trustee for the BMIS liquidation (hereinafter, the "Trustee"), is responsible for processing the claims of BMIS Customers by recovering and distributing a maximum of Customer Property to the Customers who filed claims in the SIPA proceeding.

137.    The Customer Claim form indicates that Customers may make (1) a claim for cash ("claim for money balances") held by BMIS as of December 11, 2008, and/or (2) a claim relating to securities ("claim for securities") held by BMIS as of December 11, 2008 (**Arendt & Medernach Exhibit 13**).

138.    Consequently, Alpha Prime cannot claim damages and interest, as the alleged loss is not certain and still cannot be proven as of this day.

139.    Even assuming that Alpha Prime were able to fulfill its obligations to the Trustee, it is far from certain that Alpha Prime will recover all of its net loss from its broker, BMIS.


**NOW THEREFORE**


on these grounds and on any others that may be put forward or added, even *sua sponte*, and reserving the right to supplement, change, or amend these pleadings during the course of the proceedings and as appropriate, Messr. François Kremer, on behalf of his client,


**RESPECTFULLY ASKS THE COURT TO**


Authorize [the defendant] to file with the clerk of the Luxembourg District Court (*Tribunal d'arrondissement de Luxembourg*), Second Chamber, the original Sub-Custody Agreement entered into by HSSL and BMIS in September 2004, in time for the opposing party and the Court to read it;

Order the plaintiff to produce for these proceedings a complete version, un-redacted, of the documents "Trading Authorization Directive" and "Terms and Conditions for Option Hedging Transactions," submitted in support of its claim;

Order the plaintiff to state whether it has submitted a claim (Customer Claim) in the BMIS liquidation proceeding (SIPA proceeding) and, if applicable, to produce a copy of that Customer Claim in these proceedings, as well as disclose the decision made by the Trustee in the BMIS liquidation regarding the claim;

Declare all of the plaintiff's claims inadmissible, if not unfounded;

20



Order the plaintiff to pay all court fees and costs, and order it to repay the *avocat à la cour* submitting these pleadings for costs he affirms that he advanced;

Reserve all other rights of action and remedies to the client of Messr. François Kremer.

Original

[Signature]

François Kremer

Copy served, without prejudice, on Messr. Didier Schönberger, *avocat à la cour*, who dated and countersigned it to indicate receipt of the copy, in Luxembourg, on December 17, 2013.

[Signature]

_____

Didier Schönberger

39188/9531798v5

(return to fax 407878-653)





arendt
arendt & medernach
Avocats à la Cour

Tribunal d'Arrondissement de Luxembourg
II<sup>ème</sup> chambre
Rôle n° 125.351
Notifiées le 17 décembre 2013

Case 13TC
39188/9531798v5

<u>**CONCLUSIONS**</u>

<u>**Pour :**</u>

**HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.**, société anonyme de droit luxembourgeois, établie et ayant son siège social à L-1160 Luxembourg, 16 boulevard d'Avranches, inscrite au registre de commerce et des sociétés de Luxembourg sous le numéro B 25.531, représentée par son conseil d'administration actuellement en fonctions ;

partie défenderesse aux fins d'un exploit de l'huissier de justice suppléant Gilles Hoffmann, en remplacement de Carlos Calvo, demeurant à Luxembourg, en date du 20 octobre 2009 ;

comparant par Maître François Kremer, avocat à la Cour, ayant son étude à L-2082 Luxembourg, 14, rue Erasme ;

<u>**Contre :**</u>

**ALPHA PRIME FUND LIMITED**, une société de droit des Bermudes, établie et ayant son siège social à Bank of Bermuda Building, 6 Front Street, Hamilton HM 11, Bermuda, représentée par ses *directors* actuellement en fonctions ;

comparant par Maître Didier Schönberger, avocat à la Cour, ayant son étude à L-1142 Luxembourg, 10, rue Pierre d'Aspelt ;

partie demanderesse aux termes du prédit exploit de l'huissier Gilles Hoffmann.

---

Revu l'assignation du 20 octobre 2009,
Revu le jugement n°1629/10 du 29 octobre 2010,
Revu les conclusions de Maître François Kremer du 22 mai 2012,
Revu les conclusions de Maître Didier Schönberger du 1<sup>er</sup> octobre 2012,
Revu la sommation signifiée en application de l'article 311 du Nouveau Code de Procédure Civile,

1


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co.

Revu les conclusions de Maître Didier Schönberger du 12 décembre 2012,

Revu l'inscription en faux faite au greffe du Tribunal d'arrondissement de et à Luxembourg le 14 février 2013 en application de l'article 314 du Nouveau Code de procédure civile,

Revu les conclusions de Maître François Kremer du 14 février 2013,

Revu les conclusions récapitulatives de Maître Didier Schönberger du 9 avril 2013,

Revu les conclusions de Maître François Kremer du 3 mai 2013,

Revu le jugement n° 1383/2013 du 5 juillet 2013.

---

## I.    **REMARQUES PRÉLIMINAIRES**

1.   Le 20 octobre 2009, la partie demanderesse Alpha Prime Fund Limited (ci-après « Alpha Prime ») a assigné HSBC SECURITIES SERVICES (LUXEMBOURG) S.A. (ci-après « HSSL ») devant le Tribunal d'arrondissement de Luxembourg, en vue notamment de voir condamner HSSL au paiement de dommages et intérêts pour le montant principal de 346.351.581,67 USD, soit 243.401.073,65 EUR.

2.   La demande d'Alpha Prime, telle que présentée dans l'acte introductif d'instance tend à voir engager la responsabilité contractuelle, sinon délictuelle, de HSSL, au motif que HSSL serait responsable de la perte de l'intégralité des avoirs d'Alpha Prime dans le contexte de la fraude commise par Bernard Madoff, par le biais de sa société Bernard L. Madoff Investment Securities LLC (BLMIS).

3.   Dans ses dernières conclusions au fond, notifiées en date du 1er octobre 2012, Alpha Prime prétend que :

> « Attendu qu'il existe une relation contractuelle entre la demanderesse [Alpha Prime] et la Bank of Bermuda Limited, en vertu d'un contrat de dépositaire (Custodian Agreement) conclu le 12 mars 2003 et régi par le droit des Bermudes ;
>
> Qu'il existe une relation contractuelle entre la défenderesse et la Bank of Bermuda Limited, en vertu d'un contrat de sous-dépositaire (Sub-custodian Agreement) conclu le 12 mars 2003 et régi par le droit des Bermudes ;
>
> (…)
>
> Que du fait de la concomitance desdits contrats, il y a dès lors lieu de suspecter que Bank of Bermuda Limited ne fut qu'une fiction dans ce montage et qu'il n'a jamais été prévu qu'elle assume de quelque manière que ce soit ses obligations de dépositaire ;
>
> (…)
>
> Que les avoirs de la demanderesse étaient donc clairement et contractuellement déposés directement auprès de HSSL, à charge pour elle d'assurer les missions de banque dépositaire pour la demanderesse (…) » (page 3 des conclusions de 1er octobre 2012)

2



JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

« *la défenderesse [HSSL] ne peut qu'être reconnue comme la banque dépositaire effective des avoirs confiés par la demanderesse et ce dès le premier jour.* » (page 5 des conclusions du 1er octobre 2012)

« *le dépositaire se libère valablement de son obligation de restitution en livrant les titres et autres instruments financiers.* » (page 6 des conclusions du 1er octobre 2012)

4.   Il ressort ainsi de ces développements qu'Alpha Prime entend plaider qu'HSSL serait directement sa banque dépositaire et que la société de droit des Bermudes, The Bank of Bermuda Limited, n'aurait été qu'une fiction.

