# EXHIBIT E

**AMENDMENT AGREEMENT** dated the      day of      2008

**RELATING TO** an uncommitted foreign exchange transactions facility agreement dated 23 April 2007 (as amended on 19 November 2007)

**BETWEEN**

(1)      **Alpha Prime Fund Limited** of 6, Front Street, Hamilton HM 11, Bermuda, (**'you'** or **'the Borrower'**); and

(2)      **HSBC Bank plc** of 8, Canada Square, London E14 5HQ (**'we'**, **'us'** or **'the Bank'**)

**WHEREAS**

(A)      The Borrower and the Bank have entered into an uncommitted foreign exchange transactions facility agreement dated 23 April 2007 (as amended on 19 November 2007) (the "Facility Agreement").

(B)      The Parties desire that the terms of the Facility Agreement shall be varied as more particularly set out below in this agreement (the "Amendment Agreement") and the Bank is willing to continue to provide the facilities granted under the Facility Agreement on the terms of the Facility Agreement as so amended by this Amendment Agreement.

**IT IS THEREFORE AGREED AS FOLLOWS:**

**1      VARIATIONS**

We hereby agree that the terms of the Facility Agreement shall be varied as follows:

     **1      FACILITY**

     FX Transactions Line up to a maximum at any time of the lesser at such time of USD 100,000,000 (United States Dollars one hundred million) or 100% of NAV at such time.

     The amount and value of each FX Transaction in respect of the limit expressed above shall be the US Dollar equivalent of the gross amount of the Borrower's outstanding obligation under such FX Transaction as calculated by the Bank, such calculation to be conclusive.

     The utilisation and operation of the Facility shall additionally be subject to the terms and conditions set out in Schedule 1 to this Agreement (General Terms and Conditions).

**2.      OTHER TERMS UNAFFECTED**

Save as expressly amended and varied as set out in clause 1 hereof, the terms of the Facility Agreement shall not be otherwise affected and shall remain in full force and effect.

**3      GOVERNING LAW AND JURISDICTION**

This Amendment Agreement and all matters (including the terms and conditions) relating to or arising out of or in connection with it shall be subject to and construed in accordance with the laws of England and Wales. The Borrower and the Bank irrevocably submit to the non-exclusive jurisdiction of the courts of England and Wales.

No person other than a party to this Amendment Agreement has any right under the Contracts (Rights of Third Parties) Act 1999 to enforce the provisions of this Amendment Agreement and the effect of that Act is hereby excluded.

Agreed.

For and on behalf of **HSBC Bank plc**.

**ACCEPTANCE BY THE BORROWER**

We **Alpha Prime Fund Limited** confirm our agreement to all the terms and conditions contained in this Amendment Agreement.

Date ..14 May 2008......................

Director ..Peter. Fischer...................

Signed for and on behalf of **Alpha Prime Fund Limited**, pursuant to a Resolution of the Board of Directors passed on ...............……

2

**AGREEMENT RELATING TO** an uncommitted foreign exchange transactions facility dated the
day of                    2006

**BETWEEN**

(1)    **Alpha Prime Fund Limited** of 6, Front Street, Hamilton HM 11, Bermuda, (**'you'** or **'the
Borrower'**); and

(2)    **HSBC Bank plc** of 8, Canada Square, London E14 5HQ (**'we'**, **'us'** or **'the Bank'**)

Pursuant to the terms of this agreement and its attached schedules and appendices (together the
**'Agreement'**), the Bank is pleased to offer the Borrower the uncommitted facility set out below as
supplemented from time to time (**'the Facility'**) on the terms referred to below but otherwise subject
to normal banking terms and conditions.

1      **FACILITY**

       FX Transactions Line up to a maximum at any time of the lesser at such time of USD
       50,000,000 (United States Dollars fifty million) or 100% of NAV at such time.

       The amount and value of each FX Transaction in respect of the limit expressed above shall
       be the US Dollar equivalent of the gross amount of the Borrower's outstanding obligation
       under such FX Transaction as calculated by the Bank, such calculation to be conclusive.

       The utilisation and operation of the Facility shall additionally be subject to the terms and
       conditions set out in Schedule 1 to this Agreement (General Terms and Conditions).

2      **AVAILABILITY**

       The Bank reserves the right at its absolute discretion to decide whether or not any
       utilisation may be made and to specify conditions only upon compliance with which
       such utilisation may be made. Without prejudice to the forgoing, it is understood by the
       parties that the FX Transactions that the Borrower may request the Bank to enter into
       pursuant to this Agreement shall be restricted to a tenor of 1 month or less, provided that (and
       for the avoidance of any doubt), this shall not restrict the Bank's freedom to agree to a tenor
       in excess of 1 month at its absolute discretion.

       Further, and again without prejudice to the foregoing, the Facility will not become available
       until the Collateral Documents have been delivered to the Bank, duly executed by the
       Borrower in the Bank's preferred form and otherwise in form and substance satisfactory to
       the Bank.

       In considering from time to time the continuation of the availability of the Facility, the Bank
       will have particular regard to the matters listed on the attached Schedule 2 headed
       "Additional Matters".

       Regardless of whether such Additional Matters are being observed, the Bank may still at any
       time withdraw all or any part of the unutilised Facility.

1

3    **FURTHER DOCUMENTATION**

All transactions pursuant to the Facility will be subject to and governed by the International Swaps and Derivatives Association ('ISDA') Master Agreement entered into between the Bank and the Borrower on or about the date of this Agreement and capitalised terms used in this Agreement and otherwise undefined shall have the meanings ascribed thereto in the ISDA 1998 FX and Currency Option Definitions.

