**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

Hearing Date: May 28, 2015
Hearing Time: 10:00 A.M. (EST)
Objection Deadline: May 21, 2015

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**MOTION FOR AN ORDER APPROVING SIXTH ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING SIXTH INTERIM DISTRIBUTION TO CUSTOMERS**

# TABLE OF CONTENTS

**Page**

I.      EXECUTIVE SUMMARY ............................................................................................1

II.     THE LIQUIDATION PROCEEDING .................................................................6

III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA ............8

    A.    Allocation of Property.....................................................................................8

    B.    Distributions Under SIPA .............................................................................9

    C.    Allocation Of Assets To The Customer Fund And Related Reserves ...................10

    D.    Determination Of Allowable Net Equity Claims & Related Reserves .................13

IV.     CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR SIXTH
       ALLOCATION AND SIXTH INTERIM DISTRIBUTION.............................................14

    A.    No Interim Distribution Of General Estate ...........................................................16

V.      MISCELLANEOUS ...................................................................................................17

    A.    Notice...........................................................................................................17

    B.    Record Date ...............................................................................................18

VI.     CONCLUSION............................................................................................................19

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this motion (the "Motion")

pursuant to SIPA §§ 78*lll*(4), 78fff(a)(1)(B), 78fff-2(b), and 78fff-2(c)(1), and Rule 9013 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an order (1)

approving the sixth allocation of property ("Sixth Allocation") to the fund of customer property

("Customer Fund"); and (2) authorizing a sixth pro rata interim distribution ("Sixth Interim

Distribution") to customers whose claims for customer protection under SIPA have been allowed

for amounts exceeding the SIPA statutory advance limits and which have not already been

satisfied by the first, second, third, fourth and fifth pro rata interim distributions.  This Court has

jurisdiction over this Motion pursuant to SIPA §§ 78eee(b)(2), 78eee(b)(4), 28 U.S.C. §§ 157

and 1334, and Bankruptcy Rule 5005.  This Motion is based upon the law set forth below as well

as the facts set forth in the affidavit of Vineet Sehgal ("Sehgal Aff."), filed herewith.  In support

of this Motion, the Trustee alleges and represents as follows:

## I.    EXECUTIVE SUMMARY

1.    In order to protect customers of an insolvent broker-dealer such as BLMIS,

Congress established a statutory framework pursuant to which customers of a debtor in a SIPA

liquidation are entitled to preferential treatment in the distribution of assets from a debtor's

estate.  The mechanism by which customers receive preferred treatment is through the creation

of a fund of "customer property" as defined in SIPA § 78*lll*(4), which is distinct from a debtor's

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

general estate. Customers holding allowable claims are entitled to share pro rata in the fund of customer property based on each customer's "net equity" as of the filing date, to the exclusion of general creditors. SIPA § 78fff-2(c).

2.      In order to make distributions from the Customer Fund, the Trustee must determine or be able to sufficiently estimate: (a) the total value of customer property available for distribution, or the "numerator" (including reserves for disputed recoveries), and (b) the total net equity of all allowed claims, or the "denominator" (including reserves for disputed claims). The Trustee calculates reserve amounts on a "worst-case" basis, such that the ultimate resolution of disputed amounts will not adversely affect any customers' allowed or disputed net equity distributions.

3.      In this case, for purposes of determining each customer's "net equity," the Trustee credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method"). Some claimants argued that the Trustee was required to allow customer claims in the amounts shown on the November 30, 2008 customer statements (the "Last Statement Method," creating the "Net Equity Dispute"). Litigation over the Net Equity Dispute proceeded through this Court,[2] the Second Circuit,[3] and the Supreme Court of the United States (the "Supreme Court").[4] The Trustee's Net Investment Method was upheld.

---

[2] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

[3] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision").

