LAW OFFICE OF
RICHARD E. SIGNORELLI
799 Broadway, Suite 539
New York, NY 10003
Telephone:    212 254 4218
Facsimile:    212 254 1396
rsignorelli@nycLITIGATOR.com℠
www.nycLITIGATOR.com℠
*Attorneys for the Defendants identified on*
*Exhibit 1 to the Notice of Motion submitted herewith*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
SECURITIES INVESTOR PROTECTION              :
CORPORATION,                                :    Adv. Pro. No. 08-01789 (SMB)
                                            :
                    Plaintiff-Applicant,    :    SIPA LIQUIDATION
                                            :
            v.                              :    (Substantively Consolidated)
                                            :
BERNARD L. MADOFF INVESTMENT                :
SECURITIES LLC,                             :
                                            :
                    Defendant.              :
----------------------------------------------------------------x
In re:                                      :
                                            :
BERNARD L. MADOFF,                          :
                                            :
                    Debtor.                 :
----------------------------------------------------------------x
IRVING PICARD, Trustee for the Liquidation  :
of Bernard L. Madoff Investment Securities LLC,  :
                                            :
                    Plaintiff,              :    Adv. Pro. No. 10-5394 (SMB)
                                            :
            v.                              :
                                            :
RICHARD M. GLANTZ, et al.                   :
                                            :
                    Defendants.             :
----------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.............................................................................................v

PRELIMINARY STATEMENT.......................................................................................1

STATEMENT OF RELEVANT FACTS.........................................................................3

      A.      Glantz's And Edward Glantz's Investment Activities From
              Approximately 1976 Through 1992 ...............................................................3

      B.      The SEC Actions In 1992 And 1993...............................................................4

      C.      "Red Flags" Relating To The Commission/Referral Fees Paid
              To Glantz And Edward Glantz Beginning In Around 1994..........................5

      D.      Other Alleged "Red Flags"...............................................................................6

      E.      Madoff's Lack Of Transparency.......................................................................7

      F.      Imputation Of Actual Knowledge And/Or Willful Blindness To
              Other Defendants ............................................................................................7

ARGUMENT......................................................................................................................8

POINT I

THE TRUSTEE LACKS STANDING
AND IS NOT AUTHORIZED TO
MAINTAIN THIS ACTION UNDER SIPA.......................................................................8

POINT II

THE TRUSTEE MAY NOT SEEK
AVOIDANCE OF TRANSFERS MADE
PRIOR TO THE FORMATION OF BLMIS.....................................................................11

i

POINT III

THE CLAIMS SEEKING AVOIDANCE
UNDER § 548(a)(1(B) AND UNDER THE
NYDCL MUST BE DISMISSED IN LIGHT
OF § 546(e)'S SAFE HARBOR PROVISION…………............................................................12

    A.    Section 546(e) Bars The Trustee From Seeking Avoidance
        Under § 548(a)(1)(B) And Under The NYDCL...............................................12

    B.    The "Actual Knowledge" Exception To § 546(e)'s Safe Harbor
        Is Not Applicable Here...............................................................................13

        1.    The Allegations Concerning The Commissions/Referral Fees
            Are Insufficient To Show Actual Knowledge Of Madoff's
            Fraud.......................................................................................15

        2.    The Allegations Concerning Other "Red Flags" Are
            Insufficient To Show Actual Knowledge Of Madoff's Fraud........17

        3.    The Allegations Concerning Madoff's Lack Of Transparency
            Are Insufficient To Show Actual Knowledge Of Madoff's
            Fraud.......................................................................................18

POINT IV

THE TRUSTEE MAY NOT SEEK AVOIDANCE
OF TRANSFERS UNDER § 548(a) TO THE
EXTENT THE TRANSFERS CONSIST OF
PRINCIPAL AND COMMISSION/REFERRAL FEES.................................................20

    A.    The Allegations Concerning The Commissions/Referral Fees
        Are Insufficient To Show Willful Blindness To Madoff's Fraud...............23

    B.    The Allegations Concerning Other "Red Flags" Are
         Insufficient To Show Willful Blindness To Madoff's Fraud.....................26

        1.    Short-Term Interest-Free Loans.....................................................27

        2.    Unqualified Auditing Firm.............................................................29

        3.    Guaranteed And Consistently Positive Double-Digit Returns.........31

C.      The Allegations Concerning Madoff's Lack Of Transparency Are
        Insufficient To Show Willful Blindness To Madoff's Fraud..........................36

POINT V

IMPUTED KNOWLEDGE/WILLFUL BLINDNESS IS
INSUFFICIENT TO SATISFY THE SUBJECTIVE STATE
OF MIND REQUIREMENTS UNDER § 546(e) AND § 548(c)....................…...................38

POINT VI

THE TRUSTEE FAILS TO ADEQUATELY PLEAD
THE REQUISITE INTENT IN CONNECTION WITH
THE AVOIDANCE CLAIM UNDER § 548(a)(1)(A).....................………...................41

POINT VII

THE TRUSTEE FAILS TO PROPERLY
ALLEGE A CONSTRUCTIVE FRAUDULENT
TRANSFER CLAIM UNDER EITHER THE
BANKRUPTCY CODE OR THE NYDCL....................……....................................................44

POINT VIII

THE COURT LACKS JURISDICTION OVER
THE DEFUNCT ENTITY DEFENDANTS...............................................……….............46

POINT IX

THE CLAIMS AGAINST THE ESTATE OF
EDWARD R. GLANTZ ARE TIME-BARRED.................................................................48

POINT X

THE IRA ACCOUNTS ARE STATUTORILY-
PROTECTED FROM THE TRUSTEE'S CLAIMS.............................................................49

POINT XI

COUNT EIGHT SHOULD BE DISMISSED IN ITS ENTIRETY...………........................51

POINT XII

COUNT NINE SHOULD BE DISMISSED IN ITS ENTIRETY...…….............................55

POINT XIII

THIS ACTION SHOULD BE DISMISSED
BECAUSE DEFENDANTS INTEND TO DEMAND
A JURY TRIAL AND WILL NOT CONSENT
TO THIS COURT CONDUCTING SUCH A TRIAL...…...........……….........................56

POINT XIV

ALTERNATIVELY, THE COURT
SHOULD STAY THIS ACTION...........................................……….........................56

POINT XV

JOINDER IN OTHER MOTIONS TO
DISMISS FILED IN SIMILAR CASES.................……….................................................58

CONCLUSION.................……….......................................................................…..................................................59

## TABLE OF AUTHORITIES

**Cases**

Andrew Velez Constr., Inc. v. Consolidated Edison Co. of N.Y., Inc.,
   373 B.R. 262 (Bankr. S.D.N.Y. 2007)................................................................41

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)..........................................………..................14

Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Invest. Corp.),
   256 B.R. 664 (Bankr. S.D.N.Y. 2000)...............................................23, 42, 44

Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC),
   362 B.R. 624 (Bankr. S.D.N.Y. 2007)...............................................................45

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)................................13-14, 15, 53

Briere v. Barbera, 163 A.D.2d 659 (3rd Dep't 1990)......................................................46

Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782 (N.Y. 1985)...........................38 n.13

Croscill, Inc. v. Gabriel Capital, L.P., 817 F.Supp.2d 346 (S.D.N.Y. 2011)................37

Cunningham v. Brown, 265 U.S. 1 (1924)......................................................................42

Daly v. Deptula, 286 B.R. 480 (D. Conn. 2002)............................................................42

Dobler v. Arluk Medical Ctr. Indus. Group, Inc.,
   89 Cal. App.4th 530 (Cal. Ct. App. 2001)................................................48, 49

Harte v. United Benefit Life Ins. Co., 66 Cal.2d 148 (Cal. Sup. Ct. 1967)...................40

Igbara Realty Corp. v. New York Prop. Ins. Underwriting Assoc.,
   94 A.D.2d 79 (1st Dep't 1983)............................................................................46

In re Beacon Assocs. Litig., 745 F.Supp.2d 386 (S.D.N.Y. 2010)....................23, 25, 30

In re: Bernard L. Madoff Inv. Sec. LLC, 773 F.3d 411 (2nd Cir. 2014).........................13

In re: Enron Credit. Recov. Corp. v. Alfa, S.A.B. de C.V.,
   651 F.3d 329 (2nd Cir. 2011)..............................................................................12

In re Ford, 415 B.R. 51 (Bankr. N.D.N.Y. 2009)........................................................51 n.19

In re Glenn, 430 B.R. 56 (Bankr. N.D.N.Y. 2010).........................................................49

In re Jamesway Corp., 235 B.R. 329 (Bankr. S.D.N.Y. 1999)................................51 n.19

In re Keil, 88 F.2d 7 (2nd Cir. 1937)...............................................................................49

In re Madoff Sec., 490 B.R. 46 (S.D.N.Y. 2013)..........................................................1, 8

In re Madoff Sec., 499 B.R. 416 (S.D.N.Y. 2013).............................................................9

IRR Supply Ctrs., Inc. v. Phipps, 217 B.R. 427 (Bankr. W.D.N.Y. 1998)............................51 n.19

Jehly v. Brown, 327 P.3d 351 (Col. Ct. Appeals 2014).................................................39

J.K.C. v. T.W.C., 39 Misc.3d 899 (N.Y. Sup. Ct. Monroe Co. 2013).......................50-51

Kernan v. Kurz-Hastings, Inc., 175 F.3d 236 (2nd Cir. 1999).................................47 n.17

Levinson v. PSCC Svcs., Inc., 2010 U.S. Dist. LEXIS 137537 (D. Conn. Dec. 29, 2010).....39-40

Lihosit v. I & W, Inc., 913 P.2d 262 (N.M. Ct. of App. 1996).........................................40

Madonna v. United States, 878 F.2d 62 (2nd Cir. 1989)..................................................14

Makarova v. United States, 201 F.3d 110 (2nd Cir. 2000)..........................................47 n.17

Marshall v. Picard, 2014 U.S. App. LEXIS 600 (2d Cir. Jan. 13, 2014)...................10 n.6

Morgan v. Gordon, 450 B.R. 402 (W.D.N.Y. 2011).......................................................49

Musselman v. Home Ins. Co. of Indiana,
    1990 U.S. Dist. LEXIS 10235 (S.D.N.Y. Aug. 7, 1990)..................................................56

Newman v. Family Mgmt. Corp., 748 F.Supp.2d 299 (S.D.N.Y. 2010).....................18, 20, 22, 24

Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),
    361 B.R. 369 (Bankr. S.D.N.Y. 2007)..................................................……….....................41

Orlick v. Kozyak, 309 F.3d 1325 (11th Cir. 2002).........................................................42

Picard v. Avellino, 469 B.R. 408 (S.D.N.Y. 2012)........................................................................21

Picard v. Estate of Stanley Chais, 445 B.R. 206 (Bankr. S.D.N.Y. 2011)...............................35-36

Picard v. Greiff, 476 B.R. 715 (S.D.N.Y. 2012)..................................................................51 n.19

Picard v. Katz, 462 B.R. 447 (S.D.N.Y. 2011)...............................................................24, 26, 37

Picard v. Merkin, 515 B.R. 117 (Bankr. S.D.N.Y. 2014).........................................................*passim*

Roberts Real Estate, Inc. v. New York State Dept. of State, 80 N.Y.2d 116 (N.Y. 1992)............40

Saltz v. First Frontier, LP, 782 F.Supp.2d 61 (S.D.N.Y. 2010)...................................18, 20, 22-23

Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
    2013 U.S. Dist. LEXIS 56042 (S.D.N.Y. Apr. 15, 2013)......................................13, 52, 53

Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
    505 B.R. 135 (S.D.N.Y. 2013)..................................................................................54 n.22

Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
    516 B.R. 18 (S.D.N.Y. 2014)..............................................................21, 22, 24, 39, 53 n.20

Sharp Int'l Corp. v. State Street Bank & Trust Co., 403 F.3d 43 (2nd Cir. 2005).................45 n.16

Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.),
    379 B.R. 5 (Bankr. E.D.N.Y. 2007)...........................……….....................45 n.16

Snook v. Netherby, 124 Cal. App.2d 797 (Cal. Dist. Ct. App. 1954)...........................................40

Stephenson v. Citco Group Ltd., 700 F.Supp.2d 599 (S.D.N.Y. 2010).......................................18

Stern v. Marshall, 131 S.Ct. 2594 (2011).....................................……….....................................8

U.S. Bank Nat. Assoc. v. Perlmutter, 470 B.R. 659 (E.D.N.Y. 2012)....................................56-57

Van Ostrand v. Nat'l Life Assurance Co. of Canada,
    371 N.Y.S.2d 51 (N.Y. Sup. Ct. 1975)....................................................................38 n.13

## Statutes

11 U.S.C. § 105.................................................................................................1, 56, 56 n.25

11 U.S.C. § 502(d)................................................................................................................8

11 U.S.C. § 507.................................................................................................................57

11 U.S.C. § 546(e)........................................................................................................*passim*

11 U.S.C. § 546(g)......................................................................................................54 n.22

11 U.S.C. § 548(a)(1)(A).....................................................1, 2, 20, 21, 41, 43, 53

11 U.S.C. § 548(a)(1)(B)...............................................................1, 12, 13, 20, 44

11 U.S.C. § 548(c).......................................................................................................*passim*

11 U.S.C. § 548(d)(2)(A).............................................................................................44

11 U.S.C. § 550(a)......................................................................................51, 52, 53, 55

11 U.S.C. § 550(b)(1)...........................................................................53, 53 n.20, 54

15 U.S.C. § 78fff(e).......................................................................................................57

15 U.S.C. § 78fff-2(c)(3)...............................................................................8-9, 10-11

15 U.S.C. § 78fff-2(c)(1)(A)-(D).......................................................................9, 9 n.4

15 U.S.C. § 78lll(5)..................................................................................................11 n.7

28 U.S.C. § 157(e).......................................................................................................56

California Code of Civil Procedure § 366.2......................................................48

California Code of Civil Procedure § 704.115....................................................49

California Code of Civil Procedure § 704.115(a)(3)......................................49-50

