**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | (Substantively Consolidated) |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-05421 (SMB) |
| v. | |
| FRANK J. AVELLINO, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE TRUSTEE'S AMENDED COMPLAINT**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for*
*the substantively consolidated SIPA*
*Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the estate of*
*Bernard L. Madoff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ................................................................................3

    A.    Avellino and Bienes Assisted Madoff in Concealing the Fraud from the SEC...........................................................................3

    B.    Avellino and Bienes Returned Their Original Account Statements to Madoff So They Could Be Altered and Replaced................5

    C.    Avellino and Bienes Sought Front-Men, Helped Continue the Ponzi, and Arranged for Fraudulent Side Payments from BLMIS .............................................................................7

ARGUMENT .....................................................................................11

    I.    STANDARDS GOVERNING RULE 12(b)(6) MOTIONS...................................11

    II.    DEFENDANTS CANNOT INVOKE THE SECTION 546(e) SAFE HARBOR.........................................................................12

    A.    The Section 546(e) Safe Harbor Only Protects Innocent Investors Who Did Not Have Actual Knowledge of Madoff's Fraud .............................................................................13

    B.    The Trustee Has Alleged More than Enough Evidence of Avellino's and Bienes's Knowledge of Fraud at BLMIS..........................17

    C.    Defendants Have Provided No Basis for Overruling *Cohmad* .................23

    III.    AVELLINO'S AND BIENES'S KNOWLEDGE AND CONDUCT SHOULD BE IMPUTED TO THE OTHER DEFENDANTS............................26

    A.    Avellino's and Bienes's Knowledge Should Be Imputed to the Entity Defendants of which They Are General Partners .........................27

    B.    Avellino's and Bienes's Knowledge of Fraud at BLMIS Is Imputed to the Other Defendants under Basic Principles of Agency and/or Equitable Ownership........................................27

        1.    Avellino and Bienes Acted as Agents and/or Equitable Owners of the Entity Defendants....................................28

        2.    Avellino and Bienes Acted as Agents for Mrs. Avellino and Mrs. Bienes in Connection with Their BLMIS Investments ...................................................................30

**TABLE OF CONTENTS**
**(continued)**

**Page**

3.   Avellino and Bienes Were Agents and/or Equitable
     Owners of the Remaining Defendants ............................................30

C.   Defendants' Other Challenges to Imputation Lack Merit.........................31

IV.   THE FRAUDULENT SIDE PAYMENTS ARE NOT
      COMPENSATION ...............................................................33

V.    THE TRUSTEE SUFFICIENTLY PLEADED COUNTS SEVEN AND
      NINE TO AVOID AND RECOVER TRANSFERS THAT
      OCCURRED MORE THAN SIX YEARS BEFORE THE FILING
      DATE ........................................................................36

VI.   THE INDIVIDUAL DEFENDANTS ARE LIABLE FOR THE
      INITIAL TRANSFERS RECEIVED BY THE ENTITY
      DEFENDANTS .................................................................38

A.   The Trustee Sufficiently Pleaded the Necessary Facts to Pierce
     the Veil of the Entity Defendants...............................................38

B.   The Trustee's Veil-Piercing Theory of Liability Does Not
     Divest Him of Standing to Bring Bankruptcy Claims against
     Defendants ..................................................................40

VII.  THE TRUSTEE MAY EQUITABLY SUBORDINATE
      STRATTHAM'S, KJA'S, AND MAYFAIR BOOKKEEPING'S
      CUSTOMER CLAIMS..........................................................42

VIII. DEFENDANTS' REMAINING ARGUMENTS FAIL ......................................43

A.   The Trustee Has Standing to Pursue His Avoidance Actions
     against Defendants ...........................................................43

     1.   BLMIS's Change in Corporate Form Has No Impact on
          Jurisdiction or the Trustee's Standing.............................................43

     2.   SIPA Applies to this Proceeding and the Funds at Issue
          Are Customer Property ..................................................44

     3.   The Trustee's Avoidance Action Poses No Conflict
          between SIPA and the Bankruptcy Code.......................................47

B.   Defendants' Inter-Account Transfer Argument Attempts to Re-
     Litigate Issues Already Decided ................................................48

CONCLUSION.......................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Cas. Sur. Co. v. Buck*,
  594 So. 2d 280 (Fla. 1992)...................................................................................27

*In re Alstom SA Sec. Litig.*,
  454 F. Supp. 2d 187 (S.D.N.Y. 2006)...................................................................12

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  351 F. Supp. 2d 79 (S.D.N.Y. 2004)......................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................11

*Baker v. Latham Sparrowbush Assoc.*,
  72 F.3d 246 (2d Cir. 1995).....................................................................................28

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
  256 B.R. 664 (Bankr. S.D.N.Y. 2000)....................................................................35

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................11

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
  563 F.2d 692 (5th Cir. 1977) .................................................................................42

*Bigio v. Coca-Cola Co.*,
  675 F.3d 163 (2d Cir. 2012)...................................................................................11

*In re BLMIS*,
  654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24 (2012)......................44, 49

*C.W. Bailey v. Sumpter Cnty. Farmers' Mkt. (In re Bailey)*,
  112 B.R. 449 (Bankr. M.D. Fla. 1990), *aff'd*, 124 B.R. 348 (M.D. Fla. 1991) ......................40

*Caplin v. Marine Midland Grace Trust Co. of N.Y.*,
  406 U.S. 416 (1972)...............................................................................................41

*Christianson v. Colt Indus. Operating Corp.*,
  486 U.S. 800 (1988)...............................................................................................25

*Dania Jai-Alai Palace, Inc. v. Sykes*,
  450 So.2d 1114 (Fla. 1984)....................................................................................38

*Ederer v. Gursky*,
  9 N.Y.3d 514 (2007) ..............................................................................................38

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Empresas Omajede, Inc. v. La Electronica, Inc.*,
   243 B.R. 211 (D.P.R. 1999).................................................................................24

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
   651 F.3d 329 (2d Cir. 2011)..............................................................................13

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*,
   726 F.3d 62 (2d Cir. 2013)................................................................................11

*Freeman v. Complex Computing Co., Inc.*,
   119 F.3d 1044 (2d Cir. 1997)............................................................................29

*Gowan v. Amaranth Advisors LLC (In re Dreier LLP)*,
   No. 10-03493 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) ...............46

*Gowan v. Patriot Grp., LLC (In re Dreier LLP)*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011)..............................................................12

*Grayson Consulting, Inc. v. Campbell (In re Derivium Cap. LLC)*,
   716 F.3d 355 (4th Cir. 2011) ...........................................................................49

*In re Hampton Hotel Investors, L.P.*,
   289 B.R. 563 (Bankr. S.D.N.Y. 2003)...............................................................42

*Harte v. United Benefit Life Ins. Co.*,
   66 Cal.2d 148 (1967) ......................................................................................32

*Hellenic v. Bridgeline Gas Distribution LLC (In re Hellenic Inc.)*,
   252 F.3d 391 (5th Cir. 2001) ...........................................................................32

*In re Highland Fin. Corp.*,
   216 B.R. 109 (Bankr. S.D.N.Y. 1997)...............................................................25

*In re Housecraft Indus. USA, Inc.*,
   310 F.3d 64 (2d Cir. 2002)...............................................................................41

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*,
   408 F.3d 689 (11th Cir. 2005) .........................................................................46

*InSITE Servs. Corp., LLC v. Am. Elec. Power Co., Inc. (In re InSITE Servs. Corp.,
LLC)*,
   287 B.R. 79 (Bankr. S.D.N.Y. 2002).................................................................41

*IRR Supply Centers, Inc. v. Phipps (In re Phipps)*,
   217 B.R. 427 (Bankr. W.D.N.Y. 1998)..............................................................24

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Jehly v. Brown,*
  327 P.3d 351 (Colo. Ct. App. 2014) ......................................................................32

*JMM Properties, LLC v. Erie Ins. Co.,*
  No. 5:08–CV–1382, 2013 WL 149457 (N.D.N.Y. Jan. 14, 2013) ...................28, 32

*Kirschner v. Bennett (In re Refco Sec. Litig.),*
  759 F. Supp. 2d 301 (S.D.N.Y. 2010)...................................................................11

*Kirschner v. KPMG LLP,*
  15 N.Y.3d 446 (2010) ...........................................................................................32

*McHale v. Boulder Cap. LLC (In re 1031 Tax Grp., LLC),*
  439 B.R. 47 (Bankr. S.D.N.Y. 2010).....................................................................46

*Mfrs. Hanover Trust Co. v. Jayhawk Assocs.,*
  766 F.Supp. 124 (S.D.N.Y. 1991).........................................................................27

*Miller v. Humphrey (In re Waterford Funding, LLC),*
  No. 10-02889, 2012 WL 380773 (Bankr. D. Ut. Feb. 6, 2012)..............................35

*Mishkin v. Peat, Marwick, Mitchell & Co.,*
  744 F. Supp. 531 (S.D.N.Y. 1990)........................................................................47

*Morris v. Bischoff,*
  No. 96-1384-Civ-T-17A, 1997 WL 128114 (M.D. Fla. Mar. 4, 1997) ...................39

*Ng v. Adler (In re Adler),*
  494 B.R. 43 (Bankr. E.D.N.Y. 2013).....................................................................41

*O'Connell v. Penson Fin. Servs. Inc. (In re Arbco Cap. Mgmt., LLP),*
  498 B.R. 32 (Bankr. S.D.N.Y. 2013)...............................................................14, 17

*Osherow v. Nelson Hensley & Consolidated Fund Mgmt. (In re Pace),*
  456 B.R. 253 (Bankr. W.D. Tex. 2011) .................................................................41

*In re Ozark Restaurants,*
  816 F.2d 1222 (8th Cir. 1987) ..............................................................................41

*Picard v. ABN AMRO Bank (Ir.) Ltd. (In re BLMIS),*
  505 B.R. 135 (S.D.N.Y. 2013)...............................................................................14

*Picard v. Avellino,*
  469 B.R. 408 (S.D.N.Y. 2012)...................................................................23, 40, 48

*Picard v. Chais (In re BLMIS),*
  445 B.R. 206 (Bankr. S.D.N.Y. 2011)...............................................30, 31, 37, 46

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Picard v. Charles Ellerin Revocable Trust (In re BLMIS)*,
   No. 10-04398 (SMB), 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012) ..........................46

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
   454 B.R. 317 (Bankr. S.D.N.Y. 2011) ..............................................................35, 37

*Picard v. Fox (In re BLMIS)*,
   848 F. Supp. 2d 469 (S.D.N.Y. 2012) ......................................................................42

*Picard v. Greiff*,
   476 B.R. 715 (S.D.N.Y. 2012) ..............................................................13, 14, 25

*Picard v. HSBC Bank PLC*,
   454 B.R. 25 (S.D.N.Y. 2011) ......................................................................42

*Picard v. Ida Fishman Revocable Trust (In re BLMIS)*,
   773 F.3d 411 (2d Cir. 2014) ..................................................................13

*Picard v. JP Morgan Chase & Co. (In re BLMIS)*,
   721 F.3rd 54, 70 (2d Cir. 2013) ..................................................................43

*Picard v. Katz*,
   462 B.R. 447 (S.D.N.Y. 2011) ................................................................ *passim*

*Picard v. Merkin* (*In re BLMIS*),
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ..................................................................26

*Picard v. Merkin (In re BLMIS)*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ................................................................ *passim*

*Picard v. Peter Madoff (In re BLMIS)*,
   458 B.R. 87 (Bankr. S.D.N.Y. 2011) ..........................................................36, 37

*Picard v. Taylor (In re Park S. Sec., LLC)*,
   326 B.R. 505 (Bankr. S.D.N.Y. 2005) ..................................................................45

*In re Pilgrim's Pride Corp.*,
   442 B.R. 522 (Bankr. N.D. Tex. 2010) ..................................................................25

*Raber v. Osprey Alaska, Inc.*,
   187 F.R.D. 675 (M.D. Fla. 1999) ..................................................................39

*Rosenman Family, LLC v. Picard*,
   395 Fed. App'x 766 (2d Cir. 2010) ..................................................................44

*Rosenman Family, LLC v. Picard*,
   420 B.R. 108 (S.D.N.Y. 2009) ..................................................................44

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*SEC v. Ballesteros Franco,*
253 F. Supp. 2d 720 (S.D.N.Y. 2003)..........................................................................29, 31, 32

*SEC v. Berry,*
No. C-07-04431 RMW, 2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ................................12

*SEC v. Dunn,*
587 F. Supp. 2d 486 (S.D.N.Y. 2008).....................................................................................2

*In re Shattuc Cable Corp.,*
138 B.R. 557 (Bankr. N.D. Ill. 1992) ...................................................................................25

*Shearson Lehman Hutton, Inc. v. Wagoner,*
944 F.2d 114 (2d Cir. 1991)..........................................................................................42, 43

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Tech. Ltd.),*
337 B.R. 791 (Bankr. S.D.N.Y. 2005)...................................................................................36

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.),*
379 B.R. 5 (Bankr. E.D.N.Y. 2007).......................................................................................46

*SIPC v. 2427 Parent Corp. (In re BLMIS),*
779 F.3d 74 (2d Cir. 2015)...................................................................................................49

*SIPC v. BLMIS,*
401 B.R. 629 (Bankr. S.D.N.Y. 2009) ............................................................................45, 47

*SIPC v. BLMIS (In re BLMIS),*
499 B.R. 416 (S.D.N.Y. 2013)......................................................................................34, 45, 49

*SIPC v. BLMIS (In re BLMIS),*
516 B.R. 18 (S.D.N.Y. 2014)................................................................................................13

*SIPC v. BLMIS (In re BLMIS),*
522 B.R. 41 (Bankr. S.D.N.Y. 2014)...............................................................................44, 49

*SIPC v. BLMIS (In re BLMIS),*
No. 12-MC-00115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)....................... *passim*

*SIPC v. Vigman,*
803 F.2d 1513 (9th Cir. 1986) .............................................................................................47

*Snook v. Netherby,*
124 Cal. App. 2d 797 (Cal. Dist. Ct. App. 1954).................................................................32

*Stewart Tilgman Fox & Brianchi, P.A. v. Kane (In re Kane),*
No. 09-11557-EPK, 2011 WL 165836 (Bankr. S.D. Fla. Jan. 18, 2011) ..............................38

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Syntex Corp. v. Lowsley-Williams & Cos.*,
   67 Cal.App.4th 871, 79 Cal.Rptr.2d 371 (1st Dist. 1998) ......................................................32

*Tara Prods., Inc. v. Hollywood Gadgets, Inc.*,
   No. 09-CV-61436, 2010 WL 1531489 (S.D. Fla. Apr. 16, 2010) ..........................................39

*Trefny v. Bear Stearns Sec. Corp.*,
   243 B.R. 300 (Bankr. S.D. Tex. 1999) ..................................................................................47

*United States v. Quintieri*,
   306 F.3d 1217 (2d Cir. 2002)................................................................................................25

*United States v. Rigas*,
   583 F.3d 108 (2d Cir. 2009)..................................................................................................25

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
   956 F.2d 1245 (2d Cir. 1992)................................................................................................25

*Wagner v. Fenton (In re Vaughan Co.)*,
   No. 12-1116, 2014 WL 231971 (Bankr. D. N.M. Jan. 22, 2014)...........................................35

*Warth v. Seldin*,
   422 U.S. 490 (1975)...............................................................................................................41

*Wm. Passalacqua Builders, Inc. v. Resnick Developers, Inc.*,
   933 F.2d 131 (2d Cir. 1991)..................................................................................................39

**Statutes**

11 U.S.C. § 544......................................................................................................................41

11 U.S.C. § 546(e) ..........................................................................................................*passim*

11 U.S.C. § 548..........................................................................................................*passim*

11 U.S.C. § 549......................................................................................................................41

11 U.S.C. § 704(a) .................................................................................................................48

15 U.S.C. § 78ccc(a)(2)(A) ...................................................................................................46

15 U.S.C. § 78fff-1(a) ...........................................................................................................48

15 U.S.C. § 78fff-2(c)(3) .......................................................................................................45

15 U.S.C. § 78fff(b) ...............................................................................................................48

15 U.S.C. § 78*lll*(2).................................................................................................................44

**TABLE OF AUTHORITIES**
**(continued)**

<u>Page(s)</u>

15 U.S.C. § 78*lll*(4)......................................................................................................45

FLA. STAT. § 620.8102(6) (2015).................................................................................27

FLA. STAT. § 620.8306(1) (2015).................................................................................38

N.Y. DEBT. & CRED. LAW § 276 (McKinney 2015)................................................36, 37

N.Y. P'ship Law § 23 (McKinney 2015)......................................................................27

N.Y. P'ship Law § 26(a)(2) (McKinney 2015).............................................................38

**Rules**

Fed. R. Civ. P. 9(b) .......................................................................................................33

Fed. R. Civ. P. 12(b)(6).................................................................................................11

N.Y. C.P.L.R. § 203(g) .................................................................................................36

N.Y. C.P.L.R. § 213(8) .................................................................................................36

**Other Authorities**

6 Collier on Bankruptcy ¶ 741 (15th ed. rev. 1997) .....................................................45

Restatement (Third) Agency § 5.03 (2006) ............................................................28, 33

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of

Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C.

