**Baker & Hostetler LLP**

45 Rockefeller Plaza

New York, New York 10111

Telephone: (212) 589-4200

Facsimile: (212) 589-4201

David J. Sheehan

Seanna R. Brown

Nicholas J. Cremona

Jorian L. Rose

Amy E. Vanderwal

George Klidonas

Hearing Date:  July 29, 2015

Hearing Time:  10:00 AM (EST)

Objection Deadline:  July 8, 2015

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

## TRUSTEE'S MOTION AND MEMORANDUM TO AFFIRM HIS DETERMINATIONS DENYING CLAIMS OF CLAIMANTS HOLDING INTERESTS IN PARTNERS INVESTMENT CO., NORTHEAST INVESTMENT CLUB, AND MARTIN R. HARNICK & STEVEN P. NORTON, PARTNERS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.    THE COMMENCEMENT OF THE SIPA PROCEEDING ................................. 2

    B.    THE PARTNERSHIPS' STRUCTURE, BLMIS ACCOUNTS, AND
        CLAIMS ............................................................................................................ 3

        1.    Northeast Investment Club ..................................................................... 3

        2.    Partners Investment Co. ......................................................................... 5

        3.    Martin R. Harnick and Steven P. Norton, Partners.................................. 6

    C.    THE BLMIS ACCOUNT RECORDS.................................................................. 7

    D.    THE CLAIMS.................................................................................................... 8

    E.    THE CUSTOMER DECISIONS ....................................................................... 9

ARGUMENT .................................................................................................................. 14

CONCLUSION............................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adler, Coleman Clearing Corp.*,
 216 B.R. 719 (Bankr. S.D.N.Y. 1998) .................................................................15

*Aozora Bank Ltd. v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
 480 B.R. 117 (S.D.N.Y. 2012) .............................................................................10

*Appleton v. First Nat'l Bank of Ohio*,
 62 F.3d 791 (6th Cir. 1995) ..................................................................................15

*In re Beacon Assocs. Litig.*,
 745 F. Supp. 2d 386 (S.D.N.Y. 2010) .....................................................................2

*In re Bernard L. Madoff Inv. Sec. LLC*,
 654 F.3d 229 (2d Cir. 2011) ..............................................................2, 11, 15, 17

*In re Klein, Maus & Shire, Inc.*,
 301 B.R. 408 (Bankr. S.D.N.Y. 2003) .................................................................21

*Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
 708 F.3d 422 (2d Cir. 2013) ........................................................................ *passim*

*La Russo v. Paladino*,
 109 N.Y.S.2d 627 (N.Y. Sup. Ct. 1951) ..............................................................18

*In re Lehman Bros. Inc.*,
 462 B.R. 53 (Bankr. S.D.N.Y. 2011) ...................................................................15

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
 277 B.R. 520 (Bankr. S.D.N.Y. 2002) .................................................................21

*Sec. Investor Prot. Corp. v. 2427 Parent Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
 779 F.3d 74 (2d Cir. 2015) ...................................................................................19

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
 515 B.R. 161 (Bankr. S.D.N.Y. 2014) ................................................13, 14, 17, 21

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*,
 454 B.R. 285 (Bankr. S.D.N.Y. 2011) ................................................9, 10, 12, 21

## TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*,
    Nos. 12 Civ. 1039(DLC), 12 Civ. 1139(DLC), 2012 WL 3042986 (S.D.N.Y.
    July 25, 2012)............................................................................................................12

*Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*,
    533 F.2d 1314 (2d Cir. 1976)............................................................................ *passim*

*SEC v. Madoff*,
    No. 1:08-cv-10791-LLS, 2008 WL 5197070 (S.D.N.Y. filed Dec. 11, 2008) ..........2

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*,
    463 F.3d 125 (2d Cir. 2006).............................................................................10, 15, 21

*Weisinger v. Rae*,
    188 N.Y.S.2d 10, 19-20 (N.Y. Sup. Ct. 1959) ......................................................18

**Statutes**

15 U.S.C.A. § 78*lll*(2) ...............................................................................2, 3, 12, 15

15 U.S.C. § 78 *lll*(11) ...............................................................................................19

15 U.S.C. § 78aaa *et seq.* ...........................................................................................1

15 U.S.C. § 78eee(a)(4) ..............................................................................................2

15 U.S.C. § 78eee(b)(3) ..............................................................................................2

15 U.S.C. § 78eee(b)(4) ..............................................................................................2

15 U.S.C. § 78fff-1(a) .................................................................................................3

15 U.S.C. § 78fff-2(b) ...............................................................................................16

15 U.S.C. § 78fff-3(a) .................................................................................................3

15 U.S.C. § 78*lll*(4) ...................................................................................................3

15 U.S.C. § 78*lll*(11) .................................................................................................3

Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. No. 111-
    203, § 983(b), 124 Stat. 1931 (2010) ....................................................................15

N.Y. Partnership Law § 12 .......................................................................................17

N.Y. Partnership Law § 51(2)(a) ..............................................................................17

## TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

N.Y. PARTNERSHIP LAW § 51(2)(b)................................................................................................18

**Rules**

Fed. R. Civ. P. 36(a)(3)...........................................................................................................6, 20

**Other Authorities**

1–12 *Collier on Bankruptcy* ¶ 12.12 ..........................................................................................11

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and the estate of Bernard L. Madoff ("Madoff"), respectfully submits this combined motion and memorandum of law (the "Motion") to affirm the denial of sixty-one (61) claims filed by claimants (the "Objecting Claimants") who objected to the Trustee's determinations denying their claims and who had partnership interests in any of three New York general partnerships, Northeast Investment Club ("Northeast"), Partners Investment Co. ("PIC"), and Martin R. Harnick & Steven P. Norton, Partners (hereafter "HNP" and collectively with Northeast and PIC, the "Partnerships"). The Objecting Claimants are specifically identified in Exhibit 2 to the Declaration of Vineet Sehgal filed herewith. This memorandum is based upon the law set forth below as well as the facts set forth in the accompanying declarations of Stephanie Ackerman ("Ackerman Decl.") and Vineet Sehgal ("Sehgal Decl.").

