**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. Nos. listed on Exhibit 1 Attached Hereto |
| Plaintiff, | |
| v. | |
| DEFENDANTS IN  ADVERSARY PROCEEDINGS LISTED ON EXHIBIT 1 ATTACHED HERETO, | |
| Defendants. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION**
**TO THE TRANSFEREE DEFENDANTS' MOTION TO DISMISS**
**BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT**
**OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................5

    A.    Procedural History .................................................................. 5

    B.    The Feeder Funds, Their Management and Shareholders, and Their United States Business Activities Related to BLMIS ....................................................................................... 7

        1.    Feeder Funds ..................................................................7

        2.    Feeder Fund Management and Service Providers ..........................8

            a.    Management Defendants ..................................... 8

            b.    Service Provider Defendants.............................. 9

        3.    Feeder Fund Shareholders...........................................11

        4.    Defendants Expected That United States Law Would Apply to Them. ..................................................12

ARGUMENT .....................................................................................................14

    I.    Law of the Case is Inapplicable Here ................................. 14

    II.    Legal Standards Governing the Parties' Respective Motions.............................. 16

        A.    Motion to Dismiss Standard....................................... 16

        B.    Motion for Leave to Amend ....................................... 16

    III.    The District Court Directed That This Court Analyze the Trustee's Recovery Claims Under *Maxwell I*........................................ 17

    IV.    The District Court Did Not Hold That Foreign Citizenship Alone Precludes Application of SIPA and the Bankruptcy Code to Defendants ............ 19

    V.    The Component Events of the Transfers to Defendants Are Not Purely Foreign; To the Contrary, They Are Predominantly Domestic ........................... 22

        A.    Under Any Test, Even One Based Purely on Location of the Parties, Defendants Who Received Transfers from Tremont and Fairfield Did Not Receive Purely Foreign Transfers ..................................................................... 23

            1.    Tremont and Fairfield Operated in New York..............................23

# TABLE OF CONTENTS
## (continued)

**Page**

2.    Under *Maxwell I*, Recovery Claims of Transfers From Fairfield and Tremont are Sufficiently Domestic to Apply U.S. Law ........................................................27

B.    Transfers To Defendants From Feeder Funds Other Than Tremont and Fairfield Are Not Purely Foreign, But Rather Are Predominantly Domestic ................................................... 28

1.    Transfers to Management and Service Defendants ......................29

2.    Transfers to Shareholder Defendants .............................................31

VI.    Defendants Fail to Meet their Burden of Establishing that Comity Precludes the Trustee's Recovery of the Transfers at Issue ................................. 33

A.    No Parallel Proceeding With Substantially Similar Parties and Issues Exists ..................................................................... 34

B.    Defendants Have Identified No Exceptional Circumstances to Support the Application of Comity, and None Exists .......................... 36

CONCLUSION .................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Absolute Activist Master Fund v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)....................................................................2, 7, 17, 20

*Ace Arts, LLC v. Sony/ATV Music Pub., LLC*,
56 F. Supp. 3d 436, 445 (S.D.N.Y. 2014) .......................................................34, 36

*Aldridge v. Lily-Tulip, Inc.*,
40 F.3d 1202 (11th Cir. 1994) ........................................................................15

*Allstate Life Ins. Co. v. Linter Group Ltd.*,
994 F.2d 996 (2d Cir. 1993)............................................................................33

*Anwar v. Fairfield Greenwich, Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010).............................................................7, 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................16

*Bellezza v. Holland*,
No. 09-cv-8434, 2011 WL 2848141 (S.D.N.Y. July 12, 2011)...........................16

*Cargo Partner AG v. Albatrans, Inc.*,
352 F.3d 41 (2d Cir. 2003)..............................................................................16

*Cedeno v. Intech Grp. Inc.*,
733 F. Supp. 2d 471 (S.D.N.Y. 2010)..............................................................22

*Drexel Burnham Lambert Group, Inc. v. Galadari*,
777 F.2d 877 (2d Cir. 1985)............................................................................33

*EEOC v. Arabian America Oil Co.*
499 U.S. 244 (1991)........................................................................................17

*Ehrenfeld v. Mahfouz*,
489 F.3d 542 (2d Cir. 2007).............................................................................7

*European Cmty. v. RJR Nabisco, Inc.*,
764 F.3d 129 (2d Cir. 2014).............................................................................19

*Gitlin v. Barclays Bank (In re Maxwell Commc'n Corp.)*,
170 B.R. 800 (Bankr. S.D.N.Y. 1994)..........................................................19, 28

## TABLE OF AUTHORITIES
### (continued)

*In re Gucci*,
309 B.R. 679 (Bankr. S.D.N.Y. 2004) ...................................................................35

*Hartford Fire Ins. v. California*,
509 U.S. 764 (1993) .............................................................................................34

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) ...............................................................................................26

*Hodgson v. Man Financial, Inc.*,
Civ. No. 06-1944, 2006 WL 3791341 (E.D. Pa. Dec. 22, 2006) ...........................29

*In re J.P. Jeanneret Assocs., Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011) ...................................................................16

*In re Kingate Mgmt. Ltd.*,
784 F.3d 128 (2d Cir. 2015) ...........................................................................14, 32

*Kiobel v. Royal Dutch Petroleum Co.*,
No. 02-cv-7618 (KMW), 2009 WL 3817590 (S.D.N.Y. Nov. 16, 2009) .................7

*Kregler v. City of New York*,
821 F. Supp. 2d 651 (S.D.N.Y. 2011) ...................................................................16

*Lauritzen v. Larsen*,
345 U.S. 571 (1953) .............................................................................................36

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) ..................................................................................22

*Mastafa v. Chevron Corp.*,
770 F.3d 170 (2d Cir. 2014) ............................................................................19, 20

*In re Maxwell Commc'n Corp.*,
93 F.3d 1036 (2d Cir. 1996) ......................................................................34, 35, 36

*Maxwell Commc'n Corp. plc v. Société General plc (In re Maxwell Commc'n Corp.)*,
186 B.R. 807 (S.D.N.Y. 1995) ...................................................................... *passim*

*Morrison v. Nat'l Australia Bank*,
561 U.S. 247 (2010) ..................................................................................... *passim*

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
460 U.S. 1 (1993) .................................................................................................36

## TABLE OF AUTHORITIES
### (continued)

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
  763 F.3d 198 (2d Cir. 2014)...................................................................................17, 18, 19, 20

*Picard v. Bureau of Labor Ins.*,
  480 B.R. 501 (Bankr. S.D.N.Y. 2012) ............................................................ *passim*

*Picard v. Estate (Succession) of Igoin*,
  525 B.R. 871 (Bankr. S.D.N.Y. 2015).................................................................22, 37

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
  753 F. Supp. 2d 166 (S.D.N.Y. 2010)............................................................................2

*Reich v. Lopez*,
  38 F. Supp. 3d 436, 448 (S.D.N.Y. 2014) ..............................................................19

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)....................................................................................16

*Royal and Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*,
  466 F.3d 88 (2d Cir. 2006)................................................................................34, 36

*SEC v. Compania Internacional Financiera S.A.*,
   No. 11-cv-04904 (DLC), 2011 WL 3251813 (S.D.N.Y. July 29, 2011) ................................32

*SEC v. ICP Asset Mgmt., LLC*,
  No. 10-cv-4791 (LAK), 2012 WL 2359830 (S.D.N.Y. June 21, 2012) ..................................19

*SIPC v. BLMIS (In re Madoff Sec.)*,
  513 B.R. 222 (S.D.N.Y. 2014)............................................................ *passim*

*Société Nationale Industrielle Aerospatiale v. U.S. Dist. Ct.*,
  482 U.S. 522 (1987)....................................................................................34

*Steinberg v. Barclay's Nominees (Branches) Ltd.*,
  No. 04-60897-cv, 2008 WL 4601042 (S.D. Fla. Sept. 30, 2008)...........................................22

*Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*,
  404 U.S. 6 (1971)....................................................................................17

*Tarazi v. Truehope, Inc.*,
  958 F. Supp. 2d 428 (S.D.N.Y. 2013).................................................................34

### Statutes

11 U.S.C. § 546(e) ....................................................................................14

11 U.S.C. § 547.................................................................................2, 20, 28

**TABLE OF AUTHORITIES**
(continued)

**Page**

11 U.S.C. § 550.................................................................................................2, 6

11 U.S.C. § 550(a) .......................................................................................2, 33, 35

11 U.S.C. § 550(a)(2)........................................................................................17

15 U.S.C. § 78aaa ..............................................................................................1

**Rules**

Fed. R. Bankr. P. 7012......................................................................................16

Fed. R. Bankr. P. 7015......................................................................................16

Fed. R. Civ. P. 8(a)(2).......................................................................................16

Fed. R. Civ. P. 12(b)(6).....................................................................................16

Fed. R. Civ. P. 15..............................................................................................16

Fed. R. Civ. P. 15(a)(2)......................................................................................17

**Other Authorities**

18B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
    4478 (2d ed. 2014) ......................................................................................15

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"),

15 U.S.C. § 78aaa *et seq.*, and the substantively consolidated estate of Bernard L. Madoff

("Madoff"), respectfully submits this memorandum[1] in opposition to the transferee defendants'

("Defendants") consolidated motion to dismiss based on extraterritoriality and in further support

of the Trustee's motion for leave to amend his complaints[2] under this Court's order dated

December 10, 2014.[3]

## PRELIMINARY STATEMENT

BLMIS held customer accounts for numerous feeder funds ("Feeder Funds")—single-

purpose investment vehicles that pooled their investors' assets to invest with BLMIS,

capitalizing on its consistent returns and Madoff's willingness to forego industry-standard

remuneration.  Defendants are the Feeder Funds' management ("Management Defendants"),

service providers ("Service Provider Defendants"), and shareholders ("Shareholder Defendants")

that participated in the Feeder Funds' investment relationship with BLMIS.  Collectively, the

Feeder Funds transferred to and withdrew billions of dollars from BLMIS over the life of their

accounts.

The Feeder Funds operated through the Management and Service Provider Defendants.

Without these defendants, the Feeder Funds could not have perpetuated their investment

---

[1] The Trustee also relies upon the following submissions: (i) a summary chart detailing the United States connections of Defendants' transfers and component events of those transactions, attached hereto as Exhibit 2, and (ii) filings specific to each case, including supplemental addenda further supporting the Trustee's opposition herein, and, in most cases, either proffered amended complaints or allegations pertaining to the extraterritoriality issue ("Proffered Allegations") in those proceedings.

[2] Trustee's Omnibus Motion For Leave to Replead and For Limited Discovery, *SIPC v. BLMIS (In re Madoff Sec.)*, No. 08-1789 (SMB) (Bankr. S.D.N.Y. Aug. 28, 2014), ECF Nos. 7826-28 ("Trustee's Motion").

[3] Order ¶¶ 3-5, *SIPC v. BLMIS (In re Madoff Sec.)*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 10, 2014), ECF No. 8800 ("Scheduling Order"), as modified by the Stipulations and Orders entered on January 14, 2015, ECF No. 8990; February 24, 2015, ECF No. 9350; and March 31, 2015, ECF No. 9720.

relationships with BLMIS or their shareholders, including the Shareholder Defendants. For their services, the Management and Service Provider Defendants scored hundreds of millions in fees and other payments. The Shareholder Defendants, who invested with the Feeder Funds for the purpose of obtaining access to BLMIS in New York, reaped the benefits of this arrangement in the form of subsequent transfers, with knowledge that the transfers were derived of money that originated with BLMIS. The Trustee seeks to recover those fraudulent transfers for the BLMIS estate.

