**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01239 (SMB) |
| | **TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO THE FAIRFIELD DEFENDANTS' MOTIONS TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS** |
| Plaintiff, | |
| v. | |
| FAIRFIELD INVESTMENT FUND LIMITED, *et al.*, | |
| Defendants. | |

The Trustee respectfully submits this memorandum as a supplement to his Main Brief, specifically opposing the motions to dismiss by Fairfield Greenwich Limited, Fairfield Greenwich (Bermuda) Limited, Fairfield Investment Fund Limited, Andrés Piedrahita, Richard Landsberger, Philip Toub, Harold Greisman, Andrew Smith, Corina Noel Piedrahita, Amit Vijayvergiya, and Gordon McKenzie (collectively, the "Fairfield Defendants"). As set forth below, the Second Amended Complaint proffered by the Trustee pleads facts confirming that the subsequent transfers received by the Fairfield Defendants are predominantly domestic under the standard set forth in the Extraterritoriality Decision,[1] such that the Trustee's action does not require an extraterritorial application of the Securities Investor Protection Act ("SIPA") or Bankruptcy Code § 550. The Fairfield Defendants' motions to dismiss should be denied and the Trustee's motion for leave to amend complaints should be granted.

## I.      <u>INTRODUCTION</u>

As further explained in the Second Amended Complaint proffered by the Trustee, the Fairfield Defendants are individuals and entities that formed the backbone of the Fairfield Greenwich Group ("FGG"), a *de facto* partnership in New York that operated hedge funds, including funds that invested with Madoff. FGG's hedge funds and administrative entities were managed from FGG's New York headquarters. The transfers at issue here all derive from the relationship between BLMIS—a U.S. entity purportedly trading in U.S. securities, and the FGG funds that were operated out of the U.S. for the primary purpose of investing with BLMIS. While some of the entities and individuals that have moved the Court to dismiss the Trustee's claims based on extraterritoriality were technically organized under foreign laws, or are foreign citizens,

---

[1] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 513 B.R. 222 (S.D.N.Y. 2014) ("Extraterritoriality Decision").

they all knowingly participated in the transfer of funds between U.S. entities involving U.S.

securities, were based in the United States, worked in the United States, and entered into

contracts with U.S. choice of law provisions. The transfers the Trustee is seeking to recover from

these parties are domestic.

The transfers at issue in this motion total $1,808,812,783, which originated with BLMIS

and was fraudulently transferred to the Fairfield Defendants. The Trustee's recovery of these

transfers does not require an extraterritorial application of the Bankruptcy Code or SIPA. The

Fairfield Defendants' motions to dismiss must be denied so that the Trustee can proceed in

recovering these domestic transfers from the Fairfield Defendants and returning them to

Madoff's victims.

## II.    OVERVIEW OF THE FAIRFIELD GREENWICH GROUP

In 1988, Walter Noel and Jeffrey Tucker founded FGG and opened its offices in New

York. Proffered Second Am. Compl. ("SAC") ¶ 33. They operated FGG as a *de facto* partnership

that included: individual persons; U.S. corporations; foreign corporations; and investment

vehicles launched, managed, operated, and marketed by FGG's New York office. *Id.* ¶ 34. FGG

was essentially a collection of hedge funds and the individuals and entities that operated those

funds. *Id.*

### A.    The Funds

FGG's main hedge funds were the three funds that invested directly with BLMIS—

Fairfield Sentry Limited ("Fairfield Sentry"), Greenwich Sentry, L.P. ("Greenwich Sentry"), and

Greenwich Sentry Partners, L.P. ("Greenwich Sentry Partners") (collectively, the "Feeder

Funds"). *Id.* ¶ 34. FGG also created and managed a number of additional funds that invested in

the Feeder Funds. These funds included two funds that were invested entirely in Fairfield

Sentry—Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda")

(collectively, the "Currency Funds")—but were established as separate funds so they could accept investments in foreign currencies. *Id.* ¶¶ 34, 50–51. FGG also managed funds of funds that were partially invested in the Feeder Funds, including defendant Fairfield Investment Fund Limited ("FIFL"). *Id.* ¶ 35.

### 1.    Fairfield Sentry

On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry for the purpose of creating a fund to invest with Madoff. *Id.* ¶¶ 39–40. While Noel and Tucker chose to organize Fairfield Sentry under the laws of the British Virgin Islands ("BVI"), it was present in the BVI on paper only. *Id.* ¶ 198. Fairfield Sentry never had any employees or offices in the BVI, and was legally prohibited from doing business with most BVI residents. *Id.* ¶¶ 197–99. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was FGG's New York headquarters. *Id.* ¶¶ 445–50. Fairfield Sentry is in liquidation in the BVI and the United States. *Id.* ¶ 197.

### a.    FGG New York Personnel Controlled Fairfield Sentry

FGG operated Fairfield Sentry out of its New York headquarters using FGG personnel based in New York ("FGG New York Personnel"). *Id.* ¶¶ 34, 199. FGG New York Personnel made all operational decisions regarding Fairfield Sentry; had final control of Fairfield Sentry's banking accounts; controlled and approved all subscriptions into and redemptions from the fund; monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of

Fairfield Sentry; and directed investments into and out of BLMIS. *Id.* ¶¶ 204, 207. FGG

maintained Fairfield Sentry's books and records in New York. *Id.*

> **b.** **Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was the United States**

In Fairfield Sentry's agreements with BLMIS, it was clear that Fairfield Sentry operated

in the United States. BLMIS account documents from the early 1990s listed Fairfield Sentry's

address as the office address of Fairfield International Managers, Inc. ("Fairfield International

Managers")—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. *Id.*

¶¶ 41, 200. In 1998, FGG faxed a change of address notice to BLMIS indicating Fairfield

Sentry's address, for purposes of its four BLMIS accounts, was now FGG's New York

headquarters. *Id.* ¶ 200.

The account documents were executed by FGG New York Personnel. *Id.* ¶ 202. Tucker

executed the original account opening documents on behalf of Fairfield Sentry. *Id.* Later, FGG

partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York

headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry

including: customer agreements, trade authorizations, options agreements, and Internal Revenue

Service forms. *Id.*

The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are

governed by New York law and all disputes arising under the agreements must be resolved by

mandatory arbitration in New York utilizing the laws of New York. *Id.* ¶ 201. All transactions

under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange

Act of 1934 and to the rules and regulations of the Securities and Exchange Commission

("SEC") and Board of Governors of the Federal Reserve System. *Id.* Every BLMIS trade

confirmation received and reviewed by FGG New York Personnel on behalf of Fairfield Sentry

identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection

Corporation member regulated by the SEC. *Id.*

### c.    Fairfield Sentry's Investors Knew They Were Investing with BLMIS

The fund documents Fairfield Sentry sent to its investors informed investors that Fairfield

Sentry was invested with a U.S. fund that invested in U.S. securities. From at least January 1,

2002, Fairfield Sentry subscription agreements contained New York choice of law provisions,

and provided for venue and jurisdiction for any disputes in New York. *Id.* ¶ 207.

