**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | Adv. Pro. No. 09-01239 (SMB) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | **PROFFERED** **SECOND AMENDED COMPLAINT** |
| Plaintiff, | |
| v. | |
| FAIRFIELD INVESTMENT FUND LIMITED, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ............................................................................1

JURISDICTION AND VENUE ......................................................................3

BACKGROUND, THE TRUSTEE AND STANDING ...................................4

THE PONZI SCHEME....................................................................................7

BRIEF OVERVIEW OF RELEVANT PARTIES .........................................10

    A.    The Genesis of the Fairfield Greenwich Group De Facto Partnership ...............10

        1.    Noel and Tucker.......................................................................12

        2.    Introduction to Madoff and BLMIS........................................12

        3.    Formation of Fairfield Sentry .................................................12

        4.    Formation of Greenwich Sentry..............................................14

        5.    Littlestone Associates Merger—Formation of FG Limited....15

        6.    Formation of the Currency Funds—Sigma and Lambda..........15

        7.    Formation of FG Advisors and FG Bermuda ..........................16

    B.    The FGG Partners and Employees........................................................17

THE DEFENDANTS POSSESSED EVIDENCE OF FRAUD AT BLMIS ...............19

    A.    Evidence of Fraud: Small, Unknown Auditor About Whom Madoff Repeatedly Lied ...............................................................................22

    B.    Evidence of Fraud: Madoff Refuses to Be Described as a Manager or Investment Adviser, Even When the Defendants Are Questioned by the SEC ...................................................................25

    C.    Impossibility: Options Trading Volume ................................................29

    D.    Impossibility: Equity Trading Volumes.................................................35

    E.    Impossibility: Consistent, Positive Returns ..........................................37

    F.    Evidence of Fraud: Trades Outside the Daily Range............................42

    G.    Evidence of Fraud: Buying at Market Lows and Selling at Market Highs............44

    H.    Evidence of Fraud: Unidentified Options Counterparties and Inconsistent Stories ...............................................................44

    I.    Evidence of Fraud: An Options Trading Structure that Violates Industry Standards........................................................47

    J.    Evidence of Fraud: Speculative Options Trading Inconsistent with the SSC Strategy ...................................................50

    K.    Impossibility: Lack of Scalability.........................................................51

    L.    Evidence of Fraud: Paper Trading Tickets ...........................................52

    M.    Evidence of Fraud: Avoiding SEC Reporting Requirements ................53

# TABLE OF CONTENTS
## (continued)

**Page**

N.    Evidence of Fraud: Irregular Dividend Payments ...................................................54

O.    Evidence of Fraud: Lack of Independent Broker and Custodian............................55

P.    Evidence of Fraud: BLMIS's Unusual and Unprofitable Fee Structure...............58

Q.    Evidence of Fraud: FGG's Own Consultant Tells the Defendants Madoff Is a Fraud...............................................................................................................60

THE DEFENDANTS' OTHER MOTIVE TO MAINTAIN THEIR RELATIONSHIP WITH MADOFF ...............................................................................................................63

THE DEFENDANTS AND RELATED PARTIES ...........................................................65

A.    The Feeder Funds and Currency Funds [Settled Parties].....................................65

B.    FGG Affiliates .......................................................................................................76

    1.    FGG Subsidiary Funds................................................................................76

    2.    FGG Administrative Entities ......................................................................79

C.    FGG Individuals Defendants ................................................................................90

    1.    Management Defendants .............................................................................91

    2.    Sales Defendants ......................................................................................112

IMPUTATION & PARTNERSHIP.................................................................................115

A.    FGG Was a De Facto Partnership or Partnership by Estoppel ...........................115

    1.    The Defendants Shared the Responsibilities and Benefits of FGG's Business .....................................................................................................116

    2.    The Defendants Intended for FGG to Be a Partnership............................117

B.    The FGG Individuals, Feeder Funds, and FGG Affiliates Were All Partners of FGG ....................................................................................................118

C.    The FGG Individuals Acted as Agents for the FGG Affiliates ..........................119

THE TRANSFERS ...........................................................................................................120

A.    Initial Transfers from BLMIS to the Feeder Funds ...........................................120

B.    Subsequent Transfers from the Feeder Funds to the Defendants .......................122

C.    The Subsequent Transfers Were All Domestic Transfers...................................124

CAUSES OF ACTION .....................................................................................................128

COUNT ONE: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a) .............................................................................................128

COUNT TWO: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a) .............................................................................................129

COUNT THREE: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a) .............................................................................................130

## TABLE OF CONTENTS
### (continued)

**Page**

COUNT FOUR: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§
    105(a), AND 550(a) .......................................................................................131

COUNT FIVE: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§
    105(a), AND 550(a) .......................................................................................132

COUNT SIX: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§
    105(a), AND 550(a) .......................................................................................133

COUNT SEVEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C.
    §§ 105(a), AND 550(a) ..................................................................................135

COUNT EIGHT: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C.
    §§ 105(a), AND 550(a) ..................................................................................136

COUNT NINE: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§
    105(a), AND 550(a) .......................................................................................137

COUNT TEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§
    105(a), AND 550(a) .......................................................................................138

COUNT ELEVEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C.
    §§ 105(a), AND 550(a) ..................................................................................139

COUNT TWELVE: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C.
    §§ 105(a), AND 550(a) ..................................................................................140

COUNT THIRTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11
    U.S.C. §§ 105(a), AND 550(a) ......................................................................141

COUNT FOURTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11
    U.S.C. §§ 105(a), AND 550(a) ......................................................................142

COUNT FIFTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C.
    §§ 105(a), AND 550(a) ..................................................................................143

COUNT SIXTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C.
    §§ 105(a), AND 550(a) ..................................................................................144

COUNT SEVENTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11
    U.S.C. §§ 105(a), AND 550(a) ......................................................................145

COUNT EIGHTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11
    U.S.C. §§ 105(a), AND 550(a) ......................................................................146

COUNT NINETEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11
    U.S.C. §§ 105(a), AND 550(a) ......................................................................147

COUNT TWENTY: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C.
    §§ 105(a), AND 550(a) ..................................................................................148

COUNT TWENTY-ONE: RECOVERY OF SUBSEQUENT TRANSFERS—11
    U.S.C. §§ 105(a), AND 550(a) ......................................................................149

## TABLE OF CONTENTS
### (continued)

**Page**

COUNT TWENTY-TWO: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a) .................................................................151

COUNT TWENTY-THREE: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a) ....................................................152

COUNT TWENTY-FOUR: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a) ....................................................153

COUNT TWENTY-FIVE: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a) .................................................................154

COUNT TWENTY-SIX: GENERAL PARTNER LIABILITY ....................................155

COUNT TWENTY-SEVEN: GENERAL PARTNER LIABILITY ..............................155

COUNT TWENTY-EIGHT: GENERAL PARTNER LIABILITY ...............................156

COUNT TWENTY-NINE: GENERAL PARTNER LIABILITY ..................................157

COUNT THIRTY: GENERAL PARTNER LIABILITY ..............................................157

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), under Securities Investor Protection Act, 15

U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and the consolidated estate of Bernard L. Madoff

(individually "Madoff," and collectively with BLMIS, the "Debtors"), by and through the

Trustee's undersigned counsel, for his Second Amended Complaint, states as follows:

## NATURE OF THE ACTION

1.     This Second Amended Complaint is directed at recovering funds from entities and

individuals associated with BLMIS's largest feeder fund, which was operated as part of a New

York based *de facto* partnership of business entities and individuals that marketed themselves

under the name the Fairfield Greenwich Group ("FGG").  FGG included three hedge funds that

invested virtually all of their assets with BLMIS.  These funds included Fairfield Sentry Limited

("Fairfield Sentry")—BLMIS's largest feeder fund, Greenwich Sentry, L.P. ("Greenwich

Sentry"), and Greenwich Sentry Partners, L.P. ("Greenwich Sentry Partners") (collectively, the

"Feeder Funds").  The Feeder Funds withdrew money from their BLMIS accounts and then

funneled the money to other FGG funds, administrative entities, and individual partners and

employees—the Defendants in this case.  The individual Defendants charged the Feeder Funds

significant management and performance fees  based on the fictitious performance of BLMIS,

and then divided those fees among themselves.  During the six years preceding the Filing Date

(the "Six Year Period"), the Defendants received over *2.5 billion* in funds that originated with

BLMIS.

2.     Every transfer the Defendants received that was paid using customer property, as

defined by SIPA § 78*lll*(4), must be returned to the Trustee for equitable distribution to BLMIS

customers.

3.      The Defendants justified their fees by touting their rigorous due diligence, which purportedly went above and beyond the due diligence performed by every other BLMIS feeder fund.  Through this diligence process, the Defendants were regularly faced with incontrovertible evidence that BLMIS's reported trading was impossible and that Madoff was operating the BLMIS as a fraudulent scheme.  Among many other things, at the time of the transfers:

a.      The Defendants knew BLMIS's auditor was a small, unknown firm that was not qualified to audit BLMIS.  The Defendants also knew that Madoff and the auditor itself lied to the Defendants when the Defendants asked for information regarding the auditor's size, reputation, and capabilities;

b.      The Defendants cooperated with Madoff when he requested that all references to Madoff and BLMIS be removed from the Feeder Funds' marketing materials.  The Defendants again cooperated with Madoff when he fed them answers to provide the Securities and Exchange Commission ("SEC") during the agency's investigation, following which the SEC required BLMIS to register as an investment adviser;

c.      The Defendants knew that the customer statements and trade confirmations they received from BLMIS and contemporaneously reviewed reflected implausible equities trading volumes and impossible options trading volumes, as they greatly exceeded the entire volume of reported options trading on the relevant exchange;

d.      The Defendants knew BLMIS's consistent, positive returns over nearly two decades were manufactured.  The low volatility, even in volatile markets, was an obvious sign of fraud—particularly given that BLMIS's purported trading strategy tracked the market.  The Defendants utilized the consistently low volatility as a banner to promote the success of their own funds;

e.      The Defendants knew the BLMIS account statements they received regularly contained any number of anomalies, including speculative options trades that were inconsistent with BLMIS's purported split strike conversion strategy ("SSC Strategy"), unexplained delays in settlement dates, and irregular dividend payments;

f.      The Defendants knew their options trade confirmations indicated BLMIS was trading options on the exchange. However, they also knew that Madoff eventually started telling investors the opposite—that he traded over-the-counter.

g.    The Defendants never knew the identity of a single options trade counterparty, much less whether the counterparties had the ability to perform their obligations under the trade agreements;

h.    The Defendants knew Madoff was engaging in options trading outside the parameters of the SSC Strategy. The Defendants' own consultant confronted them with evidence of Madoff's speculative options trading. Instead of pushing Madoff for an explanation, the Defendants accepted Madoff's lie that he never traded options outside the SSC Strategy;

i.    The Defendants knew their investment relationship with BLMIS prevented all of the traditional, independent checks and balances. BLMIS served as investment adviser, prime broker, sub-custodian, as well as executing broker, and all compliance and supervisory functions at BLMIS were performed by Madoff's family. This structure was tailor-made for perpetrating fraud—Madoff could readily misappropriate assets without any independent oversight;

j.    The Defendants knew Madoff was trying to hide his role as investment adviser from the SEC, and assisted him in deceiving the SEC by provided answers to the SEC that were scripted by Madoff; and

k.    The Defendants knew FGG's investors, market experts, due diligence experts, and even their own consultant hired to review BLMIS transactions considered BLMIS's reported returns to be impossible.

4.    This Court has approved settlement agreements and entered consent judgments in favor of the Trustee as to all three Feeder Funds. Through this Second Amended Complaint, the Trustee seeks to recover the money the Feeder Funds received from BLMIS and subsequently transferred to the Defendants in the form of investment redemptions, fees, partnership interests, and employment compensation, in the total amount of $2,582,860,235.

## JURISDICTION AND VENUE

5.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred

to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§ 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

6.        This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O).  The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

7.        Venue in this judicial district is proper under 28 U.S.C. § 1409.

8.        This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-

2(c)(3), 11 U.S.C. §§ 105(a), 544(b), 550(a) and 551, the New York Fraudulent Conveyance Act

(N.Y. Debt & Cred. § 270 et seq. (McKinney 2001)), the New York Civil Practice Law and

Rules (McKinney 2003) ("N.Y. C.P.L.R."), and other applicable law.[1]

## BACKGROUND, THE TRUSTEE AND STANDING

9.        On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the SEC commenced the District Court

Proceeding.

10.       On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

---

[1] Until a final determination on appeal of the applicable measure and burden of proof concerning
a defendant's knowledge in connection with the applicability of section 546(e) of the Bankruptcy
Code to the Trustee's claims to avoid and recover transfers made within six years of the Filing
Date, the Trustee asserts avoidance and recovery claims under sections 547, 548(a)(1)(B),
544(b)(1), 550 and 551 of the Bankruptcy Code, and applicable provisions of the NYDCL.

Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

11.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

12.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

13.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

14.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

15.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took

place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

16.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

17.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

18.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

19.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

- 6 -

20.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

21.    The Trustee has standing to object to customer and creditor claims under SIPA § 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and authority to discharge obligations to a customer to the extent they are established to the satisfaction of the Trustee under SIPA §§ 78*lll*(2) and 78fff-2(b).  By his objection, the Trustee seeks disallowance of any customer and general creditor claims that are unenforceable against the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not been established to his satisfaction; (ii) SIPA § 78*lll*(2), because such claims are not entitled to a distribution *pari passu* with other customers;  and (iii) 11 U.S.C. § 502(b)(1), because such claims are otherwise unenforceable under applicable law.

## THE PONZI SCHEME

22.    Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1, 2001, Madoff continued BLMIS as a sole member limited liability company under the laws of the State of New York.  BLMIS's ownership and control did not change since its formation in 1960.  During that time, BLMIS had been continually registered with the SEC, and remained a SIPC member since its formation in late 1970.  For most of its existence, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, sole owner, chairman, and chief executive officer, operated BLMIS with several family members

and other employees, including DiPascali and David Kugel, who pleaded guilty to helping

Madoff carry out the fraudulent scheme.

23.    Beginning in the 1990s, Madoff outwardly ascribed the consistent investment

success of BLMIS's IA Business to the SSC Strategy.  Madoff claimed his strategy would

produce steady returns without the volatility in the stock market or other high return investment

strategies. Madoff generally indicated that investors' funds would be invested in a basket of

common stocks within the Standard & Poor's 100 Index ("S&P 100 Index"), which is a

collection of the 100 largest publicly traded companies, as determined by Standard & Poor's

Index Committee.  The basket of stocks was designed to correlate to the movement of the S&P

100 Index.  The second part of the SSC strategy involved purporting to sell call options and buy

put options on the S&P 100 Index; this is commonly referred to as a "collar."  Madoff purported

to purchase and sell option contracts to control the downside risk of price changes in the basket

of stocks correlated to the performance of the S&P 100 Index.  All options relating to the

companies within the S&P 100 Index, including options based upon the S&P 100 Index itself,

clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that

BLMIS's IA Business cleared any trades in any exchange-listed options.

24.    BLMIS commingled all of the funds received from IA Business investors in a

single BLMIS account maintained at JPMorgan Chase Bank.

25.    Because Madoff claimed that he would carefully time purchases and sales to

maximize value, customer funds would intermittently be out of the market.  During those times,

Madoff claimed that the funds were invested in U.S. Treasury securities ("Treasury Bills") or

mutual funds invested in Treasury Bills.  There is no record of BLMIS clearing a single purchase

or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing

- 8 -

Corporation, the clearing house for such transactions, or any other trading platform on which
BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that
BLMIS traded securities using the SSC strategy.

26.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased
none of the securities listed on the IA Business customers' fraudulent statements.

27.    Madoff operated the IA Business as a Ponzi scheme.  The money received from
IA Business customers was used primarily to make distributions to, or payments for, other
customers.  The falsified trades reflected in monthly account statements made it appear that the
IA Business accounts included substantial gains on customers' principal investments.  The Ponzi
scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow
of new investments with BLMIS's IA Business.

28.    Since at least 1983, BLMIS financial reports filed with the SEC fraudulently
omitted the existence of the billions of dollars of customer funds held by BLMIS.

29.    BLMIS did not register as an investment adviser with the SEC until August 2006.
At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment
Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts
and assets under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually
with the SEC, the latest of which was filed in January 2008.  It represented that BLMIS had 23
customer accounts with assets under management of $17.1 billion.  In fact, at that time BLMIS
had over 4,900 active customer accounts with a purported value of approximately $68 billion
under management.

30.    Contrary to standard practice in the investment advisory industry, BLMIS did not
charge the IA Business customers a fee for investment advisory services.  Madoff knew others

that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged

hundreds of millions of dollars for investment advisory services attributed to BLMIS.  Instead of

investment advisory fees, BLMIS purported to accept commissions for the purported trades, as

reflected in the fraudulent IA Business customer statements.

31.     BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling &

Horowitz"), a three-person accounting firm in Rockland County, New York.  Of the three

employees at the firm, one employee was an administrative assistant and one was a semi-retired

accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole

proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and

filing false tax returns for Madoff and others.

32.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## BRIEF OVERVIEW OF RELEVANT PARTIES

### A.     The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

33.     In 1988, Defendants Walter Noel and Jeffrey Tucker became the founders of a *de

facto* partnership called the Fairfield Greenwich Group, which was based in New York City.

Later, as described below, others joined Noel and Tucker as FGG partners.

34.     The FGG *de facto* partnership included: individual persons; U.S. corporations;

foreign corporations; and investment vehicles launched, managed, operated, and marketed from

FGG's New York headquarters.  Among the FGG investment vehicles were the three Feeder

Funds, as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield

Lambda Limited ("Lambda") (the "Currency Funds") that invested entirely in Fairfield Sentry.

35.    Other FGG managed and marketed investment vehicles included so-called "fund of funds," such as defendants Fairfield Investment Fund Limited ("FIFL"), and Stable Fund LP ("Stable Fund"), which invested part of their assets in the Feeder Funds and Currency Funds. FGG also included a number of administrative entities that purportedly provided management and back office support to the funds.  These entities included defendants:  Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda) Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").  FIFL, Stable Fund, FG Limited, FG Bermuda, FG Advisors, and Fairfield International Managers will jointly be referred to as the "FGG Affiliates."

36.    The three Feeder Funds all invested at least 95% of their assets with BLMIS. A chart listing all of FGG's accounts at BLMIS is attached as Exhibit 1.  Fairfield Sentry also invested a very small percentage of its assets in other investment vehicles that FGG managed and marketed from its New York headquarters.  The Defendants knew that their success depended on their ability to market the Feeder Funds as Madoff funds.  Over time, the Feeder Funds' investments with BLMIS grew dramatically.  Between November 1990 and December 2008, Fairfield Sentry's investments with BLMIS increased from $4 million to over $6 billion.  FGG's total assets under management increased concurrently:

### Assets Under Management by FGG

| Year | AUM (billions USD) |
|------|-------------------|
| 2002 | $5.4  |
| 2003 | $6.3  |
| 2004 | $8.8  |
| 2005 | $9.4  |
| 2006 | $12.4 |
| 2007 | $16.1 |
| 2008 | $13.1 |

### 1.    Noel and Tucker

37.    Prior to forming FGG, Defendant Noel worked in management consulting and international banking. He created the international private banking group at Chemical Bank.  In 1983, Noel left Chemical Bank to start his own consulting firm to advise investors regarding U.S.-based alternative investments.

38.    Prior to forming FGG, Defendant Tucker was an attorney at the SEC from 1970 to 1978, after which he entered the private practice of law as a partner at Tucker, Globermand & Feinsand.  While in private practice Tucker represented Fred Kolber and his company Fred Kolber & Co., a registered broker-dealer.  In 1987, Tucker left private practice and became a general partner at the Kolber firm. After Tucker became a general partner, Tucker and Kolber launched a domestic hedge fund, the Greenwich Options Fund.  Kolber was responsible for the investment decisions while Tucker assisted in the administration and marketing of the fund. During this time, Tucker and Kolber sublet offices in New York City from Noel. Through this landlord-tenant relationship, Noel became acquainted with Tucker and Kolber.

### 2.    Introduction to Madoff and BLMIS

39.    In 1989, Tucker's father-in-law, Norman Schneider, introduced Noel and Tucker to Madoff.  In July 1989 Noel, Tucker, and Kolber pooled $1.5 million and invested with BLMIS through an entity they had created called Fairfield Strategies Ltd., which later invested another $1 million with BLMIS.  Following these initial investments, Noel and Tucker decided to start a separate fund that would invest nearly all of its assets with BLMIS.

### 3.    Formation of Fairfield Sentry

40.    On October 30, 1990, Noel and Tucker formally organized Fairfield Sentry as an international business company under the law of the Territory of the British Virgin Islands ("BVI").  Noel and Tucker were the original directors of Fairfield Sentry.  They chose to

organize Fairfield Sentry abroad to take advantage of the United States Internal Revenue Code's

safe harbor, which permitted them to operate Fairfield Sentry from the United States without

being subject to United States federal income tax. Fairfield Sentry enjoyed tax-free status under

BVI law as well.

41.     At the outset, and throughout its history, Fairfield Sentry was a shell corporation

with no employees.  Noel and Tucker originally outsourced Fairfield Sentry's operations to

Fairfield Investment Managers, a Delaware corporation Noel and Tucker created on January 1,

1988, and which they jointly owned equally.  Noel and Tucker later outsourced operations to

other FGG entities created, controlled, and operated by FGG New York Personnel.

42.     Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund

Services") to provide back office administrative services for Fairfield Sentry. In addition, they

contracted with Citco Global Custody N.V. ("Citco Custody") to be the custodian for Fairfield

Sentry.  Although Citco Custody was nominally Fairfield Sentry's custodian, the custodian

agreement indicated that BLMIS would serve as sub-custodian. Fairfield Sentry disclosed that

BLMIS, as sub-custodian, would have actual custody of Fairfield Sentry's assets.  Tucker and

Noel opened bank accounts in Fairfield Sentry's name at Citco Bank Nederland, N.V. Dublin

Branch ("Citco Bank Dublin") with control of the accounts held by FGG New York Personnel.

43.     In November 1990, Tucker opened an investment account and corresponding

options account at BLMIS. Tucker initially indicated Fairfield Sentry's mailing address was

Fairfield International Managers' office in Greenwich, Connecticut. Then, in 1998, FGG directed

BLMIS to mail all Fairfield Sentry account statements, trade confirmations, and correspondence

to FGG's New York headquarters.

- 13 -

44.     In Information Memoranda prepared at Noel's and Tucker's direction and presented to potential Fairfield Sentry investors, Fairfield Sentry disclosed the contractual arrangements between Fairfield Sentry, Fairfield International Managers, BLMIS, Citco Fund Services, and Citco Custody, including that Fairfield International Managers would receive a performance fee of 20% of any gains in the Fairfield Sentry BLMIS accounts for serving as Fairfield Sentry's investment manager.  Fairfield Sentry's Information Memoranda also disclosed that all investment decisions would be made by BLMIS in New York and all of Fairfield Sentry's assets would be located in discretionary accounts at BLMIS.

45.     In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. Again, Tucker initially indicated all account documents should be sent to Greenwich, Connecticut, and then later directed BLMIS to send relevant documents to FGG's New York headquarters.

### 4.     Formation of Greenwich Sentry

46.     Fairfield Sentry was operated from the United States.  However, Fairfield Sentry was limited to non-U.S. taxpayers in order to produce U.S.-driven investment returns that were not subject to U.S. taxes

47.     In November 1992, Noel and Tucker formed a Delaware limited partnership with its own BLMIS account, Greenwich Sentry.  Fairfield International Managers served as Greenwich Sentry's general partner and new investors became limited partners.  Unlike Fairfield Sentry, Greenwich Sentry was open to U.S. taxpayers.  Similar to Fairfield Sentry, Noel and Tucker had Greenwich Sentry contract with Fairfield International Managers, BLMIS, Citco Fund Services and Citco Custody to conduct its operations. In addition, similar to the structure at Fairfield Sentry, Fairfield International Managers, as Greenwich Sentry's general partner, was entitled to a performance fee equal to 20% of the gains in the Greenwich Sentry BLMIS account.

### 5.    Littlestone Associates Merger—Formation of FG Limited

48.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. In order to reflect the new ownership of FGG, Noel, Tucker and Piedrahita formed FG Limited under the laws of Ireland.

49.    Noel and Tucker through Fairfield International Managers owned 66.7% of FG Limited while Piedrahita owned 33.3% of FG Limited.  In 2001, Piedrahita transferred his ownership interest to a Cayman Islands corporation he had formed, Safehand Investments.

### 6.    Formation of the Currency Funds—Sigma and Lambda

50.    Also in 1997, in response to FGG clients' requests to be able to invest in Fairfield Sentry using Euros rather than U.S. Dollars, FGG began marketing Sigma as a Euro currency fund that invested 100% of its assets in Fairfield Sentry.  Like Fairfield Sentry, Sigma was organized as a BVI international company.  Tucker and Noel contracted with Citco Fund Services and Citco Custody to provide back office administration and custody services for Sigma. Tucker and Noel also had Sigma contract with FG Limited to be its investment adviser.

51.    Shortly after the marketing of Sigma began, FGG commenced marketing a second currency fund named Lambda, which permitted FGG customers to invest in Fairfield Sentry using Swiss Francs.  Like Fairfield Sentry and Sigma, Lambda was organized as a BVI international company.  Tucker and Noel contracted with Citco Fund Services and Citco Custody to provide back office administration and custody services for Lambda.  Tucker and Noel also had Lambda contract with FG Limited to be its investment adviser.

52.    FGG created, in addition to the Feeder Funds and Currency Funds, other investment vehicles that it managed from its New York headquarters.  Similar to the Feeder Funds, the other investment vehicles had no employees. Rather, FGG New York Personnel

provided the needed administrative, sales, marketing, and operational services for these funds

while third party service companies provided back office services. To meet the increased

demands on its New York Personnel, FGG hired more employees for the New York headquarters

and made other individuals FGG partners by awarding them percentage ownership of FG

Limited.

### 7.    Formation of FG Advisors and FG Bermuda

53.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him

FGG would be launching a new fund of funds that would be open to all investors.  FGG

informed Madoff that FGG would form a new U.S. entity to be the investment adviser of the new

fund of funds as well as other FGG operated funds, including the feeder and currency funds.

Fearing greater SEC scrutiny, Madoff rejected the idea that a United States based entity would

serve in the role as the investment manager of the Feeder and Currency Funds.  As a result, FGG

formed two new entities.

54.    In October 2003, FGG formed FG Advisors as a Delaware limited liability

company. FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG

formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

management contracts to both entities. In particular, FG Limited assigned the investment

advisory agreements for Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry to FG

Bermuda.  FG Limited remained the placement agent for the same funds.

55.    Madoff skeptics correctly attributed this restructuring to an attempt by Madoff to

shield his operations from SEC scrutiny.  FGG responded to the critics and its other investors by

falsely claiming the formation of FG Bermuda was not related to a request by Madoff but instead

was driven by tax savings.  FG Limited also arranged for FG Advisors to receive payments for

administrative services provided to Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry as most of the FGG employees managing and marketing the funds were FG Advisors employees based in FGG's New York headquarters.

56.     Within the FGG *de facto* partnership, FG Bermuda provided risk management services to a number of FGG investment vehicles as well as the Feeder Funds and Currency Funds.  With the assignment of the investment advisory contract from FG Limited, FG Bermuda was purportedly the investment adviser for Fairfield Sentry and was paid management and performance fees by Fairfield Sentry.  At the same time, FG Limited remained the placement agent of the Feeder Funds and Currency Funds and received a percentage of the management and performance fees paid by the funds to FG Bermuda.

57.     The FGG *de facto* partnership structure was in place from at least 2002 until Madoff's arrest on December 11, 2008.

**B.     The FGG Partners and Employees**

58.     While FGG technically was just a trade name rather than a legal partnership, it operated as a *de facto* partnership.  As FGG grew, the number of partners expanded.  These partners held various roles across the Feeder Funds, FGG Affiliates, and other FGG entities.  The profits received by the myriad of FGG entities were combined and distributed to individuals and entities based upon each individual's "partnership" percentage.

59.     As the founding partners, Noel, Tucker, and Piedrahita shared the responsibilities of overseeing the management and supervision of FGG's business.  Tucker focused on operations and was the person responsible for FGG's direct relationship with Madoff and BLMIS.  With their knowledge of BLMIS operations, Noel and Piedrahita traveled the world marketing FGG's funds and securing billions of dollars from investors.  FGG was headquartered

- 17 -

in New York and maintained offices around the world—in Greenwich, Miami, Bermuda,

London, Madrid, Lugano, Rio de Janeiro, and Rotterdam.

60.     As FGG grew, the founders transferred responsibility to a larger Executive

Committee.  The Executive Committee consisted of five to six members nearly all of whom

worked out of FGG's New York headquarters.  The Executive Committee typically met in New

York on at least a monthly basis.  The Executive Committee was responsible for managing the

day-to-day activities of FGG, reviewing all investment and business management decisions and

fund managers, and approving FGG's budget and partner compensation.  The Executive

Committee received detailed reports regarding fund operations (including the Feeder Funds'),

monthly performance estimates, and reports from FGG partners and employees regarding

internal and external concerns.  The Executive Committee devoted approximately a third of its

time to overseeing the operation of Fairfield Sentry.  Along with Noel, Tucker, and Piedrahita,

the following defendants served on the Executive Committee: Robert Blum ("Blum"), Gregory

Bowes ("Bowes"), Richard Landsberger ("Landsberger"), Charles Murphy ("Murphy"), Mark

McKeefry ("McKeefry"), Andrew Smith ("Smith"), Harold Greisman ("Greisman"), and Philip

Toub ("Toub").  Each of these partners also held other positions at FGG that kept them

intimately involved with the Feeder Funds and Madoff.

61.     Other FGG partners and employees played significant roles in FGG's relationship

with BLMIS.  Daniel Lipton ("Lipton") was FGG's Chief Financial Officer, Amit Vijayvergiya

("Vijayvergiya") was FG Bermuda's Chief Risk Officer and performed much of FGG's due

diligence, Gordon McKenzie ("McKenzie") was FG Bermuda's Controller and worked closely

with Vijayvergiya, and Corina Noel Piedrahita ("Noel Piedrahita")—Walter Noel's daughter and

Andrés Piedrahita's wife—headed up FGG's Investor Relations.  Blum, Bowes, Landsberger,

Lipton, Murphy, McKeefry, McKenzie, Noel, Noel Piedrahita, Piedrahita, Tucker, and Vijayvergiya are together referred to as the "Management Defendants."

