**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02149 (SMB) |
| Plaintiff, | |
| v. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO BANQUE SYZ & CO. S.A.** |
| BANQUE SYZ & CO S.A., | |
| Defendant. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the

Extraterritoriality Issue as to Banque Syz & Co. S.A. ("Banque Syz"), alleges the following:

## INTRODUCTION

1.      Banque Syz was a shareholder in Fairfield Sentry Limited ("Fairfield Sentry"),

Fairfield Sigma Limited ("Sigma" and together with Fairfield Sentry, the "Fairfield Funds"),

Kingate Global Fund Ltd. ("Kingate Global"), and Kingate Euro Fund Ltd. ("Kingate Euro" and

together with Kingate Global, the "Kingate Funds"; the Fairfield Funds and the Kingate Funds

together, the "BLMIS Feeder Funds").  Fairfield Sentry, Kingate Global, and Kingate Euro each

invested at least 95% of their assets in accounts managed by New York-based Bernard L. Madoff

Investment Securities LLC ("BLMIS").  Sigma did not have its own direct BLMIS account, but

invested 100% of its assets in Fairfield Sentry, serving solely as a vehicle for converting Euro-

denominated investments of its shareholders into U.S. dollars.[1]

2.      The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2)

Banque Syz's redemptions totaling $73,266,724 from the BLMIS Feeder Funds (the

"Transfers").  Since the filing of the Complaint, the Trustee has uncovered documents

evidencing additional subsequent transfers to Banque Syz of at least $53,409,603 from Kingate

Global and at least $142,068 from Kingate Euro.  These additional transfers will be included in

an amended complaint.

---

[1] For ease of reference, Sigma is included herein in the definition of "BLMIS Feeder Funds."

**BANQUE SYZ'S TRANSFERS AND THE COMPONENT EVENTS OF ITS
BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC**

3.      Banque Syz is a highly sophisticated and experienced asset management

specialist.

4.      Banque Syz intentionally invested in the BLMIS Feeder Funds to profit from

BLMIS's purported investments in the United States, and the Transfers and component events of

Banque Syz's BLMIS Feeder Fund transactions were predominantly domestic.

**The Entire Purpose of Banque Syz's Investments Was to Use as Many Vehicles as Possible
to Invest with BLMIS in New York.**

5.      Banque Syz spent a decade actively seeking out as many vehicles as possible

through which it could invest with BLMIS.  Banque Syz knowingly and intentionally used the

BLMIS Feeder Funds as a means for investing with Madoff in New York, for the express

purpose of receiving returns on U.S.-based investments from BLMIS.

6.      For example, Banque Syz made its interest in Madoff clear in a 2003 e-mail to

Andres Piedrahita, a founding partner of New York-based Fairfield Greenwich Group ("FGG"),

the manager and controller of the Fairfield Funds:

> I am looking for some Madoff, and since we are starting to do good business
> together I thought I would go to you first to ask for Fairfield Sentry. . . .

7.      Not only did Banque Syz gain access to Madoff by investing with Fairfield

Sentry, but between 1998 and 2008 it also invested with Madoff in New York through at least

four other different funds—Sigma, the two Kingate Funds, and Luxalpha SICAV

("Luxalpha")—and reportedly also in BLMIS feeder fund Thema International Fund LDC.

8.      In 2007 Banque Syz was given the opportunity to open its own account with

BLMIS (the "Banque Syz Direct Account"), which it used to invest substantial additional

amounts directly with BLMIS.

2

9.      Internal records at BLMIS noted that Bernard Madoff was personally responsible for introducing Banque Syz's direct account.  Banque Syz's co-founder, Eric Syz, knew Madoff personally through Syz's relative Walter Noel (another founding partner of FGG) and met with Madoff on multiple occasions.  Syz was one of a select group of individuals included in Madoff's personal telephone contact list, which was limited to individuals who had particularly close personal and/or professional relationships with Madoff.

10.      Banque Syz's transaction documents with the BLMIS Feeder Funds show that Banque Syz used the BLMIS Feeder Funds to invest with Madoff in New York, relinquishing total control to Madoff, who held and invested Banque Syz's investment monies at his discretion. As per the terms of the Fairfield Funds' private placement memoranda ("PPMs" and each, a "PPM") and the Kingate Funds' information memoranda ("Info Memos" and each, an "Info Memo"), shareholders in those funds such as Banque Syz were required to execute a subscription agreement each time they subscribed for shares in (i.e. invested money into) the BLMIS Feeder Funds.  Banque Syz remitted subscription payments to such funds at least 46 times.

