**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 09-01161 (SMB) |
| v. | |
| FEDERICO CERETTI, et al., | |
| Defendants. | |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW**
**IN OPPOSITION TO CERTAIN DEFENDANTS' MOTION TO DISMISS**
**BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF**
**TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**

The Trustee respectfully submits this supplemental memorandum in opposition to the consolidated motion to dismiss,[1] which was joined by the following defendants in this proceeding:

- Federico Ceretti ("Ceretti")

- Carlo Grosso ("Grosso")

- Kingate Management Limited ("KML")

- FIM Limited and FIM Advisers LLP (together, "FIM")

- The Ashby Trust[2] and El Prela Trust[3] (together, the "Trusts")

- First Peninsula Trustees Limited,[4] Alpine Trustees Limited, and Port of Hercules Trustees Limited[5] (together, the "Trustees")

- Ashby Holdings Services Limited[6] and El Prela Group Holding Services[7] (together, the "Holding Companies")

- Ashby Investment Services Limited[8] and El Prela Trading Investments Limited[9] (together, the "Investment Shells," and together with the Trusts, Trustees, and Holding Companies, the "Shell Companies")

- Citi Hedge Fund Services Limited, f/k/a BISYS Hedge Fund Services Limited, and successor to Hemisphere Management Limited[10] ("Citi Hedge")

- HSBC Bank Bermuda Limited f/k/a Bank Bermuda Limited[11] ("HSBC," and together with Citi Hedge, the "Service Providers").

---

[1] The Trustee submits this memorandum in opposition to the motion to dismiss and in further support of the Trustee's motion for leave to amend complaints, in accordance with this Court's Order Concerning Further Proceedings on Extraterritoriality Motion and Trustee's Omnibus Motion for Leave to Replead and for Limited Discovery with appended Exhibits A-C entered on December 10, 2014 (No. 08-01789 (SMB), Doc. 8800), as modified by the Stipulations and Orders entered on January 14, 2015 (*id.*, Doc. 8990), February 24, 2015 (*id.*, Doc. 9350), and April 1, 2015 (*id.*, Doc. 9720). This memorandum supplements the Trustee's main memorandum of law ("Trustee's main brief") filed contemporaneously with this memorandum.
[2] Grosso's trust.
[3] Ceretti's trust.
[4] The Ashby Trust's trustee.
[5] El Prela Trust's trustee.
[6] Grosso's holding company.
[7] Ceretti's holding company.
[8] Grosso's investment shell company.
[9] Ceretti's investment shell company.
[10] Compl. ¶¶ 72-78.
[11] Compl. ¶ 79.

All defined entities above are collectively referred to as the "Transferee Defendants." The Transferee Defendants seek dismissal of the Trustee's Fourth Amended Complaint (the "Complaint")[12] against them (the "Motion") on the ground that it is barred as a matter of law by *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), as applied without consideration of the facts in this proceeding by District Judge Rakoff in *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, 513 B.R. 222 (S.D.N.Y. 2014).[13]

## ARGUMENT

The Trustee seeks to recover from the Transferee Defendants property or its value initially transferred by BLMIS, an NASD-registered broker-dealer in New York, to two feeder fund customers—Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro") (collectively, the "Kingate Funds")—established by Ceretti and Grosso to invest exclusively with BLMIS's investment advisory business ("IA Business"). The Transferee Defendants are immediate or mediate transferees of the Kingate Funds that received customer property through myriad transfers (the "Transfers")[14] designed by Ceretti and Grosso to extract hundreds of millions of dollars from BLMIS for their benefit. The Transfers, as described in the Complaint,[15] include at least $300 million in fees received by KML and FIM;[16] at least $296 million in dividends and other payments received by Ceretti and Grosso and the Shell

---

[12] The Complaint was filed on March 17, 2014. Adv. Pro. Doc. 100.

[13] In opposition to the Motion, the Trustee is not proffering separate allegations on the domestic nature of the transfers to the Transferee Defendants, and is relying on his Complaint, documents referenced in the Complaint, and factual information as to which this Court may take judicial notice. *See, e.g.*, *In re Lyondell Chem. Co.*, 505 B.R. 409, 418 (S.D.N.Y. 2014) ("[F]or purposes of determining the sufficiency of a Rule 12(b)(6) claim, a court may consider: (1) factual claims in the plaintiffs complaint; (2) the exhibits accompanying the complaint or documents incorporated by reference; (3) documents in the plaintiffs possession or of which the plaintiff had knowledge and relied upon in bringing the case; and (4) matters of which judicial notice may be taken.") (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see also S.E.C. v. Gruss*, 859 F. Supp. 2d 653, 657 (S.D.N.Y. 2012); *In re Sheckard*, 394 B.R. 56, 65 (E.D. Pa. 2008) (bankruptcy court may take judicial notice of filings on its docket).

[14] The Trustee has reserved his right to add information regarding the Transfers and seek recovery of additional subsequent transfers following discovery in this proceeding. Compl. ¶ 260.

[15] *See* Compl. ¶¶ 253-61.

[16] Compl. ¶¶ 110, 254.

Companies;[17] at least $5.9 million in fees received by Citi Hedge;[18] and at least $466,364 in fees

received by HSBC.[19]  The Transfers do not include redemptions paid to subscribers in the

Kingate Funds.

      The structure of the Kingate Enterprise (as defined on page 5) and the Transfers is shown

graphically in the chart below:



---

[17] Compl. ¶¶ 255-56.
[18] Compl. ¶ 257.
[19] Compl. ¶ 258.

Under *Morrison*, which sets the standard for determining whether a transaction is

extraterritorial, the court must consider the context and focus of the governing law.[20]  Judge

Rakoff determined that in the context of an avoidance action, as here,[21] the nature of the

transaction—whether foreign or domestic—is determined by the location of the transfers and the

component events of the underlying transactions.[22]  According to Judge Rakoff, transfers whose

components are "purely foreign" are extraterritorial transfers.[23]  Consistent with this view, a

decision of the U.S. Court of Appeals for the Second Circuit rendered after the Extraterritoriality

Decision declined to treat any single factor as definitive in the extraterritoriality inquiry.[24]

Taking into account the economic reality of the securities transaction at issue,[25] the Second

Circuit instructed that determining the "foreignness" of a transaction depended upon multiple

factors, including whether the transaction involved foreign securities traded entirely on foreign

exchanges.[26]

Determining whether the Transfers in this proceeding are domestic or foreign also

requires that the Court consider the economic reality of the Transfers.  The specific facts alleged

in the Trustee's Complaint, exhibits to the Complaint, documents in the Trustee's possession

upon which he relied in bringing the Complaint, and matters of which the Court may take

---

[20] *Morrison*, 561 U.S. at 273.

[21] Because BLMIS made the initial transfers to the Kingate Funds, the Complaint seeks to avoid the initial transfers made to the Kingate Funds (which are not affected by the Extraterritoriality Decision) and recover the transferred customer property from the Kingate Funds and the Transferee Defendants.

[22] *Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 513 B.R. 222, 227 (S.D.N.Y. 2014) ("Extraterritoriality Decision") (quoting *In re Maxwell Commc'n Corp.*, 186 B.R. 807, 817 (S.D.N.Y. 1995).

[23] Extraterritoriality Decision at 231-32; *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 524-26 (Bankr. S.D.N.Y. 2012) (in the context of an avoidance action relying upon the fact-specific legal standard, as set forth, e.g., in *Maxwell Commc'n Corp.*, 186 B.R. at 807, for determining whether the application of section 550 was extraterritorial).

[24] *See Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 213, 215-16 (2d Cir. 2014).

[25] *Id.* at 213 (acknowledging that in reconciling *Morrison* to the facts before it, the lower court considered the economic reality of the swap transactions); *see also Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) (presence of some foreign activity does not render a transaction extraterritorial under *Morrison*).

[26] *Parkcentral*, 763 F.3d at 215-16 (in determining whether a statute can be applied extraterritorially, recognizing the court must consider "the foreignness of the facts constituting the defendant's alleged violation."); *see also Absolute Activist*, 677 F.3d at 69.

4

judicial notice[27] show that the component events of the Transfers are domestic. In particular, the economic reality of the Transfers is that they arose from the Kingate Funds' exclusive investment transactions with BLMIS in New York and consisted of BLMIS customer property on deposit in New York.[28] Neither the place of formation nor residence of the Transferee Defendants in a foreign jurisdiction, or the number of times the Transfers changed hands among the Transferee Defendants, alters the nature of the Transfers as customer property that the Trustee is entitled to recover under SIPA,[29] or renders them purely foreign.[30] Even if the Court were to find that the location of the Transfers was abroad, that would not alter the fact that the Transfers were comprised of customer property removed from the United States ("U.S.") with conscious disregard of BLMIS's fraudulent activities. The Motion, therefore, should be denied.

## I.    The Transfers Are Domestic in Nature.

### A.    The Transfers Were Made Through Entities Formed to Profit From BLMIS in New York.

The Transfers comprise BLMIS customer property transferred to the Kingate Funds and subsequently transferred by the Kingate Funds to the Transferee Defendants to achieve a single economic purpose:  to profit from a New York-based investment operation.[31]  Like parts of a compound machine that achieve the desired results when operating in unison, the Kingate Funds,

---

[27] *See Lyondell Chem. Co.*, 505 B.R. at 418.  While the Complaint on its face sufficiently pleads domestic transfers, the Trustee asks the Court to take judicial notice of information in the public record, attached to the Declaration of Gonzalo S. Zeballos ("Zeballos Decl.") as Exhibits A - E.  *See In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2015 WL 363894, at *3-5 & n.4 (S.D.N.Y. Jan. 28, 2015).

[28] Compl. ¶¶ 8, 247-61, 331.

[29] 15 U.S.C. § 78fff-2(c)(3).

[30] *Absolute Activist*, 677 F.3d at 69 (the *Morrison* analysis depends on a case's specific facts; residency or citizenship of a party does not affect where a transaction occurs); *In re Maxwell Commc'n Corp.*, 170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994) (deciding whether a transaction is domestic requires looking at the facts "to determine whether they have a center of gravity outside the United States. Thus, for example, a transfer made in the U.S. by a foreign national to a foreign national conceivably could be considered a domestic transaction.").

[31] Compl. ¶¶ 8, 96, 247-61, 331.

New York-based FIM (USA) Inc.,[32] and the Transferee Defendants (collectively, the "Kingate Enterprise") formed one enterprise dedicated to making money from BLMIS.[33] The Kingate Enterprise worked by having the Kingate Funds solicit subscriptions from investors through representations in Information Memoranda they published and through other marketing efforts,[34] and deposit subscription revenue in U.S. dollars with BLMIS,[35] routed through HSBC,[36] for investment in U.S. securities on domestic exchanges.[37] The Kingate Funds made withdrawals from BLMIS's customer property, and the Transferee Defendants received a substantial portion of those withdrawals in fees, dividends, and other payments.[38] The Kingate Enterprise would not have existed but for BLMIS, just as the Transfers would not have existed but for the Kingate Funds' initial withdrawals of BLMIS customer property. Each member of the Kingate Enterprise was necessary to accomplish its objective.

The component events here began with Sandra Manzke's personal introduction of Ceretti and Grosso to Madoff.[39] Manzke was a New York-based hedge fund manager and founder of a hedge fund player, Tremont.[40] The Tremont funds also invested with BLMIS and ultimately

---

[32] Compl. ¶¶ 83-85. FIM (USA) Inc. ("FIM (USA)") was a Delaware corporation owned and controlled by Ceretti and Grosso. Compl. ¶ 37. FIM (USA) was dissolved on June 17, 2009 (Compl. ¶ 85) and, therefore, is not named as a defendant. At all relevant times, however, FIM (USA) in New York actively participated in the Kingate Enterprise and interacted directly or indirectly with BLMIS in New York. Compl. ¶¶ 83-85, 87, 99.

[33] Compl. ¶¶ 2-7, 42, 96.

[34] Compl. ¶¶ 47, 52, 84-85, 106-07.

[35] Compl. ¶¶ 2-3, 41, 47 (May 1, 2000 Kingate Global Info. Mem. "Functional Currency" at KGFSAD0001778 ("The Fund's functional currency, i.e., the currency in which it maintains its books and records, its financial statements and invests its assets, is the U.S. dollar."); May 1, 2000 Kingate Euro Info. Mem. "Functional Currency; Currency Hedging" at KGFSAD0000947 ("[T]he investment Advisor invests the Fund's assets in U.S. dollar-denominated securities.").).

[36] Compl. ¶¶ 80, 88, 92.

[37] Compl. ¶ 47 (May 1, 2000 Kingate Global Info. Mem. "Investment Process" at KGFSAD0001798 (investment advisor utilizes a "'split-strike conversion' strategy" entailing the purchase and sale of S&P stocks and options); May 1, 2000 Kingate Euro Info. Mem. "Investment Process" at KGFSAD0000953 (same)).

[38] Compl. ¶¶ 3-5, 8, 45, 54, 57-59, 60-61, 63, 66-70, 86, 106-10, 113, 145, 245-46, 253-58.

[39] Compl. ¶ 94.

[40] Compl. ¶¶ 94-95; *see also Picard v. Tremont Group Holdings, Inc.*, Adv. Pro. No. 10-05310 (BRL) (Bankr. S.D.N.Y.) (Doc. 4 ¶¶ 2, 58). For example, Kingate Global's May 1, 2000 Information Memorandum ("Management" at KGFSAD0001795) stated that "Manzke has been President and Director of Tremont Advisers,

6

became among the largest and longest running funds that enabled Madoff to prolong his fraud.[41]
With the knowledge gained from Manzke and the Tremont funds, Ceretti and Grosso in 1994
formed Kingate Global[42] in the British Virgin Islands ("BVI") as an investment fund for the sole
purpose of investing with BLMIS.[43]  In 1996, a sub-fund of Kingate Global opened its own
account for exclusive investment with BLMIS.[44]  In 2000, that sub-fund became a separate
BLMIS feeder fund, Kingate Euro.[45]  Kingate Euro, also organized in the BVI,[46] was operated,
dominated, and controlled by Ceretti and Grosso jointly and in the same way as they operated,
dominated, and controlled Kingate Global.

The Kingate Funds each engaged a manager and service providers—the requisite
structure for such investment funds.[47]  Ceretti and Grosso formed a new company, KML,[48] in
Bermuda[49] to be the Kingate Funds' manager.  Ceretti and Grosso were KML's beneficial
owners,[50] and they dominated and controlled that entity.[51]  One of Manzke's companies,
Tremont (Bermuda) Limited ("Tremont Limited"), as discussed more fully below, operating
from New York, also co-managed Kingate Global with KML for approximately 10 years.[52]

Ceretti and Grosso caused KML to enter into a consulting agreement with FIM Limited,

---

Inc., a U.S. public company, since 1984.  Ms. Manzke also serves as Chairman and President of Tremont Partners, Inc. and President and Director of Tremont (Bermuda) Limited."  Compl. ¶ 47.

[41] Compl. ¶¶ 94-95; *see also Tremont Group Holdings*, Adv. Pro. No. 10-05310 (BRL) (Doc. 4 ¶ 85).

[42] Compl. ¶¶ 2, 94-95.

[43] Compl. ¶¶ 38-39, 96.

[44] Compl. ¶ 41.

