**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, Plaintiff-Applicant, v. BERNARD L. MADOFF INVESTMENT SECURITIES LLC, Defendant. | No. 08-01789 (SMB) SIPA LIQUIDATION (Substantively Consolidated) |
| In re: BERNARD L. MADOFF, Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, Plaintiff, v. HSBC Bank plc, et al., Defendants. | Adv. Pro. No. 09-1364 (SMB) |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO HSBC BANK PLC AND HSBC PRIVATE BANK (SUISSE) S.A.'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR <u>LEAVE TO AMEND COMPLAINTS</u>**

The Trustee respectfully submits this supplemental memorandum in opposition to the consolidated motion to dismiss and in further support of the Trustee's motion for leave to amend complaints (the "Motion").[1] This memorandum addresses the Trustee's claims against HSBC Bank plc and HSBC Private Bank (Suisse) S.A. ("HSBC Suisse"; together, "HSBC Transferee Defendants") to recover customer property under section 550 of the Bankruptcy Code in the above-captioned adversary proceeding. The HSBC Transferee Defendants seek dismissal of those claims on the grounds that they are barred as a matter of law by *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).[2] In connection with this supplemental memorandum, the Trustee is submitting a Proposed Second Amended Complaint (the "Complaint"). The allegations in the Complaint against the HSBC Transferee Defendants show that (i) amendment would not be futile; and (ii) the component events of the transactions at issue in this proceeding do not necessitate an extraterritorial application of section 550 or SIPA.

## **ARGUMENT**

The two groups of transfers described in this memorandum are: (1) those that HSBC Bank plc received from BLMIS Feeder Funds Harley International (Cayman) Limited ("Harley"), Rye Select Broad Market Portfolio Limited ("Rye Portfolio"), Rye Select Broad Market XL Portfolio Limited ("Rye XL Portfolio"), and Thema International Fund plc ("Thema International") in connection with HSBC's Global Structured Fund Products ("GSFP") group and (2) those that HSBC Suisse received from Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma," collectively with Fairfield Sentry, the "Fairfield

---

[1] The Trustee submits this memorandum in accordance with this Court's Order Concerning Further Proceedings on Extraterritoriality Motion and Trustee's Omnibus Motion for Leave to Replead and for Limited Discovery with appended Exhibits A–C entered December 10, 2014, as modified by the Stipulations and Orders entered January 14, 2015 and February 24, 2015 (collectively, the "Order"). This memorandum supplements the Trustee's main memorandum of law filed simultaneously with this memorandum.

[2] HSBC Holdings plc and HSBC Private Banking Holdings (Suisse) S.A., both of which joined in the Motion, are not addressed in this memorandum because they are not parties to the Trustee's Proposed Second Amended Complaint filed in connection with this memorandum.

1

Funds") in connection with HSBC's Private Banking division. (Compl. ¶¶ 123-131; 132-139.)

Through the transfers, the HSBC Transferee Defendants extracted hundreds of millions of dollars from Madoff's Ponzi scheme for their benefit. The transfers include approximately $15,599,960 from Harley, $15,900,000 from Rye Portfolio, $53,000,000 from Rye XL Portfolio, and $14,094,388 from Thema International to HSBC Bank plc and $363,383,585 from Fairfield Sentry and $9,195,298 from Fairfield Sigma to HSBC Suisse. (*Id.* ¶¶ 417, 421, 485-86, 490, 535, 541-43.)

## I. BECAUSE THEIR "COMPONENT EVENTS" OCCURRED IN THE UNITED STATES, THE TRANSACTIONS ARE NOT "PURELY FOREIGN"

### A. HSBC Bank plc

HSBC Bank plc had a significant role in the BLMIS feeder funds' investment in New York that predated any of the HSBC structured products. Several BLMIS feeder funds, including those named as defendants in this adversary proceeding, had direct relationships with Madoff and routed their subscriptions to and redemptions from BLMIS through HSBC Bank plc. (*Id.* ¶ 376.) With the creation of the structured products, HSBC Bank plc became even more heavily involved with activities centered in New York. (*Id.* ¶¶ 132-139.)

