**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-1364 (SMB) |
| Plaintiff, | |
| v. | |
| HSBC BANK PLC, et al., | **SECOND AMENDED COMPLAINT** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ...........................................................................1

II.    JURISDICTION AND VENUE ....................................................................1

III.   BACKGROUND, THE TRUSTEE, AND STANDING..................................2

IV.   THE PONZI SCHEME..................................................................................5

V.    FACTS CONCERNING THE FEEDER FUND DEFENDANTS AND
THEIR MANAGEMENT ...............................................................................8

     A.     The Benbassat Funds' Introduction to BLMIS ....................................9

     B.     The Benbassats Establish Hermes and Lagoon ...................................10

     C.     The Medici Funds' Introduction to BLMIS and Primeo's Formation ...................13

     D.     Genevalor Establishes Thema International .........................................15

     E.     Genevalor Establishes Thema Fund/Thema Wise .................................17

     F.     The Establishment of Alpha Prime .....................................................19

     G.    The Establishment of Herald Fund, Senator Fund, and Herald (Lux) ...................21

     H.    The Establishment of Lagoon Trust.....................................................24

     I.     HSBC Alternative Fund Services and HSBC's Role as Administrator and
Custodian ............................................................................................25

     J.     HSBC Private Bank ..............................................................................27

     K.    HSBC Global Structured Fund Products ..............................................29

VI.   PERSONAL JURISDICTION........................................................................30

     A.     The HSBC Administrators....................................................................31

     B.     The HSBC Custodians ..........................................................................31

     C.     HSBC Private Bank and GSFP ............................................................31

     D.     The Feeder Fund Defendants ...............................................................32

     E.     The Management Defendants ...............................................................33

VII.  BLMIS WAS THE PERFECT STRUCTURE FOR FRAUD..........................33

     A.     Unusual Fee Structure..........................................................................34

# TABLE OF CONTENTS

Page

B.   The Defendants Knew That BLMIS's Operational Structure Was Vulnerable to Fraud Because It Subverted Checks and Balances ............................................35

C.   Thema International, Its Service Providers, and Its Directors Intentionally Violated the Law and Misled Regulators in Delegating Duties to BLMIS ...........38

D.   Various HSBC Entities Knew That Having BLMIS as Custodian Was a Serious Fraud Risk ................................................................................................40

E.   HSBC Bank plc Instructed KPMG to Audit BLMIS and KPMG and Concluded That BLMIS's Structure Was Rife With Risks of Fraud....................42

F.   BLMIS's Lack of Account Segregation Was Recognized as a Serious Fraud Risk ....................................................................................................................46

G.   BLMIS, Known as an Innovator in Electronic Trading, Provided Only Delayed Paper Statements.......................................................................................47

H.   Madoff's "Strip Mall" Auditor Was Neither Qualified Nor Capable of Auditing a Global Investment Management Company with Billions of Dollars Under Management ....................................................................................49

I.   The Defendants Knew That the SSC Strategy BLMIS Purported to Employ Could Not Yield the Results Reported on the BLMIS Account Statements .........50

J.   Defendants Knew That Madoff's Returns Were Not the Result of the SSC Strategy ................................................................................................................54

     1.   Defendants Knew That Madoff's Returns Could Not Be Replicated and Sought to Explain Madoff's Returns as a Product of Illegal Front Running.........................................................................................................54

K.   Madoff's Exits From the Market Did Not Comport With the SSC Strategy.........58

L.   BLMIS Customer Statements and Confirmations Showed Trades That Were Inconsistent With the SSC Strategy.......................................................................58

     1.   Speculative Options Trading....................................................................60

     2.   Options Confirmations Reflected Trades Inconsistent with SSC Strategy ....................................................................................................62

     3.   BLMIS Customer Statements Showed Improperly Hedged Equities Positions That Were Inconsistent With the SSC Strategy .........................64

VIII.   BLMIS CUSTOMER STATEMENTS REPORTED IMPOSSIBLE TRADES ....................................................................................................................65

# TABLE OF CONTENTS

Page

A. The BLMIS Account Statements Reflected Impossible Options Trading Volumes ........................................................................................66

B. The Volume of Assets Under Management Was Too Large to Execute the SSC Strategy ........................................................................72

C. The Timing of BLMIS's Purported Securities Transactions Was Impossible ......73

D. BLMIS Purported to Sell Equities Outside the Daily Reported Price Ranges ......75

E. The Dividend Activity Shown on Customer Statements Was Impossible ............77

F. BLMIS's Trade Confirmations Frequently Contained Settlement Anomalies and Errors in Purported Options Transactions......................................................79

G. BLMIS Engaged in Unauthorized Margin Trades.................................................79

IX. PURPORTED OPTIONS CONTRACTS ENTERED INTO BY BLMIS ON BEHALF OF CUSTOMERS DID NOT IDENTIFY COUNTERPARTIES ....................................................................................................81

X. THE INITIAL AND SUBSEQUENT TRANSFERS TO THE DEFENDANTS ARE AVOIDABLE AND RECOVERABLE BY THE TRUSTEE....................................................................................................................84

A. Initial Transfers From BLMIS To Initial Transferees .........................................84

B. Subsequent Transfers from Initial Transferees ....................................................86

C. Recovery of Additional Transfers from HSBC ....................................................88

   1. The Rye Funds ............................................................................................88

      a. Background ....................................................................................88

      b. Initial Transfers to the Rye Funds.................................................92

      c. Subsequent Transfers from the Rye Funds ...................................94

      d. Tremont Received Repeated Fraud Warnings and Either Knew of, or Was Willfully Blind to, BLMIS's Fraud.............................96

      e. Tremont Knew Of And Appreciated The Multitude Of Red Flags Suggesting A High Probability Of Fraud At BLMIS.........100

         (1) BLMIS Did Not Have a Qualified or Capable Auditor ...100

         (2) BLMIS's Operations Lacked Third-Party Oversight.......101

## TABLE OF CONTENTS

**Page**

    (3)     Unidentified Options Counterparties ...............................101

    (4)     Lack of Scalability ..........................................................102

    (5)     Madoff's Unusual Fee Structure......................................102

   f.     Tremont Purposely Exempted BLMIS From Its High Due
Diligence Standards ....................................................................102

   g.     Tremont And Its Funds Received Hundreds Of Millions Of
Dollars From Its BLMIS Investment ...........................................103

  2.    Greenwich Sentry and Fairfield Sentry....................................104

   a.     Background and Initial Transfers...................................104

   b.     Subsequent Transfers from Fairfield Sentry, Fairfield Sigma,
and Greenwich Sentry...................................................................106

  3.    Harley.........................................................................................108

   a.     Harley Sought Out the United States as a Place to Invest and
the Transfers it Received Arose Out of its Investment Account
with BLMIS in New York .............................................................108

   b.     BLMIS in New York Acted as Harley's Custodian....................108

   c.     Fix Asset Management Ltd. Managed Harley from New York...109

   d.     Harley Received Transfers at Bank Accounts Held in New
York .............................................................................................111

   e.     Harley Was Administered By Fortis Entities in New York........111

   f.     Initial Transfers to Harley.............................................112

   g.     GSFP's Subsequent Transfers From Harley ...............................113

  4.    Thema International ..................................................................114

  5.    Subsequent Transfers from Thema International....................115

COUNT ONE FRAUDULENT TRANSFERS – 11 U.S.C. §§ 105(a), 502(d),
548(a)(1)(A), 550(a), AND 551 ...............................................................116

COUNT TWO FRAUDULENT TRANSFERS – 11 U.S.C. §§ 105(a), 502(d),
548(a)(1)(B), 550(a), AND 551 ...............................................................117

## TABLE OF CONTENTS

**Page**

COUNT THREE FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND
    CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§
    105(a), 502(d), 544(b), 550(a) AND 551 ........................................................119

COUNT FOUR FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND
    CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§
    105(a), 502(d), 544(b), 550 AND 551 ...........................................................120

COUNT FIVE FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND
    CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a),
    502(d), 544(b), 550(a) AND 551 ..................................................................121

COUNT SIX FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND
    CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a),
    502(d), 544(b), 550(a) AND 551 ..................................................................122

COUNT SEVEN UNDISCOVERED FRAUDULENT TRANSFERS – NEW
    YORK CIVIL PRACTICE LAW AND RULES 203(g) AND 213(8) AND
    NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278,
    AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a) AND
    551.............................................................................................................123

COUNT EIGHT RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§
    105(a) AND 550(a) ....................................................................................124

COUNT NINE OBJECTION TO AND DISALLOWANCE OF CLAIMS ..............................126

COUNT TEN EQUITABLE DISALLOWANCE OF CLAIMS..................................................126

COUNT ELEVEN EQUITABLE SUBORDINATION OF CUSTOMER
    CLAIMS ....................................................................................................128

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. § 78aaa–*lll* ("SIPA"), and the substantively consolidated estate of

Bernard L. Madoff ("Madoff," and with BLMIS, "Debtors"), by the Trustee's undersigned

counsel, for his Second Amended Complaint ("Complaint") states:

## I.    NATURE OF THE ACTION

1.      In this SIPA action, the Trustee seeks to avoid fraudulent transfers of customer

property the defendants received from BLMIS, to recover those transfers or their value from the

defendants and/or any subsequent transferees that received any portion of the initial transfers

from BLMIS, and any other relief the Court deems just, proper, and equitable.

2.      Defendants are BLMIS feeder funds, their sophisticated service providers and

institutional subsequent transferee investors, all of which either knew BLMIS was engaged in

fraud or were aware of evidence strongly indicating fraud.  Nonetheless defendants continued to

invest and/or facilitate the investment of billions of dollars with BLMIS.  Collectively,

defendants received approximately $1,493,981,000 in avoidable transfers from BLMIS.  All

moneys withdrawn from BLMIS, whether redemptions by feeder funds, their institutional

investors, or fees paid to the feeder funds' service providers, is customer property, as defined by

SIPA section 78*lll*(4), and must be returned to the Trustee for equitable distribution to BLMIS

customers with allowable claims.

## II.    JURISDICTION AND VENUE

3.      This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC*, No. 08 CV 10791 (the "District Court Proceeding"), and has been referred to this

Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and

(e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

4.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

The Trustee consents to the entry of final orders or judgment by this Court.

5.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

6.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),

11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 548(a), 550(a) and 551, the New York

Fraudulent Conveyance Act (New York Debt. & Cred. Law "(NYDCL") §§ 270–281

(McKinney 2001)), the New York Civil Practice Law and Rules (McKinney 2003) ("N.Y.

C.P.L.R."), and other applicable law.[1]

## III.    BACKGROUND, THE TRUSTEE, AND STANDING

7.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding.

8.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

---

[1] Until a non-appealable, final determination of the applicable measure and burden of proof concerning a
defendant's knowledge in connection with the application of section 546(e) of the Bankruptcy Code to the Trustee's
claims, the Trustee asserts avoidance and recovery claims under sections 548(a)(1)(B), 544(b)(1), 550, and 551 of
the Bankruptcy Code, and applicable provisions of the NYDCL.

9.      Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

(a)      appointed the Trustee for the liquidation of the business of BLMIS
pursuant to SIPA § 78eee(b)(3);

(b)      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
SIPA § 78eee(b)(3); and

(c)      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

10.      By orders dated December 23, 2008 and February 4, 2009, respectively, this

Court approved the Trustee's bond and found that the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

11.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the

SIPA Proceeding.

12.      At a plea hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information

filed against him by the United States Attorney for the Southern District of New York.  At the

plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side

of [BLMIS]."

13.      At a plea hearing on August 11, 2009, in *United States v. DiPascali*, Case No. 09-

CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count

criminal information charging him with participating in and conspiring to perpetuate the Ponzi

scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with

BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least

the 1980s.

3

14.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

15.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme perpetuated in BLMIS's investment advisory business ("IA Business").

16.     As the trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in SIPA § 78fff-2(c)(1)(A)-(D).

17.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent they are consistent with SIPA.

18.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including sections 323(b), 544,

and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers
under Bankruptcy Code sections 544, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-
2(c)(3).

19.    The Trustee has standing to object to customer and creditor claims under SIPA
§§ 78fff-1(a) and 78fff(b), and Bankruptcy Code section 502(a), because the Trustee has the
power and authority to discharge obligations to a customer to the extent they are established to
the satisfaction of the Trustee under SIPA §§ 78*lll*(2) and 78fff-2(b).  By his objection, the
Trustee seeks disallowance of any customer and general creditor claims that are unenforceable
against the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not
been established to his satisfaction; (ii) SIPA § 78*lll*(2), because such claims are not entitled to a
distribution *pari passu* with other customers;  and (iii) 11 U.S.C. § 502(b)(1), because such
claims are otherwise unenforceable under applicable law.

## IV.    THE PONZI SCHEME

20.    Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1,
2001, Madoff continued BLMIS as a sole member limited liability company organized under
New York law.  BLMIS's ownership and control structure never changed.  BLMIS was
continually registered with the SEC, and remained a SIPC member from 1970 onward.  BLMIS's
principal place of business was 885 Third Avenue, New York, New York.  Madoff, as founder,
sole owner, chairman, and chief executive officer, operated BLMIS with several family members
and other employees, including DiPascali, Kugel, Bonventure, Bongiorno, and Crupi.

21.    Beginning in the 1990s, Madoff outwardly ascribed the consistent investment
success of BLMIS's IA Business to the "split-strike conversion" ("SSC") investment strategy.
Madoff claimed his strategy would produce steady returns without the volatility in the stock
market or other high return investment strategies.  Madoff generally indicated that investors'

funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100"), which is a collection of the 100 largest publicly traded companies, as determined by Standard & Poor's Index Committee. The basket of stocks was designed to correlate to the movement of the S&P 100. The second part of the SSC strategy involved purporting to sell call options and buy put options on the S&P 100; this is commonly referred to as a "collar." Madoff purported to purchase and sell option contracts to control the downside risk of price changes in the basket of stocks correlated to the performance of the S&P 100.

22.    All options relating to the companies within the S&P 100, including options based upon the S&P 100 itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

23.    BLMIS commingled all funds received from IA Business investors in a single BLMIS account maintained at JPMorgan Chase Bank, N.A.

24.    Because Madoff claimed that he would carefully time purchases and sales to maximize value, customer funds would intermittently be out of the market. During those times, Madoff claimed that the funds were invested in U.S. Treasury bills ("Treasury Bills") or mutual funds invested in Treasury Bills. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation ("DTC"), the clearing house for such transactions, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

25.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements.

26.     Madoff operated the IA Business as a Ponzi scheme.  The money received from IA Business customers was used primarily to make distributions to, or payments for, other customers.  The falsified trades reflected in monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments.  The Ponzi scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow of new investments with BLMIS's IA Business.

27.     Since at least 1983, BLMIS financial reports filed with the SEC fraudulently omitted the existence of the billions of dollars of customer funds held by BLMIS.

28.     BLMIS did not register as an investment adviser with the SEC until August 2006.  At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser Registration) representing that BLMIS had 23 customer accounts and assets under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually with the SEC, the latest of which was filed in January 2008.  BLMIS's January 2008 Form ADV represented that BLMIS maintained 23 customer accounts with $17.1 billion in assets under management.  In fact, at that time BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion.

29.     Contrary to standard practice in the investment advisory industry, BLMIS did not charge the IA Business customers a fee for investment advisory services.  Instead of investment advisory fees, BLMIS purported to accept commissions for the purported trades, as reflected in the fraudulent IA Business customer statements. Others that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged hundreds of millions of dollars for investment advisory services attributed to BLMIS.

30.     Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person

accounting firm in Rockland County, New York, audited BLMIS.  Of the three employees, one

was an administrative assistant and one was a semi-retired accountant living in Florida.  On or

about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded

guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

31.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    FACTS CONCERNING THE FEEDER FUND DEFENDANTS AND THEIR MANAGEMENT

32.      Ponzi schemes require constant infusions of money to survive.  In the early

1990s, Madoff's sources of money threatened to run dry.  He turned his attention to European

investors as a new source of funds.  Madoff relied on his colleagues with European connections,

like Sonja Kohn, an Austrian investment professional, and the Benbassats, a family of Swiss

investment professionals, to help create new sources of revenue.

33.     Kohn developed a relationship with Madoff in the late 1980s when she was living

in New York and working in the financial industry.  Kohn referred investors to BLMIS

beginning in the 1980s.

34.     Kohn and Mario Benbassat, the patriarch of the Benbassat family, were business

colleagues.  It was Kohn who introduced Mario Benbassat to Madoff in 1992.

35.     The Benbassat family—which also included Mario's sons Alberto and

Stephane—along with colleagues in the Swiss investment community, established and managed

a group of feeder funds—investment funds that invested with BLMIS.

36.     In 1993, Kohn returned to Austria from New York.  There, Kohn forged a relationship with Unicredit Bank Austria AG ("Bank Austria"), to which she touted her connection to Madoff.  Kohn and her colleagues at Bank Austria also established and managed a group of BLMIS feeder funds.

37.     Between 1992 and 2008, Kohn, the Benbassats, and their colleagues and business associates, created a variety of BLMIS feeder funds, including defendants Hermes, Lagoon, Lagoon Trust, Thema Fund, Thema Wise, Thema International, and Alpha Prime (each as defined below, and collectively, the "Feeder Fund Defendants"), as well as Primeo, Herald, Senator, and Herald (Lux), each mimicking the structure of its predecessor.  Over the course of this 16-year period, various individuals met with Madoff for the Feeder Fund Defendants to discuss their performance and Madoff's strategy.  Based on these discussions, investments with BLMIS were continually approved.

### A.     The Benbassat Funds' Introduction to BLMIS

38.     In the early 1980s, Mario Benbassat founded Genevalor, Benbassat et Cie ("Genevalor"), a Geneva-based asset management firm that counted Mario, Alberto and Stephane Benbassat; as well as David Smith, as its partners.  In 1992, Mario Benbassat and certain of his colleagues in the Swiss financial community, Peter Schmid among them, sought to establish a market-neutral, low volatility investment vehicle.  As a director of Fairfield Sentry Limited ("Fairfield Sentry"), another BLMIS feeder fund, Schmid was familiar with BLMIS, and proposed investing with BLMIS.

39.     BLMIS had a reputation of exclusivity.  To open an account required Madoff's approval.  Mario Benbassat turned to Sonja Kohn for an introduction, and Kohn facilitated a May 1992 meeting between Benbassat and Madoff.  The meeting cleared the path for the

Benbassats' investment with BLMIS.  Over the next 15 years, the Benbassats and their associates met with Madoff dozens of times at BLMIS's offices.

40.    Madoff recognized that the Benbassats could potentially direct a large influx of new money.  For their part, the Benbassats came to believe that they had a "favored" position with Madoff.  From that position, the Benbassats established a series of BLMIS investment vehicles over the next decade.

**B.    The Benbassats Establish Hermes and Lagoon**

41.    In early 1992, the Benbassats established defendant Lagoon Investment Limited ("**Lagoon**"), a BVI corporation, with a principal office at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.

42.    In April 1992, the Benbassats, along with certain other Swiss asset managers, established defendant Hermes International Fund Limited ("**Hermes**"), a BVI corporation, whose registered agent is Codan Trust Company (B.V.I.) Ltd., now known as Codan Trustees (B.V.I) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, BVI ("Codan Trustee BVI").

43.    Despite having a registered address in BVI, Lagoon and Hermes had no physical offices or employees there.  The transfers they received from BLMIS also never entered that jurisdiction.

44.    Lagoon opened BLMIS account 1FN021 on April 30, 1992.  Lagoon entered into a BLMIS Customer Account Agreement, a Trading Authorization Limited to Purchases and Sales of Securities, and an Option Agreement (collectively, the "Lagoon Account Opening Documents").  The Lagoon Account Opening Documents were signed by David Smith as director of Lagoon.  HSSL (defined below) also signed certain Lagoon Account Opening Documents.  The Lagoon Account Opening Documents provided BLMIS with complete

10

authority to buy, sell, and trade in U.S. securities on Lagoon's behalf.  Lagoon opened BLMIS accounts 1FN066, 1FN096, 1FR015 and 1FR016 between November 1994 and April 1997.

45.    Hermes's investment manager was defendant Hermes Asset Management Limited ("**Hermes Management**"), a Bermuda corporation with a registered address at Ecosse Ltd., Bermudiana Arcade, 3rd Floor, 27 Queens Street, Hamilton, HM 11, Bermuda.  Hermes Management was owned by four entities: (i) defendant Equus Asset Management Limited ("**Equus**"), a Benbassat-owned Bermuda company with a registered address at Warner Building, 85 Reid Street, Hamilton, HM 11, Bermuda; (ii) Aurelia Fund Management Limited ("Aurelia"); (iii) Inter Asset Management Inc.; and (iv) GTM Management Services Corp. N.V.  David Smith was a director of Hermes Management.

46.    Hermes had three sub-funds that invested with BLMIS through Lagoon: Hermes World, Hermes Neutral, and Hermes Universal.  Hermes World was controlled by Aurelia, and invested principally through Lagoon's BLMIS account 1FR016.  Hermes Neutral and Hermes Universal were controlled by Equus and invested through Lagoon's BLMIS account 1FN021.

47.    Hermes's custodian, until December 2006, was defendant HSBC Bank Bermuda Limited, formerly known as The Bank of Bermuda Limited (**"HSBC Bank Bermuda"**), a Bermuda financial services company with a principal place of business at 6 Front Street, Hamilton HM 11, Bermuda.  It was replaced by defendant HSBC Institutional Trust Services (Bermuda) Limited (**"HITSB"**), a Bermuda corporation with a principal place of business at 6 Front Street, Hamilton HM 11, Bermuda.

48.    Hermes's sub-custodian was defendant HSBC Securities Services (Luxembourg) S.A., formerly known as Bank of Bermuda (Luxembourg) S.A. (**"HSSL"**), a Luxembourg

*société anonyme* with a principal place of business at 16, Boulevard d'Avranches, L-1160 Luxembourg.

49.     HSBC Bank Bermuda was Hermes's administrator until October 2003 when it was replaced by defendant HSBC Securities Services (Bermuda) Ltd., formerly known as Management International (Bermuda) Ltd. (**"HSSB"**), a Bermuda corporation with a principal place of business at 6 Front Street, Hamilton HM 11, Bermuda.

50.     HSSL was Hermes's sole sub-administrator until October 2003 when HSSB delegated part of its administration function to defendant HSBC Fund Services (Luxembourg) S.A., formerly known as Management International (Luxembourg) S.A. (**"HSBC Fund Services"**), a Luxembourg corporation with a principal place of business at 16 Boulevard d'Avranches, L-1160, Luxembourg.  From October 2003 forward, HSBC Fund Services and its subsidiary HSSL jointly acted as Hermes's sub-administrator.

51.     HSBC Bank Bermuda was Lagoon's custodian until December 2006, when it was replaced by HITSB.  HSSL acted as Lagoon's sub-custodian.

52.     In addition to members of the Benbassat family, Hermes/Lagoon's directors included Wayne Chapman, David Smith, and William Thomson, all of whom were Bank of Bermuda vice presidents, Laurent Mathysen-Gerst, who was an Aurelia principal, and John C.R. Collis.   Chapman also served as a Primeo director.

53.    The following chart depicts the structure of Lagoon and Hermes:



### C.    The Medici Funds' Introduction to BLMIS and Primeo's Formation

54.    At about the same time the Benbassats were establishing Hermes and Lagoon, Kohn and her colleagues at Bank Austria began establishing their own BLMIS feeder funds.

