**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated)<br><br>Adv. Pro. No. 10-04285 (SMB)<br><br>**SECOND AMENDED COMPLAINT** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBS AG, UBS (LUXEMBOURG) SA, UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS (LUXEMBOURG) SA) as represented by its Liquidator MAITRE FERNAND ENTRINGER, ACCESS PARTNERS SA as represented by its | |

Liquidator MAITRE FERNAND ENTRINGER,
PATRICK LITTAYE, CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) in her capacity as Executrix under
the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) individually as the sole beneficiary
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), PIERRE DELANDMETER,
THEODORE DUMBAULD, LUXALPHA SICAV as
represented by its Liquidators MAITRE ALAIN
RUKAVINA and PAUL LAPLUME, MAITRE
ALAIN RUKAVINA AND PAUL LAPLUME, in
their capacities as liquidators and representatives of
LUXALPHA SICAV, GROUPEMENT FINANCIER
LTD.,

          Defendants.

# TABLE OF CONTENTS

**Page**

NATURE OF THE PROCEEDING .................................................................................................1

JURISDICTION AND VENUE ....................................................................................................4

BACKGROUND, THE TRUSTEE AND STANDING .................................................................5

THE PONZI SCHEME..................................................................................................................8

THE DEFENDANTS...................................................................................................................11

    A.     The UBS Defendants ................................................................................11

    B.     The Access Defendants..............................................................................12

    C.     The Feeder Fund Defendants ....................................................................14

              Luxalpha ....................................................................................................14

              Luxalpha Director Defendants ..................................................................15

              Groupement Financier ...............................................................................15

              Groupement Financier Director Defendants .............................................16

PRIOR TO THE CREATION OF GROUPEMENT FINANCIER AND LUXALPHA,
THE UBS AND ACCESS DEFENDANTS WERE AWARE OF THE IMPOSSIBLE
NATURE OF BLMIS'S INVESTMENT STRATEGY .............................................................16

    A.     Early On, UBS AG and Its Affiliates Voiced Concerns About BLMIS...............16

    B.     Littaye and Access Jointly Operated and Serviced Oreades and Were
           Confronted With Indicia of Fraud at BLMIS .........................................17

THE ACCESS AND UBS DEFENDANTS ESTABLISHED GROUPEMENT
FINANCIER AND LUXALPHA DESPITE THEIR KNOWLEDGE OF, OR WILLFUL
BLINDNESS TO, FRAUD AT BLMIS .....................................................................................19

    A.     Access's Relationship With Madoff ......................................................19

    B.     Access Created Groupement Financier and Engaged UBS as a Service
           Provider....................................................................................................21

    C.     The Access and UBS Defendants Worked Together to Open Luxalpha ..............25

    D.     The UBS Defendants Insulated Themselves From Liability Through a
           Series of Undisclosed Indemnity Agreements With the Access Defendants ........28

    E.     The UBS Defendants Received Fees of at Least $97 Million In
           Connection With the Services They Purported to Render to the Feeder
           Fund Defendants ......................................................................................30

    F.     Access Was Structured and Operated to Maximize the Fees It Received
           for Services Purportedly Rendered to the Feeder Fund Defendants....................31

            1.     AIA Ltd.........................................................................................32

            2.     AML/AIA (Lux) and AP (Lux) .................................................33

# TABLE OF CONTENTS
## *(continued)*

Page

DEFENDANTS WERE AWARE BLMIS WAS THE PERFECT STRUCTURE FOR
FRAUD ..............................................................................................................................35

    A.    In Coordination with the Access Defendants, the UBS Defendants and
Luxalpha Intentionally Violated the Law and Misled Regulators in
Delegating Duties to BLMIS ...............................................................................36

        1.    UBS Circumvented UCITS Requirements ...............................................36

        2.    To Conceal the Delegation of Their Duties, the UBS Defendants Used
Subsidiaries as Luxalpha's Managers, Custodian, and Administrator ......37

        3.    UBS's Role as a "Front" and Mere "Window Dressing" for Luxalpha
Was Executed in Coordination with the Access Defendants in Order
to Market and Sell the Fund .....................................................................43

    B.    BLMIS Customer Statements and Trade Confirmations for Luxalpha and
Groupement Financier Revealed Numerous Indicia of Fraud ..............................45

        1.    The SSC Strategy BLMIS Purported to Employ Could Not Yield the
Results Reported on the BLMIS Account Statements ...............................45

        2.    Luxalpha's and Groupement Financier's Account Statements
Reflected Impossible Options Trading Volumes .......................................49

        3.    BLMIS Purported to Trade Equities and Options Outside the Daily
Reported Price Range ...............................................................................55

        4.    BLMIS's Time Slicing Success Was Statistically Impossible .................57

        5.    The Dividend Activity Reported on Luxalpha and Groupement
Financier's Customer Statements Was Impossible ...................................58

    C.    In Addition to Being Aware of Objective Evidence of Fraud, the UBS
Defendants and the Access Defendants Were Presented With Myriad
Subjective Indicia of Fraud ..................................................................................59

        1.    Luxalpha's and Groupement Financier's Account Statements
Demonstrated That Madoff Was Not Implementing the SSC Strategy .....59

        2.    Madoff's Claims to Trade Options in the Over-the-Counter Market
Were False ................................................................................................61

        3.    Luxalpha and Groupement Financier Regularly Had Negative Cash
Balances With BLMIS ..............................................................................64

        4.    BLMIS Provided Delayed Paper-Only Customer Statements ..................65

# TABLE OF CONTENTS
## *(continued)*

                                                                                                Page

5.    Madoff's "Strip Mall" Auditor Was Not Qualified or Capable of
      Auditing a Global Investment Management Company with Billions of
      Dollars Under Management ..................................................................................66

6.    Madoff's Unusual Fee Structure .................................................................67

7.    Lack of an Independent, Disclosed Custodian ...........................................68

8.    Madoff's Insistence on Secrecy .................................................................68

9.    Lack of Scalability .......................................................................................69

10.   BLMIS's Trade Confirmations Frequently Contained Settlement
      Anomalies in Purported Options Transactions ...........................................70

IMPUTATION OF KNOWLEDGE FROM THE UBS DEFENDANTS AND ACCESS
DEFENDANTS TO LUXALPHA AND GROUPEMENT FINANCIER ...................70

THE TRANSFERS ................................................................................................71
    A.    The Initial Transfers ....................................................................................71
    B.    The Subsequent Transfers ............................................................................73

CUSTOMER CLAIMS...........................................................................................79

COUNT ONE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) 11 U.S.C. §§
    105(a), 502(d), 548(a)(1)(A), 550(a), AND 551 *Against The Feeder Fund
    Defendants* .....................................................................................................79

COUNT TWO: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) 11 U.S.C. §§
    105(a), 502(d), 548(a)(1)(B), 550(a), AND 551 *Against The Feeder Fund
    Defendants* .....................................................................................................80

COUNT THREE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) NEW
    YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279,
    AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551 *Against The Feeder
    Fund Defendants* ...........................................................................................82

COUNT FOUR: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) NEW
    YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND
    11 U.S.C. §§ 105(a), 502(d), 544(b), 550, AND 551 *Against The Feeder Fund
    Defendants* .....................................................................................................83

COUNT FIVE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) NEW YORK
    DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C.
    §§ 105(a), 502(d), 544(b), 550(a), AND 551 *Against The Feeder Fund
    Defendants* .....................................................................................................85

# TABLE OF CONTENTS
## *(continued)*

Page

COUNT SIX: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) NEW YORK
DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C.
§§ 105(a), 502(d), 544(b), 550(a), AND 551 *Against The Feeder Fund
Defendants* .................................................................................................................86

COUNT SEVEN: RECOVERY OF SUBSEQUENT TRANSFERS:  11 U.S.C. §§ 105(a)
and 550(a) *Against The Access Defendants And The UBS Defendants* ...........................87

COUNT EIGHT: OBJECTION TO AND DISALLOWANCE OF CLAIMS *Against
Luxalpha And UBS SA* ...............................................................................................88

COUNT NINE: EQUITABLE DISALLOWANCE OF CLAIMS   *Against Luxalpha And
UBS SA* ......................................................................................................................89

COUNT TEN: EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS *Against
Luxalpha And UBS SA* ...............................................................................................90

Irving H. Picard, as trustee (the "Trustee") for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor

Protection Act ("SIPA"), § 78aaa *et seq.*, and the substantively consolidated estate of Bernard L.

Madoff ("Madoff") (collectively, the "Debtors"), individually, by and through his undersigned

counsel, as and for his Second Amended Complaint, alleges as follows:

## NATURE OF THE PROCEEDING

1.      In this action under SIPA, the Trustee seeks the avoidance of the fraudulent

transfers of customer property the Defendants received from BLMIS, the recovery of those

transfers or their value from the Defendants and/or any subsequent transferees that received any

portion of the initial transfers from BLMIS, and any other relief the Court deems just, proper,

and equitable.

2.      This action focuses on two BLMIS feeder funds, defendants Luxalpha SICAV

("Luxalpha") and Groupement Financier Ltd. ("Groupement Financier") (collectively, the

"Feeder Fund Defendants"), and the network of individuals and entities associated with them,

which were integral to perpetuating Madoff's Ponzi scheme.

3.      Together, these two funds directed no less than $2 billion into the scheme.

4.      Both funds had highly sophisticated service providers—UBS AG and its affiliates

(collectively, the "UBS Defendants"), and Access International Advisors, and its officers and

affiliates (collectively, the "Access Defendants")—all of which became aware of the

impossibilities and indicia of Madoff's fraud.

5.      Luxalpha was established in 2004 as a joint venture between the Access

Defendants and UBS AG and UBS (Luxembourg) S.A. ("UBS SA") to replace an earlier Access-

established fund known as Oreades SICAV ("Oreades"), which was closed when its service

provider, BNP Paribas, developed misgivings about the legitimacy of BLMIS.  UBS AG and

UBS SA stepped in to replace BNP Paribas and to create Luxalpha. The next year, certain of the UBS Defendants subsequently began to service Groupement Financier, which had been established in 2003.

6.    Even before the UBS Defendants became involved with Luxalpha and Groupement Financier, UBS analysts determined that BLMIS's purported performance was impossible given the strategy that Madoff claimed to employ. UBS analysts assessing Madoff's results concluded that "it would be IMPOSSIBLE to generate the returns that he has produced since 1990." This and other indicia of fraud led UBS's Private Wealth Management Group to put BLMIS on a "non-approved" list, prohibiting the recommendation of BLMIS to Private Wealth clients out of concern that BLMIS was a fraudulent scheme.

7.    The UBS Defendants nevertheless found a way to profit from Madoff's fraud. The UBS Defendants assumed a number of key roles for the Feeder Fund Defendants, but delegated these roles to Madoff and/or BLMIS. UBS then sought to disavow any potential liability through indemnity agreements and insurance policies that were never disclosed to investors or regulators.

8.    UBS concealed Madoff's involvement with Luxalpha from the Luxembourg regulator, the Commission de Surveillance du Secteur Financier (the "CSSF"), knowingly omitting any reference to Madoff or BLMIS when identifying Luxalpha's custodians and managers.

9.    The Access Defendants, in turn, marketed the Feeder Fund Defendants by touting a rigorous due diligence process and a series of antifraud measures that in reality never applied to the Feeder Fund Defendants. Access treated Luxalpha and Groupement Financier differently than the non-Madoff funds they promoted and monitored, and Access's BLMIS offerings were

2

allowed to operate as an exception to the Access Defendants' normal policies and procedures regarding the due diligence of funds and their managers. Madoff was, for example, excused from background checks. He was not required to allow the Access Defendants to regularly visit his office or meet with his staff. He was allowed to report his purported trades on a delayed basis, using only hard copy confirmations that provided ample opportunity for him to commit and perpetuate his fraud. All were deviations from Access's normal practices.

10.    At the same time, Access and UBS analysts and professionals received and reviewed Luxalpha's and Groupement Financier's account statements and knew—from those documents—that Madoff could not be executing all the securities transactions reported therein, because many of them were simply impossible.

11.    The Access Defendants and, thereby, Luxalpha's and Groupement Financier's Boards of Directors, which consisted of the principals of the Access entities and of UBS SA executives, knew that the volume of options trades Madoff reported was impossible, but they did not disclose that information publicly. The UBS Defendants were also aware of the false options issues, both through the account statements and because, at least once, the SEC informed UBS AG that Madoff had identified a UBS affiliate in Europe as one of his options trading counterparties. The UBS Defendants knew this to be false. The Access Defendants were informed of Madoff's impossible trading activity by an outside consultant, who advised them to exit all of their BLMIS investments. The Access Defendants and the UBS Defendants also knew that Madoff's market-timing ability and performance were impossible, among many other indicia of fraud. Together, the UBS Defendants and the Access Defendants enabled the Ponzi scheme through Luxalpha and Groupement Financier, and profited tremendously for their efforts.

3

12.     Although they had evidence strongly indicating that BLMIS was engaged in fraud, the Defendants continued to facilitate the investment of hundreds of millions of dollars with BLMIS.  Collectively, the Defendants received approximately $1.1 billion in avoidable transfers from BLMIS.  The UBS Defendants and Access Defendants profited, receiving approximately $126 million in management, custodial, advisory, administration, and performance fees in connection with moneys directed to Luxalpha and Groupement Financier's investment with BLMIS.  All moneys withdrawn from BLMIS, whether redemptions by feeder funds or fees paid to the feeder funds' service providers, is Customer Property, as defined by the SIPA statute, and must be returned to the Trustee for equitable distribution to BLMIS customers.

## JURISDICTION AND VENUE

13.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

14.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

15.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

16.     This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 548(a), 550(a) and 551, the

4

New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 et seq. (McKinney 2001)), the

New York Civil Practice Law and Rules (McKinney 2003) ("N.Y. C.P.L.R."), and other

applicable law.[1]

17.    This Court has personal jurisdiction over each of the Defendants under N.Y.

C.P.L.R. 301 and 302, and Bankruptcy Rule 7004.  Each Defendant has maintained minimum

contacts with New York in connection with the claims in this adversary proceeding.  As alleged

herein, the Defendants have or had offices in New York, or are doing or did business in New

York, and/or transact or transacted business in New York during the time periods addressed

herein.  Defendants Luxalpha and Groupement Financier had accounts with BLMIS in New

York.  The UBS Defendants, the Access Defendants, the Feeder Fund Defendants and the Feeder

Fund Director Defendants (defined below), delivered agreements or caused agreements relating

to BLMIS to be delivered in New York.  In addition, certain of the UBS Defendants and Access

Defendants communicated regularly with persons in New York regarding the Feeder Fund

Defendants and/or BLMIS, and also sent and/or received funds to and/or from BLMIS in New

York, utilizing New York banks.  In addition, Luxalpha filed Customer Claims in the SIPA

Proceeding seeking to recover funds it allegedly lost on its investments in BLMIS, and has thus

submitted to the jurisdiction of this Court.

## BACKGROUND, THE TRUSTEE AND STANDING

18.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

---

[1] Until a final determination on appeal of the applicable measure and burden of proof concerning a defendant's knowledge in connection with the applicability of section 546(e) of the Bankruptcy Code to the Trustee's claims to avoid and recover transfers made within six years of the Filing Date, the Trustee asserts avoidance and recovery claims under sections 548(a)(1)(B), 544(b)(1), 550 and 551 of the Bankruptcy Code, and applicable provisions of the NYDCL.  Until a final determination on appeal of the applicability of section 502(a) and (b)(1), and equitable grounds as a basis to challenge any claim against the estate, the Trustee asserts such grounds for relief in this proceeding.

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding.

19.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

20.    Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

    (a)    appointed the Trustee for the liquidation of the business of BLMIS
           pursuant to SIPA § 78eee(b)(3);

    (b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
           SIPA § 78eee(b)(3); and

    (c)    removed this case to this Court pursuant to SIPA § 78eee(b)(4).

21.    By orders dated December 23, 2008 and February 4, 2009, respectively, this

Court approved the Trustee's bond and found that the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

22.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the

SIPA Proceeding.

23.    At a plea hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information

filed against him by the United States Attorney for the Southern District of New York.  At the

plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side

of [BLMIS]."

24.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

25.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

26.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

27.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

28.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

29.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

30.     The Trustee has standing to object to customer and creditor claims under SIPA § 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and authority to discharge obligations to a customer to the extent they are established to the satisfaction of the Trustee under SIPA §§ 78*lll*(2) and 78fff-2(b).  By his objection, the Trustee seeks disallowance of any customer and general creditor claims that are unenforceable against the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not been established to his satisfaction; (ii) SIPA § 78*lll*(2), because such claims are not entitled to a distribution *pari passu* with other customers;  and (iii) 11 U.S.C. § 502(b)(1), because such claims are otherwise unenforceable under applicable law.

