**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Regina L. Griffin
Judith A. Selby
Andres A. Munoz

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05354 (SMB) |
| Plaintiff, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO ABN AMRO BANK N.V. (PRESENTLY KNOWN AS THE ROYAL BANK OF SCOTLAND, N.V.)** |
| v. | |
| ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.), | |
| Defendant. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the Extraterritoriality Issue as to ABN AMRO Bank N.V. (presently known as The Royal Bank Of Scotland, N.V.) ("ABN/RBS" or "Defendant"), alleges the following:

## I.    **INTRODUCTION**

1.    The Trustee seeks recovery of approximately $237.9 million in subsequent transfers of BLMIS customer property made to ABN/RBS pursuant to Section 550 of the Bankruptcy Code.

2.    ABN/RBS is a sophisticated multinational bank, one of the largest in the world, that purposefully structured financial products around, and invested in, "BLMIS Feeder Funds" operated and controlled by Tremont Group Holdings, Inc. ("TGH") and its management arm, Tremont Partners, Inc. ("Tremont Partners," collectively "Tremont"), both located in Rye, New York.

3.    BLMIS, also located in New York, was at the core of ABN/RBS's transactions with Tremont's funds. ABN/RBS made clear in its negotiations with Tremont that Madoff's role as account manager for Tremont's Feeder Funds was "central to the whole transaction" between ABN/RBS and Tremont, and in fact referred to it as the "Madoff transaction."

4.    In its transactions with Tremont, ABN/RBS negotiated provisions specifically conditioned upon BLMIS-related events. ABN/RBS was expressly permitted to terminate its agreement with Tremont if BLMIS ceased to be the "account manager" for the Tremont Feeder Fund at issue. The relevant agreements also contained explicit provisions granting ABN/RBS priority redemption rights over other Tremont investors and permitted ABN/RBS to terminate its

transactions with Tremont if BLMIS came under investigation for violations of U.S. securities laws and regulations.

5.      The transfers from the various funds Tremont managed and controlled (the "Tremont Funds") were not "purely foreign," but rather were predominantly domestic because: (1) ABN/RBS's transactions with Tremont were expressly conditioned upon BLMIS in New York continuing to provide investment management services to Tremont's Feeder Funds in connection with investments in U.S. securities, options and treasurys; (2) ABN/RBS's U.S.-based employees, including at its New York subsidiary, directed its communications and engaged in negotiations exclusively with Tremont executives located in Rye, New York; (3) ABN/RBS's U.S.-based employees, including at its New York subsidiary, conducted due diligence in New York focused on Tremont and BLMIS; (4) All of the relevant Tremont Funds were managed and directed by Tremont personnel out of its headquarters in Rye, New York; and (5) ABN/RBS received the subsequent transfers in its own New York bank account.

6.      The subsequent transfers at issue were made in connection with two transactions ABN/RBS entered into with Tremont Funds in 2006.  ABN/RBS has conceded that subsequent transfers it received pursuant to two transactions executed in 2007 are domestic and subject to the Trustee's recovery under the Bankruptcy Code.  The component events of the 2007 transactions, however, are virtually identical to those of the 2006 transactions that ABN/RBS entered into with Tremont, which ABN/RBS contends are foreign in nature.  The structures and many of the terms of the 2006 and 2007 transactions are the same.  The same Tremont and ABN/RBS employees negotiated both sets of transactions.  And all of the transactions were centered around BLMIS in New York.

7.     Detailed allegations regarding the parties, the subsequent transfers at issue and other relevant facts are more fully laid out in the Trustee's Amended Complaint in *Picard v. ABN AMRO Bank N.V. (presently known as The Royal Bank of Scotland, N.V.),* Adv. Pro. No. 10-05354, at Docket Entry No. 47.  Specific facts regarding the parties and the transfers that are particularly relevant to the extraterritoriality issue are set forth more fully below.

## II.   **RELEVANT PARTIES TO THE TRANSACTIONS**

8.     ABN/RBS is a commercial bank incorporated under the laws of the Netherlands and has a registered office in Amsterdam, the Netherlands.  At all relevant times, ABN/RBS maintained branch operations across the globe, including in New York.

9.     ABN/RBS has undergone numerous corporate changes since 2007.  Prior to 2007, ABN AMRO Bank N.V. ("ABN") was a financial institution organized under the laws of the Netherlands.  ABN was a wholly-owned subsidiary of ABN AMRO Holding, N.V.  On October 17, 2007, RFS Holdings B.V., a company jointly owned by The Royal Bank of Scotland ("RBS"), Fortis N.V., Fortis SA/NV, and Banco Santander S.A., and controlled by The Royal Bank of Scotland, acquired ABN and ABN Holding.  On February 6, 2010, ABN AMRO Bank N.V. changed its name to The Royal Bank of Scotland N.V.

10.     As a result of the October 2007 acquisition of ABN by RBS, any and all knowledge, information and/or materials regarding BLMIS, Madoff or BLMIS Feeder Funds previously obtained by ABN (including ABN's wholly-owned subsidiary ABN AMRO Incorporated ("ABNI")) or RBS independently were subsequently shared with, and imputed to, the resulting entity, ABN/RBS.

11.     ABNI, ABN/RBS's wholly-owned subsidiary in New York, was located at 55 East 52 Street, New York, New York 10055.  ABNI was incorporated in New York and was an "SEC-registered broker-dealer."  At all times relevant to this action, ABNI was authorized and/or

directed to negotiate, conduct due diligence, and act on behalf of ABN/RBS in connection with transactions with Tremont.

12.    TGH is a Delaware corporation.  Tremont Partners is a Connecticut corporation. TGH and Tremont Partners operated out of the same office in Rye, New York.

13.    Tremont operated and managed several "BLMIS Feeder Funds" that solicited funds from third parties for investment in its accounts at BLMIS in New York.  Tremont also operated and controlled several Leveraged Funds, which provided investors with a return linked to a levered exposure to the performance of its BLMIS Feeder Funds.  At all relevant times, Tremont made all management decisions for all of its funds out of its Rye, New York headquarters.

