**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>       Plaintiff-Applicant,<br><br>       v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES, LLC,<br><br>       Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated)<br><br>Adv. Pro. No. 10-05311 (SMB) |
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>       Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>       Plaintiff,<br><br>       v.<br><br>UBS AG, UBS (LUXEMBOURG) S.A., UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., RELIANCE INTERNATIONAL RESEARCH LLC, RELIANCE MANAGEMENT (GIBRALTAR) LIMITED, LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, as represented by their Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN | **TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO THE UBS DEFENDANTS' MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS** |

RUKAVINA and PAUL LAPLUME, in their
capacities as liquidators and representatives of
LUXEMBOURG INVESTMENT FUND AND
LUXEMBOURG INVESTMENT FUND U.S.
EQUITY PLUS, and LANDMARK
INVESTMENT FUND IRELAND,

Defendants.

The Trustee respectfully submits this supplemental memorandum in opposition to the motion to dismiss of Defendants (i) UBS (Luxembourg) S.A. ("UBS SA"); (ii) UBS Fund Services (Luxembourg) S.A. ("UBSFSL"); (iii) UBS Third Party Management Company S.A. ("UBSTPM"); and (iv) UBS AG (collectively, the "UBS Defendants") based on extraterritoriality and in further support of the Trustee's motion for leave to amend his complaint. As set forth below, the Trustee's proposed Amended Complaint ("Am. Compl.") pleads specific facts showing the subsequent transfers received by the UBS Defendants are predominantly domestic under the standard set forth in the Extraterritoriality Decision,[1] such that the Trustee's action does not require an extraterritorial application of SIPA or Bankruptcy Code § 550, and the UBS Defendants' motion to dismiss should be denied.

The UBS Defendants seek dismissal of the Trustee's claims to recover avoidable transfers received from Luxembourg Investment Fund-U.S. Equity Plus ("LIF-USEP"), a feeder fund the UBS Defendants operated and serviced to invest exclusively with BLMIS. The transfers to the UBS Defendants are not "purely foreign"—and are in fact predominantly domestic—because the component events of the transactions occurred in the U.S., and the legal and economic realities of the transfers were U.S.-based.[2] The transfers consist of the UBS Defendants' fees for their role in Madoff's scheme. Based on the Trustee's investigation to date, the UBS Defendants, combined, received approximately $16.8 million in fees. (Am. Compl. ¶ 109.) The UBS Defendants contracted with BLMIS to delegate management and custodial functions to BLMIS (*Id.* ¶¶ 8, 266–268, 272, 277, 281–282.) and serviced LIF-USEP through

---

[1] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 232-33 (S.D.N.Y. 2014) ("Extraterritoriality Decision").

[2] Simultaneously herewith, the Trustee has filed the omnibus Trustee's Memorandum of Law in Opposition to the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality and in Further Support of Trustee's Motion for Leave to Amend Complaints, No. 11-02796 (SMB), (Bankr. S.D.N.Y. June 26, 2015) (the "Trustee's Main Brief"), incorporated herein by reference.

regular contact with both BLMIS and New York-based Reliance International Research ("RIR"). (*Id.* ¶¶ 273, 286.)  The UBS Defendants also routed money to LIF-USEP through a bank account at UBS AG's branch in Stamford, Connecticut.  (*Id.* ¶¶ 274, 286.)  Given the substantial domestic connections and the fact that the relationships at issue were centered in the U.S., the UBS Defendants cannot now be allowed to evade the Trustee's claims on grounds of extraterritorial application of the Bankruptcy Code.[3]

## I.    THE UBS DEFENDANTS SERVICED LIF-USEP FOR THE SOLE PURPOSE OF INVESTMENT WITH BLMIS IN NEW YORK

The UBS Defendants became involved with LIF in December 2004, when Manuel Echeverría, in coordination with M&B Captial Advisors Sociedad de Valores, S.A. ("M&B"), worked with UBS SA to obtain the UBS Defendants' support for the formation of LIF-USEP and their agreement to serve as LIF-USEP's official sponsor, custodian, and administrator, in order to funnel foreign money into the United States through BLMIS.  (*Id.* ¶ 88–92.)  The new fund, LIF-USEP, was formed on August 18, 2005 as a sub-fund of the already existing Luxembourg Investment Fund. (*Id.* ¶ 42.)   LIF-USEP was designed to replicate an existing UBS AG-sponsored feeder fund that was wholly invested with BLMIS, Luxalpha SICAV ("Luxalpha"). (*Id.* ¶ 94.)  LIF-USEP opened account #1FR123 with BLMIS and began investing directly with BLMIS in September 2005.  (*Id.*)  LIF-USEP was a fund wholly invested with BLMIS in New York, with both custodial and management authority contractually delegated to BLMIS.  (*Id.* ¶¶

---

[3] *See Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 207 (2d Cir. 2014); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) (holding *Morrison* depends on a case's specific facts and that residency or citizenship of a party does not affect where a transaction occurs); *In re Maxwell Commc'n Corp.*, 170 B.R. 800, 809 (S.D.N.Y. 1994) ("The court must look at the facts of a case to determine whether they have a center of gravity outside the United States. Thus, for example, a transfer made in the U.S. by a foreign national to a foreign national could be considered a domestic transaction.").

