**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> UBS AG, UBS (LUXEMBOURG) S.A., UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., RELIANCE INTERNATIONAL RESEARCH LLC, RELIANCE MANAGEMENT (GIBRALTAR) LIMITED, LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, as represented by their Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, in their capacities as liquidators and representatives of LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, and LANDMARK INVESTMENT FUND IRELAND, <br><br> Defendants. | Adv. Pro. No. 10-05311 (SMB) <br><br> <u>**AMENDED COMPLAINT**</u> |

# TABLE OF CONTENTS

**Page**

NATURE OF THE PROCEEDING ................................................................. 1

JURISDICTION AND VENUE ..................................................................... 4

BACKGROUND, THE TRUSTEE AND STANDING ................................ 4

THE PONZI SCHEME .................................................................................. 7

THE DEFENDANTS ................................................................................... 10

    A.    Luxembourg Investment Fund and Its Sub-Fund, Luxembourg Investment Fund U.S. Equity Plus .................................................................... 11

    B.    Landmark Investment Fund Ireland ..................................................... 12

    C.    The UBS Defendants ........................................................................... 12

    D.    M&B Capital Advisers Sociedad de Valores ....................................... 13

    E.    The Reliance Group Defendants .......................................................... 13

PRIOR TO THE CREATION OF LIF-USEP, THE UBS DEFENDANTS WERE AWARE THAT IT WAS IMPOSSIBLE FOR BLMIS'S INVESTMENT STRATEGY TO GENERATE ITS PURPORTED RETURNS ................................................... 14

    A.    Early On, UBS and Its Affiliates Voiced Concerns About Madoff's Impossible Returns ............................................................................. 14

    B.    UBS Established and Serviced Luxalpha and Groupement Financier in Exchange for Millions of Dollars in Fees ............................................ 15

THE DEFENDANTS ESTABLISHED LIF-USEP AND LANDMARK DESPITE THEIR KNOWLEDGE OF, OR WILLFUL BLINDNESS TO, FRAUD AT BLMIS .......................... 17

    A.    M&B Engages Echeverría to Gain Access to Madoff ........................... 17

    B.    Through Its Agent Echeverría, M&B Was Confronted With Indicia of Fraud at BLMIS .................................................................................. 18

    C.    Echeverría and M&B Worked with UBS and the Reliance Group to Establish LIF-USEP ........................................................................... 21

    D.    Echeverría and M&B Established Landmark After UBS Closed LIF-USEP to New Subscriptions as a Result of Concerns About Madoff .............. 23

    E.    The UBS Defendants Received Fees of at Least $16.8 Million in Connection with LIF-USEP ................................................................ 25

    F.    The Reliance Group Defendants Collected Millions in LIF-USEP Fees ............. 26

    G.    M&B and Its Affiliates Redeemed Their Proprietary Investments in BLMIS Before Madoff's Arrest and Retained Millions of Dollars in Fees .......... 28

## TABLE OF CONTENTS
### *(continued)*

Page

H.    The Reliance Group Defendants Created the Defender Fund Despite the
Indicia of Fraud Surrounding BLMIS ................................................................. 29

DEFENDANTS KNEW THAT BLMIS WAS THE PERFECT STRUCTURE FOR FRAUD ... 30

A.    Defendants Were Aware of Objective Market Impossibilities for Which
There Was No Plausible Explanation Other Than Fraud ....................................... 31

    1.    The SSC Strategy BLMIS Purported to Employ Could Not Yield
the Results Reported on the BLMIS Account Statements ......................... 32

    2.    LIF-USEP's and Landmark's BLMIS Account Statements
Reported Impossible Options Trading Volumes ....................................... 37

    3.    Trades Were Executed Outside the Daily Price Range ............................. 43

    4.    The Timing of BLMIS's Securities Transactions Was Impossible ........... 44

    5.    The Dividend Activity Reported on Customer Statements Was
Impossible ............................................................................................... 45

B.    In Addition to Being Aware of Objective Evidence of Fraud, the
Defendants Were Presented With Myriad Subjective Indicia of Fraud ................ 46

    1.    LIF-USEP's and Landmark's Account Statements Demonstrated
That Madoff Was Not Implementing the SSC Strategy ........................... 46

    2.    Madoff's Claims to Trade Options in the Over-the-Counter Market
Were False ............................................................................................... 48

    3.    LIF-USEP and Landmark Regularly Had Negative Cash Balances
With BLMIS ............................................................................................ 54

    4.    BLMIS, Known as an Innovator in Electronic Trading, Provided
Delayed Paper-Only Customer Statements .............................................. 56

    5.    Madoff's "Strip Mall" Auditor Was Neither Qualified Nor Capable
of Auditing a Global Investment Company With Billions of
Dollars Under Management ...................................................................... 57

    6.    Madoff's Unusual Fee Structure .............................................................. 58

    7.    BLMIS's Role as Sub-custodian and Lack of Account Segregation
Were Recognized As Serious Fraud Risks ............................................... 59

    8.    Defendants Were Unable to Verify the Assets BLMIS Reported to
Hold or the Trading Activity in Which It Purported to Engage ............... 61

    9.    Madoff's Insistence on Secrecy and Lack of Transparency ..................... 65

    10.    Lack of Scalability .................................................................................. 68

# TABLE OF CONTENTS
## *(continued)*

Page

11.    The UBS Defendants and LIF-USEP Intentionally Violated the Law and Misled Regulators in Delegating Duties to BLMIS ................... 68

12.    BLMIS's Trade Confirmations Frequently Contained Settlement Period Abnormalities .............................................................. 76

IMPUTATION OF KNOWLEDGE FROM THE UBS DEFENDANTS, M&B, THE HSBC SERVICE PROVIDERS, AND THE RELIANCE GROUP DEFENDANTS TO LIF-USEP AND/OR LANDMARK ........................................................................ 76

THE TRANSFERS ........................................................................... 78

A.    The Initial Transfers ............................................................. 78

B.    The Subsequent Transfers ...................................................... 79

CUSTOMER CLAIMS ...................................................................... 82

COUNT ONE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551 *Against the Feeder Fund Defendants* .............. 83

COUNT TWO: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), AND 551 *Against the Feeder Fund Defendants* .............. 84

COUNT THREE: RECOVERY OF SUBSEQUENT TRANSFERS 11 U.S.C. §§ 105(a) AND 550(a) *Against the Subsequent Transferee Defendants* ..................................... 86

COUNT FOUR: OBJECTION TO AND DISALLOWANCE OF CUSTOMER CLAIMS *Against LIF, LIF-USEP, and UBS SA* ......................................................... 87

COUNT FIVE: EQUITABLE DISALLOWANCE OF CUSTOMER CLAIMS *Against LIF, LIF-USEP, and UBS SA* ...................................................................... 88

COUNT SIX: EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS *Against LIF, LIF-USEP, and UBS SA* ...................................................................... 89

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of

Bernard L. Madoff ("Madoff") (collectively, the "Debtors"), individually, under the Securities

Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"), by and through his undersigned

counsel, as and for his Amended Complaint, alleges as follows:

## **NATURE OF THE PROCEEDING**

1.      In this action under SIPA, the Trustee seeks the avoidance of the fraudulent

transfers of customer property the Defendants received from BLMIS, the recovery of those

transfers or their value from the Defendants and/or any subsequent transferees that received any

portion of the initial transfers from BLMIS, and any other relief the Court deems just, proper,

and equitable.

2.      This action focuses on transfers to two BLMIS feeder funds, defendants

Luxembourg Investment Fund-U.S. Equity Plus ("LIF-USEP") and Landmark Investment Fund

Ireland ("Landmark") and the network of individuals and entities associated with them, which

were integral to perpetuating Madoff's Ponzi scheme.

3.      LIF-USEP and Landmark were established by a group of well-connected and

sophisticated investment professionals.  The members of this group included M&B Capital

Advisers Sociedad de Valores S.A. ("M&B"), its principals, Guillermo Morenes Mariategui

("Morenes") and Francisco Javier Botín Sanz de Sautuola O'Shea ("Botín"), Reliance

International Research LLC ("RIR"), Reliance Management (BVI) Limited ("Reliance BVI"),

Reliance Management (Gibraltar) Limited (together with RIR and Reliance Gibraltar, the

"Reliance Group"), Reliance Group principals Tim Brockmann and Justin Lowe, and Manuel

Echeverría.

4.      At the time of LIF-USEP's creation, Echeverría was the head of Optimal
Investment Services, S.A. ("Optimal"), a subsidiary of Banco Santander ("Santander").  Optimal
was the investment manager for Optimal U.S. Equity Fund ("Optimal SUS"), an investment fund
whose $3.2 billion in assets were invested entirely with BLMIS.  Morenes and Botín worked at
Santander until 2000, when they left to form M&B, and it was at Santander that they formed a
relationship with Echeverría.  Even before LIF-USEP, M&B directed investments with Madoff
through Optimal SUS.

5.      Brockmann also had a close relationship with Echeverría, and positioned the
Reliance Group to capitalize on Echeverría's business ties with Madoff.  Through Echeverría,
M&B and the Reliance Group were introduced, as part of a joint venture, to Madoff.  This joint
venture led to LIF-USEP's creation in August 2005, and Landmark's creation in September
2007.

6.      Both LIF-USEP and Landmark had highly sophisticated service providers—for
LIF-USEP, the UBS Defendants and Reliance Group Defendants (as defined below), and M&B,
and for Landmark, HSBC and M&B—all of which were aware of the impossibilities associated
with Madoff's strategy and purported trading, as well other indicia of his fraud.

7.      Even before the UBS Defendants became involved with LIF-USEP, UBS analysts
determined that BLMIS's purported performance was impossible, given the strategy that Madoff
claimed to employ.  UBS analysts assessing Madoff's results concluded that "it would be
IMPOSSIBLE to generate the returns that he produced since 1990."  This and other indicia of
fraud led UBS's Private Wealth Management Group to put BLMIS on a "non-approved" list,
prohibiting the recommendation of BLMIS to Private Wealth clients out of concern that BLMIS
was a fraudulent scheme.

8.      The UBS Defendants nevertheless found a way to profit from Madoff's fraud. The UBS Defendants assumed a number of key roles for LIF-USEP, but delegated those roles to Madoff and/or BLMIS.  UBS then sought to avoid any potential liability through indemnity agreements and insurance policies that were never disclosed to investigators or regulators.

9.      UBS concealed Madoff's involvement with LIF-USEP from the Luxembourg regulator, the Commission de Surveillance du Secteur Financier (the "CSSF"), knowingly omitting any reference to Madoff or BLMIS when identifying LIF-USEP's custodians and managers.

10.      The Defendants received and reviewed LIF-USEP's, Landmark's, and other BLMIS feeder funds' account statements and, based on those documents, knew that Madoff could not be executing the securities transactions reported therein, because many of them were simply impossible.

11.      Although they had evidence strongly indicating that BLMIS was engaged in fraud, the Defendants continued to facilitate the investment of hundreds of millions of dollars with BLMIS.  Collectively, the Defendants received approximately $550,500,000 in avoidable transfers from BLMIS.  The Defendants profited, receiving at least $17.6 million in management, custodial, advisory, administration, and performance fees in connection with moneys directed to LIF and Landmark and invested with BLMIS.  All moneys withdrawn from BLMIS, whether redemptions by feeder funds or fees paid to the feeder funds' service providers, is customer property, and must be returned to the Trustee for equitable distribution to BLMIS customers.

## JURISDICTION AND VENUE

12.     This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities and Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC*, No. 08 CV 10791 (the "District Court Proceeding"), and has been referred to this

Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and

(e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

13.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H), and

(O).  The Trustee consents to the entry of final orders or judgments by this Court if it is

determined that consent of the parties is required for this Court to enter final orders or judgments

consistent with Article III of the U.S. Constitution.

14.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

15.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),

11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 548(a), 550(a), and 551, the New York

Civil Practice Law and Rules (McKinney 2003) ("N.Y. C.P.L.R."), and other applicable law.[1]

## BACKGROUND, THE TRUSTEE AND STANDING

16.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding.

---

[1] Until a final determination on appeal of the applicable measure and burden of proof concerning a defendant's knowledge in connection with the applicability of section 546(e) of the Bankruptcy Code to the Trustee's claims to avoid and recover transfers made within six years of the Filing Date, the Trustee asserts avoidance and recovery claims under sections 548(a)(1)(B), 544(b)(1), 550 and 551 of the Bankruptcy Code.  Until a final determination on appeal of the applicability of section 502(a) and (b)(1), and equitable grounds as a basis to challenge any claim against the estate, the Trustee asserts such grounds for relief in this proceeding.

17.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(4)(A)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

18.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

19.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

20.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

21.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

22.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded

guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

23.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

24.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

25.    As the trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing Customer Property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

26.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

6

to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy
Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

27.    The Trustee has standing to bring the avoidance and recovery claims under SIPA
§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b),
544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover
transfers under Bankruptcy Code sections 544, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and
78fff-2(c)(3).

28.    The Trustee has standing to object to customer and creditor claims under SIPA
§§ 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and
authority to discharge obligations to a customer to the extent they are established to the
satisfaction of the Trustee under SIPA §§ 78*lll*(2) and 78fff-2(b).  By his objection, the Trustee
seeks disallowance of any customer and general creditor claims that are unenforceable against
the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not been
established to his satisfaction; (ii) SIPA § 78*lll*(2), because such claims are not entitled to a
distribution *pari passu* with other customers; and (iii) 11 U.S.C. § 502(b)(1), because such
claims are otherwise unenforceable under applicable law.

## THE PONZI SCHEME

29.    Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1,
2001, Madoff continued BLMIS as a sole member limited liability company under the laws of
the State of New York.  BLMIS's ownership and control did not change since its formation in
1960.  During that time, BLMIS had been continually registered with the SEC, and remained a
SIPC member since its formation in late 1970.  For most of its existence, BLMIS operated from
its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder,
sole owner, chairman, and chief executive officer, operated BLMIS with several family members

7

and other employees, including DiPascali and David Kugel, who have pleaded guilty to helping

Madoff carry out the fraudulent scheme.

30.    Beginning in the 1990s, Madoff outwardly ascribed the consistent investment

success of BLMIS's IA Business to the "split-strike conversion" ("SSC") investment strategy.

Madoff claimed his strategy would produce steady returns without the volatility in the stock

market or other high return investment strategies.  Madoff generally indicated that investors'

funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index

("S&P 100 Index"), which is a collection of the 100 largest publicly traded companies, as

determined by Standard & Poor's Index Committee.  The basket of stocks was designed to

correlate to the movement of the S&P 100 Index.  The second part of the SSC strategy involved

purporting to sell call options and buy put options on the S&P 100 Index; this is commonly

referred to as a "collar."  Madoff purported to purchase and sell option contracts to control the

downside risk of price changes in the basket of stocks correlated to the performance of the S&P

100 Index.  All options relating to the companies within the S&P 100 Index, including options

based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").

The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-

listed options.

31.    BLMIS commingled all of the funds received from IA Business investors in a

single BLMIS account maintained at JPMorgan Chase Bank.

32.    Because Madoff claimed that he would carefully time purchases and sales to

maximize value, customer funds would intermittently be out of the market.  During those times,

Madoff claimed that the funds were invested in U.S. Treasury securities ("Treasury Bills") or

mutual funds invested in Treasury Bills.  There is no record of BLMIS clearing a single purchase

or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing

Corporation, the clearing house for such transactions, or any other trading platform on which

BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that

BLMIS traded securities using the SSC strategy.

33.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased

none of the securities listed on the IA Business customers' fraudulent statements.

34.    Madoff operated the IA Business as a Ponzi scheme.  The money received from

IA Business customers was used primarily to make distributions to, or payments for, other

customers.  The falsified trades reflected in monthly account statements made it appear that the

IA Business accounts included substantial gains on customers' principal investments.  The Ponzi

scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow

of new investments with BLMIS's IA Business.

35.    Since at least 1983, BLMIS financial reports filed with the SEC fraudulently

omitted the existence of the billions of dollars of customer funds held by BLMIS.

36.    BLMIS did not register as an investment adviser with the SEC until August 2006.

At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment

Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts

and assets under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually

with the SEC, the latest of which was filed in January 2008.  It represented that BLMIS had 23

customer accounts with assets under management of $17.1 billion.  In fact, at that time BLMIS

had over 4,900 active customer accounts with a purported value of approximately $68 billion

under management.

37.     Contrary to standard practice in the investment advisory industry, BLMIS did not charge the IA Business customers a fee for investment advisory services.  Madoff knew others that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged hundreds of millions of dollars for investment advisory services attributed to BLMIS.  Instead of investment advisory fees, BLMIS purported to accept commissions for the purported trades, as reflected in the fraudulent IA Business customer statements.

38.     BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York.  Of the three employees at the firm, one employee was an administrative assistant and one was a semi-retired accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

39.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE DEFENDANTS

40.     This Court has personal jurisdiction over all of the Defendants under N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004.  All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.  The Defendants have or had offices in New York, or are doing or did business in New York, and/or transact or transacted business in New York.  During the relevant time periods addressed herein, Defendants LIF-USEP and Landmark had accounts with BLMIS in New York.  The UBS Defendants, the Reliance Group Defendants, and M&B delivered agreements or caused agreements to be delivered in New York relating to BLMIS.  In addition, certain of the UBS Defendants, Reliance

Group Defendants, and M&B communicated regularly with persons in New York regarding the

Feeder Fund Defendants, as defined below, and/or BLMIS, and also sent and/or received funds

to and/or from BLMIS in New York, using New York banks.  In addition, LIF-USEP filed

customer claims in the SIPA Proceeding, seeking to recover funds it allegedly lost on

investments in BLMIS, and has thus submitted to the jurisdiction of this Court.

