**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | Adv. Pro. No. 12-01194 (SMB) |
| Plaintiff, | |
| v. | |
| KOREA EXCHANGE BANK, individually and as Trustee for Korea Global All Asset Trust I-1, and as for Trustee for Tams Rainbow Trust III, and KOREA INVESTMENT TRUST MANAGEMENT COMPANY, | |
| Defendants. | |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW
IN OPPOSITION TO KOREA EXCHANGE BANK'S AND KOREA
INVESTMENT TRUST MANAGEMENT COMPANY'S MOTION TO
DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT
OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

The Trustee respectfully submits this memorandum of law in opposition to Korea Exchange Bank's ("KEB") and Korea Investment Trust Management Company (together, "Defendants") motion to dismiss based on extraterritoriality and in support of the Trustee's motion to amend his Complaint. The Proffered Allegations plead specific facts evincing that the transfers are sufficiently domestic under the standards set forth in the Extraterritoriality Decision[1] and that the Trustee's action does not require an extraterritorial application of 11 U.S.C. § 550. Accordingly, Defendants' motion to dismiss must be denied.

## **BACKGROUND & LEGAL STANDARD**

The District Court returned this action to this Court to determine whether the Trustee's claims against Defendants seek the recovery of "purely foreign" transfers, requiring extraterritorial application of Bankruptcy Code § 550.[2] The District Court held that the Trustee must "put forth specific facts suggesting a domestic transfer" to avoid dismissal.[3] In making this determination, there is no bright-line test to determine whether a transaction is extraterritorial,[4] and courts must review "the location of the transfers as well as the component events of those transactions."[5] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[6]

The Trustee's Proffer specifically alleges Defendants received subsequent transfers of BLMIS customer property from Fairfield Sentry, a fund that invested virtually all of its assets

---

[1] *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222 (S.D.N.Y. 2014) (the "Extraterritoriality Decision").

[2] *Id.* at 232–33.

[3] *Id.* at 232, n.4.

[4] *Parkcentral Global Hub Ltd. v. Porsche Automobil Holdings SE*, 763 F.3d 198, 216-17 (2d Cir. 2014) (rejecting single-factor, bright-line rule as appropriate analysis to ascertain whether foreign or domestic elements "predominate").

[5] Extraterritoriality Decision at 227 (quoting *Maxwell Commc'n Corp. v. Socitete General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)).

[6] *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

with BLMIS in New York. Defendants argue that because they and Fairfield Sentry were organized under foreign laws, Defendants are entitled to a finding that the transfers they received are "purely foreign" and must be dismissed under the Extraterritoriality Decision. Defendants are mistaken. This superficial analysis ignores that the transactions have significant domestic components, including, for example, that Defendants invested with Fairfield Sentry to profit from New York-based BLMIS and that Fairfield Sentry maintained its principal place of business in New York. As set forth below, a comprehensive review of the transfers and the component events of the transactions demonstrate the Trustee's recovery claim against the Defendants does not require an extraterritorial application of the Bankruptcy Code or SIPA.

## THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

The subsequent transfers from Fairfield Sentry were not "purely foreign," but were predominantly domestic for the following reasons: (1) Defendants knowingly invested in Fairfield Sentry to profit from BLMIS in New York; (2) KEB, on behalf of Defendants, entered into domestic subscription agreements and agreed to be subject to New York law and New York jurisdiction; (3) KEB, on behalf of Defendants, sent and received the transfers from Fairfield Sentry through New York bank accounts; (4) KEB, on behalf of Defendants, filed multiple customer claims in this case; (5) Defendants conducted business with Fairfield Greenwich Group ("FGG"), a New York *de facto* partnership; and (6) Fairfield Sentry's principal place of business was in New York.

First, Defendants invested in Fairfield Sentry to profit from BLMIS in New York. (Proffer at ¶¶ 3-4.) BLMIS was to custody the assets in the United States and make all investment decisions to profit from the U.S. markets. (*Id.* at ¶¶ 7-8.) Defendants relinquished all control over the investments underlying the transfers to BLMIS in New York. They inserted

2

themselves into the U.S. markets through BLMIS in order to profit. (*Id.* at ¶¶ 4-8.)

Indeed, Defendants knew based on Fairfield Sentry's private placement memorandum (the "PPM") that Fairfield Sentry invested at least 95% of its assets with BLMIS, which controlled all aspects of those investments in New York. (*Id.* at ¶¶ 6-7.) Defendants knew: (i) Fairfield Sentry delegated all investment decisions to BLMIS as its investment advisor; (ii) BLMIS maintained custody of the assets in New York; and (iii) BLMIS purported to execute trades in U.S. securities on behalf of Fairfield Sentry. (*Id.* at ¶¶ 4-8.) Accordingly, BLMIS was "essential" to Fairfield Sentry's profitability and, in turn, the Defendants' profitability. (*Id.* at ¶¶ 5, 29.)

