**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br>    Plaintiff,<br>  v.<br><br>KBC INVESTMENTS LIMITED,<br><br>    Defendant. | Adv. Pro. No. 11-02761 (SMB)<br><br>**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO DEFENDANT KBC INVESTMENTS LIMITED** |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to Defendant KBC Investments Limited ("KBC Investments"), states:

I. **INTRODUCTION**

1. The Trustee seeks to recover at least $196,000,000 of BLMIS customer property that was transferred from BLMIS to Harley International (Cayman) Limited ("Harley") and subsequently transferred to KBC Investments.

2. KBC Investments is a private limited company with its registered office in the United Kingdom. During all relevant times, KBC Investments was a shell company solely used by its parent company and affiliates as an offshore investment vehicle.

3. Harley was a BLMIS feeder fund ("Feeder Fund")—a single-purpose investment fund that pooled its investors' assets to invest with BLMIS. From April 1996 until Madoff's arrest in December 2008, Harley maintained a direct customer account with BLMIS in New York.

4. Harley was operated and controlled by Fix Asset Management Services Inc., a company incorporated under New York law that maintained its principal place of business in New York.

5. In addition to Harley, KBC Investments maintained investments in, or explored investing in, other Feeder Funds. These Feeder Funds included Fairfield Sentry Limited ("Fairfield Sentry"), which was operated and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, and Feeder Funds managed by New York-based Tremont Partners, Inc. ("Tremont").

6. KBC Investments also entered into a swap transaction with Lehman Brothers Special Financing Inc. ("Lehman"), an entity incorporated in Delaware, involving the purchase

1

of Rye Select Broad Market Portfolio Limited ("Portfolio Limited Fund") shares. Portfolio Limited Fund was a Feeder Fund operated by New York-based Tremont. KBC Investments' participation in the Lehman swap transaction was designed to allow Lehman to illegally avoid U.S. tax payments and inappropriately invest in a Feeder Fund limited to non-U.S. taxpayers, as well as improve its balance sheet, during a time when Lehman's parent was facing increased scrutiny as it neared its bankruptcy filing.

7. KBC Investments purposely invested in Harley, Fairfield Sentry, and Feeder Funds managed by Tremont to profit from BLMIS in New York.

8. But for KBC Investments' choice to deliberately seek to profit from BLMIS's purported trading in U.S. securities in New York, KBC Investments would have received none of the $196,000,000 in transfers from Harley.

9. At all relevant times, KBC Investments worked closely with its New York-based affiliate, KBC Financial Products USA Inc. ("KBC USA"), to manage its investments in Harley and other Feeder Funds. KBC USA exercised significant oversight over KBC Investments' investments, and conducted due diligence in New York on behalf of KBC Investments.

10. KBC Asset Management Ltd. ("KBCAM"), another entity affiliated with KBC Investments based on Ireland, also conducted due diligence on Feeder Funds in New York for KBC Investments, and shared information gained through its due diligence with KBC Investments.

11. As a result of KBC USA's and KBCAM's due diligence, KBC Investments knew control over Harley's investments rested entirely with BLMIS in New York.

2

## II. THE TRANSACTIONS UNDERLYING THE TRANSFERS AT ISSUE INVOLVED PREDOMINANTLY DOMESTIC COMPONENTS

### A. KBC Investments Relied on its Affiliates' Domestic Connections to Manage its Investments

12. New York-based KBC USA acted as the fund manager for KBC Investments. In connection with this role, KBC USA was responsible for the day-to-day oversight and administration of KBC Investments' investments in Harley and the other New York-based Feeder Funds. KBC USA also conducted due diligence on behalf of KBC Investments, and shared information gained through due diligence on Feeder Funds, Madoff, and BLMIS with KBC Investments.

13. KBC Investments relied on KBC USA's presence in New York to manage its investments in Harley and the other Feeder Funds. For example, copies of account documents related to KBC Investments' investment in Fairfield Sentry were sent to KBC USA's New York office. Further, KBC USA employees regularly communicated with New York-based Tremont employees about KBC Investments' investment in Feeder Funds managed by Tremont.

