**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01702 (SMB) |
| Plaintiff, | |
| v. | |
| BARRENECHE, INC., DOVE HILL TRUST, FAIRFIELD GREENWICH CAPITAL PARTNERS, FG INVESTORS LTD., FORTUNA ASSET MANAGEMENT INC., INVERCOUNSEL, S.L., INVERCOUNSEL USA LLC, SELECTA FINANCIAL CORPORATION INC., AND SHARE MANAGEMENT LLC, | **TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS BASED ON EXTRATERRITORIALITY FILED BY DEFENDANTS DOVE HILL TRUST AND FG INVESTORS LTD. AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS** |
| Defendants. | |

The Trustee respectfully submits this supplemental memorandum in opposition to defendants Dove Hill Trust ("DHT") and FG Investors Ltd.'s ("FG Investors," and collectively DHT and FG Investors are referred to as "Defendants")[1] motion to dismiss based on extraterritoriality and in further support of the Trustee's motion for leave to amend the complaint. As set forth below, the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to Defendants DHT and FG Investors ("Proffer") plead facts showing the subsequent transfers received by DHT and FG Investors and the component events of the transactions are predominantly domestic under the standard set forth in the Extraterritoriality Decision,[2] such that the Trustee's action does not require an extraterritorial application of SIPA or Bankruptcy Code § 550. The motion to dismiss should be denied, and the Trustee's motion for leave to amend should be granted.

## I.    <u>BACKGROUND</u>

The transfers at issue here all derive from the relationship between BLMIS—a U.S. entity purportedly trading in U.S. securities—and hedge funds that were operated by the Fairfield Greenwich Group ("FGG") from the U.S. for the primary purpose of investing with BLMIS. Defendant FG Investors is an entity that was created by FGG partner Charles Murphy[3] to receive his partnership distributions from FGG. Proffer ¶ 1. Defendant DHT is an entity that was created by Yanko della Schiava, a FGG sales employee, to receive salary and bonus payments from FGG. *Id.*

---

[1] Defendants Barreneche, Inc., Fairfield Greenwich Capital Partners, Fortuna Asset Management Inc., Invercounsel, S.L., Invercounsel USA LLC, Selecta Financial Corporation, Inc., and Share Management LLC did not move to dismiss based on extraterritoriality.

[2] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 232–33 (S.D.N.Y. 2014) ("Extraterritoriality Decision").

[3] Murphy is a defendant in *Picard v. Fairfield Investment Fund, Ltd.* Adv. Pro. No. 09-01239 (SMB), but he did not join the extraterritoriality briefing as a U.S. citizen and resident.

A number of the hedge funds operated by FGG were BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with New York-based BLMIS. *Id.* ¶ 2. Fairfield Sentry Limited ("Fairfield Sentry"), BLMIS's largest Feeder Fund, was created, operated, and controlled almost entirely in New York by FGG personnel based in New York ("FGG New York Personnel"). *Id.* FGG New York Personnel also created, operated, and controlled: (1) sister funds to Fairfield Sentry that accepted investments in other currencies, converted the money to U.S. Dollars, and then invested their assets in Fairfield Sentry ("currency funds"); and (2) funds of funds that re-invested a portion of their assets in Feeder Funds. *Id.* ¶ 3.

The Feeder Funds, currency funds, and funds of funds operated by FGG charged investors significant fees and those fees were then funneled to administrative entities Fairfield Greenwich Limited ("FG Limited") and Fairfield Greenwich (Bermuda) Limited ("FG Bermuda"). *Id.* ¶ 4. The Feeder Funds withdrew monies from their BLMIS accounts to pay the fees to FG Limited and FG Bermuda. *Id.* ¶ 5. FG Limited and FG Bermuda then paid FGG partners distributions and employees salary and bonus payments from the fees they received from the Feeder Funds, currency funds, and funds of funds. *Id.* These partnership distributions and salary and bonus payments are the BLMIS customer property at issues in this action. *Id.*

Defendants argue that simply because they were formally organized under foreign law, they are entitled to a finding that those transfers are "purely foreign" and must be dismissed under the Extraterritoriality Decision. Defendants are wrong. Their simplistic reasoning is contrary to the *Maxwell I* "component events" analysis embraced by the District Court in the Extraterritoriality Decision,[4] and is inconsistent with Second Circuit precedent considering the

---

[4] Extraterritoriality Decision, 513 B.R. at 227; *Maxwell Commc'n Corp. v. Société General* (*In re Maxwell Commc'n Corp.*), 186 B.R. 807, 816-17 (S.D.N.Y. 1995) ("*Maxwell I*").

connection among the parties, and the economic and legal realities of the transactions.[5] As set forth below, the component events of the transactions demonstrate the Trustee's recovery claims against FG Investors and DHT do not require an extraterritorial application of SIPA or Bankruptcy Code § 550.

