**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01702 (SMB) |
| Plaintiff, | |
| v. | |
| BARRENECHE, INC., DOVE HILL TRUST, FAIRFIELD GREENWICH CAPITAL PARTNERS, FG INVESTORS LTD., FORTUNA ASSET MANAGEMENT INC., INVERCOUNSEL, S.L., INVERCOUNSEL USA LLC, SELECTA FINANCIAL CORPORATION INC., AND SHARE MANAGEMENT LLC, | **PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO DEFENDANTS DOVE HILL TRUST AND FG INVESTORS LTD.** |
| Defendants. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to Defendants Dove Hill Trust ("DHT") and FG Investors Ltd. ("FG Investors," and DHT and FG Investors are collectively referred to as "Defendants"),[1] states:

## I. INTRODUCTION

1. Defendant FG Investors is an entity that was created by Charles Murphy,[2] a partner of the Fairfield Greenwich Group ("FGG"), to receive his partnership distributions from FGG. Defendant DHT is an entity that was created by Yanko della Schiava, a FGG sales employee, to receive salary and bonus payments from FGG.

2. In or around 1988, founding partners Walter Noel and Jeffrey Tucker established FGG, a *de facto* partnership based in New York that operated hedge funds. A number of the hedge funds operated by FGG were BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with BLMIS. BLMIS operated from its principal place of business in New York, New York. Fairfield Sentry Limited ("Fairfield Sentry"), BLMIS's largest Feeder Fund, was created, operated, and controlled almost entirely in New York by FGG personnel based in New York ("FGG New York Personnel").

3. FGG New York Personnel also created, operated, and controlled: (1) sister funds to Fairfield Sentry that accepted investments in other currencies, converted the money to U.S. Dollars, and then invested their assets in Fairfield Sentry ("currency funds"); and (2) funds of funds that re-invested a portion of their assets in Feeder Funds.

4. The Feeder Funds, currency funds, and funds of funds operated by FGG charged investors significant fees and those fees were then funneled administrative entities Fairfield

---

[1] Defendants Barreneche, Inc., Fairfield Greenwich Capital Partners, Fortuna Asset Management Inc., Invercounsel, S.L., Invercounsel USA LLC, Selecta Financial Corporation, Inc., and Share Management LLC did not move to dismiss based on extraterritoriality.

[2] Murphy is a defendant in *Picard v. Fairfield Investment Fund, Ltd.* Adv. Pro. No. 09-01239 (SMB), but he did not join the extraterritoriality briefing as a U.S. citizen and resident.

1

Greenwich Limited ("FG Limited") and Fairfield Greenwich (Bermuda) Limited ("FG Bermuda"). FG Limited maintained its principal place of business in New York. FG Bermuda was created by FGG at Madoff's request.

5. FG Limited and FG Bermuda then paid FGG partners distributions and employees salary and bonus payments from the fees they received from the Feeder Funds—which came from the Feeder Fund BLMIS accounts—currency funds, and funds of funds. These partnership distributions and salary and bonus payments are the BLMIS customer property at issues in this action.

6. Specifically, the Trustee seeks to recover at least $6,617,035 in subsequent transfers of BLMIS customer property collectively made to FG Investors, including: (1) at least $5,941,335 transferred from FG Limited to FG Investors; and (2) at least $675,700 transferred from FG Bermuda to FG Investors.

7. The Trustee also seeks to recover at least $471,949 in subsequent transfers of BLMIS customer property collectively made to DHT, including: (1) at least $400,000 transferred from FG Limited to DHT; and (2) at least $71,949 transferred from Fairfield Sentry to DHT. della Schiava had a direct investment in Fairfield Sentry, and the $71,949 was a redemption payment resulting from that direct investment.

## II. THE TRANSACTIONS AT ISSUE WERE PREDOMINANTLY DOMESTIC

### A. FG Investors' Relationship with FG Limited and FG Bermuda Was Centered in the United States

8. FG Investors' relationship with FG Limited and FG Bermuda was centered in the United States. First, FGG partner Charles Murphy controlled FG Investors from New York. Second, FG Investors knew New York-Based BLMIS controlled the assets invested in the SSC Strategy and that U.S. Laws would apply in the event of BLMIS's bankruptcy. Third, FG

2

Investors received funds originating from New York-based BLMIS and received transfers from a New York bank account. Fourth, FG Investors agreed New York law applied in connection with the transfers.

### i. *Murphy Controlled FG Investors from New York*

9. Although formally organized as a Cayman Island company, FG Investors is a shell company controlled by Murphy, a U.S. citizen and, during all relevant times, a New York resident. Murphy used FG Investors to receive partnership distributions from FG Limited and FG Bermuda. Murphy controlled FG Investors from New York.

