**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> EQUITY TRADING PORTFOLIO LTD., *et al.*, <br><br> Defendant. | Adv. Pro. No. 10-04457 (SMB) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> OREADES SICAV, *et al.*, <br><br> Defendants. | Adv. Pro. No. 10-05120 (SMB) |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> BNP PARIBAS ARBITRAGE SNC, <br><br> Defendant. | Adv. Pro. No. 11-02796 (SMB) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> BNP PARIBAS S.A., *et al.*, <br><br> Defendants. | Adv. Pro. No. 12-01576 (SMB) |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM
OF LAW IN OPPOSITION TO THE BNP PARIBAS
DEFENDANTS' MOTION TO DISMISS BASED ON
EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF
THE TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated estate of

Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act ("SIPA"),

respectfully submits this supplemental memorandum in opposition to the consolidated motion to

dismiss joined by BNP Paribas S.A. ("BNP"), BNP Paribas Arbitrage SNC ("BNP Arbitrage"),

BNP Paribas Securities Services S.A. ("BNP Securities Services"), BNP Paribas Bank & Trust

(Cayman) Limited ("BNP Cayman"), BNP Paribas (Suisse) S.A. ("BNP Suisse"), and BGL BNP

Paribas Luxembourg S.A. ("BGL BNP") (collectively, "Defendants"),[1] claiming that the

Trustee's recovery against them is barred as a matter of law by *Morrison v. National Australia

Bank Ltd.*, 561 U.S. 247 (2010).[2] Because Defendants' conduct is not "purely foreign" and the

Trustee has "put forth specific facts suggesting … domestic transfer[s]," [3] this Court should deny

Defendants' motion to dismiss and grant the Trustee's motion for leave to amend the

Complaints.

## BACKGROUND

The Trustee brings claims under Section 550 of the Bankruptcy Code to recover transfers

Defendants received from investment funds that were wholly or predominantly invested with

BLMIS (the "Feeder Funds"). As set forth in the Trustee's proffered allegations, Defendants

collectively received more than **$1.25 billion** in transfers, including:

---

[1] The Trustee is prepared to seek leave of Court in order to file and serve a Consolidated Amended Complaint as to each of the Defendants named in the above-captioned adversary proceedings to recover the subsequent transfers of BLMIS customer property received by Defendants from the BLMIS Feeder Funds.

[2] Simultaneously herewith, the Trustee has filed the omnibus Trustee's Memorandum of Law in Opposition to the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality and in Further Support of Trustee's Motion for Leave to Amend the Complaints, No. 11-02796 (SMB), (Bankr. S.D.N.Y. June 30, 2015) (the "Trustee's Brief"), incorporated herein by reference.

[3] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 232 n.4 (S.D.N.Y. 2014) ("Extraterritoriality Decision").

1

- **$975,460,092** from Harley International (Cayman) Ltd. ("Harley");

- **$83,214,857** from Fairfield Sentry Ltd. ("Fairfield Sentry") and **$8,603,536** from Fairfield Sigma Ltd. ("Fairfield Sigma" and, collectively with Fairfield Sentry, the "Fairfield Funds");

- **$70,582,596** from Kingate Global Fund Ltd. ("Kingate Global") and **$22,291,731** from Kingate Euro Fund Ltd. ("Kingate Euro");

- **$39,628,385** from Rye Select Broad Market Insurance Portfolio LDC ("Insurance Portfolio"), **$36,187,866** from Rye Select Broad Market Portfolio Limited ("Portfolio Limited"), **$8,952,906** from Rye Select Broad Market XL Portfolio Ltd. ("XL Portfolio"), and **$2,987,824** from Rye Select Broad Market XL Fund L.P. ("XL LP" and, collectively with the other Feeder Funds in this paragraph, the "Tremont Funds");

- **$15,000,000** from Equity Trading Portfolio Ltd. ("Equity Portfolio"); and

- **$1,977,375** from Oreades SICAV ("Oreades").

The transfers arose from Defendants' multi-faceted investment relationship and conduct with BLMIS and the Feeder Funds. Beginning in 2003, BNP leveraged investments with BLMIS through its Funds Derivative Group in New York. (Proffer, ¶ 12.) The Fund Derivatives Group created, marketed, and executed leveraged transactions tied to the "performance" of Madoff and the Feeder Funds. (Proffer, ¶ 13.) In connection with these transactions, BNP and BNP Arbitrage also invested proprietary monies with the Feeder Funds and over time redeemed over $1 billion from the Feeder Funds. (Proffer, ¶ 5.)

Other transfers stem from administration and asset management services provided to clients, including certain of the Feeder Funds. For example, BGL BNP and BNP Securities Services received transfers as compensation for their roles as custodians and administrators to Oreades, a fund invested exclusively with BLMIS. (Proffer, ¶ 166.) BNP Securities Services, BNP Cayman, and BNP Suisse also received transfers in connection with certain asset management and private banking services provided to clients. (Proffer, ¶¶ 6, 8-9.)

