**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | |
| v. | Adv. Pro. No. 08-01789 (SMB) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | SIPA LIQUIDATION |
| Defendant. | (Substantively Consolidated) |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 09-01154 (SMB) |
| v. | |
| VIZCAYA PARTNERS LIMITED, BANQUE JACOB SAFRA (GIBRALTAR) LTD, a/k/a BANK J SAFRA LIMITED, ASPHALIA FUND LIMITED, and ZEUS PARTNERS LIMITED, | |
| Defendants. | |

<u>**SECOND AMENDED COMPLAINT**</u>

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff

(individually "Madoff," and collectively with BLMIS, the "Debtors"), for his Second Amended

Complaint, alleges:

## NATURE OF THE PROCEEDING

1.       This adversary proceeding arises from Madoff's now infamous Ponzi scheme.

Vizcaya Partners Limited ("Vizcaya"), a BLMIS account holder, and its two shareholders, Zeus

Partners Limited ("Zeus") and Asphalia Fund Limited ("Asphalia") (collectively, the "VZA

Defendants") directed investments into BLMIS.

2.       This action seeks to recover at least $180 million fraudulently transferred from

BLMIS to Vizcaya and subsequently to Zeus, Asphalia, and Bank J Safra Sarasin (Gibraltar)

Ltd. f/k/a Banque Jacob Safra (Gibraltar) Limited ("Safra Gibraltar").  These transfers have

been avoided and are recoverable customer property, as defined by SIPA § 78*lll*(4)and must be

returned to the Trustee for equitable distribution to BLMIS customers with allowed claims.

## RELEVANT PARTIES

3.       Vizcaya is a BVI company with a registered office at AMS Trustees Limited, Sea

Meadow House, P.O. Box 116, Road Town, Tortola, British Virgin Islands.  Judgment against

Vizcaya avoiding the transfers from BLMIS to Vizcaya, was entered in this action on August 6,

2010.

4.       Asphalia is a Cayman Islands company with a registered address at Ogier

Fiduciary Services (Cayman) Limited, Queensgate House, 113 South Church Street, P.O. Box

1234 GT, George Town, Grand Cayman.  Judgment against Asphalia, as the subsequent

transferee of transfers from BLMIS to Vizcaya, was also entered in this action on August 6, 2010.

5.      Asphalia had two share classes, class A and class C.  The class A shares were 100% invested with BLMIS feeder funds.  All references to Asphalia herein concern only Asphalia's class A shares.

6.      Defendant Zeus is a BVI company with a registered office at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands.  At all relevant times, Zeus was 100% invested with BLMIS through Vizcaya.

7.      Defendant Safra Gibraltar is a Gibraltar banking institution with a principal place of business at Suite 971, Europort, Gibraltar.  Safra Gibraltar and Zeus are collectively referred to herein as the "Defendants."

8.      Siam Capital Management Limited ("Siam") is a Bermuda entity.  Siam is no longer party to this action following repayment of $698,259.09 in fraudulent transfers held by Siam.  Safra Gibraltar, Siam, and the VZA Defendants are collectively referred to herein as the "Vizcaya Entities."

## PROCEDURAL HISTORY

9.      On April 9, 2009, the Trustee commenced this action against Vizcaya and Safra Gibraltar seeking to avoid and recover $150 million fraudulently transferred from BLMIS to Vizcaya and a turnover and accounting of all money transferred.  The Trustee filed an amended complaint on September 30, 2009, adding Asphalia, Zeus, and Siam as defendants, and seeking to avoid and recover an additional $30 million in fraudulent transfers made to Vizcaya.

10.      Safra Gibraltar answered the amended complaint on December 8, 2009.

11.     The Bankruptcy Court entered a Judgment By Default against the VZA

Defendants and Siam on August 6, 2010 (the "Default Judgment").

12.     On August 23, 2010, the Hon. Burton R. Lifland sent a letter to the Chief Justice

of the Supreme Court of Gibraltar (the "Gibraltar Court") seeking judicial assistance and the

Gibraltar Court's "support to ensure the successful enforcement of the Default Judgment."

Judge Lifland requested that the Gibraltar Court transfer to the U.S. Bankruptcy Court funds

previously paid into the Gibraltar Court because those funds "originate from transfers made

from BLMIS that [the Court] adjudged to be recoverable under U.S. law and payable to the

Trustee to administer as part of the liquidation of BLMIS."

13.     By stipulation dated November 23, 2010, the Trustee and Zeus agreed to vacate

the default judgment against Zeus and further agreed that the Zeus funds held by the Gibraltar

Court (approximately $61 million) would be transferred to the United States Bankruptcy Court.

The Zeus funds were received by the United States Bankruptcy Court on August 9, 2011.

## JURISDICTION AND VENUE

14.     This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment

Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"), and has been

referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28

U.S.C. §§ 1334(b) and (e)(1), and SIPA §§ 78eee(b)(2)(A) and (b)(4).

15.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H) and (O).

The Trustee consents to the entry of final orders or judgments by this Court.

16.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

17.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),

11 U.S.C. §§ 105(a) and 550(a), and other applicable law.

18.     In its August 3, 2010 Order Granting Entry of Default Judgment, the Court

"determined that the Trustee made a proper *prima facie* showing of personal jurisdiction" over

the VZA Defendants.

19.     This Court properly maintained personal jurisdiction over Vizcaya by virtue of

the fact that, *inter alia*, Vizcaya instructed Safra Gibraltar and Vendôme Capital Holding S.A.

f/k/a Banque Safra France S.A. ("Safra France") to open and maintain a BLMIS account on its

behalf and to send/receive funds to/from BLMIS's account at JPMorgan Chase Bank N.A.

("JPMorgan"), Account #xxxxxxxxxxx1703 (the "703 Account"), in New York, for Vizcaya's

BLMIS account and to conduct trading activities.  Vizcaya was properly subject to the exercise

of personal jurisdiction by this Court because Vizcaya conducted business in New York,

including entering into agreements and communicating regularly with persons in New York.

20.     Further, on March 25, 2014, Vizcaya submitted to personal jurisdiction in this

district when Safra Gibraltar, on behalf of Vizcaya and as its agent, filed a "BLMIS/Madoff

Proof of Claim Form" in the Shapiro-Hill Settlement seeking to recover from a settlement that

certain class action plaintiffs reached with JPMorgan Chase & Co. and affiliates.  Vizcaya

agreed to be subject to jurisdiction "for any matters *relating to or arising out of* this claim."

Vizcaya's claim in the JPMorgan class action includes its liability for the $180 million Default

Judgment.

21.     Zeus and Asphalia are subject to personal jurisdiction in this district because they

transacted business in New York and purposely availed themselves of the laws and protections

of the United States and the State of New York by directing funds to Vizcaya for investment in

U.S. Securities with BLMIS.  By directing their investments through Vizcaya, Zeus and

Asphalia accepted the rights, benefits, and privileges of conducting business and/or transactions

in the United States and the State of New York.  Zeus and Asphalia maintained minimum

contacts and/or general business contacts with the United States and New York in connection

with the claims alleged against them.

22.    This Court has personal jurisdiction over Safra Gibraltar because, *inter alia*, Safra

Gibraltar was Vizcaya's custodian and sent/received money to/from the 703 Account, in New

York, for application to Vizcaya's BLMIS account and in order to conduct trading activities.

Safra Gibraltar is also subject to personal jurisdiction by this Court because it entered into

agreements in New York, including the BLMIS account opening agreements, which were

delivered to BLMIS's New York headquarters.

## BACKGROUND, THE TRUSTEE, AND STANDING

23.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding.

