**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Marc Skapof

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br><br><br><br><br>    Plaintiff,<br>  v.<br><br>NOMURA INTERNATIONAL PLC,<br><br>    Defendant. | **TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO NOMURA'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**<br><br>Adv. Pro. No. 11-02759 (SMB) |

The Trustee[1] respectfully submits this supplemental memorandum of law in opposition to Nomura's motion to dismiss and in further support of the Trustee's motion for leave to amend complaints to add the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to Nomura.

## BACKGROUND

Nomura is a Shareholder Defendant that received at least $24 million from BLMIS in the form of subsequent transfers from Harley.[2] A sophisticated global financial institution and SEC-registered institutional investment manager, Nomura consciously invested with BLMIS through Harley.[3] Nomura also gained extensive information on BLMIS and its U.S.-based investment strategy through due diligence performed by Nomura and its New York-headquartered sister entity, Nomura Funds America, on the Fairfield Funds, in which Nomura was also invested.[4]

Harley was a single-purpose investment vehicle that invested substantially all of its assets with BLMIS,[5] a fact known to Nomura, and Nomura wanted to benefit from Harley's access to BLMIS and its U.S.-based investment strategy. Nomura also knew that the Harley Subsequent Transfers derived from BLMIS.[6] FAM, an institutional fund of funds manager based in New York City, operated and controlled Harley.[7] Harley withdrew funds from its BLMIS accounts in New York and transferred those funds to Nomura's Bank of America bank account in New York (the "New York Account").[8]

---

[1] Capitalized terms other than those defined herein shall have the meanings assigned to them in the Trustee's Memorandum of Law in Opposition to the Transferee Defendants' Motion to Dismiss on Extraterritoriality and in Further Support of Trustee's Motion for Leave to Amend Complaints ("Trustee's Br.") or the Proffered Allegations Pertaining to the Extraterritoriality Issue as to Nomura ("Proffered Allegations"), as applicable, both of which are fully incorporated by reference herein.
[2] *See* Proffered Allegations at ¶ 2.
[3] *See* Proffered Allegations at ¶¶ 2, 7. Nomura also invested with BLMIS through the Fairfield Funds.
[4] *See* Proffered Allegations at ¶¶ 8, 29-34.
[5] *See* Trustee's Br. at § V(B)(2); Proffered Allegations at ¶¶ 11, 38.
[6] *See* Trustee's Br. at § V(B)(2); Proffered Allegations at ¶¶ 30-35.
[7] *See* Trustee's Br. at § V(B)(2), n. 97; Proffered Allegations at ¶¶ 12, 53-64.
[8] *See* Proffered Allegations at ¶¶ 26-28, 65-66.

1

The Harley Subsequent Transfers and the component events of Nomura's transactions with Harley were predominantly domestic.  Nomura: (i) deliberately delegated control over its Harley investments to BLMIS, an SEC-registered broker dealer and qualified custodian, to invest in the U.S. securities markets; (ii) agreed to binding arbitration in New York pursuant to the rules of the American Arbitration Association in connection with its investments; (iii) instructed and received redemptions from Harley into its New York Account; and (v) knew Harley was a vehicle to access BLMIS and its investment strategy in New York.

## ARGUMENT

The District Court directed that the "transfer and component events of the transactions" test set forth in *"Maxwell I"* determines whether a subsequent transfer claim involves the domestic or extraterritorial application of the Code and SIPA.[9]  In stark contrast to the facts of *Maxwell*, the transfers and component events of Nomura's transactions with Harley show that it was not the passive recipient of transfers that flowed from a tangential or remote U.S. debtor.  The tens of millions of dollars Nomura invested in Harley were always intended to be invested with BLMIS to reap the benefits of its exclusively U.S. focused trading strategy.[10]  Nomura's movements of money to and from BLMIS were not "fortuitous or incidental," but rather "the 'ultimate objective' and the '*raison d'etre*'" of its transactions with Harley.[11]   As such, the Trustee's claims are a domestic application of SIPA and Code § 550.

---

[9] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell Commc'n. Corp. v. Société General (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 816 (S.D.N.Y. 1995)).  In *Maxwell I*, the court identified all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction underlying the debt that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded.  *Maxwell I*, 186 B.R. at 816-17.

[10] *See* Proffered Allegations at ¶¶ 13-19.  Nomura's investments in Harley were part of its overall strategy to gain access to Madoff, through the numerous BLMIS feeder funds in which it invested. *See* Proffered Allegations at ¶¶ 35-37.

[11] *SIPC v. BLI*, 480 B.R. 501, 513 (S.D.N.Y. 2012).

