**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Marc Skapof

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br><br><br><br>    Plaintiff,<br>v.<br><br>NOMURA INTERNATIONAL PLC,<br><br>    Defendant. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIAL ISSUE AS TO NOMURA INTERNATIONAL PLC**<br><br>Adv. Pro. No. 11-02759 (SMB) |

## I. NATURE OF THE ACTION

1. By his Complaint, the Trustee seeks to recover subsequent transfers of BLMIS customer property made to Defendant Nomura International plc ("Nomura") under SIPA and Section 550 of the Bankruptcy Code.

2. Nomura is a sophisticated financial institution that purposefully invested in Harley International (Cayman) Ltd. ("Harley"), a feeder fund which was wholly invested with New York-based BLMIS. Nomura received at least $24,449,880 in subsequent transfers from Harley (the "Harley Subsequent Transfers") within two years of the Filing Date (as defined in SIPA).

3. Nomura also invested millions of dollars in Fairfield Sentry Limited ("Fairfield Sentry") and Sigma Limited ("Sigma" and together with Fairfield Sentry, the "Fairfield Funds").[1] Fairfield Sentry invested substantially all of its assets with BLMIS and Sigma invested 100% of its assets in Fairfield Sentry.

4. BLMIS, located in New York, was at the core of Nomura's transactions with Harley.

5. As alleged below, the Harley Subsequent Transfers were predominantly domestic because, among other reasons, Nomura: (i) made a conscious decision to delegate control over its Harley investments to BLMIS, an SEC-registered broker dealer and qualified custodian, to invest in U.S. equities, options, and Treasurys; (ii) agreed to binding arbitration in New York, New York pursuant to the rules established by the American Arbitration Association for all potential disputes regarding its Harley investment; (iii) instructed Harley to deposit transfers, including the

---

[1] Nomura also received at least $20,013,186 in subsequent transfers from Fairfield Sentry and at least $14,051,601 in subsequent transfers from Sigma. The Trustee is seeking recovery of those transfers in a separate action styled as *Picard v. Nomura International Plc*, Adv., Pro. No., 10-05348 (SMB). Proffered Allegations on the Extraterritoriality Issue have also been filed in that action.

Harley Subsequent Transfers at issue here, into Nomura's own New York bank account at Bank of America (the "New York Account"); and (iv) understood that Harley, like the other BLMIS feeder funds in which it was also invested, were simply vehicles to access BLMIS and its investment strategy in New York.

6. Specific facts regarding the parties and the transfers that are particularly relevant to the extraterritoriality issue are set forth below.

## II. RELEVANT PARTIES TO THE SUBSEQUENT TRANSFERS AND RELATED TRANSACTIONS

7. Nomura is a commercial bank incorporated under the laws of the United Kingdom. Nomura has been registered with the SEC as an institutional investment manager and has filed required quarterly Form 13Fs since at least 1998.

8. Non-defendant Nomura Funds Research & Technologies America, Inc. ("Nomura Funds America") was at all times relevant a Delaware-incorporated and New York-registered affiliate of Nomura that maintains its principal place of business at 309 West 49th Street, New York, New York. Nomura Funds America conducted due diligence and related inquiries on the Fairfield Funds and BLMIS in New York, including those funds' substantial relationship with BLMIS. The results of these inquiries were shared with Nomura.

9. Non-defendant Nomura Securities International, Inc. ("Nomura New York") is a New York-incorporated registered SIPC broker-dealer and affiliate of Nomura with its principal place of business located at 309 West 49th Street, New York, New York. Nomura New York had a direct lending relationship with BLMIS to lend it U.S. securities in exchange for BLMIS posting collateral as security. Nomura New York's lending relationship with BLMIS predates Nomura's receipt of the Harley Subsequent Transfers.

