**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Marc Skapof

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>NOMURA INTERNATIONAL PLC,<br><br>    Defendant. | **TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO NOMURA'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**<br><br>Adv. Pro. No. 10-05348 (SMB) |

The Trustee[1] respectfully submits this supplemental memorandum of law in opposition to Nomura's motion to dismiss and in further support of the Trustee's motion for leave to amend complaints to add the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to Nomura.

## BACKGROUND

Nomura is a Shareholder Defendant that received at least $34,064,788 in subsequent transfers from Fairfield Sentry and Sigma that originated from BLMIS.[2] A sophisticated global financial institution and SEC-registered institutional investment manager, Nomura consciously invested with BLMIS through the Fairfield Funds.[3] Nomura and its New York-headquartered sister entity, Nomura Funds America, performed significant due diligence on the Fairfield Funds and BLMIS.[4]

The Fairfield Funds were single-purpose investment vehicles that invested substantially all of their assets with BLMIS.[5] Nomura knew that the Fairfield Subsequent Transfers derived from BLMIS.[6] FGG, a *de facto* partnership based in New York, created, operated and controlled the Fairfield Funds.[7] Nomura wanted to benefit from the Fairfield Funds' access to BLMIS and its U.S.-based investment strategy. And, to redeem Nomura's investments, Fairfield Sentry withdrew funds from its BLMIS account in New York and transferred those funds to Nomura's own New York bank account at Bank of America (the "New York Account").[8]

---

[1] Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Trustee's Memorandum of Law in Opposition to the Transferee Defendants' Motion to Dismiss on Extraterritoriality and in Further Support of Trustee's Motion for Leave to Amend Complaints ("Trustee's Br.") or the Proffered Allegations Pertaining to the Extraterritoriality Issue as to Nomura ("Proffered Allegations"), as applicable, both of which are fully incorporated by reference herein.
[2] *See* Proffered Allegations at ¶¶ 1, 3.
[3] *See id.* at ¶¶ 2, 5. Nomura also invested with BLMIS through at least one other BLMIS Feeder Fund.
[4] *See* Proffered Allegations at ¶¶ 6, 34-38.
[5] *See* Trustee's Br. at § V(A); Proffered Allegations at ¶¶ 10, 11.
[6] *See* Trustee's Br. at § V(A); Proffered Allegations at ¶¶ 12-20.
[7] *See* Trustee's Br. at § V(A)(1); Proffered Allegations at ¶¶ 9, 45-47, 55-56, 71-72.
[8] *See* Trustee's Br. at § V(A); Proffered Allegations at ¶¶ 27-29.

**ARGUMENT**

The District Court directed that the "transfer and component events of the transactions" test set forth in "*Maxwell I*" determines whether a subsequent transfer claim involves the domestic or extraterritorial application of the Code and SIPA.[9] In stark contrast to the facts of *Maxwell I*, the transfers and component events of Nomura's transactions with the Fairfield Funds show that it was not the passive recipient of transfers that flowed from a tangential or remote U.S. debtor. Nomura always intended that the tens of millions of dollars it invested in the Fairfield Funds would ultimately be invested with BLMIS to reap the benefits of BLMIS's exclusively U.S.- focused trading strategy.[10] Nomura's movements of money to and from BLMIS were not "fortuitous or incidental," but rather "the 'ultimate objective' and the '*raison d'etre*'" of its transactions with the Fairfield Funds.[11] As such, the Trustee's claims involve a domestic application of SIPA and § 550 of the Bankruptcy Code.

The Fairfield Subsequent Transfers and the component events of Nomura's transactions with the Fairfield Funds were predominantly domestic. Among other things, Nomura: (i) made a conscious decision to delegate control over its investments in the Fairfield Funds to BLMIS, to invest in U.S. equities, options, and Treasurys; (ii) bound itself to New York law and subjected itself to the jurisdiction of the New York courts in connection with its investments; (iii) instructed Fairfield Sentry to deposit the Fairfield Sentry Subsequent Transfers into Nomura's New York Account; (iv) maintained a presence in the United States through its domestic

---

[9] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell Commc'n. Corp. v. Société General (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 816 (S.D.N.Y. 1995)). In *Maxwell I*, the court identified all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction underlying the debt that triggered the transfers; (vi) the law governing the parties' transaction; and (vii) how the transaction was concluded. *Maxwell I*, 186 B.R. at 816-17.
[10] *See* Proffered Allegations at ¶¶ 12-20.
[11] *SIPC v. BLI*, 480 B.R. 501, 513 (S.D.N.Y. 2012).

2

affiliates who participated in its transactions with BLMIS feeder funds; and (v) negotiated the terms of its transactions with the Fairfield Funds with FGG's General Counsel in FGG's New York headquarters.

