**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Marc Skapof

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO NOMURA INTERNATIONAL PLC** |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-05348 (SMB) |
| NOMURA INTERNATIONAL PLC, | |
| Defendant. | |

I.    **NATURE OF THE ACTION**

1.    By his Amended Complaint, the Trustee seeks to recover $34,064,788 in subsequent transfers of BLMIS customer property made to Defendant Nomura International plc ("Nomura") under SIPA and Section 550 of the Bankruptcy Code.

2.    Nomura is a sophisticated financial institution that purposefully invested in Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma" and together with Fairfield Sentry, the "Fairfield Funds"), which were created, operated and controlled by the Fairfield Greenwich Group ("FGG"), which had its principal place of business in New York. Fairfield Sentry invested at least 95% of its assets in accounts managed by New York-based BLMIS. Sigma did not have its own direct BLMIS account, but invested 100% of its assets in Fairfield Sentry, serving solely as a vehicle for converting its shareholders' Euro-denominated investments into U.S. Dollars, which it used to purchase Fairfield Sentry shares.

3.    Nomura received at least $20,013,186 in subsequent transfers from Fairfield Sentry (the "Fairfield Sentry Subsequent Transfers") and at least $14,051,601 in subsequent transfers from Sigma (the "Sigma Subsequent Transfers" and together with the Fairfield Sentry Subsequent Transfers, the "Fairfield Subsequent Transfers").[1]

4.    The Fairfield Subsequent Transfers were predominantly domestic because, among other reasons, Nomura: (i) made a conscious decision to delegate control over its investments in the Fairfield Funds to BLMIS, an SEC-registered broker dealer and qualified custodian, to invest in U.S. equities, options, and Treasurys; (ii) agreed to be bound by New York law and subjected itself to the jurisdiction of the New York courts in connection with its investments; (iii) instructed Fairfield Sentry to deposit redemptions, including the Fairfield Sentry Subsequent

---

[1] The Trustee is seeking recovery of subsequent transfers from Harley International (Cayman), another BLMIS feeder fund, in a separate action styled as *Picard v. Nomura International Plc*, Adv. Pro. No., 11-02759 (SMB).

Transfers at issue here, into Nomura's own New York bank account at Bank of America (the

"New York Account"); (iv) at all times relevant, maintained a presence in the United States

through its domestic affiliates who participated in its transactions with BLMIS feeder funds; (v)

negotiated the terms governing its transactions with the Fairfield Funds with FGG's General

Counsel in FGG's New York headquarters; and (vi) understood that the Fairfield Funds, like

Harley International (Cayman) ("Harley"), another BLMIS feeder fund in which it was also

invested, were simply vehicles to access BLMIS and its investment strategy in New York.

## II.    RELEVANT PARTIES TO THE SUBSEQUENT TRANSFERS AND RELATED TRANSACTIONS

5.    Nomura is a commercial bank incorporated under the laws of, and with a principal

office in, the United Kingdom.  Nomura has been registered with the SEC as an institutional

investment manager and has filed required quarterly Form 13F's since at least 1998.

6.    Non-defendant Nomura Funds Research & Technologies America, Inc. ("Nomura

Funds America") was at all times relevant a Delaware-incorporated and New York-registered

affiliate of Nomura that maintains its principal office at 309 West 49th Street, New York, New

York.  Nomura Funds America repeatedly visited FGG's New York headquarters to conduct due

diligence inquiries on the Fairfield Funds.  The results of these inquiries were shared with

Nomura.

7.    Non-defendant Nomura Securities International, Inc. ("Nomura New York") is a

New York-incorporated registered SIPC broker-dealer and affiliate of Nomura with its principal

place of business located at 309 West 49th Street, New York, New York.  Nomura New York

had a direct lending relationship with BLMIS whereby it loaned U.S. securities to BLMIS in

exchange for BLMIS posting collateral as security.  Nomura New York's lending relationship

with BLMIS predates Nomura's receipt of the Fairfield Subsequent Transfers.

