**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> ABN AMRO BANK (IRELAND), LTD, (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED) and <br><br> ABN AMRO CUSTODIAL SERVICES (IRELAND), LTD (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), <br><br> Defendants. | Adv. Pro. No. 10-05355 (SMB) |

**TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS BASED ON**
**EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S**
**MOTION FOR LEAVE TO AMEND COMPLAINTS**

The Trustee respectfully submits this memorandum as a supplement to his Main Brief, in opposition to the motion to dismiss by Defendants FPFS Bank and FPFS Services and in further support of the Trustee's motion for leave to amend.

## BACKGROUND

The Trustee's Amended Complaint and Proffered Allegations Pertaining to the Extraterritoriality Issue as to Defendants (the "Proffered Allegations") allege that Defendants were shareholders in Kingate Global, from which they received more than $150 million in subsequent transfers of BLMIS customer property.[1] Kingate Global was a Feeder Fund—an investment vehicle that pooled investors' assets to invest with BLMIS in order to capitalize on Madoff's purported consistent returns.[2] Defendants were part of Fortis, a sophisticated global financial institution, and more specifically part of Fortis Prime Fund Solutions ("FPFS").[3] FPFS, through offices including Defendants and FPFS USA, operated as a single unit that offered administrative, custodial, financing, and other fund services to numerous Feeder Funds for a decade, ultimately exposing more than $1.5 billion of Fortis's own money to what it called the "Madoff strategy."[4]

Notably, the Trustee also has sued Defendants for more than $180 million in subsequent transfers that they received from other Feeder Funds managed by Tremont—a New York based manager that also co-managed Kingate Global for much of the relevant period.[5] Defendants have not moved to dismiss these transfers based on extraterritoriality, presumably because those

---

[1] Proffered Allegations ¶ 2.

[2] *Id.* ¶ 16; *see* Trustee's Main Brief § B.1.

[3] Proffered Allegations ¶ 9.

[4] *Id.* ¶¶ 58–60.

[5] *See* Amended Complaint ¶¶ 6, 134.

1

Tremont Feeder Funds were incorporated, operated, and managed in Rye, New York. As demonstrated by the Proffered Allegations, the transfers and the component events of the transactions between Defendants and Kingate Global were, like the Tremont transfers, domestic and centered in New York.

## ARGUMENT

The District Court directed that the test for whether a subsequent transfer claim involves an extraterritorial application of the Code and SIPA is the "transfer and component events of the transactions"[6] test set forth in *Maxwell I*.[7] This analysis is consistent with post-*Morrison* Second Circuit precedent that evaluates the connections among the parties, their transactions, and key events[8] related to the United States to determine whether a claim is "sufficiently domestic" such that an extraterritorial application of a statute is not required.[9]

Defendants argue that because they are organized under the laws of Ireland and because Kingate Global was organized under the laws of the British Virgin Islands they are entitled to a finding that the Kingate Subsequent Transfers are "purely foreign" and must be dismissed. Their motion should be denied because their argument: (i) disregards the *Maxwell* analysis directed by the District Court; (ii) ignores that Kingate Global existed for the sole purpose of investing in

---

[6] In *Maxwell I*, the court identified all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements underlay the antecedent debt the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *In re Maxwell Commc'n Corp.*, 186 B.R. 807, 816-817 (S.D.N.Y. 1995).

[7] Extraterritoriality Decision, 513 B.R. at 227.

[8] *See, e.g.*, *ParkCentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 217 (2d Cir. 2014).

[9] *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014); *European Cmty v. RJR Nabisco Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), and other cases cited in Section III of the Trustee's Main Brief.

2

BLMIS in New York; (iii) ignores that Defendants invested and transacted with Kingate Global for the sole purpose of reaping the benefits of BLMIS's purported investments in the U.S. securities markets; and (iv) ignores that Defendants directly transacted with BLMIS in New York, including through, among other things, Defendant FPFS Bank's New York bank account and the U.S. registered and New York-headquartered FPFS USA.[10]

## I. The Fortis Subsequent Transfers and the Component Events of Defendants' Transactions with Kingate Global Were Predominantly Domestic

Defendants' transactions with Kingate Global were centered entirely on BLMIS in the U.S. Among other reasons, Defendants knew from the documents governing their subscription agreements with Kingate Global—offering memoranda and subscription agreements—that it was transferring funds into BLMIS in New York for purported investment in U.S. securities.[11] Specifically, Defendants knew that: (i) BLMIS served as the investment manager, broker dealer and actual custodian of all the funds' accounts; (ii) BLMIS was a U.S. registered investment advisor and subject to U.S. securities regulations and laws; (iii) BLMIS executed a split-strike conversion strategy that relied on the purported purchase and sale of U.S. exchange-listed equity securities, options, and U.S. treasuries; and (iv) Madoff executed the split-strike conversion strategy in his full discretion.[12]

The purpose of the transactions was to receive anticipated transfers of funds back from BLMIS representing supposed returns from these U.S. investments. The movement of money

---

[10] Proffered Allegations ¶ 13.

