BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | **TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO FIRST GULF BANK'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT** |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> FIRST GULF BANK, <br><br> Defendant. | Adv. Pro. No. 11-02541 (SMB) |

The Trustee respectfully submits this memorandum as a supplement to his Main Brief being filed simultaneously herewith in opposition to the motion to dismiss based on extraterritoriality made by defendant First Gulf Bank ("First Gulf") and in further support of the Trustee's motion for leave to amend his Complaint.

## BACKGROUND

First Gulf is a large, sophisticated, full-service bank that was a shareholder in Fairfield Sentry Limited ("Fairfield Sentry"), which invested substantially all of its assets with BLMIS. (Proffered Allegations at ¶¶ 1, 3.) First Gulf received $11,532,393 in subsequent transfers of BLMIS customer property from Fairfield Sentry (the "Transfers"). (Trustee's Complaint at ¶ 2; *id.* at Ex. D.) The Trustee's Proffered Allegations demonstrate that the Trustee's action to recover the Transfers does not require an extraterritorial application of SIPA or Bankruptcy Code Section 550.

## THE TRANSFERS AND COMPONENT EVENTS OF FIRST GULF'S FAIRFIELD SENTRY TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

Citing to *Maxwell I*, the District Court directed that "the location of the transfers as well as the component events of those transactions"[1] must be used to determine whether a subsequent transfer claim involves a domestic or extraterritorial application of the Code and SIPA.[2] Under the District Court's ruling, the Trustee need only put forth "specific facts suggesting a domestic

---

[1] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 816).

[2] In *Maxwell I*, the court examined all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *In re Maxwell Commc'n Corp.*, 186 B.R. 807, 816-17 (S.D.N.Y. 1995).

transfer" to avoid dismissal.[3]  This is a fact-based inquiry in which all reasonable inferences should be drawn in the Trustee's favor.[4]

First Gulf argues that simply because it and Fairfield Sentry were formally organized under the laws of foreign countries, the subsequent transfers it received are "purely foreign" and the Trustee's recovery action must be dismissed.  This superficial argument disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit extraterritoriality case law that similarly examines a transaction's various connections to the United States.[5]

Based on the facts set forth in the Proffered Allegations, there is no basis for dismissing this case on the grounds of extraterritoriality.  The Transfers and component events of First Gulf's transactions with Fairfield Sentry were predominantly domestic.

To begin with, the entire purpose of First Gulf's investment with Fairfield Sentry was to invest in U.S. securities markets through New York-based investment adviser BLMIS, and to earn returns on that U.S.-based investment.  Specifically, First Gulf entered into a subscription agreement with Fairfield Sentry and affirmed that it knew (i) Fairfield Sentry invested almost exclusively with a New York-based, SEC-registered investment adviser (i.e. BLMIS) that invested in the U.S. securities market and (ii) First Gulf's money would be transferred to that same investment adviser in New York.  (Proffered Allegations at ¶ 8.)  As Judge Lifland

---

[3] Extraterritoriality Decision, 513 B.R. at 232 n.4.

[4] *See*, *e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 402-03 (S.D.N.Y. 2010) (deferring ruling on extraterritoriality at motion to dismiss phase and citing standard that "[t]he court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.").

[5] *See, e.g., Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,* 763 F.3d 198, 217 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014); and other cases cited in the Trustee's Main Brief.

2

concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States . . . was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and the feeder fund.[6]

The express provisions of its agreement with Fairfield Sentry further demonstrate the domestic nature of First Gulf's investment transactions with Fairfield Sentry. First Gulf agreed in its subscription agreement with Fairfield Sentry that New York law would govern its investments, and it consented to U.S. jurisdiction. (Proffered Allegations at ¶¶ 9-10.) Thus, First Gulf had every expectation that U.S. laws would apply to its investment transactions and that it would be subject to suit in the United States.

First Gulf also purposefully used its own U.S. bank account and the U.S. banking system in connection with the Transfers at issue. Specifically, in its Fairfield Sentry redemption documents, First Gulf designated a bank account in its own name at The Bank of New York in New York to receive both of its redemption payments from Fairfield Sentry. (*Id.* at ¶¶ 11-12.) First Gulf also remitted its subscription into a U.S. correspondent account at the direction of Fairfield Sentry, which funds were then ultimately delivered to BLMIS in New York. (*Id.* at ¶ 13.)

The domestic nature of the transactions is also evidenced by the fact that the United States was the focus of First Gulf's communications, meetings, and due diligence with respect to its Fairfield Sentry investments. First Gulf was an active investor in Fairfield Sentry, and New York in particular was the specific situs where First Gulf conducted Fairfield Sentry-related activities. (*Id.* at ¶¶ 14-17.) During the period of its investments from 2004-2008, high level representatives of First Gulf met in New York frequently with New York-based Fairfield

---

[6] *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 513 (Bankr. S.D.N.Y. 2012).

Greenwich Group ("FGG") co-founder Jeffrey Tucker and partner Philip Toub, as well as other FGG personnel, to, among other things, conduct due diligence. (*Id.* at ¶¶ 16-17.)

Beyond all of the above domestic components, First Gulf's argument that its transactions are purely foreign is wrong because it ignores the reality of Fairfield Sentry, from which it received the Transfers. FGG in New York created, managed, and controlled Fairfield Sentry. (*Id.* at ¶ 18-19.) Fairfield Sentry was based out of New York and had its principal place of business in New York. (*Id.* at ¶¶ 18, 24) Although technically registered in the BVI, Fairfield Sentry had no employees or offices there, and at all times, operational decisions were made by FGG employees in New York.[7] (Proffered Allegations at ¶ 23.) In its BLMIS account opening documents, FGG listed Fairfield Sentry's address as in the United States. (*Id.* at ¶¶ 25-26.) Fairfield Sentry's initial and on-going due diligence on BLMIS was conducted in New York, and the operative legal documents for its BLMIS accounts were governed by New York law. (*Id.* at ¶¶ 27, 29.) BLMIS in New York served as Fairfield Sentry's investment manager and implemented the split-strike conversion strategy for Fairfield Sentry. (*Id.* at ¶¶ 31-41.)

## CONCLUSION

For the forgoing reasons and those stated in the Trustee's Main Brief, First Gulf's motion to dismiss should be denied, and the Trustee's motion for leave to amend his Complaint should be granted.

---

[7] *See SEC v. Gruss*, 2012 WL 3306166 at *3 (S.D.N.Y. Aug 13, 2012) (finding that issues of fact existed regarding whether an offshore fund was "foreign" for purposes of extraterritoriality where complaint alleged that operational and investment decisions for the offshore fund were made in New York, "such that for all intents and purposes, the [offshore fund] was based in New York").

4

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | By: /s/ Thomas L. Long<br>Baker & Hostetler LLP<br>45 Rockefeller Plaza<br>New York, New York  10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Matthew D. Feil<br>Hannah C. Choate<br><br>*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff* |