**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | Adv. Pro. No. 11-02730 (SMB) |
| Plaintiff, | |
| v. | |
| ATLANTIC SECURITY BANK, | |
| Defendant. | |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN**
**OPPOSITION TO ATLANTIC SECURITY BANK'S MOTION TO DISMISS**
**BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT**
**OF THE TRUSTEE'S  MOTION FOR LEAVE TO AMEND THE COMPLAINT**

The Trustee respectfully submits this supplemental memorandum of law in opposition to Atlantic Security Bank's ("ASB") motion to dismiss based on extraterritoriality and in support of the Trustee's motion to amend his complaint. The Proffered Allegations plead specific facts evincing the subject transfers are predominantly domestic under the standards set forth in the Extraterritoriality Decision[1] such that the Trustee's action does not require an extraterritorial application of 11 U.S.C. § 550. Accordingly, ASB's motion to dismiss must be denied.

## BACKGROUND & LEGAL STANDARD

The District Court returned this action to this Court to determine whether the Trustee's claims against ASB seek the recovery of "purely foreign" transfers, requiring extraterritorial application of Bankruptcy Code § 550.[2] Under the Extraterritoriality Decision the Trustee need only "put forth specific facts suggesting a domestic transfer" to avoid dismissal.[3] In making this determination, there is no bright-line test to determine whether a transaction is extraterritorial,[4] and courts must review "the location of the transfers as well as the component events of those transactions."[5] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[6]

The Trustee's Proffered Allegations specifically allege ASB received subsequent transfers of BLMIS customer property from Fairfield Sentry, a fund that invested virtually all of its assets with BLMIS in New York. ASB argues that because it and Fairfield Sentry were

---

[1] *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222 (S.D.N.Y. 2014) (the "Extraterritoriality Decision").

[2] *Id.* at 232–33.

[3] *Id.* at 232, n.4.

[4] *Parkcentral Global Hub Ltd. v. Porsche Automobil Holdings SE*, 763 F.3d 198, 216-17 (2d Cir. 2014) (rejecting single-factor, bright-line rule as appropriate analysis to ascertain whether foreign or domestic elements "predominate").

[5] Extraterritoriality Decision at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)).

[6] *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

organized under foreign laws, ASB is entitled to a finding that the transfers it received are "purely foreign" and must be dismissed under the Extraterritoriality Decision. ASB is mistaken. This superficial analysis ignores that the transactions have significant domestic components, including, for example, that ASB invested in Fairfield Sentry to profit from New York-based BLMIS and that Fairfield Sentry maintained its principal place of business in New York. As set forth below, a comprehensive review of the transfers and the component events of the transactions demonstrate the Trustee's recovery claim against ASB does not require an extraterritorial application of the Bankruptcy Code or SIPA.

## THE COMPONENT EVENTS OF ASB'S TRANSACTIONS ARE DOMESTIC

The subsequent transfers from Fairfield Sentry were not "purely foreign," but were predominantly domestic for the following reasons: (1) ASB knowingly invested in Fairfield Sentry to profit from BLMIS in New York, (2) ASB sent and received the transfers from Fairfield Sentry through New York bank accounts, (3) ASB maintained an office in Miami, Florida from which it conducted due diligence on Madoff, BLMIS, and Fairfield Sentry, (4) ASB used a New York agent to conduct due diligence on Madoff, BLMIS, and Fairfield Sentry, (5) Fairfield Sentry's subscription agreements required shareholders, such as ASB, to be bound by New York law and to submit to New York jurisdiction, and (6) Fairfield Sentry's principal place of business was in New York.

First, ASB invested in Fairfield Sentry to profit from BLMIS in New York. ASB knew from Fairfield Sentry's private placement memorandum ("PPM") that Fairfield Sentry invested at least 95% of those assets with BLMIS, which controlled all aspects of its investments in New York. (Proffer at ¶¶ 4-9.) ASB knew: (i) Fairfield Sentry delegated all investment decisions to BLMIS as its investment advisor; (ii) BLMIS maintained custody of the assets in New York; and (iii) BLMIS purported to execute trades in U.S. securities on behalf of Fairfield Sentry. (*Id.*)

2

BLMIS was "essential" to Fairfield Sentry's profitability and, in turn, ASB's profitability. (*Id.* at ¶¶ 5, 34.)

ASB invested in Fairfield Sentry *because* its money would ultimately be placed with BLMIS, and in turn, Madoff would invest their assets in U.S. securities traded on U.S. markets. But for BLMIS and its U.S.-based investment strategy, ASB would not have invested in Fairfield Sentry. As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States … was not fortitious or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and Fairfield Sentry.[7]

Second, ASB sent and received transfers from New York bank accounts. ASB directed subscription payments to a New York correspondent bank account at HSBC Bank USA, N.A., which were then deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York. (*Id*. at ¶ 19.) ASB also instructed Fairfield Sentry to pay redemptions to ASB's bank account at Standard Chartered Bank in New York. (*Id*. at ¶ 20.)

