**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
|           Plaintiff-Applicant, | SIPA Liquidation |
|    v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
|           Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
|           Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02730 (SMB) |
|           Plaintiff, | |
|    v. | |
| ATLANTIC SECURITY BANK, | |
|           Defendant. | |

**THE TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE**
**EXTRATERRITORIALITY ISSUE AS TO ATLANTIC SECURITY BANK**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, by and through his undersigned counsel, respectfully submits the following proffered allegations as to the domestic nature of transfers to Atlantic Security Bank ("ASB") from Fairfield Sentry Limited ("Fairfield Sentry").

## I.    **BACKGROUND**

1.    In this action, the Trustee seeks to recover $120,168,691 in subsequent transfers of BLMIS customer property made by Fairfield Sentry to ASB.

2.    Fairfield Sentry was one of several BLMIS Feeder Funds – investment funds that pooled investments made by third parties and invested those funds with BLMIS in New York. Fairfield Sentry was created, operated, and controlled by the Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York.

3.    ASB invested in Fairfield Sentry to profit from BLMIS in New York, and Fairfield Sentry was merely the means to that end.

## II.    **THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC**

### A.    **ASB Invested with Fairfield Sentry to Profit from BLMIS, Which Acted as the Investment Advisor, Broker-Dealer, and Custodian for Fairfield Sentry**

4.    BLMIS was the investment advisor, broker-dealer, and custodian for Fairfield Sentry and for any investments made by ASB in Fairfield Sentry. ASB relinquished all control of its investments to Madoff, and fully understood and intended that those funds would be invested in U.S. securities.

5.    To invest in Fairfield Sentry, an investor such as ASB executed a subscription agreement in which it acknowledged that it had received and read a copy of Fairfield Sentry's

Private Placement Memorandum, as amended from time to time (the "PPM"). According to the PPM, "The services of BLM and its personnel are essential to the continued operations of the Fund, and its profitability, if any."

6.     Based on the PPM, ASB knew that Fairfield Sentry invested 95% of its assets with BLMIS in New York and that BLMIS purported to execute a so-called "split-strike conversion strategy" involving the purchase and sale of U.S. securities on U.S. exchanges, and U.S. Treasuries. According to the PPM, Madoff's purported strategy involved the purchase of a basket of U.S. equities "that together will highly correlate to the S&P 100 Index," as well as the sale and purchase of call and put options on the S&P 100 Index.

7.     The PPM stated, "[t]he Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ('BLM'), a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Fund at that firm … BLM is authorized to determine the price and timing of stock and option transactions in the account."

8.     ASB knew that BLMIS maintained custody of its investments in Fairfield Sentry in New York. The PPM represented "substantially all of the Fund's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of the Fund."

9.     Accordingly, ASB knew that BLMIS acted as the investment advisor, broker-dealer, and custodian for Fairfield Sentry and that control over Fairfield Sentry rested entirely with BLMIS in New York.

**B.      ASB Expected to Be Bound by New York Law and to Submit to New York Jurisdiction**

10.      From at least January 1, 2002, Fairfield Sentry's subscription agreements were governed by New York law and included a New York venue provision and an agreement to submit to the jurisdiction of New York courts.

11.      Fairfield Sentry's subscription agreements stated, "Subscriber agrees that any suit, action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York," and that the "Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding."

12.      Each of Fairfield Sentry's subscription agreements also specified that it "shall be governed and enforced in accordance with the laws of New York."

**C.      ASB's Florida Office and its New York Agent Conducted Due Diligence on Madoff, BLMIS, and Fairfield Sentry**

13.      ASB maintained an office at 121 Alhambra Plaza, Suite 1200, Coral Gables, Florida 33134.

14.      From its Florida office, ASB personnel met with FGG employees regarding ASB's investments in Fairfield Sentry and other FGG funds.  For example, in April 2003, FGG employee Lourdes Barraneche traveled from New York to Florida to meet with Bruno Ghio, ASB's deputy general manager, about several FGG funds, including Fairfield Sentry. Barraneche had managed FGG's relationship with ASB since June 1997 when ASB began investing with Fairfield Sentry.

15.      To conduct due diligence on Fairfield Sentry, ASB Miami employees also traveled to New York for meetings with FGG.  In February 2003, Fernando Montero, the director of ASB's Miami office, Carlos Munos, the president of ASB's Miami office, and Javier

3

Maggiolo, the general manager of ASB's Miami office, met in New York with Jeffrey Tucker, a founding partner of FGG, and Daniel Lipton, FGG's chief financial officer, to discuss ASB's investments in Fairfield Sentry.

16.    In addition, ASB relied upon its advisor and agent in New York, Accumulus Capital Management LLC ("Accumulus"), to conduct due diligence on Madoff, BLMIS, and Fairfield Sentry.  In July 2003, Benjamin Schliemann and Christopher Neve from Accumulus met with Tucker and Walter Noel, the other FGG founding partner, to discuss Madoff and ASB's investments in Fairfield Sentry.

17.    Following these meetings with FGG, ASB insisted on meeting Madoff as part of its due diligence and in November 2003, Ghio, Maggiolo, and Montero from ASB and Schliemann and Neve from Accumulus met with Madoff, along with Tucker and Barraneche from FGG.

### D.    The Transfers Were Received in New York

18.    ASB utilized a New York bank account to transfer funds to and from Fairfield Sentry.

19.    ASB executed subscription agreements in connection with its investments in Fairfield Sentry.  These agreements stated that all money from ASB be directed to a New York HSBC Bank USA, N.A. correspondent bank account for deposit in Fairfield Sentry's bank account.  From Fairfield Sentry's bank account, the funds were ultimately deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York.  ASB directed funds to this HSBC account on at least ten occasions over the course of two years in connection with subscribing funds to Fairfield Sentry.

20.    ASB used its Standard Chartered Bank account in New York to receive transfers from Fairfield Sentry. ASB directed that redemptions and payments be sent to this Standard

Chartered Bank account in New York. ASB utilized this account at least 11 times over a 2-year period to receive $120,168,691 in redemption payments from Fairfield Sentry.

### E. Fairfield Sentry's Principal Place of Business Was in New York

21. At all relevant times, Fairfield Sentry's principal place of business was in New York and it was a New York resident.

### i. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

22. In 1988, Noel and Tucker founded FGG, based in New York City, which created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

23. The FGG de facto partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds, including Fairfield Sentry.

24. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### ii. Fairfield Sentry

25. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the International Business Companies Act.

26.     Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

27.     Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

      **1.**     **Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

28.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.  In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070.  BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

29.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

30.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

**2.    FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities**

31.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying

7

the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

32. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

33. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry.   From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.        Fairfield Sentry's Investors Knew They Were Investing in BLMIS

34.    As noted above, Fairfield Sentry's subscription agreements also incorporated its PPMs by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's purported trading strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  The PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.        BLMIS Was Fairfield Sentry's Investment Manager

35.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Manager's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

36.      In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited FG.  FG Limited was formed under the laws of Ireland.

37.      While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

38.      In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

39.      In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG

formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

management contracts to both entities, including the investment advisory agreements for the

three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG

Bermuda.  FG Limited remained the placement agent for the same funds.

40.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

41.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

42.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

43.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

44.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

45.    The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund Limited*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated:  June 26, 2015
     New York, New York

*/s/ Thomas L. Long*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Thomas L. Long
Torello H. Calvani
Jonathan D. Blattmachr

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*

12