**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Judith A. Selby

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02760 (SMB) |
| Plaintiff, | |
| v. | |
| ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.), | |
| Defendant. | |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS BASED**
**ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT**
**OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**

The Trustee respectfully submits this memorandum as a supplement to his Main Brief in opposition to ABN AMRO Bank N.V. (presently known as The Royal Bank Of Scotland, N.V.) ("ABN/RBS" or "Defendant")'s motion to dismiss and in further support of the Trustee's motion for leave to amend complaints to add the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to ABN/RBS.

## I.    BACKGROUND

At issue are subsequent transfers of BLMIS customer property totaling $21,799,920 from Harley International (Cayman) Limited ("Harley"), a BLMIS Feeder Fund that was nearly 100% invested with BLMIS. Proffer ¶¶ 1, 2, 26. The transfers are the result of two redemption payments made by Harley to ABN/RBS in December 2008. *Id.* at ¶ 24.

As a sophisticated global financial institution, ABN/RBS consciously invested with BLMIS through Harley. *Id.* at ¶¶ 5, 9. ABN/RBS was a shareholder in Harley. *Id.* at ¶ 9. As such, ABN/RBS gained extensive information about BLMIS and its U.S.-based investment strategy through due diligence and research conducted by its employees on other BLMIS Feeder Funds,[1] including those managed by Tremont. *Id.* at ¶¶ 10-20.

Harley was a single-purpose investment vehicle that invested substantially all its assets with BLMIS – a fact known by shareholders like ABN/RBS – which permitted ABN/RBS to benefit from Harley's access to BLMIS and its U.S.-based investment strategy. *Id.* at ¶¶ 11-13, 26. With this knowledge, shareholders like ABN/RBS also knew that the subsequent transfers it received from Harley derived from BLMIS in New York. *Id.* at 11-13. After Harley withdrew

---

[1] Capitalized terms other than those defined herein shall have the meanings assigned to them in the Trustee's Memorandum of Law in Opposition to the Transferee Defendants' Motion to Dismiss on Extraterritoriality and in Further Support of Trustee's Motion for Leave to Amend Complaints ("Trustee's Brief") or the Proffered Allegations Pertaining to the Extraterritoriality Issue as to ABN Amro Bank N.V. (Presently Known as the Royal Bank of Scotland, N.V.), as applicable, both of which are fully incorporated by reference herein.

funds from its BLMIS account in New York, it transferred certain of those funds to ABN/RBS's bank account that ABN/RBS maintained at its New York branch. *Id.* at ¶¶ 23, 24.

The transfers from Harley arose from a transaction whose component events were not "purely foreign," but rather were predominantly domestic because: (1) ABN/RBS's investment in Harley, a BLMIS Feeder Fund, was a means of profiting from BLMIS's U.S. investment strategy and purported U.S. investments; (2) ABN/RBS had an active presence in New York when it received the subsequent transfers from Harley; (3) ABN/RBS received the subsequent transfers in its New York bank account, and Harley, through its agent, had those transfers sent to ABN/RBS from an account in New York; and (4) New York was Harley's principal place of business, as it was managed and administered by entities strictly based in New York.

## II.    ARGUMENT

The District Court directed that the "transfer and component events of the transactions" test set forth in "*Maxwell I*" determines whether a subsequent transfer claim involves the domestic or extraterritorial application of the Bankruptcy Code and SIPA.[2]  In contrast to the facts of *Maxwell*, the transfers and component events of ABN/RBS's transaction with Harley show that it was not the passive recipient of transfers that flowed from a tangential or remote U.S. debtor. ABN/RBS's investment in Harley was done knowing that it would essentially constitute an investment in BLMIS and that ABN/RBS would reap the benefits of BLMIS's exclusively U.S.-focused trading strategy. ABN/RBS's movements of money to and from

---

[2] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell Commc'n. Corp. v. Société General (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 816 (S.D.N.Y. 1995) ("*Maxwell I*")). In *Maxwell I*, the court identified all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction underlying the debt that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *Maxwell I*, 186 B.R. at 816-17.

BLMIS were not "fortuitous or incidental," but rather "the 'ultimate objective' and the '*raison d'etre*'" of its transactions with Harley.[3]

ABN/RBS asserts that the subsequent transfers it received from Harley were "purely foreign" because "every single transfer . . . was made by an entity *organized under the laws of a foreign jurisdiction* or an individual who was a *citizen* of a foreign country."[4] ABN/RBS's motion should be denied because its argument disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit case law that evaluates a broad range of factors[5] to determine whether a claim is "sufficiently domestic" to rebut the presumption against extraterritoriality.[6] Further, it ignores the fact that Harley maintained its principal place of business in New York.

