**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Judith A. Selby
Andres A. Munoz

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.), <br><br> Defendant. | Adv. Pro. No. 11-02760 (SMB) <br><br> **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO ABN AMRO BANK N.V. (PRESENTLY KNOWN AS THE ROYAL BANK OF SCOTLAND, N.V.)** |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, by and through the undersigned counsel, for these Proffered Allegations as to the Extraterritoriality Issue against ABN AMRO Bank N.V. (presently known as The Royal Bank Of Scotland, N.V.) ("ABN/RBS" or "Defendant"), alleges the following:

## I.  INTRODUCTION

1. The Trustee seeks recovery of approximately $21,799,720 in subsequent transfers of BLMIS customer property made by Harley International (Cayman) Limited ("Harley") to ABN/RBS.

2. The subsequent transfers were made to RBS by Harley, which was one of a number of investment vehicles that invested substantially all its assets with BLMIS (generally, a "BLMIS Feeder Fund").

3. At the time those transfers were made, ABN/RBS was very familiar with multiple BLMIS Feeder Funds, had already entered into transactions with one of the largest BLMIS Feeder Funds, and was active in New York seeking out additional BLMIS-related deals.

4. The subsequent transfers and component events of ABN/RBS's transaction were predominantly domestic. ABN/RBS understood that investing in a BLMIS Feeder Fund meant that it would be directing funds into the United States, and that by requesting redemptions of those investments, it would receive funds from BLMIS in the United States. ABN/RBS also knew that BLMIS was subject to regulation and oversight by authorities in the United States. Moreover, ABN/RBS received the subsequent transfers at its own bank account in New York.

## II. THE RELEVANT PARTIES TO THE SUBSEQUENT TRANSFERS AND RELATED TRANSACTIONS

5. Defendant ABN/RBS is a commercial bank incorporated under the laws of the Netherlands with a registered office in Amsterdam, the Netherlands. At all relevant times, ABN/RBS maintained operations across the globe, including in New York.

6. Defendant ABN/RBS had a wholly-owned subsidiary in New York, ABN Amro Incorporated ("ABNI"), located at 55 East 52 Street, New York, New York 10055. ABNI was incorporated in New York and was an SEC-registered broker-dealer. ABNI was authorized and/or directed to negotiate, conduct due diligence, and act on behalf of ABN/RBS in connection with BLMIS-related transactions.

7. Defendant ABN/RBS has undergone numerous corporate changes since 2007. Prior to 2007, ABN AMRO Bank N.V. ("ABN") was a financial institution organized under the laws of the Netherlands. ABN was a wholly-owned subsidiary of ABN AMRO Holding, N.V. ("ABN Holding"). On October 17, 2007, RFS Holdings B.V., a company jointly owned by The Royal Bank of Scotland ("RBS"), Fortis N.V., Fortis SA/NV, and Banco Santander S.A., and controlled by The Royal Bank of Scotland, acquired ABN and ABN Holding (the "2007 Acquisition"). On February 6, 2010, ABN AMRO Bank N.V. changed its name to The Royal Bank of Scotland N.V. (previously defined as "ABN/RBS" and "Defendant"). As a result of the October 2007 Acquisition of ABN by RBS, any and all knowledge, information or materials regarding BLMIS, Madoff or BLMIS Feeder Funds previously obtained by ABN (including ABN's wholly-owned subsidiary, ABNI) or RBS independently were subsequently shared with, and imputed to, the resulting entity, Defendant ABN/RBS.

8. Harley was an international business company formally organized under the laws of the Cayman Islands. Harley is in liquidation in the Cayman Islands. Harley was operated by Fix Asset Management Services Inc. ("FAM Services"), the New York subsidiary of a financial management company owned and controlled by Charles Fix.

