**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02929 (SMB) |
| Plaintiff, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO DEFENDANT LGT BANK IN LIECHTENSTEIN LTD.** |
| v. | |
| LGT BANK IN LIECHTENSTEIN LTD., | |
| Defendant. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to Defendant LGT Bank in Liechtenstein Ltd. ("LGT Liechtenstein"), states:

## I.  INTRODUCTION

1.       The Trustee seeks to recover at least $10,688,856 in subsequent transfers of BLMIS customer property collectively made to LGT Liechtenstein.  The BLMIS customer property was transferred from BLMIS to Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma"), and then to LGT Liechtenstein.

2.       LGT Liechtenstein is an international bank that maintains its principal place of business in Liechtenstein.  LGT Liechtenstein is a subsidiary of the LGT Group, a global wealth and asset management group owned by the Princely House of Liechtenstein.  LGT Liechtenstein utilizes LGT Group's broad financial network to carry out its investment objectives.

3.       Fairfield Sentry was the largest of many BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with BLMIS in New York, capitalizing on its consistent returns.  From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.  Sigma was a "currency feeder," which accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.

4.       U.S. citizens and residents Walter Noel and Jeffrey Tucker founded *de facto* partnership, Fairfield Greenwich Group ("FGG").  FGG created, operated, and controlled Fairfield Sentry and Sigma in New York.

5.       LGT Liechtenstein purposefully invested in Fairfield Sentry and Sigma to profit from BLMIS in New York.  But for BLMIS's U.S. investment activities, LGT Liechtenstein

1

would have received none of the transfers from Fairfield Sentry and Sigma.

6.      At all relevant times, LGT Liechtenstein used its affiliate within the LGT Group, LGT Capital Partners Ltd. ("LGT Capital") as its investment manager to conduct due diligence on Fairfield Sentry, Sigma, BLMIS, and Madoff.  LGT Capital maintained offices in Switzerland and New York.

7.      LGT Liechtenstein and LGT Capital also maintained investments in or conducted due diligence on other Feeder Funds: Kingate Global Fund, Ltd. ("Kingate Global"), Kingate Euro Fund, Ltd. ("Kingate Euro"), and Maxam Absolute Return Fund, Ltd. ("Maxam Limited"). LGT Liechtenstein invested in these Feeder Funds to gain access to New York-based BLMIS and the U.S. securities market.

8.      As a result of its Feeder Fund due diligence on the and the due diligence of LGT Capital, LGT Liechtenstein knew the following facts:

a.      In reality the investment adviser for the Feeder Funds was BLMIS in New York.

b.      BLMIS in New York was the executing broker for the Feeder Funds' investments, and that BLMIS in New York purportedly operated and executed Madoff's split-strike conversion investment strategy ("SSC Strategy") on behalf of the Feeder Funds.

c.      Madoff's SSC Strategy purportedly involved the purchase of U.S. S&P 100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

d.      BLMIS maintained custody of virtually all of the Feeder Funds' assets in

New York.

e.      BLMIS was a registered broker-dealer.

f.      BLMIS functioned as the Feeder Funds' investment adviser, and after 2006, BLMIS was a registered Investment Adviser with the Securities and Exchange Commission ("SEC").

g.      The entire economic purpose of the Feeder Funds was to deliver money to BLMIS in New York.

9.      Thus, LGT Liechtenstein knew control over Fairfield Sentry's and Sigma's investments rested entirely with BLMIS in New York. LGT Liechtenstein intended to benefit from BLMIS's implementation of Madoff's U.S. investment strategy.

## II.    THE TRANSFERS AND COMPONENT EVENTS OF THE TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

### A.    LGT Liechtenstein Knew Virtually All Fairfield Sentry and Sigma's Assets Were Invested with BLMIS in New York

10.     Virtually all of Fairfield Sentry's and Sigma's assets were invested with BLMIS in New York and LGT Liechtenstein knew this fact. LGT Liechtenstein chose to invest in Fairfield Sentry and Sigma as a means of placing investments with BLMIS in New York, and relinquished control over its investments with BLMIS, which made and implemented the investment decisions.

