**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01005 (SMB) |
| Plaintiff, | |
| v. | |
| SICO LIMITED, | |
| Defendant. | |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN
OPPOSITION TO SICO LIMITED'S MOTION TO DISMISS BASED ON
EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE
<u>TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT</u>**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, respectfully submits this supplemental memorandum of law in opposition to SICO Limited's ("SICO") motion to dismiss based on extraterritoriality and in support of the Trustee's motion to amend his complaint. The Proffered Allegations plead specific facts evincing that the transfers and the component events of the transactions are sufficiently domestic under the standards set forth in the Extraterritoriality Decision such that the Trustee's action does not require an extraterritorial application of SIPA or the Bankruptcy Code.[1] Accordingly, SICO's motion to dismiss must be denied.

## BACKGROUND AND LEGAL STANDARD

The District Court returned this action to this Court to determine whether the Trustee's claims against SICO seek the recovery of "purely foreign" transfers that require an extraterritorial application of Bankruptcy Code.[2] Under the Extraterritoriality Decision, the Trustee must only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[3] In making this determination, there is no bright-line test to determine whether a transaction is extraterritorial,[4] and courts must review "the location of the transfers as well as the component events of those transactions."[5] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[6]

---

[1] *Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222 (S.D.N.Y. 2014) (the "Extraterritoriality Decision").

[2] *Id.* at 232–33.

[3] *Id.* at 232, n.4.

[4] *Parkcentral Global Hub Ltd. v. Porsche Automobil Holdings SE*, 763 F.3d 198, 216-17 (2d Cir. 2014).

[5] Extraterritoriality Decision at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)).

[6] *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010); *see also SEC v. Gruss*, 859 F. Supp. 2d 653, 666 (S.D.N.Y. 2012).

In this action, the Trustee seeks to recover $15,615,417 in subsequent transfers of BLMIS customer property made to defendant SICO from Fairfield Sentry Limited ("Fairfield Sentry") and Kingate Global Fund Ltd. ("Kingate Global") (together, the "BLMIS Feeder Funds"). SICO argues because it and the BLMIS Feeder Funds were formally organized under the laws of the British Virgin Islands ("BVI"), SICO is entitled to a finding that the transfers it received are "purely foreign" and that the Trustee's claims must be dismissed under the Extraterritoriality Decision. SICO is mistaken. This superficial analysis ignores that the transactions have significant domestic components, including, among other things, that SICO invested in the BLMIS Feeder Funds to profit from BLMIS in New York. As set forth below, a comprehensive review of the transfers and the component events of the transactions demonstrates the Trustee's recovery claims against SICO does not require an extraterritorial application of the Bankruptcy Code.

## THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

The subsequent transfers from the BLMIS Feeder Funds were not "purely foreign," but were predominantly domestic for the following reasons: (1) SICO invested in the BLMIS Feeder Funds to profit from BLMIS in New York, (2) SICO sent and received the transfers to and from the BLMIS Feeder Funds through New York bank accounts, (3) the HSBC Bank USA, N.A. ("HSBC USA"), on behalf of SICO, conducted extensive due diligence on Fairfield Sentry in New York, (4) Fairfield Sentry's principal place of business was in New York, and (5) Kingate Global's investment operations were centered in New York.

First, SICO invested in the BLMIS Feeder Funds to profit from BLMIS in New York. From the BLMIS Feeder Funds' offering memoranda, SICO knew the funds invested all or at least 95% of their assets with BLMIS. (Proffer at ¶ 7.) SICO also knew: (i) the BLMIS Feeder

2

Funds delegated all investment decisions to BLMIS as their investment advisor; (ii) BLMIS maintained custody of the assets in New York; and (iii) BLMIS purported to execute trades in U.S. securities on behalf of the BLMIS Feeder Funds. (*Id.* at ¶¶ 8-18.) Accordingly, SICO knew BLMIS was "essential" to the BLMIS Feeder Funds' profitability and, in turn, SICO's profitability. (*Id.* at ¶ 11.)

