**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01005 (SMB) |
| Plaintiff, | |
| v. | |
| SICO LIMITED, | |
| Defendant. | |

**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING**
**TO THE EXTRATERRITORIALITY ISSUE AS TO SICO LIMITED**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, by and through his undersigned counsel, respectfully submits the following proffered allegations as to the domestic nature of the transfers received by SICO Limited ("SICO") from Fairfield Sentry Limited ("Fairfield Sentry") and Kingate Global Fund Ltd. ("Kingate Global," and with Fairfield Sentry, the "BLMIS Feeder Funds").

## I.    BACKGROUND

1.     The Trustee seeks to recover $15,615,417 in subsequent transfers that SICO received between 2003 and 2008 from the BLMIS Feeder Funds: $14,544,621 from Fairfield Sentry and $1,070,796 from Kingate Global.

2.     SICO is an international business incorporated under the laws of the British Virgin Islands ("BVI") and is part of the HSBC Group ("HSBC"), a sophisticated banking and financial services conglomerate that enabled Madoff's Ponzi scheme by encouraging investments into an international network of funds, including the BLMIS Feeder Funds. HSBC entities, including SICO, worked together to conduct the transactions underlying the transfers at issue.

3.     The BLMIS Feeder Funds were single-purpose investment vehicles that pooled their investors' assets to invest with BLMIS in New York. Fairfield Sentry was created, operated, marketed, and controlled by a *de facto* partnership, the Fairfield Greenwich Group ("FGG"), based in New York. Kingate Global's investments were managed from New York.

4.     As set forth below, SICO invested in the BLMIS Feeder Funds to profit from BLMIS in New York, and the BLMIS Feeder Funds were a means to that end.

## II. THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

### A. SICO Invested with the BLMIS Feeder Funds to Profit from BLMIS and its U.S.-Based Investment Strategy

5. SICO knew BLMIS acted as the investment advisor, broker-dealer, and custodian for the BLMIS Feeder Funds and that control over the BLMIS Feeder Funds rested entirely with BLMIS in New York.

#### 1. Fairfield Sentry

6. To invest in Fairfield Sentry, SICO executed subscription agreements wherein it represented that it read and reviewed a copy of Fairfield Sentry's Private Placement Memoranda, as amended from time to time (the "PPM").

7. According to the PPM, Fairfield Sentry invested 95% of its assets with BLMIS in New York, and BLMIS purported to execute a so-called "split-strike conversion investment strategy" ("SSC Strategy") involving the purchase and sale of U.S. securities over U.S. exchanges.

8. The PPM stated that the fund's objective was "to achieve capital appreciation of its assets by allocating its assets to an account at Bernard L. Madoff Investment Securities ('BLM'), a registered broker-dealer in New York, which employs an options trading strategy described as [the SSC Strategy]."

9. The PPM stated that the SSC Strategy involved the purchase and sale of a basket of U.S. equities and call and put options that together were highly correlated to the S&P 100 Index.

10. The PPM stated that FGG "delegated all investment management duties to Bernard L. Madoff Investment Securities. As a result, the Company [Fairfield Sentry] is subject

2

to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities."

11. The PPM stated that "[a]ll investment decisions in the account at BLM are effected by persons associated with BLM," and that "[t]he services of ... Bernard L. Madoff Investment Securities are essential to the continued operations of the Manager [Fairfield Greenwich Limited]."

12. The PPM stated that "Bernard L. Madoff Investment Securities has entered into an agreement with Citco Custody pursuant to which Bernard L. Madoff Investment Securities will serve as a sub-custodian of the Company's [Fairfield Sentry] assets."

13. From the PPM, SICO knew BLMIS acted as the investment advisor, broker-dealer, and custodian for Fairfield Sentry and that control over Fairfield Sentry rested entirely with BLMIS in New York.

### 2. Kingate Global

14. According to Kingate Global's Amended and Restated Information Memoranda (the "IM"), "the Fund has established a discretionary account with an Investment Advisor," *i.e.*, Madoff, "who is based in the United States and who invests or trades in a wide range of equity securities, and, to a lesser extent, other securities and derivatives."

15. The IM stated that the fund's managers had "delegated all investment management duties with regard to USD Shares to the Investment Advisor[,]" *i.e.*, Madoff.

16. The IM stated that BLMIS would employ the SSC Strategy, with a description similar to that made in Fairfield Sentry's PPM.

17. The IM stated that "neither the Fund nor the Custodian has actual custody of the assets. Such actual custody rests with the Investment Advisor and its affiliated broker-dealer. Therefore, there is the risk that the custodian could abscond with those assets."

3

18. From the Kingate Global IM, SICO knew BLMIS acted as the investment advisor, broker-dealer, and custodian for the Kingate Global and that control over Kingate Global rested entirely with BLMIS in New York.

