**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　　Plaintiff-Applicant,<br><br>　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　　Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |

In re:

BERNARD L. MADOFF,

　　　　　　Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>SNS BANK N.V., and SNS GLOBAL CUSTODY B.V.,<br><br>　　　　　　Defendants. | Adv. Pro. No. 12-01046 (SMB) |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO SNS BANK N.V. AND SNS GLOBAL CUSTODY B.V.'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, respectfully submits this supplemental memorandum of law in opposition to the consolidated motion to dismiss joined by SNS Bank N.V. ("SNS Bank") and SNS Global Custody B.V. ("SNS Custody," and together, "Defendants") claiming that the Trustee's recovery of subsequent transfers is barred as an extraterritorial application of Bankruptcy Code § 550, and in support of the Trustee's motion for leave to amend his complaint. As set forth below and in the accompanying Proffered Allegations, the Trustee has pled specific facts evidencing that the subsequent transfers made to Defendants are sufficiently domestic such that their recovery does not require an extraterritorial application of SIPA or the Bankruptcy Code. Accordingly, Defendants' motion to dismiss must be denied and the requested amendment should be allowed.

## ARGUMENT

The District Court returned this action to this Court to determine whether the Trustee's claims against Defendants seek the recovery of "purely foreign" transfers requiring an extraterritorial application of SIPA or Bankruptcy Code § 550.[1] Under the Extraterritoriality Decision, the Trustee need only "put forth specific facts suggesting a domestic transfer" to avoid dismissal.[2] In making this determination, there is no bright-line test to determine whether a transaction is extraterritorial;[3] rather this Court must review "the location of the transfers as well

---

[1] *Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 232–33 (S.D.N.Y. 2014) (the "Extraterritoriality Decision").

[2] *Id*. at 232 n.4.

[3] *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 at 216-17 (2d Cir. 2014).

as the component events of those transactions."[4] This is a fact-based inquiry for which all reasonable inferences are to be drawn in the Trustee's favor.[5]

During the six years preceding Madoff's arrest, Defendants received at least $74,222,095 in subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma"), and Fairfield Lambda Limited ("Fairfield Lambda," collectively, the "Fairfield Funds"), which invested virtually all of their assets with BLMIS in New York. (Proffer ¶ 1.)

Defendants argue because they and the Fairfield Funds are organized under foreign law, Defendants are entitled to a finding that the transfers they received are "purely foreign" and the Trustee's claims must be dismissed. Defendants are wrong. Their argument ignores the relevant legal analysis. As set forth below, a comprehensive review of the component events of the transactions demonstrates the transfers were predominantly domestic, not foreign—let alone "purely foreign"—and therefore do not require an extraterritorial application of SIPA or the Bankruptcy Code. Defendants entered into the transactions and received the transfers: (1) knowing they were essentially investing in New York-based BLMIS, (2) pursuant to domestic agreements, (3) into and through New York bank accounts, (4) in connection with business they conducted in the United States, and (5) from investment funds based in and profiting from New York.

First, Defendants knew BLMIS's control over their investments in the Fairfield Funds was so extensive they were essentially investing with BLMIS in New York. The Fairfield Funds invested at least 95% of their assets with BLMIS. (*Id.* ¶ 3.) Defendants knew BLMIS controlled

---

[4] Extraterritoriality Decision at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)).

[5] *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

2

every aspect of the Fairfield Funds' investments in New York: (i) the Fairfield Funds delegated all investment decisions to BLMIS as their investment advisor; (ii) BLMIS maintained custody of the assets in New York; and (iii) BLMIS purported to execute trades in U.S. securities on behalf of the Fairfield Funds. (*Id.* ¶¶ 6–12.) The Fairfield Funds' investment memoranda ("IM") called BLMIS "essential" to the Fairfield Funds' profitability. (*Id.* ¶ 13.)

