**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01046 (SMB) |
| Plaintiff, | |
| v. | |
| SNS BANK N.V., and SNS GLOBAL CUSTODY B.V., | |
| Defendants. | |

**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE**
**EXTRATERRITORIALITY ISSUE AS TO THE SNS DEFENDANTS**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, by and through his undersigned counsel, respectfully submits the proffered allegations below as to the domestic nature of the transfers received by SNS Bank N.V. ("SNS Bank") and SNS Global Custody B.V. ("SNS Custody," and together, "Defendants") from Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma"), and Fairfield Lambda Limited ("Fairfield Lambda," and collectively, the "Fairfield Funds").

## I.    BACKGROUND

1. In this action, the Trustee seeks to recover at least $74,222,095 in transfers of BLMIS customer property made to Defendants by the Fairfield Funds: $21,116,385 from Fairfield Sentry, $41,308,384 from Fairfield Sigma, and $11,797,326 from Fairfield Lambda.

2. SNS Custody received the transfers for the benefit of SNS Bank and, upon information and belief, subsequently transferred at least a portion of the transfers to SNS Bank.

3. Fairfield Sentry was one of the many BLMIS feeder funds—single-purpose investment vehicles that pooled their investors' assets to invest with BLMIS in New York. Fairfield Sentry had direct customer accounts with BLMIS's investment advisory business. Fairfield Sentry invested at least 95% of its assets its BLMIS customer accounts. Fairfield Sigma and Fairfield Lambda were sister funds to Fairfield Sentry that accepted subscriptions in euros and Swiss francs, respectively, converted the money to U.S. dollars, and then invested 100% of their assets by purchasing shares of Fairfield Sentry.

4. The Fairfield Funds were created, operated, controlled, and marketed by the Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, New York.

5. Defendants knew BLMIS was essential to its investments in the Fairfield Funds and invested in the Fairfield Funds to profit from BLMIS in New York.

## II. THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

### A. Defendants Invested in the Fairfield Funds to Profit from BLMIS in New York

6. Defendants knew their investments in the Fairfield Funds would be invested with BLMIS in New York, which acted as the investment advisor, executing broker, and custodian that purportedly executed the so-called "split-strike conversion" investment strategy for the Fairfield Funds. The Fairfield Funds' offering memoranda, which Defendants received and read, disclosed BLMIS's involvement with the Fairfield Funds in these capacities.

7. Fairfield Sentry's Information Memorandum ("IM") dated January 1, 1998 states that BLMIS had complete control of the trades it purported to make for Fairfield Sentry: "The Manager [of Fairfield Sentry] has delegated all investment management duties to Bernard L. Madoff Investment Securities. As a result, the [Fairfield Sentry] is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities." Fairfield Sentry's IM further states, "All investment decisions in the account at [BLMIS] are effected by persons associated with [BLMIS]."

8. Fairfield Sentry's IM states that BLMIS was a "registered broker-dealer in New York" that executed the trades for Fairfield Sentry: "[BLMIS] acts as a principal in connection with its sale of securities to [Fairfield Sentry] and the purchase of securities from [Fairfield Sentry]."

9. Fairfield Sigma's IM dated October 29, 1999 and Fairfield Lambda's IM dated January 1, 1998 make the same disclosures.

2

10. Defendants knew BLMIS's "split-strike conversion" strategy, as described in the Fairfield Funds' IMs, purportedly involved domestic transactions: the purchase and sale of U.S. equities, U.S. options, and U.S. Treasuries.

11. Defendants knew BLMIS maintained custody of their investments in the Fairfield Funds in New York. Fairfield Sentry's IM states, "[Fairfield Sentry] allocates its assets to an account at Bernard L. Madoff Investment Securities," and "Bernard L. Madoff Investment Securities has entered into an agreement with Citco Custody pursuant to which Bernard L. Madoff Investment Securities will serve as a sub-custodian of [Fairfield Sentry's] assets."

12. Similarly, Fairfield Sigma's and Fairfield Lambda's IMs state that Fairfield Sigma and Fairfield Lambda allocated their assets to Fairfield Sentry, which in turn allocated the assets to an account at BLMIS in New York.

13. Because of BLMIS's involvement with the Fairfield Funds, their IMs further state that the services of BLMIS were "essential" to the continued operations of and profitability of the Fairfield Funds.

