**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　Plaintiff-Applicant,<br><br>　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>LLOYDS TSB BANK PLC,<br><br>　　　　　Defendant. | Adv. Pro. No. 12-01207 (SMB)<br><br><br>**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO LLOYDS TSB BANK PLC** |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendant Lloyds TSB Bank plc ("Lloyds"), states:

1. The Trustee seeks to recover at least $11,183,410 in subsequent transfers of BLMIS customer property made to Lloyds by Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma," and together with Fairfield Sentry, the "Fairfield Funds").

2. Lloyds is a public limited company organized under the laws of the United Kingdom. During the relevant period, Lloyds operated offices around the world, including Miami, Florida; New York, New York; and Geneva, Switzerland.

3. Fairfield Sentry was one of many BLMIS feeder funds—single-purpose investment funds that pooled their investors' assets to invest with BLMIS.

4. Sigma was a sister fund of Fairfield Sentry known as a currency fund that accepted subscriptions in Euros, converted them to U.S. Dollars, then invested 100% of those funds in Fairfield Sentry. Fairfield Sentry also directed transfers to Sigma, which Sigma in turn transferred to Lloyds.

5. From November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS's investment advisory business. Fairfield Sentry was the largest BLMIS feeder fund, and Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry and Sigma. FGG was founded by U.S. citizens and residents, Walter Noel and Jeffrey Tucker.

6. Although formally incorporated in Territory of the British Virgin Islands ("BVI"), Fairfield Sentry and Sigma were shell corporations present in the BVI only on paper. Fairfield Sentry and Sigma had no employees and no office, and was operated almost entirely by FGG personnel in New York.

1

I. **LLOYDS PURPOSELY INVESTED IN THE FAIRFIELD FUNDS, AND OTHER FEEDER FUNDS, TO PROFIT FROM MADOFF'S PURPORTED INVESTMENT IN THE U.S. SECURITIES MARKET**

7. Prior to investing in the Fairfield Funds, Lloyds knew its investments in the Fairfield Funds were ultimately placed with BLMIS in New York. From its review of Fairfield Sentry's Private Placement Memoranda ("PPMs") and due diligence it conducted on the feeder funds, Lloyds knew the following facts:

- Madoff operated BLMIS, which in turn purported to execute the split strike conversion strategy ("SSC Strategy") on behalf of the Fairfield Funds;

- In reality, the investment adviser for each of the Fairfield Funds was BLMIS in New York;

- BLMIS maintained custody of the Fairfield Funds' investments in New York;

- BLMIS, a New York-based registered broker-dealer, was the Fairfield Funds' prime broker;

- BLMIS purported to invest the assets invested with the SSC Strategy in U.S. equities, U.S. options, and U.S. Treasury bills ("Treasurys") with equities traded on U.S. exchanges on behalf of the Fairfield Funds; and

- Madoff in New York made all investment decisions with respect to the Fairfield Funds' investments with BLMIS.

8. Lloyds knew that the success of the BLMIS feeder funds was almost entirely dictated by Madoff's purported returns.

9. Lloyds knowingly invested in the Fairfield Funds, as well as other feeder funds, in order to profit from Madoff's purported investment in the U.S. securities market.

10. In addition to its investments in the Fairfield Funds, Lloyds also sought out additional opportunities to profit from Madoff, including investing in BLMIS feeder funds Groupement Financier Levered Limited and Luxalpha SICAV operated by New York-based and Delaware-incorporated Access International Advisors Group LLC ("Access") (the "Access

2

Feeder Funds"). The Trustee's action does not seek to recover transfers Lloyds received from the Access Feeder Funds, but the Trustee expressly reserves his right to do so in the future.

11. At all relevant times, Lloyds's knew and purposefully directed its investments to the feeder funds because they provided access to BLMIS—while also acknowledging its ultimate profit was dependent on "the amount of assets [Madoff] manages . . . and the performance," not to the location of the feeder funds' incorporation.

12. Understanding the feeder funds were each invested with BLMIS, Lloyds invested with the ultimate objective to profit from its investments with BLMIS and Madoff in the United States.

