**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br> v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br> v.<br><br>BANK JULIUS BAER & CO. LTD.,<br><br>    Defendant. | Adv. Pro. No. 11-02922 (SMB)<br><br><br><br>**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO DEFENDANT BANK JULIUS BAER & CO. LTD.** |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to Defendant Bank Julius Baer & Co. Ltd. states:

## I. INTRODUCTION

1. The Trustee seeks to recover at least $47,945,178 in subsequent transfers of BLMIS customer property collectively made to Bank Julius Baer & Co. Ltd. ("BJB") from Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda").

2. Of the $47,945,178, at least $37,404,482 are subsequent transfers of BLMIS customer property made to BJB by Fairfield Sentry, at least $10,178,363 are subsequent transfers of BLMIS customer property made to BJB by Sigma, and at least $362,333 are subsequent transfers of BLMIS customer property made to BJB by Lambda.

3. BJB is a Swiss limited company engaged in banking that offers services including asset and wealth management, financial planning, and portfolio management. During all relevant times, BJB maintained an office in New York. That office conducted due diligence on BJB's investments in Fairfield Sentry, Sigma, and Lambda. That office also sent employees to meet with Madoff in his New York office to conduct due diligence on BLMIS.

4. Fairfield Sentry was the largest of many BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with BLMIS in New York, capitalizing on its consistent returns. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York. Sigma and Lambda were "currency funds," meaning they accepted subscriptions in Euros and Swiss Francs, respectively, converted the money to U.S. Dollars, and then invested 100% of their assets in Fairfield Sentry.

5. As detailed further below, Fairfield Greenwich Group ("FGG"), a *de facto*

1

partnership, created, operated, and controlled Fairfield Sentry, Sigma, and Lambda out of its New York headquarters.

6. BJB invested in Fairfield Sentry, Sigma, and Lambda for the purpose of profiting from BLMIS in New York, and relinquished control over investment decisions and their implementation to Madoff.

7. But for BLMIS's fraudulent activities in New York, BJB would have received none of the transfers from Fairfield Sentry, Sigma, and Lambda.

8. Fairfield Sentry, Sigma, and Lambda allowed their investors to subscribe only when the funds had capacity for new investors or for additional investments from existing FGG Feeder Funds. When the Feeder Funds reached these limits but BJB still wanted to invest with BLMIS, BJB directed its investments to other Feeder Funds to further increase its investments with New York-based BLMIS, including: Kingate Global Fund, Ltd. ("Kingate Global"), Kingate Euro Fund, Ltd. ("Kingate Euro"), and Ascot Fund Limited ("Ascot Fund"). Each of these Feeder Funds was entirely or almost entirely invested with BLMIS.

9. At all relevant times, BJB's New York office conducted due diligence on Fairfield Sentry, Sigma, Lambda, Kingate Global, Kingate Euro, Ascot Fund, Madoff, and BLMIS. As a result of this due diligence, BJB knew the following facts:

    a. In reality BLMIS was the New York-based investment adviser for the Feeder Funds.

    b. BLMIS in New York was the executing broker for the Feeder Funds' investments, and that purportedly operated and executed Madoff's "split-strike conversion" investment strategy ("SSC Strategy") on behalf of the Feeder Funds.

2

  c. Madoff's SSC Strategy purportedly involved the purchase of U.S. S&P 100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

  d. BLMIS in New York maintained custody of virtually all of the Feeder Funds' investments.

  e. BLMIS in New York was a Securities and Exchange Commission ("SEC")-registered broker-dealer.

  f. BLMIS always functioned as the Feeder Funds' investment adviser and after 2006, BLMIS was a registered investment adviser with the SEC.

  g. The entire economic purpose of its Feeder Funds investments was to deliver money to BLMIS in New York.

10. BJB knew control over Fairfield Sentry, Sigma, and Lambda's investments rested entirely with Madoff and BLMIS in New York. BJB intended to profit from BLMIS's U.S. control over its U.S. investments.

## II. THE TRANSFERS AND COMPONENT EVENTS OF THE TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

### A. BJB Knew That Virtually All Fairfield Sentry, Sigma, and Lambda's Assets Were Invested with BLMIS in New York

11. Virtually all of Fairfield Sentry, Sigma, and Lambda's assets were invested with BLMIS in New York and BJB knew this fact. BJB chose to invest in Fairfield Sentry, Sigma, and Lambda as a means of placing investments with BLMIS in New York, and relinquished control over its investments with BLMIS, which made and implemented the investment decisions.

12. BJB's investments in Fairfield Sentry were governed by PPMs and subscription

3

agreements. By executing Fairfield Sentry subscription agreements, BJB affirmed that it "received and read a copy of the [PPM]," and "relied solely on the [PPM] and independent investigations made by [BJB]."

