**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, <br><br> Plaintiff, <br> v. <br><br> LOMBARD ODIER DARIER HENTSCH & CIE, <br><br> Defendant. | Adv. Pro. No. 12-01693 (SMB) |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM**
**OF LAW IN OPPOSITION TO LOMBARD ODIER**
**DARIER HENTSCH & CIE'S MOTION TO DISMISS BASED ON**
**EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE**
**TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

Irving H. Picard ("Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L. Madoff, respectfully submits this supplemental memorandum of law in opposition to the consolidated motion to dismiss joined by Banque Lombard Odier & Cie S.A. ("Lombard"), formerly known as Lombard Odier Darier Hentsch & Cie, claiming that the Trustee's recovery of the subsequent transfers is barred as an extraterritorial application of Bankruptcy Code § 550, and in support of the Trustee's motion for leave to amend his complaint. As set forth below and in the accompanying Proffered Allegations, the Trustee has pled specific facts evidencing the subsequent transfers are sufficiently domestic that the recovery of the transfers does not require an extraterritorial application of SIPA or the Bankruptcy Code. Accordingly, Lombard's motion to dismiss must be denied and the requested amendment should be allowed.

## ARGUMENT

The District Court returned this action to this Court to determine whether the Trustee's claims against Lombard seek the recovery of "purely foreign" transfers requiring an extraterritorial application of SIPA or Bankruptcy Code § 550.[1] Under the Extraterritoriality Decision, the Trustee need only "put forth specific facts suggesting a domestic transfer" to avoid dismissal.[2] In making this determination, there is no bright-line test to determine whether a transaction is extraterritorial;[3] rather this Court must review "the location of the transfers as well

---

[1] *Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 232–33 (S.D.N.Y. 2014) (the "Extraterritoriality Decision").

[2] *Id.* at 232 n.4.

[3] *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 at 216-17 (2d Cir. 2014).

as the component events of those transactions."[4] This is a fact-based inquiry for which all reasonable inferences are to be drawn in the Trustee's favor.[5]

From 1998 through 2008, Lombard received at least $179,244,631 in subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma," and together, the "Fairfield Funds"), and Kingate Global Fund, Ltd. ("Kingate Global"), which invested virtually all of their assets with BLMIS in New York. (Proffer ¶ 1.)

Lombard argues because it, the Fairfield Funds, and Kingate Global are organized under foreign law, Lombard is entitled to a finding that the transfers it received are "purely foreign" and the Trustee's claims must be dismissed. Lombard is wrong. Its argument ignores the relevant legal analysis. As set forth below, a comprehensive review of the component events of the transactions demonstrates the transfers were predominantly domestic, not foreign—let alone "purely foreign"—and therefore do not require an extraterritorial application of SIPA or the Bankruptcy Code. Lombard entered into the transactions and received the transfers: (1) knowing it was essentially investing in New York-based BLMIS, (2) pursuant to domestic agreements, (3) into and through New York bank accounts, (4) in connection with business it conducted in the United States, and (5) from investment funds based in and profiting from New York.

First, Lombard knew BLMIS's control over its investments in the Fairfield Funds and Kingate Global was so extensive it was essentially investing with BLMIS in New York. Kingate Global invested 100% of its assets with BLMIS and the Fairfield Funds invested at least 95% of their assets with BLMIS. (*Id.* ¶ 2–3). Lombard knew BLMIS controlled every aspect of the

---

[4] Extraterritoriality Decision at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)).

[5] *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

2

funds' investments in New York: (i) the funds delegated all investment decisions to BLMIS as their investment advisor; (ii) BLMIS maintained custody of the assets in New York; and (iii) BLMIS purported to execute trades in U.S. securities on behalf of the funds. (*Id.* ¶¶ 6–13.) The Fairfield Funds' investment memoranda ("IM") called BLMIS "essential" to the Fairfield Funds' operations and profitability. (*Id.* ¶ 14).

Lombard invested in the Fairfield Funds and Kingate Global *because* its money would ultimately be placed with BLMIS, and in turn, Madoff would invest its assets in U.S. securities traded on U.S. markets. But for BLMIS and its U.S.-based investment strategy, Lombard would not have invested in these funds. As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States … was not fortitious or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and Fairfield Sentry.[6]

Second, the subscription agreements governing Lombard's investments with and transfers from the Fairfield Funds demonstrated the transactions were domestic. Lombard agreed that New York law would govern the agreements and agreed to submit to venue in New York and the jurisdiction of New York courts. (*Id.* ¶¶ 15–17.) Accordingly, Lombard had every reason to expect to be subject to U.S. law and courts with respect to the transfers it received from the Fairfield Funds. Lombard also directed Fairfield Sentry to send redemption payments to its New York bank account through these subscription agreements. (*Id.* ¶ 21.)

