**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01693 (SMB) |
| Plaintiff, | |
| v. | |
| LOMBARD ODIER DARIER HENTSCH & CIE, | |
| Defendant. | |

## TRUSTEE'S PROFFERED ALLEGATIONS
## PERTAINING TO THE EXTRATERRITORIALITY
## ISSUE AS TO LOMBARD ODIER DARIER HENTSCH & CIE

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, by and through his undersigned counsel, respectfully submits the proffered allegations below as to the domestic nature of the transfers received by Banque Lombard Odier & Cie S.A. ("Lombard"), formerly known as Lombard Odier Darier Hentsch & Cie, from Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma"), and Kingate Global Fund, Ltd. ("Kingate Global").

## I.    BACKGROUND

1.    In this action, the Trustee seeks to recover at least $179,244,631 in transfers of BLMIS customer property made to Lombard by Fairfield Sentry, Fairfield Sigma, and Kingate Global: $93,608,655 in transfers from Fairfield Sentry, $1,280,007 in transfers from Fairfield Sigma, and $84,355,969 in transfers from Kingate Global.

2.    Fairfield Sentry and Kingate Global were BLMIS feeder funds—single-purpose investment vehicles that pooled their investors' assets to invest with BLMIS in New York. Fairfield Sentry and Kingate Global had direct customer accounts with BLMIS's investment advisory business. Fairfield Sentry invested at least 95% of its assets and Kingate Global invested 100% of its assets in their respective BLMIS customer accounts.

3.    Fairfield Sigma was a sister fund to Fairfield Sentry that accepted subscriptions in euros, converted the money to U.S. dollars, and then invested 100% of its assets by purchasing shares of Fairfield Sentry.

4.    Fairfield Sentry and Fairfield Sigma (the "Fairfield Funds") were created, operated, controlled, and marketed by the Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York.  Kingate Global was managed in New York.

5.      Lombard knew BLMIS was essential to its investments in the Fairfield Funds and Kingate Global, and invested in the funds to profit from BLMIS in New York.

## II.     THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

### A.     <u>Lombard Invested in the Fairfield Funds and Kingate Global to Profit from BLMIS in New York</u>

6.      BLMIS in New York acted as the investment advisor, executing broker, and custodian that purportedly executed the so-called "split-strike conversion" investment strategy for the Fairfield Funds and Kingate Global. The Fairfield Funds' and Kingate Global's offering memoranda, which Lombard received and read, disclosed BLMIS's involvement with the funds in these capacities.

7.      Fairfield Sentry's Information Memorandum ("IM") dated January 1, 1998 states that BLMIS had complete control of the trades it purported to make for Fairfield Sentry: "The Manager [of Fairfield Sentry] has delegated all investment management duties to Bernard L. Madoff Investment Securities. As a result, the [Fairfield Sentry] is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities." Fairfield Sentry's IM further states, "All investment decisions in the account at [BLMIS] are effected by persons associated with [BLMIS]." This IM was in use during Lombard's investment in Fairfield Sentry.

8.      Fairfield Sentry's IM states that BLMIS was a "registered broker-dealer in New York" that executed the trades for Fairfield Sentry: "[BLMIS] acts as a principal in connection with its sale of securities to [Fairfield Sentry] and the purchase of securities from [Fairfield Sentry]."

9.      Fairfield Sigma's IM dated October 29, 1999 makes the same disclosures. This IM was in use during Lombard's investment in Fairfield Sigma.

2

10.    Kingate Global's IM dated May 1, 2000 indicates Kingate Global's "Investment Advisor" was BLMIS, which the IM described as "a New York based NASD registered broker-dealer" that "utilizes a 'split strike conversion' strategy."

11.    Kingate Global's IM states that BLMIS had complete control over the investment strategy: "The Co-Managers [of Kingate Global] have delegated all investment management duties with regard to [Kingate Global] to the Investment Advisor. … Neither the Co-Managers nor USD Shareholders will have any control over the investment and trading decisions of the Investment Advisor." Kingate Global's IM further states, "All investment decisions in the account held with the Investment Advisor are effected by persons associated with the Investment Advisor." Kingate Global's IM also indicates BLMIS provided the brokerage services for Kingate Global: "The Co-Managers will not have custody of any of the Fund's assets nor do they presently propose to perform any brokerage services for the Fund. Brokerage services may be provided to the Fund by the Investment Advisor or their affiliated firms."

