**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff,<br><br>        Plaintiff,<br><br>    v.<br><br>SAFEHAND INVESTMENTS, STRONGBACK HOLDINGS CORPORATION, and PF TRUSTEES LIMITED in its capacity as trustee of RD Trust,<br><br>        Defendants. | Adv. Pro. No. 12-01701 (SMB)<br><br>**TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO THE PIEDRAHITA ENTITIES' MOTIONS TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS** |

The Trustee respectfully submits this memorandum as a supplement to his Main Brief, opposing the motion to dismiss by three defendants that are alter ego entities created by Andrés Piedrahita, one of the founding partners of the Fairfield Greenwich Group ("FGG"). The Trustee opposes the motions to dismiss of defendants Safehand Investments ("Safehand", Strongback Holdings Corporation ("Strongback"), and PF Trustees Limited in its capacity as trustee of RD Trust ("PF Trustees") (collectively, the "Piedrahita Entities") and respectfully requests the Trustee's motion for leave to amend complaints be granted. As set forth below, the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to the Piedrahita Entities (the "Proffer") plead facts demonstrating that the Trustee's claims to recover transfers from the Piedrahita Entities involve only a domestic application of SIPA and Bankruptcy Code § 550.

## I.     **BACKGROUND**

The Piedrahita Entities are vehicles created by Andrés Piedrahita to which he diverted the partnership distributions he received from FGG, a *de facto* partnership headquartered in New York. (Proffer ¶¶ 1–2.) Between 2002 and 2008, the Piedrahita Entities received over $219 million in subsequent transfers of BLMIS customer property from Fairfield Greenwich Limited ("FG Limited") and Fairfield Greenwich (Bermuda) Ltd. ("FG Bermuda"), on behalf of Piedrahita himself. (*Id.* ¶ 5.)

The Trustee's claims against the Piedrahita Entities do not require an extraterritorial application of SIPA or the Bankruptcy Code. The transfers came from BLMIS—the New York debtor; through Fairfield Sentry, FG Limited, and FG Bermuda—all operated out of New York; to Piedrahita—who lived in the United States; for work that Piedrahita performed primarily in the United States for FGG—a New York company. (*Id.* ¶ 6.) The Piedrahita Entities' motions to dismiss must be denied so that the Trustee can proceed with recovering these domestic transfers from the Piedrahita Entities and returning them to Madoff's victims.

## II.    OVERVIEW OF THE TRANSFERORS AND MR. PIEDRAHITA

In 1988, Walter Noel and Jeffrey Tucker founded FGG and opened its offices in New York. (*Id.* ¶ 29.) They operated FGG as a *de facto* partnership that included: individual persons; United States corporations; foreign corporations; and investment vehicles launched, managed, operated, and marketed by FGG's New York office. (*Id.* ¶¶ 30–31.) FGG was essentially a collection of hedge funds and the individuals and entities that operated those funds.

### A.    Fairfield Sentry

FGG's main hedge funds were the three funds that invested directly with BLMIS— Fairfield Sentry Limited ("Fairfield Sentry"), Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P. ("Greenwich Sentry Partners") (collectively, the "Feeder Funds"). (*Id.* ¶¶ 2, 30.) FGG also created and managed a number of additional funds that invested in the BLMIS Feeder Funds.

On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry for the purpose of creating a fund to invest with Madoff. (*Id.* ¶ 32.) While Noel and Tucker chose to organize Fairfield Sentry under BVI law, the fund was present in the BVI on paper only. Fairfield Sentry never had any employees or offices in the BVI, and was legally prohibited from doing business with most BVI residents. (*Id.* ¶ 33.) Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was FGG's New York headquarters. (*Id.* ¶¶ 34–40.) Fairfield Sentry is in liquidation in the BVI and the United States.  (*Id.* ¶ 32.)

