**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | Adv. Pro. No. 12-01701 (SMB) |
| Plaintiff, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO DEFENDANTS SAFEHAND INVESTMENTS, STRONGBACK HOLDINGS CORPORATION, AND PF TRUSTEES LIMITED IN ITS CAPACITY AS TRUSTEE OF RD TRUST** |
| v. | |
| SAFEHAND INVESTMENTS, STRONGBACK HOLDINGS CORPORATION, and PF TRUSTEES LIMITED in its capacity as trustee of RD Trust, | |
| Defendants. | |

The Trustee, by his undersigned counsel, for his Proffered Extraterritoriality Allegations against defendants Safehand Investments ("Safehand"), Strongback Holdings Corporation ("Strongback"), and PF Trustees Limited in its capacity as trustee of RD Trust ("PF Trustees") (collectively, the "Piedrahita Entities"), states:

## I.    INTRODUCTION

1. The Defendants are entities that were created by Andrés Piedrahita, a founding partner of the Fairfield Greenwich Group ("FGG"), to receive his partnership distributions from FGG.

2. FGG is a New York-based *de facto* partnership that operated a group of hedge funds. These funds included three funds that were invested almost entirely with BLMIS—Fairfield Sentry Limited ("Fairfield Sentry"), Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P. (collectively, the "Feeder Funds").

3. The Feeder Funds charged investors significant fees and those fees were then funneled to two FGG administrative entities, Fairfield Greenwich Limited ("FG Limited") and Fairfield Greenwich (Bermuda) Ltd. ("FG Bermuda"), which were operated out of FGG's New York headquarters.

4. FG Limited and FG Bermuda then distributed these fees to the FGG partners, including Piedrahita, in the form of partnership distributions.

5. Between 2002 and 2008, Piedrahita, through the Piedrahita Entities, received more than $219 million from FG Limited and FG Bermuda.

6. The transfers received by the Piedrahita Entities are domestic. They came from BLMIS—the New York debtor; through Fairfield Sentry, FG Limited, and FG Bermuda—all operated out of New York; to Piedrahita—who lived in the United States; for work that

1

Piedrahita performed primarily in the United States for FGG—a New York company.

## II. THE COMPONENT EVENTS OF THE TRANSFERS TO THE DEFENDANTS WERE CENTERED IN THE UNITED STATES

7. The Defendants are vehicles created by Piedrahita to receive his partnership payments from FGG. As a Founding Partner of FGG, Piedrahita received regular partnership distributions of significant sums of money. He created the Piedrahita Entities under the laws of foreign nations and then had his partnership distributions directed to them.

8. All of the funds the Piedrahita Entities received derived from BLMIS, its relationship with FGG and Fairfield Sentry, and Piedrahita's association with FGG—relationships that were centered in New York.

### A. FGG Founding Partner Andrés Piedrahita

9. Piedrahita, a citizen of the Republic of Colombia and the United Kingdom, resided in the United States for the majority of his adult life. He attended Boston University and then moved to New York to begin his career in money management. Piedrahita obtained permanent residence status and was issued a U.S. social security number.

10. In 1989, Piedrahita married Corina Noel Piedrahita, in Greenwich, Connecticut. Noel Piedrahita is the daughter of FGG Founding Partner Walter Noel and was herself an FGG Partner. The couple maintained multiple residences in New York between at least 2001 and 2008, and also maintained residences in Florida and Connecticut. Both of the Piedrahitas are defendants in *Picard v. Fairfield Investment Fund, et al.*, Adv. Pro. No. 09-01239 (SMB).

11. Before joining FGG, Piedrahita ran a money manager called Littlestone Associates, a New York corporation with its principal place of business in New York. In 1997, Piedrahita merged his company with FGG, thereby becoming one of the three founding partners of the company, along with Walter Noel and Jeffrey Tucker.

2

12. After joining FGG, Piedrahita continued to work and live in New York. As part of his FGG duties, Piedrahita regularly met with Madoff at BLMIS's New York headquarters, hosted dinners and client events on behalf of FGG in New York, regularly attended FGG Executive Committee and Board of Directors meetings in New York, and signed investor communications using a New York address block. Piedrahita was intimately involved with FGG's operations, including the operations of the Feeder Funds. As a member of the Executive Committee and Chairman of the Board of Directors, Piedrahita was deeply involved in making day-to-day management decisions regarding the FGG entities. Although at limited times Piedrahita was affiliated with FGG's offices in London and Madrid, he always maintained an office at FGG's New York headquarters.

13. When Piedrahita joined FGG he became a one-third owner of FG Limited, an entity used to hold and distribute partnership profits. FG Limited maintained its principal place of business in New York. Through the years, Piedrahita signed multiple versions of the FG Limited shareholder agreement, which indicated that the agreements were to be governed by New York law. The payments Piedrahita received from FG Limited came from FG Limited's JPMorgan Chase & Co. bank account in New York.

