**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the substantively consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02923 (SMB) |
| Plaintiff, | |
| v. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO FALCON PRIVATE BANK LTD.** |
| FALCON PRIVATE BANK LTD. (f/k/a AIG Privat Bank AG), | |
| Defendant. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendant Falcon Private Bank Ltd. ("Falcon"), formerly known as AIG Privat Bank AG ("AIG Privat Bank"), states:

## I.    INTRODUCTION

1. The Trustee seeks to recover at least $38,745,417 in subsequent transfers of BLMIS customer property collectively made to AIG Privat Bank by Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma").

2. Although AIG Privat Bank itself was formerly a Swiss private bank, AIG Privat Bank was a direct subsidiary of American International Group, Inc. ("AIG"). Significantly, AIG is a U.S. company incorporated in Delaware that maintained, and still maintains, its principal office in New York. In 2009, after Madoff's arrest, Aabar Investments PJSC ("Aabar") acquired AIG Privat Bank and changed its name to Falcon

3. Fairfield Sentry was one of many BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with New York-based BLMIS. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS.

4. Sigma was a so-called "currency fund" that accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets by purchasing shares of Fairfield Sentry.

5. The BLMIS customer property received by AIG Privat Bank was transferred from New York-based BLMIS to Fairfield Sentry and subsequently transferred directly to AIG Privat Bank or to Fairfield Sigma, which in turn transferred the funds to AIG Privat Bank.

6. Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York,

1

created, operated, and controlled Fairfield Sentry and Sigma.

7. AIG Privat Bank purposely invested in Fairfield Sentry and Sigma to profit from New York-based BLMIS, which made investment decisions and was in control of implementing investments in U.S. markets. But for BLMIS's fraudulent activities in New York, AIG Privat Bank would have received none of the transfers from Fairfield Sentry and Sigma.

8. AIG Privat Bank also invested in Ascot Fund Limited ("Ascot"), a Feeder Fund managed by New York-based Gabriel Capital Corporation. Upon information and belief, AIG Privat Bank invested in this Feeder Fund to increase its access to New York-based BLMIS.

9. Although AIG Privat Bank was incorporated in Switzerland, during all relevant times, its New York affiliate conducted due diligence on Fairfield Sentry, Sigma, Ascot, Madoff, and BLMIS on its behalf. As a result of its due diligence and the due diligence of its New York-based affiliate, AIG Privat Bank knew the following facts:

    a. In reality the investment adviser for Fairfield Sentry and Sigma was New York-based BLMIS.

    b. New York-based BLMIS was the executing broker for Fairfield Sentry's and Sigma's investments, and purportedly operated and executed the "split-strike conversion" investment strategy ("SSC Strategy") on behalf of Fairfield Sentry.

    c. Madoff's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury Bills ("Treasurys") traded on U.S. exchanges, and all decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

    d. New York-based BLMIS was the custodian of Fairfield Sentry's and Sigma's investments.

    e. The entire economic purpose of Fairfield Sentry and Sigma was to deliver money to New York-based BLMIS.

    f. Fairfield Sentry and Sigma were entirely dependent on New York-based BLMIS.

10. AIG Privat Bank knew control over Fairfield Sentry's and Sigma's investments

2

rested entirely with New York-based BLMIS, and invested in Fairfield Sentry and Sigma precisely to profit from BLMIS's control over a U.S. investment strategy.

## II. THE TRANSACTIONS AT ISSUE INVOLVED SIGNIFICANT DOMESTIC COMPONENTS

11. The transactions at issue involved significant domestic components. First, AIG Privat Bank invested in Fairfield Sentry and Sigma to specifically profit from New York-based BLMIS. Second, a domestic affiliate of AIG Privat Bank conducted due diligence in New York on its behalf. Third, AIG Privat Bank agreed New York law applied in connection with its investments in Fairfield Sentry and Sigma. Fourth, AIG Privat Bank utilized New York bank accounts to transfer funds. Lastly, Fairfield Sentry and Sigma were domestic residents that maintained their principal place of business in New York.

### A. AIG Privat Bank Invested in BLMIS Feeder Funds Specifically to Profit from New York-Based BLMIS

12. AIG Privat Bank directed funds to Fairfield Sentry and Sigma with the intent to invest in New York-based BLMIS and treated investments in Feeder Funds as investments with BLMIS itself.

13. AIG Privat Bank knew Fairfield Sentry and Sigma were entirely dependent on New York-based BLMIS. AIG Privat Bank knew BLMIS purportedly executed the SSC Strategy, decided which U.S. equities to purchase in connection with the SSC Strategy, and that BLMIS was the custodian of virtually all of Fairfield Sentry's assets. Further, AIG Global received and reviewed a Fairfield Sentry due diligence questionnaire that cautioned, "[t]he services of . . . Bernard L. Madoff Investment Securities are essential to the continued operations" of Fairfield Sentry.

14. AIG Privat Bank also invested in Ascot, a Feeder Fund managed by New York-

3

based Gabriel Capital Corporation. Upon information and belief, AIG Privat Bank invested in Ascot to further profit from New York-based BLMIS.

### B. AIG Privat Bank's Domestic Affiliate Conducted Due Diligence on Fairfield Sentry, Sigma, Madoff, and BLMIS

15. Before it was sold to Aabar and renamed Falcon in 2009, AIG Privat Bank was a direct subsidiary of AIG, a company incorporated in Delaware that maintained, and still maintains, its principal office in New York. During all relevant times, AIG Privat Bank was also affiliated with AIG Global Investment Corporation ("AIG Global"), which was incorporated in New Jersey and maintained an office in New York. Significantly, AIG Privat Bank relied on AIG Global's presence in New York to manage its relationship with Fairfield Sentry, Sigma, and FGG.

