BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | **TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO FULLERTON CAPITAL PTE LTD.'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT** |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01004 (SMB) |
| Plaintiff, | |
| v. | |
| FULLERTON CAPITAL PTE LTD., | |
| Defendant. | |

The Trustee respectfully submits this memorandum as a supplement to his Main Brief being filed simultaneously herewith in opposition to the motion to dismiss based on extraterritoriality made by defendant Fullerton Capital PTE LTD ("Fullerton") and in further support of the Trustee's motion for leave to amend his Complaint.

## BACKGROUND

Fullerton, a sophisticated international asset manager, was a shareholder in Fairfield Sentry Limited ("Fairfield Sentry"), which invested substantially all of its assets with BLMIS. (Trustee's Complaint at ¶ 2; *id.* at Ex. C.)  Fullerton received a subsequent transfer of $10,290,445 in BLMIS customer property from Fairfield Sentry (the "Transfer").  (*Id.*)  The Trustee's Proffered Allegations demonstrate that the Trustee's action to recover this Transfer does not require an extraterritorial application of SIPA or Bankruptcy Code Section 550.

## THE TRANSFER AND COMPONENT EVENTS OF FULLERTON'S FAIRFIELD SENTRY TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

Citing to *Maxwell I*, the District Court directed that "the location of the transfers as well as the component events of those transactions"[1] must be used to determine whether a subsequent transfer claim involves a domestic or extraterritorial application of the Code and SIPA.[2]  Under the District Court's ruling, the Trustee need only put forth "specific facts suggesting a domestic

---

[1] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 816).

[2] In *Maxwell I*, the court examined all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *In re Maxwell Commc'n Corp.*, 186 B.R. 807, 816-17 (S.D.N.Y. 1995).

transfer" to avoid dismissal.[3] This is a fact-based inquiry in which all reasonable inferences should be drawn in the Trustee's favor.[4]

Fullerton argues that simply because it and Fairfield Sentry were formally organized under the laws of foreign countries, the subsequent transfer it received is "purely foreign" and the Trustee's recovery action must be dismissed. This superficial argument disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit extraterritoriality case law that similarly examines a transaction's various connections to the United States.[5]

Based on the facts set forth in the Proffered Allegations, there is no basis for dismissing this case on the grounds of extraterritoriality.

To begin with, the entire purpose of Fullerton's investments with Fairfield Sentry was to invest in U.S. securities markets through New York-based investment adviser BLMIS, and to earn returns on those U.S.-based investments. Specifically, Fullerton entered into subscription agreements with Fairfield Sentry at least 4 times and in each case affirmed that it knew (i) Fairfield Sentry invested almost exclusively with a New York-based, SEC-registered investment adviser (i.e. BLMIS) that invested in the U.S. securities market, and (ii) Fullerton's money would be transferred to that same investment adviser in New York. (Proffered Allegations at ¶¶ 6, 7.) As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from

---

[3] Extraterritoriality Decision, 513 B.R. at 232 n.4.

[4] *See*, *e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 402-03 (S.D.N.Y. 2010) (deferring ruling on extraterritoriality at motion to dismiss phase and citing standard that "[t]he court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.").

[5] *See, e.g.*, *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 217 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014); and other cases cited in the Trustee's Main Brief.

2

BLMIS in the United States . . . was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" investor and feeder fund.[6]

The express provisions of its agreements with Fairfield Sentry further demonstrate the domestic nature of Fullerton's investment transactions with Fairfield Sentry. Fullerton agreed in its subscription agreements with Fairfield Sentry that New York law would govern its investments, and it consented to U.S. jurisdiction. (Proffered Allegations at ¶¶ 8, 9.) Thus, Fullerton had every expectation that U.S. laws would apply to its investment transactions and that it would be subject to suit in the United States.

Fullerton also purposefully used its own U.S. bank account and the U.S. banking system in connection with its subscriptions into, and Transfer from, Fairfield Sentry. Specifically, Fullerton used a bank account in its own name at the Bank of New York in New York to receive the Transfer. (*Id.* at ¶ 11.) Fullerton also remitted its subscriptions into a U.S. correspondent account at the direction of Fairfield Sentry, which funds were then ultimately delivered to BLMIS in New York. (*Id.* at ¶ 12.)

