**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01019 (SMB) |
| Plaintiff, | |
| v. | |
| BANCO ITAÚ EUROPA LUXEMBOURG S.A., and BANCO ITAÚ EUROPA INTERNATIONAL, | |
| Defendants. | |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO
BANCO ITAÚ EUROPA LUXEMBOURG S.A.'S MOTION TO DISMISS BASED ON
EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S
MOTION FOR LEAVE TO AMEND THE COMPLAINT**

The Trustee respectfully submits this supplemental memorandum of law in opposition to Banco Itaú Europa Luxembourg S.A.'s ("Itaú Luxembourg") motion to dismiss based on extraterritoriality and in further support of the Trustee's motion for leave to amend his complaint. The Trustee's Proffered Allegations plead specific facts evidencing that the transfers to Itaú Luxembourg are sufficiently domestic such that the Trustee's action does not require extraterritorial application of SIPA or 11 U.S.C. § 550. Accordingly, Itaú Luxembourg's motion to dismiss must be denied.

## BACKGROUND AND LEGAL STANDARD

The District Court returned this action to this Court to determine whether the Trustee's claims against Itaú Luxembourg seek the recovery of "purely foreign" transfers, requiring extraterritorial application of Bankruptcy Code § 550.[1] Under the Extraterritoriality Decision, the Trustee must "put forth specific facts suggesting a domestic transfer" to avoid dismissal.[2] In making this determination, there is no bright-line test to determine whether a transaction is extraterritorial,[3] and courts must review "the location of the transfers as well as the component events of those transactions."[4] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[5]

The Proffer specifically alleges that Itaú Luxembourg received $71,320,203 in subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield

---

[1] *Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 232–33 (S.D.N.Y. 2014) (the "Extraterritoriality Decision").

[2] *Id*. at 232 n.4.

[3] *Parkcentral Global Hub Ltd. v. Porsche Automobil Holdings SE*, 763 F.3d 198, 216-17 (2d Cir. 2014) (rejecting single-factor, bright-line rule as appropriate for extraterritoriality analysis to ascertain whether foreign or domestic elements "predominate").

[4] Extraterritoriality Decision at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)).

[5] *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

Sentry"), Fairfield Sigma Limited ("Fairfield Sigma," and together with Fairfield Sentry, the "Fairfield Funds"), and Kingate Global Fund Ltd. ("Kingate Global"). (Proffer at ¶ 1.) Itaú Luxembourg argues that the Trustee's action must be dismissed because Itaú Luxembourg and the respective funds were organized under foreign law and therefore the Trustee seeks "purely foreign" transfers. Itaú Luxembourg is wrong. Its superficial analysis ignores the transactions' significant domestic components. As set forth below, the component events of the transactions demonstrate that the Trustee's recovery claims do not require extraterritorial application of SIPA or the Bankruptcy Code, and that Itaú Luxembourg's motion must be denied.

## THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

The subsequent transfers received by Itaú Luxembourg were not "purely foreign," but were predominantly domestic for the following reasons: (1) Itaú Luxembourg knowingly invested in the respective funds to profit from BLMIS in New York, (2) the transfers from the Fairfield Funds were made pursuant to subscription agreements that were domestic in nature, (3) Itaú Luxembourg sent and received the transfers at issue through New York bank accounts, (4) Itaú Luxembourg used a U.S. affiliate to manage and facilitate its investments in the Fairfield Funds, (5) the Fairfield Funds maintained their principal place of business in New York, and (6) Kingate Global's operations were based in New York.

First, Itaú Luxembourg invested in the Fairfield Funds and Kingate Global to profit from BLMIS in New York. Itaú Luxembourg plainly knew, based on the funds' offering memoranda, that the funds invested all (or substantially all) of their assets with BLMIS, and that BLMIS controlled all aspects of those investments from its office in New York. (*Id*. at ¶¶ 4, 10–16, 23–26.) For example, Itaú Luxembourg knew: (i) the respective funds delegated all investment decisions to BLMIS as their investment advisor; (ii) BLMIS maintained custody of the assets in

New York; and (iii) BLMIS purported to execute trades in U.S. securities on behalf of the funds. (*Id.* at ¶¶ 10–16, 23–26.) Accordingly, BLMIS was "essential" to the funds' profitability, and, in turn, Itaú Luxembourg's profitability. (*Id.* at ¶ 14.)

