**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01019 (SMB) |
| Plaintiff, | |
| v. | |
| BANCO ITAÚ EUROPA LUXEMBOURG S.A., and BANCO ITAÚ EUROPA INTERNATIONAL, | |
| Defendants. | |

**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE**
**EXTRATERRITORIALITY ISSUE AS TO BANCO ITAÚ EUROPA LUXEMBOURG**

Pursuant to the Court's December 10, 2014 Scheduling Order, Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, and the substantively consolidated estate of Bernard L. Madoff, respectfully submits the following proffered allegations as to the domestic nature of the transfers received by Banco Itaú Europa Luxembourg S.A. ("Itaú Luxembourg") from Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma," and together with Fairfield Sentry, the "Fairfield Funds"), and Kingate Global Fund Ltd. ("Kingate Global").

## I.    BACKGROUND

1.    In this action, the Trustee seeks to recover approximately $81,639,202 million in subsequent transfers of BLMIS customer property collectively made to Itaú Luxembourg and Banco Itaú Europa International ("Itaú Miami") (together, the "Itaú Defendants"). Of this amount, Itaú Luxembourg received transfers totaling $71,320,203, including $64,893,157 from Fairfield Sentry, $3,140,261 from Fairfield Sigma, and $3,286,785 from Kingate Global.

2.    The Itaú Defendants are sophisticated financial institutions operating within a global network of financial service providers that collectively comprise Itaú Unibanco Holding S.A. ("Itaú Unibanco"). Itaú Unibanco is a multi-national financial conglomerate with a registered address in Sao Paolo, Brazil and offices in New York and Miami. It advertises itself as a leading bank with $79.2 billion in market capitalization, 96,355 employees, and 4,957 branches across the globe.

3.    Itaú Luxembourg is a Luxembourg *société anonyme* that provides investment and wealth management services. It maintains a place of business at 29 Avenue de la Porte Neuve L2227, Luxembourg. Itaú Miami is an Edge Act corporation, chartered by the Federal Reserve to

engage in international banking, and maintains a place of business at 200 South Biscayne Boulevard, Suite 2200, Miami, Florida 33131. Itaú Unibanco owns the Itaú Defendants.

4.      Fairfield Sentry and Kingate Global were investment funds that pooled investments made by third parties for investment with BLMIS's investment advisory business. Fairfield Sigma was a sister fund to Fairfield Sentry that accepted subscriptions in euros, converted the money to U.S. dollars, and then invested 100% of its assets in Fairfield Sentry.

5.      The Fairfield Funds were created, marketed, operated, and controlled by the Fairfield Greenwich Group ("FGG"), a *de facto* partnership located in New York. Kingate Global was managed from New York.

6.      As set forth below, Itaú Luxembourg invested in the Fairfield Funds and Kingate Global to profit from BLMIS in New York, and the funds were merely a means to that end.

## II.      THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

### A.      <u>Itaú Luxembourg Used a U.S. Affiliate to Invest in the BLMIS Funds</u>

7.      Itaú Private Bank is a subsidiary of Itaú Unibanco that provides wealth management services and has offices in New York and Miami. Itaú Private Bank was responsible for the day-to-day oversight and administration of Itaú Luxembourg's investments with Fairfield Sentry.

8.      From its own offices in New York and Miami, Itaú Private Bank managed the Itaú Defendants' investments in the Fairfield Funds. Itaú Private Bank was authorized and directed to conduct due diligence, negotiate transactions, and otherwise act on behalf and for the benefit of Itaú Luxembourg for its Fairfield Sentry investments.

**B.** **Itaú Luxembourg Knew BLMIS Acted as the Investment Advisor, Executing Broker, and Custodian for the Fairfield Funds**

9.       To invest in Fairfield Sentry, Itaú Luxembourg executed subscription agreements wherein it represented that it read and reviewed a copy of Fairfield Sentry's Private Placement Memoranda, as amended from time to time ("PPM").

10.      Based on the PPM, Itaú Luxembourg knew that BLMIS was the investment advisor and broker-dealer that executed Madoff's so-called "split-strike conversion strategy" for the Fairfield Funds.

11.      According to the PPM, the split-strike conversion strategy involved the purchase of a basket of U.S. equities "that together will highly correlate to the S&P 100 Index," as well as the purchase and sale of U.S. options and U.S. Treasuries.

12.      The PPM explained that FGG "established a discretionary account for Sentry at Bernard L. Madoff Investment Securities, Inc. ('BLM') a registered broker-dealer in New York, New York, who utilizes a strategy described as 'split strike conversion,'" and that "BLM acts as a principal in connection with its sale of securities to the Company [Fairfield Sentry] and the purchase of securities from the Company."

13.      The PPM further explained that FGG "delegated all investment management duties to Bernard L. Madoff Investment Securities. As a result, the Company [Fairfield Sentry] is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities."

14.      The PPM also stated that "[a]ll investment decisions in the account at BLM are effected by persons associated with BLM," and that "[t]he services of ... Bernard L. Madoff

3

Investment Securities are essential to the continued operations of the Manager [Fairfield Greenwich Limited]."

