**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | Adv. Pro. No. 10-05351 (SMB) |
| Plaintiff, | |
| v. | |
| BANCO BILBAO VIZCAYA ARGENTARIA, S.A., | |
| Defendant. | |

**TRUSTEE'S SUPPLEMENTAL**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**BANCO BILBAO VIZCAYA ARGENTARIA S.A.'S MOTION**
**TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER**
**SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**

The Trustee respectfully submits this supplemental memorandum in opposition to defendant Banco Bilbao Vizcaya Argentaria, S.A.'s ("BBVA") motion to dismiss based on extraterritoriality and in further support of the Trustee's motion for leave to amend the complaint. As set forth below the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to BBVA ("BBVA Proffer") plead facts evidencing the subsequent transfers received by BBVA and the component events of the transactions are predominantly domestic under the standard set forth in the Extraterritoriality Decision,[1] such that the Trustee's action does not require an extraterritorial application of SIPA or Bankruptcy Code § 550. BBVA's motion to dismiss should be denied and the Trustee should be granted leave to amend.

## BACKGROUND

The Trustee's Proffered Allegations as to the Domestic Nature of the Transfers ("BBVA Proffer") alleges BBVA was a shareholder-investor in Fairfield Sentry Limited ("Fairfield Sentry") that received $57.5 million in subsequent transfers of BLMIS customer property. BBVA Proffer ¶ 1. BBVA is a sophisticated Spanish global banking corporation with hundreds of branch offices in more than 30 countries and throughout the United States. *Id.* ¶ 2. Fairfield Sentry was one of several BLMIS feeder funds ("Feeder Funds")—single-purpose investment vehicles that pooled their investors' assets to invest with BLMIS, capitalizing on its consistent returns—that was created, operated, and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York. *Id.* ¶¶ 3–4.

---

[1] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),* 513 B.R. 222, 232–33 (S.D.N.Y. 2014) ("Extraterritoriality Decision").

1

**ARGUMENT**

The District Court directed that the "transfer and component events of the transactions" test[2] set forth in *Maxwell I* must be used to determine whether a subsequent transfer claim involves a domestic or extraterritorial application of the Bankruptcy Code and SIPA.[3] The *Maxwell I* analysis is consistent with post-*Morrison* Second Circuit precedent that evaluates the connections among the parties, their transactions, and key events[4] related to the United States to determine whether a claim is "sufficiently domestic" such that an extraterritorial application of a statute is not required.[5] As set forth in more detail below, the transfers and the component events of BBVA's transactions with Fairfield Sentry were predominantly domestic in nature.

BBVA argues that because it was formally organized under the laws of Spain, and because Fairfield Sentry was formally organized under the law of the Territory of the British Virgin Islands ("BVI"), it is entitled to a finding that the subsequent transfers are "purely foreign" and must be dismissed. BBVA is wrong. BBVA's motion should be denied because BBVA's argument i) disregards the *Maxwell I* analysis directed by the District Court, and ii) ignores the fact that Fairfield Sentry could not be a "purely foreign" transferor, as it maintained its principal place of business in New York.

---

[2] In *Maxwell I*, the court identified all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *Maxwell Commc'n Corp. v. Société General (In re Maxwell Commc'n Corp.),* 186 B.R. 807, 816-17 (S.D.N.Y. 1995) ("*Maxwell I*").

[3] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 816).

[4] *See, e.g., Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014).

[5] *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014) (finding complaint alleged "sufficient domestic conduct" after review of facts relevant to extraterritoriality) and other cases cited in Section III of the Trustee's Main Brief.

I.    **BBVA's Transfers and the Component Events of Its Investment Transactions With Fairfield Sentry Were Predominantly Domestic**

BBVA's entire investment transaction with Fairfield Sentry was U.S.-centric in nature: BBVA knew from the documents governing its investments in Fairfield Sentry—Private Placement Memoranda ("PPMs") and subscription agreements it executed—that its investment would be transferred to BLMIS in New York purportedly for investment in U.S. equities, U.S. options, and U.S. Treasurys. BBVA Proffer at ¶¶ 28, 30–31. Thus, BBVA affirmatively reached into the United States, and engaged in transactions and transfers of funds that were centered with BLMIS in New York, for the very purpose of receiving transfers of funds back from BLMIS representing returns derived from Madoff's purported investment of their fund's assets in the U.S. securities market. As Judge Lifland concluded in a similar case, "[t]he movement of money to and from BLMIS in the United States … was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and the Feeder Fund.[6]

The domestic nature of BBVA's transactions with Fairfield Sentry is further demonstrated by the fact that the subscription agreements BBVA executed contained New York choice of law provisions and subjected BBVA to the jurisdiction and venue of the New York courts.[7] *Id.* ¶¶ 37–38. Notably, in its subscription agreements, BBVA instructed Fairfield Sentry to wire redemptions from its investments in the fund to BBVA's New York Citibank, NA bank account, and it was through this New York bank account that BBVA received the subsequent transfers at issue. *Id.* ¶¶ 75–76.

---

[6] *Picard v. Bureau of Labor Ins. (In re Bernard L. Madoff Inv. Sec.)*, 480 B.R. 501, 513 (Bankr. S.D.N.Y. 2012).

