**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

               Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | Adv. Pro. No. 10-05351 (SMB) |
| Plaintiff, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO BANCO BILBAO VIZCAYA ARGENTARIA, S.A.** |
| v. | |
| BANCO BILBAO VIZCAYA ARGENTARIA, S.A., | |
| Defendant. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the

Extraterritoriality Issue as to Banco Bilbao Vizcaya Argentaria S.A. ("BBVA"), states:

## I.     INTRODUCTION

1.      The Trustee seeks recovery of $57.5 million in subsequent transfers of BLMIS

customer property made to BBVA from Fairfield Sentry Limited ("Fairfield Sentry").

2.      BBVA is a sophisticated Spanish global banking corporation with hundreds of

branch offices in more than 30 countries and throughout the United States.

3.      Fairfield Sentry was one of several BLMIS feeder funds ("Feeder Funds")—

single-purpose investment vehicles that pooled their investors' assets to invest with BLMIS,

capitalizing on its consistent returns.  From November 1990 until Madoff's arrest in December

2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.

4.      As detailed further below, Fairfield Greenwich Group ("FGG"), a *de facto*

partnership based in New York, created, operated, and controlled Fairfield Sentry.

5.      BBVA invested in Fairfield Sentry to hedge its risk from structured notes issued

by BBVA and its affiliate Boiro Finance B.V. ("Boiro").

6.      BBVA conducted due diligence on Fairfield Sentry, Madoff, and BLMIS in

connection with its structured note program.

7.      BBVA dedicated a team of BBVA employees in New York to conduct due

diligence and manage its relationships with Fairfield Sentry, Madoff, and BLMIS in New York.

BBVA employees from Madrid also regularly traveled to New York and regularly

communicated with FGG employees in New York to conduct due diligence and help manage

BBVA's U.S. investments.

8.      From its due diligence, including but not limited to its review of Fairfield Sentry's

1

private placement memoranda ("PPMs"), BBVA knew that BLMIS acted as the investment adviser, broker-dealer, and custodian for Fairfield Sentry and that control over Fairfield Sentry's investments rested entirely with BLMIS in New York.

9.      BBVA also knew BLMIS was subject to SIPA and would be governed by SIPA in the event of bankruptcy.  And based on agreements BBVA had with FGG, which contained New York choice of law and/or New York jurisdiction and venue provisions, BBVA had every reason to expect that it would be subject to U.S. law and involved in litigation in New York.

10.     In addition to its investments in Fairfield Sentry, BBVA had investments in other Feeder Funds that were invested in full or in part with BLMIS.  BBVA deliberately targeted the Feeder Funds as vehicles to BLMIS in New York.

11.     Finally, BBVA used bank accounts in New York, including its own bank account with Citibank, N.A. in New York, to transfer money to and from Fairfield Sentry.

12.     Although BBVA and Fairfield Sentry were incorporated under the laws of foreign jurisdictions, these facts, as set forth in the proffered allegations below, demonstrate that the transfers of BLMIS customer property from Fairfield Sentry to BBVA are domestic.

## II.     **BACKGROUND**

### A.     **The Defendant**

13.     BBVA is a financial institution that is registered with and regulated by the Federal Reserve System.  BBVA ranks among the 15 largest banks in the United States, and at all relevant times, BBVA marketed the fact that it had hundreds of offices and tens of billions of dollars in assets in the United States.

14.     BBVA's "Global Markets Division – Alternative Investments" ("Alternative Investments Division") was the division responsible for selecting, understanding, monitoring, marketing, and selling the Fairfield Sentry structured notes.

15.     BBVA marketing materials from the relevant time period described the Alternative Investments Division as "a global team" tasked with hedge fund research and analysis, selection and monitoring, and structured product management.

16.     BBVA maintained, and still maintains, offices on Sixth Avenue in New York and in Madrid, Spain.  Employees in both offices worked in the Alternative Investments Division.

17.     In connection with BBVA's structured note program and its investments in Fairfield Sentry, BBVA employees from New York worked independently and with employees from BBVA's Madrid office who travelled to New York to conduct due diligence on Fairfield Sentry, Madoff, and BLMIS in connection with BBVA's structured note program and investments in Fairfield Sentry.

