**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the substantively consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01023 (SMB) |
| Plaintiff, | |
| v. | |
| ARDEN ASSET MANAGEMENT INC., ARDEN ASSET MANAGEMENT LLC, and ARDEN ENDOWMENT ADVISERS, LTD., | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO ARDEN ENDOWMENT ADVISERS, LTD.** |
| Defendants. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendant Arden Endowment Advisers, Ltd. ("Endowment Fund"),[1] states:

1. The Trustee seeks to recover at least $26,011,165 in subsequent transfers of BLMIS customer property collectively made to Endowment Fund by Fairfield Sentry Limited ("Fairfield Sentry") and Kingate Global Fund Ltd. ("Kingate Global" and together with Fairfield Sentry, the "Feeder Funds"). Of the $26,011,165, at least $4,172,864 was a single subsequent transfer of BLMIS customer property transferred to Endowment Fund by Fairfield Sentry, and at least $21,838,301 are subsequent transfers of BLMIS customer property from Kingate Global.

2. BLMIS held customer accounts for numerous feeder funds—single-purpose investment funds that pooled their investors' assets to invest with BLMIS, capitalizing on its consistent returns—including Fairfield Sentry and Kingate Global.

3. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York. From March 1994 through December 2008, Kingate Global also maintained a direct customer account with BLMIS. As detailed further below, Fairfield Sentry was the largest BLMIS feeder fund, and Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry.

## I. THE COMPONENT EVENTS OF THE TRANSFERS TO ENDOWMENT FUND WERE COMPRISED OF PREDOMINANTLY DOMESTIC ELEMENTS

4. Endowment Fund invested in the Feeder Funds because its money would ultimately be placed with BLMIS—the New York-based broker dealer where Fairfield Sentry

---

[1] Defendants Arden Asset Management Inc. and Arden Asset Management LLC do not challenge the domestic nature of the $8,413,795 in subsequent transfers they received from Fairfield Sentry Limited and Kingate Global Fund Ltd. As a result, these transfers are not addressed in these Proffered Allegations.

1

and Kingate Global maintained trading accounts for the sole purpose of having Madoff invest their assets in securities traded on the U.S. stock markets.

5. Endowment Fund's investments with BLMIS through Fairfield Sentry and Kingate Global were not accidental or fortuitous—it utilized these feeder funds for the express purpose of profiting from BLMIS and Madoff.

6. The United States served as the center of Endowment Fund's relationships with Fairfield Sentry and Kingate Global, and the associated transactions between Fairfield Sentry and Kingate Global to Endowment Fund were comprised of predominantly domestic elements.

### A.   Endowment Fund's Principal Place of Business was Located in New York

7. Although incorporated in the Cayman Islands, Endowment Fund was a shell entity present in the Cayman Islands only on paper. At all relevant times, Endowment Fund maintained its principal place of business in New York. Endowment Fund was created, directed, controlled, and operated entirely from within the United States by its New York-based investment managers, non-moving defendants Arden Asset Management Inc. ("Arden Inc."), a New York corporation, and Arden Asset Management LLC ("Arden LLC," and together with Arden Inc., "Arden Management"), a Delaware limited liability company.

8. During all relevant times, Arden Management maintained its headquarters and principal place of business in New York.

9. As early as January 2002, Endowment Fund shared an office with Arden Management in New York at 350 Park Avenue, 29th Floor, New York, New York 10021.

10. Arden Management also shared New York-based employees with Endowment Fund, including Arden Management's chief financial officer and Averell H. Mortimer ("Mortimer"), founder and chief executive officer of Arden Inc. and Arden LLC.

2

11. Arden Management conducted due diligence, negotiated transactions, and acted on Endowment Fund's behalf for all purposes related to Endowment Fund's investments in Fairfield Sentry and Kingate Global.

12. In October 2002, Endowment Fund filed a Form D with the SEC providing notice of sale of securities. The Form D identified New York-based Arden Inc. as its investment manager, and New York-based Mortimer as its executive officer and director. Mortimer signed the Form D on Endowment Fund's behalf and submitted it to the SEC.

13. In addition to coordinating and executing Endowment Fund's subscriptions in Fairfield Sentry and Kingate Global, Arden Management requested and coordinated Endowment Fund's redemptions.

