BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                      Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                      Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                      Debtor. | **TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO BSI AG'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT** |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                      Plaintiff,<br><br>    v.<br><br>BSI AG, individually and as successor in interest to BANCO DEL GOTTARDO,<br><br>                      Defendant. | Adv. Pro. No. 12-01209 (SMB) |

The Trustee respectfully submits this memorandum as a supplement to his Main Brief being filed simultaneously herewith in opposition to the motion to dismiss based on extraterritoriality made by defendant BSI AG ("BSI") and in further support of the Trustee's motion for leave to amend his Complaint.

## BACKGROUND

BSI is a sophisticated international financial institution that specializes in private banking and wealth management. (Proffered Allegations at ¶ 4.) Non-defendant Banco del Gottardo ("BDG"), to which BSI is successor-in-interest, was a leading international private bank when it merged into BSI. (*Id.*)

BSI and BDG were shareholders in Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma" and together with Fairfield Sentry, the "Fairfield Funds"). (*Id.* at ¶ 2.) Fairfield Sentry invested substantially all of its assets with BLMIS. (*Id.*) Sigma did not have its own direct BLMIS account, but invested 100% of its assets in Fairfield Sentry. (*Id.*) BSI and BDG each received subsequent transfers of BLMIS customer property from the Fairfield Funds, which totaled $56,359,583 (the "Transfers"). (Trustee's Complaint at ¶ 2; *id.* at Exs. C, D, F, G.) The Trustee's Proffered Allegations demonstrate that the Trustee's action to recover the Transfers does not require an extraterritorial application of SIPA or Bankruptcy Code Section 550.

## THE TRANSFERS AND COMPONENT EVENTS OF BSI'S AND BDG'S FAIRFIELD FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

Citing to *Maxwell I*, the District Court directed that "the location of the transfers as well as the component events of those transactions"[1] must be used to determine whether a subsequent

---

[1] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 816).

transfer claim involves a domestic or extraterritorial application of the Code and SIPA.[2]  Under the District Court's ruling, the Trustee need only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[3]  This is a fact-based inquiry in which all reasonable inferences should be drawn in the Trustee's favor.[4]

BSI argues that simply because it, BDG, and the Fairfield Funds in which they invested were formally organized under the laws of foreign countries, the subsequent transfers they received are "purely foreign" and the Trustee's recovery action must be dismissed.  This superficial argument disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit extraterritoriality case law that similarly examines a transaction's various connections to the United States.[5]

To begin with, the entire purpose of BSI's and BDG's investments with the Fairfield Funds was to invest in U.S. securities markets through New York-based investment adviser BLMIS, and to earn returns on those U.S.-based investments.  Specifically, BSI and BDG entered into subscription agreements with the Fairfield Funds at least 196 times combined and in each case affirmed that they knew (i) the Fairfield Funds invested almost exclusively with a New

---

[2] In *Maxwell I*, the court examined all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded.  *In re Maxwell Commc'n Corp.*, 186 B.R. 807, 816-17 (S.D.N.Y. 1995).

[3] Extraterritoriality Decision, 513 B.R. at 232 n.4.

[4] *See*, *e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 402-03 (S.D.N.Y. 2010) (deferring ruling on extraterritoriality at motion to dismiss phase and citing standard that "[t]he court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.").

[5] *See, e.g., Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 217 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014); and other cases cited in the Trustee's Main Brief.

2

York-based, SEC-registered investment adviser (i.e. BLMIS) that invested in the U.S. securities market, and (ii) BSI's and BDG's money would be transferred to that same investment adviser in New York. (Proffered Allegations at ¶¶ 8-9.) As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States . . . was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and the feeder fund.[6]

The express provisions of their agreements with the Fairfield Funds further demonstrate the domestic nature of BSI's and BDG's investment transactions with the Fairfield Funds. BSI and BDG both agreed in their subscription agreements with the Fairfield Funds that New York law would govern their investments, and they consented to U.S. jurisdiction. (Proffered Allegations at ¶ 11.)

In connection with their investments in the Fairfield Funds, BSI, BDG, and BSI's wholly-owned subsidiary, Florida-based Genesis Investment Advisors LLC (f/k/a BSI Investment Advisors LLC) ("Genesis"), each also entered into a distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited") to promote investment in the Fairfield Funds. (*Id.* at ¶ 12.) FG Limited was registered to do business in New York and listed its principal executive office as that of Fairfield Greenwich Group ("FGG") in New York, and its typical fee-sharing agreement stated that it was governed by New York law. (*Id.*) Thus, BSI and BDG had every expectation that U.S. laws would apply to their investment transactions and that they would be subject to suit in the United States.

