**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01209 (SMB) |
| Plaintiff, v. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO BSI AG** |
| BSI AG, individually and as successor in interest to BANCO DEL GOTTARDO, | |
| Defendant. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the Extraterritoriality Issue as to BSI AG ("BSI"), alleges the following:

## INTRODUCTION

1. Banco del Gottardo ("BDG"), to which BSI is successor-in-interest, merged into BSI on July 1, 2008, creating a new legal entity, which retained the name BSI AG, and assumed all of its predecessor entities' rights and obligations.

2. BSI and BDG were shareholders in Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma" and together with Fairfield Sentry, the "Fairfield Funds"). Fairfield Sentry invested at least 95% of its assets in accounts managed by New York-based Bernard L. Madoff Investment Securities LLC ("BLMIS"). Sigma did not have its own direct BLMIS account, but invested 100% of its assets in Fairfield Sentry, serving solely as a vehicle for converting Euro-denominated investments of its shareholders into U.S. dollars.

3. The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2) BSI's and BDG's redemptions totaling $56,359,583 from the Fairfield Funds (the "Transfers"). Since the filing of the Complaint, the Trustee has uncovered documents evidencing additional subsequent transfers to BSI and BDG of at least $962,844 from Fairfield Sentry and at least $4,499,074 from Sigma. These additional transfers will be included in an amended complaint.

## BSI'S AND BDG'S TRANSFERS AND THE COMPONENT EVENTS OF THEIR FAIRFIELD FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

4. BSI is a sophisticated international financial institution that has specialized in private banking and wealth management for decades, with tens of billions of dollars of assets

under management. At the time of its merger into BSI, BDG was similarly a leading international private bank with billions of dollars of assets under management.

5. BSI and BDG intentionally invested in the Fairfield Funds to profit from BLMIS's purported investments in the United States, and the Transfers and component events of BSI's and BDG's Fairfield Fund transactions were predominantly domestic.

**The Entire Purpose of BSI's and BDG's Investments Was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

6. The entire purpose of BSI's and BDG's investments in the Fairfield Funds was to invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and BSI's and BDG's Fairfield Fund investments were all centered in the United States.

7. BSI and BDG knew and intended that their investments would be transferred to BLMIS in New York to manage and invest in the U.S. securities markets. BSI and BDG made such investments for the express purpose of receiving returns on U.S.-based investments from BLMIS.

8. As per the terms of the Fairfield Funds' private placement memoranda ("PPMs" and each, a "PPM"), shareholders in the Fairfield Funds such as BSI and BDG were required to execute a subscription agreement each time they subscribed for shares in (i.e. invested money into) the funds. BSI and BDG remitted subscription payments to such funds at least 196 times combined.

9. By entering into the Fairfield Fund subscription agreements, BSI and BDG affirmed that they "received and read a copy of" each fund's PPM. Based on the information contained in the Fairfield Funds' PPMs, BSI and BDG knew the following facts:

2

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Sigma invested 100% of its assets with Fairfield Sentry;

- BLMIS was the investment adviser of the Fairfield Funds;

- BLMIS was registered with the Securities and Exchange Commission (the "SEC");

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the funds' behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

**BSI and BDG Submitted to U.S. Law and Jurisdiction In Connection With Its Fairfield Fund Investments.**

10. BSI's and BDG's subscription agreements also expressly provided that their investments would be subject to U.S. laws and to jurisdiction in the U.S. courts.

11. In each of their signed subscription agreements with the Fairfield Funds, BSI and BDG agreed that: (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," and they "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding"; and (ii) the subscription agreements "shall be governed and enforced in accordance with New York law . . . ."

12. In addition, BSI, BDG, and BSI's wholly-owned subsidiary, Florida-based Genesis Investment Advisors LLC (f/k/a BSI Investment Advisors LLC) ("Genesis), each entered into a distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited"), which agreements compensated BSI, BDG, and Genesis for bringing investments into BLMIS. FG Limited was the cornerstone of the New York-based Fairfield Greenwich Group

3

("FGG") *de facto* partnership, which created, managed, and controlled the Fairfield Funds. FG Limited was registered to do business in New York and listed its principal executive office as that of FGG in New York. Although the Trustee does not have possession of the specific fee agreements between BSI, BDG, Genesis, and FG Limited, FG Limited's typical fee-sharing agreements with respect to the Fairfield Funds expressly stated that they were governed by New York law. BSI also received fees from FGG pursuant to a "verbal agreement" made by FGG partner Philip Toub ("Toub") and FGG partner Lourdes Barreneche ("Barreneche"), both of whom were based in New York.

13.    Consistent with the frequency of the investments they made and were credited with bringing into the Fairfield Funds, BSI and BDG routinely received fees from FG Limited. For example, BSI received these fees in connection with Fairfield Sentry investments at least every quarter from the first quarter of 2003 through the third quarter of 2008.

**BSI and BDG Purposefully and Repeatedly Utilized U.S. Bank Accounts to Transfer Funds.**

14.    During the relevant period, BSI and BDG received at least 195 redemptions totaling approximately $47,597,014 out of Fairfield Sentry (which is inclusive of the newly discovered transfers), and New York was the specific situs repeatedly selected by BSI and BDG for receiving their redemptions. Specifically, BSI's and BDG's redemptions were received into correspondent accounts at HSBC USA in New York (the "U.S. Accounts").

