BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | Adv. Pro. No. 12-01216 (SMB) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> BANK HAPOALIM B.M. and BANK HAPOALIM (SWITZERLAND) LTD., <br><br> Defendants. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO BANK HAPOALIM B.M. AND BANK HAPOALIM (SWITZERLAND) LTD.** |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the

Extraterritoriality Issue as to Bank Hapoalim B.M. ("Hapoalim B.M.") and Bank Hapoalim

(Switzerland) Ltd. ("Hapoalim Switzerland" and together with Hapoalim B.M., the "Hapoalim

Defendants"), alleges the following:

## INTRODUCTION

1.      The Hapoalim Defendants were shareholders in Fairfield Sentry Limited

("Fairfield Sentry"), and Hapoalim Switzerland was also a shareholder in Kingate Global Fund

Ltd. ("Kingate Global" and together with Fairfield Sentry, the "BLMIS Feeder Funds").  The

BLMIS Feeder Funds invested at least 95% of their assets in accounts managed by New York-

based Bernard L. Madoff Investment Securities LLC ("BLMIS").

2.      The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2)

the Hapoalim Defendants' redemptions totaling $27,637,884 from the BLMIS Feeder Funds (the

"Transfers"), the majority of which were from Sentry.  Since the filing of the Complaint, the

Trustee has uncovered documents referencing additional subsequent transfers to the Hapoalim

Defendants of at least $2,955,727 from Fairfield Sentry.  These additional transfers will be

included in an amended complaint.

## THE HAPOALIM DEFENDANTS' TRANSFERS AND THE COMPONENT EVENTS OF THEIR BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

3.      The Hapoalim Defendants are highly sophisticated and experienced financial

institutions and asset management specialists with a global network of branches and subsidiaries,

including multiple U.S. branches with billions of dollars of assets in the U.S.

4.      The Hapoalim Defendants intentionally invested in the BLMIS Feeder Funds to profit from BLMIS's purported investments in the United States, and the Transfers and component events of the Hapoalim Defendants' BLMIS Feeder Fund transactions were predominantly domestic.

**The Entire Purpose of the Hapoalim Defendants' Investments Was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

5.      The entire purpose of the Hapoalim Defendants' investments in the BLMIS Feeder Funds was to invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and the Hapoalim Defendants' BLMIS Feeder Fund investments were all centered in the United States.

6.      The Hapoalim Defendants knew and intended that their investments would be transferred to BLMIS in New York to manage and invest in the U.S. securities markets.  The Hapoalim Defendants made such investments for the express purpose of receiving returns on U.S.-based investments from BLMIS.

7.      As per the terms of Fairfield Sentry's private placement memorandum ("PPM") and Kingate Global's information memorandum ("Info Memo"), shareholders in those funds such as the Hapoalim Defendants were required to execute a subscription agreement each time they subscribed for shares in (i.e. invested money into) the funds.  The Hapoalim Defendants remitted subscription payments to such funds at least 84 times combined.

8.      Upon entering into each of Fairfield Sentry's subscription agreements, the Hapoalim Defendants affirmed that they "received and read a copy of" the fund's PPM.  Based on the information contained in that PPM, the Hapoalim Defendants knew the following facts:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

- BLMIS was Fairfield Sentry's investment adviser;

2

- BLMIS was registered with the Securities and Exchange Commission;

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the fund's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

9.      Upon entry into its subscription agreements with Kingate Global, Hapoalim Switzerland similarly affirmed having received and read the Kingate Global Info Memo.  The Kingate Global Info Memo provided essentially the same information as the Fairfield Sentry PPM, including that Kingate Global's investments in U.S. securities would be custodied in New York by the same New York investment adviser using the same SSC Strategy.

**The Hapoalim Defendants Submitted to U.S. Law and Jurisdiction In Connection With Their Fairfield Sentry Investments.**

10.     The Hapoalim Defendants' subscription agreements also expressly provided that their investments would be subject to U.S. laws and to jurisdiction in the U.S. courts.

