**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Thomas L. Long
Deborah H. Renner
Robertson D. Beckerlegge
Jonathan A. Forman

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>          Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>          Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>          Plaintiff,<br><br>v.<br><br>STANDARD CHARTERED FINANCIAL SERVICES (LUXEMBOURG) S.A., as represented by its liquidator Hanspeter Krämer, f/k/a AMERICAN EXPRESS FINANCIAL SERVICES (LUXEMBOURG) S.A. and f/k/a AMERICAN EXPRESS BANK | Adv. Pro. No. 12-01565 (SMB)<br><br>**THE TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO STANDARD CHARTERED FINANCIAL SERVICES (LUXEMBOURG) S.A.** |

(LUXEMBOURG) S.A.,

STANDARD CHARTERED BANK
INTERNATIONAL (AMERICAS) LTD., f/k/a
AMERICAN EXPRESS BANK
INTERNATIONAL, and

STANDARD CHARTERED
INTERNATIONAL (USA) LTD., f/k/a
AMERICAN EXPRESS BANK LTD.,

Defendants.

Pursuant to the Court's December 10, 2014 Scheduling Order as amended, the Trustee

respectfully submits the following Proffered Allegations pertaining to the Extraterritoriality Issue

as to Defendant Standard Chartered Financial Services (Luxembourg) S.A. ("SCFS"), formerly

known as American Express Financial Services (Luxembourg) S.A. ("AEFS") and before that,

known as American Express Bank (Luxembourg) S.A. ("AEBL").

## I.    INTRODUCTION

1.      From December 11, 2002 through December 11, 2008, SCFS received at least

$343,673,105 in subsequent transfers of customer property (the "Transfers") that originated from

Bernard L. Madoff Investment Securities LLC ("BLMIS") from the following funds:

$274,029,164 from Fairfield Sentry Limited ("Fairfield Sentry"); $15,169,706 from Fairfield

Sigma Limited ("Fairfield Sigma"); and $54,474,235 from Kingate Global Fund Ltd. ("Kingate

Global," and together with Fairfield Sentry and Fairfield Sigma, referred to herein as the

"BLMIS Feeder Funds").

2.      The Defendants created and sold investment products based on the BLMIS Feeder

Funds.

2

3.     The Transfers at issue here were part and parcel of the Defendants' BLMIS-related business centered in Standard Chartered's New York office, located at 1095 Avenue of the Americas.

4.     From this office, Defendant Standard Chartered International (USA) Ltd. ("SC New York"), formerly known as American Express Bank Ltd. ("AEB New York"), directed SCFS and Defendant Standard Chartered Bank International (Americas) Ltd. ("SC Miami"), formerly known as American Express Bank International ("AEB Miami"), with respect to BLMIS Feeder Fund investments.

5.     SC New York, SC Miami, and SCFS acted jointly with respect to the BLMIS Feeder Fund investments, each assuming complementary and coordinated roles.

6.     The Defendants' BLMIS-related transactions were centered in, and controlled by, SC New York.  The Defendants' decision to invest in the BLMIS Feeder Funds was driven by Joseph Hardiman, who worked in Standard Chartered's New York office.  The Defendants' due diligence of BLMIS and the BLMIS Feeder Funds was directed by high level New York personnel, including Gordon Townsend.  And Robert Friedman, also in New York, was the "gatekeeper" for the Defendants' investment decisions, including the decision to invest in the BLMIS Feeder Funds.  All three continuously reviewed the performance and ongoing due diligence of such investments.

7.     Meanwhile, SC Miami actively sold the Defendants' BLMIS Feeder Fund investment products.

8.     SCFS merely provided back-office administrative services, as directed by SC New York.  SCFS had no decision-making authority whatsoever.

## II.    THE PARTIES RELEVANT TO THE TRANSFERS AND TRANSACTIONS

9.     The Defendants are affiliated subsidiaries of Standard Chartered PLC.

10.    On February 29, 2008, Standard Chartered PLC acquired AEFS, AEB New York, and AEB Miami, assumed their liabilities, and continued their business operations with respect to the BLMIS Feeder Funds.

11.    SC New York, formerly known as AEB New York, is an Agreement Corporation under the Federal Reserve Act.  SC New York is a wholly-owned subsidiary of Standard Chartered Bank, which is a wholly-owned subsidiary of Standard Chartered Holdings Ltd., which in turn is a wholly-owned subsidiary of Standard Chartered PLC.  During the relevant time period, the principal place of business of SC New York (and AEB New York) was its office located at 1095 Avenue of the Americas, New York, New York 10036.

