**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　Plaintiff-Applicant,<br><br>　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NATIXIS, NATIXIS CORPORATE & INVESTMENT BANK (f/k/a IXIS CORPORATE & INVESTMENT BANK), NATIXIS FINANCIAL PRODUCTS, INC., BLOOM ASSET HOLDINGS FUND, and TENSYR LIMITED,<br><br>　　　　　Defendants. | Adv. Pro. No. 10-05353 (SMB) |

**TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN
OPPOSITION TO THE MOTION TO DISMISS BASED ON
EXTRATERRITORIALITY FILED BY NATIXIS S.A., BLOOM
ASSET HOLDINGS FUND, AND TENSYR LIMITED, AND IN
<u>FURTHER SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND</u>**

The Trustee[1] respectfully submits this memorandum as a supplement to his Main Brief opposing defendants Natixis S.A.'s ("Natixis"),[2] Bloom Asset Holdings Fund's ("Bloom"), and Tensyr Ltd.'s ("Tensyr") (together, the "Defendants") motions to dismiss based on extraterritoriality and in further support of the Trustee's motion for leave to amend his complaint. As set forth below, the Proffered Allegations plead specific facts evidencing the subsequent transfers the Defendants received are predominantly domestic under the standard set forth in the Extraterritoriality Decision,[3] such that the Trustee's action does not require an extraterritorial application of SIPA or Bankruptcy Code § 550. The Defendants' motions to dismiss should be denied and the Trustee should be permitted to amend his complaint.

**I.    PRELIMINARY STATEMENT**

The District Court returned this action to this Court to determine whether the Trustee's claims against the Defendants seeks the recovery of "purely foreign" transfers, requiring an extraterritorial application of Bankruptcy Code § 550. Under the Extraterritoriality Decision, the Trustee must only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[4] In making this determination, this Court must review "the location of the transfers as well as the component events of those transactions."[5] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[6] There is no bright-line test to determine

---

[1] The Trustee filed Proffered Allegations as to the Domestic Nature of Transfers to Natixis S.A., Bloom Asset Holdings Fund, and Tensyr Ltd. ("Proffered Allegations" or "Proffer") contemporaneously with this Supplemental Memorandum of Law.

[2] The Trustee's action seeks recovery of transfers received by Natixis its own capacity and as successor-in-interest to IXIS Corporate & Investment Bank ("IXIS CIB").

[3] *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 232-33 (S.D.N.Y. 2014) (the "Extraterritoriality Decision").

[4] *Id.* at 232, n.4.

[5] *Id.* at 227 (quoting *Maxwell Commc'n Corp. v. Socitete General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1985) ("*Maxwell I*")).

[6] *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp. 2d 372, 403-05 (S.D.N.Y. 2010).

1

whether a transaction is extraterritorial.[7]

The Trustee's Proffer alleges the Defendants received approximately $567 million in subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry"), Groupement Financier Limited ("Groupement"), Alpha Prime Fund Limited ("Alpha Prime"), and Harley International (Cayman) Limited ("Harley") (together, the "BLMIS Feeder Funds"), all investment funds that invested all or virtually all of their assets with BLMIS in New York. Proffer at ¶ 1. Specifically, the Trustee alleges that (1) Fairfield Sentry withdrew funds from its BLMIS accounts and transferred approximately $197 million of those funds to Natixis and approximately $31 million of those funds to Tensyr, *id.* ¶ 68; Groupement withdrew funds from its BLMIS account and transferred approximately $191 million of those funds to Bloom, *id.*; Alpha Prime withdrew funds from its BLMIS account and transferred approximately $18 million of those funds to Bloom, *id.*; and; Harley withdrew funds from its BLMIS account and transferred approximately $131 million of those funds to Bloom. *Id.*

Natixis FP, though a defendant in this action and part of the underlying transactions at issue, has not challenged the domesticity of the transfers the Trustee seeks to recover because it is a Delaware company. The Defendants argue simplistically that the only fact that matters from an extraterritoriality perspective, is where a corporate entity is formally organized. Thus, they argue that because the moving Defendants were organized abroad—France (Natixis), Ireland (Bloom), and Jersey (Tensyr), and because the BLMIS Feeder Funds were formally organized under the law of the Territory of the British Virgin Islands ("BVI") (Fairfield Sentry and Groupement), Bermuda (Alpha Prime), and the Channel Islands (Harley), they are entitled to a

