**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

               Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | Adv. Pro. No. 10-05353 (SMB) |
| Plaintiff, | |
| v. | |
| NATIXIS, NATIXIS CORPORATE & INVESTMENT BANK (f/k/a IXIS CORPORATE & INVESTMENT BANK), NATIXIS FINANCIAL PRODUCTS, INC., BLOOM ASSET HOLDINGS FUND, and TENSYR LIMITED, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO NATIXIS S.A., BLOOM ASSET HOLDINGS FUND, AND TENSYR LIMITED** |
| Defendants. | |

The Trustee, by his undersigned counsel, for these Proffered Allegations as to the Domestic Nature of the Transfers ("Proffered Allegations" or "Proffer") against Natixis S.A. ("Natixis") (in its own capacity and as successor-in-interest to IXIS Corporate & Investment Bank ("IXIS CIB")), Bloom Asset Holdings Fund ("Bloom"), and Tensyr Ltd. ("Tensyr") (collectively the "Defendants") respectfully alleges the following:

1.    The Defendants, together with non-moving defendant Natixis Financial Products LLC (successor-in-interest to Natixis Financial Products Inc.) ("Natixis FP"), received approximately $567 million in subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry"), Groupement Financier Limited ("Groupement") and its levered sub-fund Groupement Financier Levered Limited ("Groupement Levered"), Alpha Prime Fund Limited ("Alpha Prime"), and Harley International (Cayman) Limited ("Harley" and collectively, the "BLMIS Feeder Funds").

2.    Non-moving defendant Natixis FP has not challenged the domesticity of any of the subsequent transfers the Trustee seeks to recover, including transfers it received from Groupement, Groupement Levered, Alpha Prime, or Harley.

3.    The BLMIS Feeder Funds were investment funds created for the purpose of investing all, or substantially all, of their assets with BLMIS to profit from the U.S. markets. In connection with the transfers the Trustee seeks to recover, the Defendants invested in the BLMIS Feeder Funds.  Defendant Natixis and non-moving defendant Natixis FP entered into swap transactions with third parties and promised those third parties leveraged returns on measured by the returns of the BLMIS Feeder Funds.  Defendant Tensyr was a collateral fund obligation ("CFO") that provided leveraged returns to its noteholders on Fairfield Sentry.

1

4.     The Defendants placed BLMIS at the center of its transactions with the BLMIS Feeder Funds and the transfers of BLMIS customer property the Defendants received were intrinsically tied to the United States.

## I.     RELEVANT PARTIES TO THE TRANSACTIONS AND TRANSFERS

5.     Defendant Natixis is a corporate and investment bank created in November 2006 through the merger of Natexis Banque Populaire and IXIS (Groupe Caisse d'Epargne).  Natixis was or is organized under the laws of France as *société anonyme à directoire et conseil de surveillance*.  Natixis is the parent company of an international network of financial institutions, service providers, and banks that maintained operations and offices in the United States through numerous subsidiary entities, including Defendants Natixis FP and Bloom.

6.     Defendant Natixis received approximately $197 million in subsequent transfers of BLMIS customer property from Fairfield Sentry.

7.     Defendant Tensyr was incorporated in the Bailiwick of Jersey of the Channel Islands, and operated as a CFO that purchased shares of Fairfield Sentry as collateral for Tensyr's issuance of structured notes whose returns were based on Fairfield Sentry's performance.

8.     Defendant Tensyr was created as a joint venture between Natixis and Fairfield Greenwich Group ("FGG"), a New York-based *de facto* partnership that created, operated, and controlled Fairfield Sentry, the largest BLMIS feeder fund.

9.     Defendant Tensyr received approximately $31 million in subsequent transfers of BLMIS customer property from Fairfield Sentry.

10.     Non-moving Defendant Natixis FP was incorporated in Delaware in 1997 and has its principal place of business in New York on West 57th Street.  Natixis FP is a wholly-owned subsidiary of New York-incorporated non-party Natixis Capital Markets Inc. ("Natixis Capital

Markets"), which in turn is a wholly-owned subsidiary of Defendant Natixis. Non-moving defendant Natixis FP operated as the structured products arm of non-party Natixis Capital Markets.

11.     Natixis FP is an affiliate of non-party Natixis North America, Inc. ("Natixis North America," and together with Natixis FP, "Natixis NY"), a registered U.S. broker-dealer incorporated in New York. Natixis FP and Natixis North America operate from the same principal place of business in New York, and share key employees, including Eric Raiten, a Natixis FP managing director and head of the firm's structured products group. Raiten operated from Natixis NY's offices and was directly involved in the transfers Defendant Bloom received from Harley, Alpha Prime, and Groupement. Raiten was also a director at Bloom and was its Financial Industry Regulatory Authority ("FINRA") registered representative of record.

12.     Non-party Natixis North America shared employees with non-moving Defendant Natixis FP and together, the two entities operated and controlled Defendant Bloom. Natixis North America was the investment adviser of record to Bloom.

13.     Defendant Bloom is an indirect subsidiary of Defendant Natixis and incorporated under the laws of Ireland. From its New York office, Natixis NY orchestrated, managed, administered, and directed all of Bloom's investments in and redemptions from the BLMIS Feeder Funds. Although Bloom was incorporated in Ireland, Bloom's relationship and transactions with the BLMIS Feeder Funds were made solely at the direction of, or by, key Natixis NY employees operating out of its New York headquarters.

14.     Defendant Bloom's corporate function was to act as a non-U.S. taxpayer on behalf of Natixis FP to invest in BLMIS Feeder Funds and other hedge funds that did not permit direct investments by U.S. taxpayers like Natixis FP. With respect to its investments in the

BLMIS Feeder Funds, Bloom functioned at the direction of Natixis FP, on Natixis FP's behalf, and for Natixis FP's benefit.

15.    Non-moving Defendant Natixis FP used defendant Bloom to facilitate its BLMIS Feeder Fund investments because those Funds prohibited investment by U.S. taxpayers. By using Bloom to make subscriptions and redemptions on its behalf, Natixis FP was able to invest in the BLMIS Feeder Funds in which it was otherwise prohibited from investing.

16.    Defendant Bloom received approximately $339 million in subsequent transfers of BLMIS customer property from Groupement, Harley, and Alpha Prime.

## II.    THE DEFENDANTS OPERATED IN THE UNITED STATES

### A.    <u>Bloom Was Operated by Natixis FP from its New York Headquarters</u>

17.    For purposes of its receipt of subsequent transfers of BLMIS customer property from Groupement, Groupement Levered, Alpha Prime, and Harley, Defendant Bloom was operated and controlled entirely by Natixis New York, made up of Natixis North America and Natixis FP, from its principal place of business in New York.

18.    As U.S. corporations that maintained their principal places of business in New York City, non-moving Defendant Natixis FP and non-party Natixis North America are both domestic.

19.    Natixis FP directed, authorized, and utilized Bloom to purchase BLMIS Feeder Fund shares as a proprietary hedge for the risk Natixis FP incurred as a result of leveraged transactions underlying Groupement, Alpha Prime, and Harley.

20.    Natixis North America detailed this arrangement in a February 2009 response letter to a FINRA inquiry (the "FINRA Response Letter"). In the FINRA Response Letter, Natixis North America described Natixis FP's use of Bloom to invest in certain BLMIS Feeder Funds, including Groupement, Alpha Prime, and Harley:

> [I]n cases where the terms of the Reference Securities [BLMIS Feeder Funds] permitted purchase by a U.S. person, Natixis FP acquired the Reference Securities for its own account. In cases where the terms of the Reference Securities did not permit purchases by U.S. persons, Natixis FP hedged its exposure via [Bloom].
>
> [Natixis North America], in its capacity as investment advisor of record to Bloom, directed the purchase of such Reference Securities for the account of Bloom so that . . . Natixis FP had effectively hedged on a portfolio basis its exposure to the Reference Securities . . . .

