**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,  Plaintiff-Applicant,  v.  BERNARD L. MADOFF INVESTMENT SECURITIES LLC,  Defendant. | Adv. Pro. No. 08-01789 (SMB)  SIPA Liquidation  (Substantively Consolidated) |
| In re:  BERNARD L. MADOFF,  Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,  Plaintiff,  v.  BORDIER & CIE,  Defendant. | Adv. Pro. No. 12-01695 (SMB) |

**TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN**
**OPPOSITION TO BORDIER & CIE'S MOTION TO DISMISS BASED**
**ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF**
<u>**TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**</u>

The Trustee respectfully submits this supplemental memorandum of law in opposition to Bordier & Cie's ("Bordier") motion to dismiss based on extraterritoriality and in further support of the Trustee's motion for leave to amend the complaint. The Proffered Allegations plead specific facts demonstrating that the subsequent transfers to Bordier are sufficiently domestic such that the Trustee's action does not require an extraterritorial application of SIPA or 11 U.S.C. § 550. Accordingly, Bordier's motion to dismiss must be denied.

## BACKGROUND AND LEGAL STANDARD

The District Court returned this action to this Court to determine whether the Trustee's claims against Bordier seek the recovery of "purely foreign" transfers requiring an extraterritorial application of SIPA or Bankruptcy Code § 550.[1] Under the Extraterritoriality Decision, the Trustee need only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[2] In making this determination, there is no bright-line test to determine whether a transaction is extraterritorial,[3] and the court must review "the location of the transfers as well as the component events of those transactions."[4] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[5]

The Proffer specifically alleges that Bordier received $8,832,527 in subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma," and together with Fairfield Sentry, the "Fairfield Funds"), Kingate

---

[1] *Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 232–33 (S.D.N.Y. 2014) (the "Extraterritoriality Decision").

[2] *Id*. at 232 n.4.

[3] *Parkcentral Global Hub Ltd. v. Porsche Automobil Holdings SE*, 763 F.3d 198, 216-17 (2d Cir. 2014) (rejecting single-factor, bright-line rule as appropriate for extraterritoriality analysis to ascertain whether foreign or domestic elements "predominate").

[4] Extraterritoriality Decision at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)).

[5] *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

1

Global Fund Ltd. ("Kingate Global"), and Kingate Euro Fund Ltd. ("Kingate Euro," and together with Kingate Global, the "Kingate Funds"). (Proffer at ¶ 1.) Bordier argues that the Trustee's action must be dismissed because Bordier, the Fairfield Funds, and the Kingate Funds are organized under foreign law and therefore the Trustee seeks "purely foreign" transfers. Bordier is wrong. Its superficial analysis ignores the transactions' significant domestic components, including, among other things, that Bordier invested in the respective funds to profit from BLMIS and utilized New York bank accounts to send and receive funds. As set forth below, the component events of the transactions demonstrate that the Trustee's recovery claims do not require extraterritorial application of the Bankruptcy Code, and that Bordier's motion must be denied.

## THE TRANSFERS AND COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

The subsequent transfers received by Bordier were not "purely foreign," but were predominantly domestic for the following reasons: (1) Bordier knowingly invested in respective funds to profit from BLMIS in New York, (2) the transfers from the Fairfield Funds were made pursuant to subscription agreements that were domestic in nature, (3) Bordier sent and received the transfers at issue through New York bank accounts, (4) Bordier used a U.S. affiliate to manage and facilitate its investments in the Fairfield Funds, (5) the Fairfield Funds maintained their principal place of business in New York, and (6) The Kingate Funds' operations were based in New York.

First, Bordier invested in the Fairfield Funds and the Kingate Funds to profit from BLMIS in New York. Bordier knew that the funds invested all (or substantially all) of their assets with BLMIS, and that BLMIS controlled all aspects of those investments from its office in New York. (*Id.* at ¶¶ 2, 5–10, 20–24.) Bordier knew: (i) the Fairfield Funds and the Kingate

2

Funds delegated all investment decisions to BLMIS as their investment advisor; (ii) BLMIS maintained custody of the assets in New York; and (iii) BLMIS purported to execute trades in U.S. securities on behalf of the funds. (*Id.* at ¶¶ 5–10, 20–24).

