**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>           Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>           Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>           Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>           Plaintiff,<br><br>    v.<br><br>EFG BANK S.A., f/k/a EFG Private Bank S.A., EFG BANK (MONACO) S.A.M, f/k/a EFG Eurofinancière d'Investissements S.A.M., and EFG BANK & TRUST (BAHAMAS) LIMITED, as successor-in-interest to Banco Atlantico (Bahamas) Bank & Trust Limited,<br><br>           Defendants. | Adv. Pro. No. 12-01690 (SMB) |

**TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS BASED**
**ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT**
**OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**

The Trustee respectfully submits this memorandum in opposition to defendants EFG

Bank S.A.'s, f/k/a EFG Private Bank S.A. ("EFG Bank"), EFG Bank (Monaco) S.A.M.'s, f/k/a

EFG Eurofinancière d'Investissements S.A.M. ("EFG Monaco"), and EFG Bank & Trust

(Bahamas) Limited's ("EFG Bahamas") as successor-in-interest to Banco Atlantico (Bahamas)

Bank & Trust Limited's ("Banco Atlantico") (collectively, the "Defendants") motion to dismiss

based on extraterritoriality and in further support of the Trustee's motion for leave to amend the

complaint.  As set forth below the Proffered Allegations Pertaining to the Extraterritoriality Issue

as to Defendants ("Proffered Allegations") plead facts evidencing the subsequent transfers

received by Defendants are predominantly domestic under the standard set forth in the

Extraterritoriality Decision,[1] such that the Trustee's action does not require an extraterritorial

application of SIPA or Bankruptcy Code § 550.  Defendants' motion to dismiss should be

denied, and the Trustee should be granted leave to amend the complaint.

## BACKGROUND & LEGAL STANDARD

This Court must determine whether the Trustee's claims against Defendants seek the

recovery of "purely foreign" transfers, requiring an extraterritorial application of Bankruptcy

Code § 550.[2]  Under the Extraterritoriality Decision, the Trustee must only put forth "specific

facts suggesting a domestic transfer" to avoid dismissal.[3]  In making this determination, this

Court must review "the location of the transfers as well as the component events of those

transactions."[4]  This is a fact-based inquiry in which all reasonable inferences are to be drawn in

---

[1] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 513 B.R. 222, 232-33 (S.D.N.Y. 2014) ("Extraterritoriality Decision").

[2] *Id.*

[3] *Id.* at 232 n.4.

[4] *Id.* at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)* (*"Maxwell I"*), 186 B.R. 807, 817 (S.D.N.Y. 1995)).

the Trustee's favor.[5]

The Trustee's Proffered Allegations allege Defendants received at least $390,350,356 in subsequent transfers of BLMIS customer property collectively made by Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma"), Fairfield Lambda Limited ("Lambda," and together with Fairfield Sentry and Sigma, the "Fairfield Funds"), and Kingate Global Fund Limited ("Kingate Global," and together with the Fairfield Funds, the "Feeder Funds"). Proffered Allegations ¶ 1.  Of the $390,350,356, at least $336,750,024 are subsequent transfers of BLMIS customer property made to EFG Bank, EFG Monaco, and Banco Atlantico, which became EFG Bahamas and an EFG Bank subsidiary in 2005, by Fairfield Sentry, at least $10,597,910 are subsequent transfers of BLMIS customer property made to EFG Bank and Banco Atlantico by Fairfield Sentry through Sigma, at least $653,819 are subsequent transfers of BLMIS customer property made to EFG Bank by Fairfield Sentry through Lambda, and at least $42,348,602 are subsequent transfers of BLMIS customer property made to EFG Bank and EFG Monaco by Kingate Global.  *Id.* ¶¶ 1, 8.

