**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br> v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br>    Plaintiff,<br> v.<br><br>EFG BANK S.A., f/k/a EFG Private Bank S.A., EFG BANK (MONACO) S.A.M., f/k/a EFG Eurofinancière d'Investissements S.A.M., and EFG BANK & TRUST (BAHAMAS) LIMITED, as successor-in-interest to Banco Atlantico (Bahamas) Bank & Trust Limited,<br><br>    Defendants. | Adv. Pro. No. 12-01690 (SMB)<br><br><br><br>**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO EFG DEFENDANTS** |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendants EFG Bank S.A., f/k/a EFG Private Bank S.A. ("EFG Bank"), EFG Bank (Monaco) S.A.M., f/k/a EFG Eurofinancière d'Investissements S.A.M. ("EFG Monaco"), and EFG Bank & Trust (Bahamas) Limited ("EFG Bahamas") as successor-in-interest to Banco Atlantico (Bahamas) Bank & Trust Limited ("Banco Atlantico") (collectively, the "Defendants"), states:

## I.  **BACKGROUND**

1.    The Trustee seeks to recover at least $390,350,356 in subsequent transfers of BLMIS customer property made to Defendants by Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma"), Fairfield Lambda Limited ("Lambda" and, together with Fairfield Sentry and Sigma, the "Fairfield Funds"), and Kingate Global Fund, Ltd. ("Kingate Global," and together with the Fairfield Funds, the "Feeder Funds").  Of the $390,350,356, at least $336,750,024 are subsequent transfers of BLMIS customer property made to EFG Bank, EFG Monaco, and Banco Atlantico by Fairfield Sentry, at least $10,597,910 are subsequent transfers of BLMIS customer property made to EFG Bank and Banco Atlantico by Fairfield Sentry through Sigma, at least $653,819 are subsequent transfers of BLMIS customer property made to EFG Bank by Fairfield Sentry through Lambda, and at least $42,348,602 are subsequent transfers of BLMIS customer property made to EFG Bank and EFG Monaco by Kingate Global.

2.    BLMIS held customer accounts for numerous feeder funds—single-purpose investment funds that pooled their investors' assets to invest with BLMIS in New York, capitalizing on its consistent returns—including Fairfield Sentry and Kingate Global.

3.    From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.  From March 1994 through December 2008, Kingate Global also maintained a direct customer account with BLMIS.

4.      Sigma and Lambda, Fairfield Sentry sister funds, were "currency funds" that accepted subscriptions in Euros and Swiss Francs, respectively, converted the money to U.S. Dollars, and then invested 100% of their assets in Fairfield Sentry.

5.      As detailed further below, Fairfield Sentry was the largest BLMIS feeder fund, and Fairfield Greenwich Group ("FGG"), a *de facto* partnership, created, operated, and controlled the Fairfield Funds from its New York headquarters.

6.      Defendant EFG Bank is a *société anonyme*, a public limited company incorporated and organized under the laws of Switzerland, with a registered address at Bahnhofstrasse 16, 8022 Zurich, Switzerland.

7.      Defendant EFG Monaco is a *société anonyme* incorporated and organized under the laws of Monaco, with a registered address at 15 Avenue d'Ostende MC 99001, Monaco.

8.      Defendant EFG Bahamas, as a successor-in-interest to Banco Atlantico, is a Bahamian company with a registered address at Centre of Commerce, 2nd floor, 1 Bay Street, Nassau, The Bahamas.  EFG Group (Switzerland) purchased Banco Atlantico, resulting in the creation of EFG Bahamas.  As of July 22, 2005, Banco Atlantico Bank & Trust, Ltd. was a subsidiary of EFG Bank.  After becoming EFG Bahamas and a subsidiary of EFG Bank, Banco Atlantico continued to receive a limited number of transfers in its name despite the change in legal ownership and name.

9.      Non-party EFG Capital International Corp. ("EFG Capital") is an indirect subsidiary of EFG International AG ("EFG International") incorporated in Delaware with a principal place of business in Miami, Florida.

10.     The chart below depicts the relationship between the Defendants and their EFG affiliates:



11.     EFG Bank, EFG Monaco, EFG Capital, EFG International, and, after the July 2005 acquisition, EFG Bahamas collectively functioned as one entity for the purposes alleged herein.

## II.    THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS WERE COMPRISED OF PREDOMINANTLY DOMESTIC ELEMENTS

12.     The United States served as the center of Defendants' relationships with the Fairfield Funds and Kingate Global.  The associated transactions between the Fairfield Funds and Kingate Global, respectively, and Defendants were comprised of predominantly domestic elements.

