**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> UNIFORTUNE ASSET MANAGEMENT SGR SPA, and UNIFORTUNE CONSERVATIVE FUND, <br><br> Defendants. | Adv. Pro. No. 11-02553 (SMB) |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM
OF LAW IN OPPOSITION TO UNIFORTUNE ASSET
MANAGEMENT SGR SPA'S AND UNIFORTUNE
CONSERVATIVE FUND'S MOTION TO DISMISS BASED ON
EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF
THE TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, respectfully submits this supplemental memorandum of law in opposition to Unifortune Asset Management SGR SpA's ("Unifortune") and Unifortune Conservative Fund's ("Conservative Fund," and together, "Defendants") motion to dismiss based on extraterritoriality and in support of the Trustee's motion for leave to amend his complaint. The Proffered Allegations plead specific facts evincing that the transfers and the component events of the transactions are sufficiently domestic under the standards set forth in the Extraterritoriality Decision such that the Trustee's action does not require an extraterritorial application of SIPA or the Bankruptcy Code.[1] Accordingly, Defendants' motion to dismiss must be denied.

## ARGUMENT

The District Court returned this action to this Court to determine whether the Trustee's claims against Defendants seek the recovery of "purely foreign" transfers that require an extraterritorial application of Bankruptcy Code.[2] Under the Extraterritoriality Decision, the Trustee must only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[3] In making this determination, there is no bright-line test to determine whether a transaction is extraterritorial,[4] and the court must review "the location of the transfers as well as the component events of those transactions."[5] This is a fact-based inquiry in which all reasonable inferences are

---

[1] *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222 (S.D.N.Y. 2014) (the "Extraterritoriality Decision").

[2] *Id*. at 232–33.

[3] *Id*. at 232, n.4.

[4] *Parkcentral Global Hub Ltd. v. Porsche Automobil Holdings SE*, 763 F.3d 198, 216-17 (2d Cir. 2014).

[5] Extraterritoriality Decision at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)).

to be drawn in the Trustee's favor.[6]

Between 2005 and 2007, Defendants received $26,772,978 in subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma," and together, the "Fairfield Funds"). (Proffer at ¶ 1.) Defendants argue because they and the Fairfield Funds were formally organized under foreign law, Defendants are entitled to a finding that the transfers they received are "purely foreign" under the Extraterritoriality Decision. Defendants are mistaken. This superficial analysis ignores that the transactions have significant domestic components, including, for example, that Defendants invested in the Fairfield Funds to profit from New York-based BLMIS and that the Fairfield Funds maintained their principal place of business in New York. As set forth below, a comprehensive review of the transfers and the component events of the transactions demonstrates the Trustee's recovery action against Defendants does not require an extraterritorial application of SIPA or the Bankruptcy Code.

### THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

The subsequent transfers from the Fairfield Funds were not "purely foreign," but were predominantly domestic for the following five reasons: (1) Defendants knowingly invested in the Fairfield Funds to profit from BLMIS in New York, (2) Defendants received the transfers pursuant to subscription agreements that were domestic in nature, (3) Defendants sent and received the transfers from the Fairfield Funds through New York bank accounts, (4) Defendants conducted business in New York in connection with the transactions at issue, and (5) the Fairfield Funds' principal place of business was in New York.

---

[6] *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010); *see also SEC v. Gruss*, 859 F. Supp. 2d 653, 666 (S.D.N.Y. 2012).

2

<u>First</u>, Defendants knowingly invested in the Fairfield Funds to profit from BLMIS in New York. Through their due diligence efforts—and pursuant to the terms of private placement memoranda ("PPMs") they received and subscription agreements they executed when investing in the Fairfield Funds—the Defendants knew, among other things, the following facts:

- BLMIS was a New York, SEC-registered broker-dealer, (*id.* at ¶ 7);
- In reality, BLMIS was the Fairfield Fund's investment advisor and had full investment discretion over assets placed with it, (*id.* at ¶¶ 6-7);
- BLMIS maintained custody of all Fairfield Funds' moneys placed with it, (*id.* at ¶ 9);
- BLMIS purported to execute all trades in U.S. securities, (*id.* at ¶ 6); and
- BLMIS was essential to the Fairfield Funds' profitability. (*Id.* at ¶ 10.)

