**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>               Plaintiff-Applicant,<br><br>               v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>               Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>               Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>               Plaintiff,<br><br>               v.<br><br>UNIFORTUNE ASSET MANAGEMENT SGR SPA, and UNIFORTUNE CONSERVATIVE FUND,<br><br>               Defendants. | Adv. Pro. No. 11-02553 (SMB) |

**PROFFERED ALLEGATIONS PERTAINING TO**
**THE EXTRATERRITORIALITY ISSUE AS TO UNIFORTUNE ASSET**
**MANAGEMENT SGR SPA AND UNIFORTUNE CONVERVATIVE FUND**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, under the Securities Investor Protection Act ("SIPA"), 15 U. S. C. §§ 78aaa *et seq.*, by and through his undersigned counsel, respectfully submits the Proffered Allegations as to the domestic nature of the transfers received by Unifortune Asset Management SGR SpA ("Unifortune") and Unifortune Conservative Fund ("Conservative Fund," together, "Defendants") from Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma," together, the "Fairfield Funds").

## I.     BACKGROUND

1. The Trustee seeks to recover approximately $26,772,978 in transfers of BLMIS customer property made to Defendants by the Fairfield Funds: $16,355,651 from Fairfield Sentry and $10,417,327 from Fairfield Sigma.

2. Conservative Fund is a fund of funds that received the transfers and subsequently transferred at least a portion of the transfers to its fund manager Unifortune.

3. Fairfield Sentry was one of the many BLMIS feeder funds—single purpose investment funds that pooled their investors' assets to invest with BLMIS in New York. Fairfield Sigma was a sister fund to Fairfield Sentry that accepted investments in euros, which it converted to U.S. dollars, and then invested 100% of its assets by purchasing shares in Fairfield Sentry. The Fairfield Funds were marketed, managed, and controlled by the Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York.

4. Defendants invested in the Fairfield Funds to profit from BLMIS in New York, and the Fairfield Funds were merely a means to that end.

## II. THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

### A. Defendants Invested with the Fairfield Funds to Profit from BLMIS and its U.S.-Based Investment Strategy

5.  To invest in Fairfield Sentry, Conservative Fund, on behalf of Defendants, executed a subscription agreement wherein it represented that it received and reviewed a copy of Fairfield Sentry's Private Placement Memorandum, as amended from time to time (the "Fairfield Sentry PPM"), as well as a copy of Fairfield Sigma's Private Placement Memorandum, as amended from time to time (the "Fairfield Sigma PPM").

6.  According to the Fairfield Sentry PPM and the Fairfield Sigma PPM, Fairfield Sentry invested 95% of its assets with BLMIS in New York, and BLMIS purported to execute Madoff's "split-strike conversion" U.S. investment strategy (the "SSC Strategy"), which involved the purported purchase and sale of U. S. equities, U. S. options, and U. S. Treasuries.

7.  The Fairfield Sentry PPM, dated August 14, 2006, and the Fairfield Sigma PPM, dated February 16, 2006, stated that BLMIS had complete control of over Madoff's "split-strike conversion" U.S. investment strategy: "The Split Strike Conversion strategy is implemented by [BLMIS], a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the [Fairfield Funds] at that firm," and that BLMIS was "authorized to determine the price and timing of stock and option transactions in the account[s]."

8.  The Fairfield Sentry PPM stated that FGG had selected BLMIS, a broker-dealer registered with the SEC, as the "execution agent" to execute the trades pursuant to the SSC Strategy.

9.  In addition, the Fairfield Sentry PPM and the Fairfield Sigma PPM disclosed how BLMIS acted as the custodian for the Fairfield Funds. The Fairfield Sentry PPM stated that "substantially all of the Fund's assets will be held in segregated accounts at [BLMIS], a U.S.

2

registered broker-dealer and qualified custodian. Accordingly, [BLMIS] will be a sub-custodian of the Fund." The Fairfield Sigma PPM, dated February 1, 2003, similarly represented, "All of the Fund's 'split strike conversion' assets are custodied at Bernard L. Madoff Investment Securities."

10. Because of BLMIS's role as the investment advisor, broker-dealer, and custodian for the Fairfield Funds, their PPMs represented, "The services of [BLMIS] and its personnel are essential to the continued operation of the Fund, and its profitability, if any."

### B. The Transfers Were Made Pursuant to Subscription Agreements That Were Domestic in Nature

11. Defendants' investments in the Fairfield Funds and the transfers therefrom were governed by subscription agreements that were governed by New York law and included agreements to submit to venue in New York and the jurisdiction of New York courts.

12. The subscription agreement stated, "This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

13. The subscription agreement stated, "Subscriber agrees that any suit, action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York," and, "Subscriber irrevocably submits to the jurisdiction of New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding."

### C. Defendants Received Transfers through a Bank Account in New York

14. The subscription agreements required Defendants to send subscription payments for investments in Fairfield Sentry to Citco Bank Nederland N.V. Dublin Branch's correspondent

3

bank account at HSBC USA Bank, N.A. in New York. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York.

15. Defendants instructed the Fairfield Funds to pay redemptions to a correspondent bank account at HSBC Bank USA, N.A. in New York. Between 2005 and 2007, Defendants collectively received the transfers from Fairfield Sentry through at least six separate wire transfers through this HSBC account.

16. By investing in the Fairfield Funds, Defendants knew they were directing funds to and receiving funds from New York bank accounts.

