**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,  Plaintiff-Applicant,  v.  BERNARD L. MADOFF INVESTMENT SECURITIES LLC,  Defendant. | Adv. Pro. No. 08-01789 (SMB)  SIPA Liquidation  (Substantively Consolidated) |
| In re:  BERNARD L. MADOFF,  Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff,  Plaintiff,  v.  ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED, f/k/a Fortis (Isle of Man) Nominees Limited, PLATINUM ALL WEATHER FUND LIMITED, and ODYSSEY,  Defendants. | Adv. Pro. No. 12-01697 (SMB) |

**TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO ABN AMRO FUND SERVICES NOMINEES LIMITED'S, PLATINUM ALL WEATHER FUND LIMITED'S, AND ODYSSEY'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**

The Trustee respectfully submits this supplemental memorandum in opposition to ABN AMRO Fund Services (Isle of Man) Nominees Limited's ("ABN IOM"), formerly known as Fortis (Isle of Man) Nominees Limited, Platinum All Weather Fund Limited's ("Platinum"), and Odyssey's (collectively, "Defendants") motion to dismiss based on extraterritoriality and in further support of the Trustee's motion for leave to amend the complaint. As set forth below, the Proffered Allegations pertaining to the Extraterritoriality Issue as to ABN IOM, Platinum, and Odyssey ("Proffered Allegations") plead specific facts showing the subsequent transfers received by Defendants are predominantly domestic under the standard set forth in the Extraterritoriality Decision,[1] such that the Trustee's action does not require an extraterritorial application of SIPA or Bankruptcy Code § 550. Defendants' motion to dismiss should be denied, and the Trustee should be granted leave to amend the complaint.

## I.  BACKGROUND & LEGAL STANDARD

This Court must determine whether the Trustee's claims against the Defendants seek the recovery of "purely foreign" transfers, requiring an extraterritorial application of SIPA or Bankruptcy Code § 550.[2] Under the Extraterritoriality Decision, the Trustee must only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[3] In making this determination, this Court must review "the location of the transfers as well as the component events of those transactions."[4] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[5]

---

[1] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 513 B.R. 222, 232–33 (S.D.N.Y. 2014) ("Extraterritoriality Decision").
[2] *Id.*
[3] *Id.* at 232 n.4.
[4] *Id.* at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)("Maxwell I")*, 186 B.R. 807, 817 (S.D.N.Y. 1995)).
[5] *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403-05 (S.D.N.Y. 2010).

1

The Trustee's Proffered Allegations allege Defendants received at least $122,216,748 in subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma," and together with Fairfield Sentry, the "Fairfield Funds"). Proffered Allegations ¶ 1. Fairfield Sentry was one of numerous BLMIS feeder funds—single-purpose investment funds that pooled their investors' assets to invest with BLMIS, capitalizing on Madoff's impossibly consistent returns. *Id.* ¶ 2. Sigma, a sister fund of Fairfield Sentry, was a "currency feeder" that accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry. *Id.* ¶ 3. Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled the Fairfield Funds. *Id.* ¶ 4. The Trustee alleges that Fairfield Sentry withdrew funds from its BLMIS accounts and transferred those funds to the Defendants, or to Sigma which in turn transferred those funds to the Defendants. *Id.* ¶¶ 1–3.

ABN IOM, Platinum, and Odyssey argue that because they were formally organized under the laws of the Isle of Man, Cayman Islands, and the Territory of the British Virgin Islands ("BVI"), respectively, and because the Fairfield Funds were both formally organized under the laws of the BVI, they are entitled to a finding that those transfers are "purely foreign" and must be dismissed under the Extraterritoriality Decision. Defendants are wrong, and their superficial analysis is contrary to the *Maxwell I* "component events" analysis embraced by the District Court in the Extraterritoriality Decision,[6] and inconsistent with Second Circuit precedent requiring courts to look at the economic and legal realities of a transaction to determine whether a claim is "sufficiently domestic" for purposes of extraterritoriality.[7] As set forth below, a review of the

---

[6] *See* Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 817).
[7] *See, e.g., Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141–42 (2d Cir. 2014); *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings,* 763 F.3d 198, 216 (2d Cir. 2014).

