**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
|             Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
|             Defendant. | |

In re:

BERNARD L. MADOFF,

            Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01697 (SMB) |
|             Plaintiff, | |
| v. | |
| ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED, f/k/a Fortis (Isle of Man) Nominees Limited, PLATINUM ALL WEATHER FUND LIMITED, and ODYSSEY, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO ABN AMRO FUND SERVICES NOMINEES LIMITED, PLATINUM ALL WEATHER FUND LIMITED, AND ODYSSEY** |
|             Defendants. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendants ABN AMRO Fund Services (Isle of Man) Nominees Limited ("ABN IOM"), formerly known as Fortis (Isle of Man) Nominees Limited, Platinum All Weather Fund Limited ("Platinum"), and Odyssey (collectively, "Defendants"), states:

## I.    <u>INTRODUCTION</u>

1.    The Trustee seeks to recover at least $122,216,748 in subsequent transfers of BLMIS customer property collectively made to Defendants by Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma" and, together with Fairfield Sentry, the "Fairfield Funds").  The Defendants redeemed shares from the Fairfield Funds and received customer property in the following amounts:

|  | ABN IOM and/or Platinum | ABN IOM and/or Odyssey | ABN IOM and/or Odyssey and/or Platinum |
|---|---|---|---|
| Fairfield Sentry | $103,541,099 | $17,396,883 | $1,063,953 |
| Sigma | $0 | $0 | $214,813 |
| **Total** | **$103,541,099** | **$17,396,883** | **$1,278,766** |

2.    Fairfield Sentry was one of many BLMIS feeder funds—single-purpose investment funds that pooled their investors' assets to invest with BLMIS in New York, capitalizing on its consistent returns.  From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.

3.    Sigma, a Fairfield Sentry sister fund, was a "currency feeder" that accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets by purchasing shares of Fairfield Sentry.

4.    Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled the Fairfield Funds.

5.      Although incorporated in the BVI, the Fairfield Funds were shell corporations present in the BVI only on paper.  The Fairfield Funds had no employees and no office, and were operated almost entirely by FGG personnel in New York.  As international business companies, BVI law restricted the Fairfield Funds from doing business with other BVI citizens and residents except with other BVI international business companies.

6.      Defendant Platinum is a single-strategy hedge fund that invested exclusively in BLMIS feeder funds.  Platinum is organized under the laws of the Cayman Islands with a registered address care of DMS Corporate Services DMS House, 20 Genesis Close, P.O. Box 31910, Grand Cayman KY1-1208.

7.      Defendant Odyssey is an alternative strategy investment fund organized under the laws of the BVI, with a registered address at 33-37 Athol Street, Douglas, Isle of Man, IM1 1AF.

8.      Defendant ABN IOM is a limited company incorporated and organized under the laws of the Isle of Man with a registered address at First Floor, Jubilee Building, Douglas, Isle of Man IM1 2SH.

9.      ABN IOM is a wholly-owned subsidiary of Fortis Prime Fund Solutions (Isle of Man) Limited ("FPFS IOM").  During the relevant period, ABN IOM and FPFS IOM functioned as one entity, sharing the same address, workspace, phone number, contact information, employees, and directors.  As a result of the collapsed corporate structure between ABN IOM and FPFS IOM, the two entities had identical information regarding BLMIS and BLMIS feeder funds.

10.     Defendants Platinum and Odyssey authorized and/or directed ABN IOM to conduct due diligence, negotiate transactions, and act on their behalf for all purposes related to their investments in Fairfield Sentry.  ABN IOM assisted Platinum and Odyssey with their

Fairfield Sentry investments and executed Fairfield Sentry subscription agreements on their behalf.

## II.  THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

11.    The United States served as the center of the Defendants' relationships with the Fairfield Funds, and the transactions between the Fairfield Funds and Defendants were comprised of predominantly domestic elements.

