**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01694 (SMB) |
| Plaintiff, | |
| v. | |
| BANQUE CANTONALE VAUDOISE, | |
| Defendant. | |

**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE**
**EXTRATERRITORIALITY ISSUE AS TO BANQUE CANTONALE VAUDOISE**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, by and through his undersigned counsel, respectfully submits the proffered allegations below as to the domestic nature of the transfers received by Banque Cantonale Vaudoise ("BCV") from Fairfield Sentry Limited ("Fairfield Sentry").

## I. BACKGROUND

1. In this action, the Trustee seeks to recover at least $11,533,129 in transfers of BLMIS customer property made to BCV by Fairfield Sentry.

2. Fairfield Sentry was one of the many BLMIS feeder funds—single purpose investment funds that pooled their investors' assets to invest with BLMIS in New York. Fairfield Sentry had direct customer accounts with BLMIS's investment advisory business. Fairfield Sentry invested at least 95% of its assets its BLMIS customer accounts.

3. Fairfield Sentry was created, operated, controlled, and marketed by the Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, New York.

## II. THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

### A. BCV Invested in Fairfield Sentry to Profit from BLMIS in New York

4. BCV invested in Fairfield Sentry to profit from BLMIS in New York. FGG employee Philip Toub told his colleagues in June 2003 that BCV wanted to invest in Fairfield Sentry because it had the "Madoff bug."

5. BCV knew its investments in Fairfield Sentry would be invested with BLMIS, which acted as the investment advisor, executing broker, and custodian that purportedly executed its so-called "split-strike conversion" investment strategy for Fairfield Sentry. Fairfield Sentry's

private placement memoranda ("PPM"), which BCV received and read, disclosed BLMIS's involvement with Fairfield Sentry in these capacities.

6. The PPM dated October 1, 2002 states that BLMIS had complete control of the trades it purported to make for Fairfield Sentry: "The Manager [of Fairfield Sentry] has allocated the predominant portion of the Fund's assets to a managed account at Bernard L. Madoff Investment Securities. As a result, the Fund is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities." The PPM further states, "All investment decisions in the account at [BLMIS] are effected by persons associated with [BLMIS]." This PPM was in use when BCV decided to invest in Fairfield Sentry.

7. The PPM states that BLMIS was "a broker-dealer in New York" that executed the trades for Fairfield Sentry: "[BLMIS] acts as a principal in connection with its sale of equity securities to [Fairfield Sentry] and the purchase of equity securities from [Fairfield Sentry]."

8. BCV knew BLMIS's "split-strike conversion" strategy, as described in the PPM, purportedly involved domestic transactions: the purchase and sale of U.S. equities, U.S. options, and U.S. Treasuries.

9. BCV knew BLMIS maintained custody of its investments in Fairfield Sentry in New York. The PPM states, "[BLMIS] has entered into an agreement with Citco Custody pursuant to which [BLMIS] will serve as a sub-custodian of the Fund's assets."

10. Because of BLMIS's involvement with Fairfield Sentry, its PPM concludes, "[t]he services of ... Bernard L. Madoff Investment Securities are essential to the continued operations of [Fairfield Sentry]."

2

### B. The Transfers Were Made Pursuant to Agreements That Were Domestic in Nature

11. BCV's investments in Fairfield Sentry were governed one or more subscription agreements executed on behalf of BCV. The subscription agreements were governed by New York law: "This Agreement shall be governed and enforced in accordance with the laws of New York."

12. The subscription agreements also included a covenant to submit to venue in New York and the jurisdiction of New York courts: "Subscriber agrees that any suit, action or proceeding ('Proceeding') with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and, "Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding."

### C. BCV Used New York Banks in Connection with the Transactions

13. By investing in Fairfield Sentry, BCV knew it was directing funds to New York-based BLMIS through New York bank accounts. BCV's Fairfield Sentry subscription agreement directed BCV to send subscription money to a New York correspondent bank account at HSBC Bank USA, N.A. for deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were ultimately deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York. BCV directed funds to this correspondent bank account on multiple occasions from 2003 to 2008 in connection with Fairfield Sentry subscriptions.

14. BCV invested in Fairfield Sentry through Citco Global Custody N.V. and, as a result, BCV received the transfers through Citco Bank Dublin's correspondent bank account at HSBC in New York.

3

**D.    BCV Conducted Business in the United States in Connection with Its Investments in Fairfield Sentry**

15.    BCV conducted business in New York with FGG in connection with its investments in Fairfield Sentry, including due diligence meetings in New York and communications with New York-based employees. In March 2003, BCV's Jose Galeano visited FGG's New York office to conduct due diligence research on Fairfield Sentry. Galeano followed up with a second visit to FGG's New York office in October 2003 with his colleague Nils Turschmidt. In June 2006, BCV employees Fabio Alessandrini and Miguel Tiedra travelled to New York to meet with FGG again.

16.    In addition to meeting with FGG, BCV employees regularly communicated with and received due diligence materials from FGG employees in the United States. BCV's primary contact at FGG was Philip Toub, an FGG partner based in FGG's New York office.

**E.    BCV Relied upon Its New York-Based Agent for Its Investments in the Feeder Funds**

17.    BCV engaged Gottex Fund Management Ltd. ("Gottex") to conduct due diligence on Fairfield Sentry on BCV's behalf. Gottex is incorporated in Delaware, is registered to conduct business in New York, and maintains offices in New York and Boston. BCV partnered with Gottex to enhance its alternative investment business.

18.    Gottex employees from New York and Boston conducted due diligence on Fairfield Sentry behalf of BCV. Gottex's Chris Hawkins from Boston met with FGG in March 2007 to conduct due diligence on Fairfield Sentry. Hawkins also requested and received Fairfield Sentry materials from FGG. From New York in April 2007, Gottex's Edward Moran asked FGG to complete a due diligence questionnaire regarding Fairfield Sentry. Moran further requested that FGG schedule a due diligence call with Gottex.

4

### F.    Fairfield Sentry's Principal Place of Business Was in New York

19.    At all relevant times, Fairfield Sentry's principal place of business was in New York and it was a domestic resident.

#### 1.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

20.    In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

21.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.

22.    FGG also included a number of administrative entities that purportedly provided management and back-office support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

#### 2.    Fairfield Sentry

23.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax-free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from

5

doing business with other BVI residents except for other entities organized under the International Business Companies Act.

24. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

25. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

      **a. Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

26. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

6

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

27. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

28. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

      **b.**    **FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities**

29. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with back-office administrative services such as coordinating subscription and redemption forms,

7

maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Dublin. FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### c. FGG New York Personnel Managed Fairfield Sentry

30. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

31. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's

8

operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d.   Fairfield Sentry's Investors Knew They Were Investing in BLMIS

32.   As noted above, Fairfield Sentry's subscription agreements also incorporated its PPMs by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's investment strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e.   BLMIS Was Fairfield Sentry's Investment Manager

33.   Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

34.   In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City.

9

Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

35. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

36. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

37. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

10

management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds to FG Bermuda. FG Limited remained the placement agent for the same funds.

38. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

39. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

40. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

41. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

11

42. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

43. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund Limited*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015  
       New York, New York

/s/ Thomas L. Long  
**Baker & Hostetler LLP**  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Thomas L. Long  
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*