**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | Adv. Pro. No. 12-01205 (SMB) |
| Plaintiff, | |
| v. | |
| MULTI-STRATEGY FUND LIMITED and CDP CAPITAL TACTICAL ALTERNATIVE INVESTMENTS, | |
| Defendants. | |

**TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**BASED ON EXTRATERRITORIALITY AND IN FURTHER**
**SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**

The Trustee respectfully submits this supplemental memorandum in opposition to Multi-Strategy Fund Limited's ("MS Fund") and CDP Capital Tactical Alternative Investments' ("CDP Tactical") (collectively, the "CDP Defendants") motion to dismiss based on extraterritoriality and in further support of the Trustee's motion for leave to amend the complaint. As set forth below, the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to the CDP Defendants ("CDP Proffer") plead facts showing that the subsequent transfers received by the CDP Defendants and the component events of the transactions are predominantly domestic under the standard set forth in the Extraterritoriality Decision,[1] such that the Trustee's action does not require an extraterritorial application of SIPA or Bankruptcy Code § 550. The CDP Defendants' motion to dismiss should be denied, and the Trustee's motion for leave to amend should be granted.

## I. BACKGROUND & LEGAL STANDARD

This Court must determine whether the Trustee's claims against the CDP Defendants seek recovery of "purely foreign" transfers, requiring an extraterritorial application of SIPA or Bankruptcy Code § 550.[2] In making this determination, this Court must review the "location of the transfers as well as the component events of those transactions."[3] There is no bright-line test to determine whether a transaction is domestic[4]—it is a factual inquiry in which all reasonable

---

[1] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 513 B.R. 222 (S.D.N.Y. 2014) ("Extraterritoriality Decision").

[2] *Id*. at 232.

[3] *Id.* at 227 (citing *Maxwell Commc'n Corp. v. Société General (In re Maxwell Commc'n Corp.),* 186 B.R. 807, 816–17 (S.D.N.Y. 1995) ("*Maxwell I*")).

[4] *See Parkcentral Global Hub Ltd. v. Porsche Automobile Holding SE*, 763 F.3d 198, 217 (2d Cir. 2014).

1

inferences are to be drawn in the Trustee's favor.[5] The Trustee must only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[6]

CDP Tactical was a hedge fund manager that managed MS Fund, a hedge fund that invested in Fairfield Sentry Limited ("Fairfield Sentry") and Kingate Global Fund Limited ("Kingate Global"). CDP Proffer ¶ 2. Fairfield Sentry and Kingate Global were BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with New York-based BLMIS. *Id.* ¶ 3. Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry. *Id.* ¶ 4. Kingate Global was operated and controlled by service providers with substantial connections to the United States, including Kingate Management Limited ("KML") and Tremont (Bermuda) Limited, which was itself managed by New York-based Tremont Partners, Inc. *Id.* ¶¶ 5, 56, 68. The Trustee's CDP Proffer alleges the CDP Defendants received subsequent transfers of BLMIS customer property from Fairfield Sentry and Kingate Global. *Id.* ¶ 1.

The CDP Defendants argue that because they were formally organized under the laws of Canada, and because Fairfield Sentry and Kingate Global were formally organized under the laws of the Territory of the British Virgin Islands ("BVI"), they are entitled to a finding that those transfers are "purely foreign" and must be dismissed under the Extraterritoriality Decision. The CDP Defendants' analysis is contrary to the *Maxwell I* "component event" analysis embraced in the Extraterritoriality Decision,[7] and inconsistent with Second Circuit precedent

---

[5] *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 403 (S.D.N.Y. 2010).
[6] Extraterritoriality Decision, 513 B.R. at 232 n.4.
[7] *Id.* at 227 (citing *Maxwell I*, 186 B.R. at 817).

2

requiring courts to examine the economic and legal realities of the transactions to determine whether a claim is "sufficiently domestic" for purposes of extraterritoriality.[8] As set forth below, a comprehensive review of the transfers and the component events of the transactions demonstrate the Trustee's recovery claims against the CDP Defendants do not require an extraterritorial application of SIPA or Bankruptcy Code § 550.

## II. THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

The transfers and transactions at issue involved significant domestic components, including that the CDP Defendants: (1) had a relationship with FGG that was centered in New York; (2) used a California-based entity to conduct due diligence on Fairfield Sentry and Kingate Global; (3) used New York bank accounts to direct subscription payments to Fairfield Sentry and Kingate Global; (4) agreed New York law applied in connection with their investments in Fairfield Sentry; and, most fundamentally, (5) invested in Fairfield Sentry and Kingate Global as a means to access New York-based BLMIS. Further, Fairfield Sentry was a domestic resident that maintained its principal place of business in New York, and Kingate Global's operations were based in New York.

