**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br><br>    Plaintiff,<br>  v.<br><br>MULTI-STRATEGY FUND LIMITED and CDP CAPITAL TACTICAL ALTERNATIVE INVESTMENTS,<br><br>    Defendants. | Adv. Pro. No. 12-01205 (SMB)<br><br><br><br><br><br><br><br><br><br>**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO THE CDP DEFENDANTS** |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to Defendants Multi-Strategy Fund Limited ("MS Fund") and CDP Capital Tactical Alternative Investments ("CDP Tactical") (collectively, the "CDP Defendants"), states:

## I. INTRODUCTION

1.   The CDP Defendants collectively received at least $36,442,100 of BLMIS customer property, including at least: (1) $25,763,374 transferred from BLMIS to Fairfield Sentry Limited ("Fairfield Sentry") and subsequently transferred to the CDP Defendants; and (2) $10,678,726 transferred from BLMIS to Kingate Global Fund Limited ("Kingate Global") and subsequently transferred to the CDP Defendants.  The Trustee seeks to recover these subsequent transfers in this proceeding.

2.   During all relevant times, CDP Tactical was a hedge fund manager that managed MS Fund, a fund that invested in Fairfield Sentry and Kingate Global.  CDP Tactical acted as the investment manager for MS Fund, and was responsible for MS Fund's investments in Fairfield Sentry and Kingate Global.  CDP Tactical also conducted due diligence on behalf of MS Fund and shared information gained through due diligence on Fairfield Sentry, Kingate Global, Madoff, and BLMIS with MS Fund.

3.   Fairfield Sentry and Kingate Global were BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with New York-based BLMIS.

4.   Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, controlled Fairfield Sentry.  From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with New York-based

1

BLMIS.

5.   Kingate Global was operated and controlled entirely by service providers with substantial connections to the United States, including Kingate Management Limited ("KML") and Tremont (Bermuda) Limited, which was itself managed from New York by Tremont Partners, Inc., a Connecticut corporation. From March 1994 until Madoff's arrest in December 2008, Kingate Global maintained a direct customer account with New York-based BLMIS.

6.   The CDP Defendants purposefully invested in Fairfield Sentry and Kingate Global to profit from New York-based BLMIS. But for the CDP Defendants' deliberate choice to seek access to BLMIS's purported trading in U.S. securities in New York, the CDP Defendants would have received none of the at least $36,442,100 in transfers from Fairfield Sentry and Kingate Global.

7.   CDP Tactical conducted due diligence on Fairfield Sentry and Kingate Global in connection with MS Fund's investments, including visiting FGG's New York headquarters and frequently communicating with New York-based FGG employees.

8.   As a result of, among other things, CDP Tactical's due diligence and the CDP Defendants' review of Fairfield Sentry's and Kingate Global's subscription agreements and Private Placement Memoranda ("PPMs"), the CDP Defendants knew:

    a.   In reality the investment adviser for Fairfield Sentry and Kingate Global was New York-based BLMIS.

    b.   New York-based BLMIS was purportedly the executing broker for Fairfield Sentry and Kingate Global's investments, and purportedly operated and executed Madoff's "split-strike conversion" investment strategy ("SSC Strategy") on behalf of Fairfield Sentry and Kingate

2

Global.

    c.    Madoff's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury Bills ("Treasurys") traded on U.S. exchanges, and decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

    d.    New York-based BLMIS was the custodian of Fairfield Sentry and Kingate Global's investments.

    e.    The entire economic purpose of Fairfield Sentry and Kingate Global was to deliver money to New York-based BLMIS.

9.    The CDP Defendants knew control over Fairfield Sentry and Kingate Global's investments rested entirely with New York-based BLMIS.

10.    The CDP Defendants also hired London-based Albourne Partners Limited ("Albourne Partners") and its California-based subsidiary, Albourne America LLC ("Albourne America") (collectively, "Albourne"), to supplement their due diligence on Fairfield Sentry, Kingate Global, Madoff, and BLMIS.

11.    In February 2005, Albourne advised the CDP Defendants that Madoff was potentially orchestrating a Ponzi scheme through BLMIS. Specifically, Albourne reported that Fairfield Sentry's and Kingate Global's returns were "too good to be true," and cautioned the CDP Defendants that there were serious concerns about whether Madoff's trades "were actually being put on at all."

