**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>EQUITY TRADING PORTFOLIO LTD., *et al.*,<br><br>    Defendants. | Adv. Pro. No. 10-04457 (SMB) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>OREADES SICAV, *et al.*,<br><br>    Defendants. | Adv. Pro. No. 10-05120 (SMB) |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02796 (SMB) |
| Plaintiff, | |
| v. | |
| BNP PARIBAS ARBITRAGE SNC, | |
| Defendant. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01576 (SMB) |
| Plaintiff, | |
| v. | |
| BNP PARIBAS S.A., *et al*., | |
| Defendants. | |

**THE TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE
EXTRATERRITORIALITY ISSUE AS TO THE BNP PARIBAS DEFENDANTS**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, by and through his undersigned counsel, respectfully submits the following proffered allegations as to the domestic nature of the transfers received by defendants BNP Paribas S.A. ("BNP"), BNP Paribas Arbitrage SNC ("BNP Arbitrage"), BNP Paribas Securities Services S.A. ("BNP Securities Services"), BNP Paribas Bank & Trust (Cayman) Limited ("BNP Cayman"), BNP Paribas (Suisse) S.A. ("BNP Suisse"), and BGL BNP Paribas Luxembourg S.A. ("BGL BNP," and collectively, "Defendants"):

1.      Defendants purposefully invested in or transacted business with Ascot Partners, L.P. ("Ascot"), Equity Trading Portfolio Ltd. ("Equity Portfolio"), Fairfield Sentry Ltd. ("Fairfield Sentry"), Fairfield Sigma Ltd. ("Fairfield Sigma"), Groupement Financiere Ltd. ("Groupement"), Harley International (Cayman) Ltd. ("Harley"), Kingate Euro Fund Ltd. ("Kingate Euro"), Kingate Global Fund Ltd. ("Kingate Global"), Legacy Capital Ltd., Luxalpha SICAV, Oreades SICAV ("Oreades"), Rye Select Broad Market Insurance Portfolio LDC ("Insurance Portfolio"), Rye Select Broad Market Portfolio Ltd. ("Portfolio Limited"), Rye Select Broad Market XL Fund L.P. ("XL LP"), and Rye Select Broad Market XL Portfolio Ltd. ("XL Portfolio," and collectively, the "BLMIS Feeder Funds") to profit from Bernard L. Madoff Investment Securities LLC ("BLMIS") in New York.

2.      Defendants collectively received at least $1.25 billion in transfers of BLMIS customer property from the BLMIS Feeder Funds, which originated from BLMIS's account at JPMorgan Chase & Co. ("JPMorgan") in New York.

3.     The proffered allegations herein demonstrate that the transfers and the component events of the transactions with the BLMIS Feeder Funds are predominantly domestic.

## I.    THE BNP DEFENDANTS

4.     Defendant BNP is a global financial institution that has conducted business in the United States since the late 1800s and currently has over 10,000 employees and more than 700 retail branches in the United States.  BNP is a resident of New York, with an office located at 787 Seventh Avenue, New York, New York.  BNP received subsequent transfers of BLMIS customer property totaling approximately $55 million from BLMIS Feeder Funds Ascot, Fairfield Sentry, Insurance Portfolio, Kingate Global, and Kingate Euro.

5.     Defendant BNP Arbitrage is wholly owned by BNP and is a member of BNP's Fund Derivatives Group.  BNP Arbitrage is a resident of New York, with an office located at 787 Seventh Avenue, New York, New York.  As a member of the Fund Derivatives Group, BNP Arbitrage received subsequent transfers of BLMIS customer property totaling approximately $1 billion from BLMIS Feeder Funds Equity Portfolio, Fairfield Sentry, Groupement, Harley, Kingate Global, Kingate Euro, and XL Portfolio.

6.     Defendant BNP Securities Services is wholly owned by BNP and is a member of BNP's Securities Services Group.  BNP Securities Services is a resident of New York, with an office located at 787 Seventh Avenue in New York, New York.  As a member of the Securities Services Group, BNP Securities Services received subsequent transfers of BLMIS customer property totaling approximately $107 million from BLMIS Feeder Funds Fairfield Sentry, Fairfield Sigma, Harley, Kingate Global, Kingate Euro, Oreades, and Portfolio Limited.

7.     Defendant BNP Cayman is wholly owned, directly or indirectly, by BNP and is a member of BNP's Securities Services Group.  As a member of the Securities Services Group, BNP Cayman received subsequent transfers of BLMIS customer property totaling approximately

2

$91 million from BLMIS Feeder Funds Ascot, Fairfield Sentry, Kingate Global, Portfolio Limited, XL LP, and XL Portfolio.

8.    Defendant BNP Suisse is wholly owned, directly or indirectly, by BNP and is a member of BNP's Asset Management Group.  As a member of the Asset Management Group, BNP Suisse received subsequent transfers of BLMIS customer property totaling approximately $7 million from BLMIS Feeder Funds Fairfield Sentry, Kingate Global, and Kingate Euro.

9.    Defendant BGL BNP is wholly owned, directly or indirectly, by BNP and is a member of BNP's Asset Management Group.  As a member of the Asset Management Group, BGL BNP received subsequent transfers of BLMIS customer property totaling approximately $24 million from BLMIS Feeder Funds Fairfield Sentry, Fairfield Sigma, Kingate Global, Kingate Euro, and Oreades.

10.    Defendants worked with non-party BNP Paribas Securities Corp. ("BNP Securities Corp.") to build and maintain Defendants' relationships with Madoff, BLMIS, and the BLMIS Feeder Funds.   BNP Securities Corp. is a broker-dealer registered with the U.S. Securities & Exchange Commission ("SEC"), and it is wholly owned, directly or indirectly, by BNP.  BNP Securities Corp. is incorporated in Delaware, and is a resident of New York, with an office located at 787 Seventh Avenue, New York, New York.

## II.    THE DEFENDANTS' MADOFF RELATED TRANSACTIONS ORIGINATED FROM THEIR NEW YORK-BASED FUND DERIVATIVES GROUP

11.    The Fund Derivatives Group is a BNP business group within BNP's Global Equity & Derivatives Division that, among other things, creates, markets, and services credit facilities and structured products that offer BNP's customers leverage on their investments.

12.    The transfers received by Defendants resulted from investment transactions, credit facilities, and structured products made possible in large part by the Fund Derivatives Group.

