**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01577 (SMB) |
| Plaintiff, | |
| v. | |
| UBS DEUTSCHLAND AG as successor in interest to Dresdner Bank Lateinamerika AG, and LGT BANK (SWITZERLAND) LTD. as successor in interest to Dresdner Bank (Schweiz) AG, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO THE DRESDNER DEFENDANTS** |
| Defendants. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendant UBS Deutschland AG as successor in interest to Dresdner Bank Lateinamerika AG ("DBLA"), and defendant LGT Bank (Switzerland) Ltd. as successor in interest to Dresdner Bank (Schweiz) AG ("Dresdner Schweiz"), states:

## I.    **<u>INTRODUCTION</u>**

1.      The Trustee seeks to recover at least $11,787,519 in subsequent transfers of BLMIS customer property made to DBLA and Dresdner Schweiz.

2.      Both DBLA and Dresdner Schweiz were at one time subsidiaries of non-party Dresdner Bank AG. German-based Dresdner Bank AG was a banking company with subsidiaries around the world.

3.      Of the $11,787,519 at issue, at least $8,409,403 are subsequent transfers of BLMIS customer property collectively made to DBLA. The BLMIS customer property received by DBLA was transferred from New York-based BLMIS to Fairfield Sentry Limited ("Fairfield Sentry") and subsequently transferred to DBLA, or to Fairfield Sigma Limited ("Sigma"), which in turn transferred the funds to DBLA. Of the $8,409,403, at least $6,549,175 are subsequent transfers of BLMIS customer property made to DBLA by Fairfield Sentry, and at least $1,860,228 is a subsequent transfer of BLMIS customer property made to DBLA by Sigma.

4.      Of the $11,787,519 at issue, at least $3,378,116 are subsequent transfers of BLMIS customer property collectively made to Dresdner Schweiz. This BLMIS customer property was transferred from BLMIS to Fairfield Sentry or Kingate Euro Fund Ltd. ("Kingate Euro") and subsequently transferred to Dresdner Schweiz. Of the $3,378,116, at least $1,095,980 are subsequent transfers of BLMIS customer property made to Dresdner Schweiz by Fairfield Sentry, and at least $2,282,136 is a subsequent transfer of BLMIS customer property made to Dresdner Schweiz by Kingate Euro.

5.     Fairfield Sentry was the largest of many BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with BLMIS in New York, capitalizing on its consistent returns.  Sigma, a Fairfield Sentry sister fund, was a "currency fund,' which accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.

6.     Kingate Euro was also a Feeder Fund that accepted investments denominated in Euros and invested directly with BLMIS.

7.     DBLA and Dresdner Schweiz purposefully invested in Fairfield Sentry, Sigma, and Kingate Euro to profit from BLMIS in New York.  But for BLMIS's purported U.S. investment activities, DBLA and Dresdner Schweiz would have received none of the transfers from Fairfield Sentry, Sigma, and Kingate Euro.

8.     At all relevant times, DBLA and Dresdner Schweiz used their sophisticated financial network to conduct due diligence on Fairfield Sentry, Sigma, Kingate Euro, Madoff, and BLMIS.  As a result of their due diligence, DBLA and Dresdner Schweiz knew the following facts:

    a.     In reality the investment adviser of the Feeder Funds was BLMIS in New York.

    b.     BLMIS in New York was the executing broker for the Feeder Funds' investments, and BLMIS in New York purportedly operated and executed Madoff's split-strike conversion investment strategy ("SSC Strategy") on behalf of the Feeder Funds.

    c.     Madoff's SSC Strategy purportedly involved the purchase of U.S. securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges, and

that the decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

    d.    BLMIS in New York was the custodian of the Feeder Funds' investments.

    e.    BLMIS was a registered broker-dealer with the SEC.

    f.    The entire economic purpose of the Feeder Funds was to deliver money to BLMIS in New York.

9.    DBLA and Dresdner Schweiz knew control over Fairfield Sentry, Sigma, and Kingate Euro's investments rested entirely with Madoff and BLMIS in New York. DBLA and Dresdner Schweiz intended to profit from BLMIS's U.S. control over its U.S. investments.

