**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>SOMERS DUBLIN LIMITED and SOMERS NOMINEES (FAR EAST) LIMITED,<br><br>    Defendants. | Adv. Pro. No. 11-02784 (SMB) |

**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO**
**THE EXTRATERRITORIALITY ISSUE AS TO SOMERS**
**DUBLIN LIMITED AND SOMERS NOMINEES (FAR EAST) LIMITED**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, by and through his undersigned counsel, respectfully submits the following proffered allegations as to the domestic nature of transfers received by Somers Dublin Limited ("Somers Dublin") and Somers Nominees (Far East) Limited ("Somers Nominees," and together, the "Somers Defendants") from Fairfield Sentry Limited ("Fairfield Sentry") and Harley International (Cayman) Limited ("Harley," and together, the "BLMIS Feeder Funds").

I. BACKGROUND

1. The Trustee seeks to recover $86,439,850 in subsequent transfers of BLMIS customer property that the Somers Defendants received between 2004 and 2008 from the BLMIS Feeder Funds. Somers Dublin received $79,999,960 from Harley in 2008 and $1,985,648 from Fairfield Sentry in 2004 and 2006. Somers Nominees received $4,454,242 from Fairfield Sentry in 2004 and 2005.

2. Somers Dublin is a subsidiary of HSBC Holdings Plc ("HSBC") and HSBC Institutional Trust Services (Ireland) Limited ("HSBC Trust Services"). Somers Nominees is a subsidiary of HSBC and HSBC Institutional Trust Services (Asia) Limited. On behalf of HSBC, the Somers Defendants invested in at least a dozen BLMIS feeder funds.

3. The BLMIS Feeder Funds were single-purpose investment vehicles that pooled their investors' assets to invest with BLMIS in New York. Fairfield Sentry was created, operated, marketed, and controlled by a *de facto* partnership, the Fairfield Greenwich Group ("FGG"), based in New York, New York. Harley was created, operated, marketed, and controlled by Fix Asset Management Ltd., which operated through its wholly owned subsidiary

Pg 3 of 19

Fix Asset Management Services Inc. ("FAM"). FAM was incorporated under New York law and headquartered in New York, New York.

## II. THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS ARE DOMESTIC

### A. The Somers Defendants Sought to Profit from BLMIS in New York

4. BLMIS acted as the investment advisor, broker-dealer, and custodian for the BLMIS Feeder Funds. Control over the BLMIS Feeder Funds rested entirely with BLMIS in New York.

5. To invest in Fairfield Sentry, the Somers Defendants executed subscription agreements wherein they acknowledged having received and read a copy of Fairfield Sentry's Private Placement Memorandum, as amended from time to time (the "Fairfield Sentry PPM").

6. Based on the Fairfield Sentry PPM, the Somers Defendants knew that Fairfield Sentry invested at least 95% of its assets with BLMIS in New York, and that BLMIS purported to execute a so-called "split-strike conversion investment strategy" ("SSC Strategy") involving the purchase and sale of U.S. securities over U.S. exchanges. The SSC Strategy involved the purchase of a basket of U.S. equities that were intended to highly correlate to the S&P 100 Index, as well as the purchase and sale of put and call options.

7. The Fairfield Sentry PPM stated that FGG "delegated all investment management duties to Bernard L. Madoff Investment Securities. As a result, the Company [Fairfield Sentry] is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities."

8. The Fairfield Sentry PPM stated that "[a]ll investment decisions in the account at BLM are effected by persons associated with BLM," and "[t]he services of ... Bernard L. Madoff

2

Investment Securities are essential to the continued operations of the Manager [Fairfield Greenwich Limited]."

9. Because Somers Dublin knew BLMIS executed the same SSC Strategy for Harley as it did for Fairfield Sentry, Somers Dublin also knew BLMIS acted as the acted in the same capacity as the investment advisor and broker-dealer for Harley.

