**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br>  v.<br><br>ORBITA CAPITAL RETURN STRATEGY LIMITED,<br><br>    Defendant. | Adv. Pro. No. 11-02537 (SMB)<br><br><br><br>**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO DEFENDANT ORBITA CAPITAL RETURN STRATEGY LIMITED** |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to Defendant Orbita Capital Return Strategy Limited states:

## I. INTRODUCTION

1. The Trustee seeks to recover at least $30,662,226 in a subsequent transfer of BLMIS customer property made to Orbita Capital Return Strategy Limited ("Orbita Capital"). The BLMIS customer property was transferred from BLMIS to Fairfield Sentry Limited ("Fairfield Sentry"), and subsequently transferred from Fairfield Sentry to Orbita Capital.

2. Orbita Capital was a sophisticated investment fund of hedge funds. One of the funds that Orbita Capital invested in, and the only fund at issue in this proceeding, was Fairfield Sentry. Orbita Capital was incorporated in Cayman Islands to obtain advantageous U.S. tax status and to be eligible for certain exemptions under U.S. securities law while still investing in the United States.

3. Fairfield Sentry was the largest of many BLMIS feeder funds ("Feeder Funds")—single-purpose investment funds that pooled their investors' assets to invest with BLMIS in New York, capitalizing on its consistent returns. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.

4. Although incorporated in the Territory of the British Virgin Islands ("BVI"), Fairfield Sentry was a shell corporation present in the BVI only on paper. Fairfield Sentry had no employees and no offices in the BVI. U.S. citizens and residents, Walter Noel and Jeffrey Tucker founded Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, which created, operated, and controlled Fairfield Sentry.

5. Orbita Capital purposefully invested in Fairfield Sentry to profit from BLMIS in

1

New York. But for Orbita Capital's intent to profit from activities in New York, Orbita Capital would not have received the transfer from Fairfield Sentry.

6. Orbita Capital was managed entirely by affiliated investment managers, first Coutts & Co. Limited ("Coutts") and then RBS Asset Management Limited ("RBS AM"). Coutts had an office in Miami, Florida and conducted due diligence from this office on behalf of Orbita Capital.

7. As a result of the due diligence conducted by Orbita Capital's investment managers on Fairfield Sentry, Madoff, and BLMIS, as well as from the documents it executed in connection with its investments in Fairfield Sentry, Orbita Capital knew the following facts:

 a. In reality, BLMIS was the New York-based investment adviser for Fairfield Sentry.

 b. BLMIS in New York was the executing broker for Fairfield Sentry's investments, and BLMIS in New York purportedly operated and executed Madoff's split-strike conversion investment strategy ("SSC Strategy") on behalf of Fairfield Sentry.

 c. Madoff's SSC Strategy purportedly involved the purchase of U.S. S&P 100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges, and decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

 d. BLMIS maintained custody of Fairfield Sentry's investments in New York.

 e. BLMIS in New York was a U.S. registered broker-dealer.

 f. The entire economic purpose of Fairfield Sentry was to deliver money to

2

BLMIS in New York.

8. Orbita Capital knew control over Fairfield Sentry's investments rested entirely with Madoff and BLMIS in New York. Orbita Capital intended to profit from BLMIS's U.S. control over its U.S. investments.

9. After conducting due diligence on Fairfield Sentry, BLMIS, and Madoff, Orbita Capital's investment managers chose to redeem Orbita Capital's entire investment in Fairfield Sentry at once.

## II. THE TRANSFER AND COMPONENT EVENTS OF THE TRANSACTIONS ARE PREDOMINANTLY DOMESTIC

### A. Orbita Capital Knew That Virtually All Fairfield Sentry's Assets Were Invested with BLMIS in New York

10. Virtually all of Fairfield Sentry's assets were invested with BLMIS in New York and Orbita Capital knew this fact. Orbita Capital chose to invest in Fairfield Sentry as a means of placing investments with BLMIS in New York, and relinquished control over its investments to BLMIS, which made and implemented the investment decisions.

11. Orbita Capital's investments in Fairfield Sentry were governed by Information Memoranda ("IMs") and Private Placement Memoranda ("PPMs"), depending on when the subscriptions were completed, and subscription agreements. By executing Fairfield Sentry subscription agreements, Orbita Capital agreed to "the terms of the Information Memorandum . . . which [Orbita Capital has] received and read."

12. Orbita Capital knew Fairfield Sentry was entirely dependent on BLMIS in New York. From the IMs, Orbita Capital knew FGG "delegated all investment management duties to [BLMIS] . . . [and a]s a result, [FGG] is subject to the judgment, decisions and trading opinions of [BLMIS] and has no control over the decisions implemented by [BLMIS]." Orbita Capital also knew that as Fairfield Sentry's investment manager, BLMIS implemented Madoff's SSC

3

Strategy by purportedly purchasing U.S. S&P 100 Index securities, U.S. options, and U.S. Treasurys traded on U.S. exchanges.

13. Orbita Capital knew from the IMs that BLMIS served as the custodian for Fairfield Sentry's funds and that BLMIS was a registered broker-dealer in New York that executed the trades for Madoff's SSC Strategy on behalf of Fairfield Sentry through accounts at BLMIS.

