**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> ABU DHABI INVESTMENT AUTHORITY, <br><br> Defendant. | Adv. Pro. No. 11-02493 (SMB) <br><br><br> **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO ABU DHABI INVESTMENT AUTHORITY** |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendant Abu Dhabi Investment Authority ("ADIA"), states:

## I.    **INTRODUCTION**

1. ADIA is an investment institution owned by the Emirate of Abu Dhabi, with a registered address in Abu Dhabi, United Arab Emirates.  Under Law (5) of 1981 of the Emirate of Abu Dhabi, ADIA has the full legal capacity to act independently from the Abu Dhabi government.

2. ADIA received $300 million in two separate transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry").  Fairfield Sentry was one of many BLMIS feeder funds ("Feeder Fund")—single-purpose investment funds that pooled their investors' assets to invest with BLMIS.  From November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS's investment advisory business.

3. Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry.

4. Although organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"), Fairfield Sentry was a shell corporation present in the BVI only on paper.  Fairfield Sentry had no employees and no offices on the BVI.  It was operated almost entirely by FGG employees based in New York ("FGG New York Personnel").

5. As an international business company, BVI law restricted Fairfield Sentry from conducting business with other BVI citizens and residents except with other BVI international business companies.

II.     **THE TRANSACTIONS INVOLVED SIGNIFICANT DOMESTIC COMPONENTS**

   A.   **ADIA Directed BLMIS Customer Property to its Tampa, Florida Bank Account at JPMorgan Chase and a New York-Based Fund of Funds**

6.      ADIA directed Fairfield Sentry redemption proceeds to U.S. bank accounts.

7.      At all relevant times, ADIA maintained a JPMorgan Chase, New York ("JPMorgan") bank account in its name in Tampa, Florida.

8.      In March 2005, ADIA completed a standardized Fairfield Sentry form entitled "Redemption Request Form Instructions," and directed a $200 million redemption payment from Fairfield Sentry to ADIA's Tampa, Florida bank account at JPMorgan.

9.      In March 2006, ADIA redeemed an additional $100 million from Fairfield Sentry. In connection with this redemption, ADIA completed a "Redemption Request Form Instructions" form, in which it directed its redemption "proceeds should be switched directly to Fairfield Holdings [Fund] Limited for value." In a letter sent with these redemption instructions, ADIA directed that its Fairfield Sentry redemption payment "be used as subscription money" for ADIA's investment in Fairfield Holdings Fund Limited ("Holdings"), another FGG fund.

10.     Holdings was a fund of funds that maintained numerous U.S. investments and was created by New York-based FGG specifically and exclusively for ADIA. FGG affiliate Fairfield Greenwich Advisors, LLC ("FG Advisors"), a Delaware limited liability company with its principal place of business in New York, was Holdings' investment manager. ADIA ultimately held New York-based FGG responsible for the fund, cautioning FGG New York Personnel during a discussion that "Holdings is your fund and the allocations are your responsibility, you will be judged on the results."

11.     ADIA directed its $100 million Fairfield Sentry redemption payment to a New York HSBC Bank USA correspondent bank account, as was required by Holdings' subscription

2

agreement. By doing so, ADIA intentionally redeemed funds from New York-based BLMIS and directed those funds to a correspondent bank account in New York to invest in Holdings, which was managed by New York-based FG Advisors and FGG, held numerous U.S. investments, and maintained a principal place of business in New York.

**B.    ADIA Invested a Significant Portion of its Assets in the United States and Utilized U.S.-Based Individuals to Manage those Investments**

12.    ADIA's purpose is to make commercial investments including, but not limited to, investments in hedge funds based in the U.S. and New York—such as Fairfield Sentry. ADIA manages a global portfolio totaling approximately $773 billion. In its 2009 Annual Review, ADIA indicated that it invested between 35% and 50% of its global portfolio in North America, including the United States.

13.    To further its U.S. investments, ADIA maintained a bank account at JPMorgan in Tampa, Florida that enabled it to make U.S. Dollar investments, including investments in Fairfield Sentry.

14.    ADIA also utilized U.S.-based individuals and entities to help manage its U.S. investments. ADIA hired a New York-based consultant to conduct due diligence on Fairfield Sentry. ADIA also engaged U.S. counsel to review its redemption from Fairfield Sentry and subsequent investment in Holdings. Specifically, ADIA asked its U.S. counsel for advice regarding compliance with U.S. Anti-Money Laundering provisions contained in Holdings' subscription agreement, recognizing that U.S. law applied to its FGG-related investments.

**C.    ADIA Invested in Fairfield Sentry as an Avenue to Profit from New York-Based BLMIS**

15.    ADIA targeted investments in Fairfield Sentry as part of its U.S.-focused investment strategy. Fairfield Sentry invested its assets with New York-based BLMIS who purported to execute Madoff's split-strike conversion strategy ("SSC Strategy") by investing

3

Fairfield Sentry's assets in the U.S. Standard & Poor's 100 Index ("S&P 100 Index"), options, U.S. Treasury Bills ("Treasurys"), and mutual funds invested in U.S. Treasurys. ADIA knew Madoff and BLMIS in New York had control over Fairfield Sentry's assets and ADIA intended to profit from BLMIS's U.S. control over its U.S. investments.

