**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the substantively consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 11-02539 (SMB) |
| v. | |
| MERITZ FIRE & MARINE INSURANCE CO., LTD., | |
| Defendant. | |

**TRUSTEE'S SUPPLEMENTAL MEMORANDUM
OF LAW IN OPPOSITION TO MERITZ FIRE & MARINE
INSURANCE CO., LTD.'S MOTION TO DISMISS BASED ON
EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF
TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**

The Trustee respectfully submits this supplemental memorandum in opposition to Meritz Fire & Marine Insurance Co., Ltd.'s ("Meritz") motion to dismiss based on extraterritoriality and in further support of the Trustee's motion for leave to amend the complaint. As set forth below the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to Meritz ("Proffer") plead specific facts showing the subsequent transfers received by Meritz are predominantly domestic under the standard set forth in the Extraterritoriality Decision,[1] such that the Trustee's action does not require an extraterritorial application of SIPA or Bankruptcy Code § 550. Meritz's motion to dismiss should be denied, and the Trustee should be granted leave to amend the complaint.

I. **BACKGROUND & LEGAL STANDARD**

The District Court returned this action to this Court to determine whether the Trustee's claims against Meritz seek the recovery of "purely foreign" transfers, requiring an extraterritorial application of Bankruptcy Code § 550.[2] Under the Extraterritoriality Decision, the Trustee must only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[3] In making this determination, this Court must review "the location of the transfers as well as the component events of those transactions."[4] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[5]

The Trustee's Proffer alleges that Meritz received at least $21,855,898 in transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry"). Proffer ¶ 1. BLMIS held customer accounts for numerous feeder funds ("Feeder Funds")—single-purpose

---

[1] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 513 B.R. 222, 232-33 (S.D.N.Y. 2014) ("Extraterritoriality Decision").
[2] *Id.*
[3] *Id.* at 232 n.4.
[4] *Id.* at 227 (quoting *Maxwell Commc'n Corp. v. Societe General PLC (In re Maxwell Commc'n Corp.)* ("*Maxwell I*"), 186 B.R. 807, 817 (S.D.N.Y. 1995)).
[5] *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403-05 (S.D.N.Y. 2010).

1

investment vehicles that pooled their investors' assets to invest with BLMIS, capitalizing on its consistent returns and Madoff's willingness to forego industry-standard remuneration—including Fairfield Sentry. *Id.* ¶ 2. FGG, a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry. *Id.* ¶ 3. The Trustee alleges that Fairfield Sentry withdrew funds from its BLMIS accounts and transferred those funds to Meritz. *Id.* ¶ 1.

Meritz argues that because it was formally organized under the law of South Korea, and because Fairfield Sentry was formally organized under the law of the Territory of the British Virgin Islands ("BVI"), it is entitled to a finding that the transfers are "purely foreign" and must be dismissed under the Extraterritoriality Decision. Meritz is wrong, and its superficial analysis is contrary to the *Maxwell I* "component events" analysis embraced by the District Court in the Extraterritoriality Decision.[6] Meritz ignores that its relationship with Fairfield Sentry was centered in the United States, and Fairfield Sentry operated from its principal place of business in New York. As set forth below, a review of the facts pertinent to the component events of the transactions, and the domestic nature of Fairfield Sentry demonstrate the Trustee's action against Meritz do not require an extraterritorial application of Bankruptcy Code § 550 or SIPA.

II. **THE TRANSFERS AND THE COMPONENT EVENTS OF THE TRANSACTIONS WERE COMPRISED OF PREDOMINANTLY DOMESTIC ELEMENTS**

The Trustee's recovery action against Meritz is not barred by the Extraterritoriality Decision because the transfers and the component events of the transactions were comprised of predominantly domestic elements. The facts show the entire purpose of Meritz's investment was to profit from the U.S. markets, and from Fairfield Sentry and BLMIS specifically, each of which operated out of the United States. Meritz also relinquished all control over its investment

---

[6] *See* Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 817).

to BLMIS, meaning that the investment was run entirely out of the U.S. Meritz knowingly directed funds to be invested with New York-based BLMIS through Fairfield Sentry, met and communicated with Fairfield Sentry representatives in New York, submitted to New York choice of law and venue in connection with its Fairfield Sentry investment, and used a New York bank account to receive the transfers. Proffer ¶ 5.

The U.S. nature of the transactions is undeniable. The fact that Meritz itself is not a U.S. entity was irrelevant to the transactions. Meritz necessarily had to, and did, conduct due diligence on Fairfield Sentry and BLMIS in New York, and received extensive access to information about Fairfield Greenwich Group ("FGG"), Fairfield Sentry, and BLMIS through its agent, Vantage Capital Pte. Ltd. ("Vantage"). *Id.* ¶ 6.

