**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>     Plaintiff-Applicant,<br> v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>     Defendant. | No. 08-01789 (SMB)<br><br>SIPA Liquidation<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>     Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff,<br><br>     Plaintiff,<br><br> v.<br><br>QUILVEST FINANCE LTD.,<br><br>     Defendant. | Adv. Pro. No. 11-02538 (SMB)<br><br><br><br>**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO QUILVEST FINANCE LTD.** |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to Quilvest Finance Ltd. ("Quilvest Finance"), states:

## I. INTRODUCTION

1. The Trustee seeks to recover at least $38,030,707 in subsequent transfers of BLMIS customer property collectively made to Quilvest Finance. The BLMIS customer property was transferred from BLMIS to Fairfield Sentry Limited ("Fairfield Sentry"), and subsequently to Quilvest Finance.

2. Quilvest Finance is a limited company registered in the British Virgin Islands ("BVI") operating as a private bank.

3. Fairfield Sentry was one of several BLMIS feeder funds ("Feeder Funds")—single-purpose investment vehicles that pooled their investors' assets to invest with BLMIS, capitalizing on its consistent returns. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.

4. Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry.

5. Quilvest Finance purposefully invested in Fairfield Sentry to profit from BLMIS in New York. But for BLMIS's fraudulent activities in New York, Quilvest Finance would have received none of the transfers from Fairfield Sentry.

6. Quilvest Finance's affiliates functioned as its investment managers, conducting due diligence in New York on Fairfield Sentry, Madoff, and BLMIS. Quilvest Finance also relied upon a Boston-based consultant to assist it in determining whether to invest with BLMIS.

7. Quilvest Finance knew the following facts:

   a. In reality the investment adviser for Fairfield Sentry was BLMIS in New York.

1

    b. BLMIS in New York was the executing broker for Fairfield Sentry's investments, and BLMIS in New York purportedly operated and executed the "split-strike conversion" investment strategy ("SSC Strategy") on behalf of Fairfield Sentry.

    c. Madoff's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasurys traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

    d. BLMIS in New York was the custodian of Fairfield Sentry's investments.

    e. While BLMIS always functioned as Fairfield Sentry's investment adviser, after 2006, BLMIS was a registered investment adviser with the Securities and Exchange Commission ("SEC").

    f. The entire economic purpose of Fairfield Sentry was to deliver money to BLMIS in New York.

8. Quilvest Finance knew control over Fairfield Sentry's investments rested entirely with Madoff and BLMIS in New York. The purpose of Quilvest Finance's investments was to invest in the U.S. markets, relinquishing all control over their investments to Madoff and BLMIS in New York.

## II. QUILVEST FINANCE'S RELATIONSHIP WITH FAIRFIELD SENTRY WAS CENTERED IN THE UNITED STATES

9. Quilvest Finance's relationship with Fairfield Sentry was centered in the United States. First, Quilvest Finance's affiliates conducted due diligence on Fairfield Sentry, Madoff, and BLMIS in the United States. Second, Quilvest Finance also relied upon a Boston-based consultant to assist in making investment decisions. Third, the transfers received by Quilvest

2

Finance involved predominantly domestic components. Finally, Quilvest Finance utilized New York bank accounts in connection with the transfers at issue.

### A. Quilvest Finance's Affiliates Conducted Due Diligence on Fairfield Sentry, BLMIS, and Madoff in New York

10. Employees from Quilvest Finance's affiliate in Switzerland traveled to FGG's New York headquarters to meet with FGG's founding partner, Jeffrey Tucker, and to conduct due diligence on Fairfield Sentry on Quilvest Finance's behalf.

11. Employees from Quilvest Finance's affiliate in Paris frequently communicated via telephone and email with New York- and Miami-based FGG employees regarding subscriptions into and redemptions out of Fairfield Sentry in connection with Quilvest Finance's investments.

### B. Quilvest Finance Relied Upon Its Boston Consultant to Assist in Making Investment Decisions

12. As part of its due diligence on Fairfield Sentry, Madoff, and BLMIS, Quilvest Finance worked with an independent consulting firm, Boston-based Cambridge Associates LLC ("Cambridge"), which was "a vital part of their decision making process" and assisted in making its investment decisions. Quilvest Finance and its affiliates' main contact at Cambridge worked in Cambridge's Boston headquarters.

13. Cambridge had serious concerns about Madoff's purported SSC Strategy as a result of its due diligence, which took place in large part in the United States. As early as March 1998, Cambridge employees met with FGG representatives at Cambridge's Boston headquarters to conduct research on another Feeder Fund, Madoff, and BLMIS. Cambridge came away with concerns about the lack of volatility associated with BLMIS's returns, and questions about conflicts of interest between BLMIS's investment advisory business and market making business.

