**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01047 (SMB) |
| Plaintiff, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO DEFENDANT KOCH INDUSTRIES, INC.** |
| v. | |
| KOCH INDUSTRIES, INC. as successor in interest to Koch Investment (UK) Company, | |
| Defendant. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to Defendant Koch Industries, Inc. ("Koch Industries") as successor in interest to Koch Investment (UK) Company ("Koch Investment"), states:

## I.     INTRODUCTION

1. Koch Investment received $21,533,871 of BLMIS customer property that was transferred from BLMIS in New York to Fairfield Sentry Limited ("Fairfield Sentry"), and subsequently transferred to Koch Investment.

2. Defendant Koch Industries is a U.S.-based company headquartered in Wichita, Kansas. Koch Industries is the second largest private company in the United States with annual revenues in the hundreds of billions of dollars and nearly 100,000 employees. Koch Industries owns a diverse group of companies in industries such as trading, petroleum, securities, and finance.

3. Koch Investment was operated and controlled entirely in the United States by Koch Industries and its domestic affiliate. At all times relevant, Koch Industries owned Koch Investment.

4. Fairfield Sentry was a BLMIS feeder fund ("Feeder Fund")—a single-purpose investment vehicle that pooled its investors' assets to invest with BLMIS. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York.

5. As detailed further below, Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry.

6. Prior to Koch Investment investing in Fairfield Sentry, Koch Industries was an investor in Greenwich Sentry L.P. ("Greenwich Sentry"), another Feeder Fund created, operated,

1

and controlled by FGG. After being an investor in Greenwich Sentry for some time, Koch Industries sought to increase its investment. At the time of Koch Industries' request to increase its investment, however, Greenwich Sentry had no capacity for additional investments. At the same time, FGG informed Koch Industries that Fairfield Sentry had capacity for additional investments, but Fairfield Sentry was limited to non-U.S. taxpaying investors. In response to FGG's disclosure of investment capacity in Fairfield Sentry, Koch Industries utilized Koch Investment, a private unlimited company in the United Kingdom—present there only on paper—to operate as an investment vehicle to purchase shares of Fairfield Sentry.

7. Koch Industries and Koch Investment understood that Fairfield Sentry and Greenwich Sentry were merely ways to access BLMIS and nearly all of the funds' assets were managed by Madoff. Koch Investment also purposely invested in Fairfield Sentry and Greenwich Sentry to profit from BLMIS in New York. But for BLMIS's fraudulent activities in New York and Koch Investment's investments in a Feeder Fund sending money to BLMIS, Koch Investment would have received none of the transfers from Fairfield Sentry.

8. Koch Industries and its domestic affiliate selected and administered Koch Investment's investments from the United States and conducted due diligence for Koch Investment, including on Fairfield Sentry and Greenwich Sentry. As a result of this due diligence, Koch Investment knew the following facts:

    a. in reality the investment adviser for Fairfield Sentry was BLMIS in New York;

    b. BLMIS in New York was the executing broker for Fairfield Sentry's investments, and BLMIS purportedly operated and executed Madoff's "split-strike conversion" investment strategy ("SSC Strategy") on behalf of Fairfield Sentry;

2

    c. Madoff's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills ("Treasurys") traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York;

    d. BLMIS in New York was the custodian of Fairfield Sentry's investments; and

    e. the entire economic purpose of Fairfield Sentry was to deliver money to BLMIS in New York.

9. Accordingly, Koch Investment knew control over Fairfield Sentry's investments rested entirely with BLMIS in New York.

10. In 2009, Koch Industries dissolved Koch Investment after the arrest of Madoff. As part of the dissolution, Koch Industries assumed all of Koch Investment's liabilities.

## II. KOCH INVESTMENT WAS OPERATED AND CONTROLLED ENTIRELY FROM THE UNITED STATES BY KOCH INDUSTRIES AND ITS AFFILIATE

### A. U.S.-based Koch Industries Utilized Koch Investment to Obtain Additional Access to BLMIS in New York

11. Koch Industries' relationship with FGG began around 1996 or 1997 when FGG's Ron Thomann began conversations with Janice Dollmann, Koch Industries' treasurer, about Koch Industries and its affiliate potentially making investments in FGG's Feeder Funds. Thomann worked out of FGG's Massachusetts office, but spent half of his time in FGG's New York headquarters. Dollmann was based in Kansas at Koch Industries' headquarters.

12. After this introduction, Koch Industries began investing in FGG Feeder Fund Greenwich Sentry through its subsidiaries. Greenwich Sentry was organized as a limited partnership under the laws of Delaware and is currently in liquidation in New York.

13. In 2003, Koch Industries wanted to increase its investments in Greenwich Sentry. Greenwich Sentry, however, did not have any capacity to sell additional investments to Koch

3

Industries. Fairfield Sentry did have capacity for additional investments, and as a result, Koch Industries began exploring the possibility of investing into Fairfield Sentry.

14. In or around October 2003, FGG's Thomann sent detailed information about Fairfield Sentry's performance record and Madoff's SSC Strategy to U.S.-based Charles Koch and David Koch. Charles Koch is Koch Industries' chief executive officer, chairman of the board, and principal owner, and David Koch is Koch Industries' executive vice president and principal owner.

