**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02573 (SMB) |
| Plaintiff, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO THE SUMITOMO TRUST AND BANKING CO., LTD.** |
| v. | |
| THE SUMITOMO TRUST AND BANKING CO., LTD., | |
| Defendant. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendant The Sumitomo Trust and Banking Co., Ltd. ("Sumitomo"), states:

1. On October 16, 2007, Sumitomo received a single $54,253,642 transfer of BLMIS customer property that was transferred from BLMIS to Fairfield Sentry Limited ("Fairfield Sentry"), and subsequently transferred to Sumitomo.

2. Sumitomo is an international bank organized under the laws of Japan with a registered address at 1-4-1 Marunouchi, Chiyoda-ku, Tokyo, Japan. Sumitomo maintains various international offices, including a branch office at 527 Madison Avenue, New York, New York 10022.

3. Fairfield Sentry was the largest of several BLMIS feeder funds—single-purpose investment funds that pooled investors' assets to invest with BLMIS in New York, capitalizing on its consistent returns. From November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS's investment advisory business.

4. Although incorporated in the Territory of the British Virgin Islands ("BVI"), Fairfield Sentry was a shell corporation present in the BVI only on paper. Fairfield Sentry had no employees and no offices in the BVI. Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry. FGG was founded by U.S. citizens and residents, Walter Noel and Jeffrey Tucker.

I. **THE TRANSFER AND COMPONENT EVENTS OF SUMITOMO'S TRANSACTIONS WITH FAIRFIELD SENTRY WERE PREDOMINANTLY DOMESTIC**

　　A.　**Sumitomo Maintains an Office in New York**

5. At all relevant times, Sumitomo maintained an office in New York, which was licensed with the Superintendent of Banks of the State of New York as a New York bank branch.

1

6. Sumitomo was required to execute a USA PATRIOT Act Certification in connection with a bank account it utilized at its New York office. In the USA PATRIOT Act Certification, Sumitomo warranted its New York office "is a resident of the United States at the following street address: 527 Madison Avenue, New York, New York 10022."

**B.    Sumitomo Knowingly Subscribed in Fairfield Sentry as a Means of Profiting from BLMIS in New York**

7. Sumitomo purposefully selected Fairfield Sentry as a means of investing with New York-based BLMIS and the U.S. securities market. Prior to its August 2006 subscription in Fairfield Sentry, Sumitomo conducted due diligence on Fairfield Sentry, BLMIS, Madoff, and Madoff's split-strike conversion investment strategy ("SSC Strategy"). Sumitomo relied on employees in its New York office to conduct research, gather information, and attend meetings with representatives of Fairfield Sentry at FGG's New York headquarters.

8. In connection with this due diligence, in the Spring of 2006, FGG representatives in New York created a customized due diligence questionnaire ("DDQ") for Sumitomo, disclosing:

- The "geographical focus of the [SSC Strategy]" is the "S&P 100 Equities (United States);"

- Fairfield Sentry utilizes the SSC Strategy, which was "executed at Madoff Securities utilizing proprietary systems built in-house;" and

- "The fund does not employ a traditional prime broker. Assets are maintained in a brokerage account at Madoff Securities" in New York.

9. Sumitomo worked with several New York-based FGG employees, including FGG managing director Mami Hidaka, its primary contact, as well as FGG representative Lauren Ross.

10. In response to its review of the DDQ, Sumitomo submitted a list of follow-up questions to FGG's New York-based Hidaka seeking clarity on certain issues, including but not

2

limited to, seeking additional detail and clarification on the role of BLMIS and Madoff as Fairfield Sentry's executing broker and sub-custodian, the SEC and Commodity Futures Trading Commission's regulatory oversight of FGG member companies, and the FGG risk management team's investment guidelines for monitoring BLMIS's securities positions for Fairfield Sentry.

11. Also prior to its August 2006 investment, Sumitomo received and reviewed Fairfield Sentry's October 2004 and May 2006 private placement memoranda ("PPMs"). Following its review and analysis of the PPMs, Sumitomo reached out to New York-based FGG representative Hidaka, with questions specifically focused on BLMIS and Madoff. Hidaka responded with the following information:

> Regarding the PPM's statement that "[t]he services of . . . BLM[IS] are essential to the continued operations of the Fund."
>
>> We believe that the services of BLM[IS] are essential to the continued operation of the Fund . . . It is the systems and trading method that have been in place for more than 15 years . . . that are essential to the execution of the strategy
>
> Regarding the role of BLMIS:
>
>> Accounts are maintained at BLM[IS]. The accounts function as prime brokerage accounts in that they are centralized accounts where cash and securities are held for the strategy . . . [and] the trading occurs in only the BLM[IS] accounts."

