**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02554 (SMB) |
| Plaintiff, | |
| v. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO NATIONAL BANK OF KUWAIT S.A.K.** |
| NATIONAL BANK OF KUWAIT S.A.K., | |
| Defendant. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendant National Bank of Kuwait S.A.K. ("NBK"), states:

1. From September 2007 through November 2008, NBK received approximately $19,178,423 in subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry"). Fairfield Sentry was a BLMIS feeder fund—a single-purpose investment fund that pooled its investors' assets to invest with BLMIS in New York, capitalizing on its purported consistent returns in the U.S. markets.

2. From November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS's investment advisory business. Although incorporated in the British Virgin Islands ("BVI"), Fairfield Sentry was a shell corporation present in the BVI only on paper. Fairfield Sentry had no employees and no offices in the BVI. Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry.

## I. DEFENDANT AND ITS AFFILIATES

3. Defendant NBK is an international bank and is organized under the laws of Kuwait with a registered address at P.O. Box 95 Safat, 13001 Kuwait.

4. NBK maintains a New York office, located at 299 Park Avenue, New York, New York, which was central to its investments with Fairfield Sentry.

5. NBK maintained a correspondent bank account at its New York office that it used in connection with fee payments related to its Fairfield Sentry investments. In connection with this account, NBK completed a USA PATRIOT Act Certification warranting that NBK's New York office is "a resident of the United States at the following street address: 299 Park Avenue, 17th Floor, NY 10171-0023."

1

## II.   THE TRANSFERS AND COMPONENT EVENTS OF THE TRANSACTIONS AT ISSUE WERE PREDOMINANTLY DOMESTIC

6.   NBK's relationship with Fairfield Sentry was centered in New York. NBK knowingly directed its funds to be invested in Fairfield Sentry because they would be invested with New York-based BLMIS in U.S. securities; executed Fairfield Sentry subscription agreements agreeing its transactions with Fairfield Sentry were governed by New York law, and submitted to jurisdiction and venue in New York; directed its subscription payments to a New York correspondent bank account; received redemption and fee payments in a New York bank account; and maintained regular contact with FGG representatives in New York. Finally, Fairfield Sentry's principal place of business was in New York where it was operated and controlled from FGG's New York headquarters.

### A.   NBK Purposefully Invested in Fairfield Sentry as a Means of Gaining Access to U.S. Investments through BLMIS

7.   Virtually all Fairfield Sentry's investments were managed in New York by BLMIS and NBK knew it. Fairfield Sentry's purported performance came from the returns Madoff claimed to generate in New York through the execution of the split-strike conversion investment strategy ("SSC Strategy"), which NBK also knew. NBK's sole purpose for investing in Fairfield Sentry was to transact business with BLMIS in New York, and to profit from BLMIS's purported U.S. investment strategy and investment in the U.S. markets.

8.   On June 28, 2009, NBK filed a customer claim with the Trustee, seeking to recover funds from Securities Investor Protection Corporation ("SIPC") as a customer of BLMIS. The Trustee designated the customer claims filed by NBK as Claims #013751 and 013899. In accordance with the Claims Procedure Order, the Trustee determined and denied NBK's claim. Objection to Determination of Claim of National Bank of Kuwait S.A.K., *Sec.*

2

*Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec.* (*In re Madoff Sec.*), Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. filed Jan. 6, 2010), ECF No. 1287-B.

9.  NBK appealed the Trustee's July 12, 2011 denial of its customer claims. In its appellant brief, NBK maintained that it:

> [M]ay not have 'deposited cash with' BLMIS in the sense of handing it directly to BLMIS, but the facts indisputably show that they handed their cash to the Feeder Funds specifically for deposit with and management by BLMIS.

Appellants Brief at 12, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec.*, No. 11-cv-06565 (DLC) (S.D.N.Y. Oct. 14, 2011), ECF No. 7.

