**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | No. 08-01789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> MERRILL LYNCH BANK (SUISSE) S.A., <br><br> Defendant. | Adv. Pro. No. 11-02910 (SMB) |

### THE TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO MERRILL LYNCH BANK (SUISSE) SA

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, and the substantively consolidated estate of Bernard L. Madoff ("Madoff"), respectfully submits the following Proffered Allegations Pertaining to the Extraterritoriality Issue as to Merrill Lynch Bank (Suisse) S.A. ("MLBS").

## I.    NATURE OF THE ACTION

1.    The Trustee seeks recovery of approximately $44 million and nearly €1.4 million in subsequent transfers of BLMIS Customer Property made to MLBS by Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma," and together with Fairfield Sentry, the "Fairfield Funds") pursuant to Section 550 of the Bankruptcy Code.

2.    At all relevant times, MLBS was a sophisticated entity and subsidiary of the global investment bank and market participant Merrill Lynch & Co., Inc. ("ML & Co." and together with its subsidiaries, "Merrill Lynch"), incorporated in Delaware and headquartered in New York.

3.    MLBS purposefully invested with the Fairfield Funds, which invested all, or substantially all, of their assets with BLMIS, a New York entity.  The Fairfield Funds were created, marketed, operated, and controlled by a *de facto* partnership located in New York, the Fairfield Greenwich Group ("FGG").  MLBS's transactions with the Fairfield Funds led to its receipt of subsequent transfers of BLMIS Customer Property.

4.    BLMIS, a New York entity, was at the core of MLBS's transactions with the Fairfield Funds and MLBS knew that Fairfield Sentry was a BLMIS Feeder Fund and that any investment with the Fairfield Funds was an investment with BLMIS.  Although not at issue in this litigation, MLBS also invested with another BLMIS Feeder Fund, Kingate Global Fund Ltd. ("Kingate Global").

5.    In connection with MLBS's transactions with the Fairfield Funds, it received subsequent transfers of BLMIS Customer Property from the Fairfield Funds. Those transfers, and the component parts of the transactions with the Fairfield Funds that led to MLBS's receipt of BLMIS Customer Property, were predominantly domestic in nature because:

- BLMIS in New York was at the center of MLBS's investment transactions with the Fairfield Funds; indeed, MLBS invested in the Fairfield Funds with the knowledge and intent that those investments would be managed by U.S. investment adviser BLMIS in New York and purportedly invested in the U.S. securities markets for the express purpose of receiving investment returns from BLMIS;

- The transaction documents governing MLBS's investments with the Fairfield Funds contained New York choice of law, jurisdiction and venue provisions, and MLBS had every reason to expect that its investments with the Fairfield Funds would be subject to U.S. law;

- In executing the Subscription Agreements with the Fairfield Funds, MLBS expressly instructed the Fairfield Funds to transfer all redemption payments into a New York bank account it held with Northern Trust International Banking Corp., and it was through this New York bank account that MLBS received the subsequent transfers of BLMIS Customer Property at issue in this action; and

- At all relevant times, MLBS knew that the funds it received from the Fairfield Funds were comprised of money originating from BLMIS and generated from BLMIS's purported investments in the U.S. securities markets.

6.    Other significant components of MLBS's investment transactions with the Fairfield Funds were conducted in the United States as well. MLBS entered into fee-based arrangements with FGG whereby MLBS received remuneration for directing investments to the Fairfield Funds and, ultimately, to BLMIS in New York. In connection with these agreements, MLBS received thousands of dollars in fees from FGG.

7.    MLBS also filed customer claims with the Trustee in connection with its transactions with Fairfield Sentry and Kingate Global.

## II.    RELEVANT PARTICIPANTS IN THE SUBSEQUENT TRANSFERS AND RELATED TRANSACTIONS

8.    Defendant MLBS was, at all relevant times, a sophisticated banking entity operating in Geneva, Switzerland, and a principal subsidiary of its domestic parent, Non-Defendant ML & Co.

