**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 12-01699 (SMB) |
| Plaintiff, | |
| v. | |
| ROYAL BANK OF CANADA; GUERNROY LIMITED; ROYAL BANK OF CANADA (CHANNEL ISLANDS) LIMITED; ROYAL BANK OF CANADA TRUST COMPANY (JERSEY) LIMITED; ROYAL BANK OF CANADA (ASIA) LIMITED; ROYAL BANK OF CANADA (SUISSE) S.A.; RBC DOMINION SECURITIES INC.; and RBC ALTERNATIVE ASSETS, L.P.; | **SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO ROYAL BANK OF CANADA, ET AL.'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS** |
| Defendants. | |

Irving H. Picard (the "Trustee") respectfully submits this memorandum as a supplement to his Main Brief being filed simultaneously herewith in opposition to the motion to dismiss based on extraterritoriality made by certain defendants and in further support of the Trustee's motion for leave to amend his Complaint to add the Proffered Allegations.

The moving defendants are: Royal Bank of Canada; Guernroy Limited ("RBC-Guernroy"); Royal Bank of Canada (Channel Islands) Limited ("RBC-CI"); Royal Bank of Canada Trust Company (Jersey) Limited ("RBC-Jersey"); Royal Bank of Canada (Asia) Limited ("RBC-Asia"); Royal Bank of Canada (Suisse) S.A. ("RBC-Suisse"); and RBC Dominion Securities Inc. ("RBC-Dominion") (collectively, the "Defendants" and each, a "Defendant") Remaining defendant named in the Complaint—U.S.-registered RBC Alternative Assets, L.P. ("RBC-Alternative Assets")—was not included in the motion to dismiss.

## BACKGROUND

The Defendants, each a highly sophisticated and experienced financial institution in its own right, are all part of the Royal Bank of Canada group of companies—a global banking and investment organization with a dozen or so U.S. affiliates (including non-moving defendant RBC-Alternative Assets) and a number of branches, offices or agencies in major U.S. cities (including a main branch in New York). (Proffered Allegations at ¶¶ 5-7.)

Defendant Royal Bank of Canada was at all relevant times the umbrella entity to, and ultimate parent of: (i) each of the other Defendants; (ii) non-movant RBC-Alternative Assets; and (iii) New York-based RBC Capital Markets LLC ("RBC Capital Markets"), which conducted Defendants' BLMIS Feeder Fund-related business. (*Id*. at ¶¶ 6-7.)

The Defendants were each shareholders in one or more of Fairfield Sentry Limited ("Fairfield Sentry"), Kingate Global Fund Ltd. ("Kingate Global"), and Rye Select Broad Market Portfolio Limited (*f/k/a* American Masters Broad Market Fund II Limited) ("Rye Portfolio

Limited") (collectively, the "BLMIS Feeder Funds"), each of which invested all or substantially all of their assets with BLMIS. (Trustee's Complaint at ¶ 2, *id*. at Exs. E, I, N.) The Defendants received $101,696,052 in subsequent transfers of BLMIS customer property from the BLMIS Feeder Funds (the "Transfers"). (*Id.*)

The Trustee's Proffered Allegations demonstrate that the Trustee's action to recover these Transfers does not require an extraterritorial application of SIPA or Bankruptcy Code Section 550.

### THE TRANSFERS AND COMPONENT EVENTS OF THE DEFENDANTS' BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

Citing to *Maxwell I*, the District Court directed that "the location of the transfers as well as the component events of those transactions"[1] must be analyzed to determine whether a subsequent transfer claim involves a domestic or extraterritorial application of the Code and SIPA.[2] Under the District Court's ruling, the Trustee need only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[3] This is a fact-based inquiry in which all reasonable inferences should be drawn in the Trustee's favor.[4]

The Defendants argue that simply because they and the BLMIS Feeder Funds in which they invested were formally organized under the laws of foreign countries, the subsequent transfers they received are "purely foreign" and the Trustee's recovery action must be dismissed.

---

[1] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 816).

[2] In *Maxwell I*, the court examined all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *In re Maxwell Commc'n Corp.*, 186 B.R. 807, 816-17 (S.D.N.Y. 1995).

[3] Extraterritoriality Decision, 513 B.R. at 232 n.4.

[4] *See*, *e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 402-03 (S.D.N.Y. 2010) (deferring ruling on extraterritoriality at motion to dismiss phase and citing standard that "[t]he court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.").

2

This superficial argument disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit extraterritoriality case law that similarly examines a transaction's various connections to the United States.[5]

The Defendants' singular focus on place of registration also ignores the fact that RBC's U.S. operations (out of its New York main branch) drove the Defendants' and non-moving defendant's RBC-Alternative Assets' coordinated BLMIS Feeder Fund activities. (Proffered Allegations at ¶ 7-8.) These activities—often conducted through the use of New York-based designated agent RBC Capital Markets—included making investments into the BLMIS Feeder Funds and using the same risk management and due diligence teams. (*Id.* at ¶¶ 9, 11-15.) For purposes of extraterritoriality as to RBC companies which invested with BLMIS Feeder Funds, there is no reason to distinguish between foreign-registered RBC entities (such as Royal Bank of Canada) and a U.S.-registered RBC entity (such as non-moving defendant RBC-Alternative Assets, which even shared the same New York office). (*Id.* at ¶ 8.)

