**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01202 (SMB) |
| Plaintiff, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO BANK VONTOBEL AG** |
| v. | |
| BANK VONTOBEL AG, f/k/a BANK J. VONTOBEL & CO. AG, and VONTOBEL ASSET MANAGEMENT INC., | |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the

Extraterritoriality Issue as to Bank Vontobel AG (f/k/a Bank J. Vontobel & Co. AG) ("Bank

Vontobel"), alleges the following:

## INTRODUCTION

1.      Bank Vontobel is a defendant in the case of *Picard v. Bank Vontobel AG, f/k/a

Bank J. Vontobel & Co. AG and Vontobel Asset Management Inc.* (Adv. Pro. No. 12-01202).

Vontobel Asset Management Inc. (f/k/a Vontobel USA Inc.) ("Vontobel Management"), which

is also a defendant in this proceeding, is a U.S.-organized entity and has not been made subject to

the pending motion to dismiss based on extraterritoriality.

2.      Bank Vontobel was a shareholder in Fairfield Sentry Limited ("Fairfield Sentry"),

Fairfield Sigma Limited ("Sigma" and together with Fairfield Sentry, the "Fairfield Funds"),

Kingate Global Fund Ltd. ("Kingate Global"), and Kingate Euro Fund Ltd. ("Kingate Euro" and

together with Kingate Global, the "Kingate Funds"; the Kingate Funds and the Fairfield Funds

together, the "BLMIS Feeder Funds").  Fairfield Sentry, Kingate Global, and Kingate Euro each

invested at least 95% of their assets in accounts managed by New York-based Bernard L. Madoff

Investment Securities LLC ("BLMIS").  Sigma did not have its own direct BLMIS account, but

invested 100% of its assets in Fairfield Sentry, serving solely as a vehicle for converting Euro-

denominated investments of its shareholders into U.S. dollars.[1]

---

[1] For ease of reference, Sigma is included herein in the definition of "BLMIS Feeder Funds."

3.    The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2) Bank Vontobel's redemptions totaling $11,830,205 from the BLMIS Feeder Funds (the "Transfers"), the majority of which were from Fairfield Sentry.

## BANK VONTOBEL'S TRANSFERS AND THE COMPONENT EVENTS OF ITS BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC

4.    Bank Vontobel is a sophisticated financial services company offering private banking, investment banking and asset management services.

5.    Bank Vontobel intentionally invested in the BLMIS Feeder Funds to profit from BLMIS's purported investments in the United States, and the Transfers and component events of Bank Vontobel's BLMIS Feeder Fund transactions were predominantly domestic.

### The Entire Purpose of Bank Vontobel's Investments Was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.

6.    The entire purpose of Bank Vontobel's investments in the BLMIS Feeder Funds was to invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and its BLMIS Feeder Fund investments were all centered in the United States.

7.    Bank Vontobel knew and intended that its investments would be transferred to BLMIS in New York to manage and invest in the U.S. securities markets. Bank Vontobel made such investments for the express purpose of receiving returns on U.S.-based investments from BLMIS.

8.    As per the terms of the Fairfield Funds' private placement memoranda ("PPMs" and each, a "PPM") and the Kingate Funds' information memoranda ("Info Memos" and each, an "Info Memo"), shareholders in those funds such as Bank Vontobel were required to execute a

subscription agreement each time they subscribed for shares in (i.e. invested money into) the

funds.  Bank Vontobel remitted subscription payments to such funds at least 84 times.

9.      Upon entering into each of the Fairfield Funds' subscription agreements, Bank

Vontobel affirmed that it "received and read a copy of" each fund's PPM.  Based on the

information contained in the Fairfield Funds' subscription agreements and PPMs, Bank Vontobel

knew the following facts:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Sigma invested 100% of its assets with Fairfield Sentry;

- BLMIS was the investment adviser of the Fairfield Funds;

- BLMIS was registered with the Securities and Exchange Commission (the "SEC");

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the funds' behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

10.     Upon entry into its subscription agreements with the Kingate Funds, Bank

Vontobel similarly affirmed having received and read the Info Memos from those funds.   The

Kingate Funds' Info Memos provided essentially the same information as the Fairfield Funds'

PPMs, including that the Kingate Funds' investments in U.S. securities would be custodied in

New York by the same New York investment adviser using the same SSC Strategy.

**Bank Vontobel Submitted to U.S. Law and Jurisdiction In Connection With Its Fairfield Fund Investments.**

11.    Bank Vontobel's subscription agreements also expressly provided that its investments would be subject to U.S. laws and to jurisdiction in the U.S. courts.

