**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 12-01699 (SMB) |
| Plaintiff, | |
| v. | |
| ROYAL BANK OF CANADA; GUERNROY LIMITED; ROYAL BANK OF CANADA (CHANNEL ISLANDS) LIMITED; ROYAL BANK OF CANADA TRUST COMPANY (JERSEY) LIMITED; ROYAL BANK OF CANADA (ASIA) LIMITED; ROYAL BANK OF CANADA (SUISSE) S.A.; RBC DOMINION SECURITIES INC.; and RBC ALTERNATIVE ASSETS, L.P.; | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO ROYAL BANK OF CANADA, ET AL.** |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the

Extraterritoriality Issue as to Royal Bank of Canada; Guernroy Limited ("RBC-Guernroy");

Royal Bank of Canada (Channel Islands) Limited ("RBC-CI"); Royal Bank of Canada Trust

Company (Jersey) Limited ("RBC-Jersey"); Royal Bank of Canada (Asia) Limited ("RBC-

Asia"); Royal Bank of Canada (Suisse) S.A. ("RBC-Suisse"); and RBC Dominion Securities Inc.

("RBC-Dominion") (collectively, the "Defendants" and each, a "Defendant"), alleges the

following:

## INTRODUCTION

1.      Each of the Defendants was a shareholder in one or more of Fairfield Sentry

Limited ("Fairfield Sentry"), Kingate Global Fund Ltd. ("Kingate Global"), and Rye Select

Broad Market Portfolio Limited (*f/k/a* American Masters Broad Market Fund II Limited) ("Rye

Portfolio Limited") (collectively, the "BLMIS Feeder Funds").  The BLMIS Feeder Funds

invested at least 95% of their assets in accounts managed by New York-based BLMIS.

2.      All Defendants invested in Fairfield Sentry.  Five of those Defendants—Royal

Bank of Canada, RBC-Suisse, RBC-Guernroy, RBC-Dominion and RBC-CI—also invested in

Kingate Global.  RBC-Guernroy and RBC-CI also invested in Rye Portfolio Limited.

3.      The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2)

the Defendants' redemptions totaling $101,696,052 from the BLMIS Feeder Funds (the

"Transfers").

## THE TRANSFERS AND THE COMPONENT EVENTS OF THE DEFENDANTS' BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

4.      The Defendants intentionally invested in the BLMIS Feeder Funds to profit from BLMIS's purported investments in the United States, and the Transfers and component events of their BMLIS Feeder Fund transactions were predominantly domestic.

### Background: The Defendants Are All a Part of the Royal Bank of Canada Group of Companies, Which Has a Trillion-Dollar Hub of Operations in the United States.

5.      The Royal Bank of Canada group of companies make up a major international banking and investment organization, often called simply "RBC," which has a long-standing, critical hub of operations in the United States.  RBC has branches, offices or agencies in a number of major U.S. cities (including New York, Miami, Houston, Dallas, San Francisco and Seattle); holds trillions of dollars of U.S. assets; and serves millions of U.S. clients across at least 45 states.

6.      At all relevant times, RBC was headed by Defendant Royal Bank of Canada, the ultimate parent of each of the other Defendants and a dozen or so U.S.-organized entities including non-movant defendant RBC-Alternative Assets.

7.      The Defendants conducted BLMIS Feeder Fund business through Royal Bank of Canada's main New York branch and its wholly-owned U.S. subsidiary non-defendant RBC Capital Markets LLC (*f/k/a* RBC Capital Markets Corporation, *f/k/a* RBC Dominion Securities Corporation) ("RBC Capital Markets").  RBC Capital Markets was housed at Royal Bank of Canada's New York branch.

8.      Royal Bank of Canada also shared the New York branch office with U.S.-registered, non-moving defendant RBC Alternative Assets, L.P. ("RBC-Alternative Assets").  Although they shared the same offices and both invested in BLMIS feeder funds, Royal Bank of

Canada—but not RBC-Alternative Assets—was included in the consolidated Motion to Dismiss Based on Extraterritoriality (the "ET Motion").

9.      Because Royal Bank of Canada utilized its New York operation in connection with its investments in the BLMIS Feeder Funds, it on occasion used the name "NYROY" as a short-hand reference to itself in documents.  For example, a September 2007 subscription agreement between Fairfield Sentry and Royal Bank of Canada listed the "name of the subscriber" as "NYROY/RBC* Acct#1568 Pledged to Royal Bank of Canada," and two redemptions by Royal Bank of Canada from one of its BLMIS feeder fund investments in December 2008 were listed in a Bank of New York statement as "BEN: NYROY ACCT # 1516 Pledge Royal."

10.     In connection with the BLMIS SIPA liquidation proceedings, Defendant RBC-Guernroy filed customer claims with the U.S. Bankruptcy Court in New York.  The claims (#004415 and #004416) were denied by the Trustee.

**U.S. Affiliate RBC Capital Markets Conducted Business with the BLMIS Feeder Funds, Including with Respect to Royal Bank of Canada's Subscriptions and Redemptions.**

11.     Royal Bank of Canada designated U.S. affiliate, New York-based RBC Capital Markets as agent to conduct business with the BLMIS Feeder Funds.

12.     RBC Capital Markets is registered as an investment adviser with the U.S. Securities and Exchange Commission ("SEC") and as a broker-dealer with the Financial Industry Regulatory Authority.

13.     RBC Capital Markets executed multiple Fairfield Sentry and Kingate Global subscription agreements for Royal Bank of Canada.  Certain subscription agreements included a rider expressly advising that RBC Capital Markets was Royal Bank of Canada's agent in New York.

