**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 12-01698 (SMB) |
| Plaintiff, | |
| v. | |
| BANQUE INTERNATIONALE À LUXEMBOURG S.A. (*f/k/a* Dexia Banque Internationale à Luxembourg S.A.), individually and as successor in interest to Dexia Nordic Private Bank S.A.; RBC INVESTOR SERVICES BANK S.A (*f/k/a* RBC Dexia Investor Services Bank S.A.).; RBC INVESTOR SERVICES TRUST (*f/k/a* RBC Dexia Investor Services Trust); RBC INVESTOR SERVICES | **SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO BANQUE INTERNATIONALE À LUXEMBOURG S.A., ET AL.'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS** |

| |
|---|
| ESPAÑA S.A (*f/k/a* RBC Dexia Investor Services España S.A.).; and BANQUE INTERNATIONALE À LUXEMBOURG (SUISSE) S.A. (*f/k/a* Dexia Private Bank (Switzerland) Ltd.); |
| Defendants. |

Irving H. Picard (the "Trustee") respectfully submits this memorandum as a supplement to his Main Brief being filed simultaneously herewith in opposition to the motion to dismiss based on extraterritoriality made by certain defendants and in further support of the Trustee's motion for leave to amend his Complaint to add the Proffered Allegations.

The moving defendants are: Banque Internationale à Luxembourg S.A. (*f/k/a* Dexia Banque Internationale à Luxembourg S.A.) ("Dexia Banque"), individually and as successor in interest to Dexia Nordic Private Bank S.A.; RBC Dexia Investor Services Bank S.A. (*n/k/a* RBC Investor Services Bank S.A.) ("RBC-Dexia Bank"); RBC Dexia Investor Services Trust (*n/k/a* RBC Investor Services Trust) ("RBC-Dexia Trust"); RBC Dexia Investor Services España S.A. (*n/k/a* RBC Investor Services España S.A.); and Banque Internationale à Luxembourg (Suisse) S.A. (*f/k/a* Dexia Private Bank (Switzerland) Ltd.) (collectively, the "Defendants" and each, a "Defendant").

## BACKGROUND

Non-defendant Royal Bank of Canada and Defendant Dexia Banque, each a part of a major international banking and investment organization with a long-standing, critical hub of operations in the Unites States, were the owners or joint venture co-owners of all the other Defendants. (*See* chart in Proffered Allegations at ¶ 10.) Royal Bank of Canada invested in the same BLMIS feeder funds in two ways—both through the joint venture entities that are

2

Defendants in this action and through various Royal Bank of Canada wholly-owned entities which are defendants in a separate recovery action by the Trustee (and for which the Trustee is making separate filings as to the domestic nature of those entities' transactions, simultaneously herewith).  (Proffered Allegations at ¶¶ 11-12.)

The Defendants were each shareholders in one or more of Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma" and together with Fairfield Sentry, the "Fairfield Funds"), Kingate Global Fund Ltd. ("Kingate Global"), and Rye Select Broad Market Portfolio Limited (*f/k/a* American Masters Broad Market Fund II Limited) ("Rye Portfolio Limited") (collectively, the "BLMIS Feeder Funds").  (Trustee's Complaint at ¶¶ 2, 4-7; *id*. at Exs. E, G, K, P.)  Fairfield Sentry, Kingate Global, and Rye Portfolio Limited each invested substantially all of their assets with BLMIS.  (*Id*. at ¶¶ 2, 4, 6-7.)  Sigma did not have its own direct BLMIS account, but invested 100% of its assets in Fairfield Sentry.[1]  (*Id*. at ¶ 5.)  The Defendants received $81,308,596 in subsequent transfers of BLMIS customer property from the BLMIS Feeder Funds (the "Transfers").  (*Id*. at Exs. E, G, K, P.)

The Trustee's Proffered Allegations demonstrate that the Trustee's action to recover these Transfers does not require an extraterritorial application of SIPA or Bankruptcy Code Section 550.

### THE TRANSFERS AND COMPONENT EVENTS OF THE DEFENDANTS' BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

Citing to *Maxwell I*, the District Court directed that "the location of the transfers as well as the component events of those transactions"[2] must be analyzed to determine whether a subsequent transfer claim involves a domestic or extraterritorial application of the Code and

---

[1] For ease of reference, Sigma is included herein in the definition of "BLMIS Feeder Funds."

[2] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 816).

