**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 12-01698 (SMB) |
| Plaintiff, | |
| v. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO BANQUE INTERNATIONALE À LUXEMBOURG S.A., ET AL.** |
| BANQUE INTERNATIONALE À LUXEMBOURG S.A. (*f/k/a* Dexia Banque Internationale à Luxembourg S.A.), individually and as successor in interest to Dexia Nordic Private Bank S.A.; RBC DEXIA INVESTOR SERVICES BANK S.A.; RBC DEXIA INVESTOR SERVICES TRUST; RBC DEXIA INVESTOR SERVICES ESPAÑA S.A.; and BANQUE INTERNATIONALE À LUXEMBOURG (SUISSE) S.A. (*f/k/a* Dexia Private Bank (Switzerland) Ltd.); | |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the

Extraterritoriality Issue as to Banque Internationale à Luxembourg S.A. (*f/k/a* Dexia Banque

Internationale à Luxembourg S.A.) ("Dexia Banque"), individually and as successor in interest to

Dexia Nordic Private Bank S.A. ("Dexia Nordic"); RBC Dexia Investor Services Bank S.A.

(*n/k/a* RBC Investor Services Bank S.A.) ("RBC-Dexia Bank"); RBC Dexia Investor Services

Trust (*n/k/a* RBC Investor Services Trust) ("RBC-Dexia Trust"); RBC Dexia Investor Services

España S.A. (*n/k/a* RBC Investor Services España S.A.) ("RBC-Dexia España"); and Banque

Internationale à Luxembourg (Suisse) S.A. (*f/k/a* Dexia Private Bank (Switzerland) Ltd.) ("Dexia

Suisse") (collectively, the "Defendants" and each, a "Defendant"), alleges the following:

## **INTRODUCTION**

1.      Each of the Defendants was a shareholder in one or more of Fairfield Sentry

Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma" and, together with Fairfield

Sentry, the "Fairfield Funds"), Kingate Global Fund Ltd. ("Kingate Global"), and Rye Select

Broad Market Portfolio Limited (*f/k/a* American Masters Broad Market Fund II Limited) ("Rye

Portfolio Limited") (collectively, the "BLMIS Feeder Funds").  Fairfield Sentry, Kingate Global,

and Rye Portfolio Limited invested at least 95% of their assets in accounts managed by New

York-based BLMIS.  Sigma did not have its own direct BLMIS account, but invested 100% of

its assets in Fairfield Sentry, serving solely as a vehicle for converting Euro-denominated

investments of its shareholders into U.S. dollars.  For ease of reference, Sigma is included herein

in the definition of "BLMIS Feeder Funds."

2.      All Defendants other than RBC-Dexia Trust invested in Fairfield Sentry.  Three

of those Defendants—Dexia Banque, Dexia Suisse, and RBC-Dexia España—also invested in

Sigma.  Dexia Banque and RBC-Dexia Bank also invested in Kingate Global.  RBC-Dexia Trust

invested in Rye Portfolio Limited.

3.      The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2)

the Defendants' redemptions totaling $81,308,596 from the BLMIS Feeder Funds (the

"Transfers").

### THE TRANSFERS AND THE COMPONENT EVENTS OF THE DEFENDANTS' BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

4.      The Defendants intentionally invested in the BLMIS Feeder Funds to profit from

BLMIS's purported investments in the United States, and the Transfers and component events of

their BMLIS Feeder Fund transactions were predominantly domestic.

### Background: The Defendants Are All Part of the Royal Bank of Canada and/or Dexia Groups of Companies, Each of Which Had Substantial U.S. Operations.

5.      Non-defendant Royal Bank of Canada and Defendant Dexia Banque were joint

venturers and the owners or co-owners of all the other Defendants.

6.      At all relevant times, both the Royal Bank of Canada and Dexia groups of

companies were major international banking and investment organizations, each with a long-

standing, critical hub of operations in the United States.

7.      The Royal Bank of Canada group of companies had a trillion-dollar hub of

operations across the United States with over two million clients and maintained a full-service

branch in New York, New York.

8.      Though less commonly known, the Dexia group of companies—led by umbrella

entity Dexia S.A., the parent company to Defendant Dexia Banque—also conducted extensive

2

business in the United States with more than 500 domestic employees and a major New York

branch.  In October 2008, Dexia S.A. received $31 billion in bailout money from the Federal

Reserve Bank—amongst the largest amount received by any single bank at the time.

9.      In connection with the BLMIS SIPA liquidation proceedings, Defendant RBC-

Dexia España filed customer claims with the U.S. Bankruptcy Court in New York.  These claims

(#007204 and #007224) were denied by the Trustee.

**A.      The Royal Bank of Canada-Dexia Banque Joint Venture**

10.      In 2006, Royal Bank of Canada and Defendant Dexia Banque entered into a joint

venture by forming non-defendant RBC Dexia Investor Services Limited (the "Joint Venture").

