**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　Plaintiff-Applicant,<br><br>　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SCHRODER & CO. BANK AG,<br><br>　　　　　Defendant. | Adv. Pro. No. 12-01210 (SMB) |

**TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANT SCHRODER & CO. BANK AG'S MOTION**
**TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER**
<u>**SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS**</u>

The Trustee respectfully submits this supplemental memorandum in opposition to Schroder & Co. Bank AG's ("Schroder") motion to dismiss based upon extraterritoriality and in further support of the Trustee's motion for leave to amend the complaints. As set forth below, the Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendant Schroder ("Proffered Allegations") plead facts evidencing the subsequent transfers received by Schroder are predominantly domestic under the standard set forth in the Extraterritoriality Decision,[1] such that the Trustee's action does not require an extraterritorial application of SIPA or Bankruptcy Code § 550. Schroder's motion to dismiss should be denied, and the Trustee should be granted leave to amend the complaint.

## BACKGROUND & LEGAL STANDARD

The Trustee's Proffered Allegations alleges Schroder received subsequent transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited, ("Sigma," and together with Fairfield Sentry, the "Fairfield Funds"), Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro," and together with Kingate Global, the "Kingate Funds") (the Fairfield Funds together with the Kingate Funds, the "Feeder Funds"). Proffered Allegations ¶ 1. Fairfield Sentry and the Kingate Funds were three of the many BLMIS feeder funds—single-purpose investment funds that pooled their investors' assets to invest with BLMIS. *Id.* ¶ 2. Sigma was a sister fund to Fairfield Sentry known as a currency fund that accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry. *Id.* The Feeder Funds withdrew funds from their BLMIS accounts and transferred those funds to Schroder. *Id.* ¶ 1. Fairfield Sentry also directed transfers to Sigma, which Sigma then transferred to Schroder. *Id.* ¶ 2.

---

[1] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),* 513 B.R. 222 (S.D.N.Y. 2014) ("Extraterritoriality Decision").

1

Schroder argues that because it was organized under the laws of Switzerland, and because the Feeder Funds were organized under the laws of the Territory of the British Virgin Islands ("BVI"), it is entitled to a finding that those transfers are "purely foreign" and must be dismissed under the Extraterritoriality Decision. Schroder is wrong, and its reasoning is contrary to the *Maxwell I* "component events" analysis articulated in the Extraterritoriality Decision,[2] as well as with Second Circuit precedent calling for courts to consider the economic and legal realities of the transactions.[3] Schroder's motion should be denied because: (1) Schroder purposely invested in the Feeder Funds to profit from Madoff's purported investment in the U.S. securities market; (2) Schroder's actions put New York at the center of its transactions with the Feeder Funds; (3) Schroder invested in the Fairfield Funds, which were both operated from their principal place of business in New York; and (4) Schroder invested in the Kingate Funds, whose sole economic purpose was to make money from BLMIS's New York-based investment operations.

### I. SCHRODER PUT NEW YORK AT THE CENTER OF ITS TRANSACTIONS WITH THE FEEDER FUNDS TO PROFIT FROM U.S. SECURITIES MARKETS

By investing in the Feeder Funds, Schroder intended to seek the benefits of investing with BLMIS in New York. Proffered Allegations ¶¶ 11–13. Prior to investing, and based on Schroder's investigation into the Feeder Funds, BLMIS, and Madoff, Schroder knew the following facts:

- In reality, BLMIS in New York was the Feeder Funds' investment adviser;
- BLMIS in New York was the Feeder Funds' custodian;
- BLMIS, a registered broker-dealer, was the Feeder Funds' prime broker;
- New York-based BLMIS implemented Madoff's "split-strike conversion" strategy ("SSC

---

[2] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell Commc'n Corp. v. Société General (In re Maxwell Commc'n Corp.)* 186 B.R. 807, 816–17 (S.D.N.Y. 1995) ("*Maxwell I*")).

[3] *See, e.g., Mastafa v. Chevron Corp.*, 770 F.3d 170, 182 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141–42 (2d Cir. 2014); *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216–17 (2d Cir. 2014).

2

- Strategy") purportedly involving the purchase of U.S. equities traded on U.S. exchanges, options, and U.S. Treasury bills on behalf of the Feeder Funds; and

- Madoff in New York made all investment decisions with respect to the Feeder Funds' investments with BLMIS.

*Id.* ¶ 11.

Schroder also reviewed investigative reports on BLMIS it directed U.S.-based due diligence firm Cambridge Associates LLC ("Cambridge Associates") to prepare, which explicitly detailed that Madoff in New York made all investment decisions with respect to the Feeder Funds' investments with BLMIS. *Id.* ¶ 14.

Schroder conducted significant due diligence on the Feeder Funds, BLMIS, and Madoff in the United States, and received due diligence through its agents, such as Cambridge Associates. *Id.* ¶¶ 18–20. In addition to communicating with other Fairfield Greenwich Group ("FGG") U.S.-based employees, Schroder communicated with Santiago Reyes, a U.S.-based FGG partner, who managed Schroder's relationship with FGG. *Id.* ¶¶ 19–20.

As a result of its due diligence, Schroder executed Fairfield Sentry and Sigma subscription agreements, in which Schroder agreed its investments in the Fairfield Funds would be subject to New York choice of law, jurisdiction, and venue. *Id.* ¶¶ 21–22. Schroder also submitted to a New York choice of law provision in a fee agreement it negotiated with FGG personnel in New York. *Id.* ¶ 23.

Schroder utilized New York bank accounts to direct funds to and from Fairfield Sentry. *Id.* ¶ 24. In its subscription agreements for Fairfield Sentry, Schroder directed that all transfers to and from Fairfield Sentry were to be made to a New York account at the Northern Trust International Banking Corporation held in Schroder's own name. *Id.* ¶¶ 24–26. All Fairfield Sentry subscription payments from Schroder flowed through an account at New York HSBC Bank USA and/or Republic National Bank of New York for ultimate deposit in Fairfield Sentry's

3

bank account, and then to BLMIS's account at JPMorgan Chase NA in New York. *Id.* ¶ 25.

Schroder knew that its transactions with the Kingate Funds were also based in the United States. *Id.* ¶¶ 29–31. Schroder knew that its investments in the Kingate Funds were placed with BLMIS, and that New York-based BLMIS and the U.S. securities market were the center of the transactions. *Id.*

## II. THE FAIRFIELD FUNDS MAINTAINED THEIR PRINCIPAL PLACE OF BUSINESS IN NEW YORK

Fairfield Sentry was the largest BLMIS Feeder Fund. Proffered Allegations ¶ 5. FGG, a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry and Sigma. *Id.* Fairfield Sentry was at all times, a minimum of 95% invested in BLMIS and Sigma 100% invested in Fairfield Sentry. *Id.* ¶¶ 2, 55. Fairfield Sentry's and Sigma's principal place of business was New York and the employees responsible for their management and operations were located in New York. *Id.* ¶¶ 32, 43, 59. Although registered in the BVI, Fairfield Sentry and Sigma had no employees or offices there—just a PO Box. *Id.* ¶¶ 37, 58. All operational decisions for Fairfield Sentry and Sigma were made in New York. *Id.* ¶¶ 43–44, 59–60. Fairfield Sentry's and Sigma's initial and on-going due diligence on BLMIS was conducted in New York and the operative legal documents regarding Fairfield Sentry's BLMIS account were governed by New York law. *Id.* ¶¶ 41, 43, 59–60. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York. *Id.* ¶ 44. BLMIS in New York served as Fairfield Sentry's investment manager and implemented the SSC Strategy for Fairfield Sentry. *Id.* ¶¶ 45–46. Like the other funds that fed Madoff's fraud, the money Fairfield Sentry received from BLMIS is customer property that the Trustee is mandated to recover under SIPA. *Id.* ¶ 1.

4

### III. THE KINGATE FUNDS' INVESTED WITH BLMIS TO MAKE MONEY FROM A NEW YORK-BASED INVESTMENT OPERATION

The Kingate Funds invested exclusively with BLMIS in New York and formed an enterprise with a single economic purpose: to make money from a New York-based investment operation. Proffered Allegations ¶¶ 65, 67. The Kingate Funds executed BLMIS customer agreements governed by U.S. law and venue, that authorized BLMIS to maintain custody of the funds' assets, act as their investment manager and executing broker, and invest their assets in U.S. securities traded only on domestic exchanges. *Id.* ¶¶ 72–73, 75–77. Control over the Kingate Funds rested entirely with BLMIS. *Id.* ¶¶ 75–77.

The Kingate Funds had no physical offices, no employees, and transacted no meaningful business in the BVI. *Id.* ¶ 68. Instead, Kingate Global operated through service providers with substantial connections to the U.S. *Id.* ¶¶ 69–70. For example, Tremont (Bermuda) Limited served as Kingate Global's co-manager for almost 10 years and was itself managed from New York by Tremont Partners, Inc., a Connecticut corporation. *Id.* ¶ 69. Kingate Global was also co-managed by Kingate Management Limited ("KML"), which operated through agents in New York. *Id.* ¶ 81. KML engaged consultants FIM Limited and FIM Advisers LLP (together "FIM") to perform due diligence on BLMIS. *Id.* ¶ 84. FIM's affiliate FIM (USA) Inc. in New York was the hub for FIM's feeder fund due diligence, including monitoring, researching, and soliciting investors for Kingate Global. *Id.* ¶¶ 85–86. Because the Kingate Funds conducted their Madoff business in the United States, the transfers made by the Kingate Funds to Schroder are not purely foreign.

### IV. CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, this Court should grant the Trustee's motion for leave to amend and deny Schroder's motion to dismiss.

5

| | |
|---|---|
| Dated: June 26, 2015<br>      New York, New York | /s/ Thomas L. Long<br>**Baker & Hostetler LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone:  (212) 589-4200<br>Facsimile:  (212) 589-4201<br>David J. Sheehan<br>Thomas L. Long<br>Catherine E. Woltering<br><br>**Baker & Hostetler LLP**<br>65 East State Street, Suite 2100<br>Columbus, Ohio 43215<br>Telephone:  (614) 228-1541<br>Facsimile:  (614) 462-2616<br>Brian R. Noethlich<br><br>*Attorneys for Irving H. Picard, Trustee*<br>*for the substantively consolidated SIPA*<br>*Liquidation of Bernard L. Madoff Investment*<br>*Securities LLC and the estate of Bernard L.*<br>*Madoff* |