**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01210 (SMB) |
| Plaintiff, | |
| v. | |
| SCHRODER & CO. BANK AG, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO SCHRODER & CO. BANK AG** |
| Defendant. | |

The Trustee, by his undersigned counsel, for his Proffered Allegations Pertaining to the Extraterritoriality Issue as to defendant Schroder & Co. Bank AG ("Schroder"), states:

1.      The Trustee seeks to recover at least $30,598,480 in subsequent transfers of BLMIS customer property made to Schroder by Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma," and together with Fairfield Sentry, the "Fairfield Funds"), Kingate Global Fund Ltd. ("Kingate Global"), and Kingate Euro Fund Ltd. ("Kingate Euro," and together with Kingate Global, the "Kingate Funds") (the Fairfield Funds together with the Kingate Funds, the "Feeder Funds").

2.      Fairfield Sentry, Kingate Global, and Kingate Euro were three of the many BLMIS feeder funds—single-purpose investment funds that pooled their investors' assets to invest with BLMIS, capitalizing on its consistent returns.  Sigma was a sister fund to Fairfield Sentry known as a currency fund, which accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of those funds in Fairfield Sentry.  Fairfield Sentry also directed transfers to Sigma which Sigma then transferred to Schroder.

3.      Schroder, formerly known as J. Henry Schroder Bank AG, is a shareholder owned company incorporated and organized under the laws of Switzerland.  Defendant Schroder is wholly owned by London-based Schroders plc.

4.      Schroder was at all times relevant part of Schroders plc's sophisticated global financial network employing over 3,500 people worldwide and operating from 37 offices in 27 different countries—including the United States—maintaining proprietary investments, structuring derivative products, and providing banking and investment services to retail, private, and commercial banking clients.

1

5.      From November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS's investment advisory business ("IA Business").   Fairfield Sentry was the largest BLMIS feeder fund, and Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, created, operated, and controlled Fairfield Sentry and Sigma.

6.      Although incorporated in the Territory of the British Virgin Islands ("BVI"), Fairfield Sentry and Sigma were shell corporations present in the BVI only on paper.  Fairfield Sentry and Sigma had no employees and no office, and were operated almost entirely by FGG personnel in New York.

7.      From 1994 to 2008 and from 1996 to 2008, Kingate Global and Kingate Euro, respectively, maintained direct customer accounts with BLMIS's IA Business.  The Kingate Funds were organized under the laws of the BVI.

I.      **SCHRODER PURPOSELY INVESTED IN FEEDER FUNDS TO PROFIT FROM MADOFF'S PURPORTED INVESTMENT IN THE U.S. SECURITIES MARKET**

8.      Schroder purposely invested in the Feeder Funds as a means of profiting from BLMIS in New York.

9.      Prior to its subscriptions in the Feeder Funds, Schroder conducted significant due diligence on the BLMIS feeder funds, BLMIS, and Madoff.

10.     Schroder's due diligence included communications with New York-based feeder funds, including the Fairfield Funds, and review of their marketing materials, due diligence reports, and other fund documents.

11.     Through its due diligence on Feeder Funds and BLMIS, and the due diligence of its agents, Schroder knew that:

- Madoff operated BLMIS, which in turn purported to execute the "split-strike conversion" strategy ("SSC Strategy") on behalf of the Fairfield Funds and Kingate Funds;

2

- Regardless of who was listed by the Feeder Funds, in reality the investment adviser for each of the Fairfield Funds and Kingate Funds was BLMIS in New York;

- BLMIS maintained custody of the Fairfield Funds' and Kingate Funds' investments in New York;

- BLMIS, a New York-based registered broker-dealer, purported to execute the SSC Strategy in New York as prime broker for the Fairfield Funds and the Kingate Funds;

- BLMIS purported to invest the assets invested with the SSC Strategy in U.S. equities and U.S. Treasury bills ("Treasurys") traded on U.S. exchanges on behalf of the Fairfield Funds and Kingate Funds; and

- Control over the Fairfield Funds' and Kingate Funds' investments rested entirely with BLMIS and Madoff in New York.

12.    Schroder knew that the success of any of the Feeder Funds was dictated by Madoff's purported returns.

13.    Schroder knowingly invested in the Feeder Funds in order to profit from Madoff's purported investment in the U.S. securities market.

14.    Schroder directors also reviewed and analyzed investigative reports on Fairfield Sentry and BLMIS it directed U.S.-based due diligence firm Cambridge Associates LLC ("Cambridge Associates") to prepare (the "Cambridge Reports").  Schroder directors, including George and Philip Mallinckrodt, were part of a review group that managed the Schroder family's investments ("Review Group").  The Review Group, including Schroder's directors, engaged Cambridge Associates to investigate Fairfield Sentry and BLMIS.  The Cambridge Reports confirmed that Schroder knew Madoff in New York made all investment decisions with respect to the Feeder Funds' investments with BLMIS.

15.    Understanding the Feeder Funds were each invested with BLMIS, Schroder invested with the ultimate objective to gain access to and profit from its investments with BLMIS and Madoff in the United States.

3

16.     Schroder's decision to redeem from the Feeder Funds was equally motivated by the Feeder Funds' complete reliance on BLMIS and Madoff—not the Feeder Funds or their location of incorporation.  Specifically, after conducting an investigation and ongoing diligence into Madoff and BLMIS, U.S.-based Cambridge Associates confirmed the Review Group's concerns and suspicions about Madoff and BLMIS.  Shortly thereafter, Schroder redeemed a significant portion of its investments in Fairfield Sentry.

## II.     SCHRODER'S ACTIONS PUT NEW YORK AT THE CENTER OF ITS TRANSACTIONS WITH THE FAIRFIELD FUNDS

17.     Schroder knowingly and purposefully put New York at the center of its transactions with the Fairfield Funds.  Specifically, Schroder conducted due diligence on the Fairfield Funds in the United States; executed subscription agreements for the Fairfield Funds agreeing its investments would be subject to New York choice of law, jurisdiction, and venue; and repeatedly utilized New York banks to transfer funds to and from the Fairfield Funds.

### A.     Schroder Conducted Due Diligence in the United States, Ultimately Investing by Executing Subscription Agreements that Invoked New York Choice of Law, Venue, and Jurisdiction

18.     Schroder conducted significant due diligence on the Fairfield Funds, Madoff, and BLMIS in the United States—either directly or through its agents, such as Cambridge Associates.

19.     U.S.-based FGG partner Santiago Reyes initiated contact with Schroder in connection with Schroder's investments in the Fairfield Funds, and subsequently served as the FGG sales representative responsible for FGG's relationship with Schroder.

20.     Schroder regularly communicated with FGG representatives in New York concerning its investments in the Fairfield Funds.  Schroder also met with New York based-FGG personnel regarding its Fairfield Funds investments.

4

21.    Based in part on the due diligence Schroder conducted on the Fairfield Funds and BLMIS in New York, Schroder executed subscription agreements with the Fairfield Funds.  By executing the subscription agreements, Schroder agreed that its Fairfield Funds investments "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

22.    Schroder also agreed "that any suit, action or proceeding . . . with respect to th[ese] Agreement[s] and [the Fairfield Funds] may be brought in New York," and Schroder "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding."

23.    Schroder also received fees from FGG for its Fairfield Sentry investments. Schroder negotiated with FGG personnel in New York to enter into a fee agreement in connection with its investments in the Fairfield Funds, whereby Schroder would receive a portion of the performance fee charged to Fairfield Fund shareholders.  This agreement also specified that it was to be "governed by and construed in accordance with the laws of the State of New York."   Under this agreement between Schroder and FGG, Schroder received tens of thousands of dollars paid from Fairfield Greenwich Limited's ("FG Limited") New York account at JPMorgan Chase Bank NA ("JP Morgan") in connection with its Fairfield Sentry investments.

**B.    Schroder Repeatedly Utilized New York Banks to Transfer Funds**

24.    Schroder utilized New York bank accounts, including its own New York account at the Northern Trust International Banking Corporation ("Northern Trust"), to transfer funds to and from Fairfield Sentry.

25.    Schroder executed subscription agreements in connection with its investments in Fairfield Sentry.  These agreements stated that all money from Schroder be directed to a New York HSBC Bank USA correspondent bank account, and/or a Republic National Bank of New

York correspondent bank account, for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York. On at least 48 occasions, over the course of 11 years, in connection with subscribing funds to Fairfield Sentry, Schroder directed funds to this New York HSBC Bank USA and/or Republic National Bank of New York account.

26.    Schroder also used an account held in its own name at Northern Trust in New York to receive transfers from Fairfield Sentry. In its Fairfield Sentry subscription agreements that Schroder completed, Schroder directed that all Schroder redemptions and payments be sent to this Northern Trust account in New York. Schroder utilized this account repeatedly—at least 34 times over a 6 year period—to receive $25,143,816 in redemption payments from Fairfield Sentry.

27.    Schroder also utilized its account at Northern Trust to receive fee payments in connection with its Fairfield Sentry investments and its fee agreement with FG Limited. On at least 7 occasions, Schroder used this account to receive fee payments from FG Limited.

## III.    SCHRODER'S ACTIONS PUT NEW YORK AT THE CENTER OF ITS TRANSACTIONS WITH THE KINGATE FUNDS

28.    Schroder received subsequent transfers of BLMIS customer property collectively made to Schroder by the Kingate Funds.

29.    Investors in the Kingate Funds received and analyzed the Kingate Funds' offering memoranda, which explained that the Kingate Funds have "established a discretionary account with an Investment Advisor who is based in the United States and who invests or trades in a wide range of equity securities, and, to a lesser extent, other securities and derivatives."

30.    The Kingate Funds' offering memoranda further detailed that:

- "[t]he Investment Advisor is a New York based NASD registered broker-dealer;"

- "[t]he Investment Advisor utilizes the 'split strike conversion strategy;'"

- the managers of the Kingate Funds had "delegated all investment management duties with regard to … Shares to the Investment Advisor;"

- "[a]ll investment decisions in the account held with the Investment Advisor are effected by person associated with the Investment Advisor;"

- "neither the Co-Managers nor…Shareholders will have any control over the investment and trading decisions of the Investment Advisor, and no person should invest in the Fund unless willing to entrust all aspects of the investment management of the Fund to the selected Investment Advisor;" and

- "custody" of Schroder's investments in the Kingate Funds would be held by the Investment Advisor.

31.    From their review of the Kingate Funds' offering memoranda, investors like Schroder knew that by investing in Kingate Global, they were really directing investments to BLMIS's unfettered discretion and custody in New York.

## IV.    THE FAIRFIELD FUNDS MAINTAINED THEIR PRINCIPAL PLACE OF BUSINESS IN NEW YORK

32.    At all relevant times, Fairfield Sentry's and Sigma's principal place of business was in New York and Fairfield Sentry and Sigma were U.S. residents.

### A.    The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

33.    In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

34.    The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Fairfield Lambda

7

Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. Dollars, and then invested all of the U.S. Dollars in Fairfield Sentry.

35.    FGG also included a number of administrative entities that purportedly provided management and back office support to the funds.  These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

**B.    Fairfield Sentry**

36.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the BVI, for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

37.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").  Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm.  The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations.  The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

8

38.    Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

      1.    **Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States**

39.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

40.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

9

41.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

**2.    FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities**

42.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with back office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

10

### 3.    FGG New York Personnel Managed Fairfield Sentry

43.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

44.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.   From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

45.    Fairfield Sentry's subscription agreements also incorporated its Private Placement Memoranda ("PPMs") by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York;

(2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's

SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or

short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's

services were "essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager

46.    Although FGG attempted to hide its manager, BLMIS served as the investment

manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality

made all of Fairfield Sentry's investment decisions.

47.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's

Littlestone Associates, which was a money management firm also located in New York City.

Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG

clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG

Limited FG.  FG Limited was formed under the laws of Ireland.

48.    While FG Limited was formed under foreign law, it reported its principal place of

business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters.  Upon the formation

of FG Limited, Fairfield International Managers assigned all of its management contracts with

Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry

12

Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

49.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

50.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three Feeder Funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

51.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

52.      Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

53.      In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

54.      After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

55.      As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

**C.    Sigma**

56.      FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield

Sentry using Euros, FGG created Sigma.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

57.    Noel and Tucker organized Sigma on November 20, 1990 as an international business company under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Sigma.  Sigma is currently in liquidation in proceedings in the BVI and United States.

58.    Also like Fairfield Sentry, Sigma was a shell corporation present in the BVI only on paper.  It had no employees and maintained no offices.  It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma to FGG's New York headquarters.  Sigma was operated almost entirely by FGG New York Personnel.

59.    As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Sigma.  Once Sigma was opened for investors, FGG New York Personnel monitored Sigma's investments into, and redemptions from, Fairfield Sentry; managed Sigma's relationships with clients and potential clients; created marketing and performance materials for Sigma; marketed Sigma; performed administrative functions required by Sigma; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma; and conducted various other due diligence and risk management activities.  Until Sigma's liquidation, FGG maintained Sigma's books and records in New York.

15

FGG New York Personnel also had final control of Sigma's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

60.    FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma shares.    Like Fairfield Sentry's subscription agreements, Sigma's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated its PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's sole assets.    Sigma's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments.    Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities.    This same risk was also disclosed in Fairfield Sentry's PPMs.

61.    Noel and Tucker were the original directors of Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma with back office administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma shares.    Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma assets.    As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma at Citco Bank Dublin.    FGG New York Personnel had final control of the Sigma Citco Bank Dublin bank accounts.    Finally, FGG New York Personnel controlled all of Sigma's relationships with the Citco entities.

62.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros and Lambda's investors' Swiss Francs into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS—Noel executed separate contracts on Sigma's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

63.    FGG New York Personnel initially listed FG Limited as the investment manager for Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma PPMs to indicate FG Bermuda was Sigma's Investment Manager.  In fact there were no duties for any investment manager because Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

64.    The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

## V.    THE KINGATE FUND TRANSFERS ARE DOMESTIC

65.    The Kingate Funds were feeder funds that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $926,351,905 of customer property to the Kingate Funds during the life of the accounts prior to December 11, 2008.

66.    Each of the Kingate Funds filed customer claims in the SIPA liquidation.

### A.    The Kingate Funds' Invested with BLMIS to Make Money from a New York-Based Investment Operation

67.    The Kingate Funds, together with their purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an

17

enterprise with a single economic purpose: to make money from a New York-based investment operation.

68.     Despite having a registered address in the BVI, the Kingate Funds had no physical offices, no employees, and transacted no meaningful business there.

69.     Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

70.     The Kingate Funds' manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Funds' investments with BLMIS.

71.     The Kingate Funds' sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and the Kingate Funds profited from their exclusive business relationship with BLMIS in New York.

**B.      The Operative Legal Documents Were New York-Based**

72.     The Kingate Funds executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

73.     Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

74.     The Kingate Funds agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to

be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### C.    BLMIS Had Full Authority to Make and Execute Investment Decisions

75.    The Funds' Trading Authorization Agreements authorized BLMIS to be the Kingate Funds' "agent and attorney in fact," giving BLMIS full discretion over the Kingate Funds' invested assets and to buy, sell, and trade in securities for the Kingate Funds.

76.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the Kingate Funds' investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

77.    BLMIS acted as the Kingate Funds' executing broker in purporting to purchase securities on the Kingate Funds' behalf, and acted as the Kingate Funds' custodian for the securities purportedly held on the Kingate Funds' behalf.

### D.    The Kingate Funds Were Managed From New York

78.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to the Kingate Funds in return for fees, it was a valuable contributor in New York to the success of the Kingate Funds.

79.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

19

80.     Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

81.     The Kingate Funds were also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of the Kingate Funds, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

82.     KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

83.     KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

84.     KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

85.     Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as the Kingate Funds' investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

86.     FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for the Kingate Funds.

87.     KML and the FIM entities actively participated in the Kingate Funds business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

### E.    Kingate Funds Used Banks in New York

88.    The Kingate Funds used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

89.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

90.    In its role as the Kingate Funds' custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and the Kingate Funds relating to investments with BLMIS.

91.    FIM also directed fee payments to be routed through a bank account in New York.

92.    The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

*[The remainder of page intentionally left blank]*

Dated: June 26, 2015
New York, New York

/s/  Thomas L. Long

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Thomas L. Long
Catherine E. Woltering

**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone:  (614) 228-1541
Facsimile:  (614) 462-2616
Brian R. Noethlich

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the estate of Bernard L.*
*Madoff*