**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: BERNARD L. MADOFF, Debtor. | |
| | Adv. Pro. No. 12-01273 (SMB) |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, Plaintiff, v. Mistral (SPC), Defendant. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO MISTRAL (SPC)** |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the Extraterritoriality Issue as to Mistral (SPC) ("Mistral"), alleges the following:

## INTRODUCTION

1. The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2) Mistral's redemptions totaling $3,400,033 (the "Transfers") from Rye Select Broad Market Portfolio Ltd. (*f/k/a* American Masters Broad Market Fund II Limited) ("Rye Portfolio Limited") and Kingate Global Fund Ltd. ("Kingate Global") (collectively, the "BLMIS Feeder Funds").

2. Mistral was a shareholder in the BLMIS Feeder Funds. Each of the BLMIS Feeder Funds invested at least 95% of their assets in accounts managed by New York-based BLMIS.

## MISTRAL'S TRANSFERS AND THE COMPONENT EVENTS OF ITS BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

3. Mistral intentionally invested in the BLMIS Feeder Funds to profit from BLMIS's purported investments in the United States, and the Transfers and component events of its BLMIS Feeder Fund transactions were predominantly domestic.

### Mistral is a Hedge Fund Managed and Operated out of the United States, Whose Investments Arose From Its New York-Based Manager's Relationship With New York-Based Tremont.

4. Mistral is a hedge fund managed and operated out of the United States, whose investments in the BLMIS Feeder Funds arose from its New York-based manager's relationship with New York-based Tremont (defined below). Mistral's business at all relevant times was to invest in other hedge funds, including the BLMIS Feeder Funds. Mistral had no employees or real offices of its own and no meaningful business operations—in the Cayman Islands where it

was registered or anywhere else. Mistral's only business activities were its investments, which were made by its U.S.-based fund manager.

5. Although organized in the Cayman Islands, Mistral has never since its formation in 2004 had more than a P.O. Box as its Cayman registered office. As an exempt company under the Cayman Islands Companies Law, Mistral was at all relevant times prohibited from soliciting investors in the Cayman Islands. *See* Section 174 of the Companies Law (2013 Revision) ("An exempted company shall not trade in the Islands with any person, firm or corporation except in furtherance of the business of the exempted company carried on outside the Islands.") Mistral was audited in New York by KPMG.

6. Mistral's manager and operator was New York-based Credit Suisse Index Co. Inc. (*f/k/a* Credit Suisse First Boston Index Co., Inc.), a Delaware corporation (the "U.S. Fund Manager"). The U.S. Fund Manager is an affiliate of Credit Suisse Group AG ("CS Group") and its principal operating subsidiary Credit Suisse AG ("CS AG"), which has a significant base of operations in the United States, including thousands of U.S. employees, billions of dollars in domestic assets, and a headquarters in New York. CS AG and certain other Credit Suisse entities are defendants in a recovery action by the Trustee for transfers received separately by those entities—*Picard v. Credit Suisse AG, et al.* (Adv. Pro. No. 11-02925) (for which the Trustee is also filing proffered allegations as to extraterritoriality).

7. Mistral's investments in the BLMIS Feeder Funds arose out of the U.S. Fund Manager's relationship with Tremont Group Holdings, Inc. ("TGH"), a Delaware corporation. TGH, together with one or more of its affiliates (collectively, "Tremont"), (i) created and operated the Rye family of BLMIS feeder funds out of Rye, New York, including Rye Portfolio Limited and (ii) managed Kingate Global at relevant times.

8. The U.S. Fund Manager was partners with TGH in a New York-based, Delaware-registered joint venture named Credit Suisse Tremont Index LLC. This joint venture operated a

2

fund index known as the Credit Suisse/Tremont Hedge Fund Index (the "CS/Tremont Index"). Mistral invested in funds that were tracked by this U.S.-based index—namely, Rye Portfolio Limited and Kingate Global. The U.S. Fund Manager also managed and operated two other hedge funds—Solon Capital, Ltd. ("Solon") and Zephyros Limited ("Zephyros")—which similarly invested in hedge funds that were tracked by the CS/Tremont Index. Solon and Zephyros are defendants in recovery actions by the Trustee as to other transfers received separately by those entities—*Picard v. Solon Capital, Ltd.* (Adv. Pro. No. 12-01025) and *Picard v. Zephyros Limited* (Adv. Pro. No. 12-01278)—for which the Trustee is also filing proffered allegations as to extraterritoriality.

**The Entire Purpose of Mistral's Investments was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

9. The entire purpose of Mistral's investments in the BLMIS Feeder Funds was to invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and its BLMIS Feeder Fund investments were all centered in the United States.

10. Mistral knew and intended that its investments would be transferred to BLMIS in New York to manage and invest in the U.S. securities markets. Mistral made such investments for the express purpose of receiving returns on U.S.-based investments from BLMIS.

11. As the operator of the CS/Tremont Index, Mistral's U.S. Fund Manager knew that Madoff and BLMIS controlled the investments in the BLMIS Feeder Funds, as noted, for example, in e-mails between Credit Suisse personnel (further discussed below) and Tremont which refer to Rye Portfolio Limited as "the Bernie Maddof [sic] fund" and refer to Madoff as the "custodian".

12. Moreover, shareholders in Rye Portfolio Limited and Kingate Global, like Mistral, were required to enter into a subscription agreement each time they subscribed for

3

shares in (i.e. invested money into) the funds. Mistral remitted subscription payments to such funds at least five times.

13. Upon entering into subscription agreements with Rye Portfolio Limited, Mistral affirmed that it received and read the Rye Portfolio Limited amended and restated prospectus (the "Rye Portfolio Limited PPM"). As a subscriber, Mistral also received marketing materials and other investor documents, such as due diligence questionnaires, from Rye Portfolio Limited.

14. Based on information contained in the Rye Portfolio Limited subscription agreements, PPM, marketing materials and other investor documents, Mistral knew that:

- Rye Portfolio Limited would have a "Manager" that used a "split-strike conversion" trading strategy (the "SSC Strategy"), a reference to BLMIS;

- Rye Portfolio Limited would be trading in large-cap U.S. stocks and related equity index options and cash would be held in short-dated U.S. T-Bills; and

- the securities would be custodied in a brokerage account at an NASD-registered broker/dealer (i.e., BLMIS in New York).

15. In connection with its investment in Kingate Global, Mistral also entered into a subscription agreement wherein it affirmed having received and read the Kingate Global amended and restated information memorandum (the "Info Memo"). The Info Memo provided substantially similar information as the Rye Portfolio Limited PPM, marketing materials and other investor documents, including that Kingate Global's investments in U.S. securities and Treasuries would be custodied in New York, managed by an NASD-registered broker dealer (i.e. BLMIS), and use the same SSC Strategy.

**Mistral Purposefully Utilized a U.S. Bank Account for the Investments and Redemptions It Made.**

16. Mistral purposefully used a U.S. bank account and the U.S. banking system in connection with its subscriptions into and redemptions from the BLMIS Feeder Funds, including with respect to the Transfers at issue.

17. During the relevant period, Mistral received at least three redemptions totaling $3,400,033 out of the BLMIS Feeder Funds, which payments constitute the Transfers at issue. Mistral remitted at least five subscription payments to the BLMIS Feeder Funds, which payments constitute the totality of its investments therein.

18. New York or New Jersey was the situs selected by Mistral for making and receiving such transfers. Specifically, Mistral used a bank account at the Northern Trust International Banking Corporation in New York or New Jersey to effect such payments (the "U.S. Account").

19. With respect to Rye Portfolio Limited, Mistral designated such use of this U.S. Account in subscription and redemption documents. With respect to Kingate Global, a Kingate Global bank statement indicates that Mistral's one redemption from Kingate Global went into this U.S. Account.

20. The BLMIS Feeder Funds also designated U.S. bank or correspondent accounts to receive subscriptions from investors, including Mistral. Kingate Global's Info Memo required that subscription payments from Mistral to Kingate Global be sent to a U.S. correspondent account, for further deposit into Kingate Global's bank account. The Rye Portfolio Limited PPM in effect as of mid- to late-2006 required that subscription payments from Mistral to Rye Portfolio Limited be sent to a U.S. bank account at Bank of New York in New York. From these bank accounts, the funds were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

21. Beginning in the fall of 2006 if not earlier, Rye Portfolio Limited also used the above Bank of New York account in New York to make redemption payments to investors. Every redemption that Mistral received from Rye Portfolio Limited came from that New York-based account.

5

**Mistral and the U.S. Fund Manager Relied Heavily on the Use of New York-Based Credit Suisse Personnel and Had Ready Access to Tremont Executives in New York to Perform Due Diligence on the BLMIS Feeder Funds.**

22.     Mistral had the benefit of several domestic sources of information and due diligence with respect to the BLMIS Feeder Funds, by virtue of the fact that (i) its U.S. Fund Manager was affiliated with Credit Suisse (and in particular Credit Suisse's U.S.-based operations) and (ii) that fund manager's access to information from New York-based Tremont, its joint venture partner.

23.     Mistral and its U.S. Fund Manager relied heavily on New York-based personnel at Credit Suisse's New York offices and had ready access to Tremont executives in order to perform due diligence on, and communicate with, the BLMIS Feeder Funds, in connection with Mistral's investments.

24.     Through the use of New York-based Credit Suisse personnel, the U.S. Fund Manager performed due diligence on BLMIS and the BLMIS Feeder Funds in connection with its responsibilities as owner of the CS/Tremont Index and U.S. manager of Mistral (and of two similar funds—Solon and Zephyros). It also had access to the information and knowledge of its U.S.-based joint venture partner Tremont, which created and/or managed both funds in which Mistral was invested—Kingate Global and Rye Portfolio Limited (as part of the Tremont family of BLMIS feeder funds)—out of Rye, New York. Tremont was Credit Suisse's primary contact for both Rye Portfolio Limited and Kingate Global.

25.     New York-based Credit Suisse employees including Maureen Meehan ("Meehan"), Jaques Clough ("Clough"), Brian Peterson ("Peterson"), and Parth Mehta ("Mehta") analyzed a significant volume of due diligence information from Tremont for Mistral, as well as the other two CS/Tremont Index-based funds, Solon and Zephyros (the three funds together, the "Index Funds"). These Credit Suisse employees had regular and on-going communications and/or meetings with Tremont's management. Typical examples of this U.S.-

6

based due diligence include: (i) a September 2006 request from Meehan to Tremont's Darren Johnston ("Johnston") in New York for Kingate Global's 2005 audited financial statements so she could conduct due diligence for all three Index Funds (Johnston emailed Kingate Global's 2004 and 2005 statements to her from his New York office); (ii) Meehan's 2007 and 2008 requests for Rye Portfolio Limited's and Kingate Global's assets under management ("AUM"), as well as other due diligence information for "index product" Mistral; (iii) a March 2008 invitation from Rupert Allan, then President & Chief Executive Officer of Tremont in Rye, New York, to Peterson and Clough to meet in Tremont's Rye, New York offices to discuss Credit Suisse's operational due diligence needs "as it relate[d] to Bernie Madoff", with an e-mail chain subject line, "CS/Tremont Index Business"; and (iv) a September 2008 request from Mehta to Tremont for Rye Portfolio Limited's AUMs on a monthly basis for use by Mistral and the other Index Funds.

**Tremont And Its BLMIS Invested Funds Had Their Principal Place of Business In New York.**

26.     TGH is a Delaware corporation.  Tremont Partners is a Connecticut corporation. TGH and Tremont Partners operated out of the same office in Rye, New York, and managed, among others, three Delaware registered funds and three Cayman Islands registered funds that were invested in Bernard L. Madoff's BLMIS.  Tremont Partners is an investment advisor registered under the Investment Advisers Act of 1940.  As alleged below, Tremont and its BLMIS funds had their principal place of business in New York and were managed from their New York headquarters.

      **A.**     **Tremont Operated And Controlled All of The Rye Funds From Its New York Headquarters.**

27.     The three Delaware registered funds (which are not at issue in the Motion to Dismiss Based on Extraterritoriality (the "ET Motion") but are relevant to the allegations herein)

7

are: (i) Rye Select Broad Market Fund, L.P. ("Rye Broad Market"), (ii) Rye Select Broad Market XL Fund, L.P. ("Rye Broad Market XL"), and (iii) Rye Select Broad Market Prime Fund, L.P. ("Rye Prime Fund") (collectively, the "Delaware Registered Funds"). The three Cayman Islands registered funds (which are at issue in the ET Motion) are: (i) Rye Portfolio Limited, (ii) Rye Select Broad Market XL Portfolio Limited ("Rye Portfolio Limited XL"), and (iii) Rye Select Broad Market Insurance Portfolio LDC ("Rye Portfolio LDC") (collectively, the "Cayman Registered Funds"). The Delaware Registered Funds and Cayman Registered Funds are referred to together as the "Rye Funds."

28. Each of Rye Broad Market, Rye Prime Fund, Rye Portfolio Limited and Rye Portfolio LDC had direct accounts with BLMIS (these funds are collectively referred to as "Rye Direct BLMIS Funds"). Tremont established the other two funds that did not have direct BLMIS accounts—Rye Broad Market XL and Rye Portfolio Limited XL—in an effort to provide investors with an investment that would triple the normal BLMIS performance through total return swaps. As part of this strategy, the Rye Broad Market XL and Rye Portfolio Limited XL funds entered into swap agreements with counterparties, consisting mainly of financial institutions, that generally agreed to pay these funds on a three times levered basis an amount equal to the increase in the net asset value of the Rye Broad Market and Rye Portfolio Limited funds. Rye Broad Market XL's swaps were based on the performance of the Rye Broad Market fund, while Rye Portfolio Limited XL's swaps were based on the performance of the Rye Portfolio Limited fund.

29. From their inception and at all relevant times thereafter, Tremont's Cayman Registered Funds were set up and thereafter operated as parallel funds to the Delaware Registered Funds. Tremont made all management decisions and conducted all due diligence regarding both the Delaware and Cayman funds from its office in Rye, New York. All of the Rye Funds were marketed alongside one another by Tremont employees in New York.

8

Employees in Tremont's New York office communicated directly with investors and potential investors regarding all of the funds. Oftentimes, Tremont's employees in New York received inquiries and sent information in the same email about both the Delaware and the Cayman funds. Tremont's employees in New York approved subscriptions and redemptions for all of the Rye Funds.

30. As was true of the Delaware Registered Funds, Tremont's employees in Rye were appointed to serve on the boards of the Cayman Registered Funds. For example, Suzanne Hammond was a director of Rye Portfolio LDC and Rye Portfolio Limited and Darren Johnston was a director of Rye Portfolio Limited and Rye Portfolio Limited XL. In addition, all of the Rye Funds were advised by the same law firm in the United States.

### B. Tremont Controlled Its Relationship With BLMIS From Its New York Headquarters.

31. BLMIS dealt with the same Tremont employees in New York regarding all of the Rye Direct BLMIS Funds. Employees in Tremont's New York office directly made redemption requests to BLMIS for the Rye Direct BLMIS Funds' BLMIS accounts, which redemptions constitute the subsequent transfers that are the subject of multiple other Trustee adversary proceedings at issue in the ET Motion.

32. Tremont's executives in New York, including its CEO Robert Schulman, executed in New York all BLMIS Customer Agreements and other documents, including Trade Authorizations, Options Agreements, and IRS Form W-9s, as authorized representatives of the Rye Direct BLMIS Funds. Executives in Tremont's Rye office were designated as authorized signatories on the accounts of the Rye Direct BLMIS Funds.

33. Beginning as early as 1991, Tremont's executives and employees in New York met regularly with Madoff and other BLMIS employees in New York, including at BLMIS's offices in New York. Sandra Manzke, who founded Tremont, began regularly meeting in New

9

York with Madoff as early as 1991. Robert Schulman, Tremont's Chief Executive Officer, also had a long running relationship with Madoff and would "periodically visit [BLMIS's office] throughout the year."

34.     From the formation of each Rye Direct BLMIS Fund, BLMIS would mail copies of trade tickets and account statements to Tremont's New York office.

### C.    Tremont's Agreements With BLMIS Granted BLMIS Full Discretion Over The Assets of The Rye Funds And Subjected Tremont To U.S. Laws And Regulations.

35.     The Customer Agreements between BLMIS and the Rye Direct BLMIS Funds gave BLMIS full discretion over the assets of the Rye Direct BLMIS Funds. Pursuant to the Trading Authorizations, the Rye Direct BLMIS Funds authorized Madoff to be their "agent and attorney in fact" to buy, sell and trade in securities. The Customer Agreements expressly state that they are governed by New York law and all of the transactions pursuant to the Customer Agreements are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System.

36.     The Rye Direct BLMIS Funds agreed that all disputes arising under the Customer Agreements must be resolved by arbitration under the laws of New York before the American Arbitration Association, or "an arbitration facility provided by any exchange of which the broker is a member, or the National Association of Securities Dealers Inc., and in accordance with the rules pertaining to the selected organization."

### D.    Tremont's Investors Knew They Were Investing In BLMIS.

37.     Investors in all of the Rye Direct BLMIS Funds knew that they were investing in Madoff's BLMIS in New York. Tremont's employees in New York spoke openly with their investors about their funds being invested in Madoff's BLMIS and regularly referred to the Rye Direct Funds as "our Madoff fund" or as a Madoff "feeder." Investors were also specifically

10

informed through the Rye Direct BLMIS Funds' Due Diligence Questionnaires that the funds would be trading in the "U.S. equity market" and related equity index options and that cash would be held in "U.S. short term treasury bills." All of the Rye Funds represented in investor documents that custody of their securities would be held in "a brokerage account with an NASD registered broker dealer" (i.e. BLMIS). Tremont's investors knew that any redemption requests were dependent on the investment manager's ability to liquidate United States securities.

### E. Tremont's Cayman Registered Funds Had Their Principal Place of Business In New York.

38. In addition, all investors were aware that the Rye Funds had U.S. based counsel and U.S. based sales contacts. The Rye Funds' Private Placement Memoranda and marketing materials openly identified these U.S. ties.

39. Investors in the Cayman Registered Funds were specifically informed that they were only permitted to make investments and receive redemptions in U.S. dollars, as was the case with the Delaware Registered Funds.

40. Although the Rye Funds at issue in the ET Motion were registered in the Cayman Islands, they had no more than a nominal presence there. The Cayman Registered Funds never had any real offices or operations in the Cayman Islands. Rye Portfolio LDC and Rye Portfolio Limited had their registered office at a P.O. Box address in the Cayman Islands, care of a company that is in the business of providing local addresses to companies. Rye Portfolio Limited XL similarly had its registered address at an international law firm in the Cayman Islands.

41. The Cayman Registered Funds were not permitted to solicit investors in the Cayman Islands because they were registered as exempted companies under the Cayman Islands Companies Law. Under the Companies Law, "[a]n exempted company shall not trade in the Islands with any person, firm, or corporation except in furtherance of business of the exempted

11

company carried on outside the Islands." *See* Section 174 of the Companies Laws (2013 Revision). The Cayman Registered Funds were prohibited from accepting investment funds from members of the public in the Cayman Islands and paid no taxes in the Cayman Islands.

42. From January 2002 forward, Tremont Partners in New York was the sub-advisor and handled all investment management duties for Rye Portfolio LDC, and from December 2005 forward, the same was true for Rye Portfolio Limited, in each case by virtue of an express delegation of all such duties to Tremont Partners from Tremont (Bermuda) Limited ("Tremont Bermuda"), the nominal investment manager for those funds. Though incorporated in Bermuda, Tremont Bermuda itself was wholly owned by TGH, registered under the U.S. Investment Advisers Act of 1940, and had Tremont executives in New York serving on its board of directors. For example, Sandra Manzke, Rupert Allan and Robert Schulman, who all served at various times as CEO of TGH, also served as directors of Tremont Bermuda while maintaining their positions in New York.

43. Prior to such delegation of all duties in 2002 and 2005 respectively, Rye Portfolio LDC and Rye Portfolio Limited were in any event run out of New York, as the Tremont Bermuda office at all times performed only low-level administrative work, handled by at most two employees. Tremont Bermuda performed no investment management, research, data collection, or sales, all of which were done in New York. Letters sent to investors on Tremont Bermuda letterhead regularly came from Tremont Partners' employees in New York, who would include their New York contact information on such letters.

44. As part of its management duties for Rye Portfolio Limited and Rye Portfolio LDC, Tremont's New York employees, among other things, approved trade tickets and monthly statements, checked bank activity, and were authorized as bank signatories for the funds. As alleged above, BLMIS communicated directly with Tremont's executives and employees in New York regarding all of the Rye Funds, including Rye Portfolio Limited and Rye Portfolio LDC.

12

For instance, Darren Johnston, who headed Tremont's Rye Investment Management ("RIM") division in New York from 2006-2007, and Harry Hodges, who worked under Johnston in New York, regularly corresponded with BLMIS's Frank DiPascali regarding subscriptions to and redemptions from Rye Portfolio Limited and Rye Portfolio LDC.

45.     On July 1, 2006, Tremont closed its Bermuda office and formally consolidated the management of all of its funds to its New York office. Thereafter, any ministerial functions that had been handled in Bermuda for Rye Portfolio Limited and Rye Portfolio LDC took place domestically. By no later than November 2006, subscriptions for Rye Portfolio Limited and Rye Portfolio LDC flowed solely through U.S. bank accounts.

46.     Beginning in the fall of 2006 if not earlier, when Tremont formally closed Rye Portfolio Limited's and Rye Portfolio LDC's Bermuda-based bank accounts, every redemption payment made by Tremont to an investor, which payment forms the basis for the Trustee's subsequent transfer complaints, came out of the fund's New York-based bank accounts at the Bank of New York.

47.     Around the same time, Tremont had formed its RIM division based out of New York, whose express purpose was to manage and operate all of the Tremont BLMIS funds together. Tremont began to refer to and market its BLMIS invested funds as the "Rye Select Funds" and renamed all of the BLMIS invested funds to include the word "Rye." Tremont explained to its investors that the reason for this change was because Tremont "had a longstanding presence in Rye, New York and the Rye Select Funds [we]re all about providing [ ] access to a select group of the investment industry's most exclusive and otherwise unavailable talent." (emphasis in original). From then on, the published materials for all the Rye Funds, including prospectus statements and marketing materials, expressly directed potential investors to contact Tremont's employees in New York.

13

48. Notably, even before the change to add "Rye" to the funds' names, Tremont had highlighted the U.S. origins of all the Rye Direct BLMIS Funds, except Rye Portfolio Limited LDC, by using the word "American" in the fund name. As alleged in the Tremont Complaint, Rye Broad Market was originally named American Masters Broad Market Fund, LP.; Rye Prime Fund was originally named American Masters Broad Market Prime Fund, LP; Rye Portfolio LDC was originally named Tremont-Broad Market Fund LDC; and Rye Portfolio Limited was originally named American Masters Broad Market Fund II Limited.

49. From July 2006 forward, investors in Rye Portfolio Limited and Rye Portfolio LDC were also specifically instructed to send all subscription agreements directly to Tremont's New York employees or to the Bank of New York in New York, New York, and all redemption requests were similarly handled by either Tremont in New York or the Bank of New York. Starting in October 2006, investors in these funds were also specifically instructed to wire subscription monies directly to accounts at the Bank of New York. During this time, the Directors of Funds, which included New York based director Darren Johnston, had the discretion to suspend subscriptions and redemptions by investors under varying circumstances, including when they found redemptions "not reasonably practical" or "prejudicial," and compel "redemption of Shares for any or no reason."

50. From 2006 onwards, New York-based Tremont Partners also held itself out as the general partner of Cayman Registered Funds Rye Portfolio Limited and Rye Portfolio Limited XL.

51. With regard to Rye Portfolio Limited XL, from its inception in late 2006, it was managed just like Delaware Registered Fund Rye Broad Market XL, with Tremont Partners as its investment manager and the Bank of New York as its custodian. Both XL funds also instructed their investors to send subscription agreements and redemption requests to the same address in New York.

14

### F. The Rye Funds With Direct BLMIS Accounts Filed Claims With The Trustee.

52. Subsequent to the revelation of BLMIS's fraud, the two Delaware Registered Funds with BLMIS accounts (Rye Broad Market and Rye Prime Fund), and the two Cayman Registered Funds with BLMIS accounts (Rye Portfolio Limited and Rye Portfolio LDC) filed claims with the Trustee. On July 25, 2011, these funds entered into a joint settlement agreement with the Trustee, which agreement was governed by New York law and pursuant to which the funds submitted to the jurisdiction of the U.S. Bankruptcy Court for purposes of enforcing the agreement. The claims of Rye Broad Market, Rye Portfolio Limited and Rye Portfolio LDC were allowed in connection with the settlement, and these funds have received and continue to receive distributions on their allowed claims.

### G. The Rye Funds Have Asserted that Their BLMIS-Related Activities Implicate the U.S. Securities Markets and U.S. Securities Laws.

53. Finally, in addition to the foregoing, each of the Rye Funds (including the Cayman Registered Funds) have, in other BLMIS-related lawsuits in which they are or were named defendants, themselves asserted (by virtue of their assertions as to preemption by the Securities Litigation Uniform Standards Act and the NY Martin Act) that (i) their BLMIS-related activities were directed to promoting or inducing the sale of securities within or from New York, and that (ii) the securities they purported to trade were U.S. securities covered by the 1933 Exchange Act. *See In re Tremont Securities Law, State Law and Insurance Litigation*, 1:08-cv-11117-TPG (S.D.N.Y.)[1]; *Peshkin et al. v. Tremont Group Holdings, Inc., et al.*, 08-CV-11183.[2]

54. The Trustee incorporates by reference the allegations of the Complaint filed in *Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-05310 (SMB) (filed December 7, 2010, Bankr. S.D.N.Y.), ECF No. 1.

---

[1] *See* Dkt. numbers 142, 149, 154, 280, 285.

[2] *See* Dkt. numbers 104, 110, 150.

15

**The Kingate Global Transfers Are Domestic.**

55. Kingate Global was a feeder fund that invested exclusively with BLMIS in New York. BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the account prior to December 11, 2008.

56. Kingate Global filed a customer claim in the SIPA liquidation.

> A. **Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation.**

57. Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

58. Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

59. Tremont Bermuda served as the co-manager of Kingate Global for approximately 10 years. Tremont Bermuda was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, a Connecticut corporation. Tremont Bermuda's and Tremont Partners' parent company was TGH, a Delaware corporation.

60. Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage Kingate Global's investments with BLMIS.

61. Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

> B. **The Operative Legal Documents Were New York-Based.**

62. Kingate Global executed Customer Agreements, and other account opening

16

documents, and delivered the agreements to BLMIS in New York.

63. Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

64. Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### C. BLMIS Had Full Authority to Make and Execute Investment Decisions.

65. Kingate Global's Trading Authorization Agreements authorized BLMIS to be Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

66. As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as Kingate Global's investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

67. BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### D. Kingate Global Was Managed From New York.

68. During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable

17

contributor in New York to the success of Kingate Global.

69.   Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

70.   Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

71.   Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

72.   KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

73.   KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

74.   KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

75.   Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

76.   FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

77.   KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New

18

York.

### E. Kingate Global Used Banks in New York.

78. Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan.

79. KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

80. In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

81. FIM also directed fee payments to be routed through a bank account in New York.

82. The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: New York, New York
       June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
Brian W. Kreutter

*Special Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

19