**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for*
*the Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| | Adv. Pro. No. 12-01025 (SMB) |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | |
| Solon Capital, Ltd., | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO SOLON CAPITAL, LTD.** |
| Defendant. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the

Extraterritoriality Issue as to Solon Capital, Ltd. ("Solon"), alleges the following:

## INTRODUCTION

1.      The Trustee seeks to recover as a subsequent transfer under 11 U.S.C. § 550(a)(2)

Solon's redemption of $2,000,087 (the "Transfer") from BLMIS feeder fund Kingate Global

Fund Ltd. ("Kingate Global").  Solon also invested with (but did not redeem from) BLMIS

feeder fund Rye Select Broad Market Portfolio Ltd. (*f/k/a* American Masters Broad Market Fund

II Limited) ("Rye Portfolio Limited," and together with Kingate Global, the "BLMIS Feeder

Funds").

2.      Solon was a shareholder in the BLMIS Feeder Funds.  Each of the BLMIS Feeder

Funds invested at least 95% of their assets in accounts managed by New York-based BLMIS.

## SOLON'S TRANSFER AND THE COMPONENT EVENTS OF ITS BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

3.      Solon intentionally invested in the BLMIS Feeder Funds to profit from BLMIS's

purported investments in the United States, and the Transfer and component events of its BLMIS

Feeder Fund transactions were predominantly domestic.

### Solon was a Hedge Fund Managed and Operated out of the United States, Whose Investments Arose From Its New York-Based Manager's Relationship With New York-Based Tremont.

4.      Solon is a hedge fund managed and operated out of the United States, whose

investments in the BLMIS Feeder Funds arose from its New York-based manager's relationship

with New York-based Tremont (defined below).  Solon's business at all relevant times was to

invest in other hedge funds, including, as relevant here, the BLMIS Feeder Funds.  Solon had no

employees or real offices of its own and no meaningful business operations—in Bermuda where

it was registered or anywhere else.  Solon's only business activities were its investments, which

were made by its U.S.-based fund manager.

5.        Although organized in Bermuda, Solon has never had more than a statutorily-

required registered office there, care of an offshore legal services provider.  As an exempt

company in Bermuda under the Bermuda Companies Act, Solon was at all relevant times

restricted from doing business in Bermuda.  *See* Bermuda Companies Act, Section 129(1)(e)

(providing that an exempted company "shall not . . . carry on business of any kind or type

whatsoever in Bermuda either alone or in partnership or otherwise except" under certain

enumerated circumstances).  Solon was audited in New York by KPMG.

6.        Solon's manager and operator was New York-based Credit Suisse Index Co. Inc.

(*f/k/a* Credit Suisse First Boston Index Co., Inc.), a Delaware corporation (the "U.S. Fund

Manager").  The U.S. Fund Manager is an affiliate of Credit Suisse Group AG ("CS Group") and

its principal operating subsidiary Credit Suisse AG ("CS AG"), which had a significant base of

operations in the United States, including thousands of U.S. employees, billions of dollars in

domestic assets, and a headquarters in New York.  CS AG and certain other Credit Suisse entities

are defendants in a recovery action by the Trustee as to other transfers received separately by

those entities—*Picard v. Credit Suisse AG, et al.* (Adv. Pro. No. 11-02925)—for which the

Trustee is also filing proffered allegations as to extraterritoriality.

7.        Solon's investments in the BLMIS Feeder Funds arose out of the U.S. Fund

Manager's relationship with Tremont Group Holdings, Inc. ("TGH"), a Delaware corporation.

TGH, together with one or more of its affiliates (collectively, "Tremont"), (i) created and

operated the Rye family of BLMIS feeder funds out of Rye, New York, including Rye Portfolio

Limited and (ii) managed Kingate Global at relevant times.

8.      The U.S. Fund Manager was partners with TGH in a New York-based Delaware-

registered joint venture named Credit Suisse Tremont Index LLC.  This joint venture operated a

fund index known as the Credit Suisse/Tremont Hedge Fund Index (the "CS/Tremont Index").

Solon invested in funds that were tracked by this U.S.-based index—namely, Rye Portfolio

Limited and Kingate Global.  The U.S. Fund Manager also managed and operated two other

hedge funds—Zephyros Limited ("Zephyros") and Mistral (SPC) ("Mistral")—which similarly

invested in hedge funds that were tracked by the CS/Tremont Index.  Zephyros and Mistral are

defendants in recovery actions by the Trustee as to other transfers received separately by those

entities—*Picard v. Zephyros Limited* (Adv. Pro. No. 12-01278) and *Picard v. Mistral (SPC)*

(Adv. Pro. No. 12-01273)—for which the Trustee is also filing proffered allegations as to

extraterritoriality.

9.      Solon also used a U.S. administrator, SEI Investments Company, a financial

services company headquartered in Pennsylvania ("SEI"), in connection with its investments in

the BLMIS Feeder Funds.  Among other things, SEI received account statements for Solon,

requested redemptions, and corresponded with BLMIS Feeder Fund management on Solon's

behalf.

10.     Solon was subject to U.S. laws and regulations.  Solon issued securities in the

United States for investment in the fund and has filed regulatory forms with the U.S. Securities

and Exchange Commission (the "SEC") and the New York Department of State.  For example,

in a June 2002 Confidential Private Placement Memorandum (the "Solon 2002 PPM"), Solon

offered certificates for investors to purchase in the fund that were "governed by the laws of the

3

United States," and Solon's U.S. legal advisors, auditors and one of its directors were based in New York.

11.     According to the Solon 2002 PPM, the U.S. Fund Manager would "locate, structure and dispose of [Solon's] investments…."  The PPM also instructed investors in the Solon fund to make subscription payments to Solon's bank account at Northern Trust International Banking Corp. ("Northern Trust") in New York (the "U.S. Account").

**The Entire Purpose of Solon's Investments was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

12.     The entire purpose of Solon's investments in the BLMIS Feeder Funds was to invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and its BLMIS Feeder Fund investments were all centered in the United States.

13.     Solon knew and intended that its investments would be transferred to BLMIS in New York to manage and invest in the U.S. securities markets.  Solon made such investments for the express purpose of receiving returns on U.S.-based investments from BLMIS.

14.     As the operator of the CS/Tremont Index, Solon's U.S. Fund Manager knew that Madoff and BLMIS controlled the investments in the BLMIS Feeder Funds, as noted, for example, in e-mails between Credit Suisse personnel (further discussed below) and Tremont which refer to Rye Portfolio Limited as "the Bernie Maddof [sic] fund" and refer to Madoff as the "custodian".

15.     Moreover, shareholders in Rye Portfolio Limited and Kingate Global, like Solon, were required to enter into a subscription agreement each time they subscribed for shares in (i.e. invested money into) the funds.  Solon remitted subscription payments to such funds at least 11 times.

16.    Upon entering into subscription agreements with Rye Portfolio Limited, Solon affirmed that it received and read the Rye Portfolio Limited amended and restated prospectus (the "Rye Portfolio Limited PPM").  As a subscriber, Solon also received marketing materials and other investor documents, such as due diligence questionnaires, from Rye Portfolio Limited.

17.    Based on information contained in the Rye Portfolio Limited subscription agreements, PPM, marketing materials and other investor documents, Solon knew that:

- Rye Portfolio Limited would have a "Manager" that used a "split-strike conversion" trading strategy (the "SSC Strategy"), a reference to BLMIS;

- Rye Portfolio Limited would be trading in large-cap U.S. stocks and related equity index options and cash would be held in short-dated U.S. T-Bills; and

- the securities would be custodied in a brokerage account at an NASD-registered broker/dealer (i.e., BLMIS in New York).

18.    In connection with its investments in Kingate Global, Solon also entered into subscription agreements wherein it affirmed having received and read the Kingate Global amended and restated information memorandum (the "Info Memo").  The Info Memo provided substantially similar information as the Rye Portfolio Limited PPM, marketing materials and other investor documents, including that Kingate Global's investments in U.S. securities and Treasuries would be custodied in New York, managed by an NASD-registered broker dealer (i.e. BLMIS), and use the same SSC Strategy.

**Solon Purposefully Utilized a U.S. Bank Account for the Investments and Redemptions It Made.**

19.    Solon purposefully used a U.S. bank account and the U.S. banking system in connection its BLMIS Feeder Fund investments.

20.    During the relevant period, Solon received at least one redemption totaling $2,000,087 out of Kingate Global, which payment constitutes the Transfer at issue.  Solon also

remitted at least 3 subscription payments to Kingate Global and 8 subscription payments to Rye

Portfolio Limited, which payments together constitute the totality of Solon's investments therein.

21.     New York was the situs selected by Solon for making and receiving such

transfers.  Specifically, Solon used its U.S. Account at Northern Trust in New York to remit

subscription payments to Rye Portfolio Limited.  Upon information and belief—based on

Solon's redemption in 2007 from a non-BLMIS Tremont hedge fund into such account and its

designation of that account in the Solon 2002 PPM—Solon used this same U.S. Account at

Northern Trust in New York to remit subscriptions to, and receive the Transfer at issue, from

Kingate Global.

22.     The BLMIS Feeder Funds also designated U.S. bank or correspondent accounts to

receive subscriptions from investors, including Solon.  Kingate Global's Info Memo required

that subscription payments from Solon to Kingate Global be sent to a U.S. correspondent

account, for further deposit into Kingate Global's bank account.  The Rye Portfolio Limited PPM

in effect as of mid- to late-2006 required that subscription payments from Solon to Rye Portfolio

Limited be sent to a U.S. bank account at Bank of New York in New York.  From these bank

accounts, the funds were then ultimately deposited into BLMIS's account at JPMorgan Chase

Bank NA in New York.

**Solon and the U.S. Fund Manager Relied Heavily on the Use of New York-Based Credit
Suisse Personnel and Had Ready Access to Tremont Executives in New York to Perform
Due Diligence on the BLMIS Feeder Funds.**

23.     Solon had the benefit of several domestic sources of information and due

diligence with respect to the BLMIS Feeder Funds, by virtue of the fact that (i) its U.S. Fund

Manager was affiliated with Credit Suisse (and in particular Credit Suisse's U.S.-based

operations) and (ii) that fund manager's access to information from New York-based Tremont,

its joint venture partner.

24.     Solon and its U.S. Fund Manager relied heavily on New York-based personnel at

Credit Suisse's New York offices and had ready access to Tremont executives in order to

perform due diligence on, and communicate with, the BLMIS Feeder Funds, in connection with

Solon's investments.

25.     Through the use of New York-based Credit Suisse personnel, the U.S. Fund

Manager performed due diligence on BLMIS and the BLMIS Feeder Funds in connection with

its responsibilities as owner of the CS/Tremont Index and U.S. manager of Solon (and of two

similar funds—Zephyros and Mistral).  It also had access to the information and knowledge of its

U.S.-based joint venture partner Tremont, which created and/or managed both funds in which

Solon was invested—Kingate Global and Rye Portfolio Limited (as part of the Tremont family

of BLMIS feeder funds)—out of Rye, New York.  Tremont was Credit Suisse's primary contact

for both Rye Portfolio Limited and Kingate Global.

26.     New York-based Credit Suisse employees including Maureen Meehan

("Meehan"), Jaques Clough ("Clough"), Brian Peterson ("Peterson"), and Parth Mehta

("Mehta") analyzed a significant volume of due diligence information from Tremont for Solon,

as well as the other two CS/Tremont Index-based funds, Zephyros and Mistral (the three funds

together, the "Index Funds").  These Credit Suisse employees had regular and on-going

communications and/or meetings with Tremont's management.  Typical examples of this U.S.-

based due diligence include: (i) a September 2006 request from Meehan to Tremont's Darren

Johnston ("Johnston") in New York for Kingate Global's 2005 audited financial statements so

she could conduct due diligence for all three Index Funds (Johnston emailed Kingate Global's

2004 and 2005 statements to her from his New York office); (ii) Meehan's 2007 and 2008

requests for Rye Portfolio Limited's and Kingate Global's assets under management ("AUM"),

as well as other due diligence information for "index product" Solon; (iii) a March 2008

invitation from Rupert Allan, then President & Chief Executive Officer of Tremont in Rye, New

York, to Peterson and Clough to meet in Tremont's Rye, New York offices to discuss Credit

Suisse's operational due diligence needs "as it relate[d] to Bernie Madoff", with an e-mail chain

subject line, "CS/Tremont Index Business"; and (iv) a September 2008 request from Mehta to

Tremont for Rye Portfolio Limited's AUMs on a monthly basis for use by Solon and the other

Index Funds.

## Tremont And Its BLMIS Invested Funds Had Their Principal Place of Business In New York.

27.    TGH is a Delaware corporation.  Tremont Partners is a Connecticut corporation.

TGH and Tremont Partners operated out of the same office in Rye, New York, and managed,

among others, three Delaware registered funds and three Cayman Islands registered funds that

were invested in Bernard L. Madoff's BLMIS.  Tremont Partners is an investment advisor

registered under the Investment Advisers Act of 1940.  As alleged below, Tremont and its

BLMIS funds had their principal place of business in New York and were managed from their

New York headquarters.

### A.    Tremont Operated And Controlled All of The Rye Funds From Its New York Headquarters.

28.    The three Delaware registered funds (which are not at issue in the Motion to

Dismiss Based on Extraterritoriality (the "ET Motion") but are relevant to the allegations herein)

are: (i) Rye Select Broad Market Fund, L.P. ("Rye Broad Market"), (ii) Rye Select Broad Market

XL Fund, L.P. ("Rye Broad Market XL"), and (iii) Rye Select Broad Market Prime Fund, L.P.

("Rye Prime Fund") (collectively, the "Delaware Registered Funds"). The three Cayman Islands registered funds (which are at issue in the ET Motion) are: (i) Rye Portfolio Limited, (ii) Rye Select Broad Market XL Portfolio Limited ("Rye Portfolio Limited XL"), and (iii) Rye Select Broad Market Insurance Portfolio LDC ("Rye Portfolio LDC") (collectively, the "Cayman Registered Funds"). The Delaware Registered Funds and Cayman Registered Funds are referred to together as the "Rye Funds."

29.    Each of Rye Broad Market, Rye Prime Fund, Rye Portfolio Limited and Rye Portfolio LDC had direct accounts with BLMIS (these funds are collectively referred to as "Rye Direct BLMIS Funds"). Tremont established the other two funds that did not have direct BLMIS accounts—Rye Broad Market XL and Rye Portfolio Limited XL—in an effort to provide investors with an investment that would triple the normal BLMIS performance through total return swaps. As part of this strategy, the Rye Broad Market XL and Rye Portfolio Limited XL funds entered into swap agreements with counterparties, consisting mainly of financial institutions, that generally agreed to pay these funds on a three times levered basis an amount equal to the increase in the net asset value of the Rye Broad Market and Rye Portfolio Limited funds. Rye Broad Market XL's swaps were based on the performance of the Rye Broad Market fund, while Rye Portfolio Limited XL's swaps were based on the performance of the Rye Portfolio Limited fund.

30.    From their inception and at all relevant times thereafter, Tremont's Cayman Registered Funds were set up and thereafter operated as parallel funds to the Delaware Registered Funds. Tremont made all management decisions and conducted all due diligence regarding both the Delaware and Cayman funds from its office in Rye, New York. All of the Rye Funds were marketed alongside one another by Tremont employees in New York.

Employees in Tremont's New York office communicated directly with investors and potential investors regarding all of the funds. Oftentimes, Tremont's employees in New York received inquiries and sent information in the same email about both the Delaware and the Cayman funds. Tremont's employees in New York approved subscriptions and redemptions for all of the Rye Funds.

31.     As was true of the Delaware Registered Funds, Tremont's employees in Rye were appointed to serve on the boards of the Cayman Registered Funds. For example, Suzanne Hammond was a director of Rye Portfolio LDC and Rye Portfolio Limited and Darren Johnston was a director of Rye Portfolio Limited and Rye Portfolio Limited XL. In addition, all of the Rye Funds were advised by the same law firm in the United States.

**B.      Tremont Controlled Its Relationship With BLMIS From Its New York Headquarters.**

32.     BLMIS dealt with the same Tremont employees in New York regarding all of the Rye Direct BLMIS Funds. Employees in Tremont's New York office directly made redemption requests to BLMIS for the Rye Direct BLMIS Funds' BLMIS accounts, which redemptions constitute the subsequent transfers that are the subject of multiple other Trustee adversary proceedings at issue in the ET Motion.

33.     Tremont's executives in New York, including its CEO Robert Schulman, executed in New York all BLMIS Customer Agreements and other documents, including Trade Authorizations, Options Agreements, and IRS Form W-9s, as authorized representatives of the Rye Direct BLMIS Funds. Executives in Tremont's Rye office were designated as authorized signatories on the accounts of the Rye Direct BLMIS Funds.

34.     Beginning as early as 1991, Tremont's executives and employees in New York met regularly with Madoff and other BLMIS employees in New York, including at BLMIS's

offices in New York.  Sandra Manzke, who founded Tremont, began regularly meeting in New

York with Madoff as early as 1991.  Robert Schulman, Tremont's Chief Executive Officer, also

had a long running relationship with Madoff and would "periodically visit [BLMIS's office]

throughout the year."

35.    From the formation of each Rye Direct BLMIS Fund, BLMIS would mail copies

of trade tickets and account statements to Tremont's New York office.

**C.    Tremont's Agreements With BLMIS Granted BLMIS Full Discretion Over
The Assets of The Rye Funds And Subjected Tremont To U.S. Laws And
Regulations.**

36.    The Customer Agreements between BLMIS and the Rye Direct BLMIS Funds

gave BLMIS full discretion over the assets of the Rye Direct BLMIS Funds.  Pursuant to the

Trading Authorizations, the Rye Direct BLMIS Funds authorized Madoff to be their "agent and

attorney in fact" to buy, sell and trade in securities.  The Customer Agreements expressly state

that they are governed by New York law and all of the transactions pursuant to the Customer

Agreements are subject to the provisions of the Securities Exchange Act of 1934 and to the rules

and regulations of the SEC and the Board of Governors of the Federal Reserve System.

37.    The Rye Direct BLMIS Funds agreed that all disputes arising under the Customer

Agreements must be resolved by arbitration under the laws of New York before the American

Arbitration Association, or "an arbitration facility provided by any exchange of which the broker

is a member, or the National Association of Securities Dealers Inc., and in accordance with the

rules pertaining to the selected organization."

**D.    Tremont's Investors Knew They Were Investing In BLMIS.**

38.    Investors in all of the Rye Direct BLMIS Funds knew that they were investing in

Madoff's BLMIS in New York.  Tremont's employees in New York spoke openly with their

investors about their funds being invested in Madoff's BLMIS and regularly referred to the Rye Direct Funds as "our Madoff fund" or as a Madoff "feeder." Investors were also specifically informed through the Rye Direct BLMIS Funds' Due Diligence Questionnaires that the funds would be trading in the "U.S. equity market" and related equity index options and that cash would be held in "U.S. short term treasury bills." All of the Rye Funds represented in investor documents that custody of their securities would be held in "a brokerage account with an NASD registered broker dealer" (i.e. BLMIS). Tremont's investors knew that any redemption requests were dependent on the investment manager's ability to liquidate United States securities.

> **E.    Tremont's Cayman Registered Funds Had Their Principal Place of Business In New York.**

39.    In addition, all investors were aware that the Rye Funds had U.S. based counsel and U.S. based sales contacts. The Rye Funds' Private Placement Memoranda and marketing materials openly identified these U.S. ties.

40.    Investors in the Cayman Registered Funds were specifically informed that they were only permitted to make investments and receive redemptions in U.S. dollars, as was the case with the Delaware Registered Funds.

41.    Although the Rye Funds at issue in the ET Motion were registered in the Cayman Islands, they had no more than a nominal presence there. The Cayman Registered Funds never had any real offices or operations in the Cayman Islands. Rye Portfolio LDC and Rye Portfolio Limited had their registered office at a P.O. Box address in the Cayman Islands, care of a company that is in the business of providing local addresses to companies. Rye Portfolio Limited XL similarly had its registered address at an international law firm in the Cayman Islands.

42.     The Cayman Registered Funds were not permitted to solicit investors in the Cayman Islands because they were registered as exempted companies under the Cayman Islands Companies Law.  Under the Companies Law, "[a]n exempted company shall not trade in the Islands with any person, firm, or corporation except in furtherance of business of the exempted company carried on outside the Islands."  *See* Section 174 of the Companies Laws (2013 Revision).  The Cayman Registered Funds were prohibited from accepting investment funds from members of the public in the Cayman Islands and paid no taxes in the Cayman Islands.

43.     From January 2002 forward, Tremont Partners in New York was the sub-advisor and handled all investment management duties for Rye Portfolio LDC, and from December 2005 forward, the same was true for Rye Portfolio Limited, in each case by virtue of an express delegation of all such duties to Tremont Partners from Tremont (Bermuda) Limited ("Tremont Bermuda"), the nominal investment manager for those funds.  Though incorporated in Bermuda, Tremont Bermuda itself was wholly owned by TGH, registered under the U.S. Investment Advisers Act of 1940, and had Tremont executives in New York serving on its board of directors. For example, Sandra Manzke, Rupert Allan and Robert Schulman, who all served at various times as CEO of TGH, also served as directors of Tremont Bermuda while maintaining their positions in New York.

44.     Prior to such delegation of all duties in 2002 and 2005 respectively, Rye Portfolio LDC and Rye Portfolio Limited were in any event run out of New York, as the Tremont Bermuda office at all times performed only low-level administrative work, handled by at most two employees.  Tremont Bermuda performed no investment management, research, data collection, or sales, all of which were done in New York.  Letters sent to investors on Tremont

Bermuda letterhead regularly came from Tremont Partners' employees in New York, who would include their New York contact information on such letters.

45.     As part of its management duties for Rye Portfolio Limited and Rye Portfolio LDC, Tremont's New York employees, among other things, approved trade tickets and monthly statements, checked bank activity, and were authorized as bank signatories for the funds.  As alleged above, BLMIS communicated directly with Tremont's executives and employees in New York regarding all of the Rye Funds, including Rye Portfolio Limited and Rye Portfolio LDC.  For instance, Darren Johnston, who headed Tremont's Rye Investment Management ("RIM") division in New York from 2006-2007, and Harry Hodges, who worked under Johnston in New York, regularly corresponded with BLMIS's Frank DiPascali regarding subscriptions to and redemptions from Rye Portfolio Limited and Rye Portfolio LDC.

46.     On July 1, 2006, Tremont closed its Bermuda office and formally consolidated the management of all of its funds to its New York office.  Thereafter, any ministerial functions that had been handled in Bermuda for Rye Portfolio Limited and Rye Portfolio LDC took place domestically.  By no later than November 2006, subscriptions for Rye Portfolio Limited and Rye Portfolio LDC flowed solely through U.S. bank accounts.

47.     Beginning in the fall of 2006 if not earlier, when Tremont formally closed Rye Portfolio Limited's and Rye Portfolio LDC's Bermuda-based bank accounts, every redemption payment made by Tremont to an investor, which payment forms the basis for the Trustee's subsequent transfer complaints, came out of the fund's New York-based bank accounts at the Bank of New York.

48.     Around the same time, Tremont had formed its RIM division based out of New York, whose express purpose was to manage and operate all of the Tremont BLMIS funds

14

together.  Tremont began to refer to and market its BLMIS invested funds as the "Rye Select

Funds" and renamed all of the BLMIS invested funds to include the word "Rye." Tremont

explained to its investors that the reason for this change was because Tremont "had a

longstanding presence in Rye, New York and the Rye Select Funds [we]re all about providing [ ]

access to a select group of the investment industry's most exclusive and otherwise unavailable

talent."  (emphasis in original).  From then on, the published materials for all the Rye Funds,

including prospectus statements and marketing materials, expressly directed potential investors

to contact Tremont's employees in New York.

49.    Notably, even before the change to add "Rye" to the funds' names, Tremont had

highlighted the U.S. origins of all the Rye Direct BLMIS Funds, except Rye Portfolio Limited

LDC, by using the word "American" in the fund name.  As alleged in the Tremont Complaint,

Rye Broad Market was originally named American Masters Broad Market Fund, LP.; Rye Prime

Fund was originally named American Masters Broad Market Prime Fund, LP; Rye Portfolio

LDC was originally named Tremont-Broad Market Fund LDC; and Rye Portfolio Limited was

originally named American Masters Broad Market Fund II Limited.

50.    From July 2006 forward, investors in Rye Portfolio Limited and Rye Portfolio

LDC were also specifically instructed to send all subscription agreements directly to Tremont's

New York employees or to the Bank of New York in New York, New York, and all redemption

requests were similarly handled by either Tremont in New York or the Bank of New York.

Starting in October 2006, investors in these funds were also specifically instructed to wire

subscription monies directly to accounts at the Bank of New York.  During this time, the

Directors of Funds, which included New York based director Darren Johnston, had the discretion

to suspend subscriptions and redemptions by investors under varying circumstances, including

when they found redemptions "not reasonably practical" or "prejudicial," and compel

"redemption of Shares for any or no reason."

51.     From 2006 onwards, New York-based Tremont Partners also held itself out as the

general partner of Cayman Registered Funds Rye Portfolio Limited and Rye Portfolio Limited

XL.

52.     With regard to Rye Portfolio Limited XL, from its inception in late 2006, it was

managed just like Delaware Registered Fund Rye Broad Market XL, with Tremont Partners as

its investment manager and the Bank of New York as its custodian.  Both XL funds also

instructed their investors to send subscription agreements and redemption requests to the same

address in New York.

> **F.     The Rye Funds With Direct BLMIS Accounts Filed Claims With The Trustee.**

53.     Subsequent to the revelation of BLMIS's fraud, the two Delaware Registered

Funds with BLMIS accounts (Rye Broad Market and Rye Prime Fund), and the two Cayman

Registered Funds with BLMIS accounts (Rye Portfolio Limited and Rye Portfolio LDC) filed

claims with the Trustee.  On July 25, 2011, these funds entered into a joint settlement agreement

with the Trustee, which agreement was governed by New York law and pursuant to which the

funds submitted to the jurisdiction of the U.S. Bankruptcy Court for purposes of enforcing the

agreement.  The claims of Rye Broad Market, Rye Portfolio Limited and Rye Portfolio LDC

were allowed in connection with the settlement, and these funds have received and continue to

receive distributions on their allowed claims.

> **G.     The Rye Funds Have Asserted that Their BLMIS-Related Activities Implicate the U.S. Securities Markets and U.S. Securities Laws.**

54.     Finally, in addition to the foregoing, each of the Rye Funds (including the Cayman Registered Funds) have, in other BLMIS-related lawsuits in which they are or were named defendants, themselves asserted (by virtue of their assertions as to preemption by the Securities Litigation Uniform Standards Act and the NY Martin Act) that (i) their BLMIS-related activities were directed to promoting or inducing the sale of securities within or from New York, and that (ii) the securities they purported to trade were U.S. securities covered by the 1933 Exchange Act. *See In re Tremont Securities Law, State Law and Insurance Litigation*, 1:08-cv-11117-TPG (S.D.N.Y.)[1]; *Peshkin et al. v. Tremont Group Holdings, Inc., et al.*, 08-CV-11183.[2]

55.     The Trustee incorporates by reference the allegations of the Complaint filed in *Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-05310 (SMB) (filed December 7, 2010, Bankr. S.D.N.Y.), ECF No. 1.

**The Kingate Global Transfers are Domestic.**

56.     Kingate Global was a feeder fund that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the account prior to December 11, 2008.

57.     Kingate Global filed a customer claim in the SIPA liquidation.

**A.      Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation.**

58.     Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

---

[1] *See* Dkt. numbers 142, 149, 154, 280, 285.

[2] *See* Dkt. numbers 104, 110, 150.

59.     Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

60.     Tremont Bermuda served as the co-manager of Kingate Global for approximately 10 years. Tremont Bermuda was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, a Connecticut corporation. Tremont Bermuda's and Tremont Partners' parent company was TGH, a Delaware corporation.

61.     Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage Kingate Global's investments with BLMIS.

62.     Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

**B.      The Operative Legal Documents Were New York-Based.**

63.     Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

64.     Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

65.     Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the

rules obtaining of the selected organization."

### C.    BLMIS Had Full Authority to Make and Execute Investment Decisions.

66.    Kingate Global's Trading Authorization Agreements authorized BLMIS to be Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

67.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as Kingate Global's investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

68.    BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### D.    Kingate Global Was Managed From New York.

69.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

70.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

71.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

72.    Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo

Grosso.  KML operated through its agents in New York.

73.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

74.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

75.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

76.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

77.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

78.    KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E.    Kingate Global Used Banks in New York.**

79.    Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan.

80.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

81.    In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to

investments with BLMIS.

82.     FIM also directed fee payments to be routed through a bank account in New York.

83.     The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: New York, New York
       June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF,
LLP**
156 West 56th Street
New York, New York 10019
Tel:  (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
Brian W. Kreutter

*Special Counsel to Irving H. Picard, Trustee for
the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff*