**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for*
*the Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>              Plaintiff-Applicant, <br><br>     v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>              Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>              Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, <br><br>              Plaintiff, <br><br>     v. <br><br> Zephyros Limited, <br><br><br><br><br><br>              Defendant. | Adv. Pro. No. 12-01278 (SMB) <br><br><br><br> **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO ZEPHYROS LIMITED** |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the

Extraterritoriality Issue as to Zephyros Limited ("Zephyros"), alleges the following:

## INTRODUCTION

1.      The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2)

Zephyros's redemptions totaling approximately $115 million (the "Transfers") from Rye Select

Broad Market Portfolio Ltd. (*f/k/a* American Masters Broad Market Fund II Limited) ("Rye

Portfolio Limited") and Kingate Global Fund Ltd. ("Kingate Global").  Zephyros also invested

with (but did not redeem from) BLMIS feeder fund Fairfield Sentry Limited ("Fairfield Sentry",

and together with Kingate Global and Rye Portfolio Limited, the "BLMIS Feeder Funds").

2.      Zephyros was a shareholder in the BLMIS Feeder Funds.  Each of the BLMIS

Feeder Funds invested at least 95% of their assets in accounts managed by New York-based

BLMIS.

## ZEPHYROS'S TRANSFERS AND THE COMPONENT EVENTS OF ITS BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

3.      Zephyros intentionally invested in the BLMIS Feeder Funds to profit from

BLMIS's purported investments in the United States, and the Transfers and component events of

its BLMIS Feeder Fund transactions were predominantly domestic.

### Zephyros was a Hedge Fund Managed and Operated out of the United States, Whose Investments Arose From Its New York-Based Manager's Relationship With New York-Based Tremont.

4.      Zephyros is a hedge fund managed and operated out of the United States, whose

investments in the BLMIS Feeder Funds arose from its New York-based manager's relationship

with New York-based Tremont (defined below).  Zephyros's business at all relevant times was to

invest in other hedge funds, including the BLMIS Feeder Funds. Zephyros had no employees or real offices of its own and no meaningful business operations—in the Cayman Islands where it was registered or anywhere else. Zephyros's only business activities were its investments, which were made by its U.S.-based fund manager.

5.       Although organized in the Cayman Islands, Zephyros has never since its formation in 2003 had more than a P.O. Box as its Cayman registered office. As an exempt company under the Cayman Islands Companies Law, Zephyros was at all relevant times prohibited from soliciting investors in the Cayman Islands. *See* Section 174 of the Companies Law (2013 Revision) ("An exempted company shall not trade in the Islands with any person, firm or corporation except in furtherance of the business of the exempted company carried on outside the Islands.") Zephyros was audited in New York by KPMG.

6.       Zephyros's manager and operator was New York-based Credit Suisse Index Co. Inc. (*f/k/a* Credit Suisse First Boston Index Co., Inc.), a Delaware corporation (the "U.S. Fund Manager"). The U.S. Fund Manager is an affiliate of Credit Suisse Group AG ("CS Group") and its principal operating subsidiary Credit Suisse AG ("CS AG"), which has a significant base of operations in the United States, including thousands of U.S. employees, billions of dollars in domestic assets, and a headquarters in New York. CS AG and certain other Credit Suisse entities are defendants in a recovery action by the Trustee for transfers received separately by those entities—*Picard v. Credit Suisse AG, et al.* (Adv. Pro. No. 11-02925) (for which the Trustee is also filing proffered allegations as to extraterritoriality).

7.       Zephyros's investments in the BLMIS Feeder Funds arose out of the U.S. Fund Manager's relationship with Tremont Group Holdings, Inc. ("TGH"), a Delaware corporation. TGH, together with one or more of its affiliates (collectively, "Tremont"), (i) created and operated the Rye family of BLMIS feeder funds out of Rye, New York, including Rye Portfolio

Limited and (ii) managed Kingate Global at relevant times.

8.      The U.S. Fund Manager was partners with TGH in a New York-based, Delaware-registered joint venture named Credit Suisse Tremont Index LLC.  This joint venture operated a fund index known as the Credit Suisse/Tremont Hedge Fund Index (the "CS/Tremont Index").  Zephyros invested in funds that were tracked by this U.S.-based index—namely, Fairfield Sentry, Rye Portfolio Limited and Kingate Global.  The U.S. Fund Manager also managed and operated two other hedge funds—Solon Capital, Ltd. ("Solon") and Mistral (SPC) ("Mistral")—which similarly invested in hedge funds that were tracked by the CS/Tremont Index.  Solon and Mistral are defendants in recovery actions by the Trustee for transfers received separately by those entities—*Picard v. Solon Capital, Ltd.* (Adv. Pro. No. 12-01025) and *Picard v. Mistral (SPC)* (Adv. Pro. No. 12-01273)—for which the Trustee is also filing proffered allegations as to extraterritoriality.

9.      Zephyros also used a U.S. administrator/custodian, SEI Investments Company, a financial services company headquartered in Pennsylvania ("SEI"), in connection with its investments in the BLMIS Feeder Funds.  Among other things, SEI signed redemption documents on behalf of Zephyros, and Zephyros made use of SEI's U.S. bank account to make subscriptions into and receive redemptions from such funds.

**The Entire Purpose of Zephyros's Investments was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

10.     The entire purpose of Zephyros's investments in the BLMIS Feeder Funds was to invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and its BLMIS Feeder Fund investments were all centered in the United States.

11.     Zephyros knew and intended that its investments would be transferred to BLMIS in New York to manage and invest in the U.S. securities markets.  Zephyros made such

investments for the express purpose of receiving returns on U.S.-based investments from BLMIS.

12.    As the operator of the CS/Tremont Index, Zephyros's U.S. Fund Manager knew that Madoff and BLMIS controlled the investments in the BLMIS Feeder Funds, as noted, for example, in e-mails between Credit Suisse personnel (further discussed below) and Tremont which refer to Rye Portfolio Limited as "the Bernie Maddof [sic] fund" and refer to Madoff as the "custodian".

13.    Moreover, shareholders in Fairfield Sentry, Rye Portfolio Limited and Kingate Global, like Zephyros, were required to enter into a subscription agreement each time they subscribed for shares in (i.e. invested money into) the funds.  Zephyros remitted subscription payments to such funds at least 22 times.

14.    Upon entering into a subscription agreement with Fairfield Sentry, Zephyros affirmed that it "received and read a copy of" such fund's Private Placement Memoranda ("PPMs").  Based on the information contained in the Fairfield Sentry subscription agreement and PPMs, Zephyros knew:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

- BLMIS was the investment adviser of Fairfield Sentry;

- BLMIS was registered with the Securities and Exchange Commission (the "SEC");

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the fund's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury Bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by BLMIS in New York;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

15.    Upon entry into subscription agreements with Rye Portfolio Limited and Kingate Global, Zephyros similarly affirmed having received and read the Rye Portfolio Limited amended and restated prospectus (the "Rye Portfolio Limited PPM") and the Kingate Global amended and restated information memorandum (the "Info Memo"), respectively.  As a subscriber in Rye Portfolio Limited, Zephyros also received marketing materials and other investor documents, such as due diligence questionnaires, from Rye Portfolio Limited.  These documents provided substantially similar information as the Fairfield Sentry PPM, including that Rye Portfolio Limited's and Kingate Global's investments in U.S. securities would be custodied in New York by a New York investment adviser using the SSC Strategy.

**Zephyros Submitted to U.S. Law and Jurisdiction In Connection With Its Fairfield Sentry Investment.**

16.    Zephyros's Fairfield Sentry subscription agreement also expressly provided that its investment would be subject to U.S. laws and jurisdiction in the U.S. courts.

17.    In a Fairfield Sentry subscription agreement, Zephyros agreed that: (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York", and it "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding"; and (ii) the Fairfield Sentry subscription agreement "shall be governed and enforced in accordance with the laws of New York .…"

**Zephyros Purposefully and Repeatedly Utilized a U.S. Bank Account for the Investments and Redemptions It Made.**

18.    Zephyros purposefully and repeatedly used a U.S. bank account and the U.S. banking system in connection with its subscriptions into and redemptions from the BLMIS Feeder Funds, including with respect to the Transfers at issue from Rye Portfolio Limited and Kingate Global.

19.     During the relevant period, Zephyros received at least 27 redemptions totaling approximately $115 million out of Rye Portfolio Limited and Kingate Global, which payments constitute the Transfers at issue.  Zephyros also remitted at least 22 subscription payments to the BLMIS Feeder Funds, which payments constitute the totality of their investments therein.

20.     The United States was the situs selected by Zephyros for making and receiving such transfers.  Specifically, Zephyros used the bank account of its U.S.-based administrator/custodian SEI at Wachovia National Bank in the United States to effect such payments (the "U.S. Account").

21.     Zephyros designated such use of the U.S. Account in a Fairfield Sentry subscription agreement and in Rye Portfolio Limited redemption documents—a number of which were signed in the United States by SEI on behalf of Zephyros.  Bank account information shows that Zephyros similarly used the U.S. Account for receiving redemptions from Kingate Global.

22.     The BLMIS Feeder Funds also designated U.S. bank or correspondent accounts to receive subscriptions from investors, including Zephyros.  The Fairfield Sentry form subscription agreement and Kingate Global's Info Memo each required that subscription payments from Zephyros be sent to U.S. correspondent accounts, for further deposit into such funds' bank accounts.  The Rye Portfolio Limited PPM in effect as of mid- to late-2006 required that subscription payments from Zephyros to Rye Portfolio Limited be sent to a U.S. bank account at Bank of New York in New York.  From these bank accounts, the funds were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

23.     Beginning in the fall of 2006 if not earlier, Rye Portfolio Limited also used the above Bank of New York account in New York to make redemption payments to investors.  Zephyros received the majority of its Rye Portfolio redemptions from this N.Y.-based account.

**Zephyros and the U.S. Fund Manager Relied Heavily on the Use of New York-Based Credit
Suisse Personnel and Had Ready Access to Tremont Executives in New York to Perform
Due Diligence on the BLMIS Feeder Funds.**

24.     Zephyros had the benefit of several domestic sources of information and due

diligence with respect to the BLMIS Feeder Funds, by virtue of the fact that (i) its U.S. Fund

Manager was affiliated with Credit Suisse (and in particular Credit Suisse's U.S.-based

operations) and (ii) that fund manager's access to information from New York-based Tremont,

its joint venture partner.

25.     Zephyros and its U.S. Fund Manager relied heavily on New York-based personnel

at Credit Suisse's New York offices and had ready access to Tremont executives in order to

perform due diligence on, and communicate with, the BLMIS Feeder Funds, in connection with

Zephyros's investments.

26.     Through the use of New York-based Credit Suisse personnel, the U.S. Fund

Manager performed due diligence on BLMIS and the BLMIS Feeder Funds in connection with

its responsibilities as owner of the CS/Tremont Index and U.S. manager of Zephyros (and of two

similar funds—Solon and Mistral).  It also had access to the information and knowledge of its

U.S.-based joint venture partner Tremont, which created and/or managed two of the three funds

in which Zephyros was invested—Kingate Global and Rye Portfolio Limited (as part of the

Tremont family of BLMIS feeder funds)—out of Rye, New York.  Tremont was Credit Suisse's

primary contact for both Rye Portfolio Limited and Kingate Global.

27.     New York-based Credit Suisse employees including Maureen Meehan

("Meehan"), Jaques Clough ("Clough"), Brian Peterson ("Peterson"), and Parth Mehta

("Mehta") analyzed a significant volume of due diligence information from Tremont for

Zephyros, as well as the other two CS/Tremont Index-based funds, Solon and Mistral (the three

funds together, the "Index Funds").  These Credit Suisse employees had regular and on-going

communications and/or meetings with Tremont's management. Typical examples of this U.S.-based due diligence include: (i) a September 2006 request from Meehan to Tremont's Darren Johnston ("Johnston") in New York for Kingate Global's 2005 audited financial statements so she could conduct due diligence for all three Index Funds (Johnston emailed Kingate Global's 2004 and 2005 statements to her from his New York office); (ii) Meehan's 2007 and 2008 requests for Rye Portfolio Limited's and Kingate Global's assets under management ("AUM"), as well as other due diligence information for "index product" Zephyros; (iii) a March 2008 invitation from Rupert Allan, then President & Chief Executive Officer of Tremont in Rye, New York, to Peterson and Clough to meet in Tremont's Rye, New York offices to discuss Credit Suisse's operational due diligence needs "as it relate[d] to Bernie Madoff", with an e-mail chain subject line, "CS/Tremont Index Business"; and (iv) a September 2008 request from Mehta to Tremont for Rye Portfolio Limited's AUMs on a monthly basis for use by Zephyros and the other Index Funds.

## Fairfield Sentry's Principal Place of Business was in New York.

28.     At all relevant times, Fairfield Sentry's principal place of business was in New York, where its creator/manager/operator was headquartered, and it was a U.S. resident.

### A.      The Genesis of the Fairfield Greenwich Group *De Facto* Partnership

29.     In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called Fairfield Greenwich Group ("FGG") based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

30.     The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles was the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich

Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited

("Sigma")  and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received

subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S.

dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

31.    FGG also included a number of administrative entities that purportedly provided

management and backoffice support to the funds.  These entities included: Fairfield Greenwich

Limited ("FG Limited"), Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield

Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc.

("Fairfield International Managers").

## B.    Fairfield Sentry

32.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized

Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

33.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From

its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

34.     Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

> **1.**     **Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States.**

35.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.  In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

36.     After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

37.      The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

> **2.     FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities.**

38.      As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

> **3.     FGG New York Personnel Managed Fairfield Sentry.**

39.      At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities.  Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

York.

40.    FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and

redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription

agreements contained New York choice of law provisions, and provided for venue and

jurisdiction for any disputes in New York.

### 4.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS.

41.    Fairfield Sentry's subscription agreements also incorporated its PPMs by

reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or

later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its

assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an

SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4)

through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S.

Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were

"essential to the continued operation of the Fund."

### 5.    BLMIS Was Fairfield Sentry's Investment Manager.

42.    Although FGG attempted to hide its manager, BLMIS served as the investment

manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality

made all of Fairfield Sentry's investment decisions.

43.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's

Littlestone Associates, which was a money management firm also located in New York City.

Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG

clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG

Limited.  FG Limited was formed under the laws of Ireland.

44.    While FG Limited was formed under foreign law, it reported its principal place of

business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters.  Upon the formation

of FG Limited, Fairfield International Managers assigned all of its management contracts with

Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry

Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even

though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts

13

controlled by BLMIS.

45.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him

FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and

foreign investors and, as a result, FGG would form a new U.S. entity to be the investment

adviser of the fund as well as other FGG operated funds, including the feeder and currency

funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would

serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG

formed two new entities, FG Advisers and FG Bermuda.

46.     In October 2003, FGG formed FG Advisors as a Delaware limited liability

company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG

formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

management contracts to both entities, including the investment advisory agreements for the

three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG

Bermuda.  FG Limited remained the placement agent for the same funds.

47.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

48.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

49.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

50.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as

Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

51.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS

accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other

fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a

number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

The seedling funds were operated and organized by FGG New York Personnel.  Many of the

seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

52.    The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

**<u>Tremont And Its BLMIS Invested Funds Had Their Principal Place of Business In New
York</u>.**

53.    TGH is a Delaware corporation.  Tremont Partners is a Connecticut corporation.

TGH and Tremont Partners operated out of the same office in Rye, New York, and managed,

among others, three Delaware registered funds and three Cayman Islands registered funds that were invested in Bernard L. Madoff's BLMIS.  Tremont Partners is an investment advisor registered under the Investment Advisers Act of 1940.  As alleged below, Tremont and its BLMIS funds had their principal place of business in New York and were managed from their New York headquarters.

### A. Tremont Operated And Controlled All of The Rye Funds From Its New York Headquarters.

54.     The three Delaware registered funds (which are not at issue in the Motion to Dismiss Based on Extraterritoriality (the "ET Motion") but are relevant to the allegations herein) are: (i) Rye Select Broad Market Fund, L.P. ("Rye Broad Market"), (ii) Rye Select Broad Market XL Fund, L.P. ("Rye Broad Market XL"), and (iii) Rye Select Broad Market Prime Fund, L.P. ("Rye Prime Fund") (collectively, the "Delaware Registered Funds").  The three Cayman Islands registered funds (which are at issue in the ET Motion) are: (i) Rye Portfolio Limited, (ii) Rye Select Broad Market XL Portfolio Limited ("Rye Portfolio Limited XL"), and (iii) Rye Select Broad Market Insurance Portfolio LDC ("Rye Portfolio LDC") (collectively, the "Cayman Registered Funds").  The Delaware Registered Funds and Cayman Registered Funds are referred to together as the "Rye Funds."

55.     Each of Rye Broad Market, Rye Prime Fund, Rye Portfolio Limited and Rye Portfolio LDC had direct accounts with BLMIS (these funds are collectively referred to as "Rye Direct BLMIS Funds").  Tremont established the other two funds that did not have direct BLMIS accounts—Rye Broad Market XL and Rye Portfolio Limited XL—in an effort to provide investors with an investment that would triple the normal BLMIS performance through total return swaps.  As part of this strategy, the Rye Broad Market XL and Rye Portfolio Limited XL funds entered into swap agreements with counterparties, consisting mainly of financial institutions, that generally agreed to pay these funds on a three times levered basis an amount

equal to the increase in the net asset value of the Rye Broad Market and Rye Portfolio Limited funds. Rye Broad Market XL's swaps were based on the performance of the Rye Broad Market fund, while Rye Portfolio Limited XL's swaps were based on the performance of the Rye Portfolio Limited fund.

56.     From their inception and at all relevant times thereafter, Tremont's Cayman Registered Funds were set up and thereafter operated as parallel funds to the Delaware Registered Funds. Tremont made all management decisions and conducted all due diligence regarding both the Delaware and Cayman funds from its office in Rye, New York. All of the Rye Funds were marketed alongside one another by Tremont employees in New York. Employees in Tremont's New York office communicated directly with investors and potential investors regarding all of the funds. Oftentimes, Tremont's employees in New York received inquiries and sent information in the same email about both the Delaware and the Cayman funds. Tremont's employees in New York approved subscriptions and redemptions for all of the Rye Funds.

57.     As was true of the Delaware Registered Funds, Tremont's employees in Rye were appointed to serve on the boards of the Cayman Registered Funds. For example, Suzanne Hammond was a director of Rye Portfolio LDC and Rye Portfolio Limited and Darren Johnston was a director of Rye Portfolio Limited and Rye Portfolio Limited XL. In addition, all of the Rye Funds were advised by the same law firm in the United States.

**B.      Tremont Controlled Its Relationship With BLMIS From Its New York Headquarters.**

58.     BLMIS dealt with the same Tremont employees in New York regarding all of the Rye Direct BLMIS Funds. Employees in Tremont's New York office directly made redemption requests to BLMIS for the Rye Direct BLMIS Funds' BLMIS accounts, which redemptions constitute the subsequent transfers that are the subject of multiple other Trustee adversary

proceedings at issue in the ET Motion.

59.    Tremont's executives in New York, including its CEO Robert Schulman,
executed in New York all BLMIS Customer Agreements and other documents, including Trade
Authorizations, Options Agreements, and IRS Form W-9s, as authorized representatives of the
Rye Direct BLMIS Funds.  Executives in Tremont's Rye office were designated as authorized
signatories on the accounts of the Rye Direct BLMIS Funds.

60.    Beginning as early as 1991, Tremont's executives and employees in New York
met regularly with Madoff and other BLMIS employees in New York, including at BLMIS's
offices in New York.  Sandra Manzke, who founded Tremont, began regularly meeting in New
York with Madoff as early as 1991. Robert Schulman, Tremont's Chief Executive Officer, also
had a long running relationship with Madoff and would "periodically visit [BLMIS's office]
throughout the year."

61.    From the formation of each Rye Direct BLMIS Fund, BLMIS would mail copies
of trade tickets and account statements to Tremont's New York office.

**C.    Tremont's Agreements With BLMIS Granted BLMIS Full Discretion Over
The Assets of The Rye Funds And Subjected Tremont To U.S. Laws And
Regulations.**

62.    The Customer Agreements between BLMIS and the Rye Direct BLMIS Funds
gave BLMIS full discretion over the assets of the Rye Direct BLMIS Funds.  Pursuant to the
Trading Authorizations, the Rye Direct BLMIS Funds authorized Madoff to be their "agent and
attorney in fact" to buy, sell and trade in securities.  The Customer Agreements expressly state
that they are governed by New York law and all of the transactions pursuant to the Customer
Agreements are subject to the provisions of the Securities Exchange Act of 1934 and to the rules
and regulations of the SEC and the Board of Governors of the Federal Reserve System.

63.    The Rye Direct BLMIS Funds agreed that all disputes arising under the Customer

18

Agreements must be resolved by arbitration under the laws of New York before the American

Arbitration Association, or "an arbitration facility provided by any exchange of which the broker

is a member, or the National Association of Securities Dealers Inc., and in accordance with the

rules pertaining to the selected organization."

> **D.    Tremont's Investors Knew They Were Investing In BLMIS.**

64.     Investors in all of the Rye Direct BLMIS Funds knew that they were investing in

Madoff's BLMIS in New York.  Tremont's employees in New York spoke openly with their

investors about their funds being invested in Madoff's BLMIS and regularly referred to the Rye

Direct Funds as "our Madoff fund" or as a Madoff "feeder."  Investors were also specifically

informed through the Rye Direct BLMIS Funds' Due Diligence Questionnaires that the funds

would be trading in the "U.S. equity market" and related equity index options and that cash

would be held in "U.S. short term treasury bills."  All of the Rye Funds represented in investor

documents that custody of their securities would be held in "a brokerage account with an NASD

registered broker dealer" (i.e. BLMIS).  Tremont's investors knew that any redemption requests

were dependent on the investment manager's ability to liquidate United States securities.

> **E.    Tremont's Cayman Registered Funds Had Their Principal Place of Business
> In New York.**

65.     In addition, all investors were aware that the Rye Funds had U.S. based counsel

and U.S. based sales contacts.  The Rye Funds' Private Placement Memoranda and marketing

materials openly identified these U.S. ties.

66.     Investors in the Cayman Registered Funds were specifically informed that they

were only permitted to make investments and receive redemptions in U.S. dollars, as was the

case with the Delaware Registered Funds.

67.     Although the Rye Funds at issue in the ET Motion were registered in the Cayman

Islands, they had no more than a nominal presence there.  The Cayman Registered Funds never

had any real offices or operations in the Cayman Islands. Rye Portfolio LDC and Rye Portfolio

Limited had their registered office at a P.O. Box address in the Cayman Islands, care of a

company that is in the business of providing local addresses to companies. Rye Portfolio

Limited XL similarly had its registered address at an international law firm in the Cayman

Islands.

68.    The Cayman Registered Funds were not permitted to solicit investors in the

Cayman Islands because they were registered as exempted companies under the Cayman Islands

Companies Law. Under the Companies Law, "[a]n exempted company shall not trade in the

Islands with any person, firm, or corporation except in furtherance of business of the exempted

company carried on outside the Islands." *See* Section 174 of the Companies Laws (2013

Revision). The Cayman Registered Funds were prohibited from accepting investment funds

from members of the public in the Cayman Islands and paid no taxes in the Cayman Islands.

69.    From January 2002 forward, Tremont Partners in New York was the sub-advisor

and handled all investment management duties for Rye Portfolio LDC, and from December 2005

forward, the same was true for Rye Portfolio Limited, in each case by virtue of an express

delegation of all such duties to Tremont Partners from Tremont (Bermuda) Limited ("Tremont

Bermuda"), the nominal investment manager for those funds. Though incorporated in Bermuda,

Tremont Bermuda itself was wholly owned by TGH, registered under the U.S. Investment

Advisers Act of 1940, and had Tremont executives in New York serving on its board of

directors. For example, Sandra Manzke, Rupert Allan and Robert Schulman, who all served at

various times as CEO of TGH, also served as directors of Tremont Bermuda while maintaining

their positions in New York.

70.    Prior to such delegation of all duties in 2002 and 2005 respectively, Rye Portfolio

LDC and Rye Portfolio Limited were in any event run out of New York, as the Tremont

Bermuda office at all times performed only low-level administrative work, handled by at most two employees. Tremont Bermuda performed no investment management, research, data collection, or sales, all of which were done in New York. Letters sent to investors on Tremont Bermuda letterhead regularly came from Tremont Partners' employees in New York, who would include their New York contact information on such letters.

71.     As part of its management duties for Rye Portfolio Limited and Rye Portfolio LDC, Tremont's New York employees, among other things, approved trade tickets and monthly statements, checked bank activity, and were authorized as bank signatories for the funds. As alleged above, BLMIS communicated directly with Tremont's executives and employees in New York regarding all of the Rye Funds, including Rye Portfolio Limited and Rye Portfolio LDC. For instance, Darren Johnston, who headed Tremont's Rye Investment Management ("RIM") division in New York from 2006-2007, and Harry Hodges, who worked under Johnston in New York, regularly corresponded with BLMIS's Frank DiPascali regarding subscriptions to and redemptions from Rye Portfolio Limited and Rye Portfolio LDC.

72.     On July 1, 2006, Tremont closed its Bermuda office and formally consolidated the management of all of its funds to its New York office. Thereafter, any ministerial functions that had been handled in Bermuda for Rye Portfolio Limited and Rye Portfolio LDC took place domestically. By no later than November 2006, subscriptions for Rye Portfolio Limited and Rye Portfolio LDC flowed solely through U.S. bank accounts.

73.     Beginning in the fall of 2006 if not earlier, when Tremont formally closed Rye Portfolio Limited's and Rye Portfolio LDC's Bermuda-based bank accounts, every redemption payment made by Tremont to an investor, which payment forms the basis for the Trustee's subsequent transfer complaints, came out of the fund's New York-based bank accounts at the Bank of New York.

21

74.     Around the same time, Tremont had formed its RIM division based out of New York, whose express purpose was to manage and operate all of the Tremont BLMIS funds together. Tremont began to refer to and market its BLMIS invested funds as the "Rye Select Funds" and renamed all of the BLMIS invested funds to include the word "Rye." Tremont explained to its investors that the reason for this change was because Tremont "had a longstanding presence in Rye, New York and the Rye Select Funds [we]re all about providing [ ] access to a _select_ group of the investment industry's most exclusive and otherwise unavailable talent." (emphasis in original). From then on, the published materials for all the Rye Funds, including prospectus statements and marketing materials, expressly directed potential investors to contact Tremont's employees in New York.

75.     Notably, even before the change to add "Rye" to the funds' names, Tremont had highlighted the U.S. origins of all the Rye Direct BLMIS Funds, except Rye Portfolio Limited LDC, by using the word "American" in the fund name. As alleged in the Tremont Complaint, Rye Broad  Market was originally named American Masters Broad Market Fund, LP.; Rye Prime Fund was originally named American Masters Broad Market Prime Fund, LP; Rye Portfolio LDC was originally named Tremont-Broad Market Fund LDC; and Rye Portfolio Limited was originally named American Masters Broad Market Fund II Limited.

76.     From July 2006 forward, investors in Rye Portfolio Limited and Rye Portfolio LDC were also specifically instructed to send all subscription agreements directly to Tremont's New York employees or to the Bank of New York in New York, New York, and all redemption requests were similarly handled by either Tremont in New York or the Bank of New York. Starting in October 2006, investors in these funds were also specifically instructed to wire subscription monies directly to accounts at the Bank of New York. During this time, the Directors of Funds, which included New York based director Darren Johnston, had the discretion

to suspend subscriptions and redemptions by investors under varying circumstances, including

when they found redemptions "not reasonably practical" or "prejudicial," and compel

"redemption of Shares for any or no reason."

77.    From 2006 onwards, New York-based Tremont Partners also held itself out as the

general partner of Cayman Registered Funds Rye Portfolio Limited and Rye Portfolio Limited

XL.

78.    With regard to Rye Portfolio Limited XL, from its inception in late 2006, it was

managed just like Delaware Registered Fund Rye Broad Market XL, with Tremont Partners as

its investment manager and the Bank of New York as its custodian.  Both XL funds also

instructed their investors to send subscription agreements and redemption requests to the same

address in New York.

**F.    The Rye Funds With Direct BLMIS Accounts Filed Claims With The
        Trustee.**

79.    Subsequent to the revelation of BLMIS's fraud, the two Delaware Registered

Funds with BLMIS accounts (Rye Broad Market and Rye Prime Fund), and the two Cayman

Registered Funds with BLMIS accounts (Rye Portfolio Limited and Rye Portfolio LDC) filed

claims with the Trustee.  On July 25, 2011, these funds entered into a joint settlement agreement

with the Trustee, which agreement was governed by New York law and pursuant to which the

funds submitted to the jurisdiction of the U.S. Bankruptcy Court for purposes of enforcing the

agreement.  The claims of Rye Broad Market, Rye Portfolio Limited and Rye Portfolio LDC

were allowed in connection with the settlement, and these funds have received and continue to

receive distributions on their allowed claims.

**G.    The Rye Funds Have Asserted that Their BLMIS-Related Activities
        Implicate the U.S. Securities Markets and U.S. Securities Laws.**

80.    Finally, in addition to the foregoing, each of the Rye Funds (including the

Cayman Registered Funds) have, in other BLMIS-related lawsuits in which they are or were named defendants, themselves asserted (by virtue of their assertions as to preemption by the Securities Litigation Uniform Standards Act and the NY Martin Act) that (i) their BLMIS-related activities were directed to promoting or inducing the sale of securities within or from New York, and that (ii) the securities they purported to trade were U.S. securities covered by the 1933 Exchange Act. *See In re Tremont Securities Law, State Law and Insurance Litigation*, 1:08-cv-11117-TPG (S.D.N.Y.)[1]; *Peshkin et al. v. Tremont Group Holdings, Inc., et al.*, 08-CV-11183.[2]

81.     The Trustee incorporates by reference the allegations of the Complaint filed in *Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-05310 (SMB) (filed December 7, 2010, Bankr. S.D.N.Y.), ECF No. 1.

**The Kingate Global Transfers are Domestic.**

82.     Kingate Global was a feeder fund that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the account prior to December 11, 2008.

83.     Kingate Global filed a customer claim in the SIPA liquidation.

**A.     Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation.**

84.     Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

85.     Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

_____

[1] *See* Dkt. numbers 142, 149, 154, 280, 285.

[2] *See* Dkt. numbers 104, 110, 150.

86.    Tremont Bermuda served as the co-manager of Kingate Global for approximately 10 years. Tremont Bermuda was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, a Connecticut corporation. Tremont Bermuda's and Tremont Partners' parent company was TGH, a Delaware corporation.

87.    Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage Kingate Global's investments with BLMIS.

88.    Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

**B.    The Operative Legal Documents Were New York-Based.**

89.    Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

90.    Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

91.    Kingate Global agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

**C.    BLMIS Had Full Authority to Make and Execute Investment Decisions.**

92.     Kingate Global's Trading Authorization Agreements authorized BLMIS to be Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

93.     As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as Kingate Global's investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

94.     BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

### D.     Kingate Global Was Managed From New York.

95.     During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

96.     Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

97.     Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

98.     Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

99.     KML's New York-based director, Michael Tannenbaum, Esq., performed certain

executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

100.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

101.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

102.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

103.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

104.    KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E.    Kingate Global Used Banks in New York.**

105.    Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan.

106.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

107.    In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

108.    FIM also directed fee payments to be routed through a bank account in New

York.

109.   The Trustee incorporates by reference the allegations of the Fourth Amended

Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No.

100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: New York, New York
      June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF,
LLP**
156 West 56th Street
New York, New York 10019
Tel:  (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
Brian W. Kreutter

*Special Counsel to Irving H. Picard, Trustee for
the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff*