**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>CACEIS BANK LUXEMBOURG and CACEIS BANK,<br><br>Defendants. | Adv. Pro. No. 11-02758 (SMB) |

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO THE CACEIS DEFENDANTS' MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF MOTION FOR LEAVE TO AMEND THE COMPLAINT**

The Trustee[1] respectfully submits this supplemental memorandum to his Main Brief in opposition to the Motion to Dismiss as it applies to the Caceis Defendants and in further support of his motion for leave to amend the Complaint. The Caceis Defendants are Shareholder Defendants and the Trustee seeks to recover not less than $113,788,403 in Transfers of BLMIS customer property from the BLMIS Feeder Funds to the Caceis Defendants. The Trustee's Proffered Allegations plead specific facts evidencing that the component events of the transactions relating to the Transfers from the BLMIS Feeder Funds are predominantly domestic and the Transfers are not "purely foreign" under the standard set forth in Judge Rakoff's decision regarding the extraterritorial application of SIPA and section 550(a)(2) of the Bankruptcy Code, such that the Trustee's action to recover the Transfers does not implicate an extraterritorial application of these provisions.[2]

## BACKGROUND AND LEGAL STANDARD

As discussed in the Main Brief, the District Court did not dismiss outright the Trustee's Complaint against the Caceis Defendants or any other Defendants subject to the Extraterritoriality Decision.[3] Rather, the matter was returned to this Court for a decision regarding—based on the factual allegations as to each individual Defendant—whether or not the Transfers to such Defendant were "purely foreign," thus implicating an extraterritorial

[1] On the date herewith, the Trustee has filed his main brief (the "Main Brief") in opposition to the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality (the "Motion to Dismiss") and certain Proffered Allegations on the Extraterritoriality Issue (the "Proffered Allegations" or "PA") regarding the above-captioned Defendants. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Main Brief or the Proffered Allegations, as relevant.
[2] *See Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("SIPC v. Madoff")*, 513 B.R. 222 (S.D.N.Y. 2014) (the "Extraterritoriality Decision")
[3] *See Extraterritoriality Decision*, 513 B.R. at 232.

application of SIPA and section 550(a)(2) of the Bankruptcy Code and requiring dismissal pursuant to the Extraterritoriality Decision.[4]

The Extraterritoriality Decision held that where two parties to a subsequent transfer of BLMIS customer property are foreign entities, the Trustee must "put forth specific facts suggesting a domestic transfer" to avoid dismissal.[5] In determining whether or not a transfer is domestic for extraterritoriality purposes, as opposed to "purely foreign," the courts should analyze the "location of the transfers as well as the component events of those transactions."[6] In this fact-based inquiry, all reasonable inferences are to be drawn in the Trustee's favor.[7]

Pursuant to the Court's December 10, 2014 Scheduling Order, the Trustee submits herewith the Proffered Allegations regarding, among other things, the Transfers of BLMIS customer property from the BLMIS Feeder Funds to the Caceis Defendants. The facts alleged in the Proffered Allegations show that the component events of the transactions relating to the Transfers to the Caceis Defendants are predominantly domestic and the Transfers are not "purely foreign." As such, the dismissal of the Complaint against the Caceis Defendants pursuant to the Extraterritoriality Decision is unwarranted.

**THE TRANSFERS AND COMPONENT EVENTS OF THEIR RELATED TRANSACTIONS ARE PREDOMINANTLY DOMESTIC**

In the aggregate, the component events of the transactions relating to the Transfers from the BLMIS Feeder Funds to the Caceis Defendants are such that the Transfers are centered in the

---

[4] *See Id.* at 231-33.
[5] *Id.* at 232, n. 4.
[6] *Id.* at 227 (quoting *Maxwell Commc'n Corp. v. Societe Generale PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)). Such component events include, but are not limited to: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *See In re Maxwell Commc'n Corp.*, 186 B.R. at 816-17.
[7] *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

United States, not in a foreign jurisdiction. The Transfers and related transactions were predominantly domestic, not foreign—let alone "purely foreign." Therefore, such Transfers are domestic for purposes of the Court's extraterritoriality analysis and the Caceis Defendant's Motion to Dismiss based on the Extraterritoriality Decision should be denied and the Trustee should be given leave to amend his Complaint.

**A. The Caceis Defendants Knowingly and Purposely Invested with the BLMIS Feeder Funds to Profit from New York-based BLMIS**

The genesis—and first component event—of the transactions and related Transfers by the BLMIS Feeder Funds is the Caceis Defendants' actual investment in the BLMIS Feeder Funds. The Caceis Defendants knowingly and purposely invested in the BLMIS Feeder Funds with deliberate intent to invest in and profit from BLMIS's New York-based activity. (PA at ¶¶ 21–22). The Caceis Defendants knew, based on, among other things, the Fairfield Sentry and Fairfield Sigma PPM, the Harley EM and other related documents, that the BLMIS Feeder Funds maintained at least 95% of their assets with New York-based BLMIS, a registered broker-dealer. (*Id.* at ¶¶ 24, 28–34, 40, 43–45, 48–49).

The Caceis Defendants further knew that BLMIS: (i) acted as *de facto* investment advisor for the BLMIS Feeder Funds in New York, including making all decisions regarding the investment of all or almost all of the BLMIS Feeder Funds' assets; (ii) purportedly executed the SSC Strategy involving U.S. equities, options and Treasuries on U.S. exchanges; and (iii) acted as prime broker and custodian for the BLMIS Feeder Funds (*Id.* at ¶¶ 24–49). Moreover, the Caceis Defendants knew that BLMIS was "essential" to the success of the BLMIS Feeder Funds and that any Transfers from the BLMIS Feeder Funds were the product of BLMIS's purported actions and investments in the United States. (*Id.* at ¶¶ 23–49, 59).

The Caceis Defendants deliberately invested their money with New York-based BLMIS in order to invest in and profit from U.S. securities on U.S. exchanges. With such U.S.-based transactions at their base, the Transfers are predominantly domestic and not "purely foreign."

**B. The BLMIS Feeder Funds Were Controlled, Operated and Managed From New York**

The second relevant component of the transactions related to the Transfers was the operation of the BLMIS Feeder Funds themselves. While the BLMIS Feeder Funds may have been organized under the laws of a foreign jurisdiction, those funds were controlled, operated and managed in New York.

**i. The Fairfield Funds**

In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* New York partnership. (*Id.* at ¶ 75). In October and November of 1990, Noel and Tucker organized Fairfield Sentry and Fairfield Sigma—a so-called currency fund that invested 100% of its assets in Fairfield Sentry—under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), as means for investors to invest with BLMIS. (*Id.* at ¶¶ 78, 98–99).

The Fairfield Funds were, however, shell corporations present in the BVI on paper only. (*Id.* at ¶¶ 79, 100). The Fairfield Funds were prohibited from transacting business with BVI residents, except other entities organized under the International Business Company Act. (*Id.* at ¶¶ 78, 99). Their statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm, which addressed its statements for services to the Fairfield Funds to FGG's New York headquarters. (*Id.* at ¶¶ 79, 100).

From their commencement of operations until their liquidation, the Fairfield Funds had no employees and no office. (*Id.*). These entities were operated almost entirely by FGG employees based in New York. (*Id.* at ¶¶ 85–86, 101–102). These employees maintained final

control of the Fairfield Funds' bank accounts and relationships with the Fairfield Funds' back office service providers. (*Id.* at ¶¶ 84, 101, 103).

At various times, in account documents executed with BLMIS, representatives of Fairfield Sentry indicated that Fairfield Sentry's address was the addresses of certain FGG affiliates in Greenwich, CT and New York City, NY. (*Id.* at ¶¶ 81–82).

From the Fairfield Funds' inception, FGG personnel in New York controlled the sales and subscriptions of the Fairfield Funds' shares. (*Id.* at ¶¶ 85–86, 101–102). After January 1, 2002, each investor in the Fairfield Funds executed a subscription agreement in which the investor agreed to be bound under New York law and submit to New York jurisdiction and venue. (*Id.* at ¶¶ 86, 102). At all relevant times, personnel at FGG's New York headquarters monitored the Fairfield Funds' investments; managed the relationship with BLMIS; directed investment into and out of BLMIS as well as into and out of Sentry; marketed the Fairfield Funds; approved all subscriptions for Fairfield Funds shares; maintained all of the Fairfield Funds' book and records; and made all strategic and operational decisions regarding the Fairfield Funds. (*Id.* at ¶¶ 85–86, 101–102).

**ii. <u>Harley</u>**

Harley was an entity formed under the Cayman Islands Companies Law. (*Id.* at ¶ 118). In its Memorandum of Association, however, Harley represented that it "will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands." (*Id.* at ¶ 119). Like the Fairfield Funds, Harley had no employees or offices of its own. (*Id.* at ¶ 125).

Fix Asset Management Services Inc. ("<u>FAM</u>"), a New York corporation, managed Harley from its headquarters in New York. (*Id.* at ¶¶ 122–133). FAM in New York monitored and

conducted due diligence on Harley's investments in BLMIS from New York, and Harley's BLMIS account statements were sent to FAM Service's New York Office. (*Id.* at ¶¶ 130–131). Also, FAM corresponded with BLMIS from New York to request redemptions from and subscriptions into Harley's BLMIS account. (*Id.* at ¶ 133). FAM marketed the sale of Harley shares to investors from New York. (*Id.* at ¶ 129).

Charles Fix, a New York resident, held all of the voting shares for Harley, and his daughter, Tatiana Fix Katisgera, also a New York resident, was the chief executive officer of FAM. (*Id.* at ¶¶ 126–127).

Based on the facts set forth above, and those other facts included in the Proffered Allegations or incorporated therein by reference, the BLMIS Feeder Funds were controlled, operated and managed from New York and were New York residents, notwithstanding the fact that these entities were organized under the laws of foreign jurisdictions. The operation of the BLMIS Feeder Funds in New York is a significant, domestic component event of the transactions relating to the Transfers and such Transfers to the Caceis Defendants are predominantly domestic.

**C. The Majority of the Transfers to the Caceis Defendants Were Made Utilizing New York-based Bank Accounts**

One of the key components of an extraterritoriality analysis is the "location of the transfers"[8] themselves. The Caceis Defendants received a majority of the Transfers into their own or their affiliates' New York-based correspondent bank accounts. (*Id.* at ¶¶ 64–65, 67–70). Caceis Bank received at least ten Transfers from Fairfield Sentry into its bank accounts at Bankers Trust NY and Brown Brother Harriman, New York. (*Id.* at ¶ 69). Caceis Bank Lux received at least twelve Transfers from the Fairfield Funds and Harley into its or its affiliate's

[8] *See Extraterritoriality Decision*, 513 B.R. at 227.

bank accounts at Citibank NY, Calyon NY and JPMorgan Chase Bank in New York. (*Id.* at ¶¶ 64, 67). The Caceis Defendants purposely chose to receive a majority of their Transfers into these New York-based accounts. (*Id.* at ¶¶ 64–65, 67–70).

Additionally, the Fairfield Sentry Transfer payments to the Caceis Defendants also utilized a New York-based account at HSBC. (*Id.* at ¶¶ 66, 71).

While the single use of a correspondent bank account in the United States, without the presence of other facts indicating that a transaction and related transfer are predominantly domestic, may not be sufficient to find that a transfer is domestic for purposes of an extraterritoriality analysis, the repeated use of U.S.-based correspondent accounts to receive multiple transfers is an important fact to consider—especially when that fact is only one of many facts that indicate that a transaction and its related transfers are predominantly domestic.[9]

### D. The Transfers from the BLMIS Feeder Funds Were Made Pursuant to Domestic Subscription Agreements

Another component of the transactions relating to the Transfers from the BLMIS Feeder Funds to the Caceis Defendants was the subscription agreements executed by the Caceis Defendants. These subscription agreements, the execution of which was a necessary event for the Caceis Defendants to invest in the BLMIS Feeder Funds and ultimately receive the Transfers, were domestic in nature. By executing the applicable Fairfield Subscription Agreement, the Caceis Defendants knowingly submitted to New York venue, jurisdiction and law, agreed to wire Fairfield Sentry subscription payments to New York and requested that redemption payments be sent to the Caceis Defendants' bank accounts located in New York. (*Id.* at ¶¶ 52–59). Indeed, Caceis Bank and Caceis Bank Lux directed at least seven and six payments for shares in Fairfield Sentry, respectively, to an HSBC account in New York for ultimate deposit in Fairfield Sentry's

[9] *Cf. e.g., Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170-71 (2d. Cir. 2013) (discussing the deliberate and recurring use of correspondent bank account in the context of personal jurisdiction analysis).

bank account, from which they were transferred to BLMIS's bank account at JPMorgan Chase N.A. in New York. (*Id.* at ¶ 59).

Furthermore, pursuant to the Fairfield Subscription Agreements, which incorporate the Fairfield Sentry and Fairfield Sigma PPM, as applicable, the Caceis Defendants agreed that BLMIS in New York would control all aspects of the Fairfield Funds' investments, as described in the Fairfield Sentry and Fairfield Sigma PPM. (*Id.*).

Similarly, Caceis Bank Lux entered into one or more Harley Subscription Agreements, whereby, in conjunction with Harley's Articles of Incorporation, Caceis Bank Lux agreed and submitted to arbitration in New York in the event of a dispute with Harley and further agreed to wire Harley subscription funds to certain bank accounts in New York. (*Id.* at ¶¶ 60–63). Caceis Bank Lux wired Harley subscription funds to a New York-based bank account on one or more occasions. (*Id.* at ¶ 62).

### E. Additional Component Events of the Transactions Show That the Transfers Were Predominantly Domestic

As discussed above, the Caceis Defendants directed multiple subscription payments for Fairfield Sentry shares to a New York-based bank account at HSBC. (*Id.* at ¶ 58). Caceis Bank Lux also directed one or more subscription payments for Harley shares to one or more bank accounts in New York. (*Id.* at ¶ 62). Fairfield Sentry and Harley specifically directed the Caceis Defendants to wire these funds accordingly. (*Id.*at ¶¶ 56–57, 60–61).

Also, in connection with their investments in the Fairfield Funds, the Caceis Defendants conducted business with FGG, the *de facto* New York partnership that marketed, managed and controlled the Fairfield Funds. The Caceis Defendants' primary contacts with FGG were Philip Toub, an FGG founding partner, Lourdes Barranche and Cornelius Boele working out of New York and Santiago Reyes working out of Miami. (*Id.* at ¶ 73). The Caceis Defendants

communicated with these US-based FGG representatives regarding the subscription and redemption of the Caceis Defendants' investments in the Fairfield Funds. (*Id.*).

In the aggregate, the component events of the transactions relating to and resulting in the Transfers received by the Caceis Defendants—and the Transfers themselves—are predominantly domestic. As such, the Transfers are not "purely foreign" for purposes of the analysis required by Judge Rakoff's Extraterritoriality Decision. Accordingly, the Caceis Defendants' Motion to Dismiss regarding the extraterritoriality issues should be denied and the Trustee's motion for leave to amend the Complaint to add the Proffered Allegations should be granted.

### G. The Caceis Defendants Previously Sought To Utilize the Bankruptcy Code's Protections Under Section 546(e)

Finally, the Caceis Defendants previously argued in this case that section 546(e) of the Bankruptcy Code's safe harbor should shield their Transfers from suit precisely because of their connection to the United States securities market in which BLMIS was purported to invest. (*Id.* at ¶¶ 144–145). This argument is inconsistent with the Caceis Defendants' current assertion that their transactions and the Transfers lack sufficient domestic connections for purposes of extraterritoriality. The Caceis Defendants should not be allowed to have it both ways, taking advantage of U.S. law when it suits them and running from it when it does not.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Trustee's Main Brief, the Trustee respectfully requests that the Court deny the Motion to Dismiss with respect to the Caceis Defendants and grant the Trustee's motion for leave to amend the Complaint to add the Proffered Allegations.

Dated: June 29, 2015
New York, New York

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Matthew B. Lunn*

Matthew B. Lunn
Justin P. Duda
Rockefeller Center
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Email: *mlunn@ycst.com*
*jduda@ycst.com*

*Attorneys for Plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC*