**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> CACEIS BANK LUXEMBOURG and CACEIS BANK, <br><br> Defendants. | Adv. Pro. No. 11-02758 (SMB) |

**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE
EXTRATERRITORIALITY ISSUE AS TO THE CACEIS DEFENDANTS**

Irving H. Picard ("Trustee"), as trustee for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and the substantively consolidated estate of Bernard L.

Madoff ("Madoff"), by the Trustee's undersigned counsel, for his Proffered Allegations on the

Extraterritoriality Issue against Defendants CACEIS Bank Luxembourg, formerly known as

Credit Agricole Investor Services Luxembourg (including its predecessors in interest, "Caceis

Bank Lux"), and CACEIS Bank France, formerly known as CACEIS Bank (including its

predecessors in interest, "Caceis Bank," and together with Caceis Bank Lux, the "Caceis

Defendants"), states:

## INTRODUCTION

1.          The below-proffered allegations address the Caceis Defendants, each of

which is a defendant in the case of *Picard v. CACEIS Bank Luxembourg, et al.*, Adv. Pro. No.

11-02758 (SMB) ) (the "Adversary Proceeding").

2.          The Trustee seeks to recover, as subsequent transfers under SIPA and 11

U.S.C. § 550(a)(2), the Caceis Defendants' redemptions from certain BLMIS feeder funds, as set

forth in the Trustee's complaint (the "Complaint") in the Adversary Proceeding and herein (the

"Transfers"), which Transfers occurred over an approximately five year period (2003-2008) (the

"Transfer Period").

3.          In the Complaint, the Trustee asserts that the Caceis Defendants

collectively received Transfers in an amount not less than $50,082,651.  Since the filing of the

Complaint, the Trustee has discovered additional Transfers to the Caceis Defendants.  As of the

filing date of this Proffer, the Trustee asserts that the Caceis Defendants collectively received

Transfers in an amount not less than $113,788,403.

4.          The BLMIS feeder funds at issue in this Adversary Proceeding are Fairfield

Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma," and together

with Fairfield Sentry, the "Fairfield Funds"), and Harley International (Cayman) Ltd. ("Harley").

Collectively, the Fairfield Funds and Harley shall be referred to herein as the "BLMIS Feeder

Funds".

## THE DEFENDANTS

### A.     Caceis Bank

5.          Defendant Caceis Bank is a French *société anonyme* and is successor in

interest to, among other entities, CACEIS Bank Ex Ixis Is, CDC Ixis and Credit Agricole

Investor Services Bank.

6.          In the Complaint, the Trustee asserts that Caceis Bank received Transfers

from Fairfield Sentry in an amount not less than $24,052,229.  As of the date of filing of this

Proffer, however, the Trustee asserts that, during the Transfer Period, Caceis Bank received

Transfers of BLMIS customer property from Fairfield Sentry in an amount not less than

$34,157,599.

7.          Caceis Bank is, and upon information and belief, during the Transfer

Period was, an indirect, majority-owned subsidiary of Credit Agricole S.A. ("Credit Agricole")

and member of a worldwide group of affiliated companies known as the "Credit Agricole

Group."

8.          Since at least 2000, Credit Agricole and certain of its subsidiaries have

maintained operations in the United States and have been subject to the authority of the Federal

Reserve Bank of New York (the "Reserve Bank") and the New York State Banking Department

(the "NYS Banking Dept."), as evidenced by the written agreement regarding such operations,

dated November 30, 2000 (the "2000 Operations Agreement"), between Credit Agricole and

certain of its subsidiaries and the Reserve Bank and the NYS Banking Dept.

9.        On or about March 9, 2004, Credit Agricole and certain of its subsidiaries,

the Board of Governors of the Federal Reserve System (the "FRB") and the NYS Banking Dept.

entered into a consensual *Order to Cease and Desist and Order of Assessment of a Civil Money

Penalty and Monetary Payment Issued Upon Consent* (the "Consent Order") regarding alleged

violations of the 2000 Operations Agreement.

10.        The Consent Order was entered "in recognition of the[] common goals to

ensure compliance with all applicable federal and state laws, rules, and regulations by all of the

U.S. operations of Credit Agricole S.A. . . . and its subsidiaries ," and "in light of  . . . Credit

Agricole S.A.'s business plans to reorganize its U.S. operations . . . ."  The Consent Order set

forth certain requirements regarding Credit Agricole's reorganization of its U.S. operations,

regarding which Credit Agricole had ultimate responsibility.

11.        Since 2006, Credit Agricole has elected to be treated as a financial holding

company pursuant to sections 4(k) and (l) of the Bank Holding Company Act and Sections

225.82 and 225.91 of the FRB's Regulation Y.

12.        On or about December 27, 2013, Credit Agricole filed a U.S. Resolution

Plan under the Resolution Plan Final Rule issued by the Federal Deposit Insurance Corporation

and the FRB.

13.    During the Transfer Period, certain wholly owned subsidiaries and/or affiliates of Caceis Bank maintained offices in New York City, Chicago, Los Angeles, Houston, Dallas and Miami.

**B.    Caceis Bank Luxembourg**

14.    Defendant Caceis Bank Lux is a Luxembourg *société anonyme*.

15.    In the Complaint, the Trustee asserts that Caceis Bank Lux received Transfers from Fairfield Sentry in an amount not less than $627,991.  As of the date of filing of this Proffer, however, the Trustee asserts that, during the Transfer Period, Caceis Bank Lux received Transfers of BLMIS customer property from Fairfield Sentry in an amount not less than $35,759,150.

16.    In the Complaint, the Trustee asserts that Caceis Bank Lux received Transfers from Fairfield Sigma in an amount not less than $19,352,471.  As of the date of filing of this Proffer, however, the Trustee asserts that, during the Transfer Period, Caceis Bank Lux received Transfers of BLMIS customer property from Fairfield Sigma in an amount not less than $37,821,694.

17.    During the Transfer Period, Caceis Bank Lux received Transfers of BLMIS customer property from Harley in an amount not less than $6,049,960.

18.    Upon information and belief, during the Transfer Period, Caceis Bank Lux was a wholly owned subsidiary of Caceis Bank.

19.    Caceis Bank Lux is and, during the Transfer Period, was a member of a worldwide group of affiliated companies known as the "Credit Agricole Group."

20.    During the Transfer Period, affiliates of Caceis Bank Lux maintained offices in New York City, Chicago, Los Angeles, Houston, Dallas and Miami.

## THE COMPONENT EVENTS OF THE TRANSACTIONS SHOW
## THAT THE TRANSFERS ARE PREDOMINANTLY DOMESTIC

**A.    The Caceis Defendants Knowingly and Purposely Invested in the BLMIS Feeder Funds in Order to Profit From BLMIS in New York**

21.    By May of 1998, June of 2005 and November of 2008, and likely earlier in each case, Caceis Bank Lux had knowingly and purposely invested in Fairfield Sentry, Fairfield Sigma and Harley, respectively, to profit from BLMIS in New York.

22.    By January 30, 2004, and likely earlier, Caceis Bank had knowingly and purposely invested in Fairfield Sentry to profit from BLMIS in New York.

23.    But for BLMIS's fraudulent Ponzi scheme in New York, the Caceis Defendants would have received none of the Transfers of BLMIS customer property via the BLMIS Feeder Funds.

24.    BLMIS in New York was the *de facto* investment advisor for the BLMIS Feeder Funds and the BLMIS Feeder Funds invested at least 95% of their assets with BLMIS.

25.    BLMIS in New York purportedly operated and executed the "split strike conversion" investment strategy (the "SSC Strategy") on behalf of the BLMIS Feeder Funds.

26.    The SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options and U.S. Treasuries traded on U.S. exchanges, and that decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

27.    BLMIS in New York was custodian for the BLMIS Feeder Funds and maintained custody of the vast majority of the BLMIS Feeder Funds' assets in New York.

28.    BLMIS was a registered broker-dealer in the United States.

29.    The Caceis Defendants knew each of the above facts because, among other reasons, such facts were set forth in Fairfield Sentry's Private Placement Memorandum (the

"Fairfield Sentry PPM") and Fairfield Sigma's Private Placement Memorandum (the "Fairfield Sigma PPM").

30.        The Fairfield Funds required each investor to enter into a subscription agreement (a "Fairfield Sentry Subscription Agreement" or "Fairfield Sigma Subscription Agreement," as applicable, and, collectively, the "Fairfield Subscription Agreements") in connection with that investor's initial investment in the Fairfield Funds and enter into an additional Fairfield Subscription Agreement in connection with each additional investment.

31.        Caceis Bank Lux entered into multiple Fairfield Sentry Subscription Agreements and one or more Fairfield Sigma Subscription Agreements.

32.        Caceis Bank entered into multiple Fairfield Sentry Subscription Agreements.

33.        Pursuant to such Fairfield Subscription Agreements, the Caceis Defendants each represented and warranted, among other things, that it was a "Professional Investor" with "such knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in" the Fairfield Funds.

34.        Pursuant to such Fairfield Subscription Agreements, the Caceis Defendants also represented that they were financially sophisticated and that they had received and reviewed the Fairfield Sentry and Fairfield Sigma PPM, which were incorporated by reference in the relevant Fairfield Subscription Agreement.

35.        The Fairfield Sentry PPM states that Fairfield Greenwich Limited ("FGL"), the manager of Fairfield Sentry for a portion of the period during which Credit Agricole Lux was invested in that fund, maintains its office in New York and "has delegated the management of [Fairfield Sentry's] investment activities to Bernard L. Madoff Investment Securities, a

registered-broker dealer in New York. . . ."  The Fairfield Sentry PPM asserts that Fairfield

Sentry "has no control over the decisions implemented" by BLMIS.

36.        The Fairfield Sentry PPM states that the "Split Strike Conversion strategy

is implemented by Bernard L. Madoff Investment Securities LLC ('BLM'), a broker-dealer

registered with the Securities and Exchange Commission, through accounts maintained by

[Fairfield Sentry] at that firm."

37.        The Fairfield Sentry PPM also states that FGL "has established a

discretionary account for [Fairfield] Sentry at Bernard L. Madoff Investment Securities ('BLM'),

a registered broker-dealer in New York, who utilizes a strategy described as 'split strike

conversion'," and that "[a]ll investment decisions in the account at BLM are effected by persons

associated with BLM."

38.        The Fairfield Sentry PPM states that BLMIS "acts as a principal in

connection with its sale of securities to [Fairfield Sentry] and the purchase of securities from

[Fairfield Sentry].  BLM acts as a market-maker in the stocks purchased and sold by [Fairfield

Setnry].  These market making activities enable BLM to trade with [Fairfield Sentry] as

principal."

39.        The Fairfield Sentry PPM further states that Fairfield Sentry "allocates its

assets to an account at [BLMIS]," and that BLMIS acts as "sub-custodian of [Fairfield Sentry's]

assets."

40.        The Fairfield Sentry PPM further states that "[a]s a result of the Investment

Manager's selection of Bernard L. Madoff Investment Securities LLC ('BLM') as execution

agent of the split strike conversion strategy, substantially all of the Fund's assets will be held in

segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian.

Accordingly, BLM will be sub-custodian of [Fairfield Sentry]."

41.     The Fairfield Sentry PPM also states that BLMIS is "essential to the

continued operations of [FGL]," and "essential to the continued operation of [Fairfield Sentry],

and its profitability, if any."  Finally, the Fairfield Sentry PPM indicated that there was a risk that

BLMIS might, as custodian and broker, "misappropriate the securities or funds (or both) of

[Fairfield Sentry]."

42.     The Fairfield Sigma PPM states that Fairfield Sigma invested all of its

assets in Fairfield Sentry and provides substantially similar information to that set forth in the

Fairfield Sentry PPM.

43.     Similar to the Fairfield Funds, investment in Harley required each investor

to enter into a subscription agreement (a "Harley Subscription Agreement"), which agreement

represents that such investor received and read Harley's Confidential Explanatory Memorandum

(the "Harley EM").

44.     Based upon the requirement that each investor execute a Harley

Subscription Agreement prior to investment in Harley and  upon information and belief, Caceis

Bank Lux entered into one or more Harley Subscription Agreements.

45.     In addition to the Harley EM, each investor in Harley, including, upon

information and belief, Caceis Bank Lux, received copies of Harley's audited yearly financial

statements, Memorandum of Association and Articles of Association.

46.     The Harley EM states that Harley "invests its assets with a single money

manager [i.e., BLMIS].  The manager invests primarily in a basket of S&P 100 stocks.  The

manager also employs an index option overlay as a hedge against adverse market movements and to preserve existing investor capital."

47.        Additionally, the Harley EM states that Harley "relies exclusively on the money manager for the management of its investment portfolio.  There could be adverse consequences to [Harley] in the event that the money manager ceases to be available to the Fund. The success of [Harley] is therefore expected to be significantly dependent upon the expertise and efforts of the money manager."

48.        Each of Harley's audited financial statements for years 2003, 2004, 2005, 2006 and 2007 disclosed that BLMIS acted as Harley's "Custodian."  Harley's audited financial statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

49.        The Caceis Defendants also knew each of the above facts because the Caceis Defendants are sophisticated financial entities and, as sophisticated financial entities, conducted due diligence regarding the BLMIS Feeder Funds and BLMIS.

50.        The Caceis Defendants also invested  in other BLMIS feeder funds, including Kingate Global Fund Limited and Kingate Euro Fund Limited (collectively, the "Kingate Funds"), with deliberate intent to profit from BLMIS.

51.        Upon information and belief, in connection with their investments in the Kingate Funds, the Caceis Defendants also received and represented that it had read those funds' operating memoranda, which memoranda provide information regarding BLMIS, its operation of the SSC Strategy and its role as broker, investment manager and custodian for the Kingate Funds.

**B.     The Transfers to the Caceis Defendants Were Made**
       **Pursuant to Subscription Agreements That Were Domestic in Nature**

52.         In connection with their investments in the BLMIS Feeder Funds, the

Caceis Defendants entered into multiple Fairfield Sentry Subscription Agreements and Caceis

Bank Lux entered into one or more Fairfield Sigma Subscription Agreements and, based upon

the requirement that each Harley investor execute a Harley Subscription Agreement and upon

information and belief, one or more Harley Subscription Agreements, which were all domestic in

nature.

53.         The Fairfield Subscription Agreements were governed by New York state

law and provided that New York courts shall have venue and jurisdiction regarding the

subscription agreements and the Fairfield Funds.

54.         Specifically, the Fairfield Subscription Agreements provide that "[t]his

Agreement shall be governed and enforced in accordance with the law of New York, without

giving effect to its conflict of laws provisions," and the relevant investor "agrees that any suit,

action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought

in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with

respect to any Proceeding and consents that service of process as provided by New York law

may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been

brought in an inconvenient forum."

55.         The Caceis Defendants expected to be subject to New York law and courts

with regards to their investments in the Fairfield Funds.

56.         Furthermore, pursuant to its Fairfield Sentry Subscription Agreements,

Caceis Bank Lux agreed to send payments for shares in Fairfield Sentry to a bank account at

HSBC Bank, N.A. ("HSBC"), New York and to receive redemption payments from Fairfield

Sentry at Caceis Bank Lux's bank account at Calyon, New York.

57.       Pursuant to its Fairfield Sentry Subscription Agreements, Caceis Bank

agreed to send subscription payments on behalf of Fairfield Sentry to a bank account at HSBC in

New York and to receive redemption payments from Fairfield Sentry at Caceis Bank's bank

accounts at Chase Bank, Brown Brothers Harriman and Bankers Trust in New York.

58.       On at least seven and six occasions, respectively, Caceis Bank and Caceis

Bank Lux directed their payments for shares of Fairfield Sentry to the denoted account with

HSBC in New York for ultimate deposit in Fairfield Sentry's bank account, from which they

were transferred to BLMIS's bank account at JPMorgan Chase N.A. in New York.

59.       The Caceis Defendants acknowledged in their Fairfield Subscription

Agreements that they received and reviewed a copy of the Fairfield Sentry and Sigma PPM,

which were incorporated into the relevant Fairfield Subscription Agreement and describe how:

(i) BLMIS in New York was "essential" to the Fairfield Funds as their investment advisor,

custodian, and broker-dealer that executed the SSC Strategy through the purchase and sale of

U.S. securities; (ii) the Fairfield Funds' purported investment manager was initially FGL, a

Fairfield Greenwich Group ("FGG") company, whose principal place of business was FGG's

office in New York, and subsequently Fairfield Greenwich (Bermuda) Ltd. which, in 2006,

registered as an investment advisor  with the Securities and Exchange Commission and was

controlled by FGG personnel in New York; (iii) the Fairfield Funds retained U.S. counsel in

New York; and (iv) FGG required subscribers, like the Caceis Defendants, to be in compliance

with the rules and regulations of the U.S. Department of the Treasury's Office of Foreign Assets

Control.

60.        Similarly, the Harley Subscription Agreements directed investors to wire their subscription payments for shares in Harley to certain bank accounts in New York. Prior to 2005, the Harley Subscription Agreements required subscription payments to be wired to a JPMorgan Chase Bank account in New York, held in the name of Fortis Bank (Cayman) Limited.

61.        After 2005, the Harley Subscription Agreements required subscriptions to be wired to a Northern Trust account in New York, held in the name of Fortis Prime Fund Solutions (IOM).

62.        Upon information and belief, Caceis Bank Lux directed one or more payments for shares in Harley to one or both of these bank accounts in New York.

63.        Finally, upon execution of the Harley Subscription Agreement and investment in Harley, Caceis Bank Lux was subject to Harley's Articles of Association, which establish that all disputes among Harley and its shareholders were referred to binding arbitration in New York pursuant to rules established by the American Arbitration Association.

**C.    The Caceis Defendants Received a Majority of Their Transfers from the BLMIS Feeder Funds Into Their Bank Accounts in the United States**

   **i.    Fairfield Sentry Redemptions by Caceis Bank Lux Were Paid Into U.S. Bank Accounts as Directed by Caceis Bank Lux**

64.        New York was the specific situs repeatedly selected by Caceis Bank Lux to receive at least eight Transfers, and, upon information and belief, at least an additional three Transfers from Fairfield Sentry. Specifically, Caceis Bank Lux used correspondent bank accounts at Calyon, New York and Citibank N.Y. (the "CBL FFS U.S. Accounts"), which accounts were in Caceis Bank Lux's own name and/or in the name of its affiliates.

65.        Caceis Bank Lux systematically designated such use of its account at Calyon, New York and, upon information and belief, its or its affiliates' account at Citibank N.Y. in its Fairfield Sentry Subscription Agreements and certain redemption documents.  The receipt of Transfers from Fairfield Sentry using the CBL FFS U.S. Accounts was purposeful on the part of Caceis Bank Lux.

66.        Fairfield Sentry also utilized an account at HSBC in New York to effectuate each of the Transfers to the CBL FFS U.S. Accounts.

**ii.    The Harley Redemption by Caceis Bank Lux Was Paid Into a U.S. Bank Account as Directed by Caceis Bank Lux**

67.        New York City, New York was the specific situs selected by Caceis Bank Lux for receipt of at least one redemption payment from Harley.  Specifically, Caceis Bank Lux used a correspondent bank account at JP Morgan Chase Bank in New York in order to receive such payment (the "CBL Harley U.S. Bank Account"), which account was in Caceis Bank Lux's own name.

68.        Upon information and belief, Caceis Bank Lux designated such use of the CBL Harley U.S. Bank Account in its Harley Subscription Agreements and/or relevant redemption documents.  The receipt of transfers from Harley using the CBL Harley U.S. Bank Account was purposeful on the part of Caceis Bank Lux.

**iii.    Fairfield Sentry Redemptions by Caceis Bank Were Paid Into U.S. Bank Accounts as Directed by Caceis Bank**

69.        New York was the specific situs repeatedly selected by Caceis Bank to receive at least six Transfers, and, upon information and belief, at least an additional four Transfers from Fairfield Sentry.  Specifically, Caceis Bank used correspondent bank accounts at

Brown Brothers Harriman NY and Bankers Trust New York (the "CB FFS U.S. Accounts"),

which accounts were in Caceis Bank's own name.

70.        Caceis Bank systematically designated such use of its CB FFS U.S.

Accounts in its Fairfield Sentry Subscription Agreements and certain redemption documents.

Thus, the receipt of Transfers from Fairfield Sentry using the CB FFS U.S. Accounts was

purposeful on the part of Caceis Bank.

71.        Fairfield Sentry also utilized an account at HSBC in New York to

effectuate each of the Transfers to the CB FFS U.S. Accounts.

**D.    The Caceis Defendants Conducted Additional Business
        in the United States in Connection with the Transfers**

72.        In addition to their delivery of Fairfield Sentry and Harley subscription

payments to New York-based bank accounts, their receipt of Fairfield Sentry Transfers from a

New York-based account at HSBC into their New York-based bank accounts and their receipt of

Harley Transfers into Caceis Bank Lux's New York-based bank account, the Caceis Defendants

conducted additional business in the United States in connection with their receipt of Transfers

of BLMIS customer property from the BLMIS Feeder Funds.

73.        In connection with the Caceis Defendants' investments in the Fairfield

Funds, FGG maintained New York-based and Miami-based representatives dedicated to the

Caceis Defendants, which representatives included Philip Toub, Lourdes Barranche, Cornelius

Boele and Santiago Reyes.  At various times, the Caceis Defendants spoke to and/or

corresponded with these parties in the United States regarding their investments in the Fairfield

Funds.

E.      **The Fairfield Funds Were Controlled, Operated and Managed From New York**

74.         At all relevant times, the Fairfield Funds' principal place of business was in New York and the Fairfield Funds were U.S. residents.

i.      **The Genesis of the FGG *De Facto* Partnership**

75.         In 1988, Walter Noel and Jeffrey Tucker founded the FGG *de facto* partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

76.         The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three Feeder Funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma and Fairfield Lambda Limited ("Lambda").  Fairfield Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

77.          FGG also included a number of administrative entities that purportedly provided management and back office support to the funds.  These entities included:  FGL, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

ii.      **Fairfield Sentry**

78.         On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("<u>BVI</u>"), for the sole purpose of creating a fund to invest with Madoff.  Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

79.        Fairfield Sentry was a shell corporation present in the BVI solely on paper.

From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("<u>FGG New York Personnel</u>").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

80.        Fairfield Sentry's operations, structure, agreements, and marketing

materials all demonstrate that Fairfield Sentry's principal place of business was in the United

States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

   **a.**  **Fairfield Sentry's Agreements With BLMIS Confirm Fairfield
      Sentry's Principal Place of Business Was in the United States**

81.        When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069.  In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

      82.        After the original BLMIS account documents were executed by Tucker on

behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all

located in FGG's New York headquarters—executed additional BLMIS account documents on

behalf of Fairfield Sentry including: customer agreements, trade authorizations, options

agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield

Sentry's address on these BLMIS account documents as FGG's New York headquarters.

      83.        The BLMIS customer agreements covering Fairfield Sentry's BLMIS

accounts are governed by New York law and all disputes arising under the agreements must be

resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions

under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange

Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal

Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on

behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC

member regulated by the SEC.

b.    **FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities**

84.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

c.    **FGG New York Personnel Managed Fairfield Sentry**

85.    At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until

19

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

86.         FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.  Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d.         Fairfield Sentry's Investors Knew They Were Investing in BLMIS

87.         The Fairfield Sentry Subscription Agreement also incorporated the Fairfield Sentry PPM by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the Fairfield Sentry PPM.  The original or later amended Fairfield Sentry PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  The Fairfield Sentry PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e.    BLMIS Was Fairfield Sentry's Investment Manager

88.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

89.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FGL.  FGL was formed under the laws of Ireland.

90.    While FGL was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FGL, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FGL.  Following the assignment of the management contracts to FGL, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FGL as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

91.        In 2002, Noel, Tucker, and others from FGG approached Madoff to inform

him FGG would be launching a new fund of funds.  The new fund would be open to both U.S.

and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment

adviser of the fund as well as other FGG operated funds, including the Feeder Funds and

currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity

would serve in the role as the investment manager of the Feeder Funds and currency funds.  As a

result, FGG formed two new entities, FG Advisors and FG Bermuda.

92.        In October 2003, FGG formed FG Advisors as a Delaware limited liability

company.  FG Advisors is a wholly owned subsidiary of FGL.  At the same time, FGG formed

FG Bermuda under Bermuda law as another wholly owned subsidiary of FGL.  Upon the

formation of FG Advisors and FG Bermuda, FGL assigned certain of its management contracts

to both entities, including the investment advisory agreements for the three Feeder Funds,

Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FGL remained the

placement agent for the same funds.

93.        In 2003, with FG Bermuda's entry into the FGG operations, FGG New

York Personnel issued new Fairfield Sentry PPMs which listed FG Bermuda as Fairfield

Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.

The new Fairfield Sentry PPMs also stated FGL would remain as Fairfield Sentry's placement

agent and receive a portion of the management and performance fees paid to FG Bermuda.  The

same Fairfield Sentry PPMs also disclosed that Fairfield Sentry would pay a percentage fee to

FG Advisors for providing administrative services and incurring administrative costs.

94.        Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Fairfield Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

95.        In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

96.        After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and Fairfield Sentry PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

97.        As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.  The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

**ii.    Fairfield Sigma**

98.        FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in

Fairfield Sentry using Euros, FGG created Fairfield Sigma. Fairfield Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Fairfield Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Fairfield Sigma investors.

99.        Noel and Tucker organized Fairfield Sigma on November 20, 1990 as an international business company under the BVI International Business Companies Act. Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so was Fairfield Sigma. Fairfield Sigma is currently in liquidation in proceedings in the BVI and United States.

100.        Also like Fairfield Sentry, Fairfield Sigma was a shell corporation present in the BVI only on paper. It had no employees and maintained no offices. It listed its registered BVI address as the same BVI post office box care of a local trust company it shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Fairfield Sigma to FGG's New York headquarters. Fairfield Sigma was operated almost entirely by FGG New York Personnel.

101.        As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Fairfield Sigma. Once Fairfield Sigma was opened for investors, FGG New York Personnel monitored Fairfield Sigma's investments into, and redemptions from, Fairfield Sentry; managed Fairfield Sigma's relationships with clients and potential clients; created marketing and performance materials for

Fairfield Sigma; marketed Fairfield Sigma; performed administrative functions required by

Fairfield Sigma; negotiated confidentiality agreements and other service provider contracts on

behalf of Fairfield Sigma; and conducted various other due diligence and risk management

activities.  Until Fairfield Sigma's liquidation, FGG maintained Fairfield Sigma's books and

records in New York.  FGG New York Personnel also had final control of Fairfield Sigma's

banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge

accounts at the Bank of Montreal.

102.     FGG New York Personnel controlled and approved the subscriptions for

and redemptions of Fairfield Sigma shares.  Like the Fairfield Sentry Subscription Agreements,

the Fairfield Sigma Subscription Agreements contained a New York choice of law provision,

provided for venue and jurisdiction for any disputes in New York, and incorporated its Fairfield

Sigma PPM that described the significant role of BLMIS in New York in Fairfield Sentry, whose

shares were Fairfield Sigma's sole assets.  The Fairfield Sigma PPM made substantially similar

disclosures as the Fairfield Sentry PPM with respect to Madoff's SSC Strategy, its use of U.S.-

based investments, and BLMIS's role in the investments.  Additionally, the October 2004

Fairfield Sigma PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's

assets, there was "always the risk" that BLMIS could misappropriate the assets or securities.

This same risk was also disclosed in the Fairfield Sentry PPM.

103.     Noel and Tucker were the original directors of Fairfield Sigma and, like

Fairfield Sentry, contracted with Citco Fund Services to provide Fairfield Sigma with backoffice

administrative services such as coordinating subscription and redemption forms, maintaining

Know Your Customer information, and serving as the independent party verifying the Net Asset

Value of the Fairfield Sigma shares.  Noel and Tucker also contracted Citco Custody to serve as

the custodian of the Fairfield Sigma assets.  As a further part of the Citco relationship, Noel and

Tucker opened a bank account on behalf of Fairfield Sigma at Citco Bank Dublin.  FGG New

York Personnel had final control of the Fairfield Sigma Citco Bank Dublin bank account.

Finally, FGG New York Personnel controlled all of Fairfield Sigma's relationships with the

Citco entities.

104.     In addition to the Citco Bank Dublin account, in order to convert Fairfield

Sigma investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and

BLMIS—Noel executed a contract on Fairfield Sigma's behalf with the Bank of Montreal for

currency swaps which were "governed by and construed in accordance with the laws of the State

of New York (without reference to choice of law doctrine)."

105.     FGG New York Personnel initially listed FGL as the investment manager

for Fairfield Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel

changed the Fairfield Sigma PPM to indicate FG Bermuda was Fairfield Sigma's Investment

Manager.  In fact there were no duties for any investment manager because Fairfield Sigma's

sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest

directly in Fairfield Sentry using U.S. Dollars.

106.     The Trustee incorporates by reference the allegations of the Second

Amended Complaint proffered in *Picard v. Fairfield Inv. Fund*, *Ltd.,* Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

**F.    Harley Was Controlled, Operated and Managed From New York**

107.     Harley invested 100% of its assets with BLMIS in New York and received

approximately $1 billion in transfers of customer property from BLMIS within two years of

December 11, 2008.

26

i.    **Harley Sought Out the United States as a Place to Invest and the Transfers it Received Arose Out of Its Investment Account With BLMIS In New York**

108.        In April 1996, Harley's predecessor, Harley International Limited, entered

into a "Customer Agreement", an "Option Agreement", and a "Trading Authorization Limited to

Purchases and Sales of Securities" with BLMIS in New York.  Thereafter, Harley maintained an

investment account with BLMIS, designated No. 1FN094.

109.        Harley agreed that all disputes arising under the Customer Agreement

would be resolved by arbitration before the American Arbitration Association, or "an arbitration

facility provided by any other exchange of which the broker is a member, or the National

Association of Securities Dealers Inc. … and in accordance with the rules … of the selected

organization."

110.        The Customer Agreement between BLMIS and Harley provided that all

transactions are subject to the provisions of the U.S. Securities Exchange Act of 1934 and to the

rules and regulations of the SEC and the Board of Governors of the Federal Reserve System.

The Customer Agreement also provided BLMIS with full discretion over Harley's assets, and

pursuant to the Trading Authorization agreement, Harley authorized Madoff to be its "agent and

attorney in fact" to buy, sell, and trade in U.S. securities.

111.        The Trustee filed a complaint against Harley in the Bankruptcy Court,

under the caption *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), and on

November 10, 2010, the Bankruptcy Court entered summary judgment against Harley in the

amount of $1,066,800,000.

112.        In support of summary judgment, the Bankruptcy Court held that "Harley

specifically sought out the United States as a place to do business when it opened an account

27

with BLMIS," and that the transfers received by Harley "arose out of business transactions tied to Harley's securities account with BLMIS in New York."

### ii.    BLMIS in New York Acted as Harley's Investment Manager, Custodian, and Executing Broker

113.    Euro-Dutch Trust Company (Bahamas) Limited ("Euro-Dutch Bahamas") acted as Harley's purported investment manager until 2003, and after 2003, Euro-Dutch Management Limited ("Euro-Dutch Cayman") in the Cayman Islands acted as Harley's purported investment manager.

114.    Neither Euro-Dutch Bahamas nor Euro-Dutch Cayman played a meaningful role in managing Harley's investments with BLMIS.  Instead, they delegated their investment management responsibilities to BLMIS in New York.

115.    As Harley's investment manager, BLMIS in New York purported to invest Harley's assets according to Madoff's SSC Strategy, and BLMIS decided which, how many, and when to purchase and sell U.S. securities on Harley's behalf.  BLMIS also acted as executing broker in purporting to purchase the U.S. securities on Harley's behalf.

116.    BLMIS acted as custodian for the U.S. securities purportedly held on Harley's behalf.  Each of Harley's audited financial statements for years 2003, 2004, 2005, 2006, and 2007 disclosed that BLMIS acted as Harley's "Custodian."  Harley's audited financial statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

117.    Harley's audited financial statements for years 2005 and 2006 also noted that "items included in the financial statements are measured using the currency of the primary economic activity in which it operates …. This is the U.S. dollar, which reflects the company's primary activity of investing in U.S. dollar denominated securities and derivatives."

### iii.    Harley Conducted No Meaningful Business in the Cayman Islands

118.        Harley was registered as an exempt company under the Cayman Islands

Companies Law and was not permitted to solicit investors in the Cayman Islands.

119.        In its Memorandum of Association, Harley represented that, under the

Cayman Islands Companies Law, "[t]he Company will not trade in the Cayman Islands with any

person, firm or corporation except in furtherance of the business of the Company carried on

outside the Cayman Islands."

120.        In its Articles of Association, Harley required that all disputes among

Harley and its shareholders would be referred to binding arbitration in New York under rules

established by the American Arbitration Association.

121.        Each shareholder in Harley, including Caceis Bank Lux, received copies of

Harley's audited financial statements, Memorandum of Association, and Articles of Association.

### iv.    Fix Asset Management Ltd. Managed Harley from New York

122.        Fix Asset Management Ltd. is the family wealth office of Charles Fix,

which over the years evolved into an institutional fund of funds manager.

123.        Fix Asset Management Ltd. operated through wholly owned subsidiaries,

including Fix Asset Management Services Inc. (f/k/a Fix Asset Management, Inc. and Fix

Capital Ltd., and collectively with Fix Asset Management Ltd., "FAM").

124.        FAM was incorporated under New York law and maintained its principal

place of business at 660 Madison Avenue, New York, New York.

125.        Harley had no employees or offices of its own.  For its investments with

BLMIS, Harley acted principally through FAM.

126.        FAM was owned and controlled by Charles Fix, who also owned and controlled all of the voting shares for Harley. During the relevant time period, Charles Fix resided in New York.

127.        Fix's daughter, Tatiana Fix Katsigera (f/k/a Tatiana Fix), was the chief executive officer of FAM, served on its investment advisory committee, and conducted due diligence for its funds, including Harley. Tatiana Fix Katsigera also lived in New York.

128.        Several other members of FAM's advisory teams, including John Fix, Abel Pacheco, and Panos Katsambas, also resided in New York during much of the relevant time period, and FAM's outside counsel was also located in New York.

129.        FAM marketed Harley from its office in New York, and FAM employees met with investors and potential investors in Harley at FAM's office in New York.

130.        FAM monitored and conducted due diligence on Harley's investments with BLMIS from it office in New York.

131.        FAM received Harley's BLMIS account statements at its office in New York. For several years BLMIS also sent Harley's BLMIS trade confirmations and account statements to FAM's agent and service provider at Bank Julius Baer & Co. Ltd. in New York.

132.        In monitoring its investments, FAM relied on external consultants in the United States, including Merfin LLC from California, X.E. Capital from New York, and Event Capital Markets from New Jersey.

133.        FAM handled subscriptions into and redemptions from Harley from its office in New York. For example, FAM employees corresponded with Madoff and Frank DiPascali to request that BLMIS accept subscriptions into Harley's account with BLMIS. FAM

employees, including Charles Fix, also corresponded with Madoff and DiPascali to request redemptions from Harley's account.

### v.    Harley Received Transfers at Bank Accounts Held in New York

134.    Harley's subscription agreements directed investors to wire U.S. dollars to bank accounts in New York. Prior to 2005, the subscription agreements required subscriptions to be wired to a JP Morgan Chase Bank N.A. account in New York, held in the name of Fortis Bank (Cayman) Limited, and after 2005, the subscription agreements required subscriptions to be wired to an account in the name of Fortis Prime Fund Solutions (IOM) Limited ("Fortis Prime Fund Solutions IOM") at the Northern Trust Banking Corporation ("Northern Trust"), 40 Broad Street, New York, New York.

135.    When Harley redeemed funds from its BLMIS account, BLMIS paid redemptions to the same Northern Trust bank account in New York. Harley previously had directed that BLMIS pay redemptions to an account held at Barclays Bank plc in New York.

### vi.    Harley Was Administered By Fortis Entities In New York

136.    Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, and then Fortis Prime Fund Solutions IOM served as Harley's administrators.

137.    The Fortis administrators' relationships with Harley and FAM were managed during much of the relevant time period by Rhonda Eldridge, a Managing Director of Fortis Financial Services, LLC ("Fortis Financial Services") who was based in New York.

138.    Eldridge worked with employees of Fortis Prime Funds Solutions (USA) LLC ("Fortis Prime Fund Solutions USA") in New York. (Fortis Fund Services (Bahamas) Limited, Fortis Fund Services (Cayman) Limited, Fortis Prime Fund Solutions IOM, Fortis Financial Services, and Fortis Prime Funds Solutions USA are collectively known as "Fortis").

31

139.        Fortis Financial Services was located on Madison Avenue in New York, and from its office Fortis employees performed much of the work necessary in administering Harley.

140.        Fortis employees conducted due diligence on BLMIS from Fortis Financial Services's office in New York.  Fortis's due diligence included inquiries into BLMIS's role as Harley's custodian as well as a "thorough examination of Harley's account" with BLMIS.

141.        Eldridge and other Fortis employees met with Madoff and DiPascali at BLMIS's office in New York.  Eldridge and other Fortis employees also regularly spoke with Madoff, DiPascali, and/or Jo Ann Crupi regarding Harley's investments with BLMIS.  In addition, Fortis employees met with Charles Fix and investors in Harley at FAM's office in New York.

142.        Fortis employees received Harley's BLMIS trade confirmations and account statements at Fortis Financial Services's office in New York, and reviewed the trade confirmations and account statements to calculate Harley's NAV.

143.        The Trustee incorporates by reference the allegations of the complaint filed in Picard v. Harley International (Cayman) Limited, Adv. Pro. No. 09-01187 (SMB), Dkt. No. 1 (Bankr. S.D.N.Y. May 12, 2009).

## G.    The Caceis Defendants Filed Certain Pleadings With the District Court In Connection With the Transfers

144.        Additionally, the Caceis Defendants were "Financial Institution Defendants" that purposely filed pleadings and participated in proceedings before Judge Rakoff regarding the application of section 546(e) of the Bankruptcy Code in the Adversary Proceedings.

145.    In their briefing, the Caceis Defendants claimed, among other things, that the safe harbor provision of section 546(e) of the Bankruptcy Code applies to their subscription agreements with the BLMIS Feeder Funds and the Transfers received pursuant to those agreements—notwithstanding the fact that the Caceis Defendants now assert that section 550(a)(2) of the Bankruptcy Code does not apply extraterritorially to those same Transfers.

Dated:  June 29, 2015
      New York, New York

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Matthew B. Lunn*
Matthew B. Lunn
Justin P. Duda
Rockefeller Center
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone:  (212) 332-8840
Facsimile: (212) 332-8855
Email:  *mlunn@ycst.com*
       *jduda@ycst.com*

*Attorneys for Plaintiff Irving H. Picard,*
*Trustee for the Liquidation of Bernard L.*
*Madoff Investment Securities LLC*