**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br>v.<br><br>CRÉDIT AGRICOLE (SUISSE) S.A., and CRÉDIT AGRICOLE S.A., a/k/a BANQUE DU CRÉDIT AGRICOLE,<br><br>        Defendants. | Adv. Pro. No. 12-01022 (SMB) |

1

**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM
OF LAW IN OPPOSITION TO THE CREDIT AGRICOLE DEFENDANTS'
MOTION TO DISMISS BASED ON EXTRATERRITORIALITY
AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR
LEAVE TO AMEND THE COMPLAINT**

The Trustee[1] respectfully submits this supplemental memorandum to his Main Brief in opposition to the Motion to Dismiss as it applies to the Credit Agricole Defendants and in further support of his motion for leave to amend the Complaint. The Credit Agricole Defendants are Shareholder Defendants and the Trustee seeks to recover not less than $31,580,994 in Transfers of BLMIS customer property from the BLMIS Feeder Funds to the Credit Agricole Defendants. The Trustee's Proffered Allegations plead specific facts evidencing that the component events of the transactions relating to the Transfers from the BLMIS Feeder Funds are predominantly domestic and the Transfers are not "purely foreign" under the standard set forth in Judge Rakoff's decision regarding the extraterritorial application of SIPA and section 550(a)(2) of the Bankruptcy Code, such that the Trustee's action to recover the Transfers does not implicate an extraterritorial application of those provisions.[2]

**BACKGROUND AND LEGAL STANDARD**

As discussed in the Main Brief, the District Court did not dismiss outright the Trustee's Complaint against the Credit Agricole Defendants or any other Defendants subject to the Extraterritoriality Decision.[3] Rather, the matter was returned to this Court for a decision

---

[1] One June 26, 2015, the Trustee has filed his main brief (the "Main Brief") in opposition to the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality (the "Motion to Dismiss") and certain Proffered Allegations on the Extraterritoriality Issue (the "Proffered Allegations" or "PA") regarding the above-captioned Defendants. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Main Brief or the Proffered Allegations, as relevant.

[2] *See Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("SIPC v. Madoff")*, 513 B.R. 222 (S.D.N.Y. 2014) (the "Extraterritoriality Decision")

[3] *See Extraterritoriality Decision*, 513 B.R. at 232.

2

regarding—based on the factual allegations as to each individual Defendant—whether or not the transfers to such Defendant were "purely foreign," thus implicating an extraterritorial application of SIPA and section 550(a)(2) of the Bankruptcy Code and requiring dismissal pursuant to the Extraterritoriality Decision.[4]

The Extraterritoriality Decision held that where two parties to a transfer of BLMIS customer property are foreign entities, the Trustee must "put forth specific facts suggesting a domestic transfer" to avoid dismissal.[5] In determining whether or not a transfer is domestic, as opposed to "purely foreign," the Court should analyze the "location of the transfers as well as the component events of those transactions."[6] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[7]

Pursuant to the Court's December 10, 2014 Scheduling Order, the Trustee submits herewith the Proffered Allegations regarding, among other things, the Transfers of BLMIS customer property from the BLMIS Feeder Funds to the Credit Agricole Defendants. The facts alleged in the Proffered Allegations show that the component events of the transactions relating to the Transfers to the Credit Agricole Defendants are predominantly domestic and the Transfers are not "purely foreign." As such, the dismissal of the Complaint against the Credit Agricole Defendants pursuant to the Extraterritoriality Decision is unwarranted

---

[4] *See Id.* at 231-33.

[5] *Id.* at 232, n. 4.

[6] *Id.* at 227 (quoting *Maxwell Commc'n Corp. v. Societe Generale PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995)). Such component events include, but are not limited to: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *See In re Maxwell Commc'n Corp.,* 186 B.R. at 816-17

[7] *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

.

## THE TRANSFERS AND COMPONENT EVENTS OF THEIR RELATED TRANSACTIONS ARE PREDOMINANTLY DOMESTIC

In the aggregate, the component events of the transactions relating to the Transfers from the BLMIS Feeder Funds to the Credit Agricole Defendants are such that the Transfers are centered in the United States, not in a foreign jurisdiction. The Transfers and related transactions were predominantly domestic, not foreign—let alone "purely foreign." Therefore, such Transfers are domestic for purposes of the Court's extraterritoriality analysis and the Credit Agricole Defendant's Motion to Dismiss based on the Extraterritoriality Decision should be denied and the Trustee should be given leave to amend his Complaint.

**A.     The Credit Agricole Defendants Knowingly and Purposely Invested with the BLMIS Feeder Funds to Profit from New York-based BLMIS**

The genesis—and first component event—of the transactions and related Transfers by the BLMIS Feeder Funds is the Credit Agricole Defendants' actual investment in the BLMIS Feeder Funds. The Credit Agricole Defendants knowingly and purposely invested in the BLMIS Feeder Funds with deliberate intent to invest in and profit from BLMIS's New York-based activity. (PA at ¶¶ 23–24). The Credit Agricole Defendants knew, based on, among other things, the Fairfield Sentry and Fairfield Sigma PPM, the Kingate Global and Euro OM and other related documents, that the BLMIS Feeder Funds maintained at least 95% of their assets with New York-based BLMIS, a registered broker-dealer. (*Id.* at ¶¶ 26, 30–38, 43).

The Credit Agricole Defendants further knew that BLMIS: (i) acted as *de facto* investment advisor for the BLMIS Feeder Funds in New York, including making all decisions regarding the investment of all or almost all of the BLMIS Feeder Funds' assets; (ii) purportedly executed the SSC Strategy involving U.S. equities, options and Treasuries on U.S. exchanges;

4

and (iii) acted as prime broker and custodian for the BLMIS Feeder Funds. (*Id.* at ¶¶ 26–51). Moreover, the Credit Agricole Defendants knew that BLMIS was "essential" to the success of the BLMIS Feeder Funds and that any Transfers from the BLMIS Feeder Funds were the product of BLMIS's purported actions and investments in the United States. (*Id.* at ¶¶ 25–51, 58).

The Credit Agricole Defendants deliberately invested their money with New York-based BLMIS in order to invest in and profit from U.S. securities on U.S. exchanges. With such U.S.-based transactions at their base, the Transfers are predominantly domestic and not "purely foreign."

**B.     The Fairfield Funds Were Controlled, Operated and Managed From New York**

The second relevant component of the transactions related to the Transfers was the operation of the BLMIS Feeder Funds themselves. While the Fairfield Funds may have been organized under the laws of a foreign jurisdiction, those funds were controlled, operated and managed in New York.

In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* New York partnership. (*Id.* at ¶ 77). In October and November of 1990, Noel and Tucker organized Fairfield Sentry and Fairfield Sigma—a so-called currency fund that invested 100% of its assets in Fairfield Sentry—under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), as a means for investors to invest with BLMIS. (*Id.* at ¶¶ 80, 100–101).

The Fairfield Funds were, however, shell corporations present in the BVI on paper only. (*Id.* at ¶¶ 81, 102). The Fairfield Funds were prohibited from transacting business with BVI residents, except other entities organized under the International Business Company Act. (*Id.* at ¶¶ 80, 101). Their statutorily required registered address in the BVI was a post office box care of

5

a local trust company owned and operated by a local law firm, which addressed its statements for services to the Fairfield Funds to FGG's New York headquarters. (*Id.* at ¶¶ 81, 102).

From their commencement of operations until their liquidation, the Fairfield Funds had no employees and no office. (*Id.*). These entities were operated almost entirely by FGG employees based in New York. (*Id.* at ¶¶ 87–88, 103–104). These employees maintained final control of the Fairfield Funds' bank accounts and relationships with the Fairfield Funds' back office service providers. (*Id.* at ¶¶ 86, 103, 105).

At various times, in account documents executed with BLMIS, representatives of Fairfield Sentry indicated that Fairfield Sentry's address was the addresses of certain FGG affiliates in Greenwich, CT and New York City, NY. (*Id.* at ¶¶ 83–84).

From the Fairfield Funds' inception, FGG personnel in New York controlled the sales and subscriptions of the Fairfield Funds' shares. (*Id.* at ¶¶ 87–88, 103–105). After January 1, 2002, each investor in the Fairfield Funds executed a subscription agreement in which the investor agreed to be bound under New York law and submit to New York jurisdiction and venue. (*Id.* at ¶¶ 88, 104).

At all relevant times, personnel at FGG's New York headquarters monitored the Fairfield Funds' investments; managed the relationship with BLMIS; directed investment into and out of BLMIS; marketed the Fairfield Funds; approved all subscriptions for Fairfield Funds shares; maintained all of the Fairfield Funds' book and records; and made all strategic and operational decisions regarding the Fairfield Funds. (*Id.* at ¶¶ 87–88, 103–104).

### C. The Kingate Funds' Operations Were Based in New York

The Kingate Funds invested exclusively with BLMIS in New York and, together with certain related entities, formed an enterprise with a single economic purpose: to make

6

money from a New York-based investment operation. (*Id.* at ¶ 111).

The Kingate Funds executed customer agreements and related documents, and delivered the agreements to BLMIS in New York. (*Id.* at ¶ 116). The agreements were governed by U.S. law, and disputes under the agreements were to be resolved in the United States. (*Id.* at ¶¶ 117–118). The agreements further authorized BLMIS to act as the Kingate Funds' investment manager, executing broker, New York-based custodian and to invest their assets according to the SSC Strategy, which purported to involve the purchase and sale of U.S. securities traded only on domestic exchanges. (*Id.* at ¶¶ 119–121).

The Kingate Funds had no offices, employees, or meaningful business in the BVI. (*Id.* at ¶ 112). Instead, the Kingate Funds operated through service providers with substantial connections to the United States. Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years and was formed in Bermuda, but was itself managed from New York by Tremont Partners, Inc., a Connecticut corporation. (*Id.* at ¶¶ 113, 122–124). The Kingate Funds were also co-managed by Kingate Management Limited ("KML"), which operated through agents in New York. (*Id.* at ¶ 125). KML engaged consultants FIM Limited and FIM Advisers LLP (together "FIM") to perform due diligence on BLMIS. (*Id.* at ¶ 128). Although FIM had a London address, the head of due diligence for its feeder fund investments was located in New York and worked with FIM's affiliate FIM (USA) Inc. in New York, which was the hub for FIM's feeder fund due diligence. (*Id.* at ¶¶ 129–130). From New York, FIM (USA) Inc. monitored, researched and solicited investors for the Kingate Funds. (*Id.* at ¶ 130).

D.   **The Majority of the Transfers to Credit Agricole Suisse Were
     Made Utilizing New York-Based Bank Accounts**

One of the key components of an extraterritoriality analysis is the "location of the transfers"[8] themselves. Credit Agricole Suisse received a majority of the Transfers into its own New York-based correspondent bank accounts. (*Id.* at ¶¶ 59–60, 62–63). Credit Agricole received at least seventy-five (75) Transfers from Fairfield Sentry and at least thirteen (13) Transfers from Kingate Global into its bank accounts at Citibank N.Y., Calyon N.Y. and JPMorgan Chase Bank in New York (the "U.S. Accounts"). (*Id.* at ¶¶ 59, 62). Credit Agricole Suisse purposely chose to receive a majority of its Transfers into these New York-based accounts. (*Id.* at ¶¶ 59–60, 62–76).

Additionally, the Fairfield Sentry and Kingate Global Transfer payments to both Credit Agricole Defendants also utilized New York-based accounts at HSBC. (*Id.* at ¶¶ 61, 64).

While the single use of a correspondent bank account in the United States, without the presence of other facts indicating that a transaction and related transfer are predominantly domestic, may not be sufficient to find that a transfer is domestic for purposes of an extraterritoriality analysis, the repeated use of U.S.-based correspondent accounts to receive multiple transfers is an important factor to consider—especially when that fact is only one of many facts that indicate that a transaction and its related transfers are predominantly domestic.[9]

E.   **The Transfers from the Fairfield Funds Were
     Made Pursuant to Domestic Subscription Agreements**

Another component of the transactions related to the Transfers from the Fairfield Funds to Credit Agricole Suisse was the Fairfield Subscription Agreements executed by Credit Agricole

---

[8] *See Extraterritoriality Decision*, 513 B.R. at 227.
[9] *Cf. e.g., Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170-71 (2d. Cir. 2013) (discussing the deliberate and recurring use of correspondent bank account in the context of personal jurisdiction analysis).

Suisse. These subscription agreements, the execution of which was a necessary event for Credit Agricole Suisse to invest in the Fairfield Funds and ultimately receive Transfers from these entities, were domestic in nature. By executing the relevant Fairfield Subscription Agreements, Credit Agricole Suisse knowingly submitted to New York venue, jurisdiction and law, agreed to wire Fairfield Sentry subscription payments to New York and requested that redemption payments from Fairfield Sentry be sent to Credit Agricole Suisse's bank account located in New York. (*Id.* at ¶¶ 52–58). Indeed, Credit Agricole Suisse directed at least seventeen (17) payments for shares in Fairfield Sentry to an HSBC account in New York for ultimate deposit in Fairfield Sentry's bank account, from which they were transferred to BLMIS's bank account at JPMorgan Chase N.A. in New York. (*Id.* at ¶¶ 57).

Furthermore, pursuant to the Fairfield Subscription Agreements, which incorporate the Fairfield Sentry and Fairfield Sigma PPM, as applicable, Credit Agricole Suisse agreed that BLMIS in New York would control all aspects of the Fairfield Funds' investments, as described in the Fairfield Sentry and Fairfield Sigma PPM. (*Id.* at ¶¶ 58).

F.  **Additional Component Events of the Transactions Show
    That the Transfers Were Predominantly Domestic**

Finally, there are numerous other component events of the transactions relating to the Transfers from the Fairfield Funds that show that such Transfers were not "purely foreign."

Credit Agricole Suisse conducted business with FGG, a *de facto* New York partnership that marketed, managed and controlled the Fairfield Funds, since at least 1996. (*Id.* at ¶ 66).

A portion of the Transfers that Credit Agricole Suisse received from Fairfield Sentry were for agent fees relating to certain investments in Fairfield Sentry. (*Id.* at ¶ 66). In December of 2001, Credit Agricole Suisse had entered into an agreement with FGG's affiliate FGL in New York that entitled Credit Agricole Suisse to such fees. (*Id.*).

9

Furthermore, with regards to Credit Agricole Suisse's investments in the Fairfield Funds and other FGG funds, FGG maintained New York and Miami-based personnel dedicated to Credit Agricole Suisse, which included Philip Toub, Lourdes Barranche, Jackie Harary, Cornelius Boele and Santiago Reyes. (*Id.* at ¶ 68). At various times, each of the above FGG representatives in the United States was in contact with representatives from Credit Agricole Suisse regarding, among other things, Credit Agricole Suisse's investments in the Fairfield Funds. (*Id.* at ¶ 69).

In addition, on a regular basis, Credit Agricole Suisse corresponded and met with New York-based FGG representatives regarding, among other things, its investments in the Fairfield Funds and a potential distribution agreement for Credit Agricole Suisse to sell FGG funds, including the Fairfield Funds. (*Id.* at ¶¶ 70–75). Credit Agricole Suisse also entered into a non-disclosure agreement with FGG and/or one of its affiliates, so that additional information regarding the Fairfield Funds and other FFF Funds could be disclosed to Credit Agricole Suisse. (*Id.* at ¶ 74).

Credit Agricole Suisse took numerous purposeful steps to transact business in the United States with FGG and its affiliates regarding, among other things, the Fairfield Funds. These actions are all component events of the transactions related to the Transfers received by Credit Agricole Suisse from the Fairfield Funds.

In the aggregate, the component events of the transactions relating to and resulting in the Transfers received by the Credit Agricole Defendants—and the Transfers themselves—are predominantly domestic. As such, the Transfers are not "purely foreign" for purposes of the analysis required by Judge Rakoff's Extraterritoriality Decision. Accordingly, the Credit Agricole Defendants' Motion to Dismiss regarding the extraterritoriality issues should be denied

10

and the Trustee's motion for leave to amend the Complaint to add the Proffered Allegations should be granted.

### G.     The Credit Agricole Defendants Previously Sought to Utilize the Bankruptcy Code's Protections Under Section 546(e)

Finally, the Credit Agricole Defendants previously argued in this case that section 546(e) of the Bankruptcy Code's safe harbor should shield their Transfers from suit precisely because of their connection to the United States securities market in which BLMIS was purported to invest. (*Id.* at ¶¶ 137–138). This argument is inconsistent with the Caceis Defendants' current assertion that their transactions and the Transfers lack sufficient domestic connections for purposes of extraterritoriality. The Caceis Defendants should not be allowed to have it both ways, taking advantage of U.S. law when it suits them and running from it when it does not.

### CONCLUSION

For the foregoing reasons and the reasons set forth in the Trustee's Main Brief, the Trustee respectfully requests that the Court deny the Motion to Dismiss with respect to the Credit Agricole Defendants and grant the Trustee's motion for leave to amend the Complaint to add the Proffered Allegations.

*[Remainder of Page Intentionally Left Blank]*

| | |
|---|---|
| Dated: June 29, 2015<br>New York, New York | YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP<br><br>*/s/ Matthew B. Lunn*<br>Matthew B. Lunn<br>Justin P. Duda<br>Rockefeller Center<br>1270 Avenue of the Americas, Suite 2210<br>New York, New York 10020<br>Telephone: (212) 332-8840<br>Facsimile: (212) 332-8855<br>Email: *mlunn@ycst.com*<br>*jduda@ycst.com*<br><br>*Attorneys for Plaintiff Irving H. Picard,*<br>*Trustee for the Liquidation of Bernard L.*<br>*Madoff Investment Securities LLC* |