**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01022 (SMB) |
| Plaintiff, | |
| v. | |
| CRÉDIT AGRICOLE (SUISSE) S.A., and CRÉDIT AGRICOLE S.A., a/k/a BANQUE DU CRÉDIT AGRICOLE, | |
| Defendants. | |

**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE
EXTRATERRITORIALITY ISSUE AS TO THE CREDIT AGRICOLE DEFENDANTS**

Irving H. Picard ("Trustee"), as trustee for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa, et seq. ("SIPA"), and the substantively consolidated estate of Bernard L.

Madoff ("Madoff"), by the Trustee's undersigned counsel, for his Proffered Allegations on the

Extraterritoriality Issue against Defendants Credit Agricole (Suisse) S.A. (including its

predecessors in interest, "Credit Agricole Suisse") and Credit Agricole S.A. (including its

predecessors in interest, "Credit Agricole," and together with Credit Agricole Suisse, the "Credit

Agricole Defendants"), states:

## INTRODUCTION

1.        The below-proffered allegations address the Credit Agricole Defendants, each of

which is a defendant in the case of *Picard v. Credit Agricole (Suisse) S.A., et al.*, Adv. Pro. No.

12-01022 (SMB) (the "Adversary Proceeding").

2.        The Trustee seeks to recover, as subsequent transfers under SIPA and 11 U.S.C.

§ 550(a)(2), the Credit Agricole Defendants' redemptions from certain BLMIS feeder funds and

fees related to Credit Agricole's investments in Fairfield Sentry Limited ("Fairfield Sentry"), as

set forth in the Trustee's complaint (the "Complaint") and herein (the "Transfers"), which

Transfers occurred over an approximately eight-year period (2000-2008) (the "Transfer Period").

3.        In the Complaint, the Trustee asserts that that Credit Agricole Defendants

collectively received Transfers in an amount not less than $30,560,968.  Since the filing of the

Complaint, the Trustee has discovered additional Transfers to the Credit Agricole Defendants.

As of the filing date of this Proffer, the Trustee asserts that the Credit Agricole Defendants

collectively received Transfers in an amount not less than $31,580,994.

4.     The BLMIS Feeder Funds at issue in this Adversary Proceeding are Fairfield Sentry, Fairfield Sigma Limited ("Fairfield Sigma," and together with Fairfield Sentry, the "Fairfield Funds"), Kingate Euro Fund Ltd. ("Kingate Euro") and Kingate Global Fund Ltd. ("Kingate Global," and together with Kingate Global, the "Kingate Funds").  Collectively, the Fairfield Funds and the Kingate Funds shall be referred to herein as the "BLMIS Feeder Funds".

### The Defendants

**A.     Credit Agricole**

5.     Defendant Credit Agricole, formerly known as Banque Du Credit Agricole, is a French *société anonyme*.

6.     During the Transfer Period, Credit Agricole received Transfers of BLMIS customer property from Kingate Global in an amount not less than $3,349,536.

7.     In the Complaint, the Trustee did not assert that Credit Agricole received any Transfers from Kingate Euro.  As of the date of filing of this Proffer, however, the Trustee asserts that, during the Transfer Period, Credit Agricole received Transfers of BLMIS customer property from Kingate Euro in an amount not less than $449,525.

8.     Credit Agricole is a member of a worldwide group of affiliated companies known as the "Credit Agricole Group."

9.     Credit Agricole is a sophisticated financial entity.

10.     Since at least 2000, Credit Agricole and certain of its subsidiaries have maintained operations in the United States and have been subject to the authority of the Federal Reserve Bank of New York (the "Reserve Bank") and the New York State Banking Department (the "NYS Banking Dept."), as evidenced by the written agreement regarding such operations,

dated November 30, 2000 (the "2000 Operations Agreement"), between Credit Agricole and certain of its subsidiaries and the Reserve Bank and the NYS Banking Dept.

11.     On or about March 9, 2004, Credit Agricole and certain of its subsidiaries, the Board of Governors of the Federal Reserve System (the "FRB") and the NYS Banking Dept. entered into a consensual *Order to Cease and Desist and Order of Assessment of a Civil Money Penalty and Monetary Payment Issued Upon Consent* (the "Consent Order") regarding alleged violations of the 2000 Operations Agreement.

12.     The Consent Order was entered "in recognition of the[] common goals to ensure compliance with all applicable federal and state laws, rules, and regulations by all of the U.S. operations of Credit Agricole S.A. . . . and its subsidiaries ," and "in light of . . . Credit Agricole S.A.'s business plans to reorganize its U.S. operations . . . ." The Consent Order set forth certain requirements regarding Credit Agricole's reorganization of its U.S. operations, regarding which Credit Agricole had ultimate responsibility.

13.     Since 2006, Credit Agricole has elected to be treated as a financial holding company pursuant to sections 4(k) and (l) of the Bank Holding Company Act and Sections 225.82 and 225.91 of the FRB's Regulation Y.

14.     On or about December 27, 2013, Credit Agricole filed a U.S. Resolution Plan under the Resolution Plan Final Rule issued by the Federal Deposit Insurance Corporation and the FRB.

15.     During the Transfer Period, Credit Agricole maintained operations in the U.S. via its subsidiaries in, among other locations, New York, Chicago, Los Angeles, Houston, Dallas and Miami.

**B.**     **Credit Agricole Suisse**

16.     Defendant Credit Agricole Suisse, formerly known as Credit Agricole Indosuez (Suisse) S.A., is a Swiss *société anonyme* .

17.     In the Complaint, the Trustee asserts that Credit Agricole Suisse received Transfers from Fairfield Sentry in an amount not less than $15,654,131.  As of the date of filing of this Proffer, however, the Trustee asserts that, during the Transfer Period, Credit Agricole Suisse received Transfers of BLMIS customer property from Fairfield Sentry in an amount not less than $16,719,943.  $12,304 of the Transfers asserted herein is on account of fees that Credit Agricole Suisse received from Fairfield Sentry, rather than proceeds from the redemption of shares in Fairfield Sentry.

18.     During the Transfer Period, Credit Agricole Suisse received Transfers of BLMIS customer property from Fairfield Sigma in an amount not less than $597,663.89.

19.     In the Complaint, the Trustee asserts that Credit Agricole Suisse received Transfers from Kingate Euro in an amount not less than $26,748.  As of the date of filing of this Proffer, however, the Trustee asserts that, during the Transfer Period, Credit Agricole Suisse received Transfers of BLMIS customer property from Kingate Euro in an amount not less than $476,019.

20.     During the Transfer Period, Credit Agricole Suisse received Transfers of BLMIS customer property from Kingate Global in an amount not less than $10,932,893.

21.     Credit Agricole Suisse is a wholly owned subsidiary of Credit Agricole and is member of the Credit Agricole Group.

01:16823780.5

22.     During the Transfer Period, Credit Agricole Suisse's affiliates maintained places of business in, among other locations, New York, Chicago, Los Angeles, Houston, Dallas and Miami.

## THE COMPONENT EVENTS OF THE TRANSACTIONS SHOW THAT THE TRANSFERS ARE PREDOMINANTLY DOMESTIC

**A.     The Credit Agricole Defendants Knowingly and Purposely Invested in the BLMIS Feeder Funds in Order to Profit From BLMIS in New York**

23.     By December of 1996, August of 2000, May of 2001 and March of 2002, and likely earlier in each case, Credit Agricole Suisse had knowingly and purposely invested in Fairfield Sentry, Kingate Global, Fairfield Sigma and Kingate Euro, respectively, to profit from BLMIS in New York.

24.     By May of 1998 and February of 2008, and likely earlier in each case, Credit Agricole had purposely invested in Kingate Global and Kingate Euro, respectively, to profit from BLMIS in New York.

25.     But for BLMIS's fraudulent Ponzi scheme in New York, the Credit Agricole Defendants would have received none of the Transfers of BLMIS customer property via the BLMIS Feeder Funds.

26.     BLMIS in New York was the *de facto* investment advisor for the BLMIS Feeder Funds and that the BLMIS Feeder Funds invested at least 95% of their assets with BLMIS.

27.     BLMIS in New York purportedly operated and executed the "split strike conversion" investment strategy (the "SSC Strategy") on behalf of the BLMIS Feeder Funds.

28.     The SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options and U.S. Treasuries traded on U.S. exchanges, and that decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

01:16823780.5

29.     BLMIS in New York was custodian for the BLMIS Feeder Funds and maintained custody of the vast majority of the BLMIS Feeder Funds' assets in New York.

30.     BLMIS Feeder Funds that BLMIS was a registered broker-dealer in the United States.

31.     The Credit Agricole Defendants knew each of the above facts because, among other reasons, such facts were set forth in Kingate Global's Offering Memorandum ("Kingate Global OM"), Kingate Euro's Offering Memorandum ("Kingate Euro OM"), Fairfield Sentry's Private Placement Memorandum (the "Fairfield Sentry PPM") and Fairfield Sigma's Private Placement Memorandum (the "Fairfield Sigma PPM").

32.     The Fairfield Funds required each investor to enter into a subscription agreement (a "Fairfield Sentry Subscription Agreement" or "Fairfield Sigma Subscription Agreement," as applicable, and, collectively, the "Fairfield Subscription Agreements") in connection with that investor's initial investment in the Fairfield Funds and enter into an additional Fairfield Subscription Agreement in connection with each additional investment.

33.     Credit Agricole Suisse entered into multiple Fairfield Sentry Subscription Agreements.

34.     Based upon the requirement that each investor execute a Fairfield Sigma Subscription Agreement prior to investment in Fairfield Sigma and upon information and belief, Credit Agricole Suisse entered into one or more Fairfield Sigma Subscription Agreements.

35.     Pursuant to such Fairfield Subscription Agreements, Credit Agricole Suisse represented and warranted, among other things, that it was a "Professional Investor" with "such knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in" the Fairfield Funds.

36.    Pursuant to such Fairfield Subscription Agreements, Credit Agricole Suisse also represented that it was financially sophisticated and that it had received and reviewed the Fairfield Sentry and Fairfield Sigma PPM, which were incorporated by reference in the relevant Fairfield Subscription Agreement.

37.    Similarly, investment in the Kingate Funds required each investor to enter into a subscription agreement (a "Kingate Global Subscription Agreement," or "Kingate Euro Subscription Agreement," as applicable), which indicates that such investor has "received, reviewed and understood" the Kingate Global or Kingate Euro OM, as applicable.

38.    Based upon the requirement that each investor execute a Kingate Global or Kingate Euro Subscription Agreement prior to investment in the relevant Kingate Fund and upon information and belief, the Credit Agricole Defendants entered into one or more such subscription agreements with each of the Kingate Funds, wherein each of the Credit Agricole Defendants represented and warranted that it "possesses requisite knowledge and experience in financial matters such that it is capable of evaluating the merits and risks of an investment in" the Kingate Funds and wherein each Credit Agricole Defendant acknowledged that it "received, reviewed and understood" the Kingate Global and the Kingate Euro OM, as applicable.

39.    Among other things, the Kingate Global OM states that "[t]he investment adviser [, i.e., BLMIS,] is a New York based NASD registered broker-dealer . . . acting primarily as a market-maker in listed and unlisted stocks and convertible securities (the 'Investment Advisor')."

40.    The Kingate Global OM indicates that the co-managers of Kingate Global for a portion of the Transfer Period, Kingate Management Limited ("KML") and Tremont (Bermuda) Limited, "have established a discretionary account with such Investment Advisor," that "[t]he

Investment Advisor utilizes a 'split strike conversion' strategy . . .," and that "[a]ll investment decisions in the account held with the Investment Advisor are effected by persons associated with the Investment Advisor."

41.    The Kingate Global OM also states that KML and Tremont (Bermuda) Limited "have delegated all investment management duties with regard to [Kingate Global] to the Investment Advisor," and that KML and Tremont Bermuda Limited do not "have any control over the investment and trading decisions of the Investment Advisor."

42.    Finally, the Kingate Global OM states that "[n]either [Kingate Global] nor the Custodian has actual custody of the assets.  Such actual custody rests with the Investment Advisor and its affiliated broker-dealer.  Therefore, there is the risk that the custodian could abscond with those assets.  There is always the risk that the assets with the Investment Advisor could be misappropriated."

43.    The Kingate Euro OM provides substantially identical information to the Kingate Global OM provisions cited above.

44.    Similarly, the Fairfield Sentry PPM states that Fairfield Greenwich Limited ("FGL"), the manager of Fairfield Sentry during a portion of the Transfer Period, maintains its office in New York and "has delegated the management of [Fairfield Sentry's] investment activities to Bernard L. Madoff Investment Securities, a registered-broker dealer in New York. . . ."  The Fairfield Sentry PPM asserts that Fairfield Sentry "has no control over the decisions implemented" by BLMIS.

45.    Fairfield Sentry's PPM further states that FGL "has established a discretionary account for [Fairfield] Sentry at Bernard L. Madoff Investment Securities ('BLM'), a registered broker-dealer in New York, who utilizes a strategy described as 'split strike conversion'," and

that "[a]ll investment decisions in the account at BLM are effected by persons associated with BLM."

46.     The Fairfield Sentry PPM states that BLMIS "acts as a principal in connection with its sale of securities to [Fairfield Sentry] and the purchase of securities from [Fairfield Sentry].  BLM acts as a market-maker in the stocks purchased and sold by [Fairfield Setnry].  These market making activities enable BLM to trade with [Fairfield Sentry] as principal."

47.     The Fairfield Sentry PPM further states that Fairfield Sentry "allocates its assets to an account at [BLMIS]," and that BLMIS acts as "sub-custodian of [Fairfield Sentry's] assets."

48.     The Fairfield Sentry PPM also states that BLMIS is "essential to the continued operations of [FGL]," and "essential to the continued operation of [Fairfield Sentry], and its profitability, if any."  The Fairfield Sentry PPM indicated that there was a risk that BLMIS might, as custodian and broker, "misappropriate the securities or funds (or both) of [Fairfield Sentry]."

49.     The Fairfield Sigma PPM states that Fairfield Sigma invested all of its assets in Fairfield Sentry and provides substantially similar information to that set forth in the Fairfield Sentry PPM.

50.     The Credit Agricole Defendants also knew each of the above facts because the Credit Agricole Defendants are sophisticated financial entities and, as sophisticated financial entities, conducted due diligence on BLMIS and the BLMIS Feeder Funds.

51.     For example, Armand Salem, former President of Credit Agricole Suisse, met with Madoff several times and was very familiar with the SSC Strategy.  Additionally, Christophe Lhote, who was involved with the selection of investment funds for Credit Agricole

Suisse, indicated to representatives for Access International Advisors—a manager and operator of certain other BLMIS feeder funds in New York—that he was aware of BLMIS for years and maintained concerns about BLMIS.

**B.** **The Vast Majority of Transfers from the Fairfield Funds to Credit Agricole Suisse Were Made Pursuant to Subscription Agreements That Were Domestic in Nature**

52.    In connection with its investments in the Fairfield Funds, Credit Agricole Suisse entered into multiple Fairfield Sentry Subscription Agreements and, based upon the requirement that each Fairfield Sigma investor execute a Fairfield Sigma Subscription Agreement and upon information and belief, one or more Fairfield Sigma Subscription Agreements which were domestic in nature.

53.    The Fairfield Subscription Agreements were governed by New York state law and provided that New York courts shall have venue and jurisdiction regarding the subscription agreements and the Fairfield Funds.

54.    Specifically, the Fairfield Subscription Agreements provide that "[t]his Agreement shall be governed and enforced in accordance with the law of New York, without giving effect to its conflict of laws provisions," and "Subscriber agrees that any suit, action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum."

55.    Credit Agricole Suisse expected to be subject to New York law and courts with regards to its investments in the Fairfield Funds.

56.     Pursuant to its Fairfield Sentry Subscription Agreements, Credit Agricole Suisse agreed to send payments for shares in Fairfield Sentry to a bank account at HSBC Bank N.A. ("HSBC") in New York and to receive redemption payments from Fairfield Sentry at Credit Agricole Suisse's New York-based bank account at Calyon, New York.

57.     On at least seventeen occasions, Credit Agricole Suisse directed its subscription payments for shares of Fairfield Sentry to the denoted account with HSBC in New York for ultimate deposit in Fairfield Sentry's bank account, from which they were transferred to BLMIS's bank account at JPMorgan Chase N.A. in New York.

58.     Credit Agricole Suisse acknowledged in its Fairfield Subscription Agreements that it received and reviewed a copy of the Fairfield Sentry and Sigma PPM, which were incorporated by reference into the relevant Fairfield Subscription Agreement and describe how: (i) BLMIS in New York was "essential" to the Fairfield Funds as their investment advisor, custodian, and broker-dealer that executed the SSC Strategy through the purchase and sale of U.S. securities; (ii) the Fairfield Funds' purported investment manager was initially FLG, a Fairfield Greenwich Group ("FGG") company whose principal place of business was FGG's office in New York, and subsequently Fairfield Greenwich (Bermuda) Ltd. which, in 2006, registered as an investment advisor with the Securities and Exchange Commission and was controlled by FGG personnel in New York; (iii) the Fairfield Funds retained U.S. counsel in New York; and (iv) FGG required subscribers, like Credit Agricole Suisse, to be in compliance with the rules and regulations of the U.S. Department of the Treasury's Office of Foreign Assets Control.

**C.     Credit Agricole Suisse Received a Majority of Its Transfers from the BLMIS
Feeder Funds Into Its Bank Accounts in the United States**

      **i.     Fairfield Sentry Transfers Were Paid Into U.S. Bank
Accounts as Directed by Credit Agricole Suisse**

59.     New York was the specific situs repeatedly selected by Credit Agricole Suisse to receive at least thirty (30) Transfers, and, upon information and belief, at least an additional forty-five (45) Transfers from Fairfield Sentry.  Specifically, Credit Agricole Suisse used correspondent bank accounts at Citibank N.Y., Calyon N.Y. and JPMorgan Chase Bank in New York (the "U.S. Accounts"), which accounts were in Credit Agricole Suisse's own name.

60.     Credit Agricole Suisse systematically designated such use of its U.S. Accounts in its Fairfield Sentry Subscription Agreements and certain redemption documents.  The receipt of Transfers from Fairfield Sentry using the U.S. Accounts was purposeful on the part of Credit Agricole Suisse.

61.     Fairfield Sentry also utilized an account at HSBC in New York to effectuate each of the Transfers to Credit Agricole Suisse.

      **ii.     Kingate Global Redemptions Were Paid Into U.S. Bank Accounts
as Directed by Credit Agricole Suisse**

62.     New York City, New York was the specific situs repeatedly selected by Credit Agricole Suisse to receive at least seven Transfers, and, upon information and belief, at least an additional six Transfers from Kingate Global.  Specifically, Credit Agricole Suisse used the U.S. Accounts, which accounts were in Credit Agricole Suisse's own name.

63.     Upon information and belief, Credit Agricole Suisse systematically designated such use of its U.S. Accounts in its Kingate Global Subscription Agreements and/or certain

redemption documents. The receipt of Transfers from Kingate Global using the U.S. Accounts was purposeful on the part of Credit Agricole Suisse.

64.    Kingate Global also utilized an account at HSBC in New York to effectuate each of the Transfers to Credit Agricole Suisse and Credit Agricole, as relevant.

**D.    Credit Agricole Suisse Conducted Additional Business
        in the United States in Connection with the Transfers**

65.    In addition to its delivery of Fairfield Sentry subscription payments to New York-based bank accounts and its receipt of Fairfield Sentry and Kingate Global Transfers from New York-based account at HSBC into Credit Agricole Suisse's New York-based bank accounts, Credit Agricole Suisse conducted additional business in the United States in connection with its receipt of Transfers of BLMIS customer property from the BLMIS Feeder Funds.

66.    Credit Agricole Suisse maintained a long-standing relationship with FGG and its affiliates, dating back until at least 1996 when Credit Agricole Suisse began investing in Fairfield Sentry.

67.    A portion of the Transfers that Credit Agricole Suisse received from Fairfield Sentry were for agent fees relating to certain investments in Fairfield Sentry. In December of 2001, Credit Agricole Suisse entered into an agreement with FGL in New York that entitled Credit Agricole Suisse to such fees.

68.    With regards to Credit Agricole Suisse's investments in the Fairfield Funds and other FGG funds, FGG maintained New York and Miami-based representatives dedicated to Credit Agricole Suisse, which representatives included Philip Toub, Lourdes Barranche, Jackie Harary, Cornelius Boele and Santiago Reyes.

69.     At various times, each of the above representatives in the United States was in contact with representatives from Credit Agricole Suisse regarding, among other things, Credit Agricole Suisse's investments in the Fairfield Funds.

70.     In 2003, Ron Thomann, an FGG employee in the United States, sent to Credit Agricole Suisse by e-mail various due diligence materials regarding Fairfield Sentry.

71.     In connection with its investments in Fairfield Sentry, in February of 2005, Mr. Alexandre de Planta from Credit Agricole Suisse spoke via telephone with Ms. Carla Castillo in FGG's New York offices regarding Credit Agricole Suisses's attempted subscription in Fairfield Sentry.

72.     As early as October of 2005, representatives from FGG were in contact with representatives from Credit Agricole Suisse regarding entering into a distribution agreement for FGG's funds, including, upon information and belief, the Fairfield Funds.

73.     In or about July of 2006, Philip Toub at FGG in New York contacted Patrick Muller and Christophe Lhote of Credit Agricole Suisse regarding investment in and distribution of FGG's funds, including, upon information and belief, the Fairfield Funds.

74.     In September of 2007, representatives on behalf of Credit Agricole Suisse entered into a non-disclosure agreement with FGG in New York and/or one or more of its affiliated entities.

75.     In or about February of 2008, Philip Toub at FGG in New York contacted representatives for Credit Agricole Suisse regarding, upon information and belief, the execution of a new agency agreement and/or distribution agreement regarding one or more FGG-affiliated funds, including the Fairfield Funds.

**E.** **The Fairfield Funds Were Controlled, Operated and Managed From New York**

76.     At all relevant times, the Fairfield Funds' principal place of business was in New York and the Fairfield Funds were U.S. residents.

**i.** **The Genesis of the FGG De Facto Partnership**

77.     In 1988, Walter Noel and Jeffrey Tucker founded the FGG de facto partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

78.     The FGG de facto partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three Feeder Funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma and Fairfield Lambda Limited ("Lambda").  Fairfield Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

79.      FGG also included a number of administrative entities that purportedly provided management and back office support to the funds.  These entities included:  FGL, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

**ii.** **Fairfield Sentry**

80.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff. Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

81.     Fairfield Sentry was a shell corporation present in the BVI solely on paper. From

its inception until its liquidation, Fairfield Sentry had no employees and no office. It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

82.     Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

> **a.      Fairfield Sentry's Agreements With BLMIS Confirm Fairfield
>           Sentry's Principal Place of Business Was in the United States**

83.     When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI. In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069. In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

84.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

85.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

        **b.**    **FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities**

86.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts.  As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### c.     FGG New York Personnel Managed Fairfield Sentry

87.     At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

01:16823780.5

88.    FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

89.    The Fairfield Sentry Subscription Agreement also incorporated the Fairfield Sentry PPM by reference. Each Fairfield Sentry subscriber acknowledged receipt of the Fairfield Sentry PPM. The original or later amended Fairfield Sentry PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. The Fairfield Sentry PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e.    BLMIS Was Fairfield Sentry's Investment Manager

90.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality

made all of Fairfield Sentry's investment decisions.

91.     In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's

Littlestone Associates, which was a money management firm also located in New York City.

Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG

clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FGL.

FGL was formed under the laws of Ireland.

92.     While FGL was formed under foreign law, it reported its principal place of

business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters.  Upon the formation

of FGL, Fairfield International Managers assigned all of its management contracts with Fairfield

Sentry and Greenwich Sentry to FGL.  Following the assignment of the management contracts to

FGL, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FGL

as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained

in the discretionary brokerage accounts controlled by BLMIS.

93.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him

FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and

foreign investors and, as a result, FGG would form a new U.S. entity to be the investment

adviser of the fund as well as other FGG operated funds, including the Feeder Funds and

currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity

would serve in the role as the investment manager of the Feeder Funds and currency funds. As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

94.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FGL. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FGL. Upon the formation of FG Advisors and FG Bermuda, FGL assigned certain of its management contracts to both entities, including the investment advisory agreements for the three Feeder Funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FGL remained the placement agent for the same funds.

95.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new Fairfield Sentry PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new Fairfield Sentry PPMs also stated FGL would remain as Fairfield Sentry's placement agent and receive a portion of the management and performance fees paid to FG Bermuda. The same Fairfield Sentry PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

96.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Fairfield Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

97.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

98.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and Fairfield Sentry PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

99.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### ii.    Fairfield Sigma

100.    FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield Sentry using Euros, FGG created Fairfield Sigma.  Fairfield Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry. When paying redemptions, Fairfield Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Fairfield Sigma investors.

101.    Noel and Tucker organized Fairfield Sigma on November 20, 1990 as an international business company under the BVI International Business Companies Act.  Just as

Fairfield Sentry was statutorily restricted from doing business with any other BVI residents

except for other entities organized under the BVI International Business Companies Act, so was

Fairfield Sigma.  Fairfield Sigma is currently in liquidation in proceedings in the BVI and United

States.

102.    Also like Fairfield Sentry, Fairfield Sigma was a shell corporation present in the

BVI only on paper.  It had no employees and maintained no offices.  It listed its registered BVI

address as the same BVI post office box care of a local trust company it shared with Fairfield

Sentry and hundreds of other unrelated investment vehicles.  The law firm operating the trust

company and the registered post office box addressed its statements for services for Fairfield

Sigma to FGG's New York headquarters.  Fairfield Sigma was operated almost entirely by FGG

New York Personnel.

103.    As with Fairfield Sentry, and as part of the FGG de facto partnership, FGG New

York Personnel made the operational decisions regarding Fairfield Sigma.  Once Fairfield Sigma

was opened for investors, FGG New York Personnel monitored Fairfield Sigma's investments

into, and redemptions from, Fairfield Sentry; managed Fairfield Sigma's relationships with

clients and potential clients; created marketing and performance materials for Fairfield Sigma;

marketed Fairfield Sigma; performed administrative functions required by Fairfield Sigma;

negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield

Sigma; and conducted various other due diligence and risk management activities.  Until

Fairfield Sigma's liquidation, FGG maintained Fairfield Sigma's books and records in New

York.  FGG New York Personnel also had final control of Fairfield Sigma's banking accounts,

including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the

Bank of Montreal.

104.    FGG New York Personnel controlled and approved the subscriptions for and redemptions of Fairfield Sigma shares.  Like the Fairfield Sentry Subscription Agreements, the Fairfield Sigma Subscription Agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated its Fairfield Sigma PPM that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Fairfield Sigma's sole assets.  The Fairfield Sigma PPM made substantially similar disclosures as the Fairfield Sentry PPM with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments.  Additionally, the October 2004 Fairfield Sigma PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities.  This same risk was also disclosed in the Fairfield Sentry PPM.

105.    Noel and Tucker were the original directors of Fairfield Sigma and, like Fairfield Sentry, contracted with Citco Fund Services to provide Fairfield Sigma with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sigma shares.  Noel and Tucker also contracted Citco Custody to serve as the custodian of the Fairfield Sigma assets.  As a further part of the Citco relationship, Noel and Tucker opened a bank account on behalf of Fairfield Sigma at Citco Bank Dublin.  FGG New York Personnel had final control of the Fairfield Sigma Citco Bank Dublin bank account.  Finally, FGG New York Personnel controlled all of Fairfield Sigma's relationships with the Citco entities.

106.    In addition to the Citco Bank Dublin account, in order to convert Fairfield Sigma investors' Euros into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS—

Noel executed a contract on Fairfield Sigma's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

107.     FGG New York Personnel initially listed FGL as the investment manager for Fairfield Sigma.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Fairfield Sigma PPM to indicate FG Bermuda was Fairfield Sigma's Investment Manager.  In fact there were no duties for any investment manager because Fairfield Sigma's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

108.     The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Inv. Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015as part of the Extraterritoriality Briefing).

**F.     The Transfers From the Kingate Funds Are Domestic**

109.     The Kingate Funds were feeder funds that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $926,351,905 of customer property to the Kingate Funds during the life of the accounts prior to December 11, 2008.

110.     Each of the Kingate Funds filed customer claims in the SIPA liquidation.

**i.     The Kingate Funds' Invested with BLMIS to Make Money from a New York-Based Investment Operation**

111.     The Kingate Funds, together with their purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose:  to make money from a New York-based investment operation.

112.    Despite having a registered address in the BVI, the Kingate Funds had no physical offices, no employees, and transacted no meaningful business there.

113.    Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years.  Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

114.    The Kingate Funds' manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Funds' investments with BLMIS.

115.    The Kingate Funds' sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and the Kingate Funds profited from their exclusive business relationship with BLMIS in New York.

**ii.    The Operative Legal Documents Were New York-Based**

116.    The Kingate Funds executed "Customer Agreements," and other account opening documents, and delivered the agreements to BLMIS in New York.

117.    Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

118.    The Kingate Funds agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration

facility provided by any other exchange of which the broker is a member, or the National
Association of Securities Dealers, Inc. or the municipal securities rule-making board and in
accordance with the rules obtaining of the selected organization."

### iii.    BLMIS Had Full Authority to Make and Execute Investment Decisions

119.    The Kingate Funds' "Trading Authorization Agreements" authorized BLMIS to
be the Kingate Funds' "agent and attorney in fact," giving BLMIS full discretion over the
Kingate Funds' invested assets and to buy, sell, and trade in securities for the Kingate Funds.

120.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the
Kingate Funds' investment manager and purported to invest exclusively according to Madoff's
SSC Strategy, which involved the purchase of U.S. securities traded only on domestic
exchanges.

121.    BLMIS acted as the Kingate Funds' executing broker in purporting to purchase
securities on the Kingate Funds' behalf, and acted as the Kingate Funds' custodian for the
securities purportedly held on the Kingate Funds' behalf.

### iv.    The Kingate Funds Were Managed From New York

122.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it
continued to introduce investors to the Kingate Funds in return for fees, it was a valuable
contributor in New York to the success of the Kingate Funds.

123.    Tremont performed its co-management duties for Kingate Global in New York.
Suzanne Hammond, based in New York, signed a co-manager agreement entered into on
Tremont's behalf with KML and Kingate Global.

124.    Under that agreement, KML and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

125.    The Kingate Funds were also co-managed by KML, a management entity formed by the founders of the Kingate Funds, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

126.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

127.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

128.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

129.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as the Kingate Funds' investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

130.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for the Kingate Funds.

131.    KML and the FIM entities actively participated in the Kingate Funds business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

v.      **Kingate Funds Used Banks in New York**

132.    The Kingate Funds used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

133.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States, as Kingate Global's custodian.

134.    In its role as the Kingate Funds' custodian, HSBC consistently used New York banks in carrying out its duties for KML and the Kingate Funds relating to investments with BLMIS.

135.    FIM also directed fee payments to be routed through a bank account in New York.

136.    The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

**G.      The Credit Agricole Defendants Filed Certain Pleadings With the District Court  In Connection  With the Transfers**

137.    Additionally, the Credit Agricole Defendants were "Financial Institution Defendants" that purposely filed pleadings and participated in proceedings before Judge Rakoff regarding the application of section 546(e) of the Bankruptcy Code in the Adversary Proceedings.

138.    In their briefing, the Credit Agricole Defendants claimed, among other things, that the safe harbor provision of section 546(e) of the Bankruptcy Code applies to their subscription agreements with the BLMIS Feeder Funds and the Transfers received pursuant to those

agreements—notwithstanding the fact that the Credit Agricole Defendants now assert that

section 550(a)(2) of the Bankruptcy Code does not apply extraterritorially to those same

Transfers.

Dated:  June 29, 2015
   New York, New York

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Matthew B. Lunn*
Matthew B. Lunn
Justin P. Duda
Rockefeller Center
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone:  (212) 332-8840
Facsimile: (212) 332-8855
Email:  *mlunn@ycst.com*
   *jduda@ycst.com*

*Attorneys for Plaintiff Irving H. Picard,*
*Trustee for the Liquidation of Bernard L.*
*Madoff Investment Securities LLC*

01:16823780.5