**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br>v.<br><br>BARFIELD NOMINEES LIMITED and NORTHERN TRUST CORPORATION,<br><br>Defendants. | Adv. Pro. No. 12-01669 (SMB)<br><br>**THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO BARFIELD'S MOTION TO DISMISS AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND THE COMPLAINT** |

01:16815876.6

The Trustee[1] respectfully submits this supplemental memorandum to his Main Brief in opposition to the Motion to Dismiss as it applies to Barfield Nominees Limited ("Barfield") and in support of his motion for leave to amend the Complaint.[2] The Trustee's Proffered Allegations plead specific facts evidencing that the component events of the transactions relating to the Transfers from the BLMIS Feeder Funds are predominantly domestic and the Transfers are not "purely foreign" under the standard set forth in Judge Rakoff's decision regarding the extraterritorial application of SIPA and section 550(a)(2) of the Bankruptcy Code, such that the Trustee's action to recover the Transfers does not implicate an extraterritorial application of those provisions.[3]

## BACKGROUND AND LEGAL STANDARD

The District Court returned the extraterritoriality matter to this Court for a decision regarding—based on the factual allegations as to each individual Defendant—whether or not the transfers to such Defendant were "purely foreign," thus implicating an extraterritorial application of SIPA and section 550(a)(2) of the Bankruptcy Code and requiring dismissal.[4] The District Court held that where two parties to a transfer of BLMIS customer property are foreign entities, the Trustee must "put forth specific facts suggesting a domestic transfer" to avoid dismissal.[5] In determining whether or not a transfer is domestic, as opposed to "purely foreign," the Court should analyze the "location of the transfers as well as the component events of those

---

[1] On June 26, 2015, the Trustee has filed his main brief (the "Main Brief") in opposition to the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality (the "Motion to Dismiss") and certain Proffered Allegations on the Extraterritoriality Issue (the "Proffered Allegations" or "PA") regarding Barfield. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Main Brief or the Proffered Allegations, as relevant.

[2] The Trustee seeks to recover not less than $70,508,965 in Transfers of BLMIS customer property from the BLMIS Feeder Funds to Barfield.

[3] *See Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("SIPC v. Madoff")*, 513 B.R. 222 (S.D.N.Y. 2014) (the "Extraterritoriality Decision")

[4] *See Id.* at 231-33.

[5] *Id.* at 232, n. 4.

transactions."[6] This is a fact-based inquiry in which all reasonable inferences are to be drawn in the Trustee's favor.[7]

The facts alleged in the Proffered Allegations show that the component events of the transactions related to the Transfers are predominantly domestic and the Transfers to Barfield are not "purely foreign." The Motion to Dismiss should be denied as to Barfield.

## THE TRANSFERS AND COMPONENT EVENTS OF THE RELATED TRANSACTIONS ARE PREDOMINANTLY DOMESTIC

In the aggregate, the component events of the transactions relating to the Transfers are such that the Transfers are centered in the United States, not in a foreign jurisdiction. Therefore, the Transfers and related transactions are predominantly domestic for purposes of an extraterritoriality analysis.

The genesis—and first component event—of the transactions and related Transfers is Barfield's actual investment in the BLMIS Feeder Funds. Barfield knowingly and purposely invested in the BLMIS Feeder Funds with deliberate intent to invest in and profit from New York-based BLMIS. (PA at ¶ 16). Barfield knew that, based on, among other things, Fairfield Sentry's PPM, the Kingate Global and Euro OM, the BLMIS Feeder Funds maintained at least 95% of their assets with New York-based BLMIS, a registered broker-dealer. (*Id.* at ¶¶ 18, 22–29, 34).

Barfield further knew that BLMIS: (i) acted as *de facto* investment advisor for the BLMIS Feeder Funds in New York, including making all decisions regarding the investment of all or almost all of the BLMIS Feeder Funds' assets; (ii) purportedly executed the SSC Strategy involving U.S. equities, options and Treasuries on U.S. exchanges; and (iii) acted as prime

---

[6] *Id.* at 227 (quoting *Maxwell Commc'n Corp. v. Societe Generale PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995))
[7] *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

01:16815876.6

3

broker and custodian for the BLMIS Feeder Funds (*Id.* at ¶¶ 18–40). Moreover, Barfield knew that BLMIS was "essential" to the success of the BLMIS Feeder Funds and that any Transfers from the BLMIS Feeder Funds were the product of BLMIS's purported actions and investments in the United States. (*Id.* at ¶¶ 17–40, 47). Barfield deliberately invested its money with New York-based BLMIS in order to invest in and profit from U.S. securities on U.S. exchanges.

The second relevant component of the transactions related to the Transfers is the operation of the BLMIS Feeder Funds themselves. Fairfield Sentry was controlled, operated and managed from New York. In October 1990, Noel and Tucker of FGG organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"). (*Id.* at ¶ 61). Fairfield Sentry was, however, a shell corporation present in the BVI on paper only. (*Id.* at ¶ 62).[8] From its inception until its liquidation, Fairfield Sentry had no employees and no office, and was operated almost entirely by New York-based FGG employees who maintained final control of Fairfield Sentry's bank accounts and relationships with its back office service providers. (*Id.* at ¶¶ 62, 67, 69).

At various time, in account documents executed with BLMIS, representatives of Fairfield Sentry indicated that Fairfield Sentry's address was the address of certain FGG affiliates in Greenwich, CT and New York City, NY. (*Id.* at ¶¶ 64–65).

At all relevant times, personnel at FGG's New York headquarters monitored Fairfield Sentry's investments; managed the relationship with BLMIS; directed investment into and out of BLMIS as well as into and out of Fairfield Sentry; marketed the funds approved all subscriptions

---

[8] Indeed, Fairfield Sentry was prohibited from transacting business with BVI residents, except other entities organized under the International Business Company Act. (*Id.*) Fairfield Sentry's statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. (*Id*).

for Fairfield Sentry shares; maintained all of Fairfield Sentry's book and records; and made all strategic and operational decisions regarding Fairfield Sentry.  (*Id*. at ¶¶ 68–69).

Similarly, the Kingate Funds' operations were centered in New York.  The Kingate Funds existed solely to make money from New York-based BLMIS and BLMIS in New York acted as the Kingate Fund's investment manager, broker and custodian.  (*Id*. at ¶ 84).The Kingate Funds had no offices, employees or meaningful business in the BVI, but operated through service providers with substantial connections to the U.S.  Tremont (Bermuda) Limited served as co-manager of Kingate Global for 10 years and was run from New York.  (*Id*. at ¶¶ 85–87, 95–97).  The Kingate Funds were also co-managed by Kingate Management Limited, which operated through agents in New York.  (*Id*. at ¶ 98).  FIM Limited and FIM Advisers LLP, which provided due diligence and other services to the Kingate Funds, provided those services utilizing a New York affiliate, FIM (USA), Inc.  (*Id*. at ¶¶ 101–104).

Barfield, Kingate Global and Fairfield Sentry utilized domestic bank accounts to receive subscription funds and to make and receive the Transfers.  Barfield received the majority of the Transfers from Fairfield Sentry and Kingate Global into Barfield's or its affiliate's Chicago-based account at Northern Trust Company.  (*Id*. at ¶¶ 48–49, 51–52).  The Kingate Global and Fairfield Sentry Transfer payments also utilized New York-based accounts at HSBC.  (*Id*. at ¶¶ 50, 53).  Further, Barfield directed its Fairfield Sentry subscription payments to a New York-based account at HSBC Bank, from where it was deposited into a Fairfield Sentry account and then transferred to BLMIS's New York bank account.  (*Id*. at ¶ 46).  Also, on at least one occasion and four occasions, respectively, Barfield's affiliate in Chicago directed subscription funds to Kingate Global and Fairfield Sentry on behalf of Barfield.  (*Id*. at ¶¶ 46, 55).

The Fairfield Sentry Transfers were made pursuant to subscription agreements that were domestic in nature. By executing the Fairfield Sentry Subscription Agreements, Barfield knowingly and willingly (i) submitted itself to venue and jurisdiction in New York, (ii) agreed that New York law would govern the agreements, (iii) agreed to wire Fairfield Sentry subscription payments to a New York bank account, and (iv) agreed to BLMIS in New York controlling all aspects of the investments, as described in the Fairfield Sentry PPM. (*Id.* at ¶¶ 41–47). Further, pursuant to one or more of these agreements, Barfield agreed to receive (and did receive) Transfers from Fairfield Sentry at Barfield's or its affiliate's Chicago-based bank account at Northern Trust Company. (*Id.* at ¶¶ 45, 48–49).

Finally, Barfield conducted business with FGG, a *de facto* partnership based in New York that marketed, managed, and controlled Fairfield Sentry. FGG maintained New York-based representatives dedicated to Barfield, which included Lourdes Barranche, Ron Thomann, Matt Brown and Jeremy Norton. (*Id.* at ¶ 56). At various times, representatives of Barfield spoke to and/or corresponded with these parties in the United States regarding Barfield's investments in Fairfield Sentry. (*Id.*).

In the aggregate, the component events of the transactions relating to and resulting in the Transfers—and the Transfers themselves—are predominantly domestic. As such, the Transfers are not "purely foreign" and Barfield's Motion to Dismiss regarding the extraterritoriality issue should be denied.

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, the Trustee respectfully requests that the Court deny the Motion to Dismiss with respect to Barfield and grant the Trustee's motion for leave to amend his Complaint with the Proffered Allegations.

Dated:  June 29, 2015  
       New York, New York

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Matthew B. Lunn*  
Matthew B. Lunn  
Justin P. Duda  
Rockefeller Center  
1270 Avenue of the Americas, Suite 2210  
New York, New York 10020  
Telephone:  (212) 332-8840  
Facsimile: (212) 332-8855  
Email:  *mlunn@ycst.com*  
       *jduda@ycst.com*

*Attorneys for Plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC*