**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01669 (SMB) |
| Plaintiff, | |
| v. | |
| BARFIELD NOMINEES LIMITED and NORTHERN TRUST CORPORATION, | |
| Defendants. | |

**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE
EXTRATERRITORIALITY ISSUE AS TO BARFIELD**

Irving H. Picard ("Trustee"), as trustee for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and the substantively consolidated estate of Bernard L.

Madoff ("Madoff"), by the Trustee's undersigned counsel, for his Proffered Allegations on the

Extraterritoriality Issue against Barfield Nominees Limited ("Barfield"), states:

## INTRODUCTION

1.      The below-proffered allegations address Barfield, which is a defendant in the case

of *Picard v. Barfield Nominees Limited, et al.*, Adv. Pro. No. 12-01669 (SMB) (the "Adversary

Proceeding").

2.      The Trustee seeks to recover as subsequent transfers under SIPA and 11 U.S.C §

550(a)(2), Barfield's redemptions from certain BLMIS feeder funds, as set forth in the Trustee's

complaint (the "Complaint") and herein (the "Transfers"), which Transfers occurred over an

approximately nine-year period (1999-2008) (the "Transfer Period").

3.      In the Complaint, the Trustee asserts that Barfield received Transfers in an

amount not less than $70,083,978.  Since the filing of the Complaint, the Trustee has discovered

additional Transfers to Barfield.  As of the filing date of this Proffer, the Trustee asserts that

Barfield received Transfers in an amount not less than $70,508,965.

4.      The BLMIS feeder funds at issue in this Adversary Proceeding are Fairfield

Sentry Ltd. ("Fairfield Sentry"), Kingate Euro Fund Ltd. ("Kingate Euro") and Kingate Global

Fund Ltd. ("Kingate Global," together with Kingate Euro, the "Kingate Funds).  Collectively,

Fairfield Sentry and the Kingate Funds shall be referred to herein as the "BLMIS Feeder Funds."

## BARFIELD

5.      Barfield is a Guernsey limited company.

6.      Barfield currently is a subsidiary of the Northern Trust Corporation ("Northern Trust") through various intermediary subsidiaries, including Northern Trust Fiduciary Services (Guernsey) Limited, which is 99% owned by Northern Trust.

7.      Northern Trust is a Delaware corporation that maintains its headquarters at 50 South LaSalle Street, Chicago, Illinois 60603.  Northern Trust's common stock is registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 and is publicly traded on the NASDAQ stock exchange under the ticker symbol NTRS.

8.      On March 31, 2005, during the Transfer Period, Northern Trust acquired Barfield in connection with its purchase of Baring Asset Management's Financial Services Group from ING Groep N.V. ("ING").

9.      In December of 2004, prior to the finalization of the acquisition of Barfield and certain of its affiliates, the Northern Trust Company, a wholly owned subsidiary of Northern Trust that is incorporated in Illinois, filed a Notice of Intent to Establish a Bank Subsidiary with the Illinois Department of Financial and Professional Regulation Division of Banks and Real Estate with regards to Barfield.

10.     Upon information and belief, following the acquisition of Barfield and certain of its subsidiaries, Barfield's business was controlled by Northern Trust from its headquarters located in Chicago, Illinois.

11.     Prior to its acquisition by Northern Trust, from approximately 1995 through March 31, 2005, Barfield was a subsidiary of ING through, upon information and belief, Barings (Guernsey) Limited.

12.     During the Transfer Period, ING was a Dutch global financial services enterprise headquartered in Amsterdam and operating in more than 50 countries.

13.     During the Transfer Period, certain of ING's securities were registered under the Securities Act of 1933 and were traded on the New York Stock Exchange under the ticker symbol ING.  In connection with these securities, during the Transfer Period, ING filed certain reports with the Securities and Exchange Commission.

14.     From 2002 through at least the time ING sold Barfield to Northern Trust, ING took certain acts in accordance with the requirements of the Sarbanes-Oxley Act, including filing reports under, among other sections, Section 404.

15.     During the Transfer Period, ING operated in the United States through one or more subsidiaries, which subsidiaries maintained offices in New York City, New York.

**THE COMPONENT EVENTS OF THE TRANSACTIONS SHOW
THAT THE TRANSFERS ARE PREDOMINANTLY DOMESTIC**

A.     **Barfield Knowingly and Purposely Invested with BLMIS in New York via the
BLMIS Feeder Funds**

16.     By March of 1999, September of 2001 and April of 2007, and likely earlier in each case, Barfield had knowingly and purposely invested in Kingate Global, Fairfield Sentry and Kingate Euro, respectively, to profit from BLMIS in New York.

17.     But for BLMIS's fraudulent Ponzi scheme in New York, Barfield would have received none of the transfers of BLMIS customer property via the BLMIS Feeder Funds.

18.     BLMIS in New York was the *de facto* investment advisor for the BLMIS Feeder Funds and the BLMIS Feeder Funds invested at least 95% of their assets with BLMIS.

19.     BLMIS in New York purportedly operated and executed the "split strike conversion" investment strategy (the "SSC Strategy") on behalf of the BLMIS Feeder Funds.

20.     The SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options and U.S. Treasuries traded on U.S. exchanges, and that the decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

21.     BLMIS in New York was custodian for the BLMIS Feeder Funds and maintained custody of the vast majority of the BLMIS Feeder Funds' assets in New York.

22.     BLMIS was a registered broker-dealer in the United States.

23.     Barfield knew each of the above facts because, among other reasons, such information was provided in Fairfield Sentry's Private Placement Memorandum (the "Fairfield Sentry PPM"), Kingate Global's Offering Memorandum ("Kingate Global OM") and Kingate Euro's Offering Memorandum ("Kingate Euro OM").

24.     Fairfield Sentry required each investor to enter into a subscription agreement (a "Fairfield Sentry Subscription Agreement") in connection with the investor's initial investment in Fairfield Sentry and enter into an additional Fairfield Subscription Agreement in connection with each additional investment.

25.     Barfield entered into multiple Fairfield Sentry Subscription Agreements.

26.     Pursuant to such Fairfield Subscription Agreements, Barfield represented and warranted, among other things, that it was a "Professional Investor" with "such knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in" the Fairfield Funds.

27.     Pursuant to such Fairfield Sentry Subscription Agreements, Barfield also represented that it was financially sophisticated and that it had received and reviewed the Fairfield Sentry PPM, which was incorporated by reference in the relevant Fairfield Sentry Subscription Agreement.

28.     Similarly, investment in the Kingate Funds required each investor to enter into a subscription agreement (a "Kingate Global Subscription Agreement," or "Kingate Euro Subscription Agreement," as applicable), which indicates that such investor has "received, reviewed and understood" the Kingate Global OM or Kingate Euro OM, as applicable.

29.     Based upon the requirement that each investor execute a Kingate Global or Kingate Euro Subscription Agreement prior to investment in the relevant Kingate Fun and upon information and belief, Barfield entered into one or more such subscription agreements with each of the Kingate Funds, wherein Barfield represented and warranted that it "possesses requisite knowledge and experience in financial matters such that it is capable of evaluating the merits and risks of an investment in" the Kingate Funds and wherein Barfield acknowledged that it "received, reviewed and understood" the Kingate Global and the Kingate Euro OM, as applicable.

30.     Among other things, the Kingate Global OM states that "[t]he investment adviser is a New York based NASD registered broker-dealer . . . acting primarily as a market-maker in listed and unlisted stocks and convertible securities (the 'Investment Advisor')."

31.     Furthermore, the Kingate Global OM indicates that the co-managers of Kingate Global, Kingate Management Limited ("KML") and Tremont (Bermuda) Limited, "have established a discretionary account with such Investment Advisor," that "[t]he Investment Advisor utilizes a 'split strike conversion' strategy . . .," and that "[a]ll investment decisions in the account held with the Investment Advisor are effected by persons associated with the Investment Advisor."

32.     The Kingate Global OM also states that KML and Tremont (Bermuda) Limited "have delegated all investment management duties with regard to [Kingate Global] to the

Investment Advisor," and that KML and Tremont (Bermuda) Limited do not "have any control over the investment and trading decisions of the Investment Advisor."

33.      Finally, the Kingate Global OM states that "[n]either [Kingate Global] nor the Custodian has actual custody of the assets.  Such actual custody rests with the Investment Advisor and its affiliated broker-dealer.  Therefore, there is the risk that the custodian could abscond with those assets.  There is always the risk that the assets with the Investment Advisor could be misappropriated."

34.      The Kingate Euro OM provides substantially similar information to that set forth above.

35.      Similarly, the Fairfield Sentry PPM states that Fairfield Green Limited ("FGL"), the manager of Fairfield Sentry during a portion of the Transfer Period, maintained an office in New York and "has delegated the management of [Fairfield Sentry's] investment activities to Bernard L. Madoff Investment Securities, a registered-broker dealer in New York. . . ."  The Fairfield Sentry PPM asserts that Fairfield Sentry "has no control over the decisions implemented" by BLMIS.

36.      The Fairfield Sentry PPM further states that FGL "has established a discretionary account for [Fairfield] Sentry at Bernard L. Madoff Investment Securities ('BLM'), a registered broker-dealer in New York, who utilizes a strategy described as 'split strike conversion'," and that "[a]ll investment decisions in the account at BLM are effected by persons associated with BLM."

37.      The Fairfield Sentry PPM states that BLMIS "acts as a principal in connection with its sale of securities to [Fairfield Sentry] and the purchase of securities from [Fairfield Sentry].  BLM acts as a market-maker in the stocks purchased and sold by [Fairfield Setnry].  These market making activities enable BLM to trade with [Fairfield Sentry] as principal."

38.     The Fairfield Sentry PPM also states that Fairfield Sentry "allocates its assets to an account at [BLMIS]," and that BLMIS acts as "sub-custodian of [Fairfield Sentry's] assets."

39.     The Fairfield Sentry PPM finally states that BLMIS is "essential to the continued operations of [FGL]," and "essential to the continued operation of [Fairfield Sentry], and its profitability, if any."  The Fairfield Sentry PPM indicated that there was a risk that BLMIS might, as custodian and broker, "misappropriate the securities or funds (or both) of [Fairfield Sentry]."

40.     Barfield also knew each of the above facts because Barfield is a sophisticated financial entity and, as a sophisticated financial entity, conducted due diligence regarding the BLMIS Feeder Funds and BLMIS.

**B.      The Transfers from Fairfield Sentry to Barfield Were Made
         Pursuant to Subscription Agreements That Were Domestic in Nature**

41.     In connection with its investments in Fairfield Sentry, Barfield entered into multiple Fairfield Sentry Subscription Agreements.

42.     The Fairfield Sentry Subscription Agreements were governed by New York state law and provided that New York courts shall have venue and jurisdictions regarding the agreements and Fairfield Sentry.

43.     Specifically, the Fairfield Sentry Subscription Agreements provide that "[t]his Agreement shall be governed and enforced in accordance with the law of New York, without giving effect to its conflict of laws provisions," and that Barfield "agrees that any suit, action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made

upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum."

44.      Barfield expected to be subject to New York law and courts with regards to its investments in BLMIS via Fairfield Sentry.

45.      Pursuant to the Fairfield Sentry Subscription Agreements it executed, Barfield agreed to send its Fairfield Sentry subscription payments to a New York-based account at HSBC Bank N.A. ("HSBC") and to receive redemption payments from Fairfield Sentry in Barfield's or Barfield's affiliate's Chicago-based bank account at affiliate Northern Trust Company.

46.      On at least four occasions, Barfield directed its payments for shares of Fairfield Sentry, which payments originated from one of Barfield's affiliates in Chicago, to the denoted account with HSBC in New York City for ultimate deposit in Fairfield Sentry's bank account, from which they were transferred to BLMIS's bank account at JPMorgan Chase N.A. in New York.

47.      Barfield acknowledged in its Fairfield Sentry Subscription Agreements that it received and reviewed a copy of the Fairfield Sentry PPM, which describes  how: (i) BLMIS in New York was "essential" to Fairfield Sentry as its investment advisor, custodian, and broker-dealer that executed the SSC Strategy through the purchase and sale of U.S. securities; (ii) Fairfield Sentry's purported investment manager was initially FGL, a Fairfield Greenwich Group ("FGG") company whose principal place of business was FGG's office in New York, and subsequently Fairfield Greenwich (Bermuda) Ltd. which registered as an investment advisor with the Securities and Exchange Commission in 2006 and was controlled by FGG personnel in New York; (iii) Fairfield Sentry retained U.S. counsel in New York; and (iv) FGG required subscribers, like Barfield, to be in compliance with the rules and regulations of the U.S. Department of the Treasury's Office of Foreign Assets Control.

C.     **Barfield Received a Majority of Its Transfers from the BLMIS Feeder Funds Into Its Bank Accounts in the United States**

     i.     **A Majority of the Fairfield Sentry Redemptions Were Paid Into a U.S. Bank Account as Directed by Barfield**

48.     Chicago was the specific situs repeatedly selected by Barfield to receive at least five Transfers, and, upon information and belief, at least one additional Transfer from Fairfield Sentry.  Specifically, Barfield used a bank account at its affiliate Northern Trust Company in Chicago, which account was in Barfield's own name or in the name of its affiliate for the benefit of Barfield.

49.     Barfield systematically designated such use of this Chicago-based account in its Fairfield Sentry Subscription Agreements and certain redemption documents.  The receipt of Transfers from Fairfield Sentry using this Chicago-based account was purposeful on the part of Barfield.

50.     Fairfield Sentry also utilized an account at HSBC in New York to effectuate each of the Transfers to Barfield.

     ii     **A Majority of the Kingate Global Redemptions Were Paid Into U.S. Bank Accounts as Directed by Barfield**

51.     Chicago was the specific situs repeatedly selected by Barfield to receive at least six Transfers, and, upon information and belief, at least two additional Transfers from Kingate Global.  Specifically, Barfield used bank accounts at its affiliate Northern Trust Company in Chicago, which accounts were in Barfield's own name or in the name of its affiliate for the benefit of Barfield.

52.     Upon information and belief, Barfield systematically designated such use of this Chicago-based account in certain redemption documents.  Thus, the receipt of Transfers from Kingate Global using this Chicago-based account was purposeful on the part of Barfield.

53.     Kingate Global also utilized an account at HSBC in New York to effectuate each of the Transfers to Barfield.

**D.      Barfield Conducted Additional Business in the
         United States in Connection with the Transfers**

54.     In addition to its delivery of Fairfield Sentry subscription payments from an account in Chicago to New York-based bank accounts and its receipt of Transfers from a New York-based account at HSBC into its or its affiliate's Chicago-based bank accounts, Barfield conducted additional business in the United States in connection with its receipt of Transfers of BLMIS customer property from the BLMIS Feeder Funds.

55.     On at least one occasion, on behalf of Barfield, an affiliate of Barfield's in Chicago directed subscription funds to Kingate Global.

56.     Also, in connection with Barfield's investments in Fairfield Sentry, FGG maintained New York-based representatives dedicated to Barfield, which included Lourdes Barranche, Ron Thomann, Matt Brown and Jeremy Norton.  At various times, representatives for Barfield spoke to and/or corresponded with these parties in the United States regarding Barfield's investments in Fairfield Sentry.

**E.      Fairfield Sentry Was Controlled, Operated and Managed From New York**

57.     At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

i.       **The Genesis of the FGG De Facto Partnership**

58.      In 1988, Walter Noel and Jeffrey Tucker founded the FGG de facto partnership

based in New York City.  FGG created, managed, and marketed a variety of investment vehicles,

the largest of which were BLMIS feeder funds

59.      The FGG de facto partnership included: individual persons; U.S. corporations;

foreign corporations; and investment vehicles created, managed, operated, and marketed from

FGG's New York headquarters.  Among the FGG investment vehicles were the three Feeder

Funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry

Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Fairfield

Sigma") and Fairfield Lambda Limited ("Lambda").  Fairfield Sigma and Lambda received

subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S.

dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

60.      FGG also included a number of administrative entities that purportedly provided

management and back office support to the funds.  These entities included:  FGL, Fairfield

Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG

Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

ii.      **Fairfield Sentry**

61.      On October 30, 1990, FGG founding partners, Noel and Tucker, organized

Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

62.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From

its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

63.    Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

> **a.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield
> Sentry's Principal Place of Business Was in the United States**

64.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069.  In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070.  BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

65.     After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

66.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member regulated by the SEC.

**b.     FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities**

67.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco

Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield

Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets

were held in the BLMIS accounts.  As a result, Citco Custody entered into a sub-custodian

agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco

Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco

entities.

### c.    FGG New York Personnel Managed Fairfield Sentry

68.    At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities.  Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

York.

69.    FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### d.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

70.    The Fairfield Sentry Subscription Agreement also incorporated the Fairfield Sentry PPM by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the Fairfield Sentry PPM.  The original or later amended Fairfield Sentry PPM's disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasuries.  The Fairfield Sentry PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e.    BLMIS Was Fairfield Sentry's Investment Manager

71.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

72.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FGL. FGL was formed under the laws of Ireland.

73.    While FGL was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FGL, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FGL.  Following the assignment of the management contracts to FGL, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FGL as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

74.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the Feeder Funds and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the Feeder Funds and currency funds.  As a result, FGG formed two new entities, FG Advisors and FG Bermuda.

75.    In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FGL.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FGL.  Upon the formation of FG Advisors and FG Bermuda, FGL assigned certain of its management contracts

to both entities, including the investment advisory agreements for the three Feeder Funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FGL remained the placement agent for the same funds.

76.    In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new Fairfield Sentry PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new Fairfield Sentry PPMs also stated FGL would remain as Fairfield Sentry's placement agent and receive a portion of the management and performance fees paid to FG Bermuda. The same Fairfield Sentry PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

77.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Fairfield Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

78.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

79.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and Fairfield Sentry PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

01:16644525.9

18

80.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.  The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

81.     The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Inv. Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

## F.     The Transfers From the Kingate Fund Are Domestic

82.     The Kingate Funds were feeder funds that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $926,351,905 of customer property to the Kingate Funds during the life of the accounts prior to December 11, 2008.

83.     Each of the Kingate Funds filed customer claims in the SIPA liquidation.

### i.     The Kingate Funds' Invested with BLMIS to Make Money from a New York-Based Investment Operation

84.     The Kingate Funds, together with their purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose:  to make money from a New York-based investment operation.

85.     Despite having a registered address in the BVI, the Kingate Funds had no physical offices, no employees, and transacted no meaningful business there.

86.     Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years.  Tremont (Bermuda) Limited was formed in Bermuda, but was itself

managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "<u>Tremont</u>").

87.    The Kingate Funds' manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Funds' investments with BLMIS.

88.    The Kingate Funds' sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and the Kingate Funds profited from their exclusive business relationship with BLMIS in New York.

### ii.    The Operative Legal Documents Were New York-Based

89.    The Kingate Funds executed "Customer Agreements," and other account opening documents, and delivered the agreements to BLMIS in New York.

90.    Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

91.    The Kingate Funds agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

01:16644525.9

### iii.    BLMIS Had Full Authority to Make and Execute Investment Decisions

92.    The Kingate Funds' "Trading Authorization Agreements" authorized BLMIS to be the Kingate Funds' "agent and attorney in fact," giving BLMIS full discretion over the Kingate Funds' invested assets and to buy, sell, and trade in securities for the Kingate Funds.

93.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the Kingate Funds' investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

94.    BLMIS acted as the Kingate Funds' executing broker in purporting to purchase securities on the Kingate Funds' behalf, and acted as the Kingate Funds' custodian for the securities purportedly held on the Kingate Funds' behalf.

### iv.    The Kingate Funds Were Managed From New York

95.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to the Kingate Funds in return for fees, it was a valuable contributor in New York to the success of the Kingate Funds.

96.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with KML and Kingate Global.

97.    Under that agreement, KML and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

98.    The Kingate Funds were also co-managed by KML, a management entity formed by the founders of the Kingate Funds, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

99.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

100.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

101.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

102.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as the Kingate Funds' investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

103.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for the Kingate Funds.

104.    KML and the FIM entities actively participated in the Kingate Funds business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**v.    Kingate Funds Used Banks in New York**

105.    The Kingate Funds used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

106.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial

institution doing business in the United States, as Kingate Global's custodian.

107.    In its role as the Kingate Funds' custodian, HSBC consistently used New York

banks in carrying out its duties for KML and the Kingate Funds relating to investments with

BLMIS.

108.    FIM also directed fee payments to be routed through a bank account in New

York.

109.    The Trustee incorporates by reference the allegations of the Fourth Amended

Complaint filed in *Picard v. Federico Ceretti, et al*., Adv. Pro. No. 09-01161 (SMB), Dkt. No.

100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated:  June 29, 2015
        New York, New York

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Matthew B. Lunn*
Matthew B. Lunn
Justin P. Duda
Rockefeller Center
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone:  (212) 332-8840
Facsimile: (212) 332-8855
Email:  *mlunn@ycst.com*
        *jduda@ycst.com*

*Attorneys for Plaintiff Irving H. Picard,
Trustee for the Liquidation of Bernard L.
Madoff Investment Securities LLC*

01:16644525.9