**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 12-01680 (SMB) |
| Plaintiff, | |
| v. | |

|  |
|---|
| INTESA SANPAOLO SPA (AS SUCCESSOR IN INTEREST TO BANCA INTESA SPA), EURIZON CAPITAL SGR SPA (AS SUCCESSOR IN INTEREST TO EURIZON INVESTIMENTI SGR SPA, F/K/A NEXTRA INVESTMENT MANAGEMENT SGR SPA, AND EURIZON ALTERNATIVE INVESTMENTS SGR SPA, FKA NEXTRA ALTERNATIVE INVESTMENTS SGR SPA), EURIZON LOW VOLATILITY F/K/A NEXTRA LOW VOLATILITY, EURIZON LOW VOLATILITY II F/K/A NEXTRA LOW VOLATILITY II, EURIZON LOW VOLATILITY PB F/K/A NEXTRA LOW VOLATILITY PB, EURIZON MEDIUM VOLATILITY F/K/A NEXTRA MEDIUM VOLATILITY, EURIZON MEDIUM VOLATILITY II F/K/A NEXTRA MEDIUM VOLATILITY II, EURIZON TOTAL RETURN F/K/A NEXTRA TOTAL RETURN, <br><br>                                  Defendants. |

## THE TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF
## LAW IN OPPOSITION TO THE INTESA DEFENDANTS' MOTION
## TO DISMISS BASED ON EXTRATERRITORIALITY
## AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION
## FOR LEAVE TO AMEND THE COMPLAINT

The Trustee[1] respectfully submits this supplemental memorandum to his Main Brief in opposition to the Motion to Dismiss as it applies to the Intesa Defendants[2] and in further support

---

[1] On June 26, 2015, the Trustee has filed his main brief (the "Main Brief") in opposition to the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality (the "Motion to Dismiss") and certain Proffered Allegations on the Extraterritoriality Issue (the "Proffered Allegations" or "PA") regarding the Intesa Defendants. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Main Brief or the Proffered Allegations, as relevant.

[2] The Defendants in this Adversary Proceeding are Intesa Sanpaolo SpA (including its predecessors in interest, "Intesa"), Eurizon Capital SGR SpA (including its predecessors in interest, "Eurizon Capital"), Eurizon Low Volatility's (formerly known as Nextra Low Volatility) ("Low Volatility"), Eurizon Low Volatility II (formerly known as Nextra Low Volatility II) ("Low Volatility II"), Eurizon Low Volatility PB (formerly known as Nextra Low Volatility PB) ("Low Volatility PB"), Eurizon Medium Volatility (formerly known as Nextra Medium Volatility) ("Medium Volatility"), Eurizon Medium Volatility II (formerly known as Nextra Medium Volatility II)

of his motion for leave to amend the Complaint. The Intesa Defendants are Shareholder Defendants and the Trustee seeks to recover not less than $119,323,347 in Transfers of BLMIS customer property from the BLMIS Feeder Funds to the Intesa Defendants. The Trustee's Proffered Allegations plead specific facts evidencing that the component events of the transactions relating to the Transfers from the BLMIS Feeder Funds are predominantly domestic and the Transfers are not "purely foreign" under the standard set forth in Judge Rakoff's decision regarding the extraterritorial application of SIPA and section 550(a)(2) of the Bankruptcy Code, such that the Trustee's action to recover the Transfers does not implicate an extraterritorial application of those provisions.[3]

## BACKGROUND AND LEGAL STANDARD

As discussed in the Main Brief, the District Court did not dismiss outright the Trustee's Complaint against the Intesa Defendants or any other Defendants subject to the Extraterritoriality Decision.[4] Rather, the matter was returned back to this Court for a decision regarding—based on the factual allegations as to each individual Defendant—whether or not the transfers to such Defendant were "purely foreign," thus implicating an extraterritorial application of SIPA and section 550(a)(2) of the Bankruptcy Code and requiring dismissal pursuant to the Extraterritoriality Decision.[5]

The Extraterritoriality Decision held that where two parties to a transfer of BLMIS

---

("Medium Volatility II"), and Eurizon Total Return (formerly known as Nextra Total Return) ("Total Return," collectively with Low Volatility, Low Volatility II, Low Volatility PB, Medium Volatility, and Medium Volatility II, the "Funds," and together with Eurizon Capital, the "Eurizon Defendants," and the Eurizon Defendants, together with Intesa, the "Intesa Defendants").

[3] *See Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("SIPC v. Madoff")*, 513 B.R. 222 (S.D.N.Y. 2014) (the "Extraterritoriality Decision")

[4] *See Extraterritoriality Decision*, 513 B.R. at 232.

[5] *See Id.* at 231-33.

2

01:16818399.4

customer property are foreign entities, the Trustee must "put forth specific facts suggesting a domestic transfer" to avoid dismissal.[6] In determining whether or not a transfer is domestic, as opposed to "purely foreign," the Court should analyze the "location of the transfers as well as the component events of those transactions."[7] Such component events include, but are not limited to: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded.[8] In this fact-based inquiry, all reasonable inferences are to be drawn in the Trustee's favor.[9]

Pursuant to the Court's December 10, 2014 Scheduling Order, the Trustee submits herewith the Proffered Allegations regarding, among other things, the Transfers of BLMIS customer property from the BLMIS Feeder Funds to the Intesa Defendants. The facts alleged in the Proffered Allegations show that the component events of the transactions relating to the Transfers to the Intesa Defendants are predominantly domestic and the Transfers are not "purely foreign." As such, the dismissal of the Complaint against the Intesa Defendants pursuant to the Extraterritoriality Decision is unwarranted.

---

[6] *Id.* at 232, n. 4.

[7] *Id.* at 227 (quoting *Maxwell Commc'n Corp. v. Societe Generale PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995))

[8] *See In re Maxwell Commc'n Corp.,* 186 B.R. at 816-17.

[9] *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403–05 (S.D.N.Y. 2010).

3

## THE TRANSFERS AND COMPONENT EVENTS OF THEIR RELATED TRANSACTIONS ARE PREDOMINANTLY DOMESTIC

In the aggregate, the component events of the transactions relating to the Transfers from the BLMIS Feeder Funds to the Intesa Defendants are such that the Transfers are centered in the United States, not in a foreign jurisdiction. The Transfers and related transactions were predominantly domestic, not foreign—let alone "purely foreign." Therefore, such Transfers are domestic for purposes of the Court's extraterritoriality analysis and the Intesa Defendant's Motion to Dismiss based on the Extraterritoriality Decision should be denied and the Trustee be given leave to amend his Complaint.

A.  **The Intesa Defendants Knowingly and Purposely Invested with the BLMIS Feeder Funds to Profit from New York-based BLMIS**

The genesis—and first component event—of the transactions and related Transfers by the BLMIS Feeder Funds is the Intesa Defendants' actual investment in the BLMIS Feeder Funds. The Intesa Defendants knowingly and purposely invested in the BLMIS Feeder Funds with deliberate intent to invest in and profit from BLMIS's New York-based activity. (PA at ¶¶ 33–34). The Intesa Defendants knew, based on, among other things, the Fairfield Sentry PPM, the Kingate Global and Euro OM and other related documents, and due diligence conducted by the Intesa Defendants and their affiliates, that the BLMIS Feeder Funds maintained at least 95% of their assets with New York-based BLMIS, a registered broker-dealer. (*Id.* at ¶¶ 36, 40–48, 53).

The Intesa Defendants further knew that BLMIS: (i) acted as *de facto* investment advisor for the BLMIS Feeder Funds in New York, including making all decisions regarding the investment of all or almost all of the BLMIS Feeder Funds' assets; (ii) purportedly executed the SSC Strategy involving U.S. equities, options and Treasuries on U.S. exchanges; and (iii) acted as prime broker and custodian for the BLMIS Feeder Funds. (*Id.* at ¶¶ 36–61). Moreover, the

4

Intesa Defendants knew that BLMIS was "essential" to the success of the BLMIS Feeder Funds and that any Transfers from the BLMIS Feeder Funds were the product of BLMIS's purported actions and investments in the United States. (*Id.* at ¶¶ 35–61).

The Intesa Defendants deliberately invested their money with New York-based BLMIS in order to invest in and profit from U.S. securities on U.S. exchanges. With such U.S.-based transactions at their base, the Transfers are predominantly domestic and not "purely foreign."

### B.   Fairfield Sentry Was Controlled, Operated and Managed From New York

The second relevant component of the transactions related to the Transfers was the operation of the BLMIS Feeder Funds themselves. While Fairfield Sentry may have been organized under the laws of a foreign jurisdiction, this fund were controlled, operated and managed in New York.

In 1988, Walter Noel and Jeffrey Tucker founded FGG, a *de facto* New York partnership. (*Id.* at ¶ 81). In October of 1990, Noel and Tucker organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), as a means for investors to invest with BLMIS. (*Id.* at ¶ 84).

Fairfield Sentry, however, was a shell corporation present in the BVI on paper only. (*Id.* at ¶ 85). Fairfield Sentry was prohibited from transacting business with BVI residents, except other entities organized under the International Business Company Act. (*Id.*). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm, which addressed its statements for services to Fairfield Sentry to FGG's New York headquarters. (*Id.*).

From its inception until its liquidation, Fairfield Sentry had no employees and no office. (*Id.*). Fairfield Sentry was operated almost entirely by FGG employees based in New York. (*Id.*

5

at ).  These employees maintained final control of Fairfield Sentry's bank accounts and relationships with its back office service providers.  (*Id.* at ¶¶ 91–92).

At various times, in account documents executed with BLMIS, representatives of Fairfield Sentry indicated that Fairfield Sentry's address was the addresses of certain FGG affiliates in Greenwich, CT and New York City, NY.  (*Id.* at ¶¶ 87–88).

From Fairfield Sentry's inception, FGG personnel in New York controlled the sales and subscriptions of Fairfield Sentry's shares.  (*Id.* at ¶¶ 91–92).  After January 1, 2002, each investor in Fairfield Sentry executed a subscription agreement in which the investor agreed to be bound under New York law and submit to New York jurisdiction and venue.  (*Id.* at ¶ 92).

At all relevant times, personnel at FGG's New York headquarters monitored Fairfield Sentry's investments; managed the relationship with BLMIS; directed investment into and out of BLMIS; marketed Fairfield Sentry; approved all subscriptions for Fairfield Sentry shares; maintained all of Fairfield Sentry's book and records; and made all strategic and operational decisions regarding Fairfield Sentry.  (*Id.* at ¶¶ 91–92).

## C.    The Kingate Funds' Operations Were Based in New York

The Kingate Funds invested exclusively with BLMIS in New York and, together with certain related entities, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.  (*Id.* at ¶ 107).

The Kingate Funds executed customer agreements and related documents, and delivered the agreements to BLMIS in New York.  (*Id.* at ¶ 112).  The agreements were governed by U.S. law, and disputes under the agreements were to be resolved in the United States.  (*Id.* at ¶¶ 113–114).  The agreements further authorized BLMIS to act as the Kingate Funds' investment manager, executing broker, New York-based custodian and to invest their assets according to the

SSC Strategy, which purported to involve the purchase and sale of U.S. securities traded only on domestic exchanges. (*Id.* at ¶¶ 115–117)

The Kingate Funds had no offices, employees, or meaningful business in the BVI. (*Id.* at ¶ 108). Instead, the Kingate Funds operated through service providers with substantial connections to the United States. Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years and was formed in Bermuda, but was itself managed from New York by Tremont Partners, Inc., a Connecticut corporation. (*Id.* at ¶¶ 109, 118–120). The Kingate Funds were also co-managed by Kingate Management Limited ("KML"), which operated through agents in New York. (*Id.* at ¶ 121). KML engaged consultants FIM Limited and FIM Advisers LLP (together "FIM") to perform due diligence on BLMIS. (*Id.* at ¶ 124). Although FIM had a London address, the head of due diligence for its feeder fund investments was located in New York and worked with FIM's affiliate FIM (USA) Inc. in New York, which was the hub for FIM's feeder fund due diligence. (*Id.* at ¶¶ 125–126). From New York, FIM (USA) Inc. monitored, researched and solicited investors for the Kingate Funds. (*Id.* at ¶ 126).

D.  **The Majority of the Transfers to the Eurizon Defendants and Intesa Were Made Utilizing New York-Based Bank Accounts**

One of the key components of an extraterritoriality analysis is the "location of the transfers"[10] themselves. The Eurizon Defendants, on behalf of the Funds, received a majority of the Transfers into Eurizon Capital's own New York-based bank accounts. (*Id.* at ¶¶ 62–63, 65–66). The Funds received at least three Transfers from Fairfield Sentry and at least eight Transfers from Kingate Global into Eurizon Capital's accounts at Intesa in New York. (*Id.* at ¶¶ 62, 65). The Eurizon Defendants purposely chose to receive a majority of the Funds' Transfers into these New York-based accounts. (*Id.* at ¶¶ 62–63, 65–66).

---

[10] *See Extraterritoriality Decision*, 513 B.R. at 227.

Additionally, the Kingate Global and Fairfield Sentry Transfer payments to both Intesa and the Funds also utilized New York-based accounts at HSBC. (*Id.* at ¶¶ 64, 67).

### F. Additional Component Events of the Transactions Show That the Transfers Were Predominantly Domestic

Finally, there are numerous other component events of the transactions related to the Transfers from the BLMIS Feeder Funds to the Intesa Defendants that indicate that such Transfers were predominantly domestic.

#### 1. Intesa

Intesa, which maintains an office in New York City, New York, conducts due diligence with regards to its proprietary investments, and conducted due diligence regarding BLMIS and Kingate Global. (*Id.* at ¶¶ 6, 68–69).

Indeed, while invested in Kingate Global, Intesa had one or more conversations with representatives for Fairfield Greenwich Group ("FGG"), the *de facto* New York partnership that created, marketed and operated Fairfield Sentry, regarding, among other things, investment in Fairfield Sentry. (*Id.* at ¶ 70). During one or more of these conversations, a representative for Intesa indicated that he knew BLMIS very well and was not interested in investing with Fairfield Sentry. (*Id.*).

In connection with Intesa's investment portfolio, Mr. Gianni Movia, head of proprietary trading for Intesa, and his colleagues have traveled to the United States to conduct due diligence and meet with managers of U.S.-based hedge funds. (*Id.* at ¶ 69). On at least one occasion, Mr. Movia met in New York with representatives from FGG regarding Intesa's investment portfolio. (*Id.* at ¶ 70).

Intesa's due diligence regarding BLMIS, a New York-based entity, was an integral component in Intesa's decision to invest in and receive the Transfers from Kingate Global.

8

01:16818399.4

### 2. Eurizon Capital and the Funds

Eurizon Capital, which maintained an office in New York City, New York during the Transfer Period, in connection with its management of its affiliated hedge funds, including the Funds, conducted due diligence on the Funds' investments and conducted due diligence on BLMIS and the BLMIS Feeder Funds. (*Id.* at ¶¶ 12, 71–74). Representatives of Eurizon Capital, including Chief Investment Officer Tomaso Corsini ("Mr. Corsini"), traveled to the United States to conduct due diligence and meet with managers of U.S.-based hedge funds regarding the Funds' investments. (*Id.* at ¶ 73). On at least one occasion, Mr. Corsini met in New York with representatives from FGG regarding investments for the Funds. (*Id.* at ¶ 74).

Also, for a portion of the Transfer Period, CAAM and/or its affiliates operated, managed and controlled the Eurizon Capital and the Funds. (*Id.* at ¶¶ 13–19, 75–76). CAAM maintained an office and operations in Chicago, Illinois through CAAM-AI, Inc. (*Id.* at ¶ 16). CAAM-AI, Inc., on behalf of its affiliates and affiliated funds, including the Funds, conducted due diligence regarding U.S.-based investment managers. (*Id.* at ¶¶ 17, 75). Upon information and belief, CAAM-AI, Inc. conducted due diligence on BLMIS and the BLMIS Feeder Funds from Chicago, Illinois. (*Id.* at ¶¶ 18, 76).

CAAM's due diligence of New York-based Fairfield Sentry and BLMIS, a portion of which was conducted in the United States, was an integral component event of the Funds' investment transactions and its receipt of the Transfers from the BLMIS Feeder Funds.

Eurizon Capital also maintained contacts with New York-based FGG representatives regarding Low Volatility and Medium Volatility's investments with Fairfield Sentry. (*Id.* at ¶ 77). In May 2003, notwithstanding that Low Volatility failed to meet the deadline for May redemptions in Fairfield Sentry, Eurizon Capital's Chief Investment Officer and Chief Executive

9

Officer both called FGG in New York and requested that Fairfield Sentry honor Low Volatility's $1 million redemption request, which request ultimately was honored. (*Id.* at ¶ 78).

Finally, on behalf of Medium Volatility and Low Volatility, Eurizon Capital directed subscription payments for Fairfield Sentry shares to a New York HSBC account for ultimate deposit in Fairfield Sentry's bank account, from which it was transferred to BLMIS's bank account at JPMorgan Chase N.A. in New York. (*Id.* at ¶ 79).

In the aggregate, all of the above component events of the transactions relating to and resulting in the Transfers received by the Intesa Defendants—and the Transfers themselves—are predominantly domestic. As such, the Transfers are not "purely foreign" for purposes of the analysis required by Judge Rakoff's Extraterritoriality Decision. Accordingly, the Intesa Defendants' Motion to Dismiss regarding the extraterritoriality issue should be denied and the Trustee's motion for leave to amend the Complaint to add the Proffered Allegations should be granted.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Trustee's Main Brief, the Trustee respectfully requests that the Court deny the Motion to Dismiss with respect to the Intesa Defendants and grant the Trustee's motion for leave to amend the Complaint to add the Proffered Allegations.

| | |
|---|---|
| Dated: June 29, 2015<br>New York, New York | YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP<br><br>*/s/ Matthew B. Lunn*<br>Matthew B. Lunn<br>Justin P. Duda<br>Rockefeller Center<br>1270 Avenue of the Americas, Suite 2210<br>New York, New York 10020<br>Telephone: (212) 332-8840<br>Facsimile: (212) 332-8855<br>Email: *mlunn@ycst.com*<br>      *jduda@ycst.com*<br><br>*Attorneys for Plaintiff Irving H. Picard,*<br>*Trustee for the Liquidation of Bernard L.*<br>*Madoff Investment Securities LLC* |