**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 12-01680 (SMB) |
| Plaintiff, | |
| v. | |
| INTESA SANPAOLO SPA (AS SUCCESSOR IN INTEREST TO BANCA INTESA SPA), EURIZON CAPITAL SGR SPA (AS SUCCESSOR IN INTEREST TO EURIZON INVESTIMENTI SGR SPA, F/K/A NEXTRA INVESTMENT MANAGEMENT SGR SPA, AND EURIZON ALTERNATIVE | |

01:16716935.7

INVESTMENTS SGR SPA, FKA NEXTRA
ALTERNATIVE INVESTMENTS SGR SPA),
EURIZON LOW VOLATILITY F/K/A
NEXTRA LOW VOLATILITY, EURIZON
LOW VOLATILITY II F/K/A NEXTRA
LOW VOLATILITY II, EURIZON LOW
VOLATILITY PB F/K/A NEXTRA LOW
VOLATILITY PB, EURIZON MEDIUM
VOLATILITY F/K/A NEXTRA MEDIUM
VOLATILITY, EURIZON MEDIUM
VOLATILITY II F/K/A NEXTRA MEDIUM
VOLATILITY II, EURIZON TOTAL
RETURN F/K/A NEXTRA TOTAL
RETURN,

                        Defendants.

---

**TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE
EXTRATERRITORIALITY ISSUE AS
TO THE INTESA DEFENDANTS**

Irving H. Picard ("Trustee"), as trustee for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and the substantively consolidated estate of Bernard L.

Madoff ("Madoff"), by the Trustee's undersigned counsel, for his Proffered Allegations on the

Extraterritoriality Issue against Defendants Intesa Sanpaolo SpA (including its predecessors in

interest, "Intesa"), Eurizon Capital SGR SpA (including its predecessors in interest, "Eurizon

Capital"), Eurizon Low Volatility's (formerly known as Nextra Low Volatility) ("Low

Volatility"), Eurizon Low Volatility II (formerly known as Nextra Low Volatility II) ("Low

Volatility II"), Eurizon Low Volatility PB (formerly known as Nextra Low Volatility PB) ("Low

Volatility PB"), Eurizon Medium Volatility (formerly known as Nextra Medium Volatility)

("Medium Volatility"), Eurizon Medium Volatility II (formerly known as Nextra Medium

Volatility II) ("Medium Volatility II"), and Eurizon Total Return (formerly known as Nextra

Total Return) ("Total Return," collectively with Low Volatility, Low Volatility II, Low

Volatility PB, Medium Volatility, and Medium Volatility II, the "Funds," and together with

Eurizon Capital, the "Eurizon Defendants," and the Eurizon Defendants, together with Intesa, the

"Intesa Defendants" ), states:

## INTRODUCTION

1.      The below-proffered allegations address the Intesa Defendants, each of which is a

defendant in the case of *Picard v. Intesa Sanpaolo SpA (as successor in interest to Banca Intesa*

*SpA), et al.*, Adv. Pro. No. 12-01680 (SMB) (the "Adversary Proceeding").

2.      The Trustee seeks to recover, as subsequent transfers under SIPA and 11 U.S.C §

550(a)(2), the Intesa Defendants' redemptions from certain BLMIS feeder funds, as set forth in

the Trustee's complaint (the "Complaint") and herein (the "Transfers"), which Transfers

occurred over an approximately three-year period (2003-2006) (the "Transfer Period").

3.      In the Complaint, the Trustee asserts that the Intesa Defendants collectively

received Transfers in an amount not less than $105,315,424.  Since the filing of the Complaint,

the Trustee has discovered additional Transfers to the Intesa Defendants.  As of the filing date of

this Proffer, the Trustee asserts that the Intesa Defendants collectively received Transfers in an

amount not less than $119,323,347.

4.      The BLMIS Feeder Funds at issue in this Adversary Proceeding are Fairfield

Sentry Ltd. ("Fairfield Sentry"), Kingate Euro Fund Ltd. ("Kingate Euro") and Kingate Global

Fund Ltd. ("Kingate Global," together with Kingate Euro, the "Kingate Funds).  Collectively,

Fairfield Sentry and the Kingate Funds shall be referred to herein as the "BLMIS Feeder Funds".

**The Defendants**

A.     **Intesa Sanpaolo SpA**

5.      Defendant Intesa is an Italian *società per azioni* and is successor in interest to, among other entities, Banca Intesa SpA (formerly known as IntesaBci).

6.      Intesa currently maintains, and maintained during the Transfer Period, a place of business at 1 William Street, New York, New York 10004.

7.      In the Complaint, the Trustee asserts that Intesa received Transfers from Kingate Global in an amount not less than $5,286,438.  As of the date of filing of this Proffer, however, the Trustee asserts that, during the Transfer Period, Intesa received Transfers of BLMIS customer property from Kingate Global in an amount not less than $19,165,526.

8.      Intesa currently is and, upon information and belief, during the Transfer Period, was licensed by the New York State Department of Financial Services and subject to regulation and oversight by the Board of Governors of the Federal Reserve System (the "FRB").

9.      In December of 2013, Intesa filed a resolution plan with the FRB and the Federal Deposit Insurance Corporation pursuant to the jointly adopted final rule pursuant to Section 165(d) of Title I of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Federal Regulation QQ, Part 381 of the FDIC Regulations).

01:16716935.7

B.        **Eurizon Capital and the Funds**

10.        Eurizon Capital is an Italian *società per azioni* that currently is a wholly owned subsidiary of Intesa and is successor in interest to Eurizon Investimenti SGR, SpA (formerly Nextra Investment Management SGR SpA) ("Eurizon Investimenti") and Eurizon Alternative Investments SGR SpA (formerly Nextra Alternative Investments SGR SpA) ("Eurizon AI").

11.        In 2007, Eurizon Investimenti was integrated into Eurizon Capital. Prior to this integration, Eurizon AI was a wholly owned subsidiary of Eurizon Investimenti. In 2011, Eurizon AI ultimately was integrated into Eurizon Capital.

12.        During the Transfer Period, the Funds were hedge funds that were managed, operated and controlled by Eurizon AI. During this period of time, Eurizon AI maintained an office in New York City, New York.

13.        As early as the first half of 2005, Intesa contemplated a joint venture (the "Joint Venture") with Credit Agricole S.A. involving Eurizon Investimenti and Credit Agricole Asset Management ("CAAM"), an indirect wholly owned subsidiary of Credit Agricole S.A.

14.        This Joint Venture became effective on December 22, 2005 and CAAM obtained a 65% stake in Eurizon Investimenti.

15.        At or prior to the effective date of the Joint Venture, CAAM obtained *de facto* management, operation and control of Eurizon Investimenti, Eurizon AI and the Funds.

16.        During the Transfer Period, CAAM maintained an office and operations in Chicago, Illinois through Credit Agricole Asset Management Alternative Investments, Inc. ("CAAM-AI, Inc."), a Delaware corporation, and Credit Agricole Asset Management Alternative Investments Services, Inc.

17.      Among other things, CAAM-AI, Inc. conducted due diligence on various U.S.-based hedge funds and their managers and provided investment recommendations to CAAM affiliates and the hedge funds they managed, operated and controlled.

18.      CAAM-AI, Inc. conducted due diligence on Madoff and BLMIS in the United States and noted an issue with BLMIS's lack of transparency.

19.      Two months after the effective date of the Joint Venture, the Funds fully divested their holdings in the BLMIS Feeder Funds.

20.      The Joint Venture was unwound on or about December 27, 2007 and Eurizon Investmenti again became wholly owned by Intesa.

21.      During the Transfer Period, Low Volatility received Transfers from Fairfield Sentry in an amount not less than $7,913,079.

22.      During the Transfer Period, Low Volatility received Transfers from Kingate Global in an amount not less than $16,971,921.

23.      During the Transfer Period, Low Volatility received Transfers from Kingate Euro in an amount not less than $10,245,248.

24.      During the Transfer Period, Low Volatility II received Transfers from Kingate Global in an amount not less than $22,964,092.

25.      During the Transfer Period, Low Volatility II received Transfers from Kingate Euro in an amount not less than $5,732,227.

26.      During the Transfer Period, Low Volatility PB received Transfers from Kingate Global in an amount not less than $934,488.

27.      During the Transfer Period, Low Volatility PB received Transfers from Kingate Euro in an amount not less than $876,842.

28.     During the Transfer Period, Medium Volatility received Transfers from Fairfield Sentry in an amount not less than $3,740,436.

29.     During the Transfer Period, Medium Volatility received Transfers from Kingate Global in an amount not less than $15,678,480.

30.     During the Transfer Period, Medium Volatility II received Transfers from Kingate Global in an amount not less than $8,520,013.

31.     During the Transfer Period, Total Return received Transfers from Kingate Global in an amount not less than $6,452,160.

32.     The above Transfers are also represented in the table below:

| __Fund__ | __Fairfield Sentry Transfers__ | __Kingate Global Transfers__ | __Kingate Euro Transfers__ |
|---|---|---|---|
| Low Volatility | $7,913,079 | $16,971,921 | $10,245,248 |
| Low Volatility II | | $22,964,092 | $5,732,227 |
| Low Volatility PB | | $934,488 | $876,842 |
| Medium Volatility | $3,740,436 | $15,678,480 | |
| Medium Volatility II | | $8,520,013 | |
| Total Return | | $6,452,160 | |

## THE COMPONENT EVENTS OF THE TRANSACTIONS SHOW THAT THE TRANSFERS ARE PREDOMINANTLY DOMESTIC

**A.     The Intesa Defendants Knowingly and Purposely Invested with BLMIS in New York via the BLMIS Feeder Funds**

33.     By February of 2002, and likely earlier, Intesa had knowingly and purposely invested in Kingate Global to profit from BLMIS in New York.

34.    By December of 2001, September of 2002 and February of 2006, and likely earlier in each case, the Eurizon Defendants had knowingly and purposely invested in Fairfield Sentry, Kingate Global and Kingate Euro, respectively, to profit from BLMIS in New York.

35.    But for BLMIS's fraudulent Ponzi scheme in New York, the Intesa Defendants would have received none of the Transfers of BLMIS customer property via the BLMIS Feeder Funds.

36.    BLMIS in New York was the *de facto* investment advisor for the BLMIS Feeder Funds and that the BLMIS Feeder Funds invested at least 95% of their assets with BLMIS.

37.    BLMIS in New York purportedly operated and executed the "split strike conversion" investment strategy (the "SSC Strategy") on behalf of the BLMIS Feeder Funds.

38.    The SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options and U.S. Treasuries traded on U.S. exchanges, and that decisions regarding which U.S. securities to purportedly purchase were made by Madoff in New York.

39.    BLMIS in New York was custodian for the BLMIS Feeder Funds and maintained custody of the vast majority of the BLMIS Feeder Funds' assets in New York.

40.    BLMIS was a registered broker-dealer in the United States.

41.    The Intesa Defendants knew each of the above facts because, among other reasons, such information was in Kingate Global's Offering Memorandum ("Kingate Global OM"), Kingate Euro's Offering Memorandum ("Kingate Euro OM") and Fairfield Sentry's Private Placement Memorandum (the "Fairfield Sentry PPM").

42.    Investment in Kingate Global and Kingate Euro required each investor to enter into a subscription agreement (a "Kingate Global Subscription Agreement" or "Kingate Euro Subscription Agreement," as applicable), which agreement indicates that such investor has "received, reviewed and understood" the Kingate Global or Kingate Euro OM, as applicable.

43.      Based upon the requirement that each investor execute a Kingate Global Subscription Agreement prior to investment and upon information and belief, Intesa entered into one or more Kingate Global Subscription Agreements, wherein Intesa represented and warranted that it "possesses requisite knowledge and experience in financial matters such that it is capable of evaluating the merits and risks of an investment in" Kingate Global and wherein Intesa acknowledged that it "received, reviewed and understood" the Kingate Global OM.

44.      Based upon the requirement that each investor execute a Kingate Global or Kingate Euro Subscription Agreement prior to investment in the relevant Kingate Fund and upon information and belief, Eurizon Capital, on behalf of each Fund, entered into one or more Kingate Global and/or Kingate Euro Subscription Agreements, as relevant, wherein Eurizon Capital represented and warranted that it "possesses requisite knowledge and experience in financial matters such that it is capable of evaluating the merits and risks of an investment in" the Kingate Funds and wherein Eurizon Capital acknowledged that it "received, reviewed and understood" the Kingate Global and the Kingate Euro OM, as applicable.

45.      Similarly, Fairfield Sentry required each investor to enter into a subscription agreement (each a "Fairfield Sentry Subscription Agreement") in connection with their initial investment in Fairfield Sentry and enter into an additional Fairfield Sentry Subscription Agreement in connection with each additional investment.

46.      Eurizon Capital entered into one or more Fairfield Sentry Subscription Agreements on behalf of Medium Volatility.

47.      Based upon the requirement that each investor execute a Fairfield Sentry Subscription Agreement prior to investment in Fairfield Sentry and upon information and belief, Eurizon Capital, on behalf of Low Volatility, entered into one or more Fairfield Sentry Subscription Agreements.

48.     In these Fairfield Sentry Subscription Agreements, Eurizon Capital acknowledged that, on behalf of Medium Volatility and Low Volatility, it received and read the Fairfield Sentry PPM.

49.     Among other things, the Kingate Global OM states that "[t]he investment adviser [i.e., BLMIS,] is a New York based NASD registered broker-dealer . . . acting primarily as a market-maker in listed and unlisted stocks and convertible securities (the 'Investment Advisor')."

50.     Furthermore, the Kingate Global OM indicates that the co-managers of Kingate Global, Kingate Management Limited ("KML") and Tremont (Bermuda) Limited, "have established a discretionary account with such Investment Advisor," that "[t]he Investment Advisor utilizes a 'split strike conversion' strategy . . .," and that "[a]ll investment decisions in the account held with the Investment Advisor are effected by persons associated with the Investment Advisor."

51.     The Kingate Global OM also states that KML and Tremont (Bermuda) Limited "have delegated all investment management duties with regard to [Kingate Global] to the Investment Advisor," and that KML and Tremont (Bermuda) Limited do not "have any control over the investment and trading decisions of the Investment Advisor."

52.     The Kingate Global OM finally states that "[n]either [Kingate Global] nor the Custodian has actual custody of the assets.  Such actual custody rests with the Investment Advisor and its affiliated broker-dealer.  Therefore, there is the risk that the custodian could abscond with those assets.  There is always the risk that the assets with the Investment Advisor could be misappropriated."

53.     The provisions of the Kingate Euro OM are substantially similar to the above provisions from the Kingate Global OM.

01:16716935.7

54.    The Fairfield Sentry PPM states that Fairfield Green Limited ("FGL"), the manager of Fairfield Sentry during a portion of the Transfer Period, maintains its office in New York and "has delegated the management of [Fairfield Sentry's] investment activities to Bernard L. Madoff Investment Securities, a registered-broker dealer in New York. . . ."  The PPM asserts that Fairfield Sentry "has no control over the decisions implemented," by BLMIS.

55.    The Fairfield Sentry PPM further states that FGL "has established a discretionary account for [Fairfield] Sentry at Bernard L. Madoff Investment Securities ('BLM'), a registered broker-dealer in New York, who utilizes a strategy described as 'split strike conversion'," and that "[a]ll investment decisions in the account at BLM are effected by persons associated with BLM."

56.    The Fairfield Sentry PPM states that BLMIS "acts as a principal in connection with its sale of securities to [Fairfield Sentry] and the purchase of securities from [Fairfield Sentry].  BLM acts as a market-maker in the stocks purchased and sold by [Fairfield Setnry].  These market making activities enable BLM to trade with [Fairfield Sentry] as principal."

57.    The Fairfield Sentry PPM also states that Fairfield Sentry "allocates its assets to an account at [BLMIS]," and that BLMIS acts as "sub-custodian of [Fairfield Sentry's] assets."

58.    The Fairfield Sentry PPM finally states that BLMIS is "essential to the continued operations of [FGL]," and, thus, the profitability of Fairfield Sentry.

59.    Intesa also knew each of the above facts because, among other reasons, Intesa conducts due diligence regarding its proprietary investments, and conducted due diligence regarding BLMIS and Kingate Global.

60.    While invested in Kingate Global, Intesa had one or more conversations with representatives for Fairfield Greenwich Group ("FGG"), the *de facto* New York partnership that created, marketed and operated Fairfield Sentry, regarding, among other things, investment in

Fairfield Sentry.  During one or more of these conversations, Intesa indicated that it knew

BLMIS very well and was not interested in investing with Fairfield Sentry.

61.    The Eurizon Defendants also knew each of the above facts because, among other

reasons, Eurizon Capital and CAAM-AI, Inc., on behalf of their affiliated hedge funds, including

the Funds, conduct due diligence regarding fund investments, and conducted due diligence

regarding BLMIS and the BLMIS Feeder Funds.

**B.      The Funds Received a Majority of Their Transfers from the BLMIS Feeder Funds
Into Their Bank Accounts in the United States**

**i.      Fairfield Sentry Redemptions by Low Volatility and Medium Volatility Were
Paid Into a U.S. Bank Account as Directed by Eurizon Capital**

62.    New York was the specific situs selected by Eurizon Capital to receive, on behalf

of Medium Volatility and Low Volatility, at least three Transfers from Fairfield Sentry.

Specifically, on behalf of Medium Volatility and Low Volatility, Eurizon Capital used its

account at affiliate Intesa's New York location, which account was in Eurizon Capital's name.

63.    Eurizon Capital designated use of its account at Intesa in New York in Medium

Volatility's Fairfield Sentry Subscription Agreements and, upon information and belief, Low

Volatility's Fairfield Sentry Subscription Agreement and in certain redemption documents.  The

receipt of Transfers from Fairfield Sentry using the account at Intesa in New York was

purposeful on the part of Eurizon Capital, Medium Volatility and Low Volatility.

64.    Fairfield Sentry also utilized an account at HSBC Bank N.A. ("HSBC") in New

York to effectuate each of the Transfers to the New York-based account at Intesa.

      **ii.**      **Kingate Global Redemptions by the Funds Were Paid Into U.S. Bank
Accounts as Directed by Eurizon Capital**

65.      New York was the specific situs selected by Eurizon Capital to receive, on behalf of the Funds, at least three Transfers, and, upon information and belief, at least an additional five Transfers from Kingate Global.  Specifically, Eurizon Capital used certain accounts at affiliate Intesa's New York location, which accounts were in Eurizon Capital's name.

66.      Upon information and belief, Eurizon Capital systematically designated such use of its accounts at Intesa in New York in certain redemption documents.  The receipt of Transfers from Kingate Global using Eurizon Capital's accounts at Intesa in New York was purposeful on the part of the Eurizon Defendants.

67.      Kingate Global also utilized an account at HSBC in New York to effectuate each of the Transfers to the Funds and Intesa.

**C.**      **The Intesa Defendants Conducted Additional Business in the United States in
Connection with the Transfers**

      **i.**      **Intesa Conducted Business in the
United States in Connection with the Transfers**

68.      Intesa conducts due diligence with regards to its proprietary investments, and conducted due diligence on BLMIS and Kingate Global.

69.      In connection with Intesa's investment portfolio, Mr. Gianni Movia, head of proprietary trading for Intesa, and his colleagues have traveled to the United States to conduct due diligence and meet with managers of U.S.-based hedge funds.

70.      On at least one occasion, Mr. Movia met in New York with representatives from FGG regarding Intesa's investment portfolio.  Mr. Movia indicated to a representative for FGG that he knew BLMIS very well and was not interested in investing in Fairfield Sentry.

ii.    **Eurizon Capital and CAAM Conducted Business in the United States in Connection with the Transfers**

71.    Eurizon Capital, in connection with its management of the Funds, conducted due diligence with regards to the Funds' investments.

72.    Eurizon Capital conducted due diligence on BLMIS and the BLMIS Feeder Funds.

73.    Tomaso Corsini ("Mr. Corsini"), Chief Investment Officer of Eurizon AI, had traveled to the United States to conduct due diligence and meet with managers of U.S.-based hedge funds.

74.    On at least one occasion, Mr. Corsini met in New York with representatives from FGG regarding investments for the Funds.

75.    CAAM-AI, Inc. in Chicago, Illinois, on behalf of its affiliates and affiliated hedge funds, including the Funds, conducted due diligence with regards to investments for the Funds.

76.    Upon information and belief, CAAM-AI, Inc. conducted due diligence on BLMIS, on behalf of the Funds and other entities managed by CAAM affiliates, in Chicago, Illinois.

77.    In connection with the Low Volatility and Medium Volatility's investments in Fairfield Sentry, FGG maintained New York-based representatives dedicated to these Funds, which representatives included Jackie Harary ("Ms. Harary") and Cornelis Boele.

78.    In May of 2003, both Edoardo Ugolini ("Mr. Ugolini"), Chief Executive Officer of Eurizon AI, and Mr. Corsini called Ms. Harary in New York and requested that Fairfield Sentry honor Low Volatility's $1 million redemption request, notwithstanding that Low Volatility purportedly failed to meet the deadline for May Fairfield Sentry redemptions.  Low

Volatility's redemption request ultimately was honored by FGG personnel and Fairfield Sentry paid the redemption request as if timely received.

79.    Finally, based upon the directions of the Fairfield Sentry Subscription Agreements and upon information and belief, on behalf of Medium Volatility and Low Volatility, Eurizon Capital directed subscription payments for Fairfield Sentry shares to a New York HSBC account for ultimate deposit in Fairfield Sentry's bank account from which it was transferred to BLMIS's bank account at JPMorgan Chase N.A. in New York.

**D.    Fairfield Sentry Was Controlled, Operated and Managed From New York**

80.    At all relevant times, Fairfield Sentry's principal place of business was in New York and Fairfield Sentry was a U.S. resident.

**i.    The Genesis of the FGG De Facto Partnership**

81.    In 1988, Walter Noel and Jeffrey Tucker founded the FGG de facto partnership based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds

82.    The FGG de facto partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three Feeder Funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Fairfield Sigma") and Fairfield Lambda Limited ("Lambda").  Fairfield Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

83.    FGG also included a number of administrative entities that purportedly provided management and back office support to the funds.  These entities included:  FGL, Fairfield

Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

**ii.    Fairfield Sentry**

84.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

85.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").  Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

86.    Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

###### a.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States

87.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI.  In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069.  In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070.  BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

88.    After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

89.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved

by mandatory arbitration in New York utilizing the laws of New York. All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of

1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve

System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf

of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a SIPC member

regulated by the SEC.

> **b.    FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities**

90.    As the original directors of Fairfield Sentry, Noel and Tucker contracted with

Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

backoffice administrative services such as coordinating subscription and redemption forms,

maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco

Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield

Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets

were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian

agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco

Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

Branch ("Citco Bank Dublin"). FGG New York Personnel had final control of the Fairfield

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco

entities.

> **c.    FGG New York Personnel Managed Fairfield Sentry**

91.    At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters. FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities. Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

York.

92.    FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS. FGG New York Personnel also had final control of

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and

redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription

agreements contained New York choice of law provisions, and provided for venue and

jurisdiction for any disputes in New York.

### d.    Fairfield Sentry's Investors Knew They Were Investing in BLMIS

93.    The Fairfield Sentry Subscription Agreement also incorporated the Fairfield

Sentry PPM by reference. Each Fairfield Sentry subscriber acknowledged receipt of the Fairfield

Sentry PPM. The original or later amended Fairfield Sentry PPM's disclosed to the Fairfield

Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at

BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in

accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100

Index securities and options or short-term U.S. Treasuries. The Fairfield Sentry PPM also

disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### e.    BLMIS Was Fairfield Sentry's Investment Manager

94.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

95.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FGL. FGL was formed under the laws of Ireland.

96.    While FGL was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters.  Upon the formation of FGL, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FGL.  Following the assignment of the management contracts to FGL, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FGL as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

01:16716935.7

20

97.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him

FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and

foreign investors and, as a result, FGG would form a new U.S. entity to be the investment

adviser of the fund as well as other FGG operated funds, including the Feeder Funds and

currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity

would serve in the role as the investment manager of the Feeder Funds and currency funds.  As a

result, FGG formed two new entities, FG Advisors and FG Bermuda.

98.     In October 2003, FGG formed FG Advisors as a Delaware limited liability

company.  FG Advisors is a wholly owned subsidiary of FGL.  At the same time, FGG formed

FG Bermuda under Bermuda law as another wholly owned subsidiary of FGL.  Upon the

formation of FG Advisors and FG Bermuda, FGL assigned certain of its management contracts

to both entities, including the investment advisory agreements for the three Feeder Funds,

Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FGL remained the

placement agent for the same funds.

99.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

Personnel issued new Fairfield Sentry PPMs which listed FG Bermuda as Fairfield Sentry's

investment manager and removed all references to the discretionary accounts at BLMIS.  The

new Fairfield Sentry PPMs also stated FGL would remain as Fairfield Sentry's placement agent

and receive a portion of the management and performance fees paid to FG Bermuda.  The same

Fairfield Sentry PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG

Advisors for providing administrative services and incurring administrative costs.

100.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Fairfield Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments,

it did not register as an investment adviser under the Investment Advisers Act of 1940.

101.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

102.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and Fairfield Sentry PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

103.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

104.    The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Inv. Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (filed June 26, 2015, Bankr. S.D.N.Y., contemporaneously herewith).

**E.    The Transfers From the Kingate Funds Are Domestic**

105.    The Kingate Funds were feeder funds that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $926,351,905 of customer property to the Kingate Funds during the life of the accounts prior to December 11, 2008.

106.     Each of the Kingate Funds filed customer claims in the SIPA liquidation.

**i.      The Kingate Funds' Invested with BLMIS to Make Money from a New York-Based Investment Operation**

107.     The Kingate Funds, together with their purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose:  to make money from a New York-based investment operation.

108.     Despite having a registered address in the BVI, the Kingate Funds had no physical offices, no employees, and transacted no meaningful business there.

109.     Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years.  Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation (collectively "Tremont").

110.     The Kingate Funds' manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Funds' investments with BLMIS.

111.     The Kingate Funds' sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and the Kingate Funds profited from their exclusive business relationship with BLMIS in New York.

**ii.     The Operative Legal Documents Were New York-Based**

112.     The Kingate Funds executed "Customer Agreements," and other account opening documents, and delivered the agreements to BLMIS in New York.

113.    Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

114.    The Kingate Funds agreed that all disputes arising under the Customer Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted in the United States before the American Arbitration Association, or "an arbitration facility provided by any other exchange of which the broker is a member, or the National Association of Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the rules obtaining of the selected organization."

### iii.    BLMIS Had Full Authority to Make and Execute Investment Decisions

115.    The Kingate Funds' "Trading Authorization Agreements" authorized BLMIS to be the Kingate Funds' "agent and attorney in fact," giving BLMIS full discretion over the Kingate Funds' invested assets and to buy, sell, and trade in securities for the Kingate Funds.

116.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the Kingate Funds' investment manager and purported to invest exclusively according to Madoff's SSC Strategy, which involved the purchase of U.S. securities traded only on domestic exchanges.

117.    BLMIS acted as the Kingate Funds' executing broker in purporting to purchase securities on the Kingate Funds' behalf, and acted as the Kingate Funds' custodian for the securities purportedly held on the Kingate Funds' behalf.

### iv.    The Kingate Funds Were Managed From New York

118.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to the Kingate Funds in return for fees, it was a valuable contributor in New York to the success of the Kingate Funds.

119.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with KML and Kingate Global.

120.    Under that agreement, KML and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

121.    The Kingate Funds were also co-managed by KML, a management entity formed by the founders of the Kingate Funds, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

122.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

123.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

124.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

125.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as the Kingate Funds' investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

126.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for the Kingate Funds.

127.    KML and the FIM entities actively participated in the Kingate Funds business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**v.    Kingate Funds Used Banks in New York**

128.    The Kingate Funds used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

129.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States, as Kingate Global's custodian.

130.    In its role as the Kingate Funds' custodian, HSBC consistently used New York banks in carrying out its duties for KML and the Kingate Funds relating to investments with BLMIS.

131.    FIM also directed fee payments to be routed through a bank account in New York.

132.    The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).

01:16716935.7

Dated:  June 29, 2015
      New York, New York

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Matthew B. Lunn*
Matthew B. Lunn
Justin P. Duda
Rockefeller Center
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone:  (212) 332-8840
Facsimile: (212) 332-8855
Email:  *mlunn@ycst.com*
       *jduda@ycst.com*

*Attorneys for Plaintiff Irving H. Picard,
Trustee for the Liquidation of Bernard L.
Madoff Investment Securities LLC*

01:16716935.7