**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br> v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | Adv. Pro. No. 11-02731 (SMB) |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>    Plaintiff,<br> v.<br><br>Trincaster Corporation,<br><br>    Defendant. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO TRINCASTAR CORPORATION** |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the Extraterritoriality Issue as to Trincastar Corporation ("Trincastar", misspelled as "Trincaster Corporation" in the Complaint), alleges the following:

## INTRODUCTION

1.  The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2) Trincastar's redemptions totaling $13,311,800 (the "Transfers") from Fairfield Sentry Limited ("Fairfield Sentry").

2.  Trincastar was a shareholder in Fairfield Sentry, which invested at least 95% of its assets in accounts managed by New York-based BLMIS.

## TRINCASTAR'S TRANSFERS AND THE COMPONENT EVENTS OF ITS FAIRFIELD SENTRY TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

3.  Trincastar intentionally invested in Fairfield Sentry to profit from BLMIS's purported investments in the United States, and the Transfers and component events of its Fairfield Sentry transactions were predominantly domestic.

**Background: Trincastar is Part of the Credit Suisse Group of Companies, Which Has a Significant Base of Operations in the United States, Including Thousands of U.S. Employees and Billions of Dollars in Domestic Assets.**

4.  Although organized in the British Virgin Islands (the "BVI"), Trincastar has no real presence there and never had more than a statutorily-required registered office, care of a trust corporation at a BVI P.O. Box.

5.  As an International Business Company under the BVI's International Business Companies Ordinance of 1984, Trincastar was restricted from operating in the BVI, and under its

Memorandum of Association, Trincastar was not authorized to "carry on business with persons resident in the [BVI]."

6. The Trustee could find no evidence that Trincastar ever had any employees of its own.

7. At all relevant times, Trincastar was 100% owned and operated by affiliates of Credit Suisse Group AG ("CS Group") and its principal operating subsidiary Credit Suisse AG ("CS AG"), a major international banking and investment organization. CS Group and CS AG had a significant base of operations in the United States, including thousands of U.S. employees, billions of dollars in domestic assets and a headquarters in New York. CS AG and certain other Credit Suisse entities are defendants in a recovery action by the Trustee for transfers received separately by those entities—*Picard v. Credit Suisse AG, et al.* (Adv. Pro. No. 11-02925) (for which the Trustee is also filing proffered allegations as to extraterritoriality).

**The Entire Purpose of Trincastar's Investments was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

8. The entire purpose of Trincastar's investments in Fairfield Sentry was to invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and its Fairfield Sentry investments were all centered in the United States.

9. Trincastar knew and intended that its investments would be transferred to BLMIS in New York to manage and invest in the U.S. securities markets. Trincastar made such investments for the express purpose of receiving returns on U.S.-based investments from BLMIS.

10. Specifically, shareholders in Fairfield Sentry, like Trincastar, were required to enter into a subscription agreement each time they subscribed for shares in (i.e. invested money into) the funds. Trincastar remitted subscription payments to such fund at least three times.

2

11. By entering into the Fairfield Sentry subscription agreements (between 1996 and 2000), Trincastar affirmed that it "received and read" Fairfield Sentry's information memoranda applicable at that time ("Info Memos"). Based on the information contained in those Info Memos, Trincastar knew the following facts pointing to the domestic nature of the transactions:

- Fairfield Sentry invested all of its assets with New York-based BLMIS;

- BLMIS was Fairfield Sentry's investment adviser;

- BLMIS was a registered broker-dealer in New York;

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the fund's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

12. Trincastar also entered into a fee sharing arrangement with Fairfield Greenwich Limited ("FG Limited"), a Fairfield Greenwich Group ("FGG") entity based in New York, pursuant to which Trincastar was compensated for bringing investments into BLMIS. FG Limited was the cornerstone of the New York-based FGG *de facto* partnership, which created, managed and controlled Fairfield Sentry. FG Limited was registered to do business in New York and listed its principal executive office as that of FGG in New York.

13. By entering into this arrangement with U.S.-based FG Limited, Trincastar subjected itself to the potential application of U.S. law.

14. Consistent with the frequency of the investments it made and was credited with

3

bringing into Fairfield Sentry, Trincastar routinely received fees from FG Limited. For example, Trincastar received fees at least every quarter from the first quarter of 2003 through the third quarter of 2008 in connection with its Fairfield Sentry investments.

**Trincastar Purposefully Utilized a U.S. Bank Account for the Investments and Redemptions It Made.**

15. Trincastar purposefully used a U.S. bank account and the U.S. banking system in connection with subscriptions into and redemptions from Fairfield Sentry, including with respect to the Transfers at issue.

16. During the relevant period, Trincastar received at least six redemptions totaling $13,311,800 out of Fairfield Sentry, which payments constitute the Transfers at issue. Trincastar also remitted at least three subscription payments to Fairfield Sentry, which payments constitute the totality of its investments therein.

17. New York was the situs selected by Trincastar for making and receiving such transfers. Specifically, Trincastar used a bank account at the Bank of New York in New York for that purpose (the "U.S. Account"), which account was in the name of Trincastar's affiliate, CS AG.

18. Trincastar designated such use of this U.S. Account in its Fairfield Sentry subscription agreements and/or redemption documents.

19. Fairfield Sentry also designated a U.S. correspondent account to receive investments from Trincastar. The Fairfield Sentry subscription agreements required that subscription payments from Trincastar to Fairfield Sentry be sent to a New York correspondent account, for further deposit into Fairfield Sentry's bank account. From this bank account, the funds were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

4

**Trincastar Relied on the Use of New York Personnel at CS AG's New York Headquarters for Due Diligence on Fairfield Sentry.**

20.     Upon information and belief based on (i) common investments in Fairfield Sentry and other coordinated business activities in the United States, (ii) the Credit Suisse group of companies' policies regarding coordinated risk management and sharing of information, and (iii) Trincastar's use of a CS AG bank account to receive redemptions, due diligence that was performed by Credit Suisse's New York operation with respect to Fairfield Sentry was for the benefit of, and shared with, Trincastar, as Credit Suisse's affiliate.

21.     Multiple CS Group entities were invested in Fairfield Sentry, and Credit Suisse New York-based personnel regularly met and communicated with Fairfield Sentry's New York-based managers and representatives over many years.

22.     CS Group's personnel functioned as one entity for this purpose. As set forth in CS Group's Securities and Exchange Commission ("SEC") filings, the CS Group of companies, including CS AG and its subsidiaries and affiliates, work in conjunction with each other as part of an intertwined, worldwide effort headed by CS AG. Specifically as to due diligence and risk management of its investments—as referred to in statements by CS Group executives—CS Group itself maintains a centralized risk management and "control framework" specifically intended to facilitate in-group exchanges of due diligence and other information gathered by various CS Group companies (including Trincastar) from U.S. and other sources.

23.     The Credit Suisse New York personnel that performed this due diligence analyzed relevant information, and met and/or corresponded with BLMIS Feeder Fund management, regarding the common investments of the CS Group companies, which would have included Trincastar.

5

**Fairfield Sentry's Principal Place of Business Was in New York.**

24.     At all relevant times, Fairfield Sentry's principal place of business was in New York, where its creator/manager/operator was headquartered, and it was a U.S. resident.

    **A.     The Genesis of the FGG *De Facto* Partnership**

25.     In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

26.     The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda").  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

27.     FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

    **B.     Fairfield Sentry**

28.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the BVI, for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize

6

Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI. Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

29. Fairfield Sentry was a shell corporation present in the BVI solely on paper. From its inception until its liquidation, Fairfield Sentry had no employees and no office. It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel"). Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm. The same post office box served as the registered address for hundreds of other investment vehicles unrelated to the FGG operations. The law firm operating the trust company and registered post office box addressed its statements for Fairfield Sentry services to FGG's New York headquarters.

30. Fairfield Sentry's operations, structure, agreements, and marketing materials all demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

      **1.**    **Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States.**

31. When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear Fairfield Sentry was operated from the United States and not the BVI. In November 1990, Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012 and options account 1FN069. In the account opening documents, Tucker listed Fairfield Sentry's address as the office address of Fairfield International Managers—a company jointly owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

7

International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account, 1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and correspondence for these accounts to the same Greenwich, Connecticut office. On January 29, 1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to FGG's New York headquarters.

32. After the original BLMIS account documents were executed by Tucker on behalf of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in FGG's New York headquarters—executed additional BLMIS account documents on behalf of Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

33. The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York. All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities.

34. As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

8

backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Kingate Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3. FGG New York Personnel Managed Fairfield Sentry.

35. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

36. FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of

9

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry. From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund. From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4. Fairfield Sentry's Investors Knew They Were Investing in BLMIS.

37. Fairfield Sentry's subscription agreements also incorporated its PPMs by reference. Each Fairfield Sentry subscriber acknowledged receipt of the PPM. The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys. Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5. BLMIS Was Fairfield Sentry's Investment Manager.

38. Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry. At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund. The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts. Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield

10

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

39. In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City. Piedrahita is Noel's son-in-law. With the merger, Littlestone Associates' clients became FGG clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited. FG Limited was formed under the laws of Ireland.

40. While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York, and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

41. In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

11

42. In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

43. In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS. The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda. The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

44. Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

45. In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds. While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940. Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

46.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry. Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

47.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts. Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel. FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel. Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

48.     The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

Dated: New York, New York
       June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
Brian W. Kreutter

*Special Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*