**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 12-01677 (SMB) |
| Plaintiff, | |
| v. | |
| SOCIETE GENERALE PRIVATE BANKING (SUISSE) S.A. (*f/k/a* SG Private Banking Suisse S.A.); SOCIETE GENERALE PRIVATE BANKING (LUGANO-SVIZZERA) S.A. (*f/k/a* SG Private Banking (Lugano-Svizzera) S.A.); SOCGEN NOMINEES (UK) LIMITED; LYXOR ASSET MANAGEMENT S.A., as Successor in Interest to Barep Asset Management S.A.; SOCIETE GENERALE | **SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO SOCIETE GENERALE PRIVATE BANKING (SUISSE) S.A., ET AL.'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS** |

| | |
|---|---|
| HOLDING DE PARTICIPATIONS S.A., as Successor in Interest to Barep Asset Management S.A.; SG AM AI PREMIUM FUND L.P. (*f/k/a* SG AM Alternative Diversified U.S. L.P.); LYXOR ASSET MANAGEMENT INC. (*f/k/a* SGAM Asset Management, Inc.), as General Partner of SG AM AI Premium Fund L.P.; SG AUDACE ALTERNATIF (*f/k/a* SGAM AI Audace Alternatif); SGAM AI EQUILIBRIUM FUND (*f/k/a* SGAM Alternative Multi Manager Diversified Fund); LYXOR PREMIUM FUND (*f/k/a* SGAM Alternative Diversified Premium Fund); SOCIETE GENERALE S.A., as Trustee for Lyxor Premium Fund; SOCIETE GENERALE BANK & TRUST S.A.; OFI MGA ALPHA PALMARES (*f/k/a* Oval Alpha Palmares); OVAL PALMARES EUROPLUS; UMR SELECT ALTERNATIF; and BANK AUDI S.A.M.- AUDI SARADAR GROUP (*f/k/a* Dresdner Bank Monaco S.A.M.),<br><br>                    Defendants. | |

Irving H. Picard (the "Trustee") respectfully submits this memorandum as a supplement to his Main Brief being filed simultaneously herewith in opposition to the motion to dismiss based on extraterritoriality made by certain defendants and in further support of the Trustee's motion for leave to amend his Complaint to add the Proffered Allegations.

The moving defendants are:  Societe Generale Private Banking (Suisse) S.A. (*f/k/a* SG Private Banking Suisse S.A.); Societe Generale Private Banking (Lugano-Svizzera) S.A. (*f/k/a* SG Private Banking (Lugano-Svizzera) S.A.) ("SG Lugano"); Socgen Nominees (UK) Limited; Lyxor Asset Management S.A.; Societe Generale Holding de Participations S.A.; SG Audace Alternatif (*f/k/a* SGAM AI Audace Alternatif); SGAM AI Equilibrium Fund (*f/k/a* SGAM Alternative Diversified Fund); Lyxor Premium Fund (*f/k/a* SGAM Alternative Diversified Premium Fund); Societe Generale S.A. ("SG"); Societe Generale Bank & Trust S.A.; OFI MGA Alpha Palmares (*f/k/a* Oval Alpha Palmares); Oval Palmares Europlus; UMR Select Alternatif;

1

and Bank Audi S.A.M.- Audi Saradar Group (*f/k/a* Dresdner Bank Monaco S.A.M.) (collectively, the "Defendants" and each, a "Defendant").[1] Remaining defendants named in the Complaint—U.S.-registered Lyxor Asset Management Inc. (f/k/a SG Asset Management, Inc., "Lyxor Asset") and U.S.-registered SG AM AI Premium Fund L.P. (f/k/a SG AM Alternative Diversified U.S. L.P.) ("SG Premium")—were not included in the motion to dismiss.

## BACKGROUND

The Defendants, each a highly sophisticated and experienced financial institution in its own right, are all part of or joint investors with the Societe Generale group of companies, a global banking and investment organization with multiple U.S. branches, including a New York principal place of business. (Proffered Allegations at ¶¶ 5-10.) In fact, SG—the umbrella entity for Societe Generale and its many companies—has on multiple occasions availed itself of the benefits of the U.S. court system and has asserted in federal court filings that it has a "principal place of business" in New York City.[2]

The Defendants were shareholders in one or more of the following funds: Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda", and together with Fairfield Sentry and Sigma, the "Fairfield Funds"); and Kingate Global Fund Ltd. ("Kingate Global", and together with the Fairfield Funds, the "BLMIS Feeder Funds"). (Trustee's Complaint at ¶¶ 2, 4-6, *id*. at Exs. E, G, I, M.) Fairfield Sentry and

---

[1] Defendants Lyxor SA and SG Holding were named as defendants in their capacity as successors in interest to Barep Asset Management S.A., an entity whose assets were acquired by Lyxor SA, and whose corporate form was merged into SG Holding, in 2009. In 2013, subsequent to the filing of the Trustee's Complaint, SG Holding was dissolved and SG became its successor in interest. As such, SG is now also a successor in interest to Barep.

[2] *See* Complaint at 1, *Societe Generale v. Florida Health Sci. Ctr. et al*, No. 03-cv-05615 (MGC) (S.D.N.Y. July 30, 2003), Doc. No. 1 (principal place of business listed as "in the United States at 1221 Avenue of the Americas, New York, New York."); Amended Complaint at 1, *Florida Health Sci. Ctr., Inc. v. Societe Generale*, No. 8:03-cv-01590 (RAL-EAJ) (M.D. Fla. Dec. 29, 2003), ECF No. 18 (same).

2

Kingate Global each invested substantially all of their assets with BLMIS. (*Id*. at ¶¶ 2, 4-5.) Sigma and Lambda did not have their own direct BLMIS accounts, but invested 100% of their respective assets in Fairfield Sentry.[3] (*Id*. at ¶ 6.) The Defendants received $161,915,306 in subsequent transfers of BLMIS customer property from the BLMIS Feeder Funds (the "Transfers"). (*Id*. at Exs. E, G, I, M.)

The Trustee's Proffered Allegations demonstrate that the Trustee's action to recover these Transfers does not require an extraterritorial application of SIPA or Bankruptcy Code Section 550.

### THE TRANSFERS AND COMPONENT EVENTS OF THE DEFENDANTS' BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

Citing to *Maxwell I*, the District Court directed that "the location of the transfers as well as the component events of those transactions"[4] must be analyzed to determine whether a subsequent transfer claim involves a domestic or extraterritorial application of the Code and SIPA.[5] Under the District Court's ruling, the Trustee need only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[6] This is a fact-based inquiry in which all reasonable inferences should be drawn in the Trustee's favor.[7]

---

[3] For ease of reference, Sigma and Lambda are included herein in the definition of "BLMIS Feeder Funds".

[4] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 816).

[5] In *Maxwell I*, the court examined all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *In re Maxwell Commc'n Corp.*, 186 B.R. 807, 816-17 (S.D.N.Y. 1995).

[6] Extraterritoriality Decision, 513 B.R. at 232 n.4.

[7] *See*, *e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 402-03 (S.D.N.Y. 2010) (deferring ruling on extraterritoriality at motion to dismiss phase and citing standard that "[t]he

The Defendants argue that simply because they and the BLMIS Feeder Funds in which they invested were formally organized under the laws of foreign countries, the subsequent transfers they received are "purely foreign" and the Trustee's recovery action must be dismissed. This superficial argument disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit extraterritoriality case law that similarly examines a transaction's various connections with the United States.[8]

The Defendants' singular focus on place of registration also ignores the fact that, although registered abroad, the Defendants, along with non-movants Lyxor Asset and SG Premium, were part of a group of companies that had extensive U.S. operations (and a "principal place of business" in New York) and coordinated with each other on BLMIS–related activities that were heavily centered in the United States. (Proffered Allegations at ¶¶ 5-11.) These activities included making investments in the BLMIS Feeder Funds and employing a centralized risk management process, with much of the necessary due diligence and investment management handled by Societe Generale personnel based in New York. (*Id.* at ¶¶ 1-2, 25-28.) In addition, three of the Defendants—SG Audace, SG Equilibrium, and Lyxor Premium (along with non-moving U.S.-based defendant SG Premium) were hedge funds that, despite being organized overseas, were at all times managed and operated out of New York by non-moving defendant Lyxor Asset, including with respect to their substantial investments in the BLMIS Feeder Funds. (*Id.* at ¶ 10.) Thus for purposes of extraterritoriality, there is no reason to distinguish between foreign-registered Societe Generale entities (like the Defendants) and U.S.-registered Societe Generale entities (like Lyxor Asset and SG Premium).

---

court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.").

[8] *See, e.g., Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 217 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014); and other cases cited in the Trustee's Main Brief.

4

The Transfers and component events of the Defendants' investment transactions with the BLMIS Feeder Funds were predominantly domestic. The entire purpose of the Defendants' investments with the BLMIS Feeder Funds was to invest in U.S. securities markets through New York-based investment adviser BLMIS and to earn returns on those U.S.-based investments. Societe Generale personnel performed a detailed due diligence review of BLMIS, on-site at BLMIS's headquarters in New York. Moreover, each of the at least 116 combined times the Defendants entered into subscription agreements with the BLMIS Feeder Funds, they affirmed that they knew (i) the BLMIS Feeder Funds invested almost exclusively with a New York-based, SEC-registered investment adviser (i.e. BLMIS) that invested in the U.S. securities market, and (ii) that the Defendants' money would be transferred to that same investment adviser in New York. (*Id.* at ¶¶ 14-16.) As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States . . . was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and the feeder fund.[9]

The express provisions of the Fairfield Invested Defendants' agreements with the Fairfield Funds further demonstrate the domestic nature of such Defendants' investment transactions with these funds. (Proffered Allegations at ¶¶ 17-18.) The Fairfield Invested Defendants—which included all of the Defendants except for Bank Audi—agreed in their subscription agreements with the Fairfield Funds that New York law would govern their investments and they consented to U.S. jurisdiction. (*Id.* at ¶ 18.) Defendants SG and Bank Audi and, upon information and belief some or all of the other Defendants, also entered into, or were covered by, fee sharing agreements with a U.S.-based Fairfield entity, the form of which was typically governed by New York law. (*Id.* at ¶ 19.) Thus, the Defendants had every

---

[9] *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 513 (Bankr. S.D.N.Y. 2012).

expectation that U.S. laws would apply to their investment transactions and that they would be subject to suit in the United States.

The Defendants also purposefully and repeatedly used U.S. bank accounts and the U.S. banking system to send subscriptions into and receive redemption payments from Fairfield Sentry and Kingate Global, which redemptions constitute the Transfers at issue from those funds.[10] The Defendants remitted at least 105 subscription payments to Fairfield Sentry and Kingate Global and received redemptions at least 90 times. (Proffered Allegations at ¶ 21.) The Defendants used U.S. bank accounts for subscriptions and redemptions. (*Id.* at ¶¶ 22-24.) Specifically, Defendants that invested in Fairfield Sentry and Kingate Global designated bank accounts at Societe Generale's New York branch to receive redemption payments from those funds.[11] (*Id*. at ¶¶ 22-23.) All Defendants also remitted their subscriptions into U.S. correspondent accounts as directed by Fairfield Sentry and Kingate Global, which were ultimately delivered to BLMIS in New York. (*Id*. at ¶ 24.)

Further evidencing the domestic nature of these transactions, the Defendants conducted in-depth due diligence with respect to the BLMIS Feeder Funds and BLMIS in the United States. (*Id*. at ¶¶ 25-28.) Much of this due diligence process and investment management was handled by personnel in Societe Generale's New York headquarters, who acted for the collective benefit of all Societe Generale entities invested in BLMIS feeder funds. (*Id*.) These individuals—who included Societe Generale's Global Co-Head of Hedge Fund Risk Management and personnel from New York-based asset manager Lyxor Asset—had ready access to, and communicated regularly with, BLMIS Feeder Fund representatives. (*Id*. at ¶¶ 27-28.) Societe Generale

---

[10] *See*, *e.g.*, *Picard v. Igoin (In re BLMIS)*, 2015 WL 603209, at *16-17 (Bankr. S.D.N.Y. Feb. 13, 2015) (in the analogous context of personal jurisdiction, repeated use of U.S. bank accounts sufficient).

[11] A single Sentry Defendant, SG Lugano, received redemptions into an account in the name of Euroclear at the Bank of New York in New York City.

6

personnel also performed a detailed due diligence review of BLMIS on-site at BLMIS's New York offices, including an analysis of Fairfield Sentry as a BLMIS feeder fund. (*Id*. at ¶ 13.)

All of these U.S.-based activities related to the Defendants' BLMIS Feeder Fund investments were part of the Societe Generale group of companies' substantial operations in the United States. At all relevant times, Societe Generale had thousands of U.S. employees, billions of dollars in U.S. assets, a principal place of business in New York City, and numerous U.S. affiliates, including Lyxor Asset and SG Premium. (*Id*. at ¶¶ 5-10, 29.) SG was subject on an on-going basis to a multitude of U.S. banking and securities laws and regulations and its activities and those of its U.S. affiliates significantly impacted the United States. (*Id*. at ¶¶ 30-33.) For that reason, SG is among the financial institutions required to file a Global Recovery and Resolution Plan with the Federal Reserve Bank and FDIC. (*Id*. at ¶ 30.)

Beyond all of the above domestic components, the Defendants' argument that their transactions are purely foreign is wrong because it ignores the reality of the BLMIS Feeder Funds. FGG in New York created, managed, and controlled the Fairfield Funds. (*Id.* at ¶¶ 35-36, 44-46, 62-65.) The Fairfield Funds were based out of New York and had their principal place of business in New York. (*Id.* at ¶¶ 34, 39, 61.) Although technically registered in the BVI, the Fairfield Funds had no employees or offices there, and at all times, operational decisions were made by FGG employees in New York.[12] (Proffered Allegations at ¶¶ 38-40, 60-62.) In its BLMIS account opening documents, FGG listed Fairfield Sentry's address as in the United States. (*Id.* at ¶ 41.) The Fairfield Funds' initial and on-going due diligence on BLMIS was conducted in New York, and the operative legal documents for Fairfield Sentry's BLMIS

---

[12] *See SEC v. Gruss*, 2012 WL 3306166 at *3 (S.D.N.Y. Aug 13, 2012) (finding that issues of fact existed regarding whether an offshore fund was "foreign" for purposes of extraterritoriality where complaint alleged that operational and investment decisions for the offshore fund were made in New York, "such that for all intents and purposes, the [offshore fund] was based in New York").

7

accounts were governed by New York law.  (*Id.* at ¶¶ 43, 45.)  BLMIS in New York served as the Fairfield Funds' investment manager and implemented the split-strike conversion strategy for the Fairfield Funds.  (*Id.* at ¶¶ 48-57, 66.)

Kingate Global similarly had no physical offices, no employees, and transacted no meaningful business in the BVI where it was technically registered.  (*Id*. at ¶ 71.)  Instead, Kingate Global operated through investment managers, consultants, and other service providers with substantial connections to the United States.  (*Id*. at ¶¶ 72-73, 81-90.)  BLMIS in New York was the investment manager, executing broker, and custodian for Kingate Global's assets, and thus control over Kingate Global rested entirely with BLMIS in New York.  (*Id*. at ¶¶ 78-80.)  New York was the hub for Kingate Global's due diligence on BLMIS, and Kingate Global's agreements with BLMIS were governed by New York law.  (*Id*. at ¶¶ 75-77, 87-89.)

## CONCLUSION

For the foregoing reasons and those stated in the Trustee's Main Brief, the Defendants' motion to dismiss should be denied, and the Trustee's motion for leave to amend his Complaint to add the Proffered Allegations should be granted.

Dated:  New York, New York
       June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel:  (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
John J. Tepedino

*Special Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

8