**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 12-01677 (SMB) |
| Plaintiff, | |
| v. | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO SOCIETE GENERALE PRIVATE BANKING (SUISSE) S.A., ET AL.** |
| SOCIETE GENERALE PRIVATE BANKING (SUISSE) S.A. (*f/k/a* SG Private Banking Suisse S.A.); SOCIETE GENERALE PRIVATE BANKING (LUGANO-SVIZZERA) S.A. (*f/k/a* SG Private Banking (Lugano-Svizzera) S.A.); | |

SOCGEN NOMINEES (UK) LIMITED;
LYXOR ASSET MANAGEMENT S.A., as
Successor in Interest to Barep Asset
Management S.A.; SOCIETE GENERALE
HOLDING DE PARTICIPATIONS S.A., as
Successor in Interest to Barep Asset
Management S.A.; SG AM AI PREMIUM
FUND L.P. (*f/k/a* SG AM Alternative
Diversified U.S. L.P.); LYXOR ASSET
MANAGEMENT INC. (*f/k/a* SGAM Asset
Management, Inc.), as General Partner of SG
AM AI Premium Fund L.P.; SG AUDACE
ALTERNATIF (*f/k/a* SGAM AI Audace
Alternatif); SGAM AI EQUILIBRIUM FUND
(*f/k/a* SGAM Alternative Multi Manager
Diversified Fund); LYXOR PREMIUM FUND
(*f/k/a* SGAM Alternative Diversified Premium
Fund); SOCIETE GENERALE S.A., as Trustee
for Lyxor Premium Fund; SOCIETE
GENERALE BANK & TRUST S.A.; OFI MGA
ALPHA PALMARES (*f/k/a* Oval Alpha
Palmares); OVAL PALMARES EUROPLUS;
UMR SELECT ALTERNATIF; and BANK
AUDI S.A.M.- AUDI SARADAR GROUP (*f/k/a*
Dresdner Bank Monaco S.A.M.),

                    Defendants.

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, submits these Proffered Allegations Pertaining

to the Extraterritoriality Issue as to Societe Generale Private Banking (Suisse) S.A. (f/k/a SG

Private Banking Suisse S.A.) ("SG Suisse"); Societe Generale Private Banking (Lugano-

Svizzera) S.A. (f/k/a SG Private Banking (Lugano-Svizzera) S.A.) ("SG Lugano"); Socgen

Nominees (UK) Limited ("SG UK"); Lyxor Asset Management S.A. ("Lyxor SA"); Societe

Generale Holding de Participations S.A. ("SG Holding"); SG Audace Alternatif (f/k/a SGAM AI

1

Audace Alternatif) ("SG Audace"); SGAM AI Equilibrium Fund (f/k/a SGAM Alternative

Diversified Fund) ("SG Equilibrium"); Lyxor Premium Fund (f/k/a SGAM Alternative

Diversified Premium Fund) ("Lyxor Premium"); Societe Generale S.A. ("SG"); Societe Generale

Bank & Trust S.A. ("SGBT"); OFI MGA Alpha Palmares (f/k/a Oval Alpha Palmares) ("OFI");

Oval Palmares Europlus ("Palmares"); UMR Select Alternatif ("UMR"); and Bank Audi S.A.M.-

Audi Saradar Group (f/k/a Dresdner Bank Monaco S.A.M.) ("Bank Audi") (collectively, the

"Defendants" and each, a "Defendant").

     Defendants Lyxor SA and SG Holding were named as Defendants in their capacity as

successors in interest to Barep Asset Management S.A. ("Barep"), an entity whose assets were

acquired by Lyxor SA, and whose corporate form was merged into SG Holding, in 2009. In

2013, subsequent to the filing of the Trustee's Complaint, SG Holding was dissolved and SG

became its successor in interest. As such, SG is now also a successor in interest to Barep.

## INTRODUCTION

     1.     The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2)

the Defendants' redemptions totaling $161,915,306 (the "Transfers") from Fairfield Sentry

Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited

("Lambda", and together with Fairfield Sentry and Sigma, the "Fairfield Funds"); and Kingate

Global Fund Ltd. ("Kingate Global", and together with the Fairfield Funds, the "BLMIS Feeder

Funds"). Since the filing of the Complaint, the Trustee has uncovered documents referencing

additional redemption payments/subsequent transfers to certain of the Defendants from the

Fairfield Funds. These additional transfers will be included in an amended complaint.

     2.     Each of the Defendants, or in two instances, their predecessors, was a shareholder

in one or more of the BLMIS Feeder Funds. All Defendants other than Bank Audi invested in

Fairfield Sentry, and some in Sigma and Lambda as well (collectively, the "Fairfield Invested Defendants"). Four Defendants—SG Suisse, SG Equilibrium, SGBT and Bank Audi—invested in Kingate Global (collectively, the "Kingate Invested Defendants").

3.    Fairfield Sentry and Kingate Global invested at least 95% of their assets in accounts managed by New York-based BLMIS. Sigma and Lambda did not have their own direct BLMIS accounts, but invested 100% of their assets in Fairfield Sentry, serving solely as vehicles for converting Euro (for Sigma) and Swiss Franc (for Lambda) investments of their shareholders into U.S. dollars. For ease of reference, Sigma and Lambda are included herein in the definition of "BLMIS Feeder Funds".

## THE DEFENDANTS' TRANSFERS AND COMPONENT EVENTS OF THEIR BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

4.    The Defendants intentionally invested in the BLMIS Feeder Funds to profit from BLMIS's purported investments in the United States, and the Transfers and component events of their BMLIS Feeder Fund transactions were predominantly domestic.

### Background:  The Defendants are All Part of or Joint Investors With the Societe Generale Group of Companies, Which has a Principal Place of Business in New York.

5.    The Societe Generale group of companies ("Societe Generale") is a large banking and investment organization with a long-standing and significant base of operations in the United States. Opening its first U.S. office in 1938, Societe Generale is today one of the largest foreign-registered banking organizations in the United States.

6.    At all relevant times, Defendant SG was the umbrella entity for Societe Generale and its many companies, with multiple locations in the United States through which it conducted substantial operations, including branches and other offices in NewYork, Chicago, Dallas, and Houston.

7.    Although organized in France, SG has asserted in federal court filings that it has a

"principal place of business" in New York City. A structure chart setting forth the Defendants'

relationships to SG and each other is as follows (moving Defendants highlighted in gray):



8.      As detailed in the chart, SG is or was at all relevant times the parent or ultimate

parent of Defendants SGBT, SG Suisse, SG Lugano, SG UK, Lyxor SA, and SG Holding and

Barep (prior to their dissolution and/or acquisition by other Defendants), as well as non-moving,

U.S.-registered defendant Lyxor Asset Management Inc. (f/k/a SG Asset Management, Inc.,

"Lyxor Asset"), with which SG shared its New York headquarters.

9.      Defendants Bank Audi, OFI, Palmares and UMR were sophisticated financial

entities that invested in the BLMIS Feeder Funds jointly with SGBT.

10.     Defendants SG Audace, SG Equilibrium, Lyxor Premium, as well as non-moving

U.S.-registered defendant SG AM AI Premium Fund L.P. (f/k/a SG AM Alternative Diversified

U.S. L.P., "SG Premium") (collectively, the "SGAM Funds") were SG-affiliated funds or funds

of funds. The SGAM Funds' operations and investment portfolios—including their substantial

investments in the BLMIS Feeder Funds—were managed and operated in the United States by

4

Lyxor Asset.

11.     Although U.S.-registered Lyxor Asset shared the same New York office with SG, and U.S.-registered SG Premium invested through the same U.S. fund manager as the other SGAM Funds, Lyxor Asset and SG Premium alone were excluded from the consolidated Motion to Dismiss Based on Extraterritoriality.

**The Entire Purpose of the Defendants' BLMIS Feeder Fund Investments was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

12.     The entire purpose of the Defendants' investments in the BLMIS Feeder Funds was to invest in U.S. securities, options, and Treasurys through BLMIS, a New York-based investment adviser, and its BLMIS Feeder Fund investments were all centered in the United States.

13.     The Defendants knew and intended that their investments would be transferred to BLMIS in New York to invest in the U.S. securities markets.  For example, in 2003, Societe Generale personnel performed a detailed due diligence review of BLMIS, including an analysis of Fairfield Sentry as a BLMIS feeder fund, on-site at BLMIS's headquarters in New York.

14.     Moreover, as shareholders in the BLMIS Feeder Funds, the Defendants were required to enter into a subscription agreement each time they subscribed for shares in (i.e. invested money into) the funds.  Combined, the Defendants remitted subscription payments to such funds at least 116 times.

15.     Upon entering into subscription agreements with one or more of the Fairfield Funds (the "Fairfield Subscription Agreements"), the Fairfield Invested Defendants (which include all Defendants except Bank Audi) affirmed that they "received and read" such funds' Private Placement Memoranda ("PPMs").  Based on the information contained in the Fairfield Subscription Agreements and PPMs, the Fairfield Invested Defendants knew the following facts:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Sigma and Lambda invested 100% of their assets with Fairfield Sentry;

- BLMIS was the investment adviser of the Fairfield Funds;

- BLMIS was registered with the Securities and Exchange Commission (the "SEC");

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the funds' behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by BLMIS in New York;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

16.    Upon entry into their subscription agreements with Kingate Global, the Kingate Invested Defendants similarly affirmed having received and read an information memorandum ("Info Memo") from that fund.  The Kingate Global Info Memo provided substantially similar information as the Fairfield Funds' PPMs, including that Kingate Global's investments in U.S. securities would be custodied in New York by the same New York investment adviser using the same SSC Strategy.

**The Defendants Submitted to U.S. Law and Jurisdiction in Connection With Their Fairfield Fund Investments.**

17.    The Defendants' subscription agreements also expressly provided that their investments would be subject to U.S. laws and jurisdiction in the U.S. courts.

18.    In the Fairfield Subscription Agreements, the Fairfield Invested Defendants expressly agreed that:  (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," and they "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding"; and (ii) the Fairfield Subscription

Agreements "shall be governed and enforced in accordance with the laws of New York..."

19.      SG and Bank Audi and upon information and belief some or all of the remaining Fairfield Invested Defendants also entered into, or were covered by, fee sharing agreements with Fairfield Greenwich Limited ("FG Limited"), a Fairfield Greenwich Group ("FGG") entity based in New York, which agreements compensated them for bringing investments into BLMIS.  FG Limited was the cornerstone of the New York-based FGG *de facto* partnership, which created, managed and controlled the Fairfield Funds.  FG Limited was registered to do business in New York and listed its principal executive office as that of FGG in New York.  Although the Trustee does not have possession of the specific fee agreements between FG Limited and these Defendants, FG Limited's fee agreements with respect to the Fairfield Funds were typically governed by New York law.

**The Defendants Purposefully and Repeatedly Utilized U.S. Bank Accounts for the Investments and Redemptions They Made.**

20.      The Defendants purposefully and repeatedly used U.S. bank accounts and the U.S. banking system in connection with their subscriptions into and redemptions from Fairfield Sentry and Kingate Global, including with respect to the Transfers at issue.

21.      During the relevant period, the Defendants collectively received at least 90 redemption payments totaling approximately $153,537,186 from Fairfield Sentry and Kingate Global, which payments constitute the Transfers at issue from those funds.  The Defendants also remitted at least 105 subscription payments to Fairfield Sentry and Kingate Global, which payments constitute the totality of their investments in those funds.  New York was the specific situs repeatedly selected by Defendants for both receiving redemptions and remitting subscriptions.

22.      The Fairfield Invested Defendants used U.S. bank accounts to make and receive

7

such payments.  All but one of these U.S. accounts were at Societe Generale's own New York

branch (the "Societe Generale U.S. Accounts") and were in the Fairfield Invested Defendants'

own names, respectively, or in the name of a Societe Generale co-investor.  Specifically, SG-

Suisse, SGBT, UMR, OFI, Lyxor SA and SG Holding, the latter two as successors in interest to

Barep, used a Societe Generale U.S. Account.  The Societe Generale U.S. Account designated by

Defendant SGBT is labeled in a document as "correspondent"; the other Societe General U.S.

Accounts are not so labeled.  Upon information and belief, the remaining Fairfield Invested

Defendants similarly used a Societe Generale account in New York.  SG Lugano received

redemptions into an account in the name of Euroclear at the Bank of New York in New York.

23.     Kingate Global bank statements indicate that Kingate Invested Defendants Bank

Audi and SG Suisse similarly used the Societe Generale U.S. Accounts for receiving redemption

payments from Kingate Global.

24.     In addition, Fairfield Sentry and Kingate Global designated U.S. bank or

correspondent accounts to receive subscriptions from the relevant Defendants.  Fairfield Sentry's

subscription agreements and Kingate Global's Info Memo each required that the relevant

Defendants send their subscription payments to a U.S. correspondent account, for deposit into

such funds' bank accounts.  From these bank accounts, the moneys were then ultimately

deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

**The United States Was the Focus of Due Diligence on the BLMIS Feeder Funds and the
Defendants Relied Heavily on New York Personnel.**

25.     In-depth due diligence with respect to the Defendants' BLMIS Feeder Fund

investments was conducted by Societe Generale in the United States.  Much of this due diligence

process was handled by Societe Generale personnel based in New York.

26.     SG and its affiliates and co-investors (including the other Defendants) functioned

8

as a global, "Societe Generale" network with respect to making investments.  As set forth in its

annual filings, Societe Generale centralized its risk management process to allow for information

sharing and establishment of risk procedures at the highest management levels of the group, and

created a global "Risk Management" group for this purpose.

27.    Consistent with this coordinated approach and the fact that they were all investing

in BLMIS-related funds, the Defendants functioned as one entity through Societe Generale's

personnel in its New York headquarters with respect to due diligence on their investments.  The

personnel that performed this diligence included Societe Generale Group's Global Co-Head of

Hedge Fund Risk Management John Dell'Aquilla and personnel from New York-based, non-

moving defendant and asset manager Lyxor Asset, including its Managing Director Benoit

Ruaudel.

28.    These and other Societe Generale persons met and/or corresponded with BLMIS

Feeder Fund representatives in order to perform their due diligence.  Societe Generale's primary

contact with regard to the Fairfield Invested Defendants' due diligence on the Fairfield Funds

was New York-based manager FGG, and Jeffrey Tucker—a New York-based Partner in and Co-

Founder of FGG—placed himself "in charge" of the Societe Generale account.

**The Defendants' U.S-Based BLMIS Feeder Fund Investments Were Part of Societe
Generale's Substantial U.S. Operations.**

29.    All of the above activities were part of the larger Societe Generale group of

companies' substantial operations in the United States.  At all relevant times, Societe Generale

had thousands of U.S. employees, billions of dollars in U.S. assets, a principal place of business

in NewYork City, and numerous U.S. affiliates, including Lyxor Asset and SG Premium.

30.    As a result of their extensive U.S.-related operations, SG and other Defendants

are and were subject on an on-going basis to a multitude of U.S. laws and regulations.  SG is

among the financial institutions that are required to periodically file a "Global Recovery and

Resolution Plan" with the U.S. Federal Reserve Bank and the Federal Deposit Insurance

Corporation.  SG's 2013 Resolution Plan confirms that SG and its U.S. subsidiaries are regulated

by, among others, the following United States "material supervisory authorities":  the Federal

Reserve Bank of New York, New York State Department of Financial Services, SEC, New York

Stock Exchange, Financial Industry Regulatory Authority, National Futures Association, U.S.

Commodities Futures Trading Commission and Chicago Mercantile Exchange.

31.    In addition, SG maintains memberships with the U.S. Depository Trust and

Clearing Corporation and with Fedwire.  As a member of Fedwire, SG is required to maintain an

account with the Federal Reserve Bank.

32.    Defendant Lyxor Premium has filed forms with the SEC in connection with its

dealings in the U.S.

33.    Because of the Societe Generale group of companies' extensive U.S. business

activities and the obvious impact U.S. laws and regulations have on its constituent businesses,

SG personnel often meet with or provide written comments and correspondence to U.S.

government agencies or branches such as the SEC, Commodity Futures Trading Commission,

the Federal Deposit Insurance Corporation and Federal Reserve in an attempt to influence

regulatory rule-making and implementation of U.S. securities and other laws.  Such efforts have

typically been spearheaded by SG's New York-based General Counsel for the Americas.

**The Fairfield Funds' Principal Place of Business Was in New York.**

34.    At all relevant times, the Fairfield Funds' principal place of business was in New

York, where their creator/manager/operator was headquartered, and they were U.S. residents.

**A.    The Genesis of the FGG *De Facto* Partnership**

35.    In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the

Fairfield Greenwich Group based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

36.     The FGG *de facto* partnership included:  individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Lambda.  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

37.     FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included:  FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

**B.     Fairfield Sentry**

38.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

39.     Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

11

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm. The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

40.    Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States. Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States.

41.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI. In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069. In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut. Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut. In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office. On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

42.    After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

FGG's New York headquarters—executed additional BLMIS account documents on behalf of

Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and

Internal Revenue Service forms. In most instances, FGG listed Fairfield Sentry's address on

these BLMIS account documents as FGG's New York headquarters.

43.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts

are governed by New York law and all disputes arising under the agreements must be resolved

by mandatory arbitration in New York utilizing the laws of New York. All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of

1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve

System. Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf

of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor

Protection Corporation ("SIPC") member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities.

44.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with

Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

backoffice administrative services such as coordinating subscription and redemption forms,

maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Fairfield Sentry shares. Noel and Tucker also contracted Citco

Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield

Sentry assets. In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets

were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian

agreement with BLMIS. As a further part of the relationship with Citco Fund Services and Citco

Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco

entities.

### 3.  FGG New York Personnel Managed Fairfield Sentry.

45.     At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities.  Until

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New

York.

46.     FGG New York Personnel made and controlled all decisions regarding Fairfield

Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of

Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin.

Even with the Citco entities' various roles, FGG New York Personnel made all ultimate

operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's

operations, FGG New York Personnel controlled and approved all subscriptions into and

redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription

agreements contained New York choice of law provisions, and provided for venue and

jurisdiction for any disputes in New York.

### 4.  Fairfield Sentry's Investors Knew They Were Investing in BLMIS.

47.    Fairfield Sentry's subscription agreements also incorporated its PPM by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were:  (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.  BLMIS Was Fairfield Sentry's Investment Manager.

48.    Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield International Managers as Fairfield Sentry's investment manager for which it was paid a performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality made all of Fairfield Sentry's investment decisions.

49.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's Littlestone Associates, which was a money management firm also located in New York City.  Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG clients.  In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG Limited.  FG Limited was formed under the laws of Ireland.

50.    While FG Limited was formed under foreign law, it reported its principal place of business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters. Upon the formation of FG Limited, Fairfield International Managers assigned all of its management contracts with Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

51.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds. The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds. Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds. As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

52.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company. FG Advisors is a wholly owned subsidiary of FG Limited. At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited. Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda. FG Limited remained the placement agent for the same funds.

53.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

54.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

55.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

56.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as

Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

57.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS

accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other

fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a

number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

The seedling funds were operated and organized by FGG New York Personnel.  Many of the

seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### C.    Sigma and Lambda

58.    FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield Sentry using Euros or Swiss Francs, FGG created Sigma and Lambda.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

59.    Similarly, Lambda accepted subscriptions in Swiss Francs, converted them to U.S. Dollars, and then invested 100% of its funds in Fairfield Sentry.  When paying redemptions, Lambda redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Swiss Francs, and paid the Swiss Francs to the redeeming Lambda investors.

60.    Noel and Tucker organized Sigma on November 20, 1990, and Lambda on December 7, 1990 as international business companies under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so were Sigma and Lambda.  Sigma is currently in liquidation in proceedings in the BVI and United States.  Lambda is in liquidation in a separate proceeding in the BVI.

61.    Also like Fairfield Sentry, Sigma and Lambda were shell corporations present in the BVI only on paper.  They had no employees and maintained no offices.  They listed their registered BVI address as the same BVI post office box care of a local trust company they shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for

services for Sigma and Lambda to FGG's New York headquarters.  Sigma and Lambda were operated almost entirely by FGG New York Personnel.

62.    As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Sigma and Lambda.  Once Sigma and Lambda were opened for investors, FGG New York Personnel monitored Sigma's and Lambda's investments into, and redemptions from, Fairfield Sentry; managed Sigma's and Lambda's relationships with clients and potential clients; created marketing and performance materials for Sigma and Lambda; marketed Sigma and Lambda; performed administrative functions required by Sigma and Lambda; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma and Lambda; and conducted various other due diligence and risk management activities.  Until Sigma's and Lambda's liquidation, FGG maintained Sigma's and Lambda's books and records in New York.  FGG New York Personnel also had final control of Sigma's and Lambda's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

63.    FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma and Lambda shares.  Like Fairfield Sentry's subscription agreements, Sigma's and Lambda's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's and Lambda's sole assets.  Sigma's and Lambda's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments.  Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was

19

"always the risk" that BLMIS could misappropriate the assets or securities.  This same risk was

also disclosed in Fairfield Sentry's PPMs.

64.    Noel and Tucker were the original directors of Sigma and Lambda and, like

Fairfield Sentry, contracted with Citco Fund Services to provide Sigma and Lambda with

backoffice administrative services such as coordinating subscription and redemption forms,

maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Sigma and Lambda shares.  Noel and Tucker also contracted Citco

Custody to serve as the custodian of the Sigma and Lambda assets.  As a further part of the Citco

relationship, Noel and Tucker opened bank accounts on behalf of Sigma and Lambda at Citco

Bank Dublin.  FGG New York Personnel had final control of the Sigma and Lambda Citco Bank

Dublin bank accounts.  Finally, FGG New York Personnel controlled all of Sigma's and

Lambda's relationships with the Citco entities.

65.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma

investors' Euros and Lambda's investors' Swiss Francs into U.S. Dollars—as required for

investment in Fairfield Sentry and BLMIS.  Noel executed separate contracts on Sigma's and

Lambda's behalf with the Bank of Montreal for currency swaps which were "governed by and

construed in accordance with the laws of the State of New York (without reference to choice of

law doctrine)."

66.    FGG New York Personnel initially listed FG Limited as the investment manager

for Sigma and Lambda.  In 2003 with the creation of FG Bermuda, FGG New York Personnel

changed the Sigma and Lambda PPMs to indicate FG Bermuda was Sigma's and Lambda's

Investment Manager.  In fact there were no duties for any investment manager because Sigma's

and Lambda's sole purpose was to purchase Fairfield Sentry shares for investors who chose not

to invest directly in Fairfield Sentry using U.S. Dollars.

67.    The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

**The Kingate Global Transfers are Domestic.**

68.    Kingate Global was a feeder fund that invested exclusively with BLMIS in New

York.  BLMIS transferred approximately $398,797,047 of customer property to Kingate Global

during the life of the account prior to December 11, 2008.

69.    Kingate Global filed a customer claim in the SIPA liquidation.

**A.    Kingate Global Invested with BLMIS to Make Money from a New York-
Based Investment Operation.**

70.    Kingate Global, together with its purported investment manager, consultant,

service providers, and others that received subsequent transfers of customer property, formed an

enterprise with a single economic purpose:  to make money from a New York-based investment

operation.

71.    Despite having a registered address in the BVI, Kingate Global had no physical

offices, no employees, and transacted no meaningful business there.

72.    Tremont (Bermuda) Limited served as the co-manager of Kingate Global for

approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself

managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation.

Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group

Holdings, Inc., a Delaware corporation (collectively "Tremont").

73.    Kingate Global's manager, consultant, and other service providers, regardless of

where they were organized, wholly or in substantial part operated in New York to manage

21

Kingate Global's investments with BLMIS.

74.     Kingate Global's sole business was centered in New York and all deposits with,

and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its

exclusive business relationship with BLMIS in New York.

**B.     The Operative Legal Documents Were New York-Based.**

75.     Kingate Global executed Customer Agreements, and other account opening

documents, and delivered the agreements to BLMIS in New York.

76.     Each Customer Agreement expressly states that it is governed by U.S. law and all

of the transactions in the Customer's Account are subject to the provisions of the Securities

Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the

Federal Reserve System, and the Commodities Futures Trading Commission.

77.     Kingate Global agreed that all disputes arising under the Customer Agreements

with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted

in the United States before the American Arbitration Association, or "an arbitration facility

provided by any other exchange of which the broker is a member, or the National Association of

Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the

rules obtaining of the selected organization."

**C.     BLMIS Had Full Authority to Make and Execute Investment Decisions.**

78.     Kingate Global's Trading Authorization Agreements authorized BLMIS to be

Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate

Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

79.     As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as

Kingate Global's investment manager and purported to invest exclusively according to Madoff's

SSC Strategy, which involved the purchase of U.S. securities traded only on domestic

exchanges.

80.    BLMIS acted as Kingate Global's executing broker in purporting to purchase securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities purportedly held on Kingate Global's behalf.

**D.    Kingate Global Was Managed From New York.**

81.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it continued to introduce investors to Kingate Global in return for fees, it was a valuable contributor in New York to the success of Kingate Global.

82.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

83.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

84.    Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

85.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

86.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

87.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

88.     Although FIM had a London address, Eric Lazear, FIM's head of due diligence

for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in

New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

89.     FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York,

FIM (USA) performed monitoring, research, and investor solicitation services for Kingate

Global.

90.     KML and the FIM entities actively participated in Kingate Global's business with

BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New

York.

**E.     Kingate Global Used Banks in New York.**

91.     Kingate Global used New York banks to deposit funds with BLMIS, transferring

investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase Bank NA.

92.     KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial

institution doing business in the United States as Kingate Global's custodian.

93.     In its role as Kingate Global's custodian, HSBC consistently used New York

banks in carrying out its duties for Kingate Management and Kingate Global relating to

investments with BLMIS.

94.     FIM also directed fee payments to be routed through a bank account in New

York.

95.     The Trustee incorporates by reference the allegations of the Fourth Amended

Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No.

100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: New York, New York
       June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
John J. Tepedino

*Special Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*