**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 12-01676 (SMB) |
| Plaintiff, | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO CREDIT SUISSE AG** |
| v. | |
| CREDIT SUISSE AG, as successor-in-interest to Clariden Leu AG and Bank Leu AG; | |
| Defendant. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, for these Proffered Allegations Pertaining to the

Extraterritoriality Issue as to Credit Suisse AG ("CS AG"), which, as successor-in-interest to

Clariden Leu AG (*f/k/a* Clariden Bank AG) ("Clariden") and Bank Leu AG ("Bank Leu," and

together with Clariden, the "Subsequent Transferees"), is the sole defendant in the case of *Picard

v. Credit Suisse AG* (Adv. Pro. No. 12-01676), alleges the following:

## INTRODUCTION

1.      The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2)

the Subsequent Transferees' redemptions totaling $49,135,288 (the "Transfers") from Fairfield

Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma") and Fairfield Lambda

Limited ("Lambda," and together with Fairfield Sentry and Sigma, the "Fairfield Funds"); and

Kingate Global Fund Ltd. ("Kingate Global", and together with the Fairfield Funds, the "BLMIS

Feeder Funds").

2.      Clariden and Bank Leu were each shareholders in Fairfield Sentry and Sigma, and

Clariden was also a shareholder in Lambda.  Bank Leu was also a shareholder in Kingate Global.

Clariden and Bank Leu received the Transfers from the BLMIS Feeder Funds.  The vast majority

of their BLMIS Feeder Fund transfers were from Fairfield Sentry.

3.      Each of Fairfield Sentry and Kingate Global invested at least 95% of their assets

in accounts managed by New York-based BLMIS.  Sigma and Lambda did not have their own

direct BLMIS accounts, but invested 100% of their assets in Fairfield Sentry, serving solely as

vehicles for converting Euro (for Sigma) and Swiss Franc (for Lambda) investments of their

shareholders into U.S. dollars. For ease of reference, Sigma and Lambda are included herein in the definition of "BLMIS Feeder Funds".

4.      Since the filing of the First Amended Complaint, the Trustee has uncovered documents referencing additional redemption payments/subsequent transfers to Clariden totaling at least $10 million from Kingate Global and additional BLMIS feeder fund Kingate Euro Fund Ltd. These additional transfers will be included in a further amended complaint.

### THE TRANSFERS AND COMPONENT EVENTS OF THE SUBSEQUENT TRANSFEREES' BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

5.      The Subsequent Transferees intentionally invested in the BLMIS Feeder Funds to profit from BLMIS's purported investments in the United States, and the Transfers and component events of their BLMIS Feeder Fund transactions were predominantly domestic.

### Background: The Subsequent Transferees Were Part of the Credit Suisse Group of Companies and Engaged in Business in Conjunction with Credit Suisse's New York Headquarters.

6.      CS AG is named as the defendant in this case because it is the successor-in-interest to the Subsequent Transferees, Clariden and Bank Leu, as a result of Bank Leu's merger into Clariden in 2007 followed by the combined entity's further merger into CS AG in 2012.

7.      Bank Leu and Clariden were at all relevant times large-scale, international private banking organizations, servicing a vast number of people and assets in the United States as well as abroad. As of 2007, Clariden employed approximately 240 relationship managers who "serviced approximately 1,500 U.S. client accounts consisting of up to approximately $2 billion in securities assets under management. . . ." The Subsequent Transferees filed Form 13Fs quarterly with the U.S. Securities and Exchange Commission (the "SEC").

8.      Prior to the 2012 merger with CS AG, and at all times relevant to this action, Bank Leu and Clariden were subsidiaries of CS AG's parent—Credit Suisse Group AG ("CS

Group")—a major international banking and investment organization. CS Group and CS AG had a significant base of operations in the United States, including thousands of U.S. employees, billions of dollars in domestic assets, and a headquarters in New York, New York. CS AG and certain other Credit Suisse entities are defendants in a recovery action by the Trustee for transfers received separately by those entities—*Picard v. Credit Suisse AG, et al.* (Adv. Pro. No. 11-02925) (for which the Trustee is also filing proffered allegations as to extraterritoriality).

9.      All of the Subsequent Transferees' BLMIS Feeder Fund investments were part of the larger CS Group of companies' substantial and coordinated U.S. operations, including that of Defendant CS AG, the principal operating subsidiary of CS Group.

10.     For example, in 2014, CS AG—on behalf of itself and Clariden—stipulated with the United States Department of Justice that CS AG and Clariden (with certain other unnamed affiliates) together operated a cross-border banking business "[f]or decades" in Switzerland and New York, and that in connection with these coordinated activities, such entities: (i) used Credit Suisse's headquarters in New York, (ii) used Credit Suisse's correspondent bank accounts in New York to effectuate transfers of money, and (iii) made filings with the Federal Reserve Bank in New York.

**The Entire Purpose of the Subsequent Transferees' Investments was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser.**

11.     The entire purpose of the Subsequent Transferees' investments in the BLMIS Feeder Funds was to invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and their BLMIS Feeder Fund investments were all centered in the United States.

12.     The Subsequent Transferees knew and intended that their investments would be transferred to BLMIS in New York to manage and invest in the U.S. securities markets. The

Subsequent Transferees made such investments for the express purpose of receiving returns on U.S.-based investments from BLMIS.

13.     Specifically, shareholders in the BLMIS Feeder Funds like the Subsequent Transferees were required to enter into a subscription agreement each time they subscribed for shares in (i.e. invested money into) the funds.  The Subsequent Transferees remitted subscription payments to such funds at least 186 times combined.

14.     Upon entering into subscription agreements with one or more of the Fairfield Funds, the Subsequent Transferees affirmed that they "received and read" such funds' Private Placement Memoranda ("PPMs").  Based on the information contained in the Fairfield Funds' subscription agreements and PPMs, the Subsequent Transferees knew:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Sigma and Lambda invested 100% of their assets with Fairfield Sentry;

- BLMIS was the investment adviser of the Fairfield Funds;

- BLMIS was registered with the SEC;

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the funds' behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by BLMIS in New York;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

15.     In connection with its investments in Kingate Global, Bank Leu also entered into subscription agreements wherein it affirmed having received and read the Kingate Global amended and restated information memorandum (the "Info Memo").  The Info Memo provided substantially similar information as the Fairfield Funds' PPMs, including that Kingate Global's

investments in U.S. securities would be custodied in New York by the same New York

investment adviser using the same SSC Strategy.

**The Subsequent Transferees Submitted to U.S. Law and Jurisdiction In Connection With Their Fairfield Fund Investments.**

16.     The Subsequent Transferees' subscription agreements also expressly provided

that their investments would be subject to U.S. laws and jurisdiction in the U.S. courts.

17.     In the Fairfield Funds' subscription agreements, the Subsequent Transferees

agreed that: (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund

may be brought in New York", and they "irrevocably submit[ted] to the jurisdiction of the New

York courts with respect to any [p]roceeding"; and (ii) the Fairfield Funds' subscription

agreements "shall be governed and enforced in accordance with New York law.…"

18.     In addition to the foregoing, Clariden entered into a fee sharing agreement with

Fairfield Greenwich Limited ("FG Limited"), a Fairfield Greenwich Group ("FGG") entity based

in New York, which agreement compensated Clariden for bringing investments into BLMIS.  FG

Limited was the cornerstone of New York-based FGG *de facto* partnership, which created,

managed and controlled the Fairfield Funds.  FG Limited was registered to do business in New

York and listed its principal executive office as that of FGG in New York.

19.     The fee agreement, and FG Limited's and Clariden's "rights and obligations"

pursuant to the agreement, were "governed by and construed in accordance with the laws of the

State of New York".

20.     Consistent with the frequency of the investments it made and was credited with

bringing to the Fairfield Funds, Clariden routinely received fees from FG Limited.  For example,

Clariden received quarterly fees from 2003 through 2008 in connection with its Fairfield Sentry

and Sigma investments.

21.     Clariden designated a Bank of New York account in its name in New York to receive these fees.

22.     Based on documents located by the Trustee, Clariden also entered into, or was covered by, one or more agreements to receive fees from Kingate Global.

**The Subsequent Transferees Purposefully and Repeatedly Utilized U.S. Bank Accounts for the Investments and Redemptions They Made.**

23.     The Subsequent Transferees purposefully and repeatedly used U.S. accounts and the U.S. banking system in connection with subscriptions into and redemptions from Fairfield Sentry and/or Kingate Global, including with respect to the Transfers at issue from those funds.

24.     During the relevant period, the Subsequent Transferees received at least 136 redemptions out of Fairfield Sentry and at least 3 redemptions out of Kingate Global, which payments constitute the Transfers at issue from these funds.  The Subsequent Transferees also remitted in the aggregate at least 163 subscription payments to Fairfield Sentry and Kingate Global, which payments constitute the totality of their investments in such funds.

25.     New York was the situs repeatedly selected by the Subsequent Transferees for making and receiving such transfers.  Specifically, with respect to Fairfield Sentry, the Subsequent Transferees used a bank account at the Bank of New York in New York (the "BNY Account") and correspondent bank accounts at HSBC USA in New York (the "HSBC Accounts") for such purposes.

26.     Upon information and belief, Bank Leu also used a U.S. bank or correspondent account to remit subscriptions into and receive its three redemptions from Kingate Global.

27.     Fairfield Sentry and Kingate Global also designated U.S. correspondent accounts to receive subscriptions from the Subsequent Transferees.  The Fairfield Sentry form subscription agreement and Kingate Global's Info Memo each required that subscription payments from the Subsequent Transferees be sent to U.S. correspondent accounts, for further

6

deposit into such funds' bank accounts.  From these bank accounts, the moneys were then

ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

**New York Personnel at CS AG's Headquarters Performed Due Diligence on the BLMIS
Feeder Funds for the Credit Suisse Group, Including the Subsequent Transferees.**

28.    Regular and extensive due diligence was conducted by New York personnel at CS

AG's headquarters with respect to all of the Credit Suisse group's BLMIS Feeder Fund

investments, and the Subsequent Transferees were subject to Credit Suisse's approval processes

in connection with such investments.

29.    CS AG's New York personnel regularly met or communicated with the BLMIS

Feeder Funds' New York-based managers or representatives, over many years, including with

respect to BLMIS and the BLMIS Feeder Funds:

- The Credit Suisse New York-based employees involved in due diligence included
  at least 4 different people—Maureen Meehan, Jaques Clough, Brian Peterson, and
  upon information and belief, Lauren Wychunas.

- New York-based *de facto* partnership FGG, which created, managed and
  controlled the Fairfield Funds at all relevant times, was CS AG's primary contact
  with regard to the Fairfield Funds.

- Similarly, Tremont Group Holdings, Inc., a Delaware corporation with a principal
  place of business in Rye, New York, and/or its affiliates (collectively,
  "Tremont")—which had its own BLMIS feeder funds and managed Kingate
  Global out of New York during relevant times—was CS AG's primary contact
  with regard to Kingate Global.

30.    In addition to all the foregoing activities with the BLMIS Feeder Funds, Credit

Suisse was also granted rare access directly to Madoff himself, with top management, including

Oswald Gruebel—a CS Group Board Member and soon-to-be CEO—and two other Credit

Suisse executives having met with Madoff and FGG representatives more than once beginning in

2000.

31.    The Credit Suisse personnel that performed this due diligence on BLMIS and the

BLMIS Feeder Funds analyzed relevant information, and met and/or corresponded with FGG

and Tremont, regarding the Credit Suisse group's investments with the Fairfield Funds and Kingate Global.

32.     CS Group's personnel functioned as one entity for this purpose.  As set forth in CS Group's SEC filings, the CS Group of companies (including the Subsequent Transferees) work in conjunction with each other as part of an intertwined, worldwide effort headed by CS AG.  Specifically as to due diligence on its investments—as referred to in statements by CS Group executives—CS Group maintains a centralized risk management and "control framework" specifically intended to facilitate in-group exchanges of due diligence and other information.

33.     Based on their common investments in BLMIS and the above policy regarding centralized risk management and the sharing of information, the due diligence conducted by CS AG's New York personnel would have been for the benefit of, and shared with, the Subsequent Transferees.

34.     In fact, the Subsequent Transferees' ability to invest moneys into the BLMIS Feeder Funds was not theirs to make, but rather contingent on obtaining pre-approval from Credit Suisse.  For instance, in July 2004, FGG noted that Bank Leu "need[ed] to seek approval though Credit Suisse['s] fund platform" in order to invest with Fairfield Sentry and Sigma, among other funds.

**The Fairfield Funds' Principal Place of Business Was in New York.**

35.     At all relevant times, the Fairfield Funds' principal place of business was in New York, where their creator/manager/operator was headquartered, and they were U.S. residents.

**A.     The Genesis of the FGG *De Facto* Partnership**

36.     In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group based in New York City.  FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

37.     The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters.  Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Lambda.  Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

38.     FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds.  These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.     Fairfield Sentry

39.     On October 30, 1990, FGG founding partners, Noel and Tucker, organized Fairfield Sentry under the International Business Company Act of the Territory of the British Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from doing business with other BVI residents except for other entities organized under the International Business Companies Act.

40.     Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").  Its statutorily required registered address in the BVI was a post office box care of a local trust company owned and operated by a local law firm.  The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

41.    Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1. Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States.

42.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069.  In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

43.    After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

FGG's New York headquarters—executed additional BLMIS account documents on behalf of

Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and

Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on these BLMIS account documents as FGG's New York headquarters.

44.     The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts are governed by New York law and all disputes arising under the agreements must be resolved by mandatory arbitration in New York utilizing the laws of New York.  All transactions under Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of 1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor Protection Corporation ("SIPC") member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities.

45.     As the original directors of Fairfield Sentry, Noel and Tucker contracted with Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco entities.

### 3.  FGG New York Personnel Managed Fairfield Sentry.

46.      At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities.  Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

47.      FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.  Fairfield Sentry's Investors Knew They Were Investing in BLMIS.

48.      Fairfield Sentry's subscription agreements also incorporated its PPMs by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an

12

SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4)

through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S.

Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were

"essential to the continued operation of the Fund."

### 5.  BLMIS Was Fairfield Sentry's Investment Manager.

49.    Although FGG attempted to hide its manager, BLMIS served as the investment

manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers' reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality

made all of Fairfield Sentry's investment decisions.

50.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's

Littlestone Associates, which was a money management firm also located in New York City.

Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG

clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG

Limited.  FG Limited was formed under the laws of Ireland.

51.    While FG Limited was formed under foreign law, it reported its principal place of

business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters.  Upon the formation

of FG Limited, Fairfield International Managers assigned all of its management contracts with

Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry

Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts controlled by BLMIS.

52.     In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and foreign investors and, as a result, FGG would form a new U.S. entity to be the investment adviser of the fund as well as other FGG operated funds, including the feeder and currency funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG formed two new entities, FG Advisers and FG Bermuda.

53.     In October 2003, FGG formed FG Advisors as a Delaware limited liability company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.  Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its management contracts to both entities, including the investment advisory agreements for the three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG Bermuda.  FG Limited remained the placement agent for the same funds.

54.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services and incurring administrative costs.

55.    Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's, Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not register as an investment adviser under the Investment Advisers Act of 1940.

56.    In 2005 and 2006, the SEC conducted an investigation of BLMIS and its relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel, executed and submitted.

57.    After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

58.    As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base. The seedling funds were operated and organized by FGG New York Personnel.  Many of the seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

## C.    Sigma and Lambda

59.    FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield Sentry using Euros or Swiss Francs, FGG created Sigma and Lambda.  Sigma accepted subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in

Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming Sigma investors.

60.    Similarly, Lambda accepted subscriptions in Swiss Francs, converted them to U.S. Dollars, and then invested 100% of its funds in Fairfield Sentry.  When paying redemptions, Lambda redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield Sentry to Swiss Francs, and paid the Swiss Francs to the redeeming Lambda investors.

61.    Noel and Tucker organized Sigma on November 20, 1990, and Lambda on December 7, 1990 as international business companies under the BVI International Business Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any other BVI residents except for other entities organized under the BVI International Business Companies Act, so were Sigma and Lambda.  Sigma is currently in liquidation in proceedings in the BVI and United States.  Lambda is in liquidation in a separate proceeding in the BVI.

62.    Also like Fairfield Sentry, Sigma and Lambda were shell corporations present in the BVI only on paper.  They had no employees and maintained no offices.  They listed their registered BVI address as the same BVI post office box care of a local trust company they shared with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm operating the trust company and the registered post office box addressed its statements for services for Sigma and Lambda to FGG's New York headquarters.  Sigma and Lambda were operated almost entirely by FGG New York Personnel.

63.    As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New York Personnel made the operational decisions regarding Sigma and Lambda.  Once Sigma and Lambda were opened for investors, FGG New York Personnel monitored Sigma's and Lambda's investments into, and redemptions from, Fairfield Sentry; managed Sigma's and Lambda's

relationships with clients and potential clients; created marketing and performance materials for Sigma and Lambda; marketed Sigma and Lambda; performed administrative functions required by Sigma and Lambda; negotiated confidentiality agreements and other service provider contracts on behalf of Sigma and Lambda; and conducted various other due diligence and risk management activities.  Until Sigma's and Lambda's liquidation, FGG maintained Sigma's and Lambda's books and records in New York.  FGG New York Personnel also had final control of Sigma's and Lambda's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

64.    FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma and Lambda shares.  Like Fairfield Sentry's subscription agreements, Sigma's and Lambda's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's and Lambda's sole assets.  Sigma's and Lambda's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments.  Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities.  This same risk was also disclosed in Fairfield Sentry's PPMs.

65.    Noel and Tucker were the original directors of Sigma and Lambda and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma and Lambda with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma and Lambda shares.  Noel and Tucker also contracted Citco

17

Custody to serve as the custodian of the Sigma and Lambda assets.  As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma and Lambda at Citco Bank Dublin.  FGG New York Personnel had final control of the Sigma and Lambda Citco Bank Dublin bank accounts.  Finally, FGG New York Personnel controlled all of Sigma's and Lambda's relationships with the Citco entities.

66.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma investors' Euros and Lambda's investors' Swiss Francs into U.S. Dollars—as required for investment in Fairfield Sentry and BLMIS.  Noel executed separate contracts on Sigma's and Lambda's behalf with the Bank of Montreal for currency swaps which were "governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

67.    FGG New York Personnel initially listed FG Limited as the investment manager for Sigma and Lambda.  In 2003 with the creation of FG Bermuda, FGG New York Personnel changed the Sigma and Lambda PPMs to indicate FG Bermuda was Sigma's and Lambda's Investment Manager.  In fact there were no duties for any investment manager because Sigma's and Lambda's sole purpose was to purchase Fairfield Sentry shares for investors who chose not to invest directly in Fairfield Sentry using U.S. Dollars.

68.    The Trustee incorporates by reference the allegations of the Second Amended Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

**The Kingate Global Transfers Are Domestic.**

69.    Kingate Global was a feeder fund that invested exclusively with BLMIS in New York.  BLMIS transferred approximately $398,797,047 of customer property to Kingate Global during the life of the account prior to December 11, 2008.

18

70.    Kingate Global filed a customer claim in the SIPA liquidation.

**A.    Kingate Global Invested with BLMIS to Make Money from a New York-Based Investment Operation.**

71.    Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

72.    Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

73.    Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation.

74.    Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage Kingate Global's investments with BLMIS.

75.    Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

**B.    The Operative Legal Documents Were New York-Based.**

76.    Kingate Global executed Customer Agreements, and other account opening documents, and delivered the agreement to BLMIS in New York.

77.    Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities

Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the

Federal Reserve System, and the Commodities Futures Trading Commission.

78.    Kingate Global agreed that all disputes arising under the Customer Agreements

with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted

in the United States before the American Arbitration Association, or "an arbitration facility

provided by any other exchange of which the broker is a member, or the National Association of

Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the

rules obtaining of the selected organization."

### C.    BLMIS Had Full Authority to Make and Execute Investment Decisions.

79.    Kingate Global's Trading Authorization Agreement authorized BLMIS to be

Kingate Global's "agent and attorney in fact," giving BLMIS full discretion over Kingate

Global's invested assets and to buy, sell, and trade in securities for Kingate Global.

80.    As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as

Kingate Global's investment manager and purported to invest exclusively according to Madoff's

SSC Strategy, which involved the purchase of U.S. securities traded only on domestic

exchanges.

81.    BLMIS acted as Kingate Global's executing broker in purporting to purchase

securities on Kingate Global's behalf, and acted as Kingate Global's custodian for the securities

purportedly held on Kingate Global's behalf.

### D.    Kingate Global Was Managed From New York.

82.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it

continued to introduce investors to Kingate Global in return for fees, it was a valuable

contributor in New York to the success of Kingate Global.

83.    Tremont performed its co-management duties for Kingate Global in New York. Suzanne Hammond, based in New York, signed a co-manager agreement entered into on Tremont's behalf with Kingate Management and Kingate Global.

84.    Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

85.    Kingate Global was also co-managed by Kingate Management Limited ("KML"), a management entity formed by the founders of Kingate Global, Federico Ceretti and Carlo Grosso.  KML operated through its agents in New York.

86.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain executive functions for KML, such as signing the co-manager agreement with Tremont on KML's behalf.

87.    KML also appointed BLMIS as its agent, giving KML itself a presence in New York.

88.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together "FIM"), to perform due diligence on BLMIS.

89.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

90.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York, FIM (USA) performed monitoring, research, and investor solicitation services for Kingate Global.

91.     KML and the FIM entities actively participated in Kingate Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in New York.

**E.      Kingate Global Used Banks in New York.**

92.     Kingate Global used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase Bank NA.

93.     KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial institution doing business in the United States as Kingate Global's custodian.

94.     In its role as Kingate Global's custodian, HSBC consistently used New York banks in carrying out its duties for Kingate Management and Kingate Global relating to investments with BLMIS.

95.     FIM also directed fee payments to be routed through a bank account in New York.

96.     The Trustee incorporates by reference the allegations of the Fourth Amended Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014).


Dated: New York, New York                    Respectfully submitted,
          June 26, 2015

                                             By: /s/ Howard L. Simon
                                             **WINDELS MARX LANE & MITTENDORF,
                                             LLP**
                                             156 West 56th Street
                                             New York, New York 10019
                                             Tel:  (212) 237-1000
                                             Howard L. Simon
                                             Antonio J. Casas
                                             Kim M. Longo
                                             Brian W. Kreutter

                                             *Special Counsel to Irving H. Picard, Trustee for
                                             the Substantively Consolidated SIPA Liquidation*

*of Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff*