**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of Bernard
L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　　Plaintiff-Applicant,<br>　　v.<br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　　Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>　　　　　　Plaintiff,<br>　　v.<br>Credit Suisse AG; Credit Suisse AG, Nassau Branch; Credit Suisse AG, Nassau Branch Wealth Management; Credit Suisse AG, Nassau Branch LATAM Investment Banking; Credit Suisse Wealth Management Limited; Credit Suisse (Luxembourg) SA; Credit Suisse International Limited; Credit Suisse Nominees (Guernsey) Limited; Credit Suisse London Nominees Limited; Credit Suisse (UK) Limited; and Credit Suisse Securities (USA) LLC;<br><br>　　　　　　Defendants. | Adv. Pro. No. 11-02925 (SMB)<br><br><br><br>**SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO CREDIT SUISSE AG, ET AL.'S MOTION TO DISMISS BASED ON EXTRATERRITORIALITY AND IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINTS** |

Irving H. Picard (the "Trustee") respectfully submits this memorandum as a supplement to his Main Brief being filed simultaneously herewith in opposition to the motion to dismiss based on extraterritoriality made by certain defendants and in further support of the Trustee's motion for leave to amend his Complaint to add the Proffered Allegations.

The moving defendants are: Credit Suisse AG ("CS AG"); Credit Suisse AG, Nassau Branch (together with its predecessor Credit Suisse (Bahamas) Limited, "CS Nassau"); Credit Suisse AG, Nassau Branch Wealth Management ("CS Wealth Management"); Credit Suisse AG, Nassau Branch LATAM Investment Banking ("CS Investment"); Credit Suisse Wealth Management Limited ("CS Management"); Credit Suisse (Luxembourg) SA ("CS Luxembourg"); Credit Suisse International ("CS International", misnamed "Credit Suisse International Limited" in the Trustee's Complaint); Credit Suisse Nominees (Guernsey) Limited ("CS Guernsey"); Credit Suisse London Nominees Limited ("CS London"); and Credit Suisse (UK) Limited ("CS UK") (collectively, the "Defendants"). Remaining defendant Credit Suisse Securities (USA) LLC ("CS USA") was not included in the motion.

## BACKGROUND

The Defendants, each a highly sophisticated and experienced financial institution in its own right, are all part of Credit Suisse—an integrated bank with multiple U.S. subsidiaries (including non-movant CS USA), branches and offices (including a New York headquarters). In fact, Defendant CS AG has availed itself of the benefits of the U.S. court system and has asserted in U.S. court filings that CS AG is headquartered and resides in New York.[1]

Defendant CS AG is the principal operating subsidiary of non-defendant parent

---

[1] *See Lloyds TSB Bank PLC v. Bank One, N.A., et al.*, No. 2:03-cv-02784-(SDW)(MCA) (D.N.J. Apr. 30, 2012), ECF No. 93-1; *See also* Summons and Complaint, *Credit Suisse Loan Funding LLC, et al. v. Highland Crusader Offshore Partners, L.P., et al.*, Index No. 652492/2013 (N.Y. Sup. Ct., N.Y. County July 17, 2013), ECF No. 1.

company Credit Suisse Group AG ("CS Group"), and CS Group and/or CS AG own each of the other Defendants. (Proffered Allegations at ¶¶ 6-7.) Defendants CS Nassau, CS Wealth Management, and CS Investment are not and were not separate entities, but rather branches or departments within Defendant CS AG. (*Id.* at ¶ 11.)

The Defendants were shareholders in one or more of the following funds: Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda", and together with Fairfield Sentry and Sigma, the "Fairfield Funds"); and Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Euro", and together with Kingate Global, the "Kingate Funds"; the Kingate Funds and Fairfield Funds together, the "BLMIS Feeder Funds"). (Trustee's Complaint at ¶ 2; *id.* at Exs. E, G, I, M, P.) Fairfield Sentry, Kingate Global and Euro invested substantially all of their assets with BLMIS. (Proffered Allegations at ¶ 3.) Sigma and Lambda did not have their own direct BLMIS accounts, but invested 100% of their respective assets in Fairfield Sentry.[2] (*Id.*) The Defendants received $374,152,731 in subsequent transfers of BLMIS customer property from the BLMIS Feeder Funds (the "Transfers"). (*Id.* at ¶ 1.)

The Trustee's Proffered Allegations demonstrate that the Trustee's action to recover these Transfers does not require an extraterritorial application of SIPA or Bankruptcy Code Section 550.

**THE TRANSFERS AND COMPONENT EVENTS OF THE DEFENDANTS' BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.**

Citing to *Maxwell I*, the District Court directed that "the location of the transfers as well

---

[2] For ease of reference, Sigma and Lambda are included herein in the definition of "BLMIS Feeder Funds."

2

as the component events of those transactions"[3] must be analyzed to determine whether a subsequent transfer claim involves a domestic or extraterritorial application of the Code and SIPA.[4] Under the District Court's ruling, the Trustee need only put forth "specific facts suggesting a domestic transfer" to avoid dismissal.[5] This is a fact-based inquiry in which all reasonable inferences should be drawn in the Trustee's favor.[6]

The Defendants argue that simply because they and the BLMIS Feeder Funds in which they invested were formally organized under the laws of foreign countries, the subsequent transfers they received are "purely foreign" and the Trustee's recovery action must be dismissed. This superficial argument disregards the *Maxwell I* analysis directed by the District Court and is inconsistent with Second Circuit extraterritoriality case law that similarly examines a transaction's various connections with the United States.[7]

The Defendants' singular focus on place of registration also ignores the fact that Credit Suisse's U.S. operations (out of its New York headquarters) drove the Defendants' and CS (USA)'s coordinated BLMIS Feeder Fund investment activities, including risk management and

---

[3] Extraterritoriality Decision, 513 B.R. at 227 (citing *Maxwell I*, 186 B.R. at 816).

[4] In *Maxwell I*, the court examined all potential connections with the United States by reviewing: (i) the debtor's location; (ii) the defendants' location; (iii) where the defendants engaged in business regarding the transaction; (iv) what transaction and agreements the parties entered into that led to the antecedent debt that the transfers were used to pay; (v) where the parties' relationship was centered when conducting the transaction that triggered the transfers; (vi) the law governing the parties' transactions; and (vii) how the transaction was concluded. *In re Maxwell Commc'n Corp.*, 186 B.R. 807, 816-17 (S.D.N.Y. 1995).

[5] Extraterritoriality Decision, 513 B.R. at 232 n.4.

[6] *See, e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 402-03 (S.D.N.Y. 2010) (deferring ruling on extraterritoriality at motion to dismiss phase and citing standard that "[t]he court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.").

[7] *See, e.g., Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 217 (2d Cir. 2014); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014); and other cases cited in the Trustee's Main Brief.

3

due diligence. (Proffered Allegations at ¶¶ 9, 34-38.) For purposes of extraterritoriality, there is no reason to distinguish between foreign-registered Credit Suisse entities (like the Defendants) and a U.S.-registered Credit Suisse entity (such as non-movant defendant CS USA), all of which invested in BLMIS Feeder Funds.

The Transfers and component events of the Defendants' investment transactions with the BLMIS Feeder Funds were predominantly domestic. To begin with, the entire purpose of the Defendants' (and CS USA's) investments with the BLMIS Feeder Funds was to invest in U.S. securities markets through New York-based investment adviser BLMIS and to earn returns on those U.S.-based investments. Credit Suisse personnel referred to the funds colloquially as "the Madoff funds" and expressed to the funds a need to do due diligence as to "Bernie Madoff". (*Id.* at ¶¶ 14, 38.) Moreover, each of the at least 989 combined times the Defendants entered into subscription agreements with the BLMIS Feeder Funds, they affirmed that they knew (i) the BLMIS Feeder Funds invested almost exclusively with a New York-based, SEC-registered investment adviser (i.e. BLMIS) that invested in the U.S. securities market and (ii) that the Defendants' money would be transferred to that same investment adviser in New York. (*Id.* at ¶¶ 15-17.) As Judge Lifland concluded in a similar matter, "[t]he movement of money to and from BLMIS in the United States . . . was not fortuitous or incidental; instead, it was 'the ultimate objective' and the '*raison d'etre*' of the Agreement between" the investor and the feeder fund.[8]

The express provisions of their agreements with the Fairfield Funds further demonstrate the domestic nature of the Defendants' investment transactions with these funds. (Proffered Allegations at ¶¶ 18-20.) The Defendants agreed in their subscription agreements with the

---

[8] *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 513 (Bankr. S.D.N.Y. 2012).

4

Fairfield Funds that New York law would govern their investments, and they consented to U.S. jurisdiction. (*Id*. at ¶ 19.) Defendant CS International also entered into a confidentiality agreement with a New York-based Fairfield entity, which agreement contained New York jurisdiction and governing law provisions. (*Id*. at ¶ 20.) Thus, the Defendants had every expectation that U.S. laws would apply to their investment transactions and that they would be subject to suit in the United States.

The Defendants also purposefully and repeatedly used U.S. bank accounts and the U.S. banking system to send subscriptions into and/or receive redemption payments from Fairfield Sentry and/or Kingate Global, which redemptions constitute the Transfers at issue from those funds.[9] The Defendants that invested with these funds collectively remitted subscriptions at least 820 times and received redemptions at least 310 times, and selected U.S. bank accounts and the New York banking system for subscriptions and redemptions. (Proffered Allegations at ¶¶ 26-30.) Specifically, these Defendants designated and used bank accounts at the Bank of New York in New York which were in their own names, or in the name of an affiliated Credit Suisse entity for that purpose. (*Id*. at ¶¶ 28-30.)[10] CS AG also designated a Bank of New York account for receiving fees from New York-based FGG affiliate, Fairfield Greenwich Limited. (*Id*. at ¶ 23.)

The above Defendants also remitted their subscriptions into U.S. correspondent accounts, as directed by Fairfield Sentry and Kingate Global, which moneys were ultimately delivered to BLMIS in New York. (Proffered Allegations at ¶ 31.)

---

[9] *See, e.g.*, *Picard v. Igoin (In re BLMIS)*, 2015 WL 603209, at *16-17 (Bankr. S.D.N.Y. Feb. 13, 2015) (in the analogous context of personal jurisdiction, repeated use of U.S. bank accounts sufficient).

[10] *See Steinberg v. Barclay's Nominees (Branches) Ltd.*, where the court held that it could exercise personal jurisdiction over Defendant CS Luxembourg based upon the entity's designation and repeated use of a Bank of New York bank account in New York to receive redemption payments from a foreign-registered hedge fund. *Steinberg v. Barclay's Nominees (Branches) Ltd.*, No. 04-60897-CIV, 2008 WL 4601043, at *6 (S.D. Fla. Sept. 30, 2008).

5

Further evidencing the domestic nature of the Defendants' transactions is that the Defendants conducted regular and extensive due diligence in New York with respect to their BLMIS Feeder Fund investments and relied heavily on personnel in Credit Suisse's New York headquarters, who acted for the collective benefit of all Credit Suisse entities invested in BLMIS feeder funds. (*Id*. at ¶¶ 32-39.) This due diligence was focused on Bernard Madoff and BLMIS. (*Id*.)

These New York-based Credit Suisse persons regularly met and/or communicated with New York-based BLMIS feeder fund managers over the course of several years for this purpose. (*Id*. at ¶¶ 36-38.) Credit Suisse's primary contact with regard to the Fairfield Funds was New York-based *de facto* partnership Fairfield Greenwich Group ("FGG"), which created, managed and controlled the funds at all relevant times. (*Id*. at ¶¶ 37-38.) Credit Suisse communicated with no fewer than four different FGG representatives who were based in New York. (*Id*. at ¶ 38.)

Credit Suisse's primary contact with regard to Kingate Global was New York-based Tremont, which had its principal place of business in Rye, New York, had its own BLMIS feeder funds, and managed Kingate Global out of New York during relevant times. (*Id*. at ¶¶ 36-38.)

All of these U.S.-based activities related to the Defendants' BLMIS Feeder Fund investments were part of the larger Credit Suisse group of companies' substantial U.S. operations. At all relevant times, Credit Suisse had thousands of U.S. employees, billions of dollars in U.S. assets, a regional headquarters/principal office in New York City, and 20 or so U.S. affiliates, including defendant CS USA. (*Id*. at ¶¶ 6-8, 40.) Credit Suisse companies formed abroad—including Defendants CS AG, CS International and CS UK—were subject on an ongoing basis to a multitude of U.S. banking and securities laws and regulations, and their

6

activities significantly impacted the U.S. (*Id*. at ¶¶ 42-44.) For example, CS AG and other Credit Suisse companies have acknowledged that they operated a cross-border banking business in Switzerland and New York for decades; and Credit Suisse acknowledged in a recent Global Recovery and Resolution Plan it filed with U.S. regulators that many of its companies—including Defendants CS AG, CS Nassau, CS International and CS UK—could have a "material impact on or pose a threat to the financial stability of … the U.S.", and that such companies must "contemplate the failure of [their] U.S. operations under … the U.S. Bankruptcy Code, the Securities Investor Protection Act and the New York Banking Law …." (*Id*. at ¶¶ 41-43.)

Beyond all of the above domestic components, the Defendants' argument that their transactions are purely foreign is wrong because it ignores the reality of the BLMIS Feeder Funds. FGG in New York created, managed, and controlled the Fairfield Funds. (*Id.* at ¶¶ 46-47, 55-57, 73-76.) The Fairfield Funds were based out of New York and had their principal place of business in New York. (*Id.* at ¶¶ 46, 50, 72.) Although technically registered in the BVI, the Fairfield Funds had no employees or offices there, and at all times, operational decisions were made by FGG employees in New York.[11] (Proffered Allegations at ¶¶ 49-51, 71-73.) In its BLMIS account opening documents, FGG listed Fairfield Sentry's address as in the United States. (*Id.* at ¶ 52.) The Fairfield Funds' initial and on-going due diligence on BLMIS was conducted in New York, and the operative legal documents for Fairfield Sentry's BLMIS accounts were governed by New York law. (*Id.* at ¶¶ 54, 56.) BLMIS in New York served as the Fairfield Funds' investment manager and implemented the split-strike conversion strategy for

---

[11] *See SEC v. Gruss*, 2012 WL 3306166 at *3 (S.D.N.Y. Aug 13, 2012) (finding that issues of fact existed regarding whether an offshore fund was "foreign" for purposes of extraterritoriality where complaint alleged that operational and investment decisions for the offshore fund were made in New York, "such that for all intents and purposes, the [offshore fund] was based in New York").

7

the Fairfield Funds. (*Id.* at ¶¶ 59-68, 77.)

The Kingate Funds similarly had no physical offices, no employees, and transacted no meaningful business in the BVI where they were technically registered. (*Id*. at ¶ 82.) Instead, the Kingate Funds operated through investment managers, consultants, and other service providers with substantial connections to the United States. (*Id*. at ¶¶ 83-84, 92-101.) BLMIS in New York was the investment manager, executing broker, and custodian for the Kingate Funds' assets, and thus control over the Kingate Funds rested entirely with BLMIS in New York. (*Id*. ¶¶ at 89-91.) New York was the hub for the Kingate Funds' due diligence on BLMIS, and the Kingate Funds' agreements with BLMIS were governed by New York law. (*Id*. ¶¶ at 86-88, 98-100.)

Finally, the Defendants previously argued in this case that Bankruptcy Code section 546(e)'s safe harbor should shield their Transfers from suit precisely because of their connection to the U.S. securities markets into which BLMIS purported to invest.[12] This argument is inconsistent with the Defendants' current assertion that their transactions lack sufficient domestic connections for purposes of extraterritoriality. Defendants should not be allowed to have it both ways, taking advantage of U.S. law when it suits them and running from it when it does not.

## **CONCLUSION**

For the foregoing reasons and those stated in the Trustee's Main Brief, Defendants' motion to dismiss should be denied, and the Trustee's motion for leave to amend his Complaint to add the Proffered Allegations should be granted.

---

[12] *See* Brief of *Amici Curiae* Financial Institution Defendants in Support of Appellees and Affirmance of the District Court, *Picard v. Ida Fishman Revocable Trusts (In re Bernard L. Madoff. Inv. Sec. LLC)*, No. 12-2557 (bk) (2d Cir. Jan. 29, 2014), ECF No. 346.

8

| | |
|---|---|
| Dated: New York, New York<br>June 26, 2015 | Respectfully submitted,<br><br>By: /s/ Howard L. Simon<br>**WINDELS MARX LANE & MITTENDORF, LLP**<br>156 West 56th Street<br>New York, New York 10019<br>Tel: (212) 237-1000<br>Howard L. Simon<br>Antonio J. Casas<br>Kim M. Longo<br>Brian W. Kreutter<br><br>*Special Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff* |

9