**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of Bernard*
*L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 11-02925 (SMB) |
| v. | |
| Credit Suisse AG; Credit Suisse AG, Nassau Branch; Credit Suisse AG, Nassau Branch Wealth Management; Credit Suisse AG, Nassau Branch LATAM Investment Banking; Credit Suisse Wealth Management Limited; Credit Suisse (Luxembourg) SA; Credit Suisse International Limited; Credit Suisse Nominees (Guernsey) Limited; Credit Suisse London Nominees Limited; Credit Suisse (UK) Limited; and Credit Suisse Securities (USA) LLC; | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO CREDIT SUISSE AG, ET AL.** |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, by and through the undersigned counsel, submits these Proffered Allegations Pertaining

to the Extraterritoriality Issue as to Credit Suisse AG ("CS AG"); Credit Suisse AG, Nassau

Branch ("CS Nassau"); Credit Suisse AG, Nassau Branch Wealth Management ("CS Wealth

Management"); Credit Suisse AG, Nassau Branch LATAM Investment Banking ("CS

Investment"); Credit Suisse Wealth Management Limited ("CS Management"); Credit Suisse

(Luxembourg) SA ("CS Luxembourg"); Credit Suisse International ("CS International",

misnamed "Credit Suisse International Limited" in the Complaint); Credit Suisse Nominees

(Guernsey) Limited ("CS Guernsey"); Credit Suisse London Nominees Limited ("CS London");

and Credit Suisse (UK) Limited ("CS UK")  (collectively, the "Defendants").  "CS Nassau" for

purposes herein also includes Credit Suisse (Bahamas) Ltd., which entity's assets and liabilities

were assigned and transferred to CS AG, Nassau Branch in 2008.

## **INTRODUCTION**

1.      The Trustee seeks to recover as subsequent transfers under 11 U.S.C. § 550(a)(2)

the Defendants' redemptions totaling $374,152,731 (the "Transfers") from Fairfield Sentry

Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited

("Lambda", together with Fairfield Sentry and Sigma, the "Fairfield Funds"); and Kingate

Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Euro", together with Kingate

Global, the "Kingate Funds"; the Kingate Funds and the Fairfield Funds collectively, the

"BLMIS Feeder Funds").

2.      Each of the Defendants was a shareholder in one or more of the BLMIS Feeder

Funds.  All Defendants invested in a Fairfield Fund: (i) all Defendants other than CS

International invested in Fairfield Sentry (and some in Sigma and Lambda as well); and (ii) CS

International invested in Sigma.  Defendants CS AG, CS Nassau, CS Guernsey, CS London and

CS UK also invested in Kingate Global (and for CS AG, in Euro as well).

3.    Each of Fairfield Sentry, Kingate Global and Euro invested at least 95% of their

assets in accounts managed by New York-based Bernard L. Madoff Investment Securities LLC

("BLMIS").  Sigma and Lambda did not have their own direct BLMIS accounts, but invested

100% of their assets in Fairfield Sentry, serving solely as vehicles for converting Euro (for

Sigma) and Swiss Franc (for Lambda) investments of their shareholders into U.S. dollars.  For

ease of reference, Sigma and Lambda are included herein in the definition of "BLMIS Feeder

Funds".

4.    Since the filing of the Complaint, the Trustee has uncovered documents

referencing additional redemption payments/subsequent transfers to certain of the Defendants

totaling at least $110 million from Fairfield Sentry, Sigma, Kingate Global and Euro.  These

additional transfers will be included in an amended complaint.

## THE DEFENDANTS' TRANSFERS AND COMPONENT EVENTS OF THEIR BLMIS FEEDER FUND TRANSACTIONS WERE PREDOMINANTLY DOMESTIC.

5.    The Defendants intentionally invested in the BLMIS Feeder Funds to profit from

BLMIS's purported investments in the United States, and the Transfers and component events of

their BMLIS Feeder Fund transactions were predominantly domestic.

## Background: The Defendants are all a Part of the Credit Suisse Group of Companies, Which has a Headquarters or Principal Office in the United States.

6.    The Credit Suisse Group of companies represent a major international banking

and investment organization with a long-standing, critical hub of operations in the United States.

2

At all relevant times, Credit Suisse Group AG ("CS Group") was the umbrella entity to each of the other Defendants, and CS Group and/or Defendant CS AG directly or indirectly owned each of the other Defendants, along with around 20 U.S.-based affiliates.

7.    Defendant CS AG—previously known as "Credit Suisse First Boston" and the wholly-owned, principal operating subsidiary of CS Group—has multiple locations in the United States employing thousands of U.S. employees.

8.    CS AG has described its offices at 11 Madison Avenue in New York City as a "headquarters" or "principal office".  As of September 2014, this New York branch held approximately $94.3 billion in assets.

9.    Personnel in this New York City office were relied upon to conduct Defendants' BLMIS Feeder Fund business.

10.    CS AG shared this New York office with U.S.-registered, non-moving defendant Credit Suisse Securities (USA) LLC ("CS USA").  CS USA invested in and received redemptions from Euro.  Despite that both entities used the same office and invested in the same BLMIS Feeder Fund, only CS AG was included in the consolidated Motion to Dismiss Based on Extraterritoriality.

11.    Although sued separately, the Trustee has learned since the filing of the Complaint that Defendants CS Nassau, CS Wealth Management, and CS Investment are or were branches or departments of CS AG, not separate entities.

**The Entire Purpose of the Defendants' BLMIS Feeder Fund Investments was to Engage in Transactions in U.S. Securities Through a New York-Based Investment Adviser**.

12.    The entire purpose of the Defendants' investments in the BLMIS Feeder Funds was to invest in U.S. securities, options, and Treasury bills through BLMIS, a New York-based investment adviser, and its BLMIS Feeder Fund investments were all centered in the U.S.

3

13.      The Defendants knew and intended that their investments would be transferred to

BLMIS in New York to manage and invest in the U.S. securities markets.  The Defendants made

such investments for the express purpose of receiving returns on U.S.-based investments from

BLMIS.

14.      The Defendants knew that Madoff controlled all aspects of their BLMIS Feeder

Fund investments, even referring in internal communications to the "Madoff funds".

15.      Shareholders in the BLMIS Feeder Funds like the Defendants were required to

enter into a subscription agreement each time they subscribed for shares in (i.e. invested money

into) the funds.  Combined, the Defendants remitted subscription payments to such funds at least

989 times.

16.      Each of the Defendants invested in one or more of the Fairfield Funds.  Upon

entering into subscription agreements with the relevant Fairfield Funds (the "Fairfield Funds'

Subscription Agreements"), the Defendants affirmed that they "received and read" such funds'

Private Placement Memoranda ("PPMs").  Based on the information contained in the Fairfield

Funds' Subscription Agreements and PPMs, each of the Defendants knew the following facts:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Sigma and Lambda invested 100% of their assets with Fairfield Sentry;

- BLMIS was the investment adviser of the Fairfield Funds;

- BLMIS was registered with the Securities and Exchange Commission (the "SEC");

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the "split-strike conversion" investment strategy (the "SSC Strategy") on the funds' behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury Bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase were made by BLMIS in New York;

4

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

17.     Upon entry into their subscription agreements with the Kingate Funds, the five Defendants that also invested in one or both of the Kingate Funds—CS AG, CS Nassau, CS Guernsey, CS London and CS UK (the "Kingate Invested Defendants")—also affirmed having received and read information memoranda from those funds ("Info Memos"). The Info Memos provided substantially similar information as the Fairfield Funds' PPMs, including that the Kingate Funds' investments in U.S. securities would be custodied in New York by the same New York investment adviser using the same SSC Strategy.

**The Defendants Submitted to U.S. Law and Jurisdiction in Connection With Their Fairfield Fund Investments.**

18.     The Defendants' subscription agreements also expressly provided that their investments would be subject to U.S. laws and jurisdiction in the U.S. courts.

19.     In the Fairfield Funds' Subscription Agreements, the Defendants agreed that: (i) "any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York", and they "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding"; and (ii) the Fairfield Funds' Subscription Agreements "shall be governed and enforced in accordance with New York law...."

20.     Also, Defendant CS International, and, upon information and belief, some or all of the other Defendants, entered into confidentiality agreements with a New York-based Fairfield entity, pursuant to which they subjected themselves to New York governing law and jurisdiction provisions.

21.     In addition to the foregoing, Defendants CS Nassau, CS AG, CS International and

CS London, and upon information and belief some or all of the remaining Defendants, entered

into, or were covered by, fee sharing agreements with New York-based Fairfield Greenwich

Limited ("FG Limited"), a Fairfield Greenwich Group ("FGG") entity based in New York,

which agreements compensated them for bringing investments into BLMIS.  FG Limited was the

cornerstone of the New York-based FGG *de facto* partnership, which created, managed and

controlled the Fairfield Funds.  FG Limited was registered to do business in New York and listed

its principal executive office as that of FGG in New York.

22.     Pursuant to these fee agreements, CS AG and CS Nassau routinely received fees

from FG Limited.  For example, CS AG received fees quarterly from 2003 through 2008.

23.     CS AG designated a U.S. bank account to receive these fees.

24.     Upon information and belief, CS London and potentially other Kingate Invested

Defendants also entered into, or were covered by, one or more distribution agreements or fee

agreements to receive similar fees on their Kingate Fund investments, and they received some or

all of these U.S. dollar payments into one or more U.S. bank accounts.

## The Defendants Purposefully and Repeatedly Utilized U.S. Bank Accounts for the Investments and Redemptions They Made.

25.     The Defendants purposefully and repeatedly used U.S. bank accounts and the

U.S. banking system in connection with their subscriptions into and/or redemptions from

Fairfield Sentry and/or Kingate Global, including with respect to the Transfers at issue from

those funds.

26.     During the relevant period, (i) the Defendants that invested in Fairfield Sentry

(which included all of the Defendants other than CS International, collectively, the "Sentry

Invested Defendants") and (ii) the Defendants that invested in Kingate Global (which included

all the Kingate Invested Defendants) received in the aggregate at least 310 redemption payments

6

totaling approximately $300 million, which payments constitute the Transfers at issue from those funds.

27.    New York was the situs repeatedly selected by the Sentry Invested Defendants and Kingate Invested Defendants for receiving redemptions.

28.    Specifically, the following Defendants used the following accounts (the "U.S. Accounts") to receive redemption payments, which are by and large at the Bank of New York in New York and in such Defendants' own name or the name of an affiliated Credit Suisse entity:

- CS Nassau used Bank of New York accounts in New York in its or its affiliate's name to receive redemptions from Fairfield Sentry and Kingate Global.

- CS Wealth Management used a Bank of New York account in New York in an affiliate's name to receive redemptions from Fairfield Sentry.

- CS London used an account in CS AG's name at the Bank of New York in New York to receive redemptions from Fairfield Sentry and Kingate Global.

- CS Management used a Bank of New York account in New York in its own name to receive redemptions from Fairfield Sentry.

- CS Guernsey used Bank of New York accounts in New York in the names of its affiliates to receive redemptions from Fairfield Sentry.

- CS AG used its own Bank of New York account in New York to receive certain redemptions from Kingate Global and a Citco HSBC account in New York to receive redemptions from Fairfield Sentry and other redemptions from Kingate Global.

29.    Upon information and belief based on the fact that each of the foregoing Defendants used Bank of New York accounts in New York to receive redemptions from Fairfield Sentry and/or Kingate Global, the remaining Defendants CS International, CS Luxembourg, CS UK, and CS Investment (which is a department of CS AG) similarly used a Bank of New York account in New York to receive their redemptions.

30.    The Sentry Invested Defendants and Kingate Invested Defendants also remitted at

least 820 subscription payments to Fairfield Sentry and Kingate Global collectively, which

payments constitute the totality of their investments in those funds. To the extent the Trustee has

documentation as to the Sentry Invested Defendants' and Kingate Invested Defendants'

subscriptions, Defendants in each case similarly used a Bank of New York account in New York

in its affiliate's names to remit subscriptions to Fairfield Sentry.

31.    Fairfield Sentry and Kingate Global also designated U.S. bank or correspondent

accounts to receive subscriptions from the relevant Defendants. Fairfield Sentry's subscription

agreements and Kingate Global's Info Memo each required that the relevant Defendants send

their subscription payments to a U.S. correspondent account, for further deposit into such funds'

bank accounts. From these bank accounts, the moneys were then ultimately deposited into

BLMIS's account at JPMorgan Chase Bank NA in New York.

**The Defendants' Due Diligence on the BLMIS Feeder Funds Was Based in New York, and
Defendants Relied Heavily on the Use of New York Personnel at CS AG's New York
Headquarters.**

32.    The Defendants conducted regular and extensive due diligence based in New

York and the Defendants relied heavily on the use of Credit Suisse's New York operation to

conduct due diligence with respect to all of the Defendants' BLMIS Feeder Fund investments.

33.    As set forth in CS Group's SEC filings, the CS Group of companies, including CS

AG and its subsidiaries and affiliates, work in conjunction with each other as part of an

intertwined, worldwide effort headed by CS AG. To that end, as reflected in marketing materials

and daily communications, the various CS Group entities use the name "Credit Suisse" globally

for investment banking, asset management, and private banking services offered by CS Group

and all of its entities, wherever located. Similarly, CS Group entity employees' e-mail addresses

and signatures generally reference the generic "Credit Suisse", rather than a specific Credit

Suisse entity or country.

34.    Specifically as to due diligence and risk management of its investments, as referred to in statements by CS Group executives (and as set forth in CS International and CS UK Annual Reports), CS Group itself maintains a centralized risk management and "control framework" intended to facilitate in-group exchanges of due diligence and other information gathered by various CS Group companies (including the Defendants and CS (USA)) from U.S. and other sources.

35.    Consistent with these policies and the fact that they were all investing in BLMIS-related funds, the Defendants (and CS (USA)) operated collectively through Credit Suisse personnel, including at CS AG's New York headquarters, with respect to risk management and due diligence on their investments and BLMIS.

36.    Such persons regularly met and communicated with the BLMIS Feeder Funds' New York-based managers or representatives, over many years:

- The Credit Suisse New York-based employees involved in due diligence included at least 4 different people—Maureen Meehan, Jaques Clough, Brian Peterson, and upon information and belief, Lauren Wychunas.

- New York-based *de facto* partnership FGG, which created, managed and controlled the Fairfield Funds at all relevant times, was the Defendants' primary contact with regard to the Fairfield Funds.

- Similarly, Tremont Group Holdings, Inc., a Delaware corporation with a principal place of business in Rye, New York, and/or its affiliates (collectively, "Tremont")—which had its own BLMIS feeder funds and managed Kingate Global out of New York during relevant times—was the Defendants' primary contact with regard to Kingate Global.

37.    The Credit Suisse personnel that performed this due diligence on the Fairfield and Kingate Funds analyzed relevant information, and met and corresponded with FGG and Tremont, regarding the Defendants' investments with the Fairfield and Kingate Funds.  The

9

Defendants' personnel functioned as one entity for this purpose.

38.    Examples of the on-going New York-based due diligence efforts of Credit Suisse

personnel with respect to the Fairfield and Kingate Funds and BLMIS include:

- On or about July 25, 2003, a Credit Suisse representative requested information regarding Sentry from New York-based FGG partner Daniel Lipton and was sent in response a Sentry tear sheet and offering memo.

- On February 19, 2004, a Credit Suisse representative forwarded to New York-based FGG partner Philip Toub ("Toub") an internal Credit Suisse email in which a Credit Suisse employee expressed what was referred to as "big concerns" regarding the Madoff funds.

- FGG's Lauren Ross, based in New York, emailed a Credit Suisse representative on September 25, 2004 and provided him with net asset value and performance data for Sentry, Sigma and other FGG-managed funds, invited him to visit FGG's U.S. website, www.fggus.com, and advised him to "feel free to contact your FGG representative for additional information. . . ."

- A Credit Suisse representative emailed FGG's Ross in New York on January 21, 2005 asking for a "monthly review of the Fairfield Sentry Fund".

- On or around May 31, 2006, Lauren Wychunas, a Credit Suisse representative who, upon information and belief, was based in New York, exchanged emails with Tremont's Darren Johnston ("Johnston") in New York regarding a contact to arrange a meeting on Global to conduct due diligence.

- In September 2006, Tremont's Johnston received a request from Maureen Meehan ("Meehan"), based in Credit Suisse's New York office, for Global's 2005 audited financial statements.  Johnston emailed Global's 2004 and 2005 statements to her from his New York office.

- In 2007 and 2008, Meehan requested and received from Tremont the assets under management for Global and other due diligence information for this feeder fund.

- In January 2008, Brian Peterson ("Peterson"), a New York-based Credit Suisse employee, emailed Johnston in New York and asked for more information as to what Kingate "actually does, how they invest, strategy or anything of the like?" This precipitated a telephone conference between Johnston and Credit Suisse's Jaques Clough ("Clough"), also based in New York, and Johnston sent information to Clough about BLMIS.

- Approximately two months later, Peterson emailed Rupert Allan, the President &

Chief Executive Officer of Tremont in Rye, New York addressing due diligence on Kingate. The email chain included an internal email Clough had sent Peterson stating that a meeting with Madoff was critical, because, in his words, "Visiting Tremont or Fairfield and seeing what they do for these funds, is a start, but since Madoff is the manager, it is Madoff that we would be interested in meeting with." Peterson asked Allan for his assistance. Allan invited Peterson and Clough "up to Tremont" in Rye, New York to discuss Credit Suisse's operational due diligence needs "as it relate[d] to Bernie Madoff."

- In March 2008, New York-based Meehan received a tear sheet summarizing Fairfield Sentry's performance after she requested Fairfield Sentry's assets under management for October 2007.

- As late as December 10, 2008, Credit Suisse personnel had a meeting with FGG's Jose Dios, who was based in New York, at which Credit Suisse requested information about Fairfield funds (a liquidity profile and tear sheets, among other things) and raised concerns about them.

- Prior to the revelation of Madoff's fraud, New York-based Clough scheduled a meeting in New York with FGG for December 18, 2008 to discuss "Fairfield Sentry's investment program."

39.    In addition to all the foregoing activities with the BLMIS Feeder Funds, the

Defendants were also granted rare access directly to Madoff himself, with top management,

including Oswald Gruebel—a CS Group Board Member and soon-to-be CEO—and two other

Credit Suisse executives having met with Madoff and FGG representatives more than once

beginning in 2000.

**The Defendants' Coordinated BLMIS Feeder Fund Activities Were Part of the Larger CS Group of Companies' Substantial U.S. Operations.**

40.    All of the Defendants' U.S.-based activities related to their BLMIS feeder fund

investments were part of the larger CS Group of companies' substantial U.S. operations. At all

relevant times, Credit Suisse had thousands of U.S. employees, billions of dollars in U.S. assets,

a regional headquarters/principal office in New York City, and 20 or so U.S. affiliates, including

defendant CS USA. Credit Suisse companies formed abroad were subject on an ongoing basis to

a multitude of U.S. banking and securities laws and regulations, and their activities significantly

11

impacted the U.S.

41.    In 2014, CS AG stipulated with the United States Department of Justice that CS AG, CS Group and various CS Group affiliates operated a cross-border banking business "[f]or decades" in Switzerland and New York, and that in connection with these coordinated activities, such entities: (i) used Credit Suisse's headquarters in New York, (ii) used Credit Suisse's correspondent bank accounts in New York to effectuate transfers of money, and (iii) made filings with the Federal Reserve Bank in New York.

42.    Because of their extensive U.S. activities, the CS Group and its "consolidated subsidiaries" (including CS AG) are amongst the financial institutions that are required to periodically file a "Global Recovery and Resolution Plan" with the U.S. Federal Reserve Bank and the Federal Deposit Insurance Corporation ("Recovery Plan").

43.    The June 2014 Recovery Plan listed CS Group and Defendants CS AG, CS International and CS UK, among others, as entities that could have a "material impact on or pose a threat to the financial stability of … the U.S.", and specified, "Governing rules require that we contemplate the failure of our US operations under ordinary insolvency law (for our US operations, this means the US Bankruptcy Code, the Securities Investor Protection Act and the New York Banking Law). . . ."

44.    In addition:

- CS AG and CS Group are regulated by the SEC and filed joint annual reports with the SEC during the relevant period.

- CS AG (like non-movant CS USA) has a membership with the U.S. Depository Trust and Clearing Corporation and is a participant in Fedwire, a major U.S.-based payment settlement system.  As a member of Fedwire, CS AG is required to maintain an account with the Federal Reserve Bank.

- From 2005 to the present, CS International, which has two U.S. subsidiaries, has filed Form 13Fs quarterly with the SEC, and New York State tax returns since

1993, and has listed CS AG's New York branch address for service of process.

- CS International, CS London and CS AG, and certain of their affiliates lobbied and otherwise engaged U.S. government agencies or branches such as the SEC, the Federal Reserve, and the U.S. Congress, and discussed multiple topics, including, most relevantly, amendments to bankruptcy laws and SEC rules and practices.

## The Fairfield Funds' Principal Place of Business Was in New York.

45.     At all relevant times, the Fairfield Funds' principal place of business was in New York, where their creator/manager/operator was headquartered, and they were U.S. residents.

### A.     The Genesis of the FGG *De Facto* Partnership.

46.     In 1988, Walter Noel and Jeffrey Tucker founded a *de facto* partnership called the Fairfield Greenwich Group based in New York City. FGG created, managed, and marketed a variety of investment vehicles, the largest of which were BLMIS feeder funds.

47.     The FGG *de facto* partnership included: individual persons; U.S. corporations; foreign corporations; and investment vehicles created, managed, operated, and marketed from FGG's New York headquarters. Among the FGG investment vehicles were the three BLMIS feeder funds—Fairfield Sentry, Greenwich Sentry, L.P. ("Greenwich Sentry"), and Greenwich Sentry Partners, L.P.—as well as the so-called currency funds, Sigma and Lambda. Sigma and Lambda received subscriptions in Euros and Swiss Francs respectively, converted the foreign currencies to U.S. dollars, and then invested all of the U.S. dollars in Fairfield Sentry.

48.     FGG also included a number of administrative entities that purportedly provided management and backoffice support to the funds. These entities included: FG Limited, Fairfield Greenwich (Bermuda), Ltd. ("FG Bermuda"), Fairfield Greenwich Advisors LLC ("FG Advisors"), and Fairfield International Managers, Inc. ("Fairfield International Managers").

### B.    Fairfield Sentry

49.    On October 30, 1990, FGG founding partners, Noel and Tucker, organized

Fairfield Sentry under the International Business Company Act of the Territory of the British

Virgin Islands ("BVI"), for the sole purpose of creating a fund to invest with Madoff.  Noel and

Tucker chose to organize Fairfield Sentry under BVI law in order to avoid U.S. taxation and

enjoy tax free status in the BVI.  Under BVI statutory law, Fairfield Sentry was prohibited from

doing business with other BVI residents except for other entities organized under the

International Business Companies Act.

50.    Fairfield Sentry was a shell corporation present in the BVI solely on paper.  From

its inception until its liquidation, Fairfield Sentry had no employees and no office.  It was

operated almost entirely by FGG personnel based in New York ("FGG New York Personnel").

Its statutorily required registered address in the BVI was a post office box care of a local trust

company owned and operated by a local law firm.  The same post office box served as the

registered address for hundreds of other investment vehicles unrelated to the FGG operations.

The law firm operating the trust company and registered post office box addressed its statements

for Fairfield Sentry services to FGG's New York headquarters.

51.    Fairfield Sentry's operations, structure, agreements, and marketing materials all

demonstrate that Fairfield Sentry's principal place of business was in the United States.  Fairfield

Sentry is currently in liquidation proceedings in the BVI and the United States.

### 1.    Fairfield Sentry's Agreements With BLMIS Confirm Fairfield Sentry's Principal Place of Business Was in the United States.

52.    When FGG opened Fairfield Sentry's BLMIS accounts, FGG made it clear

Fairfield Sentry was operated from the United States and not the BVI.  In November 1990,

Tucker executed BLMIS account documents opening Fairfield Sentry's BLMIS account 1FN012

and options account 1FN069.  In the account opening documents, Tucker listed Fairfield

Sentry's address as the office address of Fairfield International Managers—a company jointly

owned by Noel and Tucker—in Greenwich, Connecticut.  Further, Tucker directed BLMIS to

send all BLMIS account statements, trade confirmations, and correspondence to Fairfield

International Managers' offices in Greenwich, Connecticut.  In October 1992, Tucker opened a

second Fairfield Sentry account at BLMIS, 1FN045, as well as a second options account,

1FN070. BLMIS sent Fairfield Sentry's account statements, trade confirmations, and

correspondence for these accounts to the same Greenwich, Connecticut office.  On January 29,

1998, FGG notified BLMIS to change Fairfield Sentry's address for all of its BLMIS accounts to

FGG's New York headquarters.

53.    After the original BLMIS account documents were executed by Tucker on behalf

of Fairfield Sentry, FGG partners Tucker, Daniel Lipton, and Mark McKeefry—all located in

FGG's New York headquarters—executed additional BLMIS account documents on behalf of

Fairfield Sentry including: customer agreements, trade authorizations, options agreements, and

Internal Revenue Service forms.  In most instances, FGG listed Fairfield Sentry's address on

these BLMIS account documents as FGG's New York headquarters.

54.    The BLMIS customer agreements covering Fairfield Sentry's BLMIS accounts

are governed by New York law and all disputes arising under the agreements must be resolved

by mandatory arbitration in New York utilizing the laws of New York.  All transactions under

Fairfield Sentry's BLMIS customer agreements were subject to the Securities Exchange Act of

1934 and to the rules and regulations of the SEC and Board of Governors of the Federal Reserve

System.  Every BLMIS trade confirmation received and reviewed by FGG personnel on behalf

of Fairfield Sentry identified BLMIS as a U.S. registered broker-dealer and a Securities Investor

Protection Corporation ("SIPC") member regulated by the SEC.

### 2. FGG New York Personnel Controlled Fairfield Sentry's Relationship With Various Citco Entities.

55.      As the original directors of Fairfield Sentry, Noel and Tucker contracted with

Citco Fund Services (Europe) B.V. ("Citco Fund Services") to provide Fairfield Sentry with

backoffice administrative services such as coordinating subscription and redemption forms,

maintaining Know Your Customer information, and serving as the independent party verifying

the Net Asset Value of the Fairfield Sentry shares.  Noel and Tucker also contracted Citco

Global Custody N.V. ("Citco Custody") to nominally serve as the custodian of the Fairfield

Sentry assets.  In reality, BLMIS was the custodian inasmuch as all of the Fairfield Sentry assets

were held in the BLMIS accounts. As a result, Citco Custody entered into a sub-custodian

agreement with BLMIS.  As a further part of the relationship with Citco Fund Services and Citco

Custody, Noel and Tucker also opened bank accounts at Citco Bank Nederland, N.V. Dublin

Branch ("Citco Bank Dublin").  FGG New York Personnel had final control of the Fairfield

Sentry bank accounts and controlled all of Fairfield Sentry's relationships with the various Citco

entities.

### 3. FGG New York Personnel Managed Fairfield Sentry.

56.      At all relevant times, Fairfield Sentry was operated from FGG's New York

headquarters.  FGG New York Personnel monitored Fairfield Sentry's investments; managed

Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created

marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and

other service provider contracts on behalf of Fairfield Sentry; directed investments into and out

of BLMIS; and conducted various other due diligence and risk management activities.  Until

16

Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

57.     FGG New York Personnel made and controlled all decisions regarding Fairfield Sentry's assets not invested with BLMIS.  FGG New York Personnel also had final control of Fairfield Sentry's banking accounts, including Fairfield Sentry's accounts at Citco Bank Dublin. Even with the Citco entities' various roles, FGG New York Personnel made all ultimate operational decisions regarding Fairfield Sentry.  From the outset of Fairfield Sentry's operations, FGG New York Personnel controlled and approved all subscriptions into and redemptions from the fund.  From at least January 1, 2002, all Fairfield Sentry subscription agreements contained New York choice of law provisions, and provided for venue and jurisdiction for any disputes in New York.

### 4.  Fairfield Sentry's Investors Knew They Were Investing in BLMIS.

58.     Fairfield Sentry's subscription agreements also incorporated its PPMs by reference.  Each Fairfield Sentry subscriber acknowledged receipt of the PPM.  The original or later amended PPMs disclosed to the Fairfield Sentry investors that a minimum of 95% of its assets were: (1) deposited in its accounts at BLMIS in New York; (2) invested by BLMIS, an SEC-registered broker-dealer; (3) traded in accordance with Madoff's SSC Strategy; and (4) through BLMIS invested in U.S. S&P 100 Index securities and options or short-term U.S. Treasurys.  Fairfield Sentry's PPM also disclosed to investors that BLMIS's services were "essential to the continued operation of the Fund."

### 5.  BLMIS Was Fairfield Sentry's Investment Manager.

59.     Although FGG attempted to hide its manager, BLMIS served as the investment manager throughout the life of Fairfield Sentry.  At the outset, Fairfield Sentry used Information

Memoranda to solicit investments in the fund.  The Information Memoranda listed Fairfield

International Managers as Fairfield Sentry's investment manager for which it was paid a

performance fee of 20% of the reported gains in Fairfield Sentry's BLMIS accounts.  Despite

Fairfield International Managers's reported role, Fairfield Sentry disclosed that all of Fairfield

Sentry's assets were in discretionary brokerage accounts operated by BLMIS, which in reality

made all of Fairfield Sentry's investment decisions.

60.    In October 1997, Noel and Tucker agreed to merge FGG with Andrés Piedrahita's

Littlestone Associates, which was a money management firm also located in New York City.

Piedrahita is Noel's son-in-law.  With the merger, Littlestone Associates' clients became FGG

clients. In order to reflect the new ownership of FGG, Noel, Tucker, and Piedrahita formed FG

Limited.  FG Limited was formed under the laws of Ireland.

61.    While FG Limited was formed under foreign law, it reported its principal place of

business as FGG's New York headquarters, registered to do business in the State of New York,

and listed its principal executive office as FGG's New York headquarters.  Upon the formation

of FG Limited, Fairfield International Managers assigned all of its management contracts with

Fairfield Sentry and Greenwich Sentry to FG Limited. Following the assignment of the

management contracts to FG Limited, FGG New York Personnel revised the Fairfield Sentry

Information Memoranda to list FG Limited as Fairfield Sentry's investment manager, even

though all of Fairfield Sentry's assets remained in the discretionary brokerage accounts

controlled by BLMIS.

62.    In 2002, Noel, Tucker, and others from FGG approached Madoff to inform him

FGG would be launching a new fund of funds.  The new fund would be open to both U.S. and

foreign investors and, as a result, FGG would form a new U.S. entity to be the investment

18

adviser of the fund as well as other FGG operated funds, including the feeder and currency

funds.  Fearing greater SEC scrutiny, Madoff rejected the idea that a U.S.-based entity would

serve in the role as the investment manager of the feeder and currency funds.  As a result, FGG

formed two new entities, FG Advisers and FG Bermuda.

      63.     In October 2003, FGG formed FG Advisors as a Delaware limited liability

company.  FG Advisors is a wholly owned subsidiary of FG Limited.  At the same time, FGG

formed FG Bermuda under Bermuda law as another wholly owned subsidiary of FG Limited.

Upon the formation of FG Advisors and FG Bermuda, FG Limited assigned certain of its

management contracts to both entities, including the investment advisory agreements for the

three BLMIS feeder funds, Fairfield Sentry, Sigma, Lambda, and Greenwich Sentry, to FG

Bermuda.  FG Limited remained the placement agent for the same funds.

      64.     In 2003, with FG Bermuda's entry into the FGG operations, FGG New York

Personnel issued new PPMs which listed FG Bermuda as Fairfield Sentry's investment manager

and removed all references to the discretionary accounts at BLMIS.  The new PPMs also stated

FG Limited would remain as Fairfield Sentry's Placement Agent and receive a portion of the

management and performance fees paid to FG Bermuda.  The same PPMs also disclosed that

Fairfield Sentry would pay a percentage fee to FG Advisors for providing administrative services

and incurring administrative costs.

      65.     Prior to 2006, while FG Bermuda purported to manage Fairfield Sentry's,

Sigma's, Lambda's, Greenwich Sentry's, and Greenwich Sentry Partners' investments, it did not

register as an investment adviser under the Investment Advisers Act of 1940.

      66.     In 2005 and 2006, the SEC conducted an investigation of BLMIS and its

relationship to its feeder funds.  While the investigation was ongoing, in an attempt to deflect

19

further SEC inquiry, FG Bermuda registered as an investment adviser under the Investment

Advisers Act of 1940.  Following FG Bermuda's registration in April 2006, it was required to

file Form 13Fs with the SEC that Mark McKeefry, FGG's New York-based general counsel,

executed and submitted.

67.     After its 2005 and 2006 investigation, the SEC determined that BLMIS, and not

FG Bermuda, was the investment manager of Fairfield Sentry.  Accordingly, the SEC required

Fairfield Sentry to modify its investor communications and PPMs to properly disclose BLMIS as

Fairfield Sentry's investment manager for the fund's assets held in the BLMIS accounts.

68.     As originally operated, 100% of Fairfield Sentry's assets were in its BLMIS

accounts.  Beginning in 2003, Fairfield Sentry began investing up to 5% of its assets with other

fund managers, all of whom were selected by FGG New York Personnel.  FGG organized a

number of so-called "seedling funds," with Fairfield Sentry's investment serving as the base.

The seedling funds were operated and organized by FGG New York Personnel.  Many of the

seedling funds, in turn, invested part of their assets back into Fairfield Sentry.

### C.     Sigma and Lambda

69.     FGG operated Fairfield Sentry as a U.S. Dollar-based fund with all subscription

and redemptions paid in U.S. Dollars.  In response to investor requests to invest in Fairfield

Sentry using Euros or Swiss Francs, FGG created Sigma and Lambda.  Sigma accepted

subscriptions in Euros, converted them to U.S. Dollars, and then invested 100% of its assets in

Fairfield Sentry.  When paying redemptions, Sigma redeemed Fairfield Sentry shares, converted

the U.S. Dollars it received from Fairfield Sentry to Euros, and paid the Euros to the redeeming

Sigma investors.

70.     Similarly, Lambda accepted subscriptions in Swiss Francs, converted them to

U.S. Dollars, and then invested 100% of its funds in Fairfield Sentry.  When paying redemptions,

Lambda redeemed Fairfield Sentry shares, converted the U.S. Dollars it received from Fairfield

Sentry to Swiss Francs, and paid the Swiss Francs to the redeeming Lambda investors.

71.    Noel and Tucker organized Sigma on November 20, 1990, and Lambda on

December 7, 1990 as international business companies under the BVI International Business

Companies Act.  Just as Fairfield Sentry was statutorily restricted from doing business with any

other BVI residents except for other entities organized under the BVI International Business

Companies Act, so were Sigma and Lambda.  Sigma is currently in liquidation in proceedings in

the BVI and United States.  Lambda is in liquidation in a separate proceeding in the BVI.

72.    Also like Fairfield Sentry, Sigma and Lambda were shell corporations present in

the BVI only on paper.  They had no employees and maintained no offices.  They listed their

registered BVI address as the same BVI post office box care of a local trust company they shared

with Fairfield Sentry and hundreds of other unrelated investment vehicles. The law firm

operating the trust company and the registered post office box addressed its statements for

services for Sigma and Lambda to FGG's New York headquarters.  Sigma and Lambda were

operated almost entirely by FGG New York Personnel.

73.    As with Fairfield Sentry, and as part of the FGG *de facto* partnership, FGG New

York Personnel made the operational decisions regarding Sigma and Lambda.  Once Sigma and

Lambda were opened for investors, FGG New York Personnel monitored Sigma's and Lambda's

investments into, and redemptions from, Fairfield Sentry; managed Sigma's and Lambda's

relationships with clients and potential clients; created marketing and performance materials for

Sigma and Lambda; marketed Sigma and Lambda; performed administrative functions required

by Sigma and Lambda; negotiated confidentiality agreements and other service provider

contracts on behalf of Sigma and Lambda; and conducted various other due diligence and risk management activities. Until Sigma's and Lambda's liquidation, FGG maintained Sigma's and Lambda's books and records in New York. FGG New York Personnel also had final control of Sigma's and Lambda's banking accounts, including those accounts at Citco Bank Dublin, as well as the currency hedge accounts at the Bank of Montreal.

74.     FGG New York Personnel controlled and approved the subscriptions for and redemptions of Sigma and Lambda shares. Like Fairfield Sentry's subscription agreements, Sigma's and Lambda's subscription agreements contained a New York choice of law provision, provided for venue and jurisdiction for any disputes in New York, and incorporated their PPMs that described the significant role of BLMIS in New York in Fairfield Sentry, whose shares were Sigma's and Lambda's sole assets. Sigma's and Lambda's PPMs made substantially similar disclosures as Fairfield Sentry's PPMs with respect to Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in the investments. Additionally, Sigma's October 2004 PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities. This same risk was also disclosed in Fairfield Sentry's PPMs.

75.     Noel and Tucker were the original directors of Sigma and Lambda and, like Fairfield Sentry, contracted with Citco Fund Services to provide Sigma and Lambda with backoffice administrative services such as coordinating subscription and redemption forms, maintaining Know Your Customer information, and serving as the independent party verifying the Net Asset Value of the Sigma and Lambda shares. Noel and Tucker also contracted Citco Custody to serve as the custodian of the Sigma and Lambda assets. As a further part of the Citco relationship, Noel and Tucker opened bank accounts on behalf of Sigma and Lambda at Citco

Bank Dublin.  FGG New York Personnel had final control of the Sigma and Lambda Citco Bank

Dublin bank accounts.  Finally, FGG New York Personnel controlled all of Sigma's and

Lambda's relationships with the Citco entities.

76.    In addition to the Citco Bank Dublin accounts, in order to convert Sigma

investors' Euros and Lambda's investors' Swiss Francs into U.S. Dollars—as required for

investment in Fairfield Sentry and BLMIS.  Noel executed separate contracts on Sigma's and

Lambda's behalf with the Bank of Montreal for currency swaps which were "governed by and

construed in accordance with the laws of the State of New York (without reference to choice of

law doctrine)."

77.    FGG New York Personnel initially listed FG Limited as the investment manager

for Sigma and Lambda.  In 2003 with the creation of FG Bermuda, FGG New York Personnel

changed the Sigma and Lambda PPMs to indicate FG Bermuda was Sigma's and Lambda's

Investment Manager.  In fact there were no duties for any investment manager because Sigma's

and Lambda's sole purpose was to purchase Fairfield Sentry shares for investors who chose not

to invest directly in Fairfield Sentry using U.S. Dollars.

78.    The Trustee incorporates by reference the allegations of the Second Amended

Complaint proffered in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239

(SMB) (Bankr. S.D.N.Y., filed June 26, 2015 as part of the Extraterritoriality Briefing).

**The Kingate Funds' Transfers Are Domestic.**

79.    The Kingate Funds were feeder funds that invested exclusively with BLMIS in

New York.  BLMIS transferred approximately $926,351,905 of customer property to the Kingate

Funds during the life of the accounts prior to December 11, 2008.

80.    Each of the Kingate Funds filed customer claims in the SIPA liquidation.

23

**A.      The Kingate Funds Invested with BLMIS to Make Money from a New York-Based Investment Operation.**

81.      The Kingate Funds, together with their purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

82.      Despite having a registered address in the BVI, the Kingate Funds had no physical offices, no employees, and transacted no meaningful business there.

83.      Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation.

84.      The Kingate Funds' manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the Kingate Funds' investments with BLMIS.

85.      The Kingate Funds' sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York, and the Kingate Funds profited from their exclusive business relationship with BLMIS in New York.

**B.      The Operative Legal Documents Were New York-Based.**

86.      The Kingate Funds executed Customer Agreements, and other account opening documents, and delivered the agreements to BLMIS in New York.

87.      Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities

Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the

Federal Reserve System, and the Commodities Futures Trading Commission.

88.     The Kingate Funds agreed that all disputes arising under the Customer

Agreements with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to

be conducted in the United States before the American Arbitration Association, or "an arbitration

facility provided by any other exchange of which the broker is a member, or the National

Association of Securities Dealers, Inc. or the municipal securities rule-making board and in

accordance with the rules obtaining of the selected organization."

### C.     BLMIS Had Full Authority to Make and Execute Investment Decisions.

89.     The Funds' Trading Authorization Agreements authorized BLMIS to be the

Kingate Funds' "agent and attorney in fact," giving BLMIS full discretion over the Kingate

Funds' invested assets and to buy, sell, and trade in securities for the Kingate Funds.

90.     As with each of the other BLMIS Feeder Funds, BLMIS in New York acted as the

Kingate Funds' investment manager and purported to invest exclusively according to Madoff's

SSC Strategy, which involved the purchase of U.S. securities traded only on domestic

exchanges.

91.     BLMIS acted as the Kingate Funds' executing broker in purporting to purchase

securities on the Kingate Funds' behalf, and acted as the Kingate Funds' custodian for the

securities purportedly held on the Kingate Funds' behalf.

### D.     The Kingate Funds Were Managed From New York.

92.     During Tremont's tenure as co-manager of Kingate Global, and thereafter while it

continued to introduce investors to the Kingate Funds in return for fees, it was a valuable

contributor in New York to the success of the Kingate Funds.

93.     Tremont performed its co-management duties for Kingate Global in New York.

25

Suzanne Hammond, based in New York, signed a co-manager agreement entered into on

Tremont's behalf with Kingate Management and Kingate Global.

94.    Under that agreement, Kingate Management and Tremont were obligated to

evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all

other necessary management services to Kingate Global.

95.    The Kingate Funds were also co-managed by Kingate Management Limited

("KML"), a management entity formed by the founders of the Kingate Funds, Federico Ceretti

and Carlo Grosso.  KML operated through its agents in New York.

96.    KML's New York-based director, Michael Tannenbaum, Esq., performed certain

executive functions for KML, such as signing the co-manager agreement with Tremont on

KML's behalf.

97.    KML also appointed BLMIS as its agent, giving KML itself a presence in New

York.

98.    KML engaged a consultant, FIM Limited and later FIM Advisers LLP (together

"FIM"), to perform due diligence on BLMIS.

99.    Although FIM had a London address, Eric Lazear, FIM's head of due diligence

for feeder fund investments, such as the Kingate Funds' investments with BLMIS, was located in

New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

100.    FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York,

FIM (USA) performed monitoring, research, and investor solicitation services for the Kingate

Funds.

101.    KML and the FIM entities actively participated in the Kingate Funds' business

with BLMIS and knew BLMIS purported to invest U.S. securities traded over U.S. exchanges in

26

New York.

**E.    The Kingate Funds Used Banks in New York.**

102.    The Kingate Funds used New York banks to deposit funds with BLMIS,

transferring investor funds to, and obtaining money from, the BLMIS account at JPMorgan

Chase Bank NA.

103.    KML also engaged HSBC Bank N.A. ("HSBC"), a major international financial

institution doing business in the United States as Kingate Global's custodian.

104.    In its role as the Kingate Funds' custodian, HSBC consistently used New York

banks in carrying out its duties for Kingate Management and the Kingate Funds relating to

investments with BLMIS.

105.    FIM also directed fee payments to be routed through a bank account in New

York.

106.    The Trustee incorporates by reference the allegations of the Fourth Amended

Complaint filed in *Picard v. Federico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No.

100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: New York, New York
       June 26, 2015

Respectfully submitted,

By: /s/ Howard L. Simon
**WINDELS MARX LANE & MITTENDORF,
LLP**
156 West 56th Street
New York, New York 10019
Tel:  (212) 237-1000
Howard L. Simon
Kim M. Longo
Antonio J. Casas
Brian W. Kreutter

*Special Counsel to Irving H. Picard, Trustee for
the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff*