**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201

*Attorneys for Irving H. Picard, Trustee for the Substantively*
*Consolidated SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                              Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                              Defendant. | Case No.  08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                              Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                              Plaintiff,<br><br>v.<br><br>LEGACY CAPITAL LTD. and KHRONOS LLC,<br><br>                              Defendants. | Adv. Pro. No. 10-05286 (SMB)<br><br><br>**<u>AMENDED COMPLAINT</u>** |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act,

15 U.S.C. § 78aaa-*lll* ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff

(individually "Madoff," and collectively with BLMIS, the "Debtors") for his Amended

Complaint against defendants Legacy Capital Ltd. ("Legacy Capital") and Khronos LLC

("Khronos," together with Legacy Capital, the "Defendants"), alleges as follows:

## I.    **INTRODUCTION**

1.    The world now knows that BLMIS was a fraud. Defendants, however, knew at least as early as 2003. Defendants were owned and operated by the same group of people, including Rafael Mayer. While Rafael Mayer was an officer of Legacy Capital and managing director of its primary service provider, Khronos, he also sat on the committee overseeing one of Legacy Capital's major investors, Meritage Fund Ltd. ("Meritage"), an investment fund under the umbrella of Renaissance Technologies, LLC ("Renaissance"). In 2003, Renaissance conducted an analysis of BLMIS's strategy, the results of which were shared with Rafael Mayer. This analysis demonstrated, among other things, that (i) the option volume necessary to achieve Madoff's strategy did not exist on the market; (ii) the timing of Madoff's trades was statistically impossible; and (iii) Madoff's unusual fee structure resulted in his forfeiture of hundreds of millions of dollars. Each of these hallmarks of fraud was evident from the customer statements and trade confirmations BLMIS sent to Legacy Capital.

2.    After discovering these impossibilities and concluding that "Madoff's head would look pretty good above Elliot Spitzer's mantle," Renaissance redeemed its investment. Legacy Capital, however, remained invested and retained Khronos to conduct a quantitative analysis of Legacy Capital's BLMIS customer statements and trade confirmations. Khronos developed technology to track BLMIS's "pricing and volume statistics," which included valuing options according to either exchange or dealer-provided prices. These analytics demonstrated the options volume and timing impossibilities in Legacy Capital's account, only confirming what Defendants already knew from Renaissance's analysis. Notwithstanding this unimpeachable evidence, Legacy Capital continued its lucrative relationship with BLMIS, withdrawing a total of $213,180,068. Khronos received, upon information and belief, at least $6,601,079 as investment management and accounting services fees. The Trustee seeks the return of that money.

2

## II.    JURISDICTION AND VENUE

3.      This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred

to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §

1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

4.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O).  The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

5.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

6.      This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-

2(c)(3), 11 U.S.C. §§ 105(a), 544(b), 548(a), 550(a), and 551, the New York Fraudulent

Conveyance Act (N.Y. Debt & Cred. Law § 270-281. (McKinney 2001)), the New York Civil

Practice Law and Rules (McKinney 2003) ("N.Y. C.P.L.R."), and other applicable law.[1]

## III.    BACKGROUND, THE TRUSTEE AND STANDING

7.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

---

[1] Until a non-appealable, final determination of the applicable measure and burden of proof concerning a
defendant's knowledge in connection with the application of section 546(e) of the Bankruptcy Code to the Trustee's
claims, the Trustee asserts avoidance and recovery claims under sections 548(a)(1)(B), 544(b)(1), 550, and 551 of
the Bankruptcy Code, and applicable provisions of the N.Y. Debt & Cred. Law.

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding.

8.       On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

9.       Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

>       (a)       appointed the Trustee for the liquidation of the business of BLMIS
>                  pursuant to SIPA § 78eee(b)(3);
>
>       (b)       appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
>                  SIPA § 78eee(b)(3); and
>
>       (c)       removed the case to this Court pursuant to SIPA § 78eee(b)(4).

10.      By orders dated December 23, 2008 and February 4, 2009, respectively, this

Court approved the Trustee's bond and found that the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

11.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the

SIPA Proceeding.

12.      At a plea hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff*, No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed

against him by the United States Attorney for the Southern District of New York.  At the plea

hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of

[BLMIS]."

13.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

14.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

15.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

16.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

17.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

18.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.     THE PONZI SCHEME

19.     Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1, 2001, Madoff continued BLMIS as a sole member limited liability company under the laws of the State of New York.  BLMIS's ownership and control did not change since its formation in 1960.  During that time, BLMIS had been continually registered with the SEC, and remained a SIPC member since its formation in late 1970.  For most of its existence, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, sole owner, chairman, and chief executive officer, operated BLMIS with several family members and other employees, including DiPascali and Kugel, who pleaded guilty to helping Madoff carry out the fraudulent scheme.

20.     Beginning in the 1990s, Madoff outwardly ascribed the consistent investment success of BLMIS's IA Business to the "split-strike conversion" ("SSC") investment strategy. Madoff claimed his strategy would produce steady returns without the volatility in the stock market or other high return investment strategies.  Madoff generally indicated that investors' funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index

("S&P 100"), which is a collection of the 100 largest publicly traded companies, as determined

by Standard & Poor's Index Committee.  The basket of stocks was designed to correlate to the

movement of the S&P 100.  The second part of the SSC strategy involved purporting to sell call

options and buy put options on the S&P 100; this is commonly referred to as a "collar."  Madoff

purported to purchase and sell option contracts to control the downside risk of price changes in

the basket of stocks correlated to the performance of the S&P 100.  All options relating to the

companies within the S&P 100, including options based upon the S&P 100 itself, clear through

the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA

Business cleared any trades in any exchange-listed options.

21.    BLMIS commingled all of the funds received from IA Business investors in a

single BLMIS account maintained at JPMorgan Chase Bank.

22.    Because Madoff claimed that he would carefully time purchases and sales to

maximize value, customer funds would intermittently be out of the market.  During those times,

Madoff claimed that the funds were invested in U.S. Treasury securities ("Treasury Bills") or

mutual funds invested in Treasury Bills.  There is no record of BLMIS clearing a single purchase

or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing

Corporation, the clearing house for such transactions, or any other trading platform on which

BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that

BLMIS traded securities using the SSC strategy.

23.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased

none of the securities listed on the IA Business customers' fraudulent statements.

24.    Madoff operated the IA Business as a Ponzi scheme.  The money received from

IA Business customers was used primarily to make distributions to, or payments for, other

customers.  The falsified trades reflected in monthly account statements made it appear that the

IA Business accounts included substantial gains on customers' principal investments.  The Ponzi

scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow

of new investments with BLMIS's IA Business.

25.     Since at least 1983, BLMIS financial reports filed with the SEC fraudulently

omitted the existence of the billions of dollars of customer funds held by BLMIS.

26.     BLMIS did not register as an investment adviser with the SEC until August 2006.

At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment

Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts

and assets under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually

with the SEC, the latest of which was filed in January 2008.  It represented that BLMIS had 23

customer accounts with assets under management of $17.1 billion.  In fact, at that time BLMIS

had over 4,900 active customer accounts with a purported value of approximately $68 billion

under management.

27.     Contrary to standard practice in the investment advisory industry, BLMIS did not

charge the IA Business customers a fee for investment advisory services.  Madoff knew others

that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged

hundreds of millions of dollars for investment advisory services attributed to BLMIS.  Instead of

investment advisory fees, BLMIS purported to accept commissions for the purported trades, as

reflected in the fraudulent IA Business customer statements.

28.     BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling &

Horowitz"), a three-person accounting firm in Rockland County, New York.  Of the three

employees at the firm, one employee was an administrative assistant and one was a semi-retired

accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole

proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and

filing false tax returns for Madoff and others.

29.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    **DEFENDANTS**

30.    Khronos is a New York limited liability company with its principal place of

business at Two Grand Central Tower, 140 East 45th Street, 28th Floor, New York, New York

10017.

31.    Khronos was co-founded by Rafael Mayer and David Mayer, the sons of Isaac

Jimmy Mayer ("Jimmy Mayer," with Rafael and David Mayer, the "Mayers"), who both serve as

managing directors of Khronos.

32.    Legacy Capital is a British Virgin Islands Corporation, with its principal place of

business in care of Hamilton Trust & Management Company Limited, Level 1, Palm Grove

House, Wickham's Cay 1, Road Town, Tortola VG1110, British Virgin Islands.

33.    Legacy Capital commenced operations in September 2000.  Legacy Capital was a

single purpose vehicle; it invested solely with BLMIS through Account No. 1FR071 (the

"Legacy Capital Account").  Jimmy Mayer had signatory authority over and controlled the

Legacy Capital Account.  Legacy Capital's directors included Jimmy Mayer and Herbert M.

Selzer.  Rafael Mayer was also an officer of Legacy Capital.

34.    The Legacy Capital Account was opened by transfers from two other BLMIS

Accounts—HCH Management Company Ltd. (Account No. 1FR055) and Montpellier

International LDC (Account No. 1FN027).

35.    Khronos provided accounting services to Legacy Capital.  Rafael Mayer and

David Mayer, through various Khronos companies they operated, also acted as service providers

to other funds that ultimately invested in Legacy Capital, including Montpellier Resources Ltd.

d/b/a Khronos Group Ltd. ("Montpellier Resources").

36.    As a New York corporation, Khronos is subject to personal jurisdiction.

37.    This Court has personal jurisdiction over Legacy Capital because it transacted

business in New York, entered into agreements in New York, delivered agreements to BLMIS

headquarters in New York, communicated regularly with persons in New York, and

sent/received funds to/from BLMIS in New York, and wired funds to BLMIS's account at

JPMorgan Chase, Account #xxxxxxxxxxx1703, in New York, New York, for application to its

account at BLMIS and to conduct trading activities, and otherwise conducted business in New

York.

## VI.    RENAISSANCE TECHNOLOGIES' INVESTMENT WITH LEGACY CAPITAL

38.    Founded by James Simons, Renaissance is a New York hedge fund management

company.  The Mayers, who were longtime friends of Simons, invested in Renaissance's

Medallion and Meritage funds.

39.    Renaissance's Meritage fund invested in BLMIS through a swap agreement with

HCH Capital Ltd. f/k/a HCH Management Company Ltd. ("HCH Capital"), one of the Legacy

Capital's predecessors.

40.    Meritage's investment activities were overseen by a committee (the "Meritage

Oversight Committee"), which comprised Renaissance principals, including James Simons, Paul

Broder, Peter Brown, and research analyst Henry Laufer, and Meritage principals, including

Nathaniel Simons, the son of James Simons.

41.    Rafael Mayer was also a member of the Meritage Oversight Committee.  From Meritage's inception until late 2004, Rafael Mayer attended the Meritage Oversight Committee meetings in which Meritage investment and business decisions were made.

### *Renaissance Questions BLMIS's Strategy*

42.    Madoff's SSC strategy could not have eliminated market volatility.  At best, the strategy would have smoothed out peaks and valleys in the returns generated by the basket of S&P 100 stocks, but would have closely correlated with the S&P 100's performance.

43.    It was impossible for BLMIS investors to obtain gains on their investment when the S&P 100 was significantly down.  This is because downswings were hedged only by put options.  BLMIS could not have turned losses into gains by exercising put options—it could only have created a floor for losses.

44.    It was virtually impossible for the SSC strategy to outperform the S&P 100 during a major upswing, as the call options BLMIS sold would have been exercised during a significant market upswing, putting a ceiling on gains.

45.    Renaissance became concerned about BLMIS's consistent positive returns despite increased market volatility caused by the Internet stock market bubble burst and the contraction of the market due to economic concerns.

46.    Based on its understanding of the SSC strategy, Renaissance was suspicious of the lack of correlation between BLMIS's returns and the market's returns.  In 2003, Renaissance analyzed BLMIS's trading activity and attempted to replicate Madoff's SSC strategy, utilizing BLMIS account statements provided by Legacy Capital and publicly available financial information.

47.     The results were presented in a document titled "Madoff – Proposal" (the "Renaissance Proposal"), dated October 6, 2003, which was shared with the Meritage Oversight Committee, including Rafael Mayer.  The Renaissance Proposal found that (i) the market could not support the options volume Madoff purported to trade; (ii) a very high percentage of BLMIS's purported equity trades were bought below the daily closing price and sold above the daily closing price; (iii) Renaissance's simulation of Madoff's strategy put him in the market on days the account statements showed he was out; and (iv) Madoff's ability to trade billions of dollars without leaving a footprint was an unsolved mystery.

48.     The Renaissance Proposal sparked further analysis of BLMIS's operations and resulted in a November 2003 email exchange among the members of the Meritage Oversight Committee, including Rafael Mayer, expressing their disquiet about Renaissance's Madoff investment and desire to "get out."

49.     Broder wrote, "[l]ike background radiation my concern about Madoff has never really gone away . . . . I am in favour of redemption."

50.     Nathaniel Simons wrote:

> It's high season on money managers, and Madoff's head would look pretty good above Elliot Spitzer's mantle.  I propose that unless we can figure out a way to get comfortable with the regulatory tail risk in a hurry, we get out.  The risk-reward on this bet is not in our favor.

51.     Finally, James Simons concluded, "[u]nless one of you can give a compelling reason to stay I will ask Nat[haniel Simons] to withdraw the funds next week."

52.     In the meantime, Legacy Capital retained Khronos to value Legacy's portfolio on a daily basis based on "end of day pricing" and "volume statistics."  Khronos was also tasked with performing this historical valuation of trades dating back to January 1992, the time of the Mayers' original investment with BLMIS.  Upon information and belief, Rafael Mayer and

David Mayer restricted their employees' access to Legacy Capital and its BLMIS account statements. Contrary to Khronos' standard investment monitoring process, only Rafael Mayer and David Mayer were permitted to review Legacy Capital's account information.

53.     Khronos provided accounting services to Legacy Capital. As such, Khronos was Legacy Capital's agent and its knowledge of BLMIS's irregular trading activity is imputed to Legacy Capital.

54.     Rafael Mayer was an officer of Legacy Capital. Rafael Mayer was also managing director and co-founder of Khronos. As such, Rafael Mayer's knowledge of BLMIS's irregular trading activity is imputed to Legacy Capital and Khronos.

## VII.    THE DEFENDANTS KNEW OF MARKET IMPOSSIBILITIES AND INDICIA OF FRAUD

55.     Renaissance's and the Defendants' investigation and analysis of BLMIS's account statements and trade confirmations not only revealed impossible transactions—such as equity trades outside of the reported daily price range, and option volume greater than was available in the entire market—but also operations replete with indicia of fraud, including BLMIS's untraditional fee structure, extraordinarily consistent trading performance, and lack of a qualified auditor. These were not facts "suggestive" of fraud or "warning signs" that should have led to further inquiry. It was concrete evidence demonstrating that the BLMIS customer statements and trade confirmations reported non-existent securities transactions.

### Defendants Knew That BLMIS's Purported Options Trading Was Impossible

56.     Madoff claimed the SSC strategy relied on options "collars" to mitigate market volatility. BLMIS account statements and trade confirmations reported the strike price (the price at which an option may be exercised) and expiration date (the last date on which the option may be exercised) of options purportedly traded in BLMIS customers' IA accounts.

13

57.     BLMIS's confirmations and account statements showed S&P 100 call and put option contracts being traded on the Chicago Board Options Exchange ("CBOE").  The options trade confirmations BLMIS sent to the Defendants also included a unique identifier known as a CUSIP number, which allows traders to quickly access information regarding a particular transaction.  The CUSIP code is specifically assigned to CBOE, and designates OEX options, which are trademarked by the CBOE.  Trade confirmations for the purchase of options with CUSIP numbers could only have been purchased on the CBOE.  They could not have been purchased on the over-the-market ("OTC") market.

58.     Based on "prevailing wisdom," Renaissance assumed that BLMIS had $6 billion under management.  Using that assumption, the Renaissance Proposal noted that Madoff "would need approximately 133000 put or call contracts for the collar [and that d]aily volume figures for the exchange traded OEX options do not support anything like this trade size."

59.     In a December 11, 2003 email, Rafael Mayer identified BLMIS's options volume as an "open issue" that needed Madoff's explanation.  Although the confirmations sent to Legacy Capital indicated that trades were being made on CBOE, Mayer could only explain the volumes by hypothesizing that BLMIS could have been trading options on the OTC market.  Knowing that the OTC market could not support Madoff's volume, Broder helped Rafael Mayer draft a script of questions Khronos should ask Madoff in a future meeting to clarify Madoff's options trading practices.  The script demonstrates, however, that Broder and Rafael Mayer did not expect Madoff to have legitimate explanations to their concerns if he was truly executing the SSC strategy:

> First ask [Madoff how he would hedge out the other side of the trade].  To which we strongly expect an answer that he does this OTC.  Then ask (in innocent amazement!):  So you can do this kind of volume on OEX OTC Options?!?! . . . Gee, what kind of

banks are big enough to [trade with you] (more animated
amazement!!!)

60.     As to Madoff's timing regarding his options trading, Broder instructed Rafael

Mayer to ask:

> We have noticed that the strike on the OTC options trade we do
> with you always seems to be close to the closing price of the
> underlying – is this for convenience purposes (try to look as
> though this is a really serious question).

> Does this mean that you execute your OTC trades (assuming this
> was his claim earlier) towards the end of the day (I really want to
> hear that the OTC counterparty does $15bln trades almost at the
> close.)

61.     The Renaissance Proposal released two months earlier explained that trading

OEX options on the OTC market would be impossible because "the OTC market in OEX options

is not developed."

62.     In his November 21, 2003 email, Broder demonstrated that Madoff could not

hedge the amount he purported to move into the market. Broder estimated that BLMIS had

between $5 and $15 billion in assets under management; however, even if Madoff traded all of

the options available on the exchange on any given day, he could only hedge a $750 million

investment in equities. Even "assum[ing] that he spreads it over 3 days – so we get to 2.1bln –

still far short of the target numbers."

63.     In that same email, Broder also discounted the possibility BLMIS was trading

options in the OTC market. First, he noted that Renaissance interviewed several OTC options

market makers and they confirmed that no significant S&P 100 options volume was traded over

the counter. Broder also "[r]ecall[ed] that Raf[ael Mayer] stated that Madoff had said it was

necessary to spread trades over several days . . . ." An OTC trade is a private contract between

15

two parties, often at an unpublished price. Broder therefore could not understand "why" it was

necessary to spread out the trades "if you are doing OTC?"

64.     Second, Broder did not understand how a counterparty would enter into

consistently unfavorable transactions, especially at the volumes at which Madoff purported to

trade. As Broder wrote:

> Are we to believe that the market makers would take on $15bln of
> market risk at the close? Of course they might (might!!!) be
> willing to take the option risk if Madoff provided the market hedge
> in the underlying (ie they did the whole package with Madoff) but
> we already know that the trades in the underlying, compared with
> the closing prices, would leave the OTC counterparty showing
> losses (as our account always shows gains).
> . . . .
> So we need an OTC counterparty (not necessarily a bank) who is
> willing to do the basket of the options plus the underlying with
> Madoff at prices unfavourable for the OTC counterparty – in 10-
> 15bln!!!
>
> Any suggestions who that might be
>
> None of it seems to add up.

65.     Trading OTC options would have required Madoff to enter into private,

individually negotiated contracts with willing counterparties. Yet, as was typical for all BLMIS

accounts, none of the options trade confirmations sent to Defendants identified counterparties to

the options trades.

66.     Legacy Capital's account statements and trade confirmations demonstrated

Madoff was purportedly engaging in impossible option transactions. Legacy Capital's account

statements reflect that over 26% of the time, the options volume BLMIS reported trade for these

accounts exceeded the total number of OEX options traded on the CBOE for contracts with the

same purchase date, strike price, and expiration date.





67. For example, on February 19, 2003, BLMIS purportedly bought for Legacy Capital's account, 786 OEX call options (with a February expiration and a strike price of 465). There was not a single option contract with the same expiration and strike price traded on the CBOE that day.

68. On January 17, 2003, BLMIS purportedly sold on Legacy Capital's behalf 2,799 OEX call options (with a February expiration and strike price of 465), when the total volume traded on the CBOE for all such contracts that day was only 348.

69. Each of these trades was impossible. BLMIS's volume could not exceed that of the market for the identical contract on the same day.

70. Broder believed that BLMIS had assets under management of between $5 and 15 billion. Extrapolating the January 17, 2003 trade to reflect these assets under management figures, BLMIS's volume for this *particular* option contract would have been between 108,349 (if $5 billion) and 325,048 (if $15 billion).  Even using Renaissance's lower estimate, this

purported volume dwarfed the average daily volume for *all* OEX options on the CBOE, which

was, as of September 2002, 61,051.

71.    Based on its review of the trade confirmations and monthly statements and

Khronos's valuation of options, Defendants knew that BLMIS could not have been engaging in

the options trading it reported.  Moreover, Defendants were already on notice of this precise

impossibility by virtue Renaissance's analysis of the trading activity in the Legacy Capital

Account.

**Defendants Knew That the Timing of Madoff's Trades Was Impossible**

72.    Upon information and belief, Madoff represented he was time-slicing (i.e.,

entering the market for a particular stock at different times throughout a trading day) and that the

prices reported on the account statements reflected the average price over the course of the day.

The consistently favorable execution BLMIS claimed to achieve—in which it purported nearly

always to trade at the optimal price point—was statistically impossible.  If BLMIS had been

purchasing or selling stocks multiple times throughout a trading day, BLMIS's reported prices

would have necessarily gravitated toward the daily midpoint.

73.    The average price at which a security is traded throughout a trading day is

measured by a metric called volume weighted average price, or "VWAP."  Consistently buying

below VWAP and selling above VWAP year after year is statistically impossible.  But Madoff's

customer statements showed he did just that.

74.    The Renaissance Proposal, which was shared with the Meritage Oversight

Committee, including Rafael Mayer, examined BLMIS's purported equities trades and found

that an extremely high percentage of the purported equity purchases were bought below or at the

daily closing price and sold above the daily closing price.  According to Laufer, who supervised

18

Renaissance's review of BLMIS, Madoff's perfect timing "was statistically almost impossible . . . if you were trading in an ordinary way."

75.    Rafael Mayer's December 2003 email further indicates that "the timing of [Madoff's] trades" was flagged by Khronos as an issue requiring a legitimate explanation from Madoff.

76.    Laufer later explained to the SEC that, in 2003, during the time the Renaissance Proposal was prepared, "if you looked at [BLMIS's] monthly statements and looked at the executions of the stock side . . . the prices were just too good from any mode of execution that we were aware of that was legitimate."

77.    Renaissance also found that Madoff's timing for going into cash positions was extraordinary.  As Laufer later confirmed during an interview by the SEC,

> at certain points his position would go to zero [go to cash].  It seemed to us that the quarters that he'd decide to go to zero were exceptionally good quarters to have no position. . . .  It seemed to us that those quarters in which he decided to go into zero cash were quarters in which, if you blindly tried to do what he was doing, you would have lost money . . . .  We had no idea . . . how he managed to do that.

78.    Similarly, in his testimony to the SEC, Broder explained that, in 2003, he could not understand how Madoff's timing was so consistently good that almost all of his trades were profitable:

> That's pretty hard to achieve.  You know, you'd expect it to be approximately random.  If you just decide—you personally decide to buy some stocks every—you know, once a month and then you looked how you did against closing price, you'd be—some would be worse than the closing price and some would be better.  And on average, these were much better than the closing price.
> . . . .
> . . . [W]e don't trade once a month.   We trade thousands and thousands and thousands of times.
> . . . .

19

> So if I'm only right 53 times and wrong 47 times, I'm going to make some money. But Madoff wasn't doing that.
> . . . .
> More or less [he would have to be right pretty close to 100 percent of the time].
> . . . .
> . . . I knew it wasn't possible because of what we do.

79.    Legacy Capital's account statements and trade confirmations indicate that over the life of the Legacy Capital Account 81.79% of 5,776 equity buys were below the VWAP and 76.27% of 5,315 equity sales were above the VWAP.

80.    Khronos developed technology specifically to track "pricing and volume statistics," including "VWAP." This technology was used to analyze the trades reported on BLMIS account statements, dating back to 1992. Accordingly, Defendants knew that these purported trades were statistically impossible.

**Defendants Were Aware of Madoff's Unusual Fee Structure**

81.    Madoff used an unusual fee structure that, when compared to industry standards, meant that Madoff inexplicably walked away from hundreds of millions of dollars in fees that would normally be expected.

82.    Instead of charging a 1% to 2% management fee and a 10% to 20% performance fee, as is typical of investment funds, BLMIS charged none. Rather, BLMIS only charged a customary fee for its role as prime broker, which was a trading commission of $.04 per share and $1 per option contract.

83.    Though Madoff purportedly charged a commission of $.04 per equity trade, the BLMIS trade confirmations sent to Khronos did not report BLMIS commissions. For example, a trade confirmation indicates the purchase of 17,911 shares of American International Group Inc.

for the Legacy Capital Account on September 17, 2004, but the space where the commission would ordinarily be reported was left blank.

84.     In December 2003, Rafael Mayer noted Madoff's fee structure required further investigation, and that Madoff should be asked: "1) How [Madoff] make[s] money from [Legacy] since he does not charge commissions? 2) Why bother with this? Why doesn't he go to conventional financing and keep more upside for him?"

85.     Defendants' knowledge of Madoff's unusual fee structure was confirmed by Nathaniel Simons' November 13, 2003 email to the Meritage Oversight Committee, which highlighted Renaissance's concerns over Madoff's fee structure: "[W]hy does [Madoff] let us make so much money?  Why doesn't he capture that for himself?"

86.     Assuming the basic BLMIS commission structure, Legacy Capital would have paid to BLMIS only $10,826,591 in fees over the life of its BLMIS account. The Defendants therefore knew that by not utilizing standard investment advisory fee structure of 1% to 2% of assets under management plus a performance fee of 10% to 20% of any profits earned by the investment, Madoff knowingly passed on anywhere from $12 million to $36 million in fees from the Legacy Capital Account.

87.     Nathaniel Simons was even more skeptical about Madoff's fee structure when viewed in light of Fairfield Sentry's "$4 billion Madoff pass-through fund. [I]t's not clear why Madoff allows an outside group to make $100 million per year in fees for doing absolutely nothing."  Aggregating these fees across BLMIS's reported (or even assumed) assets under management, it was evident that Madoff forfeited hundreds of millions of dollars in fees annually.

**Defendants Knew That BLMIS's Enormous Trading Volume Never Impacted the Market**

88.    According to Legacy Capital's account statements, BLMIS purportedly purchased securities for all of its accounts over the span of, at most, a few days.  BLMIS also purported to liquidate those securities over, at most, a few days.

89.    As of November 2003, Defendants believed that Madoff managed between $5-15 billion.  The Defendants, therefore, understood that BLMIS purported to move billions of dollars into and out of the market over the course of just a few days numerous times every year.  This enormous volume should have caused significant market reactions and price displacement.  Such displacement was never observed because the trading did not occur.

90.    Broder believed that Madoff could not trade over 750,000 shares of a given equity without leaving a footprint.  Based on Legacy Capital's October through December 2003 statements, and assuming $5 billion under management, 156 of the 407 equities BLMIS purported to trade in that period would have exceeded 750,000 shares.  Assuming $15 billion under management, 361 of the 407 equities trades would have exceeded 750,000 shares.  Nine of the 361 equities trades would have exceeded the *total* market volume for that equity on that day.

91.    In December 2003, Rafael Mayer expressed Defendants' concerns about BLMIS's purported trading volume.  Defendants determined that they needed to address with Madoff the "timing differences based on account size."

92.    Broder urged Rafael Mayer to inquire about the market impact of BLMIS's purported equities trading volume: "Ask—given the size of these trades how do you stop the market from noticing them—doesn't the spike in volumes alert people to your trades?"

93.    Based on the lack of observable market reaction, Defendants knew that Madoff's trades were not happening as he claimed.

22

**Defendants Knew That BLMIS's Rates of Return Were Impossible**

94.     Because Madoff purported to use the SSC Strategy to invest in stocks and options within the S&P 100, the returns on the Legacy Capital Account should have correlated to the S&P 100.  They did not.

95.     Khronos screened investments "on a quantitative basis to evaluate its overall fit with the portfolio on a risk, return and market correlation basis."  This analysis included, but was not limited to, "return, volatility, market correlation, sharpe, alpha, beta and draw-down analysis."

96.     Specifically, the quantitative data Khronos analyzed indicated that from October 2000 to November 2008, Legacy Capital's annual returns with BLMIS averaged 11.32%. BLMIS purported to achieve these results with only four months of negative returns during a 98-month period, while the S&P 100 experienced 46 months of negative returns over the same period.



Monthly Rate of Return v. S&P 100
Legacy Capital Limited

97.      Regardless of market fluctuations, BLMIS achieved positive returns for the

Legacy Capital Account even during catastrophic market downturns such as the "dot com"

bubble bursting in 2000, the 2000-2002 bear market, and the recession of 2008.  BLMIS

continued to generate positive returns even during the last 14 months of BLMIS's existence,

when the S&P 100 fell no less than 39.4 %.  The SSC strategy purported to track the

performance of the S&P 100 and these results were simply not credible.  Such consistently

positive returns have no correlation with the historical fluctuations of the S&P 100, on which

BLMIS's trading activity was purportedly based.

98.      As set forth in the table below, the regularity of the positive rates of return,

especially during major market downturns, was not consistent with BLMIS's SSC strategy, a

strategy that should have produced results that correlated to the S&P 10.

| Year | Legacy Capital Rate of Return | S&P 100 Rate of Return |
|------|-------------------------------|------------------------|
| 2000 | 2.6% | (9.7%) |
| 2001 | 13.2% | (14.88%) |
| 2002 | 12.2% | (23.88%) |
| 2003 | 10.9% | 23.84% |
| 2004 | 9.9% | 4.45% |
| 2005 | 10.5% | (0.92%) |
| 2006 | 13.5% | 15.86% |
| 2007 | 10.9% | 3.82% |
| 2008 | 9.3% | (36.86%) |

99.     BLMIS's exits from the market at the end of each quarter and at year-end to evade certain SEC reporting requirements further emphasizes the implausibility of these returns.. Madoff purported to liquidate all investments at those times and invest the proceeds in Treasury Bills or mutual funds invested in Treasury Bills.  This commitment to exiting the market at quarter-end meant that BLMIS would be stuck with prevailing market conditions, regardless of whether they were favorable.  Notwithstanding this fact, the Legacy Capital Account reported only four down months over eight of the most volatile years in recent financial history.

100.     No other skilled fund managers had a similar percentage of negative months over the same period.  Managers who attempted to employ the SSC strategy purportedly used by BLMIS, like Renaissance, consistently failed to even approximate its results.

101.     Defendants knew that the returns purportedly realized by Legacy Capital were evidence of fraud not just because they were consistently successful during volatile markets, but because they were purportedly produced from a strategy that was supposed to generate returns that correlated with the performance of the S&P 100.

**Defendants Knew BLMIS's Operations Lacked Transparency and Controls**

102.     Madoff and BLMIS operated with little to no transparency.  Madoff held positions at BLMIS that would normally be occupied by three separate entities: he was the investment adviser, custodian, and the broker-dealer who initiated and executed the phantom trades.  This meant there was neither an independent custodian to assure the proper segregation of assets, nor was there an independent third party to verify the existence and value of BLMIS's investments or transactions.  This "self-custody" structure eliminated a critical internal control— widely recognized as basic in both the brokerage and investment management industry—that prevents fraud by having an independent custodian hold and confirm the existence of securities.

103.    Renaissance estimated that BLMIS had between $5 and $15 billion under management.  Yet BLMIS's publicly available regulatory filings revealed that it lacked the necessary number of employees to manage the billions of dollars of assets under management.  BLMIS reported that it had between one and five employees to perform its investment advisory functions, including research.

104.    Khronos was responsible for qualitatively evaluating BLMIS's "adequacy of accounting and back-office processes; the types and applications of internal controls; adherence to compliance, tax, and legal guidelines; integrity of key personnel; . . . and any potential for conflicts of interest."  Defendants knew BLMIS clearly lacked the staff necessary to conduct research on the investment opportunities, execute the purported trades in the IA Business, and manage the significant assets under management.

105.    These concerns were underlined by a November 13, 2003 email from Nathaniel Simons to Rafael Mayer:

> The point is that we don't know why [Madoff] does what he does we have no idea if there are conflicts in his business that could come to some regulator's attention.  Throw in that his brother-in-law is his auditor and his son is also high up in the organization and you have the risk of some nasty allegations, the freezing of accounts, etc.

**Defendants Were Aware That BLMIS Did Not Have a Capable Auditor**

106.    BLMIS ostensibly had tens of billions of dollars under management, but was audited by Friehling & Horowitz, an accounting firm with only two accountants, one of whom was semi-retired and living in Florida.  The firm's offices were in a strip mall in remote Rockland County, New York.

107.    Auditors, consistent with industry custom and practice, act as a safeguard against fraud by providing independent verification of assets and financial transactions.

26

108.    On November 3, 2009, David Friehling pleaded guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC.

109.    Information about Friehling & Horowitz's size, lack of professional qualifications, and the nature of the services they provided were readily accessible to Defendants.  All accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") annual peer review program.  In this program, experienced auditors assess a firm's audit quality.  Friehling & Horowitz, while a member of the AICPA, had not been peer reviewed since 1993.  The firm avoided the requirement by stating, in writing, that it did not actually perform any auditing work.  The results of these peer reviews are a matter of public record and on file with the AICPA.

110.    Rafael Mayer received Nathaniel Simons's November 13, 2003 email reflecting concerns over BLMIS's lack of a sufficiently independent auditor.  The email restated the widespread rumor that Friehling & Horowitz was run by Madoff's brother-in-law.  Though that assumption was incorrect, it only highlighted Renaissance's misgivings about the auditor's lack of qualifications and independence.

**Defendants Knew That BLMIS Reported Trades Outside of the Daily Range**

111.    Defendants received and reviewed trade confirmations and monthly account statements corresponding to the Legacy Capital Account.  Khronos valued securities daily according to prices reported by the relevant exchange.  Khronos also "proactively monitored [BLMIS's] investment performance, [which] consist[ed] of an ongoing reapplication of all its qualitative and quantitative analysis."

112.    Legacy Capital's trade confirmations routinely reported equity trades that reflected prices outside the range reported in the market for those respective trading days.

113.    For example, Legacy Capital's account statements for October 2003 reported a purchase of 87,472 shares of Intel Corporation (INTC).  BLMIS's trade confirmations indicate that these stocks were purchased on October 2, 2003 for $27.63 per share.  The daily price range for INTC stock purchased and sold on October 2, 2003, in fact, ranged from a low of $28.41 to a high of $28.95.

114.    Further, Legacy Capital's account statements for December 2006 reported a sale of 19,790 shares of Merck (MRK).  BLMIS's records and trade confirmations reflect that these stocks were sold on December 22, 2006 for $44.61.  In fact, the price range for MRK stock bought and sold on December 22, 2006 was between $42.78 and $43.42.

115.    In total, BLMIS reported to Legacy Capital 138 equity trades that were impossibly priced.

**Defendants Knew That BLMIS Account Statements Showed Impossible Dividends**

116.    During the periods that BLMIS investments were purportedly out of the market, BLMIS purported to invest in U.S. treasuries and the Fidelity Spartan U.S. Treasury Money Market Fund (the "Fidelity Fund").  BLMIS purported to do so notwithstanding the fact that this fund changed its name in August 2005.  Nevertheless, from the end of that year until Madoff's arrest, Legacy Capital's account statements continued to show transactions with a fund that no longer existed under that name.

117.    During the period of Legacy Capital's investment with BLMIS, the Fidelity Fund issued dividend payments only once a month.  Legacy Capital's account statements reported up to seven dividend payments in one calendar month.

118.    Over 97% of the dividend payments reported on Legacy Capital's account statements were impossible.  Of 159 dividend payments reported in Legacy Capital's account statements, 155 were reported to have been made on a date that did not match the dividend dates

reported by the Fidelity Fund. Khronos tracked the activity in Legacy Capital's account statements which reflected these improper dividends.

### Defendants Knew That BLMIS Purported to Engage in Speculative Options Trading That Deviated From the SSC Strategy

119.    Defendants understood that the SSC strategy's options "collar" was designed to protect against volatility: if the S&P 100 fell, the options "collar" would protect the equity positions from sizeable losses; similarly, the options "collar" would limit the gains if the S&P 100 rose. Defendants understood that Madoff's purported options trading was not designed to generate profit. Indeed, the Renaissance Proposal confirms that the purpose of the options is "risk control."

120.    Legacy Capital's BLMIS account statements show, however, that on at least ten separate occasions, purported options transactions were used solely to generate profit and not to hedge an equities transaction. In total, these speculative options transactions created $8,094,580 in profit in trading conditions at odds with the SSC strategy and exposed the Legacy Capital Account to significant risk.

121.    For example, Legacy Capital's August 2002 BLMIS statement indicated that on August 14, 2002 BLMIS purported to buy 2,964 S&P 100 call options at a price of $5.30 with a strike price of 450 and an August expiration. These options were purportedly sold on August 19, 2002 for a price of $18.44, a net gain of $3,891,732. Legacy Capital's August 2002 BLMIS statement makes plain that this options transaction did not hedge any equity transaction, and thus was a deviation from the SSC strategy.

### Options Confirmations Reflected Trades Inconsistent with SSC Strategy

122.    Documents purporting to confirm the execution of BLMIS's options trades evidence the trades' fraudulent nature.

29

123.    In executing the SSC strategy, the sale of call options necessarily preceded the purchase of put options because the proceeds of the sales purportedly funded the purchases. BLMIS's customer statements reflected this sequence of transactions.

124.    But BLMIS's option trade confirmations contradict the customer statements on two counts.  First, the trade confirmations show the *purchase* of call options, and the *sale* of put options—precisely the opposite of what the customer statements reported.  Second, the sequence of the transactions as reported on the trade confirmations is backwards—the purchase precedes the sale.

125.    For example BLMIS sent Khronos a trade confirmation for the Legacy Capital Account showing the sale of an "April 550" put settled on April 2, 2004 and the "purchase" of an "April 555" call on April 1, 2004.

126.    Khronos received copies of the Legacy Capital trade tickets from BLMIS and was responsible for valuing and verifying Legacy Capital's portfolio based on information contained in those trade tickets.  Defendants therefore knew that BLMIS's options trades were inconsistent with the SSC strategy.

### Defendants Were Aware That Options Collars Purportedly Executed by BLMIS Were Not Properly Balanced With Changes to the Composition of the Equities Basket

127.    The SSC strategy required that the options "collar" be adjusted to reflect changes in the basket of equities if some of the underlying securities were sold before liquidation of the entire basket.  The Legacy Capital account statements show changes to the basket of equities purportedly purchased for the Legacy Capital Account but fail to show corresponding changes to the options hedging the original trade.

128.    For example, Legacy Capital's account statements and trade confirmations in January and February 2004 indicate that on January 16, 2004, BLMIS purported to purchase a

basket of S&P 100 stocks that included shares of Texas Instruments Inc. ("TXN").  However, the

trade confirmations indicate that the shares of TXN were sold one month earlier than the other

equities in the basket.  Despite this early sale of TXN shares, the corresponding options hedges

did not change.  BLMIS's failure to rebalance the hedges on this basket was a deviation from the

SSC strategy that would have exposed the Legacy Capital Account to serious risk.

129.    Legacy Capital's account statements show that on 23 separate occasions BLMIS

did not change the corresponding hedge when an equity was purportedly sold before the rest of

the basket.  By leaving these hedges unbalanced, it was evident that BLMIS was not trading in

accordance with the SSC strategy.

**Defendants Knew That BLMIS Account Statements Showed Illegal,
Unauthorized Margin Trades**

130.    On numerous occasions, the Legacy Capital Account had negative cash balances

with BLMIS.  Certain of the negative balances resulted from either the purchase of equities that

exceeded the value of U.S. treasuries sold to fund the purchase, the purchase of put options prior

to selling the call options they were meant to fund, or cash being withdrawn prior to the sale of

equities to fund the withdrawal.  Normally, when a customer purchases assets prior to the funds

being available in the customer's account, the customer is buying on "margin."

131.    There were at least 68 occasions on which cash was withdrawn from the Legacy

Capital Account, resulting in a negative cash balance.  Upon information and belief, Legacy

Capital did not have a margin account with BLMIS and could not have traded on margin.  The

fact that Legacy Capital had a negative cash balance with BLMIS on 68 separate occasions

meant that Legacy Capital knew that there were 68 occasions on which any trades BLMIS

purported to execute on Legacy Capital's behalf could not have been executed.

132.    When buying on margin, customers are generally charged margin interest because buying on margin is effectively buying the underlying security with a loan from the investment adviser/broker dealer.  Upon information and belief, Madoff never charged Legacy Capital any margin interest for this extension of credit, effectively giving millions of dollars to Legacy Capital as an interest-free loan.  Additionally, BLMIS accounts were not charged margin fees, and most accounts at BLMIS were not designated as "margin accounts" which would have been necessary for this practice.

**Defendants Were Aware They Were Not Getting Real-Time Electronic Access to Accounts and Trade Confirmations**

133.    Typical investment management industry operating procedures allow clients to obtain account statements, balances, and other details through the Internet.  By at least June 2000, the practice of granting clients electronic access to their accounts was mainstream, particularly because the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 permits using electronic records to satisfy compliance with statutes and regulations.

134.    Throughout the 2000s, consumers were also conducting transactions and accessing their checking and savings accounts online.

135.    Upon information and belief, Defendants knew and relied upon Madoff's reputation as a technology pioneer.  BLMIS's marketing materials highlighted its abilities in this area:

> Madoff Securities' computerized transaction processing means that the firm can customize client reports and deliver them electronically in whatever format best meets the needs of customers.

136.    Despite being a technological pioneer of electronic trading, Madoff did not provide his customers with real-time electronic access to their accounts.  BLMIS used outmoded

technology and provided only printed account statements and paper trading confirmations sent via U.S. mail, three to four days after the trades occurred.

137.    The lack of real-time access to account data or electronic statements provided opportunities for fraud, particularly the manufacturing of fictitious trades, and the manipulation and/or adjustment of reported prices, which was or should have been apparent to sophisticated investment professionals.

## VIII.    DESPITE KNOWLEDGE OF FRAUD, DEFENDANTS BORROWED MONEY TO REMAIN INVESTED WITH BLMIS WHEN RENAISSANCE REDEEMED

138.    As director of Khronos and as member of Renaissance's Meritage Oversight Committee, Rafael Mayer saw the myriad impossibilities and indicia of fraud in the Legacy Capital Account.  Yet when Renaissance decided to redeem in early 2004, Rafael Mayer was the only Meritage Oversight Committee member to vote against redemption.

139.    After redeeming half of its investment, Rafael Mayer was able to persuade the Meritage Oversight Committee to delay redeeming the remainder so that he could find a lender to buy out Meritage to avoid redeeming directly from BLMIS.  Within several months, Rafael Mayer secured a loan from BNP Paribas.

140.    On July 26, 2004, Legacy Capital entered into a credit agreement with BNP Paribas – Dublin Branch, an Irish registered branch of BNP Paribas S.A. (collectively with BNP Paribas – Dublin Branch, "BNP Paribas") for a $100 million line of credit secured by the Legacy Capital Account (the "Credit Agreement").  The Credit Agreement provided that BNP Paribas Securities Corp. would be the collateral agent for BNP Paribas, and BNP Paribas Arbitrage SNC would be the calculation agent for BNP Paribas.

141.    As part of Legacy Capital's repayment of the secured loan, from September 2007 to June 2008, BLMIS transferred to BNP Paribas $87 million of Customer Property from the Legacy Capital Account.

## IX.    THE TRANSFERS

### Transfers to the Legacy Capital Account

142.    Prior to the Filing Date, BLMIS transferred at least $213,180,068 from the Legacy Capital Account (the "Initial Transfers")—$126,180,068 to Legacy Capital and $87,000,000 to BNP Paribas for the benefit of Legacy Capital—under circumstances that put Legacy Capital on notice that the Legacy Capital Transfers were made for fraudulent purposes. Of this amount, $86,505,850 comprised fictitious profits supposedly earned in the Legacy Capital Account and approximately $126,674,218 constituted the return of principal. The Transfers are Customer Property within the meaning of 15 U.S.C. § 78*lll*(4). The Transfers are avoidable and recoverable under sections 544, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly section 78fff-2(c)(3), applicable provisions of N.Y. C.P.L.R. 203(g) and 213(8); and N.Y. Debt. & Cred. Law sections 273-279.

143.    During the six years prior to the Filing Date, BLMIS made payments or other transfers from the Legacy Capital Account in the amount of $212,800,000. This included $125,800,000 transferred directly to Legacy Capital and $87,000,000 transferred to BNP Paribas for the benefit of Legacy Capital (the "Six-Year Transfers"). The Six-Year Transfers are avoidable and recoverable under 11 U.S.C. §§ 544 and 550(a)(1); applicable provisions of SIPA, particularly section 78fff-2(c)(3); and applicable provisions of N.Y. C.P.L.R. 203(g) and 213(8), and sections 273-279 of the N.Y. Debt. & Cred. Law.

144.    During the two years prior to the Filing Date, BLMIS made transfers from the Legacy Capital Account in the amount of $174,000,000. This included $87,000,000 transferred

34

directly to Legacy Capital and $87,000,000 transferred to BNP Paribas for the benefit of Legacy

Capital (the "Two-Year Transfers").  Each of the Two-Year Transfers is avoidable under

Bankruptcy Code section 548, and applicable provisions of SIPA, particularly section 78fff-

2(c)(3).  Each of the Two-Year Transfers is recoverable under section 550(a)(1) of the

Bankruptcy Code, and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

145.    Legacy received the Initial Transfers with knowledge of fraud at BLMIS, or with

willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

146.    A chart setting forth the Initial Transfers is included as Exhibit A.  The Initial

Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

**The Subsequent Transfers**

147.    Upon information and belief, a portion of the Transfers was subsequently

transferred either directly or indirectly to Khronos ("the Subsequent Transfers").

148.    From at least 2004, Khronos served as investment manager for Montpellier

Resources, a fund that placed investments into Legacy Capital, and received a monthly fee equal

to 1.2% of Montpellier Resources' net asset value, which it shared with HCH Capital.

149.    From 2004 to 2005, Khronos also received a performance fee of 5% of

Montpellier Resources' new net investment profits.  Between 2006 and 2008, Khronos received

a performance fee equal to 10% of Montpellier Resources' new net investment profits.

150.    For performing accounting services on behalf of Legacy Capital, Khronos

received an annual fee of at least $42,000, paid monthly.  Khronos also provided historical

pricing services to Legacy Capital, for which it received one-time fees.  As of the end of 2004,

Khronos received fees from Legacy Capital totaling $154,690.  Upon information and belief,

Legacy Capital paid a total of $319,190 to Khronos for providing accounting services.

151.    The Subsequent Transfers, or the value thereof, were and remain Customer

Property and are recoverable from Khronos under section 550(a) of the Bankruptcy Code and

SIPA § 78fff-2(c)(3).  Based on the Trustee's investigation, the Subsequent Transfers total, upon

information and belief, approximately $6,601,079.

152.    The Subsequent Transfers are recoverable from Khronos under section 550(a) of

the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

153.    Khronos received each of the Subsequent Transfers with actual knowledge of

fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud

at BLMIS.

154.    The Trustee's investigation is ongoing, and the Trustee reserves the right to:

(i) supplement the information on the Initial Transfers, the Subsequent Transfers, and any

additional transfers, and (ii) seek recovery of such additional transfers.

155.    If any of the recovery counts contravene each other, they are to be treated as being

pled in the alternative.

### COUNT ONE:

### FRAUDULENT TRANSFER – 11 U.S.C. §§ 105(a), 548(a)(1)(A), 550(a), AND 551

156.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

157.    The Two-Year Transfers were made on or within two years before the Filing

Date.

158.    Each of the Two-Year Transfers constituted a transfer of an interest of BLMIS in

property within the meaning of 11 U.S.C. §§ 101(54) and 548(a) of the Bankruptcy Code and

under 15 U.S.C. § 78fff-2(c)(3).

159.    The Two-Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two-Year Transfers to or for the benefit of Legacy Capital in furtherance of a fraudulent investment scheme.

160.    The Two-Year Transfers constitute fraudulent transfers avoidable by the Trustee under section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Legacy Capital under section 550(a) of the Bankruptcy Code.

161.    As a result of the foregoing, pursuant to sections 105(a), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or the value thereof, from Legacy Capital for the benefit of the estate of BLMIS; (d) directing Legacy Capital, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Legacy Capital related to or arising from, or concerning the Two-Year Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such time as the Two-Year Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from Legacy Capital; and (g) awarding any other relief the Court deems appropriate.

## COUNT TWO:

## FRAUDULENT TRANSFER – 11 U.S.C. §§ 105(a), 548(a)(1)(B), 550(a), AND 551

162.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

163.    The Two-Year Transfers were made on or within two years before the Filing
Date.

164.    Each of the Two-Year Transfers constitutes a transfer of an interest of BLMIS in
property within the meaning of 11 U.S.C. §§ 101(54) and 548(a) of the Bankruptcy Code and
under 15 U.S.C. § 78fff-2(c)(3).

165.    BLMIS received less than a reasonably equivalent value in exchange for each of
the Two-Year Transfers.

166.    At the time of each of the Two-Year Transfers, BLMIS was insolvent, or became
insolvent as a result of the Two-Year Transfer.

167.    At the time of each of the Two-Year Transfers, BLMIS was engaged in a business
or a transaction, or was about to engage in a business or a transaction, for which any property
remaining with BLMIS was an unreasonably small capital.

168.    At the time of each of the Two-Year Transfers, BLMIS intended to incur, or
believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts
matured.

169.    The Two-Year Transfers constitute fraudulent transfers avoidable by the Trustee
under section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Legacy Capital and
BNP Paribas under section 550(a) of the Bankruptcy Code.

170.    As a result of the foregoing, pursuant to sections 105(a), 548(a)(1)(B), 550(a), and
551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment:
(a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers
be set aside; (c) recovering the Two-Year Transfers, or the value thereof, from Legacy Capital
for the benefit of the estate of BLMIS; (d) directing Legacy Capital, to the extent allowable by

law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Legacy Capital related to or arising from, or concerning the Two-Year Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such time as the Two-Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from Legacy Capital; and (g) awarding any other relief the Court deems appropriate.

## <u>COUNT THREE:</u>

## <u>FRAUDULENT TRANSFER – N.Y. DEBT. & CRED. LAW §§ 276, 276-A, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 544(b), 550(a), AND 551</u>

171.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

172.    At all times relevant to the Six-Year Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

173.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under section 270 of the N.Y. Debt. & Cred. Law.

174.    Each of the Six-Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six-Year Transfers to or for the benefit of Legacy Capital in furtherance of a fraudulent investment scheme.

175.    Each of the Six-Year Transfers was received by Legacy Capital and/or BNP Paribas for the benefit of Legacy Capital with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Six-Year Transfers, and/or future creditors of BLMIS.As a

result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Legacy Capital for the benefit of the BLMIS estate; (d) directing Legacy Capital, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Legacy Capital related to or arising from, or concerning the Six-Year Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such time as the Six-Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from Legacy Capital; and (g) awarding any other relief the Court deems just and appropriate.

## COUNT FOUR:

### FRAUDULENT TRANSFER – N.Y. DEBT. & CRED. LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 544(b), 550(a), AND 551

176.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

177.    At all times relevant to the Six-Year Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

178.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under section 270 of the N.Y. Debt. & Cred. Law.

179.    BLMIS did not receive fair consideration for the Six-Year Transfers.

180.    BLMIS was insolvent at the time it made each of the Six-Year Transfers or, in the

alternative, BLMIS became insolvent as a result of each of the Six-Year Transfers.

181.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to

sections 273, 278, and/or 279 of the N.Y. Debt. & Cred. Law, and sections 105(a), 544(b), 550,

and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the

Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-

Year Transfers, or the value thereof, for the benefit of the BLMIS estate; (d) directing Legacy

Capital, to the extent allowable by law, to disgorge to the Trustee all profits, including any and

all management fees, incentive fees or other compensation and/or remuneration received by

Legacy Capital related to or arising from, or concerning the Six-Year Transfers from BLMIS to

Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that

Legacy Capital may have against the Debtors until such time as the Six-Year Transfers are

repaid to the Trustee; (f) awarding attorneys' fees and costs from Legacy Capital; and (g)

awarding any other relief the Court deems just and appropriate.

## COUNT FIVE:

### FRAUDULENT TRANSFER – N.Y. DEBT. & CRED. LAW §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 544, 550(a), AND 551

182.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Amended Complaint as if fully rewritten herein.

183.    At all times relevant to the Six-Year Transfers, there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of

the Bankruptcy Code.

184.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under section 270 of the N.Y. Debt. & Cred. Law.

185.    BLMIS did not receive fair consideration for the Six-Year Transfers.

186.    At the time BLMIS made each of the Six-Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six-Year Transfers was an unreasonably small capital.

187.    As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the N.Y. Debt. & Cred. Law, and sections 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Legacy Capital for the benefit of the BLMIS estate; (d) directing Legacy Capital, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Legacy Capital related to or arising from, or concerning the Six-Year Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such time as the Six-Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from Legacy Capital; and (g) awarding any other relief the Court deems just and appropriate.

## COUNT SIX:

### FRAUDULENT TRANSFER – N.Y. DEBT & CRED. LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 544, 550(a), AND 551

188.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

189.    At all times relevant to the Six-Year Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

190.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under section 270 of the N.Y. Debt. & Cred. Law.

191.    BLMIS did not receive fair consideration for the Six-Year Transfers.

192.    At the time BLMIS made each of the Six-Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

193.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the N.Y. Debt. & Cred. Law and sections 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Legacy Capital for the benefit of the BLMIS estate; (d) directing Legacy Capital, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Legacy Capital related to or arising from, or concerning the Six-Year Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such time as the Six-Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from Legacy Capital; and (g) awarding any other relief the Court deems just and appropriate.

**COUNT SEVEN:**

**UNDISCOVERED FRAUDULENT TRANSFERS – N.Y. C.P.L.R. §§ 203(g) AND 213(8)
AND N.Y. DEBT. & CRED. LAW §§ 276, 276-a, 278 AND/OR 279, 11 U.S.C. §§ 105(a),
544, 550(a), AND 551**

194.     The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Amended Complaint as if fully rewritten herein.

195.     At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by
BLMIS was not reasonably discoverable by at least one unsecured customer of BLMIS, who
holds matured or unmatured unsecured claims against BLMIS that are allowable under section
502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the
Bankruptcy Code.

196.     At all times relevant to the Initial Transfers, there have been one or more creditors
who have held and still hold matured or unmatured unsecured claims against BLMIS that are
allowable under section 502 of the Bankruptcy Code or that are not allowable only under section
502(e) of the Bankruptcy Code.

197.     Each of the Initial Transfers constituted a conveyance by BLMIS as defined under
section 270 of the N.Y. Debt. & Cred. Law.

198.     Each of the Initial Transfers was made by BLMIS with the actual intent to hinder,
delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of
Legacy Capital in furtherance of a fraudulent investment scheme.

199.     Each of the Initial Transfers was received by Legacy Capital and BNP Paribas for
the benefit of Legacy Capital with actual intent to hinder, delay or defraud creditors of BLMIS at
the time of each of the Initial Transfers, and/or future creditors of BLMIS.

200.    As a result of the foregoing, pursuant to N.Y. C.P.L.R. 203(g) and 213(8),

sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 544(b),

550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to

a judgment: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial

Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from Legacy

Capital for the benefit of the BLMIS estate; (d) directing Legacy Capital, to the extent allowable

by law, to disgorge to the Trustee all profits, including any and all management fees, incentive

fees or other compensation and/or remuneration  received by Legacy Capital related to or arising

from, or concerning the Initial Transfers from BLMIS to Legacy Capital and BNP Paribas for the

benefit of Legacy Capital; (e) disallowing any claim that Legacy Capital may have against the

Debtors until such time as the Initial Transfers are repaid to the Trustee; (f) awarding attorneys'

fees and costs from Legacy Capital; and (g) awarding any other relief the Court deems just and

appropriate.

## COUNT EIGHT:

## RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a) AND 550(a)

201.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

202.    On information and belief, Khronos received Subsequent Transfers, which are

recoverable under Section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

203.    Each of the Subsequent Transfers was made directly or indirectly to Khronos.

204.    Each of the Subsequent Transfers was received by Khronos at a time when it had

actual knowledge of fraud at BLMIS, or was willfully blind to facts suggesting a high probability

of fraud at BLMIS.

205.    As a result of the foregoing, pursuant to section 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Khronos: (a) recovering the Subsequent Transfers, or the value thereof, from Khronos for the

benefit of the BLMIS estate; (b) directing Khronos to disgorge to the Trustee all profits,

including any and all retrocession fees, incentive fees or other compensation and/or remuneration

received by Khronos related to, arising from, or concerning the Subsequent Transfers; (c)

recovering attorneys' fees and costs from Khronos; and (d) awarding any other relief, including

attorneys' fees and costs, the Court deems just and appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against Defendants as follows:

i.    On the First Claim for Relief, pursuant to sections 105(a), 548(a)(1)(A), 550(a),

and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and

preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c)

recovering the Two-Year Transfers, or the value thereof, from Legacy Capital for the benefit of

the estate of BLMIS; (d) directing Legacy Capital, to the extent allowable by law, to return to the

Trustee all profits, including any and all management fees, incentive fees or other compensation

and/or remuneration received by Legacy Capital related to or arising from, or concerning the

Two-Year Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy

Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such

time as the Two-Year Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs

from Legacy Capital; and (g) awarding any other relief the Court deems appropriate;

ii.    On the Second Claim for Relief, pursuant to sections 105(a), 548(a)(1)(B), 550(a),

and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and

preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c)

recovering the Two-Year Transfers, or the value thereof, from Legacy Capital for the benefit of

the estate of BLMIS; (d) directing Legacy Capital, to the extent allowable by law, to return to the

Trustee all profits, including any and all management fees, incentive fees or other compensation

and/or remuneration received by Legacy Capital related to or arising from, or concerning the

Two-Year Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy

Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such

time as the Two-Year Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs

from Legacy Capital; and (g) awarding any other relief the Court deems appropriate;

       iii.      On the Third Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279 of

the N.Y. Debt. & Cred. Law, sections 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code,

and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six-Year Transfers; (b)

directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the

value thereof, from Legacy Capital for the benefit of the BLMIS estate; (d) directing Legacy

Capital, to the extent allowable by law, to disgorge to the Trustee all profits, including any and

all management fees, incentive fees or other compensation and/or remuneration received by

Legacy Capital related to or arising from, or concerning the Six-Year Transfers from BLMIS to

Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that

Legacy Capital may have against the Debtors until such time as the Six-Year Transfers are

repaid to the Trustee; (f) awarding attorneys' fees and costs from Legacy Capital and BNP

Paribas; and (g) awarding any other relief the Court deems just and appropriate;

       iv.      On the Fourth Claim for Relief, pursuant to sections 273, 278, and/or 279 of the

N.Y. Debt. & Cred. Law, and sections 105(a), 544(b), 550, and 551 of the Bankruptcy Code, and

15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, for the benefit of the BLMIS estate; (d) directing Legacy Capital, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Legacy Capital related to or arising from, or concerning the Six-Year Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such time as the Six-Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from Legacy Capital; and (g) awarding any other relief the Court deems just and appropriate;

v.        On the Fifth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the N.Y. Debt. & Cred. Law, and sections 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Legacy Capital for the benefit of the BLMIS estate; (d) directing Legacy Capital, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Legacy Capital related to or arising from, or concerning the Six-Year Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such time as the Six-Year Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from Legacy Capital; and (g) awarding any other relief the Court deems just and appropriate;

vi.      On the Sixth Claim for Relief, pursuant to sections 275, 278, and/or 279 of the

N.Y. Debt. & Cred. Law and sections 105(a), 544(b), 550(a), and 551 of the Bankruptcy Code

and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six-Year Transfers; (b)

directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the

value thereof, from Legacy Capital for the benefit of the BLMIS estate; (d) directing Legacy

Capital, to the extent allowable by law, to disgorge to the Trustee all profits, including any and

all management fees, incentive fees or other compensation and/or remuneration received by

Legacy Capital related to or arising from, or concerning the Six-Year Transfers from BLMIS to

Legacy Capital and BNP Paribas for the benefit of Legacy Capital; (e) disallowing any claim that

Legacy Capital may have against the Debtors until such time as the Six-Year Transfers are

repaid to the Trustee; (f) awarding attorneys' fees and costs from Legacy Capital; and (g)

awarding any other relief the Court deems just and appropriate;

vii.      On the Seventh Claim for Relief, pursuant to N.Y. C.P.L.R. 203(g) and 213(8),

sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 544(b),

550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding

and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c)

recovering the Initial Transfers, or the value thereof, from Legacy Capital for the benefit of the

BLMIS estate; (d) directing Legacy Capital, to the extent allowable by law, to disgorge to the

Trustee all profits, including any and all management fees, incentive fees or other compensation

and/or remuneration received by Legacy Capital related to or arising from, or concerning the

Initial Transfers from BLMIS to Legacy Capital and BNP Paribas for the benefit of Legacy

Capital; (e) disallowing any claim that Legacy Capital may have against the Debtors until such

time as the Initial Transfers are repaid to the Trustee; (f) awarding attorneys' fees and costs from

49

Legacy Capital; and (g) awarding any other relief the Court deems just and appropriate;

viii.    On the Eighth Claim for Relief, pursuant to section 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment against Khronos: (a) recovering the Subsequent Transfers, or the value thereof, from Khronos for the benefit of the BLMIS estate; (b) directing Khronos to disgorge to the Trustee all profits, including any and all retrocession fees, incentive fees or other compensation and/or remuneration received by Khronos related to or arising from, or concerning the Subsequent Transfers; (c) recovering attorneys' fees and all applicable interest, costs, and disbursements of this proceeding from Khronos; (d) awarding prejudgment interest from the date on which the Subsequent Transfers were received by Khronos; and (e) granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

ix.    On all Claims for Relief, to the extent applicable by law, directing the Defendants to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to, arising out of, or concerning the Transfers, the Subsequent Transfers, and the associated BLMIS accounts.

x.    On all Claims for Relief, imputing individuals' knowledge to the Defendants.

xi.    On all Claims for Relief, establishment of a constructive trust over all Transfers and their proceeds, product and offspring in favor of the Trustee for the benefit of the estate;

xii.    On all Claims for Relief, under federal common law and N.Y. C.P.L.R §§ 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

xiii.    On all Claims for Relief, awarding the Trustee's attorneys' fees, all applicable interest, costs and disbursements incurred in this proceeding;

xiv.    On all Claims for Relief, assignment of Defendants' rights to seek refunds from

the government for federal, state, and local taxes paid on the Transfers during the course of the

scheme; and

xv.    Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

Dated:  July 2, 2015
        New York, New York                    *s/ Oren J. Warshavsky*
                                              Baker & Hostetler LLP
                                              45 Rockefeller Plaza
                                              New York, New York  10111
                                              Telephone:  212.589.4200
                                              Facsimile:  212.589.4201
                                              David J. Sheehan
                                              Oren J. Warshavsky
                                              Lan Hoang

                                              *Attorneys for Irving H. Picard, Trustee for the*
                                              *Substantively Consolidated SIPA Liquidation of*
                                              *Bernard L. Madoff Investment Securities LLC*
                                              *and the estate of Bernard L. Madoff*