Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Stacy A. Dasaro
Email: sdasaro@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>         v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                    Debtor. | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION AFFIRMING**
**TREATMENT OF PROFIT WITHDRAWAL TRANSACTIONS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 3

    A.    Commencement of SIPA Proceeding ........................................................ 3

    B.    The Claims Procedure Order and the Claims Process .............................. 3

    C.    Net Equity Under SIPA ............................................................................ 4

    D.    The Net Equity Calculation in the BLMIS Liquidation............................ 5

    E.    The Inter-Account Method Litigation Gives Rise to the Profit
        Withdrawal Motion.................................................................................... 8

    F.    Profit Withdrawal Transactions .............................................................. 10

        1.    Identification of the Profit Withdrawal Transactions .................. 10

        2.    Summary of the Support in the BLMIS Books and Records
              for the Profit Withdrawal Transactions........................................ 12

        3.    Specific Examples of Support in the BLMIS Books and
              Records for Profit Withdrawal Transactions ............................... 15

    G.    Direct and Indirect Profit Withdrawal Accounts .................................... 18

ARGUMENT.................................................................................................................... 18

    I.    The Trustee's Determination to Treat Profit Withdrawals as Reductions to
        Net Equity is Supported by the Books and Records of BLMIS and
        Claimants and Claimants Have Not Established Otherwise to the Trustee's
        Satisfaction.............................................................................................. 18

        A.    BLMIS Books and Records Show That Profit Withdrawal
            Transactions Were Properly Treated as Reductions to Equity in the
            Net Equity Calculation............................................................................ 18

        B.    The Trustee May Rely on His Professionals to Support His
            Determinations ....................................................................................... 20

        C.    The Burden is on Customers to Establish Their Claims Against the
            BLMIS Estate.......................................................................................... 22

        D.    There is no Evidence that any Customer Contemporaneously
            Disputed a Profit Withdrawal Transaction ............................................. 26

        E.    Securities are not Purchased by a Broker Sending Checks Directly
            to the Issuing Company .......................................................................... 28

CONCLUSION.................................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.R. Baron Co., Inc.*,
226 B.R. 790 (Bankr. S.D.N.Y. 1998)..................................................................23

*In re Adler Coleman Clearing Corp.*,
204 B.R. 111 (Bankr. S.D.N.Y. 1991)............................................................24, 25

*In re Bennett Funding Grp., Inc.*,
220 B.R. 743 (N.D.N.Y. 1997)..........................................................................21

*In re Bernard L. Madoff*,
515 B.R. 161 (Bankr. S.D.N.Y. 2014)...................................................................5

*In re BLMIS*,
424 B.R. 122 (Bankr. S.D.N.Y. 2010)...............................................................3, 6

*In re BLMIS*,
No. 13-cv-4332 (ALC), 2014 WL 1302660 (S.D.N.Y. Mar. 31, 2014) ..................25

*In re Bonham*,
251 B.R. 113 (Bankr. D. Alaska 2000)................................................................20

*In re Brentwood Sec., Inc.*,
925 F.2d 325 (9th Cir. 1991) .............................................................................24

*Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp*,
302 F.3d 83 (2d Cir. 2002)................................................................................22

*Gen. Elec.Co. v. Joiner*,
522 U.S. 136 (1997).........................................................................................21

*JPMorgan Chase Bank, N.A. v. Yuen*,
No. 11-cv-9192 (NRB), 2013 WL 2473013 (S.D.N.Y. June 3, 2013) ...................21

*In re Klein, Maus & Shire, Inc.*,
301 B.R. 408 (Bankr. S.D.N.Y. 2003)................................................................27

*Kusch v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
No. 95-08203 (JLG), 1998 WL 551972 (Bankr. S.D.N.Y. Aug. 24, 1998),
*aff'd*, 208 F.3d 202 (2d Cir. 2000) ......................................................................19

*Lopez v. Zaremba*,
No. 08-cv-01132, 2009 WL 36617 (N.D. Ohio Jan. 5, 2005) ...............................25

*In re Mason Hill & Co., Inc.*,
2004 WL 2659579 (Bankr. S.D.N.Y. Oct. 18, 2004) ............................................26

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re MF Global Holdings Ltd.*,
Nos. 11-15059 (MG), 11-02790 (MG), 2012 WL 5499847 (Bankr. S.D.N.Y.
Nov. 13, 2012) ..................................................................................5, 23, 24

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*,
No. 95-08203 (JLG), 1998 WL 160039 (Bankr. S.D.N.Y. Apr. 3, 1998) .............................20

*Modern Settings, Inc. v. Prudential-Bache Secs., Inc.*,
936 F.2d 640 (2d Cir. 1991)...................................................................................27

*In re O.P.M. Leasing Servs., Inc.*,
60 B.R. 679 (Bankr. S.D.N.Y. 1986) ....................................................................25

*In re Oberweis Secs., Inc.*,
No. 90-c-3466, 1992 WL 119272 (Bankr. E.D. Ill. May 21, 1992) .......................................27

*In re Petters Co., Inc.*,
506 B.R. 784 (Bankr. D. Minn. 2013) ..................................................................20

*Pitheckoff v. SIPC (In re Great Eastern Secs., Inc.)*,
No. 10-cv-8647, 2011 WL 1345152 (S.D.N.Y. Apr. 5, 2011) .........................................26, 27

*Richardson Greenshields Sec., Inc. v. Lau*,
819 F. Supp. 1246 (S.D.N.Y. 1993)..................................................................27

*Schultz v. Omni Mutual, Inc.*,
No. 93-3700 (KC), 1993 WL 546671 (S.D.N.Y. Dec. 30, 1993).....................................23, 25

*Estate of Sheppard ex rel. Sheppard v. Sec'y of Dep't of Health and Human Svcs.*,
No. 04-112v, 2007 WL 5160383 (Fed. Cl. Aug. 7, 2007).......................................................20

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
522 B.R. 41 (Bankr. S.D.N.Y. 2014) ....................................................................9

*SIPC v. BLMIS (In re Bernard L. Madoff Inv. Sec. LLC)*,
654 F.3d 229 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 08,
2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert. den.*, 133 S. Ct. 24, 133 S.
Ct. 25 (2012) ....................................................................................1, 5, 6, 22

*SIPC v. I.E.S. Mgmt. Grp.*,
612 F. Supp. 1172 (D.N.J. 1985), *aff'd without opinion*, 791 F.2d 921 (3d Cir.
1986) ..................................................................................22, 25

*SIPC v. Stratton Oakmont, Inc.*,
229 B.R. 273 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Arford v. Miller*, 239
B.R. 698 (S.D.N.Y. 1999), *aff'd sub nom. In re Stratton Oakmont*, 210 F.3d
420 (2d Cir. 2000)......................................................................23, 24, 25

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*SIPC v. Wise (In re Stalvey & Assoc., Inc.)*,
750 F.2d 464 (5th Cir. 1985) .................................................................25

*United States v. Int'l Bus. Mach. Corp.*,
66 F.R.D. 154 (S.D.N.Y. 1974) ...............................................................20

*United States v. United States Gypsum Co.*,
333 U.S. 364 (1948).................................................................................20

*In re Weis Sec., Inc.*,
No. 73-Civil-2332, 1976 WL 820 (S.D.N.Y. Aug. 2, 1976) ...................5

*Wiand v. Waxenberg*,
611 F. Supp. 2d 1299 (M.D. Fla. 2009)...........................................20, 21

**Statutes**

11 U.S.C. § 502(a) ...........................................................................5, 23, 24

15 U.S.C. § 78aaa .....................................................................................1

15 U.S.C. § 78eee(a)(3) .............................................................................3

15 U.S.C. § 78fff-1(a) ................................................................................3

15 U.S.C. § 78fff-2(a)(2) ..........................................................................23

15 U.S.C. § 78fff-2(b)......................................................................5, 23, 24

15 U.S.C. § 78fff(b) ...............................................................................4, 22

15 U.S.C. § 78*lll*(11) ................................................................................5

**Rules**

Fed. R. Bank. P. 3001 ..............................................................................24

Fed. R. Bank. P. 3001(a)...........................................................................23

Fed. R. Evid. 1004(a)................................................................................21

**Other Authorities**

http://www.sec.gov/answers/drip.htm .....................................................28

http://www.sec.gov/investor/pubs/tradexec.htm.......................................28

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*,[1] and the estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this memorandum of law, and the declarations of Lisa M. Collura ("Collura Decl."), Matthew B. Greenblatt ("Greenblatt Decl."), and Vineet Sehgal ("Sehgal Decl."), and the exhibits thereto, in support of the Trustee's motion (the "Motion") seeking entry of an order affirming the treatment of profit withdrawal transactions ("Profit Withdrawal Transactions") and overruling the objections thereto.

## PRELIMINARY STATEMENT

Through BLMIS, Madoff perpetrated the largest Ponzi scheme in history.  When the scheme was revealed, the Trustee was appointed to liquidate the business of BLMIS, determine each customer's net equity under SIPA, and distribute customer property on a pro rata basis to customers with allowed claims.

Although Madoff purported to employ various trading strategies to achieve consistent returns, no securities trades were made on behalf of his customers.  Because no trading took place, the Trustee calculated each customer's net equity by netting all deposits against all withdrawals over the life of each account, referred to as the Net Investment Method.  This method was approved by this Court and affirmed by the Second Circuit.  *SIPC v. BLMIS (In re Bernard L. Madoff Inv. Sec. LLC)*, 654 F.3d 229 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 08, 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert. den.*, 133 S. Ct. 24, 133 S. Ct. 25 (2012) (the "*Net Equity Decision*").

---

[1] Subsequent references to sections of the act shall be denoted as "SIPA § __."

As further described herein, the Profit Withdrawal Transactions are a subset of transactions reflected on BLMIS customer statements. Based upon BLMIS's books and records, the Trustee determined that the Profit Withdrawal Transactions were distributions of purported profits, interest, or dividends sent to customers. For purposes of the Net Investment Method, the Trustee treated the Profit Withdrawal Transactions as cash withdrawals, which reduced the net equity of each customer account. Although one customer has stated that he did not recall receiving checks in the amounts of the Profit Withdrawal Transactions in his accounts, the evidence overwhelmingly demonstrates that customers did in fact receive the purported profits. Internal BLMIS books and records, as well as third-party documents, all support the Trustee's determination. Indeed, in the ten-year period immediately preceding the commencement of this liquidation, the Trustee and his professionals have traced virtually all (99.997%) of the Profit Withdrawal Transactions occurring during that time to bank accounts held by, or for the benefit of, BLMIS accountholders.

On both sides of the net equity equation, the Trustee and his professionals undertook a comprehensive review of the available records to identify when funds were deposited or withdrawn in order to calculate the net equity of each customer account. In many instances, the same records show both deposits and withdrawals. No customer challenges these records for purposes of establishing deposits to their account; they only object to the sufficiency of the records when doing so has the potential to increase their net equity or reduce their avoidance liability. They cannot have it both ways. The Trustee and his professionals have reviewed and analyzed all available BLMIS books and records, which support his determination that Profit Withdrawal Transactions are properly treated as reductions to a customer's net equity.

2

## STATEMENT OF FACTS

### A.    Commencement of SIPA Proceeding

On December 11, 2008, federal agents arrested Madoff for criminal securities violations. *See In re BLMIS*, 424 B.R. 122, 125-26 (Bankr. S.D.N.Y. 2010) (the "*Bankr. Net Equity Decision*"). The same day, the Securities & Exchange Commission ("SEC") filed a civil complaint against Madoff and BLMIS alleging that BLMIS's investment advisor business was a Ponzi scheme. *See id.* at 124 n.3, 126.

On December 15, 2008, the SEC consented to a combination of its action with an application of the Securities Investor Protection Corporation ("SIPC") filed under section 78eee(a)(3) of SIPA. *Id.* at 126. Also on December 15, 2008, the District Court determined that BLMIS customers required the protections of SIPA, appointed the Trustee for the liquidation of BLMIS, and removed the case to the Bankruptcy Court. *Id.*

Under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers that hold allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. Under SIPA §78fff-1(a), the Trustee has the general powers of a bankruptcy trustee, in addition to the powers granted by SIPA.

### B.    The Claims Procedure Order and the Claims Process

SIPA has a unique claims process that differs from traditional bankruptcies, as reflected in specific provisions of SIPA and the claims procedures order entered by the Bankruptcy Court at the inception of the liquidation (the "Claims Procedures Order").[2]    Under the Claims

---

[2] *See* Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing Other Relief, *SIPC v. BLMIS*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 12.

Procedures Order, customers were required to file claims with the Trustee by the statutory bar date.  Moreover, claimants were instructed to provide documentation related to their accounts:

> It is also important that you provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of any cash amounts and any securities given to the Debtor from as far back as you have documentation.  You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.[3]

The Customer Claim Form contained a similar instruction.[4]

In total, over 16,000 claims were filed.  The Trustee issued claim determination letters to claimants.  For those with accounts at BLMIS, the Trustee provided his determinations of the net equity of their customer accounts and a schedule listing the transactions that resulted in the final net equity amount.  Under the Claims Procedures Order, claimants that disagreed with the Trustee's claim determination were required to file objections with the Bankruptcy Court setting forth the bases of their objection.[5]  If claimants did not object to the Trustee's determinations, the determinations became binding upon the claimant.[6]

### C.    Net Equity Under SIPA

A SIPA liquidation is conducted in accordance with the Bankruptcy Code, but where these two statutory schemes are not consistent, SIPA governs.  SIPA § 78fff(b).  Unlike an ordinary bankruptcy case, a SIPA liquidation gives priority to payment of customer net equity claims from the customer property estate, as distinguished from claims of general creditors,

---

[3] Explanatory Letter to Customers at 1, *SIPC v. BLMIS*, No. 08-01789 (SMB), ECF No. 8-2 (as approved by Claims Procedures Order at 2).

[4] Customer Claim Form at 1, *SIPC v. BLMIS*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 21, 2008), ECF No. 8-3 (as approved by Claims Procedures Order at 2); *see also* Instructions for Completing Customer Claim Form at 3, *SIPC v. BLMIS*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 21, 2008), ECF No. 8-4.

[5] Claims Procedures Order at 6-7.

[6] *Id.*

which are paid from the general estate. *See In re Weis Sec., Inc.*, No. 73-Civil-2332, 1976 WL 820, at *6 (S.D.N.Y. Aug. 2, 1976). Customers share in customer property up to the amount of their "net equity," which is the amount the debtor-broker would have owed to the customer if the broker liquidated the customer's securities positions, plus any cash deposited by the customer to purchase securities. SIPA § 78*lll*(11).

Because a "customer" with a "net equity" claim has priority status, claimants bear the burden of showing that they are entitled to such priority. *See In re Bernard L. Madoff*, 515 B.R. 161, 166 (Bankr. S.D.N.Y. 2014). For these reasons, the traditional rules in bankruptcy regarding claims allowance and the relative burdens of proof apply in this SIPA liquidation only to general creditors, not customers. *See, e.g., In re MF Global Holdings Ltd.*, Nos. 11-15059 (MG), 11-02790 (MG), 2012 WL 5499847, at *3 (Bankr. S.D.N.Y. Nov. 13, 2012) (applying standards for general bankruptcy claims in a SIPA liquidation to general creditor claims); 11 U.S.C. § 502(a). Net equity claims will only be paid "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the *satisfaction of the trustee*." SIPA § 78fff-2(b) (emphasis added).

## D.    The Net Equity Calculation in the BLMIS Liquidation

Although Madoff claimed to execute various investment strategies for his customers, in reality, he neither bought nor sold any securities on their behalf. He merely deposited customer money into checking accounts, which he used to pay customer withdrawals. To perpetuate the Ponzi scheme, BLMIS fabricated trading activity based on historical trading data, calculated to reflect "an astonishing pattern of continuously profitable trades." *Net Equity Decision*, 654 F.3d at 232. Despite this fictitious securities trading reflected on the customer statements, the actual cash deposits and withdrawals on the statements were accurate. *See id.* ("[T]he only accurate entries reflected the customers' cash deposits and withdrawals.").

5

Because no securities trading took place, the Trustee used the Net Investment Method to determine each customer's net equity, without regard to fictitious "profits" reflected on customer account statements. The Trustee determined that the Net Investment Method was the only method consistent with SIPA, the Bankruptcy Code, and Ponzi scheme case law. The Trustee rejected a method that calculated net equity based on amounts shown on the last BLMIS account statement (the "Last Statement Method"), concluding that the Last Statement Method would give undue credence to fictitious amounts engineered by Madoff. This Court and the Second Circuit upheld the Net Investment Method. *See Bankr. Net Equity Decision*, 424 B.R. at 140; *Net Equity Decision*, 654 F.3d at 242.

In order to apply the Net Investment Method to customer accounts, the Trustee and his professionals reviewed and reconstructed BLMIS's books and records. These books and records include BLMIS customer statements, bank records, cash receipts records, cash disbursement records, and customer-related files such as account maintenance folders, portfolio management reports, portfolio management transaction reports and customer correspondence.[7]

To calculate the net equity in each customer account, the Trustee and his professionals compiled a chronological listing of all "inflows" and "outflows."[8] Inflows, or credits in the Net Investment Method, include: (i) account balances reported on customer statements as of April 1, 1981; (ii) cash deposits; (iii) non-cash deposits consisting of actual securities and/or bonds deposited with BLMIS;[9] and (iv) inter-account transfers of principal into the account.[10] "Outflows," or reductions in the Net Investment Method, include: (i) cash withdrawals; (ii) inter-

---

[7] *See* Greenblatt Decl., Ex. 1 ("Greenblatt Principal Balance Report") ¶¶ 37-38.

[8] *Id.* ¶ 17.

[9] This type of inflow applied to a limited subset of customer accounts. *Id.* ¶ 17 n. 5.

[10] *Id.* ¶ 17 n.6.

account transfers of principal out of the account; and (iii) payments made by BLMIS on behalf of customers.[11]

These inflows and outflows were derived from the BLMIS books and records. As a starting point, the Trustee and his professionals reviewed all BLMIS customer statements, which were generated from BLMIS computer systems and contain line-by-line transaction detail.[12] For the ten-year period preceding the Filing Date, third party bank records relating to three BLMIS bank accounts relevant to this Motion are available.[13] During that period, approximately 225,000 cash deposit and withdrawal transactions are reflected on the BLMIS customer statements.[14] The Trustee and his professionals reconciled approximately 99% of those transactions to available BLMIS bank records.[15] Because the cash and principal transactions on BLMIS customer statements reconciled to third party bank records between December 1998 and December 2008, the Trustee determined that cash and principal transactions on BLMIS customer statements that preceded that period were similarly reliable for purposes of applying the Net Investment Method.

Other internal BLMIS books and records supported the Trustee's determination regarding the cash and principal transactions factored into the Net Investment Method. Portfolio Management Reports ("PMRs") generated by BLMIS on a monthly basis reflected monthly and year-to-date information regarding credits to and debits from BLMIS customer accounts.[16] The

---

[11] These payments applied to foreign account holders, for whom BLMIS withheld certain amounts payable to the Internal Revenue Service, and which BLMIS paid to the Internal Revenue Service on behalf of those customers. Greenblatt Principal Balance Report ¶ 17 n.7.

[12] *Id.* ¶ 5.

[13] Collura Report ¶ 20.

[14] *Id.* ¶¶ 17, 33.

[15] *Id.* ¶¶ 17, 33.

[16] Greenblatt Principal Balance Report ¶ 44; Greenblatt Decl., Ex. 2 (the "Greenblatt PW Report") ¶ 30 and Ex. 10 to the Greenblatt PW Report.

PMRs listed an account's initial investment, capital additions, capital withdrawals, profits withdrawn, current and annualized rates of return, and purported equity.[17]   Portfolio Management Transaction Reports ("PMTs") generated by BLMIS reflected the dates on which specific transactions occurred within a particular month.[18]

The Trustee and his professionals reconciled cash and principal transactions from these internal BLMIS documents to third-party records, where available.   The third-party records included bank records, as described above, as well as correspondence between customers and BLMIS,[19] and other documents received by the Trustee from BLMIS customers.[20]   Based on his review of these records in their entirety, the Trustee determined the component parts of the Net Investment Method and applied that method to all BLMIS accounts to determine net equity.[21]

### E.      The Inter-Account Method Litigation Gives Rise to the Profit Withdrawal Motion

In applying the Net Investment Method, the Trustee identified thousands of instances where funds were transferred between customer accounts, but no funds left BLMIS ("Inter-Account Transfers").   Inter-Account Transfers were reflected as book entries on the applicable customer statements.[22]   The Trustee determined that the appropriate treatment of Inter-Account Transfers was to calculate the amount of principal available in the transferor account at the time of the transfer and to credit the transferee account for the portion of the transfer that was available.   Over 400 claimants objected to the Trustee's treatment of Inter-Account Transfers. This Court agreed with the Trustee's methodology regarding Inter-Account Transfers, noting:

---

[17] Greenblatt PW Report, ¶ 30, Ex. 10; *see also* Greenblatt Principal Balance Report ¶¶ 44-47.

[18] Greenblatt Principal Balance Report ¶¶ 48-49; Greenblatt PW Report ¶ 31, Ex. 11.

[19] Collura Report ¶¶ 37-39, Exs. 8.1, 8.2.

[20] *Id.* ¶¶ 40-41.

[21] Greenblatt Principal Balance Report ¶¶ 17-19.

[22] *Id.* ¶¶ 17, 27-28, 32-34.

> [l]ike the Net Investment Method on which it is based [the Inter-Account Method] . . . ignores the imaginary, fictitious profits . . . and conserves the limited customer pool available to pay net equity claims on an equitable basis. . . . Crediting the Objecting Claimants with the fictitious profits . . . essentially applies the Last Statement Method to the transferors' accounts, and suffers from the same shortcomings noted in the *Net Equity Decision*. It turns Madoff's fiction into a fact.

*SIPC v. BLMIS (In re Bernard L. Madoff)*, 522 B.R. 41, 53 (Bankr. S.D.N.Y. 2014).[23]

During the course of the Inter-Account Transfer litigation, claimant Aaron Blecker argued that the net equity in his account should not have been reduced by the amounts reflected as Profit Withdrawal Transactions.[24] The Trustee responded that factual issues related to the Profit Withdrawal Transactions were unrelated to the Inter-Account Transfer Litigation and should be determined in a separate proceeding.[25] This proceeding followed.[26]

---

[23] An appeal of this decision is currently pending before District Judge Paul A. Engelmayer in the United States District Court of the Southern District of New York. *See Blecker v. Picard*, No. 15-cv-1236 (PAE); *Diana Melton Trust v. Picard*, No. 15-cv-1151 (PAE); *Zraick v. Picard*, No. 15-cv-1195 (PAE); *Sagor v. Picard*, No. 15-cv-1263 (PAE); *Most v. Picard*, No. 15-cv-1223 (PAE).

[24] *See* Customers' Memorandum of Law in Opposition to the Trustee's Method for Valuing Inter-Account Transfers at 4-6, No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 16, 2014), ECF No. 6708; *see also* Declaration in Opposition to the Trustee's Motion to Affirm Application of the Net Investment Method to the Determination of Customer Transfers Between BLMIS Accounts ¶¶ 4, 9, 11, No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 20, 2014), ECF No. 6761 (the "Blecker Decl.").

[25] Reply Memorandum of Law in Support of Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts at 6-7, No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 6, 2014), ECF No. 6926.

[26] The Trustee's initial motion to schedule the Profit Withdrawal litigation was subsequently withdrawn. *See* Motion for an Order Establishing Schedule for Limited Discovery and Briefing on the Profit Withdrawal Issue, *SIPC v. BLMIS*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Feb. 26, 2015), ECF No. 9357; Notice of Withdrawal of Motion, *SIPC v. BLMIS*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 19, 2015), ECF No. 10016. The Trustee's Amended Motion for Order Establishing Schedule for Limited Discovery and Briefing on Profit Withdrawal Issue, ECF No. 10017, was granted by this Court. *See* Order Establishing Schedule For Limited Discovery and Briefing on Profit Withdrawal Issue, *SIPC v. BLMIS*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 25, 2015), ECF No. 10266 ("Profit Withdrawal Scheduling Order").

F.    **Profit Withdrawal Transactions**

1.    **Identification of the Profit Withdrawal Transactions**

The Profit Withdrawal Transactions at issue on this Motion are a type of "outflow" under the Net Investment Method, which reduce an account's net equity balance.[27]  The customer statements reflected these Profit Withdrawal Transactions, indicating a debit transaction and corresponding reduction to the purported equity value of the customer account at that time.  A complete list of the Profit Withdrawal Transactions is attached to the Greenblatt PW Report as Exhibit 2.

The BLMIS customer statements contained several fields that identified the Profit Withdrawal Transactions, including a transaction code and transaction description.  The BLMIS customer statements contained a field for a transaction code, including for "PW."[28]  BLMIS's internal manual for its investment advisory business (the "House 17 Manual") indicates that "PW" stands for "profit withdrawal."[29]  There are 90,541 transactions that have a PW transaction code on the BLMIS customer statements, all of which are included in this Motion.[30]

During the review of BLMIS's books and records, these 90,541 transactions with a PW transaction code were examined to determine whether any patterns existed regarding the Profit Withdrawal Transactions.  The Trustee and his professionals reviewed the transaction description field on the customer statements,[31] which showed that the transaction descriptions for the 90,541 transactions coded as PW on the BLMIS customer statements generally fell into four categories: (1) the transaction description listed the word "Check" with no further information ("Check

---

[27] Greenblatt PW Report ¶¶ 15-18; *see also* Greenblatt Principal Balance Report ¶ 17.

[28] Greenblatt PW Report ¶¶ 14, 23.

[29] *Id.* ¶¶ 27-28, Ex. 9 (*see* MADTSS00336523; MADTSS00336545).

[30] *Id.* ¶ 21.

[31] *Id.* ¶ 23.

Only");[32] (2) the transaction description listed the words "Check" followed by the name of a

company, *i.e.*, "CHECK HOME DEPOT,"[33] ("Check + Stock Name"); (3) the transaction

description listed the word "CHECK" followed by "DIV," "INT," or "INTEREST" ("Check +

Interest/Dividend");[34] and (4) in limited cases, the transaction description was blank or contained

an indeterminable description, for example "CML" ("Other Distributions").[35]

When reviewing these categories, the Trustee and his professionals found that there were

approximately 597 transactions where the transaction descriptions fell into categories 2 and 3

(*i.e.*, transactions with a transaction description of Check + Stock Name or Check +

Interest/Dividend) that did not have the "PW" transaction code but instead were coded as "CW"

(cash withdrawal) or "JRNL" (journal).[36] For purposes of completeness, these transactions have

been included in this Motion even though they do not bear the "PW" transaction code, bringing

the total number of Profit Withdrawal Transactions included in the Motion to 91,138.

---

[32] *Id.* ¶ 23, Ex. 5.

[33] *Id.* ¶ 23, Ex. 6.

[34] *Id.* ¶ 23, Ex. 7.

[35] *Id.* ¶ 23, Ex. 8.

[36] Greenblatt PW Report ¶¶ 21.

The following chart[37] summarizes the Profit Withdrawal Transactions by transaction code and transaction description category.

| Transaction Code | Transaction Description Category | No. of Transactions |
|---|---|---|
| PW | Check Only | 52,041 |
| PW | Check + Stock Name | 34,574 |
| PW | Check + Interest / Dividend | 3,867 |
| PW | Other Distributions | 59 |
| CW/JRNL | Check + Stock Name | 489 |
| CW/JRNL | Check + Interest/Dividend | 108 |
| **TOTAL** | | **91,138** |

### 2. Summary of the Support in the BLMIS Books and Records for the Profit Withdrawal Transactions

The Trustee's determination that the Profit Withdrawal Transactions are properly treated as reductions to net equity is supported by the available BLMIS books and records. Although the support for a particular Profit Withdrawal Transaction may vary from transaction to transaction, the Trustee's determination is founded upon several core premises, each of which is amply supported by the BLMIS books and records.

First, for the ten-year period for which BLMIS bank records are available, the Trustee and his professionals identified 5,527 Profit Withdrawal Transactions (the "Ten Year Period Profit Withdrawal Transactions").[38] Of these Ten Year Period Profit Withdrawal Transactions, 5,507, or 99.6%, have reconciled to bank records.[39] This means that the Profit Withdrawal Transactions reconcile to BLMIS bank statements that indicate customer withdrawals via check

---

[37] Greenblatt PW Report ¶ 24, Table 1.

[38] Collura Report ¶ 35.

[39] *Id.*

or wire transfer and to copies of cancelled checks.  In addition, of the Ten Year Period Profit

Withdrawal Transactions, the check payee or wire beneficiary can be identified on BLMIS bank

records and can be reconciled to the respective BLMIS accountholder for 5,430 transactions.[40]

The funds that left BLMIS were then traced to bank accounts held by or for the benefit of the

respective accountholders.  In total, **99.997%** of total dollar amount of the Ten Year Period PW

Transactions was traced to bank accounts held by, or for the benefit of, the respective BLMIS

account holder.[41]

Second, including the 5,507 transactions mentioned above, the Trustee and his

professionals were able to reconcile 51,758 Profit Withdrawal Transactions (approximately

57%)[42] to available BLMIS bank records (including the bank records discussed above),

correspondence from customers, other documentation included in the BLMIS customer files, and

documents received by the Trustee from BLMIS accountholders or other parties.[43]

Third, for the Profit Withdrawal Transactions that fell into the category of Check + Stock

Name, the BLMIS customer statements and related documents support the Trustee's

determination.  From December 1995 forward, the BLMIS customer statements are available

electronically and contain the fictitious trading data in addition to the cash and principal

transactions.  There are 6,148 Profit Withdrawal Transactions that have the transaction

description of Check + Stock Name that occurred from December 1995 forward.  The Trustee

and his professionals have confirmed that the amount reported as "profit" on the customer

---

[40] Collura Report ¶ 45.  Although there were a total of 5,527 Profit Withdrawal Transactions during the ten-year period, documentation was only available to identify the check payee or wire beneficiary for 5,430 of these transactions because the relevant bank records, including copies of cancelled checks, were unavailable.

[41] *Id.* ¶¶ 51-52.  The remaining .003% could not be traced because the bank records were not available or the information on the back of the cancelled check was not legible or sufficient to identify the owner of the bank account.

[42] *Id.* ¶ 42.

[43] *Id.*

statement equals the exact amount of profit purportedly generated by a fictitious purchase and sale of a particular security as identified in the BLMIS books and records for all but three of the 6,148 transactions (99.95%).[44]  Moreover, 83 of these transactions occurred in the time period for which there are cancelled checks.  Of those 83 transactions, cancelled checks are available for 82 transactions.[45]  And all 82 cancelled checks show that the Profit Withdrawal Transaction at issue were sent to or for the benefit of the respective BLMIS accountholder.[46]

Fourth, the Trustee and his professionals have confirmed that, contemporaneously with the Profit Withdrawal Transactions, BLMIS reduced the account's purported equity value by the amount of the Profit Withdrawal Transactions.[47]  This is evidenced by the BLMIS customer statements as well as the PMRs and PMTs, where available.[48]

Finally, the House 17 Manual, which sets out the procedures for the operation of BLMIS's investment advisory business, discusses the Profit Withdrawal Transactions in a manner consistent with all of the above records.  For example, the House 17 Manual identifies the PW and CW transaction codes and states that the PW abbreviation stands for "profit

---

[44] Greenblatt PW Report ¶ 42. While records are not available electronically prior to December 1, 1995, it is reasonable to assume that if earlier records were available, they would reveal the same pattern.  Further, while the specific analysis performed on the transactions in the Check + Stock Name category could only be completed for that category because the analysis requires BLMIS to have identified the particular stock on the customer statement, there is no reason to believe that the difference between the Check + Stock Name category and the Check Only category is attributable to anything more than the vagaries of BLMIS recordkeeping.  As noted above, different types of Profit Withdrawal Transactions can be supported in different ways.

[45] *See generally* Exhibit 7 n.1 of the Collura Report defining CM ID numbers. The CM ID numbers for the 82 transactions with cancelled checks are: 299697, 241220, 247035, 286830, 206690, 222753, 99523, 112804, 307165, 206615, 54215, 290282, 29103, 304444, 9500, 189317, 54777, 223664, 144983, 281430, 197562, 182541, 24097, 249911, 259882, 9615, 259885, 277510, 281581, 161346, 161361, 281587, 209882, 114482, 182597, 279754, 281593, 229472, 299416, 9647, 183652, 207851, 193833, 268628, 219010, 296989, 284037, 144999, 73572, 145235, 13467, 176479, 73671, 292305, 13489, 235362, 182742, 76766, 114662, 187631, 313090, 221756, 177538, 200380, 313092, 304517, 169981, 145832, 183878, 185851, 10374, 42953, 182789, 128480, 5394, 191662, 41875, 282073, 274327, 99406, 15621, 216982.  *See* Collura Report, Ex. 10.

[46] *See id.*

[47] Greenblatt PW Report ¶¶ 27-28, 34.

[48] Greenblatt PW Report ¶ 55.

withdrawal" and the CW abbreviation stands for "capital withdrawal."[49]   The House 17 Manual specifically states that PW and CW codes are treated as debits and distinguishes those codes from other codes (*i.e.*, "CA" or "capital addition") that are treated as credits.[50]   Another section of the House 17 Manual provides instructions on the processing of Profit Withdrawal checks, noting "Jodi will give you checks on a daily basis.  She will give you an instruction sheet which will tell you what out going [sic] checks should be punched and the check date."[51]   Specifically referencing check codes, including "PW," those instructions direct "[o]n description type 'check & stock name,'" with a notation at the bottom of that page indicating to punch PW and CW checks as debits.[52]   Thus, the House 17 Manual supports treating the Profit Withdrawal Transactions as withdrawals from customer accounts.

These sources constitute the books and records of BLMIS and thoroughly support the Trustee's determination to treat all Profit Withdrawal Transactions as a reduction to an account's net equity balance.

### 3.    Specific Examples of Support in the BLMIS Books and Records for Profit Withdrawal Transactions

Consideration of a few examples of the analysis and reconciliation completed by the Trustee and his professionals makes clear that the Profit Withdrawal Transactions were properly treated as cash withdrawals by the Trustee.

---

[49] Greenblatt PW Report ¶¶ 27-28, Ex. 9 (MADTSS00336545).

[50] *Id.* ¶ 27-28.

[51] *See* Greenblatt PW Report, Ex. 9 (MADTSS00336545).  It is believed that the reference to Jodi is to Joann Crupi, a former BLMIS employee.  *See, e.g.,* Indictment ¶¶ 8, 43, *United States v. Joann Crupi, a/k/a/ "Jodi,"* No. 10-cr-00228 (LTS), (S.D.N.Y. Nov. 17, 2010), ECF No. 36.  Ms. Crupi was subsequently convicted of, *inter alia,* securities fraud in connection with her role at BLMIS.  *See* Judgment in a Criminal Case, No. 10-cr-00228 (LTS) (S.D.N.Y. Dec. 23, 2014), ECF No. 1243.

[52] Greenblatt PW Report, Ex. 9 (MADTSS00336545).

15

(a)    Reconciliation to BLMIS Bank Records

For the ten-year period for which BLMIS bank records are available, the Trustee and his professionals were able to reconcile Profit Withdrawal Transactions to available BLMIS bank records, including cancelled checks, and to trace those amounts to the recipient of the purported profits (as either a check payee or a wire beneficiary).  For example, a January 1999 customer statement for Account 1G0057 included a Profit Withdrawal Transaction in the amount of $256.00 with a transaction description of "CHECK BOSTON SCIENTIFIC."[53]  BLMIS bank records show that a check in that amount was made out to the accountholder and was deposited in the accountholder's bank account.[54]  Transactions such as this one form the basis for the Trustee's determination that that the purported profits was sent by BLMIS to, and received by, the accountholder.

(b)    Correlation to BLMIS Customer Statements

As described above, for Profit Withdrawal Transactions with the description Check + Stock Name that occurred from December 1995 forward, the Trustee and his professionals were able to (i) identify the purported trading that related to each Profit Withdrawal Transaction and (ii) determine that the fictitiously-reported sale of the related "security" resulted in a "profit" that equaled the amount withdrawn from the customer account.

For example, the customer statement for Account 1Z0009 for the period ending January 31, 1999 shows a line item with a "PW" transaction code, in the debit column for $141.50, with a transaction description of "CHECK BOSTON SCIENTIFIC."[55]  The $141.50 equals the amount of profits from purporting trading of shares of Boston Scientific Inc. during November and

---

[53] Collura Report, Ex. 10 at 2.

[54] *Id*., Ex. 10 at 2, 215.

[55] Greenblatt PW Report, Ex. 14 at 3.

December of 1998.[56]    And the securities holdings reflected in the January 31, 1999 customer

statement no longer list Boston Scientific as an investment.[57]

(c)    <u>Correlation to PMRs and PMTs</u>

Where available, the PMRs and PMTs confirm that the Profit Withdrawal Transactions

were properly treated as reductions to an account's net equity.  Account 1Z0009's PMT for the

year 1992 itemized all Profit Withdrawal Transactions, including an individual line item for a

transaction dated September 22, 1992 in the amount of $173.92, which was reflected as a

reduction to the purported equity in the account.[58]  The total amount of all Profit Withdrawal

Transactions listed on the PMTs for 1992 was equal to the exact amount of total Profit

Withdrawal Transactions as reflected on the 1992 annualized PMR for the same account.[59]  This

analysis provides further evidence that the Profit Withdrawals were indeed cash withdrawals of

purported profits from customer accounts.

(d)    <u>Support from BLMIS Customer Files</u>

The Trustee also found support for his determination in the customer files.  Specifically,

the Trustee and his professionals identified letters and other correspondence in which the

accountholder requested that the purported profits reflected on the customer statement be sent to

the accountholder instead of being reinvested.[60]  One such letter reads:

> As we discussed today, following is a letter of request to forward
> us all future profits from Containers of Mind Account #C-1079,
> and to no longer reinvest those profits back into the account.[61]

---

[56] *Id.*, Ex. 14 at 1-2.

[57] *Id.*, Ex. 14 at 3.

[58] *Id.* Ex. 15 at 3.

[59] *Id.* Ex. 15 at 4.

[60] Collura Report ¶¶ 38-39.

[61] *Id.*, Ex. 8.1.

17

This and other similar correspondence illustrates BLMIS's practice of distributing the purported trading profits to its customers.

### G.    Direct and Indirect Profit Withdrawal Accounts

Exhibit 4 to the Greenblatt PW Report identifies (i) the accounts for which customer statements reflect Profit Withdrawal Transactions (the "Direct Accounts") and (ii) accounts that received inter-account transfers from Direct Accounts that may be indirectly affected by the Motion (the "Indirect Accounts").  Under the Profit Withdrawal Scheduling Order, participation in these proceedings is limited to customers with Direct or Indirect Accounts who filed customer claims prior to the statutory bar date.[62]   Exhibit 1 to the Sehgal Decl. lists the Direct and Indirect Accounts that have filed customer claims.

## ARGUMENT

**I.    The Trustee's Determination to Treat Profit Withdrawals as Reductions to Net Equity is Supported by the Books and Records of BLMIS and Claimants and Claimants Have Not Established Otherwise to the Trustee's Satisfaction**

### A.    BLMIS Books and Records Show That Profit Withdrawal Transactions Were Properly Treated as Reductions to Equity in the Net Equity Calculation

The books and records of BLMIS confirm that Profit Withdrawal Transactions were withdrawals received by customers and are properly treated as reductions to net equity under the Net Investment Method.  As set forth above, the Trustee and his professionals conducted an exhaustive review that included reconciliation of cash transactions reflected on BLMIS customer statements to other BLMIS documents, relevant information contained within the customer files, bank records, and information provided by claimants.  The BLMIS books and records, along with information provided by claimants, support the Trustee's treatment of the Profit Withdrawal Transactions as reductions to net equity.

---

[62] *See* Profit Withdrawal Scheduling Order at 3.

The Trustee has identified various sources of support for his treatment of the Profit Withdrawal Transactions, as outlined above.  While each category of support may not be available for or apply to every transaction, the Trustee's determination takes into account and is consistent with all available information in the BLMIS books and records.  Based on the panoply of records available and the conclusions drawn therefrom, the Trustee may apply his conclusions to instances where the BLMIS books and records are incomplete.  For example, although cancelled checks are available for only the ten-year period prior to the commencement of the BLMIS liquidation, it is appropriate to assume that if earlier records were available, they would indicate that BLMIS operated in a manner consistent with later practice and that the cancelled checks for earlier transactions would show similar information.  Particularly where the Trustee has numerous other sources of support for his determination relating to the Profit Withdrawal Transactions, such limited inferences are not only permissible but consistent with his duties to the entire BLMIS estate.  *See, e.g., Kusch v. Mishkin (In re Adler, Coleman Clearing Corp.)*, No. 95-08203 (JLG), 1998 WL 551972, at *17 (Bankr. S.D.N.Y. Aug. 24, 1998) (holding that "the trustee's duty to the SIPA estate as a whole clearly prevails over the interests of a single customer"), *aff'd*, 208 F.3d 202 (2d Cir. 2000).

The only contrary information is an assertion by Mr. Blecker that he did not receive the profits identified on his customer statements.[63]  But this assertion is not supported by the BLMIS books and records or any other documentation.[64]  Indeed, the Trustee and his professionals have reconciled the Profit Withdrawal Transactions to purported trading activity, and confirmed the corresponding reduction in his account's purported equity value.[65]  Thus, although Mr. Blecker

---

[63] Blecker Decl. ¶¶ 4, 9,  ECF No. 6761.

[64] Greenblatt PW Report ¶¶ 74-76.

[65] Greenblatt PW Report ¶ 42, 51, 67-70.

does not recall receiving checks from BLMIS, BLMIS's books and records support the Trustee's determination.

In any event, oral testimony that conflicts with documentary evidence should be accorded less weight. *See Estate of Sheppard ex rel. Sheppard v. Sec'y of Dep't of Health and Human Svcs.*, No. 04-112v, 2007 WL 5160383, at *10 (Fed. Cl. Aug. 7, 2007) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1948)); *see also United States v. Int'l Bus. Mach. Corp.*, 66 F.R.D. 154, 160 (S.D.N.Y. 1974) (explaining the mandate of *Gypsum*). The Trustee's determination is amply supported by the BLMIS books and records.

### B.     The Trustee May Rely on His Professionals to Support His Determinations

The Trustee's reliance on experts to examine the records available and draw reasonable inferences is well-accepted, particularly in the Ponzi scheme context where it is commonplace to encounter records that are, at best, incomplete. Forensic accountants, much like the ones engaged by the Trustee in this liquidation proceeding, are precisely "the type of expert needed . . . who can take poorly kept, incomplete records, involving commingled funds, and reconstruct the business out of them." *In re Petters Co., Inc.*, 506 B.R. 784, 804 (Bankr. D. Minn. 2013) (quoting *In re Bonham*, 251 B.R. 113, 132 (Bankr. D. Alaska 2000)); *accord Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, No. 95-08203 (JLG), 1998 WL 160039, at *5, 8 (Bankr. S.D.N.Y. Apr. 3, 1998) (denying motion to exclude testimony of forensic accountant engaged to investigate the financial affairs of a failed broker in a SIPA liquidation).

*Wiand v. Waxenberg* is instructive in this regard. 611 F. Supp. 2d 1299, 1315-16 (M.D. Fla. 2009). That case involved a challenge to an expert who opined on whether a defendant was operating a Ponzi scheme because records covering a certain period of time were unavailable. *Id.* at 1315-16. Despite the fact there were "varying degrees of completeness" of records, including a seven-year period where certain records were missing, the court allowed expert

20

testimony in support of the receiver.  The court noted that "trained experts commonly extrapolate

from existing data.  [The expert's] conclusion is directly connected to the data he had, which was

substantial, and was premised on an underlying methodology of calculating deposits, profits, and

payments that [defendant] does not challenge."  *Id.* (quoting *Gen. Elec.Co. v. Joiner*, 522 U.S.

136, 146 (1997)).

　　　Other cases confirm that the Trustee and his professionals may look to all available

documentation.  For example, in *Bennett Funding*, the court noted:

> [T]he Trustee has neither analyzed, reconstructed, nor submitted
> the books and records . . . in a vacuum.  In the vast majority of
> instances, he has supported his analyses and conclusions with, not
> only books and records, but also, *inter alia*, canceled checks, wire
> instructions, invoices, receipts, bank statements and other
> documentation to trace the flow of funds to and from various
> parties.

*In re Bennett Funding Grp., Inc.*, 220 B.R. 743, 764 (N.D.N.Y. 1997).   Using the work of his

professionals, the Trustee has looked to precisely these types of records to support his

determinations.

　　　Moreover, although BLMIS's bank records prior to December 1998 are not available,

proper analysis regarding Profit Withdrawal Transactions is not limited to determining the

existence of a cancelled check for each transaction.  Instead, the Trustee looks at the totality of

BLMIS's books and records in reaching his determinations on net equity.  Where those records

are missing or incomplete, the Trustee and his experts may rely on secondary evidence. Fed. R.

Evid. 1004(a) (other evidence of content of writing is admissible if all originals are lost or

destroyed); *see JPMorgan Chase Bank, N.A. v. Yuen*, No. 11-cv-9192 (NRB), 2013 WL

2473013, at *5 (S.D.N.Y. June 3, 2013) (allowing defendant to offer secondary evidence to

prove contents of writing that could not be produced).  Thus, it is entirely proper for the Trustee

to consider and weigh the evidence he does have and use that evidence to support his

determinations even where there are gaps in specific records.    *Cf. Burt Rigid Box, Inc. v.*

*Travelers Prop. Cas. Corp*, 302 F.3d 83, 91-93 (2d Cir. 2002) (allowing insured to rely on

secondary evidence to prove existence and terms of lost insurance policy).

The Trustee was "charged with sorting out decades of fraud."  *Net Equity Decision*, 654

F.3d at 231.  The Trustee did not conduct his review, nor make his net equity determinations, in a

vacuum.   He and his professionals diligently worked to reconstruct the books and records of

BLMIS.  And based upon all of the BLMIS books and records as well as other documentation

received, the Trustee's determination that Profit Withdrawal Transactions are reductions to a

customer's net equity is proper and well-founded.

### C.    The Burden is on Customers to Establish Their Claims Against the BLMIS Estate

The Trustee has ample records that establish to his satisfaction that the Profit Withdrawal

Transactions are properly treated as reductions to net equity.   But under SIPA, it is not the

Trustee's burden to establish those facts.   SIPA requires that a claimant establish (i) she is

entitled to status as a customer and (ii) the amount owed to her by the debtor.   *See SIPC v. I.E.S.*

*Mgmt. Grp.*, 612 F. Supp. 1172, 1177 (D.N.J. 1985), *aff'd without opinion*, 791 F.2d 921 (3d Cir.

1986).

Although a SIPA liquidation is conducted "as though it were being conducted" under the

liquidation provisions of title 11, SIPA § 78fff(b), where SIPA and the Bankruptcy Code

conflict, SIPA controls.  *Id.*  Unlike claims allowance procedures under the Bankruptcy Code, a

SIPA proceeding provides for preferred "customer" status, giving customers priority over other

creditors in the distribution of customer property. For these reasons, bankruptcy rules regarding

claims allowance and the relative burdens of proof are not applicable to BLMIS customer claims

but only to creditors claiming against the general estate.  *See, e.g., In re MF Global, Ltd.*, 2012 WL 5499847, at *3.

In a SIPA proceeding, a claimant does not file a "formal proof of claim" with the Bankruptcy Court, as is required by Bankruptcy Rule 3001(a).  Instead, a claimant seeking SIPA protection files a "written statement of claim" with the Trustee.  SIPA § 78fff-2(a)(2). Thereafter, the Trustee determines the claim in writing.[66]  The claimant may file an objection to the Trustee's determination with the Court within 30 days of the Trustee's determination.[67] Thereafter, the Trustee schedules a hearing with the Court on the claimant's objection.[68]  If the claimant does not object to the Trustee's determination, it becomes final.[69]

This process differs from a non-SIPA bankruptcy proceeding, in which the creditor's claim filed with the Court is *prima facie* valid and deemed allowed unless a party in interest objects.  11 U.S.C. § 502(a).  The customer claim filed with the Trustee in a SIPA proceeding is accorded no *prima facie* validity; rather, such claim must be "ascertainable from the books and records of the debtor" or "otherwise established *to the satisfaction of the trustee*."  SIPA § 78fff-2(b) (emphasis added); *see also SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Arford v. Miller*, 239 B.R. 698 (S.D.N.Y. 1999), *aff'd sub nom. In re Stratton Oakmont*, 210 F.3d 420 (2d Cir. 2000); *In re A.R. Baron Co., Inc.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998) ("Provisions of SIPA make clear a claimant's burden by requiring that a debtor's obligations to its customers be 'ascertainable from the books and records of the debtor,' or "otherwise established to the satisfaction of the trustee"); *Schultz v. Omni Mutual*,

---

[66] Claims Procedures Order at 6.

[67] *Id.* at 6-7.

[68] *Id*. at 7.

[69] *Id.*

*Inc.*, No. 93-3700 (KC), 1993 WL 546671, at *2 (S.D.N.Y. Dec. 30, 1993); *In re Brentwood Sec., Inc.*, 925 F.2d 325, 327 (9th Cir. 1991) (claimants have burden of proving that they are customers by establishing that they entrusted cash or securities to the broker); *In re Adler Coleman Clearing Corp.*, 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1991).   The satisfaction of a claim may be further "conditioned upon the trustee requiring claimants to execute, in a form to be determined by the trustee, appropriate receipts, supporting affidavits, releases and assignments."  SIPA § 78fff-2(b).

Likewise, the Bankruptcy Code provision that a customer claim is allowed unless "a party in interest objects" does not apply.  11 U.S.C. § 502(a).  In a SIPA case, a customer claim is allowed by the Trustee only after he has reviewed the debtor's books and records or is otherwise satisfied that the claim has been established.  Because the Trustee allows the claim in the amounts that have been established to his satisfaction, it is the claimant's duty to object if he disagrees with the Trustee's determination, not the trustee's duty to object, as is the normal course in an ordinary bankruptcy case.  Because SIPA has its specific provisions regarding customer claims, section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3001 do not apply in SIPA proceedings with regard to customer claims.  For general creditor claims, courts do look to the traditional bankruptcy rules in SIPA cases.  *See, e.g., In re MF Global, Ltd.*, 2012 WL 5499847, at *3.

SIPA is consistent with the Bankruptcy Code, however, in that a claimant seeking preferred status as a "customer" bears the burden of showing that he is within the class of eligible persons and that his transactions are protected by SIPA.  *See SIPC v. Stratton Oakmont, Inc.*, 229 B.R. at 278 ("Just as all creditors in a bankruptcy case who claim priority status have the burden of showing that they are entitled to the asserted priority under the Bankruptcy Code,

the Claimants bear the burden of proving that they are the type of priority creditors known as 'customers'"); *see also Schultz v. Omni Mutual Inc.*, 1993 WL 546671, at *2 ("Claimants in a SIPA proceeding, like any other claimants seeking preferred status in a bankruptcy case, bear the burden of [proof]"); *In re O.P.M. Leasing Servs., Inc.*, 60 B.R. 679, 680 (Bankr. S.D.N.Y. 1986) (observing claimant has burden to prove priority).

Thus, in a SIPA proceeding, a claimant seeking "customer" protection under SIPA must prove her status as a "customer" and what she is owed. *See SIPC v. I.E.S. Mgmt. Grp.*, 612 F. Supp. at 1177; *Lopez v. Zaremba*, No. 08-cv-01132, 2009 WL 36617, at *4 (N.D. Ohio Jan. 5, 2005) ("if a claimant can establish status as a customer *and the amount owed by the debtor,* the SIPA trustee discharges the debtor broker-dealer obligations to such customer") (emphasis added); *see also Stratton Oakmont,* 229 B.R. at 278*; In re BLMIS*, No. 13-cv-4332 (ALC), 2014 WL 1302660, at *6, (S.D.N.Y. Mar. 31, 2014).

In challenging Profit Withdrawal Transactions, claimants assert a larger claim against the fund of customer property.  Distributions from the fund of customer property are at the heart of the "priority" accorded to customers under SIPA and thus claimants carry the burden of showing that they are entitled to that priority with respect to each transaction.  *See e.g.*, *In re Adler Coleman Clearing Corp.*, 204 B.R. at 115 (claimants must show they are "customers" and amounts in their accounts are "customer property"); *Stratton Oakmont,* 229 B.R. at 277  ("[A]n investor can be a customer vis-à-vis certain transactions but not others"); *SIPC v. Wise, (In re Stalvey & Assoc., Inc.)*, 750 F.2d 464, 471 (5th Cir. 1985) ("Customer status 'in the air' is insufficient to confer the SIPA's protection on a given transaction.").  Claimants have the burden of demonstrating their entitlement to credits for the Profit Withdrawal Transactions.  However, because the credits they seek are contradicted by the books and records of BLMIS, a mere

allegation that they do not recall receiving profit withdrawals is not sufficient to carry their burden.

### D.    There is no Evidence that any Customer Contemporaneously Disputed a Profit Withdrawal Transaction

There is no evidence in the BLMIS books and records of any customer contemporaneously objecting to any Profit Withdrawal Transaction when it occurred. Because BLMIS reduced the relevant account's balance by the amount of each Profit Withdrawal Transaction, to the extent that claimants allege they did not receive those amounts, they should have objected to BLMIS promptly after receiving the account statements showing the reductions in question.

BLMIS customer agreements contained standard language requiring customers to object, in writing, within ten days of receipt of any confirmation or customer statement containing an objectionable transaction or that transaction or statement becomes binding upon the customer.[70] Although there was correspondence in customer account maintenance files, there was no evidence suggesting that any customer objected to the Profit Withdrawal Transactions upon or within ten days of receiving BLMIS customer statements showing such transactions.

Where a customer agreement contains a written objection requirement, courts hold customers accountable to the standard provided under the agreement. *See Pitheckoff v. SIPC (In re Great Eastern Secs., Inc.)*, No. 10-cv-8647, 2011 WL 1345152, at *6 (S.D.N.Y. Apr. 5, 2011) (affirming bankruptcy court's denial of customer claim based on failure to object in accordance with account agreement); *see also In re Mason Hill & Co., Inc.*, 2004 WL 2659579, at *6 (Bankr. S.D.N.Y. Oct. 18, 2004) (noting that courts generally respect objections clauses in

---

[70] *See* Sehgal Decl., Exs. 2, 3, 4.

customer agreements); *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 416, 418-20 (Bankr. S.D.N.Y. 2003).

The Second Circuit has explained that "the purpose of the ten-day written complaint clause in the customer agreement is to require the customer to memorialize his or her complaint soon after receipt of the account statement rather than waiting to see if the trade is profitable." *Modern Settings, Inc. v. Prudential-Bache Secs., Inc.*, 936 F.2d 640, 645-46 (2d Cir. 1991). Moreover, an investor will be found to have acquiesced in a trade if the investor knew the pertinent facts surrounding the transaction and manifested a clear intent to approve it. *See, e.g., Richardson Greenshields Sec., Inc. v. Lau*, 819 F. Supp. 1246, 1259 (S.D.N.Y. 1993).

In a recent case, Judge Colleen McMahon affirmed an order of the Bankruptcy Court upholding the trustee's denial of "customer" status for amounts based on unauthorized purchases and sales of certain securities. *See Pitheckoff v. Sec. Investor Prot. Corp. (In re Great Eastern Secs., Inc.)*, 2011 WL 1345152, at *2-3. Judge McMahon noted that an investor may ratify an unauthorized trade through his conduct.

To the extent that claimants now challenge the Profit Withdrawal Transactions, the Trustee submits that they are analogous to unauthorized trades. Because no claimants have offered evidence that they contemporaneously objected to those transactions, the Court should not permit them to challenge them now for purposes of increasing net equity claims. At best, if claimants still wish to advance their argument that they never received profit withdrawals, they may have a claim for breach of contract. And if that is the case, such claim may only be asserted as a general unsecured claim, and not against the fund of customer property. *See In re Oberweis Secs., Inc.*, No. 90-c-3466, 1992 WL 119272, at *9 (Bankr. E.D. Ill. May 21, 1992) ("claims

based on fraud or breach of contract are not considered part of a customer's protected net equity claim") (citation omitted).

### E. Securities are not Purchased by a Broker Sending Checks Directly to the Issuing Company

Mr. Blecker has argued that he understood that the Check + Stock Name notations on his customer statements to indicate that a check was being sent to the identified company for purposes of purchasing stock in that entity.[71]

As an initial matter, this assertion is unsupportable because BLMIS customer statements did not reflect holdings in the company that allegedly received the check from BLMIS.[72]  There is no indication in the BLMIS books and records that Mr. Blecker, or any other claimant, expressed concern about this discrepancy, which was apparent on the face of the statements.

More fundamentally, it makes no sense to use a broker such as BLMIS to conduct a direct purchase of stock from a company whose stock is listed on national exchanges.  While it is possible for a retail investor like Mr. Blecker to purchase stock from large issuers through direct purchase programs without the involvement of a broker, these programs are designed to permit retail investors to avoid using brokers and the commissions they charge for such transactions.[73] Brokers do not send checks to companies on behalf of their customers for the purchase of stock but will instead use a particular market for execution.[74]  It is not reasonable to conclude, as Mr.

---

[71] Blecker Decl. ¶¶ 8, 10, ECF No. 6761.

[72] Greenblatt PW Report, Ex. 17 (reflecting no holdings of securities for company whose name was identified in the PW Transaction following the date of the PW Transaction).

[73] *See, e.g.*, http://www.sec.gov/answers/drip.htm ("Some companies allow you to purchase or sell stock directly through them without your having to use or pay commissions to a broker . . . [direct stock plans] usually will not allow you to buy or sell your securities at a specific market price or at a specific time. Rather, the company will purchase or sell shares for the plan at established times — for example, on a daily, weekly, or monthly basis — and at an average market price.").

[74] *See, e.g.*, http://www.sec.gov/investor/pubs/tradexec.htm ("Many investors who trade through online brokerage accounts assume they have a direct connection to the securities markets. But they don't. When you push that enter

Blecker suggests, that BLMIS had inserted itself into direct stock purchase plans by sending checks to separate companies to purchase stock in those companies on behalf of its individual customers.

## CONCLUSION

For all of the foregoing reasons, the Trustee respectfully requests the Court affirm the Trustee's treatment of Profit Withdrawal Transactions and overrule the objections thereto.[75]

Dated:  New York, New York
　　　　July 14, 2015

Respectfully submitted,

*/s/ David J. Sheehan*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Stacy A. Dasaro
Email: sdasaro@bakerlaw.com

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Estate of Bernard L.*
*Madoff*

---

key, your order is sent over the Internet to your broker—who in turn decides which market to send it to for execution. A similar process occurs when you call your broker to place a trade.")

[75] *See* Sehgal Decl., Ex. 1.