**Baker & Hostetler LLP**

45 Rockefeller Plaza

New York, New York 10111

Telephone: (212) 589-4200

Facsimile: (212) 589-4201

David J. Sheehan

Seanna R. Brown

Nicholas J. Cremona

Jorian L. Rose

Amy E. Vanderwal

George Klidonas

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**TRUSTEE'S MOTION AND MEMORANDUM TO AFFIRM HIS DETERMINATIONS DENYING CLAIMS OF CLAIMANTS HOLDING INTERESTS IN THE WHITMAN PARTNERSHIP, THE LUCKY COMPANY, THE PETITO INVESTMENT GROUP, AND THE HARWOOD FAMILY PARTNERSHIP**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ................................................................................................... 2

    A.    THE COMMENCEMENT OF THE SIPA PROCEEDING ................................. 2

    B.    THE PARTNERSHIPS' STRUCTURE, BLMIS ACCOUNTS, AND CLAIMS ................................................................................................ 3

        1.    The Whitman Partnership .......................................................... 4

        2.    The Lucky Company .................................................................. 5

        3.    The Petito Investment Group .................................................... 7

        4.    The Harwood Family Partnership ............................................. 8

    C.    THE BLMIS ACCOUNT RECORDS ............................................................ 10

    D.    THE CLAIMS ................................................................................................ 11

    E.    THE CUSTOMER DECISIONS .................................................................... 12

        1.    The Initial Feeder Fund Motion ................................................ 12

        2.    The ERISA Motion .................................................................. 14

        3.    Other Customer Motions ........................................................... 15

ARGUMENT ....................................................................................................... 17

CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adler, Coleman Clearing Corp.*,
    216 B.R. 719 (Bankr. S.D.N.Y. 1998) ..................................................................18

*Aozora Bank Ltd. v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec.
    LLC)*,
    480 B.R. 117 (S.D.N.Y. 2012) ....................................................................12, 13

*Appleton v. First Nat'l Bank of Ohio*,
    62 F.3d 791 (6th Cir. 1995) ............................................................................18

*In re Beacon Assocs. Litig.*,
    745 F. Supp. 2d 386 (S.D.N.Y. 2010) ..................................................................2

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011) .................................................................... *passim*

*In re Kane*,
    470 B.R. 902 (Bankr. S.D. Fla. 2012) ................................................................21

*In re Kane*,
    755 F.3d 1285 (11th Cir. 2014) ........................................................................21

*Kane v. Stewart Tilghman Fox & Bianchi, P.A.*,
    485 B.R. 460 (S.D. Fla. 2013) .........................................................................21

*Kaplan v. Dir., Div. of Taxn.*,
    23 N.J. Tax 594 (N.J. Tax 2008) *aff'd*, 24 N.J. Tax 415 (N.J. Super. App. Div.
    2009) ..........................................................................................................21

*In re Klein, Maus & Shire, Inc.*,
    301 B.R. 408 (Bankr. S.D.N.Y. 2003) ................................................................24

*Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    708 F.3d 422 (2d Cir. 2013) ..................................................................... *passim*

*In re Lehman Bros., Inc.*,
    14-890, 2015 WL 3938079 (2d Cir. June 29, 2015) ..............................................18

*In re Lehman Bros. Inc.*,
    462 B.R. 53 (Bankr. S.D.N.Y. 2011) ..................................................................17

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002) ............................................................3, 24

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Sec. Investor Prot. Corp. v. 2427 Parent Corp. (In re Bernard L. Madoff Inv. Sec.
LLC)*,
779 F.3d 74 (2d Cir. 2015).................................................................................22

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
Madoff)*,
515 B.R. 161 (Bankr. S.D.N.Y. 2014)............................................................. *passim*

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
Madoff Inv. Sec. LLC)*,
454 B.R. 285 (Bankr. S.D.N.Y. 2011)......................................................12, 13, 24

*Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*,
Nos. 12 Civ. 1039 (DLC), 12 Civ. 1139 (DLC), 2012 WL 3042986 (S.D.N.Y.
July 25, 2012)....................................................................................................14, 15

*SEC v. Madoff*,
No. 1:08-cv-10791-LLS, 2008 WL 5197070 (S.D.N.Y. filed Dec. 11, 2008) .........................2

*Securities Investor Protec. Corp. v. Morgan, Kennedy & Co., Inc.*,
533 F.2d 1314 (2d Cir. 1976)...............................................................14, 18, 19, 23

*Shephard v. Ouellete*,
854 So. 2d 251 (Fla. 5th Dist. App. 2003) ...............................................................21

*Shotmeyer v. New Jersey Realty Title Ins. Co.*,
948 A.2d 600 (N.J. 2008)......................................................................................21

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*,
463 F.3d 125 (2d Cir. 2006)...............................................................13, 18, 24

**Statutes**

15 U.S.C. § 78 *lll*(11)...............................................................................................22

15 U.S.C. § 78aaa *et seq.* ............................................................................................1

15 U.S.C. § 78eee(a)(4) ............................................................................................2

15 U.S.C. § 78eee(b)(3) ............................................................................................2

15 U.S.C. § 78eee(b)(4) ............................................................................................2

15 U.S.C. § 78fff-1(a) .................................................................................................3

15 U.S.C. § 78fff-2(b).................................................................................................18

**TABLE OF AUTHORITIES**
(continued)

Page(s)

15 U.S.C. § 78fff-3(a) ....................................................................................................3

15 U.S.C. § 78*lll*(2) ........................................................................................2, 3, 14, 17

15 U.S.C. § 78*lll*(4) ......................................................................................................3

15 U.S.C. § 78*lll*(11) ....................................................................................................3

Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. No. 111-
203, § 983(b), 124 Stat. 1931 (2010) ....................................................................17

FLA. STAT. ANN. § 620.8201(1) ..................................................................................20

FLA. STAT. ANN. § 620.8203 ......................................................................................20

FLA. STAT. ANN. § 620.8204 ......................................................................................20

FLA. STAT. ANN. § 620.8501 ......................................................................................20

FLA. STAT. ANN. § 620.81001 ......................................................................................5

N.J. STAT. ANN. § 42:1A-1 ..........................................................................................5

N.J. STAT. ANN. § 42:1A-9 ........................................................................................21

N.J. STAT. ANN. § 42:1A-11 ......................................................................................20

**Rules**

Fed. R. Civ. P. 36(a)(3) ....................................................................................5, 6, 9, 23

**Other Authorities**

1–12 *Collier on Bankruptcy* ¶ 12.12 (16th ed. 2012) ................................................14

John W. Larson, *Florida's New Partnership Law: The Revised Uniform
Partnership Act and Limited Liability Partnerships*, 23 FLA. ST. U. LAW REV.
201 (1995)................................................................................................................21

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and the estate of Bernard L. Madoff ("Madoff"), respectfully submits this combined motion and memorandum of law (the "Motion") to affirm the denial of twenty-nine (29) claims filed by claimants (the "Objecting Claimants") who objected to the Trustee's determinations and who had partnership interests in one of the following: the Whitman Partnership; the Lucky Company; or the Petito Investment Group (all Florida general partnerships); or the Harwood Family Partnership (a New Jersey general partnership) (all four collectively, the "Partnerships"). The Objecting Claimants are specifically identified in Exhibit 2 to the Declaration of Vineet Sehgal ("Sehgal Decl.") filed herewith. This memorandum is based upon the law set forth below as well as the facts set forth in the accompanying Sehgal Declaration and the declaration of Stephanie Ackerman ("Ackerman Decl.").

## PRELIMINARY STATEMENT

The Objecting Claimants seek customer status in this SIPA proceeding, despite acknowledging through discovery that they did not have accounts in their name and had no direct financial relationship with BLMIS. Instead, they invested in the Partnerships, each of which had a BLMIS account, invested partnership assets with BLMIS, and filed its own claim with the Trustee.[2] The case is governed by the Second Circuit decision *Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 708 F.3d 422 (2d Cir. 2013) and the many related

---

[1] *See* 15 U.S.C. § 78aaa *et seq.* (West 2009). For convenience, subsequent references to sections of the Securities Investor Protection Act shall be denoted simply as "SIPA § __."

[2] The Partnerships have been grouped together in this Motion because the Trustee believes that they represent all but one of the remaining Florida and New Jersey general partnership BLMIS account holders of which a number of investors or partners also claim "customer" status. The remaining one is still in active discovery.

decisions in this SIPA proceeding, referenced in Section E *infra*, involving the question of who is a "customer" under SIPA. The current Motion seeks to apply these decisions to the Objecting Claimants through entry of an order affirming the Trustee's denial of their claims as listed in Exhibit 2 to the supporting Declaration of Vineet Sehgal, expunging their claims, and overruling the related claims objections on the grounds that Claimants are not "customers" as such term is used at SIPA § 78*lll*(2).[3]

## BACKGROUND

### A.    THE COMMENCEMENT OF THE SIPA PROCEEDING

The basic facts of the BLMIS fraud are widely known and have been recounted in numerous decisions.  *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 231 (2d Cir. 2011); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 393–94 (S.D.N.Y. 2010).   On December 11, 2008, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court against Madoff and BLMIS, captioned *SEC v. Madoff*, No. 1:08-cv-10791-LLS, 2008 WL 5197070 (S.D.N.Y. filed Dec. 11, 2008), alleging fraud through the investment advisor activities of BLMIS.  The SEC consented to the consolidation of its case with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, SIPC filed an application under SIPA § 78eee(a)(4) alleging that because of its insolvency, BLMIS needed SIPA protection.  The District Court appointed the Trustee under SIPA § 78eee(b)(3) and removed the proceeding to this Court under SIPA § 78eee(b)(4).

Under SIPA, the Trustee is responsible, among other things, for recovering and distributing customer property to a broker's customers, assessing claims, and liquidating other assets of the firm for the benefit of the estate and its creditors.  A SIPA trustee has the general

---

[3] The Trustee reserves all other bases for objections to the claims that are the subject of the Motion.

powers of a bankruptcy trustee, in addition to the powers granted by SIPA.  SIPA § 78fff-1(a).

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding

provides that "customers," as defined in SIPA § 78*lll*(2), share pro rata in "customer property,"

defined in SIPA § 78*lll*(4), to the extent of their "net equity," defined in SIPA § 78*lll*(11).  For

each customer with a valid net equity claim, if the customer's share of customer property does

not make her whole, SIPC advances funds to the SIPA trustee up to the amount of the customer's

net equity, not to exceed $500,000 (the amount applicable to this case).  SIPA § 78fff-3(a).  It is

the customer's burden to demonstrate he or she is entitled to customer status.  *Mishkin v. Siclari*

*(In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002) ("[I]t is well-

established in the Second Circuit that a claimant bears the burden of proving that he or she is a

'customer' under SIPA.").

On December 23, 2008, this Court entered a Claims Procedures Order.  *See* ECF No. 12.

Pursuant to that order, the Trustee determines claims eligible for customer protection under

SIPA, claimants may object to the Trustee's determination of a claim by filing an objection in

this Court, and the Trustee requests a hearing date for the objection and notifies the objecting

claimant thereof.  *Id.*

## B.    THE PARTNERSHIPS' STRUCTURE, BLMIS ACCOUNTS, AND CLAIMS

The Objecting Claimants in this case invested into one or more of the Partnerships.  Two

(2) claims were filed by partners of the Whitman Partnership, seven (7) claims were filed by

partners of the Lucky Company, five (5) claims were filed by partners of the Petito Investment

Group, and fifteen (15) claims were filed by partners of the Harwood Family Partnership.  *See*

Sehgal Decl., ¶11, Ex. 3.  The claims of the Partnerships themselves are not at issue in this

Motion.

1.     **The Whitman Partnership**

Bernard Whitman and Judith Whitman admit that they opened BLMIS Account No. 1EM256 on March 18, 1993.  ECF No. 3416, at 1.  They also admit that on December 2, 1993 they formed the Whitman Partnership, "for the purpose of investing in Madoff."  *Id.*  The BLMIS account was transferred to the Whitman Partnership, which was owned by Judith Whitman and Bernard Whitman, as Trustees under their respective Living Trusts.  *Id.* at 1-2. The Whitman Partnership has indicated that it is a Florida general partnership.  It identified itself as a partnership on its "Application for Employer Identification Number," in the section labeled "Type of Entity."  Sehgal Decl., Ex. 6, AMF00284430.  Bernard Whitman also indicated in a "Partnership Account Agreement" that the Whitman Partnership was a "duly organized partnership" of which both his and his wife's trusts are the general partners.  Sehgal Decl., Ex. 6, AMF00284431.  Moreover, in connection with filing claims, the Whitman Partnership attached a partnership agreement, which states that the trusts of Judith and Bernard Whitman agreed to be partners of the Whitman Partnership, as a Florida partnership as of December 2, 1993.  Sehgal Decl., Ex. 5, MWPTAP00489782.  The BLMIS customer files reflect that all transactions with BLMIS were undertaken by Bernard Whitman on behalf of the Whitman Partnership.[4]  Sehgal Decl., Ex. 6, AMF00284395-AMF00284437.

None of the Whitman Partnership Objecting Claimants responded to discovery.  By failing to respond to the requests for admissions, each of them admitted (among other things) that they did not have an account in their name at BLMIS, they never deposited cash or securities with BLMIS, did not receive investment statements, correspondence or tax statements from BLMIS, did not have any control, investment discretion or decision-making power over any

---

[4] Before the partnership was formed, the account was initially opened in the name of Bernard Whitman's trust, and then later changed.  Sehgal Decl., Ex. 6, AMF00284433, AMF00284394.

investments at BLMIS, and the only relationship to BLMIS existed by way of their relationship to the Partnership. *See generally* Ackerman Decl., ¶¶1, 10, 15, 19, Ex. 6;[5] *see also* Fed. R. Civ. P. 36(a)(3).

The Whitman Partnership filed a proof of claim for the entire account. The Trustee denied the claim in its entirety because based on the Trustee's analysis, the amount of money that the Whitman Partnership withdrew from the account was greater than the amount that was deposited, making the account a "net winner." Thus, a determination letter was sent to the Whitman Partnership denying its customer claim.

### 2. **The Lucky Company**

BLMIS Account No. 1L0135 is an account held in the name of the Lucky Company c/o Hendler & Gersten, LLC. Sehgal Decl., Ex. 9, AMF00128757. One of the Lucky Company Objecting Claimants indicates that the Lucky Company was formed under the laws of the state of Florida. *See* ECF No. 3846 ¶1.[6] Although governance documents were not provided to BLMIS or to the Trustee, the general partners of the Lucky Company, Milton H. Hendler, Beth H. Hendler/Gersten, and Robin Eastern, all indicated in a "Partnership Account Agreement" that the Lucky Company was a "duly organized partnership." Sehgal Decl., Ex. 9, AMF00128792. The BLMIS customer files reflect that all transactions with BLMIS were undertaken by Milton Hendler and Beth Gersten on behalf of the Lucky Company. *See generally* Sehgal Decl., Ex. 9, AMF00128765-AMF00128819. Each Objecting Claimant acknowledged that their investment

---

[5] The Whitman Partners Requests for Admissions, Ackerman Decl., Exs. 4-6, (hereafter, "Whitman Partners RFA ___").

[6] BLMIS's records have a New Jersey address for the Lucky Company. Sehgal Decl., Ex. 9, AMF00128757. But even if it were assumed to be a New Jersey partnership, the Lucky Company Objecting Claimants would not benefit. There is no significant difference between New Jersey and Florida partnership law. Both states have adopted the Revised Uniform Partnership Act. *See* N.J. STAT. ANN. § 42:1A-1 *et seq.* (West); *Fla. Stat. Ann.* § 620.81001 *et seq.* (West).

was not directly with BLMIS. The Lucky Company Objecting Claimants all indicated in their objections that they invested *through* the Lucky Company, which held a BLMIS Account, and not through BLMIS directly. *See* ECF Nos., 3667, 3668, 3669, 3763, 3769, & 3773[7] ¶1.

None of the Lucky Company Objecting Claimants responded to discovery. By failing to respond to the requests for admissions, each of them admitted (among other things) that they did not have an account in their name at BLMIS, they never deposited cash or securities with BLMIS, did not receive investment statements, correspondence or tax statements from BLMIS, did not have any control, investment discretion or decision-making power over any investments at BLMIS, and the only relationship to BLMIS existed by way of their relationship to the Partnership. *See generally* Ackerman Decl. Exs. 1, 3, 7;[8] *see also* Fed. R. Civ. P. 36(a)(3).

It appears from the BLMIS customer files that all transactions with BLMIS were undertaken by one or the other of the general partners on behalf of Lucky Company. Sehgal Decl., Ex. 9, AMF00128765- AMF00128819. As far as any of the Lucky Company Objecting Claimants indicated, all payments by them were made to Lucky Company and not to BLMIS. Similarly, all withdrawals by them were received from Lucky Company and not directly from BLMIS. *See* Ackerman Decl. Exs. 1, 3, 7.

The Lucky Company filed a proof of claim for the entire account. The Trustee denied the claim in its entirety because based on the Trustee's analysis, the amount of money that the Lucky Company withdrew from the account was greater than the amount that was deposited, making the account a "net winner." Thus, a determination letter was sent to the Lucky Company denying its customer claim.

---

[7] The objection for docket number 3773 has been withdrawn.

[8] Lucky Company Partners Requests for Admissions, Ackerman Decl., Exs. 3, 5, 7, (hereafter, "Lucky Company Partners RFA ___").

### 3.    The Petito Investment Group

BLMIS Account No. 1ZA003 was opened with BLMIS on or about November 23, 1992, under the name "Dr. Frank A. Petito, Jr., Master Account."    Sehgal Decl., Ex. 12, AMF00000263-AMF00000271.  On March 4, 1994, Dr. Frank Petito corresponded with BLMIS, requesting a change in name of the account to "The Petito Investment Group."  Sehgal Decl., Ex. 12, AMF00000240.    The Petito Investment Group identified itself as a partnership on its "Application for Employer Identification Number," in the section labeled "Type of Entity." Sehgal Decl., Ex. 12, AMF00000241.  It also indicated that it was doing business in Florida and that Dr. Frank A. Petito, Jr. was the named general partner.    Sehgal Decl., Ex. 12, AMF00000241.  The BLMIS customer files reflect that most transactions with BLMIS were undertaken by Dr. Frank A. Petito, Jr. on behalf of the Petito Investment Group.[9]

While the Petito Investment Group did not produce any governance documents to the Trustee, there is evidence that it is a Florida partnership.  For example, James Reynolds, an Objecting Claimant of the Petito Investment Group filed a claim with the Trustee, attaching a Schedule K-1 tax form on which, in the "Information About the Partner" section, the box labeled "General  partner  or  LLC  member-manager"  was  checked.    Sehgal  Decl.,  Ex.  16, MWPTAP00532079; *see also* Sehgal Decl., Ex. 17, MWPTAP00533999; Sehgal Decl., Ex. 18, MWPTAP00566488; Sehgal Decl., Ex. 19, MWPTAP00580102.   Each Objecting Claimant acknowledged that their investment was not directly with BLMIS.  The Petito Investment Group Objecting  Claimants  indicated  in  their  objections  that  they  invested  *through*  the  Petito

---

[9] On March 16, 1999 Dr. Frank A. Petito, Jr. also authorized Lewis Bernard, David Petito, and Frank Petito III to make deposits and withdrawals in the event Dr. Petito was "incapacitated medically or otherwise prevented from discharging [his] responsibilities in connection with this account."  Sehgal Decl., Ex. 12, AMF00000197.  On only one occasion, David W. Petito corresponded with BLMIS on April 22, 2005 to deposit a check into the Petito Investment Group's account.  Sehgal Decl., Ex. 12, AMF00000158.

Investment Group, which held a BLMIS Account, and not through BLMIS directly. *See* ECF
Nos., 3414 & 3484 ¶1.

Since receiving the five (5) docketed objections to the claims determinations, the Trustee
served discovery on each of the Petito Investment Group Objecting Claimants seeking to
determine their basis for claiming customer status, and inquiring into deposits, payments,
communications, account openings, and their relationship with the account holder. Few of the
Petito Investment Group Objecting Claimants responded.[10] Based upon their responses, each of
them admitted (among other things) that they did not have an account in their name at BLMIS,
they never deposited cash or securities with BLMIS, did not receive investment statements or tax
statements from BLMIS, did not have any control, investment discretion or decision-making
power over any investments at BLMIS, and the only relationship to BLMIS existed by way of
their relationship to the Partnership. *See* Ackerman Decl. Ex. 2.

The Petito Investment Group filed a proof of claim for the entire account. The Trustee
denied the claim in its entirety because based on the Trustee's analysis, the amount of money
that the Petito Investment Group withdrew from the account was greater than the amount that
was deposited, making the account a "net winner." Thus, a determination letter was sent to the
Petito Investment Group denying its customer claim.

### 4.    The Harwood Family Partnership

BLMIS Account No. 1ZB442 was opened on or about October 15, 2002 under the name,
"Harwood Family Partnership." Sehgal Decl., Ex. 15, AMF00063912-AMF00063918.
Although governance documents were not provided to BLMIS or to the Trustee, the general
partners of the Harwood Family Partnership, Craig Harwood and Lowell Harwood, indicated in a

---

[10] Petito Investment Group Partners Requests for Admissions, Ackerman Decl., Exs. 2, 5, 8, (hereafter, "Petito
Investment Group Partners RFA ___").

"Partnership Account Agreement" that the Harwood Family Partnership was a "duly organized partnership." Sehgal Decl., Ex. 15, AMF00063910. All redemption requests were made by Lowell Harwood as general partner on behalf of the Harwood Family Partnership. Sehgal Decl., Ex. 15, AMF00063897-AMF00063909.

The Harwood Family Partnership was governed by its partnership agreement, Sehgal Decl., Ex. 20, p. 5, and by New Jersey partnership law. The partnership operated under an oral agreement since 1997 but apparently entered into a written partnership agreement in 2002.[11] The purpose of the partnerships was to, among other things, "invest its funds in all forms of investments." *See* Harwood Family Partnership Agreement § 3(a), Sehgal Decl., Ex. 20, MWPTAP00489494. The Partnership Property was defined as whatever the partnership invested, including but not limited to, "real estate, entities owning real estate, stocks, government bonds, corporate bonds, certificates of deposit, mutual funds, partnership interests, etc." *See* Harwood Family Partnership Agreement § 3(a), Sehgal Decl., Ex. 20, MWPTAP00489494.

None of the Harwood Family Partnership Objecting Claimants responded to discovery. By failing to respond to the requests for admissions, each of them admitted (among other things) that they did not have an account in their name at BLMIS, they never deposited cash or securities with BLMIS, did not receive investment statements, correspondence or tax statements from BLMIS, did not have any control, investment discretion or decision-making power over any investments at BLMIS, and the only relationship to BLMIS existed by way of their relationship

---

[11] The copy of the partnership agreement (the "Harwood Family Partnership Agreement") provided to the Trustee by Lowell Harwood and Craig Harwood, Trustees of the Charitable Remainder Trust FBO Craig Harwood in the context of filing claim number 010429 is not executed. But the Trustee has no information to suggest that it was anything but the actual operating document governing the Harwood Family Partnership.

to the Partnership.  *See generally* Ackerman Decl. Exs. 1, 4, 9; *see also* Fed. R. Civ. P. 36(a)(3).[12]

The Harwood Family Partnership filed a proof of claim for the entire account.  The Trustee allowed the claim because based on the Trustee's analysis, the amount of money that the Harwood Family Partnership withdrew from the account was less than the amount that was deposited, making the account a net loser.

\*          \*          \*          \*          \*          \*

As discussed *infra*, by Florida and New Jersey law, the Partnerships were treated as entities that owned their own property.  Each had a BLMIS account in its name, according to the books and records of BLMIS and entrusted its property with BLMIS for the purposes of purchasing securities.  None of the Partnerships was a bank, broker, or dealer.

## C.    THE BLMIS ACCOUNT RECORDS

The Partnerships each maintained an account in its own name (the "Accounts," and each, an "Account") with BLMIS.  The Objecting Claimants did not.  Sehgal Decl., ¶¶6, 9-14, Exs. 1-3.  The records of BLMIS reflect money deposited or withdrawn by and on behalf of the Partnerships, and not by the Objecting Claimants individually.  *See* Sehgal Decl., Exs. 6, 9, 12, 15.  Almost all of the Objecting Claimants admit that BLMIS sent Account statements and related communications to the Partnerships, not the Objecting Claimants.[13]  The BLMIS customer files for these Accounts do not reference the particular interests held by Objecting Claimants in the Partnerships.  *See* Sehgal Decl. Exs. 6, 9, 12, 15.

---

[12] Harwood Family Partnership Partners Requests for Admissions, Ackerman Decl., Exs. 5, 9 (hereafter, "Harwood Family Partners RFA ___").

[13] Robert and Barbara Mayer contend that they received correspondence directly from BLMIS, however, they do not provide evidence to this effect.  Robert and Barbara Mayer still admit, however, to never receiving investment statements or tax statements from BLMIS.  Ackerman Decl. Ex. 2.

Because the Partnerships each maintained an Account at BLMIS, and made deposits into and withdrawals from that Account, the books and records of BLMIS reflect the amounts owing and owed by the BLMIS estate for that Account. The books and records of BLMIS do not, in contrast, reflect deposits or withdrawals directly to or from BLMIS by the individual Objecting Claimants with regard to any Partnership's BLMIS Account. They also do not show what amounts individual Objecting Claimants invested in, or withdrew from, the Partnerships. *See* Sehgal Decl. Exs. 6, 9, 12, 15.

It was each Partnership that had the right to demand, on behalf of the Partnership, return of the property entrusted to its Account, and each Partnership that is accordingly entitled to a customer claim to the extent of its net equity. Moreover, in this instance, three of the Partnerships (the Whitman Partnership, the Lucky Company, and the Petito Investment Group) had no net equity at all, and interim payments have been made on the net equity of the Harwood Family Partnership.

## D.    **THE CLAIMS**

The claims at issue in this Motion involve investments into the Partnerships. Sehgal Decl. ¶¶8-12, Exs. 1-3. The Objecting Claimants, the twenty-nine (29) claims filed by them, and the objections to determination of those claims, are specifically identified in Exhibits 2 and 3 to the Sehgal Declaration. The Trustee denied their claims because they lacked BLMIS accounts and were not customers of BLMIS. Sehgal Decl. ¶11. Collectively, the Objecting Claimants filed ten (10) docketed objections to the Trustee's determination of their claims. Sehgal Decl. ¶¶ 8-12, Exs. 1-3. This Motion addresses all objections regarding the specified claims by Objecting Claimants who are identified on Exhibit 2 of the Sehgal Decl.

Since receiving the ten (10) docketed objections to the claims determinations, the Trustee served discovery on each of the Objecting Claimants seeking to determine their basis for

claiming customer status, and inquiring into deposits, payments, communications, account openings, and their relationship with the account holder.[14] Few of the Objecting Claimants responded, and even those that did provided no persuasive evidence of their entitlement to customer status under SIPA. *See* Ackerman Decl., Exs. 2, 6-9.

## E.    THE CUSTOMER DECISIONS

There have been ten prior decisions in this proceeding dealing with whether investors in BLMIS accountholders could be treated as "customers" under SIPA; all of the decisions said they could not.[15]

### 1.    The Initial Feeder Fund Motion

The Trustee's first motion regarding the definition of "customer" under SIPA was the Trustee's Motion To Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts In Their Names, Namely, Investors in Feeder Funds, filed on June 11, 2010, ECF No. 2416 (the "Initial Feeder Fund Motion"). On June 28, 2011, this Court issued its memorandum decision and order affirming the Trustee's denial of the claims. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank Ltd. v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 480 B.R. 117 (S.D.N.Y. 2012), *aff'd sub nom. Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC),* 708 F.3d 422 (2d Cir. 2013).

---

[14] Discovery was served upon Becker and Poliakoff, LLP for the Harwood Family Partnership and the Whitman Partnership but Becker and Poliakoff, LLP ultimately informed the Trustee that it was not representing any of the Objecting Claimants as to discovery. Thus, discovery was served directly upon each of the Objecting Claimant in connection with the Harwood Family Partnership and the Whitman Partnership *pro se*. Ackerman Decl. ¶¶13-22. In addition, discovery was served directly upon each of the Objecting Claimants in connection with the Petito Investment Group *pro se*. Ackerman Decl. ¶19, Ex. 8. Finally, discovery was served on counsel in connection with the Lucky Company. Ackerman Decl. ¶12, Ex. 3.

[15] One other customer motion is scheduled for hearing on July 29, 2015. *See* Trustee's Motion and Memorandum to Affirm His Determinations Denying Claims of Claimants Holding Interests in Partners Investment Co., Northeast Investment Club, and Martin R. Harnick & Steven P. Norton, Partners, ECF No. 10201. At this writing, the deadline for objections has passed and no objections have been filed.

The Court found that, in light of the plain language of SIPA and relevant case law, the claimants in the Initial Feeder Fund Motion did not qualify as "customers" under SIPA. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 454 B.R. at 290. The Court held that the claimants invested in, not through, those feeder funds, and had no individual accounts at BLMIS. *Id.* at 297. It was the feeder funds that entrusted their monies with BLMIS for the purpose of trading or investing in securities—the touchstone of "customer" status—whereas the claimants purchased interests in the feeder funds. *Id.* at 299. The Court held that absent a direct relationship with BLMIS, the claimants sought a definition of "customer" that stretched the term beyond its limits. *Id.* at 302.

After the District Court affirmed, *Aozora Bank Ltd.*, 480 B.R. 117 (S.D.N.Y. 2012), the claimants appealed to the Second Circuit, which also affirmed. The Second Circuit confirmed that "[j]udicial interpretations of 'customer' status support a narrow interpretation of the SIPA's provisions." *Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Securities LLC)*, 708 F.3d 422, 426 (2d Cir. 2013) (quoting *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006)), explaining that "the critical aspect of the 'customer' definition" was "the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." *Kruse*, 708 F.3d at 426 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236). The claimants failed to meet this fundamental requirement because the money sent to BLMIS belonged to the accountholders, not to the individual claimants, and the individual claimants therefore failed to establish that they had entrusted cash or securities to BLMIS. *Id.* at 427. The Second Circuit also found that the individual claimants did not exhibit other indicia of customer status in their dealings (or lack of dealings) with BLMIS, including that they did not

exert any control over the accounts at issue and that they were not reflected in BLMIS records. *Id.* at 426-27.

The Second Circuit held that the interests "sold by the Feeder Funds to investors . . . did not confer an ownership interest in money that the Feeder Funds ultimately invested in BLMIS." Thus, "regardless of their intent, appellants never entrusted their cash or securities to BLMIS and, thus, fail to satisfy this 'critical aspect of the "customer" definition.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236 (internal quotation marks omitted); *see Morgan, Kennedy*, 533 F.2d at 1318; *see also Kruse,* 708 F.3d at 427-28 (citing 1–12 *Collier on Bankruptcy* ¶ 12.12 (16th ed. 2012) ("[A] claimant will not be entitled to customer protection under SIPA unless the debtor actually receives the claimant's cash or securities; the debtor must actually have come into possession or control.")).

### 2.    <u>The ERISA Motion</u>

While the appeals of the Feeder Fund Decision were pending, the Trustee also filed a motion (the "ERISA Motion") to address arguments that were raised by claimants without BLMIS accounts who were benefit plans or benefit plan participants and who sought to use the Employee Retirement Income Security Act ("ERISA") as a basis for determining their customer status.[16]  *See* ECF No. 4521.  The District Court withdrew the reference and granted the motion.

The District Court noted that the first two of the three ways to qualify as a "customer" under SIPA § 78*lll*(2), "presume that a customer must have a securities account with the debtor," and that the claimants also did not qualify under the third method of having "deposited cash with the debtor for the purpose of purchasing securities." *Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, Nos. 12 Civ. 1039 (DLC), 12 Civ. 1139 (DLC), 2012 WL 3042986 *3

---

[16] Prior to the hearing on the Initial Feeder Fund Motion, the Court had removed from the scope of the motion the question of whether ERISA affects "customer" status under SIPA.

(S.D.N.Y. July 25, 2012). That was so because none of the claimants "owned any cash deposited with BLMIS. Rather, . . . in each case this cash was owned by the third-party entity in which the claimant invested, and which had a BLMIS account in its name." *Id.* at *5. The District Court also rejected arguments that fiduciary responsibilities could suffice to create a "customer" relationship. *Id*. at *12.

### 3.    Other Customer Motions

Further SIPA "customer" motions followed, each of which was determined in favor of the Trustee. On August 21, 2013, the Court issued its Bench Memorandum Granting Trustee's Second Motion to Affirm Trustee's Determinations Denying Claims of Claimants Who Invested in Certain Feeder Funds and Did Not Have BLMIS Accounts in Their Names, ECF No. 5450 ("the Second Feeder Fund Decision"). Noting that prior decisions established that the burden is on the claimant to established that he is a "customer" entitled to SIPA protection, and that such showing is not easily met, this Court concluded that the claimants had failed to establish their "customer" status. The Court noted that "they had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property interest in any feeder fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment discretion over feeder fund assets invested with BLMIS, received no accounts statements or other communications from BLMIS and had no transactions reflected on the books and records at BLMIS." Second Feeder Fund Decision at 4.

On August 22, 2014, this Court issued its Memorandum Decision Granting Motion To Affirm Trustee's Determinations Denying Claims Of Claimants Who Invested In Certain ERISA Plans. *See generally Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 515 B.R. 161 (Bankr. S.D.N.Y. 2014) ("ERISA Claimant Decision"). Again holding that the burden is on the claimant to establish that he is a customer, this Court concluded that a

claimant who wished to qualify as a person who has deposited cash with the debtor for the purposes of purchasing securities must show that she entrusted her "own assets directly through an account maintained in her own name rather than indirectly through a fund that then entrusted the fund's assets through an account maintained in the fund's name." *Id.* at 168 (internal citations omitted). This Court further noted that "not every victim of a broker-dealer's fraud is a "customer" and that even the fact that a claimant exercised some control over her own investments in the fund or the fund's investments in BLMIS was not sufficient to meet "the narrow definition of customer under SIPA." *Id.*

On February 25, 2015, this Court read into the record a decision ("S&P Decision") granting Trustee's Motion And Memorandum To Affirm His Determinations Denying Claims Of Claimants Holding Interests In S&P or P&S Associates, General Partnerships. Again, in holding that the definition of customer is narrowly interpreted, the "critical aspect" of the definition is "the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." This Court explained that the indicia of customer status are: (i) a direct financial relationship with BLMIS; (ii) a property interest in the funds invested directly with BLMIS; (iii) securities accounts with BLMIS; (iv) control over the account holders' investments with BLMIS; and (v) identification of the alleged customer in BLMIS's books and records. Hr'g. Transcript, *S&P Decision*, at p. 30, Ackerman Decl. Ex. 11. The Court held that the objecting partners failed to sustain their burden of proving that they are customers of BLMIS and an order granting the Trustee's motion was entered. *Id.* at 36; *see also* ECF No. 9450. Since the S&P Decision, there have been three more unopposed motions to the Trustee's determination each of which was granted by the Court.[17]

---

[17] *See* Order Approving Trustee's Motion To Affirm His Determinations Denying Claims of Claimants Holding Interests In Peerstate Equity Fund, L.P., ECF No. 9883 (Apr. 27, 2015); *see* Order Approving Trustee's Motion And

## ARGUMENT

To be a "customer" under SIPA, an investor must have "a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person," including "any person who has deposited cash with the debtor for the purpose of purchasing securities." SIPA § 78*lll*(2).[18] Thus, to be a "customer" an investor must have entrusted cash or securities with the debtor for the purpose of trading or investing in securities.   In *Kruse*, the Second Circuit found that investors who bought interests in a limited partnership that invested partnership funds via the partnership's own BLMIS account "never entrusted *their* cash or securities to BLMIS and, thus, fail to satisfy this 'critical aspect of the "customer" definition'" regardless of their intent.   708

---

To Affirm His Determinations Denying Claims Of Claimants Holding Interests In The Lazarus-Schy Family Partnership, The Schy Family Partnership, Or The Lazarus Investment Group, ECF No. 10010 (May 18, 2015); Order Approving Trustees Motion To Affirm His Determinations Denying Claims Of Claimants Holding Interests In Epic Ventures, LLC, ECF No. 10267 (June 25, 2015).

[18] The definition applicable to this SIPA proceeding is:

(2) CUSTOMER

The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the  purpose of purchasing securities, but does not include—

(A) any person to the extent that the claim of such  person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

SIPA § 78*lll*(2), *see* 15 U.S.C. § 78*lll*(2)  (West 2009). After the start of this case, the "customer" definition was slightly reorganized and amended in a manner irrelevant to the present issues by the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. No. 111-203, § 983(b), 124 Stat. 1931 (2010); *see In re Lehman Bros. Inc.*, 462 B.R. 53, n.9 (Bankr. S.D.N.Y. 2011).

F.3d at 427 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236). Similarly, the

Second Circuit in *In re New Times Securities. Services, Inc.* held that "the critical aspect of the

'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes

of trading securities." 463 F.3d at 128 (quoting *Appleton v. First Nat'l Bank of Ohio,* 62 F.3d

791, 801 (6th Cir. 1995)); *see also In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 724-25

(Bankr. S.D.N.Y. 1998) ("The term [customer] refers to those who entrust cash or securities to

broker-dealers for the purpose of trading and investing in the securities market."). The Second

Circuit recently further upheld this principle in *In re Lehman Bros., Inc.*, 14-890, 2015 WL

3938079 (2d Cir. June 29, 2015), concluding that the "critical aspect of the 'customer' definition

is the entrustment of cash or securities to the broker-dealer for the purposes of trading

securities." *Id.* at *4 (quoting *In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 236 (2d

Cir.2011)). The Trustee is responsible for discharging obligations of the debtor to customers

with such claims "insofar as such obligations are ascertainable from the books and records of the

debtor or are otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b).

The Objecting Claimants' investments in the Partnerships do not meet the requirements

for "customer" status outlined in the seminal Second Circuit decision *Securities Investor Protec.

Corp. v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314, 1318 (2d Cir. 1976), and reaffirmed in

*Kruse*, 708 F.3d at 427. In *Morgan Kennedy*, the Second Circuit rejected the argument that the

beneficial owners of the account holder were the "customers" under SIPA, citing the facts that:

(1) title to the trust assets was held by the account holder, not the beneficiaries; (2) the securities

account with the debtor was in the name of the account holder, not the beneficiaries; (3) the

account holder had the exclusive power to entrust the assets to the debtor; (4) the beneficiaries

were unknown to the broker; and (5) the beneficiaries had no legal capacity in which they could deal with the debtor. 533 F.2d at 1318.

The Objecting Claimants' circumstances are little different than those of the claimants in *Morgan Kennedy*, and do not show the hallmarks of customer status discussed in this Court's *S&P* decision. Hr'g. Transcript, *S&P Decision*, at p. 30, Ackerman Decl. Ex. 11. The Objecting Claimants entrusted their money to the Partnerships, not BLMIS. The Objecting Claimants lacked a direct financial relationship with BLMIS. The money entrusted to BLMIS was the property of the Partnerships, not the Objecting Claimants. The BLMIS Accounts were in the names of the Partnerships, not in the individual names of Objecting Claimants.

The individual interests of Objecting Claimants were not identified in BLMIS' books and records, and the names of most of them did not appear in the customer files. The partners who dealt with BLMIS were like the trustees who acted for the trust account in *Morgan Kennedy*, and were no more customers in their individual capacity than the trustees were. *Morgan Kennedy,* 533 F.2d at 1318, 1320-21 (notwithstanding that the trust account was in the name of the trustees, "[a]ny suggestion that each of the three Trustees has a separate customer claim against the debtor is untenable" because the Trustees together managed for the trust, "which was the true customer of the broker-dealer . . . ."; similarly, noting that under the SIPA Rules, individual coverage for multiple people who each own some portion of, or interest in, an account is "explicitly forbidden".)

Only the Partnerships, not the Objecting Claimants, entrusted their cash or securities to BLMIS, and the Objecting Claimants thus fail to satisfy this "critical aspect of the 'customer' definition." *Kruse*, 708 F.3d at 426-27 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236); *accord ERISA Claimant Decision,* 515 B.R. at 169. Whether the Objecting Claimants

intended the Partnerships to invest with BLMIS is irrelevant under SIPA.  *See Kruse*, 708 F.3d at

426-27; *ERISA Claimant Decision*, 515 B.R. at 169-70.

The funds that the Objecting Claimants contributed to the Partnerships, and anything that

the Partnerships purchased with those funds, belongs to the relevant Partnership and not to the

Objecting Claimants.  *See* FLA. STAT. ANN. § 620.8204 (West);[19] *see also* N.J. STAT. ANN.

§ 42:1A-11 (West).[20]  Both Florida and New Jersey law clearly and explicitly recognize general

partnerships such as the Partnerships as distinct legal entities that own their property.  *See* FLA.

STAT. ANN. § 620.8201(1) ("A partnership is an entity distinct from its partners"); FLA. STAT.

ANN. § 620.8203 ("Property acquired by a partnership is property of the partnership and not of

---

[19] When property is partnership property in Florida:

> (1) Property is partnership property if acquired in the name of:(a) The partnership; or(b) One or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership but without an indication of the name of the partnership.(2) Property is acquired in the name of the partnership by a transfer to:(a) The partnership in its name; or(b) One or more partners in their capacity as partners in the partnership, if the name of the partnership is indicated in the instrument transferring title to the property.(3) Property is presumed to be partnership property if purchased with partnership assets, even if not acquired in the name of the partnership or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership.(4) Property acquired in the name of one or more of the partners, without an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership and without use of partnership assets, is presumed to be separate property, even if used for partnership purposes.

FLA. STAT. ANN. § 620.8204.  Similarly, FLA. STAT. ANN. § 620.8501, titled "Partner not coowner of partnership property" provides, "Partnership property is owned by the partnership as an entity, not by the partners as co-owners. A partner has no interest that can be transferred . . . in specific partnership property."

[20] "Property acquired by a partnership is property of the partnership and not of the partners individually."  N.J. STAT. ANN. § 42:1A-11.

the partners individually.");[21] *see also* N.J. Stat. Ann. § 42:1A-9 ("A partnership is an entity distinct from its partners.").

These are also long established principles in case law. *See, e.g., In re Kane*, 470 B.R. 902, 932 (Bankr. S.D. Fla. 2012) *aff'd sub nom. Kane v. Stewart Tilghman Fox & Bianchi, P.A.*, 485 B.R. 460 (S.D. Fla. 2013) *aff'd sub nom. In re Kane*, 755 F.3d 1285 (11th Cir. 2014) (Florida general partnerships are entities distinct from their partners and has their own assets independent of their partners); *Shephard v. Ouellete*, 854 So. 2d 251, 253 (Fla. 5th Dist. App. 2003) (analyzing partners' intent and explaining that property acquired by a partnership is property of the partnership and not of the partners individually); *see also Kaplan v. Dir., Div. of Taxn.*, 23 N.J. Tax 594, 606 (N.J. Tax 2008) *aff'd*, 24 N.J. Tax 415 (N.J. Super. App. Div. 2009) (explaining that a partner "is not a co-owner of partnership property and has no interest in partnership property which can be transferred, either voluntarily or involuntarily"); *Shotmeyer v. New Jersey Realty Title Ins. Co.*, 948 A.2d 600, 606 (N.J. 2008) (holding that the partnership was owned by real estate because the partners purchased the property in their capacities as partners). Like the objecting claimants dealt with by prior Customer Opinions, the Objecting

---

[21] To the extent that older Florida law applies to the Florida general partnerships, the Trustee argues that even that prior form of ownership for general partnerships defined the tenancy in partnership in a manner that denied individual partners the usual incidents of ownership. *See* John W. Larson, *Florida's New Partnership Law: The Revised Uniform Partnership Act and Limited Liability Partnerships*, 23 FLA. ST. U. LAW REV. 201, 211 n.51 (1995). The phase-in of the new law (the Florida Revised Uniform Partnership Law, or "FRUPA") is described in the Larson law review article as follows:

> Until January 1, 1998, FRUPA will govern only those partnerships formed after January 1, 1996, the Act's effective date, unless the partnership elects to be governed by the Revised Act. Partnerships formed under present law before January 1, 1996, will continue to be governed by the Florida UPA until January 1, 1998. At any time after January 1, 1996, an existing partnership may, in the manner provided in its partnership agreement or under the UPA procedure for amending the partnership agreement, voluntarily elect to be governed by FRUPA. After January 1, 1998, FRUPA governs all Florida partnerships.

Larson, p. 3, at 247 (emphasis added).

Claimants do not individually own the assets that the Partnerships invested with BLMIS. Instead, the assets are collectively owned by the Partnerships themselves.

It was the Partnerships, not the Objecting Claimants, that entrusted assets to BLMIS for the purpose of purchasing securities. Each Partnership, through its management, had the right to direct the investment of those assets on behalf of the Partnership, and to withdraw property from its Account on behalf of the Partnership. Each Partnership, not the Objecting Claimants, was the customer for its respective Account under SIPA.

Because BLMIS did not perform a custodial function on behalf of the individual Objecting Claimants, the Objecting Claimants have neither "customer" claims nor individual net equity. The purpose of SIPA, a statute intended to deal with broker insolvency, is "to expedite the return of customer property" by "protecting the *custody* function of brokers," according to a recent Second Circuit decision that declined to permit interest or time-based damages for customer claims under SIPA. *Sec. Investor Prot. Corp. v. 2427 Parent Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 779 F.3d 74, 80 (2d Cir. 2015). Customers share in the fund of customer property ratably, according to each customer's "net equity." *Id*. at 77, 81. The definition of net equity is limited by the fundamental SIPA design "to return customer property to customers," *id.* at 77, whether in cash or in actual securities. *Id*. at 80.[22]

The Second Circuit stated in *2427 Parent Corp.*, "[w]e . . . previously concluded that in [the BLMIS] case net equity . . . should be determined based on customers' actual deposits and withdrawals. These deposits, net withdrawals, constitute customer property here." *Id.* at 81

---

[22] The definition of Net Equity at SIPA § 78 *lll*(11)begins, "The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by—

    (A) Calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated . . . on the filing date, all securities positions of such customer . . . ."

(citations omitted).  The books and records of BLMIS show that Objecting Claimants made no

individual deposits in or withdrawals from BLMIS, and those who interacted with BLMIS as to

the Accounts did so solely on the Partnerships' behalf.  Sehgal Decl., Exs 6, 9, 12, 15.  The

Objecting Claimants accordingly have no net equity and are not "customers" within the meaning

of SIPA.

Each of the Objecting Claimants was served with requests for admission, interrogatories,

and requests for production.  Except for a few Petito Investment Group Objecting Claimants

(who either admitted all the requests for admission outright or did not deny any of them in

substantial part), none of them responded.  Those Objecting Claimants who failed to respond to

the requests for admission admitted them.  Fed. R. Civ. P. 36(a)(3).  The admissions, both

deemed and actual, show that Objecting Claimants lack any relationship with BLMIS that fits the

*Morgan Kennedy* criteria and that their claims of "customer" status are baseless.  They admitted

that: (i) the relevant Account was not titled in their name;[23] (ii) that they never received

investment statements or tax statements in their names from BLMIS;[24] (iii) that they never paid

cash directly to BLMIS for credit to an account in their names;[25] (iv) never deposited securities

directly to BLMIS;[26] (v) that they never directly withdrew or received funds from BLMIS;[27] (vi)

that their only relationship to BLMIS existed by way of their relationship to the Account

---

[23] Whitman Partners RFA ¶2; Lucky Company Partners RFA ¶2; Petito Investment Group Partners RFA ¶2;
Harwood Family Partners RFA ¶2.

[24] Whitman Partners RFA ¶¶5-6; Lucky Company Partners RFA ¶¶8-9; Petito Investment Group Partners RFA ¶¶8-9; Harwood Family Partners RFA ¶¶8-9.

[25] Whitman Partners RFA ¶4; Lucky Company Partners RFA ¶5; Petito Investment Group Partners RFA ¶5;
Harwood Family Partners RFA ¶5.

[26] Whitman Partners RFA ¶3; Lucky Company Partners RFA ¶4; Petito Investment Group Partners RFA ¶4;
Harwood Family Partners RFA ¶4.

[27] Lucky Company Partners RFA ¶¶6-7; Petito Investment Group Partners RFA ¶¶6-7; Harwood Family Partners
RFA ¶¶6-7.

holder;[28] (vii) that they never entered into any contracts in their names with BLMIS;[29] and (viii

that they did not have any control, investment discretion or decision-making power over any

investment assets at BLMIS.[30]

As the Second Circuit has explained, "[j]udicial interpretations of 'customer' status

support a narrow interpretation of the SIPA's provisions." *Kruse*, 708 F.3d at 426 (citing *In re

New Times Sec. Servs., Inc.,* 463 F.3d at 127). Customer status under SIPA is narrowly

construed and is the burden of the claimant to establish. *See ERISA Claimant Decision,* 515 B.R.

at 166 ("The burden is on the claimant to establish he is a 'customer' entitled to SIPA protection,

and such a showing 'is not easily met.'"); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv.

Sec. LLC*, 454 B.R. at 294 (citing *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 418 (Bankr.

S.D.N.Y. 2003)); *see also Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R.

520, 557 (Bankr. S.D.N.Y. 2002) ("[I]it is well-established in the Second Circuit that a claimant

bears the burden of proving that he or she is a 'customer' under SIPA."). The Objecting

Claimants have not met this burden. Thus, under Second Circuit precedent, the Objecting

Claimants are not SIPA customers.

## CONCLUSION

For all of the foregoing reasons, the Court should affirm the Trustee's determination

denying the claims of the Objecting Claimants, overrule their objections, expunge the claims,

and grant such other and further relief as the Court deems just and proper.

---

[28] Whitman Partners RFA ¶7; Lucky Company Partners RFA ¶11; Petito Investment Group Partners RFA ¶11; Harwood Family Partners RFA ¶11.

[29] Lucky Company Partners RFA ¶10; Petito Investment Group Partners RFA ¶10; Harwood Family Partners RFA ¶10.

[30] Whitman Partners RFA ¶8; Lucky Company Partners RFA ¶8; Petito Investment Group Partners RFA ¶8; Harwood Family Partners RFA ¶8.

Dated: New York, New York
July 16, 2015

Respectfully submitted,

*/s/ David J. Sheehan*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Jorian L. Rose
Email: jrose@bakerlaw.com
Amy E. Vanderwal
Email : avanderwal@bakerlaw.com
George Klidonas
Email : gklidonas@bakerlaw.com
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201

Brian A. Bash
Email: bbash@bakerlaw.com
**Baker & Hostetler LLP**
1900 E. 9th St Suite 3200
Cleveland, Ohio  44114
Tel: (216) 621-0200
Fax: (216) 696-0740

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

25