# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>          Plaintiff-Applicant,<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |

In re:

BERNARD L. MADOFF,

          Debtor.

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

          Plaintiff,

          v.

ELBERT R. BROWN TRUST;

VIOLA BROWN TRUST;

DO STAY INC.;

ELBERT BROWN, in his capacities as CREATOR
and TRUSTEE of the ELBERT R. BROWN
TRUST, and INDIVIDUALLY as BENEFICIARY
of the ELBERT R. BROWN TRUST; and

VIOLA BROWN, in her capacities as CREATOR
and TRUSTEE of the VIOLA BROWN TRUST,
and INDIVIDUALLY as BENEFICIARY of the
VIOLA BROWN TRUST,

          Defendants



Adv. Pro. No. 10-05398 (BRL)

Civil Action No. 11-cv-5155 (JSR)

**AMENDED COMPLAINT**

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff individually ("Madoff"), by and through his undersigned counsel, for his amended

complaint (the "Amended Complaint"), states as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff. Over the course of the scheme, there were more than 8,000 client accounts at BLMIS.

In early December 2008, BLMIS generated client account statements for its approximately 4,900

open client accounts. When added together, these statements purport that clients of BLMIS had

approximately $65 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a

small fraction of that amount. On March 12, 2009, Madoff admitted to the fraudulent scheme

and pled guilty to 11 felony counts, and was sentenced on June 29, 2009, to 150 years in prison.

2.      The within defendants Elbert R. Brown Trust (the "Elbert Brown Trust");

Viola Brown Trust; Do Stay Inc. ("Do Stay"); Elbert Brown, in his capacities as creator and

trustee of the Elbert Brown Trust; and Viola Brown, in her capacities as creator and trustee of

the Viola Brown Trust (collectively, "Defendants") were beneficiaries of Madoff's Ponzi

scheme. The Trustee's investigation has revealed that, between December 11, 2002 and

December 11, 2008, Defendants received $2,965,200 in fictitious profits from the Ponzi

scheme, meaning that Defendants withdrew more than Defendants invested in Defendants'

BLMIS accounts. Specifically, Elbert Brown Trust and Elbert Brown, in his capacities as

creator and trustee of the Elbert Brown Trust (collectively, "Elbert Brown Trust

Defendants"), received $1,272,000 from BLMIS in respect of BLMIS account no. 1B0073

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

(the "EB Trust Account I"); Defendants Viola Brown Trust and Viola Brown, in her capacities as creator and trustee of the Viola Brown Trust (collectively, "Viola Brown Trust Defendants"), received $1,320,000 from BLMIS in respect of BLMIS account no. 1B0078 (the "VB Trust Account I"); and Defendant Do Stay received $373,200 from BLMIS in respect of BLMIS account no. 1D0040 (the "Do Stay Account"). Accordingly, Defendants received a total of $2,965,200 of other people's money. The transfers of fictitious profits to or for the benefit of Defendants constitute avoidable transfers and are recoverable by the Trustee. This action is brought to recover the transfers of fictitious profits so that this customer property can be equitably distributed among the holders of allowed claims in this SIPA proceeding.

3.   In addition to the transfers referenced above, Elbert Brown Trust Defendants received the amount of $233,000 from BLMIS in respect of BLMIS account no. 1B0142 (the "EB Trust Account II") within the 90 days prior to the Filing Date (defined below). As a result of this preference payment, Elbert Brown Trust Defendants are in a more favorable position than other defrauded customers of BLMIS.

4.   Upon information and belief, Defendant Elbert Brown and Defendant Viola Brown received subsequent transfers of the avoidable transfers referenced above. Upon information and belief, transfers from EB Trust Account I, EB Trust Account II, VB Trust Account I, and Do Stay Account were regularly withdrawn to the joint bank account, or otherwise for the benefit, of Elbert and Viola Brown. Upon information and belief, such subsequent transfers were withdrawn for the benefit of both Elbert and Viola Brown, and Elbert and Viola Brown are together hereafter referred to as "Subsequent Transferee Defendants." To the extent the funds transferred from BLMIS were for the benefit of the Subsequent Transferee Defendants, Subsequent Transferee Defendants are the initial

4

transferees of such transfers and are included in the definition of Defendants for purposes of the allegations herein.

5.   This adversary proceeding is brought pursuant to sections 78fff(b), 78fff-1(a) and 78fff-2(c)(3) of SIPA, sections 105(a), 544, 548(a), 550(a) and 551 of title 11 of the United States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York Debtor and Creditor Law § 270 *et seq.* (McKinney 2001) ("DCL")), and other applicable law, for avoidance of fraudulent obligations and conveyances in connection with certain transfers of property by BLMIS to or for the benefit of Defendant. The Trustee seeks to set aside such obligations and transfers and preserve and recover the property for the benefit of the BLMIS estate.

## JURISDICTION AND VENUE

6.   This is an adversary proceeding commenced before the same Court before which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to the Bankruptcy Court. The reference was thereafter partially withdrawn by this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

7.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

8.   Venue in this district is proper under 28 U.S.C. § 1409.

## DEFENDANTS

9.   Upon information and belief, Defendant Elbert Brown Trust is a revocable

trust that was formed under the laws of the State of Florida. Upon information and belief, its address is in Jupiter, Florida. Defendant Elbert Brown Trust holds the EB Trust Account I and EB Trust Account II in the name, "Elbert R Brown Trustee u/t/d 12/29/88," with the account addresses reported as Jupiter, Florida.

10.     Upon information and belief, Defendant Viola Brown Trust is a revocable trust that was formed under the laws of the State of Florida. Upon information and belief, its address is in Jupiter, Florida. Defendant Viola Brown Trust holds the VB Trust Account I and BLMIS account no. 1B0128 (the "VB Trust Account II") in the name, "Viola Brown Trustee u/t/d 12/29/88," with the account addresses reported as Jupiter, Florida.

11.     Upon information and belief, Defendant Do Stay is a corporation that was formed under the laws of the State of Florida. Upon information and belief, its principal place of business is located in Jupiter, Florida. Defendant Do Stay holds the Do Stay Account in the name, "Do Stay Inc.," with the account address reported as Jupiter, Florida.

12.     Upon information and belief, Defendant Elbert Brown, in his capacities as creator and trustee of the Elbert Brown Trust, and Subsequent Transferee Defendant Elbert Brown, individually, maintains his residence in Jupiter, Florida, with his wife, Defendant Viola Brown.

13.     Upon information and belief, Defendant Viola Brown, in her capacities as creator and trustee of the Viola Brown Trust, and Subsequent Transferee Defendant Viola Brown, individually, maintains her residence in Jupiter, Florida, with her husband, Defendant Elbert Brown.

## BACKGROUND, THE TRUSTEE, AND STANDING

14.     On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.   Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS.   The District Court Proceeding remains pending in the District Court.   The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

15.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

16.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").   Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

17.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

      a.     appointed the Trustee for the liquidation of the  business of BLMIS

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." 15 U.S.C. § 78*lll*(7)(B).  Thus, even though the application for a protective decree was filed on December 15, 2008, the Filing Date in this action is December 11, 2008.

pursuant to section 78eee(b)(3) of SIPA;

b. appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

c. removed the case to this Court pursuant to section 78eee(b)(4) of SIPA. By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

18. By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

19. At a Plea Hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (Docket No. 50). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009, to 150 years in prison.

20. On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS since at least the 1980s. Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009)

8

(Docket No. 11).

21. As the Trustee appointed under SIPA, the Trustee is charged with recovering and paying out customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences, payouts of fictitious profits and/or other avoidable obligations and transfers, to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

22. Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA section 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA.

23. Pursuant to sections 78fff(b) and 78lll(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

24. The Trustee has standing to bring these claims pursuant to applicable provisions of SIPA, including sections 78fff-1(a), 78fff(b) and 78fff-2(c)(3), and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

(a)     BLMIS incurred losses as a result of the claims set forth herein;

(b)     the Trustee is a bailee of customer funds entrusted to BLMIS for investment

purposes;

(c)     the Defendants received "Customer Property" as defined in SIPA § 78*lll*(4);

(d)     SIPC has not reimbursed, and will not fully reimburse, the customers for their

losses;

(e)     the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS

who have filed claims in the liquidation proceeding (such claim filing customers, collectively,

"Accountholders").  To the extent the Trustee has received express assignments of certain

BLMIS customer claims, which they could have asserted, the Trustee stands in the shoes of

persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is

entitled to seek monetary damages;

(f)     SIPC has expressly conferred upon the Trustee enforcement of its rights of

subrogation with respect to payments it has made and is making to customers of BLMIS from

SIPC funds; and

(g)     the Trustee has the power and authority to avoid obligations, and avoid and

recover transfers, pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code,

applicable state law including the DCL, and applicable provisions of SIPA, including §§ 78fff(b)

and 78fff-2(c)(3).

## THE FRAUDULENT PONZI SCHEME

25.     Founded in or around 1959, BLMIS began operations as a sole proprietorship of

Madoff and later, effective January 2001, formed as a New York limited liability company

wholly owned by Madoff.  Since in or about 1986, BLMIS operated from its principal place

of business at 885 Third Avenue, New York, New York. Madoff, as founder, proprietor, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees. BLMIS was registered with the SEC as a securities broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b). By that registration, BLMIS is a member of SIPC. BLMIS had three business units: investment advisory (the "IA Business"), market making, and proprietary trading.

26.    For certain accounts in the IA Business, BLMIS purported to participate in a capital appreciation/depreciation strategy, depending on whether the customer sought to generate gains or losses. For example, the strategy was executed by either purporting to purchase small groups of securities near lows and then purporting to sell those same securities at highs, or by purporting to short-sell securities near highs and then purporting to repurchase those securities near lows.

27.    For other accounts, Madoff described the IA Business' strategy as a "split-strike conversion" strategy. Madoff promised these clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S. publicly traded companies. The basket of stocks would be intended to mimic the movement of the S&P 100 Index. Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the clients' funds would intermittently be out of the market, at which times they would purportedly be invested in U.S. issued securities and money market funds. The second part of the split-strike conversion strategy was the hedge of such purchases with option contracts. Madoff purported to purchase and sell S&P 100 Index option contracts that closely corresponded with the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

28.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication. The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious. At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts. *See* Plea Allocution of Bernard L. Madoff at 3, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (Docket No. 50). Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain parties other than Defendants, there is no record of BLMIS having cleared any purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions.

29.     Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market after hours. To bolster that lie, Madoff periodically wired tens of millions of dollars to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity substantially owned by Madoff and his family. There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.

30.     Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased and sold.

31.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme

and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay or defraud other current and prospective customers of BLMIS. The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to -- or payments on behalf of -- other investors. The money sent to BLMIS for investment, in short, was simply used to keep the scheme going and to enrich Madoff, his associates and others, including Defendants, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

32.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

33.     During the scheme, certain investors requested and received distributions of the so-called "profits" listed for their accounts that were nothing more than fictitious profits. Other investors, from time to time, redeemed or closed their accounts, or removed portions of purportedly available funds, and were paid consistently with the statements they had been receiving. Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

34.     When payments were made to or on behalf of these investors, including Defendants, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains. In reality, BLMIS had not invested the investors' principal as reflected in customer statements. In an attempt to conceal the ongoing fraud and thereby

hinder, delay or defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors the inflated amounts reflected in the falsified financial statements, including principal and/or fictitious profits.

35.     BLMIS used the funds deposited from new investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers. Due to the siphoning and diversion of new investments to fund redemptions requested by other investors, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

36.     In an effort to hinder, delay or defraud authorities from detecting the fraud, BLMIS did not register as an investment adviser until September 2006.

37.     In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration. The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $65 billion under management.

38.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York. Of the two accountants at the firm, one was semi-retired and living in Florida for many years prior to the Filing Date.

39.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they

came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## THE ACCOUNT AGREEMENTS

40.     According to BLMIS's records, the EB Trust Account I and EB Trust Account II (Nos. 1B0073 and 1B0142, respectively),[3] the VB Trust Account I and VB Trust Account II (Nos. 1B0078 and 1B0128, respectively), and the Do Stay Account (No. 1D0040)[4] were maintained with BLMIS, as set forth on Exhibit A (collectively, the "Accounts"). Upon information and belief, for each Account, a "Customer Agreement," an "Option Agreement," and/or a "Trading Authorization Limited to Purchases and Sales of Securities" (collectively, the "Account Agreements")[5] were executed and delivered to BLMIS at its headquarters at 885 Third Avenue, New York, New York. Additionally, there were periodic customer statements, confirmations, and other communications made by BLMIS or Madoff and sent to Defendants (together with the Account Agreements, the "Account Documents").

41.     The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Account was held in New York, New York, and Defendants sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Account and the purported conducting of trading activities. Between the date the Account was opened and the Filing Date, Defendants made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or received inter-account transfers from other BLMIS accounts.

---

[3] The Account No. 1B0142 appears to have been opened with a transfer from a predecessor account. Any principal balance in such predecessor account has been credited to the Account, as reflected on Exhibit B attached hereto.
[4] The Account No. 1D0040 appears to have been opened with a transfer from a predecessor account. Any principal balance in such predecessor account has been credited to the Account, as reflected on Exhibit B attached hereto.
[5] Some of the Account Agreements were executed for predecessor accounts that were rolled into the respective Accounts and, upon information and belief, applied to the Accounts.

## THE OBLIGATIONS

42.     To the extent BLMIS or Madoff incurred obligations to the Defendant in connection with the Account Documents or any statements or representations made by BLMIS or Madoff, such obligations (collectively, the "Obligations") are avoidable under sections 105(a), 544(b) and 548(a) of the Bankruptcy Code, applicable provisions of DCL sections 273-279, and applicable provisions of SIPA, including §§ 78fff(b) and 78fff-1(b).  BLMIS or Madoff incurred the Obligations as an integral part of and in furtherance of BLMIS's Ponzi scheme.

43.     To the extent BLMIS or Madoff incurred the Obligations, such Obligations were incurred with actual intent to hinder, delay, or defraud then existing and/or future creditors.

44.     To the extent BLMIS or Madoff incurred the Obligations, such Obligations were incurred when BLMIS was insolvent, had unreasonably small capital, and/or was unable to pay its debts as they matured.  BLMIS was a massive Ponzi scheme, which, as a matter of law, was insolvent from its inception and, therefore, never capable of fulfilling its obligations to its creditors.

## THE TRANSFERS

45.     During the six years prior to the Filing Date, BLMIS made transfers (collectively, the "Transfers") to: (i) Elbert Brown Trust Defendants in respect of the EB Trust Account I totaling $1,272,000 (the "EB Trust Transfers"); (ii) Viola Brown Trust Defendants in respect of the VB Trust Account I totaling $1,320,000 (the "VB Trust Transfers"); and (iii) Defendant Do Stay in respect of the Do Stay Account totaling $373,200 (the "Do Stay Transfers").  The Transfers were made to or for the benefit of Defendants and are set forth in Columns 10 and 11 on Exhibit B annexed hereto.

46.     The Transfers that occurred between December 11, 2002 and December 11, 2008

are referred to hereafter as the "Six Year Transfers." The Six Year Transfers are avoidable and recoverable under sections 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and DCL sections 273-279 and total $2,965,200. *See* Exhibit B, Column 11. The Six Year Transfers are also avoidable to the extent they were made on account of the avoidable Obligations.

47. The Transfers that occurred between December 11, 2006 and December 11, 2008 are referred to hereafter as the "Two Year Transfers." The Two Year Transfers are avoidable and recoverable under sections 548(a), 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3) and total $1,112,000. *See* Exhibit B, Column 10. The Two Year Transfers are also avoidable to the extent they were made on account of the avoidable Obligations.

48. In addition, during the 90 days prior to the Filing Date, BLMIS made payments (hereafter, the "Preference Period Transfers") in respect of the EB Trust Account II totaling the amount of $233,000 to Elbert Brown Trust Defendants. The Preference Period Transfers were made to or for the benefit of Elbert Brown Trust Defendants, and are set forth on Exhibit B annexed hereto. *See* Exhibit B, Column 9.

49. The Preference Period Transfers represent the return of principal received during the 90 days prior to the Filing Date, and are avoidable and recoverable under sections 547, 550(a)(1), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).

50. On information and belief, the EB Trust Transfers, VB Trust Transfers, Do Stay Transfers, and Preference Period Transfers were subsequently transferred by the respective Defendants to Subsequent Transferee Defendants (collectively, the "Subsequent Transfers").

51.     The Subsequent Transfers, or the value thereof, are recoverable from Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

52.     The Trustee's investigation is ongoing and the Trustee reserves the right to (i) supplement the information regarding the Obligations, Transfers, Preference Period Transfers, Subsequent Transfers, and any additional transfers and (ii) seek recovery of such additional transfers.

53.     To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## CUSTOMER CLAIMS

54.     On or about February 13, 2009, a customer claim was filed with the Trustee for the EB Trust Account I, which the Trustee has designated as Claim # 002263. In addition, on or about July 1, 2009, an additional customer claim was filed with the Trustee for the EB Trust Account I, which the Trustee has designated as Claim # 014263.

55.     On or about February 17, 2009, a customer claim was filed with the Trustee for the VB Trust Account I, which the Trustee has designated as Claim # 002317. In addition, on or about July 1, 2009, an additional customer claim was filed with the Trustee for the VB Trust Account I, which the Trustee has designated as Claim # 014254.

56.     On or about February 13, 2009, a customer claim was filed with the Trustee for the Do Stay Account, which the Trustee has designated as Claim # 002266. In addition, on or about July 1, 2009, an additional customer claim was filed with the Trustee for the Do Stay Account, which the Trustee has designated as Claim # 014255.

57.     Each of the above customer claims is hereafter referred to as "Customer

Claim" and together with some or all of such customer claims, the "Customer Claims".

58.    On or about April 19, 2010, the Trustee issued a Notice of Trustee's Determination of Claim (the "EB Trust Account I Determination") with respect to the Customer Claims for the EB Trust Account I. On or about October 8, 2010, the Trustee issued a Revised Notice of Trustee's Determination of Claim (the "Revised EB Trust Account I Determination") with respect to the Customer Claims for the EB Trust Account I. A copy of the Revised EB Trust Account I Determination is attached hereto as Exhibit C.

59.    On or about April 27, 2010, the Trustee issued a Notice of Trustee's Determination of Claim (the "VB Trust Account I Determination") with respect to the Customer Claims for the VB Trust Account I. On or about October 8, 2010, the Trustee issued a Revised Notice of Trustee's Determination of Claim (the "Revised VB Trust Account I Determination") with respect to the Customer Claims for the VB Trust Account I. A copy of the Revised VB Trust Account I Determination is attached hereto as Exhibit C.

60.    On or about June 28, 2010, the Trustee issued a Notice of Trustee's Determination of Claim (the "Do Stay Account Determination") with respect to the Customer Claims for the Do Stay Account. A copy of the Do Stay Account Determination is attached hereto as Exhibit C.

61.    On or about May 19, 2010, an objection to the EB Trust Account I Determination was filed with the Court. On or about November 5, 2010, an objection to the Revised EB Trust Account I Determination was filed with the Court. On or about May 27, 2010, an objection to the VB Trust Account I Determination was filed with the Court. On or about November 5, 2010, an objection to the Revised VB Trust Account I Determination was filed with the Court. On or about July 28, 2010, an objection to the Do Stay Account

Determination was filed with the Court. The above claims objections are hereafter collectively referred to as the "Claims Objections".

62. Elbert Brown Trust Defendants hold the EB Trust Account II in the name 'Elbert R Brown Trustee under Trust DTD 12/29/88," designated as BLMIS account number 1B0142. Upon information and belief, Elbert Brown Trust Defendants are the absolute owners of the EB Trust Account II and/or have a beneficial or equitable interest in the EB Trust Account II. In the alternative, the EB Trust Account II is the conduit for Elbert Brown Trust Defendants.

63. Viola Brown Trust Defendants hold the VB Trust Account II in the name "Viola Brown Trustee u/t/d 12/29/88," designated as BLMIS account number 1B0128. Upon information and belief, Viola Brown Trust Defendants are the absolute owners of the VB Trust Account II and/or have a beneficial or equitable interest in the VB Trust Account II. In the alternative, the VB Trust Account II is the conduit for Viola Brown Trust Defendants.

64. On or about February 19, 2009, a customer claim was filed with the Trustee for the EB Trust Account II which the Trustee has designated as Claim # 002696. On or about July 1, 2009, an additional customer claim was filed with the Trustee for the EB Trust Account II which the Trustee has designated as Claim # 014264 (collectively, the "EB Trust Account II Claims").

65. On or about February 19, 2009, a customer claim was filed with the Trustee for the VB Trust Account II which the Trustee has designated as Claim # 002695. On or about July 1, 2009, an additional customer claim was filed with the Trustee for the VB Trust Account II which the Trustee has designated as Claim # 014253 (collectively, the "VB Trust Account II Claims").

66.     The EB Trust Account II Claims and VB Trust Account II Claims are hereafter together referred to as the "Related Account Customer Claims". The Trustee has yet to issue a determination with respect to the Related Account Customer Claims and/or make distributions on the Related Account Customer Claims.

67.     On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to resolve the Customer Claims, Related Account Customer Claims, and all objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

## COUNT ONE
### PREFERENTIAL TRANSFER – 11 U.S.C. §§ 547(b), 550, AND 551

68.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

69.     At the time of each of the Preference Period Transfers received within the 90 days prior to the Filing Date, Elbert Brown Trust Defendants were "creditors" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

70.     Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

71.     Each of the Preference Period Transfers was to or for the benefit of Elbert
Brown Trust Defendants.

72.     Each of the Preference Period Transfers was made for or on account of an
antecedent debt owed by BLMIS before such transfer was made.

73.     Each of the Preference Period Transfers was made while BLMIS was insolvent.

74.     Each of the Preference Period Transfers was made within 90 days of the
Filing Date.

75.     Each of the Preference Period Transfers enabled Elbert Brown Trust
Defendants to receive more than Elbert Brown Trust Defendants would receive if (i) this
case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been
made; and (iii) Elbert Brown Trust Defendants received payment of such debt to the extent
provided by the provisions of the Bankruptcy Code.

76.     Each of the Preference Period Transfers constituted a preferential transfer
avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and
recoverable from Elbert Brown Trust Defendants pursuant to section 550(a) and section 78fff-
2(c)(3) of SIPA.

77.     As a result of the foregoing, pursuant to sections 547(b), 550, and 551 of
the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment
against Elbert Brown Trust Defendants: (a) avoiding and preserving the Preference Period
Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the
Preference Period Transfers, or the value thereof, from Elbert Brown Trust Defendants for the
benefit of the estate of BLMIS.

## COUNT TWO
## FRAUDULENT TRANSFERS AND OBLIGATIONS – 11 U.S.C. §§ 548(a)(1)(A), 550(a) AND 551

78.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

79.     Each of the Two Year Transfers was made on or within two years before the Filing Date.

80.     Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

81.     Each of the Two Year Transfers and the Obligations was made or incurred by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing and/or future creditors.

82.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Defendants pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

83.     The Obligations are avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and applicable provisions of SIPA including sections 78fff(b) and 78fff-1(b).

84.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and sections 78fff(b), 78fff-1(b), and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

**COUNT THREE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS – 11 U.S.C. §§ 548(a)(1)(B), 550(a)**
**AND 551**

85.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

86.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

87.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

88.    BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers and the Obligations.

89.    At the time of each of the Two Year Transfers and at all times relevant to the Obligations, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers.

90.    At the time of each of the Two Year Transfers and at all times relevant to the Obligations, BLMIS was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with BLMIS was an unreasonably small capital.

91.    At the time BLMIS made each of the Two Year Transfers, and at all times relevant to the Obligations, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

92.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Defendants pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

93.    The Obligations are avoidable by the Trustee pursuant to section 548(a)(1)(B) of

24

the Bankruptcy Code and applicable provisions of SIPA including sections 78fff(b) and 78fff-1(b).

94.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFERS AND OBLIGATIONS – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

95.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

96.     At all times relevant to the Six Year Transfers and Obligations, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

97.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

98.     Each of the Six Year Transfers and Obligations was made by BLMIS with the actual intent to hinder, delay, or defraud then existing and/or future creditors of BLMIS. BLMIS made each of the Six Year Transfers and incurred the Obligations to or for the benefit of Defendants in furtherance of a fraudulent investment scheme.

99.     As a result of the foregoing, pursuant to DCL sections 276, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants:

(a) avoiding and preserving the Six Year Transfers, (b) avoiding the Obligations, (c) directing

that the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year

Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFERS AND OBLIGATIONS – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

100.    To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

101.    At all times relevant to the Six Year Transfers and Obligations, there have been

and are one or more creditors who have held and still hold matured or unmatured unsecured

claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or

that were and are not allowable only under section 502(e) of the Bankruptcy Code.

102.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under DCL section 270.

103.    BLMIS did not receive fair consideration for any of the Six Year Transfers or the

Obligations.

104.    BLMIS was insolvent, or became insolvent as a result of the Six Year Transfers

or the Obligations.

105.    As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants:

(a) avoiding and preserving the Six Year Transfers, (b) avoiding the Obligations, (c) directing

that the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year

Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT SIX
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

106.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

107.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

108.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

109.    BLMIS did not receive fair consideration for any of the Six Year Transfers.

110.    At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

111.    As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFERS AND OBLIGATIONS – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

112.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

113.    At all times relevant to the Six Year Transfers and Obligations, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

114.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

115.    BLMIS did not receive fair consideration for any of the Six Year Transfers or Obligations.

116.    At the time BLMIS made each of the Six Year Transfers or incurred the Obligations, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

117.    As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279 and sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b), and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

**COUNT EIGHT**
**RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 278 AND/OR 279 AND 11 U.S.C. §§ 544, 547, 548, 550(a), AND 551**

118.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

119.    Each of the Transfers is avoidable under sections 544, and/or 548 of the

28

Bankruptcy Code, DCL sections 273, 274, 275, and/or 276 and section 78fff-2(c)(3) of

SIPA, and each of the Preference Period Transfers is avoidable under section 547 of the

Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

120.    On information and belief, the Subsequent Transfers were transferred by

Defendants to Subsequent Transferee Defendants.

121.    Each of the Subsequent Transfers was made directly or indirectly to

Subsequent Transferee Defendants.

122.    Subsequent Transferee Defendants are immediate or mediate transferees of the

Subsequent Transfers from Defendants.

123.    As a result of the foregoing and the avoidance of the within Preference

Period Transfers and Transfers, pursuant to DCL sections 278 and/or 279, sections 544(b), 547,

548(a), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the

Trustee is entitled to a judgment against Subsequent Transferee Defendants: (a) avoiding and

preserving the Subsequent Transfers; (b) directing that the Subsequent Transfers be set aside;

and (c) recovering the Subsequent Transfers, or the value thereof, from Subsequent Transferee

Defendants for the benefit of the estate of BLMIS.

## COUNT NINE
## DISALLOWANCE OF RELATED ACCOUNT CUSTOMER CLAIMS

124.    To the extent applicable, the Trustee incorporates by reference the

allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten

herein.

125.    Elbert Brown Trust Defendants hold the EB Trust Account II.    Upon

information and belief, Elbert Brown Trust Defendants are the absolute owners of the EB

Trust Account II and/or have a beneficial or equitable interest in the EB Trust Account II.    In

the alternative, the EB Trust Account II is the conduit for Elbert Brown Trust Defendants.

126. Viola Brown Trust Defendants hold the VB Trust Account II. Upon information and belief, Viola Brown Trust Defendants are the absolute owners of the VB Trust Account II and/or have a beneficial or equitable interest in the VB Trust Account II. In the alternative, the VB Trust Account II is the conduit for Viola Brown Trust Defendants.

127. The EB Trust Account II Claims should not be allowed pursuant to section 502(d) of the Bankruptcy Code unless and until Elbert Brown Trust Defendants pay or turn over to the Trustee the Preference Period Transfers and EB Trust Transfers. Elbert Brown Trust Defendants are the recipients of the Preference Period Transfers and EB Trust Transfers of BLMIS' property which are avoidable and recoverable under sections 544, 547, 548, and/or 550 of the Bankruptcy Code, and/or DCL sections 273, 274, 275, and 276, and section 78fff-2(c)(3) of SIPA, and Elbert Brown Trust Defendants have not returned the Preference Period Transfers and EB Trust Transfers to the Trustee.

128. The VB Trust Account II Claims should not be allowed pursuant to section 502(d) of the Bankruptcy Code unless and until Viola Brown Trust Defendants pay or turn over to the Trustee the VB Trust Transfers. Viola Brown Trust Defendants are the recipients of the VB Trust Transfers of BLMIS's property which are avoidable and recoverable under sections 544, 548, and/or 550 of the Bankruptcy Code, DCL sections 273, 274, 275, and 276, and section 78fff-2(c)(3) of SIPA, and Viola Brown Trust Defendants have not returned the VB Trust Transfers to the Trustee.

129. The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. As a result of the foregoing, the Trustee intends to resolve the Related Account Customer Claims and any related objections

through the mechanisms contemplated by the Claims Procedures Order.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants as follows:

i.  On the First Claim for Relief, pursuant to sections 547, 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Preference Period Transfers; (b) directing that the Preference Period Transfers be set aside; and (c) recovering the Preference Period Transfers, or the value thereof, from Elbert Brown Trust Defendants for the benefit of the estate of BLMIS;

ii.  On the Second Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS;

iii.  On the Third Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS;

iv.  On the Fourth Claim for Relief, pursuant to DCL sections 276, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the

estate of BLMIS;

     v.     On the Fifth Claim for Relief, pursuant to DCL sections 273, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the

Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and

(d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the

estate of BLMIS;

     vi.     On the Sixth Claim for Relief, pursuant to DCL sections 274, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA:

(a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set

aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendants for the

benefit of the estate of BLMIS;

     vii.     On the Seventh Claim for Relief, pursuant to DCL sections 275, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the

Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and

(d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the

estate of BLMIS;

     viii.     On the Eighth Claim for Relief, as a result of the avoidance of the within

Preference Period Transfers and Transfers, pursuant to DCL section 278 and/or 279,

sections 544(b), 547, 548, 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of

SIPA: (a) avoiding and preserving the Subsequent Transfers; (b) directing that the Subsequent

Transfers be set aside; and (c) recovering the Subsequent Transfers, or the value thereof,

from Subsequent Transferee Defendants for the benefit of the estate of BLMIS;

    ix.      On the Ninth Claim for Relief, the Related Account Customer Claims should not be allowed pursuant to section 502(d) of the Bankruptcy Code unless and until the Transfers and Preference Period Transfers received by Elbert Brown Trust Defendants and the Transfers received by Viola Brown Trust Defendants are paid or turned over;

    viii.    On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

    ix.      On all Claims for Relief, establishing a constructive trust over the proceeds of the Transfers in favor of the Trustee for the benefit of BLMIS's estate;

    x.      On all Claims for Relief, assigning of income tax refunds of Defendants from the United States, state and local governments paid on fictitious profits during the course of the scheme;

    xi.     On all Claims for Relief, awarding the Trustee all applicable interest, costs, and disbursements of this action; and

*[Remainder of Page Intentionally Left Blank]*

xii.    On all Claims for Relief, granting the Trustee such other, further, and different

relief as the Court deems just, proper and equitable.

Date:   December 2, 2011                        By: _____
        New York, New York


**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com
Tatiana Markel
Email: tmarkel@bakerlaw.com


*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*

Exhibit A

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| ELBERT R BROWN TRUSTEE U/T/D 12/29/88 | 1B0073 |
| VIOLA BROWN TRUSTEE U/T/D 12/29/88 | 1B0078 |
| ELBERT R BROWN TRUSTEE UNDER TRUST DTD 12/29/88 | 1B0142 |
| DO STAY INC | 1D0040 |

Exhibit B

BLMIS ACCOUNT NO. 1B0073 - ELBERT R BROWN TRUST KE U/T/D 11/29/98

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported on Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |

MADC1029_00000002

Exhibit B

JLMIS ACCOUNT NO. 1J80073 - ELBERT R BROWN TRUSTEE U/T/D 12/22/88

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfer | 2-Year Fraudulent Transfer | 6-Year Fraudulent Conveyance |

MADC1029_00000003

Exhibit B

BLMIS ACCOUNT NO. 1B0073 - ELBERT R BROWN TRUSTEE UT/D 12/29/88

| Column 1<br>Date | Column 2<br>Transaction<br>Description | Column 3<br>Transaction Amount<br>Reported in<br>Customer Statement | Column 4<br>Cash<br>Deposits | Column 5<br>Cash<br>Withdrawals | Column 6<br>Transfers of<br>Principal In | Column 7<br>Transfers of<br>Principal Out | Column 8<br>Balance of<br>Principal | Column 9<br>90-Day<br>Preferential<br>Transfers | Column 10<br>2-Year<br>Fraudulent<br>Transfers | Column 11<br>6-Year<br>Fraudulent<br>Conveyance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | $ 1,978,280 | $ (6,122,191) | $ - | $ - | $ (4,143,852) | $ - | $ (624,000) | $ (1,272,000) |
| | | Total: | | | | | | | | |

[Remainder of table illegible due to image degradation]

[1] Exhibit B sets forth a cash flow forensic analysis of the specified account(s) from March 1981 up to December 11, 2008, as applicable. Although records of BLMIS customer statements exist back to November 1978 in some circumstances, there is less financial information on those statements. Accordingly, the attached cash flow analysis provides the customer(s) with a beneficial presumption that the cash and securities on a historical cost basis in the account(s) as of March 1981 were principal and did not include any fictitious profits.

[2] Although BLMIS statements reflect that funds were transferred out of this account on this date, these funds consisted entirely of fictitious profits which were never actually transferred out of the account on this date. Accordingly, the account balance has remained unchanged.

[3] Although BLMIS statements reflect that funds were transferred into this account on this date, these funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date. Accordingly, the account balance has remained unchanged.

MADC1029_00000004

Exhibit D

**BEAIS ACCOUNT NO. 1D0078 - VIOLA BROWN TRUSTEE U/T/D 12/9/88**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 26-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|

MADC1029_00000005

Exhibit D

BLMIS ACCOUNT NO. 1B0078 - VIOLA BROWN TRUSTEE U/I/D 12/29/88

| Column 1<br>Date | Column 2<br>Transaction<br>Description | Column 3<br>Transaction Amount<br>Reported in<br>Customer Statement | Column 4<br>Cash<br>Deposits | Column 5<br>Cash<br>Withdrawals | Column 6<br>Transfers of<br>Principal In | Column 7<br>Transfers of<br>Principal Out | Column 8<br>Balance of<br>Principal | Column 9<br>90-Day<br>Preferential<br>Transfers | Column 10<br>2-Year<br>Fraudulent<br>Transfers | Column 11<br>6-Year<br>Fraudulent<br>Conveyance |
|---|---|---|---|---|---|---|---|---|---|---|

MADC1029_00000006

Exhibit B

ELKIS ACCOUNT NO. 130078 - VIOLA BROWN TRUSTEE U/T/D 11/29/88

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |

MADC1029_00000007

Exhibit D

BLATS ACCOUNT NO. 1B0078 - VIOLA BROWN TRUSTEE U/T/D 12/19/88

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported In Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |

MADC1029_00000008

Exhibit B

BLMIS ACCOUNT NO. 1B0078 - VIOLA BROWN TRUSTEE U/T/D 12/1/88

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |

Exhibit B

IJLMS ACCOUNT NO. 1BX078 - VIOLA BROWN TRUSTEE U/I/D 11/29/88

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Recorded in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |

MADC1029_00000010

Page 6 of 7 - IBX078

Exhibit B

## BLMIS ACCOUNT NO. 1B0078 - VIOLA BROWN TRUST/E U/T/D 12/23/89

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported In Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90 Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|

*[Table data rows illegible]*

---

[1] Exhibit B sets forth a cash flow analysis of the specified account(s) from March 1981 up to December 11, 2008, as applicable. Although records of BLMIS customer statements exist back to November 1978 in some circumstances, there is less financial information on those statements. Accordingly, the attached each flow analysis provides the accountholder(s) with a beneficial presumption that the cash and securities on a historical cost basis in the account(s) as of March 1981 were principal and did not include any fictitious profits.

[2] Although BLMIS statements reflect that funds were transferred into this account on this date, these funds contained solely of fictitious profits which were never actually transferred into the account on this date. Accordingly, the account balance has remained unchanged.

[3] Although BLMIS statements reflect that a larger transfer was made out of the account on this date, a portion of the "transferred" funds consisted of fictitious profits which were never achieved and thus could not have been transferred. Accordingly, only the principal remaining in the account was transferred out of the account on this date.

[4] Although BLMIS statements reflect that funds were transferred out of this account on this date, those funds consisted solely of fictitious profits which were never achieved and thus no funds were actually transferred out of the account on this date. Accordingly, the account balance has remained unchanged.

MADC1029_00000011

Exhibit D

BLAUS ACCOUNT NO. 1B0142 - ELBERT R.BROWN TRUST/ER UNDER TRUST DTD 1/2/90/98

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|

MADC1029_00000012

Exhibit D

BLMIS ACCOUNT NO. 1B0142 - ELBERT R BROWN TRUSTEE UNDER TRUST DTD 12/29/88

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposit | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 2-Year Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 6,400,335 | | | |
| 7/10/2004 | CHECK | 400,000 | 400,000 | | | | | | | |
| 10/15/2004 | CHECK | 500,000 | 500,000 | | | | 6,661,385 | | | |
| 1/14/2005 | CHECK | 300,000 | 300,000 | | | | 6,714,385 | | | |
| 4/22/2005 | CHECK | 250,000 | 250,000 | | | | 6,293,335 | | | |
| | | | | | | | 6,552,385 | | | |
| 2/7/2006 | CHECK | 500,000 | 500,000 | | | | 6,086,335 | | | |
| 7/3/2006 | CHECK | | | | | | 6,552,385 | | | |
| 10/2/2006 | CHECK | 700,000 | 700,000 | | | | 6,553,385 | | | |
| 1/18/2007 | CHECK | 200,000 | 200,000 | | | | 6,350,385 | | | |
| | | | | | | | 6,767,383 | | | |
| 7/02/2007 | CHECK | 500,000 | 500,000 | | | | 3,054,385 | | | |
| 10/1/2007 | CHECK | (233,000) | | (233,000) | | | 3,521,385 | | | |
| 4/1/2008 | CHECK | | | (131,000) | | | 5,555,385 | | | |
| 7/10/2008 | CHECK | 250,000 | 250,000 | | | | 5,377,385 | | | |
| 10/05/2008 | CHECK | | | | | | 5,139,385 | (233,000) | | |
| | **Total** | **$ 14,400,000** | **$ (10,333,000)** | **$ 2,072,385** | **$ (1,000,000)** | | | **$ (233,000)** | **$ -** | **$ -** |

[1] Although BLMIS statements reflect that a larger transfer was made into the account on this date, a portion of the "transferred" funds consisted of fictitious profits which were never achieved and thus could not have been transferred. Accordingly, only the principal remaining in the originating account was transferred into this account on this date.

[2] Although BLMIS statements reflect that funds were transferred into this account on this date, these funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date. Accordingly, the amount balance has remained unchanged.

Page 2 of 2 - 1B0142

MADC1029_00000013

Exhibit B

BLMIS ACCOUNT NO. 1DO040 - DO STAY INC

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Preferential Transfers | 6-Year Fraudulent Conveyance |

MADC1029_00000014

Exhibit II

BLMIS ACCOUNT NO. 1D0046 - DO STAY INC

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposit | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Preferential Transfers | Column 11 6-Year Preferential Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | ($1,000) | | ($1,000) | | | ($1,000) | | ($1,000) | ($1,000) |
| 4/7/2008 | CHECK | ($1,000) | | ($1,000) | | | ($1,000) | | ($1,000) | ($1,000) |
| | CHECK | ($1,000) | | ($1,000) | | | ($1,000) | | ($1,000) | ($1,000) |
| 7/7/2008 | CHECK | ($1,000) | | ($1,000) | | | ($375,200) | | ($1,000) | ($1,000) |
| | CHECK | $50,000 | | | | | ($373,200) | | ($1,000) | ($1,000) |
| 10/1/2008 | CHECK | ($1,000) | | ($1,000) | | | ($373,200) | | ($1,000) | ($1,000) |
| | Total: | | $1,070,000 | $(1,443,200) | $ - | $ - | $(373,200) | $ - | $(248,000) | $(373,200) |

[1] Although BLMIS statements reflect that funds were transferred into this account on this date, these funds constitute entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date. Accordingly, the account balance has remained unchanged.

[2] Although BLMIS statements reflect that funds were transferred out of this account on this date, these funds constitute entirely of fictitious profits which were never achieved and thus no funds were actually transferred out of the account on this date. Accordingly, the account balance has remained unchanged.

MADC1029_00000015

Exhibit C

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

DECEMBER 11, 2008[1]

### NOTICE OF TRUSTEE'S REVISED DETERMINATION OF CLAIM

October 8, 2010

Elbert R. Brown, Trustee
U/T/D 12/29/88
    REDACTED
Jupiter, Florida 33469

Dear Elbert R. Brown, Trustee U/T/D 12/29/88:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee previously determined your claims on BLMIS Account No. 1B0073 designated as Claim No. 002263 and Claim No. 014263 pursuant to a Notice of Trustee's Determination of Claim dated April 19, 2010 (the "Prior Notice"). The Prior Notice disclosed an April 8, 1982 withdrawal in the amount of $100,000.00 (the "Transfer"). Based on information coming to the Trustee's attention subsequent to the issuance of the Prior Notice, the Transfer has been adjusted from a withdrawal to a deposit made to your BLMIS account. Thus, your deposit total has been adjusted by $100,000.00 to $1,978,280.08 from $1,878,280.08, and your withdrawal total has been adjusted by $100,000.00 to $6,122,131.75 from $6,022,131.75. Your account remains overdrawn by $4,143,851.67. This Notice of Trustee's Revised Determination of Claim contains corrected deposit and withdrawal totals.

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

300095032

MADC1029_00000016

This Notice of Trustee's Revised Determination of Claim supersedes the Prior Notice and serves as the Trustee's revised determination with respect to BLMIS Account No. 1B0073 designated as Claim No. 002263 and Claim No. 014263 (the latter of which is duplicative of Claim No. 002263) and combined ("Combined Claim") for purposes of this determination. This letter shall serve as the Trustee's revised determination with respect to the Combined Claim.

Your Combined Claim for securities is DENIED. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $6,122,131.75), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $1,978,280.08). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($4,143,851.67) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your Combined Claim is DENIED in its entirety.

On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.

MADC1029_00000017

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Revised Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court and the Trustee within **THIRTY DAYS** after October 8, 2010, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

MADC1029_00000018

PLEASE TAKE FURTHER NOTICE: You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004.

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

_Irving Picard_
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities

cc:   Seth M. Lipson
      REDACTED
      West Palm Beach, Florida 33409

300096032                          4

MADC1029_00000019

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 3/31/1981 | ALIX 3/31/1981 Equity | $868,280.08 | $868,280.08 |
| 4/8/1982 | CHECK | $100,000.00 | $100,000.00 |
| 10/18/1982 | CHECK | $75,000.00 | $75,000.00 |
| 4/7/1983 | CHECK | $50,000.00 | $50,000.00 |
| 4/19/1984 | CHECK | $85,000.00 | $85,000.00 |
| 7/29/1985 | CHECK | $100,000.00 | $100,000.00 |
| 1/17/1997 | CHECK | $200,000.00 | $200,000.00 |
| 1/29/1999 | TRANS FROM 1B021270 | $8,885.50 | $0.00 |
| 4/19/1999 | CHECK | $500,000.00 | $500,000.00 |
| Total Deposits: | | $1,987,165.58 | $1,978,280.08 |

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 4/16/1981 | CHECK | ($4,250.00) | ($4,250.00) |
| 4/22/1981 | CHECK | ($11,298.33) | ($11,298.33) |
| 5/26/1981 | CHECK | ($15,214.55) | ($15,214.55) |
| 5/28/1981 | CHECK | ($3,666.47) | ($3,666.47) |
| 6/5/1981 | CHECK | ($9,048.94) | ($9,048.94) |
| 6/9/1981 | CHECK | ($2,811.86) | ($2,811.86) |
| 7/27/1981 | CHECK | ($3,208.91) | ($3,208.91) |
| 7/28/1981 | CHECK | ($2,810.86) | ($2,810.86) |
| 7/31/1981 | CHECK | ($16,164.59) | ($16,164.59) |
| 8/4/1981 | CHECK | ($12,066.86) | ($12,066.86) |
| 9/14/1981 | CHECK | ($3,206.77) | ($3,206.77) |
| 9/14/1981 | CHECK | ($3,277.08) | ($3,277.08) |
| 9/18/1981 | CHECK | ($13,317.12) | ($13,317.12) |
| 9/24/1981 | CHECK | ($12,818.69) | ($12,818.69) |
| 10/30/1981 | CHECK | ($5,583.69) | ($5,583.69) |
| 11/19/1981 | CHECK | ($16,169.98) | ($16,169.98) |
| 11/23/1981 | CHECK | ($12,066.54) | ($12,066.54) |
| 12/31/1981 | CHECK | ($6,964.76) | ($6,964.76) |
| 3/30/1982 | CHECK | ($36,901.90) | ($36,901.90) |
| 3/30/1982 | CHECK | ($40,185.75) | ($40,185.75) |
| 7/6/1982 | CHECK | ($53,098.10) | ($53,098.10) |
| 10/28/1982 | CHECK 10/07 | ($133,000.00) | ($133,000.00) |
| 1/4/1983 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1983 | CHECK | ($53,000.00) | ($53,000.00) |

300096032

5

MADC1029_00000020

| 10/3/1983 | CHECK | ($53,000.00) | ($53,000.00) |
|---|---|---|---|
| 1/3/1984 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/10/1984 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/2/1984 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1984 | CHECK | ($53,000.00) | ($53,000.00) |
| 12/31/1984 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/1985 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1985 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1985 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/1986 | CHECK | ($53,000.00) | ($53,000.00) |
| 3/31/1986 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1986 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1986 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/1987 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/1987 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1987 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1987 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/4/1988 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/4/1988 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1988 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/3/1988 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/4/1989 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/3/1989 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/3/1989 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/2/1989 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/1990 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/2/1990 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/2/1990 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1990 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/1991 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/1991 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1991 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1991 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/1992 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/1992 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1992 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1992 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/4/1993 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/1993 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1993 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1993 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/3/1994 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/4/1994 | CHECK | ($53,000.00) | ($53,000.00) |

300096032

6

MADC1029_00000021

| | | | |
|---|---|---|---|
| 7/1/1994 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/3/1994 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/3/1995 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/3/1995 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/3/1995 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/2/1995 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/1996 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/1996 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/3/1996 | CHECK | ($66,000.00) | ($66,000.00) |
| 7/1/1996 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1996 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/1997 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/1997 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1997 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1997 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/1998 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/1998 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1998 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/1998 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/4/1999 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/29/1999 | TRANS TO 1B021270 | ($7,460,029.50) | $0.00 |
| 3/1/1999 | TRANS TO 1B021230 | ($1,077,262.11) | $0.00 |
| 4/1/1999 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/1999 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/12/1999 | TRANS TO 1B014230 | ($500,000.00) | $0.00 |
| 10/1/1999 | CHECK | ($233,000.00) | ($233,000.00) |
| 1/3/2000 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/3/2000 | CHECK | ($51,000.00) | ($53,000.00) |
| 7/3/2000 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/2/2000 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/2001 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/2/2001 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/2/2001 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/2001 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/2002 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/2002 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/2002 | CHECK WIRE | ($53,000.00) | ($53,000.00) |
| 10/7/2002 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/2003 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/2003 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/2003 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/2003 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/2004 | CHECK | ($53,000.00) | ($53,000.00) |

100096032

MADC1029_00000022

| | | | |
|---|---|---|---|
| 4/1/2004 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/2004 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/2004 | CHECK | ($53,000.00) | ($53,000.00) |
| 12/1/2004 | TRANS TO 1B007430 | ($155,062.39) | $0.00 |
| 1/3/2005 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/2005 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/2005 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/3/2005 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/3/2006 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/3/2006 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/3/2006 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/2/2006 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/2007 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/2/2007 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/2/2007 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/2007 | CHECK | ($53,000.00) | ($53,000.00) |
| 1/2/2008 | CHECK | ($53,000.00) | ($53,000.00) |
| 4/1/2008 | CHECK | ($53,000.00) | ($53,000.00) |
| 7/1/2008 | CHECK | ($53,000.00) | ($53,000.00) |
| 10/1/2008 | CHECK | ($53,000.00) | ($53,000.00) |
| Total Withdrawals: | | ($15,314,485.75) | ($6,122,131.75) |
| Total deposits less withdrawals: | | ($13,327,320.17) | ($4,143,851.67) |

300096032

MADC1029_00000023

Exhibit C

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

### NOTICE OF TRUSTEE'S REVISED DETERMINATION OF CLAIM

October 8, 2010

Viola Brown, Trustee U/T/D 12/29/88
             REDACTED
Jupiter, Florida 33469

Dear Viola Brown, Trustee U/T/D 12/29/88:

#### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee previously determined your claims on BLMIS Account No. 1B0078 designated as Claim No. 002317 and Claim No. 014254 pursuant to a Notice of Trustee's Determination of Claim dated April 27, 2010 (the "Prior Notice"). The Prior Notice disclosed a February 1, 1982 withdrawal in the amount of $50,000.00 (the "$50,000.00 Transfer") and an April 8, 1982 withdrawal in the amount of $100,000.00 (the "$100,000.00 Transfer", together with the $50,000 Transfer, the "Transfers"). Based on information coming to the Trustee's attention subsequent to the issuance of the Prior Notice, the Transfers have been adjusted from withdrawals to deposits made to your BLMIS account. Thus, your deposit total has been adjusted by $150,000.00 to $8,436,398.03 from $8,286,398.03, and your withdrawal total has been adjusted by $150,000.00 to $10,858,758.03 from $10,708,758.03. Your account remains overdrawn by $2,422,360.00. This Notice of Trustee's Revised Determination of Claim contains corrected deposit and withdrawal totals.

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

300096579

This Notice of Trustee's Revised Determination of Claim supersedes the Prior Notice and serves as the Trustee's revised determination with respect to BLMIS Account No. 1B0078 designated as Claim No. 002317 and Claim No. 014254 (the latter of which is duplicative of Claim No. 002317) and combined ("Combined Claim") for purposes of this determination. This letter shall serve as the Trustee's determination with respect to the Combined Claim:

Your Combined Claim securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $10,858,758.03), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $8,436,398.03). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($2,422,360.00) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your Combined Claim is **DENIED** in its entirety.

On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.

300096579

2

MADC1029_00000025

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Revised Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court and the Trustee within **THIRTY DAYS** after October 8, 2010, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

MADC1029_00000026

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

_Irving H. Picard_

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities

cc:    Christopher Van De Kieft, Esq.
Seeger Weiss LLP
REDACTED
New York, New York 10004

MADC1029_00000027

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 3/31/1981 | ALIX: 3/31/1981 Equity | $831,398.03 | $831,398.03 |
| 2/1/1982 | CHECK | $50,000.00 | $50,000.00 |
| 4/8/1982 | CHECK | $100,000.00 | $100,000.00 |
| 10/18/1982 | CHECK | $75,000.00 | $75,000.00 |
| 4/7/1983 | CHECK | $50,000.00 | $50,000.00 |
| 4/19/1984 | CHECK | $85,000.00 | $85,000.00 |
| 7/22/1985 | CHECK | $100,000.00 | $100,000.00 |
| 10/16/1987 | CHECK | $200,000.00 | $200,000.00 |
| 10/13/1988 | CHECK | $300,000.00 | $300,000.00 |
| 4/12/1989 | CHECK | $75,000.00 | $75,000.00 |
| 7/11/1989 | CHECK | $170,000.00 | $170,000.00 |
| 10/13/1989 | CHECK | $200,000.00 | $200,000.00 |
| 1/16/1990 | CHECK | $125,000.00 | $125,000.00 |
| 4/12/1990 | CHECK | $100,000.00 | $100,000.00 |
| 7/11/1990 | CHECK | $175,000.00 | $175,000.00 |
| 10/15/1990 | CHECK | $195,000.00 | $195,000.00 |
| 4/12/1991 | CHECK | $250,000.00 | $250,000.00 |
| 7/9/1991 | CHECK | $284,000.00 | $284,000.00 |
| 10/8/1991 | CHECK | $229,000.00 | $229,000.00 |
| 1/13/1992 | CHECK | $220,000.00 | $220,000.00 |
| 4/9/1992 | CHECK | $185,000.00 | $185,000.00 |
| 5/11/1992 | CHECK | $135,000.00 | $135,000.00 |
| 7/13/1992 | CHECK | $125,000.00 | $125,000.00 |
| 7/14/1992 | CHECK A/O 7/13/92 | $175,000.00 | $175,000.00 |
| 7/14/1992 | CXL CHECK A/O 7/13/92 | ($125,000.00) | ($125,000.00) |
| 10/9/1992 | CHECK | $360,000.00 | $360,000.00 |
| 1/25/1993 | CHECK | $75,000.00 | $75,000.00 |
| 4/12/1993 | CHECK | $110,000.00 | $110,000.00 |
| 7/12/1993 | CHECK | $270,000.00 | $270,000.00 |
| 10/18/1993 | CHECK | $140,000.00 | $140,000.00 |
| 10/19/1993 | CHECK | $100,000.00 | $100,000.00 |
| 1/25/1994 | CHECK | $112,000.00 | $112,000.00 |
| 4/18/1994 | CHECK | $145,000.00 | $145,000.00 |
| 7/12/1994 | CHECK | $190,000.00 | $190,000.00 |
| 10/14/1994 | CHECK | $150,000.00 | $150,000.00 |
| 1/17/1995 | CHECK | $100,000.00 | $100,000.00 |
| 2/10/1995 | TRANS FROM 1B007010 | $100,776.31 | $0.00 |

300096579

MADC1029_00000028

| Date | Transaction Description | Amount | Adjusted Amount |
|---|---|---|---|
| 4/10/1995 | CHECK | $200,000.00 | $200,000.00 |
| 7/12/1995 | CHECK | $500,000.00 | $500,000.00 |
| 10/10/1995 | CHECK | $300,000.00 | $300,000.00 |
| 1/11/1996 | CHECK | $300,000.00 | $300,000.00 |
| 7/10/1996 | CHECK | $175,000.00 | $175,000.00 |
| 10/10/1996 | CHECK | $200,000.00 | $200,000.00 |
| 1/17/1997 | CHECK | $200,000.00 | $200,000.00 |
| 4/19/1999 | CHECK | $500,000.00 | $500,000.00 |
| 6/1/2004 | TRANS FROM 1B021330 | $6,527.30 | $0.00 |
| **Total Deposits:** | | $8,543,701.64 | $8,436,398.03 |

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 4/6/1981 | CHECK | ($16,183.37) | ($16,183.37) |
| 4/13/1981 | CHECK | ($8,559.65) | ($8,559.65) |
| 5/21/1981 | CHECK | ($8,024.98) | ($8,024.98) |
| 5/27/1981 | CHECK | ($15,044.96) | ($15,044.96) |
| 6/11/1981 | CHECK | ($8,056.32) | ($8,056.32) |
| 7/17/1981 | CHECK | ($12,896.75) | ($12,896.75) |
| 7/28/1981 | CHECK | ($8,527.01) | ($8,527.01) |
| 8/3/1981 | CHECK | ($6,039.27) | ($6,039.27) |
| 9/9/1981 | CHECK | ($15,048.25) | ($15,048.25) |
| 9/24/1981 | CHECK | ($8,054.15) | ($8,054.15) |
| 10/5/1981 | CHECK | ($6,394.77) | ($6,394.77) |
| 11/9/1981 | CHECK | ($17,152.73) | ($17,152.73) |
| 11/13/1981 | CHECK | ($8,572.22) | ($8,572.22) |
| 11/23/1981 | CHECK | ($8,054.09) | ($8,054.09) |
| 3/30/1982 | CHECK | ($34,282.84) | ($34,282.84) |
| 3/30/1982 | CHECK | ($46,478.00) | ($46,478.00) |
| 7/6/1982 | CHECK | ($55,717.16) | ($55,717.16) |
| 10/7/1982 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/4/1983 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/1983 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/3/1983 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/3/1984 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/10/1984 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/2/1984 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/1984 | CHECK | ($55,000.00) | ($55,000.00) |
| 12/31/1984 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/1/1985 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/1985 | CHECK | ($55,000.00) | ($55,000.00) |

6

300096579

MADC1029_00000029

| | | | |
|---|---|---|---|
| 10/1/1985 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/2/1986 | CHECK | ($55,000.00) | ($55,000.00) |
| 3/31/1986 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/1986 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/1986 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/2/1987 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/1/1987 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/1987 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/1987 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/4/1988 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/4/1988 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/7/1988 | CHECK ADVANCED SYSTEMS | ($8,836.28) | ($8,836.28) |
| 5/25/1988 | CHECK INTERCO | ($7,798.27) | ($7,798.27) |
| 7/1/1988 | CHECK | ($55,000.00) | ($55,000.00) |
| 8/8/1988 | CHECK AMFAC | ($8,315.92) | ($8,315.92) |
| 10/3/1988 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/12/1988 | CHECK COMPAQ COMPUTERS | ($8,820.29) | ($8,820.29) |
| 11/22/1988 | CHECK TRUSTCORP | ($7,542.94) | ($7,542.94) |
| 12/5/1988 | CHECK PNC FINL | ($5,803.99) | ($5,803.99) |
| 12/28/1988 | CANADIAN W/H TAX DIV INCO | ($150.00) | ($150.00) |
| 1/4/1989 | CHECK | ($55,000.00) | ($55,000.00) |
| 2/1/1989 | INCO LTD W/H TAX FGN DIV | ($7,500.00) | ($7,500.00) |
| 2/3/1989 | CHECK GENERAL CINEMA | ($20,317.95) | ($20,317.95) |
| 3/16/1989 | CANADIAN W/H TAX INCO | ($150.00) | ($150.00) |
| 4/3/1989 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/11/1989 | CHECK PHELPS | ($21,587.55) | ($21,587.55) |
| 6/15/1989 | CHECK WARNER COMM | ($2,273.79) | ($2,273.79) |
| 6/19/1989 | CANADIAN W/H TAX - INCO | ($150.00) | ($150.00) |
| 6/20/1989 | CHECK DURR FILLAUER MED | ($19,026.67) | ($19,026.67) |
| 7/3/1989 | CHECK | ($55,000.00) | ($55,000.00) |
| 8/16/1989 | CHECK HANNA | ($21,864.80) | ($21,864.80) |
| 9/12/1989 | W/H TAX FOREIGN SEC. N | ($150.00) | ($150.00) |
| 9/13/1989 | CHECK NATIONAL MED | ($5,939.34) | ($5,939.34) |
| 10/2/1989 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/20/1989 | CHECK AMERICAN | ($23,325.79) | ($23,325.79) |

7

300096579

| | MAIZE | | |
|---|---|---|---|
| 11/10/1989 | CHECK HASBRO | ($5,413.75) | ($5,413.75) |
| 12/11/1989 | CHECK COLUMBIA PICTURES | ($18,586.00) | ($18,586.00) |
| 12/27/1989 | W/H TAX FOREIGN | ($187.50) | ($187.50) |
| 12/27/1989 | CHECK AUTOMATIC DATA | ($14,769.52) | ($14,769.52) |
| 1/2/1990 | CHECK | ($55,000.00) | ($55,000.00) |
| 2/14/1990 | CHECK APACHE | ($23,347.85) | ($23,347.85) |
| 3/7/1990 | CHECK FEDERAL | ($13,863.33) | ($13,863.33) |
| 3/12/1990 | W/H TAX FOREIGN SEC. N | ($187.50) | ($187.50) |
| 4/2/1990 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/5/1990 | CHECK SEAGULL | ($21,241.15) | ($21,241.15) |
| 5/9/1990 | CHECK MCDERMOTT | ($15,683.23) | ($15,683.23) |
| 6/12/1990 | CHECK CONNER | ($30,107.26) | ($30,107.26) |
| 6/14/1990 | W/H TAX FOREIGN SEC. N | ($187.50) | ($187.50) |
| 6/25/1990 | CHECK PFIZER | ($3,738.38) | ($3,738.38) |
| 6/29/1990 | CHECK SUN ELECTRIC | ($11,074.04) | ($11,074.04) |
| 7/2/1990 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/30/1990 | CHECK COMPAQ COMPUTERS | ($19,907.92) | ($19,907.92) |
| 8/13/1990 | CHECK FURON | ($3,180.82) | ($3,180.82) |
| 8/29/1990 | CHECK HUMANA | ($13,749.42) | ($13,749.42) |
| 9/14/1990 | W/H TAX FOREIGN SEC. N | ($187.50) | ($187.50) |
| 9/28/1990 | CHECK INTEL | ($33,130.69) | ($33,130.69) |
| 10/1/1990 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/16/1990 | CHECK DREYERS | ($3,708.55) | ($3,708.55) |
| 10/29/1990 | CHECK CBI INDUSTRIES | ($14,803.45) | ($14,803.45) |
| 12/11/1990 | CHECK ANADARKO | ($37,547.90) | ($37,547.90) |
| 12/17/1990 | CHECK ATLANTIC RICHFIELD | ($11,300.00) | ($11,300.00) |
| 12/21/1990 | CHECK BAXTER | ($3,726.80) | ($3,726.80) |
| 1/2/1991 | CHECK | ($55,000.00) | ($55,000.00) |
| 2/21/1991 | CHECK MEDCO | ($61,554.97) | ($61,554.97) |
| 3/7/1991 | CHECK UNITED | ($3,710.60) | ($3,710.60) |
| 4/1/1991 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/25/1991 | CHECK POLICY | ($50,721.78) | ($50,721.78) |
| 5/13/1991 | CHECK XOMA | ($3,427.93) | ($3,427.93) |
| 7/1/1991 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/3/1991 | CHECK USX CORP | ($55,778.18) | ($55,778.18) |

J00096579

MADC1029_00000031

| 7/12/1991 | CHECK HEALTH SOUTH | ($3,173.80) | ($3,173.80) |
|---|---|---|---|
| 7/22/1991 | CHECK LIBERTY NATL | ($350.35) | ($350.35) |
| 8/13/1991 | CHECK RUDDICK | ($51,035.12) | ($51,035.12) |
| 9/5/1991 | CHECK THERMO | ($2,517.59) | ($2,517.59) |
| 9/25/1991 | CHECK STUDENT LOAN | ($11,401.50) | ($11,401.50) |
| 10/1/1991 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/7/1991 | CHECK TIME WARNER | ($47,844.75) | ($47,844.75) |
| 10/22/1991 | CHECK RJR | ($2,522.25) | ($2,522.25) |
| 11/18/1991 | CHECK FIRST FIN | ($8,547.91) | ($8,547.91) |
| 12/11/1991 | CHECK NCR | ($6,786.41) | ($6,786.41) |
| 12/11/1991 | CHECK CML | ($63,730.00) | ($63,730.00) |
| 1/2/1992 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/10/1992 | CHECK PHL CORP | ($8,556.75) | ($8,556.75) |
| 1/24/1992 | CHECK ATLANTIC | ($18,357.25) | ($18,357.25) |
| 1/24/1992 | CHECK RJR | ($26,245.81) | ($26,245.81) |
| 2/10/1992 | CHECK WMS | ($12,196.11) | ($12,196.11) |
| 3/10/1992 | CHECK MANUFACTURES | ($11,457.37) | ($11,457.37) |
| 3/16/1992 | CHECK PRODUCTION | ($6,730.53) | ($6,730.53) |
| 3/19/1992 | CHECK QUANEX | ($12,174.70) | ($12,174.70) |
| 3/19/1992 | CHECK AMERICAN BRANDS | ($29,241.37) | ($29,241.37) |
| 3/30/1992 | CHECK WATTS | ($8,124.71) | ($8,124.71) |
| 4/1/1992 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/21/1992 | CHECK WATTS | ($3,642.52) | ($3,642.52) |
| 4/22/1992 | CHECK RAYTHEON | ($9,367.37) | ($9,367.37) |
| 4/28/1992 | CHECK TYCO TOYS | ($6,276.52) | ($6,276.52) |
| 5/6/1992 | CHECK PULTE | ($31,469.14) | ($31,469.14) |
| 5/11/1992 | CHECK PFIZER | ($8,012.98) | ($8,012.98) |
| 5/29/1992 | CHECK MEXICO | ($5,302.50) | ($5,302.50) |
| 5/29/1992 | CHECK MEXICO | ($17,104.00) | ($17,104.00) |
| 6/10/1992 | CHECK DISNEY | ($22,480.62) | ($22,480.62) |
| 6/16/1992 | CHECK PEP BOYS | ($7,504.74) | ($7,504.74) |
| 6/24/1992 | CHECK DEL WEBB | ($11,387.99) | ($11,387.99) |
| 7/1/1992 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/13/1992 | CHECK MERCK | ($3,953.50) | ($3,953.50) |
| 7/13/1992 | CHECK PHELPS DODGE | ($12,854.00) | ($12,854.00) |
| 7/27/1992 | CHECK HOME DEPOT | ($6,239.18) | ($6,239.18) |
| 7/28/1992 | CHECK UNION CARBIDE/PRAXAIR | ($8,581.50) | ($8,581.50) |
| 8/12/1992 | CHECK HOME DEPOT | ($47,895.15) | ($47,895.15) |
| 8/18/1992 | CHECK SOUTHWEST | ($15,956.50) | ($15,956.50) |
| 9/8/1992 | CHECK FLOWERS | ($34,417.88) | ($34,417.88) |

9

300096579

| 9/30/1992 | CHECK STAPLES | ($31,624.29) | ($31,624.29) |
| 10/1/1992 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/14/1992 | CHECK TIME | ($18,390.00) | ($18,390.00) |
| 11/12/1992 | CHECK AL LABS | ($46,099.51) | ($46,099.51) |
| 11/17/1992 | CHECK TRI CONT'L | ($7,220.55) | ($7,220.55) |
| 12/8/1992 | CHECK SUN MICRO | ($25,854.37) | ($25,854.37) |
| 12/16/1992 | CHECK PNC | ($32,227.00) | ($32,227.00) |
| 12/21/1992 | CHECK HARLEY | ($7,617.39) | ($7,617.39) |
| 1/4/1993 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/5/1993 | CHECK HARLEY | ($8,439.33) | ($8,439.33) |
| 1/25/1993 | CHECK XTRA | ($20,165.99) | ($20,165.99) |
| 1/26/1993 | CHECK MARVEL | ($7,104.75) | ($7,104.75) |
| 2/10/1993 | CHECK MOTOROLA | ($40,378.75) | ($40,378.75) |
| 2/18/1993 | CHECK AMERICAN BRANDS | ($8,437.50) | ($8,437.50) |
| 2/24/1993 | CHECK TJX | ($23,025.42) | ($23,025.42) |
| 3/8/1993 | CHECK WASHINGTON | ($10,692.62) | ($10,692.62) |
| 3/17/1993 | CHECK WALMART | ($40,042.75) | ($40,042.75) |
| 4/1/1993 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/27/1993 | CHECK JACKPOT | ($46,461.81) | ($46,461.81) |
| 5/20/1993 | CHECK DSC COMM | ($85,424.96) | ($85,424.96) |
| 5/27/1993 | CHECK HOME DEPOT | ($2,075.00) | ($2,075.00) |
| 6/18/1993 | CHECK BB & T FINANCIAL CORP | ($34,828.86) | ($34,828.86) |
| 6/28/1993 | CHECK INTEL | ($40,055.25) | ($40,055.25) |
| 6/29/1993 | CHECK EMC | ($2,388.00) | ($2,388.00) |
| 7/1/1993 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/21/1993 | CHECK MAY | ($26,537.50) | ($26,537.50) |
| 9/3/1993 | CHECK CIRCUS | ($25,969.25) | ($25,969.25) |
| 9/3/1993 | CHECK CARDINAL | ($58,954.41) | ($58,954.41) |
| 9/30/1993 | CHECK ENRON | ($31,497.00) | ($31,497.00) |
| 10/1/1993 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/4/1993 | CHECK BANC ONE | ($27,956.25) | ($27,956.25) |
| 10/6/1993 | CHECK NYNEX | ($2,207.50) | ($2,207.50) |
| 10/25/1993 | CHECK GEN MOTORS | ($34,120.00) | ($34,120.00) |
| 11/16/1993 | CHECK MEXICO | ($2,985.12) | ($2,985.12) |
| 12/2/1993 | CHECK MIRAGE | ($40,954.38) | ($40,954.38) |
| 12/2/1993 | CHECK APACHE | ($41,960.68) | ($41,960.68) |
| 12/16/1993 | CHECK MERRILL LYNCH | ($1,097.00) | ($1,097.00) |
| 1/3/1994 | CHECK | ($55,000.00) | ($55,000.00) |
| 2/8/1994 | CHECK AMERITECH | ($26,322.50) | ($26,322.50) |
| 3/3/1994 | CHECK HORIZON | ($48,919.62) | ($48,919.62) |
| 3/8/1994 | CHECK DIGITAL | ($2,739.08) | ($2,739.08) |

300096579

MADC1029_00000033

| 3/16/1994 | CHECK MBNA | ($34,203.63) | ($34,203.63) |
|---|---|---|---|
| 4/4/1994 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/7/1994 | CHECK HEALTH SOURCE | ($1,652.50) | ($1,652.50) |
| 4/15/1994 | CHECK COMCAST | ($30,073.23) | ($30,073.23) |
| 4/22/1994 | CHECK ALLIED | ($22,131.50) | ($22,131.50) |
| 4/22/1994 | CHECK CUMMINS | ($26,970.30) | ($26,970.30) |
| 5/11/1994 | CHECK MINN MNG MFG | ($1,835.00) | ($1,835.00) |
| 5/20/1994 | CHECK AUTOZONE | ($5,368.62) | ($5,368.62) |
| 5/26/1994 | CHECK BEST BUY | ($20,122.37) | ($20,122.37) |
| 6/2/1994 | CHECK BANK OF NY | ($12,445.00) | ($12,445.00) |
| 6/2/1994 | CHECK | ($14,850.00) | ($14,850.00) |
| 6/22/1994 | CHECK GEN ELECTRIC | ($6,289.50) | ($6,289.50) |
| 6/28/1994 | CHECK DSC COMM | ($11,875.25) | ($11,875.25) |
| 6/30/1994 | CHECK CHEVRON | ($15,005.50) | ($15,005.50) |
| 7/1/1994 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/7/1994 | CHECK COMPAQ COMPUTER | ($2,856.25) | ($2,856.25) |
| 8/17/1994 | CHECK CENT CELL CORP | ($8,437.00) | ($8,437.00) |
| 8/17/1994 | CHECK UAL CORP | ($67,682.70) | ($67,682.70) |
| 9/9/1994 | CHECK ENERGY SERVICE | ($2,676.17) | ($2,676.17) |
| 9/19/1994 | CHECK MORTON | ($9,407.50) | ($9,407.50) |
| 9/28/1994 | CHECK CATERPILLAR | ($39,877.50) | ($39,877.50) |
| 9/29/1994 | CHECK CABLETRON | ($4,457.50) | ($4,457.50) |
| 10/3/1994 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/11/1994 | CHECK SPORTS & RECREATION | ($1,901.25) | ($1,901.25) |
| 11/7/1994 | CHECK CBS INC | ($47,127.12) | ($47,127.12) |
| 11/14/1994 | CHECK HUDSON FOODS | ($12,681.35) | ($12,681.35) |
| 11/17/1994 | CHECK BLOCKBUSTER/VIACOM | ($15,529.47) | ($15,529.47) |
| 12/9/1994 | CHECK AUTO DESK | ($32,631.50) | ($32,631.50) |
| 12/14/1994 | CHECK MICROCHIP | ($22,759.00) | ($22,759.00) |
| 1/3/1995 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/11/1995 | CHECK QUAKER OATS | ($6,893.75) | ($6,893.75) |
| 1/24/1995 | CHECK CARNIVAL | ($7,004.00) | ($7,004.00) |
| 1/26/1995 | CHECK PHYCOR | ($43,920.75) | ($43,920.75) |
| 3/6/1995 | CHECK MARK IV | ($41,196.85) | ($41,196.85) |
| 3/16/1995 | CHECK ALUMINUM | ($15,329.75) | ($15,329.75) |
| 3/27/1995 | CHECK USF & G CORP | ($8,151.25) | ($8,151.25) |
| 4/3/1995 | CHECK | ($55,000.00) | ($55,000.00) |

300096579

MADC1029_00000034

| | | | |
|---|---|---|---|
| 4/6/1995 | CHECK ORACLE SYSTEMS | ($11,974.12) | ($11,974.12) |
| 4/6/1995 | CHECK CALLOWAY | ($17,505.00) | ($17,505.00) |
| 4/18/1995 | CHECK EMC CORP | ($15,206.12) | ($15,206.12) |
| 5/8/1995 | CHECK HEWLETT | ($30,218.62) | ($30,218.62) |
| 5/12/1995 | CHECK BK OF BOSTON | ($16,645.06) | ($16,645.06) |
| 5/15/1995 | CHECK HOME DEPOT | ($30,653.73) | ($30,653.73) |
| 5/30/1995 | CHECK HEALTH | ($19,218.25) | ($19,218.25) |
| 6/14/1995 | CHECK MICRON | ($20,929.00) | ($20,929.00) |
| 6/21/1995 | CHECK SCOTT PAPER | ($10,055.50) | ($10,055.50) |
| 7/3/1995 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/5/1995 | CHECK GEN MILLS | ($5,122.13) | ($5,122.13) |
| 7/17/1995 | CHECK PFIZER | ($33,049.50) | ($33,049.50) |
| 7/21/1995 | CHECK GILLETTE | ($9,056.00) | ($9,056.00) |
| 7/27/1995 | CHECK KULICKE & SOFFA | ($15,973.42) | ($15,973.42) |
| 8/2/1995 | CHECK MORGAN | ($18,251.50) | ($18,251.50) |
| 8/28/1995 | CHECK STAPLES | ($11,834.38) | ($11,834.38) |
| 9/8/1995 | CHECK TEXAS INSTRUMENTS | ($14,702.50) | ($14,702.50) |
| 9/11/1995 | CHECK CHAMPION | ($22,512.65) | ($22,512.65) |
| 9/14/1995 | CHECK WALGREEN | ($11,145.62) | ($11,145.62) |
| 10/2/1995 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/6/1995 | CHECK CHARLES SCHWAB | ($10,654.50) | ($10,654.50) |
| 10/13/1995 | CHECK KROGER | ($3,439.07) | ($3,439.07) |
| 10/17/1995 | CHECK INTL PAPER | ($38,748.00) | ($38,748.00) |
| 10/20/1995 | CHECK INTEGRATED DEV | ($11,173.75) | ($11,173.75) |
| 10/23/1995 | CHECK SCI SYSTEMS | ($5,599.19) | ($5,599.19) |
| 11/8/1995 | CHECK MEDTRONIC | ($16,826.25) | ($16,826.25) |
| 11/15/1995 | CHECK APPLIED MATERIALS | ($22,500.00) | ($22,500.00) |
| 11/20/1995 | CHECK QUICK & REILLY | ($13,773.50) | ($13,773.50) |
| 11/20/1995 | CHECK <> FINANCIAL | ($19,858.50) | ($19,858.50) |
| 12/14/1995 | CHECK HEINZ | ($16,824.50) | ($16,824.50) |
| 1/2/1996 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/4/1996 | CHECK DEERE & CO | ($31,631.50) | ($31,631.50) |
| 1/8/1996 | CHECK NATL SEMI CORP | ($24,831.88) | ($24,831.88) |
| 1/17/1996 | CHECK STARBUCKS | ($14,032.50) | ($14,032.50) |
| 1/31/1996 | TRANS TO 30 ACCT | ($3,369,234.80) | ($887,430.35) |
| 2/27/1996 | CHECK SAFEWAY | ($23,750.00) | ($23,750.00) |

300096579

MADC1029_00000035

| 2/29/1996 | CHECK NETSCAPE | ($11,019.00) | ($11,019.00) |
| 4/1/1996 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/15/1996 | CHECK SEAGATE | ($34,990.91) | ($34,990.91) |
| 4/17/1996 | CHECK DIBRELL BROS INC | ($26,003.06) | ($26,003.06) |
| 6/6/1996 | CHECK LAM RESEARCH | ($32,100.37) | ($32,100.37) |
| 6/11/1996 | CHECK STARBUCKS | ($21,671.50) | ($21,671.50) |
| 7/1/1996 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/9/1996 | CHECK IOMEGA | ($10,117.25) | ($10,117.25) |
| 7/9/1996 | CHECK PEPSICO | ($29,195.37) | ($29,195.37) |
| 8/13/1996 | CHECK HEWLETT PACKARD | ($17,405.00) | ($17,405.00) |
| 8/13/1996 | CHECK DAYTON HUDSON CORP | ($21,410.00) | ($21,410.00) |
| 8/27/1996 | CHECK TRAVELERS | ($3,607.62) | ($3,607.62) |
| 9/18/1996 | CHECK SUN AMERICA | ($14,589.00) | ($14,589.00) |
| 9/30/1996 | CHECK ANHEUSER BUSCH | ($13,616.50) | ($13,616.50) |
| 10/1/1996 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/7/1996 | CHECK HERSHEY FOODS | ($224.50) | ($224.50) |
| 10/16/1996 | CHECK JONES APPAREL | ($1,968.75) | ($1,968.75) |
| 10/22/1996 | CHECK LUCENT TECH | ($34,054.25) | ($34,054.25) |
| 11/12/1996 | CHECK NEWBRIDGE NETWORKS | ($2,415.00) | ($2,415.00) |
| 11/20/1996 | CHECK NIKE | ($2,744.50) | ($2,744.50) |
| 12/17/1996 | CHECK DUN & BRADSTREET | ($112,347.50) | ($112,347.50) |
| 12/26/1996 | CHECK SEAGATE TECHNOLOGY | ($4,253.50) | ($4,253.50) |
| 1/2/1997 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/27/1997 | CHECK EMC CORP | ($29,394.14) | ($29,394.14) |
| 2/13/1997 | CHECK STORAGE TECH | ($3,003.55) | ($3,003.55) |
| 3/11/1997 | CHECK DOLLAR GENERAL | ($15,005.25) | ($15,005.25) |
| 3/19/1997 | CHECK NATIONS BANK | ($2,496.87) | ($2,496.87) |
| 3/24/1997 | CHECK BRISTOL MYERS | ($23,487.37) | ($23,487.37) |
| 4/1/1997 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/9/1997 | TRANS TO 1B012830 | ($1,206,572.14) | $0.00 |
| 4/11/1997 | STOP PAYMENT | $55,000.00 | $55,000.00 |
| 4/14/1997 | TRANS TO 1B012830 | ($200,005.49) | $0.00 |
| 4/14/1997 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/15/1997 | CHECK EMERSON ELECTRIC | ($14,999.50) | ($14,999.50) |

300096579

MADC1029_00000036

| | | | |
|---|---|---|---|
| 4/17/1997 | TRANS TO 1B012830 | ($1,710,074.95) | $0.00 |
| 4/21/1997 | CHECK BORDERS GROUP INC | ($2,248.62) | ($2,248.62) |
| 4/23/1997 | CHECK PHILIP MORRIS | ($19,241.12) | ($19,241.12) |
| 7/1/1997 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/1997 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/2/1998 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/1/1998 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/1998 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/1998 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/4/1999 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/29/1999 | TRANS TO 1B021370 | ($3,285,781.12) | $0.00 |
| 3/1/1999 | TRANS TO 1B021330 | ($1,076,481.84) | $0.00 |
| 4/1/1999 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/1999 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/12/1999 | TRANS TO 1B012830 | ($500,000.00) | $0.00 |
| 10/1/1999 | CHECK | ($220,000.00) | ($220,000.00) |
| 1/3/2000 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/3/2000 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/3/2000 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/2/2000 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/2/2001 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/2/2001 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/2/2001 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/2001 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/2/2002 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/1/2002 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/2002 | CHECK WIRE | ($55,000.00) | ($55,000.00) |
| 10/7/2002 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/2/2003 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/1/2003 | CHECK | ($55,000.00) | ($55,000.00) |
| 5/1/2003 | TRANS TO 1B021330 | ($589,627.84) | $0.00 |
| 7/1/2003 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/2003 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/2/2004 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/1/2004 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/2004 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/2004 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/3/2005 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/1/2005 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/2005 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/3/2005 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/3/2006 | CHECK | ($55,000.00) | ($55,000.00) |

300096579

MADC1029_00000037

| | | | |
|---|---|---|---|
| 4/3/2006 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/3/2006 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/2/2006 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/2/2007 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/2/2007 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/2/2007 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/2007 | CHECK | ($55,000.00) | ($55,000.00) |
| 1/2/2008 | CHECK | ($55,000.00) | ($55,000.00) |
| 4/1/2008 | CHECK | ($55,000.00) | ($55,000.00) |
| 7/1/2008 | CHECK | ($55,000.00) | ($55,000.00) |
| 10/1/2008 | CHECK | ($55,000.00) | ($55,000.00) |
| Total Withdrawals: | | ($21,909,105.86) | ($10,858,758.03) |
| | | | |
| Total deposits less withdrawals: | | ($13,365,404.22) | ($2,422,360.00) |

300096579

15

MADC1029_00000038

Exhibit C

BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

DECEMBER 11, 2008

NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

June 28, 2010

DO Siay, Inc.
**REDACTED**
Jupiter, Florida 33469

Dear DO Siay, Inc.:

PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee, under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claims on BLMIS Account No. 1D0040 designated as Claim Number 2266 and Claim Number 14255 (the latter of which is duplicative of Claim Number 2266) and combined ("Combined Claim") for purposes of this determination. This letter shall serve as the Trustee's determination with respect to the Combined Claim:

Your Combined Claim for a credit balance of $237,120.00 and for securities is DENIED. No securities were ever purchased for your account.

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

MADC1029_00000039

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $1,443,200.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $1,070,000.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($373,200.00) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is DENIED in its entirety.

On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

PLEASE TAKE NOTICE: If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you MUST file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching

2

MADC1029_00000040

copies of any documents in support of your position, with the United States Bankruptcy Court and the Trustee within THIRTY DAYS after June 28, 2010, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

_Irving H. Picard_
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

3

MADC1029_00000041

| DEPOSITS | | | |
|---|---|---|---|
| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
| 4/14/1997 | TRANS FROM 1D002110 | $887,495.92 | $0.00 |
| 1/12/1998 | CHECK | $90,000.00 | $90,000.00 |
| 1/14/1999 | CHECK | $130,000.00 | $130,000.00 |
| 4/17/2000 | CHECK | $100,000.00 | $100,000.00 |
| 1/28/2002 | CHECK | $100,000.00 | $100,000.00 |
| 1/27/2003 | CHECK | $120,000.00 | $120,000.00 |
| 10/14/2003 | CHECK | $80,000.00 | $80,000.00 |
| 4/22/2005 | CHECK | $100,000.00 | $100,000.00 |
| 7/19/2005 | CHECK | $50,000.00 | $50,000.00 |
| 4/19/2007 | CHECK | $50,000.00 | $50,000.00 |
| 8/28/2007 | CHECK | $100,000.00 | $100,000.00 |
| 1/22/2008 | CHECK | $50,000.00 | $50,000.00 |
| 4/29/2008 | CHECK | $50,000.00 | $50,000.00 |
| 7/23/2008 | CHECK | $50,000.00 | $50,000.00 |
| Total Deposits: | | $1,957,495.92 | $1,070,000.00 |

| WITHDRAWALS | | | |
|---|---|---|---|
| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
| 7/1/1997 | CHECK | ($35,000.00) | ($35,000.00) |
| 10/1/1997 | CHECK | ($35,000.00) | ($35,000.00) |
| 1/2/1998 | CHECK | ($35,000.00) | ($35,000.00) |
| 4/1/1998 | CHECK | ($38,600.00) | ($38,600.00) |
| 7/1/1998 | CHECK | ($38,600.00) | ($38,600.00) |
| 9/10/1998 | TRANS TO 1B014230 | ($314,000.00) | $0.00 |
| 10/1/1998 | CHECK | ($26,000.00) | ($26,000.00) |
| 1/4/1999 | CHECK | ($26,000.00) | ($26,000.00) |
| 4/1/1999 | CHECK | ($31,000.00) | ($31,000.00) |
| 7/1/1999 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/1/1999 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/3/2000 | CHECK | ($31,000.00) | ($31,000.00) |
| 4/3/2000 | CHECK | ($31,000.00) | ($31,000.00) |
| 7/3/2000 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/2/2000 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/2/2001 | CHECK | ($31,000.00) | ($31,000.00) |
| 4/2/2001 | CHECK | ($31,000.00) | ($31,000.00) |
| 7/2/2001 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/1/2001 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/2/2002 | CHECK | ($31,000.00) | ($31,000.00) |
| 4/1/2002 | CHECK | ($31,000.00) | ($31,000.00) |

4

MADC1029_00000042

| | | | |
|---|---|---|---|
| 7/1/2002 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/1/2002 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/2/2003 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/13/2003 | STOP PAYMENT | $31,000.00 | $31,000.00 |
| 1/14/2003 | CHECK | ($31,000.00) | ($31,000.00) |
| 4/1/2003 | CHECK | ($31,000.00) | ($31,000.00) |
| 7/1/2003 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/1/2003 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/2/2004 | CHECK | ($31,000.00) | ($31,000.00) |
| 4/1/2004 | CHECK | ($31,000.00) | ($31,000.00) |
| 7/1/2004 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/1/2004 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/3/2005 | CHECK | ($31,000.00) | ($31,000.00) |
| 4/1/2005 | CHECK | ($31,000.00) | ($31,000.00) |
| 7/1/2005 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/3/2005 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/3/2006 | CHECK | ($31,000.00) | ($31,000.00) |
| 4/3/2006 | CHECK | ($31,000.00) | ($31,000.00) |
| 7/3/2006 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/2/2006 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/2/2007 | CHECK | ($31,000.00) | ($31,000.00) |
| 4/2/2007 | CHECK | ($31,000.00) | ($31,000.00) |
| 7/2/2007 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/1/2007 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/2/2008 | CHECK | ($31,000.00) | ($31,000.00) |
| 4/1/2008 | CHECK | ($31,000.00) | ($31,000.00) |
| 7/1/2008 | CHECK | ($31,000.00) | ($31,000.00) |
| 10/1/2008 | CHECK | ($31,000.00) | ($31,000.00) |
| Total Withdrawals: | | ($1,757,200.00) | ($1,443,200.00) |
| | | | |
| Total deposits less withdrawals: | | $200,295.92 | ($373,200.00) |

5

MADC1029_00000043