# Exhibit D – Part I

# Testimony
# of
# Broder

CONFIDENTIAL

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:            )

                             )    File No. OIG-509

OIG-509                      )

2 of 3

PAGES:    1 through 38

PLACE:    Renaissance Technologies Corporation

          800 Third Avenue, No. 34

          New York, New York  10022

DATE:     Thursday, March 12, 2009

     The above-entitled matter came on for hearing, pursuant
to notice, at 12:00 p.m.

TAPE TRANSCRIPTION

Diversified Reporting Services, Inc.

(202) 467-9200

CONFIDENTIAL
RE00000062

Page 2

1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         DAVID KOTZ, Inspector General

5         HEIDI STEIBER, Investigator

6         Securities and Exchange Commission

7         100 F Street, N.E.

8         Washington, D.C. 20549

9

10   On behalf of the Witness:

11        FRANCIS P. BARRON, ESQ.

12        Cravath, Swaine & Moore LLP

13        Worldwide Plaza

14        825 Eighth Avenue

15        New York, New York  10019-7475

16        (212) 474-1000

17

18        CARLA PORTER, ESQ., General Counsel

19        Renaissance Technologies Corporation

20        800 Third Avenue, No. 34

21        New York, New York  10022

22        (212) 486-6780

23

24

25

CONFIDENTIAL

Page 3

P R O C E E D I N G S

1

2      MR. KOTZ: Thanks for talking. Let me just kind of

3 give a real brief background. My job as the Inspector

4 General is to look into the interactions between the SEC and

5 Madoff Securities over time. And there were, you know, a

6 variety of different areas in which the SEC looked at,

7 whether it was through examinations or investigations.

8      And so, you know, what we're doing is tracing back

9 what information the SEC had, what information they obtained,

10 and why did they not come to a conclusion of a concern about

11 Madoff. And so, you know, what we're trying to get here is

12 information, really, that would lead us to understand what a

13 regulator should do.

14      So just to kind of be clear, obviously you all were

15 in a very different situation than the SEC would be. I mean,

16 you are in a situation where you were looking things for your

17 own investment purposes. And so there's, you know, different

18 kind of responsibilities with respect to that.

19      So we're not trying to kind of give them impression

20 that, you know, you should have done this or you should have

21 done that. What we're trying to understand is if you were in

22 a situation like you were in where you were obtaining

23 information without the ability of the SEC to compel,

24 subpoena, things like that, based upon the information that

25 you saw, what your conclusions or concerns were to. And then

CONFIDENTIAL

RE00000064

1   we're trying to understand what a regulator could or should

2   have done with that to follow up further.

3          And also, based on the information that came in

4   that you had that was in this e-mail that then got to the

5   SEC, what should the SEC have done in order to follow up on

6   that to get to a point where this could have been uncovered.

7          And so, you know, we're looking at all kinds of

8   different aspects of this.  This is, you know, I would say a

9   significant but small aspect of it because, you know, there

10  were numerous other pieces of information that came in to the

11  SEC that were specific complaints, you know, in great detail,

12  like Harry Markopolos.  I don't know if you read about him.

13          MR. BRODER:  Right.

14          MR. KOTZ:  You know, and that was brought to the

15  Enforcement Division, you know, where they have subpoena

16  power, et cetera.  But nevertheless, you know, the SEC is

17  charged with having the ability and expertise to look at

18  potential red flags and then follow up appropriately to

19  determine if anything happened.

20          And what happened here was there were several

21  efforts to review and examine and investigate.  There was

22  significant time, at least, spent by the SEC involved in this

23  process.  And yet they didn't come to a conclusion of really

24  any significant violations at all.  And then of course, we

25  found out in December -- you know, Madoff came forward --

CONFIDENTIAL

RE00000065

1   that, you know, this thing was, you know, an illegal action.

2           So what we're trying to do is trace back what

3   information did the SEC have and, you know, what should they

4   have made of it.  So in this, I want to just, you know, kind

5   of start by asking a few questions, a little bit about your

6   background, and then just kind of get into, you know, some of

7   the information of what you found and then, you know, maybe

8   ask you your opinion on how a regulator could or should

9   follow up based on that.  All right?

10          MS. STEIBER:  Please state your name.

11          MR. BRODER:  It's Paul Broder, B-r-o-d-e-r.

12          MR. KOTZ:  Okay.  And so you are an investment

13  manager?

14          MR. BRODER:  Correct.

15          MR. KOTZ:  And how long --

16          MR. BRODER:  I guess I'm the risk manager, but --

17          MR. KOTZ:  Okay.  How long have you been in that

18  position with Renaissance?

19          MR. BRODER:  Since 1996.

20          MR. KOTZ:  Okay.  And your duties have pretty much

21  stayed the same since then?

22          MR. BRODER:  I think they've broadened.  I

23  originally was brought in to run the execution desk.  And

24  then that was extended into independent risk management.  And

25  I'm the executive committee.  I'm on the board of directors.

CONFIDENTIAL

1    So I guess that's (inaudible).

2           MR. KOTZ:  Okay.  And so when did you first hear of

3    Bernard Madoff?

4           MR. BRODER:  Probably when we invested in him.

5           MR. KOTZ:  Okay.

6           MR. BRODER:  I mean, I would have heard about him.

7           MR. KOTZ:  Okay.  And so when you had -- when you

8    invested in him, what did you learn about Madoff at that

9    point?

10          MR. BRODER:  Well, we invested through Meritage,

11   and you probably know about Meritage.  And I guess what was

12   striking at the time was how difficult it was to invest with

13   Madoff.  It wasn't like he knocked on the door and said, I

14   want to give you money.  It was all, well, I'll think about

15   it.  I have to do this.  It seemed a very personal process.

16   And in fact, we couldn't invest directly that I remember.  We

17   invested indirectly.

18          MS. STEIBER:  How?

19          MS. PORTER:  Through a swap.  Bernie didn't want

20   Renaissance as an investor.  Shall I speculate as to why?

21          MR. KOTZ:  Sure.

22          MS. PORTER:  All right.  And it was our

23   understanding that he didn't want us because we were too

24   smart.

25          MR. KOTZ:  Meaning that you would do the due

CONFIDENTIAL

RE00000067

1  diligence that was necessary to look into it carefully, or --

2          MS. PORTER:  I don't know, you know.

3          MR. KOTZ:  Okay.

4          MS. PORTER:  I don't want to speculate as to what

5  the meaning was.  But he did not want Renaissance

6  Technologies as an investor.  So we had a relationship with

7  another fund who was also invested in us, and we were friends

8  with them.  And they had an allocation.  And so we did a swap

9  with them on a portion of their investment in Madoff, which

10  is where the HCH comes from.  You know, HCH is the swap

11  counter party.

12          MR. KOTZ:  Okay.

13          MS. PORTER:  So (inaudible).

14          MR. BRODER:  And early on back then with Meritage,

15  a lot of due diligence was done in cooperation with

16  (inaudible).  We used to co-invest in various hedge fund

17  managers and things so that, you know, the due diligence

18  issue was shared and discussed and everything else.

19          And it was difficult for them also to do due

20  diligence with -- against Madoff, you know.  There's a

21  certain sensitivity to questions and kind of things.  But

22  this guy was, you know, a big reputation, longstanding.  They

23  didn't want to upset -- you didn't walk in to a guy and say,

24  are you really telling us the truth?

25          So they had to -- and I suspect many people did the

CONFIDENTIAL

RE00000068

Page 8

1   same -- treat him with kind of kid gloves because of that.

2           MR. KOTZ:  And there was some sort of exclusivity

3   to his trading.

4           MR. BRODER:  Correct.

5           MR. KOTZ:  And so that gave what impression to you?

6   What did you make of that?

7           MR. BRODER:  Well, that didn't necessarily arouse

8   any suspicion that (inaudible).

9           MR. KOTZ:  Okay.  Okay.  Just that point?

10          MR. BRODER:  Yeah.

11          MR. KOTZ:  Okay.  All right.  And were there any

12  whispers out there about Madoff?

13          MR. BRODER:  Not that I recall, and I recall pretty

14  good.  At that time, no.

15          MR. KOTZ:  Okay.  Okay.

16          MR. BRODER:  So, you know, none that reached me.

17          MR. KOTZ:  Okay.  But there was a sense that he had

18  very good returns.

19          MR. BRODER:  Correct.

20          MR. KOTZ:  Okay.  And that's why you were

21  interested in getting involved.

22          MR. BRODER:  Right.  And we later became

23  concerned -- you know, you look at the due diligence and you

24  look at history of the returns just like you do whenever

25  you're going to a new manager.  Okay.  This guy's had a good

CONFIDENTIAL

RE00000069

Page 9

1    track record.

2          And then when you're in the investment for a while

3    and you see what's going on in the marketplace, and you have

4    various currencies going on and various things, and this guy

5    just -- every month, it's more or less a positive number, and

6    it's roughly similar to prior month number.  An insignificant

7    amount of variation.

8          Then that is how originally we (inaudible).  And I

9    remember, I guess, others, but I remember being suspicious

10   because of that.  I mean, nobody is that good unless they

11   have a kind of a technology, a particular technology like we

12   have.  And, you know, why we've been that good, we may just

13   have been lucky.

14         So now you look at some of the others.  So

15   (inaudible) seems to be as lucky.  It didn't seem likely.

16   And that's, I think, why more work was done.

17         MR. KOTZ:  Okay.  All right.  So initially it was

18   based on the fact that he was steady.

19         MR. BRODER:  Correct.

20         MR. KOTZ:  No matter what happened in the market,

21   no matter what crisis there was, he was almost exactly the

22   same.

23         MR. BRODER:  Correct.  In my mind, that was signal

24   No. 1.

25         MS. STEIBER:  So you thought, even with his stated

CONFIDENTIAL

RE00000070

1 investment strategy, he should have more correlation with

2 (inaudible) market?

3     MR. BRODER:  He should have more volatility.  He

4 should have more volatility in his returns than he actually

5 stated.  Now, at that time we did think we may be missing

6 something.  As we talked later on, could still be -- could

7 still have been -- you know, some sort of could still have

8 been a reasonable conclusion.

9     MR. KOTZ:  But that was enough, that particular

10 issue was enough, to look more closely?

11     MR. BRODER:  Yeah.  And there was two parts to

12 that.  I mean, one part was, hey, are these really true?  And

13 the other part was, hey, if they really are true, could we

14 learn something about what this guy does?

15     MR. KOTZ:  Okay.  And so what was the part about

16 "is this really true"?  What do you mean by that?

17     MR. BRODER:  Oh, because it was too steady.  It was

18 just too steady.  Either he had a fantastic system -- now,

19 remember at that time he had a fantastic system but he didn't

20 charge anybody any fees.  That seemed a little bit strange.

21     MR. KOTZ:  Okay.

22     MR. BRODER:  Perhaps he's a generous guy.

23     MR. KOTZ:  All right.  So --

24     MR. BRODER:  So, I mean, it was typical of that

25 time, you know.

CONFIDENTIAL

RE00000071

1              MR. KOTZ:  Right.

2              MR. BRODER:  A lot of his friends were in.  A lot

3    of the charities were in.

4              MR. KOTZ:  Right.

5              MR. BRODER:  Maybe this guy really was altruistic

6    and he was just doing this for community investment

7    (inaudible).

8              MR. KOTZ:  Do you know of anyone else who

9    (inaudible)?

10             MR. BRODER:  No.  But there's always exceptions.

11             MR. KOTZ:  Right.  And so when you say it could

12   have been a great system or, what was the other possibility?

13             MR. BRODER:  I think the other possibility is that

14   if we have no evidence -- I'm talking -- I'm trying to put my

15   mind back to then right now (inaudible).

16             MR. KOTZ:  Right.  Right.

17             MR. BRODER:  If we have no evidence of a great

18   system, then it's just something we don't believe in without

19   necessarily -- without necessarily thinking it was fraud.  I

20   mean, there was -- and you might remember, Carla -- there was

21   another investment we made around about that time, and it was

22   almost a similar (inaudible), in some sense.

23             It was two brothers, a family investment.  It was

24   just two brothers, and they had very steady returns.  Because

25   the other thing about steady returns sometimes is you can

CONFIDENTIAL

RE00000072

1  just be selling options.

2         If you sell way, way out-of-the-money options and

3  you don't mark them for market, then you're just getting a

4  premium in every month you sell them and get (inaudible).

5  And eventually, you know, once every hundred years, the whole

6  blows up and you lose everything.

7         So that was another possibility that we thought of

8  before -- before we got data on Madoff, before we got, you

9  know, (inaudible) data on what he's doing.  And there was

10 another strategy like that, and it was just (inaudible).

11         MS. PORTER:  Was it (inaudible)?

12         MR. BRODER:  No.  No, no, it wasn't (inaudible).

13 It was another.  It wasn't even --

14         MS. PORTER:  I don't remember.

15         MR. BRODER:  It was a small operation.  And I think

16 we were in them for about a year or so, and we got out of

17 that one for similar concerns.  It's too steady, you know.

18 What are they doing?

19         Maybe -- in that case, maybe the concerns were a

20 little more targeted.  Are they just selling options?  And --

21 but we didn't know at that point.  And they actually went

22 bust eventually.  They did blow up.

23         MS. STEIBER:  Did you think he was possibly just

24 smoothing his returns and giving false statements?  Or did

25 you think that the returns were real?  Or you didn't know?

CONFIDENTIAL

RE00000073

1          MR. BRODER:  That's a good question.  At that

2    point -- at that point, because I'm still very early on in --

3    we didn't know.  I mean, it's well-known that managers do

4    smooth their returns.  But I think the fact -- even at that

5    point, we knew what instruments he was trading.  So smooth

6    returns didn't seem very likely.

7          You know, we weren't jumping to the fraudulent

8    conclusion at that point.  Normally, smoothing makes sense.

9    It means you have a bunch of what we call right now level 3

10   assets, right, in the sense that you're choosing where you're

11   marking them to market.

12         Or, you know, we've made some good gains there.

13   Let's not realize those.  And the next month, you have a bad

14   month elsewhere and you decide you'll just realize a few of

15   those gains.

16         MR. KOTZ:  Right.

17         MR. BRODER:  And it all looks -- we didn't think he

18   was doing anything like that.

19         MR. KOTZ:  Okay.  So then, because of that, you

20   delved deeper into it?

21         MR. BRODER:  Correct.  Research work was done.  You

22   know, we had access to statements.  We had access to both --

23   two sets of statements.

24         MR. KOTZ:  Okay.  What were those?

25         MR. BRODER:  Khronos statements and Samsung

CONFIDENTIAL

RE00000074

Page 14

1   Foundation statements.

2         MR. KOTZ:  Where did you get those statements from?

3         MR. BRODER:  One from the family, family foundation

4   (inaudible).  And one from Khronos because they were -- you

5   know, they were only -- they were direct investors.

6         MR. KOTZ:  Okay.  But you didn't get anything from

7   Madoff.  Is that right?

8         MR. BRODER:  No.  Because we weren't direct

9   investors.

10         MR. KOTZ:  So you didn't communicate with Madoff at

11   all?

12         MR. BRODER:  No.

13         MR. KOTZ:  Okay.  So you got these statements and

14   you looked at the statements.  What kind of analysis did you

15   do on the statements?

16         MR. BRODER:  So the analysis that was done -- as

17   far as I remember, the analysis that was done was things

18   like, for example, you know, remember, this was a managed

19   account.  So the statements included every transaction that

20   was done for your account.

21         And as far as I remember, the transactions done in

22   both accounts were very similar, if not almost exactly the

23   same.  (Inaudible.)  And so you could see all the stock

24   executions, the prices at which those executions -- you could

25   even see the time they were executed, account by account -- I

CONFIDENTIAL

Page 15

1   remember for sure about that -- and the options that were

2   executed.

3        This turned out to be a strategy of buying a basket

4   of stocks and then selling -- (inaudible) buying them from

5   (inaudible) any options, any OAX (phonetic) options.

6        MR. KOTZ:  Right.

7        MR. BRODER:  So we could check various things out

8   about that.  I mean, you know, various things came to light,

9   as I -- as I remember, not that well, but I remember, for

10  example, the fills looked very good.  But he was a guy who

11  went into the marketplace, and when you compared the fills

12  that he got compared to the closing price, every time he did

13  this over many months of data, it always looked like a pretty

14  good fill.

15       That's pretty hard to achieve.  You know, you'd

16  expect it to be approximately random.  If you just decide --

17  you personally decide to buy some stocks every -- you know,

18  once a month and then you looked how you did against closing

19  price, you'd be -- some would be worse than the closing price

20  and some would be better.  And on average, these were much

21  better than the closing price.

22       Now, maybe he had a prediction.  You know, we have

23  predictions for stocks.  So I have to tell you, that

24  prediction he would have to have would be much better than

25  our prediction.  But we don't have, you know -- you know,

CONFIDENTIAL                                                    RE00000076

Page 16

1   we're pretty -- we don't have that kind of quality of

2   prediction.

3          MR. KOTZ:  Would it be much better than any

4   prediction you've seen?

5          MR. BRODER:  Yes.  Actually, that was one of the

6   best predictions around, that he's much better.  But the

7   reason -- I'm digressing a little bit.  The reason why our

8   prediction was (inaudible) is because we don't trade once a

9   month.  We trade thousands and thousands and thousands and

10   thousands of times.

11          MR. KOTZ:  Right.

12          MR. BRODER:  So if I'm only right 53 times and

13   wrong 47 times, I'm going to make some money.  But Madoff

14   wasn't doing that.  You know, once a month or so, he was

15   coming in with this basket of stocks.

16          MR. KOTZ:  Right.  So he would have to be right

17   pretty close to 100 percent of the time?

18          MR. BRODER:  More or less.  I can't remember the

19   exact percentage, but way --

20          MR. KOTZ:  A very, very high percentage?

21          MR. BRODER:  Very high percentage.  Right.

22          MR. KOTZ:  And that's something that you had not

23   seen before, and didn't think was possible?

24          MR. BRODER:  Well, I knew it wasn't possible

25   because of what we do.

CONFIDENTIAL

RE00000077

1           MR. KOTZ:  Okay.  Right.

2           MR. BRODER:  But I had not any before because I

3   don't think any -- in the history of America, that I

4   remember, there may be only one or two managed accounts.

5   Most of the time you give the manager your money, he sends

6   you your results.  That's it.

7           MR. KOTZ:  But from the fact that, you know, you

8   were doing your own productions, you knew that that was not

9   possible?

10          MR. BRODER:  Very unlikely.

11          MR. KOTZ:  Very unlikely?  Okay.

12          MR. BRODER:  Right.  Very unlikely.  So that

13  (inaudible).  Now, once that happened, we started asking

14  questions.  Well, I remember thinking at the time -- I don't

15  know whether I wrote it down anywhere, and if I did, I'm sure

16  you have it -- whether there was some -- I think I used the

17  phrase, the term, nonperformance-affected counter party.  I

18  was thinking of something like a mutual fund.

19          You know, mutual funds are paid by size of assets.

20  They're not really paid by performance.  I mean, they can't

21  lose too much money; otherwise they lose the assets.  But,

22  you know, if they're still being made -- if you had a blowout

23  year and make 26 percent from a mutual fund when the rest of

24  them are making 18, they don't benefit too much from that.

25          And so I was thinking, well, maybe they do some

CONFIDENTIAL

RE00000078

Page 18

1    basket trades with somebody else and they get more commission

2    and (inaudible).  So I wondered where that was going on.  But

3    it seemed too regular.  You know, (inaudible) again every

4    month some mutual fund comes in and sells in this basket,

5    slightly below the market so it looks better.  It didn't

6    quite seem likely.

7           So that was one of the things we looked at, the

8    execution of stocks.  The other thing we looked at was the

9    execution of the options.  And in particular, I can't

10   remember anything about the quality or the price of the

11   execution of the options.  But I can remember particularly

12   the volume of the options.

13          So it told you the strike price.  And at that time,

14   we didn't know for sure how much Madoff was managing.  We had

15   various estimates, and I think the range was somewhere

16   between 5- and $15 billion.  I can't remember what number we

17   used, but we used a variety of numbers, and then we looked

18   up, well, how many options does that imply in the OAX market?

19          And then I made some assumptions about the

20   distribution of the volume between the strikes in the market,

21   and then how much volume -- and I think I recall that his

22   strikes were all the same.  They were the same across the two

23   accounts.  So then we just assumed it was the same across all

24   accounts.

25          So could he possibly be doing that volume --

CONFIDENTIAL                                                                    RE00000079

Page 19

1              MR. KOTZ:  Right.

2              MR. BRODER:  -- given the volume of the

3    marketplace?  Now, the other curious thing there was that the

4    strike he chose on the day he did it was always close, very

5    close, with a near strike to where the market closed on that

6    day.

7              MR. KOTZ:  Right.

8              MR. BRODER:  Now, again, unless he had this

9    incredible prediction earlier in the day that he knew where

10   the market was going to close --

11             MR. KOTZ:  Right.

12             MR. BRODER:  -- he must be doing all those options

13   fairly close to the close.

14             MS. STEIBER:  Could you explain that?  I don't

15   completely follow that, why it would have to be close to the

16   close.

17             MR. BRODER:  Well, let's suppose that -- so let's

18   accept the fact that it was always close to the close, right,

19   which is empirically verifiable.  You see the strikes and you

20   see (inaudible).  Now let's suppose that you were running

21   something and you said, okay, I'm going to try to be close to

22   the close but I'm going to execute these trades at 10:00 in

23   the morning.

24             Well, you would have no idea where the market was

25   going to go between 10:00 and the end of the day, so

CONFIDENTIAL                                                                              RE00000080

1   presumably sometimes you would get it wrong.  You know, you'd

2   actually keep close to where the market was at that point,

3   and the market would go down a lot, so by the end of the day,

4   your strikes would be nowhere near the close, and vice versa.

5   The market could move away.

6            So it could only be them at the close, right at the

7   close; or, potentially -- well, if he was doing them in the

8   open marketplace, in the OAX -- you know, in the

9   exchange-traded market, he could only be doing them fairly

10  close to the close to ensure that the option strike was close

11  to (inaudible).  Otherwise they would just be various and all

12  around that price.

13           Or he was doing it in the OTC market.  He was going

14  to somebody late in the day and saying, I need to execute

15  this trade.  Now, that counter party would then have to do

16  these options, take on the exposure.

17           I don't know whether he was -- there was no

18  evidence that Madoff was doing a basket with him, a basket of

19  stocks.  I assume you know options.  Right?  You have a

20  (inaudible), and primary risk is a (inaudible) of the option.

21  You know, he could be doing the offsetting basket with the

22  counter party, but there's no evidence on the statement that

23  he was doing that.  He was just doing the options.

24           So now here's the counter party.  The OTC counter

25  party is taking on this huge 5- to $10 billion options

1   exposure, and where are you laying it off?  So the market's

2   almost -- you know, it's close to the end of the day and

3   you're laying it off in the OAX market because otherwise

4   you'd see it in the volume.  However, where we saw some

5   increase in volume, we didn't see anywhere near the amount of

6   volume spikes to justify what was showing on his statements.

7          MR. KOTZ:  So there was no understanding why the

8   counter party would take that kind of risk?

9          MR. BRODER:  Correct.  So to go back to one of your

10  earlier statements, you know, if you are looking at what

11  would have been nice for me to pick up a phone and say,

12  hello, this is Paul Broder, SEC Commissioner, Bernie.  Can

13  you just tell me who you did those trades with so I can call

14  him in the morning and find out what he really did.

15         MR. KOTZ:  Right.  Right.  So what would happen

16  then?

17         MR. BRODER:  If I'd asked him that question?

18         MR. KOTZ:  Yeah.

19         MR. BRODER:  Who knows.

20         MR. KOTZ:  Right.  But I mean --

21         MR. BRODER:  I never asked him that question.

22         MR. KOTZ:  -- by simply asking that question and

23  getting the information, you would be able to verify whether

24  this was real or not?

25         MR. BRODER:  Well, he may have -- he may in that

1   situation have given me an answer which wasn't clear.  I

2   guess I could have kept pressing him if I didn't (inaudible).

3          MR. KOTZ:  Right.  Right.

4          MR. BRODER:  But, you know, one of the things, I'd

5   say, oh, you did it with Goldman Sachs?  Who are the people

6   you speak to at Goldman Sachs?

7          MR. KOTZ:  Right.

8          MR. BRODER:  Now, this is different from an audit.

9   I used to work for an auditor, and one of the things we'd

10  audit, of course, you'd take all these statements.  And once

11  (inaudible) this is a waste of time because he does fraud

12  because you can never speak to the people on either side, you

13  know, get these trades and check them, look at the cash flow,

14  and whatever.

15         MR. KOTZ:  Right.

16         MR. BRODER:  But here, if he said, I did them with

17  Goldman Sachs, you can pick up the phone with Goldman Sachs.

18  Because the SEC, presumably you can call Goldman Sachs and

19  say, hey, on this date Bernie Madoff said he did this trade

20  with you.  Didn't do that.

21         MR. KOTZ:  And then you could verify what he said.

22         MR. BRODER:  You could verify what he said.

23         MR. KOTZ:  Okay.  And what if he said he was

24  trading in Europe?

25         MR. BRODER:  Well, I guess you haven't got the

CONFIDENTIAL

Page 23

1    enforcement capability there, although it would have to --

2    again, it would have to be with -- he would have to be, in my

3    mind, with a non-American firm who had no American

4    operations.

5              MR. KOTZ:  Right.

6              MR. BRODER:  Because if you people (inaudible) --

7              MR. KOTZ:  Right.

8              MR. BRODER:  -- they're going to be on -- they're

9    going to answer whatever questions you're asking.  Right?

10             MR. KOTZ:  And so if you were in the -- if you were

11   a regulator and you had these concerns, and Bernie Madoff

12   said, I'm trading in Europe, would you just let it go at

13   that?  Or would you follow up in some way or another, whether

14   you had the jurisdiction or not, to see if it was really

15   true?

16             MR. BRODER:  Yeah.  I didn't see why it would

17   make -- I mean, I don't know how the SEC operates, but I

18   don't see why it would make any difference.

19             MR. KOTZ:  Right.

20             MR. BRODER:  I mean, again, unless it was a

21   non-American institution who had no branches here at all, I

22   don't know, Berliner Bank or something --

23             MR. KOTZ:  Take away the issue of whether the SEC

24   has the ability to, in terms of just coming with a concern,

25   expressing it to Bernie Madoff, and he comes back and saying,

CONFIDENTIAL                                                      RE00000084

Page 24

1  I'm trading in Europe.  Wouldn't you take some action --

2        MR. BRODER:  Yes.

3        MR. KOTZ:  -- to find out whether that was true or

4  not?

5        MR. BRODER:  Yes.  I don't see why it would make

6  any (inaudible).

7        MR. KOTZ:  Right.  And that simple action would

8  reveal whether he was telling the truth.  Right?

9        MR. BRODER:  Yes.  I mean, for us, you know, there

10  was a certain amount of capital, which implied a certain

11  level of trading.  And that volume of trading had to go

12  somewhere.

13        MR. KOTZ:  Right.

14        MR. BRODER:  Now, one of the things, you look at

15  the statements, it wasn't clear -- well, actually, I'm not

16  actually -- I want to say something, and I'm not even sure on

17  a legal basis I'm going to say -- but I'm not even sure, and

18  you (inaudible).

19        When you get a managed account statement, I

20  remember thinking at one point that managed account is

21  showing me my trades -- assume I'm the investor -- my trades

22  with Madoff, or is he showing the trades in my account with

23  whoever he dealt with?

24        MS. PORTER:  The trades in your account that he

25  brokered on your behalf.

CONFIDENTIAL                                                      RE00000085

Page 25

1              MR. BRODER: Right. Right.

2              MS. PORTER: So -- okay?

3              MR. BRODER: Okay. So therefore, somewhere in

4    the -- somewhere in the marketplace, either in an

5    exchange-traded marketplace or an OTC marketplace, exactly

6    those trades which were on that client account statement

7    should exist on someone else's books, you know.

8              And the other thing that crossed our minds at one

9    point was, well, if we knew he had this market-making

10   operation so, you know, with our counter party somehow, that

11   market-making operation and -- but I think we dismissed that

12   in the end as regards -- you know, market-making is

13   competitive.

14             So there's not some soft income source he would be

15   siphoning off there to (inaudible). His market-making side

16   wouldn't make any money. So we kind of explored that avenue

17   and kind of dismissed it in the end.

18             To go back to your question, yes. Somewhere in the

19   marketplace, either OTC or exchange-traded, those trades were

20   taking place. And it seems to me a very simple set of steps

21   to verify that those volumes (inaudible).

22             MR. KOTZ: And now, with hindsight from what we

23   learned in December, do you think that that would have

24   brought to your attention that there was no trading?

25             MR. BRODER: I don't see how that would have been

CONFIDENTIAL

RE00000086

1    missed in a situation (inaudible).

2         MS. STEIBER:  Speak up a little bit.

3         MR. BRODER:  I don't see how that could have

4    possibly been missed.  I mean, this is a very simple

5    verification.  I mean this guy is trading -- this is a cash

6    account.  So he's turning over $10 billion off stocks each

7    particular month.  I mean, you've got to be (inaudible) in

8    the marketplace.

9         MS. STEIBER:  Where would you have looked?

10        MR. BRODER:  Well, I would ask -- I would ask

11   Bernie Madoff.  I would have said, who are the -- where are

12   you doing these trades?  Let's think of stock trades.  Who

13   are you doing these trades with?  And, you know, is it

14   Ireland?  Is it -- you know, is it New York Stock Exchange?

15   Is it OTC with Merrill Lynch?  And then you would have just

16   gone out and verified those trades actually existed.

17        MS. STEIBER:  Would you have been skeptical if he

18   said he traded over the counter?  Because isn't

19   over-the-counter trading more expensive than trading on an

20   exchange?  You know, cut into your profits?

21        MR. BRODER:  It could be, but not necessarily.

22   There may be -- if you're doing a block trade -- I mean, even

23   now, you know, if some large insurance company wants to do a

24   block trade, there's two ways of doing it -- well, there's

25   two ways of doing it.

CONFIDENTIAL

RE00000087

Page 27

1          Certainly you could put it out on the New York

2    Stock Exchange or you could just keep selling, selling,

3    selling. Or you could call Goldman Sachs and say, hey, make

4    me a deal on $2 million of this stock and I'll make you a

5    bid. And then it's off your books, and you don't even write

6    your ticket. And you don't even have to worry about the

7    (inaudible).

8          Lots of nice people do that these days. But it's

9    changing fast, and three or four years ago, it was much more

10   prevalent to do that. So it wouldn't necessarily arouse my

11   suspicions if he'd said, no, I'm doing them OTC. But it

12   would have been a lot easier to check, you know. Oh, I

13   bought $30 million of, you know, Exxon with Goldman Sachs,

14   you know. You would have only had to check one trade.

15          MR. KOTZ: Right. Correct.

16          MR. BRODER: Because as it turned out, you wouldn't

17   know that then, but if you'd just check one trade, you

18   wouldn't have found it because he didn't do any trades.

19          MR. KOTZ: So in some ways there are a couple

20   possibilities of what he could have been doing --

21   front-running or, as it turns out, a Ponzi scheme. Isn't it

22   fair to say that the Ponzi scheme would have been easier to

23   verify?

24          MR. BRODER: I don't think you could have said that

25   then. But if you'd read the e-mails --

CONFIDENTIAL

1       MR. KOTZ:  Right.

2       MR. BRODER:  -- which I guess we'll get into, you

3 would have thought the question would come to mind, hey,

4 these guys are debating whether he could possibly be doing

5 this volume.  Let's -- the next step will be let's try to

6 verify that he did this volume.

7       MR. KOTZ:  Right.

8       MR. BRODER:  And the first time you checked a

9 trade, you would have found it's not there.

10      MR. KOTZ:  Right.  So the first thing you might

11 have gone to from these e-mails would be to look if there was

12 actually volume and the trades.  And then, as we know now, if

13 you had done that, you would have seen no trades.

14      MR. BRODER:  I think so.

15      MR. KOTZ:  Do you want to talk a little bit about

16 some of the specifics of the e-mail?  And then maybe we can

17 ask you about --

18      MR. BRODER:  This?

19      MS. PORTER:  You have the --

20      MR. KOTZ:  Yeah.  The April 20, 2004, 2:12 p.m.

21      MS. PORTER:  I don't have it.  Maybe Frank does.  I

22 mean, I have the -- it would be good if you were looking at

23 the same page.

24      MS. STEIBER:  Yeah.  It's the 20th.

25      MS. PORTER:  Yeah.  But you took it back after

CONFIDENTIAL

RE00000089

Page 29

1   Henry looked at it.  There you go.  You know, you're saying

2   it -- I'm sorry.  Your versions say April 20th.  Remember,

3   that's when it went to the (inaudible).

4          MR. BARRON:  Right.  That's an internal.

5          MS. PORTER:  So to us, that means nothing.  So we

6   have to actually look at the --

7          MR. BRODER:  Neither of these are my e-mails.

8   Right?

9          MR. KOTZ:  Right.  Right.  We have another one that

10  is yours.  But just to get your kind of general thoughts on

11  some of the things that are mentioned in this e-mail, if you

12  see the first one, which I think is from Nat Simons --

13         MR. BRODER:  Right.

14         MR. KOTZ:  -- he talks about, "Been to an ex-Madoff

15  trader.  He says that Madoff cherry-picks trades and takes

16  them for the hedge funds.  He said Madoff is pretty

17  tight-lipped and therefore he didn't know much about it, but

18  he really didn't know how they made money.  David Zierk heard

19  a similar story."

20         So were you getting several accounts of other

21  people raising concerns at that time, do you remember?

22         MR. BRODER:  I can't remember when this came in

23  relation to the research and everything else.

24         MR. KOTZ:  Okay.

25         MR. BRODER:  I remember reading this.  As it turned

CONFIDENTIAL

1   out, of course, this was not true.  Right?  Because he can't

2   have been cherry-picking because he wasn't doing any trades

3   at all.

4        MR. KOTZ:  Right.  Right.  But there were a couple

5   of ex-Madoff traders that seemed to have some concerns about

6   what he was doing.

7        MR. BRODER:  Right.  Right.

8        MR. KOTZ:  And then what about this issue of, "Why

9   does he let us make so much money?  Why doesn't he capture

10  that for himself?"

11       MR. BRODER:  Right.  Well, that's what I alluded to

12  earlier in the conversation about if he had such a great

13  predictive system, why was he not keeping more of it to

14  himself?  He wasn't charging any fees.  It was thought that

15  he was making money on the flow of trades as they went

16  through.

17       But, you know, normally when you make money on the

18  flow of trades, the client loses money on the other side.

19  Right?  You know, (inaudible) at 19, you pay him 18 kind of

20  thing.

21       MR. KOTZ:  Right.

22       MR. BRODER:  But here he seemed to be getting a

23  great fill every time he executes for the client.

24       MR. KOTZ:  Right.

25       MR. BRODER:  So it was little bit suspicious how

CONFIDENTIAL

RE00000091

1   he -- how he was making that money.  Then we said, well,

2   maybe he's charging commission.

3        MR. KOTZ:  Yeah.  So then given the volume that you

4   were talking about, there was a tremendous amount of money

5   that he wasn't charging.

6        MR. BRODER:  Correct.  But also, potentially it

7   (inaudible) on commission, but actually it was back to

8   whether you believed that idea of, you know, Bernie Madoff

9   the philanthropist, you know, allowing everyone else to make

10  money on him, just passing it --

11       MR. KOTZ:  Right.

12        MR. BRODER:  You know, had to (inaudible) an

13  exception.

14       MR. KOTZ:  Was that something that, you know, was

15  believable?

16       MR. BRODER:  If you're asking me -- let's suppose

17  there was a predictive system in some way that he could make

18  money, and the only money he was choosing to take was the

19  commission on the trades.  I didn't find that completely

20  unbelievable at the time.

21       MR. KOTZ:  Okay.

22       MR. BRODER:  I mean, for some reason, he's got so

23  much money he doesn't want to (inaudible).

24       MR. KOTZ:  But it was suspicious?

25       MR. BRODER:  It was suspicious.

CONFIDENTIAL                                                    RE00000092

1            MR. KOTZ:  Okay.  And then this issue later, where

2   you talk about -- not you, but I guess Nat, talks about that

3   you saw about the conflict and learning that his

4   brother-in-law is his auditor, what did you make of that?

5            MR. BRODER:  (Inaudible.)  I have no idea

6   (inaudible).  Yeah.  So I don't understand the question.  No,

7   I actually do.  The sentence where -- oh, his brother-in-law.

8   (Inaudible) that his brother-in-law is his auditor, and he's

9   also high up in the organization.

10            MR. KOTZ:  Okay.  What is he getting at there?

11            MR. BRODER:  When he said he was (inaudible) that?

12            MS. PORTER:  No.  The brother-in-law.

13            MR. KOTZ:  Well, what would be the effect of that?

14   What was the concern or --

15            MR. BARRON:  About the brother-in-law, you mean?

16            MR. KOTZ:  Yeah.  Just about the operation, the

17   conflict and the fact that it's a family situation, and that

18   there's a relative as his auditor.  What would that mean to

19   you?

20            MR. BRODER:  Well, that just means the auditor is

21   not independent, or there's some potential influence there.

22            MS. STEIBER:  So why would that be a concern?

23            MR. BRODER:  Well, you know, when we go into a

24   hedge fund and we invest and we find that, you know, PW are

25   the auditors, then that brings a small degree of comfort that

CONFIDENTIAL

RE00000093

Page 33

1    there's some independent -- I am expecting auditors

2    generally, since I was once one -- you know, it gives you

3    some faith that, you know, there's some independent look

4    there.

5              But if the guy who's supposed to be independent is

6    actually his brother-in-law then, you know, that's not so

7    good.

8              MR. KOTZ:  Doesn't give you much faith?

9              MR. BRODER:  It gives you less faith.

10             MR. KOTZ:  Less faith.  But from a regulator's

11   perspective, wouldn't that be something that would raise a

12   big red flag for a regulator?

13             MR. BRODER:  I would have thought our due diligence

14   process, the larger the -- you know, if it turned out there

15   was a $20 million hedge fund in the brother-in-law, then the

16   SEC (inaudible).  But when it gets to 5-, $10 billion, you

17   would think you'd want to see more than -- wasn't this a

18   one-man operation, too, this auditor?  One guy?

19             MR. BARRON:  Might have been three.

20             MS. STEIBER:  Yeah.  What about --

21             MR. BRODER:  Yeah.  So it wasn't a lot.

22             MS. STEIBER:  What about custody of assets?  Is

23   that something you look at in your -- in your due diligence

24   process?  Not to get too far away, but --

25             MR. BRODER:  Where are there -- (examining).

CONFIDENTIAL
RE00000094

Page 34

1          MS. STEIBER:  Do you usually want them held by a

2     third party?

3          MR. BRODER:  You know, you would have to ask them

4     that.  I don't --

5          MS. PORTER:  Remember --

6          MR. BRODER:  I don't know all the legal

7     (inaudible).  But I just -- I'm no longer involved in that

8     part of the business.  And back then, I can't remember --

9     yeah, that must have come up, but I can't remember.  In this

10    context, he did his own custody because he had his own

11    market-making operation.

12          But in your question, you're obviously getting to,

13    you know, was that a red flag also because you hope that it

14    was done elsewhere.  Yeah, I guess most of the people that we

15    invest in have -- you know, they use Goldman or they use

16    Morgan or they use somebody.  But he was doing it himself.

17          Yeah, it's a good point.  I can't remember -- I

18    can't remember whether we missed that, but it is a good

19    point.

20          MR. KOTZ:  Okay.  And so what -- did you come to

21    kind of any conclusion or did you just know enough to have

22    concerns?

23          MR. BRODER:  I think if you're asking did we come

24    to the conclusion that there was a fraud going on, I would

25    say we didn't.  I would say we came to the conclusion --

CONFIDENTIAL

RE00000095

Page 35

1    well, there was a committee, so I'll speak for myself.

2           I came to the conclusion that we didn't understand

3    what he was doing. We had no idea how he was making his

4    money. The numbers, the volume numbers that he suggested he

5    was doing was not supported by any evidence we could find.

6    And, you know, that in itself should just mean we get out.

7           MR. KOTZ: Right. And so is it fair to say that

8    there was at least the possibility of fraud? I mean, there's

9    a reference in that e-mail to, "Madoff's head looked pretty

10   good above Eliot Spitzer's mantle."

11          MR. BRODER: Oh, yeah. I think I wouldn't put too

12   much weight on that. I think Spitzer was going around -- who

13   was he going after at that time? He wasn't after Madoff, but

14   he was going after somebody. Oh, he was going after --

15   wasn't it Greenberg? Isn't that (inaudible) in Greenberg?

16          MR. KOTZ: Right. Right.

17          MR. BRODER: I'm trying to remember back then what

18   I thought. Did I think this guy was fraudulent? I don't

19   think so. I mean, if somebody had asked me then, could this

20   guy be fraudulent, I couldn't have answered no. Right? But

21   I didn't think -- of course, if I could have asked Madoff

22   myself, you know, looked at his statements and looked at

23   counter parties, then that would be different.

24          But, you know, we couldn't do that, and I don't --

25   it was more or less just an investment decision. Given what

CONFIDENTIAL

RE00000096

1   we know, should we stay in this investment?  And I thought we

2   should not.

3          MR. KOTZ:  Okay.  Were you aware at the time that

4   the SEC had looked at Madoff?

5          MR. BRODER:  No.  I was not.  I don't know

6   (inaudible).

7          MR. KOTZ:  Okay.  If we could move to the other

8   e-mail because this is yours.  And just take a look at that

9   and see if there's anything in there that we haven't kind of

10   covered, or maybe just give us a little bit of an explanation

11   of --

12          MS. PORTER:  Could I ask you one thing?  I've just

13   been asked to ask you if by any chance you'd be willing to

14   take a lunch break at 1:00 for a couple of hours because

15   there's an executive committee meeting scheduled at 1:00.  We

16   thought we'd be done by then, and we're not.

17          MR. KOTZ:  Okay.

18          MS. PORTER:  So I've been asked by -- to relay this

19   message and request to you by Jim Simons, who would be

20   appreciative if they could keep on schedule with their 1:00.

21          MR. BRODER:  We're going to finish mine soon?

22          MS. PORTER:  We would finish you.  But then we

23   wouldn't have gotten to Nat.

24          MR. KOTZ:  Okay.  Yeah, I think what we can do is

25   we --

CONFIDENTIAL

RE00000097

1           MS. PORTER:  Can you take a break for an hour and a

2    half or two?

3           MR. KOTZ:  Yeah.  We have somebody at 2:00, but

4    that probably won't be long.  So maybe we can come back at

5    that time.  We can come back.

6           MS. STEIBER:  And we could get Nat then.

7           MR. KOTZ:  Maybe at like 3:00 -- 2:30?

8           MS. STEIBER:  2:30 or 3:00.  Maybe he could come

9    earlier.

10          MS. PORTER:  That would be --

11          MR. KOTZ:  Maybe at -- yeah.  What about 3:00?

12          MS. PORTER:  That would be terrific.

13          MR. BRODER:  So let me go through this.  So --

14          (End of tape.)

15          MR. KOTZ:  So just to kind of clarify the point

16   because we want to make sure that we got it is that from your

17   e-mail, you had concluded that Madoff couldn't have been

18   trading over the counter.

19          And if you were a regulator and you saw that and

20   Bernie Madoff represented to you that he was trading over the

21   counter, you would be very suspects about that and make sure

22   to follow up because it would seem that that couldn't be

23   true.  Is that fair?

24          MR. BRODER:  Correct.  I would certainly ask who

25   that counter party was, and then verify, you know

CONFIDENTIAL                                                          RE00000098

Page 38

1   (inaudible).

2          MR. KOTZ:  And given what you found and the

3   information in the e-mail, you wouldn't accept simply that

4   Madoff said he traded over the counter because from the

5   information in the e-mail, it seems that that wasn't the

6   case.

7          MR. BRODER:  Correct.

8          MS. STEIBER:  And did you get anyone to follow it

9   up with you from the SEC?

10          MR. BRODER:  No, they did not.

11          MR. KOTZ:  Okay.  So nobody asked you any

12   questions, asked for any more information to get any more

13   analysis about the e-mail?

14          MR. BRODER:  No, they did not.

15          MR. KOTZ:  Okay.  All right.  Thank you for your

16   time.  We appreciate it very much.

17          (Whereupon, the interview was concluded.)

18                  * * * * *

19

20

21

22

23

24

25

CONFIDENTIAL

RE00000099

CONFIDENTIAL

RE00000100

# Testimony

# of

# Laufer

CONFIDENTIAL

RE00000101

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           )   File No. OIG-509
OIG-509                    )


PAGES:     1 through 53

PLACE:     Renaissance Technologies Corporation

           800 Third Avenue, No. 34

           New York, New York   10022

DATE:      Thursday, March 12, 2009


     The above-entitled matter came on for hearing, pursuant
to notice, at 11:00 a.m.


TAPE TRANSCRIPTION


Diversified Reporting Services, Inc.

(202) 467-9200

CONFIDENTIAL

RE00000102

```
1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         DAVID KOTZ, Inspector General

5         HEIDI STEIBER, Investigator

6         Securities and Exchange Commission

7         100 F Street, N.E.

8         Washington, D.C. 20549

9

10   On behalf of the Witness:

11        FRANCIS P. BARRON, ESQ.

12        Cravath, Swaine & Moore LLP

13        Worldwide Plaza

14        825 Eighth Avenue

15        New York, New York   10019-7475

16        (212) 474-1000

17

18        CARLA PORTER, ESQ., General Counsel

19        Renaissance Technologies Corporation

20        800 Third Avenue, No. 34

21        New York, New York   10022

22        (212) 486-6780

23

24

25
```

CONFIDENTIAL

```
 1                    P R O C E E D I N G S

 2         MS. STEIBER:  This is Heidi Steiber and David Kotz

 3  at Renaissance Technologies on May 12, 2009.

 4         MS. PORTER:  -- on the examination, and she

 5  provided the documents as requested to the examiner.

 6         MR. KOTZ:  Right.

 7         MS. PORTER:  She kept a file, and so we know what

 8  documents -- there are about 4,000 pages of documents that --

 9  with what the examiner, you know, departed --

10         MR. KOTZ:  Okay.

11         MS. PORTER:  -- on a disk.

12         MR. KOTZ:  Okay.

13         MS. PORTER:  And I have an index to those

14  documents.

15         MR. KOTZ:  Okay.

16         MS. PORTER:  In addition, she has in her file these

17  Madoff-related e-mails.  She has them separate with a little

18  heading on them that says, "SEC 304 RIA Exam."  Because they

19  were of particular interest to the examiner --

20         MR. KOTZ:  Okay.

21         MS. PORTER:  -- she actually kept them apart

22  because he did focus on them.  So --

23         MS. STEIBER:  Those would be the ones we were

24  interested in, not (inaudible).

25         MS. PORTER:  No.  But I'm just telling you what --
```

CONFIDENTIAL

RE00000104

1   giving you the whole picture.  So I know only from the fact

2   that she kept clipped these particular e-mails that were of

3   interest to the examiner.

4          MR. KOTZ:  Great.  Great.

5          MS. PORTER:  So that's how I know.  Actually, one

6   of the e-mails that you cited to me, Heidi, was not in that

7   collection.  So I'm not entirely sure how that -- you know,

8   how you have it --

9          MS. STEIBER:  Right.

10          MS. PORTER:  -- and I don't have it in the little

11   grouping that she clipped as of particular interest to the

12   examiner.

13          MR. KOTZ:  Okay.  Well, we can sort all that out.

14          MS. PORTER:  Right.  Yeah.

15          MR. KOTZ:  But, I mean, as complete a record as

16   possible that we have would be helpful for us to, you know,

17   kind of make sense of all this.

18          MS. PORTER:  Yeah.

19          MR. KOTZ:  So we want to get the documents but

20   also, you know, just kind of ask a few questions about what

21   led to the writing of this e-mail and, you know, what was the

22   thinking in mind; and also, you know, whether there was

23   follow-up from the SEC back to your folks to ask further

24   questions to get more information, or whether it was just

25   kind of left.

CONFIDENTIAL

RE00000105

1           So I don't know how you want to do this.  Do you

2     want to -- can we just start with Henry or --

3           MR. LAUFER:  Sure.

4           MS. PORTER:  Yeah.  I'm sorry at some level that we

5     didn't bring Paul and Nat into this preliminary conversation.

6     I may have to ask you --

7           MR. KOTZ:  Okay.  Sure.

8           MS. PORTER:  -- because, you know, they're -- this

9     is not something that happens in their world every day of the

10    week.

11          MR. KOTZ:  Right.  Right.

12          MS. PORTER:  So I think it would be very helpful

13    for them to hear what you just said.

14          MR. KOTZ:  Okay.

15          MS. PORTER:  So perhaps later on, if you don't

16    mind, if you would revisit that veteran, it will go a long

17    way to helping them understand the framework of this

18    discussion.  So forgive me for asking you to do it again --

19          MR. KOTZ:  No, no.  Not at all.  Not at all.

20          MS. PORTER:  -- for asking you to give that speech

21    again later on.  Since you did ask to meet them

22    individually --

23          MR. KOTZ:  Right.

24          MS. PORTER:  -- we didn't have them all here at

25    once, although, who knows, it might actually be beneficial to

Page 6

1   have them all at once to converse with.  That's (inaudible).

2          MR. KOTZ:  Yeah.  I mean, I think the only -- the

3   only thing was it would be kind of hard to, you know, get it

4   all down if there's several people talking at once.

5          MS. PORTER:  I see.

6          MR. KOTZ:  It wasn't anything -- but maybe, you

7   know, we can try, and if there's further thoughts, we can

8   grab everybody back for a few minutes.

9          MS. PORTER:  Okay.

10          MR. KOTZ:  We could at least bring the other two in

11   when I go over the introduction.

12          MS. PORTER:  Then one further thought before you

13   start addressing your questions to Henry.  The issues you

14   have that are more general in scope about the SEC and our

15   interaction, how the, if you will, the end user interacts

16   with the SEC --

17          MR. KOTZ:  Right.

18          MS. PORTER:  -- and all that sort of thing is a

19   discussion I would suggest you would have not with Henry,

20   Nat, or Paul because they don't interface with the SEC.

21   That's not their province.

22          MR. KOTZ:  Okay.

23          MS. PORTER:  And I don't think they'd be

24   comfortable responding to that kind of question.

25          MR. KOTZ:  Sure.

CONFIDENTIAL

RE00000107

1           MS. PORTER:  On the other hand, that may be

2    something that, off the record without a microphone --

3           MR. KOTZ:  Yeah.

4           MS. PORTER:  -- we in the legal department --

5           MR. KOTZ:  Yeah.  No, that would be very

6    (inaudible).

7           MS. PORTER:  -- would be happy to -- you know, if

8    you really are trying to understand how the examined party --

9           MR. KOTZ:  Right.

10           MS. PORTER:  -- interacts with the examiner and

11   what our perspective is on how they conduct an examination, I

12   think if you look at our record at Renaissance, we're

13   extremely cooperative.

14           MR. KOTZ:  Right.

15           MS. PORTER:  We try very hard to be, you know, on

16   the good side of the SEC at all times.  We've gone down there

17   on numerous occasions and tried to help you regulate us and

18   the industry.

19           MR. KOTZ:  Right.  Right.

20           MS. PORTER:  And so I am sure that Mark Silber,

21   who's our chief financial officer and chief compliance

22   officer, and I and our staff would be happy to have that kind

23   of informal dialogue with you --

24           MR. KOTZ:  Sure.

25           MS. PORTER:  -- and share with you our reactions

CONFIDENTIAL

1   and our views --

2         MR. KOTZ:  Yeah.

3         MS. PORTER:  -- if what you want is a takeaway that

4   could perhaps improve the model.  But that's not something

5   that I would ask you to do with --

6         MR. KOTZ:  Okay.  Sure.  Yeah, that would be, yeah,

7   just totally informal and just, you know, having a

8   conversation.

9         MS. PORTER:  Thank you.

10        MR. KOTZ:  Okay.  Why don't we just then start with

11  Henry and get to the specific questions.  Let me just first

12  say other than myself and Heidi, Francis Barron is here from

13  Cravath, Swaine & Moore, and Carla Porter, general counsel of

14  Renaissance Technologies.  And now I will direct my questions

15  to Henry Laufer.

16        Henry, could you just tell me just very briefly

17  your current position and, you know, your --

18        MR. LAUFER:  I'm a scientist at Renaissance.

19        MR. KOTZ:  Okay.  And how long have you been with

20  Renaissance?

21        MR. LAUFER:  Depends how you count.  But we tend to

22  say 1991 full-time.  I was part-time on and off before that.

23        MR. KOTZ:  And you've always been in the same role?

24        MR. LAUFER:  No.

25        MR. KOTZ:  Okay.

CONFIDENTIAL                                    RE00000109

Page 9

1          MR. LAUFER:  I was various titles.  At one point I

2   was vice president for research.

3          MR. KOTZ:  Where were you in -- what was your

4   position in 2003?

5          MR. LAUFER:  I don't know.  Was I chief scientist

6   then?  I was one of those -- I was one of those two.

7          MR. KOTZ:  Okay.  And can you just give me

8   generally what your duties are?

9          MR. LAUFER:  Sure.  So I helped design the trading

10  systems that we use.  It was mostly my title that changed,

11  not what I did.  Well, no, I take that back.  My

12  responsibility for other people has varied over time.

13         MR. KOTZ:  Okay.  But in terms of the substantive

14  duties, it's been basically the same?

15         MR. LAUFER:  That's right.

16         MR. KOTZ:  And so at a certain point you heard of

17  Bernie Madoff.  When do you remember you first heard about

18  Bernie Madoff?

19         MR. LAUFER:  It could be one of two instances.  So

20  Meritage, which is a -- which at that time, when I heard of

21  them, was -- I wouldn't call it a subsidiary of Medallion,

22  but it was closely associated with Medallion -- had an

23  investment in Meritage.  I sat on the appropriate committees,

24  and his name came up.

25         There was another time when we were thinking of

CONFIDENTIAL

Page 10

1    doing trading through his brokerage firm, and I met him at

2    that point. ut I can't tell you which one I heard of first.

3            MR. KOTZ:  Okay.  And so what was your perspective

4    when you met him?  I mean, how did --

5            MR. LAUFER:  Seemed okay to me.  So there was a --

6    not me, not him and I, the two of us -- there was a group

7    meeting.

8            MR. KOTZ:  Okay.

9            MR. LAUFER:  Seemed reasonable.

10           MR. KOTZ:  And were there, you know, whispers about

11   him at any point that you were aware of?

12           MR. LAUFER:  Oh, yeah.  There were always -- I

13   don't know, I mean, from that time this was my conduit.  But

14   he had passed on rumors -- I don't know where he got them --

15   of, you know, that Madoff does very -- you know, his returns

16   are astoundingly good and a lt suspicious in that sense.

17           MR. KOTZ:  Okay.

18           MS. STEIBER:  About what year are you first hearing

19   whispers from (inaudible) or rumors?

20           MR. LAUFER:  I don't remember.

21           MS. STEIBER:  Was it in the '90s?  Was it in the

22   (inaudible)?

23           MR. LAUFER:  I don't remember.  It was a long time

24   ago.

25           MR. KOTZ:  So it was -- but it was, you know, a

CONFIDENTIAL

Page 11

1  long time.  It wasn't in the last three or four years?

2           MR. LAUFER:  Oh, no, no.

3           MR. KOTZ:  It was years and years ago?

4           MR. LAUFER:  A long time ago.

5           MR. KOTZ:  Okay.  And then you heard -- in

6  connection with the fact that his returns were incredible and

7  suspicious, was there any more in terms of, you know, how he

8  was able to achieve it?  What was the rumor about, you know,

9  how he was able to make these -- get these great returns?

10          MR. LAUFER:  You really want me to repeat rumors?

11  I mean, these are --

12          MR. KOTZ:  Well, I mean, I think it's important for

13  us to have the feeling in the community.

14          MR. LAUFER:  This is totally worthless, but I'll

15  tell you what I heard.  Okay?

16          MR. KOTZ:  Okay.

17          MR. LAUFER:  That, you know, because he was a

18  broker dealer, he would see order flow and he would somehow

19  deduce from the order flow that he would see -- this is the

20  good side.  The good side is he would see order flow, and

21  from that he could deduce various market forces.  And

22  therefore, he could do things.

23          The bad side is he would see order flow and he

24  would front run.

25          MR. KOTZ:  Right.  Okay.

CONFIDENTIAL

RE00000112

1          MR. LAUFER: But those are just rumors.  I mean,

2    they're totally worthless rumors.  I'm sort of embarrassed to

3    even repeat them.

4          MR. KOTZ: Okay.  But then at a certain point there

5    was some due diligence done or some review in connection with

6    an investment.

7          MR. LAUFER: That's right.  But I was not really

8    part of that.

9          MR. KOTZ: Okay.

10          MR. LAUFER: Well, mainly I was on the -- I was on

11    the committee that heard various things, but I was not --

12    you'll have to ask another question.  I don't mean to

13    (inaudible).  In other words, yes, there was due diligence

14    somewhere around (inaudible), and yes I was in some sense

15    part of this.  But I --

16          MR. KOTZ: Okay.  Okay.  So when you were -- okay.

17          MR. LAUFER: I was sort of adjunct.  (Inaudible)

18    important or not.

19          MR. KOTZ: Yeah.

20          MR. LAUFER: But I really --

21          MR. KOTZ: What do you remember about the due

22    diligence?  Just what do you remember about --

23          MR. LAUFER: I'm sort of confused here.  There was

24    a report that was referred to, e-mails referred to.

25          MR. KOTZ: Right.

CONFIDENTIAL

RE00000113

1            MR. LAUFER:  If you want me to talk about that, I

2    know.  If you want me to talk about due diligence --

3            MR. KOTZ:  Sure.  Okay.  So let's talk about the

4    e-mails.

5            MR. LAUFER:  Okay.

6         MR. KOTZ:  What was the information that you all

7    had that you were referring to the SEC?

8            MR. LAUFER:  Okay.  Well, first of all, I didn't

9    refer anything to the SEC.  That was done in other parts of

10   Renaissance.

11           MR. KOTZ:  Okay.

12           MR. LAUFER:  Okay.  So we had looked into monthly

13   reports provided to us by friends and Madoff statements of a

14   Madoff managed account, or maybe two Madoff managed accounts.

15   I don't remember exactly.  And we were looking at them to try

16   and understand what Madoff was doing, both for seeing whether

17   it was a good idea to have an investment with them or whether

18   we can learn something from his style of trading.

19           So that was done under my supervision.  I didn't do

20   all the work, but that was done under my supervision.

21           MR. KOTZ:  And do you remember when that occurred?

22           MR. LAUFER:  Well, I -- a long time ago.  About

23   five years ago, something like that.

24           MS. STEIBER:  And who did the work?

25           MR. LAUFER:  Mark Rose-Brown (phonetic) and

CONFIDENTIAL

1   possibly other people. But I remember very much supervising

2   Mark Rose-Brown in this matter.

3          MR. KOTZ: How long of a process did it take?

4          MR. LAUFER: Again, it's a long time ago. I would

5   guess three to six months, would be my guess.

6          MR. KOTZ: So what kind of work was Mark Rose-Brown

7   doing that you were supervising?

8          MR. LAUFER: Well, as I said, we have access to

9   monthly statements from an account. And we had that

10  transcribed, and we were doing what I would call fairly

11  standard analysis, although unfortunately not quite so

12  standard because we hadn't -- we don't do the type of trading

13  that Madoff did. But we were attempting to understand

14  Madoff's trading in the style of -- that we trade.

15         MR. KOTZ: So what kind of steps would you take to

16  try and understand Madoff's trading?

17         MR. LAUFER: Well, first of all, this is -- you

18  transcribe it so that you can look at his profits on a

19  monthly basis. And you see if the -- if you can understand

20  what methods he was using or what style of trading he was

21  doing. Now, it isn't as if you press a button and out comes

22  the summary --

23         MR. KOTZ: Right.

24         MR. LAUFER: -- so you can look at it and -- but

25  his style of trading was what was out in the public domain,

CONFIDENTIAL

RE00000115

Page 15

1   and he would buy on -- I think -- I forget whether it was a

2   monthly or quarterly basis.  He would buy a basket, a very

3   ordinary basket of stocks, some very large capital stocks

4   like General Electric and Microsoft.

5         And he would at the same time -- I don't remember

6   whether he bought or sold, but he would create an options

7   portfolio which was very roughly the opposite of the stock

8   portfolio.  And presumably he made money by correctly

9   pricing -- in other words, by buying the options portfolio at

10  a good price relative to the price at which he bought the

11  stock portfolio.

12        MR. KOTZ:  And did you look into how he seemed to

13  be so good at picking the right price and the right time?

14        MR. LAUFER:  Well, in some sense, yes.  But we

15  really did not know.  That's speculative.

16        MR. KOTZ:  Right.

17        MR. LAUFER:  We did not know why he was so good at

18  what he did.

19        MR. KOTZ:  Okay.  Other than the statements you

20  mentioned, did you request any documents?  What else did you

21  get?  Did you get anything else from Madoff?

22        MR. LAUFER:  We got nothing from Madoff.  We got --

23  this is all from friends.  In other words, Madoff, as I

24  understand it -- and again, this is very old, okay -- so

25  normally speaking, if you have a managed account, you get a

CONFIDENTIAL

Page 16

1    monthly brokerage statement.

2         MR. KOTZ:  Right.

3         MR. LAUFER:  So we had access to monthly brokerage

4    statements, not provided to us by provided by friends.  And

5    we looked at the monthly brokerage statements from Madoff,

6    whatever the name of his company was.

7         MR. KOTZ:  Right.  And --

8         MR. LAUFER:  But we didn't contact Madoff directly.

9         MR. KOTZ:  Okay.  And you didn't look at anything

10   else other than that?

11        MR. LAUFER:  Well, of course we have access to our

12   database of prices.

13        MR. KOTZ:  Right.

14        MR. LAUFER:  So we knew what market prices were

15   involving this information about the items that appeared in

16   the brokerage statements.

17        MR. KOTZ:  Right.  Okay.  But that was the end of

18   it.  Okay.  And so what did you find during -- or this

19   individual who worked under you, what did he find?

20        MR. LAUFER:  Do you want a brief technical summary?

21        MR. KOTZ:  Sure.

22        MR. LAUFER:  Okay.  So this is very old, you know.

23   I wouldn't swear anything I told you was correct.

24        MR. KOTZ:  Okay.

25        MR. LAUFER:  Okay.  So we found -- so there's a

CONFIDENTIAL

1   stock side on which he purchases stocks.

2          MR. KOTZ:  Right.

3          MR. LAUFER:  And there's an options side in which

4   he purchases, as I said -- I don't remember if he brought or

5   sold because there's a lot of equivalence.  So there's a

6   stock side and there's an option side.

7          And so we found that the stock side, he was able to

8   buy -- so he was buying and selling stocks.  He was able to

9   report it that he was buying stocks at -- on any given day,

10  if he bought a stock, he managed to buy it -- or he'd report

11  that he bought it at prices that were very low.  And when he

12  sold stocks, he managed to sell stocks, or reported he sold

13  stocks, at prices that were very high.

14         So this was statistically almost impossible to do

15  if you were trading in an ordinary way.  In other words, an

16  ordinary way is you wake up in the morning and you decide to

17  buy 10,000 shares of General Electric.  And you're going to

18  buy those 10,000 shares -- you're probably going to get --

19  probably going to get them average price.  And he managed to

20  report a much more favorable than average price.  We had no

21  idea how he did that, although -- yes.

22         So it's all -- on the stock side, he seemed to do

23  very well.  And on the options side, he also seemed to do

24  pretty well.  We didn't have -- pricing of options is much

25  more difficult, nor am I some expert on that.  But the option

CONFIDENTIAL

RE00000118

1   price seemed to be okay.  He seemed to be -- we had no idea

2   how he did the volumes in options that he reported.

3         Should I continue here?

4         MR. KOTZ:  Sure.

5         MR. LAUFER:  Okay.  So we only have access to one

6   or maybe two accounts, which was small accounts.  And it

7   was -- you could certainly do those volumes in those

8   individual accounts, no question about it.  And then there

9   were rumors that he was managing billions of dollars.  So we

10  didn't know how he managed -- if you assumed that whatever we

11  saw in our accounts, he did the same thing for every other

12  account, we didn't understand how he possibly could do those

13  option trades.

14        MS. STEIBER:  Why didn't you understand, based on

15  the size, how he could do it in the two accounts but he

16  couldn't do it in the larger accounts?  Could you please

17  explain how size mattered to you?

18        MR. LAUFER:  Well, there's a certain -- I don't

19  remember the numbers.  Okay?  But there's a certain reported

20  volume every day of how many options are bought and sold.  So

21  if you looked at the options he traded in our account and

22  then you multiply it -- I don't remember the numbers.

23        Let's suppose our accounts were for $10 million,

24  and you assumed he had $10 billion.  So you multiplied

25  whatever he had in our account by a thousand.  So you look at

CONFIDENTIAL

RE00000119

Page 19

1   the volumes he executed in our account and made this very

2   large assumption that he had every account run the same way

3   and that he had in fact a thousand times the amount of money.

4       You could take the volumes he did in our account,

5   multiply it by a thousand, and compare that to the published

6   volume. And you saw -- I don't remember whether it was

7   larger or it was about the same size. It was just not

8   something you could do. There wasn't enough activity out

9   there.

10      He was doing more volume -- assuming; I keep

11  repeating this. Assuming that he was managing the amounts of

12  money we had heard that he might have been managing -- I

13  mean, we're in the business of doing executions. And we

14  could never conceive of doing such a large volume in the

15  standard way, in the standard market.

16      MS. STEIBER: You were just saying that you were

17  looking at the published option numbers. What if he were

18  doing it over the counter?

19      MR. LAUFER: That's much more delicate. Yes, it's

20  possible. You're entering into larger and larger

21  speculations here. I mean, I could tell you what we might

22  have speculated. So I'm comparing it to published volumes,

23  and it seemed to us you just couldn't do it.

24      But the people who trade volumes over the counter

25  are not stupid, and so they -- whatever they did would

CONFIDENTIAL                                                    RE00000120

1   reflect public -- would be reflected in the public volume.

2   And so --

3          MS. STEIBER:  Explain that, how it's reflected in

4   the public volume.

5          MR. LAUFER:  Well, you would see -- you could ask

6   your friends, traders.  I'm sorry.  Maybe I misspoke here.

7   And I'm also pushing.  This is -- I'm not an expert here, so

8   I have to -- you know, this is not my field of expertise.

9          So you go down to our trading desk.  All right?

10  And you say, gee, it looks like Madoff on these days, you

11  know, was executing volumes the same size as here.

12         Call up your friends in the options market and ask

13  them, is anybody buying and selling?  Yes, it's possible that

14  somebody secretly was doing this.  But, you know, this is

15  not -- there aren't that many big secrets.  There was no --

16  there were no rumors of large volumes going on on these days.

17         Now, it's true it's possible.  They could have been

18  somebody, somewhere.

19         MS. STEIBER:  But unlikely?

20         MR. LAUFER:  Well, in retrospect, no.

21         (Laughter.)

22         MR. LAUFER:  But it struck us as unlikely.  That's

23  all I can say.  These were sort of wild guesses.

24         MR. KOTZ:  And so as a result of this, what were

25  your --

CONFIDENTIAL

RE00000121

Page 21

1          MR. LAUFER:  Finally, the last thing he did was he

2     did not do this every -- I don't remember whether his cycle

3     was monthly or quarterly.  He did not do this every month or

4     every quarter.  And it seemed to us that the quarters --

5     let's say it was quarterly; I don't remember -- the quarters

6     that he did not participate -- in other words, sometimes his

7     position would go to zero.

8          It seemed to us that the quarters that he'd decide

9     to go to zero were exceptionally good quarters to have no

10    position.  So he seemed to have some predictive value for the

11    market as a whole.

12         MS. STEIBER:  Explain -- explain that.  I don't

13    understand when you say the quarters went to zero.

14         MR. LAUFER:  As I said, first of all, I keep

15    repeating this because -- I don't remember whether he

16    would -- his reports, whether the trading would have a

17    quarterly cycle or a monthly cycle.  Let's suppose it's a

18    quarterly cycle.

19          :    So the idea was -- we're the peers.  At the

20    beginning of the quarter -- and I don't remember if this was

21    a calendar quarter or an option cycle quarter -- at the

22    beginning of the quarter, he would put out a position, a

23    position consisting of buying stocks and establishing an

24    option portfolio.

25         At the end of the quarter, he would typically

CONFIDENTIAL

RE00000122

1  unwind the position and establish a new position. Now,

2  sometimes, if I remember correctly, he would keep that

3  position for another quarter without any trade ever quarter.

4  But sometimes, after unwinding the position, he would not

5  reestablish a new position. He would have positions of all

6  zero, and the account would show zero balance -- I'm sorry,

7  zero cash.

8        MS. STEIBER: So it was (inaudible) cash.

9        MR. LAUFER: Only cash. It seemed to us that those

10  quarters in which he decided to go into zero cash were

11  quarters in which, if you blindly tried to do what he was

12  doing, you would have lost money, it seemed to us.

13        So he seemed to be very good at predicting when his

14  basic strategy would make money or lose money. We had no

15  idea how he -- we had no speculation how he managed to do

16  that.

17        MR. KOTZ: And in your experience, had you seen,

18  you know, other examples of people being able to do that to

19  that degree?

20        MR. LAUFER: The quick answer is no, but the better

21  answer is it's not very easy or we don't have access to

22  people's managed accounts. So this was not -- it's not too

23  often that we get an opportunity to see what a trader is

24  doing.

25        MR. KOTZ: Okay. And so what was your kind of

CONFIDENTIAL

RE00000123

1   initial conclusion from looking at this?

2         MR. LAUFER:  We didn't understand what he was

3   doing.  We didn't understand how he was doing what he was

4   doing.  Maybe that's the same statement.

5         MR. KOTZ:  Okay.  And so what would that mean,

6   necessarily?  It's just -- it's a matter of you guys not

7   being comfortable because of your lack of understanding?

8         MR. LAUFER:  Yes.  That's probably a fair

9   statement.

10        MR. KOTZ:  Okay.  And then did you have any

11  suspicions about what could be happening?

12        MR. LAUFER:  Well, the suspicions that I had -- I

13  don't want to speak for other people -- were questions of,

14  you know, front-running.  In other words, I didn't -- okay.

15  We didn't understand -- there are several things we didn't

16  understand.

17        So first of all, we didn't -- let's break it up

18  into stock trading and options trading.  I know more about

19  the stock trading than about the options.  Let's take the

20  options trading first.  So we didn't understand the volumes

21  that he was doing, how he managed to do those volumes.

22        MR. KOTZ:  Right.

23        MR. LAUFER:  You have to ask who took the other

24  side.  And since Madoff was such a profitable trader, why

25  would anybody want -- so if you -- once you -- once you leave

CONFIDENTIAL

RE00000124

Page 24

1   the public trading, okay, like I said, there seemed to be

2   absolutely no way he could do this on the exchange trades or

3   the standard over-the-counter method because there wasn't the

4   volume there.

5           MR. KOTZ:  Right.

6           MR. LAUFER:  Then you ask, well, suppose he did it

7   through private parties?  Since Madoff was well-known to have

8   very steady returns, why would anybody take the other side of

9   a Madoff trade?  Or if they did, they would be exceedingly

10  careful.

11          MR. KOTZ:  Okay.

12          MR. LAUFER:  So we don't understand how he managed

13  to execute the options.

14          MS. STEIBER:  So you didn't really think he was

15  trading options?

16          MR. LAUFER:  No.

17          MS. STEIBER:  Or (inaudible)?  No?

18          MR. LAUFER:  We didn't understand -- to say that we

19  didn't think is -- we didn't understand.

20          MS. STEIBER:  You didn't understand how he traded

21  options, but you still thought he was trading options?  Did

22  you suspect --

23          MR. LAUFER:  You're asking me what I thought four

24  or five years ago.  All I can say is I thought he was somehow

25  managing to do that, but I didn't understand how he was doing

CONFIDENTIAL                                          RE00000125

1    it.  I didn't understand why he was doing it.  I didn't

2    understand many things.  But it did not occur to me that he

3    was -- there was some possibility he wasn't doing it.  But I

4    don't know, it was very strange.

5            MR. KOTZ:  So when you said there's some

6    possibility he wasn't doing it, you mean not trading the

7    options at all?

8            MR. LAUFER:  Doing something else.  I don't know.

9    We didn't -- we weren't sure what he was doing.

10            MS. STEIBER:  Because you said you didn't see the

11    volume on the -- on CBOE.

12            MR. LAUFER:  Yes.

13            MS. STEIBER:  So you knew he wasn't trading options

14    (inaudible).

15            MR. LAUFER:  Well, we couldn't see how he could

16    possibly be doing them there.

17            MS. STEIBER:  And then you couldn't see how he

18    could be trading the options (inaudible).

19            MR. LAUFER:  Well, that was different.  We couldn't

20    see -- we didn't understand how he could be doing it because

21    of the various things that I said that -- we made inquiries.

22    We didn't see anybody saying he did a lot of trading.  We

23    didn't understand why anybody in the business of options

24    would take the other side.

25            MS. STEIBER:  Right.

CONFIDENTIAL

1          MR. LAUFER:  But it doesn't mean that somehow --

2   look.  I mean (inaudible).

3          MS. PORTER:  You're doing fine.

4          MR. LAUFER:  Suppose you weren't me, and you didn't

5   know that Renaissance was legitimate, and you saw the

6   Renaissance returns.  You would say, they couldn't do what

7   they were doing.  Everything that I was saying about Madoff

8   you would say about Renaissance.

9          MR. KOTZ:  Well, what about the aspect of looking

10  at where the options trading could have been?  I mean, what

11  about that other aspect?  Wasn't it more than just the

12  returns, but the fact that you just didn't see the volume?

13         MR. LAUFER:  Yeah.  Why didn't they -- you're

14  asking me.  Of course.

15         MR. KOTZ:  Right.  Well, that's what I'm trying to

16  get at.

17         MR. LAUFER:  But why should we go -- I mean --

18         MR. KOTZ:  No, no.  I'm not suggesting you should

19  have done anything.  I'm just trying to understand it from

20  the eyes of the regulator.  In other words, what I'm trying

21  to understand is:  Shouldn't the regulator have looked at it

22  the same way --

23         MR. LAUFER:  Yeah.

24         MR. KOTZ:  -- and seen the lack of volume, and not

25  only thought perhaps there was some front-running, but

CONFIDENTIAL

1    perhaps there wasn't trading at all?  I mean, isn't that

2    something that --

3          MR. LAUFER:  That was small possibility, that

4    somehow --

5          MR. KOTZ:  I mean, that would be one of the logical

6    conclusions that one would come to if you saw what you saw

7    (inaudible) somebody who had the --

8          MR. LAUFER:  But excuse me, let me -- I apologize.

9    Let me ask you something (inaudible).

10          MR. KOTZ:  -- somebody who had the (inaudible)

11    responsibility.  But I'm just saying --

12          MR. LAUFER:  Something much simpler.  You don't

13    have to ask that question.

14          MR. KOTZ:  Okay.

15          MR. LAUFER:  You ask:  Who took the other side of

16    the trade?  You don't have to deduce huge amounts.  Just ask

17    who took the other side of the trade, which of course we

18    couldn't find that.

19          MR. BARRON:  All right.  You didn't have the power

20    to do that.

21          MR. KOTZ:  Right.  Right.  No, I understand.

22          MR. BARRON:  A regulator might have had the power

23    to go to Madoff and say, who's on the other side of your

24    trades.

25          MR. LAUFER:  And that would answer all the

CONFIDENTIAL

1   questions, you know, who took it, or maybe he didn't do it,

2   or --

3          MR. KOTZ:  I mean, and don't you think that if you

4   had done kind of a thorough review, you would have had to

5   have asked that question as a regulator?

6          MR. LAUFER:  Yes.  I would think so.

7          MS. STEIBER:  You had just been talking about the

8   options trading.

9          MR. LAUFER:  Yes.

10          MS. STEIBER:  And then you said you were going to

11   move on to --

12          MR. LAUFER:  (Inaudible) stock trading, which I

13   know more about, both because I trade them -- (inaudible)

14   trade them but, you know, I'm closely involved with that, and

15   because I was more closely involved with that part of the

16   analysis.

17          So again, you look at the fills.  Now, these are --

18   I have to say -- well, which you may not know about, I mean,

19   technical stuff.  If you look at the fills for the stocks,

20   they are very, very good in terms of he's buying at the low

21   and selling at the high, which is extraordinarily hard to do.

22   And we would have loved to figure out how he did it so we

23   could do it ourselves.  And so that was very suspicious.

24          And then you can make better guesses on that

25   because you can say, well, the guess was that he's in the

CONFIDENTIAL

RE00000129

1    stock trading business, and he was somehow cherry-picking the

2    trades that he ran through his company, which he shouldn't

3    have been doing.  But that's -- there are ways -- not only

4    wouldn't we do this, we couldn't do this.  But there are ways

5    you can guess what you would manage.  And then you ask why he

6    did it.  But you could guess.

7           And this is also a question of volumes here, too.

8    So for a small account, you could somehow manage to imagine

9    that he has this whole big operation, and he picks off a few

10   trades and he puts them in, and he could physically do it.

11   But you have to wonder whether he could do it for a large --

12   I don't know.

13         MS. STEIBER:  Why would you wonder how he could do

14   it for a large group of trades?  As his organization got

15   bigger, why is it less likely that he could be

16   cherry-picking?

17         MR. LAUFER:  Okay.  Now, I'm guessing -- no, I'm

18   saying.  I'm not -- okay.  If you don't know what he was

19   doing (inaudible) do anything.  Okay.  But you're asking what

20   he could have been doing if he was a crook.  I mean, I'm

21   sorry, let me rephrase this.

22         Suppose that I decided to be a crook and I wanted

23   to produce statements of this type.  How could I do that?

24   Okay.  So here we run an operation, a trading -- a brokerage

25   firm.  Then there are trades that run through.  And some of

CONFIDENTIAL

RE00000130

1   them will be buys at the lowest of the day, and some of them

2   will be sells at the highest of the day.

3          And you could give those -- which you shouldn't

4   do -- you could give those trades to individual customers.

5   But the number of trades you're doing at the bottom of the --

6   bottom price, that's determined by your organization.  And if

7   you had many, many customers, you may not have enough trades.

8          MS. STEIBER:  Wouldn't your customers be more

9   likely to notice if you're doing a huge amount of

10   cherry-picking (inaudible)?

11          MR. LAUFER:  No, because each customer is small.

12   You're not following me here.

13          MS. STEIBER:  Why don't you explain, then.  My

14   understanding, would you agree that it would be easy for him

15   if he were just running, let's say, a few million dollars, to

16   be cherry-picking where the account is small (inaudible).

17          MR. LAUFER:  Only because -- only compared to the

18   fact that his main brokerage operation was presumably running

19   hundreds of millions of dollars of trades every day.  The

20   number of trades that -- it doesn't matter.

21          (Inaudible) you have an organization.  All right?

22   Merrill Lynch or whoever, Goldman Sachs.  There could be a

23   lot of trades throughout the day.  And some of those trades

24   will be buys at low prices.  Now, the question is, which

25   customer gets that?  Presumably the person who put that order

CONFIDENTIAL

Page 31

1    in, or if your instructions were to buy throughout the day,

2    you would get the certain fraction of those.

3          So some customers would get that because they were

4    smart or lucky. Okay. But if you were a crook, you

5    presumably could take those trades and give it to some

6    favorite customers. But if you are -- if every customer were

7    favored, you couldn't, because only some small fraction of

8    the trades were (inaudible).

9          So it's a question of scale, of how many customers

10    you have versus how many you want to cherry-pick.

11          MR. BARRON: That's if you consider -- if you

12    assume a normal distribution. Right? Of the trades?

13          MS. PORTER: It doesn't matter.

14          MR. LAUFER: It doesn't matter. In this

15    instance --

16          MR. BARRON: It doesn't matter?

17          MR. LAUFER: No. If -- yes and no. You don't have

18    to make such a fine statement.

19          MS. PORTER: They were all managed accounts. It

20    wasn't a fund. They were individual managed accounts. It

21    wasn't a fund.

22          MR. BARRON: Okay. Okay.

23          MS. PORTER: So there are only so many top trades.

24    Right?

25          MR. LAUFER: Yes.

CONFIDENTIAL
RE00000132

Page 32

1          MS. PORTER:  So who's getting them?  Because

2    they're not going into one pool.  They're going into itty,

3    bitty accounts.

4          MR. BARRON:  I understand.

5          MR. LAUFER:  Okay.  Now, there's another issue

6    here, which I don't -- which is very important technical --

7    speaking to somebody else, technical stuff.  So when you

8    buy -- or when you buy or you sell an option, there's a fair

9    amount of risk associated with that, depending on whether or

10   not the underlying goes up or down.

11          And so if you are a purchaser, if you are involved

12   in an option trade, you are concerned about the underlying

13   risk regarding what will happen.  And if it's an option on

14   General Electric or that General Electric will go up and

15   down, or if you're buying an option on a basket of -- a

16   basket of (inaudible) stocks, you're about (inaudible) go up

17   or down.

18          And the person who -- if you're buying an option,

19   the person who sells you an option would much rather give you

20   a better price, if you want it, in terms of there's a certain

21   fair bid/ask spread, if you like, that the person selling the

22   option is entitled to because he's taking a certain amount of

23   risk.

24          If his risk is less, he'll tend to give you a

25   fairer price.  So if the person selling you the option has

CONFIDENTIAL