Hearing Date:  October 28, 2015, 10:00 a.m.
Response Deadline: August 27, 2015

**STEVENS & LEE, P.C.**
485 Madison Avenue
New York, New York 10022
Nicholas F. Kajon
(212) 537-0403
(610) 371-1223 (fax)
nfk@stevenslee.com

*Attorneys for Legacy Capital Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | SIPA LIQUIDATION |
| Plaintiff-Applicant, | No.  08-01789 (SMB) |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor, | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05286 (SMB) |
| Plaintiff, | |
| v. | |
| LEGACY CAPITAL LTD. and KHRONOS LLC, | |
| Defendants. | |

**LEGACY CAPITAL LTD.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION**
**TO DISMISS THE AMENDED COMPLAINT UNDER BANKRUPTCY**
**RULE 7012(b) AND FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ......................................................................1

STATEMENT OF FACTS ...............................................................................4

    I.    LEGACY, KHRONOS AND BNP .................................................4

    II.    RENAISSANCE TECHNOLOGIES, LLC ......................................6

    III.    THE CENTRAL CONTENTION OF THE AMENDED COMPLAINT IS CONTRADICTED BY FACTS CONTAINED IN DOCUMENTS EXPRESSLY RELIED ON BY THE TRUSTEE ................................................7

ARGUMENT ..................................................................................................11

    I.    COUNTS II THROUGH VII SHOULD BE DISMISSED BECAUSE THE SECTION 546(E) SAFE HARBOR BARS THOSE COUNTS ..........................12

    II.    THE TRUSTEE'S CLAIM TO RECOVER PRINCIPAL SHOULD BE DISMISSED BECAUSE LEGACY WAS NOT WILLFULLY BLIND TO THE PONZI SCHEME ......................................................................16

        1.    The Trustee Has Pled Facts Showing Legacy Gave Value ...........17

        2.    The Trustee Has Failed To Meet His Burden Of Pleading Legacy Was Willfully Blind To The Fraudulent Scheme .............17

CONCLUSION ...............................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Asahi Glass Co., Ltd. v. Pentech Pharm., Inc.*,
  289 F. Supp. 2d 986 (N.D. Ill. 2003)...................................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .........................................................................................................12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................... 11, 12

*Benedict v. Amaducci*,
  No. 92 CIV. 5239, 1995 WL 702444 (S.D.N.Y. Nov. 28, 1995) ...........................................4

*Jeanette Coquette Co. v. Hartford Fire Ins. Co.*,
  No. 93 CIV. 4418 (KMW), 1995 WL 363864 (S.D.N.Y. June 19, 1995) .............................4

*Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
  740 F.3d 81 (2d Cir. 2014) ......................................................................................... 16, 17

*Newman v. Family Mgmt. Corp.*,
  748 F. Supp. 2d 299 (S.D.N.Y. 2010), *aff'd*, 530 F. App'x 21 (2d Cir. 2013)......................18

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011)............................................................................................16

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*,
  458 B.R. 87 (Bankr. S.D.N.Y. 2011) .................................................................................12

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................................passim

*SEC v. Cohmad Sec. Corp.*,
  No. 09 Civ. 5680(LLS), 2010 U.S. Dist. Lexis 8597 (S.D.N.Y. Feb. 1, 2010)......................18

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  516 B.R. 18 (S.D.N.Y. 2014)................................................................................. 13, 16, 17

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.) (Greiff)*,
  476 B.R. 715 (S.D.N.Y. 2012), *aff'd*, 773 F.3d 411 (2d Cir. 2014), *cert.
  denied*, 135 S. Ct. 2858 (2015), *cert. denied*, 135 S. Ct. 2859 (2015) ............................ 13, 16

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  No. 12 MC 115(JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)....................................13

**PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT**

*Stephenson v. Citco Grp. Ltd.*,
   700 F. Supp. 2d 599 (S.D.N.Y. 2010), *aff'd sub nom. Stephenson v.
   PricewaterhouseCoopers LLP*, 482 F. App'x 618 (2d Cir. 2012).........................................18

STATUTES

11 U.S.C. § 546(e) ................................................................................................. 1, 13, 14, 16

11 U.S.C. § 548(a)(1)(A)..................................................................................................passim

11 U.S.C. § 548(a)(1)(B).........................................................................................................13

11 U.S.C. § 548(c) ..................................................................................................................16

Legacy Capital Ltd. ("**Legacy**") respectfully submits this memorandum of law in support of its motion to dismiss the amended complaint filed by Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("**BLMIS**") (the "**Trustee**") on July 2, 2015, ECF No. 112 (the "**Amended Complaint**").

## PRELIMINARY STATEMENT

In this action, the Trustee seeks to recover transfers of both principal and net profits made to Legacy, a fund that invested in BLMIS. The Amended Complaint against Legacy fails for numerous reasons and all claims should be dismissed, except for the claim seeking the return of net profits under section 548(a)(1)(A) of the Bankruptcy Code.

As an initial matter, the safe harbor provided under section 546(e) of the Bankruptcy Code requires dismissal of all claims asserted against Legacy in the Amended Complaint except for Count I under section 548(a)(1)(A) (and, as explained further below, the section 548(a)(1)(A) claim also should be dismissed to the extent that it seeks the return of the principal amount of Legacy's investment). The Trustee attempts in vain to circumvent the section 546(e) safe harbor by pleading that Legacy knew of the BLMIS Ponzi scheme. But this aggressive attempt to circumvent the safe harbor fails because the allegations of actual knowledge are conclusory, implausible and not supported by any facts. There simply are no facts pled from which this Court can plausibly infer that Legacy subjectively believed that BLMIS was a Ponzi scheme – and there certainly are no facts suggesting "direct and clear knowledge" of the Ponzi scheme or a "high level of certainty" that BLMIS was a Ponzi scheme. Accordingly, the section 546(e) safe harbor requires dismissal of Counts II through VII against Legacy.

Further, with respect to the only surviving claim against Legacy, which is Count I arising under section 548(a)(1)(A) of the Bankruptcy Code, the portion of that claim seeking to avoid and recover BLMIS's return of principal to Legacy should be dismissed. The Trustee is not

entitled to recover principal payments to Legacy, because the Amended Complaint fails to plead that Legacy was willfully blind to the BLMIS Ponzi scheme.

The relevant allegations in the Amended Complaint amount to nothing more than vague criticism of the due diligence efforts undertaken by Legacy, through its service provider (Khronos LLC ("**Khronos**")), when Legacy became aware of certain "red flags" concerning BLMIS's operations. Specifically, according to the allegations in the Amended Complaint, Legacy, through one of its officers, became privy in 2003 to an analysis performed by Renaissance Technologies, LLC ("**Renaissance**"), in which Renaissance personnel raised "red flag" concerns about BLMIS. Instead of ignoring the concerns raised by Renaissance, the Amended Complaint concedes that Legacy's response to this information was to undertake further analysis of its BLMIS investment with Khronos' assistance. In other words, the Amended Complaint itself pleads the opposite of willful blindness – rather than turn away from these red flags, Legacy investigated them.

It is quite clear that the Amended Complaint tells only half of the story. It omits any detailed description of Legacy's due diligence efforts and does not explain what Legacy's conclusions were as a result of those efforts. In and of themselves, these noteworthy omissions render the Trustee's allegations of willful blindness deficient and implausible, because there is no basis from which any inferences can be drawn about Legacy's subjective beliefs about BLMIS.

The Amended Complaint fails to plausibly allege Legacy's willful blindness for many other reasons as well. The allegations in the Amended Complaint are contradicted by the very documents relied on by the Trustee. To provide just one example (many others are described elsewhere in this brief), while the Trustee contends that the Renaissance analysis described in the

2

Amended Complaint showed that BLMIS was operating a Ponzi scheme, the Renaissance personnel themselves involved in that analysis stated clearly on numerous occasions to the SEC that they did not suspect that Madoff was operating a Ponzi scheme.

The Amended Complaint fails to allege any fact from which it may be inferred that Legacy (or any of its agents) subjectively believed that there was a high probability that BLMIS was operating a Ponzi scheme. In other words, while the Amended Complaint pays lip service to the applicable willful-blindness standard, its recitation of that standard is merely a bare legal conclusion unsupported by plausible allegations of fact.

In sum, on the issue of willful blindness, it is clear that the Trustee is reflexively attempting to slap a "willful blindness" label on a situation that is really nothing more than the Trustee using the benefit of hindsight to second-guess Legacy's genuine due diligence efforts. Such allegations would have been insufficient to satisfy the constructive-knowledge standard previously applied by some courts – and they certainly are woefully insufficient to satisfy the willful-blindness standard that governs this case. Accordingly, the Trustee's claim for the recovery of principal payments made to Legacy should be dismissed, and the only claim in the Amended Complaint that Legacy should be required to answer is the claim for net profits under section 548(a)(1)(A) of the Bankruptcy Code.

The Amended Complaint's failings are particularly egregious in this case, which is now more than four-and-a-half years old and where the Trustee sought and received extensive pre-complaint discovery from both Khronos and Renaissance under Rule 2004 of the Bankruptcy Rules. To avoid unnecessary motion practice about leave to amend the complaint and in an effort to advance this case towards resolution, Legacy consented to allow the Trustee the "second bite at the apple" reflected in the Amended Complaint. The Trustee has now had more than

3

ample opportunity to try to plead a viable claim against Legacy. Under these circumstances, this

Court should dismiss the claim against Legacy with prejudice. *Benedict v. Amaducci*, No. 92

CIV. 5239, 1995 WL 702444, at *9 n 5 (S.D.N.Y. Nov. 28, 1995); *Jeanette Coquette Co. v.*

*Hartford Fire Ins. Co.*, No. 93 CIV. 4418 (KMW), 1995 WL 363864, at *5 (S.D.N.Y. June 19,

1995) (dismissing counterclaims with prejudice, in part, because party already amended

counterclaims once).

## STATEMENT OF FACTS

Most of the facts set forth below are based upon the allegations in the Amended

Complaint. As with any motion to dismiss, this Court is largely confined to the Trustee's version

of events in connection with this motion, though Legacy does not concede the truth of any of the

Trustee's allegations. As explained in Part III of this Statement of Facts, however, the central

contention of the Amended Complaint – that the Renaissance Report (defined below) imparted

actual knowledge of the BLMIS fraud to Legacy or rendered Legacy willfully blind to the fraud

– is contradicted by documents expressly relied on by the Trustee.

In fact, as demonstrated below, the Trustee selectively quotes from the various

Renaissance documents to give a false impression of what was known at the time by Renaissance

and other parties. On that critical issue, this Court is not bound by the Trustee's false version of

events, but instead may consider those additional facts, as well as use common sense, to reject

the implausible inferences urged by the Trustee.

## I.    LEGACY, KHRONOS AND BNP

Legacy is a British Virgin Islands company formed in 2000. Am. Compl. ¶¶ 32-33.

Legacy invested in BLMIS through Account No. 1FR071 (the "**Legacy Capital Account**"). *Id.*

¶ 33. In connection with its operations, Legacy entered into a January 1, 2004 accounting

services agreement with Khronos (the "**Accounting Services Agreement**") (attached to the

accompanying Declaration of Nicholas F. Kajon, dated July 30, 2015 (the "**Kajon Declaration**"), as Exhibit A (MAY0019168-74)). Am. Compl. ¶¶ 35, 52. Khronos is a limited liability company that provides investment management services and is named as a subsequent transferee in the Amended Complaint, in part, based on fees that Khronos received for the accounting services it provided to Legacy. *Id.* ¶¶ 30, 35, 147-155. According to the Amended Complaint, Khronos was founded by Rafael Mayer and David Mayer, who were also two of its managing directors. *Id.* ¶¶ 1, 31. Rafael Mayer was also an officer of Legacy. *Id.* ¶¶ 1, 33.

The Trustee alleges that during the six years prior to the December 2008 filing date (the "**Filing Date**"), BLMIS made payments or other transfers from the Legacy Capital Account in the amount of $212,800,000. Am. Compl. ¶ 143. This included $125,800,000 transferred directly to Legacy and $87,000,000 transferred directly to BNP Paribas Dublin Branch ("**BNP**") as a partial repayment of a $100 million secured loan pursuant to a July 26, 2004 credit agreement between BNP and Legacy (the "**Credit Agreement**") (the "**Six Year Transfers**"). Am. Compl. ¶¶ 140, 142-43; Am. Compl. Ex. A. During the two years prior to the Filing Date, BLMIS made transfers from the Legacy Capital Account in the amount of $174,000,000. Am. Compl. ¶ 144. This included $87,000,000 transferred directly to Legacy and $87,000,000 transferred directly to BNP (the "**Two Year Transfers**"). *Id.* ¶ 144; Am. Compl. Ex. A. The Trustee seeks to recover both the Six Year and Two Year Transfers solely from Legacy, as an initial transferee, including those transfers made directly to BNP. [1] *See* Am. Compl. Counts I-VII.[2]

---

[1]    The Trustee has voluntarily dismissed BNP from this action. *See* July 2, 2015 Stipulation and Order Amending Caption and Amending Complaint (ECF No. 111).

[2]    Although the Amended Complaint contains allegations about transfers that occurred before the Six Year Transfers, any claims as to these transfers are time-barred. Am. Compl. ¶ 142.

## II.    RENAISSANCE TECHNOLOGIES, LLC

In support of many of his allegations against both Legacy and Khronos in the Amended Complaint, the Trustee relies almost exclusively on communications that Rafael Mayer supposedly received from personnel at Renaissance, alleged to be a New York hedge fund management company.  Am. Compl. ¶ 38.  Specifically, Rafael Mayer sat on an investment oversight committee (the "**Meritage Committee**") for Meritage Fund Ltd. ("**Meritage**"), an investment fund affiliated with Renaissance.  *Id.* ¶¶ 1, 40-41.  Among other investments, Meritage indirectly invested with BLMIS through a swap agreement.  *Id.* ¶ 39.  Central to the Trustee's claims is a 2003 analysis of BLMIS that Renaissance shared with the Meritage Committee, including Rafael Mayer, on October 6, 2003 (the "**Renaissance Report**") (attached to the Kajon Declaration as Exhibit B (RE00004136-81)).  *Id.* ¶¶ 46-47.  The Renaissance Report raises concerns about Meritage's indirect investment in BLMIS.  *See infra* note 5; Am. Compl. ¶ 47.

The Trustee falsely suggests that the Renaissance Report led the Meritage Committee to conclude that BLMIS was a Ponzi scheme and prompted the Meritage Committee to immediately withdraw its indirect investment in BLMIS through Legacy.  Am. Compl. ¶¶ 2, 47-51.  The Trustee contends that Rafael Mayer's knowledge of the Renaissance Report, which prompted Legacy to engage Khronos to further analyze the BLMIS investment, imparted to Mr. Mayer actual knowledge of the fraud, which knowledge the Trustee then imputes to Legacy and Khronos.  *Id.* ¶¶ 53-54, 145, 153.  Essentially relying on those same allegations, the Trustee also contends, alternatively perhaps, that Legacy and Khronos were willfully blind to the BLMIS Ponzi scheme.  *Id.*  It should be noted that, while the Amended Complaint concedes that the Renaissance Report prompted Legacy to have Khronos further analyze the BLMIS investment, the Amended Complaint does not state what further analysis Khronos performed or what it

6

concluded.  *Id.* ¶ 52.  In other words, the Amended Complaint is devoid of any allegations concerning Legacy's subjective understanding of BLMIS.

## III.    THE CENTRAL CONTENTION OF THE AMENDED COMPLAINT IS CONTRADICTED BY FACTS CONTAINED IN DOCUMENTS EXPRESSLY RELIED ON BY THE TRUSTEE

The Trustee's core premise – that the Renaissance Report provided Rafael Mayer with actual knowledge that BLMIS was a fraudulent scheme – is flawed because no one, including Renaissance, Meritage, Rafael Mayer, Legacy or Khronos, knew or suspected that BLMIS was a Ponzi scheme.  When read in its entirety, the record that the Trustee relies on and quotes selectively from in the Amended Complaint, including (i) the Renaissance Report itself, *see* Am. Compl. ¶ 47; Kajon Decl. Ex. B; (ii) emails among some, but not always all, of the Meritage Committee members, *see, e.g.*, Am. Compl. ¶ 62; November 21, 2003 email from Paul Broder (RE00000240), a copy of which is attached to the Kajon Declaration as Exhibit C; and (iii) transcripts of interviews conducted by the U.S. Securities and Exchange Commission with employees of Renaissance, Paul Broder ("**Broder**"), Nathaniel Simons ("**Simons**") and Henry Laufer ("**Laufer**") (collectively, the "**SEC Transcript,**" attached to the Kajon Declaration as Exhibit D), *see* Am. Compl. ¶ 77, leads to the conclusion that no defendant knew of, or was willfully blind to, the fact that BLMIS was a Ponzi scheme.

As discussed more fully below, Legacy (and, in its own motion to dismiss, Khronos) disputes the Trustee's false characterization of the documents on which he relies in the Amended Complaint.  The Court is permitted to consider other portions of these same documents on this motion to dismiss, because the Court may consider documents "that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit.  Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss."

7

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 137 (Bankr. S.D.N.Y. 2014) (citation omitted).

The documents relied on by the Trustee in drafting the Amended Complaint consistently reflect that Renaissance and the Meritage Committee did not believe or even suspect that Madoff was operating a Ponzi scheme. Quite to the contrary, the facts show that members of Renaissance and the Meritage Committee thought that the possibility of this being a fraud was "far-fetched," and that the possibility of fraud did not even occur to them. By way of example, when interviewed by the SEC, Broder, Simons and Laufer all said that they did <u>not</u> conclude that Madoff was perpetrating a fraud:

- Broder stated, "I think if you're asking did we come to the conclusion that there was a fraud going on, I would say we didn't." SEC Tr. 34:23-25 (RE00000095).

- Laufer stated, "Well, the suspicions that I had – I don't want to speak for other people – were questions of, you know, front-running." *Id*. at 23:12-14 (RE00000124).

- Regarding the Meritage Committee considering withdrawing its BLMIS investment, Simons stated, "And so there was certainly not uniformity in terms of the view on Madoff at that time, again, *because we weren't really contemplating that it was a Ponzi scheme*." *Id*. at 28:5-7 (RE00000184) (emphasis added).

- Simons stated, "And so I guess I was given a false sense of security by the nature and the structure of Madoff that the likelihood of it being an out-and-out scam was quite – was quite low." *Id*. at 40:22-25 (RE00000196).

- Simons stated, "So I guess we felt, again, you know, with being such a public figure, being – having such – you know, being a large – you know, a large market-maker, all the other activities, the idea of out-and-out fraud struck me as just too far-fetched. I mean, I'm sorry, it didn't strike me. It was probably too far-fetched for me

to get my arms around, which is why it never really
occurred to me, which is why I wasn't pounding the table
at that time saying, we have to get out entirely because
I'm not going to – you know, we think that there's a
possibility of fraud  You don't – you don't leave half
your capital at risk" *Id*. at 41:8-19 (RE00000197).

At most, the Renaissance Report reflects that the Meritage Committee did not understand

the implementation of BLMIS's supposed investment strategy and concluded that further inquiry

was needed, but it did not conclude that Madoff was a fraud:

- Laufer stated, "We didn't understand what he was doing.
  We didn't understand how he was doing what he was
  doing."  SEC Tr. 23:2-4 (RE00000124).

- Regarding whether or not Madoff was trading options,
  Laufer stated, "I didn't understand why he was doing it.
  I didn't understand many things. *But it did not occur to
  me that he was – there was some possibility he wasn't
  [trading options].*"  *Id*.  at  25:1-3  (RE00000126)
  (emphasis added).

And the documents relied on by the Trustee also directly contradict the Trustee's

allegation that Meritage withdrew its investment in BLMIS because the Meritage Committee

suspected Madoff was operating a Ponzi scheme.  Am. Compl. ¶ 2.  Nathaniel Simons testified

to the SEC, "The point is that as we don't know why he does what he does we have no idea if

there are conflicts in his business that could come to some regulator's attention . . . *Perhaps the

best reason to get out is that we really don't expect to make an outsized return on this

investment*."  November 13, 2003 Email at RE00000008 (attached to the Kajon Declaration as

Exhibit E (RE00000001-8)) (emphasis added).

Further, in the Amended Complaint, the Trustee repeatedly refers to Nathaniel Simons'

statement that, "It's high season on money managers, and Madoff's head would look pretty good

above Elliot Spitzer's mantle [sic]" which appears in an email produced to the Trustee (Kajon Decl. Ex E (RE00000008)) and is paraphrased in the SEC Transcript (*see* SEC Tr. 25:4-23 (RE000000181)) both of which the Trustee relies on in the Amended Complaint. Am. Compl. ¶¶ 2, 50. The Trustee would have this Court believe this statement is the smoking gun of the case, and that it shows that Renaissance, the Meritage Committee and Rafael Mayer had actual knowledge of the Madoff fraud, or suspected there was a high probability that Madoff was operating a Ponzi scheme. This is not the Trustee's smoking gun. It is merely a joke, that everyone, but the Trustee, appears to be in on:

- SEC: "Okay. And then at the bottom you do make this comment about, 'Madoff said it would look pretty good above Eliot Spitzer's mantel.' *I know that's in jest*, but what was kind of the point there?"

- Simons: "*I thought it was kind of funny. It was at the time* . . . You know, Eliot Spitzer was cracking down on managers . . . We were thinking, again, maybe [Madoff]'s doing something illegal because he's front-running his clients and giving his clients bad prices." SEC Tr. 25:4-23 (RE00000181).

Finally, the Trustee's attempt to set Meritage up as a foil to Legacy is contradicted by the Amended Complaint itself and other facts. The Trustee misleadingly attempts to create the false impression that Meritage immediately withdrew its indirect investment in BLMIS once it supposedly discovered that BLMIS was a Ponzi scheme. Am. Compl. ¶¶ 2, 51. As already summarized above, Meritage did not believe that BLMIS was a Ponzi scheme. Further, it did not immediately withdraw its investment following the Renaissance Report. Indeed, when read carefully, the Amended Complaint itself concedes that Meritage remained invested with BLMIS for many months after the Renaissance Report. *Id*. ¶¶ 138-39. In fact, Meritage withdrew only half of its investment months after the Renaissance Report was released and remained invested in

10

BLMIS for many months thereafter.  *Id.*  Moreover, in its report on BLMIS, the SEC acknowledges that Renaissance did not withdraw from BLMIS due to its concerns about Madoff, but rather did so "for unrelated reasons."  Office of Investigations, U.S. SEC, Report No. OIG-509, *Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme* 157 (Aug. 31, 2009), (the "**SEC Report**").[3]

As discussed more fully below, the Amended Complaint is devoid of facts to support any plausible inference that Legacy had actual knowledge of the Madoff fraud or was willfully blind to that fraud.  For those reasons, and other reasons set forth herein, the Amended Complaint should be dismissed.

## ARGUMENT

The Amended Complaint should be dismissed in its entirety because the Trustee has failed to allege any plausible claim for relief.  As the Supreme Court explained in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007):  "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (second alteration in original) (citations omitted) (internal quotation marks omitted).  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Id.* at 558 (omission in original) (citation omitted) (internal quotation marks omitted).  Such parameters are meant to ensure, among other things, that defendants are not baselessly thrust into an "inevitably costly

---

[3]    Attached   to   the   Kajon   Declaration   as   Exhibit   F   and   available   at
http://www.sec.gov/news/studies/2009/oig-509.pdf.

and protracted discovery phase" for a wholly groundless claim. *Asahi Glass Co., Ltd. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003).

Thus, the Supreme Court has held that a motion to dismiss should be granted where the factual allegations do not "plausibly suggest[]" entitlement to relief. *Twombly*, 550 U.S. at 557. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted).

To the extent the Trustee seeks recovery of intentional fraudulent transfers, the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure applies. *Merkin*, 515 B.R. at 149. Under Rule 9(b), the trustee is required to identify the transfers sought to be avoided with particularity. *Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 458 B.R. 87, 106 (Bankr. S.D.N.Y. 2011).

As will be discussed more fully below, whether the heightened pleading standard of Rule 9(b) is applied or not, the Trustee has failed to state a claim, because he has not pled facts that plausibly suggest entitlement to relief. Accordingly, as explained below, all claims against Legacy should be dismissed, except for the Trustee's claim for net profits only pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

## I.    COUNTS II THROUGH VII SHOULD BE DISMISSED BECAUSE THE SECTION 546(E) SAFE HARBOR BARS THOSE COUNTS

Counts II through VII of the Amended Complaint are all claims that cannot be asserted if the section 546(e) safe harbor of the Bankruptcy Code applies because it bars all fraudulent conveyance claims asserted under sections 544 and 548, except for actual fraud under section

548(a)(1)(A).    Counts II through VII include claims under section 548(a)(1)(B) of the

Bankruptcy Code (Count II), and claims under New York's Debtor & Creditor Law (Counts III-

VII), which the Trustee asserts pursuant to section 544 of the Bankruptcy Code.   As set forth

more fully below, the Trustee's attempt to evade the section 546(e) safe harbor fails because he

has not included "particularized allegations" that plausibly give rise to an inference that Legacy

had actual knowledge of Madoff's Ponzi scheme.   *See, e.g., SIPC v. Bernard L. Madoff Inv. Sec.

LLC (In re Madoff Sec.)*, 516 B.R. 18, 24 (S.D.N.Y. 2014); *Merkin*, 515 B.R. at 138; *SIPC v.

Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115(JSR), 2013 WL 1609154,

at *4 (S.D.N.Y. Apr. 15, 2013) (stating that for the Trustee to allege that section 546(e) should

not apply, he "must show, at a minimum, that the transferee had actual knowledge that there

were no actual securities transactions being conducted").[4]

The standard for pleading and proving "actual knowledge" is exceedingly high and

requires a showing that the transferee had "direct and clear knowledge" of Madoff's Ponzi

scheme resulting in "a high level of certainty and [an] absence of any substantial doubt regarding

the existence" of the scheme.   *Merkin*, 515 B.R. at 139.   *Merkin* is illustrative of how high the

pleading standard is for actual knowledge.   In *Merkin*, the complaint alleged that Merkin openly

admitted during various conversations that Madoff "appeared to be running a Ponzi scheme,"

that BLMIS "could be a Ponzi scheme," and that Madoff's scheme was bigger than Ponzi and

that "Charles Ponze [sic] would lose out because it would be called the 'Madoff Scheme.'"   *Id.* at

140.   The Court found that because Merkin's statements indicated only that Madoff "could be"

---

[4]    Legacy's withdrawals from its BLMIS account were also "settlement payments" from a
stockbroker and, accordingly, fall within the section 546(e) safe harbor for that independent reason as
well.   *See SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*("*Greiff*"), 476 B.R. 715, 720-21
(S.D.N.Y. 2012), *aff'd*, 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2858 (2015), *cert. denied*,
135 S. Ct. 2859 (2015).

or "appeared to be" running a Ponzi scheme, the allegations, even if taken as true for the purpose

of a motion to dismiss, reflected Merkin's "strong suspicion" of the fraud, but did not satisfy "the

absence of doubt associated with actual knowledge." *Id.* at 140-41. Accordingly, the Court held

that the complaint failed to "plausibly allege that Merkin had actual knowledge of Madoff's

Ponzi scheme," and dismissed the counts in the complaint that sought to circumvent the safe

harbor provision of section 546(e) of the Bankruptcy Code. Because, as set forth below, the

Amended Complaint fails to adequately plead that Defendants had *actual* knowledge of

Madoff's Ponzi scheme, it fails to state a claim to the extent it seeks to recover transfers that may

have occurred more than two years before the BLMIS petition was filed or that were

constructively fraudulent.

In the Amended Complaint, the Trustee has failed to plead facts from which Legacy's

actual knowledge of the Ponzi scheme may plausibly be inferred. First, the Amended Complaint

does not contain any facts that show Legacy, Khronos or Rafael Mayer had "direct and clear

knowledge" of Madoff's Ponzi scheme. The Amended Complaint is woefully silent on what

Legacy, Khronos or Rafael Mayer knew or subjectively understood. At best, the Trustee has

pointed to a handful of emails in which Rafael Mayer indicated that he, like the rest of the

Meritage Committee, did not understand how the BLMIS trading strategy was being executed.

*See, e.g.*, Am. Compl. ¶¶ 59, 63, 75, 84, 91. This does not demonstrate the "high level of

certainty and [an] absence of any substantial doubt regarding the existence" of the fraud

necessary to plead actual knowledge. *See Merkin*, 515 B.R. at 139.

The Trustee, lacking facts that demonstrate Legacy, Khronos or Rafael Mayer's actual

knowledge, attempts to bootstrap Renaissance's supposed knowledge of Madoff's fraud to make

his case against Legacy. The fundamental flaw in the Trustee's approach is that the record that

the Trustee relies on in the Amended Complaint is clear – nobody had actual knowledge of Madoff's fraud.  Renaissance, the Meritage Committee, Meritage, Legacy, Khronos and Rafael Mayer did not suspect, let alone have a high level of certainty, that Madoff was operating a Ponzi scheme.  The record is replete with examples of Renaissance's lack of knowledge and lack of suspicion of the fraud.  *See, e.g.*, SEC Tr. 34:23-25 (RE00000095) ("I think if you're asking did we come to the conclusion that there was a fraud going on, I would say we didn't.").

Lacking any plausible allegations that Defendants had actual knowledge of Madoff's fraudulent scheme, the Trustee attempts to make his case by repeatedly quoting Nathaniel Simons who stated, "It's high season on money managers, and Madoff's head would look pretty good above Elliot Spitzer's mantle [sic]."  Am. Compl. ¶¶ 2, 50; Kajon Decl. Ex. E at RE00000008.  The Trustee's attempt falls short.  The Court has soundly rejected stronger allegations of actual fraud in the *Merkin* decision.  In *Merkin*, the Court rejected the Trustee's allegation that Merkin had actual knowledge of the fraud because he said Madoff "appeared to be running a Ponzi scheme."  The Court reasoned that Merkin's statements "seem more like jokes than acknowledgments that BLMIS was a Ponzi scheme."  *Merkin*, 515 B.R. at 140.  The Trustee's reliance on Simons' statement is weaker still than what was alleged in *Merkin*.  First, unlike in *Merkin*, Simons' statement suggests that Madoff may be engaged in unlawful conduct, but he does not ever indicate any suspicion that Madoff was operating a Ponzi scheme.  Second, here, unlike *Merkin*, it is not the Defendants that are suggesting in jest that Madoff might be a fraudster – it is a non-party to the case.  Finally, Simons stated in the same SEC transcript relied on by the Trustee that he was, in fact, making a joke.  *See* SEC Tr. 25:4-23 (RE00000181).  The Trustee has failed to plead that Legacy had direct, clear knowledge of Madoff's fraud.

15

Accordingly, Counts II through VII are barred by the section 546(e) safe harbor and should be dismissed in their entirety.

## II.     THE TRUSTEE'S CLAIM TO RECOVER PRINCIPAL SHOULD BE DISMISSED BECAUSE LEGACY WAS NOT WILLFULLY BLIND TO THE PONZI SCHEME

Where, as here, the Amended Complaint has failed to allege *actual* knowledge of Madoff's Ponzi scheme, and the safe harbor provision of section 546(e) of the Bankruptcy Code applies, the Trustee may assert avoidance claims only under section 548(a)(1)(A), seeking to avoid and recover transfers that BLMIS made to Legacy "during the two years prior to bankruptcy 'with actual intent to hinder, delay, or defraud any' of its creditors." *Greiff*, 476 B.R. at 722; *see also Picard v. Katz*, 462 B.R. 447, 451 (S.D.N.Y. 2011).

The Trustee's authority to avoid any fraudulent transfer made to Legacy is limited by section 548(c), which provides that Legacy is entitled to assert a "good faith" defense if the transfer was taken "for value" and "in good faith." *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 91 (2d Cir. 2014). The District Court, in the context of BLMIS-related litigation, has modified the "good faith" defense in the following two ways:

> First, the Trustee must plead and prove the transferee's lack of good faith. Second, the "good faith" standard is subjective rather than objective "because the securities laws do not ordinarily impose any duty on investors to investigate their brokers, [and] those laws foreclose any interpretation of 'good faith' that creates liability for a negligent failure to so inquire."

*Merkin*, 515 B.R. at 138 (quoting *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. at 24). The District Court has further clarified that the subjective "good faith" standard requires the Trustee to show that Legacy "willfully blinded" itself to the fact that Madoff was conducting a Ponzi scheme by "intentionally [choosing] to blind [itself] to the 'red flags' that suggest[ed] a high probability of fraud." *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. at 21.

16

There are two elements to "willful blindness": (1) "the defendant must subjectively believe that there is a high probability that a fact exists"; and (2) "the defendant must take deliberate actions to avoid learning of that fact." *Merkin*, 515 B.R. at 139 (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)). Notably, if the transferee is "simply confronted with suspicious circumstances, [and] fails to launch an investigation of his broker's internal practices – and how could he do so anyway? – his lack of due diligence cannot be equated with a lack of good faith." *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. at 21. Here, the Trustee has failed to allege that Legacy "took deliberate actions to avoid learning" the truth about Madoff's Ponzi scheme; thus, the allegations are insufficient to plead "willful blindness."

### 1.    The Trustee Has Pled Facts Showing Legacy Gave Value

The Amended Complaint alleges facts showing Legacy gave value for the fraudulent transfers that it purportedly received. *See Marshall*, 740 F.3d at 91. The Trustee alleges that Legacy made a principal investment of $126,674,218 into the Legacy Capital Account. *See* Am. Compl. ¶ 142; Am. Compl. Ex A. Thus, the first prong of the good faith defense is easily satisfied, even just based on the Amended Complaint's allegations.

### 2.    The Trustee Has Failed To Meet His Burden Of Pleading Legacy Was Willfully Blind To The Fraudulent Scheme

The Trustee has failed to meet his burden of pleading facts showing that Legacy willfully blinded itself to the Madoff scheme. In order to adequately plead willful blindness, the Trustee must demonstrate that Legacy "subjectively believe[d] that there was a high probability" that the fraud existed. In the Amended Complaint, the Trustee has done little more than plead a laundry

list of "red flags"[5] and identified concerns that *Renaissance* had about its own BLMIS investments. The Amended Complaint is almost silent on Legacy's subjective understanding of the potential fraud. Reciting a list of Madoff's suspicious activity, without alleging Legacy's subjective understanding of that activity, is insufficient to show that Legacy was willfully blind to the fraud. *See, e.g.*, *Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 310 (S.D.N.Y. 2010) (allegations were insufficient where they were based on "the numerous red flags that the [d]efendants recklessly disregarded, including among others, Madoff's lack of transparency and 'consistent investment returns,' the discrepancy between Madoff's supposed trading activity and the open interest of index option contracts that BLMIS was audited by a small accounting firm, and the lack of third party administrators and custodians"), *aff'd*, 530 F. App'x 21 (2d Cir. 2013); *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 623-24 (S.D.N.Y. 2010) (allegations were insufficient where they were based on consistency of Madoff's "reported excellent results"), *aff'd sub nom. Stephenson v. PricewaterhouseCoopers LLP*, 482 F. App'x 618 (2d Cir. 2012); *SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680(LLS), 2010 U.S. Dist. Lexis 8597, at *5-7 (S.D.N.Y. Feb. 1, 2010) (allegations were insufficient where they were based on Madoff's request for secrecy and irregular returns).

What the Trustee has pled is Renaissance's concerns over BLMIS, which, as discussed more fully *supra* Argument Part I, do not amount to actual knowledge of the existence of fraud.

---

[5]    Purported options trading was impossible (¶¶ 56-71); Timing of Madoff's trades was impossible (¶¶ 72-80); Madoff's unusual fee structure (¶¶ 81-87); Enormous trading volume never impacted the market. (¶¶ 88-93); Rates of return were impossible. (¶¶ 94-101); Operations lacked transparency and controls (¶¶ 102-105); No capable auditor (¶¶ 106-110); Reported trades outside the daily range (¶¶ 111-115); Account statements showed impossible dividends (¶¶ 116-118); Purported to engage in speculative options trading that deviated from the SSC strategy (¶¶ 119-121); Options confirmations reflected trades inconsistent with SSC strategy (¶¶ 122-126); Aware that options collars purportedly executed by BLMIS were not properly balanced with changes to the composition of the equities basket (¶¶ 127-129); BLMIS account statements showed illegal, unauthorized margin trades (¶¶ 130-132); Aware they were not getting real-time electronic access to accounts and trade confirmations (¶¶ 133-137).

18

For example, the Trustee alleges *Renaissance's* concern regarding unexplained options trading by BLMIS, as documented in a November 21, 2003 email from Renaissance employee, Paul Broder.  *See* Kajon Decl. Ex. C (RE00000240); Am. Compl. ¶¶ 62-64.  But the Trustee fails to point out that neither Rafael Mayer nor Legacy ever received that email.  *See id.*  Thus, there is absolutely no basis upon which to impute knowledge of this email to Legacy, and the Amended Complaint's allegations based on this email are not only false, but also disingenuous.

Similarly, the Trustee cites a November 13, 2003 email from Nathaniel Simons, in which *Renaissance* questions the auditor Madoff used, but the Trustee makes no allegation of Rafael Mayer or Legacy's subjective understanding of the issue of Madoff's auditor and what his choice of auditor might, or might not, imply.  Am. Compl. ¶ 110; *see also* Kajon Decl. Ex. E, at RE00000008 (November 13, 2003 Email).

In support of his allegation that there was a high probability of fraud, the Trustee also cites Renaissance's decision to withdraw its indirect investment with BLMIS.  Am. Compl. ¶¶ 2, 51, 138-139.  According to the Trustee, the decision to withdraw was based on Renaissance's concerns that BLMIS was a fraud.  However, contrary to the Trustee's pleadings, the record reflects that Renaissance's decision to terminate its investment in BLMIS was completely unrelated to these alleged concerns:

> After performing their due diligence, Laufer stated that "we were very worried" about the investment with Madoff.  However, opinions diverged at Renaissance about whether to entirely divest itself of the investment.  Broder and Simons wanted to get out of the investment.  But one piece of information "helped to allay concerns" of other employees: "[W]e were aware . . . [Madoff] had been investigated by the SEC."  Because of the competing viewpoints, *Renaissance stated they initially reduced their investment by approximately one half and later got out of the investment entirely for unrelated reasons.*

SEC Report 157 (emphasis added).  The SEC found that, despite what Renaissance uncovered in its due diligence, Renaissance (i) debated internally whether or not to keep investing in BLMIS

19

and (ii) while initially withdrawing some of its investment, continued to maintain approximately half of its investment with BLMIS. If Renaissance's decision to withdraw money from BLMIS was motivated by concerns about the legitimacy of BLMIS, it would have requested redemption of all its accounts, rather than maintaining a substantial part of its investment.[6] The Trustee's suggestion to the contrary is contradicted by the facts and is implausible.

The Trustee also fails to plead whether Legacy even knew of certain red flags. *See, e.g.*, Am. Compl. ¶¶ 102-121, 127-137. For example, the Trustee alleges that Legacy and Khronos were not receiving real-time electronic access to accounts and trade confirmations, but fails to allege whether or not Legacy (or Khronos) were aware of that fact, let alone whether or not Legacy had a subjective understanding that this was an indication of fraud. *Id.* ¶¶ 133-137. It is insufficient, as a matter of law, for the Trustee to recite a list of Madoff's suspicious behavior and not allege Legacy's subjective understanding of that behavior. Because the Trustee has failed to plead this first prong of the willful blindness standard, the Amended Complaint should be dismissed.

The Amended Complaint should also be dismissed for the independently sufficient reason that the Trustee has not pled, as he is required to, that Legacy took "deliberate actions to avoid learning the fact" of Madoff's fraudulent scheme. *Merkin*, 515 B.R. at 139. Instead, the Trustee has alleged that, after the Renaissance Report was shared with Rafael Mayer, Legacy engaged Khronos to conduct a quantitative analysis of Legacy's customer statements.[7] Am.

---

[6]    As Nathaniel Simons told the SEC, if you "think that there's a possibility of fraud[, y]ou don't leave half your capital at risk." SEC Tr. 41:17-19 (RE00000197).

[7]    Given the extensive list of duties Khronos was obligated to undertake pursuant to the Accounting Services Agreement, the Trustee's suggestion that David and Rafael Mayer restricted employees' access to Legacy account information is implausible on its face. Am. Compl. ¶ 52. This allegation is also contradicted by the Amended Complaint itself, which states that Rafael Mayer supplied Legacy's statements to Meritage to assist in Meritage's analysis of BLMIS. *Id.* ¶ 46. Also, as alleged in the Amended Complaint, BNP entered into a significant lending relationship with Legacy secured by the

Compl. ¶ 2.  According to the Amended Complaint, Legacy made efforts to try to understand the

BLMIS trading strategy by engaging Khronos to:

- Develop technology specifically to track pricing and volume statistics to analyze trades dating back to 1992. Am. Compl. ¶¶ 2, 80.

- "screen[ ] investments 'on a quantitative basis to evaluate its overall fit with the portfolio on a risk, return and market correlation basis.'  This analysis included, but was not limited to, 'return, volatility, market correlation, sharpe, alpha, beta and draw-down analysis.'" *Id.* ¶ 95.

- "qualitatively evaluating BLMIS's adequacy of accounting and back-office processes; the types and applications of internal controls; adherence to compliance, tax, and legal guidelines, integrity of key personnel; . . . and any potential for conflicts of interest." *Id.* ¶ 104.

- "review[ ] trade confirmations and monthly account statements corresponding to the Legacy Capital Account. . . . value[ ] securities daily according to prices reported by the relevant exchange. . . . 'proactively monitor[ ] [BLMIS's] investment performance, [which] consist[ed] of an ongoing reapplication of all its qualitative and quantitative analysis.'" *Id.* ¶ 111.

- "track[ ] the activity in Legacy Capital's account statements . . ." *Id.* ¶ 118.

- "valu[e] and verify[ ] [Legacy's] portfolio based on information contained in those trade tickets." *Id.* ¶ 126.

The Amended Complaint, thus, demonstrates that rather than take deliberate actions to avoid

learning the facts of the BLMIS investment strategy, both Legacy and Khronos sought to better

understand and resolve the concerns raised by the Renaissance Report.  In pleading these follow-

_____

Legacy account.  *Id.* ¶ 140.  In sum, it is clear that the Legacy account statements were shared widely and there was no attempt to shield them under a veil of secrecy.

up actions by Legacy and Khronos, the Trustee has undercut his own allegation that Legacy willfully blinded itself to the Madoff fraud. Having failed to adequately plead that Legacy took deliberate actions to avoid learning the truth of the fraudulent scheme, the Trustee has failed to allege that Legacy was willfully blind. As such, the Trustee's section 548(a)(1)(A) claim should be dismissed to the extent that it seeks recovery of principal returned to Legacy by BLMIS.

## CONCLUSION

For the foregoing reasons, Legacy respectfully requests that the Court dismiss Counts II through VII of the Trustee's Amended Complaint with prejudice, dismiss Count I to the extent that it seeks recovery of principal returned to Legacy by BLMIS, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      July 30, 2015

                             Respectfully submitted,

                             STEVENS & LEE, P.C.

                             By: /s/ Nicholas F. Kajon
                                 Nicholas F. Kajon
                           485 Madison Avenue
                           New York, New York 10022
                           (212) 537-0403
                           (610) 371-1223 (fax)
                           nfk@stevenslee.com

                             *Attorneys for Defendant Legacy Capital Ltd.*