# EXHIBIT G

# Congress of the United States
## Washington, DC 20515

June 3, 2011

Mr. Gene L. Dodaro
Comptroller General of the United States
Government Accountability Office
441 G St., NW
Washington, DC  20548

Dear Mr. Dodaro,

Over the last nine months, the current Chairman of the Capital Markets Subcommittee, along with his predecessor, have exchanged several letters (see attached) with the President and CEO of the Securities Investor Protection Corporation (SIPC) regarding the actions of the Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC (BLMIS).

We have several concerns regarding the Trustee's use of the so-called "Net Investment Method (NIM)" formulation for determining investor eligibility for SIPC protection in the Madoff case. The Securities and Exchange Commission (SEC) supervises SIPC, which has supported the Trustee's approach.

The serious concerns we have about the NIM formulation stem from the fact that the end result it produces – namely the Trustee suing innocent investors for so-called "clawbacks" – causes outcomes that are in direct conflict with the SEC's mission to protect investors, maintain fair, orderly and efficient markets, and facilitate capital formation.

- In the same era that the Securities Investor Protection Act (SIPA) was enacted, it was determined that for purposes of market efficiency, investors no longer would hold stock certificates and would instead need to rely on statements issued by SEC-regulated firms.
- If people can no longer trust that they will have SIPC protection through reliance on their statements issued by regulated firms, this will certainly impact on investors' confidence in our financial markets and on capital formation.
- Investors are not being protected as they were intended to be under SIPA if they are not only failing to receive SIPC protection when a broker-dealer they invest with goes bankrupt, but are actually being sued for relying on statements issued by a regulated firm.

In a 1992 report, the GAO recommended that the SEC periodically review SIPC's operations and its efforts to ensure timely and cost-efficient liquidations of failed broker-dealer firms. Thereafter, in 2000, the SEC's Inspector General reported that since the inception of SIPC in 1970, the SEC had conducted only two inspections – one in 1985 and one in 1994. More recently in 2003, the SEC conducted an oversight inspection and identified several deficiencies regarding controls over fees, improperly denied claims, internal policies and guidance, education initiatives and funding options. A March 2011 review of the SEC's oversight of SIPC by the

SEC Inspector General raised questions concerning the SEC's oversight of trustee and attorneys fees in the Madoff liquidation. The report also advised that the SEC was unable to confirm that the deficiencies identified in 2003 have been cured. Surprisingly, the SEC informed the Inspector General that an inspection of SIPC in the near term was unlikely due to the SEC's involvement in the Madoff and Lehman liquidations.

That being the case, we are requesting that the GAO conduct a comprehensive evaluation of the actions of SIPC, the Trustee in the Madoff liquidation, and the SEC's involvement and oversight of this major liquidation. We ask that the GAO focus on the following issues and actions:

- Prepare a thorough history of SIPC's selection of Irving Picard as Trustee, and the Baker Hostetler law firm as counsel to the Trustee, including the status of that process at the time Mr. Picard joined Baker Hostetler, and a summary of all the significant terms of the employment or compensation agreement(s) or other agreements between SIPC, Mr. Picard, and/or Baker Hostetler, and relevant arrangements within Baker Hostetler, including any changes to any such arrangements or agreements since the involvement in the Madoff case. Include a review of the SEC's involvement in these selections. Also, please summarize Mr. Picard's prior service for SIPC in other SIPA liquidations. Please also include such information with respect to any Baker Hostetler partners involved in the Madoff matter. Furthermore, please provide total compensation received by Mr. Picard and David Sheehan at Baker Hostetler from 2008 to present.

- Review and report on all of the relevant materials documenting discussions of significant issues and policy matters considered in the decision to abandon the traditional Final Statement Method (FSM) for determining customer "net equity" in favor of the so-called Net Investment Method (NIM) used occasionally in non-SIPA equity receiverships. Of particular interest is the role of the SEC in this decision, concern for adequacy of SIPC Fund reserves, estimate of time and cost to execute NIM in a large receivership, attention to customer costs and burdens in the claims process, and squaring NIM's time-consuming requirements with SIPA's clear mandate for prompt payment of advances to assist customers.

- Investigate the involvement, if any, of the Trustee and his law firm in the decision to use NIM, which is much more lawyer-intensive, rather than FSM, and review if SIPC and/or the SEC, if they were participants in this decision-making process, considered such involvement as presenting a possible conflict of interest.

- Review the total legal and investigative costs of the Madoff liquidation through April 30, 2011. Segment those costs, to the extent possible, by principal purpose (i.e. – account investigations, review of customer claims, preparation and filing of avoidance suits against innocent customers, other litigation, settlement negotiations, etc.). Compare these costs with those in other major SIPC liquidations.

- SIPC estimates that it has saved $1.1 Billion through denial of advance payments to some 2700 customers deemed ineligible by the NIM. However, for the IRS this means higher

refunds for 'theft loss', because there will be no "netting" for SIPC advances. Determine the amount of loss to the U.S. Treasury through this cost shifting.

- The Trustee recently reported that claims determination was essentially completed and that some 2400 accounts had been approved for priority claims on "customer funds" recovered. Of these eligible accounts, determine the number and the identity of those accounts held by institutional investors (banks, hedge funds, etc.). For these institutional accounts, determine the aggregate value of their claims and the percentage by value of all approved claims.

- SIPC's March 4, 2011, letter reveals that two institutional investors, both for long terms, made over 1800 withdrawals each, with a combined value of $8 Billion. Those withdrawals by only two institutional investors exceed by $2 to $3 Billion the funds the Trustee is seeking to clawback from some 1000 innocent individual investors – declared by the Trustee to be "net winners". While the two institutional investors, called "net losers", each have approved claims on "customer property" exceeding $450 Million. These and similar examples call for a careful cash flow comparison of the transactional behavior of typical individual customers and typical institutional customers to determine if it is, in fact, equitable to treat individuals and professional institutional customers as co-equals, as is done under the NIM methodology.

- In a contentious claims process, as is the case in the Madoff liquidation, customers need to have access to all relevant information discovered by the Trustee in the course of his investigation of the bankruptcy. This obvious need is contemplated in the SIPA statute, which directs the Trustee to prepare a full report on his findings for the Bankruptcy Court and SIPC. To date, some 30 months after the Trustee's appointment, no such report is available. Please determine why this information has not been disclosed and evaluate, as well, the Trustee's record for transparency throughout the liquidation process. For instance, please determine if investors have had the ability to review BLMIS records to determine, among other things, whether BLMIS was always operating a ponzi scheme, or whether, in fact, the firm earned actual profits for its investors for at least some of the time it was operating.

- The Trustee has entered into a number of settlements with Madoff accountholders. Please provide detailed summaries of the key elements of these settlements for the purpose of evaluating performance. Of particular interest are the settlements with the Picower estate and the accounts of the children of Norman Levy. A footnote on page 10 of SIPC's January 24, 2011, response to Chairman Garrett reports that these accounts at closing reflected negative "equity" in excess of $8 Billion. Were the Trustee's settlements merely the collection of outstanding indebtedness? Do the Trustee's investigative records suggest possible complicity of Picower and Levy with Madoff, and if so, is debt repayment a sufficient settlement outcome?

Given the ongoing situation where many defrauded investors have still not received any compensation from SIPC and/or have the threat of a lawsuit from the Trustee hanging over their heads, we ask that you undertake and complete this investigation as soon as possible. This will

be of great value in our ongoing evaluation of the SIPC's liquidation of the BLMIS firm and the treatment of the victimized customers of that firm, as well as the adequacy of the SEC's oversight of this prolonged and costly receivership.

Thank you for your cooperation and assistance in this matter. If you have any questions, please contact Scott Eckel in Chairman Garrett's office.

Sincerely,

_____
Rep. Scott Garrett

_____
Rep. Ileana Ros-Lehtinen

_____
Rep. Peter King

_____
Rep. Carolyn McCarthy