# Exhibit B

# MONTPELLIER RESOURCES LTD.

### CONFIDENTIAL PRIVATE
### OFFERING MEMORANDUM

**NOT FOR USE OR DISTRIBUTION IN THE UNITED STATES OF AMERICA**

**December 2004**

# MONTPELLIER RESOURCES LTD.

### (a Bermuda exempted mutual fund company)

| | |
|---|---|
| Investment Objective: | **The Fund is a multi-manager fund-of-funds that seeks above-average capital appreciation while emphasizing the preservation of capital through the strategic allocation of assets to independent portfolio managers that employ a number of trading and investment strategies.** |
| Securities Offered: | **Voting, Participating, Redeemable Shares** |
| Minimum Initial Purchase: | **$1,000,000** |
| Base Currency: | **U.S. Dollars ($)** |

**PERMISSION UNDER THE EXCHANGE CONTROL ACT OF 1972 OF BERMUDA (AND THE REGULATIONS THEREUNDER) HAS BEEN OBTAINED FROM THE BERMUDA MONETARY AUTHORITY FOR THE ISSUE OF 500,000,000 VOTING AND REDEEMABLE PARTICIPATING SHARES IN THE FUND.  IN ADDITION, A COPY OF THIS MEMORANDUM HAS BEEN DELIVERED TO THE REGISTRAR OF COMPANIES IN BERMUDA FOR FILING PURSUANT TO THE COMPANIES ACT 1981 OF BERMUDA, AS AMENDED.  APPROVALS RECEIVED FROM THE BERMUDA MONETARY AUTHORITY OR REGISTRAR OF COMPANIES DO NOT CONSTITUTE A GUARANTEE BY THE AUTHORITY AND REGISTRAR OF COMPANIES AS TO THE PERFORMANCE OF THE FUND OR ITS CREDITWORTHINESS.  FURTHERMORE, IN GIVING SUCH APPROVALS, THE AUTHORITY AND REGISTRAR OF COMPANIES SHALL NOT BE LIABLE FOR THE PERFORMANCE OR DEFAULT OF THE FUND OR FOR THE CORRECTNESS OF ANY OPINIONS OR STATEMENTS EXPRESSED HEREIN.**

**THE FUND HAS BEEN CLASSIFIED AS A BERMUDA INSTITUTIONAL SCHEME UNDER THE BERMUDA MONETARY AUTHORITY (COLLECTIVE INVESTMENT SCHEME CLASSIFICATION) REGULATIONS 1998.  AS SUCH, THE FUND IS EXEMPTED FROM THE REQUIREMENT TO APPOINT A BERMUDA CUSTODIAN AND MAY NOT BE SUPERVISED TO THE SAME DEGREE AS OTHER SCHEMES WHICH ARE REGULATED AND SUPERVISED BY THE AUTHORITY. THEREFORE, THE FUND SHOULD BE VIEWED AS AN INVESTMENT SUITABLE ONLY FOR INVESTORS WHO CAN FULLY EVALUATE AND BEAR THE RISKS INVOLVED.  THE FUND DOES NOT INTEND TO BE LICENSED IN ANY JURISDICTION OR WITH ANY SUPERVISORY OR REGULATORY AUTHORITY OUTSIDE BERMUDA.**

**THIS CONFIDENTIAL PRIVATE OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.**

Book No. _____          Name of Offeree _____

41281709.14

Shares in Montpellier Resources Ltd. (the "Fund") will be issued only on the basis of the information and representations contained in this Confidential Private Offering Memorandum and its Exhibits ("Memorandum"), and no other information or representation has been authorized. Any purchase made by any person on the basis of statements or representations not contained in, or inconsistent with, information in the Memorandum shall be solely at the risk of the purchaser.

This Memorandum constitutes an offer only if an offeree is named on the prior page, and only if delivery of this Memorandum is properly authorized by the Fund and complies with the law of the country in which the offeree resides. This Memorandum has been prepared by the Fund solely for the benefit of persons interested in the proposed purchase of Shares, and any reproduction of this Memorandum, in whole or in part, or the divulgence of any of its contents, without the prior written consent of the Fund, is prohibited.

You may only acquire the Shares for your own account and for investment purposes, without any intention to redistribute or to resell the Shares.

DO NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. YOU SHOULD CONSULT YOUR FINANCIAL OR LEGAL ADVISOR(S) BEFORE PURCHASING SHARES.

THE SHARES ARE SPECULATIVE SECURITIES.

THE VALUE OF THE SHARES MAY GO DOWN AS WELL AS UP.

## Table of Contents

|  | Page |
|---|---|
| DIRECTORY | ii |
| SYNOPSIS | iv |
| The Fund | 1 |
| The Investment Managers | 1 |
| Investment Objective and Strategies | 1 |
| Multi-Manager Approach | 3 |
| Manager Allocation, Selection and Monitoring | 4 |
| Borrowings | 6 |
| Leverage | 6 |
| Prior Performance Information | 7 |
| Investment Advisory Board | 7 |
| Investment Management Agreement | 7 |
| Principals of HCH and Khronos | 7 |
| Directors | 8 |
| Risk Factors | 10 |
| Conflicts of Interest | 17 |
| Administration | 17 |
| Custodian | 18 |
| Liability and Indemnification | 18 |
| Capital Structure and Rights of Shares | 19 |
| Fees and Expenses | 21 |
| Securities Offered | 22 |
| Minimum Subscriptions | 23 |
| Suitability | 23 |
| Net Asset Value | 24 |
| Redemptions | 25 |
| Dividends/ Distributions | 27 |
| Reports | 27 |
| Transferability of Shares | 27 |
| Taxation | 28 |
| Base Currency | 29 |
| Business Day | 29 |
| Counsel and Auditors | 29 |
| Fiscal Year | 30 |
| Anti-Money Laundering | 30 |
| Miscellaneous | 30 |
| Additional Information | 30 |
| Documents Available for Inspection | 31 |
| Use of this Memorandum | 31 |
| How to Subscribe | 31 |
| | |
| Subscription Documents | Exhibit A |
| Redemption Form | Exhibit B |
| Continuing Quarterly Redemption Form | Exhibit C |
| Redemption Advance Request | Exhibit D |
| Transfer Form | Exhibit E |

# DIRECTORY

## REGISTERED OFFICE

HCH Capital Ltd.
129 Front Street
Hamilton HM 12, Bermuda
Tel.: +1 441-295-1399
Fax: +1 441-295-8318

## CO-INVESTMENT MANAGER

Khronos LLC
800 Third Avenue
33rd Floor
New York, New York 10022 U.S.A.
Tel.: +1 212-829-4512
Fax: +1 212-208-4395

## CO-INVESTMENT MANAGER

HCH Capital Ltd.
129 Front Street
Hamilton HM 12, Bermuda
Tel.: +1 441-295-1399
Fax: +1 441-295-8318

## ADMINISTRATOR

Dundee Leeds Management Services Ltd.
129 Front Street
P.O. Box HM 1916
Hamilton HM 12, Bermuda
Tel.: +1 441-295-8617
Fax: +1 441-292-2239

## CUSTODIAN

Banco Santander Central Hispano (Guernsey) Ltd.
5-7 Victoria Road
St. Peter Port
Guernsey, Channel Islands GY1 1HU
United Kingdom
Tel.: +44-148-171-5424
Fax: +44-148-171-5432

## AUDITORS

PricewaterhouseCoopers LLP
300 Madison Avenue
New York, New York 10017 U.S.A.
Tel: +1 646-471-3070
Fax: +1 813-329-1191

## BERMUDA LEGAL ADVISORS

Appleby Spurling Hunter
Canon's Court
22 Victoria Street
P.O. Box HM 1179
Hamilton HM EX, Bermuda
Tel.: +1 441-295-2244
Fax: +1 441-292-8666

## U.S. LEGAL ADVISORS

Katten Muchin Zavis Rosenman
575 Madison Avenue
New York, New York 10022 U.S.A.
Tel.: +1 212-940-8720
Fax: +1 212-940-8563

(ii)

## DIRECTORS

Piero Di Capua
Torre Mercedes, Piso 6
Paseo Colon
San Jose, Costa Rica
Tel.: +506- 295- 6660
Fax: +506- 295- 6653

Rafael Mayer
Khronos LLC
800 Third Avenue, 33rd Floor
New York, New York 10022, U.S.A.
Tel.: +1 212-829-4512
Fax: +1 212-208-4395

Herbert M. Selzer
Loeb Block &Partners, LLP
505 Park Avenue
9th Floor
New York, New York 10022 U.S.A.
Tel.: +1 212-755-5510
Fax: +1 212-755-1777

Jan Spiering
c/o Kitson & Company
5 Reid Street
Hamilton HM 11, Bermuda
Tel.: +1 441-298-2305
Fax: +1 441-295-4122

William D. Thomson
Suite 733
48 Par La Ville Rd.
Hamilton HM 11, Bermuda
Tel.: +1 441-295-1300
Fax: +1 441-292-6587

(iii)

# SYNOPSIS

**Investment**

**The Fund's Investment Objective** is to achieve above-average capital appreciation while emphasizing the preservation of capital through the strategic allocation of assets to independent portfolio managers that employ a number of trading and investment strategies.

**Structure**

**The Fund** is a multi-manager "fund-of-funds" registered by way of continuation in December 2004 as a Bermuda exempted mutual fund company. The Fund conducts its investment activities through Montpellier International LDC, an affiliated Cayman Islands exempted limited duration company.

**The Co-Investment Managers** of the Fund are HCH Capital Ltd. ("**HCH**") and Khronos LLC ("**Khronos**"). The Investment Managers make all of the Fund's investment allocation and reallocation decisions.

**The Administrator** of the Fund is Dundee Leeds Management Services Ltd. which acts as registrar and transfer agent for the Fund and is responsible for reviewing the calculation of the Fund's Net Asset Value.

**Offering of Shares**

**The Minimum Investment in the Fund's shares** ("**Shares**") is US$1,000,000 (or such lesser amounts as determined by the Directors of the Fund in their sole discretion, provided however that such amounts shall not be less than US$50,000) for initial subscriptions. Subscription funds must be received no later than the last business day prior to the first day of the calendar quarter that the subscription is to be effective.

**Additional Subscriptions** by existing Shareholders must be at least US$50,000. Additional subscription funds must be received no later than the last business day prior to the first day of the calendar quarter that the subscription is to be effective.

**Redemptions** are permitted as of the last business day of each calendar quarter, provided that (i) at least 45 days' prior written notice is given if the redemption request exceeds US$1,000,000, and (ii) at least 20 days' prior written notice is given if the redemption request is for a lesser amount. Unless a Shareholder redeems all of its Shares, such Shareholder may not make a partial redemption of Shares having an aggregate net asset value of less than US$10,000.

**Taxation**: The Fund does not expect to be subject to taxation in Bermuda, or to be subject to U.S. income or branch profits taxes.

**Fees and Expenses**

**A Management Fee** at the annual rate of 1.2% of the Net Asset Value of the Shares is paid monthly in advance to the Investment Managers.

**A Performance Fee** of 5% of each Shareholder's new net investment profits with respect to each Share at the end of each quarter is paid to Khronos, subject to a loss-carryforward provision. In no event will a performance fee for any Shares be paid on the recoupment of losses for those Shares from prior periods, and will only be paid on new net appreciation in the Shares, i.e., a "new high water mark" has been reached.

**Other Fees and Expenses** include administrative fees, transaction costs (including the Fund's proportionate share of the operating expenses of any investment fund in which it invests), offering expenses, as well as other ordinary and extraordinary expenses.

**Risk Factors**

**The Risk Factors** set forth in this Memorandum should be carefully considered before making an investment in the Fund.

(iv)

# MONPELLIER RESOURCES LTD.

This Memorandum sets forth the investment objective and method of operation of the Fund, certain risks associated with an investment in the Fund, the terms on which the purchase of Shares may be made, information on the Fund's management and its service providers, and other pertinent information on the Fund.

| | |
|---|---|
| **The Fund** | The Fund is a Bermuda exempted mutual fund company.  The Fund was originally incorporated as an international business company in the British Virgin Islands on June 27, 1990 under the name "Montpellier Resources Limited."  On December 15, 1999, the Fund was registered by way of continuation in the Cayman Islands and changed its name to "Montpellier Resources LDC."  On December 14, 2004, the Fund was registered by way of continuation in Bermuda and changed its name to "Montpellier Resources Ltd." The registered office of the Fund is set forth in the Directory. |
| | The Fund's investment activities take place through Montpellier International LDC ("**Montpellier International**"), a subsidiary which is incorporated as an exempted Cayman Islands limited duration company.  For purposes of this Memorandum, all references to the investment activities of the Fund will be deemed to include the investment activities of Montpellier International. |
| **The Investment Managers** | The Fund is co-managed by HCH Capital Ltd., a Bermuda company ("**HCH**"), and Khronos LLC, a New York limited liability company ("**Khronos**").   HCH and Khronos collectively are referred to as the "**Investment Managers**."  The Investment Managers are responsible for making all allocation and re-allocation decisions for the Fund.   See "Principals of HCH and Khronos." |
| **Investment Objective and Strategies** | <u>General</u>  The Fund is a multi-manager fund-of-funds that seeks above-average rates of return while attempting to minimize risk and volatility through the strategic allocation of assets to investment pools ("**Investment Pools**") that are managed by independent portfolio managers ("**Managers**").  The Fund may also allocate assets directly to managed accounts over which the Managers have discretion. |
| | The Fund's investment philosophy is based on the idea that, over time, a diversified portfolio of alternative investment strategies can generate a better risk/reward profile than what is available from any single alternative investment strategy or from long-only investing in conventional asset classes. |

1

**Diversification.** The Investment Managers believe that by allocating the Fund's capital among a number of uncorrelated Investment Pools and Managers, employing different strategies and investing in different financial markets, the Fund's performance over a 3 to 5 year time horizon will be less volatile and less correlated to any single financial market than if invested in a single investment strategy. The risk reduction is achieved in three distinct ways. First, as suggested by modern portfolio theory, a portfolio composed of a series of uncorrelated investments should be less volatile than the majority of its underlying components. Second, by deploying assets in different markets and strategies, the impact to the portfolio of a major downturn in a specific market may be significantly reduced. Finally, by investing the capital with a varied group of largely unrelated Managers and Investment Pools, the Investment Managers hope to significantly reduce the impact that any serious problems experienced by a single Manager or Investment Pool may have on the Fund's overall portfolio.

**Alternative Investments.** In the selection of Investment Pools and Managers, the Investment Managers have chosen to focus on Alternative Investments. The term "**Alternative Investments**" (also known as "hedge funds") refers to a sub-set of highly specialized investment strategies geared to delivering superior risk-adjusted returns that are generally uncorrelated to major financial markets and to each other. Alternative Investment portfolios are usually characterized by investments where investment managers can exploit structural inefficiencies in the way the public at large (both institutional and individual) invests in order to extract superior absolute returns without taking on undue levels of additional risk.

The Investment Managers believe that Alternative Investments are appropriate for the Fund not only because they represent a better investment opportunity than traditional investment strategies, but also because their general lack of correlation make them particularly well-suited to meeting the Fund's risk diversification objectives.

The Investment Managers may employ investment strategies, either directly or through Investment Pools, that include, without limitation, investing in, trading, buying (on margin or otherwise), selling (including short sales), and otherwise acquiring, holding, disposing of, and dealing in listed and unlisted, publicly- and privately-offered, U.S. and non-U.S. securities and other investments. These may include, but are not limited to: equity securities; debt securities; convertible securities; rights, warrants, subscriptions or other contracts to acquire securities; options; certificates of deposit; letters of credit; bankers' acceptances; repurchase and reverse repurchase agreements; options on securities and securities indices; currencies; mortgage-backed securities; money market instruments; obligations of or guaranteed by the governments and their agencies and instrumentalities; futures and forward contracts; security

2

futures; swaps; other financial (including derivative) instruments; other personal property; securities of and interests in entities engaged directly or indirectly in any of the foregoing; and any derivatives, rights or interests pertaining to any of the foregoing (collectively, "**Securities**") The Fund may not be permitted to participate in profits or losses resulting from "new issues" transactions engaged in by the Investment Pools.

**Time Horizon.**    The Investment Managers consider that the time-horizon of the Fund's investments is an important component of the overall investment strategy of the Fund. With some exceptions, the majority of the allocations made to any given Investment Pool or Manager are long-term in nature. The Investment Managers will, from time to time, increase or decrease the weighting of one particular Investment Pool in the Fund's portfolio relative to the others. However, for the most part, the Investment Managers are not looking to time markets or make tactical asset plays of a short-term nature (although some portion of the Fund's portfolio will be allocated to medium-term investment strategies as described below).    Consequently, any prospective investor in the Fund should consider their investment with at least a 3-5 year time horizon in mind.

**Modification of Strategies**.  The Investment Managers reserve the right to alter or modify some or all of the Fund's investment strategies in order to take advantage of changing market conditions when the Investment Managers, in their discretion, conclude that such alterations or modifications may enhance the Fund's ability to meet its objectives.

**There is no assurance that the Fund's strategies will be implemented successfully or that its goals will be realized.**

| | |
|---|---|
| **Multi-Manager Approach** | The use of a multi-manager format, whereby the Investment Managers make investments through a variety of Managers, affords the Fund's Shareholders (the "**Shareholders**") the opportunity to: |

- invest in a diversified portfolio that is actively managed and monitored by and under the Managers;

- invest in a diversified portfolio with a smaller capital contribution than would otherwise be required if the Shareholders were to invest with each Manager separately;

- gain access to Managers which have different investment styles and philosophies, and

- gain access to Managers which otherwise have prohibitive minimum investment requirements.

3

**Manager Allocation, Selection and Monitoring**

**Investment Allocation.** The Investment Managers employ a top-down allocation process. Allocation decisions begin with an evaluation of the Alternative Investment strategies available to the Fund. In keeping with the Fund's investment philosophy, the Investment Managers prefer those strategies that exhibit less correlation to other investment strategies and a reduced dependence on the performance of specific financial markets for their source of returns. The different strategies are ranked into three distinct classes based on their market and correlation exposure as follows:

Class 1:    Strategies with little to no exposure to any specific financial market and with little to no correlation to any other investment strategy.

Class 2:    Strategies with low correlation to other investment strategies and with limited exposure to financial markets.

Class 3:    Strategies that may be highly correlated to other investment strategies and/or are significantly correlated to specific financial market performance.

As a general rule, the Investment Managers look to invest a high proportion of the Fund's assets in Class 1 strategies. However, the Investment Managers also recognize that there are only a very few superior, world-class funds that can meet the criteria of this class. Consequently, the Investment Managers will also use Class 2 strategies as an important asset allocation component of the Fund. Class 3 strategies will only be used in a limited fashion where the Investment Managers believe that significant profit opportunities exist in a financial market or asset class such that the Fund will be adequately compensated for the additional market exposure it assumes when it invests in a Class 3 investment strategy.

The extent to which investments will be made within any strategy will be at the Investment Managers' discretion, and the Investment Managers will subjectively determine the most effective asset allocation to maximize returns.

**Investment Selection**. The Investment Managers are responsible for all of the Fund's investment selection, allocation, and monitoring processes. In order to aid the Investment Managers in these processes, the Fund has established an Investment Advisory Board whose sole purpose is to make non-binding investment selection and asset allocation recommendations to the Investment Managers in accordance with the Fund's stated investment philosophy.

The Investment Managers draw from a wide network of sources for their selection of Managers and Investment Pools that are consistent

4

with the investment objective and strategies described above. Additionally, the Investment Managers have access to an extensive proprietary database containing statistical data on several thousand Managers and Investment Pools engaged in the Alternative Investment and traditional investment arenas.

The investment selection process is based on a series of rigorous analyses applied consistently to the existing universe of investment opportunities available to the Fund. Any potential new Manager or Investment Pool is screened on a quantitative basis to evaluate its overall fit with the portfolio on a risk, return and market correlation basis. A wide variety of statistical analyses are employed including, but not limited to, return, volatility, market correlation, sharpe, alpha, beta and draw-down analysis.

The Investment Managers also seek to evaluate a wide variety of less tangible qualitative factors including, but not limited to, the investment methodology of the Manager; the Manager's portfolio management experience; depth of management team; portfolio construction process; risk controls; track record of the Manager; the Manager's ability to absorb an increase in assets under management without negatively affecting future returns; organizational infrastructure; the ability of each Manager to consistently and effectively apply its investment approach; adequacy of accounting and back-office processes; the types and applications of internal controls; adherence to compliance, tax, and legal guidelines; integrity of key personnel; the depth and breadth of technology; background checks and extensive reference checks on key personnel; and any potential for conflicts of interest. Certain criteria may be emphasized above others in the selection of particular Managers or Investment Pools.

The extent to which assets are allocated to any Manager or Investment Pool is at the Investment Managers' discretion, and the Investment Managers utilize their subjective evaluation to determine which Managers and Investment Pools fit most consistently with the Fund's investment strategy.

The Investment Managers may allocate and reallocate assets to and from any Manager or Investment Pool at any time and from time to time. The Investment Managers may, from time to time, narrow the scope of the Fund's investments by reducing the number of Managers or Investment Pools to which assets are allocated, thereby creating a greater concentration of Managers and Investment Pools and, perhaps, greater volatility.

**Investment Monitoring**. The Investment Managers proactively monitor the investment performance of all of the Fund's Managers and Investment Pools. The monitoring consists of an ongoing reapplication

5

of all of its quantitative and qualitative analysis in an effort to ascertain whether a Manager continues to manage the Investment Pool in a manner which is consistent with the Investment Managers' expectations. There can be no guarantee, however, that the Investment Managers will be able to predict the performance of any Manager or Investment Pool.

**Closed Fund Investments**.   Certain of the Fund's investments in Investment Pools may be closed to new capital (the "**Closed Funds**"). The Closed Funds are typically managed by high-profile Managers. Because the Fund generally cannot increase its investment in these Closed Funds when the Fund accepts new investment capital, the Fund's assets placed with these Investment Pools as a percentage of its total assets will decrease when the Fund accepts additional subscriptions from new or existing investors.  This will result in a pro rata dilution of each existing investor's indirect interest in the Closed Funds.

**Borrowings**

The Fund, through Montpellier International, has the ability to borrow funds and does so principally to provide bridge financing for investor redemptions.  In addition, the Fund may borrow funds from time to time to make investments. See "Use of Leverage" below.

The Fund, through Montpellier International, has the ability to borrow funds to lend to two affiliated investment funds that invest in the Fund. The maximum percentage of the Fund's total borrowings which it is permitted to lend to each of those affiliated funds is limited to the percentage of the outstanding Shares of the Fund that each affiliated fund then owns.  Loans by the Fund to each of those affiliated funds are secured by the Shares of the Fund owned by the affiliated fund which have been pledged to Montpellier International as collateral.  In no event will the Fund's liability to its lenders for the amounts borrowed by the Fund that are in turn loaned by the Fund to one of the affiliated funds exceed the value of the Shares owned by the affiliated funds.

All of the Fund's borrowings are secured by the Fund's shares in Montpellier International that holds the interests in the Investment Pools and managed accounts, which shares have been pledged to the Fund's lenders as collateral.

**Leverage**

Effective January 1st, 2005, the Fund expects to employ leverage for investment purposes under a flexible model where the amount of debt as a percentage of investor equity will be set by the Investment Managers based on the risk outlook for the current environment. The Fund generally expects to run more levered in those environments offering strong opportunities with low downside and less levered in those environments offering weak opportunities with considerable risk. For the 6 to 12 months following January 1, 2005, the Fund expects to run at close to 15% debt as a percentage of investor equity.   In addition, margin may be used by the Managers and Investment Pools in an effort

6

to increase returns.

| | |
|---|---|
| **Prior Performance Information** | Prior performance information of the Fund will be provided separately upon request. |

**Investment Advisory Board**

The Fund has an investment advisory board (the "**Investment Advisory Board**") which provides non-binding investment guidance to the Investment Managers from time to time. The Fund's Directors, in consultation with the Investment Managers, designate the Investment Advisory Board. The composition of the Investment Advisory Board may change from time to time in accordance with the specific research and advisory needs of the Fund.

**Investment Management Agreement**

The Fund has entered into an agreement with the Investment Managers dated as of November 30, 2004, pursuant to which the Investment Managers perform their agreed upon functions for the Fund. The Investment Managers' compensation arrangements are set out under "Fees" below.

The Fund will indemnify the Investment Managers, and their respective principals, officers, directors, employees and controlling persons against all losses to which they may become subject relating to the business of the Fund, except for losses resulting from a violation by either Investment Manager of a certain minimum "standard of care." For this purpose, the standard of care will be met if each Investment Manager's conduct did not constitute fraud, willful misconduct, gross negligence, a material breach of its obligations, or reckless disregard of its duties under the Investment Management Agreement.

The Investment Management Agreement will continue through January 1, 2007, and automatically will be extended for successive 1 year terms, subject to termination by any party effective as of the end of any one-year term, upon not less than ninety (90) days prior written notice.

**Principals of HCH and Khronos**

A description of the principals of each of the Investment Managers is set forth below:

### HCH Capital Ltd.

**I. Jimmy Mayer** and **Edmundo Esquenazi** are directors of HCH, a company dedicated to the administration of investments for its own account and that of many close friends and associates. They are founders and lead investors of Inversiones Sanford S.A. ("**Sanford**"), a professional management company with an investment stake in a holding company currently acknowledged as one of the leading industrial groups in Colombia, Latin American Investors Ltd. ("**LAIL**"). Currently LAIL has more than numerous manufacturing facilities and interests in the following sectors: petrochemicals, plastics, wire & cable and services industries. Among these companies are: Petroquimica

7

Colombiana S.A. (PVC resin), Propilco (Polypropylene resin), Biofilm (BOPP-polypropylene film), Filmtex (calander PVC film) and Centelsa (wire and cable).

**Mr. Jimmy Mayer** retired from operational duties in 1996 and is an active member of Sanford's executive committee.  Mr. Mayer received a B.Sc. in Physics from the Massachusetts Institute of Technology ("**MIT**") in 1958.

**Mr. Esquenazi** retired from operational duties in 1997 and is an active member of Sanford's executive committee.  He served as Colombian Ambassador to Israel from 1989 to 1991.  He received a B.Sc. (1958) and an M.S. in Civil Engineering from MIT in 1959.

### Khronos LLC

**Rafael Mayer** is a Managing Director and Co-Founder of Khronos. Prior to his founding of Khronos in 1996, Rafael spent three years as Manager of Investment Research at Asset Management Advisors, an investment consulting group out of Jupiter, Florida. Rafael was responsible for coordinating all of the firm's investment research activities with particular emphasis on outside managers and alternative investments. Prior to joining Asset Management Advisors, Rafael spent five years as Director of Software Development at Franklin Electronic Publishers in Mt. Holly, New Jersey. Rafael led a software development team specializing in reference software for hand-held electronic platforms. Rafael graduated Cum Laude from the University of Pennsylvania, receiving a B.Sc. in Economics from the Wharton School.

**David Mayer** is a Managing Director and Co-Founder of Khronos. Prior to his founding of Khronos in 1996, David spent two years in the Investment Banking Division of Salomon Smith Barney. David worked as an analyst specializing in financial transactions for US-based health care companies, including public stock offerings, public debt offerings, M&A transactions and financial advisory services. David graduated Cum Laude from the University of Pennsylvania, receiving a B.A. in Mathematics.

**Directors**

The Fund is managed by its Board of Directors (the "**Directors**").  The Directors exercise ultimate management authority over the Fund, but have delegated the day-to-day investment management and administration of the Fund to the Investment Managers and Administrator.

The Directors are Messrs. Rafael Mayer, William D. Thomson, Piero Di Capua, Herbert M. Selzer and Jan Spiering.  The Directors are entitled to receive customary directors' fees for their services as such.

A summary of the business background of Mr. Mayer is set forth above. Biographical information for Messrs. Thomson, Di Capua, Selzer and

8

Spiering is set forth below.

**William D. Thomson** is a former Executive Vice President of the Bank of Bermuda Limited ("**Bank of Bermuda**") and is currently a director of a number of insurance, shipping, investment and mutual fund companies, and a member of the corporation of the Bermuda Biological Station.  He is a former director of the Bermuda Monetary Authority and past Chairman of the Bermuda International Business Association and a Fellow of the Institute of Directors.

Mr. Thomson retired from his position as Executive Vice President of the Bank of Bermuda in 1994.  He was appointed an officer of the Bank of Bermuda in 1964, and following subsequent promotions, Executive Vice President in 1990.  Mr. Thomson was educated in Bermuda and Canada.

**Piero Di Capua** joined HCH as CFO in January, 2002.  Prior to joining HCH, Mr. Di Capua spent his professional career as Vice President of Petroquimica Colombiana S.A. and later Executive Vice President of Sanford, where he is still a Director and an active member of the executive committee. Mr. Di Capua received a B.S. (Chemical Engineering) from MIT in 1974 and an M.B.A. from the Wharton School of the University of Pennsylvania in 1976.

**Herbert M. Selzer** is an attorney admitted to practice in New York State since 1971.  He is presently a partner of Loeb Block & Partners, LLP, which he has been affiliated with since 1972.  Mr. Selzer is a graduate of the George Washington University Law School (1971) and New York University Law School (LLM (Tax) 1976).  He has served on the board of directors of numerous industrial and business enterprises as part of his activities as an attorney.  He is also an Associate Trustee of the North Shore University LIJ Hospital System, Manhasset, New York.

**Jan J. Spiering**, F.C.A. is a Fellow of the Institute of Chartered Accountants in England and Wales and is the retired Managing Partner and Chairman of Ernst & Young Bermuda, a firm which he joined in 1979.  Previous to Ernst & Young, he was employed by Robson Rhodes, a United Kingdom firm of Chartered Accountants with whom he qualified. Additionally, Mr. Spiering has served as a Director on numerous companies and in particular within the investment industry. He has served on various public boards and committees including Deputy Chairman of Bermuda International Business Association, Chairman of Bermuda's International Business Association Mutual Funds Committee, Chairman of the Board of Governors of the Bermuda College and is currently Chairman of Bermuda's International Business Forum to which he was appointed in 1995.

9

**Risk Factors**     **An investment in the Fund is speculative and involves substantial risk, including the risk of loss of an investor's entire investment. Some of the more important risks are as follows:**

**Investment Risks**

- **No Guarantee of Profit**.  There is no assurance that the Fund will provide an acceptable return to investors or not incur substantial losses.

- **Reliance on Investment Managers**.  The Fund's success is dependent on the judgment and abilities of the Investment Managers in making investment allocation and re-allocation decisions among Investment Pools and Managers.  The Investment Managers are not, however, dependent on the services of any one individual.

- **Lack of Control**.  The Fund does not control the individual investments made by the Managers, their choice of investments and other investment decisions, which are totally within the discretion of the Managers. In addition, the Investment Managers generally will not have any control over the financial institutions selected by the Managers for transactional or custodial services.  Bankruptcy or fraud at one of these institutions could impair the operational capabilities or the capital position of the Fund.  There can be no assurances that such investments will be successful or will not result in substantial losses.

- **No Custody of Assets**.  The Fund does not have custody of the assets allocated to the Managers or the underlying securities held by the Managers or the Investment Pools.  Although the Investment Managers endeavor to verify the integrity of the Managers, there is always the risk that a Manager could mishandle or convert the securities or the assets under that Manager's control.

- **Monitoring Managers**.  Although the Investment Managers attempt to monitor the performance of each Manager, the Investment Managers must ultimately rely on each Manager to operate in accordance with the investment strategy or the guidelines laid out by such Manager, and the accuracy of the information provided to the Fund by such Manager.   If a Manager does not operate in accordance with its investment strategy or guidelines, or if the information furnished by a Manager is not accurate, the Fund may sustain losses with respect to its investment with the Manager despite the Investment Managers' attempt to monitor the investment. The Managers will not coordinate their investment strategies with each other, and at times may take positions on behalf of the Fund which are the same as, or opposite from, positions taken by other Managers.

10

- **Speculative Investments**.  Substantial risks are involved in trading and investing in Securities (either directly or indirectly through Investment Pools).  The prices of Securities are highly volatile and market movements are difficult to predict.  Moreover, many of the Fund's investments will be inherently speculative.  The short-term performance of the Fund's investments may fluctuate significantly, as the Fund pursues its strategy to achieve gains over the longer term.  The Fund is, therefore, not suitable for short-term investment.

- **Use of Leverage**. The use of leverage by the Managers can exacerbate losses and increase volatility.  If a Manager does not sufficiently de-leverage when necessary, there is the possibility that the Manager may be required to terminate trading altogether, thereby losing all upside potential and posing a significant risk to capital.  There can be no assurance that the Fund will perform better by investing with Managers which utilize leverage.

  The exact amount of leverage used will depend on market conditions and the discretion of the Managers.  Any leveraging strategies that the Managers employ should be expected to increase the Fund's transaction costs, interest expenses and other costs and expenses.  In addition, margin trading requires the pledge of the assets as collateral, which can result in the selling of portfolio securities at substantial losses that would not otherwise be realized.  No assurance can be given that use of margin and other leverage by Managers will not result in material losses for the Fund.

- **Limits on Information**.  In selecting Managers, the Investment Managers will request detailed information from each Manager regarding the Manager's historical performance and investment strategy.  However, the Investment Managers may not always be provided with detailed information regarding all the investments made by the Managers because certain of this information may be considered proprietary information by the Managers.

- **Risk Controls**.  Events during the past years, including the bankruptcy and other adverse financial results of major financial institutions, have focused attention upon the necessity for firms to maintain adequate risk controls and compliance procedures.  There is no assurance that the Fund's controls and procedures will be adequate.  These events have also raised concerns as to the manner in which exchanges monitor trading activities and implement regulations to protect customer funds.

- **Limited Liquidity of Investments**. Instruments in which the Managers trade may be thinly traded and relatively illiquid or may cease to be traded after a Manager invests in such instruments. The Managers may invest in restricted securities that are not traded in

11

public markets. Restricted securities generally are difficult or impossible to sell at prices comparable to the market prices of similar securities that are publicly traded. No assurance can be given that any such restricted securities will be eligible to be traded on a public market even if a public market for securities of the same class were to develop.

- **Investment Restrictions**. The Investment Pools may have restrictions in their governing documents that limit the ability to withdraw capital from or invest in these entities, other than at specified times, such as quarterly or at the end of the year. Such restrictions may limit the Fund's flexibility to reallocate assets among the Investment Pools, or to honor a redemption request.

- **Concentration of Investments**. The Investment Managers are not limited in the amount of Fund capital which they may commit to any one investment, resulting in lack of diversification and potentially increased volatility. Although the Investment Managers follow and will continue to follow a general policy of seeking to spread the Fund's capital among a number of Investment Pools, the Investment Managers may in the future depart from such policy from time to time for the purpose of holding a few, relatively large positions in relation to the Fund's capital. The result of any such concentration of investments is that a loss in any one position could materially reduce the Fund's capital.

- **Valuation**. The Fund relies on the valuations provided by the Managers and Investment Pools for purposes of calculating the Net Asset Value of the Fund and preparing the Fund's financial statements. There is no assurance that such valuations will be correct or that such information will be received in a timely manner.

- **Counterparty and Settlement Risk**. The Managers may take a credit risk on parties with whom it trades and will also bear the risk of settlement default. In addition, there may be practical or time problems associated with enforcing the Fund's right to its assets in the case of an insolvency of any such party.

- **Derivatives**. The Managers (directly or indirectly through the Investment Pools) may enter into derivative transactions with non-affiliated entities, which derivative transactions may expose the Fund to increased risk. Such derivative transactions may include, but are not limited to, credit default swaps, interest rate swaps, currency swaps, other swap contracts, forward foreign exchange contracts, swaptions, options, caps, collars, floors and repurchase agreements. The Managers have complete flexibility to invest in any such derivative instruments and which may involve additional risks not described herein. There is no assurance that a liquid

12

secondary market will exist for any derivative transactions entered into by the Managers or that the Fund will not be exposed to risks of significant losses. Derivative transactions may expose the Fund indirectly to risk of default by a counterparty, premature termination of the transaction, adverse changes in market conditions and substantial costs for creating and maintaining the transaction.

- **Smaller Capitalized or Unseasoned Companies**. Investments in smaller capitalized or unseasoned companies generally have greater earnings and sales growth potential than larger capitalized companies. However, investments in smaller capitalized or unseasoned companies may involve greater risks, such as limited product lines, markets and financial or managerial resources. In addition, less frequently-traded securities may be illiquid and subject to more abrupt price movements than securities of larger capitalized companies.

- **Non-U.S. Investments**. The Investment Pools and Managers may invest in both U.S. and non-U.S. securities markets. Since non-U.S. securities often are purchased with, and payable in, currencies of foreign countries, the value of these assets as measured in U.S. dollars may be affected favorably or unfavorably by changes in currency rates and exchange control regulations. Non-U.S. securities markets may not be as developed, liquid or efficient as those in the United States, and securities of non-U.S. issuers may be less liquid and their prices more volatile than securities of comparable U.S. issuers. Non-U.S. markets and non-U.S. issuers of securities are generally subject to less stringent or different regulations than are U.S. markets and issuers. There is generally less publicly available information regarding non-U.S. issuers of securities than is typically available about U.S. issuers. Custodial and brokerage expenses for transactions in non-U.S. securities may be higher than for transactions in U.S. securities.

- **Speculative Short Sales of Securities**. The Managers (either directly or indirectly through the Investment Pools) may sell short certain Securities. Such short sales may include Securities which the Managers believe to be overvalued in the expectation of covering the short sale with Securities purchased at a price lower than that received in the short sale. There can be no assurance that Securities which the Managers believe to be overvalued are in fact overvalued. Nor can there be any assurance that overvalued Securities will decrease in value. If the price of a company's securities which have been sold short increases, a Manager may be forced to cover its short position at a higher price than the short sale price, resulting in a loss to the Fund.

13

- **Risk Arbitrage Risks**. The Fund's portfolio may include Investment Pools whose operations may involve arbitraging between a Security and its announced buy-out price (or other forms of "risk arbitrage"), or between or among two or more Securities. This means, for example, that the Investments Pools may purchase (or sell) Securities (i.e., on a current basis) and take offsetting positions in options in the same or related Securities. To the extent the price relationships between such positions remain constant, no gain or loss on the positions will occur. These offsetting positions entail substantial risk that the price differential could change unfavorably causing a loss to the position.

- **Emerging Markets**. Emerging markets investments historically have been highly volatile and involve greater risks than comparable U.S. investments. The application of non-U.S. tax laws (e.g., the imposition of withholding taxes on dividend or interest payments) or confiscatory taxation may also affect investment in non-U.S. Securities. Emerging markets investments also may be less liquid and less subject to governmental supervision than in the United States.

- **Exchange Rate Fluctuations**. Unless a Manager hedges its positions against fluctuations in exchange rates between the United States dollar and the currencies in which trading is done on non-U.S. securities exchanges, any profits which an Investment Pool might realize in such trading could be eliminated as a result of adverse changes in exchange rates, and the Investment Pool could even incur losses as a result of any such changes.

- **Portfolio Turnover**. The trading activities of the Managers may involve substantial portfolio turnover and correspondingly high transaction costs.

- **Fees and Expenses**. The Managers charge fees for their services to the Fund or to the Investment Pools in which the Fund invests. These fees are in addition to the fees charged by the Investment Managers to the Fund. Such fees may be payable irrespective of profitability and may be substantial even during periods of loss. The Fund may be required to pay performance-based fees to certain Managers at times when the Fund as a whole has not realized a profit. Performance fees payable to Managers may create incentives for the Managers to make investments that are riskier than would be the case in the absence of such arrangements.

- **Competition**. The Managers will engage in investment and trading activities which are highly competitive with other investment and trading programs including those of mutual funds and other financial institutions, investment banks, broker/dealers, commercial banks, insurance companies and pension funds, as

14

well as private investors, all of whom may have investment objectives similar to those of the Managers. These competitors may have substantially greater resources and experience than the Managers.

- **Managers' Limited Capacity.** There is no assurance that the Managers will, as a result of capacity constraints, agree to manage as much of the Fund's assets as the Investment Managers determine to allocate to the Managers. There also is no assurance that a Manager will not terminate its relationship with the Fund or return some assets under management.

## Fund Risks

- **No Participation in Management**. You will not be able to participate in the management of the Fund; however, you have voting rights (as outlined below), including the right to remove the Directors (upon the affirmative vote of not less than one-half of the issued Shares).

- **Illiquidity**. Your Shares will be illiquid because they are not readily saleable, transfers and assignments must be approved by the Directors, and redemptions generally are permitted only at the end of each quarter on at least 45 days' prior written notice if your redemption request exceeds US$1,000,000 or on at least 20 days' prior written notice if your redemption request is for a lesser amount. Moreover, full payment with respect to your redeemed Shares will not be made at the time of the redemption. Under extraordinary circumstances, the Fund may delay redemption payments until such time as the extraordinary circumstance no longer exists. If, as a result of some change in circumstances arising from an event not presently contemplated, you wish to transfer all or part of your Shares, even if all conditions to such a transfer are met, you may find no transferee for your Shares due to market conditions or the general illiquidity of the Shares. The Directors may impose additional restrictions in appropriate circumstances.

- **Substantial Redemptions**. In the event that there are substantial redemptions from the Fund, it may be more difficult for the Fund to generate the same level of profits operating on a smaller capital base. Under such circumstances, in order to provide sufficient funds to pay redemptions, the Investment Managers might be required to liquidate positions at an inappropriate time or on unfavorable terms.

- **Redeeming Shareholders are Creditors of the Fund**. Between the Redemption Date and the date on which all redemption proceeds are paid to you, you will be a creditor of the Fund subject to the same risks as any other creditor of the Fund, including the possibility that the Fund may be unable to pay all or a portion of the

redemption proceeds to you.

- **Establishment of Reserves**.  Under certain circumstances, the Fund may find it necessary to establish an accrual for contingent liabilities and/or withhold a portion of your redemption proceeds at the time of a redemption of your Interest.  In that event, the accrued/withheld portion would remain at the risk of the Fund's activities.

- **Effects of Additional Capital**.  There are no restrictions on the Investment Managers' ability to raise additional capital.  In addition, assets under management may increase internally by accumulation of profit.  It is possible that such increase in assets may lead to a decline in the rates of return for the Fund.

- **Performance Fee**.  You may be subject to a performance fee on unrealized profits which are never realized.

- **Foreign Currency Exposure**.  The value of your Shares will be calculated in U.S. Dollars.  You will bear the risk of any foreign currency exposure resulting from differences, if any, in the value of the U.S. Dollar relative to the currency of the country in which you reside.

- **Economic Conditions**.  Changes in economic conditions, including, for example, interest rates, inflation rates, industry conditions, competition, technological developments, political and diplomatic events and trends, tax laws and innumerable other factors, can affect substantially and adversely the business and prospects of the Fund.

- **Need for Risk Controls and Compliance Procedures**.  Events during the past years, including the bankruptcy and other adverse financial results of major financial institutions, have focused attention upon the necessity for firms to maintain adequate risk controls and compliance procedures.  There is no assurance that the Fund's controls and procedures will be adequate.  These events have also raised concerns as to the manner in which certain exchanges monitor trading activities and implement regulations to protect customer funds.

- **Regulatory Changes and Governmental Actions**.  Modifications in existing governmental regulations, or actions taken by governmental bodies worldwide, may affect the Fund's investments and/or the economic climate in which the Fund operates.  These changes could be swift and adversely affect the Fund.

*       *       *

The foregoing list of risk factors does not purport to be a complete explanation of the risks involved in this offering.  Potential Subscribers

should read the entire Memorandum.

**Conflicts of Interest**

**Various conflicts of interest may arise in connection with the operation of the Fund. The Investment Managers have a responsibility to the Fund to exercise good faith and fairness in all dealings affecting the Fund and will endeavor to resolve all conflicts fairly and equitably. Among the conflicts which may arise are the following:**

- **Other Activities of the Investment Managers and Managers**. The Investment Managers and the Managers and their principals, employees, agents and affiliates may trade personal accounts independently of the Fund's account and may manage the accounts of clients other than the Fund. The records of such proprietary trading are confidential and will not be available for inspection by the Fund or the Shareholders. Prospective investors should be aware that such persons from time to time may take positions in their proprietary accounts that are different from or opposite to positions taken for the Fund. In addition, the Managers may have a conflict of interest in rendering advice to a customer because the financial benefit from managing some other customer's account may be greater, which may provide an incentive to favor such other account.

  The Investment Managers may establish, sponsor, or be affiliated with other investment pools that may engage in the same or similar businesses as the Fund using the same or similar trading strategies.

- **Performance Fee**. The Performance Fee to be received by Khronos may create an incentive for Khronos to recommend investments in a manner that is riskier or more speculative than would be the case in the absence of such an arrangement.

- **Representation of U.S. Counsel**. Katten Muchin Zavis Rosenman, the Fund's U.S. legal advisor, also acts as counsel to the Investment Managers and it also may be counsel to certain of the Managers and/or Investment Pools in matters not involving the Fund. Consequently, certain conflicts of interest may arise.

- **Directors**. Two of the Fund's Directors currently are affiliated with the Fund's Co-Investment Managers. In addition, the Fund's Directors also may act as directors for other companies and investment pools. The foregoing activities and relationships may cause certain conflicts of interest in decisions taken for the Fund.

**Administration**

**Administrator**. Dundee Leeds Management Services Ltd., a Bermuda funds' management company, with offices as set out in the Directory (the "**Administrator**"), serves as the Fund's administrator and registrar and transfer agent. Pursuant to an Administration Agreement, dated as of November 30, 2004, between the Administrator and the Fund (the

17

"**Administration Agreement**"), it is the Administrator's responsibility, among other things, to: (i) maintain the register of shareholders of the Fund and other documents in connection therewith, (ii) process subscriptions and redemptions of the Fund's shares, (iii) review the calculation of the Fund's Net Asset Value, and (iv) report to the Bermuda Monetary Authority, on such basis as it may request, certain information about the Fund, including the Net Asset Value of the Fund, the Net Asset Value per Share, percentage change in the Net Asset Value per Share from the previous reporting period, total net assets of the Fund, amount of new subscriptions and redemptions, number of shares in circulation.

As set forth below, various administrative services are provided by the Co-Investment Managers.

<u>**Accounting**</u>.   Khronos is responsible for (i) maintaining the Fund's financial and other books, records, accounts and files as requested by the Administrator; (ii) directing to and disbursing from the Fund's bank account payments for Fund expenses, (iii) calculating the Fund's Net Asset Value and Net Asset Value per Share, (iv) preparing and maintaining all customary financial and accounting books and records of the Fund, and (v) preparing and submitting unaudited financial statements of the Fund.

<u>**Investor Relations**</u>.   HCH is responsible for (i) communicating with the investors and potential investors in the Fund, (ii) updating all investor information, and (iii) interacting with the Administrator in connection with all redemption, subscription and transfer requests.

| | |
|---|---|
| **Custodian** | Banco Santander Central Hispano (Guernsey) Ltd. (the "**Custodian**") is custodian of Fund's assets.   The Custodian is responsible for maintaining Montpellier International's assets in safekeeping and supervising that the movement of these assets follows the appropriate authorized instructions. |
| **Liability and Indemnification** | <u>**Your Liability**</u>. You will not be liable for the obligations of the Fund in excess of the amount of your investment in the Shares. |

<u>**Liability of Directors and Service Providers**</u>.   Except as otherwise specified herein or as provided under Bermuda law, neither the Directors nor the Fund's service providers, nor any of their respective officers, directors, employees, representatives, agents or affiliates, will be liable, responsible, or accountable in damages or otherwise to the Fund or any Shareholder for any act or omission performed or omitted to be performed in accordance with the terms of the Memorandum of Association and Bye-Laws and/or their service agreement.   Liability under the service agreements would exist in the case of gross negligence, willful misconduct, fraud, reckless disregard of a service

18

provider's duties under its agreement, or a material breach of a service provider's contractual obligations (collectively, **"Bad Acts"**). Neither the Fund nor any of its Directors will be liable, responsible or accountable in damages for the acts or omissions of the Fund's service providers or agents, provided they were selected with due care.

**Indemnification**. The Directors, service providers and their respective officers, directors, employees, representatives, agents or affiliates will be indemnified against any liabilities (including legal expenses) incurred as a result of their activities or involvement with or on behalf of the Fund, provided they acted in accordance with the standards set forth in the Fund's Memorandum of Association and Bye-Laws or the relevant service contract, as the case may be. There will be no indemnification for any liabilities resulting from a person's Bad Acts.

**Capital Structure and Rights of Shares**

**General**. The Fund's authorized share capital is 500,000,000 consisting of 500,000,000 voting, redeemable and participating common shares, par value US$1.00 per share (the "**Shares**"). The Fund may, in the future, offer one or more additional classes of Shares (each, an "**Additional Class**" and separately a "**Class**") of its common shares, each of which may (i) be separately managed, (ii) trade a distinct portfolio, (iii) have a separate investment objective and Net Asset Value, and/or (iv) offer different fees, among other differences. The approval of the Shareholders will not be necessary under Bermuda law to offer any Additional Class as long as such Additional Class does not rank in priority (as regards to the participation in the profits or assets of the Fund) to the Shares, or the creation of an Additional Class does not materially adversely vary or abrogate the rights of the existing Shareholders.

**Multiple Series**. The Shares are being offered in multiple series (each a "**Series**"). Each outstanding Series of a Class will participate ratably with all other outstanding Series of a Class in the Fund's assets and earnings based on the respective Net Asset Value of each Series of the same Class. The Fund may create additional Classes and Series of Shares from time to time without the consent of the Shareholders.

If, at a quarterly admission date, the Net Asset Value per Share is less than the price per Share at which a Performance Fee was last paid, the Fund will designate the Shares issued on such admission date as a separate Series of Shares at an initial price per Share equal to the Net Asset Value per Share of the previously issued Series as of the last Business Day of the preceding quarter.

In order to keep the number of different Series of Shares outstanding at any one time to a minimum, and to equalize the value of the various Series, all profitable Series of Shares may be consolidated into one Series after the close of each quarterly Performance Fee (as defined

19

below) payment date of the Fund (each, a "**Performance Payment Date**").  If, on a Performance Payment Date, any Series of Shares has a gross asset value per Share before certain fees that is either greater than or equal to the higher of the purchase price per Share of that Series and the price per Share at which a Performance Fee was last paid (such a Series being a "**Profitable Series**"), Shares of that Profitable Series will be exchanged for Shares of such other Profitable Series then in issue or a newly created Series, as the Investment Managers shall in their discretion determine (the "**Selected Series**").  Shares of each Profitable Series outstanding on each Performance Payment Date shall be exchanged for Shares in the Selected Series on the first day of the following quarterly payment period at the Net Asset Value per Share of the Selected Series.  Only Profitable Series on a Performance Payment Date will be consolidated into the Selected Series as at the beginning of a quarterly payment period.

**Rights of Shares**.

- **Issuance and Transfer of Shares**.  The Directors may refuse to issue, register or permit the transfer of Shares if they reasonably determine that such issuance, registration or transfer is not in the best interests of the Fund.

- **Voting Rights**.  The Shares have voting rights on a share-by-share basis.  Each Share is entitled to one vote at all meetings of Shareholders of the Fund on any matter acted upon by the Shareholders.

- **Meetings**.  Shareholders are entitled to receive notice of and to attend and to vote at all meetings of Shareholders at which matters on which they will vote will be taken up.

- **Right to Dividends**.  Each Share carries a right to dividends, which may be declared by the Directors only out of the profits from the underlying Fund investments and otherwise in accordance with the law.  The Directors do not currently intend to declare any dividends to Shareholders.

- **Authorized Capital**.  The Fund may, from time to time, by an "Ordinary Resolution" of Shareholders (a majority of the Shares represented by the Shareholders present and entitled to vote in person or by proxy) increase the capital of the Fund by such sum and number of Shares as the Resolution shall provide.

- **Dissolution of the Fund and Winding Up**. Pursuant to the Bye-Laws of the Fund, the Fund shall be wound up and liquidated by "Special Resolution" (a two-thirds (66 2/3%) majority of the Shares represented by Shareholders present and entitled to vote in person or

20

by proxy).  On the dissolution and winding up of the Fund, the net assets of each Class, after payment of all liabilities attributable to the Shares that are available for distribution among Shareholders, will be distributed to Shareholders pro rata to the number of Shares of a Series and Class held by them.

- **Amendments**.  The Shareholders may only amend the Memorandum of Association and Bye-Laws by Special Resolution.

- **Variation of Rights**.  No material adverse variation or abrogation of the rights attaching to the Shares of any Class or Series of Shares may be made without either the written consent of all the issued Shares of that Class or Series.

**Fees and Expenses**     **Ongoing Operational Expenses**.  The Fund's expenses consist of (i) its proportionate share of any ordinary and extraordinary operating expenses of any Investment Pool in which it invests (which will be indirect Fund expenses serving only to affect the value of the Fund's investments in Investment Pools) and the expenses of the Manager's separate accounts, including all transaction costs and investment-related expenses incurred in connection with the Investment Pools' and the Managers' trading activities, such as brokerage fees, broker-dealer markups, clearing costs, margin interest, borrowing costs and custodial expenses, as well as advisory, management and performance fees to the Managers for trading the Investment Pools' and the Fund's individual account assets, and all due diligence expenses incurred in the selection and monitoring of the Investment Pools and Managers, (ii) routine legal, accounting, auditing, administration, and other routine operational fees and expenses, such as Directors' and Officers' liability insurance, (iii) expenses associated with the continued offering of Shares, (iv) extraordinary expenses (e.g., litigation costs and indemnification obligations), if any, (v) Custodian's fees and expenses, (vi) Director's expenses, (vii) its proportionate share of the operational and transactional expenses of Montpellier International, (viii) Bermuda government fees, (ix) Shareholder approved charitable contributions, and (x) the Management, Performance and Administrative Fees described below.

The indirect advisory fees and expenses payable by the Fund in (i) above consists of management (asset-based) and performance-based fees to the Managers.  Management fees are paid separately to each Manager based on each Manager's separate performance.  The Fund may be indirectly paying performance fees to some Managers in periods when the Fund's performance as a whole is negative.  In addition, to the extent the Fund allocates assets to Managers for separate managed account performance, the Fund will incur all transaction and advisory fees associated therewith.  There are no fees paid to Montpellier

International.

The Investment Managers may receive rebates for allocating the Fund's assets to certain Investment Pools.  All of these rebates will be reinvested in the Fund for the benefit of the Shareholders.

**Management Fee**.  HCH and Khronos receive a combined monthly fee which, in the aggregate, does not exceed an annual rate of 1.2% of the Net Asset Value of the Fund attributable to the Shares (the "**Management Fee**").  The Management Fee is payable in advance at the beginning of each month.

**Performance Fee**.  The Fund pays Khronos a quarterly performance fee equal to 5% of any New Net Investment Profits (both realized and unrealized) with respect to each Share of each Series at the end of each quarter (the "**Performance Fee**").  Performance Fees are paid on a Share-by-Share "High Water Mark" basis within each Series and not on the basis of the Fund's profits as a whole.

"**New Net Investment Profits**" in relation to the Shares of a particular Series is any increase in the Fund's Net Asset Value attributable to the Shares of a Series from the beginning to the end of the relevant measurement period after subtraction of the Management Fee and all other expenses for which the Fund is responsible.  To the extent that losses are allocated to any Shares of a particular Series, all such losses (except losses related to Shares that are redeemed) must be recouped before Khronos will be entitled to a Performance Fee for those Shares.  In no event will a Performance Fee for any Shares be paid on the recoupment of losses for those Shares from prior periods, and will only be paid on new net appreciation in the Shares.

**Deferral of Performance Fee**.  Khronos may defer receipt of a portion of the Performance Fee payable to it by the Fund.

**Administrative Fee**.  The Fund pays the Administrator an annual administrative fee of approximately US$40,000.

**Securities Offered**      **Private Placement.**  The Fund is offering Shares to qualified entity investors as a private placement without registration under the securities laws of any jurisdiction. The Shares are being offered and sold directly by the Fund.  The Shares are being offered to persons who are known to the Investment Managers, or who otherwise have a substantive and pre-existing relationship with the Fund, its principals, representatives or agents.

**Continuous Offering**. Shares may be purchased as of the first day of every quarter at the Net Asset Value per Share of the relevant Series as of the last Business Day of the preceding quarter.  See "Capital Structure and Rights of Shares – Multiple Series."  The size and

22

duration of the offering is subject to the discretion of the Directors.

**Issuance and Maintenance of Shares**.  If your Share application is accepted, you will become a "**Shareholder**" and will be credited with the appropriate number of whole Shares on the Fund's Share Register. Fractional Shares will not be issued.  Shares will be issued and held in book-entry form at the offices of the Administrator.  The Fund's Share Register will be the sole and conclusive proof of your Share ownership. Share certificates will not be issued.  Shares will be issued as of the beginning of each quarter or at such other times as the Directors may determine.  There is no limit on the number of persons who may become Shareholders in the Fund.

|  |  |
|---|---|
| **Minimum Subscriptions** | **Initial Investment by New Shareholders**. Each new subscriber is required to contribute a minimum of US$1,000,000 at the time of subscription.  The Directors, in their discretion, may accept subscriptions of amounts that are less than the minimum, provided however that such amounts may not be less than US$50,000. |

**Additional Investment by Existing Shareholders**.  Additional subscriptions by an existing Shareholder must be at least US$50,000. The Directors, in their discretion, may accept subscriptions of amounts that are less than the minimum.

**Suitability**          **Residency Status**.  In order to subscribe for Shares pursuant to this Memorandum, you must be a non-U.S. Person.  A non-U.S. Person is anyone other than a U.S. Person as defined in Appendix 2 to the Subscription Documents annexed as Exhibit A.  **Shareholders (or their beneficial owners) who become U.S. Persons after the purchase of Shares are obligated to notify the Fund immediately**.

**Financial Status**.

**An investment in the Fund is only suitable for investors who:**

→  have experience with investments;

→  have adequate means of providing for their current needs and contingencies;

→  have no need for liquidity in this investment;

→  can afford a complete loss of principal; and

→  (either alone or in conjunction with a financial or legal advisor) have carefully read and understand this Memorandum.

**This offering is not suitable for:**

→  U.S. Persons; and

→  Persons defined as "**Prohibited Investors**" in the Subscription Documents.

**The Directors reserve the right to reject a subscription, in whole or in part, in their discretion for any reason. Subscriptions which do not comply with the Fund's anti-money laundering policies will be rejected.**

Net Asset Value

The Net Asset Value of the Fund at any date means the total assets of the Fund (including cash, cash equivalents, including accrued interest thereon, and the fair market value of the Fund's investments, including the Fund's interests in Investment Pools), less all liabilities of the Fund, including all properly attributed fees, costs and expenses. Net Asset Value is calculated as of the close of business on the last Business Day of each month in each year, on each Redemption Date, and on such other date(s) as the Directors determine (each, a "**Valuation Date**"). The Fund's Net Asset Value is calculated by Khronos, subject to the review of the Administrator, HCH and the Directors, using its good faith judgment on each Valuation Date. Net Asset Value is calculated in accordance with generally accepted accounting principles, consistently applied in the United States under the accrual method of accounting, with such adjustments as are necessary or advisable in the sole discretion of the foregoing persons ("**GAAP**"). "Net Asset Value per Share" is equal to the Net Asset Value of a Series of a Class divided by the total number of outstanding Shares of that Series and Class.

The fair market value of the assets of the Fund is based on valuations supplied by the Managers and the Investment Pools in accordance with the stated practices and policies of each such entity. These practices and policies may not be consistent.

Valuations provided by the administrators of the Investment Pools are not subject to independent review or investigation by the Fund, and the Fund is entitled to rely on the valuations provided without independent verification.

Valuations provided by the Managers of separate accounts may be subject to independent verification, in appropriate circumstances, by Khronos using its good faith business judgment (which may also include consultation with the Investment Advisory Board) in accordance with the following principles:

- Securities listed on a national exchange will be valued based on the last quoted sales price on the Valuation Date, and where no sales have been reported on the Valuation Date, the average of the "bid and asked price."

- Illiquid investments, which include unlisted securities and securities which Khronos believes to be not readily marketable, will be valued initially at cost and thereafter with any reduction or increase in value (as the case may be) as Khronos in its absolute discretion

24

shall deem to result in an appropriate estimation of fair market values.

- In respect of the foregoing, Khronos may rely on independent sources or its own judgment. Khronos may determine that the price paid for any security or other investment does not fully represent its market value (whether because of illiquidity or otherwise) and value such security or other investment as it reasonably determines.

**The determinations of Net Asset Value and Net Asset Value per Share shall be final and conclusive as to the Fund and the Shareholders once stated in good faith by the Directors. Prospective investors should understand that these and other special situations involving uncertainties as to determinations of the market value of the Fund's assets could have a material impact on Net Asset Value and Net Asset Value per Share if the judgments of the persons involved in the valuation process regarding the appropriate determinations thereof should prove to be incorrect.**

Redemptions

**When Voluntary Redemptions are Permitted**.  Shares are redeemable as of the last Business Day of each calendar quarter, or such other date as the Directors may determine (each, a "**Redemption Date**").

**Required Notice**.  You must give the Fund (i) at least 45 days' prior written notice if the redemption request exceeds $1,000,000, and (ii) at least 20 days' prior written notice if the redemption request is for a lesser amount, unless such notice requirements are waived or reduced by the Directors.  Unless a Shareholder redeems all of its Shares, such Shareholder may not make a partial redemption of Shares having an aggregate net asset value of less than $10,000, unless such minimum amount is waived or reduced by the Directors.  Redemption requests which are denied because you failed to meet established redemption standards must be reconfirmed to be effective as of the next succeeding Redemption Date.  The Fund may modify the redemption requirements for hardship reasons or other good cause shown, and may impose additional restrictions in appropriate circumstances.  Facsimile notice is acceptable to initiate your redemption request, but remittance of redemption payments to you will not be made until the Fund has received a manually executed Redemption Form in the form attached hereto as Exhibit B from you in good order.  Redemption requests are irrevocable once submitted to the Fund.

**Continuing Quarterly Redemptions**.  You may request that a certain number of Shares, or Shares equal to a certain amount, be redeemed each quarter on an ongoing basis by completing the Continuing Quarterly Redemption Form attached hereto as Exhibit C.

25

**Redemption Payments**. Redemption payments will be at the Net Asset Value of each Share of the relevant Series as of the applicable Redemption Date (after accounting for all accrued fees, expenses and other liabilities, including Performance Fees), less any redemption charges which may be imposed by an Investment Pool from which funds are being withdrawn as necessary to honor the redemption.

**Timing of Redemption Payments**. The Fund will attempt to pay 90% of all redemption proceeds within 30 days after a Redemption Date, and if the Fund is unable to do so, it will make redemption payments as soon thereafter as reasonably practicable. The balance of the redemption proceeds will be paid to a redeeming Shareholder within 60 days following final determination of the Net Asset Value of the Shares as of the Redemption Date. A redeeming Shareholder will become a creditor of the Fund with respect to the redeemed Shares following the Redemption Date and prior to a Shareholder's receipt of the redemption proceeds.

**Form of Payment**. Although redemption proceeds generally will be paid in cash in U.S. Dollars, redemptions may also be made "in-kind" at the discretion of the Directors. "In-kind" payments may include interests in Investment Pools. Consistent with applicable law, redemption payments will be made pursuant to a Shareholder's instructions in the Redemption Form attached hereto as Exhibit B.

**Extraordinary Circumstances**. If the Fund, in good faith, determines that extraordinary circumstances exist, _e.g._, if the Fund is unable (or in the exercise of the Fund's reasonable discretion, the Fund is unwilling because of disadvantageous market conditions) to liquidate sufficient positions to meet redemption requests, or there is a default or delay in the receipt by the Fund of proceeds of the whole or any part of proceeds due to the Fund from their investments, or other significant administrative or other similar hardship exists, then, at the discretion of the Fund, the Fund may suspend the determination of Net Asset Value and/or delay redemption payments to a redeeming Shareholder until such time as the extraordinary circumstance no longer exists. Redemption proceeds available for distribution will be apportioned pari passu among the totality of Shares to be redeemed on the same Redemption Date.

**Redemption Advances**. Upon receipt and acceptance of a valid Redemption Advance Request in the form attached hereto as Exhibit D, the Directors may, in their absolute discretion, as an accommodation to a redeeming Shareholder, determine to advance all or a portion of the redemption amount, but not more than the lesser of (a) 50% of the Net Asset Value of all of the redeeming Shareholder's Shares, and (b) $1,000,000 (a "**Redemption Advance**"). In total, Redemption Advances will not be more than 3% of the Fund's Net Asset Value at any time. The Fund will honor requests for Redemption Advances on a

"first come" basis.

Redemption Advances will accrue interest at an annual rate of LIBOR plus 2.5% until the Redemption Date.  Absent a prepayment of the Redemption Advance before the Redemption Date, the Redemption Advance will be subtracted, along with all accrued interest, from your redemption proceeds.  In order to receive a Redemption Advance, you must fill out the appropriate information on the Redemption Advance Request Form, and then sign and deliver to the Fund a Promissory Note in the form attached as Appendix A to the Redemption Advance Request. The Promissory Note will evidence your promise to repay the Redemption Advance.   Generally, your obligation to repay a Redemption Advance will be secured by a lien against all of your Shares as provided in the Fund's Bye-Laws.   The Directors may, however, in their discretion, limit this lien to an appropriate portion of your Shares.  You will bear the risk of a decline in the value of your Shares from the date you receive the Redemption Advance to the date your Shares are redeemed.

**Mandatory Redemptions**.  The Directors may, in their sole discretion, require your mandatory redemption from the Fund, in whole or in part, upon at least 48 hours prior notice to you.  The redemption price will be the Net Asset Value of the Shares as of the established Redemption Date.   If the redemption results from the unauthorized transfer of Shares, the effective date of redemption for valuation purposes may be retroactive in the sole discretion of the Directors.  The Fund will pay all of the redemption proceeds to you within 30 days after the date that the Fund notifies you of the compulsory redemption.  These proceeds may, in the discretion of the Directors, be paid in cash in U.S. dollars or by the delivery of a promissory note for the redemption amount.   The promissory note will be due and payable (either in cash in U.S. dollars or in-kind) no later than 30 days from the date on which the Fund delivers its next audited financial statements to the Shareholders.

| | |
|---|---|
| **Dividends/ Distributions** | Dividends and other distributions may be declared at the discretion of the Directors and are subject to the approval of the Shareholders.  The Fund does not currently intend to declare any dividends or to make any other distributions to Shareholders.   Dividends and distributions, if made, may be in cash in U.S. Dollars or in kind. |
| **Reports** | During the year, the Fund will provide unaudited monthly statements of the Net Asset Value of Shares.  Monthly reports will contain the number of Shares you own, the Net Asset Value per Share, and the total value of your investment.   The Fund will notify Shareholders when audited annual financial reports are available after the end of each fiscal year and send audited annual financial reports to Shareholders upon request. |
| **Transferability of** | You will be restricted from transferring, assigning or pledging your Shares without the approval of the Directors.   The Transfer Form is |

27

| | |
|---|---|
| **Shares** | attached hereto as Exhibit E.  The Fund will not recognize any pledge of your Shares which is not duly noted in the Fund's Register of Shareholders.  There is no established market for the Shares, and it is not expected that any public market will develop. |
| **Taxation** | The tax discussions below are based on the facts set forth in this Memorandum as of the date hereof.  However, these disclosures are for the purpose of providing general assistance only, are not intended to be a substitute for the advice of an investor's own tax and legal advisors, and should not be interpreted as legal or tax advice.  **Investors must consult their own tax advisors and counsel with respect to their particular circumstances before subscribing for Shares.** |

<u>**Bermuda**</u>.  The Fund has been advised that there is no Bermuda income, corporation or profits tax, withholding tax, capital gains tax, capital transfer tax, estate duty or inheritance tax payable by the Fund or its Shareholders (other than Shareholders ordinarily resident in Bermuda) as a consequence of owning Shares in the Fund.  The Fund will not be subject to stamp duty on the issue, transfer or redemption of its Shares.

The Fund applied for and obtained from the Minister of Finance of Bermuda under the Exempted Undertakings Tax Protection Act, 1966, as amended, an assurance that, in the event of there being enacted in Bermuda any legislation imposing tax computed on profits or income, or computed on any capital assets, gain or appreciation or any tax in the nature of estate duty or inheritance tax, such tax shall not until March 28, 2016 be applicable to the Fund or to any of its operations, or to the Shares, debentures or other obligation so the Fund except in so far as such tax applies to persons ordinarily resident in Bermuda and holding such Shares, debentures or other obligations of the Fund or any land leased or let to the Fund.

<u>**United States**</u>.  The Fund's investment gains are not anticipated to be subject to U.S. federal income or branch profits taxes, because the Fund expects that it will not be treated as engaged in a U.S. "trade or business" for U.S. federal income tax purposes.  As a result, it is anticipated that the Fund will not be subject to U.S. federal income tax (at marginal rates as high as 35%) or branch profits tax (at a rate of 30% on after-tax income) on gains, interest or dividends earned by the Fund.  However, the Fund, through its investments, may receive U.S.-source dividends and, possibly, certain types of U.S.-source interest that will be subject to 30% U.S. federal withholding tax.

The Fund expects that it will not be subject to state and local taxes in the United States on its income or capital.  Because of the absence of full guidance under state and local law, however, this result is not entirely

clear.

If you are not otherwise subject to U.S. federal income tax, you will not become subject to U.S. federal income or withholding tax on dividends or distributions in redemption or liquidation received by you from the Fund or on capital gains realized by you on a disposition of your Shares in the Fund.  If at the time of your death you are not a citizen or resident of the United States you would not be subject to U.S. estate tax with respect to your Shares in the Fund.

Different rules may apply if you are a non-U.S. Person who is subject to special treatment under U.S. federal income tax laws, including without limitation, if you (i) have an office or fixed place of business in the United States or are otherwise carrying on a U.S. trade or business to which a distribution on or gain in respect of your Shares is attributable, (ii) are an individual who is present in the United States for 183 or more days in a taxable year, or (iii) are a former citizen or resident of the United States, a controlled foreign corporation, a foreign insurance company that holds Shares in connection with its U.S. trade or business, a foreign personal holding company or a corporation that accumulates earnings to avoid U.S. federal income tax.  If you are such a person, you are urged to consult your U.S. tax advisors regarding the tax consequences of investing in the Fund.

**Other Jurisdictions.**  In other jurisdictions where the Fund may invest, the Fund may be subject to foreign income or withholding taxes on its investments.

**Changes in Applicable Law**.  The foregoing description of Bermuda and United States tax consequences of an investment in the Fund, and the operations of the Fund, is based on laws, regulations and administrative rulings and practice, all of which are subject to change.

**You should consult with your own tax advisor for information on the income tax consequences applicable to you in your country of citizenship, residence or domicile.**

| | |
|---|---|
| **Base Currency** | All references herein to "Dollars" or "$" are to U.S. Dollars.  The Fund's reports, Net Asset Value and Net Asset Value per Share will be calculated and expressed in U.S. Dollars.  Accordingly, the Fund is not considered a multi-currency fund. |
| **Business Day** | For the purposes of this Memorandum, "Business Day" means a day on which banks in the state of New York in the United States and the Bermuda are ordinarily open for business. |
| **Counsel and Auditors** | See the Directory.  The auditor has given and not withdrawn its consent to the inclusion of its name and a reference to themselves in the form |

and context in which they appear in this Memorandum.

**Fiscal Year**

The Fund's fiscal year ends on December 31st.

**Anti-Money Laundering**

<u>**Verification of Subscribers' Identities and Subscription Sources**</u>.  As part of your subscription and the Fund's responsibility for the prevention of money laundering, and to assist in the world-wide effort to combat terrorism, the Fund and the Administrator will require a detailed verification of your identity and the source of the funds for your payment. In addition, the Fund and the Administrator may require detailed information regarding the identity of the Subscriber's beneficial owners.  The amount of detail required will depend on the circumstances of each Subscriber.  References also will be required.

In the event of delay or failure by you to produce any information required for verification purposes, the Fund may refuse to accept your subscription and all subscription monies relating thereto, or may refuse to honor a redemption request until proper information has been provided by you.

<u>**Suspicious Activities.**</u>  If any person who is a resident in Bermuda (including the Administrator) has a suspicion that a payment to the Fund (by way of subscription or otherwise) contains the proceeds of criminal conduct, that person is required to report such suspicion pursuant to the Bermuda Proceeds of Crime Act 1997.  Neither the Fund nor any agent of the Fund will incur any liability for adhering to the Fund's responsibilities under these laws, and will be indemnified by the Subscriber for any losses which the Fund, its principals or agents may incur for doing so.

<u>**Prohibited Investors**</u>.  If the Fund determines that any investor is a Prohibited Investor (as such term is defined in the Subscription Documents), the Fund may, among other things, freeze that investor's assets in the Fund and notify appropriate legal authorities.

**Miscellaneous**

- At the date hereof, Piero Di Capua, a Director, has a direct interest in the share capital of the Fund.

- The Directors of the Fund confirm that as of the date of this Memorandum (a) the Directors have approved financial statements presented at the last annual general meeting of the Fund, (b) the Auditors have audited any financial statements of the Fund, (c) the Fund has not paid any dividends, and (d) the Fund has one subsidiary.

- There is no minimum subscription which must be raised for the purpose of Section 28 of the Companies Act 1981 of Bermuda.

**Additional**

You are invited to meet with representatives of the Fund for a further

| | |
|---|---|
| **Information** | explanation of the terms and conditions of this offering of Shares. The Fund will provide you with any additional non-proprietary information, including prior performance information of the Fund, that you may request to the extent that the Fund possesses such non-proprietary information, or can acquire it without unreasonable effort or expense. Requests for non-proprietary information should be directed to Piero Di Capua at HCH at the address and telephone number shown in the Directory. |

**Documents Available for Inspection**

Copies of the following documents are available for inspection during usual business hours on any weekday (Saturday, Sundays and public holidays excepted) at the principal business office of the Fund in Bermuda:

- The Fund's Certificate of Registration By Way of Continuation;

- The Fund's Certificate of Registration as an exempted Mutual Fund Company;

- The Fund's Memorandum and Bye-Laws;

- The Bermuda Companies Act 1981, as amended;

- The annual audited financial statements of the Fund; and

- The following material contracts:

    - The Investment Management Agreement among the Fund and the Co-Investment Managers.

    - The Administration Agreement between the Fund and the Administrator.

    - The Custody Agreement between Montpellier International and the Custodian.

**Use of this Memorandum**

This Memorandum is important and should be read in its entirety, along with all Exhibits, before you decide whether to subscribe for Shares in the Fund. You should consult with your financial or legal advisors, as needed, before you make an investment decision.

**How to Subscribe**

√ If you are investing in the Fund for the first time, you must review, complete and return all Subscription Documents pursuant to the instructions to Exhibit A in order to be accepted as a Shareholder.

√ If you are an existing Shareholder seeking to add to your investment, you only need to complete, sign and return the short-form Additional Subscription Request appearing on the last page of the Subscription Documents.

√ Completed Subscription Documents should be faxed to the

31

Administrator, and the originals should then be sent to the Administrator, at the facsimile number and address, respectively, shown in the Directory.

√ An amount covering your subscription for the Shares must also be sent by wire transfer pursuant to the instructions in the Subscription Documents.

√ The completed Subscription Documents and the full subscription amount must be received at the foregoing address no later than the last Business Day prior to the first day of the fiscal quarter that the purchase of the Shares is to be effective. The Directors may, in their discretion, accept late subscriptions or funds received after the established deadline will be applied to the purchase of the Shares as of the first day of the succeeding quarter.

√ With respect to subscriptions made on behalf of an undisclosed principal, please see the Anti-Money Laundering Declarations in the Subscription Documents. The Fund reserves the right to request such additional information as it considers to be necessary to verify an applicant's identity.

√ Neither the Fund, the Administrator nor the Investment Managers, accepts responsibility for errors in transmission of documents or subscription funds.

*      *      *

**PLEASE COMPLETE THE EXECUTION COPY OF THE SUBSCRIPTION
DOCUMENTS TO SUBSCRIBE FOR SHARES.**

41281709.14