# Exhibit E – Part II

1    the opportunity to hedge out that risk all at once, then

2    he'll be -- he'll do more volume, he'll give you a fairer

3    price, all of these things, okay, so that if your option

4    trade was -- over-the-counter option trade was not just for

5    an option, or for an option with associated stocks, you might

6    be able to -- Madoff might have been doing something like

7    this.

8            So he might have been -- when he was buying and

9    selling his options, he may not have been selling them alone.

10   They may have been in conjunction with stocks.  So then the

11   question is, if he -- if he was, and he wasn't, but if he

12   were doing it that way, why would the person on the other

13   side agree to stock prices which seemed so unfavorable to the

14   person on the other side?

15           So it didn't make any sense.  But it was possible,

16   I mean.  It's just that --

17           MS. STEIBER:  But unlikely?

18           MR. LAUFER:  But unlikely.  In retrospect, it was

19   not so.

20           MR. KOTZ:  All right.  And so from your

21   perspective, you kind of knew enough to not -- that you

22   didn't understand it, that you just wanted to stay away from

23   it.  Is that --

24           MR. LAUFER:  Well, we were very worried.  At the

25   end of the day, you have to speak to somebody else, how much

CONFIDENTIAL

RE00000134

Page 34

1    we stayed away and stuff like that.

2              MR. KOTZ:  Okay.  But you were very worried because

3    you couldn't understand the process?

4              MR. LAUFER:  That's right.

5              MR. KOTZ:  But, you know, from a regulator's

6    perspective, would you say that what you saw could not

7    necessarily only be explained by front-running and there

8    might have been, you know, clues or possibilities beyond

9    front-running that would need to explain what you looked at

10   and couldn't understand?

11             MR. LAUFER:  Yes.  But that was only in conjunction

12   with a much larger portfolio than we had access to.

13             MR. KOTZ:  Right.  Right, right.  But if you had

14   access, greater access, like a regulator would --

15             MR. LAUFER:  Yes.

16             MR. KOTZ:  -- then what you found would not

17   necessarily be solely explained by front-running?

18             MR. LAUFER:  That's correct.

19             MR. KOTZ:  And so, you know, I guess you have this

20   note, and you reference in the note something about,

21   "(Inaudible) would look pretty good above Elliott's" --

22             MR. LAUFER:  I'm quoting Nat Simons.

23             MR. KOTZ:  Right.  Yes, yes.  So, I mean, at that

24   point was there some sense that there was something illegal

25   going on, potentially?

CONFIDENTIAL

RE00000135

1          MR. LAUFER:  I don't know.  I don't remember.

2     Okay.  What was also on our minds, or at least on my mind,

3     was that Madoff had been investigated --

4          MR. KOTZ:  Right.

5          MR. LAUFER:  -- and cleared.  So we --

6          MR. KOTZ:  By the SEC.  Right?

7          MR. LAUFER:  Yeah.  So we had sort of assumed that

8     the regulators were busy looking into Madoff.

9          MS. STEIBER:  Well, how did you hear this, that he

10    had been investigated and cleared?

11         MR. LAUFER:  I heard -- I don't remember; this was

12    a long time ago.  Okay.  So I believe I heard that from Nat

13    Simons, I believe.

14         MS. STEIBER:  And you heard "investigated" rather

15    than examined or --

16         MR. LAUFER:  Oh, no, no, no, no.  No, no.  I don't

17    remember what I heard.  It was my impression -- I was under

18    the impression, correct or incorrect, that Madoff had been

19    somehow examined and then something -- he had been

20    investigated.  And I don't know what "cleared" meant, but he

21    had certainly never been indicted.  There was never any

22    public mention that he had done anything wrong.

23         MR. KOTZ:  And so is it fair to say that, you know,

24    from your perspective, you are under the impression that the

25    SEC had looked at it.  You kind of go in with the assumption

CONFIDENTIAL

RE00000136

Page 36

1    that there wasn't a problem there because the SEC had looked

2    at it.

3                MR. LAUFER:  That's right.  That's right.

4                MR. KOTZ:  So you were --

5                MR. LAUFER:  Also remember, Madoff had been

6    president of the NASDAQ.

7                MR. KOTZ:  Right.

8                MR. LAUFER:  And plus, from our viewpoint, he was a

9    good guy because it was generally our feeling that we get

10   better execution on an electronic exchange than the

11   specialist exchanges.  And Madoff was -- or at least had the

12   reputation, which apparently is true -- of leading electronic

13   trading.  So we liked that.

14               MR. KOTZ:  But, you know, getting back to the SEC

15   part for a second, you know, your understanding is, you know,

16   there's a regulator involved.  The regulator has much more

17   abilities and access to information than you had.  And if the

18   regulator looked at it and didn't find anything, then that

19   would give you some comfort and make you maybe more likely to

20   go forward with an investment.

21               MR. LAUFER:  That's right.

22               MS. STEIBER:  Well, he (inaudible).

23               MR. LAUFER:  Right.  Right.

24               MS. STEIBER:  Do you want to take a look at

25   (inaudible)?

CONFIDENTIAL

Page 37

1          MR. KOTZ:  Yes.  If we could just -- there's a

2    couple of things on this e-mail you got that you might

3    remember.

4          MR. BARRON:  You're looking at the --

5          MR. LAUFER:  What do you want me to look at?

6          MS. PORTER:  The one that says, "To new members:

7    We (inaudible) your concerns"?

8          MR. LAUFER:  Okay.

9          MS. STEIBER:  You said you were a committee member.

10         MR. LAUFER:  Yes.  I was definitely a committee

11   member here.

12         MS. STEIBER:  What committee was that?

13         MR. LAUFER:  Oh, (inaudible) the name.

14         MS. STEIBER:  I'm just (inaudible).

15         MR. LAUFER:  This one --

16         MS. PORTER:  This did have a name.

17         MR. LAUFER:  It did have a name?  At any rate, this

18   possibly was the investment committee for Meritage.

19         MS. STEIBER:  And what is Meritage?

20         MR. LAUFER:  (Inaudible) what it was and what it

21   is.  All right?  So --

22         MS. PORTER:  (Inaudible.)

23         MR. LAUFER:  So I'm sorry.

24         MR. KOTZ:  Take your time.

25         MR. LAUFER:  Okay.  So Renaissance:  For a long

CONFIDENTIAL

1   time, Renaissance's main investment vehicle and our only

2   product was the Medallion fund.  At a certain point, the

3   Medallion fund -- for various reasons which I'll be happy to

4   expand upon, but my lawyers say no -- had more cash than was

5   needed to be kept at a brokerage company (inaudible).

6        Not that we had excess cash; at a certain point, we

7   actually had excess cash, but it started off with more cash

8   than was -- that the brokers -- there was more cash --

9        MS. PORTER:  Can I stop you here?  Forgive me for

10  saying this, but this is a much more complicated story and

11  it's a very short answer.

12       MR. LAUFER:  Okay.  Okay.  Maybe you can give the

13  short --

14       MS. PORTER:  No.  I'm not on -- I'm not on the

15  record.  I could give you --

16       MR. LAUFER:  Okay.  Meritage is essentially run by

17  Nat Simons for the purposes of being a fund of funds, and

18  otherwise manage money that is not in our main trading

19  system.

20       MR. KOTZ:  Okay.

21       MS. PORTER:  (Inaudible.)

22       MS. STEIBER:  So it's a fund of funds.

23       MR. LAUFER:  But there was one point when Meritage

24  was essentially a subsidiary of the Medallion fund.

25       MS. STEIBER:  So the Medallion is a hedge fund, and

CONFIDENTIAL

RE00000139

Page 39

1   then Meritage is a fund of funds?

2            MS. PORTER:  Yes.

3            MS. STEIBER:  Okay.  And who is David Zierk?

4            MR. LAUFER:  He is somebody who works closely with

5   Nat Simons in Meritage.

6            MR. KOTZ:  So there were a couple people that had

7   heard these concerns from ex-traders about Madoff.

8            MR. LAUFER:  I presume.

9            MR. KOTZ:  Okay.  The information (inaudible).

10           MR. LAUFER:  But that was not -- that was not from

11  me.  That was from outside sources.

12           MR. KOTZ:  Okay.  Right.

13           MS. STEIBER:  And what is the HCH?

14           MR. LAUFER:  I believe the HCH was the name of the

15  investment we actually had in Madoff.  And I don't remember

16  what HCH stands for or anything like that.  But on the

17  Meritage balance sheet, you know, this is in General

18  Electric.  This is in Microsoft.  This is HCH.  HCH was our

19  Meritage investment.

20           MR. KOTZ:  Okay.  This statement about, "Why does

21  he let us make so much money?  Why doesn't he capture that

22  for himself?"

23           MR. LAUFER:  Yes.

24           MR. KOTZ:  What was that all about?

25           MR. LAUFER:  You're asking?  You don't know?  I'm

CONFIDENTIAL

RE00000140

Page 40

1    sorry, I --

2              MR. KOTZ:  But I want to --

3              MR. LAUFER:  Okay.  So what are the big questions

4    about Madoff.  So Madoff is managing these funds and

5    presumably doing a very good job of it, and charging very low

6    fees -- you know, Renaissance charges very high fees --

7    charging very low fees.  You wonder, well, why is he charging

8    low fees?  Maybe he's a nice guy.

9              But he is allowing other feeder funds to invest

10   with him who are charging high fees, or you might even --

11   from our viewpoint, what the industry charges.

12             MR. KOTZ:  Right.

13             MR. LAUFER:  So that made no sense to us.

14             MS. STEIBER:  So explain why his fee structure was

15   unusual.

16             MR. LAUFER:  There was no fee structure.  He only

17   charged fees as a broker.  If you have a managed account, and

18   normally you might pay a commission, or in his case, since he

19   was -- he was presumably collecting a bid/ask spread, there

20   was no explicit commission.  There was -- so you received a

21   monthly statement, and it showed how much money you had.

22             MS. STEIBER:  Now, but --

23             MR. LAUFER:  So he didn't take a fraction of the

24   profits or anything.

25             MS. STEIBER:  Right.  How does a normal hedge fund

CONFIDENTIAL

RE00000141

1    structure its fees, basically?

2            MS. PORTER:  Remember, he wasn't a hedge fund.

3    Okay.

4            MS. STEIBER:  Okay.

5            MS. PORTER:  Madoff was not a hedge fund.

6            MS. STEIBER:  Madoff was not a hedge fund.  But how

7    does a hedge fund usually structure its fees?

8            MS. PORTER:  Okay.  We on the hedge fund side have

9    a little sensitivity to be lumped in with Madoff.

10            MR. LAUFER:  Right.  So there is a management fee

11    and a performance fee.  Typically, a management fee is a

12    certain fraction of the money of the management paid

13    quarterly over -- Renaissance charges quarterly.  And then

14    every -- in our case, every six months you see if you made or

15    lost money.  And if you've made money above previous losses,

16    a certain fraction of that is paid to the management.

17            MS. STEIBER:  And you said that it was unusual that

18    he was paying -- or getting such a large percentage of the

19    money coming into the feeder fund.

20            MR. LAUFER:  We don't know how much.  We have no

21    idea how much.

22            MS. STEIBER:  Okay.  How much would a feeder fund

23    usually get when they --

24            MR. LAUFER:  One in ten would be sort of typical.

25    I do not know what his feeder funds were getting.  But a fund

CONFIDENTIAL

Page 42

1    of funds, like Meritage, will charge a 1 percent management

2    fee and a 10 percent performance fee. That would be fairly

3    typical.

4             MS. PORTER: A typical hedge fund structure is more

5    a 2 in 20. A fund of funds is 1 in 10 because you're paying

6    the underlying funds as well. So it's a fee on top of a fee.

7             MR. LAUFER: But I did not know what fees the funds

8    feeding Madoff were charging.

9             MR. KOTZ: But he was leaving a lot of money on the

10   table?

11            MR. LAUFER: From our viewpoint.

12            MR. KOTZ: Right. And so given the volume that you

13   heard about, how much money are we talking about that he was

14   leaving out there?

15            MR. LAUFER: I don't know. You can do --

16            MR. KOTZ: But I mean --

17            MR. LAUFER: Do you want me to do the computation

18   in front of you? I'll be happy to.

19            MR. KOTZ: Sure.

20            MR. LAUFER: Okay. He was -- I haven't done this

21   before. Okay. I may make -- despite the fact that I'm not

22   (inaudible) errors. But let's assume he was managing

23   $10 billion and he'd been making 10 percent. So $10 billion,

24   he gets a 1 percent management fee, so that's $100 million.

25   And he makes 10 percent, which is one billion. And he

CONFIDENTIAL                                                                    RE00000143

Page 43

1   charges 10 percent.  So he's leaving $200 million a year in

2   fees.

3        MR. KOTZ:  Okay.  And so -- and there was no

4   explanation that you could come up with as to why somebody

5   would do that?  Is that fair?

6        MR. LAUFER:  No.  He was a good guy.  I mean, no --

7   I'm going to repeat myself here.  I'm sorry.  You could say

8   that he thought whatever he was charging was appropriate, and

9   that was his business.  But the fact he was allowing other

10  people to capture some of that --

11       MR. KOTZ:  Right.  Right.

12       MR. LAUFER:  -- was the part that made no sense to

13  us.

14       MR. KOTZ:  Right.  Okay.  I got you.  Okay.  And

15  then there was something else in this e-mail that you got

16  about "complicated business that could come to some

17  regulator's attention.  Throw in that his brother-in-law is

18  his auditor."

19       MR. LAUFER:  That's not my statements.

20       MR. KOTZ:  Right.  And I understand.  I understand.

21  But this was shown to you or sent to you.

22       MR. LAUFER:  Yeah.

23       MR. KOTZ:  So what was your -- I mean, what was

24  your reaction to that?  Did you have a concern when you

25  learned this information about the potential conflict?

CONFIDENTIAL

RE00000144

1      MR. LAUFER:  I don't remember.

2      MR. KOTZ:  Okay.  But what do you think about it

3 generally?  I mean, would that be a red flag for you in terms

4 of when you look at something in this type of situation?

5      MR. LAUFER:  Well, it would definitely be a red

6 flag.  But, you know, it isn't as if every investment is

7 perfect.  You've got to make some compromises here.

8      MR. KOTZ:  Okay.  Can you just explain --

9      MR. LAUFER:  Incidentally --

10      MR. KOTZ:  -- why it would be a red flag?

11      MR. LAUFER:  Usually you want the auditor to be an

12 independent entity.

13      MR. KOTZ:  Okay.  And just to kind of clarify, when

14 you sent the e-mail, you say, "We have totally independent

15 evidence."

16      MR. LAUFER:  Yes.

17      MR. KOTZ:  What did you -- can you tell us

18 specifically kind of what you meant by independent?

19      MR. LAUFER:  What I mean here is, very

20 specifically, that if you look at this -- if you looked at

21 those monthly statements and looked at the executions of the

22 stock side, that the prices were just too good from any mode

23 of execution that we were aware of that was legitimate.

24      MS. STEIBER:  Too good to be true was your --

25      MR. LAUFER:  (Inaudible.)  I said, we do not know

CONFIDENTIAL

Page 45

1   how to achieve executions anywhere near that using legitimate

2   methods.  I'll repeat what I said before.  If you looked at

3   Renaissance's performance from the outside, you would say it

4   was too good to be true from statistical analysis.

5          MR. KOTZ:  And you quoted in your e-mail from

6   someone else, where it said, "If you're going to panic, panic

7   early."

8          MR. LAUFER:  Yes.

9          MR. KOTZ:  What did you mean by that?

10         MR. LAUFER:  I said I quoted from Jim.

11         MR. KOTZ:  Yes.  I see.  What did you -- what does

12   that mean?  What does that quote mean?

13         MR. LAUFER:  It means exactly what it means, that

14   if you're going to do something very rash, you're probably --

15   anyway, that statement, which is a semi-joke, all right?

16   It's (inaudible).

17         MR. KOTZ:  No.  I understand.  I'm just trying to

18   understand it.

19         MR. LAUFER:  If you're going to do something that's

20   rash, you're probably better off doing it before everybody

21   else does it.

22         MS. STEIBER:  But "panic" is a strong word.  It

23   sounds like those --

24         MR. LAUFER:  When you think leaving -- you don't

25   think of leaving your investment with Madoff as panicking?

CONFIDENTIAL

RE00000146

Page 46

1            MS. STEIBER:  Well, it sounds like the red flags

2    that you're seeing are very strong if you are willing to

3    leave your investment.

4            MR. BARRON:  Is that fair?

5            MR. LAUFER:  First of all, this is sort of a joke.

6    I mean, it's a joke with some truth in it.

7            MS. PORTER:  Yeah.  This is -- he's quoting Jim,

8    and it's jocular.

9            MR. LAUFER:  Almost (inaudible).

10            MS. PORTER:  So don't put too much emphasis on the

11    word "panic."

12            MR. KOTZ:  (Inaudible.) Okay.  Sure.

13            MR. BARRON:  Yeah.  It's a generic comment.  The

14    word "panic" might not necessarily be being applied to

15    Madoff, I think.

16            MR. KOTZ:  Okay.  And so after your internal

17    discussions, did anybody else get in touch with you from the

18    SEC or (inaudible)?

19            MR. LAUFER:  No.  Not me.  Nobody from SEC ever

20    contacted me.

21            MR. KOTZ:  Okay.  But do you know if they contacted

22    other people?

23            MR. LAUFER:  They may have, but I don't know.

24            MR. KOTZ:  Okay.  This is the other e-mail, the

25    April 20th, the longer e-mail.  Do you have that?  It looks

CONFIDENTIAL                                                        RE00000147

08-01789-cgm    Doc 10909-9    Filed 07/30/15    Entered 07/30/15 17:07:20    Exhibit E

pt. II - to Fisher Declaration    Pg 16 of 75

1   like 2004, 2/12,

2           MR. LAUFER:  I don't -- this is actually the first

3   time I've seen this one.  I don't -- from -- I don't know the

4   names on top.

5           MR. KOTZ:  Yeah.  Because again, that was -- that's

6   the SEC people.

7           MR. LAUFER:  Oh, okay.  I may have --

8           MS. STEIBER:  Paul Broder signed it.

9           MR. LAUFER:  Oh, I think I may have seen this a

10  long time ago, maybe even recently.  I may have -- okay.  So

11  this is (inaudible).

12          MS. PORTER:  Let me see a second.

13          MR. LAUFER:  Okay.  So you want me to read this?

14          MS. PORTER:  Wait a second.  You may not have

15  received this one.  I think I have it in --

16          MR. LAUFER:  I don't know.  Sometimes I vaguely

17  remember, sometimes --

18          MR. KOTZ:  If you could read it and just kind of

19  maybe explain it to me.

20          MR. LAUFER:  Okay.  I'm happy to take a while to

21  read it.

22          MR. KOTZ:  Sure.

23          MR. LAUFER:  Okay.  (Examining.)  Oh, yes.  I think

24  I remember this one, only parts of it.

25          Okay.  So the first call there is a computation of

CONFIDENTIAL

RE00000148

Page 48

1   volumes, as I was saying to you.  Okay?  So the first part is

2   a computation of the -- is what I was describing the

3   summaries, as I had remembered and as was presented to me

4   since I said I don't feel like I'm an options expert.

5              And here Paul is doing some estimate of the

6   volume -- yeah.  Paul is saying what I was summarizing to

7   you.  He's analyzing the options that Madoff could have done.

8   His analysis was not the same as my analysis.

9              (Examining.)  Yeah, No. 4.  This what I was talking

10  about.  "We have spoken to several market-makers in OTC and

11  (inaudible).  None of them claim to see anything of this

12  volume in these options."  Okay.

13             And then No. 5, Paul points out that there are many

14  options available, and somehow he always chooses the right

15  one, which might be very difficult to do if you're trading in

16  a very short time frame.

17             And the last -- next-to-last paragraph is also --

18  again, I'm quoting.  This is -- this is not my own knowledge

19  I'm quoting, but Paul.  My knowledge comes from Paul.  Here.

20  Second page.  "So we need an OTC counter party who was

21  willing to take a basket" -- so here Paul -- Paul was trying

22  to figure out how Madoff managed to do these large trades

23  that we don't know how he managed to do.

24             And he's suggesting what I was summarizing to you

25  before, that if you wanted to do a very large option trade,

CONFIDENTIAL                                                      RE00000149

1   the reason why it's difficult to do is the person selling you

2   the option has this risk.  And if you lower the risk that he

3   would have, he might do a very large trade with you over the

4   center.

5         One way to lower the risk is, at the same time you

6   buy the option, you do a corresponding stock trade.  And that

7   will lower his risk.  So Paul is saying that maybe Madoff did

8   the option trade and the stock trade with the same counter

9   party at the same time, which in some sense is theoretically

10  possible.

11        But then you ask yourself, why would somebody do

12  this?  Because he's going to lose money doing the trade, so

13  far as we know.

14        MS. STEIBER:  Right.  And he seems to indicate,

15  with his exclamation points, that it's unlikely he would find

16  a counter party.

17        MR. LAUFER:  For these very large sums.

18        MS. STEIBER:  Right.

19        MR. LAUFER:  But I'm quoting Paul here.  But I

20  agree with his analysis entirely.  But look, I can't resist.

21  This is not rocket scientists.  This is not rocket science.

22        MS. STEIBER:  Do you think that someone at the SEC

23  should be able to figure this out?

24        MR. LAUFER:  Much more elementary than that.

25  Someone at the SEC could wander down, you know, to Goldman

CONFIDENTIAL

RE00000150

Page 50

1   Sachs and wander over to their options department and ask

2   them, how does somebody execute $10 billion of options, and

3   find out it's very difficult.  This is not --

4         MR. KOTZ:  So how long --

5         MR. LAUFER:  -- this is not proprietary -- this is

6   not proprietary Renaissance analysis here.

7         MS. STEIBER:  It doesn't take your mathematical

8   background to figure it out..  Is that what you're saying?

9         MR. LAUFER:  Paul Broder would not claim to be a

10  mathematician, and he's an expert on this, and he's very

11  smart.  But you don't have to be as smart as Paul Broder is

12  to do what he says here.

13        MR. KOTZ:  So you think if a regulator got this

14  information, they could take some kind of basic elemental --

15  elementary steps to figure this out?

16        MR. LAUFER:  Or ask some expert and tell them.

17  Don't do it themselves.

18        MS. STEIBER:  Based on these three e-mails that you

19  have, if you were at the SEC, what do you think you would

20  have looked at?  You'd look at options.  What else?  What

21  else do you think that you would have looked at if you were

22  given those three e-mails?

23        MR. KOTZ:  If you were the regulator?

24        MS. PORTER:  If you were the regulator and you had

25  the access.

CONFIDENTIAL

RE00000151

Page 51

1          MR. KOTZ:  I'm asking you to pretend you're the

2     regulator.

3          MR. LAUFER:  But this is -- you're not -- okay.

4     This is -- okay.  Well, I do not claim to be an expert in

5     option trading.  I claim I'm a, you know, above-average

6     layman.  I claim to be somewhat of an expert in stock

7     trading.

8          If your SEC person had a small amount of expertise, it's

9     clear you go to Madoff and you say, show me the -- show me

10    your volume.  Show me the counter parties.  And you see how

11    he's managing to do these extraordinary things.  You don't

12    have to figure out if he's front -- I mean, you don't have to

13    figure out if he's front-running or if he's doing something

14    weird.  You ask him to show you what he's doing.

15         MS. STEIBER:  What if he said, I am trading options

16    over the counter in Europe?  I don't have documentation.

17         MR. LAUFER:  I don't know.  I'm not an auditor.

18    Let me -- and I apologize to my lawyers here.  Okay.  When I

19    was a 19-year-old, okay, so that was a long time ago, I got a

20    summer job in the company where my father worked where he was

21    (inaudible) chief scientist, if you like.  It was a chemical

22    company.

23         And there was an audit going on.  And I'm a

24    19-year-old  I'm working in the library, you know.  I'm a

25    secretary.  This auditor says, you know, I have this invoice

CONFIDENTIAL

RE00000152

Page 52

1   that says Schwarz Bioresearch bought $20,000 worth of

2   chemicals from so-and-so, and my job is to make sure they

3   bought $20,000 worth of chemicals from so-and-so.

4        Show me your piece of paper, your purchase order.

5   They call up so-and-so, and they check. And this was -- you

6   know, I'm 19 years old, but I see the auditor. All they're

7   doing is making sure that the pieces of paper in my father's

8   company show what's going on in the world.

9        Madoff says, I'm doing over-the-counter trades in

10  London, and the auditor accepts that? When I as a

11  19-year-old see this random auditor who is contacting some

12  small chemical firm? Let me give you another example.

13  Sorry.

14       So (inaudible), or you've gotten a government grant

15  to build a revetment. We're very pleased with this. It's a

16  million-dollar project. A million-dollar project, not $50

17  billion. We're very pleased.

18       So a friend of mine, the mayor, who got the thing,

19  he said -- he's the former mayor -- he says, you know,

20  Michael -- the new mayor -- we will be audited on this. Not

21  we may be audited, we will be audited. Be sure and save all

22  the pieces of paper.

23       And you're telling me again that Madoff is going to

24  tell them, I did these trades in London, and they're going to

25  stop?

CONFIDENTIAL
RE00000153

Page 53

1           MS. STEIBER:  You think that that's doing a

2  thorough job?

3           MR. KOTZ:  Okay.

4           MR. LAUFER:  Now I can -- and now I can leave.

5  I've got that (inaudible).

6           MR. BARRON:  Anything else?

7           MR. KOTZ:  I think we've covered it.

8           MS. STEIBER:  Is there anything else?

9           MR. LAUFER:  (Inaudible.)

10          MR. KOTZ:  Anything else that you can think of that

11  we didn't ask?

12          MR. LAUFER:  No.

13          MR. KOTZ:  Okay.  All right.  Thank you very much.

14  Appreciate your time.

15           (Whereupon, the interview was concluded.)

16                     * * * * *

17

18

19

20

21

22

23

24

CONFIDENTIAL

CONFIDENTIAL

RE00000155

# Testimony

# of

# Simons

CONFIDENTIAL

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )

                           )    File No. OIG-509

OIG-509                    )


PAGES:     1 through 51

PLACE:     Renaissance Technologies Corporation

           800 Third Avenue, No. 34

           New York, New York  10022

DATE:      Thursday, March 12, 2009


     The above-entitled matter came on for hearing, via
videoconference, pursuant to notice, at 2:30 p.m.


                    TAPE TRANSCRIPTION




                Diversified Reporting Services, Inc.

                       (202) 467-9200

CONFIDENTIAL

Page 2

```
 1   APPEARANCES:

 2

 3   On behalf of the Securities and Exchange Commission:

 4        DAVID KOTZ, Inspector General

 5        HEIDI STEIBER, Investigator

 6        Securities and Exchange Commission

 7        100 F Street, N.E.

 8        Washington, D.C. 20549

 9

10   On behalf of the Witness:

11        FRANCIS P. BARRON, ESQ.

12        Cravath, Swaine & Moore LLP

13        Worldwide Plaza

14        825 Eighth Avenue

15        New York, New York  10019-7475

16        (212) 474-1000

17

18        CARLA PORTER, ESQ., General Counsel

19        Renaissance Technologies Corporation

20        800 Third Avenue, No. 34

21        New York, New York  10022

22        (212) 486-6780

23

24

25
```

CONFIDENTIAL

1                    P R O C E E D I N G S

2          MR. KOTZ:  Well, thank you very much for giving us

3   your time.  We will try not to be too long.  Let me just give

4   you a brief kind of background.

5          My office, the Inspector General's office, is

6   tasked with conducting an information of what occurred

7   between the SEC and its investigations, examinations, et

8   cetera.

9          Okay.  So as I was saying, we're looking into all

10  the communications the SEC had relating to the Madoff matter,

11  and so various examinations and investigations that the SEC

12  conducted.  And we're following up on all information that

13  they received.

14          There were some numerous tips.  There was that

15  complaint that Harry Markopolos provided, which was a great

16  detailed matter.  And in addition, there was some information

17  that they received in terms of your e-mails and other folks

18  in your office.  And we're trying to understand exactly what

19  could or should have been done with respect to that

20  information.

21          So just to clarify, you know, we obviously see a

22  very different level of review and responsibility of you and

23  of the regulator.  In your situation, obviously, you're

24  making investment decisions.  It doesn't really go beyond

25  there.

CONFIDENTIAL

Page 4

1          So I'm going to be asking you some questions that

2    go to, you know, what you think could have been done. That's

3    not necessarily to mean that you should have done it. It's a

4    question of, you know, what in your view should or could a

5    regulator h done.

6          Obviously, regulators have access to information.

7    There's a compulsory process, things like that. And so I

8    don't want to mean to imply that you guys are in the same

9    situation. But I do think it's helpful to understand, you

10   know, how you went about finding the information, what you

11   learned, what preliminary conclusion, if any, you drew from

12   that, and then what you might have done if you were sitting

13   in the regulator's shoes to follow up on the information that

14   they obtained.

15         So that's generally how I'm going to go through

16   this. I'll start out with some, you know, real short

17   background, then just really get into your recollections of

18   what you looked at at the time. We have an e-mail that

19   was -- that came from you. We may ask you a couple questions

20   about that. Okay?

21         MR. SIMONS: Okay.

22         MR. KOTZ: All right. Can you just tell me, you

23   know,, just for the kind of record, state your name?

24         MR. SIMONS: Nat Simons.

25         MR. KOTZ: Okay. And what's your current title?

CONFIDENTIAL

RE00000160

Page 5

1          MR. SIMONS:  Well, I guess -- it's kind of funny, I

2  mean, I'm (inaudible).  And I'm also a director of Meritage.

3  I really manage -- I'm basically the manager of the Meritage

4  fund.  So I'm (inaudible).

5          MR. KOTZ:  Okay.  Meritage fund is?

6          MR. SIMONS:  It's an investment fund that is

7  primarily a fund of other funds, of other funds, brokerage

8  funds primarily.

9          MR. KOTZ:  Okay.

10          MR. SIMONS:  And -- although I've got other

11  activity, for example, an investment private equity fund, and

12  it does have direct investing activities as well.  So we have

13  analysts that make direct investments in equities and

14  (inaudible), although at the time of the -- of that e-mail

15  and really over that time you're talking about, it was really

16  a (inaudible).

17          MS. STEIBER:  And what was your position in 2003?

18          MR. SIMONS:  I have managed Meritage from its

19  inception, which was in '97.

20          MR. KOTZ:  Okay.  And so when did you first hear of

21  Bernard Madoff?

22          MR. SIMONS:  Well, probably really when I started

23  doing Meritage.  It was '97, '98, that time frame.

24          MR. KOTZ:  Okay.  And what was -- did he have a

25  particular reputation, kind of, in the industry?

CONFIDENTIAL

RE00000161

Page 6

1           MR. SIMONS:  Yeah.  I guess he had a reputation of

2    putting extremely consistent, you know, sort of low to mid

3    teens returns for the select few that could -- that could

4    get in.

5           MR. KOTZ:  Okay.  So there was a sense of

6    exclusivity?

7           MR. SIMONS:  No question.

8           MR. KOTZ:  And were there any whispers during that

9    time period or later about otherwise he was able to achieve

10   these returns?

11          MR. SIMONS:  Certainly not at the time that I

12   became initially familiar.  Now, again, let me -- let me

13   qualify that.  I had not heard of him.  I don't know, since I

14   wasn't really paying my attention, whether or not he had as

15   early as the late '90s, '97, '98, they were (inaudible).

16          And surely Madoff as a money manager goes back

17   quite -- I don't even know when he started managing capital,

18   if it was the early '90s.  It was certainly a long time ago.

19   So there may well have been, even then, about the consistency

20   of his returns and perhaps how he could do it, but I wasn't

21   privy to that.

22          MR. KOTZ:  Okay.  But in terms of the exclusivity,

23   what was the sense of why he was so exclusive?

24          MR. SIMONS:  Well, I guess the sense of why he was

25   so exclusive was there was the notion that whatever strategy

CONFIDENTIAL

RE00000162

Page 7

1   he was engaged in had, you know, capacity at some level.  So

2   I think that the basis would have always been, you know,

3   not -- you know, inability to scale indefinitely the

4   investment strategy he was engaged in.

5         MR. KOTZ:  All right.  So then later on -- you

6   heard about him in '97, '98, but then later on there was talk

7   about trying to have some investment with him?

8         MR. SIMONS:  Yeah.

9         MR. KOTZ:  And so what happened with that?  There

10  was a direct attempt that was not successful, or --

11        MR. SIMONS:  That's right.  Joe Simons, my father,

12  who had at least -- you know, did not -- really didn't know

13  or anything, but he had -- you know, they met.  They had --

14  and of course, through the Simons Foundation and through the

15  (inaudible) Foundation, who was an investor, I guess he had

16  some at least ability to make a phone call, which he did.

17  But he was told in no uncertain terms that we couldn't

18  invest.

19        MR. KOTZ:  And was there any reason given?

20        MR. SIMONS:  Okay.  I actually -- I thought -- I'd

21  be speculating if I said -- I think that question is probably

22  better asked of Jim.  I mean, you know, it probably had

23  something to do with the fact that we were maybe a fund

24  manager ourselves, you know.

25        I mean, that's certainly an excuse, or a reason, I

CONFIDENTIAL

Page 8

1    should say, that people have given before.  And so I

2    didn't -- it's sort of, why manage our capital, because

3    they're sort of managing a competitor's capital, if you will.

4          So I suspected it had something to do with that.

5    But the question (inaudible).

6          MR. KOTZ:  And so then there was an effort made to

7    see if there could be an indirect attempt?

8          MR. SIMONS:  Uh-huh.

9          MR. KOTZ:  So how did that work?

10         MR. SIMONS:  I'm sorry.  (Inaudible.)

11         MR. KOTZ:  So what did you do to try that?

12         MR. SIMONS:  Well, we had -- from the beginning of

13   Meritage, we had a close working relationship with

14   (inaudible).  And there -- our families go way back, back to

15   college, in fact.  Jim Mayer (phonetic) and Joe Simons went

16   to college together at MIT.  Lifelong friends.  Early

17   investors.  Both (inaudible) invested with, and we invested

18   early on in some of the enterprises that Jim Mayer was

19   involved with, and vice versa.

20         And Rafael Mayer, who's roughly my age -- in fact,

21   I went to school with Raf, went to high school with Raf -- it

22   was natural that we -- you know, since he was doing something

23   very similar to what I was doing, they said we would work

24   together.  So we worked together very closely from the onset

25   because they had been doing it for longer than we had.

CONFIDENTIAL

RE00000164

1          So we often exchanged notes about managers and, you

2    know -- and so, I mean, they had access to Madoff, and I

3    guess at some point -- I don't remember when -- we approached

4    them about possibly giving us an avenue in which to invest.

5          MS. PORTER:  If I may step in one second.

6          MR. KOTZ:  Sure.

7          MS. PORTER:  You've heard in prior discussions

8    earlier of the name Khronos.  Khronos is the corporate name.

9          MR. SIMONS:  Yes.  I'm sorry.

10         MS. PORTER:  Khronos is the corporate name.  They

11   have funds that they manage.  So that's where Montpelier --

12   that's the name --

13         MR. SIMONS:  Montpelier is their fund, their

14   corresponding entity which looks like Meritage.

15         MS. PORTER:  And HGH is a subsidiary somewhere in

16   that -- in that fund family.  But the connection here is the

17   Mayer family run the Khronos company, which is an investment

18   manager that runs these other funds.

19         MR. KOTZ:  Okay.  Thanks for that.

20         Okay.  So there was this opportunity, and so then

21   you went about trying to decide whether this was a good

22   investment?  Or what happened next?

23         MR. SIMONS:  Well, yeah.  I mean, certainly it was

24   difficult for us to go through our traditional methodology of

25   establishing, you know, the quality of investment.  In this

CONFIDENTIAL

RE00000165

Page 10

1    case, I think that we felt that those standard channels were

2    not quite as important due to the nature -- due to the

3    transparent nature of the investment.

4        Obviously, most of the time you invest in hedge

5    funds, they're quite opaque.  And therefore, you know, one

6    has to understand more carefully who you're dealing with.  In

7    this case, I think the view was that Bernie was a very well-

8    known figure, high reputation.  These activities were in a

9    managed account structure with complete transparency.

10        And so it was more a question of initially sort of

11    getting in as opposed to doing the sort of standard due

12    diligence.  So it became more of a structural issue, I think,

13    than a diligence issue.  At least that's how we saw it

14    initially.

15        MR. KOTZ:  Okay.  And so then what did you do, you

16    know, from a structural perspective?  What did you do to try

17    to figure out what was happening with Madoff's operations?

18        MR. SIMONS:  We didn't.  I mean, from a structural

19    point of view, I only meant structurally setting up a

20    mechanism by which we could make investments.

21        MR. KOTZ:  Okay.  Okay.  So --

22        MR. SIMONS:  We did no due diligence, no extra due

23    diligence, as far as I remember, at that time because again,

24    we were already somewhat familiar with the investment

25    strategy because of the (inaudible) Foundation.  I had worked

Page 11

1   with Raf, you know, before they -- before they had invested

2   with Madoff for many years.

3          And so it was -- I was trying to piggyback them, if

4   you will, on their due diligence and on the nature of the

5   investment, which was really quite different than other

6   investments that we (inaudible).

7          MR. KOTZ:  Okay.  So you didn't actually meet with

8   Madoff or really seek any documents from him.

9          MS. STEIBER:  So what year was that that you made

10  your investment?

11         MR. KOTZ:  Go ahead.  So you didn't actually ever

12  meet with him or seek any documents?

13         MR. SIMONS:  I never met with Bernie Madoff.  I

14  never spoke to him.  I have never spoken to him on the phone

15  or in person.  I have never spoken to any people who work

16  within the Madoff institution.

17         MR. KOTZ:  And you never got any documents from

18  them.

19         MR. SIMONS:  Heidi, you asked a question.

20         MS. STEIBER:  I said what year did you make the

21  investment, the indirect investment, with Madoff?

22         MR. SIMONS:  I think it was '99.  I didn't actually

23  go back and look.  Did you check that, Carla?

24         MS. PORTER:  Yes.  It's not in our --

25         MS. STEIBER:  And so when did you first have

CONFIDENTIAL                                                          RE00000167

Page 12

1    suspicions that you should look into Madoff more closely?

2            MR. SIMONS:  Well, I think that -- first of all, I

3    want to put it in perspective.  We started Meritage in

4    October of '97.  It was myself, and I hired a guy who had a

5    masters in -- more than an MBA, it was a masters of

6    (inaudible) physics -- to help.  We were managing a

7    relatively small amount of capital, and it was just me going

8    around and meeting a bunch of people.

9            As it went along, we built up more expertise.  We

10    built up more internal analyst capability.  And so, you know,

11    part of it becomes a situation where you sort of -- where you

12    have a better sense of what the opportunity cost is.  Right?

13            So part of our discomfort with Madoff was just our

14    sense of the fact that we don't know, that we didn't know

15    that much about what they did and how they did it.  And we

16    had better alternatives to invest in that we felt at least we

17    understood what the up side and the down side was.

18            So it wasn't just that we were starting to learn

19    anything more about Madoff -- because in fact, we really

20    weren't, you know, although, you know, I can certainly talk

21    about some of the things that we knew -- but, I mean, all the

22    things we knew, we didn't know that much more.

23            It was actually more getting a sense that, you

24    know, we're risking this thing that we don't really know to

25    make 12.  We can actually make 12 pretty -- not to say pretty

CONFIDENTIAL                                                    RE00000168

1   easily; we were -- back then, making 12 didn't seem as hard

2   as it does today.

3          But back then, it felt like, why are we doing this?

4   Why are we taking this chance when we have a lot of other

5   good managers now.  We have much better (inaudible) so we can

6   get into just as much of that as anything else.

7          MR. KOTZ:  Okay.  And so in your e-mail, you talked

8   about speaking to ex-Madoff traders.  Tell me about that.

9          MR. SIMONS:  Well, we spoke to one.  And I don't

10  even know if he was an ex-Madoff trader.  He was somebody who

11  worked in some capacity there.

12          MR. KOTZ:  Okay.

13          MR. SIMONS:  And yeah.  I mean, we actually

14  interviewed them, I think, for a position, you know.  So it

15  was not -- it wasn't like we -- again, we didn't go out and

16  do due diligence on Madoff.  It was just that we were looking

17  to hire another person within the Meritage organization.

18          But of course, you know, you work for Madoff, you

19  know we're invested in that.  And naturally, you would ask

20  questions.  And it was in that context -- and by the way, I

21  did not interview him, so this is all secondhand.  But it was

22  in that context that those comments came out.

23          And, you know, this was somebody who had suspected

24  that they were somehow cherry-picking trades and -- which was

25  kind of consistent with what the sense was.  You asked me

CONFIDENTIAL

RE00000169

1    back in -- you know, when you asked me about rumors about

2    Madoff, I was responding to what rumors there might have been

3    just in the late '90s.  And I really can't speak to any of

4    those.

5            But by the time we interviewed this person, which

6    was more like 2002, I believe, or 2003, there were -- I seem

7    to think (inaudible) that there were more rumors.  And I

8    think the most common rumor that was out there was somehow

9    the notion that they were actively front-running their

10   institutional clients on the brokerage side.

11           And it was in that context, I think, that we put

12   the statement from that ex-Madoff employee.

13           MR. KOTZ:  Okay.  And then you said in the e-mail

14   that David Zierk heard a similar story.  Who's David Zierk?

15           MR. SIMONS:  David Zierk is -- David Zierk is

16   really -- he's worked at Renaissance, actually, since '96.

17   And he's worked on the Meritage activities since 2000.  And

18   really, he's the guy right now who more or less on a day-to-

19   day basis manages the fund of funds portfolio.

20           And that was -- that was not entirely true back

21   then, but he was the most senior -- he's the most senior guy

22   on the fund of funds side that I have.

23           MR. KOTZ:  And so what --

24           MR. SIMONS:  And David probably is the one that

25   interviewed that person.

CONFIDENTIAL

RE00000170

1        MR. KOTZ:  Okay.  And so that was a -- was that the

2   same interview, or was that a second one?  Sort of from this

3   e-mail, it looks like -- you say, "David Zierk heard a

4   similar story from a large hedge fund consultant who also

5   interviewed an ex-trader."

6        MR. SIMONS:  Oh, no.  That is entirely different.

7   That is entirely different.  And that was -- yeah.  That was

8   a completely different event.  Excuse me.  Somebody is trying

9   to make a phone call here.  We get this sometimes.  That was

10  a completely different event, which again happened around the

11  same time that served to reinforce what we heard from that

12  person.

13       MR. KOTZ:  So what was that other -- the second

14  event with David Zierk?

15       MR. SIMONS:  That he was at a conference, and he

16  heard somebody who was working at a consulting firm make a

17  comment about how he was predicting a large -- you know, a

18  well-known manager potentially running into -- running into

19  regulatory problems.

20       And David more or less went up to the guy

21  afterwards and said, who were you talking -- somehow, from

22  the things that the person said, guessed that he might have

23  been referring to Madoff.  The guy confirmed yes, indeed he

24  was.

25       MR. KOTZ:  So when you say he heard that there

CONFIDENTIAL

RE00000171

08-01789-cgm   Doc 10909-9   Filed 07/30/15   Entered 07/30/15 17:07:20   Exhibit E
pt. II - to Fisher Declaration   Pg 40 of 75

Page 16

1    was -- he was running into regulatory problems, was that that

2    the SEC was looking at him or --

3           MR. SIMONS:   (Inaudible) that he -- no, this is

4    somebody who suspected.

5           MR. KOTZ:   That he would run into regulatory

6    problems or that there was some regulatory issue out there?

7           MR. SIMONS:   No.  He suspected that -- well, what I

8    would infer from that is that the person suspected that there

9    were existing ongoing irregularities that would at some point

10   be picked up by the regulators.

11          MR. KOTZ:   Okay.  I see.  But had you heard about

12   whether the SEC had ever looked to Madoff's operations at

13   that point?

14          MR. SIMONS:   No.  The only thing that I know is

15   that we had -- you know, when we were -- well, we did have

16   discussions about making -- because again, obviously when you

17   do look at something like this and you have -- you know, when

18   you look at -- when you look at a situation where you feel

19   like you have complete transparency of the position.

20          You have none of the traditional risks associated

21   with the investment based on the position.  There was no

22   undue leverage.  There was no selling of premium that, you

23   know, (inaudible) some of the -- some of the concerns in

24   terms of the portfolio construction that one would want to

25   make sure weren't going to be issued that would step and, you

CONFIDENTIAL

RE00000172

1   know, (inaudible) the investor weren't there.

2        So naturally, there was -- to make -- you know, one

3   of the issues that (inaudible) to make sure he didn't do

4   anything irregular with regards to his -- the other side of

5   his business, which was his brokerage business. And we did,

6   I think, know -- we were aware that on an even -- he had

7   been -- he had been investigated by the SEC, and (inaudible)

8   to develop.

9        I guess afterwards we did -- I don't know.  I

10  remember hearing that we learned (inaudible) the brokerage

11  business, but we did think it was the whole business.

12        MR. KOTZ:  You did think it was the whole business?

13        MR. SIMONS:  We did but, you know, I mean, it's not

14  like we did exhaustive reach on it (inaudible).

15        MR. KOTZ:  But at the time that you were, you know,

16  writing this e-mail, you were aware that the SEC had examined

17  Madoff, you know, in some capacity and given him a clean bill

18  of health?

19        MR. SIMONS:  Correct.

20        MR. KOTZ:  Okay.  And so that led to your thinking,

21  well, if the regulators were there then, you know, you had a

22  little more confidence in his operation?

23        MR. SIMONS:  Surely that helped to allay concerns

24  about that kind of -- that kind of risk.  But again, now, my

25  comment had to do with the Attorney General, not with the

RE00000173

1   SEC.

2          MR. KOTZ:   Your comment --

3          MR. SIMONS:   When I made the comment that -- you

4   know, about Eliot Spitzer.

5          MR. KOTZ:   Oh, yeah.  Yeah.  Okay.  And so in the

6   e-mail, you also say -- I just want to read a little bit and

7   just see if you can elaborate on what you can remember.

8          "Another point to make here is that not only are we

9   unsure as to how HGH makes money for us, we are even more

10   unsure as to how HGH makes money from us, i.e. why does he

11   let us make so much money?  Why doesn't he capture that for

12   himself?  There could be a legitimate reason, but I haven't

13   heard any explanation we can be sure of."

14          MR. SIMONS:   That was one of the biggest things as

15   far as I was concerned.  We just hate to see situations which

16   are illogical, you know, on its face.  I guess I didn't have

17   the imagination to think that the whole thing was just a

18   complete (inaudible).

19          But, you know, when you see a situation where it

20   would appear that he's only making money off of his -- off

21   the brokerage fees, why is he letting the Fairfield

22   Greenwiches of the world take 2 points?  I don't know.

23          I mean, you know, and quite frankly, the only

24   thing -- again, that would lead you to the only kind of thing

25   that sort of makes sense, is this notion that, well, he's

CONFIDENTIAL

RE00000174

Page 19

1    really -- he's really front-running his institutional

2    clients, and this is the only way for him to -- he can't

3    really raise capital on that basis so he sort of does it in

4    this particular format.

5            And so, I mean, that's not the only solution, the

6    only explanation.  But it is hard to understand why someone

7    who has -- supposedly has excess demand for his product

8    and -- you know, normally you see third party marketers in

9    situations where there is enough demand for the product.

10   Right?

11           They need the third party marketer to help them

12   raise the money.  That's what they do.  That's how they earn

13   their money.  And they normally make -- they don't

14   normally -- you know, a pass-through fund.  Normally you

15   take -- you know, you take 50 basis points or something,

16   right, or a hundred basis points.

17           So in this situation where it did appear that he

18   had excess demand and much of the money was coming in up

19   here -- apparently; again, very hard to see what was going

20   on, but through third parties -- it didn't make sense on its

21   face.

22           MR. KOTZ:  So for you, that was a pretty big red

23   flag in terms of being cautious about going forward?

24           MR. SIMONS:  Yes.  And I think that that's the kind

25   of thing where, back in '99, it wasn't as evident.  And I

CONFIDENTIAL

RE00000175

1    don't even know back in '99, when we first made the

2    investment, I don't -- you know, I don't know how big

3    Fairfield Greenwich was.  I mean, that was the most visible

4    and the largest aggregator of Madoff.

5         You know, you start to hear stories about how big,

6    you know, and those kinds of stories about like, you know,

7    gee whiz, is he really running 5-, 10, $15 billion?  Because

8    now, you know, lots of other things come into the picture too

9    that really weren't there in '99, I think.

10         MR. KOTZ:  Like what?

11         MR. SIMONS:  Again, going back to when -- you know,

12    why doubts started to come in in '02, '03, that weren't

13    necessarily there in '99.  How do you ask that question

14    before?  Again, it's when you start to get a sense of how big

15    he may be and (inaudible) because most things that we are

16    aware of do not scale at that level.  And then you start to

17    wonder again how somebody can continue to do that.

18         MR. KOTZ:  Okay.  And so in addition to the fact

19    that, you know, there was kind of money left on the table, so

20    to speak, there was this point you make about how there's a

21    $4 billion Madoff pass-through fund, Fairfield Century, that

22    charges 0 to 20 percent.  It's not clear why Madoff allows an

23    outside group to make $100 million per year in fees for doing

24    absolutely nothing.

25         And so just give me a little bit of elaboration on

CONFIDENTIAL

RE00000176

Page 21

1   that.  What did you mean by that?

2          MR. SIMONS:  Well, again, (inaudible) normally are

3   required to help fundraise fees, raise fees, raise

4   (inaudible).  You are effectively outsourcing your -- you

5   know, your investment relations, you know, (inaudible), your

6   sales and marketing.

7          In Madoff's situation, when there -- you know, it

8   appeared that there was plenty of pent-up demand for his

9   product, which would mean that you just kind of hire a couple

10  of guys and set them up in offices, and you could raise money

11  all day.

12          And so why not just capture that for yourself,

13  build your own IR, you know, sales and marketing team in-

14  house?  Why continue to outsource it to Fairfield?

15          MR. KOTZ:  And so in your case, he was actually,

16  you know, kind of pushing people away who wanted to invest,

17  and here this entity was getting all this money for nothing.

18          MR. SIMONS:  Right.  I had to jump through hoops to

19  get in.

20          MR. KOTZ:  Right.  Okay.

21          MS. STEIBER:  Did you have any suspicions at the

22  time of why he would do something like that?  Did you think

23  he was avoiding regulation?

24          MR. SIMONS:  So again, you know, sometimes people

25  do things for historic reasons.  Right?  You know, you work

CONFIDENTIAL

RE00000177

1    with someone. They've come into this thing, and you're doing

2    fine and they're doing fine. And maybe there might be -- you

3    know, you want to see goodwill. Right?

4              And sometimes, you know, it's not like all hedge

5    fund managers are trying to write their own local economics.

6    Right? That's fine. I personally think that that's a smart

7    thing. I think hedge funds play it too close to the -- you

8    know, too close to the edge, and then all they need is a

9    small draw-down and the next thing you know, they could be

10   out of business.

11             So there -- you know, we thought, well, maybe there

12   was -- maybe that was that. But like I said, the other thing

13   which -- again, the concern was that there was somehow --

14   because of his underlying business, because of the fact that

15   he was somehow using his order flow on the brokerage side to

16   benefit his clients with managed accounts, that that was

17   something where he couldn't raise money in a hedge fund

18   structure for that, or he didn't want to have the money

19   directly.

20             And therefore, you know, these third parties served

21   this purpose of creating this, I don't know, you know, buffer

22   between him and the capital. I mean, that was the only sort

23   of -- again, besides just goodwill and besides historic

24   relationships and everything else, maybe he didn't -- maybe

25   he was making enough and he didn't really feel like he needed

RE00000178

Page 23

1   to capture every dime.  But it did appear that the economics

2   were pretty focused towards the -- towards the fund.

3            But of course, you don't really know.  Right?  I

4   mean, you can't get under the hood.  Right?  So maybe there

5   was some underlying agreement between Fairfield and Madoff,

6   and maybe some of that could come back to him.  Right?  Maybe

7   he had an interest in Fairfield.  Maybe he was a GP, you

8   know.  It's hard to know, when you can't go down there

9   tomorrow, what's really going on.

10           MR. KOTZ:  Okay.  And then the next point you talk

11  about is, "We don't know why he does what he does.  We have

12  no idea if there are conflicts in his business that could

13  come to some regulator's attention.  Throw in that his

14  brother-in-law is his auditor and his son is also high up in

15  the organization, and the risk of some nasty allegations,

16  freezing of accounts, et cetera, et cetera."

17           So what did you -- what did you mean by that?

18           MR. SIMONS:  Well, you know, we had -- I guess

19  talking about family members, I mean, there had been other --

20  I think Mariposa down in Florida is an example of a -- of a

21  fund that was engaging in -- you know, in illegal activities,

22  where there were a lot of family members around.

23           Of course, I don't have anything against family

24  members working in the same organization.  But clearly, when

25  you're dealing with a more closely held organization like

CONFIDENTIAL

RE00000179

Page 24

1   that, where a large percentage of the people who are working

2   at the top of the organization are in the family, that

3   creates a better environment -- creates an environment that's

4   more ripe for abuse.

5          So that was the first thing about family members.

6   And obviously, the auditor being a brother-in-law, well, I

7   mean, you know, you'd want -- the auditor serves a pretty --

8   and I don't even -- by the way, that may not be right,

9   because I think they did have -- that statement might have

10  been wrong. But I knew that there was people close up in the

11  accounting group, and you really want to see good separation

12  there.

13         MS. STEIBER:  So (inaudible) from the auditor,

14  whether it be a brother-in-law or not, you wrote this in the

15  e-mail.  And if someone from the SEC were reading the SEC,

16  you would expect that they would look at the auditor, based

17  on your e-mail.  Right?

18         MR. SIMONS:  If you're asking me whether or not the

19  SEC should have taken an e-mail like that seriously if it was

20  brought to their attention in terms of if I -- you know,

21  sure, if there had not been previous activity around that, if

22  this was like some -- you know, if the SEC weren't already

23  aware of these issues.

24         MR. KOTZ:  Right.  And you even say that their

25  concern was it would come to some regulator's attention, and

CONFIDENTIAL                                                    RE00000180

Page 25

1    then there would be an impact on the operation.  And then

2    this did come to a regulator's attention.  Right?

3            MR. SIMONS:  Yes, it did.

4            MR. KOTZ:  Okay.  And then at the bottom you do

5    make this comment about, "Madoff said it would look pretty

6    good above Eliot Spitzer's mantel."  I know that's in jest,

7    but what was kind of the point there?

8            MR. SIMONS:  I thought it was kind of funny.  It

9    was at the time.  It ceased to become funny when you guys got

10   the e-mail.

11           (Laughter.)

12           MR. SIMONS:  You know, Eliot Spitzer was cracking

13   down on managers.  I mean, this is -- I think this was around

14   the time of the -- a lot (inaudible).  Right?  And I really

15   put that sort of in a similar bucket.

16           I mean, we were thinking about mutual fund market

17   timing and the issues around that, even though I didn't refer

18   to that in my e-mail.  But I was thinking about that in the

19   context of Madoff because it was sort of that level of

20   irregularity that we were thinking about.

21           We were thinking, again, maybe he's doing something

22   illegal because he's front-running his clients and giving his

23   clients bad prices.  And just like -- just like mutual fund

24   market-timing, where the result of a mutual fund market-

25   timing is effectively a tax on the buy and hold mutual fund

CONFIDENTIAL

RE00000181

Page 26

1    owners, right, with people that are getting in and out, and

2    are really, because of the way that mutual funds operate, you

3    know, are getting in and out at -- with basically no

4    slippage.

5            So that, you know, it's more like -- I don't

6    know -- I don't know how familiar you guys are with that

7    issue. But it's a similar issue because mutual fund market-

8    timers would often go in and out of small cap funds, and

9    small cap funds tend to trend, right, because mutual fund

10   managers, if they decide to buy a small cap fund, they can't

11   buy it all in one day because they move the market too much.

12   So they buy it over multiple days.

13           So if we started to see a move-up in the small cap,

14   sometimes in a (inaudible) small cap company, you can

15   actually buy a mutual fund and take advantage of that;

16   whereas if you have to go and buy and sell the underlying

17   stock, your slippage would kill you and you wouldn't make any

18   money.

19           And because of that, you can make a lot of -- you

20   can actually make money. And what it is, basically it's an

21   unrealistic price being bought and sold by the people that

22   are getting in and out. And again, it comes out of the hide

23   of the people that just own the small cap fund throughout.

24           So it's a tax on the buy and hold. And I saw this

25   as potentially a very similar issue, where Madoff was

CONFIDENTIAL                                                    RE00000182

Page 27

1  effectively taxing the institutional clients, pension funds

2  or anything else, for the benefit of his -- of his managed

3  account clients.

4        And so I was concerned that Spitzer was going to

5  come after him and make an example of him the same way that

6  he made an example of this mutual fund market-timing.

7        MR. KOTZ:  Now, this e-mail did make its way to the

8  SEC.  Did anybody from the SEC contact you and ask you any

9  questions?

10        MR. SIMONS:  No.

11        MR. KOTZ:  So nobody followed up at all with you?

12        MR. SIMONS:  Nope.  And I would have remembered if

13  somebody had done it.

14        (Laughter.)

15        MR. KOTZ:  Okay.  And so you were at that point

16  proposing that you guys get out entirely?

17        MR. SIMONS:  Well, certainly at the time of that

18  e-mail, I was making the argument that we should get out.  I

19  was making the argument that we should get out.  Now, we

20  have -- or had, I should say; we don't have that structure

21  any more, but we did then -- an investment committee, and the

22  investment committee would make collective decisions about

23  the investments that we made.

24        I managed the fund, and we made the

25  recommendations.  But the recommendations -- and they were

CONFIDENTIAL

Page 28

1    generally followed by the committee, but the committee, you

2    know, voted on it and, you know, if two people didn't want to

3    make the investment or (inaudible), you know, we acted

4    accordingly.

5            And so there was certainly not uniformity in terms

6    of the view on Madoff at that time, again, because we weren't

7    really contemplating that it was a Ponzi scheme.  And when we

8    were given the -- when we basically were able to put -- you

9    know, so we're able to -- we reduced our risk, is the bottom

10   line.  We took half our equity out.  And we didn't eliminate

11   the position because there wasn't, again, like I said,

12   uniformity of opinions as to how to proceed.

13           MR. KOTZ:  Do you think that the fact that the --

14   that you were aware that the SEC had looked at it and kind of

15   given him a clean bill of health, do you think that had any

16   impact on the decision not to completely take all your

17   interests away?

18           MR. SIMONS:  Yes.  Yes, I do.  Not just that, but

19   because of the nature of the fact that these were brokerage

20   statements, and he had a big broker dealer business and big

21   market-maker and -- you just assume that someone was paying

22   attention to make sure that there was something on the other

23   side of the trade.

24           MR. KOTZ:  And there were other issues that

25   referenced by Paul Broder in another e-mail having to do with

08-01789-cgm    Doc 10909-9    Filed 07/30/15    Entered 07/30/15 17:07:20    Exhibit E
pt. II - to Fisher Declaration    Pg 53 of 75

Page 29

1    options.  Did you have any -- what did you -- what was that

2    all about?  What were the specifics there that you can

3    recall, the other concerns?

4         MR. SIMONS:  Sure.  We were making estimates.  We

5    were making suppositions about how large he might be.  And we

6    were making -- based on -- you know, based on some attempts

7    to aggregate information that we had in terms of Fairfield

8    and other feeder funds that we were aware of.

9         So first you sort of make an estimate of a range,

10   and then you say, well, let's say the top end of that range

11   (inaudible).  And now let's make -- let's take a look at the

12   managed account information that we had.  And now it's

13   assumed that he's manages all that other -- all those other,

14   whether they're accounts or whether they're pass-throughs,

15   let's assume that he basically manages it like a pool.

16        What does that tell you -- what does that tell you

17   if those assumptions were in fact true?  What does that

18   indicate about the size of his OEX position?  And it was in

19   that context that that concern was raised because if you did

20   assume that it would be (inaudible) the range, if you did

21   assume that everything was done on a 5 to 2 basis, it doesn't

22   work, you know.  The old interest is not big enough to

23   (inaudible) that position.

24        You know, I mean, there are other ways.  You know,

25   there are all kinds of potential flaws -- or not flaws,

RE00000185

Page 30

1  potential places where you could be wrong.  You could be

2  wrong on the size of the overall book, you know, in terms of

3  how much money he's managing, again, not a knowable number.

4      You could be wrong about the fact that all the

5  positions -- all the books were managed in lockstep because

6  again, you don't know that.  You don't know to what extent.

7  There could be very different return (inaudible) associated

8  with an account; we can't see them.

9      And the third thing is you may or may not -- you

10  know, there is always an over-the-counter situation because

11  there's quite a lot of over-the-counter volume in equity

12  options, in equity (inaudible) options.  So he could have

13  been using over-the-counter positions for parts of his book.

14      So it was really not the size of his, but again,

15  it's just another thing that makes one uncomfortable.

16      MR. KOTZ:  Was there an effort made to see if he

17  was using over-the-counter for that much volume and

18  positions?  Did you guys look at that?

19      MR. SIMONS:  No.  There's no -- right.

20      MR. KOTZ:  Yeah.  I mean, Paul Broder sent an

21  e-mail that indicate that, you know, that was looked at.  Do

22  you remember that?

23      MR. SIMONS:  I don't think that -- well, I know --

24      MR. KOTZ:  In terms of the counter party?

25      MR. SIMONS:  I don't see how -- I mean, look.  I

CONFIDENTIAL

RE00000186

Page 31

1   don't -- I mean, you've obviously already talked to Paul.  I

2   don't know how one would have gone about looking to see if

3   something was done over the counter.  I mean, you can't go

4   and talk to Goldman Sachs and (inaudible) and say, are you in

5   a big over-the-counter derivative from Bernie Madoff?  They

6   would tell you to, you know, whatever.

7               So I don't even know how we would have gone about

8   trying to ascertain that.  You know, I think -- look.  We

9   live in the listed -- you know, in the listed exchanges.  So

10  I think that -- you know, I can't recall any efforts to try

11  to delve into the over-the-counter market (inaudible).

12              MS. STEIBER:  Is there a way for him to read this

13  e-mail there to maybe refresh his memory about what Paul had

14  done that he relayed to him in this e-mail?

15              MS. PORTER:  Oh, we can certainly do that.  It'll

16  take a little time to get it --

17              MS. STEIBER:  Maybe we'll just read --

18              MR. SIMONS:  If you might (inaudible).

19              MS. PORTER:  You know, remember that Nat's the fund

20  of funds manager, and Paul manages the trading desk.  So

21  their experiences are very different.  So Nat may not know

22  substantively what Paul is talking about.

23              MR. SIMONS:  Now, and I also want to point out,

24  guys, that they were doing some things with regards to Madoff

25  that had nothing whatsoever to do with Meritage, you know.

CONFIDENTIAL                                                    RE00000187

08-01789-cgm   Doc 10909-9   Filed 07/30/15   Entered 07/30/15 17:07:20   Exhibit E
pt. II - to Fisher Declaration   Pg 56 of 75

Page 32

1   And so Paul was looking into some things, and he wasn't

2   necessarily relaying -- he obviously relayed to me about

3   like, you know, we'd talk about the size of the OEX position

4   that it would be, and I was aware of all that.  But he may

5   not have relayed to me information about what they were doing

6   over the counter.

7            MS. STEIBER:  Well, let me read to you this section

8   of this e-mail that he sent to you that's specifically about

9   the over-the-counter reach to see if it triggers any memory.

10           He said, "When we examined the issue before, we

11   concluded that maybe he does the options in the OTC market.

12   We have spoken to several market-makers in OTC equity

13   options.  None of them claim to see any significant volume in

14   OEX options.  Recall that Raf stated that Madoff said it was

15   necessary to spread trades over several days.  Why, if you

16   were doing over-the-counter," and then he (inaudible).

17           MR. SIMONS:  I see, so -- okay.  No.  I do -- I

18   guess, I mean, I should have read that, obviously, a little

19   more closely before coming here.  Look.  It makes sense, I

20   guess.  If you can really -- if it's the case, I thought that

21   there were larger volumes in the OTC market.  So obviously,

22   at the time, I'm sure I knew that, but I just forgot.

23           So yeah, okay.  So I guess what he basically -- he

24   wasn't looking into whether Madoff had positions like that.

25   He was looking into whether Madoff could have positions like

CONFIDENTIAL

RE00000188

Page 33

1    that. I mean, just talk to the major market-makers in OTC

2    options.

3                MR. KOTZ: Right.

4                MR. SIMONS: So that just -- anyway, so there are

5    other ways. I mean, remember that if you were -- I'm just

6    wondering if -- and I have to -- well, anyway. It is what it

7    is.

8                MS. STEIBER: Let me read the next point. Recall

9    point 2. "This would indicate that the over-the-counter

10   options would also have to be done at the end of the day to

11   get a strike near the close. Are we to believe that the

12   market-makers would take on 15 billion of market risk at the

13   close?

14               "Of course they might," and then he puts might and

15   three exclamation points, "be willing to take the option risk

16   if Madoff provided the market hedge in the underlying, i.e.

17   they did the whole package with Madoff. But we already know

18   that the trades in the underlying compared with the closing

19   prices would lead the over-the-counter counter parties

20   showing losses, as our account always shows gains."

21               And then he says -- his last point is, "Of course,

22   all of our trades are with Madoff as the principal, so our

23   option positions are over the counter with Madoff, so he can

24   choose to use any strike and any total volume he chooses, but

25   the risk must be covered somewhere if he is doing these

CONFIDENTIAL                                                              RE00000189

Page 34

1      trades at all.

2              So we need an over-the-counter counter party, not

3      necessarily a bank, who is willing to do the basket of the

4      options plus the underlying with Madoff at prices unfavorable

5      for the over-the-counter counter party. In 10- to 15

6      billion," three exclamation points.

7              MR. SIMONS: Right. So I certainly understand that

8      point. And it's a good point because basically, that goes

9      back to the fact that we observed that he got extraordinarily

10     good fills, which again points to the notion.

11             And so if you have to -- of course, if you have to

12     do the trades more or less at the same time and if you have

13     to go with the same counter party -- because they're never

14     going to be willing to do something like that on a naked

15     basis; they need to be hedged -- then yes, how do you -- how

16     would you do that? How would the counter party be willing to

17     take those losses? Yeah. I mean, that's certainly a very

18     good point.

19             MS. STEIBER: So would it be fair to say that based

20     on the e-mail that you received, that the research that

21     Renaissance had done concluded that he really wasn't trading

22     over the counter, or it was very unlikely that he was trading

23     over the counter?

24             MR. SIMONS: Well, I don't know. I guess so. You

25     know, if they concluded -- I mean, I think that it certainly

CONFIDENTIAL

RE00000190

Page 35

1    pointed to the difficulties that he would have in transacting

2    heavily on -- you know, over the counter.  But I don't think

3    that Paul was trying to say that it wasn't possible.

4              Again, he was making the assumption about the size.

5    15 billion was at the outside of where we thought he might

6    be.  So we were again saying he would -- if he's running

7    15 billion and if he's trying to do what (inaudible), you

8    know, a lot -- a large percentage of that over the counter,

9    it would be hard.  It would.

10             MR. KOTZ:  So if you were a regulator, you were in

11   the regulator's shoes, and you got information like this, you

12   know; what steps would you take, do you think, to look into

13   this further?

14             MR. SIMONS:  So again, I guess I'm going to make

15   the assumption that I was unaware up to this point that there

16   may be a problem (inaudible).  So this is somehow -- this is

17   like, I'm new to this game.  I never heard of Madoff.  I

18   get -- I get some information about this.  I don't have any

19   contacts (inaudible) further.

20             Look, I guess I would go down -- if I really

21   thought that this came from a credible source and if this

22   work were being done at a high level by smart people, I would

23   presumably go down to the office and some questions about --

24   you know, about the nature of what he's doing and how he's

25   doing it, and show me the other side of your trades, and all

CONFIDENTIAL

1   that good stuff.

2        MR. KOTZ:  So what if you -- so there would be ways

3   for you to determine, for example, whether he was trading

4   over the counter by perhaps talking to counter parties?

5        MR. SIMONS:  I guess.  I mean --

6        MR. KOTZ:  Okay.  And so if you went to Madoff and

7   he said, I do my trading in Europe, how would you react to

8   that?

9        MR. SIMONS:  Yeah.  I mean, I guess I would say,

10  well, (inaudible).  I need to see the other side of those

11  trades in Europe.  If they're in Europe, that's fine, but

12  you're doing them with someone.  There's got to be somebody

13  on the other side of the trade.

14        Again, you're asking me questions, though, that I

15  don't know to the extent -- the extent of the jurisdiction of

16  the SEC.  I mean, I'm assuming that you have the ability to

17  extend beyond country borders, if it's an American operation,

18  to see what they're doing.

19        MR. KOTZ:  Okay.  Putting aside the jurisdictional

20  issue, there are things that could have been better?

21        MR. SIMONS:  Well, strictly from the point of view

22  of just being the practical issue, then, you know, that's not

23  sufficient (inaudible).

24        MR. KOTZ:  So is it fair to say that when you guys

25  looked at it, you thought there was something potentially

CONFIDENTIAL

RE00000192

Page 37

1    wrong sufficient that you were uncomfortable, but you hadn't

2    really made any conclusions of whether it was front-running

3    or something else; but it was kind of enough to just simply

4    say, we got an issue here?

5             MR. SIMONS:  Remember, Madoff makes (inaudible) the

6    order of 12 or 13 percent.  That's what we were doing in our

7    portfolio outside of him.

8             MR. KOTZ:  Right.

9             MR. SIMONS:  It wasn't like he was boosting our

10   returns.  The thing that was so great about Madoff was the

11   smoothness of the returns.

12            MR. KOTZ:  Right.

13            MR. SIMONS:  But if you had a reason to believe

14   that there was an embedded (inaudible) inside of those

15   returns, for some reason then the volatility number that you

16   have is no good.  And we see that a lot.

17            You know, one of the -- you know, we used to invest

18   in a lot more funds where they would show these smooth

19   returns, and a lot of the standard way to manage those smooth

20   returns is by trading fixed income (inaudible), right, where

21   they have a lot of control over the marks, so that basically

22   they just -- they average the bid and the ask.

23            I mean, they don't do anything illegal, but they

24   have a lot of flexibility over the mark because they have an

25   over-the-counter security.  And in that situation, you know,

1    the return -- you know darn well that the volatility that the

2    manager is showing you isn't real.

3           Now, again, here we were dealing with what we

4    thought were managed -- what we believed were managed

5    accounts with complete transparency in terms of the trade,

6    and dealing with exchange-traded securities, which means that

7    that argument doesn't work. Okay.

8           So the volatility that you were seeing should be

9    true with the underlying volatility. But if there was some

10   other risk associated with it that could not be quantified,

11   then you couldn't justify being inside of the trade purely on

12   the basis of risk/reward, it starts to go completely against

13   you because he's not making 25 percent a year.

14          MR. KOTZ: So, I mean, you obviously didn't

15   identify any fraud. But it's apparent to say that from what

16   you saw, there was at least a potential that there was fraud

17   here?

18          MR. SIMONS: When you say fraud, you mean -- you

19   mean like -- you don't mean front-running your clients. You

20   mean -- I just want to make sure (inaudible) before I --

21          MS. PORTER: What do you mean by fraud?

22          MR. KOTZ: Yeah. I would me, you know, fraud like

23   not trading or some other thing other than just front-

24   running.

25          MS. STEIBER: Auditor lack of independence, you

CONFIDENTIAL

RE00000194

1   know, getting false audits, something like that.

2          MR. SIMONS:  You know, again, I think the best

3   evidence -- the only real evidence, I think, of fraud, the

4   only real -- I shouldn't say evidence; the only real

5   indication that there may be fraud, I suppose, at least in my

6   mind, was the OEX information.

7          But there, again, we just had no way of knowing

8   whether those other accounts looked like this one.  And so we

9   really -- I never, as the manager, entertained the thought

10  that it was truly fraudulent.  And, you know, perhaps I

11  should have.  But I didn't.

12          And it again was because, I think, of a combination

13  of the fact that it appeared that the idea of fraud -- it

14  would have been so -- again, it would have been so easy to

15  prove that it was fraud if it was just managed accounts that

16  were set up.  It would have been so -- again, forgive me

17  here, but, you know, it would have been pretty

18  straightforward.

19          We felt that he was sufficiently in the eye of the

20  regulators that it was just hard for us to envision that that

21  was the case.  And so then you'd fall back into these second

22  order concerns.

23          MR. KOTZ:  When you say pretty straightforward,

24  pretty easy, you mean pretty easy for a regulator like the

25  SEC.  Right?

RE00000195

Page 40

1          MR. SIMONS:  I guess I mean that.  I mean --

2          MS. PORTER:  He doesn't understand.

3          MR. SIMONS:  You know, I --

4          MS. PORTER:  Nat, you can be free.

5          MR. BARRON:  Go ahead.  You can say it.

6          MS. PORTER:  You can be free.  You can say it.

7    It's okay.  They won't take it personally.

8          MR. KOTZ:  I mean, our job is to try to figure out

9    what happened so we can improve things.  So we are dying to

10   hear what people think.

11         MR. SIMONS:  I had had -- I had met three managers

12   personally who went to jail after I met them.  Okay?  We,

13   happily, did not invest in any of them.  But they went

14   physically behind bars, and they were -- they were

15   fraudulent.

16         But these were -- they were -- they were all kind

17   of elaborate schemes, and they involved private (inaudible),

18   and they involved all these kinds of like okayed structures.

19   I had never seen something that looked on its face to be so

20   transparent that in fact was fraudulent in the way that

21   you've described.

22         And so I guess I was given a false sense of

23   security by the nature and the structure of Madoff that the

24   likelihood of it being an out-and-out scam was quite -- was

25   quite low.

CONFIDENTIAL                                                           RE00000196

Page 41

1          And, generally speaking, scams tend to be smaller.

2    Right?  These funds that I saw were 100 million, 200 million.

3    You know, we'd never seen a multi-billion-dollar fraud

4    before.  Generally speaking, my view has been that it's hard

5    to multi-billion-dollar frauds to happen because it involved

6    the complicity of so many different people.  And so it is

7    hard to pull off.

8          So I guess we felt, again, you know, with being

9    such a public figure, being -- having such -- you know, being

10   a large -- you know, a large market-maker, all the other

11   activities, the idea of out-and-out fraud struck me as just

12   too far-fetched.

13         I mean, I'm sorry, it didn't strike me.  It was

14   probably too far-fetched for me to get my arms around, which

15   is why it never really occurred to me, which is why I wasn't

16   pounding the table at that time saying, we have to get out

17   entirely because I'm not going to -- you know, we think that

18   there's a possibility of fraud.  You don't -- you don't leave

19   half your capital at risk.

20         Even at that time, it was like 2 percent.  So we'd

21   have to have (inaudible).  That's not -- you know, we're

22   trying to make 14 percent.  A 2-1/2 percent loss is pretty

23   dramatic.

24         MS. STEIBER:  Did there come a time when you

25   heard -- you (inaudible) e-mails where you heard other rumors

CONFIDENTIAL                                                    RE00000197

Page 42

1   that made you want to reduce your position even more than the

2   50 percent that you had reduced, or that you heard other

3   rumors that were more serious?

4          MR. SIMONS:  No.  You've pretty much -- that

5   e-mail -- that e-mail was the culmination of hearing these

6   things.  And there was nothing that came to my attention that

7   was of a different nature, at least not that I remember.  It

8   was obviously a fairly long time ago.  They wanted to

9   (inaudible).

10          MR. KOTZ:  So in the end, there were significant

11   funds that were lost because positions were left in after it

12   came out in December?

13          MR. SIMONS:  No.  We were out -- we were out about

14   a year after that e-mail.  But again, I do have to go back

15   over this because I don't -- you know, I don't remember

16   precisely what the terms were.  But more or less my

17   recollection is that we were -- we were kicked out

18   (inaudible).

19          MR. KOTZ:  Kicked out by?

20          MR. SIMONS:  By HGH.  At the time, we were

21   redeeming them from our funds.  As you probably know, we

22   had -- Medallion had lots of outside investors.  You know, we

23   kicked them all out by the end of '05.

24          They were large outside investors, our largest

25   outside investor, and they needed really to put -- you know,

CONFIDENTIAL

RE00000198

Page 43

1   to get that money back to work.  So certainly didn't put it

2   on payoff, I think.  But that was -- you know, they

3   basically -- they basically felt they needed the capacity.

4          And so I didn't even finally, at the end of the

5   day, decide (inaudible), which they had, in order for them to

6   look a little smarter.

7          MS. STEIBER:  So my final question.  If you had the

8   e-mails that you know that you sent and the other e-mails

9   that you received about the strange options activity, if you

10  were a regulator and you investigated the possibility of

11  front-running and didn't find anything, do you think that

12  would have satisfied all of the concerns raised in those

13  e-mails?

14         MR. SIMONS:  So if I were a regulator and I looked

15  into the particular allegation of front-running and I didn't

16  find any basis for that, to justify that claim --

17         MS. STEIBER:  If I didn't find front-running.

18         MR. SIMONS:  I didn't find front-running -- would

19  that have -- would I have felt that I didn't need to go any

20  further?

21         MS. STEIBER:  Right.  That's the question.

22         MR. SIMONS:  No, because there were two other

23  key -- you know, two other key points.  Well, I guess the --

24  you know, the main key point was obviously the OEX position,

25  the OEX option position, because the other -- I guess the

Page 44

1    three components was good fills, big OEX option position,

2    and what appears to be a predictive -- you know, ability to

3    pick the S&P.

4              I suppose you can't question somebody's ability to

5    pick the S&P.  I suppose if they can pick the S&P, they can

6    pick the S&P.  More power to them.  So I suppose it's the OEX

7    position that would be the other thing you would want to take

8    a look at.

9              MS. STEIBER:  What about the auditor independence

10    issue?

11              MR. SIMONS:  (Inaudible.)

12              MR. KOTZ:  So it's fair to say that even if front-

13    running was ruled out, the questions weren't fully answered,

14    and one would have to continue to look to see how these -- to

15    look at these potential red flags?

16              MR. SIMONS:  Yeah.  But let me tell you one other

17    thing, I guess, and I -- just -- well, you probably know

18    this.  Right?  But you asked -- actually, I'm going to go

19    back.

20              You asked me a question before about whether or not

21    I'd heard anything else.  And I should -- I should probably

22    say that the only other thing was I had heard -- and I

23    believe I had actually already heard that, but I don't really

24    remember the timing -- was that there was a restricted floor

25    within -- you know, within their activity, within their

CONFIDENTIAL

RE00000200

Page 45

1    organization.  There was some floor or some section of a

2    floor or something that was -- had restricted access.

3         MR. KOTZ:  And so that would be also something to

4    be concerned about in terms of secrecy?

5         MR. SIMONS:  The auditor, and independence, and

6    making sure the accounting is -- yeah.  I mean, there are

7    restricted -- people have, you know, restricted floors,

8    things like that.  But it is a red flag.  Right?

9         MR. KOTZ:  All right.  I think that's all we have.

10        MS. STEIBER:  Thanks, Nat.

11        MS. PORTER:  Thank you, Nat.

12        MR. KOTZ:  Thank you very much.  We appreciate it

13   very much.

14        MS. PORTER:  Thanks, Nat.  Did you -- oh, you have

15   a question?

16        MR. KOTZ:  Sure.

17        MR. SIMONS:  I figure I get one question.

18        MR. KOTZ:  You can have as many questions as you

19   want.

20        MR. SIMONS:  Well, again, I'm just curious.  I

21   think I understand from some conversation, I don't know, that

22   these e-mails triggered some investigation.  I mean,

23   obviously that may not be the only investigation that Madoff

24   (inaudible), and I -- but I'm just curious.

25        Are you guys -- are we particularly distinguished?

CONFIDENTIAL                                                    RE00000201

Page 46

1   Or are you talking to lots of folks who have had -- who, you

2   know, -- who, for whatever reason, there was some interaction

3   between them and the SEC that might have prompted, you know,

4   (inaudible)?

5           MR. KOTZ:   Yeah.   There are -- there are definitely

6   other folks.   And I think that, you know, some of the other

7   folks, like Harry Markopolos, provided, you know, a very

8   detailed, you know, 25-page complaint to the SEC asking for

9   action, then trying to follow up with them.

10          So, I mean, they're in a very different category

11  than you guys, in which just some e-mails kind of got to the

12  SEC's attention.   And then there are others who are in

13  somewhat of a similar situation to yours.   And there's been

14  numerous -- and this is relatively widely reported, so I'm

15  not giving anything away -- but there have been numerous

16  pieces of information that were brought to the SEC's

17  attention.

18          So you are not distinguished in that way, and

19  you're certainly not distinguished in that, you know, while

20  they got hold of some of your internal e-mails which you

21  looked at for a different purpose, it wasn't comparable to

22  the scale upon which somebody actually came to the SEC

23  specifically and said, this is what's going on.   It may be a

24  Ponzi scheme.   Here's why.   Please call me.

25          So I guess that's why.   But I mean, it is certainly

CONFIDENTIAL

Page 47

1   a part of the puzzle. But, you know, the report will focus,

2   you know, I think quite a bit more on other aspects of it,

3   particularly since the Harry Markopolos matter prompted the

4   investigation, in which you have more authority and ability

5   to find a Ponzi scheme, while your areas prompted more of the

6   kind of examination/review side.

7           But nevertheless, we are kind of looking at all the

8   issues to see, you know, to the extent that these things were

9   brought to the SEC's attention on more than one occasion,

10  similar type issues, consistent views in terms of the

11  appearance of red flags kind of combined all together, why

12  weren't certain things done that seem to us to have been able

13  to determine that this was a Ponzi scheme or that he wasn't

14  trading or, you know, going beyond kind of looking at the

15  front-running issues.

16          MR. SIMONS: Okay. And I guess, you know, just the

17  last sort of thing I would sort of say (inaudible), you know,

18  we invest in other funds. Yet certainly we would like to

19  believe that the SEC is helping to make -- to ensure that

20  these funds are not fraudulent.

21          So clearly, we're sort of on the same side of the

22  thing. I'm the only guy that you've talked to that directly

23  oversees activity that invests in other managers, right, so

24  that we effectively (inaudible). I mean, I see where you

25  talked to investors in the fund that we manage, but they

CONFIDENTIAL

RE00000203

1    don't do it on a daily basis.

2         So it's certainly -- you know, I want you to know

3    that clearly we're certainly happy to provide an opportunity

4    to help. And I guess the last thing is, you know, I think

5    maybe one of the reasons why, by the way, just in terms of --

6    if you did -- there is sort of the underlying question which

7    is, you know, did it ever really occur to you to call the

8    SEC, you know, why didn't you ever call the SEC, or all that

9    kind of thing.

10        We did feel that despite the fact that we're kind

11   of smart people, we were just looking at matters of public

12   record. I mean, you know, it wasn't hard to get these

13   statements. These statements, you know, hundreds of -- lots

14   and lots and lots of people had Madoff statements.

15        So we didn't really feel that we were dealing with

16   something which is proprietary, and therefore the conclusions

17   that we came to were something that was -- you know, other

18   people were unlikely to come to. And it's not like we

19   needed a PhD in mathematics to do the -- to do the study on

20   the OEX. Right? I mean, this is just -- just looking at the

21   size of the market.

22        So, you know, I just have to say that, I mean, I

23   think -- I almost think that, I mean, you know, maybe now, I

24   suppose, if there was a Madoff II floating around and some of

25   these things were out there, people would think twice about

CONFIDENTIAL                                                    RE00000204

Page 49

1  it because our imagination is that much greater.

2          But, you know, anybody else, I just don't know how

3  one would have expected to -- you know, to go and call the

4  SEC about anything like that.  And it's not that we wouldn't

5  want to be good citizens and helpful, you know, because it's

6  not in anybody's interest to see this kind of thing happen.

7  And obviously, there's great damage to our industry and to a

8  lot of -- to a lot of, you know, good people.

9          MR. KOTZ:  Right.  Now, I agree with that.  But I

10  think on the other side, there has to be a confidence level

11  in the SEC.  So for example, you know, you can't really take

12  the position, I don't think, in this case that, you know,

13  this one should have come forward and that one come forward

14  because I don't think -- you know, Harry Markopolos did come

15  forward.  He provided a 20-page document.  He followed up.

16  And, you know, it still wasn't found.

17          MR. SIMONS:  When did he first come forward?

18          MR. KOTZ:  Well, I don't want to go into too many

19  details.  But --

20          MR. SIMONS:  Oh, I'm sorry.  I thought that was a

21  matter -- I wasn't asking for anything that wasn't a matter

22  of public record.

23          MR. KOTZ:  No.  I mean, the document that's out

24  there on the internet is 2005, and there were some efforts

25  prior to that as well.

CONFIDENTIAL

RE00000205

1          MS. STEIBER:  He testified before Congress that he

2    first came forward in 2000.  So that's public.

3          MR. KOTZ:  Okay.  Yeah.  So --

4          MR. SIMONS:  I thought that -- I certainly don't

5    mean to ask you anything that's internal.

6          MR. KOTZ:  No, no, no.  So yes.  So, I mean, he

7    did, and then in 2005, as he testified, there was, you know,

8    a pretty thick document provided with a lot of information.

9    And so, you know, there has to be a feeling that the SEC

10   will, once it's brought to its attention, find it.

11          And the thing that I was asking you about before

12   that concerns me is I do think that there are people out

13   there who relied on the fact that the SEC looked at it and

14   didn't find anything.

15          And, you know, so it's almost as if, you know, it's

16   kind of bad enough that they didn't find it; but it almost

17   would have been better if they hadn't looked at it because if

18   they hear they looked at it and didn't find, then that

19   provided a level of comfort to people that wouldn't have been

20   there if they hadn't looked at it at all.

21          But, you know, I mean --

22          MS. PORTER:  A false sense of security.

23          MR. KOTZ:  Right.  So, you know, we need to kind of

24   understand how this could have happened, and then learn from

25   it and look at, you know, why it is that they were unable to

CONFIDENTIAL

RE00000206

Page 51

1   uncover this; and then, you know, look at possible

2   solutions -- training, you know, other possible ways, so that

3   they can be kind of in the same situation as you folks were,

4   you know, even in your very limited review, which you didn't

5   really need to go any further for.

6          But if you had kind of, based on that expertise,

7   been at the SEC, one would think that there were things that

8   could have been done relatively easily that could have then

9   uncovered this, you know, massive scheme.

10          MR. SIMONS:  Yup.  Well, listen.  Obviously, it's

11   in our interests to make you guys -- not make you guys -- for

12   a nice, strong, you know, well-functioning SEC in this

13   regard.  So if there's anything we can do, anything I can do

14   to follow up, happy to, you know, answer further questions.

15          MR. KOTZ:  Okay.  Great.  Well, thank you very much

16   for your time.

17          (Whereupon, the interview was concluded.)

18                    * * * * *

19

20

21

22

23

24

25

CONFIDENTIAL

RE00000207