5.   Le Tribunal pourra constater que l'argumentation d'Alpha Prime s'avère en contradiction flagrante avec sa demande principale tendant au paiement de dommages et intérêts, alors que la partie demanderesse ne formule dans son assignation aucune demande tendant à la restitution de ses avoirs, ni à l'encontre de The Bank of Bermuda Limited, ni à l'encontre d'HSSL.

6.   La partie concluante répondra point par point dans les développements qui suivent aux dernières conclusions sur le fond notifiées par Maître Schönberger en date du 1er octobre 2012 :

-   Sur les relations entre les différents intervenants (II.)
-   Sur l'absence de responsabilité de HSSL (III.)

7.   La partie concluante reviendra par ailleurs sur la procédure américaine de SIPA et sur la position prise par Alpha Prime dans le cadre de cette procédure (IV.).


II.   **SUR LES RELATIONS ENTRE LES DIFFERENTS INTERVENANTS**

A.   **Le cadre relationnel entre Alpha Prime et HSSL**

1.   **HSSL est un sous-dépositaire d'Alpha Prime**

8.   Alpha Prime a conclu le 12 mars 2003 avec la société de droit des Bermudes The Bank of Bermuda Limited un contrat de dépôt, *Custodian Agreement*, régi par la loi des Bermudes (pièce n°1 Arendt & Medernach).

9.   The Bank of Bermuda Limited a, suivant un contrat de sous-dépôt du 12 mars 2003, *Sub-custodian Agreement*, nommé HSSL comme sous-dépositaire. Ce contrat de sous-dépôt est également régi par la loi des Bermudes (pièce n°2 **Arendt & Medernach**).

10.   HSSL est l'ancienne Bank of Bermuda (Luxembourg) S.A., société de droit luxembourgeois, devenue par opération de droit HSBC Securities Services (Luxembourg) S.A. Ses activités consistent en la prestation de services pour des fonds

3



d'investissements étrangers (principalement off-shore, comme l'ancien nom de la banque l'explique d'un point de vue historique) ou luxembourgeois.

11. En l'espèce, HSSL est un <u>sous-dépositaire d'Alpha Prime</u>. Nous verrons ci-après que le contrat de sous-dépôt du 12 mars 2003 n'emporte pas novation et ne crée donc pas de relation contractuelle directe entre Alpha Prime et HSSL.

12. Comme le relève la partie adverse, le fait qu'HSSL soit un sous-dépositaire d'Alpha Prime est également mentionné dans le document d'émission d'Alpha Prime, document intitulé *Confidential Private Placement Memorandum*, qui est établi par Alpha Prime (**pièce n°5 Arendt & Medernach**, *Confidential Private Placement Memorandum*, March 2003 et **pièce n°6 Arendt & Medernach**, *Confidential Private Placement Memorandum*, August 2007).

### 2.  Sur l'absence de fiction juridique

13. La partie demanderesse prétend déduire de la concomitance des contrats de dépôt et de sous-dépôt susmentionnés que ses relations avec son dépositaire, The Bank of Bermuda Limited, relèveraient d'une fiction juridique, de sorte que ses avoirs auraient été <u>contractuellement</u> déposés <u>directement</u> auprès de HSSL.

14. Cependant, les propos de la partie demanderesse restent à l'état de simples affirmations péremptoires, qu'aucune démonstration juridique et qu'aucune pièce ne viennent corroborer. Le simple fait que les deux contrats aient été conclus à la même date n'est pas un fait suffisant pour établir une prétendue fiction.

15. Qui plus est, en acceptant de conclure le *Custodian Agreement* avec The Bank of Bermuda Limited, Alpha Prime serait soi-disant partie à la simulation alléguée !

16. Par ailleurs, l'appréciation de l'existence juridique et de la validité de la personnalité morale d'une société étrangère s'établit en application des critères tirés du droit de l'Etat dans lequel la société a été constituée[1].

17. Il est constant en cause que The Bank of Bermuda Limited est une société constituée en vertu de la législation des Bermudes.

18. Si la partie adverse entend nier l'existence de The Bank of Bermuda Limited, elle devra en rapporter la preuve en vertu du droit des Bermudes, ce qu'elle ne fait pas.

19. Il ressort certes des avis de droit des Bermudes versés en cause (**pièce n°7 Arendt & Medernach et pièce n°14 de la farde II de Maître Schönberger**) que le droit des Bermudes, applicable en l'espèce, connaît la théorie dite du « *corporate veil* », qui permet aux juridictions anglaises, ainsi que celles des Bermudes, de « lever » ce voile sous certaines conditions. Toutefois, un tel voile ne pourrait être levé qu'en cas de fraude ou encore dans l'hypothèse où la structure d'une société ne constituerait qu'une façade.

---

[1] J-C Wiwinius, Le droit international privé au Grand-Duché de Luxembourg, 3ème édition; n°234, page 72 ; TPICE, aff. T-170/94, 25 septembre 1997, Shangai Bicycle Corp., Rec (1997) : en l'espèce, il s'agissait de la République Populaire de Chine.


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

20. Or, en l'espèce, de telles circonstances ne sont nullement établies.

21. The Bank of Bermuda Limited est une des banques principales des Bermudes et ne saurait être considérée comme une société fictive, une simple façade (**pièces n° 8 et 9 Arendt & Medernach**).

22. Il résulte également des avis précités que la théorie du « *corporate veil* » ne s'applique que dans des cas exceptionnels. Il n'existerait aux Bermudes aucune décision, dans laquelle le « *corporate veil* » aurait effectivement été levé.

23. En l'occurrence, The Bank of Bermuda Limited est une société qui a toujours joué un rôle actif en tant que dépositaire d'Alpha Prime, tel que le démontre notamment l'e-mail versé comme pièce n°5 par Maître Schönberger.

24. Cet e-mail démontre en effet que le document d'émission d'Alpha Prime, document intitulé *Confidential Private Placement Memorandum*, qui a été établi par Alpha Prime, a été commenté par le dépositaire The Bank of Bermuda Limited, comme il est d'usage dans l'industrie des fonds d'investissement.

25. Aucun élément du dossier ne vient par ailleurs établir un montage fictif, tel qu'allégué par la partie demanderesse :

    " Contrairement aux affirmations de la partie demanderesse, la lettre adressée par HSSL à l'autorité de marché autrichienne aux fins de confirmer l'acceptation de sa nomination en tant que sous-dépositaire d'Alpha Prime démontre justement que HSSL se présentait auprès de l'autorité de surveillance comme sous-dépositaire et non comme banque dépositaire (pièce n°7 de la farde II de Maître Schönberger).

    - La lettre signée entre ING Capital LLC, HSSL et The Bank of Bermuda Limited relève elle aussi expressément que The Bank of Bermuda Limited est le dépositaire d'Alpha Prime et que c'est notamment Alpha Prime qui communiquera tous les mois une copie des « *BMIS monthly statements* » reçus par Alpha Prime directement à ING. Cette lettre est d'ailleurs également signée par Alpha Prime, qui ne peut dès lors invoquer aujourd'hui que le montage aurait été fictif, ce qui demeure formellement contesté par HSSL (pièce n°8 de la farde II de Maître Schönberger).

### 3. Sur l'absence de novation

26. En ce qui concerne les relations de HSSL avec The Bank of Bermuda Limited, la partie concluante conteste que le contrat de sous-dépôt (« *Sub-custodian Agreement* ») conclu entre elle et The Bank of Bermuda Limited emporte novation. Ce contrat est, rappelons-le, régi par la loi des Bermudes (**pièce n°2 Arendt & Medernach**).

27. La partie concluante a versé aux débats la déclaration d'Andrew Martin, Barrister et Attorney aux Bermudes auprès de l'étude MJM Limited, qui confirme que, selon la loi des Bermudes, le *Sub-custodian Agreement* conclu entre The Bank of Bermuda Limited et HSSL n'emporte pas novation (**pièce n°3 Arendt & Medernach**).



JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

28. C'est en conséquence à tort que la partie demanderesse entend se prévaloir de l'article 1275 du Code civil luxembourgeois (sur la novation en cas de délégation parfaite), qui lui permettrait, selon elle, d'agir directement à l'encontre de HSSL.

29. Il n'existe aucune relation contractuelle directe entre Alpha Prime et HSSL.

**B.   Sur l'existence de relations contractuelles directes entre Alpha Prime et BMIS**

**1.   Rectification de la présentation des faits d'Alpha Prime (sur la prétendue relation entre HSSL et BMIS)**

30. Alpha Prime persiste à prétendre qu'il aurait existé une relation contractuelle entre HSSL et BMIS en vertu du contrat de sous-dépositaire (*Sub-custody Agreement*) conclu en septembre 2004[2].

31. Il fut déjà exposé que ce *Sub-custody Agreement* daté « septembre 2004 » constitue un document cadre, régi par le droit luxembourgeois, qui concerne divers fonds d'investissement identifiés en Annexe A.

32. Or, ce « sous-dépôt», soumis au droit luxembourgeois, n'a jamais été parfait, étant donné qu'Alpha Prime n'a jamais remis de titres, valeurs mobilières ou autres instruments financiers à son dépositaire The Bank of Bermuda Limited (ni *a fortiori* à HSSL) et que, partant, HSSL n'a pas pu remettre en sous-dépôt de titres, valeurs mobilières ou autres instruments financiers à BMIS.

33. Cet état de fait était conforme au schéma voulu par Alpha Prime, qui a désigné BMIS comme son *broker* et dépositaire des titres, valeurs mobilières et autres instruments financiers que BMIS était censé acquérir, en sa qualité de *broker*, pour compte d'Alpha Prime.

34. Autrement dit, le *Sub-custody Agreement* signé entre BMIS et HSSL (alors Bank of Bermuda (Luxembourg)) constituait un cadre contractuel possible pour le sous-dépôt des avoirs des fonds d'investissement identifiés en Annexe A.

35. Toutefois, ce schéma contractuel n'a jamais été mis en place en ce qui concerne les avoirs d'Alpha Prime, en raison de la relation de dépôt existant directement entre Alpha Prime et BMIS, relation nouée par le *Customer Agreement* (versé comme pièce n°3 Arendt & Medernach), le document « *Trading Authorization Directive* » et le document « *Terms and Conditions for Option Hedging Transactions* ».

36. Il convient de constater que le contrat de dépôt (*Custodian Agreement*) conclu entre The Bank of Bermuda Limited et Alpha Prime stipule explicitement que les engagements de la banque dépendent de la remise des titres, valeurs mobilières ou autres instruments

---

[2] Lequel n'est pas à confondre avec le *Sub-Custody Agreement* conclu The Bank of Bermuda Limited et HSSL conclu le 12 mars 2003, cf. § ** des présentes conclusions.

6

JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

financiers (*Securities*) entre ses mains : « *received by it* » (**pièce n°1 Arendt & Medernach**).

37. En l'absence de remise de tels titres par Alpha Prime à The Bank of Bermuda Limited en dépôt, et en l'absence de remise de titres de The Bank of Bermuda Limited à HSSL en sous-dépôt, HSSL n'a pas pu les sous-sous-déposer auprès de BMIS.

38. Autrement dit, un « sous-dépôt» (ou « sous-sous-dépôt ») , soumis au droit luxembourgeois, n'a jamais été parfait en l'absence de remise de titres, valeurs mobilières ou autres instruments financiers, et ce, conformément au schéma voulu par Alpha Prime, qui a lui-même désigné BMIS comme son <u>broker et dépositaire direct</u> des titres, valeurs mobilières et autres instruments financiers que BMIS était censé acquérir, en sa qualité de *broker*, pour compte d'Alpha Prime.

39. En conséquence, la partie concluante conteste formellement l'existence d'une relation de sous-dépôt (ou plutôt de sous-sous-dépôt) entre elle et BMIS à propos des avoirs d'Alpha Prime.

40. Le reproche adverse selon lequel HSSL étant déjà le sous-dépositaire d'Alpha Prime, « *il y aurait eu lieu de conclure un contrat de sous-sous-dépôt (sub-sub-custody agreement) et non un contrat de sous-dépositaire* » est une indication supplémentaire confirmant que le Sub-custody Agreement allégué n'a jamais été parfait.

41. **La relation n'est pas celle d'un (sous-)sous-dépôt entre HSSL et BMIS mais celle d'un dépôt direct entre Alpha Prime et son broker BMIS.**

    **2. Sur la relation directe entre Alpha Prime et BMIS**

        **2.1 Alpha Prime a signé directement un *Customer* (ou *Broker*) *Agreement* avec BMIS**

42. En vertu d'une résolution circulaire de ses *directors* (**pièce n°10 Arendt & Medernach**), Alpha Prime a ouvert un compte *brokerage* (*Trading Account*) auprès de BMIS et a nommé BMIS comme *broker-dealer* pour exécuter les transactions sur le marché américain pour compte d'Alpha Prime : BMIS devait acheter/vendre des valeurs mobilières ou options. Ce document d'ouverture de compte signé entre Alpha Prime et BMIS établit l'existence de la relation de compte entre Alpha Prime et BMIS.

43. En effet, aux termes du contrat d'ouverture de compte dénommé « *Customer Agreement* », Alpha Prime (le *Customer*) nomme BMIS comme *broker-dealer* (commissionnaire) :

*"In consideration for you (the "Broker") opening or maintaining one or more accounts (the "Customer"), the Customer agrees to the terms and conditions contained in this Agreement."* (**pièce n°4 Arendt & Medernach**)

7



44. Aux termes de ce contrat et conformément à la *Trading Authorisation* et à l'*Option Agreement* (dont il sera question ci-dessous), BMIS opérait des transactions sur titres et options (achat, vente …) pour le compte d'Alpha Prime.

45. Il importe de souligner que le seul *Customer Agreement* signé entre Alpha Prime et BMIS, est versé par le soussigné à l'appui de ses conclusions (**pièce n°4 Arendt & Medernach**). Il est donc faux de prétendre que le *Customer Agreement* versé en cause par la concluante se serait « superposé » à celui versé par Maître Schönberger (le document versé par Maître Schönberger n'étant pas le *Customer Agreement* relatif à Alpha Prime mais celui d'un autre fonds d'investissement).

46. Il ne saurait y avoir deux « *Customers* » déposants pour les mêmes avoirs.

47. HSSL est étrangère au *Customer Agreement*, aux termes duquel le *broker-dealer* BMIS agit pour le compte de son client, le *Customer* Alpha Prime (article 7 du *Customer Agreement*). En signant le *Customer Agreement*, Alpha Prime a demandé au *broker* d'ouvrir un livres un compte pour lui (préambule du *Customer Agreement*) et c'est le client, c'est-à-dire Alpha Prime, qui est en droit de demander au *broker* la restitution des actifs inscrits sur ce compte (article 5 du *Customer Agreement*). HSSL n'intervient pas dans cette relation contractuelle.

48. Par ailleurs, il importe de souligner qu'en droit américain, la qualité de *broker(-dealer)* emporte avec elle celle de dépositaire (*Custodian*) des titres.

49. Les juridictions américaines ont ainsi fait observer que BMIS agissait en qualité de *broker-dealer* et était agréé en tant que *stockbroker* auprès de la Securities and Exchange Commission des Etats-Unis (ci-après, la « SEC »). [voir, à titre d'exemple, Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities, LLC, --- B.R. ----, 2012 WL 1505349, *3 (S.D.N.Y., 30 avril 2012) concluant que BMIS avait qualité de « stockbroker » au sens du code américain sur les faillites [United States Bankruptcy Code]].

50. En droit américain, les *securities brokers* fournissent fréquemment des services de conservation d'avoirs en faveur de leurs clients.

51. En effet, le droit américain exige en général que les *securities brokers* détiennent des actifs du client eu égard à des octrois de crédit par le *securities brokers* en faveur du client ou pour le compte du client (y compris lorsque le client détient des positions courtes sur titres ou des positions courtes sur options). En l'occurrence, BMIS se devait de détenir des actifs directement déposés par Alpha Prime, et ce non seulement afin de pouvoir opérer des transactions, mais également afin de garantir sa propre créance vis-à-vis d'Alpha Prime pouvant résulter des opérations réalisées pour le compte de ce dernier. Pour cette raison, un (sous-)sous-dépôt des actifs d'Alpha Prime par HSSL auprès de BMIS n'aurait pas été acceptable pour BMIS, puisque les actifs ainsi sous-déposés ne l'auraient été pas à titre de garantie du client/débiteur de BMIS (Alpha Prime) puisque c'est envers HSSL que BMIS aurait alors été débiteur au titre de son obligation de restitution.

52. Finalement, la procédure de SIPA, en vertu de laquelle BMIS a été mis en liquidation, a pour principal objectif d'assurer la protection des clients qui autorisent leur *broker* à détenir leurs espèces et leurs titres. Cf. à titre d'exemple, Rosenman Family, LLC v.


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

Picard, 395 Fed. App'x 766, 768-69 (2d Cir. 2010). La loi SIPA accorde un statut privilégié aux « clients » d'un *broker* ou *dealer* défaillant, lesquels, en général, sont des personnes qui possèdent « *une créance sur le compte de titres reçus, acquis ou détenus par le [broker-dealer] dans le cours ordinaire de ses affaires en tant que broker ou dealer, provenant de ou pour les comptes titres de ladite personne[.]* » 15 U.S.C. § 78III(2)(A). Lors d'une liquidation en vertu de la loi SIPA, les clients perçoivent des distributions de la « propriété client » du *broker* (« *espèces et titres … à tout moment reçus, acquis ou détenus par ou pour le compte d'un [broker-dealer] à partir de ou pour les comptes titres d'un client,* » 15 U.S.C. § 78III(4)), et sont en droit de recevoir un montant maximum de USD 500.000 des avances provenant de la SPIC dans la mesure où la propriété du client ne suffit pas à couvrir les créances nettes du client eu égard à la propriété confiée au broker-dealer en liquidation. 15 U.S.C. §§ 78fff-3, 78III(2)(A).

53.    Les paragraphes qui précèdent corroborent par conséquent la démonstration de HSSL, selon laquelle il existait bien une relation de dépôt directe entre BMIS et Alpha Prime.

54.    Il importe encore de souligner que ni Bernard Madoff ni sa société BMIS n'ont été choisis ou recommandés par HSSL. Le choix de BMIS a été opéré par Alpha Prime, tel que démontré par la résolution circulaire des *directors* d'Alpha Prime (**pièce n°10 Arendt & Medernach**).

55.    Comme plus amplement développé ci-après, Alpha Prime a également signé directement avec BMIS les contrats nécessaires à la réalisation des transactions sur titres et options par BMIS, établissant ainsi sa relation directe avec celui-ci :

–    un contrat d'option (*Option Agreement*),

–    une autorisation de *trading* (*Trading authorization limited to purchases and sales of securities and options*).

### 2.2    Alpha Prime a signé l'*Option Agreement* avec BMIS

56.    Le seul *Option Agreement* conclu avec BMIS concernant l'ouverture de compte pour la gestion des avoirs d'Alpha Prime a été signé par Alpha Prime (par Madame Ursula Fano-Lesczynski, l'un des *directors* d'Alpha Prime) directement avec BMIS (**pièce n°11 Arendt & Medernach**).

57.    Ledit contrat d'option prévoit [« I » désignant Alpha Prime et « you » BMIS] :

« *OPTION AGREEMENT*

*in order to induce you to carry accounts (« Option Accounts ») for me (however designated) for transactions in option contracts (including, without limitations, purchase, sale, transfer, exercise and endorsement) ("Option Transaction"), I hereby warrant, represent and agree with you as set forth below on this Option Agreement.*

*1.    I understand, and am well aware, that option trading may be highly speculative in nature. I am also aware that on certain days, option trading may cease and this could ___*

9


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

*result in a financial loss to me. I agree to hold the company, its other divisions, and its officers, directors and agents harmless for such loss.*

2.      *[...]*

3.      *If I do not satisfy my transaction obligations on a timely basis, you are authorized in your sole discretion and without notification, to take any and all steps you deem necessary to protect yourself (for any reason) in connection with option transactions for my account including the right to buy and/or sell for my account and risk any part or all the shares represented by options handled, purchased, sold for my account, or to buy for my account and risk any option as you may deem necessary or appropriate. Any and all expenses or losses incurred in this connection will be reimbursed by me.*

4.      *[...]*

5.      *This agreement shall apply to all puts or call which you may have executed, purchased, sold or handled for any account of mine and also shall apply to all puts, or calls which you may hereafter purchase, sell, handle or execute for any account of mine.*

6.      *[...]*

*Dated [...]*
*Alpha Prime Fund Limited*
*Ursula Fano-Lesczynski*
*Director »*

## 2.3    Alpha Prime a signé la *Trading Authorization* avec BMIS

58.    Alpha Prime a signé la *Trading Authorization limited to purchases and sales of securities and options* avec BMIS.

59.    La seule *Trading Authorization* conclue avec BMIS concernant l'ouverture de compte pour la gestion des avoirs d'Alpha Prime a été signé par Alpha Prime (par Madame Ursula Fano-Lesczynski, l'un des *directors* d'Alpha Prime) directement avec BMIS (**pièce n°12 Arendt & Medernach**).

60.    Ladite autorisation de *trading* prévoit :

« *TRADING AUTHORIZATION LIMITED TO PURCHASES AND SALES OF SECURITIES AND OPTIONS*

*The undersigned hereby authorizes Bernard L. Madoff (whose signature appears below) as his agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities in accordance with your terms and conditions for the undersigned's account and risk and in the undersigned's name, or number on your books. [...] »*

61.    Au vu de ces dispositions, BMIS devait utiliser les espèces reçues pour effectuer des transactions sur actions (« *stocks* »), obligations (« *bonds* ») et options (« *options* »),

10


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

notamment des achats et des ventes (*« including, without limitations, purchase, sale, transfer, exercise and endorsement», « buy, sell and trade »*).

62. Ces arrangements contractuels, conclus entre Alpha Prime et le *broker*, prévoyaient donc le droit pour BMIS d'user et de disposer des espèces transférées par HSSL sur instructions d'Alpha Prime aux fins d'acquérir ou de revendre des titres ou instruments dérivés.

63. Afin de mener ses activités et d'opérer des transactions sur les titres en sa qualité de *broker*, BMIS a demandé que les avoirs (espèces et titres) de ses clients (*Customers*) soient détenus sur leurs comptes auprès de BMIS: la relation juridique entre Alpha Prime et BMIS comprenait bien une relation de déposant à dépositaire.

## 2.4   Sur les pièces produites par Alpha Prime

64. La partie demanderesse prétend que les documents « *Trading Authorization Directive* », « *Terms and Conditions for Option Hedging Transactions* » et « *Customer Agreement* », compris dans sa pièce n°3 constituent des annexes au contrat de sous-dépôt (*Sub-Custody Agreement*) conclu entre Bank of Bermuda (Luxembourg) S.A., actuellement HSSL, et BMIS en septembre 2004.

65. Cette affirmation péremptoire est inexacte et formellement contestée par la concluante.

66. Dans son jugement n°1383/2013 du 5 juillet 2013, le Tribunal a, à juste titre, relevé qu' « aucun élément soumis au tribunal ne permet, actuellement, d'affirmer que les 4 documents soient liés, même s'ils sont fardés en tant que pièce unique ».

67. Aucune mention de ces prétendues annexes n'est d'ailleurs faite dans le corps du texte du *Sub-Custody Agreement*, qui ne prévoit qu'une Annexe « A » dans la partie « *Whereas* ». Les documents susvisés paraissent d'ailleurs simplement avoir été ajoutés artificiellement (quand bien même ne serait-ce que par mégarde) au document « *Sub-Custody Agreement* ».

68. A propos de la détention de ces pièces, la partie demanderesse prétend que lesdites pièces lui auraient été envoyées directement « dans cet état » par la partie concluante.

69. Il appartient à la partie demanderesse de prouver ces allégations et plus généralement le fait qu'elle détient lesdites pièces de manière régulière, ce qui est contesté (lesdits documents appartenant à un autre client de la partie concluante), aucune pièce ne venant par ailleurs corroborer les dires de la partie demanderesse. En effet, lorsqu'une contestation s'élève sur la régularité de la détention, c'est à celui qui entend produire ladite pièce qu'il incombe de prouver qu'il détient régulièrement (R. Mougenot, La Preuve, Larcier 1990, p.147).

70. L'on ne voit pas, au demeurant, l'intérêt qu'aurait eu HSSL d'adresser à son client un document caviardé (donc anonyme) ne le concernant pas. Si les documents en question concernaient Alpha Prime, ils ne seraient pas caviardés. Aucune circonstance ni pièce ne viennent corroborer les dires de la partie demanderesse.

11


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

71. En conséquence, la concluante sollicite le rejet desdites pièces, la preuve du caractère régulier et licite de leur détention n'étant pas rapportée.

72. En tout état de cause, il ne saurait être donné force et crédit à des pièces caviardées, dont la concluante réitère qu'elles ne concernent pas Alpha Prime.

73. Par ailleurs, la concluante dépose au greffe du Tribunal d'arrondissement de Luxembourg, deuxième chambre, l'original du *Sub-Custody Agreement* le temps que la partie adverse et le Tribunal en prennent connaissance.

### 3.   Sur les lettres de mission et les rapports établis par KPMG

74. Dans ses conclusions notifiées le 1er octobre 2012, la partie demanderesse se rapporte encore à deux lettres de mission ainsi qu'à des rapports d'activité établis par KPMG, qui selon elle, démontreraient que le contrat cadre pour le sous-dépôt (*Sub-custody Agreement*) conclu en 2004 entre Bank of Bermuda (Luxembourg) SA et BMIS, aurait effectivement été mis en application concernant le fonds Alpha Prime. Il n'en est rien.

75. Tant les lettres de mission que les rapports établis par KPMG sont des documents établis par un tiers au présent litige (KPMG), à la demande de la société HSBC Bank plc, également partie tierce à l'instance, dans le cadre de la surveillance qu'elle opérait, pour le groupe HSBC, des correspondants et sous-dépositaires avec lesquels les entités du groupe étaient en contact.

76. Alors que lesdites lettres de mission ne mentionnent pas le nom d'Alpha Prime, il ressort également clairement du langage utilisé, tel que cité par la partie demanderesse, que la possibilité pour HSBC, en tant que dépositaire, d'investir des fonds dans BMIS ne concernait aucunement tous les clients de HSBC: *« you wish us to assist you in identifying the fraud risks that may arise as a result of HSBC, acting as custodian, placing the funds of up to eight HSBC clients for investment with Madoff in New-York »*.

77. Par ailleurs, les rapports établis par KPMG concernent les fonds d'investissements visés à l'annexe A du *Sub-Custody Agreement* qui - comme il vient d'être dit - constituait un cadre contractuel possible pour les avoirs des fonds d'investissement identifiés en annexe A, mais qui n'a toutefois jamais été mis en place.

78. Le seul fait que BMIS soit dénommé « *Sub-Custodian* » dans les rapports établis par KPMG, ou encore la circonstance que des employés de HSSL aient mentionné BMIS comme un « sous-dépositaire », n'a aucune conséquence juridique quant à la qualification juridique exacte des relations entre HSSL, Alpha Prime et BMIS.

79. De fait, BMIS n'était pas le (sous-)sous-dépositaire de HSSL mais un dépositaire direct d'Alpha Prime.


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

III.   **QUANT A L'ABSENCE DE RESPONSABILITE DANS LE CHEF DE HSSL**

80.   Les développements adverses citent, à plusieurs reprises, l'ancienne loi du 20 décembre 2002 concernant les organismes de placement collectif, telle que modifiée (ci-après la « Loi du 20 décembre 2002 »).

81.   Avant d'examiner le caractère non fondé de la demande formulée par Alpha Prime, tendant à voir engager la responsabilité contractuelle, sinon délictuelle, de HSSL, il y a en conséquence lieu de rappeler, à titre préliminaire, quelle est la loi applicable au présent litige.

A.   **Remarque préliminaire quant à la loi applicable**

82.   Tant le contrat de dépôt, *Custodian Agreement*, conclu entre Alpha Prime et The Bank of Bermuda Limited que le contrat de sous-dépôt (*Sub-custodian Agreement*) conclu entre The Bank of Bermuda Limited et HSSL <u>sont régis par le droit des Bermudes (pièces n°1 et n°2 Arendt & Medernach).</u>

83.   La partie demanderesse recherche principalement la responsabilité de la partie concluante sur le fondement de la Loi du 20 décembre 2002.

84.   Or, Alpha Prime n'est pas un organisme de placement collectif (« OPC ») luxembourgeois ni un organisme étranger qui serait autorisé par la Commission de Surveillance du Secteur Financier à publiquement offrir sur le territoire luxembourgeois ses actions à la vente. Partant, il ne peut être soumis à la Loi du 20 décembre 2002.

85.   Par ailleurs, les dispositions des articles 17 et 18 citées par la partie demanderesse trouvent leur place dans la première partie de la Loi du 20 décembre 2002, qui concerne uniquement les organismes luxembourgeois de placement collectif en valeurs mobilières.

86.   L'article 2 (1) de la Loi du 20 décembre 2002 énonce ainsi que « la présente partie s'applique à tous les OPCVM situés au Luxembourg », un « OPCVM » étant par ailleurs défini à l'article 1er, au point 22), comme étant « un organisme de placement collectif en valeurs mobilières soumis à la directive 85/611/CEE ».

87.   Alpha Prime n'est indiscutablement pas un OPCVM. Il est également constant en cause qu'Alpha Prime n'a pas son siège statutaire au Luxembourg, mais aux Bermudes. La partie I de la Loi du 20 décembre 2002 ne lui est dès lors pas applicable.

88.   La demande adverse prétendant s'appuyer sur les dispositions de la Loi du 20 décembre 2002 doit, en conséquence, être écartée.

89.   Les droits et obligations incombant à un dépositaire (ou sous-dépositaire) tel que décrit par la Loi du 20 décembre 2002 sont inapplicables à HSSL dans sa relation à Alpha Prime ou à The Bank of Bermuda Limited.

13


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

**B.   Quant à l'absence de responsabilité contractuelle dans le chef de HSSL**

90.   Dans ses conclusions notifiées le 1er octobre 2012, la partie demanderesse prétend que HSSL ne pourrait « *qu'être reconnue comme la banque dépositaire effective des avoirs confiés par la demanderesse et ce dès le premier jour* ».

91.   On constatera tout d'abord que n'étant pas partie à la relation contractuelle scellée sur base du *Custodian Agreement*, ni à celle scellée sur base du *Customer Agreement*, la partie concluante ne saurait voir sa responsabilité contractuelle engagée.

**1.   Absence de novation**

92.   Dans son acte introductif d'instance, la partie demanderesse entend se prévaloir de l'article 1275 du Code civil luxembourgeois sur la novation en cas de délégation parfaite, qui lui permettrait, selon elle, d'agir directement à l'encontre de HSSL.

93.   Or, Alpha Prime a conclu le 12 mars 2003 avec The Bank of Bermuda Limited un contrat de dépôt, *Custodian Agreement*, qui est régi, aux termes de son article 27, par la loi des Bermudes (**pièce n°1 Arendt & Medernach**).

94.   Par ailleurs, le contrat de sous-dépôt (*Sub-custodian Agreement*) conclu le 12 mars 2003 entre The Bank of Bermuda Limited et HSSL est lui aussi régi par la loi des Bermudes (**pièce n°2 Arendt & Medernach**).

95.   Il n'y a aucune raison que les relations entre Alpha Prime et son dépositaire The Bank of Bermuda Limited ou son sous-dépositaire HSSL soient régies par la loi luxembourgeoise.

96.   En conséquence, la partie concluante a versé aux débats une déclaration d'expert d'Andrew Martin, qui confirme que, selon la loi des Bermudes, le *Sub-custodian Agreement* conclu entre The Bank of Bermuda Limited et HSSL n'emporte pas novation (**pièce n°3 Arendt & Medernach**).

97.   Il résulte notamment de cet avis que la clause 5, citée par la partie adverse dans ses conclusions notifiées le 1er octobre 2012, n'emporte pas novation :

« *11. Under clause 5 of the Sub-Custodian Agreement, BOB as the custodian retains control of the sub-custodian HSSL:*

*"In the performance of the duties, obligations and functions delegated to it hereunder, the Sub-Custodian shall at all times be subject to the control of and review by the Bank and shall in all respects observe and comply with (a) the Bye-laws, (b) the provisions of the (Custodian) Agreement (as if all references therein to the Bank were references to the Sub-Custodian) and (c) all orders, directions and regulations of the Bank..."*

*12. The retention of control by BOB supports the fact that liabilities and benefits were not effectively transferred to HSSL and that accordingly there was no novation to HSSL in the Sub-Custodian Agreement. Alpha Prime was not a party to the Sub-Custodian*

14


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

*Agreement and did not provide its consent to a novation. The directors of Alpha Prime merely consented to the delegation of duties in the recital to the Sub-Custodian Agreement. Delegation of duties does not amount to a novation."*

98. La partie concluante se réfère pour le surplus aux paragraphes 26 à 29 de ses développements ci-dessus.

### 2. Absence de « contrat implicite » sous le droit des Bermudes (*implied contract*)

99. La partie demanderesse a versé en cause une déclaration de Rod S. Attride-Stirling de l'étude Attride-Stirling & Woloniecki (« ASW ») (pièce n°14 de la farde II de Maître Schönberger) analysant, entre autres, la question de savoir si la relation entre Alpha Prime et HSSL serait susceptible de créer un contrat implicite en droit des Bermudes.

100. Si cette déclaration affirme qu'une telle création juridique est certes possible en droit des Bermudes, son auteur reconnaît cependant qu'il serait difficile de persuader le juge de son existence dans le cadre d'une relation « *principal – sub-agent* » (point 19, page 6 de la déclaration ASW). Son auteur reconnaît encore qu'il n'est pas en possession d'éléments lui permettant d'analyser si un tel « contrat implicite » existerait dans les circonstances de l'espèce.

101. Cet avis est partagé par la déclaration d'Andrew Martin, Barrister et Attorney aux Bermudes auprès de l'étude MJM Limited (pièce n°7 **Arendt & Medernach**) : en principe, les juridictions des Bermudes respectent le principe de l'effet relatif des contrats. Lorsque les parties ont décidé de fixer leurs droits et obligations dans un contrat écrit, les cours et tribunaux ne se mêlent pas de leur relation et respectent les engagements contractuels pris. Il est par ailleurs très improbable que les juridictions des Bermudes se délieraient des théories traditionnelles.

102. La partie demanderesse n'allègue en l'espèce aucun élément de nature à établir les raisons pour lesquelles les juridictions des Bermudes pourraient en juger autrement dans les présentes circonstances.

### 3. Absence de montage fictif

103. La partie concluante se réfère à cet égard aux paragraphes 13 à 25 de ses développements ci-dessus, qui prouvent le caractère non fondé d'une telle allégation.

### 4. Sur l'article 6 du *Custodian Agreement*

104. Les développements de cette section sub. 4) sont faits indépendamment de ce qui vient d'être exposé quant à l'absence de novation et quant à l'absence de caractère fictif du « montage » critiqué par la partie demanderesse.

15



105. Il est à relever que la partie demanderesse entend tirer une prétendue responsabilité de HSSL de l'article 6 du *Custodian Agreement* conclu entre Alpha Prime et The Bank of Bermuda Limited.

106. Cet article 6 dispose:

"(A)    Except as provided in sub-clause (B) hereof, the Custodian shall record and hold in a separate account in its books all Securities **received by it or to its order** from time to time in respect of each Sub-Fund and shall arrange for all Securities to be deposited in the Custodian's vault or otherwise held by or to the order of the Custodian as it may think proper for the purpose of providing for the safekeeping thereof. Any expenses of whatever nature incurred by the Custodian in providing safe custody (other than in vault of the Custodian) or in the settlement of Securities transactions or the collection of dividends, interest or any other rights attaching to such Securities shall be payable by the Company or the relevant Sub-Fund.

(B)    The Custodian shall upon receipt of Proper Instructions, open accounts with brokers, money managers or other intermediaries in its name on behalf of the Company or any Sub-Fund or in the name of the Company or the relevant Sub-Fund and may make such arrangements concerning the trading authorisations and other forms of authority with respect to such account or accounts as it deems advisable. The Custodian shall not be responsible for the safekeeping of Securities or cash deposited with or remaining in any such account or accounts and will not be liable for any loss occasioned by reason of the liquidation, bankruptcy or insolvency of such broker, money manager or other intermediary."

107. Or, Alpha Prime n'a jamais déposé de *Securities* entre les mains de The Bank of Bermuda Limited, ni entre celles de HSSL. Seules les souscriptions en espèces des investisseurs ont été reçues par le sous-dépositaire à des fins de libération et de dépôt sur instruction d'Alpha Prime auprès de BMIS.

108. En conséquence, contrairement aux affirmations de la partie demanderesse, il n'a pu y avoir ni dépôt entre les mains de The Bank of Bermuda Limited, ni sous-dépôt entre les mains de HSSL, ni sous-sous-dépôt entre les mains de BMIS.

109. Nul ne pourra contester cette règle de bon sens, qui veut qu'on ne peut restituer que ce dont on a la garde.

110. Alpha Prime a décidé de faire conserver une partie de ses actifs par son *broker* américain BMIS et les actifs (en l'occurrence, uniquement des espèces) transférés par le sous-dépositaire HSSL au *broker* BMIS, sur instructions d'Alpha Prime ou de son gestionnaire, ne font pas partie de l'assiette de l'obligation de restitution à charge de The Bank of Bermuda Limited (ni *a fortiori* de HSSL).

111. En particulier, les titres déposés entre les mains du tiers BMIS ne font pas partie de l'assiette de l'obligation de restitution à charge de The Bank of Bermuda Limited.

112. La responsabilité contractuelle du dépositaire The Bank of Bermuda Limited (ni *a fortiori* celle de HSSL !) ne saurait dès lors être engagée au motif d'un prétendu défaut de garde des avoirs dont ni The Bank of Bermuda Limited, ni HSSL n'ont reçu la garde !

16


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

113. Il est également constant en cause qu'Alpha Prime n'a jamais donné instruction à The Bank of Bermuda Limited, ni *a fortiori* à HSSL, d'ouvrir un compte auprès de BMIS (mais qu'Alpha Prime a lui-même ouvert ce compte).

114. Et même si, en vertu des dispositions contractuelles précitées, The Bank of Bermuda Limited ou HSSL avait ouvert, à la demande d'Alpha Prime, un compte auprès d'un *broker*, le dépositaire (de même que le sous-dépositaire) serait contractuellement exonéré de toute responsabilité si le *broker* qui s'est vu confier la conservation des actifs d'Alpha Prime venait à défaillir (Article 6 (B) du *Custodian Agreement*). Cette clause se justifie par le fait que le dépositaire n'a, dans ce cas de figure, pas à prendre le risque de conservation, et il ne peut assumer de responsabilité pour un tiers qu'il n'a pas choisi.

115. En l'espèce, la situation est encore différente de ce cas de figure.

116. En effet, le recours à un *broker* et le choix de ce *broker* en la société BMIS ont été décidés par la partie demanderesse, Alpha Prime, de sa seule initiative, comme le démontre la résolution circulaire des *directors* d'Alpha Prime décidant de l'ouverture d'un compte auprès de BMIS (**pièce n°10 Arendt & Medernach**).

117. Mais encore: c'est Alpha Prime qui a choisi et convenu avec le *broker* de leurs relations contractuelles. En effet, il ne faut pas oublier que la convention d'ouverture de compte auprès de BMIS (*Customer Agreement*) et les conventions de transactions/trading (*Option Agreement* et *Trading authorization for sales and purchases*) ont été signées par Alpha Prime, et non pas par HSSL.

118. Au vu de ces circonstances, The Bank of Bermuda Limited et - *a fortiori* - HSSL ne sauraient avoir commis de faute susceptible d'engager leur responsabilité.

**C.    Quant à l'absence de responsabilité délictuelle dans le chef de HSSL**

119. A cet égard, le raisonnement adverse s'avère difficilement compréhensible.

120. Dans ses conclusions notifiées le 1er octobre 2012, la partie demanderesse expose le motif de la prétendue responsabilité délictuelle de HSSL en ces termes :

*« Attendu que si la responsabilité contractuelle de la défenderesse ne pouvait être retenue, quod non, la défenderesse ne reste pas moins obligée de garder puis restituer les avoirs qui lui ont été confiés en dépôt par la demanderesse. »*

121. Or, il a été démontré plus haut que HSSL n'avait pas la garde des avoirs déposés par la partie demanderesse entre les mains de BMIS. HSSL n'avait donc aucune obligation de garde ni de restitution de ces avoirs.

122. Par ailleurs, toute action délictuelle exercée par un tiers – tel Alpha Prime – en raison des tâches accomplies par HSSL en sa qualité de prestataire de services de The Bank of Bermuda Limited est à déclarer irrecevable.

123. En effet, en l'espèce, HSSL est le sous-dépositaire de The Bank of Bermuda Limited, avec laquelle elle est contractuellement liée par un contrat de sous-dépôt (*Sub-*


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

*Custodian Agreement*). Alpha Prime est un tiers à ce contrat de sous-dépôt. Seule The Bank of Bermuda Limited serait partant en droit d'agir à l'encontre de HSSL en raison d'une inexécution contractuelle éventuelle, sauf au tiers (Alpha Prime) à établir une faute distincte du manquement contractuel allégué ainsi qu'un dommage autre que celui résultant seulement de la mauvaise exécution du contrat allégué.

124. La partie concluante a, à toutes fins utiles, sollicité sur le sujet un avis d'Andrew Martin, Barrister et Attorney aux Bermudes auprès de l'étude MJM Limited.

125. Après lecture de la déclaration de Rod S. Attride-Stirling de l'étude Attride-Stirling & Woloniecki (« ASW ») versée par Alpha Prime (pièce n°14 de la farde II de Maître Schönberger) et sur base d'une analyse de la jurisprudence des Bermudes, Andrew Martin conclut à l'absence d'action délictuelle dans les présentes circonstances :

*"In relation to the points raised by the ASW Declaration:*

(1) *There is in the present case no room for the application of the principle that a liability in tort may arise where a contractual obligation also exists because:*

    (a) *The House of Lords authority relied upon is not binding on the courts in Bermuda;*

    (b) *The Privy Council, whose decisions are binding on the courts in Bermuda, has made a contrary determination of the same point, which has been followed by the Court of Appeal in Bermuda, and which would be binding on any court in Bermuda or on appeal at first instance; and*

    (c) *The extent of any duty in tort could not, in any event, exceed the ambit of the contractual party.*

(2) *There is no room for the application of the principles referred to in the ASW Declaration with respect to the lifting or piercing of the corporate veil in the absence of any allegation of improbity or fraud on the part of BOB, HSSL or Alpha Prime.*

(3) *There is no room for the application of general principles of "implied" contract referred to in the ASW Declaration because the Bermuda court will not imply a contract between parties where the parties have themselves set out their respective obligations in specific contracts which are intended to govern their relationships."*

**(pièce n°7 Arendt & Medernach)**

126. Il résulte de cette déclaration que les juridictions des Bermudes ne sont pas liées par les décisions de la *House of Lords*. Elles sont liées, en revanche, par les décisions de la *Court of Appeal in Bermuda* et du *Privy Council in London*.

127. Or, ces juridictions appliquent le principe en vertu duquel <u>aucune responsabilité délictuelle ne peut être engagée vis-à-vis d'une partie à partir du moment où l'étendue des obligations de cette partie ont été définies par contrat</u>.

18


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

128. Force est de constater que la déclaration d'Andrew Martin contredit l'avis de Rod Attride-Stirling, qui se base quant à lui sur une décision de la *House of Lords* (Henderson –v– Merritt), laquelle ne lie cependant pas les juridictions des Bermudes. Comme il est exposé dans la déclaration d'Andrew Martin, celles-ci ont justement adopté une position différente sur la question et n'admettent pas l'action délictuelle du *principal* à l'encontre du *sub-agent*, alors qu'une action contractuelle du *principal* à l'encontre de l'*agent* est envisageable.

129. Par ailleurs, même à admettre le droit luxembourgeois applicable, qui suit sur ce point la jurisprudence de la Cour de cassation belge énoncée dans son arrêt dit « de l'Arrimeur » du 7 décembre 1973, il n'en reste pas moins que l'existence d'un lien contractuel ferait obstacle à toute action aquilienne intentée par un tiers contractant à l'encontre de l'agent d'exécution.

130. Ainsi, l'action d'un tiers, tel que Alpha Prime, à l'encontre de HSSL, l'agent d'exécution de The Bank of Bermuda Limited, est inconcevable à défaut d'établir une faute et un dommage étrangers à une mauvaise exécution contractuelle.

131. Alpha Prime omet de se retourner contre son seul cocontractant, The Bank of Bermuda Limited.

132. Il ressort de ce qui précède que la responsabilité de HSSL, qui est intervenue pour exécuter certaines obligations contractuelles de Alpha Prime et/ou de Bank of Bermuda Limited ne saurait être engagée, ni sur une base contractuelle ni sur une base délictuelle. L'action intentée par Alpha Prime est en conséquence à déclarer irrecevable, sinon non fondée.

## IV.  LA PROCÉDURE AMÉRICAINE DE SIPA ET LA POSITION PRISE PAR ALPHA PRIME DANS LE CADRE DE CETTE PROCÉDURE

133. Force est de constater que la partie demanderesse ne démontre toujours pas avoir sollicité ou non la restitution de ses avoirs (titres, valeurs mobilières et instruments financiers) à la société BMIS en liquidation.

134. Par conséquent, il y a lieu d'ordonner à la partie demanderesse d'exposer si elle a introduit une demande (*Customer Claim*) dans le cadre de la liquidation de BMIS (procédure américaine de SIPA) et, le cas échéant, de produire aux débats une copie de sa *Customer Claim*, ainsi que la décision prise par le Trustee à la liquidation de BMIS à propos de cette *Claim*.

135. A ce propos, il est en effet rappelé que le 15 décembre 2008, la United States District Court for the Southern District of New York a fait droit à la demande de la Securities Investor Protection Corporation (« SIPC ») d'initier une procédure judiciaire (« procédure de SIPA ») contre BMIS en vertu du Securities Investor Protection Act de 1970, tel que modifié (« SIPA »), et a nommé un trustee à la liquidation de BMIS. La procédure de liquidation se déroule actuellement devant la U.S. Bankruptcy Court for the Southern District of New York, selon les règles du SIPA et les dispositions du U.S. Bankruptcy Code, pour autant que celles-ci soient compatibles avec celles du SIPA.


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

136. Irving H. Picard, trustee de BMIS en liquidation (ci-après, le « Trustee »), est chargé de satisfaire les demandes de « Customers » de BMIS en recouvrant et en distribuant un maximum de « Customer Property » aux « Customers » qui ont déposé des demandes dans le cadre de la SIPA Proceeding.

137. Le formulaire de « Customer Claim » mentionne que les « Customers » peuvent formuler (1) une demande pour des espèces (« Claim for money balances ») détenues par BMIS au 11 décembre 2008, et/ou (2) une demande portant sur des titres (« Claim for securities ») détenus par BMIS au 11 décembre 2008 (pièce n°13 Arendt & Medernach).

138. Par conséquent, Alpha Prime ne saurait réclamer des dommages et intérêts, alors que le préjudice allégué n'est pas certain et ne peut être encore établi à ce jour.

139. En supposant qu'Alpha Prime soit en mesure de satisfaire à ses engagements vis-à-vis du Trustee, il est en effet loin d'être exclu qu'Alpha Prime ne récupérera pas toute sa perte nette auprès de son broker BMIS.

### PAR CES MOTIFS

et tous autres à déduire en plaidant et à suppléer même d'office, et sous la réserve de pouvoir majorer, changer ou modifier les présentes conclusions en cours d'instance et suivant qu'il appartiendra, Maître François Kremer, pour sa partie, conclut à ce qu'il

### PLAISE AU TRIBUNAL

donner acte à la partie concluante dépose au greffe du Tribunal d'arrondissement de Luxembourg, deuxième chambre, l'original du contrat de sous-dépositaire (Sub-custody Agreement) conclu en septembre 2004 entre HSSL et BMIS le temps que la partie adverse et le Tribunal en prennent connaissance,

ordonner à la partie demanderesse de produire aux débats une version complète, non caviardée, des documents « Trading Authorization Directive » et « Terms and Conditions for Option Hedging Transactions », versés à l'appui de sa demande ;

ordonner à la partie demanderesse d'exposer si elle a introduit une demande (Customer Claim) dans le cadre de la liquidation de BMIS (procédure de SIPA) et, le cas échéant, de produire aux débats une copie de sa Customer Claim, ainsi que la décision prise par le Trustee à la liquidation de BMIS à propos de cette Claim ;

déclarer irrecevables, sinon non fondées, les demandes de la partie demanderesse dans leur intégralité ;


JURISCRIBE
CORPORATE & LEGAL TRANSLATION SERVICES
a division of Marste & Co., Inc.

condamner la partie demanderesse à tous les frais et dépens de l'instance et en ordonner la distraction au profit de l'avocat à la Cour concluant qui affirme en avoir fait l'avance ;

voir réserver à la partie de Maître François Kremer tous autres droits, dus, moyens et actions.

Pour original

François Kremer

Notifiées en copie, et sous toutes réserves, à Maître Didier Schönberger, avocat à la Cour, qui a daté et visé la présente, pour réception de la copie, à Luxembourg, le 17 décembre 2013

s. Didier Schönberger

39188/9531798v5

*(à restituer au fax 407878-653)*