By signature of their duly authorised signatories, the parties hereby confirm their entry into of this Agreement and acceptance of all the terms and conditions set out herein and in the attached Schedules and Appendices forming part of the Agreement.

Agreed.

For and on behalf of **HSBC Bank plc**.

We **Alpha Prime Fund Limited** confirm our agreement to all the terms and conditions contained in this Agreement.

Date ........................

Director ....................
(Signed for and on behalf of Alpha Prime Fund Limited, pursuant to a Resolution of the Board of Directors passed on ...............)

2

# SCHEDULE 1

## GENERAL TERMS AND CONDITIONS

1.    **DEFINITIONS**

In the interpretation of this the facility Agreement and all its attached Schedules, the following terms shall, unless the context otherwise requires, have the following meanings:

'**Administrator**' means HSBC Institutional Trust Services (Bermuda) Limited or such other person satisfactory to the Bank as may from time to time be appointed to act as administrator to the Borrower;

'**Authorised Person**' means the Custodian and each person identified on a list provided to the Bank and certified by the Company Secretary or equivalent officer of the Borrower as being a person authorised to enter into FX Transactions on behalf of the Borrower, as the same may be amended, varied or supplemented from time to time by the submission to the Bank of a revised list certified by the Company Secretary or equivalent officer of the Borrower;

'**Collateral**' means all of the assets of the Borrower from time to time subject to the security interests granted by the Collateral Documents;

'**Collateral Documents**' means the documents listed in Schedule 3 (Collateral Documents);

'**Collateral Requirement**' means at any time, such amount as shall ensure that the aggregate of the FX Risk Amount for each then outstanding FX Transaction of the Borrower shall be 6% of such amount;

'**Custodian**' means HSBC Institutional Trust Services (Bermuda) Limited;

'**Custody Cash Account**' means an account maintained by the Custodian on behalf of the Borrower in the name of the Custodian re: the Borrower;

'**Eligible Collateral**' means Collateral consisting of credit balances on any Custody Cash Accounts and other assets which satisfy the criteria set out in Schedule 4 (Eligible Collateral), provided that, the Bank may give notice to the Borrower with regard to any asset(s) at any time that such asset(s) shall not be Eligible Collateral for the purposes of this Agreement notwithstanding that such asset(s) may otherwise satisfy the criteria set out in Schedule 4;

'**FX Risk Amount**' means, with respect to any FX Transaction at any time, the USD equivalent (as determined by the Bank by reference to its then prevailing rates of exchange) of:

(i)    the amount of the Borrower's payment obligation under such FX Transaction multiplied by the FX Risk Percentage; or

(ii)    if the Bank shall in its discretion so select, the Unrealised Loss (if any) of the Borrower in relation to such FX Transaction at such time;

'**FX Risk Percentage**' means such figure expressed as a percentage as the Bank shall determine appropriately reflects the potential for loss for the Borrower on an FX Transaction; such determination by the Bank to be in accordance with its usual policies and procedures and by

3

reference, inter alia, to the currency in which the Borrower's payment obligation under such FX Transaction is expressed and the period of time from the date of such determination to the Settlement Date of such FX Transaction;

'NAV' means the gross value of investments, cash in hand and other property and assets owned by the Borrower less accounts payable, borrowings and other liabilities, as determined by the Administrator, provided that, if the Bank shall have examined the practices, procedures, books and/or records of the Administrator and shall have determined the same to be unsatisfactory to the Bank or shall have sought to perform such an examination but shall have been unable to do so, the Bank may perform its own calculation of NAV and such NAV, as determined by the Bank, shall be the NAV for the purposes of this Agreement;

'NVAC' means the value of the Eligible Collateral from time to time as determined by the Bank less the aggregate amount of the Borrower's outstanding indebtedness and other liabilities as determined by the Bank;

'Prospectus' means the Confidential Private Placement Memorandum from time to time of the Borrower; and

'Unrealised Loss' means, in relation to any FX Transaction at any time, any shortfall between the amount of the Bank's payment obligation owed to the Borrower under such FX Transaction and the amount of the same currency as the aforesaid Bank's payment obligation which the Borrower would be required to pay in exchange for the quantity of currency of the Borrower's payment obligation under the FX Transaction at the Bank's then prevailing rate of exchange.

## 2    AUTHORITY OF BORROWER'S OFFICERS

2.1    The Bank shall be entitled to rely on any Authorised Person as having actual authority to bind the Borrower in relation to the entering into of any FX Transaction and the giving of instructions to the Bank with respect thereto.

2.2    Clause 2.1 shall be without prejudice to the Bank's right to rely on the implied or ostensible authority of any officer of the Borrower including, without limitation, with respect to the entering into of any transaction pursuant to the terms of this Agreement or the giving of any instructions in relation hereto on behalf of the Borrower.

## 3    INDEMNITY

3.1    The Borrower hereby agrees that the Bank shall not be responsible for any losses or claims resulting from errors in the transmission of any orders or instructions or other transmissions (whether oral, telephonic, written, by facsimile, by telex or other device) with regards to this Agreement.

3.2    The Borrower hereby agrees to indemnify and hold harmless the Bank against any and all claims, losses and expenses arising out of or in connection with this Agreement including the risks acknowledged or assumed by the Borrower under this Agreement.

3.3    The Borrower will reimburse the Bank on demand for all expenses (including legal expenses and any value added or similar tax imposed thereon) incurred by the Bank in connection with the negotiation, preparation and execution of this Agreement and each other document executed pursuant hereto, and will reimburse the Bank on demand for all expenses (including legal expenses and any value added or similar tax imposed thereon) incurred by the Bank in varying the terms of this Agreement or any other document as described above, in suing for

4

or recovering any sum due to the Bank under this Agreement or otherwise in protecting or enforcing its rights under this Agreement

3.4    Without prejudice to the generality of the foregoing provisions of this Clause 3, the Borrower hereby agrees to indemnify and hold harmless the Bank in respect of, and the Bank shall incur no liability to the Borrower for, acting upon oral instructions which the Bank in good faith believes have been given by any Authorised Person or Authorised Officer (including, without limitation, instructions with respect to the entering into of any FX Transaction or otherwise with respect thereto). It is further understood and agreed by the Borrower that the risks inherent in the giving of oral instructions of misunderstandings, errors and the risk of instructions being given by unauthorised persons are the Borrower's own and the Bank shall not be responsible or liable for any loss, charge, cost or expense that may result from such misunderstandings, errors or unauthorised instructions and the Borrower assumes all liability for any and all consequences and/or damages that may result from the Bank following such instructions.

## 4    ENVIRONMENTAL RESPONSIBILITY

The Borrower, by accepting the Facility, warrants and represents to the Bank that it is in full compliance with all applicable current laws, regulations and practices relating to the protection of the environment from pollution ('the environmental responsibility') and is not aware of any circumstances which may prevent full compliance in the future.

Regardless of whether such warranties and representations are being observed, the Bank may still at any time withdraw all or any of the Facility.

The Borrower, by accepting the Facility, indemnifies the Bank against all losses, claims, damages, costs, or any other liability which might arise (by reason of the Bank providing these and any other facilities and/or having a security interest in the Borrower's assets) in respect of a breach of, or a failure to meet, an environmental responsibility.

## 5    GOVERNING LAW AND JURISDICTION

The Facility and all matters (including the terms and conditions) relating to or arising out of or in connection with it shall be subject to and construed in accordance with the laws of England and Wales.  The Borrower and the Bank irrevocably submit to the non-exclusive jurisdiction of the courts of England and Wales.

No person other than a party to this Agreement has any right under the Contracts (Rights of Third Parties) Act 1999 to enforce the provisions of this Agreement and the effect of that Act is hereby excluded.

# SCHEDULE 2

## ADDITIONAL MATTERS

Notwithstanding anything contained in the following provisions, such provisions shall be read at all times subject to the paragraph headed "Availability" on page 1 of the Agreement.

**1      COLLATERAL**

1.1      The Borrower undertakes to the Bank to procure that the value of NVAC must at all times be at least equal to or exceed the Collateral Requirement.

1.2      The Collateral required under this Agreement is in addition to any other collateral requirement which may exist under any other agreements with the Bank.

**2      FINANCIAL CONDITION**

The Borrower covenants to procure that the following conditions are always satisfied:

(a)      <u>Liquidity</u>

amongst the Eligible Collateral not constituted by cash there are at all times sufficient securities redeemable (including the frequency of redemption, the relevant notice period and the contractual settlement period as may be applicable) within 7 days which amount to a cumulated value equal to 150% of the aggregate FX Risk Amount with respect to all outstanding FX Transactions at such time;

(b)      <u>NAV Per Share</u>

the NAV per share of the Borrower does not fall by more than 10% within 1 month, 15% within 2 months and/or 30% in any rolling six-month period;

(c)      <u>Fund Withdrawals</u>

withdrawals of capital from the Borrower or its funds or sub funds by investors shall not exceed 15% of the total amount invested by subscribers therein in one month or 25% of such amount in any three month period; and

(d)      <u>Minimum Investments</u>

The minimum number of distinct securities constituting the investments made by the Borrower shall be ten (10).

**3      NO CHANGE TO CUSTODIAN OR ADMINISTRATOR**

The Borrower covenants that no steps shall be taken to replace:

(i)      the Custodian with another custodian for any reason whatsoever; or

(ii)      the Administrator with another administrator without the prior approval of the Bank.

6

**4    COMPLIANCE WITH AGREEMENTS**

The Borrower covenants that it shall comply in all material respects with the terms of its agreements with the Custodian and the Administrator.

**5    ADMINISTRATOR**

The Borrower covenants to procure that the Administrator shall, at the request of the Bank:

(i)     promptly provide such information concerning the Administrator's practices and procedures (including, without limitation, its valuation methodology (with respect to the determination of NAV and otherwise) and accounting practices) as the Bank may from time to time request;

(ii)    permit the Bank, its servants or agents access to the premises of the Administrator and such of its files, books and records as concern the Borrower, shall, if requested furnish copies of the same to the Bank and shall co-operate fully (including, without limitation by way of making available such of its duly qualified staff) in facilitating the Bank's review of the same; and

(iii)   with respect to any determination of NAV performed by the Administrator, promptly provide to the Bank, at its request, copies of the working papers and such files, books and records (or relevant extracts from the same) as the Administrator shall have utilised for the purposes of making such determination of the NAV.

**6    PROSPECTUS**

The Prospectus of the Borrower shall not be amended in any way which the Bank may consider material in relation to the Facility without the consent of the Bank, such consent of the Bank not to be unreasonably withheld.

# SCHEDULE 3

## COLLATERAL DOCUMENTS

Security Agreement

Security Deed in relation to Custody Cash Accounts

# SCHEDULE 4

## ELIGIBLE COLLATERAL

Any asset that has been deposited by the Borrower into custody with the Custodian and which is subject to the terms of the Collateral Documents as specified in Schedule 3.

Provided that, assets to which any of the following characteristics apply shall not be Eligible Collateral for the purposes of this Agreement notwithstanding that such assets may fulfil the criteria set out above:

(1)    If the asset constitutes an interest in a fund where the total redemption period (being the aggregate of any notice period, redemption period and payment period) is greater than 360 days.

(2)    A price for such asset is available less frequently than monthly.

(3)    If the value of holdings in the same asset constitutes in excess of 20% of NAV at any time, the value of the holdings in excess of 20% of NAV shall not be Eligible Collateral.

**AGREEMENT RELATING TO** an uncommitted multi-currency overdraft facility dated the
     day of                   2006

**BETWEEN**

(1)     **Alpha Prime Fund Limited** of 6, Front Street, Hamilton HM 11, Bermuda, (**'you'** or **'the
          Borrower'**); and

(2)     **HSBC Bank plc** of 8, Canada Square, London E14 5HQ (**'we'**, **'us'** or **'the Bank'**); and

(3)     **HSBC Institutional Trust Services (Bermuda) Limited** of 6 Front Street, Hamilton HM 11,
          Bermuda (the **'Custodian'**)

Pursuant to the terms of this agreement and its attached schedules and appendices (together the
**'Agreement'**), the Bank is pleased to offer the Borrower a multi-currency overdraft facility on the
terms referred to below but otherwise subject to normal banking terms and conditions and any agreed
terms and conditions applicable to any accounts on which the Facilities are made available.

The Overdraft Facility is to be made available on the Custody Cash Accounts held with the Bank by
the Custodian in its name for the benefit of the Borrower and the Custodian is required to be a party
to this Agreement for such purposes.

Terms defined in the Definitions Schedule shall bear the meanings ascribed therein where used
throughout this Agreement.

**Multi-Currency Overdraft**

The multi-currency overdraft facility (the 'Overdraft Facility') is offered in the Base Currency of
United States Dollars, provided that the aggregate amount of the Base Currency Equivalent of all
drawings outstanding at any time shall not exceed the limit expressed below in the Base Currency:

       USD 5,000,000 (United States Dollars five million) or, if less, 10% of NVAC from time to
       time (the 'Overdraft Facility Limit')

The Bank may at any time withdraw all or any part of the Overdraft Facility and may at any time
demand repayment of all sums owing in respect of the Overdraft Facility. Subject to this, the
Facilities are due for review in two months time.

The Interest Rate applicable to the drawings under the Overdraft Facility shall be 1.50% above the
Bank's Base Rate.

The Borrower shall use the proceeds of the Overdraft Facility for the purpose of short term liquidity,
provided that, the Bank shall be under no obligation to verify the purposes to which the proceeds of
any borrowing hereunder may be utilised by the Borrower.

The utilisation and operation of the Overdraft Facility shall additionally be subject to the terms and
conditions set out in the Appendix to the General Terms and Conditions entitled "Multi-Currency
Overdraft Facility - Terms and Conditions".

1

**Fees**

An arrangement fee of USD 5,000 (United States Dollars five thousand) will be payable.

**Security**

The repayment and discharge of all monies at any time owing to the Bank in respect of the Overdraft Facility will be secured by all security at any time given to the Bank in respect of the Borrower's liabilities to the Bank. The security is required as a secondary source of repayment in the event that the Borrower fails to repay the Overdraft Facility as set out in this Agreement.

Without limiting the above, the Collateral Documents listed in Schedule 5 (Collateral Documents) are to be held.

All costs, fees and expenses, as mentioned in the General Terms and Conditions attached to this Agreement, shall be payable by the Borrower.

**Conditions Precedent**

The Overdraft Facility will not become available until:

(i)    the following documents shall have been supplied to the Bank in form and substance satisfactory to the Bank:

    (a)    the copy of this Agreement duly accepted and signed by the Borrower and the Custodian;

    (b)    the Collateral Documents duly executed by the Borrower and any other persons required to be a party thereto;

    (c)    a resolution of the Board of Directors of the Borrower, certified by the Company Secretary or equivalent officer of the Borrower, authorising entry into this Agreement, and designating the officer(s) of the Borrower ("Authorised Officers") who is or are authorised to execute and deliver documentation (including this Agreement) for and on behalf of the Borrower and authorising the grant of the security interests under the Collateral Documents as security for the Borrower's obligations under this Agreement;

    (d)    original specimen signatures for the Authorised Officers as specified above, certified by the Company Secretary or equivalent officer of the Borrower;

    (e)    a copy of the Certificate of Incorporation, certified by the Company Secretary or equivalent officer of the Borrower;

    (f)    a copy of the Memorandum and Articles of Association (or equivalent documentation) of the Borrower, certified by the Company Secretary or equivalent officer of the Borrower.

(ii)    If the Administrator is not a member of the HSBC group of companies, the Bank shall have confirmed in writing its satisfaction with the appointment of the Administrator to act as Administrator to the Borrower.

2

**Terms and Conditions**

The Overdraft Facility shall be subject to the General Terms and Conditions and the Appendix thereto and the Schedules attached to this Agreement, but otherwise subject to normal banking terms and conditions.

**Additional Matters**

In considering from time to time the continuation of the availability of the Overdraft Facility, the Bank will have particular regard to the matters listed on the attached pages headed "Additional Matters".

Regardless of whether such Additional Matters are being observed, the Bank may still at any time withdraw all or any part of the Overdraft Facility and/or, demand repayment of all sums owing.

**Process Agent**

You have advised us that you have appointed Law Debenture Corporate Services Ltd. of Fifth Floor, 100 Wood Street, London EC2V 7EX to be your agent for service of process in relation to any proceedings before the English courts in connection with this Agreement. By accepting the terms of this Agreement, you confirm that such appointment has been irrevocably made and you agree that failure by such process agent to notify you of any process shall not invalidate the proceedings concerned.

This Agreement replaces the agreement between the Bank, HSBC Securities Services (Luxembourg) S.A. and the Borrower dated 19 November 2004, as subsequently amended, and all existing liabilities in respect of drawings of the type referred to above shall be governed in future by the terms and conditions of this Agreement.

By signature of their duly authorised signatories, the parties hereby confirm their entry into of this Agreement and acceptance of all the terms and conditions set out herein and in the attached Schedules and Appendices forming part of the Agreement.

Agreed.

For and on behalf of **HSBC Bank plc**.

**ACCEPTANCE BY THE CUSTODIAN**

Agreed

Date: ........................................................

Signed ............................................................

Authorised Signatory
For and on behalf of **HSBC Institutional Trust Services (Bermuda) Limited**

3

**ACCEPTANCE BY THE BORROWER**

We **Alpha Prime Fund Limited** confirm our agreement to all the terms and conditions contained in this Agreement.

We irrevocably authorise the bank to pay and apply our credit monies as mentioned in this Agreement.

We authorise the Bank to debit the fees referred to in the Agreement to the appropriate Custody Cash Account.

Date ........................

Director .....................
(Signed for and on behalf of **Alpha Prime Fund Limited**, pursuant to a Resolution of the Board of Directors passed on ...............)

4

## TABLE OF SCHEDULES AND APPENDICES

**SCHEDULE**                                                                                   **PAGE**

1.   DEFINITIONS SCHEDULE..................................................................................................6

2.   GENERAL TERMS AND CONDITIONS.............................................................................8

         APPENDIX  - MULTI-CURRENCY OVERDRAFT FACILITY ................................12

3.   ADDITIONAL MATTERS ...................................................................................................14

4.   ELIGIBLE COLLATERAL ..................................................................................................17

5.   COLLATERAL DOCUMENTS ...........................................................................................18

# SCHEDULE 1

## DEFINITIONS SCHEDULE

In the interpretation of this Agreement and all its incorporated Schedules and Appendices, the following terms shall, unless the context otherwise requires, have the following meanings.

**General Definitions**

'**Administrator**' means HSBC Institutional Trust Services (Bermuda) Limited or such other person satisfactory to the Bank as may from time to time be appointed to act as administrator to the Borrower;

'**Agreed Currency**' means the British Pound Sterling, the euro, the Japanese Yen, the Swiss Franc, the United States Dollar or such other currency or currencies agreed by the Bank with the Borrower from time to time;

'**Banking Day**' means a day (other than a Saturday or Sunday) on which banks are open for general business in London or Bermuda and:

(a)     in relation to any date for payment or purchase of a currency other than euro the principal financial centre of the country of that currency; or

(b)     in relation to any date for payment or purchase of euro any TARGET Day;

'**Bank's Base Rate**' means in the case of overdrafts of accounts denominated in Sterling, the Bank's Sterling Base Rate as published from time to time and in the case of any currency other than Sterling, the Bank's Currency Overdraft Rate (or "COR") for such currency from time to time;}

'**Base Currency**' means United States Dollars;

'**Base Currency Equivalent**' means, in relation to any amount denominated in a currency other than the Base Currency at any time, the equivalent of such amount in the Base Currency calculated by reference to the Bank's then prevailing spot selling rate of exchange for such currency against the Base Currency;

'**Collateral**' means all of the assets of the Borrower from time to time subject to the security interests granted by the Collateral Documents;

'**Collateral Documents**' means the documents listed in Schedule 5 (Collateral Documents);

'**Collateral Requirement**' means at any time such amount as shall ensure that the sum of all amounts outstanding under the Overdraft Facility at such time shall be 10% of such amount;

'**Custodian**' means HSBC Institutional Trust Services (Bermuda) Limited;

'**Custodian Agreement**' means the custodian agreement between the Borrower and the Custodian dated 12 March 2003 as amended, varied and/or supplemented from time to time;

'**Custody Cash Account**' means an account maintained by the Custodian on behalf of the Borrower in the name of the Custodian re: the Borrower;

6

'**Eligible Collateral**' means Collateral consisting of credit balances on any Custody Cash Accounts and other assets which satisfy the criteria set out in Schedule 4 (Eligible Collateral), provided that, the Bank may give notice to the Borrower with regard to any asset(s) at any time that such asset(s) shall not be Eligible Collateral for the purposes of this Agreement notwithstanding that such asset(s) may otherwise satisfy the criteria set out in Schedule 4;

'**NAV**' means the Base Currency Equivalent of the gross value of investments, cash in hand and other property and assets owned by the Borrower less accounts payable, borrowings and other liabilities, in all cases as determined by the Administrator, provided that, if the Bank shall have examined the practices, procedures, books and/or records of the Administrator and shall have determined the same to be unsatisfactory to the Bank or shall have sought to perform such an examination but shall have been unable to do so, the Bank may perform its own calculation of NAV and such NAV, as determined by the Bank, shall be the NAV for the purposes of this Agreement;

'**NVAC**' means the Base Currency Equivalent of the value of the Eligible Collateral from time to time as determined by the Bank less the aggregate amount of the Borrower's outstanding indebtedness (including, but not limited, to the borrowings under this Agreement) and other liabilities as determined by the Bank;

'**Overdraft Facility Limit**' means the Overdraft Facility Limit as defined on the first page of this Agreement;

'**Prospectus**' means the Confidential Private Placement Memorandum from time to time of the Borrower;

'**TARGET**' means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system;

'**TARGET Day**' means any day on which TARGET is open for the settlement of payment in euro; and

'**Valuation Date**' means the date(s) on which the NAV of the Borrower falls to be determined as provided for in the Prospectus.

# SCHEDULE 2

## GENERAL TERMS AND CONDITIONS

**1     DRAWINGS**

Utilisation of the Overdraft Facility shall not at any time exceed the Overdraft Facility Limit.

**2     PAYMENTS**

2.1     All payments to be made under this Agreement by the Borrower to the Bank shall be made free and clear, and without deduction for, any and all present and future taxes, withholdings or charges imposed on such payments. Should any taxes be imposed on such payments or any documentary, stamp, excise or similar type of tax be imposed on this Agreement or on the execution, delivery or enforcement hereof, the Borrower shall pay the same and remit payment to the Bank in an amount equal to that which would have been payable had no taxes been imposed thereon together with receipts evidencing payment of such taxes.

2.2     If any date on which payment is due is not a Banking Day, payment shall be made on the next succeeding Banking Day.

**3     AUTHORITY OF BORROWER'S OFFICERS**

3.1     The Authorised Officers shall have continuing authority to act for the Borrower generally in relation to this Agreement including, without limitation, authority to enter into any amendment or variation of its terms and any renewal of this Agreement including, without limitation, authority to enter into any agreement with respect to any increase or decrease in the Overdraft Facility Limit.

3.2     Clause 3.1 shall be without prejudice to the Bank's right to rely on the implied or ostensible authority of any officer of the Borrower including, without limitation, with respect to the entering into of any transaction pursuant to the terms of this Agreement or the giving of any instructions in relation hereto on behalf of the Borrower.

**4     INDEMNITY**

4.1     The Borrower hereby agrees that the Bank shall not be responsible for any losses or claims resulting from errors in the transmission of any orders or instructions or other transmissions (whether oral, telephonic, written, by facsimile or other device) with regards to this Agreement.

4.2     The Borrower hereby agrees to indemnify and hold harmless the Bank against any and all claims, losses and expenses arising out of or in connection with this Agreement including the risks acknowledged or assumed by the Borrower under this Agreement.

4.3     The Borrower will reimburse the Bank on demand for all expenses (including legal expenses and any value added or similar tax imposed thereon) incurred by the Bank in connection with the negotiation, preparation and execution of this Agreement and each other document executed pursuant hereto, and will reimburse the Bank on demand for all expenses (including legal expenses and any value added or similar tax imposed thereon) incurred by the Bank in varying the terms of this Agreement or any other document as described above, in suing for

8

or recovering any sum due to the Bank under this Agreement or otherwise in protecting or enforcing its rights under this Agreement.

## 5    REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants on the date hereof and will be deemed to represent and warrant on the date of each utilisation of the Overdraft Facility by the Borrower that:

(a)    the Borrower is duly incorporated and validly existing under the laws of the jurisdiction of its incorporation;

(b)    the execution and delivery of this Agreement and performance by the Borrower of its obligations under this Agreement are within the power of the Borrower and have been duly authorised by all necessary actions, have received all necessary governmental approvals, and do not contravene the Borrower's organisational documents (if applicable), or any law, regulation or contractual restriction binding on or affecting the Borrower;

(c)    this Agreement is a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms;

(d)    there is no pending or threatened action or proceeding affecting the Borrower before any court, governmental agency or arbitrator which may materially adversely affect the financial condition, operations or affairs of the Borrower;

(e)    there has been no material adverse change in the regulatory status, financial condition, operations or affairs of the Borrower as reflected in the most recent financial statements of the Borrower since the date of such financial statements, copies of which have been furnished to the Bank;

(f)    the Borrower is the sole beneficial owner of all the assets comprising the Collateral, free and clear of all liens and encumbrances whatsoever (other than those granted to the Bank under the Collateral Documents);

(g)    the Borrower has no outstanding indebtedness which has not been disclosed to the Bank;

(h)    the latest annual audited accounts of the Borrower as provided to the Bank were prepared in accordance with accounting principles generally accepted in Luxembourg and consistently applied, and gave a true and fair view of the financial condition of the Borrower;

(i)    all factual written information provided to the Bank by the Borrower for the purposes of this Agreement was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated;

(j)    the Borrower is not required under the law of its jurisdiction of incorporation to make any deduction for or on account of any tax from any payment it may make under this Agreement;

(k)    under the law of the Borrower's jurisdiction of incorporation, it is not necessary for this Agreement to be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration or similar tax be paid on or in relation to this Agreement or the transactions contemplated hereunder; and

(l)     the choice of English law as the governing law of this Agreement and any judgement obtained in England in relation to this Agreement will be recognised and enforced in the Borrower's jurisdiction of incorporation.

## 6      PAYMENT AND APPLICATION OF CREDIT MONIES

The Borrower by accepting the terms of this Agreement irrevocably authorises the Bank at any time in its sole discretion, with or without prior notice to the Borrower, to pay and apply any monies from time to time standing to the credit of any of the Borrower's accounts with the Bank (whether in sterling or any other currency, on current account or on any term or deposit account but not accounts expressly designated as trust accounts) ('the Accounts') in and towards satisfaction of any indebtedness or liability to the Bank in respect of the Overdraft Facility.

In connection with the above the Borrower further irrevocably authorises the Bank to:

(i)     bring to an end any fixed deposit period applying to any of the Accounts and to adjust any interest payable by the Bank;

(ii)    convert one currency to another, and if it does, to do so at its then prevailing spot selling rate of exchange for that currency;

and in doing so the Borrower agrees that the Bank shall have no liability to the Borrower.

Nothing in this paragraph shall prevent the exercise by the Bank at any time of any other right of set-off or of combination of accounts in and towards satisfaction of any indebtedness to the Bank in respect of the Overdraft Facility.

## 7      ENVIRONMENTAL RESPONSIBILITY

The Borrower, by accepting the Overdraft Facility, warrants and represents to the Bank that it is in full compliance with all applicable current laws, regulations and practices relating to the protection of the environment from pollution ('the environmental responsibility') and is not aware of any circumstances which may prevent full compliance in the future.

Regardless of whether such warranties and representations are being observed, the Bank may still at any time withdraw all or any part of the Overdraft Facility and/or demand immediate repayment of all sums owing.

The Borrower, by accepting the Overdraft Facility, indemnifies the Bank against all losses, claims, damages, costs, or any other liability which might arise (by reason of the Bank providing these and any other facilities and/or having a security interest in the Borrower's assets) in respect of a breach of, or a failure to meet, an environmental responsibility.

## 8      DEMAND AND NOTICE

Unless otherwise advised by the Bank any demand or notice under this Agreement by the Bank may be made or given by any manager or officer of the Bank by letter addressed to the Borrower or any officer of the Borrower sent by first class post to or left (at the bank's option) at the Borrower's or Administrator's address last known to the Bank or at the Borrower's registered office, or by fax or other electronic means (at the Bank's option) to the Borrower's or Administrator's last known fax number or electronic mail address.  If sent by post, the demand or notice shall be deemed to have been made or given at noon the day following the day the letter was posted.  If sent by fax or other

electronic means, the demand or notice shall be deemed to have been made or given at the time of transmission.

**9        FORCE MAJEURE**

The Bank shall not be liable to the Borrower for any loss, damage or delay attributable in whole or part to action by any government or government agency or other force majeure and in particular but not limited to strikes, industrial action, whether involving the Bank's staff or not, equipment failure or interruption of power supplies.  The Bank will always endeavour to give notice generally to customers of any anticipated delays.

**10        CERTIFICATES**

The Bank's certificate of any sum due from the Borrower under the terms of this Agreement shall (apart from obvious mistake) be conclusive.

**11        GOVERNING LAW AND JURISDICTION**

The Overdraft Facility and all matters (including the terms and conditions) relating to or arising out of or in connection with it shall be subject to and construed in accordance with the laws of England and Wales.  The Borrower and the Bank irrevocably submit to the non-exclusive jurisdiction of the courts of England and Wales.

No person other than a party to this Agreement has any right under the Contracts (Rights of Third Parties) Act 1999 to enforce the provisions of this Agreement and the effect of that Act is hereby excluded.

## APPENDIX TO SCHEDULE 2
### (GENERAL TERMS AND CONDITIONS)

**MULTI-CURRENCY OVERDRAFT FACILITY - TERMS AND CONDITIONS**

**1    DRAWINGS**

1.1    The Overdraft Facility shall be made available by the Bank exclusively by way of drawings permitted on any Custody Cash Account. The Overdraft Facility shall be available to the Borrower in no other manner.

1.2    The Borrower acknowledges and agrees that, notwithstanding that a Custody Cash Account may be maintained in the name of the Custodian, any debit balance or other liability arising on or in relation to a Custody Cash Account shall be the primary obligation of the Borrower as principal debtor and not as surety, such debit balance or other liability having been incurred pursuant to this Agreement on the Borrower's behalf as principal by the Custodian acting as its duly authorised agent.

1.3    Drawings may be made in any Agreed Currency on any Custody Cash Account denominated in such Agreed Currency.

1.4    All outstanding amounts under the Overdraft Facility shall be notionally converted daily by the Bank into their Base Currency Equivalent for calculation purposes.  Should the total value of the Base Currency Equivalents of all outstanding amounts exceed the Overdraft Facility Limit at any time, the Borrower shall forthwith at the request of the Bank pay the Bank such amount as is necessary to bring the Base Currency Equivalent of the total outstanding amount within the Overdraft Facility Limit.

1.5    The Borrower undertakes to apply the amounts drawn down under the Overdraft Facility for the purposes specified in the Agreement;

**2    DRAWINGS IN EXCESS**

Notwithstanding clause 1 of Schedule 2 (General Terms and Conditions), the Bank may, at its absolute discretion, agree to permit drawings under the Overdraft Facility in excess of the Overdraft Facility Limit, provided that, such borrowings by the Borrower shall not benefit from the interest conditions under this Agreement, unless the Bank's prior written approval has been obtained. Accordingly, unless the Bank's prior written approval has been obtained, interest on the principal amount of such borrowings in excess of the Overdraft Facility Limit shall accrue daily at the interest rate equal to four percent (4%) above the Bank's Base Rate.

**3    INTEREST**

From one Business Day to the next interest will accrue on a daily basis and on the basis that there are 360 or 365 days in each year (as appropriate) on the aggregate debit balance on the currency account at the relevant percentage per annum over the Bank's Base Rate as varied from time to time.  Interest calculated on whichever of these bases is appropriate will be payable in respect of each of the 365 days in a calendar year (366 in a leap year).  Such interest shall be calculated up to and including the last Business Day of each month or upon earlier termination of the Overdraft Facility and debited in arrears on such day as the Bank shall determine to the relevant Custody Cash Account together with any applicable commission charge in accordance with the Bank's then current tariff.

12

Interest after demand will be charged at the same rate and calculated on the same basis as before such demand.

**4      FURTHER TERMS AND CONDITIONS**

The Overdraft Facility will be subject to the further provisions set out in the General Terms and Conditions attached to this Agreement.

13

# SCHEDULE 3

## ADDITIONAL MATTERS

Notwithstanding anything contained in the following provisions, such provisions shall be read at all times subject to the paragraph headed "Additional Matters" on page 3 of this Agreement.

**1      INFORMATION**

The Borrower shall furnish the Bank with:

(i)      Within 120 days after the close of each fiscal year of the Borrower, financial statements of the Borrower prepared and audited by independent certified public accountants as at the end of such period;

(ii)     at the request of the Bank, monthly portfolio valuations of the Borrower by no later than 30 days following the relevant Valuation Date;

(iii)    such other financial or other information as the Bank may from time to time request;

**2      NEGATIVE PLEDGE**

Other than pursuant to this Agreement, the Borrower shall not create nor permit to continue or subsist any mortgage, charge, pledge, lien or other security interest over any of the assets of the Borrower without the prior written consent of the Bank;

**3      FURTHER BORROWINGS**

The Borrower shall not, without the Bank's prior written consent, borrow, sell short or raise money, give any guarantee or indemnity or underwrite the issue of any securities, or permit any of the same to continue, in excess of any limit as may be agreed from time to time with the Bank;

**4      DISPOSALS**

The Borrower shall not sell, transfer or otherwise dispose of the whole or a substantial part of its assets, whether in one or several transactions, related or not, except against receipt of adequate compensation therefor at market value or with the Bank's prior written consent;

**5      CO-OPERATION**

The Borrower shall execute and deliver from time to time to the Bank all such further documents and instruments and do all such other acts and things as may be required by the Bank to enable the Bank to exercise and enforce its rights hereinafter and under other documents referred to herein and to perfect, continue the perfection of, preserve or protect its security interests over the Collateral.

**6**    **FINANCIAL CONDITION**

The Borrower covenants to procure that the following conditions are always satisfied:

(a)    Liquidity

amongst the Eligible Collateral not constituted by cash, there are at all times
sufficient securities redeemable (including the frequency of redemption, the relevant
notice period and the contractual settlement period as may be applicable) within 7
days which amount to a cumulated value equal to 150% of the amount drawn under
the Overdraft Facility Limit;

(b)    NAV Per Share

the NAV per share of the Borrower does not fall by more than 10% within 1 month,
15% within 2 months and/or 30% in any rolling six-month period;

(c)    Fund Withdrawals

withdrawals of capital from the Borrower or its funds or sub funds by investors shall
not exceed 15% of the total amount invested by subscribers therein in one month or
25% of such amount in any three month period; and

(d)    Minimum Investments

The minimum number of distinct securities constituting the investments made by the
Borrower shall be ten (10).

**7**    **COLLATERAL**

7.1    The Borrower undertakes to the Bank to procure that the value of NVAC, must at all times be
at least equal to or exceed the Collateral Requirement

7.2    The Collateral required under this Agreement is in addition to any other collateral
requirement which may exist under any other agreements with the Bank.

**8**    **ADMINISTRATOR**

The Borrower covenants to procure that the Administrator shall, at the request of the Bank:

(i)    promptly provide such information concerning the Administrator's practices and procedures
(including, without limitation, its valuation methodology (with respect to the determination of
NAV and otherwise) and accounting practices) as the Bank may from time to time request;

(ii)    permit the Bank, its servants or agents access to the premises of the Administrator and such
of its files, books and records as concern the Borrower, shall, if requested furnish copies of
the same to the Bank and shall co-operate fully (including, without limitation by way of
making available such of its duly qualified staff) in facilitating the Bank's review of the
same; and

(iii)    with respect to any determination of NAV performed by the Administrator, promptly provide
to the Bank, at its request, copies of the working papers and such files, books and records (or
relevant extracts from the same) as the Administrator shall have utilised for the purposes of
making such determination of the NAV.

15

**9      PROSPECTUS**

The Prospectus of the Borrower shall not be amended in any way which the Bank may consider material in relation to the Facility without the consent of the Bank, such consent of the Bank not to be unreasonably withheld.

# SCHEDULE 4

### ELIGIBLE COLLATERAL

Any asset that has been deposited by the Borrower into custody with the Custodian and which is subject to the terms of the Collateral Documents as specified in Schedule 5.

Provided that, assets to which any of the following characteristics apply shall not be Eligible Collateral for the purposes of this Agreement notwithstanding that such assets may fulfil the criteria set out above:

(1)    If the asset constitutes an interest in a fund where the total redemption period (being the aggregate of any notice period, redemption period and payment period) is greater than 360 days.

(2)    A price for such asset is available less frequently than monthly.

(3)    If the value of holdings in the same asset constitutes in excess of 20% of NAV at any time, the value of the holdings in excess of 20% of NAV shall not be Eligible Collateral.

17

## SCHEDULE 5

### COLLATERAL DOCUMENTS

Security Agreement

Security Deed in relation to Custody Cash Accounts