[4] Two petitions for writ of certiorari were denied by the Supreme Court of the United States on June 25, 2012. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Ryan v. Picard*, 133 S.Ct. 24 (2012); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (In re Bernard L. Madoff Inv. Sec., LLC), 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Velvel v. Picard*, 133 S.Ct. 25 (2012). A third petition

4.    The Trustee previously filed five motions seeking entry of an order approving allocations of property to the Customer Fund and authorizing pro rata interim distributions of Customer Property, and this Court entered orders approving those motions:

| No. of Distribution | Date of Distribution | Amount Allocated | Amount Distributed | Percentage Distributed | ECF No. for Motion | ECF No. for Order |
|---|---|---|---|---|---|---|
| 1 | 10/05/2011 | $2.618 billion | $615.813 million | 4.602% | 4048 | 4217 |
| 2 | 09/19/2012 | $5.501 billion | $4.472 billion | 33.556% | 4930 | 4997 |
| 3 | 03/29/2013 | $1.198 billion | $625.120 million | 4.721% | 5230 | 5271 |
| 4 | 05/05/2014 | $477.504 million | $420.300 million | 3.180% | 6024 | 6340 |
| 5 | 02/06/2015 | $704.396 million | $362.071 million | 2.743% | 8860 | 9014 |

5.    At the time of the Second Allocation and Second Interim Distribution, a final, nonappealable order had been entered on the Net Equity Dispute, upholding the Trustee's Net Investment Method.  As a result of that ruling, a separate but related question of whether claimants are entitled to an increase of their claims based on the time that elapsed while their monies were deposited with BLMIS ("Time-Based Damages") was relevant to the Second Allocation Motion (the "Time-Based Damages Dispute").  In its order approving the Second Allocation Motion (ECF No. 4997), the Court required the Trustee to maintain a reserve for the Time-Based Damages Dispute at not less than 3% ("the 3% Reserve").

6.    On September 10, 2013, Judge Lifland held a hearing on the Time-Based Damages Dispute and granted the Trustee's motion, finding that claimants were not entitled to Time-Based Damages as part of their net equity claims against the fund of customer property (the "Time-Based Damages Decision").  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv.*

---

for writ of certiorari was dismissed.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. dismissed sub nom. Sterling Equities Assocs. v. Picard*, 132 S.Ct. 2712 (2012).

*Sec. LLC*, 496 B.R. 744 (Bankr. S.D.N.Y. 2013). On September 24, 2013, the Court certified the Time-Based Damages Decision for a direct appeal to the Second Circuit, (ECF No. 5514), which was accepted on January 22, 2014. *In re Bernard L. Madoff Inv. Sec. LLC*, No. 14-97(L) (2d Cir. Jan. 22, 2014). The Second Circuit affirmed the Time-Based Decision on February 20, 2015. *In re Bernard L. Madoff Inv. Sec. LLC,* 779 F.3d 74 (2d Cir. Feb. 20, 2015). No petitions for a writ of certiorari to the Supreme Court have been filed to date.

7.      Under the terms of Judge Lifland's order requiring the 3% Reserve, the Trustee set a Time-Based Damages reserve and allocated such reserve to the Customer Fund as part of the total amount allocated to the Customer Fund in the Second through Fifth Allocations and Interim Distributions. Of the total amount allocated to the Customer Fund from the First through the Fifth Allocations, the Trustee reserved $1,444,937,833.62 for Time-Based Damages. Since the Fifth Allocation, an additional $3,779,791.64 has been added to the Time-Based Damages reserve, bringing the total reserve amount to $1,448,717,625.26. In this Motion, the Trustee seeks approval to release the bulk of the Time-Based Damages reserve and distribute such funds under the terms set forth herein.

8.      The Trustee stands ready to make a sixth significant distribution to customers with allowed claims—approximately 6.883% on each allowed claim—arising from the release of the 3% Reserve. The Trustee cannot, however, make such distribution if a petition for certiorari is filed on the Time-Based Damages Decision as he must maintain that reserve until litigation is completed on that issue. The Trustee is filing this Motion in advance of the date by which a petition for certiorari is due so that if no petitions are filed and this Court approves this Motion, the distributions to customers can commence promptly. If petitions for certiorari are filed on the Time-Based Damages Decision, the Trustee will withdraw this Motion until such time as the Supreme Court rules on any such petitions.

- 4 -

9.      Thus, by way of this Motion, the Trustee seeks to distribute approximately $903.980 million (with an additional $313.884 million available for distribution to certain "net loser" accounts in litigation, if the claims relating to their accounts become allowed prior to the time the distribution is made, or reserved, if not allowed).[5]  The Sixth Interim Distribution, when combined with the First through Fifth Interim Distributions, will provide up to 55.685% of each customer's allowed claim amount, plus the SIPC advance of up to $500,000.   The proposed distribution will be paid on claims relating to 1,057 BLMIS accounts.   The average payment amount to those 1,057 BLMIS accounts will be $855,231.62.   Twenty payments will go to claimants who qualified for hardship status under the Trustee's claims Hardship Program.   If approved, and when combined with the SIPC payment and the amounts from the First through Fifth Interim Distributions, 1,252 accounts will be fully satisfied (all accounts with a net equity of up to $1,126,923.91).

10.      Of the 3% Reserve, the Trustee proposes maintaining a general reserve of $200,000,000.00 for unknown contingencies.   The Trustee seeks to release and distribute the remainder of the 3% Reserve at this time.

11.      The proposed Sixth Allocation and Sixth Interim Distribution are interim in nature.   The Trustee anticipates recovering additional assets through litigation and settlements. Final resolution of certain disputes will permit the Trustee to reduce the reserves he is required to maintain, which will allow him to make additional distributions to customers in the future.   The

---

[5] If all of these "net loser" accounts were allowed prior to the distribution, the total distribution to claimants would be approximately $1.218 billion ($1,217,864,004.84), based on the net equity amount for deemed determined accounts.

Trustee will seek authorization for these further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.[6]

## II.    THE LIQUIDATION PROCEEDING

12.    Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11" to the extent these provisions are consistent with SIPA.

13.    SIPA affords special protection to "customers," as defined in SIPA § 78*lll*(2), who receive preferential treatment by having their claims satisfied ahead of general creditors. *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (recognizing that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment"). The amounts owed to each customer are determined by valuing his or her "net equity," defined in SIPA § 78*lll*(11), as of the Filing Date[7].

14.    To date, the Trustee has received 16,519 customer claims. (Sehgal Aff. ¶ 4). To date, the Trustee has determined 16,397 of those claims. (*Id.* ¶ 4). The other 122 claims are discussed in Paragraph 15 below. The Trustee allowed 2,552 claims and committed to pay approximately $824.3 million in funds advanced to him by SIPC. (*Id.*). To date, the allowed claims total approximately $13.568 billion. (*Id.*). The Trustee denied 12,965 claims that were

---

[6] The Trustee seeks permission to include in the Sixth Interim Distribution those claims that are allowed between the time an order is entered on this Motion and the date of the Sixth Interim Distribution.

[7] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm. *See* SIPA § 78*lll*(7)(B).

purported to be customer claims.  Twelve other claims were filed that asserted no claim.  Another 868 claims have been withdrawn.  (*Id.*).

15.    One hundred twenty-two claims are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants.  (*Id.* ¶ 5).  The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under section 502(d) of the Bankruptcy Code.  Accordingly, such claims will not be allowed until the avoidance action is resolved by settlement or otherwise and any judgment rendered against the claimant in the avoidance action is satisfied.

16.    To date, the Trustee has received 427 timely and 22 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.743 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 449 claims, 94 are general creditor claims and 49 are broker-dealer claims, which together total approximately $264.975 million of the $1.743 billion.[8]  (*Id.* ¶ 6).

17.    2,192 docketed objections have been filed to the Trustee's claims determinations relating to 3,817 claims, which will be noticed for hearing as necessary.  (*Id.* ¶ 7).  These 2,192 objections relate to 1,104 BLMIS accounts.  (*Id.*).  The objections raise various issues, including the proper interpretation of "net equity" (now resolved), the right to interest or time value of money, and whether the Trustee's calculation of allowed claims amounts are correct.

---

[8] The 449 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims.  (Sehgal Aff. ¶ 6).  They do not include "customer" claims, even though each "customer" claim—both those allowed and denied—has a "general creditor" component.  All BLMIS creditors, including customers whose claims were allowed, customers whose claims were denied, and general creditors, may have claims as general creditors against BLMIS for misrepresentation, fraud, and breach of contract (assuming they filed claims).  Customers who filed customer claims need not have specifically filed claims as general creditors to protect such rights.

- 7 -

## III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA

### A.    Allocation of Property

18.     SIPA sets forth a bipartite statutory framework that gives customers priority over general creditors of the broker-dealer. Pursuant to SIPA § 78fff-2(c)(1)(B), all customers with allowed claims share ratably in the fund of customer property. Pursuant to SIPA § 78fff-2(c), general creditors and customers, to the extent of their respective unsatisfied net equities, share in any general estate. Estate property not allocable to the fund of customer property is distributed in the order of priority established in section 726 of the Bankruptcy Code. SIPA § 78fff(e). Any property allocated to the fund of customer property that is not necessary to satisfy customer and other priority claims will become part of the general estate. SIPA § 78fff-2(c).

19.     According to SIPA § 78*lll*(4), "customer property" consists of "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

20.     Among the assets that comprise "customer property" are "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . ." SIPA § 78*lll*(4)(D). Under SIPA § 78*lll*(4)(D), a trustee is permitted to look to the property of the debtor to rectify the actions taken by the debtor that resulted in a shortfall in customer property. *See Ferris, Baker, Watts v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 132 (Bankr. D. Minn. 2002) ("Application of the plain meaning of 15 U.S.C. § 78*lll*(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall. . . . Thus, if the debtor failed to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78*lll*(4)(D) would require the trustee to correct the debtor's error.").

- 8 -

21.     Thus, if the trustee determines that there is a shortfall in assets such that customer property is insufficient to satisfy net equity claims, then he may look to other assets of the debtor and allocate property to the fund of customer property.

22.     SIPA liquidations generally take a broad and inclusive customer-related approach to the allocation of property. For example, in *In re Park South Securities, LLC*, 99% of the debtor's estate was allocated to customer property. See Order, No. 03-08024A (Bankr. S.D.N.Y. Oct. 30, 2008) (ECF No. 201).[9] Consistent with prior liquidations, the Trustee expects to allocate the vast majority of the BLMIS estate to the Customer Fund, inasmuch as here, recovered property either belonged to customers or was derived from the misuse of customer property.

### B.    Distributions Under SIPA

23.     The SIPA distribution scheme, while complex, can be distilled to a simple equation. Each customer is entitled to his or her pro rata share of customer property. To determine the percentage that each allowed customer will receive from the fund of customer property in an interim distribution, the aggregate amount collected to date by the Trustee and allocated to customer property is divided by the aggregate amount of net equity claims allowed

---

[9] *Accord SIPC v. Lehman Brothers, Inc.*, Adv. Pro. No. 08-01420, Motion for Order Approving Allocation of Property of the Estate at 27-28, n.33 (Bankr. S.D.N.Y. Oct. 5, 2009) (ECF No. 1866) (allocating "most" of debtor's assets to customer property); *In re Vision Inv. Grp., Inc.*, Adv. Pro. No. 97-1035B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); *In re Klein Maus & Shire, Inc.*, Adv. Pro. No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); *In re MJK Clearing*, 286 B.R. at 132 (allocating 100% the debtor's assets as customer property); *In re A.R. Baron & Co., Inc.*, Order Approving Final Report and Account and Related Relief, Adv. Pro. No. 96-8831A (Bankr. S.D.N.Y. Feb. 10, 2004) (allocating 99% of the debtor's assets to customer property); *In re Hanover, Sterling & Co.*, Adv. Pro. No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

by the Trustee. The percentage result is then to be applied to each net equity claim to determine a customer's pro rata share. The equation is as follows:

<u>Fund of Customer Property ("Numerator")</u>           = Customer Pro Rata Share
Allowable Customer Net Equity Claims ("Denominator")

24.    SIPA § 78fff-2(c)(1) establishes the order of distribution of customer property. The second and third priorities of distribution are relevant here. The second priority is to distribute customer property among customers based on their filing date net equities. SIPA § 78fff-2(c)(1)(B). The third priority is to distribute customer property to SIPC as subrogee. SIPA § 78fff-2(c)(1)(C). Thereafter, any customer property remaining becomes part of the general estate.

25.    The amount advanced by SIPC to the Trustee in full or partial satisfaction of a customer claim is based on the difference between the customer's net equity and his share of customer property, subject to the $500,000 limit of SIPA's statutory protection. The SIPC advance does not reduce the customer's net equity or his claim against customer property. If the sum of the amount of a customer's SIPC advance and any subsequent distribution of customer property exceeds the customer's net equity, SIPC has the right to recoup its advance from the excess. In effect, SIPC becomes subrogated to the claims of customers to the extent it has made advances but cannot seek recovery from customer property as to any individual customer until the customer has been fully satisfied. SIPA §§ 78fff-3(a), 78fff-2(c)(1).

### C.    <u>Allocation Of Assets To The Customer Fund And Related Reserves</u>

26.    As this Court previously found in its Net Equity Decision, and as numerous courts in civil and criminal proceedings have also found, Madoff did not engage in securities trading on behalf of BLMIS customers. Madoff used customer funds to support operations and fulfill requests for redemptions to perpetuate a Ponzi scheme. Thus, payment of "profits" to any one

customer in fact came from another customer's deposit of funds.  In essence, all of the funds withdrawn by BLMIS customers were simply other people's money.

27.      BLMIS had an obligation to set aside sufficient assets to cover its statutory obligations to customers.  *See* Securities Exchange Act Rule 15c3-3; 17 C.F.R. § 240.15c3-3.[10] At this time, the assets of BLMIS and Madoff are insufficient to cover those obligations.

28.      For these reasons, and because it is not uncommon for almost all property available to a broker-dealer to be deemed "customer property," this Court previously approved allocation of the funds in the Trustee's possession to the Customer Fund.  ECF Nos. 4217, 4997, 5271, 6340, 9014; *see also First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 362-66 (D.N.J. 1986) (describing and approving SIPA allocation and distribution scheme similar to that proposed by Trustee).

29.      The Trustee previously sought and obtained approval to allocate the following amounts:

| No. of Allocation | Amount Allocated | Percentage Distributed | ECF No. for Motion | ECF No. for Order |
|---|---|---|---|---|
| 1 | $2.618 billion | 4.602% | 4048 | 4217 |
| 2 | $5.501 billion | 33.556% | 4930 | 4997 |
| 3 | $1.198 billion | 4.721% | 5230 | 5271 |
| 4 | $477.504 million | 3.180% | 6024 | 6340 |
| 5 | $704.396 million | 2.743% | 8860 | 9014 |

---

[10] SIPA's definitional paragraphs were amended in 1978 to incorporate in the "customer property" definition any other property of the debtor's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers.  Thus, to the extent that prior to the Filing Date BLMIS failed to maintain cash and securities in compliance with the Net Capital Rule issued by the SEC (Rule 15c3-1), as affected by the Customer Protection Rule (Rule 15c3-3) (both issued pursuant to the Exchange Act, 15 U.S.C. § 78o(c)(3)(A)), the Trustee is required to allocate property as necessary to remedy such non-compliance.  The Customer Protection Rule effectively requires that a broker-dealer maintain control of all property that would have to be delivered to customers in the event of a liquidation: either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.

30. The amounts previously distributed as outlined in each of the First through Fifth Allocation Motions change as additional accounts are determined. Below is a summary of the amounts allocated and distributed, as of April 15, 2015:

| No. | Amount Allocated | Reserve From Previous[11] | Amount Available for Distribution | Allocation for Allowed Claims[12] | Allocation for Deemed Determined Claims[13] | SIPC Subrogation | Other Reserves[14] |
|---|---|---|---|---|---|---|---|
| 1 | $2.618 billion | N/A | $2.618 billion | $615.813 million | $210.488 million | $8.591 million | $1.783 billion |
| 2 | $5.501 billion | $1.783 billion | $7.284 billion | $4.472 billion | $1.535 billion | $80.863 million | $1.197 billion |
| 3 | $1.198 billion | $1.197 billion | $2.395 billion | $625.120 million | $215.931 million | $15.430 million | $1.538 billion |
| 4 | $477.504 million | $1.538 billion | $2.016 billion | $420.300 million | $145.448 million | $11.166 million | $1.439 billion |
| 5 | $756.538 million[15] | $1.439 billion | $2.195 billion | $362.071 million | $125.460 million | $10.102 million | $1.698 billion |

31. The total amount of the 3% Reserve is $1,444,937,833.62, which was previously allocated to the Customer Fund in the Second through Fifth Allocations. The Trustee seeks to re-allocate that amount, plus an additional $3,779,791.64, for a total of $1,448,717,625.26 for purposes of this Sixth Allocation.

32. The Trustee will maintain a general reserve of $200,000,000.00. Thus, the amount available for the Sixth Interim Distribution will be $1,248,717,625.26.

33. Of the $1,248,717,625.26 numerator, $903,979,820.12 will be distributed as part of the Sixth Interim Distribution to allowed accounts, and SIPC subrogation for allowed accounts

---

[11] Reserve from Previous represents amounts that were reserved in the prior allocation.
[12] Allocation for Allowed Claims represents the amount allocated for claims that have been allowed.
[13] Allocation for Deemed Determined Claims represents amounts allocated and reserved for claims that are currently in litigation with the Trustee.
[14] Other Reserves represents all funds that are reserved for various issues, including the 3% Reserve for the Time-Based Damages litigation.
[15] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58. Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

in the amount of $29,798,353.43[16] will be released to SIPC.  For deemed determined accounts,

$314,817,377.61 will be reserved.

34.    The Trustee does not seek to allocate any funds to the General Estate at this time.

**D.    Determination Of Allowable Net Equity Claims & Related Reserves**

35.    For distribution purposes, the Customer Fund numerator is only one half of the

equation.  In order to calculate each customer's pro rata share of customer property, the Trustee

also needs to establish the denominator, or the amount of allowable net equity claims.

36.    If the Trustee had determined all customer claims and his determinations were

final either through the passage of time or judicial determination, the denominator would simply

equal the amount of allowed claims.  Because the Trustee seeks to make a Sixth Interim

Distribution prior to a final determination of all customer claims and certain disputes are

pending, the Trustee cannot use as the denominator the amount of allowed claims as of this date.

Doing so could result in an uneven distribution to customers, in violation of SIPA and the

Bankruptcy Code, because there could be insufficient funds to distribute to claimants whose

claims are allowed in the future.  Instead, the Trustee must project as to the amount of all

allowable net equity claims and establish sufficient reserves to ensure that all possibly-eligible

claimants receive a pro rata distribution, should their claims be allowed.  In order to do so, he

must maintain sufficient reserves.

37.    As discussed above, Time-Based Damages is a contingency for which the Trustee

previously reserved.  Per the Court's order (ECF No. 4997), the Trustee previously calculated

this reserve by applying a 3% interest rate to positive account balances.  As discussed herein, the

Trustee requests approval to release the Time-Based Damages reserve.  Thus, for purposes of

---

[16] An additional $113,920.14 of SIPC subrogation associated with the Sixth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

this Motion, the Trustee seeks to set the denominator at $18,141,936,238.30 (the "Denominator"). (Sehgal Aff. ¶ 21).

38.    Certain accountholders decided against filing a claim in this proceeding, even though they may have had allowable net equity claims. The statutory bar date to file claims was July 2, 2009. SIPA § 78fff-2(a)(3). Thus, a failure to file a claim by that date means that there is no distribution that can be made to these accounts. No reserves are maintained for these accounts.

39.    Further, certain accountholders have entered into final settlements not contingent on the Net Equity Dispute. No reserves are maintained for these accounts.

## IV.    CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR SIXTH ALLOCATION AND SIXTH INTERIM DISTRIBUTION

40.    SIPA § 78fff-2(c)(1) establishes, in pertinent part, that a customer is to receive his ratable share from the fund of customer property. To the extent the customer's share has been fully satisfied through an advance of funds by SIPC, SIPC steps into the shoes of the customer as subrogee and receives that customer's share of customer property. In that manner, a customer does not receive a double recovery on his claim that was already fully satisfied by the SIPC advance.

41.    As set forth above and in the Sehgal Affidavit, the Trustee proposes to re-allocate $1,448,717,625.26, the Time-Based Damages reserve, to the Customer Fund at this time and release $1,248,717,625.26 for distribution.

42.    Of the $1,248,717,625.26 numerator, $903,979,820.12 will be distributed as part of the Sixth Interim Distribution to allowed accounts and SIPC subrogation for allowed accounts

in the amount of $29,798,353.43[17] will be released to SIPC.  For deemed determined accounts, $314,817,377.56 will be reserved.

43.     The Denominator is $18,141,936,238.30 (*Id.* ¶ 21).  To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the Denominator, resulting in the following percentage:

$$\frac{\$1,248,717,625.26 \text{ (Net Customer Fund)}}{\$18,141,936,238.30 \text{ (Denominator)}} = 6.883\%$$

44.     Under this scenario, a total of 1,057 accounts will receive a distribution up to 6.883% of their net equity claims.  (Sehgal Aff. ¶ 22).  Of these 1,057 accounts, 93 will become fully satisfied, bringing the total of fully satisfied account holders to 1,252 (964 accounts will remain partially satisfied and will be entitled to participate in future distributions).  (*Id.*).

45.     An additional 82 accounts that are currently "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. (*Id.* ¶ 23).  Thirty-five of the 82 accounts would be fully satisfied by the SIPC advance.  The remaining 47 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion and the Sixth Allocation and Sixth Interim Distribution.  (*Id.*).  Ten of the remaining 47 accounts would be fully satisfied by the First through Sixth Interim Distributions. (*Id.*).

46.     SIPC is entitled to receive repayment as to any given customer to the extent the customer's claim was fully repaid by a combination of the SIPC advance and the Trustee's distributions.  *See In re Bell & Beckwith*, 104 B.R. 842, 852-55 (Bankr. N. D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).  SIPC, as subrogee, is entitled to receive partial repayment of its

---

[17] An additional $113,920.14 of SIPC subrogation associated with the Sixth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance was held in reserve.

cash advances to the Trustee pursuant to SIPA § 78fff-3(a)(1).  If all of the "net loser" accounts were allowed prior to the distribution and received their SIPC advance, the total SIPC subrogation would be $161,227,510.55.  A SIPC subrogation payment was made on March 29, 2013 in the amount of $102,805,012.23, on May 5, 2014 in the amount of $11,299,366.89, and on February 6, 2015 in the amount of $11,226,253.72, for a total of $125,330,632.84 in subrogation payments to SIPC, leaving a total SIPC subrogation claim through this Sixth Allocation of approximately $35.897 million ($35,896,877.71).  Based on the "net loser" accounts that have been allowed and have returned a signed Partial Assignment and Release (PAR) through this Sixth Interim Distribution, SIPC's subrogation claim is approximately $29.811 million ($29,811,262.16).  The $29.811 million is comprised of $29.798 million ($29,798,353.43)[18] of SIPC subrogation from the Sixth Interim Distribution and $12,908.73 of SIPC subrogation associated with the First through Fifth Interim Distributions (this $12,908.73 represents SIPC subrogation for accounts re-determined after the February 6, 2015 payment was made).  This amount will be released to SIPC.

47.     As noted above, the Trustee is making an interim distribution of the Time-Based Damages reserve that was previously allocated to the Customer Fund.  Unless otherwise noted, the numbers contained herein are based on recoveries as of December 31, 2015 and claims allowed as of April 15, 2015.  To the extent additional claims are allowed, the Trustee will distribute funds consistent with the formulas set forth in this Motion.

A.     **No Interim Distribution Of General Estate**

48.     Under SIPA § 78fff(e), funds from the general estate satisfy the administrative costs and expenses of a Debtor's estate and a liquidation proceeding.  To the extent the general

---

[18] An additional $113,920.14 of SIPC subrogation associated with the Sixth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

estate is insufficient, SIPC makes advances to the Trustee for the payment of such costs and expenses.  SIPA § 78fff-3(b)(2).  All administrative advances made by SIPC are recoverable from the general estate under section 507(a)(2) of the Bankruptcy Code.  SIPA §§ 78eee(b)(5)(E), 78fff(e).  The general estate is distributed in accordance with section 726 of the Bankruptcy Code, with section 507(a)(2) expenses receiving second priority.[19]  SIPA § 78fff(e).

49.    As noted previously, the Trustee has received 427 timely and 22 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.743 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 449, 94 are general creditor claims and 49 are broker-dealer claims which together total approximately $264.975 million of the $1.743 billion.  Inasmuch as the Trustee proposes to allocate no assets to the General Estate, there are no funds in the General Estate from which to make a distribution to general creditors at this time.  Accordingly, "[no] purpose would be served" by the examination of or the institution of actions seeking to disallow such claims.  See 11 U.S.C. § 704(5).

## V.    **MISCELLANEOUS**

### A.    **Notice**

50.    Pursuant to Bankruptcy Rules 2002(a)(6), 2002(f)(8), and 2002(h), the Trustee has given notice of the hearing on the Trustee's Motion by first class mail, postage prepaid, to all claimants that filed a claim.  Pursuant to the Order Establishing Notice Procedures (ECF No. 4650), the Trustee has given notice of the hearing on the Trustee's Motion via email and/or U.S. Mail to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney

---

[19] There are no § 507(a)(1) expenses in this liquidation proceeding.

for the Southern District of New York; and (v) all persons who have filed notices of appearance in the BLMIS proceeding.  The Trustee believes that no further notice need be given of this or any further matter in the proceeding.

**B.**    **Record Date**

51.    The Sixth Interim Distribution will be made to all record holders as of May 28, 2015.

## VI.   **CONCLUSION**

52.    This Motion and the relief requested by the Trustee are consistent with the policy and purposes underlying SIPA and are in the best interests of the customers of BLMIS, the Estate, and its creditors.

53.    No prior application for the relief sought herein has been made to this or any other Court.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) approving: (i) the proposed Sixth Allocation of Property to the Customer Fund and to the General Estate; (ii) the proposed Sixth Interim Distribution of the Customer Fund; and (b) granting such other and further relief as may be deemed just and proper.

Dated: April 15, 2015
       New York, New York

Respectfully submitted,

*/s/ David J. Sheehan*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Estate of Bernard L.*
*Madoff*