California Code of Civil Procedure § 704.115(b)................................................50

California Probate Code § 9100 .................................................................................................49

N.Y. Bus. Corp. Law § 1006(a) ...........................................…….....................................46

N.Y. Bus. Corp. Law § 1006(a)(4) ...........................…….......................................46

N.Y.C.P.L.R. § 5205 ...............................................................................50

N.Y.C.P.L.R. § 5205(c) ..................................................50, 51, 51 n.19

N.Y. Debt. & Cred. Law § 273 ...................................…….........................................44

N.Y. Debt. & Cred. Law § 274 ...........................…….................................44

N.Y. Debt. & Cred. Law § 275 ...........................…….....................................44

**Rules**

Fed. R. Bankr. P. 7008(a) ...............................……...........................................1

Fed. R. Bankr. P. 7009 ...........................…….....................................1, 14

Fed. R. Bankr. P. 7012(b) ...............................……...........................................1

Fed. R. Bankr. P. 8(a) ...........................…….....................................1, 53

Fed. R. Civ. P. 9(b) ...........................…….....................................1, 14, 41

Fed. R. Civ. P. 12(b)(2) ...........................…….....................................1, 46

Fed. R. Civ. P. 12(b)(6) ...............................……...........................................1

Defendants respectfully submit this memorandum of law in support of their

motion to dismiss the Trustee's first Amended Complaint ("FAC") pursuant to Rules 8(a), 9(b),

12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure and Rules 7008(a), 7009

and 7012(b) of the Federal Rules of Bankruptcy Procedure or, alternatively, for a stay of this

action pursuant to 11 U.S.C. § 105.[1]

## PRELIMINARY STATEMENT

As an initial matter, this Court does not have the power to "finally decide" this

action. At most this Court may "recommend proposed findings of fact and conclusions of law,

which the district court would then review de novo." In re Madoff Sec., 490 B.R. 46, 55

(S.D.N.Y. 2013). As discussed below, the FAC should be dismissed in its entirety for the

following reasons:

(1) the Trustee lacks standing and is not authorized to maintain this action under

the Securities Investor Protection Act ("SIPA");

(2) the Trustee may not seek avoidance of transfers made prior to the formation of

Bernard L. Madoff Investment Securities LLC ("BLMIS");

(3) the Trustee may not seek avoidance pursuant to 11 U.S.C. § 548(a)(1)(A) and

the New York Debtor and Creditor Law ("NYDCL") in light of 11 U.S.C. § 546(e)'s safe harbor

provision;

(4) in light of the good faith defense under 11 U.S.C. § 548(c), the Trustee may

not seek avoidance of transfers under § 548(a)(1)(A) or § 548(a)(1)(B) to the extent the transfers

consist of principal or commission/referral fees;

---

[1]The moving defendants are identified on Exhibit 1 to the Notice of Motion submitted herewith.

(5) there is no basis for imputing Richard M. Glantz's ("Glantz") or Edward

Glantz's alleged "actual knowledge" or "willful blindness" to the other defendants and, in any

event, any imputed state of mind by definition cannot equate with the subjective states of mind

required to invoke the exception to § 546(e)'s safe harbor and to overcome § 548(c)'s good faith

defense;

(6) the Trustee fails to adequately plead the requisite intent in connection with the

avoidance claim under § 548(a)(1)(A);

(7) the Trustee fails to properly allege a constructive fraudulent transfer claim

under either the Bankruptcy Code or the NYDCL;

(8) this Court lacks jurisdiction over the entities that had been dissolved and

whose affairs had been wound up at the time this action was commenced;

(9) the claims against the Estate of Edward R. Glantz ("ERG Estate") are time-

barred;

(10) Glantz's and Edward Glantz's IRA accounts are exempt from the claims of

judgment creditors such as the Trustee;

(11) Count Eight, which seeks to recover from subsequent transferees the initial

transfers alleged to be avoidable in Counts One through Seven, should be dismissed in its

entirety;

(12) Count Nine, which seeks recovery from the alleged general partners of

defendants EJS Associates, L.P. ("EJS"), Jelris & Associates, L.P. ("Jelris"), Grace & Company

("Grace") and Lakeview Investment, LP ("Lakeview") to the extent these defendants are unable

to satisfy any judgments that may be entered against them in this action, should be dismissed in

its entirety; and

(13) insofar as defendants have a right to a trial by jury, they at the present time respectfully intend to demand such a trial and do not consent to this Court conducting such a trial.

Alternatively, to the extent that any part of this action is not dismissed because it cannot be determined whether the assets recovered by the Trustee and the Justice Department are sufficient to pay all claims in this case, defendants respectfully submit that this action should be stayed until such time as such a determination can be made.

## STATEMENT OF RELEVANT FACTS[2]

The FAC is rife with extraneous, inflammatory rhetoric and conclusory allegations of fraud directed at defendant Glantz and his late father Edward Glantz (who is not named as a defendant in this case). Putting all the rhetoric and conclusory allegations aside, the Trustee essentially alleges the following:

**A.    Glantz's And Edward Glantz's Investment Activities From Approximately 1976 Through 1992**

From approximately 1976 through 1992, Glantz and Edward Glantz allegedly operated investment entities that "served as 'sub-feeders' to feeder funds operated by" the accounting firm Avellino & Bienes ("A&B"). (FAC ¶¶ 92, 93-105). Two of those entities are defendants Merlin & Associates, Ltd. ("Merlin") and Enhancement Group ("Enhancement"), which Glantz allegedly operated from approximately the mid-1980s until 1992. (Id. ¶¶ 93-97). The entity that Edward Glantz was involved in was Telfran Associates Corp. ("Telfran"), which

---

[2]The facts set forth herein are derived from the allegations in the FAC. A copy of the FAC is attached as Exhibit A to the Declaration of Bryan Ha ("Ha Decl.") submitted herewith.

he allegedly operated with colleagues from 1982 until 1992.  (Id. ¶¶ 101-105).

Through these investment entities, Glantz and Edward Glantz allegedly "pooled their customers' capital and provided it to A&B, which in turn provided it to Madoff for purported discretionary investment by BLMIS in securities."  (Id. ¶ 92).  According to the Trustee, A&B paid Glantz's and Edward Glantz's entities "a guaranteed rate of return lower than the guaranteed rate of return that A&B received from its BLMIS accounts."  (FAC ¶ 106).  Glantz and Edward Glantz, through their entities, allegedly "profited by retaining the difference between the returns their sub-feeders received from A&B and the returns they provided to their investors."  (Id.).

Notably, there is no allegation that Glantz or Edward Glantz knew that Madoff was a fraud or knew facts suggesting a high probability that BLMIS was a fraudulent operation during this period (i.e., from 1976 through 1992),

**B.    The SEC Actions In 1992 And 1993**

In 1992, the Securities and Exchange Commission ("SEC") began investigating A&B's feeder fund and Glantz's and Edward Glantz's sub-feeder entities.  (FAC ¶ 119).  On or about November 25, 1992, the SEC filed an enforcement action against Telfran, Edward Glantz, and one of his colleagues charging them with operating an unregistered investment company and selling and offering to sell unregistered securities.  (Id. ¶¶ 121-26, 128).  About a year later, the SEC filed a similar enforcement action against Glantz, Merlin, and Enhancement.  (Id. ¶ 127).  Significantly, the SEC did not allege that Glantz or Edward Glantz engaged in any fraudulent activity.  They were only charged with operating unregistered investment companies and selling and offering to sell unregistered securities.

4

Glantz and Edward Glantz settled the SEC enforcement actions against them and their entities "without any admissions of wrongdoing but agreeing to consent judgments imposing injunctions and monetary penalties[.]" (Id. ¶ 130). As a result of the SEC actions, the A&B feeder fund operation was closed down and "hundreds of millions of dollars that had been invested with A&B and the Glantz and Edward Glantz entities" were returned and re-distributed to their investors. (FAC ¶¶ 133-38).

C.    **"Red Flags" Relating To The Commission/Referral Fees Paid To Glantz And Edward Glantz Beginning In Around 1994**

The Trustee alleges that, following the closing of the A&B feeder fund operation, BLMIS began providing compensation to managers like Glantz and Edward Glantz for bringing investments directly to BLMIS. (FAC ¶ 139). The Trustee uses the very loaded label "Fraudulent Side Payments" to describe these payments, but admits that they were "in the nature of a commission or referral fee" based on the amounts of the investments brought to BLMS. (Id. ¶¶ 177). The amounts of the commission/referral fees paid to Glantz and Edward Glantz "were determined primarily based on the amount of reinvestment by their customers, *i.e.*, how much of the money that previously had been invested with A&B through the Glantz and Edward Glantz sub-feeders were reinvested with BLMIS after the funds were shut down." (Id. ¶ 171).

According to the Trustee, BLMIS paid the commission/referral fees by recording fictitious option transactions and the gains they purported to generate "in designated accounts owned or controlled by the individuals to be rewarded." (Id. ¶¶ 168-69). The Trustee alleges that Glantz and Edward Glantz knew that the option transactions by which the payments were made were "fictitious" in light of the following "red flags":

5

- The payment of commission/referral fees through option transactions is not "consistent with normal business practices for payments of" such fees.  (FAC ¶ 177).

- The option transactions by which the payments were made "were consistently and hugely profitable"; "purported to create gains each year that virtually matched the predetermined amounts of" the payments; and were always recorded in December.  (Id. ¶¶ 179-81).

- The statements for the accounts that received the payments each December "showed greater percentage gains than the statements for other BLMIS accounts managed by Glantz and Edward Glantz", which "contrasted with the virtually uniform performance across all the accounts managed by Glantz and Edward Glantz for each of the other 11 months of each year."  (Id. ¶ 182).

- The option transactions by which the payments were made "were inconsistent with Madoff's purported strategy [i.e., the split-strike conversion strategy] and noticeably different from the option transactions typically represented as occurring in Glantz's and Edward Glantz's BLMIS accounts."  (Id. ¶ 183).[3]

## D.    Other Alleged "Red Flags"

Aside from the commission/referral fee payments, the Trustee alleges that Glantz and Edward Glantz knew the following "additional facts that made them aware of the fraud at BLMIS":  (1) their accounts received "guaranteed and consistently positive double-digit annual

---

[3]The Trustee also alleges that Edward Glantz "knew that the Fraudulent Side Payments were fictitious transactions" because he "explicitly stated as much in conversations with Joel Levey[.]" (FAC ¶ 174).  According to the Trustee, Edward Glantz "told Joel Levey that, if Joel Levey opened a BLMIS account, Joel Levey would receive, in addition to whatever return he would otherwise receive, an extra payment equal to $155,000 each year, based on the amount that former Telfran investors reinvested with BLMIS." (Id. ¶ 174).  It is not clear how this shows that Edward Glantz knew that the option transactions by which the payments were made were "fictitious".  He was simply telling Levey, who was one of the owners of Telfran, that BLMIS would pay him the commission/referral fees that it was paying to other managers who brought investments to BLMIS.

6

returns that were too good to be true and were not correlated to the performance of the S&P 100

Index"; (2) BLMIS provided their accounts with loans without charging margin interest; and (3)

BLMIS purportedly used "an auditing firm that lacked the resources to audit an organization of

the size and scope of BLMIS." (FAC ¶¶ 212, 249).

### E.  Madoff's Lack Of Transparency

The Trustee alleges that "Glantz knew that Madoff refused to allow institutions or

other potential new investors access to information that would allow them insight into Madoff's

operations or investment methods."  (FAC ¶ 312).  Glantz allegedly did not identify Madoff to

some investors and prospective investors and informed some of them that Madoff would not

allow them to conduct due diligence on him.  (Id. ¶¶ 313-24).  For example, the offering circular

for Fern Creek, one of Glantz's investment vehicles, "did not identify Madoff but instead referred

to him as the 'Manager.'" (Id. ¶ 314).  The Trustee also alleges that Glantz told a manager of an

investment fund that "Madoff prohibited anyone who raised money for investment with Madoff

from disclosing to investors in writing that money raised would be invested with Madoff" and

that Glantz complied with these "rules imposed by Bernie."  (Id. ¶¶ 325-26).

### F.  Imputation Of Actual Knowledge And/Or Willful Blindness To Other Defendants

The FAC only alleges that Glantz and Edward Glantz had actual knowledge of

Madoff's fraud and/or were willfully blind to facts indicating a high probability that BLMIS was

a fraudulent operation.  There is no allegation that any of the other defendants have such

knowledge or were so willfully blind.  Instead, the Trustee alleges that Glantz's and Edward

Glantz's knowledge and/or willful blindness should be imputed to the other defendants.  (FAC ¶¶

7

329-348).

# ARGUMENT

As an initial matter, pursuant to <u>Stern v. Marshall</u>, 131 S.Ct. 2594 (2011) and

other Supreme Court precedent, this Court "may not finally decide avoidance actions except

conceivably in the process of resolving identical claims under § 502(d)[.]" <u>See</u> <u>In re Madoff</u>

<u>Sec.</u>, 490 B.R. at 55.  The Trustee does not allege any claim under 11 U.S.C. § 502(d) in this

case.  Defendants do not consent to the adjudication of this action by this Court.  Accordingly,

this Court does not have the power to "finally decide" this action.  At most, the Court may

"recommend proposed findings of fact and conclusions of law, which the district court would

then review de novo." <u>In re Madoff Securities</u>, 490 B.R. at 55.

## POINT I

### THE TRUSTEE LACKS STANDING
### AND IS NOT AUTHORIZED TO
### <u>MAINTAIN THIS ACTION UNDER SIPA</u>

The FAC should be dismissed in its entirety because the Trustee lacks standing

and is not authorized to maintain this action under SIPA.  Under SIPA § 78fff-2(c)(3), a trustee is

only authorized to bring an avoidance action under the Bankruptcy Code to recover property

transferred by the debtor when there are insufficient funds in the estate to pay allowed customer

claims and certain other specified claims. Section 78fff-2(c)(3) provides:

> Whenever customer property is not sufficient to pay in full the
> claims set forth in subparagraphs (A) through (D) of [§ 78fff-
> 2(c)(1)], the trustee may recover any property transferred by the
> debtor which, except for such transfer, would have been customer
> property if and to the extent that such transfer is voidable or void
> under the provisions of Title 11.

8

15 U.S.C. § 78fff-2(c)(3). If the fund of customer property is sufficient to satisfy the claims

specified in § 78fff-2(c)(1)(A)-(D), then the trustee has no power to bring an avoidance action to

recover any property transferred by the debtor.[4] See In re Madoff Sec., 499 B.R. 416, 420

(S.D.N.Y. 2013) ("to the extent that existing 'customer property is not sufficient to pay in full'

those statutorily identified claims, the trustee is empowered by SIPA to [bring an avoidance

action to] 'recover any property transferred by the debtor which, except for such transfer, would

have been customer property'").

Here, the Trustee alleges that, "[a]bsent this and other recovery actions, the

Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA

section 78fff-2(c)(1)." (FAC ¶ 60). However, the fund of customer property is sufficient to pay

all claims in this case. To date, the Trustee has allowed customer claims totaling $13.568 billion.

---

[4]SIPA § 78fff-2(c)(1) specifies that the fund of customer property must be used to pay claims as follows:

> (A) first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(1) of this title, to the extent such advances recovered securities which were apportioned to customer property pursuant to section 78fff(d) of this title;
>
> (B) second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;
>
> (C) third, to SIPC as subrogee for the claims of customers;
>
> (D) fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(2) of this title.

15 U.S.C. § 78fff-2(c)(1).

9

(Exh. B).[5]  As of April 6, 2015, the Trustee has recovered (and will be recovering pursuant to

settlement agreements that he has entered into) approximately $10.571 billion for the customer

property fund.  (Exh. C).  In addition to that sum, there are approximately $4.443 billion

available from the Justice Department to compensate customers with allowed claims: (1) $2.2

billion that the Justice Department received in connection with the Jeffrey Picower settlement

that will be "distributed to victims of the fraud"[6]; and (2) approximately $2.243 billion that "will

flow to 'net loser' victims of Madoff's fraud" pursuant to the Justice Department's and the

Trustee's settlements with JPMorgan Chase Bank.  (Exh. D, p. 3).  The Justice Department has

established a "Madoff Victim Fund" to distribute this money to victims of Madoff's fraud who

have "'allowed' claims in the Madoff bankruptcy proceedings."  (Exh. E).

In sum, there are approximately $15.014 billion available to pay the customer

claims in this case.  This sum exceeds the total amount of all allowed claims by approximately

$1.446 billion ($15.014 billion minus $13.568 billion). Accordingly, because the Trustee is only

authorized to seek avoidance under the Bankruptcy Code when the fund of customer property is

insufficient to pay all claims, the Trustee lacks standing and is not authorized to bring this

avoidance action under SIPA.  The FAC should therefore be dismissed.

---

[5]Unless otherwise stated, all the exhibits referenced herein are attached to the Ha Decl.

[6]Marshall v. Picard, 2014 U.S. App. LEXIS 600, at *10 and n.6 (2d Cir. Jan. 13, 2014).

10

## POINT II

### THE TRUSTEE MAY NOT SEEK
### AVOIDANCE OF TRANSFERS MADE
### PRIOR TO THE FORMATION OF BLMIS

BLMIS is a New York limited liability company formed on or about December 4,
2000. (Exh. F). Prior to that date BLMIS did not exist and Madoff operated the business as a
sole proprietorship. (FAC ¶ 63). Madoff had operated the business as a sole proprietorship since
about 1960. (Id.).

Shortly after Madoff's arrest the Securities Investor Protection Corporation filed
an application pursuant to SIPA § 78eee(a)(4)(B) alleging, among other things, "that BLMIS
could not meet its obligations to securities customers as they came due and its customers needed
the protections afforded by SIPA." (Id. ¶ 52). The District Court granted the application and
entered an order "appoint[ing] the Trustee for the liquidation of the business of BLMIS pursuant
to SIPA § 78eee(b)(3)" and "remov[ing] the case to [the Bankruptcy Court] pursuant to SIPA §
78eee(b)(4)." (Id. ¶ 53). Accordingly, before the Court is the liquidation proceeding of BLMIS,
the New York limited liability company formed on or about December 4, 2000. BLMIS is the
sole "debtor" before the Court.[7]

Thus the only transfers that the Trustee may seek to avoid and recover in this
proceeding are those made by BLMIS, the debtor. That is because the Trustee is only authorized
under SIPA to seek avoidance and recovery of "property transferred by the debtor[.]" SIPA §

---

[7] The term "debtor" is defined under SIPA as "a member of SIPC with respect to whom
an application for a protective decree has been filed under section 78eee(a)(3) of this title or a
direct payment procedure has been instituted under section 78fff-4(b) of this title." 15 U.S.C. §
78lll(5).

78fff-2(c)(3) (emphasis added).   The Trustee has no power to seek avoidance of transfers made

prior to the formation of BLMIS (or to calculate net equity based on any transfers made prior to

the formation of BLMIS) while Madoff was operating his business as a sole proprietorship.  Such

transfers are not before the Court and the Court has no jurisdiction over them since a protective

decree was sought and granted only as to BLMIS and the proceeding before this Court is limited

to the liquidation of BLMIS.

Accordingly, the FAC should be dismissed to the extent it seeks to avoid and

recover transfers made prior to the formation of BLMIS on or about December 4, 2000.

**POINT III**

**THE CLAIMS SEEKING AVOIDANCE
UNDER § 548(a)(1)(B) AND UNDER THE
NYDCL MUST BE DISMISSED IN LIGHT
OF § 546(e)'S SAFE HARBOR PROVISION**

In light of § 546(e)'s safe harbor provision, Counts Two through Seven of the

FAC, which seek avoidance under § 548(a)(1)(B) and under the NYDCL, should be dismissed in

their entirety.  The "actual knowledge" exception to the safe harbor is not applicable here

because the Trustee fails to adequately allege that defendants had actual knowledge of Madoff's

fraud.

**A.      Section 546(e) Bars The Trustee From Seeking Avoidance
         Under § 548(a)(1)(B) And Under The NYDCL**

Section 546(e)'s safe harbor was enacted "as a means of 'minimiz[ing] the

displacement caused in the commodities and securities markets in the event of a major

bankruptcy affecting those industries.'"  In re: Enron Credit. Recov. Corp. v. Alfa, S.A.B. de

C.V., 651 F.3d 329, 334 (2nd Cir. 2011) (citation omitted).  In light of this safe harbor, "the

12

Trustee can only avoid and recover intentional fraudulent transfers under Bankruptcy Code §

548(a)(1)(A) that were made within two years of the filing date." Picard v. Merkin, 515 B.R.

117, 138 (Bankr. S.D.N.Y. 2014) ("Merkin II"); see In re: Bernard L. Madoff Inv. Sec. LLC, 773

F.3d 411, 417 (2nd Cir. 2014).

   Accordingly, Counts Two through Seven of the FAC, which seek avoidance under

§ 548(a)(1)(B) and under the NYDCL, must be dismissed in their entirety.

**B. The "Actual Knowledge" Exception To § 546(e)'s Safe Harbor
Is Not Applicable Here**

   The "actual knowledge" exception to § 546(e)'s safe harbor is not applicable here.

The District Court has held that if "an initial (or subsequent) transferee had *actual* knowledge of

Madoff's Ponzi scheme, he cannot avail himself of the § 546(e) safe harbor, and the Trustee can

avoid and recover preferences and actual and constructive fraudulent transfers to the full extent

permitted by state and federal bankruptcy law." Merkin II at 138 (emphasis in original) (citing

Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 2013 U.S. Dist. LEXIS 56042

(S.D.N.Y. Apr. 15, 2013) ("Cohmad")). For this exception to apply the Trustee must plead and

prove that the transferee "had, not mere suspicions, but actual knowledge" that BLMIS was a

Ponzi scheme. See Cohmad, 2013 U.S. Dist. LEXIS 56042 at *29-30. "[T]he Trustee must

show, at a minimum, that the transferee had actual knowledge that there were no actual securities

transactions being conducted." Id. at *32. In this context "'actual knowledge' implies a high

level of certainty and absence of any substantial doubt regarding the existence of a fact." Merkin

II at 139.

   To meet his pleading burden, the Trustee must allege "more than labels and

13

conclusions[.]" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citation omitted). "[T]he tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."

Id. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" Id. (citation omitted). A

complaint that does no more than show that a claim for relief is "possible" or "conceivable" is

inadequate and must be dismissed. See id. at 1950-51. "[D]etermining whether a complaint

states a plausible claim" is "a context-specific task that requires the reviewing court to draw on

its judicial experience and common sense." Id. at 1950.

       In addition, Fed. R. Civ. P. 9(b) requires that in alleging fraud "a party must state

with particularity the circumstances constituting [the] fraud[.]" See Fed. R. Bankr. P. 7009.

"[C]onclusory averments of the existence of fraud made on information and belief and

unaccompanied by a statement of clear and convincing probative facts which support such belief

do not serve to raise the issue of the existence of fraud[.]" Madonna v. United States, 878 F.2d

62, 66 (2nd Cir. 1989) (internal quotation marks and citation omitted).

       Here, the Trustee claims that Glantz and Edward Glantz had actual knowledge of

Madoff's fraud and that their actual knowledge should be imputed to certain of the other

defendants. His allegations that they had such actual knowledge fall into three categories: (1)

allegations concerning the commission/referral fees they received from BLMIS; (2) allegations

concerning certain other "red flags"; and (3) allegations concerning Madoff's lack of

transparency. For the reasons discussed below, these allegations are insufficient to show that

Glantz and Edward Glantz had actual knowledge of Madoff's fraud. In addition, all the reasons

set forth in Point IV below regarding the Trustee's failure to adequately allege willful blindness

are also applicable here and further illustrate the Trustee's failure to adequately allege actual

knowledge.

> 1.    **The Allegations Concerning The Commissions/Referral Fees
>       Are Insufficient To Show Actual Knowledge Of Madoff's
>       Fraud**

As an initial matter, the Trustee labels the commission/referral fee payments made

by BLMIS as "Fraudulent Side Payments" and repeatedly refers to them as such in the FAC. The

Court should give no consideration whatsoever to such labels in evaluating whether the Trustee

has met his pleading burden. See Twombly, 550 U.S. at 555 ("a plaintiff's obligation to provide

the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions").

The Trustee's allegations concerning the commission/referral fee payments center

on the alleged suspiciousness and implausibility of the option transactions by which the

payments were made, i.e., they "were consistently and hugely profitable"; "purported to create

gains each year that virtually matched the predetermined amounts of" the payments; were always

recorded in December; and "were inconsistent with Madoff's purported strategy [i.e., the split-

strike conversion strategy] and noticeably different from the option transactions typically

represented as occurring in Glantz's and Edward Glantz's BLMIS accounts." (FAC ¶¶ 179-86).

In addition, the Trustee alleges that this method of payment is not "consistent with "normal

business practices for payments of commissions or referral fees." (Id. ¶ 177).

These allegations "do not imply the level of certainty or absence of substantial

doubt associated with actual knowledge[.]" Merkin II at 139. Merkin II is instructive and

15

dispositive of the issue here.  In <u>Merkin II</u>, this Court found the "numerous trading

impossibilities and suspicious information" alleged by the Trustee concerning the option

transactions in Merkin's account – which are much more serious than those alleged here –

insufficient to show that Merkin had actual knowledge of Madoff's fraud.  Among a host of other

highly suspicious circumstance the Trustee alleged the following in <u>Merkin II</u> regarding the

option transactions in Merkin's accounts and his actual awareness and understanding that the

transactions were implausible:

- Merkin was aware that BLMIS' "returns were too consistent" and "just not possible" and that BLMIS "could be a Ponzi scheme."

- "Merkin acknowledged the impossibility of the volume of Madoff's trading activity, and specifically, whether there was enough volume in the market to accommodate BLMIS' large option trades."

- "Merkin knew that the volume of daily put and call options BLMIS supposedly bought and sold for the Defendant Funds exceeded the daily volume of the Chicago Board Options Exchange [] and were impossible, and demonstrated that BLMIS was not actually making the trades represented on the trade confirmations provided to Merkin."

- "BLMIS frequently reported more option trades than were available in the entire exchange market, and on ten occasions purportedly executed option trades for the Defendant Funds' accounts when publically available records showed that no volume traded that day." (internal citation omitted).

- Merkin received and reviewed trade confirmations and monthly account statements that showed "trading prices outside of the daily price range of the reported trades" and "equity trades that could not have occurred because of insufficient trading volume."

<u>Merkin II</u> at 129-33.  In addition, similarly to what he alleges here, the Trustee alleged that

Merkin knew that BLMIS engaged in transactions that were "inconsistent with its purported

16

investment strategy" and that it had an unusual fee structure that was not consistent with normal industry practice. Id. at 129, 133.

This Court found all those allegations (and numerous allegations of other "red flags" and suspicious circumstances that Merkin was actually aware of) insufficient to show that Merkin had actual knowledge of Madoff's fraud. See id. at 140-41. For the same reasons, the Trustee's allegations here concerning the option transactions by which the commission/referral fee payments were made – which are much weaker than the allegations in Merkin II – are insufficient to show actual knowledge of Madoff's fraud. Indeed, as discussed at length in Point IV below, unlike in Merkin II, where Merkin's actual awareness and understanding of the "trading impossibilities and suspicious information" concerning the option transactions in his accounts were alleged in vivid detail, the FAC here is devoid of any non-conclusory allegations that Glantz and Edward Glantz were actually aware of and understood the purported "red flags" concerning the option transactions by which BLMIS paid their commission/referral fees.

### 2. The Allegations Concerning Other "Red Flags" Are Insufficient To Show Actual Knowledge Of Madoff's Fraud

The other "red flags" alleged by the Trustee in this case are also insufficient to show that Glantz and Edward Glantz had actual knowledge of Madoff's fraud. The other "red flags" alleged here are: (1) "guaranteed and consistently positive double-digit annual returns that were too good to be true and were not correlated to the performance of the S&P 100 Index"; (2) BLMS gave interest-free loans to Glantz's and Edward Glantz's accounts; and (3) BLMIS's use of an unqualified auditing firm. (FAC ¶¶ 212).

The same "red flags" were also alleged in Merkin II: (1) BLMIS's "returns were

17

too consistent" and "performed independently of " and were "dramatically higher than the S&P

500" even though "Madoff's purported strategy depended on the S&P 100, which correlated to

the S&P 500"; (2) BLMIS gave interest-free loans to Merkin's funds; and (3) BLMIS's use of an

unqualified auditing firm. Merkin II at 129, 131-34. This Court found these and the numerous

other "red flags" alleged by the Trustee insufficient to show that Merkin had actual knowledge of

Madoff's fraud. See id. at 140-41. It follows that they are also insufficient here to show that

Glantz and Edward Glantz had such actual knowledge. See, e.g., Saltz v. First Frontier, LP, 782

F.Supp.2d 61, 69, 72 (S.D.N.Y. 2010) ("red flags" including the size and nature of BLMIS's

outside auditor and consistent returns not sufficient basis for inferring knowledge); Newman v.

Family Mgmt. Corp., 748 F.Supp.2d 299, 307, 309-311 (S.D.N.Y. 2010) ("red flags" including

the size of BLMIS's outside accounting firm and the lack of third-party administrators and

custodians insufficient basis for inferring knowledge); Stephenson v. Citco Group Ltd., 700

F.Supp.2d 599, 623-24 (S.D.N.Y. 2010) ("red flags" including the fact that "Madoff was both

trader and custodian" insufficient basis for inferring knowledge).

3.    **The Allegations Concerning Madoff's Lack Of Transparency Are Insufficient To Show Actual Knowledge Of Madoff's Fraud**

With respect to Madoff's lack of transparency, in Merkin II the Trustee alleged,

among other things, that "Madoff refused to answer questions about assets and other basic

questions" and that the offering materials and quarterly newsletters for Merkin's funds failed to

disclose and/or misrepresented Madoff's/BLMIS's involvement. Merkin II at 130-31. The

Trustee also alleged that Merkin accepted Madoff's refusal to provide information about his

operation and discouraged others from seeking such information:

18

When Merkin asked Madoff which assets BLMIS managed,
Madoff refused to answer.  Merkin did not press him and stated, "I
don't really care, because I've made my peace with Bernie."
[citation omitted].  In 2002, Merkin told Madoff during a telephone
conversation:

> So I told one person, look, you can ask me how
> Bernie does it and that's fine, but when are you
> going to ask Bernie? . . . I said, look, all I can tell
> you is don't ask so many questions.  Sit tight.  And
> that's what I tell everybody. . . .

(Id. at 131).  This Court found these and other allegations in Merkin II insufficient to show that

Merkin had actual knowledge of Madoff's fraud.  See id. at 140-41

Here, just like in Merkin II, the Trustee alleges that "Glantz knew that Madoff

refused to allow" investors or potential investors access to information regarding his operation.

(FAC ¶ 312).  And just as Merkin allegedly failed to disclose Madoff's involvement and

discouraged investors or potential investors from seeking information and told them to "[s]it

tight" and "don't ask so many questions", Glantz allegedly did not identify Madoff to some

investors and prospective investors and informed some of them that Madoff would not allow

them to conduct due diligence on him.  (Id. ¶¶ 313-24).  For example, just like some of the

offering materials for Merkin's funds, the offering circular for Fern Creek "did not identify

Madoff but instead referred to him as the 'Manager.'" (Id. ¶ 314).  Finally, just as Merkin

allegedly accepted Madoff's refusal to answer questions or provide information about his

operation, the Trustee alleges that Glantz did the same, i.e., he complied with the "rules imposed

by Bernie."  (FAC ¶ 326).

In short, the allegations concerning Madoff's lack of transparency in this case are

similar to those in Merkin II.  Just as those allegations are insufficient to show that Merkin had

19

actual knowledge of Madoff's fraud, the allegations here are insufficient to show that Glantz had

such actual knowledge.  See Saltz, 782 F.Supp.2d at 61, 69, 72 ("red flags" including Madoff's

secrecy not sufficient basis for inferring knowledge); Newman, 748 F.Supp.2d at 307, 309-311

("red flags" including BLMIS's lack of transparency and limited to access to BLMIS's books and

records provide insufficient basis for inferring knowledge).

In sum, as in Merkin II, the Trustee's allegations here "do not imply the level of

certainty or absence of substantial doubt associated with actual knowledge[.]"  Merkin II at 140.

Because the Trustee fails to adequately allege that either Glantz or Edward Glantz had actual

knowledge of Madoff's fraud, there is no basis for imputing any such knowledge to the other

defendants in this case.  Accordingly, the "actual knowledge" exception to the § 546(e) safe

harbor is not applicable here.  Counts Two through Seven of the FAC thus should be dismissed

in their entirety in light of § 546(e)'s safe harbor provision.

## POINT IV

### THE TRUSTEE MAY NOT SEEK AVOIDANCE
### OF TRANSFERS UNDER  § 548(a) TO THE
### EXTENT THE TRANSFERS CONSIST OF
### PRINCIPAL AND COMMISSION/REFERRAL FEES

The defendants have a good faith defense under § 548(c) to Count One and Count

Two of the FAC, which seek avoidance under § 548(a)(1)(A) and § 548(a)(1)(B), respectively.

These counts should therefore be dismissed  to the extent the transfers that the Trustee is seeking

to avoid consist of principal or commission/referral fees paid to Glantz and Edward Glantz.[8]

Section 548(c) "provides a defense to a fraudulent transfer claim brought under

_____

[8] Count Two is also subject to dismissal in its entirety in light of § 546(e)'s safe harbor
provision (see supra, Point III).

20

Bankruptcy Code § 548(a) to the extent the transferee 'takes for value and in good faith.'"

Merkin II at 138.  In the context of the BLMIS proceedings a transferee "gave value to the extent

it deposited cash with BLMIS."  Id. at 139.  A broker's services in soliciting and procuring

investors for BLMIS constitutes fair consideration for finders' fees or commissions from BLMIS

and thus also constitutes "value" given to BLMIS.  See Balaber-Strauss v. Sixty-Five Brokers,

256 B.R. 664, 680-82 (Bankr. S.D.N.Y. 2000).  Accordingly, the Trustee may not avoid transfers

consisting of principal and commission/referral fees if the transferee took in good faith.

     "Good faith" in this context "means that the transferee neither had actual

knowledge of the Madoff Securities fraud nor willfully blinded himself to circumstances

indicating a high probability of such fraud."  See Securities Inv. Prot. Corp. v. Bernard L. Madoff

Inv. Sec. LLC, 516 B.R. 18, 23 (S.D.N.Y. 2014) ("Good Faith Decision").  In adopting this

subjective standard the District Court expressly rejected the objective inquiry notice standard

advocated by the Trustee "under which a transferee may be found to lack good faith when the

information the trustee learned would have caused a reasonable person in the transferee's

position to investigate the matter further."  Id. at 21 (internal quotation marks omitted).  As the

District Court explained, "because the securities laws do not ordinarily impose any duty on

investors to investigate their brokers, those laws foreclose any interpretation of 'good faith' that

creates liability for a negligent failure to so inquire.'"  Picard v. Avellino, 469 B.R. 408, 412

(S.D.N.Y. 2012).

     Significantly, the Trustee has the burden of pleading and proving the transferee's

lack of subjective good faith under § 548(c).  See Good Faith Decision at 24.  "[A] defendant

may succeed on a motion to dismiss by showing that the complaint does not plausibly allege that

the defendant did not act in good faith." Id.

Here, the Trustee fails to plausibly allege that the defendants did not act in good faith. As discussed above in Point III, the Trustee fails to adequately allege that any of the defendants had actual knowledge of Madoff's fraud. Thus, to overcome § 548(c)'s good faith defense, the Trustee must plausibly allege that the defendants willfully blinded themselves to Madoff's fraud. In the FAC the Trustee alleges that Glantz and Edward Glantz were willfully blind to Madoff's fraud and that their willful blindness should be imputed to certain of the other defendants. As discussed below, the Trustee fails to plausibly allege such willfulness blindness on the part of Glantz or Edward Glantz. There is thus no basis for imputing such a state of mind to any of the other defendants in this case.

To show willful blindness based on a "red flags" theory (as the Trustee is attempting to do here), the Trustee must plausibly allege that the defendant was actually aware of the "red flags" and "understood them and purposely ignored them." Merkin II at 144. Further, the "red flags" must be so serious as to "raise[]a high probability that BLMIS was a fraudulent operation." Id. at 141; Good Faith Decision at 23 (good faith means that the transferee did not willfully blind himself to "circumstances indicating a high probability of [] fraud"). Allegations that the "red flags" existed and were publicly available and/or that the defendant should have or must have been aware of them are insufficient to show that the defendant was actually aware of them. See Merkin II at 144; see, e.g., Newman, 748 F.Supp.2d at 310 (allegations that defendants "must have known of the red flags because they were detected by many investment professionals in the industry, and were equally available" to the defendants insufficient to give rise to inference of scienter); Saltz , 782 F.Supp.2d at 72 ("red flags" theory of scienter "has been

22

routinely rejected where . . . Plaintiffs offer no evidence Defendants were aware of most red

flags, and those of which Defendants were aware, were not so serious as to infer intent to

defraud"); In re Beacon Assocs. Litig., 745 F.Supp.2d 386, 414 (S.D.N.Y. 2010) (rejecting "red

flags" theory of scienter where defendant was not advised of the risk of investing with Madoff

and "there is no allegation that [defendant] was actually aware of the publicly available red

flags").

        As discussed below, the FAC fails to plausibly allege that Glantz or Edward

Glantz were willfully blind to facts indicating a high probability that BLMIS was a fraudulent

operation.

A.      **The Allegations Concerning The Commissions/Referral Fees**
        **Are Insufficient To Show Willful Blindness To Madoff's Fraud**

        The Trustee does not allege that Glantz or Edward Glantz was aware of any "red

flag" indicating a high probability of fraud at BLMIS during the period from approximately 1976

through 1992, when they were allegedly operating the sub-feeders to feeder funds operated by

A&B. The first "red flags" alleged by the Trustee concern the commissions/referral fees paid by

BLMIS beginning in 1994. (FAC ¶¶ 166-188).

        However, there are no non-conclusory allegations in the FAC that Glantz and

Edward Glantz were actually aware of the purported "red flags" concerning these payments and

"understood them and purposely ignored them." For example, the Trustee alleges that the

payments were made via option transactions entered in their accounts, which he baldly alleges is

not "consistent with normal business practices for payments of commissions or referral fees."

(Id. ¶ 177). But there is no allegation that Glantz and/or Edward Glantz were actually aware that

23

this method of payment was not consistent with "normal business practices."  Any suggestion by

the Trustee that they should have or must have known that is insufficient in this regard.  See, e.g.,

Newman, 748 F.Supp.2d at 310 (allegations that defendants "must have known of the red flags

because they were detected by many investment professionals in the industry, and were equally

available" to the defendants insufficient to give rise to inference of scienter).  Indeed, the fact that

the payments were made via option transactions is not in itself remarkable.  From Glantz's and

Edward Glantz's perspective, they were simply being paid their commission/referral fees from

"the proceeds of a securities transaction[.]"  See Good Faith Decision at 22 ("From the

perspective of an investor withdrawing funds from his account, any payments from Madoff

Securities merely constituted the proceeds of a securities transaction on that customer's behalf.").

        Moreover, even if it is assumed that the Trustee has plausibly alleged that Glantz

and Edward Glantz were actually aware and understood that this method of payment was not

consistent with "normal business practices", this is not so serious a "red flag" as to indicate a

high probability of fraud.  Drawing all inferences in the Trustee's favor, it is at most something

not ordinarily done that arguably "would have caused a reasonable person in the transferee's

position to investigate the matter further."  Good Faith Decision at 21.  But an investor is under

no duty to investigate his broker just because he is "confronted with suspicious circumstances[.]"

Picard v. Katz, 462 B.R. 447, 455 (S.D.N.Y. 2011). Thus any failure on Glantz's and Edward

Glantz's to "investigate the matter further" cannot equate to willful blindness and lack of "good

faith" under § 548(c).

        The Trustee alleges as another "red flag" the fact that the option transactions by

which the payments were made "were inconsistent with Madoff's purported strategy [i.e., the

'split-strike conversion' strategy] and noticeably different from the option transactions typically

represented as occurring in Glantz's and Edward Glantz's BLMIS accounts." (FAC ¶ 183-86).

These allegations are also insufficient to show willful blindness. First, it is not clear why the

fact that BLMIS purported to engage in some option transactions that are different from other

option transactions that it also purported to engage in is a "red flag" indicating a high probability

that it was a fraudulent operation. It is not. But even if it is assumed that it is, there is no

allegation that Glantz or Edward Glantz knew, understood and purposely ignored this supposed

"red flag". To start, while the Trustee alleges that BLMIS's purported use of the split-strike

conversion ("SSC") strategy was "widely known" and was mentioned in a December 1992 *Wall

Street Journal* article regarding the SEC enforcement action against Edward Glantz, there is no

allegation that Edward Glantz was actually aware of that. (Id. ¶ 184). Such actual awareness

cannot be inferred from the fact that the information was publicly available (or "widely known").

See See In re Beacon Assocs. Litig., 745 F.Supp.2d at 414 (rejecting "red flags" theory of

scienter where "there is no allegation that [defendant] was actually aware of the publicly

available red flags"). Further, there is no allegation that he was actually aware and understood

that the option transactions by which the commission/referral fee payments were made were

inconsistent with the SSC strategy. Likewise, while the FAC arguably does allege that Glantz

was aware of BLMIS's purported use of the SSC strategy, there is no allegation that Glantz was

actually aware and understood that the option transactions by which the commission/referral fee

payments were made were inconsistent with that strategy. (FAC ¶ 185).

        The Trustee also alleges as "red flags" the fact that the option transactions by

which the commission/referral fee payments were made were consistently profitable and

25

"purported to create gains each year that virtually matched the predetermined amounts of" the

payments and were recorded in December each year. (Id. ¶¶ 179-81). These are not

circumstances that would have been viewed and understood by Glantz and/or Edward Glantz as

indicating a high probability that BLMIS was a fraudulent operation. According to the FAC,

BLMIS agreed to pay Glantz and Edward Glantz annual commission/referral fees equal to a fixed

percentage of the total amount of money that their former investors reinvested with BLMIS after

the A&B feeder fund operation was shut down. (Id. ¶¶ 189-92, 200-203). Glantz and Edward

Glantz thus expected these "predetermined" annual commission/referral fees to be paid to them

each year. That the payments were in fact made as they expected and were in the agreed-upon

amounts and were made at around the same time each year thus would not have been viewed and

understood by them as "red flags" indicating a high probability of fraud. From their perspective,

the payments were simply payments of commission/referral fees that BLMIS had agreed to make

and was making. That the payments were made via option transactions is not, as discussed

above, remarkable. And as noted above, even if is assumed that there was something unusual

about that, Glantz and Edward Glantz were under no duty to "investigate the matter further" and

their failure to do so cannot equate to willful blindness and lack of "good faith" under § 548(c).

See Katz, 462 B.R. at 455.

**B.    The Allegations Concerning Other "Red Flags" Are**
       **Insufficient To Show Willful Blindness To Madoff's Fraud**

       The Trustee's allegations concerning other purported "red flags" are also

insufficient to show that Glantz and Edward Glantz willfully blinded themselves to Madoff's

fraud.

26

1.      **Short-Term Interest-Free Loans**

BLMIS allegedly provided Glantz's and Edward Glantz's accounts with loans

without charging interest. (FAC ¶¶ 212, 249). These "loans" were essentially cash withdrawals

that exceeded the amount of cash actually available in their accounts. (Id. ¶ 244). They were

very short-term; within a matter of days, less than a week, cash or other securities would be

deposited into the accounts to bring them back to a positive cash balance. (Id. ¶¶ 249-267). The

Trustee does not allege that it was in any way unusual for a broker to make such loans to its

customers. He only alleges that the loans were unusual in that BLMIS did not charge margin

interest on them.

The fact that BLMIS allegedly provided Glantz's and Edward Glantz's accounts

with these run-of-the-mill loans for a few days without charging margin interest (which would

have been minimal given the short loan duration) is not a "red flag" that suggests a high

probability of fraud. First of all, there is no allegation that Glantz and Edward Glantz were even

aware that BLMIS was not charging them interest on these loans, or that they were even aware

that they were being provided with these loans.[9] This alone defeats the Trustee's claim of willful

blindness based on this supposed "red flag". In any event, even if it is assumed that they were

aware of that, it is just not plausible that they would have concluded from the fact that they were

not being charged margin interest for a few days while moving assets into their accounts to

---

[9] The Trustee alleges that the account statements show that cash withdrawals exceeding
the cash balance in the accounts were made and that no interest was charged but does not allege
that Glantz or Edward Glantz was actually aware of that. (FAC ¶¶ 252, 255, 258, 261, 265, 267).
As discussed above, allegations that the "red flag" existed and was available to the defendant or
that the defendant should have or must have been aware of it are insufficient to show that the
defendant was actually aware of it. See, e.g., Merkin II at 144.

27

restore the accounts to a positive cash balance that BLMIS was a fraudulent operation. Indeed,

under those circumstances it would have been much more reasonable for them to believe instead

that their broker-dealer was affording them a short "grace period" to cover the margin deficit in

their accounts. The Trustee's assertion that Glantz and Edward Glantz "knew that no legitimate,

investment manager would repeatedly [make such loans] without charging interest" states a

conclusion that is not supported by any plausible factual allegation. (FAC ¶ 268). How could

they have possibly known that? How could they have possibly known that BLMIS was not

simply giving them a short "grace period" to allow them to transfer assets to cover the margin

deficit in their accounts? And why would they, almost immediately after taking out the loans,

move new assets into their accounts to pay down the loans if they believed or had reason to

believe that BLMIS was a fraudulent operation? The Trustee's allegations are not plausible.

      The Trustee also alleges that the fact that BLMIS made these interest-free loans

"further indicated to Glantz and Edward Glantz that the account statements for these accounts

were fraudulent, in that the accounts were not, as represented in the statements, fully or almost

fully invested in securities" and is "further evidence that [they] knew that BLMIS was not

engaging in the securities transactions that were represented on the account statements." (FAC ¶

269). It is not clear from these vague and conclusory allegations what is the "red flag" indicating

a high probability of fraud here. As discussed above, generally within a matter of days after the

loans were made, cash or other securities would be deposited into the accounts to pay them

down. (Id. ¶¶ 249-267). The account statements reflected these loans and the new assets that

were deposited into the accounts to pay them down. (Id. ¶¶ 249-267). So it is not at all clear

what inconsistency the Trustee is alleging with respect to the account statements. In any event,

28

there is no allegation that Glantz or Edward Glantz was actually aware of any such inconsistency,

understood that it was a "red flag" indicating a high probability of fraud, and purposely ignored

it.[10]

### 2. <u>Unqualified Auditing Firm</u>

The Trustee asserts that Glantz and Edward Glantz "knew facts showing that

BLMIS's purported auditor was not reasonable capable of" auditing BLMIS.  (FAC ¶ 271).  But

he fails to support this conclusory statement with any plausible factual allegations as required

under <u>Twombly</u>/<u>Iqbal</u>.

First, the Trustee fails to plausibly allege that Glantz knew that BLMIS was

audited by Friehling & Horowitz.  According to the Trustee, Glantz allegedly knew this because

"Glantz's own files contained the annual audited report for BLMIS for the year ended October

31, 2000, which indicated Friehling & Horowitz as the auditor."  (<u>Id.</u> ¶ 272).  But it cannot be

inferred from the fact that Glantz's files contained a document bearing that information that he

was actually aware of that information.  As discussed above, allegations that information existed

and was available to the defendant or that the defendant should have or must have been aware of

it are insufficient to show that the defendant was actually aware of it.  <u>See</u>, <u>e.g.</u>, <u>Merkin II</u> at 144.

The Trustee also fails to plausibly allege that Edward Glantz knew that BLMIS

was audited by Friehling & Horowitz.  The Trustee suggests that he knew because "BLMIS had

disclosed that its auditor was Friehling & Horowitz on publicly available SEC forms."  (FAC ¶

---

[10]Notably, while finding that the Trustee had adequately alleged that Merkin had willfully
blinded himself to Madoff's fraud in <u>Merkin II</u>, the Court did not rely on the fact that Merkin's
funds had received interest-free loans in making that finding.  The Court did not cite that as one
of the "facts that raised a high probability of fraud" that Merkin was allegedly aware of.  <u>See</u>
<u>Merkin II</u> at 141-46.

272). But it is well-established in the context of Madoff's fraud that a person's actual awareness

of a piece of information cannot be inferred from the fact that the information was publicly

available.  See, e.g., In re Beacon Assocs., 745 F.Supp.2d at 414 (rejecting "red flags" theory of

scienter where, among other things, "there is no allegation that [defendant] was actually aware of

the publicly available red flags").

   The Trustee fails, moreover, to plausibly allege that Glantz and/or Edward Glantz

were actually aware that Friehling & Horowitz was not qualified to audit BLMS.  The Trustee

alleges that the firm "had only three employees, one of whom was an administrative assistance

and one of whom was semi-retired." (FAC ¶ 272).  But there is no allegation that Glantz and/or

Edward Glantz were actually aware of these alleged facts.

   With respect to Edward Glantz, the Trustee also alleges that as a certified public

accountant he "knew that all accounting firms that perform audit work must enroll in the peer

review program of the American Institute of Certified Public Accounts ('AICPA')."  (Id. ¶ 275).

The Trustee then alleges that "Friehling & Horowitz never appeared on the public peer review

list because Friehling had notified the AICIPA that he did not perform audits."  (Id.).  But the

Trustee does not allege that Edward Glantz was actually aware that Friehling & Horowitz was

not on this peer review list or that Friehling had notified the AICIPA that he did not perform

audits.  The fact that the peer review list was "public" does not help the Trustee here, as

discussed above.  See, e.g., In re Beacon Assocs., 745 F.Supp.2d at 414.

   Notably, in Merkin II the Trustee alleged a critical fact concerning Merkin's

actual awareness of BLMIS's use of an unqualified auditing firm that is missing here with

respect to Glantz and Edward Glantz: that Merkin had been explicitly "warned . . . that Madoff's

failure to use a large, public accounting firm was a 'potential red flag.'" Merkin II at 134. The

Court specifically cited that allegation in finding that the Trustee had adequately alleged that

Merkin "saw and appreciated" this "red flag." Id. At 141. There is no such allegation here.

There is no plausible allegation here that Glantz or Edward Glantz was actually aware that

Freihling & Horowitz was BLMIS's auditor or that it did not have the resources and was not

qualified to audit BLMIS.

### 3.    Guaranteed And Consistently Positive Double-Digit Returns

The Trustee fails to plausibly allege that Glantz was willfully blind to "red flags"

concerning the alleged guaranteed and consistently positive double-digit annual returns in his

accounts. (FAC ¶¶ 212, 229, 243).[11]

With respect to the allegedly guaranteed rates of returns, the Trustee alleges that

Glantz's knowledge that the rates were guaranteed "is evidenced by his own creation and

issuance of promissory notes guaranteeing rates of return to his investors, with regard to one" of

the accounts that he allegedly controlled, the Ostrin Family Account ("OFA"). (Id. ¶ 215). But

the Trustee also alleges, contradictorily, that the returns paid to OFA (and other accounts

managed by Glantz) actually varied over the years. (Id. ¶¶ 214, 222). In other words, there was

actually no guaranteed rate of return. For example, the Trustee alleges that the returns were

initially "at least approximately 17%" a year but were "reduced a number of times" over the

years. (Id. ¶ 214). There is no allegation that Glantz was informed by anyone at BLMIS what the

return for each year would be.

---

[11]These allegations are directed only at Glantz. The Trustee does not allege that Edward
Glantz was willfully blind to these alleged facts.

31

Moreover, the Trustee acknowledges that, for many of the OFA investors, Glantz did not promise any fixed rate of return on their investments but instead provided a "range" as to the returns they might expect to receive. (FAC ¶ 223). For example, Glantz's assistant wrote to one investor: "[E]nclosed is a statement of your account to date showing 17% interest earned. This percentage may change. Generally, it is a little higher than that." (Id. ¶ 224). To another investor this assistant wrote that "the annual rate of return can vary from 13% to 20%." (Id. ¶ 225). The fact that Glantz told his investors that their returns could vary year by year directly contradicts the Trustee's own allegations about the purported guaranteed rates of return.

With respect to the allegedly consistent positive double-digit annual returns, the Trustee alleges that "[a]s Glantz knew, the SSC strategy was a 'collared ' investment strategy that was supposed to track the S&P 100 and also temper investors' exposure to volatility in that market." (FAC ¶ 231). But the allegation that "Glantz knew" this is purely conclusory. It is not supported by any factual allegation. The Trustee then proceeds to allege:

> 232. The returns in investment accounts that actually followed the SSC strategy would be closely correlated to the S&P 100, but without any sharp down- or up-swings. The options collars attached to stock purchases would ensure that when the S&P 100 dropped, the investors' accounts would not drop quite as far. Collapses in stock price would be hedged by put contracts.
>
> 233. At the same time, when the S&P 100 went up, SSC customer gains would be tempered by the sale of call contracts to fund the purchase of put options.
>
> 234. It would be impossible for SSC investors to obtain gains on their investment when the S&P 100 was significantly down. This is because downswings were purportedly hedged by put options. The exercise of put options would not have turned losses into gains; it would simply have put a floor on losses.

32

235.  Similarly, it would be impossible for SSC investors to outperform the S&P 100 during a major upswing, as the call options that were sold would have been exercised during a significant market upswing, putting a ceiling on gains.

236.  The 13 years from 1995 through 2007 included many periods of market volatility, including such events as the Asian financial crisis of 1997, the bursting of the "dot.com bubble" beginning in 2000, and the September 11, 2001 terrorist attacks.  During this time, the S&P 100 Index experienced many periods of losses, including years with double-digit losses.

. . .

238.  Specifically, in the 13 years from 1995 through 2007, the S&P 100 Index recorded an annual gain in nine years, but an annual loss in four years.  In three of those years, the annual loss in the S&P 100 Index exceeded 10%.

(FAC ¶¶ 232-36, 238).

However, there is no allegation that Glantz was actually aware of and understood any of these alleged facts regarding the SSC, the S&P 100 and the interplay between them. While the Trustee alleges that "[t]hrough his management and oversight of [the BLMIS] accounts, including review of BLMIS account statements, Glantz was aware that these accounts posted purported" annual double-digit returns, it does not follow that he was therefore also aware that these results were "impossibly consistent and irreconciliable with actual securities trading in the marketplace consistent with the SSC strategy in which BLMIS purported to engage" as the Trustee tries to suggest.   (FAC ¶ 241).  Nor can such actual awareness be inferred from the alleged fact that he was "sophisticated with regard to financial and investment matters" (whatever that means).  (Id. ¶ 85).  Glantz would have been aware that the returns were impossible only if he had been actually aware of and understood all the facts regarding the SSC

33

and the S&P 100 alleged by the Trustee set forth above. But there is no allegation in the FAC

that he was actually aware of or understood those alleged facts.

In this respect also this case stands in stark contrast to <u>Merkin II</u>. In <u>Merkin II</u> the

Trustee made the following non-conclusory allegations, among others, to show that Merkin was

actually aware that the consistent returns in his funds were impossible and cannot be reconciled

with actual securities trading in the marketplace:

- Victor Teicher, a money manager who had managed parts of the portfolios of two of Merkin's funds, "told Merkin, in the presence of Jack Mayer, an employee under Teicher, that BLMIS' trading was impossible and 'could be a Ponzi scheme.'"

- "Teicher warned Merkin that BLMIS' 'returns were too consistent,' and 'just not possible.'"

- "Merkin acknowledged the impossibility of the volume of Madoff's trading activity, and specifically, whether there was enough volume in the market to accommodate BLMIS' large option trades."

- "Merkin knew that the volume of daily put and call options BLMIS supposedly bought and sold for the Defendant Funds exceeded the daily volume of the Chicago Board Options Exchange [] and were impossible, and demonstrated that BLMIS was not actually making the trades represented on the trade confirmations provided to Merkin."

- "Merkin specifically acknowledged . . . to Research Company A . . . that BLMIS' trades were at times outside the daily trade price range."

- Merkin said in a meeting with an asset management firm that "he was 'aware' that there were not enough options in the entire options market to conduct BLMIS's purported trading activities."

- "Merkin kept a Madoff folder that contained a document prepared by a third party analyst questioning the possibility of BLMIS' returns. According to this document, BLMIS' returns performed independently of the S&P 500, no matter 'whether the S&P 500 trends up or down.' Madoff's purported strategy depended on the S&P 100, which correlated to the S&P 500, yet the third-party's chart of BLMIS's Series B showed the performance of Series B was dramatically higher than the S&P 500."

Merkin II at 129-30. These allegations plainly demonstrate the requisite actual awareness and understanding that is lacking here. This Court specifically relied on these allegations (and others) in finding that "Merkin was aware of facts that raised a high probability that BLMIS was a fraudulent operation." Id. at 141. There are no such allegations in this case. There are no allegations that can support such a finding in this case. For example, there is no allegation that Glantz was warned by anyone that the returns his funds were getting were impossible. There is no allegation that Glantz was aware of any specific fact about BLMIS's trading activities that shows that they were impossible.

It is worth noting here that many of the more egregious "red flags" concerning improbable returns present in other cases are not present here. For example, in Picard v. Estate of Stanley Chais, 445 B.R. 206 (Bankr. S.D.N.Y. 2011), the "red flags" included: (1) "fantastical rates of return" in defendants' accounts "including 125 instances of returns exceeding 50%, more than 35 instances of returns exceeding 100%, and one instance of returns exceeding 300%"; (2) the manufacturing of losses in the defendants' accounts for tax purposes; and (3) the remedying of such purported losses in subsequent periods "with monumental rates of return that far outpaced the market, including a rebound in one Moving Defendant's account from negative 89% returns in 2003 to positive 165% returns the following year[.]" Id. at 217-18, 222.

35

**C.    The Allegations Concerning Madoff's Lack Of Transparency Are**
**Insufficient To Show Willful Blindness To Madoff's Fraud**

The Trustee's allegations regarding Madoff's lack of transparency show that

Glantz: (1) was aware that Madoff did not allow due diligence to be conducted and in some

instances prohibited any disclosure in writing that money would be invested with him; (2)

conveyed to some investors and prospective investors that Madoff would not allow due diligence

to be conducted; and (3) did not identify Madoff to some investors and prospective investors.

(FAC ¶¶ 313-25).  This is clearly not enough to show that Glantz was actually aware of facts

indicating a high probability that BLMIS was a fraudulent operation.  Significantly, according to

the Trustee's allegations Glantz himself did not prevent or obstruct anyone from conducting due

diligence on Madoff.  Rather, when an investor or potential investor asked to conduct due

diligence, he duly passed on the request to BLMIS.  For example, in response to the ABN

AMRO representative's request Glantz wrote: "I spoke to Frank DiPascalli [sic] who is his

operations chief who referred me directly to Bernie."  (Id. ¶ 320).  That Glantz actually contacted

BLMIS and conveyed the request is smoking gun proof that he did not know and did not suspect

that BLMS was a fraudulent operation.  If he knew or seriously suspected fraud and was helping

to cover up the fraud as the Trustee suggests, there would be no reason for him to bother actually

calling Madoff and asking him to allow outsiders access to conduct due diligence that would

have probably revealed the fraud.  It is telling that Glantz was totally forthright with the investors

about Madoff's position on due diligence.  He did not try to mislead them or hide anything from

them.

At most, Madoff's lack of transparency might be a suspicious circumstance that

36

should have led a reasonable person to investigate the matter further.  But as discussed above, an investor is under no duty to investigate his broker just because he is "confronted with suspicious circumstances[.]" Katz, 462 B.R. at 455.  Any failure on Glantz's part to "investigate the matter further" here thus cannot equate to willful blindness and lack of "good faith" under § 548(c)

It is important to note here Glantz's and Edward Glantz's significant personal exposure to Madoff's fraud.  As alleged in the FAC, they invested substantial sums of their own personal money and the money of their close relatives in the EJS, Jelris, Grace, GFF accounts and their IRA accounts at BLMIS.  (FAC ¶¶ 19, 24, 29, 142, 147, 150-54, 162).  The Trustee does not allege that any "outside" investor money was invested through these accounts.  This significant personal exposure renders even more implausible any allegation that they were willfully blind to Madoff's fraud.  See Croscill, Inc. v. Gabriel Capital, L.P., 817 F.Supp.2d 346, 357 n.8 (S.D.N.Y. 2011) ("Defendant Merkin's significant personal exposure to Madoff's fraud also belies any inference of intent.").

In sum, the FAC fails to plausibly allege that Glantz and/or Edward Glantz were willfully blind to facts indicating a high probability that BLMIS was a fraudulent operation. There is thus no basis for imputing such a state of mind to any of the other defendants in this case, and the Trustee fails to meet his burden of pleading that defendants did not act in good faith under § 548(c).  Accordingly, Count One and Count Two of the FAC should be dismissed pursuant to § 548(c) to the extent the transfers that the Trustee is seeking to avoid consist of principal and commission/referral fees paid to Glantz and Edward Glantz.

## POINT V

### IMPUTED KNOWLEDGE/WILLFUL BLINDNESS IS INSUFFICIENT TO SATISFY THE SUBJECTIVE STATE OF MIND REQUIREMENTS UNDER § 546(e) AND § 548(c)

The avoidance claims in the FAC (Counts One through Seven) are asserted primarily against defendants other than Glantz and Edward Glantz.[12]  However, as discussed above, the FAC only purports to allege that Glantz and Edward Glantz had actual knowledge of Madoff's fraud and/or were willfully blind to facts indicating a high probability that BLMIS was a fraudulent operation.  There is no allegation that any of the other defendants had such actual knowledge or willful blindness.

Accordingly, to invoke the exception to the safe harbor under § 546(e) and to overcome § 548(c)'s good faith defense with respect to Counts One through Seven, the Trustee must allege and prove: (1) that Glantz's and Edward Glantz's alleged actual knowledge and/or willful blindness is imputable to the other defendants;[13] and (2) that such imputed knowledge/willful blindness is equivalent to the subjective states of mind required to invoke the

---

[12]These claims are asserted against Glantz only insofar as he was a beneficiary of his IRA account.  (FAC ¶ 49).  None of them is asserted against Edward Glantz, who is deceased and not named as a defendant in this action.

[13]The Trustee seeks to impute Glantz's alleged actual knowledge and willful blindness not only to various entity defendants he allegedly control but also to defendant Elaine Ostrin.  (FAC ¶¶ 329-48).  There is no basis under any principle of agency or partnership law for imputing his knowledge to her.  There is no allegation in the FAC that he was her agent or any allegation that would otherwise provide a basis for imputing his knowledge to her.  See Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 784 (N.Y. 1985) (under both agency law and partnership law, the knowledge of any agent may be imputed to another only if it was acquired by the agent acting within the scope of his authority as an agent); New York P'ship Law § 23 (knowledge of a partner must be "the knowledge of the partner acting in the particular matter"); Van Ostrand v. Nat'l Life Assurance Co. of Canada, 371 N.Y.S.2d 51, 56-57 (N.Y. Sup. Ct. 1975).

exception to § 546(e)'s safe harbor and to overcome § 548(c)'s good faith defense.

He cannot do so. As discussed in Point III and Point IV above, the Trustee fails to adequately allege that Glantz and Edward Glantz had such actual knowledge or willful blindness. Thus there is nothing to impute to the other defendants. But even if it is assumed that the Trustee has plausibly alleged that Glantz and/or Edward Glantz had actual knowledge and/or were willfully blind, any imputed state of mind by definition cannot equate with the subjective states of mind required to invoke the exception to the safe harbor under § 546(e) and to overcome § 548(c)'s good faith defense. The "actual knowledge" required to invoke the exception to § 546(e)'s safe harbor is necessarily subjective. It is the transferee's own knowledge that is determinative. For the exception to apply, the Trustee must plead and prove that the transferee himself had actual knowledge, as opposed to constructive or any other form of implied/imputed knowledge, of Madoff's fraud. See Merkin II at 139 (noting that actual knowledge is distinguishable from constructive knowledge). Similarly, the "good faith" required under § 548(c) is subjective; it is judged "by a subjective standard of willful blindness[.]" Good Faith Decision at 21. In determining a transferee's subjective good faith (or lack thereof), it is the transferee's "own knowledge . . . which is decisive" rather than the knowledge of any third person that may be imputed to the transferee by law.

Any imputed knowledge is therefore insufficient to trigger the exception to the safe harbor under § 546(e) or to overcome § 548(c)'s good faith defense. See Jehly v. Brown, 327 P.3d 351, 355 (Col. Ct. Appeals 2014) ("a plaintiff cannot rely upon or request imputation of the knowledge of an agent to establish actual knowledge, or conscious awareness, on the part of the principal"); Levinson v. PSCC Svcs., Inc., 2010 U.S. Dist. LEXIS 137537 (D. Conn. Dec. 29,

39

2010) (in order to toll the statute of limitations on a fraudulent concealment claim,"actual

awareness" of the relevant facts is required; "imputed knowledge" is insufficient); Harte v.

United Benefit Life Ins. Co., 66 Cal.2d 148, 152-53 (Cal. Sup. Ct. 1967) (knowledge that may be

imputed under agency law principles not relevant because the issue of whether the insured acted

in good faith must be decided based on his "own knowledge as to the state of his health", i.e., his

actual knowledge of the facts, "rather than the uncommunicated knowledge of a third person");

Roberts Real Estate, Inc. v. New York State Dept. of State, 80 N.Y.2d 116, 121-23 (N.Y. 1992)

(imputed knowledge not sufficient to satisfy statutory requirement of "actual knowledge");

Lihosit v. I & W, Inc., 913 P.2d 262, 267 (N.M. Ct. of App. 1996) ("When knowledge is required

for purposes of tort liability, the central issue is the knowledge of the actual tortfeasor, which

knowledge cannot be imputed from an agent."); Snook v. Netherby, 124 Cal. App.2d 797, 802

(Cal. Dist. Ct. App. 1954) (bad faith is subjective and "necessarily requires actual rather than

imputed knowledge"; "it would be a contradiction in terms to base breach in bad faith upon

imputed knowledge").

      In sum, even if it is assumed that the Trustee has plausibly alleged that Glantz

and/or Edward Glantz had actual knowledge of Madoff's fraud and/or were willfully blind to

facts indicating a high probability that BLMIS was a fraudulent operation, and that such actual

knowledge and willful blindness are imputed to the other defendants: (1) Counts Two through

Seven must still be dismissed in their entirety in light of § 546(e)'s safe harbor provision; and (2)

Count One and Count Two must still be dismissed to the extent the transfers that the Trustee is

seeking to avoid consist of principal and commission/referral fees paid to Glantz and Edward

Glantz.

40

## POINT VI

### THE TRUSTEE FAILS TO ADEQUATELY PLEAD
### THE REQUISITE INTENT IN CONNECTION WITH
### THE AVOIDANCE CLAIM UNDER § 548(a)(1)(A)

Count One, which seeks avoidance of actual fraudulent transfers under §

548(a)(1)(A), must be dismissed because the Trustee fails to adequately plead that the transfers at

issue were made with the requisite "actual intent to hinder, delay, or defraud[.]"

Actual fraudulent transfer claims under § 548(a)(1)(A) must meet the heightened

pleading requirements of Fed. R. Civ. P. 9(b).  See Andrew Velez Constr., Inc. v. Consolidated

Edison Co. of N.Y., Inc., 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007).  Rule 9(b) requires a party

alleging fraud to "state with particularity the circumstances constituting fraud or mistake."  See

Nisselson v. Softbank AM Corp., 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) ("courts take a

more liberal view when examining allegations of actual fraud . . . in the context of a fraudulent

conveyance, since a trustee is an outsider to the transaction who must plead fraud from second-

hand knowledge") (internal quotation marks and citation omitted).

Here, the Trustee makes no effort  or makes an inadequate effort to describe the

particular facts and circumstances concerning the withdrawals at issue to show that they were

made with the requisite fraudulent intent.  Instead, the Trustee relies solely on the Ponzi scheme

presumptions – which essentially excuse him from having to establish that the transactions were

made with fraudulent intent – by simply affixing the Ponzi scheme label to BLMIS's operations.

However, the facts as shown in documents filed in the case do not provide sufficient support for

the application of the Ponzi scheme label or reliance on the Ponzi scheme presumptions here.

The essential features of a Ponzi scheme as established in the caselaw are: (1)

41

little or no legitimate underlying business; (2) the promise of exorbitant returns over a short finite

period of time; (3) early scheduled payment of such returns to early (or "top") investors; (4) the

need to attract new money in order to pay the exiting top investors; and (5) the scheme's

inevitable failure.  See Cunningham v. Brown, 265 U.S. 1, 7-8 (1924); Orlick v. Kozyak, 309

F.3d 1325, 1327 n.2 (11th Cir. 2002); Daly v. Deptula, 286 B.R. 480, 482-84 nn. 2 and 7 (D.

Conn. 2002); Balaber-Strauss, 264 B.R. at 305-306.

These features are not present here, other than the failure of Madoff's scheme and

his arrest.  First, BLMIS operated legitimate trading businesses.  It was "largely involved in

legitimate trading with institutional counterparties."  (Declaration of Joseph Looby ("Looby

Decl.") ¶ 28).[14]  Documents referenced in the Trustee's complaints and the records of the

Bankruptcy Court case, including the Trustee's First Interim Report[15] and the Looby Decl., show

that BLMIS was once one of the largest traders of securities.  It employed 200 people, 94% of

whom conducted trades equal to 10% of the daily volume on the New York Stock Exchange.

See Randall Smith, *Wall Street Mystery Features a Big Board Rival*, Wall Street Journal, Dec.

16, 1992.  The Looby Decl. makes it clear that customers' money was used to purchase securities

in BLMIS's legitimate trading operation.  Money was deposited "directly and indirectly" into the

---

[14]See Securities Inv. Prot. Corp. v. Bernard L. Madoff Invest. Sec., Inc., Adv. Pro. No.
08-01789 (SMB), Declaration Of Joseph Looby In Support Of Trustee's Motion For Order
Upholding Trustee's Determination Denying "Customer" Claims For Amount Listed On Last
Customer Statement, Affirming Trustee's Determination Of Net Equity, And Expunging Those
Objections Relating To The Determination Of Net Equity filed on October 16, 2009 [Dkt. No.
524-1].

[15]See Securities Inv. Prot. Corp. v. Bernard L. Madoff Invest. Sec., Inc., Adv. Pro. No.
08-01789 (SMB), Trustee's First Interim Report For The Period December 11, 2008 through
June 30, 2009 [Dkt. No. 314].

42

BLMIS trading account. (Looby Decl. ¶¶ 9, 17, 18, 19, 26, 27). As of the date of the

commencement of the SIPC liquidation proceedings, BLMIS had legitimate trades and securities

positions outstanding that ultimately yielded proceeds of more than $334 million. (Trustee's

First Interim Report ¶¶ 30-34). In addition, the Trustee successfully sold BLMIS's market-

making operation for approximately $25.5 million. (Id. ¶¶ 24-28).

        Second, BLMIS investors used their accounts just like investors in any brokerage

firm would use their accounts. They deposited and withdrew money from their accounts as

needed and to the extent there were funds available in their accounts. There is no pattern of early

investors being paid with later investors' money and then exiting. Many early investors in fact

stayed invested with BLMIS until the fraud was discovered, while there were new customers who

opened accounts and then withdrew all their money within the same year. Further, there was no

finite period of investment. There was no deadline for investments. The BLMIS operations

continued for decades. Customers were free to deposit and withdraw money from their accounts

at any time. Finally, when Madoff was arrested, there were securities and cash worth hundreds

of millions of dollars in the BLMIS accounts.

        In short, the facts do not support application of the Ponzi scheme label or

reliance on the Ponzi scheme presumptions in this case. Count One therefore must be dismissed

because the Trustee fails to adequately plead that the transfers at issue were made "with actual

intent to hinder, delay, or defraud" as required under § 548(a)(1)(A).

**POINT VII**

**THE TRUSTEE FAILS TO PROPERLY
ALLEGE A CONSTRUCTIVE FRAUDULENT
TRANSFER CLAIM UNDER EITHER THE
BANKRUPTCY CODE OR THE NYDCL**

The Trustee fails to properly allege the requisite lack of "value" or "fair

consideration" in connection with the constructive fraudulent transfer claims under the

Bankruptcy Code and the NYDCL (Counts Two, Four, Five and Six).

To state a constructive fraudulent transfer claim under the Bankruptcy Code, the

Trustee must allege facts showing, among other things, that the debtor "received less than a

reasonably equivalent value in exchange for such transfer[.]"  11 U.S.C. § 548(a)(1)(B)(i).

"Value" in this context "means property, or satisfaction or securing of a present or antecedent

debt of the debtor[.]" 11 U.S.C. § 548(d)(2)(A).  Similarly, to state a constructive fraudulent

transfer claim under the NYDCL, the Trustee must allege facts showing, among other things, that

there was a lack of "fair consideration" for the transfer.  N.Y. Debt. & Cred. Law  §§ 273-75.

The term "fair consideration" has "the same fundamental meaning" as the term "reasonably

equivalent value" used in the Bankruptcy Code and these two terms "are interpreted similarly by

the courts."  Balaber-Strauss, 256 B.R. at 677.

It is not disputed that principal sums deposited into accounts at BLMIS constitute

"value" given to the debtor.  See Merkin II at 138 (transferee "gave value to the extent it

deposited cash with BLMIS").  A broker's services in soliciting and procuring investors for

BLMIS constitutes fair consideration for finders' fees or commissions and thus also constitutes

"value" given to the debtor.  See Balaber-Strauss, 256 B.R. at 680-82.  Transfers from BLMIS

consisting of the return of principal or payments of commission/referral fees are thus made for

"value" and cannot be avoided as constructively fraudulent.

Here, it is plain from the face of the FAC that at least portions of the Two Year

Transfers and Six Year Transfers consist of principal and commission/referral fees. (FAC ¶¶

357, 363, 367, 370-71). Nevertheless the Trustee seeks avoidance of all these transfers in their

entirety in connection with his constructive fraudulent transfer claims, without discriminating

between principal, commission/referral fees, and "fictitious profits". This is clearly improper.

Constructive fraudulent transfer claims are, as a matter of law, "limited to any fictitious profits

which were paid to any of the defendants." Bayou Superfund, LLC v. WAM Long/Short Fund II,

L.P. (In re Bayou Group, LLC), 362 B.R. 624, 634 (Bankr. S.D.N.Y. 2007).

In short, the Trustee fails to properly plead the constructive fraudulent transfer

claims under the Bankruptcy Code and the NYDCL.[16]  These claims (Counts Two, Four, Five

and Six) should therefore be dismissed.

---

[16] Notably, "fair consideration" under the NYDCL also requires a showing of "good faith". Sharp Int'l Corp. v. State Street Bank & Trust Co., 403 F.3d 43, 54 (2nd Cir. 2005) (citation omitted). "[T]he party seeking to have the transfer set aside has the burden of proof on the element of fair consideration and, since it is essential to a finding of fair consideration, good faith." Silverman v. Actrade Capital, Inc., 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005). To meet this burden, the Trustee must plead and prove lack of good faith on the part of the transferee. See Sharp, 403 F.3d at 53-56. As discussed above, the Trustee fails to adequately such lack of good faith.

## POINT VIII

## THE COURT LACKS JURISDICTION OVER
## THE DEFUNCT ENTITY DEFENDANTS

The FAC should be dismissed as against defendants Merlin, Enhancement, The

Glantz-Ostrin Trust I ("G-O Trust I"), The Glantz-Ostrin Trust II ("G-O Trust II"), The Edward

R. Glantz Living Trust ("ERG Trust"), and The Thelma Glantz Living Trust ("TG Trust")

(hereinafter sometimes referred to collectively as "defunct entity defendants") for lack of

personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  At the time that this action was

commenced, these entities had been dissolved and their affairs had been wound up, such that they

could no longer be sued and served with process.  The attempted service of process on them by

the Trustee thus cannot be deemed proper service and, consequently, this Court did not (and

cannot) acquire jurisdiction over them.

A dissolved corporation "may continue to function for the purpose of winding up

the affairs of the corporation[.]"  N.Y. Bus. Corp. Law § 1006(a).   While it is winding up its

affairs, a dissolved corporation "may sue or be sued in all courts and participate in actions and

proceedings, whether judicial, administrative, arbitrative or otherwise, in its corporate name, and

process may be served by or upon it."  N.Y. Bus. Corp. Law § 1006(a)(4); see Briere v. Barbera,

163 A.D.2d 659, 660 (3rd Dep't 1990) ("Business Corporation Law § 1006 permits a dissolved

corporation to be sued as part of the winding up of its affairs."); Igbara Realty Corp. v. New York

Prop. Ins. Underwriting Assoc., 94 A.D.2d 79, 80 (1st Dep't 1983) (dissolved corporation may

sue and be sued while engaged in winding up its affairs).

46

Here, all of the defunct entity defendants had been dissolved and their affairs had

been wound up prior to the commencement of this action on December 9, 2010:

- Merlin was dissolved and ceased doing business in 1994. All of its affairs were wound up and its final tax return was filed in 1994. It has not transacted any business since then. (Declaration of Richard M. Glantz ("Glantz Decl.") ¶¶ 1-2).[17]

- Enhancement was dissolved and ceased doing business in 1994. Its affairs were also wound up in 1994 and its final tax return was filed that year. It has not transacted any business since then. (Id. ¶¶ 3-4).

- G-O Trust I and G-O Trust II were both dissolved in 2008. Their affairs were wound up and their final tax returns were filed in 2009. Neither of them has transacted any business since then. (Id. ¶¶ 5-8).

- The ERG Trust was dissolved by operation of law upon the death of Edward Glantz in February 2007. All of its affairs were wound up and its final tax return was filed in 2009. It has not transacted any business since then. (Id. ¶¶ 9-10).

- The TG Trust was dissolved by operation of law upon the death of Thelma Glantz in July 2010. All of its affairs have been wound up and it has not transacted any business since then. (Glantz Decl. ¶ 11).

In short, at the time the Trustee commenced this action, the defunct entity

defendants were no longer entities amenable to being sued and served with process. The

Trustee's attempted service of process on them thus cannot be deemed proper service and this

Court therefore did not (and cannot) acquire jurisdiction over any of them. Accordingly, the

FAC should be dismissed in its entirety as against the defunct entity defendants.

---

[17]On a motion to dismiss for lack of jurisdiction, a court may consider "jurisdictional facts" outside the pleadings, including facts set forth in an affidavit. Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 239-40 (2nd Cir. 1999); see Makarova v. United States, 201 F.3d 110, 113 (2nd Cir. 2000).

## POINT IX

## THE CLAIMS AGAINST THE ESTATE OF
## EDWARD R. GLANTZ ARE TIME-BARRED

The FAC should be dismissed as against the ERG Estate because the claims

against the estate are time-barred.[18]

The applicable time limit for filing a claim against the ERG Estate is set forth in

California Code of Civil Procedure § 366.2.  Section 366.2 "provides for an outside time limit of

one year for filing any claim against a decedent."  Dobler v. Arluk Medical Ctr. Indus. Group,

Inc., 89 Cal. App.4th 530, 535 (Cal. Ct. App. 2001).  It states, in pertinent part:

> If a person against whom an action may be brought on a liability of
> the person, whether arising in contract, tort, or otherwise, and
> whether accrued or not accrued, dies before the expiration of the
> applicable limitations period, and the cause of action survives, an
> action may be commenced within one year after the date of death,
> and the limitations period that would have been applicable does not
> apply.

Cal. Code Civ. Proc. § 366.2(a).  This one-year limitations period may be "tolled by (1) the

timely filing of a creditor claim [in the probate proceedings]; (2) the filing of a petition for

payment of debts, claims or expenses from the decedent's revocable trust; or (3) a proceeding to

judicially construe a 'no contest' provision."  Dobler, 89 Cal. App.4th at 535 (internal footnotes

omitted).  "[I]f a claim is not filed in a probate proceeding within either the claims filing period

of Probate Code section 9100, or within the one-year limitation period of Code of Civil

Procedure section 366.2, a creditor will be forever barred from asserting a claim against the

---

[18]Counts One through Seven are asserted against, inter alia, the "Edward Glantz IRA
Beneficiaries", which is defined to include the Estate.  (FAC ¶ 50).  The Estate is also named as a
defendant in Count Eight.

48

decedent." Id. at 535-36.

Here, as alleged in the FAC, Edward Glantz died on or about February 9, 2007.

(FAC ¶ 35). The Trustee does not allege that he has filed a probate claim against the ERG

Estate (indeed, no such claim has been filed). The probate claims filing period has long since

passed. See Dobler, 89 Cal. App.4th at 535; California Probate Code § 9100. The outside one-

year limitations period for filing claims against the ERG Estate, which runs from "the date of

death", has also long since passed. The Trustee has not alleged any basis for tolling the

limitations period.

Accordingly, all the claims asserted against the ERG Estate in this action are time-

barred. The FAC should therefore be dismissed as against the ERG Estate.

## POINT X

## THE IRA ACCOUNTS ARE STATUTORILY-
## PROTECTED FROM THE TRUSTEE'S CLAIMS

Glantz's and Edward Glantz's IRA accounts are exempt from the claims of

judgment creditors such as the Trustee under both California and New York law.

"[I]t is well-settled that exemption provisions are to be construed liberally."

Morgan v. Gordon, 450 B.R. 402, 405 (W.D.N.Y. 2011); In re Keil, 88 F.2d 7, 8 (2nd Cir. 1937)

("Exemption statutes are to be liberally construed[.]"). The Trustee "bears the burden of proof

to establish that the exemption is improper." In re Glenn, 430 B.R. 56, 58 (Bankr. N.D.N.Y.

2010).

California Code of Civil Procedure § 704.115 exempts "private retirement plans"

from judgment creditors' claims. A "private retirement plan" is defined to include, among other

things, "[s]elf-employed retirement plans and individual retirement annuities or accounts

provided for the in the Internal Revenue Code of 1986 . . . including individual retirement

accounts qualified under section 408 or 408A of that code[.]" Cal. Code of Civ. Proc. §

704.115(a)(3). "All amounts held, controlled, or in process of distribution by a private retirement

plan, for the payment of benefits as an annuity, pension, retirement allowance, disability

payment, or death benefit from a private retirement plan are exempt." Cal. Code of Civ. Proc. §

704.115(b).

      Under New York law, certain categories of personal property are exempt from

judgment creditors' claims. See N.Y.C.P.L.R. § 5205. "In general they are what the legislature

deems to be the necessities of life, which not even a person's judgment creditors should be

allowed to reach." David D. Siegel, New York Practice § 490 (5th ed. 2011). Under CPLR §

5205(c), "all property while held in trust for a judgment debtor, where the trust has been created

by, or the fund so held in trust has proceeded from, a person other than the judgment debtor, is

exempt from application to the satisfaction of a money judgment." CPLR § 5205(c)(2) provides,

in pertinent part, that all "monies, assets or interests established as part of, and all payments

from, either any trust or plan, which is qualified as an individual retirement account under [the

United States Internal Revenue Code]" – such as Glantz's and Edward Glantz's IRA accounts –

"shall be considered a trust which has been created by or which has proceeded from a person

other than the judgment debtor, even though such judgment debtor is [] in the case of an

individual retirement account plan, an individual who is the settlor of and depositor to such

account plan[.]" Individual retirement accounts are thus exempt from the claims of creditors

under CPLR § 5205(c). See J.K.C. v. T.W.C., 39 Misc.3d 899, 905 (N.Y. Sup. Ct. Monroe Co.

50

2013) ("In 1989 and 1994, the New York State Legislature, through amendments to CPLR §

5205, clarified that IRAs were exempt from claims of creditors.").

Accordingly, Glantz's and Edward Glantz's IRA accounts are protected from the

Trustee's avoidance claims under both California and New York law.   The Trustee's claims to

avoid the transfers from these accounts therefore must be dismissed.  Notably, the exemption

under New York law is subject to the exception that transfers to a trust are not exempt if

"deemed to be fraudulent conveyances under article ten of the debtor and creditor law [i.e., the

NYDCL]."  CPLR § 5205(c)(5).  This exception is not applicable here because, as discussed

above, the Trustee's avoidance claims under the NYDCL are barred by § 546(e)'s safe harbor

provision.[19]

## POINT XI

## COUNT EIGHT SHOULD BE
## DISMISSED IN ITS ENTIRETY

Count Eight seeks recovery, pursuant to 11 U.S.C. § 550(a), of subsequent

transfers of the initial transfers alleged to be avoidable in Counts One through Seven.  The

---

[19] The District Court had rejected an argument for exemption under New York law in
Picard v. Greiff, 476 B.R. 715, 729 n.13 (S.D.N.Y. 2012).  However, in that case the District
Court did not address the fact that the exception under CPLR § 5205(c)(5) applies only to
fraudulent conveyances under the NYDCL and that the Trustee's claims under the NYDCL are
barred by § 546(e).  See id.  In any event, this Court is not bound by the District Court's decision
in that action.  See In re Jamesway Corp., 235 B.R. 329, 337 n.1 (Bankr. S.D.N.Y. 1999) ("We
find that where the bankruptcy court sits in a multi-judge district, it is not bound by principles of
stare decisis by the decision of a district court in that district.") (citing cases); In re Ford, 415
B.R. 51, 61 (Bankr. N.D.N.Y. 2009) ("In carefully considering this issue, this court respectfully
concludes that principles of *stare decisis* do not control the outcome of the resolution of the
matter before it and finds that it is not bound by the district court's [decision]."); but see IRR
Supply Ctrs., Inc. v. Phipps, 217 B.R. 427, 430 (Bankr. W.D.N.Y. 1998) (bankruptcy court
bound by district court decision in multi-judge district).

Trustee seeks recovery of these subsequent transfers from the following "Subsequent Transferee Defendants": Glantz, Elaine Ostrin, The Richard M. Glantz 1991 Living Trust, the ERG Estate, the ERG Trust, The Estate of Thelma Glantz ("TG Estate"), the TG Trust, G-O Trust I, G-O Trust II, Austin Bosarge ("Bosarge"), Grace, EJS, Jelris, The Glantz Family Foundation, Inc., Lakeview and Vista Management Co.   Count Eight should be dismissed for the reasons discussed below.

       First.  If Counts One through Seven are dismissed in their entirety for the reasons set forth above, then Count Eight should also be dismissed in its entirety since it only purports to seek recovery of subsequent transfers of the initial transfers alleged to be avoidable in Counts One through Seven.  If Counts One through Seven are not dismissed in their entirety, and only some of them and/or some parts of them are dismissed, then Count Eight should be dismissed to the extent it seeks recovery of subsequent transfers of initial transfers alleged to be avoidable in the counts and/or parts of the counts that are dismissed.  See Cohmad, 2013 U.S. Dist. LEXIS 56042 at *40 ("In order to recover a fraudulent or preferential transfer of debtor property from a subsequent transferee, the Trustee must first show that the initial transfer of that property by the debtor is subject to avoidance under one of the Bankruptcy Code's avoidance provision"); 11 U.S.C. § 550(a) (trustee may only recover a transfer from a subsequent transferee "to the extent that [the] transfer is avoided").

       Second.  Count Eight should also be dismissed in its entirety for the separate and independent reason that the Trustee fails to adequately state a claim for relief.  Significantly, the FAC fails to identify the initial transfers from which the subsequent transfers alleged to be recoverable were made.  This is crucial because where, as here, "Section 546(e) applies to the

Trustee's claims, the Trustee may only proceed against a subsequent transferee insofar as he

seeks to recover those subsequent transfers under Section 550(a) as to which he could have

avoided the initial transfer under Section 548(a)(1)(A)." Cohmad, 2013 U.S. Dist. LEXIS 56042

at *41.  Because the Trustee fails to  identify the initial transfers from which the subsequent

transfers alleged to be recoverable were made, it is impossible to determine whether any of those

initial transfers are avoidable under § 548(a)(1)(A), and thus impossible to determine whether

any of the subsequent transfers are recoverable under § 550(a).  In addition, because the initial

transfers are not identified, it is impossible to determine whether and to what extent they consist

of principal and commission/referral fees and thus may not be avoided in light of § 548(c)'s good

faith defense.  For these reasons, the Trustee fails to meet his "obligation to provide the

'grounds' of his 'entitle[ment] to relief'" with respect to Count Eight.  Twombly, 550 U.S. at

555; see Fed. R. Civ. P. 8(a)(2) (requiring that a complaint contain a "short and plain statement

of the claim showing that the pleader is entitled to relief").

        Third.  Count Eight should also be dismissed as to the TG Estate and Bosarge for

the separate and independent reason that the Trustee fails to allege any basis for invoking the

"actual knowledge" exception to 546(e)'s safe harbor or for overcoming the good faith defense

under 11 U.S.C. § 550(b)(1) as to them.[20]  The TG Estate and Bosarge are different from all the

other defendants in this case in one important respect: (1) the Trustee does not allege that either

of them have actual knowledge of Madoff's fraud or were willfully blind to facts indicating a

_____

[20]Section 550(b)(1) provides a defense to claims for recovery of subsequent transfers
where the subsequent transferee "takes for value . . . in good faith,, and without knowledge of the
voidability of the transfer avoided[.]"  This defense is analogous to and employs the same
subjective standard as the good faith defense under § 548(c).  See Good Faith Decision at 22-23.

53

high probability that BLMIS was a fraudulent operation; and (2) the Trustee does not allege that

Glantz's and/or Edward Glantz's actual knowledge and willful blindness should be imputed to

either of them.[21]  In other words, there is not even an alleged basis here for invoking the "actual

knowledge" exception to 546(e)'s safe harbor or for overcoming § 550(b)(1)'s good faith defense

as to the TG Estate and Bosarge.  Count Eight thus should be dismissed in its entirety as against

them in light of § 546(e)'s  safe harbor (since the entire claim is subject to dismissal under the

safe harbor, there is no need to apply the good faith defense under § 550(b)(1)).[22]

> Fourth.  Count Eight should also be dismissed as to all the Subsequent Transferee

Defendants other than the TG Estate and Bosarge in light of § 546(e)'s safe harbor provision.

The Trustee alleges that Glantz's and/or Edward Glantz's actual knowledge and willfulness

should be imputed to these subsequent transferee defendants.  However, for all the reasons

discussed in Point III, IV and V above: (1) Trustee fails to adequately allege that Glantz or

Edward Glantz had such actual knowledge and/or willful blindness and thus there is nothing to

impute to these defendants; and (2) even if it is assumed that the Trustee has plausibly alleged

---

[21]The Trustee only makes a formulaic allegation in connection with Count Eight that "[t]he Subsequent Transferee Defendants received the Subsequent Transfers with knowledge of and/or willful blindness to BLMIS's fraudulent scheme."  (FAC ¶ 430).  This generic, conclusory allegation lumping all the Subsequent Transferee Defendants together is obviously not enough to satisfy the Trustee's obligation to plausibly actual knowledge and willful blindness.

[22]Notably, in Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 505 B.R. 135, 143 (S.D.N.Y. 2013), the defendants argued that applying § 546(g)'s safe harbor "to protect subsequent transfers is in keeping with congressional intent because widespread recovery of subsequent transfers could be even more disruptive to financial markets than the avoidance and recovery of initial transfers[.]"  The District Court rejected this argument.  It does not appear, however, that the District Court has addressed this issue with respect § 546(e)'s safe harbor.  It is defendants' position that this safe harbor applies to subsequent transfers as well as initial transfers.

that Glantz and/or Edward Glantz had actual knowledge and/or were willfully blind, any imputed

state of mind by definition cannot equate with the subjective state of mind required to invoke the

exception to § 546(e)'s safe harbor.    Accordingly, Count Eight should also be dismissed as

against these subsequent transferee defendants in light of § 546(e)'s safe harbor (since the entire

claim is subject to dismissal under the safe harbor, there is no need to apply the good faith

defense under § 550(b)(1)).[23]

    In sum, Count Eight should be dismissed in its entirety as against all the

Subsequent Transferee Defendants.

**POINT XII**

**COUNT NINE SHOULD BE
DISMISSED IN ITS ENTIRETY**

    Count Nine seeks recovery from the alleged general partners of EJS, Jelris, Grace

and Lakeview to the extent these entities are unable to satisfy any judgments that may be entered

against them in this action.    However, for all the reasons set forth above, all the claims against

these entities are subject to dismissal.    Count Nine therefore should also be dismissed in its

entirety.

---

[23]See footnote 22.

## POINT XIII

### THIS ACTION SHOULD BE DISMISSED
### BECAUSE DEFENDANTS INTEND TO DEMAND
### A JURY TRIAL AND WILL NOT CONSENT
### TO THIS COURT CONDUCTING SUCH A TRIAL

Insofar as defendants have a right to a trial by jury in this case, they presently intend to exercise this right and demand a trial by jury. However, this Court may conduct a jury trial only "if specially designated to exercise such jurisdiction by the district court and with the express consent of all parties." 28 U.S.C. § 157(e) (emphasis added). Defendants do not presently consent to this Court conducting the jury trial in this action. Accordingly, this action should be dismissed in the absence of such consent.[24]

## POINT XIV

### ALTERNATIVELY, THE COURT
### SHOULD STAY THIS ACTION

Alternatively, to the extent that any part of this action is not dismissed because it cannot be determined whether the assets recovered by the Trustee and the Justice Department are sufficient to pay all claims in this case, defendants respectfully submit that this action should be stayed until such time as such a determination can be made.

A bankruptcy court "has the authority to enter a complete stay of an adversary proceeding" pursuant to 11 U.S.C. § 105.[25] Musselman v. Home Ins. Co. of Indiana, 1990 U.S. Dist. LEXIS 10235, at *5 (S.D.N.Y. Aug. 7, 1990). "The determination whether to issue a stay is

---

[24]Defendants respectfully reserve their right to reconsider their position on this issue at a later stage of this case.

[25]Title 11 U.S.C. § 105(a) authorizes a bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]"

56

committed to the court's sound discretion." U.S. Bank Nat. Assoc. v. Perlmutter, 470 B.R. 659,

684 (E.D.N.Y. 2012). The factors that courts consider in determining whether to grant a stay

include the following: (1) the private interests of the plaintiffs in proceeding expeditiously versus

any prejudice caused to the plaintiffs by the delay; (2) the private interests and burdens on the

defendants; (3) the interests of the court; and (4) the interests of persons not parties to the

proceeding. See id. at 685 (citations omitted). "In balancing these factors, the basic goal is to

avoid prejudice." Id. (quotation marks and citations omitted).

       These factors weigh in favor of a stay in this case. First, the Trustee will not

suffer any prejudice from a stay as the Trustee and the Justice Department have already recovered

more than enough assets to pay all allowed customer claims and general unsecured claims.

Permitting this action to go forward at this point would only prejudice the general estate, as the

Trustee will incur substantial fees and costs in litigating this proceeding which SIPC – which has

been advancing funds to the Trustee to cover such fees and costs – may ultimately seek to

recover from the estate pursuant to SIPA § 78fff(e). SIPC's claim to recover such fees and costs

would have priority over other general unsecured claims. See SIPA § 78fff(e); 11 U.S.C. § 507.

       Second, defendants would be substantially burdened by having to devote

resources to litigating this action which may be moot once all the funds recovered by the Trustee

and the Justice Department are disbursed and all allowed customer claims and general unsecured

claims against the estate are satisfied. No purpose is served by imposing this burden on

defendants when the funds recovered are sufficient to satisfy all claims.

       Third, a stay will promote judicial economy and allow the Court to avoid

expending judicial resources overseeing litigation that may ultimately be moot. Fourth, a stay

would benefit non-parties who would otherwise be burdened with non-party discovery in this

case.  It is anticipated that discovery in this action will include depositions and document

discovery from various non-party witnesses who participated in or have knowledge of Madoff's

fraud.

In sum, defendants respectfully submit that the relevant factors weigh in favor of

granting a stay and this action should be stayed to the extent any part of it is not dismissed.

## POINT XV

## JOINDER IN OTHER MOTIONS TO
## DISMISS FILED IN SIMILAR CASES

Defendants adopt by reference any arguments made in other motions to dismiss

filed by similarly-situated defendants in other BLMIS adversary proceedings to the extent such

arguments are applicable and beneficial to them.

58

## CONCLUSION

For the foregoing reasons, the Court should dismiss the FAC in its entirety or,

alternatively, grant a stay of this action.

Dated:  New York, New York
        May 1, 2015

Respectfully submitted,

LAW OFFICE OF
RICHARD E. SIGNORELLI

By:    /s/ Richard E. Signorelli
_____

Richard E. Signorelli
Bryan Ha
799 Broadway, Suite 539
New York, NY 10003
Telephone:     212 254 4218
Facsimile:     212 254 1396
rsignorelli@nycLITIGATOR.com[SM]
www.nycLITIGATOR.com[SM]
Attorneys for Defendants

FILING AND SERVICE VIA ELECTRONIC FILING

59