§§ 78aaa, *et seq.*, by and through his undersigned counsel, respectfully submits this

Memorandum of Law in Opposition to the Motion to Dismiss[1] the Amended Complaint[2] filed by

Defendants.[3]

## PRELIMINARY STATEMENT

For more than forty years, Frank Avellino ("Avellino") and Michael Bienes ("Bienes")

worked hand in hand with Madoff to pool money from unwitting investors, fueling the Ponzi

scheme and lining their pockets with millions of dollars.  Avellino and Bienes were more than

mere customers of BLMIS's Investment Advisory ("IA") business—they were actually a critical

part of the machinery needed to sustain the Ponzi scheme.  Working together with Madoff during

the early years of the fraud, Avellino and Bienes made certain that there was sufficient capital for

the shell game to continue in return for handsome profits disguised as phony returns on non-

existent investments.  These profits allowed Avellino, Bienes, and their families to live a life of

luxury at the expense of others.

As specifically alleged in the Amended Complaint, Avellino and Bienes were not

innocent victims of Madoff's fraud.  Instead, they had actual knowledge of the fraud and actively

assisted Madoff in concealing it from government regulators who were closing in on the truth.

Not content with the tens of millions of dollars they had already enriched themselves with,

---

[1] Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss Trustee's Am. Compl., *Picard v. Avellino (In re BLMIS)*, No. 10-05421 (SMB) (Bankr. S.D.N.Y. Jan. 28, 2015), ECF No. 86 (the "Motion" or "Mot.").

[2] Am. Compl., *Picard v. Avellino (In re BLMIS)*, No. 10-05421 (SMB) (Bankr. S.D.N.Y. Nov. 24, 2014), ECF No. 86 (the "Amended Complaint" or "Am. Compl.").

[3] Defined terms herein have the same meaning as in the Amended Complaint.

Avellino and Bienes followed the instructions of Madoff and his lieutenants and assisted in the

creation of phony documents, fabricated trading activity, and other chicanery intended to deceive

regulators, conceal the fraud and, most importantly to them, preserve continued access to tens of

millions of dollars of other people's money.

Now, more than six years after Madoff's fraud ended and Avellino's and Bienes's

participation and complicity in the fraud was exposed, Defendants bring this Motion as a

desperate attempt to avoid responsibility for their actions and cling to their ill-gotten gains.  The

Motion is largely a hodgepodge of legal arguments and positions that were already rejected by

this Court and others.  It is also belied not only by the law but the well-pleaded allegations of the

Amended Complaint, which set forth in great detail Avellino's and Bienes's actual knowledge of

the fraud, as well as the imputation of that knowledge to the entities they owned and controlled,

and the family members who profited alongside them.  Nothing in the Motion, factually or

legally, warrants a dismissal of any of the Trustee's claims, especially at the pleading stage.

Further, Defendants cannot find any shelter in the "safe harbor" of section 546(e) of the

Bankruptcy Code ("Section 546(e)") as the Amended Complaint plausibly alleges that Avellino,

Bienes, and Thomas Avellino had actual knowledge of Madoff's fraud—all that is required at the

pleading stage.  In fact, it is telling that Avellino does not dispute many of the Trustee's factual

allegations in his papers and Bienes has not even bothered to submit a brief addressing or

refuting the specific allegations against him.[4]  The Court should deny the Motion in its entirety.

---

[4] Indeed, by filing a motion that "join[ed] in, adopted, and fully incorporate[d]" the Motion filed by the Avellino
Defendants, Bienes and the rest of the Bienes Defendants failed to address *any* of the Trustee's allegations against
them. Mot. to Join Co-Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss, *Picard v. Avellino (In re BLMIS)*,
No. 10-05421 (SMB) (Bankr. S.D.N.Y. Jan. 28, 2015), ECF No. 90.  For this reason alone, this Court should reject
any challenge by the Bienes Defendants to the Trustee's allegations, including those related to Bienes's actual
knowledge of BLMIS's fraud. *See SEC v. Dunn*, 587 F. Supp. 2d 486, 490 (S.D.N.Y. 2008) (where a defendant
only incorporated by reference the arguments made by co-defendant in his motion to dismiss, the court's decision as
to general arguments about the insufficiency of the complaint would apply equally to both defendants, but specific
allegations for the joining defendant would not be evaluated).

## STATEMENT OF FACTS

Avellino, and later with Bienes, began pooling money for purported discretionary investment with Madoff as early as 1962. Am. Compl. ¶¶ 30, 38. Avellino and Bienes, both Certified Public Accountants, used their accounting firm—Avellino & Bienes ("A&B")—to solicit and pool millions of dollars from investors located throughout the United States. *Id*. ¶¶ 2, 116. A&B was BLMIS's first "feeder fund." *Id.* By 1992, when the Securities and Exchange Commission ("SEC") began its investigation of A&B, records reflected more than $400 million purportedly held for investment by BLMIS in IA accounts owned and controlled by Avellino and Bienes. *Id*. ¶¶ 126, 130-31. Because of their importance to the maintenance and expansion of the Ponzi scheme, Avellino and Bienes enjoyed access to Madoff that other customers did not have. *Id*. ¶ 119. As early as the late 1970s, it was readily apparent to Avellino and Bienes that the trading activity reflected on their account statements was impossible, did not represent legitimate securities trading, and was the product of fraud. *Id.* ¶¶ 263-91. Even if Avellino and Bienes willfully blinded themselves to these facts, by the time of the SEC's investigation in 1992, there is no question that they had actual knowledge of Madoff's fraud. *See, e.g.*, *id*. ¶¶ 9-10, 126-69, 208-62.

### A.    Avellino and Bienes Assisted Madoff in Concealing the Fraud from the SEC

The SEC commenced its investigation of A&B in June 1992. *Id.* ¶ 126. On June 30, 1992, just prior to being summoned for testimony in that investigation, internal records maintained by A&B revealed that its underlying investors were owed approximately $413 million. *Id.* ¶¶ 130, 132. As of that same date, BLMIS account statements for the Original A&B IA Accounts reflected a total value of just $364 million, almost $50 million less than A&B's records. *Id.* ¶ 131. Avellino and Bienes knew from the careful analysis they claimed to perform on their BLMIS account statements that there was a significant shortfall between these two

3

amounts. *Id.* ¶¶ 129, 133-41.  Realizing that the shortfall would raise serious questions that would likely lead to the exposure of the Ponzi scheme, Madoff, Avellino, and Bienes hatched a plan in late June 1992 to conceal the shortfall from the SEC through the creation of the Phony A&B IA Account, a fictitious IA account layered with a false paper-trail designed to close the gap. *Id.* ¶¶ 142-51.  This cover-up could not have occurred without the active assistance and participation of Avellino and Bienes.  *Id.* ¶ 153.

Shortly after the creation of the Phony A&B IA Account, Avellino and Bienes jointly testified to the SEC that they always carefully scrutinized their BLMIS monthly statements to ensure their purported equity matched what they owed to their customers and to reconcile the fair market value of their positions each month. *Id.* ¶¶ 133, 135, 139-41.  They also told the SEC that they always maintained a balance well in excess of what they owed to their customers in order to provide a "cushion" of at least 20% in the event of any losses.  *Id.* ¶¶ 136-38.  Avellino and Bienes knew this representation was a lie and that their BLMIS account statements revealed an almost $50 million shortfall.  *Id.* ¶¶ 141-42.  They felt confident making these misrepresentations because they knew Madoff had created the Phony A&B IA Account with a paper trail supporting the fiction that there was sufficient cash and securities to cover the amounts owed to A&B's investors, as well as the imaginary cushion.  *Id.* ¶ 142.  The Phony A&B IA Account appeared to hold approximately $66 million in total value, an amount sufficient to cover the shortfall and provide the cushion.  *Id.* ¶ 146.  Although the Phony A&B IA Account was first created on or around June 23, 1992, its account statements contained transactions that purportedly occurred as early as December 1989. *Id.* ¶¶ 146-49.  Avellino and Bienes knew from their careful review of their account statements that the Phony A&B IA Account did not exist, did not reflect legitimate securities transactions, and could not have existed prior to June 1992.  *Id.* ¶¶ 133, 135, 139, 145-

50. As such, they knew that Madoff created the Phony A&B IA Account out of thin air in June

1992 as part of the cover-up and was engaged in fraud. *Id.* ¶ 151. In fact, in later sworn

testimony in connection with the liquidation of A&B, Avellino confirmed the existence of the

Phony A&B IA Account. *Id.* ¶¶ 143, 151.

> **B.    Avellino and Bienes Returned Their Original Account Statements to Madoff
> So They Could Be Altered and Replaced**

Avellino and Bienes assisted with Madoff's scheme to protect themselves from the

consequences that would have resulted from the revelation of the fraud and to continue to reap

the rich financial rewards they had enjoyed for decades. *Id.* ¶¶ 6, 10, 11, 144, 151. During the

SEC investigation, Avellino and Bienes—together with Madoff—were concerned with what

would happen if the SEC or others carefully scrutinized the historical account statements for the

Original A&B IA Accounts. *Id.* ¶¶ 152-54. Specifically, they were concerned that this scrutiny

would reveal similar shortfalls in other time periods, trading activity that was not consistent with

the purported "conservative" investment strategy, or other peculiarities that would heighten

suspicion and encourage further scrutiny. *Id.* ¶ 153. To eliminate these issues, Madoff and his

associates began a separate process in or around June 1992 to recreate the account statements for

certain Original A&B IA Accounts for a three-year period from 1989-1992. *Id.* ¶¶ 8, 153-57.

In order to carry out this part of the scheme, Madoff again required the assistance and

complicity of Avellino and Bienes, who agreed to return the original statements for the Original

A&B IA Accounts so they could be concealed from—and never produced to—the SEC or

Receiver. *Id.* Instead, a new set of sanitized statements would be provided in their place,

furthering the fiction Madoff wanted the SEC to believe. *Id.* ¶ 159. Madoff could not have

pulled this off without Avellino's and Bienes's active assistance and their agreement not to

produce the original statements. *Id.* ¶ 153. This fact is corroborated by materials located at

BLMIS that indicate clearly that the original A&B account statements were returned to BLMIS.

*Id.* ¶ 155.  There was no legitimate reason for original account statements purporting to represent

securities transactions from many years earlier to have been returned and replaced by statements

with other fictitious transactions.  *Id.* ¶¶ 153, 157.

In addition to returning the original statements, Avellino and Bienes went one step further

and provided Madoff with internal A&B documents, including accounting ledgers that tracked

periodic balances in the Original A&B IA Accounts.  *Id.* ¶ 158.  This allowed Madoff to closely

tailor the revised statements to match what appeared on internal A&B accounting documents

(which would likely be produced to the SEC) and conceal any discrepancies between the two

that would raise questions or call attention to the fraud.  *Id.* ¶ 158.  For example, Avellino and

Bienes had previously represented to the SEC that A&B owed its investors $245,067,378 as of

December 31, 1989, and $299,760,401 as of December 31, 1990.  *Id.* ¶ 160.  But the original

statements for the Original A&B IA Accounts revealed values that were approximately $32

million less than what Avellino and Bienes represented to the SEC.  *Id.* ¶ 160.  In order to close

this shortfall, BLMIS added 86 million US Treasury notes to the holdings for one of the

accounts, in one fell swoop "closing" the $32 million gap for each year-end period.  *Id.* ¶¶ 161-

62.  Had Avellino and Bienes not enabled Madoff to revise these statements by returning the

originals and concealing them from the SEC, the shortfalls in prior years would have threatened

to expose the fraud.  *Id.* ¶ 166.  The altered statements were also filled with dozens of other

instances of backdated transactions going as far back as 1989, including fictitious entries to

disguise negative cash balances or the identity of prior account holders.  *Id.* ¶¶ 164-65.  Months

later, when asked to produce statements to the Receiver, Avellino claimed that A&B did not

maintain statements beyond a three-year period, the period of time precisely matching the time

span of the statements Madoff and his associates feverishly worked to recreate.  *Id.* ¶ 167.

Avellino, Bienes, and even Mrs. Bienes further assisted Madoff in the cover-up.  They

signed and provided otherwise blank account opening documentation to Madoff during the SEC

investigation so that he could fill in the information to make it falsely appear to anyone who

looked that their accounts were properly opened years earlier.  *Id.* ¶ 168.  Yet again, Avellino

and Bienes cooperated with Madoff so the fraud would remain hidden.  *Id.* ¶ 169.  Their

complicity in the effort to paper-over their IA accounts and recreate original account statements

was conclusive proof that they knew BLMIS was not engaged in any legitimate or actual

securities transactions.  *Id.* ¶¶ 157, 166, 169.

In November of 1992, the SEC commenced litigation against A&B, Avellino, and Bienes

alleging they had operated an unregistered investment adviser who offered unregistered

securities for more than 30 years.  *Id.* ¶ 170.  The Receiver was assigned to liquidate the firm and

pay off the moneys owed to A&B's underlying customers.  *Id.* ¶¶ 171-72.  Employees at BLMIS

scrambled to raise funds to pay off these customers while continuing to conceal the fraud.  *Id.* ¶

171.  A&B, Avellino, and Bienes were permanently enjoined by the SEC for their violations of

the securities laws.  *Id.* ¶ 173.

### C.    Avellino and Bienes Sought Front-Men, Helped Continue the Ponzi, and Arranged for Fraudulent Side Payments from BLMIS

Undeterred by the SEC injunction and motivated by the tens of millions of dollars they

earned from participating in Madoff's fraud, Avellino and Bienes sought to continue reaping the

financial windfall they enjoyed for decades.  *Id.* ¶ 174.  To conceal their continued involvement

in BLMIS from the SEC, they first attempted to find front-men who would control accounts on

their behalf in return for a fee.  *Id.* ¶¶ 175-77.  When this plan did not work, Avellino, Bienes,

and certain family members created a web of interconnected entities solely to hold IA accounts with BLMIS for their benefit, while avoiding regulatory scrutiny. *Id.* ¶¶ 12, 178-80. In early 1993, Avellino and Bienes opened two IA accounts in the names of Mayfair Ventures and Grosvenor Partners. *Id.* ¶¶ 62-63, 183, 188. In 1995, Avellino arranged for Thomas Avellino to open an IA account in the name of Strattham so that he too could reap the benefits of the Ponzi. *Id.* ¶¶ 66, 194. In 2004, Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes opened additional IA accounts in the names of Aster and St. James. *Id.* ¶¶ 64-65, 192-93. These IA accounts continued to withdraw tens of millions of dollars from BLMIS until its collapse in December 2008. *Id.* ¶¶ 187-88, 192-93, Exs. A, B.

Not content with merely profiting from the fictitious trading in their IA accounts, Avellino and Bienes negotiated with Madoff to receive additional illicit gains in their accounts, even though they knew he was operating a fraud. *Id.* ¶¶ 14, 209-11. Madoff promised these additional financial incentives to Avellino and Bienes in return for their assistance in bringing former A&B investors—and their cash—back to BLMIS. *Id.* ¶¶ 14, 208. In the winter of 1993, Avellino met with Madoff and negotiated a deal whereby he and Bienes would continue to reap a financial windfall for helping former customers open accounts with Madoff. *Id.* ¶ 209. Specifically, Madoff agreed to provide the Post-1992 IA Accounts with guaranteed annual rates of return as high as 17% and additional fraudulent side payments as high as 2% of the total amount of cash former A&B investors reinvested directly in BLMIS as of March 31, 1993. *Id.* ¶¶ 14, 210, 213. The fraudulent side payments were made year after year for more than a decade, and were entirely unrelated to the underlying performance of the IA accounts opened by former A&B customers. *Id.* ¶ 15.

Although Defendants now seek to cloak these illicit payments as legitimate compensation, the method Madoff used to pay these guaranteed returns and fraudulent side payments belies any legitimacy and further bolsters Avellino's and Bienes's knowledge of the fraud. *Id.* ¶¶ 17, 225-37; Mot. at 17-18, 22-24. The fraudulent side payments (and at times the guaranteed returns) were paid through the use of a blatantly fictitious process referred to internally at BLMIS as the "Schupt." Am. Compl. ¶¶ 15-17, 225-26. This process bore no relation to the SSC Strategy and involved the use of fabricated non-hedged options trades that would be added to certain IA accounts at the end of each year in nearly exact amounts needed to close any shortfall in the guaranteed rate of return and the fraudulent side payment owed to Avellino and Bienes. *Id.* ¶¶ 17, 227. This on-demand gain led to outlandish rates of return in the Post-1992 IA Accounts as high as 94%. *Id.* ¶¶ 223, 247. Madoff and his employees tracked the amounts owed to the IA accounts controlled by Avellino and Bienes and other specially favored customers through the use of handwritten "Schupt" schedules. *Id.* ¶¶ 217-18, 223, 225-28. These schedules tracked the amount owed to the specific account and, with the benefit of hindsight, identified the specific option, price, and quantity needed to meet the fraudulent side payment or provide the guaranteed return. *Id.* ¶¶ 225-28.

Avellino and Bienes were not passive spectators of this process. *Id.* ¶ 238. As alleged in the Amended Complaint, Avellino and Bienes carefully monitored the balances in the Post-1992 IA Accounts to be certain Madoff paid every dollar he agreed to pay. *Id.* On at least an annual basis, Avellino performed detailed reconciliations and communicated to Madoff and his associates what he believed the Post-1992 IA Accounts were owed and which accounts should receive the payments. *Id.* ¶ 238-40. These instructions were usually in writing and accompanied by Avellino's own detailed calculations of what was owed. *Id.* In one instance, Avellino

happily noted "Yes, it's that time of year again" and then detailed the amount owed to a specific

Post-1992 IA Account. *Id.* ¶ 240. Soon thereafter, a fictitious non-hedged option purchase and

sale would magically appear on the relevant account statements yielding a "profit" in the amount

owed for the fraudulent side payment and/or guaranteed rate of return. *Id.* ¶ 241. This occurred

each and every year from at least 1994 through 2007, providing at least $59 million in additional

fictitious gains above and beyond the tens of millions of dollars in fictitious profits that were

already withdrawn from these accounts. *Id.* ¶¶ 16, 219, 221; Ex. B, at 29-36. Avellino and

Bienes knew that it was not possible for Madoff to make on-demand options trades that matched

what they were owed each and every year. *Id.* ¶¶ 17, 224, 237. They knew the options

transactions that appeared on their statements were not the result of actual securities trading and

were the product of fraud. *Id.* Coupled with the knowledge of the fraud they acquired in

connection with the cover-up during the SEC investigation, Avellino and Bienes cannot credibly

maintain at the pleading stage that they were unaware of Madoff's fraud.

After the exposure of the fraud, Bienes gave a television interview whereby he repeatedly

lied about his knowledge of Madoff's fraud in a misguided attempt to conceal his involvement in

it. *Id.* ¶¶ 4, 308. Despite his participation in the SEC cover-up and the numerous other instances

of his own fraudulent conduct, Bienes denied having any "inkling" of Madoff's fraud. *Id.* ¶ 309.

He also lied about the size of the returns he received on his investments and neglected to mention

the significant fraudulent side payments—totaling almost $59 million—that he and Avellino

received for bringing investors back to BLMIS. *Id.* ¶¶ 309-314. Bienes, in a rare moment of

candor, did admit he was motivated by greed and willfully blind to Madoff's fraud. *Id.* ¶¶ 320,

323-26. When Avellino, Bienes, Thomas Avellino, and Mrs. Bienes were called to testify by the

Trustee, they asserted their Fifth Amendment right against self-incrimination to each and every

question regarding Madoff and their IA accounts.  *Id.* ¶¶ 21, 328.  At the pleading stage, the

Trustee is only required to set forth factual allegations that provide plausible support for the

claims in the Amended Complaint.  The Trustee has met and exceeded his burden and the

Motion should be denied in its entirety.

## ARGUMENT

### I.   STANDARDS GOVERNING RULE 12(b)(6) MOTIONS

The standard governing a motion to dismiss made pursuant to Federal Rule of Civil

Procedure ("FRCP") 12(b)(6) is well settled.  The Court must "accept[] all well-pleaded

allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor."

*Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) (internal marks omitted).  "To survive

a motion to dismiss, the complaint must plead 'enough facts to state a claim for relief that is

plausible on its face.'"  *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62,

71 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is

facially plausible where "the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).  "Determining whether a claim is plausible is 'a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense.'"  *Picard*

*v. Merkin (In re BLMIS)*, 515 B.R. 117, 137 (Bankr. S.D.N.Y. 2014) ("*Merkin II*") (quoting

*Iqbal*, 556 U.S. at 679).  Whereas legal conclusions "are not entitled to the assumption of truth,"

the "court should give all 'well-pleaded factual allegations' an assumption of veracity and

determine whether, together, they plausibly give rise to an entitlement of relief."  *Id.* at 137

(quoting *Iqbal*, 556 U.S. at 679).

At the pleading stage, actual knowledge of fraud may be inferred from circumstantial

evidence.  *See Kirschner v. Bennett (In re Refco Sec. Litig.)*, 759 F. Supp. 2d 301, 335 (S.D.N.Y.

2010) (denying motion to dismiss fraud claim against defendants and noting "actual knowledge

may also be implied from a strong inference of fraudulent intent") (internal marks omitted).

Further, the issue of knowledge of the voidability of a transfer is a fact question better left for the

jury and should not be decided on a motion to dismiss. *See, e.g.*, *Gowan v. Patriot Grp., LLC (In*

*re Dreier LLP)*, 452 B.R. 391, 427 (Bankr. S.D.N.Y. 2011) (denying motion to dismiss

avoidance action, in part, because good faith determination "is a factual inquiry that is

inappropriate at the motion to dismiss stage"); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette*

*Sec. Corp.*, 351 F. Supp. 2d 79, 107 (S.D.N.Y. 2004).

Finally, this Court can and should draw an adverse inference from Avellino's, Bienes's,

Mrs. Bienes's, and Thomas Avellino's invocation of the Fifth Amendment right against self-

incrimination during depositions conducted prior to the commencement of this Adversary

Proceeding. *See SIPC v. BLMIS (In re BLMIS)*, No. 12-MC-00115 (JSR), 2013 WL 1609154, at

*6 n.4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"); *see also In re Alstom SA Sec. Litig.*, 454 F. Supp.

2d 187, 208 n.17 (S.D.N.Y. 2006) (noting that the court is permitted to draw adverse inference

from defendants' invocation of Fifth Amendment in considering and ultimately denying motion

to dismiss fraud claims); *SEC v. Berry*, No. C-07-04431 RMW, 2008 WL 4065865, at *5 (N.D.

Cal. Aug. 27, 2008) (holding that defendant's invocation of the Fifth Amendment permitted the

court to draw an unfavorable inference and required denial of her motion to dismiss fraud claim).

## II.    DEFENDANTS CANNOT INVOKE THE SECTION 546(e) SAFE HARBOR

Defendants move to dismiss Counts II through IX by claiming they may avail themselves

of the "safe harbor" contained in Section 546(e).[5]  But Avellino and Bienes are precisely the kind

---

[5] In Count One of the Amended Complaint, the Trustee seeks to avoid, under section 548(a)(1)(A) of the
Bankruptcy Code, actual fraudulent transfers received by Defendants within two years of the Filing Date (the "Two
Year Transfers").  Of the Two Year Transfers, $17.2 million constituted fictitious profits from Madoff's Ponzi
scheme.  *See* Am. Compl., Exs. A and B.  Because value can never be given for fictitious profits, Defendants' lack

of defendants the safe harbor is *not* intended to protect: customers who knew of—and indeed

participated in—the fraud at BLMIS.  Avellino and Bienes knew their securities contracts with

BLMIS were not legitimate and that any settlements payments from BLMIS were not bona fide.

Defendants, therefore, cannot claim the protection of Section 546(e).

### A.    The Section 546(e) Safe Harbor Only Protects Innocent Investors Who Did Not Have Actual Knowledge of Madoff's Fraud

The Section 546(e) safe harbor prevents a trustee from avoiding "settlement payment[s] .

. . in connection with a securities contract," except in cases of actual fraud under 11 U.S.C. §

548(a)(1)(A).  *Merkin II*, 515 B.R. at 138 (citing *Cohmad*, 2013 WL 1609154, at *6).  The safe

harbor is intended to "minimiz[e] the displacement caused in the commodities and securities

markets in the event of a major bankruptcy affecting those industries."  *Enron Creditors*

*Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011).  The District Court has

held "in the context of the Madoff Securities' fraud, that goal is best achieved by protecting the

*reasonable expectations of investors who believed they were signing a securities contract*."

*Cohmad*, 2013 WL 1609154, at *4 (emphasis added).[6]

Applying the safe harbor in a trilogy of cases, the District Court held that investors who

understood BLMIS to be acting as their stockbroker had agreements with BLMIS that were

---

of "good faith" under section 548(c) of the Bankruptcy Code, which "requires a showing that a given defendant acted with willful blindness to the truth," is not relevant to these Two Year Transfers.  *SIPC v. BLMIS (In re BLMIS)*, 516 B.R. 18, 21 (S.D.N.Y. 2014); *Merkin II*, 515 B.R. at 138.  Defendants' lack of "good faith" is relevant to the more than $17.9 million of the Two Year Transfers that constituted transfers of principal.  *Id.*  As the Amended Complaint sufficiently alleges Defendants' actual knowledge of BLMIS's fraud, the Trustee has more than met his pleading burden to establish Defendants' lack of "good faith" to avoid and recover such transfers of principal.

[6] The Trustee appealed the District Court's holding in *Greiff* that the Section 546(e) safe harbor applies in this liquidation, and on December 8, 2014, the Second Circuit upheld it.  *See Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411, 423 (2d Cir. 2014).  The Trustee recently filed a petition for a writ of certiorari on that decision to the Supreme Court.  *See* Petition for Writ of Certiorari, *Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, No. 14-1129 (U.S. Mar. 17, 2015).  For the purposes of the Motion only, the Trustee will apply the holding in *Greiff*, but nothing contained herein should be construed to alter the basis set forth in the Trustee's petition.

securities contracts. *Picard v. Katz*, 462 B.R. 447, 451-52 (S.D.N.Y. 2011) ("*Katz*")*; Picard v.

Greiff*, 476 B.R. 715, 720 (S.D.N.Y. 2012) (*"Greiff"*)*; Cohmad*, 2013 WL 1609154 ,at *2-3.

The District Court further held that transfers from BLMIS to those customers were settlement

payments in connection with those securities contracts and thus fell within the safe harbor of

Section 546(e). *Katz*, 462 B.R. at 452*; Greiff*, 476 B.R. at 719-720. Under the District Court's

reasoning, the safe harbor protects legitimate investors who reasonably believed that BLMIS was

trading securities on their behalf. *Katz*, 462 B.R. at 452 n.3; *Greiff*, 476 B.R. at 720; *Cohmad*,

2013 WL 1609154, at *4. But an investor with no such belief, like Avellino and Bienes, who

"had actual knowledge of Madoff's scheme[,] . . . stands in a different posture from an innocent

transferee, even as concerns the application of Section 546(e)." *Cohmad*, 2013 WL 1609154, at

*4. As the District Court explained:

> [A] transferee who had actual knowledge of the Madoff "Ponzi"
> scheme did not have any such expectations, but was simply
> obtaining moneys while he could. Neither law nor equity permits
> such a person to profit from a safe harbor intended to promote the
> legitimate workings of the securities markets and the reasonable
> expectations of legitimate investors.

*Cohmad*, 2013 WL 1609154, at *4; *see also O'Connell v. Penson Fin. Servs. Inc. (In re Arbco

Cap. Mgmt., LLP)*, 498 B.R. 32, 43-44 (Bankr. S.D.N.Y. 2013) (adopting *Cohmad* and holding

that the 546(e) safe harbor was unavailable to defendants who had actual knowledge of

underlying fraud).

The Section 546(e) safe harbor inquiry, therefore, "turn[s] on the investors'

understanding of what they had contracted for." *Picard v. ABN AMRO Bank (Ir.) Ltd. (In re

BLMIS)*, 505 B.R. 135, 142 n.6 (S.D.N.Y. 2013). The safe harbor does not protect "actual

participants in the fraud" or those "who had actual knowledge of its workings (and thereby

effectively participated in it by taking advantage of its workings)" because "unlike innocent

customers, they would not have believed that the settlement payments were entirely bona fide."
*Cohmad*, 2013 WL 1609154, at *4 (quoting *Katz*, 462 B.R. at 452 n.3).

Further, an investor with "actual knowledge that there were no actual securities
transactions being conducted" also could not have expected that his securities contracts with
BLMIS were "entirely bona fide." *Cohmad*, 2013 WL 1609154, at *4; *Katz*, 462 B.R. at 452
n.3. A transferee may have lacked insight into the exact nature of Madoff's fraud, but may have
known that there were no actual securities being traded in his or her account. In this scenario,
the investor cannot avail himself of Section 546(e) because he had no legitimate expectations
that the transfers received from BLMIS were "settlement payments" or "transfers" made "in
connection with a securities contract." 11 U.S.C § 546(e); *Cohmad*, 2013 WL 1609154, at *4.
Indeed, it would be an absurd and inequitable result to allow an investor who knew his
"securities contracts" with and "settlement payments" from BLMIS were premised on fraud to
be granted refuge in a safe harbor reserved for innocent customers.

In the Motion, Defendants argue that the Trustee must show they "had actual knowledge
that there were no actual securities transactions being conducted by BLMIS *and* actual
knowledge that BLMIS was a *Ponzi scheme*." Mot. at 15-16 (emphasis added and internal
quotations and citations omitted). This overly broad assertion misstates the appropriate standard.
First, the three District Court cases summarized above use terms such as Madoff's "fraud,"
"scheme," and "Ponzi" interchangeably as exemplars of actual knowledge allegations that may
be pleaded to defeat the safe harbor defense.[7] Likewise, this Court also used actual knowledge of

---

[7] The District Court in *Cohmad* articulated the following formulations: (1) "the Trustee has alleged that the initial
transferee had actual knowledge of Madoff Securities' fraud," *Cohmad*, 2013 WL 1609154, at *1; (2) "where the
Trustee has adequately alleged that the[] defendants had, not mere suspicions, but actual knowledge of Madoff's
scheme," *id.* at *3; (3) "defendants are alleged to have known in effect that the account agreements never led to a
transaction for the 'purchase, sale, or loan of a security,'" *id.* at *3 (quoting 11 U.S.C. § 546(e)); (4) "a transferee
who had actual knowledge of the Madoff 'Ponzi,'" *id.* at *4; (5) "those who had actual knowledge of [the fraud's]

Madoff's "scheme," "fraud," and "Ponzi" interchangeably in describing the standard.[8]

Moreover, the District Court in *Cohmad* had no trouble drawing the *inference* of the defendants'

actual knowledge of Madoff's fraud despite the absence of any allegations in the operative

complaint that the defendants knew Madoff was conducting a "Ponzi scheme." *Cohmad*, 2013

WL 1609154, at *6 (identifying factual allegations supporting actual knowledge). This Court

acknowledged as much when citing approvingly to the alleged facts of participation and

coordination "that supported the *inference* of actual knowledge and actual participation in

*Cohmad*." *Merkin II*, 515 B.R. at 141 n.16 (emphasis added). Further, there is no support for the

proposition that the Trustee must show actual knowledge that there were no actual securities

transactions being transacted *and* that BLMIS was a Ponzi scheme. Under the three District

Court cases set forth above—and by Defendants' own admissions throughout their Motion—the

Trustee can defeat the safe harbor by establishing Defendants' actual knowledge of Madoff's

fraud, Madoff's scheme, *or* Madoff's Ponzi, *or* that no actual securities were being transacted.[9]

If Defendants had actual knowledge of any one of these, they had no reasonable expectation their

securities contracts or settlement payments were bona fide, and they cannot invoke the safe

harbor defense.

---

workings" as well as to "actual participants in the fraud," *id.* at *4 (quoting *Katz*, 462 B.R. at 452 n.3); and (6) transferees with "actual knowledge that there were no actual securities transactions being conducted," *id.* at *4.

[8] *See Merkin II*, 515 B.R. at 138 ("If, however, an initial (or subsequent) transferee had *actual* knowledge of Madoff's Ponzi scheme, he cannot avail himself of the § 546(e) safe harbor, and the Trustee can avoid and recover preferences and actual and constructive fraudulent transfers to the full extent permitted by state and federal bankruptcy law.") (emphasis in original); *id.* at 139 (the Trustee "must plead and prove that BLMIS made an avoidable transfer and the transferee had actual knowledge of Madoff's scheme."); *id.* at 141 ("In order to sustain his claim under Count Two, the Trustee must initially plead that Merkin willfully blinded himself to Madoff's fraudulent scheme."); *id.* at 144 ("Where the complaint alleges facts showing that the defendant was aware of the 'red flags' and the probability that Madoff was running a fraudulent scheme, it sufficiently pleads scienter.").

[9] Defendants themselves describe the standard in various different ways throughout the Motion as: "actual knowledge of Madoff's fraud" (Mot. at 4, 7, 18, 27), "actual knowledge that there were no actual securities transactions being conducted" (*id.* at 13, 15, 17, 18, 19, 26, 28, 32), and "actual knowledge that BLMIS was a Ponzi scheme" (*id.* at 4, 13-15, 17-19, 26, 28, 32).

Significantly, the detailed, non-conclusory allegations in the Amended Complaint satisfy all articulations of the applicable standard.  They support Avellino's and Bienes's actual knowledge of BLMIS's fraud and that no actual securities transactions were taking place in their accounts, their coordination with Madoff to conceal and continue the fraud, and their actual participation in the scheme itself.  The totality of these allegations "provide [more than] enough detail to get the Trustee to trial." *In re Arbco*, 498 B.R. at 44.

### B.    The Trustee Has Alleged More than Enough Evidence of Avellino's and Bienes's Knowledge of Fraud at BLMIS

In the Amended Complaint, the Trustee not only alleges Avellino and Bienes knew for decades that Madoff was operating a fraud and that no actual transactions were being conducted in their accounts, but also that they actively participated in and assisted the scheme.  In addition to Avellino's and Bienes's creation of the first BLMIS "feeder fund" that fueled the Ponzi for decades and their unique decades-long access to Madoff and his associates (Am. Compl. ¶¶ 2, 116, 119), the Amended Complaint specifically alleges that Avellino and Bienes:

- knew that BLMIS had fraudulently created the Phony A&B IA Account out of thin air with over $66M in fictitious value and manufactured at least three years' worth of accompanying account statements reflecting transactions that never occurred (*id.* ¶¶ 6, 146, 151);

- knew BLMIS had altered the Original A&B IA Account statements for a period of at least three years to reflect certain transactions that never occurred (*id.* ¶¶ 7-8, 153, 159-61, 165-67);

- participated and were complicit in Madoff's fraud and its cover-up by: (i) testifying falsely to the SEC about the purported balances in their IA accounts (*id.* ¶¶ 7, 132-41); (ii) returning certain of their Original A&B IA Account statements to BLMIS so that they could be altered for production to the SEC (*id.* ¶¶ 8, 153-57, 159); and (iii) providing BLMIS with signed but otherwise blank account opening documents, as well as A&B's general ledgers and bank records to ensure they were consistent with the revised account statements (*id.* ¶¶ 158, 168); and

- knew that the fraudulent side payments and predetermined, guaranteed rates of return they received in their IA accounts from 1993 forward was further proof of fraud at BLMIS (*id.* ¶ 17, 225-42).

17

Based on these facts, taken as true for the purposes of the Motion, it is more than plausible—indeed a finder of fact could reasonably infer and conclude—that Avellino and Bienes knew of, participated in, and took full advantage of BLMIS's fraud.[10]  Moreover, Defendants tellingly do not address anywhere in their Motion the creation of the Phony A&B IA Account, their false testimony to the SEC and participation in the cover-up, the return of their Original A&B IA Account statements to BLMIS, or the fraudulent method by which they received the fraudulent side payments.[11]

Far from "conclusory allegations," the Amended Complaint specifically alleges that during the SEC investigation, Avellino and Bienes knew that Madoff had created the Phony A&B IA Account out of thin air with over $66M in fictitious value and three years' worth of corresponding backdated account statements containing fabricated trades that never occurred. *Id.* ¶¶ 130-31, 133-46, 149-51.  The Phony A&B IA Account concealed a shortfall between the purported value reflected on the Original A&B IA Account statements as of June 1992, and the amounts Avellino and Bienes represented to the SEC were owed to their investors.  *Id.*  The Court can rely on this machination alone to establish that Avellino and Bienes had direct and unequivocal knowledge of Madoff's fraud.  Avellino and Bienes also could not have reasonably believed that the transfers they received from BLMIS were legitimate "settlement payments" or made in connection with bona fide securities contracts.  Indeed, when Avellino and Bienes withdrew the millions in fictitious value created by this account, they knew it was not generated by actual trading activity and had to have been taken from some other source.

---

[10] Defendants attempt to argue that because Madoff masterminded a scheme and took steps to conceal the fraud, Avellino and Bienes could not have known of the fraud. Mot. at 19.  But the two outcomes are not mutually exclusive.  Defendants cannot hide behind Madoff's efforts to conceal his fraud from others when they were part of the select few who assisted him in his efforts.

[11] As noted *supra* note 4, by merely joining the Motion, Bienes did not address a single factual allegation made against him in the Amended Complaint.

18

This was not the only way Avellino and Bienes gained knowledge of Madoff's fraud.  In connection with the SEC investigation, Avellino and Bienes returned their Original A&B IA Account statements to Madoff so that BLMIS could generate an entirely new set of fabricated account statements for a three-year period for production to the SEC and/or Receiver.  *Id.* ¶¶ 8, 153-57, 159.  Avellino and Bienes also provided BLMIS with A&B's general ledgers and bank records to ensure these documents were consistent with the revised statements.  *Id.* ¶ 158.  By taking these active steps, Avellino and Bienes assisted Madoff in concealing BLMIS's fraud from the SEC, which enabled Defendants to continue profiting from it.  *Id.* ¶¶ 11, 153-54, 169.  By returning their account statements to BLMIS for alteration, Avellino and Bienes knew BLMIS was placing transactions on their account statements that never actually occurred.  *Id.* ¶ 157.  As a result, they also knew the funds paid from their IA Accounts were not legitimate "settlement payments" and could not have been made in connection with an actual bona fide securities contract.  Avellino's and Bienes's conduct reveals that they had "actual knowledge of [the fraud's] workings (and thereby effectively participated in it by taking advantage of its workings)."  *Cohmad*, 2013 WL 1609154, at *4.

Avellino, Bienes, and Mrs. Bienes also took additional steps to assist Madoff in concealing the fraud.  They signed and returned to BLMIS otherwise blank account opening documents, trading authorizations, customer agreements, and other account agreements BLMIS faxed to them during the SEC investigation.  Am. Compl. ¶ 168.  This made it appear that proper account documentation existed for the Original A&B IA Accounts in the event the SEC requested and reviewed these materials as part of its investigation.[12]  *Id.*  Of course, this not only

---

[12] Defendants argue that these allegations do not "make a plausible inference that Avellino knew that Madoff was engaged in a Ponzi scheme or was not engaged in actual securities transactions."  Mot. at 17.  Defendants further argue these facts may have put Avellino on inquiry notice that "something was amiss," but that this is insufficient to hold them accountable.  *Id.*  Defendants have wholly ignored the specific factual allegations detailing Avellino's and

eviscerates any argument that Defendants had *any* legitimate expectations that their supposed "securities agreements" or "settlement payments" were bona fide, but it also shows that Avellino, Bienes, and Mrs. Bienes knew of BLMIS's overall effort to "paper" the files to deceive government regulators and conceal the fraud.

After the SEC investigation, Avellino and Bienes knew—at a minimum—that Madoff was committing fraud, manipulating records, and reporting securities transactions on their account statements that did not actually take place.[13]  By actively assisting Madoff in these efforts, their conduct rises to the level of "participation in every aspect of Madoff's Ponzi scheme." *Cohmad*, 2013 WL 1609154, at *6.

Avellino's and Bienes's actual knowledge of Madoff's fraud does not end there.  After the SEC investigation and subsequent shut down of A&B, rather than walk away from the fraud they knew existed at BLMIS, Avellino and Bienes continued to exploit it.  Am. Compl. ¶¶ 12, 178.  By creating a web of inter-connected entities and opening IA accounts in such entities' names, Avellino and Bienes ensured that their BLMIS investments were hidden from regulators and that they, as well as those closest to them, would continue to reap the benefits of Madoff's fraud.  *Id.* ¶¶ 12-13, 178-80.  Avellino and Bienes negotiated with Madoff to receive guaranteed

---

Bienes's knowledge of BLMIS's fraud set forth in the Amended Complaint.  Defendants also inexplicably tout that "[n]owhere in the TAC does it allege that the SEC accused any of Defendants of committing fraud" (*id.* at 16), when in fact—as set forth in the Amended Complaint—Avellino and Bienes lied to the SEC and assisted Madoff in *covering up* BLMIS's fraud from the SEC.

[13] In a desperate attempt to try to erase these egregious facts from the Court's consideration, Defendants argue that the Trustee never alleged the date BLMIS and Madoff began their Ponzi scheme; therefore, if it began after the closing of A&B, the factual allegations related to 1992 and 1993 have no bearing or relevance to Avellino's actual knowledge.  Mot. at 18.  But Defendants' argument is entirely futile because the Amended Complaint alleges that the fraud began in at least the 1970s.  Am. Compl. ¶ 109.  Even if Defendants have evidence to the contrary, the pleading stage is not the appropriate time for it to be considered.  Defendants also question whether any knowledge gained in 1992 and 1993 "should have lasted for some twenty years as to each and every transaction with BLMIS and Madoff."  Mot. at 17.  As alleged by the Trustee, the reality is that Avellino and Bienes were tainted with knowledge of, and participation in, Madoff's fraud since at least 1992.  *See e.g.*, Am. Compl. ¶¶ 6, 142, 153.  They were never scrubbed of this knowledge and conduct and, in fact, continued to benefit knowingly from BLMIS's fraud thereafter.  *Id.* ¶ 225-42.

rates of returns as high as 17% in the Post-1992 IA Accounts. *Id.* ¶¶ 14, 208-15. Avellino and

Bienes knew that it was not possible for Madoff to guarantee and consistently deliver a

predetermined rate of return if he were actually transacting in securities. *Id.* ¶ 224. Further,

Avellino and Bienes also negotiated with Madoff for annual fraudulent side payments based on a

percentage of the total cash former A&B investors reinvested with BLMIS as of March 1993. *Id.*

¶¶ 14-15, 208-15.

While Defendants are attempting now to characterize the over $59 million they received

in fraudulent side payments as "compensation" (Mot. at 17, 22-24), the method by which they

were paid belies any legitimacy and further bolsters Avellino's and Bienes's knowledge of the

Ponzi scheme. Defendants received the fraudulent side payments through their IA accounts via

the "Schupt" process, which was limited to specially favored BLMIS investors. Am. Compl. ¶¶

17, 225-42. In or around December of each year, highly profitable, non-hedged options

transactions would magically appear on various account statements that approximated the precise

value of the fraudulent side payments due and, in some instances, the amount necessary to reach

a promised rate of return. *Id.* ¶¶ 211, 227, 229-37. Avellino and Bienes knew that such an "on-

demand gain" at the same time each year, which in some instances elevated certain IA accounts

to outlandish rates of return as high as 94%, was not possible. *Id.* ¶¶ 16-17, 217, 223-24, 247-48.

Accordingly, they knew that the BLMIS account statements they received contained blatantly

fictitious transactions that never occurred.[14] *Id.* ¶¶ 223-24. Far from having any reasonable

expectations in the legitimacy of their account statements, "securities contracts," or "settlement

---

[14] As set forth in the Amended Complaint, Thomas Avellino also knew that the BLMIS statements he received for
the IA account he controlled in the name of Strattham benefitted from the illicit fraudulent side payments and
guaranteed rates of return Madoff promised. Am. Compl. ¶¶ 19, 196, 216-24, 233-37. Accordingly, he knew the IA
account statements he received contained blatantly fictitious transactions that never occurred. The Trustee further
alleges that Thomas Avellino knew of, or was willfully blind to, improbably consistent and predetermined rates of
return, as well as impossible trading activity in Strattham's IA account. *Id.* ¶¶ 243-62. For these reasons, the
Amended Complaint adequately alleges Thomas Avellino's actual knowledge of fraud at BLMIS.

payments" received from BLMIS, Avellino and Bienes were "simply obtaining moneys while [they] could." *Cohmad*, 2013 WL 1609154, at *4.

Avellino and Bienes were not passive bystanders to the "Schupt" process—they carefully monitored the balances in their IA accounts to be certain they were receiving the rates of return and every dollar in fraudulent side payments Madoff promised. Am. Compl. ¶ 238. After performing detailed reconciliations, Avellino—with Bienes's knowledge—would often communicate to Madoff and his associates the exact amounts that needed to be added to their IA accounts to yield the fraudulent side payment due or promised rate of return.[15] *Id.* ¶¶ 238-41. This is yet another example of Avellino's and Bienes's knowledge of the "workings" of the fraud and their "effective participat[ion] in it by taking advantage of its workings." *Cohmad*, 2013 WL 1609154, at *4 (finding similar facts related to a defendant's request for and receipt of fictitious gains and losses in almost exact dollar amounts in his IA accounts indicative of actual knowledge of and indeed participation in BLMIS's fraud).

In sum, Avellino and Bienes had no reasonable expectations that BLMIS was actually executing securities transactions based on legitimate "securities contracts" or that they were receiving bona fide "settlement payments" from BLMIS. This is compounded not only by Avellino's and Bienes's active participation in the fraud, but also by Avellino's, Bienes's, Mrs. Bienes's, and Thomas Avellino's invocation of the Fifth Amendment and refusal to answer any questions related to BLMIS or their IA Accounts during the Trustee's Rule 2004 examination. As a result, this Court should draw an adverse inference from these assertions, just as the District

---

[15] Defendants try to downplay Avellino's knowledge of the fraudulent side payments by explaining that his calculation of the amounts owed to him was simply a non-sinister attempt to "reconcile the contractual amounts promised him" (Mot. at 18), an explanation that only seems to have recently materialized. Absent from such explanation is any acknowledgement of the fraudulent manner in which the fraudulent side payments were made. In any event, Defendants will have an opportunity during discovery to establish the merits of this claim.

Court suggested in *Cohmad* with respect to a defendant who had invoked his Fifth Amendment

rights when asked about Madoff and BLMIS. *Id.* at *6 n.4. Accordingly, the Trustee has

sufficiently alleged Avellino's and Bienes's "actual knowledge of, and indeed participation in,

every aspect of Madoff's Ponzi scheme that . . . would negate applicability of Section 546(e)."

*Id.* at *6.[16]

### C.    Defendants Have Provided No Basis for Overruling *Cohmad*

In a last ditch effort to prevent this Court from considering the Trustee's allegations

against them, Defendants ask this Court to overrule or revise the District Court's interpretation of

Section 546(e) in *Cohmad*, particularly the portion holding that a defendant with actual

knowledge of Madoff's fraud cannot invoke the protections of 546(e). Mot. at 4-8. Such efforts

are suspect when four years ago, Defendants moved for mandatory withdrawal of the reference

from the Bankruptcy Court arguing this issue "*must*" be left to "[a]n Article III Court."[17] The

District Court granted Defendants' motion and held that withdrawal of the reference on this issue

was mandatory as it involved substantial consideration of federal securities law. *Picard v.

Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012). Defendants' withdrawal motion and the

consolidated briefing that followed culminated in the District Court's *Cohmad* decision.[18]

Defendants—apparently dissatisfied with the outcome of their litigation strategy—should not be

permitted to reverse course now, particularly when the District Court remanded this action back

---

[16] The outcome is the same for Individual Defendants to the extent they were subsequent transferees of Initial Transfers received by Entity Defendants. Individual Defendants cannot be "permitted to in effect launder what [they know] to be fraudulently transferred funds through a nominal third party and still obtain the protections of Section 546(e)." *Cohmad*, 2013 WL 1609154, at *7.

[17] Mem. of Law In Supp. of Defs.' Mot. to Withdraw the Reference at 20-27, *Picard v. Avellino (In re BLMIS)*, No. 11-cv-00763 (JSR) (S.D.N.Y. June 7, 2011), ECF No. 2 (emphasis added); ECF No. 3 (Bienes Defs.' Notice of Adoption of Co-Defs.' Mot. to Dismiss and to Withdraw the Reference).

[18] *Cohmad*, 2013 WL 1609154, at *10 (applying decision to all adversary proceedings listed in Exhibit A of the District Court's Order Relating to Consolidated Proceedings on Section 546(e) Issues, *SIPC v. BLMIS*, 12-mc-00115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 119, which includes the instant action against Defendants).

to this Court "for further proceedings consistent with" its interpretation of Section 546(e).[19]  In

fact, this Court has already applied *Cohmad* in *Merkin II* and acknowledged during a related oral

argument that it is bound by *Cohmad.  See* Tr. of Oral Arg. at 12:20-23, *Picard v. Merkin*, No.

09-01182 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2014), ECF No. 241.

      Moreover, Defendants' request for this Court to overrule *Cohmad* is an improper attempt

to re-argue the same arguments Defendants already raised to the District Court.  While

Defendants suggest they have not yet argued that "an actual knowledge exception to 546(e) is

improper," Mot. at 16 n.10, the consolidated brief considered by the District Court in *Cohmad*—

which was filed by Defendants and the rest of the "Remaining 546(e) Defendants"—sets forth a

similar argument under the same rationale.  *See* Mem. of Law in Supp. of Consol. Mot. to

Dismiss the Trustee's Claims Against BLMIS Customers and Others that Are Precluded by

Section 546(e) of the Bankr. Code, *SIPC v. BLMIS (In re BLMIS)*, 12-mc-00115 (JSR) (S.D.N.Y.

July 27, 2012), ECF No. 260.  Specifically, the consolidated brief devotes many pages to arguing

that an exception to 546(e) based on the Trustee's allegations of a defendant's intent or "bad

faith" is contrary to the statute's express language and principles of statutory construction.  *Id.* at

16-21.  By holding as it did in *Cohmad*, the District Court already rejected Defendants'

arguments, and Defendants should not be permitted to re-litigate them here.

      Finally, Defendants' argument that the law of the case doctrine is inapplicable to *Cohmad*

is equally unavailing.[20]  The law of the case doctrine "holds that when a court has ruled on an

---

[19] *Cohmad*, 2013 WL 1609154, at *10; *see also Empresas Omajede, Inc. v. La Electronica, Inc.*, 243 B.R. 211, 216-17 (D.P.R. 1999) (holding in the same procedural context that on remand "the bankruptcy court [was] bound by the directives of the district court" because the original withdrawal placed this issue within the exclusive ambit of Article III courts).

[20] Defendants also argue that the *stare decisis* doctrine—which provides that a higher court's decision on a point of law binds a lower court's ruling on that issue—is inapplicable here because bankruptcy courts are not inferior to district courts.  Mot. at 8 n.6.  But some courts in this Circuit have adopted the view that bankruptcy courts should treat district court opinions as *stare decisis.  See, e.g., IRR Supply Centers, Inc. v. Phipps (In re Phipps)*, 217 B.R.

issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (quotation omitted); *see also In re Highland Fin. Corp.*, 216 B.R. 109, 113 (Bankr. S.D.N.Y. 1997) (Bernstein, J.). This Court can only overturn or modify the law of this case in "extraordinary circumstances," none of which exist here. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988).[21] Therefore, *Cohmad* should be applied to the instant adversary proceeding.

The Trustee disagrees with the holding in *Cohmad* on entirely separate grounds, namely that 546(e) is inapplicable in this liquidation in the first instance, an issue for which the Trustee is currently seeking a writ of certiorari from the Supreme Court in the *Greiff* case. *See supra* note 6. Further, in the *Merkin* case, the Trustee moved for entry of final judgment under FRCP 54(b) and certification for direct appeal on whether the Trustee has the burden to plead "actual knowledge" of fraud to avoid application of Section 546(e); however, this Court denied the

---

427 (Bankr. W.D.N.Y. 1998). Moreover, the case cited by Defendants in support of their position, *In re Shattuc Cable Corp.*, 138 B.R. 557 (Bankr. N.D. Ill. 1992), involved a district court decision arising from a *separate* case. A different posture exists here: the district court withdrew the reference in the *same* case and then remanded it back to the bankruptcy court for implementation of its holdings. *See, e.g.*, *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 534-35 (Bankr. N.D. Tex. 2010) (explaining that district court's ruling issued in connection with a motion to withdraw the reference in one adversary proceeding is "extremely persuasive authority" in another adversary proceeding emanating from the same bankruptcy, even if not technically *stare decisis*).

[21] Defendants have failed to present any "cogent" or "compelling reason," such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," to warrant revisiting *Cohmad*. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). The District Court in *Cohmad* interpreted the text of Section 546(e) to exclude those who, like Defendants, knew of Madoff's fraud. This interpretation does not create manifest injustice, as Defendants contend. Mot. at p. 8 n.6. *See United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009) (limiting "manifest injustice" to extraordinary of circumstances). Rather, in this context, it does just the opposite—it prevents those who knew about Madoff's fraud from hiding behind the safe harbor of Section 546(e). Defendants' remaining arguments for why this Court should overrule *Cohmad* misstate the law. Defendants contend the law of the case doctrine does not apply to interlocutory orders and further that this Court may revisit *Cohmad* "for any reason it deems sufficient" under FRCP 54(b). Mot. at 7, 8 n. 6. But the actual standard is that "[e]ven if Rule 54(b) allows parties to request . . . courts to revisit earlier rulings [including interlocutory orders], the moving party must do so within the strictures of the law of the case doctrine." *Virgin Atl.*, 956 F.2d at 1255 (refusing to revisit prior interlocutory order under the law of the case doctrine).

motion.[22]  In any event, despite both parties' disagreement with the *Cohmad* decision for

different reasons, Defendants have set forth no basis to avoid its application.

### III.     AVELLINO'S AND BIENES'S KNOWLEDGE AND CONDUCT SHOULD BE IMPUTED TO THE OTHER DEFENDANTS

The Trustee's allegations are more than sufficient to establish that Avellino's and

Bienes's knowledge of fraud at BLMIS is imputed to the other Defendants under basic principles

of general partnership law, agency, and equitable ownership.  Moreover, at the pleading stage,

"where the Trustee has not had the opportunity to conduct discovery concerning the relationships

between [Defendants], the question is not whether the Trustee has proved the existence of an

agency relationship, merely whether he should have the chance to do so."  *Picard v. Merkin* (*In*

*re BLMIS*), 440 B.R. 243, 260 (Bankr. S.D.N.Y. 2010) (quotation and marks omitted).

Defendants lodge several challenges to the imputation of Avellino's and Bienes's

knowledge that completely ignore or misstate the allegations in the Amended Complaint.  First,

Defendants inexplicably focus on the husband and wife relationship between Avellino and Mrs.

Avellino, asserting that "automatic" imputation between a husband and wife is improper.  Mot.

at 28.  In so arguing, Defendants grossly misstate the Trustee's imputation theories, none of

which are premised solely on the marital relationship.  Second, Defendants' argument that

"[w]here actual knowledge is required for a cause of action then such knowledge cannot be

imputed" (*id.*), is not supported by the case law, policy, or common sense.

---

[22] Trustee's Mem. of Law in Supp. of Mot. to Direct Entry of Final J. under Fed. R. of Civ. P. 54(b) and to Certify J. for Immediate Appeal under 28 U.S.C. § 158(d), *Picard v. Merkin (In re BLMIS)*, No. 09-1182 (SMB) (Bankr. S.D.N.Y. Sept. 5, 2014), ECF No. 227; Mem. Decision Den. Trustee's Mot. for Entry of Final J. Pursuant to Fed. R. Civ. P. 54(b) and Certification for Direct Appeal under 28 U.S.C. § 158(d), *Picard v. Merkin (In re BLMIS)*, No. 09-1182 (SMB) (Bankr. S.D.N.Y. Dec. 4, 2014), ECF No. 246.

A.     **Avellino's and Bienes's Knowledge Should Be Imputed to the Entity
Defendants of which They Are General Partners**

Under both New York and Florida law, it is well-settled that the knowledge of any

partner regarding a matter concerning partnership affairs operates as knowledge of the

partnership.  N.Y. P'SHIP Law § 23 (McKinney 2015); FLA. STAT. § 620.8102(6) (2015); *Mfrs.*

*Hanover Trust Co. v. Jayhawk Assocs.*, 766 F.Supp. 124, 126 (S.D.N.Y. 1991) ("Under the New

York law of partnership, this knowledge is imputed to all the partners[.]"); *Aetna Cas. Sur. Co. v.*

*Buck*, 594 So. 2d 280, 282 n.2 (Fla. 1992) ("In Florida . . . under partnership law, the knowledge

of any partner regarding a matter concerning partnership affairs operates as knowledge on the

part of the partnership.").  The Trustee has alleged—and Defendants do not dispute—that

Avellino and Bienes were general partners of the Entity Defendants, including A&B and certain

of the Post-1992 Entities.[23]  *See, e.g.*, Am. Compl. ¶¶ 33, 40, 329-89.  Thus, under basic tenets of

general partnership law, Avellino's and Bienes's knowledge of Madoff's fraud can and should be

imputed to the Entity Defendants, whether Florida or New York law applies.

B.     **Avellino's and Bienes's Knowledge of Fraud at BLMIS Is Imputed to the
Other Defendants under Basic Principles of Agency and/or Equitable
Ownership**

The Amended Complaint further alleges multiple bases under basic principles of agency

and equitable ownership to impute Avellino's and Bienes' knowledge to: (i) the Entity

Defendants; (ii) Mrs. Avellino and Mrs. Bienes; and (iii) the remaining Defendants, including the

Frank Avellino Trusts and Other Subsequent Transferee Defendants.

---

[23] The only exception is for Post-1992 Entity Strattham, which is a general partnership solely owned and controlled
by Thomas Avellino.  Am. Compl. ¶¶ 56, 66, 195, 331, 391.  Therefore, Thomas Avellino's knowledge of Madoff's
fraud, *see supra* note 14, should be imputed to Strattham.  The Trustee also alleged that Frank Avellino was an agent
for Strattham in connection with its investments in BLMIS.  *Id.* ¶¶ 66, 200, 395.  As discussed herein, this provides
a separate basis for imputation of actual knowledge—namely from Frank Avellino to Strattham.

1.    Avellino and Bienes Acted as Agents and/or Equitable Owners of the
Entity Defendants

It is black-letter law that the knowledge of an agent acting within the scope of his or her

agency is imputed to the principal.  Restatement (Third) Agency § 5.03 (2006); *see id.* § 5.03

cmt. b ("If an agent has actual knowledge of a fact, the principal is charged with the legal

consequences of having actual knowledge of the fact."); *Merkin II*, 515 B.R. at 146-47 (finding

under these "well-established principles of agency law," the Trustee had adequately established

Mr. Merkin was an agent of other defendants sufficient to impute willful blindness).  The Trustee

has alleged—and Defendants do not dispute—that Avellino and Bienes were officers, directors,

partners, managers, owners, and/or control persons of the Entity Defendants.  *See, e.g.*, Am.

Compl. ¶¶ 33, 40, 178, 184, 292-306, 329-98.  Such roles create an agency relationship between

Avellino and/or Bienes and the Entity Defendants.  *See Baker v. Latham Sparrowbush Assoc.*, 72

F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or

controlling person of a corporation is imputable to that corporation."); *JMM Properties, LLC v.

Erie Ins. Co.*, No. 5:08–CV–1382 (GTS/ATB), 2013 WL 149457, at *6 (N.D.N.Y. Jan. 14, 2013)

("[A] characteristic of both corporations and partnerships is that the acts of the principals are

imputed to the business entity.").  Therefore, Avellino's and Bienes's knowledge must be

imputed to the Entity Defendants.

Second, far from just acting as agents of the Entity Defendants, the Amended Complaint

meticulously details how Avellino and Bienes equitably owned and controlled the Entity

Defendants and their assets, including their IA accounts.  *See, e.g.*, Am. Compl.  ¶¶ 31-33, 39-40,

59-65, 67, 178-79, 206, 292-306.  Avellino and Bienes not only formed, funded, directed, and/or

controlled the Entity Defendants, but they also retained beneficial use over those entities' assets,

including their IA accounts.  *See, e.g.*, *id.* ¶¶ 206, 292-306.  For example, Avellino and Bienes

directed the flow of funds into and out of the Entity Defendants' IA accounts and determined

how funds received from those IA accounts would be disbursed.  *See, e.g.*, *id.*  Avellino and

Bienes also routinely commingled the assets of the Post-1992 Entities (and Mayfair

Bookkeeping) and directed intra-account transfers between and among these entities' IA

accounts.  *See, e.g., id.*  Avellino and Bienes were the sole decision-makers for the Entity

Defendants, and actively directed and controlled their daily activities, including their dealings

with Madoff and BLMIS.  *See, e.g., id.* ¶¶ 335, 342, 348, 358, 366, 374, 384.  Avellino and

Bienes also made all decisions relating to the Entity Defendants' investments in BLMIS.  *See,*
*e.g., id.*

    In sum, Avellino and Bienes were the corporate embodiments of the Entity Defendants,

controlling their assets and coordinating all of their dealings with BLMIS.  Accordingly, the

Trustee's specific, direct allegations are sufficient to impute Avellino's and Bienes's knowledge

to the Entity Defendants.[24]  *See SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 728-30

(S.D.N.Y. 2003) (denying motion to dismiss and imputing individual defendant's knowledge of

fraud to various trust defendants that had no "autonomous or separate existence outside of [the

individual defendant]"); *see also Katz*, 462 B.R. at 454 n. 7 (finding that the intent of defendant-

partnership and its principals could be imputed to other defendants because they were the

"common vehicle" who "sufficiently coordinated" the investment decisions of such other

defendants); *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1051 (2d Cir. 1997)

(individual who exercises considerable authority over an entity and acts as though its assets are

his alone may be deemed equitable owner of the entity).

---

[24] As set forth herein, such allegations are also sufficient to pierce the corporate veil of the Entity Defendants and
hold Avellino and Bienes liable for the transfers the Entity Defendants received from BLMIS.  *See infra* Sect. VI.

In fact, this Court has already held that similar allegations made by the Trustee in other cases were sufficient to withstand a motion to dismiss as to imputation. *See, e.g.*, *Merkin II*, 515 B.R. at 147-48 (finding at the pleading stage that Mr. Merkin's willful blindness will be imputed to certain defendants because Mr. Merkin was their agent, partner, sole director, sole shareholder, investment advisor and/or money manager); *Picard v. Chais (In re BLMIS)*, 445 B.R. 206, 223 (Bankr. S.D.N.Y. 2011) (finding that the Trustee sufficiently alleged bases for imputing Mr. Chais's knowledge to the entity defendants he controlled and for which he served as trustee, officer, director, and/or general partner).

2.     <u>Avellino and Bienes Acted as Agents for Mrs. Avellino and Mrs. Bienes in Connection with Their BLMIS Investments</u>

The allegations make clear—and Defendants do not dispute—that Avellino and Bienes acted as agents of their wives, Mrs. Avellino and Mrs. Bienes, in connection with their BLMIS investments.[25] Avellino and Bienes closely monitored and handled the day-to-day transactions and communications with BLMIS related to the IA accounts held by Mrs. Bienes or in which Mrs. Avellino and Mrs. Bienes held interests. *See, e.g.*, Am. Compl. ¶¶ 32, 34, 44, 50. Imputation here is based on well-settled agency principles, and not solely by virtue of the marital relationship, as Defendants erroneously assert.

3.     <u>Avellino and Bienes Were Agents and/or Equitable Owners of the Remaining Defendants</u>

The Trustee also sufficiently alleges that Avellino's and/or Bienes's knowledge should be imputed to the remaining Defendants, including the Frank Avellino Trusts and the Subsequent

---

[25] With the exception of one IA Account held in the name of Mrs. Bienes, Mrs. Avellino and Mrs. Bienes held their interests in BLMIS through the Entity Defendants. Am. Compl. ¶¶ 42-43, 48-49. As set forth *supra* Sect. III(A) & (B), the Trustee has a valid basis to impute Avellino's and Bienes's knowledge to the Entity Defendants under basic principles of general partnership, agency, and equitable ownership. Regarding the one IA Account held in the name of Mrs. Bienes, the Trustee not only adequately alleged that both Avellino and Bienes acted as her agent in connection with this IA Account, but also that Bienes owned and controlled it. Am. Compl. ¶¶ 39, 41, 49-50, 404.

Transferee Defendants.  Avellino served as trustee, sole beneficiary, equitable owner, settlor, and/or grantor of the Frank Avellino Trusts.  *Id.* ¶¶ 35-36, 407-16.  Avellino also controlled the Frank Avellino Trusts, including their investments in BLMIS through IA accounts held by Entity Defendants in which they held interests.  *Id.* ¶¶ 409-12.  Under these circumstances, Avellino's knowledge should be imputed to the Frank Avellino Trusts.  *See Ballesteros Franco*, 253 F. Supp. 2d at 730 (holding that trusts "stand in the same position" as corporations and have the knowledge of those who controlled them); *Chais*, 445 B.R. at 224 ("[A] trust can be attributed with the knowledge of the individual or entity by which it is controlled or dominated.").  The Amended Complaint also details how Avellino and Bienes created, dominated, controlled, and were trustees, officers, managers, and/or directors of the Subsequent Transferee Defendants that were entities: 27 Cliff, AFF, and Mayfair Bookkeeping.  Am. Compl. ¶¶ 33(g), 40(f), 69, 75-76, 417-18, 420.  Lastly, the Amended Complaint alleges that Avellino acted as a trustee and agent of the Other Subsequent Transferee Individual Defendants and Trusts in connection with their BLMIS investments through the Entity Defendants in which they held interests.  *Id.* ¶¶ 36-37, 78-79, 81-82, 84-86, 88, 421-23.  As set forth above, these allegations provide sufficient bases to impute Avellino's and/or Bienes's knowledge to these Defendants.

### C.    Defendants' Other Challenges to Imputation Lack Merit

Defendants' remaining argument that actual knowledge cannot be imputed is simply not an accurate assessment of the law and contrary to policy and common sense.  Most of the authority upon which Defendants rely involves the imputation of knowledge from an agent to an individual—rather than from an agent to a business entity—making these cases entirely

distinguishable and inapplicable.[26]  Further, both of Defendants' primary cases—*Harte* and

*Snook*—were directly criticized and distinguished in *Syntex Corp. v. Lowsley-Williams & Cos.*,

67 Cal.App.4th 871, 79 Cal.Rptr.2d 371 (1st Dist. 1998), which held that imputed knowledge is

necessary in the case of a corporation because a corporation can only "know" what is imputed to

it through its agents.   As *Syntex Corp.* explained:

> [T]he very nature of a corporation's knowledge, intentions, or
> beliefs is a fiction. Only through a corporation's officers,
> employees, and documents, can a corporation know something or
> ought to know something.  If persons within the corporation acting
> as its agents actually know a thing (or documents show knowledge
> of a thing), then the corporation actually knows a thing.   The
> corporation can only know what is imputed to it.

*Id.* at 387.  This principle applies with equal force to Defendants that are partnerships and trusts.

*See, e.g.*, *JMM Properties*, 2013 WL 149457, at *6 ("[A] characteristic of both corporations and

partnerships is that the acts of the principals are imputed to the business entity."); *Ballesteros*

*Franco*, 253 F. Supp. 2d at 730 (trusts treated like corporations for imputation analysis).

    Thus, Defendants' cases do not support a broad prohibition against imputation of actual

knowledge. To the contrary, Courts recognize that imputation of knowledge is necessary to

prevent bad actors from shielding themselves from acquiring culpable knowledge simply by

acting through an entity.  *See, e.g.*, *Hellenic v. Bridgeline Gas Distribution LLC (In re Hellenic*

*Inc.)*, 252 F.3d 391, 395-96 (5th Cir. 2001) (imputation "discourage[s] corporate owners and

corporate principals from willfully insulating themselves from knowledge and involvement with

the operations of their subordinates merely to secure limited liability."); *Kirschner v. KPMG*

*LLP*, 15 N.Y.3d 446, 465 (2010) ("Corporations are not natural persons. Of necessity, they must

---

[26] *See Harte v. United Benefit Life Ins. Co.*, 66 Cal.2d 148 (1967) (involving imputation to an individual insurance policy holder); *Snook v. Netherby*, 124 Cal. App. 2d 797 (Cal. Dist. Ct. App. 1954) (involving imputation to an individual home seller); *Jehly v. Brown*, 327 P.3d 351 (Colo. Ct. App. 2014) (same).

act solely through the instrumentality of their officers or other duly authorized agents.") (internal

marks and quotations omitted).  Because the Entity Defendants and most of the Subsequent

Transferee Defendants are legal entities, their only "link[s] to the external world [are] through

[their] agents."  Restatement (Third) Agency § 5.03, cmt. c (2006).  Thus, any knowledge

possessed by Avellino and Bienes must be imputed to them.

Lastly, if imputation of an agent's "actual knowledge" were prohibited—as Defendants

would have it (Mot. at 28)—then a corporation would simply never "know" anything.  Not only

would such a result prevent entities from ever acquiring "actual knowledge," but it would also

encourage wrongdoers to commit their acts through entities to shield themselves from "actual

knowledge" of harmful facts.  Such a result would work a particular inequity here, where

Avellino and Bienes are not remote or downstream actors, but rather active participants in

creating, funding, managing, and profiting from a web of inter-connected entities whose sole

purpose was to exploit Madoff's fraud.  *See, e.g.*, Am. Compl. ¶¶ 12-13, 32-33, 40, 178-80.

Defendants have simply set forth no reason to depart from basic tenets of partnership and agency

law here.  Avellino's and Bienes's actual knowledge of BLMIS's fraud must be imputed to the

other Defendants.

## IV.   THE FRAUDULENT SIDE PAYMENTS ARE NOT COMPENSATION

Defendants' contention that the fraudulent side payments and guaranteed rates of return

were compensation in satisfaction of an antecedent debt and were taken "for value" under

Section 548(c) of the Bankruptcy Code ("Section 548(c)") is a red herring.  Mot. at 22-23.[27]  The

fraudulent side payments are indistinguishable from any other avoidable transfer of fictitious

---

[27] Contrary to Defendants' contentions about a lack of specificity under FRCP 9(b) (Mot. at 22), the Amended
Complaint specifically alleges *why* the fraudulent side payments Defendants received were fraudulent.  Am. Compl.
¶¶ 208-24.  Additionally, the Trustee alleges the amount of fraudulent side payments Defendants received into their
IA Accounts, and the Amended Complaint contains exhaustive exhibits setting forth the exact dates and amounts of
withdrawals from such accounts.  *Id*. Exs. B, D.

profits.  The Amended Complaint alleges in great detail how these illicit payments were "paid" on-demand through the use of fictitious non-hedged options transactions in the Post-1992 IA Accounts.  The proceeds from these fake trades were no different than the proceeds from any other fake trades and constituted nothing other than a more sinister form of fictitious profits. Indeed, the primary significance of the fraudulent side payments in this litigation (in addition to the tens of millions of dollars it provided to Defendants) lies in the fact that it is further evidence of Avellino's and Bienes's knowledge and participation in the fraud.  This Court should not be sidetracked by the specious claim that Avellino and Bienes somehow provided value for the fictitious profits they received through the overtly fraudulent "Schupt" process.

The District Court has already ruled on this issue in the Madoff context and held that a "customer may only seek the protections of section 548(c) to the extent of investments of principal, and federal and state law claims cannot be used to increase the amount to which a customer is entitled from the customer property estate."  *SIPC v. BLMIS* (*In re BLMIS*), 499 B.R. 416, 426 (S.D.N.Y. 2013) ("*Antecedent Debt Opinion*").  In other words, fictitious profits— which include the fraudulent side payments—are not subject to the protections of Section 548(c). *Id.*  Defendants do not contest the *Antecedent Debt Opinion* and articulate no basis to depart from it here.

Even if Defendants could somehow establish that they provided value for the fraudulent side payments, they overlook the fact that a successful Section 548(c) affirmative defense requires that a transferee also take "in good faith."  11 U.S.C. § 548(c).  As the Amended Complaint alleges their actual knowledge of fraud at BLMIS, Defendants simply cannot establish the "good faith" prong of the Section 548(c) affirmative defense.

34

Defendants rely heavily on *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000), to bolster the theory that their "compensation" from BLMIS was for value. Mot. at 22-23. This reliance is misplaced. The *Churchill* trustee sought to recover commissions paid to brokers employed as independent contractors of an alleged Ponzi scheme. *Id.* at 667. The *Churchill* trustee conceded that the services rendered in each specific broker transaction at issue were equivalent to the services received. *Id.* at 675. Additionally, there was no evidence that the brokers had knowledge of the Ponzi scheme or that their own activities were unlawful or wrongful in any respect. *Id.* at 673-74. In fact, the *Churchill* trustee went so far as to formally acknowledge that the brokers did nothing wrong. *Id.*

Here, the Amended Complaint has dozens of allegations that Defendants actively participated in the fraud to enrich themselves at the expense of others. Considering the fraudulent side payments were paid through blatantly fake options transactions that mysteriously appeared in Defendants' IA accounts, this "compensation" was well outside the ordinary course of business. Am. Compl. ¶¶ 208-42. Any attempt to prove "good faith" concerning these payments, especially at the pleading stage, collapses in light of Defendants' actual knowledge of the fraud. Even if Defendants could establish the fraudulent side payments were something other than fictitious profits, courts have held that referring investors into a Ponzi scheme does not constitute value. *See, e.g.*, *Wagner v. Fenton (In re Vaughan Co.)*, No. 12-1116, 2014 WL 231971, at *4 (Bankr. D. N.M. Jan. 22, 2014); *Miller v. Humphrey (In re Waterford Funding, LLC)*, No. 10-02889, 2012 WL 380773, at *5 (Bankr. D. Ut. Feb. 6, 2012). In addition, a value defense is a highly fact-based inquiry that is not properly before the Court on a motion to dismiss. *See, e.g.*, *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 334-37 (Bankr.

S.D.N.Y. 2011) ("*2011 Cohmad Decision*") (finding value analysis for payments defendants'

received for referring investors to BLMIS inappropriate at the motion to dismiss stage);

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Tech. Ltd.)*, 337 B.R. 791, 804 (Bankr.

S.D.N.Y. 2005) ("[T]he question of 'reasonably equivalent value' and 'fair consideration' is fact

intensive, and usually cannot be determined on the pleadings.").[28]

## V.   THE TRUSTEE SUFFICIENTLY PLEADED COUNTS SEVEN AND NINE TO AVOID AND RECOVER TRANSFERS THAT OCCURRED MORE THAN SIX YEARS BEFORE THE FILING DATE

The Trustee's claims to recover transfers that occurred more than six years before the

filing date are timely and not barred by the statute of limitations.  He can pursue those transfers

through New York's discovery rule, which allows causes of action predicated on fraud, such as

section 276 of the New York Debtor & Creditor Law ("NYDCL"), to be commenced "within

two years of the date the fraud was or should have been discovered with reasonable diligence."

N.Y. C.P.L.R. §§ 213(8), 203(g).[29]

The discovery rule is available to the Trustee with respect to Counts VII (recovery of all

fraudulent transfers) and IX (recovery of subsequent transfers) so long as he "provides sufficient

notice" to Defendants of at least one category of creditors who could not have reasonably

discovered BLMIS's fraud during the relevant time period.  *Picard v. Peter Madoff (In re*

*BLMIS)*, 458 B.R. 87, 109 (Bankr. S.D.N.Y. 2011) ("*Madoff Family*").  Here, the Trustee

---

[28] It is only after former BLMIS employee Frank DiPascali testified about the fraudulent side payments on December 5, 2013, in the criminal trial of *United States v. O'Hara*, 10-cr-00228 (S.D.N.Y.), that Defendants claim the illicit payments they received were somehow "compensation" for services rendered.  Defendants' prior motion to dismiss filed *before* this testimony did not in any way reference this explanation.  *See* Mem. of Law In Supp. of Defs.' Mot. to Dismiss, *Picard v. Avellino (In re BLMIS)*, No. 10-05421 (SMB) (Bankr. S.D.N.Y. June 6, 2011), ECF No. 25-26.  In any event, discovery is the appropriate time for Defendants to try to establish this fact and for the Trustee to challenge its merits, including, among other things, the tax treatment Defendants accorded their purported "compensation."

[29] The Trustee's state law causes of action, including those under section 276 of the NYDCL, are not precluded in this case based on the Trustee's allegations of Avellino's and Bienes's actual knowledge of BLMIS's fraud.

sufficiently alleges that "the fraudulent scheme perpetrated by BLMIS was not reasonably

discoverable by at least one unsecured creditor of BLMIS." [30]  Am. Compl. ¶ 524.  Defendants

contend that the Trustee must plead the exact identities of such creditors at the pleading stage.

Mot. at 24.  But this is yet another attempt by Defendants to re-litigate—unnecessarily—an

argument that has already been rejected multiple times in this liquidation. [31]  *See Madoff Family*,

458 B.R. at 109-10 (the Trustee's allegation that at least one unsecured creditor could not have

reasonably discovered BLMIS's fraud is sufficient at the pleading stage); *Chais*, 445 B.R. at 234;

*2011 Cohmad Decision*, 454 B.R. at 339.  Defendants' argument that the Trustee cannot at the

same time allege their actual knowledge and the existence of a creditor who could not have

discovered the fraud is misplaced as these two concepts are not mutually exclusive.  Mot. at 24-

25; *see, e.g.*, *Chais*, 445 B.R. at 233 (allegations that defendants knew or should have known of

the fraud did not bar Trustee's use of discovery rule).

Further, in three other adversary proceedings in this case, the Court found that the Trustee

had sufficiently invoked the discovery rule on the face of his pleadings.  *See 2011 Cohmad

Decision*, 454 B.R. at 338 ("The Trustee has sufficiently pled [Count Eight] . . . to recover actual

fraudulent transfers from the Defendants made more than six years before the Filing Date

pursuant to New York's 'discovery rule.'"); *Madoff Family*, 458 B.R. at 109 ("[The] Trustee has

standing under section 544(b) to invoke the discovery rule for . . . [t]ransfers that occurred more

than six years before the Filing Date."); *Chais*, 445 B.R. at 233 ("[The Trustee] is entitled to seek

---

[30] Because section 276 of the NYDCL provides that a transfer made with the intent to defraud is fraudulent "as to both present and future creditors," the Trustee need not step into the shoes of an individual or entity that held a claim against BLMIS at the time of the transfers in question.  N.Y. DEBT. & CRED. LAW § 276 (McKinney 2015).  Thus, even a person or entity that became a creditor just prior to the Filing Date is sufficient.

[31] While the Trustee maintains that providing this information at the motion to dismiss stage is premature, it is in his possession.  Should the Court hold that pleading the identity of the exact creditor the Trustee will be relying on under section 544(b)(1) of the Bankruptcy Code is necessary, the Trustee should be granted leave to re-plead.  Moreover, the Trustee has already identified these witnesses in initial disclosures in other active cases.

recovery for all of the Transfers over the life of the Moving Defendants' accounts.").

Defendants have set forth no viable basis for this Court to rule otherwise.

## VI.    THE INDIVIDUAL DEFENDANTS ARE LIABLE FOR THE INITIAL TRANSFERS RECEIVED BY THE ENTITY DEFENDANTS

The Trustee has adequately alleged that the Individual Defendants are liable for the

fraudulent transfers that the Entity Defendants received from BLMIS both under general

partnership law and the long-standing principle of liability through piercing the corporate veil.

Defendants again misconstrue the allegations of the Amended Complaint and erroneously argue

that the Trustee lacks standing to bring common law piercing the corporate veil claims.  Mot. at

8-11.  The Trustee did not bring any *common law claim* for piercing the corporate veil; he

alleged specific facts supporting a *theory of liability* to recover his fraudulent transfer claims,

which has no impact whatsoever on his standing.

As a threshold matter, the Trustee has adequately alleged—and Defendants have not

contested—that the Individual Defendants (and certain other Defendants), as general partners of

the Entity Defendants, are liable for the transfers from BLMIS to the Entity Defendants.  *See,*

*e.g.*, Am. Compl. ¶¶ 33, 40, 45, 51, 331.  Under both Florida and New York law, general partners

are jointly and severally liable for the debts and obligations of the general partnership.  *See* N.Y.

P'SHIP LAW § 26(a)(2) (McKinney 2015); FLA. STAT. § 620.8306(1) (2015); *Ederer v. Gursky*,

9 N.Y. 3d 514, 521 (2007); *Stewart Tilgman Fox & Brianchi, P.A. v. Kane (In re Kane)*, No. 09-

11557-EPK, 2011 WL 165836, *4 (Bankr. S.D. Fla. Jan. 18, 2011).

### A.    The Trustee Sufficiently Pleaded the Necessary Facts to Pierce the Veil of the Entity Defendants

The Trustee has met his burden at this stage to pierce the corporate veil of the Entity

Defendants.  To pierce the corporate veil under Florida law, a plaintiff must allege that the

defendant controlled and dominated an entity for an improper purpose.  *See Dania Jai-Alai*

*Palace, Inc. v. Sykes*, 450 So.2d 1114, 1117 (Fla. 1984).[32]  Courts generally refrain from

engaging in fact-intensive piercing-the-corporate-veil analyses at the pleading stage.  *See, e.g.*,

*Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, No. 09-CV-61436, 2010 WL 1531489, at *12

(S.D. Fla. Apr. 16, 2010).  Nonetheless, the Trustee has alleged more than sufficient facts to

support his assertions here.

       The Trustee has alleged that the Individual Defendants "routinely and completely

disregarded the corporate form" of the Entity Defendants.  Am. Compl. ¶ 292.  The Amended

Complaint further alleges that the Individual Defendants commingled the Entity Defendants'

funds with their personal bank accounts, converted the Entity Defendants' assets for their own

personal benefit, and transferred funds freely between the Entity Defendants without financial

consideration.  *Id.* ¶¶ 293-306.  The Entity Defendants shared common addresses, had

overlapping control persons, and lacked any semblance of corporate formalities.  *Id.* ¶¶ 181, 306.

Indeed, they "were one and the same" as the Individual Defendants.  *Id.* ¶ 306.  Far from

"conclusory," as Defendants contend, these allegations are sufficient under Florida law to

withstand a motion to dismiss.  *See Raber v. Osprey Alaska, Inc.*, 187 F.R.D. 675, 679 (M.D.

Fla. 1999) (allegations that individual defendants commingled corporate funds, disregarded

corporate formalities, and acted fraudulently in business operations were sufficient to establish

veil-piercing at the pleading stage); *Morris v. Bischoff*, No. 96-1384-Civ-T-17A, 1997 WL

128114, at *8 (M.D. Fla. Mar. 4, 1997) (same).

---

[32] The analysis under New York law for veil piercing purposes is virtually identical.  Under New York law, a plaintiff must establish:  (i) complete control and domination; and (ii) that the domination was used to perpetrate a fraud or wrong.  *See Wm. Passalacqua Builders, Inc. v. Resnick Developers, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991). Therefore, under New York or Florida law, the conclusion is the same: Avellino and Bienes should be held liable for the initial transfers received by the Entity Defendants.

The Trustee also adequately alleged that the Individual Defendants created the Entity

Defendants for an improper purpose, namely to circumvent the SEC injunction, mislead

regulators, and continue profiting from BLMIS, which they knew was a fraud.  Am. Compl. ¶¶

178, 180.  Similar allegations were sufficient to establish an improper purpose and survive a

motion to dismiss in *C.W. Bailey v. Sumpter Cnty. Farmers' Mkt. (In re Bailey)*, 112 B.R. 449,

450-51 (Bankr. M.D. Fla. 1990), *aff'd*, 124 B.R. 348 (M.D. Fla. 1991), where defendants created

a shell company they controlled to circumvent a federal order and continue proscribed business

activity.  In sum, the Trustee has more than satisfied his pleading burden here to show that

Avellino and Bienes should be held liable for the transfers received by the Entity Defendants.

### B.       The Trustee's Veil-Piercing Theory of Liability Does Not Divest Him of Standing to Bring Bankruptcy Claims against Defendants

The fact that the Trustee's avoidance claims against Defendants incorporate a common

law veil-piercing theory of recovery has no effect on the Trustee's standing to pursue his

bankruptcy claims.  In fact, when stripped to its core, Defendants essentially reargue a position

already rejected by the District Court: that the Trustee lacks standing to bring avoidance claims.

*Avellino*, 469 B.R. at 414 (rejecting the same standing challenge Defendants raise here and

stating that "Avellino has cited no case holding that a Trustee lacks standing to bring an

avoidance claim on behalf of an estate.  Nor has Avellino identified any persuasive reason why a

court might reach that conclusion.").  Nevertheless, Defendants challenge the Trustee's standing

by arguing that his veil-piercing allegations somehow morph his avoidance claims into a

common law claim that would only belong to the creditors of BLMIS's estate.  Mot. at 8-13.

Defendants are wrong.

The Trustee brought fraudulent transfer claims under federal and state law for which he

undoubtedly has standing because it is well settled that these claims belong to the BLMIS

estate.[33]  Indeed, the use of common law theories of liability to recover bankruptcy transfers is

commonplace by bankruptcy trustees because "the Bankruptcy Code incorporates many

common-law principles, including the veil-piercing and alter ego doctrines."  *Ng v. Adler (In re*

*Adler)*, 494 B.R. 43, 79 (Bankr. E.D.N.Y. 2013).  Bankruptcy trustees regularly use veil-piercing

principles of liability in avoidance actions without any limitations to their standing.  *See, e.g.*,

*InSITE Servs. Corp., LLC v. Am. Elec. Power Co., Inc. (In re InSITE Servs. Corp., LLC)*, 287

B.R. 79, 96-97 (Bankr. S.D.N.Y. 2002) (at the pleading stage, bankruptcy trustee sufficiently

alleged facts to pierce corporate veil of transferee company defendant); *Osherow v. Nelson*

*Hensley & Consolidated Fund Mgmt. (In re Pace)*, 456 B.R. 253, 276-278 (Bankr. W.D. Tex.

2011) (bankruptcy trustee successfully pierced corporate veil in relation to his fraudulent

conveyance claim).  The Trustee's use of veil-piercing theories of liability in conjunction with

those claims simply does not affect standing because standing turns on the "nature and source of

the *claim*," not on the theory of liability.  *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (emphasis

added).

Defendants cite nothing to the contrary.  Their reliance on *Caplin v. Marine Midland*

*Grace Trust Co. of N.Y.*, 406 U.S. 416 (1972), and its progeny misses the mark because those

cases stand for the proposition that bankruptcy trustees lack standing to bring claims that belong

to the creditors and not the estate.  Mot. at 8-11.  Here, however, the avoidance claims against

Defendants undoubtedly belong to the estate and not to its creditors.  *See* 11 U.S.C. §§ 544, 548,

and 549.[34]

---

[33] *See* 11 U.S.C. §§ 544, 548, and 549; *In re Housecraft Indus. USA, Inc.*, 310 F.3d 64, 71 (2d Cir. 2002) (explaining any challenge to a bankruptcy trustee's standing to bring avoidance actions would be "meritless").

[34] Defendants' reliance on cases where the bankruptcy trustees lacked standing to bring veil-piercing claims under common law (Mot. at 9) is similarly misplaced because here the Trustee brings no such claims.  Moreover, those cases narrowly focus on whether a bankruptcy trustee can assert an alter ego cause of action against the debtor on behalf of the debtor's creditors, which the Trustee is not attempting to do here.  *See, e.g.*, *In re Ozark Restaurants*,

For similar reasons, Defendants' standing challenge under the *Wagoner* Rule is also

misplaced. Mot. at 11-13. The *Wagoner* Rule bars bankruptcy trustees from bringing state law

claims for damages; it does not apply to avoidance actions. *Shearson Lehman Hutton, Inc. v.

Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991); *Picard v. Fox (In re BLMIS)*, 848 F. Supp. 2d 469,

483 (S.D.N.Y. 2012) (refusing to apply the *Wagoner* Rule); *In re Hampton Hotel Investors, L.P.*,

289 B.R. 563, 580 (Bankr. S.D.N.Y. 2003) ("It would be turning the *Wagoner* Rule and concepts

of *in pari delicto* on their heads to hold that the Trustee lacks standing to recover [avoidable

transfers under the bankruptcy code].") Defendants do not cite—and the Trustee is unaware

of—any case where the *Wagoner* Rule barred an avoidance action that incorporated common law

principles of liability.

## VII.    THE TRUSTEE MAY EQUITABLY SUBORDINATE STRATTHAM'S, KJA'S, AND MAYFAIR BOOKKEEPING'S CUSTOMER CLAIMS

Under this Court's ruling in *Merkin II*—which is now law of the case—Strattham's,

KJA's, and Mayfair Bookkeeping's customer claims must be equitably subordinated. *See

Merkin II*, 515 B.R. at 158-61 (rejecting challenge to Trustee's standing to bring equitable

subordination claim against Defendant Funds, which allegedly received transfers from BLMIS in

bad faith). Equitable subordination is appropriate where a claimant's misconduct is "contrary to

equity and good conscience," *id.* (citing *Katz*, 462 B.R. at 456) (citation and marks omitted), and

injures the creditors of the estate or confers an unfair advantage on the claimant. *Id.* (citing

*Benjamin v. Diamond* (*In re Mobile Steel Co.*), 563 F.2d 692, 700 (5th Cir. 1977)). Similar to

*Merkin II*, the Amended Complaint here is replete with allegations regarding the fraudulent

---

816 F.2d 1222, 1223-24 (8th Cir. 1987) (holding that a Chapter 7 Trustee lacked standing to bring an alter ego cause of action against the debtor corporation on behalf of the corporation's creditors). Defendants also rely on *Picard v. HSBC Bank PLC*, but that case held that "the Trustee [has] the authority to bring avoidance claims, not common law claims." 454 B.R. 25, 31 (S.D.N.Y. 2011).

conduct of Avellino and Bienes, whose actual knowledge of BLMIS's fraud is imputed to

Strattham, KJA, and Mayfair Bookkeeping as these entities' agents, partners, control persons

and/or equitable owners.  *See, e.g.* Am. Comp. ¶¶ 66, 67, 69, 382-86, 395, 420.  These

allegations are sufficient to demonstrate the entities' inequitable conduct.  *See Merkin II*, 515

B.R. at 158-59.  The Trustee has also pleaded that the inequitable conduct of Strattham, KJA,

and Mayfair Bookkeeping harmed all customers and creditors of the BLMIS estate.  *See, e.g.*,

Am. Compl. ¶¶ 562-64.

Defendants' challenge to the Trustee's equitable subordination claim on standing grounds

must also fail in light of *Merkin II*.  The Court in *Merkin II* flatly rejected the same argument

Defendants advance here (Mot. at 32)—*i.e.*, that *Picard v. JP Morgan Chase & Co. (In re

BLMIS)*, 721 F.3rd 54, 70 (2d Cir. 2013), and the *Wagoner* Rule strip the Trustee of standing to

assert a claim for equitable subordination.  *See Merkin II*, 515 B.R. at 159.

## VIII.  DEFENDANTS' REMAINING ARGUMENTS FAIL

### A.  The Trustee Has Standing to Pursue His Avoidance Actions against Defendants

Contrary to numerous prior decisions issued in this case, Defendants argue that the

Trustee lacks standing and jurisdiction to assert his avoidance action against them.  Mot. at 2-4,

33-37.  Each of Defendants' arguments is wrong as a matter of law and fact.

#### 1.  BLMIS's Change in Corporate Form Has No Impact on Jurisdiction or the Trustee's Standing

Defendants obliquely reference BLMIS's change in corporate form in 2001 from a sole

proprietorship to a limited liability company as a basis to challenge the Trustee's standing.  Mot.

at 2-4.  In addition to being irrelevant to the issue of standing, Defendants are wrong on the facts.

The Amended Complaint clearly alleges that BLMIS was a member of SIPC since 1970.  Am.

Compl. ¶ 102.  Moreover, this Court previously stated that the change in corporate form is not

relevant to issues in dispute in this liquidation proceeding.  In *SIPC v. BLMIS* (*In re BLMIS*), 522

B.R. 41 (Bankr. S.D.N.Y. 2014) (the "*Inter-Account Transfer Decision*"), this Court explained:

> Madoff has always been a member of SIPC, and the incorporation
> of BLMIS as a limited liability company continued his business
> without change. . . .  Thus, nothing has changed since 1960 except
> for the business form that Madoff used to conduct his Ponzi
> scheme.

*Inter-Account Transfer Decision*, 522 B.R. at 60.  Defendants' argument, therefore, has already

been rejected in this case.

2.    <u>SIPA Applies to this Proceeding and the Funds at Issue Are Customer
Property</u>

Defendants' arguments that SIPA does not apply to the instant proceeding and the funds

at issue are not customer property border on frivolous.  The Second Circuit has held that the

funds deposited with BLMIS are debtor property subject to SIPA.  *See, e.g., Rosenman Family,*

*LLC v. Picard*, 395 Fed. App'x 766, 769 (2d Cir. 2010) (holding that funds deposited with

BLMIS constituted property of the estate and are subject to SIPA).  That decision is consistent

with SIPA's definitions of "customer" and "customer property."  A customer is defined as "any

person who has deposited cash with the debtor for the purpose of purchasing securities."  SIPA §

78*lll*(2).  The Second Circuit has held that BLMIS investors, like Defendants here, who

deposited cash with BLMIS are "customers" under SIPA.  *See In re BLMIS*, 654 F.3d 229, 235-

36 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24 (2012) (the "*Net Equity Decision*").  Contrary to

Defendants' argument (Mot. at 35), the fact that they did not provide BLMIS with instructions to

purchase specific securities does not change their customer status.  Courts have rejected

arguments that a "specific authorization instruction is required to move a party into 'customer'

status."  *Rosenman Family, LLC v. Picard*, 420 B.R. 108, 111 (S.D.N.Y. 2009).

44

Similarly, customer property is defined as "cash and securities . . . at any time received,

acquired, or held by or for the account of a debtor from or for the securities accounts of a

customer, and the proceeds of any such property transferred by the debtor, including property

unlawfully converted." SIPA § 78*lll*(4). "Essentially, the fund of customer property includes all

property that was or should have been set aside for customers" and includes "bank accounts

containing customer funds." *SIPC v. BLMIS*, 401 B.R. 629, 636 (Bankr. S.D.N.Y. 2009)

("*Rosenman 2009 Decision*") (quoting 6 Collier on Bankruptcy ¶ 741.05[1] and 741-14 (15th ed.

rev. 1997)). Defendants do not dispute that they had IA accounts at BLMIS or that they

deposited money with BLMIS. The Amended Complaint adequately alleges that BLMIS

investors placed money in the same bank account from which the transfers at issue emanated.

Am. Compl. ¶¶ 105, 108, 426. Those transfers were comprised of "cash . . . held by a debtor . . .

including property unlawfully converted." SIPA § 78fff-2(c)(3). Accordingly, the funds at issue

are "customer property" under SIPA. Because the deposits made by BLMIS customers are

"customer property" and the transfers at issue were comprised of customer property, the Trustee

has standing to seek recovery of funds transferred by BLMIS. *See Antecedent Debt Opinion*,

499 B.R. at 419-20; *Picard v. Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505, 512 (Bankr.

S.D.N.Y. 2005).

Defendants further argue that the Trustee lacks standing because he cannot show that the

money Defendants received was indeed customer property. Mot. at 33-39. To the contrary, the

Amended Complaint adequately pleads that all of the money in the JPMorgan Chase account was

comprised of BLMIS investor deposits. Am. Compl. ¶ 105. The Amended Complaint also

alleges that the initial transfers were made from the JPMorgan Chase account and were shown as

deductions from Defendants' respective IA accounts.  *Id*. ¶¶ 427-55.  These allegations

sufficiently plead that the funds at issue are customer property under SIPA.

A trustee need only "identif[y] relevant pathways" though which the funds flowed, *see*

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 709 (11th Cir. 2005),

and is not required to provide a "dollar for dollar" accounting of the exact funds at issue.  *Picard*

*v. Charles Ellerin Revocable Trust (In re BLMIS)*, No. 10-04398 (SMB), 2012 WL 892514, at *3

(Bankr. S.D.N.Y. Mar. 14, 2012) (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou*

*Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007)); *see also McHale v. Boulder Cap. LLC*

*(In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 77-78 (Bankr. S.D.N.Y. 2010).  This Court recognized

the challenges of reconstructing a decades-long fraud and noted that it would be "premature to

cut off the Trustee's opportunity to satisfy his burden on a motion to dismiss because the burden

[of tracing] may be a difficult one to meet."  *Merkin II*, 515 B.R. at 152 (citing *Gowan v.*

*Amaranth Advisors LLC (In re Dreier LLP)*, No. 10-03493 (SMB), 2014 WL 47774, at *14

(Bankr. S.D.N.Y. Jan. 3, 2014)).  At this stage, the Trustee has met his burden of alleging that

the funds at issue originated with the debtor.  *See Chais*, 445 B.R. at 235.  Even at the summary

judgment stage, the Trustee need only prove that "a reasonable fact finder could conclude that

the funds . . . originated with the debtor," a standard that is more than satisfied here.  *See Gowan*,

2014 WL 47774, at *14.

Finally, Defendants argue that because BLMIS was a broker-dealer as well as an

investment advisor, SIPA does not apply and the Trustee does not have standing to sue them.

Mot. at 34-35.  SIPA only requires that a party be a member of SIPC, and does not differentiate

between any internal lines of business of such member, making the distinction Defendants raise

regarding BLMIS's investment advisor activities meaningless.  *See* SIPA § 78ccc(a)(2)(A)

(defining members).  Further, SIPA applies to the liquidation proceedings of its members.  *See*

*Rosenman 2009 Decision*, 401 B.R. at 633 ("SIPA establishes procedures for liquidating

financially troubled SIPC members.").

For all of these reasons, Defendants' facile arguments that SIPA does not apply to this

proceeding should be rejected.  SIPA applies here, and the Trustee has standing under SIPA to

pursue the recovery of the customer property at issue here.

      3.    <u>The Trustee's Avoidance Action Poses No Conflict between SIPA and the
Bankruptcy Code</u>

Defendants contend that even if the Trustee has sufficiently pled jurisdictional facts

regarding standing, he cannot pursue the avoidance claims against Defendants because doing so

would conflict with SIPA.  Mot. at 36-37.  To arrive at this tortured conclusion, Defendants

claim that SIPA was not intended to permit the Trustee to sue third parties based upon fraud and

that his avoidance powers cannot conflict with the purpose of SIPA to provide for an orderly

liquidation and speed the return of customer property.

As an initial matter, the instant action is not one in which the Trustee is suing third parties

for fraud.  Rather, the Trustee sued Defendants to avoid and recover fraudulent transfers made by

the Debtor, which is explicitly provided for in SIPA and the Bankruptcy Code.  As such, the

cases cited by Defendants regarding trustee suits for fraud, securities fraud, violation of

securities rules, malpractice, and negligence are completely inapposite.  *See Mishkin v. Peat,*

*Marwick, Mitchell & Co.*, 744 F. Supp. 531 (S.D.N.Y. 1990) (SIPA trustee sued debtor's

auditors for malpractice, negligence, and violation of SEC Rule 10(b)-5); *SIPC v. Vigman*, 803

F.2d 1513, 1516-17 (9th Cir. 1986) (addressing SIPC's subrogation as to securities fraud claims);

*Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 323 (Bankr. S.D. Tex. 1999) (explaining that

tort claims of fraud are not "properly characterized as the recovery, under section 548 of the

Bankruptcy Code, for fraudulent transfer of an interest of the debtor in property"). It is beyond

cavil that a SIPA trustee may pursue avoidance actions under SIPA and the Bankruptcy Code,

which is precisely what the Trustee has done here. *See Avellino*, 469 B.R. at 414.

Moreover, the power to avoid fraudulent transfers under SIPA harmonizes rather than

conflicts with the Bankruptcy Code. The Trustee is specifically empowered to recover customer

property in furtherance of his statutory duty to "collect and reduce to money the property of the

estate." *See* SIPA § 78fff-1(a); 11 U.S.C. § 704(a). As such, the Trustee's avoidance actions

pose no conflict with SIPA or the Bankruptcy Code. Also, SIPA expressly incorporates the

Bankruptcy Code, to the extent it is not inconsistent. *See id.* § 78fff(b). For all of the above

reasons, Defendants' arguments that the Trustee lacks standing must be rejected.

### B.    Defendants' Inter-Account Transfer Argument Attempts to Re-Litigate Issues Already Decided

Defendants argue that the Trustee's avoidance claims fail to the extent that they involve

amounts transferred between BLMIS accounts ("inter-account transfers") because inter-account

transfers do not constitute transfers of property of the Debtor and did not reduce the assets of the

Debtor. Mot. at 37-40. They further argue that because the inter-account transfers were

"fictitious," they cannot be avoided by the Trustee. *Id.* at 39-40. Defendants are wrong.

The issue of inter-account transfers arises in the context of calculating the amounts of

principal or fictitious profits that any particular Defendant received. In determining both "net

equity" under SIPA or the amounts fraudulently transferred to any particular account, the Trustee

used the "net investment method." In addition to deposits and withdrawals, some accounts had

inter-account transfers, meaning a transfer between BLMIS accounts in which no new funds

entered or left BLMIS. In those instances, the Trustee credits the transfer in an amount up to the

available net balance in the transferor account at the time of the transfer, to the extent there was

such a balance in the transferor's account. If the BLMIS transferor account did not have any principal at the time of the desired transfer, no credit was given to the transferee account because no real dollars existed to transfer. In a nutshell, this methodology determines which portion of any account is comprised of principal or fictitious profits. The correctness of this approach has been upheld by this Court in the *Inter-Account Transfer Decision* and is supported by the decisions of the Second Circuit and District Court. *See Inter-Account Transfer Decision*, 522 B.R. 41; *Net Equity Decision*, 654 F.3d at 229; *SIPC v. 2427 Parent Corp. (In re BLMIS)*, 779 F.3d 74 (2d Cir. 2015); *Antecedent Debt Opinion*, 499 B.R. at 424-30.[35]

The Trustee is not seeking to avoid the inter-account transfer between accounts. The Trustee seeks to avoid the amount of principal or fictitious profits transferred to any particular Defendant, which amounts are calculated by reference to all transactions that occurred in the account, including deposits, withdrawals, and inter-account transfers. The Exhibits to the Complaint support this point. *See* Am. Compl. Ex. B. For example, on March 29, 2007, $8,185,000 was transferred from Grosvenor's IA account, 1ZB046, to Strattham's IA account, 1ZB262; the transfers are listed in Column 3 of those IA accounts' respective transaction records and are designated as either a "Transfer from" (Grosvenor's account) or a "Transfer to" (Strattham's account). *See id.* Ex. B, at 32, 34. But the amounts forming the basis for avoidable transfers are found in Column 5 of these transaction records, which lists the amounts *actually withdrawn* by Defendants by cash, wire or check directly to a non-BLMIS account of the account-owner. *See id.* Since the Trustee only seeks to avoid the amounts transferred from BLMIS to Defendants, those transfers indisputably depleted the estate and are subject to

---

[35] Defendants' reliance on *In re Derivium Capital LLC* (Mot. at 37-39) is misplaced as this case stands for the unremarkable proposition that a trustee can only avoid fraudulent transfers that originated from the debtor. *Grayson Consulting, Inc. v. Campbell (In re Derivium Cap. LLC)*, 716 F.3d 355, 361 (4th Cir. 2011).

avoidance by the Trustee.  Defendants' attempt to conflate inter-account transfers with avoidable transfers should be rejected.

## CONCLUSION

For the reasons set forth above, the Trustee respectfully requests that Defendants' Motion be denied in its entirety.

Date:  May 21, 2015
     New York, New York

Of Counsel:

Marco Molina
David M. McMillan
Joshua B. Rog

By: */s/ David J. Sheehan*       

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jimmy Fokas
Email:jfokas@bakerlaw.com
Kathryn M. Zunno
Email: kzunno@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and the estate of Bernard L. Madoff*