## PRELIMINARY STATEMENT

The Objecting Claimants seek customer status in this SIPA proceeding, despite their acknowledgement that they lacked accounts in their name and had no relevant individual relationship with BLMIS. Instead, they invested in the Partnerships, each of which had a BLMIS account and invested partnership assets with BLMIS, and each of which filed its own claim regarding the account.[2] The case is ruled by the Second Circuit decision *Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 708 F.3d 422 (2d Cir. 2013) and

---

[1] *See* 15 U.S.C.A. § 78aaa et seq. (West 2009). For convenience, subsequent references to sections of the Securities Investor Protection Act shall be denoted simply as "SIPA § __."

[2] The Partnerships have been grouped together in this Motion because the Trustee believes that they represent all but one of the remaining New York general partnership BLMIS account holders concerning which a number of investors or partners also claim "customer" status. The remaining one is still in active discovery.

the many other decisions in this SIPA proceeding, discussed in Section E *infra*, involving the

question of who is the "customer" under SIPA, as to general partnerships and other entities. The

current Motion seeks to apply these decisions to the Objecting Claimants through entry of an

order affirming the Trustee's denial of their claims as listed in Exhibit 2 to the supporting

Declaration of Vineet Sehgal, expunging their claims, and overruling the related claims

objections on the grounds that Claimants are not "customers" as such term is used at SIPA §

78*lll*(2).[3]

## BACKGROUND

### A.    THE COMMENCEMENT OF THE SIPA PROCEEDING

The basic facts of the BLMIS fraud are widely known and have been recounted in

numerous decisions.  *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 231 (2d

Cir. 2011); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 393–94 (S.D.N.Y. 2010).   On

December 11, 2008, the Securities and Exchange Commission ("SEC") filed a complaint in the

District Court against Madoff and BLMIS, captioned *SEC v. Madoff*, No. 1:08-cv-10791-LLS,

2008 WL 5197070 (S.D.N.Y. filed Dec. 11, 2008), alleging fraud through the investment advisor

activities of BLMIS.  The SEC consented to the consolidation of its case with an application of

the Securities Investor Protection Corporation ("SIPC"). Thereafter, SIPC filed an application

under SIPA § 78eee(a)(4) alleging that because of its insolvency, BLMIS needed SIPA

protection. The District Court appointed the Trustee under SIPA § 78eee(b)(3) and removed the

proceeding to this Court under SIPA § 78eee(b)(4).

Under SIPA, the Trustee is responsible, among other things, for recovering and

distributing customer property to a broker's customers, assessing claims, and liquidating other

---

[3] The Trustee reserves all other bases for objections to the claims that are the subject of the Motion.

assets of the firm for the benefit of the estate and its creditors. A SIPA trustee has the general

powers of a bankruptcy trustee, in addition to the powers granted by SIPA. SIPA § 78fff-1(a).

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding

provides that "customers," as defined in SIPA § 78*lll*(2), share pro rata in "customer property,"

defined in SIPA § 78*lll*(4), to the extent of their "net equity," defined in SIPA § 78*lll*(11).  For

each customer with a valid net equity claim, if the customer's share of customer property does

not make her whole, SIPC advances funds to the SIPA trustee up to the amount of the customer's

net equity, not to exceed $500,000 (the amount applicable to this case). SIPA § 78fff-3(a).

On December 23, 2008, this Court entered a Claims Procedures Order. (ECF No. 12.)

Pursuant to that order, the Trustee determines claims eligible for customer protection under

SIPA, claimants may object to the Trustee's determination of a claim by filing an objection in

this Court, and the Trustee requests a hearing date for the objection and notifies the objecting

claimant thereof. *Id.*

## B.    THE PARTNERSHIPS' STRUCTURE, BLMIS ACCOUNTS, AND CLAIMS

The Objecting Claimants in this case invested into one or more of the Partnerships.

Objecting Claimants filed 46 claims in their capacities as partners of Northeast, 13 claims in their

capacities as partners of PIC, and the remaining two claims in their capacities as partners of

HNP. *See* Sehgal Decl., Ex. 3.  The claims of the Partnerships themselves are not at issue in this

Motion.

### 1.    Northeast Investment Club

Northeast indicates that it was created as a means for numerous small investors

collectively to profit from Madoff's supposed investment acumen. *See, e.g.*, ECF No. 3533, pp.

1-2. While Northeast did not produce any governance documents to the Trustee, Northeast has

indicated that it is a New York partnership.  It identified itself as a partnership on K-1 tax forms

on which, in the "Information About the Partner" section, the box labeled "General partner or LLC member-manager" was checked. *See* Ackerman Decl. ¶ 15, Ex 6. Its president also said it was a New York partnership in a letter from the club president to a prospective investor. *See* Ackerman Decl. ¶ 16, Ex. 7 at 1 ("We are officially registered as a partnership by NY state laws . . . ."). Its New York accountant likewise declared it to be a partnership in a letter included in, among others, claim number 001791. Sehgal Decl. ¶ 24, Ex 14. Finally, members also identified it as such in their filed objections to determination. *See* Objection to Trustee's Determination of Claim, ECF No. 3533 at 1-2 (stating that Mr. Madoff told Mr. Berkwitz that he should form a partnership and open an account in the partnership's name, and that following Mr. Madoff's suggestion, the Northeast Investment Club was established under New York law in 1993, and opened the Account that same year).

Northeast filed separate tax returns and had its own bank account. *See* Ackerman Decl. ¶ 15, Ex. 6; Sehgal Decl. ¶ 25, Ex. 15. It began investing with BLMIS in 1993 in an account under the Northeast name (No. 1ZB123). *See* Sehgal Decl. ¶ 26, Ex. 15. It was always invested solely with BLMIS, according to filed claims in this SIPA proceeding. *See e.g.* Sehgal Decl. ¶ 26, Ex. 15. Northeast filed its own claim, which was allowed for the complete net equity in its BLMIS account. The full allowed amount has been paid. *See* Sehgal Decl. ¶ 14.

The BLMIS customer files reflect that all transactions with BLMIS were undertaken by Morrey Berkwitz on behalf of Northeast Investment Club.[4] Sehgal Decl. ¶ 17, Ex. 6. The Northeast Objecting Claimants indicated that the payments by them were made to Northeast

---

[4] Before the club was formed, the account was initially opened in the names of Mr. Berkwitz and his wife, then quickly changed. *See* Sehgal Decl. ¶ 17 Ex. 6 at AMF0052262-AMF00052265; AMF00051838.

rather than to BLMIS, and withdrawals by them were received from Northeast and not directly

from BLMIS. *See, e.g.,* Sehgal Decl. ¶16, Ex. 16, p. 19; NE RFA 4-7.[5]

### 2.    **Partners Investment Co.**

PIC was governed by its partnership agreement, *see* Sehgal Decl. ¶ 19, Ex. 8, pp.

MWPTAP00274498-MWPTAP00274517 (the "PIC Partnership Agreement"), and by New York

partnership law.  PIC was formed December 15, 2003 under New York law.  *See* PIC Partnership

Agreement at recitals, §§ 2.3, 11.8.  It opened BLMIS account number 1CM846 that same

month.  *See* Sehgal Decl. ¶ 20, Ex. 9.  Its stated "sole purpose" was that of investing "the

Partnership's capital" in a BLMIS account.  *See* PIC Partnership Agreement § 2.5.  PIC filed

claim number 004131 as to its BLMIS account.  Sehgal Decl. ¶ 19, Ex. 8.  The Trustee allowed

the customer claim in the amount of PIC's net equity and has paid on it accordingly.  Sehgal

Decl. ¶14.

The PIC Partnership Agreement expressly precluded individual ownership of any specific

partnership property.  PIC Partnership Agreement § 6.3.  It also provided that a partner could not

receive any portion of his or her Capital Account until indebtedness and liabilities of the

partnership were paid for or adequately reserved for, and moreover, that a partner could only

receive cash in return, upon withdrawal of his capital contribution.  PIC Partnership Agreement §

6.7.  The PIC Partnership Agreement restricted assignment of partnership interests.  *Id.* at §§ 9.1,

9.2.

PIC had two managing partners responsible for conducting the partnership's business.

PIC Partnership Agreement, Article 4.  Jeffrey Stavin and Jay Goldstein were the designated

Managing Partners, unless subsequently changed by partnership vote.  *Id.* at § 4.1.   The

---

[5] Northeast Requests for Admissions, Ackerman Decl. ¶¶ 11-14, 22, Exs. 2-5, 9, 10, at Request Nos. 4-7 (hereafter, "NE RFA ___").

Managing Partners had numerous stated powers, including that of buying and selling property, banking and investing partnership funds, purchasing insurance, bringing litigation, entering into contracts, hiring professionals, and otherwise acting in connection with partnership business. *Id.* at § 4.2. In contrast, no other person had any power or authority to bind the partnership unless authorized by the Managing Partners or by the PIC Partnership Agreement. *Id.* at § 4.3.

None of the PIC Objecting Claimants responded to discovery. By failing to respond to the requests for admissions,[6] each of them admitted (among other things) that PIC is a legally formed partnership of which they are partners, that an agreement among PIC partners restricted management rights of partners, and that they interacted with BLMIS solely in their roles as partners and transmitted funds to BLMIS solely for the benefit of PIC, which had its own bank account and kept its funds separate from theirs. PIC RFA 13-18; *see also* Fed. R. Civ. P. 36(a)(3).

It appears from the BLMIS customer files that all transactions with BLMIS were undertaken by one or the other of the managing partners on behalf of PIC. *See* Sehgal Decl. ¶ 20, Ex. 9. So far as any of the PIC Objecting Claimants indicated, all payments by them were made to PIC and not to BLMIS. Similarly, all withdrawals by them were received from PIC and not directly from BLMIS. *See* PIC RFA 4-7.

### 3.    <u>Martin R. Harnick and Steven P. Norton, Partners</u>

The HNP Account (No. 1H0123) was opened on or around July 25, 1997, replacing a prior account that had also been titled in the HNP name (and was subsequently closed.) *See* Sehgal Decl. ¶ 23, Ex. 13. The HNP Account was titled as a partnership account and used what was apparently a partnership EIN number. The BLMIS files also contain a Partnership Account

---

[6] PIC Requests for Admissions, Ackerman Decl. ¶ 22, Exs. 11, 12, at Request Nos. 4-7 (hereafter, "PIC RFA ___").

Agreement listing both Harnick and Norton as general partners. Sehgal Decl. ¶ 23, Ex. 13. All addresses for the HNP Account in the BLMIS customer files were New York addresses. Sehgal Decl. ¶ 23, Ex. 13.

Neither of the HNP Objecting Claimants has produced any governance documents relating to HNP, nor did they otherwise respond to discovery. But so far as BLMIS records show, correspondence concerning deposit or withdrawal requests for either the HNP Account or the predecessor account were routinely made in the name and under the letterhead of the HNP partnership and signed jointly by the partners. *See* HNP RFA 3-5;[7] Sehgal Decl. ¶ 23, Ex. 13.

HNP filed a proof of claim for the entire value of the account, which was disallowed because the account withdrawals were more than the actual amount of all deposits into the HNP Account, meaning that there was no net equity in the HNP Account, and that HNP was a net winner in the parlance of this proceeding. The claims filed by the HNP Objecting Claimants were each for half of what they contended was in the HNP Account. *See* Objection To Trustee's Determination of Claim, ECF No. 3123 at ¶¶ 2, 5; Sehgal Decl. ¶ 14.

As discussed *infra*, by New York law, the Partnerships were treated as at least quasi entities that owned their own property. Each had a BLMIS account in its name, according to the books and records of BLMIS. None of the Partnerships was a bank, broker, or dealer.

## C.    THE BLMIS ACCOUNT RECORDS

The Partnerships each maintained an account in its own name (the "Accounts," and each, an "Account") with BLMIS. The Objecting Claimants did not. Sehgal Decl. ¶¶ 6, 9-14, 27, Exs. 1-3. The records of BLMIS reflect money deposited or withdrawn by the Partnerships, acting through their managing partners or, in the case of HPN, jointly by both partners, and not by the

---

[7] HNP Requests for Admissions, Ackerman Decl. ¶ 22, Ex. 13, at Request Nos. 3-5 (hereafter, "HNP RFA ___").

Objecting Claimants individually. *See* Sehgal Decl. ¶¶ 17, 20, 23, Exs. 6, 9, 13.  BLMIS sent Account statements and related communications to the Partnerships, not the Objecting Claimants.[8]  The BLMIS customer files for these Accounts do not reference the particular interests held by Objecting Claimants in the Partnerships. *See* Sehgal Decl. ¶¶ 17, 20, 23, Exs. 6, 9, 13.

Because the Partnerships each maintained an Account at BLMIS, and made deposits into and withdrawals from that Account, the books and records of BLMIS reflect the amounts owing and owed by the BLMIS estate for that Account.  The books and records of BLMIS do not, in contrast, reflect deposits or withdrawals directly to or from BLMIS by the individual Objecting Claimants with regard to any Partnership's BLMIS Account.  They also do not show what amounts individual Objecting Claimants invested in, or withdrew from, the Partnerships.  Sehgal Decl. ¶27.

## D.    THE CLAIMS

The claims at issue in this Motion involve investments into the Partnerships.  Sehgal Decl. ¶¶ 8-12, Exs. 1-3.  The Objecting Claimants, the 61 claims filed by them, and the objections to determination of those claims, are specifically identified in Exhibits 2 and 3 to the Sehgal Declaration.  The Trustee denied their claims because they lacked BLMIS accounts and were not customers of BLMIS.  Sehgal Decl. ¶ 11.  Collectively, the Objecting Claimants filed 18 docketed objections to the Trustee's determination of their claims.  Sehgal Decl. ¶¶ 8-12, Exs. 1-3.  This Motion addresses all objections regarding the specified claims by Objecting Claimants who are identified on Exhibit 2 of the Sehgal Decl.[9]

---

[8] *See* NE RFA 3, 8, 9; PIC RFA 3, 8, 9; HNP RFA 6, 7; Sehgal Decl. ¶¶ 15, 18, 21, Exs. 4, 7, 10.

[9] Apart from the Objecting Claimants, whose customer claims arising from their interests in the Partnerships are set out in Sehgal Decl., Exs. 2 and 3, there are 20 other Partnership investors whose objections have been expunged.

Since receiving the 18 docketed objections to the claims determinations, the Trustee served discovery on each of the Objecting Claimants seeking to determine their basis for claiming customer status, and inquiring into deposits, payments, communications, account openings, and their relationship with the account holder.[10]  Few of the Objecting Claimants responded.  They have provided no persuasive evidence of their entitlement to customer status under SIPA.  *See* Ackerman Decl. ¶¶ 10-14, 17-23, Exs. 2-5, 8.

## E.    THE CUSTOMER DECISIONS

There have been nine prior decisions in this proceeding dealing with whether investors in BLMIS accountholders could be treated as "customers" under SIPA; all of the decisions said they could not.[11]  The Trustee's first motion regarding the definition of "customer" under SIPA was the Trustee's Motion To Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts In Their Names, Namely, Investors in Feeder Funds, filed on June 11, 2010 (ECF No. 2416) (the "Initial Feeder Fund Motion").  On June 28, 2011, this Court issued

---

Their counsel included them as parties to the objections despite the fact that those parties never filed claims.  The Trustee brought two motions, Trustee's First Omnibus Motion Seeking to Expunge Objections by Parties That Did Not File Claims (ECF No. 4711) and Trustee's Second Omnibus Motion Seeking to Expunge Objections by Parties That Did Not File Claims (ECF No. 4712), to resolve their claims objections.  This Court granted the requested relief, and its orders were not appealed.  (ECF Nos. 4778, 4780).  Those parties are not included in the instant Motion.  Also, six Partnership related claimants have not been included who either did not file objections to determination or who subsequently withdrew them.  Finally, one Objecting Claimant, Ms. Greenfield, withdrew a pro se objection that she had filed, *see* ECF No. 5478, but remains in this motion because of a separately docketed objection filed by counsel in part on her behalf.  This Motion seeks to resolve all remaining objections related to the Partnerships.

[10] Becker and Poliakoff, LLP filed objections to determination on behalf of all of the Objecting Claimants associated with Northeast and HNP and was initially served with discovery for the Objecting Claimants associated with Northeast.  Becker and Poliakoff, LLP ultimately confirmed to the Trustee that it was not representing any of the Objecting Claimants as to discovery.  Discovery was also served directly upon each of the Objecting Claimants *pro se*.  Ackerman Decl. ¶¶ 7-10.

[11] One other customer motion was scheduled for hearing on June 24, 2015.  *See* Trustee's Motion And Memorandum To Affirm His Determinations Denying Claims Of Claimants Holding Interests In Epic Ventures, LLC (ECF No. 9932).  At this writing, the deadline for objections has passed, no objections have been filed, the objecting claimants have filed a statement of no objection to the motion and to the disallowance of their claims (ECF No. 10053), and the Trustee has filed the Certificate of No Objection Pursuant to LR 9075-2 of Trustee's Motion and Memorandum to Affirm his Determinations Denying Claims of Claimants Holding Interests in the Epic Ventures, LLC (ECF 10161).

its memorandum decision and order affirming the Trustee's denial of the claims. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank Ltd. v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 480 B.R. 117 (S.D.N.Y. 2012), *aff'd sub nom. Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC),* 708 F.3d 422 (2d Cir. 2013).

The Court found that, in light of the plain language of SIPA and relevant case law, the claimants in the Initial Feeder Fund Motion did not qualify as "customers" under SIPA. *Id.* at 290. The Court found that the claimants invested in, not through, those feeder funds, and had no individual accounts at BLMIS. *Id.* at 297. It was the feeder funds that entrusted their monies with BLMIS for the purpose of trading or investing in securities—the touchstone of "customer" status—whereas the claimants purchased interests in the feeder funds. *Id.* at 299. The Court held that absent a direct relationship with BLMIS, the claimants sought a definition of "customer" that stretched the term beyond its limits. *Id.* at 302.

Certain claimants appealed this decision to the District Court. The District Court affirmed, extensively analyzing the statutory definition and holding that the claimants did not qualify as customers under the plain language of SIPA. *Aozora Bank Ltd.*, 480 B.R. 117 (S.D.N.Y. 2012). The District Court determined that "'*exclusive* power' to entrust the assets to the debtor, to invest and reinvest, and to purchase and trade securities in the account is a '*required* aspect[ ]' of customer status." *Id.* at 127 (quoting *Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1318 (2d Cir. 1976), *cert. denied*, 426 U.S. 936 (1976) ("*Morgan Kennedy*").

On further appeal, the Second Circuit also affirmed, confirming that "[j]udicial interpretations of 'customer' status support a narrow interpretation of the SIPA's provisions." *Id.*

10

at 426 (citing *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006)).  The Second Circuit held that "the critical aspect of the 'customer' definition" was "the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." *Kruse*, 708 F.3d at 426 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236.).  The Second Circuit found that the claimants failed to meet this fundamental requirement because the money sent to BLMIS belonged to the accountholders, not to the individual claimants, and the individual claimants therefore failed to establish that they had entrusted cash or securities to BLMIS.  *Kruse*, 708 F.3d at 427.  The Second Circuit also found that the individual claimants did not exhibit other indicia of customer status in their dealings (or lack of dealings) with BLMIS, including that they did not exert any control over the accounts at issue and that they were not reflected in BLMIS records.  *Id.* at 426-27.

The Second Circuit held that the interests "sold by the Feeder Funds to investors . . . did not confer an ownership interest in money that the Feeder Funds ultimately invested in BLMIS." Thus, the Second Circuit concluded, "regardless of their intent, appellants never entrusted their cash or securities to BLMIS and, thus, fail to satisfy this 'critical aspect of the "customer" definition.' *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236 (internal quotation marks omitted); *see Morgan, Kennedy*, 533 F.2d at 1318; *see also* 1–12 *Collier on Bankruptcy* ¶ 12.12 (16th ed. 2012) ('[A] claimant will not be entitled to customer protection under SIPA unless the debtor actually receives the claimant's cash or securities; the debtor must actually have come into possession or control.')."  *Kruse,* 708 F.3d at 427-28.

While the appeals of the First Feeder Fund Decision were pending, the Trustee also filed a motion (the "ERISA Motion") to address arguments that were raised by claimants without BLMIS accounts who were benefit plans or benefit plan participants and who sought to use the

Employee Retirement Income Security Act ("ERISA") as a basis for determining their customer status.[12] (ECF No. 4521.)  The District Court withdrew the reference from the Bankruptcy Court and granted the ERISA Motion.  *Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, Nos. 12 Civ. 1039(DLC), 12 Civ. 1139(DLC), 2012 WL 3042986 *3 (S.D.N.Y. July 25, 2012).

The District Court noted that the first two of the three ways to qualify as a "customer" under SIPA § 78*lll*(2), "presume that a customer must have a securities account with the debtor," and that the claimants also did not qualify under the third method of having "deposited cash with the debtor for the purpose of purchasing securities."  *Id.* at *4.  That was so because none of the claimants "owned any cash deposited with BLMIS.  Rather, . . . in each case this cash was owned by the third-party entity in which the claimant invested, and which had a BLMIS account in its name." *Id.* at *5.  The District Court also rejected arguments that fiduciary responsibilities could suffice to create a "customer" relationship: "Without an account in his or her name with BLMIS or title to any assets with BLMIS, a claimant cannot achieve customer status merely by virtue of having a fiduciary relationship with the debtor." *Id.* at *12.

Further SIPA "customer" motions followed, each of which was determined in favor of the Trustee.  On August 21, 2013, the Court issued its Bench Memorandum Granting Trustee's Second Motion to Affirm Trustee's Determinations Denying Claims of Claimants Who Invested in Certain Feeder Funds and Did Not Have BLMIS Accounts in Their Names (ECF No. 5450) ("the Second Feeder Fund Decision").  That decision reaffirmed that "the burden is on the claimant to establish he is a 'customer' entitled to SIPA protection, and such a showing is not easily met." Second Feeder Fund Decision at 4 (quoting *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. at 294).  Also, the Court determined that the claimants "fail[ed]

---

[12] Prior to the hearing on the Initial Feeder Fund Motion, the Court had removed from the scope of the motion the question of whether ERISA affects "customer" status under SIPA.

to [meet their burden] because they lack any of the indicia of a 'customer' relationship with BLMIS." *Id.*   In particular, "they had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property interest in any feeder fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment discretion over feeder fund assets invested with BLMIS, received no accounts statements or other communications from BLMIS and had no transactions reflected on the books and records at BLMIS." *Id.*

On August 22, 2014, this Court issued its Memorandum Decision Granting Motion To Affirm Trustee's Determinations Denying Claims Of Claimants Who Invested In Certain ERISA Plans. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 515 B.R. 161 (Bankr. S.D.N.Y. 2014) (hereinafter, "*ERISA Claimant Decision*").   In affirming the Trustee's determinations, this Court concluded that "[t]he claimant has the burden to establish his status as a 'customer'" and "not every victim of a broker-dealer's fraud is a 'customer.'" *Id.* at 166.   The Court found that "to qualify as a 'person who has deposited cash with the debtor for the purpose of purchasing securities,' . . . the party asserting that she was a BLMIS customer must show that she entrusted her own assets directly through an account maintained in her own name rather than indirectly through a fund that then entrusted the fund's assets through an account maintained in the fund's name." *Id.* at 168 (internal citations omitted). Moreover, even the fact that a claimant exercised some control over her own investments in the fund or the fund's investments in BLMIS is not sufficient to meet "the narrow definition of customer under SIPA." *Id.*

On February 25, 2015, this Court read into the record a decision (the "S&P Decision") granting Trustee's Motion And Memorandum To Affirm His Determinations Denying Claims Of

Claimants Holding Interests In S & P or P & S Associates, General Partnerships.    This Court

summarized the state of the law, as expressed in its prior decision[13] as follows: First, it said,

"customer status under SIPA is narrowly interpreted."    Further, "[t]he 'critical aspect' of the

customer definition is 'the entrustment of cash or securities to the broker-dealer for the purposes

of trading securities.'"    In addition, "[t]he indicia of customer status include a direct financial

relationship with BLMIS, a property interest in the funds invested directly with BLMIS,

securities accounts with BLMIS, control over the account holders' investments with BLMIS and

identification of the alleged customer in BLMIS' books and records."    The Court concluded,

"[f]inally, the claimant has the burden of showing that he or she is a customer."    Hr'g.

Transcript, *S&P Decision*, at p. 30 (Ackerman Decl. Ex. 15). The Court held that the objecting

partners failed to sustain their burden of proving that they are SIPA customers of BLMIS.  *Id.* at

36.  An order granting the Trustee's motion was entered March 10, 2015. (ECF No. 9450).

On April 27, 2015, the Court entered its Order Approving Trustee's Motion To Affirm

His Determinations Denying Claims of Claimants Holding Interests In Peerstate Equity Fund,

L.P.  (ECF No. 9883).  The Trustee's motion (ECF No. 9463) was unopposed.

Finally, on May 18, 2015, this Court entered an order (ECF No. 10010) granting the

unopposed Trustee's Motion And To Affirm His Determinations Denying Claims Of Claimants

Holding Interests In The Lazarus-Schy Family Partnership, The Schy Family Partnership, Or The

Lazarus Investment Group (ECF No. 9771).

## **ARGUMENT**

To be a "customer" under SIPA, an investor must have "a claim on account of securities

received, acquired, or held by the debtor in the ordinary course of its business as a broker or

---

[13] *ERISA Claimant Decision*, 515 B.R. at 165-68.

dealer from or for the securities accounts of such person," including "any person who has deposited cash with the debtor for the purpose of purchasing securities." SIPA § 78*lll*(2).[14] Thus, to be a "customer" an investor must have entrusted cash or securities with the debtor for the purpose of trading or investing in securities.  In *Kruse*, the Second Circuit found that investors who bought interests in a limited partnership that invested partnership funds via the partnership's own BLMIS account "never entrusted *their* cash or securities to BLMIS and, thus, fail to satisfy this 'critical aspect of the "customer" definition'" regardless of their intent.  708 F.3d at 427 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236).  Similarly, the Second Circuit in *In re New Times Sec. Servs., Inc.*  held that "the critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities."  463 F.3d at 128 (quoting *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995)).  *See also In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 724–25 (Bankr. S.D.N.Y. 1998)

---

[14] The definition applicable to this SIPA proceeding is:

(2) CUSTOMER

The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the  purpose of purchasing securities, but does not include—

(A) any person to the extent that the claim of such  person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

SIPA § 78*lll*(2), *see* 15 U.S.C.A. § 78*lll*(2)  (West 2009). After the start of this case, the "customer" definition was slightly reorganized and amended in a manner irrelevant to the present issues by the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. No. 111-203, § 983(b), 124 Stat. 1931 (2010); *see In re Lehman Bros. Inc.*, 462 B.R. 53, n.9 (Bankr. S.D.N.Y. 2011).

("The term [customer] refers to those who entrust cash or securities to broker-dealers for the purpose of trading and investing in the securities market."). The Trustee is responsible for discharging obligations of the debtor to customers with such claims "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b).

The Objecting Claimants' investments in the Partnerships do not meet the requirements for "customer" status outlined in the seminal Second Circuit decision *Morgan Kennedy*, and reaffirmed in *Kruse*. 708 F.3d at 427. In *Morgan Kennedy*, the Second Circuit rejected the argument that the beneficial owners of the account holder were the "customers" under SIPA, citing the facts that: (1) title to the trust assets was held by the account holder, not the beneficiaries; (2) the securities account with the debtor was in the name of the account holder, not the beneficiaries; (3) the account holder had the exclusive power to entrust the assets to the debtor; (4) the beneficiaries were unknown to the broker; and (5) the beneficiaries had no legal capacity in which they could deal with the debtor. 533 F.2d at 1318.

The Objecting Claimants' circumstances are little different than the claimants in *Morgan Kennedy*, and do not show the hallmarks of customer status discussed in this Court's most recent decision. Hr'g. Transcript, *S&P Decision*, at p. 30 (Ackerman Decl. Ex. 15). The Objecting Claimants entrusted their money to the Partnerships, not BLMIS. The Objecting Claimants lacked a direct financial relationship with BLMIS as to the Account money. The money entrusted to BLMIS was the property of the Partnerships, not just of the Objecting Claimants. The BLMIS Accounts were in the names of the Partnerships, not in the individual names of Objecting Claimants. Only those Objecting Claimants acting on behalf of the Partnerships could

control the Partnerships' investments with BLMIS, and then only to the extent provided by applicable law and respective partnership agreements.

The individual interests of Objecting Claimants were not identified in BLMIS' books and records, and the names of most of them did not appear in the Account Maintenance files.  The partners who dealt with BLMIS were like the trustees who acted for the trust account in *Morgan Kennedy*, and were no more customers in their individual capacity than the trustees were. *Morgan Kennedy,* 533 F.2d at 1318, 1320-21 (notwithstanding that the trust account was in the name of the trustees, "[a]ny suggestion that each of the three Trustees has a separate customer claim against the debtor is untenable" because the Trustees together managed for the trust, "which was the true customer of the broker-dealer . . . ."; similarly, noting that under the SIPA Rules, individual coverage for multiple people who each own some portion of, or interest in, an account is "explicitly forbidden".)

Only the Partnerships, not the Objecting Claimants, entrusted their cash or securities to BLMIS, and the Objecting Claimants thus fail to satisfy this "critical aspect of the 'customer' definition."  *Kruse*, 708 F.3d at 426-27 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236); *accord ERISA Claimant Decision,* 515 B.R. at 169.  Whether the Objecting Claimants intended the Partnerships to invest with BLMIS is irrelevant under SIPA. *See Kruse*, 708 F.3d at 426-27; *ERISA Claimant Decision*, 515 B.R. at 169-70.

The money the Objecting Claimants contributed to the Partnerships, and anything that the Partnerships purchased with that money, belongs to the relevant Partnership and not to the Objecting Claimants.  *See* N.Y. Partnership Law § 12 (McKinney 2015) ("1. All property originally brought into the partnership stock or subsequently acquired . . . on account of the partnership is partnership property" and allowing for title, even of real property, to be acquired

and passed in the partnership name.); N.Y. Partnership Law § 51(2)(a) (McKinney 2015) ("A partner, subject to . . . any agreement between the partners, has an equal right with his partners to possess specific partnership property for partnership purposes; but he has no right to possess such property for any other purpose without the consent of his partners."); N.Y. Partnership Law § 51(2)(b) (McKinney 2015) ("A partner's right in specific partnership property is not assignable except in connection with the assignment of the rights of all the partners in the same property.") These are also long established principles in case law. *See La Russo v. Paladino*, 109 N.Y.S.2d 627, 630 (N.Y. Sup. Ct. 1951) ("[A] partner has no personal right in any specific partnership property" and on the partnership's dissolution by the death of a partner, "the only property right which the survivor of such partner possesses is a claim for an accounting."), *Weisinger v. Rae*, 188 N.Y.S.2d 10, 19-20 (N.Y. Sup. Ct. 1959) ("A partner has no personal right in any specific partnership property," therefore, "partnership property is not subject to attachment or levy by a creditor of an individual partner."). Like the objecting claimants dealt with by prior Customer Opinions, the Objecting Claimants do not individually own the assets that the Partnerships invested with BLMIS. Instead, they are collectively owned by the Partnerships themselves.

It was the Partnerships, not the Objecting Claimants, that entrusted assets to BLMIS for the purpose of purchasing securities. Each Partnership through its agreed management had the right to direct the investment of those assets on behalf of the Partnership, and to withdraw property from its Account on behalf of the Partnership. Each Partnership, not the Objecting Claimants, was the customer for its respective Account under SIPA.

Because BLMIS never exercised a custodial function as to the Accounts on behalf of the individual Objecting Claimants, who made no deposits or withdrawals at BLMIS, the Objecting Claimants have neither "customer" claims nor individual net equity. The purpose of SIPA, a

statute intended to deal with broker insolvency, is "to expedite the return of customer property" by "protecting the *custody* function of brokers," according to a recent Second Circuit decision that declined to permit interest or time-based damages for customer claims under SIPA. *Sec. Investor Prot. Corp. v. 2427 Parent Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 779 F.3d 74, 80 (2d Cir. 2015). Customers share in the fund of customer property ratably, according to each customer's "net equity." *Id*. at 77, 81. The definition of net equity is limited by the fundamental SIPA design "to return customer property to customers," *id*. at 77, whether in cash or in actual securities. *Id*. at 80. [15]

It was each Partnership that had the right to demand, on behalf of the Partnership, return of the property entrusted to its Account, and each Partnership that is accordingly entitled to a customer claim to the extent of its net equity. Moreover, in this instance, one of the Partnerships (HNP) had no net equity at all, and the net equity of another (Northeast) has been completely paid. Consequently, both those Partnerships have already been paid the full net equity in their respective Accounts, and interim payments have been made on the net equity of the third Partnership (PIC) in its Account.

The Second Circuit stated in *2427 Parent Corp.*, "[w]e . . . previously concluded that in [the BLMIS] case net equity . . . should be determined based on customers' actual deposits and withdrawals. These deposits, net withdrawals, constitute customer property here." *Id*. at 81 (citations omitted). The books and records of BLMIS show that Objecting Claimants made no individual deposits in or withdrawals from BLMIS, and those who interacted with BLMIS as to

---

[15] The definition of Net Equity at SIPA §78 *lll*(11)begins, "The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by—

(A) Calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated . . . on the filing date, all securities positions of such customer . . . ."

the Accounts did so solely on the Partnerships' behalf.  Sehgal Decl. ¶¶ 17, 20, 23, 27, Exs 6, 9,

13.  The Objecting Claimants accordingly have no net equity and are not "customers" within the

meaning of SIPA.

  Each of the Objecting Claimants was served with requests for admission, interrogatories,

and requests for production.  Except for a few Northeast Objecting Claimants (who either

admitted all the requests for admission outright or did not deny any of them in substantial part),

none of them responded.  Those Objecting Claimants who failed to respond to the requests for

admission admitted them.  Fed. R. Civ. P. 36(a)(3).  The admissions, both deemed and actual,

show that Objecting Claimants lack any relationship with BLMIS that fits the *Morgan Kennedy*

criteria and that their claims of "customer" status are baseless.  They admitted that the relevant

Account was not titled in their name (HNP RFA 1, PIC RFA 1, NE RFA 1), that they never

received correspondence directly from BLMIS (PIC RFA 3, NE RFA 3), that they never received

investment statements (HNP RFA 6, PIC RFA 8, NE RFA 8) or tax statements (HNP RFA 7,

PIC RFA 9, NE RFA 9) in their names from BLMIS, that they never paid cash directly to

BLMIS for credit to an account in their names (HNP RFA 4, PIC RFA 5, NE RFA 5), and never

deposited securities directly to BLMIS (HNP RFA 3, PIC RFA 4, NE RFA 4), that they never

directly withdrew (PIC RFA 6, NE RFA 6) or received (PIC RFA 7, NE RFA 7) funds from

BLMIS, and that any funds withdrawn were transmitted to them from the Account holder (HNP

RFA 5, PIC RFA 7, NE RFA 7), and that their only relationship to BLMIS existed by way of

their relationship to the Account holder (PIC RFA 11, NE RFA 11), that they never entered into

any contracts in their names with BLMIS (PIC RFA 10, NE RFA 10), and that they did not have

any control, investment discretion or decision-making power over any investment assets at

BLMIS (HNP RFA 8, PIC RFA 12, NE RFA 12).

As the Second Circuit has explained, "[j]udicial interpretations of 'customer' status support a narrow interpretation of the SIPA's provisions." *Kruse*, 708 F.3d at 426 (citing *In re New Times Sec. Servs., Inc.,* 463 F.3d at 127). Customer status under SIPA is narrowly construed and is the burden of the claimant to establish. *See ERISA Claimant Decision,* 515 B.R. at 166 ("The burden is on the claimant to establish he is a 'customer' entitled to SIPA protection, and such a showing 'is not easily met.'") *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. at 294 (citing *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003)); *see also Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002) ("[I]it is well-established in the Second Circuit that a claimant bears the burden of proving that he or she is a 'customer' under SIPA.") The Objecting Claimants have not met this burden. Thus, under Second Circuit precedent, the Objecting Claimants are not SIPA customers.

## CONCLUSION

For all of the foregoing reasons, the Court should affirm the Trustee's determination denying the claims of the Objecting Claimants, overrule their objections, expunge the claims, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 17, 2015

Respectfully submitted,

*/s/ David J. Sheehan*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Jorian L. Rose
Email: jrose@bakerlaw.com
Amy E. Vanderwal
Email : avanderwal@bakerlaw.com
George Klidonas
Email : gklidonas@bakerlaw.com
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201

Brian A. Bash
Email: bbash@bakerlaw.com
Wendy J. Gibson
Email: wgibson@bakerlaw.com
**Baker & Hostetler LLP**
1900 E. 9th St Suite 3200
Cleveland, Ohio  44114
Tel: (216) 621-0200
Fax: (216) 696-0740

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

300359726