On a consolidated basis, the District Court found that "purely foreign" transfers are not subject to recovery under section 550(a) of the Bankruptcy Code, 11 U.S.C. § 550.[4] In so holding, the District Court set forth the legal framework under which this Court now must apply the facts in the 88 cases before it. The District Court recognized that the inquiry is whether the *conduct* alleged in the complaints is extraterritorial, which is consistent with the holdings of *Morrison*, *Absolute Activist*, and *Maxwell I*—all of which reject a bright-line citizenship test.[5] The District Court returned these cases to this Court to determine whether the component events and circumstances surrounding the transfers, the parties' relationships, and the conduct at issue results in an extraterritorial application of the law.[6] Critical to that analysis is Defendants' relationships with both the Feeder Funds and BLMIS as well as the circumstances under which

---

[4] *SIPC v. BLMIS (In re Madoff Sec.)*, 513 B.R. 222, 231 (S.D.N.Y. 2014) ("Extraterritoriality Decision").

[5] Extraterritoriality Decision, 513 B.R. at 227; *see Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 273 (2010) (determining that claims must concern United States securities and related conduct as opposed to citizenship of the parties alone); *Absolute Activist Master Fund v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) ("a purchaser's citizenship or residency does not affect where a transaction occurs") (quoting *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 176 (S.D.N.Y. 2010)); *Maxwell Commc'n Corp. plc v. Société General plc (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 816 (S.D.N.Y. 1995) ("*Maxwell I*") (rejecting a bright-line single-factor test for extraterritoriality, "such a limited conception of "transfer" for purposes of an extraterritoriality analysis would have potentially dangerous implications . . . a more appropriate analysis of the relevant conduct under § 547 is to consider all component events of the transfer").

[6] Extraterritoriality Decision, 513 B.R. at 232; *accord Maxwell I*, 186 B.R. at 816.

they knowingly received—and in most cases, directed or facilitated—avoidable transfers from BLMIS.

Eschewing any analysis of the location of the transfers and component events of the transactions, Defendants argue that the only salient inquiry is citizenship. Defendants contend that if an initial transferee and a subsequent transferee are each foreign citizens, the Trustee's recovery claim must be dismissed. But this is contrary not only to the District Court's decision but also common sense. If two foreign nationals doing business in New York enter into a transaction in an industry regulated by the United States and based in New York, the facts and conduct related to the transaction—not the parties' citizenship—govern the extraterritoriality analysis.

Of the 88 cases before the Court on this motion,[7] 72 involve transfers from Feeder Funds formed, operated, controlled, and marketed by the Fairfield Greenwich Group ("Fairfield"); and 7 involve transfers from Feeder Funds formed, operated, controlled, and marketed by Tremont Group Holdings, Inc. and its management arm, Tremont Partners, Inc. (collectively "Tremont").[8] The component events surrounding Fairfield's and Tremont's transactions were not foreign, much less "purely foreign"—to the contrary, Fairfield and Tremont did business in New York, almost all of their employees were in New York, they listed New York as their primary place of business, and they dealt with their shareholders from New York. Therefore, Fairfield's and Tremont's transactions with their subsequent transferees were predominantly domestic, precisely the conduct meant to be regulated by the recovery provisions of the Bankruptcy Code.

---

[7] Of these 88 cases, one case involves subsequent transferees that did not invest in Feeder Funds. *See Picard v. Radcliff Inv. Ltd.*, No. 10-04517 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) (BLMIS account beneficially owned and controlled by moving defendant Rothschild Trust Guernsey Ltd.).

[8] In certain instances, transfers from both Fairfield and Tremont are at issue in the same action.

Defendants who received subsequent transfers from Feeder Funds other than Fairfield and Tremont fare no better.  Regardless of where these Feeder Funds maintained operations, their transactions related to BLMIS were predominantly domestic, permitting the Trustee to recover the transfers stemming from those transactions.  The facts and circumstances surrounding the transfers vary among Defendants.  The Management and Service Provider Defendants were the agents of their respective funds, acting as management companies, custodians, and administrators.  They played a vital role in the Feeder Funds' relationships with BLMIS by placing the Feeder Funds' investments with BLMIS and facilitating the initial transfers from BLMIS to the Feeder Funds.  These Defendants knew that the flow of subsequent transfers to them required the Feeder Funds' ongoing investment relationship with BLMIS.  The Shareholder Defendants knowingly invested with their respective Feeder Funds to take advantage of BLMIS's purported investment strategy in the United States securities markets that provided consistent returns.  They knew, therefore, the subsequent transfers they received from the Feeder Funds initially came from BLMIS.  What all Defendants shared was the deliberate intent to profit from BLMIS's activity in the United States, and all of the alleged transfers resulted from Defendants' knowing participation in that domestic activity.

At a minimum, the Trustee has alleged specific facts and component events plausibly suggesting sufficient domestic components as to each and every transfer alleged in the complaints and accompanying proffers.  None of the transfers alleged is so purely foreign as to be facially insufficient under the analysis endorsed by the District Court, *Maxwell I*, or any other salient authority.  Accordingly, the Trustee must be permitted to pursue his recovery claims against Defendants under SIPA and the Bankruptcy Code.

4

# BACKGROUND

## A.    Procedural History

The Trustee commenced numerous actions to avoid and recover initial transfers of

BLMIS customer property and to recover BLMIS customer property transferred from Feeder

Funds to subsequent transferees.  Hundreds of defendants filed motions in the District Court to

withdraw the reference.  In May 2012, the District Court withdrew the reference on eight

separate legal issues, including the "extraterritoriality issue," framed as "whether SIPA applies

extraterritorially, permitting the Trustee to avoid or recover transfers that occurred abroad."[9]

Finding that the extraterritoriality issue posed "only a legal question," the District Court partially

consolidated proceedings on that issue.[10]  Other defendants subsequently joined the proceeding,

and the District Court issued a further order, withdrawing the additional cases:

> for the limited purpose of hearing and determining whether SIPA
> and/or the Bankruptcy Code as incorporated by SIPA apply
> extraterritorially, permitting the Trustee to avoid the initial
> Transfers that were received abroad or to recover from initial,
> immediate, or mediate foreign transferees.[11]

The District Court's order expressly reserved the parties' rights to dispute all issues other

than that legal question, and the Trustee's and Defendants' consolidated briefs acknowledged

that reservation.[12]  Accordingly, Defendants and the Trustee litigated only the legal issue of

---

[9] Order at 6, *SIPC v. BLMIS*, No. 12-mc-115 (JSR) (S.D.N.Y. May 15, 2012), ECF No. 97.

[10] *Id.* at 11.

[11] Order at 3, *SIPC v. BLMIS*, No. 12-mc-115 (JSR) (S.D.N.Y. June 7, 2012), ECF No. 167.

[12] *Id.* at 5-6; *see* Consolidated Memorandum of Law in Support of Extraterritorial Defendants' Motion to Dismiss, at
1, *SIPC v. BLMIS*, No. 12-mc-115 (JSR) (S.D.N.Y. July 13, 2012), ECF No. 235; Trustee's Memorandum of Law in
Opposition to Defendants' Motion to Dismiss Concerning Extraterritoriality at 27, *SIPC v. BLMIS*, No. 12-mc-115
(JSR) (S.D.N.Y. Aug. 17, 2012), ECF No. 312.

whether SIPA and the avoidance and recovery provisions of the Code apply extraterritorially.[13]

Neither Defendants nor the Trustee addressed the factual allegations of any individual

proceeding.

In its July 6, 2014 decision, the District Court held that the presumption against the

extraterritorial application of section 550 of the Bankruptcy Code and SIPA was not rebutted[14]

because Congress did not clearly indicate that either statute applied extraterritorially.[15]   The

decision further set forth the test to determine whether recovery of a subsequent transfer requires

a domestic or extraterritorial application of the Code and SIPA:

> To determine whether the transfers at issue in this consolidated
> proceeding occurred extraterritorially, "the court considers the
> location of the transfers as well as the component events of those
> transactions."[16]

As it had not considered the facts alleged in each case, the District Court did not dismiss

any of the Trustee's claims.  Instead, the District Court returned the cases to this Court,

indicating that the pleadings in each case should be reviewed to determine whether the Trustee

---

[13] Notably, while the Extraterritoriality Decision addresses the application of international comity, the issue was not part of the question withdrawn by the District Court.  The first time the Defendants raised the issue was in their reply.  *See* Consolidated Reply Memorandum in Support of the Extraterritorial Defendants' Motion to Dismiss at 14, *SIPC v. BLMIS*, No. 12-mc-115 (JSR) (S.D.N.Y. Aug. 31, 2012), ECF No. 322.

[14] Extraterritoriality Decision, 513 B.R. at 231. The Trustee believes the Extraterritoriality Decision is erroneous for several reasons, including that it contradicts, without explanation, the reasoning set forth in a decision issued prior to the Extraterritoriality Decision by the Bankruptcy Court in this liquidation proceeding.  *See Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 526-27 (Bankr. S.D.N.Y. 2012) ("BLI Decision") (determining focus as well as noting that Congress expressly intended Bankruptcy Code section 550 to apply extraterritorially).  However, no final order has been entered disposing of any one proceeding from which to appeal.  The Trustee reserves all rights with respect to the District Court's determination that SIPA and the Bankruptcy Code do not apply extraterritorially, and that the focus of these statutes is on the "property subsequently transferred," until such time as an appeal can be taken.  Moreover, the issue of extraterritoriality was pending in both the Bankruptcy Court and District Court concurrently in separate proceedings, and the BLI Decision expressly acknowledged the agreement between the Bankruptcy Court and the District Court providing that "to the extent that the issues overlap, whichever court reaches [the extraterritoriality issue] first can provide guidance for the other." *Id.* at 518 n.17 (quoting Order, *SIPC v. BLMIS*, 12-mc-115 (JSR) (S.D.N.Y. July 3, 2012), ECF No. 214).

[15] Extraterritoriality Decision, 513 B.R. at 231.

[16] *Id.* at 227 (quoting *Maxwell I*, 186 B.R. at 817).

sets forth facts plausibly alleging a transfer has domestic elements.[17]   Under the District Court

decision, a purely foreign transfer must be dismissed.[18]

### B.    The Feeder Funds, Their Management and Shareholders, and Their United States Business Activities Related to BLMIS

#### 1.    Feeder Funds

As set forth in the Trustee's pleadings, by placing funds with BLMIS and selecting

Madoff as their investment adviser, the Feeder Funds sought to capitalize on Madoff's strategy

of exclusively investing in United States securities, options, and Treasurys.  The Feeder Funds

executed BLMIS account opening documents, including agreements that: (i) granted Madoff full

discretion and authority to manage their investment;[19] (ii) designated Madoff as their "agent and

attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities;"[20]

(iii) subjected all securities transactions to United States securities laws and regulations;[21]

(iv) required arbitration before the American Arbitration Association, the New York Stock

---

[17] *Id.* at 232 n.4.

[18] The District Court rejected the Trustee's argument that dismissal at the pleading stage would be inappropriate because additional fact-gathering is necessary to determine where the transfers took place.  *Id.* (citing *Absolute Activist*, 677 F.3d at 69).  But *Absolute Activist* did not address whether discovery would be appropriate as to extraterritoriality.  As is the case with respect to other threshold issues, such as personal jurisdiction and subject matter jurisdiction, *see Ehrenfeld v. Mahfouz*, 489 F.3d 542, 550 n. 6 (2d Cir. 2007); *Kiobel v. Royal Dutch Petroleum Co.*, No. 02-cv-7618 (KMW), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009), discovery is permissible as to extraterritoriality.  *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 405 (S.D.N.Y. 2010) (deferring ruling on extraterritoriality at motion to dismiss phase as not ripe until factual record was further developed).  To the extent that defendants dispute the Trustee's factual allegations regarding extraterritoriality, the Trustee's allegations should be taken as true at the motion to dismiss stage and the parties should proceed to discovery.

[19] *See, e.g.*, Proffered Second Amended Complaint ¶¶ 87, 159, *Picard v. UBS AG*, No. 10-04285 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) ("UBS Compl.") (citing BLMIS trade authorization).

[20] *Id.*

[21] *Id.* ¶¶ 87, 160 (The customer agreements provided that "where applicable, the transactions shall be subject (a) to the provisions of (1) Securities Exchange Act of 1934, as amended, and (2) the Commodities Exchange Act, as amended; and (b) to the rules and regulations of (1) the Securities and Exchange Commission, (2) the Board of Governors of the Federal Reserve System and (3) the Commodities Futures Trading Commission").

Exchange, Inc. or the National Association of Securities Dealers;[22] and (v) were subject to New York law.[23]

## 2.    Feeder Fund Management and Service Providers

The Feeder Funds generally did not have their own employees[24] but instead required management entities and service providers to run their day-to-day operations and market to prospective shareholders.  The Feeder Funds could not function independent of their agents described below.

## a.    Management Defendants

In many cases, the Management Defendants comprised entities created, owned, and/or controlled by individuals with direct relationships with Madoff.  The Feeder Funds' agreements expressly authorized the delegation of certain investment duties and those duties were delegated exclusively to BLMIS.[25]  The Management Defendants received hundreds of millions of dollars in compensation, which was tied to the assets the Feeder Funds had under management with BLMIS as well as the fictional performance of Madoff's investment strategy.  To the extent that the fees received by the Management Defendants were derived from BLMIS customer property, the Trustee seeks recovery of those subsequent transfers here.

---

[22] *Id.*

[23] *Id.*

[24] *See, e.g.*, Brief of Amici Curiae Financial Institution Defendants at 12, *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff. Inv. Sec. LLC)*, No. 12-2557 (bk) (2d Cir. Oct. 18, 2013), ECF No. 305.

[25] *See* Fourth Amended Complaint ¶¶ 46, 106, 111, 114, *Picard v. Ceretti*, No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17, 2014) ("Kingate Compl.") (Kingate Euro's manager agreement stating "[i]t is expected that investment management functions . . . will be assigned and delegated to Bernard L. Madoff Investment Securities, a New York based NASD registered broker-dealer.  Upon a proper delegation, the Manager shall be relieved of any responsibility for the acts or omissions of such delegate"); *see also* Proffered Second Amended Compl. ¶¶ 276-79, *Picard v. Fairfield Inv. Fund Ltd.*, No. 09-01239 (SMB) (Bankr. S.D.N.Y. June 26, 2015) ("Fairfield Compl.").

The Management Defendants:

- Opened accounts for the Feeder Funds by executing or causing others to execute BLMIS's customer agreements in New York that authorized Madoff "to make all decisions relating to the manner, method and timing of investment transactions" and generally included a New York choice of law provision;[26]

- Met with Madoff in New York and had regular communications and correspondence with BLMIS employees about the Feeder Fund accounts;[27]

- Marketed the consistent, positive returns Madoff purportedly achieved to attract potential investors;[28]

- In the majority of cases, specifically marketed Madoff as being responsible for the Feeder Fund's investments in New York to attract potential investors;[29]

- Approved subscriptions from shareholders and directed when the Feeder Fund investors' capital should be transferred to or from BLMIS;[30] and

- Authorized the transfer of capital to and from BLMIS's bank account at JPMorgan Chase in New York as part of their management responsibilities to the Funds.[31]

### b.    Service Provider Defendants

The Feeder Funds' managers entered into agreements for administrative and custodial services with the Service Provider Defendants.  In many instances, the Service Provider Defendants were affiliated with the Feeder Fund managers.[32]  The Service Provider Defendants maintained the books and records for the Feeder Funds, reviewed BLMIS customer statements and trade confirmations, and calculated the net asset value of the Feeder Funds based, at least in

---

[26] *See, e.g.,* Fairfield Compl. ¶¶ 43, 45, 446.

[27] *Id.* ¶¶ 53, 69, 71, 137, 317, 354.

[28] *Id.* ¶¶ 3(d), 117.

[29] *Id.* ¶¶ 205, 208, 210, 232.

[30] *Id.* ¶ 207.

[31] *Id.* ¶ 204.

[32] For example, UBS-related management entities also utilized UBS-related service providers in connection with their Feeder Fund investments. *See* UBS Compl. ¶¶ 158-77.

part, on their review of BLMIS customer statements.[33]  The Service Provider Defendants

engaged directly with BLMIS.  The Service Provider Defendants sub-delegated custodial

functions to BLMIS.[34]  To the extent that the fees received by the Service Providers came from

subsequent transfers of BLMIS customer property, the Trustee seeks their recovery here.

The Service Provider Defendants:

- Knew BLMIS was a U.S. broker-dealer registered with the SEC or other U.S. regulators;[35]

- Received fees dependent on the Feeder Funds' net asset value, which in turn derived from BLMIS's purported success in managing the fund's investments in New York;[36]

- Knew they received their subsequent transfers because of their dealings, communications, and/or direct contractual relationships with BLMIS;[37]

- Knew that BLMIS retained custody and control of the Feeder Funds' assets in New York;[38] and

- In the case of administrative service providers, calculated the "net asset value" of the Feeder Funds by reviewing and analyzing BLMIS customer statements and daily trade confirmation tickets reflecting the purported U.S. securities trades and prices.[39]

---

[33] *See*, *e.g.*, Kingate Compl. ¶¶ 6, 47 (Kingate Global information memorandum), 144, 161.

[34] *See*, *e.g.*, UBS Compl. ¶ 163 (UBS (Luxembourg) S.A. entered into an agreement with BLMIS, in which it appointed Madoff as subcustodian "with the function of safekeeping holder and settlement and corporate agent of United States securities, cash, derivatives instruments and other assets").

[35] *See*, *e.g.*, Kingate Compl. ¶¶ 2-3, 6, 25-26, 41, 47 (Kingate Global information memorandum stating "The investment advisor is a New York based NASD registered broker-dealer . . . ."); UBS Compl. ¶¶ 87, 143, 147, 160.

[36] *See*, *e.g.*, Kingate Compl. ¶¶ 6, 47 (Kingate Global information memorandum), 142-45, 161; *see also* UBS Compl. ¶¶ 12, 177; *see also* Proffered Second Amended Complaint ¶ 121, 150, *Picard v. HSBC Bank PLC*, No. 09-01364 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) ("HSBC Compl.").

[37] *See*, *e.g.*, Kingate Compl. ¶¶ 6, 46-47 (Kingate Global information memorandum), 106, 111, 114 (Kingate Global management agreement), 142-45, 161; UBS Compl. ¶¶ 17, 81-84, 87, 95, 129, 160, 170-73.

[38] *See*, *e.g.*, Kingate Compl. ¶¶ 6, 46-47 (Kingate Global information memorandum), 106, 111, 114 (Kingate Global management agreement), 142-45; UBS Compl. ¶¶ 8, 85, 92, 98, 154, 176.

[39] *See*, *e.g.*, Kingate Compl. ¶¶ 6, 47 (Kingate Global information memorandum), 142-45; UBS Compl. ¶¶ 95, 98, 148, 171-72, 219; *see also* HSBC Compl. ¶ 112, 340, 343.

### 3.    Feeder Fund Shareholders

The Management Defendants marketed the Feeder Funds to shareholders, including the

Shareholder Defendants, who received subsequent transfers from BLMIS.  The Shareholder

Defendants knew their money was being invested in a United States-based investment strategy at

BLMIS and decided to invest with the Feeder Funds precisely for that reason.

The Shareholder Defendants knew:

- Investments were with BLMIS, a U.S. broker-dealer registered with the SEC or other U.S. regulators;[40]

- The primary or sole business objective of the Feeder Funds was to deposit all, or nearly all, of their assets with BLMIS in New York for investment in U.S. securities, options and Treasurys;[41]

- The Feeder Funds selected U.S. investment adviser BLMIS to manage and execute the investment strategy in New York;[42]

- BLMIS retained custody and control of the Feeder Funds' assets in New York;[43]

---

[40] *See, e.g.*, BLI Decision, 480 B.R. at 508 (Fairfield Sentry's 2006 private placement memorandum, which the Fairfield Sentry subscription agreement expressly incorporated, disclosed Fairfield Sentry invested with BLMIS, a U.S.-registered broker-dealer); Proffered Allegations ¶ 84, *Picard v. BNP Paribas Arbitrage SNC*, No. 11-02796 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) ("BNP Proffer"); *see also* Kingate Compl. ¶ 47 (Kingate's information memoranda stating to investors that BLMIS was registered with the National Association of Securities Dealers).

[41] *See, e.g.*, BLI Decision, 480 B.R. at 508 (Fairfield Sentry 2004 and 2006 private placement memoranda acknowledged Fairfield Sentry invested at least 95% of its assets with BLMIS for investment in U.S. equity markets and Treasury Bills); BNP Proffer ¶¶ 59, 84 (knowledge from Feeder Funds Tremont and Harley concerning primary business object to deposit all, or nearly all, assets with BLMIS in New York, including "the parties contemplated that the borrowed money would be invested in BLMIS through Harley, and the credit agreement documents explicitly reference Harley's 'Madoff Account' with BLMIS"); Proffered Allegations ¶ 44, *Picard v. Natixis*, No. 10-05353 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) ("Natixis Proffer") (marketing materials identified Groupement and Luxalpha funds' investment adviser would be "located in the U.S., in such cities as New York . . . [and the] [m]ajority of assets are invested in U.S. securities within the U.S. markets (*i.e.* no currencies, no commodities)"); Kingate Compl. ¶ 47 (Kingate Global information memorandum stating "The Fund is a single-advisor fund and the overall success of the Fund depends upon the ability of the Investment Advisor to be successful in its own strategy").

[42] *See, e.g.*, BLI Decision, 480 B.R. at 508 (Fairfield Sentry 2006 private placement memorandum stated the investment manager selected BLMIS as execution agent of the split strike conversion strategy); BNP Proffer ¶¶ 1, 15, 59, 84; *see also* Kingate Compl. ¶ 47 (Kingate Global information memorandum stating "[t]he Investment Advisor is a New York based NASD registered broker-dealer . . . . utiliz[ing] a 'split-strike conversion' strategy . . . . [and] has managed the assets of the Fund since its inception . . .").

- BLMIS determined which U.S. stocks to purchase, and the timing of such purchase and sales;[44]

- The Shareholder Defendants shareholder agreements with the Feeder Funds were governed by New York law, and contained New York jurisdiction and forum provisions;[45]

- Any redemptions the Shareholder Defendants requested were dependent on BLMIS's ability to liquidate United States securities;[46] and

- In the event of a default by the Feeder Fund's sole investment adviser, BLMIS, the investors risked losing their investment.[47]

### 4. Defendants Expected That United States Law Would Apply to Them.

The domestic nature of the conduct and transfers at issue is further demonstrated by the following additional facts. Certain Defendants:

- Are United States citizens or entities registered to do business in the United States;[48]

---

[43] *See, e.g.*, BLI Decision, 480 B.R. at 508 ("In addition, the PPMs set forth that BLMIS would retain custody of at least 95% of the Fund's assets in the United States and would determine which shares of companies on the S & P 100 would be purchased, as well as the timing of such purchases"); BNP Proffer ¶¶ 14-16, 59, 84 (stating "Defendants knew BLMIS purportedly held custody over the BLMIS Feeder Funds' investments," including those investments made via Harley and Tremont); *see also* Kingate Compl. ¶ 47 (Kingate Global information memorandum), 114 (Kingate Global management agreement stating "[a]s of the date hereof, custody of substantially all of the Fund's assets is in custody with Bernard Madoff Investment Securities LLC, a New York financial institution ('Madoff'). The Manager has no custody of any of the Fund's assets").

[44] *See, e.g.*, BLI Decision, 480 B.R. at 508 (Fairfield Sentry 2006 private placement memorandum disclosed BLMIS determined which shares to purchase and timing of purchases); BNP Proffer ¶¶ 59, 84; *see also* Kingate Compl. ¶ 47 (Kingate Global information memorandum stating the Investment Advisor implemented a "split-strike conversion" investment strategy entailing the purchase and sale of S&P 100 Index stocks).

[45] *See, e.g.*, BLI Decision, 480 B.R. at 508 (Fairfield Sentry subscription agreement specified New York law applied and contained New York jurisdiction and forum provisions). This fact is alleged for the vast majority of shareholder defendants. *See* Exhibit 2.

[46] *See, e.g.*, Supplemental Declaration of Thomas L. Long in Support of the Trustee's Sur-Reply at Ex. 1 at 32, *Picard v. Bureau of Labor Ins.*, No. 11-02732 (BRL) (Bankr. S.D.N.Y. July 16, 2012), ECF No. 46-1(hereinafter "Long BLI Decl.") (Fairfield Sentry 2006 private placement memorandum listed "inability to liquidate existing positions" as an extraordinary circumstance that could occur, preventing redemptions); Natixis Proffer ¶ 28; Kingate Compl. ¶ 47 (Kingate Euro information memorandum providing same).

[47] *See, e.g.*, Long BLI Decl. at Ex. 1 at 27 (Fairfield Sentry 2006 private placement memorandum stated that widespread insolvency involving BLMIS could result in substantial losses for investors); Natixis Proffer ¶¶ 38, 42-50; *see also* Kingate Compl. ¶ 47 (Kingate Euro information memorandum stating "[n]either the Manager nor Shareholders have any control over the investment and trading decisions of the Investment Advisor, and no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to the selected Investment Advisor").

- Are part of global financial institutions in which a United States office or headquarters was essential to the transactions surrounding the BLMIS subsequent transfers received;[49]

- Maintained United States bank accounts into which they received BLMIS subsequent transfers[50] or otherwise utilized U.S. bank accounts in connection with their transfers;[51]

- Conducted due diligence concerning BLMIS, either in person or through an agent in New York, including in some cases participating in due diligence meetings with BLMIS in New York;[52]

- Corresponded with Feeder Fund managers in the United States as part of their transactions, including in connection with their request to withdraw funds resulting in the BLMIS subsequent transfers;[53]

- Were expressly informed that United States law would apply to their transactions with the Feeder Funds, particularly if BLMIS became insolvent, including, in some cases, receiving one or more legal opinions from U.S. counsel to this effect;[54]

- Filed proofs of claim with the United States Bankruptcy Court in this SIPA proceeding;[55] or

---

[48] *See, e.g.,* Fairfield Compl. ¶¶ 347, 354, 364, 370, 380, 392.

[49] *See, e.g.,* Proffered Allegations ¶¶ 14-19, *Picard v. Merrill Lynch Int'l*, No. 10-05346 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); Proffered Allegations ¶¶ 2-8, 17-41, *Picard v. Standard Chartered Fin. Servs. (Luxembourg) S.A.,* No. 12-01565 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015).

[50] *See, e.g.,* Proffered Allegations ¶¶ 6-11, *Picard v. Abu Dhabi Inv. Auth.*, No. 11-02493 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); Proffered Allegations ¶¶ 12-17, *Picard v. Barclays Bank (Suisse) S.A.*, No. 11-02569 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) ("Barclays Proffer"); Proffered Allegations ¶¶ 23-25, *Picard v. Koch Indus., Inc.*, No. 12-01047 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) ("Koch Proffer").

[51] *See* Exhibit 2, at 2-A Column 12.

[52] *See, e.g.,* Proffered Allegations ¶¶ 13-17, *Picard v. Atl. Sec. Bank*, No. 11-02730 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); Proffered Allegations ¶¶ 3, 9, 24-27, *Picard v. Bank Julius Baer & Co.,* No. 11-02922 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); Proffered Allegations ¶¶ 19-21, 23-26, *Picard v. EFG Bank S.A.*, No. 12-01690 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); *see also* Exhibit 2, at 2-A Column 9.

[53] *See, e.g.,* Proffered Allegations ¶¶ 23-26, *Picard v. Nat'l Bank of Kuwait, S.A.K.*, No. 11-02554 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) ("Nat'l Bank of Kuwait Proffer"); Natixis Proffer ¶ 158; Proffered Allegations ¶¶ 14-16, *Picard v. Sumitomo Trust & Banking Co.*, No. 11-02573 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); *see also* Exhibit 2, at 2-A Column 13.

[54] *See, e.g.,* Proffered Allegations ¶¶ 56-58, *Picard v. Banco Bilbao Vizcaya Argentaria, S.A.,* No. 10-05351 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); Natixis Proffer ¶¶ 38, 42-50.

[55] *See, e.g.,* Barclays Proffer ¶¶ 25-28; Proffered Allegations ¶ 23, *Picard v. Lloyds TSB Bank PLC,* No. 12-01207 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); Nat'l Bank of Kuwait Proffer ¶¶ 8-9; *see also* Exhibit 2, at 2-A Column 17.

- Invoked United States law to safeguard the transfers, specifically arguing on a prior appeal in this case that Bankruptcy Code section 546(e)'s safe harbor shields the transfers they received, because they are financial institutions trading a large volume of United States securities, as well as the application of the Securities Litigation Uniform Standards Act ("SLUSA").[56]

Based on the legal analysis discussed below and the facts discussed in the supplemental briefs, the Trustee's recovery actions against the Defendants do not constitute an extraterritorial application of SIPA or the Bankruptcy Code.

## ARGUMENT

The Trustee's claims are against Defendants whose conduct is directed to the United States and involves predominantly domestic elements.  Defendants' transfers and the component events of their transactions with the Feeder Funds and BLMIS demonstrate that Defendants deliberately chose to participate in one or more of the Feeder Funds with the express purpose of receiving profits from BLMIS's purported investments in the United States securities market. All Defendants sought to reap the rewards of investing in the United States securities markets. They should not be permitted to invoke the privilege of doing business under United States laws and then claim those laws should not apply when it no longer suits them.

## I.    Law of the Case is Inapplicable Here

Seeking to avoid a *Maxwell I* analysis, Defendants suggest that law of the case precludes this Court from determining whether the Trustee has pled, or can plead, facts suggesting that a particular transfer was not purely foreign.[57]  Defendants are wrong.

---

[56] *See, e.g.*, Brief of Amici Curiae at 12, *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff. Inv. Sec. LLC)*, No. 12-2557 (bk) (2d Cir. Oct. 18, 2013), ECF No. 305 (invoking section 546(e)); *In re Kingate Mgmt. Ltd.*, 784 F.3d 128, 135 (2d Cir. 2015) (invoking SLUSA as defense to class action on claims relating to BLMIS); Answer at 9, *Picard v. Bureau of Labor Ins.*, No. 11-02732 (BRL) (Bankr. S.D.N.Y. Feb. 28, 2013), ECF No. 54 (same).

[57] Consolidated Supplemental Memorandum of Law in Support of the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality at 9, *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 31, 2014) ("Defs. Br.") (Judge Rakoff's decision "is controlling in all of the adversary

*(continued on next page)*

The District Court resolved the legal question of whether SIPA and the Bankruptcy Code can be used to recover "transfers made abroad between a foreign transferor and a foreign transferee."[58]  On the consolidated motion before it, the District Court's ruling could not—and did not—include individual determinations regarding whether each of the hundreds of transferors and transferees were "foreign."[59]  Instead, that had to be presumed to determine the legal question withdrawn.  Facts presumed for the purposes of enabling a court to determine legal issues are not "decided" for purposes of law of the case.[60]

Nor did the "purely legal" issue withdrawn by the District Court involve the facts of any particular case.  Certain language from the Extraterritoriality Decision—"to the extent" that the Trustee's pleadings allege "purely foreign transfers," whether the Trustee "can put forth specific facts suggesting a domestic transfer," and whether the Trustee's claims "should be dismissed"— confirms that the Trustee's pleadings have yet to be reviewed and must be reviewed by this Court.[61]  Thus, the District Court's decision could not—and did not—dismiss any of the Trustee's claims, instead issuing a statement on the law and returning the proceedings to this Court to review the Trustee's pleadings.[62]  Even if the District Court had found that any particular complaint failed to plead facts suggesting a domestic transfer—which it did not—that

proceedings subject to this motion and requires that the Trustee's claims to recover these subsequent transfers be dismissed").

[58] Extraterritoriality Decision, 513 B.R. at 225.

[59] Several defendants who now seek dismissal of their claims did not participate in the consolidated briefing before the District Court and thus there is no way that their cases were considered by the District Court at the time of its ruling.  *See* Scheduling Order ¶ L, Ex. B.

[60] 18B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478 (2d ed. 2014) ("A position that has been assumed without decision for purpose of resolving another issue is not law of the case"); *see also Aldridge v. Lily-Tulip, Inc.*, 40 F.3d 1202, 1207-08 (11th Cir. 1994) (finding law of the case did not apply since the court assumed the facts presented in the certified question and made no specific factual findings).

[61] Extraterritoriality Decision, 513 B.R. at 232 & n.4.

[62]*Id.* at 232 ("[T]he Court directs that the . . . adversary proceedings be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order").

finding would not be "law of the case" as to an amended complaint containing new allegations.[63]

Nor could the District Court's decision be law of the case as to a separate action with entirely

different facts.

## II.    Legal Standards Governing the Parties' Respective Motions

### A.    Motion to Dismiss Standard

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), made applicable here by Fed. R.

Bankr. P. 7012, the Court "must liberally construe all claims, accept all factual allegations in the

complaint as true, and draw all reasonable inferences" in the Trustee's favor.[64]  To survive the

motion, the pleading must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief."[65]  The allegations need only meet the "plausibility" standard, such

that they "nudge[] the[] claims across the line from conceivable to plausible."[66]  A claim is

facially plausible where the plaintiff pleads "factual content [that] allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."[67]

### B.    Motion for Leave to Amend

The Trustee moved for leave to amend and plead additional facts relevant to, *inter alia*,

the extraterritoriality issue under Fed. R. Civ. P. 15.[68]  That rule states leave to amend should be

---

[63] *Bellezza v. Holland*,  No. 09-cv-8434, 2011 WL 2848141, at *3 (S.D.N.Y. July 12, 2011); *see also Kregler v. City of New York*, 821 F. Supp. 2d 651, 658 (S.D.N.Y. 2011).

[64] *In re J.P. Jeanneret Assocs., Inc*., 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) (citing *Cargo Partner AG v. Albatrans, Inc*., 352 F.3d 41, 44 (2d Cir. 2003)); *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

[65] Fed. R. Civ. P. 8(a)(2).

[66] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

[67] *Iqbal*, 556 U.S. at 678; *see also Anwar*, 728 F. Supp. 2d at 405 (deferring ruling on extraterritoriality at motion to dismiss phase as not ripe until factual record was further developed).

[68] Made applicable to adversary proceedings under Fed. R. Bankr. P. 7015; *see* Trustee's Motion, *supra* text accompanying note 2.

"freely give[n] . . . when justice so requires."[69]  In this Circuit, requests for leave to amend

should be denied only if the amendment would be futile.[70]  Particularly relevant here, the Second

Circuit has explained that leave to amend should be given when a higher court has provided

guidance with respect to the presumption against extraterritoriality.[71]

### III.    The District Court Directed That This Court Analyze the Trustee's Recovery Claims Under *Maxwell I*

The Supreme Court's decision in *Morrison* recently reexamined the longstanding

presumption against extraterritoriality, reiterating that the presumption "rests on the perception

that Congress ordinarily legislates with respect to domestic, not foreign matters."[72]

Consequently, the Supreme Court held that unless Congress affirmatively intends for a statute to

apply extraterritorially, courts "must presume it is primarily concerned with domestic

conditions."[73]  To determine whether a claim implicates the presumption against

extraterritoriality, *Morrison* considers the statute's "focus," *i.e.*, the "transactions that the statute

seeks to regulate."[74]

Applying *Morrison*, the District Court determined the transaction regulated by section

550(a)(2) of the Bankruptcy Code was a "transfer of property to a subsequent transferee."[75]  The

---

[69] Fed. R. Civ. P. 15(a)(2).

[70] *Absolute Activist*, 677 F.3d at 71.

[71] *Id.* (granting defendant leave to amend in light of new guidance set forth by Supreme Court as to pleading domestic transactions in securities); *see also Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 217 (2d Cir. 2014) (remanding to district court to entertain motion to amend).

[72] *Morrison*, 561 U.S. at 255.

[73] *Id*. (quoting *EEOC v. Arabian America Oil Co*. 499 U.S. 244, 248 (1991)).

[74] *Id.* at 266-67 (quoting *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971)).

[75] Extraterritoriality Decision, 513 B.R. at 227. The Trustee respectfully submits that the District Court's holdings in the Extraterritoriality Decision that SIPA and the Bankruptcy Code do not apply extraterritorially and that the focus of section 550(a)(2) of the Bankruptcy Code is on the "transfer" are erroneous.  *See BLI Decision*, 480 B.R. at 513; *see also supra* note 13.  The Trustee is not able to appeal those rulings until an order finally disposing of a proceeding is entered.  Until such time, the Trustee reserves all rights with respect to those rulings.  That the Trustee

*(continued on next page)*

District Court found that the "transfer and component events of the transaction" test set forth in *Maxwell I* must be used to determine whether a subsequent transfer claim involves the domestic or extraterritorial application of the Code and SIPA.[76]  In *Maxwell I*, the court identified all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction underlying the debt that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded.[77]  Although the transfers in *Maxwell I* consisted of funds originating from the United States, there was no other domestic connection. The debtor, the defendants, and all of the component events of the transactions in *Maxwell I* underlying the transfers—the transactions that created the debt the funds were used to repay— were all foreign.  Specifically, U.K. defendants had entered into transactions in the U.K. with the U.K. debtor; the debtor unilaterally chose to pay its debts with funds it transferred from the U.S. In "the absence of any other domestic connection," the *Maxwell I* court found this isolated fact insufficient to characterize the transfers as domestic.[78]

The *Maxwell I* analysis is consistent with post-*Morrison* Second Circuit precedent that evaluates connections among the parties, their transactions, and key events[79] related to the United

---

does not seek to re-litigate those issues here is not an admission that such rulings are correct and is not a waiver of those issues on appeal.

[76] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 817).

[77] *Maxwell I*, 186 B.R. at 816-17.

[78] *Id.* at 817.

[79] *See*, *e.g.*, *Parkcentral*, 763 F.3d at 207 ("Inasmuch as this appeal involves the applicability of the securities laws to claims involving foreign elements, the location of certain key events, entities, and instruments is essential to our analysis").

States to determine whether a claim is "sufficiently domestic" and constitutes a domestic

application of a statute.[80]  These precedents endorse a holistic factual review and caution against

an overly narrow or perfunctory extraterritoriality inquiry.[81]

## IV.    The District Court Did Not Hold That Foreign Citizenship Alone Precludes Application of SIPA and the Bankruptcy Code to Defendants

Defendants seek dismissal under the District Court's decision, claiming that the transfers

were "made outside the United States," purportedly between foreign citizens or entities

organized under the laws of a foreign jurisdiction.[82]  Defendants contend that "[w]hen Judge

Rakoff stated that a transferor and transferee 'reside' outside the United States, he *meant* a

transferor or transferee that was a business entity was organized under the laws of a foreign

jurisdiction."[83]

---

[80] *Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014) ("An evaluation of the presumption's [against extraterritoriality] application to a particular case is essentially an inquiry into whether the domestic contacts are sufficient to avoid triggering the presumption at all"); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014) (finding complaint alleged "sufficient domestic conduct" after review of facts relevant to extraterritoriality); *Reich v. Lopez*, 38 F. Supp. 3d 436, 448 (S.D.N.Y. 2014) (holding allegations "are sufficient to render the underlying conduct 'domestic' enough to be actionable under RICO"); *see also Morrison*, 561 U.S. at 281 ("the real question in this case is how much, and what kinds of, domestic contacts are sufficient to trigger application of § 10(b)") (Stevens, J. & Ginsburg, J., concurring in judgment but disagreeing with test adopted by majority).

[81] *See Mastafa*, 770 F.3d at 187 ("as instructed by the Supreme Court, the lower federal courts must proceed with caution when determining whether a particular case alleges conduct that is sufficiently 'domestic,' such that the presumption is 'displaced' (*i.e.*, does not apply)"); *Parkcentral*, 763 F.3d at 217 ("We do not purport to proffer a test that will reliably determine when a particular invocation of § 10(b) will be deemed appropriately domestic or impermissibly extraterritorial.  We believe courts must carefully make their way with careful attention to the facts of each case and to combinations of facts that have proved determinative in prior cases, so as eventually to develop a reasonable and consistent governing body of law on this elusive question"); *see also Gitlin v. Barclays Bank (In re Maxwell Commc'n Corp.)*, 170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994) ("Not every transaction that has a foreign element represents an extraterritorial application of our laws.  The court must look at the facts of a case to determine whether they have a center of gravity outside the United States"); *SEC v. ICP Asset Mgmt., LLC*, No. 10-cv-4791 (LAK), 2012 WL 2359830, at *3 (S.D.N.Y. June 21, 2012) (denying motion for summary judgment based on extraterritoriality in finding sufficient evidence that conduct serving as basis for claim was domestic and not foreign).

[82] Defs. Br. at 11.  Notably, as discussed *infra*, many of the transfers were in fact sent from and/or received in the United States.  The physical location of the transfers is, like the location of the transferee and transferor, only a part of the relevant component events analysis.

[83] Defs. Br. at 11-12 (emphasis in original).

Putting aside Defendants' characterization of what Judge Rakoff "meant," his decision referred literally to residence, not citizenship or place of incorporation.[84]  It is well established that persons or entities can reside in multiple places—as is the case of the transferor Feeder Funds and transferee Defendants here.  More fundamentally, applying a strict "citizenship" test would contravene the District Court's direction to this Court to apply *Maxwell I*, which requires analysis of "the location of the transfers as well as the component events of those transactions,"[85] as well as other Second Circuit precedent that rejects the notion that the extraterritoriality inquiry can be reduced to a single factor.[86]  In fact, *Maxwell I* specifically rejected that a single-factor approach, such as the geographic location of the transfer, would be sufficient to deem the events as extraterritorial.[87]

Analyzing citizenship and place of incorporation alone would lead to the preposterous conclusion that foreign citizens are not subject to United States law, regardless of where their conduct occurs and what their conduct impacts.  The Trustee's proffered allegations and amended complaints specifically allege facts showing that many of the transfers never flowed to the jurisdictions where the Feeder Funds were registered or where Defendants were citizens.[88]  Clearly, citizenship has no connection to such transfers.

---

[84] Extraterritoriality Decision, 513 B.R. at 232 n.4.

[85] *Id.* at 227.

[86] *Parkcentral*, 763 F.3d at 215; *Mastafa v. Chevron Corp.*, 770 F.3d at 188; *see also Absolute Activist*, 677 F.3d at 69 (a "party's residency or citizenship is irrelevant to the location of a given transaction"); *Maxwell I*, 186 B.R. at 816; Extraterritoriality Decision, 513 B.R. at 232 n.4 (even if both parties reside abroad, the Trustee's claims survive if they sufficiently allege "facts suggesting a domestic transfer").

[87] *Maxwell I*, 186 B.R. at 816-17 ("The fact that funds were electronically transferred to accounts in England is not, standing alone, sufficient to characterize the events as extraterritorial.  A more appropriate analysis of the relevant conduct under § 547 is to consider all component events of the transfers"); *see also Parkcentral*, 763 F.3d at 215 (cautioning lower courts about the problems of narrowly "treating the location of the transaction as the definitive factor in the extraterritoriality inquiry").

[88] For example, although Fairfield Sentry was organized under the laws of the BVI, none of its investors' subscriptions or redemptions flowed through the BVI.  Investors wired funds to Fairfield's account at Citco Bank in

*(continued on next page)*

Notably, Defendants cannot even agree among themselves whether citizenship is dispositive of the extraterritoriality inquiry.  Several Defendants are United States citizens and transfers to them would be indisputably domestic under a strict citizenship test.[89]  Unsurprisingly, the United States citizens abandon the citizenship test and rely instead on their residence outside the United States at the time of the subsequent transfers.  Thus, while Defendants claim to set forth a bright-line citizenship test,[90] the fact that they ignore it when it suits them further demonstrates that the Court must indeed consider more than just citizenship.

Defendants' argument that the District Court arrived at a single-factor test after "rejecting" four other facts raised "either singly or in combination,"[91] in the Trustee's complaint against Caceis is false.  According to Defendants, the District Court considered certain facts alleged against Caceis to be insufficient to rebut the extraterritoriality presumption.[92]  Two of the Caceis allegations pointed out by Defendants—the presence of a foreign affiliate and sending investment-related documents to New York—were not even mentioned in the District Court's decision, much less analyzed.  Defendants claim that a third fact alleged against Caceis—consent to United States jurisdiction—was supposedly rejected by the District Court.  In fact, the District Court found just the opposite, noting that such an allegation would be relevant to an

---

Ireland and those funds were then wired to BLMIS's JP Morgan Chase account in New York.  At all times, Fairfield Sentry's bank accounts were controlled by Fairfield from its New York headquarters.  Likewise, Tremont's Feeder Funds were registered in the Cayman Islands, but the investments directed to BLMIS never flowed through the Caymans.  Its bank accounts were at all times controlled by Tremont from its New York headquarters.  *See* Section V.A.1. *infra*.

[89] *See* Fairfield Compl. ¶¶ 347, 354, 370, 380, 392; *see also* Exhibit 2, 2-A Column 18.

[90] Defs. Br. at 11 ("every single transfer that is the subject of this motion was made by an entity organized under the laws of a foreign jurisdiction or an individual who was a citizen of a foreign country").

[91] The four allegations referenced in the Defendants' brief as presumptively insufficient include: (i) transferring funds through a correspondent bank in the United States; (ii) consent to jurisdiction in New York; (iii) sending subscription agreement and wiring investment funds to New York; and (iv) an affiliate with an office in New York. *Id.* at 13.

[92] *Id.* at 13-14.

extraterritoriality analysis but mistakenly indicating that such an allegation was absent in

*Caceis*.[93]   Finally, as to the fourth fact—use of a correspondent bank account—Defendants

misconstrue the District Court's decision.  The District Court found that such an account

standing alone would not suffice to make a transaction domestic.[94]   However, use of a

correspondent bank account may be considered with other component events surrounding the

transfers as a relevant factor, especially in pleadings focused on a pattern of frequent and

necessary use of United States banks in connection with the transfers.[95]

In sum, the District Court's reference to a few illustrative facts from one complaint does

not even begin to address the different facts and component events of the transfers in the cases

before this Court.  The single-factor test fabricated by Defendants is not supported by any

precedent, including the Extraterritoriality Decision, and its use should be rejected by this Court.

## V.   The Component Events of the Transfers to Defendants Are Not Purely Foreign; To the Contrary, They Are Predominantly Domestic

The Trustee's claims here involve predominantly domestic elements.  The plaintiff is a

domestic SIPA trustee seeking to recover fraudulent transfers made by a United States broker-

dealer debtor to initial transferee Feeder Funds.  The Feeder Funds' business was investing all or

nearly all of their assets in the United States securities market through BLMIS.  The

---

[93] *See* Extraterritoriality Decision, 513 B.R. at 232 ("Without any agreement to the contrary (which the Trustee does not suggest exists), investors in these foreign funds had no reason to expect that U.S. law would apply to their relationships with the feeder funds").  The District Court overlooked the Trustee's specific allegation that Caceis submitted to New York jurisdiction.  *See* Complaint ¶ 1, *Picard v. Caceis Bank Luxembourg*, No. 11-02758 (Bankr. S.D.N.Y. Oct. 6, 2011), ECF No. 1 (defendants "entered, or caused their agent to enter, into subscription agreements with Fairfield Sentry under which they submitted to New York jurisdiction").

[94] Extraterritoriality Decision, 513 B.R. at 228 (citing *Cedeno v. Intech Grp. Inc.*, 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010)) (finding impermissible extraterritorial application of RICO statute where "[t]he scheme's contacts with the United States, however, were limited to the movement of funds into and out of U.S.-based bank accounts" not owned by the defendant).

[95] *Cf., Picard v. Estate (Succession) of Igoin*, 525 B.R. 871, 886 (Bankr. S.D.N.Y. 2015); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170-71(2d Cir. 2013); *Steinberg v. Barclay's Nominees (Branches) Ltd.*, No. 04-60897-cv, 2008 WL 4601042, at *5-6 (S.D. Fla. Sept. 30, 2008).

Management and Service Provider Defendants received their subsequent transfers in fees and

performance incentives for managing the Feeder Funds' investment activities with BLMIS. The

Shareholder Defendants specifically sought out Feeder Funds that invested with BLMIS and

were informed that their money would be exclusively invested in the United States securities

markets by BLMIS. Defendants received their subsequent transfers because of substantial and

targeted conduct occurring in the United States. These facts demonstrate that the component

events of the transactions leading to Defendants' receipt of subsequent transfers are not purely

foreign but are in fact sufficiently domestic.

A.     **Under Any Test, Even One Based Purely on Location of the Parties,
       Defendants Who Received Transfers from Tremont and Fairfield Did Not
       Receive Purely Foreign Transfers**

A majority of Defendants seeking dismissal received transfers from Fairfield and

Tremont, Feeder Funds that were operating almost entirely in New York. Defendants who

received transfers from Fairfield or Tremont cannot obtain a dismissal of the Trustee's claims on

the basis of extraterritoriality because Tremont and Fairfield are New York residents and the

relevant component events of the transactions under the *Maxwell I* test are domestic.

1.     **Tremont and Fairfield Operated in New York**

Both Fairfield and Tremont comprise a group of related funds that had their principal

place of business in New York and were managed from their respective New York headquarters.

Fairfield was comprised of a New York partnership that was originally formed by U.S.

citizens and residents Walter Noel and Jeffrey Tucker, and included funds of funds and various

management and administrative entities also formed by Walter Noel and Jeffrey Tucker.[96]

Through these entities, Noel and Tucker formed, managed, and operated three BLMIS Feeder

---

[96] Fairfield Compl. ¶¶ 33-36.

Funds: Fairfield Sentry Limited ("Fairfield Sentry"), Greenwich Sentry, L.P., and Greenwich

Sentry Partners, L.P.   They also formed Fairfield Sigma Limited and Fairfield Lambda Limited,

two currency funds that accepted investments in Euros and Swiss Francs, respectively, and then

invested all their assets in Fairfield Sentry (collectively, the "Fairfield Funds").[97]  Although

Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda were incorporated in the British Virgin

Islands ("BVI"), their only BVI presence was a registered office consisting of a post office box.

The remaining Fairfield Funds were incorporated in Delaware.[98]

The Fairfield Funds had no employees; they were operated and managed by Fairfield

personnel working at Fairfield's New York offices.  Fairfield managed the Fairfield Funds by: (i)

transferring monies between the Fairfield Funds and BLMIS; (ii) monitoring Fairfield Sentry's

BLMIS investments; (iii) dealing directly with BLMIS and its employees; (iv) regularly

communicating with clients and marketing the Fairfield Funds; and (v) approving Fairfield

Funds' subscriptions and coordinating redemptions; (vi) maintaining Fairfield Funds' books and

records at Fairfield's New York headquarters; and (vii) controlling third party administrator back

office service providers and corresponding bank accounts.[99]

For instance, Fairfield Sentry's account opening documents with BLMIS were executed

by Fairfield's New York personnel and list Fairfield's New York address.[100]  Fairfield's New

---

[97] *See* Fairfield Compl. ¶¶ 197-237.  The Fairfield Funds at issue on this motion are Fairfield Sentry, Fairfield Sigma, Fairfield Lambda.

[98] The Fairfield Funds' BVI statutorily required registered address for Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda was a post office box, care of a local trust company owned and operated by a local law firm. *Id.* ¶¶ 198, 227. The other two Fairfield Funds, Greenwich Sentry and Greenwich Sentry Partners, were incorporated in Delaware.  *Id.* ¶¶ 216, 220.

[99] *Id.* ¶¶ 197-211, 224-33.

[100] *Id.* ¶¶ 43, 200, 446.  Between 1998 and 2008, Fairfield listed its New York address in connection with Fairfield Sentry's BLMIS account opening documents. Prior to 1998, Fairfield listed its Greenwich, Connecticut address.  *Id.* ¶¶ 43, 200.

York personnel directed BLMIS to mail all of the Fairfield Funds' account statements and account related communications to Fairfield's New York City headquarters.[101]  Finally, the Fairfield Funds' subscription agreements required shareholders to submit to New York choice of law and venue provisions.[102]

Tremont was comprised of domestic corporations that formed, managed, and operated three Delaware-registered BLMIS Feeder Funds and three Cayman-registered BLMIS Feeder Funds.[103]  None of Tremont's Cayman funds were permitted to solicit Cayman investors because they were "exempted companies" under Cayman Islands Companies Law.[104]  Their Cayman "offices" either consisted of a post office box or the address of an international law firm.[105] Although Tremont at one point did have an office with two administrative employees and two bank accounts in Bermuda, each was closed in 2006, at which point Tremont opened two new bank accounts with the Bank of New York, where the Tremont funds' other accounts were located.[106]  Aside from that, the Tremont Funds—both those incorporated in the United States and those incorporated overseas—were jointly operated from Tremont's headquarters in Rye, New York.[107]

---

[101] *Id.* ¶¶ 43, 200, 446.

[102] *Id.* ¶¶ 207, 232.

[103] *See* HSBC Compl. ¶ 388; BNP Proffer ¶ 1.  Tremont did operate other funds, but this subset only includes the funds for which the Trustee is currently seeking recovery from subsequent transferees.  The Tremont offshore funds at issue on this motion are: (i) Rye Select Broad Market Portfolio Limited; (ii) Rye Select Broad Market Insurance Portfolio LDC; and (iii) Rye Select Broad Market Portfolio Limited XL. *See* Scheduling Order, ECF No. 8800, Exs. A, B.

[104] *Id.* ¶ 394.

[105] *Id.* ¶ 392.

[106] BNP Proffer ¶¶ 73, 78-81.

[107] HSBC Compl. ¶ 392; BNP Proffer ¶¶ 68-81.

Specifically, Tremont personnel in New York undertook the following actions on behalf of the Tremont Funds: (i) transferring monies between the Tremont Funds and BLMIS; (ii) monitoring the Tremont Funds' BLMIS investments; (iii) dealing directly with BLMIS and its employees; (iv) regularly communicating with clients and marketing the Tremont Funds (v) approving all Tremont Funds' subscriptions and redemptions; (vi) executing account opening documents at BLMIS; and (vii) controlling Tremont funds' bank accounts, which at most relevant times were in the United States.[108]

Given the substantial investment that occurred in New York, activities related to those investments, and the absence of any meaningful activity in any other jurisdiction, the principal place of business and residence for the Tremont and Fairfield Funds is New York.[109] The Fairfield and Tremont Funds were not engaged in purely foreign activity and any transfers received from those Fairfield and Tremont Funds are not purely foreign. To the contrary, the Tremont and Fairfield Funds are domestic residents that conduct their business in this jurisdiction and conduct no meaningful business elsewhere. Thus, recovery by the Trustee of transfers made to Defendants by Fairfield and Tremont does not implicate the presumption against extraterritoriality.[110]

---

[108] HSBC Compl. ¶¶ 392, 395-98, 401, 405; *see also* BNP Proffer ¶¶ 68-81.

[109] In diversity jurisdiction, a business has its principal place of business where its "nerve center" is located. *Hertz Corp. v. Friend*, 559 U.S. 77 (2010). New York is the nerve center for the Fairfield and Tremont Funds because all centralized decision-making occurred here.

[110] The District Court's opinion considered only whether the Trustee could recover a transfer made from a foreign transferor to a foreign transferee. Extraterritoriality Decision, 513 B.R. at 225. It did not rule upon whether transfers from parties like Fairfield and Tremont whose principal place of business was New York implicate extraterritoriality. Either way, the recovery of transfers made by Fairfield and Tremont is permissible.

**2.    Under *Maxwell I*, Recovery Claims of Transfers From Fairfield and Tremont are Sufficiently Domestic to Apply U.S. Law**

The Trustee's recovery claims against subsequent transferees of the Fairfield and Tremont Funds also meet the legally operative test, the "component events" test enunciated in *Maxwell I* and adopted by the District Court.   The *Maxwell I* court did not, as Defendants urge here, limit its inquiry to the physical location of the transfers or the transferring parties.  Instead, it analyzed the component events of the transactions underlying the transfers at issue.  As discussed above, the trustee's claims in that case related to U.K. transactions between a U.K. debtor and defendant banks in the U.K. and France.  The agreements and relationships underlying the transfers at issue in *Maxwell I* were governed by U.K. law; the preference claim arose from the U.K. debtor's overdrafts on its accounts with English banks governed by English law, which the debtor repaid by transferring funds to accounts in England.[111]  In contrast to all of these factors, the *Maxwell I* court noted, "the only possible U.S. connections" to the parties' transactions was the isolated fact that U.K. debtor unilaterally chose to transfer funds stemming from the United States in order to pay those debts.  The court viewed that fact as completely incidental and fortuitous to the relationship between the debtor and defendants.  In "the absence of any other domestic connection," that fact alone was insufficient to characterize the transfer between the parties as domestic.[112]

Applied here, the *Maxwell I* analysis leads to precisely the opposite result.  This plaintiff is a SIPA trustee appointed under United States law, seeking to recover fraudulent transfers

---

[111] *Maxwell I*, 186 B.R. at 817.

[112] *Id.*

made by a United States broker-dealer.[113]  The Fairfield and Tremont Funds are initial transferees

that have their principal places of business in New York, directed the BLMIS transfers from New

York, and filed SIPA claims in New York.  The Defendants that received subsequent transfers

from Fairfield and Tremont affirmatively placed the United States at the center of their

transactions.  The Management and Service Provider Defendants received transfers that arose

from their conduct in directing and facilitating Tremont and Fairfield's investments with BLMIS.

The Shareholder Defendants received transfers that arose from their investments in Tremont and

Fairfield.  The factual proffers or pending complaints show that the component events and

transactions as they relate to subsequent transfers from Fairfield and Tremont were domestic.

The Trustee's recovery claims of subsequent transfers made by Fairfield and Tremont, therefore,

are not purely foreign, and the presumption against extraterritoriality does not bar the Trustee's

claims.[114]

### B.    Transfers To Defendants From Feeder Funds Other Than Tremont and Fairfield Are Not Purely Foreign, But Rather Are Predominantly Domestic

As set forth in the accompanying chart,[115] this Motion also involves several other initial

transferee Feeder Funds that, unlike the Fairfield and Tremont Funds, did not necessarily

maintain a physical location in the United States.[116]  But physical location of the parties is only

---

[113] Courts have not yet addressed whether the presumption against extraterritoriality applies to a United States trustee of a United States debtor.  *Gitlin*, 170 B.R. at 808 n.13 ("Much as I would relish the opportunity to address whether a debtor which is a U.S. entity could use section 547 to recover a preference made to a foreign creditor, I think it is best to refrain from such dicta. . . . To be clear, I do not hold today that no debtor may pursue a transfer overseas.  What I do hold is that where a foreign debtor makes a preferential transfer to a foreign transferee and the center of gravity of that transfer is overseas, the presumption against extraterritoriality prevents utilization of section 547 to avoid the transfer").

[114] *See* Extraterritoriality Decision, 513 B.R. at 232; *Maxwell I*, 186 B.R. at 817.

[115] *See* Exhibit 2.

[116] While some Feeder Funds did not have physical operations or employees in the United States, other Feeder Funds did in fact operate in large part from the United States.  For example, BLMIS Feeder Funds created at the direction of Access International Advisors ("Access"), were incorporated abroad but operated in large part from

*(continued on next page)*

one of the component events that formed the transactions underlying the transfers at issue.  And

as to those transactions, the Feeder Funds operated domestically through BLMIS: they

authorized BLMIS to carry out their main, and in some cases, sole purpose of investing in a

strategy involving United States securities.  In addition to other specific facts alleged in the

various complaints and proffers, BLMIS acted as the investment adviser, prime broker, and sub-

custodian for these Feeder Funds.

Whether they transacted business with the Feeder Funds as Management, Service

Providers, or Shareholders, Defendants understood that BLMIS was the ultimate investment

adviser, custodian, and U.S.-regulated broker-dealer responsible for the Feeder Funds'

investments, and that BLMIS purported to transact exclusively in the United States securities

markets.[117]  By actively seeking out and facilitating investment with BLMIS in the United States,

Defendants' own conduct placed the United States at the center of their transactions regardless of

where the Feeder Funds were formed, rendering the conduct and transfers at issue domestic.

### 1.    Transfers to Management and Service Defendants

The Management and Service Provider Defendants were inseparable from the Feeder

Funds when it came to the business relationship with BLMIS.  These Defendants had a hand in

---

New York.  In conjunction with UBS AG and its subsidiaries, Access operated and controlled Luxalpha SICAV and Groupement Financier Ltd. from its headquarters in New York.  Access was founded and controlled by two principals, one who resided in New York and the other who kept an office in New York and travelled to New York to meet regularly with Madoff.  UBS Compl. ¶¶ 87-111, 127-45.  Similarly, Harley International (Cayman) Ltd. ("Harley"), created by New York resident, Charles Fix, was a BLMIS Feeder Fund incorporated in the Cayman Islands.  Harley was managed by Fix Asset Management Services Inc. ("FAM") a company incorporated under New York law, headquartered in New York, and whose CEO was Fix's New York-based daughter.  Charles Fix owned FAM and all the voting shares of Harley. *See, e.g.,* BNP Proffer ¶¶ 34-47; Proffered Allegations ¶¶ 11-12, 53-74, *Picard v. Nomura Int'l PLC*, No. 11-02759 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) ("Nomura Proffer").

[117] *See* Exhibit 2, at 2-A; *cf. Hodgson v. Man Financial, Inc.*, Civ. No. 06-1944, 2006 WL 3791341, at *5 (E.D. Pa. Dec. 22, 2006) (denying motion to dismiss for lack of personal jurisdiction where Cayman directors of fund incorporated in the Cayman Islands was headquartered in Pennsylvania, and the fund's investment strategy was run out of Pennsylvania by Pennsylvania investment manager, to whom the fund had given broad authority to direct its trading activities).

creating the non-United States-based Feeder Funds; they promoted the Feeder Funds'

investments with BLMIS to the Shareholder Defendants; they nurtured, protected, and thus

prolonged the Feeder Funds' relationships with BLMIS; and they used as much or as little of the

skills and expertise for which they were engaged as necessary to maintain the status quo with

Madoff and BLMIS.[118]  The Management and Service Provider Defendants were sophisticated

agents of the Feeder Funds, who could not operate solely abroad and facilitate purely foreign

transfers when the Feeder Funds' entire business revolved around BLMIS in New York.

As with the transfers from Fairfield and Tremont, an analysis under *Maxwell I*

demonstrates that the transactions underlying the transfers here were predominantly domestic.  In

contrast to *Maxwell I*, these were not foreign entities transacting business abroad with a foreign

debtor that happened to use domestic funds to repay the debts arising from those foreign

transactions.  These entities conducted business through and in some cases directly with BLMIS,

for the express purpose of profiting from the purported sales of United States securities.  The

Management Defendants, among other things, executed (or caused to be executed) agreements

with BLMIS authorizing BLMIS to operate for them by purportedly transacting United States

securities in New York, conducted due diligence on BLMIS in New York, marketed BLMIS's

purported returns—and in many cases, BLMIS itself—in order to attract potential investors, and

directed transfers of capital in and out of BLMIS in New York.

Similarly, the Service Provider Defendants received transfers of BLMIS customer

property in order to carry out the tasks necessary to grow and sustain the Feeder Funds' business

with BLMIS in the United States.  The Service Provider Defendants understood that BLMIS's

---

[118] *See, e.g.,* Proffered Allegations as to Inter Investissments S.A. ¶¶ 6-32, *Picard v. Oreades Sicav*, No. 10-5120 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); UBS Compl. ¶¶ 87-111, 151-83; HSBC Compl. ¶¶ 37, 39, 54, 56-57, 59, 64, 80, 82, 104, 163-64.

investment strategy involved trading exclusively in United States securities listed on United

States exchanges, in United States dollars, necessitating a course of dealing with New York

banks.  These Defendants received fees dependent on the value of the Feeder Funds' assets in the

custody of BLMIS in New York, which were in many cases calculated based on their review and

analysis of BLMIS customer statements and trade confirmations reflecting purported United

States securities trades.  Having engaged in transactions in the United States in order to receive

transfers of BLMIS customer property, these Defendants cannot now claim that these transfers

were not domestic.  *Morrison*, *Maxwell I*, and the District Court's decision all preclude this

result.

### 2.    Transfers to Shareholder Defendants

While most Shareholder Defendants invested in the Fairfield and Tremont Funds, some

invested through other Feeder Funds.[119]  This distinction is largely irrelevant because every

Feeder Fund offered the same access to Madoff, BLMIS, and the United States securities

markets.  All the Shareholder Defendants knew and intended their investments to be sent to New

York and that their redemptions emanated from New York.[120]

In those instances where a Shareholder Defendant invested in more than one Feeder

Fund—including in many instances Fairfield or Tremont—the decision regarding whether and

how much to invest in the separate funds was not tied to where the Feeder Funds were

incorporated or where the Feeder Funds' management were located.  The only relevant inquiry

was ensuring that—no matter the specific vehicle or fund—they could ultimately transact and

---

[119] *See* Exhibit 2.

[120] *See* Exhibit 2; *see, e.g.,* BNP Proffer ¶¶ 14-16, 58-59, 82-92, 106-111, 144-46, 159-63, 177-82 (alleging that Defendants knew that their investments in Harley, Oreades, the Fairfield Funds, the Tremont Funds, Equity Portfolio, and the Kingate Funds were invested with BLMIS in New York and that redemptions from these funds originated from BLMIS in New York).

invest with BLMIS in United States and profit from Madoff's purported investment in the United

States securities markets.  Shareholder Defendants aggregated information received from

numerous Feeder Funds,[121] using this information to determine their overall limits on their

respective Madoff exposure or "Madoff risk."[122]  In many instances, Shareholder Defendants

invested in multiple Feeder Funds because their appetite for Madoff investment was greater than

what a single Feeder Fund could accommodate.[123]  As Judge Lifland concluded in a prior matter,

"[t]he movement of money to and from BLMIS in the United States . . . was not fortuitous or

incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement

between" the Feeder Fund investor and the Feeder Fund.[124]

At a minimum, the Trustee has alleged sufficient facts to plausibly show that the transfers

received by Defendants were domestic.[125]  The transactions were not purely foreign because they

---

[121] *See, e.g.*, Nat'l Bank of Kuwait Proffer ¶ 18-22 (reviewing no fewer than seven Feeder Funds and preparing a report titled, "Hedge Funds linked to the managed accounts with Bernard L. Madoff LLC, NY" prior to investing in Fairfield Sentry).

[122] *See, e.g.*, Natixis Proffer ¶¶ 40-43 (aggregating total Madoff exposure and revealing a $300 million Madoff limit for all investments by Natixis FP); Proffered Allegations ¶¶ 17-20, *Picard v. ABN Amro Bank N.V. (p/k/a The Royal Bank of Scotland, N.V.)*, 11-02760 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015) (transactions with BLMIS Feeder Funds referred to as "undertaking Madoff risk," and overall internal BLMIS limit, regardless of BLMIS Feeder Fund, designated as "madoff capacity"); Proffered Allegations ¶¶ 60-64, *Picard v. ABN Amro Bank N.V. (p/k/a The Royal Bank of Scotland, N.V.)*, 10-05354 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015); Proffered Allegations ¶¶ 54-60, *Picard v. ABN AMRO Bank (Ireland) Ltd.*, No. 10-05355 (SMB) (Bankr. S.D.N.Y. dated June 26, 2015).

[123] Koch Proffer ¶ 6, 13 (when defendant was denied capacity in one of the Delaware-registered Fairfield Funds, it instead used a U.K. affiliate to invest in Fairfield Sentry, which had investment capacity, but prohibited investment by U.S.-incorporated entities); *see also* Nat'l Bank of Kuwait Proffer ¶ 22 (internal emails discuss replacing Fairfield Sentry with "another equivalent product" when Fairfield was only able to accept half the desired investment).

[124] BLI Decision, 480 B.R. at 513.

[125] *See In re Kingate Mgmt. Ltd.*, 784 F.3d at 142 (determining transfers from the Kingate Funds were made in connection with the purchase or sale of a covered security—one listed on a U.S. exchange or issued by a U.S. registered investment company—because shareholders purposefully invested their assets with the Kingate Funds with the understanding that BLMIS used those to purchase shares of common stock traded on national exchanges); *see also SEC v. Compania Internacional Financiera S.A.*, No. 11-cv-04904 (DLC), 2011 WL 3251813, at *6 (S.D.N.Y. July 29, 2011) (U.S. law applies to overseas purchase of investment product because product was linked to U.S.-traded securities, explaining "*Morrison* . . . never states that a defendant must itself trade in securities listed on domestic exchanges or engage in other domestic transactions").

have numerous domestic components.  The fact that the transferred funds stemmed from BLMIS

was in no way an incidental result of an otherwise foreign transaction, as in *Maxwell I*.  Nor are

the transactions at issue in this case similar to the "foreign-cubed" scenario in *Morrison*, where

the plaintiff, defendants, and cause of action all took place abroad.[126]  In these circumstances, the

presumption against extraterritoriality does not bar the Trustee's claims, and recovery of the

transfers to Defendants under SIPA and the Bankruptcy Code is appropriate.  There is thus no

basis for Defendants' request to dismiss the Trustee's claims as facially insufficient, and their

motion should be denied in its entirety.

## VI.    Defendants Fail to Meet their Burden of Establishing that Comity Precludes the Trustee's Recovery of the Transfers at Issue

Determining that the Trustee had not rebutted "the presumption against extraterritorial

application of federal statutes," the District Court alternatively reasoned that even if Congress

had intended such application, concerns of international comity would also preclude the

Trustee's use of section 550(a) to recover *foreign* transfers.[127]  This alternative holding is not

determinative of the question as to whether the transfers are, in fact, foreign.  Thus, if this Court

determines after analyzing the component events and transactions that the transfers are not

foreign but sufficiently domestic to apply United States law, then the District Court's alternative

rationale of comity is not implicated.

In any event, comity is an affirmative defense dependent on the specific facts present in

each case.[128]  Defendants did not seek to withdraw the reference as to comity; the parties did not

---

[126] *See Morrison*, 561 U.S. at 273 ("This case involves no securities listed on a domestic exchange, and all aspects of the purchased complained of by those petitions who still have live claims occurred outside the United States").

[127] Extraterritoriality Decision, 513 B.R. at 231.

[128] *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) (citing *Drexel Burnham Lambert Group, Inc. v. Galadari*, 777 F.2d 877, 880 (2d Cir. 1985)).

previously litigate the issue; and the District Court did not decide the issue beyond its potential

application to purely foreign subsequent transfers.  Aside from liberally quoting the District

Court's comity discussion, Defendants have made no showing under the Second Circuit's multi-

factor comity analysis as to why this Court should abstain.

In conducting a comity analysis, courts in this Circuit apply a two-part test requiring a

defendant to show that: (i) parallel proceedings in the United States and overseas constitute "a

true conflict between American law and that of a foreign jurisdiction"[129] and (ii) "the specific

facts . . . are sufficiently *exceptional* to justify abstention" to "outweigh the district court's

general obligation to exercise its jurisdiction."[130]  Defendants do not address either factor.

Instead, they baldly assert that the District Court "held that all the claims should be dismissed

based on the grounds of comity" because of the "*likelihood that such claims would interfere* with

[unspecified] foreign insolvency proceedings."[131]  This assertion misconstrues the District

Court's decision and falls well short of satisfying the Second Circuit's two-part test for comity.

## A.    No Parallel Proceeding With Substantially Similar Parties and Issues Exists

To prevail on the basis of comity, Defendants must show that "substantially the same

[parties are] litigating substantially the same issues" simultaneously in the United States and

overseas.[132]  Defendants have not made, and never could make, this requisite showing, because

BLMIS is not subject to parallel liquidation proceedings in any other court, and the Trustee's

---

[129] *See In re Maxwell Commc'n Corp.* ("*Maxwell II*"), 93 F.3d 1036, 1049 (2d Cir. 1996) (citing *Hartford Fire Ins. v. California*, 509 U.S. 764, 798 (1993)); *Société Nationale Industrielle Aerospatiale v. U.S. Dist. Ct.*, 482 U.S. 522, 555 (1987) (Blackmun, J., dissenting) (existence of a true conflict is a "threshold question").

[130] *Royal and Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94-95 (2d Cir. 2006).

[131] Defs. Br. at 15 (emphasis added).

[132] *Royal and Sun Alliance*, 466 F.3d at 94; *see also Ace Arts, LLC v. Sony/ATV Music Pub., LLC*,  56 F. Supp. 3d 436, 445 (S.D.N.Y. 2014) (actions involving one common party and one common claim insufficiently parallel to warrant abstention); *Tarazi v. Truehope, Inc.*, 958 F. Supp. 2d 428, 435 (S.D.N.Y. 2013).

actions are not parallel to any foreign liquidation proceedings.[133]  Though some Defendants state

they are involved in liquidation proceedings abroad,[134] this presents no actual conflict. The

foreign liquidations referenced by Defendants are not parallel proceedings to the Trustee's

domestic recovery actions; they are third-party actions to which the Trustee is not a party and in

which the Trustee did not participate, and the outcome of which will not resolve the Trustee's

claims.  Thus, any foreign liquidation proceedings and the subsequent transfer actions before this

Court do not involve the same parties or issues.  Nor have Defendants shown that section 550(a)

conflicts with the laws of any country where foreign liquidations are pending.

    Defendants' argument that comity bars the Trustee's claims even in the absence of a

foreign proceeding representing a true conflict rings hollow in the face of Second Circuit

precedent cited in the Extraterritoriality Decision, which requires identification of a specific

parallel proceeding presenting a true conflict with Defendants' own actions before abstention on

comity grounds would be appropriate.[135]  The District Court decision explicitly acknowledges

this precedent with its reference to *Maxwell II*, which considers the existence of a true conflict in

parallel proceedings to be a threshold issue on comity.[136]  Because no parallel proceedings exist

here, then *a fortiori* no "true" conflict can exist either.

---

[133] Judge Lifland rejected comity for this exact reason in an earlier BLMIS subsequent transferee recovery action
because, as a threshold matter, "BLMIS is not subject to parallel liquidation proceedings in another court."  BLI
Decision, 480 B.R. at 523; *see also In re Gucci*, 309 B.R. 679, 684 (Bankr. S.D.N.Y. 2004) ("this case is a far
weaker one for abstention, as there is no parallel proceeding").

[134] Defendants identify sixteen entities that are in foreign liquidation proceedings.  *See* Defs. Br. at 15.

[135] *Maxwell II*, 93 F.3d at 1049 (citing Supreme Court opinion concerning this "threshold" issue, "[i]nternational
comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction").

[136] *See id.*; Extraterritoriality Decision, 513 B.R. at 231.

**B.    Defendants Have Identified No Exceptional Circumstances to Support the Application of Comity, and None Exists**

Even if Defendants could prove that a parallel proceeding posed a true conflict with United States law in each of the Trustee's recovery proceedings, Defendants would have to show that exceptional circumstances exist.[137]  Courts do not defer to a foreign jurisdiction based on circumstances that routinely exist in a parallel litigation.[138]

To evaluate whether "exceptional circumstances" are present, the Second Circuit reviews: (i) adequacy of the alternate forum; (ii) potential prejudice to either party; (iii) the convenience of the parties; (iv) the connection between the litigation and the United States; and (v) the connection between the litigation and the foreign jurisdiction.[139]  No one factor is determinative; instead, the court's ultimate determination is based upon the "totality of the circumstances."[140]

No exceptional circumstances are present here.  Concerning "potential prejudice to and convenience of the parties," the Trustee is not a party to foreign liquidation proceedings, and such proceedings do not implicate the BLMIS estate.  Considering "the connection between the litigation and the United States and with the foreign jurisdictions," this Court has noted that the United States "has a strong interest in applying the fraudulent transfer provisions of the

---

[137]*Royal and Sun Alliance*, 466 F.3d at 93 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25-26 (1993).

[138] *Royal and Sun Alliance*, 466 F.3d at 92 ("parallel proceedings in the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other").

[139] *Id.* at 94; *see also Lauritzen v. Larsen,* 345 U.S. 571, 582 (1953); *Maxwell II*, 93 F.3d at 1048; *Ace Arts*, 56 F. Supp. 3d at 444-45.

[140] *Royal and Sun Alliance*, 466 F.3d at 94.

Bankruptcy Code which are incorporated through SIPA."[141]  Defendants have failed to identify

any parallel proceedings, analyze these factors in any of the Trustee's recovery actions, or make

any affirmative showing to warrant dismissal on comity grounds.  This Court should not abstain

from hearing the Trustee's recovery claims.

**CONCLUSION**

The Trustee respectfully requests that the Court grant the Trustee's omnibus motion for

leave to amend his complaints and deny Defendants' Motion.


Dated: June 26, 2015                    */s/ David J. Sheehan*
     New York, New York          **Baker & Hostetler LLP**
                             45 Rockefeller Plaza
                             New York, New York 10111
                             Telephone:  (212) 589-4200
                             Facsimile:  (212) 589-4201
                             David J. Sheehan
                             dsheehan@bakerlaw.com
                             Regina Griffin
                             rgriffin@bakerlaw.com
                             Thomas L. Long
                             tlong@bakerlaw.com
                             Seanna R. Brown
                             sbrown@bakerlaw.com
                             Amanda E. Fein
                             afein@bakerlaw.com
                             Catherine E. Woltering
                             cwoltering@bakerlaw.com

                             *Attorneys for Irving H. Picard, Trustee*
                             *for the Substantively Consolidated SIPA*
                             *Liquidation of Bernard L. Madoff Investment*
                             *Securities LLC and the Estate of Bernard L. Madoff*

---

[141] *Igoin*, 525 B.R. at 886.  Moreover, this Court has found that it has a "substantial interest" in trying the adversary proceedings that share common factual and legal issues with the more than 1,000 cases in the BLMIS liquidation. *Id.*