Fairfield Sentry's subscription agreements also incorporated its Private Placement

Memoranda ("PPMs") by reference. *Id.* Each Fairfield Sentry subscriber acknowledged receipt

of the PPM. *Id.* ¶ 208. Up until 2003, the PPMs disclosed to Fairfield Sentry investors that a

minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York;

(2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's

SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or

short-term U.S. Treasurys. *Id.* Fairfield Sentry's PPM also disclosed to investors that BLMIS's

services were "essential to the continued operation of the Fund." *Id.* In 2003, FGG removed all

references to Madoff and BLMIS from its PPM at Madoff's request. *Id.* ¶ 209. Then in 2006,

after an SEC investigation that led to BLMIS having to register as an investment adviser, FGG

was forced to disclose BLMIS's role in the funds. *Id.* ¶ 210.

### 2.    The Currency Funds—Sigma and Lambda

FGG created Sigma and Lambda to satisfy investor requests for funds that accepted

investments in foreign currencies. *Id.* ¶¶ 224–25. FGG operated Fairfield Sentry as a U.S. Dollar-

based fund with all subscription and redemptions paid in U.S. Dollars. *Id.* ¶ 224. Sigma and

Lambda accepted subscriptions in Euros and Swiss Francs, respectively, converted them to U.S.

5

Dollars, and then invested 100% of their assets in Fairfield Sentry. *Id.* ¶¶ 224–25. To pay

redemptions, Sigma and Lambda redeemed Fairfield Sentry shares, converted the U.S. Dollars to

foreign currency, and made payments in foreign currency to investors. *Id.* Both funds are in

liquidation. *Id.* ¶ 226.

Noel and Tucker organized Sigma on November 20, 1990 and Lambda on December 7,

1990 as international business companies under the BVI International Business Companies Act.

*Id.* As with Fairfield Sentry, Sigma and Lambda were present in the BVI on paper only. *Id.*

¶ 227. The Currency Funds never had any employees or offices in the BVI, and were legally

prohibited from doing business with most BVI residents. *Id.* ¶¶ 226–27. Sigma's and Lambda's

operations, structure, agreements, and marketing materials all demonstrate that their principal

place of business was in the United States. *Id.* ¶¶ 227–28, 231–33.

### a.    FGG New York Personnel Controlled Sigma and Lambda

Sigma and Lambda were operated almost entirely by FGG New York Personnel. *Id.*

¶ 228. FGG New York Personnel made all operational decisions regarding Sigma and Lambda.

*Id.* ¶ 228. FGG New York Personnel monitored Sigma's and Lambda's investments in, and

redemptions from, Fairfield Sentry; managed Sigma's and Lambda's relationships with clients

and potential clients; created marketing and performance materials for Sigma and Lambda;

marketed Sigma and Lambda; performed administrative functions required by Sigma and

Lambda; negotiated confidentiality agreements and other service provider contracts on behalf of

Sigma and Lambda; had final control of Sigma's and Lambda's banking accounts; and controlled

and approved all subscriptions for and redemptions of Sigma and Lambda shares. *Id.* ¶¶ 231–32.

FGG maintained all of Sigma's and Lambda's books and records in New York. *Id.* ¶ 231.

### b. Sigma's and Lambda's Investors Knew They Were Investing with BLMIS

Sigma's and Lambda's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's and Lambda's sole assets. *Id.* ¶ 232. Sigma's and Lambda's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments. *Id.*

### 3. FGG Funds that Invested in the Feeder Funds

As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. *Id.* ¶ 211. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. *Id.* FGG created a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base for these funds of funds. *Id.* The seedling funds were operated and organized by FGG New York Personnel. *Id.* Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry. *Id.*

Two of the seedling funds, FIFL and FIF Advanced, Ltd. ("FIFA") are at issue in this motion. FIFL is a defendant and also the transferor of transfers to other defendants. FIFA also transferred funds to certain defendants but is not a defendant itself. Both funds invested significantly with Fairfield Sentry and redeemed millions of dollars from Fairfield Sentry. *Id.* ¶¶ 238, 246–48. Both funds were organized under BVI but were operated entirely out of New York. *Id.* ¶¶ 238, 240, 247.

B.    The Administrative Entities

FGG also included a number of administrative entities that provided management and
back office support to the funds. *Id.* ¶ 35. These entities included: Fairfield Greenwich Limited
("FG Limited"), Fairfield Greenwich (Bermuda) Ltd. ("FG Bermuda"), Fairfield Greenwich
Advisors LLC ("FG Advisors"), Fairfield International Managers, and Fairfield Greenwich (UK)
Limited ("Fairfield-UK"). *Id.* ¶¶ 35, 298. While some of these entities were organized under the
laws of foreign countries to avoid scrutiny from U.S. regulators, all of the entities were operated
primarily from FGG's New York headquarters and provided services to FGG's funds, which
were similarly operated out of New York. *Id.* ¶¶ 41, 54–55, 258, 271–72, 298.

FGG formed Fairfield International Managers in 1988 under the laws of Delaware. *Id.*
¶ 41. The entity was created to act as an investment manager and was owned in equal parts by
Noel and Tucker. *Id.* ¶¶ 41, 44. Fairfield International Managers was essentially used by Noel
and Tucker to hold their ownership interests in later-created FGG entities such as FG Limited
and FG Bermuda. *Id.* ¶ 296.

In 1997, FGG acquired Littlestone Associates, a money manager owned by Piedrahita. *Id.*
¶ 315. In the same year, the three Founding Partners—Noel, Tucker, and Piedrahita—formed FG
Limited under the laws of Ireland. *Id.* ¶ 253. FG Limited was owned by Noel and Tucker through
Fairfield International Managers (66.7%) and by Piedrahita through Safehand Investments. *Id.*
FG Limited was listed as the investment manager for Fairfield Sentry, Fairfield Sigma, and
Fairfield Lambda (when it opened in 1999), even though BLMIS in fact served in that position.
*Id.* ¶¶ 206, 233. FG Limited reported its principal place of business as FGG's New York
headquarters and it was registered to do business in New York. *Id.* ¶ 258.

In 1997, FGG created Fairfield-UK to serve as the investment adviser to certain of the
seedling funds. *Id.* ¶ 298. Although Fairfield-UK was organized as a limited company under the

laws of England and Wales, it had only a small office and a handful of employees in London. *Id.* ¶ 299. FGG New York personnel controlled the entity's operations. *Id.* ¶ 298.

In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds investment vehicle. *Id.* ¶ 53. The new fund would be open to all investors and as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the Feeder Funds and Currency Funds. *Id.* Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve as the investment manager of the funds. *Id.* As a result, FGG formed two new entities, FG Advisors and FG Bermuda. *Id.* ¶¶ 53–54.

In October 2003, FGG formed FG Advisors as a Delaware limited liability company with its principal place of business in New York. *Id.* ¶¶ 54–55. At the same time, FGG formed FG Bermuda under Bermuda law. *Id.* ¶ 54. Both FG Advisors and FG Bermuda are wholly-owned subsidiaries of FG Limited. *Id.* Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to each entity. *Id.* In particular, FG Limited assigned the investment advisory agreements for Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry to FG Bermuda. *Id.* FG Limited continued to provide sales and administrative services to the funds. *Id.* ¶¶ 54–55.

In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. *Id.* ¶ 278. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. *Id.* Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted. *Id.* As a result of the investigation, the SEC determined that BLMIS, and not FG

Bermuda, was the investment manager of Fairfield Sentry. *Id.* ¶ 279. Accordingly, the SEC

required Fairfield Sentry to modify its investor communications and PPMs to properly disclose

BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS

accounts. *Id.*

### C.    The Partnership

FGG was founded by Noel, Tucker, and Piedrahita. *Id.* ¶ 59. It was operated as a *de facto*

partnership: the partners shared control, profits, and losses as a partnership. *Id.* ¶¶ 413–14.

Many of the defendants in the Trustee's case against the Fairfield individuals and entities

were FGG partners, including certain individuals who have moved to dismiss based on

extraterritoriality: Andrés Piedrahita ("Piedrahita"), Amit Vijayvergiya ("Vijayvergiya"),

Richard Landsberger ("Landsberger"), Philip Toub ("Toub"), Harold Greisman ("Greisman"),

Andrew Smith ("Smith"), and Corina Noel Piedrahita ("Noel Piedrahita"). SAC ¶¶ 60–61. They

internally referred to their interests in FGG's profits as "partnership interests." *Id.* ¶ 421. As

partners, they received distributions of profits through FG Limited and FG Bermuda based on

their respective partnership interests. *Id.* ¶ 58. The vast majority of these profits came from

management and performance fees the Feeder Funds and seedling funds charged their investors

based on the purported returns from BLMIS. *Id.* ¶ 1.

### III.    <u>THE TRANSFERS TO THE FAIRFIELD DEFENDANTS ARE DOMESTIC</u>

The Trustee has brought claims against the Fairfield Defendants to recover the more than

a billion dollars that was transferred from BLMIS to the Fairfield Defendants. SAC ¶ 2. The

Fairfield Defendants seek to dismiss these claims on the basis that they require an extraterritorial

application of the Bankruptcy Code and SIPA. The transfers at issue here are domestic. The

Fairfield Defendants were all part of the FGG enterprise that was headquartered in New York.

*Id.* ¶ 34. They worked from the United States, were operated from the United States, received

funds that they knew derived from BLMIS (a U.S. entity) based on its trading in U.S. securities, and entered into agreements that contained U.S. choice of law provisions. *Id.* ¶¶ 34–36, 60–63, 67. The fact that certain entities were nominally organized under foreign laws, and certain individuals were citizens of foreign countries, does not change the fact that the component events of these transfers indicate they were domestic in nature. *See Maxwell Commc'n Corp. PLC v. Societe General PLC (In re Maxwell Commc'n Corp. PLC)*, 186 B.R. 807, 816–17 (S.D.N.Y. 1995) ("*Maxwell I*"). The Fairfield Defendants' motions must be denied.

## A.    The Legal Standard

As further explained in the Main Brief, the District Court explained the standard by which the Fairfield Defendants' motion should be analyzed. *See Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, 513 B.R. 222, 227–31 (S.D.N.Y. 2014). To determine whether conduct is extraterritorial, this Court must determine whether the "transfer and component events of the transaction" are domestic. *See id.* at 227; *see also Maxwell I*, 186 B.R. at 816–17. The relevant component events include, without limitation: (i) the debtor's location; (ii) the defendant's location; (iii) where the defendant engaged in business regarding the transaction; (iv) the relevant transactions and agreements entered into by the parties; (v) where the parties relationship was centered at the relevant times; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *See Maxwell I*, 186 B.R. at 816–17. The component events of each of the transfers challenged by the Fairfield Defendants indicate the transfers are domestic.

B.    **Each of the Transfers to the Fairfield Defendants Is Domestic in Nature and Within the Scope of the Bankruptcy Code and SIPA**

1.    **The Transfers to FG Limited Are Domestic**

FG Limited received approximately $604,392,398 that originated from BLMIS and was subsequently transferred to FG Limited. SAC ¶ 266, Ex. 11. As specifically pleaded in the Second Amended Complaint, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 265. FG Limited's motion to dismiss based on extraterritoriality must be denied.

FG Limited was the nerve center of all FGG operations. *Id.* ¶ 257. FG Limited was the entity through which FGG's profits passed through to its partners. *Id.* ¶ 420. FG Limited directed, controlled, and operated all FGG entities, including the Feeder Funds, the other FGG funds and investment vehicles, and the FGG entities that serviced the funds. *Id.* ¶¶ 257, 415. The transfers FG Limited received consisted of fees paid to it by: (1) the Feeder Funds, (2) FGG funds invested fully or in part in the Feeder Funds, and (3) transfers from other FG Limited wholly owned FGG entities that provided services to the Feeder Funds and other FGG operated funds and investment vehicles. *Id.* ¶¶ 259–64.

FG Limited argues that the transfers it received from Fairfield Sentry, Fairfield Lambda, Fairfield Sigma, FG Bermuda, Fairfield-UK, FIFL, and FIFA are purely foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the location of BLMIS as the debtor in the United States, indicate that the transfers to FG Limited are domestic.

*FG Limited's Location*: FG Limited was formally organized as a Cayman Island company. *Id.* ¶ 254. However, it maintained its principal place of business in the United States, at FGG's New York City headquarters. *Id.* ¶ 258.

*Where FG Limited Engaged in Business Regarding the Transactions*: Although FG Limited was organized as a Cayman Island company, it was operated entirely out of New York. *Id.* ¶ 258. It had no offices, employees, or operations in the Cayman Islands. *Id.* From its inception, it registered to do business in the State of New York, listing its principal place of business as FGG's New York headquarters. *Id.* FGG partners were FG Limited shareholders and also served on the FGG Executive Committee. *Id.* ¶¶ 60, 254. FG Limited affirmatively submitted documentation to the U.S. Internal Revenue Service to ensure it was taxed as a U.S. partnership. *Id.* ¶ 420. FG Limited maintained its bank account in New York at JP Morgan Chase bank. *Id.* ¶ 259. FG Limited received all of the transfers at issue in New York as they were deposited in FG Limited's New York bank account. *Id.*

*Transactions and Agreements*: The transactions and agreements that led to the transfers indicate that the parties all understood their transactions to be domestic. FGG New York Personnel approved, directed and controlled all of the subsequent transfers made to FG Limited. *Id.* ¶¶ 207, 232, 243, 259. Each of the subsequent transfers at issue was made to FG Limited in New York as they were made to FG Limited's New York JP Morgan bank account. *Id.* ¶ 259.

*Center of the Parties' Relationship*: FG Limited's relationship with BLMIS and FGG was centered in the United States. FG Limited operated entirely from FGG's New York offices—it was a Cayman Island corporation in name only. *Id.* ¶ 258. FG Limited's shareholders knew that the Feeder Funds were invested almost entirely with BLMIS, and knew that BLMIS was supposedly investing entirely in U.S. securities. *See, e.g.*, *id.* ¶¶ 256, 302–39, 346–409.

*Governing Law*: FG Limited executed agreements with Fairfield Sentry and FG Bermuda that contained New York choice of law provisions. *Id.* ¶¶ 257, 285–87.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers

13

received by FG Limited are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

### 2.   The Transfers to FG Bermuda Are Domestic

FG Bermuda received approximately $621,737,949 that originated from BLMIS and was subsequently transferred to FG Bermuda. *Id.* ¶ 289, Ex. 12. As specifically pleaded in the Second Amended Complaint, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 288. FG Bermuda's motion to dismiss based on extraterritoriality must be denied.

FGG created FG Bermuda at Madoff's direction to purportedly serve as the investment adviser for the Feeder Funds. *Id.* ¶¶ 268–69. As a result, in 2003, FGG organized FG Bermuda as Bermuda exempt company with FG Limited, the cornerstone of the FGG partnership, holding all of its shares. *Id.* ¶ 271. The transfers made to FG Bermuda consisted of management and performance fees paid to it by the Feeder Funds and the Currency Funds, which invested all of their assets in Fairfield Sentry. *Id.* ¶ 56, Ex. 12. FG Bermuda also received transfers from FG Limited. *Id.* at Ex. 12. Finally, FG Bermuda received $35,807,185 from Greenwich Sentry and Greenwich Sentry Partners (*id.* at Ex. 12), which it does not challenge in its motion to dismiss.

FG Bermuda argues that the transfers it received from Fairfield Sentry, Lambda, Sigma, and FG Limited are purely foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the location of BLMIS as the debtor in the United States, indicate that the transfers to FG Bermuda are domestic.

*FG Bermuda's Location*: FG Bermuda was organized as a Bermuda exempt company. *Id.* ¶ 271. FG Bermuda had a small office in Bermuda and a handful of employees. *Id.* ¶¶ 272–74. However, FGG New York Personnel controlled all of FG Bermuda's operations. *Id.* ¶ 274.

*Where FG Bermuda Engaged in Business Regarding the Transactions*: Although FG Bermuda was technically organized as a Bermuda company, most of the business it engaged in regarding the transfers took place in New York. *Id.* ¶¶ 273–74. FG Bermuda was run primarily from FGG's New York office. *Id.* For example, any financial transaction in excess of $10,000 required the approval of specified FGG New York personnel. *Id.* ¶ 273. Also, FGG maintained FG Bermuda's corporate records at FGG's New York headquarters. *Id.* ¶ 274. Finally, FGG's New York Chief Financial Officer had to jointly approve all transfers from FG Bermuda to the other FGG entities. *Id.* ¶ 273.

*Transactions and Agreements*: The transactions and agreements that led to the transfers indicate that the parties all understood their transactions to be domestic. FGG New York personnel approved, directed, and controlled all of the subsequent transfers made to FG Bermuda. *Id.* ¶¶ 207, 232, 243, 272.

*Center of the Parties' Relationship*: FG Bermuda's relationship with BLMIS and FGG was centered in the United States. FGG organized FG Bermuda outside the United States at the direction of Madoff. *Id.* ¶¶ 268–69. FGG then reported FG Bermuda as the investment adviser of the Feeder Funds and Currency Funds, even though BLMIS was actually performing that function. *Id.* ¶¶ 209–10. In 2005, in an attempt to thwart an ongoing SEC investigation into the feeder funds and BLMIS, FGG registered FG Bermuda as an investment adviser with the SEC. *Id.* ¶ 278. The SEC later determined FG Bermuda was not performing any investment adviser functions and instructed FGG to revise its marketing materials to reflect the fact that BLMIS was performing those functions. *Id.* ¶ 279. FG Limited owned 100% of FG Bermuda's shares until January 1, 2008, when FG Limited distributed its FG Bermuda shares to the FG Limited

shareholders—the FGG partners. *Id.* ¶ 284. FG Bermuda was essentially created to further

FGG's relationship with BLMIS—a relationship that was based entirely in New York.

*Governing Law*: FG Bermuda executed agreements with Fairfield Sentry and FG Limited

that contained New York choice of law provisions. *Id.* ¶¶ 285–87.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers

received by FG Bermuda are domestic and do not require an extraterritorial application of SIPA

or the Bankruptcy Code.

### 3.    The Transfers to FIFL Are Domestic

FIFL received approximately $332,805,673 that originated from BLMIS and was

subsequently transferred to FIFL. *Id.* ¶ 246, Ex. 7. As specifically pleaded in the Second

Amended Complaint, all of these transfers are domestic in nature and fall within the intended

reach of the Bankruptcy Code and SIPA. *Id.* ¶ 245. FIFL's motion to dismiss based on

extraterritoriality must be denied.

FGG operated FIFL as a fund of funds that partially invested its assets in Fairfield Sentry.

*Id.* ¶ 238. FIFL received subsequent transfers of BLMIS customer property from Fairfield Sentry

when it redeemed its interests in Fairfield Sentry. *Id.* ¶ 263, Ex. 7. FIFL also received transfers

from FG Limited.  *Id.* at Ex. 7.

FIFL argues that the transfers it received from Fairfield Sentry and FG Limited[2] are

purely foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the

location of BLMIS as the debtor in the United States, indicate that the transfers to FIFL are

domestic.

---

[2] FIFL indicated in Exhibit A to its motion to dismiss that it was challenging only transfers from
Fairfield Sentry. (Dkt. No. 8800-1.) However, out of an abundance of caution, the Trustee
explains below why the transfers FIFL received from FG Limited are also domestic.

*FIFL's Location*: FGG organized FIFL as a BVI international business company. *Id.* ¶ 238. However, it was a shell corporation present in the BVI on paper only. *Id.* ¶ 239. It had no employees, no offices and maintained no operations in the BVI. *Id.* Its BVI address was a post office box care of a local trust company that served as the BVI registered address for numerous FGG funds and hundreds of other non-FGG investment vehicles. *Id.* The law firm that operated the trust company and post office box sent invoices for services it performed for FIFL to FGG's New York headquarters. *Id.*

*Where FIFL Engaged in Business Regarding the Transactions*: Although FIFL was technically a BVI company, its business regarding the transactions took place in the United States. FIFL was operated and managed by FGG New York Personnel. *Id.* ¶ 240. In addition, FGG founding partners Walter Noel and Jeffrey Tucker, both U.S. residents, served as the directors for FIFL. *Id.* ¶ 241. Many of the fund's formal documents and SEC filings indicated the fund, its investment manager, and its placement agent were located in New York. *Id.* ¶¶ 240, 242.

*Transactions and Agreements*: The transactions and agreements that led to the transfers indicate that the parties all understood their transactions to be domestic. FGG New York personnel approved and directed the Fairfield Sentry transfers to FIFL. *Id.* ¶¶ 207, 232, 243. FGG New York personnel also approved and directed the FG Limited transfers to FIFL, which were made from FG Limited's New York JP Morgan bank account. *Id.* ¶ 259.

*Center of the Parties' Relationship*: FIFL's relationship with BLMIS and FGG was centered in the United States. FIFL was a foreign company in name only. *Id.* ¶ 239. It was operated entirely from the United States. It invested in BLMIS through Fairfield Sentry. *Id.* ¶ 240. When it invested in Fairfield Sentry, those subscriptions were approved by FGG New

17

York Personnel. *Id.* ¶¶ 207, 244. It also received funds from FG Limited, which, like FIFL, was a foreign company operated entirely from New York. *Id.* at Ex. 7.

*Governing Law*: FIFL's Fairfield Sentry subscription agreement, as well the subscription agreement FIFL provided to its shareholders, contained a New York choice of law provision and provided for venue and jurisdiction for any disputes in New York. *Id.* ¶¶ 207, 243.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers received by FIFL are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

### 4.      The Transfers to Andrés Piedrahita Are Domestic

FGG Founding Partner Andrés Piedrahita received approximately $172,680,713 that originated from BLMIS and was subsequently transferred to Piedrahita. *Id.* ¶ 315, Exs. 18-A, 18-B. As specifically pleaded in the Second Amended Complaint, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 321. Piedrahita's motion to dismiss based on extraterritoriality must be denied.

In 1997, Piedrahita's New York-based company, Littlestone Investments, merged with FGG and Piedrahita became a founding partner and the executive chairman of FGG. *Id.* ¶¶ 48, 315, 319. As a founding partner, Piedrahita had a very large ownership interest in FGG. *Id.* He received his partnership payments based on his ownership interest from FG Limited and FG Bermuda. *Id.* ¶¶ 254, 273, 316. He also served as a director of Fairfield-UK in 2005, for which he received a monthly salary. *Id.* ¶ 317.

Piedrahita argues that the transfers he received from FG Limited, FG Bermuda, and Fairfield-UK were purely foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the location of BLMIS as the debtor in the United States, indicate that the transfers to Piedrahita are domestic.

18

*Piedrahita's Location*: At all relevant times, Piedrahita resided in the United States.

*Id.* ¶ 314. He maintained multiple residences in the New York, Connecticut, and Florida with his

wife, Corina Noel Piedrahita, the daughter of FGG founding partner Walter Noel. (*Id.*) Piedrahita

is a citizen of Columbia. *Id.* ¶ 313.

*Where Piedrahita Engaged in Business Regarding the Transactions*: Piedrahita

performed his work for FGG, including his work marketing the Feeder Funds, in New York,

London, and Madrid. *Id.* ¶ 318. He was a founding partner of FGG and a member of its

Executive Committee, which oversaw all FGG operations. *Id.* ¶¶ 60, 315, 319. While at FGG,

Piedrahita maintained a U.S. email address; utilized FGG's New York address on his letterhead

and in email signatures; maintained an office in FGG's New York headquarters; and worked

closely with FGG's New York Personnel. *Id.* ¶¶ 318, 445. While he also performed marketing

efforts abroad, his work with FGG—which serves as the basis for these transfers—was centered

in New York. *Id.* ¶ 318.

*Transactions and Agreements*: The transactions and agreements that led to the transfers

indicate that the parties all understood their transactions to be domestic. FGG New York

Personnel approved, directed, and controlled each of Piedrahita's quarterly FG Limited

shareholder distributions, which were made from FG Limited's New York JP Morgan bank

account. *Id.* ¶ 259. FGG New York Personnel approved, directed, and controlled each of the FG

Bermuda shareholder distributions made to Piedrahita. *Id.* ¶¶ 207, 232, 243.

*Center of the Parties' Relationship*: Piedrahita's relationship with BLMIS and FGG was

centered in the United States. As a founding partner and member of FGG's Executive

Committee, Piedrahita knew that the transfers he received originated from BLMIS in New York.

*Id.* ¶¶ 60, 315, 319.  He had extensive knowledge of the Feeder Funds' investments with BLMIS

and that BLMIS was purportedly investing the Feeder Funds' assets in U.S. securities. *See, e.g.*, *id.* ¶¶ 119, 120, 317–18.

*Governing Law*: Piedrahita executed shareholder agreements with FG Limited that contained New York choice of law provisions. *Id.* ¶ 252.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers received by Piedrahita are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

### 5.    The Transfers to Richard Landsberger Are Domestic

FGG Partner Richard Landsberger received approximately $29,733,655 that originated from BLMIS and was subsequently transferred to Landsberger. *Id.* ¶ 353, Ex. 23. As specifically pleaded in the Second Amended Complaint, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 352. Landsberger's motion to dismiss based on extraterritoriality must be denied.

Landsberger joined FGG in 2001, and became an FGG partner in 2002. *Id.* ¶ 347. He was a member of FGG's Executive Committee, Director of Fairfield-UK, and Head of Sales of FIFL. *Id.* As a partner, Landsberger had a significant ownership interest in FGG. *Id.* He received his partnership payments based on his ownership interest from FG Limited and FG Bermuda. In addition, Landsberger received salary and bonus payments from Fairfield-UK and FIFA. *Id.* ¶¶ 299, 261–264, 347. Finally, he received $118,000 from FG Advisors, which he does not challenge in his motion to dismiss.

Landsberger argues that the transfers he received from FG Limited, FG Bermuda, Fairfield-UK, and FIFA were purely foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the location of BLMIS as the debtor in the United States, indicate that the transfers to Landsberger are domestic.

*Landsberger's Location*: Landsberger is a citizen of the United States and he maintained his bank account at UBS AG in New York. *Id.* ¶¶ 347, 351. Between 2002 and 2008, Landsberger resided in the United Kingdom. *Id.* ¶ 347.

*Where Landsberger Engaged in Business Regarding the Transactions*: Although Landsberger was affiliated with FGG's London office, he regularly attended meetings in New York and frequently communicated with FGG personnel located in FGG's New York headquarters in his capacity as a member of the FGG Executive Committee, which managed and controlled all of FGG's operations, including the Feeder Funds and Currency Funds. *Id.* ¶¶ 60, 347–48.

*Transactions and Agreements*: The transactions and agreements that led to the transfers indicate that the parties all understood their transactions to be domestic. FGG New York Personnel approved, directed, and controlled each of Landsberger's quarterly FG Limited partner distributions which were made from FG Limited's bank account at JPMorgan in New York to Landsberger's bank account at UBS AG in New York. *Id.* ¶¶ 259, 351. FGG New York Personnel approved, directed, and controlled each of Landsberger's FG Bermuda shareholder distributions, which were made to Landsberger's UBS AG bank account in New York *Id.* ¶¶ 273, 351. In addition, the salary and bonus payments he received arose directly from his work marketing the Feeder Funds and FGG funds that invested in the Feeder Funds. *Id.* ¶¶ 63, 347–48.

*Center of the Parties' Relationship*: Landsberger's relationship with BLMIS and FGG was centered in the United States. As a partner and member of FGG's Executive Committee, Landsberger knew that the transfers he received originated from BLMIS in New York. *Id.* ¶¶ 60, 347–48. He had extensive knowledge of the Feeder Funds' investments with BLMIS and

21

that BLMIS was purportedly investing the Feeder Funds' assets in U.S. securities. *See, e.g.*, *id.*
¶¶ 155, 169, 347.

*Governing Law*: Landsberger executed shareholder agreements with FG Limited that
contained New York choice of law provisions. *Id.* ¶¶ 255, 350.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers
received by Landsberger are domestic and do not require an extraterritorial application of SIPA
or the Bankruptcy Code.

### 6.    The Transfers to Philip Toub Are Domestic

FGG Partner Philip Toub received approximately $46,284,503 that originated from
BLMIS and was subsequently transferred to Toub. *Id.* ¶ 363, Ex. 24. As specifically pleaded in
the Second Amended Complaint, all of these transfers are domestic in nature and fall within the
intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 362. Toub's motion to dismiss based on
extraterritoriality must be denied.

Toub, another one of Walter Noel's sons-in-law, joined FGG in 1997 in its New York
office.  *Id.* ¶¶ 354, 356. Toub became a partner on January 1, 2001 and was a member of the
Executive Committee. *Id.* ¶ 354. Throughout his employment with FGG, Toub served as a
Director of FG Limited and as a member of FGG's Client Development Group. *Id.* As a partner,
Toub had a significant ownership interest in FGG. *Id.* He received his partnership payments
based on his ownership interest from FG Limited and FG Bermuda. *Id.* ¶¶ 254, 273, 354, Ex. 24.
He also received $484,473 from FG Advisors, *id.* at Ex. 24, which he does not challenge in his
motion to dismiss.

Toub argues that the transfers he received from FG Limited and FG Bermuda were purely
foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the

location of BLMIS as the debtor in the United States, indicate that the transfers to Toub are domestic.

*Toub's Location*: Toub is a citizen of the United States. *Id.* ¶ 354. He resided in Brazil from 1999 to 2004 and in New York and Connecticut between 2004 and 2008. *Id.* ¶ 354. Even when he was living abroad, Toub maintained his bank account at Chase Manhattan Bank in New York. *Id.* ¶¶ 354, 360.

*Where Toub Engaged in Business Regarding the Transactions*: From 1999 to 2004, Toub worked at FGG's Rio de Janeiro, Brazil office. *Id.* ¶ 357. From 2004 through 2008, Toub worked at FGG's headquarters in New York. *Id.* Even when he was technically affiliated with the Brazil office, Toub regularly conducted FGG business in New York. *Id.* ¶ 358. He regularly attended meetings in New York and frequently communicated with FGG personnel located in FGG's New York headquarters in his capacity as a member of the FGG Executive Committee, which managed and controlled all of FGG's operations, including the Feeder Funds and Currency Funds. *Id.* ¶¶ 60, 354–55, 358.

*Transactions and Agreements*: The transactions and agreements that led to the transfers indicate that the parties all understood their transactions to be domestic. FGG New York Personnel approved, directed, and controlled each of Toub's quarterly FG Limited partner distributions, which were made from FG Limited's bank account at JPMorgan in New York to Toub's bank account at Chase Manhattan Bank in New York. *Id.* ¶¶ 256, 353. FGG New York Personnel approved, directed, and controlled each of Toub's FG Bermuda shareholder distributions which were made to Toub's Chase Manhattan bank account in New York. *Id.* ¶¶ 273, 353.

23

*Center of the Parties' Relationship*: Toub's relationship with BLMIS and FGG was centered in the United States. As a partner and member of FGG's Executive Committee, Toub knew that the transfers he received originated from BLMIS in New York. *Id.* ¶¶ 60, 354. He had extensive knowledge of the Feeder Funds' investments with BLMIS and that BLMIS was purportedly investing the Feeder Funds' assets in U.S. securities. *See, e.g.*, *id.* ¶¶ 120, 137, 155, 157, 169, 353–54.

*Governing Law*: Toub executed shareholder agreements with FG Limited that contained New York choice of law provisions. *Id.* ¶¶ 255, 359.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers received by Toub are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

## 7.    The Transfers to Harold Greisman Are Domestic

FGG Partner Harold Greisman received approximately $23,620,902 that originated from BLMIS and was subsequently transferred to Greisman. *Id.* ¶ 387, Ex. 28. As specifically pleaded in the Second Amended Complaint, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 386. Greisman's motion to dismiss based on extraterritoriality must be denied.

Greisman joined FGG in 1990 in the New York office and served as FGG's Chief Investment Officer. *Id.* ¶ 379. Greisman became an FGG partner on January 1, 2002, and served on FGG's Executive Committee, which managed and controlled all of FGG's operations including the Feeder Funds. *Id.* ¶¶ 60, 379, 382. As FGG's CIO, Greisman was responsible for establishing FGG's risk systems and evaluating investments and managers including the Feeder Funds. *Id.* ¶ 379. As a partner, Greisman had a significant ownership interest in FGG. *Id.* ¶ 382. He received his partnership payments based on his ownership interest from FG Limited and FG

Bermuda. *Id.* ¶ 383, Ex. 28. In addition, Greisman received payments from FIFA as part of his deferred compensation arrangement as an FG Limited shareholder. *Id.* ¶ 382, Ex. 28. Finally, he received $79,548 from FG Advisors, *id.* at Ex. 28, which he does not challenge in his motion to dismiss.

Greisman argues that the transfers he received from FG Limited, FG Bermuda, and FIFA were purely foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the location of BLMIS as the debtor in the United States, indicate that the transfers to Greisman are domestic.

*Greisman's Location*: Greisman is a U.S. citizen. *Id.* ¶ 379. Prior to 2008, Greisman worked in New York at FGG's headquarters during which time he resided in New York. *Id.* ¶¶ 379–80. According to his FGG website biography, beginning in 2008, Greisman was "based in the New York and London offices." *Id.* ¶ 380. Even while he resided in the United Kingdom, Greisman maintained bank accounts in New York at HSBC Bank. *Id.* ¶ 378.

*Where Greisman Engaged in Business Regarding the Transactions*: Greisman worked in FGG's New York office until 2008, at which time he was also affiliated with FGG's London office. *Id.* ¶¶ 379–80. He regularly attended meetings in New York and frequently communicated with FGG personnel located in FGG's New York headquarters in his capacity as a member of the FGG Executive Committee, which managed and controlled all of FGG's operations, including the Feeder Funds and Currency Funds. *Id.* ¶¶ 60, 379–81.

*Transactions and Agreements*: The transactions and agreements that led to the transfers indicate that the parties all understood their transactions to be domestic. FGG New York Personnel approved, directed, and controlled each of Greisman's 2008 FG Limited shareholder distributions, which were made from FG Limited's New York JPMorgan bank account to one of

Greisman's New York bank accounts. *Id.* ¶¶ 259, 383. FGG New York Personnel approved, directed, and controlled each of Greisman's FG Bermuda shareholder distributions. *Id.* ¶ 273. The payments Greisman received from FIFA were part of his deferred compensation as an FG Limited shareholder. *Id.* ¶ 382.

*Center of the Parties' Relationship*: Greisman's relationship with BLMIS and FGG was centered in the United States. As a partner and member of FGG's Executive Committee, Greisman knew that the transfers he received originated from BLMIS in New York. *Id.* ¶¶ 379, 382. He had extensive knowledge of the Feeder Funds' investments with BLMIS and that BLMIS was purportedly investing the Feeder Funds' assets in U.S. securities. *See, e.g.*, *id.* ¶¶ 107, 119, 169, 378, 380. As FGG's CIO, he was intimately familiar with the investments and investment managers for FGG's funds, including the Feeder Funds. *Id.* ¶ 379.

*Governing Law*: Greisman executed shareholder agreements with FG Limited that contained New York choice of law provisions. *Id.* ¶¶ 255, 382.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers received by Greisman are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

### 8. The Transfers to Andrew Smith Are Domestic

FGG Partner Andrew Smith received approximately $13,483,585 that originated from BLMIS and was subsequently transferred to Smith. *Id.* ¶ 378, Ex. 27. As specifically pleaded in the Second Amended Complaint, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 377. Smith's motion to dismiss based on extraterritoriality must be denied.

Smith was an Executive Director and partner at FGG in the Fund of Funds Division of the Investment Group. *Id.* ¶ 370. Smith joined FGG in 2003 as a member of the London office

and became affiliated with the New York office in 2005. *Id.* ¶¶ 370, 373. He became a partner on

January 1, 2006. *Id.* ¶ 370. After becoming an FGG partner, Smith was a member of the FGG

Executive Committee, and a member of the Board of Directors for FG Limited and FG Bermuda.

*Id.* As a partner, Smith had a significant ownership interest in FGG. *Id.* He received his

partnership payments based on his ownership interest from FG Limited and FG Bermuda. *Id.*

¶¶ 370, 375, Ex. 27. In addition, Smith received salary and bonus payments from Fairfield-UK.

*Id.* at Ex. 27. Finally, he received $184,506 from FG Advisors, *id.* at Ex. 27, which he does not

challenge in his motion to dismiss.

Smith argues that the transfers he received from FG Limited, FG Bermuda, and Fairfield-

UK were purely foreign. On the contrary, the component events identified in *Maxwell I*, in

addition to the location of BLMIS as the debtor in the United States, indicate that the transfers to

Smith are domestic.

*Smith's Location*: Smith is a U.S. citizen. *Id.* ¶ 370. He resided in the United Kingdom

through 2004 and then moved to FGG's New York office. *Id.* ¶¶ 370, 373. At all relevant times,

even while he resided in the United Kingdom, Smith maintained his bank account at HSBC in

New York. *Id.* ¶¶ 370, 375.

*Where Smith Engaged in Business Regarding the Transactions*: Although Smith was

initially affiliated with FGG's London office, he regularly attended meetings in New York and

frequently communicated with FGG personnel located in FGG's New York headquarters. *Id.*

¶¶ 370, 373–74, 369. He then became a member of FGG's New York office in 2005. *Id.* ¶¶ 370,

373.

*Transactions and Agreements*: The transactions and agreements that led to the transfers

indicate that the parties all understood their transactions to be domestic. FGG New York

27

Personnel approved, directed, and controlled each of Smith's quarterly FG Limited partner distributions, which were made from FG Limited's bank account at JPMorgan in New York to Smith's bank account at HSBC in New York. *Id.* ¶¶ 259, 375. FGG New York Personnel approved, directed, and controlled each of Smith's FG Bermuda shareholder distributions, which were made to Smith's HSBC bank account in New York *Id.* ¶¶ 273, 375.

*Center of the Parties' Relationship*: Smith's relationship with BLMIS and FGG was centered in the United States. As a partner, member of FGG's Executive Committee, and member of FGG's Investment Group, Smith knew that the transfers he received originated from BLMIS in New York. *Id.* ¶¶ 60, 370, 376. He had extensive knowledge of the Feeder Funds' investments with BLMIS and that BLMIS was purportedly investing the Feeder Funds' assets in U.S. securities. *See, e.g.*, *id.* ¶¶ 86, 120, 169, 370, 372, 376.

*Governing Law*: Smith executed shareholder agreements with FG Limited that contained New York choice of law provisions. *Id.* ¶¶ 255, 371.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers received by Smith are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

### 9.    The Transfers to Corina Noel Piedrahita Are Domestic

FGG Partner Corina Noel Piedrahita received approximately $5,961,689 that originated from BLMIS and was subsequently transferred to Noel Piedrahita. *Id.* ¶ 398, Exs. 30-A, 30-B. As specifically pleaded in the Second Amended Complaint, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 397. Noel Piedrahita's motion to dismiss based on extraterritoriality must be denied.

Noel Piedrahita, daughter of Walter Noel and wife of Andrés Piedrahita, joined FGG as a partner on January 1, 2002. *Id.* ¶ 394. Noel Piedrahita was Head of Client Services and Investor

Relations until she retired in 2007. *Id.* ¶ 391. As a partner, Noel Piedrahita had a significant

ownership interest in FGG. *Id.* ¶ 394. She received her partnership payments based on her

ownership interest from FG Limited and FG Bermuda. *Id.* ¶ 395, Exs. 30-A, 30-B. In addition,

Noel Piedrahita received salary and bonus payments from Fairfield-UK. *Id.* at Ex. 30-A. Finally,

she received $57,000 from FG Advisors, *id.* at Ex. 30-A, which he does not challenge in his

motion to dismiss.

Noel Piedrahita argues that the transfers she received from FG Limited, FG Bermuda,

and Fairfield-UK were purely foreign. On the contrary, the component events identified in

*Maxwell I*, in addition to the location of BLMIS as the debtor in the United States, indicate that

the transfers to Noel Piedrahita are domestic.

*Noel Piedrahita's Location*: Noel Piedrahita is a dual citizen of the United States and

Brazil. *Id.* ¶ 392. At all relevant times, Noel Piedrahita resided and worked in the United States

maintaining multiple residences in New York, Connecticut, and Florida. *Id.*

*Where Noel Piedrahita Engaged in Business Regarding the Transactions*: During the

relevant time period, Noel Piedrahita worked in the FGG New York headquarters. *Id.* ¶ 393.

Even when she was working with the U.K. office, she worked closely with FGG's New York

office and she maintained a U.S. email address. *Id.* ¶ 396.

*Transactions and Agreements*: The transactions and agreements that led to the transfers

indicate that the parties all understood their transactions to be domestic. FGG New York

Personnel approved, directed, and controlled each of Noel Piedrahita's quarterly FG Limited

shareholder distributions, which were made from FG Limited's New York JP Morgan bank

account to Noel Piedrahita's New York Sterling National bank account. *Id.* ¶¶ 259, 395. FGG

New York Personnel approved, directed, and controlled each of the FG Bermuda shareholder

distributions made to Noel Piedrahita, which also were made to Noel Piedrahita's New York

Sterling National bank account. *Id.* ¶¶ 273, 395.

*Center of the Parties' Relationship*: Noel Piedrahita's relationship with BLMIS and FGG

was centered in the United States. As a partner and member of FGG's Executive Committee,

Noel Piedrahita knew that the transfers she received originated from BLMIS in New York. *Id.*

¶¶ 60, 394. She had extensive knowledge of the Feeder Funds' investments with BLMIS and that

BLMIS was purportedly investing the Feeder Funds' assets in U.S. securities. *See, e.g.*, *id.*

¶¶ 120, 391, 396.

*Governing Law*: Noel Piedrahita executed shareholder agreements with FG Limited that

contained New York choice of law provisions. *Id.* ¶¶ 255, 394.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers

received by Noel Piedrahita are domestic and do not require an extraterritorial application of

SIPA or the Bankruptcy Code.

### 10.    The Transfers to Amit Vijayvergiya Are Domestic

FGG Partner, Amit Vijayvergiya, received approximately $8,362,650 that originated

from BLMIS and was subsequently transferred to Vijayvergiya. *Id.* ¶ 340, Ex. 21. As specifically

pleaded in the Second Amended Complaint, all of these transfers are domestic in nature and fall

within the intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 339. Vijayvergiya's motion to

dismiss based on extraterritoriality must be denied.

Vijayvergiya joined FGG in June 2003 as the Risk Manager for FG Bermuda. *Id.* ¶ 330.

He was later promoted to serve as Chief Risk Officer, which included heading FGG's Risk

Management Division in the New York-based Investment Group, and serving on FGG's New

York-based Investment, Risk, and Asset Allocation Committees. *Id.* On January 1, 2007,

Vijayvergiya became an FGG partner and, as a result, a shareholder in FG Limited. *Id.* ¶ 337. He

received his partnership payments based on his ownership interest from FG Limited and FG

Bermuda. *Id.* ¶ 338, Ex. 21. Vijayvergiya also received salary and bonus payments from FG

Limited and FG Bermuda, and invested in and redeemed interests directly from Fairfield Sentry.

*Id.* ¶¶ 254, 273, 340, Ex. 21. Finally, he received $7,916 from FG Advisors, *id.* at Ex. 21, which

he does not challenge in his motion to dismiss.

Vijayvergiya argues that the transfers he received from Fairfield Sentry, FG Limited, and

FG Bermuda are purely foreign. On the contrary, the component events identified in *Maxwell I*,

in addition to the location of BLMIS as the debtor in the United States, indicate that the transfers

to Vijayvergiya are domestic.

*Vijayvergiya's Location*: At all relevant times, Vijayvergiya was located in Bermuda and

is a citizen of Canada. *Id.* ¶ 332.

*Where Vijayvergiya Engaged in Business Regarding the Transactions*: Vijayvergiya

performed his work for FGG, including his work managing risk for the Feeder Funds, in New

York and Bermuda. *Id.* ¶¶ 330–33. In his various roles related to risk and investment services,

Vijayvergiya reported directly to FGG's Executive Committee in New York, regularly traveled

to New York, constantly communicated with other FGG New York Personnel and FGG

investors, and maintained a U.S. email address. *Id.*

*Transactions and Agreements*: The transactions and agreements that led to the transfers

indicate that the parties all understood their transactions to be domestic. FGG personnel located

in New York approved, directed, and controlled Fairfield Sentry's transfers to Vijayvergiya.

*Id.* ¶¶ 207, 450. FGG New York Personnel approved, directed, and controlled FG Limited's

transfers to Vijayvergiya, which were made from FG Limited's New York JP Morgan bank

account. *Id.* ¶¶ 259, 338. FGG New York Personnel approved, directed, and controlled the FG Bermuda salary, bonus, and shareholder distribution transfers to Vijayvergiya. *Id.* ¶ 273.

*Center of the Parties' Relationship*: Vijayvergiya's relationship with BLMIS and FGG was centered in the United States. As the Chief Risk Officer for FGG and a regular contributor to FGG's Executive Committee meetings, Vijayvergiya knew that the transfers he received originated from BLMIS in New York. *Id.* ¶¶ 60, 330. He had extensive knowledge of the Feeder Funds' investments with BLMIS and that BLMIS was purportedly investing the Feeder Funds' assets in U.S. securities. *See, e.g., id.* ¶¶ 75–78, 86, 89–94, 99, 107–08, 115, 119–20, 137, 140, 151, 157, 159, 162, 169 181–82, 184, 186, 188, 330–31. He conducted analyses of BLMIS's purported trading, including analysis of his purported transactions in U.S. securities. *Id.* ¶ 331.

*Governing Law*: All Fairfield Sentry subscription agreements contained New York choice of law provisions and provided for venue and jurisdiction for any disputes in New York. *Id.* ¶¶ 207, 450. In addition, Vijayvergiya executed shareholder agreements with FG Limited that contained New York choice of law provisions. *Id.* ¶¶ 255, 337.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers received by Vijayvergiya are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

### 11.    The Transfers to Gordon McKenzie Are Domestic

Controller Gordon McKenzie received approximately $513,779 that originated from BLMIS and was subsequently transferred to McKenzie. *Id.* ¶ 346, Ex. 22. As specifically pleaded in the Second Amended Complaint, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. *Id.* ¶ 345. McKenzie's motion to dismiss based on extraterritoriality must be denied.

FGG hired McKenzie in 2003 to be FG Bermuda's Controller. *Id.* ¶ 341. McKenzie's

responsibilities at FG Bermuda included accounting and back office operations for the Feeder

Funds; preparing and coordinating audits of FGG's funds with PricewaterhouseCoopers; and

reviewing the financial statements prepared by PricewaterhouseCoopers for numerous FGG

entities. *Id.* ¶ 342. He reported directly to Dan Lipton, FGG's New York-based CFO. *Id.* ¶ 343.

He worked very closely with defendant Vijayvergiya in managing risk at FGG and performing

quantitative analyses of the Feeder Funds. *Id.* ¶¶ 61, 344. The Trustee alleges McKenzie received

salary and bonus payments from FG Bermuda and shareholder redemption payments from FIFL.

*Id.* ¶ 342.

McKenzie argues that the transfers he received from FG Bermuda and FIFL were purely

foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the

location of BLMIS as the debtor in the United States, indicate that the transfers to McKenzie are

domestic.

*McKenzie's Location*: At all relevant times, McKenzie resided in Bermuda. *Id.* ¶ 341. He

is a citizen of Canada. *Id.*

*Where McKenzie Engaged in Business Regarding the Transactions*: While McKenzie

was technically affiliated with FGG's Bermuda office, he worked closely with the New York

office. *Id.* ¶¶ 341, 343. McKenzie was a member of the Fund Accounting Division in FGG's

New York-based operations group. *Id.* ¶ 343. He reported directly to FGG's New York-based

CFO Daniel Lipton and other personnel at FGG's New York office. *Id.* As a result, McKenzie

routinely traveled to New York—sometimes for weeks at a time—to meet with his supervisors.

*Id.* McKenzie also traveled to FGG's New York headquarters to meet with current and potential

feeder fund investors, to solicit investments, and to respond to due diligence inquiries. *Id.*

33

*Transactions and Agreements*: The transactions and agreements that led to the transfers indicate that the parties all understood their transactions to be domestic. FGG New York Personnel approved, directed, and controlled the FG Bermuda salary and bonus transfers to McKenzie. *Id.* ¶ 273. FGG New York personnel, who controlled and managed FIFL, approved, directed, and controlled all of the FIFL transfers to McKenzie. *Id.* ¶¶ 243, 342.

*Center of the Parties' Relationship*: McKenzie's relationship with BLMIS and FGG was centered in the United States. In managing risk for FGG, McKenzie was intimately aware of the structure of BLMIS and the Feeder Funds, and the fact that they were located in the United States and operated in U.S. securities. *See, e.g.*, *id.* ¶¶ 81–84, 89, 119, 137, 140, 162, 169, 182, 341–44.

*Governing Law*: The subscription agreement FIFL provided to its shareholders contained a New York choice of law provision and provided for venue and jurisdiction for any disputes in New York. *Id.* ¶ 243.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers received by McKenzie are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

## IV.   <u>CONCLUSION</u>

For these reasons, the Trustee respectfully requests that the Court deny the motions to dismiss of defendants Fairfield Greenwich Limited, Fairfield Greenwich (Bermuda) Limited, Fairfield Investment Fund Limited, Andrés Piedrahita, Amit Vijayvergiya, Richard Landsberger, Philip Toub, Harold Greisman, Andrew Smith, Corina Noel Piedrahita, and Gordon McKenzie. The subsequent transfers they received as a result of their relationship with BLMIS were domestic in nature and are subject to the Trustee's claims under the Bankruptcy Code and SIPA.

In addition, the Trustee respectfully requests that the Court grant his motion for leave to amend

complaints.


Dated: New York, New York          /s/ Thomas L. Long
       June 26, 2015          **Baker & Hostetler LLP**
                          45 Rockefeller Plaza
                          New York, New York 10111
                          Telephone: (212) 589-4200
                          Facsimile: (212) 589-4201
                          David J. Sheehan
                          Email: dsheehan@bakerlaw.com
                          Thomas L. Long
                          Email: tlong@bakerlaw.com
                          Mark A. Kornfeld
                          Email: mkornfeld@bakerlaw.com
                          Jessie M. Gabriel
                          Email: jgabriel@bakerlaw.com
                          Catherine E. Woltering
                          Email: cwoltering@bakerlaw.com

                          **Baker & Hostetler LLP**
                          65 East State Street, Suite 2100
                          Columbus, Ohio 43215
                          Telephone: (614) 228-1541
                          Facsimile: (614) 462-2616
                          Lauren M. Hilsheimer
                          Email: lhilsheimer@bakerlaw.com

                          *Attorneys for Irving H. Picard, Trustee for the*
                          *Substantively Consolidated SIPA Liquidation*
                          *of Bernard L. Madoff Investment Securities*
                          *LLC and the estate of Bernard L. Madoff*