62.     FGG also had an experienced financial product sales team, including: Lourdes Barreneche ("Barreneche"), Cornelis Boele ("Boele"), Santiago Reyes ("Reyes"), and Jacqueline Harary ("Harary") (together, the "Sales Defendants").

63.     These individuals (the "FGG Individuals") were beneficiaries of funds that flowed from BLMIS.  Collectively, they received partnership distributions, fund redemptions, salaries, and bonuses totaling nearly half a billion dollars.  Through this action, the Trustee seeks to recover those funds and the funds transferred to the FGG Affiliates.

## THE DEFENDANTS POSSESSED EVIDENCE OF FRAUD AT BLMIS

64.     The Defendants repeatedly told investors and potential investors they conducted superior due diligence, far beyond any due diligence performed by their peers.  The Defendants monitored FGG's investments with Madoff by analyzing BLMIS's performance, including the execution of the SSC Strategy, and investigating BLMIS's auditor.

65.     The Defendants claimed, among other things, that they had full transparency into the Feeder Funds' investments with BLMIS, that they conducted monthly quantitative analyses, and that BLMIS only used counterparties for his over-the-counter ("OTC") options trading that the Defendants had identified on an approved list.  The Defendants further claimed that they saw all of the trades on a "daily basis."  They employed sophisticated risk analysis tools such as RiskMetrics to analyze BLMIS's purported trading.  The Defendants also emphasized to investors that they confirmed the adequacy of the Feeder Funds' investment managers and staff, as well as BLMIS's technological capabilities.

66.     The Defendants had access to vast amounts of information about BLMIS, including information that was not available to the public.  This included, but was not limited to: the Feeder Funds' account statements and trade confirmations, and the Defendants' internal analyses of those statements; FGG's own consultant, Gil Berman, whom they tasked with analyzing the BLMIS trading activity; FGG's investors and potential investors who repeatedly communicated that Madoff and BLMIS were frauds; publicly published concerns about Madoff and BLMIS; market and industry experts who expressed the possibility of fraud and that BLMIS was not legitimate; market rumors; and their own common sense.  The Defendants possessed irrefutable evidence of fraud at BLMIS.

67.     The Defendants knew, among other things, that:

- BLMIS's purported consistent, positive returns for more than 15 years were virtually impossible;

- BLMIS alone purportedly traded more OEX options—options traded on the S&P 100 Index—than were traded on the entire options exchange;

- The volume of securities BLMIS was purportedly trading was impossibly large relative to the total amount of securities that were trading on the entire NYSE, NASDAQ and Chicago Board Options Exchange ("CBOE");

- BLMIS was supposedly executing billion-dollar options transactions on the Feeder Funds' behalf with anonymous counterparties who never asked for the Feeder Funds' identity or for collateral, and from whom the Feeder Funds never sought similar assurances;

- BLMIS was purportedly audited by a small, unknown auditor incapable of performing a legitimate audit, and about whom Madoff lied; and

- Madoff often provided the Defendants with contradictory and sometimes nonsensical explanations for his market transactions.

68.     The Defendants' extensive review of quantitative information confirmed that BLMIS's purported returns and trading activity were impossible and could only be achieved through fraud.

69.    Knowledge of the evidence of fraud at BLMIS moved through the FGG organization and involved each and every Defendant.  The Defendants knew Madoff was being investigated by the SEC and that he did not want to be described as an investment adviser to avoid further SEC scrutiny.  In response, the Defendants assisted Madoff by reviewing all potential questions and responses with Madoff in advance of the call with the SEC, and then reporting back to Madoff immediately after the call.

70.    In addition, the Sales Defendants were in touch with investors and potential investors who repeatedly conveyed that there was evidence Madoff was a fraud.  Many potential investors told the Sales Defendants they would not invest with the Feeder Funds or closed their Feeder Funds accounts due to their concerns of fraud at BLMIS.

71.    Appreciating the significance of the red flags raised by investors, the Sales Defendants elevated investors' concerns to the Management Defendants, who conducted due diligence into the investors' concerns and crafted responses.  The Management Defendants were also privy to information they received directly from Madoff and were responsible for organizing and implementing FGG's due diligence protocols.

72.    The totality of the information available to, reviewed by, and understood by the Defendants gave them contemporaneous knowledge of fraud at BLMIS.  This was not fraud by hindsight.  The Defendants were faced with evidence of fraud on a regular basis while the fraud was being perpetrated.

73.    Despite the regular and repeated evidence of fraud at BLMIS that the Defendants saw and understood, the Defendants continued to invest through BLMIS.  The Defendants were motivated maintain and increase the assets under management so they could continue to reap hundreds of millions in management and performance fees.  Even the Defendants' own

- 21 -

consultant reported that the entire success of the FGG operation was based on the opportunity to
market access to BLMIS.  Beyond that, Defendants had another motivation as well: to increase
FGG's value on paper in hopes of selling FGG to a third party.

> **A.    Evidence of Fraud: Small, Unknown Auditor About Whom Madoff
> Repeatedly Lied**

74.    BLMIS had false audit reports prepared by Friehling & Horowitz, a one-man firm
from Rockland County, New York consisting of one CPA, an administrative assistant, and a
semi-retired accountant living in Florida.

75.    In 2003, an investor emailed a number of FGG employees, including Barreneche,
asking "Is the auditor that Madoff uses recognized within this industry? Are references
available?"  These questions were forwarded to Lipton, who wrote to McKeefry and Tucker,
"Friehling & Horowitz do *[sic]* not have a web site, nor is there any information on them at the
AICPA [American Institute of Certified Public Accountants].  Do you know how many clients
they have and if they have any references[?]"  Tucker responded, "I do not know them; suggest
you call Frank [DiPascali] and ask if they have a brochure or he can give you some info as
several clients over the years have asked about the firm."  Lipton and Vijayvergiya then arranged
to call DiPascali.

76.    Following up on the investor's questions, Lipton emailed Vijayvergiya saying
"Amit and I called today and we accidentally got transferred to the Man himself.  He told us that
they have been in business for over 25 years.  They have 100's of clients and numerous broker-
dealers."

77.    The information Madoff provided Lipton and Vijayvergiya was suspect given that
as early as 2003, FGG knew that there was no information about Friehling & Horowitz on the
AICPA website.  As a nine-year veteran of a Big Four accounting firm, Ernst & Young, Lipton

knew that all accounting firms performing audit work must enroll in the AICPA peer review

program. This program involves having experienced auditors assess a firm's audit quality each

year. Friehling & Horowitz, while a member of the AICPA, had not been peer reviewed since

1993. The results of these peer reviews are on public file with the AICPA. Friehling &

Horowitz never appeared on the public peer review list because Friehling had notified the

AICPA he did not perform audits. The firm's absence on the list was a major red flag because it

meant it would have been impossible for the firm to perform a legitimate audit of BLMIS.

78.    In February 2004, after it was internally reported that Lipton and Vijayvergiya

told an investor that PwC audited BLMIS, Landsberger asked Blum, Vijayvergiya, and Lipton,

"doesn't a small accounting firm audit Madoff?? . . . there is a difference… (big difference)."

Blum responded "pwc does the fund, some small acctg firm does madoff."

79.    During 2005, the Defendants were again confronted about Friehling & Horowitz

when the $400 million Bayou Ponzi scheme became public. Bayou displayed a number of major

red flags similar to those exhibited by BLMIS. Both Bayou and BLMIS delivered steady,

positive annual returns with almost no volatility. Neither Bayou nor BLMIS charged a

management fee based on the assets under management. This fee structure was atypical of hedge

fund and other alternative investment managers. Finally, both Bayou and BLMIS had obscure,

non-independent auditors—Bayou, an in-house accountant and BLMIS, Friehling & Horowitz.

80.    When the Bayou fraud came to light, a Fairfield Sentry investor raised parallels

between Madoff and Bayou, questioning FGG about "the risk [of] investing in Sentry" in light of

"certain similarities with Bayou." The investor expressly identified the conflict of interest in

BLMIS acting as the self-clearing broker and receiving commission-based fees, and pointed out

that BLMIS employed a small auditor rather than using one of the "big four."

81.    When the investor pressed for direct answers to the questions about Madoff and

BLMIS's auditor, his questions were escalated within FGG to Tucker, McKeefry, Lipton, and

McKenzie.  Tucker asked Lipton and McKenzie to investigate so he could respond to the

investor's concerns.

82.    Lipton reported to Tucker:

> Frehling [*sic*] & Horowitz, CPAs are a small to medium size
> financial services audit and tax firm, specializing in broker-dealers
> and other financial services firms.  They are located in Rockland
> County, NY.  They have [hundreds] of clients and are well
> respected in the local community.

83.    Two days after Lipton's report, Tucker somehow "addressed all the clients'

questions, and gave them the comfort they were seeking."  Later on the same day that Tucker

spoke with the investor, McKenzie obtained and distributed to Tucker, Lipton, Barreneche, and

McKeefry a Dun & Bradstreet report on Friehling & Horowitz that indicated that Madoff had

lied about Friehling and Horowitz's ability to conduct proper audits of BLMIS.  The report,

reflecting information provided by Friehling & Horowitz, showed it only had one employee and

annual receipts of $180,000.  Tucker's response upon learning that BLMIS's auditor was similar

to Bayou's auditor was "thank you."  FGG knew this report proved Madoff lied to them in 2003

when he claimed Friehling & Horowitz had hundreds of clients and numerous broker-dealers.

84.    McKenzie then called DiPascali at BLMIS to ask about Friehling & Horowitz.

DiPascali was unable, or unwilling, to answer any questions about Friehling & Horowitz, and

directed McKenzie to Madoff.  Because DiPascali was often the principal source of information

regarding the Feeder Funds' accounts and BLMIS's operations, his inability and/or

unwillingness to answer simple questions about BLMIS's auditor was further evidence of fraud.

McKenzie, knowing Madoff would not speak to him, sent an email to Tucker asking him to bring

up the topic the next time Tucker spoke with Madoff.  There is no evidence Tucker did so.

85.    The Defendants also knew that Madoff told them changing stories about the relationship between BLMIS and its auditor.  When questioned about Friehling & Horowitz, Madoff sometimes told customers, including FGG, that he did not change auditors because there was a family connection to Friehling.  Defendants knew and understood Madoff's family connection claim was another badge of fraud as auditors must be independent from their clients and a family connection would prevent an independent relationship.

86.    On or around March 15, 2008, Landsberger, Smith, Toub, della Schiava, Vijayvergiya, Tucker, and the rest of the Executive Committee at the time discussed customer concerns that BLMIS's auditor was a member of Madoff's family.  This lack of independence between the auditor and audit client would be a conflict of interest.  Later, on or around March 26, 2008, the Executive Committee discussed how Madoff changed his story and claimed he had no family ties to Friehling when the so-called family auditor conflict of interest issue arose again.

87.    The Defendants knew that Friehling had lied to them when Lipton contacted Friehling & Horowitz.  The Defendants knew that Madoff himself lied to them when he told them about Friehling & Horowitz's substantial client list.  The Defendants knew Friehling & Horowitz could not perform an audit of any company, much less a company with billions in assets that BLMIS purported to manage.  The Defendants knew Madoff lied about the family connection with Friehling & Horowitz.

**B.    Evidence of Fraud: Madoff Refuses to Be Described as a Manager or Investment Adviser, Even When the Defendants Are Questioned by the SEC**

88.    The Defendants knew that BLMIS never wanted to be characterized accurately as the manager or investment adviser of the Feeder Funds.  If BLMIS were disclosed as the investment adviser, it would have to register with the SEC, garnering greater regulatory scrutiny and risk its fraud would be detected.  In addition, if registered, BLMIS would have to publicly

disclose its assets under management.  In an attempt to avoid registration, Madoff demanded the

Feeder Funds describe BLMIS as the non-discretionary executing broker.  Of course, this was

entirely false and the Defendants knew it was false.  BLMIS always acted autonomously, making

all investment decisions for the Feeder Funds' accounts without ever consulting the Defendants.

Yet, until 2006, when finally forced by the SEC to properly describe BLMIS's role, the Feeder

Funds' marketing materials described and disclosed BLMIS as non-discretionary executing

broker as directed by Madoff.  At the same time, the Defendants continued to tell their investors

(through means other than their formal marketing materials) that Madoff was advising the Feeder

Funds.

89.    The Defendants were repeatedly told by Madoff that he did not want them to

accurately describe BLMIS and the Defendants complied:

- On August 22, 2003, after reviewing a draft due diligence questionnaire
  for a potential investor, Blum directed Vijayvergiya (copying Landsberger
  and Tucker) to, "always keep in mind the prime directive and downplay
  Madoff's role—never to have his name within 30 words of the word
  'manage' as you do in the second paragraph ('…BLM manages the assets
  of the Fund'.).  He is extremely sensitive to this and wants to be referred
  to merely as our broker and custodian."

- In June 2004, the Defendants started removing references to BLMIS from
  their marketing materials despite the fact that Madoff managed and
  controlled almost all of the money in the Feeder Funds.  On June 23, 2004,
  McKenzie indicated in an email to Lipton, McKeefry and another FGG
  employee that they needed to "take out all mention of Madoff" from the
  FGG website.

90.    In 2005, the SEC began investigating BLMIS's feeder funds, including, but not

limited to, the FGG Feeder Funds.  After being contacted by the SEC, Vijayvergiya and

McKeefry called Madoff in the middle of December 2005 to inform him of the upcoming

interview.  Prior to the call, they forwarded to Madoff some of FGG's marketing materials,

including a summary of how they intended to describe the SSC Strategy to the SEC.

91.    Vijayvergiya secretly taped the conversation.  The parties first agreed that no one was ever to know they were scripting their responses:

| | |
|---|---|
| Mr. Madoff: | Obviously, first of all, this conversation never took place, Mark, okay? |
| Mr. Vijayvergiya: | Yes, of course. |
| Mr. Madoff: | All right.  There are a couple of things that, you know, could come [up with the SEC] . . . number one . . . we never want to be looked at as the investment manager . . . . |
| Mr. Vijayvergiya: | Right. |

                    ****************************

| | |
|---|---|
| Mr. Madoff: | So the—you know, the less that you know about how we execute, and so on and so forth, the better you are . . . if they asked do you know . . . if Madoff has Chinese walls, and you say, yes, look – you know, your position is say, listen, Madoff has been in business for 45 years . . . you  know, he's a well known broker.  You know, we make the assumption that he's—he's doing everything properly. |

                    ****************************

| | |
|---|---|
| Mr. Madoff: | [O]ur role has always been defined as the executing broker for our clients . . . . |

                    ****************************

| | |
|---|---|
| Mr. Madoff: | The objective of the fund is to achieve capital appreciation . . . but don't say—consistent monthly returns. |
| Mr. Vijayvergiya: | Okay.  You can delete that, yeah. |

92.    Madoff gave precise instructions on how to respond to the SEC's questions in order to mislead the agency as to BLMIS's role with the Feeder Funds and hopefully avoid having to register BLMIS as an investment adviser.  Madoff specifically told McKeefry and Vijayvergiya to tell the SEC he was merely "the executing broker," and all investment decisions were made by FGG.  All participants to the conversation knew this to be false.

93.     During the SEC interview, on December 21, 2005, the SEC asked that FGG keep

confidential the contents of the interview.  McKeefry and Vijayvergiya gave no indication that

they would not do so.  Instead, they sent a transcript of the interview to BLMIS two days later.

94.     The transcript made clear that Vijayvergiya and McKeefry, acting on behalf of

FGG, had dutifully followed Madoff's instructions.  They told the SEC that FG Bermuda acted

as the investment adviser and made all discretionary decisions, while BLMIS's role was

extremely limited:

> FGBL is the Investment Manager of Fairfield Sentry.  We allocate
> a majority of the fund's assets to the Split Strike Conversion
> Strategy.  We also allocate 5% to seedlings to cultivate growth.
> The Madoff organization executes the other 95% of trades within
> the parameters of the Split Strike Conversion Strategy.  There are
> very clear guidelines that govern the execution of this strategy that
> we have agreed to.  The only areas of decision made by BLM are
> with respect to price and timing of the trades.

95.     While the investigation was ongoing, in attempt to deflect further SEC inquiry,

FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.

This was particularly unusual given that FG Bermuda had purportedly been serving as the

investment advisers to the Feeder Funds since 2003.

96.     Ultimately, despite Madoff's and the Defendants' efforts, in 2006, the SEC

required BLMIS to register as an investment adviser.  The SEC also determined FGG had to

modify its Feeder Funds' marketing materials—which had previously been revised to remove all

mention of both Madoff and BLMIS—to make clear that the strategy the Feeder Funds were

selling was being managed and executed in all respects by Madoff.  The SEC required the Feeder

Funds and BLMIS to execute new customer agreements because the existing agreements did not

limit Madoff to acting merely as an executing broker, as had been for years, claimed by FGG.

C.    **Impossibility: Options Trading Volume**

97.    The Defendants understood BLMIS did not make separate trades for each of the

IA Business customer accounts.  Instead, BLMIS purportedly purchased large baskets of stocks

and options, and proportionately allocated them to each customer account.  As a result, by

comparing the amount in the Feeder Funds' accounts to the estimated overall assets under

management at BLMIS, the Defendants easily determined what percentage the Feeder Funds'

assets were of the total assets BLMIS purportedly invested using the SSC Strategy.  In this way,

the Defendants knew that BLMIS's total purported trading volume was impossibly large.

98.    The Defendants estimated BLMIS's total assets under management based on their

estimate of the Feeder Funds' share of BLMIS's assets.  They were then able to apply this same

calculation to estimate the total amount of option and equity trades BLMIS performed for all of

its customers.

99.    In 2006, Vijayvergiya estimated that the Feeder Funds accounted for 35-40% of

all trading by BLMIS.  Vijayvergiya based this on an estimate that BLMIS had $12 billion in

assets under management, $4.7 billion of which were attributed to the Feeder Funds.

100.    These figures were confirmed when BLMIS was forced to register as an

investment adviser in August 2006.  At that time, BLMIS reported that it had $11.7 billion under

management at the end of July 2006.  Later filings stated that BLMIS was managing $13.2

billion at the end of 2006, and $17.1 billion at the end of 2007. At the same time, the Feeder

Funds' accounts reported balances of $4.9 billion through July 2006, $5.5 billion at the end of

2006, and $7.2 billion at the end of 2007, or approximately 42% of the assets BLMIS reported it

was managing.  Based upon the Defendants' understanding that the Feeder Funds accounted for

approximately 42% of BLMIS's trading, the Defendants knew the basket of trades BLMIS

would have been executing for all of its customers was approximately 2.4 times the trades he
was reporting on the Feeder Funds' account statements and trade confirmations.

101.    S&P 100 Index options are traded on the CBOE under the symbol OEX.  BLMIS
*nearly always* reportedly traded more OEX options than were traded on the entire CBOE.
Because of this, Madoff eventually started telling the Defendants that he traded on the OTC
options market, where the volume could not be confirmed.  However, every trade confirmation
sent by BLMIS to FGG's headquarters in New York were labeled OEX, indicating all options
trades were exchange-based and not OTC trades.

102.    From 2001 to 2008, when comparing the volume of OEX options that BLMIS
was purportedly trading on behalf of the Feeder Funds, with the CBOE volume, BLMIS traded
more OEX options than the entire volume of the CBOE *97.6% of the time*.  During those eight
years, BLMIS purportedly traded fewer options than were traded on the options exchange on a
given day *only 18 times*.

103.    A comparison between the volume of OEX put options BLMIS claimed to trade
on behalf of the Feeder Funds and the volume of those same put options traded on the entire
exchange is striking, as demonstrated on the next page.

**FGG Historic Put Activity Compared to CBOE 2001-2008**



**Red line** indicates put options volumes for the FGG Feeder Funds
**Black line** indicates put options volumes for the entire CBOE

104.    The volume of OEX put options BLMIS purportedly traded on behalf of the

Feeder Funds (the red line) completely dwarfs the volume of OEX put options traded on the

entire CBOE (the black line).  Almost every time BLMIS purportedly entered the market to trade

put options for the Feeder Funds, it traded more OEX put options than all trades on the CBOE

*combined*.

105.    In as much as the Feeder Funds accounted for approximately 42% of BLMIS's

trading, the Defendants knew that when BLMIS was purportedly trading 140,000 options for the

Feeder Funds' accounts in late 2008, BLMIS was purportedly trading over 300,000 options for

all of his accounts. The amount by which BLMIS's purported trading overshadows the trades

made by every other person who traded OEX put options on the CBOE is unbelievable, as shown below.

**Estimated Put Activity for all BLMIS Accounts Compared to CBOE 2001-2008**



**Red line** indicates estimated put options volumes for all BLMIS accounts (based on 2.4x multiplier)
**Black line** indicates put options volumes for the entire CBOE

106.    The volume of OEX call options BLMIS purportedly traded on behalf of the Feeder Funds, and on behalf of all BLMIS customers, versus the volume of those same call options traded on the entire exchange, is equally telling.  There was rarely a time when BLMIS purportedly traded *fewer* OEX call options than were traded on the CBOE.

**FGG Historic Call Activity Compared to CBOE 2001-2008**



**Blue line** indicates call options volumes for the FGG Feeder Funds
**Black line** indicates call options volumes for the entire CBOE

**Estimated Call Activity for all BLMIS Accounts Compared to CBOE 2001-2008**



**Blue line** indicates estimated call options volumes for all BLMIS accounts (based on 2.4x multiplier)
**Black line** indicates call options volumes for the entire CBOE

107.    The Defendants knew that several of their clients also recognized the

impossibility of BLMIS's alleged options volume.  For example:

- On November 20, 2003, Vijayvergiya and Blum received an email from
  FGG salesperson, Mami Hidaka, relaying an investor's questions, stating
  "I also got a question regarding the large volume of index options used by
  Madoff.  Is it really as excessive as they implied."

- On February 9, 2004, a bank that owned shares of Fairfield Sentry told
  Greisman and Vijayvergiya that one of the bank's investors "doubt[ed]
  there is sufficient liquidity in these options to cover the needs of a
  portfolio the size of which is managed by Madoff in its totality."

108.    In response to such doubts, in at least one incident, Vijayvergiya responded that

BLMIS "utilizes over-the-counter . . . options contracts rather than transacting on any of the U.S.

options exchanges. This is because the level of options activity required to notionally protect the stock basket would exceed the amount available on the listed options exchanges." Yet the Defendants knew this was false—BLMIS did not trade OTC.

109.    The trade confirmations they received and reviewed at the time received confirmed that the options trades were supposedly being performed on the exchange. Options traded on the CBOE have an identification number known as a "CUSIP" (Committee on Uniform Security Identification Procedures). The CUSIP allows traders to quickly access electronic information regarding a particular option by simply inputting the CUSIP number into data terminals. Although OTC options can obtain a CUSIP, because OTC options are private transactions, the parties to an OTC trade rarely request the assignment of a CUSIP to their private agreement. BLMIS's trade confirmations – reviewed upon receipt by FGG – included the CUSIP indicating that they were traded on the CBOE, not OTC.

### D.    Impossibility: Equity Trading Volumes

110.    The Defendants knew that BLMIS's purported equity trading volumes were impossible.

111.    The Defendants received and reviewed at the time received the Feeder Funds' account statements, which regularly indicated that BLMIS's trades in a particular stock for Feeder Funds' accounts alone accounted for a large percentage of that stock's daily trading volume on the listed markets.

112.    Using the same calculation the Defendants used to determine the total volume of BLMIS's purported options trading, BLMIS's purported equity trades for all of its IA Business customers would have often approached, or exceeded, the entire volume of trades on the listed markets.

113.    Each time BLMIS entered the market, it purportedly traded between 35 and 50 S&P 100 Index stocks for the Feeder Funds' accounts.  There were 228 occasions on which the stocks BLMIS purchased for Fairfield Sentry alone accounted for over 20% of the trading volume for those stocks *on the entire New York Stock Exchange*.  Extrapolating from the Feeder Funds' own share of BLMIS's trade by multiplying that number by 2.4, BLMIS was by itself purportedly trading for the IA Business customers nearly 50% of all market trading in those stocks.  There were also 69 instances in which Fairfield Sentry's account was responsible for over 25% of market trading in a particular stock (meaning over 60% of market trading for all of the IA Business customers), and 27 times when Fairfield Sentry accounted for over 30% of the trading in a particular stock (meaning the IA Business customer trading constituting over 75% of market activity).  On at least 4 occasions, BLMIS would have had to engage in *more trading than occurred on the entire NYSE* in a particular stock to execute the purported trades of the stock for all of the IA Business customers.

114.    Even using the OTC market, a single investment adviser could not reasonably be responsible for over half of the reported trading of a particular S&P 100 Index stock.  That BLMIS could be responsible for more trading than occurred on an entire trading exchange was impossible, and the Defendants, as sophisticated hedge fund professionals, knew this.

115.    So did many of the Feeder Fund investors who questioned defendants about the volume of options being purportedly traded by BLMIS.  In response, in the summer of 2008, Vijayvergiya asked one of his reports, Charles Oddy, to perform an analysis of the volumes traded by Madoff.  Oddy agreed, but Vijayvergiya immediately changed his mind and assigned the project to an even more junior analyst, Elizabeth Colebrooke.  Oddy offered to assist

Colebrooke, but Vijayvergiya said no.  When Oddy followed up with Colebrooke, it became

clear that she had never performed the analysis.

### E.    Impossibility: Consistent, Positive Returns

116.    Because Madoff's SSC Strategy purported to invest in S&P 100 Index stocks, the

strategy's returns should have exhibited a significant correlation to the performance of the S&P

100 Index.  In the Fairfield Sentry PPMs, the Defendants explained to their investors that the

SSC Strategy's trades were constructed to replicate the S&P 100 Index with a very high degree

of correlation.  However, as reflected in the Defendants' marketing materials, the SSC Strategy's

reported returns bore almost no correlation to the S&P 100 Index.  Instead, the Feeder Funds

maintained impossibly consistent and positive rates of return during events that devastated the

S&P 100 Index.  Between Fairfield Sentry's inception in 1990 and 2008, the fund did not

experience any negative annual returns and experienced negative monthly returns on only sixteen

occasions over the fund's 215-month history.  In contrast, during the same period, the S&P 100

Index endured approximately 72 months  of negative returns.

117.    The marketing materials the Defendants helped prepare and/or approved for the

Feeder Funds highlighted during Fairfield Sentry's 18-year history the impossibly positive and

consistent, rates of return:

**Fairfield Sentry Rate of Return Versus S&P 100 Index**
**(Years Associated with a Negative S&P 100 Return Are Highlighted in Yellow)**

| Year | Fairfield Sentry Rate of Return | S&P 100 Rate of Return |
|---|---|---|
| Dec. 1990 | 2.77% | 1.54% |
| 1991 | 17.64% | 24.19% |
| 1992 | 13.72% | 2.87% |
| 1993 | 10.75% | 8.28% |
| 1994 | 10.57% | (0.19%) |
| 1995 | 12.04% | 36.69% |
| 1996 | 12.08% | 22.88% |

| Year | Fairfield Sentry Rate of Return | S&P 100 Rate of Return |
|---|---|---|
| 1997 | 13.10% | 27.677% |
| 1998 | 12.52% | 31.33% |
| 1999 | 13.29% | 31.26% |
| 2000 | 10.67% | (13.42%) |
| 2001 | 9.82% | (14.88%) |
| 2002 | 8.43% | (23.88%) |
| 2003 | 7.27% | 23.84% |
| 2004 | 6.44% | 4.45% |
| 2005 | 7.26% | (0.92%) |
| 2006 | 9.38% | 15.86% |
| 2007 | 7.34% | 3.82% |
| Jan.-Oct. 2008 | 4.50% | (33.11%) |

118.    In addition, on a monthly basis, the Defendants performed numerous statistical

analysis on the Fairfield Sentry returns.  These analyses included comparing the monthly returns

for Fairfield Sentry against the monthly returns for the S&P 100, which showed that there was in

fact very little correlation between the two investments.  The Defendants even compared

Fairfield Sentry's returns to the S&P 100 during various "crises" between 1994 and 2007,

including tech bubble 2000-2001, the World Trade Center attacks, the 2002 recession, and the

second Gulf War.  These comparisons showed that, while the rest of the market was in freefall,

BLMIS and Fairfield Sentry were unfazed, continuing to generate steady, positive returns:

**Fairfield Sentry Rate of Return Versus S&P 100 Index: Times of Crisis**

| Crisis | Time Period | Fairfield Sentry Rate of Return | S&P 100 Rate of Return |
|---|---|---|---|
| Tech Bubble | Sept. 2000 to Mar. 2001 | 5.89% | (28.05%) |
| World Trade Center Attack | Aug. 2001 to Sept. 2001 | 1.75% | (14.08%) |
| Recession | May 2002 to Sept. 2002 | 5.90% | (22.91%) |
| Second Gulf War | Dec. 2002 to Mar. 2003 | 1.80% | (9.76%) |

119.    The Defendants themselves knew BLMIS's consistent, positive returns were too good to be true and indicated fraud.  When they received inquiries from investors, they dodged the questions rather than telling investors what they already knew—Madoff was a fraud.

- On April 9, 2003, Bowes wrote to Blum, Tucker, Lipton, and Piedrahita: "[i]t is quite clear that the market can be down for the month as a whole but that Sentry was only in the market for a small portion of the month when it may have gone up.  The stat is a reflection of his market timing capabilities which are truly remarkable.  It does not really indicate that the fund can make money when the market is going down.  That would be an improper conclusion."

- In a letter to investors dated December 5, 2003, signed by Noel, Tucker, and Piedrahita, and addressed from FGG's headquarters in New York, FGG responded to the MAR/Hedge and Barron's articles recognizing, among other things, the "unusual steadiness of [Fairfield Sentry's performance]."

- On April 16, 2004, Lipton commented to Vijayvergiya, McKenzie, and Greisman that Fairfield Sentry "being up for the week is suspicious. Can Bermuda look into a spike in vol or other reasons for this as the S&P fell last week?"

- On November 27, 2007, Murphy acknowledged to McKenzie, Vijayvergiya, and FGG's Executive Committee that it was "extraordinary that [BLMIS returns] could be this good given market indices and performance of nearly all [of FGG's] other funds" and expressed the need to "more fully understand how/why."

- On April 29, 2008, Piedrahita wrote all of the FGG employees stressing, "[o]ur industry is without a shadow of a doubt going through one of the most challenging periods in its history.  March was the first time that everything that could go wrong did go wrong AND over every single strategy, the exception being our favourite and steadfast Uncle Bernie, who is always there to give us a helping hand."

- On May 23, 2008, McKenzie emailed Lipton about a large Fairfield Sentry gain saying "the mystery continues," to which Lipton replied, "I'm glad but be careful explaining it."  McKenzie added, "I can't wait for all the email theories this weekend."

- On November 14, 2008, Lipton commented incredulously to FGG's finance team that Sentry's returns were "amazing. OEX drops 8% and [BLMIS] makes 55bps."

120.    The Feeder Funds' investors and potential investors often questioned the

Defendants about BLMIS's ability to legitimately generate such consistent, positive returns,

making it impossible for the Defendants to ignore this evidence of fraud:

- On October 20, 2003, Vijayvergiya and Harary compiled answers to questions relating to "Madoff rumours, [*sic*]" including "How can we explain the impressive performance record (consistent returns, low risk)?"

- On February 24, 2004, Vijayvergiya and Blum devised a list of "[c]ommon concerns regarding Madoff and the split strike conversion strategy," which listed the following items:  "[c]onflict of interest as custodian," "[c]onflict of interest as market maker (Chinese walls)," "[f]ront-running orders," and "[h]ow can Sentry generate such consistent returns?"

- On August 11, 2004, Tucker and Noel Piedrahita received an email explaining that a potential investor had been hesitant to invest in Sentry, "yielding to rumors about the lack of transparency of the fund. This was after the Barrons article of 3 years ago, which suggested that the consistent returns of the fund were simply too good to be true, and must thus have been the result of cooking the books."

- On January 26, 2005, Toub learned that a potential investor was concerned over the manner in which "such consistently positive returns are generated."

- On May 24 and 25, 2005, Reyes, Smith, Tucker, and Vijayvergiya were forwarded an email from a potential investor raising concerns "regarding the source and repeatability of [Fairfield Sentry's] returns . . . Many market participants are perplexed and amazed at the consistency and lack of volatility in Madoff's strategy."

- On October 24, 2007, Landsberger and Vijayvergiya discussed one customer's concerns, saying: "They heard the usual stories about lack of transparency, etc, but somebody told them, even worse, that quote 'numbers in Madoff are completely fudged and that this fund is going to be the next Amaranth [Advisors] to explode . . . !' unquote.  Apparently, there is a big Advisor who included us in their 'black list' etc."

- On April 29, 2008, another investor rhetorically asked Reyes whether Madoff's returns could consistently be the result of "good stock picking on the 40 to 50 stocks choosen [*sic*]?"  He answered himself – "I don't think so!"  The investor later concluded he was "not that comfortable with Madoff strategy," and, on May 23, 2008, Reyes asked Vijayvergiya to

provide some "pointers" to help convince the investor that there was no
fraudulent activity at BLMIS.

121.     Quantitative analysis in the hedge fund industry revealed that BLMIS's positive,

consistent returns were statistically, nearly impossible.  FGG's marketing materials emphasized

that FGG's risk management team performed above-standard, exacting quantitative analysis of

the Feeder Funds' investments.  Their analysis included utilizing a metric known as the Sharpe

ratio to gauge portfolio performance.

122.     Financial industry participants utilize a variety of mathematical ratios to assess

investment performance. Among those widely accepted and used in the industry is the Sharpe

ratio.  The Sharpe ratio, developed by Nobel Prize winning economist, William Sharpe,

measures how well a trading strategy compensates an investor for risk.  For investment funds,

such as Fairfield Sentry, the Sharpe ratio is calculated as follows:

$$\frac{\text{(The Fund's Average Monthly Rate of Return)} - \text{(Average Monthly Risk Free Rate)}}{\text{Standard Deviation of the Fund's Monthly Returns } (i.e., \text{Volatility})}$$

123.     Inasmuch as the equity component of the SSC Strategy was to be 95% correlated

to the S&P 100 Index, the strategy should have produced results with the same, or substantially

similar, volatility as the index.  However, because BLMIS reported fictional trades that were not

correlated to the S&P 100 Index, the SSC Strategy did not have the same volatility as the S&P

100 Index.  BLMIS's volatility was much lower resulting in a high Sharpe ratio.  Because

BLMIS's fictional trades produced consistent results, they produced a high Sharpe ratio which

was impossible if Madoff had traded with the claimed correlation to the S&P 100 Index.

124.     For years, on every month's tear sheet Fairfield Sentry reported its high Sharpe

ratio for the fund from its inception to its investors and prospective investors.  FGG also

generated an internal Monthly Risk Report that analyzed the Sharpe ratio.

125.    In contrast, other managers who attempted to employ the SSC Strategy

purportedly used by BLMIS could not approximate its results.  This inability to duplicate

BLMIS's consistent and positive returns was communicated to the financial community as early

as May 2001 in a Barron's article entitled "Don't Ask Don't Tell – Bernie Madoff is so secretive,

he even asks investors to keep mum," and a MAR/Hedge article of the same month, entitled

"Madoff tops charts; skeptics ask how."  These articles reported that industry experts had

expressed "amazement, fascination, and curiosity" about BLMIS's ability to achieve remarkably

non-volatile and consistent rates of return for 11-plus years, noting that no other investment

professional had been able to duplicate BLMIS's returns using the SSC Strategy.

126.    The Feeder Funds' nearly impossible Sharpe ratio was in fact one of the factors

that led quantitative analysts, such as Edward Thorp and Harry Markopolos, to conclude that

Madoff was operating a Ponzi scheme.  Independent analysts viewed the Feeder Funds' Sharpe

ratio with a great deal of skepticism because the Feeder Funds' Sharpe ratio *always* remained

high.

127.    The Defendants touted this deep understanding and detailed analysis of the

Sharpe ratio as part of their exceptional due diligence procedures.  They knew BLMIS's returns

were too consistently positive and that this improbable quantitative result was strong evidence of

fraud in the IA Business.

**F.    Evidence of Fraud: Trades Outside the Daily Range**

128.    It was not only the consistency of BLMIS's returns and the volume of BLMIS's

trading that was impossible.  It is also impossible to trade a stock at prices lower or higher than

its daily range of trading . . . yet the Feeder Funds' trade confirmations and account statements,

received by the Defendants, showed numerous instances when BLMIS traded stocks at prices

that were outside the daily stocks price ranges and the Defendants checked these records against

trading information provided by industry sources, such as their Bloomberg terminals. Simply put, the trades were impossible and Defendants knew and understood that to be the case at the time they received and reviewed the confirmations.

129.    As an example, Fairfield Sentry's trade confirmations reported purchases of 2,247,553 shares of Intel Corporation (INTC) on October 2, 2003 for $27.63 per share. The daily price range for Intel Corporation stock purchased and sold on October 2, 2003 in fact ranged from a low of $28.41 to a high of $28.95. BLMIS had supposedly purchased shares at a price lower than the lowest price available to anyone trading Intel Corporation stock on the exchange that day.

130.    Both Fairfield Sentry's and Greenwich Sentry Partners' trade confirmations reported sales of 544,473 shares of Merck (MRK) on December 22, 2006 for $44.61. The price range for Merck stock in fact bought and sold on December 22, 2006 was between $42.78 and $43.42. This time, BLMIS was supposedly able to sell stocks at a higher price than any person who traded the same stock on the exchange that day.

131.    The Defendants saw these impossible trades regularly appear on the Feeder Funds' BLMIS trade confirmations. Between 1998 and 2006, Fairfield Sentry's trade confirmations showed that BLMIS traded equities at a price outside the daily range of prices for that equity approximately 286 times. The same anomalies appeared on Greenwich Sentry's and Greenwich Sentry Partners' trade confirmations approximately 155 times.

132.    On one occasion DiPascali wrote to Lipton in response to an inquiry from Citco Fund Services (Europe) B.V. ("Citco") about market index value of options contracts reported for July 2002, stating that "the pricing [Citco] received from vendor sources was somewhat different from those recorded by our system." The Defendants even instructed Citco on at least

one occasion to use the independent prices when they differed from Madoff's.  Given the

rigorous analysis the Defendants were performing each month on the statements they received

from BLMIS, they knew these anomalies indicated fraud.

### G.    Evidence of Fraud: Buying at Market Lows and Selling at Market Highs

133.    Madoff seemed to have an uncanny ability to buy low and sell high.  The Feeder

Funds' trade confirmations reflected that BLMIS consistently purchased shares in the lower half

of the reported daily price range and sold shares in the upper half of the reported daily price

range.  Comparing the prices on the Feeder Funds' trade confirmations to the volume-weighted

average price ("VWAP") of the stocks BLMIS was purportedly purchasing, approximately 80%

of equity buys occurred below the daily VWAP, and approximately 77% of equity sales occurred

above the daily VWAP, after accounting for commissions.

134.    The consistent ability to predict the time during the day when it would be most

advantageous to trade is an indicator of fraud.  BLMIS revealed it purportedly executed orders

via time-slicing—"across the span of an entire day or specified period, lessening [] vulnerability

to significant price swings."  If BLMIS had been time-slicing, its trading prices should have

gravitated toward the daily VWAP.  The Feeder Funds' trade confirmations, however, showed

that instead prices for BLMIS's trades gravitated toward the daily *optimal* price.  The Defendants

received this information and understood its significance.

### H.    Evidence of Fraud: Unidentified Options Counterparties and Inconsistent Stories

135.    In the OTC marketplace, each transaction requires a private contract between the

buyer and seller. BLMIS had the Feeder Funds execute a Master Agreement for OTC Options.

Under that Agreement, BLMIS served as the Feeder Funds' agent in executing any options trade.

The Agreement explicitly states the Feeder Funds could not look to BLMIS to perform the trade

if the counterparty failed to perform.  Thus, unless the counterparties were reliable, sufficiently

capitalized, and liquid, the options could be rendered useless in hedging the Feeder Funds'

investments.  As a result, under the Master Agreement, if a counterparty failed to perform, it was

the Feeder Funds, and not BLMIS, who were exposed.

136.    The Defendants did not review, comment, modify, negotiate, or reject any form of

draft or final counterparty agreement or OTC transaction confirmation.  Despite bearing the risk

of the counterparties' failure to perform, the Defendants had no knowledge of the counterparties'

identities.  The Defendants knew that in a proper OTC trade the identity of the counterparty

would be disclosed to the other principal, such as the Feeder Funds.  Yet, Madoff refused to

identify the counterparties, claiming he had to prevent his clients from dealing directly with the

counterparties and that the names of counterparties were proprietary. Madoff would eventually

state that the counterparties were large European financial institutions.

137.    The Defendants knew Madoff's failure to identify BLMIS's counterparties was

evidence of a fraudulent scheme:

- On May 26, 2005, in response to a financial institution that told
Vijayvergiya "that his contacts at two of the largest investment firms on
Wall Street had no knowledge of the options business (Citi and CSFB),"
Vijayvergiya told Tucker that the investor "seemed fine with my response
re: options counterparties."  He noted the investor was "OK for now - but I
may still pose the casual question to Frank [DiPascali] at some point."

- On August 22, 2005, Toub received requests from Credit Suisse regarding
BLMIS's counterparties. Specifically, Credit Suisse asked, "What are your
main counterparties in OTC index options? . . . How do you manage your
counterparty risk? . . . Could you provide us with some information on the
valuation of these OTC options?"  Toub suggested getting a
confidentiality agreement before answering, to which Vijayvergiya
responded that FGG would provide responses verbally, but not in writing.
In fact, no one at FGG could respond to the question because they did not
know the counterparties' names and they did not in fact take any actions to
manage their counterparty risk.

- On May 18, 2008, after analyzing a purported role of options with BLMIS, Vijayvergiya noted in an email to Tucker, McKenzie, and the FGG Partners that one of FGG's "open 'operational' questions" was how BLMIS logistically could have traded with twenty counterparties within a very short time frame. Vijayvergiya pointed specifically to April 17, 2008, when BLMIS purportedly traded the entire position at one price over only 49 minutes.

- In May 2006, FGG's own consultant reviewed suspicious trades on the Feeder Funds' account statements and informed Defendants they needed to learn the identity of the options counterparties. On June 4, 2008, Vijayvergiya and McKenzie called Madoff and asked him about BLMIS's counterparties. Madoff refused to identify the counterparties but told Vijayvergiya and McKenzie no one counterparty accounted for more than 10% of the options trades and reiterated that he did not want FGG providing their investors with too much information regarding BLMIS.

- As late as October 2008, the Defendants still did not know who Madoff's counterparties were. But after their consultant again raised the issue with them in 2008, they were forced to at least appear to make an effort at diligence. Noel, Tucker, McKeefry, Toub, and Vijayvergiya met with Madoff by telephone on October 22, 2008 and asked him to provide additional information about the options counterparties. Madoff told them his options counterparties were large institutions and that he performed credit checks on each of them. Even though they were FGG's counterparties and not BLMIS's, Madoff again refused to provide the names of any counterparties.

138.    With the massive purported volume of BLMIS-related options trades, there were only a limited number of institutions that could have satisfied BLMIS's and FGG's trading needs. The Defendants regularly communicated with many large European financial institutions—BLMIS's alleged counterparties. Despite their regular contacts with institutions that fit BLMIS's options counterparty profile, the Defendants never asked any of these institutions if they were trading options with BLMIS. The Defendants never uncovered any evidence that the counterparties to these transactions with BLMIS existed, but the Defendants continued to invest through BLMIS, despite this evidence of fraud.

139.    In addition, Madoff told the Defendants conflicting stories about how he contacted counterparties. When the Feeder Funds' investors expressed concern that BLMIS

could purchase equities but might not find counterparties from whom to purchase the put options

to protect the equities purchases from a market drop, Madoff reassured FGG by claiming that he

spoke to option counterparties to determine option availability before he purchased any equities.

140.    By contrast, during the 2006 SEC investigation, Madoff expressed concern to the

Defendants that the SEC would conclude that the SSC Strategy would promote front-running.

During the "scripting" call with Vijayvergiya and McKenzie, Madoff reminded them not to say

anything that might allow the SEC to conclude one party could front-run the trades.  When

Vijayvergiya stated based on Madoff's previous answer that Madoff spoke to counterparties to

assure puts were available before he purchased equities, Madoff replied that he did not contact

the options counterparties ahead of time because it would be too easy for them to front-run his

trades.  The Defendants knew Madoff had lied to them but did nothing in response.

I.      **Evidence of Fraud: An Options Trading Structure that Violates Industry Standards**

141.    Madoff told the Feeder Funds two different, and obviously irreconcilable stories

about how he traded options for the Feeder Funds' accounts.  The Master Agreement for OTC

Options between the Feeder Funds and BLMIS stated BLMIS was acting as the agent of the

Feeder Funds when he entered into options trades.  Both Madoff and the Defendants claimed the

options counterparties entered into agreements that were identical to the agreements the Feeder

Funds entered into with BLMIS.  In other words, the Feeder Funds and the options counterparty

would be the principals and BLMIS would be entering into the agreement as the agent of the

Feeder Funds.  More importantly, once BLMIS was registered as an investment adviser with the

SEC in 2006, SEC regulations prevented BLMIS from trading for a customer account as a

principal without written authorization from the customer for each trade.  Each of the

confirmations the Feeder Funds received for options trading BLMIS performed for their accounts

indicated BLMIS was making those trades as an agent.  There was a box on the front of the

confirmations that was marked "1" for Agent or "2" or Principal.  Each of the trade

confirmations the Feeder Funds received were marked with a "1"—trades made by BLMIS as an

agent for the Feeder Funds.  This was one story.

142.    The Defendants and BLMIS claimed Madoff traded large blocks of options

contracts and then allocated them proportionately to each of the IA Business customers, like the

Feeder Funds.  Under normal industry practice, a block trade and allocation process requires the

broker to trade as a principal and not an agent, with all transactions consisting of two trades:  one

between the one party and the broker and then a second trade between the broker and the other

party. The two-trade process is required for block trade and later allocation transactions because

OTC option trades are contracts between the two parties and the identity of the customer being

allocated the option agreement is unknown at the time of the trade.  In order for the SSC Strategy

to be consistent with industry practice, BLMIS would have been the principal in the two trades,

one with the counterparty and the second with the BLMIS customer.  This structure is the exact

opposite of the structure provided in contracts between BLMIS and the Feeder Funds, and

confirmed by the trade confirmations the Feeder Funds received from BLMIS.

143.    Other structural issues and inconsistencies the Defendants knew included the

alleged collateral for the options trading.  Madoff told the Defendants that he limited each

counterparty's exposure to 10% of his overall position, and required each counterparty to post

Treasurys in escrow accounts as collateral to guarantee performance of the put options.  When

Defendants later asked what collateral the counterparties required of the Feeder Funds to

guarantee the performance of the call options sold to them, Madoff claimed none was required

because his customers held the equities.

144.    Madoff's explanation was facially false for several reasons: (1) the basket of the 35 to 50 equities did not perfectly match the entire S&P 100 Index – the basis of the call option; (2) BLMIS was free to sell the equities, which it did on occasion, prior to the expiration of the call, leaving the counterparty with no collateral at all; and (3) Madoff stated that the option counterparty had no lien against its allocated equities which, if true, meant the counterparties had no collateral protecting their position.

145.    The Defendants knew and understood that standard industry practice required the principle counterparties to be directly in contact with one another so as to assess the other party's creditworthiness.  The Defendants also knew that BLMIS's purported options trading structure, leaving the IA Business customer's counterparty exposed to large credit risk without ever knowing the identity of the IA Business customer, was irregular and inconsistent with industry practice.

146.    The timing of BLMIS's options trades was also contrary to industry practice.  The Feeder Funds' account statements demonstrated that many of the options trades BLMIS was purportedly making on their behalf took much longer to settle than was normal in the industry. Industry standard dictated that options trades be settled one business day following the date the trade was made, or T+1.  While Madoff claimed to perform options trading in the OTC market, he stated that terms of BLMIS's options trades were identical to exchange-traded options.  Thus, the Feeder Funds' account statements should have shown settlement dates for all of their options trades of T+1.

147.    Between 2000 and 2008, almost a quarter of all of the options trades purportedly performed by BLMIS for the Fairfield Sentry's and Greenwich Sentry's accounts settled more than a day after the trade took place.  During this period, Fairfield Sentry's account statements

showed delayed settlement 628 times, and Greenwich Sentry's statements showed 206 instances

of delay.  The option trades anomalies on Greenwich Sentry Partners' account statements, 97%

settled on a date other than T+1.  The Defendants saw these dates and knew and understood that

BLMIS was performing options trading in a way that was extremely unusual and indicative of

fraudulent activity.

148.    The Defendants knew that Madoff was not telling them the truth regarding his

options transactions.  Despite this knowledge and understanding, the Defendants kept their

BLMIS accounts open and continued to move money in and out of those accounts.

**J.      Evidence of Fraud: Speculative Options Trading Inconsistent with the SSC Strategy**

149.    Madoff claimed that the SSC Strategy involved buying put options and selling

call options to purchase a collar around the executed trades he purportedly made.  BLMIS

purchased the put options to hedge losses on the underlying basket of equities and sold the call

options to finance the put options.  The strategy was not supposed to include separate trades in

options.

150.    However, during the Six Year Period, on 105 occasions, the Feeder Funds'

account statements showed gains resulting from speculative options trading.  These trades

accounted for huge gains in the Feeder Funds' accounts, totaling over $340 million.  For

example, in August 2002, two of Fairfield Sentry's accounts each showed gains from a single

speculative options transaction of approximately $60 million.

151.    The Defendants and their consultant detected these speculative trades inconsistent

with the SSC strategy on the Feeder Funds trade confirmation and account statements but took

no action, even when their investors and potential investors expressed concern over the same

issue:

- On July 23, 2003, Vijayvergiya met with representatives from Bank Safra. They discussed how BLMIS had overbought puts and oversold calls in the past and how often this occurred.

- On June 16, 2006, Vijayvergiya and Tucker discussed BLMIS's overhedging in May, why this occurred and whether this was permissible.

152.    Additionally, the SSC strategy required that the put and call "collar" be adjusted to reflect changes in the basket of equities if some of the underlying equities were sold before liquidation of the entire basket.  BLMIS's falsified account statements indicated that BLMIS often sold out of an equity position prior to liquidating the entire basket and did not adjust the collar for that sale.  This anomaly appeared on the Feeder Funds' account statements approximately 104 times.

153.    The Defendants knew that these trades were inconsistent with the SSC Strategy and that BLMIS was violating the terms of its agreements with the Feeder Funds each time it entered into such a trade and that BLMIS was not generating its returns based on the SSC Strategy.

### K.    Impossibility: Lack of Scalability

154.    The sheer size of BLMIS's SSC Strategy presented numerous concerns for any sophisticated investor.  Such investors, like the Defendants, use the concept of scalability to evaluate the ability of an investment strategy to handle higher trading volumes or increased assets under management.  As assets under management increase, it becomes more difficult for a fund to find opportunities on a scale that is proportional to the growing size of the fund.  Some strategies simply cannot withstand massive growth, which is why certain types of funds must limit the assets they will agree to manage.

155.    FGG's investors were aware of this red flag.  For example, in November 2003, an investor "express[ed] surprise in Madoff's ability to make the split strike strategy work so

effectively on such a big amount of money." Toub, who spoke to the investor, conveyed this information to Boele, Tucker, and Landsberger.

156.    The scalability of Madoff's SSC Strategy, which purported to capitalize on market inefficiencies, was limited. The SSC Strategy involved trading stocks on the S&P 100 Index, which are some of the most efficiently traded and tracked stocks on the market. This meant that there were very few inefficiencies on which to capitalize. The strategy was further limited by the available volume of options on the S&P 100 Index, which, as explained in greater detail above, would not have been sufficient to meet the needs of the Feeder Funds, much less meet the needs of all of BLMIS's customers.

157.    The Defendants knew scalability was an issue as evidenced when Toub and Vijayvergiya explained to an investor during a due diligence meeting in 2004: "[s]ize is definitely a factor contributing to lower performance" of Fairfield Sentry because "[s]ome days Madoff represents 15% to 17% of the NYSE volume" and as a result "it may take 4 to 5 business days for the Sentry account to become fully invested."

**L.    Evidence of Fraud: Paper Trading Tickets**

158.    The Defendants knew about the glaring contradiction between BLMIS's market-making business, well-known for cutting-edge technology, and the more primitive back-office systems used by the IA Business. The Defendants knew that Madoff refused to provide trade information electronically or in real-time, but instead only delivered paper confirmations by regular mail days after trades were supposedly executed.

159.    The delayed access to trade information did not go unnoticed by the Defendants. For example, on August 27, 2003, Vijayvergiya raised the issue in an internal email, asking Tucker, Boele, Lipton, and Blum, "[a]s a broker/dealer with an advanced technology platform, I wonder whether Madoff could give us electronic access to our accounts (either online access or

by emailed reports)."  Blum responded, "[a]s Dan and CITCO can tell you, we have tried to get

electronic input from madoff [sic] but they are not willing to do so."

160.    The Defendants knew BLMIS's IA Business's continued use of paper reporting

and outmoded technology was additional evidence of fraud.  By using paper trading tickets and

sending them on a delay, Madoff was able to backdate trade confirmations.  The Defendants

knew that Madoff could not have backdated the confirmations if the Defendants had insisted on

access to real-time, electronic trade information.

**M.    Evidence of Fraud: Avoiding SEC Reporting Requirements**

161.    Various SEC reporting requirements are triggered when securities are invested in

the market at either the end of the quarter or the end of the year.  The Defendants knew that in

order to evade those reporting requirements, BLMIS purported to liquidate all investment in

equities and options at both quarter-end and year-end and invest the proceeds in Treasury Bills.

162.    On December 11, 2003, della Schiava contacted Vijayvergiya in preparation for a

meeting he had with an investor the next day.  He anticipated that one of the questions that was

likely to arise was why Madoff was always reportedly in cash at the end of the year.

Vijayvergiya was already aware of this behavior by Madoff and the reasons behind it.  However,

he first tried to respond with false reasons: that there were fewer "reliable trade signals" in

December to make the strategy profitable, and BLMIS generally generated enough returns

through November that they did need to take the risk of investing in December.  Della Schiava

responded, "I remember Jeffrey [Tucker] once specifically mentioning about the last days of the

year to be in cash so he did not have to fill certain tax forms . . . or something similar."

Vijayvergiya acknowledged this was a "third possible reason" for Madoff's behavior, but that he

"had been advised not to emphasize this."  He further explained: "I am told that the rule to which

Jeffrey [Tucker] is referring requires that if Madoff ends the year invested on December 31, then

they are required by law to report their holdings in these same positions for the next four

quarters.  I am further told Madoff has been reluctant to do this."  On April 15, 2008, Lipton

remarked to McKenzie how BLMIS was "playing over my head" when he attempted to explain

how Madoff "rolled 6-7BN of Tbills on the last day of the year" with "the cost and the market

value of investments . . . the exact same" in consecutive years.

163.    The Defendants knew BLMIS touted "market-timing" as a cornerstone of the SSC

Strategy and knew the practice of liquidating all stocks and options at quarter-end and year-end

contravened that strategy.  Madoff's transparent desire to avoid reporting requirements by

exiting the market according to the calendar, rather than market or economic indicators,

evidenced fraud.  As a result, the only reason BLMIS claimed to exit the market was to avoid

detection of its impossible trades once the purported holdings were disclosed to the public.

### N.    Evidence of Fraud: Irregular Dividend Payments

164.    Certain of the equities that BLMIS purportedly purchased for the Feeder Funds'

accounts paid dividends.  At various times when BLMIS was "out of the market," BLMIS

reported investing the Feeder Funds' money in a money market fund that also paid dividends.

The timing of these dividend payments was another indicator of fraud at BLMIS.

165.    First, the Feeder Funds account statements regularly showed that they received

dividend payments on certain equities on a different date than the dividend payments were

issued.  For instance, Fairfield Sentry's account statements showed that they received equity

dividends 130 times.  Of those dividends, only 15—less than 12%—were "paid" to Fairfield

Sentry's account on the same day the dividends were paid to the market.  The Feeder Funds

received dividends from the money market account even more often, but almost never on the

correct market date.  For instance, over 86.5% of the money market dividends shown on Fairfield

Sentry's and Greenwich Sentry's customer statements, and over 79% of the money market

dividends shown on Greenwich Sentry Partners' customer statements, took place on the wrong date.

166.    Second, the frequency of the Feeder Funds' reported money market dividend payments did not comply with industry standards.  Typically, money market funds declare dividends on a daily basis but pay dividends to their investors on a monthly basis.  Even if an investor makes multiples trades over the course of a month, those dividends accrue during the month and are still paid only once each month.  Fairfield Sentry's account statements, however, showed dividend payments being made each time a trade occurred.  According to their statements, Fairfield Sentry's two accounts at BLMIS received multiple money market dividends in the same month in 83 out of 312 months—over 26% of the time.  Greenwich Sentry showed similar activity 48 out of 141 months—or 30.8% of the time, and 25 out of 31 months—a stark 86.1% of the time—for Greenwich Sentry Partners.

167.    In reviewing the Feeder Funds' account statements from BLMIS, and running them through their sophisticated diligence system, the Defendants saw these anomalies, understood them, and could not explain them or provide a legitimate reason for them, but still took no action.

**O.    Evidence of Fraud: Lack of Independent Broker and Custodian**

168.    The Defendants knew BLMIS functioned as the Feeder Funds' custodian, investment adviser, and prime broker—a structure atypical in the investment industry that allows for the opportunity to commit fraud easily.  The Defendants were all experienced in the financial industry.  They knew that this type of arrangement was atypical and allowed Madoff unfettered discretion to act as he pleased.

169.    The Feeder Funds' investors and potential investors were similarly aware.  They raised the issue with the Defendants over and over again:

- 55 -

- When one investor pointed out that BLMIS did not use a third-party broker during a meeting with Blum, Tucker, and Toub on December 18, 2002, FGG declined to address the lack of independence in BLMIS's operations.

- On April, 28, 2003, an investor raised concerns to Bowes regarding BLMIS's "conflict of interest in Madoff acting as both principal in connection with the sale or purchase of securities to the fund and as market-maker in the stocks purchased or sold by the fund." Bowes passed along this concern along to Tucker and Landsberger.

- Vijayvergiya prepared a memorandum on or around October 14, 2003 for Harary to pass along to her client, who had specifically raised concerns regarding the potential lack of independence and conflict of interest at BLMIS.

- On August 27, 2003, one of Boele's investors voiced similar concerns to Vijayvergiya and Boele about "the potential conflict of interest presented by Madoff serving as custodian of the assets in addition to trading on the account." Vijayvergiya passed along this concern to Tucker, Blum and Lipton.

- In a December 2, 2003 email, Blum told Landsberger, Tucker, and Vijayvergiya that a potential investor was "totally fixated on the usual Swiss gossip mongering subjects (front running, etc.), as well as valid, but overplayed . . . custody subject."

- On February 1, 2005, an investment group explained that it had "decided to NOT invest in the Fairfield Sentry fund" due to the "non pure independence between the true manager of the fund and the prime broker/Custodian of the fund." An FGG employee forwarded the investor's email to Tucker, Landsberger, and Vijayvergiya stating, "at least their reason was [sic] a good one."

- On March 24, 2005, Lipton, Noel, Tucker, Blum, Vijayvergiya, Greisman, and McKeefry were told that, after conducting due diligence on Fairfield Sentry, Citicorp was still concerned about the "theoretical fraud risk given that Madoff is the custodian of the assets." Earlier that month, Vijayvergiya, Landsberger, Lipton, Blum, Tucker, Noel, Greisman, McKeefry, and McKenzie learned from another FGG employee that "[t]he concerns that Citibank has are primarily credit concerns as opposed to performance risk concerns, i.e. could the money disappear from the account in any one day, leaving Citibank exposed with a $150 million loan and no collateral. They are not necessarily concerned about the transparency to the portfolio, they just would feel more comfortable if there were some sort of control on money leaving the account."

- Another client raised the issue with FGG on August 31, 2005. Carla Castillo, an investor relations employee for FGG, received a request for feedback regarding "the perceived conflict of interest with the two relationships (brokerage and auditing) in Bayou, and any similarities between Bayou and Sentry related to their use of 'in-house' brokerage." Castillo conveyed the customer's inquiry to others at FGG, including Vijayvergiya, McKeefry, Tucker, and Smith. Castillo then sent a separate message to Vijayvergiya on September 1, 2005, joking about the similarities between Bayou and BLMIS: "Does this 'perceived conflict of interest with the two relationships (brokerage and auditing)' sound familiar? Hehehe."

- Another investor contacted Barreneche on October 24, 2005 with concerns that BLMIS maintaining custody of Fairfield Sentry's investments was just like Refco. The next day, Barreneche forwarded these concerns to Vijayvergiya and Smith.

- In June 2006, an investor notified Toub that his adviser recommended selling Sentry holdings because of issues "related to conflicts of interest between the broker of Fairfield (well known in the industry) and that in the midst of a changing regulatory environment this conflict of interest could hit the radar screens of regulators and become an issue for investors. That is the official version, but between you and me, my fear would be more related to the stampede which could occur if the larger banks start recommending clients to sell. This could get ugly." This issue was forwarded to Tucker that day.

- On August 23, 2006, Barreneche, McKeefry, and Tucker received a letter from an investor warning them of the risk posed by BLMIS maintaining custody of Fairfield Sentry's assets due to BLMIS's limited amount of capital—approximately $275 million—compared to the major international banks that provide custody for most investment funds.

- On July 24, 2007, when another investor asked Landsberger about BLMIS's role as custodian and apprised concerns about Madoff lying about the trades, Vijayvergiya scripted a false response explaining that it is "common practice in the US brokerage industry" for brokers such as BLMIS to custodize their clients' assets.

- On August 19, 2008, just a few months before the collapse of BLMIS, key FGG employees including Murphy, Vijayvergiya, Piedrahita, Landsberger, Toub, Tucker, and the remaining members of FGG's Executive Committee (McKeefry, Smith, and Greisman) corresponded regarding a client's decision to redeem from Fairfield Sentry, citing concerns it had with a statement in Fairfield Sentry's private placement memorandum that the fund did "not have custody of the assets," which increased the risk "[t]hat the personnel of any entity with which [Fairfield

Sentry] invests could misappropriate the securities or funds (or both) of the Fund."

170.     The benefit of using an industry standard, third-party custodian is clear—it acts as an independent check on the investment adviser.  The involvement of multiple parties in the management of assets significantly reduces the potential for misappropriation of assets.  If there is a third-party custodian, client assets are safe even if the investment advisor becomes insolvent. If the investment adviser represents himself as the custodian, it is rife with the possibility of fraud, in that the adviser could theoretically misreport or misappropriate the assets, which is in fact what occurred at BLMIS.  Having third parties hold securities (*i.e.*, through the use of custodians) deters potential fraud.

171.     The Defendants knew that BLMIS was acting as an investment adviser, prime broker, and custodian for the Feeder Funds but took no action, and instead ignored this structural defect that enhanced Madoff's ability to commit fraud.

**P.     Evidence of Fraud: BLMIS's Unusual and Unprofitable Fee Structure**

172.     BLMIS used an unusual fee structure that, when compared to the fees charged by most investment funds, including those charged by the Defendants, meant that Madoff inexplicably walked away from hundreds of millions of dollars in fees that would normally be expected.

173.     Investment fund managers typically charge two types of fees for managing a client's assets: (i) management fees; and (ii) performance fees.  These fees compensate managers for managing the portfolio. The management fee is usually a fixed percentage of the assets under management, while the performance fee is based on the profits that are realized, compensating the manager for successful performance. Fees to pay broker-dealers for trading securities, as well as other expenses, are either charged for separately, or can be covered in management fees.

174.    Instead of charging a 1% to 2% management fee and a 10% to 20% performance fee, which is typical of investment funds, BLMIS charged a commission for trades—$0.04 per share on stock transactions, and $1.00 per option contract.

175.    Madoff sometimes explained his decision not to charge fees by stating he was "perfectly happy to just earn commissions."

176.    A number of professional investors noticed BLMIS's failure to charge fees, in addition to the multitude of other red flags, and made the decision to invest their money elsewhere.  The Defendants knew Madoff's decision to not have BLMIS collect traditional investment manager's fees was another indicator of fraud given the sheer amount of money that Madoff was foregoing.  BLMIS could easily have earned an additional *billion dollars* in annualized management and performance fees based on the Feeder Funds' purported returns, assuming a standard 1% management fee and 20% performance fee structure.  Investment professionals reasonably concluded that a fee structure where the true investment manager voluntarily chose to pass on massive amount of fees was further evidence of fraud.  The foregone fees essentially compensate Ponzi scheme marketers for continuing to feed funds into the Ponzi scheme.

177.    In addition, BLMIS purported to execute the SSC Strategy on all of the accounts managed, including the Feeder Funds' accounts.  It is highly inefficient for an investment adviser, following the same investment strategy for every account, to implement a fee structure that required an accounting of fees for each and every share and option contract.  It is simpler to apply a management and performance fee to each account and operate as a fund.

Q.    **Evidence of Fraud: FGG's Own Consultant Tells the Defendants Madoff Is a Fraud**

178.    FGG consultant, Gil Berman, who had formerly traded options on the CBOE and reviewed and summarized the trades BLMIS reported on the Feeder Fund trade confirmations and account statement shortly after the inception of the Feeder Funds, raised serious concerns regarding BLMIS and Madoff and told the Defendants that there was evidence of fraud.

179.    Berman was with FGG from the very beginning—he was hired in 1990, before FGG had a risk management team.  Noel and Tucker hired Berman to provide them with monthly summaries of BLMIS's trading, based on the account statements and trade confirmations they received from BLMIS.  Berman was not hired to view the statements for anomalies; he was simply supposed to summarize the information in a way that would be understandable to Noel and Tucker.  However, even Berman could not help but notice and point out to the Defendants the anomalies and red flags apparent on the face of the Feeder Funds' account documents.

180.    When reviewing the trade confirmations and customer statements, Berman noticed that BLMIS was at times reporting trades inconsistent with the SSC Strategy.  The Feeder Funds' Master Agreement for OTC Options with BLMIS indicated that BLMIS would "only write (sell) covered calls against long stock positions, and buy stock index puts or puts on the individual stocks that the account owns."  Berman noticed BLMIS was occasionally purchasing double the notional amount of put options to cover a single basket of stocks, a trade not consistent with the SSC Strategy.  Doubling the put option position should actually be detrimental to the SSC Strategy because BLMIS had to pay for put options, and thus was wasting money by purchasing excess puts.  However, Berman noted that doubling up on the puts produced excess profits when the S&P 10 Index subsequently dropped.

181.    In May of 2008, the speculative trading of options not required for the
implementation of the SSC Strategy accounted for approximately $95 million of Fairfield
Sentry's total earnings.  In a June 13, 2008 email to Vijayvergiya, after having reviewed the May
trade confirmations, Berman stated that "there were several unusual transactions relative to the
typical [execution of] the split-strike conversion strategy" in May 2008, and that "[a]ll of the
[options] trades produced excess profits."  He told Vijayvergiya that he found "the May options
trading activity to be unusual and difficult to explain," and he encouraged further investigation.

182.    Vijayvergiya had members of his team—Bjorn Axelsson, Disha Atavar, and
McKenzie—perform an internal analysis of the profit impact of BLMIS's deviations from the
SSC Strategy and confirmed that the deviations significantly contributed to the SSC Strategy's
gains in April and May 2008.  This internal analysis was circulated to members of the Executive
Committee.

183.    FGG regularly emphasized the significant role options played in profitability in
monthly reports they sent to investors.  For example:

- The April 2004 Sentry Monthly Strategy Review stated: "[w]ith the
  decline in the S&P100 Index this month, the stock basket also posted a
  loss of -2.66% in gross terms.  This was more than offset by the increase
  in the value of put options and the premium collected from the sale of call
  options during April."

- The June 2005 and September 2008 Sentry Monthly Strategy Reviews
  stated: "[t]he Fund's positive performance this month was driven
  primarily by gains in the value of the options positions.  The stock
  positions detracted slightly from net income as would be expected in a
  falling market."

- The April 2007 Sentry Monthly Strategy Review stated: "the fund's
  positive performance this month was driven primarily by gains in the
  value of the options positions . . .  The stock positions detracted from net
  income, however, the gain in options positions more than offset this loss."

184.    Berman's notes from a telephone call with Vijayvergiya on June 25, 2008 state plainly that "not even Madoff" could manage 100% profitability on all trades.  Berman expressed concern that Madoff might be backdating trade confirmations.  He recommended FGG require same-day trading tickets, obtain information on the options counterparties, and verify that BLMIS was actually holding all of the assets purportedly in the Feeder Funds' accounts.

185.    At another point in time Berman also noticed that, in addition to making options trades inconsistent with the SSC Strategy, BLMIS engaged in at least one risky "naked call position," where BLMIS had sold an S&P 100 Index call option but did not hold the underlying stock. If the index rose, the call would be exercised by the buyer and the Feeder Funds would be exposed to significant losses because they would not have hedged the risk.

186.    Berman brought these anomalous trades activities to Tucker's and Vijayvergiya's attention because they were once again inconsistent with the SSC Strategy and indicated fraud. In addition, depending on how the market moved, this trading was very risky for the Feeder Funds.  The real reason the Feeder Funds' statements showed these unusual positions was that during certain down periods in the market, it was extremely difficult, even for Madoff, to fabricate trades that could justify BLMIS's returns.  Madoff created fictitious options trades inconsistent with BLMIS's mandate and trading authority in order to create the appearance of consistently positive returns.

187.    This type of speculative options trading violated the terms of BLMIS's investment agreement with the Feeder Funds, where BLMIS agreed to invest all of the Feeder Funds' money pursuant to the SSC Strategy.

188.    In October 2008, Madoff told Noel, Tucker, McKeefry, and Vijayvergiya that the value of the options would never exceed the notional amount of the equities.  The Defendants

knew Madoff was lying because his claim was directly contradicted by their own review of the

Feeder Funds' trading records and Berman's warnings. The Defendants knew Madoff's lie was

evidence of fraud at BLMIS.

### THE DEFENDANTS' OTHER MOTIVE TO MAINTAIN THEIR RELATIONSHIP WITH MADOFF

189.    From at least January, 2002, FGG had Management Planning, Inc. ("MPI"), a

business management consulting firm, conduct a periodic "Financial and Economic Analysis and

Evaluation" of the firm. The MPI analyses reported the fair market value of FGG, and, in doing

so, repeatedly noted FGG's fair market value depended on its strategic relationship with BLMIS

and Madoff.

190.    With the advancing age of Noel and Tucker as well as the admission of new FGG

partners, in late 2006, the Individual Defendants began exploring ways to further increase their

wealth through an initial public offering of FGG shares or a merger with another wealth

management firm. In order to successfully undertake any of these options, it was necessary for

the Defendants not to disclose their knowledge of fraud at BLMIS to potential buyers or merger

candidates—but instead to continue to invest the Feeder Funds with BLMIS to increase the value

of FGG.

191.    In 2007, when Murphy joined the Executive Committee, his prime responsibility

was to organize an initial public offering or a sale of FGG to another entity. In 2007, Murphy

negotiated a merger with Marathon Acquisition Corp., ("Marathon") located in New York.

Marathon was a special purpose acquisition corporation ("SPAC")—a company that had

previously conducted a blind pool public offering to raise money to acquire another company,

and thereby make that acquired company (here, FGG) public. This structure would have allowed

FGG to effectively conduct an initial public offering without the normal cost and regulatory scrutiny.

192.    After Murphy negotiated the Marathon merger terms, FGG informed Madoff of its plans.  Madoff objected, presumably for fear that the additional scrutiny of a public company managing the largest BLMIS feeder fund would result in the discovery of his fraud.  Knowing FGG had no value without its BLMIS connection, FGG terminated the merger negotiations with Marathon.

193.    Following the failed Marathon merger, the Individual Defendants were still desirous of a capital transaction from which they would benefit financially but meet Madoff's concerns.  In 2008, Murphy began negotiations for the acquisition of a Swiss private bank, Banque Bénédict Hentsch ("BBH") based in Geneva. They engaged Ernst & Young, who communicated directly with Lipton, to perform diligence on BBH.  Ernst & Young submitted their final report on July 24, 2008, noting the potential synergies for FGG, including an expansion of the client base for FGG products and greater access to the Swiss market. Of course, the Individual Defendants did not disclose their knowledge of fraud at BLMIS as FGG's value was highly dependent on its BLMIS relationship.

194.    By August 2008, both sides of the transaction had executed the Stock Purchase and Combination Agreement.  Noel congratulated his team, gushing, "I believe it is a great step in building what can become 'a' or even 'the' premier international, worldwide wealth management, private banking operation. Let's go . . ."

195.    In September 2008, FGG announced that the merger to its investors. The September 8, 2008 email from Piedrahita explained: "[w]e believe that this partnership will benefit Fairfield Greenwich investors in two key ways: it will allow our clients to gain access to

BBH's broad suite of wealth management services; it will provide Fairfield Greenwich a broader base of operations within Switzerland, a country in which Fairfield Greenwich already has many strong client relationships and business interests."

196.    On December 14, 2008, three days after Madoff's arrest, BBH terminated its partnership with FGG because without the Madoff connection, FGG had no value.  The bank explained, "Following the massive securities fraud by Bernard L. Madoff on the clients of his investment advisory business, the board of directors and management of Banque Bénédict Hentsch have immediately taken all appropriate steps in order to protect the interests of its clients and those of the bank.  The founding shareholders of the bank have terminated their partnership with the Fairfield Greenwich Group."

## THE DEFENDANTS AND RELATED PARTIES

### A.    The Feeder Funds and Currency Funds [Settled Parties]

197.    *Fairfield Sentry [settled party]*: On October 30, 1990, Noel and Tucker organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands.   Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

198.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG New York Personnel.  Its statutorily required registered address in the BVI, and the address of its registered agent, was a post office box.

199.    From its inception until its liquidation, Fairfield Sentry had no employees and no

office.  It was operated almost entirely by FGG New York Personnel. Following the formation of

FG Bermuda in 2003, under the direction primarily of FGG's New York Risk Management and

Finance Division, FG Bermuda employees located in Bermuda performed some risk analysis on

the Fairfield Sentry assets.  The FG Bermuda employees performing the risk analysis reported to

FGG New York Personnel.

200.    In November 1990, Tucker signed account documents with BLMIS in Fairfield

Sentry's name opening an investment account and corresponding options account.  In the

account opening documents, Tucker listed Fairfield Sentry's mailing address as Fairfield

International Managers' office located in Greenwich, Connecticut. Further, Tucker directed

BLMIS to mail all Fairfield Sentry monthly account statements to Fairfield International

Managers' Greenwich, Connecticut office.   Later, on January 29, 1998, FGG notified BLMIS to

mail all Fairfield Sentry account statements, trade confirmations, and correspondence to FGG's

New York headquarters. In October 1992, Tucker opened a second Fairfield Sentry account at

BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's

account statements, trade confirmations, and correspondence for these accounts to the same

Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield

Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

201.    The BLMIS Customer Agreements covering Fairfield Sentry's BLMIS accounts

are governed by New York law and all disputes arising under the agreements must be resolved

by mandatory arbitration in New York utilizing the laws of New York.  All transactions under

Fairfield Sentry's BLMIS Customer Agreements were subject to the Securities Exchange Act of

1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve

System. Every BLMIS trade confirmation received and/or reviewed by FGG personnel on

behalf of Fairfield Sentry identified BLMIS as a United States registered broker-dealer and a

SIPC member regulated by the SEC.

202. After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG principals Tucker, Lipton, and McKeefry—all located in FGG's New

York headquarters—executed additional BLMIS account documents on behalf of Fairfield

Sentry including: Customer Agreements, Trade Authorizations, Options Agreements, and

Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on

these BLMIS account documents as FGG's New York headquarters and not Fairfield Sentry's

BVI-registered address.

203. Noel and Tucker were the original Directors of Fairfield Sentry and remained so

until approximately 1997. Noel and Tucker contracted with Citco Fund Services to provide

Fairfield Sentry with backroom administrative services such as coordinating subscription and

redemption forms, maintaining Know Your Customer information and serving as the

independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker

also contracted Citco Custody to nominally serve as the custodian of the Fairfield Sentry assets.

In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in

the BLMIS accounts. As a further part of the Citco relationship, Noel and Tucker opened bank

accounts at Citco Bank Dublin.

204. Once Fairfield Sentry was opened for investors, FGG New York Personnel

monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS,

Madoff, clients, and potential clients; created marketing and performance materials for Fairfield

Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield

Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of

Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due

diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained

all of Fairfield Sentry's books and records in New York. All decisions regarding Fairfield

Sentry's assets not invested with BLMIS were made and controlled by FGG New York

Personnel. Even with the Citco entities' various roles, FGG New York Personnel made all

operational decisions regarding Fairfield Sentry.

205.    At the outset, Fairfield Sentry used Information Memoranda to solicit investments

in the fund.  The Information Memoranda listed Fairfield International Managers, a Delaware

corporation, as Fairfield Sentry's investment manager for which it was paid a performance fee of

the 20% of the gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International

Managers' Investment Manager title, the same memoranda disclosed that all of Fairfield Sentry's

assets were in discretionary brokerage accounts operated by BLMIS, which was in reality

making all of Fairfield Sentry's investment decisions.

206.    In 1997, with the formation of FG Limited, FGG New York Personnel revised the

Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment

manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage

accounts controlled by BLMIS and not by FG Limited.

207.    FGG New York Personnel controlled and approved all subscriptions into and

redemptions from Fairfield Sentry. From at least January 1, 2002, all Fairfield Sentry

subscription agreements contained New York choice of law provisions, and provided for venue

and jurisdiction for any disputes in New York.  Fairfield Sentry's subscription agreements also

incorporated its Private Placement Memoranda ("PPM") by reference.

208.    Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The PPM disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC–registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry also disclosed to its investors that BLMIS's services were "essential to the continued operation of the Fund."

209.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

210.    After an investigation in 2005 and 2006, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

211.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

212.    At all relevant times, for purposes of any extraterritoriality analysis, Fairfield Sentry was a United States resident and a domestic transferor of subsequent transfers of BLMIS customer property.

213.    Fairfield Sentry opened its first account with BLMIS in November 1990 (Account No. 1FN012) and a second account in October 1992 (Account No. 1FN045).  The fund also opened corresponding options accounts (Account Nos. 1FN069 and 1FN070).  All of Fairfield Sentry's accounts were still open when Madoff was arrested on December 11, 2008.  In the six years prior to the Filing Date (the "Six Year Period"), Fairfield Sentry withdrew $2,895,000,000 from those accounts, including $1,580,000,000 that Fairfield Sentry withdrew during the two years preceding the Filing Date (the "Two Year Period").  A summary chart of Fairfield Sentry's withdrawals from BLMIS is attached hereto as Exhibit 2.

214.    Pursuant to a settlement between the Trustee and the Fairfield Sentry Liquidators on May 9, 2011, the Court entered a Consent Judgment in favor of the Trustee on its claims against Fairfield Sentry pursuant to 11 U.S.C. §§ 544, 547, 548, 550, SIPA § 78fff-2(c)(3), and New York Debtor and Creditor Law §§ 270–281.  Judgment was entered in favor of the Trustee on July 13, 2011 in the amount of $3,054,000,000.  (Dkt. No. 109.)

215.    Fairfield Sentry transferred many of the funds it received from BLMIS to the Defendants.  In order to make each of these subsequent transfers, Fairfield Sentry withdrew funds from its BLMIS accounts.

216.    *Greenwich Sentry [settled party]*: Greenwich Sentry was a hedge fund that was part of the FGG organization and maintained an account at BLMIS.  Greenwich Sentry was a limited partnership organized under the laws of the State of Delaware. It maintained its principal place of business in New York and was managed by FG Limited, whose principal place of

business was FGG's New York headquarters. It maintained bank accounts at JPMorgan Chase

Bank NA ("JPMorgan") in New York. Greenwich Sentry is currently in liquidation in other

proceedings in this court.

217.    Greenwich Sentry opened its account with BLMIS in November 1992 (Account

No. 1G0092)  This account was still open when Madoff was arrested on December 11, 2008.  In

the Six Year Period, Greenwich Sentry withdrew $206,038,654 from this account, including

$81,700,000 that Greenwich Sentry withdrew during the Two Year Period.  A summary chart of

Greenwich Sentry's withdrawals from BLMIS is attached hereto as Exhibit 3.

218.    Pursuant to a settlement between the Trustee and Greenwich Sentry as Debtor in

Possession, on April 17, 2012, the Court entered a Consent Judgment in favor of the Trustee on

its claims against Greenwich Sentry pursuant to 11 U.S.C. §§ 544, 547, 548, 550, SIPA § 78fff-

2(c)(3), and New York Debtor and Creditor Law §§ 270-281.  Judgment was entered in favor of

the Trustee in the amount of $206,038,654.  (Dkt. No. 125.)

219.    Greenwich Sentry subsequently transferred many of the funds it received from

BLMIS to the Defendants.  In order to make each of these subsequent transfers, Greenwich

Sentry withdrew funds from its BLMIS accounts.

220.    *Greenwich Sentry Partners [settled party]*: Greenwich Sentry Partners was a

hedge fund that was part of the FGG organization and maintained an account at BLMIS.

Greenwich Sentry Partners was a limited partnership organized under the laws of the State of

Delaware.  It maintained its principal place of business in New York and was managed primarily

from FGG's New York headquarters.  Greenwich Sentry Partners is currently in liquidation in

other proceedings in this court.

221.     Greenwich Sentry Partners opened its account with BLMIS in May 2006 (Account No. 1G0371).  This account was still open when Madoff was arrested on December 11, 2008.  During the Six Year Period, Greenwich Sentry Partners withdrew $5,985,000 from this account, including $5,425,000 that Greenwich Sentry Partners withdrew during the Two Year Period.  A summary chart of Greenwich Sentry Partners' withdrawals from BLMIS is attached hereto as Exhibit 4.

222.     Pursuant to a settlement between the Trustee and Greenwich Sentry Partners as Debtor in Possession, on April 17, 2012, the Court entered a Consent Judgment in favor of the Trustee on its claims against Greenwich Sentry Partners pursuant to 11 U.S.C. §§ 544, 547, 548, 550, SIPA § 78fff-2(c)(3), and New York Debtor and Creditor Law §§ 270-281.  Judgment was entered in favor of the Trustee in the amount of $5,985,000.  (Dkt. No. 126.)

223.     Greenwich Sentry Partners subsequently transferred many of the funds it received from BLMIS to the Defendants.  In order to make each of these subsequent transfers, Greenwich Sentry Partners withdrew funds from its BLMIS accounts.

224.     *Sigma & Lambda [settled parties]*: FGG operated Fairfield Sentry as a United States Dollar-based fund with all subscription and redemptions paid in United States Dollars. In response to investor requests to invest in Fairfield Sentry using Euros or Swiss Francs, FGG created Sigma and Lambda.  Sigma accepted subscriptions in Euros, converted them to United States Dollars, and then invested 100% of its funds  in Fairfield Sentry. When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the United States Dollars it received from Fairfield Sentry to Euros and paid them to the redeeming Sigma investor.

225.     Similarly, Lambda accepted subscriptions in Swiss Francs, converted them to United States Dollars, and then invested 100% of its funds in Fairfield Sentry. When paying

redemptions, Lambda redeemed Fairfield Sentry shares, converted the United States Dollars it received from Fairfield Sentry to Swiss Francs and paid them to the redeeming Lambda investor.

226.    Noel and Tucker organized Sigma on November 20, 1990 and Lambda on December 7, 1990 as international business companies under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so were Sigma and Lambda. Although organized in 1990, Sigma and Lambda did not begin operations until 1997.  Sigma is currently in liquidation in proceedings in the BVI and United States. Lambda is in liquidation in a separate proceeding in the BVI.

227.    Also like Fairfield Sentry, Sigma and Lambda were shell corporations present in the BVI only on paper. They had no employees and maintained no offices. They listed their registered BVI address as the same BVI post office box care of a local trust company they shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma and Lambda to FGG's New York headquarters.

228.    Inasmuch as Sigma and Lambda had no employees, they were operated almost entirely by FGG New York Personnel.

229.    FGG contracted with Citco Fund Services to provide Sigma and Lambda with back office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information and serving as the independent party verifying the Net Asset Value of the Sigma and Lambda shares. FGG also contracted Citco Custody to serve as the custodian of the Sigma and Lambda assets. As further part of the Citco relationship, FGG opened bank accounts on behalf of Sigma and Lambda at Citco Bank Dublin.

230.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma

investors' Euros and Lambda's investors' Swiss Francs into U.S. Dollars—as required for

investment in Fairfield Sentry and BLMIS, Noel executed separate contracts on Sigma's and

Lambda's behalf with the Bank of Montreal for currency swaps which were "governed by and

construed in accordance with the laws of the State of New York (without reference to choice of

law doctrine)."

231.    As with Fairfield Sentry, as part of the FGG *de facto* partnership, FGG New York

Personnel made all operational decisions regarding Sigma and Lambda. Once Sigma and

Lambda were opened for investors, FGG New York Personnel monitored Sigma's and Lambda's

investments in, and redemptions from, Fairfield Sentry; managed Sigma's and Lambda's

relationships with clients and potential clients; created marketing and performance materials for

Sigma and Lambda; marketed Sigma and Lambda; performed administrative functions required

by Sigma and Lambda; negotiated confidentiality agreements and other service provider

contracts on behalf of Sigma and Lambda; and conducted various other due diligence and risk

management activities. Until Sigma's and Lambda's liquidation, FGG maintained all of Sigma's

and Lambda's books and records in New York. FGG New York Personnel also had final control

of Sigma's and Lambda's currency hedge accounts at the Bank of Montreal.

232.    FGG New York Personnel controlled and approved all subscriptions for and

redemptions of Sigma and Lambda shares. Like Fairfield Sentry's subscription agreements,

Sigma's and Lambda's subscription agreements contained a New York choice of law provision,

provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs

that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were

Sigma's and Lambda's sole assets. Sigma's and Lambda's PPMs made substantially similar

disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets and there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPM.

233. FGG New York Personnel initially listed FG Limited as the investment manager for Sigma and Lambda. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma and Lambda PPMs to indicate FG Bermuda was Sigma's and Lambda's Investment Manager. In fact there were no duties for any investment manager because Sigma's and Lambda's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using United States Dollars.

234. At all relevant times, for purposes of any extraterritoriality analysis, Sigma and Lambda resided in the United States, were domestic transferees and domestic transferors of subsequent transfers of BLMIS customer property, and received transfers of BLMIS customer property from domestic transferors.

235. During the Six Year Period, Sigma received $783,320,553 in subsequent transfers of funds that originated with BLMIS. A summary chart of the transfers to Sigma is attached as Exhibit 5.

236. During the Six Year Period, Lambda received over $54,148,049 in subsequent transfers of funds that originated with BLMIS. A summary chart of the transfers to Lambda is attached as Exhibit 6.

237. Pursuant to a settlement between the Trustee and the Fairfield Sentry, Sigma and Lambda Liquidators on May 9, 2011, the Court entered a Consent Judgment in favor of the

Trustee on its claims against Sigma and Lambda pursuant to 11 U.S.C. §§ 544, 547, 548, 550,

SIPA § 78fff-2(c)(3), and New York Debtor and Creditor Law §§ 270-281.  Judgment was

entered in favor of the Trustee on July 13, 2011 in the amount of $752,300,000 (as to Sigma) and

$52,900,000 (as to Lambda).  (Dkt. No. 110.)

### B.    FGG Affiliates

#### 1.    FGG Subsidiary Funds

238.    *FIFL*: FGG operated Defendant FIFL as a fund of funds that partially invested its

assets in Fairfield Sentry and Greenwich Sentry.  FGG organized FIFL as a BVI international

business company on July 27, 2000. FIFL began operations on November 1, 2000. Under BVI

law, as an international business company, FIFL was restricted from doing business with other

BVI residents except for other international business companies.  FIFL maintained bank

accounts at Citco Bank Dublin and at Union Bancaire Privee in Geneva.  The fund is currently in

liquidation.

239.    Like Fairfield Sentry, Sigma, and Lambda, FIFL was a shell corporation present

in the BVI only on paper.  It had no employees and maintained no offices. Its BVI registered

address was the same post office box care of a local trust company that served as the BVI

registered address for Fairfield Sentry, Sigma, Lambda, and hundreds of other unrelated

investment vehicles.  The law firm that operated the trust company and post office box sent

invoices for its services for FIFL to FGG's New York headquarters.

240.    FGG New York Personnel operated and managed FIFL from FGG's New York

headquarters. FG Advisors served as FIFL's investment manager while FG Limited served as

FIFL's placement agent.  FIFL's PPM listed both FG Advisors' and FG Limited's address as

FGG's New York headquarters. The PPMs also directed all FIFL investors or potential FIFL

investors to communicate with the fund by corresponding with FG Limited or FG Advisors at FGG's New York headquarters.

241.    Noel and Tucker served as FIFL's directors. Noel and Tucker had FIFL contract with FG Advisors and FG Limited to provide the investment advisory and placement agent services under a written agreement which was executed in New York and "governed by and construed in accordance with the laws of the State of New York without regard to the principles of conflict of laws."  In addition to the FG Advisors and FG Limited agreement, Noel and Tucker had FIFL contract with Citco Fund Services to provide backroom administrative services and serve as the independent evaluator of FIFL's shares Net Asset Value.  FGG New York Personnel directed Citco Fund Services in performing its back office administrative duties for FIFL.

242.    In 2004, FIFL filed a Form D with the SEC.  Noel signed the SEC form as a director and listed FIFL's address as FGG's New York headquarters.

243.    FGG New York Personnel controlled and approved all subscriptions for and redemptions of FIFL shares.  FIFL's subscription agreement contained a New York choice of law provision, and provided for venue and jurisdiction for any disputes in New York. FIFL's subscription agreement also directed investors to deliver the executed subscription agreement to FG Limited at FGG's New York headquarters.

244.    FGG New York Personnel conducted due diligence for FIFL's investments.  The FGG New York Personnel directed funds in which FIFL was invested or was considering for investment to return completed due diligence questionnaires to FGG's New York headquarters so that the FGG New York Personnel could determine in which funds FIFL should invest or from which funds FIFL should redeem its investments.  All decisions to approve investments in

or redemptions from Fairfield Sentry by FIFL were made by the same FGG New York Personnel

servicing both Fairfield Sentry and FIFL.

245.    At all relevant times, for purposes of any extraterritoriality analysis, FIFL resided

in the United States, was a domestic transferee and domestic transferor of subsequent transfers of

BLMIS customer property, and received transfers of BLMIS customer property from domestic

transferors.

246.    During the Six Year Period, FIFL received $332,805,673 in subsequent transfers

of funds that originated with BLMIS (the "FIFL Subsequent Transfers").  A summary chart of

the transfers to FIFL is attached as Exhibit 7.

247.    *Stable Fund*:  Defendant Stable Fund was an FGG fund partially invested in

Greenwich Sentry.  Stable Fund was created as a fund of funds, and placed its investors' money

with other hedge funds.  Stable Fund was a Delaware limited partnership with its registered

office and principal place of business at FGG's New York headquarters.  It maintained bank

accounts at JPMorgan in New York and at Bank of New York in New York.

248.    Numerous FGG partners and employees, as well as their respective spouses,

purchased limited partnership interests in Stable Fund and then redeemed those interests.

249.    During the Six Year Period, Stable Fund received $14,848,335 in subsequent

transfers of funds that originated with BLMIS (the "Stable Fund Subsequent Transfers").  A

summary chart of the transfers to Stable Fund is attached as Exhibit 8.

250.    *FIF Advanced, Ltd. [dismissed party]*: FIF Advanced, Ltd. ("FIFA") is an FGG

fund that invested a portion of its assets in Fairfield Sentry. FIFA was organized as an

international business company under the laws of the BVI but maintained no offices and no

employees in the BVI. FIFA was managed by FG Advisors and wholly-owned by FG Limited,

- 78 -

both of which maintained their principle places of business at FGG's New York City headquarters.

251.    FIFA redeemed substantial shareholder interests in Fairfield Sentry.  During the Six Year Period, FIFA received $45,279,292  in subsequent transfers of funds that originated with BLMIS.  A summary chart of the transfers to FIFA is attached as Exhibit 10.

252.    On January 17, 2013, the Trustee voluntarily dismissed without prejudice his claims against FIFA.  (Dkt. No. 130.)

### 2.    FGG Administrative Entities

253.    *FG Limited*: Defendants Noel, Tucker, and Piedrahita incorporated FG Limited under the laws of Ireland in 1997 as part of the merger between Noel's and Tucker's FGG and Piedrahita's Littlestone Associates.  Prior to the merger, Noel and Tucker owned the FGG *de facto* partnership through Fairfield International Managers.  Post-merger, in order to facilitate Piedrahita's new ownership interest, Noel, Tucker, and Piedrahita formed FG Limited with Fairfield International Managers owning 66.7% of FG Limited's shares and Piedrahita owning the remaining 33.3%.  In 2001, Piedrahita transferred his FG Limited ownership to Safehand Investments.

254.    In 2002, Noel, Tucker, and Piedrahita reorganized FG Limited as a limited liability company under the laws of the Cayman Islands.  Following the reorganization, Noel, Tucker, and Piedrahita made certain FGG personnel partners by providing them with percentage ownership of FG Limited shares.  From 2002 forward, FGG annually reviewed the performance of FGG personnel and partners.  Based on the performance reviews, FGG made new partners granting them FG Limited shareholder status and/or adjusting their respective FG Limited shareholder percentages.

255. In order to allow for the admittance of new FGG partners, on January 1, 2002, FG

Limited's shareholders executed a Shareholder and Voting Agreement. By executing this

agreement, the FG Limited shareholders acknowledged and agreed that: (1) the agreement "shall

be governed by the laws of the State of New York," (2) any controversy or claim arising out of

or relating to the agreement would be settled by binding arbitration administered by the

American Arbitration Association taking place in New York, New York, and (3) the agreement

"shall be construed in accordance with the laws of the State of New York."

256. As of April 2008, FGG depicted the ownership of FG Limited as set out below:



257. FG Limited was the head of the FGG *de facto* partnership. It was taxed as a

partnership under United States tax law. FG Limited served as the investment adviser and/or

placement agent for many of the FGG investment vehicles including Fairfield Sentry, Sigma,

Lambda, Greenwich Sentry, and FIFL. FG Limited also owned 100% of various FGG

components including FG Advisors, FG Bermuda, Fairfield Greenwich UK Limited ("Fairfield-

UK"), and Fairfield Heathcliff Capital LLC. During the Six Year Period, Fairfield-UK received

$24,464,782 in subsequent transfers of funds that originated with BLMIS.  A summary chart of

the transfers to Fairfield-UK is attached as Exhibit 9.  As a result, fees from the BLMIS feeder

funds, currency funds, and FIFL flowed directly or indirectly to FG Limited.

258.    FG Limited never had employees, nor did it ever maintain an office in Ireland or

the Cayman Islands.  Throughout its history, FG Limited reported its principal place of business

as FGG's New York headquarters.  When FG Limited registered to do business in the State of

New York, it listed its principal executive office as FGG's New York headquarters.  For the

FGG-operated funds using FG Limited as the investment manager or placement agent, FGG

prepared Information Memoranda or PPMs identifying FG Limited's address as the FGG New

York headquarters.

259.    At all relevant times, FG Limited maintained its bank account at JPMorgan in

New York, New York. FG Limited utilized its New York JPMorgan account to receive funds

from the FGG operated investment funds, including from the BLMIS feeder funds, the currency

funds, and FIFL, and to make partnership distributions to the FG Limited shareholders directly or

to entities designated by them to receive their distributions.

260.    In its role as a placement agent for Fairfield Sentry, Sigma, Lambda, and FIFL,

FG Limited contracted with numerous third-party entities that purchased or distributed the fund's

shares.  Under these contracts, FG Limited shared the management or performance fees it

received from the BLMIS feeder funds, currency funds, and/or FIFL with the third party entity.

FGG New York Personnel prepared and/or approved each of these contracts.  Nearly all of the third party fee sharing agreements contained New York choice of law provisions.

261.    FG Limited served as investment manager and placement agent for a number of FGG funds.  Between 1999 and 2003, FG Limited purportedly acted as the investment manager to Fairfield Sentry.  In this capacity, FG Limited received a performance fee equal to 20% of the gains in Fairfield Sentry's BLMIS accounts.  In 2002 and 2003, FG Limited also received a management fee equal to 1% of Fairfield Sentry's assets.  Fairfield Sentry paid these fees from funds it withdrew from its BLMIS accounts and transferred them to FG Limited.

262.    From 1999 through 2003, FG Limited also served as Greenwich Sentry's general partner for which it received a performance fee equal to 20% of the gains in Greenwich Sentry's BLMIS account.  FG Limited received these performance fees from Greenwich Sentry in the form of limited partnership interests, which it then redeemed to receive over $19 million.  In order to pay the FG Limited redemptions, Greenwich Sentry withdrew funds from its BLMIS account and then transferred them to FG Limited.

263.    In addition, FG Limited served as the placement agent for FIFL and FIFA. As placement at to FIFL and FIFA, FG Limited received a placement fee equal to 1% of each fund's assets.  To pay the placement fee, FIFL and FIFA redeemed Fairfield Sentry shares.  Summary charts of the transfers to FIFL and FIFA are attached as Exhibits 7 and 10, respectively.

264.    As detailed below, through its 100% ownership of FG Bermuda and FG Advisors, FG Limited ultimately received the fees received by both entities from the BLMIS feeder funds, the currency funds, and FIFL.  To pay the fees to FG Bermuda and FG Advisors the BLMIS feeder funds, currency funds, and FIFL obtained funds from BLMIS accounts.

265.    At all times relevant, for purposes of any extraterritoriality analysis, the transfers to FG Limited are domestic.

266.    During the Six Year Period, FG Limited received $604,392,398 in subsequent transfers of funds that originated with BLMIS (the "FG Limited Subsequent Transfers").  A summary chart of the transfers to FG Limited is attached as Exhibit 11.

267.    FG Limited is also responsible for repayment to the Trustee of all avoidable transfers received by Greenwich Sentry while it was its general partner, from 1999 until June 2003, which totals $53,956,500.

268.    *FG Bermuda*: As described earlier, in 2002, FGG decided to expand its offerings to include additional funds of funds. As part of this process, FGG approached Madoff to inform him of the new funds and that a United States entity would be formed to serve as their investment adviser to and to perform risk assessments for the new funds. In addition, the same United States entity would become the investment adviser and risk evaluator for the BLMIS feeder funds and the currency funds.  Fearing greater SEC scrutiny of the BLMIS IA operation, Madoff immediately objected to the concept of a United States-based entity serving as the investment adviser and risk evaluator for the FGG funds associated with BLMIS.  In response to Madoff's objection, FGG's Executive Committee decided to organize a new investment adviser and risk assessment entity off shore.

269.    In 2003, FGG announced FG Bermuda would become the investment manager for Fairfield Sentry, Sigma, Lambda, the general partner of Greenwich Sentry, and provide risk assessment services for all FGG operated funds and investment vehicles.

270.    Upon learning of FGG's plan for the new Bermuda operation, Madoff skeptics immediately, and correctly, raised concerns that the move by FGG was an attempt by Madoff to

avoid SEC scrutiny of BLMIS.  FGG New York Personnel responded to these skeptics and other

FGG investors and potential investors by formulating a response that falsely claimed the

formation of the Bermuda entity was solely for tax purposes.

271.    On June 12, 2003, FGG incorporated FG Bermuda as an exempt company under

the laws of Bermuda.  New York-based FG Limited held 100% of the FG Bermuda shares.

Under Bermuda law, at least one of a Bermuda exempt company's directors must be a Bermuda

citizen.  As a consequence, FGG named Noel, Tucker, and Ian Pilgrim, a Bermuda citizen and

Citco employee, as the original FG Bermuda directors.

272.    To commence FG Bermuda's operations, Rob Blum, FGG's New York based

Chief Operating Officer, leased small office space for FG Bermuda. In addition, FG Bermuda

opened a bank account at The Bank of NT Butterfield & Son Ltd. ("Butterfield Bank")

273.    FGG New York Personnel then interviewed and selected individuals to staff the

Bermuda operation.  FGG selected Defendant Vijayvergiya as the Risk Manager of FG

Bermuda.  Vijayvergiya reported directly to the New York-based FGG Executive Committee,

FGG's Chief Operating Officer, General Counsel, and Chief Financial Officer.  FGG permitted

Vijayvergiya, as head of the Bermuda office, to have signature authority over FG Bermuda's

Butterfield Bank account up to $10,000.  Any FG Bermuda transaction in excess of $10,000 had

to be approved and include the signature of FGG executives located at FGG's New York

headquarters.

274.    FG Bermuda never had more than a handful of employees beyond Vijayvergiya,

including Defendant McKenzie, an accountant with the title of Controller; four financial analysts

who primarily reviewed and researched other hedge funds and investment managers for possible

investment by FGG's non-BLMIS related funds; a local IT assistant and a few administrative

assistants.  Except for the administrative assistants, all FG Bermuda employees reported directly to FGG New York Personnel. FG Bermuda's files were maintained in FGG's New York headquarters.

275.    In July 2003, FG Limited assigned its investment manager agreements for Fairfield Sentry, Sigma, Lambda and its role as general partner to Greenwich Sentry to FG Bermuda.  From July 2003 to December 2008, FG Bermuda purportedly served as Fairfield Sentry's, Sigma's, and Lambda's investment manager.  As compensation for these purported services, FG Bermuda received a management fee equal to 1% of the net asset value of Fairfield Sentry, as well as a performance fee equal to 20% of Fairfield Sentry's net gains. According to Fairfield Sentry's financial statements, between 2003 and the first half of 2008, FG Bermuda received over $750 million in fees from Fairfield Sentry. In order to pay those fees to FG Bermuda, Fairfield Sentry withdrew funds from its BLMIS accounts and then transferred the money to FG Bermuda.

276.    In 2003 and 2004, FG Bermuda served as Greenwich Sentry's general partner. As Greenwich Sentry's general partner, FG Bermuda was purportedly responsible for directing all of its investment and trading activities—while in reality all of these functions were delegated to BLMIS.  In exchange for these "responsibilities," FG Bermuda received management and performance fees from Greenwich Sentry. In 2003, as Greenwich Sentry's general partner, FG Bermuda received a management fee equal to 0.1% of assets under management and a performance fee equal to 20% of capital appreciation in Greenwich Sentry's BLMIS account.  In 2004, FGG modified the Greenwich Sentry arrangement by assigning the 0.1% management fee to FG Advisors.

277.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, and Greenwich Sentry's investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

278.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Defendant McKeefry, FGG's New York-based general counsel, executed and submitted.

279.    During its investigation of BLMIS and its feeder funds, the SEC determined BLMIS, and not FG Bermuda, was actually performing the feeder funds' investment advisory services. As a consequence, in addition to requiring BLMIS to register as an investment adviser, the SEC required the feeder funds disclose to their investors and potential investors that BLMIS was the investment adviser responsible for investing virtually all of the feeder funds' assets.

280.    On December 23, 2004, FGG created a new Bermuda exempt company called Greenwich Bermuda Limited ("GBL"). At the same time, FGG assigned FG Bermuda's role and duties as the Greenwich Sentry general partner to GBL. GBL received a performance fee equal to 20% of the capital appreciation in Greenwich Sentry's BLMIS accounts.

281.    In April 2006, FGG created Greenwich Sentry Partners, another Delaware limited partnership. Greenwich Sentry Partners began operations in May 2006 with FG Bermuda as its general partner.  At the same time, FGG returned FG Bermuda to its role as the general partner of Greenwich Sentry.  As the general partner for both Greenwich Sentry and Greenwich Sentry Partners, FG Bermuda charged a management fee equal to 1% of the assets under management

of both partnerships and a performance fee equal to 20% of the net gains in both partnerships'

BLMIS accounts.

282.    Greenwich Sentry and Greenwich Sentry Partners compensated FG Bermuda as

their respective general partner in two ways: (1) performance fees in the form of limited

partnership interests which FG Bermuda then redeemed; and (2) management fees in the form of

cash payments. In order to pay FG Bermuda's redemptions of the limited partnership interests

and make the cash payments, Greenwich Sentry and Greenwich Sentry Partners withdrew funds

from their BLMIS accounts and then transferred the funds to FG Bermuda.

283.    In total, Greenwich Sentry's and Greenwich Sentry Partners' financial statements

reported FG Bermuda received a combination of limited partnership interests and cash payments

totaling more than $12.5 million while serving as general partner to both entities.

284.    Until December 31, 2007, FG Limited owned 100% of the shares of FG Bermuda.

On January 1, 2008, FG Limited distributed its ownership of FG Bermuda shares to the FG

Limited shareholders of record: Fairfield International Managers, Fairfield Greenwich Capital

Partners, Safehand Investments, Toub, Greisman, Landsberger, Smith, and Share Management

LLC ("Share Management").

285.    As part of the distribution of the FG Bermuda shares to the FG Limited

shareholders, FG Bermuda and FG Limited entered into a written Franchise Agreement dated

January 1, 2008 wherein the entities acknowledged:

> [T]he success of [FG Limited] as manager of [Fairfield Sentry] and
> general manager of [Greenwich Sentry] was largely determined by
> a trading strategy implemented by Bernard L. Madoff Investment
> Securities LLP ("BLMIS"), a broker-dealer, though accounts each
> entity maintained at that firm.

And further agreed:

> For so long as BLM[IS] continues to implement trading strategies, [FG Limited] agrees that [FG Bermuda] shall have exclusive rights to the Sentry Franchise, including the right to act as investment manager for [Fairfield Sentry], to act as general partner of [Greenwich Sentry] and [Greenwich Sentry Partners] and to maintain and develop the trading strategies implemented by BLM[IS].

286.    As part of the franchise agreement, FG Limited agreed to continue acting as the placement agent for the BLMIS feeder funds and not develop or promote investments in any other feeder fund or other entity utilizing BLMIS and the SSC strategy.  In exchange, FG Bermuda agreed to pay FG Limited:

- 50% of FG Bermuda's fees earned from the Feeder Funds that are based on assets under management plus FG Bermuda's incentive fees, minus $2.6 million, increasing by 5% per annum, and

- 50% of FG Bermuda's general partner income allocation from Greenwich Sentry and Greenwich Sentry Partners.

287.    Vijayvergiya and McKeefry executed the Franchise Agreement that was to "be construed and covered in accordance with the laws of New York, without regard to the principles of conflict laws thereof."

288.    At all times relevant, for purposes of any extraterritoriality analysis, the transfers to FG Bermuda are domestic.

289.    During the Six Year Period, FG Bermuda received $621,737,949 in subsequent transfers of funds that originated with BLMIS (the "FG Bermuda Subsequent Transfers").  A summary chart of the transfers to FG Bermuda is attached as Exhibit 12.

290.    FG Bermuda is also responsible for repayment to the Trustee of all avoidable transfers received by Greenwich Sentry while it was its general partner, from July 2003 to 2004 and 2006 to 2008, which totals $118,812,154, as well as all avoidable transfers received by

Greenwich Sentry Partners while FG Bermuda was its general partner, from 2006 to 2008, which totals $5,985,000.

291.    *FG Advisors*:  Defendant FG Advisors is a Delaware limited liability company and a wholly owned subsidiary of FG Limited.  FG Advisors has been registered as an investment adviser with the SEC since November 17, 2003.  Its principal place of business is FGG's New York headquarters.  FG Advisors maintained bank accounts at JPMorgan in New York.

292.    FG Advisors provided administrative services and back-office support to Greenwich Sentry, Greenwich Sentry Partners, Sigma, and Lambda.  According to financial statements issued by those funds, FG Advisors received the fees of over $6 million between 2003 and 2007.

293.    FG Advisors also served as investment manager to a number of FGG funds that were at least partially invested in the Feeder Funds.  These funds included:  Stable Fund, for which FG Advisors received a 1% management fee; and FIFL and FIFA, for which FG Advisors received an expense reimbursement of 0.15% and 0.1%, respectively.

294.    During the Six Year Period, FG Advisors received $134,372,646 in subsequent transfers of funds that originated with BLMIS (the "FG Advisors Subsequent Transfers").  A summary chart of the transfers to FG Advisors is attached as Exhibit 13.

295.    *Fairfield International Managers*: Defendant Fairfield International Managers is a Delaware corporation formed on January 4, 1988.  Fairfield International Managers' principal place of business was FGG's New York headquarters .  It maintained its bank account at JPMorgan in New York.

296.    Noel and Tucker each owned 50% of the shares of Fairfield International Managers. Noel and Tucker utilized Fairfield International Managers to accept their shares of FG Bermuda and FG Limited.

297.    During the Six Year Period, Fairfield International Managers received $391,573,387 in subsequent transfers of funds that originated with BLMIS (the "Fairfield International Managers Subsequent Transfers").  A summary chart of the transfers to Fairfield International Managers is attached as Exhibit 14.

298.    *Fairfield-UK [dismissed party]*: Fairfield-UK was an FGG entity that served as the investment manager to certain FGG funds. Fairfield-UK was incorporated in England and Wales in 1997 and listed its registered office as Fifth Floor, 32 Dover Street, London W1X 3RA, England.

299.    The entity maintained a small staff in London, but it was effectively managed from FGG's New York City headquarters. For example, salaries were determined by a compensation committee comprised of five partners, four of which were based in the New York office.

300.    Fairfield-UK received significant money from other FGG entities in the form of management and performance fees for its service as investment manager. During the Six Year Period, Fairfield-UK received $24,464,782 in subsequent transfers of funds that originated with BLMIS. A summary chart of the transfers to Fairfield-UK is attached as Exhibit 9.

301.    On January 17, 2013, the Trustee voluntarily dismissed without prejudice his claims against Fairfield-UK.  (Dkt. No. 130.)

## C.    FGG Individuals Defendants

302.    A finite number of individuals who were FG Limited shareholders, FG Advisors employees, or FG Bermuda employees were responsible for the creation, marketing, sales,

relationships, and ultimate failure of "FGG." These same individuals make up the Management and Sales Defendants in this Second Amended Complaint.

### 1.    Management Defendants

303.    *Walter Noel*: Defendant Noel is a founding partner of FGG and sat on its Board of Directors. He also served as a director of Fairfield Sentry, Sigma, and FG Bermuda. From 1992 to 1998, Noel was the general partner to Greenwich Sentry. Through his 50% ownership of Fairfield International Managers, Noel is also an indirect shareholder in FG Advisors, FG Limited, and FG Bermuda. Noel also served on FGG's Executive Committee and worked in FGG's New York and Greenwich offices. He maintains residences in New York and Connecticut.

304.    As one of FGG's founding partners, Noel was intimately involved with its operations. Noel made day-to-day management decisions regarding the Feeder Funds and the FGG Affiliates. He was also involved in marketing the Feeder Funds, as well as the preparation and review of sales and marketing materials. As further described herein, Noel had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

305.    Noel and his immediate and extended family became exceptionally wealthy as a result of the fees paid to him by the Feeder Funds. Noel took for himself and his family millions of dollars of customer property in the form of fees and profits. This enabled him, and his family, to live what has been publicly described as a life of grandeur, including a prestigious home in Greenwich, Connecticut, a tropical retreat in Mustique, and extravagant vacation homes in Palm Beach, Florida, and Southampton, New York.

306.    During the Six Year Period, Noel received $12,964,286 in subsequent transfers of funds that originated with BLMIS (the "Noel Subsequent Transfers"). These included

transfers he received from, *inter alia*, the Noel 2004 Family Trust. During the Six Year Period, the Noel 2004 Family Trust received $4,264,806 in subsequent transfers of funds that originated with BLMIS. A summary chart of the transfers to the Noel 2004 Family Trust is attached as Exhibit 15. A summary chart of the transfers to Noel is attached as Exhibit 16.

307.    Noel is also personally responsible for repayment to the Trustee of all avoidable transfers received by Greenwich Sentry while he was its general partner, from 1992 to 1998, which totals $37,303,975.

308.    *Jeffrey Tucker*: Defendant Tucker is a founding partner of FGG and sits on its Board of Directors.  He served as a director of FG Bermuda and FG Limited, and as a principal of FG Limited.  He also served, along with Noel, as general partner of Greenwich Sentry from 1992 to 1998.  Through his 50% ownership of Fairfield International Managers, Tucker is an indirect shareholder in FG Advisors, FG Limited, and FG Bermuda.  Tucker also served on FGG's Executive Committee  and worked in FGG's New York headquarters.  Tucker is a New York resident.

309.    Tucker was intimately involved with FGG's operations, including the operation of the Feeder Funds.  As a director, Tucker was involved in making day-to-day management decisions regarding the Feeder Funds and the FGG Affiliates.  He also reviewed and helped prepare sales and marketing materials.  As further described herein, Tucker had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

310.    Tucker and his immediate and extended family became exceptionally wealthy as a result of fees paid by the Feeder Funds.  Prized racehorses, private jets, and luxurious mansions

were just a few of the riches amassed by Tucker from management and partnership fees he received.

311.    During the Six Year Period, Tucker received $2,500,000 in subsequent transfers of funds that originated with BLMIS (the "Tucker Subsequent Transfers").  A summary chart of the transfers to Tucker is attached as Exhibit 17.

312.    Tucker is also personally responsible for repayment to the Trustee of all avoidable transfers received by Greenwich Sentry while he was its general partner, from 1992 to 1998, which totals $37,303,975.

313.    *Andrés Piedrahita:* Defendant Piedrahita is a citizen of the Republic of Colombia. However, he resided in the United States for the majority of his adult life.  Piedrahita received his education in the United States and graduated from Boston University.  Following his graduation from Boston University, Piedrahita remained in the United States and began his career in money management.  He worked for Prudential Bache Securities in New York from 1981 to 1987 and then became a Vice President at Shearson Lehman Hutton in New York from 1987 to 1990.  In order to permit him to be employed in the United States, Piedrahita obtained permanent residence status and was issued a United States social security number.

314.    In 1989 Piedrahita married Noel's daughter and fellow FGG partner, Corina Noel Piedrahita, in Greenwich, Connecticut. At all relevant times, Piedrahita resided in the United States.  He maintained multiple residences in New York between at least 2001 and 2008, and also maintained residences in Florida and Connecticut.

315.    In the early 1990s, Piedrahita founded Littlestone Associates, Inc. as a money management services provider which was a New York corporation with its principal place of

business in New York.  In 1997, Piedrahita agreed to merge Littlestone Associates with FGG.

Upon the merger, FGG described Piedrahita as an FGG founding partner.

316.    As part of the FGG-Littlestone Associates merger, Piedrahita became a one-third

owner of FG Limited.  In executing FG Limited's Shareholder and Voting Agreement Piedrahita

acknowledged: (1) the agreement "shall be governed by the laws of the State of New York," (2)

any controversy or claim arising out of or relating to the agreement would be settled by binding

arbitration administered by the American Arbitration Association that shall take place in New

York, New York, and (3) the agreement "shall be construed in accordance with the laws of the

State of New York."

317.    Piedrahita placed his FG Limited shares in Safehand Investments which is owned

by a Piedrahita-settled trust, RD Trust, both Safehand Investments and RD Trust are defendants

in a separate adversary proceeding. Piedrahita received quarterly partnership distributions that

were paid from FG Limited's New York JPMorgan bank account.

318.    Piedrahita briefly served as a director of Fairfield-UK in 2005, for which he

received a monthly salary. Although at limited times Piedrahita was affiliated with FGG's offices

in London and Madrid, he always maintained an office in FGG's New York headquarters.  As

part of his FGG duties, Piedrahita regularly met with Madoff at BLMIS's New York

headquarters, hosted dinners and client events on behalf of FGG in New York, regularly attended

FGG Executive Committee and Board of Directors meetings in New York, and signed investor

communications using a New York address block.

319.    Piedrahita was intimately involved with FGG's operations, including the

operations of the Feeder Funds.  As a member of the Executive Committee and Chairman of the

Board of Directors, Piedrahita was deeply involved in making day-to-day management decisions

regarding the FGG entities. As further described herein, Piedrahita had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

320.    As a direct result of his FGG roles, Piedrahita became exorbitantly rich. According to published reports, he lived a whirlwind lifestyle of Gulfstream jets, multi-million dollar yachts, extravagant parties, pheasant hunting with royalty, and spent tens of millions of dollars on homes around the world. After Madoff's arrest, Piedrahita and his wife, Noel Piedrahita, sold their New York residence and moved from country to country after taking delivery of a $12 million yacht.

321.    At all times relevant, for purposes of any extraterritoriality analysis, the transfers to Piedrahita are domestic.

322.    During the Six Year Period, Piedrahita received $172,680,713 in subsequent transfers of funds that originated with BLMIS (the "Piedrahita Subsequent Transfers"). A summary chart of the transfers to Piedrahita is attached as Exhibit 18. These include transfers that FGG records indicate went to Piedrahita (Exhibit 18-A), as well as transfers that FGG records indicate went to either Piedrahita or his wholly-owned entity, Safehand Investments (Exhibit 18-B).

323.    *Mark McKeefry*: Defendant McKeefry joined FGG in 2003. 2003. He became a partner in 2005 and served on FGG's Executive Committee since 2007. He also acted as FGG's Chief Compliance Officer; FG Bermuda's Chief Legal Officer, Assistant Secretary, and Director; FG Limited's Executive Director, Chief Operating Officer, and Vice President; FG Advisors' President; and Director of Fairfield-UK. As FGG's Chief Legal Officer, McKeefry was responsible for legal and compliance issues. He was also responsible for maintaining FGG's

relationship with Madoff in 2007 and 2008. McKeefry worked in FGG's New York

headquarters and resides in Connecticut.

324.    McKeefry was responsible for approving and signing various documents on

FGG's behalf. Such documents included:  letters to investors;  Form 13F filings with the SEC;

agreements with BLMIS, including customer agreements and option-trading agreements; Form

ADV Applications for Investment Adviser Registration; subscription agreements; confidentiality

agreements; distribution agreements; letters of understanding; written resolutions; delegation

agreements; selling agreements; and certificates of incumbency. As further described herein,

McKeefry had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to

circumstances suggesting a high probability of fraud at BLMIS.

325.    During the Six Year Period, McKeefry received $16,838,931 in subsequent

transfers of funds that originated with BLMIS (the "McKeefry Subsequent Transfers"). A

summary chart of the transfers to McKeefry is attached as Exhibit 19.

326.    *Daniel Lipton*: Defendant Lipton joined FGG in 2002. During his employment

with FGG, he served as Chief Financial Officer and Assistant Secretary of FG Bermuda, and

Vice President and CFO of FG Advisors. Lipton has been a partner of FGG since 2005. Lipton

worked in FGG's New York headquarters and resides in New York.

327.    As CFO, Lipton was principally responsible for overseeing the annual FGG

audits. Lipton also assisted in managing FGG's operations, including:  authorizing and

requesting wire transfers into FGG accounts; communicating with FGG investors regarding

audits of FGG's financial statements; and approving and signing numerous documents on FGG's

behalf. Such documents included:  letters to clients regarding amendments to their agreements

with FGG and their statements for various FGG funds; the Feeder Funds' customer, option, and

trading authorization agreements with BLMIS; numerous loan requests on behalf of FGG;

agreements establishing FGG entities as investment managers and placement agents; requests for

wire transfers redeeming money from the Feeder Funds' BLMIS accounts; and letters requesting

a confirmation of assets in a number of the Funds

328.    After Madoff's Ponzi scheme was revealed, Lipton immediately emailed his

personal broker and asked that a new account be set up in his wife's name only, where he

transferred all of his municipal bonds and treasury investments.  As further described herein,

Lipton had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to

circumstances suggesting a high probability of fraud at BLMIS.

329.    During the Six Year Period, Lipton received $9,284,957 in subsequent transfers of

funds that originated with BLMIS (the "Lipton Subsequent Transfers").  A summary chart of the

transfers is Lipton attached as Exhibit 20.

330.    *Amit Vijayvergiya*: FGG hired Defendant Vijayvergiya in June 2003 to serve as

the FG Bermuda Risk Manager and was later promoted to become FGG's Chief Risk Officer.

As FGG's Chief Risk Officer, Vijayvergiya headed FGG's Risk Management Division in the

New York-based Investment Group, reporting directly to FGG's Executive Committee in New

York.  Vijayvergiya also served on FGG's New York-based Investment, Risk, and Asset

Allocation Committees.  Vijayvergiya focused primarily on hedge fund manager selection and

risk management.  Vijayvergiya was originally an FG Bermuda employee and later became an

FGG partner and FG Limited shareholder.

331.    Vijayvergiya was responsible for conducting due diligence, initial risk modeling

and ongoing risk analysis on investments, fund operations services, supervising staff, and

shareholder communications.  He was charged with assessing the risk of the Feeder Fund

investments.  Vijayvergiya was also involved in responding to investors' due diligence inquiries, and frequently prepared responses to client questions for FGG agents who maintained the client relationships.  In addition, Vijayvergiya supported FGG's marketing and sales efforts by fielding questions from sales agents—including, but not limited to, inquiries from the Sales Defendants—and responding to customer inquiries.  As further described herein, Vijayvergiya had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

332.    Vijayvergiya is a Canadian citizen and he resided in Bermuda between 2003 and 2008.  While at FG Bermuda, Vijayvergiya resided in Bermuda but traveled regularly to FGG's headquarters.  Vijayvergiya regularly conducted business with Madoff, BLMIS, and FGG clients in New York, including conducting over 150 Fairfield Sentry client meetings and conference calls in 2005.  He also assisted New York-based FGG sale personnel with responses to FGG client inquiries regarding FGG investment vehicles, including the feeder funds, currency funds, and FIFL.  In connection with his marketing and sales efforts for the feeder funds, currency funds, and FIFL, Vijayvergiya utilized a United States FGG email account—"amit@fggus.com."

333.    Vijayvergiya constantly communicated with his colleagues in FGG's New York headquarters and reported directly to the New York-based Executive Committee.  Additionally, Vijayvergiya was responsible for FGG's communications with U.S.-based consultant, Gil Berman.

334.    The SEC interviewed Vijayvergiya in New York during its investigation of BLMIS and its feeder funds in 2005 and 2006.  During the interview, Vijayvergiya worked with Madoff to attempt to mislead the SEC about BLMIS's actual role as the feeder funds' investment adviser.

335.    On numerous occasions, Vijayvergiya made representations to Fairfield Sentry's investors regarding BLMIS's SIPC membership and the protection SIPC membership provided to the feeder funds, including affirmative representations that any insolvency at BLMIS would be governed by applicable provisions of SIPA and the United States Bankruptcy Code.

336.    Even though FG Bermuda was purportedly the investment manager or general partner for Fairfield Sentry, Greenwich Sentry, and Greenwich Sentry Partners, Vijayvergiya sent to BLMIS address change verifications for all three funds, directing BLMIS to send all future communications for each fund to FGG's New York headquarters.

337.    On January 1, 2007, Vijayvergiya became an FGG partner and a shareholder of FG Limited. By executing FG Limited's First Amended and Restated Shareholder and Voting Agreement for and its related amendments, Vijayvergiya acknowledged: (1) the agreement "shall be governed by the laws of the State of New York," (2) any controversy or claim arising out of or relating to the agreement would be settled by binding arbitration administered by the American Arbitration Association to take place in New York, New York, and (3) in a separate provision, affirmed the agreement "shall be construed in accordance with the laws of the State of New York."

338.    As an FG Limited shareholder, Vijayvergiya received quarterly partnership distributions that were paid from FG Limited's New York JPMorgan bank account.

339.    At all times relevant, for purposes of any extraterritoriality analysis, the transfers to Vijayvergiya are domestic.

340.    During the Six Year Period, Vijayvergiya received $8,362,650 in subsequent transfers of funds that originated with BLMIS (the "Vijayvergiya Subsequent Transfers"). A summary chart of the transfers to Vijayvergiya is attached as Exhibit 21.

341.    *Gordon McKenzie*: FGG hired Defendant McKenzie in 2003 to be FG Bermuda's Controller. McKenzie is a Canadian citizen, a licensed Certified Public Accountant in Maine, and he resided in Bermuda between 2003 and 2008.

342.    McKenzie's responsibilities at FGG included overseeing the accounting aspects of FG Bermuda's operations; assisting in sales efforts for Fairfield Sentry; accounting and back-office operations for the feeder funds; preparing and coordinating audits of FGG's funds with PricewaterhouseCoopers; and reviewing PricewaterhouseCoopers prepared financial statements. He received salary and bonus payments from FG Bermuda and deferred compensation from FIFL. As further described herein, McKenzie had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

343.    As a member of the Fund Accounting Division in FGG's New York-based operations group, McKenzie reported directly to FGG's New York-based Chief Financial Officer Lipton and other FGG New York Personnel.  As a result, McKenzie routinely traveled to New York—sometimes for weeks at a time—to meet with his supervisors.  McKenzie also traveled to FGG's New York headquarters to meet with current and potential feeder fund investors, solicit investments, and to respond to due diligence inquiries.

344.    McKenzie communicated with personnel at BLMIS including Madoff, Frank DiPascali, and Jo Ann Crupi.  On June 4, 2008, McKenzie participated in a phone conference with Vijayvergiya and Madoff where FGG inquired about options transactions, counterparties, and market timing associated with the SSC Strategy.  On the call, Madoff explained that BLMIS acted as agent in the options transactions and all accounts were pooled and traded together. Yet

McKenzie routinely saw and understood BLMIS trade confirmations which showed BLMIS

trading as a principal and not as an agent.

345.    At all times relevant, for purposes of any extraterritoriality analysis, the transfers

to McKenzie are domestic.

346.    During the Six Year Period, McKenzie received $513,779 in subsequent transfers

of funds that originated with BLMIS (the "McKenzie Subsequent Transfers").  A summary chart

of the transfers to McKenzie is attached as Exhibit 22.

347.    *Richard Landsberger*: Defendant Landsberger joined FGG in 2001.  Landsberger

became an FGG partner on January 1, 2002, and was a member of FGG's Executive Committee,

Director of Fairfield-UK, and head of sales for FIFL.  Landsberger is a United States citizen who

resided in London between 2002 and 2008.  He maintained a bank account at UBS in New York.

348.    While Landsberger was affiliated with FGG's London office, Landsberger

regularly attended meetings in New York in his capacity as a member of the FGG Executive

Committee and frequently communicated with FGG New York Personnel.  As a member of the

Executive Committee, Landsberger was regularly involved in conversations regarding BLMIS's

returns being "too good to be true"; BLMIS's improper, dual role as custodian and investment

manager; and the truth about BLMIS's auditor's inability to properly audit BLMIS.  He also

received numerous inquiries from customers highlighting evidence that Madoff was a fraud, and

was involved in internal discussions regarding the customers' concerns.  As further described

herein, Landsberger had actual knowledge of the fraud at BLMIS or, at a minimum, was

willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

349.    Landsberger worked out of FGG's New York headquarters, sometimes for weeks at a time.  In 2008, Landsberger had spent over $20,000 in travel expenses for lodging, transportation, meals, and entertainment in connection with work-related trips to New York.

350.    Upon becoming an FGG partner and FG Limited shareholder Landsberger executed the FG Limited Shareholder and Voting Agreement and its related amendments. In so doing, Landsberger acknowledged: (1) the agreement "shall be governed by the laws of the State of New York;" (2) any controversy or claim arising out of or relating to the agreement would be settled by binding arbitration administered by the American Arbitration Association that would take place in New York, New York; and (3) in a separate provision, affirmed the agreement "shall be construed in accordance with the laws of the State of New York."

351.    As a shareholder of FG Limited, Landsberger received quarterly partnership distributions.  These distributions were paid from FG Limited's New York JPMorgan bank accounts to Landsberger's New York UBS AG banking account

352.    At all times relevant, for purposes of any extraterritoriality analysis, the transfers to Landsberger are domestic.

353.    During the Six Year Period, Landsberger received $29,733,655 in subsequent transfers of funds that originated with BLMIS (the "Landsberger Subsequent Transfers").  A summary chart of the transfers to Landsberger is attached as Exhibit 23.

354.    *Philip Toub*: Defendant Toub joined FGG in 1997 in FGG's New York headquarters.  Toub became an FGG partner on January 1, 2002, and was a member of the Executive Committee.  As an FGG partner Toub was a FG Limited shareholder. Throughout his relationship with FGG, Toub served as a director of FG Limited and as a member of FGG's Client Development Group.  Toub is a United States citizen who resided in Rio de Janeiro, Brazil

between 2001 and 2004, and in New York between 2005 and 2008.  He maintained a bank account at JPMorgan in New York.

355.    While at FGG, Toub was responsible for marketing FGG's funds and developing new products, including marketing the feeder funds and developing investment products underlying the feeder funds.  In connection with his FGG responsibilities, Toub attended at least one meeting with Madoff at BLMIS's office in New York.  As further described herein, Toub had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

356.    Toub is married to Alix Noel Toub ("Noel Toub"), the daughter of FGG founding partner, Walter Noel.  At all pertinent times, Toub maintained one or more residences in New York and/or Connecticut, including purchasing his father-in-law's Greenwich, Connecticut home in November 2004, where Toub and Noel Toub currently reside.  After Madoff's arrest, in response to an SEC inquiry, FGG reported Toub was based in FGG's New York headquarters.

357.    From at least 1997 through 1999, and again from 2004 through 2008, Toub was based in FGG's New York headquarters.  From 1999 through 2004, Toub maintained an office in FGG's Rio de Janeiro office.

358.    During the short period of time he worked from FGG's Rio de Janeiro office, Toub represented he worked for FGG in New York or Connecticut.  In connection with holding his FINRA Series 7 and 63 licenses, Toub was required to file Form U4s providing up to 10 years of an individual broker's employment history.  Toub's FINRA records report that from January 1997 through April 2009 he was employed by "Fairfield Greenwich Group" which he reported had an "Employer Location" of Greenwich, Connecticut. Additionally, FINRA records reveal that from May 2006 through April 2009, Toub was employed by Fairfield Heathcliff

Capital, LLC, an SEC registered broker dealer and SIPC member located in New York, New York.

359.     On January 1, 2002, Toub became an FGG partner at FGG by becoming a shareholder of FG Limited. Toub executed the FG Limited Shareholder and Voting Agreement and its related amendments. In doing so Toub acknowledged: (1) the agreement "shall be governed by the laws of the State of New York;" (2) any controversy or claim arising out of or relating to the agreement would be settled by binding arbitration administered by the American Arbitration Association that will take place in New York, New York; and (3) in a separate provision, affirmed the agreement "shall be construed in accordance with the laws of the State of New York."

360.     As a shareholder of FG Limited, Toub received quarterly partnership distributions.  These distributions were paid from FG Limited's New York JPMorgan bank accounts to Toub's New York Chase Manhattan Bank accounts.

361.     On January 1, 2008, when FG Limited transferred its FG Bermuda shares to FG Limited shareholders, FG Bermuda listed Toub's address on the share register as Greenwich, Connecticut.

362.     At all times relevant, for purposes of any extraterritoriality analysis, the transfers to Toub are domestic.

363.     During the Six Year Period, Toub received $46,284,503 in subsequent transfers of funds that originated with BLMIS (the "Toub Subsequent Transfers").  A summary chart of the transfers to Toub is attached as Exhibit 24.

364.     *Charles Murphy*: Defendant Murphy joined FGG as a partner on April 1, 2007. Based in FGG's New York headquarters, Murphy served on FGG's Executive Committee and

focused on strategy and capital markets for FGG. Murphy resides in New York and is a citizen
of the United States and the Republic of Ireland.

365.    Murphy was involved in important strategic decisions involving Madoff. Such
decisions included, among other issues, the amount of money FGG should invest through
BLMIS, which FGG funds should invest through BLMIS, and whether FGG should leverage its
investor funds by borrowing cash in order to increase investments through BLMIS. Murphy also
was often involved in email correspondence about Madoff, which included discussions about
important client redemptions that were requested due to client concerns about BLMIS. As
further described herein, Murphy had actual knowledge of the fraud at BLMIS or, at a minimum,
was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

366.    During the Six Year Period, Murphy received $2,059,799 in subsequent transfers
of funds that originated with BLMIS (the "Murphy Subsequent Transfers"). A summary chart of
the transfers to Murphy is attached as Exhibit 25. These include transfers that FGG records
indicate went to Murphy (Exhibit 25-A), as well as transfers that FGG records indicate went to
either Murphy or his wholly-owned entity, FG Investors Ltd. (Exhibit 25-B).

367.    *Robert Blum*: Defendant Blum served as a Managing Partner at FGG and the
Chief Operating Officer of FG Bermuda and FG Advisors. He started at FGG in 2000 and made
partner on January 1, 2002. He was a member of the Executive Committee. Blum resigned from
his FGG positions in June of 2005. However, because Blum's partnership interest had fully
vested at the time of his departure, he continued to receive distributions even after he left FGG.
Blum worked in FGG's New York headquarters and is a New York resident.

368.    While serving as a Managing Partner of FGG, Blum oversaw or assisted in all
aspects of FGG's activities. Blum was involved in making day-to-day management decisions

- 105 -

related to the Feeder Funds and FGG Affiliates.  He also reviewed FGG sales and marketing materials, including webcasts and monthly commentaries.  As further described herein, Blum had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

369.    During the Six Year Period, Blum received $29,733,443 in subsequent transfers of funds that originated with BLMIS (the "Blum Subsequent Transfers").  A summary chart of the transfers to Blum is attached as Exhibit 26.

370.    *Andrew Smith*: Defendant Smith joined FGG in 2003 in the New York headquarters.  Smith became an FGG partner and FG Limited shareholder on January 1, 2006, and was an Executive Director, a member of the Executive Committee, a partner in the Fund of Funds Division of the Investment Group, and a member of the Board of Directors for FG Limited and FG Bermuda.  Smith is a United States citizen who resided in London from 2003 to 2004 and in New York from 2005 to 2008.  He maintained a bank account at HSBC in New York.

371.    When Smith became a partner at FGG and a shareholder of FG Limited, he executed the FG Limited First Amended and Restated Shareholder and Voting Agreement and its related amendments, in which Smith acknowledged: (1) the agreement "shall be governed by the laws of the State of New York;" (2) any controversy or claim arising out of or relating to the agreement would be settled by binding arbitration administered by the American Arbitration Association to take place in New York, New York; and (3) in a separate provision, affirmed the agreement "shall be construed in accordance with the laws of the State of New York."

372.    In connection with Smith's responsibilities for FGG's fund of fund business, he played a significant role in selecting Fairfield Sentry's seedling program investments and the

decision by certain of FGG's funds of funds' to invest in Fairfield Sentry. Smith was also

responsible for marketing the Feeder Funds and hosted numerous due diligence meetings and

presentations in FGG's New York headquarters for Fairfield Sentry's investors and potential

investors.

373.    In 2003 and 2004, prior to making partner, Smith had an office at FGG's London

office. By 2005, FGG's records showed Smith was working in FGG's New York headquarters.

374.    Even while having an office in London, Smith represented to regulatory officials

he worked for FGG in New York. In connection with his FINRA Series 7 and 63 licenses, Smith

filed required Form U4s providing up to 10 years of his employment history. In his FINRA

records, Smith reported that from March 2003 through April 2009 he was employed by in New

York Fairfield Heathcliff Capital, LLC, another FG Limited wholly owned entity.

375.    As a shareholder of FG Limited, Smith received quarterly partnership

distributions paid from FG Limited's New York JPMorgan bank accounts to Smith's New York

HSBC bank account.

376.    As a member of FGG's Executive Committee in New York, Smith worked

closely with Piedrahita, McKeefry, Landsberger, Toub, and Murphy to make day-to-day

management decisions regarding the feeder funds and other FGG operated non-BLMIS feeder

funds. As the representative from FGG's Investment Group on the Executive Committee, Smith

played an integral role in making decisions regarding investor and potential investor requests for

information about BLMIS and Madoff. As further described herein, Smith had actual knowledge

of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high

probability of fraud at BLMIS.

377.    At all times relevant, for purposes of any extraterritoriality analysis, the transfers to Smith are domestic.

378.    During the Six Year Period, Smith received $13,483,585 in subsequent transfers of funds that originated with BLMIS (the "Smith Subsequent Transfers").  A summary chart of the transfers to Smith is attached as Exhibit 27.

379.    *Harold Greisman*: Defendant Greisman joined FGG in 1990 in the New York headquarters.  He served as FGG's Chief Investment Officer and was a member of the Executive Committee.  As FGG's Chief Investment Officer, Greisman was responsible for establishing FGG's risk systems, evaluating alternative asset investments and managers, including Fairfield Sentry.  Greisman was also the lead manager for Fairfield Sentry's seedling fund, FIFL operated from FGG's New York headquarters.  He maintained bank accounts at HSBC in New York.

380.    Greisman is a United States citizen who resided in New York from 2001 to 2007 and in London for some portion of 2008. At all relevant times, Greisman was based in FGG's New York headquarters.

381.    Greisman was responsible for overseeing the day-to-day investment activities of FGG.  This required him to monitor the investment decision-making process, from initial manager search and selection to research and ongoing manager oversight.  Greisman utilized Vijayvergiya and Smith, as well as additional FGG employees, to assist him in his duties as Chief Investment Officer.  Both Vijayvergiya and Smith reported directly to Greisman.  As further described herein, Greisman had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

382.    On January 1, 2002, Greisman became an FGG partner and executed FG Limited's Shareholder and Voting Agreement and its related amendments. In doing so Greisman

acknowledged: (1) the agreement "shall be governed by the laws of the State of New York," (2)

any controversy or claim arising out of or relating to the agreement would be settled by binding

arbitration administered by the American Arbitration Association to take place in New York,

New York, and (3) in a separate provision, affirmed the agreement "shall be construed in

accordance with the laws of the State of New York."

383.    As an FG Limited shareholder, Greisman received quarterly partnership

distributions.  These distributions were paid from FG Limited's New York JPMorgan bank

accounts to Greisman's New York HSBC bank account. Greisman also received distributions

from FG Bermuda, as well as deferred compensation payments from FIFA based on his status as

an FG Limited shareholder.

384.    Greisman was also an investor in United States-based Greenwich Sentry.  On

December 9, 2002, Greisman and his wife executed a subscription agreement and suitability

questionnaires for Greenwich Sentry, investing $180,000 with the fund for the purpose of

investing with BLMIS.  The subscription agreement was executed by Greisman in "New York

City" and was witnessed and notarized by Tucker, a registered Notary Public in the State of New

York, as Vice President of FG Limited. Greisman's subscription agreement lists his residence as

in New York, New York.

385.    On March 14, 2007, Greisman requested the limited partnership interests in

Greenwich Sentry he previously held with his wife as joint tenants with right of survivorship be

transferred to him, individually.  In connection with this request, Greisman executed a new

Greenwich Sentry subscription agreement, listing a new residential address in New York.

386.    At all times relevant, for purposes of any extraterritoriality analysis, the transfers

to Greisman are domestic.

387.    During the Six Year Period, Greisman received $23,620,902 in subsequent

transfers of funds that originated with BLMIS (the "Greisman Subsequent Transfers").  A

summary chart of the transfers to Greisman is attached as Exhibit 28.

388.    *Gregory Bowes*: Defendant Bowes was a partner of FGG and served on FGG's

Executive Committee.  His official title was co-managing partner of FG Advisors.  He joined

FGG in 2000, became partner in 2002, and resigned in 2003.  But because his partnership

interest had already vested, he continued to receive multi-million dollar partnership distributions.

Bowes worked in FGG's New York headquarters and resides in Washington, DC.

389.    Bowes was in charge of business development, and his primary responsibility was

to assist salespeople with the sale of new products. In this role and as a member of the Executive

Committee he regularly received and reviewed reports of fraudulent behavior by BLMIS.  As

further described herein, Bowes had actual knowledge of the fraud at BLMIS or, at a minimum,

was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

390.    During the Six Year Period, Bowes received $27,952,357 in subsequent transfers

of funds that originated with BLMIS (the "Bowes Subsequent Transfers").  A summary chart of

the transfers to Bowes is attached as Exhibit 29.

391.    *Corina Noel Piedrahita*: Defendant Noel Piedrahita, daughter of Noel and wife of

Piedrahita, joined FGG in 1985.  She served as FGG's Head of Client Services and Investor

Relations until she retired in 2007.

392.    Noel Piedrahita has dual United States and Brazilian citizenship.  At all relevant

times, she resided in the United States.  She maintained multiple residences in New York

between at least 2001 and 2008, as well as residences in Connecticut and Florida.

393.    From 1996 through 2000, Noel Piedrahita worked primarily in FGG's Greenwich, Connecticut office.  She also worked for Fairfield International Managers which shared FGG's Greenwich, Connecticut address.

394.    On January 1, 2002, Noel Piedrahita became an FGG partner and an FG Limited shareholder.  She executed the FG Limited Shareholder and Voting Agreement in which she acknowledged:  (1) the agreement "shall be governed by the laws of the State of New York;" (2) any controversy or claim arising out of or relating to the agreement would be settled by binding arbitration administered by the American Arbitration Association to take place in New York, New York; and (3) in a separate provision, affirmed the agreement "shall be construed in accordance with the laws of the State of New York."

395.    As an FG Limited shareholder Noel Piedrahita received quarterly partnership distributions.  These distributions were paid from FG Limited's New York JPMorgan bank account to Noel Piedrahita's New York Sterling National Bank account, in the name of Share Management Corp. ("Share Management"), a New York limited liability company she established solely for the purpose of receiving payments from FG Limited.

396.    Noel Piedrahita was intimately involved with FGG's enterprise, including the operation of its Feeder Funds.  She maintained a U.S.-based FGG email account and often corresponded with FGG's New York-based representatives.  Among other things, she was responsible for approving subscriptions in and redemptions from various FGG funds and overseeing rebate payments made to FGG agents.  She also worked closely with Tucker on a variety of issues, including how much money to invest at BLMIS.  She was responsible for communicating with BLMIS in New York regarding Fairfield Sentry subscriptions and redemptions.  As further described herein, Noel Piedrahita had actual knowledge of the fraud at

BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of

fraud at BLMIS.

397.    At all times relevant, for purposes of any extraterritoriality analysis, the transfers

to Noel Piedrahita are domestic.

398.    During the Six Year Period, Noel Piedrahita received $5,961,689 in subsequent

transfers of funds that originated with BLMIS (the "Noel Piedrahita Subsequent Transfers").  A

summary chart of the transfers to Noel Piedrahita is attached as Exhibit 30. These include

transfers that FGG records indicate went to Noel Piedrahita (Exhibit 30-A), as well as transfers

that FGG records indicate went to either Noel Piedrahita or her wholly-owned entity, Share

Management LLC (Exhibit 30-B).

### 2.    Sales Defendants

399.    *Lourdes Barreneche*: Defendant Barreneche joined FGG in 1997 and became an

FGG partner in 2002.  She was based in FGG's New York headquarters and worked in FGG's

Business Development Group.  She was an international sales specialist who coordinated FGG's

sales efforts in Latin America, Spain, Portugal, and Switzerland.  Barreneche is a resident of

New York.

400.    As a sales specialist, Barreneche regularly interacted with investors and potential

investors.  For example, she was repeatedly told by these investors and potential investors that

they had concerns regarding the similarities between BLMIS and the Refco fraud, and BLMIS's

improper role as custodian of the Feeder Funds' assets.  She was also privy to conversations at

FGG regarding who audited BLMIS, the auditor's legitimacy and ability to audit an entity as

large as BLMIS, and to other customer concerns that prompted the diligence by FGG.  As further

described herein, Barreneche had actual knowledge of the fraud at BLMIS or, at a minimum, was

willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

401.     During the Six Year Period, Barreneche received $31,964,152 in subsequent transfers of funds that originated with BLMIS (the "Barreneche Subsequent Transfers").  A summary chart of the transfers is attached as Exhibit 31.  These include transfers that FGG records indicate went to Barreneche (Exhibit 31-A), as well as transfers that FGG records indicate went to either Barreneche or her wholly-owned entity, Barreneche Inc. (Exhibit 31-B).

402.     *Cornelis Boele*: Defendant Boele joined FGG in 1997 and became an FGG partner in 2002.  He was responsible for structuring and raising assets, and worked for FGG's Business Development Group.  Boele worked in FGG's New York headquarters and maintains residences in New York and Connecticut.

403.     Through his interactions with investors and potential investors, Boele was repeatedly faced with evidence of fraud at BLMIS.  Boele received investor and potential investor inquiries regarding how the SSC Strategy could create the returns BLMIS was purportedly generating and the conflict between Madoff's acting as custodian and investment manager.  He was also involved in internal discussions regarding Madoff's refusal to provide electronic trading access.  As further described herein, Boele had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

404.     During the Six Year Period, Boele received $24,421,373 in subsequent transfers of funds that originated with BLMIS (the "Boele Subsequent Transfers").  A summary chart of the transfers is attached as Exhibit 32. These include transfers that FGG records indicate went to Boele (Exhibit 32-A), as well as transfers that FGG records indicate went to either Boele or his wholly-owned entity, Fortuna Asset Management Inc. (Exhibit 32-B).

405.    *Santiago Reyes*: Defendant Reyes joined FGG in 1996 and became a partner on January 1, 2002.  Reyes was the head of FGG's Miami office where he was responsible for marketing FGG's offshore funds, including Sentry, worldwide.  Reyes was in charge of business development and held a position on FGG's sales team.  Reyes resides in Florida.

406.    Reyes was responsible for communicating with clients and convincing them and prospective investors to invest in FGG's products, including those funds invested in BLMIS, such as Fairfield Sentry.  Reyes often asked Vijayvergiya and other FGG employees for advice on how to field client questions or respond to client concerns about Madoff and Fairfield Sentry.  In fact, Reyes worked closely with Vijayvergiya, requesting information on Madoff's investment strategy and Fairfield Sentry's performance.  As further described herein, Reyes had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

407.    During the Six Year Period, Reyes received $11,291,251 in subsequent transfers of funds that originated with BLMIS (the "Reyes Subsequent Transfers").  A summary chart of the transfers is attached as Exhibit 33.  These include transfers that FGG records indicate went to Reyes (Exhibit 33-A), as well as transfers that FGG records indicate went to either Reyes or his wholly-owned entity, Selecta Financial Corporation (Exhibit 33-B).

408.    *Jacqueline Harary*: Defendant Harary was a partner at FGG who marketed the Feeder Funds worldwide, focusing on Latin America.  She joined FGG in 1997 as part of FGG's merger with Littlestone Associates and became partner on January 1, 2002.  Harary was based in FGG's New York headquarters and resides in New York.

409.    Harary's responsibilities included cultivating relationships with investors and potential investors and projects related to manager selection and development.  Harary worked

closely with Vijayvergiya, communicating with him on a frequent basis regarding her client

inquiries and concerns about Madoff and BLMIS.  Harary also fielded and responded to investor

concerns after Madoff's arrest.  As further described herein, Harary had actual knowledge of the

fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high

probability of fraud at BLMIS.

410.    During the Six Year Period, Harary received $13,477,822 in subsequent transfers

of funds that originated with BLMIS (the "Harary Subsequent Transfers").  A summary chart of

the transfers is attached as Exhibit 34.

## IMPUTATION & PARTNERSHIP

411.    As detailed above, the FGG Individuals had actual knowledge of the fraud at

BLMIS or, at a minimum, were willfully blind to circumstances suggesting a high probability of

fraud at BLMIS.  The FGG Individuals acted as agents of the FGG Affiliates, serving in multiple

official capacities across the entities and managing the entities.  FGG operated as a *de facto*

partnership, with all of the Defendants acting as partners.  Under basic principles of agency,

partnership, and equitable ownership, the FGG Individuals' knowledge is imputed to the FGG

Affiliates.

**A.    FGG Was a *De Facto* Partnership or Partnership by Estoppel**

412.    FGG was a *de facto* partnership or partnership by estoppel comprised of the

Feeder Funds, the FGG Affiliates, and the FGG Individuals.  Although the Feeder Funds and

FGG Affiliates were ostensibly separate legal entities on paper, in reality they operated as a

single business enterprise—FGG.

- 115 -

### 1.      The Defendants Shared the Responsibilities and Benefits of FGG's Business

413.     The Defendants shared profits and losses and jointly controlled and managed FGG's business.  The Defendants each contributed property, financial resources, effort, skill, or knowledge to FGG's business.

414.     The Defendants shared the profits and losses as a partnership.  With the exception of McKenzie, each of the FGG Individuals, individually or through a personal entity,  as well as one of the FGG Affiliates—Fairfield International Managers—owned a percentage interest in FGG, which they referred to as "partnership interests."  The profits across the Feeder Funds and the FGG Affiliates were then transferred between various FGG entities, including as salaries to each of the FGG Individuals, and ultimately divided between the FGG Individuals and Fairfield International Managers based on these "partnership interests."

415.     FGG was owned and controlled by the FG Limited.  The various FGG Affiliate feeder funds invested in the BLMIS accountholder Feeder Funds, with the FGG administrative entities servicing all the funds in various capacities.

416.     The inter-relations among the FGG entities is clear from the multiple roles played by individuals across the entities.  For instance, Tucker was a director of FG Bermuda, and general partner of Greenwich Sentry and FG Limited.  Tucker also sat on the Management Committee and the Board of Directors of FG Bermuda, Greenwich Sentry, and FG Limited.  In addition, he co-owned Fairfield International Managers with Noel, which owned between 25-50% of FG Bermuda.  Likewise, Tucker was extensively involved in operations at Fairfield Sentry.  He participated in countless discussions regarding the fund, responded to investors' inquiries relating to the fund, and was for many years Fairfield Sentry's principal contact with Madoff and BLMIS.

417.    The Feeder Funds and FGG Affiliates are similarly interconnected.  For example,
FG Limited served as placement agent for Fairfield Sentry, Sigma, and Lambda; general partner
of Greenwich Sentry (from January 1, 2002 to June 30, 2003); investment manager for Fairfield
Sentry (from December 31, 2001 to June 1, 2003); and investment adviser and placement agent
for other FGG funds.

418.    Each FGG entity had its own roster of officers drawn from the same group of
FGG employees.  All of the entities were managed by the same group of individuals: the
"founding" partners, Noel, Tucker, and Piedrahita, McKeefry, FGG's Chief Legal Officer and
Chief Operating Officer; Lipton, FGG's Chief Financial Officer; Vijayvergiya, FGG's Head of
Risk Management; McKenzie, Controller for FG Bermuda; Blum, FGG's Chief Operating
Officer until 2005; Greisman, FGG's Chief Investment Officer; Noel Piedrahita, FGG's Head of
Client Services and Investor Relations; the remaining members of the Executive Committee,
Landsberger, Toub, Murphy, Smith, and Bowes; and the domestic and international sales forces,
headed by Barreneche, Boele, Reyes, and Harary.

### 2.    The Defendants Intended for FGG to Be a Partnership

419.    The Defendants intended to be partners and held themselves out as a partnership.

420.    FG Limited, which distributed partnership interests to the Defendants, was taxed
as a partnership under United States tax law.

421.    FGG described itself both internally and externally as a partnership.  Internal
documents refer to FGG's "partners" and to their "partnership interests."  Externally, FGG
advertised itself as operating "[u]nder the leadership of its Partners."

**B.** **The FGG Individuals, Feeder Funds, and FGG Affiliates Were All Partners of FGG**

422.    FGG's interconnected and undifferentiated nature demonstrates that none of its constituent components had any independent business and none could have operated separately from FGG's collective business enterprise. Thus, FGG as a whole was a *de facto* partnership with each Feeder Fund, FGG Affiliate, and FGG Individual serving as its agent and partner.

423.    The FGG Individuals intended to act as partners, identified themselves as partners, held themselves out to investors as partners and conducted business under the name FGG without regard to corporate structure and formalities.  The FGG Individuals controlled the day-to-day operations of FGG.

424.    The FGG Individuals: (i) shared, on a pro rata basis, the profits and losses realized by FGG and the FGG entities; (ii) participated in the management of FGG and the FGG entities; (iii) contributed financial resources, property, effort, skill and knowledge to FGG and the FGG entities; and (iv) intended to carry on as co-owners of FGG with the common goal of earning a profit.

425.    FGG held itself out as a partnership and attributed the business activities of the FGG Individuals to FGG.  For instance, an FGG brochure described FGG as consisting of "Partners" and attributed the activities of the Partners to FGG, stating: "Under the leadership of its Partners, FGG has built a team of professionals who specialize in product development, risk management, marketing, operations, compliance, and client services on a global basis."

426.    The same brochure also touts the central and singular nature of FGG's operations and portrays FGG as a partnership: "FGG has approximately USD $16 billion in client and firm assets under management.  It is an employee-owned firm with 140+ employees, 23 of whom are Partners, and has offices in New York, London and Bermuda, and representative offices

elsewhere in the U.S. and Europe. In Asia, FGG has registered a representative office in Beijing

and has a joint venture in Singapore."

427.    Moreover, Fairfield Sentry's Private Placement Memorandum characterizes FGG

as consisting of "member companies," which included the FGG Affiliates.  Specifically, it reads:

> FG Bermuda and FG Limited are member companies of the
> Fairfield Greenwich Group ("FGG"), which was established in
> 1983 and had, as of May 1, 2006, more than $9.0 billion employed
> in alternative management funds.  Throughout its history, FGG has
> internally managed its own alternative asset funds and selectively
> identified external managers for affiliations where it serves as a
> managerial and distribution partner.

428.    The FGG Individuals drafted, reviewed, authorized, or otherwise participated in

the presentation and dissemination of private placement and confidential offering memoranda

and marketing materials to prospective investors and were responsible for the content of those

materials. Thus, as a *de facto* partnership, the knowledge of all its members (i.e., the FGG

Individuals, Feeder Funds, and FGG Affiliates) is imputed among each other through the

partnership itself.

## C.    The FGG Individuals Acted as Agents for the FGG Affiliates

429.    As detailed above, the FGG Individuals acted as agents for the subsidiary funds

and administrative entities that made up the FGG Affiliates.  The FGG Individuals held

management positions at the FGG Affiliates.

430.    In addition, because FGG operated as a *de facto* partnership, the actions taken by

the FGG Individuals as agents of FGG were similarly taken as agents of the FGG Affiliates.  For

this additional reason, the FGG Individuals' knowledge is imputed to the FGG Affiliates.

## THE TRANSFERS

### A.    Initial Transfers from BLMIS to the Feeder Funds

431.    The Bankruptcy Court has entered Consent Judgments in favor of the Trustee on

his claims against the Feeder Funds.  The Bankruptcy Court granted judgments for the Trustee in

the amount of $3,054,000,000 as to Fairfield Sentry, $206,038,654 as to Greenwich Sentry, and

$5,985,000 as to Greenwich Sentry Partners.

432.    During the Six Year Period, BLMIS made transfers to the Feeder Funds in the

collective amount of $3,107,023,654 (the "Six Year Initial Transfers").  The Six Year Initial

Transfers included transfers of $2,895,000,000 to Fairfield Sentry (the "Fairfield Six Year Initial

Transfers"), $206,038,654 to Greenwich Sentry, and $5,985,000 to Greenwich Sentry Partners

(collectively, the "Greenwich Six Year Initial Transfers").  (*See* Exhibits 2, 3, 4.)  The Six Year

Initial Transfers were and continue to be customer property within the meaning of SIPA

§ 78*lll*(4).  Each of the Six Year Initial Transfers is avoidable under section 544 of the

Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-

279, and of SIPA, particularly § 78fff-2(c)(3).  The Feeder Funds received each of the Six Year

Initial Transfers with knowledge of fraud at BLMIS.

433.    The Six Year Initial Transfers include $1,667,125,000 BLMIS transferred to the

Feeder Funds during the Two Year Period, (the "Two Year Initial Transfers").  The Two Year

Initial Transfers included transfers of $1,580,000,000 to Fairfield Sentry (the "Fairfield Two

Year Initial Transfers"), $81,700,000 to Greenwich Sentry, and $5,425,000 to Greenwich Sentry

Partners (collectively, the "Greenwich Two Year Initial Transfers").  (*See* Exhibits 2, 3, 4.)  Each

of the Two Year Initial Transfers is avoidable under Bankruptcy Code section 548, and

applicable provisions of SIPA, particularly § 78fff-2(c)(3).  The Feeder Funds received each of

the Two Year Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

434.    The Six Year Initial Transfers and Two Year Initial Transfers include $1,153,000,000 BLMIS transferred to the Feeder Funds during the 90 days preceding the Filing Date (the "Preference Period Initial Transfers").  The Preference Period Initial Transfers included transfers of approximately $1,130,000,000 to Fairfield Sentry (the "Fairfield Preference Period Transfers") and $23,000,000 to Greenwich Sentry (the "Greenwich Preference Period Transfers").  (*See* Exhibits 2, 3.)  Each of the Preference Period Initial Transfers is avoidable under Bankruptcy Code section 547, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).  The Feeder Funds received each of the Preference Period Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

435.    The Trustee may recover the Greenwich Six Year Initial Transfers from all entities and individuals that served as general partner at the time the transfers were made. Greenwich Sentry's and Greenwich Sentry Partners' partnership agreements provided that the general partner would have unlimited liability for the repayment and discharge of all debts and obligations of the partnership.

436.    Noel and Tucker served as general partners of Greenwich Sentry from 1990 to 1998, FG Limited served as general partner from 1999 to June 2003, FG Bermuda served as general partner from July 2003 to 2004, and then again from 2006 to the present, and Greenwich Bermuda Limited served as general partner from 2004 to 2006.  FG Bermuda has served as Greenwich Sentry Partners' general partner since its inception in 2006.

437.    Both Greenwich Sentry and Greenwich Sentry Partners were formed as limited

partnerships under the laws of the State of Delaware.  The entities and individuals that served as

general partner are also liable under the Delaware Code provisions governing limited

partnerships.  Under Delaware law, general partners of limited partnerships have the same

liability as partners in general partnerships.  Del. Code Ann. tit. 6, § 17-403(b).  Partners in

general partnerships are "liable jointly and severally for all obligations of the partnership." Del.

Code Ann. tit. 6, § 15-306(a).

**B.    Subsequent Transfers from the Feeder Funds to the Defendants**

438.    Hundreds of millions of dollars initially transferred from BLMIS to the Feeder

Funds was subsequently transferred by the Feeder Funds to the Currency Funds, FGG Affiliates

and FGG Individuals.

439.    Because the FGG Affiliates, FGG Individual Defendants did not take the funds in

good faith or without knowledge of the voidability of the initial transfers, all transfers from

BLMIS to the Feeder Funds, which the Feeder Funds subsequently transferred, either directly or

indirectly, to the FGG Affiliates, and Individual Defendants, were and remain customer property

and are recoverable by the Trustee under section 550(a) of the Bankruptcy Code.

440.    Based on the Trustee's investigation to date, the recoverable transfers include: the

FIFL Subsequent Transfers (Exhibit 7), the Stable Fund Subsequent Transfers (Exhibit 8), the

FG Limited Subsequent Transfers (Exhibit 11), the FG Bermuda Subsequent Transfers (Exhibit

12), the FG Advisors Subsequent Transfers (Exhibit 13), the Fairfield International Managers

Subsequent Transfers (Exhibit 14), the Noel Subsequent Transfers (Exhibit 16), the Tucker

Subsequent Transfers (Exhibit 17), the Piedrahita Subsequent Transfers (Exhibits 18-A, 18-B),

the McKeefry Subsequent Transfers (Exhibit 19), the Lipton Subsequent Transfers (Exhibit 20),

the Vijayvergiya Subsequent Transfers (Exhibit 21), the McKenzie Subsequent Transfers

(Exhibit 22), the Landsberger Subsequent Transfers (Exhibit 23), the Toub Subsequent Transfers (Exhibit 24), the Murphy Subsequent Transfers (Exhibits 25-A, 25-B), the Blum Subsequent Transfers (Exhibit 26), the Smith Subsequent Transfers (Exhibit 27), the Greisman Subsequent Transfers (Exhibit 28), the Bowes Subsequent Transfers (Exhibit 29), the Noel Piedrahita Subsequent Transfers (Exhibits 30-A, 30-B), the Barreneche Subsequent Transfers (Exhibits 31-A, 31-B), the Boele Subsequent Transfers (Exhibits 32-A, 32-B), the Reyes Subsequent Transfers (Exhibits 33-A, 33-B), and the Harary Subsequent Transfers (Exhibit 34) (collectively, the "Subsequent Transfers").

441.    The chart below summarizes the Subsequent Transfers to the Defendants within the Two Year Period and the Six Year Period.

| Defendant | Exhibit | Amount within two years of December 11, 2008 | Amount within six years of December 11, 2008 |
|---|---|---|---|
| FIFL | 7 | $83,321,184 | $332,805,673 |
| Stable Fund | 8 | $8,483,335 | $14,848,335 |
| FG Limited | 11 | $199,031,661 | $604,392,398 |
| FG Bermuda | 12 | $293,663,126 | $621,737,949 |
| FG Advisors | 13 | $61,990,494 | $134,372,646 |
| Fairfield International Managers | 14 | $210,976,568 | $391,573,387 |
| Walter Noel | 16 | $8,015,421 | $12,964,286 |
| Jeffrey Tucker | 17 | $2,500,000 | $2,500,000 |
| Andrés Piedrahita | 18-A, 18-B | $101,724,561 | $172,680,713 |
| Mark McKeefry | 19 | $13,531,268 | $16,838,931 |
| Daniel Lipton | 20 | $7,632,867 | $9,284,957 |

| Defendant | Exhibit | Amount within two years of December 11, 2008 | Amount within six years of December 11, 2008 |
|---|---|---|---|
| Amit Vijayvergiya | 21 | $7,249,764 | $8,362,650 |
| Gordon McKenzie | 22 | $479,681 | $513,779 |
| Richard Landsberger | 23 | $21,334,027 | $29,733,655 |
| Philip Toub | 24 | $31,846,823 | $46,284,503 |
| Charles Murphy | 25-A, 25-B | $2,059,799 | $2,059,799 |
| Robert Blum | 26 | $17,331,640 | $29,733,443 |
| Andrew Smith | 27 | $12,489,896 | $13,483,585 |
| Harold Greisman | 28 | $15,435,803 | $23,620,902 |
| Gregory Bowes | 29 | $16,482,240 | $27,952,357 |
| Corina Noel Piedrahita | 30-A, 30-B | $3,604,396 | $5,961,689 |
| Lourdes Barreneche | 31-A, 31-B | $24,690,663 | $31,964,152 |
| Cornelis Boele | 32-A, 32-B | $17,137,142 | $24,421,373 |
| Santiago Reyes | 33-A, 33-B | $7,653,989 | $11,291,251 |
| Jacqueline Harary | 34 | $8,400,827 | $13,477,822 |
| Totals | | $1,177,067,175 | $2,582,860,235 |

## C.    The Subsequent Transfers Were All Domestic Transfers

442.    Each of the Subsequent Transfers was a domestic transfer.

443.    Established in New York in 1988, FGG functioned as a *de facto* partnership that marketed and managed several investment funds through a network of member companies. FGG included various hedge funds, along with entities serving as investment managers, providing

back office services, conducting risk analyses, executing broker-dealer services, and providing

client relations and marketing support. Certain investment adviser and administrative services

were outsourced to companies like BLMIS and Citco Fund Services ("Citco").  At all times

relevant, FGG operated its funds and other entities from its principal office in New York.

444.    Fairfield Sentry was one of the FGG member companies. Although Sentry was

organized as an international business company under the laws of the Territory of the British

Virgin Islands ("BVI"), it was present there only on paper.  It had no employees in the BVI. It

had no offices in the BVI. Its registered address was a post office box care of a local trust

company which served as the mailing address of hundreds of other hedge funds.  As disclosed in

its Private Placement Memorandum, as an international business company, Fairfield Sentry was

statutorily prohibited under BVI law to carry on business with persons resident in the BVI.

445.    Fairfield Sentry's principal place of business was in New York at FGG's New

York headquarters.  New York based personnel, all with New York contact information and

email addresses ending in "fggus.com," acted on behalf of the FGG investment funds and entities

including Fairfield Sentry, Sigma, and Lambda.  Among other things, the New York based FGG

personnel corresponded with and circulated information to Fairfield Sentry investors and

potential investors, monitored Fairfield Sentry investments, made management decisions as to

Fairfield Sentry, and conducted various due diligence and risk management activities.

446.    Various BLMIS account opening and other documents for Fairfield Sentry,

including Customer Agreements, Trade Authorizations, Options Agreements, and Internal

Revenue Service forms, were executed on behalf of Fairfield Sentry by FGG personnel resident

in New York, including FGG principals Tucker and McKeefry.  On many of the BLMIS related

documents, FGG listed the address for Fairfield Sentry as the FGG office address in New York

and not the BVI registered address.  The BLMIS Customer Agreement covering all four of

Fairfield Sentry's BLMIS accounts is governed by New York law and all disputes arising under

the agreement must be resolved by arbitration under the laws of New York.  All transactions

under the Customer Agreement are subject to the Securities Exchange Act of 1934 and to the

rules and regulations of the SEC and Board of Governors of the Federal Reserve System.

447.    Fairfield Sentry contracted with other FGG related companies based in FGG's

New York headquarters to provide investment management, administrative, and marketing and

placement services.  FG Limited was organized under the laws of the Cayman Islands but had no

physical presence there.  It was registered to do business in the state of New York, operated from

the FGG New York headquarters and served as the marketing and placement agent for Fairfield

Sentry.  FG Limited contracted with many third-party entities to share the management or

performance fees it received from Fairfield Sentry in exchange for the entity purchasing and/or

distributing shares of Fairfield Sentry.  All of these agreements were made by FGG personnel in

FGG's New York headquarters and nearly all such written agreements were governed by New

York law.

448.    By contract, FG Bermuda—an SEC registered investment adviser—served on

paper as Fairfield Sentry's investment manager.  Although FG Bermuda did have a small office

in Bermuda, all FG Bermuda personnel and operations were controlled by FGG personnel in

New York.  As an SEC registered investment adviser, FG Bermuda filed Form 13Fs with the

SEC that were executed by its general counsel located in the FGG's New York headquarters.

449.    In 2006, after reviewing the Fairfield Sentry-BLMIS relationship, the SEC

determined BLMIS, and not FG Bermuda, was actually performing the investment advisory

services for Fairfield Sentry.  Further the SEC required Fairfield Sentry to disclose to its
investors and potential investors that BLMIS was Fairfield Sentry's investment adviser.

450.    The marketing and sales of Fairfield Sentry's shares was performed primarily by
FGG personnel located in the FGG New York headquarters.  All subscriptions for Fairfield
Sentry shares were approved by New York FGG personnel.  All Fairfield Sentry subscription
agreements were governed by New York law, contained New York choice of law provisions, and
provided for venue and jurisdiction for any disputes in New York. No individual or entity located
in the BVI, or any other jurisdiction, had any control over the subscription or redemption
process.

451.    All Fairfield Sentry subscribers and shareholders were notified: (1) a minimum of
95% of Fairfield Sentry's assets were deposited in its BLMIS accounts; (2) BLMIS was a
broker-dealer registered with the SEC; (3) BLMIS invested Fairfield Sentry's account assets in
U.S. S&P 100 Index securities or short-term U.S. government obligations; and (4) BLMIS'
services were "essential to the continued operation of the Fund."  All decisions regarding
Fairfield Sentry's remaining 5% of assets were made and controlled by New York FGG
personnel.

452.    Fairfield Sentry contracted with Citco to provide administrative and custodial
services. It was disclosed to all Fairfield Sentry investors and potential investors, Citco had
entered into a sub-custodial agreement with BLMIS and a minimum of 95% of Fairfield Sentry's
assets would be held by BLMIS in the United States. All decisions regarding the Citco
agreements and implementation of any operational decisions were controlled by FGG personnel
in New York. FGG personnel in New York also controlled Fairfield Sentry's banking accounts,
including those accounts held for Fairfield Sentry by Citco in Ireland.

453.    Greenwich Sentry and Greenwich Sentry Partners were organized as limited partnership under the laws of the State of Delaware.  As with Fairfield Sentry, Greenwich Sentry and Greenwich Sentry Partners were run out of FGG's New York headquarters.

454.    In addition, FG Bermuda, Noel, Tucker, Blum, and Harary filed proofs of claim in the SIPC Liquidation, thereby subjecting themselves to the equitable jurisdiction of this Court.

455.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information on the Six Year Initial Transfers, the Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

## CAUSES OF ACTION

### COUNT ONE: RECOVERY OF SUBSEQUENT TRANSFERS—
### 11 U.S.C. §§ 105(a), AND 550(a)

#### *Against FIFL*

456.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

457.    Each of the Six Year Initial Transfers that was subsequently transferred to FIFL is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the FIFL Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

458.    Each of the FIFL Subsequent Transfers was made directly or indirectly to FIFL.

459.    FIFL is the immediate or mediate transferee of the FIFL Subsequent Transfers.

460.    Each of the FIFL Subsequent Transfers was received by FIFL with actual knowledge of fraud at BLMIS or, with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

461.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

FIFL:  (a) recovering the FIFL Subsequent Transfers, or the value thereof, from FIFL for the

benefit of the BLMIS estate; (b) directing FIFL to disgorge all profits related to, arising out of, or

concerning the FIFL Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all

applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee

prejudgment interest from the date the FIFL Subsequent Transfers were received; and (e)

granting the Trustee such other further and different relief as the Court deems just, proper, and

equitable.

## COUNT TWO: RECOVERY OF SUBSEQUENT TRANSFERS—
## 11 U.S.C. §§ 105(a), AND 550(a)

### *Against Stable Fund*

462.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

463.    Each of the Six Year Initial Transfers that was subsequently transferred to Stable

Fund is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the

Stable Fund Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code

and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

464.    Each of the Stable Fund Subsequent Transfers was made directly or indirectly to

Stable Fund.

465.    Stable Fund is the immediate or mediate transferee of the Stable Fund Subsequent

Transfers.

466.    Each of the Stable Fund Subsequent Transfers was received by Stable Fund,

which had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to

circumstances suggesting a high probability of fraud at BLMIS at the time of each of the Stable Fund Subsequent Transfers.

467.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Stable Fund:  (a) recovering the Stable Fund Subsequent Transfers, or the value thereof, from Stable Fund for the benefit of the BLMIS estate; (b) directing Stable Fund to disgorge all profits related to, arising out of, or concerning the Stable Fund Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Stable Fund Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT THREE: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against FG Limited*

468.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

469.    Each of the Six Year Initial Transfers that was subsequently transferred to FG Limited is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the FG Limited Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA.

470.    Each of the FG Limited Subsequent Transfers was made directly or indirectly to FG Limited.

471.    FG Limited is the immediate or mediate transferee of the FG Limited Subsequent Transfers.

- 130 -

472.    Each of the FG Limited Subsequent Transfers was received by FG Limited, which had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the FG Limited Subsequent Transfers.

473.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against FG Limited:  (a) recovering the FG Limited Subsequent Transfers, or the value thereof, from FG Limited for the benefit of the BLMIS estate; (b) directing FG Limited to disgorge all profits related to, arising out of, or concerning the FG Limited Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the FG Limited Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT FOUR: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against FG Bermuda*

474.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

475.    Each of the Six Year Initial Transfers that was subsequently transferred to FG Bermuda is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the FG Bermuda Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

476.    Each of the FG Bermuda Subsequent Transfers was made directly or indirectly to FG Bermuda.

477.    FG Bermuda is the immediate or mediate transferee of the FG Bermuda Subsequent Transfers.

478.    Each of the FG Bermuda Subsequent Transfers was received by FG Bermuda, which had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the FG Bermuda Subsequent Transfers.

479.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against FG Bermuda:  (a) recovering the FG Bermuda Subsequent Transfers, or the value thereof, from FG Bermuda for the benefit of the BLMIS estate; (b) directing FG Bermuda to disgorge all profits related to, arising out of, or concerning the FG Bermuda Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the FG Bermuda Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT FIVE: RECOVERY OF SUBSEQUENT TRANSFERS—
## 11 U.S.C. §§ 105(a), AND 550(a)

### *Against FG Advisors*

480.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

481.    Each of the Six Year Initial Transfers that was subsequently transferred to FG Advisors is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the FG Advisors Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

482.    Each of the FG Advisors Subsequent Transfers was made directly or indirectly to FG Advisors.

483.    FG Advisors is the immediate or mediate transferee of the FG Advisors Subsequent Transfers.

484.    Each of the FG Advisors Subsequent Transfers was received by FG Advisors, which had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the FG Advisors Subsequent Transfers.

485.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against FG Advisors:  (a) recovering the FG Advisors Subsequent Transfers, or the value thereof, from FG Advisors for the benefit of the BLMIS estate; (b) directing FG Advisors to disgorge all profits related to, arising out of, or concerning the FG Advisors Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the FG Advisors Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT SIX: RECOVERY OF SUBSEQUENT TRANSFERS—
## 11 U.S.C. §§ 105(a), AND 550(a)

### *Against Fairfield International Managers*

486.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

487.    Each of the Six Year Initial Transfers that was subsequently transferred to Fairfield International Managers is avoidable under sections 544, 547, and/or 548 of the

Bankruptcy Code. Each of the Fairfield International Managers Subsequent Transfers is

recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA,

particularly 15 U.S.C. § 78fff-2(c)(3).

488.    Each of the Fairfield International Managers Subsequent Transfers was made

directly or indirectly to Fairfield International Managers.

489.    Fairfield International Managers is the immediate or mediate transferee of the

Fairfield International Managers Subsequent Transfers.

490.    Each of the Fairfield International Managers Subsequent Transfers was received

by Fairfield International Managers, which had actual knowledge of the fraud at BLMIS or, at a

minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS

at the time of each of the Fairfield International Managers Subsequent Transfers.

491.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Fairfield International Managers:  (a) recovering the Fairfield International Managers Subsequent

Transfers, or the value thereof, from Fairfield International Managers for the benefit of the

BLMIS estate; (b) directing Fairfield International Managers to disgorge all profits related to,

arising out of, or concerning the Fairfield International Managers Subsequent Transfers; (c)

awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this

proceeding; (d) awarding the Trustee prejudgment interest from the date the Fairfield

International Managers Subsequent Transfers were received; and (e) granting the Trustee such

other further and different relief as the Court deems just, proper, and equitable.

## COUNT SEVEN: RECOVERY OF SUBSEQUENT
## TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Noel*

492.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

493.    Each of the Six Year Initial Transfers that was subsequently transferred to Noel is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Noel Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

494.    Each of the Noel Subsequent Transfers was made directly or indirectly to Noel.

495.    Noel is the immediate or mediate transferee of the Noel Subsequent Transfers.

496.    Each of the Noel Subsequent Transfers was received by Noel, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the Noel Subsequent Transfers.

497.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Noel:  (a) recovering the Noel Subsequent Transfers, or the value thereof, from Noel for the benefit of the BLMIS estate; (b) directing Noel to disgorge all profits related to, arising out of, or concerning the Noel Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Noel Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT EIGHT: RECOVERY OF SUBSEQUENT
## TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Tucker*

498.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

499.    Each of the Six Year Initial Transfers that was subsequently transferred to Tucker

is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Tucker

Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

500.    Each of the Tucker Subsequent Transfers was made directly or indirectly to

Tucker.

501.    Tucker is the immediate or mediate transferee of the Tucker Subsequent

Transfers.

502.    Each of the Tucker Subsequent Transfers was received by Tucker, who had actual

knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS at the time of each of the Tucker Subsequent

Transfers.

503.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Tucker:  (a) recovering the Tucker Subsequent Transfers, or the value thereof, from Tucker for

the benefit of the BLMIS estate; (b) directing Tucker to disgorge all profits related to, arising out

of, or concerning the Tucker Subsequent Transfers; (c) awarding the Trustee attorneys' fees and

all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee

prejudgment interest from the date the Tucker Subsequent Transfers were received; and (e)

- 136 -

granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT NINE: RECOVERY OF SUBSEQUENT TRANSFERS— 11 U.S.C. §§ 105(a), AND 550(a)

### *Against Piedrahita*

504.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

505.    Each of the Six Year Initial Transfers that was subsequently transferred to Piedrahita is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Piedrahita Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

506.    Each of the Piedrahita Subsequent Transfers was made directly or indirectly to Piedrahita.

507.    Piedrahita is the immediate or mediate transferee of the Piedrahita Subsequent Transfers.

508.    Each of the Piedrahita Subsequent Transfers was received by Piedrahita, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the Piedrahita Subsequent Transfers.

509.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Piedrahita:  (a) recovering the Piedrahita Subsequent Transfers, or the value thereof, from Piedrahita for the benefit of the BLMIS estate; (b) directing Piedrahita to disgorge all profits related to, arising out of, or concerning the Piedrahita Subsequent Transfers; (c) awarding the

Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding;

(d) awarding the Trustee prejudgment interest from the date the Piedrahita Subsequent Transfers

were received; and (e) granting the Trustee such other further and different relief as the Court

deems just, proper, and equitable.

### COUNT TEN: RECOVERY OF SUBSEQUENT TRANSFERS—
### 11 U.S.C. §§ 105(a), AND 550(a)

#### *Against McKeefry*

510.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

511.    Each of the Six Year Initial Transfers that was subsequently transferred to

McKeefry is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the

McKeefry Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and

applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

512.    Each of the McKeefry Subsequent Transfers was made directly or indirectly to

McKeefry.

513.    McKeefry is the immediate or mediate transferee of the McKeefry Subsequent

Transfers.

514.    Each of the McKeefry Subsequent Transfers was received by McKeefry, who had

actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS at the time of each of the McKeefry Subsequent

Transfers.

515.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

McKeefry:  (a) recovering the McKeefry Subsequent Transfers, or the value thereof, from

McKeefry for the benefit of the BLMIS estate; (b) directing McKeefry to disgorge all profits

related to, arising out of, or concerning the McKeefry Subsequent Transfers; (c) awarding the

Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding;

(d) awarding the Trustee prejudgment interest from the date the McKeefry Subsequent Transfers

were received; and (e) granting the Trustee such other further and different relief as the Court

deems just, proper, and equitable.

### COUNT ELEVEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

#### *Against Lipton*

516.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

517.    Each of the Six Year Initial Transfers that was subsequently transferred to Lipton

is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Lipton

Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

518.    Each of the Lipton Subsequent Transfers was made directly or indirectly to

Lipton.

519.    Lipton is the immediate or mediate transferee of the Lipton Subsequent Transfers.

520.    Each of the Lipton Subsequent Transfers was received by Lipton, who had actual

knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS at the time of each of the Lipton Subsequent

Transfers.

521.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

- 139 -

Lipton:  (a) recovering the Lipton Subsequent Transfers, or the value thereof, from Lipton for the

benefit of the BLMIS estate; (b) directing Lipton to disgorge all profits related to, arising out of,

or concerning the Lipton Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all

applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee

prejudgment interest from the date the Lipton Subsequent Transfers were received; and (e)

granting the Trustee such other further and different relief as the Court deems just, proper, and

equitable.

## COUNT TWELVE: RECOVERY OF SUBSEQUENT
## TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Vijayvergiya*

522.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

523.    Each of the Six Year Initial Transfers that was subsequently transferred

Vijayvergiya is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of

the Vijayvergiya Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy

Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

524.    Each of the Vijayvergiya Subsequent Transfers was made directly or indirectly to

Vijayvergiya.

525.    Vijayvergiya is the immediate or mediate transferee of the Vijayvergiya

Subsequent Transfers.

526.    Each of the Vijayvergiya Subsequent Transfers was received by Vijayvergiya,

who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to

circumstances suggesting a high probability of fraud at BLMIS at the time of each of the

Vijayvergiya Subsequent Transfers.

527.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Vijayvergiya:  (a) recovering the Vijayvergiya Subsequent Transfers, or the value thereof, from Vijayvergiya for the benefit of the BLMIS estate; (b) directing Vijayvergiya to disgorge all profits related to, arising out of, or concerning the Vijayvergiya Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Vijayvergiya Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT THIRTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### Against McKenzie

528.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

529.    Each of the Six Year Initial Transfers that was subsequently transferred to McKenzie is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the McKenzie Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

530.    Each of the McKenzie Subsequent Transfers was made directly or indirectly to McKenzie.

531.    McKenzie is the immediate or mediate transferee of the McKenzie Subsequent Transfers.

532.    Each of the McKenzie Subsequent Transfers was received by McKenzie, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS at the time of each of the McKenzie Subsequent Transfers.

533.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against McKenzie:  (a) recovering the McKenzie Subsequent Transfers, or the value thereof, from McKenzie for the benefit of the BLMIS estate; (b) directing McKenzie to disgorge all profits related to, arising out of, or concerning the McKenzie Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the McKenzie Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT FOURTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Landsberger*

534.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

535.    Each of the Six Year Initial Transfers that was subsequently transferred to Landsberger is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Landsberger Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

536.    Each of the Landsberger Subsequent Transfers was made directly or indirectly to Landsberger.

537.    Landsberger is the immediate or mediate transferee of the Landsberger Subsequent Transfers.

538. Each of the Landsberger Subsequent Transfers was received by Landsberger, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the Landsberger Subsequent Transfers.

539. As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landsberger: (a) recovering the Landsberger Subsequent Transfers, or the value thereof, from Landsberger for the benefit of the BLMIS estate; (b) directing Landsberger to disgorge all profits related to, arising out of, or concerning the Landsberger Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Landsberger Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT FIFTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Toub*

540. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

541. Each of the Six Year Initial Transfers that was subsequently transferred to Toub is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code. Each of the Toub Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

542. Each of the Toub Subsequent Transfers was made directly or indirectly to Toub.

543. Toub is the immediate or mediate transferee of the Toub Subsequent Transfers.

- 143 -

544.     Each of the Toub Subsequent Transfers was received by Toub, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the Toub Subsequent Transfers.

545.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Toub:  (a) recovering the Toub Subsequent Transfers, or the value thereof, from Toub for the benefit of the BLMIS estate; (b) directing Toub to disgorge all profits related to, arising out of, or concerning the Toub Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Toub Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT SIXTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Murphy*

546.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

547.     Each of the Six Year Initial Transfers that was subsequently transferred to Murphy is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Murphy Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

548.     Each of the Murphy Subsequent Transfers was made directly or indirectly to Murphy.

549.    Murphy is the immediate or mediate transferee of the Murphy Subsequent Transfers.

550.    Each of the Murphy Subsequent Transfers was received by Murphy, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the Murphy Subsequent Transfers.

551.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Murphy:  (a) recovering the Murphy Subsequent Transfers, or the value thereof, from Murphy for the benefit of the BLMIS estate; (b) directing Murphy to disgorge all profits related to, arising out of, or concerning the Murphy Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Murphy Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT SEVENTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Blum*

552.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

553.    Each of the Six Year Initial Transfers that was subsequently transferred to Blum is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Blum Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

- 145 -

554.     Each of the Blum Subsequent Transfers was made directly or indirectly to Blum.

555.     Blum is the immediate or mediate transferee of the Blum Subsequent Transfers.

556.     Each of the Blum Subsequent Transfers was received by Blum, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the Blum Subsequent Transfers.

557.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Blum:  (a) recovering the Blum Subsequent Transfers, or the value thereof, from Blum for the benefit of the BLMIS estate; (b) directing Blum to disgorge all profits related to, arising out of, or concerning the Blum Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Blum Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT EIGHTEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Smith*

558.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

559.     Each of the Six Year Initial Transfers that was subsequently transferred to Smith is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Smith Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

560.    Each of the Smith Subsequent Transfers was made directly or indirectly to Smith.

561.    Smith is the immediate or mediate transferee of the Smith Subsequent Transfers.

562.    Each of the Smith Subsequent Transfers was received by Smith, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the Smith Subsequent Transfers.

563.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Smith:  (a) recovering the Smith Subsequent Transfers, or the value thereof, from Smith for the benefit of the BLMIS estate; (b) directing Smith to disgorge all profits related to, arising out of, or concerning the Smith Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Smith Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT NINETEEN: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Greisman*

564.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

565.    Each of the Six Year Initial Transfers that was subsequently transferred Greisman is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Greisman Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

- 147 -

566.    Each of the Greisman Subsequent Transfers was made directly or indirectly to Greisman.

567.    Greisman is the immediate or mediate transferee of the Greisman Subsequent Transfers.

568.    Each of the Greisman Subsequent Transfers was received by Greisman, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the Greisman Subsequent Transfers.

569.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Greisman:  (a) recovering the Greisman Subsequent Transfers, or the value thereof, from Greisman for the benefit of the BLMIS estate; (b) directing Greisman to disgorge all profits related to, arising out of, or concerning the Greisman Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Greisman Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable.

## COUNT TWENTY: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Bowes*

570.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

571.    Each of the Six Year Initial Transfers that was subsequently transferred to Bowes is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Bowes

Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

572.    Each of the Bowes Subsequent Transfers was made directly or indirectly to

Bowes.

573.    Bowes is the immediate or mediate transferee of the Bowes Subsequent Transfers.

574.    Each of the Bowes Subsequent Transfers was received by Bowes, who had actual

knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS at the time of each of the Bowes Subsequent

Transfers.

575.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Bowes:  (a) recovering the Bowes Subsequent Transfers, or the value thereof, from Bowes for

the benefit of the BLMIS estate; (b) directing Bowes to disgorge all profits related to, arising out

of, or concerning the Bowes Subsequent Transfers; (c) awarding the Trustee attorneys' fees and

all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee

prejudgment interest from the date the Bowes Subsequent Transfers were received; and (e)

granting the Trustee such other further and different relief as the Court deems just, proper, and

equitable.

### COUNT TWENTY-ONE: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

#### *Against Noel Piedrahita*

576.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

577.    Each of the Six Year Initial Transfers that was subsequently transferred to Noel

Piedrahita is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the

Noel Piedrahita Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy

Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

578.    Each of the Noel Piedrahita Subsequent Transfers was made directly or indirectly

to Noel Piedrahita.

579.    Noel Piedrahita is the immediate or mediate transferee of the Noel Piedrahita

Subsequent Transfers.

580.    Each of the Noel Piedrahita Subsequent Transfers was received by Noel

Piedrahita, who had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully

blind to circumstances suggesting a high probability of fraud at BLMIS at the time of each of the

Noel Piedrahita Subsequent Transfers.

581.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Noel Piedrahita:  (a) recovering the Noel Piedrahita Subsequent Transfers, or the value thereof,

from Noel Piedrahita for the benefit of the BLMIS estate; (b) directing Noel Piedrahita to

disgorge all profits related to, arising out of, or concerning the Noel Piedrahita Subsequent

Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and

disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date

the Noel Piedrahita Subsequent Transfers were received; and (e) granting the Trustee such other

further and different relief as the Court deems just, proper, and equitable.

## COUNT TWENTY-TWO: RECOVERY OF SUBSEQUENT
## TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Barreneche*

582.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

583.    Each of the Six Year Initial Transfers that was subsequently transferred to

Barreneche is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of

the Barreneche Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy

Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

584.    Each of the Barreneche Subsequent Transfers was made directly or indirectly to

Barreneche.

585.    Barreneche is the immediate or mediate transferee of the Barreneche Subsequent

Transfers.

586.    Each of the Barreneche Subsequent Transfers was received by Barreneche, who

had actual knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to

circumstances suggesting a high probability of fraud at BLMIS at the time of each of the

Barreneche Subsequent Transfers.

587.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Barreneche:  (a) recovering the Barreneche Subsequent Transfers, or the value thereof, from

Barreneche for the benefit of the BLMIS estate; (b) directing Barreneche to disgorge all profits

related to, arising out of, or concerning the Barreneche Subsequent Transfers; (c) awarding the

Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding;

(d) awarding the Trustee prejudgment interest from the date the Barreneche Subsequent

- 151 -

Transfers were received; and (e) granting the Trustee such other further and different relief as the

Court deems just, proper, and equitable.

## COUNT TWENTY-THREE: RECOVERY OF SUBSEQUENT
## TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Boele*

588.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

589.    Each of the Six Year Initial Transfers that was subsequently transferred to Boele

is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Boele

Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

590.    Each of the Boele Subsequent Transfers was made directly or indirectly to Boele.

591.    Boele is the immediate or mediate transferee of the Boele Subsequent Transfers.

592.    Each of the Boele Subsequent Transfers was received by Boele, who had actual

knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS at the time of each of the Boele Subsequent

Transfers.

593.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Boele:  (a) recovering the Boele Subsequent Transfers, or the value thereof, from Boele for the

benefit of the BLMIS estate; (b) directing Boele to disgorge all profits related to, arising out of,

or concerning the Boele Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all

applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee

prejudgment interest from the date the Boele Subsequent Transfers were received; and (e)

granting the Trustee such other further and different relief as the Court deems just, proper, and

equitable.

### COUNT TWENTY-FOUR: RECOVERY OF SUBSEQUENT TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

*Against Reyes*

594.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

595.    Each of the Six Year Initial Transfers that was subsequently transferred to Reyes

is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Reyes

Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

596.    Each of the Reyes Subsequent Transfers was made directly or indirectly to Reyes.

597.    Reyes is the immediate or mediate transferee of the Reyes Subsequent Transfers.

598.    Each of the Reyes Subsequent Transfers was received by Reyes, who had actual

knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS at the time of each of the Reyes Subsequent

Transfers.

599.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Reyes:  (a) recovering the Reyes Subsequent Transfers, or the value thereof, from Reyes for the

benefit of the BLMIS estate; (b) directing Reyes to disgorge all profits related to, arising out of,

or concerning the Reyes Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all

applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee

prejudgment interest from the date the Reyes Subsequent Transfers were received; and (e)

granting the Trustee such other further and different relief as the Court deems just, proper, and

equitable.

## COUNT TWENTY-FIVE: RECOVERY OF SUBSEQUENT
## TRANSFERS—11 U.S.C. §§ 105(a), AND 550(a)

### *Against Harary*

600.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

601.    Each of the Six Year Initial Transfers that was subsequently transferred to Harary

is avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code.  Each of the Harary

Subsequent Transfers is recoverable under section 550(a) of the Bankruptcy Code and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

602.    Each of the Harary Subsequent Transfers was made directly or indirectly to

Harary.

603.    Harary is the immediate or mediate transferee of the Harary Subsequent

Transfers.

604.    Each of the Harary Subsequent Transfers was received by Harary, who had actual

knowledge of the fraud at BLMIS or, at a minimum, was willfully blind to circumstances

suggesting a high probability of fraud at BLMIS at the time of each of the Harary Subsequent

Transfers.

605.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Harary:  (a) recovering the Harary Subsequent Transfers, or the value thereof, from Harary for

the benefit of the BLMIS estate; (b) directing Harary to disgorge all profits related to, arising out

of, or concerning the Harary Subsequent Transfers; (c) awarding the Trustee attorneys' fees and

all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee

prejudgment interest from the date the Harary Subsequent Transfers were received; and (e)

granting the Trustee such other further and different relief as the Court deems just, proper, and

equitable.

## COUNT TWENTY-SIX: GENERAL PARTNER LIABILITY

### *Against Noel (Greenwich Sentry General Partner)*

606.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

607.    Noel served as the general partner to Greenwich Sentry from 1992 to 1998, during

which time certain of the Six Year Initial Transfers were made.

608.    Greenwich Sentry is insolvent, and its assets are insufficient to satisfy any

judgment on the claims asserted herein.  Noel, as the general partner, is liable to satisfy any

judgment against Greenwich Sentry based on obligations Greenwich Sentry incurred while Noel

was serving as general partner.

609.    As a result of the foregoing, pursuant to applicable Delaware law, Noel is jointly

and severally liable for all obligations Greenwich Sentry incurred while Noel was serving as

general partner, and the Trustee is entitled to a judgment against Noel recovering the Six Year

Initial Transfers to Greenwich Sentry, or their value, that Greenwich Sentry received while Noel

was serving as general partner, for the benefit of the estate of BLMIS.

## COUNT TWENTY-SEVEN: GENERAL PARTNER LIABILITY

### *Against Tucker (Greenwich Sentry General Partner)*

610.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

611.    Tucker served as the general partner to Greenwich Sentry from 1992 to 1998, during which time certain of the Six Year Initial Transfers were made.

612.    Greenwich Sentry is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.  Tucker, as the general partner, is liable to satisfy any judgment against Greenwich Sentry based on obligations Greenwich Sentry incurred while Tucker was serving as general partner.

613.    As a result of the foregoing, pursuant to applicable Delaware law, Tucker is jointly and severally liable for all obligations Greenwich Sentry incurred while Tucker was serving as general partner, and the Trustee is entitled to a judgment against Tucker recovering the Six Year Initial Transfers to Greenwich Sentry, or their value, that Greenwich Sentry received while Tucker was serving as general partner, for the benefit of the estate of BLMIS.

## COUNT TWENTY-EIGHT: GENERAL PARTNER LIABILITY

### *Against FG Limited (Greenwich Sentry General Partner)*

614.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

615.    FG Limited served as the general partner to Greenwich Sentry from 1998 to 2003, during which time certain of the Six Year Initial Transfers were made.

616.    Greenwich Sentry is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.  FG Limited, as the general partner, is liable to satisfy any judgment against Greenwich Sentry based on obligations Greenwich Sentry incurred while FG Limited was serving as general partner.

617.    As a result of the foregoing, pursuant to applicable Delaware law, FG Limited is jointly and severally liable for all obligations Greenwich Sentry incurred while FG Limited was serving as general partner, and the Trustee is entitled to a judgment against FG Limited

recovering the Six Year Initial Transfers to Greenwich Sentry, or their value, that Greenwich

Sentry received while FG Limited was serving as general partner, for the benefit of the estate of

BLMIS.

## COUNT TWENTY-NINE: GENERAL PARTNER LIABILITY

### *Against FG Bermuda (Greenwich Sentry General Partner)*

618.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

619.    FG Bermuda served as the general partner to Greenwich Sentry from July 2003 to

2004, and from 2006 to the present, during which time certain of the Six Year Initial Transfers

were made.

620.    Greenwich Sentry is insolvent, and its assets are insufficient to satisfy any

judgment on the claims asserted herein.  FG Bermuda, as the general partner, is liable to satisfy

any judgment against Greenwich Sentry based on obligations Greenwich Sentry incurred while

FG Bermuda was serving as general partner.

621.    As a result of the foregoing, pursuant to applicable Delaware law, FG Bermuda is

jointly and severally liable for all obligations Greenwich Sentry incurred while FG Bermuda was

serving as general partner, and the Trustee is entitled to a judgment against FG Bermuda

recovering the Six Year Initial Transfers to Greenwich Sentry, or their value, that Greenwich

Sentry received while FG Bermuda was serving as general partner, for the benefit of the estate of

BLMIS.

## COUNT THIRTY: GENERAL PARTNER LIABILITY

### *Against FG Bermuda (Greenwich Sentry Partners General Partner)*

622.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

623.    FG Bermuda served as the general partner to Greenwich Sentry Partners from its inception in 2006 to the present, during which time certain of the Six Year Initial Transfers were made.

624.    Greenwich Sentry Partners is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein. FG Bermuda, as the general partner, is liable to satisfy any judgment against Greenwich Sentry based on obligations Greenwich Sentry Partners incurred while FG Bermuda was serving as general partner.

625.    As a result of the foregoing, pursuant to applicable Delaware law, FG Bermuda is jointly and severally liable for all obligations Greenwich Sentry Partners incurred while FG Bermuda was serving as general partner, and the Trustee is entitled to a judgment against FG Bermuda recovering the Six Year Initial Transfers to Greenwich Sentry Partners, or their value, that Greenwich Sentry Partners received while FG Bermuda was serving as general partner, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

(i)    On the First Claim for Relief, as a result of the foregoing and pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against FIFL:  (a) recovering the FIFL Subsequent Transfers, or the value thereof, from FIFL for the benefit of the BLMIS estate; (b) directing FIFL to disgorge all profits related to, arising out of, or concerning the FIFL Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the FIFL Subsequent Transfers were

received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable;

(ii)    On the Second Claim for Relief, as a result of the foregoing and pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Stable Fund:  (a) recovering the Stable Fund Subsequent Transfers, or the value thereof, from Stable Fund for the benefit of the BLMIS estate; (b) directing Stable Fund to disgorge all profits related to, arising out of, or concerning the Stable Fund Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Stable Fund Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable;

(iii)    On the Third Claim for Relief, as a result of the foregoing and pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against FG Limited:  (a) recovering the FG Limited Subsequent Transfers, or the value thereof, from FG Limited for the benefit of the BLMIS estate; (b) directing FG Limited to disgorge all profits related to, arising out of, or concerning the FG Limited Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the FG Limited Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable;

(iv)    On the Fourth Claim for Relief, as a result of the foregoing and pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against FG Bermuda:  (a) recovering the FG Bermuda Subsequent

Transfers, or the value thereof, from FG Bermuda for the benefit of the BLMIS estate; (b)

directing FG Bermuda to disgorge all profits related to, arising out of, or concerning the FG

Bermuda Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable

interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment

interest from the date the FG Bermuda Subsequent Transfers were received; and (e) granting the

Trustee such other further and different relief as the Court deems just, proper, and equitable;

(v)    On the Fifth Claim for Relief, as a result of the foregoing and pursuant to sections

105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled

to a judgment against FG Advisors:  (a) recovering the FG Advisors Subsequent Transfers, or the

value thereof, from FG Advisors for the benefit of the BLMIS estate; (b) directing FG Advisors

to disgorge all profits related to, arising out of, or concerning the FG Advisors Subsequent

Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and

disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date

the FG Advisors Subsequent Transfers were received; and (e) granting the Trustee such other

further and different relief as the Court deems just, proper, and equitable;

(vi)    On the Sixth Claim for Relief, as a result of the foregoing and pursuant to sections

105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled

to a judgment against Fairfield International Managers:  (a) recovering the Fairfield International

Managers Subsequent Transfers, or the value thereof, from Fairfield International Managers for

the benefit of the BLMIS estate; (b) directing Fairfield International Managers to disgorge all

profits related to, arising out of, or concerning the Fairfield International Managers Subsequent

Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and

disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date

the Fairfield International Managers Subsequent Transfers were received; and (e) granting the

Trustee such other further and different relief as the Court deems just, proper, and equitable;

(vii)    On the Seventh Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Noel:  (a) recovering the Noel Subsequent Transfers, or the value

thereof, from Noel for the benefit of the BLMIS estate; (b) directing Noel to disgorge all profits

related to, arising out of, or concerning the Noel Subsequent Transfers; (c) awarding the Trustee

attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d)

awarding the Trustee prejudgment interest from the date the Noel Subsequent Transfers were

received; and (e) granting the Trustee such other further and different relief as the Court deems

just, proper, and equitable;

(viii)    On the Eighth Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Tucker:  (a) recovering the Tucker Subsequent Transfers, or the

value thereof, from Tucker for the benefit of the BLMIS estate; (b) directing Tucker to disgorge

all profits related to, arising out of, or concerning the Tucker Subsequent Transfers; (c) awarding

the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this

proceeding; (d) awarding the Trustee prejudgment interest from the date the Tucker Subsequent

Transfers were received; and (e) granting the Trustee such other further and different relief as the

Court deems just, proper, and equitable;

(ix)    On the Ninth Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Piedrahita:  (a) recovering the Piedrahita Subsequent Transfers, or

the value thereof, from Piedrahita for the benefit of the BLMIS estate; (b) directing Piedrahita to

disgorge all profits related to, arising out of, or concerning the Piedrahita Subsequent Transfers;

(c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of

this proceeding; (d) awarding the Trustee prejudgment interest from the date the Piedrahita

Subsequent Transfers were received; and (e) granting the Trustee such other further and different

relief as the Court deems just, proper, and equitable;

       (x)      On the Tenth Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against McKeefry:  (a) recovering the McKeefry Subsequent Transfers, or

the value thereof, from McKeefry for the benefit of the BLMIS estate; (b) directing McKeefry to

disgorge all profits related to, arising out of, or concerning the McKeefry Subsequent Transfers;

(c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of

this proceeding; (d) awarding the Trustee prejudgment interest from the date the McKeefry

Subsequent Transfers were received; and (e) granting the Trustee such other further and different

relief as the Court deems just, proper, and equitable;

       (xi)     On the Eleventh Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Lipton:  (a) recovering the Lipton Subsequent Transfers, or the

value thereof, from Lipton for the benefit of the BLMIS estate; (b) directing Lipton to disgorge

all profits related to, arising out of, or concerning the Lipton Subsequent Transfers; (c) awarding

the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this

proceeding; (d) awarding the Trustee prejudgment interest from the date the Lipton Subsequent

Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable;

(xii)    On the Twelfth Claim for Relief, as a result of the foregoing and pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Vijayvergiya:  (a) recovering the Vijayvergiya Subsequent Transfers, or the value thereof, from Vijayvergiya for the benefit of the BLMIS estate; (b) directing Vijayvergiya to disgorge all profits related to, arising out of, or concerning the Vijayvergiya Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the Vijayvergiya Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable;

(xiii)    On the Thirteenth Claim for Relief, as a result of the foregoing and pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against McKenzie:  (a) recovering the McKenzie Subsequent Transfers, or the value thereof, from McKenzie for the benefit of the BLMIS estate; (b) directing McKenzie to disgorge all profits related to, arising out of, or concerning the McKenzie Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment interest from the date the McKenzie Subsequent Transfers were received; and (e) granting the Trustee such other further and different relief as the Court deems just, proper, and equitable;

(xiv)    On the Fourteenth Claim for Relief, as a result of the foregoing and pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landsberger:  (a) recovering the Landsberger Subsequent

Transfers, or the value thereof, from Landsberger for the benefit of the BLMIS estate; (b)

directing Landsberger to disgorge all profits related to, arising out of, or concerning the

Landsberger Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable

interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment

interest from the date the Landsberger Subsequent Transfers were received; and (e) granting the

Trustee such other further and different relief as the Court deems just, proper, and equitable;

(xv)    On the Fifteenth Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Toub:  (a) recovering the Toub Subsequent Transfers, or the value

thereof, from Toub for the benefit of the BLMIS estate; (b) directing Toub to disgorge all profits

related to, arising out of, or concerning the Toub Subsequent Transfers; (c) awarding the Trustee

attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d)

awarding the Trustee prejudgment interest from the date the Toub Subsequent Transfers were

received; and (e) granting the Trustee such other further and different relief as the Court deems

just, proper, and equitable;

(xvi)    On the Sixteenth Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Murphy:  (a) recovering the Murphy Subsequent Transfers, or the

value thereof, from Murphy for the benefit of the BLMIS estate; (b) directing Murphy to

disgorge all profits related to, arising out of, or concerning the Murphy Subsequent Transfers; (c)

awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this

proceeding; (d) awarding the Trustee prejudgment interest from the date the Murphy Subsequent

Transfers were received; and (e) granting the Trustee such other further and different relief as the
Court deems just, proper, and equitable;

(xvii)   On the Seventeenth Claim for Relief, as a result of the foregoing and pursuant to
sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is
entitled to a judgment against Blum:  (a) recovering the Blum Subsequent Transfers, or the value
thereof, from Blum for the benefit of the BLMIS estate; (b) directing Blum to disgorge all profits
related to, arising out of, or concerning the Blum Subsequent Transfers; (c) awarding the Trustee
attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; (d)
awarding the Trustee prejudgment interest from the date the Blum Subsequent Transfers were
received; and (e) granting the Trustee such other further and different relief as the Court deems
just, proper, and equitable;

(xviii)  On the Eighteenth Claim for Relief, as a result of the foregoing and pursuant to
sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is
entitled to a judgment against Smith:  (a) recovering the Smith Subsequent Transfers, or the
value thereof, from Smith for the benefit of the BLMIS estate; (b) directing Smith to disgorge all
profits related to, arising out of, or concerning the Smith Subsequent Transfers; (c) awarding the
Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding;
(d) awarding the Trustee prejudgment interest from the date the Smith Subsequent Transfers
were received; and (e) granting the Trustee such other further and different relief as the Court
deems just, proper, and equitable;

(xix)    On the Nineteenth Claim for Relief, as a result of the foregoing and pursuant to
sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is
entitled to a judgment against Greisman:  (a) recovering the Greisman Subsequent Transfers, or

- 165 -

the value thereof, from Greisman for the benefit of the BLMIS estate; (b) directing Greisman to

disgorge all profits related to, arising out of, or concerning the Greisman Subsequent Transfers;

(c) awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of

this proceeding; (d) awarding the Trustee prejudgment interest from the date the Greisman

Subsequent Transfers were received; and (e) granting the Trustee such other further and different

relief as the Court deems just, proper, and equitable;

(xx)    On the Twentieth Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Bowes:  (a) recovering the Bowes Subsequent Transfers, or the

value thereof, from Bowes for the benefit of the BLMIS estate; (b) directing Bowes to disgorge

all profits related to, arising out of, or concerning the Bowes Subsequent Transfers; (c) awarding

the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this

proceeding; (d) awarding the Trustee prejudgment interest from the date the Bowes Subsequent

Transfers were received; and (e) granting the Trustee such other further and different relief as the

Court deems just, proper, and equitable;

(xxi)    On the Twenty-First Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Noel Piedrahita:  (a) recovering the Noel Piedrahita Subsequent

Transfers, or the value thereof, from Noel Piedrahita for the benefit of the BLMIS estate; (b)

directing Noel Piedrahita to disgorge all profits related to, arising out of, or concerning the Noel

Piedrahita Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable

interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment

interest from the date the Noel Piedrahita Subsequent Transfers were received; and (e) granting

the Trustee such other further and different relief as the Court deems just, proper, and equitable;

(xxii)  On the Twenty-Second Claim for Relief, as a result of the foregoing and pursuant

to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee

is entitled to a judgment against Barreneche:  (a) recovering the Barreneche Subsequent

Transfers, or the value thereof, from Barreneche for the benefit of the BLMIS estate; (b)

directing Barreneche to disgorge all profits related to, arising out of, or concerning the

Barreneche Subsequent Transfers; (c) awarding the Trustee attorneys' fees and all applicable

interest, costs, and disbursements of this proceeding; (d) awarding the Trustee prejudgment

interest from the date the Barreneche Subsequent Transfers were received; and (e) granting the

Trustee such other further and different relief as the Court deems just, proper, and equitable;

(xxiii)  On the Twenty-Third Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Boele:  (a) recovering the Boele Subsequent Transfers, or the value

thereof, from Boele for the benefit of the BLMIS estate; (b) directing Boele to disgorge all

profits related to, arising out of, or concerning the Boele Subsequent Transfers; (c) awarding the

Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding;

(d) awarding the Trustee prejudgment interest from the date the Boele Subsequent Transfers

were received; and (e) granting the Trustee such other further and different relief as the Court

deems just, proper, and equitable;

(xxiv)  On the Twenty-Fourth Claim for Relief, as a result of the foregoing and pursuant

to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee

is entitled to a judgment against Reyes:  (a) recovering the Reyes Subsequent Transfers, or the

- 167 -

value thereof, from Reyes for the benefit of the BLMIS estate; (b) directing Reyes to disgorge all

profits related to, arising out of, or concerning the Reyes Subsequent Transfers; (c) awarding the

Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding;

(d) awarding the Trustee prejudgment interest from the date the Reyes Subsequent Transfers

were received; and (e) granting the Trustee such other further and different relief as the Court

deems just, proper, and equitable;

(xxv)   On the Twenty-Fifth Claim for Relief, as a result of the foregoing and pursuant to

sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is

entitled to a judgment against Harary:  (a) recovering the Harary Subsequent Transfers, or the

value thereof, from Harary for the benefit of the BLMIS estate; (b) directing Harary to disgorge

all profits related to, arising out of, or concerning the Harary Subsequent Transfers; (c) awarding

the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this

proceeding; (d) awarding the Trustee prejudgment interest from the date the Harary Subsequent

Transfers were received; and (e) granting the Trustee such other further and different relief as the

Court deems just, proper, and equitable;

(xxvi)  On the Twenty-Sixth Claim for Relief, pursuant to applicable Delaware law, Noel

is jointly and severally liable for all obligations Greenwich Sentry incurred while Noel was

serving as general partner, and the Trustee is entitled to a judgment against Noel recovering the

Six Year Initial Transfers to Greenwich Sentry, or their value, that Greenwich Sentry received

while Noel was serving as general partner, for the benefit of the estate of BLMIS;

(xxvii) On the Twenty-Seventh Claim for Relief, pursuant to applicable Delaware law,

Tucker is jointly and severally liable for all obligations Greenwich Sentry incurred while Tucker

was serving as general partner, and the Trustee is entitled to a judgment against Tucker

recovering the Six Year Initial Transfers to Greenwich Sentry, or their value, that Greenwich

Sentry received while Tucker was serving as general partner, for the benefit of the estate of

BLMIS;

(xxviii)On the Twenty-Eighth Claim for Relief, pursuant to applicable Delaware law, FG

Limited is jointly and severally liable for all obligations Greenwich Sentry incurred while FG

Limited was serving as general partner, and the Trustee is entitled to a judgment against FG

Limited recovering the Six Year Initial Transfers to Greenwich Sentry, or their value, that

Greenwich Sentry received while FG Limited was serving as general partner, for the benefit of

the estate of BLMIS;

(xxix)   On the Twenty-Ninth Claim for Relief, pursuant to applicable Delaware law, FG

Bermuda is jointly and severally liable for all obligations Greenwich Sentry incurred while FG

Bermuda was serving as general partner, and the Trustee is entitled to a judgment against FG

Bermuda recovering the Six Year Initial Transfers to Greenwich Sentry, or their value, that

Greenwich Sentry received while FG Bermuda was serving as general partner, for the benefit of

the estate of BLMIS;

(xxx)   On the Thirtieth Claim for Relief, pursuant to applicable Delaware law, FG

Bermuda is jointly and severally liable for all obligations Greenwich Sentry Partners incurred

while FG Bermuda was serving as general partner, and the Trustee is entitled to a judgment

against FG Bermuda recovering the Six Year Initial Transfers to Greenwich Sentry Partners, or

their value, that Greenwich Sentry Partners received while FG Bermuda was serving as general

partner, for the benefit of the estate of BLMIS;

(xxxi)  On all Claims for Relief, the Trustee seeks a judgment under Fed. R. Bankr. P.

7001(1) and (9) declaring that the Initial Transfers are avoidable pursuant to 15 U.S.C. § 78fff-

2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-

279 of the NYDCL, as applicable, and as necessary to recover the Subsequent Transfers pursuant

to section 550 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

(xxxii) On all Claims for Relief, imputing each Defendant's knowledge to each of the

other Defendants;

(xxxiii) On all Claims for Relief, directing the Defendants to disgorge to the Trustee all

profits, including any and all management fees, incentive fees or other compensation and/or

remuneration received by the Defendants related to, arising from, or concerning the Six Year

Initial Transfers or Subsequent Transfers;

(xxxiv) On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001

and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the

Six Year Initial Transfers or Subsequent Transfers were received by the Defendants;

(xxxv) On all Claims for Relief, awarding the Trustee attorneys' fees, all applicable

interest, costs and disbursements incurred in this proceeding;

(xxxvi) On all Claims for Relief, establishing a constructive trust over all Six Year Initial

Transfers and Subsequent Transfers and their proceeds, product and offspring in favor of the

Trustee for the benefit of the estate; and

(xxxvii)        Granting the Trustee such other, further, and different relief as the Court

deems just, proper, and equitable.


Dated:  New York, New York
        June 26, 2015                        /s/ Thomas L. Long
                                             **Baker & Hostetler LLP**
                                             45 Rockefeller Plaza
                                             New York, New York 10111
                                             Telephone: (212) 589-4200
                                             Facsimile: (212) 589-4201

David J. Sheehan
Thomas L. Long
Mark A. Kornfeld
Jessie M. Gabriel
Torello H. Calvani
Jonathan A. Forman
Catherine E. Woltering

**Baker & Hostetler LLP**
Capital Square
65 E. State St., Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Lauren M. Hilsheimer

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and the estate of Bernard L. Madoff*