11.      By entering into the Fairfield Funds' subscription agreements, Banque Syz affirmed that it "received and read a copy of" each fund's Private Placement Memorandum ("PPM").  Based on the information contained in the PPMs, Banque Syz knew the following facts:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Sigma invested 100% of its assets with Fairfield Sentry;

- BLMIS was the investment adviser of the Fairfield Funds;

- BLMIS was registered with the Securities and Exchange Commission (the "SEC");

3

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the funds' behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operations of" the Fairfield Funds.

12.     In connection with its investments in the Kingate Funds, Banque Syz similarly entered into subscription agreements wherein it affirmed having received and read Info Memos from those funds.  The Kingate Funds' Info Memos provided essentially the same information as the Fairfield Funds' PPMs, including that the Kingate Funds' investments in U.S. securities would be custodied in New York by the same New York investment adviser using the same SSC strategy.

**Banque Syz Submitted to U.S. Law and Jurisdiction In Connection With Its Fairfield Sentry Investment.**

13.     Banque Syz's subscription agreements also expressly provided that its investments would be subject to U.S. laws and to jurisdiction in the U.S. courts.

14.     In each of its signed subscription agreements with the Fairfield Funds, Banque Syz agreed that: (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," and it "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding"; and (ii) the subscription agreements "shall be governed and enforced in accordance with New York law . . . ."

15.     Banque Syz similarly subjected itself to U.S. law when it signed its various Banque Syz Direct Account agreements with BLMIS.  Banque Syz agreed that its investments

would be governed by U.S. law; that any disputes would be arbitrated before the American

Arbitration Association, the New York Stock Exchange, Inc. or the National Association of

Securities Dealers; and that where applicable, its transactions would be subject (a) to the

provisions of the Securities Exchange Act of 1934, as amended, and (b) to the rules and

regulations of (1) the Securities and Exchange Commission and (2) the Board of Governors of

the Federal Reserve System.

### Banque Syz Understood the Ultimate Risk Was a BLMIS/Madoff Bankruptcy in the United States.

16.    Banque Syz knew that the ultimate risk of investing with the BLMIS Feeder

Funds was a BLMIS or Madoff bankruptcy proceeding in the United States.  In 2004, Banque

Syz received from U.S.-based Access International Advisors ("Access"), the manager of BLMIS

feeder fund Luxalpha, a legal memo provided to Access by the U.S. law firm then known as

Katten Muchin Zavis Rosenman LLP.  Entitled "Legal Review of the Bernard L. Madoff

Investment Securities Managed Account Program," the opinion, among other things, (i)

identified BLMIS as a U.S. broker-dealer registered as a limited liability company in the State of

New York, (ii) noted that BLMIS is subject to oversight and regulation by the SEC, the National

Association of Securities Dealers, and the Securities Investor Protection Corporation ("SIPC"),

and (iii) advised that BLMIS is required to maintain insurance with SIPC.  Exhibit G to the

opinion was a brochure entitled "How SIPC Protects You," explaining that when a brokerage

firm like BLMIS fails, SIPC will appoint a trustee to liquidate the firm.

17.    When BLMIS ultimately collapsed, Banque Syz sought to utilize the protections

provided by SIPC in the U.S. bankruptcy process, by filing a Customer Claim with the Trustee in

connection with its Banque Syz Direct Account.

**Banque Syz Purposefully and Repeatedly Utilized a U.S. Bank Account to Transfer Funds.**

18.     Banque Syz specifically directed Fairfield Sentry and Kingate Global to deposit its Transfers from those funds into its U.S. bank account, and used its U.S. bank account to remit subscription payments to Fairfield Sentry.

19.     During the relevant period, Banque Syz received over 25 redemptions out of Fairfield Sentry and Kingate Global, and New York was the specific situs repeatedly selected by Banque Syz for receiving its redemptions.  Similarly, during the relevant period, Banque Syz remitted multiple subscription payments to Fairfield Sentry, and New York was the specific situs repeatedly selected by Banque Syz for remitting its subscriptions.  Specifically, Banque Syz used a bank account in its own name at UBS in New York in order to make and receive such payments (the "U.S. Account").

20.     Banque Syz systematically designated such use of this U.S. Account in its Fairfield Sentry subscription agreements and redemption documents.  The Trustee does not have access to similar documentation showing Banque Syz's express designations for Kingate Global, but Kingate Global bank statements indicate that Banque Syz used the U.S. Account for receiving Kingate Global redemption payments.

21.     By investing in the BLMIS Feeder Funds, Banque Syz also knew it was directing funds to New York-based BLMIS through U.S. bank accounts.  Fairfield Sentry's form subscription agreements required that Banque Syz send its subscription payments to a U.S. correspondent bank account, and Kingate Global's form subscription agreements similarly required that Banque Syz send its subscription payments to a U.S. correspondent bank account, for deposit into such funds' bank accounts.  From these accounts, the moneys were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

**The Fairfield Funds' Principal Place of Business Was in New York.**

22.    At all relevant times, the Fairfield Funds' principal place of business was in New York, where their creator/manager/operator was headquartered, and they were U.S. residents.

**A.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership**

23.    In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

24.    The FGG de facto partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

25.    FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

**B.    Fairfield Sentry**

26.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British

7

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

27.     Fairfield Sentry was a shell corporation present in the BVI solely on paper. From

its inception until its liquidation, Fairfield Sentry had no employees and no office. It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

28.     Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

**1.      Fairfield Sentry's Agreements With BLMIS Confirm Fairfield
          Sentry's Principal Place of Business Was in the United States.**

29.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI. In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069. In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to

8

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield
International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a
second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,
1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and
correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29,
1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to
FGG's New York headquarters.

30.    After the original BLMIS account documents were executed by Tucker on behalf
of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in
FGG's New York headquarters—executed additional BLMIS account documents on behalf of
Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and
Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on
these BLMIS account documents as FGG's New York headquarters.

31.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts
are governed by New York law and all disputes arising under the agreements must be resolved
by mandatory arbitration in New York utilizing the laws of New York.  All transactions under
Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of
1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve
System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf
of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor
Protection Corporation ("SIPC") member regulated by the SEC.

**2.     FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities.**

32.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

**3.     FGG New York Personnel Managed Fairfield Sentry.**

33.     At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

34.     FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.     Fairfield Sentry's Investors Knew They Were Investing in BLMIS.

35.     Fairfield Sentry's subscription agreements also incorporated its PPMs by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.     BLMIS Was Fairfield Sentry's Investment Manager.

36.     Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality

made all of Fairfield Sentry's investment decisions.

37.     In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's

Littlestone Associates, which was a money management firm also located in New York City.

Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG

clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG

Limited FG.  FG Limited was formed under the laws of Ireland.

38.     While FG Limited was formed under foreign law, it reported its principal place of

business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters.  Upon the formation

of FG Limited, Fairfield International Managers assigned all of its management contracts with

Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry

Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even

though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts

controlled by BLMIS.

39.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him

FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and

foreign investors and, as a result, FGG would form a new U.S. entity to be the investment

adviser of the fund as well as other FGG operated funds, including the feeder and currency

funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would

serve in the role as the investment manager of the feeder and currency funds. As a result, FGG

formed two new entities, FG Advisers and FG Bermuda.

40.    In October 2003, FGG formed FG Advisors as a Delaware limited liability

company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG

formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

management contracts to both entities, including the investment advisory agreements for the

three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG

Bermuda. FG Limited remained the placement agent for the same funds.

41.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda. The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

42.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

43.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

44.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as

Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

45.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS

accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other

fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a

number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

The seedling funds were operated and organized by FGG New York Personnel.  Many of the

seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

**C.     Sigma**

46.     FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription

and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield

Sentry using Euros, FGG created Sigma.  Sigma accepted subscriptions in Euros, converted them

to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying

redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received

from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

47.     Noel and Tucker organized Sigma on November 20, 1990, as international

business companies under the BVI International Business Companies Act.  Just as Fairfield

Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma. Sigma is currently in liquidation in proceedings in the BVI and United States.

48.    Also like Fairfield Sentry, Sigma was a shell corporations present in the BVI only on paper.  It had no employees and maintained no offices.  It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters.  Sigma was operated almost entirely by FGG New York Personnel.

49.    As with Fairfield Sentry, and as part of the FGG de facto partnership, FGG New York Personnel made the operational decisions regarding Sigma.  Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities.  Until Sigma's liquidation, FGG maintained Sigma's books and records in New York. FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

50.    FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares.  Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the

significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole

assets.  Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with

respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the

investments.  Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the

custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could

misappropriate the assets or securities.  This same risk was also disclosed in Fairfield Sentry's

PPM's.

51.     Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry,

contracted with Citco Fund Services to provide Sigma with backoffice administrative services

such as coordinating subscription and redemption forms, maintaining Know Your Customer

information, and serving as the independent party verifying the Net Asset Value of the Sigma

shares.  Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma

assets.  As a further part of the Citco relationship, Noel and Tucker opened bank accounts on

behalf of Sigma at Citco Bank Dublin.  FGG New York Personnel had final control of the Sigma

Citco Bank Dublin bank accounts.  Finally, FGG New York Personnel controlled all of Sigma's

relationships with the Citco entities.

52.     In addition to the Citco Bank Dublin accounts, in order to convert Sigma

investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS—

Noel executed separate contracts on Sigma's behalf with the Bank of Montreal for currency

swaps which were "governed by and construed in accordance with the laws of the State of New

York (without reference to choice of law doctrine)."

53.     FGG New York Personnel initially listed FG Limited as the investment manager

for Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the

Sigma PPM to indicate FG Bermuda was Sigma's Investment Manager. In fact there were no

duties for any investment manager because Sigma's sole purpose was to purchase Fairfield

Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S.

Dollars.

54.     The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

**The Kingate Fund Transfers Are Domestic.**

55.     The Kingate Funds were feeder funds that invested exclusively with BLMIS in

New York. BLMIS transferred approximately $926,351,905 of customer property to the Kingate

Funds during the life of the accounts prior to December 11, 2008.

56.     Each of the Kingate Funds filed customer claims in the SIPA liquidation.

**A.  The Kingate Funds Invested with BLMIS to Make Money from a New York-Based Investment Operation.**

57.     The Kingate Funds, together with their purported investment manager, consultant,

service providers, and others that received subsequent transfers of customer property, formed an

enterprise with a single economic purpose: to make money from a New York-based investment

operation.

58.     Despite having a registered address in the BVI, the Kingate Funds had no physical

offices, no employees, and transacted no meaningful business there.

59.     Tremont (Bermuda) Limited served as the co-manager of Kingate Global for

approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself

managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation.

Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

60.     The Kingate Funds' manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Funds' investments with BLMIS.

61.     The Kingate Funds' sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and the Kingate Funds profited from their exclusive business relationship with BLMIS in New York.

**B.  The Operative Legal Documents Were New York-Based.**

62.     The Kingate Funds executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

63.     Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

64.     The Kingate Funds agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

**C.  BLMIS Had Full Authority to Make and Execute Investment Decisions.**

65.     The Funds' Trading Authorization Agreements authorized BLMIS to be the

Kingate Funds' "agent and attorney in fact," giving BLMIS full discretion over the Kingate

Funds' invested assets and to buy, sell, and trade in securities for the Kingate Funds.

66.     As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the

Kingate Funds' investment manager and purported to invest exclusively according to Madoff's

SSC Strategy, which involved the purchase of U.S. securities traded only on domestic

exchanges.

67.     BLMIS acted as the Kingate Funds' executing broker in purporting to purchase

securities on the Kingate Funds' behalf, and acted as the Kingate Funds' custodian for the

securities purportedly held on the Kingate Funds' behalf.

**D.  The Kingate Funds Were Managed From New York.**

68.     During Tremont's tenure as co-manager of Kingate Global, and thereafter while it

continued to introduce investors to the Kingate Funds in return for fees, it was a valuable

contributor in New York to the success of the Kingate Funds.

69.     Tremont performed its co-management duties for Kingate Global in New York.

Suzanne Hammond, based in New York, signed a co-manager agreement entered into on

Tremont's behalf with Kingate Management and Kingate Global.

70.     Under that agreement, Kingate Management and Tremont were obligated to

evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all

other necessary management services to Kingate Global.

71.     The Kingate Funds were also co-managed by Kingate Management Limited

("KML"), a management entity formed by the founders of the Kingate Funds, Federico Ceretti

and Carlo Grosso.  KML operated through its agents in New York.

19

72.     KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

73.     KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

74.     KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

75.     Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as the Kingate Funds' investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

76.     FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for the Kingate Funds.

77.     KML and the FIM entities actively participated in the Kingate Funds business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E.  Kingate Funds Used Banks in New York.**

78.     The Kingate Funds used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

79.     KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

80.    In its role as the Kingate Funds' custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and the Kingate Funds relating to investments with BLMIS.

81.    FIM also directed fee payments to be routed through a bank account in New York.

82.    The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: June 26, 2015          By:  /s/ Thomas L. Long
       New York, New York          Baker & Hostetler LLP
                                    45 Rockefeller Plaza
                                    New York, New York  10111
                                    Telephone: (212) 589-4200
                                    Facsimile: (212) 589-4201
                                    David J. Sheehan
                                    Thomas L. Long
                                    Matthew D. Feil
                                    Hannah C. Choate

                                    *Attorneys for Irving H. Picard, Trustee for the*
                                    *Substantively Consolidated SIPA Liquidation of*
                                    *Bernard L. Madoff Investment Securities LLC*
                                    *and the Estate of Bernard L. Madoff*