[45] Compl. ¶ 41.

[46] Compl. ¶ 40.

[47] Compl. ¶¶ 46, 73, 80.

[48] Compl. ¶¶ 4, 45.

[49] Compl. ¶ 44.  KML's and the other Transferee Defendants' respective places of organization and foreign registered addresses are not dispositive under *Morrison* and its progeny as to the location of the Transfers.  *See, e.g., Absolute Activist*, 677 F.3d at 69 (analysis under *Morrison* depends on a case's specific facts; residency or citizenship of a party does not affect where a transaction occurs).

[50] Compl. ¶¶ 5, 45.  KML is in a liquidation proceeding in Bermuda.  On December 11, 2008 (the "Filing Date"), KML was directly and equally owned by the Holding Companies following a transfer of ownership by the Trusts. Compl. ¶ 13.

[51] Compl. ¶¶ 5, 45, 54, 59, 63, 67, 121, 131.

[52] Compl. ¶¶ 106, 113.  Tremont Limited is not named a defendant in this proceeding, because the Trustee filed a separate avoidance proceeding against Tremont that settled in 2011.

an experienced investment advisory firm, which later was succeeded by FIM Advisers.[53]  KML

was a new company and needed operational, administrative, marketing, accounting, and other

consulting services[54] that the FIM entities, including FIM and FIM (USA) ("FIM Entities"), had

the capacity to provide.[55]  While FIM (USA) existed, FIM made no distinction in billing for the

services performed in New York, and FIM and FIM (USA) were treated as one company.[56]

Grosso founded FIM Limited in London and served as its executive chairman.[57]  Ceretti and

Grosso were equal owners of FIM Limited[58] and founding members of FIM Advisers.[59]  FIM

Limited was the managing member of FIM Advisers, and was FIM Advisers' immediate and

FIM (USA)'s ultimate parent.[60]  Ceretti and Grosso were the sole directors of FIM Limited, the

designated members of FIM Advisers, and dominated and controlled the FIM Entities.[61]

---

[53] Compl. ¶¶ 5, 110-12.

[54] Compl. ¶¶ 104-06, 110.

[55] Compl. ¶¶ 104, 110-12.

[56] Compl. ¶¶ 5, 84-85, 110.

[57] Compl. ¶ 35.

[58] This information was reflected in FIM Limited's Annual Returns filed with Companies House, an agency of the UK government responsible for the incorporation of limited companies in England and Wales and for holding information which companies are under a statutory obligation to file, such as accounts, shareholder and director details, and financial information.  The FIM Limited Annual Returns are publicly available at http://wck2.companieshouse.gov.uk/ (follow "Order information on this company;" the reports are available under the header "Type" of "363a"), and are properly subject to judicial notice.  *See* Fed. R. Evid. 201; *Refco Group Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654(RA), 2014 WL 2610608, at *15 & n.16 (S.D.N.Y. June 10, 2014) (relationships between defendant entities detailed in regulatory filings are the proper subject of judicial notice, as they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned") (quoting Fed. R. Evid. 201(b)(2)); *Foreign Exchange Benchmark Rates*, 2015 WL 363894, at *3-4 & n.4 (taking judicial notice of information obtained by various governments' agencies); *see also supra* notes 13, 27.  *See, e.g.*, Ex. A to Zeballos Decl. (FIM Limited Annual Return (July 9, 2007)).

[59] Compl. ¶ 36.

[60] Compl. ¶¶ 5, 35-37.  This information was reflected in audited Reports and Financial Statements FIM Limited and FIM Advisers filed annually with Companies House.  The FIM Reports and Financial Statements are publicly available at http://wck2.companieshouse.gov.uk/ (follow "Order information on this company;" the reports are available under the header "Type" of "AA"), and are properly subject to judicial notice.  *See supra* notes 13, 27, 58.  The FIM Limited financial statements provided consolidated financial information on its subsidiaries, including FIM Advisers and FIM (USA).

[61] Compl. ¶¶ 5, 35-37.  The FIM Limited consolidated financial statements expressly stated that "FIM Limited is jointly owned and controlled by C Grosso and F Ceretti."  *See, e.g.*, Ex. B to Zeballos Decl. (FIM Limited Report and Financial Statements (Dec. 31, 2007)); Ex. C to Zeballos Decl. (FIM Advisers LLP's Report and Financial Statements (Dec. 31, 2007)).  Certain officers and directors of the FIM Entities overlapped, including Thomas Healy, who was secretary of FIM Limited, a member of FIM Advisers, and a director of FIM (USA), and Scott Dragoo, who was a member of FIM Advisers and a director of FIM (USA).  *Id.*  Ex. D to Zeballos Decl. (FIM Advisers LLP's Report and Financial Statements (Dec. 31, 2008)).

Ceretti and Grosso selected HSBC, a Bermuda bank, as custodian for the Kingate Funds.[62]  HSBC was a familiar custodian for feeder funds to BLMIS and has been named as a defendant in other proceedings commenced by the Trustee.[63]  HSBC received and held the Kingate Funds' subscription money[64] and transferred the Kingate Funds' investment money to BLMIS in U.S. dollars.  Ceretti and Grosso also engaged Citi Hedge, based in Bermuda, as administrator.[65]  Citi Hedge had a connection to FIM, as the chief operating officer of FIM Limited, Thomas Healy, was formerly with Hemisphere, a predecessor of Citi Hedge.[66]  Citi Hedge's role in the Kingate Enterprise was to review and verify the purported trading information obtained from BLMIS, including in customer statements and trade confirmations,[67] and calculate the Kingate Funds' net asset value ("NAV")[68] based on that information.[69]

Ceretti and Grosso deposited a portion of the Transfers for their own and their family members' personal benefit into their respective Trusts, each formed in Jersey.[70]  Ceretti and Grosso formed their respective Shell Companies, which they also controlled and, as to the

---

[62] Compl. ¶¶ 79-80.

[63] *See, e.g.*, *Picard v. HSBC Bank PLC*, Adv. Pro. No. 09-01364 (SMB) (Bankr. S.D.N.Y.); *Picard v. Primeo Fund*, Adv. Pro. No. 09-01366 (SMB) (Bankr. S.D.N.Y.); *Picard v. Herald Fund SPC*, Adv. Pro. No. 09-01359 (SMB) (Bankr. S.D.N.Y.)

[64] Compl. ¶¶ 80, 242-44.

[65] Compl. ¶¶ 72-73.

[66] Compl. ¶ 144.  Hemisphere was the administrator in 2000, and at that time was wholly owned by Mutual Risk Management Ltd., a public company listed on the New York Stock Exchange.  *See* Mut. Risk Mgmt. Ltd., Annual Report (Form 10-K/A) (Apr. 27, 2000).  This document is publicly available at http://www.sec.gov/edgar/searchedgar/companysearch.html (search "Mutual Risk Management Ltd;" the document is available under the header "Filings" of "10K/A" and header "Filing Date" of "2000-04-27"), and is properly subject to judicial notice.  *See supra* notes 13, 27, 58.  The ownership of Hemisphere by Mutual Risk Management Ltd. also is reflected in the Information Memoranda.  Compl. ¶ 47.

[67] Compl. ¶¶ 6, 144, 161.

[68] The Kingate Funds' Information Memoranda to prospective investors defined, in relevant part, the Kingate Funds' NAV as generally "equal to the Fund's assets less the Fund's liabilities and any accrued but unpaid expenses and reasonable reserves that have not yet been charged.  Expenses, fees and other liabilities will be determined in accordance with U.S. Generally Accepted Accounting Principles.  The Net Asset Value will be calculated as of the close of business in New York on the last Business Day of each month or on such other date when such computation is necessary or appropriate. . . ."  Compl. ¶ 47 (May 1, 1000 Kingate Global Info. Mem. "Net Asset Value" at KGFSAD0001774-75; May 1, 2000 Kingate Euro Info. Mem. "Net Asset Value" at KGFSAD0000944; *see also id.* 143-44.

[69] Compl. ¶ 144.

[70] Compl. ¶¶ 54, 59-61, 63, 67-68, 71.

Trusts, the Investment Shells, and the Holding Companies, beneficially owned.[71]  The Trusts,

together with the Trustees,[72] and the other Shell Companies were key components of the Kingate

Enterprise, receiving portions of the Transfers from KML,[73] and enabling Ceretti and Grosso to

shield the Transfers they received from the reach of their and their respective family members'

creditors.

The Transferee Defendants each played a role in maintaining the flow of funds to and

from BLMIS, enriching themselves in the process.[74]

**B.**     **BLMIS Performed Investment Adviser, Investment Custodian, and
Broker/Dealer Functions for the Kingate Enterprise That Were Governed by
U.S. Law.**

The Kingate Funds' sole business was investing with BLMIS's IA Business in New

York.[75]  Despite having a registered address in the BVI, the Kingate Funds had no physical

offices, no employees, and transacted no meaningful business there.  To do business with

BLMIS, KML and the Kingate Funds each signed and delivered to BLMIS certain agreements

authorizing BLMIS to invest for the Kingate Funds.[76]  Each of the Kingate Funds filed a

customer claim with the Trustee based on that customer relationship.[77]  The agreements between

the Kingate Funds and BLMIS were expressly subject to U.S. law, and disputes under them had

to be resolved in the U.S.[78]  Pursuant to the agreements, KML and the Kingate Funds delegated

---

[71] Compl. ¶¶ 54, 61, 63, 69-71.

[72] The Ashby Trust's trustee, First Peninsula Trustees Limited, was formed in Liberia.  Compl. ¶ 66.  El Prela
Trust's trustee, Alpine Trustees Limited and Port of Hercules Trustees Limited, were formed in Liberia and the BVI,
respectively.  Compl. ¶¶ 57-58.

[73] Compl. ¶¶ 59-61, 63, 67-68, 70-71, 86.

[74] *See supra* note 38.

[75] Compl. ¶¶ 93, 96.

[76] The Kingate Funds each opened an account with BLMIS in New York and signed and delivered to BLMIS in
New York a Customer Agreement, Option Agreement, and Trading Authorization Limited to Purchases and Sales of
Securities and Options.  Compl. ¶¶ 39, 41.

[77] Claim Nos. 15359 and 15358.  Compl. ¶ 90.

[78] The Kingate Funds' Customer Agreements provided that all transactions in the Customer's Account must be
subject "(a) to the provisions of (1) the Securities Exchange Act of 1934, . . . and (2) the Commodities Exchange
Act; . . . and (b) to the rules and regulations of (1) the Securities and Exchange Commission, (2) the Board of

investment management and custody of the Kingate Funds' investment assets to BLMIS.[79]

BLMIS served as the Kingate Funds' agent[80] to take custody of the Kingate Funds' subscription

---

Governors of the Federal Reserve System and (3) the Commodities Futures Trading Commission," thereby contractually accepting the application of U.S. law to govern their commercial activities. *See* Compl. ¶¶ 39 (Kingate Global Customer Agreement "Applicable Rules and Regulations" at KGFSAC0000638), 41 (Kingate Euro Customer Agreement "Applicable Rules and Regulations" at FADSC0008884).  The Customer Agreements also provided that any controversies between BLMIS and the Kingate Funds must be determined by arbitration under the Federal Arbitration Act, to be conducted in the U.S. "before the American Arbitration Association, or before the New York Stock Exchange, Inc., or an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule making board and in accordance with the rules obtaining of the selected organization."  Compl. ¶¶ 39 (Kingate Global Customer Agreement "Arbitration" at KGFSAC0000640), 41 (Kingate Euro Customer Agreement "Arbitration" at FADSC0008886).

[79] Compl. ¶ 47 (May 1, 2000 Kingate Global Info. Mem. "Dependence on the Investment Advisor" at KGFSAD0001788 ("[A]ll investment management duties with regard to [Kingate Global's assets] [are delegated] to the Investment Advisor [(i.e., BLMIS)]"), "Possibility of Fraud or Misappropriation" at KGFSAD0001793 ("Neither the Fund nor the Custodian [i.e., HSBC] have actual custody of the assets," and "[s]uch actual custody rests with the Investment Advisor and its affiliated broker-dealer."); May 1, 2000 Kingate Euro Info. Mem. "Dependence on the Investment Advisor" at KGFSAD0000957 ("[A]ll investment management duties with regard to [Kingate Euro's assets] [are delegated] to the Investment Advisor [(i.e., BLMIS)]"), "Possibility of Fraud or Misappropriation" KGFSAD0000961 ("The Fund will not have actual custody of the assets.  Such actual custody rests with the Investment Advisor . . . .").  The Management Agreement between Kingate Global and KML dated January 1, 2006 also provided that "the Manager has delegated responsibilities as follows . . . To Madoff, investment advisory activities and custody services . . . ."  Compl. ¶ 114 (Kingate Global Mgmt. Agreement dated Jan. 1, 2006 5.9(d) at KGFSAA0000238).  That agreement provided that, "As of the date hereof, custody of substantially all of the Fund's assets is in custody with Bernard Madoff Investment Securities LLC, a New York financial institution ('Madoff'). The Manager has no custody of any of the Fund's assets."  *Id.* (Kingate Global Mgmt. Agreement dated Jan. 1, 2006 2.2 at KGFSAA0000231).  Likewise, the Kingate Euro Manager Agreement dated May 1, 2000 provided that "It is expected that investment management functions . . . will be assigned and delegated to Bernard L. Madoff Investment Securities, a New York based NASD registered broker-dealer," and that, "[u]pon a proper delegation, the Manager shall be relieved of any responsibility for the acts or omissions of such delegate."  Compl. ¶¶ 46, 106, 111, 114 (Kingate Euro Manager Agreement dated May 1, 2000 2.6 at KGFSAA0000246).

[80] The Kingate Funds' Trading Authorizations authorized BLMIS to act as the Kingate Funds' "agent and attorney-in-fact" (Compl. ¶¶ 39 (Kingate Global Trading Authorization Limited to Purchases and Sales of Securities and Options at KGFSAC0000635), 41 (Kingate Euro Trading Authorization Limited to Purchases and Sales of Securities and Options at FADSAC0008881), and implement the Kingate Funds' investment strategy, as set forth in the Memoranda in the Kingate Funds' Information Memoranda (Compl. ¶ 47).  Moreover, the Kingate Funds' Information Memoranda clearly stated that the Investment Advisor, i.e., BLMIS would have unfettered control over investment and trading.  Compl. ¶ 47 (May 1, 2006 Kingate Global Info. Mem. "Dependence on the Investment Advisor" at KGFSAD0001710 ("Neither the Manager nor USD Shareholders have any control over the investment and trading decisions of the Investment Advisor, and no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to the selected Investment Advisor . . . ."); May 1, 2006 Kingate Euro Info. Mem. "Dependence on the Investment Advisor" at KGFSAD0001006 ("Neither the Manager nor the Shareholders have any control over the investment and trading decisions of the Investment Advisor, and no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to the selected Investment Advisor . . . .")).  Ceretti and Grosso controlled the Shell Companies (Compl. ¶¶ 54-71) and controlled KML and the subsequent transfers of BLMIS customer property KML made to FIM, the Service Providers, and the Shell companies.  *See infra* at 7-9; *see also supra* note 38.  The subscribers in the Kingate Funds were put on notice that BLMIS's control over investments could result in delayed or suspended redemptions.  Compl. ¶ 47 (May 1, 2000 Kingate Global Info. Mem. "Redemptions" at KGFSAD0001805-06; May 1, 2000 Kingate Euro Info. Mem. "Redemptions" at KGFSAD0000973).  Subsequent transfers to all of the Transferee Defendants were equally subject to such delays.  Compl. ¶¶ 253-261.

money in New York,[81] and to implement the split-strike conversion investment strategy in New

York[82] by purchasing U.S. securities traded exclusively on U.S. exchanges.[83]  Each of the

Transferee Defendants knew that BLMIS's investment strategy purportedly involved purchasing

U.S. securities traded only on U.S. exchanges and that BLMIS in New York performed

investment advisory, custody, and reporting services regarding the Kingate Funds' invested

assets.[84]

### C.    The Core of the Kingate Enterprise Was in New York.

[81] Compl. ¶¶ 47, 88, 218.  *See In re Maxwell Commc'n Corp.*, 186 B.R. 807, 817 (S.D.N.Y. 1995) (analyzing as a component event of the transaction *where* the parties entered into their related transactions).

[82] Compl. ¶¶ 25-26.

[83] Compl. ¶¶ 25-26; *see also* ¶ 47 (May 1, 2006 Kingate Global Info. Mem. "The Investment Advisor" at KGFSAD0001719 ("The investment advisor is a New York based NASD registered broker-dealer . . . . and has managed the assets of the Fund since its inception."); May 1, 2006 Kingate Euro Info. Mem. "The Investment Advisor" at KGFSAD0001015 (same); May 1, 2006 Kingate Global Info. Mem. "Investment Process" at KGFSAD0001707 (investment advisor utilizes a "'split-strike conversion' strategy" entailing the purchase and sale of S&P stocks and options); May 1, 2006 Kingate Euro Info. Mem. "Investment Process" at KGFSAD0001002 (same); Kingate Global May 1, 2006 Info. Mem. "Temporary Investments" at KGFSAD0001708 (investment advisor may invest in U.S. government securities); May 1, 2006 Kingate Euro Info. Mem. "Temporary Investments" at KGFSAD0001015 (same); May 1, 2006 Kingate Global Info. Mem. "Trading Strategies of the Investment Advisor" at KGFSAD0001710 ("The Fund is a single-advisor fund and the overall success of the Fund depends upon the ability of the Investment Advisor to be successful in its own strategy."); May 1, 2006 Kingate Euro Info. Mem. at KGFSAD0001006 (same)).  As stated expressly in Kingate Global's Information Memoranda, the currency in which Kingate Global maintained its books, records, and financial statements and invested its assets was the U.S. dollar.  While Kingate Euro's books and records relied on the Euro, its investments with BLMIS likewise were transacted in "U.S. dollar-denominated securities."  *See supra* note 35.

[84] *See supra* notes 79-80.  Ceretti, Grosso, KML, FIM, Citi Hedge, and HSBC all were aware of the contents of Information Memoranda and the management agreements.  Ceretti and Grosso helped prepare the Information Memoranda.  Compl. ¶¶ 47, 83, 86-87, 96.  Ceretti and Grosso controlled their respective Shell Companies.  *See supra* note 71.  The Information Memoranda incorporated referenced agreements, including the Management Agreement.  Compl. ¶ 47 (May 1, 2006 Kingate Global Info. Mem. "Summary" at KGFSAD0001694 (information memorandum "should be read in conjunction with . . . the documents and agreements referred to herein, all of which are available from the Administrator upon request); May 1, 2006 Kingate Euro Info. Mem.  "Summary" at KGFSAD0000989 (same)); May 1, 2006 Kingate Global Info. Mem. at KGFSAD0001718 (referencing the Kingate Global Mgmt. Agreement dated Jan. 1, 2006); May 1, 2006 Kingate Euro Info. Mem. at KGFSAD0000990, KGFSAD0001014 (referencing the Kingate Euro Manager Agreement dated May 1, 2000).  Moreover, the Management Agreement to which KML was a party, the Consulting Services Agreement to which FIM was a party, the Administration Agreement to which Citi Hedge was a party, and the Custodian Agreement to which HSBC was a party all expressly incorporated and were subject to the Information Memoranda.  *See, e.g.*, Compl. ¶ 114 (Kingate Global Mgmt. Agreement dated Jan. 1, 2006 4.2 at KGFSAA0000232 (shares offered at price and on terms and conditions set forth in Information Memorandum), 4.4 at KGFSAA0000232 ("The Manager shall deliver, or arrange for the delivery by any authorized dealer selected by the Manager, to each person to whom Shares are offered a copy of the Fund's most recently published Information Memorandum . . . ."); Compl. ¶ 112 (April 23, 2001 Distribution Agreement between KML and FIM Limited relating to Kingate Euro dated April 23, 2001 1 at KGFSAC0000730); Compl. ¶ 73 (Administration Agreement between Kingate Euro, KML, and Hemisphere Management Limited dated May 1, 2000 at KGFSAC0000173); Compl. ¶ 80 (Custodian Agreement between Kingate Euro and HSBC dated May 1, 2000 "Interpretation" at FADSBB0000004).

Tremont Limited, the co-manager with KML of Kingate Global for approximately 10 years,[85] was formed in Bermuda, but was itself managed from New York[86] by employees of Tremont Partners, Inc., a related Connecticut corporation registered with the SEC under the Investment Advisers Act of 1940.[87]  Tremont Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation.[88]  Michael Tannenbaum, Esq., with the New York law firm of Tannenbaum Helpern, was one of KML's directors located in New York.[89]  Mr. Tannenbaum actively performed executive functions for KML, such as signing on behalf of KML the co-manager agreement entered into among KML, Tremont Limited, and Kingate Global.[90]  Suzanne Hammond, based in New York, signed the co-manager agreement on Tremont Limited's behalf.[91]  During Tremont Limited's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to the Kingate Funds in return for a fee, it was a valuable contributor in New York to the success of the Kingate Enterprise.

KML performed its management role for the Kingate Funds in consultation with the FIM Entities.[92]  KML appointed BLMIS as KML's agent, giving KML itself a presence in New York.[93]  Although FIM had a London address, Eric Lazear, FIM's head of due diligence for

---

[85] Compl. ¶¶ 106, 113.

[86] *See Picard v. Tremont Group Holdings, Inc.*, Adv. Pro. No. 10-05310 (BRL) (Bankr. S.D.N.Y.) (Doc. 4 ¶ 1).

[87] *See Tremont*, Adv. Pro. No. 10-05310 (Doc. 4 ¶¶ 47-51).

[88] *See Tremont*, Adv. Pro. No. 10-05310 (Doc. 4 at 21-22 & ¶ 46).

[89] The Kingate Funds' Information Memoranda list Michael Tannenbaum as a director of KML. Compl. ¶ 47 (May 1, 2000 Kingate Global Info. Mem. "The Co-Managers" at KGFSAD0001796; May 1, 2000 Kingate Euro Info. Mem. "Management" at KGFSAD0000965).

[90] Compl. ¶¶ 106, 113-14 (Co-Manager Agreement between KML and Kingate Global dated July 1, 2004 at KGFSAC0000676).

[91] Compl. ¶¶ 106, 114 (Co-Manager Agreement between Tremont Limited and Kingate Global dated July 1, 2004 at KGFSAA0000365).

[92] Compl. ¶¶ 84, 85, 110.

[93] Compl. ¶¶ 46-47.  *Cf. Cutco Indus., Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) (an agent's jurisdictional contacts are attributable to a principal for personal jurisdiction purposes); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 55 (1st Cir. 2002) (same).  BLMIS's appointment as KML's agent was

feeder fund investments, such as the Kingate Funds' investments with BLMIS, was located in

New York working with FIM (USA)[94] at its principal place of business in New York.[95]  In

addition to being the hub for FIM's feeder fund due diligence, FIM (USA) performed

monitoring, research, and investor solicitation services for the Kingate Funds.[96]  FIM (USA) was

part of the FIM family of companies,[97] and part of the Kingate Enterprise in New York

performing services for KML and the Kingate Funds.[98]  Ceretti, Grosso, KML, and the FIM

Entities actively participated in the Kingate Funds' business with BLMIS.[99]  In addition to the

services that FIM (USA) performed, Ceretti, Grosso, KML, and FIM reviewed and verified

BLMIS customer statements and trade confirmations reflecting BLMIS's purported investment

performance in domestic securities for the Kingate Funds' investments in New York.[100]  Ceretti

and Grosso, who were part of Madoff's inner circle,[101] met regularly with Madoff in New York

and communicated with BLMIS by phone to carry out the business of the Kingate Enterprise.[102]

During those meetings and telephone calls, Ceretti, Grosso, and Madoff discussed BLMIS's

performance for the Kingate Funds and Madoff's strategy.[103]

---

reflected, for example, in Kingate Global's May 1, 2000 Information Memorandum ("Dependence on the
Investment Advisor" at KGFSAD0001788 (stating that "[KML and Tremont Limited] have delegated all investment
management duties with regard to [Kingate Global's assets] to the Investment Advisor [(i.e., BLMIS)])).  Compl. ¶
47; see also Compl. ¶ 114 (Kingate Global Management Agreement dated Jan. 1, 2006 5.9(d) at KGFSAA0000238
(stating that KML has delegated "[t]o Madoff" responsibilities for "investment advisory activities and custody
services")).
[94] Compl. ¶¶ 84, 132-34.
[95] Compl. ¶ 37.
[96] Compl. ¶¶ 84-85, 124.
[97] Compl. ¶¶ 37, 84-85.  Ex. B to Zeballos Decl. (FIM Limited Report and Financial Statements (Dec. 31, 2007) at
15).
[98] Compl. ¶¶ 37, 84-85, 123, 132-34.
[99] Compl. ¶¶ 6-7, 47, 51-52, 84-85, 96, 98-103, 106, 110-12, 115-18, 146, 166, 170-71, 184.
[100] Compl. ¶¶ 6, 24, 141, 146, 166, 170-71, 184.
[101] Compl. ¶ 98.
[102] Compl. ¶¶ 87, 99-101.  Moreover, all of the Transferee Defendants and/or their agents communicated directly
with BLMIS in New York or with FIM (USA) in New York.  Compl. ¶ 83.
[103] Compl. ¶¶ 87, 99.  Grosso also participated in over 200 phone calls with Jonathan Greenberg of Cohmad
Securities Corp., an entity that was co-owned by Madoff in New York and that, like the Kingate Funds, referred
billions of dollars in investments to BLMIS.  Compl. ¶ 103.  Grosso's contacts with Madoff-owned Cohmad in New

Citi Hedge,[104] well-known to Ceretti and Grosso, was brought into the Kingate Enterprise through agreements with KML and the Kingate Funds.[105]  Citi Hedge's founder was the president and a director of KML at the time.[106]  Citi Hedge was the Kingate Funds' agent.[107] KML also engaged HSBC, which is a major international financial institution doing business in the U.S.[108]  In its role as the Kingate Funds' custodian, HSBC consistently used New York banks in carrying out its duties for KML and the Kingate Funds[109] relating to investments with BLMIS.[110]  Representatives of HSBC conducted due diligence on BLMIS's IA Business in New York that facilitated the success of the Kingate Enterprise.[111]

> ### D.    In Economic Reality, the Transfers Resulted From the Kingate Enterprise's Relationship With BLMIS in New York.

The labyrinthine structure of the Kingate Enterprise, which Ceretti and Grosso created using entities formed in sometimes remote and non-transparent jurisdictions, does not change the fact that the economic base of the structure that gave rise to the Transfers was New York. BLMIS's performance of Madoff's investment strategy in U.S. securities was the attraction for

---

York provided Grosso with additional information about Madoff's investment strategy and other business arrangements he had.

[104] Citi Hedge is indirectly owned by Citigroup, Inc. and is affiliated with Citi Hedge Fund Services, Inc.  Compl. ¶ 91; *Picard v. Ceretti, et al.*, Case No. 11-cv-07256 (S.D.N.Y.) (Doc. 4).  Both Citigroup, Inc. and Citi Hedge Fund Services, Inc. are Delaware corporations registered to do, and doing, business in New York.  Compl. ¶ 91; *Picard v. Ceretti, et al.*, Case No. 11-cv-07256 (S.D.N.Y.) (Doc. 4).

[105] Compl. ¶¶ 73-78.

[106] Compl. ¶¶ 73-78, 47 (May 1, 2000 Kingate Global Info. Mem. "Management" at KGFSAD0001795).

[107] Compl. ¶¶ 47, 73-78, 142-43.

[108] Compl. ¶¶ 79-80 (Custodian Agreement between Kingate Global, HSBC, and KML dated March 1, 1994 at FADSAC0060006, FADSAC0060020-21).

[109] *See Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (for personal jurisdiction purposes, "complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States.") (quoting *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012)); *see also Picard v. Estate (Succession) of Igoin*, 525 B.R. 871, 885-86 (Bankr. S.D.N.Y. 2015) (same).  In *Licci*, the "frequency and deliberate nature of [defendant's] use of its correspondent account" were "determinative" in the Court's finding that defendant purposefully availed itself "of the privilege of doing business in the New York forum."  *Licci*, 732 F.3d at 168.

[110] Compl. ¶¶ 88, 92.

[111] Compl. ¶¶ 80, 225.

subscribers to the Kingate Funds.[112]  KML and FIM were compensated in fees, generally payable

monthly, that were a percentage of the Kingate Funds' NAV invested with BLMIS in New York

and that consisted of customer property taken from New York.[113]  Under KML's agreement with

FIM,[114] FIM did not charge the Kingate Funds a separate fee for the services rendered by FIM

(USA) in New York, and FIM was paid a portion of the fee KML received from the Transfers.[115]

Citi Hedge received a portion of the Transfers in the form of fees that also represented a

percentage of the Kingate Funds' NAV invested with BLMIS.[116]  Likewise, HSBC received a

portion of the Transfers as compensation in fees based upon a percentage of the Kingate Funds'

gross asset values with BLMIS in New York.[117]  The Transfers that KML, FIM, and the Service

Providers received compensated them for the respective roles they played in the Kingate

Enterprise's investment relationship with BLMIS.

The amount of KML's, FIM's, Citi Hedge's, or HSBC's fees was not determined by the

scope or complexity of, or the time allotted to, the services they rendered.  Even though FIM

(USA) performed services in New York and the fee payments to FIM at FIM's direction were

routinely routed directly or indirectly through a bank account in New York,[118] the Transfers that

KML, FIM, and the Service Providers received also were not dependent upon *where* the services

---

[112] Compl. ¶¶ 2, 47; *see supra* notes 83-84 (Information Memoranda and agreements describe BLMIS's performance of Madoff's investment strategy in U.S. securities for the Kingate Funds).  The subscribers in the Kingate Funds, too, all were aware of the contents of the Information Memoranda, which were referenced in the subscription agreements accompanying the Information Memoranda.  Compl. ¶ 47 (May 1, 2000 Kingate Global Info. Mem. enclosing Subscription Agreement at KGFSAD0001816 (The subscriber "acknowledges having received, reviewed and understood" the accompanying Information Memorandum.); May 1, 2000 Kingate Euro Info. Mem. accompanying Subscription Agreement at KGFSAD0000982 (same).  Likewise, the subscribers were on notice of the agreements referenced in the Information Memoranda.  *See supra* notes 83-84.

[113] Compl. ¶¶ 8, 47 (May 1, 2000 Kingate Global Info. Mem. "Fees and Expenses" at KGFSAD0001800-01; May 1, 2000 Kingate Euro Info. Mem. "Fees and Expenses" at KGFSAD0000968-69), 107-10, 247-61.

[114] Compl. ¶ 110.

[115] Compl. ¶¶ 89, 110; *see also* Compl. 47 (May 1, 2000 Kingate Global Info. Mem. "Fees and Expenses" at KGFSAD0001800-01; May 1, 2000 Kingate Euro Info. Mem. "Fees and Expenses" at KGFSAD0000968-69).

[116] Compl. ¶ 145.

[117] Compl. ¶¶ 47 (May 1, 2000 Kingate Global Info. Mem. "Fees and Expenses" at KGFSAD0001800-01), 80, 245-46, 258.

[118] Compl. ¶¶ 89.

were performed.  The Transfers received by KML, FIM, Citi Hedge, and HSBC were directly

based upon the Kingate Funds' assets under the management and in the custody of BLMIS in

New York.  The Transfers were created from and existed because of the Kingate Enterprise's

relationship with BLMIS.  And the Complaint alleges that but for the Transfers that money

would have been part of BLMIS's customer property estate.[119]

As ultimate owners of KML and FIM, Ceretti and Grosso profited from the fees paid for

the management and consultancy services performed for the Kingate Funds, whether in the form

of dividends, draws, member remunerations, loans, repayment of capital, or other payments.[120]

The Shell Companies and Ceretti and Grosso, through their ownership interests and as

beneficiaries, would not have been enriched by the Transfers to the Shell Companies but for the

Kingate Enterprise's exclusive business relationship with BLMIS.  Ceretti's and Grosso's Trusts

owned their respective Holding Companies and Investment Shells.[121]  No entity in the Kingate

Enterprise acted independently from Ceretti and Grosso.[122]

In sum, although Ceretti and Grosso reside abroad, and the corporate members of the

Kingate Enterprise were incorporated or formed abroad, the Kingate Enterprise flourished for 14

years due to the component events that depended upon:  BLMIS's New York IA Business;

BLMIS's split strike conversion strategy that involved exclusively U.S. securities listed on U.S.

exchanges and attracted billions of investment dollars into the Kingate Funds; BLMIS's

---

[119] Compl. ¶¶ 8, 247-61, 317-321.
[120] Compl. ¶¶ 5, 45, 50-51, 54, 60, 63, 67-68, 110, 253-56; *see also, e.g.*, Ex. B to Zeballos Decl. (FIM Limited Report and Financial Statements (Dec. 31, 2007)).  As owners of FIM Limited and members of FIM Advisers, Ceretti and Grosso were entitled to receive profit allocations.  *See, e.g.*, Ex. B to Zeballos Decl. (FIM Limited Report and Financial Statements (Dec. 31, 2007)); Ex. A to Zeballos Decl. (FIM Limited Annual Return (July 9, 2007)).
[121] Compl. ¶¶ 54, 59, 61, 63, 67, 71.
[122] Compl. ¶¶ 5, 36-37, 45, 54, 59, 61, 63, 67, 69-73, 80, 131, 144, 225; Ex. B to Zeballos Decl. (FIM Limited Report and Financial Statements (Dec. 31, 2007)); Ex. C to Zeballos Decl. (FIM Advisers LLP's Report and Financial Statements (Dec. 31, 2007)); Ex. E to Zeballos Decl. (Certificate of Dissolution of FIM (USA) Inc., filed with the Delaware Secretary of State (June 8, 2009)).

management and custody of the Kingate Funds' assets in New York; BLMIS's initial transfers of

customer property to the Kingate Funds, from which the Transfers to the Transferee Defendants

were made; exclusive investments with BLMIS in U.S. dollars, necessitating a course of dealing

with New York banks; BLMIS-issued customer statements and trade confirmations in New York

that formed the basis for calculating the Kingate Funds' NAV and the fees, dividends, and other

payments to the Transferee Defendants; [123] and operational, administrative, marketing, and due

diligence services performed in New York.  When BLMIS ceased operating, so did the Kingate

Enterprise.  The Transfers made to the Transferee Defendants were wholly dependent upon

Madoff's Ponzi scheme and caused injury in New York by prolonging Madoff's fraud and

reducing BLMIS's customer property estate.[124]  The component events in this proceeding are

domestic.

## II.    The Transferee Defendants Had Every Reason to Expect That They Would Be Subject to U.S. Law and Involved in Litigation in New York.

Compliance with U.S. law was expressly required under the Kingate Funds' Information

Memoranda:  "the Fund[s] and the Investment Advisor must comply with various legal

requirements, including requirements imposed by the federal securities laws, tax laws, and

pension laws."[125]  The Information Memoranda also stated that Michael Tannenbaum, Esq., was

legal counsel to the Kingate Funds, Tremont Limited, KML, and FIM on matters involving U.S.

law.[126]  In addition to being a director of KML, Mr. Tannenbaum also was a director of FIM

---

[123] Compl. ¶¶ 6, 144, 161.
[124] Compl. ¶ 331.  *Cf. Igoin*, 525 B.R. at 885 (finding personal jurisdiction where conduct caused injury in New York).
[125] Compl. ¶ 47 (May 1, 2000 Kingate Global Info. Mem. "Changes in Applicable Law" at KGFSAD0001793; May 1, 2000 Kingate Euro Info. Mem. "Changes in Applicable Law" at KGFSAD0000962).
[126] Compl. ¶ 47 (May 1, 2000 Kingate Global Info. Mem. "Common Counsel" at KGFSAD0001794, "Potential Conflicts of Interest" at KGFSAD0001809, "Counsel" at KGFSAD0001811; May 1, 2000 Kingate Euro Info. Mem. "Common Counsel" at KGFSAD0000962, "Potential Conflicts of Interest at KGFSAD0000975, "Counsel" at KGFSAD0000979).

(USA).[127]  KML, FIM, Ceretti, and Grosso all were aware of the disclosures in the Information

Memoranda.[128]  And Ceretti and Grosso controlled the flow of BLMIS withdrawals through

KML to Ceretti's and Grosso's respective Shell Companies.[129]

KML's, FIM's, and the Service Providers' compensation resulted from the Kingate

Enterprise's investments with BLMIS in New York, and the role KML, FIM, and the Service

Providers played in the Enterprise.[130]  The Kingate Funds' customer relationship with BLMIS

was based upon agreements governed by U.S. law.[131]  The Transfers to Ceretti and Grosso and

their Shell Companies also resulted from the Kingate Funds' customer relationship with

BLMIS.[132]  For these reasons, the Transferee Defendants reasonably should have known that any

disputes relating to the Transfers would be resolved in New York.

In fact, Ceretti, Grosso, KML, and Citi Hedge purposely availed themselves of U.S. and

New York law[133] by seeking dismissal of state law securities fraud claims against them on the

grounds that they were barred under the Securities Litigation Uniform Standards Act of 1998

("SLUSA")[134] and that New York's Martin Act preempted those claims because a "substantial

portion of the events giving rise to the claim[s]" occurred in New York.[135]  Having invoked

---

[127] Ex. E to Zeballos Decl. (Certificate of Dissolution of FIM (USA) Inc., filed with the Delaware Secretary of State (June 8, 2009)).

[128] *See supra* note 84.

[129] *See infra* at 7-9; *see also supra* note 38.

[130] Compl. ¶¶ 4, 6, 8, 47, 110, 112, 121, 145, 161, 168, 247-61.

[131] *See supra* note 78.

[132] Compl. ¶¶ 8, 60, 68, 86, 254, 256.

[133] *See Igoin*, 525 B.R. at *885-87 (purposeful availment of New York and U.S. law may confer personal jurisdiction over defendants)

[134] Pub. L. No. 105-353, § 101, 112 Stat. 3227 (1998).

[135] *In re Kingate Mgmt. Ltd. Litig.*, No. 09-CV-5386 (DAB) (S.D.N.Y.) (Docs. 82 at 23-24, 97 at 21-22, 102 at 30-31, 111 at 25-27).  The Defendants' invocation of U.S. and New York law is sufficient to deny their attempt here to evade its reach.  In ruling on the motions to dismiss, Judge Batts accepted the Defendants' arguments and found that repleading the non-fraud claims would be futile because they would be preempted by the Martin Act.  *Id.* (Doc. 173 at 24-30 (concluding that the nexus with New York required for Martin Act preemption was satisfied).  Although the parties ultimately had agreed that Plaintiffs' claims were not preempted by the Martin Act, *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 154 & n.26 (2d Cir. 2015), the Second Circuit's ruling did not discuss, or reject, Judge Batts's findings that the transactions had a nexus with New York.  *Id.*  The Second Circuit remanded the case to the district

American law as entitling them to protection in connection with Madoff's Ponzi scheme, these Transferee Defendants cannot now be heard to argue that their transactions with Madoff are "extraterritorial" or that comity supports a dismissal. As discussed in this memorandum and based upon the legal authorities discussed in the Trustee's main brief, recovery of the Transfers is not barred by *Morrison* or the Extraterritoriality Decision.

Dated: June 26, 2015
New York, New York

/s/ David J. Sheehan
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Geraldine E. Ponto
Email:  gponto@bakerlaw.com
Marshall J. Mattera
Email:  mmattera@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*

---

court on grounds unrelated to the Martin Act, i.e., to determine whether Plaintiffs' claims fell within the terms of SLUSA's preclusion.  *Id.* at 153-54.

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>FEDERICO CERETTI, et al.,<br><br>Defendants. | Adv. Pro. No. 09-01161 (SMB) |

**DECLARATION OF GONZALO S. ZEBALLOS, ESQ. IN SUPPORT OF TRUSTEE'S
SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO CERTAIN
DEFENDANTS' MOTION TO DISMISS BASED ON EXTRATERRITORIALITY**

Gonzalo S. Zeballos, Esq. hereby declares as follows:

1.    I am a member of the Bar of the State of New York and this Court, and a partner at Baker

& Hostetler LLP, attorneys for the Trustee.

2.    I am fully familiar with the facts set forth herein based either upon my own personal

knowledge or information conveyed to me that I believe to be true.  I make this Declaration to

submit, for the Court's convenience and ease of reference, a true and correct copy of the

following documents:

      A.     Attached hereto as **Ex. A** is a true and correct copy of the Annual Return
dated July 9, 2007 of FIM Limited.

      B.     Attached hereto as **Ex. B** is a true and correct copy of the Report and
Financial Statement dated December 31, 2007 of FIM Limited.

      C.     Attached hereto as **Ex. C** is a true and correct copy of the Report and
Financial Statement dated December 31, 2007 of FIM Advisers LLP.

      D.     Attached hereto as **Ex. D** is a true and correct copy of the Report and
Financial Statement dated December 31, 2008 of FIM Advisers LLP.

      E.     Attached hereto as **Ex. E** is a true and correct copy of the Certificate of
Dissolution of FIM (USA) Inc. dated June 8, 2009 filed with the Delaware
Secretary of State.

     Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing

statements made by me are true and correct.

Dated: June 23, 2015
      New York, New York

                                    */s/ Gonzalo S. Zeballos____*
                                      Gonzalo S. Zeballos

# EXHIBIT A

# 363a(ef)



## Companies House
—— *for the record* ——

<div style="border:1px solid">

## Annual Return

</div>

*Company Name:*    **FIM LIMITED**

*Company Number:*    **01536755**

*Received for filing in Electronic Format on the:* **09/07/2007**

XBTRMR38

---

## Company Details

*Period Ending:* **30/06/2007**

*Company Type:* **PRIVATE COMPANY LIMITED BY SHARES**

*Principal Business Activities:*

SIC Codes
**6523**

| *Registered Office:*<br>*Address:* | *Register of*<br>*Members Address:* | *Register of Debenture*<br>*Holders Address:* |
|---|---|---|
| **20 ST JAMESS STREET**<br>**LONDON**<br>**SW1A 1ES** | **20 ST. JAMES'S STREET**<br>**LONDON**<br>**SW1A 1ES** | **Not Applicable** |

---

## Details of Officers of the Company

*Company Secretary:*

| *Name:* | **MR THOMAS HEALY** | *Address:* | **24 ST ANN'S TERRACE**<br>**ST. JOHN'S WOOD**<br>**LONDON   NW8 6PJ** |
|---|---|---|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

*Director 1:*

| *Name:* | **MR FEDERICO CERETTI** | *Address:* | **37 QUEENS GATE GARDENS**<br>**LONDON   SW7 5RR** |
|---|---|---|---|
| *Date of Birth:* | **12/01/1961** | | |
| *Nationality:* | **ITALIAN** | | |
| *Occupation:* | **COMPANY DIRECTOR** | | |

---

*Director 2:*

| | | | |
|---|---|---|---|
| *Name:* | **MR CARLO GROSSO** | *Address:* | **22 CATHCART ROAD** |
| *Date of Birth:* | **27/07/1944** | | **LONDON   SW10 9NN** |
| *Nationality:* | **ITALIAN** | | |
| *Occupation:* | **COMPANY DIRECTOR** | | |

## Share Capital

*Issued Share Capital Details:*

| Class of share | Number of shares issued | Aggregate nominal value of issued shares |
|---|---|---|
| **ORDINARY** | **100000** | **GBP100000** |
| *TOTALS* | **100000** | **GBP100000** |

## Full Details of Shareholders

The details below relate to individuals / corporate bodies that were shareholders as at 30/06/2007, or that had ceased to be shareholders since the made up date of the previous Annual Return.

*Shareholding 1:*

**50000 ORDINARY Shares held as at 30/06/2007**

*Name:* **FEDERICO CERETTI**

*Address:* **37 QUEENS GATE GARDENS**
**LONDON   SW7 5RR**

*Shareholding 2:*

**50000 ORDINARY Shares held as at 30/06/2007**

*Name:* **CARLO GROSSO**

*Address:* **27 CATHCART ROAD**
**LONDON   SW10 9NN**

## Authorisation

*Authoriser Designation:* **SECRETARY**  *Date Authorised:* **09/07/2007**  *Authenticated:* **Yes (E/W)**

# EXHIBIT B

# FIM Limited

**Report and Financial Statements**

31 December 2007

1536755



WEDNESDAY

"LKOZ7199"
LD4        09/07/2008        87
COMPANIES HOUSE

## FIM Limited

Registered No   1536755

### Directors
C Grosso
F Ceretti

### Secretary
T Healy

### Auditors
Ernst & Young LLP
1 More London Place
London SE1 2AF

### Bankers
HSBC Bank PLC
69 Pall Mall
London SW1Y 5EY

### Legal Advisors
Simmons & Simmons
CityPoint
One Ropemaker Street
London EC2Y 9SS

### Registered Office
20 St James's Street
London SW1A 1ES

FIM Limited

# Directors' report

The directors present their annual report and the financial statements of the group for the year ended 31 December 2007

## Principal activity and review of the business

The principal activity of the group is the provision of investment services   FIM Advisers LLP (the "LLP") is regulated by the Financial Services Authority

## Principal risks and uncertainties

In assessing its principal risks and uncertainties, the group has considered their potential impact, their likelihood, what controls it has in place and what steps it can take to mitigate such risks   The group's principal risks and uncertainties can be broadly grouped as - operational, business and financial/credit risk

### Operational Risk

The group has appropriate controls in place to manage its operational risk, including the loss of key staff, system failures, fraud/theft, failure to comply with taxation requirements and breach of regulatory rules and other legislation.

### Business Risk

The group  faces a number of potential business risks, including the loss of key advisory/management mandates, poor investment performance and changes in the regulatory environment

### Financial/Credit Risk

Whilst the group believes this risk to be minimal, it manages its business to limit undue client/counterparty exposure and ensure sufficient working capital exists

## Future developments

The group has no plans that will significantly change the nature of its activities

## Results and dividends

Retained profit for the year amounted to £2,228,353 (2006  £4,851,066)

No dividends were paid during the current year or prior year   The directors do not recommend the payment of a final dividend and the profit for the year is to be transferred to reserves

Shareholders' funds increased from £8,887,052 at 31 December 2006 to £11,173,568 at 31 December 2007.

## Directors

The directors in office during the year and as at the date of this report were as follows

C Grosso
F Ceretti

## Charitable contributions

During the year, the company made charitable contributions totalling £59,000 (2006  £54,000)

## Auditors

A resolution to reappoint Ernst & Young LLP as auditors will be put to the members at the Annual General Meeting  So far as the directors are aware, there is no relevant audit information of which the group's auditors are unaware  The directors have taken all steps that they ought to have taken as directors

FIM Limited

# Directors' report

in order to make themselves aware of any relevant audit information and to establish that the auditors are aware of this information

By order of the board

Director

1 July 2008

FIM Limited

# Statement of directors' responsibilities in respect of the financial statements

The directors are responsible for preparing the annual report and the financial statements in accordance with applicable United Kingdom law and United Kingdom Generally Accepted Accounting Practice.

Company law requires the directors to prepare financial statements for each financial year which give a true and fair view of the state of affairs of the company and of the group and of the profit or loss of the group for that period  In preparing those financial statements, the directors are required to

- select suitable accounting policies and then apply them consistently,

- make judgements and estimates that are reasonable and prudent, and

- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the company will continue in business

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the group and to enable them to ensure that the financial statements comply with the Companies Act 1985  They are also responsible for safeguarding the assets of the group and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities

# Independent auditors' report

**to the members of FIM Limited**

We have audited the group and parent company financial statements (the "financial statements") of FIM Limited for the year ended 31 December 2007 which comprise the Group Profit and Loss Account, the Group Statement of Total Recognised Gains and Losses, the Group and Company Balance Sheets, the Group Cash Flow Statement and the related notes 1 to 19  These financial statements have been prepared under the accounting policies set out therein

This report is made solely to the company's members, as a body, in accordance with Section 235 of the Companies Act 1985  Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditors' report and for no other purpose  To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed

## Respective responsibilities of directors and auditors

The directors' responsibilities for preparing the Annual Report and the financial statements in accordance with applicable United Kingdom law and Accounting Standards (United Kingdom Generally Accepted Accounting Practice) are set out in the Statement of Directors' Responsibilities

Our responsibility is to audit the financial statements in accordance with relevant legal and regulatory requirements and International Standards on Auditing (UK and Ireland)

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Companies Act 1985  We also report to you whether in our opinion the information given in the directors' report is consistent with the financial statements

In addition we report to you if, in our opinion, the company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit, or if information specified by law regarding directors' remuneration and other transactions is not disclosed

We read the directors' report and consider the implications for our report if we become aware of any apparent misstatements within it

## Basis of audit opinion

We conducted our audit in accordance with International Standards on Auditing (UK and Ireland) issued by the Auditing Practices Board  An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements  It also includes an assessment of the significant estimates and judgments made by the directors in the preparation of the financial statements, and of whether the accounting policies are appropriate to the group's and company's circumstances, consistently applied and adequately disclosed

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error  In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements

# Independent auditors' report

**to the members of FIM Limited** (continued)

## Opinion

In our opinion

- the financial statements give a true and fair view, in accordance with United Kingdom Generally Accepted Accounting Practice, of the state of the group's and the parent company's affairs as at 31 December 2007 and of the group's profit for the year then ended,

- the financial statements have been properly prepared in accordance with the Companies Act 1985, and

- the information given in the directors' report is consistent with the financial statements

*Ernst & Young LLP*

Ernst & Young LLP
Registered Auditor
London

*7 July 2008*

FIM Limited

# Group profit and loss account
**for the year ended 31 December 2007**

|  | Notes | 2007 £ | 2006 £ |
|---|---|---|---|
| *Income* | 2 | 27,284,025 | 17,068,464 |
| Administrative expenses |  | (12,605,458) | (8,977,486) |
| *Operating profit* | 3 | 14,678,567 | 8,090,978 |
| Interest receivable | 4 | 200,646 | 198,814 |
| *Profit on ordinary activities before taxation* |  | 14,879,213 | 8,289,792 |
| Tax (charge)/credit on profit on ordinary activities | 6 | (160,736) | 4,490 |
| *Profit on ordinary activities after taxation* |  | 14,718,477 | 8,294,282 |
| Distributions to minority interests |  | (12,490,124) | (3,443,216) |
| *Retained profit for the financial year* |  | 2,228,353 | 4,851,066 |

All amounts are in respect of continuing activities

# Group statement of total recognised gains and losses
**for the year ended 31 December 2007**

|  | 2007 £ | 2006 £ |
|---|---|---|
| Profit for the financial year | 2,228,353 | 4,851,066 |
| Exchange difference on retranslation of net assets of subsidiary undertakings | 58,163 | (158,259) |
| Total recognised gains and losses | 2,286,516 | 4,692,807 |

FIM Limited

# Group balance sheet
**at 31 December 2007**

| | Notes | 2007 £ | 2006 £ |
|---|---|---|---|
| **Fixed assets** | | | |
| Tangible assets | 7 | 377,430 | 347,599 |
| Investments | 8 | 51 | 51 |
| | | 377,481 | 347,650 |
| **Current assets** | | | |
| Debtors | 9 | 9,755,032 | 5,998,955 |
| Cash | | 6,782,275 | 6,413,825 |
| | | 16,537,307 | 12,412,780 |
| **Creditors:** amounts falling due within one year | 10 | (5,668,347) | (3,750,672) |
| **Net current assets** | | 10,868,960 | 8,662,108 |
| **Total assets less current liabilities** | | 11,246,441 | 9,009,758 |
| **Creditors** amounts falling due after more than one year | 11 | (36,873) | (87,706) |
| Minority interests | | (36,000) | (35,000) |
| **Net assets** | | 11,173,568 | 8,887,052 |
| **Capital and reserves** | | | |
| Share capital | 13 | 100,000 | 100,000 |
| Other reserves | 14 | (106,684) | (164,847) |
| Profit and loss account | 14 | 11,180,252 | 8,951,899 |
| **Shareholders' funds** | | 11,173,568 | 8,887,052 |

Signed on behalf of the Board

Director

1 July 2008

FIM Limited

# Company balance sheet
## at 31 December 2007

|  | Notes | 2007 £ | 2006 £ |
|---|---|---|---|
| **Fixed assets** |  |  |  |
| Tangible assets | 7 | 257,538 | 308,685 |
| Investments | 8 | 1,274,000 | 1,274,000 |
|  |  | 1,531,538 | 1,582,685 |
| **Current assets** |  |  |  |
| Debtors | 9 | 1,198,474 | 1,063,288 |
| Cash |  | 498,363 | 320,167 |
|  |  | 1,696,837 | 1,383,455 |
| **Creditors:** amounts falling due within one year | 10 | (1,360,299) | (1,024,015) |
| **Net current assets** |  | 336,538 | 359,440 |
| **Total assets less current liabilities** |  | 1,868,076 | 1,942,125 |
| **Creditors:** amounts falling due after more than one year | 11 | (36,873) | (87,706) |
| **Net assets** |  | 1,831,203 | 1,854,419 |
| **Capital and reserves** |  |  |  |
| Share capital | 13 | 100,000 | 100,000 |
| Profit and loss account | 14 | 1,731,203 | 1,754,419 |
| **Shareholders' funds** |  | 1,831,203 | 1,854,419 |

Signed on behalf of the Board

Director

1 July 2008

FIM Limited

# Group statement of cash flows
**for the year ended 31 December 2007**

|  | Notes | 2007 £ | 2006 £ |
|---|---|---|---|
| *Cash inflow from operating activities* | 15(a) | 12,109,147 | 5,624,243 |
| *Returns on investments and servicing of finance* | 15(b) | (11,471,346) | (2,946,802) |
| *Taxation* | 15(b) | (51,093) | (210,730) |
| *Capital expenditure* | 15(b) | (218,258) | (265,575) |
| *Increase in cash in the year* |  | 368,450 | 2,201,136 |

## Reconciliation of net cash flow to movement in net funds

|  | Notes | 2007 £ | 2006 £ |
|---|---|---|---|
| *Increase in cash in the year and change in net funds resulting from cash flows* | 15(c) | 368,450 | 2,201,136 |
| Movement in net funds in the year |  | 368,450 | 2,201,136 |
| Net funds at 1 January 2007 | 15(c) | 6,413,825 | 4,212,689 |
| *Net funds at 31 December 2007* | 15(c) | 6,782,275 | 6,413,825 |

FIM Limited

# Notes to the financial statements
### at 31 December 2007

## 1.    Accounting policies

The financial statements have been prepared under the historical cost convention and in accordance with applicable accounting standards

### Basis of consolidation

The group accounts consolidate the results of the company and its subsidiaries, disclosed in note 8, for the year ended 31 December 2007  The company is not required to present a separate profit and loss account as permitted by section 230 of the Companies Act 1985

### Depreciation of tangible fixed assets

Depreciation is provided at the following annual rates in order to write off each asset over its useful life

| | |
|---|---|
| Leasehold improvements | Over life of lease |
| Office equipment | 50% on cost |
| Furniture and fittings | 25% on cost |
| Computer software | 33% on cost |

### Investment in subsidiary undertakings

Shares in subsidiary undertakings are stated at cost less provision for any permanent diminution in value

### Other investments

Other investments are unlisted investments in funds included at cost and restated at the balance sheet date rate of exchange where acquired in foreign currency  Where a deficit to cost is thought to be a permanent diminution, it is taken to the profit and loss account

### Minority interest

Minority interest in the consolidated balance sheet represents the capital contributions in FIM Advisers LLP of members other than FIM Limited  Minority interests in the consolidated profit and loss account represents the share of profit of FIM Advisers LLP attributable to the members other than FIM Limited Profit allocations from FIM Advisers LLP are governed by the Limited Liability Partnership Agreement dated 29 July 2005 and the amendments within the supplemental deed dated 28 April 2006

### Foreign currencies

Assets and liabilities in foreign currencies are translated into sterling at the rates of exchange ruling at the balance sheet date  Transactions in foreign currencies are translated into sterling at the rate of exchange ruling at the date of the transaction  Exchange differences are taken into the profit and loss account for the year  Exchange differences on the translation of the opening balances of subsidiaries are taken to reserves

### Operating lease commitments

Lease payments under operating leases, where substantially all the risks and benefits remain with the lessor, are charged as expenses in the periods in which they are incurred

### Taxation and deferred taxation

Provision is made for corporation tax at the current rates on the excess of taxable income over allowable expenses  Provision is made for deferred tax on all material timing differences arising from the different treatment of items for accounting and tax purposes  A deferred tax asset is recognised only to the extent that it is more likely than not that there will be taxable profits in the future against which the asset can be offset

FIM Limited

# Notes to the financial statements
### at 31 December 2007

## 2. Income

All income is stated net of VAT and relates to one continuing activity being the supply of investment services to clients based in the United Kingdom, Europe and the Americas   Income is recognised on a receivable basis

## 3. Operating profit

|  | 2007 £ | 2006 £ |
|---|---|---|
| Operating profit is stated after charging |  |  |
| Depreciation of fixed assets | 188,931 | 155,020 |
| Auditors' remuneration |  |  |
|   Audit services | 78,824 | 60,466 |
|   Other services in relation to taxation | 193,148 | 138,786 |
| Operating lease rentals – land and buildings | 532,759 | 516,063 |
| (Gain)/loss on foreign currencies | (75,773) | 31,588 |

## 4. Interest receivable

|  | 2007 £ | 2006 £ |
|---|---|---|
| Interest received and receivable |  |  |
| Bank interest | 200,646 | 198,814 |

## 5. Staff costs and Directors' emoluments

|  | 2007 £ | 2006 £ |
|---|---|---|
| Staff costs |  |  |
| Wages and salaries | 3,716,674 | 2,763,646 |
| Social security costs | 214,619 | 313,821 |
| Pension | 3,979 | 878 |
|  | 3,935,272 | 3,078,344 |

|  | 2007 No | 2006 No |
|---|---|---|
| The average number of employees during the year was made up as follows |  |  |
| Management | 3 | 3 |
| Investment | 15 | 16 |
| Administration | 17 | 13 |
| Marketing | 5 | 6 |
|  | 40 | 38 |

|  | 2007 £ | 2006 £ |
|---|---|---|
| Directors' emoluments | – | – |

The highest paid director was paid £0 (2006 - £nil)

The directors are also Members of FIM Advisers LLP, and receive a profit allocation from that entity

12

FIM Limited

# Notes to the financial statements
**at 31 December 2007**

6.  **Tax on profit on ordinary activities**

(a)  Analysis of tax (credit)/charge for the year

| | 2007 £ | 2006 £ |
|---|---|---|
| UK Corporation tax | | |
| Current year | 29,135 | 23,318 |
| Prior year | 1,099 | (32,551) |
| Foreign taxation | 27,775 | 4,743 |
| Provision for prior period tax | 102,727 | – |
| | | |
| Total current tax – note 6(b) | 160,736 | (4,490) |
| | | |
| Deferred tax (see note 12) | – | – |
| | | |
| | 160,736 | (4,490) |

(b)  Factors affecting tax charge for year

| | 2007 £ | 2006 £ |
|---|---|---|
| Profit on ordinary activities before tax | 14,879,213 | 8,289,792 |
| | | |
| Tax on profits from ordinary activities at 30% (2006 – 30%) | 4,463,764 | 2,486,937 |
| | | |
| Effects of | | |
| Marginal relief | (3,608) | (4,477) |
| Adjustments in respect of previous periods | 1,099 | (32,551) |
| Adjustments in respect of profits of FIM Advisers LLP not taxable within the group | (4,403,246) | (2,454,399) |
| Provision for prior period tax | 102,727 | – |
| | | |
| Current tax (credit)/charge for year – note 6(a) | 160,736 | (4,490) |

There is no unprovided deferred tax

13

FIM Limited

# Notes to the financial statements
**at 31 December 2007**

7. **Tangible fixed assets**

*Group*

| | Leasehold improvements £ | Office equipment £ | Furniture and fittings £ | Computer software £ | Total £ |
|---|---|---|---|---|---|
| Cost | | | | | |
| At 1 January 2007 | 96,783 | 240,215 | 232,621 | 201,170 | 770,789 |
| Additions | 67,100 | 73,780 | 24,748 | 52,630 | 218,258 |
| Disposals | – | (85,476) | (50,539) | – | (136,015) |
| Exchange adjustment | 52 | (92) | 468 | – | 428 |
| | | | | | |
| At 31 December 2007 | 163,935 | 228,427 | 207,298 | 253,800 | 853,460 |
| | | | | | |
| Depreciation | | | | | |
| At 1 January 2007 | 33,606 | 203,821 | 153,335 | 32,428 | 423,190 |
| Charge for year | 23,921 | 49,669 | 34,939 | 80,402 | 188,931 |
| Disposals | – | (84,348) | (51,667) | – | (136,015) |
| Exchange adjustment | 61 | (156) | 19 | – | (76) |
| | | | | | |
| At 31 December 2007 | 57,588 | 168,986 | 136,626 | 112,830 | 476,030 |
| | | | | | |
| Net book value | | | | | |
| At 31 December 2007 | 106,347 | 59,441 | 70,672 | 140,970 | 377,430 |
| | | | | | |
| At 31 December 2006 | 63,177 | 36,394 | 79,286 | 168,742 | 347,599 |

*Company*

| | Leasehold improvements £ | Office equipment £ | Furniture and fittings £ | Computer software £ | Total £ |
|---|---|---|---|---|---|
| Cost | | | | | |
| At 1 January 2007 | 78,558 | 257,083 | 166,804 | 201,170 | 703,615 |
| Additions | – | 58,303 | – | 52,629 | 110,932 |
| Disposals | – | (85,476) | (50,539) | – | (136,015) |
| | | | | | |
| At 31 December 2007 | 78,558 | 229,910 | 116,265 | 253,799 | 678,532 |
| | | | | | |
| Depreciation | | | | | |
| At 1 January 2007 | 31,106 | 217,284 | 114,112 | 32,428 | 394,930 |
| Charge for year | 16,145 | 37,614 | 27,918 | 80,402 | 162,079 |
| Disposals | – | (84,348) | (51,667) | – | (136,015) |
| | | | | | |
| At 31 December 2007 | 47,251 | 170,550 | 90,363 | 112,830 | 420,994 |
| | | | | | |
| Net book value | | | | | |
| At 31 December 2007 | 31,307 | 59,360 | 25,902 | 140,969 | 257,538 |
| | | | | | |
| At 31 December 2006 | 47,452 | 39,799 | 52,692 | 168,742 | 308,685 |

FIM Limited

# Notes to the financial statements
**at 31 December 2007**

## 8. Fixed asset investments
*Group*

|                      | 2007 £ | 2006 £ |
|----------------------|-------:|-------:|
| Cost at 1 January    | 101    | 58     |
| Additions            | –      | 50     |
| Exchange adjustments | –      | (7)    |
|                      | 101    | 101    |

The investment by the group stated above relates to 100 shares of $1 each in FIM Long–Invest PCC Limited, and 100 shares of $1 each in FIM Long–Invest Plus PCC Limited, funds managed by FIM Management (Guernsey) Limited

*Company*

|                        | 2007 £    | 2006 £    |
|------------------------|----------:|----------:|
| Cost at 1 January      | 1,274,000 | 1,280,982 |
| Disposals              | –         | (7,030)   |
| Exchange adjustments   | –         | 48        |
|                        | 1,274,000 | 1,274,000 |
| Investment in subsidiary | 1,274,000 | 1,274,000 |

All the subsidiaries are consolidated   They are

|                                  | Country of Incorporation/ Registration |
|----------------------------------|----------------------------------------|
| FIM Advisers LLP                 | England and Wales                      |
| FIM Holdings Limited             | England and Wales                      |
| FIM Management Limited           | Bermuda                                |
| FIM Management (Guernsey) Limited | Guernsey                              |
| FIM (USA) Inc                    | USA                                    |

All the companies and the limited liability partnership are engaged in the provision of investment management and related services   All of the above entities are wholly owned, except for FIM Advisers LLP to which the group has contributed 98 7% of the capital   The interest in FIM Advisers LLP is owned directly by FIM Limited   The other subsidiaries are held via this direct holding

On 7 April 2006, FIM International Limited, a non–trading subsidiary was wound up   The group incurred a loss on disposal of £7,030

FIM Limited

# Notes to the financial statements
### at 31 December 2007

### 9. Debtors

| | Group 2007 £ | Group 2006 £ | Company 2007 £ | Company 2006 £ |
|---|---|---|---|---|
| Amounts due from subsidiaries | – | – | 786,173 | 679,122 |
| Trade debtors | 9,265,073 | 5,562,889 | 4,568 | – |
| Other debtors | 284,862 | 275,535 | 226,156 | 238,035 |
| Prepayments and accrued income | 205,097 | 160,531 | 181,577 | 146,131 |
| | 9,755,032 | 5,998,955 | 1,198,474 | 1,063,288 |

Included within other debtors is a rent deposit of £159,564 (2006 £166,899) which is due after more than one year

### 10. Creditors: amounts falling due within one year

| | Group 2007 £ | Group 2006 £ | Company 2007 £ | Company 2006 £ |
|---|---|---|---|---|
| Trade creditors | 2,104,173 | 164,543 | 101,185 | 158,989 |
| Corporation tax | 132,844 | 23,318 | 132,844 | 23,318 |
| Other taxes and social security costs | 64,768 | 149,917 | 55,287 | 137,334 |
| Accruals and deferred income | 1,802,091 | 2,130,743 | 1,070,983 | 704,374 |
| Other creditors | 1,564,471 | 1,282,151 | – | – |
| | 5,668,347 | 3,750,672 | 1,360,299 | 1,024,015 |

### 11. Creditors: amounts falling due after more than one year
*Group and Company*

| | 2007 £ | 2006 £ |
|---|---|---|
| Other creditors | 36,873 | 87,706 |

FIM Limited

# Notes to the financial statements
**at 31 December 2007**

## 12. Deferred taxation

|  | 2007 | 2006 |
|---|---|---|
|  | £ | £ |
| Analysis of provision for deferred tax |  |  |
| At 1 January | – | – |
| Movement in the year | – | – |
| Adjustments in relation to prior years | – | – |
| At 31 December | – | – |

## 13. Share capital
*Group and Company*

|  | Authorised | | Allotted, called up and fully paid | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
|  | No | No | £ | £ |
| Equity interests |  |  |  |  |
| 100,000 ordinary shares of £1 each | 100,000 | 100,000 | 100,000 | 100,000 |

## 14. Reconciliation of shareholders' funds and movement in reserves
*Group*

|  | Share capital | Other reserves | Profit and loss account | Total shareholders' funds |
|---|---|---|---|---|
|  | £ | £ | £ | £ |
| At 1 January 2007 | 100,000 | (164,847) | 8,951,899 | 8,887,052 |
| Profit for the financial year | – | – | 2,228,353 | 2,228,353 |
| Gain on foreign currency translation | – | 58,163 | – | 58,163 |
| At 31 December 2007 | 100,000 | (106,684) | 11,180,252 | 11,173,568 |

FIM Limited

# Notes to the financial statements
## at 31 December 2007

### 14. Reconciliation of shareholders' funds and movement in reserves (continued)

Company

| | Share capital £ | Profit and loss account £ | Total shareholders' funds £ |
|---|---|---|---|
| At 1 January 2007 | 100,000 | 1,754,419 | 1,854,419 |
| Loss for the year | – | (23,216) | (23,216) |
| At 31 December 2007 | 100,000 | 1,731,203 | 1,831,203 |

### 15. Notes to statement of cash flows

(a)    Cash flow statement

| | 2007 £ | 2006 £ |
|---|---|---|
| *Reconciliation of operating profit to net cash outflow from operating activities:* | | |
| Operating profit | 14,678,567 | 8,090,978 |
| Depreciation | 188,931 | 155,020 |
| (Increase) in debtors | (3,756,077) | (1,692,589) |
| Increase/(Decrease) in creditors | 1,015,841 | (807,004) |
| Net (gain)/loss on foreign exchange | (75,773) | 31,588 |
| Exchange adjustment on retranslation of net assets of subsidiary undertakings | 58,163 | (158,259) |
| Exchange adjustment on fixed assets | (505) | 4,509 |
| Net cash inflow from operating activities | 12,109,147 | 5,624,243 |

(b)    Analysis of cash flows for headings netted in the cash flow statement

| | 2007 £ | 2006 £ |
|---|---|---|
| *Returns on investments and servicing of finance* | | |
| Interest received | 200,646 | 198,814 |
| Distributions to minority interests | (11,672,992) | (3,154,616) |
| Contribution by minority interests | 1,000 | 9,000 |
| Net cash outflow from returns on investments and servicing of finance | (11,471,346) | (2,946,802) |
| | | |
| *Taxation* | (51,093) | (210,730) |
| | | |
| *Capital expenditure* | | |
| Purchase of tangible fixed assets | (218,258) | (265,575) |

18

FIM Limited

# Notes to the financial statements
**at 31 December 2007**

### 15. Notes to statement of cash flows (continued)

(c)    Analysis of net funds

|  | 2006 £ | Cash flow £ | 2007 £ |
|---|---|---|---|
| Cash at bank and in hand | 6,413,825 | 368,450 | 6,782,275 |

### 16. Future financial commitments

At the year end, the company was committed to making the following annual payments in respect of operating leases with expiry dates as follows

|  | Land and buildings | |
|---|---|---|
|  | 2007 £ | 2006 £ |
| Within two to five years | 305,000 | 305,000 |

### 17. Related party transactions

There have been no related party transactions with entities outside the group

### 18. Commitments

In order to hedge effectively against foreign currency transaction risks, the group has entered into a number of forward foreign currency contracts   At the year end, there were 5 open contracts to sell a total of US$0 and €5,340,000 (2006 - US$1,825,000 and €2,525,000) which expire during the succeeding accounting period

### 19. Ultimate controlling party

FIM Limited is jointly owned and controlled by C Grosso and F Ceretti

# EXHIBIT C

# FIM Advisers LLP

## Report and Financial Statements

For the year ended 31 December 2007



THURSDAY

*LGOBG40K*

LD3          16/10/2008          30

COMPANIES HOUSE

FIM Advisers LLP

Registered No   OC309543

## Members

C Grosso
F Ceretti
FIM Limited
T Healy
G D'Oria
A Albright
B Robertson
M Jochems (appointed 1 September 2007)

## Auditors

Ernst & Young LLP
1 More London Place
London SE1 2AF

## Bankers

HSBC Plc
69 Pall Mall
London SW1Y 5EY

## Solicitors

Simmons & Simmons
CityPoint
One Ropemaker Street
London EC2Y 9SS

## Registered Office

20 St James's Street
London
SW1A 1ES

FIM Advisers LLP

# Members' report

The Members present their report and financial statements for the year ended 31 December 2007

## Principal activity and review of the business

The principal activity of FIM Advisers LLP (the "LLP") is the provision of investment services   The LLP is regulated by the Financial Services Authority

## Results and distributions

The results for the year are shown in the profit and loss account on page 6   The LLP's balance sheet as detailed on page 7 shows a satisfactory position with Members' interests amounting to £7,511,178 (2006 - £6,537,882)

## Members' profit allocation

Profits are shared among the Members as decided by the Managing Member and governed by the Limited Liability Partnership Agreement dated 29 July 2005 and the amendments within the Supplemental Deed dated 28 April 2006

## Policy for Members' drawings, subscriptions and repayments of Members' capital

Policies for Members' drawings, subscriptions and repayment of Members' capital are governed by the Limited Liability Partnership Agreement dated 29 July 2005 and the amendments within the Supplemental Deed dated 28 April 2006

## Members

The Members of the LLP during the year were as follows

C Grosso
F Ceretti
FIM Limited
T Healy
G D'Oria
A Albrighi
B Robertson
J Chapman (resigned 05 April 2008)
M Jochems (appointed 1 September 2007)

C Grosso and F Ceretti are Designated Members   The Managing Member is FIM Limited

## Auditors

A resolution to reappoint Ernst & Young LLP as auditors will be put to the Members at the Annual General Meeting   So far as the Members are aware there is no relevant audit information of which the LLP's auditors are unaware   The Members have taken all steps that they ought to have taken as Members in order to make themselves aware of any relevant audit information and to establish that the auditors are aware of this information

By order of the Members

Member

30 April 2008

2

FIM Advisers LLP

# Statement of Members' responsibilities in respect of the financial statements

The Members are responsible for preparing the annual report and financial statements in accordance with the applicable United Kingdom Generally Accepted Accounting Practice

The Limited Liability Partnerships Regulations 2001 (LLP regulations) made under the Limited Liability Partnerships Act 2000 require the Members to prepare financial statements for each financial year which give a true and fair view of the state of affairs and of the profit or loss of the partnership for that period In preparing those financial statements, the Members are required to

- select suitable accounting policies and then apply them consistently,

- make judgements and estimates that are reasonable and prudent,

- state whether applicable accounting standards have been followed, subject to any material departures and explained in the financial statements, and

- prepare the financial statements in accordance with generally accepted accounting principles applied on a consistent basis

Under the LLP Regulations the Members are responsible for ensuring that proper accounting records are kept which disclose with reasonable accuracy the financial position of the partnership and which enable them to ensure that the financial statements will comply with those regulations The Members have a general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the partnership and to prevention and detect fraud and other irregularities

3

# Independent auditors' report

## to the Members of FIM Advisers LLP

We have audited the Limited Liability Partnership's financial statements for the year ended 31 December 2007 which comprise Profit and Loss Account, Statement of Total Recognised Gains and Losses, Balance Sheet, Statement of Cash Flows and the related notes 1 to 13  These financial statements have been prepared on the basis of the accounting policies set out therein

This report is made solely to the Members, as a body, in accordance with the Limited Liability Partnerships Regulations 2001 made under the Limited Liability Partnerships Act 2000  Our audit work has been undertaken so that we might state to the Members those matters we are required to state to them in an auditors' report and for no other purpose  To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Members as a body, for our audit work, for this report, or for the opinions we have formed

## Respective responsibilities of Members and auditors

As described in the Statement of Members' Responsibilities the Members are responsible for the preparation of the financial statements in accordance with applicable United Kingdom law and accounting standards

Our responsibility is to audit the financial statements in accordance with relevant legal and regulatory requirements and International Standards on Auditing (UK and Ireland)

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Limited Liability Partnerships Regulations 2001 made under the Limited Liability Partnerships Act 2000   We also report to you if, in our opinion, the LLP has not kept proper accounting records, or if we have not received all the information and explanations we require for our audit

We read the Members' Report and consider the implications for our report if we become aware of any apparent misstatements within it

## Basis of audit opinion

We conducted our audit in accordance with International Standards on Auditing (UK and Ireland) issued by the Auditing Practices Board   An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements  It also includes an assessment of the significant estimates and judgements made by the Members in the preparation of the financial statements, and of whether the accounting policies are appropriate to the LLP's circumstances, consistently applied and adequately disclosed

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error  In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements

# Independent auditors' report
## to the Members of FIM Advisers LLP (continued)

### Opinion

In our opinion

- the financial statements give a true and fair view, in accordance with United Kingdom Generally Accepted Accounting Practice, of the state of affairs of the LLP as at 31 December 2007 and of its profit for the year then ended, and

- the financial statements have been properly prepared in accordance with the Limited Liability Partnerships Regulations 2001

*Ernst & Young LLP*

Ernst & Young LLP
Registered Auditor
London

30 April 2008

FIM Advisers LLP

# Profit and loss account

**For the year ended 31 December 2007**

|  | Notes | Year ended 31 December 2007 £ | Year ended 31 December 2006 £ |
|---|---|---|---|
| *Income* | 2 | 15,987,981 | 9,975,119 |
| *Expenses* | | | |
| Administration expenses | | (1,228,034) | (652,773) |
| Expenses reimbursed to FIM Limited | | (4,622,103) | (3,978,387) |
| *Operating profit* | 3 | 10,137,844 | 5,343,959 |
| Income from investments | 4 | 2,665,159 | 769,315 |
| Interest receivable | | 95,076 | 105,913 |
| Interest payable | | (82,018) | (67,338) |
| Profit on foreign exchange | | 52,923 | (16,392) |
| *Profit before Members' remuneration and profit shares* | | 12,868,984 | 6,135,457 |
| Members' remuneration charged as an expense | 5 | (1,135,000) | (780,000) |
| *Profit available for discretionary division among Members* | | 11,733,984 | 5,355,457 |

All amounts are in respect of continuing activities

# Statement of total recognised gains and losses

There were no recognised gains and losses in the year other than the profit for the year

The notes on pages 9 to 13 form part of these financial statements

FIM Advisers LLP

# Balance sheet
## at 31 December 2007

| | Notes | 2007 £ | 2006 £ |
|---|---|---|---|
| **Fixed assets** | | | |
| Investments | 6 | 11,052 | 11,132 |
| **Current assets** | | | |
| Debtors | 7 | 5,798,261 | 3,203,521 |
| Cash | | 2,248,574 | 3,566,035 |
| | | 8,046,835 | 6,769,556 |
| **Current liabilities** | | | |
| Creditors  amounts falling due within one year | 8 | 546,709 | 242,806 |
| **Net current assets** | | 7,500,126 | 6,526,750 |
| **Net assets attributable to Members** | | 7,511,178 | 6,537,882 |
| **Represented by** | | | |
| **Loans and other debts due to Members within one year** | | | |
| Other debts | 9 | 1,561,159 | 967,723 |
| | | 1,561,159 | 967,723 |
| **Equity** | | | |
| Members' capital | 9 | 2,710,000 | 2,709,000 |
| Non-cash capital contribution | 9 | (1,400,000) | (1,400,000) |
| Members' other interests – other reserves | 9 | 4,640,019 | 4,261,159 |
| | | 5,950,019 | 5,570,159 |
| | | 7,511,178 | 6,537,882 |

| | Notes | 2007 £ | 2006 £ |
|---|---|---|---|
| **Total Members' interests** | | | |
| Loans and other debts due to Members | | 1,561,159 | 967,723 |
| Members' other interests | | 5,950,019 | 5,570,159 |
| Members' total interests | 9 | 7,511,178 | 6,537,882 |

Signed on behalf of the Members

Member

30 April 2008

The notes on pages 9 to 13 form part of these financial statements

FIM Advisers LLP

# Statement of cash flows
## at December 2007

| | Notes | Year ended 31 December 2007 £ | Year ended 31 December 2006 £ |
|---|---|---|---|
| *Net cash inflow from operating activities* | 10 (a) | 7,900,010 | 4,962,548 |
| *Returns on investments and servicing of finance* | 10 (b) | 2,678,217 | 807,890 |
| *Transactions with Members* | 10 (b) | (11,895,688) | (3,740,537) |
| *(Decrease)/increase in cash* | 10 (c) | (1,317,461) | 2,029,901 |

The notes on pages 9 to 13 form part of these financial statements

FIM Advisers LLP

# Notes to the financial statements
**at 31 December 2007**

## 1.  Accounting policies

### Basis of accounting

The financial statements have been prepared in accordance with applicable accounting standards, and the historical cost convention   The Members adopted the provisions of the Statement of Recommended Practice 'Accounting by Limited Liability Partnerships' (SORP) issued in March 2006   The financial statements have been prepared on this basis

### Consolidation

The LLP has taken advantage of the exemption under FRS 1, not to prepare consolidated accounts on the basis that it is a subsidiary and the LLP's results are included in the consolidated financial statements of the ultimate parent undertaking, FIM Limited

### Investments

Investments are included at cost, restated at the balance sheet date rate of exchange where acquired in foreign currency, less a provision for any permanent diminution in value

### Foreign currencies

Monetary assets and liabilities in foreign currencies are translated into sterling at the rates of exchange ruling at the balance sheet date   Transactions in foreign currencies are translated into sterling at the rate of exchange ruling at the date of the transaction   Exchange differences are taken to the profit and loss account

### Taxation

No provision has been made for taxation in the accounts   Each Member is exclusively liable for any tax liabilities arising out of their interest in the LLP, which will be assessed on the individual Members and not on the LLP

## 2.  Income

All income is stated net of VAT and relates to one continuing activity being the supply of investment services to clients based in Europe and the Americas   Income is recognised on a receivable basis

## 3.  Operating profit

This is stated after charging

|  | Year ended 31 December 2007 £ | Year ended 31 December 2006 £ |
|---|---|---|
| Auditors' remuneration |  |  |
| Audit services | – | – |
| Non audit services  tax services | – | – |

The remuneration for audit services of £12,600 (2006 - £12,000) is borne by the LLP's parent undertaking, FIM Limited

9

FIM Advisers LLP

# Notes to the financial statements
**at 31 December 2007**

### 4. Income from investments

Income from investments represents dividends received from subsidiary undertakings. The amount of £2,665,159 (2006 - £769,315) received during the year, was in relation to dividends paid by FIM Management Limited and FIM Holdings Limited

### 5. Members' remuneration

|  | Year ended 31 December 2007 £ | Year ended 31 December 2006 £ |
|---|---|---|
| Profit for the financial year before Members' remuneration and profit share | 12,868,984 | 6,135,457 |
| Members' remuneration | 1,135,000 | 780,000 |
| Profit for the financial year available for discretionary division among Members | 11,733,984 | 5,355,457 |
| Amount in respect of the Member with the largest entitlement to profit during the year | 4,816,776 | 1,394,159 |

The average number of Members in the year was 8

### 6. Investments

|  | Unlisted investments 2007 £ | Unlisted investments 2006 £ |
|---|---|---|
| Cost |  |  |
| At 1 January 2007 | 11,132 | 11,982 |
| Exchange rate adjustment | (80) | (850) |
| Additions | – | – |
| At 31 December 2007 | 11,052 | 11,132 |

Details of the above holdings are

|  | Country of registration | Principle activity | Holding |
|---|---|---|---|
| FIM Holdings Limited | England and Wales | Holding Company | 100% |
| FIM Management Limited | Bermuda | Investment Services | 100% |

FIM Advisers LLP

# Notes to the financial statements
at 31 December 2007

7. **Debtors**

|  | 2007 £ | 2006 £ |
|---|---|---|
| Trade debtors | 1,507,687 | 1,232,884 |
| Due from group companies | 4,283,329 | 1,960,295 |
| Other debtors | 7,245 | 10,342 |
|  | 5,798,261 | 3,203,521 |

8. **Creditors: amounts falling due within one year**

|  | 2007 £ | 2006 £ |
|---|---|---|
| Owed to group companies | 473,189 | 232,231 |
| Accruals and deferred income | 73,520 | 10,575 |
|  | 546,709 | 242,806 |

9. **Reconciliation of movements in Members' other and Members' total interests**

|  | Members' capital £ | Other reserves £ | Total Members' other interests £ | Loans and other debts due to/(from) Members £ | Members' total interests £ |
|---|---|---|---|---|---|
| At 31 December 2006 | 2,709,000 | 2,861,159 | 5,570,159 | 967,723 | 6,537,882 |
| Transfer from capital to equity | – | – | – | – | – |
| Members' remuneration charged as an expense | – | – | – | 1,135,000 | 1,135,000 |
| Profit for the year available for discretionary allocation | – | 11,733,984 | 11,733,984 | – | 11,733,984 |
| Discretionary allocations to Members | – | (11,355,124) | (11,355,124) | 11,355,124 | – |
| Payments to Members | – | – | – | (16,518,791) | (16,518,791) |
| Capital contributions | 1,000 | – | 1,000 | – | 1,000 |
| Expenses incurred by Members on behalf of the LLP | – | – | – | 4,622,103 | 4,622,103 |
|  | 2,710,000 | 3,240,019 | 5,950,019 | 1,561,159 | 7,511,178 |

| Other reserves consist of |  |
|---|---|
| Unallocated profits | 4,640,019 |
| Non-cash capital contribution | (1,400,000) |
|  | 3,240,019 |

FIM Advisers LLP

# Notes to the financial statements
**at 31 December 2007**

## 10. Notes to the statement of cash flows

(a)    Reconciliation of operating profit to net cash inflow from operating activities

|  | Year ended 31 December 2007 £ | Year ended 31 December 2006 £ |
|---|---|---|
| Operating profit | 10,137,844 | 5,343,959 |
| Increase in debtors | (2,594,740) | (487,478) |
| Increase in creditors | 303,903 | 121,609 |
| Gain/(loss) on foreign exchange | 52,923 | (16,392) |
|  | 7,900,010 | 4,962,548 |

(b)    Analysis of cash flows for headings netted in the statement of cash flows

| *Returns on investments and servicing of finance* | | |
|---|---|---|
| Income from investments | 2,665,159 | 769,315 |
| Interest received | 62,037 | 105,913 |
| Interest paid | (48,979) | (67,338) |
|  | 2,678,217 | 807,890 |

| *Transactions with Members* | | |
|---|---|---|
| Capital contributions | 1,000 | 9,000 |
| Payments to Members | (16,518,791) | (7,727,924) |
| Expenses incurred by Members | 4,622,103 | 3,978,387 |
|  | (11,895,688) | (3,740,537) |

(c)    Analysis of changes in net funds

|  | At 31 December 2006 £ | Cash flows £ | At 31 December 2007 £ |
|---|---|---|---|
| Cash at bank | 3,566,035 | (1,317,461) | 2,248,574 |

FIM Advisers LLP

# Notes to the financial statements
### at 31 December 2007

## 11. Related parties

The LLP has taken advantage of the exemption under FRS 8 not to disclose any transactions with entities in the same group on the basis that it is a subsidiary and its results are included in the consolidated financial statements of the ultimate parent undertaking, FIM Limited  The consolidated financial statements of FIM Limited are available from the LLP's registered office

## 12. Commitments

In order to hedge effectively against foreign exchange transaction risk the LLP has entered into a number of forward foreign currency contracts  At the year end, there were 5 open contracts to sell a total of US$ Nil and €5,340,000 (2006 - US$1,825,000 and €2,525,000) which expire during the succeeding accounting period

## 13. Ultimate parent undertaking and controlling party

The LLP's immediate and ultimate parent undertaking is FIM Limited, a company incorporated in England and Wales  FIM Limited is controlled jointly by C Grosso and F Ceretti

**EXHIBIT D**

# FIM Advisers LLP

**Report and Financial Statements**

For the year ended 31 December 2008



FRIDAY

*LXTTTEJU*

L55       30/10/2009       113
COMPANIES HOUSE

## FIM Advisers LLP

Registered No: OC309543

### Members

C Grosso
F Ceretti
FIM Limited
T Healy
G D'Oria
A Albrighi
B Robertson
M Jochems
S Dragoo (appointed 01 May 2008)

### Auditors

Ernst & Young LLP
1 More London Place
London SE1 2AF

### Bankers

HSBC Plc
69 Pall Mall
London SW1Y 5EY

### Solicitors

Simmons & Simmons
CityPoint
One Ropemaker Street
London EC2Y 9SS

### Registered Office

20 St James's Street
London
SW1A 1ES

# Members' report

The Members present their report and financial statements for the year ended 31 December 2008.

## Principal activity and review of the business

The principal activity of FIM Advisers LLP (the "LLP") is the provision of investment services.
The LLP is regulated by the Financial Services Authority.

As with most fund of hedge fund ("FoHF") advisers, 2008 was a difficult and turbulent year for FIM. The well-publicised and dramatic events in the world's financial markets, and the resulting illiquidity and negative performance of many hedge funds, lead to substantial redemptions from FoHFs including those managed/advised by FIM. In turn, this lead to a significant decline in FIM's assets under management/ advice from a peak of USD 4.4bn (approx.) in March 2008 to USD 1.8bn (approx.) at 31 December 2008, and forced FIM to scale back its operations in November 2008.

Certain FoHFs managed/advised by FIM (the "Funds") had invested part of their assets in Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (the "Kingate Funds"), whose assets were managed by Kingate Management Limited (a Bermudan company). Kingate Management Limited outsourced the investment management of the assets of the Kingate Funds to Bernard L. Madoff Investment Securities LLC via a managed account structure. Certain Funds had invested approximately 5-7% of their assets in the Kingate Funds, and the total amount invested across these Funds was approximately USD146m. In these cases, the Funds' investment in the Kingate Funds has been written down to nil.

FIM acted as a consultant to Kingate Management Limited in relation to the Kingate Funds. In that regard, FIM has received some potentially litigious correspondence in recent months. However, as at the date of this report FIM is not subject to any litigation proceedings.

## Results and distributions

The results for the year are shown in the profit and loss account on page 7. The LLP's balance sheet as detailed on page 8 shows a satisfactory position with Members' interests amounting to £4,726,782 (2007 - £7,511,178).

## Members' profit allocation

Profits are shared among the Members as decided by the Managing Member and governed by the Limited Liability Partnership Agreement dated 29 July 2005 and the amendments within the Supplemental Deeds dated 28 April 2006 and 8 April 2008.

## Policy for Members' drawings, subscriptions and repayments of Members' capital

Policies for Members' drawings, subscriptions and repayment of Members' capital are governed by the Limited Liability Partnership Agreement dated 29 July 2005 and the amendments within the Supplemental Deed dated 28 April 2006 and 8 April 2008.

## Members

The Members of the LLP during the year were as follows:

C Grosso
F Ceretti
FIM Limited
T Healy
G D'Oria
A Albrighi
B Robertson
J Chapman (resigned 5 April 2008)

FIM Advisers LLP

## Members' report

M Jochems
S Dragoo (appointed 01 May 2008)

C Grosso and F Ceretti are Designated Members.  The Managing Member is FIM Limited.

### Auditors

A resolution to reappoint Ernst & Young LLP as auditors will be put to the Members at the Annual General Meeting.  So far as the Members are aware there is no relevant audit information of which the LLP's auditors are unaware.  The Members have taken all steps that they ought to have taken as Members in order to make themselves aware of any relevant audit information and to establish that the auditors are aware of this information.

By order of the Members

Member

27.4.09

3

FIM Advisers LLP

# Statement of Members' responsibilities in respect of the financial statements

The Members are responsible for preparing the annual report and financial statements in accordance with the applicable United Kingdom Generally Accepted Accounting Practice.

The Limited Liability Partnerships Regulations 2001 (LLP regulations) made under the Limited Liability Partnerships Act 2000 require the Members to prepare financial statements for each financial year which give a true and fair view of the state of affairs and of the profit or loss of the partnership for that period. In preparing those financial statements, the Members are required to:

- select suitable accounting policies and then apply them consistently;

- make judgements and estimates that are reasonable and prudent;

- state whether applicable accounting standards have been followed, subject to any material departures and explained in the financial statements; and

- prepare the financial statements in accordance with generally accepted accounting principles applied on a consistent basis.

Under the LLP Regulations the Members are responsible for ensuring that proper accounting records are kept which disclose with reasonable accuracy the financial position of the partnership and which enable them to ensure that the financial statements will comply with those regulations. The Members have a general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the partnership and to prevention and detect fraud and other irregularities.

# Independent auditors' report

**to the Members of FIM Advisers LLP**

We have audited the Limited Liability Partnership's financial statements for the year ended 31 December 2008 which comprise Profit and Loss Account, Statement of Total Recognised Gains and Losses, Balance Sheet, Statement of Cash Flows and the related notes 1 to 13. These financial statements have been prepared on the basis of the accounting policies set out therein.

This report is made solely to the Members, as a body, in accordance with the Limited Liability Partnerships Regulations 2001 made under the Limited Liability Partnerships Act 2000. Our audit work has been undertaken so that we might state to the Members those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Members as a body, for our audit work, for this report, or for the opinions we have formed.

## Respective responsibilities of Members and auditors

As described in the Statement of Members' Responsibilities the Members are responsible for the preparation of the financial statements in accordance with applicable United Kingdom law and accounting standards.

Our responsibility is to audit the financial statements in accordance with relevant legal and regulatory requirements and International Standards on Auditing (UK and Ireland).

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Limited Liability Partnerships Regulations 2001 made under the Limited Liability Partnerships Act 2000. We also report to you if, in our opinion, the LLP has not kept proper accounting records, or if we have not received all the information and explanations we require for our audit.

We read the Members' Report and consider the implications for our report if we become aware of any apparent misstatements within it.

## Basis of audit opinion

We conducted our audit in accordance with International Standards on Auditing (UK and Ireland) issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgements made by the Members in the preparation of the financial statements, and of whether the accounting policies are appropriate to the LLP's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements.

# Independent auditors' report
**to the Members of FIM Advisers LLP (continued)**

### Opinion

In our opinion:

- the financial statements give a true and fair view, in accordance with United Kingdom Generally Accepted Accounting Practice, of the state of affairs of the LLP as at 31 December 2008 and of its profit for the year then ended; and

- the financial statements have been properly prepared in accordance with the Limited Liability Partnerships Regulations 2001.

*Ernst & Young*

Ernst & Young LLP
Registered Auditor
London

27 April 2009

FIM Advisers LLP

# Profit and loss account

## For the year ended 31 December 2008

| | Notes | Year ended 31 December 2008 £ | Year ended 31 December 2007 £ |
|---|---|---|---|
| *Income* | 2 | 11,228,090 | 15,987,981 |
| *Expenses* | | | |
| Administration expenses | | (1,331,860) | (1,228,034) |
| Expenses reimbursed to FIM Limited | | (4,863,034) | (4,622,103) |
| *Operating profit* | 3 | 5,033,196 | 10,137,844 |
| Income from investments | 4 | 6,299,478 | 2,665,159 |
| Interest receivable | | 69,266 | 95,076 |
| Interest payable | | (72,783) | (82,018) |
| Profit on foreign exchange | | 146,795 | 52,923 |
| *Profit before Members' remuneration and profit shares* | | 11,475,952 | 12,868,984 |
| Members' remuneration charged as an expense | 5 | (1,158,333) | (1,135,000) |
| *Profit available for discretionary division among Members* | | 10,317,619 | 11,733,984 |

All amounts are in respect of continuing activities.

# Statement of total recognised gains and losses

There were no recognised gains and losses in the year other than the profit for the year.

The notes on pages 10 to 14 form part of these financial statements.

FIM Advisers LLP

# Balance sheet
## at 31 December 2008

| | Notes | 2008 £ | 2007 £ |
|---|---|---|---|
| **Fixed assets** | | | |
| Investments | 6 | 13,233 | 11,052 |
| **Current assets** | | | |
| Debtors | 7 | 1,077,971 | 5,798,261 |
| Cash | | 4,109,102 | 2,248,574 |
| | | 5,187,073 | 8,046,835 |
| **Current liabilities** | | | |
| Creditors: amounts falling due within one year | 8 | 473,524 | 546,709 |
| **Net current assets** | | 4,713,549 | 7,500,126 |
| **Net assets attributable to Members** | | 4,726,782 | 7,511,178 |
| **Represented by:** | | | |
| **Loans and other debts due to Members within one year** | | | |
| Other debts | 9 | 762,219 | 1,561,159 |
| | | 762,219 | 1,561,159 |
| **Equity** | | | |
| Members' capital | 9 | 2,710,000 | 2,710,000 |
| Non-cash capital contribution | 9 | (1,400,000) | (1,400,000) |
| Members' other interests – other reserves | 9 | 2,654,563 | 4,640,019 |
| | | 3,964,563 | 5,950,019 |
| | | 4,726,782 | 7,511,178 |

| | | 2008 £ | 2007 £ |
|---|---|---|---|
| **Total Members' interests** | | | |
| Loans and other debts due to Members | | 762,219 | 1,561,159 |
| Members' other interests | | 3,964,563 | 5,950,019 |
| **Members' total interests** | 9 | 4,726,782 | 7,511,178 |

Signed on behalf of the Members          27\4\09

Member

The notes on pages 10 to 14 form part of these financial statements.

8

FIM Advisers LLP

# Statement of cash flows
**at December 2008**

| | Notes | Year ended 31 December 2008 £ | Year ended 31 December 2007 £ |
|---|---|---|---|
| *Net cash inflow from operating activities* | 10 (a) | 9,827,096 | 7,900,010 |
| *Returns on investments and servicing of finance* | 10 (b) | 6,293,780 | 2,678,217 |
| *Transactions with Members* | 10 (b) | (14,260,348) | (11,895,688) |
| *(Decrease)/increase in cash* | 10 (c) | 1,860,528 | (1,317,461) |

The notes on pages 10 to 14 form part of these financial statements.

FIM Advisers LLP

# Notes to the financial statements
## at 31 December 2008

1. ## Accounting policies

### Basis of accounting

The financial statements have been prepared in accordance with applicable accounting standards, under the historical cost convention and in accordance with the Statement of Recommended Practice 'Accounting by Limited Liability Partnerships' (SORP) issued in March 2006.

### Consolidation

The LLP has taken advantage of the exemption under FRS 1, not to prepare consolidated accounts on the basis that it is a subsidiary and the LLP's results are included in the consolidated financial statements of the ultimate parent undertaking, FIM Limited.

### Investments

Investments are included at cost, restated at the balance sheet date rate of exchange where acquired in foreign currency, less a provision for any permanent diminution in value.

### Foreign currencies

Monetary assets and liabilities in foreign currencies are translated into sterling at the rates of exchange ruling at the balance sheet date. Transactions in foreign currencies are translated into sterling at the rate of exchange ruling at the date of the transaction. Exchange differences are taken to the profit and loss account.

### Taxation

No provision has been made for taxation in the accounts. Each Member is exclusively liable for any tax liabilities arising out of their interest in the LLP, which will be assessed on the individual Members and not on the LLP.

2. ## Income

All income is stated net of VAT and relates to one continuing activity being the supply of investment services to clients based primarily in Europe. Income is recognised on a receivable basis.

3. ## Operating profit

This is stated after charging:

|  | Year ended 31 December 2008 £ | Year ended 31 December 2007 £ |
|---|---|---|
| Auditors' remuneration: |  |  |
| Audit services | -- | – |
| Non audit services: tax services | – | – |

The remuneration for audit services of £12,600 (2007 - £12,600) is borne by the LLP's parent undertaking, FIM Limited.

FIM Advisers LLP

# Notes to the financial statements
### at 31 December 2008

## 4. Income from investments

Income from investments represents dividends received from subsidiary undertakings. The amount of £6,299,478 (2007 - £2,665,159) received during the year, was in relation to dividends paid by FIM Management Limited and FIM Holdings Limited.

## 5. Members' remuneration

| | Year ended 31 December 2008 £ | Year ended 31 December 2007 £ |
|---|---|---|
| Profit for the financial year before Members' remuneration and profit share | 11,475,952 | 12,868,984 |
| Members' remuneration | (1,158,333) | (1,135,000) |
| Profit for the financial year available for discretionary division among Members | 10,317,619 | 11,733,984 |
| Amount in respect of the Member with the largest entitlement to profit during the year | £3,474,181 | 4,816,776 |

The average number of Members in the year was 9.

## 6. Investments

| | Unlisted investments 2008 £ | Unlisted investments 2007 £ |
|---|---|---|
| Cost: | | |
| At 1 January 2008 | 11,052 | 11,132 |
| Exchange rate adjustment | 2,181 | (80) |
| Additions | – | – |
| At 31 December 2008 | 13,233 | 11,052 |

Details of the above holdings are:

| | Country of registration | Principle activity | Holding |
|---|---|---|---|
| FIM Holdings Limited | England and Wales | Holding Company | 100% |
| FIM Management Limited | Bermuda | Investment Services | 100% |

FIM Advisers LLP

# Notes to the financial statements
### at 31 December 2008

### 7.  Debtors

|  | 2008 £ | 2007 £ |
|---|---|---|
| Trade debtors | 610,970 | 1,507,687 |
| Due from group companies | 462,500 | 4,283,329 |
| Other debtors | 4,501 | 7,245 |
|  | 1,077,971 | 5,798,261 |

### 8.  Creditors: amounts falling due within one year

|  | 2008 £ | 2007 £ |
|---|---|---|
| Owed to group companies | 379,533 | 473,189 |
| Accruals and deferred income | 93,991 | 73,520 |
|  | 473,524 | 546,709 |

### 9.  Reconciliation of movements in Members' other and Members' total interests

|  | Members' capital £ | Other reserves £ | Total Members' other interests £ | Loans and other debts due to/(from) Members £ | Members' total interests £ |
|---|---|---|---|---|---|
| At 31 December 2007 | 2,710,000 | 3,240,019 | 5,950,019 | 1,561,159 | 7,511,178 |
| Transfer from capital to equity |  |  |  |  | – |
| Members' remuneration charged as an expense | | – | – | 1,158,333 | 1,158,333 |
| Profit for the year available for discretionary allocation | | 10,317,619 | 10,317,619 | – | 10,317,619 |
| Discretionary allocations to Members | | (12,303,075) | (12,303,075) | 12,303,075 | – |
| Payments to Members | | | | (19,123,382) | (19,123,382) |
| Capital contributions | | | | | |
| Expenses incurred by Members on behalf of the LLP | | | | 4,863,034 | 4,863,034 |
|  | 2,710,000 | 1,254,563 | 3,964,563 | 762,219 | 4,726,782 |

Other reserves consist of:

|  |  |
|---|---|
| Unallocated profits | 2,654,563 |
| Non-cash capital contribution | (1,400,000) |
|  | 1,254,563 |

FIM Advisers LLP

# Notes to the financial statements
**at 31 December 2008**

## 10. Notes to the statement of cash flows

(a)    Reconciliation of operating profit to net cash inflow from operating activities:

|  | Year ended 31 December 2008 £ | Year ended 31 December 2007 £ |
|---|---|---|
| Operating profit | 5,033,196 | 10,137,844 |
| Increase in debtors | 4,720,290 | (2,594,740) |
| Increase in creditors | (73,185) | 303,903 |
| Gain/(loss) on foreign exchange | 146,295 | 52,923 |
|  | 9,827,096 | 7,900,010 |

(b)    Analysis of cash flows for headings netted in the statement of cash flows

| *Returns on investments and servicing of finance:* |  |  |
|---|---|---|
| Income from investments | 6,299,478 | 2,665,159 |
| Interest received | 69,266 | 62,037 |
| Interest paid | (72,783) | (48,979) |
| Exchange rate adjustment | (2,181) | – |
|  | 6,293,780 | 2,678,217 |

| *Transactions with Members:* |  |  |
|---|---|---|
| Capital contributions | – | 1,000 |
| Payments to Members | (19,123,382) | (16,518,791) |
| Expenses incurred by Members | 4,863,034 | 4,622,103 |
|  | (14,260,348) | (11,895,688) |

(c)    Analysis of changes in net funds

|  | At 31 December 2007 £ | Cash flows £ | At 31 December 2008 £ |
|---|---|---|---|
| Cash at bank | 2,248,574 | 1,860,528 | 4,109,102 |

FIM Advisers LLP

# Notes to the financial statements
**at 31 December 2008**

## 11. Related parties

The LLP has taken advantage of the exemption under FRS 8 not to disclose any transactions with entities in the same group on the basis that it is a subsidiary and its results are included in the consolidated financial statements of the ultimate parent undertaking, FIM Limited.   The consolidated financial statements of FIM Limited are available from the LLP's registered office.

## 12. Commitments

In order to hedge effectively against foreign exchange transaction risk the LLP has entered into a number of forward foreign currency contracts.   At the year end, there were 4 open contracts to sell a total of €920,000 (2007 - €5,340,000) which expire during the succeeding accounting period.

## 13. Ultimate parent undertaking and controlling party

The LLP's immediate and ultimate parent undertaking is FIM Limited, a company incorporated in England and Wales.  FIM Limited is controlled jointly by C Grosso and F Ceretti.

# EXHIBIT E

# Delaware

**PAGE 1**

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF DISSOLUTION OF "FIM (USA) INC.", FILED IN THIS OFFICE ON THE EIGHTH DAY OF JUNE, A.D. 2009, AT 4:04 O'CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

**AUTHENTICATION: 2039395**

**DATE: 01-14-15**

3910776   8100

150052777

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 04:04 PM 06/08/2009*
*FILED 04:04 PM 06/08/2009*
*SRV 090597413 - 3910776 FILE*

CERTIFICATE OF DISSOLUTION
OF
FIM (USA) INC.

It is hereby certified that:

FIRST: The name of the corporation is FIM (USA) INC. (the "Corporation").

SECOND: The dissolution of the Corporation was authorized on May 9, 2009.

THIRD: The dissolution of the Corporation has been authorized by all of the stockholders of the Corporation entitled to vote on a dissolution in accordance with subsection (c) of Section 275 of the General Corporation Law of the State of Delaware.

FOURTH: The names and addresses of the directors of the Corporation and the names, titles and addresses of the officers of the Corporation are as follows:

### DIRECTORS

| Name | Address |
|---|---|
| Scott Dragoo | c/o FIM (USA) Inc.<br>780 Third Avenue, 6th Floor<br>New York, NY 10017 |
| Tom Healy | c/o FIM Advisers LLP<br>20 St. James's Street<br>London SW1A 1ES<br>United Kingdom |
| Michael G. Tannenbaum | c/o Tannenbaum Helpern, et al<br>900 Third Avenue<br>New York, NY 10022 |

### OFFICERS

| Name | Title | Address |
|---|---|---|

[859057-2]

| Scott Dragoo | President | c/o FIM (USA) Inc.<br>780 Third Avenue, 6th Floor<br>New York, NY 10017 |
| Tom Healy | Vice President | c/o FIM Advisers LLP<br>20 St. James's Street<br>London SW1A 1ES<br>United Kingdom |
| Michael G. Tannenbaum | Secretary<br>(non-executive) | c/o Tannenbaum Helpern, et al<br>900 Third Avenue<br>New York, NY 10022 |

Signed on June 8 , 2009.

Scott Dragoo, President

|859057-2|