GSFP, which created all of the structured products referred to in the Complaint, was managed out of New York. (*Id.* ¶¶ 132-137.) Each structured product followed a basic pattern. In connection with each, HSBC created a derivative product that provided leverage to would-be investors in BLMIS feeder funds. (*Id.* ¶ 137.) HSBC hedged its risk on that leverage by investing an equivalent amount directly in those same BLMIS feeder funds, or "reference funds." (*Id.* ¶ 137.) Before finalizing each structure product, GSFP reviewed the reference fund. (*Id.* ¶¶ 136-137.)

GSFP employees were integrally involved in the sales of the structured product transactions, received notifications relating to the GSFP structured products, and monitored and

2

researched the reference funds. (*Id.* ¶ 138.) GSFP also monitored the reference fund for compliance with GSFP's investment guidelines. (*Id.* ¶ 139.)

The reference funds received subscriptions of investment moneys from HSBC Bank plc. (*Id.* ¶ 134.) GSFP in New York oversaw the investments and facilitated subscriptions and redemptions with respect to structured products and related investments in the Harley, Rye Portfolio, and Thema International feeder funds. (*Id.* ¶¶ 134, 417, 529-30, 533, 539-540, 543.) Pursuant to subscription agreements to which HSBC Bank plc was a party, all subscriptions were routed through New York bank accounts, and HSBC Bank plc received all redemptions to its New York bank account at HSBC Bank USA N.A. ("HSBC Bank USA"). (*Id.*)

The Harley subscription agreement required HSBC Bank plc to wire U.S. dollars to an account in the name of Fortis Prime Fund Solutions (Isle of Man) Ltd. at the Northern Trust Banking Corporation ("Northern Trust"), 40 Broad Street, New York, New York. (*Id.* ¶¶ 512-13, 529.) At least one of the Harley subscription agreements was executed by a New York-based HSBC employee. (*Id.* ¶ 529.) Harley sent redemptions which were requested by an HSBC employee in New York to HSBC Bank plc's account at HSBC Bank USA. (*Id.* ¶ 533.) For Thema International, HSBC Bank plc invested in Thema International's U.S. dollar class by sending money to HSBC Bank plc's account at HSBC Bank USA for the benefit of "HSSI USD A/c." (*Id.* ¶ 537.) When it redeemed from Thema International, GSFP requested that the money be sent to HSBC Bank plc's account at HSBC Bank USA in New York. (*Id.* ¶ 540.) For Rye Portfolio, an HSBC employee in New York entered a subscription agreement on behalf of HSBC Bank plc agreeing to send U.S. dollars to an account for Rye Portfolio at the Bank of New York in New York. (*Id.* ¶¶ 396, 416.) Likewise, transfers from Rye Portfolio and Rye XL Portfolio were wired to HSBC Bank plc's account at HSBC Bank USA. (*Id.* ¶¶ 417, 421.)

3

At each step, HSBC Bank plc was aware of BLMIS's involvement with the reference funds. For example, when entering into a transaction with Rye XL Portfolio (the "Rye XL Portfolio Swap"), investment manager Tremont Partners, Inc. ("Tremont") wrote to counterparty HSBC Bank plc (care of HSBC Bank USA), stating that BLMIS was the "Account Manager" referred to in the confirmations. (*Id.* ¶ 170.) Before HSBC Bank plc invested in Harley, members of the New York GSFP team visited Fix Asset Management Services, Inc.'s ("FAM") Madison Avenue, New York offices to review Harley. (*Id.* ¶ 531.) Before HSBC Bank plc invested with Thema International, GSFP's Market Risk department in New York approved Thema International's underlying trading strategy. (*Id.* ¶ 538.) And before HSBC Bank plc entered into the Rye XL Portfolio Swap, invested in Rye Portfolio, and substituted HSBC Bank USA in a transaction with Rye Select Broad Market XL Fund L.P., GSFP visited Tremont's Rye, New York office. (*Id.* ¶ 416.)

### B.    HSBC Suisse

The allegations in the Complaint show that component events of the transactions between Fairfield Sentry and Fairfield Sigma and HSBC Suisse do not necessitate the extraterritorial application of the United States Bankruptcy Code. HSBC Suisse invested in Fairfield Sentry and Fairfield Sigma by executing subscription agreements, each of which was governed by New York law and required that disputes be resolved in New York. (*Id.* ¶ 477.) In the agreements, HSBC Suisse acknowledged that it had read and understood the Private Placement Memoranda for Fairfield Sentry and Fairfield Sigma (the "PPMs"), which describe BLMIS as an SEC-registered New York broker-dealer that custodied Fairfield Sentry's and Fairfield Sigma's assets. (*Id.*) The PPMs also set forth that BLMIS was employing the SSC strategy, which involved the purchase of U.S. securities and U.S. Treasury bills on Fairfield Sentry's and Fairfield Sigma's

4

behalf. (*Id.*) The PPMs state that BLMIS's services are "essential to the continued operation of the Fund." (*Id.*)

Since at least 2000, all of Fairfield Sentry's subscriptions and redemptions passed through an account at HSBC Bank USA in New York. (*Id.* ¶ 478.) Similarly, with respect to HSBC Suisse, Fairfield Sentry's withdrawals of funds from its BLMIS accounts were routed to either HSBC Suisse's account at HSBC Bank USA, or to Fairfield Sigma, which transferred the funds to HSBC Suisse. (*Id.* ¶ 480-81, 485.)

HSBC's Private Bank division, consisting of HSBC Suisse and HSBC Bank USA, regularly sent its New York employees to Fairfield Greenwich Group ("FGG")'s office in New York to review Fairfield Sentry. (*Id.* ¶ 128.) HSBC's internal reports on the reviews show that HSBC knew BLMIS was behind Fairfield Sentry's investment and that an adequate review of Fairfield Sentry necessarily entailed reviewing BLMIS's operations. (*Id.* ¶¶ 477, 482.) HSBC questioned FGG and sought to understand BLMIS by, "see[ing] the desks where the SSC Strategy is executed" and "meet[ing] with a [sic] operations person at BLM[IS] to understand how the custody of assets takes place." (*Id.* ¶ 482.)

## II. The HSBC Transferee Defendants Knew That For Disputes Involving Their Investments, They Were Subject to U.S. Law and Litigation in New York.

This Court should also deny the Motion because the component events of the transactions with the BLMIS feeder funds do not require an extraterritorial application of the Bankruptcy Code or SIPA. The BLMIS feeder funds, with the exception of Fairfield Sigma and Rye XL Portfolio, had direct accounts and agreements with BLMIS authorizing Madoff to act as the Funds' agent to buy and sell securities. (*Id.* ¶¶ 44, 65, 75, 146, 148, 389, 399, 493.) BLMIS also acted as these funds' investment adviser and purported to invest the funds' assets according to the SSC strategy that involved the purchase and sale of U.S. securities and U.S. Treasury bills over U.S. exchanges. (*Id.* ¶ 387.) BLMIS acted as the executing broker for the transactions and

5

as custodian for the securities purportedly held on the BLMIS feeder funds' behalf. (*Id.* ¶ 387.)

### A. Harley Maintained its Principal Place of Business in New York

This Court previously entered summary judgment against Harley in an amount of more than $1 billion, holding that "Harley specifically sought out the United States as a place to do business when it opened an account with BLMIS," and that the transfers received by Harley "arose out of business transactions tied to Harley's securities account with BLMIS in New York." (*Id.* ¶ 523.)

Although incorporated in the Cayman Islands, Harley was operated and controlled by FAM, which was incorporated under New York law and maintained its principal place of business in New York, New York. (*Id.* ¶ 502.) Harley had no employees or offices in the Cayman Islands and acted principally through FAM. (*Id.* ¶ 503.) For example, FAM in New York: (i) conducted due diligence on BLMIS and monitored Harley's investments with BLMIS; (ii) received Harley's account statements from BLMIS; (iii) corresponded directly with BLMIS to request redemptions into and subscriptions from Harley's BLMIS account; and (iv) marketed the sale of shares in Harley to investors. (*Id.* ¶¶ 507-511.)

Charles Fix held all of the voting shares for Harley and lived in New York. (*Id.* ¶ 504.) Mr. Fix's daughter, Tatiana Fix Katisgera, was the chief executive officer of FAM and Ms. Fix also lived in New York. (*Id.* ¶ 505.)

Harley was registered as an exempt company under Cayman Islands law and was not permitted to solicit investors in the Cayman Islands. (*Id.* ¶ 496.) In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands." (*Id.* ¶ 497.)

6

In its subscription agreements, Harley directed investors to wire U.S. dollars to bank accounts in New York held by its administrator. The agreements required subscriptions to be wired to an account at Northern Trust in New York. (*Id.* ¶ 512.) When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York. (*Id.* ¶ 513.) Because Harley maintained its principal place of business in New York, the transfers made from Harley to HSBC Bank plc are not purely foreign.

### B.    Tremont and the Rye Funds Had Their Principal Place of Business in New York

Tremont Group Holdings, a Delaware corporation, and Tremont Partners, a Connecticut corporation, (together "Tremont") operated from Rye, New York and managed, among others, three Delaware registered funds (Rye Select Broad Market Fund L.P. ("Rye Broad Market"), Rye Select Broad Market XL Fund L.P. ("Rye XL") and Rye Select Broad Market Prime Fund L.P. ("Rye Prime Fund")) and three Cayman Islands registered funds (Rye Portfolio, Rye XL Portfolio, and Rye Select Broad Market Insurance Portfolio LDC ("Rye Insurance") (the "Cayman Registered Rye Funds")) (collectively, the "Rye Funds"). (*Id.* ¶ 388.) Rye Portfolio, Rye Prime Fund, Rye Broad Market, and Rye Insurance each had direct accounts with BLMIS and filed a customer claim with the Trustee. (*Id.* ¶ 389.) Rye XL Portfolio received indirect transfers from BLMIS through Rye Portfolio, Rye Insurance, and Rye XL. (*Id.* ¶¶ 390-91, 418, 420.) Rye XL received indirect transfers from BLMIS through Rye Broad Market and Rye Prime Fund. (*Id.* ¶¶ 390-91, 419, 420.)

New York-based Tremont employees conducted all activities relating to the Rye Funds' marketing, operations, management decisions and due diligence from its office in Rye, New York. (*Id.* ¶¶ 392-93.) Tremont maintained only a nominal presence in the Cayman Islands, and none of the Cayman Registered Rye Funds were permitted to solicit investors there. (*Id.* ¶¶ 392, 394.) During the time when transfers were made to HSBC Bank plc, all subscriptions and

7

redemptions from the Rye Funds with BLMIS accounts went through the Rye Funds' bank accounts in New York. (*Id.* ¶¶ 416-417.) Tremont's New York office handled all redemption requests, subscriptions, and communications with BLMIS for the Rye Funds, and its employees met regularly with Madoff and other BLMIS employees beginning in 1991. (*Id.* ¶¶ 396, 398.)

Tremont's investors in Rye Portfolio knew that it was invested with BLMIS and openly referred to the funds as "our Madoff fund" or as a Madoff "feeder." (*Id.* ¶ 401.) Through Rye Portfolio's private placement memoranda and marketing materials, investors were informed that the fund would be trading in the U.S. equities and equity options markets and would be holding U.S. treasury bills. (*Id.* ¶ 401.) Investors in the Cayman Registered Rye Funds were informed that investments were only permitted in U.S. dollars. (*Id.* ¶ 404.) The Rye Funds also asserted certain defenses in other actions that their BLMIS investment activities involved the sale of U.S. securities in New York and were covered by U.S. securities laws. (*Id.* ¶ 406.)

### C.    Fairfield Sentry's and Fairfield Sigma's Principal Place of Business Was in New York

The Trustee commenced an adversary proceeding against Fairfield Sentry and Fairfield Sigma in the Bankruptcy Court, and in the Complaint, the Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Inv. Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 30, 2015 as part of the Extraterritoriality Briefing) ("Fairfield Greenwich Complaint"). The Fairfield Funds resided in New York. They were principally operated in New York by FGG, a New York-based *de facto* partnership.

In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker founded FGG. (Fairfield Greenwich Compl. ¶¶ 33, 40.) Through FGG, Noel and Tucker organized the largest BLMIS feeder fund, Fairfield Sentry, as well as Fairfield Sigma, which invested all of its assets in Fairfield Sentry. (*Id.* ¶ 34.) Fairfield Sigma was a "currency fund" that accepted

8

subscriptions from investors in Euros, respectively, converted the money to U.S. Dollars, and then purchased shares of Fairfield Sentry. (*Id.* ¶¶ 34, 50, 224.)

Noel and Tucker formally organized the Fairfield Funds as international business companies under the laws of the Territory of the British Virgin Islands ("BVI"). (*Id.* ¶ 40.) As international business companies, BVI law restricted the Fairfield Funds from doing business with other BVI citizens and residents except with other BVI international business companies. (*Id.* ¶¶ 197, 226.) The Fairfield Funds were shell corporations present in the BVI solely on paper. (*Id.*) Their registered address, as required by BVI statute, was a post office box, care of a local trust company owned and operated by a local law firm. (*Id.* ¶¶ 198, 227, 239.)

From their inception until their liquidation in 2009, the Fairfield Funds had no employees and no offices. (*Id.* ¶ 199.) At all relevant times, the Fairfield Funds were operated almost entirely by FGG personnel who maintained final control of the Fairfield Funds' bank accounts and relationships with the Fairfield Funds' back office service providers. (*Id.* ¶¶ 199, 204, 207, 211, 228, 231-32.)

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. (*Id.* ¶¶ 200, 213.) In the account opening documents, Tucker identified Fairfield Sentry's mailing address as Fairfield International Managers' office in Greenwich, Connecticut and directed BLMIS to send Fairfield Sentry's monthly account statements, trade confirmations, and correspondence to the same Fairfield International Managers office. (*Id.* ¶ 200.) In January 1998, FGG requested BLMIS to send all Fairfield Sentry account information to FGG's New York City headquarters. (*Id.*)

From the Fairfield Funds' inception, FGG personnel at its New York headquarters controlled the sales and subscriptions of the funds' shares. (*Id.* ¶ 204, 231-32.) Each of the Fairfield Funds' shareholders, including HSBC Suisse, executed a subscription agreement and,

9

beginning in at least January 1, 2003, agreed to be bound under New York law and further submit to jurisdiction for all disputes in New York. (*Id.* ¶ 207, 232; Compl. ¶ 477.)

FGG New York headquarters personnel monitored the Fairfield Funds' investments, managed the relationships and investments with BLMIS, marketed the Fairfield Funds, approved all subscriptions for Fairfield Funds' shares, maintained the Fairfield Funds' books and records at the FGG New York City headquarters, and made all strategic and operational decisions regarding the Fairfield Funds. (Fairfield Greenwich Compl. ¶¶ 204, 231-32.)

## CONCLUSION

For the reasons set forth herein and in the Trustee's main brief, the Trustee's claims against HSBC Bank plc and HSBC Suisse are not purely foreign or subject to dismissal on the grounds of extraterritoriality, and the Trustee should be granted leave to amend.

Dated: June 26, 2015  
New York, New York

/s/ David J. Sheehan  
David J. Sheehan  
Baker & Hostetler LLP  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*