55.    In 1993, Stephan Zapotocky, the head of Bank Austria's securities department, recruited Kohn to become a Bank Austria consultant.

56.    Kohn introduced Zapotocky to Madoff and, together, Kohn and Zapotocky established Primeo, a feeder fund that invested exclusively with BLMIS.

57.    Zapotocky traveled to New York in October 1993 and April 1994 to meet Madoff and open Primeo's first BLMIS account—1FN060.  In 1996, Primeo opened a second BLMIS

account—1FN092.  Zapotocky and officers of HSSL executed the Account Opening Documents for Primeo's BLMIS accounts.  Primeo's 1FN060 account closed in 2000 and 1FN092 closed in 2007.

58.    Bank Austria held 100% of Primeo's voting rights and the exclusive right to appoint Primeo's directors.  Bank Austria appointed its and its affiliates' high-level managers to the board, including Zapotocky and his colleagues, Peter Fischer and Ursula Radel-Leszczynski.  All three later became directors of defendant Alpha Prime (as defined below).

59.    At the same time Primeo was founded, Bank Austria sold Kohn a 90% stake (and retained for itself a 10% stake) in a company called Anton-Schwarz GmbH.  Kohn renamed the company Medici Finanz Beratung.  In 2003, Medici Finanz Beratung obtained a banking license and was renamed Bank Medici AG, now known as defendant 20:20 Medici AG ("**Bank Medici**"), with an address at Hegelgasse 17/17, 1010 Vienna, Austria.  Kohn owned approximately 75% of Bank Medici and Bank Austria owned the remainder.  Through Bank Medici, Kohn and her colleagues played a prominent role in establishing service providers and providing services to several BLMIS feeder funds.

60.    Defendant BA Worldwide Limited ("**BA Worldwide**"), a subsidiary of Bank Austria, was Primeo's investment adviser through 2007, pursuant to an agreement executed on December 15, 1993.  Bank Medici and Eurovaleur, another Kohn-owned entity, were its sub-advisers.

61.    Primeo appointed HSSL its custodian and HSBC Bank (Cayman) Ltd. its administrator.  HSBC Bank (Cayman) Ltd. delegated certain administrator duties to HSSL.

62.    The following chart depicts Primeo's structure:



### D.    Genevalor Establishes Thema International

63.    It was very difficult to publicly market Hermes and Lagoon due to EU regulations governing retail investment funds.  Those regulations, commonly referred to as the "UCITS" directives, impose a high regulatory burden on publicly marketed investment funds.

64.    In 1996, the Benbassats, through Genevalor, created defendant Thema International Fund plc ("**Thema International**"), an Irish limited company, for which William Fry, Solicitors, at Fitzwilton House, Wilton Place, Dublin 2, Ireland acts as registered agent. Thema International was set up to be compliant with the UCITS directive (a "UCITS Fund") and, as such, could be more easily marketed to the public across the European Union.  Its directors included Mario Benbassat, Alberto Benbassat, Stephane Benbassat, David Smith, Gerald Brady, and Daniel Morrissey.  The transfers Thema International received from BLMIS never entered that jurisdiction.

15

65.     Thema International opened BLMIS account 1FN095 in 1996.  From 1997 until 2008, it invested exclusively through that account.  Mario Benbassat executed the BLMIS Trading Authorization for Thema International.

66.     From 1996 through 2006, Thema International's investment manager was defendant Thema Asset Management Limited ("**Thema Management BVI**"), a BVI company whose registered agent is Codan Trustee BVI.  Thema Management BVI's directors included David Smith, Mario Benbassat, Stephane Benbassat, and Alberto Benbassat.

67.     Thema Management BVI was administered and operated by Genevalor and Equus and had no employees of its own.

68.     On December 31, 2006, Bank Medici replaced Thema Management BVI as Thema International's investment manager.

69.     Thema International appointed as its custodian defendant HSBC Institutional Trust Services (Ireland) Ltd., formerly known as Bermuda Trust Dublin Limited ("**HITSI**"), an Irish limited liability company with a principal place of business at 1 Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland.  HSBC Bank Bermuda was appointed sub-custodian.

70.     Thema International's administrator was defendant HSBC Securities Services (Ireland) Ltd., formerly known as Management International (Dublin) Limited ("**HSSI**"), an Irish limited liability company with a principal place of business at 1 Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland.

71.    The following chart depicts Thema International's structure:



E.    **Genevalor Establishes Thema Fund/Thema Wise**

72.    Defendant Thema Fund Limited ("**Thema Fund**") is a BVI corporation. Its registered agent is Codan Trustee BVI. Thema Fund's directors included Alberto Benbassat, David Smith, Roberto Nespolo (a Genevalor partner and Equus director), and John Collis.

**73.**    Thema Coral Fund ("Thema Coral") was a sub-fund of Thema Fund and invested with BLMIS through defendant Thema Wise Investments Ltd. ("**Thema Wise**"), a BVI corporation, created by Genevalor in December 2002. Its registered agent is Codan Trustee BVI. Thema Wise is a subsidiary of Thema Fund and Thema Coral was its sole investor.

74.    Despite having a registered address in BVI, Thema Fund and Thema Wise had no physical offices or employees there. The transfers they received from BLMIS never entered BVI.

75.     In December 2002, Thema Wise opened BLMIS account 1FR093 and HSBC Bank Bermuda signed the Account Opening Documents on behalf of Thema Wise.  In February 2003, Mario Benbassat executed the BLMIS Trading Authorization for Thema Wise.  Thema Wise's Account Opening Documents provided BLMIS with complete authority to buy, sell, and trade in U.S. securities on Thema Wise's behalf.

76.     Defendant Thema Asset Management (Bermuda) Ltd. ("**Thema Management Bermuda**"), is a Bermuda corporation that was Thema Fund's and Thema Coral's investment manager.  Its registered agent is Ecosse Ltd., Bermudiana Arcade, 3rd Floor, 27 Queen Street, Hamilton HM 11, Bermuda.  Its directors are Nespolo and Mario, Alberto, and Stephane Benbassat.

77.     Equus provided administrative services to Thema Management Bermuda.

78.     HSBC Bank Bermuda was Thema Fund's custodian and administrator until December 2006 when it was replaced by HITSB as custodian and HSSB as administrator.  HSSL was Thema Fund's sub-custodian and sub-administrator.

79.    The following chart depicts the structure of Thema Fund, Thema Coral, and

Thema Wise:



F.    **The Establishment of Alpha Prime**

80.    Through Kohn, Madoff developed a relationship with a small group of Bank

Austria employees, including Radel-Leszczynski, Zapotocky, and Fischer.  These individuals

regularly traveled to New York to meet with Madoff in person.  Radel-Leszczynski, for example,

visited Madoff in New York at least twice a year between 1998 and 2008 on behalf of BA

Worldwide and its associated BLMIS feeder funds.

81.    In 1995, Zapotocky hired Radel-Leszczynski to work at BA Worldwide and assist

with Primeo's management.  Radel-Leszczynski became BA Worldwide's president in 2000.

82.    In 2003, in light of Primeo's success, Bank Austria, BA Worldwide, Kohn,

Zapotocky, Radel-Leszczynski, and Fischer created defendant Alpha Prime Fund Limited

("**Alpha Prime**"), a Bermuda corporation with a registered address at Bank of Bermuda Building, 6, Front Street, Hamilton HM11, Bermuda.  Despite having a registered address in Bermuda, Alpha Prime had no physical offices or employees there.  The transfers Alpha Prime received from BLMIS also never entered Bermuda.

83.    In June 2003, Alpha Prime opened BLMIS customer account 1FR097.  Radel-Leszczynski signed the Account Opening Documents on behalf of Alpha Prime.  The Account Opening Documents provided BLMIS with complete authority to buy, sell, and trade in U.S. securities on Alpha Prime's behalf.

84.    Zapotocky, Fischer, and Radel-Leszcynski, along with Kohn, were named to Alpha Prime's board of directors.  Another Alpha Prime director, Nigel Fielding, was also a Primeo director, a senior HSSL employee, and deputy head of Global Client Services for Bank of Bermuda's Global Fund Services group.  He went on to become Chief Administration Officer of HSBC's Alternative Fund Services group and is now HSBC Bank Luxembourg's CEO.

85.    Zapotocky testified that Alpha Prime was founded "on the initiative of American institutional investors" with a "very specific vision right from the start as to who should be service providers of Alpha Prime; the Bank of Bermuda/HSBC . . . and . . . Madoff acting as broker/dealer."

86.    Alpha Prime appointed defendant Alpha Prime Asset Management Ltd. ("**APAM**") as its investment manager in March 2003.  APAM is a Bermuda company with a registered address at 83 Front Street, Hamilton HM 12, Bermuda.

87.    BA Worldwide served as Alpha Prime's investment adviser from Alpha Prime's inception until August 2007.

88.    In March 2003 Alpha Prime appointed HSBC Bank Bermuda and HSSB as its administrator and HSBC Bank Bermuda as custodian and HSSL was appointed as Alpha Prime's sub-administrator and sub-custodia.

89.    On January 2, 2007, the administrator and custodian duties were novated from HSBC Bank Bermuda to HSSB and HITSB, respectively.

90.    The following chart depicts Alpha Prime's structure:



### G.    The Establishment of Herald Fund, Senator Fund, and Herald (Lux)

91.    Bank Medici, Bank Austria, BA Worldwide, Kohn, Zapotocky, Radel-Leszczynski, and Fischer continued to open BLMIS feeder funds.  For each newly established fund, HSBC entities were installed as service providers.

92.    In 2004, Kohn formed Herald Fund SPC ("Herald") "as a progression of the Primeo Fund."

93.    Kohn created another company, Herald Asset Management, to serve as Herald's investment manager, and Bank Medici was appointed the fund's primary distributor. As with Alpha Prime and Primeo, Herald's board of directors was staffed with senior executives of Bank Austria and Bank Medici.

94.    Herald appointed HSSL its custodian and administrator.

95.    The following chart depicts Herald's structure:



96.    In July 2006, Radel-Leszczynski opened an account with BLMIS for Senator Fund SPC ("Senator"). Senator's directors included Fischer and Adam Zielinski, who were also Alpha Prime directors.

97.    Senator appointed HSSL its custodian and administrator.

98.    The following chart depicts Senator's structure:



99.    On February 18, 2008, Kohn, through Bank Medici, launched Herald (Lux) SICAV ("Herald (Lux)").  Herald (Lux)'s directors and managers were Kohn's associates or had ties to other BLMIS feeder funds.  Bank Medici was appointed Herald (Lux)'s investment manager.

100.    Herald (Lux) appointed HSSL its administrator and custodian.

101.    The following chart depicts Herald (Lux)'s structure:



102.    The Bankruptcy Court has approved the Trustee's settlements with Primeo, Herald, Senator, and Herald (Lux).

103.    Alpha Prime, Primeo, Herald, Senator, and Herald (Lux) are collectively referred to herein as the "Medici Funds."

**H.    The Establishment of Lagoon Trust**

104.    In May 2006, Aurelia approached J.P. Morgan Securities Ltd. ("JPMorgan Securities") concerning the creation of a structured product referencing Hermes World.  To accomplish this, Aurelia and JPMorgan Securities created defendant Lagoon Investment Trust ("**Lagoon Trust**"), a BVI professional fund with a principal office at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Despite having a registered address in BVI, Lagoon Trust transacted no meaningful business and had no physical offices or employees there.  The transfers Lagoon Trust received from BLMIS also never entered that jurisdiction.

105.    On November 28, 2006 Lagoon Trust was constituted by a trust deed between Hermes Management as manager and Lagoon as trustee.

106.    Aurelia was Lagoon Trust's investment adviser.

107.    HSSL was Lagoon Trust's administrator and custodian.

108.    Lagoon Trust invested directly into Lagoon's BLMIS account 1FR016.

109.    The following chart depicts Lagoon Trust's structure:



110.    Lagoon Trust along with Lagoon, Hermes, Thema International, Thema Wise, and Thema Fund are collectively referred to herein as the "Benbassat Funds."

**I.    HSBC Alternative Fund Services and HSBC's Role as Administrator and Custodian**

111.    Various HSBC divisions played prominent roles for each of the Feeder Fund Defendants, and other BLMIS feeder funds, some of which are defendants in other adversary proceedings commenced by the Trustee.

112.    Pursuant to certain agreements, HSSB, HSBC Bank Bermuda, HSSL, HSSI, and HSBC Fund Services (collectively, the "HSBC Administrators") acted as administrators to the Feeder Fund Defendants.  The HSBC Administrators' primary responsibility was to calculate the funds' net asset value ("NAV").

113.    Pursuant to certain agreements, HITSB, HSBC Bank Bermuda, HSSL, and HITSI (collectively, the "HSBC Custodians") acted as custodians to the Feeder Fund Defendants.  The HSBC Custodians' primary responsibility was to safeguard the funds' assets.

114.    Through at least December 2008, HITSI also served as custodian to BLMIS

feeder funds: Defender Limited ("Defender"), BLMIS account 1FR132;  Optimal Arbitrage

Limited, BLMIS account 1FN091; Optimal Strategic US Equity Limited, BLMIS account

1FR008 (together with Optimal Arbitrage Limited, "Optimal"); and Landmark Investment Fund

Ireland ("Landmark"), BLMIS account 1FR133.

115.    HSSI also served as administrator to Defender, Optimal, and Landmark.

116.    Through at least December 2008, HSBC Bank Bermuda served as custodian to

BLMIS feeder funds: Kingate Global Fund, Ltd. ("Kingate Global"), BLMIS account 1FN061;

Kingate Euro Fund, Ltd. ("Kingate Euro"), BLMIS account 1FN086; and as administrator and

custodian to Square One Limited ("Square One"), BLMIS account 1FR048.

117.    Lagoon, Lagoon Trust, Hermes, Primeo, Thema International, Thema Fund,

Thema Wise, Alpha Prime, Senator, Herald, Herald (Lux), Defender, Optimal, Landmark,

Kingate Euro, Kingate Global, and Square One are collectively referred to as the "BLMIS Feeder

Funds."

118.    Each HSBC Administrator and HSBC Custodian acted on behalf of Alternative

Fund Services, a subdivision of HSBC's Securities Services group.  Before HSBC acquired Bank

of Bermuda, Alternative Fund Services was known as Global Fund Services. HSBC Securities

Services is itself a division of HSBC Holdings plc and part of the overall HSBC group

headquartered in London and operating through entities that include HSBC Bank plc and HSBC

Bank USA, N.A.  On behalf of Alternative Fund Services, representatives of HSSL, HSBC Bank

plc and HSBC Bank USA N.A. visited BLMIS.

119.    David Smith signed a 1996 sub-custody agreement between BLMIS and HSBC

Bank Bermuda.  Therefore, David Smith's employers and the entities for which he acted as

director—Equus, HSBC Bank Bermuda, Lagoon, Thema Wise, Thema International, Thema

Management BVI, and Thema Management Bermuda—knew that BLMIS was ultimately

holding the money.

120.    Nigel Fielding signed a 2002 sub-custody agreement between BLMIS and HSSL.

Therefore, Nigel Fielding's employers and the entities for which he acted as director—Alpha

Prime, Primeo, HSSL, and Alternative Fund Services—knew that BLMIS was ultimately holding

the money.

121.    Each HSBC Administrator and HSBC Custodian received fees based on either the

NAV or the gross assets of the BLMIS Feeder Fund to which it provided services.

122.    Additionally, defendant **HSBC Bank plc**, a British public limited company with a

principal place of business at 8 Canada Square, London E14 5HQ, United Kingdom, provided

administrative support as well as overdraft, foreign exchange, and credit facilities to the BLMIS

Feeder Funds.

### J.    HSBC Private Bank

123.    In addition to being a service provider, HSBC invested its own moneys in

BLMIS's scheme through its Private Banking and Global Structured Fund Products groups.

124.    Defendant HSBC Bank USA, N.A. ("**HSBC Bank USA**") is a national bank

chartered by the Office of the Comptroller of the Currency with its principal executive office at

452 Fifth Avenue, New York, New York 10018 and its corporate headquarters at 1800 Tysons

Boulevard, Suite 50, McLean, Virginia 22102.  HSBC Private Bank in New York is a division of

HSBC Bank USA and is located at 452 Fifth Avenue, New York, New York 10018.

125.    HSBC Bank USA invested in and redeemed from BLMIS feeder fund Fairfield

Sentry.

126.     Defendant HSBC Private Bank (Suisse) S.A., formerly known as Republic National Bank of New York (Suisse) S.A., HSBC Republic Bank (Suisse), and HSBC Guyerzeller Bank AG (collectively, "**HSBC Suisse**") is a Swiss public company with its principal place of business at Quai des Bergues 9-17, P.O. Box 2888, 1211 Geneva 1, Switzerland, and serves as the headquarters for HSBC's Private Banking group.  HSBC Suisse was an investor in and redeemed from Fairfield Sentry and Fairfield Sigma Limited ("Fairfield Sigma").

127.     HSBC Bank USA and HSBC Suisse are referred to collectively as "HSBC Private Bank."

128.     Starting in or around 2000, HSBC Private Bank conducted extensive due diligence on Fairfield Sentry on an annual or semi-annual basis using HSBC Private Bank's New York employees.  These HSBC Private Banking employees repeatedly visited Fairfield Greenwich Group's ("FGG") headquarters in New York. FGG managed Fairfield Sentry, Fairfield Sigma and Greenwich Sentry L.P. ("Greenwich Sentry").

129.     Beginning in the late 1990s, HSBC Private Bank solicited its clients to invest in BLMIS feeder funds, including, but not limited to, Fairfield Sentry, Fairfield Sigma, Kingate Global, Kingate Euro, Primeo, Thema International, and Ascot Fund, Ltd. (collectively, the "Madoff Private Bank Feeder Funds").

130.     HSBC Private Bank marketed, recommended, and invested in the Madoff Private Bank Feeder Funds even though funds like Fairfield Sentry were not approved for HSBC's own fund platform. HSBC Private Bank also made written and oral representations that it performed due diligence on the funds it recommended.

131.    HSBC Private Bank told clients that it invested in BLMIS feeder funds and

distributed a list of recommended investments, which included the Madoff Private Bank Feeder

Funds.

### K.    HSBC Global Structured Fund Products

132.    HSBC's Global Structured Fund Products Group ("HSBC GSFP" or "GSFP")

was managed out of New York and entered into transactions involving several BLMIS feeder

funds (the "GSFP Structured Products").

133.    The GSFP Structured Products transactions involved HSBC Bank plc, HSBC

Bank USA, and defendant **HSBC USA Inc.**, a Maryland corporation registered to do business in

New York, with a principal executive office at 452 Fifth Avenue, Tower 7, New York, New

York 10018.  HSBC USA Inc. and HSBC Bank USA share the same principal executive offices,

chief executive officer and president (since 2000), and multiple directors (since 2006).  HSBC

Bank plc, HSBC Bank USA, and HSBC USA Inc. are collectively referred herein to as the

"GSFP Entities."

134.    With respect to certain GSFP Structured Products, HSBC Bank plc invested in

and redeemed from the following BLMIS feeder funds: (i) Harley International (Cayman) Ltd.

("Harley") beginning in June 2007; (ii) Thema International beginning in August 2007; (iii) Rye

Select Broad Market Portfolio Limited ("Rye Portfolio") beginning in August 2007; and (iv)

Senator beginning in September 2007.

135.    With respect to certain GSFP Structured Products, HSBC USA Inc. and/or HSBC

Bank USA invested in and redeemed from the following BLMIS feeder funds: (i) Rye Select

Broad Market Fund, L.P. ("Rye Broad Market") beginning in September 2006, and (ii)

Greenwich Sentry beginning in March 2007.

136.    The Madoff feeder funds in which GSFP invested are collectively referred herein as the "Madoff Reference Funds."

137.    The GSFP Structured Products—which bore names like "accreting strike call option" and "collateralized swap"—provided leverage to would-be investors in BLMIS feeder funds.  GSFP shouldered little risk in promising levered returns—it hedged these facilities by investing the levered amounts in the Madoff Reference Funds.  Before finalizing each GSFP Structured Product, GSFP analyzed the Madoff Reference Funds.

138.    GSFP employees in New York and London worked together to create the GSFP Structured Products and invest in the Madoff Reference Funds.  GSFP's members in New York were integrally involved in the creation and sale of the GSFP Structured Product transactions.  They also received notifications relating to the GSFP Structured Products, and were integrally involved in researching and monitoring the Madoff Reference Funds.

139.    GSFP monitored the reference fund for compliance with GSFP's investment guidelines directed to the transactions and related hedges.

140.    Upon information and belief, no later than February 2008, HSBC's Alternative Fund Services, GSFP, and HSBC Private Bank were aware of each other's analyses of BLMIS feeder funds.

141.    HSBC Bank plc, HSBC Bank USA, HSBC USA Inc., HSSB, HITSB, HSBC Bank Bermuda, HSSL, HSBC Suisse, HITSI, HSSI, and HSBC Fund Services are collectively referred to as "HSBC."

## VI.    PERSONAL JURISDICTION

142.    This Court has personal jurisdiction over all of the defendants because they invested or assisted others to invest with BLMIS in New York, transacted business in New York, entered into agreements in New York, delivered agreements to BLMIS in New York,

30

communicated regularly with persons in New York, sent money to and received money from

BLMIS in New York.

### A.    The HSBC Administrators

143.    This Court has personal jurisdiction over the HSBC Administrators because they

acted as agents for the funds they administered in dealing with BLMIS in New York.  The HSBC

Administrators purposefully availed themselves of the laws of the State of New York by

undertaking substantial commercial activities in New York and by receiving customer property

in exchange for such activity.

### B.    The HSBC Custodians

144.    This Court has personal jurisdiction over the HSBC Custodians because the

HSBC Custodians purposely availed themselves of the laws of the State of New York by

undertaking substantial commercial activities in New York and by receiving customer property

in exchange for such activity.

145.    The HSBC Custodians acted as agents for the funds for which they had custodial

duties.  Each HSBC Custodian, except HITSB, executed one or more sub-custody agreements

with BLMIS.  As custodians and sub-custodians, the HSBC Custodians directed and facilitated

the transfer of billions of dollars to and from BLMIS through HSBC Bank USA in New York for

the BLMIS feeder funds they serviced.  The transfers directed and/or facilitated by the HSBC

Custodians to BLMIS were for the purported purchase and sale of securities in New York.

### C.    HSBC Private Bank and GSFP

146.    HSBC Private Bank and the GSFP Entities—HSBC Suisse, HSBC Bank USA,

HSBC USA Inc., and HSBC Bank plc—are subject to personal jurisdiction in this judicial

district because they purposely availed themselves of the laws and protections of the United

States and New York by, among other things, knowingly creating, analyzing, and directing

31

investments into BLMIS via various BLMIS feeder funds.  HSBC Bank plc regularly analyzed

BLMIS.  HSBC Private Bank regularly conducted due diligence on BLMIS feeder funds such as

Fairfield Sentry and Harley by sending HSBC Bank USA employees to the New York offices

that supported these funds.  HSBC Private Bank and GSFP also knowingly invested with feeder

funds that invested with BLMIS, thereby knowingly accepting the rights, benefits, and privileges

of conducting business and/or transactions in the United States and New York.

>    **D.**    **The Feeder Fund Defendants**

147.    This Court has personal jurisdiction over the Feeder Fund Defendants that opened

and maintained BLMIS accounts and instructed the HSBC Custodians to send moneys to and

receive moneys from BLMIS's account at JPMorgan Chase Bank, N.A., Account

#xxxxxxxxxxx1703, in New York, New York, for their accounts at BLMIS to conduct trading

activities in U.S. securities in New York.  All Feeder Fund Defendants otherwise purposely

availed themselves of the laws of the State of New York by conducting business in New York,

entering into agreements in New York, and communicating regularly with persons in New York

about their BLMIS investments.  HSBC Bank plc, which was the Feeder Fund Defendants'

transfer bank, held an account at HSBC Bank USA in New York.  For all purposes herein, the

Feeder Fund Defendants acted through their agents.

148.    Several of the Feeder Fund Defendants have filed customer claims with the

Trustee in connection with their BLMIS accounts, thereby submitting to the jurisdiction of the

Bankruptcy Court.  On February 2, 2009, Alpha Prime filed a claim with the Trustee with respect

to BLMIS account number 1FR097.  On March 9, 2009, Lagoon filed two claims with the

Trustee with respect to BLMIS account numbers 1FR016 and 1FN021.  Also on March 9, 2009,

Thema Wise filed a claim with the Trustee with respect to BLMIS account number 1FR093.  On

July 2, 2009, Thema International filed, under SIPA and the Bankruptcy Code, a customer claim

for losses in connection with its BLMIS account.   By filing these customer claims Alpha Prime,

Lagoon, Thema Wise and Thema International submitted to the jurisdiction of this Court.

### E. <u>The Management Defendants</u>

149.    APAM, BA Worldwide, Hermes Management, Thema Management Bermuda,

Thema Management BVI, Bank Medici, and Equus are collectively referred to as the

"Management Defendants."

150.    This Court has personal jurisdiction over the Management Defendants because, as

agents for the Feeder Fund Defendants, either directly or through their subsidiaries and affiliates,

the Management Defendants ordered the delivery and receipt of money to and from the Feeder

Fund Defendants' BLMIS accounts to conduct trading activities.  The Management Defendants

also purposely availed themselves of the laws of the State of New York by undertaking

substantial commercial activities in New York and by receiving customer property in exchange

for such activity in the form of investment management fees that were based on the NAV of the

Feeder Fund Defendants' investment with BLMIS.

## VII.  BLMIS WAS THE PERFECT STRUCTURE FOR FRAUD

151.    BLMIS "is a perfect structure for fraud."  These were the words of Christine Coe,

the head of Global Risk for HSBC Securities Services at HSBC Bank plc.  Coe was right.  The

problem she observed, the delegation of multiple key functions to BLMIS—which BLMIS

performed for free and which obscured any system of checks and balances—was an obvious,

unequivocal hallmark of fraud.  The defendants' incentive was Madoff's promise of guaranteed

returns.  But it was this very incentive that created the "perfect structure for fraud."

152.    Defendants knew of numerous trading impossibilities in the reported performance

of the BLMIS Feeder Funds' accounts.  These impossibilities are not facts "suggestive" of fraud

or "warning signs" that should have led to further inquiry—they are quantitative evidence

demonstrating that their BLMIS customer statements and trade confirmations reported non-existent securities transactions.  In addition to objective trading impossibilities, defendants saw and recognized myriad other indicia of fraud.

### A.    Unusual Fee Structure

153.    BLMIS was to perform three basic services for these feeder funds: (i) investment management; (ii) custody of assets; and (iii) securities trading.  In a traditional setting, BLMIS would have charged fees for each service.

154.    An investment fund's performance depends on the skill and active decision-making of its investment managers, which typically charge two types of fees: (i) management fees, usually based on a fixed percentage of the NAV; and (ii) performance fees, usually based on gains.

155.    The Feeder Fund Defendants turned over all investment advisory duties to Madoff at BLMIS, who performed those services for free, and inexplicably walked away from hundreds of millions of dollars in management and performance fees.

156.    As early as 2001, HSBC Private Bank recognized that madoff's forfeiture of the typical management and performance fees was a concern.

157.    In a 2007 diligence report on Fairfield Sentry, HSBC Private Bank noted that Madoff did not charge management and performance fees, and found that "[t]he lack of transparency involving fees paid to Madoff was disturbing." The report also noted that the only fees that BLMIS was supposed to charge—brokerage fees—were "not disclosed anywhere, not even [in] the audited financial statements."

158.    David Smith, one of Thema International's directors, knew that Madoff's fees were unusual and wrote to Paul Smith, who at one point was the head of HSBC Alternative Fund Services and in charge of HSBC's relationship with Madoff, commenting that "Madoff does not

34

receive a management fee." David Smith further noted that BLMIS's brokerage fees were "extremely cheap . . . and below market price."

159.   The Management Defendants, on the other hand, did charge and receive fees. The following chart shows estimated fees received by the Management Defendants:

|  | Estimated Fees |
|---|---|
| APAM | $16,767,897 |
| Bank Medici | $12,905,415 |
| Hermes Management | $79,334,375 |
| BA Worldwide | $12,292,607 |
| Thema Management BVI | $105,437,711 |
| Thema Management Bermuda | $10,558,411 |
| Equus | $1,761,740 |

## B.   The Defendants Knew That BLMIS's Operational Structure Was Vulnerable to Fraud Because It Subverted Checks and Balances

160.   Under their management contracts with the Feeder Fund Defendants, the Management Defendants had the duty to implement and oversee investment strategies.

161.   The Feeder Fund Defendants knew these duties existed. For example, Alberto Benbassat testified that Thema Management BVI had the following duties: managing the asset portfolio; maintaining responsibility for the behavior, composition, and analytics of the portfolio; selecting and monitoring investment sub-managers and sub-advisers; understanding the fund's strategy and assessing the repeatability of the strategy's returns; monitoring the portfolio's performance; reviewing portfolio risk; and reporting to the board of directors on performance risk and compliance.

162.   The Management Defendants knew that BLMIS—although required to under SEC regulations—did not register with the SEC as an investment adviser before August 2006, but, nonetheless, delegated their investment advisory duties to BLMIS.

163.    Under their custodial contracts with the Feeder Fund Defendants, the HSBC

Custodians' primary duty was to safeguard and verify assets.  HSBC Bank Bermuda, HSSL, and

HITSI each entered into sub-custody agreements with BLMIS on behalf of the BLMIS feeder

funds delegating to BLMIS their primary custodial duty of holding and safeguarding assets.

HSBC Bank Bermuda and HSSL, as custodians of Herald, Hermes, Lagoon, Thema Fund, and

Senator were permitted to delegate custodial responsibilities, but were required to supervise and

monitor the sub-custodians.

164.    The Management Defendants and the HSBC Custodians delegated most of these

duties to BLMIS, concentrating in BLMIS the functions of the fund's investment adviser,

custodian, and broker-dealer responsible for initiating and executing securities trades.

165.    Aside from their contractual obligations, the HSBC Administrators and

Custodians were obligated to follow their respective jurisdictions statutes and regulations

governing to whom they could sub-delegate duties.  For instance, under Luxembourg law, HSSL

could sub-delegate only to entities as sophisticated and reputable as HSSL was, and then only if

HSSL could perform ongoing due diligence to ensure the sub-delegate's compliance.

166.    Kohn was aware that Madoff was broker and custodian, and managed the

accounts.  Likewise, Alberto Benbassat knew that Madoff was the one making the investment

decisions, while acting as both investment adviser and custodian.  An internal Hermes document

lists Madoff and DiPascali as Lagoon's fund managers and BLMIS as Lagoon's administrator.

167.    The Feeder Fund Defendants' directors had a duty to ensure that their funds'

offering documents, including the prospectuses, accurately disclosed these relationships.

168.    Immediately after BLMIS's collapse, HSBC Private Bank informed its customers

it had "consistently not approved the Madoff strategy for investment.  All hedge funds that we

36

recommend are followed by our analysts in terms of due diligence, including meeting physically

the managers, which was not possible with Madoff's hedge funds."

169.    In 2007, HSBC conducted a Structured Trade Annual Review (STAR) of GSFP's

investments in various BLMIS feeder funds (the "STAR Review").  The STAR Review noted

that due to a lack of transparency, HSBC was relying on Madoff, rather than HSBC Product

Control, to monitor investment guidelines relating to the underlying funds, which differed from

its normal process.  GSFP admitted that it could not confirm BLMIS's trade data with

independent data.  By the end of 2007, HSBC refused to increase GSFP's Madoff investment

capacity.

170.    GSFP knew that funds invested with GSFP Structured Products were invested

with BLMIS.  Yet with respect to two structured products with funds managed by Tremont

Group Holdings, Inc. ("TGH"), and Tremont Partners, Inc. ("Tremont Partners," and with TGH,

"Tremont"), HSBC Bank USA and HSBC Bank plc each agreed to refer to Madoff only as the

"Account Manager" and not by name.  The letter to HSBC Bank plc on behalf of Rye Select

Broad Market XL Portfolio Limited ("Rye XL Portfolio") was sent care of HSBC Bank USA.

171.    GSFP understood that BLMIS was custodian, prime broker, and investment

manager.  In connection with GSFP's analysis of Rye Broad Market, Tremont understood that

HSBC could accept the "reality that the custody of the assets is with Madoff (the[y] seem to have

experience with this already)."

172.    Tremont banned GSFP from contacting BLMIS in 2007—around the time GSFP

sought internal approval for the swap involving Rye XL Portfolio and HSBC Bank plc (the "Rye

XL Portfolio Swap")—and admonished a GSFP employee for calling Madoff to ask about the

number of people BLMIS employed.

C.    **Thema International, Its Service Providers, and Its Directors Intentionally Violated the Law and Misled Regulators in Delegating Duties to BLMIS**

173.    The UCITS directives require UCITS Funds to have separate, independent entities perform the roles of custodian and "investment managers."  The UCITS directives define "investment manager" as the person or entity that manages the assets of the fund and sets the investment strategy.  These functions were performed by BLMIS, which was Thema International's investment adviser and custodian.

174.    The UCITS directives also require UCITS Funds to publicly disclose their investment adviser and custodian.

175.    To ensure the investment adviser's independence from the custodian, a UCITS Fund's management company may not transform itself into a "letter box entity" by "delegat[ing] its ctions."  Thema Management BVI's delegation of all investment strategy, decision making and investment advisory functions to BLMIS relegated it to "letter box" status.

176.    By failing to disclose BLMIS as Thema International's custodian and investment adviser, Thema International violated the UCITS directives as implemented under Irish law.

177.    Before delegating custodian and advisory responsibilities to BLMIS, the Thema International Directors filed a submission with the Central Bank of Ireland, the relevant regulatory authority, proposing that the Central Bank agree that Thema International not required to identify sub-advisors  Upon information and belief, that submission was filed to avoid disclosure of the multiple, improper roles BLMIS was intended to hold for Thema International. The Central Bank rejected the submission.

178.    Following the Central Bank's rejection, no disclosure of BLMIS's multiple roles was ever made.

179.    Instead, Thema International identified HITSI as custodian.  HITSI appointed HSBC Bank Bermuda sub-custodian of Thema International, and HSBC Bank Bermuda subsequently entered into an agreement with BLMIS designating BLMIS as sub-custodian.  A June 19, 1996 email from a Bank of Bermuda entity to BLMIS explains that the sub-custody arrangement was "required to avoid the disclosure [of Madoff's role as custodian] to the [Irish] Central Bank."

180.    Thema Management BVI, and later Bank Medici, designated several investment advisers, all of which were Bank Austria affiliates.  From 2000 until December 31, 2006, BA Worldwide, Primeo's investment adviser, served as Thema International's investment adviser.

181.    Thema International, in breach of the UCITS directives, did not disclose BLMIS's role as investment adviser or include it in any Thema International prospectus.

182.    Thema International and its officers knew that BLMIS's undisclosed, dual role was illegal.

183.    Thema International knew that Madoff sought to avoid disclosing BLMIS's role as Thema International's investment adviser because BLMIS was not registered with the SEC as an investment adviser.  Moreover, Alberto Benbassat withheld Madoff's and BLMIS's names from Thema International's auditors when they asked who was making Thema International's investment decisions.  Alberto Benbassat feared the repercussions—he was concerned that Madoff would be unhappy—if the Benbassats were to disclose Madoff's name.

184.    Thema International also removed any mention of Madoff and BLMIS from all Thema International board meeting minutes, prospectuses, and other fund documents to avoid disclosing Madoff's involvement with the fund to the Irish Central Bank.

185.    David Smith explained to a third party, "Madoff never gives permission for groups to include his name on prospectuses so this document is general in nature without full disclosure."

186.    Between 2002 and 2007, the UCITS directives were further amended to require, *inter alia*, UCITS Funds to appoint a European entity as investment manager.

187.    The Thema International directors appointed Bank Medici its investment manager, knowing that Bank Medici "[would] not do anything in practice" in that role, because that function had already been delegated to BLMIS.

188.    Sonja Kohn admitted that Bank Medici was only a nominal investment manager, stating that Bank Medici did "not pick the stocks."

### D.    **Various HSBC Entities Knew That Having BLMIS as Custodian Was a Serious Fraud Risk**

189.    The HSBC Custodians were contractually obligated to ensure proper custody of fund assets.

190.    In the relevant jurisdictions, local law requires an independent custodian to hold and properly segregate assets and verify the existence and value of the assets and transactions. Failure to have such independent parties violates best industry practices.  The service providers, including those that delegated their duties to BLMIS, were required to secure against fraud and/or verify the information BLMIS provided.

191.    As early as 1996, Thema International and its custodian HITSI knew that HITSI could not independently confirm the existence of Thema International's assets and was "dependent on the flow of information from Madoff."

192.    In 1997, a member of the Global Fund Services group stated that Thema International used an "unauthorized custodian . . . that is not subject to any form of vetting and performance monitoring by the bank's network managers."

193.    In or around 2000, another Global Fund Services employee expressed a desire for "[i]ndependent confirmation that the assets of Thema [International] exist and are registered in the name of Thema [International]."

194.    In late 2001, Brian Wilkinson, an HSSI managing director, expressed additional concerns over [Thema International's] custody arrangement.  Wilkinson informed Gerald Brady, an HSBC employee and Thema International director, that HSSI could not independently verify that Madoff was trading: "[T]here are no 'Chinese' walls between asset management and clearing/custody [at BLMIS].  We are receiving trade details from Madoff the sub-custodian with no confirmation from Madoff the investment adviser, consequently we are posting trades . . . with no confirmation . . . [that] these are valid trades."

195.    By 2002, Wilkinson and Paul Smith worried about the risks inherent in BLMIS acting as both investment manager and sub-custodian without being subject to normal due diligence and monitoring procedures.

196.    Paul Smith later wrote to Fielding:  "[w]e have a problem with [Madoff].  He is the manager, broker and custodian to his accounts.  In today's world this is a red flag."

197.    By May 2005, John Gubert, head of HSBC Securities Services, was prepared to terminate Madoff relationships in relation to HSBC's activities as custodian and administrator.  He told Brian Pettitt, an HSBC Bank plc employee and head of network management for HSBC Securities Services, that the information BLMIS provided was "unacceptable."  Gubert also told Christine Coe and Brian Pettitt that HSBC had neither "full control of assets" nor "realtime site

41

[sic] of transaction flows," and noted that "there [was] no proof of best execution . . . or even actual execution."

198.     Between 2001 and 2008, HSBC Private Bank performed due diligence on Fairfield Sentry on at least nine occasions.  Each time it raised as a concern the lack of an independent custodian and the inability to verify Fairfield Sentry's trading activity.

## E.     HSBC Bank plc Instructed KPMG to Audit BLMIS and KPMG and Concluded That BLMIS's Structure Was Rife With Risks of Fraud

199.     Because of its concerns with BLMIS, in September 2005, HSBC Bank plc engaged KPMG to review BLMIS for fraud and related operational risk that would arise from BLMIS's custody of the assets of eight BLMIS feeder funds, including the Feeder Fund Defendants (the "2005 KPMG Review").

200.     Prior to the review, Fielding expressed concern that the review would not be well received by Madoff.   Nevertheless, the decision was made and the review focused on BLMIS's methods of recording and reporting client funds it held as sub-custodian.  HSBC sought evidence that BLMIS properly segregated the BLMIS feeder funds' assets—an unresolved concern since 2002, if not earlier.

201.     The 2005 KPMG Review was undertaken not as a routine, periodic review, but as a specific review for fraud prompted by concern that Madoff controlled all key aspects of the funds' investment activity.  The review was to "make sure that the trades were real and that the money that the investors were placing into Madoff Securities was being used to make investments."

202.     The Thema International directors were concerned about the 2005 KPMG Review and "tried to resist it."  In line with their consistent position to prevent scrutiny of BLMIS, David

Smith told Paul Smith that when the review was to be conducted at BLMIS's office "we expect your team will display full deference to the people they meet."

203.    Paul Smith attempted to meet with Madoff personally prior to the review, but when Madoff was unavailable, Paul Smith coordinated with Fielding, Coe, and KPMG to send an outline to help Madoff prepare for the 2005 KPMG Review.

204.    Following Madoff's receipt of the outline, KPMG conducted the BLMIS review. KPMG's findings from the 2005 KPMG Review were set forth in a February 16, 2006 report, titled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2006 KPMG Report"). It found, among other things, that there were risks of:

- falsification of client mandates;

- embezzlement of client funds;

- use of fabricated client instructions to disguise poor proprietary positions;

- diversion of client funds for Madoff's personal gain;

- inaccurate allocation of reinvested funds;

- diversion of cash resulting from the sale of equities and Treasury Bills;

- trades executed by unauthorized BLMIS staff members;

- sham trading to divert client cash;

- false reporting of trades without execution to collect commissions; and

- falsification of trade confirmations.

205.    As part of the 2006 KPMG Report, KPMG recommended that HSBC Bank plc independently confirm BLMIS's purported trading activities because the materials KPMG relied

on for the review were provided by HSBC and could have been "easily replicated or falsified in order to commit fraud." Clearly, KPMG's concerns were well founded.

206. By the end of 2007, HSBC Bank plc asked KPMG to conduct a second review and revisit BLMIS. This review was to examine the same risks as the 2005 KPMG Review, but was expanded to assess the risk presented by BLMIS having custody of the assets of 12 BLMIS feeder funds, including the Feeder Fund Defendants, and by HSBC having its own BLMIS investments through its HSBC GSFP and Private Banking divisions.

207. Coe testified that the second KPMG review in 2008 came about as a result of HSBC's reexamination of various lines of credit for BLMIS feeder funds. She was concerned that "[b]ecause of the way that cash was no longer as freely available as it had been, . . . [Madoff] m[ight] be tempted to use the money to do other things in the event that many of the funds asked for their money back."

208. In late June 2008, Coe wrote to KPMG requesting an urgent meeting among KPMG and HSBC personnel, including the "structured [products] team." A July 17, 2008 conference call involved HSBC employees from New York, London, and around the world, who voiced concerns that BLMIS was running a Ponzi scheme, front running, or employing other practices that opened HSBC to fraud risk (the "2008 HSBC Conference Call"). It was in connection with this meeting that Coe commented that BLMIS "is a perfect structure for fraud."

209. On the 2008 HSBC Conference Call, in response to a discussion of "the biggest risk" at BLMIS, Coe noted that it was that Madoff was "taking the money." KPMG offered "[t]he key thing is you need to test the existence of the actual trade. It's the only way you're going to be able to verify that this is not just an elaborate fraud."

210.    KPMG sent BLMIS a list of funds and the related accounts it would be analyzing in advance of the KPMG visit.

211.    KPMG's conclusions were set forth in a September 8, 2008 report entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2008 KPMG Report").  The 2008 KPMG Report reiterated the concerns of fraud identified by the 2006 KPMG Report, and identified additional indicia of fraud including:

- "Client cash is diverted—signatures falsified on client instruction in an attempt to legitimize an unauthorized transaction (i.e., redemption)."

- "Stocks are intentionally not allocated a fair price from the bulk trade."

212.    After the 2008 KPMG Report, Thema International continued to resist, successfully, a meaningful audit of BLMIS.

213.    Following the 2008 KPMG Report, HSBC Bank plc's Head of Network Management expressed "nervousness in HSBC about the model i.e. broking, asset [management] and custody all under one roof, particularly in view of the Sentinel fraud, which had a similar structure."

214.    In October 2008, GSFP redeemed $65 million from Senator, the majority of its hedge on swap transactions with Wailea Advisors LP's funds.  In an email to Radel-Leszczynski and Fischer, Wailea Advisors' principal, Joel Yanowitz, remarked that HSBC indicated it was "shorting" Madoff, and betting on Senator losing money.

215.    HSBC's decision to redeem came as surprise to Wailea and Senator.  Yanowitz stated that "there [had] never been a situation where the bank chose to not own the underlying fund (at least in the case of Madoff investments) . . . until now."

F.    **BLMIS's Lack of Account Segregation Was Recognized as a Serious Fraud Risk**

216.    HSBC had concerns not only about the risk that there were no assets or trades, but also that client accounts were not segregated at BLMIS or at the DTC.

217.    The HSBC Custodians' main responsibility was safekeeping the Feeder Fund Defendants' assets.  Safekeeping assets included (a) recording all securities the fund received and holding them in a separate account in its books, (b) arranging for all securities to be secured, (c) holding all cash received for the fund in a separate bank account in the fund's name, (d) making payments from such accounts for the fund, and (e) depositing and maintaining in a segregated account, either physically or by book entry, securities, cash, or other assets for options transactions.

218.    DiPascali informed KPMG that BLMIS deposited all client assets into a single Fidelity money-market account in BLMIS's name.  This was identified as a red flag during the 2008 HSBC Conference Call when an HSBC employee noted that this practice was similar to that which occurred in the "Refco" fraud.  At another point during the 2008 HSBC Conference Call, there was another comparison to Refco: "[I]n Refco's case, they were able to essentially use client money as a way of funding themselves . . . ."

219.    During the 2008 HSBC Conference Call, in response to a discussion about the merits of verifying assets with DTC, an HSBC employee noted that "we're concerned [about] the fact that there could be a fraud and . . . there is no real trading . . . and it's just a Ponzi scheme."

220.    Stephan Phan, Global Head of GSFP, noted similar concerns after the 2008 HSBC Conference Call.  In correspondence with Coe, he asked: "[h]ave you been able to verify . . . that the month end positions calculated by going through the intramonth deal tickets, add up to the statements we received from Madoff for month end holdings?  This would finally and fully clear

46

out concerns over [BLMIS's] ability to generate returns, i.e., [that BLMIS is] not a Ponz[i] scheme."

221.    The 2006 and 2008 KPMG Reports identify the "failure to hold stocks in client names" as a fraud risk.  The reports specifically identify DTC's segregation of client assets as a control against this and other fraud risks.

222.    HSBC Bank plc acknowledged in an internal report that, under HSBC Bank Bermuda's 1996 sub-custodian agreement with BLMIS, BLMIS was required to act as a fiduciary and segregate the custodied assets from the assets of other BLMIS customers.  HSBC Bank plc stated that "this should be confirmed annually."

223.    On January 12, 2007, in response to an inquiry from a Herald investor about asset segregation, HSSL sent a letter to Herald stating that HSSL's sub-custody agreement with BLMIS requires that "all property in the account . . . be physically segregated from the general assets of [BLMIS] and . . . its other customers."

224.    In response to an inquiry from a potential Lagoon investor, HSSL confirmed that the "funds deposited in the Madoff account [were] designated as 'client money' and held by a separate legal custodian, and a sub-custodian to HSBC."  By the end of July 2008, an GSFP report compared the BLMIS feeder funds in which it invested and confirmed a KPMG finding that all of the Madoff Reference Funds were feeding into a single managed account at BLMIS and concluded that there was "no segregation of fund positions."

### G.    BLMIS, Known as an Innovator in Electronic Trading, Provided Only Delayed Paper Statements

225.    By June 2000, the practice of granting clients electronic access to their accounts was mainstream, particularly as a result of the Electronic Signatures in Global and National

Commerce Act, 15 U.S.C. § 7001, which permits using electronic records to comply with federal law.

226.    Throughout the 2000s, ordinary consumers were also conducting transactions and accessing their checking, savings, and investment accounts online.

227.    Although electronic access was industry custom, and although Madoff held himself out as a pioneer of electronic trading technology, he did not provide his customers with electronic access to their accounts and even refused to put information about customers' accounts holdings online.  BLMIS instead used outmoded technology and provided only paper account statements and paper confirmations, sent by U.S. mail or fax three to four days after the trades supposedly occurred.

228.    The lack of real-time access to account data or electronic statements facilitated the manufacture of fictitious trades and manipulation of reported prices on BLMIS customer statements.

229.    BLMIS's paper statements did not include standard information, such as opening account balances, trade dates, commissions charged, or ticker symbols for equities.  By using paper statements that omitted such standard information, BLMIS could purport to trade a security after Madoff would have seen actual market activity, indicating a high probability of fraud at BLMIS.

230.    BLMIS provided paper statements to customers either by U.S. mail or fax.  Aside from faxes, Madoff allowed no form of electronic communication regarding trade confirmations and instructions.

231.    An Aurelia employee noted that receiving BLMIS's monthly statements was cumbersome because of the length of the statements.  Aurelia knew that receiving the statements

by fax was inefficient and unusual, but accepted that there was no alternative means of dealing with BLMIS.

232.    Madoff's insistence on using faxes also caused difficulties for Aurelia's relationship with JPMorgan Securities in connection with Lagoon Trust.  An internal JPMorgan Securities email indicated frustration with the lag in receiving trading information from Lagoon Trust: "Why are these guys consistently not sending us the NAV on time?  Please inform them this is unacceptable and that we are very uncomfortable with this."

233.    HITSI, Thema International's custodian, and HSSI, its administrator, frequently complained to Thema International about receiving trading information by fax, and the delay it caused.  The late trading information affected HSSI's timely calculation of Thema International's NAV.

234.    HSBC's sub-custodian agreements with BLMIS required information to be timely delivered.  In 2005, HSBC Bank plc noted that the typical one-week delay in delivering information to HSSL did not comply with its sub-custodian agreement.

**H.    Madoff's "Strip Mall" Auditor Was Neither Qualified Nor Capable of Auditing a Global Investment Management Company with Billions of Dollars Under Management**

235.    BLMIS had tens of billions of dollars under management, but was audited by Friehling & Horowitz, an accounting firm with only two accountants, one of whom was semi-retired and living in Florida.  The firm's offices were located in a strip mall in suburban Rockland County, New York.

236.    Auditors, consistent with industry custom and practice, act as a safeguard against fraud by providing independent verification of assets and financial transactions.

237.    All accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program, and those that do are

49

listed on the public area of the AICPA website. Despite holding itself out as an AICPA member, Friehling & Horowitz avoided peer review after 1993 by representing that it did no audit work and, therefore, was not listed on the AICPA website.

238.    Thema International knew that Ernst & Young was concerned that Madoff employed as its auditor a "two-person shop."

239.    Friehling & Horowitz was not on HSBC's list of recognized auditors, and Coe questioned whether HSBC could rely on statements produced by the firm. During the 2008 HSBC Conference Call, Coe expressed her concern that BLMIS's auditor was insufficient "to make sure [Madoff was] not fabricating" his returns. Acknowledging Coe's concern about whether BLMIS's auditor provided a sufficient safeguard, KPMG responded, "Exactly. And the answer is no."

240.    KPMG's 2006 and 2008 Reports identified risks that a genuine auditor would have been able to confront—for example, that BLMIS could be engaging in unauthorized trading in client accounts and/or inflating call values to disguise misappropriation or poor positions.

241.    HSBC Private Bank did not believe that Friehling & Horowitz was capable of auditing BLMIS, noting that Friehling & Horowitz was not a "realistically independent auditor," and that its only major client was BLMIS.

## I.    The Defendants Knew That the SSC Strategy BLMIS Purported to Employ Could Not Yield the Results Reported on the BLMIS Account Statements

242.    "I would not invest in this fund, nor would I want investors to invest." So concluded a member of HSBC's Private Bank, who reported that, in addition to other concerns, "investors (and the media) have questioned" whether Madoff's investment strategy could yield BLMIS's returns. It was plain that industry professionals considering Madoff—including the defendants here—had little faith in the legitimacy of Madoff's purported trading strategy.

243.    The SSC strategy involved acquiring of a basket of common stocks selected from the S&P 100.  The basket of stocks was designed to correlate to the movement of the S&P 100.  The second part of the SSC strategy involved the purchase and sale of S&P 100 put and call options to "collar" the underlying securities holdings.  The put options hedged the downside risk of price changes in the underlying basket of stocks.  The sale of call options, which limited potential gains, largely offset the purchase of the puts.

244.    Because Madoff claimed to carefully time purchases and sales of the basket of common stocks to maximize value, customer funds were intermittently out of the market.  Madoff claimed, during those times, that the funds were invested in U.S. Treasury bills or mutual funds invested in Treasury Bills.

245.    The SSC strategy could not have eliminated market volatility.  At best, the strategy would have smoothed out peaks and valleys in the returns generated by the basket of S&P 100 stocks, but would have correlated with the S&P 100's performance when BLMIS was in the market.

246.    It should have been impossible for BLMIS investors to obtain gains on their investment when the S&P 100 was significantly down.  This is because downswings were hedged only by put options.  BLMIS could not have turned losses into gains by exercising put options—that could only have created a floor for losses.

247.    Similarly, it was virtually impossible for the SSC strategy to outperform the S&P 100 during a major upswing, as the call options BLMIS sold would have been exercised during a significant market upswing, putting a ceiling on gains.

248.    Hermes's prospectus stated that the fund's standard practice was to continuously supervise and statistically analyze the fund's investments as to their correlation, performance, volatility, and Sharpe ratio.

249.    In 2001, Thema International's directors received and discussed *Barron's* and *MAR/Hedge* articles questioning Madoff's ability to achieve his reported returns.  Thema International's directors otherwise did no further due diligence in response to these articles, which specifically identify Thema International as a BLMIS feeder fund.

250.    Thema Management BVI knew that Thema International's consistently positive returns were generated despite events that had such pervasive effects on the market's performance they could not have been avoided by using a strategy that correlated to market performance.

251.    Even during the last 14 months of its existence, the IA Business generated positive returns while the S&P 100 plummeted by nearly 40%.  Overall, from January 2000 through November 2008, none of the Benbassat Funds' BLMIS accounts experienced more than five months of negative returns; the S&P 100 had 52 negative months.

252.    Nespolo was aware that third parties wondered "how on earth can [Madoff] always produce 12% per anum [sic]" and then wondered whether "it [was] all fictitious."

253.    A 2001 diligence report by HSBC Private Bank states:

> Bernie Madoff's 12 year track record trading a split strike conversion strategy on the S&P 100, is quite simply astounding. His annualized return of 15%, (net of a 20% performance fee) at a risk of 3%, yields a sharpe ratio of 3.3.  Over this period the fund has endured only 4 down months (the maximum of which was down 0.5%), and has now gone almost 6 years without a drawdown.  With this track record, seemingly derived from such a simple investment strategy, certain members of the investment community are baffled, as to how such a return stream has been earned [(emphasis in original)].

254.    In January 2003, HSBC Private Bank found it "unclear how [Madoff's] strategy has generated a track record with almost no down months."

255.    In 2004, HSBC Private Bank issued another diligence report warning that Madoff had a "'too good to be true' track record," and concluding that Fairfield Sentry is "a fund we are not completely comfortable with" and "not a fund that we recommend."

256.    HSBC Private Bank's research committee's May 2007 meeting minutes note that Fairfield Sentry didn't "really know how [BLMIS's trading] model work[ed]."

257.    GSFP understood the SSC strategy "to replicate the performance of the S&P100." It monitored certain trades to ensure that the equity basket had a correlation of at least 90% with the S&P100.

258.    In 2008, Bank Medici prepared and provided JPMorgan Securities with reports showcasing Herald's performance.  The reports charted times when Madoff was in and out of the market, and purported to show Herald's performance compared to the S&P 100's performance during months when the S&P 100 suffered significant downturns.  The data reflected that Herald generally was invested in the market during times of market gains and was out of the market during downturns, outperforming the S&P 100 at every point in time.



259.    Shortly after receiving this chart from Herald, JPMorgan Securities redeemed its

investment and then filed a "suspicious activity report" with U.K. regulatory authorities.

**J.      Defendants Knew That Madoff's Returns Were Not the Result of the SSC
         Strategy**

260.    Defendants marketed BLMIS's SSC strategy to attract investors.  Indeed, many of

the Feeder Fund Defendants' subscribers invested with them only to place their money with

BLMIS in New York.  Despite touting Madoff's SSC strategy, however, defendants knew that

the returns could not be the product of that strategy.

**1.      Defendants Knew That Madoff's Returns Could Not Be Replicated
         and Sought to Explain Madoff's Returns as a Product of Illegal Front
         Running**

261.    In 1995, Zapotocky arranged for a high-level Bank Austria executive ("BA

Executive No. 1") to visit Madoff in New York.  During the meeting, Madoff explained that he

observed the direction of the market based on large trades for his market making clients.

According to Madoff, he capitalized on this information to achieve his returns.  Upon

information and belief, after meeting with Madoff, BA Executive No. 1 urged Kohn and

Zapotocky to refrain from investing with BLMIS because the strategy was improperly based on

Madoff's ability to trade ahead of his clients' investments.  BA Executive No. 1 further warned

Zapotocky that Bank Austria should avoid associating with Madoff.

262.    In 1996, Zapotocky directed another Bank Austria employee ("BA Executive No.

2") to meet with Madoff.

263.    In explaining how he achieved his remarkably consistent returns, Madoff told BA

Executive No. 2 that he charged lower fees than his market making competitors, allowing him to

attract and keep large investors, see his clients' trades, and then trade in front of his clients' order

flow.  Upon his return, BA Executive No. 2 told his superior and Kohn that he was concerned

that Madoff was engaged in illegal trading.

264.    The conclusion that Madoff was engaged in illegal "front running" was shared at

the highest levels of Bank Austria and BA Worldwide.  An internal memorandum summarizing

several visits and discussions involving BA Worldwide, Madoff, Mark Madoff, and Frank

DiPascali during 1998, 1999, and 2000 was used as training material for at least one BA

Worldwide employee.  It quotes Frank DiPascali as follows:

> maybe we can predict only the next 10 or 15 minutes but we watch
> the market continuously and if we get an order to buy a large stake
> of an equity which is quoted currently at 40$ with a limit up to
> 44$, there can't be anything wrong with buying [sic] same stock
> for our portfolio at 41$ or 42$.

265.    In 2001, while President of BA Worldwide, Radel-Leszczynski used this

document to explain Madoff's investment strategy.

266.    In 2002, one of the Bank Austria executives who founded Primeo ("BA Executive

No. 3"), attempted to replicate Madoff's strategy to see if it was possible to obtain similar

results.  The executive was unable to replicate Madoff's results, and his analysis yielded

hypothetical returns with significant losses.

267.    Upon information and belief, after concluding that Madoff's returns were impossible, BA Executive No. 3 approached Kohn with the results of his test.  Kohn reassured BA Executive No. 3 that even if Madoff's results were obtained through front running, Bank Austria need not be concerned because Madoff had not been detected by U.S. authorities.

268.    A few years later, BA Executive No. 3's concerns about Madoff were communicated to a Bank Medici executive ("Bank Medici Executive No. 1").  Upon learning of BA Executive No. 3's test results, Bank Medici Executive No. 1 confronted Kohn with his own suspicions that Madoff could not achieve these results legitimately and that BLMIS could generate such consistent returns only if it was engaged in illegal front running.

269.    Bank Austria was not the only Defendant that knew Madoff's strategy could not be replicated.  Nespolo reviewed each statement and analyzed the SSC strategy over a two to three year period in hopes of replicating the strategy in other markets.  He was unsuccessful.

270.    Thema International director David Smith knew that sophisticated investors attempted to apply the strategy over significant periods of time but were unable to replicate the returns.  In relaying this information to HSBC's Paul Smith (who in turn forwarded the information to Fielding and Coe), David Smith offered no explanation for this other than that Madoff had a "magic formula."  When an investor questioned David Smith in 2004 as to whether Madoff manipulated performance or smoothed earnings, Smith dismissed the investor as "anti-Madoff" and "annoying."

271.    In 2007, Kohn recruited a retired executive director of a large Austrian bank to work at Bank Medici as an unpaid adviser (the "Bank Medici Consultant").

272.    The Bank Medici Consultant questioned Kohn about Madoff and his strategy. Kohn explained to him that Madoff traded in front of his own market making clients as a

"special favor."  The Bank Medici Consultant told Kohn that what she described was considered

illegal front running in both Austria and the United States.   Kohn acknowledged that Madoff

might be engaged in unlawful trading, but that it was not her concern.

273.    According to the Bank Medici Consultant, Kohn had two standard responses to

inquiries about Madoff's investment strategy.  First, Kohn would describe the SSC strategy.  If

that failed to satisfy an investor's concerns, Kohn would resort to telling investors that Madoff's

secret was his willingness to capitalize on inside information.

274.    A Thema International investor asked Stephane Benbassat about rumors regarding

Madoff's front running.  Stephane responded that such "rumours [were] the result of some large

bank being unable to perform as well as Madoff . . . ."

275.    HSBC Private Bank did not believe that Madoff's results were attained by

executing the SSC strategy.  "[G]iven the fact that the strategy loses money in down markets we

believe that this is unlikely that the returns can be attributed solely to this strategy."

276.    HSBC Private Bank suspected that Madoff was using returns from the market

making business to subsidize the IA Business.  It also suggested that Madoff was making "trades

outside the stated universe," and worried that "[a] potentially greater risk could be that BLM

[was] seek[ing] another means of generating returns."

277.    In the 2006 and 2008 KPMG Reports, KPMG informed HSBC that there were

risks that BLMIS could be (i) using client funds to make opportunistic trades that deviated from

the SSC strategy; (ii) systematically over-valuing positions and failing to report positions to

HSBC to manipulate control relationships; and (iii) front running order flow in the market

making business.

**K.**     **Madoff's Exits From the Market Did Not Comport With the SSC Strategy**

278.     Various SEC reporting requirements are triggered when securities are invested in the market at either quarter-end or year-end.  To evade those reporting requirements, Madoff purported to liquidate all investments at those times and invest the proceeds in Treasury Bills or mutual funds invested in Treasury Bills.

279.     Consistent with those purported periodic market exits, BLMIS account statements showed full investment in Treasury Bills at quarter-end and year-end.  Madoff's practice of exiting the market according to the calendar, rather than market or economic indicators, was a badge of fraud.  Defendants knew that Madoff touted "market-timing" as a cornerstone of the SSC strategy and that Madoff's practice of exiting the market at quarter-end and year-end contravened that strategy because it locked Madoff into prevailing market conditions, regardless of whether they were favorable.  The SSC strategy, based on long positions hedged by options contracts, themselves subject to expiration, could not be implemented effectively under these circumstances.

280.     As early as 2001, HSBC Private Bank expressed concerns that Madoff always liquidated the portfolio at year-end.

**L.**     **BLMIS Customer Statements and Confirmations Showed Trades That Were Inconsistent With the SSC Strategy**

281.     The 2006 KPMG Report alerted HSBC to risks of fraud involving Madoff's options trades.  The report identified the risks that Madoff was (i) manipulating option prices to maximize commissions; (ii) exercising options without informing the client that option was set to expire; and (iii) inflating call values to disguise misappropriation or poor positions.

282.     The HSBC Custodians received monthly statements and confirmations from BLMIS.  Custody services involved trade review and verification.

283.     The Management Defendants monitored the trading in the Feeder Fund Defendants' BLMIS accounts to ensure compliance with the SSC strategy.  For example, Radel-Leszczynski confirmed that BA Worldwide, as Alpha Prime's investment adviser, reviewed Madoff's options strategy to ensure proper hedging in the portfolio.

284.     APAM, as Alpha Prime's investment manager, was required to provide certain services to Alpha Prime, as set forth in both their service agreement and Alpha Prime's offering memorandum.  APAM was required to: (i) "render and implement investment advice and management in connection with the conduct by the Fund of its investment activities"; (ii) "appoint and . . . replace advisers to the different Funds . . . and . . . delegate the investment decision making to such investment advisers provided such investments are made in accordance with the [Fund's] investment objectives"; (iii) "render investment advice and recommendations to the Fund on a regular and ongoing basis regarding the selection and investment of assets of the Fund . . . [including] all kinds of financial Instruments and securities, including but not limited to equities, equity related instruments, fixed income and other debt-related instruments, securities that lack active public markets and other financial investments and securities."

285.     BA Worldwide also monitored Alpha Prime's investment policies.

286.     Bank Medici received BLMIS customer statements and valuation reports from HSBC.  Herald Asset Management provided Herald's board of directors with data showing the fund's "buying and selling transactions," and other information showing the impossibilities of Madoff's trading.

287.     Hermes's service providers received and reviewed BLMIS trade tickets and account statements for the Lagoon accounts.

288.    Hermes Management and APAM were statutorily obligated to ensure that their respective funds complied with the investment objectives set forth in the funds' prospectuses and report any breaches to both the Bermuda Monetary Authority and investors in the next annual or periodic report.

289.    As Lagoon Trust's custodian, HSSL was required to produce a line-by-line report of the trade positions BLMIS held.

290.    Thema Management Bermuda was responsible for the ongoing evaluation and monitoring of BLMIS.

291.    Thema Management BVI regularly reviewed BLMIS's trading for compliance with the SSC strategy.

292.    GSFP monitored the monthly trade activity and underlying portfolios for the GSFP Structured Products' reference funds.

293.    After implementing enhanced reporting standards in 2007, GSFP received position reports, transaction reports, risk reports, and/or trade tickets BLMIS sent for: Greenwich Sentry, Harley, Rye Broad Market, Rye Portfolio, Thema International, and Senator.

### 1.    Speculative Options Trading

294.    At times, Madoff purported to engage in short term, speculative options trades that resulted in substantial gains for BLMIS customers.  Speculative options trades are inconsistent with the SSC strategy.

295.    Under the SSC strategy, options trades were intended to hedge the underlying equities, not generate profit.  Deviating from an investment strategy is a significant hallmark of fraud.

296.    On many occasions, BLMIS purported to buy back its call positions, only to rewrite them the following business day almost invariably at a significant profit.  For example,

on August 5, 2008, on behalf of Rye Broad Market, Madoff purported to buy 15,685 August 585

call options.  On August 6, 2008, Madoff purported to sell these options for a net gain of

$10,948,130.  As was clear from the trading information HSBC received from Rye Broad

Market, this options transaction was not executed for the purpose of hedging an equity position,

but rather to generate short-term profit and completely at odds with the SSC strategy.

297.    The 2006 and 2008 KPMG Reports alerted HSBC to the fraud risk that Madoff

could be using client funds to make opportunistic trades that deviated from the SSC strategy.

298.    BA Worldwide and Alberto Benbassat reviewed Madoff's options strategy,

including whether the portfolio was properly hedged.

299.    As set forth in the following table and evidenced in BLMIS Feeder Funds' and

Madoff Reference Funds' customer statements, BLMIS purported to enter into hundreds of these

speculative options transactions, virtually all of which were profitable:

| | Speculative Option Trades | Net Gain |
|---|---|---|
| Alpha Prime/APAM | 12 | $4,191,723 |
| BA Worldwide | 94 | $57,713,120 |
| Bank Medici | 22 | $43,593,458 |
| Benbassat Funds | 178 | $81,981,347 |
| GSFP | 12 | $58,133,383 |
| Hermes Management/Hermes/Lagoon | 132 | $27,261,819 |
| HITSB | 16 | $13,725,892 |
| HSBC Bank Bermuda | 330 | $246,075,101 |
| HSBC Fund Services | 20 | $12,516,517 |
| HSBC Service Providers* | 476 | $363,488,314 |
| HSSB | 36 | $19,195,978 |
| HSSI/HITSI | 98 | $108,877,072 |
| HSSL | 236 | $81,637,746 |
| Thema International | 46 | $52,045,335 |
| Thema Management BVI | 42 | $38,054,047 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 14 | $3,328,620 |

*The figure for the HSBC Service Providers reflects each trade only once, despite the fact that each trade would
have been viewed by multiple HSBC service providers.

### 2. Options Confirmations Reflected Trades Inconsistent with SSC Strategy

300. Documents purporting to confirm the execution of BLMIS's options trades evidence the trades' fraudulent nature.

301. In BLMIS's strategy, the sale of call options necessarily preceded the purchase of put options because the proceeds of the sales purportedly funded the purchase of call options. BLMIS's customer statements reflected the proper sequence of these transactions.

302. But BLMIS's option trade confirmations contradict the customer statements on two counts. First, the trade confirmations show the *purchase* of call options, and the *sale* of put options—precisely the opposite of what the customer statements reported.

303. Second, the sequence of the transactions as reported on the trade confirmations is backwards—the purchase precedes the sale. Because BLMIS did not allow trading on margin in the BLMIS Feeder Fund Defendants' accounts, any given customer would have had to first sell the call to have cash on hand available to purchase the put options.

304. GSFP received copies of BLMIS trade tickets from Harley, Rye Broad Market and Rye Portfolio.

305. HSSL received "copies of all trade tickets from Madoff and replicate[d] the trades on their system rather than simply receiving the month-end statements."

306. The image below shows an option trade confirmation in connection with Thema International's account. The statement illustrates the deficiencies outlined above, showing the sale of an "October 550" put settled on October 11, 2005 and the purchase of an "October 555" call on October 7, 2005.





### 3.    BLMIS Customer Statements Showed Improperly Hedged Equities Positions That Were Inconsistent With the SSC Strategy

307.    BLMIS customer statements regularly reflected "unbalanced hedges," in which the basket of equities purportedly purchased for customers did not correspond to the hedge.  An unbalanced hedge occurs where, for example, certain equities in a basket are sold, but there is no corresponding adjustment to the options collar.  Such an unbalanced hedge creates potentially significant exposure to losses because the value of the basket and the corresponding options positions no longer match, reducing the potential gain and leaving the customer exposed to potential losses.

308.    For example, between January 5 and 12, 2004, on behalf of Lagoon, Alpha Prime, Thema International, and Thema Wise, Madoff purported to purchase three baskets of S&P 100 stocks, each of which included Texas Instruments Inc. shares.  According to the account statements, the Texas Instruments shares were sold on January 16, 2004 rather than between February 17 and 20, 2004 when the other equities contained in the baskets were sold.  In light of this early sale of the Texas Instruments shares, the corresponding options collar should have been rebalanced to protect against exposure to market risk.  No such adjustment was reflected in the customer statements or trade confirmations.

309.    Further, on April 16, 2007, Madoff purported to purchase on behalf of Rye Broad Market a basket of S&P 100 stocks, which included 3M Company shares.  According to the account statements, the 3M shares were sold on May 16, 2007 whereas the other equities contained in the baskets were not sold until mid-June 2007.  In light of this early sale of the 3M shares, the corresponding options collar should have been rebalanced to protect against exposure to market risk.  No such adjustment was reflected in the customer statements or trade confirmations.

64

310.    GSFP reviewed and monitored "actual portfolios to ensure that the put options

executed provide[d] the expected downside protection."

311.    As set forth in the following table, the BLMIS Feeder Funds' and Madoff

Reference Funds' BLMIS account statements demonstrate that Madoff regularly did not make

changes to the corresponding hedges when he purportedly sold one equity before the rest of the

basket:

|  | Early Sells Without Hedge Adjustment |
| --- | --- |
| Alpha Prime/APAM | 22 |
| BA Worldwide | 72 |
| Bank Medici | 8 |
| Benbassat Funds | 111 |
| GSFP | 15 |
| Hermes Management/Hermes/Lagoon | 67 |
| HITSB | 5 |
| HSBC Bank Bermuda | 214 |
| HSBC Fund Services | 12 |
| HSBC Service Providers | 266 |
| HSSB | 36 |
| HSSI/HITSI | 48 |
| HSSL | 132 |
| Thema International | 32 |
| Thema Management BVI | 29 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 12 |

## VIII.   BLMIS CUSTOMER STATEMENTS REPORTED IMPOSSIBLE TRADES

312.    As the world now knows, BLMIS's IA Business was a fiction.  And while the

Feeder Fund Defendants went to great lengths to try to explain how Madoff generated his

returns, their customer statements and trade confirmations were replete with transactions that

defied explanation—because they were objectively impossible.

65

### A.    The BLMIS Account Statements Reflected Impossible Options Trading Volumes

313.    BLMIS account statements frequently showed OEX call and put option contracts being traded at volumes that exceeded the total market volume of calls and puts with the same strike price and expiration date being traded on the Chicago Board Options Exchange ("CBOE").

314.    When verifying BLMIS's purported trading activity, no one could have believed that it was possible to trade above the market volume for any security—even once.

315.    The BLMIS feeder funds' account statements and trade confirmations reported the strike price (the price at which an option may be exercised) and expiration date (the last date at which the holder of the option may exercise it) of options purportedly traded in their respective BLMIS accounts.

316.    As described in the following graphs, from 2001 to 2008, BLMIS purported to trade—on behalf of accounts serviced by the HSBC Administrators—volumes that regularly were many hundreds of times greater than the total number of put and call options executed on the CBOE with the same trade date, strike price, and expiration date:





317.    Similarly, as described in the following graphs, from 2001 to 2008, BLMIS purported to trade—on behalf of accounts serviced by the HSBC Custodians—volumes that regularly were many thousands of times greater than the total number of put and call options executed on the CBOE with the same trade date, strike price, and expiration date:





318.    In or around 2005, Kohn approached Capital Bank, an Austrian investment bank, to structure a guaranteed product based on Herald.  Capital Bank initially refused because of Kohn's and other Bank Medici personnel's inability to answer questions about Herald's BLMIS account statements, including concerns regarding Herald's options transactions.  Capital Bank reconsidered when Kohn suggested a meeting with HSSL, Herald's administrator and custodian.

319.    Capital Bank's diligence team met with HSSL in Luxembourg, and expressed concerns about trade volumes, and specifically asked how BLMIS could trade in seemingly impossible volumes.  HSSL's administrative team explained the procedure for calculating Herald's NAV, and confirmed to Capital Bank that it verified all options trading in Herald's account.  HSSL's administrative team also proffered the explanation that Madoff operated an

options exchange over which he traded the options for his IA accounts.  If HSSL's explanation

had been true, Madoff's option exchange would have been larger than the CBOE.

320.    On October 18, 2001, Thema International's and Lagoon's BLMIS account

statements reflected a purchase of 3,674 OEX call option contracts (with an October 20, 2001

expiration date and a strike price of 505).  CBOE market data shows that there was not a single

option contract with the same expiration date and strike price traded that day.  In ten instances in

which BLMIS purported to execute options trades for both Thema International and Lagoon, no

matching options contracts were traded that day.

321.    The BLMIS account records of Thema International, Lagoon, Thema Wise, and

Alpha Prime reflect the sale of thousands of OEX put option contracts (with a November 22,

2008 expiration date and a strike price of 475) on November 14, 2008.  Public records show only

three such contracts actually traded on the CBOE on that date.

322.    As set forth in the following table, the BLMIS Feeder Funds' and Madoff

Reference Funds' customer statements regularly reported options trades that exceeded the total

volume for options with the same trade date, strike price and expiration date as traded over the

CBOE:

|  | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|
| Alpha Prime/APAM | 153 | 440 | 34.8% |
| BA Worldwide | 487 | 739 | 65.9% |
| Bank Medici | 282 | 532 | 53.0% |
| Benbassat Funds | 609 | 848 | 71.8% |
| GSFP | 349 | 381 | 91.6% |
| Hermes Management/Hermes/Lagoon | 379 | 846 | 44.8% |
| HITSB | 141 | 161 | 87.6% |
| HSBC Bank Bermuda | 794 | 863 | 92.0% |
| HSBC Fund Services | 251 | 455 | 55.2% |
| HSBC Service Providers | 801 | 877 | 91.3% |

| | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|
| HSSB | 275 | 473 | 58.1% |
| HSSI/HITSI | 655 | 827 | 79.2% |
| HSSL | 560 | 861 | 65.0% |
| Thema International | 502 | 825 | 60.9% |
| Thema Management BVI | 366 | 674 | 54.3% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 126 | 553 | 22.8% |

323.    An October 2008 Hermes due diligence memo indicates that Madoff told the

Hermes directors that he was trading options on the over-the-counter (the "OTC") market.  But

BLMIS's trade confirmations included a unique identifier, known as a CUSIP number.  Only

exchange-traded OEX options would have been assigned CUSIP numbers.  Any reported option

trade with a CUSIP number must have been traded over an exchange, not the OTC market.

**B.    The Volume of Assets Under Management Was Too Large to Execute the SSC Strategy**

324.    It was impossible to execute the SSC strategy at the volume of assets under

management purportedly held by BLMIS.  The Thema International directors knew that in

August 2006, BLMIS filed a Form ADV with the SEC stating that, as of the end of July 2006,

BLMIS had approximately $11.7 billion of assets under management.  To execute the SSC

strategy with at least $11.7 billion under management, BLMIS would have needed at least $11.7

billion of notional value in call options.

325.    In the 2006 KPMG Report, KPMG stated that BLMIS managed $2 billion in

assets on behalf of HSBC's clients out of a total of $16 billion, and estimated that approximately

five to eight percent of all of BLMIS's trade executions related to HSBC clients.

326.    In or around September 2007, GSFP estimated that BLMIS's assets under

management were $20 billion.

327.    On the 2008 HSBC Conference Call, HSBC estimated that BLMIS's assets under management were $22-24 billion.

328.    The 2008 KPMG Report stated that HSBC clients' investments represented 33% of BLMIS's assets under management.

329.    Between 2001 and 2008, there were not enough options on the entire listed market to implement the SSC strategy at any point in time.

330.    GSFP's STAR Review "raised concerns about the strategy of the underlying Madoff [Reference F]unds, noting possible liquidity issues as [the] strategy grows."

331.    The SSC strategy's lack of scalability was evident from Thema International's own account statements.  A potential investor analyzing the Thema International statement from February 27, 2007 noted that there were not enough available options for BLMIS to execute the SSC strategy:

> Since this is a snapshot at end of February and he is holding March cont[r]acts, I looked at similar situation now.  If you look at entire open interest of August OEX calls there is [sic] only 22,248 contracts outstanding.  Assuming Madoff was the entire open interest for the upcoming month at an average strike of 700, he could only hedge $1.5B of stock.  Given the fact he is running $5 to $20B depending on who you talk to, then this would be impossible."

### C.    The Timing of BLMIS's Purported Securities Transactions Was Impossible

332.    Upon information and belief, Madoff also represented that he was time-slicing (i.e., entering the market for a particular stock at different times throughout a trading day) and that the prices reported on the account statements reflected the average price over the course of the day.  The consistently favorable execution BLMIS claimed to achieve—in which it purported nearly always to trade at an optimal price point—was statistically impossible.  If BLMIS had

been purchasing or selling stocks multiple times throughout a trading day, BLMIS's reported

prices would have necessarily gravitated toward the daily midpoint.

333.    The average price at which a given security is traded throughout a trading day is

measured by a metric called volume weighted average price, or "VWAP."  Consistently buying

below the VWAP and selling above the VWAP year after year is statistically impossible.  But

BLMIS's customer statements showed that it did just that.

334.    These statistical impossibilities were apparent to the BLMIS feeder funds and

their service providers.

335.    As Lagoon Trust's investment adviser, Aurelia was required to evaluate

investments and analyze the price movements of such investments, to recommend the purchase,

acquisition or sale of particular investments, including appropriate timing, and to analyze

continually the progress of all investments.

336.    During HSBC's investment with Harley, Harley's trade tickets show that BLMIS

reported 850 purchases of equities, 651 (or 76.59%) of which were below the VWAP and 661

equity sales, 454 (or 68.68%) of which were above the VWAP.

337.    As illustrated in the table below, BLMIS reported to the BLMIS Feeder Funds

and Madoff Reference Funds that it was purchasing equities below the VWAP and selling

equities above the VWAP at statistically impossible rates:

| | Total Below VWAP | Total Buys | Percentage Below VWAP | Total Above VWAP | Total Sells | Percentage Above VWAP |
|---|---|---|---|---|---|---|
| Alpha Prime/APAM | 2,728 | 3,241 | 84.2% | 2,175 | 2,825 | 77.0% |
| BA Worldwide | 10,686 | 12,912 | 82.8% | 9,159 | 11,694 | 78.3% |
| Bank Medici | 4,942 | 6,087 | 81.2% | 3,637 | 5,064 | 71.8% |
| Benbassat Funds | 20,002 | 24,787 | 80.7% | 16,646 | 22,191 | 75.0% |
| GSFP | 2,337 | 2,650 | 88.2% | 1,621 | 2,476 | 65.5% |
| Hermes Management/Hermes/Lagoon | 11,282 | 14,117 | 79.9% | 9,378 | 12,620 | 74.3% |
| HITSB | 3,812 | 4,800 | 79.4% | 2,761 | 4,281 | 64.5% |

| | Total Below VWAP | Total Buys | Percentage Below VWAP | Total Above VWAP | Total Sells | Percentage Above VWAP |
|---|---|---|---|---|---|---|
| HSBC Bank Bermuda | 33,346 | 41,024 | 81.3% | 28,327 | 36,930 | 76.7% |
| HSBC Fund Services | 5,758 | 6.958 | 82.7% | 4,926 | 6,556 | 75.1% |
| HSBC Service Providers | 54,022 | 66,425 | 81.3% | 44,686 | 59,259 | 75.4% |
| HSSB | 9,439 | 11,399 | 82.8% | 7,822 | 10,490 | 74.6% |
| HSSI/HITSI | 13,783 | 16,855 | 81.8% | 11,466 | 15,219 | 75.3% |
| HSSL | 25,822 | 31,774 | 81.3% | 21,077 | 27,998 | 75.3% |
| Thema International | 5,166 | 6,395 | 80.8% | 4,277 | 5,676 | 75.4% |
| Thema Management BVI | 4,213 | 5,195 | 81.1% | 3,678 | 4,719 | 77.9% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 3,554 | 4,275 | 83.1% | 2,991 | 3,895 | 76.8% |

338.    Achieving these statistics while trading even a single equity is impossible, but Madoff claimed to trade in baskets containing between 35 and 40 equities.  To achieve the results reported on the BLMIS feeder fund account statements, Madoff would have had to enter and exit the market at the optimal time of the day, not just for one equity, but for 35 to 40 equities simultaneously.

### D.    BLMIS Purported to Sell Equities Outside the Daily Reported Price Ranges

339.    BLMIS regularly purported to execute equities transactions for the BLMIS feeder funds' accounts that were outside the security's daily price range.

340.    Each HSBC Administrator's primary responsibility was to calculate the NAV of the fund for which it was administrator.  According to Alpha Prime's offering memorandum, for example, securities held for the fund were to be valued pursuant to International Financial Reporting Standards.

341.    As Alpha Prime's investment adviser, BA Worldwide was, among other things, required to "carry out reviews of the investment portfolio of the Fund and . . . report as soon as practicable all transactions effected on behalf of the Fund to the Administrator and Custodian."

342.    HSSL regularly reviewed the trade confirmations for the Medici Funds as part of its duties as the funds' service provider.  Thus, HSSL knew that on many occasions Madoff purported to buy or sell shares outside the range of daily prices.

343.    As Herald's administrator, HSSL "provide[d] share issue, redemption, transfer, accounting and valuation services . . . . These valuations [were] based on trade tickets Madoff sen[t] to HSBC."  HSSL entered trades and independently verified the trade details on Reuters, and calculated Herald's NAV.

344.    Nigel Fielding explained that HSSL "provide[d] a fund accounting and investment valuation service.  As part of this service we validate the price of all investments to market data sources, this includes all investments held by BLMIS."

345.    Thema International's service providers received and reviewed the fund's monthly BLMIS account statements, reviewed trade confirmations, and independently priced securities purportedly held in the fund's BLMIS account.

346.    According to Radel-Leszczynski, BA Worldwide did much more than that.  BA Worldwide "undertook extensive analytical work; it reviewed, for example, whether the transactions were in line with the market."  This included checking the securities prices Madoff reported against the prices Bloomberg reported.

347.    Hermes's prospectus required that Hermes's directors determine the fund's NAV with calculations determined by reference to the last quoted price on the relevant exchange.

348.    HSBC administrators priced "investment fund assets independently of the Fund Manager . . . using a number of market sources . . . ."  Upon information and belief, HSSL and Equus were aware of differences between actual market values reported in the financial press and the trades reported on Thema Wise's customer statements.

349.    For example, the December 2006 account statements of Alpha Prime, Lagoon, Thema International, and Thema Wise reported the sale of thousands of shares of Merck & Co. with a settlement date of December 28, 2006 at a price of $44.61.  BLMIS's records indicate that these shares were purchased on December 22, 2006 at a price of $44.61.  On December 28, 2006, however, Merck & Co. stock traded between $42.78 and $43.42 that day.

350.    The total equities transactions outside of the daily price range over the life of the BLMIS Feeder Funds' accounts are set forth in the following table:

| | Equities Total Trades Out of Range |
|---|---|
| Alpha Prime/APAM | 28 |
| BA Worldwide | 333 |
| Bank Medici | 102 |
| Benbassat Funds | 565 |
| Hermes Management/Hermes/Lagoon | 306 |
| HITSB | 3 |
| HSBC Bank Bermuda | 1,045 |
| HSBC Fund Services | 138 |
| HSBC Service Providers | 1,461 |
| HSSB | 167 |
| HSSI/HITSI | 388 |
| HSSL | 619 |
| Thema International | 152 |
| Thema Management BVI | 152 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 107 |

351.    Each one of these trades was objectively impossible.

**E.    The Dividend Activity Shown on Customer Statements Was Impossible**

352.    During the periods that BLMIS's IA Business was purportedly out of the market, BLMIS claimed to invest in the Fidelity Spartan U.S. Treasury Money Market Fund (the "Fidelity Spartan Fund").  BLMIS purported to do so notwithstanding the fact that the Fidelity Spartan Fund changed its name in August 2005.  Nevertheless, from the end of 2005 until

Madoff's arrest in 2008, the BLMIS Feeder Funds' account statements continued to show

transactions with a fund that no longer existed under the name reported on customer statements.

353.    The Fidelity Spartan Fund issued dividend payments only once a month, either at

month's beginning or end.  But the BLMIS Feeder Funds' account statements often reported

multiple dividend payments by Fidelity Spartan Fund in a calendar month, on dates that did not

correspond with published dividend payments.  In February 2007, for example, Thema

International's BLMIS account statement reported eight dividend payments purportedly made by

the Fidelity Spartan Fund (which by then no longer existed).  During the same month, Alpha

Prime's BLMIS account statement reported seven Fidelity Spartan Fund dividends.

354.    The number of improper dividend payments credited to the BLMIS Feeder Funds'

and Madoff Reference Funds' accounts are set forth in the following table:

| | Improper Dividend Payments | Total Dividend Payments | Percentage of Improper Dividend Payments |
|---|---|---|---|
| Alpha Prime/APAM | 128 | 133 | 96.2% |
| BA Worldwide | 422 | 433 | 97.5% |
| Bank Medici | 235 | 237 | 99.2% |
| Benbassat Funds | 876 | 901 | 97.2% |
| GSFP | 144 | 147 | 98.0% |
| Hermes Management/Hermes/Lagoon | 518 | 537 | 96.5% |
| HITSB | 235 | 242 | 97.1% |
| HSBC Bank Bermuda | 1,304 | 1,342 | 97.2% |
| HSBC Fund Services | 244 | 249 | 98.0% |
| HSBC Service Providers | 2,281 | 2,342 | 97.4% |
| HSSB | 432 | 442 | 97.7% |
| HSSI/HITSI | 561 | 570 | 98.4% |
| HSSL | 1,187 | 1,224 | 97.0% |
| Thema International | 222 | 227 | 97.8% |
| Thema Management BVI | 153 | 158 | 96.8% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 136 | 137 | 99.3% |

### F.    BLMIS's Trade Confirmations Frequently Contained Settlement Anomalies and Errors in Purported Options Transactions

355.    According to industry standards, the settlement period for listed options is the business day following the trade date, referred to as T+1.  On numerous occasions, the trade confirmations issued by BLMIS showed trades settling on other than T+1.  All of the trade confirmations showed CBOE-listed OEX options.  More than 96% of the options confirmations that HITSB reviewed showed trades settling outside of the industry standard settlement date.

356.    As set forth in the following table, BLMIS purported to enter into thousands of options transactions on behalf of the BLMIS Feeder Funds that did not settle on the business day following the execution of the trade:

| | Options - Trades not Settling T+1 | Options - Percentage not Settling T+1 |
|---|---|---|
| Alpha Prime/APAM | 233 | 51.9% |
| BA Worldwide | 374 | 20.6% |
| Bank Medici | 476 | 59.7% |
| Benbassat Funds | 972 | 28.8% |
| Hermes Management/Hermes/Lagoon | 479 | 25.4% |
| HITSB | 630 | 96.3% |
| HSBC Bank Bermuda | 1,179 | 19.8% |
| HSBC Fund Services | 466 | 50.1% |
| HSBC Service Providers | 3,056 | 32.0% |
| HSSB | 859 | 55.6% |
| HSSI/HITSI | 965 | 38.3% |
| HSSL | 1,497 | 35.2% |
| Thema International | 258 | 28.0% |
| Thema Management BVI | 108 | 14.1% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 235 | 41.7% |

### G.    BLMIS Engaged in Unauthorized Margin Trades

357.    There were no agreements allowing BLMIS to trade on margin for the BLMIS Feeder Funds' accounts.  In many instances, BLMIS purported to purchase securities before it

had the cash on hand to do so.  At other times, BLMIS paid redemptions prior to liquidating securities.

358.    BLMIS never charged the BLMIS Feeder Funds any interest for margin trades, effectively providing millions of dollars of interest-free loans.

359.    For example, on December 4, 2006, Lagoon withdrew $5 million from BLMIS account number 1FN021, resulting in a cash deficit of $4,947,019.  The account did not regain a positive cash balance until December 26, 2006 when equities purportedly held in the account were liquidated and put options sold.  In this unauthorized margin transaction, BLMIS loaned Lagoon nearly $5 million interest-free for 22 days.

360.    Between December 1995 and December 2008, Hermes/Lagoon's BLMIS account statements reported negative cash balances for a total of 1,069 days.  Over 25% of these unauthorized margin transactions involved Hermes/Lagoon withdrawing money from its BLMIS accounts before the sale of securities that purportedly funded the withdrawal.  Other negative cash balances reported on Hermes/Lagoon's BLMIS account statements resulted from options trading that did not comply with the SSC strategy, i.e., where put options were purportedly purchased before the call options that were supposed to fund the purchase were sold.

361.    The following chart sets forth the number of instances and days a negative cash balance was reported to the BLMIS Feeder Funds:

|  | Number of Days with Negative Cash Balances | Number of Instances of Negative Balances |
|---|---|---|
| Alpha Prime/APAM | 112 | 34 |
| BA Worldwide | 1,033 | 258 |
| Bank Medici | 266 | 62 |
| Benbassat Funds | 1,668 | 501 |
| Hermes Management/Hermes/Lagoon | 1,069 | 321 |
| HITSB | 57 | 15 |

| | Number of Days with Negative Cash Balances | Number of Instances of Negative Balances |
|---|---|---|
| HSBC Bank Bermuda | 2,728 | 858 |
| HSBC Fund Services | 209 | 67 |
| HSBC Service Providers | 3,737 | 1,146 |
| HSSB | 323 | 103 |
| HSSI/HITSI | 657 | 227 |
| HSSL | 2,075 | 581 |
| Thema International | 437 | 131 |
| Thema Management BVI | 410 | 123 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 162 | 49 |

## IX.  PURPORTED OPTIONS CONTRACTS ENTERED INTO BY BLMIS ON BEHALF OF CUSTOMERS DID NOT IDENTIFY COUNTERPARTIES

362.    Options trades undertaken in the OTC market are entered into pursuant to private contracts between a party and a counterparty.  Madoff claimed to be trading options in the OTC market, which would have required BLMIS to enter into private, individually negotiated, arm's length contracts with willing counterparties.  The BLMIS customer bore the risk if the counterparty failed to perform.  Alberto Benbassat confirmed that counterparty default was "the greatest risk" to Thema International.

363.    Madoff claimed that counterparties entered into agreements identical to those executed by BLMIS's investors, and that counterparties were obligated to deposit Treasury Bills as collateral for performance.  But no such agreements ever were produced to BLMIS customers, nor did Madoff ever provide any confirmation of where and how those Treasury Bills were posted.

364.    Because BLMIS allegedly traded options in large blocks and then divided the contracts proportionally among its investors, a party (such as a BLMIS investor or its service provider) could not assess the credit risk of the counterparty upon which it was relying for

performance.  Furthermore, there were only a few possible counterparties capable of supplying the necessary options liquidity at the volume BLMIS was trading.  One such counterparty would have been HSBC, but HSBC knew that it was not engaged in options trading with BLMIS.

365.    The HSBC Custodians were responsible for "receiv[ing] and retain[ing] confirmations or other documents evidencing the purchase or writing of an option . . . in accordance with a notice or other communication evidencing the expiration, termination, or exercise of any such option furnished by the securities or options exchange on which such option is traded. . . ."

366.    Thema International, as a UCITS fund, could trade in OTC options only if the counterparties were subject to prudential supervision, belonged to the categories approved by the Central Bank of Ireland and were subject to reliable and verifiable valuation on a daily basis. In particular, Thema International's investment manager was obliged to employ a process for the accurate and independent assessment of the value of OTC options.

367.    The Feeder Fund Defendants were required to limit their exposure to a specific counterparty to a certain percentage of the fund's NAV.

368.    Thema International's prospectus stated that OTC options contracts would be permitted only if, among other things, "the name of the counterparty is disclosed in the subsequent half yearly or annual report issued . . . ."  Despite the fact that there were no counterparties—because there were no trades—Thema Management BVI represented to third parties that option counterparties were known and the requisite risk assessment had been performed.

369.    Thema International never inquired "who the counterparties were."

370.     In fall 2008, JPMorgan Securities began to have serious concerns about the lack
of transparency into Madoff's operations.  On October 27, 2008, JPMorgan Securities formalized
its concerns in a letter that was sent to Kohn and Bank Medici.  JPMorgan Securities warned that
if the "[i]dentification of the Counterparty to each Put option and Call option held by the
[Herald] Fund . . . ." was not provided by 5:00 pm the following day, JPMorgan Securities would
redeem its investment in Herald.

371.     Kohn contacted Madoff regarding the identification of BLMIS's counterparties,
but was given only a perfunctory response on counterparty risk mitigation.  Kohn relayed
Madoff's explanation to JPMorgan Securities, but on October 29, 2008 JPMorgan Securities
redeemed its entire investment in Herald.  According to JPMorgan Securities, its inability to
access the counterparty identities for Madoff's OTC options and the fact that the custodian did
not actually hold the Herald's assets caused JPMorgan Securities to seek to terminate its Madoff
exposure.

372.     On the same day, JPMorgan Securities filed a Suspicious Activity Report with the
government agency in the United Kingdom charged with investigating organized crime
violations.

373.     On the 2008 HSBC Conference Call, HSBC discussed the options counterparties,
noting, "the only thing you actually can see is the option on [Madoff's] blotter.  And you can't
actually see the name of the account or party . . . ."

374.     By October 2008, Coe was told that "there is little transparency around this . . .
[t]he real risk here is the Put on [sic] Call Options on the S&P 100.  Who is the counterparty?"

## X.    THE INITIAL AND SUBSEQUENT TRANSFERS TO THE DEFENDANTS ARE AVOIDABLE AND RECOVERABLE BY THE TRUSTEE

### A.    Initial Transfers From BLMIS to Initial Transferees

375.    The Trustee seeks to avoid and recover a total of $978,577,331 that BLMIS transferred to or for the benefit of Hermes, Lagoon, Lagoon Trust, Thema International, Thema Fund, Thema Wise, and Alpha Prime (collectively, the "Initial Transferees").

376.    From the opening of the Initial Transferees' accounts with BLMIS to the Filing Date, BLMIS made transfers to, or for the benefit of, Hermes, Lagoon, and/or Lagoon Trust of approximately $297,354,246 (the "Lagoon Transfers"), Thema International of approximately $735,536,907 (the "Thema Transfers"), Thema Fund/Thema Wise of approximately $130,135,000 (the "Thema Wise Transfers"), and Alpha Prime of approximately $83,170,000 (the "Alpha Prime Transfers") (collectively the "Transfers").  The Transfers were made via the Fedwire and CHIPS payment systems.  In late 2004, HSBC Bank plc began acting as the bank receiving redemptions and sending subscriptions for Defendant Feeder Funds' BLMIS accounts through HSBC Bank plc's account in New York.

377.    The Transfers were, and continue to be, customer property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, NYDCL §§ 273–279, applicable provisions of SIPA, partiularly SIPA § 78fff-2(c)(3), and N.Y. C.P.L.R. 203(g) and 213(8).

378.    Of the Lagoon Transfers, during the six years preceding the Filing Date, BLMIS made transfers to, or for the benefit of, Lagoon, Hermes and/or Lagoon Trust of $240,743,808 (the "Lagoon Six Year Transfers").  Of the Thema Transfers, during the six years preceding the Filing Date, BLMIS made transfers to, or for the benefit of, Thema International of $675,840,000 (the "Thema Six Year Transfers").  Of the Thema Wise Transfers, during the six

years preceding the Filing Date, BLMIS made transfers to, or for the benefit of, Thema

Fund/Thema Wise of $130,135,000 (the "Thema Wise Six Year Transfers"). Of the Alpha

Prime Transfers, during the six years preceding the Filing Date, BLMIS made transfers to, or for

the benefit of, Alpha Prime of $83,170,000 (the "Alpha Prime Six Year Transfers"). The

Hermes/Lagoon Six Year Transfers, Thema Six Year Transfers, Thema Wise Six Year Transfers,

and Alpha Prime Six Year Transfers are collectively referred to herein as the "Six Year

Transfers."

379.    Of the Lagoon Six Year Transfers, BLMIS transferred $163,170,000 to or for the

benefit of Lagoon, Hermes and/or Lagoon Trust during the two years prior to the Filing Date (the

"Lagoon Two Year Transfers"). Of the Thema Six Year Transfers, BLMIS transferred

$675,840,000 to or for the benefit of Thema International during the two years prior to the Filing

Date (the "Thema Two Year Transfers"). Of the Thema Wise Six Year Transfers, BLMIS

transferred $116,505,000 to or for the benefit of Thema Fund/Thema Wise during the two years

prior to the Filing Date (the "Thema Wise Two Year Transfers"). Of the Alpha Prime Six Year

Transfers, BLMIS transferred $76,450,000 to or for the benefit of Alpha Prime during the two

years prior to the Filing Date (the "Alpha Prime Two Year Transfers"). The Hermes/Lagoon

Two Year Transfers, Thema Two Year Transfers, Thema Wise Two Year Transfers, and Alpha

Prime Two Year Transfers are collectively referred to herein as the "Two Year Transfers."

380.    If, through discovery, it is established that the Initial Transferees made transfers

between or amongst each other, such transfers will be deemed subsequent transfers and the

transferee deemed a subsequent transferee.

381.     Each of the Initial Transferees received the Transfers with actual knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

382.     Charts detailing these transactions are included as Exhibits A and B.

**B.     Subsequent Transfers from Initial Transferees**

383.     Hermes Management, APAM, Thema Management Bermuda, Equus, Thema Management BVI, Bank Medici, BA Worldwide, HSBC Bank plc, HSBC Bank Bermuda, HSSB, HITSB, HSSI, HITSI, HSSL, HSBC Fund Services, Thema Fund, Hermes, and/or Lagoon Trust are collectively referred to as the "Defendant Subsequent Transferees."

384.     Based on the Trustee's investigation to date, upon information and belief, the Initial Transferees transferred approximately $260,267,183 to the Defendant Subsequent Transferees prior to the Filing Date (the "Defendant Subsequent Transfers") as follows:

*a.*     Hermes, Lagoon, and/or Lagoon Trust transferred to:

    i.     Hermes Management approximately $79,334,375 in monthly fees for serving as Hermes's investment manager from 1996 to December 2008;

    ii.     HSBC Bank Bermuda, HITSB, and/or HSSL, in the aggregate, approximately $4,154,514 in monthly fees for serving as Hermes's custodian and/or sub-custodian from 1996 to 2008 and $117,802 in monthly fees for serving as Lagoon Investment Trust's sub-administrator and sub-custodian from 2006 to 2008; and

    iii.     HSBC Bank Bermuda, HSSB, HSBC Fund Services, and/or HSSL, in the aggregate, approximately $1,148,549 in monthly fees for serving as Hermes's administrator and/or sub-administrator from 1996 to 2008.

*b.*     Alpha Prime transferred to:

    i.     HSBC Bank Bermuda, HSSB, HITSB, and/or HSSL, in the aggregate, approximately $1,090,669 in monthly fees for the services they rendered as Alpha Prime's custodian, administrator, registrar, sub-custodian, sub-administrator, sub-registrar, and payment bank from March 2003 to December 2008;

    ii.     APAM approximately $16,767,897 in monthly management fees and annual performance fees for serving as Alpha Prime's investment manager from June 1, 2003 to December 2008; and

    iii.    BA Worldwide approximately $975,816 in monthly fees for serving as Alpha Prime's investment adviser from February 24, 2003 through July 2007.

c.    Thema Wise/Thema Fund transferred to:

    i.     HSBC Bank Bermuda, HITSB, and/or HSSL, in the aggregate, approximately $535,922 in monthly fees for serving as Thema Wise/Thema Fund's custodian and/or sub-custodian;

    ii.    HSBC Bank Bermuda, HSSB, and/or HSSL, in the aggregate, approximately $754,445 in monthly fees for serving as Thema Wise/Thema Fund's administrator and/or sub-administrator;

    iii.    Thema Management Bermuda approximately $10,558,411 in monthly fees for serving as Thema Fund's investment manager from 2003 to December 2008; and

    iv.    Equus approximately $1,761,740 in monthly fees for providing Thema Wise administrative support from 2003 to 2008.

d.    Thema International transferred to:

    i.     HSSI approximately $5,344,343 in monthly fees for serving as Thema International's administrator from May 1996 to December 2006;

    ii.    HITSI and/or HSBC Bank Bermuda approximately $4,830,499 in monthly fees for serving as Thema International's custodian and/or sub-custodian from May 1996 to December 2006;

    iii.    HSSI, HITSI, and/or HSBC Bank Bermuda approximately $3,232,218 in monthly fees for serving as Thema International's custodian and/or administrator from January 2007 to December 2008 (A chart setting forth these transfers is attached as Exhibit C);

    iv.    Thema Management BVI approximately $105,437,711 in monthly fees for serving as Thema International's investment manager and distributor from 1996 to 2008;

    v.     Bank Medici approximately $12,905,415 in monthly fees for serving as Thema International's investment manager from 2007 to 2008;

    vi.    BA Worldwide approximately $11,316,791 in monthly fees for serving as Thema International investment adviser from 2000 to 2006; and

vii.    Equus fees for providing Thema International administrative support.

### C.    Recovery of Additional Transfers from HSBC

385.    The Trustee also seeks to recover transfers to HSBC Bank plc, HSBC Bank USA, HSBC USA Inc., and HSBC Suisse from feeder funds named in other adversary proceedings brought by the Trustee (together with the Defendant Subsequent Transfers, the "Subsequent Transfers").

386.    Rye Broad Market, Rye Portfolio, Rye Select Broad Market Prime Fund L.P. ("Rye Prime Fund"), Rye Select Broad Market Insurance Portfolio LDC ("Rye Insurance"), Greenwich Sentry, Harley, Fairfield Sentry (collectively, the "Non-Defendant Initial Transferees"), and Thema International received transfers directly from BLMIS.  Those transfers were then subsequently transferred either directly or indirectly to HSBC Bank plc, HSBC Bank USA, HSBC USA Inc., and HSBC Suisse in connection with HSBC's Private Bank and GSFP businesses.  Based on the Trustee's investigation to date, HSBC Bank USA, HSBC USA Inc., HSBC Bank plc, and HSBC Suisse received approximately $529,498,361 before the Filing Date.

387.    BLMIS acted as the Non-Defendant Initial Transferees' and Thema International's investment adviser and purported to invest the funds' assets according to the SSC strategy that involved the purchase and sale of U.S. securities and U.S. Treasury bills over U.S. exchanges.  BLMIS also acted as the executing broker for the transactions and as custodian for the securities purportedly held on the BLMIS feeder funds' behalf.

### 1.    The Rye Funds

#### a.    Background

388.    TGH, a Delaware corporation, and Tremont Partners, a Connecticut corporation registered under the Investment Advisers Act of 1940, operating from Rye, New York, managed six BLMIS feeder funds.  Rye Broad Market, Rye Select Broad Market XL Fund L.P. ("Rye

XL"), and Rye Prime Fund—were registered in Delaware (collectively, the "Delaware Registered Funds"). Rye Portfolio, Rye XL Portfolio, and Rye Insurance (collectively, the "Cayman Registered Funds") were registered in the Cayman Islands (together with the Delaware Registered Funds, the "Rye Funds").

389.    Except for Rye XL and Rye XL Portfolio, all of the Rye Funds had direct accounts with BLMIS, in connection with which they filed customer claims with the Trustee.

390.    Rye XL and Rye XL Portfolio received transfers as set forth in the following chart. The below transfers to Rye XL and Rye XL Portfolio are set forth in Exhibit F.



391.    Rye XL and Rye XL Portfolio were levered funds whose returns were based on Rye Broad Market's and Rye Portfolio's performance respectively. Generally, investments in Rye XL and Rye Portfolio were affected through swap transactions, for example a swap involving Rye XL and HSBC Bank USA (later novated to HSBC Bank plc) (the "Rye XL Swap"), and a swap involving Rye XL Portfolio and HSBC Bank plc (the "Rye XL Portfolio Swap")—Rye XL's returns were based on Rye Broad Market's performance and Rye XL Portfolio's returns were based on Rye Portfolio's performance.

392.    Although Tremont and the Rye Funds had nominal presence in the Cayman Islands, none had offices or operations there.  TGH, Tremont Partners, and the Rye Funds all had their principal place of business in New York and, while they had registered offices in the Cayman Islands, they were managed from their Rye, New York headquarters.  Rye XL Portfolio similarly had its registered address at a law firm in the Cayman Islands.

393.    At the time of the Rye Funds' transfers to the HSBC entities, their marketing, operations, diligence, and their communications with BLMIS, investors, and potential investors were conducted by Tremont's employees in New York.

394.    Because they were registered as exempted companies under the Cayman Islands Companies Law, the Cayman Registered Funds were not permitted to solicit or accept investments from Cayman investors.  They paid no taxes in the Cayman Islands.

395.    Tremont's New York employees were appointed to serve on the boards of the Cayman and Delaware Registered Funds.  For example, Suzanne Hammond was a director of Rye Insurance and Rye Portfolio and Darren Johnston was a director of Rye Portfolio and Rye XL Portfolio.

396.    The transfers from Rye Broad Market, Rye Portfolio and Rye XL Portfolio to the GSFP Entities, as well as all redemptions and subscriptions for the Rye Funds to/from BLMIS, went through New York bank accounts at the Bank of New York.

397.    Tremont executives in New York, including its CEO Robert Schulman, executed all BLMIS Customer Agreements and other documents, including Trade Authorizations, Options Agreements, and IRS Form W-9s, as authorized representatives of the Rye Funds with BLMIS accounts.  Executives in Tremont's Rye office were designated as authorized signatories on these accounts.

398.    Beginning as early as 1991, Tremont's New York executives and employees met regularly with Madoff and other BLMIS employees in New York.  Sandra Manzke, who founded Tremont, began regularly meeting in New York with Madoff as early as 1991.  Schulman also had a long-running relationship with Madoff and visited BLMIS many times.

399.    The Customer Agreements between BLMIS and the Rye Funds with BLMIS accounts gave BLMIS full discretion over the assets under management.  Pursuant to the Trading Authorizations, Madoff was authorized to be the Rye Funds' "agent and attorney in fact" to buy, sell and trade in securities.  The Customer Agreements are governed by New York law and the transactions under the Customer Agreements are subject to the provisions of the Securities Exchange Act of 1934 and the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System.

400.    Disputes under the Rye Funds' Customer Agreements would be resolved under New York law by the American Arbitration Association, or "an arbitration facility provided by any exchange of which the broker is a member, or the National Association of Securities Dealers Inc., and in accordance with the rules pertaining to the selected organization."

401.    Investors in the Rye Funds with BLMIS accounts knew they were investing in BLMIS.  Tremont's New York employees spoke openly with their investors about their funds being invested in BLMIS.  Rye Portfolio investors knew the fund invested with BLMIS and openly referred to it as "our Madoff fund" or as a Madoff "feeder."  Investors also were informed that the fund would be trading in the U.S. equity market and related equity index options and that cash would be held in short term Treasury Bills.  Rye Portfolio's private placement memoranda and marketing materials openly identified these U.S. ties.

402.    The Rye Funds represented to investors that custody of their securities would be held in "a brokerage account with an NASD registered broker dealer" (i.e. BLMIS).

403.    The Rye Funds' investors were aware that the Rye Funds had U.S.-based counsel and U.S.-based sales contacts.

404.    Tremont informed investors in the Cayman Registered Funds that they were permitted to invest only in U.S. dollars.

405.    In managing Rye Portfolio and Rye Insurance, Tremont's New York employees approved trade tickets and monthly statements, checked bank activity, and were authorized as bank signatories for the funds.

406.    In other BLMIS-related lawsuits in which they have been named defendants, each of the Rye Funds has invoked the Securities Litigation Uniform Standards Act and New York General Business Law article 23-A, §§ 352–353 to assert that (i) their BLMIS-related activities were directed to promoting or inducing the sale of securities within or from New York, and that (ii) the securities they purported to trade were U.S. securities covered by the 1933 Exchange Act. *See In re Tremont Securities Law, State Law and Insurance Litigation*, No. 08-cv-11117 (TPG) (S.D.N.Y.), *Peshkin et al. v. Tremont Group Holdings, Inc., et al.*, No. 08-CV-11183 (TPG) (S.D.N.Y.).

### b.    *Initial Transfers to the Rye Funds*

407.    The Trustee commenced a separate adversary proceeding against Rye Broad Market, Rye Portfolio, Rye Insurance, Rye XL Portfolio, Rye XL, and other defendants in the Bankruptcy Court under the caption, *Picard v. Tremont Group Holdings, Inc. et al*, Adv. Pro. No. 10-05310 (SMB) (the "Tremont Avoidance Action").

408.    The Tremont Avoidance Action sought to avoid and recover initial transfers of customer property from BLMIS to: (1) Rye Broad Market in the approximate amount of

$384,140,000 (the "Rye Broad Market Initial Transfers"); (2) Rye Portfolio in the approximate

amount of $619,287,477 (the "Rye Portfolio Initial Transfers"); (3) Rye Prime Fund in the

approximate amount of $1,010,000,000 (the "Rye Prime Fund Initial Transfers"); and (4) Rye

Insurance in the approximate amount of $126,869,887 (the "Rye Insurance Initial Transfers",

and collectively, the "Rye Initial Transfers").  Charts setting forth the Rye Initial Transfers are

attached as Exhibits D and E.  The Trustee incorporates by reference the allegations contained in

*Picard v. Tremont Group Holdings, Inc. et al*, Adv. Pro. No. 10-05310 (SMB), Amended

Complaint, ECF. No. 4 (February 28, 2011) (the "Tremont Amended Complaint") as if fully set

forth herein.

409.    On July 25, 2011, Rye Broad Market, Rye Prime Fund, Rye Portfolio, and Rye

Insurance entered into a joint settlement agreement with the Trustee, which was governed by

New York law and pursuant to which the funds submitted to the jurisdiction of the U.S.

Bankruptcy Court for purposes of enforcing the agreement.  The customer claims of Rye Broad

Market, Rye Portfolio, and Rye Insurance were allowed in connection with the settlement, and

these funds have received and continue to receive distributions on their allowed claims.

410.    On September 22, 2011, the Bankruptcy Court approved a settlement among the

Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a

former chief executive associated with Tremont Group Holdings, Inc. (the "Tremont Settlement

Agreement").  As part of the Tremont Settlement Agreement, the Bankruptcy Court entered a

consent judgment in favor of the Trustee in the amount of $1,025,000,000.

411.    The Rye Broad Market Initial Transfers and the Rye Portfolio Initial Transfers

were and continue to be customer property within the meaning of SIPA § 78*lll*(4).  The Rye

Broad Market Initial Transfers and the Rye Portfolio Initial Transfers have been avoided under

sections 544 and 548 of the Bankruptcy Code, and have been preserved under section 551 of the

Bankruptcy Code, the NYDCL §§ 273–279, and applicable provisions of SIPA, and are

recoverable under section 550 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

412.    The Rye Prime Fund Initial Transfers and the Rye Insurance Initial Transfers

were and continue to be customer property within the meaning of SIPA § 78lll(4).  The Rye

Prime Fund Initial Transfers and the Rye Insurance Initial Transfers have been avoided under

sections 544 and 548 of the Bankruptcy Code, and have been preserved under section 551 of the

Bankruptcy Code, the NYDCL §§ 273–279, and applicable provisions of SIPA, and are

recoverable under section 550 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

413.    Of the Rye Initial Transfers, approximately $252,000,000 was transferred to Rye

Broad Market, approximately $945,000,000 was transferred to Rye Prime Fund, approximately

$609,000,000 was transferred to Rye Portfolio, and approximately $90,650,000 was transferred

to Rye Insurance during the six years prior to the Filing Date (the "Rye Six Year Transfers").

414.    Of the Rye Six Year Transfers, approximately $60,000,000 was transferred to Rye

Broad Market, approximately $495,000,000 was transferred to Rye Prime Fund, approximately

$350,000,000 was transferred to Rye Portfolio, and approximately $48,750,000 was transferred

to Rye Insurance during the two years prior to the Filing Date (the "Rye Two Year Transfers").

415.    Rye Broad Market, Rye Prime Fund, Rye Portfolio, and Rye Insurance received

the Rye Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to

circumstances suggesting a high probability of fraud at BLMIS.

### c.    *Subsequent Transfers from the Rye Funds*

416.    Before investing with the Rye Funds, GSFP visited Tremont's Rye, New York

office, including on March 29, 2007, before HSBC Bank plc entered the Rye XL portfolio swap

purchased Rye Portfolio shares, and substituted for HSBC Bank USA as the counterparty in the

Rye XL Swap on or about August 31, 2005. Thereafter, an HSBC employee in New York entered a subscription agreement on behalf of HSBC Bank plc agreeing to send U.S. dollars to an account for Rye Portfolio at the Bank of New York in New York.

417.    On December 1, 2008, a GSFP employee in New York submitted a redemption request for HSBC Bank plc to make a partial redemption of $15.9 million from Rye Portfolio. The funds were wired to the HSBC Bank plc account at HSBC Bank USA on or about that same date.

418.    Rye XL Portfolio received transfers of at least $74,298,573 from Rye Portfolio, at least $318,000 from Rye Insurance, and at least $4,726,202 from Rye XL.

419.    Rye XL received at least $48 million from Rye Broad Market and at least $292,472,765 from Rye Prime Fund.

420.    Rye XL and Rye XL Portfolio received the transfers with actual knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS. A chart setting forth transfers from the Rye Funds to Rye XL and Rye XL Portfolio is attached as Exhibit F.

421.    HSBC Bank plc received at least $53,000,000 from Rye XL Portfolio to HSBC Bank plc's account at HSBC Bank USA. HSBC Bank plc received at least $15.9 million of the Rye Portfolio Initial Transfers in transfers from Rye Portfolio.

422.    HSBC Bank USA received at least $50,000,000 of the Rye Broad Market Initial Transfers in transfers from Rye Broad Market.

423.    HSBC USA Inc. received at least $13,500,000 of the Rye Broad Market Initial Transfers in transfers from Rye Broad Market Fund.

424.     A chart setting forth the transfers from Rye Broad Market, Rye Portfolio, and/or

Rye XL Portfolio to HSBC Bank plc, HSBC Bank USA, and/or HSBC USA Inc. is attached as

Exhibit H.

> **d.     *Tremont Received Repeated Fraud Warnings and Either Knew
> of, or Was Willfully Blind to, BLMIS's Fraud***

425.     Tremont received numerous, direct warnings and observed myriad indicia that

BLMIS was engaging in fraud.  These warnings go back to at least April 2001, when a

representative of Silver Creek, a Tremont investor, wrote to Schulman: "[M]an is it hot out there

with the Bernie fraud rumors."  The investor specifically questioned why Madoff "need[ed] to go

to cash at year-end every year" and used such a "small" firm as its auditor.

426.     In May 2001, the *Barron's* and *Mar/Hedge* articles questioning Madoff's

legitimacy were published, one of which identified Tremont's Rye Broad Market as a BLMIS

feeder fund.  On May 7, 2001, TGH's Chief Operating Officer (and later President), Barry

Colvin, sent an internal email to Tremont employees identifying "a few press articles regarding

Bernie Madoff" in recent news.  The email instructed employees to direct questions about the

article to Tremont's management and otherwise decline comment.  In 2007 and 2008, Tremont

executives distributed the May 2001 *Barron's* article internally.

427.     On April 25, 2003, Jim Mitchell, an executive in Tremont's Rye Investment

Management Group, relayed to Schulman a discussion with an investor about "associating

Madoff with broker-dealer wrongdoing of late."  Mitchell, Schulman, and that investor visited

Madoff the following month.  That investor prepared extensive notes about the meeting which

characterized Madoff's operation as "controversial" and expressed concerns regarding Madoff's

undisclosed amounts under management, his unwillingness to meet with investors, the fees he

forfeited, the absence of a third-party custodian, and his "exceptionally stable" returns "with only

7 negative months since 1990."

428.    The Silver Creek representative emailed Schulman again in March 2004, seeking

to redeem Silver Creek's investments in BLMIS explaining:

> My motivation for doing this is not due to some new buzz out there
> for as you know that is a constant din but rather that I can no
> longer ignore my core instincts as an investor in which I have the
> [sic] battle the fact that I really don't know what is going on, what
> a [sic] do know is I am in an investment program that no one else
> in history has been able to make work, return series is flat out too
> good given how efficient the underlying securities are priced and
> he doesn't charge a fee all compounded by it seems every stone I
> turn over is another multi billion $ madoff feeder.  I . . . found that
> my inability to rationalize & be intellectually honest on why I was
> invested bothered me more than it has in the past . . . .

429.    In May 2004, Chris Cichella, a Tremont employee in the Investment Advisory

Group, informed the head of the group and others at Tremont that RogersCasey—a leading

investment consulting firm—was "concerned about Tremont's relationship with Madoff" and

therefore would not recommend that its client invest with Tremont.  Cichella reported that his

contact failed to convince RogersCasey to reconsider its negative position on Madoff, because of

the belief "that [BLMIS] was prone to a blow-up that would destabilize Tremont."

430.    RogersCasey's internal meeting notes contained similar predictions:

> [T]he magnitude of the exposure and the truth of Tremont's
> transparency remain extremely disconcerting. . . . The Madoff
> exposure is a potential disaster.  Even though some products will
> not be directly affected . . . Tremont's products will still see their
> reputations vaporized when Madoff rolls over like a big ship.

431.    In 2005, Citibank relayed to Tremont concerns about BLMIS and demanded

indemnification against potential fraud by BLMIS as a condition to providing a credit facility to

Tremont.  Citibank also sought counsel regarding SIPA protections in the event of a BLMIS

liquidation.  In June 2006, Johnston informed Schulman, Stuart Pologe, Senior Vice President

and head of Product Management, and others at Tremont that Citibank wanted to meet with

Madoff because its employees could not "'resolve their internal wonder' remaining from their

due diligence . . . on how Madoff executes the trades." These concerns did not dissipate. In

March 2008, two weeks before terminating the credit facility, Citibank again requested

"indemnification from manager fraud."

432.    ABN AMRO Bank N.V. ("ABN") similarly sought BLMIS fraud-related

protection from Tremont, when renegotiating a 2006 swap agreement with one of Tremont's Rye

Funds. In 2006, ABN began receiving copies of BLMIS statements and trade confirmations

provided to Tremont. After receiving and analyzing these BLMIS records, ABN, citing "trust"

issues with Madoff, sought to renegotiate the 2006 swap agreement to ensure greater liquidity

from Tremont if Madoff was investigated.

433.    ABN sought "new termination rights resulting from investigations of Madoff

related to breaches of securities laws or regulations." Johnston wrote to Schulman and others at

Tremont that ABN's proposed language was "to cover fraud." In response, Tremont proposed

allowing ABN to immediately redeem a substantial portion of its investment if BLMIS was

investigated for a breach of securities laws or regulations.

434.    In response to ABN's concerns about recovering the balance of its investment,

Tremont responded as follows:

> We discussed that in detail here and found it next to impossible for
> the account manager to [be] found guilty prior to being charged
> with a breach. It would be our expectation that ABN would have
> ample opportunity to unwind via the normal redemption process
> well in advance of a guilty verdict.

435.    The amendment to the 2006 swap agreement was executed on September 1, 2007

with ABN's requested language.

436.    In August 2008, in connection with another transaction, ABN required Tremont to sign a side letter providing ABN a special right of redemption if BLMIS "bec[a]me[] the subject of a formal investigation by a U.S. court, governmental or regulatory body or agency related to a specific breach of a U.S. securities law or regulation."

437.    HSBC Bank plc obtained a similar "special" redemption right from Tremont in August 2007 before investing $85 million in Rye Portfolio.

438.    The Agile Group ("Agile") conducted due diligence and met with Johnston and others at Tremont in March 2007, and concluded that the assets could be fictitious and that Madoff could be running a Ponzi scheme.

439.    Agile expressed to Tremont that it had serious concerns about a fraudulent scheme at BLMIS, noting numerous red flags, including BLMIS's choice of auditors, BLMIS's options trading and lack of counterparty identification, BLMIS's use of paper trade tickets and account statements, and BLMIS going in and out of the market with no overall effect.

440.    Mariah Quish, an Agile employee who spearheaded Agile's due diligence efforts, found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

441.    Johnston suggested that Tremont respond to Agile and "give answers by phone rather than email . . . if possible."

442.    In October 2007, a Rye Fund investor repeatedly complained to Tremont that there were inexplicable differences between his returns and those of a family member who was a direct BLMIS investor, noting the "[m]ath ma[de] no sense." The investor also forwarded Schulman an email from that family member which stated, "[m]akes me concerned about the

legitamacy [sic] of the whole Bernie thing". Tremont was unable to reconcile the discrepancies or reassure the investor. The investor ultimately redeemed his entire Tremont investment.

443.    In April 2008, Mitchell emailed Schulman and suggested that BLMIS might be engaged in a fraudulent scheme, commenting that it was "almost as if [Madoff and other BLMIS employees] kn[e]w the return then portion[ed] a bit of this return to the accounts."

444.    On November 24, 2008, a Tremont salesman, Adrian Gordon, informed others at Tremont that a potential investor in Madrid was "very anti Madoff" and believed that Madoff was "probably [operating] a pyramid structure!"

445.    James Purnell, who joined Tremont in 2008 as Head of Risk Management, also warned Tremont about BLMIS. Analyzing Tremont for a prospective investor in 2005, Purnell raised concerns to Tremont about, among other things, whether BLMIS' assets were segregated and/or verified by a third party. After Madoff's arrest, a former coworker emailed Purnell and boasted that they were "finally vindicated on Madoff. If it looks too good to be true. . . ." Purnell replied: "[T]here is only so much progress one can make in 5 months."

### e.    *Tremont Knew Of And Appreciated The Multitude Of Red Flags Suggesting A High Probability Of Fraud At BLMIS.*

#### (1)    BLMIS Did Not Have a Qualified or Capable Auditor

446.    At least as early as 2001, Tremont knew that BLMIS used Friehling & Horowitz as its auditors. The Silver Creek representative who communicated with Tremont's management in 2001 about "Bernie fraud rumors" emphasized that a small, little-known firm conducted BLMIS's audits.

447.    Tremont knew that Friehling & Horowitz was not known in the hedge fund industry, did not specialize in investment firms, and had no auditing clients other than BLMIS. Tremont was specifically warned by a company that does background searches on auditors that

"[t]he red flag is thrown when the firm is not someone generally recognized in the alternatives business."

448.    Manzke acknowledged that Madoff's use of Friehling & Horowitz "bothered her."

### (2)    BLMIS's Operations Lacked Third-Party Oversight

449.    Tremont knew that Madoff went to cash periodically and that the practice was designed to avoid regulatory oversight.

450.    Tremont knew BLMIS deviated from well-established hedge fund industry practice by acting as investment adviser, prime broker, and custodian of the purported securities. In April 2006, Citibank informed Tremont that it could not proceed with a proposed transaction due to "fundamental roadblocks," including that Madoff, rather than a third party, was custodian. Tremont itself acknowledged the "inherent risk in having the Investment Advisor to the Fund also being a broker dealer."

451.    Tremont executives, including Mitchell, Johnston, and Cichella, failed to respond in writing regarding investors' questions about Madoff's operational integrity, including one pointed question from an investor asking, "how do I get comfort that the money is really there?"

452.    With respect to one such request, Johnston told Cichella this "lead[s] closer to BLMIS which [Tremont] strictly wants to avoid," to which Cichella replied: "Keep in mind, they are looking for independent (of Rye or Madoff) verification of the assets in a tangible form. . . . [I]t would be great if you could convince them" that the assets exist.

### (3)    Unidentified Options Counterparties

453.    A representative of JPMorgan Structured Fund Management, operating under the assumption that BLMIS traded OTC options, expressed concern that the trading counterparties

were unknown to Tremont if Madoff supposedly traded in the name of the account holder (i.e.,

Tremont's Rye Funds), and not in his own name.

454.    Citibank, which investigated the matter, could not find a counterparty.  Tremont

described the lack of counterparty information and anomalies regarding the supposed

counterparties as a "critical issue" for Citibank, which "asked around" and "[could not] find

anyone who admit[ted] to being [BLMIS's] counterparty."  Given BLMIS's purported assets

under management, Tremont knew that the lack of an identifiable counterparty was inexplicable.

(4)    Lack of Scalability

455.    The investor who advised Schulman of the "Bernie fraud rumors" commented to

Schulman, "[I]t seems every stone I turn over is another multi billion $ [M]adoff feeder."

456.    The assets under management and number of accounts disclosed in BLMIS's

ADV filings were substantially less than Tremont's estimates of BLMIS' assets under

management and only 1/3 of Tremont's highest estimate of $30 billion, strongly suggesting that

BLMIS's Form ADV was false.

457.    This raised obvious concerns regarding the scalability of BLMIS's SSC strategy.

(5)    Madoff's Unusual Fee Structure

458.    Tremont knew that Madoff charged only a commission on trades, and walked

away from between $200 million and $600 million based on Tremont's investments alone.

f.    **Tremont Purposely Exempted BLMIS From Its High Due
Diligence Standards**

459.    Tremont marketed itself as a sophisticated fund manager that followed industry-

leading due diligence standards and procedures, and undertook industry initiatives to prevent

fraud by monitoring investment managers.  However, Tremont exempted BLMIS from its

stringent due diligence standards.  In response to an investor's "[insistence] on meeting Bernie,"

one Tremont employee commented, "[o]ur own analysts don't get to see Madoff – why should [the investors?]"

460.    In a 2006 email, Mitchell, then head of Rye Investment Management which operated Tremont's Rye Funds, stated that Madoff was not to be asked about BLMIS's assets, how he achieved his returns, or BLMIS's auditors.

461.    Tremont's head of Product Management, Pologe, confided to a strategic consulting firm that Tremont had "no manager due dili[gence] process for [its BLMIS investments]" and referred to Tremont's business with BLMIS as "a highly vulnerable, highly profitable business."

>    **g.    Tremont and Its Funds Received Hundreds of Millions of Dollars From Its BLMIS Investment**

462.    Tremont received hundreds of millions of dollars in fees from its BLMIS investments.

463.    As noted by Lynn Keeshan, Tremont's head of Corporate Finance, Tremont was "highly dependent" on the Madoff business, as it accounted for "all of the profits of the firm." Cichella similarly wrote to a potential investor that the Rye Prime Fund's "only reason for being is as a $2b feeder into Madoff." Pologe commented that BLMIS was a "crack addiction business."

464.    Pologe acknowledged, "[Tremont] just sell[s] access [to BLMIS] for 2% management fee . . . .  We make a lot of money off this."  A potential investor pointed this out to Cichella:

>    I guess your 2% fee is sort of a mark up on the 50% credit facility because in reality, what is it that you are really managing?  You really aren't managing anything because Madoff has full unencumbered control over the investing.

465.    From its inception in May 1994 to November 2008, Rye Broad Market's AUM grew from approximately $14.8 million to approximately $2.4 billion.  The success of Rye Broad Market led Tremont to create additional BLMIS feeder funds, which also achieved success and projected an aura of profitability.

466.    From May 1997 until October 2008, the Rye Prime Fund grew from approximately $14.7 million to approximately $937 million.  Similarly, the Rye Portfolio grew from approximately $13.3 million in September 2001 to approximately $1.1 billion.

467.    Rye XL and Rye XL Portfolio each more than doubled in size over their two year investment with Madoff.  Rye XL Portfolio from approximately $131 million to $330 million, and Rye XL from approximately $152 million to $330 million.

### 2.    Greenwich Sentry and Fairfield Sentry

#### a.    *Background and Initial Transfers*

468.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry, Fairfield Sigma, Greenwich Sentry, and other defendants in the Bankruptcy Court under the caption, *Picard v. Fairfield Inv.Fund, Ltd., et al.*, Adv. Pro. No. 09-01239 (SMB) (the "Fairfield Avoidance Action"), seeking to avoid and recover initial transfers of customer property from BLMIS to Greenwich Sentry in the approximate amount of $206,038,654 (the "Greenwich Sentry Initial Transfers").  The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Inv. Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 30, 2015 as part of the Extraterritoriality Briefing) and any subsequent amendments as if fully set forth herein.

469.    On July 7, 2011, the Bankruptcy Court approved a settlement among the Trustee, Greenwich Sentry, and others (the "Greenwich Settlement Agreement").  As part of the

Greenwich Settlement Agreement, on April 17, 2012, the Bankruptcy Court entered a consent judgment in favor of the Trustee in the amount of $206,038,654.

470.    The Fairfield Avoidance Action seeks to avoid and recover approximately $3 billion in initial transfers of customer property from BLMIS to Fairfield Sentry (the "Fairfield Sentry Initial Transfers" and collectively with Greenwich Sentry Initial Transfers, "Fairfield Initial Transfers").

471.    By orders dated June 7 and June 10, 2011, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Fairfield Settlement Agreement"). As part of the Fairfield Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment in favor of the Trustee in the amount of $3,054,000,000.

472.    The Fairfield Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, NYDCL §§ 273–279, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and N.Y. C.P.L.R. 203(g) and 213(8).

473.    Of the Fairfield Initial Transfers, at least $206,000,000 was transferred to Greenwich Sentry and approximately $3,000,000,000 was transferred to Fairfield Sentry during the six years prior to the Filing Date (the "Fairfield Six Year Transfers").

474.    Of the Fairfield Six Year Transfers, at least $81,700,000 was transferred to Greenwich Sentry and at least $1,600,000,000 was transferred to Fairfield Sentry during the two years prior to the Filing Date (the "Fairfield Two Year Transfers").

475.    Greenwich Sentry and Fairfield Sentry received the Fairfield Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

476.    Charts setting forth the Fairfield Initial Transfers are included as Exhibits D and E.

### b.    *Subsequent Transfers from Fairfield Sentry, Fairfield Sigma, and Greenwich Sentry*

477.    HSBC Private Bank invested in Fairfield Sentry and/or Fairfield Sigma by executing subscription agreements.  Beginning in at least January 1, 2003, those agreements were governed by New York law and require that disputes be resolved only in New York.  By executing these agreements, HSBC Private Bank represented it read and understood the Private Placement Memoranda for Fairfield Sentry and/or Fairfield Sigma ("Fairfield PPMs").  The Fairfield PPMs describe BLMIS as an SEC-registered New York broker-dealer, which custodied most, if not all, of Fairfield Sentry's and Fairfield Sigma's assets.  BLMIS also was identified as executing the SSC strategy through the purchase of U.S. securities and U.S. Treasury bills on Fairfield Sentry's and Fairfield Sigma's behalf.  The Fairfield PPMs state that BLMIS's services are "essential to the continued operation of the Fund."

478.    Since at least 2000, all subscriptions and redemptions sent to and received by Fairfield Sentry passed through an account at HSBC Bank USA in New York.

479.    HSBC Bank USA and HSBC Suisse understood FGG was a New York-based group that operated Fairfield Sentry from its primary offices in New York.

480.    HSBC Suisse redeemed monies from Fairfield Sentry and requested that redemptions be sent in U.S. dollars to HSBC Suisse's account at HSBC Bank USA in New York.

481.    Fairfield Sigma was invested entirely in Fairfield Sentry.  FGG personnel made all operational decisions regarding Fairfield Sentry, Fairfield Sigma, and Fairfield Greenwich.

482.    HSBC Private Bank regularly sent its New York employees to FGG's office in New York to review Fairfield Sentry.  Internal HSBC reports from these reviews showed that

HSBC knew BLMIS was behind Fairfield Sentry's investment and that the only way to adequately review Fairfield Sentry was to review BLMIS's operations.  HSBC questioned FGG and sought to understand BLMIS by "see[ing] the desks where the SSC strategy is executed" and "meet[ing] with a [sic] operations person at BLM[IS] to understand how the custody of assets takes place."

483.    Fairfield Sentry subsequently transferred at least $783,320,553 of the Fairfield Initial Transfers to Fairfield Sigma ("Fairfield Sigma Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma Subsequent Transfers is attached as Exhibit G.

484.    Fairfield Sigma received the Fairfield Sigma Subsequent Transfers with actual knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

485.    Fairfield Sigma subsequently transferred approximately $9,195,298 of the Fairfield Sigma Subsequent Transfers to HSBC Suisse.

486.    HSBC Suisse received approximately $363,383,585 in transfers from Fairfield Sentry.

487.    HSBC Bank USA received, upon information and belief, approximately $31,775,129 in transfers from Fairfield Sentry.

488.    HSBC USA Inc., as part of GSFP, received at least $13,000,000 of the Greenwich Sentry Initial Transfers in transfers from Greenwich Sentry, a limited partnership formed under the laws of the State of Delaware and a direct investor in BLMIS.

489.    Charts setting forth the presently known subsequent transfers from Fairfield Sentry, Fairfield Sigma, and/or Fairfield Greenwich to HSBC Suisse, HSBC Bank USA, and/or HSBC USA Inc. are attached as Exhibit H.

### 3.    Harley

490.    Harley invested nearly 100% of its assets with BLMIS in New York and received

approximately $1 billion in transfers of customer property from BLMIS within two years of the

Filing Date.  Of this amount, HSBC Bank plc received approximately $15,599,960 in transfers

from Harley.

> *a.    Harley Sought Out the United States as a Place to Invest and the Transfers It Received Arose Out of Its Investment Account with BLMIS in New York*

491.    In April 1996, Harley's predecessor, Harley International Limited, entered into a

Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases

and Sales of Securities with BLMIS in New York.  Thereafter, Harley maintained an investment

account with BLMIS, designated No. 1FN094.

492.    Harley agreed that all disputes arising under the Customer Agreement would be

resolved by arbitration before the American Arbitration Association, or "an arbitration facility

provided by any other exchange of which the broker is a member, or the National Association of

Securities Dealers Inc. . . . and in accordance with the rules . . . of the selected organization."

493.    The Customer Agreement between BLMIS and Harley provided that all

transactions are subject to the provisions of the U.S. Securities Exchange Act of 1934 and to the

rules and regulations of the SEC and the Board of Governors of the Federal Reserve System.

The Customer Agreement also provided BLMIS with full discretion over Harley's assets, and

pursuant to the Trading Authorization agreement, Harley authorized Madoff to be its "agent and

attorney in fact" to buy, sell, and trade in U.S. securities.

> *b.    BLMIS in New York Acted as Harley's Custodian*

494.    BLMIS acted as custodian for the U.S. securities purportedly held on Harley's

behalf.  Each of Harley's audited financial statements for 2003, 2004, 2005, 2006, and 2007

disclosed that BLMIS acted as Harley's "Custodian." Harley's audited financial statements for 2007 disclosed that BLMIS held 99.99% of Harley's assets.

495.    Harley's audited financial statements for 2005 and 2006 also noted that "items included in the financial statements are measured using the currency of the primary economic activity in which it operates . . . . This is the U.S. dollar, which reflects the company's primary activity of investing in U.S. dollar denominated securities and derivatives."

496.    Harley was registered as an exempt company under the Cayman Islands Companies Law and was not permitted to solicit investors in the Cayman Islands.

497.    In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands."

498.    In its Articles of Association, Harley required that all disputes among Harley and its shareholders would be referred to binding arbitration in New York under rules established by the American Arbitration Association.

499.    Each of Harley's shareholders, including BNP Arbitrage, received copies of Harley's audited financial statements, Memorandum of Association, and Articles of Association.

### c.    *Fix Asset Management Ltd. Managed Harley from New York*

500.    Fix Asset Management Ltd. is the family wealth office of Charles Fix, which over the years evolved into an institutional fund of funds manager.

501.    Fix Asset Management Ltd. operated through its wholly owned subsidiaries, including Fix Asset Management Services Inc. (f/k/a Fix Asset Management, Inc. and Fix Capital Ltd., and collectively with Fix Asset Management Ltd., "FAM").

502.    FAM was incorporated under the laws of the State of New York and maintained

its principal place of business at 660 Madison Avenue, New York, New York.

503.    Harley had no employees or offices of its own.  For its investments with BLMIS,

Harley acted principally through FAM.

504.    FAM was owned and controlled by Charles Fix, who also owned and controlled

all of the voting shares for Harley.  During the relevant time period, Charles Fix resided in New

York.

505.    Fix's daughter, Tatiana Fix Katsigera was the chief executive officer of FAM,

served on its investment advisory committee, and conducted due diligence for its funds,

including Harley.  Katsigera also lived in New York.

506.    Several other members of FAM's advisory teams, including John Fix, Abel

Pacheco, and Panos Katsambas, also resided in New York during much of the relevant time

period.  FAM's outside counsel was also located in New York.

507.    FAM marketed Harley from its office in New York, and FAM employees met

with investors and potential investors in Harley at FAM's office in New York.

508.    FAM monitored and conducted due diligence on Harley's investments with

BLMIS from its office in New York.

509.    FAM received Harley's BLMIS account statements at its office in New York.  For

several years BLMIS also sent Harley's BLMIS trade confirmations and account statements to

FAM's agent and service provider at Bank Julius Baer & Co. Ltd. in New York.

510.    In monitoring its investments, FAM relied on external consultants in the United

States, including Merfin LLC from California, X.E. Capital from New York, and Event Capital

Markets from New Jersey.

511.    FAM handled subscriptions into and redemptions from Harley from its New York office.  For example, FAM employees corresponded with Madoff and DiPascali to request that BLMIS accept subscriptions into Harley's account with BLMIS.  FAM employees, including Charles Fix, also corresponded with Madoff and DiPascali to request redemptions from Harley's account.

> **d.    Harley Received Transfers at Bank Accounts Held in New York**

512.    Harley's subscription agreements directed investors to wire U.S. dollars to an account in the name of Fortis Prime Fund Solutions (IOM) Limited ("Fortis Prime Fund Solutions IOM") at the Northern Trust Banking Corporation ("Northern Trust"), 40 Broad Street, New York, New York.

513.    When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York.

> **e.    Harley Was Administered By Fortis Entities in New York**

514.    Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, and then Fortis Prime Fund Solutions IOM served as Harley's administrators.

515.    The Fortis administrators' relationships with Harley and FAM were managed during much of the relevant time period by Rhonda Eldridge, a Managing Director of Fortis Financial Services, LLC ("Fortis Financial Services"), who was based in New York.

516.    Eldridge worked with employees of Fortis Prime Funds Solutions (USA) LLC ("Fortis Prime Fund Solutions USA") in New York.  (Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, Fortis Prime Fund Solutions IOM, Fortis Financial Services, and Fortis Prime Funds Solutions USA are collectively known as "Fortis").

517.    Fortis Financial Services was located on Madison Avenue in New York, and from its office Fortis employees performed much of the work necessary in administering Harley.

518.    Fortis employees conducted due diligence on BLMIS from Fortis Financial
Services's office in New York.  Fortis's due diligence included inquiries into BLMIS's role as
Harley's custodian as well as a "thorough examination of Harley's account" with BLMIS.

519.    Eldridge and other Fortis employees met with Madoff and DiPascali at BLMIS's
office in New York.  Eldridge and other Fortis employees also regularly spoke with Madoff,
DiPascali, and/or Crupi regarding Harley's investments with BLMIS.  In addition, Fortis
employees met with Charles Fix and investors in Harley at FAM's office in New York.

520.    Fortis employees received Harley's BLMIS trade confirmations and account
statements at Fortis Financial Services's office in New York, and reviewed the trade
confirmations and account statements to calculate Harley's NAV.

### f.        Initial Transfers to Harley

521.    The Trustee commenced an adversary proceeding against Harley in the
Bankruptcy Court under the caption, *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-
01187 (SMB) (the "Harley Avoidance Action"), seeking to avoid and recover initial transfers of
customer property from BLMIS to Harley in excess of $1 billion (the "Harley Initial Transfers").
The Trustee incorporates by reference the allegations in the Complaint filed in the Harley
Avoidance Action.

522.    On November 10, 2010, the Bankruptcy Court granted summary judgment against
Harley in the amount of $1,066,800,000 and entered a default judgment against Harley in the
amount of $6,020,000, for a total judgment against Harley for $1,072,820,000.

523.    In support of summary judgment, the Bankruptcy Court held that "Harley
specifically sought out the United States as a place to do business when it opened an account
with BLMIS," and that the transfers received by Harley "arose out of business transactions tied
to Harley's securities account with BLMIS in New York."

524.    The Harley Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4) and have been avoided under sections 544 and 548 of the Bankruptcy Code and applicable provisions of SIPA, and have been preserved under section 551 of the Bankruptcy Code,  and are recoverable under SIPA § 78fff-2(c)(3) and section 550 of the Bankruptcy Code, and N.Y. C.P.L.R. 203(g) and 213(8).

525.    Of the Harley Initial Transfers, approximately $1,072,800,000 was transferred to Harley during the six years prior to the Filing Date (the "Harley Six Year Transfers").

526.    Of the Harley Six Year Transfers, approximately $1,066,800,000 was transferred to Harley during the two years prior to the Filing Date (the "Harley Two Year Transfers").

527.    Harley received the Harley Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

528.    Charts setting forth the Harley Initial Transfers are included as Exhibits D and E.

### g.    GSFP's Subsequent Transfers From Harley

529.    HSBC Bank plc invested directly in Harley by executing subscription agreements, at least one of which was signed by a New York-based HSBC employee.  Pursuant to these subscription agreements, HSBC Bank plc agreed to send subscriptions to Fortis's bank account at The Northern Trust Banking Corporation in New York.

530.    HSBC Bank USA in New York also facilitated the structured product relating to GFSP's investment in Harley, which was to be booked with HSBC Bank plc.

531.    Prior to finalizing this transaction, on May 16, 2007, members of GSFP went to FAM in New York to perform a due diligence review of Harley and FAM which was summarized in a written report (the "FAM Due Diligence Report").

532.    The FAM Due Diligence Report noted that Harley's risk management was weaker than that employed by other BLMIS feeder funds, but that HSBC would be provided with "full position transparency . . . ."

533.    On or about November 25, 2008, an HSBC Bank USA employee requested from Harley a redemption of $3,599,960 for HSBC Bank plc. The redemption was sent to HSBC Bank plc's account at HSBC Bank USA in New York.

534.    Upon information and belief, sometime in early December 2008, HSBC Bank plc redeemed an additional $12 million from Harley.

535.    HSBC Bank plc received, upon information and belief, approximately $15,599,960 of the Harley Initial Transfers from Harley. A chart setting forth the presently known transfers from Harley to HSBC Bank plc is attached as Exhibit H.

### 4.    Thema International

536.    In 2007, HSBC Bank plc entered into a swap transaction with Gaspee Offshore Fund Ltd. ("Gaspee") (the "Gaspee Offshore Swap").

537.    To hedge its commitment in the Gaspee Offshore Swap, HSBC Bank plc invested in Thema International's U.S. dollar class, and agreed to send subscriptions to HSBC Bank USA's account in New York for the benefit of Thema International's administrator, HSSI.

538.    GFSP's team in New York created, approved, and monitored the Gaspee Offshore Swap and knew that the underlying investment was in BLMIS. HSBC's Market Risk department in New York approved the underlying trading strategy and was very comfortable with the Gaspee Offshore Swap. GSFP in New York also performed the due diligence on Prospect Capital, the investment manager for Gaspee. GSFP worked with HSBC's Alternative Fund Services in its review of Genevalor in relation to Thema International.

539.    HSBC's Product Control group in New York handled the monitoring of the Thema International's related compliance and guidelines.

### 5.    Subsequent Transfers from Thema International

540.    On April 10, 2008, GSFP employees in New York through a GSFP New York employee, requested a full redemption from Thema International directing that the money be sent to HSBC Bank USA in New York for the benefit of HSBC Bank plc.

541.    On May 22, 2008, $14,094,388.97 was transferred out of Thema International's custodial account, for, upon information and belief, HSBC Bank plc.

542.    Based on the Trustee's investigation to date, Thema International subsequently transferred prior to the Filing Date at least $14,094,388.97 of the initial transfers it received from BLMIS directly to HSBC Bank plc ("Thema Subsequent Transfers").

543.    HSBC Bank plc received $14,094,388.97 in transfers from Thema International directing that the money be sent to HSBC Bank USA in New York for the benefit of HSBC Bank plc.  A chart setting forth the presently known Thema International transfers to HSBC Bank plc is attached as Exhibit H.

544.    All avoided and/or avoidable transfers from BLMIS to the Initial Transferees and Non-Defendant Initial Transferees, which were subsequently transferred, either directly or indirectly, to the Defendant Subsequent Transferees, HSBC Bank USA, HSBC USA Inc., HSBC Bank plc, and/or HSBC Suisse (collectively, the "Subsequent Transferees") as well as Rye XL, Rye XL Portfolio, and Fairfield Sigma, are recoverable from the Subsequent Transferees, Rye XL, Rye XL Portfolio, and Fairfield Sigma under section 550(a) of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

545.    Each of the Subsequent Transferees received the Subsequent Transfers with actual knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

546.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

547.    The Trustee's discovery and investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the Initial Transfers, the Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE
**FRAUDULENT TRANSFERS – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551**

548.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

549.    The Two Year Transfers were made on or within two years before the Filing Date.

550.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property under sections 11 U.S.C. §§ 101(54) and 548(a), and SIPA § 78fff-2(c)(3).

551.    BLMIS made the Two Year Transfers with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two Year Transfers to or for the benefit of the Initial Transferees in furtherance of a fraudulent investment scheme.

552.    The Two Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from each of the Initial Transferees pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

553.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the Initial Transferees related to, arising from, or concerning the Two Year Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial Transferees may have against the Debtors until such time as the Two Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding any other relief the Court deems just and appropriate.

## COUNT TWO
## FRAUDULENT TRANSFERS – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), AND 551

554.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

555.    The Two Year Transfers were made on or within two years before the Filing Date.

556.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and SIPA § 78fff-2(c)(3).

557.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

558.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers.

559.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

560.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

561.    The Two Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the defendants pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

562.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the Initial Transferees related to, arising from, or concerning the Two Year Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial Transferees may have against the Debtors until such time as the Two Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding any other relief the Court deems just and appropriate.

## COUNT THREE
### FRAUDULENT TRANSFERS – NYDCL
#### §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

563.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

564.    At all times relevant to the Six Year Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

565.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under section 270 of the NYDCL.

566.    Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Initial Transferees in furtherance of a fraudulent investment scheme.

567.    Each of the Six Year Transfers was received by the Initial Transferees with actual intent to hinder, delay, or defraud the creditors of BLMIS at the time of each of the Six Year Transfers, and/or future creditors of BLMIS.

568.    As a result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of the NYDCL, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the Initial Transferees related to, arising from, or concerning the Six

Year Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial

Transferees may have against the Debtors until such time as the Six Year Transfers are repaid to

the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding

any other relief the Court deems just and appropriate.

## COUNT FOUR
### FRAUDULENT TRANSFERS – NYDCL §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550, AND 551

569.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

570.    At all times relevant to the Six Year Transfers there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of

the Bankruptcy Code.

571.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under section 270 of the NYDCL.

572.    BLMIS did not receive fair consideration for the Six Year Transfers.

573.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the

alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

574.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to

sections 273, 278, and/or 279 of the NYDCL, and sections 105(a), 502(d), 544(b), 550, and 551

of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year

Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year

Transfers, or the value thereof, for the benefit of the BLMIS estate; (d) directing the Initial

Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any

and all management fees, incentive fees, or other compensation and/or remuneration received by

the Initial Transferees related to, arising from, or concerning the Six Year Transfers from

BLMIS to the Initial Transferees, (e) disallowing any claim that the Initial Transferees may have

against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (f)

awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding any other relief

the Court deems just and appropriate.

## COUNT FIVE
### FRAUDULENT TRANSFERS – NYDCL §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

575.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

576.    At all times relevant to the Six Year Transfers there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of

the Bankruptcy Code.

577.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under section 270 of the NYDCL.

578.    BLMIS did not receive fair consideration for the Six Year Transfers.

579.    At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or

was about to engage in a business transaction for which the property remaining in its hands after

each of the Six Year Transfers was an unreasonably small capital.

580.    As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the

NYDCL, and sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and

SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six

Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year

Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate;

(d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all

profits, including any and all management fees, incentive fees, or other compensation and/or

remuneration received by the Initial Transferees related to, arising from, or concerning the Six

Year Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial

Transferees may have against the Debtors until such time as the Six Year Transfers are repaid to

the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding

any other relief the Court deems just and appropriate.

**COUNT SIX**
**FRAUDULENT TRANSFERS – NYDCL**
**§§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551**

581.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

582.    At all times relevant to the Six Year Transfers there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of

the Bankruptcy Code.

583.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under section 270 of the NYDCL.

584.    BLMIS did not receive fair consideration for the Six Year Transfers.

585.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its liability to pay them as

the debts matured.

586.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the

NYDCL and sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code and

SIPA§ 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six

122

Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year

Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate;

(d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all

profits, including any and all management fees, incentive fees, or other compensation and/or

remuneration received by the Initial Transferees related to, arising from, or concerning the Six

Year Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial

Transferees may have against the Debtors until such time as the Six Year Transfers are repaid to

the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding

any other relief the Court deems just and appropriate.

## COUNT SEVEN
### UNDISCOVERED FRAUDULENT TRANSFERS – N.Y. C.P.L.R. 203(g) AND 213(8), AND NYDCL §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

587.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

588.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by

BLMIS was not reasonably discoverable by at least one unsecured customer of BLMIS, who

holds matured or unmatured unsecured claims against BLMIS that are allowable under section

502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the

Bankruptcy Code.

589.    At all times relevant to the Initial Transfers, there have been one or more creditors

holding matured or unmatured unsecured claims against BLMIS that are allowable under section

502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the

Bankruptcy Code.

590.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under section 270 of the NYDCL.

591.    Each of the Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Initial Transfers to or for the benefit of the Initial Transferees in furtherance of a fraudulent investment scheme.

592.    Each of the Initial Transfers was received by the Initial Transferees with actual intent to hinder, delay, or defraud the creditors of BLMIS at the time of each of the Initial Transfers, and/or future creditors of BLMIS.

593.    As a result of the foregoing, pursuant to N.Y. C.P.L.R. 203(g) and 213(8), sections 276, 276-a, 278, and/or 279 of the NYDCL, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the Initial Transferees related to, arising from, or concerning the Initial Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the defendants may have against the Debtors until such time as the Initial Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the defendants; and (g) awarding any other relief the Court deems just and appropriate.

## COUNT EIGHT
### RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a) AND 550(a)

594.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

124

595.    Each of the Subsequent Transfers is recoverable from the Subsequent Transferee

Defendants under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

596.    Upon information and belief, some or all of the Initial Transfers were

subsequently transferred to the Subsequent Transferee Defendants and Subsequent Transferee

Defendants are immediate or mediate transferees of all or some portion of the Initial Transfers

pursuant to section 550(a)(2) of the Bankruptcy Code.

597.    Each of the Subsequent Transfers was made directly or indirectly to the

Subsequent Transferee Defendants.

598.    Each of the Subsequent Transfers was received by the Subsequent Transferee

Defendants with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each

of the Subsequent Transfers, and/or future creditors of BLMIS.

599.    Each of the Subsequent Transfers was received by the Subsequent Transferee

Defendants at a time when it had actual knowledge of fraud at BLMIS, or was willfully blind to

facts suggesting a high probability of fraud at BLMIS.

600.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the

Subsequent Transferee Defendants: (a) recovering the Subsequent Transfers, or the value

thereof, from the Subsequent Transferee Defendants for the benefit of the BLMIS estate; (b)

directing the Subsequent Transferee Defendants to disgorge to the Trustee all profits, including

any and all retrocession fees, incentive fees, or other compensation and/or remuneration received

by the Subsequent Transferee Defendants related to, arising from, or concerning the Subsequent

Transfers; (c) recovering attorneys' fees and costs from the Subsequent Transferee Defendants;

and (d) awarding any other relief, including attorneys' fees and costs, as the Court deems

appropriate.

## COUNT NINE
## OBJECTION TO AND DISALLOWANCE OF CLAIMS

601.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

602.    Initial Transferees were not innocent investors at the time they invested with

BLMIS and provided no consideration to the estate.

603.    Initial Transferees acted with actual knowledge of fraudulent activity at BLMIS at

the time they invested with BLMIS.  By Initial Transferees' conduct, at the time they invested

with BLMIS, Initial Transferees enabled Madoff to perpetuate the fraud at BLMIS.

604.    Alternatively, Initial Transferees were willfully blind to numerous and serious

indications of fraudulent activity at BLMIS, as described in this Second Amended Complaint.

605.    As a result of Initial Transferees' conduct, they are not entitled to the protections

afforded by SIPA.  Thus, Initial Transferees do not have a claim enforceable against the BLMIS

estate under SIPA or other applicable law.

606.    As a result of Initial Transferees' conduct, as described above, pursuant to section

502(a) of the Bankruptcy Code and SIPA § 78fff-2, the Trustee objects to any and all claims of

Initial Transferees against the BLMIS estate, which should be disallowed, and not entitled to

receive a distribution from the estate pursuant to section 502(b)(1) of the Bankruptcy Code.

## COUNT TEN
## EQUITABLE DISALLOWANCE OF CLAIMS

607.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

608.    The Initial Transferees engaged in and benefited from inequitable conduct and with knowledge of fraudulent activity at BLMIS, including the conduct described in this Second Amended Complaint.  By the Initial Transferees' conduct, they have taken unconscionable advantage of, resulting in injury to, innocent customers and other creditors of the estate.

609.    Based upon the Initial Transferees' failure to deal fairly and in good faith, as described above, all customers and other creditors of BLMIS have been injured, including by being (a) misled as to the true financial condition of the Debtor; (b) induced to invest with BLMIS without knowledge of BLMIS's financial condition; and (c) hindered and delayed in recovering the full amounts due to them.  The Initial Transferee's conduct further enabled Madoff to continue the Ponzi scheme.

610.    By submitting their customer claims, Alpha Prime, Lagoon, Hermes, Thema International, and Thema Wise exchanged their legal claims for equitable claims to share pro rata in the estate and submitted to this Court's equitable jurisdiction.

611.    The conduct of Alpha Prime, Lagoon, Hermes, Thema International, and Thema Wise was so egregious that they should not be allowed to share in any equitable distribution made by the Trustee to innocent customers holding allowed claims against BLMIS and/or Madoff.

612.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits of whatever kind or nature, which are asserted or sought by the Initial Transferees against the estate are disallowed.

613.    Equitable disallowance is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT ELEVEN
## EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS

614.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

615.     The Initial Transferees engaged in inequitable conduct, including the conduct described in this Second Amended Complaint.

616.     Based on the Initial Transferees' inequitable conduct, BLMIS's customers have been misled as to the true financial condition of BLMIS and have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them.

617.     The Initial Transferees' conduct enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on the Initial Transferees.

618.     Prior to the Filing Date, the Initial Transferees benefited by the withdrawal of approximately $978,577,331 from BLMIS.  But for these withdrawals, there would have been additional customer property available on the Filing Date for distribution.

619.     The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the Initial Transferees, directly or indirectly against the estate, and only to the extent such claims are allowed, are subordinated for distribution purposes pursuant to sections 510(c) and 105(a) of the Bankruptcy Code to the allowed claims of all other customers and creditors of BLMIS.

620.     Equitable subordination, as requested herein, is consistent with the provisions and purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the defendants as follows:

A.      On the First Claim for Relief, judgment pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3):  (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the Initial Transferees related to, arising from, or concerning the Two Year Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial Transferees may have against the Debtors until such time as the Two Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding any other relief the Court deems just and appropriate;

B.      On the Second Claim for Relief, judgment pursuant to sections 105(a), 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the Initial Transferees related to, arising from, or concerning the Two Year Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial Transferees may have against the Debtors until such time as

the Two Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the

Initial Transferees; and (g) awarding any other relief the Court deems just and appropriate;

C.       On the Third Claim for Relief, judgment pursuant to sections 276, 276-a, 278,

and/or 279 of the NYDCL, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy

Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers; (b) directing

that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value

thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial

Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any

and all management fees, incentive fees, or other compensation and/or remuneration received by

the Initial Transferees related to,  arising from, or concerning the Six Year Transfers from

BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial Transferees may have

against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (f)

awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding any other relief

the Court deems just and appropriate;

D.       On the Fourth Claim for Relief, judgment pursuant to sections 273, 278, and/or

279 of the NYDCL, and sections 105(a), 502(d),544(b), 550, and 551 of the Bankruptcy Code,

and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers; (b) directing that

the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof,

for the benefit of the BLMIS estate; (d) directing the Initial Transferees, to the extent allowable

by law, to disgorge to the Trustee all profits, including any and all management fees, incentive

fees, or other compensation and/or remuneration received by the Initial Transferees related to,

arising from, or concerning the Six Year Transfers from BLMIS to the Initial Transferees, (e)

disallowing any claim that the Initial Transferees may have against the Debtors until such time as

the Six Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding any other relief the Court deems just and appropriate;

E.      On the Fifth Claim for Relief, Judgment pursuant to sections 274, 278, and/or 279 of the NYDCL, and sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the Initial Transferees related to, arising from, or concerning the Six Year Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial Transferees may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding any other relief the Court deems just and appropriate;

F.      On the Sixth Claim for Relief, judgment pursuant to sections 275, 278, and/or 279 of the NYDCL and sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial Transferees, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the Initial Transferees related to, arising from, or concerning the Six Year Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial Transferees may have against the

131

Debtors until such time as the Six Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding any other relief the Court deems just and appropriate;

G.      On the Seventh Claim for Relief, judgment pursuant to NY CPLR 203(g) and 213(8), sections 276, 276-a, 278, and/or 279 of the NYDCL, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Initial Transferees for the benefit of the BLMIS estate; (d) directing the Initial Transferees to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the Initial Transferees related to, arising from, or concerning the Initial Transfers from BLMIS to the Initial Transferees; (e) disallowing any claim that the Initial Transferees may have against the Debtors until such time as the Initial Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Initial Transferees; and (g) awarding any other relief the Court deems just and appropriate;

H.      On the Eighth Claim for Relief, pursuant to sections 276-a and 278 of the NYDCL, section 105(a) and 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3), judgment against Subsequent Transferees: (a) recovering the Subsequent Transfers, or the value thereof, from the defendants for the benefit of the BLMIS estate; (b) directing the defendants, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by the defendants related to. arising from, or concerning the Subsequent Transfers; (c) awarding attorneys' fees and

costs from the Subsequent Transferees; and (d) awarding any other relief, including attorneys'

fees and costs, the Court deems just and appropriate;

I.      On the Ninth Claim for Relief, sustaining the Trustee's objections to the Initial

Transferees' claims pursuant to section 502(a) of the Bankruptcy Code, and disallowing such

claims pursuant to section 502(b)(1) of the Bankruptcy Code and SIPA § 78fff-2(b);

J.      On the Tenth Claim for Relief, pursuant to this Court's equitable power,

disallowing each and every claim that defendants assert against Debtors' estate, all of which

claims have no lawful existence under principles of restitution and other applicable law;

K.      On the Eleventh Claim for Relief, subordinating all claims of the Initial

Transferees for purposes of distribution to all allowed claims of BLMIS's customers and

creditors due to the Initial Transferees' inequitable conduct pursuant to sections 105(a) and

510(c) of the Bankruptcy Code, such that no claim of the Initial Transferee is paid ahead of the

allowed claim of any customer or creditor of BLMIS;

L.      On the First through Eighth Claims for Relief, to the extent allowable by law,

directing the defendants to disgorge to the Trustee all profits, including any and all management

fees, incentive fees, or other compensation and/or remuneration received by the defendants

related to, arising out of, or concerning the Initial Transfers, the Subsequent Transfers, and the

defendants' BLMIS Accounts;

M.      On the Eighth Claim for Relief, if any Subsequent Transferee challenges the

avoidability of the Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P.

7001(1) and (9) declaring that such Initial Transfers are avoidable pursuant to SIPA § 78fff-

2(c)(3) and sections 105(a), 544(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of

the NYDCL, as applicable, and as necessary to recover the Subsequent Transfers pursuant to

section 550(b) and SIPA § 78fff-2(c)(3);

N.      On all Claims for Relief, imputing to the Feeder Fund Defendants knowledge of

the Management Defendants, the directors of the Feeder Fund Defendants, the HSBC

Custodians, the HSBC Administrators, and all of the Feeder Fund Defendants' service providers

identified herein;

O.      On all Claims for Relief, imputing to the Management Defendants knowledge of

the directors of the Feeder Fund Defendants, the HSBC Custodians, the HSBC Administrators,

and all of the Feeder Fund Defendants' service providers identified herein;

P.      On all Claims for Relief, establishing a constructive trust over all Transfers and

their proceeds, product and offspring in favor of the Trustee for the benefit of the estate;

Q.      On all Claims for Relief, pursuant to federal common law and/or N.Y. C.P.L.R.

5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which

the Initial Transfers were received;

R.      On all Claims for Relief, awarding the Trustee's attorneys' fees, all applicable

interest, costs, and disbursements incurred in this proceeding; and

S.      Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

Date: June 26, 2015
New York, New York                    **BAKER & HOSTETLER LLP**


By: /s/  David J. Sheehan
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
substantively consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
and the estate of Bernard L. Madoff*

135