## THE PONZI SCHEME

31.     Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1, 2001, Madoff continued BLMIS as a sole member limited liability company under the laws of the State of New York.  BLMIS's ownership and control did not change since its formation in 1960.  During that time, BLMIS had been continually registered with the SEC, and remained a SIPC member since its formation in late 1970.  For most of its existence, BLMIS operated from

its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder,

sole owner, chairman, and chief executive officer, operated BLMIS with several family members

and other employees, including DiPascali and David Kugel, who pleaded guilty to helping

Madoff carry out the fraudulent scheme.

32.    Beginning in the 1990s, Madoff outwardly ascribed the consistent investment

success of BLMIS's IA Business to the "split-strike conversion" ("SSC") investment strategy.

Madoff claimed his strategy would produce steady returns without the volatility in the stock

market or other high return investment strategies. Madoff generally indicated that investors'

funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index

("S&P 100 Index"), which is a collection of the 100 largest publicly traded companies, as

determined by Standard & Poor's Index Committee. The basket of stocks was designed to

correlate to the movement of the S&P 100 Index. The second part of the SSC strategy involved

purporting to sell call options and buy put options on the S&P 100 Index; this is commonly

referred to as a "collar." Madoff purported to purchase and sell option contracts to control the

downside risk of price changes in the basket of stocks correlated to the performance of the S&P

100 Index. All options relating to the companies within the S&P 100 Index, including options

based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").

The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-

listed options.

33.    BLMIS commingled all of the funds received from IA Business investors in a

single BLMIS account maintained at JPMorgan Chase Bank.

34.    Because Madoff claimed that he would carefully time purchases and sales to

maximize value, customer funds would intermittently be out of the market. During those times,

Madoff claimed that the funds were invested in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

35.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements.

36.    Madoff operated the IA Business as a Ponzi scheme. The money received from IA Business customers was used primarily to make distributions to, or payments for, other customers. The falsified trades reflected in monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments. The Ponzi scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow of new investments with BLMIS's IA Business.

37.    Since at least 1983, BLMIS financial reports filed with the SEC fraudulently omitted the existence of the billions of dollars of customer funds held by BLMIS.

38.    BLMIS did not register as an investment adviser with the SEC until August 2006. At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts and assets under management of $11.7 billion. Thereafter, BLMIS filed a Form ADV annually with the SEC, the latest of which was filed in January 2008. It represented that BLMIS had 23 customer accounts with assets under management of $17.1 billion. In fact, at that time BLMIS

10

had over 4,900 active customer accounts with a purported value of approximately $68 billion under management.

39.     Contrary to standard practice in the investment advisory industry, BLMIS did not charge the IA Business customers a fee for investment advisory services.  Madoff knew others that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged hundreds of millions of dollars for investment advisory services attributed to BLMIS.  Instead of investment advisory fees, BLMIS purported to accept commissions for the purported trades, as reflected in the fraudulent IA Business customer statements.

40.     BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York.  Of the three employees at the firm, one employee was an administrative assistant and one was a semi-retired accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

41.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE DEFENDANTS

### A.    The UBS Defendants

42.     Defendant UBS AG is a Swiss public company with registered and principal offices at Bahnhofstrasse 45, CH-8001 Zurich, and Aeschenvorstadt 1, CH-4051 Basel, Switzerland.  UBS AG is the parent company of the global UBS bank, and is present in New York, with offices at 299 Park Avenue, New York, NY 10171 and 101 Park Avenue, New York,

NY 10178.  It also conducts daily business activities in Stamford, Connecticut and other

locations in the United States.

43.    Defendant UBS (Luxembourg) S.A. ("UBS SA"), a wholly owned subsidiary of

UBS AG, is a Luxembourg limited liability company incorporated as a *société anonyme*.  Its

registered office is at 33a, Avenue John F. Kennedy, BP 2, L-1855 Luxembourg.

44.    Defendant UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), a wholly owned

subsidiary of UBS AG, is a Luxembourg limited liability company incorporated as a *société

anonyme*.  Its registered office is at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.

45.    Defendant UBS Third Party Management Company S.A. ("UBSTPM"), a wholly

owned subsidiary of UBS AG, is a Luxembourg limited liability company incorporated as a

*société anonyme*.  Its registered office is at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.

**B.    The Access Defendants**

46.    Defendant Access International Advisors LLC ("AIA LLC") is a Delaware

limited liability company.  Its principal place of business was at 509 Madison Avenue, 22nd

Floor, New York, New York 10022 during the relevant period.

47.    Defendant Access International Advisors Ltd. ("AIA Ltd.") is a Bahamas limited

liability company.  Its registered address is MMG Bahamas Ltd., P.O. Box CB – 13937, Suite

102, Saffrey Square, Bay Street & Bank Lane, Nassau, Bahamas.

48.    Defendant Access Management Luxembourg S.A. ("AML") (f/k/a Access

International Advisors (Luxembourg) S.A. ("AIA (Lux)")) is a Luxembourg limited liability

company incorporated as a *société anonyme*.  Its registered office is at 34A, rue Philippe II, L-

2340 Luxembourg.  AML is in liquidation in Luxembourg.  Maître Fernand Entringer, with

offices at 34A, rue Philippe II, L-2340, Luxembourg, is AML's liquidator.

49.     Defendant Access Partners S.A. (Luxembourg) ("AP (Lux)") is a Luxembourg limited liability company incorporated as a *société anonyme*.  Its registered office is at 34A, rue Philippe II, L-2340 Luxembourg.  AP (Lux) is in liquidation in Luxembourg.  Maître Fernand Entringer, with offices at 34A, rue Philippe II, L-2340, Luxembourg, is AP (Lux)'s liquidator.

50.     Defendant Patrick Littaye ("Littaye") co-founded the Access International Advisors group in 1994 with the creation of a New York corporation, Access International Advisors Inc. ("AIA Inc."), and co-founded AIA LLC as a wholly owned subsidiary in 2001. Littaye was Access International Advisors' Partner and Chief Executive Officer and AIA LLC's Partner, Chairman, Chief Executive Officer, and co-owner. He was a director of AIA Inc. from at least 2003 through 2008.  He was a Director of Luxalpha, Groupement Financier, and Groupement Financier Levered Ltd. ("Groupement Levered").  Littaye co-owns AIA Ltd., AML, and AP (Lux), and at various times served as a director of each of these Defendants. Littaye is a citizen of France.

51.     Claudine Magon de la Villehuchet a/k/a Claudine de la Villehuchet ("Ms. Villehuchet"), is named in her capacity as Executrix under the Last and Will and Testament of Thierry Magon de la Villehuchet a/k/a René Thierry de la Villehuchet, dated November 6, 2000. Thierry Magon de la Villehuchet ("Villehuchet") co-founded the Access International Advisors group in 1994 with the creation of a New York corporation, AIA Inc. and co-founded AIA LLC as a wholly owned subsidiary in 2001.  Villehuchet was Access International Advisors' Partner and Chief Executive Officer and AIA LLC's President, Partner, Chairman, Chief Executive Officer, and co-owner up until his death on December 22, 2008.  He was also Director of Groupement Financier and Groupement Levered.  In addition, Villehuchet co-owned AIA Ltd., AML, and AP (Lux), and at various times served as a director of each of these Defendants.  At

the time of Villehuchet's death, Villehuchet and Ms. Villehuchet were U.S. citizens and resided in New York.

52.    Ms. Villehuchet is also named individually as the sole beneficiary under Villehuchet's last will and testament.

53.    Defendant Pierre Delandmeter ("Delandmeter") was a member of AML's board. He was both a Director and Legal Advisor of Luxalpha, and an advisor to Littaye, Villehuchet, and the other Access Defendants.  Delandmeter was a Legal Advisor to Groupement Financier and Groupement Levered.  In addition, Delandmeter was a Director of AML, AP (Lux), and AIA Inc.  Delandmeter is a Belgian citizen.

54.    Beginning in 2002, Defendant Theodore Dumbauld ("Dumbauld") was a Partner at AIA LLC.  He also served as Chief Investment Officer of AIA LLC until his departure in 2006.  Dumbauld resides in Connecticut.

## C.    The Feeder Fund Defendants

### *Luxalpha*

55.    Defendant Luxalpha is a Luxembourg-based UCITS fund sponsored by UBS AG and UBS SA, with its registered office at 33A, Avenue J.F. Kennedy, L-1855 Luxembourg. UCITS is an acronym for "Undertakings for Collective Investments in Transferable Securities" and refers to a series of EU directives regulating open-ended collective investment schemes. Each EU member state was required to enact legislation implementing various EU UCITS directives.  The UCITS regulatory structure allows a collective investment scheme to operate throughout the EU once it is approved and authorized by a single member state.

56.    Luxalpha was authorized under Luxembourg law and was subject to the regulatory authority of the Luxembourg financial regulator, the CSSF.  Luxalpha is listed in the Trade and Companies Register under number B.98874.  Luxalpha was placed in liquidation by

the District Court of Luxembourg on April 2, 2009 and is represented by its court-appointed

liquidators, Maître Alain Rukavina, barrister (avocat á la Cour) and Paul Laplume, company

auditor (the "Luxembourg Liquidators"). Me. Rukavina resides at 10A, Boulevard de la Foire,

L-1528 Luxembourg. Mr. Laplume resides at 42, Rue des Cerises, L-6113 Junglinster.

57.    Me. Rukavina and Mr. Laplume are also defendants in their capacity as the court-

appointed liquidators and representatives of Luxalpha, and as representatives of Luxalpha's

investors and creditors, according to the provisions of the District Court of Luxembourg

judgment dated April 2, 2009. Me. Rukavina and Mr. Laplume are both residents of

Luxembourg. References to Defendant Luxalpha herein include Me. Rukavina and Mr.

Laplume.

### Luxalpha Director Defendants

58.    Defendant Littaye was a Director of Luxalpha from June 26, 2006 through its

liquidation.

59.    Defendant Delandmeter was a Director of and Legal Advisor to Luxalpha from

February 2004 through its liquidation.

60.    Defendants Littaye and Delandmeter are referred to collectively as the "Luxalpha

Director Defendants."

### Groupement Financier

61.    Defendant Groupement Financier is an investment fund organized under the laws

of the British Virgin Islands ("BVI"). Groupement Financier's registered agent is Maples &

Calder and its registered office is at Sea Meadow House, P.O. Box 173, Road Town, Tortola VG

1110, BVI.

15

***Groupement Financier Director Defendants***

62.    Access Defendants Littaye and Villehuchet were the Directors of Groupement Financier, and are referred to collectively as the "Groupement Financier Director Defendants."

63.    The Luxalpha Director Defendants and the Groupement Financier Director Defendants are collectively referred to herein as the "Feeder Fund Director Defendants."

## PRIOR TO THE CREATION OF GROUPEMENT FINANCIER AND LUXALPHA, THE UBS AND ACCESS DEFENDANTS WERE AWARE OF THE IMPOSSIBLE NATURE OF BLMIS'S INVESTMENT STRATEGY

**A.    Early On, UBS AG and Its Affiliates Voiced Concerns About BLMIS**

64.    Before the UBS Defendants created Luxalpha and began servicing Groupement Financier, UBS Wealth Management, a UBS AG business division, considered and rejected BLMIS as a vehicle for direct investment and derivative financial products.

65.    Several other UBS entities—the UBS AG subsidiary UBS O'Connor, among them—also analyzed BLMIS and as early as 2002 found its performance figures to be "more or less impossible" in light of the strategy Madoff claimed to employ.  The UBS analysts assessing the strategy stated "[w]e consider ourselves pretty smart and no one in their firm [BLMIS] has properly explained their strategy to match the return profile to us, so we avoid stuff like that." Like UBS Wealth Management, UBS O'Connor also considered and then rejected the idea of recommending Madoff investment to its clients.

66.    Assessing BLMIS again in 2004, UBS O'Connor concluded that "it would be IMPOSSIBLE to generate the returns that [Madoff] has produced since 1990."  UBS O'Connor also questioned Madoff's practice of not charging fees, choosing to earn revenue only from commissions.  The "simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another [was] a non-starter" in UBS O'Connor's assessment, and was reason enough to stay away from BLMIS investment.

16

67.     In 2005, when considering another Madoff investment, UBS O'Connor reiterated its doubts about the propriety of Madoff's operations and whether Madoff's purported implementation of the SSC strategy could generate the results he reported.

68.     Between September 2007 and December 2008, UBS AG was approached about investing in several BLMIS-related products.  In accordance with UBS policy, UBS designated its London-based risk analysts to visit BLMIS headquarters and meet "face to face" with BLMIS's manager.  Madoff declined the request for a meeting on the grounds that agreeing to meet with one potential investor would force him to meet with others.

69.     UBS AG ultimately decided that it did not have sufficient information on Madoff and BLMIS to recommend BLMIS as an investment target for its clients.

70.     In the aftermath of Madoff's collapse, UBS sought to portray UBS Wealth Management's caution toward Madoff as indicative of UBS's overall approach to BLMIS, touting UBS Wealth Management's ability to foresee the problems at BLMIS.  UBS cultivated the public perception that it had reviewed Madoff in the early 2000s, detected risks and, consequently, designated Madoff as "'non-approved' for investment."  But that is not the whole story.  As more fully set forth below, the UBS Defendants were integral in creating, operating and servicing several feeder Funds that funneled over billions of dollars into BLMIS, and earned lucrative fees in the process.

**B.     Littaye and Access Jointly Operated and Serviced Oreades and Were Confronted With Indicia of Fraud at BLMIS**

71.     Oreades was a Madoff feeder fund that predated Groupment Financier and Luxalpha.  Oreades was jointly operated by Littaye, certain Access Defendants, and BNP Paribas.  The BLMIS accounts for Oreades were opened in November 1997.  The fund was shut

down in March 2004 after BNP Paribas grew increasingly uncomfortable with the operations of

Oreades and BLMIS.

72.     In July 2003, BNP Paribas told Littaye that it was particularly concerned that

BLMIS's role as asset manager had not been properly disclosed, noting that in the eyes of the

Luxembourg regulator, BLMIS "does not exist."  BNP Paribas knew that it would bear the risk

of any liabilities associated with the management of Oreades.  BNP Paribas also questioned

BLMIS's capacity to serve as a custodian, noting that BLMIS was not a bank and asking where

the fund's assets were actually being held.

73.     In 2003, BNP Paribas also attempted to confirm that a segregated Oreades

account existed at BLMIS, and raised issues concerning the fact that reports of trading activity

and positions for Oreades were delivered only by fax and mail, seven or eight days after the

reported trades.  BNP Paribas and Access knew that this process failed to provide any

opportunity to verify trades.

74.     Such practices departed from BNP Paribas's standard operating procedures in

2003, which provided for order transmission by fax or electronic communication on the day of

the trade, followed by settlement confirmation by the depository bank within one to three days

thereafter.  During internal audits, BNP Paribas's risk and ethics department highlighted

Madoff's refusal to conform to then-current practices, or to otherwise satisfy BNP Paribas's

requests for more timely transmission of trade information.

75.     In spring 2004, shortly after BNP Paribas raised its concerns to Access and

BLMIS, Oreades was shut down and its BLMIS accounts were closed.

## THE ACCESS AND UBS DEFENDANTS ESTABLISHED GROUPEMENT FINANCIER AND LUXALPHA DESPITE THEIR KNOWLEDGE OF, OR WILLFUL BLINDNESS TO, FRAUD AT BLMIS

### A.    Access's Relationship With Madoff

76.    Littaye and Madoff had a social and professional relationship dating back to 1985, and this relationship led to Access's dealings with BLMIS.

77.    Investing with BLMIS was Access's primary business.  Access functioned as the manager and/or portfolio advisor for numerous BLMIS feeder funds.  As such, Access was the point of entry to BLMIS for billions of dollars from European investors.

78.    Littaye and Madoff's relationship gave rise to several BLMIS feeder funds, including the Feeder Fund Defendants.  Aside from the Feeder Fund Defendants, Littaye had a role in founding Trotanoy Investment Company Ltd. and Citrus Investment Holdings Ltd., feeder funds which together invested over $200 million with BLMIS.  He opened or introduced at least eight other BLMIS managed accounts.  Tens of millions of dollars were directed into Madoff's scheme through those accounts.  Those funds and accounts are implicated in other actions commenced by the Trustee.

79.    Access's BLMIS-related investments (which, at their peak, exceeded $2 billion), dwarfed its non-Madoff holdings.  In 2005, 50% of Access subscriptions were invested with BLMIS, accounting for 61% of Access's total net revenue.  By February 2008, 79% of Access subscriptions were invested with BLMIS, accounting for 92% of Access's total net revenue.

80.    Littaye closely guarded his relationship with Madoff.  He assumed primary responsibility for Access products that invested with BLMIS and had responsibility for doing due diligence on Madoff.  Whenever questions arose at Access with regard to its BLMIS funds, it was Littaye who would raise them with Madoff.

81.     Littaye visited BLMIS's New York offices quarterly, and relayed the substance of his discussions with Madoff to Access's New York employees.  Littaye was also in regular written communication with BLMIS on a wide range of matters, including the opening of accounts, the receipt and review of trade tickets and account statements, and instructions regarding redemptions.

82.     Littaye also regularly attended and presented at Access's strategy meetings in New York regarding its BLMIS funds.  When not in New York, Littaye was in regular email and telephone contact with Access's headquarters there, directing and managing its operations along with Villehuchet.  Access's marketing materials listed Littaye as having an office and phone number in New York.  Villehuchet was a U.S. citizen who lived in New Rochelle, New York and was permanently based in Access's New York office.

83.     Along with Littaye and Villehuchet, Delandmeter was also involved in Access's New York-based operations.  On several occasions, Delandmeter attended Access's quarterly strategic meetings in New York in person, and on many other occasions Delandmeter participated in Access's strategic, administrative or partners' meetings by telephone conference.  Luxalpha, Groupement Financier and Access's other BLMIS-related investments were among the key items discussed and reviewed at these meetings.

84.     Delandmeter was also in regular communication with Access's New York staff regarding many matters relating to the Feeder Fund Defendants and BLMIS.  As just one example, as of October 2008, Access's procedures mandated that any written communications from Access's New York staff involving Luxalpha or Groupement Financier be authorized by Delandmeter before the communications could be sent.

20

85.     Delandmeter was also involved with Access's investments in BLMIS in several

other ways.  Delandmeter executed the board resolution directing the opening of Luxalpha's

BLMIS accounts and approved the prospectus that concealed the delegation of custodial and

management authority to BLMIS. Among many other tasks, Delandmeter also participated in the

drafting of prospectuses, and was responsible for meeting with and approving invoices from a

New York-based insurance broker who was responsible for professional liability insurance for

Luxalpha's board.

86.     Together, Littaye, Villehuchet and Delandmeter worked with the Access partners

and staff in New York to coordinate Access's overall operations and to grow Access's fees

relating to the Feeder Fund Defendants.

**B.     Access Created Groupement Financier and Engaged UBS as a Service Provider**

87.     The Access Defendants established Groupement Financier in February 2003,

opening BLMIS account 1FR096 in April 2003.  Littaye executed Groupement Financier's

BLMIS account opening documents, including a Customer Agreement, an Option Agreement,

and a Trading Authorization Limited to Purchases and Sales of Securities and Options ("BLMIS

Account Opening Agreements").  The Trading Authorization granted complete managerial

authority for Groupement Financier to BLMIS.  According to its terms, the Customer Agreement

was deemed to have been made in New York, included a New York choice of law clause and

included an arbitration clause that required any controversies between BLMIS and Groupement

Financier be settled under the Federal Arbitration Act "before the American Arbitration

Association, or before the New York Stock Exchange, Inc., or an arbitration facility provided by

any other exchange of which the broker is a member, or the National Association of Securities

Dealers, Inc. . . . ."  The Customer Agreement further provided that all transactions in the

customers' account must be subject to the provisions of the Securities Exchange Act of 1934, the

21

Commodities Exchange Act, the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and the Commodities Futures Trading Commission.

88.     In June 2003, the Access Defendants created the Groupement Levered fund, also known as Groupement Financier II Limited.  Groupement Levered invested all of its assets with Groupement Financier, which in turn invested all of its assets directly with BLMIS.  Both Groupement Financier and Groupement Levered were thus effectively 100% invested in BLMIS.

89.     Groupement Financier's BLMIS account remained open until Madoff's arrest in December 2008.

90.     At all times, Littaye and Villehuchet comprised both Groupement Financier's and Groupement Levered's board of directors.

91.     AIA Ltd. served as both Groupement Financier's and Groupement Levered's official manager, while AML and AP (Lux), served at different times as the official investment advisor to both funds.  But Access provided no actual investment management or advisory services, as all investment authority over the money invested with Groupement Financier and Groupement Levered was contractually delegated to BLMIS.

92.     In 2005, the UBS Defendants began to service Groupement Financier and Groupement Levered.  UBS SA was Groupement Financier's official prime bank and Groupement Levered's official custodian.  But UBS SA did not exercise any actual custodial authority over the money invested with Groupement Financier or Groupement Levered, as this responsibility was contractually delegated to BLMIS.  From February 2005, UBSFSL served as the Groupement Financier's and Groupement Levered's official administrator, and was responsible for calculating the funds' net asset values.

22

93.     To minimize their direct association with Madoff, UBSFSL and UBS SA sought

to maintain a hands off-approach to BLMIS.  In a combined Groupement Financier and

Groupement Levered Operating Memorandum dated July 12, 2005, § 3.5 entitled "Not to do"

reads in extra-large, bold font: **"Neither UBSL nor UBSFSL should ever enter into a direct

contact with Bernard Madoff!!!"**

94.     Groupement Financier and Groupement Levered were formally managed and

supervised by UBS SA and UBSFSL, in conjunction with several of the Access Defendants,

including AIA Ltd., AIA (Lux), and AP (Lux).  AIA Ltd. was designated as Groupement

Financier's and Groupement Levered's investment manager.  AIA (Lux), and then AP (Lux),

served as Groupement Financier's and Groupement Levered's purported investment advisers,

though in practice, this role was performed by Madoff.

95.     Along with communicating with BLMIS directly, UBSFSL employees frequently

corresponded with Access's New York office regarding issues related to the administration of

Groupement Financier or Groupement Levered, such as NAV calculations, NAV reports and

Access's indemnity of the UBS Defendants.  UBSFSL also communicated with CDC Financial

Products, the New York-based provider of leverage to Groupement Levered, regarding

Groupement Financier and Groupement Levered valuations and received invoices from a New

York-based insurance broker for professional liability policies.

96.     UBSFSL processed subscriptions for Groupement Financier and Groupement

Levered, instructing investors to route U.S. dollar subscriptions through UBS SA's account at

UBS AG in Stamford, Connecticut.  UBS SA and UBSFSL's operating memorandum for

Groupement Financier and Groupement Levered notes that "Groupement . . . will invest the

subscription monies with Bernard Madoff," as UBS SA would transfer the funds to

Groupement's account at the Bank of Bermuda, which then forwarded the funds on to BLMIS's

account at JPMorgan in New York (the "703 Account").   The subscription forms for both funds

also made specific reference to U.S. anti-money laundering laws and the U.S. Patriot Act.

97.    Redemptions in U.S. dollars for Groupement Financier, Groupement Levered and

Luxalpha were also processed through UBS S.A.'s account at UBS AG in Stamford,

Connecticut.

98.    BLMIS had custody of Groupement Financier's assets and served as its exclusive

trader.  All transactions involving the Groupement Financier's assets were permitted to be

executed and settled solely by BLMIS.  Groupement Financier's NAV was calculated by

UBSFSL based on unverified and unconfirmed trade confirmations that BLMIS provided to UBS

SA.  UBSFSL only created "mirror" accounting records based on the trade confirmations and

account statements that it received from BLMIS.  There was no third-party verification of the

information provided by BLMIS.  In fact, UBSFSL was aware of instances in which options

trade information from BLMIS was in direct conflict with prices reported in Bloomberg and

understood that BLMIS's trades at such prices were impossible. The UBS Defendants' Operating

Memorandum for Groupement Financier further accepted the "considerable delay" with which

BLMIS dispatched trade confirmations and provided for "the issu[ance of] the NAV with a delay

of **up to 9** business days." (emphasis in original)

99.    Thus, acting with the Access Defendants, UBS SA and UBSFSL implemented

and supported a series of operational procedures for Groupement Financier and Groupement

Levered that facilitated Madoff's ability to commit and perpetuate his fraud.

100.    The following chart sets forth the organizational structure of Groupement

Financier and Groupement Levered:

24



## C.   The Access and UBS Defendants Worked Together to Open Luxalpha

101.    After BNP Paribas closed Oreades, Access found itself without a prime bank to administer the investments it directed into BLMIS.  Not wanting to lose its access to Madoff, Access's principals sought and found new partners, the UBS Defendants.

102.    Notwithstanding that several UBS entities had rejected BLMIS as an unsuitable investment, UBS recognized that there was a strong market demand for investment in BLMIS, and that there was money to be made by meeting that demand.  Luxalpha provided UBS with the means to capture that market.   Luxalpha was incorporated in February 2004.

25

103.    A week after Oreades was closed, UBS SA opened BLMIS Account 1FR108 in

March 2004, and executed on behalf of Luxalpha and as Luxalpha's agent, BLMIS Account

Opening Agreements.

104.    UBS SA also entered into a separate agreement with BLMIS which explicitly

designated BLMIS as the sub-custodian of Luxalpha's assets.

105.    UBS SA operated as Luxalpha's agent and held the account in the name of "UBS

(Luxembourg) S.A. for the benefit of Luxalpha." Luxalpha's BLMIS Account was still open

when Madoff was arrested on December 11, 2008.

106.    Luxalpha's nascency was fraught with negative feedback about BLMIS. A UBS

AG (Zurich) employee stated that Madoff's role as both Luxalpha's manager and custodian was,

standing alone, sufficient reason to decline investment with BLMIS:

> We normally have to give "NO" as the answer in cases like
> Madoff.   In doing so, we make reference to the following
> principles:  no broker as depository, and the broker may under no
> circumstances also be a depository at the same time!  Such a NO is
> easy to comprehend for both business policy reasons and risk
> reasons.

107.    UBS SA was aware of and dismissed these and other concerns, and concluded

that even though "[t]he risk of [investing with BLMIS] should not be underestimated . . .

[investing with BLMIS] would be advantageous on the income side."

108.    UBS SA's response to reports of indicia of fraud at BLMIS was to look into

"additional insurance," and press forward to establish Luxalpha regardless of these concerns.

109.    The internal message imparted by high-level UBS employees was clear: concerns

about fraud at BLMIS were not to prevent UBS from profiting. Bernd Stiehl, a Luxalpha

director and a UBS SA managing director, subordinated negative reports on BLMIS to UBS's

drive to capitalize on Madoff.  "Business is business," Stiehl wrote. "We cannot permit ourselves to lose 300 million.  Accept client."

110.    With the opening of  Luxalpha, the infusions of cash previously made into Oreades were maintained and even augmented, and in the process generated hundreds of millions of dollars in fees for Access and UBS.

111.    The following chart sets forth Luxalpha's organizational structure:

**[This Space Intentionally Left Blank]**



**D.    The UBS Defendants Insulated Themselves From Liability Through a Series of Undisclosed Indemnity Agreements With the Access Defendants**

112.    Because its analysis had already identified BLMIS as a fraud risk, the UBS Defendants recognized that their connection to Luxalpha exposed them to liability for BLMIS. The UBS Defendants therefore sought to protect themselves through a series of indemnity agreements with the Access Defendants, who were responsible for marketing Luxalpha to

28

investors.  None of these indemnity agreements were ever disclosed to Luxalpha investors or the

CSSF.

113.    Through these indemnity agreements, the UBS defendants sought to avoid the

risks associated with Luxalpha's creation and management.  On or about February 5, 2004, AIA

(Lux), which purported to advise UBS SA in connection with UBS's nominal role as Luxalpha's

portfolio manager from February 4, 2004 to August 1, 2004, entered into a series of indemnity

agreements with Luxalpha directors who were also UBS SA employees.  The agreements

purported to indemnify and hold harmless the directors and UBS SA for any liabilities resulting

from their involvement with Luxalpha.

114.    In the indemnity agreement between AIA (Lux) and UBS SA, the parties

acknowledged and agreed that AIA (Lux) "[R]equested [UBS SA] to act as a figure head to third

parties in the sponsorship and in the managementship [sic] of the Fund."

115.    In the indemnity agreement, AIA (Lux) also agreed that it would assume UBS

SA's liability for "damages resulting from proved irregularities, inadequacies, or omissions in

the administration or management" of Luxalpha.

116.    From UBS's perspective, such agreements were necessary to avoid the "worst

case scenario": BLMIS's failure and UBS SA's resulting liability to Luxalpha investors.

117.    UBS SA took other measures to limit its liability in the event of BLMIS's failure.

UBS SA demanded that Access provide a "hold harmless" letter from Luxalpha's investors for

loss resulting from BLMIS's failure.  It also required Access to obtain and pay for an insurance

policy covering Luxalpha's risks.

118.    Upon its appointment as Luxalpha's manager in November 2008, AML entered

into substantially similar indemnity agreements with UBS SA and the Luxalpha directors (the

"November 2008 Indemnity Letters"). Through these indemnity agreements, the UBS

Defendants continued to limit the liability to which Luxalpha exposed them.

119. The November 2008 indemnity letter between UBS SA and AML replaced the

prior 2004 indemnity agreement between AIA (Lux) and UBS SA. This letter indemnified and

held harmless UBS SA and acknowledged that UBS SA was appointed Luxalpha's sponsor to

establish it as a "figure head."

120. In November 2008, AML also executed indemnity agreements in favor of

directors Kranz, Egger, Schroeter and Hondequin, who were UBS employees, and Delandmeter,

an Access employee. The November 2008 Indemnity Letters were all executed on November

17, 2008—less than a month before Madoff confessed.

**E.     The UBS Defendants Received Fees of at Least $97 Million In Connection With the
         Services They Purported to Render to the Feeder Fund Defendants**

121. Even though they claimed no responsibility and purported to disclaim all liability

for the investment and management of the Luxalpha and Groupement Financier funds, and

subdelegated all of their material responsibilities to BLMIS or Madoff, the UBS Defendants

received more than $97 million in fees for their purported duties relating to these funds.

122. UBSFSL was paid a fee of .05% of fund assets for its administration services to

Luxalpha, resulting in a total of at least $2,500,000.

123. UBS SA was paid at least $39,400,000 in fees, in connection with its purported

roles as Luxalpha's custodian, and as Luxalpha's purported manager from February 2004 until

August 2006.

124. UBSTPM was paid at least $53,300,000 in fees, in connection with its purported

role as Luxalpha's manager from August 2006 until November 2008.

125.    UBS SA was paid at least $1,500,000 in fees for its official roles as prime bank

for Groupement Financier, and as custodian for Groupement Levered.

126.    UBSFSL was paid at least $497,000 in fees for its official role as administrator to

Groupement Financier and Groupement Levered.

**F.    Access Was Structured and Operated to Maximize the Fees It Received for Services
Purportedly Rendered to the Feeder Fund Defendants**

127.    In 1994, Defendants Littaye and Villehuchet founded the Access International

Advisors group with the formation of a New York corporation, AIA Inc., and in 2001, created its

wholly owned subsidiary, AIA LLC.  Both AIA Inc. and AIA LLC were based out of Access's

New York headquarters office.

128.    Both Littaye and Villehuchet were sophisticated investment professionals who

had long held senior-level positions at major financial institutions before they founded AIA LLC.

Upon founding AIA LLC, they installed themselves as its co-Chairmen and co-Chief Executive

Officers.

129.    AIA LLC served outwardly as Luxalpha's portfolio advisor from August 1, 2004

to November 17, 2008, charged with primary responsibility for marketing and monitoring

Luxalpha's investments through BLMIS.  In this capacity, AIA LLC also contracted with UBS

SA to provide UBS SA with "portfolio advisory services," in connection with UBS SA's role as

Luxalpha's portfolio manager from August 1, 2004 to August 1, 2006.  AIA LLC's purported

advisory services included advising UBS SA on "the manner in which the assets of the Fund

might be traded, cleared and invested . . ."—that is, with BLMIS in New York.  Moreover, the

contract between UBS SA and AIA LLC contains a New York choice of law clause and an

arbitration provision that requires any dispute to be arbitrated in New York City.

31

130. At various times between 1995 and December 2008 , Littaye and Villehuchet formed several additional entities, including AIA Ltd., AIA (Lux), later known as AML, AP (Lux), and AIA Europe, which they referred to, collectively, as "Access."

131. The Access entities were installed in management and administration positions for the Luxalpha and Groupement Financier funds to create the appearance that those positions were occupied by separate, independent actors.

132. Littaye and Villehuchet cultivated the appearance that the entities that comprised Access were distinct from one another and separately organized, but those entities operated as a single business enterprise, or alter egos of one another. AIA LLC's New York offices served as the headquarters for Access's operations, and Access's quarterly strategic meetings were held in New York.

133. Littaye and Villehuchet operated many of the Access entities as shell entities, and some did not have employees of their own. All of Access's approximately twenty employees were located in New York, London, and Paris. No Access employees were based in the Bahamas or Luxembourg.

### 1. AIA Ltd.

134. According to various operating memoranda, Access's Bahamian entity AIA Ltd. was the purported investment manager of Groupement Financier until July 2007, though it had improperly delegated those responsibilities to BLMIS. At various times, AIA Ltd. was also identified as Groupement Financier's operator, sponsor, and investment advisor, and also served as the official investment manager of Groupement Levered. AIA Ltd. also served as the official "Consultant and Client Introducer" and exclusive introducing agent for Luxalpha.

135. Although it was formed in 1998, as of 2004, AIA Ltd. was a shell entity that did not have a physical presence in any jurisdiction. AIA Ltd. is described in Access's internal

documents as an offshore "money box" set up for the "prime purpose [of] … the receipt of fees" on behalf of Access.  Money from AIA Ltd. funds was indeed used to pay Access employees in New York.  In another internal Access document, an Access employee in New York stated that AIA Ltd. was incorporated offshore in the Bahamas because "Bernie Madoff wants to only deal with offshore entities related to our accounts."

136.    Access's employees in New York regularly compiled reports regarding the performance of Luxalpha and Groupement Financier and tracked BLMIS's purported entrances and exits from the stock market.  These reports state they were "[p]repared by [New York-based] Access International Advisors, Inc. for Access International Advisors Limited."

137.    Although AIA Ltd. held itself out as the investment manager of both Groupement Financier and Groupement Levered, AIA Ltd.'s own accountants recognized that it was never licensed anywhere in the world to act as an investment manager.

138.    AIA Ltd. received the vast majority of fees that Access collected from Luxalpha and Groupement Financier.

## 2.    AML/AIA (Lux) and AP (Lux)

139.    AML (formerly AIA (Lux)) and AP (Lux) were other shell entities set up for the receipt of fees by Access, and to provide nominal Luxembourg presences for the operation of Luxalpha.

140.    AML formally served as portfolio manager for Luxalpha from November 17, 2008 through its liquidation, but entered into an Investment Advisory Agreement with Access Partners S.A. (Luxembourg).  AML ultimately left the management of Luxalpha's portfolio to BLMIS.  As AIA (Lux), AML also served as Luxalpha's portfolio advisor from February 4, 2004 until August 1, 2004, where it purported to advise UBS SA in connection with UBS SA's role as

Luxalpha's portfolio manager.  As AIA (Lux), it also served as the investment adviser of

Groupement Financier and Groupement Levered before 2007.

141.    AP (Lux) formally served as Luxalpha's investment advisor from February 13,

2007 through its liquidation, where it purported to advise UBSTPM, and later AML, in

connection with their roles as managers for Luxalpha.  AP (Lux) was also the purported

investment adviser of Groupement Financier and Groupement Levered beginning in 2007.

142.    A September 2004 questionnaire regarding Luxalpha completed by Access states

that AIA (Lux) has "no regular employees" and "no full time employees," lists Littaye and its

outside counsel Pierre Delandmeter as the only investment professionals at the firm, and

identifies no one as carrying out its responsibilities other than Littaye or Delandmeter.  The

questionnaire also indicates that AIA (Lux) "outsourced" the functions of trading; research and

development; IT/programming; administration; and marketing and business development.  And

notes from an Access meeting confirm AIA (Lux)'s purpose as an overseas shell entity for the

receipt of funds—stating that a "[s]ervice agreement will have to be put in place between the

companies of AIA group, to spread the AIA Lux incomes."

143.    Access used AP (Lux) as a shell entity to protect Luxalpha and BLMIS from U.S.

regulatory scrutiny.  Littaye acknowledged in an internal meeting that Access "already took a

small risk for Luxalpha" with respect to BLMIS and the U.S. Securities and Exchange

Commission when it had New York-incorporated AIA LLC previously serve as the investment

advisor for Luxalpha and, therefore, created AP (Lux) to take over that role.

144.    Analyses of Luxalpha and Groupement Financier performance were composed on

AP (Lux) letterhead and distributed, but internal Access documents show that these analyses

were prepared by employees in Access's New York headquarters. A 2008 contact list for various

Access entities, including AP (Lux), shows an address and a phone number for a Luxembourg office, but not a single Access employee is associated with this phone number.

145.    In February 2005, a memo was circulated in Access's New York office providing instructions as to how to use remote access software to access the Luxembourg office, where no meaningful business actually took place, and concerning how emails, faxes and phone calls sent there would be forwarded.

### DEFENDANTS WERE AWARE
### BLMIS WAS THE PERFECT STRUCTURE FOR FRAUD

146.    The UBS Defendants' operating procedures for Luxalpha had the overall effect of enabling and perpetuating Madoff's Ponzi scheme.  The operational procedures that the UBS Defendants established for Luxalpha placed both custody and investment authority in Madoff's hands.

147.    The Operating Memorandum for Luxalpha dated October 10, 2008 provides that any cash and security movements for Luxalpha would be communicated by Madoff and/or BLMIS on a daily basis to UBS SA, and states that, "[a]s B. Madoff is at the same time acting as investment trader, broker and sub-custodian, there will be one single confirmation form issued by BM."  Despite UBSFSL's knowledge that some options trades took place at prices outside the daily range as reported in Bloomberg, the operating procedures further provide that UBSFSL, as administrator, was to take the unconfirmed and unverified information that UBS SA received from BLMIS to determine Luxalpha's NAV.

148.    With regard to the calculation of Luxalpha's NAV, the Operating Memorandum specifically states:

> [d]ue to the considerable delay in the dispatching of the trade confirmations and Broker statements from B. Madoff, the client has accepted that UBSFSL issues the NAV with a delay of up to 10 business days.

149.    The Operating Memorandum also provides that BLMIS, as sub-custodian, will

"promptly report by fax as of each trade date the transactions entered into the Account." These

daily faxes were supposed to be sent to UBS SA. Nothing in BLMIS's records suggests that this

procedure was followed. Instead, BLMIS reported trades in hard copy only, usually days after

the purported trade date.

150.    This Operating Memorandum specified that Luxalpha's Management Company,

identified as AML, would provide UBS SA **"with a backdated monthly investment**

**recommendation."** (Emphasis added.) UBS knowingly participated in Madoff's fraud by

endorsing these backdated recommendations.

A.    **In Coordination with the Access Defendants, the UBS Defendants and Luxalpha
      Intentionally Violated the Law and Misled Regulators in Delegating Duties to
      BLMIS**

1.    **UBS Circumvented UCITS Requirements**

151.    To establish Luxalpha as a Madoff feeder fund, UBS had to give BLMIS

"'special' handling"—granting exceptions to UBS policies in order to accede to BLMIS

requirements. Many of these exceptions violated Luxembourg's UCITS regulations.

152.    Under applicable Luxembourg law, a Luxembourg UCITS fund must have a

sponsor, or promoter, responsible for creating the fund. Under then-existing law, the promoter is

liable to third parties for damages if the fund is mismanaged.

153.    UBS AG and UBS SA served as Luxalpha's co-sponsor and co-promoter. UBS

AG's sponsorship of Luxalpha was integral to the fund obtaining approval as a UCITS-

compliant fund. It created the appearance, both with the CSSF and with potential investors, that

the fund was backed by a highly capitalized, stable bank.

154.    Luxembourg's UCITS regulations prohibit UCITS fund custodians from sub-

delegating custodial functions except under very specific circumstances. Those circumstances

were not met here.  UBS SA, a UBS AG subsidiary, was Luxalpha's custodian in name only,

improperly delegating its core custodial functions to BLMIS upon Luxalpha's inception.

155.    Luxembourg's UCITS regulations further prohibit UCITS funds from appointing

one entity as both custodian and investment manager.  When UBS delegated its duty as fund

custodian to BLMIS, it did so knowing that BLMIS was also Luxalpha's investment manager,

and knowing that this structure was illegal.  The delegation of these functions was disclosed

neither to the CSSF nor in Luxalpha's sales prospectus.  Nonetheless, UBS SA continued to

receive fees for acting as the fund's custodian, and remained responsible on paper for

safekeeping the fund's assets and supervising the fund.

156.    UBS AG made an exception to its usual policy prohibiting the delegation of

custodial and management authority to a single entity after being persuaded to do so by UBS SA.

157.    The purpose of the UCITS regulations was to protect against fraud, yet the UBS

Defendants, together with the Access Defendants, orchestrated a structure designed to

circumvent those very regulations.

### 2.    To Conceal the Delegation of Their Duties, the UBS Defendants Used Subsidiaries as Luxalpha's Managers, Custodian, and Administrator

158.    UBS SA was Luxalpha's nominal portfolio manager from February 2004 until

August 2006, but in reality the management of the fund's assets had been delegated to BLMIS

since the fund's inception.

159.    On March 18, 2004, in its capacity as Luxalpha's manager, UBS SA executed an

agreement with BLMIS entitled "Trading Authorization Limited to Purchases and Sales of

Securities and Options."  Under the agreement's terms, Luxalpha delegated management of

Luxalpha's assets to BLMIS, designating BLMIS as their "agent and attorney in fact to buy, sell

and trade in stocks, bonds, options and any other securities."  The Trading Authorization also

states that the assets of Luxalpha would be invested with U.S. equities listed on the S&P 100

Index.

160.    The BLMIS Account Opening Agreements executed by UBS SA also contain an

Option Agreement and a Customer Agreement.  The Customer Agreement was deemed to have

been made in New York, included a New York choice of law clause and included an arbitration

clause that required any controversies between BLMIS and Luxalpha be settled under the

Federal Arbitration Act "before the American Arbitration Association, or before the New York

Stock Exchange, Inc., or an arbitration facility provided by any other exchange of which the

broker is a member, or the National Association of Securities Dealers, Inc. . . ."  The Customer

Agreement further provided that all transactions in the customers' account must be subject to the

provisions of the Securities Exchange Act of 1934, the Commodities Exchange Act, the rules and

regulations of the SEC, the Board of Governors of the Federal Reserve System and the

Commodities Futures Trading Commission.

161.    The delegation of management functions was disclosed neither to the CSSF nor in

Luxalpha's prospectus.  Even after the delegation, UBS SA represented to the CSSF and

potential investors on Luxalpha's prospectuses that it managed Luxalpha's assets and monitored

and adjusted the fund's investments, under the supervision of the fund's board of directors.

162.    UBS SA also represented itself as Luxalpha's custodian on sales prospectuses for

the life of the fund, but in reality the custodial function of the fund's assets had been delegated to

BLMIS since the fund's inception.

163.    By February 5, 2004, UBS SA had entered into a Sub-Custodian Agreement with

BLMIS (the "Sub-Custodian Agreement"), which delegated UBS SA's custodial duties to

BLMIS "with the function of safekeeping holder and settlement and corporate agent of United

States securities, cash, derivatives instruments and other assets" and noted that the "US assets of

the Fund" would be invested with BLMIS. The Sub-Custodian Agreement was not disclosed in

any prospectus filed with the CSSF. Nor could the Sub-Custodian Agreement have been

approved by the CSSF, because neither Madoff nor BLMIS complied with Luxembourg law

governing fund custodians. BLMIS received no compensation for serving as *de facto* manager

and sub-custodian.

164.    The UBS Defendants concealed the delegation of duties to BLMIS because they

knew and understood such a structure facilitated the fraud from which they profited. The

February 2004, August 2004, August 2006, March 2007, and November 2008 Luxalpha sales

prospectuses each misleadingly state that UBS SA had assumed Luxalpha's custodial rights and

duties, failing to disclose the delegation of custodial responsibilities to BLMIS. Each of those

prospectuses touted UBS SA's banking experience.

165.    Documents submitted to the CSSF on UBS SA's behalf also misrepresented UBS

SA's custodial function. In a report dated January 15, 2008 entitled "Control Report of the

Independent Auditor on the Custodian Bank Function in the Context of the CSSF Circular

02/81," to meet CSSF requirements, UBS SA purported to set forth complete lists of the funds

for which it served as custodian and the sub-custodians that it used worldwide. Although

Luxalpha was included in the list of funds in the report, neither Madoff nor BLMIS was

identified as a sub-custodian and are nowhere to be found in the report. The report misleadingly

identifies Brown Brothers Harriman as the only sub-custodian that UBS SA used in the United

States.

166.    Upon information and belief, UBS SA submitted such reports regarding its

custodial function and its global custodial network to the CSSF annually from 2004 (the year of

its delegation to BLMIS) through 2008, and failed to identify Madoff or BLMIS as a sub-custodian in any of those reports.

167.    In an August 14, 2009 interview given to *Les Echos*, a French financial publication, Jean Guill, General Director of the CSSF, confirmed that Luxalpha and UBS SA never disclosed—either to the CSSF or in sales prospectuses—that they had ultimately delegated custody of the fund's assets to BLMIS, and that the non-disclosure violated UCITS law.

168.    The 2009 Annual Report of the CSSF further confirms that the documents that were submitted to it on behalf of Luxalpha, upon which the CSSF based its decision to approve Luxalpha as a UCITS fund,

> did not contain any reference either to the identity of B[L]MIS or to the multiple responsibilities carried on *de facto* by one entity. Between the launch of [Luxalpha] and the breakout of the Madoff affair in December 2008, the CSSF was never informed in a transparent manner, by the professionals involved, of the structure actually set in place nor [sic] of the role played in practice by B[L]MIS at different levels of this structure.

169.    UBS SA's legal department acknowledged that the delegation of both custodial and management authority to BLMIS was improper.  The UBS Defendants also knew that their failure to disclose Madoff and BLMIS in the sales prospectus was a violation of Luxembourg law.  UBS AG admitted as much, stating, "[a]s far as I understand it, the bottom line seems to be that what the fund does is not in line with what the prospectus says (???)."  Knowing that Luxalpha was neither structured nor managed as represented in its prospectuses, many UBS employees complained that the irregularities and non-disclosures put UBS at risk.  UBS SA squelched the dissenting voices.

170.    Following the delegation of custodial and management functions to BLMIS, UBS SA remained in regular contact with BLMIS.  In addition to receiving account statements and trade confirmations from BLMIS, UBS SA communicated regularly with BLMIS via mail, fax

40

and telephone to request withdrawals from Luxalpha's account and to address a variety of issues, including mismatched trade tickets, tax issues, and missing account statements.

171.    UBS AG subsidiary UBSFSL was Luxalpha's administrator for the life of the fund.  In this role, UBSFSL was responsible for calculating Luxalpha's Net Asset Value, or NAV, which is the market value of each share of the fund, by independently verifying the execution of trades and prices at which those trades took place.  Without any independent verification, UBSFSL only created "mirror" accounting records based on the trade confirmations and account statements that it received from BLMIS.

172.    UBSFSL facilitated the concealment of BLMIS's true involvement and perpetuated the fraud by relying solely upon trade data provided by BLMIS to calculate the fund's NAV, despite verifying and understanding that some BLMIS trade tickets showed options traded at prices outside the daily range as published in Bloomberg.

173.    Along with direct communications with BLMIS, UBSFSL employees frequently corresponded with Access's New York office regarding issues related to Luxalpha's administration, such as Access's SEC registration, Luxalpha investor subscriptions and redemptions, and payment of Access's portfolio advisory fees.  UBSFSL also received invoices from a New York-based insurance broker for professional liability policies.  UBSFSL also directed subscriptions for Luxalpha, instructing investors to route U.S. dollar subscriptions through UBS SA's account at UBS AG in Stamford, Connecticut.  These subscriptions were pooled by UBS SA and then sent to BLMIS's 703 Account at JPMorgan in New York—-again passing through UBS SA in Stamford.  When Luxalpha redeemed money from BLMIS, the money flowed from the 703 Account at JPMorgan in New York to UBS SA's account at UBS AG's Stamford branch and then to Luxalpha's bank account at UBS SA.

41

174.     UBS AG subsidiary UBSTPM replaced UBS SA as Luxalpha's nominal investment manager from August 2006 to November 2008.  UBSTPM represented to the CSSF and Luxalpha investors that it managed, administered, and monitored the fund's investment policies and restrictions.  But UBSTPM never managed Luxalpha, as that function had already been delegated to BLMIS under the asset management agreement between UBS SA and BLMIS, which delegation was disclosed neither to the CSSF nor in Luxalpha's sales prospectus.

175.     When UBSTPM was contracted as Luxalpha's new management company, the UBS Defendants continued to conceal the delegation of the fund's management to BLMIS.  Luxalpha's August 2006 prospectus states that UBSTPM, as management company:

> [i]s responsible for the management, the administration and the distribution of the Fund's assets but is allowed to delegate, under its supervision and control, all or part of these duties to third parties.  In case of changes or appointment of additional third parties, the prospectus will be updated accordingly.

No such "updated" prospectus disclosing Luxalpha's delegation of management to BLMIS was ever provided.  Further, this provision of the August 2006 prospectus fostered the misleading impression that, as of 2006, Luxalpha had not yet delegated its management to BLMIS.  But UBS had already delegated that role—in 2004—upon Luxalpha's launch.  Nor did UBSTPM ever attempt to exercise any "supervision" or "control" over BLMIS.  UBSTPM assumed the official managerial role only to nominally comply with regulations that prohibited the same entity from serving as both custodian and manager.  The UBS Defendants created a façade to make it appear that Luxalpha's custodial and managerial duties had been divided separately between two Luxembourg companies, UBS SA and UBSTPM, when in fact both roles had rested solely with BLMIS in New York from the first day of Luxalpha's operation.

176.     AML nominally became Luxalpha's new manager as a result of a "Management Company Services Agreement," entered into on or about November 17, 2008.  On the same date,

a new "Investment Advisory Agreement" was signed between AML and AP (Lux), which replaced an agreement signed in February 2007 between UBSTPM and AP (Lux).  Neither agreement had any impact on the sub-delegation of investment management and advisory responsibilities to BLMIS, which at all times, managed and controlled Luxalpha's assets.

177.    Despite representations to the contrary in sales prospectuses and disclosures to the CSSF, the UBS Defendants performed no investment management or custodial functions for Luxalpha, even though they collected significant fees for those services.  Since Luxalpha's inception, all such responsibilities were delegated to Madoff and/or BLMIS.  Certain Access Defendants also purported to serve as Luxalpha advisors and managers, even though Luxalpha was always intended to be and always was 100% invested with BLMIS.

**3.    UBS's Role as a "Front" and Mere "Window Dressing" for Luxalpha Was Executed in Coordination with the Access Defendants in Order to Market and Sell the Fund**

178.    The UBS Defendants' figurehead role with respect to Luxalpha was widely acknowledged and freely discussed among Access's insiders.  The minutes of Access's February 2007 Quarterly Executive Meeting state that "Luxalpha UCITS is a strange entity; **UBS is window dressing or a front**."  (Emphasis added.)

179.    When shown a copy of the minutes of Access's February 2007 Quarterly Executive Meeting in a Bankruptcy Rule 2004 examination, Philip H. Wogsberg, who was with AIA LLC for ten years and who served as its Director of Research, testified:  "[T]he rules are one thing, but also there is [sic] some winks and nods in regulation in Europe, and I think this was a wink and a nod to Patrick [Littaye] please sanitize this and get it all Luxembourgy-looking … "

43

180.     When also asked in a Bankruptcy Rule 2004 examination about the comment that

UBS was a mere front or window dressing, Theodore Dumbauld, a former Access partner and its

Chief Investment Officer, testified as follows:

> UBS was just a pass-through entity.   It really didn't have any
> responsibilities in the management of the product, whether it was
> collecting investors or maintaining a relationship with Madoff.  So,
> in that it was purely – Access was using its [*i.e.*, UBS's] balance
> sheet or its reputation in order to be compliant with the regulations
> in Luxembourg.

181.     As set forth in further detail below, the Access Defendants were privy to clear

evidence of fraud.  Nevertheless, in soliciting European investors for BLMIS, they touted

controls, oversight, and protections that they knew did not exist.  They also knew that BLMIS

could not be trading in accordance with the SSC strategy.  The Access Defendants'

misrepresentations and omissions facilitated the flow of new money into BLMIS, thereby

helping to perpetuate the scheme.

182.     The Access Defendants were sophisticated investors, who knew and understood

the working of the financial markets.  As self-proclaimed diligence experts, the Access

Defendants knew and understood that Madoff was not engaged in legitimate securities

transactions.

183.     In materials issued by their New York office, the Access Defendants touted their

rigorous due diligence processes, which were designed "to avoid the three main risk[s] to the

hedge fund industry. . . , [protecting against] [r]isk of fraud by doing an extensive due diligence

. . . , [r]isk of drift by the implementation of an ongoing qualitative, operational and quantitative

monitoring . . . , [and] [r]isk of dilution of the performance . . .  by controlling the flow of

investment."

**B.     BLMIS Customer Statements and Trade Confirmations for Luxalpha and Groupement Financier Revealed Numerous Indicia of Fraud**

184.    The Access Defendants and the UBS Defendants received and reviewed

Luxalpha's and Groupement Financier's account statements and trade confirmations.

Luxalpha's account statements and trade confirmations were sent from BLMIS to UBS SA, who

then shared their contents with UBSFSL.  BLMIS also sent Luxalpha's account statements and

trade confirmations to Access's New York and London offices.  Groupement Financier's account

statements and trade confirmations were sent from BLMIS to Access's New York and London

offices.  The Access Defendants shared Groupement Financier's account statements and trade

confirmations with UBS SA and UBSFSL.  The UBS Defendants and the Access Defendants

were, therefore, aware of numerous trading impossibilities in the reported performance of the

Luxalpha and Groupement Financier accounts at BLMIS.  These impossibilities are not just facts

suggestive of fraud, or mere warning signs that should have led to further inquiry—they are

quantitative evidence demonstrating that the Luxalpha and Groupement Financier account

statements and trade confirmations reported non-existent securities transactions.

**1.     The SSC Strategy BLMIS Purported to Employ Could Not Yield the Results Reported on the BLMIS Account Statements**

185.    The SSC strategy was a "collared" investment strategy that was supposed to track

the S&P 100 Index and also temper volatility in that market.  But the virtual elimination of

market volatility would have been impossible under the SSC strategy.  At best, this strategy

would have leveled out peaks and valleys but could not have eliminated volatility otherwise

inherent in the S&P 100 Index.  Luxalpha's and Groupement's Financier's account statements

should have been closely correlated to the S&P 100 Index, but with less dramatic down or

upswings.

45

186.    The S&P 100 Index put and call options ("OEX Options") collars attached to BLMIS's stock purchases should, in theory, have ensured that when the S&P 100 Index dropped, it would not drop as much for BLMIS investors.  Collapses in stock price would be hedged by put contracts funded by the sale of call options.  The effect of that strategy, however, would also limit gains when the S&P 100 Index went up.

187.    It would have been impossible for Luxalpha or Groupement Financier to post gains on their investment when the S&P 100 Index was significantly down if BLMIS was genuinely deploying the SSC strategy.  This is because the put options only limited losses during downswings.  The exercise of those put options would not have turned losses into gains; it would simply have put a floor on losses.

188.    Similarly, outperforming the S&P 100 Index during a major upswing should also have been impossible, as call options sold by BLMIS would have been exercised during a significant market upswing, putting a ceiling on gains.

189.    Luxalpha's and Groupement Financier's respective account statements consistently show gains where the market shows losses, and when the market is moving up, show gains outperforming that market.  This is objectively impossible under the SSC strategy.

190.    BLMIS's returns purported to be immune from any market instability, enjoying consistently positive rates of return at all times, even during catastrophic market downturns such as the "dot com" bubble burst of 2000, the 2000–2002 bear market, and the disastrous and unforeseeable market impact of September 11, 2001:

| Year | Luxalpha Account Rate of Return | Groupement Financier Account Rate of Return | S&P 100 Index Rate of Return |
|---|---|---|---|
| 2004 | 8.1% (partial year) | 9.4% | 4.5% |
| 2005 | 10.5% | 10.4% | (0.9%) |
| 2006 | 13.1% | 13.3% | 15.9% |
| 2007 | 11.0% | 10.7% | 3.8% |
| 2008 (through Nov.) | 9.4% | 9.3% | (36.9%) |

191.    During its 68-month operational life, Groupement Financier's BLMIS account had a negative rate of return during only one month. The S&P 100 Index had a negative rate of return in 26 months over this period. Likewise, Luxalpha's BLMIS account had only one month of negative performance during its 57 month operational life, whereas over the same period, the S&P 100 Index was negative for 25 months.

192.    As early as 1999, with Oreades, Access assessed BLMIS's returns and acknowledged the irregularity of BLMIS's performance in that BLMIS returns were unusually stable.

193.    The following chart used in one of Access's communications to investors, shows Luxalpha's impossibly consistent performance, as compared to the S&P 100:

**[This Space Intentionally Left Blank]**

ACCESS INTERNATIONAL ADVISORS LLC





194.    UBS recognized Madoff's impossibly consistent returns even before Luxalpha's or Groupement Financier's creation.  In response to UBS SA's inquiries about BLMIS in March 2004, UBS O'Connor remarked that "people often speculate how Madoff actually makes money so consistently . . . with only a handful of negative months . . . ."  UBS concluded that if Madoff were running the strategy legitimately, "it would be IMPOSSIBLE to generate the returns that he has produced since 1990."

**2.    Luxalpha's and Groupement Financier's Account Statements Reflected Impossible Options Trading Volumes**

195.    Madoff's SSC strategy required the purchase and sale of massive quantities of OEX Options to put together the "collar" on BLMIS's securities baskets.  These trades were reported on the Luxalpha and Groupement Financier customer statements and trade confirmations.  OEX Options are traded on the Chicago Board Options Exchange (the "CBOE"), and their trading volume is commonly measured and reported.

196.    Even using conservative estimates of BLMIS's assets under management, there were not enough OEX options contracts with the relevant strike price and expiration date to hedge a fund the size of BLMIS's IA Business.  The statements and trade confirmations revealed that in 52% of the instances when Madoff purported to trade options for Luxalpha, or Groupement Financier, he purported to trade more than 100% of such options that were traded on the entire CBOE on that day.  This is, of course, impossible.  Even one instance of such a trade should have been a major red flag.  But there was not one instance, there were many— hundreds of incidents where purported purchases or sales of options with the same strike price and expiration date for Luxalpha and Groupement Financier exceeded the entire volume of such options traded on the CBOE.

197.    Graphical displays of the options needed to hedge *just* Luxalpha's and Groupement Financier's BLMIS investments show the impossibility of these purported trades.  The below charts depict the volume of S&P 100 Index put options BLMIS purported to trade on behalf of Luxalpha and Groupement Financier as compared to the entire CBOE volume.

198.    As shown below in charts 1(a) and 1(b), the volume of S&P 100 Index put options BLMIS purported to trade on behalf of Luxalpha and Groupement (red bars) completely dwarfs the volume of S&P 100 Index put options on the entire CBOE (black bars).

**Chart 1(a)**



**Chart 1(b)**



199.    Charts 2(a) and 2(b) below depict the volume of S&P 100 Index call options

BLMIS purportedly traded on behalf of Luxalpha and Groupement (blue bars) as compared to

the entire CBOE exchange volume (black bars).

**Chart 2(a)**



[This Space Intentionally Left  Blank]

**Chart 2(b)**



Groupement, 1FR096 - Historic Option Activity compared to CBOE 2007-2008  (Calls Only)

Blue bars indicate BLMIS Volume
Black bars indicate CBOE Volume

200.    There were 473 instances over the lifetime of Luxalpha and Groupement

Financier where BLMIS purported to execute trades on behalf of Luxalpha and Groupement

Financier that exceeded the total available volume on the CBOE.  On 362 of these instances, the

volume traded was twice the CBOE; on 151 of these instances, the volume traded was *ten times*

the volume traded on the CBOE.  When verifying BLMIS's purported trading activity, Luxalpha

and Groupement Financier, their managers, and their administrators understood it was

impossible to trade above the market volume for any security—even once.

201.    By no later than 2006, when the reported option trade volumes in the accounts of

Luxalpha and Groupement Financier alone exceeded the entire reported market for such options,

all of the Defendants were well aware of this glaring indicator of fraud.

202.    During 2006, at the same time a Swiss private bank was making inquiries to

Access regarding BLMIS's inexplicable option volumes, Access was conducting its own review

of the issue.  Initially, Defendant Theodore Dumbauld, an Access partner and the Chief

Investment Officer, looked into the issue and concluded that the options trades could not be

occurring as reported by BLMIS.  Dumbauld reported his findings to Villehuchet, who refused to

accept that conclusion, and demanded that Dumbauld get a second opinion.

203.    Access hired Chris Cutler, a consultant doing business as Manager Analysis

Services LLC, to provide a second opinion.  Cutler specialized in providing due diligence

services on hedge funds, and he was asked to look at BLMIS and provide his opinion.  Cutler

had previously done work for Access relating to non-Madoff funds.

204.    In doing due diligence on BLMIS, Cutler reviewed available information,

including information on the business of BLMIS generally, its auditor, audit reports, available

trade tickets and descriptions of the trading strategy.  Although he was asked to do due diligence

on Madoff and BLMIS, he was specifically instructed not to speak to Madoff or anyone at

BLMIS.

205.    It took Cutler the equivalent of four days' work to determine that there were

serious problems with BLMIS.  In addition to confirming the impossible options volume

previously identified by Dumbauld as a red flag, Cutler also identified and saw, among other

things:  (i) serious problems with the feasibility of Madoff's strategy; (ii) the lack of any

independent verification of trades or assets; and (iii) the opportunity for fraud caused by the

delayed, paper confirmation-only way in which trades were reported to Access.

206.    On April 20, 2006, Cutler sent an email to Dumbauld outlining his preliminary

findings concerning BLMIS.  In that email, Cutler wrote, "Ted, if this were a new investment

product, not only would it simply fail to meet due dili standards: **you would likely shove it out

the door.**"  In the same email, Cutler went on to note, "EITHER extremely sloppy errors OR

serious omissions in tickets. That's the best case ... arithmetic errors in the founder's strategy

description [found at another source], which is so basic that it suggests that the founder doesn't

really understand the costs of the option strategy." Cutler also noted with regard to Madoff's

purported option counterparties, "I just can't find the other side of the trade."

207.    Upon the completion of his due diligence and analysis, Cutler came to the

conclusion that BLMIS certainly did not meet his standards and that Access should exit all of its

investments with BLMIS. Cutler was not asked to produce a formal report or to put his findings

in writing, despite having done so in the past when advising the Access Defendants with regard

to other investments.

208.    Cutler conveyed his conclusions in an oral report given to Access's inner circle.

In late April or early May 2006, Cutler attended a lunch meeting at the University Club in New

York. Present at the meeting were Littaye, Villehuchet, Dumbauld and Chantal Lanchon, a long-

time, trusted adviser to Littaye and Villehuchet who did work for Access from time to time.

Cutler conveyed his conclusion at this meeting that Access should exit BLMIS and concentrate

on building other aspects of its business.

209.    As he was conveying his conclusion, Cutler was interrupted by Littaye, who said

that he questioned Cutler's "business judgment" given that the Access Defendants' BLMIS

business was "going well," while the other parts of the Access Defendants' business were not

going well. Chantal Lanchon then declared her view that Cutler's conclusions could not be

correct because, she claimed, BLMIS was audited on a regular basis by the SEC and FINRA, and

that there could not possibly be a problem. Littaye thus considered the subject closed.

210.    On May 9, 2006, Cutler sent an e-mail to Dumbauld concerning the University

Club lunch which stated in relevant part:

> Ted, I did my best to inject doubt in a courteous yet effective manner. I would actually like to follow up with Patrick via phone.

On May 10, 2006, Dumbauld replied:

> I believe you handled the lunch perfectly. As you could tell, Patrick is highly sensitive and defensive of the situation. We have not had a chance to discuss post lunch; I will give you some feedback when I have it. I will also let you know about a call with Patrick.

211. There was never any follow-up conversation between Dumbauld and any of Littaye, Villehuchet, or Lanchon. Cutler was never given any feedback on the evidence of fraud that he had so easily identified.

212. Cutler's findings were not shared with anyone else at the Access Defendants, including its research and marketing staff. In his Rule 2004 Bankruptcy examination, Cutler testified that it was "understood" that his conclusion would not be shared beyond the individuals at the University Club lunch meeting.

213. On May 12, 2006, the Access Products Committee held a meeting that was attended by, among others, Littaye, Villehuchet, Dumbauld, and Lanchon. The minutes from that meeting state:

> As a result of the conversations we had recently with various sources, it was decided we need to add additional disclosures to the monthly report describing monthly portfolio movements. **The disclosure needs to make clear that AIA is dependent on the information provided to us by BMI and that we do not validate the accuracy of that information.** (Emphasis added.)

### 3.    BLMIS Purported to Trade Equities and Options Outside the Daily Reported Price Range

214. BLMIS trade confirmations showed the prices for every purported purchase and sale of stocks and options. The Luxalpha and Groupement Financier BLMIS trade confirmations showed many trades executed outside the daily price range.

215.    Over the lifetime of these accounts, there were no fewer than 100 instances where BLMIS purported to execute an equity trade at a price that fell outside the publicly reported daily price range.  These 100 impossibly priced transactions represented more than 4.8 million shares of stock.

216.    For example, Luxalpha's account statements and trade confirmations report the sale of 127,275 shares of Merck on December 22, 2006.  Groupement Financier's account statements and trade confirmations also report the sale of 20,953 shares of Merck on December 22, 2006.  The account statements reflect that these shares were sold for $44.61.  This was impossible given that the actual price range for Merck on December 22, 2006 ranged from $42.78 to $43.42.

217.    Even one such instance should have been sufficient to reveal the existence of a fraud.  Both the Access Defendants and the UBS Defendants, who each received and reviewed copies of BLMIS's trade confirmations for Luxalpha and Groupement Financier, were aware of these impossibilities.

218.    As Luxalpha and Groupement Financier's investment advisor and Groupement Financier's investment manager, the Access Defendants were, among other things, required to "keep the net assets of the Fund[s] under surveillance and constant review; carry out reviews and controls of the portfolio" and "assist the Fund[s] in obtaining necessary information to determine the net asset value of the sub-funds."

219.    As Luxalpha and Groupement Financier's administrator, UBSFSL's primary duty was to calculate the NAV of the fund.  In so doing, UBSFSL was aware of specific instances in which trade information from BLMIS was in direct conflict with prices reported in Bloomberg and understood that BLMIS's trades at such prices were impossible.

220.    Under their respective management agreements with Luxalpha, UBS SA and

UBSTPM were responsible for managing the fund's assets.  Thus, the UBS Defendants, who

received and analyzed BLMIS reported trade data and customer statements, were well aware of

trades executed outside the daily price range and understood that such trades were impossible.

### 4.    BLMIS's Time Slicing Success Was Statistically Impossible

221.    Madoff claimed that he was time slicing, i.e., entering the market at different

times throughout a trading day—and that the equity price reported on an account statement

reflected the average price.  When Madoff claimed to be purchasing equities, the reported

average price was almost always in the lower half of the daily trade range; when he claimed to be

selling equities, the sale price was almost always in the upper half of the daily trade range.

222.    Over the lifetime of the Luxalpha and Groupement Financier accounts, BLMIS

account statements and trade confirmations disclose that 83.5% of 6,790 (reported) stock

purchases occurred below the volume-weighted average price and 74.8% of 6,131 (reported)

stock sales occurred above the volume-weighted average price.  The Access Defendants, as well

as the UBS Defendants possessed clear evidence that the frequency with which BLMIS

purported to trade at the optimal price point was statistically impossible.

223.    Within Access, there was skepticism that Madoff could legitimately achieve the

consistent returns he reported through the SSC strategy. The Access Defendants suspected that

Madoff was engaging in illegal frontrunning (i.e., trading ahead of other customers' orders) or

was otherwise illicitly using his market-making operation for insight as to when the market

would move.

224.    Ultimately, Littaye quashed the Access Defendants' concerns regarding Madoff's

suspected market-timing edge.   Littaye reported to the rest of Access that BLMIS had three

models – short, middle and long-term models of the market – that Madoff used in making

57

decisions of when to enter and exit the market. Access's research staff, including Wogsberg, was never provided with any detail concerning these purported models, and the Access Defendants accepted them as an explanation of Madoff's market-timing ability. The notion of short, middle, and long-term market models made no sense, especially because Madoff purported to move customer funds out of the market at quarter-end and into the market at the beginning of each quarter, regardless of the market's prevailing performance.

### 5.     The Dividend Activity Reported on Luxalpha and Groupement Financier's Customer Statements Was Impossible

225.    During the period that BLMIS's IA Business was purportedly out of the market, BLMIS claimed to invest in U.S. Treasury Bills, including the Fidelity Spartan U.S. Treasury Money Market Fund (the "Fidelity Fund"). BLMIS purported to do so notwithstanding the fact that this fund changed its name in August 2005. Nevertheless, from the end of that year until Madoff's arrest, Luxalpha's and Groupement Financier's account statements continued to show transactions with a fund that no longer existed under that name.

226.    The Fidelity Fund and its successor issues dividend payments once a month at either the end or beginning of the month. During Luxalpha and Groupement Financier's investment with BLMIS, neither the Fidelity Fund nor its successor ever deviated from this payment schedule.

227.    Luxalpha and Groupement Financier's customer statements and trade confirmations, in more than sixty percent of months in which money market dividends were paid, show multiple dividend payments in the same month—even though the money market funds at issue paid dividends only once a month.

228.     Even where account statements show single monthly payments, they are issued on the wrong date.  In total, ninety-nine percent of the money market payments purportedly received were impossible.

**C.     In Addition to Being Aware of Objective Evidence of Fraud, the UBS Defendants and the Access Defendants Were Presented With Myriad Subjective Indicia of Fraud**

229.     In addition to objective trading impossibilities, Defendants saw and recognized myriad indicia of fraud.  Coupled with the objective evidence, this overwhelmingly demonstrated that BLMIS was a fraudulent operation.

### 1.     Luxalpha's and Groupement Financier's Account Statements Demonstrated That Madoff Was Not Implementing the SSC Strategy

230.     Various SEC reporting requirements are triggered when securities are invested in the market at either the end of the quarter or the end of the year.  To evade these reporting requirements, Madoff purported to liquidate all investments at those times, and invest the proceeds in Treasury Bills.  Luxalpha's and Groupement Financier's account statements reflected this practice.

231.     Madoff's exiting the market according to the calendar, rather than based on market or economic indicators is strong evidence of fraud.  The Defendants knew that Madoff touted "market timing" as a cornerstone of the SSC strategy and that Madoff's practice of liquidating all stocks and options at quarter- and year-end contravened that strategy because it meant that Madoff was locked into whatever market conditions existed at those times, regardless of whether they were favorable.  Such trading circumstances were inconsistent with the SSC strategy, which was purportedly based on long positions hedged by options contracts subject to expiration.

59

232.    In addition, Luxalpha's and Groupement Financier's account statements showed the purchase and sale of options to generate short-term gains. These speculative options trades on behalf of Luxalpha and Groupement Financier often showed significant gains, but they were high-risk, short-term gains that were wholly inconsistent with the SSC strategy.

233.    For example, in 2008, Luxalpha and Groupement Financier each participated in two of these trades, which generated gains of approximately $17.5 million and $4.7 million, respectively. These gains were purportedly achieved through highly risky speculation in the options market, which would contradict the inherently conservative premise of the SSC strategy. Between 2003 and 2008, Luxalpha and Groupement Financier together benefitted in excess of $30 million from such trades.

234.    BLMIS customer statements regularly reflected "unbalanced hedges," in which the basket of equities purportedly purchased for customers did not correspond to the hedge. An unbalanced hedge occurs where, for example, certain equities in a basket are sold, but there is no corresponding adjustment to the options collar. Such an unbalanced hedge creates potentially significant exposure to losses because the value of the basket and the corresponding options positions no longer match, reducing the potential gain and leaving the customer exposed to potential losses.

235.    For example, Luxalpha's account statements indicate that on May 16, 2007, BLMIS purported to purchase a basket of S&P 100 Index stocks that included shares of 3M Company. The shares of 3M Company were sold on May 21, 2007 whereas the other equities contained in the basket were not sold until June 21, 2007. In light of the early sale of the 3M shares, the corresponding options collar should have been rebalanced to protect against exposure

to market risk.  No such adjustment was reflected in the customer statements or trade

confirmations.

**2.    Madoff's Claims to Trade Options in the Over-the-Counter Market Were False**

236.    When confronted with questions concerning his options trading practices, Madoff

sometimes claimed to be trading options on the over-the-counter market (the "OTC"), for which

volumes of trades are not publicly reported.  To sophisticated financial entities like the UBS

Defendants and the Access Defendants, such an explanation could only be a lie.  Luxalpha's and

Groupement Financier's trade confirmations indicated the purchase of OEX Options and

included a unique identifier, known as a "CUSIP" number.  The CUSIP number allows traders to

quickly access information regarding a particular transaction.  An OEX Option would have a

CUSIP number only if were traded on the CBOE.  Any explanation referring to OTC trading was

therefore objectively false and a clear indication of fraud.

237.    Even Madoff's claims to be trading over the OTC were to be taken at face value,

trading OTC options also would have required BLMIS to enter into private contracts with willing

counterparties.  BLMIS purportedly entered into those options contracts as an agent on behalf of

BLMIS's IA Business customers, such as Luxalpha and Groupement Financier.  Had those

theoretical counterparties defaulted on those contracts, BLMIS's IA Business customers,

including Luxalpha and Groupement Financier, would have been exposed to substantial losses.

Had a counterparty failed to perform, it was Luxalpha and Groupement Financier—not

BLMIS—that would have suffered the loss.

238.    Madoff refused to identify the counterparties, claiming he had to prevent his

customers from dealing directly with the counterparties, and that the names of parties were

"proprietary."  The Defendants never reviewed, commented, modified, negotiated, or rejected

61

any form of draft or final counterparty agreement or OTC transaction confirmation.  Indeed, the

Defendants never knew the identities of these options counterparties due to Madoff's refusal to

identify counterparties that did not exist.

239.    The Defendants, who were sophisticated, financially savvy professionals,

recognized that Luxalpha and Groupement Financier had hundreds of millions of dollars in

counterparty exposure, yet they had no idea whether the counterparties were reliable, well

capitalized and liquid, or whom they would pursue in the event of a default.  The Defendants

were concerned about their lack of knowledge and recognized Madoff's secrecy about his

counterparties as a badge of fraud.

240.    Starting in February 2006, and continuing through at least the fall of that year,

representatives from Access's client, a Swiss private bank, demanded an explanation for how the

purported trades could be taking place at the volume Madoff represented and who the purported

counterparties for those trades were.  Access repeatedly failed to provide any explanation, and by

October 2006, the representatives of the Swiss private bank decided to contact BLMIS directly

for an answer.

241.    The inquiry from the Swiss private bank prompted Madoff to call Littaye at

Access.  Littaye's notes of that call indicate that Madoff stated he would not identify the

counterparties for the options trades unless there was a default, and that there was no risk

because the options were part of "portfolio assurance programs."  Littaye's notes further indicate

that he had never heard of a "portfolio assurance program" and had no idea what such a program

was.

242.    Littaye then conveyed Madoff's response to the Swiss private bank.  In notes and

emails, the bank observed that Littaye "did not understand the reply from Madoff and was unable

to elaborate," and that Littaye's explanation was "not very credible." Villehuchet also called an employee of the Swiss bank and asked that he not send any more inquiries directly to Madoff.

243.     The UBS Defendants were also aware of problems regarding BLMIS's purported option counterparties. As set forth in the SEC Office of Inspector General's report dated August 30, 2009 (the "OIG Report"), the SEC's Enforcement Staff sent a draft document request to UBS's offices in the U.S. on June 16, 2006 in an attempt to verify whether any of UBS's European affiliates served as one of Madoff's purported OTC option counterparties as Madoff had claimed. The OIG Report details that, instead of providing the SEC with a direct answer, UBS's U.S. offices claimed to be unable to access the relevant data from Europe, and informed the SEC's Enforcement Staff that it would have to seek the relevant information directly from Europe. However, the UBS Defendants knew in 2006 that they had never been a counterparty to one of Madoff's trades. Despite being alerted to yet another significant indicia of fraud relating to Madoff's purported trading activity, the UBS Defendants continued to service the BLMIS feeder funds.

244.     Another example of the UBS Defendants' misrepresentations concerning BLMIS's options counterparties can be seen in Risk Approach Memos that were prepared for Luxalpha's auditors. Those memos, which were prepared by UBS SA and sent to the fund's auditors in 2004 and 2006, falsely state that the option counterparties are approved by UBS AG as promoter of Luxalpha. In reality, no such counterparties were ever identified to, or approved by, UBS AG.

### 3. Luxalpha and Groupement Financier Regularly Had Negative Cash Balances With BLMIS

245.    On at least twenty-five occasions, for a total of 64 days, Luxalpha's cash balance with BLMIS had a negative value.  When the Luxalpha cash balance was negative, its average negative cash balance was $8,825,154.

246.    On at least forty occasions, for a total of 112 days, Groupement Financier's cash balance with BLMIS had a negative value.  When the Groupement Financier cash balance was negative, its average negative cash balance was $3,370,627.

247.    For example, on March 3, 2006, Littaye sent a fax to BLMIS requesting a $16,000,000 withdrawal from Groupement Financier's account.  The request from Littaye asked that securities be redeemed to fund the withdrawal.  On March 8, 2006, BLMIS issued a $16,000,000 wire to Groupement Financier's account at the Bank of Bermuda.

248.    The account statements sent to and reviewed by the Access Defendants and UBS Defendants show that as of the time of Littaye's request, the cash balance at the beginning of the month in Groupement Financier's BLMIS account was $0.88, no securities were redeemed prior to the withdrawal, and that after the withdrawal the account cash balance was negative $15,435,156.36 and was not returned to a positive balance until March 16, 2006, when equities and call options were sold.

249.    UBSFSL, as the administrator to not only Luxalpha and Groupement Financier but also to Luxembourg Investment Fund–U.S. Equity Plus, another BLMIS feeder fund, tracked the funds' cash balance, and noted that, from time to time, the funds had a negative cash balance. For example, in July 2006, UBSFSL recognized that a fund had been in an "overdraft position" for several weeks, and attempted to obtain an explanation for that "leverage situation."

250.    In another example, on July 1, 2004, employees of UBS SA sent a fax to BLMIS

requesting a $4,000,000 withdrawal from Luxalpha's account.  On July 6, 2004, BLMIS issued a

$4,000,000 wire to Luxalpha's account at UBS AG in Stamford, Connecticut.  The account

statements sent to and reviewed by the Access Defendants and UBS Defendants showed that as

of the time of the request, the cash balance in Luxalpha's BLMIS account was $0.47.

Accordingly, after the withdrawal. the account cash balance was negative $3,952,257.79.  The

account was not returned to a positive balance until July 12, 2004, when Treasury Bills were

purportedly sold.

251.    BLMIS was therefore purporting to provide Luxalpha and Groupement Financier

with millions of dollars of interest-free loans for days at a time.

252.    As Luxalpha and Groupement Financier did not have margin accounts with

BLMIS, neither fund could have traded on credit.  As Defendants knew, no legitimate broker-

dealer would have advanced the funds millions of dollars at zero interest under these

circumstances.

### 4.    BLMIS Provided Delayed Paper-Only Customer Statements

253.    The Access Defendants knew that the trade confirmations received from BLMIS

were only in a hard copy, paper format and were delayed because they were sent via regular mail

service, sometimes several days after the purported trade.  The Access Defendants knew it was

"abnormal" in the mid-2000s not to have more prompt, electronic access to such information.

254.    Of all the funds whose investment portfolios the Access Defendants managed,

BLMIS was the lone investment for which Access did not have immediate or next-day

transparency, either through website access or next-day batch reports.

255.    As a result of BLMIS's delays in providing trade information, AML provided

UBS SA with "backdated monthly investment recommendation[s]" for Luxalpha, a practice that

UBS SA endorsed in the October 16, 2008 Luxalpha Operating Memorandum. This backdating

procedure was made necessary and put in place to accommodate BLMIS's delayed, hard copy

reporting of its purported trades.

256.    The UBS Defendants repeatedly asked Madoff for electronic trade and transfer

information, but were rebuffed on multiple occasions.  In a January 13, 2006 email, a UBS SA

managing director stated: "Unfortunately although we submitted this request [for electronic data]

on several times the answer remains still no."  Despite having their requests for electronic

account access rebuffed, the UBS Defendants were undeterred from continuing to facilitate

investment with BLMIS.

> **5.    Madoff's "Strip Mall" Auditor Was Not Qualified or Capable of
> Auditing a Global Investment Management Company with Billions of
> Dollars Under Management**

257.    The Defendants knew that BLMIS's auditor was neither legitimate, nor

independent, nor reasonably capable of performing the required domestic and international

auditing functions for BLMIS.  BLMIS, which purported to have tens of billions of dollars under

management, was audited not by a major firm, but by Friehling & Horowitz, a three-person

accounting "firm," located in a strip mall in Rockland County, New York.  Of the firm's three

employees, one was an administrative assistant, another was semi-retired and living in Florida.

258.    As sophisticated market participants, the Defendants knew that all accounting

firms that perform audit work must enroll in the peer review program of the American Institute

of Certified Public Accountants ("AICPA"), and those that do are listed on the public area of the

AICPA website.  Although it held itself out as a member of AICPA, Friehling & Horowitz had

avoided peer review since 1993 by representing that it did not perform any audit work and,

therefore, was not listed AICPA's public peer review list.  With billions of dollars under

management, BLMIS's use of a small, ill-equipped auditor like Friehling & Horowitz was a clear indicia of fraud.

259.    The Access Defendants knew that BLMIS was using a small, unknown auditing firm for the reports it filed with the SEC and provided to investors. They expressed concern after preliminary research on Friehling & Horowitz, but quashed any further inquiry.

260.    Access was aware that Friehling & Horowitz was incapable of providing large-scale and international auditing services to BLMIS and the billions it had under management.

### 6.    Madoff's Unusual Fee Structure

261.    BLMIS did not charge investors any traditional management or performance fees, which were standard in the hedge fund industry. Madoff was purportedly satisfied with simply charging BLMIS's IA Business customers $1 per option contract and $0.04 per equity share traded. The standard investment advisory fee charged by a hedge fund manager ranges from 1% to 2% of assets under management plus a performance fee of 10% to 20% of any profits earned by the investment. Fees normally run higher for investment advisers with a history of success. Compared with industry practice, this fee structure had Madoff leaving hundreds of millions, if not billions, of dollars on the table. As UBS O'Connor had previously recognized as a reason to spurn investments with BLMIS, the "simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter." BLMIS allowed investment funds, their managers, and advisers to collect those lucrative fees for themselves.

262.    Other industry professionals realized that BLMIS's highly unusual fee structure was a serious warning sign. The Defendants, however, having already invested millions of dollars of their clients' funds in BLMIS feeder funds, knowingly ignored this evidence of fraud.

### 7.    Lack of an Independent, Disclosed Custodian

263.    The UBS Defendants knew that the lack of an independent, disclosed custodian

for the assets invested with BLMIS violated UBS's compliance procedures, but decided to

establish Luxalpha anyway.

264.    The Access Defendants also knew that the Feeder Fund Defendants did not have

an independent custodian for the funds' assets and that the assets were not being independently

verified.

### 8.    Madoff's Insistence on Secrecy

265.    Madoff's insisted that his name not appear in any official offering document

relating to the Feeder Fund Defendants.  The Access Defendants acquiesced to that request even

when the absence of his name from such documents would violate applicable laws.

266.    Madoff's name was not allowed to appear as the custody broker or the manager

for any fund.  The Feeder Fund Defendants' offering documents reflected only that an Access

entity was the fund manager.  The documents omitted references to the Access entities acting in

other capacities.

267.    In 2000 Access instructed that "BMI should not appear in any official document."

In a 2004 document, Littaye wrote, "[w]e underline the confidentiality of the product and insist

on the fact that BM name must never be published."

268.    During a May 10, 2006 lunch, Madoff asked Littaye if his name was mentioned in

Luxalpha's prospectus.  In his notes on the meeting, Littaye wrote that he assured Madoff that

"by no means" did his name appear in the prospectus—for which Madoff expressed relief.

269.    The UBS Defendants also complied with Madoff's demand for secrecy.  In

addition to omitting Madoff's name from Luxalpha's offering documents and the Control Report

on custodian bank functions submitted to the CSSF, UBS SA also took steps to remove all

references to Madoff from Luxalpha audit reports, prepared by Ernst & Young. Ernst & Young agreed to remove Madoff's name from its reports after "very long discussions on the subject" with a UBS SA executive. That same executive later cautioned another UBS SA executive that "[o]ne has to be careful about everything" when it comes to ensuring Madoff's name remains undisclosed. UBS SA chose to risk regulatory and legal sanctions rather than jeopardize its lucrative relationship with BLMIS.

**9.    Lack of Scalability**

270.    In connection with financial markets, scalability refers to an investment strategy's ability to handle higher trading volumes or growing assets under management. As a fund grows, and its assets under management increase, it becomes more difficult for the fund to find opportunities of a scale in proportion to the fund's size.

271.    The SSC strategy was not scalable for the amount of BLMIS's purported assets under management. Even before the creation of Luxalpha and Groupement Financier, the Access Defendants and UBS SA knew that BLMIS purportedly held more than $10 billion of assets under management. To execute the SSC strategy with at least $10 billion of assets under management, BLMIS would need $10 billion of notional value in call options.

272.    By 2006, BLMIS began publicly disclosing its assets under management in Form ADV's filed with the SEC, reporting that its assets under management was approximately $11.7 billion as of July 2006, $13.2 billion as of December 2006, and $17.1 billion as of December 2007. The Access Defendants and UBS SA reviewed BLMIS's filings.

273.    Between 2000 and 2008, there was no time when there were enough options on the listed market to implement Madoff's purported SSC strategy.

10. **BLMIS's Trade Confirmations Frequently Contained Settlement Anomalies in Purported Options Transactions**

274.     According to industry standards, the settlement date for exchange-listed options is the business day following the trade date, referred to as "T+1."   Trade confirmations produced by BLMIS and sent to the UBS Defendants and the Access Defendants regularly showed options transactions that settled more than one day after execution. All of the options trade confirms showed CBOE-traded OEX Options, which would have been subject to the T+1 settlement date.

275.     Approximately 51% of Luxalpha's, and 48% of Groupement Financier's purported options transactions settled at least three business day after execution and therefore did not comply with standard market practices.

## IMPUTATION OF KNOWLEDGE FROM THE UBS DEFENDANTS AND ACCESS DEFENDANTS TO LUXALPHA AND GROUPEMENT FINANCIER

276.     At all times, the UBS Defendants and the Access Defendants dominated and controlled Luxalpha and Groupement Financier.  Neither Luxalpha nor Groupement Financier ever had any employees or independent office space.  Rather, the UBS Defendants and Access Defendants operated the funds as joint business ventures.

277.     The UBS Defendants and Access Defendants created Luxalpha.  The UBS Defendants served as official sponsor, custodian, administrator, and manager of Luxalpha, while the Access Defendants served in official advisory and managerial roles.  Both the Access Defendants and UBS Defendants received Luxalpha's BLMIS account statements and trade confirmations.  Luxalpha's board of directors was at all times composed of UBS SA and Access principals.

278.     Likewise, the Access Defendants created Groupement Financier.  The UBS Defendants served as the official prime bank and administrator of Groupement Financier, while the Access Defendants served in official management and advisory roles.  Both the Access

Defendants and the UBS Defendants received Groupement Financier's BLMIS account

statements and trade confirmations.   The board of directors of Groupement Financier was at all

times composed of Access founders Littaye and Villehuchet.

279.    The UBS Defendants and the Access Defendants were the agents of Luxalpha and

Groupement Financier, and their conduct and/or direct knowledge of fraud at BLMIS is imputed

to these two funds.

## THE TRANSFERS

**A.    The Initial Transfers**

280.    Prior to the Filing Date, the Feeder Fund Defendants – Luxalpha and Groupement

Financier – maintained two accounts, 1FR108 and 1FR096, respectively (collectively, the

"Accounts"), as set forth on Exhibit A.  For each account, the respective Feeder Fund Defendant

executed, or caused to be executed, a Customer Agreement, an Option Agreement, and/or a

Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, as

previously defined, the "BLMIS Account Opening Agreements"), and delivered such documents,

or caused them to be delivered, to BLMIS at BLMIS's headquarters at 885 Third Avenue, New

York, New York.

281.    The BLMIS Account Opening Agreements were to be performed in New York,

New York through securities trading activities that would take place in New York, New York.

The Accounts were held in New York, New York and the Feeder Fund Defendants sent funds to

BLMIS and/or to the 703 Account in New York, New York for application to the Accounts and

the purported conducting of trading activities.

282.    The Feeder Fund Defendants collectively invested approximately $2 billion with

BLMIS through more than 150 separate transfers via check and wire directly into the 703

Account at JPMorgan Chase in New York, New York.

283.    During the six years preceding the Filing Date, BLMIS made transfers to the Feeder Fund Defendants in the collective amount of at least $1.1 billion (the "Six Year Initial Transfers"). The Six Year Initial Transfers include transfers of approximately $752 million to Defendant Luxalpha (the "Luxalpha Six Year Initial Transfers") and $352 million to Defendant Groupement Financier (the "Groupement Six Year Initial Transfers"). Each of the Six Year Initial Transfers is avoidable under § 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3). Each of the Six Year Initial Transfers is recoverable under § 550(a)(1) of the Bankruptcy Code, and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 278 and 279, and of SIPA, particularly § 78fff-2(c)(3). The Feeder Fund Defendants received each of the Six Year Initial Transfers with knowledge of fraud at BLMIS.

284.    The Six Year Initial Transfers include approximately $1.01 billion which BLMIS transferred to the Feeder Fund Defendants during the two years preceding the Filing Date (the "Two Year Initial Transfers"). The Two Year Initial Transfers included transfers of approximately $735 million to Luxalpha (the "Luxalpha Two Year Initial Transfers") and approximately $275 million to Groupement Financier (the "Groupement Two Year Initial Transfers"). Each of the Two Year Initial Transfers is avoidable under § 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3). Each of the Two Year Initial Transfers is recoverable under § 550(a)(1) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3). The Feeder Fund Defendants received each of the Two Year Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

285.    The Six Year Initial Transfers and Two Year Initial Transfers are collectively referred to herein as "Initial Transfers."

286.    Charts setting forth the Initial Transfers are included as Exhibits B and C.

287.    The Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

**B.     The Subsequent Transfers**

288.    Based on the Trustee's investigation to date, Feeder Fund Defendants Luxalpha and Groupement Financier subsequently transferred some of the Initial Transfers to the Access Defendants and the UBS Defendants (collectively, the "Subsequent Transferee Defendants") as payment for their alleged service of the Feeder Fund Defendants, which in reality were being managed by BLMIS.  In addition, some of the Initial Transfers to Groupement Financier were subsequently transferred to Groupement Levered.  Groupement Levered then further subsequently transferred the Initial Transfers to the Subsequent Transferee Defendants.  All of these payments from the Feeder Fund Defendants constitute subsequent transfers of the Initial Transfers from BLMIS to the Feeder Fund Defendants.  All avoidable transfers from BLMIS to the Feeder Fund Defendants, which the Feeder Fund Defendants subsequently transferred, either directly or indirectly, to the Subsequent Transferee Defendants (collectively, the "Subsequent Transfers"), are recoverable from the Subsequent Transferee Defendants by the Trustee under § 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

289.    Based on the Trustee's investigation to date, the UBS Defendants received at least $97 million in Subsequent Transfers, including but not limited to:

>    a.    UBS SA received at least $32.8 million in fees from Luxalpha for serving as the official custodian and official manager of Luxalpha from February 2004 to August 2006, and an additional $6.6 million in fees from

Luxalpha for serving as the official custodian of Luxalpha from August 2006 to December 2008. UBS SA also received at least $1 million in fees from Groupement Financier for serving as the official prime bank of Groupement Financier from 2005 to December 2008, and at least $500,000 in fees from Groupement Levered for serving as the official custodian of Groupement Levered from 2005 to December 2008.

b.     UBSFSL received at least $2.5 million in fees from Luxalpha for serving as the official administrator of Luxalpha from February 2004 to December 2008. UBSFSL also received at least $497,000 from Groupement Financier for serving as the official administrator of Groupement and Groupement Levered from 2005 to December 2008.

c.     UBSTPM received at least $53.3 million in fees from Luxalpha for serving as the official manager of Luxalpha from August 2006 to November 2008.

d.     UBS AG received at least $4.2 million in recoverable Subsequent Transfers from 2004 through 2008, in the form of dividends paid by UBS SA and UBSFSL, which were comprised, in part, of fee amounts received from Luxalpha, Groupement Financier, and Groupement Levered. UBS SA paid dividends to corporate parent UBS AG in 2004, 2006, 2007, and 2008, and UBSFSL paid dividends to corporate parent UBS AG in each year from 2004 to 2008, all of which were based upon revenues received by UBS SA and UBSFSL.

290.   Based on the Trustee's investigation to date, the Access Defendants AIA Ltd.,

AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) received at least $100.6 million in Subsequent

Transfers, including but not limited to:

a.     AIA Ltd. received at least $25.4 million in fees from February from UBS SA pursuant to a February 5, 2004 "Consulting and Exclusive Introducing Agreement," which consisted of fees received by UBS SA from Luxalpha for serving as Luxalpha's official manager. AIA Ltd. also received at least $28.5 million in fees from UBSTPM under an August 1, 2006 "Client Introducer Agreement," which consisted of fees received by UBSTPM from Luxalpha for serving as Luxalpha's official manager. AIA Ltd. further received at least $15 million in fees from Groupement Financier for serving as the official manager of Groupement Financier from 2003 to December 2008, and received at least $400,000 in fees for serving as the official manager of Groupement Levered from 2003 to December 2008.

b.     AIA LLC received at least $189,000 in fees from UBS SA in connection with its role as official portfolio advisor to Luxalpha from August 2004 to

August 2006, which consisted of fees received by UBS SA for serving as Luxalpha's official manager.

c.  AP (Lux) received at least $17.8 million in fees from UBSTPM for serving as the investment advisor to Luxalpha from 2007 to December 2008, consisting of fees received by UBSTPM from Luxalpha for serving as Luxalpha's official manager.  AP (Lux) also received at least $8.4 million in fees from Groupement Financier for serving as the official investment advisor to Groupement Financier from 2007 to December 2008, and received an additional $2.5 million in fees from Groupement Levered for serving as the official investment advisor to Groupement Levered from 2007 to December 2008.

d.  AML (f/k/a AIA (Lux)) received at least $2.4 million in fees from Groupement Financier for serving as the investment advisor to Groupement Financier from 2003 to 2007, and received at least $50,000 for serving as the investment advisor to Groupement Levered from 2003 to 2007.  In addition, AML (f/k/a AIA (Lux)) received fees from UBS SA in connection with its role as official portfolio advisor to Luxalpha from February 2004 to August 2004, which consisted of fees received by UBS SA from Luxalpha for serving as Luxalpha's official manager, in an amount to be proven at trial.

291.    Based on the Trustee's investigation to date, Access Defendants Littaye, Villehuchet and Ms. Villehuchet, received millions of dollars of Subsequent Transfers, in an amount to be proven at trial.  At all relevant times, each of AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) was either completely or nearly-completely owned by Littaye and Villehuchet.  At various times, each of Littaye and Villehuchet also served as directors of AIA Ltd., AP (Lux), and AML (f/k/a AP (Lux)).  A significant amount of the Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to Littaye and Villehuchet, either directly or indirectly, in the form of distributions, payments, or other transfers of value.  Among other transfers, Villehuchet received $6.5 million in compensation paid from bank accounts controlled by Access's New York office from 2004 through 2008, and, upon information and belief, his co-owner Littaye received at least the same amount of compensation paid from other Access-controlled bank accounts.  The transfers

received by Villehuchet are recoverable from Ms. Villehuchet, as the executrix and sole

beneficiary under the will of Villehuchet.

292.    Access Defendant Delandmeter received approximately $350,000 in Subsequent

Transfers from Luxalpha, in connection with Delandmeter's purported provision of legal services

to Luxalpha.  Delandmeter also received Subsequent Transfers from Groupement Financier in

connection with Delandmeter's purported provision of legal services to Groupement Financier,

in an amount to be proven at trial.  Upon information and belief, a portion of the Luxalpha,

Groupement Financier, and Groupement Levered-related Subsequent Transfers received by AIA

Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to

Delandmeter, directly or indirectly, in compensation for Luxalpha, Groupement Financier and

Groupement Levered-related services Delandmeter provided to Access, in an amount to be

proven at trial.

293.    Based on the Trustee's investigation to date,  a portion of the Luxalpha,

Groupement Financier, and Groupement Levered-related Subsequent Transfers received by AIA

Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to Access

Defendant Dumbauld, in an amount to be proven at trial.  At minimum, Dumbauld received

$1.25 million in compensation paid from bank accounts controlled by Access's New York office

from 2004 through 2007.  Dumbauld received these transfers as distributions, payments, or other

transfers of value in connection with his role as Access partner and Chief Investment Officer.

294.    The Subsequent Transferee Defendants received each of the Subsequent Transfers

with actual knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting

a high probability of fraud at BLMIS.

295.    To the extent that any of the avoidance and recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

296.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Initial Transfers, the Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

297.    The following chart summarizes the Initial Transfers and the Subsequent Transfers:

**[This Space Intentionally Left Blank]**



# Transfers from BLMIS to Defendants

## CUSTOMER CLAIMS

298.    On or about March 2, 2009, Defendant Luxalpha filed a customer claim with the Trustee that the Trustee has designated as Claim No. 004419.   On March 3, 2009, Defendant Luxalpha filed another customer claim with the Trustee that the Trustee has designated as Claim No. 005725.   These two claims, which are duplicative of each other, were signed by two of Luxalpha's directors, Ralf Schroeter and Alan Hondequin, and both claim the same amount of $1,537,099,731.  In addition, on or about March 2, 2009, Defendant UBS SA filed an additional customer claim on behalf of Luxalpha with the Trustee, which the Trustee has designated as Claim No. 005025.   These three customer claims are referred to herein as the "Customer Claims."  The Trustee is seeking to have these claims disallowed and/or equitably subordinated.

## COUNT ONE
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
## 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551

### *Against The Feeder Fund Defendants*

299.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully realleged herein.

300.    Each of the Two Year Initial Transfers were made on or within two years before the Filing Date.

301.    Each of the Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and 15 U.S.C. § 78fff-2(c)(3).

302.    Each of the Two Year Initial Transfers were made by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Two Year Initial Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

303.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable

by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from

the Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and  applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

304.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A),

550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to

a judgment against the Feeder Fund Defendants:  (a) avoiding and preserving the Two Year

Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside; (c) recovering the

Two Year Initial Transfers or the value thereof, for the benefit of the estate of BLMIS; (d)

directing the Feeder Fund Defendants, to the extent allowable by law, to disgorge to the Trustee

all profits, including any and all compensation and/or remuneration received by the Feeder Fund

Defendants related to or arising from, or concerning the Two Year Initial Transfers from BLMIS

to the Feeder Fund Defendants; (e) disallowing any claim that the Feeder Fund Defendants may

have against the Debtors until such time as the Two Year Initial Transfers are repaid to the

Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other

relief the Court deems just and appropriate.

## COUNT TWO
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
## 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), AND 551

### *Against The Feeder Fund Defendants*

305.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully realleged herein.

306.    Each of the Two Year Initial Transfers were made on or within two years before

the Filing Date.

307.    Each of the Two Year Initial Transfers constitutes a transfer of an interest of

BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and 15 U.S.C. §

78fff-2(c)(3).

308.    BLMIS received less than a reasonably equivalent value in exchange for each of

the Two Year Initial Transfers.

309.    At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or

became insolvent as a result of each of the Two Year Initial Transfers.

310.    At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a

business or a transaction, or was about to engage in a business or a transaction, for which any

property remaining with BLMIS was an unreasonably small capital.

311.    At the time of each of the Two Year Initial Transfers, BLMIS intended to incur,

or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts

matured.

312.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable

by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the

Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

313.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(B),

550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to

a judgment against the Feeder Fund Defendants:  (a) avoiding and preserving the Two Year

Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; (c) recovering the

Two Year Initial Transfers, or the value thereof, for the benefit of the estate of BLMIS; (d)

directing the Feeder Fund Defendants, to the extent allowable by law, to disgorge to the Trustee

all profits, including any and all compensation and/or remuneration received by the Feeder Fund

Defendants related to or arising from, or concerning the Two Year Initial Transfers from BLMIS

to the Feeder Fund Defendants; (e) disallowing any claim that the Feeder Fund Defendants may

have against the Debtors until such time as the Two Year Initial Transfers are repaid to the

Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other

relief the Court deems just and appropriate.

## COUNT THREE
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
## NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a,
## 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

### *Against The Feeder Fund Defendants*

314.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully realleged herein.

315.    At all times relevant to the Six Year Initial Transfers, there have been one or more

creditors who have held and still hold matured or unmatured unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under

section 502(e) of the Bankruptcy Code.

316.    Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as

defined under section 270 of the N.Y. Debt. & Cred. Law.

317.    Each of the Six Year Initial Transfers were made by BLMIS and transferees with

the actual intent to hinder, delay or defraud the creditors of BLMIS.  BLMIS made the Six Year

Initial Transfers to or for the benefit of Luxalpha and/or Groupement Financier in furtherance of

a fraudulent investment scheme.

318.    Each of the Six Year Initial Transfers were received by the Feeder Fund

Defendants with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each

of the transfers and/or future creditors of BLMIS.

319.    As a result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of

the N.Y. Debt. & Cred. Law., sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy

Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder

Fund Defendants:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that

the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the

value thereof, for the benefit of the estate of BLMIS; (d)  directing the Feeder Fund Defendants,

to the extent allowable by law, to disgorge to the Trustee all profits, including any and all

compensation and/or remuneration received by the Feeder Fund Defendants related to or arising

from, or concerning the Six Year Initial Transfers from BLMIS to the Feeder Fund Defendants;

(e) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until

such time as the Six Year Initial Transfers are repaid to the Trustee; (f) recovering attorneys' fees

and costs from the Defendants; and (g) awarding any other relief the Court deems just and

appropriate.

## COUNT FOUR
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
## NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
## AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550, AND 551

### *Against The Feeder Fund Defendants*

320.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully realleged herein.

321.    At all times relevant to the Six Year Initial Transfers there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under § 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

322.   Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as defined under section 270 of the N.Y. Debt. & Cred. Law.

323.   BLMIS did not receive fair consideration for the Six Year Initial Transfers.

324.   BLMIS was insolvent at the time it made each of the Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Initial Transfers.

325.   As a result of the foregoing, pursuant to sections 273, 278, and/or 279 of the N.Y. Debt. & Cred. Law., sections 105(a), 502(d), 544(b), 550, and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the value thereof, for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation and/or remuneration received by the Feeder Fund Defendants related to or arising from, or concerning the Six Year Initial Transfers from BLMIS to the Feeder Fund Defendants; (e) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such time as the Six Year Initial Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems just and appropriate.

## COUNT FIVE
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
## NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279,
## AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

### *Against The Feeder Fund Defendants*

326.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully realleged herein.

327.    At all times relevant to the Six Year Transfers there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under section 502 of the Bankruptcy Code or that are not allowable only under § 502(e) of the

Bankruptcy Code.

328.    Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as

defined under section 270 of the N.Y. Debt. & Cred. Law.

329.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

330.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS was

engaged or was about to engage in a business or transaction for which the property remaining in

its hands after each of the Six Year Initial Transfers was an unreasonably small capital.

331.    As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the N.Y.

Debt. & Cred. Law., sections 105(a), 502(d), 544(b), 550(a) and 551 of the Bankruptcy Code,

and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving

the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c)

recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants

for the benefit of the estate of BLMIS; (d)  directing the Feeder Fund Defendants, to the extent

allowable by law, to disgorge to the Trustee all profits, including any and all compensation

and/or remuneration received by the Feeder Fund Defendants related to or arising from, or

concerning the Six Year Initial Transfers from BLMIS to the Feeder Fund Defendants; (e)

disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such

time as the Six Year Initial Transfers are repaid to the Trustee; (f) recovering attorneys' fees and

costs from the Defendants; and (g) awarding any other relief the Court deems just and

appropriate.

**COUNT SIX**
**FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)**
**NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278,**
**AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551**

*Against The Feeder Fund Defendants*

332.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully realleged herein.

333.    At all times relevant to the Six Year Initial Transfers there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under section 502 of the Bankruptcy Code, or that are not allowable only under section 502(e) of

the Bankruptcy Code.

334.    Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as

defined under section 270 of the N.Y. Debt. & Cred. Law.

335.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

336.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS had

incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay

them as the debts matured.

337.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the N.Y.

Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code,

and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving

the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c)

recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants

for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants, to the extent

allowable by law, to disgorge to the Trustee all profits, including any and all compensation

and/or remuneration received by the Feeder Fund Defendants related to or arising from, or

concerning the Six Year Initial Transfers from BLMIS to the Feeder Fund Defendants; (e)

disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such

time as the Six Year Initial Transfers are repaid to the Trustee; (f) recovering attorneys' fees and

costs from the Defendants; and (g) awarding any other relief the Court deems just and

appropriate.

## COUNT SEVEN
## RECOVERY OF SUBSEQUENT TRANSFERS: 11 U.S.C. §§ 105(a) and 550(a)

### *Against The Access Defendants And The UBS Defendants*

338.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully realleged herein.

339.    Each of the Initial Transfers is avoidable under sections 544, 548 and/or 550 of

the Bankruptcy Code.

340.    Each of the Subsequent Transfers is recoverable from the Subsequent Transferee

Defendants under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

341.    Each of the Subsequent Transfers were made directly or indirectly to the

Subsequent Transferee Defendants.

342.    Each of the Subsequent Transfers was received by each of the Subsequent

Transferee Defendants at a time when it had actual knowledge of fraud at BLMIS, or was

willfully blind to facts suggesting a high probability of fraud at BLMIS.

343.     As a result of the foregoing, pursuant to sections 105(a), 502(d), and 550(a) of the

Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the

Subsequent Transferee Defendants: (a) recovering the Subsequent Transfers, or the value

thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS, (b)

directing the Subsequent Transferee Defendants to the extent allowable by law, to disgorge to the

Trustee all profits, including any and all management fees, incentive fees or other compensation

and/or remuneration received by the Subsequent Transferee Defendants related to or arising

from, or concerning the Subsequent Transfers from BLMIS to the Subsequent Transferee

Defendants; (c) disallowing any claim that the Subsequent Transferee Defendants may have

against the Debtors until such time as the Subsequent Transfers are repaid to the Trustee; (d)

recovering attorneys' fees and costs from the Defendants; and (e) awarding any other relief the

Court deems just and appropriate.

## COUNT EIGHT
## OBJECTION TO AND DISALLOWANCE OF CLAIMS

### *Against Luxalpha And UBS SA*

344.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully realleged herein.

345.     Luxalpha and UBS SA were not innocent investors at the time they invested with

BLMIS and provided no consideration to the estate.

346.     Luxalpha and UBS SA acted with actual knowledge of fraudulent activity at

BLMIS at the time they invested with BLMIS.  By their conduct, at the time they invested with

BLMIS, they enabled Madoff to perpetuate the fraud at BLMIS.

347.     Alternatively, Luxalpha and UBS SA were willfully blind to numerous and serious indications of fraudulent activity at BLMIS, as described in this Second Amended Complaint.

348.     As a result of Luxalpha's and UBS SA's conduct, they are not entitled to the protections afforded by SIPA.  Thus, Luxalpha and UBS SA do not have a claim enforceable against the BLMIS estate under SIPA or other applicable law.

349.     As a result of Luxalpha's and UBS SA's conduct, as described above, pursuant to section 502(a) of the Bankruptcy Code and section 78fff-2 of SIPA, the Trustee objects to any and all claims of Luxalpha and UBS SA against the BLMIS estate, which should be disallowed, and not entitled to receive a distribution from the estate pursuant to section 502(b)(1) of the Bankruptcy Code.

**COUNT NINE**
**EQUITABLE DISALLOWANCE OF CLAIMS**

***Against Luxalpha And UBS SA***

350.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully realleged herein.

351.     Luxalpha and UBS SA engaged in and benefited from inequitable conduct and with actual knowledge of fraudulent activity at BLMIS, including the conduct described in this Second Amended Complaint.  By their conduct, they have taken unconscionable advantage of, resulting in injury to, innocent customers and other creditors of the estate.

352.     Based upon Luxalpha's and UBS SA's failure to deal fairly and in good faith, as described above, all customers and other creditors of BLMIS have been injured, including by being (a) misled as to the true financial condition of the debtor; (b) induced to invest with BLMIS without knowledge of BLMIS's financial condition; and (c) hindered and delayed in

recovering the full amounts due to them.  Luxalpha's and UBS SA's conduct further enabled

Madoff to continue the Ponzi scheme.

353.    By submitting their Customer Claims, Luxalpha and UBS SA exchanged their

legal claim for an equitable claim to share pro rata in the estate and submitted to this Court's

equitable jurisdiction.

354.    Luxalpha's and UBS SA's conduct was so egregious that they should not be

allowed to share in any equitable distribution made by the Trustee to innocent customers holding

allowed claims against BLMIS and/or Madoff.

355.    Pursuant to the Court's equitable powers, the Court should exercise the full extent

of its equitable powers to ensure that claims, payments or benefits, of whatever kind or nature,

which are asserted or sought by Luxalpha and UBS SA against the estate, are disallowed.

356.    Equitable disallowance is consistent with the provisions and purposes of the

Bankruptcy Code.

### COUNT TEN
### EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS

#### *Against Luxalpha And UBS SA*

357.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully realleged herein.

358.    Luxalpha and UBS SA engaged in inequitable conduct, including the conduct

described in this Second Amended Complaint.

359.    Based on Luxalpha and UBS SA's inequitable conduct, BLMIS's customers have

been misled as to the true financial condition of BLMIS, and have been induced to invest without

knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and

creditors are less likely to recover the full amounts due to them.

360.    Luxalpha's and UBS SA's conduct enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on Luxalpha and UBS SA.

361.    Prior to the filing date, Luxalpha and UBS SA benefited by the withdrawal of at least $766 million from BLMIS.  But for these withdrawals, there would have been additional customer property available on the Filing Date for distribution.

362.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by Luxalpha and/or UBS SA directly or indirectly against the estate – and only to the extent such claims are allowed – are subordinated for distribution purposes pursuant to sections 510(c) and 105(a) of the Bankruptcy Code to the allowed claims of all other customers and creditors of BLMIS.

363.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

(i)    On the First Claim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside; (c) recovering the Two Year Initial Transfers or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d)  directing the Feeder Fund Defendants, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation and/or remuneration received by the

Feeder Fund Defendants related to or arising from, or concerning the Two Year Initial Transfers from BLMIS to the Feeder Fund Defendants; (e) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such time as the Two Year Initial Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems just and appropriate;

(ii)      On the Second Claim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d)  directing the Feeder Fund Defendants, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation and/or remuneration received by the Feeder Fund Defendants related to or arising from, or concerning the Two Year Initial Transfers from BLMIS to the Feeder Fund Defendants; (e) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such time as the Two Year Initial Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems just and appropriate;

(iii)      On the Third Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; (d)  directing the Feeder Fund

Defendants, to the extent allowable by law, to disgorge to the Trustee all profits, including any

and all compensation and/or remuneration received by the Feeder Fund Defendants related to or

arising from, or concerning the Six Year Initial Transfers from BLMIS to the Feeder Fund

Defendants; (e) disallowing any claim that the Feeder Fund Defendants may have against the

Debtors until such time as the Six Year Initial Transfers are repaid to the Trustee; (f) recovering

attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems

just and appropriate;

(iv)    On the Fourth Claim for Relief, pursuant to sections 273, 278, and/or 279

of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550, and 551 of the Bankruptcy

Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and

preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set

aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund

Defendants for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants, to

the extent allowable by law, to disgorge to the Trustee all profits, including any and all

compensation and/or remuneration received by the Feeder Fund Defendants related to or arising

from, or concerning the Six Year Initial Transfers from BLMIS to the Feeder Fund Defendants;

(e) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until

such time as the Six Year Initial Transfers are repaid to the Trustee; (f) recovering attorneys' fees

and costs from the Defendants; and (g) awarding any other relief the Court deems just and

appropriate;

(v)    On the Fifth Claim for Relief, pursuant to sections 274, 278, and/or 279 of

the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a) and 551 of the Bankruptcy

Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and

preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set

aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund

Defendants for the benefit of the estate of BLMIS; (d)  directing the Feeder Fund Defendants, to

the extent allowable by law, to disgorge to the Trustee all profits, including any and all

compensation and/or remuneration received by the Feeder Fund Defendants related to or arising

from, or concerning the Six Year Initial Transfers from BLMIS to the Feeder Fund Defendants;

(e) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until

such time as the Six Year Initial Transfers are repaid to the Trustee; (f) recovering attorneys' fees

and costs from the Defendants; and (g) awarding any other relief the Court deems just and

appropriate;

        (vi)      On the Sixth Claim for Relief, pursuant to sections 275, 278, and/or 279 of

the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy

Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and

preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set

aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund

Defendants for the benefit of the estate of BLMIS; (d) directing the Feeder Fund Defendants, to

the extent allowable by law, to disgorge to the Trustee all profits, including any and all

compensation and/or remuneration received by the Feeder Fund Defendants related to or arising

from, or concerning the Six Year Initial Transfers from BLMIS to the Feeder Fund Defendants;

(e) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until

such time as the Six Year Initial Transfers are repaid to the Trustee; (f) recovering attorneys' fees

and costs from the Defendants; and (g) awarding any other relief the Court deems just and

appropriate;

(vii)    On the Seventh Claim for Relief, pursuant to sections 105(a), 502(d) and 550(a) of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS, (b) directing the Subsequent Transferee Defendants, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Subsequent Transferee Defendants related to or arising from, or concerning the Subsequent Transfers from BLMIS to the Subsequent Transferee Defendants; (c) disallowing any claim that the Subsequent Transferee Defendants may have against the Debtors until such time as the Subsequent Transfers are repaid to the Trustee; (d) recovering attorneys' fees and costs from the Defendants; and (e) awarding any other relief the Court deems just and appropriate;

(viii)    On the Eighth Claim for Relief, sustaining the Trustee's objections to the Customer Claims filed by Luxalpha and UBS SA pursuant to section 502(a) of the Bankruptcy Code, and disallowing such claims pursuant to section 502(b)(1) of the Bankruptcy Code and 15 U.S.C § 78fff-2(b);

(ix)    On the Ninth Claim for Relief, pursuant to this Court's equitable power, disallowing each and every claim that Luxalpha and UBS SA assert against the Debtors' estate, all of which claims have no lawful existence under principles of restitution and other applicable state law;

(x)    On the Tenth Claim for Relief, pursuant to this Court's equitable powers, subordinating all claims of Luxalpha and UBS SA for purposes of distribution to all allowed claims of BLMIS's customers and creditors due to Luxalpha and UBS SA's inequitable conduct

95

pursuant to sections 105(a) and 510(c) of the Bankruptcy Code, such that no claim of Luxalpha

or UBS SA is paid ahead of the allowed claim of any customer or creditor of BLMIS

(xii)    On the First through the Seventh Claims for Relief, to the extent allowable

by law, directing the Defendants to disgorge to the Trustee all profits, including any and all

management fees, incentive fees, or other compensation and/or remuneration received by the

Defendants related to, arising out of, or concerning the Initial Transfers, the Subsequent

Transfers, and the Luxalpha and Groupement Financier BLMIS Accounts;

(xiii)    On all Claims for Relief, establishing a constructive trust over all of the

Initial Transfers and Subsequent Transfers and their proceeds, product, and offspring in favor of

the Trustee for the benefit of the estate;

(xiv)    On all Claims for Relief, pursuant to federal common law and/or N.Y.

C.P.L.R. 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date

on which the Initial Transfers were received;

(xv)    On all Claims for Relief, awarding the Trustee's attorneys' fees, all

applicable interest, costs and disbursements incurred in this proceeding; and

(xvi)    Granting the Trustee such other, further and different relief as the Court

deems just, proper and equitable.

Dated:    June 26, 2015
          New York, New York

                              Respectfully submitted,

                              /s/ David J. Sheehan

                              **Baker & Hostetler LLP**
                              45 Rockefeller Plaza
                              New York, New York 10111
                              Telephone: (212) 589-4200
                              Facsimile: (212) 589-4201
                              David J. Sheehan
                              E-mail: dsheehan@bakerlaw.com

                              *Attorneys for Irving H. Picard, Trustee*
                              *for the Substantively Consolidated SIPA*
                              *Liquidation of Bernard L. Madoff Investment*
                              *Securities LLC and Estate of Bernard L. Madoff*