14.    Rye Select Broad Market XL Portfolio ("Rye Portfolio Limited XL") was a Leveraged Fund that provided its investors leveraged returns based on the performance of Rye Select Broad Market Portfolio Limited ("Rye Portfolio Limited"), a BLMIS Feeder Fund.  At all relevant times, Rye Portfolio Limited XL, an exempted company registered under Cayman Islands law, had no real offices in the Cayman Islands and was operated and controlled by Tremont from its Rye, New York headquarters.

15.    Rye Portfolio Limited was an investment fund with a direct account with BLMIS. At all relevant times, Rye Portfolio Limited, an exempted company registered under Cayman Islands law, had no real offices in the Cayman Islands and was operated and controlled by Tremont from its Rye, New York headquarters.

16.    Rye Select Broad Market Insurance Portfolio LDC ("Rye Portfolio LDC") was an investment fund with a direct account with BLMIS.  At all relevant times, Rye Portfolio LDC, an

exempted company registered under Cayman Islands law, had no real offices in the Cayman Islands and was operated and controlled by Tremont from its Rye, New York headquarters.

17. Rye Select Broad Market XL Fund, L.P. ("Rye Broad Market XL") was a Leveraged Fund that provided its investors leveraged returns based on the performance of Rye Select Broad Market Fund, L.P. ("Rye Broad Market"), a BLMIS Feeder Fund. Rye Broad Market XL, a Delaware registered limited partnership, was operated and controlled by Tremont from its Rye, New York headquarters.

18. Rye Broad Market was an investment fund with a direct account with BLMIS. Rye Broad Market, a Delaware registered limited partnership, was operated and controlled by Tremont from its Rye, New York headquarters.

19. Rye Select Broad Market Prime Fund, L.P. ("Rye Prime Fund") was an investment fund with a direct account with BLMIS. Rye Prime Fund, a Delaware registered limited partnership, was operated and controlled by Tremont from its Rye, New York headquarters.

III. **THE COMPONENT EVENTS RELATING TO ABN/RBS'S TRANSACTIONS WITH THE TREMONT FUNDS WERE CENTERED IN NEW YORK**

A. **ABN/RBS's 2006 Transactions with the Tremont Funds that Led to the Subsequent Transfers at Issue**

20. ABN/RBS entered into a series of transactions with certain Tremont Funds in September 2006 (the "2006 Transactions") and in November 2007 (the "2007 Transactions").

21. In September 2006, ABN/RBS entered into a Swap Agreement with Rye Portfolio Limited XL, a Tremont Leveraged Fund. In exchange for fees, ABN/RBS agreed to pay returns to Rye Portfolio Limited XL as specified in its agreement with that Fund. ABN/RBS received approximately $74.6 million of BLMIS customer property representing collateral payments from Rye Portfolio Limited XL. The collateral payments transferred from Rye Portfolio Limited XL

were BLMIS customer property fraudulently transferred from BLMIS to, among others, Rye

Portfolio LDC, a Tremont BLMIS Feeder Fund, and then to Rye Portfolio Limited XL.

22.     During the same timeframe, ABN/RBS entered into Subscription Agreements to

invest in Rye Portfolio Limited, a BLMIS Feeder Fund managed by Tremont.  ABN/RBS

redeemed approximately $74.4 million of BLMIS customer property from Rye Portfolio

Limited.

> **B.     ABN/RBS's 2006 Transactions with the Tremont Funds were Expressly
> Conditioned on BLMIS in New York Executing Trades in U.S. Securities**

23.     ABN/RBS considered BLMIS in New York so "central" to its transactions with

the Tremont Funds, that it negotiated default and termination provisions in its agreements with

Tremont that hinged directly on whether BLMIS continued to be the "Account Manager" of

Tremont's Funds in connection with their investments in U.S. securities, options and treasurys.

24.     The terms and conditions of the 2006 Transactions with Tremont are set forth in a

September 1, 2006 letter agreement (referred to as the "Confirmation") and its amendments, a

September 1, 2006 "Side Letter" agreement, and the Subscription Agreement that ABN/RBS

executed with Rye Portfolio Limited to become an investor.

> a.     ABN/RBS specified that BLMIS was to serve as the "Account
> Manager" and execute the split strike conversion strategy

25.     Rye Portfolio Limited's Prospectus indicated that the fund's objective was to

achieve capital appreciation through investments by one unidentified "Account Manager," who

executed a split strike conversion ("SSC") strategy:

> The Company's objective is to seek to (i) achieve long term capital appreciation
> and (ii) consistently generate positive returns irrespective of stock market
> volatility or direction…. The Company [Rye Portfolio Limited] attempts to
> accomplish this investment objective by investing the majority of the assets with
> one Manager who employs a "split strike conversion" strategy (the "Account
> Manager").

26.    ABN/RBS knew that BLMIS served as the Account Manager for Rye Portfolio

Limited.  ABN/RBS observed that although the Prospectus referenced an "Account Manager,"

Madoff was not referenced.

27.    ABN/RBS viewed Madoff as so "central" to the transaction that it insisted as a

term that Madoff would be identified formally as the Account Manager.  It advised Tremont:

> "We do need to see Madoff named somewhere (albeit not necessarily in the
> Prospectus or Supplement).  Madoff's role as account manager is *central* to the
> whole transaction…."

[emphasis added].

28.    Accordingly, a Side Letter to the 2006 Swap "Confirmation" that identified

BLMIS as the Tremont Fund's Account Manager was negotiated and executed between

ABN/RBS and Tremont executive Darren Johnston in New York on behalf of Rye Portfolio

Limited:

> 1.  The "Account Manager" specified in the Prospectus and Supplemental
> Prospectus, each issued by Rye Select Broad Market Portfolio Limited (the
> "Company") and dated 1 September 2006, and the Cash-settled Index Swap
> Transaction dated as of September 1, 2006 by and between the Company and
> ABN AMRO Bank N.V., London Branch ("ABN AMRO") *is Bernard L. Madoff
> Investment Securities LLC.*

[emphasis added].

> b.    ABN/RBS negotiated special rights that would be triggered if
> BLMIS were no longer the "Account Manager" or failed to carry
> out the SSC strategy

29.    ABN/RBS also negotiated provisions permitting it to terminate the 2006

Transactions with the Tremont Funds if BLMIS ceased to be the Account Manager of Rye

Portfolio Limited.  Specifically, Annex 1, Section 2.2 of the 2006 Swap Confirmation entitled

"Index Disruption Events," permitted ABN/RBS to terminate the agreement with Tremont if it

determined:

(p) the manager employing the split strike conversion strategy…ceases to be the Account Manager (as defined in the Side Letter);

30.     ABN/RBS also insisted as a term of its transaction with Tremont that it have priority redemption rights over other investors that would be triggered if BLMIS in New York failed to utilize its U.S.-based SSC strategy.  ABN/RBS negotiated for itself a special class of shares – "Class D Shares" that Tremont created especially for ABN/RBS as a leverage provider.

31.     Specifically, a September 1, 2006, "Supplement to Amended and Restated Prospectus" issued by Tremont included events related to BLMIS and Madoff's use of the SSC strategy that would trigger ABN/RBS's special redemption rights:

Special Redemption Events for Class D Shares

Upon the occurrence of the following events ("Special Redemption Events"), a Class D Shareholder may request a redemption of its Shares in the Company on five Business Days prior written notice to the Administrator:

a) the Investment Manager **ceases to invest the majority of its assets with the Account Manager [BLMIS] employing the "split strike conversion" strategy**; or

b) There is a **change in the management or control of the Account Manager [BLMIS]**; or

\*\*\*

d) The **Account Manager no longer employs the "split strike conversion"** investment strategy; For the purposes of this clause, the "split strike conversion" investment strategy consists of: (i) the purchase of a group or basket of equity securities, at least 80% of which belong to the S&P 100, that is highly correlated to the S&P 100 Index, (ii) the purchase of out-of-the money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities or maintains investments in USD cash, USD money market fund or US Treasury Securities;

[emphasis added].

32.     Demonstrating that BLMIS was key to the transactions, if any of these events occurred – Madoff no longer controlling BLMIS or BLMIS failing to use the SSC strategy –

ABN/RBS could redeem its funds out of the Tremont Fund much more quickly than other investors. ABN/RBS, as a Class D Shareholder, was permitted to request a redemption of its investments in Rye Portfolio Limited on only <u>five</u> days written notice to the Fund's administrator. All other investors in the Fund seeking to redeem their shares were required under the governing prospectus to give <u>36</u> days prior notice.

33.     If any of those BLMIS-related events occurred, ABN/RBS was also permitted to terminate the 2006 Transactions with Tremont. Annex 1, Section 2.2 of the 2006 Swap Confirmation entitled "Index Disruption Events," permitted ABN/RBS to terminate the agreement with Tremont if it determined that a Special Redemption event had occurred.

> c.     ABN/RBS amended the 2006 Transactions because of its "trust" issues with Madoff

34.     ABN/RBS had self-described "trust" concerns about Madoff and reached out to Tremont to re-negotiate one of the 2006 Transactions because of those concerns. ABN/RBS told Tremont that it wanted to amend the agreement because of the "degree of trust which ABN AMRO has to have in Madoff," which it identified as "the key issue of the transaction."

35.     To accomplish this amendment, on March 5, 2007, an ABNI employee in New York asked for a meeting with Tremont "to introduce our senior people to Bob Schulman [the Chief Executive Officer of TGH] to discuss the <u>Madoff</u> transaction." [emphasis added]. Internal Tremont emails indicate that Tremont held this meeting in Rye, New York.

36.     Following that meeting, ABN/RBS and Tremont agreed that ABN/RBS could exercise its priority redemption rights if BLMIS were to become the subject of investigation for violations of U.S. securities laws and regulations. Specifically, ABN/RBS negotiated with Tremont a new "Supplement to Amended and Restated Prospectus" relating to Class D Shares

dated September 1, 2007, which provided ABN/RBS an additional "Special Redemption Event"

in the event:

> Special Redemption Events for Class D Shares
>
> Upon the occurrence of the following events ("Special Redemption Events"), a Class D Shareholder may request a redemption of its Shares in the Company on five Business Days prior written notice to the Administrator:
>
> * * *
>
> g)  If the **Account Manager [BLMIS] becomes the subject of a formal investigation by a U.S. court, governmental or regulatory body or agency related to a specific breach of a U.S. securities law or regulation** and the effect of such a breach would, as reasonably determined by the Calculation Agent [ABN/RBS], have a material adverse effect on the Account Manager and its ability to conduct its investment management business, a Class D Shareholder may reduce it's [sic] investment by 33%.
>
> [emphasis added].

37.     During the course of these negotiations, Tremont assured ABN/RBS that if

BLMIS were charged and found guilty of violating U.S. securities laws and regulations,

ABN/RBS would have enough time to withdraw all its investment from Rye Portfolio Limited.

According to Tremont, ABN/RBS would not need priority redemption rights for its entire

investment.  Specifically, Tremont told ABN/RBS:

> We discussed that in detail here and found it next to impossible for the **account manager** [BLMIS] to found [sic] guilty prior to being charged with a breach would have ample opportunity to unwind [the balance of its investment in Rye Portfolio Limited] via the normal redemption process well in advance of a **guilty verdict**."
>
> [emphasis added].

38.     ABN/RBS didn't trust Madoff.  It knew that BLMIS's activities were regulated

by U.S. law and regulations and that its investment in the Tremont BLMIS Feeder Fund would

be negatively impacted if BLMIS were to be investigated for violating those laws.  In order to

continue to exploit its investment in the Tremont BLMIS Feeder Fund, while also minimizing

the effect of an investigation on its investment, ABN/RBS negotiated the right to be the first investor to get its money back should BLMIS come under investigation by U.S. authorities for violation of U.S. law.

### C.    Additional Elements in the 2006 Swap Confirmation Further Demonstrate the Domestic Nature of the Component Events of the 2006 Transactions

39.    The 2006 Swap Confirmation indicated that the "Account for payments to ABN AMRO" was an account number ending in 1541 that ABN/RBS held at its New York branch. All of the subsequent transfers at issue were received by ABN/RBS in this account at its New York branch.

40.    Similarly, the 2006 Swap Confirmation indicated that the "Account for payments to [Rye Portfolio Limited XL]" was an account held at Bank of New York in New York.

41.    The 2006 Swap Confirmation also required that any communication or notice to Rye Portfolio Limited XL was to be directed to Tremont's headquarters in New York, and Darren Johnston, a New York-based Tremont representative signed the 2006 Swap Confirmation on Rye Portfolio Limited XL's behalf.

## IV.    THE 2007 TRANSACTIONS WITH THE TREMONT FUNDS DEMONSTRATE THE PREDOMINANTLY DOMESTIC NATURE OF THE 2006 TRANSACTIONS

42.    The 2007 Transactions that ABN/RBS entered into with Tremont were substantially the same as the 2006 Transactions; the main distinction was that the funds involved with the 2007 Transactions were incorporated in Delaware whereas those involved with the 2006 Transactions were registered in the Cayman Islands.  ABN/RBS has conceded that the subsequent transfers it received pursuant to the 2007 Transactions were domestic.

43.    On or about November 1, 2007, ABN/RBS entered into transactions with Rye Broad Market XL, another Tremont Leveraged Fund and with Rye Broad Market, a Tremont BLMIS Feeder Fund.

44.    ABN/RBS's 2006 and 2007 Transactions were structurally the same.  Under the 2007 Transactions, ABN/RBS received collateral payments from Rye Broad Market XL, and in exchange for fees, agreed to pay certain returns to Rye Broad Market XL.  During the same timeframe, ABN/RBS entered into Subscription Agreements to invest in Rye Broad Market Fund.

45.    While the Tremont Funds at issue in the 2006 Transactions were registered in the Cayman Islands, the Tremont Funds involved in the 2007 Transactions were registered in Delaware.  At all relevant times, all of the Tremont Funds, including those registered in the Cayman Islands, had their principal place of business in New York and were managed from Tremont's New York headquarters.

46.    As with the 2006 Transactions, the terms of the 2007 Transactions required BLMIS to be the Account Manager for Rye Broad Market.  If ABN/RBS determined that BLMIS ceased to be the Account Manager or stopped using the SSC strategy, then it was permitted to terminate the 2007 Transactions with the Tremont Funds.

47.    As with the 2006 Transactions, the terms of the 2007 Transactions expressly provided ABN/RBS with Special Redemption Events expressly contingent upon the activities of BLMIS.  For example, ABN/RBS was entitled to quickly redeem a significant amount of its investment if BLMIS no longer employed the SSC strategy, or if U.S. authorities investigated BLMIS for violations of U.S. securities laws and regulations.

48.     The negotiations for the 2006 and 2007 Transactions involved the same people. As with the 2006 Transactions, ABN/RBS's negotiations around the 2007 Transactions were led by its U.S.-based ABNI personnel, who dealt exclusively with Tremont's New York-based executives.

49.     All of the subsequent transfers at issue were transfers by Tremont from its New York bank accounts to ABN/RBS's own bank account in New York.

## V.     DEFENDANT'S NEW YORK SUBSIDIARY ABNI PLAYED A PRIMARY ROLE IN NEGOTIATIONS WITH TREMONT IN NEW YORK IN CONNECTION WITH THE 2006 AND 2007 TRANSACTIONS

50.     ABN/RBS's subsidiary, ABNI, was intimately involved in the negotiations of the 2006 and 2007 Transactions.

51.     David Schwartz ("Schwartz"), executive director of ABNI's Fund Linked Derivatives and Structured Credit Products division, was based in New York. On behalf of ABN/RBS, Schwartz had primary responsibility for communications with Tremont concerning the 2006 and 2007 Transactions. A document prepared by Tremont employees identified Schwartz as Tremont's "main contact" for transactions with ABN/RBS. Following the RBS acquisition of ABN, Schwartz's office moved to Greenwich, Connecticut, and his title changed to Head of Product Management - Fund Derivatives Group and Structured Credit for RBS Global Banking & Markets.

52.     Schwartz and Tremont employees in New York engaged in numerous email communications and telephone calls to negotiate the 2006 and 2007 Transactions. Tremont employees in New York sent information regarding Tremont's BLMIS Feeder Funds to Schwartz at ABNI in New York. Schwartz also met with Tremont employees in New York in connection with the negotiations of the 2006 and 2007 Transactions, including the above-mentioned meeting to discuss the amendment to the 2006 Transactions. After the 2006 and 2007

Transactions were completed, ABNI's Schwartz continued to be ABN/RBS's primary point of

contact with Tremont.

## VI.    ABN/RBS'S DUE DILIGENCE IN CONNECTION WITH THE TRANSACTIONS WITH THE TREMONT FUNDS WAS TIED TO THE U.S.

53.    Before entering into the 2006 and 2007 Transactions, ABN/RBS focused its due

diligence efforts on BLMIS and Tremont in New York.

54.    ABN/RBS knew from its communications with Tremont and Rye Portfolio

Limited's offering memoranda that it invested all or substantially all of its assets with BLMIS.

ABN/RBS knew that its investments in Rye Portfolio Limited were essentially investments with

BLMIS.

55.    Tremont provided ABN/RBS with prospectuses for Rye Portfolio Limited that

disclosed the following information:

- The fund "attempts to accomplish [its] investment objective by investing the majority of the assets with one Manager who employs a "split strike conversion" strategy (the "Account Manager")";

- As of September 1, 2006, when ABN/RBS executed the 2006 Transactions, the fund "[c]urrently, the majority of the assets are allocated to the Account Manager," i.e., BLMIS;

-  "the 'split strike conversion' investment strategy consists of: (i) the purchase of a group or basket of equity securities, at least 80% of which belong to the S&P 100, that is highly correlated to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities or maintains investments in USD cash, USD money market fund or US Treasury Securities

56.    Before entering into the 2006 Transactions, ABN/RBS requested, received and

reviewed more than a decade's worth of detailed information about multiple BLMIS Feeder

Funds' returns.  Specifically, Schwartz requested that Tremont furnish certain information to

help ABN/RBS draft a "meaningful" term sheet for the proposed transactions, including "Historic portfolio composition of the underlying Madoff Securities fund to review for style drift" and "Historic NAV (daily) time series of the underlying Madoff Securities fund to review for implied volatility." [emphasis added]. Tremont responded to ABN/RBS by providing, among other things, "historical weekly returns for Kingate Global Fund, Ltd. (a proxy for our [Rye Portfolio Limited] that is also managed by the same advisor [BLMIS])" and the "offering document" for Rye Portfolio Limited.

57.    Schwartz also asked for and received Rye Portfolio Limited's BLMIS account opening documents, which provided that all securities transactions in the fund's account would be subject, where applicable, to the provisions of (1) Securities Exchange Act of 1934, as amended, and (2) the Commodities Exchange Act, as amended; and (3) to the rules and regulations of the Securities and Exchange Commission, (2) the Board of Governors of the Federal Reserve System and (3) the Commodities Futures Trading Commission.  The BLMIS account opening documents further provided for mandatory arbitration before the American Arbitration Association or before the New York Stock Exchange, Inc. or the National Association of Securities Dealers in the event of any controversies arising between BLMIS and Rye Portfolio Limited in connection with the account.

58.    The above-mentioned BLMIS due diligence documentation was obtained by Schwartz in ABNI's New York office.

59.    Schwartz was not the only U.S.-based employee involved with ABN/RBS's due diligence efforts.  ABN/RBS tasked U.S.-based Rae Etherington ("Etherington"), Head of Hedge Fund Credit Risk, with the credit review of the Tremont Funds.  Etherington had a U.S. ABN

AMRO email address and was "responsible for Madoff from a credit risk perspective within

ABN" through 2008.

## VII.    ABN/RBS INTERNALLY SET AN OVERALL "MADOFF CAPACITY" BASED ON THE ECONOMIC REALITY THAT ALL TRANSACTIONS WITH BLMIS FEEDER FUNDS WERE CENTERED AROUND BLMIS IN NEW YORK

60.    In addition to the Transactions with Tremont, ABN/RBS pursued a number of

transactions with other BLMIS Feeder Funds in the hopes of gaining access to Madoff's

purported returns.  All of the BLMIS Feeder Funds it pursued represented a means of tapping

into BLMIS in New York.  As it explored those potential deals, ABN/RBS did not distinguish

between Feeder Funds that were incorporated in the U.S. and those that were registered abroad.

Rather, all simply represented an entry point to BLMIS.

61.    In addition to its Transactions with Tremont, ABN/RBS pursued BLMIS-related

transactions through a variety of other BLMIS Feeder Funds, including Fairfield Sentry Limited

and Greenwich Sentry, L.P. ("Fairfield"), Maxam Capital Management LLC, and Lakeview

Investment, LP.

62.    ABN/RBS also entered into a transaction with Harley International (Cayman)

Limited ("Harley"), another BLMIS Feeder Fund.  ABN/RBS received subsequent transfers of

BLMIS customer property from Harley, totaling approximately $21.8 million.  ABN/RBS

received those funds in its New York bank account.  The Trustee is seeking recovery of those

funds in a separate action *Picard v. ABN AMRO Bank N.V. (presently known as The Royal Bank

of Scotland N.V.)*, Adv. Pro. No. 11-02760 (S.D.N.Y.).

63.    ABN/RBS was aware that investments with any BLMIS Feeder Fund were

wholly or substantially investments with BLMIS, and that all BLMIS Feeder Funds were subject

to the same risk of loss or positive returns because each relied wholly on BLMIS to execute the

SSC strategy.  In other words, ABN/RBS considered any transaction with a BLMIS Feeder Fund

as "undertaking Madoff risk."

64.     In fact, ABN/RBS set an overall internal limit on BLMIS-related investments,

designated as "madoff capacity," regardless of which BLMIS Feeder Fund it pursued.

ABN/RBS thus made decisions about the Tremont Funds based on the economic reality that

BLMIS in New York was at the core of all transactions with the BLMIS Feeder Funds.

## VIII.    THE SUBSEQUENT TRANSFERS RECEIVED BY ABN/RBS FROM THE TREMONT FUNDS WERE SENT FROM AND RECEIVED IN NEW YORK BANK ACCOUNTS

65.     ABN/RBS instructed Tremont to make all transfers in connection with the 2006

Transactions to ABN/RBS's bank account in New York.  In the 2006 Swap Confirmation,

ABN/RBS instructed Tremont to make all payments to ABN/RBS via a bank account that

ABN/RBS held at its New York branch; ABN/RBS received all payments from Rye Portfolio

Limited XL in its New York account.  In connection with ABN/RBS's investment in Rye

Portfolio Limited, Subscription Agreements provided that redemption payments would be made

to ABN/RBS's bank account at its New York branch; ABN/RBS received all payments from Rye

Portfolio Limited in its New York account.  Accordingly, every one of the subsequent transfers

at issue was sent from the Tremont Funds' bank accounts in New York to ABN/RBS's bank

account in New York.

66.     ABN/RBS maintained a bank account at its ABN AMRO Bank NV New York

Branch in New York, which was a "resident of the United States" according to its July 2008

USA Patriot Act Certification.  ABN/RBS designated that account, which had an account

number ending in 1541, in the 2006 Transactions to receive both collateral and redemption

payments – the subsequent transfers at issue – from the Tremont Funds.

67.     With respect to the 2006 Transactions, Rye Portfolio Limited XL utilized its bank account at the Bank of New York to transfer each of the collateral payments at issue to ABN/RBS's bank account at its New York Branch.

68.     Likewise, Rye Portfolio Limited utilized its account at the Bank of New York to transfer each redemption payment to ABN/RBS at its New York bank account.

69.     Similarly, with regard to the transfers sent and received in connection with the 2007 Transactions, ABN/RBS designated its bank account at its ABN AMRO Bank NV New York Branch to receive both collateral and redemption payments from the Tremont Funds. Utilizing their bank accounts at the Bank of New York, Rye Broad Market XL and Rye Broad Market – the Tremont Funds involved with the 2007 Transactions – made transfers of collateral and redemption payments to ABN/RBS's bank account at its New York Branch.

70.     In addition, transfers from ABN/RBS to Tremont were directed to New York. The 2006 Swap Confirmation provided that ABN/RBS would pay returns to Rye Portfolio Limited XL from its account in New York. The Subscription Agreements for the 2006 Transactions directed Tremont to debit ABN/RBS's bank account in New York for all subscription payments in connection with ABN/RBS's investment in Rye Portfolio Limited.

## IX.    TREMONT AND ITS BLMIS INVESTED FUNDS HAD THEIR PRINCIPAL PLACE OF BUSINESS IN NEW YORK

71.     TGH is a Delaware corporation. Tremont Partners, Inc. ("Tremont Partners") is a Connecticut corporation. TGH and Tremont Partners operated out of the same office in Rye, New York, and managed, among others, three Delaware registered funds and three Cayman Islands registered funds that were invested in Bernard L. Madoff's BLMIS. Tremont Partners is an investment advisor registered under the Investment Advisers Act of 1940. As alleged below,

Tremont and its BLMIS funds had their principal place of business in New York and were

managed from their New York headquarters.

**A.    Tremont Operated and Controlled All of the Rye Funds From its New York Headquarters**

72.    The three Delaware registered funds (which are not at issue in the Motion to

Dismiss Based on Extraterritoriality (the "ET Motion") but are relevant to the allegations herein)

are: (i) Rye Select Broad Market Fund, L.P. ("Rye Broad Market"), (ii) Rye Select Broad Market

XL Fund, L.P. ("Rye Broad Market XL"), and (iii) Rye Select Broad Market Prime Fund, L.P.

("Rye Prime Fund") (collectively, the "Delaware Registered Funds").   The three Cayman

Islands registered funds (which are at issue in the ET Motion) are: (i) Rye Select Broad Market

Portfolio Limited ("Rye Portfolio Limited"), (ii) Rye Select Broad Market XL Portfolio Limited

("Rye Portfolio Limited XL"), and (iii) Rye Select Broad Market Insurance Portfolio LDC ("Rye

Portfolio LDC") (collectively, the "Cayman Registered Funds").   The Delaware Registered

Funds and Cayman Registered Funds are referred to together as the "Rye Funds."

73.    Each of Rye Broad Market, Rye Prime Fund, Rye Portfolio Limited and Rye

Portfolio LDC had direct accounts with BLMIS (these funds are collectively referred to as "Rye

Direct BLMIS Funds").   Tremont established the other two funds that did not have direct

BLMIS accounts—Rye Broad Market XL and Rye Portfolio Limited XL—in an effort to provide

investors with an investment that would triple the normal BLMIS performance through total

return swaps.   As part of this strategy, the Rye Broad Market XL and Rye Portfolio Limited XL

funds entered into swap agreements with counterparties, consisting mainly of financial

institutions, that generally agreed to pay these funds on a three times levered basis an amount

equal to the increase in the net asset value of the Rye Broad Market and Rye Portfolio Limited

funds.   Rye Broad Market XL's swaps were based on the performance of the Rye Broad Market

fund, while Rye Portfolio Limited XL's swaps were based on the performance of the Rye Portfolio Limited fund.

74.    From their inception and at all relevant times thereafter, Tremont's Cayman Registered Funds were set up and thereafter operated as parallel funds to the Delaware Registered Funds. Tremont made all management decisions and conducted all due diligence regarding both the Delaware and Cayman funds from its office in Rye, New York. All of the Rye Funds were marketed alongside one another by Tremont employees in New York. Employees in Tremont's New York office communicated directly with investors and potential investors regarding all of the funds. Oftentimes, Tremont's employees in New York received inquiries and sent information in the same email about both the Delaware and the Cayman funds. Tremont's employees in New York approved subscriptions and redemptions for all of the Rye Funds.

75.    As was true of the Delaware Registered Funds, Tremont's employees in Rye were appointed to serve on the boards of the Cayman Registered Funds. For example, Suzanne Hammond was a director of Rye Portfolio LDC and Rye Portfolio Limited and Darren Johnston was a director of Rye Portfolio Limited and Rye Portfolio Limited XL. In addition, all of the Rye Funds were advised by the same law firm in the United States.

**B.    Tremont Controlled its Relationship with BLMIS From its New York Headquarters**

76.    BLMIS dealt with the same Tremont employees in New York regarding all of the Rye Direct BLMIS Funds. Employees in Tremont's New York office directly made redemption requests to BLMIS for the Rye Direct BLMIS Funds' BLMIS accounts, which redemptions constitute the subsequent transfers that are the subject of multiple other Trustee adversary proceedings at issue in the ET Motion.

77.     Tremont's executives in New York, including its CEO Robert Schulman,
executed in New York all BLMIS Customer Agreements and other documents, including Trade
Authorizations, Options Agreements, and IRS Form W-9s, as authorized representatives of the
Rye Direct BLMIS Funds.   Executives in Tremont's Rye office were designated as authorized
signatories on the accounts of the Rye Direct BLMIS Funds.

78.     Beginning as early as 1991, Tremont's executives and employees in New York
met regularly with Madoff and other BLMIS employees in New York, including at BLMIS'
offices in New York.   Sandra Manzke, who founded Tremont, began regularly meeting in New
York with Madoff as early as 1991.   Robert Schulman, Tremont's Chief Executive Officer, also
had a long running relationship with Madoff and would "periodically visit [BLMIS' office]
throughout the year."

79.     From the formation of each Rye Direct BLMIS Fund, BLMIS would mail copies
of trade tickets and account statements to Tremont's New York office.

C.     **Tremont's Agreements with BLMIS Granted BLMIS Full Discretion Over
       the Assets of the Rye Funds and Subjected Tremont to U.S. Laws and
       Regulations**

80.     The Customer Agreements between BLMIS and the Rye Direct BLMIS Funds
gave BLMIS full discretion over the assets of the Rye Direct BLMIS Funds.  Pursuant to the
Trading Authorizations, the Rye Direct BLMIS Funds authorized Madoff to be their "agent and
attorney in fact" to buy, sell and trade in securities.  The Customer Agreements expressly state
that they are governed by New York law and all of the transactions pursuant to the Customer
Agreements are subject to the provisions of the Securities Exchange Act of 1934 and to the rules
and regulations of the SEC and the Board of Governors of the Federal Reserve System.

81.    The Rye Direct BLMIS Funds agreed that all disputes arising under the Customer

Agreements must be resolved by arbitration under the laws of New York before the American

Arbitration Association, or "an arbitration facility provided by any exchange of which the broker

is a member, or the National Association of Securities Dealers Inc., and in accordance with the

rules pertaining to the selected organization."

### D.    Tremont's Investors Knew They Were Investing in BLMIS

82.    Investors in all of the Rye Direct BLMIS Funds knew that they were investing in

Madoff's BLMIS in New York.  Tremont's employees in New York spoke openly with their

investors about their funds being invested in Madoff's BLMIS and regularly referred to the Rye

Direct Funds as "our Madoff fund" or as a Madoff "feeder."  Investors were also specifically

informed through the Rye Direct BLMIS Funds' Due Diligence Questionnaires that the funds

would be trading in the "U.S. equity market" and related equity index options and that cash

would be held in "U.S. short term treasury bills."  All of the Rye Funds represented in investor

documents that custody of their securities would be held in "a brokerage account with an NASD

registered broker dealer" (i.e. BLMIS).  Tremont's investors knew that any redemption requests

were dependent on the investment manager's ability to liquidate United States securities.

### E.    Tremont's Cayman Registered Funds Had Their Principal Place of Business in New York

83.    In addition, all investors were aware that the Rye Funds had U.S. based counsel

and U.S. based sales contacts.  The Rye Funds' Private Placement Memoranda and marketing

materials openly identified these U.S. ties.

84.    Investors in the Cayman Registered Funds were specifically informed that they

were only permitted to make investments and receive redemptions in U.S. dollars, as was the

case with the Delaware Registered Funds.

85.     Although the Rye Funds at issue in the ET Motion were registered in the Cayman Islands, they had no more than a nominal presence there.  The Cayman Registered Funds never had any real offices or operations in the Cayman Islands.  Rye Portfolio LDC and Rye Portfolio Limited had their registered office at a P.O. Box address in the Cayman Islands, care of a company that is in the business of providing local addresses to companies.  Rye Portfolio Limited XL similarly had its registered address at an international law firm in the Cayman Islands.

86.     The Cayman Registered Funds were not permitted to solicit investors in the Cayman Islands because they were registered as exempted companies under the Cayman Islands Companies Law.  Under the Companies Law, "[a]n exempted company shall not trade in the Islands with any person, firm, or corporation except in furtherance of business of the exempted company carried on outside the Islands."  *See* Section 174 of the Companies Laws (2013 Revision).  The Cayman Registered Funds were prohibited from accepting investment funds from members of the public in the Cayman Islands and paid no taxes in the Cayman Islands.

87.     From January 2002 forward, Tremont Partners in New York was the sub-advisor and handled all investment management duties for Rye Portfolio LDC, and from December 2005 forward, the same was true for Rye Portfolio Limited, in each case by virtue of an express delegation of all such duties to Tremont Partners from Tremont (Bermuda) Limited ("Tremont Bermuda"), the nominal investment manager for those funds.  Though incorporated in Bermuda, Tremont Bermuda itself was wholly owned by TGH, registered under the U.S. Investment Advisers Act of 1940, and had Tremont executives in New York serving on its board of directors. For example, Sandra Manzke, Rupert Allan and Robert Schulman, who all served at

various times as CEO of TGH, also served as directors of Tremont Bermuda while maintaining their positions in New York.

88.     Prior to such delegation of all duties in 2002 and 2005 respectively, Rye Portfolio LDC and Rye Portfolio Limited were in any event run out of New York, as the Tremont Bermuda office at all times performed only low-level administrative work, handled by at most two employees.  Tremont Bermuda performed no investment management, research, data collection, or sales, all of which were done in New York.  Letters sent to investors on Tremont Bermuda letterhead regularly came from Tremont Partners' employees in New York, who would include their New York contact information on such letters.

89.     As part of its management duties for Rye Portfolio Limited and Rye Portfolio LDC, Tremont's New York employees, among other things, approved trade tickets and monthly statements, checked bank activity, and were authorized as bank signatories for the funds.  As alleged above, BLMIS communicated directly with Tremont's executives and employees in New York regarding all of the Rye Funds, including Rye Portfolio Limited and Rye Portfolio LDC. For instance, Darren Johnston, who headed Tremont's Rye Investment Management ("RIM") division in New York from 2006-2007, and Harry Hodges, who worked under Johnston in New York, regularly corresponded with BLMIS's Frank DiPascali regarding subscriptions to and redemptions from Rye Portfolio Limited and Rye Portfolio LDC.

90.     On July 1, 2006, Tremont closed its Bermuda office and formally consolidated the management of all of its funds to its New York office.  Thereafter, any ministerial functions that had been handled in Bermuda for Rye Portfolio Limited and Rye Portfolio LDC took place domestically.  By no later than November 2006, subscriptions for Rye Portfolio Limited and Rye Portfolio LDC flowed solely through U.S. bank accounts.

91.     Beginning in the fall of 2006 if not earlier, when Tremont formally closed Rye Portfolio Limited's and Rye Portfolio LDC's Bermuda-based bank accounts, every redemption payment made by Tremont to an investor, which payment forms the basis for the Trustee's subsequent transfer complaints, came out of the fund's New York-based bank accounts at the Bank of New York.

92.     Around the same time, Tremont had formed its RIM division based out of New York, whose express purpose was to manage and operate all of the Tremont BLMIS funds together. Tremont began to refer to and market its BLMIS invested funds as the "Rye Select Funds" and renamed all of the BLMIS invested funds to include the word "Rye." Tremont explained to its investors that the reason for this change was because Tremont "had a longstanding presence in Rye, New York and the Rye Select Funds [we]re all about providing [ ] access to a <u>select</u> group of the investment industry's most exclusive and otherwise unavailable talent."  (emphasis in original).  From then on, the published materials for all the Rye Funds, including prospectus statements and marketing materials, expressly directed potential investors to contact Tremont's employees in New York.

93.     Notably, even before the change to add "Rye" to the funds' names, Tremont had highlighted the U.S. origins of all the Rye Direct BLMIS Funds, except Rye Portfolio Limited LDC, by using the word "American" in the fund name. As alleged in the Tremont Complaint, Rye Broad Market was originally named American Masters Broad Market Fund, LP.; Rye Prime Fund was originally named American Masters Broad Market Prime Fund, LP; Rye Portfolio LDC was originally named Tremont-Broad Market Fund LDC; and Rye Portfolio Limited was originally named American Masters Broad Market Fund II Limited.

94.     From July 2006 forward, investors in Rye Portfolio Limited and Rye Portfolio

LDC were also specifically instructed to send all subscription agreements directly to Tremont's

New York employees or to the Bank of New York in New York, New York, and all redemption

requests were similarly handled by either Tremont in New York or the Bank of New York.

Starting in October 2006, investors in these funds were also specifically instructed to wire

subscription monies directly to accounts at the Bank of New York.  During this time, the

Directors of Funds, which included New York based director Darren Johnston, had the discretion

to suspend subscriptions and redemptions by investors under varying circumstances, including

when they found redemptions "not reasonably practical" or "prejudicial," and compel

"redemption of Shares for any or no reason."

95.     From 2006 onwards, New York-based Tremont Partners also held itself out as the

general partner of Cayman Registered Funds Rye Portfolio Limited and Rye Portfolio Limited

XL.

96.     With regard to Rye Portfolio Limited XL, from its inception in late 2006, it was

managed just like Delaware Registered Fund Rye Broad Market XL, with Tremont Partners as

its investment manager and the Bank of New York as its custodian.  Both XL funds also

instructed their investors to send subscription agreements and redemption requests to the same

address in New York.

**F.      The Rye Funds With Direct BLMIS Accounts Filed Claims With the Trustee**

97.     Subsequent to the revelation of BLMIS' fraud, the two Delaware Registered

Funds with BLMIS accounts (Rye Broad Market and Rye Prime Fund), and the two Cayman

Registered Funds with BLMIS accounts (Rye Portfolio Limited and Rye Portfolio LDC) filed

claims with the Trustee.  On July 25, 2011, these funds entered into a joint settlement agreement

with the Trustee, which agreement was governed by New York law and pursuant to which the

funds submitted to the jurisdiction of the U.S. Bankruptcy Court for purposes of enforcing the

agreement.  The claims of Rye Broad Market, Rye Portfolio Limited and Rye Portfolio LDC

were allowed in connection with the settlement, and these funds have received and continue to

receive distributions on their allowed claim

### G.     The Rye Funds Have Asserted that Their BLMIS-Related Activities Implicate U.S. Securities Laws

98.     Finally, in addition to the foregoing, each of the Rye Funds (including the

Cayman Registered Funds) have, in other BLMIS-related lawsuits in which they are or were

named defendants, themselves asserted (by virtue of their assertions as to preemption by the

Securities Litigation Uniform Standards Act and the NY Martin Act) that (i) their BLMIS-related

activities were directed to promoting or inducing the sale of securities within or from New York,

and that (ii) the securities they purported to trade were U.S. securities covered by the 1933

Exchange Act.  *See In re Tremont Securities Law, State Law and Insurance Litigation*, 1:08-cv-

11117-TPG (S.D.N.Y.) (Dkt. Nos. 142, 149, 154, 280, 285); *Peshkin et al. v. Tremont Group*

*Holdings, Inc., et al.*, 08-CV-11183 (Dkt. Nos. 104, 110, 150).

Dated: June 26, 2015
New York, New York

/s/ Judith A. Selby

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Regina L. Griffin
Judith A. Selby
Andres A. Munoz

**Baker & Hostetler LLP**
1050 Connecticut Ave. NW
Suite 1100
Washington, DC 20036
Telephone:  (202) 861-1500
Facsimile:  (202) 861-1783
Katherine L. McKnight
Dena S. Kessler

*Attorneys for Irving H. Picard, Trustee
for the substantively consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the estate of Bernard L.
Madoff*