8, 266–268, 272, 277, 281–282.)  The UBS Defendants knew this.  The UBS Defendants'

activity with regarding to LIF-USEP was entirely focused on directing investments to BLMIS in

New York and profiting from these investments.

LIF-USEP did not have any employees or independent office space in Luxembourg. (*Id.*

¶ 95.)  Rather, the UBS Defendants, in conjunction with M&B, RIR and Reliance Management

(Gibraltar) Limited ("Reliance Gibraltar," and collectively with RIR the "Reliance Group

Defendants"), operated the fund.  (*Id.*)

## II.    THE UBS DEFENDANTS RECEIVED TRANSFERS IN THE FORM OF FEES BASED ON ACTIVITY THAT WAS CENTERED IN THE UNITED STATES

As the service providers of LIF-USEP, the UBS Defendants intended to and did transact

their Madoff-related business in the U.S.  The UBS Defendants delegated their duties to BLMIS

in New York, communicated directly and frequently with BLMIS in New York, and directed the

transfer of hundreds of millions of dollars between New York and LIF-USEP.  The Trustee has

alleged specific facts demonstrating that the subsequent transfers the UBS Defendants received

for these activities, in the form of custodial fees, management fees, administrative fees and

dividends, are not "purely foreign."   As such, the Trustee's action cannot be dismissed.

### A.   **UBS AG Transacted Business in the United States and Received Transfers from UBS SA and UBSFSL Based on Activity Centered in the United States**

UBS AG received approximately $1.7 million in recoverable subsequent transfers from

2004 through 2008, in the form of dividends paid by UBS SA and UBSFSL, which were

comprised, in part, of fee amounts received from LIF-USEP.  (*Id.* ¶ 303d.)  UBS AG is the

parent company of the global UBS bank, and the ultimate owner of subsidiaries UBS SA,

UBSTPM, and UBSFSL. [4]   (*Id.* ¶¶ 49–51, 59.) Although headquartered in Switzerland, it

maintains offices and conducts daily business activities in New York City, Stamford,

Connecticut and other locations in the United States. (*Id.* ¶ 48.)

UBS AG was not merely the corporate parent of the particular UBS Defendants who

served as the manager, custodian, and administrator of the Feeder Fund Defendants. UBS AG

also served as a co-sponsor of LIF-USEP during the life of the fund's existence.  (*Id.* ¶ 97.)  UBS

AG's role as co-sponsor was essential for the Luxembourg regulator's approval of LIF-USEP, as

that representation led the Luxembourg regulator to believe that one of the world's biggest

financial institutions was safeguarding the fund and would ultimately be responsible for losses.

(*Id.* ¶¶ 261–264.)

UBS AG's approval of the fund structure of Luxalpha served as the basis of the fund

structure of LIF-USEP—one that delegated custodial and management authority to BLMIS in

New York. (*Id.* ¶¶ 67–72, 94.)   UBS AG granted an exception to its usual policy prohibiting

such arrangements, and enabled the contractual relationships giving rise to the fees at issue in

this action.  (*Id.* ¶¶ 69–70.)

UBS AG was represented as an integral part of LIF-USEP's operations with respect to

the fund's purported investments in U.S. securities.  Indeed, the UBS Defendants not only

characterized the fund as one that "UBS AG is offering," but as a fund that that was "powered by

UBS AG."  (*Id.* ¶ 264.)  In connection with UBS AG's role as a sponsor and promoter of

Luxalpha, UBS SA represented to LIF-USEP's auditors at Ernst & Young that UBS AG was

approving BLMIS's option counterparties.  (*Id.* ¶ 205.)  A description of LIF-USEP's risk

---

[4] UBS SA paid dividends to corporate parent UBS AG in 2006, 2007, and 2008; and UBSFSL paid dividends to
corporate parent UBS AG in each year from 2005 to 2008 – which were comprised, in part, of fees paid by LIF-
USEP to UBS SA and UBSFSL.  (*Id.* ¶ 303d.)

management system stated that as part of its control measures for counterparty settlement risks,

"UBS [SA] correspondents and custodians are carefully selected among a list authorized by UBS

AG network management[,]" meaning, in other words, that UBS AG "authorized" the use of

BLMIS as LIF-USEP's *de facto* custodian.  (*Id.* ¶ 280.)  Additionally, UBS AG provided the

services of its branch in Stamford, Connecticut to transfer money between LIF-USEP's bank

account at UBS SA and BLMIS, and to process U.S. dollar subscriptions for LIF-USEP.  (*Id.* ¶

286.)

UBS AG served as co-sponsor of LIF-USEP and provided the use of its banking facilities

in Stamford, Connecticut to support its subsidiaries' operation of, and receipt of fees from LIF-

USEP, through which UBS AG received considerable profits in the form of dividends.

### B.  UBS SA Received Fees Based on Activity That Was Centered in the United States

Defendant UBS SA served nominally as the official manager of LIF-USEP from the

fund's inception to 2006.  (*Id.*  ¶¶ 111, 268, 269.)  It represented itself as manager in LIF-USEP's

prospectuses, and made similar claims to the financial regulator in Luxembourg.  (*Id.* ¶ 268.)

UBS SA also served as the official custodian of LIF-USEP for the lifetime of the fund, making

representations about its official functions in each of LIF-USEP's prospectuses and to the

financial regulator in Luxembourg.  (*Id.* ¶¶ 92, 97, 266.)  However, UBS SA performed no

custodial or managerial work in Luxembourg for LIF-USEP because it directly contracted with

BLMIS to delegate all custodial and managerial authority for the fund to BLMIS.  (*Id.* ¶¶ 266,

267.)

In August 2005, employees of Defendant UBS SA executed LIF-USEP's BLMIS account

opening documents, consisting of a Customer Agreement, Trading Authorization, and Option

Agreement, and transmitted them to BLMIS.  (*Id.* ¶¶ 267, 270–271.)  Although UBS SA

5

officially served as LIF-USEP's manager, the Trading Authorization provided BLMIS with complete authority to trade the assets of LIF-USEP. (*Id.* ¶ 267.) The Customer Agreement also contained a choice of law clause providing that New York law applied to the agreement and to the rights and liabilities of the parties pursuant to the agreement. (*Id.* ¶ 271.)[5]

Even though UBS SA served as LIF-USEP's official custodian (*Id.* ¶¶ 92, 97, 266), it performed no custodial work in Luxembourg for LIF-USEP because it contracted with BLMIS to delegate all custodial authority for the fund to BLMIS in New York. (*Id.* ¶ 266.) Contemporaneous with the formation of LIF-USEP in August 2005, UBS SA entered into an undisclosed Sub-Custodian Agreement with BLMIS, dated August 18, 2005. (*Id.*) This Sub-Custodian Agreement delegated custodial authority to BLMIS, and noted that the "US assets of the Fund" would be invested with BLMIS. (*Id.*) BLMIS received no compensation for serving as the *de facto* manager and sub-custodian. (*Id.* ¶ 267.)

UBS SA regularly communicated with BLMIS, directing the transfer of millions of dollars of LIF-USEP's assets into and out of BLMIS in New York. (*Id.* ¶ 273.) UBS SA personnel also requested information from BLMIS, including mismatched trade tickets, tax issues, and missing account statements. (*Id.*) In addition to these communications with BLMIS, UBS SA also communied with employees of RIR in New York regarding LIF-USEP subscriptions and redemptions and to facilitate LIF-USEP's investment with BLMIS. (*Id.*)

---

[5] The Customer Agreement also provided that any controversies between BLMIS and LIF-USEP must be determined by arbitration under the Federal Arbitration Act, to be conducted in one of the following forums, all located in the U.S.: "before the American Arbitration Association, or an arbitration facility provided by any exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. and in accordance with the rule pertaining to the selected organization." The Customer Agreement further provided that all transactions in the customers' account must be subject to the provisions of the Securities Exchange Act of 1934, the rules and regulations of the SEC, and the Board of Governors of the Federal Reserve System. (*Id.* ¶ 271.)

These regular and frequent communications, which gave rise to the subsequent transfers at issue, are evidence of the domestic nature of UBS SA's activity.

UBS SA also used a U.S. bank account to process LIF-USEP's subscriptions and redemptions. (*Id.* ¶ 274.) In furtherance of its custodial function (and the delegation of this function to BLMIS), UBS SA regularly sent LIF-USEP's investor money to and from BLMIS's bank account at JPMorgan in New York, with funds passing through a bank account at a Stamford, Connecticut branch of LIF-USEP's sponsor, UBS AG. (*Id.*) LIF-USEP's U.S. dollar investors wired money into UBS SA's account at UBS AG's Stamford branch, which was then forwarded to UBS SA. (*Id.*) These subscriptions were pooled by UBS SA and then sent to BLMIS's bank account at JPMorgan in New York – again passing through UBS AG in Stamford. (*Id.*) When LIF-USEP requested money from BLMIS, the money flowed from JPMorgan in New York to UBS SA's account at UBS AG's Stamford branch and then to LIF-USEP's bank account at UBS SA. (*Id.*)

Luxembourg-based UBS SA received approximately $5.5 million from LIF-USEP for custodial and managerial services that it sub-contracted to BLMIS for performance in New York. (*Id.* ¶ 303a.) In furtherance of this delegation, UBS SA communicated frequently with New York, transferred money to and from New York, and worked in coordination with New York based BLMIS and RIR. (*Id.* ¶ 273.) The Trustee's subsequent transfer claims against UBS SA seek to recover the custodial and management fees it received. The component events of these transactions involve domestic activity. UBS SA had every reason to believe that U.S. law would apply when it contracted with BLMIS for the purpose of providing services that UBS SA was itself receiving fees for providing.

7

### C.  **UBSTPM Received Fees for Activity That Was Centered in the United States**

In May 2006, Defendant UBSTPM became LIF-USEP's official manager, continuing UBS SA's practice of leaving all management of LIF-USEP to Madoff, while collecting fees based on the investment activities (i.e., trading of U.S. securities) purportedly executed by BLMIS in New York.  (*Id.* ¶¶ 113, 303c.)  Under its contract with LIF-USEP, UBSTPM was officially responsible for LIF-USEP's investment management decisions.  (*Id.* ¶¶ 170, 268.) However, all actual investment management authority over LIF-USEP had previously been delegated to BLMIS for performance in New York, under the Trading Authorization executed by UBS SA in 2005.  (*Id.* ¶¶ 268, 281–283.)

UBSTPM assumed the official managerial role only to nominally comply with regulations that prohibited the same entity from serving as both custodian and manager.  (*Id.* ¶ 283.)  The UBS Defendants created a façade to make it appear that LIF-USEP's custodial and managerial duties had been divided separately between two Luxembourg companies, UBS SA and UBSTPM, when in fact both roles had rested solely with BLMIS in New York from the first day of LIF-USEP's operation.  (*Id.*)

UBSTPM received approximately $10.6 million in fees from LIF-USEP for serving as LIF-USEP's official manager from May 2006 to December 2008.  (*Id.* ¶ 303c.)  The subsequent transfers the Trustee seeks to recover from UBSTPM are for management fees paid to it for work performed in New York.

### D.  **UBSFSL Received Fees for Activity That Was Centered in the United States**

UBSFSL received approximately $748,000 in fees from LIF-USEP for serving as the official administrator of LIF-USEP from September 2005 to December 2008. (*Id.* ¶ 303b.)  As the Luxembourg-based administrator of LIF-USEP, UBSFSL was responsible for performing

these funds' accounting and calculating their net asset value ("NAV"). (*Id.* ¶¶ 97, 169, 173,

284.) However, because LIF-USEP was entirely invested with BLMIS, and performed no

securities trading of its own, UBSFSL relied entirely on the accounting performed by BLMIS

and listed on BLMIS's account statements and trading confirmations to determine LIF-USEP's

NAV. (*Id.* ¶ 284.) UBSFSL performed no independent verification of Madoff's purported

trades, or the prices reported by Madoff. (*Id.*) UBSFSL only created "mirror" accounting

records based on the trade confirmations and account statements that it received from BLMIS.

(*Id.* ¶ 285.)

UBSFSL was in regular communication with RIR in New York regarding the

administration of LIF-USEP. UBSFSL corresponded with RIR regarding money to be sent to

BLMIS in New York, the receipt of mid-month Madoff statements and questions regarding

currency hedging for LIF-USEP. (*Id.* ¶ 286.) UBSFSL also was in communication with BLMIS

directly. (*Id.*) Moreover, UBSFSL processed subscriptions for LIF-USEP, instructing clients to

route U.S. dollar subscriptions through UBS SA's bank account at UBS AG in Stamford,

Connecticut. (*Id.*)

For these reasons, UBSFSL received fees for activity that was centered in the United

States.


**[This Space Intentionally Left Blank]**

## **CONCLUSION**

For the foregoing reasons and those stated in the Trustee's Main Brief, this Court should

grant the Trustee's motion for leave to amend and deny the UBS Defendants' motion to dismiss.


Dated: June 26, 2015
      New York, New York

Respectfully submitted,

*/s/ David J. Sheehan*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Estate of Bernard L. Madoff*

10