A.    **Luxembourg Investment Fund and Its Sub-Fund, Luxembourg Investment Fund U.S. Equity Plus**

41.    Defendant Luxembourg Investment Fund ("LIF") was a Luxembourg corporation,

with its registered office at 33a Avenue John F. Kennedy, L-1855 Luxembourg.  It was

registered in the Luxembourg Trade and Companies Register under No. B.88859.

42.    LIF was structured as a *société d'investissement à capital variable*, or

"SICAV"—an open-ended umbrella investment company with multiple sub-funds.  On August

18, 2005, defendant LIF-USEP, a sub-fund of LIF, was formed for the exclusive purpose of

investing with BLMIS.  An account in the name of "UBS (Luxembourg) S.A. for the benefit of

Luxembourg Investment Fund U.S. Equity Plus" was opened with BLMIS, and held account

number 1FR123 with BLMIS.  LIF-USEP's account was still open when Madoff was arrested on

December 11, 2008.

43.    LIF, including LIF-USEP, was placed in liquidation by the District Court of

Luxembourg on April 30, 2009 and is represented by its court-appointed liquidators, Alain

Rukavina, barrister (*avocat á la Cour*) and Paul Laplume, company auditor (Me. Rukavina and

Mr. Laplume are, together, the "Luxembourg Liquidators").  Me. Rukavina and Mr. Laplume

reside in Luxembourg.  Me. Rukavina resides at 10A, Boulevard de la Foire, L-1528

Luxembourg.  Mr. Laplume resides at 42, Rue des Cerises, L-6113 Junglinster.  Me. Rukavina

and Mr. Laplume are also defendants in their capacities as LIF's and LIF-USEP's liquidators and

representatives; accordingly, the defined terms "LIF" and "LIF-USEP" include Me. Rukavina and Mr. Laplume.

44.     On or about March 2, 2009, LIF filed a customer claim with the Trustee, which the Trustee designated as Claim No. 004417.  On or about March 3, 2009, LIF filed another customer claim with the Trustee, which the Trustee designated as Claim No. 006182.

**B.      Landmark Investment Fund Ireland**

45.     Defendant Landmark was an Irish corporation established as a sub-fund of AA (Alternative Advantage) plc ("AA").  Before November 25, 2004, AA's name was M&B Capital plc, a reference to its founders, Morenes and Botín.  Upon information and belief, Landmark's office was located at HSBC House, Harcourt Centre, Harcourt Street, Dublin 2, Ireland.

46.     At all relevant times, HSBC Institutional Trust Services (Ireland) Ltd. ("HITSI") served as the custodian for AA and its sub-funds, including Landmark.  At all relevant times, HSBC Securities Services (Ireland) Ltd. ("HSSI") was Landmark's administrator.  HITSI and HSSI are not parties to this action; the Trustee is pursuing claims against them in a separate action.  HITSI and HSSI are hereinafter referred to collectively as the "HSBC Service Providers."

47.     Landmark was formed for the exclusive purpose of investing with BLMIS.  An account in the name of "HSBC Institutional Trust Svcs (Ireland) Ltd. for the benefit of Landmark Investment Fund Ireland" was opened with BLMIS, and held account number 1FR133 with BLMIS.  Landmark's account was still open when Madoff was arrested on December 11, 2008.

**C.      The UBS Defendants**

48.     Defendant UBS AG is a Swiss corporation with registered and principal offices at Bahnhofstrasse 45, CH-8098 Zurich, and at Aeschenvorstadt 1, CH-4051 Basel, Switzerland.  UBS AG also has New York offices, located at 299 Park Avenue, New York, NY 10171 and 787

Seventh Avenue, New York, NY 10019, along with offices in Stamford, Connecticut and other locations in the United States.

49.    Defendant UBS (Luxembourg) S.A. ("UBS SA"), is a wholly-owned subsidiary of UBS AG, and is a Luxembourg *société anonyme* (public limited company) with its registered office at 33a, Avenue John F. Kennedy, BP2, L-1855 Luxembourg.

50.    Defendant UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), is a wholly-owned subsidiary of UBS AG, and is a Luxembourg *société anonyme*, with registered offices at 33a Avenue John F. Kennedy, L-1855 Luxembourg.

51.    Defendant UBS Third Party Management Company S.A. ("UBSTPM" and together with UBS AG, UBS SA, and UBSFSL, the "UBS Defendants"), is a wholly-owned subsidiary of UBS AG and a Luxembourg *société anonyme*, with its registered office at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.

52.    On or about March 2, 2009, on behalf of LIF-USEP, UBS SA filed a customer claim with the Trustee.  The Trustee designated the claim as Claim No. 004536.

**D.    M&B Capital Advisers Sociedad de Valores**

53.    Defendant M&B is a Spanish investment services firm, with headquarters at Paseo de la Castellana, No. 21, 28046, Madrid, Spain.

54.    M&B served as Landmark's investment manager from the fund's inception in 2007 until April 2008.  Beginning in April 2008, M&B affiliate M&B Capital Advisers Gestión SGIIC ("M&B SGIIC") was Landmark's investment manager.  In January 2010, M&B SGIIC was merged into M&B.  The defined term "M&B" includes M&B SGIIC.

**E.    The Reliance Group Defendants**

55.    Defendant Reliance Gibraltar is a Gibraltar corporation, with its registered address at Suite 207, Neptune House, Marina Bay, Gibraltar.

13

56.     Defendant RIR is a New York limited liability company, with registered offices at

147 East 48th Street, New York, NY 10017, USA.

## PRIOR TO THE CREATION OF LIF-USEP, THE UBS DEFENDANTS WERE AWARE THAT IT WAS IMPOSSIBLE FOR BLMIS'S INVESTMENT STRATEGY TO GENERATE ITS PURPORTED RETURNS

### A.     Early On, UBS and Its Affiliates Voiced Concerns About Madoff's Impossible Returns

57.     In the early 2000s, UBS Wealth Management, a UBS AG business division

considered, and rejected, BLMIS as a vehicle for investment and derivative financial products.

58.     In the aftermath of Madoff's collapse, in 2009, UBS sought to create a public

perception that UBS Wealth Management's approach was indicative of UBS's overall approach

to investment with Madoff.   Post-collapse, UBS touted UBS Wealth Management's ability to

foresee the problems at BLMIS as its own.  But UBS Wealth Management's assessment of

Madoff in the early 2000s is not an accurate depiction of UBS's involvement with Madoff feeder

funds.   Indeed, the UBS Defendants created, sponsored and operated multiple BLMIS feeder

funds, directing billions of dollars into the Ponzi scheme.

59.     After Madoff's fraud was revealed, UBS AG, the parent company of the other

UBS Defendants, stated publicly that it had no material exposure to BLMIS.  UBS cultivated the

public perception that it had reviewed Madoff in the early 2000s, detected risks and,

consequently, designated Madoff as "non approved" for investment.

60.     Several other UBS entities—the UBS AG-subsidiary UBS O'Connor, among

them—also analyzed BLMIS and as early as 2002 found its performance figures to be "more or

less impossible" in light of the strategy Madoff claimed to employ.  The UBS analysts assessing

the strategy stated "[w]e consider ourselves pretty smart and no one in their firm [BLMIS] has

properly explained their strategy to match the return profile to us, so we avoid stuff like that."

14

Like UBS Wealth Management, UBS O'Connor also considered and then rejected the idea of recommending Madoff investment to its clients.

61.    Assessing BLMIS again in 2004, UBS O'Connor concluded that "it would be IMPOSSIBLE to generate the returns that [Madoff] has produced since 1990."

62.    In addition to concluding that BLMIS's returns were impossible under the SSC strategy, UBS O'Connor also questioned Madoff's practice of not charging fees, choosing to earn revenue only from commissions.  The "simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another [was] a non-starter" in UBS O'Connor's assessment, and reason enough to stay away from BLMIS investment.

63.    In 2005, when considering another Madoff investment, UBS O'Connor reiterated its doubts about the propriety of Madoff's operations and whether Madoff's purported implementation of the SSC strategy could generate the results he reported.

64.    Between September 2007 and December 2008, UBS AG was approached about investing in several BLMIS-related products.  In accordance with UBS policy, UBS designated its London-based risk analysts to visit BLMIS headquarters and meet "face to face" with BLMIS's manager.

65.    Madoff declined the request for a meeting on the grounds that agreeing to meet with one potential investor would force him to meet with others.

66.    UBS AG ultimately decided that it did not have sufficient information on Madoff and BLMIS to recommend BLMIS as an investment target for its clients.

**B.    UBS Established and Serviced Luxalpha and Groupement Financier in Exchange for Millions of Dollars in Fees**

67.    Although several UBS entities had rejected BLMIS as an unsuitable investment, UBS recognized that there was strong market demand for Madoff investments and that there was

money to be made by meeting that demand.  By creating BLMIS feeder fund Luxalpha SICAV ("Luxalpha"), UBS established a means of capturing that market.

68.    In March 2004, UBS SA opened BLMIS account number 1FR108 which was held in the name "UBS (Luxembourg) S.A. for the benefit of Luxalpha."  UBS assumed various roles in support of Luxalpha, including administrator (UBSFSL), investment manager (UBSTPM), and portfolio manager (UBS SA).  Through Luxalpha, more than $1.5 billion was directed into BLMIS.  The UBS Defendants received millions of dollars in fees in connection with their roles as Luxalpha service providers.

69.    Luxalpha's nascency was fraught with negative feedback about BLMIS.  A UBS AG (Zurich) employee stated that Madoff's role as both Luxalpha's manager and custodian was, by itself, a sufficient reason to decline investment with BLMIS:

> [W]e normally have to give "NO" as the answer in cases like Madoff.  In doing so, we make reference to the following principles: no broker as depository, and the broker may under no circumstances also be a depository at the same time!  Such a NO is easy to comprehend for both business policy reasons and risk reasons.

70.    Nevertheless, after UBS SA persuaded it to do so, UBS AG granted an exception to its usual policy prohibiting the delegation of custodial and management authority to a single entity.

71.    UBS SA recognized the considerable risk of investing with BLMIS, but because it knew that BLMIS's investment "would be advantageous on the income side," it dismissed the risks, looked into "additional insurance," and forged ahead to establish Luxalpha.

72.    The internal message imparted by high-level UBS employees was clear: concerns about fraud at BLMIS were not to prevent UBS from profiting.  Bernd Stiehl, a Luxalpha director and a UBS SA managing director, subordinated negative reports on BLMIS to UBS's

drive to capitalize on Madoff.  "Business is business," Stiehl wrote.  "We cannot permit

ourselves to lose 300 million.  Accept client."

73.    The UBS Defendants set aside their concerns about fraud at BLMIS to service

another BLMIS feeder fund, Groupement Financier Ltd. ("Groupement Financier"), which held a

direct BLMIS account.  Starting in 2005, UBS SA acted as Groupement Financier's prime bank,

and UBSFSL served as its administrator.  In a Groupement Financier Operating Memorandum

dated July 12, 2005, the UBS Defendants stated in extra-large, bold font: "**Not to do: Neither**

**[UBS SA] nor UBSFSL should ever enter into a direct contact with Bernard Madoff!!!**"

The UBS Defendants were explicitly aware of the risks of doing business with BLMIS, and took

steps to try to limit their exposure.

74.    Through Luxalpha and Groupement Financier, the UBS Defendants observed

many impossibilities and indicia of Madoff's fraud, beginning in April 2003.  The UBS

Defendants are also the subject of a separate action by the Trustee with respect to Luxalpha and

Groupement Financier.

### THE DEFENDANTS ESTABLISHED LIF-USEP AND LANDMARK DESPITE THEIR KNOWLEDGE OF, OR WILLFUL BLINDNESS TO, FRAUD AT BLMIS

**A.    M&B Engages Echeverría to Gain Access to Madoff**

75.    In the early 2000s, M&B engaged Echeverría to act on its behalf in creating a

vehicle designed to invest exclusively with BLMIS.  M&B associated themselves with

Echeverría because he provided them access to BLMIS and Madoff.  As one of Madoff's top

European envoys, Echeverría was uniquely situated.  He had access to a wealth of knowledge

about Madoff and his purported investment strategy.  M&B knew that Echeverría played a

prominent role in creating a network of entities and individuals designed to direct investments

into BLMIS.  Before joining Optimal, Echeverría had long been a high-ranking official with

Santander, first as Banco Santander (Suisse)'s Executive Vice President, and then as manager of the International Private Banking Division of Santander's Portfolio Management and Fund Management Group.

76.     M&B was formed in 2000 by Morenes and Botín.  Morenes and Botín are part of the immediate family that founded Santander.  Botín's father, Emilio Botín Sanz, was Santander's executive chairman until his death in September 2014.  Morenes's wife, Ana Patricia Botín, is Mr. Botín Sanz's daughter, and, upon his death, succeeded him as Santander's executive chair.  Botín is on Santander's Board of Directors, a position he has held since 2004.

77.     M&B operated as a broker under the supervision of the Spanish market regulator *La Comisión Nacional del Mercado de Valores* until it transformed into a broker-dealer and incorporated as a member of the Madrid Stock Exchange in 2004.  M&B provided asset management, portfolio management, financial advisory, trade execution, investment advisory, IPO and secondary placement, and private placement services.

78.     M&B became involved with Madoff through Optimal SUS, a wholly-owned Santander subsidiary that Echeverría ran and M&B marketed to investors.  In 2009, the Trustee entered into a settlement agreement with Optimal SUS that was approved by the Bankruptcy Court.

## B.      Through Its Agent Echeverría, M&B Was Confronted With Indicia of Fraud at BLMIS

79.     Echeverría was one of Madoff's top envoys in Europe.  Madoff favored Echeverría because Echeverría was ensconced in the circles of wealthy European investors that Madoff sought as new sources of money to sustain his Ponzi scheme.  Echeverría regularly met with Madoff in New York and frequently communicated with him by telephone and fax.

80.    Echeverría used his relationship with Madoff to manage multiple direct accounts at BLMIS.  In 1996, Optimal Arbitrage Limited fund opened an account at BLMIS.  In 1997, Optimal SUS fund opened an account with BLMIS.  Optimal Arbitrage Limited and Optimal SUS, both of which were ultimately owned by Santander and managed by Echeverría, together directed more than $2 billion into BLMIS.

81.    With Echeverría's access to Madoff came his exposure to evidence of Madoff's and BLMIS's fraud.  Under Echeverría's management, Optimal prided itself on its "intensive and thorough due diligence" of its investment targets.  BLMIS was no exception.

82.    In September 2002, Optimal sent an investigative team to New York to meet with Madoff and attorneys from several New York law firms.  The investigation resulted in two memoranda to Echeverría by Optimal in-house counsel, one setting forth Optimal's concerns going into the meeting and the second addressing concerns that had arisen before the meeting and that the meeting failed to dispel.

83.    The first memorandum stated, "Madoff is very secretive and has a policy requiring its clients of not disclosing [BLMIS's] name in any documents such as Prospectus, audited financial statements, marketing reports . . . ."  The memorandum further noted that BLMIS held Optimal Arbitrage Limited's and Optimal SUS's assets, and refused to allow the assets to be custodied elsewhere.  The second memorandum stated that "[Optimal's] primary main concern was that Madoff did not permit any customer, including us, to disclose his/[BLMIS's] name in the Prospectus, financial statements, both as broker-dealer and as custodian of the assets."  It also mentioned Madoff's insistence on self-custody.

84.    As Echeverría and his team performed more due diligence on BLMIS, they observed more indicia of fraud.  An August 4, 2003 meeting in New York between Echeverría

and his team and Madoff yielded a memorandum describing indicia of fraud.  For some indicia,

Optimal trotted out explanations that only raised greater concern—for example, even though

Optimal recognized that collecting management fees would have been highly lucrative for

Madoff, it noted Madoff's forgoing such fees "to avoid attracting regulatory inspection."

85.    Other indicia of fraud were so glaring that they defied legitimate explanation.

86.    After the August 2003 meeting, Optimal's concerns about Madoff only grew.  On

June 16, 2004, senior Optimal due diligence employee Hugh Burnaby-Atkins wrote an email to

Echeverría that all but concluded that BLMIS was a Ponzi scheme:

> QUESTIONS: Why are there no former Madoff employees out in the market place? Does he really pay them so well that they never leave? These people ought to be able to command unholy prices if they were to go to say, Millennium, DE Shaw or Rennaissance [sic] taking his "secret" with them . . . Why are tickets not time stamped? What are the commissions on winning/losing trades? How can he move $20bn of equities in/our[sic] of the market without affecting prices?  Has anyone spoken to any of his counterparties (either on the equity or the option trades) to confirm fills?
>
> **SUPPOSE this was the largest Ponzi scheme in history** – unpalatable but we are not the first to suggest it – he would need (1) to ensure that no-one saw how the signal was generated (2) ensure that no one knew which trades were split-strike and which were regular customer orders – **this could be achieved if there really were no trades! And no traders to take the secret to competitors.  But for this he would need a constant inflow of funds to support the pyramid – which appears to be the case** . . . No doubt many of these questions have been asked already but given his size and significance to our business we feel we should be asking them again.  (emphasis added).

87.    Echeverría was aware of the contents of these memoranda, in addition to other

Optimal memoranda raising concerns about BLMIS.  Nevertheless, Echeverría facilitated

M&B's establishment of LIF-USEP, and acted at all times as M&B's and LIF-USEP's agent.

C.    **Echeverría and M&B Worked with UBS and the Reliance Group to Establish LIF-**
      **USEP**

88.    In or around 2004, M&B established a new Madoff feeder fund, which, once

established, was named LIF-USEP.  M&B drew on Echeverría's connections to enlist both the

UBS Defendants and the Reliance Group Defendants to serve in various roles for the new fund,

thereby facilitating its establishment and its approval as a UCITS fund.

89.    In 2004, Echeverría approached his long-time friend, Tim Brockmann, Reliance's

founder, with an opportunity for a yet-to-be-determined Reliance entity to act as the fund's

official investment advisor.

90.    Like M&B's principals, the Reliance Group's principals, Brockmann and his

childhood friend Justin Lowe, sought to capitalize on Madoff and BLMIS through Echeverría's

connections.  When Echeverría and M&B presented the Reliance Group with the lucrative

opportunity to be a service provider for a new Madoff feeder fund, the Reliance Group seized it.

91.    In late 2004, M&B asked Echeverría to approach Madoff to open a direct BLMIS

account for M&B.

92.    In December 2004, Echeverría worked with Serge Karp of UBS SA to obtain the

UBS Defendants' support for the formation of a new fund—LIF-USEP—and their agreement to

serve as LIF-USEP's official sponsor, custodian, and administrator.

93.    Reliance Gibraltar assumed the role of LIF-USEP's investment advisor, a position

it held until the fund was placed into liquidation.  M&B served as the fund's distributor.

94.    LIF-USEP was designed to replicate the UBS AG-sponsored Luxalpha which was

also wholly invested with BLMIS.  LIF-USEP opened account number 1FR123 with BLMIS and

began investing directly with BLMIS in September 2005.  Throughout LIF-USEP's life, it was

wholly invested with BLMIS in New York.

95.    LIF-USEP did not have any employees or independent office space.  Rather, the UBS Defendants, in conjunction with M&B and the Reliance Group Defendants, operated the fund.

96.    M&B was essential to the formation of LIF-USEP.  As M&B principal and director Juan Carlos Rodriguez Hergueta ("Hergueta") wrote in a letter to Echeverría, "[w]ithout M&B [LIF-USEP] would not be possible."  M&B placed more than €150 million of its clients' private and institutional capital with BLMIS.  M&B founder Morenes met with Madoff twice in the two years prior to Madoff's arrest.  M&B employees also communicated with New York-based RIR by email at least several times every month between 2005 and 2008, discussing LIF-USEP's account activity, Madoff's purported trades and the process of obtaining trade-level information, subscriptions and redemptions from LIF-USEP's accounts, negotiations about the fees M&B would collect, LIF-USEP's offering documents and financial statements, and discussions of Madoff's investment strategy.

97.    UBS recognized that in connection with LIF-USEP, it could enrich itself by installing subsidiaries as service providers with Madoff feeder funds and collecting fees, just as it had done with Groupement Financier, founded in 2003, and Luxalpha, founded in 2004.  UBS AG and its subsidiaries were deliberately positioned with LIF-USEP to give outsiders the impression that UBS occupied prominent roles with the fund.  UBS SA and UBS AG were the fund's co-sponsors.  UBS SA was its official custodian.  UBS SA and UBSTPM, another UBS AG subsidiary, were the fund's official investment managers.  UBSFSL was its administrator.

98.    LIF-USEP's board of directors was stocked with UBS SA employees: at all times, all members of LIF's board of directors were also UBS SA employees.  The following chart sets forth LIF-USEP's organizational structure:

22



**D.      Echeverría and M&B Established Landmark After UBS Closed LIF-USEP to New Subscriptions as a Result of Concerns About Madoff**

99.      M&B correctly predicted that LIF-USEP would inspire significant demand for investment.  The fund's rapid growth left UBS SA and UBS AG " not comfortable with their overall exposure to Madoff."

100.      In March, 2007, concerns about BLMIS prompted the UBS Defendants to close LIF-USEP to new subscriptions.  Echeverría wrote to Karp at UBS SA, commenting that, "we [M&B] commit to not allow any more subscriptions into the fund going forward and more important, create a new product . . . to channel the growth going forward and to reduce [assets under management] in LIF."

101.      That new product was Landmark.  To found Landmark, Madoff's approval was needed, and, once again, M&B looked to Echeverría for assistance.  Upon information and belief, in early 2007, Echeverría arranged a meeting between Madoff and M&B to discuss the

creation of a new feeder fund.  In August 2007, Hergueta wrote to enlist Echeverría's help in obtaining Madoff's approval for opening Landmark's BLMIS account opening documents.

102.    In September 2007, with Echeverría's assistance, Hergueta executed Landmark's BLMIS account opening documents, including a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options.  Through these agreements, M&B delegated to BLMIS all management authority for Landmark.  These documents contain a New York choice of law clause.

103.    Echeverría also arranged for Landmark's BLMIS's trade confirmations to be sent directly from BLMIS to M&B.

104.    Landmark had no employees and no independent office space.  M&B operated the fund in connection with HITSI, which served as the official custodian for Landmark's parent fund AA.  Hergueta was both an M&B principal and an AA director, the latter a position he held from November 12, 2003 to July 7, 2008.

105.    Along with M&B, HITSI and HSSI were Landmark's service providers.  HITSI was Landmark's custodian, and HSSI its administrator.

106.    The following chart shows Landmark's organizational structure:


**[This Space Intentionally Left Blank]**



107.    Less than a year after closing LIF-USEP to new subscriptions, the UBS

Defendants had reconsidered and in early 2008 re-opened the fund to new subscriptions.

108.    The UBS Defendants received fees based on LIF-USEP's assets under

management.  To increase their profits, the UBS Defendants set aside their knowledge of fraud at

BLMIS and sought to continue increasing investments in LIF-USEP.

## E.    The UBS Defendants Received Fees of at Least $16.8 Million in Connection with LIF-USEP

109.    Based on the Trustee's investigation to date, throughout LIF-USEP's existence,

the UBS Defendants received at least $16.8 million in fees from the fund.

110.    Upon information and belief, throughout the LIF-USEP's existence, UBS SA

received at least $5.2 million in fees as the fund's custodian.

111.    Upon information and belief, for serving as LIF-USEP's manager from

September 2005 to April 2006, UBS SA received at least $291,000 in fees.

112.    Upon information and belief, for serving as LIF-USEP's administrator, UBSFSL

received at least $748,000 in fees.

113.    Upon information and belief, for serving as LIF-USEP's manager from May 2006 through December 2008, UBSTPM received at least $10.6 million in fees.

**F.    The Reliance Group Defendants Collected Millions in LIF-USEP Fees**

114.    Reliance Gibraltar was one of three companies bearing the name "Reliance" that were created and operated by Tim Brockmann.  Brockmann also created Reliance BVI, Reliance Gibraltar's parent company, and RIR, based in New York.  Initially, Brockmann and his business partner Justin Lowe, a U.S. citizen living and working in New York, co-owned RIR.  Brockmann later sold his interest to Lowe and RIR analyst William Trevor Uhl.

115.    Reliance Gibraltar earned substantial fees for the services it purportedly provided to LIF-USEP.  Reliance Gibraltar earned these fees through its August 18, 2005 Portfolio Advisory Agreement with LIF-USEP and UBS SA and its May 2, 2006 Investment Advisory Agreement with UBSTPM.

116.    Based on the Trustee's investigation to date, UBS SA and UBSTPM paid Reliance Gibraltar approximately $2.4 million in fees, which consisted of a portion of the management fees that UBS SA and UBSTPM received from LIF-USEP.  Upon information and belief, Reliance Gibraltar received additional fees from UBS SA and UBSTPM based upon amounts collected from LIF-USEP.

117.    Reliance Gibraltar subsequently paid a portion of the fees derived from LIF-USEP to RIR pursuant to the Research Services Agreement, dated May 24, 2005, between Reliance Gibraltar and RIR and the Research and Administrative Support Services Agreement, dated September 15, 2008.  These fees were transferred to RIR's bank account in New York. From January 2006 through December 2008, Reliance Gibraltar transferred at least $4,324,482 to RIR's New York bank account.

26

118.    The Reliance Group held itself out as a single business enterprise whose New York operations were essential to the Reliance Group's ability to market and perform services to its clients.  RIR housed the majority of the Reliance Group's employees, and of the eight members of the Reliance Group's "Investment Team," six were RIR employees.  Brockmann visited the RIR office in New York—located just blocks from BLMIS's offices—at least once a quarter for approximately eight years.  At least one of Brockmann's stints in New York lasted several months.  Even when Brockmann was not in New York, he and other Reliance Group personnel were in near-constant communications with RIR.   The Reliance Group used the website "www.reliance-funds.com," which RIR helped design and maintain.   New York-based Lowe and Uhl were listed in the Reliance Group's promotional materials as part of Reliance Gibraltar.  Lowe sent emails with disclaimers stating that the emails were sent by Reliance Gibraltar, not RIR.

119.    Although RIR ostensibly was created to provide research services, it worked together with Reliance Gibraltar, the UBS Defendants, and M&B to effectively manage LIF-USEP.  RIR performed functions beyond those typically performed by a research team, including but not limited to, fundraising, meeting with investors, communicating with UBS SA regarding LIF-USEP's subscriptions and redemptions, and facilitating LIF-USEP's investments with BLMIS.  Over time, RIR took over more and more of Reliance Gibraltar's responsibilities, in part because Reliance Group members believed these activities needed to be performed in New York.  According to Lowe, the "whole purpose" for having RIR operate out of New York was because a majority of the hedge funds were located there.  Brockmann and Lowe met with Madoff in New York on at least two occasions to discuss the Reliance Group's BLMIS investments, including LIF-USEP.  On both occasions, RIR's own notes indicate that

Brockmann was representing Reliance Gibraltar at the meetings.  RIR acted as Reliance

Gibraltar's agent in New York and fulfilled its official investment advisory obligations for LIF-

USEP.

**G.     M&B and Its Affiliates Redeemed Their Proprietary Investments in BLMIS Before Madoff's Arrest and Retained Millions of Dollars in Fees**

120.     M&B and its corporate affiliates invested tens of millions of dollars of their own

money with BLMIS through LIF-USEP and Landmark.  Guided by their knowledge of Madoff's

fraud, they profited through its timely redemptions from BLMIS.  M&B redeemed all of their

proprietary investments—at least $27 million—before BLMIS collapsed in December 2008.

121.     M&B made proprietary investments in LIF-USEP in 2006.  By 2007, it had

redeemed its entire investment position—$2,878,168.

122.     M&B invested millions of dollars in Landmark in 2007; in 2008, it redeemed its

entire investment position—$8,103,190.

123.     M&B's corporate affiliate M&B SGIIC invested in LIF-USEP in 2006.  By 2007,

it had redeemed its entire investment position—$900,455.

124.     M&B's corporate affiliate M&B Capital Markets Sociedad de Valores, S.A.

invested in Landmark in Landmark in 2007.  In 2008, it redeemed its entire investment

position—$15,859,888.

125.     As service providers to LIF-USEP and Landmark, M&B also received millions of

dollars in fees for the services it purportedly provided.

126.     M&B was LIF-USEP's official distributor in Spain and Portugal.  Pursuant to a

September 1, 2005 Consultancy and Exclusive Introducing Agreement between M&B and UBS

SA, a January 1, 2006 Distribution Agreement between LIF and M&B, and a May 2, 2006

Distribution Agreement between M&B and UBSTPM, M&B received fees based upon
investments placed with LIF-USEP.

127.     Upon information and belief, under those agreements, M&B received at least $6
million in trailing and distribution fees from UBS SA and UBSTPM. Those fees consisted of a
portion of the management fees that UBS SA and UBSTPM collected from LIF-USEP.

128.     M&B was Landmark's official investment manager from the inception of the fund
in 2007 until April 2008. Beginning in April 2008, M&B affiliate M&B SGIIC served as
Landmark's official investment manager. M&B and M&B SGIIC together earned management
fees of approximately $777,420.39, based on Landmark's net asset value ("NAV").

**H.     The Reliance Group Defendants Created the Defender Fund Despite the Indicia of
Fraud Surrounding BLMIS**

129.     Despite their awareness of indicia of fraud, in late 2006 the Reliance Group
Defendants sought, with Echeverría's assistance, to open a new BLMIS account. When UBS SA
closed LIF-USEP to new investments, the Reliance Group Defendants' ability to direct
investments into BLMIS and, consequently, their ability to receive fees, were hindered.

130.     The Reliance Group Defendants' new BLMIS feeder fund, Defender Limited
("Defender"), opened a BLMIS account in early May 2007. Reliance Gibraltar's parent
company, Reliance BVI, became Defender's manager. Additionally, M&B served as the
distributor for a class of Defender shares. Defender was a defendant in a separate action brought
by the Trustee; the Trustee has settled his claims against Defender.

131.     RIR received BLMIS trade confirmations in connection with LIF-USEP's and
Defender's BLMIS accounts. In February 2007, RIR hired a Senior Hedge Fund Analyst (the
"Senior Analyst") to assist with the Defender account. The Senior Analyst began to analyze the
data on BLMIS trade confirmations and set up an Excel program that, among other things,

compared LIF-USEP's performance to Defender's.  The Reliance Group Defendants understood

that the LIF-USEP and Defender accounts were "identical in strategy" and, therefore, any

knowledge of fraud or impossibility that the Reliance Group Defendants had with respect to

either fund was applicable to the other.

132.    Through its management of LIF-USEP, and its role in the creation and

management of other BLMIS investment vehicles, such as Defender, the Reliance Group

Defendants also knew that Madoff acted as the investment adviser implementing the strategy and

selecting the securities to be purchased and sold, the broker-dealer executing the trades, and the

custodian responsible for the safekeeping of assets.  The Reliance Group Defendants knew that

BLMIS purported to employ a trading strategy by which investors' funds were transferred to

New York for BLMIS to purchase U.S. securities traded exclusively on U.S. exchanges.

133.    The Reliance Group Defendants were also familiar with the terms of BLMIS

account opening documents.  Every BLMIS account holder was required to execute a Customer

Agreement, Trading Authorization, and Option Agreement.  Those account opening documents

provided BLMIS with complete authority to trade in U.S. securities on LIF-USEP's (and

Defender's) behalf, and explicitly referred to U.S. law.

## DEFENDANTS KNEW THAT BLMIS WAS THE PERFECT STRUCTURE FOR FRAUD

134.    In the early 2000s—before LIF-USEP and Landmark were created—service

providers to other BLMIS feeder funds recognized that Madoff's unusual structure lacked the

normal separation that would have ensured the independence of a fund's custodian and

investment manager, and that Madoff's insistence on maintaining assets precluded independent

confirmation of the assets' existence.

135.    For example, these concerns prompted Christine Coe, the head of Global Risk for HSBC Securities Services at HSBC Bank plc—of which HITSI and HSSI (service providers to Landmark) were part—to comment that BLMIS "is a perfect structure for fraud."  BLMIS feeder funds delegated multiple key functions to BLMIS, obscuring any system of checks and balances, and BLMIS performed these functions for free.  This was an obvious, unequivocal hallmark of fraud.

**A.**      **Defendants Were Aware of Objective Market Impossibilities for Which There Was No Plausible Explanation Other Than Fraud**

136.    The UBS Defendants, M&B, and the Reliance Group Defendants, along with the HSBC Service Providers received and reviewed BLMIS's account statements and trade confirmations.  They were, therefore, aware of numerous trading impossibilities in the reported performance of the LIF-USEP and Landmark accounts at BLMIS.   These impossibilities are not just facts suggestive of fraud, or mere warning signs that should have led to further inquiry— they are quantitative evidence demonstrating that LIF-USEP's and Landmark's account statements and trade confirmations reported non-existent securities transactions.

137.    Defendants were operated by sophisticated, experienced investment professionals who accepted money from their customers in consideration for the due diligence they were expected to exercise in selecting and monitoring investment managers such as Madoff.

138.    The UBS Defendants together comprise parts of one of the world's most sophisticated international banks, as well as one of the world's largest wealth managers.  UBS SA received copies of the account statements and trade confirmations for LIF-USEP's BLMIS account directly from BLMIS.  The UBS Defendants reviewed, analyzed, and understood these accounts statements and trade confirmations.  In fact, UBSFSL, which served as the official

administrator of LIF-USEP, used these account statements and trade confirmations to compute

the net asset value of LIF-USEP.

139.    M&B was also a highly sophisticated wealth manager closely affiliated with

Santander.

140.    Upon information and belief, M&B received LIF-USEP's account statements and

trade confirmations.  M&B also received Landmark's BLMIS account statements and trade

confirmations directly from BLMIS.  In addition, the HSBC Service Providers received copies of

the Landmark account statements and trade tickets directly from BLMIS.  As sophisticated

financial institutions, M&B and the HSBC Service Providers reviewed, analyzed, and understood

the trade confirmations and account statements they received.

141.    The Reliance Group Defendants also received LIF-USEP's and Defender's

account statements and trade confirmations directly from BLMIS.  The Reliance Group

Defendants actively monitored, analyzed, and understood the account statements and trade

confirmations they received from BLMIS, and used these documents to track the performance of

their BLMIS accounts.  They also performed due diligence on securities trades purportedly

transacted for LIF-USEP's BLMIS accounts and the corresponding options trades.

**1.    The SSC Strategy BLMIS Purported to Employ Could Not Yield the Results
Reported on the BLMIS Account Statements**

142.    The SSC strategy was a "collared" investment strategy that was supposed to track

the S&P 100 Index and temper volatility in the market.  It involved the acquisition of a basket of

S&P 100 stocks designed to correlate to the movement of the S&P 100.  But the SSC strategy

could not have eliminated market volatility.  At best, the strategy would have smoothed out

peaks and valleys, in the returns generated by the basket of S&P 100 stocks, but would have

correlated with the S&P 100's performance when Madoff was in the market.

143. The S&P 100 Index options collars attached to BLMIS's stock purchases should, in theory, have ensured that when the S&P 100 Index dropped, it would not drop as much for BLMIS investors. Collapses in stock price would be hedged by put contracts funded by the sale of call options. The effect of that strategy, however, would also limit gains when the S&P 100 Index went up.

144. It should have been impossible for LIF-USEP or Landmark to post gains on their BLMIS investments when the S&P 100 Index was significantly down, had BLMIS genuinely been employing the SSC strategy. This is because the put options only limited losses during downswings. BLMIS could not have turned losses into gains, by exercising put options—that could have only created a floor for losses.

145. Similarly, it was virtually impossible for the SSC strategy to outperform the S&P 100 Index during a major upswing, as the call options BLMIS sold would have been exercised during a significant market upswing, putting a ceiling on gains.

146. LIF-USEP's and Landmark's respective account statements consistently show gains when the market was down, and gains outperforming the market when the market was up. This is objectively impossible under the SSC strategy. A prospective investor raised concerns to the Reliance Group Defendants about Madoff's ability to consistently generate positive returns during downturns in the market. The investor even requested that the Reliance Group Defendants provide an analysis of "positive results under the downward market environment." The Reliance Group Defendants determined they would respond to the investor's concerns by showing him "the dummy math."

147. Based upon their investments in other BLMIS feeder funds, the Reliance Group Defendants were aware that BLMIS purported to have earned extraordinarily consistent rates of

return since at least 1999.  Reliance Group entities began directing investments into Kingate

Global Fund Ltd. ("Kingate") in or around 1999 and into Optimal SUS in or around 2001.  Upon

information and belief, M&B was also privy to these funds' annual rate of return information

through Optimal SUS's investment with BLMIS.  Upon information and belief, the consistency

of the IA Business's returns was one of the key motivating factors behind the decision of the

UBS Defendants, M&B, and the Reliance Group Defendants to form LIF-USEP, and M&B's

subsequent decision to create Landmark.

148.     In 2007, the Reliance Group Defendants produced promotional materials for

Defender, touting Madoff's "very consistent, low-volatility returns through the sideways markets

of 2004 and 2005" and his "ability to produce positive returns in months when the index is

down."

149.     M&B's marketing materials also promoted Madoff's fantastical performance.  For

example, a 2008 presentation on LIF-USEP noted Madoff's "[p]ositive absolute returns,

regardless of market environment," his "[l]ow correlation with fixed income and equity

markets," and that his "[r]isk returns parameters are exceptionally good and difficult to find

elsewhere."

150.     The following chart depicts the annual rate of return on Kingate's, Optimal

SUS's, LIF-USEP's, and Landmark's IA Business accounts, based on information BLMIS

provided to each fund, as compared to the rate of return on the S&P 100 Index.

**KINGATE'S, OPTIMAL SUS'S, LIF-USEP'S, AND LANDMARK'S RATES OF
RETURN COMPARED TO THE S&P 100 INDEX'S RATE OF RETURN**

| Year | Kingate Rate of Return | Optimal SUS Rate of Return | LIF-USEP Rate of Return | Landmark Rate of Return | S&P 100 Rate of Return |
|---|---|---|---|---|---|
| 1997 | 17.2% | 15.7% | | | 27.8% |
| 1998 | 16.6% | 16.7% | | | 31.3% |
| 1999 | 18.2% | 18.3% | | | 31.3% |
| 2000 | 14.6% | 14.4% | | | -13.4% |
| 2001 | 13.7% | 13.6% | | | -14.9% |
| 2002 | 12.2% | 12.2% | | | -23.9% |
| 2003 | 10.8% | 10.8% | | | 23.8% |
| 2004 | 10.0% | 9.9% | | | 4.5% |
| 2005 | 10.5% | 10.4% | 4.3%[2] | | -0.9% |
| 2006 | 13.2% | 13.4% | 12.3% | | 15.9% |
| 2007 | 10.9% | 11.0% | 11.2% | 2.2%[3] | 3.8% |
| 2008[4] | 9.4% | 9.2% | 9.3% | 9.1% | -36.9% |

151.    Madoff maintained remarkably consistent positive returns even when the S&P

100 Index was devastated by unpredictable events, like the September 11, 2001 terrorist attacks,

or market trends too far-reaching to avoid, like the burst of the "dotcom bubble" in 2000 and the

recession and housing crisis of 2008.  Each of those events caused double-digit percentage losses

in the S&P 100 Index.  Yet in each instance, Madoff claimed that the SSC strategy outperformed

the S&P 100 Index by anywhere from 27 to 46 percent.  In 2008, when the S&P 100 Index was

down nearly 40%, LIF-USEP and Landmark showed annual positive returns of 9.3% and 9.1%,

respectively.

152.    During the thirty-five months of its life—from September 2005 to November

2008—LIF-USEP experienced only one month of negative returns; in that period, the S&P 100

---

[2] Since LIF-USEP began investing with BLMIS in September 2005, this data point only represents returns calculated from September 2005 through December 2005.
[3] Since Landmark began investing with BLMIS in October 2007, this data point only represents returns calculated from October 2007 through December 2007.
[4] All 2008 data points are calculated through November 2008.

35

Index had sixteen such months. During the twelve months of its life—from October 2007 to

November 2008—Landmark had no negative months; the S&P 100 Index had nine.

153.    UBS recognized Madoff's impossibly consistent returns even before LIF-USEP's

creation. In response to UBS SA's inquiries about BLMIS in March 2004, UBS O'Connor

remarked that "people often speculate how Madoff actually makes money so consistently . . .

with only a handful of negative months . . . ." UBS concluded that if Madoff were running the

strategy legitimately, "it would be IMPOSSIBLE to generate the returns that he has produced

since 1990."

154.    Not only did the Defendants know that the returns Madoff claimed to produce

were too good to be true, they used this performance as a selling point for the funds. In fact, the

Reliance Group Defendants marketed Defender by presenting the following chart, highlighting

Madoff's impossibly consistent returns.



155.    By mid-2008, the Reliance Group Defendants were entirely aware that it was

impossible for BLMIS's and Madoff's claims of continuous and steady returns during times of

economic turmoil to be true.  In an email to RIR employee Trevor Uhl in August 2008, the

Senior Analyst commented that there was "too much unknown fraud risk at [M]adoff."

Nevertheless, the Reliance Group Defendants willfully ignored the indications of fraud and

continued their lucrative business relationship with Madoff.

156.    Optimal recognized BLMIS's "risk-adjusted performance" over the previous

decade to be so incongruous with the strategy BLMIS claimed to employ, that it could not

explain it.  Optimal remarked only that the rate of return was "stunning" and unlike the "return

profile" of any other firm employing a similar strategy.  In sweeping these revelations under the

carpet, Optimal classed itself among the "quiescent capital from fund-of-funds who do not ask

too many questions" that it knew Madoff preferred.

157.    M&B also marketed LIF-USEP to its clients using charts that compared Madoff's

steady gains to the S&P 100 Index's up-and-down results.

## 2.    LIF-USEP's and Landmark's BLMIS Account Statements Reported Impossible Options Trading Volumes

158.    Madoff's SSC strategy required the purchase and sale of massive quantities of

S&P 100 Index put and call options ("OEX Options") to put together the "collar" on BLMIS's

securities baskets.  These trades were reported on LIF-USEP's and Landmark's customer

statements and trade confirmations.   OEX Options are traded on the Chicago Board Options

Exchange ("CBOE"), and their trading volume is commonly measured and reported.

159.    Even using conservative estimates of BLMIS's assets under management, there

were not enough OEX options contracts with the relevant strike price and expiration date to

hedge a fund the size of BLMIS's IA Business.  On many occasions—including on most days in

2008—to carry out the SSC strategy for either LIF-USEP or Landmark alone, BLMIS would

have had to trade more OEX options with the relevant strike price and expiration date than were

traded on the entire CBOE.  BLMIS account statements frequently showed OEX call and put

options contracts being traded at volumes that exceeded the total market volume of calls and puts

with the same strike price and expiration date being traded on the CBOE.  With respect to LIF-

USEP, the number of options BLMIS purported to trade exceeded the total options available on

the CBOE approximately 61%  of the time.  With respect to Landmark, the number of options

BLMIS purported to trade exceeded the total options available on the CBOE 54% of the time.

Defendants were aware of BLMIS's statistically impossible options trading, which was evidence

of fraud.

160.    Graphical displays of the options needed to hedge *just* LIF-USEP and Landmark's

BLMIS investments show the impossibility of these purported trades.  The below charts depict

the volume of S&P 100 Index put options BLMIS purported to trade on behalf of LIF-USEP and

Landmark as compared to the entire CBOE volume.

161.    As shown below in charts 1(a) and 1(b), the volume of S&P 100 Index put options

BLMIS purported to trade on behalf of LIF-USEP and Landmark (the red bars) completely

dwarfs the volume of S&P 100 Index put options with the same strike price and expiration date

traded on the entire CBOE (the black bars).


**[This Space Intentionally Left Blank]**

**CHART 1(a)**

**LIF-USEP, 1FR123 – HISTORIC OPTION ACTIVITY COMPARED TO CBOE 2007-2008 (PUTS ONLY)**



Red bars indicate BLMIS Volume
Black bars indicate CBOE Volume

**CHART 1(b)**

**LANDMARK, 1FR133 – HISTORIC OPTION ACTIVITY COMPARED TO CBOE 2007-2008 (PUTS ONLY)**



Red bars indicate BLMIS Volume
Black bars indicate CBOE Volume

162.    Charts 2(a) and 2(b) below show the volume of S&P 100 Index call options

BLMIS purportedly traded on behalf of LIF-USEP and Landmark (the blue bars) as compared to

the entire CBOE exchange volume (the black bars).

**CHART 2(a)**

**LIF-USEP, 1FR123 – Historic Option Activity compared to CBOE 2007-2008 (Calls Only)**



Blue bars indicate BLMIS Volume
Black bars indicate CBOE Volume

**CHART 2(b)**

**LANDMARK, 1FR133 – HISTORIC OPTION ACTIVITY COMPARED TO CBOE 2007-2008 (CALLS ONLY)**



Blue bars indicate BLMIS Volume
Black bars indicate CBOE Volume

163.    In performing services for Landmark and LIF-USEP, UBS, M&B, and the

Reliance Group Defendants received the funds' BLMIS customer statements that showed that

BLMIS purported to execute options contracts in volumes exceeding the total volume for options

with the same purchase date, strike price, and expiration date traded over the CBOE:

a.    The UBS Defendants and the Reliance Group Defendants observed that LIF-USEP's customer statements purported to show that of the 277 options contracts BLMIS executed, 169 options contracts, or 61%, exceeded the total volume for options with the same purchase date, strike price and expiration date.

b.    M&B saw that Landmark's customer statements purported to show that of the 80 options contracts BLMIS executed, 43 options contracts, or 53.75%, exceeded the total volume for options with the same purchase date, strike price and expiration date.

164.    LIF-USEP's and Landmark's BLMIS customer statements are replete with these types of anomalies.  For example, on November 14, 2008, with a settlement date of November 19, 2008, BLMIS purportedly purchased 8,824 S&P 100 Index put options for the LIF-USEP account and 2,404 S&P 100 Index put options for the Landmark account (with a strike price of 420 and a December 20, 2008 expiration date).  Only 132 put options with the same expiration date and strike price were traded on the CBOE that day.  BLMIS purportedly sold 8,824 S&P 100 Index call options for the LIF-USEP account and 2,404 S&P 100 Index call options for the Landmark account (with a strike price of 430 and a December 20, 2008 expiration date).  Only 255 call options with the same expiration date and strike price were traded on the CBOE that day.  In each of these instances, Defendants knew that the trading volumes BLMIS reported were impossible if the options had been exchange-traded.

165.    The Reliance Group Defendants considered hiring a private detective as a possible means to "[i]dentify option counterparts that can confirm not only that they trade with Madoff but that they do it in the appropriate size" given Madoff's assets under management.  However, Lowe noted that "[t]his will be extremely difficult as they are unlikely to reveal size."

### 3.    Trades Were Executed Outside the Daily Price Range

166.    BLMIS regularly purported to execute equities and options transactions for the LIF-USEP's and Landmark's accounts that were outside the transacted security's daily price range.

167.    On at least four occasions, BLMIS sent trade confirmations for LIF-USEP's account showing stock trades that could not have occurred, because they took place outside of the range of stock prices on the day of the purported trades.  These impossibly priced transactions represented more than 117,000 shares of stock.  For example, BLMIS's records for LIF-USEP's account reflect that 46,659 shares of Merck (MRK) were sold for $44.61 with a

trade date of December 22, 2006 and settlement date of December 28, 2006. The price range for

Merck stock actually bought and sold in the marketplace on December 22, 2006 was between

$42.78 and $43.42, a difference of $1.19. Defendants, who received and monitored BLMIS's

trade confirmations, knew that BLMIS was reporting trades that objectively could not have taken

place, or willfully blinded themselves to that fact.

168.    As LIF-USEP's investment advisor, the Reliance Group Defendants were, among

other things, required to assist UBSTPM in "obtaining [the] necessary information to determine

the net asset value of [LIF-USEP]."

169.    As LIF-USEP's administrator, UBSFSL's primary duty was to calculate the NAV

of the fund. In so doing, UBSFSL was aware of specific instances in which trade information

from BLMIS (regarding the BLMIS fund that served as the model for LIF-USEP) was in direct

conflict with prices reported in Bloomberg and understood that BLMIS's trades at such prices

were impossible.

170.    Under their respective management agreements with LIF, UBS SA and UBSTPM

were responsible for managing the fund's assets, including "continuous monitoring and

adjustments of investments in line with the specific investment policy." Thus, the UBS

Defendants, who received and analyzed BLMIS reported trade data and customer statements,

were well aware of trades executed outside the daily price range and understood such trades were

impossible.

## 4.    The Timing of BLMIS's Securities Transactions Was Impossible

171.    Madoff claimed that he was time slicing, i.e., entering the market at different

times throughout a trading day—and that the equity price reported on an account statement

reflected the average price. When Madoff claimed to be purchasing equities, the reported

average price was almost always in the lower half of the daily trade range; when he claimed to be selling equities, the sale price was almost always in the upper half of the daily trade range.

172.    As LIF-USEP's investment adviser, the Reliance Group Defendants were required to "give recommendations to UBSFSL for the manner in which the assets of [LIF-USEP] might be invested."

173.    In its role as LIF-USEP's administrator, UBSFSL's primary responsibility was to calculate the NAV of the fund.  Thus, the UBS Defendants, who received and analyzed BLMIS reported trade data and customer statements, were well aware of and understood that BLMIS's market-timing was statistically impossible.

174.    The average price at which a given security is traded throughout a trading day is measured by a metric called volume weighted average price, or "VWAP."  LIF-USEP's and Landmark's trade data reveals that for approximately 80% and approximately 71%, respectively, of trades in which BLMIS purported to have purchased shares for LIF-USEP and Landmark, the purported purchase price was below the VWAP.  A similar analysis reveals that, when purportedly selling shares for LIF-USEP and Landmark, approximately 70% and approximately 65%, respectively, of Madoff's trades were above the VWAP.

175.    The consistently favorable execution BLMIS claimed to achieve—in which it purported nearly always to trade at an optimal price point—was statistically impossible.  If BLMIS had been purchasing or selling a stock multiple times throughout a trading day, BLMIS's reported prices would have necessarily gravitated towards the daily midpoint.

**5.    The Dividend Activity Reported on Customer Statements Was Impossible**

176.    Typically, money market funds declare dividends daily and pay such dividends monthly.  If an entity transacts in a money market fund multiple times in one month, that activity is tracked, the proper dividend is accrued for the days invested, and the dividend is paid at one

time.  BLMIS's account statements issued to LIF-USEP and Landmark, however, showed a

dividend being paid upon each sale transaction of the money market fund.  The LIF-USEP

account statements showed multiple dividends from the same money market fund in 33 of 39

months, i.e., 84.6%.  Likewise, the Landmark account statements showed multiple dividends

from the same money market fund in 9 of 14 months, i.e., 64.3%.

177.    LIF-USEP's account statements showed purported dividends from money market

funds being paid on 109 occasions throughout the life of the fund.  Over 98% of the time—on

107 occasions—the statements showed payment dates that differed from the dates on which the

relevant money market fund actually paid dividends.

178.    Landmark's account statements showed dividends from money market funds

being paid on 34 occasions over the life of the fund. On every one of those occasions, 100% of

the time—the account statements showed a payment date for those dividends that differed from

the date on which the money market fund paid dividends.

179.    The Defendants knew that BLMIS's account statements showed impossible

dividend payments.

**B.    In Addition to Being Aware of Objective Evidence of Fraud, the Defendants Were
Presented With Myriad Subjective Indicia of Fraud**

180.    In addition to objective trading impossibilities, Defendants saw and recognized

myriad indicia of fraud.  Coupled with the objective evidence, this overwhelmingly demonstrated

that BLMIS was a fraudulent operation.

**1.    LIF-USEP's and Landmark's Account Statements Demonstrated That
Madoff Was Not Implementing the SSC Strategy**

181.    Various SEC reporting requirements are triggered when securities are invested in

the market at either the end of the quarter or the end of the year.  To evade these reporting

requirements, Madoff purported to liquidate all investments at those times, and invest the

proceeds in Treasury Bills.  LIF-USEP's and Landmark's account statements showed reflected

this practice

182.    Madoff's practice of exiting the market according to the calendar, rather than

market or economic indicators was a badge of fraud.  Defendants knew that Madoff touted

"market timing" as a cornerstone of the SSC strategy and that Madoff's practice of exiting the

market at quarter- and year-end contravened that strategy because it locked Madoff into

prevailing market conditions, regardless of whether they were favorable.  The SSC strategy

based on long positions hedged by options contracts, themselves subject to expiration, could not

be effectively implemented under these circumstances.

183.    In addition, the Defendants were aware that, in several instances, account

statements purported to show gains on behalf of LIF-USEP and Landmark resulting from short-

term options trades.  These speculative options trades often showed significant gains, but they

were high-risk, short-term gains that were wholly inconsistent with the SSC strategy.

184.    For example, in 2008, LIF-USEP and Landmark each participated in two of these

trades, which generated gains of approximately $5.9 million and $1.2 million, respectively.

These transactions represented approximately 11% of the total return for LIF-USEP in 2008, and

approximately 12% of the total return for Landmark in 2008.  These gains were purportedly

achieved through speculation in the options market, which contradicted the premise of the SSC

strategy.  Between 2005 and 2008, LIF-USEP and Landmark benefitted in excess of $7 million

from such trades.

185.    BLMIS customer statements regularly reflected "unbalanced hedges," in which

the basket of equities purportedly purchased for customers did not correspond to the hedge.  An

unbalanced hedge occurs where, for example, certain equities in a basket are sold, but there is no

corresponding adjustment to the options collar.  Such an unbalanced hedge creates potentially

significant exposure to losses because the value of the basket and the corresponding options

positions no longer match, reducing the potential gain and leaving the customer exposed to

potential losses.

186.    For example, LIF-USEP's account statements indicate that on May 16, 2007,

BLMIS purported to purchase a basket of S&P 100 Index stocks that included shares of 3M

Company.  The shares of 3M Company were sold on May 21, 2007 whereas the other equities

contained in the basket were not sold until June 21, 2007.  In light of the early sale of the 3M

shares, the corresponding options collar should have been rebalanced to protect against exposure

to market risk.  No such adjustment was reflected in the customer statements or trade

confirmations.

## 2.    Madoff's Claims to Trade Options in the Over-the-Counter Market Were False

187.    When confronted with questions concerning his options trading practices, Madoff

sometimes claimed to be trading options on the over-the-counter market (the "OTC"), for which

volumes of trades are not publicly reported.  Sophisticated financial entities like the Defendants

would have recognized such an explanation to be a lie.  The BLMIS trade confirmations LIF-

USEP and Landmark received indicated the purchase of OEX Options and included a unique

identifier, known as a "CUSIP" number.  The CUSIP number allows traders to quickly access

information regarding a particular transaction.  Only exchange-traded OEX Options would have

CUSIP numbers.  Any reported options trade with a CUSIP number must have been traded over

an exchange, not the OTC market.

188.    Trading OTC options also would have required BLMIS to enter into private contracts with willing counterparties. BLMIS purportedly entered into those options contracts as an agent on behalf of BLMIS's IA Business customers, such as LIF-USEP and Landmark.

189.    Had those theoretical counterparties defaulted on those contracts, BLMIS's IA Business customers, including LIF-USEP and Landmark, would have been exposed to substantial losses. Had a counterparty failed to perform, it was LIF-USEP and Landmark—not BLMIS—that would have suffered the loss.

190.    Madoff refused to identify the counterparties, claiming he had to prevent his customers from dealing directly with the counterparties, and that the names of parties were "proprietary." The Defendants never reviewed, commented on, modified, negotiated, or rejected any form of draft or final counterparty agreement or OTC transaction confirmation.

191.    The Defendants, who were sophisticated financial professionals, recognized that LIF-USEP and Landmark had hundreds of millions of dollars in counterparty exposure, yet they had no idea whether the counterparties were reliable, well-capitalized, liquid, or whom they would have to pursue in the event of a default. The Defendants were concerned about their lack of knowledge and recognized that Madoff's refusal to identify counterparties was indicative of fraud.

192.    The Reliance Group Defendants knew from the July 2006 Optimal due diligence report that BLMIS posed a significant "counterparty risk in the options trading." Ultimately, the Reliance Group Defendants concluded that their "risk on the counterparty side is really Madoff."

193.    Madoff's refusal to identify the counterparties to his options transactions remained a concern for the Reliance Group Defendants. Even after their February 2007 meeting with Madoff, the Reliance Group's concerns went unabated. Justin Lowe concluded afterwards

49

that "[a]s we knew prior to the meeting OTC options are [a] key piece of the puzzle and important to gain comfort with the counterparts."

194.    The Reliance Group's concerns about Madoff's options counterparties culminated with its Senior Analyst's repeated warnings to redeem all of the Reliance Group's BLMIS-related investments.

195.    On February 1, 2007, Echeverría brokered a meeting with Madoff during which he introduced Madoff to Lowe and Brockmann.  In a February 1, 2007 note to file, Lowe noted that options counterparties remaining unidentified continued to be a concern for the Reliance Group:

> • We discussed the strategy and he [Madoff] confirmed that he was not using the major investment banks as counterparts on the option side as they were not competitive (they had to hedge back themselves . . .) but used long term clients of the firm such as US and European pension funds and life insurances. . . .
>
> • Finally, when we discussed the biggest risk to the strategy he said that if we should see a major disruption in the markets and that all the put option counterparts were to default th[e]n we would be left over with a basket of the most prominent US stocks at probably depressed valuations.

**Conclusion**

> • Need to dig in the next meeting further into the details as not all questions on the list answered.

196.    In the face of the ongoing global economic downturn (during which the S&P 100 Index had declined nearly 40% between 2007 and 2008), Madoff's continuing low volatility and near-double-digit returns were suspicious.  The Senior Analyst repeatedly raised concerns to his superiors about the Reliance Group Defendants' Madoff-related investments.  Upon information and belief, based upon the Reliance Group Defendants' responses to him, the Senior Analyst understood that Madoff was a "sacred cow" in that the BLMIS IA Business was a highly lucrative investment opportunity that the Reliance Group research team was not to question.  The

Senior Analyst was even told by a colleague at the Reliance Group that "those that touch the madoff [sic] product get to share in its rewards."

197.    The Senior Analyst was concerned with counterparty risk relative to Madoff's extensive options trading, particularly after the collapse of Bear Stearns in March 2008 and Lehman Brothers in September 2008.  Upon information and belief, the Senior Analyst could not ascertain Madoff's options trading counterparties because he already knew that he could rule out the major players: Deutsche Bank, which he knew not to be doing business with BLMIS, and Bear Stearns and Lehman Brothers, whose failures did not affect Madoff's ability to trade options.  The Senior Analyst recommended that the Reliance Group Defendants' principals withdraw all of their BLMIS-related investments on multiple occasions in 2007 and 2008, but his advice was repeatedly rejected.  In a September 29, 2008, instant message exchange with Lowe, the Senior Analyst asked:

> Senior Analyst: Given what is going on, is there any chance to use this as an opportunity to get more clarity (maybe through [M]anuel) on [M]adoff counterparties? It makes absolutlely [sic] zero sense that [L]ehman was not one given their prominence in the otc equity derivatives market (and neither is [D]eutsche as we recently heard, also a large player).  I don't even want to send this by email, **but my actual opinion is that IF the whole thing is a fraud, in this environment it could/will be exposed**.  I am not trying to give you a heart attack...but my honest opinion is that it is extremely worrisome.

> Lowe: Manuel [Echeverría] is coming to NY in Oct[ober] and we can visit him then.  You are right not to be complacent but I am not sure how else to check.  Perhaps calling competition to cross check[.] . . .

> Senior Analyst: Nobody seems to know (that I have spoken to).  **I am really uncomfortable with the risk....putting my FOF hat on, my recommendation is to redeem.**

> Senior Analyst: I really fear that all the account holders (ourselves included) are so hooked on the low vol[ume] returns that we are not really thinking objectively: it makes no sense.

51

(Emphasis added.)

198.    The Reliance Group Defendants learned in mid-November 2008 that the head of Santander's risk management would be meeting with Madoff on Thanksgiving and offered to raise concerns with Madoff for them.  Lowe recognized that it was "a unique chance" and directed the Reliance Group Defendants to "put something together."  Among other things, the Senior Analyst proposed asking the following questions—to which they had never received satisfactory responses—regarding the problems they perceived with the Reliance Group Defendants' massive BLMIS investments:

- Does Madoff have insurance in excess of the SIPA protections for account holders ([i.e.] surety bonds issued by CAPCO or a similar company)?

- Who are the counterparties for the options? Can BLM give specific examples (top 3 or top 5) even if not disclosing all? How many counterparties are there? What is the maximum exposure to any one counterparty?

- Are the option trades between the accounts and the broker/dealer, which may then have its own trades with counterparties? Or, are the option trades with the counterparties directly?

199.    During the set-up of Landmark, M&B requested the disclosure of counterparty identities, a request that Madoff summarily rejected.  Madoff's refusal to answer did not sway M&B from moving forward with the establishment and operation of Landmark.

200.    Just before Landmark was established, M&B requested that BLMIS identify its options trading counterparties.  Madoff rebuffed the request in a handwritten note.  The refusal to identify counterparties was an indicia of fraud.

201.    On September 19, 2007, in regard to Landmark's establishment, Justin Lowe wrote to Reliance Group personnel: "I spoke to Juan Carlos [Hergueta] . . . [M&B is] still in

holding pattern as they need some assurance from Madoff as to [the number] and names of

options counterparties. Allegedly Manuel [Echeverría] is working on that."

202.    On the same day, Echeverría relayed a request from Irish "lawyers/regulators"

that BLMIS execute a Trading Authority Directive for Landmark that specified that BLMIS's

option counterparties satisfied antifraud requirements. The Irish regulators required that options

counterparties had an "A2/P2" credit rating and that no counterparty occupy more than ten

percent of the account's net assets. They also requested that BLMIS provide updates to the list

of authorized counterparties and identify each counterparty's notional market exposure.

203.    Madoff rejected that request. In a September 19, 2007 email to an undisclosed

recipient, Echeverría wrote "Madoff just phoned and stated, apologetically but firmly, that he has

no interest in divulging the information requested." The recipient—upon information and belief,

Hergueta—responded, "Manuel thank you for all your efforts, this is difficult." Yet even

without this information, M&B moved forward to establish Landmark, which was opened in or

about October 2007.

204.    The UBS Defendants were also aware of problems regarding BLMIS's purported

option counterparties. As set forth in the SEC Office of Inspector General's report dated August

30, 2009 (the "OIG Report"), the SEC's Enforcement Staff sent a draft document request to

UBS's offices in the U.S. on June 16, 2006 seeking to verify whether any of UBS's European

affiliates were counterparties to Madoff's options trading, as Madoff had claimed. The OIG

Report explains that, instead of providing the SEC with a direct answer, UBS's U.S. offices

claimed to be unable to access the relevant data from Europe, and informed the SEC's

Enforcement Staff that it would have to seek the relevant information directly from Europe. But

the UBS Defendants knew in 2006 that they were not and had never been a counterparty to one

of Madoff's trades.  Despite being alerted to yet another significant indicia of fraud relating to

Madoff's purported trading activity, the UBS Defendants continued to service the BLMIS feeder

funds.

205.    In connection with UBS AG's role as a sponsor and promoter of Luxalpha, UBS

SA represented to LIF-USEP's auditors at Ernst & Young that UBS AG was approving BLMIS's

option counterparties.  This representation was false.

### 3.    LIF-USEP and Landmark Regularly Had Negative Cash Balances With BLMIS

206.    At least fifteen times, LIF-USEP's BLMIS account had a negative cash value.

207.    UBSFSL, as LIF-USEP's administrator, tracked the fund's cash balance, and

noted that, from time to time, the fund had a negative cash balance.  For example, in July 2006,

UBSFSL recognized that the fund had been in "an overdraft position" for several weeks, and

attempted to obtain an explanation for that "leverage situation."

208.    These negative cash events followed a pattern: at a time when there was

insufficient cash in LIF-USEP's account to satisfy the fund's request for a withdrawal, BLMIS

nevertheless satisfied the request, without liquidating any of the fund's equity positions.  As a

consequence, BLMIS appeared to be providing LIF-USEP with millions of dollars of free loans.

These negative cash events extended for as long as several weeks at a time.

209.    Three such instances occurred in LIF-USEP's account in December 2007 alone.

210.    On December 3, 2007, UBS SA requested a $16,000,000 withdrawal from the

account.  At the time of the request, the account's cash balance was $0.75.  On December 4,

2007, BLMIS issued a $16,000,000 wire, resulting in an account balance of negative

$15,940,292.47.  Only on December 5, when Treasury Bills were purportedly sold did the

account regain a positive balance.

211.    On December 17, 2007, UBS SA requested a $3,000,000 withdrawal from the account.  BLMIS issued a $3,000,000 wire on December 18, 2007, resulting in an account balance of negative $2,789,862.80.  Only on December 20, 2007, when Treasury Bills, securities, and put options were purportedly sold, did the account regain a positive balance.

212.    On December 21, 2007, UBS SA requested a $15,000,000 withdrawal from the account.  BLMIS issued a $15,000,000 wire on December 24, 2007, resulting in an account balance of negative $14,789,862.49.  Only on December 31, 2007, when Treasury Bills were purportedly sold, did the account regain a positive balance.

213.    At least four times, Landmark's BLMIS account, number 1FR133, had a negative value.

214.    For example, on November 18, 2008, HITSI requested a $10,500,000 withdrawal from the Landmark account.  At the time, the account had a balance of $0.57.  On November 21, 2008, BLMIS issued a $10,500,000 wire, resulting in an account balance of negative $10,476,915.22.  Only on November 28, 2008, when securities and put options were purportedly sold did the account regain a positive balance.

215.    In July 2006, over a seven-day period, LIF-USEP had an average negative balance of more than $9 million.  Notably, upon information and belief, the UBS Defendants highlighted this occurrence as a leverage situation for the LIF-USEP account.  Despite recognizing this problem, the UBS Defendants continued directing additional investments into BLMIS.

216.    In November 2008, over a seven-day period, Landmark had an average negative balance of more than $10 million.

217.    BLMIS was, in effect, providing LIF-USEP and Landmark millions of dollars of

interest-free loans for days at a time.  As LIF-USEP and Landmark did not have margin accounts

with BLMIS, neither fund could have traded on credit.  As Defendants knew, no legitimate

broker-dealer would have advanced the funds millions of dollars for zero interest under these

circumstances.

### 4.    BLMIS, Known as an Innovator in Electronic Trading, Provided Delayed Paper-Only Customer Statements

218.    Despite Madoff's reputation as a pioneer of electronic record-keeping in the

market-making business, as a standard practice, Madoff did not send electronic trade

confirmations to clients of BLMIS's IA Business.  The Defendants knew that Madoff provided

only paper print-outs of trade confirmations for the IA Business which he sent via standard mail.

Although electronic access was industry custom, and although Madoff held himself out as a

pioneer of electronic trading technology, he did not provide his customers with electronic access

to their accounts and even refused to put information about customers' account holdings online.

BLMIS instead used outmoded technology and provided only paper account statements and

paper confirmations sent by U.S. mail or fax three to four days after the trades purportedly

occurred.

219.    The UBS Defendants repeatedly asked Madoff for electronic trade and transfer

information, but were rebuffed on multiple occasions.  In a January 13, 2006 email, UBS SA

managing director Karp stated: "Unfortunately although we submitted this request [for electronic

data] on several times the answer remains still no."

220.    An Operating Memorandum for LIF-USEP dated January 1, 2007, prepared by

UBS SA, specifies that LIF-USEP's investment advisor, Reliance Gibraltar, would provide UBS

SA "with a backdated monthly investment recommendation." This backdating procedure was

made necessary and put in place to accommodate BLMIS's delayed, hard copy reporting of its

purported trades.

221.    The Reliance Group Defendants repeatedly identified that receipt of paper-only

trade confirmations impeded their ability to monitor the trading activity purportedly carried out

in their BLMIS accounts.  For instance, Lowe called BLMIS in September 2007 to ask why the

Reliance Group Defendants had not yet received trade confirmations.  Lowe reported that

BLMIS personnel informed him that "it happens sometimes that tickets are late . . . and we

should give it more time."  In a July 2008 email to Emilio Botín-Sanz, the father of M&B co-

founder Botín, Trevor Uhl of RIR wrote that the receipt of paper trade confirmations was "one of

our key challenges in monitoring the Madoff accounts."  Uhl explained that the Reliance Group

Defendants could not guarantee a timetable for the delivery of the funds' portfolio because

"[t]rade tickets are shipped to our office via post without advance notice."

222.    Although it was an obvious indicia of fraud, the Defendants accepted Madoff's

use of delayed, paper-only statements.

### 5.    Madoff's "Strip Mall" Auditor Was Neither Qualified Nor Capable of Auditing a Global Investment Company With Billions of Dollars Under Management

223.    Upon information and belief, the Defendants knew that BLMIS's auditor was

neither legitimate, nor independent, nor reasonably capable of performing the required domestic

and international auditing functions for BLMIS.  BLMIS, which purported to have tens of

billions of dollars under management, was audited not by a major firm, but by Friehling &

Horowitz, an accounting firm with only two accountants, one of whom was semi-retired and

living in Florida.  The firm's offices were located in a strip mall in Rockland County, New York.

224.    All accounting firms that perform audit work must enroll in the peer review

program of the American Institute of Certified Public Accountants ("AICPA"), and those that do

are listed on the public area of the AICPA website.  Although it held itself out as a member of

AICPA, Friehling & Horowitz had avoided peer review since 1993 by representing that it did not

perform any audit work and, therefore, was not listed on the AICPA website.  With billions of

dollars under management, BLMIS's use of a small, ill-equipped auditor like Friehling &

Horowitz was a clear indicia of fraud.

225.    For example, on several occasions, the Reliance Group Defendants' Senior

Analyst raised with his superiors that Friehling & Horowitz was unqualified, stating:  it "looks so

sketchy to me: why would they use an unheard of accountant in New City, New York (up near

where [. . .] lives)?"

226.    The Reliance Group Defendants were in possession of a July 2006 report written

by Optimal due diligence employee Jonathan Clark, in which Clark summarized a number of

areas of risk related to investments with BLMIS, including the:

- Lack of realistically independent auditor – Friehling & Horowitz is a very
  small firm with Madoff as its only major client[.]

**6.    Madoff's Unusual Fee Structure**

227.    The Defendants knew that the fee structure between BLMIS and the BLMIS

feeder funds was highly atypical.  BLMIS did not charge investors any traditional management

or performance fees, which were standard in the hedge fund industry.  Madoff was purportedly

satisfied with simply charging BLMIS's IA Business customers $1 per option contract and $0.04

per equity share traded.  The standard investment advisory fee charged by a hedge fund manager

ranges from 1% to 2% of assets under management plus a performance fee of 10% to 20% of any

profits the investments earn.  For investment advisers with a history of success.  Compared with

industry practice, Madoff's fee structure left hundreds of millions, if not billions, of dollars on

the table.  Instead, BLMIS allowed investment funds, their managers, and advisers to collect

those lucrative fees for themselves.

228.    Other industry professionals realized that BLMIS's highly unusual fee structure

was a serious warning sign.  The Defendants, however, having already invested millions of

dollars of their clients' funds in BLMIS feeder funds, knowingly ignored this evidence of fraud.

**7.    BLMIS's Role as Sub-custodian and Lack of Account Segregation Were Recognized As Serious Fraud Risks**

229.    The Defendants knew that they could not ascertain whether BLMIS's customer

accounts were segregated.  Adequate segregation allows independent checks and balances

throughout the trading cycle, the movement of cash, and the custody process.

230.    The Reliance Group Defendants recognized that the lack of segregation of assets

at BLMIS was problematic, and determined that they needed to ask Madoff if "the assets in

Defender's account are segregated from other assets."  The Reliance Group Defendants admitted

to their auditors, PricewaterhouseCoopers, that, with regard to the segregation of assets at

BLMIS, they could not "say how strong the legal separation is or how this separation would hold

up in a bankruptcy scenario."  In an email, the Senior Analyst responded to questions from

Brockmann regarding segregation of the accounts at BLMIS by writing that he had "no way of

confirming that the securities are deposited in segregated accounts or not…without calling and

asking them for that information.  To my knowledge, we have nothing in writing that confirms or

denies that."

231.    The Reliance Group Defendants possessed a report, authored by Optimal chief

risk officer Rajiv Jaitly, which analyzed Optimal's visit with Madoff on February 1, 2006.

Jaitly's report identified the following indicia of fraud:

**Integrity and Enforceability of contractual arrangements with the Broker Dealer:**

- . . . if you look at the trading authorisation under which our accounts are managed it is not clear who the agreement is with – whether it is Madoff the individual or Madoff the Corporation.  If it is the individual then there is a significant risk to this investment and reliance cannot be place[d] on the balance sheet of the Madoff corporation.

**Traceability and recovery of assets in the event of a failure of the Broker Dealer or a counterparty:**

- . . . nothing in the documentation reviewed to-date indicates that properly segregated client accounts have been set up for the receipt of cash and from which the transactions on an execution only basis will be managed.

. . .

- In addition we should consider the extent to which we should seek to have either Madoff[']s auditor or indeed the Optimal Funds auditor to carry out certain restricted procedures to confirm that segregated accounts have been properly set up and are in place and are capable of identifying our assets as belonging to us, verify their counterparty assessment procedures for the Options strategy.

**Risk of Fraud and misrepresentation of process:**

- One of the difficulties with this account is the current inability to verify actual trading activity in the market through counterparty and other market user intelligence.

- A major issue is that the key controls are all in the hands of family members . . . .

**Reliance on a single person – Keyman risk:**

- . . . the keyman risk here is of particular note because there is a considerable reliance being placed on one person in relation to the decision making process and although he is supported by a broader organisation – the Client side activities do not have the formal documentation and external service providers that one would expect with a normal hedge fund and hence some of the safeguards that those structures might provide.

232.    The July 2006 due diligence report provided to the Reliance Group Defendants also identified another cause for concern: the lack of segregation of customer assets.  The report concluded that there was "[n]o independent custody of client assets (Madoff is the custodian)."

233.    In April 2008, the Reliance Group Defendants were informed of another financial services provider's problems with BLMIS.  Lowe emailed other Reliance personnel regarding his attendance at a Deutsche Bank conference, at which he spoke about Madoff with Deutsche Bank's representative.  Lowe reported to his Reliance Group colleagues that Deutsche Bank was not willing to provide additional leverage on Madoff products because they were "not comfortable taking on any more risk with the sub-custody arrangement that Madoff requires." Hergueta worked with HITSI to ensure that there was a sub-custodian agreement in place with BLMIS for the assets entrusted to Landmark.  Madoff's insistence on serving as sub-custodian was an additional indicia of fraud, particularly because M&B had also delegated management authority for Landmark to BLMIS.

### 8.    Defendants Were Unable to Verify the Assets BLMIS Reported to Hold or the Trading Activity in Which It Purported to Engage

234.    The UBS Defendants, M&B, and the Reliance Group Defendants all knew that BLMIS functioned not only as LIF-USEP's and Landmark's *de facto* investment adviser and/or manager, but also as their prime broker and custodian.  As Defendants knew, this arrangement, unusual within the hedge fund industry, eliminated a key check and balance in investment management by excluding an independent custodian of securities from the process.  Defendants knew it would be impossible, without an independent party to verify the existence of assets and execution of purported securities trades, to verify Madoff's purported trading activity.

235.    The Reliance Group Defendants sought to verify that "Defender stated assets and other [BLMIS] account stated assets = total held at BLMIS DTC account" by finding someone at the DTC to confirm.  They also asserted that the incongruity between account stated assets and assets held at a DTC account, which did not exist, "is basically the only way to commit some kind of fraud."

61

236.    Through Brockmann's close relationship with Echeverría, the Reliance Group

Defendants obtained internal due diligence documents and detailed meeting notes prepared by

Optimal regarding research on BLMIS and visits with Madoff.  These reports and notes put the

Reliance Group Defendants on notice of numerous indicia of fraud uncovered by Optimal

employees and provided an in-depth look at BLMIS's trading strategy.  The due diligence

reports prepared by Optimal and shared with the Reliance Group Defendants also noted that

BLMIS was regulated by the National Association of Securities Dealers and the SEC, and that

U.S. law governed BLMIS's trading activities.

237.    The Reliance Group Defendants were in possession of an internal due diligence

report dated August 2005, written by Optimal employee Claire Ikeda-Thew, in which Optimal

recommended "try[ing] to meet the team members responsible for maintaining/building

[Madoff's investment] model," elaborating that to "determine that they exist and they are

competent would be reassuring and increase Madoff's credibility."  This report further

recommended that Optimal "look into ways to independently verify the existence of Optimal's

brokerage account at Madoff, and the net asset value it contains."

238.    The Reliance Group Defendants also knew from the July 2006 Optimal due

diligence report that there was "no independent verification of trading activity (unlike a standard

hedge fund that has a prime broker)."

239.    In connection with BLMIS feeder fund Thema International Fund plc, HSSI

recognized that it could not independently verify that Madoff was trading.  One HSSI employee

commented that "there are no 'Chinese' walls between Asset Management and clearing/custody

[at BLMIS].  We are receiving trade details from Madoff the sub-custodian and nothing from

Madoff the investment advisor, consequently we are posting trades . . . with no confirmation . . . that these are valid trades."

240.    When HITSI agreed to serve as Landmark's custodian, it did so knowing that all custodial authority would be delegated to BLMIS.  When HSSI agreed to serve as Landmark's administrator, it did so knowing that it would have to rely on trade-level information provided by BLMIS that was not independently verifiable.

241.    In September 2005, HSBC Bank plc engaged KPMG to review BLMIS for fraud and related operational risks that arose from BLMIS's custody of the assets of eight BLMIS feeder funds (the "2005 KPMG Review").  The 2005 KPMG Review was prompted by concern that Madoff controlled all key aspects of the funds' investment activity, and specifically targeted fraud risks.  The review was to "make sure that the trades were real and that the money that the investors were placing into Madoff Securities was being used to make investments."

242.    KPMG's findings from the 2005 KPMG Review were set forth in a February 16, 2006 report, titled "Review of fraud and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2006 Report").   It found that there were risks of:

- falsification of client mandates;

- embezzlement of client funds;

- use of fabricated client instructions to disguise poor proprietary positions;

- failure to segregate client funds from BLMIS funds;

- diversion of client funds for Madoff's personal gain;

- inaccurate allocation of clients' reinvested funds;

- manipulation of option prices to maximize commissions;

- exercising options without informing the client that the option was set to expire;

- use of client funds to make opportunistic trades that deviated from the SSC Strategy;

- diversion of cash resulting from the sale of equities and Treasury bills;

- systematic over-valuing of positions and the failure to report positions to HSBC in order to manipulate control relationships;

- failure to hold stocks in client names;

- inflation of call values to disguise misappropriation or poor positions;

- unauthorized trading in client accounts;

- trades executed by unauthorized BLMIS staff members;

- sham trading to divert client cash;

- front-running order flow in the market-making business;

- false reporting of trades without execution to collect commissions; and

- falsification of trade confirmations.

243.    KPMG recommended that HSBC Bank plc independently confirm BLMIS's purported trading activities, because the materials KPMG relied on for the review could have been "easily replicated or falsified in order to commit fraud."

244.    In or around June 2007, HSBC engaged KPMG to conduct a second review of BLMIS. This review was to examine the same risks as the 2005 KPMG Review, but was expanded to assess the risk posed by BLMIS having custody of the assets of twelve BLMIS feeder funds, and by having its own proprietary BLMIS investments.

245.    In late June 2008, Christine Coe requested an urgent meeting among KPMG and HSBC personnel. The meeting, which involved HSBC employees from New York, London, and around the world, revealed widespread concern within HSBC that BLMIS was running a Ponzi scheme, front running, or employing other practices that opened HSBC to fraud risk. It was in

connection with this meeting that Coe commented that BLMIS "is the perfect structure for fraud."

246.    KPMG's conclusions were set forth in a September 8, 2008 report entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2008 KPMG Report").  The 2008 KPMG Report reiterated and identified the concerns of fraud the 2005 Review, and identified additional risks of fraud:

- "Client cash is diverted—signatures falsified on client instruction in an attempt to legitimize an unauthorized transaction (i.e., redemption)."

- "Stocks are intentionally not allocated a fair price from the bulk trade."

The HSBC Service Providers were aware of the concerns of fraud surrounding the relationship with BLMIS and that prompted the two KPMG reviews.

**9.    Madoff's Insistence on Secrecy and Lack of Transparency**

247.    Madoff avoided questions about his IA Business operations, was consistently vague in responding to any such questions, and operated with no transparency.  The Defendants were aware of this lack of transparency and of the elusive, nonsensical answers that principal employees at BLMIS provided to questions about Madoff's trading.  For example, Lowe commented to the Reliance Group Defendants' Senior Analyst that he had called BLMIS and that "calling them is like [F]ort [K]nox – I am concerned about the day we really have an issue. It's the KGB – no one gives their name."  The Reliance Group Defendants even specifically instructed their own employees not to contact Madoff.  The Reliance Group's contracts  database contained a note that employees should never call BLMIS without Lowe's authorization.

248.    The Defendants further acquiesced to Madoff's insistence that his name not appear in any official marketing or offering document relating to BLMIS feeder funds.  UBS SA,

for example, omitted all mention of Madoff from all of LIF-USEP's offering documents, such as prospectuses and marketing materials.

249.    UBS SA also strove to remove all references to Madoff from their audit reports, which Ernst & Young prepared.  For example, on November 13 and 14, 2006, Karp of UBS SA asked Laurence Blanchard of Ernst & Young to remove Madoff's name from the March 2006 long form report for LIF that Ernst & Young was preparing.  Karp noted that Ernst & Young had already agreed to remove Madoff's name from the equivalent report for Luxalpha, and that UBS SA and Ernst & Young had already "had very long discussions on the subject."  In a November 29, 2006 email, Blanchard assented to Karp's request, stating that "E&Y has agreed to take out the name of Madoff in all of the report."  Karp also forwarded to DeAngelis of UBS SA his request to remove Madoff's name, with a cover email that stated "[o]ne has to be careful about everything."  UBS SA chose to risk regulatory and legal sanctions rather than jeopardize its lucrative relationship with BLMIS.

250.    The Reliance Group Defendants similarly omitted Madoff from their marketing materials to existing and potential clients in violation of applicable law.  For example, a January 2008 draft version of the Reliance Group Defendants' Due Diligence Questionnaire for LIF-USEP did not even mention that the sub-fund's assets had been entrusted to a sub-custodian— BLMIS.  Rather, the document misleadingly stated that UBS SA was LIF-USEP's prime broker and custodian of its assets.  Lowe also discussed Madoff's "sensitivity" in an email regarding the drafting of Defender's offering memorandum, and explained that Madoff would not review the offering memorandum and that he "does not care as long as his name does not appear."

251.    The Reliance Group Defendants confirmed their intent to maintain Madoff's secrecy when, in an email discussing the Reliance Group Defendants' relationship with a third

party distributor, Lowe wrote that he did not "want these guys mentioning the word Madoff…If

they do that and I get hold of them then I want to be able to terminate immediately."

252.    The fact that BLMIS was a "privately owned family business shrouded in

secrecy" was a cause for concern for Optimal and the Reliance Group.

253.    In October 2007, Reliance personnel were informed that "speculation and rumour

persist – only pipes are as controversial as this . . . People are obsessed with the idea that

[Madoff] must be guilty of some form of fraud."  The writer went on to point out that the "audit

is an issue.  People say he's never been audited and that although various madoff [sic] feeders

are audited they have massive disclaimers."

254.    On December 4, 2008, merely days before the inevitable collapse of the Ponzi

scheme, Brockmann and Lowe met with Echeverría and Madoff.  Lowe's December 4, 2008

note to file describing that meeting demonstrated the Reliance Group Defendants' concerns

about Madoff, especially in light of his evasiveness and anxiety about escalating redemptions.

255.    Lowe contrasted the overall tone of this meeting with the meeting in February

2007: "BM appears extremely nervous when compared to previous encounters and very

concerned by redemptions.  This leads us to think that perhaps something is not right."  Lowe

commented that Madoff's "answers remain still too vague for comfort."

256.    Further, during the meeting, Madoff seemed to suggest to the Reliance Group

Defendants and Echeverría he had a new and profitable strategy that he planned to employ in the

new year for which he was seeking more investments.  Lowe remarked: "Clearly the sense of

urgency to launch a new variation from someone who has run the same system for years is kind

of odd."

10.    **Lack of Scalability**

257.    In connection with financial markets, scalability refers to an investment strategy's ability to handle higher trading volumes or growing assets under management.  As a fund grows, and is assets under management increase, it becomes more difficult for the fund to find opportunities of a scale in proportion to the fund's size.

258.    The SSC strategy was not scalable for the amount of BLMIS's purported assets under management.  Even before LIF-USEP's creation, UBS SA knew that BLMIS purported to have assets under management of  more than $10 billion.  To execute the SSC strategy, BLMIS would have needed $10 billion of notional value in call options.

259.    By 2006, BLMIS began publicly disclosing its assets under management in Form ADV's filed with the SEC, reporting that its assets under management was approximately $11.7 billion as of July 2006, $13.2 billion as of December 2006, and $17.1 billion as of December 2007.  UBS SA reviewed BLMIS's filings.

260.    Between 2000 and 2008, there was no time when there were enough options on the listed market to implement the SSC strategy Madoff purported to employ.

11.    **The UBS Defendants and LIF-USEP Intentionally Violated the Law and Misled Regulators in Delegating Duties to BLMIS**

261.    Under Luxembourg law, a Luxembourg UCITS fund must have a sponsor or promoter—terms used interchangeably—responsible for creating the fund.  The sponsor is responsible to third parties for damages if the fund is mismanaged.  The appeal of UCITS compliance for a fund is that it allows the fund to market itself not just to qualified investors, but to the public at large.  For an investor, the appeal of compliance is the assurance that certain steps have been taken to enhance the security of the investment.

262.    UBS AG's sponsorship of LIF-USEP was integral to the fund obtaining approval as a UCITS-compliant fund.  It created the appearance, both with the CSSF and with potential investors, that the fund was backed by a highly capitalized, stable bank.

263.    UBS AG was identified as the fund's sponsor in the draft prospectus sent to the CSSF as part of its approval application in 2002.  Its role was confirmed in each subsequent LIF prospectus.

264.    The UBS Defendants not only characterized the fund as one that "UBS AG is offering," but as a fund that that was "powered by UBS AG."

265.    Luxembourg's UCITS regulations prohibit UCITS fund custodians from sub-delegating custodial functions except under very specific circumstances.  Those circumstances were not met here.  UBS SA, a UBS AG subsidiary, was LIF's official custodian, pursuant to a Custody Agreement dated August 26, 2002, and was represented as such on LIF-USEP's prospectuses.

266.    Upon LIF-USEP's inception in August 2005, UBS SA entered into a Sub-Custodian Agreement with BLMIS, delegating its custodial functions to BLMIS.  The Sub-Custodian agreement stated that the "US assets of the Fund" would be invested with BLMIS.  The Sub-Custodian Agreement was not disclosed in any prospectus filed with the CSSF.  Nor could the Sub-Custodian Agreement have been approved by the CSSF, because neither Madoff nor BLMIS complied with Luxembourg law governing fund custodians.  UBS SA continued to receive substantial fees as LIF-USEP's custodian even though it had delegated substantially all of its functions to BLMIS.

267.    Luxembourg's UCITS regulations further prohibit UCITS funds from appointing one entity as both custodian and investment manager.  When UBS SA delegated its duty as fund

custodian to BLMIS, it did so knowing that BLMIS was also LIF-USEP's investment manager.

UBS SA entered into a "Trading Authorization Limited to Purchases and Sales of Securities and

Options" with BLMIS, and delivered this document to BLMIS. The Trading Authorization

provided BLMIS with complete authority to trade the assets of LIF-USEP. UBS SA knew that

this structure was not compliant with rules that prohibit delegation. The delegation of these

functions was disclosed neither to the CSSF nor to investors on LIF-USEP's prospectuses.

Nonetheless, UBS SA continued to receive fees for acting as the fund's custodian, and remained

statutorily and contractually responsible as custodian of the fund. BLMIS received no

compensation for serving as the de facto manager and sub-custodian.

268.    UBS SA was LIF's and LIF-USEP's nominal portfolio manager from the fund's

inception, when it entered into a Portfolio Advisory Agreement with Reliance Gibraltar, LIF, and

LIF-USEP. UBS SA's official managerial role was disclosed on LIF-USEP's prospectus and to

the CSSF. As of May 2, 2006, UBS SA's official managerial responsibility was assigned to

UBSTPM. When UBSTPM took on that role, it represented to the CSSF and to investors that it

had assumed responsibility for the management, administration, and monitoring of LIF-USEP's

investment policies and restrictions. But UBSTPM never managed LIF-USEP, because that

function had already been delegated to BLMIS under the trading authorization agreement

between UBS and BLMIS. The delegation was not disclosed to the CSSF or to investors in LIF-

USEP's prospectus.

269.    UBS SA's abdication of its asset management responsibilities surprised even its

Head of Portfolio Management, Christian Schoen. In a March 22, 2004 e-mail, Schoen wrote:

> I am wondering how this is supposed to work and how one can
> argue that we are officially the portfolio manager but do not have a
> cent posted to our books. To date I had assumed that Madoff
> certainly makes the trades and executes them, but that the assets lie

with us and that in the end we settle the trades with Madoff. This way I would have been in a position to exercise a certain oversight function.

270.    UBS SA also entered into two other agreements with BLMIS regarding LIF-USEP, and transmitted these to BLMIS. The first was an "Option Agreement," dated August 18, 2005, and the second, a "Customer Agreement," was undated.

271.    The Customer Agreement contained a choice of law clause providing that New York law applied to the agreement and to the rights and liabilities of the parties pursuant to the agreement. The Customer Agreement also provided that any controversies between BLMIS and LIF-USEP must be determined by arbitration under the Federal Arbitration Act, to be conducted in the United States: "before the American Arbitration Association, or an arbitration facility provided by any exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. and in accordance with the rule pertaining to the selected organization." The Customer Agreement further provided that all transactions in the customers' account must be subject to the provisions of the Securities Exchange Act of 1934, the rules and regulations of the SEC, and the Board of Governors of the Federal Reserve System.

272.    Upon LIF-USEP's creation, UBS SA delegated nearly every aspect of its custodial and asset management responsibilities to BLMIS.

273.    Yet even after delegating those responsibilities, UBS SA remained in regular contact with BLMIS. In addition to receiving account statements and trade confirmations from BLMIS, UBS SA communicated regularly with BLMIS by mail, fax, and telephone to request withdrawals from LIF-USEP's account and to address various issues, including mismatched trade tickets, tax issues, and missing account statements. In addition to these communications with BLMIS, UBS SA also communicated with employees of RIR in New York regarding LIF-USEP subscriptions and redemptions and to facilitate LIF-USEP's investment with BLMIS.

71

274.     UBS SA also used a U.S. bank account to process LIF-USEP's subscriptions and redemptions.  In furtherance of its custodial function (and the delegation of this function to BLMIS), UBS SA regularly sent LIF-USEP's investor money to and from BLMIS's account at JPMorgan Chase & Co. in New York, Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account"), with funds passing through a bank account at a Stamford, Connecticut branch of LIF-USEP's sponsor, UBS AG.  LIF-USEP's U.S. dollar investors wired money into UBS SA's account at UBS AG's Stamford branch, and that money was then forwarded to UBS SA.  These subscriptions were pooled by UBS SA and then sent to the BLMIS Bank Account in New York again passing through UBS AG in Stamford.  When LIF-USEP requested money from BLMIS, the money flowed from JPMorgan in New York to UBS SA's account at UBS AG's Stamford branch and then to LIF-USEP's bank account at UBS SA.

275.     As a UCITS fund, LIF-USEP could be marketed throughout Europe.  But, upon information and belief, the CSSF did not approve the arrangement to which the UBS Defendants, M&B, the Reliance Group Defendants, and BLMIS had agreed because all power was concentrated in Madoff and/or BLMIS, with no checks and balances.  The complete, undisclosed delegation of both custodial and management authority in the hands of Madoff and/or BLMIS violated the Luxembourg laws implementing the UCITS directives that governed LIF-USEP.

276.     UBS SA's legal department acknowledged that the delegation of both custodial and management authority to BLMIS was improper.  In a March 5, 2004 email containing comments on the proposed structure of Luxalpha, whose structure LIF-USEP mimicked, was UBS in-house counsel Katharina Mayer stated,

> Please note . . . [w]e did not take into account applicable US laws, especially not the question if US authorities might regard the trading authority [*sic*] and the structure . . . as circumvention of an obvious prohibition to be on the one hand sub-Custodian of the

72

Fund and on the other hand perform the Portfolio Management function.

The UBS Defendants knew that the failure to disclose Madoff and BLMIS in the sales prospectus was a violation of Luxembourg law. The UBS Defendants admitted as much with respect to Luxalpha, stating, "the bottom line seems to be that what the fund does is not in line with what the prospectus says (???)." Knowing that Luxalpha was neither structured nor managed in the manner represented in its prospectuses, many UBS employees complained that the irregularities put UBS at risk. UBS SA squelched the dissenting voices.

277. In an August 14, 2009 interview given to *Les Echos*, a French financial publication, Jean Guill, General Director of the CSSF, confirmed that neither LIF-USEP, UBS SA, nor UBSTPM disclosed—either to the CSSF or in sales prospectuses—that they had ultimately delegated custody of the fund's assets to BLMIS, and that the non-disclosure violated UCITS.

278. The 2009 Annual Report of the CSSF further confirms that the documents it received upon which the CSSF based its decision to approve LIF and LIF-USEP as UCITS-compliant:

> did not contain any reference either to the identity of [BLMIS] or to the multiple responsibilities carried on *de facto* by one entity. Between the launch of [LIF and LIF-USEP] and the breakout of the Madoff affair in December 2008, the CSSF was never informed in a transparent manner, by the professionals involved, of the structure actually set in place nor of the role played in practice by [BLMIS] at different levels of this structure.

279. Documents submitted to the CSSF on UBS SA's behalf also evidence this deception. To meet CSSF requirements, in a report dated January 15, 2008 entitled "Control Report of the Independent Auditor on the Custodian Bank Function in the Context of the CSSF Circular 02/81," UBS SA purported to set forth complete lists of funds for which it served as

custodian and the sub-custodians UBS SA used worldwide. Although LIF-USEP was included in the list of funds listed in the report, neither Madoff nor BLMIS was identified as a sub-custodian and are nowhere to be found in the report. The report identifies Brown Brothers Harriman as the only sub-custodian that UBS SA used in the United States.

280.    Upon information and belief, UBS SA submitted such reports regarding its custodial function and its global custodial network to the CSSF annually, at least from 2004 through 2008, and failed to identify Madoff or BLMIS as a sub-custodian in any such report. This was so even though LIF-USEP stated in its long form report that as part of its risk management system of control measures for counterparty settlement risks, "UBS [SA] correspondents and custodians are carefully selected among a list authorized by UBS AG network management."

281.    When UBSTPM was brought on as LIF's (and its sub-funds') new Management Company, the UBS Defendants continued to conceal the delegation of the fund's management to BLMIS. The fund's July 2006 prospectus states that UBSTPM, as Management Company:

> [i]s responsible for the management, the administration and the distribution of the Fund's assets but is allowed to delegate, under its supervision and control, all or part of these duties to third parties. In case of changes or appointment of additional third parties, the prospectus will be updated accordingly.

282.    This provision of the July 2006 prospectus fostered the misleading impression that, as of 2006, LIF-USEP had not yet delegated its management to BLMIS. But UBS had already designated that role—in 2005—upon LIF-USEP's launch. Nor did UBSTPM ever attempt to exercise any "supervision" or "control" over BLMIS. The prospectus was never "updated" to disclose LIF-USEP's delegation of management to BLMIS.

283.    UBSTPM assumed the official managerial role only to nominally comply with regulations that prohibited the same entity from serving as both custodian and manager. The

UBS Defendants created a façade to give the appearance that LIF-USEP's custodial and

managerial duties were divided between two Luxembourg companies, UBS SA and UBSTPM,

when in fact both roles had rested solely with BLMIS in New York from the first day of LIF-

USEP's operation.

284.    UBS AG subsidiary UBSFSL was LIF-USEP's administrator.  In this role,

UBSFSL was responsible for calculating LIF-USEP's NAV by independently verifying the

execution of trades and prices at which those trades took place.  But rather than verify trade data

through independent sources, UBSFSL relied solely upon trade data provided by BLMIS.

285.    UBSFSL only created "mirror" accounting records based on the trade

confirmations and account statements that it received from BLMIS.  Such "mirror" accounting

records were, in essence, reflections of BLMIS records produced in New York detailing the

activity of LIF-USEP's purported investments in U.S. securities.

286.    UBSFSL was in regular communication with RIR in New York regarding LIF-

USEP's administration.  UBSFSL corresponded with RIR regarding money to be sent to BLMIS

in New York, the receipt of mid-month Madoff statements and questions regarding currency

hedging for LIF-USEP.  UBSFSL also communicated with BLMIS directly.  Moreover,

UBSFSL processed subscriptions for LIF-USEP, instructing clients to route U.S. dollar

subscriptions through UBS SA's bank account at UBS AG in Stamford, Connecticut.

287.    Additionally, the operational procedures that UBS SA and UBSFSL put into place

for LIF-USEP were tailor-made for Madoff's atypical methods.  These procedures, set forth in an

internal operating memorandum prepared by the UBS Defendants, included the complete

reliance on unverified pricing and trade confirmations issued by BLMIS, and the calculation of

the sub-fund's NAV on an abnormally delayed basis as a result of Madoff's use of delayed, paper-only statements.

### 12.    BLMIS's Trade Confirmations Frequently Contained Settlement Period Abnormalities

288.    The Defendants knew that a high percentage of options transactions in their BLMIS accounts settled in a time range outside of market practices. It is industry practice for the purchase or sale of exchange-traded options to settle on the business day following execution ("T +1"). However, trade confirmations produced by BLMIS and sent to the Defendants regularly showed options transactions that settled more than one day after execution. 80% of the purported options transactions for LIF-USEP, and 93% of the purported options transactions for Landmark, settled more than one business day after execution and did not comply with standard market practices. These settlement abnormalities were clear indicia of fraud.

### IMPUTATION OF KNOWLEDGE FROM THE UBS DEFENDANTS, M&B, THE HSBC SERVICE PROVIDERS, AND THE RELIANCE GROUP DEFENDANTS TO LIF-USEP AND/OR LANDMARK

289.    After LIF-USEP was established in 2005, Echeverría continued to serve at M&B's direction, carrying out M&B's instructions with regard to LIF-USEP and BLMIS. For example, in October 2005, M&B principal and director Hergueta wrote to Echeverría, expressing his disappointment with the UBS Defendants' handling of LIF-USEP's rollout, and requesting that Echeverría ask the UBS Defendants to reduce their fees and finalize the Distribution Agreement between LIF-USEP and M&B. Upon information and belief, Echeverría followed up with UBS SA regarding these matters. UBS SA agreed to reduce its fees, and the Distribution Agreement became effective January 1, 2006.

290.    In 2007, to provide M&B with additional access to BLMIS, Echeverría assisted in establishing Landmark.

291.    At M&B's direction, Echeverría regularly communicated with Madoff in person, by telephone, and by fax regarding the establishment and operations of LIF-USEP and Landmark. He also regularly communicated with RIR regarding BLMIS, LIF-USEP, and Landmark. At least fifty times during LIF-USEP's and Landmark's existence, Echeverría communicated with Madoff, RIR, or the UBS Defendants on M&B's behalf, to direct investments into BLMIS. With Echeverría's assistance, M&B earned millions of dollars in fees for the investments it directed into LIF-USEP and Landmark.

292.    At all relevant times, Echeverría served as M&B's agent with regard to LIF-USEP and Landmark, and their investments with BLMIS, such that Echeverría's knowledge of fraud at BLMIS is imputed to M&B.

293.    The UBS Defendants, M&B, and the Reliance Group Defendants were LIF-USEP's agents. M&B and the HSBC Service Providers were Landmark's agents. LIF-USEP and Landmark were each, at all times, operated by its agents. Each of those defendants' knowledge of fraud at BLMIS is imputed to the fund for which it was an agent.

294.    The UBS Defendants, M&B, and the Reliance Group Defendants created LIF-USEP. The UBS Defendants served as LIF-USEP's official sponsor, custodian, administrator, and manager. M&B and the Reliance Group Defendants served in distribution and advisory roles. Each of the UBS Defendants and the Reliance Group Defendants received LIF-USEP's BLMIS account statements and trade confirmations. Upon information and belief, M&B also received LIF-USEP's BLMIS account statements and trade confirmations. LIF-USEP's board of directors was, at all times, comprised of UBS SA principals.

295.    M&B directed the creation of Landmark, and served as its official manager. M&B received Landmark's BLMIS account statements and trade confirmations. M&B

managing partner Hergueta served on the board of directors of Landmark's parent fund, AA.

The HSBC Service Providers operated Landmark through service as its official custodian and

administrator, and also received its BLMIS account statements and trade confirmations.

## THE TRANSFERS

A.   **The Initial Transfers**

296.   According to BLMIS's records, Defendants LIF-USEP and Landmark (together,

the "Feeder Fund Defendants") maintained accounts (Nos. 1FR123 and 1FR133, respectively)

with BLMIS, set forth on Exhibit A (collectively, the "Accounts").  For their respective

accounts, the Feeder Fund Defendants each executed, or caused to be executed, a Customer

Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales

of Securities and Options (collectively, the "Account Agreements"), and delivered such

documents to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

297.   The Account Agreements were to be performed in New York, New York through

securities trading activities in New York, New York.  The Accounts were held in New York,

New York, and the Feeder Fund Defendants sent funds to BLMIS and/or to the BLMIS Bank

Account in New York, New York for application to the Accounts and the purported conducting

of trading activities.

298.   During the two years preceding the Filing Date, BLMIS made transfers to the

Feeder Fund Defendants in the collective amount of at least $550,500,000 (the "Two Year Initial

Transfers").  The Two Year Initial Transfers include approximately $498,300,000 to LIF-USEP

(the "LIF-USEP Two Year Initial Transfers") and approximately $52.2 million to Landmark (the

"Landmark Two Year Initial Transfers").  Each of the Two Year Initial Transfers is avoidable

under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15

U.S.C. § 78fff-2(c)(3).   Each of the Two Year Initial Transfers is recoverable under section

550(a)(1) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. §

78fff-2(c)(3).  LIF-USEP and Landmark received each of the Two Year Initial Transfers with

knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high

probability of fraud at BLMIS.

299.    The Two Year Initial Transfers and any undiscovered initial transfers, are

collectively referred to herein as "Initial Transfers."

300.    Charts setting forth the Initial Transfers are included as Exhibits B and C.  The

Initial Transfers were and continue to be Customer Property within the meaning of 15 U.S.C. §

78*lll*(4).

## B.    The Subsequent Transfers

301.    Prior to the Filing Date, LIF-USEP subsequently transferred a portion of the LIF-

USEP Two Year Initial Transfers to the UBS Defendants, M&B, and the Reliance Group

Defendants (the "LIF-USEP Subsequent Transfers").  Prior to the Filing Date, Landmark

subsequently transferred a portion of the Landmark Two Year Initial Transfers to M&B (the

"Landmark Subsequent Transfers").  Together, the Landmark Subsequent Transfers and the LIF-

USEP Subsequent Transfers are known as the "Subsequent Transfers."

302.    The Subsequent Transfers are recoverable from the Subsequent Transferee

Defendants under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA,

particularly 15 U.S.C. § 78fff-2(c)(3).

303.    Based on the Trustee's investigation to date, the UBS Defendants received at least

$16.8 million in subsequent transfers from LIF-USEP:

a.    UBS SA received at least $5.2 million in fees from LIF-USEP for serving as the
     official custodian of LIF-USEP from September 2005 to December 2008, and
     received another $291,000 in fees for serving as the official manager of LIF-
     USEP from September 2005 through at least April 2006.

79

b.      UBSFSL received at least $748,000 in fees from LIF-USEP for serving as the official administrator of LIF-USEP from September 2005 to December 2008.

c.      UBSTPM received at least $10.6 million in fees from LIF-USEP for serving as the official manager of LIF-USEP from May 2006 to December 2008.

d.      UBS AG received at least $1.7 million in recoverable subsequent transfers from 2005 through 2008, in the form of dividends paid by UBS SA and UBSFSL, which were comprised, in part, of fee amounts received by LIF-USEP. UBS SA paid dividends to corporate parent UBS AG in 2006, 2007 and 2008, and UBSFSL paid dividends to corporate parent UBS AG in each year from 2005 to 2008, all of which were based upon revenues received by UBS SA and UBSFSL.

304.    Based on the Trustee's investigation to date, M&B (including M&B SGIIC, which merged into M&B) received at least $18,683,556 in subsequent transfers from LIF-USEP and Landmark:

a.      M&B received at least $6,024,323 in trailing and distribution fees from UBS SA and UBSTPM, which consisted of management fees received by UBS SA and UBSTPM from LIF-USEP in connection with M&B's role as distributor for LIF-USEP from September 2005 to December 2008.

b.      M&B SGIIC received at least $777,420 in fees for serving as the official manager of Landmark from April 2008 to December 2008.

c.      Between 2006 and 2007, LIF-USEP transferred at least $2,878,168 to M&B in connection with M&B's proprietary investments.

d.      Between 2006 and 2007, LIF-USEP transferred at least $900,455 to M&B SGIIC in connection with M&B SGIIC's proprietary investments.

e.      In 2008, Landmark transferred at least $8,103,190 to M&B in connection with M&B's proprietary investments.

305.    Based on the Trustee's investigation to date, Reliance Gibraltar received at least $2,358,709 in advisory fees from UBS SA and UBSTPM from September 2005 to December 2008, which consisted of management fees received by UBS SA and UBSTPM from LIF-USEP, in connection with Reliance Gibraltar's official role as investment advisor to LIF-USEP. Reliance Gibraltar shared a portion of these fees with RIR, in an amount to be proved at trial.

From January 2006 through December 2008, Reliance Gibraltar transferred at least $4,324,482 to RIR's New York bank account.

306.    The Subsequent Transferee Defendants received each of the Subsequent Transfers with actual knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

307.    To the extent that any of the avoidance and recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

308.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Initial Transfers, the Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

309.    The following chart provides a visual summary of the Initial Transfers and the Subsequent Transfers:

**[This Space Intentionally Left Blank]**



## CUSTOMER CLAIMS

310.    LIF's account was still open when Madoff was arrested on December 11, 2008.

Three claims were filed with the Trustee in this SIPA proceeding.  Two of the claims, Claim

Nos. 004417 and 006182, were filed by LIF on March 2, 2009 and March 3, 2009 respectively.

These two claims, which are duplicative of each other, were signed by two of LIF's directors,

Ralf Schroeter and Alain Hondequin, and claim the same amount, $492,145,401.25.  The third

claim, Claim No. 004536, was filed by UBS SA on behalf of LIF-USEP on March 2, 2009, and

also claims the amount $492,145,401.25.  These three customer claims are referred to

collectively as the "Customer Claims."

311.    The Trustee is seeking to have these claims disallowed and/or equitably

subordinated.

## COUNT ONE
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
## 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551

### *Against the Feeder Fund Defendants*

312.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

313.    Each of the Two Year Initial Transfers was made on or within two years before

the Filing Date.

314.    Each of the Two Year Initial Transfers constituted a transfer of an interest of

BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code

and pursuant to 15 U.S.C. § 78fff-2(c)(3).

315.    Each of the Two Year Initial Transfers was made by BLMIS with the actual intent

to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS

made the Two Year Initial Transfers to or for the benefit of the Feeder Fund Defendants in

furtherance of a fraudulent investment scheme.

316.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable

by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from

the Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and 15 U.S.C. §

78fff-(2)(c)(3).

317.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A),

550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to

a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Two Year Initial

Transfers; (b) directing that the Two Year Initial Transfers be set aside; (c) recovering the Two

Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of

the BLMIS estate; (d) directing the Feeder Fund Defendants, to the extent allowable by law, to

disgorge to the Trustee all profits, including any and all compensation and/or remuneration

received by the Feeder Fund Defendants related to or arising from, or concerning the Two Year

Initial Transfers; (e) disallowing any claim that the Feeder Fund Defendants may have against

the Debtors until such time as the Two Year Initial Transfers are repaid to the Trustee; (f)

awarding attorneys' fees and costs from the Feeder Fund Defendants; and (g) awarding any other

relief the Court deems just and appropriate.

### COUNT TWO
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
### 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), AND 551

#### *Against the Feeder Fund Defendants*

318.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

319.    Each of the Two Year Initial Transfers was made on or within two years before

the Filing Date.

320.    Each of the Two Year Initial Transfers constitutes a transfer of an interest of

BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code

and pursuant to 15 U.S.C. § 78fff-2(c)(3).

321.    BLMIS received less than a reasonably equivalent value in exchange for each of

the Two Year Initial Transfers.

322.    At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or

became insolvent as a result of the Two Year Initial Transfers.

323.    At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

324.    At the time of each of the Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

325.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to section 550(a) and 15 U.S.C. § 78fff-(2)(c)(3).

326.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-(2)(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the BLMIS estate; (d)  directing the Feeder Fund Defendants, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation and/or remuneration received by the Feeder Fund Defendants related to or arising from, or concerning the Two Year Initial Transfers; (e) disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such time as the Two Year Initial Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Feeder Fund Defendants; and (g) awarding any other relief the Court deems just and appropriate.

## COUNT THREE
## RECOVERY OF SUBSEQUENT TRANSFERS
## 11 U.S.C. §§ 105(a) AND 550(a)

### *Against the Subsequent Transferee Defendants*

327.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

328.    Each of the Initial Transfers is avoidable under sections 544 and/or 548 of the

Bankruptcy Code.

329.    Each of the Subsequent Transfers is recoverable from the Subsequent Transferee

Defendants under section 550(a) of the Bankruptcy Code.

330.    Each of the Subsequent Transfers was made directly or indirectly to the

Subsequent Transferee Defendants.

331.    Each of the Subsequent Transfers was received by each of the Subsequent

Transferee Defendants at a time when it had actual knowledge of fraud at BLMIS, or was

willfully blind to facts suggesting a high probability of fraud at BLMIS.

332.    As a result of the foregoing, pursuant to sections 105(a), 502(d), and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the

Subsequent Transferee Defendants: (a) recovering the Subsequent Transfers, or the value thereof

from the Subsequent Transferee Defendants for the benefit of the BLMIS estate; (b) directing the

Subsequent Transferee Defendants, to the extent allowable by law, to disgorge to the Trustee all

profits, including any and all management fees, incentive fees or other compensation and/or

remuneration received by the Subsequent Transferee Defendants related to or arising from, or

concerning the Subsequent Transfers; (c) disallowing any claim that the Subsequent Transferee

Defendants may have against the Debtors until such time as the Subsequent Transfers are repaid

to the Trustee; (d) awarding attorneys' fees and costs from the Subsequent Transferee

Defendants; and (e) awarding any other relief the Court deems just and appropriate.

## COUNT FOUR
## OBJECTION TO AND DISALLOWANCE OF CUSTOMER CLAIMS

### *Against LIF, LIF-USEP, and UBS SA*

333.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

334.    LIF, LIF-USEP, and UBS SA were not innocent investors at the time they

invested with BLMIS and provided no consideration to the estate.

335.    LIF, LIF-USEP and UBS SA acted with actual knowledge of fraudulent activity

at BLMIS at the time they invested with BLMIS.  By their conduct, at the time they invested

with BLMIS, they enabled Madoff to perpetuate the fraud at BLMIS.

336.    Alternatively, LIF, LIF-USEP and UBS SA were willfully blind to numerous and

serious indications of fraudulent activity at BLMIS, as described in this Amended Complaint.

337.    As a result of their conduct, LIF, LIF-USEP, and UBS SA are not entitled to the

protections afforded by SIPA.  Thus, LIF, LIF-USEP and UBS SA do not have a claim

enforceable against the BLMIS estate under SIPA or other applicable law.

338.    As a result of LIF's, LIF-USEP's, and UBS SA's conduct, as described above,

pursuant to section 502(a) of the Bankruptcy Code and section 78fff-2 of SIPA, the Trustee

objects to any and all claims of LIF, LIF-USEP, and UBS SA against the BLMIS estate, which

should be disallowed, and not entitled to receive a distribution from the estate pursuant to section

502(b)(1) of the Bankruptcy Code.

## COUNT FIVE
## EQUITABLE DISALLOWANCE OF CUSTOMER CLAIMS

### *Against LIF, LIF-USEP, and UBS SA*

339.    The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Amended Complaint as if fully rewritten herein.

340.    LIF, LIF-USEP, and UBS SA engaged in and benefited from inequitable conduct
and with knowledge of fraudulent activity at BLMIS, including the conduct described in this
Amended Complaint. By their conduct, they have taken unconscionable advantage of, resulting
in injury to, innocent customers and other creditors of the estate.

341.    Based upon LIF's, LIF-USEP's, and UBS SA's failure to deal fairly and in good
faith, as described above, all customers and other creditors of BLMIS have been injured,
including by being (a) misled as to the true financial condition of the debtor; (b) induced to
invest with BLMIS without knowledge of BLMIS's financial condition; and (c) hindered and
delayed in recovering the full amounts due to them.  LIF, LIF-USEP, and UBS SA's conduct
further enabled Madoff to continue the Ponzi scheme.

342.    By submitting their Customer Claims, LIF, LIF-USEP and UBS SA exchanged
their legal claim for  an equitable claim to share pro rata in the estate and submitted to this
Court's equitable jurisdiction.

343.    LIF's, LIF-USEP's, and UBS SA's conduct was so egregious that they should not
be allowed to share in any equitable distribution made by the Trustee to innocent customers
holding allowed claims against BLMIS and/or Madoff.

344.    The Court should exercise the full extent of its equitable powers to ensure that
claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by LIF,
LIF-USEP, and UBS SA against the estate, are disallowed.

345.    Equitable disallowance is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT SIX
## EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS

### *Against LIF, LIF-USEP, and UBS SA*

346.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

347.    LIF, LIF-USEP, and UBS SA engaged in inequitable conduct, including the conduct described in this Amended Complaint.

348.    Based on LIF's, LIF-USEP's, and UBS SA's inequitable conduct, BLMIS's customers have been misled as to the true financial condition of BLMIS and have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them.

349.    LIF's, LIF-USEP's, and UBS SA's conduct enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on LIF, LIF-USEP, and UBS SA.

350.    Prior to the filing date, LIF, LIF-USEP, and UBS SA benefited by the withdrawal of at least $498,300,000 from BLMIS. But for these withdrawals, there would have been additional Customer Property available on the Filing Date for distribution.

351.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by LIF, LIF-USEP, and UBS SA, directly or indirectly against the estate, and only to the extent such claims are allowed, are subordinated for distribution purposes pursuant to sections 510(c) and

105(a) of the Bankruptcy Code to the allowed claims of all other customers and creditors of

BLMIS.

352.    Equitable subordination, as requested herein, is consistent with the provisions and

purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against the Defendants as follows:

i.    On the First Claim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(A),

550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a

judgment against the Feeder Fund Defendants: (a) avoiding and preserving the Two Year Initial

Transfers; (b) directing that the Two Year Initial Transfers be set aside; (c) recovering the Two

Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of

the BLMIS estate; (d)  directing the Feeder Fund Defendants, to the extent allowable by law, to

disgorge to the Trustee all profits, including any and all compensation and/or remuneration

received by the Feeder Fund Defendants related to or arising from, or concerning the Two Year

Initial Transfers from BLMIS to the Feeder Fund Defendants; (e) disallowing any claim that the

Feeder Fund Defendants may have against the Debtors until such time as the Two Year Initial

Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from the Feeder Fund

Defendants; and (g) awarding any other relief the Court deems just and appropriate;

ii.    On the Second Claim for Relief,  pursuant to sections 105(a), 502(d),

548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee

is entitled to a judgment against the Feeder Fund Defendants: (a) avoiding and preserving the

Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; (c)

recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants

for the benefit of the BLMIS estate; (d)  directing the Feeder Fund Defendants, to the extent

allowable by law, to disgorge to the Trustee all profits, including any and all compensation

and/or remuneration received by the Feeder Fund Defendants related to or arising from, or

concerning the Two Year Initial Transfers from BLMIS to the Feeder Fund Defendants; (e)

disallowing any claim that the Feeder Fund Defendants may have against the Debtors until such

time as the Two Year Initial Transfers are repaid to the Trustee; (f) awarding attorneys' fees and

costs from the Feeder Fund Defendants; and (g) awarding any other relief the Court deems just

and appropriate;

iii.    On the Third Claim for Relief, pursuant to sections 105(a), 502(d), and 550(a) of

the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

the Subsequent Transferee Defendants; (a) recovering the Subsequent Transfers, or the value

thereof from the Subsequent Transferee Defendants for the benefit of the BLMIS estate; (b)

directing the Subsequent Transferee Defendants, to the extent allowable by law, to disgorge to

the Trustee all profits, including any and all management fees, incentive fees or other

compensation and/or remuneration received by the Subsequent Transferee Defendants related to

or arising from, or concerning the Subsequent Transfers; (c) disallowing any claim that the

Subsequent Transferee Defendants may have against the Debtors until such time as the

Subsequent Transfers are repaid to the Trustee; (d) awarding attorneys' fees and costs from the

Subsequent Transferee Defendants; and (e) awarding any other relief the Court deems just and

appropriate.

iv.    On the Fourth Claim for Relief, sustaining the Trustee's objections to the

Customer Claims filed by LIF, LIF-USEP, and UBS SA, pursuant to section 502(a) of the

Bankruptcy Code, and disallowing such claims pursuant to section 502(b)(1) of the Bankruptcy

Code and 15 U.S.C. § 78fff-2(b);

v.       On the Fifth Claim for Relief, pursuant to this Court's equitable power,

disallowing each and every claim that LIF, LIF-USEP, and UBS SA asserts against the Debtors'

estate, all of which claims have no lawful existence under principles of restitution and other

applicable law;

vi.      On the Sixth Claim for Relief, subordinating all claims of LIF, LIF-USEP and

UBS SA for purposes of distribution to all allowed claims of BLMIS's customers and creditors

due to LIF's, LIF-USEP's, and UBS SA's inequitable conduct pursuant to sections 105(a) and

510(c) of the Bankruptcy Code, such that no claim of LIF, LIF-USEP, or UBS SA is paid ahead

of the allowed claim of any customer or creditor of BLMIS;

vii.     On the First Through Third Claims for Relief, to the extent allowable by law,

directing the Defendants to disgorge to the Trustee all profits, including any and all management

fees, incentive fees or other compensation and/or remuneration received by the Defendants

related to, arising out of, or concerning the Initial Transfers, the Subsequent Transfers, and the

Landmark and LIF-USEP BLMIS Accounts;

viii.    On all Claims for Relief, establishing a constructive trust over all Initial Transfers

and Subsequent Transfers and their proceeds, product and offspring in favor of the Trustee for

the benefit of the estate;

ix.      On all Claims for Relief, pursuant to federal common law and/or N.Y. C.P.L.R.

5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which

the Initial Transfers were received;

x.      On all Claims for Relief, awarding the Trustee's attorneys' fees, all applicable

interest, costs and disbursements incurred in this proceeding; and

xi.      Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

Dated:  June 26, 2015                                Respectfully submitted,


By: */s/ David J. Sheehan*
      **Baker & Hostetler LLP**
      45 Rockefeller Plaza
      New York, New York 10111
      Telephone: (212) 589-4200
      Facsimile: (212) 589-4201
      David J. Sheehan
      Email:dsheehan@bakerlaw.com

      *Attorneys for Irving H. Picard, Trustee*
      *for the Substantively Consolidated SIPA*
      *Liquidation of Bernard L. Madoff Investment*
      *Securities LLC and the Estate of Bernard L.*
      *Madoff*