The Defendants invested in Fairfield Sentry *because* their money would ultimately be placed with BLMIS, and in turn, Madoff would invest their assets in U.S. securities traded on U.S. markets. But for BLMIS and its U.S.-based investment strategy, Defendants would not have invested in Fairfield Sentry. As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States … was not fortitious or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and Fairfield Sentry.[7]

Second, the transfers were made pursuant to subscription agreements that were domestic in nature. By executing the subscription agreements on behalf of Defendants, KEB knowingly (i) submitted to New York courts' jurisdiction, (ii) agreed that New York law would govern the agreement, (iii) agreed to wire Fairfield Sentry subscription payments to a New York correspondent bank account, and (iv) agreed to BLMIS in New York controlling all aspects of the investments, as described in the PPM. (*Id*. at ¶¶ 10-12.)

---

[7] *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 523 (Bankr. S.D.N.Y. 2012).

<u>Third</u>, KEB sent and received transfers from New York bank accounts. On behalf of Defendants, KEB directed subscription payments to New York correspondent bank accounts at HSBC Bank USA, N.A., which were then deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York. (*Id*. at ¶ 14.) KEB also instructed Fairfield Sentry to pay at least 22 separate redemptions over 4 years to a Deutsche Bank Trust Company, Americas in New York. (*Id*. at ¶ 15.)

<u>Fourth</u>, KEB filed multiple customer claims and sought to take advantage of U.S. law in connection with its investments in BLMIS through Fairfield Sentry. (*Id.* at ¶ 41.) Defendants should not be able to invoke the Bankruptcy Code to receive customer property from the BLMIS estate but then deny that the Bankruptcy Code applies to them when the Trustee seeks to recover customer property.

<u>Fifth</u>, Defendants conducted business with FGG, which created, marketed, managed, and controlled Fairfield Sentry, which was based in New York. (*Id*. at ¶¶ 16, 27-28.) KEB, on behalf of Defendants, made subscription and redemption requests to FGG in New York, and FGG New York personnel approved them. (*Id*. at ¶ 14.) These facts further evince the parties' long-standing relationship was centered in the United States.

<u>Sixth</u>, Fairfield Sentry's principal place of business was New York. In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG. (*Id*. at ¶ 17.) Noel and Tucker incorporated Fairfield International Managers, Inc. ("Fairfield International Managers") under Delaware law as part of FGG. (*Id*. at ¶ 19.) Through Fairfield International Managers, Noel and Tucker organized the largest BLMIS feeder fund, Fairfield Sentry. (*Id*. at ¶¶ 2, 19, 23, 30.)

Noel and Tucker organized Fairfield Sentry as an international business company under BVI law. (*Id*. at ¶ 20.) As such, BVI law restricted Fairfield Sentry from doing business in the

4

BVI except with BVI international business companies. (*Id.*) Fairfield Sentry was a shell corporation present in the BVI solely on paper. (*Id.* at ¶ 21.) Its BVI registered address was a post office box care of a local trust company owned and operated by a local law firm. (*Id.*)

From its inception until its liquidation, Fairfield Sentry had no employees and no offices. (*Id.*) Fairfield Sentry was operated nearly entirely from FGG's New York headquarters. (*Id.* at ¶¶ 26-28.)

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. (*Id.* at ¶ 23.) In the account opening documents, Tucker identified Fairfield Sentry's mailing address in the United States and directed BLMIS to send all Fairfield Sentry correspondence there. (*Id.*)

From Fairfield Sentry's inception, FGG personnel at its New York City headquarters controlled the sales and subscriptions of the fund's shares. (*Id.* at ¶¶ 27-28.) From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York. (*Id.* at ¶ 28.)

FGG New York headquarters personnel conducted all germane functions for Fairfield Sentry, including managing the BLMIS relationship; directing investments into and out of BLMIS; and approving subscriptions for Fairfield Sentry. (*Id.* at ¶¶ 27-28.)

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's main brief, this Court should grant the Trustee's motion for leave to amend his Complaint and deny the Defendants' motion to dismiss.

5

Dated: June 26, 2015  
      New York, New York

*/s/* Thomas L. Long  
**Baker & Hostetler LLP**  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Thomas L. Long  
Torello H. Calvani  
Jonathan D. Blattmachr

*Attorneys for Irving H. Picard, Trustee*  
*for the Substantively Consolidated SIPA*  
*Liquidation of Bernard L. Madoff Investment*  
*Securities LLC and the estate of Bernard L.*  
*Madoff*