14. KBCAM also conducted due diligence on Feeder Funds in New York on behalf of KBC Investments. For example, KBCAM employees traveled to New York to conduct due diligence on Fairfield Sentry and frequently communicated with FGG's New York-based personnel about Madoff and BLMIS.

15. Through KBC USA and KBCAM's due diligence on multiple Feeder Funds, KBC Investments understood that BLMIS purported to pool the billions of dollars it received from its multitude of investors and trade these pooled assets as one. BLMIS then purported to internally allocate the trades to the separate accounts pro rata. Because of this purported pooling and

3

internal allocation system, KBC Investments was able to corroborate and supplement its knowledge regarding Harley, Madoff, and BLMIS.

### B. KBC Investments Knew Control Over Harley's Investments Rested Entirely with BLMIS in New York

16. As a result of KBC USA's and KBCAM's due diligence on Harley, other Feeder Funds, Madoff, and BLMIS, KBC Investments knew the following facts:

   a. In reality the investment adviser for Harley was BLMIS in New York.

   b. BLMIS in New York was the executing broker for Harley's investments, and BLMIS in New York purportedly operated and executed the SSC Strategy on behalf of Harley.

   c. Madoff's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury Bills traded on U.S. exchanges, and the decisions regarding which U.S. equities to purportedly purchase were made by Madoff in New York.

   d. Harley reported in its audited financial statements that 99.99% of its assets were in the custody of BLMIS in New York.

   e. While BLMIS always functioned as the Harley's investment adviser, after 2006, BLMIS was a registered investment adviser with the SEC.

   f. The entire economic purpose of Harley was to deliver money to BLMIS in New York.

17. KBC Investments knew control over Harley's investments rested entirely with BLMIS in New York.

### C. KBC Investments Used New York Bank Accounts in Connection with its Investments

18. KBC Investments used New York bank accounts to transfer money to and from Harley.

19. KBC Investments executed subscription agreements in connection with its investments in Harley. The agreements stated that all money from KBC Investments be directed to New York correspondent bank accounts at JP Morgan Chase, New York ("JP Morgan") or the

4

Northern Trust Banking Corporation ("Northern Trust") for ultimate deposit in Harley's bank account. From Harley's bank account, the funds were deposited in BLMIS's account at JP Morgan in New York.

20. KBC Investments used a HSBC Bank USA account in New York to receive transfers from Harley. Harley redemption confirmations indicate that KBC Investments directed all of its Harley redemption payments—totaling four payments over a ten month period—to this HSBC Bank USA account in New York.

**D.   KBC Investments Filed Quarterly Reports with the SEC because it Managed Substantial U.S. Investments**

21. At the time it received redemption payments from Harley, KBC Investments was required to file quarterly institutional investment manager reports with the SEC. These reports must be filed whenever an institutional investment manager uses United States mailings or other means or instrumentality of interstate commerce in the course of its business and exercises investment discretion over $100 million or more of certain securities.

**E.   KBC Investments Entered into a Swap Agreement with Lehman Involving Domestic Entities and Investments**

22. KBC Investments also entered into a swap transaction with U.S.-based Lehman, involving the purchase of Portfolio Limited Fund shares. Portfolio Limited Fund was a Feeder Fund operated by New York-based Tremont. KBC Investments' participation in the Lehman swap transaction was designed to allow Lehman to illegally avoid U.S. tax payments and inappropriately invest in a Feeder Fund limited to non-U.S. taxpayers, as well as improve its balance sheet, during a time when Lehman's parent was facing increased scrutiny as it neared its bankruptcy filing.

### F. Harley Maintained its Principal Place of Business in New York

23. Harley invested 100% of its assets with BLMIS in New York and received approximately $1 billion in transfers of customer property from BLMIS within two years of December 11, 2008. Of this amount, KBC Investments received at least $196,000,000 from Harley.

#### 1. Harley Sought Out the United States as a Place to Invest and the Transfers it Received Arose Out of its Investment Account with BLMIS in New York

24. In April 1996, Harley's predecessor, Harley International Limited, entered into a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities with BLMIS in New York. Thereafter, Harley maintained an investment account with BLMIS, designated No. 1FN094.

25. Harley agreed that all disputes arising under the Customer Agreement would be resolved by arbitration before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers Inc. … and in accordance with the rules … of the selected organization."

26. The Customer Agreement between BLMIS and Harley provided that all transactions are subject to the provisions of the U.S. Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System. The Customer Agreement also provided BLMIS with full discretion over Harley's assets, and pursuant to the Trading Authorization agreement, Harley authorized Madoff to be its "agent and attorney in fact" to buy, sell, and trade in U.S. securities.

27. The Trustee filed a complaint against Harley in the Bankruptcy Court, under the caption *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), and on November

6

10, 2010, the Bankruptcy Court entered summary judgment against Harley in the amount of $1,066,800,000.

28. In support of summary judgment, the Bankruptcy Court held that "Harley specifically sought out the United States as a place to do business when it opened an account with BLMIS," and that the transfers received by Harley "arose out of business transactions tied to Harley's securities account with BLMIS in New York."

### 2. BLMIS in New York Acted as Harley's Investment Manager, Custodian, and Executing Broker

29. Euro-Dutch Trust Company (Bahamas) Limited ("Euro-Dutch Bahamas") acted as Harley's purported investment manager until 2003, and after 2003, Euro-Dutch Management Limited ("Euro-Dutch Cayman") in the Cayman Islands acted as Harley's purported investment manager.

30. Neither Euro-Dutch Bahamas nor Euro-Dutch Cayman played a meaningful role in managing Harley's investments with BLMIS. Instead, they delegated their investment management responsibilities to BLMIS in New York.

31. As Harley's investment manager, BLMIS in New York purported to invest Harley's assets according to Madoff's SSC Strategy, and BLMIS decided which, how many, and when to purchase and sell U.S. securities on Harley's behalf. BLMIS also acted as executing broker in purporting to purchase the U.S. securities on Harley's behalf.

32. BLMIS acted as custodian for the U.S. securities purportedly held on Harley's behalf. Each of Harley's audited financial statements for years 2003, 2004, 2005, 2006, and 2007 disclosed that BLMIS acted as Harley's "Custodian." Harley's audited financial statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

7

33. Harley's audited financial statements for years 2005 and 2006 also noted that "items included in the financial statements are measured using the currency of the primary economic activity in which it operates …. This is the U.S. dollar, which reflects the company's primary activity of investing in U.S. dollar denominated securities and derivatives."

### 3. Harley Conducted No Meaningful Business in the Cayman Islands

34. Harley was registered as an exempt company under the Cayman Islands Companies Law and was not permitted to solicit investors in the Cayman Islands.

35. In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands."

36. In its Articles of Association, Harley required that all disputes among Harley and its shareholders would be referred to binding arbitration in New York under rules established by the American Arbitration Association.

37. Each shareholder in Harley, including KBC Investments, received copies of Harley's audited financial statements, Memorandum of Association, and Articles of Association.

### 4. Fix Asset Management Ltd. Managed Harley from New York

38. Fix Asset Management Ltd. is the family wealth office of Charles Fix, which over the years evolved into an institutional fund of funds manager.

39. Fix Asset Management Ltd. operated through wholly owned subsidiaries, including Fix Asset Management Services Inc. (f/k/a Fix Asset Management, Inc. and Fix Capital Ltd., and collectively with Fix Asset Management Ltd., "FAM").

40. FAM was incorporated under New York law and maintained its principal place of business at 660 Madison Avenue, New York, New York.

8

41. Harley had no employees or offices of its own. For its investments with BLMIS, Harley acted principally through FAM.

42. FAM was owned and controlled by Charles Fix, who also owned and controlled all of the voting shares for Harley. During the relevant time period, Charles Fix resided in New York.

43. Fix's daughter, Tatiana Fix Katsigera (f/k/a Tatiana Fix), was the chief executive officer of FAM, served on its investment advisory committee, and conducted due diligence for its funds, including Harley. Tatiana Fix Katsigera also resided in New York.

44. Several other members of FAM's advisory teams, including John Fix, Abel Pacheco, and Panos Katsambas, also resided in New York during much of the relevant time period. FAM's outside counsel was also located in New York.

45. FAM marketed Harley from its office in New York, and FAM employees met with investors and potential investors in Harley at FAM's office in New York.

46. FAM monitored and conducted due diligence on Harley's investments with BLMIS from its office in New York.

47. FAM received Harley's BLMIS account statements at its office in New York. For several years BLMIS also sent Harley's BLMIS trade confirmations and account statements to FAM's agent and service provider at Bank Julius Baer & Co. Ltd. in New York.

48. In monitoring its investments, FAM relied on external consultants in the United States, including Merfin LLC from California, X.E. Capital from New York, and Event Capital Markets from New Jersey.

49. FAM handled subscriptions into and redemptions from Harley from its office in New York. For example, FAM employees corresponded with Madoff and Frank DiPascali to

9

request that BLMIS accept subscriptions into Harley's account with BLMIS. FAM employees, including Charles Fix, also corresponded with Madoff and DiPascali to request redemptions from Harley's account.

### 5. Harley Received Transfers at Bank Accounts Held in New York

50. Harley's subscription agreements directed investors to wire U.S. dollars to bank accounts in New York. Prior to 2005, the subscription agreements required subscriptions to be wired to a JPMorgan Chase Bank N.A. account in New York, held in the name of Fortis Bank (Cayman) Limited, and after 2005, the subscription agreements required subscriptions to be wired to an account in the name of Fortis Prime Fund Solutions (IOM) Limited ("Fortis Prime Fund Solutions IOM") at the Northern Trust Banking Corporation ("Northern Trust"), 40 Broad Street, New York, New York.

51. When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York. Harley previously had directed that BLMIS pay redemptions to an account held at Barclays Bank plc in New York.

### 6. Harley Was Administered By Fortis Entities in New York

52. Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, and then Fortis Prime Fund Solutions IOM served as Harley's administrators.

53. The Fortis administrators' relationships with Harley and FAM were managed during much of the relevant time period by Rhonda Eldridge, a Managing Director of Fortis Financial Services, LLC ("Fortis Financial Services") who was based in New York.

54. Eldridge worked with employees of Fortis Prime Funds Solutions (USA) LLC ("Fortis Prime Fund Solutions USA") in New York. (Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, Fortis Prime Fund Solutions IOM, Fortis Financial Services, and Fortis Prime Funds Solutions USA are collectively known as "Fortis").

10

55. Fortis Financial Services was located on Madison Avenue in New York, and from its office Fortis employees performed much of the work necessary in administering Harley.

56. Fortis employees conducted due diligence on BLMIS from Fortis Financial Services's office in New York. Fortis's due diligence included inquiries into BLMIS's role as Harley's custodian as well as a "thorough examination of Harley's account" with BLMIS.

57. Eldridge and other Fortis employees met with Madoff and DiPascali at BLMIS's office in New York. Eldridge and other Fortis employees also regularly spoke with Madoff, DiPascali, and/or Jo Ann Crupi regarding Harley's investments with BLMIS. In addition, Fortis employees met with Charles Fix and investors in Harley at FAM's office in New York.

58. Fortis employees received Harley's BLMIS trade confirmations and account statements at Fortis Financial Services's office in New York, and reviewed the trade confirmations and account statements to calculate Harley's NAV.

59. The Trustee incorporates by reference the allegations of the Complaint filed in *Picard v. Harley International (Cayman) Limited*, Adv. Pro. No. 09-01187 (SMB), Dkt. No. 1 (Bankr. S.D.N.Y. May 12, 2009).

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br><br>**Baker & Hostetler LLP**<br>65 East State Street<br>Suite 2100<br>Columbus, Ohio 43215<br>Telephone: (614) 228-1541<br>Facsimile: (614) 462-2616<br>Lauren M. Hilsheimer<br>Justin J. Joyce<br><br>*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff* |