## II.     OVERVIEW OF FG LIMITED, FG BERMUDA, AND FAIRFIELD SENTRY

### A.     FG Limited Was a U.S. Resident that Maintained Its Principal Place of Business in New York

FG Limited's principal place of business was in New York and FG Limited was a U.S. resident. *Id.* ¶ 32.

FGG founding partners Walter Noel, Jeffrey Tucker, and Andrés Piedrahita formed FG Limited under the laws of Ireland in 1997, and reorganized FG Limited is a limited liability company under the laws of the Cayman Islands in 2002. Proffer ¶ 33. FG Limited reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and was taxed as a partnership under U.S. tax law. *Id.* ¶¶ 35–36.

FG Limited's shareholders executed a Shareholder and Voting Agreement and multiple Amended Shareholder and Voting Agreements. *Id.* ¶¶ 19–20, 34. These agreements were governed by New York law, and required that all disputes arising under the agreements be resolved by mandatory arbitration in New York. *Id.*

FG Limited served as the investment adviser and/or placement agent for many FGG Feeder Funds, including Fairfield Sentry, currency funds, and funds of funds. *Id.* ¶ 35. FG Limited also owned 100% of FG Bermuda. *Id.* In connection with these roles, FG Limited received fees from FG Bermuda, Feeder Funds, currency funds, and funds of funds invested in

---

[5] *See, e.g., Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215–17 (2d Cir. 2014) (cautioning lower courts about the problems of narrowly "treating the location of the transaction as the definitive factor in the extraterritoriality inquiry"); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014).

Feeder Funds. *Id.* To pay these fees the Feeder Funds withdrew money from BLMIS accounts. *Id.* ¶ 5.

At all relevant times, FG Limited maintained its bank account at JPMorgan Chase Bank ("JPMorgan") in New York. *Id.* ¶ 37. FG Limited utilized its New York JPMorgan account to receive funds and make partnership distributions to the FG Limited shareholders directly or to entities designated by them to receive their distributions. *Id.*

### B. FGG Created FG Bermuda at Madoff's Direction

In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. *Id.* ¶ 39. The new fund would be open to all investors and as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the Feeder Funds. *Id.* Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve as the investment manager of the funds. *Id.*

As a result, on June 12, 2003, FGG formed FG Bermuda under Bermuda law. *Id.* ¶¶ 39–40, 42. FG Bermuda is a wholly-owned subsidiary of FG Limited. *Id.* ¶ 42. FGG New York Personnel selected individuals to staff FG Bermuda, and nearly every FG Bermuda employee aside from a few administrative assistants reported directly to FGG New York Personnel. *Id.* ¶ 43.

Upon the formation of FG Bermuda, FG Limited assigned certain of its management contracts to FG Bermuda, including the investment advisory agreements for Feeder Funds. *Id.* ¶ 44. As compensation for its services, FG Bermuda received management and performance fees from FGG Feeder Funds. *Id.* In order to pay these fees, Feeder Funds caused funds to be withdrawn from BLMIS accounts and then transferred the money to FG Bermuda. *Id.*

4

In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its Feeder Funds. *Id.* ¶ 46. While the investigation was ongoing, in attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. *Id.* As a result of the investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. *Id.* ¶ 47. Accordingly, the SEC required Fairfield Sentry to modify its investor communications to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts. *Id.* Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that FGG's New York-based general counsel executed and submitted. *Id.* ¶ 46.

## C.    Fairfield Sentry's Principal Place of Business Was in New York and It Was a Domestic Resident

Fairfield Sentry's principal place of business was in New York and it was a domestic resident.

On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry for the purpose of creating a fund to invest with Madoff. *Id.* ¶ 50. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax-free status in the BVI. *Id.* Fairfield Sentry was present in the BVI on paper only. *Id.* ¶ 51. Fairfield Sentry never had any employees or offices in the BVI, and was legally prohibited from doing business with most BVI residents. *Id.* ¶ 50. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry was a U.S. entity. *Id.* ¶ 52. Fairfield Sentry is in liquidation. *Id.*

### 1.    Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was the United States

In Fairfield Sentry's agreements with BLMIS, it was clear that Fairfield Sentry operated in the United States. *Id.* ¶ 53. BLMIS account documents from the early 1990s listed Fairfield

Sentry's address as the office address of Fairfield International Managers, Inc.—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. *Id.* In 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters. *Id.*

The Fairfield Sentry account documents were executed by FGG New York Personnel. *Id.* ¶ 54. Tucker executed the original account opening documents on behalf of Fairfield Sentry. *Id.* Later, FGG New York Personnel executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. *Id.*

The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts were governed by New York law and all disputes arising under the agreements were required to be resolved by mandatory arbitration in New York utilizing the laws of New York. *Id.* ¶ 55. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. *Id.* Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC. *Id.*

### 2.    FGG New York Personnel Controlled Fairfield Sentry

FGG ran Fairfield Sentry out of its New York headquarters and the fund was operated almost entirely by FGG New York Personnel. *Id.* ¶ 57. FGG New York Personnel made all operational decisions regarding Fairfield Sentry; had final control of Fairfield Sentry's bank accounts; controlled and approved all subscriptions into and redemptions from the fund; monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield

Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield

Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of

Fairfield Sentry; and directed investments into and out of BLMIS. *Id.* FGG maintained all of

Fairfield Sentry's books and records in New York. *Id.* From at least January 1, 2002, Fairfield

Sentry subscription agreements contained New York choice of law provisions, and provided for

venue and jurisdiction for any disputes in New York. *Id.* ¶ 58.

## III.    THE LEGAL STANDARD

As further explained in the Main Brief, the District Court explained the standard by

which the Defendants' motion should be analyzed.[6]    To determine whether conduct is

extraterritorial, this Court must determine whether the "transfer and component events of the

transaction" are domestic.[7]    The relevant component events include: (i) the debtor's location;

(ii) the defendant's location; (iii) where the defendant engaged in business regarding the

transaction; (iv) the relevant transactions and agreements entered into by the parties; (v) where

the parties relationship was centered at the relevant times; (vi) the law governing the parties'

transactions; and (vii) how the transaction was concluded.[8]

## IV.    THE TRANSFERS TO FG INVESTORS AND COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

FG Investors received at least $6,617,035 that originated from BLMIS and was

subsequently transferred to FG Investors by FG Limited and FG Bermuda. Proffer ¶ 6. As

pleaded in the Proffer, these transfers and the component events of the transactions are domestic

in nature and fall within the intended reach of the Bankruptcy Code and SIPA. An application of

the *Maxwell I* factors demonstrates FG Investors' motion to dismiss based on extraterritoriality

---

[6] Extraterritoriality Decision, 513 B.R. at 227–31.

[7] *See id.* at 227; *see also Maxwell I*, 186 B.R. at 816–17.

[8] *See Maxwell I*, 186 B.R. at 816–17.

should be denied:

*Location of the Debtor:* BLMIS operated from its principal place of business in New York, New York. *Id.* ¶ 2.

*Location of Defendant FG Investors:* Despite being organized in the Cayman Islands, FG Investors is a company controlled entirely by Charles Murphy—a U.S. citizen and, during all relevant times, a New York resident. *Id.* ¶ 9.

*Where FG Investors Engaged in Business Regarding the Transactions:* Murphy joined FGG as a partner in April 2007 and was based in FGG's New York headquarters. *Id.* ¶ 10. When Murphy joined FGG he was given a percentage of FG Limited's shares. *Id.* ¶¶ 10, 33. Murphy created FG Investors as a shell company to hold the FG Limited shares on his behalf. *Id.* ¶ 9. Murphy directed his FG Limited and FG Bermuda partnership distributions to FG Investors. *Id.* Murphy controlled FG Investors and did so from New York. *Id.*

*Transactions and Agreements:* FGG New York Personnel approved, directed, and controlled each of the partnership distributions that were made from FG Limited's New York JPMorgan bank account to FG Investors, and each FG Bermuda partnership distribution to FG Investors. *Id.* ¶¶ 17, 37.

*Center of the Parties' Relationship:* FG Investors' relationship with BLMIS and FGG was centered in the United States. *Id.* ¶ 8. Murphy controlled FG Investors, and was a U.S. citizen, a New York resident during the relevant time period, and worked out of FGG's New York headquarters. *Id.* ¶¶ 9–10. FG Limited maintained its principal place of business in New York and was a U.S. resident, and FGG created FG Bermuda at Madoff's direction. *Id.* ¶ 4. Moreover, FG Investors, through Murphy, knew: (1) New York-based BLMIS controlled assets invested in Madoff's split-strike strategy ("SSC Strategy"), which purportedly involved the

purchase of U.S. S&P 100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges; (2) BLMIS was the custodian of assets invested with the SSC Strategy; (3) U.S. law would apply in the event of BLMIS's bankruptcy; and (4) that the entire economic purpose of FGG Feeder Funds was to deliver money to BLMIS in New York. *Id.* ¶¶ 13–14.

*Governing Law:* FG Investors executed FG Limited shareholder agreements that contained New York choice of law provisions and directed that any controversy arising out of the agreements would be subject to New York arbitration. *Id.* ¶¶ 19–20.

*How the Transactions Were Concluded:* At least 23 partnership distributions and other payments made by FG Limited to FG Investors originated from FG Limited's New York bank account at JPMorgan. *Id.* ¶ 17.

## V.    THE TRANSFERS TO DHT AND COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

DHT received a total of at least $471,949 that originated from BLMIS and was subsequently transferred to DHT by FG Limited and Fairfield Sentry. Proffer ¶ 7. As pleaded in the Proffer, these transfers and the component events of the transactions are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. An application of the *Maxwell I* factors demonstrates DHT's motion to dismiss based on extraterritoriality should be denied:

*Location of the Debtor:* BLMIS operated from its principal place of business in New York, New York. *Id.* ¶ 2.

*Location of Defendant DHT:* DHT is a trust that was controlled by FGG sales employee della Schiava. *Id.* ¶ 22. DHT's trustee is based in Singapore. *Id.*

*Where DHT Engaged in Business Regarding the Transactions:* della Schiava joined FGG in 1999 and worked as a sales employee for the FGG Feeder Funds, entitling him to

compensation and bonuses from New York-based FG Limited. *Id.* ¶ 23. He also invested in New York-based Fairfield Sentry himself. *Id.* della Schiava established DHT to receive his salary and bonus payments from FG Limited in New York and a redemption from Fairfield Sentry in New York. *Id.* ¶ 22.

*Transactions and Agreements:* FGG New York Personnel approved, directed, and controlled each salary and bonus payment that were made from FG Limited's New York JPMorgan bank account to DHT, and the redemption payment made from Fairfield Sentry to DHT. *Id.* ¶¶ 30, 37.

*Center of the Parties' Relationship:* DHT's relationship with BLMIS and FGG was centered in the United States. *Id.* ¶ 21. FG Limited and Fairfield Sentry maintained their principal places of business in New York and were domestic residents as a result. *Id.* ¶¶ 32, 49. Moreover, DHT, through della Schiava, knew: (1) New York-based BLMIS controlled assets invested in Madoff's SSC Strategy, including Fairfield Sentry's assets, which purportedly involved the purchase of U.S. S&P 100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges; (2) BLMIS in New York was the custodian of assets invested with the SSC Strategy; and (3) that the entire economic purpose of FGG Feeder Funds was to deliver money to BLMIS in New York. *Id.* ¶¶ 24–25.

*Governing Law:* The Trustee is not aware that any agreements between DHT and the transferors contained choice of law provisions during the relevant time period of the transfers.

*How the Transaction Was Concluded:* DHT, through della Schiava, received transfers from FG Limited paid through its New York bank account at JPMorgan. *Id.* ¶ 30.

## VI.    **CONCLUSION**

For these reasons, the Trustee respectfully requests that this Court deny the motions to dismiss of defendants FG Investors and DHT and grant the Trustee's motion for leave to amend.

Dated: June 26, 2015
New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Thomas L. Long

**Baker & Hostetler LLP**
Capital Square
65 E. State St., Suite 2100
Columbus, Ohio 43215-4260
Telephone:  (614) 228-1541
Facsimile:  (614) 462-2616
Lauren M. Hilsheimer
Melonia A. Bennett
Justin J. Joyce

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the estate of Bernard L.
Madoff*