10. Murphy joined FGG as a partner on April 1, 2007, and was thereafter based in FGG's New York headquarters. Murphy served on FGG's Executive Committee and was an Executive Director of FG Limited.

11. While at FGG, Murphy maintained a residence in New York, New York.

12. Murphy controlled FG Investors through FG Trust and the Harry Demetriou and Family trust—Murphy's family trust. FG Investors was wholly-owned by FG Trust, which was wholly-owned by the Harry Demetriou and Family trust. Harry Demetriou is Murphy's father-in-law. FG Investors, FG Trust, and the Harry Demetriou and Family trust were entities controlled by Murphy from New York.

### ii. *FG Investors Knew New York-Based BLMIS Controlled the Assets Invested in the SSC Strategy and that U.S. Laws Would Apply in the Event of BLMIS's Bankruptcy*

13. As a partner and director of FGG, Murphy learned information about Madoff and New York-based BLMIS. Through Murphy, FG Investors knew the following facts:

   a. FG Limited and FG Bermuda earned fees based on the performance of Feeder Funds, currency funds, and funds of funds;

   b. In reality the investment advisor for the Feeder Funds was New York-based BLMIS;

3

  c. BLMIS purportedly operated the SSC Strategy—which involved the purchase of U.S. S&P 100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges—and decisions regarding which U.S. securities to purchase were made by Madoff in New York;

  d. BLMIS was the custodian of assets invested with the SSC Strategy; and

  e. U.S. law would apply in the event of BLMIS's bankruptcy.

14. FG Investors knew control over assets invested in Madoff's SSC Strategy rested entirely with BLMIS and that the entire economic purpose of the Feeder Funds was to deliver money to BLMIS in New York.

  *iii.* *FG Investors Received Funds Originating from New York-Based BLMIS and Received Transfers from a New York Bank Account*

15. FG Investors, through Murphy, knew that FG Limited and FG Bermuda received management and performance fees as compensation for their purported services from Feeder Funds, currency funds, and funds of funds. In order to pay these fees, Feeder Funds withdrew money from their BLMIS accounts in New York, and then transferred the money to FG Limited and FG Bermuda. In some cases the money flowed from the BLMIS account, to the Feeder Funds, to the currency funds or funds of funds, and then to FG Limited and FG Bermuda.

16. These monies originating from BLMIS accounts were then distributed to FG Investors in the form of partnership distributions for Murphy.

17. The transfer of BLMIS customer property FG Investors received from FG Limited flowed from FG Limited's New York bank account at JPMorgan Chase Bank ("JPMorgan"). At least 23 partnership distribution made by FG Limited to FG Investors originated from FG Limited's New York bank account at JPMorgan.

  *iv.* *FG Investors Agreed New York Law Applied in Connection with the Transfers*

18. FG Investors also signed agreements that contained New York choice of law

4

provisions.

19. As the entity holding Murphy's FG Limited shares, FG Investors executed FG Limited's April 2007 First Amended and Restated Shareholder and Voting Agreement and amendments thereto, which governed, among other things, partnership distributions from FG Limited. FG Investors acknowledged the agreement "shall be governed by the laws of the State of New York;" and any controversy or claim arising out of or relating to the agreement would be settled by arbitration in New York administered by the American Arbitration Association.

20. When FG Investors executed FG Limited's September 2008 Second Amended and Restated Shareholder and Voting Agreement, it agreed to the same New York choice of law provisions.

**B. DHT's Relationship with FG Limited and Fairfield Sentry Was Centered in the United States**

21. DHT's relationship with FG Limited and Fairfield Sentry was centered in the United States. First, DHT knew control of the Feeder Funds' investments rested with BLMIS in New York. Second, DHT received funds originating from New York-Based BLMIS and used New York bank accounts in connection with the transfers at issue.

*i. DHT Knew Control of the Feeder Funds' Investments Rested with BLMIS in New York*

22. della Schiava established DHT to receive his salary and bonus payments from FG Limited and a redemption payment from Fairfield Sentry. Although Asiaciti Trust Singapore Pte Ltd. serves as DHT's trustee, della Schiava controls DHT.

23. della Schiava, Noel's son-in-law, joined FGG in 1999 as a sale employee in charge of business development. della Schiava marketed Feeder Funds to investors. In connection with this role, della Schiava received compensation in the form of salary and bonuses from FG Limited. He also invested in Fairfield Sentry himself.

5

24. In connection with his position as a business developer for Feeder Funds and his personal investments in Fairfield Sentry, della Schiava performed due diligence on BLMIS and Madoff in New York. Through della Schiava, DHT knew the following facts:

    a. FG Limited earned fees based on the performance of Feeder Funds, currency funds, and funds of funds.

    b. In reality the investment advisor for the Feeder Funds was New York-based BLMIS;

    c. BLMIS purportedly operated the SSC Strategy—which involved the purchase of U.S. S&P 100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges—and decisions regarding which U.S. securities to purchase were made by Madoff in New York; and

    d. BLMIS was the custodian of assets invested with the SSC Strategy and held them in accounts in New York.

25. DHT knew control over the Feeder Funds' assets invested in Madoff's SSC Strategy rested entirely with BLMIS and that the entire economic purpose of the Feeder Funds, including Fairfield Sentry, was to deliver money to BLMIS in New York.

    *ii. DHT Received Funds Originating from New York-Based BLMIS and Used New York Bank Accounts in Connection with the Transfers at Issue*

26. DHT, through della Schiava, knew that FG Limited received management and performance fees as compensation for its purported services from Feeder Funds, currency funds, and funds of funds. In order to pay these fees, Feeder Funds withdrew money from their BLMIS accounts in New York, and then transferred the money to FG Limited. In some cases the money flowed from the BLMIS account, to the Feeder Funds, to the currency funds or funds of funds, and then to FG Limited.

27. These monies originating from BLMIS accounts were then distributed to DHT in the form of salary and bonus payments for della Schiava.

28. DHT, through della Schiava, knew that redemption of della Schiava's direct

6

investment in Fairfield Sentry originated with BLMIS as Fairfield Sentry maintained direct accounts with BLMIS.

29. DHT also used New York bank accounts in connection with the transfers at issue.

30. DHT, through della Schiava, received transfers from FG Limited through FG Limited's New York bank account at JP Morgan.

31. DHT, through della Schiava, also directed investments in Fairfield Sentry to a New York HSBC Bank USA correspondent bank account, for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York.

**C. FG Limited's Principal Place of Business Was in New York**

32. FG Limited's principal place of business was in New York, and FG Limited was a New York resident.

33. Founding partners Noel, Tucker, and Andrés Piedrahita formally incorporated FG Limited under the laws of Ireland in 1997 as part of the merger between Noel's and Tucker's FGG and Piedrahita's company, Littlestone Associates Inc. In 2002, Noel, Tucker, and Piedrahita reorganized FG Limited as a limited liability company under the laws of the Cayman Islands. Following the reorganization, Noel, Tucker, and Piedrahita made certain FGG personnel partners by providing them with percentage ownership of FG Limited shares.

34. In order to allow for the admittance of new FGG partners, on January 1, 2002, FG Limited's shareholders executed a Shareholder and Voting Agreement. By executing this agreement, the FG Limited shareholders acknowledged and agreed that: (1) the agreement "shall be governed by the laws of the State of New York," (2) any controversy or claim arising out of or relating to the agreement would be settled by binding arbitration administered by the American Arbitration Association taking place in New York, New York, and (3) the agreement

7

"shall be construed in accordance with the laws of the State of New York."

35. Despite being formally organized under the laws of Ireland and then the Cayman Islands, FG Limited was the head of the FGG *de facto* partnership. It was taxed as a partnership under United States tax law. FG Limited served as the investment advisor and/or placement agent for many Feeder Funds, currency funds, and funds of funds. FG Limited also owned 100% of various FGG components, including FG Bermuda. As a result, fees from the Feeder Funds, currency funds and funds of funds flowed to FG Limited.

36. FG Limited never had employees, nor did it ever maintain an office in Ireland or the Cayman Islands. Throughout its history, FG Limited reported its principal place of business as FGG's New York headquarters. When FG Limited registered to do business in the State of New York, it listed its principal executive office as FGG's New York headquarters. For the FGG-operated funds using FG Limited as the investment manager or placement agent, FGG prepared Information Memoranda or Private Placement Memoranda ("PPMs") identifying FG Limited's address as the FGG New York headquarters.

37. At all relevant times, FG Limited maintained its bank account at JPMorgan in New York, New York. FG Limited utilized its New York JPMorgan account to receive monies from the FGG operated investment funds, including from the Feeder Funds, the currency funds, and funds of funds, and to make partnership distributions to the FG Limited shareholders directly or to entities designated by them to receive their distributions. FGG New York Personnel approved, directed, and controlled the partnership distributions that were made from FG Limited's New York JPMorgan bank account.

38. In its role as a placement agent for the Feeder Funds, currency funds, and funds of funds, FG Limited contracted with numerous third-party entities that purchased or distributed the

8

fund's shares. Under these contracts, FG Limited shared the management or performance fees it received with the third party entity. FGG New York Personnel prepared and/or approved each of these contracts. Nearly all of the third party fee sharing agreements contained New York choice of law provisions.

### D.     FGG Created FG Bermuda at Madoff's Direction

39.    FGG created FG Bermuda at Madoff's direction. In 2002, FGG decided to expand its offerings to include additional funds of funds. As part of this process, FGG approached Madoff to inform him of the new funds and that a United States entity would be formed to serve as their investment adviser to and to perform risk assessments for the new funds. In addition, the same United States entity would become the investment adviser and risk evaluator for the Feeder Funds and the currency funds. Fearing greater SEC scrutiny of the BLMIS investment advisory operation, Madoff immediately objected to the concept of a United States-based entity serving as the investment adviser and risk evaluator for the FGG funds associated with BLMIS. In response to Madoff's objection, FGG's Executive Committee decided to organize a new investment adviser and risk assessment entity off shore.

40.    In 2003, FGG announced FG Bermuda would become the investment manager for Feeder Funds and currency funds, and provide risk assessment services for all FGG operated funds and investment vehicles.

41.    Upon learning of FGG's plan for the new Bermuda operation, Madoff skeptics immediately, and correctly, raised concerns that the move by FGG was an attempt by Madoff to avoid SEC scrutiny of BLMIS. FGG New York Personnel responded to these skeptics and other FGG investors and potential investors by formulating a response that falsely claimed the formation of the Bermuda entity was solely for tax purposes.

42.    On June 12, 2003, FGG incorporated FG Bermuda as an exempt company under

9

the laws of Bermuda. New York-based FG Limited held 100% of the FG Bermuda shares. Under Bermuda law, at least one of a Bermuda exempt company's directors must be a Bermuda citizen. As a consequence, FGG named Noel, Tucker, and Ian Pilgrim, a Bermuda citizen, as the original FG Bermuda directors.

43. To commence FG Bermuda's operations, Rob Blum, FGG's New York based Chief Operating Officer, leased small office space for FG Bermuda. FG Bermuda never had more than a handful of employees beyond Amit Vijayvergiya, the Risk manager of FG Bermuda and Gordon McKenzie, an accountant with the title of Controller. These employees were selected by FGG New York Personnel. Except for the administrative assistants, all FG Bermuda employees reported directly to FGG New York Personnel. FG Bermuda's files were maintained in FGG's New York headquarters.

44. In July 2003, FG Limited assigned its investment manager agreements for certain Feeder Funds and currency funds to FG Bermuda. FG Bermuda received management and performance fees in connection with its purported services, and in order to pay those fees, the Feeders Funds withdrew funds from their BLMIS accounts and transferred the money to FG Bermuda.

45. Prior to 2006, while FG Bermuda purported to manage the Feeder Funds' and currency funds' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

46. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its Feeder Funds. While the investigation was ongoing, in attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to

10

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

47. During its investigation of BLMIS and its Feeder Funds, the SEC determined BLMIS, and not FG Bermuda, was actually performing the Feeder Funds' investment advisory services. As a consequence, in addition to requiring BLMIS to register as an investment adviser, the SEC required the Feeder Funds to modify their investor communications and disclose to their investors and potential investors that BLMIS was the investment adviser responsible for investing virtually all of the Feeder Funds' assets.

48. Until December 31, 2007, FG Limited owned 100% of the shares of FG Bermuda. On January 1, 2008, FG Limited distributed its ownership of FG Bermuda shares to the FG Limited shareholders of record.

### E. Fairfield Sentry's Principal Place of Business Was in New York

49. At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

50. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

51. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG New York Personnel. Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law

11

firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

52. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

> i. *Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States*

53. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

54. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and McKeefry—all located in FGG's

12

New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

55. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

> ii.    *FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities*

56. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

13

Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### iii. *FGG New York Personnel Controlled Fairfield Sentry*

57. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

58. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### iv. *BLMIS Was Fairfield Sentry's Investment Manager*

59. Fairfield Sentry's subscription agreements also incorporated its PPMs by

14

reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

60.    Finally, the Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

15

Dated: June 26, 2015  /s/ Thomas L. Long
     New York, New York  **Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long

**Baker & Hostetler LLP**
Capital Square
65 E. State St., Suite 2100
Columbus, Ohio 43215-4260
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Lauren M. Hilsheimer
Melonia A. Bennett
Justin J. Joyce

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*

16