2

Defendants acted collectively as a New York-driven enterprise that deliberately sought to profit from BLMIS's U.S.-based "split-strike conversion" ("SSC") investment strategy, which involved the purported purchase and sale of U.S. securities traded over U.S. markets. BNP, BNP Arbitrage, and BNP Securities Services maintained offices and employees in New York, who were responsible for executing their BLMIS-related business activities. (Proffer, ¶ 15.) Defendants entered into a series of agreements with BLMIS and the Feeder Funds that were negotiated in New York, executed in New York by New York-based employees of Defendants, and/or contained New York choice of law, jurisdiction and venue provisions. (Proffer, ¶¶ 75, 99, 149, and 173.) Pursuant to these agreements, Defendants received transfers in bank accounts held by BNP in New York. (Proffer, ¶¶ 46-47, 63-64, 80, 87, 92, 110-11, 146, and 162.) Defendants' communications with and conduct relating to BLMIS and the Feeder Funds flowed predominantly through their New York operations. (Proffer, ¶¶ 13, 62, 92, 109, 112, 145, 160, 180, 186.) In sum, Defendants' conduct was purposefully and knowingly directed to the United States.

## **LEGAL STANDARD**

The Trustee's recovery claims against Defendants can only be dismissed to the extent he seeks to recover "purely foreign" transfers.[4] Whether the Trustee's recovery action seeks domestic or "purely foreign" transfers is a fact-based inquiry for which all reasonable inferences must be drawn in the Trustee's favor.[5] When conducting a *Morrison* extraterritoriality analysis, this Court must consider the distinct and separate facts alleged by the Trustee in each case and

---

[4] *Extraterritoriality Decision*, 513 B.R. at 232 n.4.

[5] *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403-05 (S.D.N.Y. 2010); *see also Sec. Exch. Comm'n v. ICP Asset Mgmt., LLC*, No 10 Civ. 4791 (LAK), 2012 WL 2359830, at *2 (S.D.N.Y. June 21, 2012) (denying summary judgment because evidence permitted inference that conduct at issue was domestic).

must reject the one-size-fits-all, single-factor citizenship test advocated by Defendants.[6] Because

the Trustee sets forth specific facts alleging the transfers are not "purely foreign" and that the

transfers and the component events of the transactions are in fact predominantly domestic,

Defendants' motion is properly denied.

## ARGUMENT

The Trustee has set forth specific facts showing that the transfers and the component

events of the transactions do not result in an extraterritorial application of the Bankruptcy Code

or SIPA.[7] First, Defendants reside in New York or used BNP Paribas Securities Corp. ("BNP

Securities Corp.") as their agent in New York to facilitate the transfers.  Second, the transfers

predominantly arose from work performed by BNP's Fund Derivatives Group in New York.

Third, the transfers were received by Defendants in accounts held by BNP in New York.  Fourth,

many of the investment agreements underlying the transfers were negotiated and executed in

New York and governed by New York law.  Fifth, Defendants' communications with BLMIS

and the Feeder Funds flowed through New York.  Sixth, the Feeder Funds either maintained their

principal places of business in New York or their operations were centered in New York. For

these reasons, and those set forth herein, this Court should deny Defendants' motion.

## I.    Defendants BNP, BNP Arbitrage, and BNP Securities Services Reside in New York

Defendants BNP, BNP Arbitrage, and BNP Securities Services each reside in New York

at 787 Seventh Avenue, New York, New York, and conduct significant business in the United

---

[6] *See Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 207 (2d Cir. 2014); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) (*Morrison* analysis is a case-by-case factual determination that should not be limited to the citizenship or residency of the defendant); *In re Maxwell Commc'n Corp.*, 170 B.R. 800, 809 (S.D.N.Y. 1994) ("The court must look at the facts of a case to determine whether they have a center of gravity outside the United States.  Thus, for example, a transfer made in the U.S. by a foreign national to a foreign national could be considered a domestic transaction.").

[7] *Maxwell Commc'n Corp.*, 186 B.R. at 817 (analyzing "the location of the transfers as well as the component events of those transactions").

States. (Proffer, ¶ 5.) Because BNP, BNP Arbitrage, and BNP Securities Services are not foreign transferees and are in fact located in New York, there is no bar under the Extraterritoriality Decision to the Trustee's claims under the Bankruptcy Code.[8]

## II.    The Transfers Originate from Work Performed by BNP's Fund Derivatives Group in New York

Approximately $1 billion out of the $1.25 billion in transfers received by Defendants derived from the leverage business BNP operated through its New York-based Fund Derivatives Group. The Fund Derivatives Group is comprised of New York employees of BNP, BNP Arbitrage, and BNP Securities Corp. (Proffer, ¶ 12.) BNP operated the Fund Derivatives Group in New York since at least 2003 when it acquired the infrastructure and personnel for this business from New York-based Zurich Capital Markets ("ZCM"). (Proffer, ¶ 12.)

The Fund Derivatives Group created, marketed, and serviced credit facilities and structured products designed to offer BNP clients leverage on their investments. For example, the Fund Derivatives Group entered into a credit facility with one of the levered sub-funds that invested exclusively with Harley. (Proffer, ¶ 19.) The credit facility originated with ZCM in New York. Contemporaneous with the ZCM purchase, BNP hired sixty of ZCM's New York employees, including employees who created and managed the Harley credit facility for BNP in New York. (Proffer, ¶ 57.) The credit agreement and related custody, control, and pledge agreements were negotiated in New York, and each agreement contained a New York choice of law and venue provision. (Proffer, ¶ 60.) The credit agreement documents explicitly reference Harley's "Madoff Account," and the purported investments in Harley's Madoff Account were the purported collateral for the credit facility. (Proffer, ¶ 59.) BNP Arbitrage's agent and affiliate,

---

[8] *See* Extraterritoriality Decision, 513 B.R. at 232 n.4 (limiting extraterritorial application of the Bankruptcy Code to situations where "foreign" funds transferred assets "abroad to their foreign customers and other foreign transferees").

BNP Securities Corp. in New York, acted as the collateral agent and calculation agent under the credit agreement. (Proffer, ¶ 61.) From Harley alone, BNP Arbitrage received $975 million in transfers. (Proffer, ¶ 63.)

The Fund Derivatives Group in New York also created, marketed, and serviced credit facilities and structured products with other Feeder Funds, including (i) a credit facility with Legacy Capital, an investment company that invested with BLMIS, (ii) a credit facility with Tremont's Rye, New York Insurance Portfolio Fund, (iii) a structured option agreement with Tremont's Rye, New York Portfolio Limited fund, (iv) a structured option agreement with Equity Trading Fund, Ltd., a fund that invested exclusively with Equity Portfolio, and (v) structured notes for BNP clients that referenced investments in Fairfield Sentry, Kingate Global, and Groupement Financiere Ltd. (Proffer, ¶ 11.)

The Fund Derivatives Group was responsible for each component of the leverage transactions. For example, New York employees of the Fund Derivatives Group (i) met with Madoff at BLMIS's offices in New York, (ii) conducted initial and ongoing due diligence on BLMIS and the Feeder Funds, (iii) oversaw the execution of subscription agreements with the Feeder Funds, (iv) regularly corresponded with the Feeder Funds, (v) calculated the amounts that BNP should invest in or redeem from the Feeder Funds, and (vi) regularly requested redemptions (*i.e.*, the transfers) from the Feeder Funds. (Proffer, ¶ 13.)

The work performed by BNP's Fund Derivatives Group in New York evidences the domestic nature of the transactions alleged by the Trustee. Under the holistic review endorsed by

6

this Circuit the Trustee's actions constitute a domestic application of SIPA and the Bankruptcy

Code.[9]

### III.    Defendants Relied upon BNP Securities Corp. as Their Agent in New York to Facilitate the Transfers

Defendants worked with their agent BNP Securities Corp. to invest in, transact business

with, and receive transfers of customer property from the Feeder Funds. BNP Securities Corp.

exercised power of attorney over certain Defendants' investments with the Feeder Funds,

executed subscription agreements with the Feeder Funds, and requested redemptions from the

Feeder Funds. (Proffer, ¶ 144.) BNP Securities Corp. is a U.S. broker-dealer registered with the

Securities & Exchange Commission ("SEC") and is wholly owned by BNP. BNP Securities

Corp. is incorporated in Delaware and is a resident of New York, with an office located at 787

Seventh Avenue, New York, New York. (Proffer, ¶ 10.) Defendants' use of BNP Securities

Corp. as their agent in New York further demonstrates that the component events of the

transactions are predominantly domestic, and in any case, not "purely foreign."[10]

### IV.    The Feeder Funds Delivered the Transfers to an Account Held by BNP in New York

Defendants instructed the Feeder Funds to send transfers to bank accounts held by BNP

in New York, and Defendants in fact received the transfers in accounts held by BNP in New

York. (Proffer, ¶¶ 46-47, 63-64, 80, 87, 92, 110-11, 146, and 162.) For example, within one year

of BLMIS's collapse, BNP Arbitrage received nineteen separate transfers directly from Harley,

---

[9] *See Sec. Exch. Comm'n v. Gruss*, 859 F. Supp. 2d 653, 664-65 (S.D.N.Y. 2012) (the SEC could bring action even though funds were located abroad based on conduct of a domestic investment adviser that occurred in the United States).

[10] Extraterritoriality Decision, 513 B.R. at 232 n.4 (S.D.N.Y. 2014).

totaling $975 million, to an account held by BNP located at "919 3rd Avenue, New York City, NY." (Proffer, ¶ 64.) Hence the location of the transfers is domestic.[11]

## V.    The Agreements Underlying the Transfers Were New York-Centric

Defendants received transfers in connection with credit facility, subscription, custodian, and related agreements with BLMIS or the Feeder Funds. The express terms of these agreements and their surrounding circumstances evince the domestic nature of these agreements and the parties' relationships.

First, Defendants negotiated the relevant agreements in New York. For example, Fund Derivatives Group personnel in New York negotiated the BLMIS-related leverage agreements, including the Harley credit facility. (Proffer, ¶ 62.)

Second, BNP and BNP Securities Corp. employees in New York executed many of the agreements on behalf of Defendants. For example, New York employees signed: (i) BNP Arbitrage's subscription agreements with Fairfield Sentry, XL Portfolio, and the Kingate Funds, (ii) BGL BNP's subscription agreements with the Kingate Funds, (iii) BNP's subscription agreements with the Kingate Funds; (iv) BNP Cayman's subscription agreement with Fairfield Sentry; and (v) BNP Securities Services's subscription agreement with Fairfield Sentry. (Proffer, ¶¶ 83, 109, 112-14, 145.)

Third, Defendants understood and agreed that New York law would govern the relevant agreements and that any disputes arising from these agreements would be resolved exclusively by New York courts. For example, the Harley credit facility agreement and related custody, control, and pledge agreements contained New York choice of law and venue provisions. (Proffer, ¶ 60.) Similarly, Defendants' subscription agreements with Fairfield Sentry contained

---

[11] *Maxwell Commc'n Corp. v. Societe General PLC* (*In re Maxwell Commc'n Corp.*), 186 B.R. 807, 816-17 (S.D.N.Y. 1995) (considering how the transaction was concluded as one component event of the transaction").

New York choice of law, jurisdiction, and venue provisions. (Proffer, ¶ 107.) The same is true for BNP Securities Services' subscription agreements with Portfolio Limited, and BNP Cayman's subscription agreements with Portfolio Limited, XL LP, and XL Portfolio—each contained New York choice of law and venue provisions. (Proffer, ¶¶ 75, 87, 99.)

Fourth, Defendants designated their domestic affiliate BNP Securities Corp. as their agent in many of the agreements. For example, BNP identified BNP Securities Corp. as the collateral agent and calculation agent in its Harley credit facility agreement. (Proffer, ¶ 61.) Similarly, BNP Securities Corp. acted as the collateral agent and calculation agent for BNP's credit facility agreements with Tremont's Rye, New York Insurance Portfolio fund. (Proffer, ¶ 86.) In addition, BNP Securities Corp. acted as agent for (i) BNP Securities Services's subscription agreements with the Fairfield Funds, the Kingate Funds, and Portfolio Limited, (ii) BNP Cayman's subscription agreements with Portfolio Limited, XL LP, XL Portfolio, and Kingate Global, and (iii) BNP Arbitrage's subscription agreement with XL Portfolio. (Proffer, ¶¶ 91-92, 113, 145.)

Fifth, Defendants instructed the Feeder Funds in many of these agreements to wire transfers through New York bank accounts. For example, Defendants' respective subscription agreements with the Fairfield Funds, Portfolio Limited, and Kingate Global each requested that the Feeder Funds wire the transfers in U.S. dollars through a bank account held by BNP in New York. (Proffer, ¶ 146.)

Sixth, from their agreements Defendants understood the purported investments were located in the United States and subject to U.S. laws and regulations.  For example, Defendants acknowledged in the subscription agreements with Fairfield Sentry that they received and reviewed Fairfield Sentry's private placement memorandum, which described how BLMIS in

New York would have custody of at least 95% of Fairfield Sentry's assets and would execute

Fairfield Sentry's investment strategy through the purchase of U.S. securities (*i.e.*, S&P 100

Index equities, options, and U.S. Treasuries). (Proffer, ¶ 108.)

Accordingly, Defendants had every reason to expect that U.S. law would apply to them

and the transfers they received from the Feeder Funds.[12]

## VI.    Defendants' Communications with BLMIS and the Feeder Funds Flowed through New York

Defendants regularly communicated with BLMIS and the Feeder Funds regarding the

transfers, and these communications flowed through New York as a result of the respective

operations of Defendants, the Feeder Funds, and BLMIS. Defendants often instructed the Feeder

Funds to direct communications to BNP's office in New York. (Proffer, ¶¶ 13, 62, 92, 109, 112,

145, 160, 180, 186.) In the Fairfield Sentry subscription agreements, for example, Defendants

directed communications to BNP's New York office, listing BNP's New York mailing addresses

as well as New York telephone and facsimile numbers and U.S. email addresses. (Proffer, ¶ 109.)

BNP, BNP Arbitrage, BNP Securities Services, BNP Securities Corp., Fix Asset Management

Services, Inc. ("FAM"), Fairfied Greenwich Group ("FGG"), Tremont, Access International

Advisors, and BLMIS all resided in New York. (Proffer, ¶¶ 4-6, 10, 15, 36, 96, and 170.)

Accordingly, Defendants' New York communications and the fact that the relevant parties were

located in New York demonstrate that there is no extraterritorial bar to the Trustee's claims.

## VII.   Defendants Knew They Were Investing in BLMIS's Domestic Strategy

Defendants knew the investment advisor for each of the Feeder Funds was BLMIS and

that control over their investments, from which the transfers stem, rested entirely with Madoff in

New York. (Proffer, ¶ 14.) Defendants also knew BLMIS was the executing broker for the

---

[12] Extraterritoriality Decision, 513 B.R. at 232 (whether defendant "had reason to expect that U.S. law would apply to their relationships with the feeder funds" was relevant to an extraterritoriality analysis).

Feeder Funds, and that Madoff in New York purported to execute his SSC investment strategy on behalf of the Feeder Funds. (Proffer, ¶ 15.) Defendants further knew Madoff's SSC investment strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasuries traded over U.S. exchanges, and that the decisions regarding which U.S. securities to purchase were made by Madoff. (Proffer, ¶ 15.) Finally, Defendants knew BLMIS in New York purportedly held custody over the Feeder Funds' investments. (Proffer, ¶ 16.)

### VIII.    The Feeder Funds Maintained their Principal Places of Business in New York or Their Operations for Investing with BLMIS Were Centered in New York

To do business with BLMIS in New York, each of the Feeder Funds signed and delivered to BLMIS certain customer agreements authorizing BLMIS to invest for the Funds. The agreements between the Funds and BLMIS were expressly subject to U.S. law, and the securities transactions made pursuant to the agreements were subject to the provisions of the U.S. Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System. Disputes under the agreements were to be resolved in the United States. (Proffer, ¶¶ 22, 124, 149, and 173.)

Pursuant to the customer agreements, the Feeder Funds authorized Madoff to act as the Funds' "agent and attorney in fact," and authorized BLMIS to act as the Funds' investment manager and executing broker. (Proffer, ¶¶ 22, 99, 126, 151, and 175.) Accordingly, BLMIS purported to invest the Funds' assets according to Madoff's SSC strategy.

The Feeder Funds also delegated custody of the Funds' investment assets to BLMIS. As the Feeder Funds' custodian, BLMIS held custody of the Funds' subscription money in New York. (Proffer, ¶ 16.) Because of BLMIS's role as the Funds' investment manager, executing broker, and custodian, control over the Feeder Funds rested entirely with BLMIS in New York, and BLMIS's operations in New York were essential to the investments.

### A.    Harley Maintained Its Principal Place of Business in New York

This Court previously entered summary judgment against Harley in the amount of more than $1 billion, holding that "Harley specifically sought out the United States as a place to do business when it opened an account with BLMIS," and that the transfers received by Harley "arose out of business transactions tied to Harley's securities account with BLMIS in New York." (Proffer, ¶¶ 23-24.)

Although formally incorporated in the Cayman Islands, Harley was operated and controlled by FAM, which is incorporated under New York law and headquartered in New York, New York. (Proffer, ¶¶ 35-36.) Harley had no employees or offices in the Cayman Islands and acted principally through FAM in New York. (Proffer, ¶¶ 30-33.) For example, FAM in New York: (i) conducted due diligence on BLMIS and monitored Harley's investments with BLMIS; (ii) received Harley's account statements from BLMIS, (iii) corresponded directly with BLMIS to request redemptions into and subscriptions from Harley's BLMIS account, and (iv) marketed the sale of shares in Harley and Harley's levered sub-funds to investors. (Proffer, ¶¶ 34-45.)

Harley did not conduct meaningful business in the Cayman Islands. In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands." (Proffer, ¶ 31.) As such, Harley was registered as an exempt company under Cayman Islands law and was not permitted to solicit investors in the Cayman Islands.

In its subscription agreements, Harley directed investors to wire U.S. dollars to bank accounts in New York held by its administrator. For example, the agreements required subscriptions to be wired to an account at the Northern Trust Banking Corporation ("Northern Trust"), located at 40 Broad Street, New York, New York. (Proffer, ¶ 46.) When Harley

redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York. (Proffer, ¶ 47.)

Because Harley maintained its principal place of business in New York, the transfers made from Harley to BNP Arbitrage are not "purely foreign," and again there can be no bar under the Extraterritoriality Decision to the Trustee's claims under the Bankruptcy Code.

### B.    Fairfield Sentry and Fairfield Sigma Maintained Their Principal Place of Business in New York

Although incorporated in the British Virgin Islands ("BVI"), Fairfield Sentry and its sister fund Fairfield Sigma were operated and controlled by FGG, a New York-based *de facto* partnership. (Proffer, ¶ 101.) FGG organized the Fairfield Funds as international business companies under BVI law, which restricted the funds from doing business in the BVI except with other BVI international business companies. (Proffer, ¶ 101.) The Fairfield Funds were not present in the BVI. (Proffer, ¶ 97.) Their BVI statutorily required registered address was a post-office box care of a local trust company. (Proffer, ¶ 97.)

From their inception, the Fairfield Funds had no employees and no offices. (Proffer, ¶ 97.) At all relevant times, the Fairfield Funds operated almost entirely from FGG's offices in New York headquarters. (Proffer, ¶ 96.) When FGG opened Fairfield Sentry's BLMIS accounts in 1990, Tucker identified Fairfield Sentry's mailing address in the account opening documents as FGG's office in Greenwich, Connecticut and directed BLMIS to send Sentry's monthly account statements, trade confirmations, and correspondence to the same FGG office. In January 1998, FGG requested BLMIS to send all Sentry account information to FGG's New York headquarters. (Proffer, ¶¶ 101-102.)

At all relevant times, FGG's New York personnel controlled the sales and subscriptions of the Fairfield Funds' shares; monitored Fairfield Sentry's purported investments with BLMIS;

managed the relationships with BLMIS; directed investments into and out of BLMIS; marketed the Fairfield Funds; approved all subscriptions for Fairfield Funds shares; maintained all of Fairfield Sentry's books and records at FGG's New York headquarters; and made all strategic and operational decisions regarding Fairfield Sentry. (Proffer, ¶¶ 101-102.)

Finally, the Fairfield Funds' subscription agreements evidence their connections to New York. The subscription agreements contain New York choice of law and venue provisions and an agreement by their shareholders to submit to the jurisdiction of New York courts. (Proffer, ¶ 107.) In executing the agreements, the shareholders acknowledged that they had received and reviewed the Fairfield Funds' respective Private Placement Memorandum ("PPM") that described how BLMIS in New York would have custody of at least 95% of Fairfield Sentry's assets and would execute Fairfield Sentry's investment strategy through the purchase of U.S. securities. (Proffer, ¶ 108.) The PPM for Fairfield Sentry further stipulated that the shareholder would make subscription and redemption payments in U.S. dollars and route the payments through an account held at HSBC Bank in New York. (Proffer, ¶ 110.)

Because the Fairfield Funds maintained their principal place of business in New York, the transfers made by the Fairfield Funds to Defendants are not "purely foreign," and the Trustee's claims cannot be dismissed under the Extraterritoriality Decision.

### C.    The Tremont Funds Maintained Their Principal Place of Business in New York

Similarly, the Tremont Funds also operated exclusively within the United States.  One Tremont Fund, XL LP, is incorporated in Delaware, and with its registered office in Rye, New York. (Proffer, ¶ 68.) Although incorporated in the Cayman Islands, the other Tremont Funds— Insurance Portfolio, Portfolio Limited, and XL Portfolio (together, the "Cayman Registered Funds") —are similarly domestic in that each of the Cayman Registered Funds was controlled

14

and managed by two U.S. companies, Tremont Group Holdings, Inc. and Tremont Partners, Inc. (together, "Tremont") from Rye, New York. (Proffer, ¶ 68.)

From Rye New York, Tremont employees: (i) monitored and conducted due diligence on all the Tremont Funds, (ii) marketed and sold shares in the Tremont Funds, (iii) communicated with investors and potential investors, and (iv) approved investors' subscriptions and redemptions of shares in the Tremont. (Proffer, ¶¶ 70, 72-75.) Marketing materials for the Tremont Funds, including prospectus statements, directed potential investors to contact Tremont's employees in New York. (Proffer, ¶ 92.)

Tremont shareholders, including Defendants, sent subscription agreements for investments in the Tremont Funds to either Tremont Partners or the funds' administrators in New York. (Proffer, ¶ 72.) Pursuant to the subscription agreements, investors wired funds in U.S. dollars to Tremont's account with the Bank of New York in New York. Investors also received redemption payments in from the same Bank of New York accounts. (Proffer, ¶ 80.)

Although incorporated in the Cayman Islands, the Cayman Registered Funds did not have any real offices or operations in the Cayman Islands. (Proffer, ¶ 76.) Insurance Portfolio and Portfolio Limited's registered address was a post-office box in the Cayman Islands, care of a company that is in the business of providing local addresses to companies. (Proffer, ¶ 76.) XL Portfolio similarly had its registered address at an international law firm in the Cayman Islands. (Proffer, ¶ 76.)

The Cayman Registered Funds were registered as exempted companies under the Cayman Islands Companies Law and were not permitted to do business in the Cayman Islands. (Proffer, ¶ 77.) Under the Companies Law, "[a]n exempted company shall not trade in the

Islands with any person, firm, or corporation except in furtherance of business of the exempted company carried on outside the Islands." (Proffer, ¶ 77.)

Tremont (Bermuda) Limited was the purported investment manager for Insurance Portfolio and Portfolio Limited, but ultimately delegated its management duties to Tremont Partners in New York. Tremont Partners in Rye, New York acted as the purported investment manager for XL Portfolio. (Proffer, ¶ 70.) Accordingly, BLMIS sent copies of trade tickets and account statements for all the Tremont Funds to Tremont's office in New York. (Proffer, ¶ 69.)

For a limited amount of time Tremont did maintain an office in Bermuda, from which two low-level administrative employees worked. (Proffer, ¶ 78.) The employees in Bermuda did not manage the Tremont Funds or perform any investment research or sales, all of which were performed by Tremont employees in New York. (Proffer, ¶ 78.) Letters sent to Tremont investors on Tremont Bermuda letterhead came from Tremont employees in New York. In July 2006, Tremont formalized what was previously a *de facto*, New York-based operation and closed its Bermuda office and "consolidated the administration" of all its funds in New York. (Proffer, ¶ 79.) Thereafter, any nominal distinctions between the Cayman Registered Funds and the U.S. registered fund XL LP were eliminated. (Proffer, ¶ 79.)

Because the Tremont Funds are New York residents—including XL LP, which is also a New York citizen—that conducted their Madoff investment business in the United States, the transfers made by the Tremont Funds to Defendants are not "purely foreign" such that the Trustee must be allowed to seek the recovery of those transfers under the Bankruptcy Code.

### D.    The Kingate Funds' Operations Were Based in New York

The Kingate Funds invested exclusively with BLMIS in New York and, together with their purported investment managers and other service providers, formed an enterprise with a single economic purpose: to profit from a New York-based investment operation.

The Kingate Funds executed customer agreements, and other account-opening documents, and delivered the agreements to BLMIS in New York. (Proffer, ¶ 123.) The agreements were governed by U.S. law, and disputes under the agreements were to be resolved in New York. (Proffer, ¶ 124.) The agreements further authorized BLMIS to act as the Kingate Funds' investment manager and executing broker, and stated that BLMIS would invest the Kingate Funds' assets according to Madoff's SSC investment strategy, which purported to involve the purchase and sale of U.S. securities exclusively traded over U.S. exchanges. (Proffer, ¶ 127.) In addition, the agreements provided that BLMIS would hold custody of the Kingate Funds' investments in New York.  (Proffer, ¶ 128.) Accordingly, control over the Kingate Funds rested entirely with BLMIS in New York.

Though registered under the laws of the BVI, the Kingate Funds had no physical offices, no employees, and transacted no meaningful business in the BVI. (Proffer, ¶ 119.) Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years and was formed in Bermuda, but was managed from New York by Tremont Partners. (Proffer, ¶ 120.)

The Kingate Funds' purported management company, Kingate Management Limited ("KML"), together with KML's consultants FIM Limited and FIM Advisers LLP (together "FIM"), performed due diligence on BLMIS in New York. (Proffer, ¶¶ 132-38.) Although FIM had a London address, the head of due diligence for the Kingate Funds' investments with BLMIS resided in New York and worked with FIM's affiliate FIM (USA) Inc. in New York. (Proffer, ¶ 136.) In addition to being the hub for FIM's due diligence, FIM (USA) Inc. monitored, researched and solicited investors for the Kingate Funds in New York. (Proffer, ¶ 137.)

Because the Kingate Funds conducted their Madoff investment business in the United

States, the transfers made by the Kingate Funds to Defendants are not "purely foreign." The

Defendants' motion is properly denied as to these transfers.

### E.    The Oreades Fund's Operations Were Based in New York

Oreades invested exclusively with BLMIS in New York and, together with its service

providers BGL BNP, BNP Securities Services, and Inter Investissements S.A. ("Inter"), formed

an enterprise with a single economic purpose: to profit from a New York-based investment

operation. (Proffer, ¶ 167.) From its BLMIS accounts, Oreades withdrew $160 million in

fictitious profits. (Proffer, ¶ 165.)

On behalf of Oreades, BGL BNP executed customer agreements, and other accounts

opening documents, and delivered the agreements to BLMIS in New York. (Proffer, ¶ 178.) The

agreements are governed by U.S. law, and disputes under the agreements are to be resolved in

the United States. (Proffer, ¶ 173.) The agreements further authorized that BLMIS would act as

Oreades's investment manager and executing broker and would invest the Funds' assets

according to Madoff's SSC investment strategy. (Proffer, ¶ 175.)

From 1998 to 2002, BGL BNP served as the official custodian for Oreades. (Proffer,

¶ 177.) However, BGL BNP delegated all its custodial duties to BLMIS through an undisclosed

sub-custodian agreement with BLMIS. BGL BNP nevertheless earned substantial fees from

Oreades for work delegated to and performed by BLMIS in New York. (Proffer, ¶ 179.)

Although registered in Luxembourg, Oreades had no physical office, no employees, and transacted no meaningful business there. (Proffer, ¶ 168.) Rather, Oreades was created, operated, and marketed on a day-to-day basis by BGL BNP, BNP Securities Services, and Inter, in conjunction with New York-based Access International Advisors, which assisted Inter in managing and marketing Oreades's investments with BLMIS. (Proffer, ¶ 170.)

Because Oreades conducted its Madoff investment business in the United States, the transfers made by Oreades are not "purely foreign." The Trustee's claims therefore cannot be dismissed.

### F. Equity Portfolio's Operations Were Based in New York

Equity Portfolio invested exclusively with BLMIS in New York and, together with its purported investment manager and other service providers, formed an enterprise with a single economic purpose: to profit from a New York-based investment operation.

As with each of the Feeder Funds, BLMIS in New York acted as the investment manager, executing broker, and custodian for Equity Portfolio. In marketing Equity Portfolio to investors, Equity Portfolio's Offering Memorandum represented that BLMIS would act as its investment advisor and that BLMIS operated from its principal place of business in New York. (Proffer, ¶ 154.)

In its Offering Memorandum, Equity Portfolio also reported that Essex Asset Management ("Essex") would act as the investment manager of Equity Portfolio and would monitor Equity Portfolio's investments with BLMIS. (Proffer, ¶ 155.) A director of Essex, who was also the Chief Financial Officer of Capital E Advisors, Inc. ("Capital E"), carried out the responsibilities outlined in the Offering Memorandum from Capital E's offices in New York. (Proffer, ¶ 156.)

Equity Portfolio directed BLMIS to send all of its trade confirmations and account statements to Capital E's offices in New York. (Proffer, ¶ 157.) Capital E analyzed Equity Portfolio's trade conformations and account statements, approved subscriptions into and redemptions from Equity Portfolio's BLMIS account and, upon information and belief, Capital E oversaw the day-to-day operations, compliance, and due diligence on Equity Portfolio's investments with BLMIS. (Proffer, ¶ 157.)

On or around December 2005, BNP entered into an option agreement to provide leverage to Equity Trading Fund, Ltd. ("Equity Fund"), a fund that invested exclusively in Equity Portfolio. (Proffer, ¶ 147.) The option agreement called for a Resettable Strike Equity Option Transaction, wherein BNP sold Equity Fund a structured option to leverage Equity Portfolio's BLMIS investments. (Proffer, ¶ 159.) Capital E and BNP worked closely together on the Equity Portfolio option, and BNP directed communications with Capital E through BNP's office and employees in New York. (Proffer, ¶ 160.) The CFO of Capital E communicated often with BNP in New York to discuss liquidity under the Equity Portfolio option and to discuss transfers into and out of Equity Portfolio's BLMIS account. (Proffer, ¶ 160.)

Equity Portfolio utilized New York banks with respect to its BLMIS investments. For example, on November 5, 2008, Equity Portfolio requested a $15 million withdrawal from BLMIS. (Proffer, ¶ 162.) On November 10, 2008, $15 million was wired from BLMIS's account at JPMorgan in New York to an account at HSBC Bank in New York held in the name of Citco Bank Nederland N.V., Dublin Branch for the benefit of Equity Portfolio. (Proffer, ¶ 162.) Shortly thereafter, Equity Portfolio transferred $15 million into an account held by BNP in New York on behalf of BNP Arbitrage. (Proffer, ¶ 162.)

Because Equity Portfolio conducted its Madoff business in the United States, the transfer made by Equity Portfolio to BNP Arbitrage is not "purely foreign" and is properly recovered by the Trustee.

## CONCLUSION

Based on the foregoing, the Trustee respectfully requests that the Court deny the Consolidated Motion with respect to Defendants and grant the Trustee's motion for leave to amend Complaints.

Dated: June 26, 2015
      New York, New York

/s/ David J. Sheehan
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Mark A. Kornfeld
Torello H. Calvani
Jonathan A. Forman
Marco Molina
Anat Maytal
Madiha M. Zuberi

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the estate of Bernard L. Madoff*