24.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

25.    Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to
SIPA § 78eee(b)(3);

(b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA §
78eee(b)(3); and

(c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

26.    By orders dated December 23, 2008 and February 4, 2009, respectively, this

Court approved the Trustee's bond and found that the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

27.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into

the SIPA Proceeding.

28.    At a plea hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information

filed against him by the United States Attorney for the Southern District of New York.  At the

plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory

side of [BLMIS]."

29.    At a plea hearing on August 11, 2009, in the case captioned *United States v.*

*DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded

guilty to a ten-count criminal information charging him with participating in and conspiring to

perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took

place in connection with BLMIS customer accounts and that the Ponzi scheme had been

ongoing at BLMIS since at least the 1980s.

30.    At a plea hearing on November 21, 2011, in the case captioned *United States v.*

*Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded

guilty to a six-count criminal information charging him with securities fraud, falsifying BLMIS

records, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in

BLMIS customer accounts beginning in the early 1970s.

      31.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George

Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their

participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA

Business").

      32.     As the Trustee appointed under SIPA, the Trustee is charged with assessing

claims, recovering, and distributing customer property to BLMIS's customers holding allowed

customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and

its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid

and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers

and others to the detriment of defrauded, innocent customers whose money was consumed by

the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy

the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

      33.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case arising under the Bankruptcy Code in addition to the powers granted by SIPA

pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the

Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA

§ 78fff(b).

      34.     The Trustee has standing to bring the avoidance and recovery claims under SIPA

§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b),

and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## THE PONZI SCHEME

35.    Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1, 2001, Madoff continued BLMIS as a sole member limited liability company under the laws of the State of New York.  BLMIS's ownership and control structure never changed.  BLMIS was continually registered with the SEC, and remained a SIPC member from 1970 onward. BLMIS's principal place of business was 885 Third Avenue, New York, New York.  Madoff, as founder, sole owner, chairman, and chief executive officer, operated BLMIS with several family members and other employees, including DiPascali and Kugel, who pleaded guilty to helping Madoff carry out the fraudulent scheme.

36.    Beginning in the 1990s, Madoff outwardly ascribed the consistent investment success of BLMIS's IA Business to the "split-strike conversion" ("SSC") investment strategy. Madoff claimed his strategy would produce steady returns without the volatility in the stock market or other high return investment strategies.  Madoff generally indicated that investors' funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100 Index"), which is a collection of the 100 largest publicly traded companies, as determined by Standard & Poor's Index Committee.  The basket of stocks was designed to correlate to the movement of the S&P 100 Index.  The second part of the SSC strategy involved purporting to sell call options and buy put options on the S&P 100 Index; this is commonly referred to as a "collar."  Madoff purported to purchase and sell option contracts to control the downside risk of price changes in the basket of stocks correlated to the performance of the S&P 100 Index.

37.     All options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared trades in any exchange-listed options.

38.     BLMIS commingled all funds received from IA Business investors in a single BLMIS account maintained at JPMorgan.

39.     Because Madoff claimed that he would carefully time purchases and sales to maximize value, customer funds would intermittently be out of the market.  During those times, Madoff claimed that the funds were invested in U.S. Treasury bills or mutual funds invested in Treasury bills.  There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records demonstrating that BLMIS traded securities using the SSC strategy.

40.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements.

41.     Madoff operated the IA Business as a Ponzi scheme.  The money received from IA Business customers was used primarily to make distributions to, or payments for, other customers.  The falsified trades reflected in monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments.  The Ponzi scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow of new investments with BLMIS's IA Business.

42.    Since at least 1983, BLMIS financial reports filed with the SEC fraudulently omitted the existence of the billions of dollars of customer funds held by BLMIS.

43.    BLMIS did not register as an investment adviser with the SEC until August 2006. At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts and assets under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually with the SEC, the latest of which was filed in January 2008.  BLMIS's January 2008 Form ADV represented that BLMIS had 23 customer accounts and $17.1 billion in assets under management.  In fact, at that time BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion.

44.    Contrary to standard practice in the investment advisory industry, BLMIS did not charge the IA Business customers a fee for investment advisory services.  Instead of investment advisory fees, BLMIS purported to accept commissions for the purported trades, as reflected in the fraudulent IA Business customer statements. Others that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged hundreds of millions of dollars for investment advisory services attributed to BLMIS.

45.    Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York, audited BLMIS.  Of the three employees, one was an administrative assistant and one was a semi-retired accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

46.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE CREATION OF THE VIZCAYA-ZEUS-ASPHALIA FUND STRUCTURE

47.     Gerard Vila, an investment banker who had previously been involved with other BLMIS feeder funds, set up each of the VZA Defendants.  The VZA Defendants shared the same investment manager, Siam (owned and controlled by Vila), and shared overlapping directors (including Vila, who was a director of each).  At all relevant times, Zeus and Asphalia directed investments into Vizcaya for the sole purpose of profiting from Vizcaya's exclusive investment with BLMIS.

48.     Prior to creating Vizcaya, Vila directed investments into several BLMIS-related feeder funds, giving him significant insight into BLMIS operations and trading activity.

49.     Vila created Vizcaya, which gave him direct access to BLMIS, and he used Zeus and Asphalia to direct investment into this new fund.  Vila became aware of concerns surrounding one of the other BLMIS feeder funds through which he invested.  Rather than investigate these concerns, Vila directed the VZA Defendants to invest exclusively with BLMIS.

**A.**     *The Creation of Vizcaya, Its Corporate Structure, and the Vizcaya Account*

50.     Vila knew of Madoff's purported investment strategy and the nature of his returns even before creating Vizcaya.  Prior to establishing Vizcaya, Vila was a fund manager and member of the Strategic Board of the New York-based investment firm Access Advisors International ("Access"), a defendant in another action filed by the Trustee.

51.    In March 1999, Vila formed Glenwyne Fund Ltd. ("Glenwyne"), which *inter alia*, invested in BLMIS feeder funds Oréades SICAV ("Oréades") and M-Invest Limited ("M-Invest").

52.    In 2000, Vila and Lilia Clemente, a New York-based businesswoman, discussed creating a BLMIS investment structure.

53.    Vila also worked as an adviser to Safra France.  Vila informed Clemente that a Safra entity wanted to invest with BLMIS.  Clemente later met in New York with Jacques Laoui, the president of Safra France, and Joseph Haboubba, a Safra France director, to discuss setting up an investment with BLMIS.

54.    Following those meetings and discussions, in or around October 2001, Vila and Clemente formed Vizcaya in the BVI.

55.    Vizcaya was created solely to invest with BLMIS in New York.

56.    Upon information and belief, Vizcaya had no employees and no place of business other than a registered address—a post-office box in the BVI.

57.    Vila and Raymond Pousaz were Vizcaya's directors.

58.    On December 21, 2001, Vizcaya's agent and custodian, Safra France, opened Vizcaya's BLMIS account, number 1FR083 (the "Vizcaya Account").

59.    In opening the Vizcaya Account, on or around December 21, 2001, Laoui and Haboubba, on behalf of Safra France and acting as Vizcaya's agents, executed a BLMIS Customer Agreement (the "Safra France Customer Agreement"), an Option Agreement, and Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Safra France Account Opening Agreements").  The Safra France Account Opening

Agreements appointed BLMIS, a NASD-registered broker-dealer, to act as Vizcaya's agent, exclusively implementing BLMIS's proprietary investment strategy.

60.    At Clemente's request, the Safra France Account Opening Agreements were sent from the New York office of Rosenman & Colin LLP (now, Katten Muchin Rosenman LLP) and hand delivered to BLMIS at 885 Third Avenue, New York, New York.

61.    Upon information and belief, Vizcaya's first investment manager was Clemente Asset Management ("CAM"), a New York company founded by Clemente. Bernard, Ruth, Andrew, and Mark Madoff were listed as shareholders of CAM.

62.    Siam became Vizcaya's investment manager on January 18, 2002.

63.    LevCap Systems Ltd. ("LevCap"), a Florida-based Siam affiliate, served as Vizcaya's original administrator. Under its agreements with Vizcaya, LevCap coordinated with Safra France to ensure:

> (i) accurate trade blotter processing, (ii) correct trade confirmation, (iii) confirmed trade tickets printed and returned for signature, (iv) timely updated portfolio positions, (v) compilation of reports, including daily monitoring, projection and reporting of settlements, fails, available cash and daily reconciliation of cash with the Broker or Custodian, (vi) timely collection of cash from financial instruments, (vii) tracking of financial collateral, and (viii) compilation of monthly transaction reports, including net asset values, transaction reports or other report as requested by the Company.

64.    On July 1, 2005, PricewaterhouseCoopers Accounting Services Limited ("PwC") replaced LevCap as Vizcaya's administrator and registrar. PwC also served as the administrator for Zeus and Asphalia.

65.    On or about March 23, 2005, Safra Gibraltar replaced Safra France as Vizcaya's custodian. At the same time, Safra Gibraltar also became the custodian for Asphalia and Zeus.

66.    On March 23, 2005, BLMIS and Vizcaya entered into a new Customer Agreement (the "Safra Gibraltar Customer Agreement"), Option Agreement, and Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Safra Gibraltar Account Opening Documents").  Safra Gibraltar signed the Safra Gibraltar Account Opening Documents as Vizcaya's agent.  The Safra Gibraltar Account Opening Agreements appointed BLMIS, a NASD-registered broker-dealer, to act as Vizcaya's agent, exclusively implementing BLMIS's proprietary investment strategy.

67.    Vizcaya and Safra Gibraltar entered into a custodian agreement, dated April 18, 2005 and amended in February 2007, permitting Safra Gibraltar to open and maintain custodial accounts for Vizcaya.

68.    By their terms, the Safra France Customer Agreement and the Safra Gibraltar Customer Agreement were entered into and performed in New York, and authorized securities trading activities expected to take place in New York.  The agreements and the parties' respective rights and liabilities are governed by New York law.  The Vizcaya Entities knew the Vizcaya Account was held in New York and funds were consistently wired to BLMIS's bank account in New York for application to the Vizcaya Account.

69.    Both the Safra France Customer Agreement and the Safra Gibraltar Customer Agreement provide that all transactions thereunder would be subject to the Securities Exchange Act of 1934, the Commodities Exchange Act, the SEC rules and regulations, the Board of Governors of the Federal Reserve System, the Commodities Futures Trading Commission, and all laws of the United States.  Safra France and Safra Gibraltar, as Vizcaya's agents, bound Vizcaya to the agreements.

70.     As of March 23, 2005, Safra Gibraltar was the only authorized signatory of the Vizcaya Account over which it exercised operational control.

**B.     *Asphalia Is Formed to Direct Investments Into BLMIS***

71.     Asphalia was formed on or around December 17, 2002.  Initially, Pousaz served as Asphalia's sole director.  Later, Asphalia's directors were, and upon information and belief remain, Vila, Michael Paton, and Charles Galliano.

72.     From its inception until November 1, 2004, Moore Park Asset Management Ltd. ("Moore Park") was Asphalia's investment manager.  Vila, Paton, and Pousaz were directors of Moore Park.

73.     Upon information and belief, at or about the same time Moore Park became Asphalia's investment manager, Moore Park delegated its investment management duties for Asphalia to Vila who was responsible for "monitor[ing] the risk profile and related aspects of the split strike strategy to be predominantly used in investing the assets of the company."

74.     Upon information and belief, another Pousaz-affiliated entity, Moore Park Fund Services Ltd., served as Asphalia's administrator until 2005.

75.     Asphalia invested exclusively through a number of BLMIS feeder funds, including: (1) Vizcaya, (2) Oréades, (3) M-Invest, and (4) Mount Capital Fund Ltd.

76.     As of December 31, 2003, Asphalia had approximately $118,905,806 invested in BLMIS feeder funds, including $48,362,631 invested with Vizcaya.

**C.     *Asphalia Pulls Its Shares Out of All Other BLMIS Feeder Funds and Invests Exclusively With Vizcaya***

77.     In July 2003, Lionel Trouvain, a senior executive at BNP Paribas Securities Services, which served as Oréades's custodian, communicated to Access BNP's concerns regarding BLMIS.  These concerns included conflicts between BLMIS serving as broker-dealer

and asset manager, BLMIS's inability to confirm the existence of assets, and delays in receiving

trade confirmations.  Upon information and belief, Vila was aware of BNP's concerns and that

Oréades would be closed.

78.    On or about February 26, 2004, Vila directed redemption of investments in

Oréades, totaling approximately $36 million.  On March 1, 2004, Vila re-directed the deposit of

most of that amount—$35 million—into Vizcaya's BLMIS account.

79.    In March 2004, BNP closed Oréades's accounts with BLMIS.

80.    On or around November 1, 2004, Siam replaced Moore Park as Asphalia's

investment manager and remained Asphalia's investment manager until BLMIS's collapse.

81.    By May 31, 2005, and up until BLMIS's collapse, Asphalia was exclusively

invested with Vizcaya.

**D.    *Zeus Is Formed to Direct Investments of Safra Group Customers into BLMIS through Vizcaya***

82.    Zeus was incorporated on November 23, 2004 to invest with BLMIS in New York

through Vizcaya.

83.    Safra New York employees revised and negotiated Zeus's corporate documents

and reviewed the fund's performance.

84.    Correspondence from PwC, Zeus's administrator, regarding Zeus's operations

was directed to Safra New York's headquarters in New York.

85.    Zeus's board of directors met in New York and resolved to change the fund's

custodian from Bank Safra France to Bank Safra Gibraltar.

86.    Siam became Zeus's investment manager on November 30, 2004.

87.    On November 30, 2004, Safra New York invested $17,250,000 in Zeus.  Safra

New York invested $67,285,000 over the life of its investment with Zeus.

17

88.    On or about December 1, 2004, Zeus, Siam, and Safra New York entered into an agreement confirming that Safra New York would control investments into Zeus.

89.    In February 2008, Safra New York transferred all of its Zeus shares to Banque Jacob Safra (Suisse) S.A., now known as Banque J. Safra Sarasin A.G. ("Safra Suisse"), which became the registered shareholder of all of Zeus's common shares.

90.    Vila, Paton, and Galliano were, and upon information and belief remain, Zeus's directors.

91.    Zeus was at all relevant times exclusively invested with Vizcaya.

92.    By the terms of its subscription agreement, all subscriptions into and redemptions from Zeus were denominated in U.S. dollars and were wired to Safra France's or Safra Suisse's account at the Stamford, Connecticut branch of UBS AG.

**E.    *Siam Acts as Investment Manager for Each of Vizcaya, Zeus, and Asphalia***

93.    Siam, controlled and owned by Vila, served as the VZA Defendants' investment manager.

94.    The investment management agreements between Siam and each VZA Defendant provided that Siam was their agent for investments with Vizcaya and BLMIS.  Pursuant to these investment management agreements, Siam made all trading and asset allocation decisions and was required to keep accurate and detailed records of daily transactions and to forward those reports to each VZA Defendant.

95.    Upon information and belief, Siam complied with its obligations, though with respect to trading and asset allocation, its decisions never went beyond directing Zeus's and Asphalia's investments solely into Vizcaya and Vizcaya's investment solely into BLMIS.

96.    Siam provided the VZA Defendants with month-end reports detailing trading activity, securities inventory, market valuations, portfolio accounting, and monthly portfolio performance reports.

97.    Siam computed the market value of all securities and options held by the VZA Defendants based on prices listed on the national securities exchanges.

98.    Upon information and belief, in his individual capacity and as director of Siam, Vila received and reviewed Vizcaya account statements and trade confirmations.

99.    Vila had "primary responsibility for allocating assets managed by [Siam]."

100.    Each of the Vizcaya Entities had full access to information regarding the purported investments held by BLMIS for Vizcaya through their authorized agents and advisers.

**F.    *Safra France and Safra Gibraltar Share Information With all Defendants***

101.    Safra France and Safra Gibraltar, acting as the VZA Defendants' custodian, received Vizcaya's BLMIS account statements and trade confirmations and created position reports that were sent weekly to the funds' administrators to facilitate calculation of the funds' respective net asset values.

102.    Under the Safra Gibraltar custodian agreement with Vizcaya, Safra Gibraltar kept "such books, records and statements as may be necessary to give a complete record of all Property held[, which included cash and securities,]  and transactions carried out by it on behalf of [Vizcaya]."

103.    Safra Gibraltar supplied Vizcaya and Siam with "a written statement which lists all Property in the account . . . together with a full account of all receipts and payments made and other action taken by [Safra Gibraltar]" and a "notification of any transfers of Property to or from the Account indicating relevant prices and as to Property acquired for the Account the identity of the party having physical possession of such Property."

104.    By virtue of the Safra France custodian agreement, Safra France acted as Vizcaya's agent and its knowledge of BLMIS's irregular trading activity is therefore imputed to Vizcaya.

105.    Even after Safra France ceased acting as Vizcaya's custodian in March 2005, it continued communicating with Vila and BLMIS, including providing instructions concerning redemptions from the Vizcaya Account.

106.    By virtue of the Safra Gibraltar custodian agreement, Safra Gibraltar was the VZA Defendants' agent, and its knowledge of BLMIS's irregular trading activity is therefore imputed to each of these entities.

107.    Laoui was, at relevant times, an officer of Safra France and a director of Safra Gibraltar, and his knowledge is therefore imputed to each of those entities.

**G.    *The VZA Defendants and Siam Shared All Relevant Knowledge in Connection With Their BLMIS Investments***

108.    Vila was involved in the creation of each of the VZA Defendants.  The VZA Defendants were set up with overlapping directors.  Galliano was a director of Zeus, Asphalia, and Siam, as well as a signatory on Vizcaya's Safra Gibraltar bank account.  Paton was a director of Zeus and Asphalia.  Vila was, at all relevant times, a director of, and controlled, the VZA Defendants and Siam.

109.    Siam held Asphalia's and Zeus's voting shares.

110.    At all times, Vizcaya had only two major investors: Zeus and Asphalia.

111.    At relevant times, Zeus and Vizcaya shared the same registered office in the BVI.

112.    Zeus had no physical offices or employees in the BVI.

113.    Vizcaya retained monies from Asphalia's subscriptions to fund Zeus redemptions.

114.    The investment management agreements between Siam and each VZA Defendant appointed Siam their agent for investments with Vizcaya and BLMIS.  Siam's knowledge relating to BLMIS is therefore imputed to each of the VZA Defendants.

115.    The Vizcaya Entities each had knowledge concerning BLMIS's purported trading activity for Vizcaya as a result of their: (i) overlapping directors; (ii) unity of commercial activity and sources of revenue; and (iii) sharing of service providers with access to their respective books and records.

**THE VIZCAYA ENTITIES WERE IN POSSESSION OF OVERWHELMING
OBJECTIVE AND SUBJECTIVE EVIDENCE OF FRAUD**

116.    Under their agreements and the underlying Vizcaya-Zeus-Asphalia investment structure, the Vizcaya Entities and/or their agents received and reviewed Vizcaya's monthly BLMIS account statements; reviewed trade confirmations; independently priced securities purportedly held in the Vizcaya Account; and performed correlation analyses comparing Vizcaya's returns to the S&P 100 index.  The Vizcaya Entities knew of numerous trading impossibilities in the reported performance of the Vizcaya Account.  These impossibilities are not facts "suggestive" of fraud or "warning signs" that should have led to further inquiry—they are quantitative evidence demonstrating that their BLMIS customer statements and trade confirmations reported non-existent securities transactions.  In addition to objective trading impossibilities, the Vizcaya Entities saw and recognized myriad other indicia of fraud.

A.    **The Vizcaya Entities Knew of Objective Market Impossibilities for Which There
Was No Plausible Explanation Other Than Fraud**

The SSC Strategy Could Not Yield the Results Reported on Vizcaya's Account Statements

117.    The SSC strategy was a "collared" investment strategy that was supposed to track the S&P 100, while also tempering volatility in that market.  But the virtual elimination of market volatility would have been impossible under the SSC strategy.  At best, the strategy

21

would have smoothed out peaks and valleys, but it would not have eliminated volatility

otherwise inherent in the S&P 100.  Vizcaya's account statements should have been closely

correlated with the S&P 100, but with less dramatic down or upswings.

118.    The S&P 100 options ("OEX Options") collars attached to BLMIS's stock

purchases should, in theory, have ensured that when the S&P 100 dropped, it would not drop as

much for BLMIS investors.  Collapses in stock price would be hedged by put contracts funded

by the sale of call options.  The effect of that strategy, however, also limits gains if the S&P 100

went up.

119.    It would have been impossible for Vizcaya to post gains on its BLMIS investment

when the S&P 100 was significantly down if BLMIS was genuinely deploying the SSC

strategy.  This is because the put options only limited the losses caused by downswings.  The

exercise of those options would not have turned losses into gains; it simply would have put a

floor on losses.  But this is not what is reflected in Vizcaya's account statements, which

consistently show gains when the S&P 100 was down significantly.

120.    Similarly, outperforming the S&P 100 during a major market upswing would

have been impossible, as the call options sold by BLMIS would have been exercised under

those market conditions, putting a ceiling on Vizcaya's potential gains.  Yet Vizcaya's account

statements consistently show gains significantly outperforming the S&P 100.

121.     In comparison to the S&P 100, the Vizcaya Account consistently showed

positive returns.  The quantitative data in Vizcaya's account statements indicates that from

January 2002 to November 2008, Vizcaya's annual returns with BLMIS averaged

approximately 11.3%.  BLMIS purported to achieve these results with only three months of

negative returns during the 83 months that Vizcaya was invested with BLMIS, while the S&P

100 experienced 36 months of negative returns over the same period.

122.   BLMIS purported to achieve positive returns for the Vizcaya Account even during catastrophic market downturns such as the recession of 2008.  BLMIS continued to generate positive returns even during the last 14 months of BLMIS's existence, when the S&P 100 fell no less than 39.4%.

123.   Safra New York marketed Zeus as having virtually no correlation to the S&P 500 (a sister index to the S&P 100, with which the S&P 500 is highly correlated).  Safra Latin America marketed Zeus to potential clients stating "low correlation with the stock market (very important these days!!!)," while marketing materials provided by Safra Group (which included Safra New York and Safra Suisse) in 2007 and 2008 featured a monthly correlation analysis that reported Zeus having a correlation coefficient to the S&P 500 ranging from -0.04 to 0.06.  A zero correlation means that there is no correlation to the reference.

124.   Correlation coefficients between a fund and a benchmark measure the degree that the fund tracks the benchmark index or security.  Correlation coefficients range from -1 to 1.  A correlation coefficient of 1 means that the fund perfectly tracks the reference; a coefficient of -1 indicates that the fund's performance is the exact opposite of the reference—the fund will increase the same amount as the reference decreases and vice versa.  Safra Group, therefore, knew that the SSC strategy, which purportedly mimicked the S&P 100 while minimizing volatility, had no correlation whatsoever—and even moved in the opposite direction—to the S&P 500 and the S&P 100.

125.    Vila had a subscription to the PerTrac financial performance tracking software system.  Upon information and belief, Vila received PerTrac reports analyzing, *inter alia*, the correlation to the S&P 100 and S&P 500 of Vizcaya, Asphalia, Zeus, Glenwyne, Oréades, M-Invest, and Mount Capital.

126.    Vila also received Access's "Monthly Manager Activities Reports," which analyzed the investment activities of Access-sponsored funds, including Oréades, and contained information concerning BLMIS's correlation with the S&P 500.  For example, the November 1999 Monthly Manager Activities Report showed BLMIS's correlation coefficient to the S&P 500 at 0.234.

127.    Based on Vizcaya's account statements and Vila's knowledge of performance analyses, which is imputed to Siam and the VZA Defendants, the Vizcaya Entities knew, or were willfully blind to, the fact that the SSC strategy, purportedly correlated to the S&P 100 and hedged by OEX Options collars, could not produce the returns BLMIS purported to yield.

<u>Vizcaya's Account Statements and Trade Confirmations</u>
<u>Reflected Impossible Options Trading Volumes</u>

128.    The execution of the SSC strategy would have required the purchase and sale of vast quantities of options.  Vizcaya's account statements and trade confirmations frequently showed OEX Options calls and puts being traded at volumes that exceeded the total market volume of calls and puts with the same strike price and expiration dates traded on the Chicago Board Options Exchange ("CBOE").

129.    When verifying BLMIS's purported trading activity for Vizcaya, the fund, its managers, directors, officers, administrators, and custodians could not have believed that it was possible to trade greater than the market volume for any security—even once.

130.    Vizcaya's account statements reflect that almost one-third of the time, BLMIS's purported purchases and sales of OEX Options comprised 100%, or more, of the entire volume of OEX Options with the same strike price and expiration traded on the CBOE on that day. Trading more than 100% of the market is obviously impossible.  But where, as here, multiple feeder funds were investing with BLMIS—a fact known to Vila—for Vizcaya to trade even close to the market volume also would be impossible.

131.    In August 2006, BLMIS filed a Form ADV with the SEC, a publicly available document, stating that, as of the end of July 2006, BLMIS had approximately $11.7 billion of assets under management.  From August 2006 until the collapse of BLMIS, Vizcaya's purported share of the CBOE-traded OEX Options comprised 50% or more of the entire market volume of OEX Options traded on the CBOE more than 82% of the time.  The Vizcaya Account, however, represented far less than 50% of BLMIS's reported assets under management.   BLMIS's reported assets under management thus rendered it impossible for BLMIS to trade more than 50% of the total available options for the Vizcaya Account alone.

132.    When asked, Madoff occasionally attempted to explain to others his options trading practices, but his explanation only further indicated fraud.  Madoff claimed he was trading options on the over-the-counter market (the "OTC"), for which volumes of trades are not publicly reported.  To sophisticated financial entities like the Vizcaya Entities, such an explanation could only be understood as a lie.  BLMIS's trade confirmations indicated the purchase and sale of S&P 100 options and included a unique identifier, known as a CUSIP number.  The CUSIP number allows traders to quickly access information regarding a particular transaction.  An option would have a CUSIP number only if it were traded on the CBOE.  Any

explanation referring to OTC trading was therefore objectively false and a clear indication of fraud.

133.    Under the terms of the Safra Gibraltar custodian agreement with Vizcaya, Safra Gibraltar "provide[d] custodian services in connection with the purchase or issue of options by [Vizcaya]" and supplied Vizcaya with a "notification of any transfers of Property to or from the Account indicating relevant prices."

134.    On April 16, 2004, BLMIS purportedly sold on Vizcaya's behalf a total of 1,526 OEX Option puts.  CBOE market data shows that there was not a single option contract with the same expiration and strike price traded that day.

135.    On seven occasions, while BLMIS purportedly executed OEX Option trades for the Vizcaya Account, publicly available records show no OEX Options with the same expiration and strike price traded on those dates.

136.    On November 11, 2005, BLMIS purportedly purchased on Vizcaya's behalf 3,490 OEX Option puts (with a December 17, 2005 expiration and a strike price of 565), when the total volume traded on the CBOE for all such contracts that day was 311.

137.    On November 19, 2008, BLMIS purportedly sold on Vizcaya's behalf 2,018 OEX Option puts (with a November 22, 2008 expiration and a strike price of 475), when the total volume traded on the CBOE for all such contracts that day was three.

There Were Not Enough Options Available on the CBOE Market to Execute the SSC Strategy

138.    The impossibly high volumes of options trades reflected in the fraudulent Vizcaya account statements demonstrated the lack of scalability of the SSC strategy for BLMIS's purported assets under management.  To execute the SSC strategy, with at least $11.7 billion under management as reported on the Form ADV, BLMIS would have needed at least approximately $11.7 billion in notional value of call options.  Between 2002-2008, i.e., the life

of the Vizcaya Account, there were not enough options on the entire listed market to implement Madoff's SSC strategy.

<u>Vizcaya's Account Statements and Trade Confirmations Show That BLMIS Purported to Sell
Equities and Options Outside the Daily Reported Price Ranges</u>

139.    Trade confirmations for the Vizcaya Account showed the prices for each and every purported purchase and sale of stocks and options.  The Vizcaya Entities received and reviewed trade confirmations and monthly account statements for the Vizcaya Account.  As Vizcaya's custodians, Safra France and Safra Gibraltar were required to notify, and represented that they notified Vizcaya of transfers of assets and their relevant prices.  In its capacity as investment manager for each VZA Defendant, Siam computed the market value of securities based on national exchange listings.

140.    Trade confirmations for the Vizcaya Account reported equity trades reflecting the purchase and sale of securities outside the range of reported daily market prices.

141.    For example, Vizcaya's account statements for October 2003 reported a purchase of 16,170 shares of Intel Corporation.  Vizcaya's trade confirmations indicate that these stocks were purchased on October 2, 2003 for $27.59 per share.  Impossible, given that he actual price range for Intel on October 2, 2003 ranged from $28.41 to $28.95.

142.    Vizcaya's account statements for December 2006 reported the sale of 31,498 shares of Merck.  Vizcaya's account statements and trade confirmations reflect that these stocks were sold on December 22, 2006 for $44.61.  Again impossible, given that the actual price range for Merck on December 22, 2006 was between $42.78 and $43.42.

143.    In total, BLMIS reported to Vizcaya at least 61 distinct equity trades that were impossibly priced.  These 61 impossibly priced transactions represented more than one million shares of stock.

144.   Any investment professional verifying trades reported by an investment fund would consider even a single reported trade outside the daily price range to raise serious issues of misrepresentation and constitute evidence of fraud requiring immediate and urgent investigation.  Such a trade is, on its face, impossible.  Siam valued securities purportedly traded in the Vizcaya Account based on published prices and shared this information with the VZA Defendants.  The Vizcaya Entities therefore knew BLMIS was purportedly making equities trades that bore no relation to real securities trading.  The only possible explanation was that no such trades ever took place.

Vizcaya's Account Statements Showed Impossible Dividend Payments

145.   During the periods that BLMIS's IA Business was purportedly out of the market, BLMIS claimed to invest in U.S. Treasury bills, including the Fidelity Spartan U.S. Treasury Money Market Fund (the "Fidelity Fund").  BLMIS purported to do so notwithstanding the fact that this fund changed its name in August 2005.  Nevertheless, from the end of that year until Madoff's arrest, Vizcaya's account statements continued to show transactions with a fund that no longer existed under that name.

146.   The Fidelity Fund and its successor issued dividend payments once a month at either the end or beginning of the month.  During Vizcaya's investment with BLMIS, the Fidelity Fund and its successor never deviated from this payment schedule.  But Vizcaya's account statements on occasion reported up to seven dividend payments in one calendar month.

147.   For example, the October and November 2008 Vizcaya account statements, show seven dividend payments purportedly made by the Fidelity Fund's successor on (1) October 10, 2008, (2) October 31, 2008, (3) November 6, 2008, (4) November 7, 2008, (5) November 10, 2008, (6) November 19, 2008, and (7) November 25, 2008.  The Fidelity Fund, however (doing business under its new name), reported dividend payment dates on September 30, 2008, October

31, 2008, and November 28, 2008.

148.   More than 99% of the dividend payments reported on Vizcaya's account statements were impossible.

### Defendants Knew That the Timing of Madoff's Trades Was Impossible

149.   Madoff often claimed that he was time-slicing, *i.e.*, entering the market at different times throughout a trading day, and that the equity price reported on the account statements reflected the volume-weighted average price ("VWAP").  When Madoff claimed to be purchasing equities for Vizcaya, the reported average price was below VWAP 85.2% of the time.  When he claimed to be selling equities, the sale price was above VWAP 77% of the time.  This consistently favorable execution was statistically impossible because if BLMIS had been purchasing or selling stocks multiple times throughout a trading day, BLMIS's reported prices would have necessarily gravitated toward the VWAP.

150.   Achieving these statistics while trading even a single equity is impossible, but Madoff claimed to trade in baskets containing between 35 and 40 equities.  To achieve the results reported on Vizcaya's account statements, Madoff would have had to enter and exit the market at the optimal time, not just for one equity, but for 35-40 equities simultaneously.

151.   Upon information and belief, the Vizcaya Entities knew of Madoff's claims to be time-slicing, and that the reported stock prices from multiple purchases of stock throughout the day would gravitate toward the volume-weighted average price.  Accordingly, the Vizcaya Entities, knew, or were willfully blind to, Madoff's fraud.

B.     **In Addition to Being Aware of the Objective Evidence of Fraud, Defendants Were Also Bombarded With Myriad Subjective Indicia of Fraud**

Vizcaya's Account Statements Demonstrated That
Madoff Was Not Implementing the SSC Strategy

152.   Madoff consistently purported to exit the market at quarter-end and year-end as part of the SSC strategy.  Vizcaya's account statements reflected this practice.

153.   Madoff's exiting the market according to the calendar, rather than based on market or economic indicators, is strong evidence of fraud.  The Vizcaya Entities knew that Madoff touted "market timing" as a cornerstone of the SSC strategy and that Madoff's practice of liquidating all stocks and options at quarter- and year-end contravened that strategy because it meant that Madoff was locked into whatever market conditions existed at those times, regardless of whether they were favorable.  Such trading circumstances were inconsistent with the SSC strategy, which was based on long positions hedged by options contracts subject to expiration.

154.   In addition, Vizcaya's account statements showed the purchase and sale of options to generate short-term gains.  This practice was based on high-risk, short-term gains and completely inconsistent with the SSC strategy.

155.   Vizcaya's account statements show that on at least eight occasions, speculative options transactions were purportedly used solely to generate profit and not to hedge any equity positions.  For example, Vizcaya's account statement for August 2002 shows that on August 14, 2002, BLMIS purported to purchase at a price of $5.30 210 OEX Option calls with a strike price of 450 and an August 17 expiration.  These option contracts were sold on August 16 at a price of $18.44, resulting in a net gain of $275,730.  Vizcaya's account statement makes plain that this options transaction did not hedge any securities, but was rather a naked options transaction completely at odds with the SSC strategy.

156.    On other occasions, BLMIS purported to buy back its call positions, only to rewrite them the following business day almost invariably at a significant profit.  For example, Vizcaya's August 2008 BLMIS statement indicated that on August 8, 2008 BLMIS purported to buy at a price of $8.00 3,237 OEX Options calls with a strike price of 585 and an August 16, 2008 expiration.  These options were purportedly sold on August 11, 2008 for a price of $15.00, a net gain of $2,259,426.  As was clear from Vizcaya's trade confirmations, this options transaction was not executed for the purpose of hedging any equity positions, but rather to generate short-term profit.

157.    Speculative options transactions generated $6,097,288 in profit for the Vizcaya Account, but at significant risk and at odds with the SSC Strategy.  Vizcaya's account statements and trade confirmations showed that Madoff was gambling with the money used to finance the purchase of the put option collar because there was no guarantee that the price of the call options would go up when the positions were rewritten.  Those speculative options transactions were inconsistent with the SSC strategy.

158.    Speculative options trades were not the only cause of unbalanced hedge positions. The SSC strategy required adjustment of the options "collar" to reflect changes in the basket of equities if some of the underlying securities were sold before liquidation of the entire basket. When Vizcaya's account statements show changes to the basket of equities purportedly purchased for the Vizcaya Account, they fail to show corresponding changes to the options hedging the original trade.

159.    For example, Vizcaya's account statements and trade confirmations in January and February 2004 indicate that on January 5, 7, and 12, 2004, BLMIS purported to purchase a basket of S&P 100 stocks that included shares of Texas Instruments Inc. ("TXN").  The basket

of stocks was liquidated over four days between February 17 and 20, 2004.  However, the trade

confirmations indicate that the shares of TXN were sold one month earlier than the other

equities contained in the basket.  Despite this early sale of TXN shares, the corresponding

options hedges did not change.

160.   On January 28, 2004, Vila received from Safra France a trade confirmation

indicating that TXN was sold on January 16, 2004 as well as the options trade confirmations

showing that the options collar was being re-extended for February (OEX Options expire on the

third Saturday of every month).  The trade confirmations for the February options collar make

clear that the options hedge was not readjusted to take into account the sale of TXN shares as

should have been done if the SSC strategy was being applied properly.

161.   Vizcaya's account statements show that on 33 separate occasions BLMIS did not

alter the corresponding hedge when equities were purportedly sold before the rest of the basket.

BLMIS's failure to rebalance the hedges on the basket was a deviation from the SSC strategy

that would have exposed the Vizcaya Account to potentially significant losses on the unhedged

securities.

Documents Purporting to Confirm the Execution of BLMIS's Options Trades Evidence the
Trades' Fraudulent Nature.

162.   To properly execute the SSC strategy, the sale of call options must necessarily

precede the purchase of put options because the proceeds from the sale of the calls would fund

the purchase of the puts.  BLMIS's customer statements reflected this sequence of transactions.

163.   But BLMIS's option trade confirmations contradict the customer statements on

two counts.  First, the trade confirmations show the purchase of call options, and the sale of put

options—precisely the opposite of what Vizcaya's account statements reported.  Second, the

sequence of the transactions as reported on Vizcaya's trade confirmations was frequently

32

backwards, with the purchase preceding the sale.

164.   Because Vizcaya did not have a margin account with BLMIS, the sequence of

trades was not possible.





165.   The images above show BLMIS options trade confirmations sent to Vila.  These

statements illustrate the impossible trade sequence showing the sale of a "February 560" put

settled on January 20, 2004 preceded by the "purchase" of a "February 570" call on January 16,

2004.

<u>Vizcaya's Trade Confirmations Showed Frequent Trading Anomalies</u>

166.    BLMIS's trade confirmations frequently contained settlement anomalies in purported options transactions.  According to industry standards, the settlement date for listed options is the business day following the trade date, referred to as T+1.  On numerous occasions, BLMIS trade confirmations show settlement more than one day after the trade date.

167.    All of Vizcaya's trade confirmations showed CBOE-traded OEX Options, which would have been subject to the T+1 settlement date.

168.    Trade confirmations for the Vizcaya Account show that out of 566 purported options transactions in the Vizcaya Account, 233 failed to conform to the industry standard settlement date.

<u>Madoff's Auditor Was Neither Qualified Nor Capable of Auditing a Global Investment
Management Company With Billions of Dollars Under Management.</u>

169.    BLMIS ostensibly had almost $12 billion under management, but was audited by Friehling & Horowitz, an accounting firm with only two accountants, one of whom was semi-retired and living in Florida.  The firm's offices were located in a strip mall in suburban Rockland County, New York.

170.    Auditors, consistent with industry custom and practice, act as a safeguard against fraud by providing independent verification of assets and financial transactions.

171.    Friehling & Horowitz's size, lack of professional qualifications, and the limited nature of the services they provided were readily accessible to the Vizcaya Entities.

172.    All accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program, and those that do are listed on the public portion of the AICPA website.  Despite holding itself out as an AICPA member, Friehling & Horowitz avoided peer review after 1993, by representing that it did no

34

audit work and, therefore, was not listed on the AICPA website.

The Vizcaya Entities Knew BLMIS's Operations Lacked Transparency and Controls

173.    The Vizcaya Entities knew Madoff held positions at BLMIS that would normally be occupied by three separate entities: he was investment adviser, custodian, and broker-dealer purporting to initiate and execute trades for the Vizcaya Account.  This meant there was neither an independent custodian to assure proper segregation of assets, nor an independent third party verifying the existence and value of BLMIS's investments and transactions.  This "self-custody" structure eliminated a critical internal control—widely recognized as basic in both the brokerage and investment management industries—that prevents fraud by having an independent custodian hold and confirm the existence of investors' securities.

174.    Furthermore, despite occupying these roles, neither Madoff nor BLMIS are mentioned in the Vizcaya or Zeus executive summaries prepared for investors even though both Vizcaya and Zeus were 100% invested with BLMIS.

175.    BLMIS's publicly available regulatory filings revealed that it lacked the necessary number of employees to manage the billions of dollars of assets under management reported on BLMIS's Form ADV and its annual amendments.  BLMIS's regulatory filings also indicated that there only were between one and five employees performing investment advisory functions, including research.  The Vizcaya Entities knew BLMIS lacked the staff necessary to conduct research on investment opportunities, execute the purported trades in the IA Business, and manage the significant assets under management at BLMIS.

<u>Despite BLMIS's Status as a Cutting-Edge Technology Firm, BLMIS Provided Only Time-
Delayed Paper Statements</u>

176.    Typical investment management industry operating procedures allow clients to obtain account statements, balances, and other details via the Internet.  By at least June 2000, the practice of granting clients electronic access to their accounts was mainstream, particularly as a result of the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001, which permits the use of electronic records to satisfy compliance with statutes and regulations.

177.    Throughout the 2000s, consumers were conducting transactions and accessing their checking and savings accounts online.

178.    Upon information and belief, the Vizcaya Entities knew about Madoff's reputation as a global leader in the use of technology, specifically, as highlighted in publications including *Securities Week, The New York Times, and Wall Street & Technology*.  Further, BLMIS's marketing materials highlighted its abilities in this area, specifically stating, "[m]oreover, Madoff Securities' computerized transaction processing means that the firm can customize client reports and deliver them electronically in whatever format best meets the needs of customers."

179.    Despite being a pioneer of electronic trading, Madoff did not provide Vizcaya with real-time electronic access to its account.  BLMIS used outmoded technology and provided only printed account statements and paper trade confirmations that were sent via regular mail, three to four days after the trades purportedly occurred.

180.    The lack of real-time access to account data or electronic statements facilitated the manufacture of fictitious trades and manipulation of reported prices on BLMIS customer statements.

181.    In fact, Safra New York sought to receive trade confirmations for the Vizcaya

Account in a more timely manner, complaining in a memorandum to Vila in November 2004

that "Banque Safra Paris (SP) receives trade tickets T+5 and month end statements by mail appx

5 days after month end (we must try to arrange to get them sooner electronically)." Again, in

January 2005, the COO of Safra Asset Management Corp., an affiliate of Safra New York, told

Vila, Laoui, Safra France and Safra New York that going forward they expected "to receive the

trade tickets on a daily basis . . . so that the trades can be booked on a more timely basis . . . ."

Neither Safra France nor its successor, Safra Gibraltar, ever received timely trade tickets but

continued, nevertheless, to confirm trade data as custodian.

<u>The Vizcaya Entities Knew That the Vizcaya's Account Statements Showed Unauthorized
Margin Trades</u>

182.    On numerous occasions, the Vizcaya Account had a negative cash balance with

BLMIS.  Certain of the negative balances resulted from either the purchase of equities that

exceeded the value of U.S. treasuries sold to fund that purchase; the purchase of put options

prior to selling the call options necessary for that purchase; or cash being withdrawn prior to the

sale of equities to fund the withdrawal.  Normally, when a customer purchases assets prior to

the funds being available in the customer's account, the customer is buying on "margin."

183.    There were at least 54 separate occasions where cash was withdrawn from the

Vizcaya Account, resulting in a negative cash balance.  On July 7, 2003, cash was withdrawn

from the Vizcaya Account, resulting in a negative cash balance of $9,274,766.78.  The account

did not return to a positive cash balance until July 10, 2003.

184.    Vizcaya did not have a margin account with BLMIS and could not have traded on

margin.  Nevertheless, the Vizcaya Account had a negative cash balance for 142 days.

185.    Even if BLMIS was buying on margin with Vizcaya's permission, the Vizcaya

Entities knew BLMIS was acting in an irregular and suspicious manner.  When buying on margin, customers incur and are generally charged margin interest because buying on margin is effectively buying the underlying security with a loan from the investment adviser/broker dealer.  Madoff never charged Vizcaya margin interest for this extension of credit, effectively giving millions of dollars to Vizcaya as an interest-free loan.

<u>Proper Due Diligence, Analysis, or Investigation Revealed the BLMIS Fraud</u>

186.    Many banks and industry advisers, after having conducted reasonable due diligence, refused to deal with Madoff due to serious concerns over the legitimacy of the IA Business's operations. These included, for example, Goldman Sachs, Morgan Stanley, Bear Stearns, Acorn Partners, and Aksia LLC.

187.    London-based due diligence firm Albourne Partners similarly urged its clients not to invest in funds that invested with BLMIS on the basis of BLMIS's fee structure and lack of transparency, indicating warning signs of fraud.

188.    In May 2008, Albourne reviewed on behalf of Safra New York a portfolio of funds in which the Safra Group was invested.  On May 16, 2008, the results of the review were emailed to a Safra New York employee.  The email included the following warning: "we note you are invested in a number of Madoff feeders.  As you are probably aware this manager gives limited transparency and as such it is not a fund that we recommend clients hold."
Albourne knew enough to be wary of Madoff based their conclusions on publicly available facts concerning BLMIS's investment strategies and practices.  The Vizcaya Entities had even more information at their disposal yet ignored it.

## THE TRANSFERS

**A.    *Initial Transfers to Vizcaya***

189.    On or about August 27, 2008, Safra Gibraltar, as Vizcaya's custodian, issued a redemption request for $30,000,000.  On August 29, 2008, BLMIS wired $30,000,000 from the 703 Account in New York via the Fedwire payment system to Safra Suisse in Connecticut for Safra Gibraltar and for the ultimate credit of Vizcaya.

190.    On October 29, 2008, Safra Gibraltar, as Vizcaya's custodian, issued a redemption request for $150,000,000.  On October 31, 2008, BLMIS wired $150,000,000 from the 703 account in New York via the Fedwire payment system to Safra Suisse in New York for Safra Gibraltar and for the ultimate credit of Vizcaya.

191.    During the two years preceding the Filing Date, BLMIS made transfers to Vizcaya of approximately $180,000,000 (the "Initial Transfers").  The Initial Transfers were avoided under section 548(a)(1), and are recoverable under section 550(a)(1) of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

192.    Vizcaya received each of the Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

193.    Charts detailing these transactions are included as Exhibits A and B.  The Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

**B.    *The Subsequent Transfers from Vizcaya to Zeus***

194.    Prior to the Filing Date, Vizcaya subsequently transferred a portion of the Initial Transfers to Zeus (the "Zeus Subsequent Transfers").  Based on the Trustee's investigation to date, Zeus received $30,000,000 on October 30, 2008 and $78,000,000 on November 3, 2008, for a total of $108,000,000.

195.    The Zeus Subsequent Transfers are recoverable from Zeus under section 550(a) of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

196.    Zeus received each of the Zeus Subsequent Transfers with actual knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

C.    *The Subsequent Transfers from Vizcaya to Asphalia*

197.    Prior to the Filing Date, Vizcaya subsequently transferred a portion of the Initial Transfers to Asphalia (the "Asphalia Subsequent Transfers").  Based on the Trustee's investigation to date, Asphalia received $65,000,000 on November 3, 2008 and $2,000,000 on November 26, 2008 for a total of $67,000,000.

198.    The Asphalia Subsequent Transfers are recoverable from Asphalia under section 550(a) of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

199.    Asphalia received each of the Ashpalia Subsequent Transfers with actual knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

200.    The Trustee has a judgment for the Asphalia Subsequent Transfers.

D.    *The Safra Gibraltar Subsequent Transfers*

201.    Upon information and belief, Safra Gibraltar received $31,405.19 from Asphalia as "Custody Fees" in two separate transfers of $15,699.87 and $15,705.32 on November 25, 2008 and November 28, 2008, respectively.  Zeus paid Safra Gibraltar $45,300.46 in custody fees in two separate transactions of $22,639.72 and $22,660.74 on November 25, 2008 and November 28, 2008, respectively.  Safra Gibraltar also received $362,700.91 on November 14,

2008 and $363,163.70 on December 2, 2008 in rebates from Siam.  Each of these transfers

constitutes a subsequent transfer from Vizcaya.

202.    Therefore, prior to the Filing Date, Vizcaya subsequently transferred a portion of

the Initial Transfers to Zeus, Asphalia and Siam, which subsequently transferred a portion of the

Initial Transfers to Safra Gibraltar (the "Safra Gibraltar Subsequent Transfers" and, together

with Zeus Subsequent Transfers, the "Safra-Zeus Subsequent Transfers").  Based on the

Trustee's investigation to date, the Safra Gibraltar Subsequent Transfers total $802,570.26.

203.    The Safra Gibraltar Subsequent Transfers are recoverable from Safra Gibraltar

under section 550(a) of the Bankruptcy Code, applicable provisions of SIPA, particularly 15

U.S.C. § 78fff-2(c)(3).

204.    Safra Gibraltar received each of the Safra Gibraltar Subsequent Transfers with

actual knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a

high probability of fraud at BLMIS.

205.    To the extent that any of the recovery counts may be inconsistent with each other,

they are to be treated as being pleaded in the alternative.

206.    The Trustee's investigation is ongoing, and the Trustee reserves the right to:

(i) supplement the information on the Initial Transfers, the Safra-Zeus Subsequent Transfers,

and any additional transfers, and (ii) seek recovery of such additional transfers.

## COUNT ONE

### RECOVERY OF SUBSEQUENT TRANSFERS –11 U.S.C. §§ 105(a) AND 550(a)

207.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

208.    Each of the Initial Transfers was avoided, and is recoverable under section 550(a)

of the Bankruptcy Code.

209.    Each of the Safra-Zeus Subsequent Transfers is recoverable from Zeus and Safra Gibraltar under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

210.    Each of the Safra-Zeus Subsequent Transfers was made directly or indirectly to Zeus and Safra Gibraltar.

211.    Zeus and Safra Gibraltar are immediate or mediate transferees of the Safra-Zeus Subsequent Transfers from Vizcaya.

212.    Each of the Safra-Zeus Subsequent Transfers was received by Zeus and Safra Gibraltar when they had actual knowledge of fraud at BLMIS, or were willfully blind to facts suggesting a high probability of fraud at BLMIS.

213.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Zeus and Safra Gibraltar: (a) recovering the Safra-Zeus Subsequent Transfers, or the value thereof, from Zeus and Safra Gibraltar for the benefit of the estate of BLMIS; (b) directing Zeus and Safra Gibraltar, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Zeus and Safra Gibraltar related to or arising from, or concerning the Safra-Zeus Subsequent Transfers; (c) recovering attorneys' fees and costs from Zeus and Safra Gibraltar; and (d) awarding any other relief, including attorneys' fees and costs, as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

i.    On the First Claim for Relief, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3), judgment against Zeus and Safra Gibraltar: (a) recovering the Safra-Zeus Subsequent Transfers, or the value thereof, from Zeus and Safra

Gibraltar for the benefit of the estate; (b) directing Zeus and Safra Gibraltar, to the extent

allowable by law, to disgorge to the Trustee all profits, including any and all retrocession fees,

incentive fees or other compensation and/or remuneration received by Zeus and Safra Gibraltar

related to or arising from, or concerning the Safra-Zeus Subsequent Transfers; (c) awarding the

Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding;

(d) awarding the Trustee prejudgment interest from the date on which the Safra-Zeus Subsequent

Transfers were received by Zeus and Safra Gibraltar; and (e) granting the Trustee such other,

further, and different relief as the Court deems just, and appropriate;

  ii.  On the First Claim for Relief, to the extent allowable by law, directing the

Defendants to disgorge to the Trustee all profits, including any and all management fees,

incentive fees or other compensation and/or remuneration received by them related to, arising out

of, or concerning the Initial Transfers, or any subsequent transfers therefrom, and the Vizcaya

Account;

  iii.  On the First Claim Relief, imputing to Defendants the knowledge of their agents;

  iv.  On the First Claim for Relief, impressing the Defendants' property, or the

proceeds, product and offspring of such property, with an equitable lien and/or a constructive

trust in favor of the Trustee for the benefit of the estate, to the extent that the Safra-Zeus

Subsequent Transfers were used, in whole or in part, to purchase, improve and/or maintain such

property;

  v.  On the First Claim for Relief, pursuant to federal common law and/or N.Y. CPLR

5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which

the Safra-Zeus Subsequent Transfers were received;

vi.    On the First Claim for Relief, awarding the Trustee's attorneys' fees, all

applicable interest, costs and disbursements incurred in this proceeding; and

vii.    Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

Dated: June 26, 2015                **BAKER & HOSTETLER LLP**
        New York, New York

By: /s/ David J. Sheehan
45 Rockefeller Plaza
New York, New York  10111
Telephone:  212.589.4200
Facsimile:  212.589.4201
David J. Sheehan
Email: dsheehan@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

44