Nomura asserts that the Harley Subsequent Transfers were "purely foreign" because "every single transfer . . . was made by an entity *organized under the laws of a foreign jurisdiction* or an individual who was a *citizen* of a foreign country."[12] Nomura's motion should be denied because Nomura's argument disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit case law that evaluates a broad range of factors[13] to determine whether a claim is "sufficiently domestic" to rebut the presumption against extraterritoriality.[14] Further, it ignores the fact that Harley maintained its principal place of business here in New York.[15]

### Nomura's Transfers and the Component Events of the Harley Subsequent Transfers Were Centered in the United States.

Nomura's transactions with Harley were governed by the Harley Articles of Association, the Harley PPM and the Harley subscription agreements Nomura was required to execute as a Class C shareholder in Harley.[16] Nomura knew from these agreements, in addition to Harley's Audited Financial Statements, that its Harley investments, like its investments in the Fairfield Funds, would be managed and held by BLMIS in New York to execute its purported trading strategy derived from the U.S. securities markets.[17]

The Harley Articles of Association, which were incorporated into the Harley PPM governing Nomura's investments in Harley, provided that disputes were subject to binding arbitration in New York, New York pursuant to the rules of the American Arbitration

---

[12] Consolidated Supplemental Memorandum of Law in Support of the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality, at p. 15 (emphasis added).
[13] *See, e.g. ParkCentral Global Hub Ltd.*, 763 F.3d at 216.
[14] *See Mastafa v. Chevron Corp.*, 770 F.3d 129, 141 (2d Cir. 2014); *European Cmty. V. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014) (finding complaint alleged "sufficient domestic conduct" after review of facts relevant to extraterritoriality) and other cases cited in the Trustee's Main Brief.
[15] *See* Proffered Allegations at ¶ 12.
[16] *See* Proffered Allegations at ¶¶ 14-16, 23, 51-52, 65.
[17] *See* Proffered Allegations at ¶¶ 14-17, 20-21.

3

Association,[18] further demonstrating the domestic nature of the transactions at issue.[19] Nomura purchased Class C shares in Harley by sending funds to a New York bank account in the name of Harley's administrator and it received the subsequent transfers from Harley at issue here in its New York Account.[20]

### Harley Maintained Its Principal Place of Business in New York.

Nomura received transfers from Harley, which maintained its principal place of business in New York and is a New York resident.

In connection with its investments with BLMIS, Harley acted principally through FAM. FAM is a New York-based institutional fund of funds manager created by New York residents and incorporated under New York law. Although Harley was organized as an international business company under Cayman law, from its inception until its liquidation in 2010, Harley had no employees and no offices.

FAM personnel at its New York City headquarters (i) controlled the sales and subscriptions of the fund's shares; (ii) maintained final control of Harley's bank account; (iii) monitored Harley's investments; (iv) managed the relationships with BLMIS; (v) directed investments into and out of BLMIS as well as into and out of Harley; (vi) marketed Harley; (vii) approved all subscriptions for Harley's shares; (viii) maintained the relationships with Harley's backoffice service providers; (ix) maintained all of Harley's books and records at FAM's New

---

[18] *See* Proffered Allegations at ¶¶ 23, 40, 51-52. Nomura also voluntarily agreed to be bound by New York law and voluntarily subjected itself to the jurisdiction and venue of the New York courts for any disputes arising with respect to its investments in the Fairfield Funds.

[19] *See Maxwell I*, 186 B.R. at 817 (considering the parties' anticipation as to what law would govern their transaction as a factor in an extraterritoriality inquiry); *BLI*, 480 B.R. at 517, n. 15 (finding that Fairfield Sentry subscription agreement's New York choice of law and forum selection clauses was evidence of "strong nexus with New York") (S.D.N.Y. 2012).

[20] *See* Trustee's Br. at §§ B(4), IV; Proffered Allegations at ¶¶ 26-27, 65-66. Nomura also used its New York Account to receive the Fairfield Subsequent Transfers. *See* Proffered Allegations, at ¶ 28.

4

York City headquarters; and (x) made all strategic and operational decisions regarding Harley. Accordingly, Harley's principal place of business was FAM's New York City headquarters.

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, Nomura's motion to dismiss should be denied and this Court should grant the Trustee leave to amend his complaint against Nomura.

Dated: June 26, 2015  
       New York, New York

*/s/ Marc Skapof*  
**Baker & Hostetler LLP**  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Email: dsheehan@bakerlaw.com  
Regina L. Griffin  
Email: rgriffin@bakerlaw.com  
Marc Skapof  
Email: mskapof@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*