2

10. At all relevant times, Nomura, Nomura Funds America and Nomura New York were part of the Nomura Group, which, according to Nomura Holdings Inc. ("Nomura Holdings") is "a financial services group comprising Nomura Holdings and its subsidiaries." Nomura Holdings is a global financial institution that has maintained a continuous presence in the United States since at least 1969 and is the ultimate parent of the Nomura Group. During the time Nomura was invested in Harley, Nomura Funds America and Nomura New York were two of at least nine U.S.-based Nomura Group entities whose principal executive offices were located in New York City. According to Nomura Holding's 2007 Corporate Responsibility Report, the Nomura Group operated as one global firm, a principle with which employees were instructed to "approach [their] work."

11. Non-defendant Harley was at all times relevant a Cayman-registered BLMIS Feeder Fund that invested 100% of its assets with BLMIS in New York. Harley received over $1 billion in avoidable transfers of customer property from BLMIS within two years of December 11, 2008. The Trustee commenced an adversary proceeding against Harley to avoid and recover these transfers. In 2010, this Court entered summary judgment against Harley in the amount of $1,066,800,000.

12. Harley had no employees or offices of its own. It acted primarily through Fix Asset Management Services Inc. ("FAM"). FAM was incorporated under New York law and maintained its principal place of business at 660 Madison Avenue, New York, New York.

III. **THE SUBSEQUENT TRANSFERS OF BLMIS CUSTOMER PROPERTY AND THE COMPONENT EVENTS OF NOMURA'S TRANSACTIONS WITH HARLEY WERE PREDOMINANTLY DOMESTIC IN NATURE**

A. **The Very Purpose Underlying Nomura's Transactions with Harley was to Earn Profits from a U.S. Investment Advisor/Broker Dealer's Transactions in U.S. Securities.**

13. Nomura invested with Harley because it knew and intended that its investments would be transferred to BLMIS in New York to be invested with BLMIS in the U.S. securities markets, and subsequently redeemed in the form of returns earned from BLMIS's purported trading in U.S. securities, options and Treasurys.

   1. **From the Transaction Documents Governing Nomura's Investments in Harley, Nomura Understood That Any Returns on its Investments Would be Earned in New York by BLMIS's Engaging in Transactions in U.S. Securities, Options and Treasurys.**

14. Nomura was a Class C shareholder in Harley. Shareholder investors in Harley, like Nomura, were required to execute subscription agreements with Harley as a precondition to making any investments in it. By executing the subscription agreements, investors affirmed having read, understood and accepted the terms set forth in the Harley Confidential Explanatory Memorandum ("Harley PPM"). As set forth in the Harley PPM, shareholders like Nomura also received copies of the fund's annual audited financial statements.

15. As set forth in the Harley PPM and Harley's audited financial statements for years 2003, 2004, 2005, 2006, and 2007 (collectively, the "Audited Financial Statements"), Nomura understood that any returns on its investments in Harley were to be earned in New York by BLMIS engaging in the purchase and sale of U.S. securities, options and Treasurys.

16. Specifically, the Harley PPM disclosed that:

   - "Fund assets will typically be invested either directly or indirectly in a large number (20-50) of U.S. equity securities and equity index related options;" and

4

- "[the] manager also employs an index option overlay as a hedge against adverse market movements" that may be "executed in the [U.S.] over-the-counter-market."

17. The 2007 Harley Audited Financial Statements further disclosed that Harley's investments with BLMIS included U.S. Treasury Bills as well as U.S. traded equity securities. The 2007 Harley Audited Financials disclosed that on December 31, 2007, all of Harley's over $3 billion of assets invested with BLMIS were purportedly invested in U.S. Treasury Bills.

18. The information contained in the Audited Financial Statements was consistent with what Nomura knew about the other BLMIS feeder funds from its investments with the Fairfield Funds. The Fairfield PPMs disclosed a detailed description of Madoff's investment strategy executed on behalf of the Fairfield Funds. The August 14, 2006, Fairfield Sentry PPM, which was the operative document when Nomura began investing in Fairfield Sentry, disclosed that:

> The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. . . The basket typically consists of between 35 to 50 stocks in the S&P 100 Index.

19. From, among other things, the almost identical description of Harley's and the Fairfield Funds' investment strategies, Nomura knew that regardless of which BLMIS feeder fund it invested in, any return on those investments would come from the purported purchase and sale of U.S. securities, options and Treasurys by BLMIS in New York.

5

### 2. The Transaction Documents Governing Nomura's Investments with Harley Had Express Provisions Disclosing that BLMIS in New York Would be the Custodian for those Investments.

20. The Audited Financial Statements disclosed that BLMIS in New York acted as the "Custodian" for substantially all of Harley's assets. Specifically, those statements disclosed that:

- "The company holds cash with . . . Bernard L. Madoff Investment Securities LLC;" and

- "Bernard L. Madoff Investment Securities LLC holds assets worth $3,329,129,954."

21. Similarly, from its review of and consent to the documents governing its investments in the Fairfield Funds, Nomura understood that, as with Harley, BLMIS in New York acted as the custodian for substantially all of the Fairfield Funds' assets.

### B. The Documents Governing Nomura's Transactions with Harley Contained New York Arbitration Requirements.

22. The documents governing Harley's transactions with shareholders like Nomura provided that the transactions were subject to binding arbitration in New York.

23. As set forth in the Harley PPM, Harley shareholders, like Nomura, agreed that their investments in Harley would be governed by the fund's articles of association ("Harley Articles of Association"). The Harley Articles of Association, in turn, provided that all disputes among Harley and its shareholders were subject to binding arbitration in New York pursuant to the rules established by the American Arbitration Association. As a Class C shareholder in Harley, Nomura agreed that any disputes with Harley would be adjudicated in New York, New York under the rules established by the American Arbitration Association.

24. Additionally, in connection with its due diligence on, and on-going management of, its investments in the Fairfield Funds, Nomura and Nomura Funds America reached

6

agreement with FGG on the terms of non-disclosure agreements so as to receive non-public information about Fairfield Sentry and Sigma. These non-disclosure agreements both contained New York choice of law and jurisdiction provisions.

25. Nomura also entered into a similar confidentiality agreement in connection with its due diligence on another BLMIS Feeder Fund operated and controlled by New York-headquartered Tremont Group Holdings, Inc. ("Tremont"). Specifically, on May 29, 2007, Nomura entered an agreement with Tremont wherein Nomura agreed not only to be bound by the laws and jurisdiction of New York but "agree[d] not to commence any action, suit or proceeding relating thereto except in such [New York] court."

    **C.**    **Nomura Used New York Bank Accounts to Accomplish its Transactions and Transfers with Harley.**

26. Nomura used New York bank accounts to accomplish its transactions and transfers with Harley. Specifically, Harley instructed shareholders like Nomura to make subscription payments to a New York bank account at the Northern Trust Banking Corporation in the name of Fortis Prime Fund Solutions (IOM), the administrator, banker and nominal custodian to Harley. Before 2005, Harley's prior administrator, Fortis Prime Fund Solutions (Cayman), directed investors to send their subscription payments to a New York bank account at JP Morgan Chase. As a Class C shareholder in Harley, Nomura would have complied with these instructions and sent its Harley subscriptions payments to one or both of the New York bank accounts.

27. The bank records of Harley's administrators indicate that Nomura received the Harley Subsequent Transfers at issue here in Nomura's New York Account. These records also show that these funds were sent from a New York bank account held in the name of Harley's administrator.

7

28.   In addition, Nomura also used its same New York Account to deposit funds into, and receive distributions from, other BLMIS feeder funds with which it was invested, including Fairfield Sentry.

**D.   Nomura's and Nomura Funds America's Due Diligence Efforts on the Fairfield Funds Focused on BLMIS in New York.**

29.   Nomura's and Nomura Funds America's respective due diligence inquiries were focused on the Fairfield Funds and BLMIS in New York.

30.   On August 3, 2007, Nomura's Khizer Ahmed asked FGG a series of questions about the risks related to BLMIS's custody and control of the Fairfield Funds' assets, whether the Fairfield Funds had implemented any control measures to address these risks and what recourse the Fairfield Funds would have if "Madoff" were to go into liquidation. These questions included:

- "Can Madoff run away with cash in the Sentry account?"

- "Are there any controls in place that make sure that any of Madoff employees don't defraud Sentry of its cash balance?"

- "What is the process for requesting monies when there is a cash requirement to pay investors at Fairfield Sentry? Does Sentry just request Madoff to liquidate part of the trade (when Madoff is invested) or does it rely on another liquidity mechanism like a credit line?"

- "Can Madoff refuse to pay cash to Sentry when Sentry requests it? If yes, under what circumstances?"

- "Upon the purchase of securities, which particular legal instrument is used in order to establish ownership of stocks and options in a particular account – i.e. if Madoff were to go into liquidation while it was in the market and a liquidator had to establish the position of each managed account, what set of records/other items would it use to establish exactly who owned what?"

- "How does it [Fairfield Sentry] know that the trade tickets that it has been provided [by BLMIS] in respect of stocks are a complete and accurate representation of all activity on its account?"

8

31. Nomura Funds America identified similar concerns and repeatedly sought information from FGG regarding Fairfield Sentry's contractual relationships with BLMIS. In the course of multiple due diligence meetings at FGG's New York City Office, Nomura Funds America also inquired about BLMIS's multiple roles as investment advisor, prime broker and custodian with respect to the Fairfield Funds.

32. FGG shared the due diligence information it prepared for Nomura Funds America with Nomura.

33. Internal FGG emails indicate that Nomura Funds America also shared due diligence reports it prepared regarding the Fairfield Funds with Nomura. Consistent with the Nomura Group's mission to think of themselves "as a single business unit" and "approach their work with the sense that they are part of one organization," these FGG emails indicate that Nomura Funds America provided Nomura with the due diligence reports it prepared from its visits to FGG's New York City headquarters.

34. Because Nomura understood that BLMIS in New York served as Harley's custodian as well as the custodian for the Fairfield Funds, the questions Nomura and Nomura Funds America asked FGG about the risks related to BLMIS's custody and control of the Fairfield Funds' assets were equally applicable to Nomura's investments in Harley.

E. **Nomura Understood the BLMIS Feeder Funds were Identical Access Points to BLMIS in New York.**

35. Because, as discussed above, Nomura, Nomura Funds America and Nomura New York knew that the BLMIS feeder funds were operated as identical investments with BLMIS, Nomura calculated its exposure to Madoff's split strike conversion strategy based on its aggregate investments in all of the BLMIS feeder funds. Nomura and the other members of the

9

Nomura Group with which it was affiliated informed the managers of certain BLMIS feeder funds that Nomura had reached its global limit on investments with Madoff.

36. Beginning in summer/fall 2007, Nomura and Nomura New York began to inform the BLMIS feeder funds that Nomura had reached its risk limit on Madoff's split strike conversion strategy. Moreover, Nomura indicated that the limit was not based on its investments in any particular Feeder Fund, but rather Nomura's overall exposure to Madoff and his split strike conversion strategy. On August 7, 2007, Nomura noted to FGG employees in New York that: "we [Nomura] need to escalate our investment proposition to the highest level of approval here in London, primarily on grounds of overall exposure we have to Madoff." Nomura further explained that the cap on exposure was "nothing Fairfield/Sentry specific."

37. Similarly, on September 4, 2007, Nomura New York declined an offer to receive information from Pioneer Asset Management about another Feeder Fund, stating that "Nomura has decided to cap the exposure to his [Madoff's] strategy at current levels. We already have exposure to a number of *his* funds." (Emphasis supplied).

### IV. NOMURA RECEIVED THE TRANSFERS FROM HARLEY, WHICH MAINTAINED ITS PRINCIPAL BUSINESS IN NEW YORK

#### A. Harley Maintained its Principal Place of Business in New York.

38. Harley invested 100% of its assets with BLMIS in New York and received approximately $1 billion in transfers of customer property from BLMIS within two years of December 11, 2008. Of this amount, Nomura received approximately $25 million.

##### 1. Harley Sought Out the United States as a Place to Invest and the Transfers it Received Arose Out of its Investment Account with BLMIS in New York.

39. In April 1996, Harley's predecessor, Harley International Limited, entered into a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases

and Sales of Securities with BLMIS in New York. Thereafter, Harley maintained an investment account with BLMIS, designated No. 1FN094.

40. Harley agreed that all disputes arising under the Customer Agreement would be resolved by arbitration before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers Inc. … and in accordance with the rules … of the selected organization."

41. The Customer Agreement between BLMIS and Harley provided that all transactions are subject to the provisions of the U.S. Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System. The Customer Agreement also provided BLMIS with full discretion over Harley's assets, and pursuant to the Trading Authorization agreement, Harley authorized Madoff to be its "agent and attorney in fact" to buy, sell, and trade in U.S. securities.

42. The Trustee filed a complaint against Harley in the Bankruptcy Court, under the caption *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), and on November 10, 2010, the Bankruptcy Court entered summary judgment against Harley in the amount of $1,066,800,000.

43. In support of summary judgment, the Bankruptcy Court held that "Harley specifically sought out the United States as a place to do business when it opened an account with BLMIS," and that the transfers received by Harley "arose out of business transactions tied to Harley's securities account with BLMIS in New York."

    **2.    BLMIS in New York Acted as Harley's Investment Manager, Custodian, and Executing Broker.**

44. Euro-Dutch Trust Company (Bahamas) Limited ("Euro-Dutch Bahamas") acted as Harley's purported investment manager until 2003, and after 2003, Euro-Dutch Management

11

Limited ("Euro-Dutch Cayman") in the Cayman Islands acted as Harley's purported investment manager.

45. Neither Euro-Dutch Bahamas nor Euro-Dutch Cayman played a meaningful role in managing Harley's investments with BLMIS. Instead, they delegated their investment management responsibilities to BLMIS in New York.

46. As Harley's investment manager, BLMIS in New York purported to invest Harley's assets according to Madoff's SSC Strategy, and BLMIS decided which, how many, and when to purchase and sell U.S. securities on Harley's behalf. BLMIS also acted as executing broker in purporting to purchase the U.S. securities on Harley's behalf.

47. BLMIS acted as custodian for the U.S. securities purportedly held on Harley's behalf. Each of Harley's audited financial statements for years 2003, 2004, 2005, 2006, and 2007 disclosed that BLMIS acted as Harley's "Custodian." Harley's audited financial statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

48. Harley's audited financial statements for years 2005 and 2006 also noted that "items included in the financial statements are measured using the currency of the primary economic activity in which it operates …. This is the U.S. dollar, which reflects the company's primary activity of investing in U.S. dollar denominated securities and derivatives."

### 3. Harley Conducted No Meaningful Business in the Cayman Islands.

49. Harley was registered as an exempt company under the Cayman Islands Companies Law and was not permitted to solicit investors in the Cayman Islands.

50. In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands."

12

51. In its Articles of Association, Harley required that all disputes among Harley and its shareholders would be referred to binding arbitration in New York under rules established by the American Arbitration Association.

52. Each shareholder in Harley, including Nomura, received copies of Harley's audited financial statements, Memorandum of Association, and Articles of Association.

### 4. Fix Asset Management Ltd. Managed Harley from New York.

53. Fix Asset Management Ltd. is the family wealth office of Charles Fix, which over the years evolved into an institutional fund of funds manager.

54. Fix Asset Management, Ltd. operated through wholly owned subsidiaries, including FAM.

55. FAM was incorporated under New York law and maintained its principal place of business at 660 Madison Avenue, New York, New York.

56. Harley had no employees or offices of its own. For its investments with BLMIS, Harley acted principally through FAM.

57. FAM was owned and controlled by Charles Fix, who also owned and controlled all of the voting shares for Harley. During the relevant time period, Charles Fix resided in New York.

58. Fix's daughter, Tatiana Fix Katsigera (f/k/a Tatiana Fix), was the chief executive officer of FAM, served on its investment advisory committee, and conducted due diligence for its funds, including Harley. Tatiana Fix Katsigera also lived in New York.

59. Several other members of FAM's advisory teams, including John Fix, Abel Pacheco, and Panos Katsambas, also resided in New York during much of the relevant time period. FAM's outside counsel was also located in New York.

13

60. FAM marketed Harley from its office in New York, and FAM employees met with investors and potential investors in Harley at FAM's office in New York.

61. FAM monitored and conducted due diligence on Harley's investments with BLMIS from its office in New York.

62. FAM received Harley's BLMIS account statements at its office in New York. For several years BLMIS also sent Harley's BLMIS trade confirmations and account statements to FAM's agent and service provider at Bank Julius Baer & Co. Ltd. in New York.

63. In monitoring its investments, FAM relied on external consultants in the United States, including Merfin LLC from California, X.E. Capital from New York, and Event Capital Markets from New Jersey.

64. FAM handled subscriptions into and redemptions from Harley from its office in New York. For example, FAM employees corresponded with Madoff and Frank DiPascali to request that BLMIS accept subscriptions into Harley's account with BLMIS. FAM employees, including Charles Fix, also corresponded with Madoff and DiPascali to request redemptions from Harley's account.

**5.  Harley Received Transfers at Bank Accounts Held in New York.**

65. Harley's subscription agreements directed investors to wire U.S. Dollars to bank accounts in New York. Prior to 2005, the subscription agreements required subscriptions to be wired to a JPMorgan Chase Bank N.A. account in New York, held in the name of Fortis Bank (Cayman) Limited, and after 2005, the subscription agreements required subscriptions to be wired to an account in the name of Fortis Prime Fund Solutions (IOM) Limited ("Fortis Prime Fund Solutions IOM") at the Northern Trust Banking Corporation ("Northern Trust"), 40 Broad Street, New York, New York.

14

66. When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York. Harley previously had directed that BLMIS pay redemptions to an account held at Barclays Bank plc in New York.

### 6. Harley Was Administered By Fortis Entities in New York.

67. Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, and then Fortis Prime Fund Solutions IOM served as Harley's administrators.

68. The Fortis administrators' relationships with Harley and FAM were managed during much of the relevant time period by Rhonda Eldridge, a Managing Director of Fortis Financial Services, LLC ("Fortis Financial Services") who was based in New York.

69. Eldridge worked with employees of Fortis Prime Funds Solutions (USA) LLC ("Fortis Prime Fund Solutions USA") in New York. (Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, Fortis Prime Fund Solutions IOM, Fortis Financial Services, and Fortis Prime Funds Solutions USA are collectively known as "Fortis").

70. Fortis Financial Services was located on Madison Avenue in New York, and from its office Fortis employees performed much of the work necessary in administering Harley.

71. Fortis employees conducted due diligence on BLMIS from Fortis Financial Services's office in New York. Fortis's due diligence included inquiries into BLMIS's role as Harley's custodian as well as a "thorough examination of Harley's account" with BLMIS.

72. Eldridge and other Fortis employees met with Madoff and DiPascali at BLMIS's office in New York. Eldridge and other Fortis employees also regularly spoke with Madoff, DiPascali, and/or Jo Ann Crupi regarding Harley's investments with BLMIS. In addition, Fortis employees met with Charles Fix and investors in Harley at FAM's office in New York.

15

73. Fortis employees received Harley's BLMIS trade confirmations and account statements at Fortis Financial Services's office in New York, and reviewed the trade confirmations and account statements to calculate Harley's NAV.

74. The Trustee incorporates by reference the allegations of the Complaint filed in Picard v. Harley International (Cayman) Limited, Adv. Pro. No. 09-01187 (SMB), Dkt. No. 1 (Bankr. S.D.N.Y. May 12, 2009).


Dated: June 26, 2015
      New York, New York

/s/ Marc Skapof
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Regina L. Griffin
Email: rgriffin@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*