Nomura asserts that the Fairfield Subsequent Transfers were "purely foreign" because "every single transfer . . . was made by an entity *organized under the laws of a foreign jurisdiction* or an individual who was a *citizen* of a foreign country."[12] Nomura's focus on place of incorporation and citizenship is wrong. Nomura's position disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit case law that evaluates a broad range of factors[13] to determine whether a claim is "sufficiently domestic" to rebut the presumption against extraterritoriality.[14] Further, Nomura ignores that the Fairfield Funds are not "foreign" transferors because they maintained their principal place of business in New York.

### The Fairfield Subsequent Transfers and Component Events of Nomura's Transactions with the Fairfield Funds Were Centered in the United States.

The focus of Nomura's transactions with the Fairfield Funds was directed to the U.S. and its investments with the Fairfield Funds were governed by the PPMs and subscription agreements it executed. Nomura knew from these agreements that its investments would be held and managed by BLMIS for its purported U.S.-focused trading strategy.[15]

The subscription agreements bound Nomura to New York law and subjected it to the jurisdiction and venue of the New York courts.[16] Nomura used its New York Account to

---

[12] Consolidated Supplemental Memorandum of Law in Support of the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality, at 15 (emphasis added).
[13] *See, e.g. ParkCentral Global Hub Ltd.*, 763 F.3d at 216.
[14] *See Mastafa v. Chevron Corp.*, 770 F.3d 129, 141 (2d Cir. 2014); *European Cmty. V. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014) (finding complaint alleged "sufficient domestic conduct" after review of facts relevant to *extraterritoriality*) and other cases cited in the Trustee's Main Brief.
[15] *See* Trustee's Br. at § B(3); Proffered Allegations at ¶¶ 13-20.
[16] *See* Trustee's Br. at § B(3); Proffered Allegations at ¶¶ 21-22.

3

purchase shares in Fairfield Sentry and received the Fairfield Sentry Subsequent Transfers in that same account.[17]

Nomura also negotiated the terms of its transactions with the Fairfield Funds with FGG's General Counsel in FGG's New York City headquarters.[18] Specifically, Nomura's in-house counsel negotiated the terms of the agreements, which bound Nomura to New York jurisdiction and choice of law, with FGG's COO and General Counsel in New York.[19] These voluntary and deliberate actions directed towards New York, which Nomura understood to be the nucleus of the Fairfield Funds' operations, establish Nomura's intent and expectation that its transactions with the Fairfield Funds, and by implication BLMIS, would be centered in New York and governed by New York law.[20]

### Nomura Received the Transfers from the Fairfield Funds, Which Maintained Their Principal Place of Business in New York.

Nomura received their transfers from the Fairfield Funds, which maintained their principal place of business in New York.

FGG is a New York-based *de facto* partnership created by U.S. citizens that used Fairfield International Managers, (organized under Delaware law) to organize the Fairfield Funds. The Fairfield Funds were organized under BVI law in name only from their inception through their liquidations in 2009, and at all times relevant had no employees and no offices. FGG personnel at its New York City headquarters, among other things: (i) controlled the sales and subscriptions of the funds' shares; (ii) maintained final control of the Fairfield Funds' bank

---

[17] *See* Trustee's Br. at §§ B(4), IV; Proffered Allegations at ¶¶ 27-29. Although the Trustee does not allege that Nomura received subsequent transfers from Sigma in its New York Account, Nomura nevertheless understood from reading the Sigma PPM that its investments in Sigma were wholly invested in Fairfield Sentry, which in turn transferred substantially all of its assets to BLMIS in New York to be invested in U.S. securities. Nomura also used this New York Account to receive the Harley Subsequent Transfers. *See* Proffered Allegations at ¶¶ 30-31.
[18] *See* Proffered Allegations at ¶¶ 32-33.
[19] *See id.*
[20] *See* Proffered Allegations at ¶¶ 13, 17, 20, 21, 27-28, 32, 34-38.

4

accounts; (iii) monitored the Fairfield Funds' investments; (iv) managed the relationships with BLMIS; (v) directed investments into and out of BLMIS as well as into and out of the Fairfield Funds; (vi) marketed the Fairfield Funds; (vii) approved all subscriptions for the Fairfield Funds' shares; (viii) maintained the relationships with the Fairfield Funds' back office service providers; (ix) maintained all of the Fairfield Funds' books and records at the FGG New York City headquarters; and (x) made strategic and operational decisions regarding the Fairfield Funds. Accordingly, the Fairfield Funds' principal place of business was FGG's New York City headquarters.

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, Nomura's motion to dismiss should be denied and this Court should grant the Trustee leave to amend his Amended Complaint to add the Proffered Allegations.

Dated: June 26, 2015
New York, New York

/s/ *Marc Skapof*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Regina L. Griffin
Email: rgriffin@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the estate of Bernard L.*
*Madoff*

5