8.      At all relevant times, Nomura, Nomura Funds America and Nomura New York were part of the Nomura Group, which according to Nomura Holdings Inc. ("Nomura Holdings") is "a financial services group comprising Nomura Holdings and its subsidiaries.. . ." Nomura Holdings is a global financial institution that has maintained a continuous presence in the United States since at least as early as 1969 and is the ultimate parent over the Nomura Group.  During the time Nomura was invested in the Fairfield Funds, Nomura Funds America and Nomura New York were two of at least nine U.S.-based Nomura Group entities whose principal executive offices were located in New York City.  According to Nomura Holding's 2007 Corporate Responsibility Report, the Nomura Group operated as one global firm, a principle with which employees were instructed to "approach [their] work"."

9.      Non-defendant FGG is a *de facto* partnership based in New York City that created, operated, and controlled investment vehicles, including several that were almost entirely invested with BLMIS such as Fairfield Sentry.

10.      Non-defendant Fairfield Sentry was a feeder fund incorporated in the British Virgin Islands ("BVI") that invested substantially all of its assets with BLMIS in New York.  At all relevant times, Fairfield Sentry was managed and controlled by FGG from its New York headquarters.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

11.      Non-defendant Sigma was incorporated in the BVI and invested 100% of its assets in Fairfield Sentry and, therefore, substantially all of its assets with BLMIS in New York.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  At all relevant times, Sigma was operated and controlled by

3

FGG from its New York headquarters.  Sigma is currently in liquidation proceedings in the BVI

and the United States.

**III.    THE SUBSEQUENT TRANSFERS OF BLMIS CUSTOMER PROPERTY AND
THE COMPONENT EVENTS OF NOMURA'S TRANSACTIONS WITH THE
FAIRFIELD FUNDS WERE PREDOMINANTLY DOMESTIC IN NATURE**

**A.    The Purpose Underlying the Transactions was to Earn Profits from a U.S.
Investment Advisor/Broker Dealer's Transactions in U.S. Securities.**

12.    Nomura entered into its investment transactions with the Fairfield Funds, and

other BLMIS feeder funds like Harley, because it knew and intended that these investments

would be transferred to BLMIS in New York to manage and invest in the U.S. securities

markets.  Nomura made its investments in the Fairfield Funds for the express purpose of

receiving funds back from BLMIS in the form of returns earned from BLMIS's purported trading

in U.S. securities, options and Treasurys.

**1.    The Transaction Documents Governing Nomura's Investments with
the Fairfield Funds Had Express Provisions Noting that the
Investments Would be Managed, Invested and Custodied by BLMIS
in New York.**

13.    To invest in the Fairfield Funds, Nomura entered into subscription agreements

affirming that it had read, received and agreed to be bound by the terms set forth in the funds'

private placement memoranda (individually "PPM," and together "PPMs"), which informed

Nomura that BLMIS served as the investment advisor, prime broker and actual custodian of the

assets in Fairfield Sentry's BLMIS investment advisory accounts, and, by design, substantially

all of Sigma's assets.

14.    The Fairfield Funds' PPMs were specific about the critical roles performed by

BLMIS on behalf of the funds.  The August 14, 2006 Fairfield Sentry Limited Private Placement

Memorandum (Sigma's PPMs contained identical language) expressly informed Nomura that:

- [t]he Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ('BLM')"; and

- "BLM is authorized to determine the price and timing of stock and options transactions in [the Fairfield Funds'] account"; and

- "substantially all of the Fund's assets will be held in segregated accounts at BLM[IS], a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM[IS] will be a sub-custodian of [Fairfield Sentry]."

15.    Moreover, Nomura knew from the PPMs that the Fairfield Funds' performance depended on BLMIS and its personnel. Specifically, the PPMs disclosed that:

- The "services of BLM [BLMIS] and its personnel are essential to the continued operation of the Fund [Fairfield Sentry], and its profitability, if any;" and

- "their absence would have an adverse impact upon an investment in the Fund [Fairfield Sentry]."

16.    Additionally, Nomura and its U.S.-based affiliate, Nomura Funds America, specifically asked FGG what was the extent of Madoff's control over the Fairfield Funds' assets. In April 2007, Nomura Funds America similarly asked about Madoff's discretion to make investment decisions and "[h]ow often Madoff's trading activities are monitored by [FGG]?" And on August 3, 2007, Nomura's Khizer Ahmed emailed FGG to ask: "Can Madoff run away with cash in the Sentry account?"

    **2.    Nomura Understood That Any Return on its Investments in the Fairfield Funds was to be Earned in New York by BLMIS Engaging in Transactions in U.S. Securities, Options and Treasurys.**

17.    Nomura understood that any return on its investments in the Fairfield Funds would be earned in New York by BLMIS engaging in the purchase and sale of U.S. securities, options and Treasurys with those very same assets. As disclosed in the Fairfield Funds' PPMs, Nomura knew that these returns would be earned "principally through the utilization of a

5

nontraditional options trading strategy described as 'split-strike conversion,' to which the Fund

[Fairfield Sentry] allocates the predominant portion of its assets."

18.    The August 14, 2006 Fairfield Sentry PPM ("Fairfield Sentry PPM"), which was

the operative document when Nomura began investing in Fairfield Sentry in September 2006,

described Fairfield Sentry's investments in detail stating:

> The establishment of a typical position entails (i) the purchase of a group or
> basket of equity securities that are intended to highly correlate to the S&P 100
> Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a
> notional value that approximately equals the market value of the basket of equity
> securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with
> a notional value that approximately equals the market value of the basket of
> equity securities. . . The basket typically consists of between 35 to 50 stocks in the
> S&P 100 Index.

19.    In addition to the PPMs Nomura received, Nomura and Nomura Funds America

also specifically directed inquiries to FGG concerning Madoff's split-strike conversion strategy.

FGG personnel made clear to Nomura and Nomura Funds America that the strategy was wholly

based on the purchase and sale of U.S. securities, options and Treasurys.

20.    From the Sigma PPM, which Nomura affirmed having received and read, Nomura

understood that Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then

invested 100% of its assets in Fairfield Sentry.  When paying redemptions, Sigma redeemed

Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and

paid the Euros to the redeeming Sigma investors.  Regardless of whether denominated in U.S.

Dollars or Euros, all investments by the Fairfield Funds with BLMIS were almost entirely

controlled at all relevant times by FGG from its New York headquarters or by BLMIS in New

York.

**B.      The Documents Governing the Transactions Contained New York Choice of Law and Jurisdiction Provisions.**

21.      Nomura executed subscription agreements with the Fairfield Funds that contained express New York choice of law and New York jurisdiction provisions.

22.      On September 26, 2006 and September 27, 2006, Nomura executed subscription agreements with Sigma and Fairfield Sentry, respectively. The subscription agreements contained virtually identical New York choice of law and jurisdiction provisions.  Specifically, the Fairfield Sentry subscription agreements provide that the "[a]greement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."  The Sigma subscription agreement provided: "[t]his Agreement shall be governed and enforced in accordance with New York law, without giving effect to its conflict of law provisions."  The Fairfield Sentry subscription agreement required Nomura to "irrevocably submit to the jurisdiction of the New York courts" and "agree that any suit, action or proceeding . . . with respect to this Agreement and the Fund [Fairfield Sentry] may be brought in New York."  The Sigma subscription agreement required Nomura to "irrevocably submit to the jurisdiction of New York courts" and "agree that any suit, action or proceeding . . . with respect to this Agreement and the Fund [Sigma] may be brought in New York."

23.      Moreover, in connection with its due diligence on and on-going management of its investments in the Fairfield Funds, Nomura agreed to terms on a non-disclosure agreement with FGG on or about August 7, 2007 to, among other things, receive non-public information about Fairfield Sentry.  This non-disclosure agreement also contained New York choice of law and jurisdiction provisions.  Specifically, the agreement provided that:

> This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its conflict of law principles.  Each party hereby irrevocably and unconditionally consents to submit to the

jurisdiction of the State of New York for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby.

24.    Nomura Funds America also entered into a similar non-disclosure agreement with FGG on March 26, 2007, in connection with the due diligence it conducted on the Fairfield Funds.  That agreement contained identical New York choice of law and jurisdiction provisions.

25.    Nomura also entered into a similar confidentiality agreement in connection with its due diligence on another BLMIS feeder fund operated and controlled by New York-headquartered Tremont Group Holdings, Inc. ("Tremont").  Specifically, on May 29, 2007, Nomura entered into an agreement with Tremont in which Nomura agreed not only to be bound by the laws and jurisdiction of New York but "agree[d] not to commence any action, suit or proceeding relating thereto except in such [New York] court."

26.    Nomura also received subsequent transfers from, and entered into transactions with, the Harley feeder fund.  As a Class C shareholder in Harley, Nomura was required to consent to the terms set forth in Harley's Articles of Association that expressly required that all disputes regarding its Harley investment to be referred to binding arbitration in New York, New York under rules established by the American Arbitration Association.

## C.    Nomura Designated a U.S. Bank Account to Receive the Transfers from Fairfield Sentry.

27.    At all times relevant, Nomura maintained its New York Account.  On its Fairfield Sentry subscription agreement, Nomura designated this account as the account from which it would purchase shares of Fairfield Sentry.

28.    In its subscription agreement with Fairfield Sentry, Nomura also instructed Fairfield Sentry to send any transfers of funds in connection with its investments in the fund to the New York Account.

29.     Nomura received the Fairfield Sentry Subsequent Transfers in the New York

Account.

30.     In connection with Nomura's investments in the Harley feeder fund, Harley

instructed shareholders like Nomura to make subscription payments to a New York bank account

at the Northern Trust Banking Corporation in the name of Fortis Prime Fund Solutions (IOM),

the administrator, banker and nominal custodian to Harley.  Before 2005, Harley's prior

administrator, Fortis Prime Fund Solutions (Cayman), directed investors to send their

subscription payments to a New York bank account at JP Morgan Chase.  As a Class C

shareholder in Harley, Nomura would have complied with these instructions and sent its Harley

subscription payments to one or both of the New York bank accounts.

31.     Nomura also received subsequent transfers from Harley in its New York

Account.

### D.     Nomura Negotiated the Terms of its Transactions with FGG Personnel in New York.

32.     Nomura negotiated the terms of its transactions with the Fairfield Funds with

FGG personnel located in FGG's New York headquarters.  FGG operated and controlled the

Fairfield Funds from New York.

33.     Prior to executing the Fairfield Funds' subscription agreements, Nomura

negotiated the terms of its Fairfield Sentry subscription agreement with FGG personnel in New

York.  Specifically, in August 2006, Nomura's in-house counsel, Charles Carvell, communicated

with FGG's Chief Operating Officer and General Counsel, Mark McKeefry, and Associate

General Counsel, Michael Thorne, in FGG's New York City headquarters to propose certain

amendments to its subscription agreement and a proposed supplemental side letter.  In turn,

Nomura received FGG's comments to its proposed amendments and draft side letter from the same FGG personnel in New York.

      **E.**    **Nomura's and Nomura Funds America's Due Diligence Efforts Focused on the Fairfield Funds and BLMIS in New York.**

34.    Nomura's and Nomura Funds America's respective due diligence inquiries were focused on the Fairfield Funds and BLMIS in New York.

35.    On August 3, 2007, Nomura's Ahmed asked FGG a series of questions about BLMIS's custody and control of the Fairfield Funds' assets, whether the Fairfield Funds had implemented any control measures to address the risks related to custody and control, and what recourse the Fairfield Funds would have if "Madoff" were to go into liquidation.  These questions included:

- "Can Madoff run away with cash in the Sentry account?"

- "Are there any controls in place that make sure that any of Madoff employees don't defraud Sentry of its cash balance?"

- "What is the process for requesting monies when there is a cash requirement to pay investors at Fairfield Sentry? Does Sentry just request Madoff to liquidate part of the trade (when Madoff is invested) or does it rely on another liquidity mechanism like a credit line?"

- "Can Madoff refuse to pay cash to Sentry when Sentry requests it?  If yes, under what circumstances?"

- "Upon the purchase of securities, which particular legal instrument is used in order to establish ownership of stocks and options in a particular account – i.e. if Madoff were to go into liquidation while it was in the market and a liquidator had to establish the position of each managed account, what set of records/other items would it use to establish exactly who owned what?"

- "How does it [Fairfield Sentry] know that the trade tickets that it has been provided [by BLMIS] in respect of stocks are a complete and accurate representation of all activity on its account?"

36.     Nomura Funds America identified similar concerns and repeatedly sought

information from FGG regarding Fairfield Sentry's contractual relationships with BLMIS.  In the

course of multiple due diligence meetings at FGG's New York City Office, Nomura Funds

America also inquired about BLMIS's multiple roles as investment advisor, prime broker and

custodian with respect to the Fairfield Funds.

37.     FGG shared the due diligence information it prepared for Nomura Funds America

with Nomura.

38.     Internal FGG emails indicate that Nomura Funds America also shared due

diligence reports it prepared regarding the Fairfield Funds with Nomura.  Consistent with the

Nomura Group's mission to think of themselves "as a single business unit" and "approach their

work with the sense that they are part of one organization," these FGG emails indicate that

Nomura Funds America provided Nomura with the due diligence reports it prepared from its

visits to FGG's New York City headquarters.

> **F.     After the Collapse of BLMIS, Nomura Funds America Contacted FGG Personnel in New York with Respect to Nomura's Investments in the Fairfield Funds.**

39.     On December 11, 2008, Madoff was arrested and BLMIS was exposed as a fraud.

Immediately after Madoff's arrest, Nomura Funds America contacted FGG at its New York

headquarters to ascertain the status of Nomura's investments in the Fairfield Funds.

40.     Mere hours after the news of Madoff's fraud was released, Junji Kawahara, the

President and CEO of Nomura Funds America, emailed FGG personnel in New York stating:

"We must discuss about Madoff ASAP.  Let us contact you today."  The following day, Nomura

Funds America personnel showed up unannounced at FGG's New York City headquarters to

meet with FGG personnel.  Nomura Funds America also scheduled meetings with FGG

11

personnel at FGG's New York City headquarters on December 16, 2008 and again in January 2009.

IV.     **NOMURA UNDERSTOOD THE BLMIS FEEDER FUNDS WERE IDENTICAL ACCESS POINTS TO BLMIS IN NEW YORK**

41.     Because, as discussed above, Nomura, Nomura Funds America, and Nomura New York knew that the BLMIS feeder funds were operated as identical investments with BLMIS, Nomura calculated its exposure to Madoff's split strike conversion strategy based on its aggregate investments in all of the BLMIS feeder funds.  Nomura and the other members of the Nomura Group with which it was affiliated were conscious of the global limit the Nomura Group set on investments in the BLMIS feeder funds.

42.     Beginning in summer/fall 2007, Nomura and Nomura New York began to inform the BLMIS feeder funds that Nomura had reached its risk limit on Madoff's split strike conversion strategy.  Moreover, Nomura indicated that the limit was not based on its investments in any particular Feeder Fund, but rather Nomura's overall exposure to Madoff and his split strike conversion strategy.  On August 7, 2007, Nomura noted to FGG employees in New York that: "we [Nomura] need to escalate our investment proposition to the highest level of approval here in London, primarily on grounds of overall exposure we have to Madoff." Nomura further explained that the cap on exposure was "nothing Fairfield/Sentry specific."

43.     Similarly, on September 4, 2007, Nomura New York declined an offer to receive information from Pioneer Asset Management about another Feeder Fund, stating that "Nomura has decided to cap the exposure to his [Madoff's] strategy at current levels.  We already have exposure to a number of *his* funds." (Emphasis supplied).

## V.    FAIRFIELD SENTRY AND SIGMA'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

44.    At all relevant times, Fairfield Sentry and Sigma's principal place of business was in New York and they were domestic residents.

### A.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

45.    In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were feeder funds.

46.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

47.    FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.    Fairfield Sentry

48.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose

of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

49.    Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

50.    Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

1.    **Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business was in the United States**

51.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office. On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

52.     After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

FGG's New York headquarters—executed additional BLMIS account documents on behalf of

Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and

Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on

these BLMIS account documents as FGG's New York headquarters.

53.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts

are governed by New York law and all disputes arising under the agreements must be resolved

by mandatory arbitration in New York utilizing the laws of New York. All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of

1934 and to the rules and regulations of the United States Securities and Exchange Commission

("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade

confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified

BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

**2.      FGG New York Personnel Controlled Fairfield Sentry's Relationship
with Various Citco Entities**

54.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with

Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

backoffice administrative services such as coordinating subscription and redemption forms,

maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco

Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield

Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets

were held in the BLMIS accounts.  As a result, Citco Custody entered into a sub-custodian

agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco

Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco

entities.

### 3.    FGG New York Personnel Managed Fairfield Sentry

55.    At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities.  Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

York.

56.    FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and

redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription

agreements contained New York choice of law provisions, and provided for venue and

jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

57.    Fairfield Sentry's subscription agreements also incorporated its PPMs by

reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or

later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its

assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an

SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4)

through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S.

Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were

"essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

58.    Although FGG attempted to hide its manager, BLMIS served as the investment

manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality

made all of Fairfield Sentry's investment decisions.

17

59.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

60.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

61.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

62.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG

formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

management contracts to both entities, including the investment advisory agreements for the

three feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.

FG Limited remained the placement agent for the same funds.

63.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

64.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

65.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

66.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as

Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

67.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS

accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other

fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a

number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

The seedling funds were operated and organized by FGG New York Personnel.  Many of the

seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

**C.     <u>Sigma</u>**

68.     FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription

and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield

Sentry using Euros, FGG created Sigma.  Sigma accepted subscriptions in Euros, converted them

to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying

redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received

from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

69.     Noel and Tucker organized Sigma on November 20, 1990, as an international

business company under the BVI International Business Companies Act.  Just as Fairfield Sentry

was statutorily restricted from doing business with any other BVI residents except for other

entities organized under the BVI International Business Companies Act, so was Sigma.  Sigma is

currently in liquidation in proceedings in the BVI and United States.

70.     Also like Fairfield Sentry, Sigma was a shell corporation present in the BVI only

on paper.  It had no employees and maintained no offices.  It listed its registered BVI address as

the same BVI post office box care of a local trust company it shared with Fairfield Sentry and

hundreds of other unrelated investment vehicles. The law firm operating the trust company and

the registered post office box addressed its statements for services for Sigma to FGG's New

York headquarters.  Sigma was operated almost entirely by FGG New York Personnel.

71.    As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New

York Personnel made the operational decisions regarding Sigma.  Once Sigma was opened for

investors, FGG New York Personnel monitored Sigma's investments into, and redemptions

from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created

marketing and performance materials for Sigma; marketed Sigma; performed administrative

functions required by Sigma; negotiated confidentiality agreements and other service provider

contracts on behalf of Sigma; and conducted various other due diligence and risk management

activities.  Until Sigma's liquidation, FGG maintained Sigma's books and records in New York.

FGG New York Personnel also had final control of Sigma's banking accounts, including those

accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

72.    FGG New York Personnel controlled and approved the subscriptions for and

redemptions of Sigma shares.  Like Fairfield Sentry's subscription agreements, Sigma's

subscription agreements contained a New York choice of law provision, provided for venue and

jurisdiction for any disputes in New York, and incorporated its PPMs that described the

significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole

assets.  Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with

respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the

investments.  Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the

custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could

misappropriate the assets or securities.  This same risk was also disclosed in Fairfield Sentry's PPM's.

73.    Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma shares.  Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma assets.  As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma at Citco Bank Dublin.  FGG New York Personnel had final control of the Sigma Citco Bank Dublin bank accounts.  Finally, FGG New York Personnel controlled all of Sigma's relationships with the Citco entities.

74.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS—Noel executed a separate contract on Sigma's behalf with the Bank of Montreal for a currency swap which was "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

75.    FGG New York Personnel initially listed FG Limited as the investment manager for Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPM's to indicate FG Bermuda was Sigma's Investment Manager.  In fact, there were no duties for any investment manager because Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

76.     The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., proffered June 26, 2015 as part of the Extraterritoriality Briefing).


Dated: June 26, 2015                         /s/ Marc Skapof
         New York, New York                  **Baker & Hostetler LLP**
                                             45 Rockefeller Plaza
                                             New York, New York 10111
                                             Telephone: (212) 589-4200
                                             Facsimile: (212) 589-4201
                                             David J. Sheehan
                                             Email: dsheehan@bakerlaw.com
                                             Regina L. Griffin
                                             Email: rgriffin@bakerlaw.com
                                             Marc Skapof
                                             Email: mskapof@bakerlaw.com

                                             *Attorneys for Irving H. Picard, Trustee*
                                             *for the Substantively Consolidated SIPA*
                                             *Liquidation of Bernard L. Madoff Investment*
                                             *Securities LLC and the estate of Bernard L.*
                                             *Madoff*