[11] *Id.* ¶¶ 24–25.

[12] *Id.* ¶¶ 24–29.

3

into and out of the U.S. was not "fortuitous or incidental" but rather was the "'ultimate objective' and the 'raison d'etre' of the Agreement" between Defendants and Kingate Global.[13]

Moreover, Defendants and other Fortis entities' due diligence on Kingate Global and other funds confirmed that Kingate Global was identical to the myriad of Feeder Funds with which Fortis transacted. As part of its diligence in connection with potential transactions with the Tremont Feeder Funds, Fortis employees sent employees of its predecessor entity, MeesPierson, to meet with Madoff in New York.[14] The meeting resulted in a memorandum, whose information was circulated among numerous Fortis entities including Defendants. The memorandum correctly observed that Kingate Global, like the Tremont Feeder Funds and Fairfield Sentry, delegated its investment duties entirely to BLMIS in New York and earned returns based on Madoff's purported trading in U.S. securities.[15]

The domestic nature of the Kingate Subsequent Transfers is further confirmed by the fact that they were received by Defendants at Defendant FPFS Bank's account at Northern Trust Bank in New York.[16] Defendant FPFS Bank maintained this account in its own name. It, and numerous other Fortis entities including Defendant FPFS Services, used the account to send and receive funds from BLMIS, the Feeder Funds—including receiving the Kingate Subsequent Transfers—and Feeder Fund investors.[17]

Finally, the Defendants previously argued in this case that Bankruptcy Code § 546(e)'s safe harbor should shield the Fortis Subsequent Transfers from suit precisely because of their

---

[13] *See Picard v. Bureau of Labor Ins. (In re Bernard L. Madoff)*, 480 B.R. 502, 513 (Bankr. S.D.N.Y. 2012).

[14] Proffered Allegations ¶ 38.

[15] *Id.* ¶¶ 38–40.

[16] *Id.* ¶ 30.

[17] *Id.* ¶ 31.

4

connection to the U.S. securities markets into which BLMIS purported to invest.[18] This argument is inconsistent with the Defendants' current assertion that their transactions lack sufficient domestic connections for purposes of extraterritoriality. Defendants should not be allowed to have it both ways, taking advantage of U.S. law when it suits them and running from it when it does not.

## II. Fortis Made Business Decisions Based on the Reality That BLMIS in New York Was at the Core of all Transactions with the Feeder Funds

Fortis sought out opportunities to profit from and invest with BLMIS through multiple Feeder Funds, registered both within and outside of the United States.[19] Over at least a decade, through Defendants and its other FPFS offices in New York, the Isle of Man, and elsewhere, Fortis provided services for and/or invested with Feeder Funds.[20] In none of its roles did Fortis distinguish among the funds based on where they were formed or nominally located. Instead, Fortis made its business decisions, including investment decisions, based on its global "Madoff exposure" and how it could best leverage off its access to the "Madoff strategy."[21]

Fortis entities worked together to carry out its relationship with BLMIS and the Feeder Funds in New York. As Fortis explained to its shareholders, Fortis strategically "bundled [its] fund services – both onshore and offshore to form a single unit" and instructed its offices to work together in order to "limit the amount of service providers with which they [clients] must liaise to one – Fortis."[22] Accordingly, various FPFS entities, including Defendants and FPFS USA,

---

[18] *See* Consolidated Reply Memorandum of Law on Behalf of Financial Institution Defendants, *Sec. Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 12-mc-00115 (JSR) (S.D.N.Y. Oct. 19, 2012), ECF No. 398.

[19] Proffered Allegations ¶¶ 2–4.

[20] *Id.* ¶¶ 2–4, 15, 50.

[21] *Id.* ¶¶ 54–59.

[22] *Id.* ¶ 9.

5

coordinated to provide services to Feeder Funds, conducted due diligence together in New York, carried out each other's administrative responsibilities in New York, and directed funds into and out of New York bank accounts, including Defendant FPFS Bank's New York account.[23] In addition to their consistent contact with each other, Defendants and the Fortis network were in regular contact with BLMIS and the Feeder Funds in New York to carry out transactions with the funds.[24]

Fortis's investments with the Tremont Feeder Funds alleged in the Amended Complaint are instructive. In engaging in these transactions, Fortis did not distinguish between those Tremont Feeder Funds that were registered in the United States and those that were registered in the Cayman Islands.[25] To the contrary, Fortis recognized that "they are identical products" as the "investments strategy of the Offshore Master [Cayman Islands] is regarded as being materially the same as the Onshore Master [United States]."[26] This was consistent with Fortis's recognition that Madoff served the same role for Kingate Global, Fairfield Sentry, and the other Feeder Funds with which Fortis transacted.[27] Thus, as discussed by Fortis in internal memoranda, "[a]lthough the clients [Feeder Funds] that pursue BMS [BLMIS] strategy are different legal entities, they are in effect economically tied together since they are exposed to (exactly) the same risks."[28]

---

[23] Proffered Allegations ¶ 13.

[24] *See id.* ¶¶ 47, 52–53.

[25] *See id.* ¶ ¶ 35.

[26] *Id.* ¶¶ 33–40.

[27] *See id.* ¶ 40.

[28] *Id.* ¶¶ 33–40.

6

Because Fortis intended that its transactions with Feeder Funds were to benefit from BLMIS and what Fortis described as the "Madoff strategy,"[29] the component events of Fortis's transactions with the Feeder Funds took place in the United States. Fortis, including Defendants, among other things, met, corresponded, and transacted with BLMIS and the Feeder Funds' investment managers and other service providers in New York, including Kingate Global's co-manager Tremont, as well as fund investors located in the United States.[30] Specifically, the Fortis network, acting in New York: (i) met and had regular correspondence with Madoff and BLMIS employees; (ii) submitted fund subscription and redemption requests to BLMIS; (iii) maintained New York bank accounts from which they transferred funds to and from BLMIS, and subsequently to investors; (iv) transferred funds to and from BLMIS's New York bank account; (v) received customer statements, trade confirmations, and other due diligence from BLMIS on behalf of the Feeder Funds; and (vi) corresponded and received transfers of funds from investors, including investors in the U.S.[31]

Fortis internally recognized that all of the Feeder Funds were "structures with exposure to Madoff."[32] Regardless of which Feeder Fund Fortis was transacting with, much less the location of that fund, Fortis remained mindful that its profit or loss rested solely in the hands of Madoff in New York and the performance of the U.S. securities markets.[33] To manage its exposure to BLMIS through the Feeder Funds, Fortis implemented a "Madoff policy" under which it

---

[29] Proffered Allegations ¶¶ 58-59.

[30] *See id.* ¶¶ 38, 44, 48.

[31] *See id.* ¶¶ 22–53.

[32] *Id.* ¶ 7.

[33] *See, e.g., id* ¶ 37

7

continually re-evaluated, and continually increased, its exposure to BLMIS.[34] In considering investments and loans to Feeder Funds, Fortis decided the total amount it was willing to dedicate to the "Madoff strategy" and allocated that amount.[35] By the time BLMIS collapsed in December 2008, Fortis had loaned or invested more than $1.5 billion into the "Madoff strategy."[36]

### III. The Transfers the Defendants Received From Kingate Global Are Domestic in Nature

The transfers that Defendants received from Kingate Global are domestic insofar as Kingate Global's business activities were operated out of and directed at the United States. Kingate Global invested exclusively with BLMIS in New York and, together with their purported investment managers and other service providers, formed an enterprise with a single economic purpose: to profit from a New York-based investment adviser who was to engage in transactions in U.S. securities markets.[37] As set forth in detail in the Proffered Allegations, Kingate Global's investment managers, consultants, and other service providers, regardless of where they were incorporated, wholly or largely operated in New York to manage Kingate Global's investments with BLMIS.[38] Among other things, Kingate Global's co-manager, Tremont, was headquartered in New York, the head of due diligence for Kingate Global's investments with BLMIS resided in New York and worked with FIM's affiliate FIM (USA) in

---

[34] Proffered Allegations ¶ 56.

[35] *Id.* ¶ 58–59.

[36] *Id.*

[37] *See e.g.*, *id.* ¶ 63.

[38] *Id.* ¶¶ 61–88.

8

New York.[39] In addition to being the hub for FIM's due diligence, FIM (USA) monitored, researched, and solicited investors for Kingate Global in New York.[40]

Although Kingate Global had a registered address in the BVI, it had no physical offices, no employees, and transacted no meaningful business in the BVI.[41]

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, the Trustee respectfully requests that the Court deny Defendants' motion to dismiss, and grant the Trustee's motion for leave to amend.

Dated: June 26, 2015
New York, New York

/s/ *Tracy L. Cole*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Tracy L. Cole
Loura Alaverdi
A. Mackenna Mosier
Samuel M. Light

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*

---

[39] Proffered Allegations ¶¶ 65, 81–82.

[40] *Id.* ¶ 82.

[41] *Id.* ¶ 64.

9