Third, ASB maintained an office at 121 Alhambra Place, Suite 1200, Coral Gables, Florida 33134. (*Id.* at ¶ 13.) From this office, ASB employees met with representatives of FGG and conducted due diligence on Fairfield Sentry. (*Id.* at ¶ 14.) In July 2003, ASB employees also travelled to New York to meet with FGG to discuss ASB's investments in Fairfield Sentry. (*Id*. at ¶¶ 15, 17.)

Fourth, In addition to its own due diligence efforts, ASB used a New York agent, Accumulus Capital Management LLC ("Accumulus"), to conduct additional due diligence on Madoff, BLMIS, and Fairfield Sentry. (*Id*. at ¶ 16.) In November 2003, ASB and Accumulus employees met with Madoff and FGG partners in November 2003 to discuss ASB's investments

---

[7] *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 523 (Bankr. S.D.N.Y. 2012).

3

in Fairfield Sentry. (*Id*. at ¶ 17.)

Fifth, to invest in Fairfield Sentry, investors such as ASB executed subscription agreements that were domestic in nature. Under Fairfield Sentry's subscription agreements, shareholders (i) submitted to New York courts' jurisdiction, (ii) agreed that New York law would govern the agreements, (iii) agreed to wire Fairfield Sentry subscription payments to a New York correspondent bank account, and (iv) agreed to BLMIS in New York controlling all aspects of the investments, as described in the PPM. (*Id*. at ¶¶ 10-12.) Under the subscription agreement, ASB had every expectation that New York law apply to their investments.

Sixth, ASB conducted business with Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York that created, marketed, managed, and controlled Fairfield Sentry. ASB had a long-standing business relationship with FGG dating back to at least 1997 when it began investing in Fairfield Sentry. ASB's primary contact at FGG was Lourdes Barrenche, an FGG partner from FGG's headquarters in New York. (*Id*. at ¶¶ 2, 14.)

Fairfield Sentry was principally operated in New York by FGG. In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG. (*Id*. at ¶ 22.) Noel and Tucker incorporated Fairfield International Managers, Inc. ("Fairfield International Managers") under Delaware law as part of FGG. Through Fairfield International Managers, Noel and Tucker organized Fairfield Sentry, the largest BLMIS feeder fund. (*Id*. at ¶¶ 24, 28, 35.)

Noel and Tucker organized Fairfield Sentry as an international business company under BVI law. (*Id*. at ¶ 25.) As such, BVI law restricted Fairfield Sentry from doing business in the BVI except with BVI international business companies. (*Id*.) Fairfield Sentry was a shell corporation present in the BVI solely on paper. Its BVI registered address was a post office box care of a local trust company owned and operated by a local law firm. (*Id*. at ¶ 26.)

4

From its inception until its liquidation in 2009, Fairfield Sentry had no employees and no offices. (*Id*. at ¶ 26.) At all relevant times, Fairfield Sentry was operated almost entirely by FGG's New York City headquarters personnel who maintained final control of Fairfield Sentry's bank accounts and relationships with Fairfield Sentry's back office service providers. (*Id*. at ¶¶ 31-33.)

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. In the account opening documents, Tucker identified Fairfield Sentry's mailing address in the United States and directed BLMIS to send Fairfield Sentry's monthly account statements, trade confirmations, and correspondence to a U.S. address. In January 1998, FGG requested BLMIS to send all Fairfield Sentry account information to FGG's New York City headquarters. (*Id*. at ¶¶ 28-29.)

From Fairfield Sentry's inception, FGG personnel at its New York City headquarters controlled the sales and subscriptions of the fund's shares. (*Id*. at ¶ 33.) From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York. (*Id*.)

At all relevant times, FGG New York City headquarters personnel monitored Fairfield Sentry's investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of Fairfield Sentry; marketed Fairfield Sentry; approved all subscriptions for Fairfield Sentry shares; maintained Fairfield Sentry's books and records; and made all strategic and operational decisions regarding Fairfield Sentry. (*Id*. at ¶¶ 32-33.)

## **CONCLUSION**

Together, these facts further evince the parties' long-standing relationship was centered in the United States.

For the foregoing reasons and those stated in the Trustee's main brief, this Court should deny ASB's motion to dismiss and grant the Trustee's motion for leave to amend the complaint.

5

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | */s/ Thomas L. Long*<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Torello H. Calvani<br>Jonathan D. Blattmachr<br><br>*Attorneys for Irving H. Picard, Trustee*<br>*for the Substantively Consolidated SIPA*<br>*Liquidation of Bernard L. Madoff Investment*<br>*Securities LLC and the estate of Bernard L.*<br>*Madoff* |