### III. THE SUBSEQUENT TRANSFERS AND COMPONENT EVENTS OF THE TRANSACTION WITH HARLEY WERE PREDOMINANTLY DOMESTIC

ABN/RBS was a Class C shareholder of Harley. Proffer ¶ 9. Shareholder investors in Harley, like ABN/RBS, were required to execute subscription agreements with Harley as a precondition to making any investments in it. *Id.* at ¶ 10. By executing the subscription agreements, investors affirmed having read, understood and accepted the terms set forth in the Harley Confidential Explanatory Memorandum ("Harley PPM"). *Id.* As set forth in the Harley PPM, shareholders like ABN/RBS also received copies of the fund's annual Audited Financial Statements. *Id.* at ¶ 11.

---

[3] *SIPC v. BLI*, 480 B.R. 501, 513 (S.D.N.Y. 2012).
[4] Consolidated Supplemental Memorandum of Law in Support of the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality, at 15 (emphasis added).
[5] *See, e.g. ParkCentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014).
[6] *See Mastafa v. Chevron Corp.*, 770 F.3d 129, 141 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014) (find complaint alleged "sufficient domestic conduct" after review of facts relevant to extraterritoriality) and other cases cited in the Trustee's Brief.

As set forth in the Harley PPM and Harley's Audited Financial Statements, ABN/RBS understood that any returns on its investments in Harley were to be earned in New York by BLMIS engaging in the purchase and sale of U.S. securities, options and Treasurys. *Id.* at ¶¶ 11-13. The information contained in the Audited Financial Statements was consistent with what ABN/RBS knew about other BLMIS Feeder Funds from its investments with various funds managed by Tremont. *Id.* at ¶ 14.

Through its extensive research and due diligence on multiple BLMIS Feeder Funds, ABN/RBS was already intimately familiar with BLMIS's U.S.-based SSC strategy when it received the subsequent transfers from Harley, and knew that BLMIS was subject to U.S. securities laws and regulations. *Id.* at ¶¶ 15, 16. ABN/RBS knew that an investment with any one BLMIS Feeder Fund was essentially an investment with BLMIS, and that all Feeder Funds relied on Madoff to execute the SSC strategy. *Id.* at ¶ 20. It also knew that any redemption from Harley would result in receiving funds from BLMIS in New York. *Id.* at ¶ 9.

What's more, at the time ABN/RBS received the subsequent transfers from Harley, it had a strong and active presence in the United States, including a New York branch and a wholly-owned subsidiary in New York. *Id.* at ¶ 21. During this time, its U.S.-based employees conducted due diligence on Madoff-related funds. *Id.* at ¶ 22.

Finally, ABN/RBS received all $21,799,920 of the subsequent transfers at issue in a bank account it maintained at its New York branch. *Id.* at ¶¶ 23, 24. Harley sent those transfers to ABN/RBS from a bank account in New York. *Id*. at ¶ 25.

## IV.   ABN/RBS RECEIVED THE SUBSEQUENT TRANSFERS FROM HARLEY WHOSE PRINCIPAL PLACE OF BUSINESS WAS NEW YORK

In connection with its investments with BLMIS, Harley acted principally through FAM

Services. Although incorporated in the Cayman Islands, Harley was operated and controlled by Fix Asset Management Services Inc. ("FAM Services"), which was incorporated under New York law and headquartered in New York, New York. Proffer ¶¶ 8, 43, 44.

Charles Fix held all of the voting shares for Harley and lived in New York. *Id.* at ¶ 45. Charles Fix's daughter, Tatiana Fix Katisgera, was the chief executive officer of FAM, and Ms. Fix also lived in New York. *Id.* at 46.

Harley had no employees or offices of its own in the Cayman Islands and acted principally through FAM Services. *Id.* at ¶¶ 37, 38, 44. For example, FAM in New York: (i) conducted due diligence on BLMIS and monitored Harley's investments with BLMIS; (ii) received Harley's account statements from BLMIS, (iii) corresponded directly with BLMIS to request redemptions into and subscriptions from Harley's BLMIS account, and (iv) marketed the sale of shares in Harley to investors. *Id.* at ¶¶ 48-52. Accordingly, Harley's principal place of business was FAM Services' New York City headquarters.

## V.  CONCLUSION

Based on the foregoing and the Trustee's Main Brief, the Trustee respectfully requests that the Court deny the Motion with respect to the transfers ABN/RBS received from Harley and grant the Trustee's motion to amend.

Dated: June 26, 2015         */s/ Judith A. Selby*
New York, New York           Baker & Hostetler LLP
                             45 Rockefeller Plaza
                             New York, New York 10111
                             Telephone: (212) 589-4200/Facsimile: (212) 589-4201
                             David J. Sheehan, Regina L. Griffin, Judith A. Selby

                             *Attorneys for Irving H. Picard, Esq., Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*