### III. THE TRANSFERS AND COMPONENT EVENTS OF THE TRANSACTION BETWEEN ABN/RBS AND HARLEY WERE DOMESTIC

#### A. ABN/RBS knew that BLMIS in New York was at the core of its investment transaction with Harley

9. ABN/RBS was a Class C shareholder of Harley as early as May 2008. Based on information ABN/RBS knew from other transactions it entered into with other BLMIS Feeder Funds, it was obvious from documents Harley provided to its investors that Harley was a BLMIS Feeder Fund, that an investment in Harley would essentially constitute an investment with BLMIS in New York, and that any redemptions from Harley would result in receiving funds from BLMIS in New York.

10. Shareholder investors in Harley, like ABN/RBS, were required to execute subscription agreements with Harley as a precondition to making any investments in it. By executing the subscription agreements, investors affirmed having read, understood and accepted the terms set forth in the Harley Confidential Explanatory Memorandum ("Harley PPM"). As set forth in the Harley PPM, shareholders like ABN/RBS also received copies of the fund's annual audited financial statements.

11. As set forth in the Harley PPM and Harley's audited financial statements for years 2003, 2004, 2005, 2006, and 2007 (collectively, the "Audited Financial Statements"), ABN/RBS

understood that any returns on its investments in Harley were to be earned in New York by BLMIS engaging in the purchase and sale of U.S. securities, options and Treasurys.

12. Specifically, the Harley PPM disclosed that:

- Harley invested clients' assets "with a single money manager" who "invests primarily in a basket of S&P 100 stocks.

- "Fund assets will typically be invested either directly or indirectly in a large number (20-50) of U.S. equity securities and equity index related options;" and

- "[the] manager also employs an index option overlay as a hedge against adverse market movements" that may be "executed in the [U.S.] over-the-counter-market."

13. The 2007 Harley Audited Financial Statements further disclosed that Harley's investments with BLMIS included U.S. Treasury Bills as well as U.S. traded equity securities. For example, the 2007 Harley Audited Financials disclosed that on December 31, 2007, all of Harley's more than $3 billion of assets invested with BLMIS were purportedly invested in U.S. Treasury Bills.

14. The information contained in the Audited Financial Statements was consistent with what ABN/RBS knew about the other BLMIS feeder funds from its investments with various funds managed by Tremont Partners, Inc. ("Tremont").

15. ABN/RBS was intimately familiar with this strategy – BLMIS's so-called split strike conversion ("SSC") strategy – through transactions that it entered into with certain funds managed by Tremont (the "Tremont Funds.")

16. Through due diligence conducted by its employees with respect to its transactions with the Tremont Funds, ABN/RBS knew that BLMIS purported to execute the SSC strategy in New York as broker for the BLMIS Feeder Funds. ABN/RBS also knew that the strategy

4

purported to involve: (i) the purchase of a group or basket of equity securities, at least 80% of which belong to the S&P 100 that is highly correlated to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities; and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities or maintains investments in U.S. dollars cash, U.S. dollars money market fund or U.S. Treasurys.

17. In fact, ABN/RBS considered BLMIS in New York so "central" to its transactions with the Tremont Funds that it negotiated default and termination provisions in its agreements with Tremont that would be triggered if BLMIS no longer acted as the "Account Manager" of the relevant Tremont BLMIS Feeder Funds.

18. Through its work related to transactions with the Tremont Funds, ABN/RBS also knew that BLMIS was subject to U.S. securities laws and regulations and could be investigated by U.S. authorities for any suspected violation. In fact, ABN/RBS was so concerned that BLMIS was violating U.S. laws and regulations that it successfully negotiated for special redemption rights for its investments in two Tremont-managed BLMIS Feeder Funds if BLMIS were to "become[] the subject of a formal investigation by a U.S. court, governmental or regulatory body or agency related to a specific breach of a U.S. securities law or regulation."

19. In addition to transactions with Tremont and Harley, ABN/RBS pursued deals with at least four other BLMIS Feeder Funds, including Fairfield Sentry Limited and Greenwich Sentry, L.P., Maxam Capital Management LLC, and Lakeview Investment, LP. Through its pursuit of transactions with these other funds, ABN/RBS received abundant information about

5

BLMIS, including BLMIS's standardized account opening documents; those documents included the customer agreement, which specified that the purported transactions in the BLMIS accounts would be subject to the provisions of the Securities Exchange Act and Commodities Exchange Act, as well as the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

20. ABN/RBS knew that investments with any of the BLMIS Feeder Funds were wholly or substantially investments with BLMIS, and that all of the Feeder Funds were subject to the same risk of loss or positive returns because each relied wholly on BLMIS to execute the split strike strategy. In other words, ABN/RBS considered a transaction with any of the BLMIS Feeder Funds as "undertaking Madoff risk." In fact, ABN/RBS set an overall internal limit on BLMIS-related investments, designated as "madoff [sic] capacity," regardless of which BLMIS Feeder Fund it pursued.

**B.    ABN/RBS had an active presence in New York when it received the subsequent transfers from Harley**

21. At all relevant times, ABN/RBS operated in the United States through ABNI, through its New York branch, which was a "resident of the United States" according to its July 2008 USA Patriot Act Certification, and through its employees who were located in New York.

22. As early as 2006, ABN/RBS tasked its U.S.-based Head of Hedge Fund Credit Risk, with the credit review of Madoff-related funds, and remained responsible for this review until Madoff confessed in December 2008. In addition, ABN/RBS's New York-based Director of Hedge Fund Risk, Group Risk Management for ABN AMRO Bank NV was involved in conducting due diligence on BLMIS-related deals.

## IV. THE TRANSFERS WERE RECEIVED BY ABN/RBS IN NEW YORK FROM A BANK ACCOUNT IN NEW YORK

23. ABN/RBS received all of the subsequent transfers at issue in a bank account it maintained at its New York branch. According to Harley's bank records, ABN/RBS had Harley send the subsequent transfers to its account at its New York branch with the account number ending in 1541. It used this same New York account to receive transfers from other BLMIS-related funds, including the Tremont-managed BLMIS Feeder Funds.

24. Bank records indicate that these transfers were redemption payments made to ABN/RBS. On December 2, 2008, Harley sent $4,799,960 to ABN/RBS's New York bank account. On December 10, 2008, Harley sent $16,999,960 to this same New York bank account of ABN/RBS.

25. ABN/RBS received both transfers from Harley's account at The Northern Trust International Banking Corp. ("Northern Trust") in New York held by Fortis Prime Solutions Bank, which served as Harley's administrator. This bank account, whose account number ended in 0230, had an address of 40 Broad Street, 10th Floor, New York, NY 10004. The bank also had a SWIFT code corresponding to an account located in New York.

## V. ABN/RBS RECEIVED THE TRANSFERS FROM HARLEY, WHICH MAINTAINED ITS PRINCIPAL PLACE OF BUSINESS IN NEW YORK

### A. Harley Maintained its Principal Place of Business in New York

26. Harley invested nearly 100% of its assets with BLMIS in New York and received approximately $1 billion in transfers of customer property from BLMIS within two years of December 11, 2008. Of this amount, ABN/RBS received $21,799,720 from Harley.

### 1. Harley Sought Out the United States as a Place to Invest and the Transfers it Received Arose Out of its Investment Account with BLMIS in New York

27. In April 1996, Harley's predecessor, Harley International Limited, entered into a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities with BLMIS in New York. Thereafter, Harley maintained an investment account with BLMIS, designated No. 1FN094.

28. Harley agreed that all disputes arising under the Customer Agreement would be resolved by arbitration before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers Inc. … and in accordance with the rules … of the selected organization."

29. The Customer Agreement between BLMIS and Harley provided that all transactions are subject to the provisions of the U.S. Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System. The Customer Agreement also provided BLMIS with full discretion over Harley's assets, and pursuant to the Trading Authorization agreement, Harley authorized Madoff to be its "agent and attorney in fact" to buy, sell, and trade in U.S. securities.

30. The Trustee filed a complaint against Harley in this Court, under the caption *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), and on November 10, 2010, this Court entered summary judgment against Harley in the amount of $1,066,800,000.

31. In support of summary judgment, this Court held that "Harley specifically sought out the United States as a place to do business when it opened an account with BLMIS," and that

8

the transfers received by Harley "arose out of business transactions tied to Harley's securities account with BLMIS in New York."

### 2. BLMIS in New York Acted as Harley's Investment Manager, Custodian, and Executing Broker

32. Euro-Dutch Trust Company (Bahamas) Limited ("Euro-Dutch Bahamas") acted as Harley's purported investment manager until 2003, and after 2003, Euro-Dutch Management Limited ("Euro-Dutch Cayman") in the Cayman Islands acted as Harley's purported investment manager.

33. Neither Euro-Dutch Bahamas nor Euro-Dutch Cayman played a meaningful role in managing Harley's investments with BLMIS. Instead, they delegated their investment management responsibilities to BLMIS in New York.

34. As Harley's investment manager, BLMIS in New York purported to invest Harley's assets according to Madoff's SSC strategy, and BLMIS decided which, how many, and when to purchase and sell U.S. securities on Harley's behalf. BLMIS also acted as executing broker in purporting to purchase the U.S. securities on Harley's behalf.

35. BLMIS acted as custodian for the U.S. securities purportedly held on Harley's behalf. Each of Harley's Audited Financial Statements for years 2003, 2004, 2005, 2006, and 2007 disclosed that BLMIS acted as Harley's "Custodian." Harley's Audited Financial Statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

36. Harley's Audited Financial Statements for years 2005 and 2006 also noted that "items included in the financial statements are measured using the currency of the primary economic activity in which it operates …. This is the U.S. dollar, which reflects the company's primary activity of investing in U.S. dollar denominated securities and derivatives."

9

### 3. Harley Conducted No Meaningful Business in the Cayman Islands

37. Harley was registered as an exempt company under the Cayman Islands Companies Law and was not permitted to solicit investors in the Cayman Islands.

38. In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands."

39. In its Articles of Association, Harley required that all disputes among Harley and its shareholders would be referred to binding arbitration in New York under rules established by the American Arbitration Association.

40. Each shareholder in Harley, received copies of Harley's Audited Financial Statements, Memorandum of Association, and Articles of Association.

### 4. Fix Asset Management Ltd. Managed Harley from New York

41. Fix Asset Management Ltd. is the family wealth office of Charles Fix, which over the years evolved into an institutional fund of funds manager.

42. Fix Asset Management Ltd. operated through wholly owned subsidiaries, including Fix Asset Management Services Inc. (f/k/a Fix Asset Management, Inc. and Fix Capital Ltd., and collectively with Fix Asset Management Ltd., previously defined as "FAM Services").

43. FAM Services was incorporated under New York law and maintained its principal place of business at 660 Madison Avenue, New York, New York.

44. Harley had no employees or offices of its own. For its investments with BLMIS, Harley acted principally through FAM Services.

45. FAM Services was owned and controlled by Charles Fix, who also owned and controlled all of the voting shares for Harley. During the relevant time period, Charles Fix resided in New York.

46. Fix's daughter, Tatiana Fix Katsigera (f/k/a Tatiana Fix), was the chief executive officer of FAM Services, served on its investment advisory committee, and conducted due diligence for its funds, including Harley. Tatiana Fix Katsigera also lived in New York.

47. Several other members of FAM Services' advisory teams, including John Fix, Abel Pacheco, and Panos Katsambas, also resided in New York during much of the relevant time period. FAM Services' outside counsel was also located in New York.

48. FAM Services marketed Harley from its office in New York, and FAM Services employees met with investors and potential investors in Harley at FAM Services' office in New York.

49. FAM Services monitored and conducted due diligence on Harley's investments with BLMIS from its office in New York.

50. FAM Services received Harley's BLMIS account statements at its office in New York. For several years BLMIS also sent Harley's BLMIS trade confirmations and account statements to FAM Services' agent and service provider at Bank Julius Baer & Co. Ltd. in New York.

51. In monitoring its investments, FAM Services relied on external consultants in the United States, including Merfin LLC from California, X.E. Capital from New York, and Event Capital Markets from New Jersey.

52. FAM Services handled subscriptions into and redemptions from Harley from its office in New York. For example, FAM Services employees corresponded with Madoff and Frank DiPascali to request that BLMIS accept subscriptions into Harley's account with BLMIS. FAM Services employees, including Charles Fix, also corresponded with Madoff and DiPascali to request redemptions from Harley's account.

### 5. Harley Received Transfers at Bank Accounts Held in New York

53. Harley's subscription agreements directed investors to wire U.S. dollars to bank accounts in New York. Prior to 2005, the subscription agreements required subscriptions to be wired to a JPMorgan Chase Bank N.A. account in New York, held in the name of Fortis Bank (Cayman) Limited, and after 2005, the subscription agreements required subscriptions to be wired to an account in the name of Fortis Prime Fund Solutions (IOM) Limited ("Fortis Prime Fund Solutions IOM") at the Northern Trust Banking Corporation ("Northern Trust"), 40 Broad Street, New York, New York.

54. When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York. Harley previously had directed that BLMIS pay redemptions to an account held at Barclays Bank plc in New York.

### 6. Harley Was Administered By Fortis Entities in New York

55. Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, and then Fortis Prime Fund Solutions IOM served as Harley's administrators.

56. The Fortis administrators' relationships with Harley and FAM Services were managed during much of the relevant time period by Rhonda Eldridge, a Managing Director of Fortis Financial Services, LLC ("Fortis Financial Services") who was based in New York.

57. Eldridge worked with employees of Fortis Prime Funds Solutions (USA) LLC ("Fortis Prime Fund Solutions USA") in New York. (Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, Fortis Prime Fund Solutions IOM, Fortis Financial Services, and Fortis Prime Funds Solutions USA are collectively known as "Fortis").

58. Fortis Financial Services was located on Madison Avenue in New York, and from its office Fortis employees performed much of the work necessary in administering Harley.

59. Fortis employees conducted due diligence on BLMIS from Fortis Financial Services's office in New York. Fortis's due diligence included inquiries into BLMIS's role as Harley's custodian as well as a "thorough examination of Harley's account" with BLMIS.

60. Eldridge and other Fortis employees met with Madoff and DiPascali at BLMIS's office in New York. Eldridge and other Fortis employees also regularly spoke with Madoff, DiPascali, and/or Jo Ann Crupi regarding Harley's investments with BLMIS. In addition, Fortis employees met with Charles Fix and investors in Harley at FAM Services' office in New York.

61. Fortis employees received Harley's BLMIS trade confirmations and account statements at Fortis Financial Services's office in New York, and reviewed the trade confirmations and account statements to calculate Harley's NAV.

62. The Trustee incorporates by reference the allegations of the Complaint filed in *Picard v. Harley International (Cayman) Limited*, Adv. Pro. No. 09-01187 (SMB), Dkt. No. 1 (Bankr. S.D.N.Y. May 12, 2009).

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | */s/ Judith A. Selby*<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Regina L. Griffin<br>Judith A. Selby<br>Andres A. Munoz<br><br>**Baker & Hostetler LLP**<br>1050 Connecticut Avenue, NW Suite 1100<br>Washington, DC 20036<br>Telephone: (202) 861-1500<br>Facsimile: (202) 861-1783<br>Katherine L. McKnight<br>Dena S. Kessler<br><br>*Attorneys for Irving H. Picard, Trustee*<br>*for the substantively consolidated SIPA*<br>*Liquidation of Bernard L. Madoff Investment*<br>*Securities LLC and the estate of Bernard L.*<br>*Madoff* |