11.     LGT Liechtenstein's investments in Fairfield Sentry were governed by Private Placement Memoranda ("PPMs") and subscription agreements. By executing Fairfield Sentry subscription agreements, LGT Liechtenstein affirmed that it "received and read a copy of the [PPM]," and "relied solely on the [PPM] and independent investigations made by [LGT Liechtenstein]."

12.     Because LGT Liechtenstein subscribed funds into Fairfield Sentry throughout the

years, LGT Liechtenstein received and analyzed several PPMs in connection with subscribing

funds into Fairfield Sentry.

13.     LGT Liechtenstein knew Fairfield Sentry was entirely dependent on BLMIS in

New York.  From the Fairfield Sentry PPMs, LGT Liechtenstein knew Madoff's SSC Strategy

purportedly involved the purchase and sale of U.S. S&P 100 Index securities, options, and U.S.

Treasurys traded on U.S. exchanges.  The PPMs also stated that "[t]he services of BLM[IS] and

its personnel are essential to the continued operation of [Fairfield Sentry]."  Thus, LGT

Liechtenstein intended to profit from BLMIS's control over its U.S. investments.

14.     LGT Liechtenstein knew from the Fairfield Sentry PPMs that BLMIS was an SEC

registered broker-dealer in New York that executed the trades for the SSC Strategy on behalf of

Fairfield Sentry through accounts at BLMIS.

15.     LGT Liechtenstein also knew that BLMIS served as the custodian for Fairfield

Sentry's funds and there was a possibility BLMIS could misappropriate the assets it invested in

Fairfield Sentry.  The PPMs received and analyzed by LGT Liechtenstein contained a section

titled "Possibility of Misappropriation of Assets" that explained: "When [Fairfield Sentry]

invests utilizing the [SSC Strategy] . . . it will not have custody of the assets so invested.

Therefore, there is always the risk that the personnel of [BLMIS] with which [Fairfield Sentry]

invests could misappropriate the securities or funds (or both) of [Fairfield Sentry]."

16.     Accordingly, LGT Liechtenstein knew BLMIS in New York acted as the

investment adviser, broker-dealer, and custodian for Fairfield Sentry and knew control over

Fairfield Sentry's investments rested entirely with BLMIS.  LGT Liechtenstein intended to profit

from BLMIS's implementation of Madoff's SSC Strategy.

17.     LGT Liechtenstein also executed subscription agreements in connection with its

4

investments in Sigma, in which LGT Liechtenstein agreed that it had received and reviewed Sigma's PPMs.  Sigma's PPMs were substantially similar to Fairfield Sentry's PPMs, and also disclosed New York-based BLMIS implemented Madoff's SSC Strategy, and simultaneously acted as investment adviser, broker-dealer, and custodian.

> **B.    LGT Liechtenstein Agreed New York Choice of Law, Jurisdiction, and Venue Applied in Connection with Its Investments with Fairfield Sentry and Sigma**

18.    LGT Liechtenstein executed subscription agreements in connection with its investments.  LGT Liechtenstein's executed Fairfield Sentry subscription agreements specified that "[the agreements] shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provision."  By executing Fairfield Sentry subscription agreements, LGT Liechtenstein also "agree[d] any suit, action or proceeding . . . with respect to th[ese] [a]greement[s] and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any proceeding."

19.    LGT Liechtenstein also chose to invest in Sigma by executing its subscription agreements.  Like Fairfield Sentry subscription agreements, Sigma's subscription agreements contained New York choice of law provisions and provided for venue and jurisdiction for any disputes in New York.

> **C.    LGT Liechtenstein Repeatedly Used a New York Bank to Transfer Funds to Fairfield Sentry**

20.    LGT Liechtenstein used a New York bank account to transfer money to Fairfield Sentry.

21.    LGT Liechtenstein executed Fairfield Sentry subscription agreements in connection with its investments.  These agreements stated that all money from LGT

Liechtenstein be directed to an HSBC Bank, New York correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York. LGT Liechtenstein directed funds to this HSBC Bank, New York account on more than 16 occasions in connection with subscribing funds to Fairfield Sentry.

**D.     LGT Liechtenstein Used Its Affiliate's New York Office to Conduct Due Diligence on BLMIS in New York in Connection with Its Domestic Investments**

22.     LGT Liechtenstein utilized the New York office of its affiliate LGT Capital to conduct due diligence on Fairfield Sentry, Sigma, BLMIS, and Madoff in New York. LGT Capital is a leading alternative investment manager based in Switzerland that maintains an office in New York.

23.     LGT Capital selected hedge fund investments for LGT Liechtenstein, including its investments in Fairfield Sentry and Sigma. LGT Liechtenstein and LGT Capital conducted due diligence on Fairfield Sentry and Sigma and shared information gained through due diligence on Fairfield Sentry, Sigma, BLMIS, and Madoff.

24.     LGT Capital worked with U.S. FGG employee Ron Thomann, who operated out of the FGG's Boston office but spent half of his time in FGG's New York headquarters. Thomann sent LGT Capital due diligence materials, communicated with LGT Capital employees about Fairfield Sentry and Sigma, and coordinated meetings in New York between FGG and LGT Capital representatives.

25.     In May 2003, Thomann arranged meetings for LGT Capital employees who were traveling from their Switzerland office to their New York office and wanted to meet with FGG while they were in New York to receive in-person answers to their due diligence questions.

26.     LGT Liechtenstein and LGT Capital also conducted due diligence on and invested

in other Feeder Funds, including Kingate Global, Kingate Euro, and Maxam Limited.   LGT

Liechtenstein knew each of these Feeder Funds was entirely invested with BLMIS and invested

in these Feeder Funds to gain access to New York-based BLMIS and the U.S. securities market.

> **E.    LGT Liechtenstein Understood Fairfield Sentry, Sigma, and BLMIS Were Operated Out of New York but Were Trying to Avoid SEC Scrutiny by Organizing Offshore**

27.    In June 2003, Stefan Muehlemann, LGT Capital's vice president and senior hedge

fund analyst, met with FGG's founding partner Jeffrey Tucker in New York to discuss his

Madoff-related "concerns."  Muehlemann understood that Fairfield Sentry, Sigma, and BLMIS

were operated out of New York.  The purpose of Muehlemann's trip was to express his concerns

to Tucker and understand FGG's then-recent decision to assign FG Limited's investment

management agreement for Fairfield Sentry to FG Bermuda.  FGG explained in an internal email

that Muehlemann was worried that "the move [was] an attempt by Madoff to avoid SEC scrutiny

of his firm and market making activities."

28.    Madoff had in fact rejected FGG's plan to have an entity formed under the laws

of the United States serve as an investment manager to Fairfield Sentry, and FGG created FG

Bermuda as a result of Madoff's direction.   When the SEC eventually did conduct an

investigation of BLMIS and its relationship to its Feeder Funds in 2005 and 2006, it determined

BLMIS, not FG Bermuda, was the actual investment manager of Fairfield Sentry.  In 2006, the

SEC ultimately required BLMIS to register as an investment adviser.  The SEC also required

FGG to modify its investor communications—which had previously been revised to remove all

mention of both Madoff and BLMIS—to make clear that the SSC Strategy Fairfield Sentry and

Sigma were selling was being managed and executed by Madoff in New York.

> **F.    Fairfield Sentry and Sigma's Principal Place of Business Was in New York**

29.    At all relevant times, Fairfield Sentry and Sigma's principal place of business was

in New York and they were U.S. residents.

### 1.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

30.    In 1988, Walter Noel and Jeffrey Tucker founded *de facto* partnership FGG based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were Feeder Funds.

31.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three Feeder Funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

32.    FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### 2.    Fairfield Sentry

33.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

34.     Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

35.     Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

a.   *Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States*

36.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.   In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

37.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

38.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

        *b.  FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities*

39.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms,

10

maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### c.  FGG New York Personnel Managed Fairfield Sentry

40.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

41.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry.    From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.    From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

42.    Fairfield Sentry's subscription agreements also incorporated its PPMs by reference.    Each Fairfield Sentry subscriber acknowledged receipt of the PPM.    The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.    Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e. BLMIS Was Fairfield Sentry's Investment Manager

43.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.    At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.    The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.    Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

44.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

45.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

46.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

47.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG

formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

management contracts to both entities, including the investment advisory agreements for the

three Feeder Funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.

FG Limited remained the placement agent for the same funds.

48.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

49.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

50.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

51.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

14

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

52.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.  The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### 3.     Sigma

53.     FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield Sentry using Euros, FGG created Sigma.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

54.     Noel and Tucker organized Sigma on November 20, 1990, as an international business company under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma.  Sigma is currently in liquidation in proceedings in the BVI and United States.

55.     Also like Fairfield Sentry, Sigma was a shell corporation present in the BVI only on paper.  It had no employees and maintained no offices.  It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and

hundreds of other unrelated investment vehicles. The law firm operating the trust company and

the registered post office box addressed its statements for services for Sigma to FGG's New

York headquarters.  Sigma was operated almost entirely by FGG New York Personnel.

56.      As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New

York Personnel made the operational decisions regarding Sigma.   Once Sigma was opened for

investors, FGG New York Personnel monitored Sigma's investments into, and redemptions

from, Fairfield Sentry; managed Sigma's relationship with clients and potential clients; created

marketing and performance materials for Sigma; marketed Sigma; performed administrative

functions required by Sigma; negotiated confidentiality agreements and other service provider

contracts on behalf of Sigma; and conducted various other due diligence and risk management

activities.  Until Sigma's liquidation, FGG maintained Sigma's books and records in New York.

FGG New York Personnel also had final control of Sigma's banking accounts, including those

accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

57.      FGG New York Personnel controlled and approved the subscriptions for and

redemptions of Sigma shares.   Like Fairfield Sentry's subscription agreements, Sigma's

subscription agreements contained a New York choice of law provision, provided for venue and

jurisdiction for any disputes in New York, and incorporated their PPMs that described the

significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole

assets.  Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with

respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the

investments.  Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the

custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could

misappropriate the assets or securities.  This same risk was also disclosed in Fairfield Sentry's

16

PPMs.

58.    Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry,

contracted with Citco Fund Services to provide Sigma with backoffice administrative services

such as coordinating subscription and redemption forms, maintaining Know Your Customer

information, and serving as the independent party verifying the Net Asset Value of the Sigma

shares.  Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma

assets.  As a further part of the Citco relationship, Noel and Tucker opened bank accounts on

behalf of Sigma at Citco Bank Dublin.  FGG New York Personnel had final control of the Sigma

Citco Bank Dublin bank accounts.  Finally, FGG New York Personnel controlled all of Sigma's

relationships with the Citco entities.

59.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma

investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS.

Noel executed separate contracts on Sigma's behalf with the Bank of Montreal for currency

swaps which were "governed by and construed in accordance with the laws of the State of New

York (without reference to choice of law doctrine)."

60.    FGG New York Personnel initially listed FG Limited as the investment manager

for Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the

Sigma PPMs to indicate FG Bermuda was Sigma's Investment Manager.  In fact there were no

duties for any investment manager because Sigma's sole purpose was to purchase Fairfield

Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S.

Dollars.

61.    The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB), (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015
     New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long

**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Lauren M. Hilsheimer
Melonia A. Bennett

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the estate of Bernard L.
Madoff*