SICO invested in the BLMIS Feeder Funds *because* their money would ultimately be placed with BLMIS, and in turn, Madoff would invest their assets in U.S. securities traded on U.S. markets. But for BLMIS and its U.S.-based investment strategy, SICO would not have invested in the BLMIS Feeder Funds. As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States … was not fortitious or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and Fairfield Sentry.[7]

Second, SICO sent and received transfers to and from the BLMIS Feeder Funds using New York bank accounts. SICO directed subscription payments to the BLMIS Feeder Funds' New York correspondent bank accounts at HSBC USA, which were ultimately deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York. (*Id.* at ¶ 25.) SICO also instructed Fairfield Sentry to pay dozens of redemptions to an HSBC Private Bank (Suisse) S.A. account at HSBC USA in New York. (*Id.* at ¶ 26.)

Third, HSBC USA conducted extensive due diligence on Fairfield Sentry in New York. From this due diligence, SICO understood that Fairfield Greenwich Group ("FGG") created, managed, and controlled Fairfield Sentry from its primary offices in New York. (*Id.* at ¶¶ 21-22.) Each year HSBC USA visited FGG's offices in New York and issued a yearly or semi-yearly

---

[7] *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 523 (Bankr. S.D.N.Y. 2012).

3

due diligence report on Fairfield Sentry that identified numerous badges of fraud with respect to BLMIS. (*Id*.). On at least two occasions, HSBC USA met with Madoff at BLMIS's New York offices. (*Id*.)

Fourth, Fairfield Sentry's principal place of business was in New York at FGG's headquarters. In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG, a New York-based *de facto* partnership. (*Id*. at ¶ 27.) Noel and Tucker formally organized Fairfield Sentry as an international business company under BVI law. (*Id*. at ¶ 31.) As such, BVI law restricted Fairfield Sentry from doing business in the BVI except with BVI international business companies. (*Id.*)

From its inception until its liquidation in 2009, Fairfield Sentry had no employees and no offices. (*Id*. at ¶ 32.) At all relevant times, Fairfield Sentry was operated almost entirely by FGG's New York headquarters personnel who maintained final control of Fairfield Sentry's bank accounts and relationships with Fairfield Sentry's back office service providers. (*Id*. at ¶ 37.) Fairfield Sentry had no actual presence in the BVI. Its BVI registered address was a post office box care of a local trust company owned and operated by a local law firm. (*Id*. at ¶ 32.)

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. (*Id*. at ¶ 34.) In the account opening documents, Tucker identified Fairfield Sentry's mailing address in the United States and directed BLMIS to send Fairfield Sentry's monthly account statements, trade confirmations, and correspondence to the same U.S. address. (*Id*.) In January 1998, FGG requested that BLMIS send all Fairfield Sentry account information to FGG's New York headquarters. (*Id*.)

At all relevant times, FGG New York headquarters personnel monitored Fairfield Sentry's investments; managed the relationships with BLMIS; directed investments into and out

4

of BLMIS as well as into and out of Fairfield Sentry; marketed Fairfield Sentry; approved all subscriptions for Fairfield Sentry shares; maintained all of Fairfield Sentry's books and records; and made all strategic and operational decisions regarding Fairfield Sentry. (*Id*. at ¶¶ 38-39.)

<u>Fifth</u>, Kingate Global invested exclusively with BLMIS in New York and, together with its purported investment manager, consultant, and other service providers, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation. (*Id*. at ¶ 53.)

Kingate Global had no physical offices, no employees, and transacted no meaningful business in the BVI. (*Id*. at ¶ 54.) Instead, Kingate Global operated through service providers with substantial connections to the United States. Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years and was formed in Bermuda, but was itself managed from New York by Tremont Partners, Inc., a Connecticut corporation. (*Id*. at ¶ 55.) Kingate Global was also co-managed by Kingate Management Limited ("KML"), which operated through agents in New York. (*Id*. at ¶¶ 67.) KML engaged consultants FIM Limited and FIM Advisers LLP (together "FIM") to perform due diligence on BLMIS. (*Id*. at ¶ 70.) Although FIM had a London address, the head of due diligence for its feeder fund investments was located in New York and worked with FIM's affiliate FIM (USA) Inc. in New York, which was the hub for FIM's feeder fund due diligence. (*Id*. at ¶¶ 71-72.) From New York, FIM (USA) Inc. monitored, researched and solicited investors for Kingate Global. (*Id*. at ¶ 72.)

## **CONCLUSION**

For the foregoing reasons and those stated in the main brief, the Trustee respectfully requests that the Court deny SICO's motion to dismiss and grant the Trustee's leave to amend the Complaint.

5

Dated: June 26, 2015  /s/ Thomas L. Long
      New York, New York  **Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Torello H. Calvani

6