### B. HSBC USA Conducted Due Diligence in New York on Behalf of HSBC

19. HSBC Bank USA, N.A. ("HSBC USA") is a national bank chartered by the Office of the Comptroller of the Currency with a principal executive office at 452 Fifth Avenue, New York, New York 10018.

20. HSBC USA operates more than 240 bank branches throughout the United States, with over 150 branches in New York State.

21. Starting in or around 2000, HSBC USA, on behalf of HSBC and its subsidiaries, including SICO and HSBC Private Bank (Suisse) S.A. ("HSBC Suisse"), formerly known as HSBC Guyerzeller Bank AG, conducted extensive due diligence on Fairfield Sentry on an annual and at times semi-annual basis. HSBC USA's diligence included regular meetings with FGG in New York and at least two separate meetings with Madoff at BLMIS's offices in New York.

22. From its due diligence, HSBC USA, and consequently SICO, understood that FGG operated Fairfield Sentry from FGG's principal place of business in New York.

### C. SICO Affiliates Regularly Corresponded with FGG in New York Regarding SICO's Subscriptions and Redemptions

23. Philip Toub, an FGG partner based in New York, acted as SICO's FGG representative for its investments in Fairfield Sentry.

24. HSBC Suisse assisted SICO with respect to SICO's investments in the BLMIS Feeder Funds and requested subscriptions into and redemptions from Fairfield Sentry by contacting FGG in New York.

### D. SICO Received the Transfers in New York

25. SICO executed subscription agreements in connection with its investments in Fairfield Sentry. These agreements stated all money from SICO be directed to a New York correspondent bank account at HSBC USA for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York.

26. SICO also instructed Fairfield Sentry to pay redemptions to an HSBC Suisse account at HSBC USA in New York, and between February 2003 and February 2008, SICO received dozens of redemption payments from the HSBC USA account in New York. By investing in Fairfield Sentry, SICO knew it was directing funds to and receiving funds from New York bank accounts.

### E. Fairfield Sentry Maintained its Principal Place of Business in New York

27. At all relevant times, Fairfield Sentry's principal place of business was in New York, and it was a domestic resident.

#### 1. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

28. In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group (previously defined as "FGG") based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

29. The FGG de facto partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds, including Fairfield Sentry.

5

30. FGG also included a number of administrative entities that purportedly provided management and back-office support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### 2. Fairfield Sentry

31. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

32. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

33. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

6

### a. Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States

34. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

35. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

36. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under

7

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities & Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

### b. FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities

37. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### c. FGG New York Personnel Managed Fairfield Sentry

38. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed

8

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

39. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

        **d.**        **Fairfield Sentry's Investors Knew They Were Investing in BLMIS**

40. As noted above, Fairfield Sentry's subscription agreements also incorporated its PPMs by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term

9

U.S. Treasurys. The PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e.     BLMIS Was Fairfield Sentry's Investment Manager

41. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

42. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited FG. FG Limited was formed under the laws of Ireland.

43. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

44. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

45. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for Fairfield Sentry to FG Bermuda.

46. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

47. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

11

48. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

49. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

50. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

51. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund Limited*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

### F. The Kingate Global Transfers Are Domestic

52. BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the accounts prior to December 11, 2008.

12

### 1. Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation

53. Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

54. Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

55. Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

56. Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage Kingate Global's investments with BLMIS.

57. Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

### 2. The Operative Legal Documents Were New York-Based

58. Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

59. Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities

13

Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

60. Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### 3. BLMIS Had Full Authority to Make and Execute Investment Decisions

61. Kingate Global's Trading Authorization Agreements authorized BLMIS to be Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

62. As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as Kingate Global's investment manager and purported to invest exclusively according to Madoff's strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

63. BLMIS acted as Kingate Global's broker-dealer in purporting to purchase securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### 4. Kingate Global Was Managed From New York

64. During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

14

65. Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

66. Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

67. Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso. KML operated through its agents in New York.

68. KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

69. KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

70. KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

71. Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

72. FIM (USA) was the hub for FIM's feeder fund due diligence. From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

15

73. KML and the FIM entities actively participated in Kingate Global business with BLMIS and knew BLMIS purported to invest U.S. securities traded on U.S. exchanges in New York.

### 5. Kingate Global Used Banks in New York

74. Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase Bank N.A.

75. KML also engaged HSBC Bank USA, N.A., a major international financial institution doing business in the United States as Kingate Global's custodian.

76. In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

77. FIM also directed fee payments to be routed through a bank account in New York.

78. The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti*, Adv. Pro. No. 09-01161 (SMB), filed March 17, 2014 (Bankr. S.D.N.Y.).

Dated: June 26, 2015
      New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*