Defendants invested in the Fairfield Funds *because* their money would ultimately be placed with BLMIS, and in turn, Madoff would invest their assets in U.S. securities traded on U.S. markets. But for BLMIS and its U.S.-based investment strategy, Defendants would not have invested in the Fairfield Funds. As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States … was not fortitious or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and Fairfield Sentry.[6]

Second, the subscription agreements governing Defendants investments with and transfers from the Fairfield Funds demonstrated the transactions were domestic. Defendants executed subscription agreements through which they agreed that New York law would govern the agreements and agreed to submit to venue in New York and the jurisdiction of New York courts. (*Id.* ¶ 14–16.) Accordingly, Defendants had every reason to expect to be subject to U.S. law and courts with respect to the transfers they received from the Fairfield Funds.

Third, Defendants knowingly directed funds to and from New York-based BLMIS using New York bank accounts in connection with their investments. Between 1997 and 2008, Defendants sent at least 124 separate subscription payments to a New York correspondent account for Fairfield Sentry, who ultimately sent the funds to BLMIS's bank account in New

---

[6] *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 523 (Bankr. S.D.N.Y. 2012).

3

York. (*Id.* ¶ 18.) From 1998 to 2008, Defendants also received at least 112 separate redemption payments from Fairfield Sentry into and through New York bank accounts. (*Id.* ¶ 19.) The continuous use of New York bank accounts for hundreds of transactions over the course of more than ten years demonstrates the transfers were domestic and not "purely foreign."

Fourth, to facilitate their investments in the Fairfield Funds, Defendants conducted business in New York with BLMIS and the Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York that created, operated, controlled, and marketed the Fairfield Funds. SNS Bank met with Madoff at BLMIS's New York office in 2004 and its affiliate SNS Securities N.V. demanded a second meeting with Madoff later in 2004. (*Id.* ¶ 22.) SNS Asset Management N.V., an affiliate who helped to manage the investments, visited FGG's principal office in New York to conduct due diligence on the Fairfield Funds. (*Id.* ¶ 23.) Defendants also regularly communicated with FGG employees in New York. (*Id.* ¶ 24.) Their primary contact at FGG was Cornelis Boele, a partner from FGG's New York office. (*Id.*)

Fifth, the Fairfield Funds, which sent the transfers to Defendants, had extensive connections with the United States. The Fairfield Funds' principal place of business was in New York. In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG. (*Id.* ¶ 27.) Noel and Tucker formally organized the Fairfield Funds as international business companies under BVI law (*id.* ¶¶ 30, 52), but the Fairfield Funds were shell corporations present in the BVI solely on paper. Their BVI registered address was a post office box care of a local trust company owned and operated by a local law firm. (*Id.* ¶ 31, 53.) From their inception until their liquidation in 2009, the Fairfield Funds had no employees and no offices. (*Id.*) As international business companies, BVI law restricted the Fairfield Funds from doing business in the BVI except with other BVI international business companies. (*Id.* ¶¶ 30, 52.)

4

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. (*Id.* ¶ 33.) In the account opening documents, Tucker provided a U.S. mailing address. (*Id.*) Later, FGG requested BLMIS to send all Fairfield Sentry account information to FGG's New York headquarters. (*Id.*)

At all relevant times, the Fairfield Funds were operated almost entirely by FGG's New York headquarters personnel who maintained final control of the Fairfield Funds' bank accounts and relationships with the Fairfield Funds' back-office service providers. (*Id.* ¶ 36–38, 56–57.) FGG New York headquarters personnel monitored the Fairfield Funds' investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of Fairfield Sentry; marketed the Fairfield Funds; approved and controlled all subscriptions for Fairfield Funds shares; maintained all of the Fairfield Funds' books and records; and made all strategic and operational decisions regarding the Fairfield Funds. (*Id.* ¶¶ 37–38, 54–55.)

Sixth, SNS Custody filed a customer claim with the Trustee for its investments in Fairfield Sigma. (*Id.* ¶ 25.) Defendants should not be able to invoke the Bankruptcy Code to receive customer property from the BLMIS estate but then deny that the Bankruptcy Code applies to them when the Trustee seeks to recover customer property.

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's main brief, the Trustee respectfully requests that the Court deny Defendants' motion to dismiss and grant the Trustee's motion for leave to amend his complaint.

5

| | |
|---|---|
| Dated: June 26, 2015<br>     New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Torello H. Calvani<br><br>*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff* |