**B.   The Transfers Were Made Pursuant to Subscription Agreements That Were Domestic in Nature**

14. Defendants entered into subscription agreements with Fairfield Sentry and Fairfield Sigma. The subscription agreements were governed by New York law: "This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

15. Defendants' subscription agreements also included agreements to submit to venue in New York and to the jurisdiction of New York courts: "Subscriber agrees that any suit, action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York," and, "Subscriber irrevocably submits to the jurisdiction of the New York courts with

3

respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding."

16.     To invest in Fairfield Lambda, FGG required shareholders, like Defendants, to execute subscription agreements. Fairfield Lambda's subscription agreements were also governed by New York law, included agreements to submit to venue in New York and to the jurisdiction of New York courts, and contained an acknowledgement that the subscriber received and reviewed a copy of Fairfield Lambda's IM, which describes Fairfield Lambda's connections with the United States.

17.     Defendants' subscription agreements governed their investments in the Fairfield Funds, and Defendants received the Fairfield Fund transfers pursuant to their subscription agreements.

### C.     Defendants Used New York Bank Accounts in Connection with the Transactions

18.     By investing in Fairfield Sentry, Defendants knew they were directing funds to New York-based BLMIS through New York bank accounts. SNS Bank's Fairfield Sentry subscription agreement directed Defendants to send subscription money to a New York correspondent bank account at HSBC Bank USA, N.A. for deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were ultimately deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York. SNS Custody directed funds to this correspondent bank account on at least 124 occasions from 1997 to 2008 in connection with Fairfield Sentry subscriptions.

19.     Defendants also received the transfers from the Fairfield Funds into or through at least three bank accounts in New York. Defendants received Fairfield Sentry transfers into SNS Bank's own account at Citibank N.A. in New York, as well as through a Citibank N.A.

4

correspondent bank account in New York. On at least one occasion, Defendants also requested Fairfield Sentry send a redemption payment to SNS Bank's account at Deutsche Bank Trust Company Americas in New York. Defendants received at least 112 wire transfers at or through these New York bank accounts from 1998 to 2008.

20. In addition, SNS Custody instructed FGG in its Fairfield Sigma subscription agreement to send redemption payments to SNS Bank's account at Deutsche Bank Trust Company Americas in New York.

### D. Defendants Conducted Business in the United States in Connection with Its Investments in the Fairfield Funds

21. Defendants and their affiliates conducted business in New York with FGG and BLMIS in connection with their investments in the Fairfield Funds, including due diligence meetings in New York and communications with New York-based employees.

22. In early 2004, SNS Bank met with Madoff at BLMIS's office in New York. Sandra Manzke, the founder of New York-based Tremont Group Holdings, Inc. ("Tremont"), arranged the meeting. Later in 2004, SNS Securities N.V., an affiliate of Defendants, demanded that Tremont set up another meeting at BLMIS.

23. In June 2004, two employees of SNS Asset Management N.V., another affiliate of Defendants that helped manage their investments, visited FGG's office in New York to conduct due diligence on BLMIS, FGG, and the Fairfield Funds on behalf of Defendants.

24. In addition to meeting with BLMIS and FGG in New York, SNS Bank regularly communicated with FGG employees in the United States regarding their investments in the Fairfield Funds. Defendants' primary contact at FGG was Cornelis Boele, a partner from FGG's New York office.

5

25. SNS Custody filed a customer claim with the Trustee for its investments in Fairfield Sigma.

### E. The Fairfield Funds' Principal Place of Business Was in New York

26. At all relevant times, the Feeder Funds' principal place of business was in New York and they were domestic residents.

#### 1. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

27. In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

28. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma and Fairfield Lambda.

29. FGG also included a number of administrative entities that purportedly provided management and back-office support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

#### 2. Fairfield Sentry

30. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and

6

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax-free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

31.     Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

32.     Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

        **a.     Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

33.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

7

International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

34.  After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

35.  The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

### b.  FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities

36.  As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with back-office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### c.  FGG New York Personnel Managed Fairfield Sentry

37.  At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until

9

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

38.     FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d.     Fairfield Sentry's Investors Knew They Were Investing in BLMIS

39.     As noted above, Fairfield Sentry's subscription agreements also incorporated its private placement memoranda ("PPM") by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's investment strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPMs also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

10

### e. BLMIS Was Fairfield Sentry's Investment Manager

40. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

41. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

42. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

11

43. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

44. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the Fairfield Funds to FG Bermuda. FG Limited remained the placement agent for the same funds.

45. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

46. Prior to 2006, while FG Bermuda purported to manage the Fairfield Funds' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

47. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

48. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

49. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### 3. Fairfield Sigma and Fairfield Lambda

50. FGG operated Fairfield Sentry as a U.S. dollar-based fund with all subscription and redemptions paid in U.S. dollars. In response to investor requests to invest in Fairfield Sentry using euros or Swiss francs, FGG created Fairfield Sigma and Fairfield Lambda. Fairfield Sigma accepted subscriptions in euros, converted them to U.S. dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Fairfield Sigma redeemed Fairfield Sentry shares, converted the U.S. dollars it received from Fairfield Sentry to euros, and paid the euros to the redeeming Fairfield Sigma investors.

13

51. Similarly, Fairfield Lambda accepted subscriptions in Swiss francs, converted them to U.S. dollars, and then invested 100% of its funds in Fairfield Sentry. When paying redemptions, Fairfield Lambda redeemed Fairfield Sentry shares, converted the U.S. dollars it received from Fairfield Sentry to Swiss francs, and paid the Swiss francs to the redeeming Fairfield Lambda investors.

52. Noel and Tucker organized Fairfield Sigma on November 20, 1990 and Fairfield Lambda on December 7, 1990 as international business companies under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so were Fairfield Sigma and Fairfield Lambda. Fairfield Sigma is currently in liquidation in proceedings in the BVI and United States. Fairfield Lambda is in liquidation in a separate proceeding in the BVI.

53. Also like Fairfield Sentry, Fairfield Sigma and Fairfield Lambda were shell corporations present in the BVI only on paper. They had no employees and maintained no offices. They listed their registered BVI address as the same BVI post office box care of a local trust company they shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Fairfield Sigma and Fairfield Lambda to FGG's New York headquarters. Fairfield Sigma and Fairfield Lambda were operated almost entirely by FGG New York Personnel.

54. As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Fairfield Sigma and Fairfield Lambda. Once Fairfield Sigma and Fairfield Lambda were opened for investors, FGG New York

Personnel monitored Fairfield Sigma's and Fairfield Lambda's investments into, and redemptions from, Fairfield Sentry; managed Fairfield Sigma's and Fairfield Lambda's relationships with clients and potential clients; created marketing and performance materials for Fairfield Sigma and Fairfield Lambda; marketed Fairfield Sigma and Fairfield Lambda; performed administrative functions required by Fairfield Sigma and Fairfield Lambda; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sigma and Fairfield Lambda; and conducted various other due diligence and risk management activities. Until Fairfield Sigma's and Fairfield Lambda's liquidation, FGG maintained Fairfield Sigma's and Fairfield Lambda's books and records in New York. FGG New York Personnel also had final control of Fairfield Sigma's and Fairfield Lambda's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

55. FGG New York Personnel controlled and approved the subscriptions for and redemptions of Fairfield Sigma and Fairfield Lambda shares. Like Fairfield Sentry's subscription agreements, Fairfield Sigma's and Fairfield Lambda's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Fairfield Sigma's and Fairfield Lambda's sole assets. Fairfield Sigma's and Fairfield Lambda's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's investment strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Fairfield Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets,

15

there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPMs.

56. Noel and Tucker were the original directors of Fairfield Sigma and Fairfield Lambda and, like Fairfield Sentry, contracted with Citco Fund Services to provide Fairfield Sigma and Fairfield Lambda with back-office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sigma and Fairfield Lambda shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Fairfield Sigma and Fairfield Lambda assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Fairfield Sigma and Fairfield Lambda at Citco Bank Dublin. FGG New York Personnel had final control of the Fairfield Sigma and Fairfield Lambda Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Fairfield Sigma's and Fairfield Lambda's relationships with the Citco entities.

57. In addition to the Citco Bank Dublin accounts, in order to convert Fairfield Sigma investors' euros and Fairfield Lambda's investors' Swiss francs into U.S. dollars for investment in Fairfield Sentry and BLMIS, Noel executed separate contracts on Fairfield Sigma's and Fairfield Lambda's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

58. FGG New York Personnel initially listed FG Limited as the investment manager for Fairfield Sigma and Fairfield Lambda. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Fairfield Sigma and Fairfield Lambda PPMs to indicate FG Bermuda was Fairfield Sigma's and Fairfield Lambda's Investment Manager. In fact there were

16

no duties for any investment manager because Fairfield Sigma's and Fairfield Lambda's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. dollars.

59. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund Limited*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015
      New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*