## II. LLOYDS'S NEW YORK AND MIAMI OFFICES MANAGED ITS GLOBAL RELATIONSHIP WITH, AND INVESTMENTS IN, THE FAIRFIELD FUNDS

13. At all relevant times, Lloyds maintained offices in Miami, Florida (the "Miami Office") and New York, New York (the "New York Office").

14. Lloyds's New York and Miami Offices were the driving force behind Lloyds's transactions with Fairfield Sentry, directing investments, conducting due diligence on, managing its relationship with, and ultimately directing redemptions from Fairfield Sentry.

15. New York-based Lourdes Barreneche was the FGG sales representative and partner responsible for managing FGG's relationship with Lloyds from FGG's principal place of business in New York, and served as Lloyds's primary contact at FGG.

16. According to Barreneche's notes, "[Lloyds's] Miami and NY office serve as the hub for the Americas business" and that "[FGG's] relationship with Lloyds goes back to over 10 years."

17. Lloyds representatives in both the Miami and New York Offices worked together to perform due diligence on the Fairfield Funds, BLMIS, and Madoff's SSC Strategy in the

3

United States, while Lloyds's Miami Office directed subscriptions in and redemptions from Fairfield Sentry.

18. In connection with this due diligence, Lloyds utilized representatives from its New York and Miami Offices to conduct research, gather information, and attend meetings with representatives of the Fairfield Funds in New York and Miami. The Fairfield Funds information was subsequently shared with Lloyds's Geneva, Switzerland office ("Geneva Office"). For purposes of its BLMIS investments through the feeder funds, Lloyds functioned as a single global unit.

19. Following the Miami Office's receipt of Fairfield Sentry's PPMs, Lloyds's Miami Office entered into no fewer than eight subscription agreements with Fairfield Sentry.

20. In its subscription agreements, Lloyds directed FGG to send all written communication about Fairfield Sentry to its Miami Office, including Lloyds's redemption confirmations. In these subscription agreements, Lloyds listed as its contact information two telephone numbers and a facsimile number with Miami, Florida area codes, and an email address for Lloyds's U.S.-based offices.

21. Lloyds Geneva Office also entered into subscription agreements with Fairfield Sentry. These subscription agreements were executed by Citco Global Custody N.V. ("Citco Custody") as Lloyds's Geneva Office's agent. Lloyds also invested in Sigma through its Geneva Office.

22. Lloyds's Miami and New York Offices worked with Lloyds's Geneva Office in connection with its investments in Fairfield Sentry and Sigma.

23. After Madoff's arrest, Lloyds's New York and Miami Offices coordinated with FGG in preparing its customer claims, which Lloyds's Miami Office filed with the Trustee. The

4

Trustee has designated the customer claims filed by Lloyds as Claims #014668, #014669, #014670, #014671, #014672, #014673, #014674, #014675, and #015602.

### III. TO INVEST IN THE FAIRFIELD FUNDS, LLOYDS SUBMITTED TO NEW YORK CHOICE OF LAW, JURISDICTION, AND VENUE

24. Lloyds executed subscription agreements in which it submitted that its transactions with Fairfield Sentry and Sigma would be governed by New York law, jurisdiction, and venue of New York courts.

25. Specifically, Lloyds's Miami Office executed no fewer than eight subscription agreements with Fairfield Sentry in which Lloyds agreed that its Fairfield Sentry investments "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

26. Lloyds also agreed "that any suit, action or proceeding . . . with respect to th[ese] Agreement[s] and [Fairfield Sentry] may be brought in New York" and that Lloyds "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

27. Similarly, on behalf of Lloyds's Geneva Office, Citco Custody executed Fairfield Sentry subscription agreements agreeing to the same New York choice of law, jurisdiction, and venue provisions.

28. Finally, Lloyds's Geneva Office invested in Sigma. Pursuant to Sigma's PPM, Lloyds agreed that its Sigma investment would be governed by New York law, jurisdiction, and venue.

### IV. LLOYDS REPEATEDLY UTILIZED U.S. BANKS TO TRANSFER FUNDS TO AND FROM FAIRFIELD SENTRY

29. Lloyds utilized U.S. bank accounts to transfer funds to and from Fairfield Sentry.

30. Lloyds executed subscription agreements in connection with its investments in Fairfield Sentry. Those agreements stated that all money from Lloyds be directed to a New York

5

HSBC Bank USA correspondent bank account, and/or a Republic National Bank of New York correspondent bank account, for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York. On at least 55 occasions, over the course of 11 years, in connection with subscribing funds to Fairfield Sentry, Lloyds directed funds to this New York HSBC Bank USA and/or Republic National Bank of New York account.

31.     Lloyds Miami Office also utilized its accounts at State Street Bank & Trust ("State Street Bank") in Boston and Bank of America New York ("Bank of America") located in New York, both held in its own name, to receive transfers from Fairfield Sentry.

32.     Lloyds Miami Office completed standardized Fairfield Sentry forms entitled "Redemption Request Form Instructions," which directed redemption payments to be sent to its account at State Street Bank. Lloyds utilized this account repeatedly—at least 25 times over a 6 year period—to receive $9,056,624 in redemption payments from Fairfield Sentry.

33.     Lloyds Miami Office completed another standardized Fairfield Sentry form entitled "Redemption Request Form Instructions," which directed redemption payments to be sent to its account at Bank of America. Lloyds utilized this account to receive $171,167 in redemption payments from Fairfield Sentry.

34.     Lloyds also received transfers through its Geneva Office in connection with the Fairfield Sentry agreements executed by Citco Custody as Lloyds's Geneva Office's agent. Lloyds used an account at HSBC in New York held in the name "CITCO BANK NEDERLAND N.V." to receive transfers from Fairfield Sentry. Lloyds utilized this account repeatedly—at least 10 times over a 6 year period—to receive $1,906,783.

## V. FAIRFIELD SENTRY AND SIGMA MAINTAINED THEIR PRINCIPAL PLACE OF BUSINESS IN NEW YORK

35. At all relevant times, Fairfield Sentry's and Sigma's principal place of business was in New York and Fairfield Sentry and Sigma were U.S. residents.

### A. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

36. In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called FGG based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

37. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three Feeder Funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

38. FGG also included a number of administrative entities that purportedly provided management and back office support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B. Fairfield Sentry

39. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose

7

of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

40. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

41. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

    **1. Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

42. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

8

International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

43. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

44. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities

45. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

9

back office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Custody to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

46. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

47. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

10

operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

48. Fairfield Sentry's subscription agreements also incorporated its PPMs by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5. BLMIS Was Fairfield Sentry's Investment Manager

49. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

11

50. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited FG. FG Limited was formed under the laws of Ireland.

51. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

52. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

53. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG

12

formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

54. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

55. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

56. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

57. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required

13

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

58. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

**C.  Sigma**

59. FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars. In response to investor requests to invest in Fairfield Sentry using Euros, FGG created Sigma. Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

60. Noel and Tucker organized Sigma on November 20, 1990 as an international business company under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma. Sigma is currently in liquidation in proceedings in the BVI and United States.

61. Also like Fairfield Sentry, Sigma was a shell corporation present in the BVI only on paper. It had no employees and maintained no offices. It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and

14

the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters. Sigma was operated almost entirely by FGG New York Personnel.

62. As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Sigma. Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities. Until Sigma's liquidation, FGG maintained Sigma's books and records in New York. FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

63. FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares. Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated its PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole assets. Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPMs.

15

64. Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma with back office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma at Citco Bank Dublin. FGG New York Personnel had final control of the Sigma Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Sigma's relationships with the Citco entities.

65. In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros and Lambda's investors' Swiss Francs into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS—Noel executed separate contracts on Sigma's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

66. FGG New York Personnel initially listed FG Limited as the investment manager for Sigma. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPMs to indicate FG Bermuda was Sigma's Investment Manager. In fact there were no duties for any investment manager because Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

67. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

|  |  |
|---|---|
| Dated: June 26, 2015<br>New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Catherine E. Woltering<br><br>**Baker & Hostetler LLP**<br>65 East State Street, Suite 2100<br>Columbus, Ohio 43215<br>Telephone: (614) 228-1541<br>Facsimile: (614) 462-2616<br>Brian R. Noethlich<br><br>*Attorneys for Irving H. Picard, Trustee for the substantively consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff* |