13. Because BJB subscribed funds into Fairfield Sentry over at least 12 years, BJB received and analyzed several PPMs.

14. BJB knew Fairfield Sentry was entirely dependent on BLMIS in New York. From the PPMs, BJB knew Madoff's SSC Strategy purportedly involved the purchase and sale of U.S. S&P 100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges. The PPMs also stated that "[t]he services of BLM[IS] and its personnel are essential to the continued operation of [Fairfield Sentry]." Thus, BJB intended to profit from BLMIS's control over its U.S. investments.

15. BJB knew from the PPMs that BLMIS was an SEC registered broker-dealer in New York that executed the trades for the SSC Strategy on behalf of Fairfield Sentry through accounts at BLMIS.

16. BJB also knew that BLMIS served as the custodian for Fairfield Sentry's funds and there was a possibility BLMIS could misappropriate the assets it invested in Fairfield Sentry. The PPMs contained a section titled "Possibility of Misappropriation of Assets" that explained: "When [Fairfield Sentry] invests utilizing the [SSC Strategy] . . . it will not have custody of the assets so invested. Therefore, there is always the risk that the personnel of [BLMIS] with which [Fairfield Sentry] invests could misappropriate the securities or funds (or both) of [Fairfield Sentry]."

17. BJB knew BLMIS in New York acted as the investment adviser, broker-dealer, and custodian for Fairfield Sentry and knew control over Fairfield Sentry's investments rested

4

entirely with BLMIS. BJB intended to benefit from BLMIS's implementation of Madoff's U.S. investment strategy.

18. BJB also executed subscription agreements in connection with its investments in Sigma and Lambda, in which BJB agreed that it had received and reviewed Sigma's and Lambda's PPMs, respectively. Sigma's and Lambda's PPMs were substantially similar to Fairfield Sentry's PPMs, and also disclosed New York-based BLMIS implemented Madoff's SSC Strategy, and simultaneously acted as investment adviser, broker-dealer, and custodian.

**B.     BJB Agreed New York Law Applied in Connection with the Transactions**

19. BJB chose to invest in Fairfield Sentry, Sigma, and Lambda and in doing so, agreed to be bound by New York law and submitted to the jurisdiction and venue of the New York courts in connection with its investments.

20. BJB's executed Fairfield Sentry subscription agreements specified that they "shall be governed and enforced in accordance with New York law, without giving effect to its conflict of laws provisions." BJB also "agree[d] that any suit, action or proceeding . . . with respect to th[ese] Agreement[s] and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any proceeding."

21. The Sigma and Lambda subscription agreements executed by BJB contained similar New York choice of law, jurisdiction, and venue provisions.

22. BJB also entered into a letter of understanding with Fairfield Greenwich Limited ("FG Limited"), an FGG administrative entity. FG Limited was registered to conduct business in the State of New York and listed its principal executive office as FGG's New York headquarters.

23. The letter of understanding outlined the fees BJB would receive in connection with its investments Fairfield Sentry, Sigma, and Lambda. As part of this agreement, BJB received in fee payments from FG Limited for investments it placed in Fairfield Sentry, Sigma,

5

Lambda. BJB agreed in the letter that "the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of New York."

### C. BJB's New York Office Conducted Due Diligence on BLMIS in Connection with Its Investments

24. Although BJB was formed as a Swiss limited company, at all relevant times, it maintained an office in New York. That office conducted due diligence on Fairfield Sentry, Sigma, Lambda, BLMIS, and Madoff in connection with BJB's investments. Through its New York office BJB maintained a close relationship with FGG in New York.

25. BJB even had direct access to Madoff through FGG. In the spring of 2003, three New York-based BJB employees met with Madoff in his New York office. These BJB employees questioned Madoff about his SSC Strategy, specifically asking Madoff how he determined the strategy's positions in U.S. securities market. After their discussions with Madoff, the BJB employees toured BLMIS's trading room.

26. BJB also sent its Swiss-based employees to visit FGG's New York headquarters. These same employees corresponded with FGG New York Personnel as part of BJB's ongoing due diligence on Fairfield Sentry, Sigma, and Lambda. For example, Swiss-based BJB employees worked with FGG's New York-based employee Cornelis Boele and FGG's Florida-based employee Santiago Reyes to coordinate subscriptions and redemptions.

27. In addition to its investments in Fairfield Sentry, Sigma, and Lambda, BJB invested in other Feeder Funds—Kingate Global, Kingate Euro, and Ascot Fund— contemporaneously with its investments in Fairfield Sentry, Sigma, and Lambda to obtain additional access to BLMIS. BJB also conducted due diligence on Kingate Global, Kingate Euro, and Ascot Fund. Through this due diligence, BJB knew that these Feeder Funds were also

entirely or almost entirely invested with BLMIS in New York, and therefore the U.S. securities markets as well.

### D. BJB Repeatedly Used New York Banks to Transfer Funds

28. BJB used New York bank accounts to transfer money to and from Fairfield Sentry.

29. The subscription agreements for Fairfield Sentry executed by BJB stated that all money from BJB be directed to a Republic National Bank of New York or New York HSBC Bank USA correspondent bank account, depending on when the subscription agreement was executed, for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York. BJB directed funds to these New York bank accounts on at least 249 occasions over the course of 12 years in connection with subscribing funds to Fairfield Sentry.

30. BJB also used a JPMorgan account in New York held in its own name to receive transfers from Fairfield Sentry. In its Fairfield Sentry subscription agreement, BJB directed that all BJB redemptions be sent to this JPMorgan account in New York only. BJB utilized this account repeatedly—at least 119 times over a 6 year period—to receive $37,404,482 in redemption payments from Fairfield Sentry.

### E. Fairfield Sentry, Sigma, and Lambda's Principal Place of Business was in New York

31. At all relevant times, Fairfield Sentry, Sigma, and Lambda's principal place of business was in New York and they were U.S. residents.

#### 1. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

32. In 1988, Walter Noel and Jeffrey Tucker founded *de facto* partnership FGG based

7

in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

33. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Lambda. Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

34. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### 2. Fairfield Sentry

35. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

36. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

8

Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

37.  Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

  *a. Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States*

38.  When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

39.  After the original BLMIS account documents were executed by Tucker on behalf

9

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

40. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation member regulated by the SEC.

      *b. FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities*

41. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco

10

Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

*c. FGG New York Personnel Managed Fairfield Sentry*

42.     At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

43.     FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

*d. Fairfield Sentry's Investors Knew They Were Investing in BLMIS*

44.     Fairfield Sentry's subscription agreements also incorporated its PPMs by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

*e. BLMIS Was Fairfield Sentry's Investment Manager*

45.     Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

46.     In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City.  Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

47.     While FG Limited was formed under foreign law, it reported its principal place of

12

business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

48.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

49.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

50.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

13

Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

51. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

52. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

53. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

54. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

14

The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### 3. Sigma and Lambda

55. FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars. In response to investor requests to invest in Fairfield Sentry using Euros or Swiss Francs, FGG created Sigma and Lambda. Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

56. Similarly, Lambda accepted subscriptions in Swiss Francs, converted them to U.S. Dollars, and then invested 100% of its funds in Fairfield Sentry. When paying redemptions, Lambda redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Swiss Francs, and paid the Swiss Francs to the redeeming Lambda investors.

57. Noel and Tucker organized Sigma on November 20, 1990, and Lambda on December 7, 1990 as international business companies under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so were Sigma and Lambda. Sigma is currently in liquidation in proceedings in the BVI and United States. Lambda is in liquidation in a separate proceeding in the BVI.

58. Also like Fairfield Sentry, Sigma and Lambda were shell corporations present in the BVI only on paper. They had no employees and maintained no offices. They listed their registered BVI address as the same BVI post office box care of a local trust company they shared

15

with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma and Lambda to FGG's New York headquarters. Sigma and Lambda were operated almost entirely by FGG New York Personnel.

59. As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Sigma and Lambda. Once Sigma and Lambda were opened for investors, FGG New York Personnel monitored Sigma and Lambda's investments into, and redemptions from, Fairfield Sentry; managed Sigma and Lambda's relationships with clients and potential clients; created marketing and performance materials for Sigma and Lambda; marketed Sigma and Lambda; performed administrative functions required by Sigma and Lambda; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma and Lambda; and conducted various other due diligence and risk management activities. Until Sigma and Lambda's liquidation, FGG maintained Sigma and Lambda's books and records in New York. FGG New York Personnel also had final control of Sigma's and Lambda's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

60. FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma and Lambda shares. Like Fairfield Sentry's subscription agreements, Sigma's and Lambda's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's and Lambda's sole assets. Sigma's and Lambda's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-

16

based investments, and BLMIS's role in the investments. Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPMs.

61. Noel and Tucker were the original directors of Sigma and Lambda and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma and Lambda with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma and Lambda shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma and Lambda assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma and Lambda at Citco Bank Dublin. FGG New York Personnel had final control of the Sigma and Lambda Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Sigma and Lambda's relationships with the Citco entities.

62. In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros and Lambda's investors' Swiss Francs into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS. Noel executed separate contracts on Sigma's and Lambda's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

63. FGG New York Personnel initially listed FG Limited as the investment manager for Sigma and Lambda. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma and Lambda PPMs to indicate FG Bermuda was Sigma and Lambda's

17

Investment Manager. In fact there were no duties for any investment manager because Sigma and Lambda's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

64. Finally, the Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB), (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015
     New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long

**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Lauren M. Hilsheimer
Melonia A. Bennett

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the estate of Bernard L.*
*Madoff*