Third, Lombard knowingly directed funds to and from New York-based BLMIS using New York bank accounts in connection with its investments. Between 1996 and 2008, Lombard sent at least 65 separate subscription payments to New York bank accounts for Fairfield Sentry

---

[6] *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 523 (Bankr. S.D.N.Y. 2012).

3

and Kingate Global, who ultimately sent the funds to BLMIS's bank account in New York. (*Id.* ¶ 19–20.) From 1998 to 2008, Lombard also received at least 189 redemption payments from Fairfield Sentry and Kingate Global into New York bank accounts. (*Id.* ¶ 22.) The continuous use of New York bank accounts for hundreds of transactions over the course of more than ten years demonstrates the transfers were domestic and not "purely foreign."

Fourth, to facilitate its investments in the Fairfield Funds, Lombard conducted business in New York with the Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York which created, operated, controlled, and marketed the Fairfield Funds. Lombard had a long-standing business relationship with FGG dating back to at least 1992 when Lombard began investing in Fairfield Sentry. (*Id.* ¶ 23.) Lombard's primary contacts at FGG were founding partner Jeffrey Tucker and Philip Toub, both partners from FGG's New York office. (*Id.*)

Fifth, the Fairfield Funds and Kingate Global, which sent the transfers to Lombard, had extensive connections with the United States.

The Fairfield Funds' principal place of business was in New York. In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG. (*Id.* ¶ 25.) Noel and Tucker formally organized the Fairfield Funds as international business companies under BVI law (*id.* ¶¶ 28, 49), but they were shell corporations present in the BVI solely on paper. Their BVI registered address was a post office box care of a local trust company owned and operated by a local law firm and BVI law restricted the Fairfield Funds from doing business in the BVI except with other BVI international business companies. (*Id.* ¶¶ 28–29, 49–50.) From their inception until their liquidation in 2009, the Fairfield Funds had no employees and no offices. (*Id.* ¶¶ 29, 50.) In its BLMIS account opening documents, Tucker provided a U.S. mailing address. (*Id.* ¶ 31.) At all relevant times, the Fairfield Funds were operated almost entirely by FGG's New York

4

headquarters personnel who maintained final control of the Fairfield Funds' bank accounts and relationships with the Fairfield Funds' back-office service providers. (*Id.* ¶¶ 34–36, 53–54.) FGG New York headquarters personnel monitored the Fairfield Funds' investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of Fairfield Sentry; marketed the Fairfield Funds; approved all subscriptions for Fairfield Funds shares; maintained all of the Fairfield Funds' books and records; and made all strategic and operational decisions regarding the Fairfield Funds. (*Id.* ¶¶ 35–36, 51–52.)

Kingate Global had a single economic purpose: to make money from New York-based BLMIS. Kingate Global executed a customer agreement, and other accounts opening documents, and delivered the agreements to BLMIS in New York. (*Id.* ¶ 63.) The agreements authorized BLMIS to act as Kingate Global's investment manager, executing broker, and custodian. (*Id.* ¶ 65–67.) They were governed by U.S. law, and disputes under the agreements were to be resolved in the United States. (*Id.* ¶¶ 63–64.)

Kingate Global had no physical offices, no employees, and transacted no meaningful business in the BVI. (*Id.* ¶ 59.) Instead, Kingate Global operated through service providers with substantial connections to the United States. Kingate Global's co-manager, Tremont (Bermuda) Limited, was managed from New York by Tremont Partners, Inc., a Connecticut corporation. (*Id.* ¶ 60.) Its other co-manager, Kingate Management Limited ("KML"), operated through agents in New York. (*Id.* ¶ 71.) KML engaged consultants with a presence in New York to perform due diligence on BLMIS. (*Id.* ¶ 74–76.)

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's main brief, the Trustee respectfully requests that the Court deny Lombard's motion to dismiss and grant the Trustee's motion for leave to amend his complaint.

5

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Torello H. Calvani<br><br>*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff* |