12.    Lombard knew BLMIS's investment strategy, as described in the Fairfield Funds' and Kingate Global's IMs, purportedly involved domestic transactions: the purchase and sale of U.S. equities, U.S. options, and U.S. Treasuries.

13.    Lombard also knew BLMIS maintained custody of its investments in the Fairfield Funds and Kingate Global in New York. Fairfield Sentry's IM states, "[Fairfield Sentry] allocates its assets to an account at Bernard L. Madoff Investment Securities," and "Bernard L. Madoff Investment Securities has entered into an agreement with Citco Custody pursuant to which Bernard L. Madoff Investment Securities will serve as a sub-custodian of [Fairfield Sentry's] assets." Kingate Global's IM also indicates BLMIS maintained custody of Kingate Global's assets in New York.

14.     Because of BLMIS's involvement with the Fairfield Funds, their IMs state that the services of BLMIS were "essential" to the continued operations of and profitability of the Fairfield Funds.

**B.     The Fairfield Fund Transfers Were Made Pursuant to Subscription Agreements That Were Domestic in Nature**

15.     Lombard entered into several subscription agreements with Fairfield Sentry. The subscription agreements were governed by New York law: "This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

16.     Lombard's subscription agreements also included agreements to submit venue in New York and to the jurisdiction of New York courts: "Subscriber agrees that any suit, action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York," and, "Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding." In its subscription agreements, Lombard designated its bank account at Citibank N.A. in New York as the account for both sending subscription payments and receiving redemption payments for Fairfield Sentry.

17.     To invest in Fairfield Sigma, FGG required shareholders, like Lombard, to execute subscription agreements. Fairfield Sigma's subscription agreements also were governed by New York law, included agreements to submit to venue in New York and to the jurisdiction of New York courts, and contained an acknowledgement that the subscriber received and reviewed a copy of Fairfield Sigma's IM, which describes Fairfield Sigma's connections with the United States.

18.    Lombard's subscription agreements governed its investments in the Fairfield Funds, and Lombard received the Fairfield Fund transfers pursuant to its subscription agreements.

### C.    Lombard Used New York Banks in Connection with the Transactions

19.    By investing in Fairfield Sentry and Kingate Global, Lombard knew it was directing funds to New York-based BLMIS through New York bank accounts. Lombard's Fairfield Sentry subscription agreements directed Lombard to send subscription money to a New York correspondent bank account at HSBC Bank USA, N.A. for deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were ultimately deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York. Lombard directed funds to this correspondent bank account at least 37 times from 1996 to 2008 in connection with Fairfield Sentry subscriptions.

20.    Kingate Global's IMs directed subscribers like Lombard to send subscription money to New York correspondent bank accounts at Citibank N.A. or HSBC Bank USA, N.A. for ultimate deposit in Kingate Global's bank account. From Kingate Global's bank accounts, the funds were deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York. Lombard directed funds to these Kingate Global correspondent bank accounts on at least 28 occasions from 1998 to 2006.

21.    Lombard also used New York bank accounts to receive the transfers. In its Fairfield Sentry subscription agreements, Lombard instructed that redemption payments be made to its bank account at Citibank N.A. in New York. Lombard also sent a redemption request directing FGG to send a Fairfield Sigma redemption payment to its Citibank account.

22.    Lombard received some of the its Fairfield Sentry and Kingate Global transfers at its Citibank account and others through correspondent bank accounts at HSBC Bank USA in

5

New York. In connection with these Fairfield Sentry and Kingate Global redemptions, Lombard received at least 189 separate wire transfers at or through these New York bank accounts from 1998 to 2008.

**D.    Lombard Conducted Business in the United States in Connection with Its Investments in the Fairfield Funds**

23.    Lombard had a long-standing business relationship with FGG dating back to at least 1992 when it began investing in Fairfield Sentry. Lombard communicated with FGG employees in the United States regarding its investments in and the transfers from the Fairfield Funds. Lombard's primary contacts at FGG were founding partner Jeffrey Tucker and partner Philip Toub, both based in FGG's New York office.

**E.    The Fairfield Funds' Principal Place of Business Was in New York**

24.    At all relevant times, the Fairfield Funds' principal place of business was in New York and they were domestic residents.

**1.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership**

25.    In 1988, Walter Noel and Tucker founded FGG, a *de facto* partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

26.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as a so-called currency fund, Fairfield Sigma.

27.    FGG also included a number of administrative entities that purportedly provided management and back-office support to the funds.  These entities included: Fairfield Greenwich

Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield

Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc.

("Fairfield International Managers").

### 2.    Fairfield Sentry

28.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized

Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax-free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

29.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From

its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

30.    Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

a.    **Fairfield Sentry's Agreements with BLMIS Confirm Fairfield
Sentry's Principal Place of Business Was in the United States**

31.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear
Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,
Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012
and options account 1FN069.  In the account opening documents, Tucker listed Fairfield
Sentry's address as the office address of Fairfield International Managers, Inc. ("Fairfield
International Managers")—a company jointly owned by Noel and Tucker—in Greenwich,
Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade
confirmations, and correspondence to Fairfield International Managers' offices in Greenwich,
Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS,
1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account
statements, trade confirmations, and correspondence for these accounts to the same Greenwich,
Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's
address for all of its BLMIS accounts to FGG's New York headquarters.

32.    After the original BLMIS account documents were executed by Tucker on behalf
of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in
FGG's New York headquarters—executed additional BLMIS account documents on behalf of
Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and
Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on
these BLMIS account documents as FGG's New York headquarters.

33.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts
are governed by New York law and all disputes arising under the agreements must be resolved
by mandatory arbitration in New York utilizing the laws of New York.  All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

> **b.    FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities**

34.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with back-office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

> **c.    FGG New York Personnel Managed Fairfield Sentry**

35.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

36.     FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

> **d.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS**

37.     As noted above, Fairfield Sentry's subscription agreements also incorporated its private placement memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's investment strategy; and (4) through BLMIS invested in U.S. S&P

100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also

disclosed to investors that BLMIS's services were "essential to the continued operation of the

Fund."

### e.    BLMIS Was Fairfield Sentry's Investment Manager

38.    Although FGG attempted to hide its manager, BLMIS served as the investment

manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality

made all of Fairfield Sentry's investment decisions.

39.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's

Littlestone Associates, which was a money management firm also located in New York City.

Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG

clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG

Limited.  FG Limited was formed under the laws of Ireland.

40.    While FG Limited was formed under foreign law, it reported its principal place of

business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters.  Upon the formation

of FG Limited, Fairfield International Managers assigned all of its management contracts with

Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry

Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even

though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

41.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

42.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the Fairfield Funds to FG Bermuda.  FG Limited remained the placement agent for the same funds.

43.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

44.     Prior to 2006, while FG Bermuda purported to manage the Fairfield Funds'
investments, it did not register as an investment adviser under the Investment Advisers Act of
1940.

45.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its
relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect
further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment
Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to
file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,
executed and submitted.

46.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not
FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required
Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as
Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

47.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS
accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other
fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a
number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.
The seedling funds were operated and organized by FGG New York Personnel.  Many of the
seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### 3.     Fairfield Sigma

48.     FGG operated Fairfield Sentry as a U.S. dollar-based fund with all subscription
and redemptions paid in U.S. dollars.  In response to investor requests to invest in Fairfield
Sentry using euros, FGG created Fairfield Sigma.  Fairfield Sigma accepted subscriptions in
euros, converted them to U.S. dollars, and then invested 100% of its assets in Fairfield Sentry.

When paying redemptions, Fairfield Sigma redeemed Fairfield Sentry shares, converted the U.S. dollars it received from Fairfield Sentry to euros, and paid the euros to the redeeming Fairfield Sigma investors.

49.     Noel and Tucker organized Fairfield Sigma on November 20, 1990 as an international business company under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Fairfield Sigma.  Fairfield Sigma is currently in liquidation in proceedings in the BVI and United States.

50.     Also like Fairfield Sentry, Fairfield Sigma was a shell corporation present in the BVI only on paper.  It had no employees and maintained no offices.  Fairfield Sigma listed its registered BVI address as the same BVI post office box care of a local trust company they shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Fairfield Sigma to FGG's New York headquarters.  Fairfield Sigma was operated almost entirely by FGG New York Personnel.

51.     As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Fairfield Sigma.  Once Fairfield Sigma was opened for investors, FGG New York Personnel monitored Fairfield Sigma's investments into, and redemptions from, Fairfield Sentry; managed Fairfield Sigma's relationships with clients and potential clients; created marketing and performance materials for Fairfield Sigma; marketed Fairfield Sigma; performed administrative functions required by Fairfield Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield

Sigma; and conducted various other due diligence and risk management activities.   Until

Fairfield Sigma's liquidation, FGG maintained Fairfield Sigma's books and records in New

York.   FGG New York Personnel also had final control of Fairfield Sigma's banking accounts,

including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the

Bank of Montreal.

52.    FGG New York Personnel controlled and approved the subscriptions for and

redemptions of Fairfield Sigma shares.   Like Fairfield Sentry's subscription agreements,

Fairfield Sigma's subscription agreements contained a New York choice of law provision,

provided for venue and jurisdiction for any disputes in New York, and incorporated its PPM that

described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were

Fairfield Sigma's sole assets.   Fairfield Sigma's PPMs made substantially similar disclosures as

Fairfield Sentry's PPMs with respect to Madoff's investment strategy, its use of U.S.-based

investments, and BLMIS's role in the investments.   Additionally, Fairfield Sigma's October

2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there

was "always the risk" that BLMIS could misappropriate the assets or securities.   This same risk

was also disclosed in Fairfield Sentry's PPMs.

53.    Noel and Tucker were the original directors of Fairfield Sigma and, like Fairfield

Sentry, contracted with Citco Fund Services to provide Fairfield Sigma with back-office

administrative services such as coordinating subscription and redemption forms, maintaining

Know Your Customer information, and serving as the independent party verifying the Net Asset

Value of the Fairfield Sigma shares.   Noel and Tucker also contracted Citco Custody to serve as

the custodian of the Fairfield Sigma assets.   As a further part of the Citco relationship, Noel and

Tucker opened bank accounts on behalf of Fairfield Sigma at Citco Bank Dublin.   FGG New

York Personnel had final control of the Fairfield Sigma Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Fairfield Sigma's relationships with the Citco entities.

54.     In addition to the Citco Bank Dublin accounts, in order to convert Fairfield Sigma investors' euros into U.S. dollars—as required for investment in Fairfield Sentry and BLMIS. Noel executed separate contracts on Fairfield Sigma's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

55.     FGG New York Personnel initially listed FG Limited as the investment manager for Fairfield Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPMs to indicate FG Bermuda was Fairfield Sigma's Investment Manager. In fact there were no duties for any investment manager because Fairfield Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. dollars.

56.     The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund Limited*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

**F.     Kingate Global's Operations Were Centered in New York**

57.     BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the accounts prior to December 11, 2008.

**1.     Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation**

58.     Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an

enterprise with a single economic purpose: to make money from a New York-based investment operation.

59.    Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

60.    Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

61.    Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage Kingate Global's investments with BLMIS.

62.    Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

### 2.    The Operative Legal Documents Were New York-Based

63.    Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York. Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

64.    Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted

in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### 3.    BLMIS Had Full Authority to Make and Execute Investment Decisions

65.    Kingate Global's Trading Authorization Agreements authorized BLMIS to be Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

66.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as Kingate Global's investment manager and purported to invest exclusively according to Madoff's strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

67.    BLMIS acted as Kingate Global's broker-dealer in purporting to purchase securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### 4.    Kingate Global Was Managed From New York

68.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

69.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

70.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

71.    Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

72.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

73.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

74.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

75.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

76.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

77.    KML and the FIM entities actively participated in Kingate Global business with BLMIS and knew BLMIS purported to invest U.S. securities traded on U.S. exchanges in New York.

19

### 5.    Kingate Global Used Banks in New York

78.    Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase Bank N.A.

79.    KML also engaged HSBC Bank USA, N.A., a major international financial institution doing business in the United States as Kingate Global's custodian.

80.    In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

81.    FIM also directed fee payments to be routed through a bank account in New York.

82.    The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: June 26, 2015
      New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the estate of Bernard L.*
*Madoff*