### 1.    FGG New York Personnel Controlled Fairfield Sentry

FGG operated Fairfield Sentry out of its New York headquarters using FGG personnel based in New York ("FGG New York Personnel"). (*Id.* ¶ 34.) FGG New York Personnel made all operational decisions regarding Fairfield Sentry; had final control of Fairfield Sentry's

banking accounts; controlled and approved all subscriptions into and redemptions from the fund;

monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS,

Madoff, clients, and potential clients; created marketing and performance materials for Fairfield

Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield

Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of

Fairfield Sentry; and directed investments into and out of BLMIS. (*Id.*) FGG maintained

Fairfield Sentry's books and records in New York. (*Id.*)

### 2. Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was the United States

In Fairfield Sentry's agreements with BLMIS, it was clear that Fairfield Sentry operated

in the United States. BLMIS account documents from the early 1990s listed Fairfield Sentry's

address as the office address of Fairfield International Managers—a company jointly owned by

Noel and Tucker—in Greenwich, Connecticut. (*Id.* ¶ 35.) In 1998, FGG faxed a change of

address notice to BLMIS indicating Fairfield Sentry's address, for purposes of its four BLMIS

accounts, was now FGG's New York headquarters. (*Id.*) The account documents were executed

by FGG New York Personnel. (*Id.*)

The agreements also made clear the parties intended for them to be governed by New

York law. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are

governed by New York law and all disputes arising under the agreements must be resolved by

mandatory arbitration in New York utilizing the laws of New York. (*Id.* ¶ 36.) All transactions

under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange

Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal

Reserve System. (*Id.*) Every BLMIS trade confirmation received and reviewed by FGG

personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a

Securities Investor Protection Corporation member regulated by the SEC. (*Id.*)

### 3. Fairfield Sentry's Partners and Investors Knew the Feeder Funds Were Investing with BLMIS

The fund documents Fairfield Sentry sent to its investors informed investors that Fairfield

Sentry was invested with a U.S. fund that invested in U.S. securities. From at least January 1,

2002, Fairfield Sentry subscription agreements contained New York choice of law provisions,

and provided for venue and jurisdiction for any disputes in New York. (*Id.* ¶ 37.)

Fairfield Sentry's subscription agreements also incorporated its Private Placement

Memoranda ("PPMs") by reference. (*Id.* ¶ 38.) Each Fairfield Sentry subscriber acknowledged

receipt of the PPM. (*Id.*) The PPMs disclosed to the Fairfield Sentry investors that a minimum of

95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by

BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy;

and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term

U.S. Treasurys. (*Id.*) Fairfield Sentry's PPM also disclosed to investors that BLMIS's services

were "essential to the continued operation of the Fund." (*Id.*)

### B. The Administrative Entities

FGG also included a number of administrative entities that provided management and

back office support to the funds. These entities included: FG Limited, FG Bermuda, and Fairfield

Greenwich Advisors LLC ("FG Advisors"). While some of these entities were organized under

the laws of foreign countries to avoid scrutiny from U.S. regulators, all of the entities were

operated from FGG's New York headquarters and provided services to FGG's funds, which were

similarly operated out of New York. (*Id.* ¶¶ 39–45.)

4

In 1997, FGG acquired Littlestone Associates, a money manager owned by Piedrahita. (*Id.* ¶ 39.) In the same year, the three Founding Partners—Noel, Tucker, and Piedrahita—formed FG Limited under the laws of Ireland. (*Id.*) FG Limited was owned by Noel and Tucker through Fairfield International Managers (66.7%) and by Piedrahita through Safehand. (*Id.*) FG Limited reported its principal place of business as FGG's New York headquarters and it was registered to do business in New York. (*Id.* ¶ 40.)

In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds investment vehicle. (*Id.* ¶ 41.) The new fund would be open to all investors and as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. (*Id.*) Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve as the investment manager of the funds. (*Id.*) As a result, FGG formed two new entities, FG Advisors and FG Bermuda. (*Id.*)

In October 2003, FGG formed FG Advisors as a Delaware limited liability company with its principal place of business in New York. (*Id.* ¶ 42.) At the same time, FGG formed FG Bermuda under Bermuda law. (*Id.*) Both FG Advisors and FG Bermuda are wholly-owned subsidiaries of FG Limited. (*Id.*) Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to each entity. (*Id.*)

In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. (*Id.* ¶ 45.) While the investigation was ongoing, in attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. (*Id.*) Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted. (*Id.*) As a result of the investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. (*Id.* ¶ 46.) Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts. (*Id.*)

### C.    The Partnership and Piedrahita

FGG was founded by Noel, Tucker, and Piedrahita. (*Id.* ¶ 29.) It was operated as a *de facto* partnership: the partners shared control, profits, and losses as a partnership. (*Id.*) The partners internally referred to their interests in FGG's profits as "partnership interests." (*Id.*)

The partners received distributions of profits through FG Limited and FG Bermuda based on their respective partnership interests. (*Id.*) The vast majority of these profits came from management and performance fees the Feeder Funds and seedling funds charged their investors based on the purported returns from BLMIS. (*Id.*)

## III.    <u>THE TRANSFERS TO THE PIEDRAHITA ENTITIES ARE DOMESTIC</u>

The Trustee has brought claims against the Piedrahita Entities to recover the more than two hundred million dollars that were transferred from BLMIS to the Piedrahita Entities. (*Id.* ¶ 5.) The Piedrahita Entities seek to dismiss these claims on the basis that they require an extraterritorial application of the Bankruptcy Code and SIPA. The transfers at issue here are domestic.

The Piedrahita Entities were essentially alter egos for FGG Partner Andrés Piedrahita, a New York-based partner, who received partnership distributions that arose from FGG's operations in New York, and which came from two entities—FG Limited and FG Bermuda— that were based in New York. (*Id.* ¶¶ 4–5.) The fact that these entities were nominally organized under foreign laws does not change the fact that the component events of these transfers indicate

they were domestic in nature. *See Maxwell Commc'n Corp. PLC v. Societe General PLC (In re Maxwell Commc'n Corp. PLC)*, 186 B.R. 807, 816–17 (S.D.N.Y. 1995) ("*Maxwell I*"). The Piedrahita Entities' motions must be denied.

### A.    The Legal Standard

As further explained in the Main Brief, the District Court explained the standard by which the Piedrahita Entities' motion should be analyzed. *See Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, 513 B.R. 222, 227–31 (S.D.N.Y. 2014). To determine whether conduct is extraterritorial, this Court must determine whether the "transfer and component events of the transaction" are domestic. *See id.* at 227; *see also Maxwell I*, 186 B.R. at 816–17. The relevant component events include, without limitation: (i) the debtor's location; (ii) the defendant's location; (iii) where the defendant engaged in business regarding the transaction; (iv) the relevant transactions and agreements entered into by the parties; (v) where the parties relationship was centered at the relevant times; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *See Maxwell I*, 186 B.R. at 816–17. The component events of each of the transfers challenged by the Piedrahita Entities indicate the transfers are domestic.

### B.    Each of the Transfers to the Piedrahita Entities Is Domestic in Nature and Within the Scope of the Bankruptcy Code and SIPA

#### 1.    The Transfers to Safehand Are Domestic

Safehand received approximately $219,004,944 that originated from BLMIS and was subsequently transferred to Safehand. (*Id.* ¶ 20.) As specifically pleaded in the Piedrahita Entities Proffer, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. (*Id.* ¶¶ 16–20.) Safehand's motion to dismiss based on extraterritoriality must be denied.

7

Safehand was created by Piedrahita and essentially operated as his alter ego. (*Id.* ¶ 17.)
Safehand accepted partnership distributions on Piedrahita's behalf and did not have any purpose
other than serving as a holder of his money. (*Id.* ¶¶ 16–17.)

Safehand argues that the transfers it received from FG Limited and FG Bermuda were
purely foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the
location of BLMIS as the debtor in the United States, indicate that the transfers to Safehand are
domestic.

*Safehand's Location*: Safehand was organized under the laws of the Cayman Islands. (*Id.*
¶ 16.)  However, Safehand did not have an office, employees, or a principal place of business.
(*Id.*) Safehand was operated by Piedrahita, its sole shareholder, from New York. (*Id.* ¶¶ 10–12,
17.) Piedrahita submitted tax forms to the U.S. government regarding Safehand. (*Id.* ¶ 17.)

*Where Safehand Engaged in Business Regarding the Transactions*: Safehand did not
itself engage in any business. It simply accepted partnership distributions on Piedrahita's behalf.
(*Id.* ¶¶ 17–18.) Piedrahita performed his work for FGG, including his work marketing the Feeder
Funds, primarily in New York. (*Id.* ¶¶ 10–12.)

*Transactions and Agreements*: The transactions and agreements that led to the debt that
the transfers satisfied indicate that the parties all understood their transactions to be domestic.
The vast majority of Piedrahita's partnership distributions that went to Safehand came from FG
Limited, which maintained its principle place of business in New York. (*Id.* ¶ 13.) Each of
Piedrahita's quarterly FG Limited shareholder distributions which were made from FG Limited's
New York JP Morgan bank account. (*Id.*)  FGG New York personnel approved, directed, and
controlled each of the FG Bermuda shareholder distributions made to Safehand. (*Id.* ¶ 42.)

8

*Center of the Parties' Relationship*: Safehand's and Piedrahita's relationship with BLMIS and FGG was centered in the United States. As a founding partner and member of FGG's Executive Committee, and parts of its marketing team, Piedrahita had detailed knowledge about the Feeder Funds and their investments with BLMIS. (*Id.* ¶ 12.) As Piedrahita's alter ego, this knowledge is imputed to Safehand.

*Governing Law*: Safehand executed shareholder agreements with FG Limited that contained New York choice of law provisions. (*Id.* ¶ 19.)

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers received by Safehand are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

### 2.    The Transfers to Strongback Are Domestic

Strongback received funds that originated from BLMIS and were subsequently transferred to Strongback. (*Id.* ¶ 23.) As specifically pleaded in the Piedrahita Entities Proffer, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. (*Id.* ¶¶ 21–24.) Strongback's motion to dismiss based on extraterritoriality must be denied.

Strongback was created by Piedrahita and essentially operated as his alter ego. (*Id.* ¶ 22.) Strongback accepted transfers on Piedrahita's behalf and did not have any purpose other than serving as a holder of his money. (*Id.* ¶ 23.)

Strongback argues that the transfers it received were purely foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the location of BLMIS as the debtor in the United States, indicate that the transfers to Strongback are domestic.

*Strongback's Location*: Strongback was organized under the laws of the Cayman Islands and subsequently re-registered in Malta. (*Id.* ¶ 21.) There is no indication Strongback had any

office, employees, or a principal place of business, or was operated by anyone other than
Piedrahita. (*See id.* ¶ 22.)

*Where Strongback Engaged in Business Regarding the Transactions*: Piedrahita used
Strongback to invest in domestic FGG funds on Piedrahita's behalf. Piedrahita also directed the
payments he received from FG Advisors. (*Id.* ¶ 23.) Piedrahita performed his work for FGG,
including his work marketing the Feeder Funds, primarily in New York. (*Id.* ¶¶ 10–12.)

*Transactions and Agreements*: The transactions and agreements that led to the debt that
the transfers satisfied indicate that the parties all understood their transactions to be domestic.
Transfers made to Piedrahita through Strongback were approved, directed, and controlled by
Piedrahita, who worked and resided in New York. (*Id.* ¶¶ 10–12, 23.)

*Center of the Parties' Relationship*: Strongback's and Piedrahita's relationship with
BLMIS and FGG was centered in the United States. As a founding partner and member of
FGG's Executive Committee, and parts of its marketing team, Piedrahita had detailed knowledge
about the Feeder Funds and their investments with BLMIS. (*Id.* ¶ 12.) As Piedrahita's alter ego,
this knowledge is imputed to Strongback.

*Governing Law*: Piedrahita executed shareholder agreements with FG Limited that
contained New York choice of law provisions. (*Id.* ¶ 19.) The Trustee is not aware of any
agreements between Strongback itself and FGG that contain a choice of law provision.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers
received by Strongback are domestic and do not require an extraterritorial application of SIPA or
the Bankruptcy Code.

### 3.    The Transfers to PF Trustees Are Domestic

PF Trustees, in its capacity as trustee to RD Trust, received as much as $219,004,944 that
originated from BLMIS and was subsequently transferred to RD Trust. (*Id.* ¶¶ 20, 28.) As

specifically pleaded in the Piedrahita Entities Proffer, all of these transfers are domestic in nature and fall within the intended reach of the Bankruptcy Code and SIPA. (*Id.* ¶¶ 25–28.) PF Trustees' motion to dismiss based on extraterritoriality must be denied.

RD Trust was created by Piedrahita and essentially operated as his alter ego. He was the settlor and beneficiary of the trust and retained the power to revoke the trust at any time, at which point all assets would revert to him, and to change the trustee's investment strategy at any time. (*Id.* ¶¶ 25–27.) As the owner of Safehand, PF Trustees has now received all the transfers that were originally made to Safehand. (*Id.* ¶ 28.)

PF Trustees argues that the transfers it received were purely foreign. On the contrary, the component events identified in *Maxwell I*, in addition to the location of BLMIS as the debtor in the United States, indicate that the transfers to PF Trustees are domestic.

*RD Trust's Location*: RD Trust was created under the laws of the Cayman Islands. (*Id.* ¶ 25.) However, RD Trust was operated by Piedrahita, as the settlor, beneficiary, and investment manager, from New York. (*Id.* ¶¶ 25–27.)

*Where RD Trust Engaged in Business Regarding the Transactions*: RD Trust did not itself engage in any business other than accepting assets that included Piedrahita's partnership distributions. (*Id.* ¶ 28.) Piedrahita performed his work for FGG, including his work marketing the Feeder Funds, primarily in New York. (*Id.* ¶¶ 10–12.)

*Transactions and Agreements*: The transactions and agreements that led to the debt that the transfers satisfied indicate that the parties all understood their transactions to be domestic. The vast majority of Piedrahita's partnership distributions that went to Safehand, and ultimately to RD Trust, came from FG Limited, which maintained its principle place of business in New York. (*Id.* ¶ 13.) Each of Piedrahita's quarterly FG Limited shareholder distributions which were

made from FG Limited's New York JP Morgan bank account. (*Id.*) FGG New York personnel approved, directed, and controlled each of the FG Bermuda shareholder distributions made to Safehand, which are now owned by RD Trust. (*Id.* ¶¶ 28, 42.)

*Center of the Parties' Relationship*: RD Trust's and Piedrahita's relationship with BLMIS and FGG was centered in the United States. As a founding partner and member of FGG's Executive Committee, and parts of its marketing team, Piedrahita had detailed knowledge about the Feeder Funds and their investments with BLMIS. (*Id.* ¶ 12.) As Piedrahita's alter ego, this knowledge is imputed to RD Trust and PF Trustees.

*Governing Law*: Piedrahita executed shareholder agreements with FG Limited that contained New York choice of law provisions. (*Id.* ¶ 19.) The Trustee is not aware of any agreements between RD Trust or PF Trustees and FGG that contain a choice of law provision.

Accordingly, the Trustee has alleged specific facts demonstrating that the transfers received by PF Trustees in its capacity as trustee to RD Trust are domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

## IV.    CONCLUSION

For these reasons, the Trustee respectfully requests that the Court deny the motions to dismiss of defendants Safehand Investments, Strongback Holdings Corporation, and PF Trustees Limited in its capacity as trustee of RD Trust. The subsequent transfers they received as a result of their relationship with BLMIS were domestic in nature and are subject to the Trustee's claims under the Bankruptcy Code and SIPA. In addition, the Trustee respectfully requests that the Court grant his motion for leave to amend complaints.

Dated:  New York, New York
         June 26, 2015

/s/ Thomas L. Long

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Thomas L. Long
Email: tlong@bakerlaw.com
Mark A. Kornfeld
Email: mkornfeld@bakerlaw.com
Jessie M. Gabriel
Email: jgabriel@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the estate of Bernard L. Madoff*