14. FG Limited and FG Bermuda, of which Piedrahita was also a shareholder, were used to retain and divide up FGG profits between its partners. Feeder Fund investors paid management and performance fees on their investments. These fees, minus any operating expenses—which were limited given that Madoff was managing the investments at no charge—were transferred to FG Limited and FG Bermuda pursuant to agreements between the entities and the funds. Each of the FGG Partners received profit distributions based on his or her relative interest as a shareholder of FG Limited and FG Bermuda. As a founding partner, Piedrahita's cut

3

was significant. Between 2002 and 2008, Piedrahita and the Piedrahita Entities received $219,004,944 from FG Limited and FG Bermuda. These funds originated from BLMIS.

15.     However, to protect the hundreds of millions of dollars he received as an FGG Partner, Piedrahita moved his profit distributions into entities created in foreign countries. These entities are the three Defendants in this action.

B.     **Safehand Investments**

16.     Piedrahita formed Safehand in 2001 as a Cayman Islands corporation. It was incorporated on November 6, 2001 and lists its registered address as Zephyr House, Mary Street, PO Box 709, Grand Cayman KY1-1107, Cayman Islands. Its Memorandum and Articles of Association do not list any employees or any offices other than a post office box. As an exempt company, Safehand was not permitted to engage in business within the Cayman Islands except to further its business interests outside the Cayman Islands.

17.     Piedrahita was the sole shareholder of Safehand, which effectively served as Piedrahita's alter ego. When the entity was created, Piedrahita indicated to the U.S. government that Safehand was a "foreign eligible entity with a single owner electing to be disregarded as a separate entity."

18.     Following Safehand's formation, Piedrahita transferred his entire interests in FG Limited and FG Bermuda to Safehand. As a shareholder in FG Limited and FG Bermuda, Safehand received the partnership distributions to which Piedrahita was entitled. Safehand received the payments from FG Limited from FG Limited's New York bank account into Safehand's New York correspondent account at Wachovia Bank N.A.

19.     As a shareholder of FG Limited, Safehand executed copies of the shareholder agreement in at least 2002, 2004, and 2008. Each of these shareholder agreements indicated that the agreement would be governed by the laws of the State of New York.

4

20. Safehand received $212,777,342 in distributions attributed to Piedrahita from FG Limited between 2002 and 2008. Safehand also received $6,227,602 in distributions attributed to Piedrahita from FG Bermuda in 2008.

### C. Strongback Holdings Corporation

21. Strongback is an S-corporation that was formed under the laws of the Cayman Islands on November 6, 2001. It was subsequently deregistered in December 2011, and reregistered as Strongback Holdings Limited with the Malta Registry of Companies. Strongback Holdings Corporation is the same entity as Strongback Holdings Limited, and will be jointly referred to as Strongback.

22. Like Safehand, Strongback served as the alter ego of Piedrahita. Numerous FGG documents refer to Strongback and Piedrahita interchangeably.

23. Piedrahita used Strongback to invest in domestic FGG funds on Piedrahita's behalf. Piedrahita also directed the payments he received from Fairfield Greenwich Advisors LLC ("FG Advisors") to Strongback. Strongback does not challenge the domesticity of the transfers it received from FG Advisors in the motion to dismiss.

24. Transfers to Piedrahita through Strongback were deposited in Strongback's New York account at Wachovia Bank N.A.

### D. RD Trust and PF Trustees

25. RD Trust was created on April 4, 2002 under the laws of the Cayman Islands. The trust was settled by Piedrahita and First Island Trustees (Guernsey) Limited was named as the original trustee. Piedrahita's father, Samuel Piedrahita, and his sister, Carmen Piedrahita, were named as the committee of the protector. The trust beneficiaries are Piedrahita, his wife, and his children.

26. By a Deed of Removal and Appointment of New Trustee executed on

5

November 25, 2003, First Island Trustees (Guernsey) Limited was removed as trustee in favor of Defendant PF Trustees. PF Trustees is a Cayman Islands company with a registered office at Zephyr House, P.O. Box 709 G.T., Mary Street, Grand Cayman, Cayman Islands—the same address as Safehand.

27. Piedrahita as settlor retained significant control over RD Trust. He reserved the power, free of any fiduciary duty, to direct the trust regarding the retention or disposal of any asset and the trust's investment policy. Piedrahita was himself one of the beneficiaries of the trust. He also retained the right to revoke the trust at any time, in which case all assets of the trust would be distributed to Piedrahita. The trust agreement indicated that the terms of the trust required only that the trustee invest the assets and then distribute them to the beneficiaries as directed by the committee of the protector—Piedrahita's father and sister. In short, Piedrahita retained virtually complete control over the trust, which served as Piedrahita's alter ego.

28. RD Trust is now the sole owner of Safehand. Thus, PF Trustees in its capacity as trustee of RD Trust, owns and is in possession of all transfers that were received by Safehand. As explained above, Safehand received over $219 million in transfers of funds that were initially transferred from BLMIS to the Feeder Funds, and then to FG Limited and FG Bermuda.

### III. FAIRFIELD SENTRY, FG LIMITED, AND FG BERMUDA WERE OPERATED AND CONTROLLED FROM FGG'S NEW YORK HEADQUARTERS

#### A. The Genesis of the FGG *De Facto* Partnership

29. In 1988, Walter Noel and Jeffrey Tucker founded the FGG *de facto* partnership in New York City. FGG created, managed, and marketed a variety of investment funds, the largest of which were Feeder Funds. FGG operated as a *de facto* partnership in that partners shared control, profits, and losses as a partnership and received what they internally referred to as "partnership interests." Profits were funneled to either FG Limited or FG Bermuda and then

6

distributed to the partnership based on their respective interests. The vast majority of these profits came from management and performance fees the Feeder Funds and seedling funds charged their investors based on the purported returns from BLMIS.

30. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment funds created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment funds were the three Feeder Funds, as well as Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda") (the "Currency Funds"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

31. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: FG Limited, FG Bermuda, FG Advisors, and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B. Fairfield Sentry

32. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands for the purpose of investing with Madoff. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act. Fairfield Sentry is currently in liquidation in proceedings in the BVI and the United States.

33. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

7

Its statutorily required registered address in the BVI, and the address of its registered agent, was a post office box.

### 1. FGG New York Personnel Controlled Fairfield Sentry

34. Once Fairfield Sentry was opened for investors, FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained all of Fairfield Sentry's books and records in New York. All decisions regarding Fairfield Sentry's assets not invested with BLMIS were made and controlled by FGG New York Personnel. Even with the Citco entities' various roles, FGG New York Personnel made all operational decisions regarding Fairfield Sentry.

### 2. Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was the United States

35. In November 1990, Tucker signed account documents with BLMIS in Fairfield Sentry's name opening an investment account and corresponding options account. In the account opening documents, Tucker listed Fairfield Sentry's mailing address as Fairfield International Managers' office in Greenwich, Connecticut. Further, Tucker directed BLMIS to mail all Fairfield Sentry monthly account statements to Fairfield International Managers' Greenwich, Connecticut office. Later, on January 29, 1998, FGG notified BLMIS to mail all Fairfield Sentry account statements, trade confirmations, and correspondence to FGG's New York headquarters. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well

as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

36. The BLMIS Customer Agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS Customer Agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and/or reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a United States registered broker-dealer and a Securities Investor Protection Corporation member regulated by the SEC.

### 3. Fairfield Sentry's Investors Knew They Were Investing with BLMIS

37. The fund documents Fairfield Sentry sent to its investors informed investors that Fairfield Sentry was invested with a U.S. fund that invested in U.S. securities. From at least January 1, 2002, Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

38. Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPM") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The PPM disclosed to Fairfield Sentry investors that a minimum of 95% of the fund's assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC–registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S.

9

Treasurys. Fairfield Sentry also disclosed to its investors that BLMIS's services were "essential to the continued operation of the Fund."

### C. The Administrative Entities—FG Limited and FG Bermuda

39. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. Noel and Tucker through Fairfield International Managers owned 66.7% of FG Limited while Piedrahita owned 33.3% of FG Limited. In 2001, Piedrahita transferred his ownership interest to Safehand. FG Limited was formed under the laws of Ireland.

40. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

41. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the new fund, as well as other FGG funds, including the Feeder Funds and Currency Funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would

serve in the role as the investment manager of the Feeder Funds and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

42.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the Feeder Funds and the Currency Funds to FG Bermuda. FG Limited remained the placement agent for the same funds. While FG Bermuda had a small number of employees, major decisions were still handled out of FGG's New York headquarters. For instance, any FG Bermuda transaction in excess of $10,000 had to be approved and include the signature of FGG executives located at FGG's New York headquarters.

43.    In 2003, with FG Bermuda's entry into FGG operations, FGG New York Personnel issued new PPMs that listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's placement agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

44.    Prior to 2006, while FG Bermuda purported to manage the Feeder Funds' and Currency Funds' investments, it did not register as an investment adviser.

45.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its Feeder Funds. While the investigation was ongoing, in an attempt to deflect

11

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

46. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

47. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, et al.*, Adv. Pro. No. 09-01239 (SMB), (proffered June 26, 2015, Bankr. S.D.N.Y., contemporaneously with the Extraterritoriality Briefing).

Dated: June 26, 2015  /s/ Thomas L. Long
      New York, New York  **Baker & Hostetler LLP**
        45 Rockefeller Plaza
        New York, New York 10111
        Telephone: (212) 589-4200
        Facsimile: (212) 589-4201
        David J. Sheehan
        Tom L. Long
        Mark A. Kornfeld
        Jessie M. Gabriel

        *Attorneys for Irving H. Picard, Trustee*
        *for the Substantively Consolidated SIPA*
        *Liquidation of Bernard L. Madoff Investment*
        *Securities LLC and the estate of Bernard L.*
        *Madoff*