16. AIG Global conducted due diligence in New York on behalf of AIG Privat Bank. From its New York office, AIG Global conducted due diligence on Fairfield Sentry, Sigma, Madoff, and BLMIS, and exchanged the information it learned from this due diligence with AIG Privat Bank.

17. AIG Global visited FGG's New York headquarters on behalf of AIG Privat Bank to conduct due diligence on Fairfield Sentry and Sigma. After meeting with FGG, AIG Global received and analyzed Fairfield Sentry due diligence materials, including a Fairfield Sentry due diligence questionnaire that directed AIG Privat Bank and AIG Global to send all correspondence regarding Fairfield Sentry to FGG's New York headquarters. The Fairfield Sentry due diligence questionnaire also detailed that New York-based BLMIS was the custodian, investment manager, and prime broker for assets invested with the SSC Strategy.

18. AIG Global and AIG Privat Bank communicated with FGG's New York-based Cornelis Boele to request Fairfield Sentry and Sigma due diligence materials and schedule visits

4

to FGG's New York headquarters. Boele was the FGG representative responsible for AIG Privat Bank's investments in Fairfield Sentry and Sigma, and FGG's relationship with AIG Privat Bank and AIG Global.

### C. AIG Privat Bank Agreed New York Law Applied in Connection with the Transactions

19. AIG Privat Bank voluntarily executed Fairfield Sentry subscription agreements in connection with investing funds in Fairfield Sentry that contained New York choice of law, venue, and jurisdiction provisions. Specifically, these agreements specified that they "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions." Further, by executing these agreements, AIG Privat Bank "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

20. The Sigma subscription agreement executed by AIG Privat Bank contained similar New York choice of law, venue, and jurisdiction provisions.

### D. AIG Privat Bank Used New York Banks to Transfer Funds

21. AIG Privat Bank used New York bank accounts to transfers funds to and from Fairfield Sentry.

22. Fairfield Sentry's subscription agreements directed all money from AIG Privat Bank to a New York correspondent bank account at either Republic National Bank of New York or HSBC Bank USA for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York.

23. AIG Privat Bank also used an account at HSBC Bank USA in New York to

5

receive transfers from Fairfield Sentry. AIG Privat Bank utilized this New York HSBC Bank USA bank account on multiple occasions to receive $38,675,129 in redemption payments from Fairfield Sentry.

### E. Fairfield Sentry and Sigma's Principal Place of Business Was in New York

24. At all relevant times, Fairfield Sentry and Sigma's principal place of business was in New York and they were domestic residents.

#### 1. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

25. In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were feeder funds.

26. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

27. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

6

**2.    Fairfield Sentry**

28.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

29.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

30.    Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

> a.    *Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business was in the United States*

31.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.  In the account opening documents, Tucker listed Fairfield

7

Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

32. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

33. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

8

*b.    FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities*

34.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

*c.    FGG New York Personnel Managed Fairfield Sentry*

35.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

9

York.

36. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

      *d.*  *Fairfield Sentry's Investors Knew They Were Investing in BLMIS*

37. Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

      *e.*  *BLMIS Was Fairfield Sentry's Investment Manager*

38. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield

10

International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

39. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

40. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

41. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency

funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

42. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

43. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

44. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

45. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

12

Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

46.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

47.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### 3.    Sigma

48.    FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars. In response to investor requests to invest in Fairfield Sentry using Euros, FGG created Sigma. Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

49.    Noel and Tucker organized Sigma on November 20, 1990, as an international business company under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other

13

08-01789-cgm   Doc 10370   Filed 06/27/15   Entered 06/27/15 10:49:45   Main Document
                                    Pg 15 of 17

entities organized under the BVI International Business Companies Act, so was Sigma. Sigma is currently in liquidation in proceedings in the BVI and United States.

50.     Also like Fairfield Sentry, Sigma was a shell corporation present in the BVI only on paper. It had no employees and maintained no offices. It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters. Sigma was operated almost entirely by FGG New York Personnel.

51.     As with Fairfield Sentry, and as part of the FGG de facto partnership, FGG New York Personnel made the operational decisions regarding Sigma. Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities. Until Sigma's liquidation, FGG maintained Sigma's books and records in New York. FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

52.     FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares. Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated its PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole

14

assets. Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPM's.

53. Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma at Citco Bank Dublin. FGG New York Personnel had final control of the Sigma Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Sigma's relationships with the Citco entities.

54. In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS—Noel executed a separate contract on Sigma's behalf with the Bank of Montreal for a currency swap which was "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

55. FGG New York Personnel initially listed FG Limited as the investment manager for Sigma. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPM's to indicate FG Bermuda was Sigma's Investment Manager. In fact, there were no

15

duties for any investment manager because Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

56.  The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB), (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015  
  New York, New York

/s/ Thomas L. Long  
**Baker & Hostetler LLP**  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Thomas L. Long  

**Baker & Hostetler LLP**  
65 East State Street  
Suite 2100  
Columbus, Ohio 43215  
Telephone: (614) 228-1541  
Facsimile: (614) 462-2616  
Lauren M. Hilsheimer  
Justin J. Joyce  

*Attorneys for Irving H. Picard, Trustee for the substantively consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*