The domestic nature of Fullerton's transactions is also evidenced by the fact that its due diligence as to its Fairfield Sentry transactions took place in New York and was specifically focused on BLMIS. Prior to investing with BLMIS through Fairfield Sentry, Fullerton conducted due diligence regarding Fairfield Sentry and BLMIS through Fairfield Greenwich Group's ("FGG") New York office, including visiting and corresponding with FGG personnel based in New York. (*Id.* at ¶¶ 16-23.)

Fullerton and its parent company Temasek's New York office were closely connected when it came to Fullerton's Fairfield Sentry investments and due diligence thereon. The

---

[6] *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 513 (Bankr. S.D.N.Y. 2012).

3

Fullerton investment team originally operated as Temasek's internal fund management division (prior to Fullerton's independent establishment in 2003), and when Temasek was given capacity to invest in Fairfield Sentry, it allocated that capacity to Fullerton. (*Id.* at ¶ 14.) The two entities also shared personnel—Antony Dirga, the primary individual who communicated with FGG on behalf of Fullerton, served as the Associate Director of Fund Management for both Fullerton and Temasek. (*Id.* at ¶¶ 17, 20-22.) Internally, FGG noted that personnel from its New York office had "carefully developed [a] relationship with Temasek's New York office" and "used over $10 million of its scarce Fairfield Sentry limited capacity to cultivate this account. . . ." (*Id.* at ¶¶ 15, 18.)

Together, Fullerton and Temasek met and communicated regularly with high-level New York-based executives at FGG in New York in connection with Fullerton's investments. (*Id.* at ¶¶ 15-22.) Through these communications and meetings with New York based FGG personnel in New York, Fullerton obtained in-depth information, and addressed numerous questions and concerns it had, regarding both Fairfield Sentry and BLMIS. (*Id.* at ¶¶ 16-22.)

Fullerton's due diligence was so focused on BLMIS that it expressly questioned FGG as to what would happen in the event BLMIS failed and how that would impact its investments in Fairfield Sentry. In July 2004 e-mail communications with FGG, Antony Dirga specifically asked FGG for follow up information on this point, querying, in part: "do investors have ready access to the fund when BLM goes bankrupt or will the account be frozen pending court settlement?" (*Id.* at ¶ 22.) Thus Fullerton clearly anticipated that BLMIS's failure would lead to a United States bankruptcy action and that its investments would be subject to U.S. laws.

Beyond all of the above domestic components, Fullerton's argument that its transactions are "purely foreign" is wrong because it ignores the reality of Fairfield Sentry, from which it

4

received the Transfer.  FGG in New York created, managed, and controlled Fairfield Sentry.  (*Id.* at ¶ 24.)  Fairfield Sentry was based out of New York and had its principal place of business in New York.  (*Id.*)  Although technically registered in the BVI, Fairfield Sentry had no employees or offices there, and at all times, operational decisions were made by FGG employees in New York.[7]  (Proffered Allegations at ¶¶ 28, 29, 35.)  In its BLMIS account opening documents, FGG listed Fairfield Sentry's address as in the United States.  (*Id.* at ¶ 31.)  Fairfield Sentry's initial and on-going due diligence on BLMIS was conducted in New York, and the operative legal documents for its BLMIS accounts were governed by New York law.  (*Id.* at ¶¶ 33, 35.)  BLMIS in New York served as Fairfield Sentry's investment manager and implemented the split-strike conversion strategy for Fairfield Sentry.  (*Id.* at ¶¶ 7, 37, 38.)

## CONCLUSION

For the forgoing reasons and those stated in the Trustee's Main Brief, Fullerton's motion to dismiss should be denied, and the Trustee's motion for leave to amend his Complaint should be granted.

---

[7] *See SEC v. Gruss*, 2012 WL 3306166 at *3 (S.D.N.Y. Aug 13, 2012) (finding that issues of fact existed regarding whether an offshore fund was "foreign" for purposes of extraterritoriality where complaint alleged that operational and investment decisions for the offshore fund were made in New York, "such that for all intents and purposes, the [offshore fund] was based in New York").

5

|                              |                                                                                      |
|------------------------------|--------------------------------------------------------------------------------------|
| Dated: June 26, 2015<br>　　　New York, New York | By: /s/ Thomas L. Long<br>Baker & Hostetler LLP<br>45 Rockefeller Plaza<br>New York, New York  10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Matthew D. Feil<br>Hannah C. Choate<br><br>*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff* |