Itaú Luxembourg invested in the Fairfield Funds *because* its money would ultimately be placed with BLMIS, and in turn, Madoff would invest its assets in U.S. securities traded on U.S. markets. But for BLMIS and its U.S.-based investment strategy, Itaú Luxembourg would not have invested in the Fairfield Funds. As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States … was not fortitious or incidental; instead, it was 'the ultimate objective' and the 'raison d'etre' of the Agreement between" Itaú Luxembourg the Fairfield Funds.[6]

Second, the transfers from the Fairfield Funds were made pursuant to subscription agreements that were domestic in nature. By executing the agreements, Itaú Luxembourg knowingly (i) submitted to New York courts' jurisdiction, (ii) agreed that New York law would govern the agreements, (iii) agreed to wire the Fairfield Funds subscription payments to a New York bank account, and (iv) agreed to BLMIS in New York controlling all aspects of the investments. (*Id.* at ¶¶ 9, 20–22, 28.)

Third, Itaú Luxembourg deliberately selected a New York bank account to receive redemption payments. From 1999 to 2008, Itaú Luxembourg received more than 200 separate transfers from Fairfield Sentry in its account with UBS AG in Connecticut. (*Id.* at ¶ 29.) It wired over 180 subscription payments to Fairfield Sentry through a correspondent bank account at HSBC Bank USA, N.A. which were ultimately deposited in BLMIS's JPMorgan Chase Bank N.A. account in New York. (*Id.* at ¶ 28.)

---

[6] *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 523 (Bankr. S.D.N.Y. 2012).

Fourth, Itaú Luxembourg used its U.S. affiliate, Itaú Private Bank, to manage its relationship with and investments in the Fairfield Funds. (*Id*. at ¶¶ 7–8.) From its offices in New York and Miami, Itaú Private Bank corresponded directly with the Fairfield Greenwich Group ("FGG") regarding Itaú Luxembourg's investments in the Fairfield Funds. (*Id*. at ¶ 18.) For example, Itaú Private Bank asked FGG about Madoff's fee structure and the performance of the split-strike conversion strategy, among other things. (*Id*. at ¶ 19.)

Fifth, the Fairfield Funds' were principally operated in New York by FGG.  Walter Noel and Jeffrey Tucker, both U.S. citizens, organized the Fairfield Funds in 1988 as international business companies under BVI law. (*Id*. at ¶¶ 34, 55.) As such, BVI law restricted the funds from doing business in the BVI except with BVI international business companies. (*Id*.)

The Fairfield Funds were shell corporations with no employees and no offices in the BVI. Their BVI registered address was a post office box care of a local trust company operated by a local law firm. (*Id*. at ¶¶ 35, 56.) The funds were operated almost entirely by FGG's New York City headquarters personnel who maintained final control of Fairfield Sentry's bank accounts and relationships with Fairfield Sentry's back office service providers. (*Id*. at ¶¶ 40–42, 57–60.)

At all relevant times, FGG personnel in New York monitored the Fairfield Funds' investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of the Fairfield Funds; marketed the Fairfield Funds; approved all subscriptions for Fairfield Funds shares; maintained the Fairfield Funds' books and records at the FGG New York City headquarters; and made all strategic and operational decisions regarding the Fairfield Funds. (*Id*. at ¶¶ 41–42, 57.)

Sixth, Kingate Global invested exclusively with BLMIS in New York and, together with its purported investment manager, consultant, and other service providers, formed an enterprise

with a single economic purpose: to make money from a New York-based investment operation. (*Id*. at ¶ 63.)

Kingate Global executed a customer agreement, and other accounts opening documents, that were governed by U.S. law, and disputes under the agreements were to be resolved in the United States. (*Id*. at ¶¶ 69-71.) The agreements authorized BLMIS to act as Kingate Global's investment manager, custodian and executing broker, and to invest its assets according to Madoff's SSC investment strategy. (*Id*. at ¶¶ 72-74.) )

Kingate Global had no physical offices, no employees, and transacted no meaningful business in the BVI. (*Id*. at ¶ 65.) Tremont (Bermuda) Limited, which served as the co-manager of Kingate Global, was managed from New York by Tremont Partners, Inc., a Connecticut corporation. (*Id*. at ¶ 66.) Kingate Global was also co-managed by Kingate Management Limited ("KML"), which operated through agents in New York. (*Id*. at ¶ 78.) KML engaged consultants FIM Limited and FIM Advisers LLP (together "FIM") to perform due diligence on BLMIS. (*Id*. at ¶ 81.) The head of due diligence for FIM's feeder fund investments was located in New York and worked with FIM's affiliate FIM (USA) Inc. in New York, which was the hub for FIM's feeder fund due diligence. (*Id*. at ¶¶ 82-83.)

## CONCLUSION

For the above reasons and those stated in the Trustee's main brief, this Court should grant the Trustee's motion for leave to amend the Complaint and deny Itaú Luxembourg's motion to dismiss.

Dated:  June 26, 2015
       New York, New York

    /s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Thomas L. Long
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*

6