15.    Itaú Luxembourg also knew that BLMIS maintained custody of its investments in Fairfield Sentry in New York. The PPM explained that "Bernard L. Madoff Investment Securities has entered into an agreement with Citco Custody pursuant to which Bernard L. Madoff Investment Securities will serve as a sub-custodian of the Company's [Fairfield Sentry] assets."

16.    The Fairfield Sigma private placement memoranda contained similar representations regarding the SSC Strategy and BLMIS's role as investment advisor, executing broker, and custodian.

### C.    Itaú Luxembourg Regularly Corresponded with FGG in New York About Its Investments

17.    Philip Toub, an FGG partner based in New York, acted as Itaú Luxembourg's representative for its investments in the Fairfield Funds.

18.    Itaú Luxembourg, and Itaú Private Bank on behalf of Itaú Luxembourg, periodically requested permission to subscribe to—and redeem from—Fairfield Sentry by contacting FGG in New York. In July 2002, Itaú Luxembourg emailed Toub to request a subscription for Fairfield Sentry. In March 2006, Itaú Private Bank emailed FGG on behalf of Itaú Luxembourg about a delayed subscription into Fairfield Sentry. In January 2007, Itaú Private Bank emailed FGG to confirm a Fairfield Sentry subscription. Each request was approved by an FGG representative in New York.

19.    Following Itaú Luxembourg's purchase of Fairfield Sentry shares, Itaú Private Bank corresponded with FGG New York personnel regarding Madoff's role with respect to the

Fairfield Funds, including, for example, his fee structure and the performance of the split-strike conversion strategy, among other things.

**D.      Itaú Luxembourg Agreed to New York Jurisdiction and to Be Bound by New York Law with Regard to Its Investments in the Fairfield Funds**

20.      To invest in the Fairfield Funds, Itaú Luxembourg entered into subscription agreements that were governed by New York law and included agreements to submit to venue in New York and the jurisdiction of New York courts.

21.      Itaú Luxembourg's Fairfield Sentry subscription agreement stated that "Subscriber agrees that any suit, action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York," and that "Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding."

22.      This subscription agreement also specified that it "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

**E.      Itaú Luxembourg Knew BLMIS Acted as the Investment Advisor, Broker-Dealer, and Custodian for Kingate Global**

23.      Kingate Global's amended and restated information memoranda ("IM") stated that "the Fund has established a discretionary account with an Investment Advisor who is based in the United States and who invests or trades in a wide range of equity securities, and, to a lesser extent, other securities and derivatives."

24.      The IM also stated that the fund's assets "are managed by a New York based NASD registered broker-dealer" that "utilizes a 'split-strike conversion' options strategy[.]"

Further, the Kingate Global IM stated that the fund's managers had "delegated all investment management duties with regard to USD Shares to the Investment Advisor[,]" i.e., Madoff.

25.     Itaú Luxembourg knew that the split-strike conversion strategy, as described in the IM, exclusively involved domestic investments: U.S. equities, U.S. options, and U.S. Treasuries.

26.     Itaú Luxembourg also knew that BLMIS maintained custody of Kingate Global's assets in New York. For example, the IM stated, "Neither the Fund nor the Custodian has actual custody of the assets. Such actual custody rests with the Investment Advisor and its affiliated broker-dealer. Therefore, there is the risk that the custodian could abscond with those assets. There is always the risk that the assets with the Investment Advisor could be misappropriated."

### F.     Itaú Luxembourg Used New York Bank Accounts in Connection with the Transactions

27.     Itaú Luxembourg utilized New York bank accounts to transfer funds to and from Fairfield Sentry.

28.     Itaú Luxembourg's subscription agreements stated that all money from Itaú Luxembourg be directed to a New York HSBC Bank USA, N.A. correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York. On over 180 separate occasions over a 9-year period, Itaú Luxembourg directed funds to this HSBC account.

29.     Itaú Luxembourg also used a bank account at UBS AG in Stamford, Connecticut to receive transfers from Fairfield Sentry. Itaú Luxembourg completed a standardized Fairfield Sentry form entitled "Redemption Request Form Instructions," which directed redemption payments to be sent to this UBS account. Itaú Luxembourg utilized this account on at least 200

separate occasions from 1999 to 2008 to receive $64,893,157 in redemption payments from Fairfield Sentry.

## III.    THE FAIRFIELD FUNDS' PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

30.    At all relevant times, the Fairfield Funds' principal place of business was in New York.

### A.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

31.    In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group (previously defined as "FGG") based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

32.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, including Fairfield Sigma. Fairfield Sigma received subscriptions in euros and Swiss francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

33.    FGG also included a number of administrative entities that purportedly provided management and back-office support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

7

B.     **Fairfield Sentry**

34.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

35.     Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

36.     Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

1.     **Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

37.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

38.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

39.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of

Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor

Protection Corporation ("SIPC") member regulated by the SEC.

**2.    FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities**

40.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with

Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

back-office administrative services such as coordinating subscription and redemption forms,

maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global

Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry

assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were

held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement

with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody,

Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch

("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank

accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

**3.    FGG New York Personnel Managed Fairfield Sentry**

41.    At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities. Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

42.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

43.    Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

44.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

45.     In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

46.     While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

47.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency

funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

48.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the BLMIS feeder funds and Fairfield Sigma to FG Bermuda. FG Limited remained the placement agent for the same funds.

49.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

50.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Fairfield Sigma's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

51.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

52.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

53.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### C.     Fairfield Sigma

54.     FGG operated Fairfield Sentry as a U.S. dollar-based fund with all subscription and redemptions paid in U.S. dollars. In response to investor requests to invest in Fairfield Sentry using euros, FGG created Fairfield Sigma. Fairfield Sigma accepted subscriptions in euros, converted them to U.S. dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Fairfield Sigma redeemed Fairfield Sentry shares, converted the U.S. dollars it received from Fairfield Sentry to euros, and paid the euros to the redeeming Fairfield Sigma investors.

55.     Noel and Tucker organized Fairfield Sigma on November 20, 1990, as international business company under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents

except for other entities organized under the BVI International Business Companies Act, so was Fairfield Sigma. Fairfield Sigma is currently in liquidation in proceedings in the BVI and United States.

56.    Also like Fairfield Sentry, Fairfield Sigma was a shell corporation present in the BVI only on paper. It had no employees and maintained no offices. It listed its registered BVI address as the same BVI post office box care of a local trust company they shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Fairfield Sigma to FGG's New York headquarters. Fairfield Sigma was operated almost entirely by FGG New York Personnel.

57.    As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Fairfield Sigma. Once Fairfield Sigma was opened for investors, FGG New York Personnel monitored Fairfield Sigma's investments into, and redemptions from, Fairfield Sentry; managed Fairfield Sigma's relationships with clients and potential clients; created marketing and performance materials for Fairfield Sigma; marketed Fairfield Sigma; performed administrative functions required by Fairfield Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sigma; and conducted various other due diligence and risk management activities. Until Fairfield Sigma's liquidation, FGG maintained Fairfield Sigma's books and records in New York. FGG New York Personnel also had final control of Fairfield Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as its currency hedge account at the Bank of Montreal.

58.    FGG New York Personnel controlled and approved the subscriptions for and redemptions of Fairfield Sigma shares. Like Fairfield Sentry's subscription agreements, Fairfield Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Fairfield Sigma's sole assets. Fairfield Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Fairfield Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPMs.

59.    Noel and Tucker were the original directors of Fairfield Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Fairfield Sigma with back-office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sigma shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Fairfield Sigma assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Fairfield Sigma at Citco Bank Dublin. FGG New York Personnel had final control of the Fairfield Sigma Citco Bank Dublin bank account. Finally, FGG New York Personnel controlled all of Fairfield Sigma's relationships with the Citco entities.

60.    In addition to the Citco Bank Dublin accounts, in order to convert Fairfield Sigma investors' euros into U.S. dollars—as required for investment in Fairfield Sentry and BLMIS.

Noel executed separate contracts on Fairfield Sigma's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

61.     FGG New York Personnel initially listed FG Limited as the investment manager for Fairfield Sigma. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Fairfield Sigma PPMs to indicate FG Bermuda was Fairfield Sigma's Investment Manager. In fact there were no duties for any investment manager because Fairfield Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. dollars.

62.     The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund Limited*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

## IV.    KINGATE GLOBAL'S OPERATIONS WERE CENTERED IN NEW YORK

63.     BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the accounts prior to December 11, 2008.  Kingate Global filed customer claims in the SIPA liquidation.

### A.    Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation

64.     Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

65.     Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

66.    Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

67.    Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage Kingate Global's investments with BLMIS.

68.    Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

### B.    The Operative Legal Documents Were New York-Based

69.    Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

70.    Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

71.    Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

C.    **BLMIS Had Full Authority to Make and Execute Investment Decisions**

72.    Kingate Global's Trading Authorization Agreements authorized BLMIS to be Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

73.    As with each of the other BLMIS feeder funds, BLMIS in New York acted as Kingate Global's investment manager and purported to invest exclusively according to Madoff's strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

74.    BLMIS acted as Kingate Global's broker-dealer in purporting to purchase securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

D.    **Kingate Global Was Managed from New York**

75.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

76.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

77.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

78.    Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso. KML operated through its agents in New York.

79.     KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

80.     KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

81.     KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

82.     Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

83.     FIM (USA) was the hub for FIM's feeder fund due diligence. From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

84.     KML and the FIM entities actively participated in Kingate Global business with BLMIS and knew BLMIS purported to invest U.S. securities traded on U.S. exchanges in New York.

**E.      Kingate Global Used Banks in New York**

85.     Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase Bank N.A.

86.     KML also engaged HSBC Bank USA, N.A., a major international financial institution doing business in the United States as Kingate Global's custodian.

87.     In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

88.    FIM also directed fee payments to be routed through a bank account in New York.

89.    The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al*., Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated:  June 26, 2015
          New York, New York

*/s/* Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*