[7] BBVA also entered into a separate confidentiality agreement with other FGG entities which purported to provide management services to FGG Feeder Funds that also contained New York choice of law provisions. *Id*. ¶¶ 39–41.

That BBVA's transactions with Fairfield were not "purely foreign" is further shown by the fact that BBVA's New York employees managed the transactions and relationship with Fairfield Sentry and BLMIS in New York. *Id.* ¶ 45. These New York BBVA employees met with BLMIS employees at BLMIS's New York headquarters and FGG personnel at FGG's New York headquarters in connection with their due diligence related to BBVA's investments. *Id.* ¶¶ 48, 51. BBVA also had a team of employees in Madrid, Spain that regularly traveled to New York and communicated with FGG personnel, and their own New York colleagues, in New York in connection with managing BBVA's investments. *Id.* ¶ 55.

Moreover, BBVA expressly understood that SIPA and the Bankruptcy Code would apply in connection its investments with Fairfield Sentry that were being managed by BLMIS. *Id.* ¶¶ 60–61. When BBVA inquired of FGG as to what would happen to Fairfield Sentry's account at BLMIS "in the event of serious financial distress at BLMIS," FGG's general counsel located in New York advised BBVA that BLMIS was subject to NASD Conduct Rules, and that SIPA would apply in a liquidation proceeding of BLMIS. *Id.* ¶¶ 58, 61.

BBVA had investments in other BLMIS Feeder Funds, including Kingate Global Fund Limited, Thema Fund Ltd. or Thema International Fund plc, Maxam Absolute Return Fund L.P., Primeo Select Fund, Optimal Strategic US Equity Fund, and a Tremont Group Holdings, Inc. fund or funds. *Id.* ¶ 70. BBVA knew that Fairfield Sentry and the other BLMIS Feeder Funds were simply access points by which to gain entry to invest with BLMIS in New York. *Id.* ¶ 72.

Under the foregoing circumstances, BBVA's transfers and the component events of its transactions with FGG are not "purely foreign" but rather are sufficiently domestic such that the Trustee's claims do not call for an extraterritorial application of SIPA or the Bankruptcy Code.

4

**II.    Fairfield Sentry Maintained Its Principal Place of Business in New York**

Further contrary to BBVA's argument, Fairfield Sentry, the entity from which it received the subsequent transfers at issue, maintained its principal place of business in New York.

As set forth in the Trustee's BBVA Proffer, FGG is a New York-based *de facto* partnership created by Walter Noel and Jeffrey Tucker that created, operated, and controlled the BLMIS Feeder Fund, Fairfield Sentry. *Id.* ¶¶ 78, 81. While Noel and Tucker formally organized Fairfield Sentry as an international business company under BVI law, from its inception until its liquidation in 2009, Fairfield Sentry had no employees and no offices in the BVI. *Id.* ¶¶ 81–82. FGG personnel at its New York City headquarters controlled the sales and subscriptions of the funds' shares; maintained final control of Fairfield Sentry's bank accounts; monitored Fairfield Sentry's investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of Fairfield Sentry; marketed Fairfield Sentry; approved all subscriptions for Fairfield Sentry shares; maintained the relationships with Fairfield Sentry's back office service providers; maintained all of Fairfield Sentry's books and records at the FGG New York City headquarters; and made all strategic and operational decisions regarding Fairfield Sentry. *Id.* ¶¶ 87–89.

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, this Court should deny BBVA's motion to dismiss and grant the Trustee's motion for leave to amend.

Dated: June 26, 2015　　　　　　　　　　　/s/ Regina Griffin
　　　New York, New York　　　　　　　　**Baker & Hostetler LLP**
　　　　　　　　　　　　　　　　　　　　45 Rockefeller Plaza
　　　　　　　　　　　　　　　　　　　　New York, New York 10111
　　　　　　　　　　　　　　　　　　　　Telephone:  (212) 589-4200
　　　　　　　　　　　　　　　　　　　　Facsimile:  (212) 589-4201
　　　　　　　　　　　　　　　　　　　　David J. Sheehan
　　　　　　　　　　　　　　　　　　　　Regina Griffin
　　　　　　　　　　　　　　　　　　　　Loura Alaverdi
　　　　　　　　　　　　　　　　　　　　Torello Calvani

　　　　　　　　　　　　　　　　　　　　**Baker & Hostetler LLP**
　　　　　　　　　　　　　　　　　　　　65 East State Street, Suite 2100
　　　　　　　　　　　　　　　　　　　　Columbus, Ohio 43215
　　　　　　　　　　　　　　　　　　　　Telephone:  (614) 228-1541
　　　　　　　　　　　　　　　　　　　　Facsimile:  (614) 462-2616
　　　　　　　　　　　　　　　　　　　　Lauren M. Hilsheimer
　　　　　　　　　　　　　　　　　　　　Damon M. Durbin

　　　　　　　　　　　　　　　　　　　　*Attorneys for Irving H. Picard, Trustee*
　　　　　　　　　　　　　　　　　　　　*for the Substantively Consolidated SIPA*
　　　　　　　　　　　　　　　　　　　　*Liquidation of Bernard L. Madoff Investment*
　　　　　　　　　　　　　　　　　　　　*Securities LLC and the estate of Bernard L.*
　　　　　　　　　　　　　　　　　　　　*Madoff*