18.     BBVA's New York office is licensed and supervised by the New York State Department of Financial Services.

19.     BBVA also maintained an office in Miami, Florida, from which BBVA employees sold the structured notes as well as shares in Fairfield Sentry to BBVA's private banking clients.  BBVA New York and Madrid employees in the Alternative Investments Division traveled to the Miami office to meet with BBVA's private banking clients and to market the structured notes.

20.     Since December 1988, BBVA's Miami office has been registered with the Florida Department of State Division of Corporations.

**B.     BBVA's Structured Note Programs**

21.     BBVA's structured notes fell into two broad categories: (1) notes issued by Boiro, BBVA's special purpose vehicle, that contained embedded swap transactions between Boiro and

BBVA (the "Boiro Notes"); and (2) notes issued by BBVA or a BBVA affiliate that did not contain the embedded swap transactions (the "BBVA Notes").

22.     The Boiro Notes and the BBVA Notes invested in a reference fund or funds that were Feeder Funds, or funds of funds that were partially invested in Feeder Funds.   The underlying Feeder Funds included Fairfield Sentry and another Feeder Fund, Kingate Global Fund Limited ("Kingate Global"), and the funds of funds included FGG-operated Irongate Global Strategy Fund Limited ("Irongate") and Fairfield Investment Fund, Ltd. ("FIFL").

23.     By way of background, a swap is a bilateral financial transaction where one counterparty "swaps" cash flows ("Counterparty 1") in exchange for cash flows from the underlying reference fund or funds from the other counterparty ("Counterparty 2").   The swap allows Counterparty 1 to receive upside returns from the reference fund or funds without actually having to own shares of the reference fund or funds.   To hedge its exposure to pay the return to Counterparty 1, Counterparty 2 uses the cash flow from Counterparty 1 or its own money to purchase shares of the reference fund or funds.

24.     Under a structured note program, an investor pays a financial institution an amount of money, called the note principal, for an investment.   The financial institution provides leverage for the investment and charges the investor fees for both administering the note program and providing leverage.   In return, the financial institution agrees to pay a multiple of the reference fund's or funds' cumulative positive performance at the note's future maturity date. For example, an investor in a three times (3x) leverage note could invest $100,000 but ultimately receive returns as if he or she had invested $300,000 in the reference fund or funds, provided the value of the reference fund or funds increased.

25.     For the Boiro Notes with the embedded swap, Boiro acted as Counterparty 1 and

BBVA as Counterparty 2. Boiro received money from investors, which it "swapped" with BBVA. BBVA then leveraged the investment amount (4x or 5x) and hedges its risk by investing in Fairfield Sentry and the other underlying reference funds.

26. For the BBVA notes, BBVA or its affiliate received money from investors, leveraged the investment amount (between 1-2xs), and again hedged its risk by investing in Fairfield Sentry and the other underlying reference funds.

27. BBVA redeemed at least $57.5 million in connection with it investments as a result of structured products described above, which is the money at issue here.

## III. THE COMPONENT EVENTS OF THE TRANSACTIONS WERE CENTERED IN THE UNITED STATES

### A. BBVA Knew That Control Over Fairfield Sentry's Investments Rested Entirely with BLMIS in New York

28. BBVA's investments with Fairfield Sentry were governed by PPMs and subscription agreements. BBVA voluntarily executed Fairfield Sentry subscription agreements and by doing so, affirmed that it "has received and read a copy of the Memorandum [PPM]" and that in making the decision to subscribe, BBVA "has relied solely upon the Fund Documents and independent investigations made by Subscriber."

29. For example, in the summer of 2006 BBVA requested, received, and reviewed a Fairfield Sentry PPM dated May 8, 2006 (the "2006 Fairfield Sentry PPM") in connection with subscribing funds into Fairfield Sentry.

30. From the 2006 Fairfield Sentry PPM, BBVA knew Madoff's "split-strike conversion" investment strategy ("SSC Strategy") purportedly involved the purchase and sale of U.S. equities, U.S. options, and U.S. Treasurys traded on U.S. exchanges.

31. BBVA understood that Madoff in New York decided which U.S. securities BLMIS purported to purchase. Specifically, the 2006 Fairfield Sentry PPM represented that the

"[SSC Strategy] is implemented by Bernard L. Madoff Investment Securities LLC ('BLM[IS]').

. . . BLM[IS] is authorized to determine the price and timing of stock and option transactions in

the account."

32.     BBVA knew from the 2006 Fairfield Sentry PPM that BLMIS was the broker-

dealer and agent that executed the trades for Fairfield Sentry: "The [SSC Strategy] is

implemented by [BLMIS], a broker-dealer registered with the Securities and Exchange

Commission, through accounts maintained by the Fund at that firm."

33.     BBVA knew that BLMIS in New York was the custodian of Fairfield Sentry's

investments.  The 2006 Fairfield Sentry PPM represented that "substantially all of the Fund's

assets will be held in segregated accounts at BLM[IS], a U.S. registered broker-dealer and

qualified custodian.  Accordingly, BLM[IS] will be a sub-custodian of the Fund."

34.     BBVA knew that there was a possibility BLMIS could misappropriate the assets

invested in Fairfield Sentry.   The 2006 Fairfield Sentry PPM explained: "When the Fund invests

utilizing the [SSC Strategy] . . . it will not have custody of the assets so invested" and as a result,

"there is always the risk that the personnel of any entity with which the Fund invests could

misappropriate the securities or funds (or both) of the Fund."

35.     BBVA knew Fairfield Sentry was entirely dependent on BLMIS in New York.

The 2006 Fairfield Sentry PPM explicitly stated that "[t]he services of . . . BLM[IS] are essential

to the continued operations of the Fund."

36.     Accordingly, BBVA knew BLMIS in New York acted as the investment adviser,

broker-dealer, and custodian for Fairfield Sentry and knew control over Fairfield Sentry's

investments rested entirely with BLMIS in New York.

### B.    BBVA Agreed New York Law Applied in Connection with the Transactions

> *i.    BBVA Executed Fairfield Subscription Agreements and Agreed New York Law Applied*

37.    Understanding that virtually all of Fairfield Sentry's assets would be invested domestically by a SEC-registered broker-dealer in New York, BBVA decided to invest in Fairfield Sentry and in so doing, submitted to venue in and the jurisdiction of New York courts and agreed to be bound by New York law.

38.    By executing Fairfield Sentry subscription agreements in connection with its investments, BBVA "agree[d] that any suit, action or proceeding . . . with respect to th[ese] Agreement[s] and [Fairfield Sentry] may be brought in New York" and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding." The Fairfield Sentry subscription agreements also specified that "[the agreement] shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

> *ii.    BBVA Entered Into a Confidentiality Agreement with FGG and Agreed New York Law Applied*

39.    In May 2006, BBVA entered into a confidentiality agreement with Fairfield Greenwich (Bermuda) Ltd. ("FG Bermuda") regarding due diligence materials on Fairfield Sentry that FG Bermuda planned to share with BBVA for the purpose of evaluating investments in the fund. FG Bermuda is a FGG administrative entity, which purportedly provided management services to FGG's funds.

40.    BBVA executed the confidentiality agreement with FG Bermuda to receive due diligence information it had requested about Fairfield Sentry "regarding risk and exposure reports and other information concerning portfolio holdings of the Fund."

41.    BBVA agreed that any disputes arising out of the confidentiality agreement would be governed by New York law without reference to conflicts of law principles and "irrevocably and unconditionally" submitted to the jurisdiction of New York courts.

      *iii.    BBVA Entered Into a Letter of Understanding with FGG and Again Agreed New York Law Applied*

42.    In the fall of 2006, BBVA entered into a letter of understanding with Fairfield Greenwich Limited ("FG Limited"), another FGG administrative entity.  Under the terms of this agreement, BBVA agreed to promote FGG's funds to customers of its Miami office in exchange for receiving quarterly fees from FGG.

43.    Like the other agreements BBVA entered into with FGG, the letter of understanding was governed by New York law: "the parties hereto shall be governed by and construed in accordance with the laws of the State of New York."

44.    Under the agreement, FG Limited directed all notices to its New York headquarters on Third Avenue, and BBVA directed all notices to its Miami office on South Biscayne Boulevard.

**C.    BBVA Dedicated a Team of Employees in Its New York Office to Manage Its Relationship with Fairfield Sentry, Madoff, and BLMIS in New York**

45.    Because FGG and BLMIS were each headquartered in New York, a team of high-level BBVA employees from its New York office managed the business relationships with and conducted due diligence on Fairfield Sentry, Madoff, and BLMIS in connection with BBVA's investments.

46.    Specifically, a New York-based director and Head of Hedge Fund Analysis (USA) in the Alternative Investments Division (the "New York BBVA Director") communicated with and conducted due diligence on Fairfield Sentry, Madoff, and BLMIS.

8

47.    From BBVA's New York office, and as alleged below, the New York BBVA Director worked closely with BBVA's employees in Madrid, including BBVA's Head of Hedge Fund Selection and Monitoring in the Alternative Investments Division (the "Global BBVA Director").

48.    The New York BBVA Director met with FGG's New York-based partner Andrew Smith in New York and frequently discussed BBVA's ongoing due diligence issues with Smith.

49.    In September 2008, Smith arranged for a due diligence call between the New York BBVA Director and FGG's Chief Risk Officer, Amit Vijayvergiya.  The New York BBVA Director explained to Vijayvergiya that BBVA was "a fairly large investor in Sentry," and inquired if in "the spirit of ongoing due diligence" they could discuss the security of Fairfield Sentry's "cashposition" with BLMIS.

50.    On the due diligence call, the New York BBVA Director requested BLMIS's audited financials, and following the call, Vijayvergiya sent the New York BBVA Director BLMIS's 2007 audited financials, which disclosed that BLMIS's auditor was Friehling & Horowitz, CPA's P.C., located on North Main Street, New City, New York.

51.    The New York BBVA Director visited BLMIS's office in New York and met with BLMIS employees on behalf of BBVA.  Based on available records, the visitor list for BLMIS's office building in New York reflects that the New York BBVA Director visited BLMIS in October 2008 and again in November 2008.

52.    Two additional New York-based BBVA employees, including the Managing Director – Head of Sales, marketed and sold BBVA's Fairfield Sentry structured notes from New York.

53.    Based on their due diligence and sales efforts in New York, BBVA's New York

employees were integral to managing BBVA's U.S. investments and its relationships with FGG and BLMIS.

> **D.  BBVA Employees in Madrid Regularly Traveled to New York and Communicated With Persons in New York to Assist in Managing BBVA's U.S. Investments**

54.     In conjunction with BBVA's team in New York, BBVA employees in Madrid worked to select, monitor, market, and sell the Fairfield Sentry structured notes.

55.     These employees regularly communicated with BBVA employees in New York and traveled to New York to conduct due diligence on Fairfield Sentry, Madoff, and BLMIS. Between May 2006 and November 2008, BBVA's employees from Madrid traveled to New York specifically in connection with BBVA's Fairfield Sentry investments on at least six occasions.

56.     In early May 2006, prior to BBVA's first investment, BBVA sent four employees from Madrid to FGG's New York headquarters for a high-level meeting with FGG, which included discussions regarding Fairfield Sentry's operations.  The BBVA employees met with numerous FGG employees, including FGG's founder—Jeffrey Tucker.

57.     During the meeting with FGG, BBVA's Madrid employees reported that BBVA had "very strong reservations as to the Madoff counter-party risk" and understanding the risk posed by Madoff was "the main objective of our trip."  Accordingly, FGG arranged for a meeting between the BBVA employees and Madoff.

58.     The BBVA employees requested additional due diligence information from FGG after the May 2006 meeting.  Among other things,  BBVA wanted trade reports, FGG's BLMIS account opening agreement and trading authorization agreement, and a letter from FGG's New York-based General Counsel, Mark McKeefry "confirming that (a) our [FGG's] accounts at

BLM[IS] are segregated from other accounts at BLM[IS], [and] (b) in the event of any serious
financial distress at BLM[IS], FGBL [FG Bermuda] would still have complete access to its
accounts and that these accounts are protected from any claims that may be made from any third
party creditors of BLM[IS]."

59.    BBVA received and analyzed the trade reports and FGG's BLMIS account
opening agreement and trading authorization agreement.

       *i.*      *BBVA Had Every Reason to Expect That It Would be Subject to U.S. Law,
Including SIPA*

60.    As a result of its request to McKeefry, BBVA understood BLMIS was subject to
SIPA and that BLMIS would be governed by SIPA in the event of bankruptcy.

61.    In his response to BBVA, McKeefry explained that BLMIS was subject to the
NASD Conduct Rules and SIPA, and that SIPA would apply in a liquidation proceeding:

> As a registered broker-dealer, BLM[IS] is subject to (i) the NASD [National
> Association of Securities Dealers] Conduct Rules, and (ii) Securities Investor
> Protection Act of 1970 ("SIPA").   NASD Conduct Rule 2330(d) requires
> BLM[IS] to hold its customer's securities in segregated and clearly identifiable
> accounts.  Section 78fff-2(c)(2) of SIPA states that in the event of a liquidation
> proceeding, the trustee appointed to oversee the liquidation shall deliver customer
> name securities to or on behalf of a customer of the debtor provided that the
> customer is not indebted to the debtor.

62.    McKeefry continued on, explaining that Fairfield Sentry "has established both
cash accounts and margin accounts at BLM[IS]" and that FGG "believe[d] that in the event
BLM[IS] were to go into liquidation, the Fund would receive all fully-paid securities to which it
is entitled . . . [and] all margin securities upon full payment by the Fund to BLM[IS] of its
indebtedness, if any, to BLM[IS]."

63.    In March 2007, a BBVA employee asked Vijayvergiya if he could "prepare a list
of all the different Regulators (NASD, NYSE, SEC,    ) [sic] and Rules or Acts that Madoff is
subject to, as a broker-dealer in the US?"  Vijayvergiya replied that BLMIS was subject to the

11

supervision of the United States Securities and Exchange Commission (SEC), National Association of Securities Dealers (NASD), National Association of Securities Dealers Automated Quotations (NASDAQ), and National Stock Exchange (NSX). In addition, "[a]s a Registered Investment Advisor, BLM[IS] is subject to the SEC Investment Advisors Act of 1940," and "[a]s a regulated broker/dealer, BLM[IS] is subject to the Securities Exchange Act of 1934."

<ol type="i" start="2">
<li>*BBVA Returned to New York to Meet with FGG and Madoff Again*</li>
</ol>

64.    In April 2007, BBVA's employees in Madrid planned another in-person meeting in New York with FGG to discuss Fairfield Sentry and "catch up with all the Fairfield Sentry projects." BBVA also requested that during its trip to New York, FGG arrange another in-person meeting with Madoff.

65.    In November 2007, the New York BBVA Director worked with the Global BBVA Director from Madrid to arrange a weeklong series of meetings in New York. The purpose of the meetings was to, among other things, visit FGG in New York and "[s]trengthen the relationship and common knowledge between the Madrid and NY teams."

66.    BBVA's employees in New York and Madrid conducted further "in depth" due diligence on FGG and its funds in December 2007. As part of this due diligence, BBVA's employees in Madrid traveled to New York and visited FGG's New York headquarters. After the meeting, BBVA's employees, in Madrid and New York, continued to communicate with FGG employees regarding follow-up issues.

67.    Finally, in 2008, BBVA employees returned to New York to visit with Madoff. The visitor list for BLMIS's New York office reflects that two different Madrid-based BBVA employees accompanied the New York BBVA Director on visits in October 2008 and November

2008.

68.     BBVA's Madrid employees were therefore integral to BBVA's U.S. investments and its New York-centered relationships with FGG and BLMIS.

**E.     BBVA Knew That Fairfield Sentry and Other Feeder Funds Were Simply Vehicles Through Which to Access BLMIS in New York**

69.     BBVA understood that Fairfield Sentry was, in the words of the BBVA New York Director, just another "Madoff Feeder[]."  In May 2006, early in BBVA's relationship with FGG, BBVA understood that Madoff managed the majority of FGG's assets under management and that FGG depended entirely on Madoff.

70.     In addition to its investments in Fairfield Sentry, BBVA invested in other Feeder Funds including, but not limited to: Kingate Global, Thema Fund Ltd. or Thema International Fund plc, Maxam Absolute Return Fund L.P., Primeo Select Fund, Optimal Strategic US Equity Fund, and a Tremont Group Holdings, Inc. fund or funds.  BBVA also invested in funds of funds that were partially invested in Feeder Funds including Irongate and FIFL.  BBVA conducted due diligence on these Feeder Funds and funds of funds.

71.     From its due diligence on the Feeder Funds, BBVA understood that BLMIS purported to pool the billions of dollars it received from the funds, trade the pooled assets under the same SSC Strategy, and then allocate the trades pro rata across its customer accounts.

72.     BBVA did not invest in these other Feeder Funds by coincidence.  BBVA purposefully invested with the funds because it knew that they provided access to BLMIS in New York.

73.     As such, BBVA calculated its exposure to Madoff's SSC Strategy and measured its risk based on its collective, aggregate investments in all of the Feeder Funds.  BBVA even considered asking Madoff if he would set up a direct account for BBVA because it was "paying

13

these feeders a lot of money."

### F.    BBVA Utilized New York Banks to Transfer Funds

74.    BBVA utilized New York bank accounts to transfer funds to and from Fairfield Sentry.

75.    BBVA executed subscription agreements in connection with its investments in Fairfield Sentry. These agreements stated that all money from BBVA be directed to a New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York. In connection with subscribing funds to Fairfield Sentry, BBVA directed funds to this New York HSBC Bank USA account.

76.    BBVA also used a Citibank NA account in New York held in its own name to receive transfers from Fairfield Sentry. In a Fairfield Sentry subscription agreement BBVA completed, BBVA directed that all BBVA redemption payments be sent to this Citibank NA account in New York only. BBVA received the $57.5 million of subsequent transfers at issue in this New York bank account.

## IV.    FAIRFIELD SENTRY'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

77.    At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

### A.    The Genesis of the FGG *De Facto* Partnership

78.    In 1988, Walter Noel and Jeffrey Tucker founded the FGG *de facto* partnership in New York City. FGG created, managed, and marketed a variety of investment funds, the largest of which were Feeder Funds.

79.    The FGG *de facto* partnership included: individual persons; U.S. corporations;

foreign corporations; and investment funds created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment funds were the three Feeder Funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

80.    FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: FG Limited, FG Bermuda, Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

**B.    Fairfield Sentry**

81.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

82.    Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the

15

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

83.     Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1.    Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business was in the United States

84.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069.   In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

85.     After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

FGG's New York headquarters—executed additional BLMIS account documents on behalf of

Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

86.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

## 2.    FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities

87.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield

17

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3.    FGG New York Personnel Managed Fairfield Sentry

88.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

89.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

90.    Fairfield Sentry's subscription agreements also incorporated its PPMs by

reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

91.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

92.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City.  Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

93.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

94.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the Feeder Funds and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the Feeder Funds and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

95.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three Feeder Funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

96.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

97.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

98.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its Feeder Funds.  While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

99.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as

Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

100.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS

accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other

fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a

number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

The seedling funds were operated and organized by FGG New York Personnel.  Many of the

seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

101.    The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015              /s/ Regina Griffin
       New York, New York         **Baker & Hostetler LLP**
                                  45 Rockefeller Plaza
                                  New York, New York 10111
                                  Telephone:  (212) 589-4200
                                  Facsimile:  (212) 589-4201
                                  David J. Sheehan
                                  Regina Griffin
                                  Loura Alaverdi
                                  Torello Calvani

                                  **Baker & Hostetler LLP**
                                  65 East State Street, Suite 2100
                                  Columbus, Ohio 43215
                                  Telephone:  (614) 228-1541
                                  Facsimile:  (614) 462-2616
                                  Lauren M. Hilsheimer
                                  Damon M. Durbin

                                  *Attorneys for Irving H. Picard, Trustee*
                                  *for the Substantively Consolidated SIPA*
                                  *Liquidation of Bernard L. Madoff Investment*
                                  *Securities LLC and the estate of Bernard L.*
                                  *Madoff*