14. As a result of duties to Endowment Fund, New York-based Mortimer and Arden Management received and analyzed Endowment Fund's Fairfield Sentry and Kingate Global redemption confirmations, as well as Fairfield Sentry's weekly net asset value statements for Endowment Fund's account.

15. Fairfield Sentry's administrator used Arden Management's New York address as Endowment Fund's address of record for investor communications.

16. Endowment Fund also marketed itself to tax-exempt institutional investors in the United States.

17. In connection with its fund management operations, including Endowment Fund, Arden Management utilized legal counsel and an auditor based in the United States. Since 1995, New York-based Seward & Kissel LLP has represented Arden Management as its lead outside counsel. Since its formation, Arden Management has used Ernst & Young LLP in New York as its auditor.

**B.   Endowment Fund's Relationship with Fairfield Sentry Was Centered in the United States**

18.   On behalf of Endowment Fund, New York-based Arden Management conducted due diligence on BLMIS and Fairfield Sentry, including attending meetings in New York with Madoff and FGG.

19.   Arden Management employees also communicated with Fairfield Sentry representatives at FGG's New York office, exchanging emails and phone calls.

20.   Moreover, Arden Management had significant access to FGG and Fairfield Sentry through Andrés Piedrahita ("Piedrahita"), a co-founder of FGG. From at least 1997 through 2002, Piedrahita solicited investments and raised money for a fund managed by Arden Management.

**1.   Endowment Fund Knowingly Subscribed in Fairfield Sentry as a Means of Profiting from BLMIS in New York**

21.   As a result of Arden Management's due diligence and investigation on Madoff, BLMIS, and Fairfield Sentry, Endowment Fund knew that New York-based BLMIS had custody of at least 95% of Fairfield Sentry's investments. In fact, after a July 2003 meeting with FGG, Arden Management noted in meeting minutes that "from a mechanical/structuring perspective, Fairfield Sentry is essentially just a brokerage account [with BLMIS]."

22.   In the spring of 2003, FGG's New York office provided Arden Management with a Fairfield Sentry due diligence questionnaire identifying the United States as Fairfield Sentry's "geographical market focus." Endowment Fund knew this "U.S. focus" was because New York-based BLMIS was the executing broker for Fairfield Sentry's investments, and BLMIS purportedly operated and executed Madoff's split-strike conversion strategy ("SSC Strategy") on behalf of Fairfield Sentry.

4

23. Prior to its investments with Fairfield Sentry, Endowment Fund also knew the following facts:

- In reality New York-based BLMIS was Fairfield Sentry's investment adviser.

- The SSC Strategy purportedly involved the purchase of U.S. equities and U.S. Treasury bills ("Treasurys") traded on U.S. exchanges.

- Madoff controlled the decisions regarding which U.S. securities to purportedly purchase.

- BLMIS was a U.S. broker-dealer regulated by the SEC.

- Fairfield Sentry's entire economic purpose was to deliver money to and profit from BLMIS in New York.

24. Arden Management, on behalf of Endowment Fund, also reviewed BLMIS trade tickets each of which listed BLMIS as a member of SIPC regulated by the SEC.

25. Endowment Fund knew control over Fairfield Sentry's investments rested almost entirely with New York-based Madoff and BLMIS.

### 2. In Connection with its Investments, Endowment Fund Submitted to New York Law, Jurisdiction, and Venue

26. Endowment Fund executed a subscription agreement in connection with its investment in Fairfield Sentry. By executing a Fairfield Sentry subscription agreement, Endowment Fund agreed their investment would be governed by New York law, and agreed to jurisdiction and venue in New York for any disputes.

27. In connection with its due diligence on and investment in Fairfield Sentry, Endowment Fund's investment manager, Arden Management, voluntarily entered into a confidentiality agreement with New York-based FGG that also contained a New York jurisdiction provision, wherein Arden Management warranted that it:

> "irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of New York and of

5

the United States of America located in the City of New York for any actions, suits or proceedings arising out of or relating to this Agreement and the transaction contemplated hereby . . . ."

### C. Endowment Fund's Relationship with Kingate Global was Centered in the United States

28. Endowment Fund understood Fairfield Sentry and Kingate Global were virtually identical in their reliance on BLMIS. Specifically, Endowment Fund knew the following facts:

- BLMIS had custody of all of Kingate Global's investments, noting that Kingate Global was "100% [] invested with Madoff."

- In reality New York-based BLMIS was Kingate Global's investment adviser. On behalf of Endowment Fund, Arden Management reviewed Kingate Global's May 2000 information memorandum identifying that, "[t]he investment advisor [BLMIS] invests primarily in the United States . . . ."

- New York-based BLMIS was the executing broker for Kingate Global's investments, and BLMIS purportedly operated and executed Madoff's SSC Strategy on behalf of Kingate Global.

- The SSC Strategy purportedly involved the purchase of U.S. equities and U.S. Treasurys traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

- Endowment Fund knew Kingate Global's entire economic purpose was to deliver money to and profit from BLMIS in New York.

29. Endowment Fund knew New York-based BLMIS controlled Kingate Global's investments and purported to invest in the U.S. stock market.

### D. Endowment Fund Utilized New York Banks to Transfer Funds

30. Endowment Fund utilized New York bank accounts to transfer funds to and from Fairfield Sentry and Kingate Global.

31. Endowment Fund executed a subscription agreement in connection with its investment in Fairfield Sentry. This agreement stated that all money from Endowment Fund be directed to a New York HSBC Bank USA correspondent bank account for ultimate deposit in

6

Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York. In connection with subscribing funds to Fairfield Sentry, Endowment Fund directed funds to be transferred to this New York HSBC Bank USA account.

32. Endowment Fund also used an account at Citi Private Bank in New York to receive a transfer from Fairfield Sentry. Endowment Fund utilized this account to receive its one and only redemption payment from Fairfield Sentry in the amount of $4,172,864.

33. Moreover, Endowment Fund executed subscription agreements in connection with its investments in Kingate Global. These agreements stated that all money from Endowment Fund be directed to a Citibank N.A. correspondent bank account in New York for ultimate deposit in Kingate Global's bank account. From Kingate Global's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York. In connection with subscribing funds to Kingate Global, Endowment Fund directed funds to be transferred to this Citibank N.A. account in New York.

34. Pursuant to Endowment Fund's representations in Fairfield Sentry wiring instructions that it maintained an account at Citi Private Bank, upon information and belief, Kingate Global redemption proceeds were also received in Endowment Fund's account at Citi Private Bank. Upon information and belief, Endowment Fund utilized this account to receive $21,838,301 in redemption payments from Kingate Global.

## II. **FAIRFIELD SENTRY MAINTAINED ITS PRINCIPAL PLACE OF BUSINESS IN NEW YORK**

35. At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

### A. The Genesis of the FGG *De Facto* Partnership

36. In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called FGG based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

37. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

38. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B. Fairfield Sentry

39. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

8

enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

40. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

41. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1. Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States

42. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a

9

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

43. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

44. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

**2. FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities**

45. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms,

10

maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

46. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

47. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

11

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

48.    Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

49.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

50.     In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

51.     While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

52.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

13

53. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

54. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

55. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

56. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

57. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

58. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

59. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

### III. THE KINGATE GLOBAL TRANSFERS ARE DOMESTIC

60. Kingate Global was a feeder fund that invested exclusively with BLMIS in New York. BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the account prior to December 11, 2008.

61. Kingate Global filed a customer claim in the SIPA liquidation.

**A. Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation**

62. Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

15

63. Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

64. Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

65. Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Global's investments with BLMIS.

66. Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

### B. The Operative Legal Documents Were New York-Based

67. Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

68. Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

69. Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of

16

Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### C. BLMIS Had Full Authority to Make and Execute Investment Decisions

70. Kingate Global's Trading Authorization Agreements authorized BLMIS to be the Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

71. As with each of the other BLMIS feeder funds, BLMIS in New York acted as the Kingate Global's investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

72. BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as the Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### D. Kingate Global Was Managed From New York

73. During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

74. Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

75. Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

76. Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso. KML operated through its agents in New York.

77. KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

78. KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

79. KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

80. Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

81. FIM (USA) was the hub for FIM's feeder fund due diligence. From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

82. KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E. Kingate Global Used Banks in New York**

83. Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

84. KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

18

85. In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

86. FIM also directed fee payments to be routed through a bank account in New York.

87. The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Ceretti*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17, 2014), ECF 100.

Dated: June 26, 2015
       New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Catherine E. Woltering

**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Douglas A. Vonderhaar

*Attorneys for Irving H. Picard, Trustee for the substantively consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*