BSI and BDG also purposefully and repeatedly used the U.S. banking system in connection with their subscriptions into and redemptions from Fairfield Sentry, including the

---

[6] *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 513 (Bankr. S.D.N.Y. 2012).

3

Transfers at issue from Fairfield Sentry.[7]  Specifically, BSI and BDG repeatedly received redemptions into a U.S. correspondent account in New York and, at the direction of Fairfield Sentry, repeatedly remitted subscriptions into a U.S. correspondent account, which funds were then ultimately delivered to BLMIS in New York.  (*Id*. at ¶¶ 14-15.)

The domestic nature of the transactions is also evidenced by the fact that BSI and BDG used New York personnel to regularly meet and communicate with FGG in New York and perform due diligence on their Fairfield Fund investments.  BSI principally dealt with FGG in connection with its Fairfield Fund investments through two of its wholly-owned subsidiaries in the U.S.: (i) Florida-based Genesis, which was registered as an investment adviser with the SEC and had a New York office; and (ii) Thalia SA ("Thalia"), which also had an office in New York. (Proffered Allegations at ¶ 17.)

FGG considered New York-based Robert Puccio of Thalia to be the key relationship person for BSI, dubbing him "the gatekeeper at BSI."  (*Id.* at ¶ 19.)  Genesis executive Harvey Glover ("Glover") worked closely with FGG regarding BSI's investments in the Fairfield Funds. In 2005, Glover left Genesis for FGG, working out of its Miami office and continuing to focus on the FGG/BSI relationship.  (*Id.* at ¶ 18.)  BDG also employed two New York-based due diligence advisers in connection with its investment activity with the Fairfield Funds.  (*Id.* at ¶ 20.)

Through these and other U.S. personnel, BSI and BDG regularly met and communicated with high-level FGG personnel in New York for several years.  (*Id.* at ¶ 22.)  BSI's and BDG's primary contacts at FGG were U.S.-based, including New York-based FGG partners Philip

---

[7] *See, e.g.*, *Picard v. Igoin (In re BLMIS)*, 2015 WL 603209, at *16-17 (Bankr. S.D.N.Y. Feb. 13, 2015) (in the analogous context of personal jurisdiction, repeated use of U.S. bank accounts sufficient).

4

Toub, Lourdes Barreneche, and Cornelis Boele, and, beginning in 2005, Miami-based (former Genesis executive) Glover.  (*Id.* at ¶ 21.)

Beyond all of the above domestic components, BSI's argument that its and BDG's transactions are "purely foreign" is wrong because it ignores the reality of the Fairfield Funds, from which it and BDG received the Transfers.  FGG in New York created, managed, and controlled the Fairfield Funds.  (*Id.* at ¶ 12.)  The Fairfield Funds were based out of New York and had their principal place of business in New York.  (*Id.* at ¶ 23.)  Although technically registered in the BVI, the Fairfield Funds had no employees or offices there, and at all times, operational decisions were made by FGG employees in New York.[8]  (Proffered Allegations at ¶¶ 28, 49.)  In its BLMIS account opening documents, FGG listed Fairfield Sentry's address as in the United States.  (*Id.* at ¶¶ 30-31.)  The Fairfield Funds' initial and on-going due diligence on BLMIS was conducted in New York, and the operative legal documents for their BLMIS accounts were governed by New York law.  (*Id.* at ¶¶ 34, 50.)  BLMIS in New York served as the Fairfield Funds' investment manager and implemented the split-strike conversion strategy for the Fairfield Funds.  (*Id.* at ¶ 9.)

## CONCLUSION

For the forgoing reasons and those stated in the Trustee's Main Brief, BSI's motion to dismiss should be denied and the Trustee's motion for leave to amend his Complaint should be granted.

---

[8] *See SEC v. Gruss*, 2012 WL 3306166 at *3 (S.D.N.Y. Aug 13, 2012) (finding that issues of fact existed regarding whether an offshore fund was "foreign" for purposes of extraterritoriality where complaint alleged that operational and investment decisions for the offshore fund were made in New York, "such that for all intents and purposes, the [offshore fund] was based in New York").

5

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | By: /s/ Thomas L. Long<br>Baker & Hostetler LLP<br>45 Rockefeller Plaza<br>New York, New York  10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Matthew D. Feil<br>Hannah C. Choate<br><br>*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff* |