15.    By investing in Fairfield Sentry, BSI and BDG also directed funds to New York-based BLMIS through a New York bank account. Fairfield Sentry's form subscription agreements required that BSI and BDG send their subscription payments to a New York correspondent bank account, for deposit in Fairfield Sentry's bank account. From Fairfield

4

Sentry's bank account, the funds were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

**BSI and BDG Used U.S. Personnel to Regularly Meet, Communicate With, and Perform Due Diligence on FGG in New York In Connection with Their Fairfield Fund Investments.**

16. BSI and BDG used U.S.-based personnel to regularly meet and communicate with FGG in New York and perform due diligence on their Fairfield Fund investments.

17. BSI principally dealt with FGG through two of its wholly-owned subsidiaries in the U.S.: (i) Florida-based Genesis, which registered as an investment adviser with the SEC in 2005 and had a New York office; and (ii) Thalia SA ("Thalia"), which also had an office in New York.

18. Genesis executive Harvey Glover ("Glover") worked closely with FGG regarding BSI's investments in the Fairfield Funds. In 2005 Glover left Genesis for FGG, working out of its Miami office and continuing to focus on the FGG/BSI relationship.

19. BSI created Thalia to manage external fund relationships on behalf of BSI and its parent company, and Thalia played this role with respect to the Fairfield Funds. FGG considered New York-based Robert Puccio ("Puccio") of Thalia to be the key relationship person for BSI, dubbing him "the gatekeeper at BSI."

20. BDG also used U.S.-based advisers in connection with its investments in the Fairfield Funds. After meeting with BDG on November 24, 2004, FGG Partner Yanko Della Schiava ("Della Schiava") reported that BDG had appointed "Richcourt" as an additional due diligence adviser regarding the Fairfield Funds, and that previously BDG's adviser regarding hedge fund investments had been "Towers in NY." "Richcourt" is an apparent reference to New York-based Richcourt Fund Advisors Inc., and "Towers in NY" is an apparent reference to New York-based Towers Watson & Co. (f/k/a Towers Perrin).

21.     BSI's primary contacts at FGG were New York-based FGG partner Toub and, beginning in 2005, Miami-based (former Genesis executive) Glover. BDG's primary contacts at FGG included New York-based FGG partners Barreneche and Cornelis Boele.

22.     BSI's and BDG's numerous meetings and correspondence with U.S.-based FGG representatives regarding BLMIS and their Fairfield Fund investments include, for instance, the following:

- On December 8, 2003, Glover, while still employed at Genesis, met with Barreneche in Miami to discuss Fairfield Sentry.

- On December 12, 2003, FGG's Della Schiava reported internally that he had met with "the gatekeeper at BSI" (i.e., New York-based Puccio) regarding Fairfield Sentry. He noted that "they will want to meet up in January in our NY office to have a close look at our operations."

- On April 28, 2004 – in response to Toub's email the previous day sending him Fairfield Sentry's monthly performance report – Puccio emailed Toub regarding a recent Fairfield Sentry subscription BSI had made.

- On January 24 and 25, 2005, BDG's Dawson Tang ("Tang") met with a number of FGG personnel in New York, including FGG co-founder Jeffrey Tucker.

- On May 12, 2005, BDG's Tang emailed New York-based Veronica Barco of FGG, asking about the basket of stocks in which Fairfield Sentry was purportedly invested through BLMIS.

- In October 2005, Miami-based Glover (now working for FGG) had a number of conversations with BSI representatives regarding FGG funds.

**The Fairfield Funds' Principal Place of Business Was in New York.**

23.     At all relevant times, the Fairfield Funds' principal place of business was in New York, where their creator/manager/operator was headquartered, and they were U.S. residents.

6

### A. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

24. In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

25. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency fund, Sigma. Sigma received subscriptions in Euros, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

26. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B. Fairfield Sentry

27. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

7

28. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

29. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

    **1.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

30. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29,

8

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

31. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

32. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities

33. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield

9

Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

34. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

35. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and

10

redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

36. Fairfield Sentry's subscription agreements also incorporated its PPMs by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5. BLMIS Was Fairfield Sentry's Investment Manager

37. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

38. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City.

11

Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited FG. FG Limited was formed under the laws of Ireland.

39. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

40. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

41. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

12

management contracts to both entities, including the investment advisory agreements for three BLMIS feeder funds, Fairfield Sentry, Sigma, and Fairfield Lambda Limited ("Lambda"), and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

42. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

43. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

44. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

45. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required

13

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

46. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

**C.     Sigma**

47. FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars. In response to investor requests to invest in Fairfield Sentry using Euros, FGG created Sigma. Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

48. Noel and Tucker organized Sigma on November 20, 1990, as international business companies under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma. Sigma is currently in liquidation in proceedings in the BVI and United States.

49. Also like Fairfield Sentry, Sigma was a shell corporations present in the BVI only on paper. It had no employees and maintained no offices. It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and

14

hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters. Sigma was operated almost entirely by FGG New York Personnel.

50. As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Sigma. Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities. Until Sigma's liquidation, FGG maintained Sigma's books and records in New York. FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

51. FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares. Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole assets. Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could

15

misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPM's.

52. Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma at Citco Bank Dublin. FGG New York Personnel had final control of the Sigma Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Sigma's relationships with the Citco entities.

53. In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS— Noel executed separate contracts on Sigma's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

54. FGG New York Personnel initially listed FG Limited as the investment manager for Sigma. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPM to indicate FG Bermuda was Sigma's Investment Manager. In fact there were no duties for any investment manager because Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

55. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015  
       New York, New York

By: /s/ Thomas L. Long  
Baker & Hostetler LLP  
45 Rockefeller Plaza  
New York, New York  10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Thomas L. Long  
Matthew D. Feil  
Hannah C. Choate

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*