11.     In each of their signed subscription agreements with Fairfield Sentry, the Hapoalim Defendants agreed that: (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," and they "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding"; and (ii) the subscription agreements "shall be governed and enforced in accordance with New York law . . . ."

3

**The Hapoalim Defendants Purposefully and Repeatedly Utilized U.S. Bank Accounts to Transfer Funds.**

12.     The Hapoalim Defendants specifically directed the BLMIS Feeder Funds to deposit the Transfers at issue into their U.S. bank accounts.

13.     During the relevant period, the Hapoalim Defendants received at least 55 redemption payments totaling approximately $30,593,612 out of the BLMIS Feeder Funds (which is inclusive of the newly discovered transfers), and New York was the specific situs repeatedly selected by the Hapoalim Defendants for receiving their redemptions.  Specifically, Hapoalim B.M. used a bank account at its own New York branch in order to receive such payments from Fairfield Sentry, which account was in Hapoalim B.M.'s own name, and (ii) Hapoalim Switzerland used a U.S. correspondent account at Chase Manhattan Bank in New York in order to receive such payments from Fairfield Sentry and Kingate Global (the "Chase U.S. Account").

14.     Hapoalim B.M. and Hapoalim Switzerland designated such use of their respective U.S.-based accounts in their Fairfield Sentry subscription agreements and/or redemption documents.

15.     Although the Trustee does not have access to documentation showing Hapoalim Switzerland's designations for Kingate Global, upon information and belief, based on the redemption payment instructions it gave to Fairfield Sentry, Hapoalim Switzerland similarly designated the Chase U.S. Account for receiving redemption payments from Kingate Global.

16.     By investing in the BLMIS Feeder Funds, the Hapoalim Defendants also directed funds to New York-based BLMIS through U.S. bank accounts.  Fairfield Sentry's form subscription agreements required that the Hapoalim Defendants send their subscription payments to a U.S. correspondent bank account, and Kingate Global's form subscription agreements

4

similarly required that the Hapoalim Defendants send their subscription payments to a U.S.

correspondent bank account, for deposit in such funds' bank accounts. From these bank

accounts, the moneys were then ultimately deposited into BLMIS's account at JPMorgan Chase

Bank NA in New York.

**Significant Elements of the Hapoalim Defendants' BLMIS-Related Business Were
Conducted Out of Their U.S. Operations, Including Due Diligence.**

17.    Significant elements of the Hapoalim Defendants' BLMIS-related business were

conducted out of their U.S. operations, including due diligence.

18.    Hapoalim B.M. is the parent company of other "Bank Hapoalim" entities,

including Hapoalim Switzerland. Hapoalim B.M. does or has done business in the United States

through its branches in New York City, Miami, and Chicago, each of which conducted

significant elements of the Hapoalim Defendants' BLMIS-related business activities.

**A.  Miami**

19.    The Miami branch was regulated, and subject to regulatory enforcement, by both

U.S. state and federal financial agencies. Specifically, the Miami branch was regulated by the

Florida Department of Financial Services. The Miami branch was also involved in a formal

United States regulatory enforcement procedure that resulted in a Written Agreement with the

Federal Reserve of New York, the Federal Reserve of Atlanta, and the Office of Financial

Regulation of the State of Florida, whereby Hapoalim B.M. was required to be in compliance

with U.S. law.

20.    The Miami branch was particularly involved in the Hapoalim Defendants'

investments with BLMIS through another BLMIS feeder fund, Primeo Select Fund ("Primeo"),

which also invested substantially all of its assets with BLMIS. Although the Trustee's

Complaint does not at this time seek to recover subsequent transfers received from Primeo, the

5

Miami branch's activities with respect to Primeo were applicable to all of the Hapoalim

Defendants' BLMIS Feeder Fund investments, as such feeder funds were all interchangeable

vehicles for investing in BLMIS.

21.    The Miami branch performed due diligence on BLMIS in connection with

Primeo.  The Miami branch did this work in conjunction with Hapoalim Securities USA, Inc.

("Hapoalim Securities"), a Delaware corporation with a principal place of business in New York,

and a wholly-owned subsidiary of Hapoalim B.M.  Hapoalim Securities is an SEC-registered

broker-dealer and a member of the New York Stock Exchange and the National Association of

Securities Dealers.

22.    In connection with these activities, employees of the Miami branch met and

corresponded regularly with employees of Pioneer Investment Management, a U.S.-based

Delaware corporation ("Pioneer"), which itself marketed and distributed Primeo.  These

meetings and discussions involved, among other things, providing the Miami employees with

various due diligence and analyses on BLMIS feeder funds and the expectation that such funds

would invest in U.S. securities.

23.    Consistent with its prominent role with respect to the Hapoalim Defendants'

BLMIS Feeder Fund investments, the Miami branch also received and communicated warnings

it received about BLMIS.  For example, in or around October 2008, Eddie Sarnow, First Vice

President of the Miami branch, corresponded with Pioneer's Paul Brito as to a warning that the

Hapoalim Defendants had received regarding their investments in Primeo and his concerns

regarding the same.  Sarnow told Brito that: "The comment(s) made was (were): 'Be careful with

it.'"  Shortly after Sarnow received this warning, the Hapoalim Defendants redeemed at least

$2.2 million from Primeo.

6

24.     The Miami branch's role with respect to BLMIS feeder funds also included the marketing and distribution of Primeo.  To this end, employees of the Miami branch met and corresponded with Pioneer personnel as to the entry by a wholly-owned subsidiary of Hapoalim B.M. into a distribution agreement, whereby such Hapoalim entity would receive fees on any moneys invested by the Hapoalim Defendants in Primeo.  The distribution agreement authorized the Miami branch to market and distribute Primeo.

### B.  New York

25.     As set forth in Hapoalim B.M.'s 2009 Annual Statement, "[m]ost of the Bank Group's international corporate activity is conducted" through the New York branch.  The New York branch operates under the trade name "BHI USA," is a member of the Federal Deposit Insurance Corporation (FDIC), and is licensed as a foreign banking organization by the New York Department of Financial Services.

26.     The New York branch is a full-service depository bank, and is the bank where Hapoalim B.M. specifically instructed Fairfield Sentry to send redemption payments in connection with its BLMIS-related investments.

### C.  Chicago

27.     The Chicago branch participated as a lender in a credit facility which was secured by a direct investment advisory business account at BLMIS belonging to the borrower, Minnetonka Moccasin Company, based in Minneapolis, Minnesota, and Dorado Investment Co. (the "Dorado Credit Facility").

28.     In connection with its participation in the Dorado Credit Facility, Hapoalim B.M. corresponded directly with BLMIS in New York and received copies of Dorado Investment Co.'s ("Dorado") BLMIS account statements at the Hapoalim B.M. branch in New York.  For

7

example, Hapoalim B.M.'s internal audit department requested and received at a Bank Hapoalim

address in New York, a "detailed statement of holdings and valuations as of June 30, 2002" for

Minnetonka Moccasin Company Inc.'s BLMIS account number 1-D0026-3.

29.    Upon information and belief, by virtue of its participation in the Dorado Credit

Facility, Hapoalim B.M. regularly received reports about BLMIS at its address in New York.

**Fairfield Sentry's Principal Place of Business Was in New York.**

30.    At all relevant times, Fairfield Sentry's principal place of business was in New

York, where its creator/manager/operator was headquartered, and it was a U.S. resident.

### A.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

31.    In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the

Fairfield Greenwich Group ("FGG") based in New York City.  FGG created, managed, and

marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

32.    The FGG *de facto* partnership included: individual persons; U.S. corporations;

foreign corporations; and investment vehicles created, managed, operated, and marketed from

FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS

feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich

Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited

("Sigma") and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received

subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S.

dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

33.    FGG also included a number of administrative entities that purportedly provided

management and backoffice support to the funds.  These entities included: Fairfield Greenwich

Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield

8

Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc.

("Fairfield International Managers").

### B.    Fairfield Sentry

34.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized

Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

35.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From

its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

36.    Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

1.    **Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States.**

37.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.  In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

38.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

39.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

> **2.      FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities.**

40.      As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

> **3.      FGG New York Personnel Managed Fairfield Sentry.**

41.      At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities. Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

York.

42.    FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and

redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription

agreements contained New York choice of law provisions, and provided for venue and

jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS.

43.    Fairfield Sentry's subscription agreements also incorporated its PPMs by

reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or

later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its

assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an

SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4)

through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S.

Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were

"essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager.

44.    Although FGG attempted to hide its manager, BLMIS served as the investment

manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality

made all of Fairfield Sentry's investment decisions.

45.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's

Littlestone Associates, which was a money management firm also located in New York City.

Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG

clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG

Limited FG.  FG Limited was formed under the laws of Ireland.

46.    While FG Limited was formed under foreign law, it reported its principal place of

business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters.  Upon the formation

of FG Limited, Fairfield International Managers assigned all of its management contracts with

Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry

Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even

13

though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

47.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

48.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

49.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

50.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

51.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

52.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as

Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

53.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS

accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other

fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a

number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

The seedling funds were operated and organized by FGG New York Personnel.  Many of the

seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

54.    The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

**The Kingate Global Transfers are Domestic.**

55.     Kingate Global was a Feeder Fund that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the account prior to December 11, 2008.

56.     Kingate Global filed a customer claim in the SIPA liquidation.

**A.   Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation**

57.     Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

58.     Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

59.     Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

60.     Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Global's investments with BLMIS.

61.     Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

16

**B.  The Operative Legal Documents Were New York-Based.**

62.    Kingate Global executed Customer Agreements, and other account opening

documents, and delivered the agreements to BLMIS in New York.

63.    Each Customer Agreement expressly states that it is governed by U.S. law and all

of the transactions in the Customer's Account are subject to the provisions of the Securities

Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the

Federal Reserve System, and the Commodities Futures Trading Commission.

64.    Kingate Global agreed that all disputes arising under the Customer Agreements

with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted

in the United States before the American Arbitration Association, or "an arbitration facility

provided by any other exchange of which the broker is a member, or the National Association of

Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the

rules obtaining of the selected organization."

**C.  BLMIS Had Full Authority to Make and Execute Investment Decisions.**

65.    Kingate Global's Trading Authorization Agreements authorized BLMIS to be the

Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate

Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

66.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the

Kingate Global's investment manager and purported to invest exclusively according to Madoff's

SSC Strategy, which involved the purchase of U.S. securities traded only on domestic

exchanges.

67.    BLMIS acted as Kingate Global's executing broker in purporting to purchase

securities on Kingate Global's behalf, and acted as the Kingate Global's custodian for the

securities purportedly held on Kingate Global's behalf.

17

**D.  Kingate Global Was Managed From New York.**

68.     During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

69.     Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

70.     Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

71.     Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

72.     KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

73.     KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

74.     KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

75.     Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

18

76.     FIM (USA) was the hub for FIM's Feeder Fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

77.     KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E.  Kingate Global Used Banks in New York.**

78.     Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan.

79.     KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

80.     In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

81.     FIM also directed fee payments to be routed through a bank account in New York.

82.     The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: June 26, 2015          By: /s/ Thomas L. Long
      New York, New York          Baker & Hostetler LLP
                                   45 Rockefeller Plaza
                                   New York, New York  10111
                                   Telephone: (212) 589-4200
                                   Facsimile: (212) 589-4201
                                   David J. Sheehan
                                   Thomas L. Long
                                   Matthew D. Feil
                                   Hannah C. Choate

                                   *Attorneys for Irving H. Picard, Trustee for the
                                   Substantively Consolidated SIPA Liquidation of
                                   Bernard L. Madoff Investment Securities LLC
                                   and the Estate of Bernard L. Madoff*