12.    SC Miami, formerly known as AEB Miami, is an Edge Act corporation organized under the laws of the United States of America.  SC Miami is a wholly-owned subsidiary of Standard Chartered Bank, which is a wholly-owned subsidiary of Standard Chartered Holdings Ltd., which is a wholly-owned subsidiary of Standard Chartered PLC.  During the relevant time period, the principal place of business for SC Miami (and AEB Miami) was its office located at 1111 Brickell Avenue, Miami, Florida 33131.  Prior to its acquisition by Standard Chartered PLC, AEB Miami was a wholly-owned subsidiary of AEB New York.

13.    SCFS, formerly known as AEFS and before that, AEBL, is a *société anonyme* incorporated and organized under the laws of the Grand Duchy of Luxembourg.  SCFS is an indirect wholly-owned subsidiary of Standard Chartered PLC.  AEFS, and AEBL before it, were both indirect wholly-owned subsidiaries of AEB New York prior to Standard Chartered PLC's acquisition of AEFS.  SCFS is currently in liquidation under the laws of the Grand Duchy of Luxembourg and is represented by its liquidator, Mr. Hanspeter Krämer, located at 30 Rue Schrobilgen, L-2526 Luxembourg.

4

14.     SC New York, SC Miami, and their parent corporations are currently defendants in numerous proceedings currently pending in a multidistrict litigation in the U.S. District Court for the Southern District of New York brought by their clients who invested in Fairfield Sentry through the Defendants based on the Defendants' recommendations.

15.     Fairfield Sentry and Fairfield Sigma were marketed, managed, and controlled by a *de facto* partnership in New York commonly referred to as the Fairfield Greenwich Group ("FGG").  Fairfield Sentry was a U.S. Dollar-based fund, and Fairfield Sigma was a currency fund, accepting subscriptions in Euros, converting them to U.S. Dollars, and investing 100% of its assets in Fairfield Sentry.

16.     Kingate Global invested exclusively with BLMIS in New York, and was marketed, managed, and controlled by various entities in New York.

## III. THE TRANSFERS AND COMPONENT EVENTS OF DEFENDANTS' BLMIS-RELATED INVESTMENT TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

### A.     SC New York Managed the Defendants' BLMIS Feeder Fund Investments

17.     SC New York operated a full-service private banking platform (the "Private Bank"), which offered investment advisory services to high net worth clients around the world. The Defendants actively sold BLMIS-related investment products and received the Transfers through the operation of the Private Bank.

18.     Despite the global expanse of the Defendants' BLMIS-related operations, SC New York centrally managed the Private Bank.  SC New York executives made the decisions regarding the Private Bank's BLMIS Feeder Fund investments and served on inter-office groups and committees responsible for the approval, due diligence, and oversight of all aspects of the Private Bank's investment products, and had the authority to request the Transfers.

19.    The minutes of meetings of these committees do not reflect employees in Standard Chartered's Luxembourg office attending such meetings or the Luxembourg office's hosting such meetings.

20.    At all relevant times, the management and oversight of the Private Bank's BLMIS Feeder Fund investments flowed through, and were directed from, Standard Chartered's New York office.

### 1.    The Global Investment Group

21.    Standard Chartered's Global Investment Group was one of the groups primarily responsible for due diligence of the Private Bank's investment products, including the BLMIS Feeder Fund investments.

22.    In particular, the Global Investment Group monitored and measured the risk of the Private Bank's investment products.  As part of this function, the Global Investment Group reviewed monthly reports discussing internal controls and risk management processes to ensure that all the day-to-day duties concerning active risk management of these investments were being carried out by the underlying investment advisers and custodians, such as BLMIS.

23.    The Global Investment Group also performed frequent compliance and risk management checks to ensure that the Private Bank's investments complied with all relevant objectives, limitations, and other restrictions as outlined in prospectuses, such as the BLMIS Feeder Funds' private placement memoranda or information memoranda ("PPM").

24.    Robert Friedman, an Executive Director working in Standard Chartered's New York office, was Head of the Global Investment Group during the relevant time period. Friedman was responsible for integrating the Private Bank's global investment product offerings and organizing their world-wide investment staff into a cohesive team.  Friedman was identified as the "Utility Head" in the Global Investment Group's memorandum to the Client Investment

Committee (described below) recommending Fairfield Sentry for investment. Friedman was referred to as the "N.Y. gatekeeper" who was "the decision maker for their merged private banking org [sic] for 'all products'" both before and after Standard Chartered PLC acquired the Defendants on February 29, 2008.

25. Joseph Hardiman, a Managing Director working in Standard Chartered's New York office, served as Chief Operating Officer of the Global Investment Group during the relevant time period. Hardiman was central to the launch and ongoing management of the Private Bank's hedge fund business by, among other things, establishing and implementing compliance models to monitor the Private Bank's investment products, including Fairfield Sentry. Hardiman was identified as the "Sponsor" of the Private Bank's investment in Fairfield Sentry in the Global Investment Group's memorandum to the Client Investment Committee recommending that investment.

26. Gordon Townsend, a Senior Director working in Standard Chartered's New York office, served on the Global Investment Group during the relevant time period. Townsend was instrumental to the build-out of the Private Bank's Luxembourg fund platforms by, among other things, conducting due diligence on fund-of-fund investment products, including Fairfield Sentry.

27. These New York-based senior managers directed, managed, and oversaw the Private Bank's investments with the BLMIS Feeder Funds both before and after Standard Chartered PLC's acquisition of the Defendants on February 29, 2008.

## 2. The Client Investment Committee

28. The Client Investment Committee was responsible for reviewing and approving the Private Bank's investment products, including the BLMIS Feeder Funds. The Global Investment Group formally reported to the Client Investment Committee on the Global

7

Investment Group's supervision of investment products and ongoing due diligence findings,

including with respect to administration and custody of the BLMIS Feeder Funds.

29.     The Client Investment Committee met quarterly and was comprised in part of

certain members of the Global Investment Group, including those working in Standard

Chartered's New York office.

### 3.    The Product Approval Committee

30.     Like the Client Investment Committee, the Defendants' Product Approval

Committee vetted investment products that the Private Bank created and sold to its clients,

including one that contained a significant allocation of Fairfield Sentry.

31.     Also, like the Client Investment Committee, the Product Approval Committee

was comprised in part of senior managers working in Standard Chartered's New York office who

were also members of the Global Investment Group.

### 4.    SC New York's Risk Management Committee

32.     The Client Investment Committee and the Product Approval Committee in turn

formally reported to SC New York's Risk Management Committee.

33.     All questions or issues posed about the BLMIS Feeder Funds, Madoff, or BLMIS

were processed through the Global Investment Group to the Client Investment Committee or the

Product Approval Committee and ultimately directed to SC New York's Risk Management

Committee.

34.     This reporting structure remained in place before and after Standard Chartered

PLC's acquisition of the Defendants on February 29, 2008.

**B.**      **SC New York Directed SC Miami's Sales Operations and SCFS's Administration Operations**

35.      SC New York approved the sale of Fairfield Sentry through the Private Bank in 2003.  Under the direction of SC New York, various affiliated offices around the world, including SC Miami, began selling Fairfield Sentry to the Private Bank's clients.

36.      Consistent with this structure, in March 2004, Hardiman instructed FGG that the Private Bank "will manage any allocation [of Fairfield Sentry] from our NY office."

37.      SC Miami issued monthly statements to the Private Bank's clients listing the performance of the BLMIS Feeder Funds and investment products comprised of BLMIS Feeder Fund shares.

38.      Because the BLMIS Feeder Funds were restricted by design to non-U.S. taxpayers, SC New York and SC Miami were unable to invest directly in those funds.

39.      To qualify for investment in the BLMIS Feeder Funds, SC New York routed the Private Bank's investments through SCFS, which provided administrative services and purchased shares under the name "FS/AEB Lux."  The Defendants then "sold" the shares to clients, but maintained the ownership of the BLMIS Feeder Fund shares in SCFS's name.

40.      Upon information and belief, investing through SCFS in Luxembourg also offered the Defendants tax advantages.

41.      SCFS's mere nominal status is further evidenced by the Defendants' actions with the implementation of the Gramm-Leach-Bliley Act ("GLBA").  To comply with GLBA, the Defendants formed a wholly owned U.S. regulated broker dealer, StanChart Securities, and began transferring the customer investment accounts "owning" BLMIS Feeder Fund shares to it.

## IV.    KEY ASPECTS OF THE TRANSFERS WERE DOMESTIC

42.     In addition to the BLMIS related business being run out of New York, other economic realities and legal underpinnings of the Transfers show they were domestic in nature. Among other things, the Transfers:  (i) were made pursuant to subscription and distribution agreements with the BLMIS Feeder Funds that were domestic in nature; (ii) were made through bank accounts located in New York as directed by SC New York; (iii) were made in connection with regular communications with employees of the BLMIS Feeder Funds in New York; and (iv) related to the Private Bank's investments through the BLMIS Feeder Funds with BLMIS in New York.

### A.    <u>The Transfers Were Made Pursuant to Subscription and Distribution Agreements with the BLMIS Feeder Funds that Were Domestic in Nature</u>

43.     The Defendants entered into subscription and distribution agreements with the BLMIS Feeder Funds that governed the Transfers.  The express terms of these agreements reflect the domestic nature of the transactions that resulted in the Transfers.

### 1.    <u>The BLMIS Feeder Fund Subscription Agreements Were Domestic in Nature</u>

44.     SCFS entered into subscription agreements with Fairfield Sentry as directed by SC New York.

45.     By executing subscription agreements with Fairfield Sentry, SCFS agreed that its investments "shall be governed and enforced in accordance with the laws of New York."

46.     The Fairfield Sentry subscription agreements also contained express provisions that SCFS "agree[d] that any suit, action or proceeding … with respect to this Agreement and [Fairfield Sentry] may be brought in New York" and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

47.    In its subscription agreements with Fairfield Sentry, SCFS directed Fairfield

Sentry to send redemption payments (*i.e.*, the Transfers) through a New York bank account at

The Bank of New York on SCFS's behalf.

48.    The Fairfield Sentry subscription agreements required that all subscription

payments from SCFS be made in U.S. Dollars through an HSBC Bank USA account in New

York.

49.    At least one Fairfield Sentry subscription agreement indicated that SCFS's

investments in Fairfield Sentry were associated with an FGG partner working in FGG's New

York office.

50.    SCFS acknowledged in the Fairfield Sentry subscription agreements that it

received and reviewed a copy of Fairfield Sentry's PPM, which described how, among other

things:  (i) BLMIS, a registered broker-dealer in New York, would make "[a]ll investment

decisions" with regard to Fairfield Sentry, would execute the split strike conversion strategy

("SSC Strategy") trades for Fairfield Sentry through the purchase and sale of U.S. equities, U.S.

options, and U.S. Treasuries traded on U.S. exchanges ("U.S. Securities"), and would have

custody of at least 95 percent of Fairfield Sentry's assets; (ii) the services of BLMIS "are

essential to the continued operations of [Fairfield Sentry];" (iii) Fairfield Sentry's initial

investment manager was Fairfield Greenwich Limited, an FGG company whose principal place

of business was FGG's office in New York; (iv) Fairfield Sentry retained U.S. counsel in New

York; and (v) Fairfield Sentry required subscribers, like SCFS, to be in compliance with the rules

and regulations of the U.S. Department of the Treasury's Office of Foreign Assets Control

("OFAC").

11

51.    SCFS entered into subscription agreements with Fairfield Sigma that were nearly identical to the Fairfield Sentry subscription agreements.  In particular, pursuant to the Fairfield Sigma subscription agreements, SCFS agreed its investments would be governed by New York law, submitted to the jurisdiction of the courts of the State of New York, and acknowledged that it received and reviewed a copy of Fairfield Sigma's PPM.

52.    The Defendants in fact received Fairfield Sigma's PPM, which described how, among other things:  (i) Fairfield Sigma invested exclusively in Fairfield Sentry, receiving investments in Euros and converting them to U.S. Dollars to invest in Fairfield Sentry, with a small currency hedge; (ii) Fairfield Greenwich Limited in New York was Fairfield Sigma's initial investment manager; (iii) Fairfield Sigma retained U.S. counsel in New York; and (iv) Fairfield Sigma required subscribers, like the Defendants, to be in compliance with the rules and regulations of OFAC.

53.    Upon information and belief, the Defendants entered into a subscription agreement with Kingate Global.

54.    Like the Fairfield Sentry and Fairfield Sigma subscription agreements, Kingate Global's subscription agreement required subscriptions in U.S. Dollars and subscribers to be in compliance with OFAC rules and regulations.

55.    Kingate Global's subscription agreement also required that subscribers acknowledge receiving and reviewing Kingate Global's PPM.

56.    Kingate Global's PPM disclosed that Kingate Global's "investment advisor is a New York based NASD registered broker-dealer employs approximately 350 people and acting primarily as a market-maker in listed and unlisted stocks (the 'Investment Advisor'). . . . The

Investment Advisor utilizes a 'split strike conversion' strategy."  The Defendants understood this "New York based NASD registered broker-dealer" to be BLMIS.

57.     Kingate Global's PPM also described how, among other things:  (i) "[Kingate Management Limited] delegated all investment management duties with regard to the USD Shares to the Investment Advisor [BLMIS]" and how "[n]either [Kingate Management Limited] nor USD Shareholders have any control over the investment and trading decisions of the Investment Advisor"; (ii) the "Investment Advisor" (BLMIS) would execute the SSC Strategy trades for Kingate Global through the purchase and sale of U.S. Securities, and would have custody over Kingate Global's assets in New York; (iii) Kingate Global retained U.S. counsel in New York; and (iv) all subscription payments were required to be made in U.S. Dollars through an HSBC Bank USA account in Newark, Delaware.

### 2.      The Defendants' Related Distribution Agreements With the Fairfield Funds Were Domestic in Nature

58.     SC New York and SC Miami negotiated and entered into agreements with Fairfield Greenwich Limited in New York pursuant to which the Defendants received a percentage of management fees paid to FGG entities by the Fairfield Funds for the Private Bank's investments.  These agreements were governed by the laws of the State of New York and were addressed to Standard Chartered's New York office.

59.     Consistent with the distribution agreement, SC Miami was identified as SCFS's agent on performance and management fee reports prepared by Fairfield Sentry's administrator, which detailed the fees SC Miami received for the Private Bank's investments.

**B.** **The Defendants Used New York Bank Accounts in Connection with the Investment Transactions Underlying the Transfers**

60.     Directing the operation of the Private Bank, SC New York deliberately chose to, and did, receive all or virtually all of its redemption payments from Fairfield Sentry and Kingate Global (*i.e.* Transfers) through a correspondent bank account in New York.

61.     Specifically, in the subscription agreement with Fairfield Sentry, SCFS specifically designated and instructed that redemption payments be made in U.S. Dollars through a New York correspondent account at The Bank of New York.  Defendants also utilized this same account to receive Transfers from Kingate Global.

62.     Each Transfer was deposited by Fairfield Sentry or Kingate Global into an account at The Bank of New York in New York, where the Transfer was cleared.  The Defendants utilized this correspondent bank account repeatedly—at least 174 times over a five-year period—to receive $328,503,399 in Transfers from Fairfield Sentry and Kingate Global.

63.     Similarly, Fairfield Sentry and Kingate Global both required that subscription payments be made in U.S. Dollars to bank accounts at HSBC Bank USA, N.A.  From Fairfield Sentry's and Kingate Global's bank accounts, the funds were deposited in BLMIS's account at JPMorgan Chase Bank BA in New York.  Pursuant to the Fairfield Sentry and Kingate Global subscription agreements, SC New York directed approximately $649,988,571 to these bank accounts through at least 236 subscription payments from 2003 to 2008.

**C.** **The Transfers Were Made in Connection with Regular Communications in New York**

64.     SC New York and SC Miami regularly communicated with the BLMIS Feeder Funds in connection with the Private Bank's investments through frequent emails and phone calls with FGG partners in New York and repeated meetings in New York to conduct initial and ongoing due diligence.

14

65.     Because SC New York understood that BLMIS in New York acted as the

investment adviser, executing broker, and custodian for each BLMIS Feeder Fund, its findings

relating to the initial and ongoing due diligence of Fairfield Sentry were relevant to its decisions

to invest in, and request Transfers from, Fairfield Sigma and Kingate Global.

66.     SC Miami communicated with Kingate Global to facilitate the Private Bank's

investments.

67.     Upon information and belief, SC New York conducted similar initial and ongoing

due diligence of Kingate Global as it did for Fairfield Sentry.

**1.      SC New York's Initial Due Diligence of the BLMIS Feeder Funds
Was Centered in New York**

68.     In connection with its investments with Fairfield Sentry, SC New York conducted

"[a] full due diligence review" of Fairfield Sentry, including review and approval by the Global

Investment Group,  the Product Approval Committee, the Client Investment Committee, and the

Defendants' General Counsel's Office in New York.

69.     In conducting the initial due diligence, the Global Investment Group, among other

things:

- Requested, obtained, and reviewed information on Fairfield Sentry
  from FGG in New York, including, but not limited to, a due diligence
  questionnaire and a PPM, dated October 1, 2002;

- Communicated regularly with FGG in New York regarding Fairfield
  Sentry, Madoff, and BLMIS, including emails, phone calls, and
  meeting with FGG partners in New York to discuss Fairfield Sentry,
  Madoff, and BLMIS;

- Prepared reports outlining SC New York's initial due diligence
  findings and recommendations that (i) the Product Approval
  Committee approve the creation and sale of a fund-of-fund investment
  product that included a significant allocation of Fairfield Sentry, and
  (ii) the Client Investment Committee approve selling Fairfield Sentry
  directly to the Private Bank's clients; and

15

- Instructed Standard Chartered's General Counsel's office in New York
  to conduct a legal check on Fairfield Sentry, which it did.

70.    As a result of this initial due diligence, in a December 2002 memorandum to the

Client Investment Committee, the Global Investment Group indicated that, during a meeting in

New York, the Private Bank determined that Fairfield Sentry would attract substantial sales due

to investor demand.

71.    Then, at its January 2003 meeting, which was attended by Friedman and

Hardiman, the Product Approval Committee approved the creation and sale of the fund-of-fund

investment product that included a 25% allocation of Fairfield Sentry.

72.    At its October 2003 meeting, which was attended by Friedman, Hardiman, and

Townsend, the Client Investment Committee approved the Private Bank's selling of Fairfield

Sentry directly to Private Bank clients.

### 2.    SC New York's Ongoing Due Diligence of the BLMIS Feeder Funds Was Centered in New York

73.    SC New York, including the Global Investment Group, the Client Investment

Committee,  the legal and compliance departments in New York, and SC New York's Risk

Management Committee, conducted ongoing due diligence on Fairfield Sentry, Madoff, and

BLMIS.

74.    Pursuant to this ongoing due diligence, SC New York performed its own analyses

of Fairfield Sentry information, including comparing the returns of Fairfield Sentry to the returns

of the S&P 100 Index  and comparing Fairfield Sentry to "peer groups" and "replicating

benchmarks" to track "performance attribution" as developed by the Global Investment Group

and Standard Chartered's legal and compliance departments in New York.

75.    SC New York personnel Friedman, Hardiman, and Townsend even met with Madoff and two partners from FGG's New York office at BLMIS's office in New York in April 2008.

76.    As a further part of this due diligence in connection with its investment transaction with the Fairfield Funds, the Global Investment Group focused its efforts on BLMIS and the Fairfield Funds in New York, and among other things:

- Communicated regularly with FGG in New York regarding Fairfield Sentry, Madoff, and BLMIS, including frequent emails and phone calls and periodic meetings in New York to discuss, among other things, "Madoff [q]uestions" and FGG's "risk oversight process" and "onsite operational due diligence;"

- Reviewed due diligence questionnaires, tear sheets, marketing materials, monthly strategy reviews, semi-annual updates, and annual reports, and other materials issued by FGG's New York office on the performance of Fairfield Sentry, which described, among other things, how each portion of the SSC Strategy (*i.e.*, U.S. stock basket, U.S. options, U.S. Treasury Bills) purportedly contributed to Fairfield Sentry's overall returns;

- Reviewed Fairfield Sentry's "full portfolio and trade activity" for November 2004 "in detail[]" in FGG's New York office  and Fairfield Sentry's portfolios detailing the positions held within the split-strike conversion strategy at June 30, 2004 (when BLMIS purportedly was invested in U.S. Treasury Bills) and April 30, 2004 (when BLMIS purportedly was invested in a collared U.S. stock basket) with its own "compliance experts;"

- Entered into a non-disclosure agreement with FGG in or around January 2007 to receive access to the BLMIS account statements and trade confirmations for Fairfield Sentry, which reflected additional impossible and suspicious trading;

- Reviewed "aggregated risk reports" detailing, among other things, how Fairfield Sentry would perform in certain historic market situations (*e.g.*, "Black Monday," "Gulf War 1," "Asian Crisis," and "Sept 11th") received from FGG's New York office pursuant to this non-disclosure agreement; and

- Assessed whether Fairfield Sentry conformed with its investment guidelines as outlined in its PPM.

77.    Information relating to Fairfield Sentry was also communicated routinely to the Client Investment Committee, which reviewed the performance of, and risks associated with, Fairfield Sentry, at each of its quarterly meetings.  Friedman, Hardiman, and Townsend attended these meetings.

78.    SC Miami also relayed questions it received from clients regarding Fairfield Sentry, Madoff, and BLMIS to members of the Client Investment Committee.

79.    SC New York and SC Miami routinely passed along these questions to FGG's New York office and obtained responses and additional information from FGG's New York office.

**D.**    **The Transfers Related to the Private Bank's Purposeful Investments with BLMIS in New York**

80.    The Transfers related to the Private Bank's purposeful investment in the BLMIS Feeder Funds.  The investments were designed to profit from BLMIS in New York, a purpose sponsored by Hardiman in New York under Friedman's leadership in New York.

81.    Based on SC New York's due diligence, the Defendants knew:

- The BLMIS Feeder Funds were almost entirely invested with BLMIS in New York;

- BLMIS was the *de facto* investment adviser, executing broker, and custodian of the BLMIS Feeder Fund investments;

- Madoff in New York controlled the BLMIS Feeder Funds' investments and purported to execute the SSC Strategy—involving the purchase and sale of U.S. Securities—on behalf of the BLMIS Feeder Funds;

- BLMIS was regulated as a broker-dealer by the SEC and the National Association of Securities Dealers; and

- BLMIS was a member of SIPC such that, in the event of a BLMIS insolvency, SIPC could "appoint a trustee other than SIPC for the liquidation," as is the case here, and thus the Defendants' investments were protected under U.S. law.

82.     As alleged above, during the process of conducting due diligence on the BLMIS Feeder Funds, Friedman, Hardiman, and Townsend met with Madoff and two FGG partners at BLMIS's offices in New York.

83.     But for BLMIS in New York and the specific structure of such investments designed by SC New York, SCFS would not have received the Transfers from the BLMIS Feeder Funds.

## V.     THE DEFENDANTS RECEIVED THE TRANSFERS FROM BLMIS FEEDER FUNDS WHOSE OPERATIONS WERE BASED IN NEW YORK

### A.     The Fairfield Funds' Principal Place of Business Was in New York

#### 1.     The Genesis of the Fairfield Greenwich Group De Facto Partnership

84.     In 1988, Walter Noel and Jeffrey Tucker founded a de facto partnership called the Fairfield Greenwich Group (previously defined as "FGG") based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

85.     The FGG de facto partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P.—as well as a so-called currency fund, Fairfield Sigma.  Fairfield Sigma received subscriptions in Euros, converted the Euros to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

86.     FGG also included a number of administrative entities that purportedly provided management and back-office support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield

Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc.

("Fairfield International Managers").

### 2.    Fairfield Sentry

87.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized

Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax-free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

88.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From

its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

89.    Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

a.    **Fairfield Sentry's Agreements With BLMIS Confirm Fairfield
Sentry's Principal Place of Business Was in the United States**

90.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069.  In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

91.    After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

FGG's New York headquarters—executed additional BLMIS account documents on behalf of

Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and

Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on

these BLMIS account documents as FGG's New York headquarters.

92.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts

are governed by New York law and all disputes arising under the agreements must be resolved

by mandatory arbitration in New York utilizing the laws of New York.  All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of

1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve

System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf

of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor

Protection Corporation ("SIPC") member regulated by the SEC.

### b.    FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities

93.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with

Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

back-office administrative services such as coordinating subscription and redemption forms,

maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco

Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield

Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets

were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian

agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco

Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco

entities.

### c.    FGG New York Personnel Managed Fairfield Sentry

94.    At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities. Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

York.

95.    FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and

redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription

agreements contained New York choice of law provisions, and provided for venue and

jurisdiction for any disputes in New York.

### d.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

96.    As alleged above, Fairfield Sentry's subscription agreements also incorporated its

PPMs by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The

original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of

95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by

BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy;

and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term

U.S. Treasurys.  Fairfield Sentry's PPMs also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e.    BLMIS Was Fairfield Sentry's Investment Manager

97.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

98.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

99.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited.  Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even

24

though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

100.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

101.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the Fairfield Funds to FG Bermuda.  FG Limited remained the placement agent for the same funds.

102.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

103.     Prior to 2006, while FG Bermuda purported to manage the Fairfield Funds'
investments, it did not register as an investment adviser under the Investment Advisers Act of
1940.

104.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its
relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect
further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment
Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to
file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,
executed and submitted.

105.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not
FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required
Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as
Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

106.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS
accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other
fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a
number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.
The seedling funds were operated and organized by FGG New York Personnel.  Many of the
seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

107.     At all relevant times, Fairfield Sentry's principal place of business was in New
York and Fairfield Sentry was a U.S. resident.

### 3.     Fairfield Sigma

108.     FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription
and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield

Sentry using Euros, FGG created Fairfield Sigma.  Fairfield Sigma accepted subscriptions in

Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.

When paying redemptions, Fairfield Sigma redeemed Fairfield Sentry shares, converted the U.S.

Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Fairfield

Sigma investors.

109.    Noel and Tucker organized Fairfield Sigma on November 20, 1990 as an

international business company under the BVI International Business Companies Act.  Just as

Fairfield Sentry was statutorily restricted from doing business with any other BVI residents

except for other entities organized under the BVI International Business Companies Act, so was

Fairfield Sigma.  Fairfield Sigma is currently in liquidation in proceedings in the BVI and United

States.

110.    Also like Fairfield Sentry, Fairfield Sigma was a shell corporation present in the

BVI only on paper.  It had no employees and maintained no offices.  Fairfield Sigma listed its

registered BVI address as the same BVI post office box care of a local trust company it shared

with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm

operating the trust company and the registered post office box addressed its statements for

services for Fairfield Sigma to FGG's New York headquarters.  Fairfield Sigma was operated

almost entirely by FGG New York Personnel.

111.    As with Fairfield Sentry, and as part of the FGG de facto partnership, FGG New

York Personnel made the operational decisions regarding Fairfield Sigma.  Once Fairfield Sigma

was opened for investors, FGG New York Personnel monitored Fairfield Sigma's investments

into, and redemptions from, Fairfield Sentry; managed Fairfield Sigma's and relationships with

clients and potential clients; created marketing and performance materials for Fairfield Sigma;

marketed Fairfield Sigma; performed administrative functions required by Fairfield Sigma;

negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield

Sigma; and conducted various other due diligence and risk management activities.  Until

Fairfield Sigma's liquidation, FGG maintained Fairfield Sigma's books and records in New

York.  FGG New York Personnel also had final control of Fairfield Sigma's banking accounts,

including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the

Bank of Montreal.

> 112.    FGG New York Personnel controlled and approved the subscriptions for and

redemptions of Fairfield Sigma shares.  Like Fairfield Sentry's subscription agreements,

Fairfield Sigma's subscription agreements contained a New York choice of law provision,

provided for venue and jurisdiction for any disputes in New York, and incorporated its PPM that

described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were

Fairfield Sigma's sole assets.  Fairfield Sigma's PPMs made substantially similar disclosures as

Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based

investments, and BLMIS's role in the investments.  Additionally, Fairfield Sigma's October

2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there

was "always the risk" that BLMIS could misappropriate the assets or securities.  This same risk

was also disclosed in Fairfield Sentry's PPMs.

> 113.    Noel and Tucker were the original directors of Fairfield Sigma and, like Fairfield

Sentry, contracted with Citco Fund Services to provide Fairfield Sigma with back-office

administrative services such as coordinating subscription and redemption forms, maintaining

Know Your Customer information, and serving as the independent party verifying the Net Asset

Value of the Fairfield Sigma shares.  Noel and Tucker also contracted Citco Custody to serve as

the custodian of the Fairfield Sigma assets.  As a further part of the Citco relationship, Noel and

Tucker opened bank accounts on behalf of Fairfield Sigma at Citco Bank Dublin.  FGG New

York Personnel had final control of the Fairfield Sigma's Citco Bank Dublin bank accounts.

Finally, FGG New York Personnel controlled all of Fairfield Sigma's relationships with the

Citco entities.

114.    In addition to the Citco Bank Dublin accounts, in order to convert Fairfield Sigma

investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS.

Noel executed separate contracts on Fairfield Sigma's behalf with the Bank of Montreal for

currency swaps which were "governed by and construed in accordance with the laws of the State

of New York (without reference to choice of law doctrine)."

115.    FGG New York Personnel initially listed FG Limited as the investment manager

for Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the

Fairfield Sigma PPMs to indicate FG Bermuda was Fairfield Sigma's Investment Manager.  In

fact there were no duties for any investment manager because Fairfield Sigma's sole purpose was

to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield

Sentry using U.S. Dollars.

116.    At all relevant times, Fairfield Sigma had its principal place of business in New

York and resided in the United States.

117.    The Trustee incorporates by reference the allegations of the Second Amended

Complaint filed in *Picard v. Fairfield Inv. Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (proffered

June 26, 2015, Bankr. S.D.N.Y., contemporaneously with the Extraterritoriality Briefing).

**B.      The Defendants Received Their Transfers From Kingate Global Whose Operations Were Substantially Domestic**

118.    Kingate Global was a feeder fund that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the accounts prior to December 11, 2008.

119.    Kingate Global filed a customer claim in the SIPA liquidation.

**1.      Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation**

120.    Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

121.    Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

122.    Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

123.    Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage Kingate Global's investments with BLMIS.

124.    Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

**2.    The Operative Legal Documents Were New York-Based**

125.    Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

126.    Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

127.    Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

**3.    BLMIS Had Full Authority to Make and Execute Investment Decisions**

128.    Kingate Global's Trading Authorization Agreements authorized BLMIS to be Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

129.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as Kingate Global's investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

130.    BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### 4.    Kingate Global Was Managed From New York

131.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

132.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

133.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

134.    Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

135.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

136.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

137.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

138.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

139.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

140.    KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

### 5.    Kingate Global Used Banks in New York

141.    Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

142.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

143.    In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

144.    FIM also directed fee payments to be routed through a bank account in New York.

145.    The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: June 26, 2015
     New York, New York

/s/ David J. Sheehan

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Thomas L. Long
Deborah H. Renner
Robertson D. Beckerlegge
Jonathan A. Forman

**Baker & Hostetler LLP**
Capital Square
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone:  (614) 228-1541
Facsimile:  (614) 462-2616
Alan deVries

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*