---

[7] *See Parkcentral Global Hub Ltd. v. Porsche Automobil Holding SE*, 763 F.3d 198, 217 (2d Cir. 2014) ("We do not purport to proffer a test that will reliably determine when a particular invocation. . . will be deemed appropriately domestic or impermissibly extraterritorial. We believe courts must carefully make their way with careful attention to the facts of each case and to combinations of facts that have proved determinative in prior cases, so as eventually to develop a reasonable and consistent governing body of law on this elusive question.");

2

finding that the transfers they received are "purely foreign" and must be dismissed under the Extraterritoriality Decision. They are wrong and accepting this analysis would permit some corporate affiliates to escape judicial scrutiny in the United States, while other corporate affiliates would be subjected to scrutiny for the same acts—an argument that highlights the Defendants' faulty reasoning. It is the "component events" of the transactions underlying the transfers that matter, not the place of incorporation alone. A review of the operative facts demonstrates the predominantly domestic nature of the transfers and transactions at issue. The Defendants' motion must be denied.

## II.   OPERATIVE FACTS

The Defendants' superficial analysis ignores the significant domestic component events of the transactions at issue, including that: (1) Defendants invested in the BLMIS Feeder Funds with the intent to profit from New York-based BLMIS; (2) Defendants intentionally centered their relationship with the BLMIS Feeder Funds in New York; (3) Defendants utilized U.S. bank accounts to receive subsequent transfers of BLMIS customer property, and (4) Defendants received the transfers from Groupement, Harley, and Fairfield Sentry, each of which maintained its principal place of business in New York.

### A.   BLOOM AND TENSYR ARE SUBSTANTIALLY DOMESTIC

Bloom and Tensyr were managed and controlled from New York. *Id.* ¶¶ 23-28. Their nominal formation in foreign jurisdictions is insufficient to overcome the predominantly domestic components that form the basis for the Trustee's action.

#### 1.   Bloom was Operated, Managed, and Controlled by Natixis FP, a Delaware Company, from its New York Headquarters

While ultimately owned by Defendant Natixis S.A., Defendant Bloom served as a mere instrumentality of non-moving defendant Natixis FP, an admittedly domestic company

3

incorporated in Delaware with a principal place of business in New York, and an SEC-registered broker-dealer. *Id.* ¶ 11. Natixis FP utilized and controlled Bloom to facilitate investments and carry out its investments in, and subsequent redemptions from, Groupement, Alpha Prime, and Harley. *Id.* ¶ 17. Natixis FP operated as Natixis's U.S. structured products arm. *Id.* ¶ 10. As a New York resident and incorporated in Delaware, Natixis FP is a domestic transferee.

It is clear why Natixis FP did not move to dismiss based on extraterritoriality, and because Natixis FP controlled Bloom in all respects relevant to the transactions and transfers, this Court can also reasonably infer Bloom was sufficiently domestic for purposes of the transfers and transactions at issue in the Trustee's complaint. *Id.* ¶¶ 17-24.

But for its relationship with Natixis FP, Bloom would not have received the at-issue subsequent transfers of BLMIS customer property. Natixis FP bore responsibility for all losses—and stood to profit from all gains—stemming from Bloom's BLMIS Feeder Fund investments. *Id.* ¶ 21. All of Bloom's actions were controlled by Natixis FP, for Natixis FP's benefit, and from Natixis FP's New York office, including decision-making related to the transfers. *Id.* ¶¶ 17-21. Eric Raiten, a Natixis FP managing director and head of the firm's U.S. structured products group, operated from Natixis FP's New York offices and was directly involved with the transfers Bloom received. *Id.* ¶ 11. Raiten was also a director at Bloom and was its Financial Industry Regulatory Authority registered representative of record. *Id.* Natixis FP executives also represented to the BLMIS Feeder Funds that Bloom and Natixis FP were one in the same. *Id.* ¶ 22. As such, Bloom's principal place of business for the transactions at issue is Natixis FP's New York office.

Because the Trustee specifically alleges that Natixis FP controlled Bloom in all respects relevant to the transactions and transfers this Court must reasonably infer Bloom was

4

"sufficiently domestic" for purposes of the transfers and transactions at issue in the complaint.

### 2. Tensyr was Created & Controlled by a U.S. Partnership in New York

Defendant Tensyr is a structured investment fund incorporated in Jersey. *Id.* ¶ 7. At all relevant times, however, Tensyr maintained no employees and no office there. *Id.* ¶ 27. As a shell entity, New York-based FGG and Defendant Natixis were responsible for Tensyr's concept, creation, documentation, rating, formation, and management. *Id.* ¶ 25.

FGG's New York representatives communicated directly with Madoff in New York to get his explicit approval to create Tensyr as a collateralized fund obligation that invested all of its assets in Fairfield Sentry and, in turn, BLMIS. *Id.* ¶¶ 29-30.

As a shell, Natixis and FGG assigned all of Tensyr's functions and duties to third parties, primarily New York-based FGG with limited assistance from Natixis. *Id.* ¶ 27. On behalf of Tensyr, FGG's New York office prepared marketing materials, solicited investments, and made the ultimate decisions regarding subscriptions into and redemptions from Fairfield Sentry. *Id.* ¶ 28.

### B. THE UNITED STATES WAS CENTRAL TO THE DEFENDANTS' INVESTMENTS

At all times, the Defendants knew the BLMIS Feeder Funds were almost entirely invested with New York-based BLMIS. *Id.* ¶ 35. By investing in at least five BLMIS Feeder Funds, the Defendants intentionally tried to profit from BLMIS's operations in New York, and more specifically, from Madoff's U.S.-based "split strike strategy" for U.S. stock market investment. *Id.* ¶ 44. Each Defendant—whether directly or through its agents or affiliates—conducted due diligence on BLMIS and the BLMIS Feeder Funds in New York. *Id.* ¶¶ 70, 85, 91, 111, 117.

Through their due diligence efforts—and pursuant to the terms of private placement

5

memoranda ("PPMs") they received and subscription agreements they executed when investing in the BLMIS Feeder Funds—the Defendants knew, among other things, the following facts:

- BLMIS was a New York, SEC-registered broker-dealer, *id.* ¶ 46;

- BLMIS was each BLMIS Feeder Fund's investment advisor and had full investment discretion over assets placed with it, *id.* ¶ 86;

- BLMIS maintained custody of all BLMIS Feeder Funds' moneys placed with it, *id.* ¶ 47;

- BLMIS purported to execute all trades in U.S. securities, *id.* ¶ 44;

- various U.S. laws, federal agencies, and quasi-governmental entities operated to govern BLMIS, *id.* ¶¶ 49-56; and

- the Defendants were subject to New York law, jurisdiction, and venue. *Id.* ¶¶ 57-60.

The Defendants understood each BLMIS Feeder Fund was, at base, identical because they each invested virtually all their assets with BLMIS. *Id.* ¶ 62. The Defendants invested in the BLMIS Feeder Funds *because* their money would ultimately be placed with BLMIS, and in turn, Madoff would invest their assets in U.S. securities traded on U.S. exchanges. *Id.* ¶ 43.

### C. THE TRANSFERS ARE PREDOMINANTLY DOMESTIC

#### 1. Bloom's Transfers Are Predominantly Domestic

The Trustee's recovery of subsequent transfers Bloom received is not barred by the Extraterritoriality Decision because the transactions' "component events" were centered in the United States. Common to all Bloom's BLMIS Feeder Fund investments is Natixis FP, an admittedly domestic company that controlled and orchestrated all these investments, including the related redemptions and subsequent transfers at issue here. *Id.* ¶¶ 17-24.

##### a. Bloom's Groupement Transfers Are Predominantly Domestic

Bloom's transactions with Groupement were centered in the U.S. On behalf of Bloom, Natixis FP managed the relationship with Groupement's manager, Access International Advisors, LLC ("Access"), a domestic entity registered to do business in New York, and

6

operated from its Manhattan office. *Id.* ¶ 71. Natixis FP attended due diligence meetings there to review information related to Bloom's Groupement investment. *Id.* ¶ 72.

Natixis FP entered into independent transactions with Groupement's levered sub-fund that led to Bloom's receipt of certain transfers. *Id.* ¶ 72, 80. These deals contained both New York choice of law and venue provisions, provided New York addresses for notices to either parties, and indicated all payments would be made to and from New York bank accounts. *Id.* ¶¶ 73, 78-79, 83. To hedge Natixis FP's exposure to these transactions, Natixis FP directed Bloom to make investments in Groupement. *Id.* ¶ 79. Bloom sent subscription payments through a Connecticut UBS AG account and Bloom received redemptions from Groupement through a correspondent bank account in New York. *Id.* ¶ 80. Natixis FP and Groupement also entered into a letter agreement governing Bloom's subscriptions in Groupement that provided its investment was governed by New York law. Natixis FP also knew Groupement's customer agreement with BLMIS contained a New York choice of law provision. *Id.* ¶ 74.

### b. Bloom's Alpha Prime Transfers Are Predominantly Domestic

Bloom's transfers from Alpha Prime had significant U.S. ties. Natixis FP's affiliate IXIS Capital Markets' risk department in New York approved Bloom's Alpha Prime investment, *id.* ¶ 85, and Natixis FP handled all of the subscriptions in and redemptions from Alpha Prime. *Id.* ¶ 90. Natixis FP sent money from its New York Citibank account to one of two New York bank accounts Alpha Prime provided. *Id.* ¶¶ 89-90.

When Natixis FP representatives from New York signed the underlying agreement and confirmations connected to its Alpha Prime investment, Natixis FP directed all related notices to its West 57th Street office. *Id.* ¶ 84. New York law governed the underlying agreement and the parties submitted to New York jurisdiction. *Id.* ¶ 87.

7

### c. Bloom's Harley Transfers Are Predominantly Domestic

Natixis FP's and Bloom's relationship with Harley was centered in the U.S. Non-party affiliate IXIS Capital Markets' risk department in New York approved the investment in Harley. *Id.* ¶ 93. To subscribe in Harley, Natixis FP, through Bloom, directed payments to a New York account. *Id.* ¶ 96.

### 2. Natixis's and Tensyr's Fairfield Sentry Transfers Are Predominantly Domestic

Natixis's and Tensyr's relationship with Fairfield Sentry was centered in the United States. Natixis and Tensyr each invested in Fairfield Sentry, both executing subscription agreements that contained a New York choice of law and venue provision. *Id.* ¶¶ 108, 112.

### a. Tensyr's Fairfield Sentry Transfers Are Predominantly Domestic

Tensyr was created only after obtaining Madoff's explicit approval. *Id.* ¶ 29. After its creation, Tensyr was primarily marketed, operated, and managed by FGG in New York. *Id.* ¶ 32. In connection with its creation and ongoing operations, Tensyr retained multiple New York law firms to perform legal services. *Id.* ¶ 51.

Tensyr executed two sub-agreements, one by FGG's New York-based vice president and the other by an FGG co-founder. *Id.* ¶ 28. Tensyr identified Fairfield Greenwich Limited ("FG Limited")—which operated from its principal place of business in New York—as the only authorized entity "to give and receive instructions between [Fairfield Sentry] and [Tensyr]." Tensyr directed communications to FGG's New York office. *Id.* ¶ 105.

As compensation for serving as Tensyr's Leverage Manager, FGG and Natixis directed payments on Tensyr's behalf from through a Bank of New York account in New York ("BoNY Account") for deposit at FGL's New York bank account at JPMorgan Chase Bank N.A. ("JPMorgan"). *Id.* ¶ 106.

8

Tensyr executed subscription agreements in connection with its Fairfield Sentry investments that required all money from Tensyr be directed through the BoNY Account to a New York HSBC Bank USA, N.A. correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York. In connection with subscribing funds to Fairfield Sentry, Tensyr directed funds to the New York HSBC account. Tensyr directed redemptions from Fairfield Sentry through the BoNY Account. *Id.* ¶ 107.

### b. Natixis's Transactions with Fairfield Sentry Are Predominantly Domestic

Natixis and its New York subsidiaries conducted due diligence on its Fairfield Sentry investments and BLMIS in New York. *Id.* ¶¶ 116-18. Natixis wired all Fairfield Sentry subscription funds to and received redemptions from a New York correspondent account. *Id.* ¶ 113. Natixis directed all redemptions from Fairfield Sentry to a New York bank account, meaning it received the transfers in New York. *Id.* ¶ 114. Natixis's subscription agreement for Fairfield Sentry contained New York choice of law and venue provisions. *Id.* ¶ 112.

### D. THE BLMIS FEEDER FUNDS ARE SUBSTANTIALLY DOMESTIC

Although the BLMIS Feeder Funds were incorporated under the laws of foreign jurisdictions, they conducted business in the United States; they were, in fact, each created for the *sole* purpose of doing business in the United States. *Id.* ¶ 3. Their purpose and efforts included the management, approval, and facilitation of investments in Madoff's Ponzi scheme in New York. *Id.* ¶¶ 125-27, 144, 148, 176-77. The BLMIS Feeder Funds were designed to do only one thing: attract investors to put their money into Madoff's IA Business located in New York. *Id.* ¶ 3.

9

### 1. Fairfield Sentry's Domestic Nature

Fairfield Sentry was principally operated in New York by FGG. *Id.* ¶ 25. In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG, a New York-based *de facto* partnership. *Id.* ¶ 119. As part of FGG, Noel and Tucker organized the largest BLMIS feeder fund, Fairfield Sentry. *Id.* ¶ 8. All Fairfield Sentry subscription agreements included New York choice of law and venue provisions. *Id.* ¶ 130. At all relevant times, FGG New York headquarters performed all Fairfield Sentry's functions and made all decisions, strategic and tactical, executive and administrative. *Id.* ¶ 28.

### 2. Groupement's Domestic Nature

Access International Advisors LLC ("AIA") and AIA Inc. comprised Access's New York office, which served as the headquarters for Access's operations. *Id.* ¶ 71. Access created Groupement and opened its BLMIS account. *Id.* ¶¶ 71, 74. The BLMIS account opening documents included a New York choice of law clause. *Id.* ¶ 74. All management and custodial authority was effectively delegated to BLMIS. *Id.* ¶ 146. Groupement had no employees or independent office space, it was created for the sole purpose of investing with BLMIS in New York. *Id.* ¶¶ 71, 144-45.

### 3. Alpha Prime's Domestic Nature

Alpha Prime's directors traveled regularly to New York to market Alpha Prime and to meet with Madoff and BLMIS executives. *Id.* ¶¶ 152-53. Alpha Prime's directors created at least five BLMIS feeder funds, all with the sole purpose of placing funds with BLMIS in New York. *Id.* ¶¶ 148-51. An Alpha Prime director filed a customer claim in these proceedings, affirmatively seeking relief under U.S. law for losses she purported to suffer from her BLMIS investments. *Id.* ¶ 158. Alpha Prime filed a customer claim seeking to recover funds from the estate. *Id.*

### 4. Harley's Domestic Nature

Harley had no offices or employees of its own; it operated by and through Fix Asset Management New York. *Id.* ¶ 177. Fix Asset Management New York was located in New York and operated and managed by New York residents. *Id.* ¶¶ 176-82. Harley used New York bank accounts to made transfers germane to this action. *Id.* ¶¶ 186-87. This Court filed a summary judgment order against Harley and held that "Harley specifically sought out the United States as a place to do business when it opened an account with BLMIS," and that the transfers received by Harley "arose out of business transactions tied to Harley's securities account with BLMIS in New York." *Id.* ¶ 164.

### III. MAXWELL ANALYSIS

#### A. THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE PREDOMINANTLY DOMESTIC

Under the Extraterritoriality Decision, this Court must consider the transfers at issue and the relevant component events of the transaction, as set forth in *Maxwell I*, which include: (i) the debtor's location; (ii) the defendant's location; (iii) where the defendant engaged in business regarding the transactions; (iv) the relevant transactions and agreements entered into by the parties; (v) where the parties relationship was centered at the relevant times; (vi) the law governing the parties' transactions; and (vii) how the transactions were concluded.[8]

#### 1. The Transfers Bloom Received Are Predominantly Domestic

Bloom's principal place of business was the United States. While formally organized as an Irish company, for purposes of the transactions and transfers at issue, Bloom's principal place of business was located in the United States at Natixis FP's New York headquarters.[9]

---

[8] Extraterritoriality Decision at 227 (quoting *Maxwell I*, 186 B.R. at 816-17).
[9] *See SEC v. Gruss*, No. 11 Civ. 2420, 2012 WL 3306166, at *3 (S.D.N.Y. Aug. 13, 2012) (finding that issues of fact existed regarding whether an offshore fund was "foreign" for purposes of extraterritoriality where complaint

11

Bloom engaged in business in New York regarding the transactions, and all relevant actions related to the transactions were in New York. Bloom was operated entirely out of New York. Bloom used Natixis FP's New York address as its own. *Id*. ¶ 79. A Natixis FP managing director in New York was the authorized signatory for all relevant documents. *Id*. Natixis FP in New York conducted all relevant due diligence there. *Id*. ¶ 24. Natixis FP's New York affiliate drafted due diligence memoranda in connection with Bloom's BLMIS Feeder Fund investments. *Id*. ¶¶ 72, 85-86.

The relevant transactions and agreements were centered in New York, where Natixis FP personnel approved, directed and controlled all subscriptions in and redemptions from the BLMIS Feeder Funds. *Id*. ¶ 13. Natixis FP personnel executed all relevant documents in New York. *Id*. ¶ 24.

The center of the parties' relationship was New York. The transfers occurred through New York bank accounts. *Id*. ¶¶ 79-80, 89-90, 96. Natixis FP made all investment and redemption decisions in New York, and Natixis FP—not Bloom—stood to profit or lose from Bloom's BLMIS Feeder Fund investments. *Id*. ¶ 21. Bloom's BLMIS Feeder Fund investments provided Natixis FP with access to BLMIS, who maintained custody of the funds' assets and purportedly invested them in U.S. securities on U.S. exchanges. *Id*. ¶¶ 44-47. Natixis FP personnel met with BLMIS Feeder Fund personnel in New York to conduct due diligence. *Id*. ¶ 72.

New York's law governed the underlying customer agreement between BLMIS and Groupement contained New York choice of law and venue provisions. *Id*. ¶ 74. New York law also governed the letter agreement between Natixis FP and Groupement. *Id*. ¶ 73.

---

alleged that operational and investment decisions for the offshore fund were made in New York, "such that for all intents and purposes, the [offshore fund] was based in New York").

12

Accordingly, the Trustee has alleged the Transfers received by Bloom are predominantly domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

## 2. The Transfers Tensyr Received Are Predominantly Domestic

Tensyr's principal place of business was FGG's New York headquarters, despite being formally organized as a Jersey company.

Tensyr engaged in business in New York regarding the transactions and virtually all the relevant activities related to the transactions took place in New York. Tensyr was operated almost entirely out of New York by FGG. *Id*. ¶ 25. Tensyr used FGG's New York address as its own, FGG and FG Limited in New York made all decisions regarding its Fairfield Sentry investments as well all other major matters, and FGG and Natixis also conducted due diligence on BLMIS in New York. *Id*. ¶ 28. Tensyr retained New York counsel in connection with its Fairfield Sentry investments. *Id*. ¶ 51. Tensyr was created only with the explicit approval of Madoff. *Id*. ¶ 29.

The relevant transactions and agreements were centered in New York where FGG personnel approved, directed and controlled all subscriptions in and redemptions from Fairfield Sentry. *Id*. ¶ 28. FGG personnel executed all relevant documents in New York. *Id*. ¶ 32.

Tensyr's relationship with FGG and Fairfield Sentry was centered in New York and the relevant transfers occurred through bank accounts and correspondent accounts in New York. *Id*. ¶¶ 106-07. FGG, the *de facto* New York partnership that created and controlled Fairfield Sentry, also created Tensyr with the sole purpose to invest leveraged funds back into Fairfield Sentry. *Id*. ¶ 25. FGG obtained direct approval from Madoff to form Tensyr. *Id*. ¶ 29. BLMIS maintained custody of, and purported to trade, Tensyr's assets in New York in U.S. securities on U.S. exchanges. *Id*. ¶ 47. FGG and Natixis personnel met with Fairfield Sentry personnel and Madoff himself in New York. *Id*. ¶ 29.

Pursuant to the terms of the Fairfield Sentry subscription agreements Tensyr executed, it agreed its investments in Fairfield Sentry would be governed by New York law, jurisdiction, and venue. *Id*. ¶ 105.

Accordingly, the Trustee has alleged the transfers received by Tensyr are predominantly domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

### 3. The Transfers Natixis Received Are Predominantly Domestic

Natixis's principal place of business is located in the France, where it is organized under the laws of that country. *Id*. ¶ 5. In connection with the transactions and transfers at issue, however, Natixis engaged in significant business in New York, including: visiting FGG's New York office; having its New York affiliate Natixis FP conduct due diligence on Fairfield Sentry and BLMIS from which they prepared and sent Natixis summary memoranda discussing the results of their investigations; and maintaining constant communications with its New York affiliates regarding BLMIS and Fairfield Sentry. *Id*. ¶¶ 111, 117-18.

The relevant transactions and agreements were centered in New York. Natixis guaranteed its New York subsidiaries' investments in the BLMIS Feeder Funds, including Fairfield Sentry, and submitted to New York jurisdiction under the guarantee agreement. *Id*. ¶ 59.

The center of the parties' relationship was New York and the transfers occurred through New York bank accounts and correspondent accounts. *Id*. ¶¶ 114-15. Natixis used a New York bank account to receive the subject transfers. *Id*. BLMIS, a New York broker-dealer, maintained custody of Natixis's assets there and purportedly traded Natixis's assets U.S. securities on U.S. exchanges. *Id*. ¶¶ 46-47. Natixis met with FGG personnel and Madoff himself in New York. *Id*. ¶ 29.

Pursuant to the terms of the Fairfield Sentry subscription agreements Natixis executed, it agreed its investments in Fairfield Sentry would be governed by New York law, jurisdiction, and

14

venue. *Id.* ¶ 112.

Accordingly, the Trustee has alleged the transfers received by Natixis are predominantly domestic and do not require an extraterritorial application of SIPA or the Bankruptcy Code.

### B. DEFENDANTS' PRIOR FILINGS CONCEDE APPLICABILITY OF U.S. LAW AND EVIDENCE U.S. CONNECTIONS

Finally, the Defendants previously argued in this case that Bankruptcy Code section 546(e)'s safe harbor should shield their Transfers from suit precisely because of their connection to the U.S. securities markets into which BLMIS purported to invest. This argument is inconsistent with the Defendants' current assertion that their transactions lack sufficient domestic connections for purposes of extraterritoriality. Defendants should not be allowed to have it both ways, taking advantage of U.S. law when it suits them and running from it when it does not.

### IV. CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, this Court should grant the Trustee's motion for leave to amend and deny Natixis's, Bloom's, and Tensyr's motion to dismiss.

[*Remainder of page intentionally left blank*]

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | */s/ Thomas L. Long*<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Email: dsheehan@bakerlaw.com<br>Thomas L. Long<br>Email: tlong@bakerlaw.com<br>Regina Griffin<br>Email: rgriffin@bakerlaw.com<br>Catherine E. Woltering<br>Email: cwoltering@bakerlaw.com<br>Jonathan D. Blattmachr<br>Email: jblattmachr@bakerlaw.com<br><br>*Attorneys for Irving H. Picard, Trustee*<br>*for the Substantively Consolidated SIPA*<br>*Liquidation of Bernard L. Madoff Investment*<br>*Securities LLC and the estate of Bernard L.*<br>*Madoff* |

16