21.    Natixis North America reported Natixis FP was the sole beneficiary of any profit realized by Bloom's BLMIS Feeder Fund investments. Natixis FP also bore the entire risk of loss, not Bloom.

22.    Under this structure, Natixis FP often referred to itself and Bloom as the same entity. For example, in an April 2007 email to FGG, Natixis FP's vice president of structured products, Benedicte Rabier, represented Bloom and Natixis FP were one in the same.

23.    Natixis FP and/or Natixis NY were solely responsible for the management, operations, and investments Bloom made in the BLMIS Feeder Funds. The profits, losses, and risks associated with Defendant Bloom's investments in the BLMIS Feeder Funds resided with non-moving Defendant Natixis FP in New York.

24.    From its New York office, Natixis FP negotiated swap transactions where the BLMIS Feeder Funds served as the underlying reference assets, conducted due diligence in connection with Bloom's investments in the BLMIS Feeder Funds, executed the relevant documents, and managed Bloom's investments in the BLMIS Feeder Funds.

### B.    Tensyr Was Created, Operated, Managed, and Controlled by FGG from FGG's New York Headquarters

25.    Defendant Natixis and New York-based FGG established Defendant Tensyr as a joint venture, which was created as an entity entirely invested in FGG's Fairfield Sentry fund.

5

FGG and Natixis were solely responsible for the concept, creation, documentation, rating, formation, and general management of Tensyr. At all times following its formation, Tensyr was principally operated, controlled, and managed by FGG from its New York headquarters.

26.    Tensyr's *raison d'etre* as Fairfield Sentry's levered clone is highlighted by its name: "Tensyr" is simply an anagram for "Sentry."

27.    Although Tensyr was organized under the laws of Jersey, from its inception through Madoff's arrest, Tensyr was a shell corporation with no employees or offices in Jersey, or anywhere else. By design and in function, Tensyr delegated all its functions and duties to third parties, primarily to New York-based FGG, with other duties performed and assistance provided by Natixis and the Bank of New York.

28.    At all times relevant, Tensyr's management and operations were primarily based out of New York, with FGG personnel executing the corporate documents and directing Tensyr's day-to-day operations. These duties included:

- FGG made the decisions to subscribe to and redeem from Fairfield Sentry;

- Tensyr's "Leverage Manager" was Fairfield Greenwich Limited ("FG Limited"), an FGG-member entity registered to do business in the State of New York with a self-reported principal place of business at FGG's New York headquarters;

- Tensyr appointed FG Limited as its "Information Agent" whereby FG Limited agreed "to act as [Tensyr's] agent to carry out and perform the services, duties and obligations of [Tensyr]"as provided in the Information Agency Agreement executed by the parties;

- FG Limited, as Information Agent, had specific obligations related to Tensyr's ultimate investment with BLMIS in New York. Specifically, FG Limited was obligated to notify various parties "after learning of any adverse change with respect to the condition, financial or otherwise, of…BLM which could reasonably be expected to have a material adverse effect on the performance or liquidity of [Fairfield Sentry] Shares";

- FG Limited's vice president and chief legal officer, Mark McKeefry, executed one of Tensyr's two subscription agreements with Fairfield Sentry—the other was executed by FGG co-founder and president, Jeffrey Tucker; and

- The transfers to Tensyr were based on redemption requests placed by Mark McKeefry. On the redemption request form, Tensyr's address was listed as 919 Third Avenue in New York, New York, FGG's headquarters, just two blocks from BLMIS's headquarters at 885 Third Avenue.

29.     Prior to its formation, key FGG executives in New York requested Madoff's explicit approval to create Tensyr and they and Natixis personnel met with Madoff. They needed Madoff's approval because Tensyr was to be formed to explicitly invest leveraged funds with BLMIS, something Madoff generally avoided. FGG did not want to harm its long-standing relationship with Madoff by surreptitiously creating a leveraged fund: But for Madoff's direct authorization, Tensyr would not have been formed.

30.     Madoff finally granted FGG and Natixis approval in November 2006 to move forward. An email from FGG co-founder and partner Andres Piedrahita to his other FGG partners explained that "[a]fter months and hundreds of hours of work…lot[s] of sleepless nights…Uncle Bernie has given us the OK to go forward with the CFO [Tensyr]."

31.     In marketing materials, FGG advertised Tensyr as its own product. In November 2006, FGG prepared the "Tensyr Limited Collateralized Fund Obligation Preliminary Transaction Summary" identifying Tensyr as "Fairfield Greenwich Group's . . . first Collateralized Fund Obligation to be brought to market." In other marketing materials, Tensyr advertised FGG's presence in New York, identifying FG Limited as "Information Agent & Leverage Manager," and noting that "FGG entities are registered with the U.S. SEC as an investment adviser and broker dealer."

32.     New York was where, through FGG New York personnel, Tensyr executed and submitted its Fairfield Sentry subscription agreements, directed the associated investments, made its redemption decisions, and executed and submitted its redemption requests pursuant to which

it received subsequent transfers of BLMIS customer property. Tensyr's relationship with Fairfield Sentry and BLMIS was centered in and managed from New York.

33.     As a joint venture between Defendant Natixis and FGG, created with Madoff's explicit approval, and managed by FGG and FG Limited from their New York headquarters, Tensyr's principal place of business was New York.

## III.    DEFENDANTS KNEW BLMIS WAS AT THE CENTER OF ALL ITS TRANSACTIONS WITH THE BLMIS FEEDER FUNDS

34.     The Defendants had information advising them their investments with the BLMIS Feeder Funds would be centered in the United States.  Over the course of six years, the Defendants acquired and analyzed information regarding at least five BLMIS Feeder Funds.  The Defendants had varied, detailed, and specific sources of information, including due diligence memoranda, legal opinions, private placement memoranda and others, as detailed below.

35.     Through this information, the Defendants knew that the moneys they invested with the BLMIS Feeder Funds were sent to New York, with custody of those assets maintained in New York by BLMIS, an SEC-registered broker-dealer, and invested in U.S. assets trading in U.S. dollars on U.S. exchanges.

36.     The Defendants' purpose and intent in making their BLMIS Feeder Fund investments was to allocate assets in New York with BLMIS. Because Madoff took on few direct investors and the Defendants could not secure a direct account at BLMIS, they invested with the BLMIS Feeder Funds.  The BLMIS Feeder Funds gave the Defendants access to the asset manager they truly desired: Madoff at BLMIS in New York.

### A.    The Defendants Possessed Information Showing Their BLMIS Investments Were Centered in New York

37.     The Defendants received and reviewed the following documents in connection with their investment with BLMIS through the BLMIS Feeder Funds: (1) BLMIS's customer

account opening documents, monthly statements, and trade tickets for certain BLMIS Feeder Fund accounts; (2) BLMIS Feeder Fund marketing materials, offering memoranda, net asset valuations, annual financial statements, and due diligence responses; (3) legal opinions drafted by U.S. counsel regarding BLMIS; (4) internal due diligence and risk reports; (5) private placement memoranda from and regarding the respective BLMIS Feeder Funds; and (6) other third-party reports on BLMIS and the BLMIS Feeder Funds.

38.    From their review of these materials, the Defendants knew the significance of the following facts about the BLMIS Feeder Funds, Madoff, and BLMIS:

- Madoff operated BLMIS, which purported to execute Madoff's proprietary split-strike conversion strategy ("SSC Strategy") on behalf of the BLMIS Feeder Funds;

- virtually all moneys invested in the BLMIS Feeder Funds would be channeled to BLMIS in New York;

- BLMIS maintained custody and investment discretion over the BLMIS Feeder Funds' investments in New York;

- BLMIS functioned as the broker-dealer, purporting to execute the SSC Strategy from New York for the BLMIS Feeder Funds;

- BLMIS purported to invest the assets invested with the SSC Strategy in U.S. equities, U.S. options, and U.S. Treasury bills ("Treasurys");

- BLMIS purported to execute trades in these U.S. assets collectively for all the BLMIS Feeder Funds and then allocate the trades to each account pro rata;

- BLMIS and Madoff maintained ultimate control over the BLMIS Feeder Funds' investments in New York;

- BLMIS was an SEC-regulated entity, a Securities Investor Protection Corporation ("SIPC") member, and member of the National Association of Securities Dealers ("NASD");

- in the event of a BLMIS insolvency, Securities Investor Protection Act ("SIPA") and the Bankruptcy Code would control the disposition of BLMIS's assets; and

- the Defendants subjected themselves to New York law and would be subject to the jurisdiction of the courts of the State of New York and the Southern District of New York in a suit between themselves and certain of the BLMIS Feeder Funds.

39.     The Defendants knew and intended the United States to be at the center of their investments with BLMIS through the BLMIS Feeder Funds.

**B.      The Defendants' Purpose in Investing with the BLMIS Feeder Funds Was to Funnel Assets to BLMIS, a New York Broker-Dealer**

40.     The Defendants selected specific feeder funds based on secondary factors such as capacity for investment, management fees, or rebates, because the underlying investment strategy was the same for all five BLMIS Feeder Funds.  The Defendants understood the BLMIS Feeder Funds were identical in their reliance on BLMIS, Madoff's SSC Strategy, and that each of the feeder funds' BLMIS accounts were aggregated by BLMIS, traded as one, then the purported trades were allocated proportionally.

41.     Natixis FP's investment limit was for "Madoff" not Bloom's individual investments in Alpha Prime, Groupement, or Harley. For example, Natixis FP prepared approval memoranda seeking approval for its investments in Alpha Prime and Harley, each identifying the aggregated exposure to Madoff. For Alpha Prime, the approval memorandum indicated that "[t]his transaction, combined with Santa Clara [Harley], would give us $252.2mm exposure to Madoff, the manager, which complies with our $300mm limit.  The remaining cushion would be $47.8mm."  The corresponding approval memorandum for Harley, drafted contemporaneously with the Alpha Prime memorandum, similarly stated, "[t]his transaction, combined with FMG [Alpha Prime], would give us $252.2mm exposure to Madoff, the manager, which complies with our $300mm limit.  The remaining cushion would be $47.8mm."

42.     This shows that the Defendants viewed their Madoff investment in the aggregate, regardless of with which BLMIS Feeder Fund they invested their moneys.

43.     The Defendants invested in the BLMIS Feeder Funds because their money would ultimately be placed with BLMIS in New York.  BLMIS's involvement was so central to the

Defendants' BLMIS Feeder Fund investments that Natixis FP and Tensyr conditioned certain of their transactions with the BLMIS Feeder Funds on Madoff's explicit approval.

### C.    The Defendants Knew BLMIS Purported to Invest All Moneys in U.S. Securities Traded on U.S. Markets

44.    The Defendants understood that Madoff in New York—and not the feeder funds—decided which U.S. securities BLMIS purported to trade.   For example, Fairfield Sentry's 2006 Private Placement Memorandum ("PPM") represented that the SSC Strategy "is implemented by Bernard L. Madoff Investment Securities LLC ('BLM[IS]'). . . . BLM[IS] is authorized to determine the price and timing of stock and option transactions in the account."   It further disclosed that Madoff purported to invest exclusively in U.S. securities.   Groupement's manager, Access International Advisors, LLC ("Access"), distributed a General Presentation explaining that all its managers, understood to include BLMIS, would be "***based in the U.S.***, . . . located in the U.S., in such cities as New York . . . [and the] majority of assets are invested in U.S. securities within the U.S. markets (i.e. no currencies, no commodities)[.]"   (Emphasis in original.)   This memorandum further explained that its managers' "[u]nderlying assets should be US based, as ACCESS believes in the importance of the high levels of liquidity provided by the US markets").

45.    Knowing this, the Defendants chose to subscribe in the BLMIS Feeder Funds to benefit from Madoff's investments in U.S. securities traded on U.S. markets.

### D.    The Defendants Knew BLMIS Would Custody the Money They Invested with the BLMIS Feeder Funds

46.    The Defendants knew that money they invested in the BLMIS Feeder Funds would "be held in segregated accounts at BLM[IS], a U.S. registered broker-dealer and qualified custodian."

11

47.    The Defendants knew that BLMIS in New York having custody posed risks to their investments in the BLMIS Feeder Funds.  The 2006 Fairfield Sentry PPM explained: "When the Fund invests utilizing the [SSC Strategy] . . . it will not have custody of the assets so invested" and as a result, "there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund." Other BLMIS Feeder Fund offering memoranda made similar disclosures.

48.    The Defendants willingly ceded control of their assets to BLMIS in New York— and those assets would be at risk in New York—is further evidence of the subject transactions' domesticity.

**E.    The Defendants Knew U.S. Law Would Apply in the Event of a BLMIS Insolvency**

49.    The Defendants knew that SIPA and the Bankruptcy Code would operate to protect customer assets if BLMIS experienced an insolvency event.

50.    In connection with their investments in BLMIS Feeder Funds, the Defendants relied on a 300-plus page legal opinion prepared by KMZ Rosenman in New York, which served as legal counsel to Groupement's manager, Access.  The opinion, titled "Legal Review of the Bernard L. Madoff Investment Securities LLC Managed Account Program" (the "KMZ Madoff Memo"), identified BLMIS as a U.S. broker-dealer registered as a limited liability company with the State of New York.  The KMZ Madoff Memo also identified BLMIS as a member of SIPC and the NASD, noting BLMIS:

> is required to maintain insurance with the Securities Investor Protection Corporation…to protect customer assets.  SIPC insures investors against certain losses when a brokerage fails, or due to certain other reasons . . . .
>
> Customer-investors are provided protection against [BLMIS's] bankruptcy via Securities Investor Protection Corporation  . . .

insurance that guarantees recovery of a certain level of capital and
cash held in the account.

The KMZ Madoff Memo also attached SIPC's informational brochure entitled, "How SIPC Protects You," explaining that when a brokerage firm like BLMIS fails, SIPC will appoint a trustee to liquidate the firm.  By no later than 2003 and 2006, respectively, Natixis FP and Natixis had reviewed the KMZ Madoff Memo.

51.    According to Tensyr's marketing materials, Tensyr retained Baker Botts LLP as counsel in the United States.  In connection with the creation and operation of Tensyr, Natixis also received and reviewed a 2006 legal opinion from FGG's New York counsel, DLA Piper, further detailing SIPC's involvement and the Bankruptcy Code's role during a contemplated insolvency at BLMIS.  The opinion confirmed what Natixis already knew: in the event of a BLMIS insolvency, SIPC would appoint a trustee to carry out the liquidation of BLMIS in accordance with applicable provisions of SIPA and the Bankruptcy Code.

52.    Each Defendant knew its transactions with the BLMIS Feeder Funds centered on BLMIS's operations in New York and each specifically contemplated, and affirmatively confirmed through legal opinions that SIPA and the Bankruptcy Code would apply should BLMIS become insolvent.

53.    Certain of the BLMIS Feeder Funds provided the Defendants with copies of their monthly BLMIS trade confirmations and account statements. On their face, these materials showed that BLMIS was a member of SIPC.  As sophisticated financial institutions operating in the United States, the Defendants knew that in the event of a BLMIS insolvency, SIPA and the Bankruptcy Code would govern.

54.    The Defendants had copies of these statements and confirmations prior to investing in the BLMIS Feeder Funds.  For example, when considering the 2006 Alpha Prime

swap, Raiten drafted a deal memorandum that stated, "IXIS has full transparency to trades and positions in monthly broker statements from Madoff."

55.     The confirmations and statements also indicated the transactions with BLMIS were subject to the Securities Exchange Act and the Commodities Exchange Act, and regulated by the SEC, the Board of Governors of the Federal Reserve System, and the Commodity Futures Trading Commission.

56.     Through advice of counsel and their receipt and understanding of the statements and confirmations, the Defendants understood that U.S. law would operate in the event of an insolvency at BLMIS.

**F.      In Connection with the BLMIS Feeder Fund Transactions, the Defendants Knowingly Submitted to New York Law, Jurisdiction, and Venue**

57.     The Defendants signed agreements with certain of the BLMIS Feeder Funds that contained New York choice of law provisions and subjected themselves to the jurisdiction of the courts of New York and the Southern District of New York.

58.     For example, Natixis and Tensyr invested moneys with Fairfield Sentry and agreed that New York law would govern the agreement and in the event of a dispute between the parties, they would be subject to personal jurisdiction in New York courts.

59.     Natixis, in addition, guaranteed its New York subsidiaries' transactions, including non-moving defendant Natixis FP's (and consequently, Bloom's) dealings with the BLMIS Feeder Funds.  In October 2003, Natixis executed such a guarantee wherein it "unconditionally and irrevocably . . . guarantee[d] the payment . . . of all present and future payment obligations of [Natixis FP] arising from any Transaction entered into after November 1, 2003, whether incurred by [Natixis FP] directly or as maker, endorser, drawer, acceptor, guarantor, accommodation party or otherwise."

60.     Natixis's guarantee included a New York choice of law provision and the terms of

the guarantee included a provision that Natixis submitted to jurisdiction in New York.

> The Guarantor [Natixis] hereby irrevocably submits to the jurisdiction of any New York State court in the Borough of Manhattan or Federal court sitting in the Southern District of New York in any action or proceeding arising out of or relating to this Guarantee, and hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court in the Borough of Manhattan and irrevocably waives any objection they may now or hereafter have based upon improper venue or forum non convenient with respect to any such action or proceeding in such court.

**G.      The Defendants Set up the BLMIS Feeder Fund Transactions so "The Madoff Component for Each Deal Was the Same"**

61.     Each investment by the Defendants into a BLMIS Feeder Fund had one, central

constant: BLMIS would purportedly custody, manage, and control essentially all funds placed

with each BLMIS Feeder Fund.

62.     In connection with the internal approval processes, non-moving defendant Natixis

FP drafted memoranda summarizing the proposed transactions involving Groupement, Alpha

Prime, and Harley. These memoranda included virtually the same information regarding BLMIS:

Any variations in the memoranda were based on deal-specific factors like pricing, fees, and size

of the transaction because each fund was virtually identically invested with BLMIS.  The same

was true for Tensyr's and Natixis's BLMIS Feeder Fund investments.

63.     Eric Raiten, managing director of Natixis FP and director of Bloom, stated Natixis

FP knew "the Madoff component for each deal was the same."

64.     For example, in a January 2006 memorandum summarizing Natixis FP's potential

structured deal underlying Alpha Prime, Natixis FP's New York affiliate, non-party Natixis

Capital Markets, compared Alpha Prime to Harley, stating "[t]his trade has the same terms with

the *FIX-Madoff* [Harley] transaction, including the leverage, term and the risk guidelines. For risk purposes, the only significant difference concerns its size." (Emphasis in original).

65.    Knowing the "Madoff component" was always the same, Raiten's related due diligence involved a meeting with Madoff at BLMIS's New York office.

## IV.    THE DEFENDANTS' TRANSACTIONS WITH THE BLMIS FEEDER FUNDS WERE CENTERED IN THE UNITED STATES

### A.    The Transactions Underlying the Transfers

66.    Between 2002 and 2008, the Defendants invested approximately $618 million in at least five different BLMIS Feeder Funds. These investments represented the Defendants' proprietary investments used to hedge the risk associated with at least four separate leveraged transactions and a collateralized fund obligation transaction between 2002 and 2008.

67.    At a base level, structured products enable the transfer of risk, for a fee, from those who do not want to bear the risk (the counterparty), to those who are willing to bear that risk (the leverage provider). Once the leverage provider has accepted this risk, it determines how, if at all, to mitigate or reduce its exposure to this risk. Leverage providers have the ability to mitigate this risk by investing in the underlying asset, here the BLMIS Feeder Funds, which serve as the benchmark to calculate the returns owed to the counterparty. Assuming there are no contractual restrictions in the transaction, if the leverage provider believes its risk is better mitigated by investing an equivalent amount in a different asset, or in nothing at all, it is free to do so.

68.    The Defendants entered into the following transactions centered in the United States:

- **2002 Groupement Swap**:  In 2002, Bloom, in partnership with Access, entered into a leveraged transaction with Groupement Levered. The deal was renewed in 2007. To make its initial collateral payment, Groupement Levered transferred approximately $82 million to Bloom. Subsequently, Bloom hedged the risk by investing

approximately $165 million in Groupement. At the close of the transaction in 2008, Bloom redeemed approximately $191 million from Groupement. At all relevant times and in connection with the 2002 Groupement Swap, Bloom only acted on Natixis FP's instructions and Natixis FP carried all loss risk and profit potential.

- **2006 Alpha Prime Swap**: In 2006, Natixis FP entered into a leveraged transaction with an Alpha Prime sub-fund, FMG Select Fund, Ltd. ("FMG"), under which Natixis FP agreed to provide FMG with 4x returns on Alpha Prime. FMG made an initial collateral payment of approximately $3 million to Bloom, and Bloom made an initial $12 million investment in Alpha Prime. Over the course of the 2006 Alpha Prime Swap, Bloom invested a total of approximately $56 million in Alpha Prime. During the pendency of the 2006 Alpha Prime Swap, Bloom redeemed over $18 million in customer property from Alpha Prime. At all relevant times and in connection with the 2006 Alpha Prime Swap, Bloom only acted on Natixis FP's instructions and Natixis FP carried all loss risk and profit potential.

- **2006 Harley Swap:** In 2006, Natixis FP entered into a leveraged transaction with Santa Clara Holdings Ltd. ("Santa Clara"), an entity related to FIX/FAM, Harley's creator and manager. Under the 2006 Harley Swap, Natixis FP agreed to provide Santa Clara with 4x returns on Harley. Santa Clara made an initial collateral payment of $15 million to Bloom, and Bloom made an initial $60 million investment in Harley. During the pendency of the 2006 Harley Swap, Bloom redeemed approximately $131 million in customer property from Harley. At all relevant times and in connection with the 2006 Harley Swap, Bloom only acted on Natixis FP's instructions and Natixis FP carried all loss risk and profit potential.

- **Tensyr CFO**: In 2006 Natixis and New York-based FGG entered into a joint venture, creating Tensyr. Tensyr offered investors a notional 5x return on Fairfield Sentry's performance. Investors made initial collateral payments of approximately $80 million to Tensyr, and Tensyr invested approximately $400 million in Fairfield Sentry. During the pendency of the Tensyr Swap, Tensyr redeemed approximately $31 million in customer property from Fairfield Sentry.

- **The Natixis Notes Program:** Over several months in 2007 and 2008, a New York Natixis entity, Natixis CIB, issued a series of seven structured notes, giving note purchasers a notional 4x return on the shares of Fairfield Sentry. Note purchasers purchased a total of approximately $48 million of Natixis Notes Program, and Natixis and Natixis CIB invested a total of approximately $193 million in Fairfield Sentry. During the pendency of the Natixis Notes Program, Natixis and Natixis CIB redeemed approximately $179 million in customer property from Fairfield Sentry.

69.    In total, the Defendants received approximately $567 million in subsequent transfers of BLMIS customer property from the BLMIS Feeder Funds.

B.    **Bloom's Groupement Transactions Have Substantial Domestic Connections**

70.    Both Natixis FP and Access were based in New York, Natixis FP conducted due diligence on Groupement and BLMIS at Access's New York office and Natixis FP managed the relationship with Access and Groupement from its New York office.

71.    Groupement had no employees or independent office space and was managed by Access, a company incorporated in the U.S. with its principal place of business in New York. Natixis FP requested and reviewed certain third-party reports that confirmed Access's U.S. incorporation: "New York Department of State records name May 1995 as the incorporation date of Access International Advisors, Inc. and June 2003 as the filing date for the LLC version of the company.  August 2003 saw the filing of AIA Capital Markets, LLC in New York."

72.    In New York, Natixis FP conducted diligence on Bloom's behalf in connection with the Groupement investment.  In September 2003, Natixis FP's New York credit department prepared a memorandum summarizing "a due diligence meeting at the offices of Access International Advisors LLC . . . in New York City," which was led by Natixis FP employees. The memorandum described the proposed transaction "with the underlying fund being Groupement Financier Ltd., a fund whose sole holding is a managed account managed by Madoff Investment Securities LLC."  The memorandum detailed Access's focus on U.S. investments, noting it concentrated its single strategy hedge fund management on "funds located in the US" with underlying assets that were "US based."  The credit department's memorandum also explained the proposed "transaction will be managed by Bernard Madoff Investment Securities LLC."  Natixis FP's credit department recognized the centrality of BLMIS's New York operations to the transaction.

73.    Access offered Natixis FP certain retrocession fees to invest in Groupement as an incentive to choose Access's funds over other BLMIS Feeder Funds.  Prior to directing Bloom's

investments in Groupement, Natixis FP accepted Access's offer and executed a letter agreement with Groupement providing rebates to Natixis FP "as inducements for [Natixis FP]'s investment in [Groupement]." The agreement between Natixis FP and Groupement—which governed Natixis FP's subscriptions in Groupement via Bloom—contained a New York choice of law provision.

74.    Access, which opened Groupement's BLMIS account, provided Natixis FP with copies of Groupement's BLMIS Customer Agreement, which provided the "agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York."

75.    When it was time for Bloom to invest in Groupement, an Access representative in New York provided Natixis FP with copies of Groupement's offering memoranda and subscription agreements asking Natixis FP to "pass these onto Bloom/State Street."

76.    Non-moving Natixis FP personnel in New York executed the relevant Groupement subscription agreement on Defendant Bloom's behalf.

77.    At Natixis FP's direction, Bloom subscribed in Groupement to hedge Natixis FP's swap transactions in New York. Also at Natixis FP's direction, Bloom redeemed from Groupement when Natixis FP made the decision to unwind its proprietary hedge.

78.    Groupement's subscription agreements required Bloom to send subscription payments to a New York correspondent account at "Citibank N.A., 111 Wall Street, New York, NY."

79.    From non-moving defendant Natixis FP's New York office, Raiten directed Bloom's custodian, State Street International Custodial Services (Ireland) Limited ("State Street") to transfer the $6 million in subscription funds from Bloom's account to Groupement.

To communicate this directive to State Street, Raiten utilized "Bloom Asset Holdings Fund" letterhead that provided Bloom's address as: "9 West 57th Street, 35th Floor, New York, New York 10091, United States." From his Natixis NY office, Raiten signed these orders and sent them to State Street and provided State Street with his Natixis NY contact information for any questions related to Bloom's investment in Groupement.

80.     Defendant Bloom requested its Groupement redemptions from Access in New York.  For example, in September 2008, Natixis FP directed Access to wire Bloom more than $150 million in Groupement redemption proceeds through a New York correspondent account at State Street Bank & Trust Co., N.A.  Bloom sent subscription payments through a Connecticut UBS AG account.

81.     Access and its legal counsel recognized that Natixis FP and not Bloom was solely responsible for management of the relationship with Access an investment in Groupement, even though Bloom was the investor of record.  When Natixis FP requested that Access add Bloom as a party to certain agreements unwinding the swap and directing the transfer of Bloom's shares of Groupement, counsel for Access objected on grounds that the relationship was exclusively between Access and Natixis FP in New York, and not with Bloom, despite Bloom being the shareholder of record.  Access indicated it "never had any direct relations with Bloom. Therefore, Bloom should not be party to the control or settlement agreements.  It is solely Natixis [FP's] responsibility to have the shares [of Groupement] transferred…."

82.     At Natixis FP's insistence, Access ultimately agreed to include Bloom in the transfer agreements.  The exchange highlights Natixis FP's role managing the relationship with Access and Groupement, and the economic realities of the investment: Bloom invested in Groupement at Natixis FP's direction and for Natixis FP's benefit.

83.    The related swap agreements, executed by Natixis FP's managing director and Bloom's director, Eric Raiten, stated the swap transactions would be "governed by and construed in accordance with the laws of the State of New York." Natixis FP also agreed in these agreements to submit to the "jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City." Natixis FP and the swap counterparty both provided New York addresses for notices or communications related to the transactions and identified New York bank accounts as their "Account for Payment."

### C.    Bloom's Transactions with Alpha Prime Have Substantial Domestic Components

84.    From its New York office, Natixis FP managed the relationship with Alpha Prime, including Bloom's investments and subsequent redemptions. Natixis FP directed all related notices to its West 57th Street office.

85.    Natixis FP's New York credit department drafted due diligence memoranda recommending Natixis FP enter into the 2006 Alpha Prime Swap. These memoranda emphasized the role of BLMIS in New York as paramount to the transaction. For example, in its January 9, 2006 memorandum, the New York credit department explained:

> Alpha Prime's only investment is a managed account in Madoff Investment Securities LLC . . . . IXIS [Natixis NY] has full transparency to trades and positions in monthly broker statements from Madoff. Structurally, the transaction is very similar to our existing transactions involving Madoff with Access International Advisors.

86.    Natixis FP's New York credit department further identified its dependence on BLMIS's success in order to profit from the transaction:

> As the transaction has no recourse to the counterparty, the relative success or failure of the referenced asset [Alpha Prime], will depend on the operations and the strategy implementation by Madoff Investments LLC . . . . [BLMIS's] managed account

> program permits [BLMIS] to act as a broker for an account on a
> discretionary basis with full authority over the account.

87.     Non-moving defendant Natixis FP personnel in New York executed the relevant

Alpha Prime subscription agreement on Defendant Bloom's behalf.  New York law governed the

underlying agreement and the parties submitted to New York jurisdiction.

88.     At Natixis FP's direction, Bloom subscribed in Alpha Prime to hedge Natixis

FP's swap transactions in New York.  Also at Natixis FP's direction, Bloom redeemed from

Alpha Prime when Natixis FP made the decision to unwind its proprietary hedge.

89.     To submit subscription payments, Alpha Prime alternatively directed Natixis

FP—via Bloom—to send funds to correspondent accounts at Citibank on Park Avenue in New

York and HSBC Bank USA, N.A. in New York.

90.     Natixis FP managed and directed each of Bloom's subscriptions in and

redemptions from Alpha Prime.  In the case of each subscription, a Natixis FP New York

employee wrote an internal trade ticket and referenced payment to "HSBC Bank USA New

York."  Natixis FP wired funds to Alpha Prime at its correspondent Citibank account in New

York to pay for each subscription.  Natixis FP in New York also managed redemptions,

including the ultimate decision to redeem.

### D.     Bloom's Transactions with Harley Have Substantial Domestic Connections

91.     Natixis FP managed the relationship with Harley from New York, and profits

from Bloom's subscription in Harley resided with Natixis FP in New York.  Natixis FP was

responsible for any and all due diligence associated with Bloom's investments in Harley.

92.     Natixis FP's Capital Markets group drafted a memorandum detailing the

investment with Harley, stating that "Harley is a 'Madoff feeder fund' ultimately managed by

Charles Fix of Fix Asset Management.  The feeder fund's sole holding is a managed account

managed by [BLMIS]." The memorandum also states that "the transaction is very similar to our existing transactions involving Madoff and Access International Advisors."

93.    IXIS Capital Markets' risk department in New York approved the Harley investment.

94.    Non-moving defendant Natixis FP personnel in New York executed the relevant Harley subscription agreement on Defendant Bloom's behalf.

95.    At Natixis FP's direction, Bloom subscribed in Harley to hedge Natixis FP's swap transactions in New York. Also at Natixis FP's direction, Bloom redeemed from Harley when Natixis FP made the decision to unwind its proprietary hedge.

96.    To invest in Harley, Natixis FP, through Bloom, directed investments to a New York bank account at The Northern Trust Banking Corporation, as detailed in Harley's subscription agreement.

**E.    Tensyr's Transactions with Fairfield Sentry Have Substantial Domestic Connections**

97.    Defendant Tensyr was operated and managed in New York as a joint venture between FGG and Defendant Natixis, launched after obtaining Madoff's explicit approval.

98.    According to Tensyr's marketing materials, Tensyr retained U.S. counsel, including Baker Botts LLP in New York. Invoices reveal Tensyr also utilized DLA Piper US LLP's New York office to perform professional legal services under FGG's client account, and Fairfield Sentry's matter number. The invoices for these professional services were addressed to Tensyr at FGG's New York headquarters.

99.    To market Tensyr, FG Limited's New York representative, Mark McKeefrey, executed a Letter of Understanding with a third party broker to attract clients interested in

investing in Tensyr.  The Letter of Understanding directed all notices to FG Limited's New York address and contained a New York choice of law provision.

100.    To obtain a credit rating for Tensyr, Natixis and FGG communicated with several rating agencies, including those operating out of New York.  In connection with these ratings, Standard & Poor's, Moody's Investor Service, and Fitch Ratings ("Fitch," and collectively, the "Ratings Agencies") each utilized their New York offices to conduct some or all of the due diligence on Fairfield Sentry, which included meetings and communications with FGG in New York.

101.    While reviewing Tensyr, Fitch identified the center of the transaction as BLMIS in New York.  According to Natixis's Emanuel Lefort, Fitch believed "everything is on BLM[IS]'s shoulders."  In light of BLMIS's central role, Fitch demanded a meeting with BLMIS in New York as a "sine qua non condition" for providing a credit rating for Tensyr.

102.    Prior to launching Tensyr, Natixis specifically contemplated the dangers posed by the potential bankruptcy of BLMIS, and Natixis recited the protections afforded by SIPC as an underlying factor supporting Tensyr's creation.  Throughout late 2006, Natixis repeatedly raised concerns with FGG regarding the risk of a BLMIS bankruptcy.  For example, in October 2006, while working to obtain a favorable rating for Tensyr, Natixis explained to FGG that,

> we are finalizing our story for the rating agency re BLM bankruptcy and/or the [disappearance] of a put counterparty.  On the BLM bankruptcy, the story we want to tell is that if BLM goes bankrupt, the fund should get its stocks back within max 30 days.

In a separate email the following week, Natixis specified:

> The scenario we are considering today is that if Madoff was bankrupt, the SIPC will try to transfer the Cash Account and the Margin Account to a safe broker-dealer, and that this should take between one week and one month.

103.    Ultimately, Natixis and FGG attempted to quiet concerns about potential bankruptcy at BLMIS by reciting the protections afforded by SIPA.  For example, Natixis and FGG prepared a memorandum for the Ratings Agencies that, among other things, highlighted the fact that BLMIS was a member of SIPC:

> [BLMIS] is a broker/dealer registered with the SEC and the NASD, is an SEC registered Investment Adviser and is a member of SIPC.
>
> This means that [BLMIS] must act within a very tight framework that protects investors' assets.  For example, [BLMIS] must report on a daily basis the position of each of the accounts it holds for its customers so that, in case of bankruptcy, the SIPC trustee can transfer within a few days these accounts to a safe broker/dealer.

104.    FGG's co-founder and president, Jeffrey Tucker, and FG Limited's vice president and chief legal officer, Mark McKeefrey—both based in New York—executed Tensyr's subscription agreements with Fairfield Sentry on behalf of Tensyr.  Similarly, New York-based FGG personnel also placed Tensyr's redemption requests from Fairfield Sentry.

105.    In its subscription agreements with Fairfield Sentry, Tensyr identified FG Limited —which operated almost exclusively in New York—as the only person/entity authorized "to give and receive instructions between [Fairfield Sentry] and [Tensyr]."  Tensyr further directed communications to FGG's New York office, including account confirmations from Fairfield Sentry's administrator, which were sent to "Tensyr c/o Fairfield Greenwich Group" at FGG's New York office.

106.    To compensate FG Limited for its role as Tensyr's Leverage Manager, FGG and Natixis representatives directed payments from Tensyr's account at the Bank of New York to FG Limited's New York account at JPMorgan Chase Bank N.A.

107.    As detailed in its Fairfield Sentry subscription agreements, Tensyr utilized a New York correspondent account at the Bank of New York to wire transfer its subscription payments for Fairfield Sentry to an HSBC correspondent bank account in New York.  In its subscription agreements, Tensyr also directed its redemptions from Fairfield Sentry through the same New York correspondent account at the Bank of New York.

108.    In executing its Fairfield Sentry subscription agreements, Tensyr agreed that "any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York" and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."  The subscription agreement also specified it "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

### F.    Natixis's Transactions with Fairfield Sentry Have Substantial Domestic Connections

109.    Defendant Natixis maintained its own Fairfield Sentry investments and received transfers of BLMIS customer property from Fairfield Sentry.

110.    To facilitate and help manage its Fairfield Sentry investments, Natixis communicated regularly with its New York subsidiaries, including non-moving defendant Natixis FP regarding investments in BLMIS Feeder Funds.

111.    Natixis knew Fairfield Sentry was based at FGG's New York headquarters; Natixis visited FGG's New York office to review Fairfield Sentry.  Through its due diligence on Fairfield Sentry, Madoff, and BLMIS—including its numerous conversations with FGG regarding the launch of Tensyr—Natixis knew its transactions with Fairfield Sentry revolved around BLMIS's operations in New York.

112.    By executing subscription agreements with Fairfield Sentry, Defendant Natixis agreed that "any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York" and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding." The subscription agreement also specified it "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

113.    To invest in Fairfield Sentry, Defendant Natixis executed subscription agreements in connection with its investments in Fairfield Sentry. These agreement stated that all money from Natixis be directed to a New York HSBC Bank USA, N.A. correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York.

114.    In connection with subscribing funds to Fairfield Sentry, Natixis used its New York bank account at Deutsche Bank Trust Company Americas (the "Deutsche Bank Account") to transfer subscription payments to HSBC Bank USA. In its redemption requests, Natixis directed that Fairfield Sentry send redemption payments to the Deutsche Bank Account.

115.    Through the use of this Deutsche Bank Account, Defendant Natixis received the transfers at issue in this action in New York.

**G.    Natixis and Natixis FP Did Diligence Together on Another New York-based BLMIS Feeder Fund**

116.    In 2004, Defendant Natixis and non-moving Defendant Natixis FP worked together on a potential transaction with Ascot Partners, LP ("Ascot"), another BLMIS Feeder Fund. In connection with this deal, Natixis visited Natixis FP in New York to review Ascot and meet with its manager. Natixis refused to move forward with an Ascot deal unless it received explicit approval from Madoff.

117.    Natixis received from its New York subsidiaries due diligence regarding BLMIS. For example, New York-based Natixis FP shared the 300-plus page KMZ Madoff Memo with Natixis.  This memorandum identified BLMIS as a U.S. broker-dealer registered as a limited liability company in the State of New York, analyzed BLMIS's purported execution of the SSC Strategy in New York, reviewed the application of SIPA to protect investors, and attached articles regarding industry suspicions around Madoff and BLMIS that specifically identified Fairfield Sentry as a New York-based feeder fund "managed by Madoff."

118.    Natixis and Natixis FP also openly discussed concerns about BLMIS, including concerns regarding the volume of options BLMIS purported to trade under the SSC Strategy and whether such option trading volume was possible.

## V.    THE BLMIS FEEDER FUNDS PRINCIPALLY OPERATED IN THE UNITED STATES

### A.    Fairfield Sentry's Principal Place of Business Was in New York

At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

### 1.    The Genesis of the Fairfield Greenwich Group De Facto Partnership

119.    In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were feeder funds.

120.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited

("Sigma") and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in euros and Swiss francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

121.    FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### a.    Fairfield Sentry

122.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

123.    Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

124.    Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

    **b.**    **Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business was in the United States**

125.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.  In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

126.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

127.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

### c.    FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities

128.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts.  As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### d.    FGG New York Personnel Managed Fairfield Sentry

129.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

130.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### e.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

131.    Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a

minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.   Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### f.    BLMIS Was Fairfield Sentry's Investment Manager

132.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

133.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

134.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

135.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

136.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited.  Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

137.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

138.   Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

139.   In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

140.   After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

141.   As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

142.    The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund Limited*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., proffered June 26, 2015 as part of the Extraterritoriality Briefing).

**B.    Groupement Principally Operated in New York by Access, a New York
        Company**

143.    The Trustee incorporates by reference the allegations of the complaint filed

against Groupement in *Picard v. UBS AG, et al.*, Adv. Pro. No. 10-04285 (SMB) (Bankr.

S.D.N.Y., proffered June 26, 2015 as part of the Extraterritoriality Briefing).

144.    Luxalpha SICAV ("Luxalpha") and Groupement were funds created at the

direction of Access that invested 100% of their assets with BLMIS.  Luxalpha was incorporated

in Luxembourg in 2004 and Groupement was incorporated in the British Virgin Islands in 2003.

Those funds, however, were operated and managed by Access in New York.

145.    Access, in conjunction with UBS AG and its subsidiaries, operated and controlled

the Luxalpha and Groupement funds from its headquarters in New York.  Access was founded

and controlled by Patrick Littaye and Thierry Villehuchet.  Villehuchet resided in New York, and

Littaye kept an office in New York and travelled to New York to meet regularly with Madoff.

From its office in New York, Access (i) received the funds' BLMIS account statements and trade

confirmations, (ii) prepared reports for investors regarding BLMIS's purported monthly trading

activity, (iii) marketed the funds to investors, and (iv) communicated regularly with BLMIS and

its employees.

146.    UBS (Luxembourg) S.A. was designated Luxalpha's official custodian and

manager. UBS SA, however, secretly contracted with BLMIS to delegate custodial and

management authority to BLMIS in New York. Various Access entities contracted with

Luxalpha to serve as the fund's "advisor," "consultant," and "client introducer." Access entities,

similarly, served as Groupement's official manager and investment advisor, while UBS AG

subsidiaries served as the fund's official prime bank and administrator. But as with Luxalpha, all

custodial and managerial control over Groupement's assets rested with BLMIS in New York.

### C.    Alpha Prime Principally Operated in the United States

147.    The Trustee incorporates by reference the allegation of the complaint filed against

Alpha Prime in *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (SMB) (Bankr.

S.D.N.Y., proffered June 26, 2015 as part of the Extraterritoriality Briefing).

148.    UniCredit Bank Austria AG ("Bank Austria"), through certain of its directors and

officers, directed the investments of hundreds of millions of dollars into BLMIS from five

BLMIS feeder funds, including Alpha Prime, founded by Bank Austria.

149.    Alpha Prime was an investment fund organized under the laws of Bermuda.

Incorporated in March 2003, Alpha Prime opened BLMIS account no. 1FR097 in June 2003.

Over the course of its investment history with BLMIS, Alpha Prime received approximately

$85,824,714 million in avoidable transfers from BLMIS.

150.    Alpha Prime's directors included Bank Austria executives Sonja Kohn ("Kohn"),

Ursula Radel-Leszczynski ("Radel-Leszczynski"), Stefan Zapotocky ("Zapotocky") and Peter

Fischer ("Fischer") (collectively, the "Directors"). The Directors earned fees in their various

roles as service providers or distributors of Alpha Prime.

151.    The Directors worked together to create, market and manage several identically

structured investment funds, including Alpha Prime, whose sole purpose was to invest in

BLMIS.

152.    Kohn has testified that she and Madoff had an agreement whereby Madoff paid

her commissions for the investments she solicited on BLMIS's behalf. Kohn stated that she

made the introduction between Bank Austria and Madoff which resulted in the creation of Prime

Fund ("Primeo"), a BLMIS feeder fund progenitor. Kohn's introduction allowed Zapotocky to travel to New York to meet with Madoff for purposes of setting up Primeo's investment in BLMIS in October of 1993 and April of 1994. According to Kohn, Primeo Select was designed exclusively for investment with BLMIS. Over the years, Kohn scheduled so many meetings with Madoff and potential investors that she was forced to send surrogates in her place, or not attend at all. Kohn readily concedes that the purpose of these meetings was to propose ideas for the development of investment vehicles, some of which included these funds.

153. Certain Directors and other Bank Austria and BA Worldwide employees have made similar statements regarding Bank Austria's contacts with Madoff in New York. For example, Radel-Leszczynski has testified that she visited Madoff at least twice a year between 1998 and 2008 in connection with BA Worldwide's management of Alpha Prime and Primeo. Another Bank Austria employee, Werner Kretschmer, who was the president of BA Worldwide immediately prior to Radel-Leszczynski, also testified that he, Zapotocky, and Fischer traveled to New York to meet with Madoff about these funds. Zapotocky has testified that he traveled to New York to meet with Madoff about the Funds. Many internal BLMIS documents confirm the fact that Kohn, Radel-Leszczynski and Zapotocky were frequent visitors to BLMIS—both before and after the creation of Alpha Prime.

154. The meetings the Directors attended at BLMIS prior to the creation of Alpha Prime are instructive because Alpha Prime was designed to mimic the performance of Primeo. That is, it was created for the specific purpose of being managed by BLMIS, and to match the returns Primeo generated.

155. In fact, all of the Funds that followed Primeo were marketed as clones of one another; the only thing that mattered was that Madoff managed the fund. In marketing Senator

to American investors, Fischer tied one of the fund's future performance to the past performance of other Madoff feeder funds—*i.e.*, Alpha Prime and Primeo. According to Fischer, the "real performance of these funds is the only source of historical performance for [the new] Fund."

156.    The Directors were so confident in Alpha Prime's ability to track Primeo's performance, they did not conduct any due diligence that otherwise would have been conducted. In describing her experience working with Alpha Prime and Primeo, Radel-Leszczynski testified that "[n]o due diligence was performed on Alpha Prime because Mr. Madoff was already well known to us—also through other funds." The similarities between the two funds extended beyond mere performance. Most, if not all, of the investors knew that their money was being held and managed by Madoff in New York.

157.    Although Zapotocky had departed Bank Austria by the time Alpha Prime was opened, he was the driving force behind its creation and the architect of its organizational structure. Zapotocky testified that Alpha Prime was founded "on the initiative of American institutional investors" and that "these institutional investors had a very specific vision right from the start as to who should be the service providers of Alpha Prime; the Bank of Bermuda/HSBC . . . and Madoff acting as broker/dealer." This means that before the first dollar was invested in Alpha Prime, investors knew that their money would be placed with BLMIS in New York.

158.    Radel-Leszcynski and Alpha Prime each filed a customer claim in these cases.

**D.      The Transfers and Component Events of the Harley Transactions Are Predominantly Domestic**

### *1.      Harley Maintained its Principal Place of Business in New York*

159.    Harley invested 100% of its assets with BLMIS in New York and received approximately $1 billion in transfers of customer property from BLMIS within two years of December 11, 2008.

a.      **Harley Sought Out the United States as a Place to Invest
and the Transfers it Received Arose Out of its Investment
Account with BLMIS in New York**

160.    In April 1996, Harley's predecessor, Harley International Limited, entered into a

Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases

and Sales of Securities with BLMIS in New York.  Thereafter, Harley maintained an investment

account with BLMIS, designated No. 1FN094.

161.    Harley agreed that all disputes arising under the Customer Agreement would be

resolved by arbitration before the American Arbitration Association, or "an arbitration facility

provided by any other exchange of which the broker is a member, or the National Association of

Securities Dealers Inc. … and in accordance with the rules … of the selected organization."

162.    The Customer Agreement between BLMIS and Harley provided that all

transactions are subject to the provisions of the U.S. Securities Exchange Act of 1934 and to the

rules and regulations of the SEC and the Board of Governors of the Federal Reserve System.

The Customer Agreement also provided BLMIS with full discretion over Harley's assets, and

pursuant to the Trading Authorization agreement, Harley authorized Madoff to be its "agent and

attorney in fact" to buy, sell, and trade in U.S. securities.

163.    The Trustee filed a complaint against Harley in the Bankruptcy Court, under the

caption *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), and on November

10, 2010, the Bankruptcy Court entered summary judgment against Harley in the amount of

$1,066,800,000.

164.    In support of summary judgment, the Bankruptcy Court held that "Harley

specifically sought out the United States as a place to do business when it opened an account

with BLMIS," and that the transfers received by Harley "arose out of business transactions tied

to Harley's securities account with BLMIS in New York."

40

b.    **BLMIS in New York Acted as Harley's Investment Manager,
Custodian, and Executing Broker**

165.    Euro-Dutch Trust Company (Bahamas) Limited ("Euro-Dutch Bahamas") acted as Harley's purported investment manager until 2003, and after 2003, Euro-Dutch Management Limited ("Euro-Dutch Cayman") in the Cayman Islands acted as Harley's purported investment manager.

166.    Neither Euro-Dutch Bahamas nor Euro-Dutch Cayman played a meaningful role in managing Harley's investments with BLMIS.    Instead, they delegated their investment management responsibilities to BLMIS in New York.

167.    As Harley's investment manager, BLMIS in New York purported to invest Harley's assets according to Madoff's SSC Strategy, and BLMIS decided which, how many, and when to purchase and sell U.S. securities on Harley's behalf.    BLMIS also acted as executing broker in purporting to purchase the U.S. securities on Harley's behalf.

168.    BLMIS acted as custodian for the U.S. securities purportedly held on Harley's behalf.    Each of Harley's audited financial statements for years 2003, 2004, 2005, 2006, and 2007 disclosed that BLMIS acted as Harley's "Custodian."    Harley's audited financial statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

169.    Harley's audited financial statements for years 2005 and 2006 also noted that "items included in the financial statements are measured using the currency of the primary economic activity in which it operates …. This is the U.S. dollar, which reflects the company's primary activity of investing in U.S. dollar denominated securities and derivatives."

c.    **Harley Conducted No Meaningful Business in the
Cayman Islands**

170.    Harley was registered as an exempt company under the Cayman Islands Companies Law and was not permitted to solicit investors in the Cayman Islands.

41

171.    In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands."

172.    In its Articles of Association, Harley required that all disputes among Harley and its shareholders would be referred to binding arbitration in New York under rules established by the American Arbitration Association.

173.    Each shareholder in Harley, including BNP Arbitrage, received copies of Harley's audited financial statements, Memorandum of Association, and Articles of Association.

### d.    Fix Asset Management Ltd. Managed Harley from New York

174.    Fix Asset Management Ltd. is the family wealth office of Charles Fix, which over the years evolved into an institutional fund of funds manager.

175.    Fix Asset Management Ltd. operated through wholly owned subsidiaries, including Fix Asset Management Services Inc. (f/k/a Fix Asset Management, Inc. and Fix Capital Ltd., and collectively with Fix Asset Management Ltd., "FAM").

176.    FAM was incorporated under New York law and maintained its principal place of business at 660 Madison Avenue, New York, New York.

177.    Harley had no employees or offices of its own.  For its investments with BLMIS, Harley acted principally through FAM.

178.    FAM was owned and controlled by Charles Fix, who also owned and controlled all of the voting shares for Harley.  During the relevant time period, Charles Fix resided in New York.

179.    Fix's daughter, Tatiana Fix Katsigera (f/k/a Tatiana Fix), was the chief executive officer of FAM, served on its investment advisory committee, and conducted due diligence for its funds, including Harley.  Tatiana Fix Katsigera also lived in New York.

180.    Several other members of FAM's advisory teams, including John Fix, Abel Pacheco, and Panos Katsambas, also resided in New York during much of the relevant time period. FAM's outside counsel was also located in New York.

181.    FAM marketed Harley from its office in New York, and FAM employees met with investors and potential investors in Harley at FAM's office in New York.

182.    FAM monitored and conducted due diligence on Harley's investments with BLMIS from its office in New York.

183.    FAM received Harley's BLMIS account statements at its office in New York.  For several years BLMIS also sent Harley's BLMIS trade confirmations and account statements to FAM's agent and service provider at Bank Julius Baer & Co. Ltd. in New York.

184.    In monitoring its investments, FAM relied on external consultants in the United States, including Merfin LLC from California, X.E. Capital from New York, and Event Capital Markets from New Jersey.

185.    FAM handled subscriptions into and redemptions from Harley from its office in New York.  For example, FAM employees corresponded with Madoff and Frank DiPascali to request that BLMIS accept subscriptions into Harley's account with BLMIS.  FAM employees, including Charles Fix, also corresponded with Madoff and DiPascali to request redemptions from Harley's account.

### e.    Harley Received Transfers at Bank Accounts Held in New York

186.    Harley's subscription agreements directed investors to wire U.S. dollars to bank accounts in New York.  Prior to 2005, the subscription agreements required subscriptions to be wired to a JPMorgan Chase Bank N.A. account in New York, held in the name of Fortis Bank (Cayman) Limited, and after 2005, the subscription agreements required subscriptions to be wired to an account in the name of Fortis Prime Fund Solutions (IOM) Limited ("Fortis Prime Fund Solutions IOM") at the Northern Trust Banking Corporation ("Northern Trust"), 40 Broad Street, New York, New York.

187.    When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York.  Harley previously had directed that BLMIS pay redemptions to an account held at Barclays Bank plc in New York.

### f.    Harley Was Administered By Fortis Entities in New York

188.    Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, and then Fortis Prime Fund Solutions IOM served as Harley's administrators.

189.    The Fortis administrators' relationships with Harley and FAM were managed during much of the relevant time period by Rhonda Eldridge, a Managing Director of Fortis Financial Services, LLC ("Fortis Financial Services") who was based in New York.

190.    Eldridge worked with employees of Fortis Prime Funds Solutions (USA) LLC ("Fortis Prime Fund Solutions USA") in New York.  (Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, Fortis Prime Fund Solutions IOM, Fortis Financial Services, and Fortis Prime Funds Solutions USA are collectively known as "Fortis").

191.    Fortis Financial Services was located on Madison Avenue in New York, and from its office Fortis employees performed much of the work necessary in administering Harley.

44

192.    Fortis employees conducted due diligence on BLMIS from Fortis Financial Services's office in New York.  Fortis's due diligence included inquiries into BLMIS's role as Harley's custodian as well as a "thorough examination of Harley's account" with BLMIS.

193.    Eldridge and other Fortis employees met with Madoff and DiPascali at BLMIS's office in New York.  Eldridge and other Fortis employees also regularly spoke with Madoff, DiPascali, and/or Jo Ann Crupi regarding Harley's investments with BLMIS.  In addition, Fortis employees met with Charles Fix and investors in Harley at FAM's office in New York.

194.    Fortis employees received Harley's BLMIS trade confirmations and account statements at Fortis Financial Services's office in New York, and reviewed the trade confirmations and account statements to calculate Harley's NAV.

195.    The Trustee incorporates by reference the allegations of the Complaint filed in *Picard v. Harley International (Cayman) Limited*, Adv. Pro. No. 09-01187 (SMB), Dkt. No. 1 (Bankr. S.D.N.Y. May 12, 2009).

*[Remainder of this page intentionally left blank]*

Dated: June 26, 2015
       New York, New York

*/s/ Thomas L. Long*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Thomas L. Long
Email: tlong@bakerlaw.com
Catherine E. Woltering
Email: cwoltering@bakerlaw.com
Jonathan D. Blattmachr
Email: jblattmachr@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the estate of Bernard L.
Madoff*