Bordier invested in the Fairfield Funds *because* its money would ultimately be placed with BLMIS, and in turn, Madoff would invest its assets in U.S. securities traded on U.S. markets. But for BLMIS and its U.S.-based investment strategy, Bordier would not have invested in the Fairfield Funds. As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States … was not fortitious or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" Bordier and the Fairfield Funds.[6]

Second, the transfers from the Fairfield Funds were made pursuant to subscription agreements that were domestic in nature. By executing the agreements, Bordier knowingly (i) submitted to New York courts' jurisdiction, (ii) agreed that New York law would govern the agreements, (iii) agreed to wire Fairfield Sentry's subscription payments to a New York bank account, and (iv) agreed to BLMIS in New York controlling all aspects of the investments. (*Id*. at ¶¶ 17–19, 26.)

Third, Bordier used U.S. bank accounts to receive redemptions payments. Over a 9-year period leading up to 2008, Border received at least 15 separate transfers from the Fairfield Funds in its bank accounts with Brown Brothers Harriman in New York or UBS AG in Stamford, Connecticut. (*Id.* at ¶ 27-28.) It wired over 20 subscription payments to the Fairfield Funds through a correspondent bank account at HSBC Bank USA, N.A., which were ultimately deposited in BLMIS's JPMorgan Chase Bank N.A. account in New York. (Proffer at ¶ 26.)

---

[6] *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 523 (Bankr. S.D.N.Y. 2012).

<u>Fourth</u>, Bordier used a New York-based due diligence firm, Greenlake Capital LLC ("Greenlake"), to facilitate its subscriptions into, and redemptions from, the Fairfield Funds. (*Id.* at ¶ 11.) As an ostensible member of "the Bordier Group," Greenlake repeatedly requested, received and relayed to Bordier information from FGG regarding Fairfield Sentry. (*Id.* at ¶¶ 12–13.)

<u>Fifth</u>, the Fairfield Funds were principally operated in New York by Fairfield Greenwich Group ("FGG"). In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG, a New York-based *de facto* partnership. (*Id.* at ¶¶ 30-31.) Noel and Tucker organized the Fairfield Funds as international business companies under BVI law. (*Id.* at ¶¶ 33, 54.) BVI law restricted the funds from doing business in the BVI except with BVI international business companies. (*Id.*)

The Fairfield Funds were shell corporations with no employees and no offices in the BVI. Their BVI registered address was a post office box care of a local trust company operated by a local law firm. (Proffer at ¶¶ 34, 55.) The funds were operated almost entirely by FGG's New York City headquarters personnel who maintained final control of Fairfield Sentry's bank accounts and relationships with Fairfield Sentry's back office service providers. (*Id.* at ¶¶ 40–42, 57–60.)

FGG personnel in New York monitored the Fairfield Funds' investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of the Fairfield Funds; marketed the Fairfield Funds; approved all subscriptions for Fairfield Fund shares; maintained the Fairfield Funds' books and records; and made all strategic and operational decisions regarding the Fairfield Funds. (*Id.* at ¶¶ 40–41, 56.)

<u>Sixth</u>, the Kingate Funds invested exclusively with BLMIS in New York and, together

4

with their purported investment manager, consultant, and other service providers, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation. (*Id.* at ¶ 64.)

The Kingate Funds executed customer agreements and other accounts opening documents that were governed by U.S. law. (*Id.* at ¶ 69-70.) The agreements authorized BLMIS to act as the funds' investment manager, custodian and executing broker, and to invest the funds' assets according to Madoff's investment strategy. (*Id.* at ¶¶ 72–74.)

The Kingate Funds had no physical offices, no employees, and transacted no meaningful business in the BVI. (*Id.* at ¶ 65.) Instead, the funds operated through service providers with substantial connections to the United States. Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years and was formed in Bermuda, but was itself managed from New York by Tremont Partners, Inc., a Connecticut corporation (*Id.* at ¶ 67.) The Kingate Funds were also co-managed by Kingate Management Limited ("KML"), which operated through agents in New York. (Proffer at ¶ 80.) KML engaged consultants FIM Limited and FIM Advisers LLP (together "FIM") to perform due diligence on BLMIS. (*Id.* at ¶ 82.) Although FIM had a London address, the head of due diligence for its feeder fund investments was located in New York and worked with FIM's affiliate FIM (USA) Inc. in New York, which was the hub for FIM's feeder fund due diligence. (*Id.* at ¶¶ 82–83)

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's main brief, this Court should deny Bordier's motion to dismiss and grant the Trustee's motion for leave to amend the Complaint.

5

Dated: June 26, 2015  
      New York, New York

/s/ Thomas L. Long  
**Baker & Hostetler LLP**  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Thomas L. Long  
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*