BLMIS held customer accounts for several feeder funds—single-purpose investment funds that pooled their investors' assets to invest with BLMIS, capitalizing on its consistent returns—including Fairfield Sentry and Kingate Global.  *Id.* ¶ 2.  Sigma and Lambda, Fairfield Sentry sister funds, were "currency feeders" that accepted subscriptions in Euros and Swiss francs, respectively, converted the currency to U.S. Dollars, and then purchased shares of Fairfield Sentry.  *Id.* ¶ 4.  Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry, Sigma, and Lambda.  *Id.* ¶ 5.  The Trustee alleges that Fairfield Sentry and Kingate Global withdrew funds from their BLMIS

---

[5] *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403-05 (S.D.N.Y. 2010).

accounts and transferred those funds to Defendants. *Id.* ¶¶ 1, 3. Some of the transfers from Fairfield Sentry were directed to Defendants through Sigma and Lambda. *Id.* ¶¶ 1, 4.

Defendants argue that because both they and the Feeder Funds were organized under the laws of foreign countries, they are entitled to a finding that transfers from these funds are "purely foreign" and must be dismissed under the Extraterritoriality Decision. Defendants are wrong, and their superficial analysis is contrary to the *Maxwell I* "component events" analysis embraced by the District Court in the Extraterritoriality Decision,[6] and inconsistent with Second Circuit precedent requiring courts to look at the economic and legal realities of a transaction to determine whether a claim is "sufficiently domestic" for purposes of extraterritoriality.[7] As set forth below, a comprehensive review of the component events of the transactions, facts pertinent to the Fairfield Funds maintaining their principal place of business in New York, and the economic reality of Kingate Global's operations demonstrate the Trustee's recovery claims against Defendants do not require an extraterritorial application of SIPA or Bankruptcy Code § 550.

## I. THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS WERE COMPRISED OF PREDOMINANTLY DOMESTIC ELEMENTS

The United States served as the center of Defendants' relationships with the Fairfield Funds and Kingate Global, and the associated transactions between the Fairfield Funds and Kingate Global and Defendants were comprised of predominantly domestic elements.

The Proffered Allegations set forth specific facts that show the component events of the transactions were comprised of predominantly domestic elements, including: (1) EFG Bank and

---

[6] *See* Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 817).

[7] *See, e.g., Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141–42 (2d Cir. 2014); *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings,* 763 F.3d 198, 216 (2d Cir. 2014).

EFG Monaco utilized U.S. agents to manage their Feeder Fund investments in the United States;

(2) Defendants' relationships with the Feeder Funds were centered in the United States; (3) each

of the Defendants separately met with Madoff; (4) Defendants submitted to New York law and

venue in connection with their investments; (5) Defendants repeatedly utilized New York bank

accounts to transfer funds; (6) the Fairfield Funds operated from their principal place of business

in New York; and (7) Kingate Global had a single economic purpose: to make money from

BLMIS, a New York-based investment operation.

### A.    EFG Bank Utilized U.S. Agents to Manage Investments in Feeder Funds in the United States

EFG Bank managed its investments in Feeder Funds in the United States through the use

of U.S.-based affiliates and agents. EFG Bank specifically relied on a U.S.-based affiliate EFG

Capital International Corp. ("EFG Capital") and Access International Advisors, LLC—both

incorporated in Delaware and headquartered in the U.S.—to conduct due diligence on BLMIS

for EFG Bank and manage its investments in Feeder Funds. Proffered Allegations ¶ 2.

From Miami, Florida, EFG Capital initiated and managed EFG Bank's relationship with

the Fairfield Funds, directed transfers between EFG Bank and the Fairfield Funds, and executed

subscription agreements or redemption requests with the Fairfield Funds on EFG Bank's behalf.

*Id.* ¶¶ 18–21, 48.

### B.    EFG Monaco Utilized U.S. Agents to Manage Investments in Feeder Funds in the United States

EFG Monaco managed its investments in the Feeder Funds in the United States through

the use of U.S.-based affiliates and agents. *Id.* ¶¶ 18, 27. EFG Monaco relied on U.S.-based

EFG Capital to initiate and manage EFG Monaco's relationship with Fairfield Sentry and to

conduct due diligence on BLMIS. *Id.* ¶ 19. EFG Capital received retrocession fees from FGG—

an investment incentive FGG provided to large subscribers of the Fairfield Funds—for

4

facilitating EFG Monaco's investments in Fairfield Sentry.  *Id.* ¶ 48.

EFG Monaco also relied on JPMorgan Chase's Capital Markets Investment Program ("JPMorgan CMI") in New York to manage its proprietary investments in the United States, including its investments with Fairfield Sentry and Kingate Global.  *Id.* ¶ 27.  Through the use of EFG Capital and JPMorgan CMI, EFG Monaco transacted business with Fairfield Sentry and Kingate Global from the United States.  *Id.* ¶ 18, 27.

**C.**   **Defendants' Relationships with the Feeder Funds Were Centered in the United States**

**1.**   **Defendants Knew New York was the Center of Their BLMIS Investments through the Feeder Funds**

Through their due diligence, meetings with Madoff, and review of the Fairfield Funds' and Kingate Global's private placement memoranda ("PPM"), the Defendants knew the Fairfield Funds and Kingate Global were almost entirely invested with New York-based BLMIS.  *Id.* ¶ 32. As a result, the Defendants intentionally tried to profit from BLMIS's operations in New York through investments in the Feeder Funds.  *Id.*

Through their due diligence on Madoff, BLMIS, and the Feeder Funds—and pursuant to the terms of the PPMs and subscription agreements each executed among other things—the Defendants knew the following facts:

- Madoff operated BLMIS, which in turn purported to execute the split-strike conversion investment strategy ("SSC Strategy") on behalf of the Feeder Funds.

- In reality New York-based BLMIS was the investment adviser for each of the Feeder Funds.

- BLMIS maintained custody of the Feeder Funds' investments in New York.

- BLMIS functioned as a registered broker-dealer executing the SSC Strategy in New York for the Feeder Funds.

- BLMIS purported to invest Feeder Funds' assets exclusively in U.S. equities and U.S. Treasurys.

5

- Control over the Feeder Funds' investments rested entirely with BLMIS and Madoff in New York.

- BLMIS was a member of SIPC regulated by the SEC.

*Id.* ¶ 34.

The Defendants also knew that the Fairfield Funds and Kingate Global were virtually identical in their reliance on BLMIS. *Id.* ¶ 35. The Defendants' investments with BLMIS through the Fairfield Funds and Kingate Global were not accidental or fortuitous—they utilized these funds to profit from BLMIS and Madoff. *Id.* ¶ 36. The Defendants acted with intent when they made their Fairfield Funds and Kingate Global investments, including directing more than 1600 separate subscriptions for Fairfield Sentry shares. *Id.*

### 2. EFG Bank's Relationship with the Fairfield Funds Was Centered in the United States

EFG Bank subscribed in the Fairfield Funds and Kingate Global as a means of accessing and profiting from BLMIS in New York. *Id.* ¶¶ 46, 78. EFG Bank met with Madoff directly, and EFG Bank had access to the due diligence compiled from EFG Capital's recurrent meetings with BLMIS in New York. *Id.* ¶¶ 47, 50.

EFG Bank knew the Fairfield Funds were managed, operated, and based in New York, and EFG Bank visited FGG headquarters in New York to conduct due diligence on the Fairfield Funds and BLMIS. *Id.* ¶ 49. At times, EFG Bank also directed EFG Capital in Miami to visit New York to review Fairfield Sentry on EFG Bank's behalf. *Id.* ¶ 47.

Moreover, by executing subscription agreements with the Fairfield Funds—both directly and through EFG Capital in Miami—EFG Bank agreed to submit to New York law and venue. *Id.* ¶¶ 51–54. Pursuant to the direction of these subscription agreements, on nearly 730 occasions over the course of approximately 11 years, EFG Bank directed subscription payments to correspondent bank accounts in New York for ultimate deposit in Fairfield Sentry's bank

6

account. *Id.* ¶ 56. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York. *Id*. EFG Bank also utilized U.S. bank accounts repeatedly—nearly 500 times over a 10 year period—to receive $230,243,474 in redemption payments from Fairfield Sentry. *Id.* ¶ 57.

### 3. EFG Monaco's Relationship with the Fairfield Funds Was Centered in the United States

EFG Monaco subscribed in Fairfield Sentry and Kingate Global in order to profit from BLMIS in New York. *Id.* ¶¶ 58, 78. EFG Monaco maintained direct access to Madoff in connection with its investments in Equity Trading Portfolio Limited ("Equity Trading"), another feeder fund that channeled EFG Monaco's investments to BLMIS. *Id.* ¶ 40. This direct access included the opportunity to participate in annual meetings with Madoff and communications with Madoff via email or telephone to discuss upcoming redemptions or subscriptions in Equity Trading's BLMIS account. *Id.*

As previously noted, EFG Monaco transacted business with Fairfield Sentry and Kingate Global through the use of its U.S. agents and affiliates. *Id.* ¶ 59, 60. EFG Monaco also knew Fairfield Sentry was managed, operated, and based in New York, and EFG Monaco directed communications with Fairfield Sentry—independently or through the use of its U.S. agents—to FGG's New York headquarters. *Id.*

Further, by executing Fairfield Sentry subscription agreements, EFG Monaco agreed its investments would be governed by New York law and venue provisions. *Id.* ¶¶ 63, 64. Pursuant to these subscription agreements, on 17 occasions over the course of nearly 4 years, in connection with subscribing funds to Fairfield Sentry, EFG Monaco directed funds to New York correspondent bank accounts for ultimate deposit in Fairfield Sentry's account. *Id.* ¶ 65. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in

7

New York.  *Id.*

### 4.    Banco Atlantico's Relationship with the Fairfield Funds Was Centered in the United States

EFG Group (Switzerland) purchased Banco Atlantico, resulting in the creation of Defendant EFG Bahamas.  *Id. ¶ 8*.  As of July 22, 2005, Banco Atlantico Bank & Trust, Ltd. was a subsidiary of EFG Bank.  *Id.*  After becoming EFG Bahamas and a subsidiary of EFG Bank, Banco Atlantico continued to receive a limited number of transfers in its name despite the change in legal ownership and name.  *Id.*

Banco Atlantico subscribed in the Fairfield Funds as a means of placing investments with BLMIS in New York.  *Id. ¶ 66*.  In November 2003, Banco Atlantico visited New York to conduct due diligence on the Fairfield Funds, which included meetings with FGG's most senior partners.  *Id. ¶ 68*.  Because Banco Atlantico knew its investments with the Fairfield Funds revolved around BLMIS's operations in New York, Banco Atlantico also visited BLMIS's New York offices as part of its due diligence on the Fairfield Funds.  *Id. ¶ 69*.  After the meeting with Madoff, Banco Atlantico returned to FGG's New York headquarters to review BLMIS account records, including customer account statements and trade confirmations, which demonstrated that BLMIS purported to execute the SSC Strategy exclusively in U.S. markets.  *Id. ¶ 71*.

Banco Atlantico knew the Fairfield Funds were managed, operated, and based in New York, and Banco Atlantico agreed to U.S. law in connection with its investments in the Fairfield Funds.  *Id. ¶ 73*.  By executing Fairfield Sentry subscription agreements, Banco Atlantico also submitted to New York jurisdiction and venue in connection with its investments in Fairfield Sentry.  *Id. ¶ 74*.  Moreover, on approximately 63 occasions over the course of more than 7 years, in connection with subscribing funds to Fairfield Sentry, Banco Atlantico directed funds to New York correspondent bank accounts for ultimate deposit in Fairfield Sentry's bank account.

*Id.* ¶ 76.  From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York.  Banco Atlantico also utilized U.S. bank accounts repeatedly—approximately 42 times over a 6 year period—to receive $97,805,255 in redemption payments from Fairfield Sentry.  *Id.* ¶ 77.

> **D.**      **EFG Bank's and EFG Monaco's Relationship with Kingate Global Was Centered in the United States**

EFG Bank and EFG Monaco each knew Kingate Global was a Feeder Fund, meaning the purported underlying portfolio for Kingate Global was identical to other feeder funds.  *Id.* ¶ 79. As a result, the information about BLMIS that EFG Bank and EFG Monaco collected from their U.S. contacts also applied to their investments in Kingate Global including any of the following contacts, which were described in greater detail above:  (1) direct meetings with Madoff or FGG in New York; (2) reliance on EFG Capital in Miami for due diligence on BLMIS; or (3) use of other U.S. investment managers, such as Access or JPMorgan CMI.  *Id.* ¶ 79.

EFG Monaco's New York-based investment agent, JPMorgan CMI, also specifically communicated with Kingate Global regarding capacity for potential subscriptions from EFG Monaco, and otherwise transacted with Kingate Global on EFG Monaco's behalf from New York.  *Id.* ¶ 80.  Furthermore, Kingate Global's subscription agreement directed investors to wire investments to a correspondent bank account in New York for further credit to Kingate Global's account with the Bank of Bermuda.  *Id.* ¶ 84.

As a result of their due diligence and review of Kingate Global's offering memoranda, EFG Bank and EFG Monaco each knew that by investing in Kingate Global, they were directing investments to BLMIS's unfettered discretion and custody in New York.  *Id.* ¶ 83.  Because EFG Bank and EFG Monaco each knew Kingate Global delegated virtually all investment management, custody, and brokerage functions to BLMIS in New York, EFG Bank and EFG

9

Monaco knew their transactions with Kingate Global were centered in the United States in the same ways as the Fairfield Funds. *Id.* ¶ 85.

## II.    FAIRFIELD SENTRY, SIGMA, AND LAMBDA MAINTAINED THEIR PRINCIPAL PLACE OF BUSINESS IN NEW YORK

In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG, a New York-based *de facto* partnership. Proffered Allegations ¶ 86. As part of FGG, Noel and Tucker incorporated Fairfield International Managers, Inc. ("Fairfield International Managers"). *Id.* ¶ 89. Through Fairfield International Managers, Noel and Tucker organized the largest feeder fund, Fairfield Sentry, as well as its so-called "currency funds," Sigma and Lambda, which invested all of its assets in Fairfield Sentry. *Id.* ¶¶ 5, 88.

Noel and Tucker formally organized the Fairfield Funds as international business companies under BVI law. *Id.* ¶¶ 90, 112. As international business companies, BVI law restricted the Fairfield Funds from doing business with other BVI citizens and residents except with other BVI international business companies. *Id.* The Fairfield Funds were shell corporations present in the BVI solely on paper. *Id.* ¶¶ 91, 113. Their BVI statutorily required registered address was a post office box care of a local trust company owned and operated by a local law firm. *Id.*

From their inception until their liquidation in 2009, the Fairfield Funds had no employees and no offices. *Id.* At all relevant times, the Fairfield Funds were operated almost entirely by FGG's New York City headquarters personnel who maintained final control of the Fairfield Funds' bank accounts and relationships with the Fairfield Funds' back office service providers. *Id.* ¶¶ 91, 96, 113, 116.

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. *Id.* ¶ 93. In the account opening documents, Tucker identified Fairfield Sentry's mailing address as Fairfield

10

International Managers' office in Greenwich, Connecticut and directed BLMIS to send Fairfield Sentry's monthly account statements, trade confirmations, and correspondence to the same Fairfield International Managers office.  *Id.*  In January 1998, FGG requested BLMIS to send all Fairfield Sentry account information to FGG's New York City headquarters.  *Id.*

From the Fairfield Funds' inception, FGG personnel at its New York City headquarters controlled the sales and subscriptions of the funds' shares.  *Id.* ¶¶ 98, 115.  From at least January 1, 2002, Fairfield Sentry's subscription agreements contained New York choice of law provisions and provided for venue and jurisdiction for any disputes in New York.  *Id.* ¶ 98.  Like Fairfield Sentry's subscription agreements, Sigma's and Lambda's subscription agreements also contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's and Lambda's sole assets.  *Id.* ¶ 115.

At all relevant times, FGG New York City headquarters personnel monitored the Fairfield Funds' investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of Fairfield Sentry; marketed the Fairfield Funds; approved all subscriptions for Fairfield Funds shares; maintained all of the Fairfield Funds' books and records at the FGG New York City headquarters; and made all strategic and operational decisions regarding the Fairfield Funds.  *Id.* at ¶¶ 97–98, 114–115.

Because Fairfield Sentry maintained its principal place of business in New York and conducted its business from its New York headquarters, the transfers made by Fairfield Sentry to Defendants are not purely foreign.

## III.  <u>KINGATE GLOBAL'S OPERATIONS WERE BASED IN NEW YORK</u>

Kingate Global invested exclusively with BLMIS in New York and, together with its

purported investment manager, consultant, and other service providers, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation. Proffered Allegations ¶ 122.

Kingate Global executed customer agreements, and other accounts opening documents, and delivered the agreements to BLMIS in New York. *Id.* ¶ 127. The agreements were governed by U.S. law, and disputes under the agreements were to be resolved in the United States. *Id.* ¶¶ 128–129. The agreements further authorized BLMIS to act as Kingate Global's investment manager and executing broker and to invest Kingate Global's assets according to Madoff's SSC investment strategy, which purported to involve the purchase and sale of U.S. securities traded only on domestic exchanges. *Id.* ¶¶ 130–132. In addition, the agreements provided that BLMIS would hold custody of Kingate Global's investments in New York. *Id.* ¶ 143. Accordingly, control over Kingate Global rested entirely with BLMIS in New York.

Kingate Global had no physical offices, no employees, and transacted no meaningful business in the BVI. *Id.* ¶ 123. Instead, Kingate Global operated through service providers with substantial connections to the United States. Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years and was formed in Bermuda, but was itself managed from New York by Tremont Partners, Inc., a Connecticut corporation. *Id.* ¶ 124. Kingate Global was also co-managed by Kingate Management Limited ("KML"), which operated through agents in New York. *Id.* ¶ 136. KML engaged consultants FIM Limited and FIM Advisers LLP (together "FIM") to perform due diligence on BLMIS. *Id.* ¶ 139. Although FIM had a London address, the head of due diligence for its feeder fund investments was located in New York and worked with FIM's affiliate FIM (USA) Inc. in New York, which was the hub for FIM's feeder fund due diligence. *Id.* ¶¶ 140–141. From New York, FIM (USA) Inc.

12

monitored, researched and solicited investors for Kingate Global.  *Id.* ¶ 141.

Because Kingate Global conducted its Madoff business in the United States, the transfers made by Kingate Global to Defendants are not purely foreign.

## IV.   CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, this Court should grant the Trustee's motion for leave to amend the complaint and deny Defendants' motion to dismiss.

Dated: June 26, 2015                                      /s/ Thomas L. Long
      New York, New York                  **Baker & Hostetler LLP**
                                                 45 Rockefeller Plaza
     New York, New York 10111
     Telephone:  (212) 589-4200
     Facsimile:  (212) 589-4201
     David J. Sheehan
     Thomas L. Long
     Catherine E. Woltering

     **Baker & Hostetler LLP**
     65 East State Street, Suite 2100
     Columbus, Ohio 43215
     Telephone:  (614) 228-1541
     Facsimile:  (614) 462-2616
     Douglas A. Vonderhaar

     *Attorneys for Irving H. Picard, Trustee*
     *for the substantively consolidated SIPA*
     *Liquidation of Bernard L. Madoff Investment*
     *Securities LLC and the estate of Bernard L.*
     *Madoff*