### A.    Defendants Maintained Continuous Operations in the United States

#### 1.    *Defendants Operated as Part of an Integrated Network of Financial Entities that Maintained Continuous Operations in the United States through EFG Capital*

13.     The Defendants are direct or indirect subsidiaries of EFG International, the parent company of a group of global banking and asset management entities that make up the "EFG Group."  The Defendants operated collectively as part of this global network, working together to profit from investments, including investments in Feeder Funds.

14.     Members of the EFG Group advertised their ability to "access [EFG International's] extensive global infrastructure, and bring together the best ideas for [each] portfolio." This global infrastructure included consolidating certain functions related to hedge fund research, monitoring, diligence, and ongoing relationships with managers.

15.     The EFG Group maintained a centralized due diligence team, and members of the EFG Group—including the Defendants—shared hedge fund due diligence prepared by this team with one another. Similarly, EFG Monaco's FUNDEX Department prepared and circulated a monthly Investment Funds Performance Review summarizing the performance of various hedge funds for representatives employed by the various companies within the EFG Group, including the other Defendants.

16.     As a cooperative network, the EFG Group maintained significant and continuous operations in the United States through EFG Capital, an indirect subsidiary of EFG International based in Miami, Florida. On its website, EFG Capital explains that "EFG Capital . . . together with its affiliated investment advisers are the principal providers of wealth management services in the United States for EFG International."

17.     EFG Capital was incorporated in Delaware, based in Miami, Florida, and is a member of SIPC. EFG Capital's filings with the New York and Florida Departments of State identify its principal office address as 701 Brickell Avenue, 9th Floor, Miami, Florida. EFG Capital also maintains a branch office in New York, New York.

18.     EFG Capital was responsible for managing certain hedge fund relationships on behalf of the EFG Group, including the Defendants' relationships with the Fairfield Funds and Kingate Global. EFG Capital representatives provided what they referred to as "US coverage" for the entire EFG Group.

4

19.    From Miami, Florida, EFG Capital communicated with the Fairfield Funds and Kingate Global, conducted due diligence, and aggregated research materials, which EFG Capital then made available to the EFG Group, including Defendants.  Sixto Campano, EFG Capital's chief executive officer, noted that "out of the different EFG offices, [EFG Capital] had the lead relationship with [FGG]."  This lead was demonstrated in 2003 when EFG Capital reviewed BLMIS's unusual custody arrangement with Fairfield Sentry and shared its analysis and concerns with EFG Bank.

20.    As the provider of "US coverage" for the members of the EFG Group, EFG Capital was particularly involved in initiating and developing the EFG Group's relationship with the Fairfield Funds.  According to EFG Capital's Sixto Campano, the relationship between the EFG Group and the Fairfield Funds was "born in Miami" at EFG Capital.

21.    EFG Capital managed the relationship with the Fairfield Funds on behalf of the rest of the EFG Group entities, including Defendants EFG Bank, EFG Monaco and, after its acquisition, EFG Bahamas.  As the manager of these relationships, EFG Capital regularly met with BLMIS and FGG in New York to conduct due diligence and review investments with the Fairfield Funds.

22.    In addition to their reliance on EFG Capital to review BLMIS and manage relationships with the Fairfield Funds from the United States, both EFG Bank and EFG Monaco utilized other U.S. agents in connection with their Fairfield Funds, Kingate Global, and other Feeder Fund investments.

**2.    *EFG Bank Utilized Access International Advisors, LLC to Manage Its Investments and Conduct Due Diligence on a BLMIS Feeder Fund***

23.    EFG Bank maintained significant operations in the United States by contracting Delaware-incorporated Access International Advisors, LLC ("Access")—an investment adviser

5

registered with the SEC that managed a number of feeder funds from its office in New York—to conduct due diligence in the United States on EFG Bank's behalf.

24.     Beginning in August 2004 and continuing through December 2008, EFG Bank engaged New York-based Access as "sub-advisor" with "limited power-of-attorney" to manage investments in at least three funds, one of which was Access's BLMIS feeder fund similar to the Fairfield Funds and Kingate Global, Groupement Financier Limited ("Groupement").  The sub-advisory agreement between EFG Bank and Access included a New York choice of law provision and directed Access to provide "discretionary investment advisory services" to EFG Bank.

25.     In connection with this engagement, EFG Bank maintained regular communications with Access, including visits to Access's New York office.  As Access's managing director highlighted in a December 2005 email, "[a]lthough Access is solely responsible for investing and re-investing the assets of [EFG Bank's investment fund], we include EFG in the monthly allocation meetings" that were hosted by Access's New York office.

26.     From New York, Access provided EFG Bank with spreadsheets compiling the information contained in Groupement's BLMIS account statements and trade confirmations. From 2004 through at least 2007, EFG Bank and/or its agents regularly received, analyzed, and monitored this data, which reflected BLMIS's purported trading in U.S. securities, S&P 100 Index options, and U.S. Treasury bills ("Treasurys").

### 3.     *EFG Monaco Utilized JP Morgan Chase's Investment Program in New York as Its Investment Adviser*

27.     In addition to its reliance on EFG Capital in Miami, Defendant EFG Monaco engaged JPMorgan Chase Bank NA's ("JPMorgan") New York-based investment program,

Capital Markets Investment Program ("JPMorgan CMI"), to manage its proprietary investments, including its investments in the Fairfield Funds and Kingate Global.

28.    JPMorgan CMI was EFG Monaco's agent for purposes of its investments in the Fairfield Funds and Kingate Global, including communications from JPMorgan's New York office with FGG representatives in New York and Kingate Global's co-founders Federico Ceretti and Carlo Grosso.

29.    Euripides Matos was one of the principal JPMorgan CMI representatives responsible for EFG Monaco's proprietary investments, including its investments in the Fairfield Funds and Kingate Global.  Prior to working at JPMorgan, Matos was an Associate Portfolio Manager and Senior Research Analyst at Tremont Advisers, Inc. ("Tremont"), where he had significant involvement with Tremont's numerous BLMIS feeder funds.

30.    Based on his experience at Tremont, Matos understood BLMIS purported to invest exclusively in U.S. markets.  Matos knew the feeder funds profited from Madoff's split-strike conversion strategy ("SSC Strategy") and its purported dependence on certain U.S. stock market conditions.  Matos used such knowledge as he managed EFG Monaco's proprietary investments in Feeder Funds.

31.    Through the use of JPMorgan CMI as its investment adviser in New York, EFG Monaco communicated and transacted with the Feeder Funds from the United States, including conducting due diligence on, investing in, and redeeming from, the Feeder Funds.

**B.    Defendants Knew New York was the Center of Their BLMIS Investments through the Feeder Funds**

*1.    Defendants Knowingly Subscribed in Fairfield Sentry as a Means of Profiting from BLMIS in New York*

32.    At all relevant times, through their due diligence, meetings with Madoff, and review of offering memoranda and/or private placement memoranda ("PPMs"), among other

things, the Defendants knew the Fairfield Funds and Kingate Global were almost entirely invested with New York-based BLMIS. Through their investments in the Feeder Funds, the Defendants intentionally tried to profit from BLMIS's operations in New York.

33.    By executing one or more subscription agreements with the Feeder Funds, each of the Defendants agreed to the terms in the funds' PPMs.

34.    Through their due diligence on Madoff, BLMIS, and the Feeder Funds—and pursuant to the terms of the PPMs each received and subscription agreements each executed—the Defendants knew the following facts:

- Madoff operated BLMIS, which in turn purported to execute the SSC Strategy on behalf of the Feeder Funds.

- In reality New York-based BLMIS was the investment adviser for each of the Feeder Funds.

- BLMIS maintained custody of the Feeder Funds' investments in New York.

- BLMIS functioned as a registered broker-dealer executing the SSC Strategy in New York for the Feeder Funds.

- BLMIS purported to invest Feeder Funds' assets exclusively in U.S. equities and U.S. Treasurys.

- Control over the Feeder Funds' investments rested entirely with BLMIS and Madoff in New York.

- BLMIS was a member of SIPC regulated by the SEC.

35.    Because the Defendants understood the Fairfield Funds and Kingate Global were virtually identical in their reliance on BLMIS, the Defendants' based their decision to invest in particular Feeder Funds on other factors—not on differences in BLMIS's underlying investment strategy, which was the same for each Feeder Fund.

36.    The Defendants' investments with BLMIS through the Fairfield Funds and Kingate Global were not accidental or fortuitous—they utilized these funds to profit from

8

BLMIS and Madoff. The Defendants acted with intent when they made their Fairfield Funds and Kingate Global investments, including directing more than 1600 individual subscriptions in Fairfield Sentry.

### 2.    *Each of the Defendants Met Separately with Madoff*

37.    Because the Defendants' knew their transactions with the Fairfield Funds and Kingate Global revolved around BLMIS's New York operations, each of the Defendants met separately with Madoff at BLMIS's offices in New York.

38.    EFG Bank met with Madoff in February 2005 to discuss due diligence issues related to its investments in the Fairfield Funds and other feeder funds. Additionally, EFG Bank knew EFG Capital repeatedly visited BLMIS's New York office to conduct due diligence, and EFG Bank maintained access to the due diligence file EFG Capital compiled from its numerous meetings with BLMIS.

39.    Banco Atlantico visited BLMIS's New York office in connection with its investments in Fairfield Sentry and Sigma. In November 2003, representatives of Fairfield Sentry hosted Banco Atlantico at FGG's New York headquarters, reviewed BLMIS's trade confirmations with Banco Atlantico, and escorted Banco Atlantico to BLMIS's New York office to meet with Madoff.

40.    EFG Monaco maintained direct access to BLMIS in connection with its investments in Equity Trading Portfolio Limited ("Equity Trading"), another Feeder Fund managed by Capital E Advisors, Inc. in New York. In connection with these investments, EFG Monaco's George Catsiapis was invited to participate in annual meetings with Madoff, including a May 2008 meeting at BLMIS's New York office. Catsiapis also communicated with Madoff by email or telephone regarding upcoming subscriptions in or redemptions from Equity

Trading's BLMIS account. Additionally, in November 2008, a phone call from Catsiapis to the phone line of Eleanor Squillari, Madoff's secretary, lasted over six hours.

41.     EFG Monaco worked with Equity Trading's managers and marketing representatives to maintain a close relationship with BLMIS, including discussions regarding possible "token" subscriptions of $1 or $2 million to appease Madoff, or, alternatively, the use of leverage to avoid having to redeem from BLMIS during times when Madoff would be particularly sensitive to redemptions.

### C.     Defendants' Relationships with the Fairfield Funds were Centered in the United States

42.     According to EFG Capital's Sixto Campano, the EFG Group's relationship with the Fairfield Funds was "born in Miami." From Miami, Florida, EFG Capital initiated and managed this relationship on behalf of the rest of the EFG Group, including EFG Bank, EFG Monaco, and after its 2005 acquisition, EFG Bahamas. Through the use of EFG Capital, the Defendants transacted with the Fairfield Funds from the United States.

43.     As a Delaware corporation responsible for maintaining EFG Group's "US coverage," EFG Capital conducted due diligence on BLMIS and the Fairfield Funds, and EFG Capital made the resulting due diligence files available to other members of the EFG Group. As part of its due diligence on Fairfield Sentry for the Defendants, EFG Capital made repeated visits to FGG's and BLMIS's offices in New York.

44.     At all times relevant, the Defendants knew their investments in the New York-based Fairfield Funds were managed by BLMIS in New York. In February 2003, after visiting FGG's New York office to conduct due diligence on Fairfield Sentry, EFG Bank's Mats Pehrsson prepared and disseminated a memorandum to EFG Capital identifying New York-based BLMIS as the "manager" of the Defendants' investments in Fairfield Sentry:

10

> F.S. [Fairfield Sentry] is managed by Bernard L. Madoff Securities
> LLC, New York (=MS). Established in 1960 by Bernard Madoff,
> MS is a US Broker Dealer and one of the largest market-makers in
> US equities . . . . It is located on Third Avenue, a few blocks away
> from FGG.

45.    The specific details of each Defendant's relationship with the Fairfield Funds

demonstrate that the transactions were centered in the United States.

### 1.    *EFG Bank's Relationship with the Fairfield Funds was Centered in the United States*

46.    EFG Bank received transfers from Fairfield Sentry, Sigma, and Lambda. EFG

Bank knew these Fairfield Funds were managed, operated, and based in New York at FGG's

headquarters with ultimate investment responsibility given to New York-based BLMIS.

47.    In connection with its investments in the Fairfield Funds, EFG Bank relied

heavily on EFG Capital's presence in the United States. In a February 2003 email to EFG

Capital's Miami office, EFG Bank's senior vice president, Jerome Schonbachler, wrote, "As

Miami does manage the relationship on behalf of all of us, do you think you could ask Fairfield

about the Sentry fund['s] recent performances." A week later, Schonbachler directed

representatives of EFG Capital in Miami to travel to FGG's New York office on its behalf to

conduct due diligence on Fairfield Sentry, including physical review of BLMIS trade

confirmations. Based on the face of these trade confirmations, EFG Capital knew that BLMIS

was a member of SIPC and the National Association of Securities Dealers and maintained its

offices in New York.

48.    From Miami, Florida, EFG Capital executed and sent EFG Bank's subscription

agreements and redemption requests to representatives of the Fairfield Funds. EFG Bank also

directed duplicate copies of its account confirmations be sent from the Fairfield Funds'

administrator to EFG Capital in Miami. EFG Capital received retrocession fees—an investment

incentive FGG provided to large subscribers—for its role in facilitating EFG Bank's investments in Fairfield Sentry.

49.    In addition to its reliance on EFG Capital, EFG Bank maintained a direct relationship with the Fairfield Funds, which was centered in the United States.  EFG Bank's Mats Pehrsson visited FGG's New York headquarters in 2003 to conduct due diligence on the Fairfield Funds, and disseminated a due diligence memorandum to EFG Capital for use by all of the EFG Group.  Because EFG Capital managed hedge fund relationships on behalf of the EFG Group, Pehrsson prepared and sent the due diligence memorandum to EFG Capital for consolidation with the rest of EFG Capital's due diligence on Fairfield Sentry and Madoff.  In addition to explaining that BLMIS managed Fairfield Sentry from New York—just a few blocks away from FGG—the due diligence memorandum explained that BLMIS was the "investment advisor/manager _and_ custodian _and_ prime broker for [the Fairfield Funds]." (Emphasis in original).  EFG Bank knew and appreciated that BLMIS's New York operations were central to EFG Bank's transactions with the Fairfield Funds.

50.    Throughout its relationship with the Fairfield Funds, EFG Bank met with BLMIS in New York, made numerous visits to FGG's New York headquarters, and relied on EFG Capital in Miami, Florida as its agent responsible for conducting due diligence and managing investments in, and redemptions from, the Fairfield Funds.

**a.    EFG Bank Submitted to U.S. Law, Venue, and Jurisdiction in Connection with Its Investments in the Fairfield Funds**

51.    EFG Bank submitted to U.S. law in connection with its investments in the Fairfield Funds.  Specifically, EFG Bank—directly and through EFG Capital—executed subscription agreements with Fairfield Sentry and Sigma, which EFG Bank agreed "shall be

governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

52.    EFG Bank further agreed that "any suit, action or proceeding . . . with respect to this Agreement and [the Fairfield Funds] may be brought in New York," and EFG Bank "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

53.    EFG Bank invested in Lambda, and from at least July 1, 2003, all Lambda subscription agreements contained New York choice of law provisions and provided for venue and jurisdiction for any disputes in New York.

54.    In July 2003, EFG Bank also negotiated and entered into a Letter of Understanding with New York-based Fairfield Greenwich Limited ("FGL")—an FGG member entity involved in the management of Fairfield Sentry and registered to do business in the State of New York.  FGL's agreement with EFG Bank provided for retrocession payments to EFG Bank as an incentive for investing in the Fairfield Funds.  The Letter of Understanding contained a New York choice of law provision and directed FGL to wire EFG Bank's retrocession fees to the U.S. bank account at UBS AG Stamford, Connecticut Branch, that it held in its former name, EFG Private Bank S.A. Zurich.

## b.    EFG Bank Repeatedly Utilized New York Banks to Transfer Funds

55.    EFG Bank utilized New York bank accounts to transfer funds to and from Fairfield Sentry.

56.    EFG Bank executed subscription agreements in connection with its investments in Fairfield Sentry.  This agreement stated that all money from EFG Bank be directed to either a Republic National Bank of New York or New York HSBC Bank USA correspondent bank

13

account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York. On nearly 730 occasions over the course of approximately 11 years, in connection with subscribing funds to Fairfield Sentry, EFG Bank directed funds to either the Republic National Bank of New York or New York HSBC Bank USA account.

57.    EFG Bank also used an account held in its former name, EFG Private Bank S.A. Zurich, at UBS AG in Stamford, Connecticut or UBS AG in New York to receive transfers from Fairfield Sentry. EFG Bank completed Fairfield Sentry subscription agreements, which directed redemptions payments to its UBS AG account in Stamford Connecticut. Each time EFG Bank submitted a redemption request to Fairfield Sentry, EFG Bank directed the remittances to EFG Bank's account at UBS AG in Stamford or UBS AG in New York. EFG Bank utilized U.S. bank accounts repeatedly—nearly 500 times over a 10 year period—to receive $230,243,474 in redemption payments from Fairfield Sentry.

### 2.    *EFG Monaco's Relationship with Fairfield Sentry was Centered in the United States*

58.    EFG Monaco received transfers from Fairfield Sentry knowing the fund was managed, operated, and based at FGG's headquarters in New York, New York.

59.    As a member of the EFG Group, EFG Monaco also relied on its U.S. affiliate, EFG Capital, to initiate and manage EFG Monaco's relationship with Fairfield Sentry. EFG Capital visited BLMIS's and FGG's New York offices numerous times to conduct due diligence on the Fairfield Funds on behalf of the EFG Group, including EFG Monaco. In this capacity, EFG Capital received retrocession fees in exchange for facilitating EFG Monaco's investments in Fairfield Sentry.

60.    EFG Monaco also relied on its New York-based JPMorgan investment adviser, JPMorgan CMI, to manage its relationship with Feeder Funds, including Fairfield Sentry.  By February 2003, EFG Monaco's agent, JPMorgan CMI, was working with FGG's New York office to conduct due diligence on and obtain capacity in Fairfield Sentry.  Email exchanges between FGG and JPMorgan CMI's  New York-based Euripides Matos and Shakil Riaz reveal that JPMorgan CMI maintained regular contact with FGG in New York, including "periodic calls about FSL [Fairfield Sentry]" to review Fairfield Sentry.  FGG provided JPMorgan CMI with due diligence reports and "monthly reviews" for Fairfield Sentry.

61.    EFG Monaco also maintained direct access to Madoff and BLMIS in connection with its investments in Equity Trading.

62.    Because EFG Monaco knew BLMIS purported to execute the SSC Strategy the same way for each feeder fund, EFG Monaco knew any information it gained from its direct access to Madoff in New York was applicable to its investments in Fairfield Sentry.

63.    By executing a Fairfield Sentry subscription agreement, EFG Monaco agreed that its investments "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

64.    EFG Monaco further agreed that "any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and EFG Monaco "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

65.    EFG Monaco also utilized New York bank accounts to transfer funds to Fairfield Sentry.  EFG Monaco's executed subscription agreements stated that all money from EFG Monaco be directed to either a Republic National Bank of New York or New York HSBC Bank

USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York. On 17 occasions over the course of nearly 4 years, in connection with subscribing funds to Fairfield Sentry, EFG Monaco directed funds to either the Republic National Bank of New York or New York HSBC Bank USA account.

### 3.   *Banco Atlantico's Transactions with Fairfield Sentry and Sigma were Centered in the United States*

66.    Banco Atlantico received transfers from Fairfield Sentry and Sigma knowing the funds were managed, operated, and based at FGG's headquarters in New York. As detailed above, after becoming EFG Bahamas and a subsidiary of EFG Bank, Banco Atlantico continued to receive a limited number of transfers in its name despite the change in legal ownership and name.

67.    According to internal FGG emails, Banco Atlantico was once "one of FGG's biggest clients," and in November 2003, Banco Atlantico visited FGG in New York "to conduct an extensive due diligence on their investments in FGG funds, primarily Fairfield Sentry Limited."

68.    During this due diligence trip to New York, Banco Atlantico attended separate meetings with FGG's most senior partners, including: (1) FGG's manager of risk oversight, John Wartman; (2) FGG's co-founder Jeffrey Tucker and co-managing partner, Robert Blum; and (3) FGG's chief financial officer, Dan Lipton. FGG hosted these meetings with Banco Atlantico over the course of two days at its headquarters in New York.

69.    FGG also arranged for Banco Atlantico to meet with Madoff at BLMIS's offices in New York. In the meeting agenda prepared for Banco Atlantico in advance of its trip, FGG

16

listed Madoff as the portfolio manager for Fairfield Sentry.  The agenda also indicated that the

purpose of the meeting was to address Banco Atlantico's questions related to Fairfield Sentry.

70.    In preparation for this meeting, Banco Atlantico submitted its due diligence

inquiries to Fairfield Sentry's New York representatives, and FGG provided Banco Atlantico

with a "Sentry Q&A questionnaire . . . in order to make the discussion with Madoff more

informed and meaningful."  The questionnaire explained that approximately 98% of Fairfield

Sentry's $4.2 billion in assets under management were allocated to BLMIS's SSC Strategy in

New York.

71.    After meeting with Madoff, Banco Atlantico returned to FGG's New York office

to review Fairfield Sentry's trade confirmations and account statements from BLMIS, as well as

monthly reports prepared by FGG's external consultant in Colorado, Gil Berman, which

analyzed BLMIS's purported movements in the U.S. markets.

72.    Banco Atlantico knew the Fairfield Funds were based in New York, and Banco

Atlantico knew its transactions with the Fairfield Funds revolved around BLMIS's New York

operations.

> **a.    Banco Atlantico Submitted to U.S. Law, Venue, and
> Jurisdiction in Connection with Its Investments in the Fairfield
> Funds**

73.    To subscribe in the Fairfield Funds, Banco Atlantico agreed to submit to the laws

of New York.  Specifically, Banco Atlantico executed subscription agreements with Fairfield

Sentry and Sigma, which Banco Atlantico agreed "shall be governed and enforced in accordance

with the laws of New York, without giving effect to its conflict of laws provisions."

74.    Banco Atlantico further agreed that "any suit, action or proceeding . . . with

respect to this Agreement and [the Fairfield Funds] may be brought in New York," and EFG

17

Bank "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

> **b.    Banco Atlantico Repeatedly Utilized New York Bank Accounts to Transfer Funds**

75.    Banco Atlantico repeatedly utilized New York bank accounts to transfer funds to and from Fairfield Sentry.

76.    Banco Atlantico executed subscription agreements in connection with its investments in Fairfield Sentry.  This agreement stated that all money from Banco Atlantico be directed to either a Republic National Bank of New York or New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account.  From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York.  On approximately 63 occasions over the course of more than 7 years, in connection with subscribing funds to Fairfield Sentry, Banco Atlantico directed funds to either the Republic National Bank of New York or New York HSBC Bank USA account.

77.    Banco Atlantico also used an account at Bank of New York in New York to receive transfers from Fairfield Sentry.  Banco Atlantico completed Fairfield Sentry subscription agreements, which directed redemptions payments to this Bank of New York account.  Banco Atlantico utilized U.S. bank accounts repeatedly—approximately 42 times over a 6 year period—to receive $97,805,255 in redemption payments from Fairfield Sentry.

### D. EFG Bank's and EFG Monaco's Relationship with Kingate Global was Centered in the United States

78.     EFG Bank and EFG Monaco received transfers from Kingate Global.  Similar to the transactions with the Fairfield Funds, EFG Bank's and EFG Monaco's relationships with Kingate Global were centered in the United States.

79.     EFG Bank and EFG Monaco each knew Kingate Global was a Feeder Fund, meaning the purported underlying portfolio for Kingate Global was identical to other feeder funds.  The information about BLMIS or Fairfield Sentry that EFG Bank and EFG Monaco collected from their U.S. contacts also applied to their investments in Kingate Global.

80.     Additionally, EFG Monaco's New York-based investment agent, JPMorgan CMI, specifically communicated with Kingate Global regarding capacity for potential subscriptions from EFG Monaco, and otherwise transacted with Kingate Global on EFG Monaco's behalf from New York.

81.     EFG Bank and EFG Monaco knew their transactions with Kingate Global revolved around BLMIS's operations in New York.  EFG Bank and EFG Monaco—or EFG Capital as their agent—received and analyzed Kingate Global's offering memoranda, which explained that Kingate Global "shall primarily invest with an Investment Advisor who is based in the United States," and who specializes in "hedged transactions using equities, derivatives and index options."  At all times relevant, EFG Bank and EFG Monaco knew Kingate Global's "Investment Advisor" was BLMIS.

82.     Kingate Global's offering memoranda further disclosed to EFG Bank and EFG Monaco that:

- "[t]he Investment Advisor is a New York based NASD registered broker-dealer;"

- "[t]he Investment Advisor utilizes the 'split strike conversion strategy;'"

19

- the managers of Kingate Global had "delegated all investment management duties with regard to USD Shares to the Investment Advisor;"

- "[a]ll investment decisions in the account held with the Investment Advisor are effected by person associated with the Investment Advisor;"

- "neither the Co-Managers nor USD Shareholders will have any control over the investment and trading decisions of the Investment Advisor, and no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to the selected Investment Advisor;" and

- "actual custody" of EFG Bank and EFG Monaco's investments in Kingate Global would be held by the Investment Advisor.

83.     As a result of their due diligence and review of Kingate Global's offering memoranda, EFG Bank and EFG Monaco each knew that by investing in Kingate Global, they were really directing investments to BLMIS's unfettered discretion and custody in New York.

84.     Kingate Global's subscription agreement directed investors to wire investments to a correspondent bank account in New York for further credit to Kingate Global's account with the Bank of Bermuda.

85.     EFG Bank and EFG Monaco each knew Kingate Global delegated virtually all investment management, custody, and brokerage functions to BLMIS in New York.

## III.    FAIRFIELD SENTRY, SIGMA, AND LAMBDA MAINTAINED THEIR PRINCIPAL PLACE OF BUSINESS IN NEW YORK

86.     At all relevant times, Fairfield Sentry, Sigma, and Lambda's principal place of business was in New York and Fairfield Sentry, Sigma, and Lambda were U.S. residents.

### A.    The Genesis of the FGG *De Facto* Partnership

87.     In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called FGG based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

20

88.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Lambda.  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

89.    FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.    Fairfield Sentry

90.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

91.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

21

Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

92.     Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1.     Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States

93.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

22

94.     After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

95.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

### 2.     FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities

96.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian

agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3.    FGG New York Personnel Managed Fairfield Sentry

97.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

98.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription

24

agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

99.    Fairfield Sentry's subscription agreements also incorporated its PPMs by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

100.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

101.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG

clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG

Limited FG.  FG Limited was formed under the laws of Ireland.

102.    While FG Limited was formed under foreign law, it reported its principal place of

business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters.  Upon the formation

of FG Limited, Fairfield International Managers assigned all of its management contracts with

Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry

Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even

though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts

controlled by BLMIS.

103.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him

FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and

foreign investors and, as a result, FGG would form a new U.S. entity to be the investment

adviser of the fund as well as other FGG operated funds, including the feeder and currency

funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would

serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG

formed two new entities, FG Advisors and FG Bermuda.

104.    In October 2003, FGG formed FG Advisors as a Delaware limited liability

company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG

formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

management contracts to both entities, including the investment advisory agreements for the

three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

105.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

106.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

107.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

108.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

27

109.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.  The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### C.    Sigma and Lambda

110.    FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield Sentry using Euros or Swiss Francs, FGG created Sigma and Lambda.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

111.    Similarly, Lambda accepted subscriptions in Swiss Francs, converted them to U.S. Dollars, and then invested 100% of its funds in Fairfield Sentry.  When paying redemptions, Lambda redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Swiss Francs, and paid the Swiss Francs to the redeeming Lambda investors.

112.    Noel and Tucker organized Sigma on November 20, 1990, and Lambda on December 7, 1990 as international business companies under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business

28

Companies Act, so were Sigma and Lambda. Sigma is currently in liquidation in proceedings in the BVI and United States. Lambda is in liquidation in a separate proceeding in the BVI.

113.    Also like Fairfield Sentry, Sigma and Lambda were shell corporations present in the BVI only on paper. They had no employees and maintained no offices. They listed their registered BVI address as the same BVI post office box care of a local trust company they shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma and Lambda to FGG's New York headquarters. Sigma and Lambda were operated almost entirely by FGG New York Personnel.

114.    As with Fairfield Sentry, and as part of the FGG de facto partnership, FGG New York Personnel made the operational decisions regarding Sigma and Lambda. Once Sigma and Lambda were opened for investors, FGG New York Personnel monitored Sigma's and Lambda's investments into, and redemptions from, Fairfield Sentry; managed Sigma's and Lambda's relationships with clients and potential clients; created marketing and performance materials for Sigma and Lambda; marketed Sigma and Lambda; performed administrative functions required by Sigma and Lambda; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma and Lambda; and conducted various other due diligence and risk management activities. Until Sigma's and Lambda's liquidation, FGG maintained Sigma's and Lambda's books and records in New York. FGG New York Personnel also had final control of Sigma's and Lambda's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

115.    FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma and Lambda shares. Like Fairfield Sentry's subscription agreements,

Sigma's and Lambda's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's and Lambda's sole assets.  Sigma's and Lambda's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments.  Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities.  This same risk was also disclosed in Fairfield Sentry's PPM's.

116.    Noel and Tucker were the original directors of Sigma and Lambda and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma and Lambda with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma and Lambda shares.  Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma and Lambda assets.  As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma and Lambda at Citco Bank Dublin.  FGG New York Personnel had final control of the Sigma and Lambda Citco Bank Dublin bank accounts.   Finally, FGG New York Personnel controlled all of Sigma's and Lambda's relationships with the Citco entities.

117.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros and Lambda's investors' Swiss Francs into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS.  Noel executed separate contracts on Sigma's and Lambda's behalf with the Bank of Montreal for currency swaps which were "governed by and

construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

118.    FGG New York Personnel initially listed FG Limited as the investment manager for Sigma and Lambda.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma and Lambda PPM's to indicate FG Bermuda was Sigma's and Lambda's Investment Manager.  In fact there were no duties for any investment manager because Sigma's and Lambda's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

119.    The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

## III.    THE KINGATE GLOBAL TRANSFERS ARE DOMESTIC

120.    Kingate Global was a Feeder Fund that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $398,797,047of customer property to Kingate Global during the life of the account prior to December 11, 2008.

121.    Kingate Global filed a customer claim in the SIPA liquidation.

### A.    Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation

122.    Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

123.    Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

31

124.    Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

125.    Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Global's investments with BLMIS.

126.    Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

### B.    The Operative Legal Documents Were New York-Based

127.    Kingate Global executed customer agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

128.    Each customer agreement expressly states that it is governed by U.S. law and all of the transactions in the customer's account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

129.    Kingate Global agreed that all disputes arising under the customer agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

32

### C.    BLMIS Had Full Authority to Make and Execute Investment Decisions

130.    Kingate Global's trading authorization agreements authorized BLMIS to be the Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

131.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the Kingate Global's investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

132.    BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as the Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### D.    Kingate Global Was Managed From New York

133.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

134.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

135.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

136.    Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

33

137.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

138.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

139.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

140.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for Feeder Fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

141.    FIM (USA) was the hub for FIM's Feeder Fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

142.    KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E.    Kingate Global Used Banks in New York**

143.    Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan.

144.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

145.    In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

34

146.    FIM also directed fee payments to be routed through a bank account in New

York.

147.    The Trustee incorporates by reference the allegations of the Fourth Amended

Complaint filed in *Picard v. Ceretti*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17,

2014), ECF 100.


Dated: June 26, 2015                          /s/ Thomas L. Long
      New York, New York                 **Baker & Hostetler LLP**
                                            45 Rockefeller Plaza
                                            New York, New York 10111
                                            Telephone:  (212) 589-4200
                                            Facsimile:  (212) 589-4201
                                            David J. Sheehan
                                            Thomas L. Long
                                            Catherine E. Woltering

                                            **Baker & Hostetler LLP**
                                            65 East State Street, Suite 2100
                                            Columbus, Ohio 43215
                                            Telephone:  (614) 228-1541
                                            Facsimile:  (614) 462-2616
                                          Douglas A. Vonderhaar

                                            *Attorneys for Irving H. Picard, Trustee*
                                            *for the substantively consolidated SIPA*
                                            *Liquidation of Bernard L. Madoff Investment*
                                            *Securities LLC and the estate of Bernard L.*
                                            *Madoff*