Defendants invested in the Fairfield Funds *because* their money would ultimately be placed with BLMIS, and in turn, Madoff would invest their assets in U.S. securities traded on U.S. markets. But for BLMIS and its U.S.-based investment strategy, Defendants would not have invested in the Fairfield Funds. As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States … was not fortitious or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and Fairfield Sentry.[7]

<u>Second</u>, the transfers were made pursuant to subscription agreements that were domestic in nature. In executing the Fairfield Funds' subscription agreements, Defendants knowingly (i) agreed that New York law would govern the agreements, (ii) submitted to venue in New York and the jurisdiction of New York courts, (iii) agreed to wire subscription payments to a correspondent bank account at HSBC Bank USA, N.A. ("HSBC USA") in New York, (iv) received the transfers in eight separate wire transfers from the HSBC USA account, and

---

[7] *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 523 (Bankr. S.D.N.Y. 2012).

3

(v) agreed to BLMIS in New York controlling all aspects of the investments, as described in the PPMs. (*Id*. at ¶¶ 11-13.) Accordingly, Defendants had every reason to expect that U.S. law would apply to them and the transfers they received from the Fairfield Funds.

Third, in relation to their investments in the Fairfield Funds, Defendants conducted business in New York with the Fairfield Greenwich Group ("FGG"), the *de facto* partnership based in New York that created, marketed, managed, and controlled the Fairfield Funds. Unifortune visited FGG's office in New York to conduct due diligence on the Fairfield Funds in April 2004, March 2005, and January 2006. (*Id.* at ¶ 17-19.) At the meetings, FGG and Unifortune discussed a broad range of topics relating to Defendants' investments, including the history of FGG's relationship with Madoff, BLMIS's assets under management, and BLMIS's execution of the "split-strike conversion" investment strategy. (*Id.*) Conservative Fund expanded its role with FGG by executing a letter agreement with FGG in New York through which Conservative Fund received retrocession fees as a rebate for investments with Fairfield Sentry. (*Id.* at ¶ 21.)

Fourth, the Fairfield Funds' principal place of business was in New York. (*Id.* at ¶ 22.) In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG. Noel and Tucker through Fairfield International Managers, an FGG entity, organized Fairfield Sentry as well as its sister fund Fairfield Sigma. (*Id.*)

Noel and Tucker formally organized the Fairfield Funds as international business companies under BVI law. (*Id.* at ¶ 26.) As international business companies, BVI law restricted the Fairfield Funds from doing business in the BVI except with other BVI international business companies. (*Id.*) The Fairfield Funds were shell corporations present in the BVI solely on paper. Their BVI registered address was a post office box care of a local trust company owned and

4

operated by a local law firm. (*Id.* at ¶ 27.) From their inception until their liquidation in 2009, the Fairfield Funds had no employees and no offices. (*Id.*) At all relevant times, the Fairfield Funds were operated almost entirely by FGG's New York City headquarters personnel who maintained final control of the Fairfield Funds' bank accounts and relationships with the Fairfield Funds' back-office service providers. (*Id.* at ¶ 32.)

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. In the account opening documents, Tucker identified Fairfield Sentry's mailing address in the United States and directed BLMIS to send Fairfield Sentry's monthly account statements, trade confirmations, and correspondence to the same office. (*Id.* at ¶ 29.) In January 1998, FGG requested BLMIS to send all Fairfield Sentry account information to FGG's New York City headquarters. (*Id.*)

From the Fairfield Funds' inception, FGG personnel at its New York City headquarters controlled the sales and subscriptions of the funds' shares. (*Id.* at ¶¶ 33-34.) At all relevant times, FGG New York City headquarters personnel monitored the Fairfield Funds' investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of Fairfield Sentry; marketed the Fairfield Funds; approved all subscriptions for Fairfield Funds shares; maintained all of the Fairfield Funds' books and records; and made all strategic and operational decisions regarding the Fairfield Funds. (*Id.* at ¶ 33.)

## **CONCLUSION**

For the foregoing reasons and those stated in the Trustee's main brief, the Trustee respectfully requests that the Court deny Defendants' motion to dismiss and grant the Trustee's motion for leave to amend the complaint.

5

Dated: June 26, 2015  /s/ Thomas L. Long
    New York, New York  **Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the estate of Bernard L.*
*Madoff*