### D. Defendants Conducted Business in the United States in Connection with the Transactions

17. To conduct due diligence on their investments in the Fairfield Funds, Defendants visited FGG's principal office in New York. Defendants' first due diligence visit to FGG in New York occurred as early as April 2004. At the meeting, FGG and Unifortune discussed a broad range of topics relating to Defendants' investments, including the history of FGG's relationship with Madoff, Fairfield Sentry's correlation with market indexes, the SSC Strategy's assets under management, and BLMIS's execution of the SSC Strategy.

18. In March 2005, Unifortune again visited New York to meet with FGG. During this meeting, Unifortune and FGG discussed Fairfield Sentry's 2004 returns, portfolio composition, and risk profile, and BLMIS's assets under management.

19. Unifortune met with FGG in New York again in January 2006. Unifortune asked FGG substantive questions about BLMIS's SSC Strategy, including why Madoff hedged the strategy if his market timing was so good and why no one was able to replicate the strategy with the same degree of success as Madoff. FGG's notes from the meeting indicate that Unifortune

4

was skeptical about Madoff. Unifortune told FGG they wanted to meet Madoff and visit BLMIS's offices in New York.

20. In addition to meetings in New York, Defendants communicated with FGG employees in the United States regarding their investments in the Fairfield Funds and the transfers.

### E. Defendants Received Transfers Pursuant to a Rebate Agreement with FGG in New York

21. A portion of the transfers received by Conservative Fund stemmed from a letter agreement with FGG in New York through which Conservative Fund received retrocession fees as a rebate for investments with Fairfield Sentry. Conservative Fund executed the agreement in April 2004, and pursuant to the agreement, Conservative Fund received shares in Fairfield Sentry of an amount equal to 40 basis points of Fairfield Sentry's management fee of the shares held by Conservative Fund. The agreement was signed by Dan Lipton, an FGG partner who worked in FGG's New York office.

### F. The Fairfield Funds' Principal Place of Business Was in New York

22. At all relevant times, the Fairfield Funds' principal place of business was in New York, and they were domestic residents.

#### 1. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

23. In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group (previously defined as "FGG") based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which was Fairfield Sentry.

24. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from

5

FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds, including Fairfield Sentry.

25. FGG also included a number of administrative entities that purportedly provided management and back-office support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### 2. Fairfield Sentry

26. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax-free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

27. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

6

28. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

      **a.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

29. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

30. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

7

31. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

      **b.**    **FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities**

32. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with back-office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

8

### c. FGG New York Personnel Managed Fairfield Sentry

33. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

34. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

35. As noted above, Fairfield Sentry's subscription agreements also incorporated its PPMs by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of

9

95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPMs also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e.     BLMIS Was Fairfield Sentry's Investment Manager

36.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

37.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

38.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

10

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

39. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

40. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds.

41. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that

11

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

42. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's and Fairfield Sigma's investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

43. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

44. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

45. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### f.   Fairfield Sigma

46. FGG operated Fairfield Sentry as a U.S. dollar-based fund with all subscription and redemptions paid in U.S. dollars. In response to investor requests to invest in Fairfield

12

Sentry using euros, FGG created Fairfield Sigma. Fairfield Sigma accepted subscriptions in euros, converted them to U.S. dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Fairfield Sigma redeemed Fairfield Sentry shares, converted the U.S. dollars it received from Fairfield Sentry to euros, and paid the euros to the redeeming Fairfield Sigma investors.

47. Noel and Tucker organized Fairfield Sigma on November 20, 1990 as an international business company under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Fairfield Sigma. Fairfield Sigma is currently in liquidation in proceedings in the BVI and United States.

48. Also like Fairfield Sentry, Fairfield Sigma was a shell corporation present in the BVI only on paper. It had no employees and maintained no offices. Fairfield Sigma listed its registered BVI address as the same BVI post office box care of a local trust company they shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Fairfield Sigma to FGG's New York headquarters. Fairfield Sigma was operated almost entirely by FGG New York Personnel.

49. As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Fairfield Sigma. Once Fairfield Sigma was opened for investors, FGG New York Personnel monitored Fairfield Sigma's investments into, and redemptions from, Fairfield Sentry; managed Fairfield Sigma's and relationships with clients and potential clients; created marketing and performance materials for Fairfield Sigma;

13

marketed Fairfield Sigma; performed administrative functions required by Fairfield Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sigma; and conducted various other due diligence and risk management activities. Until Fairfield Sigma's liquidation, FGG maintained Fairfield Sigma's books and records in New York. FGG New York Personnel also had final control of Fairfield Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

50. FGG New York Personnel controlled and approved the subscriptions for and redemptions of Fairfield Sigma shares. Like Fairfield Sentry's subscription agreements, Fairfield Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated its PPM that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Fairfield Sigma's sole assets. Fairfield Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Fairfield Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPMs.

51. Noel and Tucker were the original directors of Fairfield Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Fairfield Sigma with back-office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sigma shares. Noel and Tucker also contracted Citco Custody to serve as

14

the custodian of the Fairfield Sigma assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Fairfield Sigma at Citco Bank Dublin. FGG New York Personnel had final control of the Fairfield Sigma Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Fairfield Sigma's relationships with the Citco entities.

52. In addition to the Citco Bank Dublin accounts, in order to convert Fairfield Sigma investors' euros—as required for investment in Fairfield Sentry and BLMIS. Noel executed separate contracts on Fairfield Sigma's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

53. FGG New York Personnel initially listed FG Limited as the investment manager for Fairfield Sigma. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Fairfield Sigma PPMs to indicate FG Bermuda was Fairfield Sigma's Investment Manager. In fact there were no duties for any investment manager because Fairfield Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. dollars.

54. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund Limited*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

15

Dated: June 26, 2015  /s/ Thomas L. Long
     New York, New York  **Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Thomas L. Long
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the estate of Bernard L.*
*Madoff*