2

component events of the transactions demonstrate the transactions were predominantly domestic, not foreign—let alone "purely foreign"—and therefore do not require an extraterritorial application of SIPA or Bankruptcy Code § 550.

## II. THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS WERE COMPRISED OF PREDOMINANTLY DOMESTIC ELEMENTS

The Trustee's recovery action against Defendants is not barred by the Extraterritoriality Decision because the location of the transfers and transactions were in the United States and predominantly domestic. But for Defendants' foreign incorporations, little if anything was foreign about the transfers. Defendants invested in the Fairfield Funds for the sole purpose of benefiting from the U.S. markets, and specifically, from Madoff's split-strike conversion strategy ("SSC Strategy").

The Trustee's Proffered Allegations demonstrate that the component events of the transactions between the Fairfield Funds and Defendants were made up of predominantly domestic elements, including: (1) ABN IOM and Platinum maintained operations in the United States; (2) Defendants knew BLMIS in New York controlled the Fairfield Funds' investments and Madoff purported to invest in U.S. markets; (3) Platinum and Odyssey marketed themselves as feeder funds into Madoff and BLMIS; (4) Defendants agreed that New York law would govern their investments in the Fairfield Funds; (5) Defendants submitted to New York jurisdiction and venue for investments in the Fairfield Funds; (6) Defendants repeatedly utilized New York banks in connection with the transactions at issue; and (7) the Fairfield Funds operated from their principal place of business in New York. Proffered Allegations ¶¶ 12–73.

### A. ABN IOM Maintained Operations in the United States

ABN IOM, a wholly-owned subsidiary of Fortis Prime Fund Solutions (Isle of Man) Limited ("FPFS IOM"), operated as part of an integrated network of financial entities (the

3

"Fortis Network") that maintained operations in New York and the United States. *Id.* ¶¶ 9, 12.

During the relevant period, ABN IOM and FPFS IOM functioned as one entity, sharing the same address, workspace, phone numbers, contact information, employees, and directors. *Id.* ¶ 9. As a result of the collapsed corporate structure between ABN IOM and FPFS IOM, the two entities had identical information regarding BLMIS and the BLMIS feeder funds. *Id.*

In addition to its Fairfield Sentry connection, ABN IOM, together with FPFS IOM, served as administrator for another BLMIS feeder fund managed and operated out of New York. *Id.* ¶ 30. Moreover, in the ordinary course of business, ABN IOM's personnel collaborated with affiliate Fortis Prime Fund Solutions (USA) LLC ("Fortis USA"), a Delaware company based in New York, to provide financial and administrative services to clients, including BLMIS feeder funds. *Id.* ¶¶ 12, 31. To fulfill its responsibilities as the BLMIS feeder fund's administrator, ABN IOM relied, in part, on the services of Fortis USA in New York. *Id.* ¶ 31.

### B. Platinum Was Launched From New York and Managed From Offices in the United States

In 2003, Platinum was launched and operated from New York as a single-strategy fund that invested exclusively with Madoff through BLMIS feeder funds. *Id.* ¶¶ 13, 15. Upon its launch, Platinum was managed from New York and marketed to institutional investors in the United States. *Id.* ¶¶ 14, 16.

Platinum was established by Platinum Capital Management Ltd. ("Platinum Management"), which was based in London, England, but maintained offices and subsidiaries in the United States to manage its U.S.-based investments. *Id.* ¶ 13. These U.S.-based investments included Platinum's transactions with Fairfield Sentry, which were managed, at least in part, by Platinum Management's New York and Stamford, Connecticut offices. *Id.* ¶ 16.

4

### C. Defendants Knew New York-based BLMIS Controlled the Fairfield Funds' Investments and Madoff Purported to Invest in U.S. Markets

In connection with their investments, Defendants conducted due diligence on Madoff, BLMIS, and the Fairfield Funds in New York. As the administrator for a BLMIS feeder fund, ABN IOM's personnel regularly communicated with BLMIS and collaborated with affiliated members of the Fortis Network—including Fortis USA—to analyze Madoff's purported trades. *Id.* ¶¶ 30–31. Moreover, in addition to communicating and meeting with New York-based FGG representatives concerning its investments, Platinum had managers that maintained direct access to BLMIS, including visits to BLMIS's New York office. *Id.* ¶¶ 25–26. Odyssey also visited FGG's New York headquarters to review its investments in Fairfield Sentry. *Id.* ¶ 29.

As a result of their due diligence on BLMIS, the Fairfield Funds, and other New York-based BLMIS feeder funds they considered for potential investment, Defendants knew the Fairfield Funds were managed and operated out of FGG's New York headquarters, and BLMIS's operations in New York were almost entirely responsible for the purported success of the Fairfield Funds. *Id.* ¶¶ 17–19, 24, 29.

BLMIS and Fairfield Sentry were U.S.-based, and knowing this, Defendants invested in Fairfield Sentry precisely to profit from BLMIS's U.S. market strategy. Specifically, the Defendants knew the following facts:

- BLMIS had custody of at least 95% of Fairfield Sentry's investments.

- In reality New York-based BLMIS was the Fairfield Funds' investment adviser.

- New York-based BLMIS was the executing broker for the Fairfield Funds' investments.

- BLMIS in New York purportedly operated and executed Madoff's SSC Strategy on behalf of the Fairfield Funds.

- The SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and decisions

5

> regarding which U.S. securities to purportedly purchase were made by Madoff in New York.
>
> - BLMIS was a registered U.S. broker-dealer regulated by the SEC.

*Id.* ¶ 18.

### D. Platinum and Odyssey Marketed Themselves as Feeder Funds into Madoff and BLMIS

Platinum and Odyssey marketed themselves as full or partial feeder funds into Madoff or BLMIS. *Id.* ¶¶ 20–23, 27–28. Indeed, that was their purpose—to feed into a U.S. entity and profit from U.S. markets, and specifically, Madoff's SSC Strategy. Platinum was created as a single-manager fund directing 100% of its assets to BLMIS through BLMIS feeder funds. *Id.* ¶ 20. Platinum boasted about this, marketing itself as "a feeder fund into Madoff," and at other times as a "feeder fund investing into Bernard Madoff's funds." *Id.* ¶¶ 20–21. In its marketing materials, Platinum also identified Madoff's SSC Strategy and described the purported execution of the SSC Strategy to its investors or potential investors. *Id.* ¶ 22.

Odyssey also knew BLMIS's central role in Defendants' investments in the Fairfield Funds, and Odyssey marketed itself as a partial feeder fund into Madoff or BLMIS. *Id.* ¶ 27. In its 2003 portfolio summary, Odyssey specifically identified Madoff—and not Fairfield Sentry—as the "manager" of approximately 12% of its portfolio, which it invested in Fairfield Sentry shares. *Id.* ¶ 28.

### E. Defendants Knew U.S. Law Would Govern Their Investments in the Fairfield Funds

By executing subscription agreements with Fairfield Sentry, Defendants agreed that New York law would govern their relationships with Fairfield Sentry, and submitted to New York jurisdiction and venue in connection with their investments. *Id.* ¶¶ 32–36. By executing subscription agreements with Sigma, Defendants also agreed their Sigma investments would be

6

governed by New York law, jurisdiction, and venue. *Id.*

ABN IOM and Platinum had access to BLMIS customer trade confirmations, each of which identified BLMIS as a member of SIPC. *Id.* ¶¶ 26, 30–31. Platinum also reviewed BLMIS account opening documents specifying that transactions with BLMIS would be subject to the provisions of the Securities Exchange Act and the Commodities Exchange Act, as well as the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodity Futures Trading Commission. *Id.* ¶ 26.

### F.    Defendants Repeatedly Utilized New York Banks to Transfer Funds

Defendants repeatedly utilized New York bank accounts to transfer funds to and from Fairfield Sentry. In connection with subscribing funds to Fairfield Sentry, Defendants directed funds to a New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. *Id.* ¶ 38. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York. *Id.*

Platinum used an account at Northern Trust International Banking Corporation in New York to receive transfers from Fairfield Sentry. *Id.* ¶ 39. Platinum utilized this account repeatedly—at least 8 times in a single year—to receive $103,541,099 in redemption payments from Fairfield Sentry. *Id.* Odyssey used an account at Brown Brothers Harriman & Co. in New York to receive transfers from Fairfield Sentry. *Id.* ¶ 40. Odyssey utilized this account repeatedly—at least 15 times in a 3 year period—to receive $17,396,822 in redemption payments from Fairfield Sentry. *Id.*

### III.    FAIRFIELD SENTRY AND SIGMA'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

In 1988, U.S. citizens and residents, Walter Noel and Jeffrey Tucker, founded FGG, a New York-based *de facto* partnership. *Id.* ¶ 42. As part of FGG, Noel and Tucker incorporated

7

Fairfield International Managers, Inc. ("Fairfield International Managers"). *Id.* ¶ 44. Through Fairfield International Managers, Noel and Tucker organized the largest BLMIS feeder fund, Fairfield Sentry, as well as its so-called "currency fund," Sigma, which invested all of its assets in Fairfield Sentry. *Id.* ¶ 43.

Noel and Tucker formally organized the Fairfield Funds as international business companies under BVI law. *Id.* ¶¶ 45, 66. As international business companies, BVI law restricted the Fairfield Funds from doing business with other BVI citizens and residents except with other BVI international business companies. *Id.* The Fairfield Funds were shell corporations present in the BVI solely on paper. *Id.* ¶¶ 46, 67. Their BVI statutorily required registered address was a post office box care of a local trust company owned and operated by a local law firm. *Id.*

From their inception until their liquidation in 2009, the Fairfield Funds had no employees and no offices. *Id.* At all relevant times, the Fairfield Funds were operated almost entirely by FGG's New York City headquarters personnel who maintained final control of the Fairfield Funds' bank accounts and relationships with the Fairfield Funds' back office service providers. *Id.* ¶¶ 52–53, 69–70.

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. *Id.* ¶ 48. In the account opening documents, Tucker identified Fairfield Sentry's mailing address as Fairfield International Managers' office in Greenwich, Connecticut and directed BLMIS to send Fairfield Sentry's monthly account statements, trade confirmations, and correspondence to the same Fairfield International Managers office. *Id.* In January 1998, FGG requested BLMIS to send all Fairfield Sentry account information to FGG's New York City headquarters. *Id.*

From the Fairfield Funds' inception, FGG personnel at its New York City headquarters

8

controlled the sales and subscriptions of the funds' shares. *Id.* ¶¶ 53, 69. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York. *Id.* ¶ 53. Similarly, Sigma's subscription agreements contained a New York choice of law provision, and provided for venue and jurisdiction for any disputes in New York. *Id.* ¶ 69.

At all relevant times, FGG New York City headquarters personnel monitored the Fairfield Funds' investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of Fairfield Sentry; marketed the Fairfield Funds; approved all subscriptions for Fairfield Funds shares; maintained the Fairfield Funds' books and records at the FGG New York City headquarters; and made all strategic and operational decisions regarding the Fairfield Funds. *Id.* ¶¶ 52–53, 68.

Because the Fairfield Funds maintained their principal place of business in New York and conducted business from their New York headquarters, the transfers made by the Fairfield Funds to Defendants are not "purely foreign."

## IV.    **CONCLUSION**

For the foregoing reasons and those stated in the Trustee's Main Brief, this Court should grant the Trustee's motion for leave to amend the complaint and deny Defendants' motion to dismiss.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

| | |
|---|---|
| Dated:  June 26, 2015<br>         New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Catherine E. Woltering<br><br>**Baker & Hostetler LLP**<br>65 East State Street<br>Suite 2100<br>Columbus, Ohio 43215<br>Telephone:  (614) 228-1541<br>Facsimile:  (614) 462-2616<br>Douglas A. Vonderhaar<br>Justin J. Joyce<br><br>*Attorneys for Irving H. Picard, Trustee*<br>*for the Substantively Consolidated SIPA*<br>*Liquidation of Bernard L. Madoff Investment*<br>*Securities LLC and the estate of Bernard L.*<br>*Madoff* |