### A.    ABN IOM Was Part of a Network of Entities that Maintained U.S. Operations

12.    ABN IOM operated as part of an integrated network of financial entities, and in the ordinary course of business collaborated with Fortis Prime Fund Solutions (USA) LLC ("Fortis USA"), an affiliated Delaware company based in New York.  ABN IOM and Fortis USA provided financial and administrative services to clients, including another New York-based BLMIS feeder fund.

### B.    Platinum Was Launched From New York and Managed From Offices in the United States

13.    In 2003, Platinum Capital Management Ltd. ("Platinum Management")—a global investment firm that manages and distributes single-strategy funds, funds of funds, and structured products—launched and operated Platinum from its New York subsidiary.  Although based in London, England, Platinum Management maintains offices in the United States to manage its U.S.-based investments, including offices in New York, Los Angeles, and Stamford, Connecticut.

3

14.    Platinum Management hired U.S.-based Eric Munson to serve as the president of its New York subsidiary, and together Munson and Platinum Management's New York-based subsidiary launched and operated Platinum from New York.

15.    Platinum was a single-strategy hedge fund created for the sole purpose of profiting from New York-based BLMIS and Madoff through investments in BLMIS feeder funds.

16.    Platinum used Platinum Management's New York subsidiary and Stamford, Connecticut offices to manage its investments in Fairfield Sentry.  Additionally, Platinum was marketed to institutional investors in the United States.

### C.    Defendants Invested in the Fairfield Funds to Profit from New York-based BLMIS and Conducted Due Diligence in New York

17.    Defendants knew the Fairfield Funds were managed out of FGG's New York headquarters, and the Fairfield Funds directed at least 95% of their assets to BLMIS in New York.  Defendants purposely invested in the Fairfield Funds as a means of accessing and profiting from BLMIS in New York.

18.    Prior to their subscriptions in the Fairfield Funds, Defendants received and reviewed Fairfield Sentry's offering memoranda detailing that at least 95% of the Fairfield Funds' assets were invested with BLMIS.  Through their due diligence on BLMIS, the Fairfield Funds, and other BLMIS feeder funds, Defendants knew the following facts about BLMIS:

- In reality New York-based BLMIS was the Fairfield Funds' investment adviser.

- New York-based BLMIS was the executing broker for the Fairfield Funds' investments.

- BLMIS in New York purportedly operated and executed Madoff's split-strike conversion strategy ("SSC Strategy") on behalf of the BLMIS feeder funds.

4

- The SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills ("Treasurys") traded on U.S. exchanges, and that the decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

- BLMIS was a registered U.S. broker-dealer regulated by the SEC.

19.    New York-based BLMIS controlled the Fairfield Funds' investments.  Not only did Defendants know control of the Fairfield Funds investments rested entirely with BLMIS and Madoff, they planned to profit precisely from it.

### 1.    Platinum Marketed Itself as a "Feeder Fund into Madoff" and Conducted Due Diligence on Its Investments in New York

20.    Platinum was created as a single-manager fund directing 100% of its assets to BLMIS through investments in BLMIS feeder funds.  Platinum boasted this, marketing itself as "a feeder fund investing into Bernard Madoff's funds."  As such, Platinum described itself as a BLMIS feeder fund investing with a U.S. broker dealer that purportedly purchased U.S. securities traded on U.S. exchanges.

21.    Platinum also identified itself as a BLMIS feeder fund during a June 2003 call with a representative of Ivy Asset Management, LLC ("Ivy").  According to Ivy's call log at the time, Platinum Management's Craig Reeves informed Ivy that Platinum "is actually a feeder fund into Madoff."

22.    In its marketing materials, Platinum also identified Madoff's SSC Strategy and described the purported execution of the SSC Strategy to its investors or potential investors.

23.    Because Platinum's strategy was centered around BLMIS's operations in New York, Platinum knew it could substitute its investments in one BLMIS feeder fund for another without changing the ultimate source of its purported returns.  Prior to subscribing in Fairfield Sentry, Platinum maintained investments in a BLMIS feeder fund named Kingate Global Fund

5

Limited ("Kingate Global").  In January 2007, Platinum subscribed in Fairfield Sentry as a substitute for a portion of its previous investments in Kingate Global.  The Trustee's action does not seek to recover transfers Platinum might have received from Kingate Global, but the Trustee expressly reserves his right to do so in the future.

24.     Platinum communicated with representatives from FGG's New York headquarters, including attending meetings in New York to review its investments in Fairfield Sentry and Sigma.  FGG's New York-based representative, Scott Nevin, served as Platinum's primary Fairfield Sentry contact responsible for managing Platinum's relationship with Fairfield Sentry.

25.     Platinum's managers visited BLMIS in New York and otherwise maintained direct communication with BLMIS.

26.     Platinum reviewed BLMIS trade confirmations, each of which listed BLMIS as a member of SIPC regulated by the SEC.  Platinum also reviewed BLMIS account opening documents specifying that transactions with BLMIS would be subject to the provisions of the Securities Exchange Act and the Commodities Exchange Act, as well as the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodity Futures Trading Commission.

### 2.     Odyssey Marketed Itself as a Partial Feeder Fund into Madoff or BLMIS and Conducted Due Diligence on Its Investments in New York

27.     Odyssey knew BLMIS's central role in Defendants' investments in the Fairfield Funds, and Odyssey marketed itself as a partial feeder fund into Madoff or BLMIS precisely to profit from BLMIS's U.S. strategy and management.

28.    In its July 2003 portfolio summary, Odyssey identified Madoff—and not Fairfield Sentry—as the "manager" of approximately 12% of the assets in its portfolio, which were invested in Fairfield Sentry shares.

29.    Odyssey further communicated with New York-based FGG representatives, including meetings in New York to review its Fairfield Sentry investments.

### 3.    ABN IOM's Relationships with BLMIS and Fortis USA were Centered in New York

30.    ABN IOM maintained regular contact with New York entities and individuals regarding BLMIS, including direct communications with BLMIS in New York by facsimile and telephone.  In addition to its contact with Fairfield Sentry as Platinum and Odyssey's representative, from at least November 2005 through December 2008, ABN IOM acted as administrator for another BLMIS feeder fund managed and operated out of New York.  In this capacity, ABN IOM communicated directly with New York-based representatives of BLMIS, received and analyzed BLMIS account statements and trade tickets sent directly from BLMIS, and met with representatives of the BLMIS feeder fund in New York.

31.    ABN IOM also collaborated with Fortis USA in New York to review BLMIS trade confirmations and analyze BLMIS's purported trading.  Because BLMIS purported to execute the SSC Strategy the same way for each BLMIS feeder fund, ABN IOM knew the information it learned about BLMIS through its and Fortis USA's analysis of BLMIS feeder fund account information was also relevant to its investments in the Fairfield Funds.  Further, ABN IOM knew from its review of BLMIS's trade confirmations that BLMIS identified itself as a member of SIPC.

7

    **D.**      **Defendants Agreed that Their Transactions with the Fairfield Funds Would be Governed by New York Law, and Subject to U.S. Jurisdiction and Venue**

32.      The transactions and associated transfers from the Fairfield Funds to Defendants were governed by New York law and subject to U.S. jurisdiction and venue. To invest in the Fairfield Funds, Defendants knowingly submitted to New York law, jurisdiction, and venue.

33.      By executing the Fairfield Funds' subscription agreements, through ABN IOM, Defendants agreed that their investments "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

34.      The Defendants further agreed "that any suit, action or proceeding . . . with respect to this Agreement and [the Fairfield Funds] may be brought in New York" and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

35.      In connection with their investments, the Defendants agreed: "If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder."

36.      By executing these agreements, Defendants knew and agreed that U.S. law would apply to their transactions with the Fairfield Funds.

    **E.**      **Defendants Repeatedly Used New York Banks for the Transfers**

37.      Defendants repeatedly used New York bank accounts to transfer funds to and from Fairfield Sentry.

38.      Defendants executed subscription agreements in connection with their investments in Fairfield Sentry. These agreements stated that all money for the purchase of

Fairfield Sentry shares from Defendants be directed to a New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York. In connection with subscribing funds to Fairfield Sentry, Defendants directed their funds to this New York HSBC Bank USA account.

39.     Platinum used an account at Northern Trust International Banking Corporation in New York to receive transfers from Fairfield Sentry. Platinum directed ABN IOM to execute a Fairfield Sentry subscription agreement on its behalf, wherein ABN IOM directed redemption payments from Fairfield Sentry to this Northern Trust International Banking Corporation account. Platinum used this account repeatedly—at least 8 times in a year—to receive $103,541,099 in redemption payments from Fairfield Sentry.

40.     Odyssey used an account at Brown Brothers Harriman & Co. in New York to receive transfers from Fairfield Sentry. Odyssey directed ABN IOM to execute a Fairfield Sentry subscription agreement on its behalf, wherein ABN IOM directed redemption payments to this Brown Brothers Harriman & Co. account. Odyssey used this account repeatedly—at least 15 times in a 3 year period—to receive $17,396,822 in redemption payments from Fairfield Sentry.

## III.    FAIRFIELD SENTRY AND SIGMA'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

41.     At all relevant times, Fairfield Sentry and Sigma's principal place of business was in New York and they were domestic residents.

9

### A.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

42.    In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were feeder funds.

43.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

44.    FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.    Fairfield Sentry

45.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI

statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

46.     Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

47.     Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1.     Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business was in the United States

48.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.  In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

49.     After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

50.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

### 2.     FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities

51.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.   Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.   In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts.   As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.   As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").   FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3.    FGG New York Personnel Managed Fairfield Sentry

52.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.   FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.   Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

53.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.   FGG New York Personnel also had final control of

13

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

54.    Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

55.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield

14

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

56.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

57.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

58.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

15

59.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited.  Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

60.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

61.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

62.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

16

63.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

64.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### C.    Sigma

65.    FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield Sentry using Euros, FGG created Sigma.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

66.    Noel and Tucker organized Sigma on November 20, 1990, as an international business company under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma.  Sigma is currently in liquidation in proceedings in the BVI and United States.

17

67.    Also like Fairfield Sentry, Sigma was a shell corporation present in the BVI only on paper.  It had no employees and maintained no offices.  It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters.  Sigma was operated almost entirely by FGG New York Personnel.

68.    As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Sigma.  Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities.  Until Sigma's liquidation, FGG maintained Sigma's books and records in New York. FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

69.    FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares.   Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated its PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole assets.  Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the

18

investments.  Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities.  This same risk was also disclosed in Fairfield Sentry's PPMs.

70.    Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma shares.  Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma assets.  As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma at Citco Bank Dublin.  FGG New York Personnel had final control of the Sigma Citco Bank Dublin bank accounts.  Finally, FGG New York Personnel controlled all of Sigma's relationships with the Citco entities.

71.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS— Noel executed a separate contract on Sigma's behalf with the Bank of Montreal for a currency swap which was "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

72.    FGG New York Personnel initially listed FG Limited as the investment manager for Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPM's to indicate FG Bermuda was Sigma's Investment Manager.  In fact, there were no duties for any investment manager because Sigma's sole purpose was to purchase Fairfield

Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

73.    The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated:  June 26, 2015          /s/ Thomas L. Long____
       New York, New York          **Baker & Hostetler LLP**
                                   45 Rockefeller Plaza
                                   New York, New York 10111
                                   Telephone:  (212) 589-4200
                                   Facsimile:  (212) 589-4201
                                   David J. Sheehan
                                   Thomas L. Long
                                   Catherine E. Woltering

                                   **Baker & Hostetler LLP**
                                   65 East State Street
                                   Suite 2100
                                   Columbus, Ohio 43215
                                   Telephone:  (614) 228-1541
                                   Facsimile:  (614) 462-2616
                                   Douglas A. Vonderhaar
                                   Justin J. Joyce

                                   *Attorneys for Irving H. Picard, Trustee*
                                   *for the substantively consolidated SIPA*
                                   *Liquidation of Bernard L. Madoff Investment*
                                   *Securities LLC and the estate of Bernard L.*
                                   *Madoff*