### A. The CDP Defendants' Conduct Put the United States at the Center of the Transactions at Issue

The CDP Defendants' conduct put the United States at the center of the transactions at issue. The CDP Defendants directed funds to Fairfield Sentry and Kingate Global with the intent to invest with New York-based BLMIS, and knew investments in Fairfield Sentry and Kingate

---

[8] *See, e.g., Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141–42 (2d Cir. 2014); *ParkCentral Global Hub Ltd.*, 763 F.3d at 216.

3

Global were simply investments with BLMIS itself. CDP Proffer ¶¶ 6, 9. Recognizing that BLMIS and Madoff generated the Feeder Funds' purported returns, the CDP Defendants repeatedly asked New York-based FGG employees questions about Madoff and BLMIS while conducting due diligence on Fairfield Sentry. *Id.* ¶¶ 7, 22.

The CDP Defendants visited FGG's New York headquarters to meet with FGG personnel and conduct due diligence on Fairfield Sentry, Madoff, and BLMIS. *Id.* ¶¶ 7, 13. Philip Toub, a partner based in FGG's New York headquarters and member of FGG's Executive Committee, was the CDP Defendants' primary contact at FGG. *Id.* ¶ 14. The CDP Defendants knew that FGG employees based in New York had the authority to approve subscriptions in Fairfield Sentry, and asked Toub for the opportunity to increase MS Fund's investments in Fairfield Sentry on at least three occasions. *Id.* ¶ 15.

The CDP Defendants also used London-based Albourne Partners Limited ("Albourne Partners") and its California-based subsidiary, Albourne America LLC ("Albourne America"), to conduct due diligence on Fairfield Sentry and Kingate Global. *Id.* ¶¶ 10. The CDP Defendants' investment decisions, including their decision to redeem from Fairfield Sentry and Kingate Global, were informed and influenced by the opinions of Albourne America and Albourne Partners. *Id.* ¶ 17.

The CDP Defendants executed subscription agreements in connection with their investments in Fairfield Sentry and Kingate Global. *Id.* ¶¶ 24–25. Fairfield Sentry's subscription agreements stated that all money from the CDP Defendants be directed to a New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. *Id.* ¶ 24. Kingate Global's subscription agreements stated that all money from the CDP Defendants be directed to a New York Citibank N.A. correspondent bank account for

4

ultimate deposit in Kingate Global's bank account. *Id.* ¶ 25. From both Fairfield Sentry and Kingate Global's bank accounts, the CDP Defendants' funds were deposited in BLMIS's New York account at JPMorgan Chase Bank NA. *Id.* ¶¶ 24–25. The CDP Defendants utilized these New York HSBC Bank USA and Citibank N.A. correspondent bank accounts when subscribing funds to Fairfield Sentry and Kingate Global, respectively, on multiple occasions. *Id*.

The Fairfield Sentry subscription agreements the CDP Defendants executed also contained New York choice of law, jurisdiction, and venue provisions. *Id.* ¶ 26. The CDP Defendants agreed that the subscription agreement "shall be governed and enforced in accordance with the laws or New York, without giving effect to its conflict of laws provisions." *Id*. The CDP Defendants also "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding." *Id*.

### B. Fairfield Sentry Maintained its Principal Place of Business in New York

In 1988, Walter Noel and Jeffrey Tucker founded FGG, a New York-based *de facto* partnership. CDP Proffer ¶ 28. As part of FGG, Noel and Tucker incorporated Fairfield International Managers, Inc. ("Fairfield International Managers"). *Id.* ¶¶ 28, 30. Through Fairfield International Managers, Noel and Tucker organized Fairfield Sentry. *Id.* ¶ 31.

Noel and Tucker formally organized Fairfield Sentry as an international business company under BVI law. *Id.* As an international business company, BVI law restricted Fairfield Sentry from doing business with other BVI citizens and residents except with other BVI international business companies. *Id.* Fairfield Sentry was a shell corporation present in the BVI solely on paper. *Id.* ¶ 32. Its BVI statutorily required registered address was a post office box care of a local trust company owned and operated by a local law firm. *Id.*

5

From its inception until its liquidation in 2009, Fairfield Sentry had no employees and no offices. *Id*. At all relevant times, Fairfield Sentry was operated almost entirely by FGG's New York City headquarters personnel who maintained final control of the Fairfield Sentry's bank accounts and relationships with the fund's back office service providers. *Id.* ¶¶ 32, 37–39.

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. *Id.* ¶ 34. In the account opening documents, Tucker identified Fairfield Sentry's mailing address as Fairfield International Managers' office in Greenwich, Connecticut and directed BLMIS to send Fairfield Sentry's monthly account statements, trade confirmations, and correspondence to the same Fairfield International Managers office. *Id*. In January 1998, FGG requested BLMIS to send all Fairfield Sentry account information to FGG's New York City headquarters. *Id*.

From Fairfield Sentry's inception, FGG personnel at its New York City headquarters controlled the sales and subscriptions of the fund's shares. *Id.* ¶¶ 37–39. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York. *Id.* ¶ 39.

At all relevant times, FGG New York City headquarters personnel monitored Fairfield Sentry's investments; managed the relationships with BLMIS; directed investments into and out of BLMIS as well as into and out of Fairfield Sentry; marketed Fairfield Sentry; approved all subscriptions for Fairfield Sentry shares; maintained all of Fairfield Sentry's books and records at the FGG New York City headquarters; and made all strategic and operational decisions regarding Fairfield Sentry. *Id.* ¶ 38–39.

### C. Kingate Global's Operations Were Based in New York

Kingate Global invested exclusively with BLMIS in New York and, together with its purported investment manager, consultant, and other service providers, formed an enterprise with

6

a single economic purpose: to make money from a New York-based investment operation. CDP Proffer ¶ 54.

Kingate Global executed customer agreements, and other accounts opening documents, and delivered the agreements to BLMIS in New York. *Id.* ¶ 59. The agreements were governed by U.S. law, and disputes under the agreements were to be resolved in the United States. *Id.* ¶¶ 60–61. The agreements further authorized BLMIS to act as Kingate Global's investment manager and executing broker and to invest Kingate Global's assets according to Madoff's SSC investment strategy, which purported to involve the purchase and sale of U.S. securities traded only on domestic exchanges. *Id.* ¶ 63. In addition, the agreements provided that BLMIS would hold custody of Kingate Global's investments in New York. *Id.* ¶ 64. Accordingly, control over Kingate Global rested entirely with BLMIS in New York.

Kingate Global had no physical offices, no employees, and transacted no meaningful business in the BVI. *Id.* ¶ 55. Instead, Kingate Global operated through service providers with substantial connections to the United States. Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years and was formed in Bermuda, but was itself managed from New York by Tremont Partners, Inc., a Connecticut corporation. *Id.* ¶ 56. Kingate Global was also co-managed by KML, which operated through agents in New York. *Id.* ¶ 68. KML engaged consultants FIM Limited and FIM Advisers LLP (together "FIM") to perform due diligence on BLMIS. *Id.* ¶ 71. Although FIM had a London address, the head of due diligence for its Feeder Fund investments was located in New York and worked with FIM's affiliate FIM (USA) Inc. in New York, which was the hub for FIM's Feeder Fund due diligence. *Id.* ¶ 72–73. From New York, FIM (USA) Inc. monitored, researched and solicited investors for Kingate Global. *Id.* ¶ 73. Because Kingate Global conducted its Madoff business in the United

States, the Transfers made by Kingate Global to the CDP Defendants are not purely foreign.

### III.   CONCLUSION

   For the foregoing reasons and those stated in the Trustee's Main Brief, this Court should deny the CDP Defendants' motion to dismiss and grant the Trustee's motion for leave to amend the complaint.

Dated: June 26, 2015    /s/ Thomas L. Long
   New York, New York    **Baker & Hostetler LLP**
   45 Rockefeller Plaza
   New York, New York 10111
   Telephone: (212) 589-4200
   Facsimile: (212) 589-4201
   David J. Sheehan
   Thomas L. Long

   **Baker & Hostetler LLP**
   65 East State Street
   Suite 2100
   Columbus, Ohio 43215
   Telephone: (614) 228-1541
   Facsimile: (614) 462-2616
   Lauren M. Hilsheimer
   Justin J. Joyce

   *Attorneys for Irving H. Picard, Trustee*
   *for the Substantively Consolidated SIPA*
   *Liquidation of Bernard L. Madoff Investment*
   *Securities LLC and the estate of Bernard L.*
   *Madoff*