## II. THE TRANSACTIONS AT ISSUE INVOLVED SIGNIFICANT DOMESTIC COMPONENTS

12.    The transactions at issue were centered in the U.S. and involved significant domestic components. First, the CDP Defendants' purpose in entering into the transactions was

3

to benefit from BLMIS's purported trading strategy in the U.S. Second, the CDP Defendants visited FGG's New York headquarters, communicated with New York-based FGG personnel, and used California-based Albourne America to conduct due diligence on Fairfield Sentry, Kingate Global, Madoff, and BLMIS on their behalf. Third, the CDP Defendants used New York banks to transfer funds to the Feeder Funds, and agreed New York law applied in connection with the Fairfield Sentry transaction at issue. Finally, Fairfield Sentry maintained its principal place of business in New York and was a domestic resident, and Kingate Global invested exclusively with BLMIS in New York.

### A. The CDP Defendants Conduct Put the United States at the Center of the Transactions

13. Shortly after investing in Fairfield Sentry, the CDP Defendants visited FGG's New York headquarters to meet with FGG senior partners and discuss Fairfield Sentry, Madoff, and BLMIS. At this meeting, FGG personnel based in New York ("FGG New York Personnel") provided the CDP Defendants with due diligence materials to "avoid them feeling the need to go see Madoff," including reports analyzing BLMIS's purported monthly trading activities. These reports were prepared by FGG's U.S.-based external consultant, Gil Berman, and analyzed BLMIS's purported investments in U.S. equities, U.S. options, and U.S. Treasurys.

14. Philip Toub, a partner based in FGG's New York headquarters and member of FGG's executive committee, managed FGG's relationship with the CDP Defendants. Toub served as the CDP Defendants' primary contact with FGG, and the CDP Defendants directed any questions or concerns related to Fairfield Sentry, Madoff, and BLMIS to Toub.

15. The CDP Defendants knew FGG New York Personnel had the authority to approve subscriptions in Fairfield Sentry. The CDP Defendants asked New York-based Toub for the opportunity to increase MS Fund's investments in Fairfield Sentry on at least three occasions.

4

16. The CDP Defendants also used California-based Albourne America to conduct due diligence on Fairfield Sentry, Kingate Global, Madoff, and BLMIS. The due diligence performed by Albourne America and its London-based parent company, Albourne Partners, was an essential part of the CDP Defendants' due diligence process.

17. The CDP Defendants' investment decisions, including their decision to redeem from Fairfield Sentry and Kingate Global, were informed and influenced by the opinions of Albourne America and Albourne Partners. The day after Madoff's arrest, CDP Tactical's President, Mario Therrien, wrote an email to Albourne Partners' Managing Director and said:

> I remember a conversation you and I had in February of 2005 . . . We had discussed Madoff and the potential [P]onzi scheme. Got so scared . . . that we redeemed on March 31st of 2005.

18. In March 2005, the CDP Defendants redeemed MS Fund's entire investments in Fairfield Sentry and Kingate Global in two lump sum payments because they were "scared" the fraud had become so obvious at that point.

**B.    The CDP Defendants Invested in Fairfield Sentry and Kingate Global Specifically to Profit from New York-Based BLMIS**

19. The CDP Defendants directed funds to Fairfield Sentry and Kingate Global with the intent to invest with BLMIS, and knew investments in these Feeder Funds were going almost entirely to New York-based BLMIS.

20. The CDP Defendants first invested in Kingate Global in 1999. In 2004, the CDP Defendants also began investing in Fairfield Sentry in an effort to direct additional funds to New York-based BLMIS. Shortly after the CDP Defendants' first investment in Fairfield Sentry, FGG's Toub commented in an internal FGG email that the CDP Defendants should be added "to the long list of Madoff addicts who need a fix."

21. CDP Tactical, Albourne Partners, and Albourne America each performed due

5

diligence on Fairfield Sentry, Kingate Global, Madoff, and BLMIS in connection with MS Funds' investments. As a result of this due diligence, the CDP Defendants knew Fairfield Sentry and Kingate Global were entirely dependent on New York-based BLMIS.

22. In communications with FGG New York Personnel, the CDP Defendants frequently asked about Madoff and BLMIS. When the CDP Defendants could not understand how Fairfield Sentry generated returns in a particular month, they asked FGG's Toub for a report "which shows how Madoff made money." When the CDP Defendants began growing concerned about Madoff and BLMIS, they asked FGG's Toub to "communicate any info [sic] that you've got on Madoff." Finally, after the CDP Defendants determined that Madoff was potentially orchestrating a Ponzi scheme through Fairfield Sentry and Kingate Global, they confirmed this conclusion with Albourne.

    **C.**    **The CDP Defendants Utilized New York Banks to Transfer Funds and Agreed New York Law Applied in Connection with the Transactions at Issue**

23. The CDP Defendants utilized New York bank accounts to transfer funds to Fairfield Sentry and Kingate Global.

24. The CDP Defendants executed subscription agreements in connection with their investments in Fairfield Sentry. These agreements stated that all money from the CDP Defendants be directed to a New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York. The CDP Defendants directed funds to this New York HSBC Bank USA account on multiple occasions in connection with subscribing funds to Fairfield Sentry.

25. The CDP Defendants also executed subscription agreements in connection with their investments in Kingate Global. These agreements stated that all money from the CDP

6

Defendants be directed to a New York Citibank N.A. correspondent bank account for ultimate deposit in Kingate Global's bank account. From Kingate Global's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York. The CDP Defendants utilized this New York Citibank N.A. correspondent account on multiple occasions when subscribing funds to Kingate Global.

26.   The CDP Defendants also agreed New York law applied in connection with MS Fund's investments in Fairfield Sentry. The CDP Defendants voluntarily executed a Fairfield Sentry subscription agreement, and in doing so, agreed that the subscription agreement "shall be governed and enforced in accordance with the laws or New York, without giving effect to its conflict of laws provisions." The CDP Defendants also "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

### D.   Fairfield Sentry Maintained its Principal Place of Business in New York

27.   At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

#### 1.   The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

28.   In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were feeder funds.

29.   The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS

7

feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

30. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### 2. Fairfield Sentry

31. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

32. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations.

8

The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

33. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

      a. *Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business was in the United States*

34. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

35. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and

9

Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

36. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

        *b.    FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities*

37. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco

10

entities.

### c. *FGG New York Personnel Managed Fairfield Sentry*

38. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

39. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d. *Fairfield Sentry's Investors Knew They Were Investing in BLMIS*

40. Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of

11

the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

*e.     BLMIS Was Fairfield Sentry's Investment Manager*

41.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

42.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

43.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation

12

of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

44. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

45. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

46. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated

13

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

47.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

48.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

49.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

50.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

14

51. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.,* Adv. Pro. No. 09-01239 (SMB), (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

### E. The Kingate Global Transfers Are Domestic

52. Kingate Global was a Feeder Fund that invested exclusively with BLMIS in New York. BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of its accounts prior to December 11, 2008.

53. Kingate Global filed customer claims in the SIPA liquidation.

#### 1. Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation

54. Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

55. Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

56. Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

57. Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage Kingate Global's investments with BLMIS.

15

58. Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

### 2. The Operative Legal Documents Were New York-Based

59. Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

60. Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

61. Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### 3. BLMIS Had Full Authority to Make and Execute Investment Decisions

62. Kingate Global's Trading Authorization Agreements authorized BLMIS to be Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global invested assets and to buy, sell, and trade in securities for Kingate Global.

63. As with each of the other Feeder Funds, BLMIS in New York acted as Kingate Global's investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

16

64. BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### 4. Kingate Global Was Managed From New York

65. During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

66. Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

67. Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

68. Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso. KML operated through its agents in New York.

69. KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

70. KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

71. KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

72. Although FIM had a London address, Eric Lazear, FIM's head of due diligence

17

for Feeder Fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

73. FIM (USA) was the hub for FIM's Feeder Fund due diligence. From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

74. KML and the FIM entities actively participated in Kingate Global business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

### 5. Kingate Global Used Banks in New York

75. Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

76. KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States, as Kingate Global's custodian.

77. In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

78. FIM also directed fee payments to be routed through a bank account in New York.

79. The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

18

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone:  (212) 589-4200<br>Facsimile:  (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br><br>**Baker & Hostetler LLP**<br>65 East State Street<br>Suite 2100<br>Columbus, Ohio 43215<br>Telephone:  (614) 228-1541<br>Facsimile:  (614) 462-2616<br>Lauren M. Hilsheimer<br>Justin J. Joyce<br><br>*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff* |