The Fund Derivatives Group has operated from New York since 2003 when BNP acquired the necessary infrastructure and personnel from New York-based Zurich Capital Markets, Inc. ("ZCM").  After acquiring ZCM's structured products business, BNP created BNP Securities Corp. in New York to act as its agent with respect to BLMIS investment transactions involving the Fund Derivatives Group.

13.    The Fund Derivatives Group: (i) marketed leverage services to BLMIS feeder funds; (ii) created structured products that provided leverage to these funds and to clients; (iii) conducted initial and ongoing due diligence on BLMIS and BLMIS feeder funds; (iv) calculated the amounts that BNP should invest or redeem from the BLMIS feeder funds; (vi) corresponded regularly with the BLMIS feeder funds and their administrators; and (vi) assumed certain operational responsibilities, which included the requests for redemptions that resulted in the fraudulent transfers the Trustee seeks to recover.

## III.    DEFENDANTS PURPOSEFULLY SOUGHT TO PROFIT FROM BLMIS'S DOMESTIC INVESTMENT STRATEGY

14.    From their own due diligence and the BLMIS Feeder Funds' marketing materials and offering memoranda, each of the Defendants knew the investment advisor for each of the BLMIS Feeder Funds was BLMIS and that control over the investments rested entirely with Madoff in New York.  For example, Fairfield Sentry's Private Placement Memoranda ("PPM") stated that the fund had "delegated all investment management duties to Bernard L. Madoff Investment Securities.  As a result, [Fairfield Sentry] is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities."

15.    Each of the Defendants knew BLMIS was the executing broker for the BLMIS Feeder Funds, and that Madoff in New York purported to execute his "split-strike conversion"

4

investment strategy ("SSC Strategy") on behalf of the BLMIS Feeder Funds.  For example,
Fairfield Sentry's PPM stated that BLMIS, a broker-dealer registered with the SEC, acted as the
"execution agent" that implemented Madoff's SSC Strategy, which involved the purported
purchase and sale of U.S. exchange-traded equities from the S&P 100 Index, U.S. options, and
U.S. Treasuries.

16.     Each of the Defendants knew BLMIS purportedly held custody over the BLMIS
Feeder Funds' investments.  For example, Fairfield Sentry's PPM, Harley's financial statements,
and Tremont's account statements stated that the investments were custodied at BLMIS.

17.     But for BLMIS in New York, Defendants would not have received transfers of
customer property from the BLMIS Feeder Funds.

## IV.     THE TRANSFERS AND COMPONENT EVENTS OF THE HARLEY TRANSACTIONS ARE PREDOMINANTLY DOMESTIC

### A.     BNP Paribas Arbitrage and BNP Paribas Securities Services Received Transfers from Harley Which Maintained its Principal Place of Business in New York

18.     Harley invested 100% of its assets with BLMIS in New York and received
approximately $1 billion in transfers of customer property from BLMIS within two years of
December 11, 2008.

19.     Of this amount, BNP Arbitrage received approximately $975 million and BNP
Securities Services received approximately $500,000 from Harley.   BNP Arbitrage received
transfers from Harley pursuant to a credit facility through which BNP, and its predecessor ZCM,
loaned money to Santa Barbara Holdings Ltd. ("Santa Barbara"), a sub-fund that invested
exclusively with Harley

1.    **Harley Sought Out the United States as a Place to Invest and the Transfers it Received Arose Out of its Investment Account with BLMIS in New York**

20.    In April 1996, Harley's predecessor, Harley International Limited, entered into a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities with BLMIS in New York.  Thereafter, Harley maintained an investment account with BLMIS, designated No. 1FN094.

21.    Harley agreed that all disputes arising under the Customer Agreement would be resolved by arbitration before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers Inc. … and in accordance with the rules … of the selected organization."

22.    The Customer Agreement between BLMIS and Harley provided that all transactions are subject to the provisions of the U.S. Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System. The Customer Agreement also provided BLMIS with full discretion over Harley's assets, and pursuant to the Trading Authorization agreement, Harley authorized Madoff to be its "agent and attorney in fact" to buy, sell, and trade in U.S. securities.

23.    The Trustee filed a complaint against Harley in the Bankruptcy Court, under the caption *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), and on November 10, 2010, the Bankruptcy Court entered summary judgment against Harley in the amount of $1,066,800,000.

24.    In support of summary judgment, the Bankruptcy Court held that "Harley specifically sought out the United States as a place to do business when it opened an account with BLMIS," and that the transfers received by Harley "arose out of business transactions tied to Harley's securities account with BLMIS in New York."

6

2.      **BLMIS in New York Acted as Harley's Investment Manager, Custodian, and Executing Broker**

25.      Euro-Dutch Trust Company (Bahamas) Limited ("Euro-Dutch Bahamas") acted as Harley's purported investment manager until 2003, and after 2003, Euro-Dutch Management Limited ("Euro-Dutch Cayman") in the Cayman Islands acted as Harley's purported investment manager.

26.      Neither Euro-Dutch Bahamas nor Euro-Dutch Cayman played a meaningful role in managing Harley's investments with BLMIS.    Instead, they delegated their investment management responsibilities to BLMIS in New York.

27.      As Harley's investment manager, BLMIS in New York purported to invest Harley's assets according to Madoff's SSC Strategy, and BLMIS decided which, how many, and when to purchase and sell U.S. securities on Harley's behalf.    BLMIS also acted as executing broker in purporting to purchase the U.S. securities on Harley's behalf.

28.      BLMIS acted as custodian for the U.S. securities purportedly held on Harley's behalf.    Each of Harley's audited financial statements for years 2003, 2004, 2005, 2006, and 2007 disclosed that BLMIS acted as Harley's "Custodian."    Harley's audited financial statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

29.      Harley's audited financial statements for years 2005 and 2006 also noted that "items included in the financial statements are measured using the currency of the primary economic activity in which it operates …. This is the U.S. dollar, which reflects the company's primary activity of investing in U.S. dollar denominated securities and derivatives."

3.      **Harley Conducted No Meaningful Business in the Cayman Islands**

30.      Harley was registered as an exempt company under the Cayman Islands Companies Law and was not permitted to solicit investors in the Cayman Islands.

7

31.     In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands."

32.     In its Articles of Association, Harley required that all disputes among Harley and its shareholders would be referred to binding arbitration in New York under rules established by the American Arbitration Association.

33.     Each shareholder in Harley, including BNP Arbitrage, received copies of Harley's audited financial statements, Memorandum of Association, and Articles of Association.

### 4.     Fix Asset Management Ltd. Managed Harley from New York

34.     Fix Asset Management Ltd. is the family wealth office of Charles Fix, which over the years evolved into an institutional fund of funds manager.

35.     Fix Asset Management Ltd. operated through wholly owned subsidiaries, including Fix Asset Management Services Inc. (f/k/a Fix Asset Management, Inc. and Fix Capital Ltd., and collectively with Fix Asset Management Ltd., "FAM").

36.     FAM was incorporated under New York law and maintained its principal place of business at 660 Madison Avenue, New York, New York.

37.     Harley had no employees or offices of its own.  For its investments with BLMIS, Harley acted principally through FAM.

38.     FAM was owned and controlled by Charles Fix, who also owned and controlled all of the voting shares for Harley.  During the relevant time period, Charles Fix resided in New York.

39.     Fix's daughter, Tatiana Fix Katsigera (f/k/a Tatiana Fix), was the chief executive officer of FAM, served on its investment advisory committee, and conducted due diligence for its funds, including Harley.  Tatiana Fix Katsigera also lived in New York.

40.     Several other members of FAM's advisory teams, including John Fix, Abel Pacheco, and Panos Katsambas, also resided in New York during much of the relevant time period.  FAM's outside counsel was also located in New York.

41.     FAM marketed Harley from its office in New York, and FAM employees met with investors and potential investors in Harley at FAM's office in New York.

42.     FAM monitored and conducted due diligence on Harley's investments with BLMIS from its office in New York.

43.     FAM received Harley's BLMIS account statements at its office in New York.  For several years BLMIS also sent Harley's BLMIS trade confirmations and account statements to FAM's agent and service provider at Bank Julius Baer & Co. Ltd. in New York.

44.     In monitoring its investments, FAM relied on external consultants in the United States, including Merfin LLC from California, X.E. Capital from New York, and Event Capital Markets from New Jersey.

45.     FAM handled subscriptions into and redemptions from Harley from its office in New York.  For example, FAM employees corresponded with Madoff and Frank DiPascali to request that BLMIS accept subscriptions into Harley's account with BLMIS.  FAM employees, including Charles Fix, also corresponded with Madoff and DiPascali to request redemptions from Harley's account.

### 5.      Harley Received Transfers at Bank Accounts Held in New York

46.     Harley's subscription agreements directed investors to wire U.S. dollars to bank accounts in New York.  Prior to 2005, the subscription agreements required subscriptions to be

wired to a JPMorgan Chase Bank N.A. account in New York, held in the name of Fortis Bank (Cayman) Limited, and after 2005, the subscription agreements required subscriptions to be wired to an account in the name of Fortis Prime Fund Solutions (IOM) Limited ("Fortis Prime Fund Solutions IOM") at the Northern Trust Banking Corporation ("Northern Trust"), 40 Broad Street, New York, New York.

47.     When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York.  Harley previously had directed that BLMIS pay redemptions to an account held at Barclays Bank plc in New York.

### 6.     Harley Was Administered By Fortis Entities in New York

48.     Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, and then Fortis Prime Fund Solutions IOM served as Harley's administrators.

49.     The Fortis administrators' relationships with Harley and FAM were managed during much of the relevant time period by Rhonda Eldridge, a Managing Director of Fortis Financial Services, LLC ("Fortis Financial Services") who was based in New York.

50.     Eldridge worked with employees of Fortis Prime Funds Solutions (USA) LLC ("Fortis Prime Fund Solutions USA") in New York.  (Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, Fortis Prime Fund Solutions IOM, Fortis Financial Services, and Fortis Prime Funds Solutions USA are collectively known as "Fortis").

51.     Fortis Financial Services was located on Madison Avenue in New York, and from its office Fortis employees performed much of the work necessary in administering Harley.

52.     Fortis employees conducted due diligence on BLMIS from Fortis Financial Services's office in New York.  Fortis's due diligence included inquiries into BLMIS's role as Harley's custodian as well as a "thorough examination of Harley's account" with BLMIS.

53.    Eldridge and other Fortis employees met with Madoff and DiPascali at BLMIS's office in New York. Eldridge and other Fortis employees also regularly spoke with Madoff, DiPascali, and/or Jo Ann Crupi regarding Harley's investments with BLMIS. In addition, Fortis employees met with Charles Fix and investors in Harley at FAM's office in New York.

54.    Fortis employees received Harley's BLMIS trade confirmations and account statements at Fortis Financial Services's office in New York, and reviewed the trade confirmations and account statements to calculate Harley's NAV.

55.    The Trustee incorporates by reference the allegations of the Complaint filed in *Picard v. Harley International (Cayman) Limited*, Adv. Pro. No. 09-01187 (SMB), Dkt. No. 1 (Bankr. S.D.N.Y. May 12, 2009).

### B.    The Component Events of the Harley Transactions with Defendants Are Predominantly Domestic

56.    BNP Arbitrage received transfers from Harley pursuant to the credit facility through which BNP, and its predecessor ZCM, loaned money to Santa Barbara, the FAM fund that invested exclusively with Harley.

57.    The credit facility originated with ZCM, which was headquartered in New York and incorporated in Delaware. BNP took over the credit facility when it purchased the assets of ZCM in July 2003. Contemporaneous with the purchase, BNP hired sixty of ZCM's New York employees, including employees who later operated the Harley credit facility for BNP.

58.    Through this credit facility, BNP and BNP Arbitrage purposefully leveraged Madoff's U.S.-based SSC Strategy to profit from BLMIS's domestic activities.

59.    Under the credit agreement, the parties contemplated that the borrowed money would be invested in BLMIS through Harley, and the credit agreement documents explicitly

reference Harley's "Madoff Account" with BLMIS, which served as collateral for the credit facility.

60.    The credit agreement and the related custody, control, and pledge agreements were negotiated by the parties and their attorneys in New York, and each of the agreements contain New York choice of law and venue provisions.

61.    BNP Securities Corp., from its office in New York, acted as the collateral agent and calculation agent under the credit agreement.  As the collateral agent, BNP Securities Corp. conducted due diligence, monitored the facility, and provided operational support to BNP, and as the calculation agent BNP Securities Corp. calculated the facility's interest rates, fees, and loan-to-value ratio

62.    Communications regarding BNP's investments with Harley flowed through BNP's office in New York.  For example, a BNP Securities Corp. employee signed a request for BNP Arbitrage to redeem shares from Harley and asked that confirmation be sent to fundinfo@americas.bnpparibas.com and that any questions be sent to BNP's Trade Operations Group in New York.

63.    BNP Arbitrage and BNP Securities Services, each with offices in New York, received at least twenty (20) transfers totaling more than $975 million from Harley at BNP's bank account in New York.

64.    The transfers originated from BLMIS's bank account with JPMorgan in New York, passed through a bank account held by Harley's administrator, and returned to an account for BNP Arbitrage at "Banque Nationale de Paris, 919 3rd Avenue, New York City, NY 10022."

## V.    THE TRANSFERS AND THE COMPONENT EVENTS OF THE TREMONT TRANSACTIONS ARE PREDOMINANTLY DOMESTIC

65.    The Tremont funds Insurance Portfolio and Portfolio Limited invested all of their assets with BLMIS in New York and received approximately $870 million in transfers of customer property from BLMIS within six years of December 11, 2008.

66.    Of this amount, BNP, BNP Arbitrage, BNP Cayman, and BNP Securities Services collectively received approximately $87 million in transfers of BLMIS customer property. These Defendants received transfers, at least in part, the transfers from the Tremont Funds arise out of levered transactions with BNP's Fund Derivatives Group in New York.

67.    Insurance Portfolio transferred approximately $39 million to BNP.  Portfolio Limited transferred approximately $24 million to BNP Securities Services and approximately $11 million to BNP Cayman.  XL Portfolio transferred approximately $6 million to BNP Arbitrage and approximately $2 million to BNP Cayman.  Finally, XL LP transferred $3 million to BNP Cayman.

### A.    BNP, BNP Arbitrage, BNP Cayman, and BNP Securities Services Received Transfers from the Tremont Funds Which Maintained their Principal Place of Business in New York

68.    Tremont Group Holdings, Inc., a Delaware corporation ("TGH"), and its U.S. management arm, Tremont Partners, Inc., a Connecticut corporation registered with the SEC as an investment adviser ("Tremont Partners," and together with TGH, "Tremont"), operated out of the same office in Rye, New York, and managed a number of funds that were directly or indirectly invested with BLMIS, including Insurance Portfolio, Portfolio Limited, XL LP, and XL Portfolio (collectively, the "Tremont Funds").  Of the Tremont Funds, XL LP was incorporated in Delaware, and Insurance Portfolio, Portfolio Limited, and XL Portfolio were

13

incorporated in the Cayman Islands (together, the "Cayman Registered Funds"), but all had their principal place of business in New York.

69.    Tremont managed and conducted due diligence for all the Tremont Funds from its offices in Rye, New York.  BLMIS would mail copies of trade tickets and account statements for Insurance Portfolio and Portfolio Limited to Tremont's New York office.

70.    The reported investment manager for XL Portfolio was in fact Tremont Partners in New York.  The reported investment manager for Insurance Portfolio and Portfolio Limited was Tremont (Bermuda) Limited, which was wholly owned by TGH and registered as an investment adviser with the SEC.  However, Tremont (Bermuda) Limited delegated its management duties to Tremont Partners in New York whose employees, among other things, approved trade tickets and monthly statements, checked bank activity, and were authorized as bank signatories for the funds.  Tremont (Bermuda) Limited provided no management services and relied on Tremont Partners in New York to manage the funds.

71.    Bank of New York in New York served as the nominal custodial bank for each of the Tremont Funds.

72.    Tremont Partners or Bank of New York, each in New York, served as the purported administrator for the Tremont Funds.  Investors, including BNP, BNP Arbitrage, BNP Cayman, BNP Securities Services, sent subscription agreements for investments in the Tremont Funds to either Tremont Partners or a Bank of New York entity in New York.

73.    Pursuant to the subscription agreements, investors wired funds in U.S. dollars to Bank of New York in New York.  Pursuant to the subscription agreements, investors also sent redemption requests to Tremont Partners or Bank of New York and received redemption payments in U.S. dollars from Bank of New York in New York.  Investors' subscriptions and

redemptions of shares in the Tremont Funds were approved by Tremont employees in New York.

74.    The marketing and sale of shares in the Tremont Funds was performed by Tremont employees in New York. Employees in Tremont's New York office communicated directly with investors and potential investors regarding all of the Tremont Funds. From 2006 forward, the published materials for all the Tremont Funds, including prospectus statements and marketing materials, directed potential investors to contact Tremont's employees in New York.

75.    Tremont employees in New York also signed BLMIS Customer Agreements and other account opening documents on behalf of Insurance Portfolio and Portfolio Limited, and the Customer Agreements expressly stated that they were governed by New York law and that all disputes arising under the Customer Agreement would be resolved by arbitration under New York law. These agreements gave BLMIS full discretion over the assets of the Tremont Funds. Tremont employees in New York communicated directly with BLMIS employees in New York regarding the Tremont Funds, including, among other things, redemption requests and regular meetings in New York at BLMIS's office.

76.    The Cayman Registered Funds did not have any real offices or operations in the Cayman Islands. Insurance Portfolio, Portfolio Limited had their registered office at a P.O. Box address in the Cayman Islands, care of a company that is in the business of providing local addresses to companies. XL Portfolio similarly had its registered address at an international law firm in the Cayman Islands.

77.    The Cayman Registered Funds were registered as exempted companies under the Cayman Islands Companies Law and were not permitted to solicit investors in the Cayman Registered Funds. Under the Companies Law, "[a]n exempted company shall not trade in the

15

Islands with any person, firm, or corporation except in furtherance of business of the exempted company carried on outside the Islands."  The Cayman Registered Funds were further prohibited from accepting investment funds from members of the public in the Cayman Islands and paid no taxes in the Cayman Islands.

78.     For a limited amount of time Tremont did maintain an office in Bermuda, from which two low-level administrative employees worked.  These two employees in Bermuda did not manage the Tremont Funds or perform any investment research or sales, all of which was performed by Tremont employees in New York.  Letters sent to Tremont investors on Tremont Bermuda letterhead came from Tremont employees in New York with their New York contact information.

79.     In July 2006, Tremont formalized what was previously a *de facto*, New York-based operation and closed its Bermuda office and "consolidated the administration" of all its funds in New York.  Thereafter, any nominal distinctions between the Cayman Registered Funds and the U.S. registered fund XL LP were eliminated.

80.     Beginning in the fall of 2006, if not earlier, every redemption payment made by Tremont to an investor, including Defendants BNP, BNP Arbitrage, BNP Cayman, and BNP Securities Services, came out of Tremont's New York-based bank account at the Bank of New York.

81.     The Trustee incorporates by reference the allegations of the Amended Complaint filed in *Picard v. Tremont Group Holdings Inc. et al.*, Adv. Pro. No. 10-05310 (SMB), Dkt. No. 4 (Bankr. S.D.N.Y. Feb. 28, 2011).

**B.**    **The Component Events of the Tremont Transactions with Defendants are Predominantly Domestic**

82.    BNP, BNP Arbitrage, and BNP Securities Services resided in New York and managed their investments in the Tremont Funds from their offices in New York.

83.    The transfers from the Tremont Funds arise out of levered transactions—credit facilities, swaps, and option agreements with the Tremont Funds—that were created, marketed, operated, and supervised by members of BNP's Fund Derivatives Group in New York to profit from BLMIS in New York.  BNP's credit agreement explicitly referenced BLMIS, and Insurance Portfolio's account with BLMIS as collateral for the credit facility.

84.    Based on the transactions between the Fund Derivatives Group and the Tremont Funds, Defendants BNP, BNP Arbitrage, BNP Cayman, and BNP Securities Services knew that the primary or sole business of the Tremont Funds was to invest their assets with BLMIS in New York for the purported purchase and sale of U.S. equities, U.S. options, and U.S. Treasuries. These Defendants, which received transfers from the Tremont Funds, knew BLMIS in New York acted as the Tremont Funds' U.S. broker-dealer registered with the SEC, custodian, and investment advisor that determined which U.S. stocks on the S&P 100 Index to purchase, and the timing of such purchases and sales.

85.    BNP's credit agreement with Tremont in 2006 was signed by BNP Securities Corp., the Delaware entity headquartered in New York.  After acquiring ZCM's structured products business, BNP created BNP Securities Corp. in New York to act as its agent with respect to BLMIS investment transactions involving the Fund Derivatives Group.

86.    BNP Securities Corp. in New York served as the calculation agent for the Tremont credit facility and calculated the facility's interest rates, fees, and loan-to-value ratio. BNP Securities Corp. also served as the collateral agent for the Tremont credit facility and was

responsible for conducting due diligence, monitoring the facility, and providing operational support to BNP.

87.     The credit agreement with Tremont contained New York choice of law and New York venue provisions.  Pursuant to the credit agreement, BNP received transfers from the Insurance Portfolio in BNP's bank account in New York.

88.     Pursuant to the credit facility, BNP in New York received account statements for certain of the Tremont Funds, including the Insurance Portfolio, which reflected BLMIS's purported execution of the SSC Strategy.

89.     In 2006, BNP Securities Corp. entered into an option agreement to provide leverage to Tremont.  The agreement called for a Resettable Strike Equity Option Transaction wherein BNP sold Tremont a structured option to leverage certain Tremont Funds.

90.     In 2007, BNP Securities Corp. subsequently entered into a swap agreement to provide leverage to certain of the Tremont Funds.

91.     As with the credit facility, the events and circumstances surrounding the Tremont option and swap transactions are domestic.  For example, BNP Securities Corp. acted as the collateral and calculation agent for each transaction.  The option and swap agreements were subject to New York law.  The option and swap agreements requested that notice under the agreements be provided to BNP Securities Corp. in New York.

92.     Defendants executed subscription agreements for investments in the Tremont Funds that were domestic in nature.  For example, the subscription agreements requested that all communication from Tremont go to "BNP Paribas Equity Derivatives" in New York, and designated BNP Securities Corp. employees in New York to act as agents on behalf of BNP Cayman.  In addition, BNP Securities Corp. employees signed Tremont subscription agreements

on behalf of BNP Cayman.  Finally, the subscription agreements requested that Tremont direct

redemptions to BNP's bank account in New York.

## VI. THE TRANSFERS AND THE COMPONENT EVENTS OF THE FAIRFIELD SENTRY AND FAIRFIELD SIGMA TRANSACTIONS ARE PREDOMINANTLY DOMESTIC

93.    Fairfield Sentry invested at least 95% of its assets with BLMIS in New York and

received approximately $3 billion in transfers of customer property from BLMIS within two

years of December 11, 2008.

94.    Of this amount, Defendants as shareholders of Fairfield Sentry and Fairfield

Sigma (together, the "Fairfield Funds") collectively received approximately $90,818,393 in

subsequent transfers of BLMIS customer property.

95.    From Fairfield Sentry, BNP received approximately $8 million; BNP Arbitrage

received approximately $20 million; BNP Securities Services received $39 million; BNP

Cayman received approximately $13 million; BNP Suisse received approximately $1 million;

and BGL BNP received approximately $300,000.  And from Fairfield Sigma, BNP Securities

Services received approximately $7 million and BGL BNP received approximately $1 million.

### A.    Defendants Received Transfers from Fairfield Sentry and Fairfield Sigma Which Maintained Their Principal Place of Business in New York

96.    The principal place of business for the Fairfield Funds was FGG's office in New

York.

97.    Although incorporated in the BVI, the Fairfield Funds had no employees or

offices in the BVI.  The Fairfield Funds' registered address in the BVI was care of a local trust

company, which served as the mailing address of hundreds of other hedge funds.

98.    BLMIS account opening documents for Fairfield Sentry were executed on behalf

of the fund by Jeffrey Tucker, a principal and partner of FGG who resided and worked in New

19

York.  The address listed for Fairfield Sentry on the account opening documents was not Fairfield Sentry's BVI registered address but was FGG's office in New York.

99.    Fairfield Sentry's Customer Agreement with BLMIS expressly states that it is governed by New York law and that all disputes arising under the Customer Agreement would be resolved by arbitration under New York law.  The Fairfield Sentry Customer Agreement also gave BLMIS full discretion over Fairfield Sentry's assets, and pursuant to an accompanying Trade Authorization agreement, Fairfield Sentry authorized Madoff to be its "agent and attorney in fact" to buy, sell, and trade in securities.

100.    As disclosed in its PPM, as an international business company, Fairfield Sentry was statutorily prohibited under BVI law to carry on business with persons resident in the BVI.

101.    Fairfield Sentry's initial investment advisor was Fairfield Greenwich Limited, an FGG company whose principal place of business was FGG's office in New York.  Fairfield Greenwich (Bermuda), Ltd. ("FGB"), another FGG company, later served as Fairfield Sentry's investment advisor.  All FGB personnel and operations were controlled by FGG personnel in New York.  After reviewing Fairfield Sentry's relationship with BLMIS, the SEC determined that BLMIS, and not FGB, was actually performing the investment advisory services for Fairfield Sentry.  The SEC required Fairfield Sentry to revise its disclosures to reflect that BLMIS was Fairfield Sentry's investment advisor.

102.    The marketing and sale of shares in the Fairfield Funds was performed primarily by FGG personnel in New York.  All subscriptions and redemptions of shares in the Fairfield Funds were approved by FGG personnel in New York.  No individual or entity located in the BVI had any control over the subscription and redemption process.  A minimum of 95% of

Fairfield Sentry's assets were deposited in its BLMIS accounts, and all decisions regarding the remaining balance of assets were made by FGG personnel in New York.

103.    Fairfield Sentry contracted with Citco Fund Services (Europe) B.V. ("Citco") to provide administrative and custodial services.  All decisions regarding the Citco agreements were controlled by FGG personnel in New York.  FGG personnel in New York controlled all of Fairfield Sentry's bank accounts.

104.    The Trustee incorporates by reference the allegations of the Second Amended Complaint in *Picard v. Fairfield Sentry Limited et al.*, Adv. Pro. No. 09-01239 (SMB) (proffered June 26, 2015, Bankr. S.D.N.Y., contemporaneously with the Extraterritoriality Briefing).

**B.    The Component Events of the Fairfield Funds' Transactions with Defendants are Predominantly Domestic**

105.    BNP, BNP Arbitrage, and BNP Securities Services resided in New York and managed their investments in the Fairfield Funds from their offices in New York.

**1.    The Transfers Were Made Pursuant to Subscription Agreements that Were Domestic in Nature**

106.    Each Defendant executed a subscription agreement for investments in at least one of the Fairfield Funds.

107.    In the subscription agreements, each Defendant agreed to submit to the jurisdiction of the courts in the State of New York and agreed that disputes regarding their investments in the Fairfield Funds would be governed by New York law.

108.    In the subscription agreements, each Defendant acknowledged that they received and reviewed Fairfield Sentry's PPM, which described how BLMIS in New York would have custody of at least 95% of Fairfield Sentry's assets and would execute Fairfield Sentry's investment strategy through the purchase of U.S. securities (*i.e.*, S&P 100 Index equities, options, and U.S. Treasuries).

21

109.    In the subscription agreements, each Defendant directed communications to BNP's offices in New York, listing New York mailing addresses, New York telephone and facsimile numbers, and U.S. email addresses.

110.    The Fairfield Sentry subscription agreements required that all subscriptions and redemptions be made in U.S. dollars through an HSBC account in New York.  The subscription agreements further indicated that Defendants would pay subscriptions and receive redemptions made in U.S. dollars through a BNP bank account in New York.  And pursuant to the subscription agreements, Defendants in fact wired U.S. dollars from BNP bank accounts in New York to an HSBC bank account in New York.

111.    Pursuant to the subscription agreements, Defendants received the transfers at issue in U.S. dollars at BNP bank accounts in New York.

### 2.    BNP Offices in New York and Miami Were Central to Defendants' Investments in the Fairfield Funds

112.    After investing in the Fairfield Funds, BNP in New York communicated with FGG in New York about Defendants' investments in the Fairfield Funds.  From its office in New York, BNP received and reviewed Fairfield Sentry's monthly portfolio statements and net asset value ("NAV") calculations.

113.    BNP in New York worked on structuring potential leveraged transactions that used Fairfield Sentry as the underlying reference fund.  BNP Securities Corp. in New York acted as the calculation agent and the collateral agent for the structured products that referenced Fairfield Sentry.

114.    BNP employees in Miami, Florida negotiated distribution agreements with FGG in New York for investments by BNP in Fairfield Sentry, and through these agreements BNP received fees for investing with Fairfield Sentry.

22

VII.   **THE TRANSFERS AND THE COMPONENT EVENTS OF THE KINGATE GLOBAL AND KINGATE EURO TRANSACTIONS ARE PREDOMINANTLY DOMESTIC**

115.   Kingate Global and Kingate Euro (together, the "Kingate Funds") invested all of their assets with BLMIS in New York and received approximately $925 million in transfers of customer property from BLMIS during the life of the accounts prior to December 11, 2008.  Of this amount, Defendants as shareholders of the Kingate Funds collectively received approximately $92 million in subsequent transfers of BLMIS customer property.

116.   From Kingate Global, BNP received approximately $4 million; BNP Arbitrage received $5 million; BNP Securities Services received approximately $34 million; BNP Cayman received approximately $4 million; BNP Suisse received approximately $5 million; and BGL BNP received approximately $17 million.

117.   From Kingate Euro, BNP received approximately $300,000; BNP Arbitrage received approximately $15 million; BNP Securities Services received approximately $1 million; BNP Suisse received approximately $75,000; and BGL BNP received approximately $6 million.

A.   **Kingate Global's and Kingate Euro's Investments in BLMIS Were Centered in New York**

118.   The Kingate Funds, together with their purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

119.   Despite having a registered address in the BVI, the Kingate Funds had no physical offices, no employees, and transacted no meaningful business there.

120.   Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself

managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively, "Tremont").

121.    The Kingate Funds' manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Funds' investments with BLMIS.

122.    The Kingate Funds' sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and the Kingate Funds profited from their exclusive business relationship with BLMIS in New York.

### 2.    The Operative Legal Documents Were New York-Based

123.    The Kingate Funds executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

124.    Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

125.    The Kingate Funds agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### 3.    BLMIS Had Full Authority to Make and Execute Investment Decisions

126.    The Funds' Trading Authorization Agreements authorized BLMIS to be the Kingate Funds' "agent and attorney in fact," giving BLMIS full discretion over the Kingate Funds' invested assets and to buy, sell, and trade in securities for the Kingate Funds.

127.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the Kingate Funds' investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

128.    BLMIS acted as the Kingate Funds' executing broker in purporting to purchase securities on the Kingate Funds' behalf, and acted as the Kingate Funds' custodian for the securities purportedly held on the Kingate Funds' behalf.

### 4.    The Kingate Funds Were Managed From New York

129.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to the Kingate Funds in return for fees, it was a valuable contributor in New York to the success of the Kingate Funds.

130.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

131.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

132.    The Kingate Funds were also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of the Kingate Funds, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

133.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

134.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

135.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together, "FIM"), to perform due diligence on BLMIS.

136.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as the Kingate Funds' investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

137.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for the Kingate Funds.

138.    KML and the FIM entities actively participated in the Kingate Funds business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

### 5.    Kingate Funds Used Banks in New York

139.    The Kingate Funds used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

140.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States, as Kingate Global's custodian.

141.    In its role as the Kingate Funds' custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and the Kingate Funds relating to investments with BLMIS.

142.    FIM also directed fee payments to be routed through a bank account in New York.

143.    The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

## B.    The Component Events of the Kingate Funds' Transactions with Defendants Are Predominantly Domestic

144.    BNP employees in New York executed the Kingate Funds' subscription agreement on behalf of certain Defendants.    For example, BNP Arbitrage granted BNP employees in New York power of attorney to execute orders for the purchase, sale, or transfer of shares in the Kingate Funds.    Redemption requests also reference BNP's power of attorney for orders related to the purchase, sale, or transfer of fund shares held by BNP Arbitrage.

145.    Communication with the Kingate Funds flowed through BNP's office in New York.    In executing the agreement, BNP Arbitrage, for example, requested that Kingate Global confirm receipt of the subscription agreement and payments to fundinfo@americas.bnpparibas.com.    BGL BNP requested that the Kingate Funds send all due diligence materials to BNP to duediligence@americas.bnpparibas.com.    BGL BNP also requested that the Kingate Funds send trade confirmations to the same email addresses at

americas.bnpparibas.com.   Correspondence with third parties about the transfer of shares in Kingate Global was also sent to BNP's office in New York.

146.    Pursuant to Defendants' subscription agreements and redemption requests, Defendants received transfers from Kingate Global in a BNP's bank account in New York.

## VIII.   THE TRANSFER AND THE COMPONENT EVENTS OF THE EQUITY PORTFOLIO TRANSACTION IS PREDOMINANTLY DOMESTIC

147.    Equity Portfolio invested all of its assets with BLMIS in New York and received approximately $15 million in transfers of customer property from BLMIS within two years of December 11, 2008.   Pursuant to an option agreement to provide leverage to Equity Trading Fund, Ltd. ("Equity Fund"), Equity Portfolio subsequently transferred the $15 million into an account held by BNP in New York on behalf of BNP Arbitrage.

### A.    Equity Portfolio's Investments in BLMIS Were Centered in New York

148.    Equity Portfolio is an international business company organized under the laws of the BVI.  On or about December 5, 2005, Equity Portfolio opened a customer account at BLMIS, designated No. 1FR124.

149.    For its customer account at BLMIS, Equity Portfolio executed a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and delivered them to BLMIS in New York.  The Customer Agreement expressly stated that it was governed by New York law and all of the transactions pursuant to the Customer Agreement were subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System.

150.    Equity Portfolio also agreed that all disputes arising under the Customer Agreement would be resolved by arbitration under the laws of New York before the American Arbitration Association, or "an arbitration facility provided by any exchange of which the broker

28

is a member, or the National Association of Securities Dealers Inc., and in accordance with the rules pertaining to the selected organization."

151.    The Customer Agreement also gave BLMIS full discretion over Equity Portfolio's assets, and pursuant to the Trading Authorization agreement, Equity Portfolio authorized Bernard Madoff to be its "agent and attorney in fact" to buy, sell, and trade in securities.

152.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the investment manager, executing broker, and custodian for Equity Portfolio.

153.    Equity Portfolio utilized New York banks when it invested with BLMIS and redeemed funds distributed to it by BLMIS.  Equity Portfolio's shareholders also wired funds to an account held for Equity Portfolio at HSBC in New York.

154.    In marketing Equity Portfolio to investors, Equity Portfolio's Offering Memorandum represented that Equity Portfolio would employ BLMIS as its investment advisor and that BLMIS operated from its principal place of business in New York.

155.    In its Offering Memorandum, Equity Portfolio reported that Essex Asset Management ("Essex") would act as the investment manager of Equity Portfolio and monitor Equity Portfolio's investments with BLMIS.

156.    A director of Essex, who was also the Chief Financial Officer of Capital E Advisors, Inc. ("Capital E"), carried out the responsibilities outlined in the Offering Memorandum from Capital E's offices in New York.

157.    Equity Portfolio directed BLMIS to send all of Equity Portfolio's trade confirmations and account statements to Capital E's offices in New York.  Capital E analyzed Equity Portfolio's trade conformations and account statements, approved subscriptions into and redemptions from Equity Portfolio's BLMIS account, and upon information and belief, Capital E

oversaw the day-to-day operations, compliance, and due diligence on Equity Portfolio's investments with BLMIS.

158.    The Trustee incorporates by reference the allegations of the Complaint in *Picard v. Equity Trading Portfolio Limited et al.*, Adv. Pro. No. 10-04457 (SMB), Dkt. No. 1 (Bankr. S.D.N.Y. Nov. 30, 2010).

## B.    The Component Events of the Equity Portfolio Transactions with Defendants are Predominantly Domestic

159.    On or around December 2005, BNP entered into an option agreement to provide leverage to Equity Fund, a fund that invested exclusively in Equity Portfolio. The option agreement called for a Resettable Strike Equity Option Transaction, wherein BNP sold Equity Fund a structured option to leverage Equity Portfolio's BLMIS investments. The Equity Portfolio option was marketed within the United States to U.S. investors.

160.    Capital E and BNP worked closely together on the Equity Portfolio option, and BNP directed communications with Capital E through BNP's office and employees in New York. As directed, the CFO of Capital E communicated often with BNP in New York to discuss liquidity under the Equity Portfolio option and to discuss transfers into and out of Equity Portfolio's BLMIS account.

161.    BNP received Equity Portfolio's account statements from BLMIS at BNP's offices in New York.

162.    On November 5, 2008, Equity Portfolio requested a $15 million withdrawal from BLMIS. On November 10, 2008, $15 million was wired from BLMIS's account at JPMorgan in New York to an account at HSBC Bank in New York held in the name of Citco Bank Nederland N.V., Dublin Branch for the benefit of Equity Portfolio. Shortly thereafter, Equity Portfolio transferred $15 million into an account held by BNP in New York on behalf of BNP Arbitrage.

30

163.    BNP Arbitrage had acted as BNP's agent with respect to the leverage provided by BNP to Equity Fund, and BNP Arbitrage received the $15 million transfer on BNP's behalf.

164.    On November 27, 2008, two weeks before Madoff's arrest, BNP in New York directed Equity Portfolio to request an additional redemption from BLMIS of $30 million, but Madoff was arrested before the transfer was completed.

## IX.    THE TRANSFERS AND THE COMPONENT EVENTS OF THE OREADES TRANSACTIONS ARE PREDOMINANTLY DOMESTIC

165.    Oreades invested all of its assets with BLMIS in New York and received approximately $610 million in transfers of customer property from BLMIS in the six years prior to December 11, 2008.    Throughout its existence from 1997 to 2004, Oreades withdrew approximately $160 million in fictitious profits from its accounts with BLMIS in New York.

166.    Of this amount, BGL BNP received approximately $500,000 and BNP Securities Services received approximately $1.5 million in transfers of customer property from Oreades for their roles as purported custodians and administrators for Oreades.

### A.    Oreades's Investments in BLMIS Were Centered in New York

167.    Oreades was incorporated as an investment fund in 1997, for the sole purpose of investment with BLMIS in New York.    BGL BNP and BNP Securities Services, along with Inter Investissements S.A. ("Inter"), created, directed, and controlled Oreades.

168.    Oreades had no employees or office space of its own, in Luxembourg or anywhere else.    Rather, Oreades was created, operated, serviced, and marketed on a day-to-day basis by BGL BNP, BNP Securities Services, and Inter, in conjunction with New York-based Access.

169.    Inter served as the official manager for Oreades and earned tens of millions of dollars in management fees from Oreades.    Inter was created for the specific purpose of

31

concealing BLMIS from Luxembourg regulators.  Inter entered into an undisclosed agreement with BLMIS, through which it delegated all management authority for Oreades to BLMIS in New York.

170.    Inter entered into two Management Oversight Agreements with Alternative Advisors Limited ("AAL"), a component entity of New York-based Access.  These agreements, dated May 1998 and December 2000, granted Access responsibility for overseeing Inter's management activities.  Although AAL was incorporated in the Bahamas, it was managed from Access's headquarters in New York.  Access's own documents disclose that AAL served as a "money box" for Access, and that it was incorporated overseas because Madoff himself wanted to only deal with offshore entities.

171.    With respect to Oreades, Inter, BGL BNP, and BNP Securities Services conducted no meaningful business anywhere but New York, as all of Oreades's assets were custodied and held in New York and all investment decisions were made by BLMIS in New York.

172.    In December 1997 and January 1998, BGL BNP opened two accounts with BLMIS, Nos. 1FR032 and 1FR036, on behalf of Oreades, and signed and delivered a Customer Agreement, Option Agreement, and Trading Authorization Limited to Purchases and Sales of Securities and Options to BLMIS in New York.

173.    The Customer Agreement expressly stated that it was governed by New York law and all of the transactions pursuant to the Customer Agreement were subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System.

174.    Oreades also agreed that all disputes arising under the Customer Agreement would be resolved by arbitration under the laws of New York before the American Arbitration Association, or "an arbitration facility provided by any exchange of which the broker is a member, or the National Association of Securities Dealers Inc., and in accordance with the rules pertaining to the selected organization."

175.    The Customer Agreement also gave BLMIS full discretion over Oreades's assets, and pursuant to the Trading Authorization agreement, Oreades authorized Bernard Madoff to be its "agent and attorney in fact" to buy, sell, and trade in securities on its behalf.

176.    The Trustee incorporates by reference the allegations of the Complaint in *Picard v. Oreades SICAV et al.*, Adv. Pro. No. 10-05120 (SMB), Dkt. No. 1 (Bankr. S.D.N.Y. Dec. 2, 2010).

**B.    The Component Events of the Oreades Transactions with Defendants are Predominantly Domestic**

177.    BGL BNP served as Oreades's official custodian from January 1998 to March 2002, and BNP Securities Services served as Oreades's custodian and administrator from 2002 until Oreades's liquidation in 2004.

**1.    BGL BNP Received Transfers as Oreades's Purported Custodian**

178.    BGL BNP entered into an undisclosed Sub-Custodian agreement with BLMIS in New York, pursuant to which BGL BNP delegated all its custodial duties to BLMIS in New York.  BGL BNP did not disclose to investors or the Luxembourg regulatory authority that it had delegated all custodial duties to BLMIS in New York.

179.    BLMIS collected no fees for serving as Oreades's actual custodian.  Instead, BGL BNP earned fees from Oreades for the services sub-contracted to BLMIS in New York.

180.    BGL BNP regularly communicated with BLMIS to direct transfers of Oreades's assets into and out of BLMIS in New York.  BGL BNP also communicated with BLMIS regarding Oreades's trade tickets and specific U.S. stocks BLMIS had purportedly purchase on Oreades's behalf.

181.    BGL BNP used a bank account with BNP in New York to process Oreades's subscriptions and redemptions.

182.    When an investor wanted to invest with Oreades, he or she contacted BGL BNP directly.  BGL BNP represented to at least one investor in Oreades that it monitored Madoff from BNP's offices in New York.

### 2.    BNP Securities Services Received Transfers as Oreades's Purported Custodian and Administrator

183.    In 2002 BNP Securities Services executed a novation which extended the existing Sub-Custodian Agreement with BLMIS, allowing the undisclosed delegation of custodial duties to BLMIS to continue.

184.    Oreades's prospectuses and financial statements disclosed to investors and the Luxembourg regulator that BNP Securities Services was serving as the custodian of Oreades.

185.    As administrator, BNP Securities Services calculated Oreades's NAV but was completely dependent upon accounting information received from BLMIS.

186.    BNP Securities Services, as Oreades's administrator and custodian, frequently communicated with BLMIS in New York.  BNP Securities Services also communicated with Access regarding serious concerns it had about BLMIS's role with regard to Oreades, including (i) BLMIS's failure to register as an investment advisor; (ii) BLMIS not being disclosed to the Luxembourg regulator; (iii) delegation of custodial authority to BLMIS; and (iv) trades reports

"sent by mail after 7 or 8 days," which gave BNP Securities Services "no opportunity to consider the true validity of the orders."

187.    As custodian and administrator, BNP Securities Services transferred millions of dollars of Oreades's assets into and out of BLMIS in New York, and in the process used BNP's bank account in New York.

Dated: June 26, 2015
      New York, New York

            /s/ David J. Sheehan
            **Baker & Hostetler LLP**
            45 Rockefeller Plaza
            New York, New York 10111
            Telephone:  (212) 589-4200
            Facsimile:  (212) 589-4201
            David J. Sheehan
            Mark A. Kornfeld
            Torello H. Calvani
            Marco Molina
            Jonathan Forman
            Anat Maytal
            Madiha Zuberi