## II.   <u>RELEVANT ENTITIES</u>

10.    DBLA was a German bank with offices around the world as well as an office in Miami, Florida. In 2005, DBLA sold its banking and wealth management operations to a subsidiary of UBS AG, and UBS AG merged DBLA into UBS Deutschland AG. UBS Deutschland AG is an indirect subsidiary of USB AG and maintains its headquarters in Frankfurt, Germany. UBS Deutschland AG is the successor in interest to DBLA.

11.    Dresdner Schweiz was a Swiss banking entity specializing in providing investment advisory and private wealth management services. In 2009, LGT Group acquired Dresdner Schweiz and by 2010, had fully integrated Dresdner Schweiz into LGT Bank (Switzerland) Ltd. LGT Bank (Switzerland) Ltd. is the successor in interest to Dresdner Schweiz.

12.    Feeder Funds Fairfield Sentry and Sigma were created, operated, and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership founded by U.S. citizens and residents, Walter Noel and Jeffrey Tucker. FGG maintained its principal place of business in

New York.  From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry

maintained direct customer accounts with BLMIS in New York.

13.    Feeder Fund Kingate Euro was founded by Frederico Ceretti and Carlo Grosso

and managed by Kingate Management Limited ("KML").  KML and its consultants, FIM

Limited and FIM Advisors LLP (together, "FIM"), performed due diligence in New York on

Madoff and BLMIS.  From April 2000 until Madoff's arrest in December 2008, Kingate Euro

maintained direct customer accounts with BLMIS in New York.

## III.    DBLA'S RELATIONSHIP WITH FAIRFIELD SENTRY, SIGMA, AND BLMIS WAS CENTERED IN THE UNITED STATES

### A.    DBLA Utilized Its U.S. Office to Conduct Due Diligence on Fairfield Sentry, Sigma, and BLMIS

14.    Despite being headquartered in Germany, DBLA maintained an office in Miami,

Florida that was registered to conduct business in Florida.  The employees in this Miami office

served as DBLA's primary contacts responsible for its relationship with FGG and DBLA's

Fairfield Sentry and Sigma investments.

15.    FGG personnel based in New York ("FGG New York Personnel") traveled to

Miami in June 2003 to meet with at least 13 DBLA employees for a due diligence and marketing

meeting.  During the course of the meeting, DBLA decided to invest into Fairfield Sentry.

16.    As a result of DBLA's due diligence and its review of the Fairfield Funds' Private

Placement Memoranda ("PPMs") provided by FGG, it knew BLMIS in New York purportedly

operated and executed Madoff's SSC Strategy by investing Fairfield Sentry's assets in U.S. S&P

100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges, and that all of

Sigma's assets were invested in Fairfield Sentry.  DBLA also knew BLMIS in New York served

as the investment adviser, broker-dealer, and custodian for the Fairfield Funds, and that control

of the Fairfield Funds' investments rested entirely with BLMIS in New York.  DBLA

4

purposefully invested in the Fairfield Funds to profit from the U.S. market through BLMIS in New York.

17.      DBLA's Miami-based employees were also responsible for directing funds to Fairfield Sentry in connection with DBLA's subscription payments.  New York-based FGG partner Lourdes Barreneche worked with the Miami-based DBLA employees to assist DBLA with this process.  Lauren Ross, a New York-based FGG investment relations employee, also assisted in managing the relationship between FGG and DBLA.

**B.      DBLA Agreed New York Choice of Law, Jurisdiction, and Venue Applied in Connection with the Transactions**

18.      DBLA executed Fairfield Sentry subscription agreements in connection with its investments, and agreed the subscription agreement would be "governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provision." DBLA also "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York" and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

19.      When DBLA executed Sigma subscription agreements, the agreements contained similar provisions as in the Fairfield Sentry subscription agreements, in which DBLA agreed to New York choice of law, jurisdiction, and venue provisions.

**C.      DBLA Repeatedly Used New York Banks to Transfer Funds**

20.      DBLA used New York bank accounts to transfer money to and from Fairfield Sentry.

21.      When DBLA executed Fairfield Sentry subscription agreements in connection with its investments, it agreed all of the subscription payments from DBLA be directed to a New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's

5

bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York. DBLA directed funds to this New York bank account on at least 13 occasions over the course of almost 2 years in connection with investments into Fairfield Sentry.

22.    DBLA also used its Citibank account in New York held in its own name to receive transfers from Fairfield Sentry. In its Fairfield Sentry subscription agreement, DBLA directed that all its redemptions and other payments be sent to this Citibank account in New York only. DBLA utilized this account repeatedly—at least 11 times in 2005 and 2006—to receive $6,549,175 in redemption proceeds from Fairfield Sentry.

## IV.    DRESDNER SCHWEIZ'S RELATIONSHIP WITH FAIRFIELD SENTRY AND BLMIS WAS CENTERED IN NEW YORK

### A.    Dresdner Schweiz Purposefully Invested in Fairfield Sentry to Invest with BLMIS in New York

23.    Dresdner Schweiz purposefully invested in Fairfield Sentry to access BLMIS in New York, and relinquished control over its investments with BLMIS, which made and implemented the investment decisions. Dresdner Schweiz knew from Fairfield Sentry's PPMs that BLMIS in New York served as the investment adviser and custodian for Fairfield Sentry and that control of Fairfield Sentry's investments rested entirely with BLMIS in New York. Dresdner Schweiz also knew BLMIS purportedly invested the Fairfield Sentry's assets in U.S. securities, U.S. options, and U.S. Treasurys.

### B.    Dresdner Schweiz Worked with a New York-Based FGG Employee in Connection with the Transactions

24.    As with DBLA, FGG's New York-based Ross also managed Dresdner Schweiz's relationship with FGG, and assisted Dresdner Schweiz with making subscriptions into Fairfield Sentry.

6

C.    **Dresdner Schweiz Agreed New York Choice of Law, Jurisdiction, and Venue Applied in Connection with the Transactions**

25.    Like DBLA, Dresdner Schweiz also executed Fairfield Sentry subscription agreements that specified "[the agreement] shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."  In Fairfield Sentry subscription agreements Dresdner Schweiz executed, it also "agree[d] that any suit, action or proceeding . . . with respect to this agreement and [Fairfield Sentry] may be brought in New York" and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

D.    **Dresdner Schweiz Used New York Banks to Transfer Funds**

26.    Dresdner Schweiz used New York bank accounts to transfer money to and from Fairfield Sentry.

27.    When Dresdner Schweiz executed Fairfield Sentry subscription agreements in connection with its investments, it agreed all of the subscription payments from Dresdner Schweiz be directed to a New York HSBC Bank correspondent bank account for ultimate deposit in Fairfield Sentry's bank account.  From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York.  Dresdner Schweiz directed funds to these New York bank accounts on at least 14 occasions over the course of 9 years in connection with investments into Fairfield Sentry.

28.    Dresdner Schweiz also used a New York HSBC Bank USA correspondent bank account to receive transfers from Fairfield Sentry.  Pursuant to Dresdner Schweiz's redemption request, all Dresdner Schweiz's redemptions were directed to this New York HSBC Bank USA account.  Dresdner Schweiz utilized this account repeatedly—at least 23 times over a 3 year period—to receive $1,095,980 in redemption proceeds from Fairfield Sentry.

## V. FAIRFIELD SENTRY AND SIGMA'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

29.     At all relevant times, Fairfield Sentry and Sigma's principal place of business was in New York and they were U.S. residents.

### A.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

30.     In 1988, Walter Noel and Jeffrey Tucker founded *de facto* partnership FGG based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

31.     The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

32.     FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.    Fairfield Sentry

33.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

34.      Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG New York Personnel. Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

35.      Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1.      Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States

36.      When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070.  BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

37.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

38.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation member regulated by the SEC.

> **2.      FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities**

39.      As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.   Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").   FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

> **3.      FGG New York Personnel Managed Fairfield Sentry**

40.      At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.   Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

11

York.

41.     FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry.   From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and

redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription

agreements contained New York choice of law provisions, and provided for venue and

jurisdiction for any disputes in New York.

### 4.      Fairfield Sentry's Investors Knew They Were Investing in BLMIS

42.     Fairfield Sentry's subscription agreements also incorporated its PPMs by

reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or

later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its

assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an

SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4)

through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S.

Treasurys.   Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were

"essential to the continued operation of the Fund."

### 5.      BLMIS Was Fairfield Sentry's Investment Manager

43.     Although FGG attempted to hide its manager, BLMIS served as the investment

manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

44.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

45.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

46.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would

serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG

formed two new entities, FG Advisers and FG Bermuda.

47.    In October 2003, FGG formed FG Advisors as a Delaware limited liability

company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG

formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

management contracts to both entities, including the investment advisory agreements for the

three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG

Bermuda.  FG Limited remained the placement agent for the same funds.

48.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

49.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

50.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

14

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

51.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

52.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### C.     Sigma

53.     FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscriptions and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield Sentry using Euros, FGG created Sigma.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

54.     Noel and Tucker organized Sigma on November 20, 1990, as an international business company under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma.  Sigma is

currently in liquidation in proceedings in the BVI and United States.

55.     Also like Fairfield Sentry, Sigma was a shell corporation present in the BVI only on paper.  It had no employees and maintained no offices.  It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters.  Sigma was operated almost entirely by FGG New York Personnel.

56.     As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Sigma.  Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's relationship with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities.  Until Sigma's liquidation, FGG maintained Sigma's books and records in New York.  FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

57.     FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares.  Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole assets.  Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with

respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPMs.

58.    Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma at Citco Bank Dublin. FGG New York Personnel had final control of the Sigma Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Sigma's relationships with the Citco entities.

59.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS. Noel executed separate contracts on Sigma's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

60.    FGG New York Personnel initially listed FG Limited as the investment manager for Sigma. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPMs to indicate FG Bermuda was Sigma's Investment Manager. In fact there were no duties for any investment manager because Sigma's sole purpose was to purchase Fairfield

Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

61.    The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund*, *Ltd*., Adv. Pro. No. 09-01239 (SMB), (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

## VI.    KINGATE EURO'S TRANSFERS ARE DOMESTIC

62.    Kingate Euro was a feeder fund that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $527,554,858 of customer property to Kingate Euro during the life of its account prior to December 11, 2008.

63.    Kingate Euro filed a customer claim in the SIPA liquidation.

### A.    Kingate Euro Invested with BLMIS to Make Money from a New York-Based Investment Operation

64.    Kingate Euro, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

65.    Despite having a registered address in the BVI, Kingate Euro had no physical offices, no employees, and transacted no meaningful business there.

66.    Kingate Euro's manager, consultant, and other service providers, regardless of where it was organized, wholly or in substantial part operated in New York to manage the Kingate Euro's investments with BLMIS.

67.    Kingate Euro's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Euro profited from its exclusive business relationship with BLMIS in New York.

18

### B.    The Operative Legal Documents Were New York-Based

68.    Kingate Euro executed customer agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

69.    Each customer agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

70.    Kingate Euro agreed that all disputes arising under the customer agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### C.    BLMIS Had Full Authority to Make and Execute Investment Decisions

71.    Kingate Euro's Trading Authorization Agreements authorized BLMIS to be the "agent and attorney in fact," giving BLMIS full discretion over Kingate Euro's invested assets and to buy, sell, and trade in securities for Kingate Euro.

72.    As with each of the other Feeder Funds, BLMIS in New York acted as the Kingate Euro investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

73.    BLMIS acted as Kingate Euro's executing broker in purporting to purchase securities on Kingate Euro's behalf, and acted as Kingate Euro's custodian for the securities purportedly held on Kingate Euro's behalf.

### D.    Kingate Euro Was Managed From New York

74.    The Kingate Funds were co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Euro, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

75.    KML's New York-based director, Michael Tannenbaum, Esq., performed executive functions for KML.

76.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

77.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

78.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Euro's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

79.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Euro.

80.    KML and the FIM entities actively participated in Kingate Euro business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

### E.    Kingate Euro Used Banks in New York

81.    Kingate Euro used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan.

82.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Euro's custodian.

83.    In its role as Kingate Euro's custodian, HSBC consistently used New York banks

in carrying out its duties for Kingate Management and Kingate Euro relating to investments with

BLMIS.

84.    FIM also directed fee payments to be routed through a bank account in New

York.

85.    The Trustee incorporates by reference the allegations of the Fourth Amended

Complaint filed in *Picard v. Federico Ceretti,* Adv. Pro. No. 09-1161 (SMB), (Bankr. S.D.N.Y.

March 17, 2014), ECF. No. 100.


Dated: June 26, 2015
      New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long

**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Lauren M. Hilsheimer
Melonia A. Bennett

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the estate of Bernard L.*
*Madoff*