10. The Fairfield Sentry PPM stated that "Bernard L. Madoff Investment Securities has entered into an agreement with Citco Custody pursuant to which Bernard L. Madoff Investment Securities will serve as a sub-custodian of [Fairfield Sentry]'s assets." Similarly, Harley's audited financial statements, which were distributed to Harley's shareholders, disclosed that BLMIS acted as Harley's custodian.

**B.  The Somers Defendants Knew FGG and FAM Managed the BLMIS Feeder Funds From New York**

11. To conduct due diligence on the BLMIS Feeder Funds or to request subscriptions in or redemptions from the BLMIS Feeder Funds, the Somers Defendants, either directly or through affiliates, dealt with FGG and FAM in New York.

12. Through their HSBC affiliates, the Somers Defendants requested subscriptions into and redemptions from Fairfield Sentry by contacting FGG in New York. Jacqueline Harary, an FGG partner in New York, acted as FGG's representative for the Somers Defendants' investments with Fairfield Sentry. Santiago Reyes, an FGG employee in Miami, acted as FGG's representative for Somers Nominees's investments in Fairfield Sentry. Each request for a subscription in or redemption from Fairfield Sentry by the Somers Defendants was approved by FGG personnel in New York.

### C. The Somers Defendants Agreed to New York Jurisdiction and to Be Bound by New York Law

13. To invest in Fairfield Sentry, the Somers Defendants entered into subscription agreements that were governed by New York law and included agreements to submit to venue in New York and to the jurisdiction of New York courts.

14. The Fairfield Sentry subscription agreements stated they "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions." The subscription agreement further stated, "Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York," and that the "Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding."

### D. The Transfers from the BLMIS Feeder Funds Were Received in New York

15. When Somers Dublin redeemed from Harley, Somers Dublin instructed Harley to pay the redemption to an HSBC Bank USA, N.A. ("HSBC USA") bank account in New York. Accordingly, on October 22, 2008, Harley's administrator transferred $79,999,960 of BLMIS customer property to the HSBC USA account for the benefit of Somers Dublin.

16. The Somers Defendants' executed Fairfield Sentry subscription agreements that stated that subscription payments from the Somers Defendants would be directed to New York correspondent bank accounts at HSBC USA for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank N.A. in New York.

17. When Somers Nominees redeemed from Fairfield Sentry, Somers Nominees specifically instructed Fairfield Sentry to pay redemptions to an account held by HSBC "Fund

4

Services" at Citibank, N.A. in New York. Upon information and belief, and based on redemption requests it made to other BLMIS funds, Somers Dublin instructed Fairfield Sentry to pay redemptions to either the same HSBC USA account or the Citibank, N.A. account in New York. Based on the redemption requests, the Somers Defendants received the transfers from Fairfield Sentry in New York.

### E. Fairfield Sentry Maintained its Principal Place of Business in New York

18. At all relevant times, Fairfield Sentry's principal place of business was in New York and it was a domestic resident.

#### i. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

19. In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group (previously defined as "FGG") based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

20. The FGG de facto partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds, including Fairfield Sentry.

21. FGG also included a number of administrative entities that purportedly provided management and back-office support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

5

### ii. Fairfield Sentry

22. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

23. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

24. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

**1.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

25. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield

6

Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

26. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

27. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified

7

BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities

28. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

29. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

8

of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

30. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

31. As noted above, Fairfield Sentry's subscription agreements also incorporated its PPMs by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. The PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

9

### 5. BLMIS Was Fairfield Sentry's Investment Manager

32. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

33. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited FG. FG Limited was formed under the laws of Ireland.

34. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

10

35. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

36. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for Fairfield Sentry to FG Bermuda.

37. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

38. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

11

39. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

40. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

41. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

42. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund Limited*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y, filed June 26, 2015 as part of the Extraterritoriality Briefing).

**F.    The Harley Transfers Are Predominantly Domestic**

43. Harley's principal place of business was in New York. Harley invested 100% of its assets with BLMIS in New York and received approximately $1 billion in transfers of customer property from BLMIS within two years of December 11, 2008.

12

### 1. Harley Sought Out the United States as a Place to Invest and the Transfers it Received Arose Out of its Investment Account with BLMIS in New York

44. In April 1996, Harley's predecessor, Harley International Limited, entered into a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities with BLMIS in New York. Thereafter, Harley maintained an investment account with BLMIS, designated No. 1FN094.

45. Harley agreed that all disputes arising under the Customer Agreement would be resolved by arbitration before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers Inc. … and in accordance with the rules … of the selected organization."

46. The Customer Agreement between BLMIS and Harley provided that all transactions are subject to the provisions of the U.S. Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System. The Customer Agreement also provided BLMIS with full discretion over Harley's assets, and pursuant to the Trading Authorization agreement, Harley authorized Madoff to be its "agent and attorney in fact" to buy, sell, and trade in U.S. securities.

47. The Trustee filed a complaint against Harley in the Bankruptcy Court, under the caption *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), and on November 10, 2010, the Bankruptcy Court entered summary judgment against Harley in the amount of $1,066,800,000.

48. In support of summary judgment, the Bankruptcy Court held that "Harley specifically sought out the United States as a place to do business when it opened an account with BLMIS," and that the transfers received by Harley "arose out of business transactions tied to Harley's securities account with BLMIS in New York."

13

### 2. BLMIS in New York Acted as Harley's Investment Manager, Custodian, and Executing Broker

49. Euro-Dutch Trust Company (Bahamas) Limited ("Euro-Dutch Bahamas") acted as Harley's purported investment manager until 2003, and after 2003, Euro-Dutch Management Limited ("Euro-Dutch Cayman") in the Cayman Islands acted as Harley's purported investment manager.

50. Neither Euro-Dutch Bahamas nor Euro-Dutch Cayman played a meaningful role in managing Harley's investments with BLMIS. Instead, they delegated their investment management responsibilities to BLMIS in New York.

51. As Harley's investment manager, BLMIS in New York purported to invest Harley's assets according to Madoff's SSC Strategy, and BLMIS decided which, how many, and when to purchase and sell U.S. securities on Harley's behalf. BLMIS also acted as executing broker in purporting to purchase the U.S. securities on Harley's behalf.

52. BLMIS acted as custodian for the U.S. securities purportedly held on Harley's behalf. Each of Harley's audited financial statements for years 2003, 2004, 2005, 2006, and 2007 disclosed that BLMIS acted as Harley's "Custodian." Harley's audited financial statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

53. Harley's audited financial statements for years 2005 and 2006 also noted that "items included in the financial statements are measured using the currency of the primary economic activity in which it operates …. This is the U.S. dollar, which reflects the company's primary activity of investing in U.S. dollar denominated securities and derivatives."

### 3. Harley Conducted No Meaningful Business in the Cayman Islands

54. Harley was registered as an exempt company under the Cayman Islands Companies Law and was not permitted to solicit investors in the Cayman Islands.

14

55. In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands."

56. In its Articles of Association, Harley required that all disputes among Harley and its shareholders would be referred to binding arbitration in New York under rules established by the American Arbitration Association.

57. Each shareholder in Harley, including Somers Dublin, received copies of Harley's audited financial statements, Memorandum of Association, and Articles of Association.

### 4.     Fix Asset Management Ltd. Managed Harley from New York

58. Fix Asset Management Ltd. is the family wealth office of Charles Fix, which over the years evolved into an institutional fund of funds manager.

59. Fix Asset Management Ltd. operated through wholly owned subsidiaries, including Fix Asset Management Services Inc. (f/k/a Fix Asset Management, Inc. and Fix Capital Ltd., and collectively with Fix Asset Management Ltd., previously defined as "FAM").

60. FAM was incorporated under New York law and maintained its principal place of business at 660 Madison Avenue, New York, New York.

61. Harley had no employees or offices of its own. For its investments with BLMIS, Harley acted principally through FAM.

62. FAM was owned and controlled by Charles Fix, who also owned and controlled all of the voting shares for Harley. During the relevant time period, Charles Fix resided in New York.

63.     Fix's daughter, Tatiana Fix Katsigera (f/k/a Tatiana Fix), was the chief executive officer of FAM, served on its investment advisory committee, and conducted due diligence for its funds, including Harley. Tatiana Fix Katsigera also lived in New York.

64.     Several other members of FAM's advisory teams, including John Fix, Abel Pacheco, and Panos Katsambas, also resided in New York during much of the relevant time period. FAM's outside counsel was also located in New York.

65.     FAM marketed Harley from its office in New York, and FAM employees met with investors and potential investors in Harley at FAM's office in New York.

66.     FAM monitored and conducted due diligence on Harley's investments with BLMIS from its office in New York.

67.     FAM received Harley's BLMIS account statements at its office in New York. For several years BLMIS also sent Harley's BLMIS trade confirmations and account statements to FAM's agent and service provider at Bank Julius Baer & Co. Ltd. in New York.

68.     In monitoring its investments, FAM relied on external consultants in the United States, including Merfin LLC from California, X.E. Capital from New York, and Event Capital Markets from New Jersey.

69.     FAM handled subscriptions into and redemptions from Harley from its office in New York. For example, FAM employees corresponded with Madoff and Frank DiPascali to request that BLMIS accept subscriptions into Harley's account with BLMIS. FAM employees, including Charles Fix, also corresponded with Madoff and DiPascali to request redemptions from Harley's account.

### 5.      Harley Received Transfers at Bank Accounts Held in New York

70.     Harley's subscription agreements directed investors to wire U.S. dollars to bank accounts in New York. Prior to 2005, the subscription agreements required subscriptions to be

16

wired to a JPMorgan Chase Bank N.A. account in New York, held in the name of Fortis Bank (Cayman) Limited, and after 2005, the subscription agreements required subscriptions to be wired to an account in the name of Fortis Prime Fund Solutions (IOM) Limited ("Fortis Prime Fund Solutions IOM") at the Northern Trust Banking Corporation ("Northern Trust"), 40 Broad Street, New York, New York.

71. When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York. Harley previously had directed that BLMIS pay redemptions to an account held at Barclays Bank plc in New York.

### 6. Harley Was Administered By Fortis Entities in New York

72. Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, and then Fortis Prime Fund Solutions IOM served as Harley's administrators.

73. The Fortis administrators' relationships with Harley and FAM were managed during much of the relevant time period by Rhonda Eldridge, a Managing Director of Fortis Financial Services, LLC ("Fortis Financial Services") who was based in New York.

74. Eldridge worked with employees of Fortis Prime Funds Solutions (USA) LLC ("Fortis Prime Fund Solutions USA") in New York. (Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, Fortis Prime Fund Solutions IOM, Fortis Financial Services, and Fortis Prime Funds Solutions USA are collectively known as "Fortis").

75. Fortis Financial Services was located on Madison Avenue in New York, and from its office Fortis employees performed much of the work necessary in administering Harley.

76. Fortis employees conducted due diligence on BLMIS from Fortis Financial Services's office in New York. Fortis's due diligence included inquiries into BLMIS's role as Harley's custodian as well as a "thorough examination of Harley's account" with BLMIS.

17

77. Eldridge and other Fortis employees met with Madoff and DiPascali at BLMIS's office in New York. Eldridge and other Fortis employees also regularly spoke with Madoff, DiPascali, and/or Jo Ann Crupi regarding Harley's investments with BLMIS. In addition, Fortis employees met with Charles Fix and investors in Harley at FAM's office in New York.

78. Fortis employees received Harley's BLMIS trade confirmations and account statements at Fortis Financial Services's office in New York, and reviewed the trade confirmations and account statements to calculate Harley's NAV.

79. The Trustee incorporates by reference the allegations of the Complaint filed in *Picard v. Harley International (Cayman) Limited*, Adv. Pro. No. 09-01187 (SMB), Dkt. No. 1 (Bankr. S.D.N.Y. May 12, 2009).

Dated: June 26, 2015  
     New York, New York

/s/ Thomas L. Long  
**Baker & Hostetler LLP**  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Thomas L. Long  
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*