14. Orbita Capital knew BLMIS in New York acted as the investment adviser, broker-dealer, and custodian for Fairfield Sentry and knew control over Fairfield Sentry's investments rested entirely with BLMIS. Orbita Capital intended to benefit from BLMIS's implementation of Madoff's U.S. investment strategy.

### B. Orbita Capital Used a New York Bank Account to Transfer Funds

15. Orbita Capital used a New York bank account to transfer funds to Fairfield Sentry. The Fairfield Sentry subscription agreements Orbita Capital executed in connection with its investments in Fairfield Sentry designated that all money from Orbita Capital be directed to a Republic National Bank of New York correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JP Morgan Chase Bank NA in New York. In connection with subscribing funds to Fairfield Sentry, Orbita Capital directed each of its three subscription payments to this Republic National Bank of New York account.

### C. Orbita Capital's Investment Managers Conducted Due Diligence on BLMIS in New York in Connection with Its Investments

16. At its inception in 1998, Orbita Capital was managed by Coutts. In 2000, Royal Bank of Scotland Group plc ("RBS Group") acquired Coutts as part of a business acquisition. After this acquisition, Coutts remained Orbita Capital's investment manager and continued to

4

operate somewhat independently from under the ownership of RBS Group. In or around 2004, RBS Group's asset management subsidiary, RBS AM, a Securities and Exchange Commission ("SEC")-registered investment adviser, took over Orbita Capital's management from Coutts.

17. As Orbita Capital's investment managers, Coutts and RBS AM's personnel selected hedge fund investments for Orbita Capital, and were responsible for the day-to-day oversight and administration of Orbita Capital's investments. Coutts and RBS AM conducted due diligence on behalf of Orbita Capital.

18. Coutts had offices in Miami, Florida and London, England and utilized employees in both offices in connection with its investment management responsibilities for Orbita Capital. RBS AM later managed Orbita Capital out of its London office, and its London personnel continued to foster the relationship with FGG personnel based in New York ("FGG New York Personnel") after the acquisition.

19. FGG New York Personnel traveled to Coutts's Miami office in 2003 and Coutts's employees questioned the FGG New York Personnel about Orbita Capital's investments in Fairfield Sentry.

20. Coutts also sent its London-based employees to FGG's New York headquarters on a quarterly basis to conduct ongoing due diligence on Fairfield Sentry, Madoff, and BLMIS in connection with Orbita Capital's investments. Coutts's employees asked typical due diligence questions for FGG, including queries about Madoff's market timing—when Madoff was purportedly investing Orbita Capital's funds in the U.S. market by buying and selling U.S. securities and options.

21. New York-based FGG Chief Operating Officer Robert Blum was responsible for Orbita Capital's Fairfield Sentry investments. Blum was Orbita Capital's FGG point of contact

5

and he arranged meetings between Coutts and FGG New York Personnel.

22. After RBS Group acquired Coutts, in or around 2004, Coutts was phasing out its investment management role and RBS AM took over management of Orbita Capital. During that process, many of the same individuals at Coutts's London-based office who began and cultivated Orbita Capital's relationship with FGG and Fairfield Sentry continued to manage these relationships for Orbita Capital as employees of RBS AM.

23. RBS AM employees continued regular communication with FGG's New York Personnel and continued to request due diligence information on a quarterly basis from Fairfield Sentry in connection with Orbita Capital's investments.

24. As a result of its ongoing due diligence on Fairfield Sentry, Madoff, and BLMIS—most of which took place in the United States—Orbita Capital and its investment managers observed and understood signs of fraud at BLMIS. On December 29, 2004, shortly after completing its quarterly due diligence, RBS AM informed New York-based FGG employee Lauren Ross that it would be redeeming Orbita Capital's "full position in Fairfield Sentry as of Jan 31 [2005]." Ross reported to her New York-based FGG partners that RBS AM's reasoning, in part, for redeeming Orbita Capital's Fairfield Sentry investment, was due to "transparency—they were concerned with lack of transparency for Sentry."

### D.  Fairfield Sentry's Principal Place of Business Was in New York

25. At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

#### 1.  The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

26. In 1988, Walter Noel and Jeffrey Tucker founded *de facto* partnership, FGG, based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

6

27. The FGG de facto partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

28. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### 2. Fairfield Sentry

29. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

30. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG New York Personnel. Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law

7

firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

31. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

    **a. Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

32. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

33. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

8

FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

34. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation member regulated by the SEC.

**b. FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities**

35. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

9

Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### c. FGG New York Personnel Managed Fairfield Sentry

36. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

37. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

38. Fairfield Sentry's subscription agreements also incorporated its PPMs by

10

reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e. BLMIS Was Fairfield Sentry's Investment Manager

39. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

40. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

41. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

42. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

43. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

44. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

12

and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

45. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

46. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

47. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

48. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

13

The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

49.     Finally, the Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*., Adv. Pro. No. 09-01239 (SMB), (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015
      New York, New York

/*s*/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long

**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Lauren M. Hilsheimer
Melonia A. Bennett

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*