16. By investing in Fairfield Sentry, ADIA knew it was directing funds to New York-based BLMIS through New York bank accounts. ADIA executed subscription agreements in connection with its investments in Fairfield Sentry. These agreements stated all money from ADIA be directed to New York correspondent bank accounts at Citibank N.A., New York, Republic National Bank of New York, or HSBC Bank USA for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York. ADIA directed funds to these correspondent bank accounts on multiple occasions over a nearly six year period in connection with subscribing funds to Fairfield Sentry.

17. In connection with its investments, ADIA conducted due diligence on Fairfield Sentry, Madoff, and BLMIS. ADIA received and analyzed hundreds of due diligence materials from FGG, including reports highlighting the dates upon which BLMIS entered and exited the U.S. market, analyses showing the specific U.S. S&P 100 Index equities BLMIS purportedly purchased, and materials highlighting the volume of options BLMIS purported to purchase and sell in connection with the SSC Strategy. From its review of these materials, ADIA knew the following facts:

- Fairfield Sentry invested its assets in Madoff's SSC Strategy;

- In reality New York-based BLMIS was Fairfield Sentry's investment adviser;

- Madoff determined which shares of U.S. companies on the U.S. S&P 100 Index BLMIS purportedly purchased;

4

- Madoff determined the price and timing of such purchases;

- BLMIS purported to execute the SSC Strategy in New York as broker for Fairfield Sentry;

- BLMIS maintained custody of Fairfield Sentry's assets in New York; and,

- Control over Fairfield Sentry's investments rested entirely with BLMIS and Madoff in New York.

18. Understanding that New York-based BLMIS drove the purported success of Fairfield Sentry, ADIA asked FGG "for a meeting with Bernie Madoff" while conducting due diligence on Fairfield Sentry. ADIA knew that Madoff in New York controlled Fairfield Sentry's investments in the U.S. markets. While ADIA never got its requested meeting with Madoff or a representative of BLMIS, ADIA discussed BLMIS and Madoff with FGG "at length," and one of FGG's New York-based founding partners, Jeffrey Tucker, offered to speak with ADIA to share his knowledge from conducting on-site due diligence at BLMIS.

**D.   From its Inception through ADIA's Redemptions, ADIA's Relationship With Fairfield Sentry and FGG was Centered in New York**

19. ADIA met with and maintained relationships with New York-based entities and individuals in connection with its investments in Fairfield Sentry.

20. ADIA's relationship with FGG was managed by Philip Toub, a partner based in FGG's New York headquarters and member of FGG's Executive Committee. Toub served as ADIA's primary contact regarding its investments, potential investments, questions, or concerns related to Fairfield Sentry and other FGG funds. In connection with these responsibilities, Toub repeatedly met with ADIA in New York.

21. At various points between 1996 and 2008, ADIA was Fairfield Sentry's largest investor. Because of the size of ADIA's investments, FGG enlisted other FGG New York

5

Personnel to assist in maintaining and further expanding its relationship with ADIA. New York-based FGG founding partners Walter Noel and Tucker met and communicated with ADIA on numerous occasions.

22.     Whenever ADIA developed concerns about Fairfield Sentry, FGG, or BLMIS, it directed its concerns to FGG New York Personnel. ADIA: (1) sent FGG's Toub a letter threatening to redeem all of its investments in Fairfield Sentry; (2) negotiated fee rebates with Tucker and FGG's chief financial officer, Daniel Lipton; and, (3) addressed its Fairfield Sentry due diligence questions to FGG's director of investor relations, Lauren Ross. ADIA knew Toub, Tucker, Lipton, and Ross were all based in FGG's New York headquarters.

23.     ADIA also hired a New York-based consultant, Russell Olson, to conduct due diligence on Fairfield Sentry, including attending due diligence meetings at FGG's New York headquarters on ADIA's behalf.

24.     FGG prepared Fairfield Sentry due diligence materials for ADIA at its New York headquarters and FGG New York Personnel distributed these materials to ADIA via email containing New York signature blocks. Monthly reports received and reviewed by ADIA frequently noted FGG was headquartered in New York.

25.     ADIA received and analyzed monthly reports prepared in the U.S. by FGG's external consultant, Gil Berman, analyzing BLMIS's purported monthly trading activity for Fairfield Sentry. These reports specifically analyzed BLMIS's purported investments in S&P 100 Index equities, options, U.S. Treasurys, and mutual funds invested in U.S. Treasurys.

### E.     Fairfield Sentry's Principal Place of Business Was in New York

26.     At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

6

### 1. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

27. In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were feeder funds.

28. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

29. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### 2. Fairfield Sentry

30. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents

7

except for other entities organized under the International Business Companies Act.

31. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

32. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

        *a.    Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business was in the United States*

33. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

8

correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

34. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

35. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

                b. *FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities*

36. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco

9

Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### c. *FGG New York Personnel Managed Fairfield Sentry*

37. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

38. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's

10

operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

       *d.*  *Fairfield Sentry's Investors Knew They Were Investing in BLMIS*

  39.  Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

       *e.*  *BLMIS Was Fairfield Sentry's Investment Manager*

  40.  Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

  41.  In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's

11

Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

42.     While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

43.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

44.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

45.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

46.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

47.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

48.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as

13

Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

49. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

50. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.,* Adv. Pro. No. 09-01239 (SMB), (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015
New York, New York

/s/ Thomas L. Long
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Catherine E. Woltering

**Baker & Hostetler LLP**
65 East State Street
Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Justin J. Joyce

*Attorneys for Irving H. Picard, Trustee for the substantively consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*