Meritz did not enter the U.S. market by mistake. To the contrary, it decided to profit from BLMIS after extensive due diligence. Prior to receiving the transfers at issue, Meritz and Vantage conducted due diligence on Fairfield Sentry and BLMIS, including Meritz meeting with FGG at FGG's headquarters in New York. *Id.* ¶ 8. As a result of Vantage's and its own due diligence, Meritz knew that control over its Fairfield Sentry investment rested almost entirely with Madoff and BLMIS in New York. *Id.* ¶¶ 7, 13–17. A series of emails in July 2007 demonstrate Meritz knew not only that BLMIS was at the center of the transactions at issue, but also that it made its redemptions from Fairfield Sentry based on concerns regarding BLMIS. *Id.* ¶¶ 13–17. The transfer was U.S.-based in every way, and Meritz knew it and wanted precisely that.

Due diligence and other communications between FGG's New York office and Meritz reveal that Meritz also knew, from the U.S. nature of the transactions, the following facts: (1) in reality New York-based BLMIS was Fairfield Sentry's investment adviser; (2) BLMIS purported

3

to invest exclusively in U.S. markets; (3) BLMIS in New York had custody of at least 95% of Fairfield Sentry's investments; (4) the entire economic purpose of Fairfield Sentry was to deliver money to BLMIS in New York; and (5) BLMIS's auditor was Friehling and Horowitz, CPA, P.C., a small audit firm located in New York. *Id.* ¶ 11.

Meritz agreed to be bound by New York law and subject to the New York courts in recognition of the U.S.-based nature of the transactions. By executing a Fairfield Sentry subscription agreement, Meritz agreed that New York law and jurisdiction of New York courts would apply to its relationship with Fairfield Sentry. *Id.* ¶ 18. Specifically, Meritz agreed "that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and that Meritz "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding." *Id.* Meritz further agreed that the subscription agreement "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions." *Id.* Additionally, in connection with subscribing funds to Fairfield Sentry, Meritz directed funds to a New York HSBC Bank USA correspondent bank account. *Id.* ¶ 20.

## III. FAIRFIELD SENTRY'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

In 1988, Walter Noel and Jeffrey Tucker, founded FGG, a New York-based *de facto* partnership. Proffer ¶ 22. Through FGG, Noel and Tucker organized the Feeder Fund Fairfield Sentry. *Id.* ¶ 23.

Noel and Tucker formally organized Fairfield Sentry as an international business company under BVI law. *Id.* ¶ 25. Fairfield Sentry was a shell corporation present in the BVI solely on paper. *Id.* ¶ 26. Its BVI statutorily required registered address was a post office box care of a local trust company owned and operated by a local law firm. *Id.*

4

From its inception until its liquidation in 2009, Fairfield Sentry had no employees and no offices. *Id.* At all relevant times, Fairfield Sentry was operated almost entirely by FGG New York City headquarters personnel who maintained final control of Fairfield Sentry's bank accounts and relationships with Fairfield Sentry's back office service providers. *Id.* ¶¶ 26–27.

Beginning in 1990, Tucker opened Fairfield Sentry's BLMIS accounts. *Id.* ¶ 28. In the account opening documents, Tucker identified Fairfield Sentry's mailing address as Fairfield International Managers, Inc.'s office in Greenwich, Connecticut and directed BLMIS to send Fairfield Sentry's monthly account statements, trade confirmations, and correspondence to the same Fairfield International Managers, Inc. office. *Id.* In January 1998, FGG requested BLMIS to send all Fairfield Sentry account information to FGG's New York headquarters. *Id.*

From Fairfield Sentry's inception, FGG personnel at its New York headquarters controlled the sales and subscriptions of the fund's shares. *Id.* ¶¶ 32–33. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York. *Id.* ¶ 33.

At all relevant times, FGG New York headquarters personnel monitored Fairfield Sentry's investments; managed the relationships with BLMIS; directed investments into and out of BLMIS; marketed Fairfield Sentry; approved all subscriptions for Fairfield Sentry shares; maintained all of Fairfield Sentry's books and records at the FGG New York headquarters; and made all strategic and operational decisions regarding Fairfield Sentry. *Id.* ¶ 32–33.

## IV.   CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, Meritz's motion to dismiss should be denied, and the Trustee should be granted leave to amend.

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone:  (212) 589-4200<br>Facsimile:  (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Catherine E. Woltering<br><br>**Baker & Hostetler LLP**<br>65 East State Street, Suite 2100<br>Columbus, Ohio 43215<br>Telephone:  (614) 228-1541<br>Facsimile:  (614) 462-2616<br>Douglas A. Vonderhaar<br>Damon M. Durbin<br><br>*Attorneys for Irving H. Picard, Trustee*<br>*for the substantively consolidated SIPA*<br>*Liquidation of Bernard L. Madoff Investment*<br>*Securities LLC and the estate of Bernard L.*<br>*Madoff* |