3

14. In August 2001, Cambridge employees again documented concerns related to Madoff after meeting with a BLMIS investor. Specifically, the Cambridge employees felt Madoff provided no transparency for his investors. In June 2006, Cambridge employees visited FGG's New York office to learn more about Fairfield Sentry and determined within an hour "that this was not an institutional quality fund." Cambridge cited a number of reasons for this conclusion, including an inability to replicate the strategy and lack of value added by FGG.

### C. Control Over Fairfield Sentry's Investments Rested Entirely with BLMIS in New York, and Quilvest Knew It

15. Quilvest Finance's investments with Fairfield Sentry were governed by private placement memoranda ("PPMs") and subscription agreements. Quilvest Finance voluntarily executed Fairfield Sentry subscription agreements and by doing so affirmed that it "received and read" a copy of the PPMs.

16. For example, in the summer and fall of 2000, Quilvest Finance executed a series of Fairfield Sentry subscription agreements acknowledging receipt and review of a Fairfield Sentry PPM dated July 1, 2000 (the "2000 Fairfield Sentry PPM").

17. From the 2000 Fairfield Sentry PPM, and from the due diligence of its affiliates and Cambridge, Quilvest Finance knew Madoff's SSC Strategy purportedly involved the purchase and sale of U.S. equities, U.S. options, and U.S. Treasurys traded on U.S. exchanges.

18. Quilvest Finance understood that Madoff decided which U.S. securities BLMIS purported to purchase. Specifically, the 2000 Fairfield Sentry PPM represented that "BLM[IS] acts as principal in connection with its sale of securities to [Fairfield Sentry] and the purchase of securities from [Fairfield Sentry]."

19. Quilvest Finance also knew from the 2000 Fairfield Sentry PPM that BLMIS in New York was the broker-dealer and agent that executed the trades for Fairfield Sentry, that

4

BLMIS was the custodian of Fairfield Sentry's investments, and that there was a possibility BLMIS could misappropriate the assets invested in Fairfield Sentry.

20. The 2000 Fairfield Sentry PPM explained that Fairfield Sentry "delegated all investment management duties to [BLMIS]" and as a result, "[Fairfield Sentry] is subject to the judgment, decisions and trading opinions of [BLMIS] and has no control over the decisions implemented by [BLMIS]."

21. Quilvest Finance knew Fairfield Sentry was entirely dependent on BLMIS in New York. The 2000 Fairfield Sentry PPM explicitly stated that "[t]he services of . . . [BLMIS] are essential to the continued operations of [Fairfield Sentry]."

22. BLMIS acted as the investment adviser, broker-dealer, and custodian for Fairfield Sentry and control over Fairfield Sentry's investments rested entirely with BLMIS in New York, and Quilvest Finance knew it.

### D.   Quilvest Finance Used New York Banks to Transfer Funds

23. Quilvest Finance used New York bank accounts to transfer funds to and from Fairfield Sentry.

24. Quilvest Finance's Fairfield Sentry subscription agreements stated that all money from Quilvest Finance be directed to a New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York. On at least 46 occasions over the course of five years, in connection with subscribing funds to Fairfield Sentry, Quilvest Finance directed funds to this New York HSBC Bank USA account.

5

25. Quilvest Finance also used its affiliate in Switzerland's account at JPMorgan in New York to receive transfers from Fairfield Sentry. In the Fairfield Sentry subscription agreements Quilvest Finance completed, Quilvest Finance directed that all redemptions and payments be sent to this JPMorgan account in New York only. Quilvest Finance utilized this account repeatedly—at least 36 times over a five year period—to receive $38,030,707 in redemption proceeds from Fairfield Sentry.

### III. FAIRFIELD SENTRY'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

26. At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

#### A. The Genesis of the FGG *De Facto* Partnership

27. In 1988, Walter Noel and Jeffrey Tucker founded the FGG *de facto* partnership in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were Feeder Funds.

28. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three Feeder Funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

29. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: Fairfield Greenwich

6

Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B. Fairfield Sentry

30. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

31. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

32. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1. Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States

7

33. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

34. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

35. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of

1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities

36. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

37. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

9

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

38. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

39. Fairfield Sentry's subscription agreements also incorporated its PPMs by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5. BLMIS Was Fairfield Sentry's Investment Manager

40. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

41. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

42. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

43. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the Feeder Funds and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the Feeder Funds and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

44. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three Feeder Funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

45. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

46. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

12

register as an investment adviser under the Investment Advisers Act of 1940.

47. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its Feeder Funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

48. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

49. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

50. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | */s/* Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br><br>**Baker & Hostetler LLP**<br>65 East State Street, Suite 2100<br>Columbus, Ohio 43215<br>Telephone: (614) 228-1541<br>Facsimile: (614) 462-2616<br>Lauren M. Hilsheimer<br>Damon M. Durbin<br>Justin J. Joyce<br><br>*Attorneys for Irving H. Picard, Trustee*<br>*for the Substantively Consolidated SIPA*<br>*Liquidation of Bernard L. Madoff Investment*<br>*Securities LLC and the estate of Bernard L.*<br>*Madoff* |