15. In 2004, Koch Industries decided to invest in Fairfield Sentry to gain additional access to BLMIS. Because Fairfield Sentry was limited to non-U.S. taxpayers and Koch Industries was a U.S. taxpayer, Koch Industries utilized Koch Investments to invest in Fairfield Sentry.

16. By utilizing Koch Investment as an investment entity with a U.K. address, Koch Industries gained access to Fairfield Sentry.

**B.   Koch Investment Was Operated Entirely from the United States**

17. Although registered in the United Kingdom, Koch Investment had no employees or operations in the United Kingdom, and was operated and managed entirely from the United States. Koch Industries and a non-party affiliate, Houston, Texas-based Koch Capital Markets LP ("KCM"), selected and administered Koch Investment's investments, and conducted due diligence on those investments, from the United States.

18. Eric Westphal, an employee of KCM based in Houston, led Koch Investment's due diligence efforts and was the primary liaison between Koch Investment and FGG.

19. Koch Industries and KCM personnel held due diligence meetings with FGG employees at KCM's Houston office. For example, in May 2004, Thomann and FGG's head of

4

risk management, Amit Vijayvergiya, traveled to Houston to meet with Koch Investment representatives, including Westphal, and discussed Koch Investment's holdings in Fairfield Sentry and Fairfield Sentry's performance history.

20. Koch Industries and KCM personnel in Houston also directed all subscriptions in and redemptions from Fairfield Sentry on behalf of Koch Investment.

21. Gerald Seade, a Houston-based attorney and at the time a director of Koch Investment and KCM, executed a subscription agreement on behalf of Koch Investment in connection with Koch Investment's first investment in Fairfield Sentry. Koch Investment directed Fairfield Sentry to send all communications to KCM's Houston address in the subscription agreement.

22. When it redeemed its Fairfield Sentry shares, Koch Investment utilized KCM's Houston address atop its letterhead in its redemption request. The redemption confirmations were then sent to this Houston address by Fairfield Sentry's administrator. In April 2005, Koch Industries' employee Robert George in Houston sent a facsimile to FGG requesting a partial redemption of Koch Investment's Fairfield Sentry investment. The facsimile listed Koch Investment's address as KCM's Houston office at the top. Once the redemption was complete, the confirmation was also sent to the Houston office. In September 2005, Koch Investment redeemed its remaining investment in Fairfield Sentry. The redemption confirmation, again, was addressed to the Houston office.

### III.  KOCH INVESTMENT UTILIZED ITS OWN U.S. BANK ACCOUNTS TO TRANSFER FUNDS

23. Koch Investment utilized New York bank accounts, including its own New York account at JPMorgan Chase Bank NA ("JPMorgan"), to transfer money to and from Fairfield Sentry.

5

24. The Fairfield Sentry subscription agreement executed by Seade on Koch Investment's behalf stated that all money from Koch Investment for the purchase of Fairfield Sentry shares be directed to a New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York. On two occasions, Koch Investment directed funds to this New York HSBC Bank USA account, in connection with subscribing funds to Fairfield Sentry.

25. Koch Investment also used an account at JPMorgan located in New York held in its own name to receive the transfers from Fairfield Sentry. In the executed Fairfield Sentry subscription agreement, Koch Investment directed that all Koch Investment redemptions and other payments be sent to this JPMorgan account in New York only. Koch Investment utilized this account to receive $21,533,871 in transfers from Fairfield Sentry.

## IV. KOCH INVESTMENT ENTERED INTO AGREEMENTS WITH FGG IN WHICH IT SUBMITTED TO NEW YORK LAW, VENUE, AND JURISDICTION

26. By signing the Fairfield Sentry subscription agreement, Koch Investment agreed that "[the agreement] shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provision."

27. Koch Investment also agreed "that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

28. In addition, Koch Investment executed a "side letter" agreement with Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), a FGG administrative entity, that contained terms supplementing the subscription agreement. In the side letter agreement, which KCM's Westphal drafted in part, FG Bermuda agreed to provide Koch Investment with periodic financial reports

6

on Fairfield Sentry, which FG Bermuda sent to KCM in Houston. The side letter also provided that the parties' relationship "shall be governed by and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of New York."

## V. FAIRFIELD SENTRY MAINTAINED ITS PRINCIPAL PLACE OF BUSINESS IN NEW YORK

29. At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

### A. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

30. In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called FGG based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

31. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

32. FGG also included a number of administrative entities that purportedly provided management and back office support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), FG Bermuda, Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

7

### B. Fairfield Sentry

33. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

34. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

35. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

#### 1. Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States

36. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield

8

Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

37.     After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

38.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation member regulated by the SEC.

9

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities

39. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with back office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

40. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until

10

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

41. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

42. Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5. BLMIS Was Fairfield Sentry's Investment Manager

43. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information

11

Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

44. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

45. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

46. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment

12

adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

47.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

48.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

49.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

50.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect

13

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

51. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

52. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

53. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.,* Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015  /s/ Thomas L. Long
    New York, New York  **Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long

**Baker & Hostetler LLP**
65 E. State St., Suite 2100
Columbus, Ohio 43215-4260
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Lauren M. Hilsheimer
Brian R. Noethlich

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*