12. Subsequent communications between FGG's New York employees and Sumitomo evidence that at all times prior to its investment in Fairfield Sentry, Sumitomo knew the following facts:

- Madoff was "the key person" behind the purported performance of the SSC Strategy;
- Fairfield Sentry's assets were managed in New York by BLMIS;
- Fairfield Sentry's purported returns were based almost entirely on the returns BLMIS purported to generate through the execution of Madoff's SSC Strategy;

3

- BLMIS maintained custody of at least 95% of Fairfield Sentry's assets in New York;

- BLMIS maintained exclusive control over all the assets invested in the SSC Strategy;

- Madoff purported to execute the SSC Strategy in New York as prime broker; and

- BLMIS purported to invest the assets of the SSC Strategy in U.S. securities, U.S. Treasury bills ("Treasurys"), or mutual funds invested in U.S. Treasurys.

13. Knowing these facts, Sumitomo deliberately invested in Fairfield Sentry with the intent to profit from New York-based BLMIS and the U.S. securities market.

C. **From Its Inception through Its End, New York Was the Center of Sumitomo's Relationship with Fairfield Sentry**

14. New York-based Hidaka managed FGG's relationship with Sumitomo, and served as Sumitomo's primary contact and representative at FGG.

15. In July 2004, after learning Hidaka was based in New York, representatives from Sumitomo's New York office began meeting regularly with Hidaka at FGG's headquarters in New York.

16. From 2004 through 2006, through a series of meetings with FGG representatives at FGG's New York headquarters, Sumitomo conducted extensive due diligence on Fairfield Sentry, BLMIS, and other FGG-managed funds that invested a portion of their assets in Fairfield Sentry.

D. **Sumitomo Submitted to New York Law, Jurisdiction, and Venue In Connection with Its Fairfield Sentry Investment**

17. In order to invest in Fairfield Sentry, Sumitomo executed a subscription agreement agreeing that its relationship with Fairfield Sentry "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

18. By executing the Fairfield Sentry subscription agreement, Sumitomo also agreed

4

"that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," and Sumitomo "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

19. In addition, in connection with its due diligence on Fairfield Sentry, Sumitomo executed a confidentiality agreement with an FGG-member entity based in New York that managed Fairfield Sentry. In the confidentiality agreement, Sumitomo warranted that it "irrevocably and unconditionally consents to submit to the jurisdiction of the courts of the State of New York for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby."

20. Sumitomo knew and intended that U.S. law apply to its transactions with Fairfield Sentry.

### E. Sumitomo Used New York Bank Accounts to Transfer Funds

21. Sumitomo used New York bank accounts to transfer funds to and from Fairfield Sentry.

22. The Fairfield Sentry subscription agreement Sumitomo executed required all funds from Sumitomo be directed to an HSBC Bank, New York correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York. In connection with subscribing funds to Fairfield Sentry, Sumitomo directed $50 million to this HSBC Bank, New York account.

23. Sumitomo also used a Citibank N.A. account in New York held its own name to receive its full redemption payment from Fairfield Sentry. In the redemption request form Sumitomo completed, Sumitomo specified that it was redeeming all of its shares of Fairfield

5

Sentry and directed the $54,253,642 redemption payment to its New York Citibank N.A. account.

### F. Fairfield Sentry Maintained its Principal Place of Business in New York

24. At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

#### 1. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

25. In 1988, Noel and Tucker founded *de facto* partnership FGG based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

26. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

27. FGG also included a number of administrative entities that purportedly provided management and back office support to the funds. These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

#### 2. Fairfield Sentry

28. On October 30, 1990, FGG founding partners, Noel and Tucker, organized

6

Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

29. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

30. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

    *a.  Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States*

31. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to

7

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

32. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

33. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation member regulated by the SEC.

        *b.     FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities*

34. As the original directors of Fairfield Sentry, Noel and Tucker contracted with

8

Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with back office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### c.　*FGG New York Personnel Managed Fairfield Sentry*

35.　At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

36.　FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of

9

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

37. Fairfield Sentry's subscription agreements also incorporated its PPMs by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e. BLMIS Was Fairfield Sentry's Investment Manager

38. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield

10

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

39.     In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

40.     While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

41.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

11

42. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

43. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

44. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

45. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

12

46. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

47. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

48. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.,* Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

[*The remainder of page intentionally left blank*]

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone:  (212) 589-4200<br>Facsimile:  (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Catherine E. Woltering<br><br>**Baker & Hostetler LLP**<br>65 East State Street, Suite 2100<br>Columbus, Ohio 43215<br>Telephone:  (614) 228-1541<br>Facsimile:  (614) 462-2616<br>Melonia A. Bennett<br>Brian R. Noethlich<br><br>*Attorneys for Irving H. Picard, Trustee*<br>*for the Substantively Consolidated SIPA*<br>*Liquidation of Bernard L. Madoff Investment*<br>*Securities LLC and the estate of Bernard L.*<br>*Madoff* |

14