### B. NBK Agreed its Transactions with Fairfield Sentry Were Governed by New York Law and Subject to New York Jurisdiction and Venue

10.  New York law applied to NBK's relationship with Fairfield Sentry. Once NBK elected to invest in Fairfield Sentry, NBK executed subscription agreements with Fairfield Sentry, through its custodial bank Euroclear Bank S.A./Fundsettle ("Fundsettle"), "agree[ing] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York" and "irrevocably submit[ing] to the jurisdiction of the New York courts with respect to any [p]roceeding."

11.  By executing the Fairfield Sentry subscription agreements, NBK also acknowledged that its relationship with Fairfield Sentry "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

12.  In January 2007, NBK executed a Letter of Understanding with Fairfield Greenwich Limited ("FG Limited")—an FGG-member entity registered to do business in the State of New York, with its self-reported principal place of business in New York that was involved in the management of Fairfield Sentry. NBK negotiated the Letter of Understanding with personnel from FGG's New York headquarters. The Letter of Understanding provided for

3

retrocession payments—fees paid to NBK for placing money with Fairfield Sentry as an incentive for investing.

13. FGG partner Daniel Lipton executed the agreement in New York on behalf of FG Limited in New York and sent the executed copy to NBK from FGG's New York headquarters. NBK and FG Limited agreed in this Letter of Understanding that their relationship was governed by New York law: the "rights and obligations of the parties hereto shall be governed and construed in accordance with the laws of the State of New York."

### C. NBK Directed Subscription Payments to New York

14. NBK directed its subscription payments to New York. The Fairfield Sentry subscription agreement executed by Fundsettle on behalf of NBK stated that all money from NBK be directed to an HSBC Bank, New York correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York. In connection with subscribing funds to Fairfield Sentry, NBK directed funds to this HSBC Bank, New York account on at least 49 occasions.

### D. NBK Used New York Banks to Receive Funds in Connection with Its Redemptions from Fairfield Sentry

15. NBK used New York bank accounts to receive its redemptions and payments in connection with its Fairfield Sentry investments.

16. For its Fairfield Sentry redemptions, NBK utilized Fundsettle's account at The Bank of New York in New York to receive transfers from Fairfield Sentry. In a confirmation of order received, Fundsettle provided that all NBK's redemptions payments be sent to this The Bank of New York account. NBK directed its money through this account repeatedly—at least 30 times—to receive $18,724,399 in redemption payments from Fairfield Sentry.

4

17. NBK also utilized its account with its New York office to receive retrocession payments in connection with its Fairfield Sentry investments. In the January 2007 Letter of Understanding NBK executed with FG Limited, NBK directed all its retrocession payments to its account at its New York office. NBK use this account repeatedly—at least seven times—to receive $454,024 in redemption payments from FG Limited. NBK received these retrocession fees from a bank account maintained by FG Limited at JPMorgan in New York, which ultimately came from BLMIS's New York JPMorgan account.

    E.  **NBK Conducted Due Diligence on New York-Based BLMIS in Connection with Its Investments**

18. Fairfield Sentry was not the only BLMIS feeder fund NBK considered investing in to place its funds with BLMIS in New York. NBK compiled a list of and reviewed no fewer than seven BLMIS feeder funds as possible avenues for its ultimate investment in BLMIS and compared their management and performance fees, as well as their retrocession payments. Representatives of NBK reviewed: Fairfield Sentry, Greenwich Sentry Limited ("Greenwich Sentry"), Optimal Strategic US Equity Ltd. ("Optimal"), Kingate Global Fund Limited ("Kingate"), Thema International Fund PLC ("Thema"), Groupement Financier Limited, and Luxalpha SICAV. NBK considered each of these funds because they provided access to BLMIS's U.S. investment strategy and the U.S. markets. NBK wanted to invest in the U.S. markets through Madoff, even though this required ceding all control over its investments to Madoff.

19. As it prepared to invest in U.S. securities with BLMIS, NBK prepared an analysis titled "Hedge Funds linked to the managed accounts with Bernard L. Madoff LLC, NY," comparing Fairfield Sentry, Kingate, Optimal, and Thema, the fees charged by these funds and

their assets under management. NBK reviewed this analysis prior to its first subscription in Fairfield Sentry.

20. From its due diligence on Fairfield Sentry, other BLMIS feeder funds, and BLMIS, NBK knew BLMIS held custody of the assets invested with the SSC Strategy in New York, maintained investment discretion over the price and timing of the purported stock and option transactions of the SSC Strategy, and purported to execute the SSC Strategy in New York as prime broker. NBK further knew BLMIS purported to invest the assets of the SSC Strategy exclusively in U.S. securities listed on the U.S. S&P 100 Index, U.S. S&P 100 Index options, U.S. Treasurys, or mutual funds invested in Treasurys.

21. Eager to invest and profit from the U.S. markets, NBK knowingly relinquished control over its U.S. investment strategy and the execution of that strategy to Madoff, even giving him full custody of their assets.

22. By ultimately selecting and subscribing in Fairfield Sentry, NBK intentionally directed investments to BLMIS in New York. However, NBK considered investing with other BLMIS feeder funds that had additional capacity for new investments to access BLMIS in New York. NBK internally discussed replacing Fairfield Sentry with "another equivalent product," when Fairfield Sentry was only able to accept half of NBK's desired investment.

**F.     NBK Conducted Its Relationship with Fairfield Sentry in New York**

23. NBK knew Fairfield Sentry was managed and operated from FGG's headquarters in New York. In connection with its Fairfield Sentry investments, NBK directed its communications to FGG's New York headquarters, including meetings with personnel from FGG's New York headquarters.

24. Philip Toub, an FGG partner based in New York, was responsible for managing FGG's relationship with NBK. In this capacity, Toub operated as NBK's primary contact

6

regarding its investments, due diligence on, monitoring of, and ultimate redemption from Fairfield Sentry.

25. NBK's personnel also communicated with FGG's New York-based representatives Lauren Ross and Lina Pava regarding its Fairfield Sentry investments.

26. NBK's personnel received and analyzed Fairfield Sentry due diligence materials sent by FGG's New York headquarters, including Fairfield Sentry's due diligence questionnaire, marketing materials, performance summaries, offering memoranda, and subscription forms. NBK also received and analyzed weekly fund reports from FGG's New York office, updating NBK on the purported performance of the SSC Strategy and its U.S. investments.

## III. FAIRFIELD SENTRY'S PRINCIPAL PLACE OF BUSINESS WAS IN NEW YORK

27. At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

### A. The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

28. In 1988, Walter Noel and Jeffrey Tucker founded *de facto* partnership FGG based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

29. The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda"). Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S.

7

Dollars in Fairfield Sentry.

30. FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B. Fairfield Sentry

31. On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff. Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

32. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

33. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

8

08-01789-cgm    Doc 10423    Filed 06/27/15    Entered 06/27/15 15:03:27    Main Document
        Pg 10 of 16

### 1.  Fairfield Sentry's Agreements with BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States

34.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

35.     After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

36.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship with Various Citco Entities

37.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry

38.     At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

10

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

39. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4. Fairfield Sentry's Investors Knew They Were Investing in BLMIS

40. Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5. BLMIS Was Fairfield Sentry's Investment Manager

41. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

42. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

43. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

44. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him

12

FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

45. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

46. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

47. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

13

48. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

49. After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

50. As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

51. The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB), (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

14

| | |
|---|---|
| Dated: June 26, 2015<br>New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Catherine E. Woltering<br><br>**Baker & Hostetler LLP**<br>65 East State Street, Suite 2100<br>Columbus, Ohio 43215<br>Telephone: (614) 228-1541<br>Facsimile: (614) 462-2616<br>Melonia A. Bennett<br><br>*Attorneys for Irving H. Picard, Trustee*<br>*for the substantively consolidated SIPA*<br>*Liquidation of Bernard L. Madoff Investment*<br>*Securities LLC and the estate of*<br>*Bernard L. Madoff* |