9.    Non-Defendant ML & Co. was a global financial institution incorporated in Delaware with its principal place of business in New York and the ultimate parent company of Defendant MLBS.   At all relevant times, ML & Co. provided financial services through a number of subsidiaries from its global headquarters in New York.   In public SEC filings, ML & Co. stated that it is a Delaware corporation that "through its subsidiaries, provides broker-dealer, investment banking, financing, wealth management, advisory, asset management, insurance, lending, and related products and services on a *global basis*" (emphasis added).

10.    The Hedge Fund Group, a group within the Merrill Lynch organization, oversaw Merrill Lynch's global hedge fund investment activities.   One of the Hedge Fund Group's responsibilities was to conduct due diligence on hedge funds and alternative investment products out of New York.   Upon information and belief, the Hedge Fund Group conducted due diligence on BLMIS and the Fairfield Funds in connection with the transactions at issue.

11.    Non-defendant Fairfield Greenwich Group ("FGG") is a *de facto* New York partnership with its principal place of business in New York, New York.   FGG managed and marketed the Fairfield Sentry BLMIS Feeder Fund, and Fairfield Sigma.

12.    Non-defendant Fairfield Sentry was an investment vehicle which invested substantially all of its assets with BLMIS.   While nominally organized under the laws of the Territory of the British Virgin Islands, from its inception until its liquidation, Fairfield Sentry

had no employees and no office, and was operated almost entirely by FGG employees based in New York.

13.     Non-defendant Fairfield Sigma was a sister fund to Fairfield Sentry that accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets by purchasing shares of Fairfield Sentry.

## III.    MLBS'S TRANSFERS FROM, AND TRANSACTIONS WITH, THE FAIRFIELD FUNDS ARE PREDOMINANTLY DOMESTIC

### A.    MLBS Purposefully Directed Its Investments to BLMIS to Engage in Transactions in the U.S. Securities Market

14.     MLBS deliberately invested in the Fairfield Funds, intending that its investments would be transferred to BLMIS in New York to invest in the U.S. securities markets, and with the expectation that it would receive transfers of funds from BLMIS in the form of returns on those U.S. investments.

15.     Prior to entering into the transactions with the Fairfield Funds, MLBS received Private Placement Memoranda ("PPMs").  The governing PPMs at the time MLBS invested with the Fairfield Funds disclosed that substantially all of Fairfield Sentry's assets were deposited with BLMIS, a New York broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC"), for purported investment in U.S. securities, options, or treasurys.  The PPMs also made clear that Fairfield Sigma invested all of its assets in Fairfield Sentry.

16.     Upon entering into the Subscription Agreements with the Fairfield Funds, MLBS affirmed that it had "received and read a copy of" the PPMs.  Based on the information contained in the Fairfield Funds' Subscription Agreements and PPMs, MLBS knew that:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

- BLMIS was the investment adviser of Fairfield Sentry;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS;

4

- BLMIS was registered with the SEC;

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the split-strike conversion investment strategy on the fund's behalf;

- BLMIS's split-strike conversion strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury Bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, the pricing, and when to make such purchases, were made by BLMIS in New York; and

- The services of BLMIS and its personnel were essential to the continued operation of the Fairfield Funds, and their profitability.

17.     MLBS gained additional knowledge about BLMIS and its purported investment strategy from its investments with Kingate Global, another BLMIS Feeder Fund with which MLBS was invested from at least 1998.  In connection with its Kingate Global investments, MLBS received BLMIS Customer Statements, which reflected BLMIS's purported trading activity in U.S. securities, options, and treasurys.

**B.     MLBS Agreed that Disputes Concerning Its Investments in the Fairfield Funds Would Be Governed By New York Law and it Consented to the Jurisdiction of Courts in New York**

18.     MLBS executed multiple Subscription Agreements with the Fairfield Funds pursuant to which it agreed that its investments in the Fairfield Funds would be governed by New York law and whereby it consented to the jurisdiction of courts in New York.

19.     The Subscription Agreements expressly provided that New York law would apply:

> Governing Law This *Agreement shall be governed and enforced in accordance with the laws of New York*, without giving effect to its conflict of laws provisions.

(Emphasis added.)

20.     The Subscription Agreements between MLBS and the Fairfield Funds expressly provided:

> New York Courts Subscriber agrees that *any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.* Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.

(Emphasis added.)

21.    The Fairfield Sigma Subscription Agreements that MLBS signed contained identical language to the Fairfield Sentry Subscription Agreements. By signing the Fairfield Sigma Subscription Agreements, MLBS agreed to be bound by the laws of New York and consented to the jurisdiction of courts in New York.

### C.    MLBS Expressly Instructed the Fairfield Funds to Deposit its BLMIS Investment Returns Into Its New York Bank Account

22.    In the Subscription Agreements governing its investments, MLBS instructed the Fairfield Funds that any deposits with the Fairfield Funds for investments with BLMIS and, eventually, any return on its investments with BLMIS, would be made through its Northern Trust International Banking Corp. bank account in New York, in the name of "Merrill Lynch Bank Suisse SA Geneva."

23.    In its Subscription Agreements, MLBS directed that, for all but one of its investments with the Fairfield Funds, it would deposit funds from its Northern Trust International Banking Corp. bank account located in New York to Fairfield's HSBC bank account located in New York.

24.     In all but one instance, MLBS also directed its redemptions from the Fairfield Funds, which represented returns on its BLMIS investments, to its account at Northern Trust International Banking Corp. in New York.

25.     Pursuant to MLBS's instructions in the Subscription Agreements, MLBS received almost all of the subsequent transfers of BLMIS Customer Property at issue in its New York bank account at Northern Trust International Banking Corp.

**D.      MLBS Entered Into Fee-Based Agreements With New York-Based FGG to Refer Investors to the Fairfield Funds**

26.     MLBS entered into at least two agreements with New York-based FGG to obtain fees by directing its investors to invest in the Fairfield Funds and BLMIS.

27.     In 2002, MLBS negotiated a fee arrangement with FGG employees in New York for rebates that MLBS would earn for referring investors to Fairfield's investment fund products. As part of that agreement, MLBS would earn a 1% rebate on these referrals.

28.     The 2002 fee agreement was executed in New York and, as communicated by a FGG New York employee to MLBS, would be subject to U.S. laws and regulations.

29.     In 2004, MLBS entered into another fee arrangement with New York-based FGG.  Pursuant to the terms of that agreement, MLBS would earn a 15% performance fee and 1% per annum management fee for referring investors to Fairfield Sentry, and one of its affiliates.

30.     In connection with these two agreements, MLBS received thousands of dollars in fees from FGG for directing investors to Fairfield Sentry, a BLMIS Feeder Fund, and certain of its related entities.

E.      **Merrill Lynch's Due Diligence Efforts Took Place in New York**

31.      The global Merrill Lynch organization, headquartered in New York, directed due diligence on BLMIS and the Fairfield Funds from New York.

32.      The Merrill Lynch organization established due diligence procedures that employees across the organization knew was a necessary step prior to entering into any investments.

33.      Internal Merrill Lynch groups in New York, including the Hedge Fund Group, conducted and coordinated due diligence for the global organization.  The global heads of a number of due diligence committees, including the Hedge Fund Investment Research Due Diligence Committee and the Hedge Fund Operational Due Diligence, were also located in, and directed activity from, Merrill Lynch's New York headquarters.

34.      Merrill Lynch's established due diligence procedures were implemented by a number of groups and committees, including the Hedge Fund Group.  The Hedge Fund Group conducted due diligence in connection with the Fairfield Funds and communicated with Fairfield employees in New York.

35.      Upon information and belief, Merrill Lynch groups and committees conducted due diligence on the Fairfield Funds and BLMIS in connection with MLBS's transactions at issue here.

F.      **MLBS Invoked the U.S. Bankruptcy Laws By Filing Customer Claims In Connection With Its Investments with the BLMIS Feeder Funds**

36.      MLBS filed customer claims with the Trustee in connection with its investments with the Fairfield Funds and Kingate Global.

37.      MLBS filed claims for its investments with Fairfield Sentry, designated by the Trustee as Claims # 004476, # 004479, and # 011120.   In those customer claims, MLBS

acknowledged that it owned shares of Fairfield Sentry, a BLMIS Feeder Fund, and acknowledged that it granted Fairfield Sentry "discretionary authority to execute securities transactions with [BLMIS]."

38.     MLBS filed claims for its investments with Kingate Global, designated by the Trustee as Claims # 004480, # 004481, # 005222, # 005223, # 011121, and # 015448.  In those customer claims, MLBS acknowledged that it was a shareholder in Kingate Global, a BLMIS Feeder Fund, and that it received BLMIS Customer Statements.  MLBS also acknowledged that it had investments with BLMIS since 1998 through Kingate Global.

39.     By filing these customer claims, MLBS understood that it would receive protection from U.S. Bankruptcy laws in regards to its investments with the BLMIS Feeder Funds.

## V.     MLBS RECEIVED THE SUBSEQUENT TRANSFERS FROM THE FAIRFIELD FUNDS WHICH HAD THEIR PRINCIPAL PLACE OF BUSINESS IN NEW YORK

40.     MLBS received transfers from, and transacted business with, the Fairfield Funds which at all relevant times had their principal place of business in New York.

### A.     The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

41.     In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were feeder funds.

42.     The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda

Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

43.    FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: Fairfield Greenwich Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.    Fairfield Sentry

44.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

45.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").  Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

46.    Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

**1.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

47.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.  In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070.  BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

48.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

11

49.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the United States Securities and Exchange Commission ("SEC") and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

### 2.    FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities

50.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts.  As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3.    FGG New York Personnel Managed Fairfield Sentry

51.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

52.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

53.    Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2)

invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

54.     Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

55.     In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

56.     While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry

Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

57.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

58.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly-owned subsidiary of FG Limited.  Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

59.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

60.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

61.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

62.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

63.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

**C.    Sigma**

64.    FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield

Sentry using Euros, FGG created Sigma.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

65.     Noel and Tucker organized Sigma on November 20, 1990, as an international business company under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma.  Sigma is currently in liquidation in proceedings in the BVI and United States.

66.     Also like Fairfield Sentry, Sigma was a shell corporation present in the BVI only on paper.  It had no employees and maintained no offices.  It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters.  Sigma was operated almost entirely by FGG New York Personnel.

67.     As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Sigma.  Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities.  Until Sigma's liquidation, FGG maintained Sigma's books and records in New York.

FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

68.     FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares.   Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated its PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole assets.   Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments.   Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities.   This same risk was also disclosed in Fairfield Sentry's PPM's.

69.     Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma shares.   Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma assets.   As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma at Citco Bank Dublin.   FGG New York Personnel had final control of the Sigma Citco Bank Dublin bank accounts.   Finally, FGG New York Personnel controlled all of Sigma's relationships with the Citco entities.

70.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS— Noel executed a separate contract on Sigma's behalf with the Bank of Montreal for a currency swap which was "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

71.    FGG New York Personnel initially listed FG Limited as the investment manager for Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPM's to indicate FG Bermuda was Sigma's Investment Manager.  In fact, there were no duties for any investment manager because Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

72.    The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: June 26, 2015
     New York, New York

/s/ Stacey A. Bell

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Regina Griffin
Stacey A. Bell
Margaret E. Hirce
Amanda Fein

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and estate of Bernard L.*
*Madoff*