The Transfers and component events of each of the Defendants' investment transactions with the BLMIS Feeder Funds were predominantly domestic. The Defendants conducted BLMIS Feeder Fund business through a New York-based designated agent—U.S. subsidiary RBC Capital Markets, an SEC-registered investment adviser and FINRA-registered broker-dealer. (*Id.* at ¶¶ 11-12.) Among other things, RBC Capital Markets (which was housed in Royal Bank of Canada's main New York office), executed subscription agreements with, requested redemptions from, and/or otherwise communicated with (and as discussed further below performed due diligence on) the BLMIS Feeder Funds, in each case for the benefit of the RBC entities invested in such funds, including the Defendants. (*Id.* at ¶¶ 13-15.)

Moreover, the entire purpose of the Defendants' investments with the BLMIS Feeder

---

[5] *See, e.g., Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 217 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014); and other cases cited in the Trustee's Main Brief.

Funds was to invest in U.S. securities markets through New York-based investment adviser BLMIS and to earn returns on those U.S.-based investments. Royal Bank of Canada internally referred to "[t]he core Madoff strategy as described by several of its feeder funds" and used "Madoff" as a short-hand description for the funds themselves. (*Id*. at ¶ 18.) In addition, each of the at least 251 combined times the Defendants entered into subscription agreements with the BLMIS Feeder Funds, they affirmed that they knew (i) the BLMIS Feeder Funds invested almost exclusively with a New York-based, SEC-registered investment adviser (i.e. BLMIS) that invested in the U.S. securities market, and (ii) that the Defendants' money would be transferred to that same investment adviser in New York. (*Id*. at ¶¶ 20-22.) As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States . . . was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and the feeder fund.[6]

The express provisions of their agreements with Fairfield Sentry further demonstrate the domestic nature of the Defendants' investment transactions with Fairfield Sentry. The Defendants agreed in their subscription agreements with Fairfield Sentry that New York law would govern their investments, and they consented to U.S. jurisdiction. (Proffered Allegations at ¶ 24.) Defendant Royal Bank of Canada also entered into a distribution and fee-sharing agreement with a U.S.-based Fairfield entity, the form of which was typically governed by New York law. (*Id.* at ¶ 26.) And Defendant Royal Bank of Canada entered into letter agreements with Kingate Global's manager, supplementing the terms of Royal Bank of Canada's subscription agreements with Kingate Global, which letter agreements were governed by New York law. (*Id.* at ¶ 25.) Thus, the Defendants had every expectation that U.S. laws would apply to their investment transactions and that they would be subject to suit in the United States.

The Defendants also purposefully and repeatedly used U.S. bank accounts and the U.S.

---

[6] *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 513 (Bankr. S.D.N.Y. 2012).

banking system to send subscriptions into and receive redemption payments from the BLMIS Feeder Funds, which redemptions constitute the Transfers at issue.[7] (Proffered Allegations at ¶¶ 27-28.) The Defendants remitted at least 251 separate subscription payments to, and received at least 128 separate redemption payments from, the BLMIS Feeder Funds, and each of the Defendants repeatedly and systematically used their own or their affiliates' U.S. bank accounts to make and receive these payments, including at Chase Manhattan Bank, JPMorgan Chase Bank, Deutsche Bank, and Deutsche Trust Co. Americas. (*Id*. at ¶¶ 27-30.)

The BLMIS Feeder Funds also designated U.S. bank or correspondent accounts to receive subscriptions from the relevant Defendants, which moneys were then ultimately delivered to BLMIS in New York. (*Id*. at ¶ 31.) In addition, the majority of redemptions that RBC-Guernroy or RBC-CI received from Rye Portfolio Limited came from that fund's New York-based bank account. (*Id*. at ¶ 32.)

Further evidencing the domestic nature of the transactions is that the Defendants conducted regular and extensive due diligence in New York with respect to their BLMIS Feeder Fund investments through New York-based designated agent RBC Capital Markets, who acted for the collective benefit of all RBC entities invested in the BLMIS Feeder Funds. (*Id*. ¶ at 33-36.)

These New York-based RBC Capital Markets persons regularly met and/or communicated with New York-based managers of the BLMIS Feeder Funds for this purpose, and after each such meeting or call, they typically prepared a detailed due diligence report. (*Id*. at ¶¶ 37-42.) Meetings took place in New York, and communications originated from, and/or were received by, RBC in the United States. (*Id*. at ¶¶ 39-40, 42.) Participants included no fewer than 16 different U.S.-based RBC Capital Markets persons. (*Id*. at ¶ 37.)

---

[7] *See*, *e.g.*, *Picard v. Igoin (In re BLMIS)*, 2015 WL 603209, at *16-17 (Bankr. S.D.N.Y. Feb. 13, 2015) (in the analogous context of personal jurisdiction, repeated use of U.S. bank accounts sufficient).

5

RBC's primary contact with regard to the Fairfield Funds was New York-based *de facto* partnership Fairfield Greenwich Group ("FGG"), which created and managed the funds at all relevant times, including FGG co-founder Jeffrey Tucker. (*Id*. at ¶ 37, 39.) RBC's primary contact with regard to Kingate Global and Rye Portfolio Limited was New York-based Tremont, which created, managed, and operated Rye Portfolio Limited (in addition to other BLMIS feeder funds) and managed Kingate Global out of New York during relevant times. (*Id*. at ¶ 37, 40.)

All of the above U.S.-based activities related to the Defendant's BLMIS Feeder Fund investments were part of the larger Royal Bank of Canada group of companies' substantial U.S. operations. At all relevant times, RBC had multiple U.S. locations, trillions of dollars of U.S. assets and millions of U.S. clients across at least 45 states. (*Id*. at ¶ 5.) Royal Bank of Canada and other Defendants were subject on an ongoing basis to a multitude of U.S. banking and securities laws and regulations, and their activities significantly impacted the U.S. (*Id*. at ¶ 44.) To cite just a few examples, Royal Bank of Canada: (i) has listed itself and RBC Capital Markets as "material entities in its U.S. organization," per a 2014 "U.S. Resolution Plan"; (ii) is a member of the Automated Clearing House and Fedwire, U.S.-based financial transaction/payment systems; (iii) files regularly with the U.S. Securities and Exchange Commission (the "SEC"); and (iv) is listed on the New York stock exchange. (*Id*. at ¶ 44-46.) Defendant RBC-Dominion files a form 13F quarterly with the SEC. (*Id*. at ¶ 46.)

Beyond all of the above domestic components, the Defendants' argument that their transactions are purely foreign is wrong because it ignores the reality of the BLMIS Feeder Funds. FGG in New York created, managed, and controlled Fairfield Sentry. (*Id.* at ¶¶ 48-49, 57-59.) Fairfield Sentry was based out of New York and had its principal place of business in New York. (*Id.* at ¶¶ 47, 52.) Although technically registered in the BVI, Fairfield Sentry had no employees or offices there, and at all times, operational decisions were made by FGG

6

employees in New York.[8] (Proffered Allegations at ¶¶ 51-53.) In its BLMIS account opening documents, FGG listed Fairfield Sentry's address as in the United States. (*Id.* at ¶¶ 54.) Fairfield Sentry's initial and on-going due diligence on BLMIS was conducted in New York, and the operative legal documents for its BLMIS accounts were governed by New York law. (*Id.* at ¶ 56, 58.) BLMIS in New York served as Fairfield Sentry's investment manager and implemented the split-strike conversion strategy for Fairfield Sentry. (*Id.* at ¶¶ 61-70.)

Although technically registered in the Cayman Islands, Rye Portfolio Limited had no real presence there—just a P.O. Box—and, as an exempted company under Cayman Islands law, was not allowed to solicit investors there. (*Id.* at ¶¶ 86-87.) At all relevant times, Rye Portfolio Limited's principal place of business was at the Rye, New York offices of Delaware corporation Tremont Group Holdings, Inc., which, together with one or more of its affiliates, formed, managed and operated Rye Portfolio Limited along with multiple other BLMIS feeder funds. (*Id*. at ¶¶ 72-76, 88-97.) Rye Portfolio Limited's initial and on-going due diligence on, and communications with, BLMIS took place in New York through Tremont's New York personnel, and its agreements with BMLIS were governed by New York law. (*Id*. at ¶¶ 75, 77-80.)

Kingate Global similarly had no physical offices, no employees, and transacted no meaningful business in the BVI where it was technically registered. (*Id*. at ¶ 104.) Instead, Kingate Global operated through investment managers, consultants, and other service providers with substantial connections to the United States. (*Id*. at ¶¶ 105-06, 114-23.) BLMIS in New York was the investment manager, executing broker, and custodian for Kingate Global's assets, and thus control over Kingate Global rested entirely with BLMIS in New York. (*Id*. at ¶¶ 111-13.) New York was the hub for Kingate Global's due diligence on BLMIS, and Kingate

---

[8] *See SEC v. Gruss*, 2012 WL 3306166 at *3 (S.D.N.Y. Aug 13, 2012) (finding that issues of fact existed regarding whether an offshore fund was "foreign" for purposes of extraterritoriality where complaint alleged that operational and investment decisions for the offshore fund were made in New York, "such that for all intents and purposes, the [offshore fund] was based in New York").

7

Global's agreements with BLMIS were governed by New York law. (*Id*. at ¶¶ 108-10, 120-22.)

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, the Defendants' motion to dismiss should be denied, and the Trustee's motion for leave to amend his Complaint to add the Proffered Allegations should be granted.

Dated: New York, New York
       June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
Alan D. Lawn

*Special Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

8