12.    In each of its signed subscription agreements with the Fairfield Funds, Bank Vontobel agreed that: (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," and it "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding"; and (ii) the subscription agreements "shall be governed and enforced in accordance with New York law . . . ."

13.    In addition, Bank Vontobel and Vontobel Management each entered into a distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited"), which agreement compensated Bank Vontobel and Vontobel Management for bringing investments into BLMIS.  FG Limited was the cornerstone of the New York-based Fairfield Greenwich Group ("FGG") *de facto* partnership, which created, managed, and controlled the Fairfield Funds.  FGL was registered to do business in New York and listed its principal executive office as that of FGG in New York.  Although the Trustee does not have possession of the specific fee agreements between Bank Vontobel, Vontobel Management, and FG Limited, FG Limited's typical fee-sharing agreements with respect to the Fairfield Funds were governed by New York law.

14.    Consistent with the frequency of the investments they made and were credited with bringing into the Fairfield Funds, Bank Vontobel and Vontobel Management routinely received fees from FG Limited.

**Bank Vontobel Purposefully and Repeatedly Utilized a U.S. Bank Account to Transfer Funds.**

15.     Bank Vontobel specifically directed Fairfield Sentry and Kingate Global to deposit its Transfers from those funds into its U.S. bank account.

16.     During the relevant period, Bank Vontobel received at least 40 redemption payments totaling approximately $10,359,900 out of Fairfield Sentry and Kingate Global, and New York was the specific situs repeatedly selected by Bank Vontobel for receiving its redemptions.  Specifically, Bank Vontobel used a bank account at JP Morgan Chase Bank in New York in order to receive such payments (the "U.S. Account"), which account was in Bank Vontobel's own name.

17.     Bank Vontobel systematically designated such use of this U.S. Account in its Fairfield Sentry redemption documents.  Although the Trustee does not have access to documentation showing Bank Vontobel's designations for Kingate Global, a Kingate Global bank statement indicates that Bank Vontobel used the U.S. Account for receiving Kingate Global redemption payments.

18.     By investing in the BLMIS Feeder Funds, Bank Vontobel also directed funds to New York-based BLMIS through U.S. bank accounts.  Fairfield Sentry's form subscription agreements required that Bank Vontobel send its subscription payments to a U.S. correspondent bank account, and Kingate Global's form subscription agreements similarly required that Bank Vontobel send its subscription payments to a U.S. correspondent bank account, for deposit in such funds' bank accounts.  From these bank accounts, the moneys were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

**Significant Elements of Bank Vontobel's BLMIS-Related Business Were Conducted out of
Its U.S. Operations Through Vontobel Management, Including Due Diligence.**

19.      Significant elements of Bank Vontobel's BLMIS-related business were conducted
out of its U.S. operations, and Bank Vontobel's relationship with the BLMIS Feeder Funds was
centered in New York.

20.      At all relevant times, Bank Vontobel maintained a base of operations in the
United States through defendant Vontobel Management, which is a New York corporation with
its principal place of business located at 1540 Broadway, 38th Floor, New York, New York.
Vontobel Management was also an SEC-registered investment adviser and served as the
investment adviser to former defendant Vontobel Absolute Return Fund ("Vontobel Fund"),[2]
which invested as much as 80% of its assets under management with BLMIS through Fairfield
Sentry.

21.      Bank Vontobel and Vontobel Management are sister corporations and wholly-
owned subsidiaries of Vontobel Holding AG.  Bank Vontobel worked together with Vontobel
Management with regard to both entities' investments with the BLMIS Feeder Funds.

22.      Bank Vontobel and Vontobel Management also partnered with FGG to manage
and market Vontobel Fund, which as noted above invested a large majority of its assets under
management with BLMIS through Fairfield Sentry.

23.      Specifically, in its capacity as an SEC-registered investment adviser, U.S.-based
Vontobel Management served as the investment adviser to Vontobel Fund, while FGG served as
the sub-adviser, and Bank Vontobel's sales force marketed the fund.  In 2003, when FGG

---

[2] Former defendant Vontobel Fund was a hedge fund domiciled in the Cayman Islands.  The
fund is currently in liquidation in the Cayman Islands.  The Trustee dismissed the fund without
prejudice from this adversary proceeding pursuant to a stipulation filed on May 13, 2013.

resigned as sub-adviser to the Vontobel Fund, upon information and belief, Bank Vontobel assumed the sub-adviser role.

24. U.S.-based Vontobel Management conducted due diligence as to Bank Vontobel's BLMIS Feeder Fund transactions in New York.

25. Vontobel Management maintained frequent contact with New York-based personnel from the BLMIS Feeder Funds, including communications and meetings with FGG and Madoff in New York, and FGG viewed the Vontobel entities together as "Vontobel New York."

26. Vontobel Management maintained a close relationship with FGG, and, based on internal FGG documents, FGG considered the Vontobel Defendants top-50 clients. In fact, FGG documents indicate that FGG co-founders Walter Noel and Jeffrey Tucker brought three New York-based Vontobel Management representatives to BLMIS's New York office to meet with Madoff himself. In advance of that meeting, FGG's Tucker wrote to Madoff to remind him that he invited "up to three people from Bank Vontobel, Peter Newell, Henry Schlegel and Thomas Wittwer." Wittwer, who was based in Vontobel Management's New York office, was formerly employed directly by Bank Vontobel.

27. On March 26, 2003, Greg Bowes from FGG's New York office met with Newell from Vontobel Management's New York office. Following the meeting, Bowes reported to his colleagues, "Peter is a good guy and we have a good relationship with Vontobel New York." During the meeting, the two discussed the partnership between Vontobel Management, Bank Vontobel, and FGG with regard to Vontobel Fund, as well as allocation of Fairfield Sentry's limited investment capacity to the Vontobel Defendants.

**The Fairfield Funds' Principal Place of Business Was in New York.**

28.     At all relevant times, the Fairfield Funds' principal place of business was in New York, where their creator/manager/operator was headquartered, and they were U.S. residents.

**A.     The Genesis of the FGG *De Facto* Partnership**

29.     In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

30.     The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

31.     FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

**B.     Fairfield Sentry**

32.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and

8

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

33.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From

its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

34.    Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States.

35.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069.  In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

 36. After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

FGG's New York headquarters—executed additional BLMIS account documents on behalf of

Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and

Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on

these BLMIS account documents as FGG's New York headquarters.

 37. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts

are governed by New York law and all disputes arising under the agreements must be resolved

by mandatory arbitration in New York utilizing the laws of New York.  All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of

1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve

System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf

of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor

Protection Corporation ("SIPC") member regulated by the SEC.

> **2.** **FGG New York Personnel Controlled Fairfield Sentry's Relationship
> With Various Citco Entities.**

 38. As the original directors of Fairfield Sentry, Noel and Tucker contracted with

Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

backoffice administrative services such as coordinating subscription and redemption forms,

maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco

Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield

Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets

were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian

agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco

Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco

entities.

### 3.    FGG New York Personnel Managed Fairfield Sentry.

39.    At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities.  Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

York.

40.    FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of

11

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and

redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription

agreements contained New York choice of law provisions, and provided for venue and

jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS.

41.    Fairfield Sentry's subscription agreements also incorporated its PPMs by

reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or

later amended PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its

assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an

SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4)

through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S.

Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were

"essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager.

42.    Although FGG attempted to hide its manager, BLMIS served as the investment

manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite

Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

43.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited FG.  FG Limited was formed under the laws of Ireland.

44.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

45.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

13

46.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.  Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

47.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

48.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

49.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

50.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

51.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### C.    Sigma

52.    FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield Sentry using Euros, FGG created Sigma.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

53.    Noel and Tucker organized Sigma on November 20, 1990, as international business companies under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma. Sigma is currently in liquidation in proceedings in the BVI and United States.

15

54.     Also like Fairfield Sentry, Sigma was a shell corporations present in the BVI only on paper.  It had no employees and maintained no offices.  It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters.  Sigma was operated almost entirely by FGG New York Personnel.

55.     As with Fairfield Sentry, and as part of the FGG de facto partnership, FGG New York Personnel made the operational decisions regarding Sigma.  Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's  relationships with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities.  Until Sigma's liquidation, FGG maintained Sigma's books and records in New York. FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

56.     FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares.  Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole assets.  Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the

investments.  Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the

custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could

misappropriate the assets or securities.  This same risk was also disclosed in Fairfield Sentry's

PPM's.

57.    Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry,

contracted with Citco Fund Services to provide Sigma with backoffice administrative services

such as coordinating subscription and redemption forms, maintaining Know Your Customer

information, and serving as the independent party verifying the Net Asset Value of the Sigma

shares.  Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma

assets.  As a further part of the Citco relationship, Noel and Tucker opened bank accounts on

behalf of Sigma at Citco Bank Dublin.  FGG New York Personnel had final control of the Sigma

Citco Bank Dublin bank accounts.  Finally, FGG New York Personnel controlled all of Sigma's

relationships with the Citco entities.

58.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma

investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS—

Noel executed separate contracts on Sigma's behalf with the Bank of Montreal for currency

swaps which were "governed by and construed in accordance with the laws of the State of New

York (without reference to choice of law doctrine)."

59.    FGG New York Personnel initially listed FG Limited as the investment manager

for Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the

Sigma PPM to indicate FG Bermuda was Sigma's Investment Manager.  In fact there were no

duties for any investment manager because Sigma's sole purpose was to purchase Fairfield

Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S.

Dollars.

60.     The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

**The Kingate Fund Transfers Are Domestic.**

61.     The Kingate Funds were feeder funds that invested exclusively with BLMIS in

New York.  BLMIS transferred approximately $926,351,905 of customer property to the Kingate

Funds during the life of the accounts prior to December 11, 2008.

62.     Each of the Kingate Funds filed customer claims in the SIPA liquidation.

**A. The Kingate Funds Invested with BLMIS to Make Money from a New York-Based
   Investment Operation.**

63.     The Kingate Funds, together with their purported investment manager, consultant,

service providers, and others that received subsequent transfers of customer property, formed an

enterprise with a single economic purpose: to make money from a New York-based investment

operation.

64.     Despite having a registered address in the BVI, the Kingate Funds had no physical

offices, no employees, and transacted no meaningful business there.

65.     Tremont (Bermuda) Limited served as the co-manager of Kingate Global for

approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself

managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation.

Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group

Holdings, Inc., a Delaware corporation (collectively "Tremont").

18

66.     The Kingate Funds' manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Funds' investments with BLMIS.

67.     The Kingate Funds' sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and the Kingate Funds profited from their exclusive business relationship with BLMIS in New York.

**B.  The Operative Legal Documents Were New York-Based.**

68.     The Kingate Funds executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

69.     Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

70.     The Kingate Funds agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

**C.  BLMIS Had Full Authority to Make and Execute Investment Decisions.**

71.     The Funds' Trading Authorization Agreements authorized BLMIS to be the Kingate Funds' "agent and attorney in fact," giving BLMIS full discretion over the Kingate Funds' invested assets and to buy, sell, and trade in securities for the Kingate Funds.

19

72.     As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the

Kingate Funds' investment manager and purported to invest exclusively according to Madoff's

SSC Strategy, which involved the purchase of U.S. securities traded only on domestic

exchanges.

73.     BLMIS acted as the Kingate Funds' executing broker in purporting to purchase

securities on the Kingate Funds' behalf, and acted as the Kingate Funds' custodian for the

securities purportedly held on the Kingate Funds' behalf.

**D.  The Kingate Funds Were Managed From New York.**

74.     During Tremont's tenure as co-manager of Kingate Global, and thereafter while it

continued to introduce investors to the Kingate Funds in return for fees, it was a valuable

contributor in New York to the success of the Kingate Funds.

75.     Tremont performed its co-management duties for Kingate Global in New York.

Suzanne Hammond, based in New York, signed a co-manager agreement entered into on

Tremont's behalf with Kingate Management and Kingate Global.

76.     Under that agreement, Kingate Management and Tremont were obligated to

evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all

other necessary management services to Kingate Global.

77.     The Kingate Funds were also co-managed by Kingate Management Limited

("KML"), a management entity formed by the founders of the Kingate Funds, Federico Ceretti

and Carlo Grosso.  KML operated through its agents in New York.

78.     KML's New York-based director, Michael Tannenbaum, Esq., performed certain

executive functions for KML, such as signing the co-manager agreement with Tremont on

KML's behalf.

20

79.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

80.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

81.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as the Kingate Funds' investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

82.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for the Kingate Funds.

83.    KML and the FIM entities actively participated in the Kingate Funds business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E.  Kingate Funds Used Banks in New York.**

84.    The Kingate Funds used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

85.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

86.    In its role as the Kingate Funds' custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and the Kingate Funds relating to investments with BLMIS.

87.     FIM also directed fee payments to be routed through a bank account in New

York.

88.     The Trustee incorporates by reference the allegations of the Fourth Amended

Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No.

100 (Bankr. S.D.N.Y. Mar. 17, 2014).


Dated: June 26, 2015                    By:  /s/ Thomas L. Long
       New York, New York                    _____
                                             Baker & Hostetler LLP
                                             45 Rockefeller Plaza
                                             New York, New York  10111
                                             Telephone: (212) 589-4200
                                             Facsimile: (212) 589-4201
                                             David J. Sheehan
                                             Thomas L. Long
                                             Matthew D. Feil
                                             Hannah C. Choate

                                             *Attorneys for Irving H. Picard, Trustee for the*
                                             *Substantively Consolidated SIPA Liquidation of*
                                             *Bernard L. Madoff Investment Securities LLC*
                                             *and the Estate of Bernard L. Madoff*