3

14.    RBC Capital Markets regularly conducted business with the BLMIS Feeder Funds in connection with investment transactions. For example:

- Royal Bank of Canada instructed Kingate Global in a February 2004 subscription agreement to send all notices, communications, net asset value reports, and subscription confirmations to the attention of RBC Capital Markets at a New York address.

- Later that year, RBC Capital Markets helped effectuate a transfer of shares in Fairfield Sentry from Citco Global Custody NV Cash to Royal Bank of Canada by, among other things, executing an assignment of interest on behalf of Royal Bank of Canada.

- On July 25, 2007, RBC Capital Markets corresponded with Kingate Global's manager to confirm that Royal Bank of Canada's copies of the Kingate Global subscription agreement and other investment documents were up to date.

- RBC Capital Markets sent "subscription documents" to Kingate Global's administrator in January 2008 and asked that the shares be registered "in the name of the Royal Bank of Canada."

- Letters to Fairfield Sentry's administrator requesting specific redemptions in 2008 for Royal Bank of Canada were signed in New York by Phillip B. Wisener, Managing Director of RBC Capital Markets, "as agent for Royal Bank of Canada."

- On April 15, 2008, Fairfield Sentry's administrator sent RBC Capital Markets documents including Fairfield Sentry's audited financial statements.

15.    RBC Capital Markets utilized the information it received to perform due diligence for all the Defendants on their BLMIS Feeder Fund investments.

**The Entire Purpose of the Defendants' BLMIS Feeder Fund Investments Was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

16.    The entire purpose of the Defendants' investments in the BLMIS Feeder Funds was to manage and invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and their BLMIS Feeder Fund investments were all centered in the United States.

17.    The Defendants knew and intended that their investments would be transferred to BLMIS in New York to invest in the U.S. securities markets.  The Defendants made such investments for the express purpose of receiving returns on U.S.-based investments from BLMIS.

18.    Due diligence performed, and related reports created, by RBC Capital Markets, confirmed that the transactions with the BLMIS Feeder Funds all revolved around BLMIS in New York.  An internal Royal Bank of Canada memorandum regarding BLMIS referred to "[t]he core Madoff trading strategy as described by several of its feeder funds," and summarized the strategy's U.S. investments.

19.    Information as to the critical role of the United States and U.S. securities, and of the BLMIS Feeder Funds' U.S. investment advisor/manager (i.e. BLMIS), was disclosed in, among other things, Fairfield Sentry's private placement memorandum ("PPM"), the prospectus provided to all Rye Portfolio Limited investors ("Prospectus"), and the amended and restated information memorandum provided to all Kingate Global investors ("Info Memo").

20.    Specifically, shareholders in Fairfield Sentry, Rye Portfolio Limited, and Kingate Global such as the Defendants were required to enter into a subscription agreement each time they subscribed for shares in (i.e. invested money into) the funds.  Combined, the Defendants remitted subscription payments to such funds at least 251 times.

21.    Each of the Defendants invested into Fairfield Sentry.  Upon entering into each of their subscription agreements with Fairfield Sentry, the Defendants affirmed that they "received and read a copy of" such fund's PPM.  Based on the information contained in Fairfield Sentry's subscription agreements and PPM, the Defendants knew:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

5

- BLMIS was Fairfield Sentry's investment adviser;

- BLMIS was registered with the SEC;

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the fund's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

22.    Upon entry into their subscription agreements with Rye Portfolio Limited and Kingate Global, the two Defendants that invested in Rye Portfolio Limited—RBC-Guernroy and RBC-CI—and the five Defendants that invested in Kingate Global—Royal Bank of Canada, RBC-Guernroy, RBC-CI, RBC-Dominion, and RBC-Suisse—similarly affirmed having received and read Rye Portfolio Limited's Prospectus and Kingate Global's Info Memo, respectively. These documents provided substantially similar information as the Fairfield Sentry PPM, including that Rye Portfolio Limited's and Kingate Global's investments in U.S. securities would be custodied in New York by a New York investment adviser using the SSC Strategy.

**The Defendants Submitted to U.S. Law and Jurisdiction in Connection With Their BLMIS Feeder Fund Investments.**

23.    The Defendants' Fairfield Fund subscription agreements also expressly provided that their investments would be subject to U.S. laws and to jurisdiction in the U.S. courts.

24.    In each of their signed subscription agreements with Fairfield Sentry, the Defendants agreed that: (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," and they "irrevocably submit[ted] to the jurisdiction of

the New York courts with respect to any [p]roceeding"; and (ii) the subscription agreements "shall be governed and enforced in accordance with New York law . . . ."

25.     Royal Bank of Canada also entered into letter agreements with Kingate Global's manager, supplementing the terms of Royal Bank of Canada's Kingate Global subscription agreements; the letter agreements provided that they shall be governed by New York law.

26.     In addition, Royal Bank of Canada entered into a distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited"), a Fairfield Greenwich Group ("FGG") entity based in New York, which agreement compensated it for bringing investments into BLMIS. FG Limited was the cornerstone of the New York-based FGG *de facto* partnership, which created, managed and controlled the Fairfield Funds. FG Limited was registered to do business in New York and listed its principal executive office as that of FGG in New York. Although the Trustee does not have possession of the specific fee agreement between Royal Bank of Canada and FG Limited, FG Limited's typical fee agreements with respect to the Fairfield Funds were governed by New York law. RBC-Jersey, RBC-Asia, and RBC-Suisse also received such fees from FG Limited.

**The Defendants Purposefully and Repeatedly Utilized U.S. Bank Accounts for the Investments and Redemptions They Made.**

27.     The Defendants purposefully and repeatedly used U.S. bank accounts and the U.S. banking system in connection with their subscriptions into and redemptions from the BLMIS Feeder Funds, including with respect to the Transfers at issue.

28.     During the relevant period, the Defendants received at least 128 redemption payments out of the BLMIS Feeder Funds, which payments constitute the Transfers at issue. Defendants also remitted at least 251 subscription payments to the BLMIS Feeder Funds, which

payments constitute the totality of their investments therein.  New York was the situs repeatedly

selected by Defendants for both receiving redemptions and remitting subscriptions.

29.    Specifically, the following Defendants used the following bank accounts to

receive redemption payments:

- Royal Bank of Canada used an account in an affiliate's name at Chase Manhattan Bank in New York to receive redemptions from Fairfield Sentry and Kingate Global.

- RBC-Asia used an account in an affiliate's name at JPMorgan Chase Bank in New York to receive redemptions from Fairfield Sentry.

- RBC-Guernroy and RBC-Jersey used an account in RBC-CI's name at Deutsche Bank in New York to receive redemptions from Fairfield Sentry.

- RBC-Guernroy also used an account in RBC-CI's name at JPMorgan Chase Bank in New York to receive redemptions from Fairfield Sentry, Kingate Global, and Rye Portfolio Limited.

- RBC-Suisse used an account in its own name at Deutsche Trust Co. Americas in New York to receive redemptions from Fairfield Sentry and Kingate Global.

- RBC-Dominion used an account in Royal Bank of Canada's name at JP Morgan Chase Manhattan Bank in New York to receive redemptions from Fairfield Sentry.

30.    And the following Defendants used the following bank accounts to remit

subscription payments:

- Royal Bank of Canada used an account in an affiliate's name at Chase Manhattan Bank in New York to remit subscriptions to Kingate Global.

- RBC-Asia used an account in an affiliate's name at JP Morgan Chase Bank in New York to remit subscriptions to Fairfield Sentry.

- RBC-Guernroy and RBC-Jersey used an account in RBC-CI's name at Deutsche Bank in New York to remit subscriptions to Fairfield Sentry.

- RBC-Jersey also used an account in RBC-CI's name at JP Morgan Chase Bank in New York to remit subscriptions to Fairfield Sentry.

- RBC-Guernroy used an account in RBC-CI's name at Deutsche Bank in New York to remit subscriptions to Rye Portfolio Limited.

31.    The BLMIS Feeder Funds also designated U.S. bank or correspondent accounts to receive subscriptions from the relevant Defendants.  Fairfield Sentry's subscription agreements and Kingate Global's Info Memo each required that the relevant Defendants send their subscription payments to a U.S. correspondent account, for further deposit into such funds' bank accounts.  The Rye Portfolio Limited Prospectus in effect as of mid- to late-2006 required that subscription payments to Rye Portfolio Limited be sent to a U.S. bank account at Bank of New York in New York.  From these bank accounts, the moneys were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

32.    Beginning in the fall of 2006 if not earlier, Rye Portfolio Limited also used the above Bank of New York account in New York to make redemption payments to investors.   At least $3.8 million of the approximately $4.6 million in redemptions that RBC-Guernoy or RBC-CI received from Rye Portfolio Limited came from that New York-based account.

**Due Diligence and Risk Management as to BLMIS and the BLMIS Feeder Funds Was Conducted in the U.S. by U.S.-Based RBC Capital Markets for All Defendants.**

33.    Regular and extensive due diligence was conducted in the United States by U.S.-based RBC personnel with respect to all of the Defendants' BLMIS Feeder Fund investments.

34.    Royal Bank of Canada and its affiliates and subsidiaries (including the other Defendants and U.S.-registered defendant RBC-Alternative Assets) functioned as a global, integrated enterprise.  As stated in the introduction to Royal Bank of Canada's 2008 Annual Report:

> Royal Bank of Canada (RY on TSX and NYSE) and its subsidiaries operate under the master brand name RBC. . . .

9

35.    Royal Bank of Canada and its affiliates and subsidiaries operated under a centralized management structure which encouraged and facilitated the sharing of knowledge and information among such entities wherever they were located.  Specifically as to risk management on their investments, according to a Royal Bank of Canada SEC filing, such entities had an "effective enterprise risk management framework," the "cornerstone" of which "was a strong risk management culture, supported by a robust enterprise-wide set of policies, procedures and limits which involve[d] [their] risk management professionals, business segments and other functional teams."

36.    Consistent with these policies and the fact that they were all investing in BLMIS-related funds, the Defendants functioned as one entity through RBC Capital Markets in New York with respect to risk management and due diligence on their investments.

37.    As part of its due diligence, RBC Capital Markets' U.S.-based employees regularly met and communicated with the BLMIS Feeder Funds' New York-based managers:

- The RBC Capital Markets U.S. employees involved in due diligence included at least 16 different people.

- Those persons' primary contacts at FGG in New York included co-founder Jeffrey Tucker, who was based there.

- Their primary contacts for Rye Portfolio Limited worked out of the Rye, New York offices of U.S.-organized companies Tremont Group Holdings, Inc. ("TGH"), Tremont Partners (TGH's management arm), or Rye Investment Management (a division of TGH) (TGH, Tremont Partners, and Rye Investment Management together, "Tremont," meaning any one or more of them).  They included New York-based Tremont executives Suzanne Hammond, Harry Hodges, and Darren Johnston.

- These same Tremont personnel were also RBC Capital Markets' primary contacts for Kingate Global, as Tremont managed Kingate Global at relevant times.

38.    From New York, these BLMIS Feeder Fund contacts provided RBC Capital Markets with information as to, among other things, the funds' size, relationship to BLMIS as a

feeder fund, the mechanics of the SSC Strategy and its use of the U.S. securities markets,

historical performance data, and the names of service providers to the fund (such as FG Limited

in New York).

39.    Beginning at least as early as 2003, RBC regularly met and communicated with

its FGG contacts in New York regarding BLMIS and Fairfield Sentry, including conducting due

diligence meetings annually at FGG's New York headquarters.  After each meeting or call, RBC

Capital Markets' typical practice was to prepare detailed, updated due diligence reports on the

information provided to it by the managers with whom it met.  Examples of the on-going due

diligence efforts of RBC Capital Markets in New York with respect to Fairfield Sentry include:

- On June 17, 2003, a due diligence team from RBC Capital Markets reportedly met with FGG's New York-based Jeffrey Tucker ("Tucker"), Scott Nevin, and Cornelis Boele ("Boele") to discuss Fairfield Sentry.  Seeking confirmation of this meeting in a June 11, 2003 e-mail to FGG, Stacey Troub of RBC Capital Markets in New York stated that the meeting would be with "our due diligence team."

- On September 4, 2003, RBC Capital Markets' New York-based Dan Glusker and Andrew Timpson met with FGG's Tucker and Boele at FGG's New York office to discuss Fairfield Sentry.  RBC Capital Markets issued a due diligence report after the meeting.

- On June 22, 2004, at RBC's annual due diligence meeting with FGG in New York, RBC Capital Market's Aaron Hara ("Hara") and Amrith Ravi met with FGG to discuss, among other things, RBC's investments in Fairfield Sentry.  RBC Capital Markets issued a due diligence report after the meeting.

- On June 13, 2005, a meeting took place in New York between RBC Capital Market's New York-based Hara, Arun Loomba ("Loomba"), and Parin Tolia, and various FGG personnel.  RBC Capital Markets issued a due diligence report after the meeting.

- On October 26, 2005, RBC Capital Markets' New York-based Loomba and/or Sang Kim reportedly participated in a due diligence call with FGG to discuss, among other things, Fairfield Sentry's pricing policies, its monthly net asset value calculations, the status of its SEC registration, its disaster recovery plan, its account reconciliations process, and its cash controls.

- In June of the following year, RBC Capital Markets' New York-based Eric Aldous ("Aldous"), Adam Liebman, and Leor Shapiro participated in its annual due diligence meeting at FGG's New York office, where they received an update from Vijayvergiya on the performance and outlook of Fairfield Sentry. RBC Capital Markets issued a due diligence report after the meeting.

- On December 17, 2007, RBC Capital Markets' New York-based Jeffrey Saltzman participated in a conference call with FGG to conduct due diligence on FGG-run funds, including Fairfield Sentry. RBC Capital Markets issued a due diligence report after the conference call.

40.     Beginning at least as early as 2003, RBC Capital Markets similarly regularly met and communicated with its Tremont contacts in New York regarding BLMIS, Kingate Global, and Rye Portfolio Limited. Tremont operated a parallel set of U.S.-registered funds in which non-moving defendant RBC-Alternative Assets and Defendant Royal Bank of Canada were invested. RBC Capital Markets made no distinction between these U.S.-registered and foreign-registered funds, and due diligence was performed on them together at the same meetings, by, in many instances, the same RBC Capital Markets personnel.

41.     As with Fairfield Sentry, after such meetings, RBC Capital Markets' typical practice was to prepare detailed, updated due diligence reports on the information provided to it by the managers with whom it met.

42.     Examples of the on-going due diligence efforts of RBC Capital Markets in New York with respect to Kingate Global, Rye Portfolio Limited and BLMIS include:

- On September 9, 2003, RBC Capital Markets' New York-based Aldous met or spoke with Suzanne Hammond and Harry Hodges of New York-based Tremont to conduct due diligence on Rye Portfolio Limited and domestic Tremont fund Rye Select Broad Market Prime Fund, L.P. ("Rye Prime Fund"). RBC Capital Markets issued a due diligence report afterward.

- On February 18, 2004, RBC Capital Markets' New York-based Michael Lutz emailed Tremont's Hodges requesting the identities and contact information of every prime broker used by Tremont's BLMIS feeder funds in connection with a periodic due diligence review.

- On November 17, 2004, RBC Capital Markets' New York-based Hara met or spoke with Hammond and Hodges to conduct due diligence on Tremont domestic fund Rye Select Broad Market Fund, L.P. ("Rye Broad Market"), Rye Prime Fund, and Kingate Global.  RBC Capital Markets issued a resulting due diligence report.

- On November 29, 2006, RBC Capital Markets' New York-based Nicholas Aromando met with Tremont's Hodges and Johnston in New York to conduct due diligence on Rye Broad Market, Rye Prime Fund, and Kingate Global.  A related email from Johnston referred to due diligence from "RBC," and RBC Capital Markets issued a due diligence report after the meeting.

- On November 30, 2006, Tremont's Johnston emailed a New York-based representative of RBC Capital Markets "a snapshot of information on [BLMIS's] portfolio."

- On March 13, 2007, a New York-based representative of RBC Capital Markets emailed a representative of The Bank of New York requesting Rye Portfolio Limited's current amount of assets under management, and Tremont's Johnston responded.

- On December 5, 2007, a New York-based representative of RBC Capital Markets spoke with Tremont's Hodges "to catch up on [the domestic] Rye Select Broad Market [funds] (LP, Prime Fund LP, and XL Fund LP) and Kingate: basically an overview on what's been happening with Madoff lately and what you're expecting for 2008."  RBC Capital Markets issued a due diligence report after the conversation.

## The Defendants' Coordinated BLMIS Feeder Fund Activities Were Part of the Larger Royal Bank of Canada Group of Companies' Substantial U.S. Operations.

43.    All of the Defendants' U.S. based activities related to their BLMIS feeder fund investments were part of the larger Royal Bank of Canada group of companies' substantial U.S. operations.

44.    Because of their extensive U.S. activities, Royal Bank of Canada and other Defendants are subject on an on-going basis to a multitude of U.S. laws and regulations.  For example, Royal Bank of Canada is amongst the financial institutions that are required to periodically file a "U.S. Resolution Plan" with the Federal Reserve and the Federal Deposit Insurance Corporation (the "Resolution Plan").

13

45.     The December 2014 Resolution Plan lists Royal Bank of Canada itself and its

U.S.-organized subsidiary and agent RBC Capital Markets as "material entities in its U.S.

organization."  The Resolution Plan also indicates that Royal Bank of Canada is a member of the

Automated Clearing House, an electronic network for U.S. financial transactions, and Fedwire, a

major U.S.-based payment system.  As a member of Fedwire, Royal Bank of Canada is required

to maintain an account with the U.S. Federal Reserve Bank.

46.     In addition:

- Royal Bank of Canada is regulated by the SEC and routinely files with the SEC,
  and Royal Bank of Canada's shares are traded on the New York Stock Exchange
  under the ticker symbol "RY."

- As of 2008, Royal Bank of Canada's New York and Miami branches were
  licensed and supervised by the U.S. Office of the Comptroller of the Currency and
  the U.S. Federal Reserve System (the "Federal Reserve").  Its representative
  offices were regulated by the Federal Reserve and state regulators.

- In or around 2008, Defendant RBC-Suisse also had a representative office in
  Miami, Florida, which was regulated by the Federal Reserve and state regulators;
  and

- Defendant RBC-Dominion files a Form 13F quarterly with the SEC.

**Fairfield Sentry's Principal Place of Business Was in New York.**

47.     At all relevant times, Fairfield Sentry's principal place of business was in New

York, where its creator/manager/operator was headquartered, and it was a U.S. resident.

**A.      The Genesis of the FGG *De Facto* Partnership**

48.     In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the

Fairfield Greenwich Group based in New York City.  FGG created, managed, and marketed a

variety of investment vehicles, the largest of which were BLMIS feeder funds.

49.     The FGG *de facto* partnership included: individual persons; U.S. corporations;

foreign corporations; and investment vehicles created, managed, operated, and marketed from

FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS

feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich

Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited

("Sigma") and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received

subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S.

dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

     50.     FGG also included a number of administrative entities that purportedly provided

management and backoffice support to the funds.  These entities included: FG Limited, Fairfield

Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG

Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.     Fairfield Sentry

     51.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized

Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

     52.     Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From

its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

53.    Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

**1.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States.**

54.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069.  In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070.  BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

55.    After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

FGG's New York headquarters—executed additional BLMIS account documents on behalf of

Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

56.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

### 2.     FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities.

57.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield

17

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3.    FGG New York Personnel Managed Fairfield Sentry.

58.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

59.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS.

60.    Fairfield Sentry's subscription agreements also incorporated its PPMs by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager.

61.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

62.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

19

63.     While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

64.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

65.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.  Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

66.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

67.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

68.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

69.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as

Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

70.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS

accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other

fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a

number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

The seedling funds were operated and organized by FGG New York Personnel. Many of the

seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

71.    The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

## Tremont and Its BLMIS Invested Funds Had Their Principal Place of Business In New York.

72.    TGH is a Delaware corporation. Tremont Partners is a Connecticut corporation.

TGH and Tremont Partners operated out of the same office in Rye, New York, and managed,

among others, three Delaware registered funds and three Cayman Islands registered funds that

were invested in Bernard L. Madoff's BLMIS. Tremont Partners is an investment advisor

registered under the Investment Advisers Act of 1940. As alleged below, Tremont and its

BLMIS funds had their principal place of business in New York and were managed from their

New York headquarters.

### A.    Tremont Operated and Controlled All of The Rye Funds From Its New York Headquarters.

73.    The three Delaware registered funds (which are not at issue in the ET Motion but

are relevant to the allegations herein) are: (i) Rye Select Broad Market Fund, L.P. ("Rye Broad

Market"), (ii) Rye Select Broad Market XL Fund, L.P. ("Rye Broad Market XL"), and (iii) Rye

Prime Fund (collectively, the "Delaware Registered Funds"). The three Cayman Islands

registered funds (which are at issue in the ET Motion) are: (i) Rye Portfolio Limited, (ii) Rye

Select Broad Market XL Portfolio Limited ("Rye Portfolio Limited XL"), and (iii) Rye Select

Broad Market Insurance Portfolio LDC ("Rye Portfolio LDC") (collectively, the "Cayman

Registered Funds"). The Delaware Registered Funds and Cayman Registered Funds are referred to together as the "Rye Funds."

74.      Each of Rye Broad Market, Rye Prime Fund, Rye Portfolio Limited and Rye Portfolio LDC had direct accounts with BLMIS (these funds are collectively referred to as "Rye Direct BLMIS Funds"). Tremont established the other two funds that did not have direct BLMIS accounts—Rye Broad Market XL and Rye Portfolio Limited XL—in an effort to provide investors with an investment that would triple the normal BLMIS performance through total return swaps. As part of this strategy, the Rye Broad Market XL and Rye Portfolio Limited XL funds entered into swap agreements with counterparties, consisting mainly of financial institutions, that generally agreed to pay these funds on a three times levered basis an amount equal to the increase in the net asset value of the Rye Broad Market and Rye Portfolio Limited funds. Rye Broad Market XL's swaps were based on the performance of the Rye Broad Market fund, while Rye Portfolio Limited XL's swaps were based on the performance of the Rye Portfolio Limited fund.

75.      From their inception and at all relevant times thereafter, Tremont's Cayman Registered Funds were set up and thereafter operated as parallel funds to the Delaware Registered Funds. Tremont made all management decisions and conducted all due diligence regarding both the Delaware and Cayman funds from its office in Rye, New York. All of the Rye Funds were marketed alongside one another by Tremont employees in New York. Employees in Tremont's New York office communicated directly with investors and potential investors regarding all of the funds. Oftentimes, Tremont's employees in New York received inquiries and sent information in the same email about both the Delaware and the Cayman funds.

23

Tremont's employees in New York approved subscriptions and redemptions for all of the Rye Funds.

76.    As was true of the Delaware Registered Funds, Tremont's employees in Rye were appointed to serve on the boards of the Cayman Registered Funds. For example, Suzanne Hammond was a director of Rye Portfolio LDC and Rye Portfolio Limited and Darren Johnston was a director of Rye Portfolio Limited and Rye Portfolio Limited XL. In addition, all of the Rye Funds were advised by the same law firm in the United States.

**B.    Tremont Controlled Its Relationship With BLMIS From Its New York Headquarters.**

77.    BLMIS dealt with the same Tremont employees in New York regarding all of the Rye Direct BLMIS Funds. Employees in Tremont's New York office directly made redemption requests to BLMIS for the Rye Direct BLMIS Funds' BLMIS accounts, which redemptions constitute the subsequent transfers that are the subject of multiple other Trustee adversary proceedings at issue in the ET Motion.

78.    Tremont's executives in New York, including its CEO Robert Schulman, executed in New York all BLMIS Customer Agreements and other documents, including Trade Authorizations, Options Agreements, and IRS Form W-9s, as authorized representatives of the Rye Direct BLMIS Funds. Executives in Tremont's Rye office were designated as authorized signatories on the accounts of the Rye Direct BLMIS Funds.

79.    Beginning as early as 1991, Tremont's executives and employees in New York met regularly with Madoff and other BLMIS employees in New York, including at BLMIS' offices in New York. Sandra Manzke, who founded Tremont, began regularly meeting in New York with Madoff as early as 1991. Robert Schulman, Tremont's Chief Executive Officer, also

had a long running relationship with Madoff and would "periodically visit [BLMIS' office] throughout the year."

80.     From the formation of each Rye Direct BLMIS Fund, BLMIS would mail copies of trade tickets and account statements to Tremont's New York office.

### C.    Tremont's Agreements With BLMIS Granted BLMIS Full Discretion Over The Assets of The Rye Funds And Subjected Tremont To U.S. Laws And Regulations.

81.     The Customer Agreements between BLMIS and the Rye Direct BLMIS Funds gave BLMIS full discretion over the assets of the Rye Direct BLMIS Funds.  Pursuant to the Trading Authorizations, the Rye Direct BLMIS Funds authorized Madoff to be their "agent and attorney in fact" to buy, sell and trade in securities.  The Customer Agreements expressly state that they are governed by New York law and all of the transactions pursuant to the Customer Agreements are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System.

82.     The Rye Direct BLMIS Funds agreed that all disputes arising under the Customer Agreements must be resolved by arbitration under the laws of New York before the American Arbitration Association, or "an arbitration facility provided by any exchange of which the broker is a member, or the National Association of Securities Dealers Inc., and in accordance with the rules pertaining to the selected organization."

### D.    Tremont's Investors Knew They Were Investing In BLMIS.

83.     Investors in all of the Rye Direct BLMIS Funds knew that they were investing in Madoff's BLMIS in New York.  Tremont's employees in New York spoke openly with their investors about their funds being invested in Madoff's BLMIS and regularly referred to the Rye Direct Funds as "our Madoff fund" or as a Madoff "feeder."  Investors were also specifically

25

informed through the Rye Direct BLMIS Funds' Due Diligence Questionnaires that the funds

would be trading in the "U.S. equity market" and related equity index options and that cash

would be held in "U.S. short term treasury bills."  All of the Rye Funds represented in investor

documents that custody of their securities would be held in "a brokerage account with an NASD

registered broker dealer" (i.e. BLMIS).  Tremont's investors knew that any redemption requests

were dependent on the investment manager's ability to liquidate United States securities.

> **E.      Tremont's Cayman Registered Funds Had Their Principal Place of Business
> In New York.**

84.      In addition, all investors were aware that the Rye Funds had U.S. based counsel

and U.S. based sales contacts.  The Rye Funds' Private Placement Memoranda and marketing

materials openly identified these U.S. ties.

85.      Investors in the Cayman Registered Funds were specifically informed that they

were only permitted to make investments and receive redemptions in U.S. dollars, as was the

case with the Delaware Registered Funds.

86.      Although the Rye Funds at issue in the ET Motion were registered in the Cayman

Islands, they had no more than a nominal presence there.  The Cayman Registered Funds never

had any real offices or operations in the Cayman Islands.  Rye Portfolio LDC and Rye Portfolio

Limited had their registered office at a P.O. Box address in the Cayman Islands, care of a

company that is in the business of providing local addresses to companies.  Rye Portfolio

Limited XL similarly had its registered address at an international law firm in the Cayman

Islands.

87.      The Cayman Registered Funds were not permitted to solicit investors in the

Cayman Islands because they were registered as exempted companies under the Cayman Islands

Companies Law.  Under the Companies Law, "[a]n exempted company shall not trade in the

Islands with any person, firm, or corporation except in furtherance of business of the exempted company carried on outside the Islands." *See* Section 174 of the Companies Laws (2013 Revision). The Cayman Registered Funds were prohibited from accepting investment funds from members of the public in the Cayman Islands and paid no taxes in the Cayman Islands.

88.     From January 2002 forward, Tremont Partners in New York was the sub-advisor and handled all investment management duties for Rye Portfolio LDC, and from December 2005 forward, the same was true for Rye Portfolio Limited, in each case by virtue of an express delegation of all such duties to Tremont Partners from Tremont (Bermuda) Limited ("Tremont Bermuda"), the nominal investment manager for those funds. Though incorporated in Bermuda, Tremont Bermuda itself was wholly owned by TGH, registered under the U.S. Investment Advisers Act of 1940, and had Tremont executives in New York serving on its board of directors. For example, Sandra Manzke, Rupert Allan and Robert Schulman, who all served at various times as CEO of TGH, also served as directors of Tremont Bermuda while maintaining their positions in New York.

89.     Prior to such delegation of all duties in 2002 and 2005 respectively, Rye Portfolio LDC and Rye Portfolio Limited were in any event run out of New York, as the Tremont Bermuda office at all times performed only low-level administrative work, handled by at most two employees. Tremont Bermuda performed no investment management, research, data collection, or sales, all of which were done in New York. Letters sent to investors on Tremont Bermuda letterhead regularly came from Tremont Partners' employees in New York, who would include their New York contact information on such letters.

90.     As part of its management duties for Rye Portfolio Limited and Rye Portfolio LDC, Tremont's New York employees, among other things, approved trade tickets and monthly

statements, checked bank activity, and were authorized as bank signatories for the funds. As alleged above, BLMIS communicated directly with Tremont's executives and employees in New York regarding all of the Rye Funds, including Rye Portfolio Limited and Rye Portfolio LDC. For instance, Darren Johnston, who headed Tremont's Rye Investment Management ("RIM") division in New York from 2006-2007, and Harry Hodges, who worked under Johnston in New York, regularly corresponded with BLMIS's Frank DiPascali regarding subscriptions to and redemptions from Rye Portfolio Limited and Rye Portfolio LDC.

91.     On July 1, 2006, Tremont closed its Bermuda office and formally consolidated the management of all of its funds to its New York office. Thereafter, any ministerial functions that had been handled in Bermuda for Rye Portfolio Limited and Rye Portfolio LDC took place domestically. By no later than November 2006, subscriptions for Rye Portfolio Limited and Rye Portfolio LDC flowed solely through U.S. bank accounts.

92.     Beginning in the fall of 2006 if not earlier, when Tremont formally closed Rye Portfolio Limited's and Rye Portfolio LDC's Bermuda-based bank accounts, every redemption payment made by Tremont to an investor, which payment forms the basis for the Trustee's subsequent transfer complaints, came out of the fund's New York-based bank accounts at the Bank of New York.

93.     Around the same time, Tremont had formed its RIM division based out of New York, whose express purpose was to manage and operate all of the Tremont BLMIS funds together. Tremont began to refer to and market its BLMIS invested funds as the "Rye Select Funds" and renamed all of the BLMIS invested funds to include the word "Rye." Tremont explained to its investors that the reason for this change was because Tremont "had a longstanding presence in Rye, New York and the Rye Select Funds [we]re all about providing [ ]

28

access to a <u>select</u> group of the investment industry's most exclusive and otherwise unavailable talent." (emphasis in original).  From then on, the published materials for all the Rye Funds, including prospectus statements and marketing materials, expressly directed potential investors to contact Tremont's employees in New York.

94.    Notably, even before the change to add "Rye" to the funds' names, Tremont had highlighted the U.S. origins of all the Rye Direct BLMIS Funds, except Rye Portfolio Limited LDC, by using the word "American" in the fund name.  As alleged in the Tremont Complaint, Rye Broad Market was originally named American Masters Broad Market Fund, LP.; Rye Prime Fund was originally named American Masters Broad Market Prime Fund, LP; Rye Portfolio LDC was originally named Tremont-Broad Market Fund LDC; and Rye Portfolio Limited was originally named American Masters Broad Market Fund II Limited.

95.    From July 2006 forward, investors in Rye Portfolio Limited and Rye Portfolio LDC were also specifically instructed to send all subscription agreements directly to Tremont's New York employees or to the Bank of New York in New York, New York, and all redemption requests were similarly handled by either Tremont in New York or the Bank of New York. Starting in October 2006, investors in these funds were also specifically instructed to wire subscription monies directly to accounts at the Bank of New York.  During this time, the Directors of Funds, which included New York based director Darren Johnston, had the discretion to suspend subscriptions and redemptions by investors under varying circumstances, including when they found redemptions "not reasonably practical" or "prejudicial," and compel "redemption of Shares for any or no reason."

96.    From 2006 onwards, New York-based Tremont Partners also held itself out as the

general partner of Cayman Registered Funds Rye Portfolio Limited and Rye Portfolio Limited

XL.

97.    With regard to Rye Portfolio Limited XL, from its inception in late 2006, it was

managed just like Delaware Registered Fund Rye Broad Market XL, with Tremont Partners as

its investment manager and the Bank of New York as its custodian.  Both XL funds also

instructed their investors to send subscription agreements and redemption requests to the same

address in New York.

**F.    The Rye Funds With Direct BLMIS Accounts Filed Claims With The
       Trustee.**

98.    Subsequent to the revelation of BLMIS' fraud, the two Delaware Registered

Funds with BLMIS accounts (Rye Broad Market and Rye Prime Fund), and the two Cayman

Registered Funds with BLMIS accounts (Rye Portfolio Limited and Rye Portfolio LDC) filed

claims with the Trustee.  On July 25, 2011, these funds entered into a joint settlement agreement

with the Trustee, which agreement was governed by New York law and pursuant to which the

funds submitted to the jurisdiction of the U.S. Bankruptcy Court for purposes of enforcing the

agreement.  The claims of Rye Broad Market, Rye Portfolio Limited and Rye Portfolio LDC

were allowed in connection with the settlement, and these funds have received and continue to

receive distributions on their allowed claims.

**G.    The Rye Funds Have Asserted that Their BLMIS-Related Activities
       Implicate the U.S. Securities Markets and U.S. Securities Laws.**

99.    Finally, in addition to the foregoing, each of the Rye Funds (including the

Cayman Registered Funds) have, in other BLMIS-related lawsuits in which they are or were

named defendants, themselves asserted (by virtue of their assertions as to preemption by the

Securities Litigation Uniform Standards Act and the NY Martin Act) that (i) their BLMIS-related

activities were directed to promoting or inducing the sale of securities within or from New York,

and that (ii) the securities they purported to trade were U.S. securities covered by the 1933

Exchange Act.  *See In re Tremont Securities Law, State Law and Insurance Litigation*, 1:08-cv-

11117-TPG (S.D.N.Y.)[1]; *Peshkin et al. v. Tremont Group Holdings, Inc., et al.*, 08-CV-11183.[2]

100.    The Trustee incorporates by reference the allegations of the Complaint filed in

*Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-05310 (SMB) (filed December

7, 2010, Bankr. S.D.N.Y.), ECF No. 1.

**The Kingate Global Transfers Are Domestic.**

101.    Kingate Global was a feeder fund that invested exclusively with BLMIS in New

York.  BLMIS transferred approximately $398,797,047 of customer property to Kingate Global

during the life of the account prior to December 11, 2008.

102.    Kingate Global filed a customer claim in the SIPA liquidation.

**A.    Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation.**

103.    Kingate Global, together with its purported investment manager, consultant,

service providers, and others that received subsequent transfers of customer property, formed an

enterprise with a single economic purpose: to make money from a New York-based investment

operation.

104.    Despite having a registered address in the BVI, Kingate Global had no physical

offices, no employees, and transacted no meaningful business there.

105.    Tremont Bermuda served as the co-manager of Kingate Global for approximately

10 years. Tremont Bermuda was formed in Bermuda, but was itself managed from New York by

---

[1] See Dkt. #s 142, 149, 154, 280, 285.
[2] See Dkt. #s 104, 110, 150.

employees of Tremont Partners, a Connecticut corporation. Tremont Bermuda's and Tremont

Partners' parent company was TGH, a Delaware corporation.

106.    Kingate Global's manager, consultant, and other service providers, regardless of

where they were organized, wholly or in substantial part operated in New York to manage the

Kingate Global's investments with BLMIS.

107.    Kingate Global's sole business was centered in New York and all deposits with,

and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its

exclusive business relationship with BLMIS in New York.

### B.    The Operative Legal Documents Were New York-Based.

108.    Kingate Global executed Customer Agreements, and other account opening

documents, and delivered the agreements to BLMIS in New York.

109.    Each Customer Agreement expressly states that it is governed by U.S. law and all

of the transactions in the Customer's Account are subject to the provisions of the Securities

Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the

Federal Reserve System, and the Commodities Futures Trading Commission.

110.    Kingate Global agreed that all disputes arising under the Customer Agreements

with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted

in the United States before the American Arbitration Association, or "an arbitration facility

provided by any other exchange of which the broker is a member, or the National Association of

Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the

rules obtaining of the selected organization."

### C.    BLMIS Had Full Authority to Make and Execute Investment Decisions.

111.    Kingate Global's Trading Authorization Agreements authorized BLMIS to be the

Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate

Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

112.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the

Kingate Global's investment manager and purported to invest exclusively according to Madoff's

SSC Strategy, which involved the purchase of U.S. securities traded only on domestic

exchanges.

113.    BLMIS acted as Kingate Global's executing broker in purporting to purchase

securities on Kingate Global's behalf, and acted as the Kingate Global's custodian for the

securities purportedly held on Kingate Global's behalf.

**D.      Kingate Global Was Managed From New York.**

114.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it

continued to introduce investors to Kingate Global in return for fees, it was a valuable

contributor in New York to the success of Kingate Global.

115.    Tremont performed its co-management duties for Kingate Global in New York.

Suzanne Hammond, based in New York, signed a co-manager agreement entered into on

Tremont's behalf with Kingate Management and Kingate Global.

116.    Under that agreement, Kingate Management and Tremont were obligated to

evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all

other necessary management services to Kingate Global.

117.    Kingate Global was also co-managed by Kingate Management Limited ("KML"),

a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo

Grosso.  KML operated through its agents in New York.

118.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain

executive functions for KML, such as signing the co-manager agreement with Tremont on

KML's behalf.

119.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

120.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

121.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

122.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

123.    KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E.    Kingate Global Used Banks in New York.**

124.    Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan.

125.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

126.    In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

127.    FIM also directed fee payments to be routed through a bank account in New York.

128.    The Trustee incorporates by reference the allegations of the Fourth Amended

34

Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No.

100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: New York, New York
      June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
Alan D. Lawn

*Special Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*