SIPA.[3] Under the District Court's ruling, the Trustee need only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[4] This is a fact-based inquiry in which all reasonable inferences should be drawn in the Trustee's favor.[5]

The Defendants argue that simply because they and the BLMIS Feeder Funds in which they invested were formally organized under the laws of foreign countries, the subsequent transfers they received are "purely foreign" and the Trustee's recovery action must be dismissed. This superficial argument disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit extraterritoriality case law that similarly examines a transaction's various connections with the United States.[6]

The Transfers and component events of each of the Defendants' investment transactions with the BLMIS Feeder Funds were predominantly domestic. To begin with, the entire purpose of the Defendants' investments with the BLMIS Feeder Funds was to invest in U.S. securities markets through New York-based investment adviser BLMIS and to earn returns on those U.S.-based investments. Royal Bank of Canada internally referred to "[t]he core Madoff strategy as described by several of its feeder funds" and used "Madoff" as a short-hand description for the

---

[3] In *Maxwell I*, the court examined all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *In re Maxwell Commc'n Corp.*, 186 B.R. 807, 816-17 (S.D.N.Y. 1995).

[4] Extraterritoriality Decision, 513 B.R. at 232 n.4.

[5] *See, e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 402-03 (S.D.N.Y. 2010) (deferring ruling on extraterritoriality at motion to dismiss phase and citing standard that "[t]he court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.").

[6] *See, e.g., Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 217 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014); and other cases cited in the Trustee's Main Brief.

4

funds themselves. (Proffered Allegations at ¶ 16.) In addition, each of the at least 58 combined times the Defendants entered into subscription agreements with the BLMIS Feeder Funds, they affirmed that they knew (i) the BLMIS Feeder Funds invested almost exclusively with a New York-based, SEC-registered investment adviser (i.e. BLMIS) that invested in the U.S. securities market, and (ii) that the Defendants' money would be transferred to that same investment adviser in New York. (*Id.* at ¶¶ 18-20.) As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States . . . was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and the feeder fund.[7]

The express provisions of Defendants' agreements with the Fairfield Funds further demonstrate the domestic nature of their investment transactions. The Fairfield Invested Defendants (meaning all Defendants except RBC-Dexia Trust, which did not invest in a Fairfield Fund) agreed in their subscription agreements with the Fairfield Funds that New York law would govern their investments and they consented to U.S. jurisdiction. (Proffered Allegations at ¶ 22.) Defendant Dexia Suisse also entered into a distribution and fee-sharing agreement with a U.S.-based Fairfield entity, the form of which typically was governed by New York law. (*Id.* at ¶ 23.) Thus, the Fairfield Invested Defendants had every expectation that U.S. laws would apply to their investment transactions and that they would be subject to suit in the United States.

The Defendants also purposefully and repeatedly used U.S. bank accounts and the U.S. banking system to receive redemption payments from Fairfield Sentry, Kingate Global, and Rye

---

[7] *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 513 (Bankr. S.D.N.Y. 2012).

5

Portfolio Limited, which redemptions constitute the Transfers at issue from those funds.[8] (Proffered Allegations at ¶¶ 24-25.) The Defendants received at least 42 separate redemption payments from these funds, and the Defendants used their own U.S. bank accounts to receive these payments. (*Id*. at ¶¶ 24-28.) Specifically, each of the Defendants that invested in Fairfield Sentry and/or Kingate Global designated bank accounts at Citibank in New York and/or JPMorgan Chase in New York to receive redemption payments. (*Id*. at ¶¶ 26-27.) Upon information and belief, RBC-Dexia Trust—which invested solely in Rye Portfolio Limited—did the same with respect to its redemptions from that fund. (*Id*. at ¶ 28.) The Defendants also remitted their subscriptions into U.S. bank or correspondent accounts at the direction of the BLMIS Feeder Funds, which were then ultimately delivered to BLMIS in New York. (*Id*. at ¶ 29.) In addition, all of the redemptions that RBC-Dexia Trust received from Rye Portfolio Limited came from that fund's bank account at Bank of New York in New York. (*Id*. at ¶ 30.)

Further evidencing the domestic nature of the Defendants' transactions is that regular and extensive due diligence was conducted in the United States by non-defendant U.S.-based Royal Bank of Canada personnel through designated agent RBC Capital Markets LLC, who acted for the collective benefit of all RBC-related entities invested in the BLMIS Feeder Funds. (*Id.* at ¶ 31, 35, 38.) These New York-based RBC Capital Markets persons regularly met and/or communicated with New York-based managers of the BLMIS Feeder Funds for this purpose, and after each such meeting or call, they typically prepared a detailed due diligence report, which would have been shared with the Defendants. (*Id*. at ¶¶ 34-38.)

In addition, Dexia Banque conducted due diligence on BLMIS feeder funds in the U.S.

---

[8] *See, e.g.*, *Picard v. Igoin (In re BLMIS)*, 2015 WL 603209, at *16-17 (Bankr. S.D.N.Y. Feb. 13, 2015) (in the analogous context of personal jurisdiction, repeated use of U.S. bank accounts sufficient).

6

through New York-based consultant and BLMIS feeder fund manager Access International Advisors. (*Id.* at ¶ 33.)

All of the above U.S.-based activities related to the Defendants' BLMIS Feeder Fund investments were part of the larger Royal Bank of Canada and Dexia groups of companies' substantial U.S. operations. RBC maintained a full service branch in New York and had a trillion-dollar hub of operations across the United States with over two million clients. (*Id.* at ¶ 7.) Though less commonly known, the Dexia group of companies also conducted extensive business in the United States with hundreds of domestic employees and a major New York branch. (*Id.* at ¶ 8.) In October 2008, Dexia S.A., the umbrella entity for the Dexia group of companies and parent of Dexia Banque, received $31 billion in bailout money from the Federal Reserve Bank—among the largest amounts received by any single bank at that time. (*Id.*)

Beyond all of the above domestic components, the Defendants' argument that their transactions are purely foreign is wrong because it ignores the reality of the BLMIS Feeder Funds. FGG in New York created, managed, and controlled the Fairfield Funds. (*Id.* at ¶¶ 40-41, 49-51, 66-69.) The Fairfield Funds were based out of New York and had their principal place of business in New York. (*Id.* at ¶¶ 39, 44, 65.) Although technically registered in the BVI, the Fairfield Funds had no employees or offices there, and at all times, operational decisions were made by FGG employees in New York.[9] (Proffered Allegations at ¶¶ 43-45, 64-66.) In its BLMIS account opening documents, FGG listed Fairfield Sentry's address as in the United States. (*Id.* at ¶ 46.) The Fairfield Funds initial and on-going due diligence on BLMIS

---

[9] *See SEC v. Gruss*, 2012 WL 3306166 at *3 (S.D.N.Y. Aug 13, 2012) (finding that issues of fact existed regarding whether an offshore fund was "foreign" for purposes of extraterritoriality where complaint alleged that operational and investment decisions for the offshore fund were made in New York, "such that for all intents and purposes, the [offshore fund] was based in New York").

7

was conducted in New York, and the operative legal documents for Fairfield Sentry's BLMIS accounts were governed by New York law. (*Id.* at ¶¶ 48, 50.) BLMIS in New York served as the Fairfield Funds' investment manager and implemented the split-strike conversion strategy for the Fairfield Funds. (*Id.* at ¶¶ 53-62, 70.)

Similarly, although technically registered in the Cayman Islands, Rye Portfolio Limited had no real presence there—just a P.O. Box—and, as an exempted company under Cayman Islands law, was not allowed to solicit investors there. (*Id.* at ¶¶ 86-87.) At all relevant times, Rye Portfolio Limited's principal place of business was at the Rye, New York offices of Delaware corporation Tremont Group Holdings, Inc., which, together with one or more of its affiliates, formed, managed and operated Rye Portfolio Limited along with multiple other BLMIS feeder funds. (*Id*. at ¶¶ 72-76, 88-97.) Rye Portfolio Limited's initial and on-going due diligence on, and communications with, BLMIS took place in New York through Tremont's New York personnel, and its agreements with BMLIS were governed by New York law. (*Id*. at ¶¶ 75, 77-80.)

Kingate Global similarly had no physical offices, no employees, and transacted no meaningful business in the BVI where it was technically registered. (*Id*. at ¶ 104.) Instead, Kingate Global operated through investment managers, consultants, and other service providers with substantial connections to the United States. (*Id*. at ¶¶ 105-06, 114-23.) BLMIS in New York was the investment manager, executing broker, and custodian for Kingate Global's assets, and thus control over Kingate Global rested entirely with BLMIS in New York. (*Id*. at ¶¶ 111-13.) New York was the hub for Kingate Global's due diligence on BLMIS, and Kingate Global's agreements were BLMIS were governed by New York law. (*Id*. at ¶¶ 108-110, 120-22.)

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, the Defendants' motion to dismiss should be denied, and the Trustee's motion for leave to amend his Complaint to add the Proffered Allegations should be granted.

Dated: New York, New York
June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
Alan D. Lawn

*Special Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*