On or about that time, Defendants RBC-Dexia Bank, RBC-Dexia Trust, and RBC-Dexia España

were formed as well and were each 100% owned by the Joint Venture.  The fifth defendant—

Dexia Suisse—was formed in 1996 and was 100% owned by Defendant Dexia Banque, which is

in turn 100% owned by parent entity Dexia S.A..  A chart setting forth this structure is as follows

(moving Defendants highlighted in gray):



**B.    Non-Defendant Royal Bank of Canada Invested in the BLMIS Feeder Funds Both Directly and Through the RBC-Dexia Joint Venture.**

11.    Royal Bank of Canada, which is not a defendant in this action, invested in the same BLMIS Feeder Funds in two different ways—both through Royal Bank of Canada entities and through the Joint Venture entities that are the subject of this action.

12.    Royal Bank of Canada and its various subsidiaries are defendants in a separate recovery action filed by the Trustee in connection with the subsequent transfers they received from Fairfield Sentry, Kingate Global, and Rye Portfolio Limited. *See Picard v. Royal Bank of Canada, et al.* (Adv. Pro. No. 12-01699). Those defendants, with the exception of a U.S.-organized Royal Bank of Canada subsidiary, have all been made subject to the consolidated Motion to Dismiss Based on Extraterritoriality (the "ET Motion"). In response thereto, the Trustee has submitted proffered allegations which detail the domestic nature of the transfers and component events of the transactions at issue in that action.

13.    Royal Bank of Canada invested in the same BLMIS Feeder Funds by virtue of its joint ownership of Defendants RBC-Dexia Bank, RBC-Dexia Trust, and RBC-Dexia España, and their investments in those funds.

**The Entire Purpose of the Defendants' BLMIS Feeder Fund Investments Was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

14.    The entire purpose of the Defendants' investments in the BLMIS Feeder Funds was to manage and invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and their BLMIS Feeder Fund investments were all centered in the United States.

15.    The Defendants knew and intended that their investments would be transferred to BLMIS in New York to invest in the U.S. securities markets. The Defendants made such

4

investments for the express purpose of receiving returns on U.S.-based investments from

BLMIS.

16.     Due diligence performed, and related reports created, by a U.S.-based Royal Bank

of Canada entity, confirmed that the transactions with the BLMIS Feeder Funds all revolved

around BLMIS in New York.  An internal Royal Bank of Canada memorandum regarding

BLMIS referred to "[t]he core Madoff trading strategy as described by several of its feeder

funds," and summarized the strategy's U.S. investments.

17.     Information as to the critical role of the United States and U.S. securities, and of

the BLMIS Feeder Funds' U.S. investment adviser/manager (i.e. BLMIS), was disclosed in,

among other things, the Fairfield Funds' private placement memoranda ("PPMs" and each, a

"PPM"), the prospectus provided to all Rye Portfolio Limited investors ("Prospectus"), and the

amended and restated information memorandum provided to all Kingate Global investors ("Info

Memo").

18.     Specifically, shareholders in the Fairfield Funds, Rye Portfolio Limited, and

Kingate Global—such as the Defendants—were required to enter into a subscription agreement

each time they subscribed for shares in (i.e. invested money into) the funds.  Combined, the

Defendants remitted subscription payments to such funds at least 58 times.

19.     Upon entering into each of their subscription agreements with the Fairfield Funds,

the Defendants that invested in one or both of the Fairfield Funds—which includes all

Defendants other than RBC-Dexia Trust—(collectively, the "Fairfield Invested Defendants")—

affirmed that they "received and read a copy of" such funds' PPMs.  Based on the information

contained in the Fairfield Funds' subscription agreements and PPMs, the Fairfield Invested

Defendants knew:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Sigma invested 100% of its assets with Sentry;

- BLMIS was the investment adviser of the Fairfield Funds;

- BLMIS was registered with the Securities and Exchange Commission ("SEC");

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the funds' behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

20.    Upon entry into their subscription agreements with Rye Portfolio Limited and Kingate Global, the Defendant that invested in Rye Portfolio Limited—RBC-Dexia Trust—and the two Defendants that invested in Kingate Global—Dexia Banque (individually and as successor in interest to Dexia Nordic) and RBC-Dexia Bank—similarly affirmed having received and read Rye Portfolio Limited's Prospectus and Kingate Global's Info Memo, respectively. These documents provided substantially similar information as the Fairfield Funds' PPMs, including that Rye Portfolio Limited's and Kingate Global's investments in U.S. securities would be custodied in New York by a New York investment adviser using the SSC Strategy.

**The Fairfield Invested Defendants Submitted to U.S. Law and Jurisdiction in Connection With Their Fairfield Fund Investments.**

21.    The Fairfield Fund subscription agreements also expressly provided that the Fairfield Invested Defendants' investments would be subject to U.S. laws and to jurisdiction in the U.S. courts.

6

22.     In each of their signed subscription agreements with the Fairfield Funds, the Fairfield Invested Defendants agreed that: (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," and they "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding"; and (ii) the subscription agreements "shall be governed and enforced in accordance with New York law . . ."

23.     In addition, Defendant Dexia Suisse entered into a distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited"), a Fairfield Greenwich Group ("FGG") entity based in New York, which agreement compensated it for bringing investments into BLMIS.  FG Limited was the cornerstone of the New York-based FGG *de facto* partnership, which created, managed and controlled the Fairfield Funds.  FG Limited was registered to do business in New York and listed its principal executive office as that of FGG in New York. Although the Trustee does not have possession of the specific fee agreement between Dexia Suisse and FG Limited, FG Limited's typical fee agreements with respect to the Fairfield Funds were governed by New York law.

## The Defendants Purposefully and Repeatedly Utilized U.S. Bank Accounts for the Redemptions They Made.

24.     The Defendants purposefully and repeatedly used U.S. bank accounts and the U.S. banking system to receive the Transfers at issue from Fairfield Sentry, Kingate Global, and Rye Portfolio Limited.

25.     During the relevant period, the Defendants received at least 42 redemption payments totaling approximately $80 million out of Fairfield Sentry, Kingate Global, and Rye Portfolio Limited, which payments constitute the Transfers at issue for those funds.  New York was the situs repeatedly selected for receiving the Defendants' redemptions from those funds.

7

26.     Specifically, each of the Fairfield Invested Defendants used U.S. bank accounts to receive redemption payments from Fairfield Sentry:

- RBC-Dexia Bank used an account in its own name at Citibank in New York and an account in its own name at JPMorgan Chase in New York to receive redemptions from Fairfield Sentry.

- The remaining Fairfield Invested Defendants—Dexia Banque, Dexia Suisse, and RBC-Dexia España—used accounts in their own names at Citibank in New York in to receive redemptions from Fairfield Sentry.

27.     In addition, Kingate Global bank statements indicate that RBC-Dexia Bank used the same aforementioned New York account in its own name at Citibank for receiving Kingate Global redemption payments.

28.     Upon information and belief based on the other RBC-Dexia entities' designations of their own U.S. bank account (by and large at Citibank in New York), RBC-Dexia Trust similarly designated and received its redemptions from Rye Portfolio Limited into a bank account in the United States.

29.     In addition, Fairfield Sentry, Kingate Global and Rye Portfolio Limited designated U.S. bank or correspondent accounts to receive subscriptions from the relevant Defendants.  Fairfield Sentry's subscription agreements and Kingate Global's Info Memo each required that the relevant Defendants send their subscription payments to a U.S. correspondent account, for further deposit into such funds' bank accounts.  The Rye Portfolio Limited Prospectus in effect as of mid- to late-2006 required that RBC-Dexia Trust send its subscription payments to Rye Portfolio Limited to a U.S. bank account at Bank of New York in New York. From these bank accounts, the moneys were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

8

30.     Beginning in the fall of 2006 if not earlier, Rye Portfolio Limited also used the above Bank of New York account in New York to make redemption payments to investors. Every redemption that RBC-Dexia Trust received from Rye Portfolio Limited came from that New York-based account.

**The Defendants Relied on U.S.-Based Agents and Consultants for Due Diligence and Risk Management with Respect to the BLMIS Feeder Funds.**

31.     Regular and extensive due diligence was conducted in the United States by U.S.-based Royal Bank of Canada personnel with respect to all of the group's BLMIS Feeder Fund investments, and  Dexia Banque also conducted due diligence on BLMIS feeder funds in the U.S.

32.     In connection with their BLMIS investments, both the Royal Bank of Canada and Dexia groups of companies utilized U.S.-based entities to, among other things, gather and analyze information as part of their risk management and due diligence process.

33.     Dexia Banque consulted New York-based BLMIS feeder fund manager Access International Advisors ("Access") regarding investments with BLMIS.  In 2002, Dexia Banque corresponded with Access and apparently expressed concerns about doing business with Madoff. Access's internal partners' meeting notes indicated that "Madoff" could be a "difficulty" for Dexia Banque.

34.     Royal Bank of Canada designated wholly-owned U.S. subsidiary RBC Capital Markets LLC (*f/k/a* RBC Capital Markets Corporation, *f/k/a* RBC Dominion Securities Corporation) ("RBC Capital Markets"), as agent to conduct business with, and perform due diligence on, BLMIS feeder funds.  RBC Capital Markets is registered as an investment adviser with the SEC and as a broker-dealer with the Financial Industry Regulatory Authority.

9

35.     This due diligence would have been for the benefit of, and shared with, all RBC-related entities with BLMIS Feeder Fund investments, including the Defendants.  As described in SEC filings, Royal Bank of Canada and its affiliates and subsidiaries functioned as a global, integrated enterprise, with a centralized risk management structure intended to facilitate the sharing of such information.

36.     As part of its due diligence, beginning at least as early as 2003, RBC Capital Markets' U.S.-based employees regularly met and communicated with the BLMIS Feeder Funds' New York-based managers.

37.     From New York, these BLMIS Feeder Fund contacts provided RBC Capital Markets with information as to, among other things, the funds' size, relationship to BLMIS as a feeder fund, the mechanics of the SSC Strategy and its use of the U.S. securities markets, historical performance data, and the names of service providers to the fund (such as FG Limited in New York).

38.     After each meeting or call, RBC Capital Markets' typical practice was to prepare detailed, updated due diligence reports on performance and other information about the funds as provided to it by the fund managers with whom it met.  Although not addressed to any specific recipients, these reports would also have been for the benefit of, and shared with, the Defendants.

**The Fairfield Funds' Principal Place of Business Was in New York.**

39.     At all relevant times, the Fairfield Funds' principal place of business was in New York, where their creator/manager/operator was headquartered, and they were U.S. residents.

10

### A.    The Genesis of the FGG *De Facto* Partnership

40.    In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

41.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

42.    FGG also included a number of administrative entities that purportedly provided management and back office support to the funds.  These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.    Fairfield Sentry

43.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

44.      Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From

its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

45.      Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

**1.      Fairfield Sentry's Agreements With BLMIS Confirm Fairfield
Sentry's Principal Place of Business Was in the United States.**

46.      When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069.  In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

12

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office. On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

47.    After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

FGG's New York headquarters—executed additional BLMIS account documents on behalf of

Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and

Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on

these BLMIS account documents as FGG's New York headquarters.

48.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts

are governed by New York law and all disputes arising under the agreements must be resolved

by mandatory arbitration in New York utilizing the laws of New York. All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of

1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve

System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf

of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor

Protection Corporation ("SIPC") member regulated by the SEC.

> **2.    FGG New York Personnel Controlled Fairfield Sentry's Relationship
> With Various Citco Entities.**

49.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with

Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

13

backoffice administrative services such as coordinating subscription and redemption forms,

maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco

Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield

Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets

were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian

agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco

Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco

entities.

### 3.    FGG New York Personnel Managed Fairfield Sentry.

50.    At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities.  Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

York.

51.    FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and

redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription

agreements contained New York choice of law provisions, and provided for venue and

jurisdiction for any disputes in New York.

    **4.  Fairfield Sentry's Investors Knew They Were Investing in BLMIS.**

   52.  Fairfield Sentry's subscription agreements also incorporated its PPMs by

reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or

later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its

assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an

SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4)

through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S.

Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were

"essential to the continued operation of the Fund."

    **5.  BLMIS Was Fairfield Sentry's Investment Manager.**

   53.  Although FGG attempted to hide its manager, BLMIS served as the investment

manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield

15

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

54.     In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

55.     While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

56.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

16

57.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

58.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

59.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

60.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

61.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not
FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required
Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as
Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

62.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS
accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other
fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a
number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.
The seedling funds were operated and organized by FGG New York Personnel.  Many of the
seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

**C.     Sigma**

63.     FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription
and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield
Sentry using Euros, FGG created Sigma.  Sigma accepted subscriptions in Euros, converted them
to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying
redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received
from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

64.     Noel and Tucker organized Sigma on November 20, 1990, as international
business companies under the BVI International Business Companies Act.  Just as Fairfield
Sentry was statutorily restricted from doing business with any other BVI residents except for
other entities organized under the BVI International Business Companies Act, so was Sigma.
Sigma is currently in liquidation in proceedings in the BVI and United States.

18

65.    Also like Fairfield Sentry, Sigma was a shell corporations present in the BVI only

on paper.  It had no employees and maintained no offices.  It listed its registered BVI address as

the same BVI post office box care of a local trust company it shared with Fairfield Sentry and

hundreds of other unrelated investment vehicles. The law firm operating the trust company and

the registered post office box addressed its statements for services for Sigma to FGG's New

York headquarters.  Sigma was operated almost entirely by FGG New York Personnel.

66.    As with Fairfield Sentry, and as part of the FGG de facto partnership, FGG New

York Personnel made the operational decisions regarding Sigma.  Once Sigma was opened for

investors, FGG New York Personnel monitored Sigma's investments into, and redemptions

from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created

marketing and performance materials for Sigma; marketed Sigma; performed administrative

functions required by Sigma; negotiated confidentiality agreements and other service provider

contracts on behalf of Sigma; and conducted various other due diligence and risk management

activities.  Until Sigma's liquidation, FGG maintained Sigma's books and records in New York.

FGG New York Personnel also had final control of Sigma's banking accounts, including those

accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

67.    FGG New York Personnel controlled and approved the subscriptions for and

redemptions of Sigma shares.  Like Fairfield Sentry's subscription agreements, Sigma's

subscription agreements contained a New York choice of law provision, provided for venue and

jurisdiction for any disputes in New York, and incorporated their PPMs that described the

significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole

assets.  Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with

respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the

19

investments. Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the

custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could

misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's

PPMs.

68.    Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry,

contracted with Citco Fund Services to provide Sigma with backoffice administrative services

such as coordinating subscription and redemption forms, maintaining Know Your Customer

information, and serving as the independent party verifying the Net Asset Value of the Sigma

shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma

assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on

behalf of Sigma at Citco Bank Dublin. FGG New York Personnel had final control of the Sigma

Citco Bank Dublin bank accounts. Finally, FGG New York Personnel controlled all of Sigma's

relationships with the Citco entities.

69.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma

investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS—

Noel executed separate contracts on Sigma's behalf with the Bank of Montreal for currency

swaps which were "governed by and construed in accordance with the laws of the State of New

York (without reference to choice of law doctrine)."

70.    FGG New York Personnel initially listed FG Limited as the investment manager

for Sigma. In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the

Sigma PPM to indicate FG Bermuda was Sigma's Investment Manager. In fact there were no

duties for any investment manager because Sigma's sole purpose was to purchase Fairfield

Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S.

Dollars.

71.     The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

## Tremont And Its BLMIS Invested Funds Had Their Principal Place of Business In New York.

72.     Tremont Group Holdings, Inc. is a Delaware corporation.  Tremont Partners is a

Connecticut corporation.  TGH and Tremont Partners operated out of the same office in Rye,

New York, and managed, among others, three Delaware registered funds and three Cayman

Islands registered funds that were invested in Bernard L. Madoff's BLMIS.  Tremont Partners is

an investment advisor registered under the Investment Advisers Act of 1940.  As alleged below,

Tremont and its BLMIS funds had their principal place of business in New York and were

managed from their New York headquarters.

### A.     Tremont Operated And Controlled All of The Rye Funds From Its New York Headquarters.

73.     The three Delaware registered funds (which are not at issue in the ET Motion but

are relevant to the allegations herein) are: (i) Rye Select Broad Market Fund, L.P. ("Rye Broad

Market"), (ii) Rye Select Broad Market XL Fund, L.P. ("Rye Broad Market XL"), and (iii) Rye

Select Broad Market Prime Fund, L.P. ("Rye Prime Fund") (collectively, the "Delaware

Registered Funds").  The three Cayman Islands registered funds (which are at issue in the ET

Motion) are: (i) Rye Portfolio Limited, (ii) Rye Select Broad Market XL Portfolio Limited ("Rye

Portfolio Limited XL"), and (iii) Rye Select Broad Market Insurance Portfolio LDC ("Rye

21

Portfolio LDC") (collectively, the "Cayman Registered Funds"). The Delaware Registered

Funds and Cayman Registered Funds are referred to together as the "Rye Funds."

74.     Each of Rye Broad Market, Rye Prime Fund, Rye Portfolio Limited and Rye

Portfolio LDC had direct accounts with BLMIS (these funds are collectively referred to as "Rye

Direct BLMIS Funds"). Tremont established the other two funds that did not have direct BLMIS

accounts—Rye Broad Market XL and Rye Portfolio Limited XL—in an effort to provide

investors with an investment that would triple the normal BLMIS performance through total

return swaps. As part of this strategy, the Rye Broad Market XL and Rye Portfolio Limited XL

funds entered into swap agreements with counterparties, consisting mainly of financial

institutions, that generally agreed to pay these funds on a three times levered basis an amount

equal to the increase in the net asset value of the Rye Broad Market and Rye Portfolio Limited

funds. Rye Broad Market XL's swaps were based on the performance of the Rye Broad Market

fund, while Rye Portfolio Limited XL's swaps were based on the performance of the Rye

Portfolio Limited fund.

75.     From their inception and at all relevant times thereafter, Tremont's Cayman

Registered Funds were set up and thereafter operated as parallel funds to the Delaware

Registered Funds. Tremont made all management decisions and conducted all due diligence

regarding both the Delaware and Cayman funds from its office in Rye, New York. All of the

Rye Funds were marketed alongside one another by Tremont employees in New York.

Employees in Tremont's New York office communicated directly with investors and potential

investors regarding all of the funds. Oftentimes, Tremont's employees in New York received

inquiries and sent information in the same email about both the Delaware and the Cayman funds.

22

Tremont's employees in New York approved subscriptions and redemptions for all of the Rye
Funds.

76.     As was true of the Delaware Registered Funds, Tremont's employees in Rye were
appointed to serve on the boards of the Cayman Registered Funds. For example, Suzanne
Hammond was a director of Rye Portfolio LDC and Rye Portfolio Limited and Darren Johnston
was a director of Rye Portfolio Limited and Rye Portfolio Limited XL.  In addition, all of the
Rye Funds were advised by the same law firm in the United States.

**B.      Tremont Controlled Its Relationship With BLMIS From Its New York
Headquarters.**

77.     BLMIS dealt with the same Tremont employees in New York regarding all of the
Rye Direct BLMIS Funds.  Employees in Tremont's New York office directly made redemption
requests to BLMIS for the Rye Direct BLMIS Funds' BLMIS accounts, which redemptions
constitute the subsequent transfers that are the subject of multiple other Trustee adversary
proceedings at issue in the ET Motion.

78.     Tremont's executives in New York, including its CEO Robert Schulman,
executed in New York all BLMIS Customer Agreements and other documents, including Trade
Authorizations, Options Agreements, and IRS Form W-9s, as authorized representatives of the
Rye Direct BLMIS Funds.  Executives in Tremont's Rye office were designated as authorized
signatories on the accounts of the Rye Direct BLMIS Funds.

79.     Beginning as early as 1991, Tremont's executives and employees in New York
met regularly with Madoff and other BLMIS employees in New York, including at BLMIS'
offices in New York.  Sandra Manzke, who founded Tremont, began regularly meeting in New
York with Madoff as early as 1991.  Robert Schulman, Tremont's Chief Executive Officer, also

23

had a long running relationship with Madoff and would "periodically visit [BLMIS' office]

throughout the year."

80.      From the formation of each Rye Direct BLMIS Fund, BLMIS would mail copies

of trade tickets and account statements to Tremont's New York office.

### C.      Tremont's Agreements With BLMIS Granted BLMIS Full Discretion Over The Assets of The Rye Funds And Subjected Tremont To U.S. Laws And Regulations.

81.      The Customer Agreements between BLMIS and the Rye Direct BLMIS Funds

gave BLMIS full discretion over the assets of the Rye Direct BLMIS Funds.  Pursuant to the

Trading Authorizations, the Rye Direct BLMIS Funds authorized Madoff to be their "agent and

attorney in fact" to buy, sell and trade in securities.  The Customer Agreements expressly state

that they are governed by New York law and all of the transactions pursuant to the Customer

Agreements are subject to the provisions of the Securities Exchange Act of 1934 and to the rules

and regulations of the SEC and the Board of Governors of the Federal Reserve System.

82.      The Rye Direct BLMIS Funds agreed that all disputes arising under the Customer

Agreements must be resolved by arbitration under the laws of New York before the American

Arbitration Association, or "an arbitration facility provided by any exchange of which the broker

is a member, or the National Association of Securities Dealers Inc., and in accordance with the

rules pertaining to the selected organization."

### D.      Tremont's Investors Knew They Were Investing In BLMIS.

83.      Investors in all of the Rye Direct BLMIS Funds knew that they were investing in

Madoff's BLMIS in New York.  Tremont's employees in New York spoke openly with their

investors about their funds being invested in Madoff's BLMIS and regularly referred to the Rye

Direct Funds as "our Madoff fund" or as a Madoff "feeder."  Investors were also specifically

24

informed through the Rye Direct BLMIS Funds' Due Diligence Questionnaires that the funds

would be trading in the "U.S. equity market" and related equity index options and that cash

would be held in "U.S. short term treasury bills."  All of the Rye Funds represented in investor

documents that custody of their securities would be held in "a brokerage account with an NASD

registered broker dealer" (i.e. BLMIS).  Tremont's investors knew that any redemption requests

were dependent on the investment manager's ability to liquidate United States securities.

> **E.     Tremont's Cayman Registered Funds Had Their Principal Place of Business In New York.**

84.     In addition, all investors were aware that the Rye Funds had U.S. based counsel

and U.S. based sales contacts.  The Rye Funds' Private Placement Memoranda and marketing

materials openly identified these U.S. ties.

85.     Investors in the Cayman Registered Funds were specifically informed that they

were only permitted to make investments and receive redemptions in U.S. dollars, as was the

case with the Delaware Registered Funds.

86.     Although the Rye Funds at issue in the ET Motion were registered in the Cayman

Islands, they had no more than a nominal presence there.  The Cayman Registered Funds never

had any real offices or operations in the Cayman Islands.  Rye Portfolio LDC and Rye Portfolio

Limited had their registered office at a P.O. Box address in the Cayman Islands, care of a

company that is in the business of providing local addresses to companies.  Rye Portfolio

Limited XL similarly had its registered address at an international law firm in the Cayman

Islands.

87.     The Cayman Registered Funds were not permitted to solicit investors in the

Cayman Islands because they were registered as exempted companies under the Cayman Islands

Companies Law.  Under the Companies Law, "[a]n exempted company shall not trade in the Islands with any person, firm, or corporation except in furtherance of business of the exempted company carried on outside the Islands."  *See* Section 174 of the Companies Laws (2013 Revision).  The Cayman Registered Funds were prohibited from accepting investment funds from members of the public in the Cayman Islands and paid no taxes in the Cayman Islands.

88.    From January 2002 forward, Tremont Partners in New York was the sub-advisor and handled all investment management duties for Rye Portfolio LDC, and from December 2005 forward, the same was true for Rye Portfolio Limited, in each case by virtue of an express delegation of all such duties to Tremont Partners from Tremont (Bermuda) Limited ("Tremont Bermuda"), the nominal investment manager for those funds.  Though incorporated in Bermuda, Tremont Bermuda itself was wholly owned by TGH, registered under the U.S. Investment Advisers Act of 1940, and had Tremont executives in New York serving on its board of directors. For example, Sandra Manzke, Rupert Allan and Robert Schulman, who all served at various times as CEO of TGH, also served as directors of Tremont Bermuda while maintaining their positions in New York.

89.    Prior to such delegation of all duties in 2002 and 2005 respectively, Rye Portfolio LDC and Rye Portfolio Limited were in any event run out of New York, as the Tremont Bermuda office at all times performed only low-level administrative work, handled by at most two employees.  Tremont Bermuda performed no investment management, research, data collection, or sales, all of which were done in New York.  Letters sent to investors on Tremont Bermuda letterhead regularly came from Tremont Partners' employees in New York, who would include their New York contact information on such letters.

90.     As part of its management duties for Rye Portfolio Limited and Rye Portfolio

LDC, Tremont's New York employees, among other things, approved trade tickets and monthly

statements, checked bank activity, and were authorized as bank signatories for the funds.  As

alleged above, BLMIS communicated directly with Tremont's executives and employees in New

York regarding all of the Rye Funds, including Rye Portfolio Limited and Rye Portfolio LDC.

For instance, Darren Johnston, who headed Tremont's Rye Investment Management ("RIM")

division in New York from 2006-2007, and Harry Hodges, who worked under Johnston in New

York, regularly corresponded with BLMIS's Frank DiPascali regarding subscriptions to and

redemptions from Rye Portfolio Limited and Rye Portfolio LDC.

91.     On July 1, 2006, Tremont closed its Bermuda office and formally consolidated the

management of all of its funds to its New York office.  Thereafter, any ministerial functions that

had been handled in Bermuda for Rye Portfolio Limited and Rye Portfolio LDC took place

domestically.  By no later than November 2006, subscriptions for Rye Portfolio Limited and Rye

Portfolio LDC flowed solely through U.S. bank accounts.

92.     Beginning in the fall of 2006 if not earlier, when Tremont formally closed Rye

Portfolio Limited's and Rye Portfolio LDC's Bermuda-based bank accounts, every redemption

payment made by Tremont to an investor, which payment forms the basis for the Trustee's

subsequent transfer complaints, came out of the fund's New York-based bank accounts at the

Bank of New York.

93.     Around the same time, Tremont had formed its RIM division based out of New

York, whose express purpose was to manage and operate all of the Tremont BLMIS funds

together.  Tremont began to refer to and market its BLMIS invested funds as the "Rye Select

Funds" and renamed all of the BLMIS invested funds to include the word "Rye." Tremont

27

explained to its investors that the reason for this change was because Tremont "had a

longstanding presence in Rye, New York and the Rye Select Funds [we]re all about providing [ ]

access to a <u>select</u> group of the investment industry's most exclusive and otherwise unavailable

talent."  (emphasis in original).  From then on, the published materials for all the Rye Funds,

including prospectus statements and marketing materials, expressly directed potential investors

to contact Tremont's employees in New York.

94.      Notably, even before the change to add "Rye" to the funds' names, Tremont had

highlighted the U.S. origins of all the Rye Direct BLMIS Funds, except Rye Portfolio Limited

LDC, by using the word "American" in the fund name.  As alleged in the Tremont Complaint,

Rye Broad Market was originally named American Masters Broad Market Fund, LP.; Rye Prime

Fund was originally named American Masters Broad Market Prime Fund, LP; Rye Portfolio

LDC was originally named Tremont-Broad Market Fund LDC; and Rye Portfolio Limited was

originally named American Masters Broad Market Fund II Limited.

95.      From July 2006 forward, investors in Rye Portfolio Limited and Rye Portfolio

LDC were also specifically instructed to send all subscription agreements directly to Tremont's

New York employees or to the Bank of New York in New York, New York, and all redemption

requests were similarly handled by either Tremont in New York or the Bank of New York.

Starting in October 2006, investors in these funds were also specifically instructed to wire

subscription monies directly to accounts at the Bank of New York.  During this time, the

Directors of Funds, which included New York based director Darren Johnston, had the discretion

to suspend subscriptions and redemptions by investors under varying circumstances, including

when they found redemptions "not reasonably practical" or "prejudicial," and compel

"redemption of Shares for any or no reason."

28

96.    From 2006 onwards, New York-based Tremont Partners also held itself out as the general partner of Cayman Registered Funds Rye Portfolio Limited and Rye Portfolio Limited XL.

97.    With regard to Rye Portfolio Limited XL, from its inception in late 2006, it was managed just like Delaware Registered Fund Rye Broad Market XL, with Tremont Partners as its investment manager and the Bank of New York as its custodian.  Both XL funds also instructed their investors to send subscription agreements and redemption requests to the same address in New York.

**F.    The Rye Funds With Direct BLMIS Accounts Filed Claims With The Trustee.**

98.    Subsequent to the revelation of BLMIS' fraud, the two Delaware Registered Funds with BLMIS accounts (Rye Broad Market and Rye Prime Fund), and the two Cayman Registered Funds with BLMIS accounts (Rye Portfolio Limited and Rye Portfolio LDC) filed claims with the Trustee.  On July 25, 2011, these funds entered into a joint settlement agreement with the Trustee, which agreement was governed by New York law and pursuant to which the funds submitted to the jurisdiction of the U.S. Bankruptcy Court for purposes of enforcing the agreement.  The claims of Rye Broad Market, Rye Portfolio Limited and Rye Portfolio LDC were allowed in connection with the settlement, and these funds have received and continue to receive distributions on their allowed claims.

**G.    The Rye Funds Have Asserted that Their BLMIS-Related Activities Implicate the U.S. Securities Markets and U.S. Securities Laws.**

99.    Finally, in addition to the foregoing, each of the Rye Funds (including the Cayman Registered Funds) have, in other BLMIS-related lawsuits in which they are or were named defendants, themselves asserted (by virtue of their assertions as to preemption by the

29

Securities Litigation Uniform Standards Act and the NY Martin Act) that (i) their BLMIS-related activities were directed to promoting or inducing the sale of securities within or from New York, and that (ii) the securities they purported to trade were U.S. securities covered by the 1933 Exchange Act. *See In re Tremont Securities Law, State Law and Insurance Litigation*, 1:08-cv-11117-TPG (S.D.N.Y.)[1]; *Peshkin et al. v. Tremont Group Holdings, Inc., et al.*, 08-CV-11183.[2]

100.    The Trustee incorporates by reference the allegations of the Complaint filed in *Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-05310 (SMB) (filed December 7, 2010, Bankr. S.D.N.Y.), ECF No. 1.

**The Kingate Global Transfers Are Domestic.**

101.    Kingate Global was a feeder fund that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the account prior to December 11, 2008.

102.    Kingate Global filed a customer claim in the SIPA liquidation.

**A.    Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation.**

103.    Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

104.    Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

105.    Tremont Bermuda served as the co-manager of Kingate Global for approximately

---

[1] See Dkt. #s 142, 149, 154, 280, 285

[2] See Dkt. #s 104, 110, 150.

10 years. Tremont Bermuda was formed in Bermuda, but was itself managed from New York by

employees of Tremont Partners, a Connecticut corporation. Tremont Bermuda's and Tremont

Partners' parent company was Tremont Group Holdings, Inc., a Delaware corporation

(collectively "Tremont").

106.    Kingate Global's manager, consultant, and other service providers, regardless of

where they were organized, wholly or in substantial part operated in New York to manage the

Kingate Global's investments with BLMIS.

107.    Kingate Global's sole business was centered in New York and all deposits with,

and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its

exclusive business relationship with BLMIS in New York.

## B.    The Operative Legal Documents Were New York-Based.

108.    Kingate Global executed Customer Agreements, and other account opening

documents, and delivered the agreements to BLMIS in New York.

109.    Each Customer Agreement expressly states that it is governed by U.S. law and all

of the transactions in the Customer's Account are subject to the provisions of the Securities

Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the

Federal Reserve System, and the Commodities Futures Trading Commission.

110.    Kingate Global agreed that all disputes arising under the Customer Agreements

with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted

in the United States before the American Arbitration Association, or "an arbitration facility

provided by any other exchange of which the broker is a member, or the National Association of

Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the

rules obtaining of the selected organization."

31

### C.    BLMIS Had Full Authority to Make and Execute Investment Decisions.

111.    Kingate Global's Trading Authorization Agreements authorized BLMIS to be the Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

112.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the Kingate Global's investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

113.    BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as the Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### D.    Kingate Global Was Managed From New York.

114.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

115.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

116.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

117.    Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo

32

Grosso.  KML operated through its agents in New York.

118.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

119.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

120.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

121.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

122.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

123.    KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

### E.    Kingate Global Used Banks in New York.

124.    Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan.

125.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

126.    In its role as Kingate Global's custodian, HSBC consistently used New York

33

banks in carrying out its duties for Kingate Management and Kingate Global relating to

investments with BLMIS.

127.    FIM also directed fee payments to be routed through a bank account in New

York.

128.    The Trustee incorporates by reference the allegations of the Fourth Amended

Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No.

100 (Bankr. S.D.N.Y. Mar. 17, 2014).


Dated: New York, New York
      June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF,
LLP**
156 West 56th Street
New York, New York 10019
Tel:  (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
Alan D. Lawn

*Special Counsel to Irving H. Picard, Trustee for
the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff*