# Exhibit G



U.S. Securities and Exchange Commission

# Office of Investigations

# Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme - Public Version -



August 31, 2009
Report No. OIG-509

# Report of Investigation
# Case No. OIG-509
# - Public Version -
# Table of Contents

Page

Introduction ........................................................................................................1

Scope of the Investigation ....................................................................................3

I.  Document Preservation and Meetings with
    Senior-Level Officials ...............................................................................3

II.  E-mail Searches and Reviews of E-mails .....................................................3

III.  Document Requests and Review of Records ................................................4

IV.  Document and Information Requests to
     Independent Third-Parties .......................................................................5

V.  Retention of Expert in Analyzing Examination
    and Investigatory Work ............................................................................5

VI.  Retention of Expert in Recovering E-mails ................................................6

VII.  Testimony and Interviews .........................................................................7

Executive Summary ............................................................................................20

Results of the Investigation ................................................................................42

I.  SEC 1992 INVESTIGATION OF AVELLINO & BIENES .......................42

    A.  Customers Complained about Avellino & Bienes'
        Investments ........................................................................................42

    B.  SEC Contacted Avellino and Suspected that Avellino &
        Bienes Was Selling Unregistered Securities and Running
        A Ponzi Scheme ..................................................................................44

    C.  Counsel for Avellino & Bienes Contacted the SEC and
        Avellino and Bienes Came in for Voluntary Joint Testimony ................45

    D.  The SEC Conducted a Brief, Limited Cause Examination of
        Madoff .................................................................................................47

        1.  The Examination was Conducted by a Relatively
            Inexperienced Team and Its Scope was Limited .......................47

2. A Net Capital Review was Performed and the SEC Examiners Sought DTC Records From Madoff, Not from DTC directly................................................48

3. The Examiners Never Looked into Where the Money That Was Used to Pay Back Avellino & Bienes' Investors Came From..............................................49

4. The Examiners Were Aware of Madoff's Stature ......................50

E. The SEC Filed a Complaint against Avellino & Bienes for Selling Unregistered Securities, But the Complaint Did Not Allege Fraud and Did Not Assert Any Claims Against Madoff. ......................................................50

F. The Trustee Retained Price Waterhouse to Conduct an Audit of Avellino & Bienes' Financial Statements and Conducted Discovery But Its Jurisdiction was Limited ........................53

G. Price Waterhouse Experienced Great Difficulties in Conducting its Audit of Avellino & Bienes' Financial Statements and a Request was made to the Presiding Judge for Additional Time ......................................................55

H. After the Request for Additional Time was Denied, Price Waterhouse Issued its Report But was Unable to Render an Opinion on Avellino & Bienes' Financial Statements..........................56

I. The SEC Conducted Limited Discovery About Madoff But Avellino & Bienes Objected Aggressively and it is Unclear if the SEC Obtained any Relevant Information ......................57

J. A Final Judgment of Permanent Injunction was Entered on Consent Against the Defendants, Penalties were Assessed And the Investigation was Closed............................................58

K. Conclusion ......................................................59

II. SEC REVIEW OF 2000 AND 2001 MARKOPOLOS COMPLAINTS ......................................................61

A. Markopolos Approached the SEC's Boston Office in May 2000 with Evidence that Madoff was Operating a Ponzi Scheme......................................................61

1. The 2000 Submission......................................................61

2. Markopolos Met with Grant Ward, a Senior SEC Enforcement Official ......................................................63

3. Ward Decided Not to Pursue the 2000 Submission....................64

4. Ward's Testimony Regarding the 2000 Submission is Suspect ......................................................65

B.      Markopolos Made a Second Submission to the
        Boston Office in March 2001 ................................67

        1.      The 2001 Submission.................................67

        2.      Boston Forwarded the 2001 Submission to NERO ...................70

        3.      NERO Decided Not to Investigate Madoff Only One
                Day After Receiving the 2001 Submission..............................71

        4.      Two Articles Were Published in May 2001
                Questioning the Legitimacy of Madoff's Returns ......................74

        5.      NERO Did Not Reconsider Its Decision Not to
                Investigate Madoff After Publication of the Articles ................76

III.    SEC 2004 OCIE WASHINGTON DC CAUSE
        EXAMINATION OF MADOFF ................................77

    A.  An Employee of a Registered Hedge Fund Provided
        The OCIE Investment Management Group With A
        Detailed Complaint About Madoff ..........................77

        1.      During Due Diligence of Madoff Feeder Funds,
                Fund Managers Identified Red Flags in Madoff's
                Representations ..........................78

        2.      MarHedge Article Raised Red Flags About
                Madoff's Returns ..........................80

        3.      Investment Management Examiners Would have
                Validated Madoff's Returns..........................82

        4.      Investment Management Examination Group
                Referred the Complaint to the Broker-Dealer/
                Self-Regulatory Organization Examination Group ...................82

        5.      SRO Group Received the Complaint No Later
                Than the Fall of 2003..........................84

        6.      OCIE's SRO Examination Group Had No Policies
                Or Procedures for Handling Tips or Complaints ........................85

        7.      OCIE Received Another Tip About Madoff in
                December 2003 ..........................85

        8.      It Appears Richards First Sent McCarthy the
                Barron's Article About Madoff in 2001 ......................86

        9.      Richards and McCarthy Called Madoff Prior to
                OCIE's Examination.................................87

    B.  SRO Group Began Planning Its Examination of Madoff in
        December 2003 ..........................89

1.     The Madoff Examination Team Consisted Entirely of Attorneys ........................................................................................ 89

2.     OCIE Expanded Rapidly and Lacked Trained Examiners ............................................................................ 90

3.     SRO Group Chose Not To Include Investment Management Examiners on Examination Team ......................... 91

4.     Examination Planning Memorandum Stated Trading Data Would be Sought From the NASD ................................... 92

5.     McCarthy Focused the Examination on Front-Running ............. 93

6.     Swanson Acknowledged in Testimony that If He Had Carefully Reviewed the Complaint, He Would Have Investigated Additional Red Flags That Were Raised ............... 95

7.     Donohue Acknowledged Issues Raised in the Hedge Fund Manager's Complaint Other Than Front-running Should Have Been Investigated .................................................. 95

8.     The Examination Did Not Focus on Red Flags Raised in *MarHedge* Article About Madoff's Trades Not Being Seen in the Market ...................................................... 96

9.     Investment Management Examiners Did Not Read the Complaint's Main Focus to be Front-running ............................ 96

C.    Conduct of the Examination .................................................................. 97

1.     Examination Team Did Not Send Draft Letter to NASD ............ 97

2.     OCIE Examiners Did Not Request Documents from Madoff Feeder Funds .................................................................... 98

3.     Draft OCIE Document Request Referenced Madoff's Call with Richards and McCarthy ................................................ 99

4.     After Sending OCIE Document Request, Swanson Discussed Request with Madoff ................................................. 99

5.     Documents and Information Madoff Produced Contradicted the 2001 Articles and the 2003 Complaint, But OCIE Did Not Seek to Verify the Accuracy of Madoff's Representations ...................................... 100

6.     Exam Team Spoke to the Hedge Fund Manager Who Submitted the Complaint and Conveyed Concerns About Madoff, Including Inexplicable Returns and Options Trading ......................................................................... 101

7.     Examination Team Analyzed Data and Detected Inconsistencies ........................................................................... 103

8.    Examiners Discovered Madoff was Making More Money from Hedge Funds than Through Market Making ...................................................................103

9.    Examination Team Contacted Madoff About Open Issues................................................................................104

10.    Examination was Expanded to Examine Whether Madoff was Acting as an Investment Adviser...........................105

11.    Examination Team Never Resolved Question of Whether Madoff Was Acting as an Investment Adviser .........................................................................108

12.    Examiners Did Not Request Audit Trail Data from Madoff in Supplementary Document Request.......................108

13.    Examination Team Failed to Request Data from Any Independent Third-Party ...............................................109

14.    Donohue was Promoted to Assistant Director and Took Over Primary Responsibility for the Examination ...............................................................111

15.    Madoff's Responses to the Document Request Led To Additional Questions and Concerns .......................................112

16.    Follow-Up Call With Madoff Did Not Resolve Examination Teams Open Questions............................................115

17.    Walker Raised Additional Questions About the Information Produced by Madoff ..................................117

18.    Hostility Arose Between Donohue and Walker..........................120

19.    After Donohue Reviewed the Data Madoff Produced, He Had Numerous Unanswered Questions..................................122

20.    After Reviewing the Data Madoff Provided, Walker Also Had Additional Unanswered Questions .............................124

D.    The Madoff Examination was Halted......................................................125

1.    Examiners Stopped Working on Madoff Examination To Focus on Mutual Fund Project ...............................125

2.    Not Unusual to Shift Attention to High Priority Projects in OCIE and Leave Some Projects Incomplete.............126

3.    OCIE Performed Only 1½ More Days of Work on Madoff Examination ...............................................128

4.    Madoff Examination Put on the Backburner While Exam Team Still Had Unresolved Questions ...............................................................128

5.     Swanson Told Kelly the Examination Was
Ongoing After the Team Had Stopped Working on the
Examination ...................................................................................129

6.     Eleven Months After the Examination Was Set Aside,
Swanson Asked Donohue About the Examination
After Seeing Shana Madoff at a Conference;
Donohue Said Examination Was "Deady" ................................130

7.     OCIE Examination Was Still Inactive When NERO
Told OCIE They Had Also Been Conducting A Cause
Examination of Madoff ..............................................................131

E.     OCIE and NERO Learned of Their Parallel Examinations
From Madoff..............................................................................132

1.     OCIE and NERO Had Been Unaware That Were
Both Conducting Madoff Examinations ....................................132

2.     OCIE Had Conference Calls with NERO About
Madoff.......................................................................................134

3.     NERO Examiners Recalled OCIE Warned them
Madoff Was a Powerful and Influential Person..........................135

4.     When OCIE Sent Examination Documents to NERO
In June 2005, the Examination Was Unresolved........................135

F.     The OCIE Examination Concluded Without a Closing
Report ......................................................................................136

G.     Summary of FTI Engagement Team Expert Analysis............................138

1.     OCIE's Analysis of the Complaint Was Inadequate
For a Number of Reasons ..........................................................138

2.     The Team Assembled for Cause Examination was
Inadequately Experienced in Investment
Management Issues....................................................................141

3.     The Start of the Examination Should Not Have Been
Delayed for Seven Months.........................................................142

4.     The Examination Should Have Been Logged Into the
STARS System ..........................................................................142

5.     The Planning Memorandum Was Too Narrowly
Focused and Not All Courses of Action Were
Followed Through Upon.............................................................142

6.     There Were Numerous Red Flags in the Course of
The Examination that Were Not Pursued ...................................143

7.     SEC Offices Failed to Communicate...........................................144

8.     The Investment Adviser Issue Was Never Resolved .................144

9.    FTI Engagement Team Conclusion ..............................................145

IV.    SEC 2005 NERO EXAMINATION OF MADOFF  ....................................145

A.    NERO Investment Adviser Examiner Discovered
Renaissance Technologies E-mails Questioning Whether
Madoff Was Involved in Illegal Activity................................................145

B.    Renaissance Employees Suspected Madoff Was
Misrepresenting His Trading ..................................................................149

1.    Madoff's Secrecy, Auditor, and Non-volatile
Returns Were Significant Red Flags............................................149

2.    Madoff's Fee Structure Was a Significant Red Flag ..................150

3.    Renaissance Examined Madoff's Reported Equity
And Options Trading Using Widely Available
Information ..................................................................................151

4.    Madoff's Stock Predictions Were Too Good to Be
True ..............................................................................................151

5.    Cherry Picking Was an Unlikely Explanation for
Madoff's Incredible Fills ............................................................152

6.    Madoff Was Misrepresenting His Options Trading....................153

7.    Renaissance Employees Felt the SEC Could Have
Verified Whether Madoff Was Trading Options By
Taking Elementary Steps ............................................................153

8.    The SEC Had the Expertise to Perform Broder's
Analysis .......................................................................................155

9.    Front-Running Would Not Have Answered All of
The Questions in the Renaissance E-mails .................................157

10.    Renaissance Relied on Prior SEC Examination in
Making the Decision to Retain Part of Their Madoff
Investment....................................................................................157

C.    Renaissance E-mails Raised Significant Red Flags For
Investment Management Examiners ........................................................158

D.    NERO Investment Adviser Examination Group Referred
E-mails Implying Madoff is Involved in Illegal Activity to
NERO Broker-Dealer Examination Group..............................................160

E.    Examination of Madoff Was Commenced ..............................................161

1.    Examination Team of Non-Attorneys Was Chosen....................161

2.    Joint Examination with Investment Management
Examiners Was Not Considered ..................................................163

3.   Team Began Background Work in Preparation for
On-site Examination Ten Months After Referral ........................164

4.   No Planning Memorandum Was Drafted Describing
Focus and Scope of the Examination............................................166

5.   Nee Determined the Renaissance E-mails Only Raised
Issues Related to Front-Running and Cherry Picking.................167

6.   Madoff's Unusually Consistent Returns Were Not
Focused on In the Examination.....................................................168

7.   Examiners Were Still Suspicious of Madoff's
Unusually Consistent Returns at the End of the
Examination ...................................................................................170

8.   Madoff's Options Trading Was Not A Focus of the
Examination ...................................................................................171

a.   Examiners Investigated Madoff's Options
Trading Solely By Relying on Madoff's
Representation That He Stopped Trading
Options .............................................................................172

9.   Madoff's Fee Structure Was Not A Focus of the
Examination ...................................................................................172

a.   The SEC Examined Madoff's Fee Structure
Solely by Asking Madoff About It and
Relying on His Response ..................................................172

10.   Madoff's Auditor Was Not Looked Into During the
Examination ...................................................................................173

11.   The Examination Team Did Not Contact
Renaissance...................................................................................174

F.   Examiners Performed Pre-examination Work .........................................175

1.   Examiners Reviewed Articles about Madoff's
Stature in the Industry...................................................................175

2.   NASD Reports of BMIS Did Not Mention Madoff's
Advisory Accounts.........................................................................175

3.   Examiners Accepted Madoff's Explanation for
Relationship With Cohmad Securities..........................................177

4.   Document Request Did Not Contain a Request for
Trade Data.....................................................................................178

G.   NERO On-Site Examination Began Almost a Year After
Referral was Made ...................................................................................179

1.   Bernard Madoff was the Examiners' Exclusive
Contact at BMIS ...........................................................................179

2.     Madoff Attempted To Intimidate and Impress
       Examiners ..............................................................................180

3.     Despite the Evidence, Madoff Would Not Admit To
       Managing Money for Hedge Funds .............................................182

4.     Madoff Became Difficult for Examiners to Deal
       With NERO Supervisors Did Not Push Back .............................183

5.     Examiners Noticed Madoff's Representations Contradicted
       News Reports and Noted "Weird Descriptions" in Books
       and Records..............................................................................187

6.     Nee Sent Document Request to Barclays, and
       Barclays Responded There Was No Trading in
       Madoff's Account ....................................................................188

7.     Madoff Continued to Press Examiners to Finish the
       Examination and Produced A Limited Amount of
       Trading Data ...............................................................................190

8.     Examination Team Did Not Go to an Independent
       Source for Trading Data.............................................................191

9.     Madoff Finally Confessed to Executing Trades for a Small
       Number of Institutional Clients ..................................................193

H.     Examiners Learned from Madoff that OCIE Had
       Been Conducting Its Own Examination of Madoff ...............................195

I.     2003-2004 OCIE Examination Finished Without
       Conclusions.............................................................................198

1.     OCIE and NERO Had a Conference Call ...................................198

2.     OCIE Told NERO that Madoff was Powerful and
       Well-Connected ..........................................................................199

3.     OCIE Sent Their Examination Papers to NERO ........................200

J.     NERO Examination Continued.............................................................201

1.     Madoff Failed to Produce Correspondence, E-mail
       And Other Documents Requested by the
       Examination Team ...................................................................201

2.     Questions About Trade Executions and Clearance
       Were Never Resolved ...............................................................203

3.     The Examiners Investigated How Madoff Executed
       And Cleared Trades by Asking Madoff and Relying
       On His Responses ...................................................................204

4.     According to Associate Director Sollazzo, The Key
       To Uncovering the Ponzi Scheme Would Have Been
       Going to Third Parties ...............................................................206

5.      Examiners Identified Additional Discrepancies ..........................207

6.      Examiners Tested Madoff's Truthfulness ...................................207

7.      The Account Numbers Madoff Produced Were
        Suspicious to Examiners ............................................................209

8.      Examiners Were Skeptical of Madoff's Claim to
        Time the Market Using His "Gut Feel" ......................................210

9.      Madoff's Statement Were as "Clear as Mud" to
        Examiners ...................................................................................211

10.     The Examiners Learned Madoff Was Required to
        Produce All Documents to the SEC.............................................211

11.     Examiners Preliminarily Determined Madoff Was
        Not Front-Running.......................................................................212

12.     Examiners Did not Contact the Feeder Funds
        Madoff Disclosed.........................................................................213

13.     The Examiners Learned that BMIS's Market Maker
        Would be Losing Money Without the Hedge Fund
        Business ......................................................................................214

14.     Issues Regarding the Status of BMIS's London
        Office and Whether Madoff Should Register as an
        Investment Adviser Were Not Resolved.......................................215

15.     Examiners Were Told To Keep Their "Eyes On
        The Prize" ...................................................................................215

16.     There was Pressure on the Examination Program to
        Complete a Large Number of Examinations Each
        Year..............................................................................................217

17.     Examiners Thought Madoff Had Lied to Them; Nee
        Played Down Madoff's Misrepresentations.................................218

18.     Nee Did Not Allow the Examiners to Visit Feeder
        Funds............................................................................................219

19.     Examiners Were Not Allowed to Visit Feeder Funds,
        In Part Due to Fear of Lawsuits ...................................................220

20.     Time for the Madoff Examination Had Expired..........................223

K.      The Examination was Concluded ...........................................................224

1.      The Examination Team Never Understood How
        Madoff Was Acheiving His Returns.............................................224

2.      When Examiners Finished the Examination, They
        Still Had Open Questions About Madoff......................................225

3.      Examination Report Recited Information Provided By
        Madoff...................................................................................226

4.      Examination Report Did Not Describe Madoff's
        Misrepresentations to Examiners or The Issues That
        Remained Unresolved..............................................................227

L.      Lamore is Promoted, In Part, Based on The Madoff
        Examination ............................................................................228

M.      Summary of FTI Engagement Team Expert Analysis...........................229

1.      The Focus of the Exam Was Chosen In Error ............................229

2.      The Team Was Inadequately Staffed and
        Examination Should Not Have Been Delayed A
        Year........................................................................................231

3.      The Conduct of the Examination Was Flawed ............................231

4.      There Was Little Communication Between Offices....................233

5.      Red Flags That Arose in the Examination Were Not
        Pursued...................................................................................234

6.      The Examination Concluded with Unresolved Issues ................234

7.      FTI Engagement Team Conclusion ............................................235

V.      SEC 2006 INVESTIGATION OF MARKOPOLOS COMPLAINT ...........235

A.      Markopolos Made a Third Submission to the Boston Office
        In October 2005 .....................................................................235

1.      Markopolos and His Team Continued to Gather
        Information About Madoff .........................................................235

2.      The 2005 Submission................................................................237

3.      The Boston and New York SEC Offices Reacted
        Very Differently to the 2005 Submission ...................................240

        a.      The BDO Thought the 2005 Submission
                Warranted an Investigation  ..............................................240

        b.      The BDO Forwarded the 2005 Submission to
                NERO..............................................................................242

4.      NERO was Skeptical About the 2005 Submission......................244

        a.      The Matter was Assigned to a Relatively
                Inexperienced Team, Particularly with Respect to
                Conducting Ponzi Scheme Investigations.............................244

b.    The Enforcement Staff Assigned to the Matter Gave Little Weight to the 2005 Submission's Evidence that Madoff was Operating a Ponzi Scheme ................................................................247

(1).    The Enforcement Staff Considered the Evidence of Little Value Because Markopolos Was Not a Madoff Investor or Someone Personally Involved in the Alleged Ponzi Scheme ..........................................................247

(2).    The Enforcement Staff Questioned Markopolos' Credibility because of his Perceived Self-Interest .....................................249

(3).    Several Other Sources Raised Similar Concerns That Madoff Was Operating a Ponzi Scheme ...........................................251

(4).    NERO's Examination Staff Initially Misled Enforcement Staff Regarding the Scope of the Recent Exam ...........................................255

(5).    Enforcement Staff Knew that, Irrespective of Their Initial Representations, the Examination Staff Had Not Looked for Evidence that Madoff Was Operating a Ponzi Scheme .........................259

(6).    The Enforcement Staff Concluded that Madoff Did Not Fit the "Profile" of a Ponzi Scheme Operator ..........................................261

5.    The Enforcement Staff Delayed Opening a Matter Under Inquiry (MUI)    262

a.    The Madoff MUI was Not Opened Until January 2006 ....................................................................262

b.    As a Result of the Delay in Opening a MUI, The Enforcement Staff Never Learned of a Tip From A Madoff Investor Who Suspected That Madoff Was Operating a Ponzi Scheme .................................264

6.    The Enforcement Staff Investigated Madoff, But Focused on Issues Unrelated to a Ponzi Scheme Investigation ...............................................................266

a.    The Focus of the Investigation Was on Whether Madoff Should Register as an Investment Adviser And Whether His Hedge Fund Clients Were Adequately Disclosing Madoff's Role to Investors ....................266

b.  The Investigation Focused on Reviewing Records
    Created by Madoff Without Verifying Those
    Records Through Independent Sources ......................................269

    (1).    In December 2005, the Enforcement Staff
            Reviewed Documents Produced By Madoff's
            Largest Hedge Fund Investor...........................................269

    (2).    The Documents from Fairfield Demonstrated
            That Madoff Had Lied to the Examination
            Staff....................................................................................271

    (3).    In December 2005, Enforcement Staff Did
            Not Exhibit an Interest in Additional
            Information Offered by Markopolos...............................274

    (4).    In December 2005, the Enforcement Staff
            Interviewed an Executive from Fairfield and
            Became More Convinced that Madoff Had
            Lied to the Examination Staff...........................................276

    (5).    In January 2006, the Enforcement Staff
            Reviewed Documents Produced by Madoff....................280

    (6).    The Enforcement Staff Was Not Suspicious
            When Madoff Did Not Produce Documents
            Related to His Claimed OTC Options
            Contracts ...........................................................................284

    (7).    The MUI Was Converted to an Informal
            Investigation in January 2006 ..........................................286

    (8).    Madoff's "Right-Hand Man" and a Founding
            Partner of Fairfield Testified in January 2006,
            Raising More Questions That Were Never
            Resolved.............................................................................289

    (9).    In February 2006, Madoff Produced
            Documents Identifying Clearing Entities and
            Counterparties for His Purported Equities
            And Options Trades ...........................................................294

    (10).   In February 2006 and April 2006,
            Enforcement Staff Sought Assistance from
            The Office of Economic Analysis (OEA) ......................295

    (11).   In April 2006, Enforcement Staff Decided
            That Madoff Should Register as an
            Investment Adviser ...........................................................301

    (12).   In May 2006, Enforcement Staff Considered
            Verifying Madoff's Trades with Third Parties ...............303

(13).    Despite the Enforcement Staff's Confusion About Madoff's Operations, They Never Sought Information or Assistance from the SEC's Division of Market Regulation .............................305

(14).    Enforcement Staff Learned from NASD that Madoff Had Not Reported Holding Any Options Positions, but Failed to Pursue that Information ........................................................306

(15).    Enforcement Staff Contacted an NASD Options Expert Who Advised them to Postpone Madoff's Testimony because of Their Lack of Understanding about Options ..................309

c.    Madoff Testified on May 19, 2006 .............................................310

(1).    Madoff Attributed His Consistently High Returns to His Personal "Feel" for Timing The Market .......................................................310

(2).    Madoff Testified That All Equity Trades for His Advisory Investors Were Settled in His DTC Account ...................................................312

(3).    Contrary to His Previous Representations, Madoff Testified That He Had Documents Related to His OTC Option Contracts, but Enforcement Staff Did Not Insist That He Produce Those Documents   .............................313

(4).    Madoff Contradicted his Representations to The Examination Staff Regarding Where the Equity Trades were Executed and Cleared .....................315

(5).    Madoff's Denial that he had Lied to the Examination Staff about his Purported Options Trading Activity was not Credible....................................317

(6).    During Madoff's Testimony, Enforcement Staff Caught Madoff Lying about the Number And Identity of his Investors............................................319

d.    Enforcement Staff Contacted DTC but Decided to Not Request Any Records ..........................................................323

e.    Enforcement Staff Halted Efforts to Obtain Records From Madoff's Purported Option Counter-parties .....................334

f.    Enforcement Staff Never Thought to Trace the Movement of the Investors' Funds ...............................................342

g.   The Investigation Effectively Stopped in August
2006 After Madoff Agreed to Register as an
Investment Adviser ....................................................................348

h.   Enforcement Staff Officially Closed the
Investigation in January 2008, Characterizing it as a
"Fishing Expedition" ................................................................350

(1).   The Enforcement Staff Ignored Additional,
Troubling Information About Madoff While
the Investigation Was Inactive for 18 Months................352

(2).   The Madoff Investigation Officially Closed in
January 2008, Although Enforcement Staff
Recognized that Madoff Had Lied About His
Advisory Business ..........................................................356

B.   In March 2008, Enforcement Staff Received a Second Tip
Regarding Norman Levy that may have Come From a Madoff
Insider ......................................................................................358

1.   Suh and Cheung's Work on the Madoff
Investigation Are Cited in their Evaluations................................360

C.   In April 2008, Markopolos Attempted to Send a Version of the
2005 Submission to the SEC's Office of Risk Assessment, but it
Was Not Received......................................................................361

D.   Enforcement Staff's Reflections ..............................................363

E.   Factors in the SEC's Failure to Discover Madoff's Ponzi Scheme.........368

VI.   ALLEGATIONS OF IMPROPER INFLUENCE,
INTERACTIONS BETWEEN MADOFF AND THE SEC
AND THE EFFECT OF MADOFF'S STATURE AND
REPUTATION ON SEC EXAMINATIONS AND
INVESTIGATIONS ........................................................................373

A.   The OIG Investigation Found No Evidence of Improper
Influence by Senior SEC Officials Based upon Their
Relationships with Madoff........................................................373

B.   The OIG Found that Madoff Participated in SEC Panels and
Events and Communicated with SEC Chairmen, and that
SEC Officials Participated in Conferences Arranged by
Shana Madoff ...........................................................................377

C.   The OIG Investigation Found that the SEC Secured an
Exemption from a Short Sale rule for Bernard Madoff's firm ..............379

D.   The OIG Investigation Found that on Occasion Over the
Years, the SEC Visited Madoff's Firm's Offices as Part of
Official SEC Events...................................................................381

E.      The OIG Investigation Found no Evidence of Inappropriate
        Financial or Other Relationships with Madoff, But Did Find
        That Madoff Used His Stature in the Industry to Try to
        Intimidate the SEC staffers and His Stature Played an
        Ancillary Role in the Conduct of Their Examination and
        Investigatory Work. ...................................................................................382

        1.      No Evidence of Improper Financial or Other
                Connections Between Examiners and
                Investigators and Madoff .......................................................382

        2.      Evidence of Awareness by Examiners and
                Investigators of Madoff's Stature and Ancillary
                Role His Stature Played in their Work...................................382

                a.      Introduction.................................................................382

                b.      1992 Investigation of Avellino & Bienes .................383

                c.      2003 DC OCIE Examination .....................................383

                d.      2005 NERO Examination ..........................................384

                e.      2005-2006 Enforcement Investigation.......................388

                f.      Conclusion .................................................................389

VII.    ALLEGATIONS OF CONFLICT OF INTEREST OR
        IMPROPER INFLUENCE ARISING FROM THE
        RELATIONSHIP BETWEEN ERIC SWANSON AND
        SHANA MADOFF ......................................................................................389

        A.      Introduction..............................................................................389

        B.      Swanson's Initial Contact with Shana Madoff  .......................390

        C.      Swanson's First in-Person Meeting with Shana Madoff .........391

        D.      Swanson's Further Contacts with Shana Madoff at SIAB
                Conferences...............................................................................393

        E.      Swanson's Romantic Relationships Between 2003 and 2005 ...............397

        F.      In February 2006, Swanson Learned About the Enforcement
                Investigation and Was Asked to "Put the Squeeze on Shana" ...............399

        G.      Swanson and Shana Madoff Became Romantically Involved
                In Early 2006  ...........................................................................401

        H.      Swanson's Supervisor, John McCarthy, Opposed the
                Relationship and Swanson Kept it a Secret .............................402

        I.      Swanson's Recusal from Madoff Matters..................................404

        J.      McCarthy Cancelled April 2006 Greenwich SIAB
                Conference .................................................................................405

K.    Swanson and Shana's Relationship Continued and Swanson
      Left the SEC.............................................................................406

L.    Swanson's Reaction to Learning Madoff Confessed to Ponzi
      Scheme....................................................................................408

M.    Conclusion ..............................................................................408

VIII.  PRIVATE ENTITIES' DUE DILIGENCE EFFORTS
       REVEALED SUSPICIOUS ACTIVITY AND RED FLAGS
       ABOUT MADOFF'S OPERATIONS...........................................411

A.    Introduction.............................................................................411

B.    There Were Rumors and Suspicion about Madoff in the
      Industry Even Before Due Diligence was Initiated ................................411

C.    Due Diligence Efforts of Private Entities Revealed Greater
      Suspicions and Numerous Red Flags......................................................412

      1.    Basic Due Diligence Activities...................................................412

      2.    There Were Immediate Questions about Madoff's
            Trading Strategy .......................................................................413

      3.    There Were Immediate Questions about Madoff's
            Trading Strategy .......................................................................417

      4.    There Were Also Questions About Madoff's Fee
            Structure....................................................................................418

      5.    The Identity of Madoff's Auditor Was Also a
            Concern.......................................................................................419

      6.    When They Met with Madoff, They Were not
            Impressed with his Answers to Their Questions........................420

D.    Comments on the SEC's Ability to Uncover Fraud and
      Inadequacy of SEC Examinations ...........................................420

E.    Conclusion ..............................................................................424

IX.    THERE IS EVIDENCE THAT POTENTIAL INVESTORS
       RELIED UPON THE FACT THAT THE SEC HAD
       EXAMINED AND INVESTIGATED MADOFF IN MAKING
       DECISIONS TO INVEST WITH HIM ......................................425

X.     ADDITIONAL COMPLAINTS RECEIVED BY THE SEC
       REGARDING MADOFF ..........................................................429

A.    Introduction.............................................................................429

B.    Complaints Identified as Relevant to the OIG's Madoff
      Investigation............................................................................430

1.   Anonymous Complaint about Manipulation of
Securities, Prices or Markets .......................................................430

2.   Anonymous Complaint Unrelated to Madoff's
Investment Advisory Business Referred to the NASD ...............430

3.   Investor Complaint Unrelated to Madoff's
Investment Advisory Business Was Referred to
NERO Examiners Conducting a Cause Examination
At BMIS; Examiners Did Not Document Results of
Complaint Investigation..............................................................430

4.   Anonymous, Generalized Complaint about Madoff's
Investment Advisory Business Was Not Referred to
Enforcement.................................................................................431

5.   Anonymous Complaint About Madoff's Investment
Advisory Business Referred to Enforcement, Which
Relied on Madoff's Representation that the Complaint
Was False ...................................................................................433

C.   Conclusion .............................................................................................435

XI.   ADDITIONAL EXAMINATIONS AND INSPECTIONS OF
BERNARD MADOFF'S FIRMS CONDUCTED BY THE SEC ...............436

A.   1993-1994 Special Purpose Inspection of Bernard Madoff
Securities.................................................................................................436

1.   Summary of Inspection................................................................436

2.   Conclusion ..................................................................................437

B.   1994-1995 Oversight Examination of NASD Examination
Of Bernard Madoff Securities.................................................................438

1.   Summary of Examination ............................................................438

2.   Conclusion ..................................................................................439

C.   1997-1998 Inspection of Third Market Firms .........................................439

1.   Summary of Inspection................................................................439

2.   Conclusion ..................................................................................440

D.   1999 Special Purpose Examination Limit Order Display
Rule.........................................................................................................440

1.   Summary of Examination ............................................................440

2.   Conclusion ..................................................................................443

E.   2003 OCIE QQQ Examination ...............................................................443

1.   Introduction.................................................................................443

2.    March 3, 2003 Planning Memorandum ......................................444

3.    Staff Involvement in and Recollections of Madoff
      QQQ Examination  .......................................................................446

4.    Conduct of the OCIE QQQ Examination ...................................449

5.    Daugherty, the Lead Attorney on the Madoff QQQ
      Examination, Was Put on Another Project .................................450

6.    September 12, 2003 Memorandum Finding Madoff
      Violated Duty of Best Execution ................................................451

7.    November 10, 2003 Memorandum Recommending
      That a Deficiency Letter be Issued to Madoff  ..........................452

8.    There is no Record of a Deficiency Letter being
      Issued to Madoff  .......................................................................453

9.    Conclusion .................................................................................456

**Conclusion** .............................................................................................**456**

# REPORT OF INVESTIGATION

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## OFFICE OF INSPECTOR GENERAL

## Case No. OIG-509

## Investigation of Failure of the SEC
## To Uncover Bernard Madoff's Ponzi Scheme

## Introduction

On December 11, 2008, the Securities and Exchange Commission (SEC) charged Bernard L. Madoff (Madoff) with securities fraud for a multi-billion dollar Ponzi scheme that he perpetrated on advisory clients of his firm. The complaint charged Madoff with violations of the anti-fraud provisions of the Securities Act of 1933, the Securities Exchange Act of 1934 and the Investment Advisers Act of 1940. In addition, the U.S. Attorney's Office in the Southern District of New York also indicted Madoff for criminal offenses on the same date. On March 12, 2009, Madoff pled guilty to all charges and on June 29, 2009, federal District Judge Denny Chin sentenced Madoff to serve 150 years in prison, which was the maximum sentence allowed.

By mid-December 2008, the SEC learned that credible and specific allegations regarding Madoff's financial wrongdoing were repeatedly brought to the attention of SEC staff, but were never recommended to the Commission for action. As a result, on the late evening of December 16, 2008, former SEC Chairman Christopher Cox[1] contacted the SEC Office of Inspector General (OIG) asking us to undertake an investigation into allegations made to the SEC regarding Madoff, going back to at least 1999, and the reasons that these allegations were found to be not credible. Former Chairman Cox also asked that the OIG investigate the SEC's internal policies that govern when allegations of fraudulent activity should be brought to the Commission. In addition, he requested that the OIG investigation include all staff contact and relationships with the Madoff family and firm, and any impact such relationships had on staff decisions regarding the firm.

The OIG's investigation of the SEC's failure to uncover Madoff's Ponzi scheme analyzed the SEC's response to all complaints it received regarding the activities of Madoff, and traced the path of these complaints through the Commission from inception, reviewing what investigative or examination work was conducted with respect to these allegations. We have also investigated the allegations of conflicts of interest regarding relationships between any SEC officials or staff and members of the Madoff family,

---

[1] Chairman Cox resigned on January 20, 2009. Current SEC Chairman Mary Schapiro was appointed by President Barack Obama on January 20, 2009, and was sworn in on January 27, 2009.

including examining the role that former SEC Assistant Director Eric Swanson (Swanson), who eventually married Madoff's niece, Shana Madoff (Shana), may have played in the examination or other work conducted by the SEC with respect to Madoff or related entities, and whether such role or such relationship in any way affected the manner in which the SEC conducted its regulatory oversight of Madoff and any related entities.

Further, we have assessed the conduct of examinations and/or investigations of Madoff and/or Bernard Madoff Investment Securities, LLC (BMIS) by the SEC and conducted an analysis of whether there were "red flags" that were overlooked by SEC examiners or investigators (which may have been identified by other entities conducting due diligence), that could have led to a more comprehensive examination or investigation.  We have also considered the extent to which the reputation and status of Madoff and the fact that he served on SEC Advisory Committees, participated on securities industry boards and panels, and had social and professional relationships with SEC officials, may have affected Commission decisions regarding investigations, examinations and inspections of his firm.[2]

The Report of Investigation (ROI) includes the following sections: (a) the 1992 investigation of Avellino & Bienes and the related examination of Madoff (Section I); (b) the circumstances surrounding the 2000 and 2001 complaints presented to the SEC by Harry Markopolos (Markopolos) (Section II); (c) the Office of Compliance Inspections and Examinations (OCIE) Washington, D.C. examination of Madoff triggered by a May 2003 complaint from a Hedge Fund Manager (Section III); (d) the Northeast Regional Office (NERO) examination of Madoff that arose out of an internal complaint found in April 2004 during a routine examination of an SEC registrant (Section IV); (e) the Enforcement investigation of Madoff based upon Markopolos' 2005 complaint (Section V); (f) a discussion of whether there was any improper influence by senior-level officials at the SEC upon the examinations and investigations of Madoff and the effect that Madoff's stature had on the SEC's conduct of its examinations and investigations of Madoff (Section VI); (g) an analysis of the allegation that former OCIE Assistant Director Eric Swanson's relationship with Shana Madoff impacted the SEC's examinations of Madoff (Section VII); (h) a summary of the due diligence efforts undertaken by private parties who determined that Madoff was not a wise investment and a comparison with the methods utilized by the SEC in its examinations and investigations(Section VIII); (i) the extent of reliance by potential investors with Madoff on the fact that the SEC conducted examinations and investigations of Madoff in making investment decisions; (Section IX); (j) a summary of all the additional complaints that the SEC received regarding Madoff, or any of his firms or related entities (Section X); and (k) a description of all the additional examinations that the SEC conducted of Madoff or his firms (Section XI).

---

[2] The OIG also intends to issue separate audit reports that analyze the findings of this ROI and make concrete and specific recommendations to both the Office of Compliance Inspection and Examinations (OCIE) and the Division of Enforcement for improvements in their operations based upon the findings in this ROI.  We also intend to issue a third audit report analyzing why Madoff was not subjected to an OCIE Investment Adviser (IA) examination after he was forced to register as an investment adviser in 2007.

## Scope of the Investigation

I.    DOCUMENT PRESERVATION AND MEETINGS WITH SENIOR-LEVEL OFFICIALS

On December 18, 2008, we issued a document preservation notice to the entire Commission informing them that the Office of Inspector General has initiated an investigation regarding all Commission examinations, investigations or inquiries involving BMIS, and any related individuals or entities.  We formally requested that each employee and contractor in the Commission preserve all electronically-stored information and paper records related to BMIS in their original format.

In the next several days, the Inspector General (IG) H. David Kotz (Kotz) met with senior officials from the Commission's Division of Enforcement (Enforcement) and the Office of Compliance Inspections and Examinations (OCIE), to ensure their cooperation in our investigation and our ability to gain access to their files and records. The IG also met with the Chairman's office to seek information and documentation relevant to the investigation.

II.    E-MAIL SEARCHES AND REVIEWS OF E-MAILS

On December 17, 2008, the OIG requested that the SEC's Office of Information Technology (OIT) provide the OIG with (1) all e-mails of former OCIE employee Eric Swanson during his tenure with the Securities and Exchange Commission (SEC), i.e., from August 14, 1996 until September 15, 2006, to the extent those e-mails were available; and (2) the e-mails of six Northeast Regional Office (NERO) staff members who were involved in NERO's investigation of the Madoff firm that was initiated in 2006 (Case No. NY-07653) for the period from January 2006 through January 2008.[3]  We requested that OIT provide these e-mails on an expedited basis.[4]

On the following day, December 18, 2008, the OIG requested that OIT perform a search of all e-mails for SEC Headquarters, New York Regional Office (NYRO) and Boston Regional Office (BRO) staff members from January 1, 1999, through December 11, 2008, or from the earliest available date if e-mails were not available going back to January 1, 1999.  We also requested that this search be given priority and that the search results be provided to us on a rolling basis rather than waiting unit the entire search was completed.

Subsequent to the initial OIG e-mail requests made on December 17 and 18, 2008, the OIG made numerous requests to OIT for the e-mails of current and former SEC

---

[3]  We requested the e-mails for this time period because, according to SEC case tracking records, the investigation was opened on January 4, 2006 and closed on January 3, 2008.

[4]  In February 2008, the OIG and OIT entered into a memorandum of understanding that provided that all OIG requests for e-mails will receive the highest priority with e-mail requests responding to subpoenas, except in unusual circumstances where a subpoena request must be complied with first, and will be processed before all other requests from SEC divisions or offices.

employees for various periods of time pertinent to the investigation.  The e-mails were received, loaded onto computers with specialized search tools and searched on a continuous basis throughout the course of the investigation.

In all, in addition to the e-mails received through the search of Headquarters, NYRO and BRO e-mails for the term "Madoff," the OIG received from OIT e-mails for a total of approximately 68 current and former SEC employees for various time periods relevant to the investigation, ranging from 1999 to 2009.  These included:  24 NYRO employees, 15 OCIE employees, ten BRO employees, six Los Angeles Regional Office employees, six Headquarters Division of Enforcement employees, four Office of Economic Analysis employees, and three employees from other SEC offices.  The OIG estimates that it obtained and searched approximately 3.7 million e-mails during the course of its investigation.

III.    DOCUMENT REQUESTS AND REVIEW OF RECORDS

On December 24, 2008, we sent comprehensive document requests to both the Enforcement Division and OCIE specifying the documents and records we required to be produced for the investigation.  We followed up with memoranda to OCIE dated April 3, 2009, May , 2009, and June 12, 2009.  We also had follow-up communications with Enforcement on January 21, 2009 and July 22, 2009.  We further had numerous e-mail and telephonic communications with both OCIE and Enforcement, regarding the scope and timing of the document requests and responses, as well as meetings to clarify and expand the document requests as necessary.

We collected all the information we received as a result of our document production request and carefully reviewed and analyzed all investigative papers of all SEC investigations conducted relating to Madoff, Madoff's firms, members of Madoff's family, and Madoff's associates between 1975 and the present.

Through the course of the investigation, the OIG also reviewed the workpapers and examination files of nine SEC examinations of BMIS from 1990 to December 11, 2008 as follows:  1990 BD NERO 0118 (routine examination), 1993 BD NERO 0015 (routine examination), 1994 Special Purpose Inspections of BMIS and the Instinet Corporation, 1995 NERO 0027 (NASD Oversight Examination), 1998 Inspection of Eight Third Market Firms, 1999 Limit Order Display Review, 2003 QQQ Trading Review, 2004 OCIE Examination (Front-Running), and 2005 NERO Examination (Front-Running).  The examinations are described in Sections XI, II, and IV of this Report of Investigation.  Where documents from the examination were not available, the OIG sought testimony and conducted interviews of current and former SEC personnel who had worked on the examinations.

We also sought documents from the Department of Justice via an OIG request dated May 1, 2009, and communicated with DOJ frequently as part of our investigation.

IV.    DOCUMENT AND INFORMATION REQUESTS TO INDEPENDENT
       THIRD-PARTIES

        In order to properly analyze how the SEC could have conducted examinations and
investigations of Madoff that may have uncovered Madoff's Ponzi scheme, the SEC
sought information and documentation from third-parties in order to undertake our own
analysis of Madoff's trading records.  During the course of the OIG investigation, the
OIG requested and obtained from the Depository Trust Company (DTC) position reports
for BMIS (account # 646) for the following dates: August 10, 2006; May 19, 2006;
March 16, 2005; March 15, 2005; February 18, 2005; January 31, 2005; January 26,
2005; January 25, 2005.

        We also requested and obtained from the National Securities Clearing
Corporation (NSCC) all clearing data records for all executions effected by BMIS,
whether BMIS was on the purchasing side or on the selling side of the securities, in 14
specific equity securities, on a daily basis, in Excel format, by trade date for the trading
time period of March 10 through March 18, 2005.

        We also received from the Financial Industry Regulatory Authority (FINRA):
Order Audit Trail System data (OATS) submitted by BMIS for 6 National Association of
Securities Dealers Automated Quotations (NASDAQ)-listed stocks (ticker symbol
included) and NASDAQ Automated Confirmation of Transactions (ACT) database for
the trading time period of March 10 through March 18, 2005.

V.    RETENTION OF EXPERT IN ANALYZING EXAMINATION AND
      INVESTIGATORY WORK

        In February 2009, the OIG retained several securities experts from FTI
Consulting, Inc. (the FTI Engagement Team) to assist with the review of the examinations
and investigations of Madoff and BMIS that were conducted by the SEC.  Members of the
FTI team engaged by the OIG were Charles R. Lundelis, Jr. (Lundelis), senior managing
director, Forensic and Litigation Consulting, Simon Wu (Wu), managing director,
Forensic and Litigation Consulting, John C. Crittenden III (Crittenden), managing
director, Corporate Finance Group, and James Conversano (Conversano) director,
Forensic and Litigation Consulting.

        Each individual member of the FTI Engagement team brought unique and
specialized experience to the analysis contained in this ROI.  Lundelis specializes in Rule
10b-5 securities fraud, insider trading and manipulation cases, SEC, National Association
of Securities Dealers (NASD, now FINRA), New York Stock Exchange (NYSE) market
regulation investigations, securities valuation, financial accounting and reporting
standards, share price modeling and commodities trading.  He is also an expert in the
areas of the underwriting process, securities market pricing, hedge fund operations,
investment suitability, accounting fraud, compliance and due diligence practices.
Lundelis is a CPA, Accredited in Business Valuation and Certified in Financial Forensics
by the American Institute of Certified Public Accountants.

Wu was formerly a Senior Economist at the NASD and subsequently the NASDAQ Stock Market where he led a major study on the decimalization of securities quotations on NASDAQ. Dr. Wu has been qualified as an expert and testified before the SEC Administrative Law Judge, in Federal and State courts, and before the NASD/FINRA Arbitration Panels. Dr. Wu is an expert in SEC, NASD, Over-the-Counter Bulletin Board (OTCBB), NYSE and American Stock Exchange (AMEX) market regulation rules (Rule 10b-5, Best Execution, Order Handling Rules, Front-Running, etc.), as well as market structure issues. Dr. Wu received his Ph.D. in Economics from Vanderbilt University with a focus on finance and international finance.

Crittenden advises insurance, retail and institutional broker-dealers and investment advisers, including hedge funds, regarding development of reasonable and adequate compliance policies and procedures, infrastructures and internal processes and controls. Mr. Crittenden also has been engaged as a regulatory compliance advisor, and was recently elected as Director for the failed Bear Stearns hedge funds to investigate and maximize recoveries. Mr. Crittenden holds the FINRA/WHARTON Certified Regulatory and Compliance Professional (CRCP) designation and is a FINRA registered General Securities Principal.

Conversano has more than 15 years of regulatory, compliance and forensic investigation experience. Mr. Conversano has substantial experience in complex financial fraud investigations, securities related inspections and examinations, compliance assessments, antitrust matters, bankruptcy proceedings, restructurings, damages calculations, cash flow analysis, and valuations.

At the direction of the OIG, the FTI Engagement Team conducted a thorough review of all of the relevant workpapers and documents associated with the OCIE examinations, and scrutinized the conduct of the SEC examinations and investigations, analyzing whether there were "red flags" that were overlooked by SEC examiners that could have led to the discovery of Madoff's Ponzi scheme. The FTI Engagement Team also replicated aspects of the OCIE cause examinations of Madoff to determine whether the SEC sought the appropriate information in the examinations and analyzed such information correctly.[5]

## VI.   RETENTION OF EXPERT IN RECOVERING E-MAILS

During the course of the investigation, OIT informed the OIG that there were gaps in the e-mails that the OIG was seeking to review as part of its investigation because of failures to backup the tapes, hardware or software failures during the backup process, and/or lost, mislabeled or corrupted tapes. In order to ensure that the OIG was able to conduct a thorough and comprehensive investigation, in June, 2009, the OIG retained the services of First Advantage Litigation Consulting Services (First Advantage), to assist the

---

[5] The OIG is issuing a separate audit report prepared by the FTI Engagement Team which will document the FTI Engagement Team's analyses and provide recommendations to the SEC with respect to areas of improvements as a result of the FTI Engagement Team's work.

OIG in the restoration and production of relevant electronic data. First Advantage's team had significant experience in leading numerous large-scale electronic discovery consulting projects as well as assisting with highly sensitive and confidential investigations for corporations and the Federal Bureau of Investigation.

In connection with its engagement, First Advantage provided consulting and technical support to understand how the SEC's e-mail Exchange and file servers were configured and to understand the backup procedures relating to these systems for the relevant period. First Advantage also provided technical support to identify relevant electronic data from the SEC's inventory of backup tapes and its online enterprise archive system that the SEC began using in 2008 to store copies of all e-mails sent to, from, or within the SEC. Based upon this work, First Advantage was able to successfully preserve and restore potentially responsive data from this universe of electronic data and coordinated the restoration of SEC electronic records identified by the OIG as relevant to our investigation. The OIG was therefore, able to review all e-mails that were pertinent to its investigation.

## VII.    TESTIMONY AND INTERVIEWS

The OIG conducted 140 testimonies and interviews of 122 individuals with knowledge of facts or circumstances surrounding the SEC's examinations and/or investigations of Madoff and his firms.

SEC IG Kotz personally led the questioning in the testimony and interviews of nearly all the witnesses in the investigation. Kotz also led the investigative team for this ROI, which included Noelle Frangipane, Deputy Inspector General, who worked on all aspects of the investigation; Assistant Inspector General for Investigations J. David Fielder and Senior Counsel David Witherspoon, who focused their efforts on Sections II and V of the ROI; Senior Counsel Heidi Steiber, who concentrated on Sections III, IV and X of the ROI; and Chris Wilson, Senior Counsel, who worked on Sections VII and XI of the ROI.[6]

The OIG conducted testimony on-the-record and under oath of the following individuals:

(1)    Harry Markopolos, Chartered Financial Analyst and Certified Fraud Examiner, taken on February 5, 2009, at 9:42 a.m., excerpted portions of which are at Exhibit 1.

(2)    Alex Sadowski, Assistant General Counsel, Getco LLC, former Branch Chief, Office of Compliance Inspections and Examinations, Securities and Exchange Commission, taken on February 13, 2009, at 10:15 a.m., excerpted portions of which are at Exhibit 2.

---

[6] Significant assistance in this investigation was also provided by Assistant to the Inspector General Roberta Raftovich, and OIG Summer Interns Kristina Katz and April Elliot.

(3)    Redacted[*] name of Staff Accountant, Office of Compliance Inspections
       and Examinations, Securities and Exchange Commission, taken on
       February 19, 2009, at 2:20 p.m., referred to in the ROI as "OCIE Staff
       Accountant," excerpted portions of which are at Exhibit 3.

(4)    Mavis Kelly, Branch Chief (now Assistant Director), Office of
       Compliance Inspections and Examinations, Securities and Exchange
       Commission, taken on February 23, 2009, at 10:35 a.m., excerpted
       portions of which are at Exhibit 4.

(5)    Walter Ricciardi, Partner, Paul Weiss Rifkind Wharton & Garrison LLP,
       former District Administrator, Boston District Office and former Deputy
       Director, Division of Enforcement, Securities and Exchange Commission,
       taken on February 26, 2009, at 10:48 a.m., excerpted portions of which are
       at Exhibit 5.

(6)    Redacted* name of Eric Swanson's former fiancé, taken on March 2,
       2009, at 2:45 p.m., referred to in the ROI as "Jane Doe," excerpted
       portions of which are at Exhibit 6.

(7)    Jacqueline Wood, Associate, Proskauer Rose LLP, former Staff Attorney
       Securities and Exchange Commission, taken on March 9, 2009, at 9:40
       a.m., excerpted portions of which are at Exhibit 7.

(8)    Redacted* name of Assistant Director, Office of Compliance Inspections
       and Examinations, Securities and Exchange Commission, taken on March
       13, 2009, at 9:29 a.m., referred to in the ROI as "OCIE Assistant
       Director," excerpted portions of which are at Exhibit 8.

(9)    Gene Gohlke, Associate Director, Office of Compliance Inspections and
       Examinations, Securities and Exchange Commission, taken on March 16,
       2009, at 2:03 p.m., excerpted portions of which are at Exhibit 9.

(10)   Matthew Daugherty, Branch Chief (now Senior Special Counsel), Office
       of Compliance Inspections and Examinations, Securities and Exchange
       Commission, taken on March 23, 2009, at 2:06 p.m., excerpted portions of
       which are at Exhibit 10.

(11)   Redacted* name of Staff Attorney, Office of Compliance Inspections and
       Examinations (now Staff Attorney, Division of Trading and Markets),
       Securities and Exchange Commission, taken on March 25, 2009, at 11:02
       a.m., referred to in the ROI as "OCIE Staff Attorney," excerpted portions
       of which are at Exhibit 11.

---

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a
modified public version of the ROI which redacted the identities of certain individuals because of privacy
concerns as well as additional language at the request of the U.S. Department of Justice.

(12)    Dorothy Eschwie, Assistant Regional Director, New York Regional
Office,[7] Securities and Exchange Commission, taken on March 26, 2009,
at 11:50 a.m., excerpted portions of which are at Exhibit 12.

(13)    Thomas Thanasules, Securities Compliance Examiner (now Staff
Accountant), New York Regional Office, Securities and Exchange
Commission, taken on March 26, 2009, at 1:32 p.m., excerpted portions of
which are at Exhibit 13.

(14)    Michael Kress, Branch Chief, New York Regional Office, Securities and
Exchange Commission, taken on March 26, 2009, at 2:04 p.m., excerpted
portions of which are at Exhibit 14.

(15)    Neil Chelo, Director of Research, Benchmark Plus Management LLC,
taken on March 31, 2009, at 11:45 a.m., excerpted portions of which are at
Exhibit 15.

(16)    Frank Casey, President-USA, Fortune Asset Management, taken on March
31, 2009, at 3:06 p.m., excerpted portions of which are at Exhibit 16.

(17)    Grant Ward, Senior Counsel, MetLife Group, former Assistant District
Administrator, Boston District Office, Securities and Exchange
Commission, taken on March 31, 2009, at 5:10 p.m., excerpted portions of
which are at Exhibit 17.

(18)    Edward Manion, Staff Accountant, Boston Regional Office, Securities and
Exchange Commission, taken on April 1, 2009, at 1:15 p.m., excerpted
portions of which are at Exhibit 18.

(19)    Michael Garrity, Branch Chief (now Assistant Regional Director), Boston
Regional Office,[8] Securities and Exchange Commission, taken on April 1,
2009, at 10:30 am and April 2, 2009, at 2:30 p.m., excerpted portions of
which are at Exhibit 19.

(20)    John Dugan, former Branch Chief and Assistant Regional Director, now
Associate Regional Director, Boston Regional Office, Securities and
Exchange Commission, taken on April 2, 2009, at 9:25 a.m.

(21)    Andrew Caverly, former Staff Attorney and Branch Chief (now Assistant
Regional Director, Broker-Dealer Inspection Program, Boston Regional
Office, Securities and Exchange Commission, taken on April 2, 2009, at
1:15 p.m., excerpted portions of which are at Exhibit 20.

(22)    David Bergers, Assistant District Administrator (now Regional Director),
Boston Regional Office, Securities and Exchange Commission, taken on
April 2, 2009, at 3:12 p.m., excerpted portions of which are at Exhibit 21.

(23)    Eric Swanson, General Counsel, BATS Trading, former Assistant
Director, Office of Compliance Inspections and Examinations, Securities

---

[7] As of March 30, 2007, the Northeast Regional Office of the SEC (NERO), became known as the New
York Regional Office (NYRO).
[8] The Boston office of the SEC was elevated from a District Office to a Regional Office on April 2, 2007.

and Exchange Commission, taken on April 15, 2009, at 9:25 a.m., excerpted portions of which are at Exhibit 22.

(24)    Lori Richards, former Director, Office of Compliance Inspections and Examinations, Securities and Exchange Commission, taken on April 17, 2009, at 10:05 a.m., excerpted portions of which are at Exhibit 23.

(25)    Redacted* name former Branch Chief, Office of Investor Education and Advocacy, Securities and Exchange Commission, taken on April 20, 2009, at 2:05 p.m., referred to in the ROI as "former OIEA Branch Chief," excerpted portions of which are at Exhibit 24.

(26)    Vance Anthony, Financial Economist, Office of Economic Analysis, Securities and Exchange Commission, taken on April 21, 2009, at 10:10 am excerpted portions of which are at Exhibit 25.

(27)    Stewart Mayhew, Assistant Chief Economist (now Deputy Chief Economist), Office of Economic Analysis, Securities and Exchange Commission, taken on April 21, 2009, at 12:45 p.m., excerpted portions of which are at Exhibit 26.

(28)    Jonathan Sokobin, Deputy Chief Economist, (now Director, Office of Risk Assessment), Securities and Exchange Commission, taken on April 22, 2009, at 3:20 p.m., excerpted portions of which are at Exhibit 27.

(29)    Mark Donohue, Branch Chief and Assistant Director, Office of Compliance Inspections and Examinations, Securities and Exchange Commission, taken on April 23, 2009, at 10:06 a.m., excerpted portions of which are at Exhibit 28.

(30)    John McCarthy, General Counsel, Getco LLC, former Staff Attorney, Division of Market Regulation,[9] and former Associate Director, Office of Compliance Inspections and Examinations, Securities and Exchange Commission, taken on April 27, 2009, at 9:45 a.m., excerpted portions of which are at Exhibit 29.

(31)    Juan Marcelino, Shareholder, Greenberg Traurig LLP, former Regional Administrator, Boston Regional Office, Securities and Exchange Commission, taken on April 27, 2009, at 1:30 p.m., excerpted portions of which are at Exhibit 30.

(32)    William Dale, former Assistant Chief Economist, Office of Economic Analysis, Securities and Exchange Commission, taken on April 28, 2009, at 2:43 p.m., excerpted portions of which are at Exhibit 31.

---

[9] The Division of Market Regulation was renamed the Division of Trading and Markets on November 14, 2007.

* After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a modified public version of the ROI which redacted the identities of certain individuals because of privacy concerns as well as additional language at the request of the U.S. Department of Justice.

(33)    George Curtis, Regional Director, Denver Regional Office (now Deputy Director, Division of Enforcement), Securities and Exchange Commission, taken on April 29, 2009, at 4:33 p.m.

(34)    Leslie Kazon, Assistant Regional Director, Division of Enforcement, New York Regional Office, Securities and Exchange Commission, taken on April 30, 2009, at 11:12 a.m., excerpted portions of which are at Exhibit 32.

(35)    Andrew Calamari, Branch Chief (now Associate Regional Director), Division of Enforcement, New York Regional Office, Securities and Exchange Commission, taken on April 30, 2009, at 12:10 p.m.

(36)    Mark Schonfeld, Litigation Partner, Gibson Dunn & Crutcher, former Senior Counsel, Boston District Office and former Branch Chief, Assistant Director, Associate Director and Regional Director, Northeast Regional Office, Securities and Exchange Commission, taken on April 30, 2009, at 2:55 p.m., excerpted portions of which are at Exhibit 33.

(37)    Redacted* name of Branch Chief, Office of Investor Education and Advocacy, Securities and Exchange Commission, taken on May 1, 2009, at 2:02 p.m., referred to in the ROI as "OIEA Branch Chief," excerpted portions of which are at Exhibit 34.

(38)    Tina Barry, Branch Chief (now Assistant Director), Office of Compliance Inspections & Examinations, Securities and Exchange Commission, taken on May 1, 2009, at 3:29 p.m., excerpted portions of which are at Exhibit 35.

(39)    William Ostrow, Senior Compliance Examiner (now Staff Accountant), New York Regional Office, Securities and Exchange Commission, taken on May 5, 2009, at 9:59 a.m. and August 19, 2009, at 10:08 a.m., excerpted portions of which are at Exhibit 36 and Exhibit 37, respectively.

(40)    John Nee, Assistant Regional Director, New York Regional Office, Securities and Exchange Commission, taken on May 6, 2009, at 10:50 a.m., excerpted portions of which are at Exhibit 38.

(41)    Redacted* name of Staff Attorney, New York Regional Office, Securities and Exchange Commission, taken on May 11, 2009, at 11:00 a.m., referred to in the ROI as "New York Staff Attorney," excerpted portions of which are at Exhibit 39.

(42)    Redacted* name of Senior Attorney, New York Regional Office, Securities and Exchange Commission, taken on May 11, 2009, at 1:54 p.m., referred to in the ROI as "New York Staff Attorney," excerpted portions of which are at Exhibit 40.

---

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a modified public version of the ROI which redacted the identities of certain individuals because of privacy concerns as well as additional language at the request of the U.S. Department of Justice.

(43)   Israel Friedman, Staff Attorney (now Branch Chief), New York Regional
Office, Securities and Exchange Commission, taken on May 11, 2009, at
12:00 p.m., excerpted portions of which are at Exhibit 41.

(44)   Alex Vasilescu, Supervisory Trial Counsel and Chief of the Trial Unit,
New York Regional Office, Securities and Exchange Commission, taken
on May 11, 2009, at 12:54 p.m.

(45)   Jason Gettinger, Regional Litigation Counselor, Division of Enforcement,
New York Regional Office, Securities and Exchange Commission, taken
on May 11, 2009, at 2:35 p.m., excerpted portions of which are at Exhibit
42.

(46)   Linda Thomsen, Partner, Davis Polk & Wardwell, former Director,
Division of Enforcement, Securities and Exchange Commission, taken on
May 11, 2009, at 2:34 p.m., excerpted portions of which are at Exhibit 43.

(47)   Redacted* name of former Examiner, Office of Compliance Inspections
and Examinations, Securities and Exchange Commission, taken on May
11, 2009, at 3:19 p.m., referred to in the ROI as "former Examiner #1,"
excerpted portions of which are at Exhibit 44.

(48)   Paul Pocress, Staff Accountant, New York Regional Office, Securities and
Exchange Commission, taken on May 11, 2009, at 3:31 p.m., excerpted
portions of which are at Exhibit 45.

(49)   Redacted* name of Staff Accountant (now Branch Chief), Division of
Investment Management, New York Regional Office, Securities and
Exchange Commission, taken on May 11, 2009, at 3:48 p.m., referred to in
the ROI as "IM Staff Accountant," excerpted portions of which are at
Exhibit 46.

(50)   Robert Sollazzo, Associate Regional Director, New York Regional Office,
Securities and Exchange Commission, taken on May 12, 2009, at 10:35
a.m., excerpted portions of which are at Exhibit 47.

(51)   Peter Lamore, Securities Compliance Examiner (now Staff Accountant),
New York Regional Office, Securities and Exchange Commission, taken
on May 14, 2009, at 9:25 a.m. and August 19, 2009, at 10:30 a.m.,
excerpted portions of which are at Exhibit 48 and at Exhibit 49,
respectively.

(52)   Stephen Johnson, Staff Accountant (now Branch Chief), Division of
Enforcement, New York Regional Office, Securities and Exchange
Commission, taken on May 21, 2009, at 10:38 a.m., excerpted portions of
which are at Exhibit 50.

---

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a
modified public version of the ROI which redacted the identities of certain individuals because of privacy
concerns as well as additional language at the request of the U.S. Department of Justice.

(53)   Redacted* name of Staff Attorney, Division of Enforcement, Securities
and Exchange Commission, taken on May 21, 2009, at 11:00 a.m.,
referred to in the ROI as "Enforcement Staff Attorney," excerpted portions
of which are at Exhibit 51.

(54)   Redacted* name of former Attorney Advisor, Office of Compliance
Inspections and Examinations, Securities and Exchange Commission,
taken on May 21, 2009, at 2:05 p.m., referred to in the ROI as "former
OCIE Attorney Advisor," excerpted portions of which are at Exhibit 52.

(55)   Simona Suh, Staff Attorney (now Branch Chief), Division of
Enforcement, New York Regional Office, Securities and Exchange
Commission, taken on May 27, 2009, at 9:35 a.m., excerpted portions of
which are at Exhibit 53.

(56)   Peter Uhlmann, Chief of Staff to the Chairman (now Senior Advisor,
Office of Executive Director), Securities and Exchange Commission,
taken on May 28, 2009, at 10:00 a.m., excerpted portions of which are at
Exhibit 54.

(57)   Doria Bachenheimer, former Assistant Director, Division of Enforcement,
Northeast Regional Office, Securities and Exchange Commission, taken
on June 3, 2009, at 12:10 p.m., excerpted portions of which are at Exhibit
55.

(58)   Meaghan Cheung, former Branch Chief, Division of Enforcement,
Northeast Regional Office, Securities and Exchange Commission, taken
on June 4, 2009, at 10:40 a.m., excerpted portions of which are at Exhibit
56.

(59)   Redacted* name of former Staff Attorney, Division of Enforcement,
Northeast Regional Office, Securities and Exchange Commission, taken
on June 10, 2009, at 1:55 p.m., referred to in the ROI as "former New
York Enforcement Staff Attorney #2," excerpted portions of which are at
Exhibit 57.

(60)   Redacted* name of Assistant Regional Director, Division of Enforcement,
New York Regional Office, Securities and Exchange Commission, taken
on June 10, 2009, at 4:20 p.m., referred to in the ROI as "Enforcement
Assistant Regional Director," excerpted portions of which are at Exhibit
58.

(61)   Susan Tibbs, Director, Market Regulation Department, formerly known as
National Association of Securities Dealers (NASD), now known as
Financial Industry Regulatory Authority (FINRA), taken on June 19,
2009, at 3:20 p.m., excerpted portions of which are at Exhibit 59.

---

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a
modified public version of the ROI which redacted the identities of certain individuals because of privacy
concerns as well as additional language at the request of the U.S. Department of Justice.

(62)   Christopher Cox, former Chairman, Securities and Exchange Commission, taken on June 19, 2009, at 3:11 p.m., excerpted portions of which are at Exhibit 60.

(63)   Jordan Materna, Director, Chicago Board Options Exchange, taken on June 22, 2009, at 2:35 p.m., excerpted portions of which are at Exhibit 61.

(64)   Gene DeMaio, Senior Vice President, National Association of Securities Dealers, taken on June 25, 2009, at 2:07 p.m., excerpted portions of which are at Exhibit 62.

(65)   Susan Geigel, Director of Legal and Regulatory Compliance Depository Trust and Clearing Corporation, taken on June 26, 2009, at 11:30 a.m., excerpted portions of which are at Exhibit 63.

(66)   Annette Nazareth, former Commissioner, Securities and Exchange Commission, taken on July 9, 2009, at 10:34 a.m., excerpted portions of which are at Exhibit 64.

(67)   William Donaldson, Chairman, Donaldson Enterprises, former Chairman, Securities and Exchange Commission, taken on July 9, 2009, at 11:03 a.m., excerpted portions of which are at Exhibit 65.

(68)   Redacted* name of Office of Internet Enforcement Official, Division of Enforcement, Securities and Exchange Commission, taken on July 30, 2009, at 2:35 p.m., referred to in the ROI as "Office of Internet Enforcement Official," excerpted portions of which are at Exhibit 66.

(69)   Redacted* name of Senior Counsel, Division of Enforcement, Securities and Exchange Commission, taken on July, 31. 2009, at 10:04 a.m., referred to in the ROI as "Enforcement Senior Counsel," excerpted portions of which are at Exhibit 67.

(70)   Elisse Walter, Commissioner, Securities and Exchange Commission, taken on August 5, 2009, at 2:33 p.m., excerpted portions of which are at Exhibit 68.

(71)   Unidentified Former SEC Examiner, New York Regional Office, Securities and Exchange Commission, taken on August 5, 2009, at 2:55 p.m., excerpted portions of which are at Exhibit 69.

(72)   Elaine Solomon, former Secretary, Bernard L. Madoff Investment Securities, LLP, taken on August 17, 2009, at 11:08 a.m. excerpted portions of which are at Exhibit 70.

---

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a modified public version of the ROI which redacted the identities of certain individuals because of privacy concerns as well as additional language at the request of the U.S. Department of Justice.

The OIG also conducted the following interviews of persons with knowledge of relevant facts in the investigation:

(1) Unidentified Chief Executive Officer (CEO) of Research Firm, unidentified independent hedge fund research and advisory firm, conducted on January 6, 2009, at Exhibit 71.

(2) Unidentified Investment Bank Due Diligence Team, unidentified investment bank, conducted on January 6, 2009, at Exhibit 72.

(3) Unidentified Chief Executive Officer (CEO), unidentified fund of funds firm, taken on January 12, 2009, at 11:00 a.m., excerpted portions of which are at Exhibit 73.

(4) Michael Ocrant, Journalist, Institutional Investor, former Managing Editor, MARHedge, taken on January 12, 2009, at 2:00 p.m., excerpted portions of which are at Exhibit 74.

(5) James Hedges IV, President and Chief Investment Officer, LJH Global Investments, conducted on January 22, 2009, excerpted portions of which are at Exhibit 75.

(6) Laura Goldman, Investment Advisor, LSG Capital, conducted on January 23, 2009, excerpted portions of which are at Exhibit 76.

(7) Ron Egalka, President and CEO, Rampart Investment Management, conducted on February 9, 2009.

(8) Edward Perkins, former Examiner (now Staff Accountant), New York Regional Office, Securities and Exchange Commission, conducted on February 27, 2009.

(9) William Dale, former Assistant Chief Economist, Office of Economic Analysis, Securities and Exchange Commission, Securities and Exchange Commission, conducted on February 27, 2009.

(10) Thomas Thanasules, Securities Compliance Examiner (now Staff Accountant), New York Regional Office, Securities and Exchange Commission, conducted on March 3, 2009.

(11) Redacted* name of Staff Attorney, Office of Compliance Inspections and Examinations (now Staff Attorney, Division of Trading and Markets), Securities and Exchange Commission, conducted on March 3, 2009, referred to in the ROI as "OCIE Staff Attorney."

---

* After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a modified public version of the ROI which redacted the identities of certain individuals because of privacy concerns as well as additional language at the request of the U.S. Department of Justice.

(12)  Dawn Libal, Examiner (now Staff Accountant), New York Regional Office, Securities and Exchange Commission, conducted on March 4, 2009.

(13)  Harvey Westbrook Jr., former Financial Economist (now Senior Economist), Office of Risk Assessment, Securities and Exchange Commission, conducted on March 4, 2009.

(14)  Redacted* name of former Attorney Advisor, Office of Compliance Inspections and Examinations, Securities and Exchange Commission, conducted on March 4, 2009, referred to in the ROI as "former OCIE Attorney Advisor."

(15)  Gregory Stahl, Chartered Financial Analyst, SEI Investments, conducted on March 6, 2009, excerpted portions of which are at Exhibit 77.

(16)  James Overdahl, Chief Economist, Office of Economic Analysis, Securities and Exchange Commission, conducted on March 11, 2009.

(17)  Paul Broder, Risk Manager, Renaissance Technologies Corporation, conducted on March 12, 2009, excerpted portions of which are at Exhibit 78.

(18)  Henry Laufer, Chief Scientist, Renaissance Technologies Corporation, conducted on March 12, 2009, excerpted portions of which are at Exhibit 79.

(19)  Nathaniel Simons, Portfolio Manager, the Meritage Fund, conducted on March 12, 2009, excerpted portions of which are at Exhibit 80

(20)  Joseph Cella, former Chief, Office of Market Surveillance, Division of Enforcement, Securities and Exchange Commission, conducted on March 13, 2009.

(21)  Redacted* name of former Securities Compliance, Chicago Regional Office (formerly Midwest Regional Office), Securities and Exchange Commission, conducted on March 17, 2009, referred to in the ROI as "former Securities Compliance Examiner," excerpted portions of which are at Exhibit 81.

(22)  John Ehinger, Chief Compliance Officer and General Counsel for Placemark Investments, former Staff Attorney, Division of Market Regulation, Securities and Exchange Commission, conducted on March 17, 2009, excerpted portions of which are at Exhibit 82.

(23)  Redacted* name of Senior Counsel, Division of Enforcement, Securities and Exchange Commission, conducted on March 20, 2009, referred to in the ROI as "Enforcement Senior Counsel."

---

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a modified public version of the ROI which redacted the identities of certain individuals because of privacy concerns as well as additional language at the request of the U.S. Department of Justice.

(24)   Redacted* name of Office of Internet Enforcement Official, Division of Enforcement, Securities and Exchange Commission, conducted on March 20, 2009, referred to in the ROI as "Office of Internet Enforcement Official."

(25)   Jim Adelman, General Counsel, Commonwealth Financial Network, former Associate District Administrator, Boston District Office, Securities and Exchange Commission, conducted on March 24, 2009 and April 30, 2009, excerpted portions of which are at Exhibit 83.

(26)   Unidentified Hedge Fund Manager, taken on March 26, 2009, excerpted portions of which are at Exhibit 84.

(27)   Unidentified Chief Information Officer (CIO), unidentified fund of funds firm, conducted on April 7, 2009, excerpted portions of which are at Exhibit 85.

(28)   Silvestre Fontes, Branch Chief (now Senior Trial Counsel), Division of Enforcement, Boston Regional Office, Securities and Exchange Commission, conducted on April 7, 2009 and April 10, 2009, at Exhibit 86 and Exhibit 87, respectively.

(29)   Grant Ward, Senior Counsel, MetLife Group, former Assistant District Administrator, Boston District Office, Securities and Exchange Commission, conducted on April 8, 2009, at Exhibit 88.

(30)   John Guthery, Vice President, LPL Financial, conducted on April 9, 2009, excerpted portions of which are at Exhibit 89.

(31)   Harry Markopolos, Chartered Financial Analyst and Certified Fraud Examiner, conducted on April 13, 2009.

(32)   Redacted* name of Staff Attorney, Division of Enforcement, Securities and Exchange Commission, conducted on April 13, 2009, referred to in the ROI as "Enforcement Staff Attorney."

(33)   Juan Marcelino, Shareholder, Greenberg Traurig LLP, former Regional Administrator, Boston District Office, Securities and Exchange Commission, conducted on April 14, 2009.

(34)   Steve Luparello, Vice Chairman, Financial Industry Regulatory Authority, conducted on April 14, 2009.

(35)   Michael Garrity, Branch Chief (now Assistant Regional Director), Boston Regional Office, Securities and Exchange Commission, conducted on April 17, 2009.

(36)   Jim Fanslau, Criminal Investigator, Division of Enforcement, Securities and Exchange Commission, conducted on April 17, 2009.

---

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a modified public version of the ROI which redacted the identities of certain individuals because of privacy concerns as well as additional language at the request of the U.S. Department of Justice.

(37)    Sonam Varghese, Branch Chief, Office of Compliance Inspections and Examinations, New York Regional Office, Securities and Exchange Commission, conducted on April 17, 2009, at Exhibit 90.

(38)    Sheryl Marcus, Staff Accountant, Office of Compliance Inspections and Examinations, New York Regional Office, Securities and Exchange Commission, conducted on April 22, 2009, at Exhibit 91.

(39)    David Marder, Partner, Robbins Kaplan Miller & Ciresi LLP, former Assistant District Administrator, Boston District Office, Securities and Exchange Commission, conducted on April 30, 2009, at Exhibit 92.

(40)    Azam Riaz, Staff Accountant, New York Regional Office, Securities and Exchange Commission, conducted on May 4, 2009.

(41)    Redacted* name of former Assistant Regional Administrator, New York Regional Office, Securities and Exchange Commission, conducted on May 5, 2009, referred to in the ROI as "former Assistant Regional Administrator," at Exhibit 93.

(42)    Redacted* name of former Assistant Regional Director, Division of Enforcement, New York Regional Office, Securities and Exchange Commission, conducted on May 6, 2009, referred to in the ROI as "former Assistant Regional Director," at Exhibit 94.

(43)    Richard Walker, General Counsel, Deutsche Bank, former Regional Director of the New York Regional Office, conducted on May 8, 2009, excerpted portions of which are at Exhibit 95.

(44)    Redacted* name of former Staff Attorney, Division of Enforcement, New York Regional Office, Securities and Exchange Commission, conducted on May 18, 2009 and June 26, 2009, referred to in the ROI as "former New York Enforcement Staff Attorney,"at Exhibit 96 and Exhibit 97, respectivley.

(45)    Edwin Nordlinger, former Deputy Regional Administrator, Division of Enforcement, Northeast Regional Office, Securities and Exchange Commission, conducted on May 19, 2009, at Exhibit 98.

(46)    Redacted* name of former Examiner, Securities and Exchange Commission, conducted on May 27, 2009, at 6:27 p.m., referred to in the ROI as "former Examiner #2," excerpted portions of which are at Exhibit 99.

---

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a modified public version of the ROI which redacted the identities of certain individuals because of privacy concerns as well as additional language at the request of the U.S. Department of Justice.

(47)    John Gentile, Partner, Ascendant Compliance, former Branch Chief, Division of Market Regulation, Securities and Exchange Commission, taken on June 10, 2009, at 11:20 a.m., excerpted portions of which are at Exhibit 100.

(48)    Demetrios Vasilakis, Chief Compliance Officer, Atticus Capital LLC, former Compliance Examiner and Branch Chief, Northeast Regional Office, Securities and Exchange Commission, conducted on June 10, 2009, at 12:10 p.m. and August 17, 2009, excerpted portions of which are at Exhibit 101 and Exhibit 102, respectively.

(49)    Lee Richards, Partner, Richards Kibbe & Orbe LLP, taken on June 10, 2009, excerpted portions of which are at Exhibit 103.

(50)    Bernard L. Madoff, former Chairman, Bernard L. Madoff Investment Securities LLP, conducted on June 17, 2009, excerpted portions of which are at Exhibit 104.

(51)    Arthur Levitt, former Chairman, Securities and Exchange Commission, taken on June 22, 2009, at Exhibit 105.

(52)    Brian Snively, Branch Chief, Office of Compliance Inspection and Examinations, Securities and Exchange Commission, taken on July, 23, 2009, at 10:35 a.m., excerpted portions of which are at Exhibit 106.

(53)    Unidentified former girlfriend of Eric Swanson, conducted on August 4, 2009, at Exhibit 107.

(54)    Kelly Bowers, Senior Assistant Regional Director, Division of Enforcement, Securities and Exchange Commission, conducted on August 5, 2009.

(55)    Victoria Levin, Branch Chief, Division of Enforcement, Securities and Exchange Commission, conducted on August 5, 2009.

(56)    Annette Nazareth, former Commissioner, Securities and Exchange Commission, conducted on August 6, 2009, at Exhibit 108.

(57)    Redacted* name of former Staff Attorney, Division of Enforcement, Securities and Exchange Commission, conducted on August 7, 2009, referred to in the ROI as "former Enforcement Staff Attorney," at Exhibit 109.

(58)    Clifford Hyatt, former Deputy Assistant Regional Director, Division of Enforcement, Securities and Exchange Commission, conducted on August 7, 2009 and August 12, 2009.

_____

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a modified public version of the ROI which redacted the identities of certain individuals because of privacy concerns as well as additional language at the request of the U.S. Department of Justice.

(59)  Redacted* name of Examiner, New York Regional Office, Securities and
Exchange Commission, conducted on August 12, 2009, referred to in the
ROI as "New York Examiner," at Exhibit 110.

(60)  Redacted* name of Senior Counsel, Office of Investor Education and
Advocacy, Securities and Exchange Commission, conducted on August
13, 2009, referred to in the ROI as "OIEA Senior Counsel," at Exhibit
111.

(61)  Kenneth Liebl, Securities Compliance Examiner (now Branch Chief),
New York Regional Office, Securities and Exchange Commission,
conducted on August 17, 2009, at Exhibit 102.

The OIG also reviewed the testimony of the Hearing Before the Committee on
Financial Services, United States House of Representatives, 111th Congress, February 4,
2009, *Assessing the Madoff Ponzi Scheme and Regulatory Failures*, which included
testimony from Harry Markopolos, former Enforcement Director Linda Thomsen,
Investment Management Director Andrew Donohue, former Trading and Markets
Director Erik Sirri, then-acting General Counsel Andy Vollmer, former Office of
Compliance Inspections and Examinations Director Lori Richards, and FINRA's then-
Interim Chief Executive Officer Stephen Luparello.

We also reviewed various documents in connection with the current criminal
investigation of Madoff, including the allocution transcripts of Bernard Madoff (March
12, 2009 Allocution Testimony) and Frank DiPascali (August 11, 2009 Allocution
Testimony).

## Executive Summary

The OIG investigation did not find evidence that any SEC personnel who worked
on an SEC examination or investigation of Bernard L. Madoff Investment Securities,
LLC (BMIS) had any financial or other inappropriate connection with Bernard Madoff or
the Madoff family that influenced the conduct of their examination or investigatory work.
The OIG also did not find that former SEC Assistant Director Eric Swanson's romantic
relationship with Bernard Madoff's niece, Shana Madoff, influenced the conduct of the
SEC examinations of Madoff and his firm.  We also did not find that senior officials at
the SEC directly attempted to influence examinations or investigations of Madoff or the
Madoff firm, nor was there evidence any senior SEC official interfered with the staff's
ability to perform its work.

The OIG investigation did find, however, that the SEC received more than ample
information in the form of detailed and substantive complaints over the years to warrant a

---

*  After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a
modified public version of the ROI which redacted the identities of certain individuals because of privacy
concerns as well as additional language at the request of the U.S. Department of Justice.

thorough and comprehensive examination and/or investigation of Bernard Madoff and BMIS for operating a Ponzi scheme, and that despite three examinations and two investigations being conducted, a thorough and competent investigation or examination was never performed. The OIG found that between June 1992 and December 2008 when Madoff confessed, the SEC received six[10] substantive complaints that raised significant red flags concerning Madoff's hedge fund operations and should have led to questions about whether Madoff was actually engaged in trading. Finally, the SEC was also aware of two articles regarding Madoff's investment operations that appeared in reputable publications in 2001 and questioned Madoff's unusually consistent returns.

The first complaint, brought to the SEC's attention in 1992, related to allegations that an unregistered investment company was offering "100%" safe investments with high and extremely consistent rates of return over significant periods of time to "special" customers. The SEC actually suspected the investment company was operating a Ponzi scheme and learned in their investigation that all of the investments were placed entirely through Madoff and consistent returns were claimed to have been achieved for numerous years without a single loss.

The second complaint was very specific and different versions were provided to the SEC in May 2000, March 2001 and October 2005. The complaint submitted in 2005 was entitled "The World's Largest Hedge Fund is a Fraud" and detailed approximately 30 red flags indicating that Madoff was operating a Ponzi scheme, a scenario it described as "highly likely." The red flags included the impossibility of Madoff's returns, particularly the consistency of those returns and the unrealistic volume of options Madoff represented to have traded.

In May 2003, the SEC received a third complaint from a respected Hedge Fund Manager identifying numerous concerns about Madoff's strategy and purported returns, questioning whether Madoff was actually trading options in the volume he claimed, noting that Madoff's strategy and purported returns were not duplicable by anyone else, and stating Madoff's strategy had no correlation to the overall equity markets in over 10 years. According to an SEC manager, the Hedge Fund Manager's complaint laid out issues that were "indicia of a Ponzi scheme."

The fourth complaint was part of a series of internal e-mails of another registrant that the SEC discovered in April 2004. The e-mails described the red flags that a registrant's employees had identified while performing due diligence on their own Madoff investment using publicly-available information. The red flags identified included Madoff's incredible and highly unusual fills for equity trades, his misrepresentation of his options trading and his unusually consistent, non-volatile returns over several years. One of the internal e-mails provided a step-by-step analysis of why Madoff must be misrepresenting his options trading. The e-mail clearly explained that Madoff could not be trading on an options exchange because of insufficient volume and

---

[10] There were arguably eight complaints, since as described in greater detail below, three versions of one of these six complaints were actually brought to the SEC's attention, with the first two versions being dismissed entirely, and an investigation not opened until the third version was submitted.

could not be trading options over-the-counter because it was inconceivable that he could find a counterparty for the trading. The SEC examiners who initially discovered the e-mails viewed them as indicating "some suspicion as to whether Madoff is trading at all."

The fifth complaint was received by the SEC in October 2005 from an anonymous informant and stated, "I know that Madoff [sic] company is very secretive about their operations and they refuse to disclose anything. If my suspicions are true, then they are running a highly sophisticated scheme on a massive scale. And they have been doing it for a long time." The informant also stated, "After a short period of time, I decided to withdraw all my money (over $5 million)."

The sixth complaint was sent to the SEC by a "concerned citizen" in December 2006, advising the SEC to look into Madoff and his firm as follows:

> Your attention is directed to a scandal of major proportion which was executed by the investment firm Bernard L. Madoff . . . . Assets well in excess of $10 Billion owned by the late [investor], an ultra-wealthy long time client of the Madoff firm have been "co-mingled" with funds controlled by the Madoff company with gains thereon retained by Madoff.

In March 2008, the SEC Chairman's office received a second copy of the previous complaint, with additional information from the same source regarding Madoff's involvement with the investor's money, as follows:

> It may be of interest to you to that Mr. Bernard Madoff keeps two (2) sets of records. The most interesting of which is on his computer which is always on his person.

The two 2001 journal articles also raised significant questions about Madoff's unusually consistent returns. One of the articles noted his "astonishing ability to time the market and move to cash in the underlying securities before market conditions turn negative and the related ability to buy and sell the underlying stocks without noticeably affecting the market." This article also described that "experts ask why no one has been able to duplicate similar returns using [Madoff's] strategy." The second article quoted a former Madoff investor as saying, "Anybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story. To take it at face value is a bit naïve."

The complaints all contained specific information and could not have been fully and adequately resolved without thoroughly examining and investigating Madoff for operating a Ponzi scheme. The journal articles should have reinforced the concerns about how Madoff could have been achieving his returns.

The OIG retained an expert in accordance with its investigation in order to both analyze the information the SEC received regarding Madoff and the examination work conducted. According to the OIG's expert, the most critical step in examining or investigating a potential Ponzi scheme is to verify the subject's trading through an independent third party.

The OIG investigation found the SEC conducted two investigations and three examinations related to Madoff's investment advisory business based upon the detailed and credible complaints that raised the possibility that Madoff was misrepresenting his trading and could have been operating a Ponzi scheme. Yet, at no time did the SEC ever verify Madoff's trading through an independent third-party, and in fact, never actually conducted a Ponzi scheme examination or investigation of Madoff.

The first examination and first Enforcement investigation were conducted in 1992 after the SEC received information that led it to suspect that a Madoff associate had been conducting a Ponzi scheme. Yet, the SEC focused its efforts on Madoff's associate and never thoroughly scrutinized Madoff's operations even after learning that the investment decisions were made by Madoff and being apprised of the remarkably consistent returns over a period of numerous years that Madoff had achieved with a basic trading strategy. While the SEC ensured that all of Madoff's associate's customers received their money back, they took no steps to investigate Madoff. The SEC focused its investigation too narrowly and seemed not to have considered the possibility that Madoff could have taken the money that was used to pay back his associate's customers from other clients for which Madoff may have had held discretionary brokerage accounts. In the examination of Madoff, the SEC did not seek Depository Trust Company (DTC) (an independent third-party) records, but sought copies of such records from Madoff himself. Had they sought records from DTC, there is an excellent chance that they would have uncovered Madoff's Ponzi scheme in 1992.[1]

In 2004 and 2005, the SEC's examination unit, OCIE, conducted two parallel cause examinations of Madoff based upon the Hedge Fund Manager's complaint and the series of internal e-mails that the SEC discovered. The examinations were remarkably similar. There were initial significant delays in the commencement of the examinations, notwithstanding the urgency of the complaints. The teams assembled were relatively inexperienced, and there was insufficient planning for the examinations. The scopes of the examination were in both cases too narrowly focused on the possibility of front-running, with no significant attempts made to analyze the numerous red flags about Madoff's trading and returns.

During the course of both these examinations, the examination teams discovered suspicious information and evidence and caught Madoff in contradictions and inconsistencies. However, they either disregarded these concerns or simply asked Madoff about them. Even when Madoff's answers were seemingly implausible, the SEC examiners accepted them at face value.

---

[1] As discussed in the body of the Report of Investigation, this is premised upon the assumption that Madoff had been operating his Ponzi scheme in 1992, which most of the evidence seems to support.

In both examinations, the examiners made the surprising discovery that Madoff's mysterious hedge fund business was making significantly more money than his well-known market-making operation. However, no one identified this revelation as a cause for concern.

Astoundingly, both examinations were open at the same time in different offices without either knowing the other one was conducting an identical examination. In fact, it was Madoff himself who informed one of the examination teams that the other examination team had already received the information they were seeking from him.

In the first of the two OCIE examinations, the examiners drafted a letter to the National Association of Securities Dealers (NASD) (another independent third-party) seeking independent trade data, but they never sent the letter, claiming that it would have been too time-consuming to review the data they would have obtained. The OIG's expert opined that had the letter to the NASD been sent, the data would have provided the information necessary to reveal the Ponzi scheme. In the second examination, the OCIE Assistant Director sent a document request to a financial institution that Madoff claimed he used to clear his trades, requesting trading done by or on behalf of particular Madoff feeder funds during a specific time period, and received a response that there was no transaction activity in Madoff's account for that period. However, the Assistant Director did not determine that the response required any follow-up and the examiners testified that the response was not shared with them.

Both examinations concluded with numerous unresolved questions and without any significant attempt to examine the possibility that Madoff was misrepresenting his trading and operating a Ponzi scheme.

The investigation that arose from the most detailed complaint provided to the SEC, which explicitly stated it was "highly likely" that "Madoff was operating a Ponzi scheme," never really investigated the possibility of a Ponzi scheme. The relatively inexperienced Enforcement staff failed to appreciate the significance of the analysis in the complaint, and almost immediately expressed skepticism and disbelief. Most of their investigation was directed at determining whether Madoff should register as an investment adviser or whether Madoff's hedge fund investors' disclosures were adequate.

As with the examinations, the Enforcement staff almost immediately caught Madoff in lies and misrepresentations, but failed to follow up on inconsistencies. They rebuffed offers of additional evidence from the complainant, and were confused about certain critical and fundamental aspects of Madoff's operations. When Madoff provided evasive or contradictory answers to important questions in testimony, they simply accepted as plausible his explanations.

Although the Enforcement staff made attempts to seek information from independent third-parties, they failed to follow up on these requests. They reached out to the NASD and asked for information on whether Madoff had options positions on a certain date, but when they received a report that there were in fact no options positions

on that date, they did not take any further steps.  An Enforcement staff attorney made several attempts to obtain documentation from European counterparties (another independent third-party), and although a letter was drafted, the Enforcement staff decided not to send it.  Had any of these efforts been fully executed, they would have led to Madoff's Ponzi scheme being uncovered.

The OIG also found that numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was unwise.  Specifically, Madoff's description of both his equity and options trading practices immediately led to suspicions about Madoff's operations.  With respect to his purported trading strategy, many simply did not believe that it was possible for Madoff to achieve his returns using a strategy described by some industry leaders as common and unsophisticated.  In addition, there was a great deal of suspicion about Madoff's purported options trading, with several entities not believing that Madoff could be trading options in such high volumes where there was no evidence that any counterparties had been trading options with Madoff.  The private entities' conclusions were drawn from the same "red flags" in Madoff's operations that the SEC considered in its examinations and investigations, but ultimately dismissed.

We also found that investors who may have been uncertain about whether to invest with Madoff were reassured by the fact that the SEC had investigated and/or examined Madoff, or entities that did business with Madoff, and found no evidence of fraud.  Moreover, we found that Madoff proactively informed potential investors that the SEC had examined his operations.  When potential investors expressed hesitation about investing with Madoff, he cited the prior SEC examinations to establish credibility and allay suspicions or investor doubts that may have arisen while due diligence was being conducted.  Thus, the fact the SEC had conducted examinations and investigations and did not detect the fraud, lent credibility to Madoff's operations and had the effect of encouraging additional individuals and entities to invest with him.

A more detailed description of the circumstances surrounding the five major investigations and examinations that the SEC conducted of Madoff and his firm is provided below.  In June 1992, several customers of an investment firm known as Avellino & Bienes approached the SEC conveying concerns about investments they had made.  The SEC was provided with several documents that Avellino & Bienes created that indicated that they were offering "100%" safe investments, which they characterized as loans, with high and extremely consistent rates of return over significant periods of time.  Not everyone could invest with Avellino & Bienes, as this was a "special" and exclusive club, with some special investors getting higher returns than others.

As the SEC began investigating the matter, they learned that Madoff had complete control over all of Avellino & Bienes' customer funds and made all investment decisions for them, and, according to Avellino, Madoff had achieved these consistent returns for them for numerous years without a single loss.  Avellino described Madoff's

strategy for these extraordinarily consistent returns as very basic:  investing in long-term Fortune 500 securities, with hedges of the Standard & Poor's (S&P) index.

The SEC suspected that Avellino & Bienes was operating a Ponzi scheme and took action to ensure that all of Avellino & Bienes' investors were refunded their investments.  Yet, the OIG found that the SEC never considered the possibility that Madoff could have taken the money that was used to pay back Avellino & Bienes' customers from other clients as part of a larger Ponzi scheme.

The SEC actually conducted an examination of Madoff that was triggered by the investigation of Avellino & Bienes, but assembled an inexperienced examination team. The examination team conducted a brief and very limited examination of Madoff, but made no effort to trace where the money that was used to repay Avellino & Bienes' investors came from.  In addition, although the SEC examiners did review records from DTC, they obtained those DTC records from Madoff rather than going to DTC itself to verify if trading occurred.  According to the lead SEC examiner, someone should have been aware of the fact that the money used to pay back Avellino & Bienes' customers could have come from other investors, but there was no examination of where the money that was used to pay back the investors came from.  Another examiner said such a basic examination of the source of the funds would have been "common sense."  In addition, although the SEC's lead examiner indicated that the investment vehicle offered by Avellino & Bienes had numerous "red flags" and was "suspicious," no effort was made to look at the investment strategy and returns.

Instead, the SEC investigative team, which was also inexperienced, brought a limited action against Avellino & Bienes for selling unregistered securities, not fraud, and did not take any further steps to inquire into Madoff's firm.  The SEC lawyers working on the matter were aware of the questionable returns and the fact that all the investment decisions were made by Madoff, but the focus of the investigation was limited to whether Avellino & Bienes was selling unregistered securities or operating an unregistered investment firm.  A trustee and accounting firm were retained to ensure full distribution of the assets, but its jurisdiction was limited, and they did not take any action to independently verify account balances and transaction activity included in Madoff's financial and accounting records.  Even after the accounting firm was unable to audit Avellino & Bienes' financial statements and uncovered additional red flags, such as Avellino & Bienes' failure to produce financial statements or have the records one would have expected from such a large operation, no further efforts were made to delve more deeply into either Avellino & Bienes' or Madoff's operations.

The result was a missed opportunity to uncover Madoff's Ponzi scheme 16 years before Madoff confessed.  The SEC had sufficient information to inquire further and investigate Madoff for a Ponzi scheme back in 1992.  There was evidence of incredibly consistent returns over a significant period of time without any losses, purportedly achieved by Madoff using a basic trading strategy of buying Fortune 500 stocks and hedging against the S&P index.  Yet, the SEC seemed satisfied with closing Avellino & Bienes down, and never even considered investigating Madoff, despite knowing that

Avellino & Bienes invested all of their clients' money exclusively with Madoff.  The SEC's lead examiner said Madoff's reputation as a broker-dealer may have influenced the inexperienced team not to inquire into Madoff's operations.

In May 2000, Harry Markopolos provided the SEC's Boston District Office (BDO) with an eight-page complaint questioning the legitimacy of Madoff's reported returns.  The 2000 complaint posited the following two explanations for Madoff's unusually consistent returns:  (1) that "[t]he returns are real, but they are coming from some process other than the one being advertised, in which case an investigation is in order;" or (2) "[t]he entire fund is nothing more than a Ponzi Scheme."  Markopolos' complaint stated that Madoff's returns were unachievable using the trading strategy he claimed to employ, noting Madoff's "perfect market-timing ability."  Markopolos also referenced the fact that Madoff did not allow outside performance audits.

Markopolos explained his analysis presented in the 2000 complaint at a meeting at the SEC's Boston office and encouraged the SEC to investigate Madoff.  After the meeting, both Markopolos and an SEC staff accountant testified that it was clear that the BDO's Assistant District Administrator did not understand the information presented.  Our investigation found that this was likely the reason that the BDO decided not to pursue Markopolos' complaint or even refer it to the SEC's Northeast Regional Office (NERO).

In March 2001, Markopolos provided the BDO with a second complaint, which supplemented his previous 2000 complaint with updated information and additional analysis.  Markopolos' 2001 complaint included an analysis of Madoff's returns versus the S&P 500, showing that he had only three down months versus the market's 26 down months during the same period, with a worst down month of only -1.44% versus the market's worst down month of -14.58%.  Markopolos concluded that Madoff's "numbers really are too good to be true."  Markopolos' analysis was supported by the experience of two of his colleagues, Neil Chelo and Frank Casey, both of whom had substantial experience and knowledge of investment funds.

Although this time the BDO did refer Markopolos' complaint, NERO decided not to investigate the complaint only one day after receiving it.  The matter was assigned to an Assistant Regional Director in Enforcement for initial inquiry, who reviewed the complaint, determined that Madoff was not registered as an investment adviser, and the next day, sent an e-mail stating, "I don't think we should pursue this matter further."  The OIG could find no explanation for why Markopolos' complaint, which the Enforcement attorney and the former head of NERO acknowledged was "more detailed than the average complaint," was disregarded so quickly.

Just one month after NERO decided not to pursue Markopolos' second submission to the SEC, in May 2001, *MARHedge* and *Barron's* both published articles questioning Madoff's unusually consistent returns and secretive operations.  The *MARHedge* article, written by Michael Ocrant and entitled "Madoff tops charts; skeptics ask how," stated how many were "baffled by the way [Madoff's] firm has obtained such

consistent, nonvolatile returns month after month and year after year," describing the fact Madoff "reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15.0%." The *MARHedge* article further discussed how industry professionals "marvel at [Madoff's] seemingly astonishing ability to time the market and move to cash in the underlying securities before market conditions turn negative and the related ability to buy and sell the underlying stocks without noticeably affecting the market." It further described how "experts ask why no one has been able to duplicate similar returns using [Madoff's] strategy."

The *Barron's* article, written by Erin Arvedlund and entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," discussed how Madoff's operation was among the three largest hedge funds, and has "produced compound average annual returns of 15% for more than a decade" with the largest fund "never [having] had a down year." The *Barron's* article further questioned whether Madoff's trading strategy could have been achieving those remarkably consistent returns.

The OIG found that the SEC was aware of the *Barron's* article when it was published in May 2001. On May 7, 2001, an Enforcement Branch Chief in the BDO followed up with NERO regarding Markopolos' 2001 complaint and the *Barron's* article, and asked the Director of NERO if he wanted a copy of the article. However, the decision not to commence an investigation was not reconsidered and there is no evidence the *Barron's* article was ever even reviewed. In addition, we found that former OCIE Director Lori Richards reviewed the *Barron's* article in May 2001 and sent a copy to an Associate Director in OCIE shortly thereafter, with a note on the top stating that Arvedlund is "very good" and that "This is a great exam for us!" However, OCIE did not open an examination, and there is no record of anyone else in OCIE reviewing the *Barron's* article until several years later.

In May 2003, OCIE's investment management group in Washington, D.C. received a detailed complaint from a reputable Hedge Fund Manager, in which he laid out the red flags that his hedge fund had identified about Madoff while performing due diligence on two Madoff feeder funds. The Hedge Fund Manager attached four documents to his complaint, including performance statistics for three Madoff feeder funds and the *MARHedge* article.

The Hedge Fund Manager's complaint identified numerous concerns about Madoff's strategy and purported returns. According to the Hedge Fund Manager's complaint, while Madoff purported to trade $8-$10 billion in options, he and his partner had checked with some of the largest brokers and did not see the volume in the market. Further, the Hedge Fund Manager explained in his complaint that Madoff's fee structure was suspicious because Madoff was foregoing the significant management and performance fees typically charged by asset managers. The complaint also described specific concerns about Madoff's strategy and purported returns such as the fact that the strategy was not duplicable by anyone else; there was no correlation to the overall equity

28

markets (in over 10 years); accounts were typically in cash at month end; the auditor of the firm was a related party to the principal; and Madoff's firm never had to face redemption.

According to an SEC supervisor, the Hedge Fund Manager's complaint implied that Madoff might be lying about its option trading and laid out issues that were "indicia of a Ponzi scheme." One of the senior examiners on the team also acknowledged that the Hedge Fund Manager's complaint could be interpreted as alleging that Madoff was running a Ponzi scheme.

The OIG's expert concluded that based upon issues raised in the Hedge Fund Manager's complaint, had the examination been staffed and conducted appropriately and basic steps taken to obtain third-party verifications, Madoff's Ponzi scheme should and would have been uncovered.

However, we found that OCIE did not staff or conduct the examination adequately, and thus, missed another opportunity to uncover Madoff's fraud. The complaint was immediately referred to OCIE's broker-dealer examination group even though the complaint mainly raised investment management issues. The broker-dealer group decided not to request investment adviser staff support for the examination even though the examiners testified that such support could have been arranged whether or not Madoff was registered as an investment adviser. The OIG was informed that, at that time, the two OCIE groups rarely collaborated on examinations.[12]

The broker-dealer examination team assigned to the examination was inexperienced. According to an examiner, at the time of the Madoff examination, OCIE "didn't have many experienced people at all" noting that "we were expanding rapidly and had a lot of inexperienced people" conducting examinations. Another OCIE examiner stated that "there was no training," that "this was a trial by fire kind of job" and there were a lot of examiners who "weren't familiar with securities laws." The team was composed entirely of attorneys, who according to one member, did "not have much experience in equity and options trading" but "rather, their experience was in general litigation." As noted above, the complaint included issues typically examined by investment adviser personnel, such as verification of purported investment returns and account balances, but the group assigned to the examination had no significant experience conducting examinations of these issues.

In addition, notwithstanding the serious issues raised in the Hedge Fund Manager's complaint, the start of the examination was delayed for seven months, until December 2003. No reason was given for this delay.

---

[12] It should be noted that the fact that Madoff's hedge fund business had not been registered at the time of the examinations would not have been an impediment to the examiners' ability to obtain information from Madoff as, at all relevant times, the SEC had authority to examine all of Madoff's firm's books and records, whether they were related to market making or hedge fund clients.

The OIG investigation also found that the complaint was poorly analyzed and the focus of the examination was much too limited. The examination focused solely on front-running, notwithstanding the numerous other "red flags" raised in the complaint, and failed to analyze how Madoff could have achieved his extraordinarily consistent returns, which had no correlation to the overall markets. When asked why the other issues in the Hedge Fund Manager's complaint and the two 2001 articles were not investigated, the Associate Director stated he focused on front-running because "that was the area of expertise for my crew."

A Planning Memorandum for the examination was prepared, but it failed to address several critical issues from the complaint, including the unusual fee structure; the inability to see the volume of options in the marketplace; the remarkable returns; the fact that Madoff's trading strategy was not duplicable; the returns had no correlation to actual equity markets; the accounts were in cash at month's end; there were no third party brokers; and the auditor of Madoff's firm was a related party.

In addition, courses of action outlined in the Planning Memorandum that involved verification of trading with independent third parties should have been carried out, but were not. For example, the staff drafted a letter to the NASD (an independent third-party), which was critical to any adequate review of the complaint because the data and information from the NASD would have assisted in independently verifying trading activity conducted at Madoff's firm. However, the letter was never sent, with the explanation given by staff that it would have been too time-consuming to review the information they would have obtained. According to the OIG's expert, had the letter been sent out, the NASD would have provided order and execution data that would have indicated that Madoff did not execute the significant volume of trades for the discretionary brokerage accounts that he represented to the examiners, and the data would likely have provided the information necessary to reveal the Ponzi scheme.

During the course of the examination, the examination team discovered suspicious information and evidence, but failed to follow up on numerous "red flags." Responses by Madoff to the document requests contradicted the Hedge Fund Manager's complaint and the 2001 articles. For example, Madoff's claim that his firm did not manage or advise hedge funds was contradicted by the articles that reported Madoff was managing billions of dollars in assets. In addition, although known for advanced technology, Madoff claimed not to have e-mail communications with clients. However, the examiners did not follow up on these red flags.

We also found that Madoff's responses to the examiners' document requests should have raised suspicions because the information provided appeared incomplete and, at times, inconsistent when compared to other information provided. For example, Madoff's account statements only included average prices during each day without the actual prices for each transaction. According to the OIG's expert, based on the questions raised by the examination team with regard to differing trade patterns for certain clients, there should have been significant suspicions as to whether or not Madoff was implementing the strategy as claimed.

The examiners also made the surprising discovery that Madoff's mysterious hedge fund business was making significantly more money than his well-known market-making operation.  However, this was not identified as a cause for concern.  When the examination team contacted Madoff to discuss their open questions, his answers failed to clarify matters and he again claimed not to act as an investment adviser.  In February 2004, the examination was expanded to analyze the question of whether Madoff was acting as an investment adviser. Legal memoranda were drafted to seek guidance on this issue, but never sent.  In a subsequent draft of a supplemental document request to Madoff, the examiners sought detailed audit trail data, including the date, time, and execution price for all of his trades in 2003.  But the examiners removed the request for this critical data from the supplemental request before it was sent out.  The reason given was that they were generally hesitant to get audit trail data "because it can be tremendously voluminous and difficult to deal with" and "takes a ton of time" to review.  No requests were made from independent third-parties for any data, although an OCIE examiner acknowledged obtaining such data should not have been difficult.

Although there were numerous unresolved questions in the examination, in early April 2004, the examiners were abruptly instructed to shift their focus to "mutual funds" projects, placing the Madoff examination on the "backburner."  We found that it was not unusual at that time to shift attention to high priority projects in OCIE and leave some projects incomplete.

As the examination of Madoff in Washington, D.C. was shelved, in NERO, a nearly identical examination of Madoff was just beginning.  In April 2004, a NERO investment management examiner had been conducting a routine examination of an unrelated registrant when it discovered internal e-mails from November and December 2003 that raised questions about whether Madoff was involved in illegal activity involving managed accounts.  These internal e-mails described the red flags the registrant's employees identified while performing due diligence using widely available information on their Madoff investment.  The red flags the registrant had identified included Madoff's:  (1) incredible and highly unusual fills for equity trades; (2) misrepresentation of his options trading; (3) secrecy; (4) auditor; (5) unusually consistent and non-volatile returns over several years; and (6) fee structure.

Crucially, one of the internal e-mails provided a step-by-step analysis of why Madoff must be misrepresenting his options trading.  The e-mail explained that Madoff could not be trading on an options exchange because of insufficient volume and could not be trading options over-the-counter because it was inconceivable he could find a counterparty for the trading.  For example, the e-mail explained that because customer statements showed that the options trades were always profitable for Madoff, there was no incentive for a counterparty to continuously take the other side of those trades since it would always lose money.  These findings raised significant doubts that Madoff could be implementing his trading strategy.  The internal e-mails included the statement that the registrant had "totally independent evidence" that Madoff's executions were "highly unusual."

The investment management examiner who initially discovered the e-mails and his supervisors viewed them as indicating the registrant's employees were clearly "trying to find out where exactly the trades were taking place" and the e-mails evidenced that "there's some suspicion as to whether Madoff is trading at all." They indicated they would have followed up on the allegation in the e-mails about "whether Madoff was actually trading."

As with the examination, in Washington, D.C., there was a significant delay before the examination was commenced. Although the e-mails were discovered in April 2004 and immediately referred to the NERO broker-dealer examination program, a team was not assembled until December 2004.

The team assembled in NERO consisted of an Associate Director, an Assistant Director and two junior examiners in the broker-dealer examination program. A branch chief, whose role would be to oversee and assist the junior examiners, was not assigned to the examination. One of the junior examiners assigned to examination in 2004 graduated from college in 1999 and joined the SEC as his first job out of school. The other examiner had worked as an equity trader for a few years before coming to the SEC. He had worked on approximately four examinations before being assigned to the Madoff examination.

Once again, no consideration was given to performing a joint examination with investment management examiners, despite the fact that the internal e-mails raised suspicions about Madoff's performance and returns. An examiner stated that each of the examination programs in NERO was a "silo" and they almost never worked together.

In late March 2005, approximately ten months after receiving the referral, the NERO broker-dealer examination team began performing background research in preparation for an on-site examination of Madoff to begin in April. Unlike the OCIE examination team, the NERO examination team did not draft a planning memorandum laying out the scope of the examination. The examiners recalled that, at the time of the examination, NERO did not have a practice of writing planning memoranda.

Once again, although the e-mails raised significant issues about whether Madoff was engaging in trading at all, the decision was made to focus exclusively on front-running. The NERO Associate Director stated that despite identifying Madoff's returns as an issue, he did not necessarily have "an expectation" that the examiners would analyze Madoff's returns because portfolio analysis was not a strength of broker-dealer examiners.

To the extent that the NERO examiners did examine issues outside of front-running, they conducted their examination by simply asking Madoff about their concerns and accepting his answers. With respect to the significant concerns about Madoff's options trading, they asked Madoff about this issue, and when Madoff said he was no longer using options as part of his strategy, they stopped looking at the issue, despite the fact that Madoff's representation was inconsistent with the internal e-mails, the two 2001

articles, and the investment strategy Madoff claimed to employ. As to why Madoff did not collect fees like all other hedge fund managers, they accepted his response that he was not "greedy" and was happy with just receiving commissions.

Several issues, including the allegation in the internal e-mails that Madoff's auditor was a related party, were never examined at all. Yet, after Madoff confessed to operating a Ponzi scheme, a staff attorney in NERO's Division of Enforcement was assigned to investigate Madoff's accountant, David Friehling, and within a few hours of obtaining the work papers, he determined that no audit work had been done.

In addition, although one of the NERO examiners placed a "star" next to the statement in the internal e-mails about having "totally independent evidence" that Madoff's executions were "highly unusual," NERO never followed up with the registrant to inquire about or obtain this evidence. The NERO examiners explained that it was not their practice to seek information from third parties when they conducted examinations.

When the examiners began their on-site examination of Madoff, they learned Bernard Madoff would be their primary contact and Madoff carefully controlled to whom they spoke at the firm. On one occasion, when a Madoff employee was speaking to the NERO examiners at Madoff's firm, after a couple of minutes, another Madoff employee rushed in to escort her from the conversation, claiming she was urgently needed. When the examiners later asked Madoff the reason for the urgency, Madoff told them her lunch had just arrived, even though it was 3:00 o'clock in the afternoon.

Madoff made efforts during the examination to impress and even intimidate the junior examiners from the SEC. Madoff emphasized his role in the securities industry during the examination. One of the NERO examiners characterized Madoff as "a wonderful storyteller" and "very captivating speaker" and noted that he had "an incredible background of knowledge in the industry." The examiner said he found it "interesting" but also "distracting" because they were there "to conduct business."

The other NERO examiner noted that "[a]ll throughout the examination, Bernard Madoff would drop the names of high-up people in the SEC." Madoff told them that Christopher Cox was going to be the next Chairman of the SEC a few weeks prior to Cox being officially named. He also told them that Madoff himself "was on the short list" to be the next Chairman of the SEC. When the NERO examiners would seek documents Madoff did not wish to provide, Madoff became very angry, with an examiner recalling that Madoff's "veins were popping out of his neck" and he was repeatedly saying, "What are you looking for? . . . . Front running. Aren't you looking for front running," and "his voice level got increasingly loud."

Throughout the examination, the NERO examiners "had a real difficult time dealing with" Madoff as he was described as growing "increasingly agitated" during the examination, and attempting to dictate to the examiners what to focus on in the examination and what documents they could review. Yet, when the NERO examiners

33

reported back to their Assistant Director about the pushback they received from Madoff, they received no support and were actively discouraged from forcing the issue.

One effort was made to verify Madoff's trading with an independent third-party, but even after they received a very suspicious response, there was no follow-up. The Assistant Director sent a document request to a financial institution that Madoff claimed he used to clear his trades, requesting records for trading done by or on behalf of particular Madoff feeder funds during a specific time period. Shortly thereafter, the financial institution responded, stating there was no transaction activity in Madoff's account for that period. Yet, the response did not raise a red flag for the Assistant Director, who merely assumed that Madoff must have "executed trades through the foreign broker-dealer." The examiners did not recall ever being shown the response from the financial institution, and no further follow-up actions were taken.

At one point in the NERO examination, the examiners were planning to confront Madoff about the many contradictory positions he was taking, particularly as they related to Madoff's changing stories about how many advisory clients he had. However, when the NERO examiners pushed Madoff for documents and information about his advisory clients, he rebuffed them, pointing out that he had already provided the information to the Washington, D.C. staff in accordance with their examination. The NERO examiners were taken aback, since they were unaware that the D.C. office of OCIE had been conducting a simultaneous examination of Madoff on the identical issues they were examining.

When the NERO examiners asked the Washington, D.C. examiners about Madoff's claim, they first learned about the Washington, D.C. examination, which by that time, had been dormant for months. There were a couple of brief conference calls between the two offices about their examinations, but relatively little sharing of information. One of the few points that was made in a conference call between the offices was a comment by a senior-level Washington D.C. examiner reminding the junior NERO examiners that Madoff "was a very well-connected, powerful, person," which one of the NERO examiners interpreted to raise a concern for them about pushing Madoff too hard without having substantial evidence. While the Washington, D.C. examination team decided not to resume their examination and sent their workpapers to NERO, the NERO examiners reported conducting only a cursory review of the workpapers and did not recall even reviewing the Hedge Fund Manager's detailed complaint that precipitated the D.C. examination, appear to have never discussed the D.C. examiners' open questions about Madoff's representations and trading, and did not compare the list of clients Madoff produced to them with the list he produced to the D.C. team.

Meanwhile, as the NERO examination continued, Madoff was failing to provide the NERO examiners with requested documents and the examiners continued to find discrepancies in the information Madoff did provide. As the examiners continued to review the documents Madoff produced, their confusion and skepticism grew. While the NERO examiners had significant questions about Madoff's trade executions and clearance, as well as Madoff's claim that he used his "gut feel" to time the market based

on "his observations of the trading room," Madoff was pushing them to finish the examination.

As had been the case with the Washington, D.C. examination, the NERO examiners learned that Madoff's well-known market making business would be losing money without the secretive hedge fund execution business. Although they described this revelation as "a surprising discovery," the issue was once again never pursued.

Although the NERO examiners determined Madoff was not engaged in front-running, they were concerned about issues relating to the operation of his hedge fund business, and sought permission to continue the examination and expand its scope. Their Assistant Regional Director denied their request, telling them to "keep their eyes on the prize," referring to the front-running issue. When the examiners reported that they had caught Madoff in lies, the Assistant Director minimized their concerns, stating "it could [just] be a matter of semantics." The examiners' request to visit Madoff feeder funds was denied, and they were informed that the time for the Madoff examination had expired. The explanation given was that "field work cannot go on indefinitely because people have a hunch or they're following things."

Thus, the NERO cause examination of Madoff was concluded without the examination team ever understanding how Madoff was achieving his returns and with numerous open questions about Madoff's operations. Many, if not most, of the issues raised in both the Hedge Fund Manager's complaint that precipitated the Washington, D.C. examination and the internal e-mails that triggered the NERO examination had not been analyzed or resolved. In September 2005, NERO prepared a closing report for the examination that relied almost entirely on information verbally provided by Madoff to the examiners for resolution of numerous "red flags." One of the two primary examiners on the NERO examination team was later promoted based on his work on the Madoff examination.

Only a month after NERO closed its examination of Madoff, in October 2005, Markopolos provided the SEC's BDO with a third version of his complaint entitled "The World's Largest Hedge Fund is a Fraud." Markopolos' 2005 complaint detailed approximately 30 red flags indicating Madoff was operating a Ponzi scheme, a scenario Markopolos described as "highly likely." Markopolos' 2005 complaint discussed an alternative possibility – that Madoff was front-running – but characterized that scenario as "unlikely." The red flags identified by Markopolos were similar to the ones previously raised in the Hedge Fund Manager's complaint and the internal e-mails that led to the two cause examinations of Madoff, although somewhat more detailed. They generally fell into one of three categories: (1) Madoff's obsessive secrecy; (2) the impossibility of Madoff's returns, particularly the consistency of those returns; and (3) the unrealistic volume of options Madoff was supposedly trading.

The BDO found Markopolos credible, having worked with him previously and took his 2005 complaint seriously. While senior officials with the BDO considered Markopolos' allegation that Madoff was operating a Ponzi scheme worthy of serious

investigation, they felt it made more sense for NERO to conduct the investigation because Madoff was in New York and NERO had already conducted an examination of Madoff. The BDO made special efforts to ensure that NERO would "recognize the potential urgency of the situation" which was evidenced by the Director of the BDO e-mailing the complaint to the Director of NERO personally, and by following up to ensure the matter was assigned within NERO.

While the Madoff investigation was assigned within NERO Enforcement, it was assigned to a team with little to no experience conducting Ponzi scheme investigations. The majority of the investigatory work was conducted by a staff attorney who recently graduated from law school and only joined the SEC nineteen months before she was given the Madoff investigation. She had never previously been the lead staff attorney on any investigation, and had been involved in very few investigations overall. The Madoff assignment was also her first real exposure to broker-dealer issues.

The NERO Enforcement staff, unlike the BDO, failed to appreciate the significance of the evidence in the 2005 Markopolos complaint and almost immediately expressed skepticism and disbelief about the information contained in the complaint. The Enforcement staff claimed that Markopolos was not an insider or an investor, and thus, immediately discounted his evidence. The Enforcement staff also questioned Markopolos' motives, indicating concerns that "he was a competitor of Madoff's" who "was looking for a bounty." These concerns were particularly misplaced because in Markopolos' complaint, he described that it was "highly likely" that Madoff was operating a "Ponzi scheme," and acknowledged that if he were correct, he would **not** be eligible for a bounty. Moreover, even after the branch chief assigned to the Madoff Enforcement investigation spoke with a senior official at the BDO, who vouched for Markopolos' credibility, she remained skeptical of him throughout the investigation.

The OIG investigation also found the Enforcement staff was skeptical about Markopolos' complaint because Madoff did not fit the "profile" of a Ponzi scheme operator, with the branch chief on the Madoff investigation noting that there was "an inherent bias towards [the] sort of people who are seen as reputable members of society."

The NERO Enforcement staff also received a skeptical response to Markopolos' complaint from the NERO examination team who had just concluded their examination. Even though the NERO examination had focused solely on front-running, NERO examination team downplayed the possibility that Madoff was conducting a Ponzi scheme, saying, "these are basically some of the same issues we investigated" and that Markopolos "doesn't have the detailed understanding of Madoff's operations that we do which refutes most of his allegations." In testimony before the OIG, the examiners acknowledged that their examination "did not refute Markopolos' allegations regarding a Ponzi scheme" and that the examiners' reaction may have given the impression their examination had a greater focus than it did. Indeed, since the NERO examination had ruled out front-running, the NERO examiners should have encouraged the Enforcement staff to analyze Markopolos' more likely scenario, the Ponzi scheme. Yet, that scenario was never truly analyzed.

The Enforcement staff delayed opening a matter under inquiry (MUI) for the Madoff investigation for two months, which was a necessary step at the beginning of an Enforcement investigation for the staff to be informed of other relevant information that the SEC received about the subject of the investigation. As a result of the delay in opening a MUI, the Enforcement staff never learned of another complaint sent to the SEC in October 2005 from an anonymous informant stating, "I know that Madoff [sic] company is very secretive about their operations and they refuse to disclose anything. If my suspicions are true, then they are running a highly sophisticated scheme on a massive scale. And they have been doing it for a long time." The informant also stated, "After a short period of time, I decided to withdraw all my money (over $5 million)." As a result, there was no review or analysis of this complaint.

In addition, as was the case with the SEC examinations of Madoff, the focus of the Enforcement staff's investigation was much too limited. Markopolos' 2005 complaint primarily presented evidence that Madoff was operating a Ponzi scheme, calling that scenario "highly likely." However, most of the Enforcement staff's efforts during their investigation were directed at determining whether Madoff should register as an investment adviser or whether Madoff's hedge fund investors' disclosures were adequate. In fact, the Enforcement staff's investigative plan primarily involved comparing documents and information that Madoff had provided to the examination staff (which he fabricated) with documents that Madoff had sent his investors (which he also fabricated).

Yet, the Enforcement staff almost immediately caught Madoff in lies and misrepresentations. An initial production of documents the Enforcement staff obtained from a Madoff feeder fund demonstrated Madoff had lied to the examiners in the NERO examination about a fundamental component of his claimed trading activity. Specifically, while Madoff told the examiners he had stopped using options as part of his strategy after they scrutinized his purported options trading, the Enforcement staff found evidence from the feeder funds that Madoff was telling his investors that he was still trading options during that same time period. Yet, the Enforcement staff never pressed Madoff on this inconsistency. After an interview with an executive from a Madoff feeder fund, the Enforcement staff noted several additional "discrepancies" between what Madoff told the examiners in the NERO examination and information they received in the interview. The Enforcement staff also discovered that the feeder fund executive's testimony had been scripted and he had been prepped by Madoff.

As the investigation progressed, in December 2005, Markopolos approached the Enforcement staff to provide them additional contacts and information. However, the branch chief assigned to the Madoff Enforcement investigation took an instant dislike to Markopolos and declined to even pick up the "several inch thick file folder on Madoff" that Markopolos offered. One of the Enforcement staff described the relationship between Markopolos and the Branch Chief as "adversarial."

37

In February 2006, the Enforcement staff contacted the SEC's Office of Economic Analysis (OEA) seeking assistance in analyzing Madoff's trading. OEA failed to respond to the request for two and a half months. In April 2006, the Enforcement staff went back to OEA, but failed to provide OEA with a copy of Markopolos' 2005 complaint. An expert on options trading in OEA did review certain documents that OEA received from the Enforcement staff and, based upon a 20 minute review, concluded Madoff's split-strike conversion strategy "was not a strategy that would be expected to earn significant returns in excess of the market." However, this analysis was not conveyed to the Enforcement staff. In addition, the OEA options trading expert told the OIG that if he had been made aware of the amount of assets that Madoff had been claiming to manage, he would have ruled out "front-running" as a possible explanation for Madoff's returns. In the end, the Enforcement staff never obtained any useful information or analysis from OEA.

Throughout the Enforcement staff's investigation, the Enforcement staff was confused about certain critical and fundamental aspects of Madoff's operations. They had trouble understanding Madoff's purported trading strategy, basic custody of assets issues and, generally, how Madoff's operation worked. Despite the Enforcement staff's confusion, after their unsuccessful attempt to seek assistance from OEA, they never consulted the SEC's own experts on broker-dealer operations, the SEC's Division of Trading and Markets (formerly the Division of Market Regulation), who could have facilitated inquiries with independent third-parties such as the NASD and DTC. Similarly, after Madoff claimed his purported trading activity took place in Europe, the Enforcement staff did not seek help from the SEC's Office of International Affairs (OIA). Had they simply sought assistance from OIA on matters within its area of expertise, the Enforcement staff should have discovered that Madoff was not purchasing equities from foreign broker dealers and that he did not have Over-the-Counter (OTC) options agreements with European counterparties.

At a crucial point in their investigation, the Enforcement staff was informed by a senior-level official from the NASD that they were not sufficiently prepared to take Madoff's testimony, but they ignored his advice. On May 17, 2006, two days before they were scheduled to take Madoff's testimony, the Enforcement staff attorney contacted the Vice President and Deputy Director of the NASD Amex Regulation Division to discuss Madoff's options trading. The NASD official told the OIG that he answered "extremely basic questions" from the Enforcement staff about options trading. He also testified that, by the end of the call, he felt the Enforcement staff did not understand enough about the subject matter to take Madoff's testimony. The NASD official also recalled telling the Enforcement staff that they "needed to do a little bit more homework before they were ready to talk to [Madoff]," but that they were intent on taking Madoff's testimony as scheduled. He testified that when he and a colleague who was also on the call hung up, "we were both, sort of, shaking our heads, saying that, you know, it really seemed like some of these [options trading] strategies were over their heads." Notwithstanding the advice, the Enforcement staff did not postpone Madoff's testimony.

On May 19, 2006, Madoff testified voluntarily and without counsel in the SEC investigation.  During Madoff's testimony, he provided evasive answers to important questions, provided some answers that contradicted his previous representations, and provided some information that could have been used to discover that he was operating a Ponzi scheme.  However, the Enforcement staff did not follow-up with respect to the critical information that was relevant to uncovering Madoff's Ponzi scheme.

For example, when Enforcement staff asked the critical question of how he was able to achieve his consistently high returns, Madoff never really answered the question but, instead, attacked those who questioned his returns, particularly the author of the *Barron's* article.  Essentially, Madoff claimed his remarkable returns were due to his personal "feel" for when to get in and out of the market, stating,  "Some people feel the market.  Some people just understand how to analyze the numbers that they're looking at."  Because of the Enforcement staff's inexperience and lack of understanding of equity and options trading, they did not appreciate that Madoff was unable to provide a logical explanation for his incredibly consistent returns.  Each member of the Enforcement staff accepted as plausible Madoff's claim that his returns were due to his perfect "gut feel" for when the market would go up or down.

During his testimony, Madoff also told the Enforcement investigators that the trades for all of his advisory accounts were cleared through his account at DTC.  He testified further that his advisory account positions were segregated at DTC and gave the Enforcement staff his DTC account number.  During an interview with the OIG, Madoff stated that he had thought he was caught after his testimony about the DTC account, noting that when they asked for the DTC account number, "I thought it was the end game, over.  Monday morning they'll call DTC and this will be over . . . and it never happened."  Madoff further said that when Enforcement did not follow up with DTC, he "was astonished."

This was perhaps the most egregious failure in the Enforcement investigation of Madoff; that they never verified Madoff's purported trading with any independent third parties.  As a senior-level SEC examiner noted, "clearly if someone … has a Ponzi and, they're stealing money, they're not going to hesitate to lie or create records" and, consequently, the "only way to verify" whether the alleged Ponzi operator is actually trading would be to obtain "some independent third-party verification" like "DTC."

A simple inquiry to one of several third parties could have immediately revealed the fact that Madoff was not trading in the volume he was claiming.  The OIG made inquiries with DTC as part of our investigation.  We reviewed a January 2005 statement for one Madoff feeder fund account, which alone indicated that it held approximately $2.5 billion of S&P 100 equities as of January 31, 2005.  On the contrary, on January 31, 2005, DTC records show that Madoff held less than $18 million worth of S&P 100 equities in his DTC account.  Similarly, on May 19, 2006, the day of Madoff's testimony with the Enforcement staff, DTC records show that Madoff held less than $24 million worth of S&P 100 equities in his DTC account and on August 10, 2006, the day Madoff agreed to register as an investment adviser and the Enforcement staff effectively ended

the Madoff investigation, DTC records showed the Madoff account held less than $28 million worth of S&P 100 equities in his DTC account.  Had the Enforcement staff learned this information during the course of their investigation, they would have immediately realized that Madoff was not trading in anywhere near the volume that he was showing on the customer statements.[13]  When Madoff's Ponzi scheme finally collapsed in 2008, an SEC Enforcement attorney testified that it took only "a few days" and "a phone call … to DTC" to confirm that Madoff had not placed any trades with his investors' funds.

Our investigation did find that the Enforcement staff made attempts to seek information from independent third-parties; however, they failed to follow up on these requests. On May 16, 2006, three days before Madoff's testimony, the Enforcement staff reached out to the Director of the Market Regulation Department at the NASD and asked her to check a certain date on which Madoff had purportedly held S&P 100 index option positions.  She reported back that they had found no reports of such option positions for that day.  Yet, the Enforcement staff failed to make any further inquiry regarding this remarkable finding.  The Enforcement staff also failed to scrutinize information obtained in the NERO cause examination when the examination staff had attempted to verify Madoff's claims of trading OTC options with a financial institution and found that "no relevant transaction activity occurred during the period" requested.  Finally, although the Enforcement staff attorney attempted to obtain documentation from U.S. affiliates of European counterparties and one of Madoff's purported counterparties was in the process of drafting a consent letter asking Madoff's permission to send the Enforcement staff the documents from its European account, the inexplicable decision was made not to send the letter and to abandon this effort.  Had any of these efforts been pursued by the Enforcement staff, they would have uncovered Madoff's Ponzi scheme.

The Enforcement staff effectively closed the Madoff investigation in August 2006 after Madoff agreed to register as an investment adviser.  They believed that this was a "beneficial result" as once he registered, "he would have to have a compliance program, and he would be subject to an examination by our [Investment Adviser] team."  However, no examination was ever conducted of Madoff after he registered as an investment adviser.

A few months later, in December 2006, the Enforcement staff received another complaint from a "concerned citizen," advising the SEC to look into Madoff and his firm:

> Your attention is directed to a scandal of major proportion which was executed by the investment firm Bernard L. Madoff … Assets well in excess of $10 Billion owned by the late [investor], an ultra-wealthy long time client of the Madoff firm have been "co-mingled" with funds controlled by the Madoff company with gains thereon retained by Madoff.

---

[13]  The $18 to $24 million in positions were associated with the firm's own account.

In investigating this complaint, the Enforcement staff simply asked Madoff's counsel about it, and accepted the response that Madoff had never managed money for this investor. This turned out to be false. When news of Madoff's Ponzi scheme broke, it became evident not only that Madoff managed this investor's money, but also that he was actually one of Madoff's largest individual investors.

Shortly after the Madoff Enforcement investigation was effectively concluded, the staff attorney on the investigation received the highest performance rating available at the SEC, in part, for her "ability to understand and analyze the complex issues of the Madoff investigation."

Markopolos also tried again in June 2007, sending an e-mail to the Enforcement branch chief on the Madoff investigation attaching "some very troubling documents that show the Madoff fraud scheme is getting even more brazen" and noting ominously, "When Madoff finally does blow up, it's going to be spectacular, and lead to massive selling by hedge fund, fund of funds as they face investor redemptions." His e-mail was ignored.

After Madoff was forced to register as an investment adviser, the Enforcement investigation was inactive for 18 months before being officially closed in January 2008. A couple of months later, in March 2008, the Chairman's office received additional information regarding Madoff's involvement with the investor's money from the same source. The previous complaint was re-sent, and included the following information:

> It may be of interest to you to that Mr. Bernard Madoff keeps two (2) sets of records.[14] The most interesting of which is on his computer which is always on his person.

This updated complaint was forwarded to the Enforcement staff who had worked on the Madoff investigation, but immediately sent back, with a note stating, in pertinent part, "[W]e will not be pursuing the allegations in it."

As the foregoing demonstrates, despite numerous credible and detailed complaints, the SEC never properly examined or investigated Madoff's trading and never took the necessary, but basic, steps to determine if Madoff was operating a Ponzi scheme. Had these efforts been made with appropriate follow-up at any time beginning in June of 1992 until December 2008, the SEC could have uncovered the Ponzi scheme well before Madoff confessed.

---

[14] The allegation that Madoff kept two sets of records also turned out to be true.

# Results of the Investigation

I.      SEC 1992 INVESTIGATION OF AVELLINO & BIENES

A.      Customers Complained about Avellino & Bienes' Investments

In or before June 1992, the SEC was notified both verbally and in writing by two customers, Earl McClain and Sandra Bozarth, of investments that they had made with the firm of Avellino & Bienes.  Memorandum dated June 24, 1992 from the former New York Enforcement Staff Attorney to File regarding the Matter of King Arthur MNY-1490 (Former New York Enforcement Staff Attorney June 24, 1992 Memorandum) at p. 1, at Exhibit 1.  The SEC determined that the transactions with Avellino & Bienes "were set up to give the appearance of a demand note."  *Id.*  The SEC was also provided with an August 7, 1991 letter from Avellino & Bienes to a potential investor, which stated, in pertinent part, as follows:

> Avellino & Bienes invests with one particular Wall Street Broker (the same company since we first started doing business over 25 years ago) who buys and sells stocks and bonds in the name of Avellino & Bienes.  The list of securities being traded are top corporations such as IBM, AT&T, etc.  It's the mechanics being used to protect the portfolio that makes our business successful, not just the top name securities being traded.
>
> …
>
> We do not encourage new accounts and therefore we do not solicit same.  We do, however, like to accommodate those individuals, etc. that are recommended as you have been through Virginia Atherton.[15]  Summarily, this is a very private group and no financial statements, prospectuses or brochures have been printed or are available.
>
> Let me clarify one important thing.  The money that is sent to A&B is a loan to A&B who in turns invests it on behalf of A&B for which our clients receive quarterly interest payments.
>
> …

---

[15]  The SEC found that the fact that prospective investors had to be referred to Avellino & Bienes created an impression that the Avellino & Bienes' investment program was "special" and exclusive.  SEC Summary Memorandum dated November 13, 1992, at p. 7, at Exhibit 114.

> The minimum deposit is $5,000.00. … Interest rate is
> 16.0% annually.   Interest is computed quarterly.

Letter dated August 7, 1991 from Avellino & Bienes to prospective investor, at p.
1, at Exhibit 113.

The SEC also obtained a "Fact Sheet" that described the structure of the
investments with Avellino & Bienes.  King Arthur Account Fact Sheet (undated) by
Andrew Copperman,[16] (The Fact Sheet), at p. 1, at Exhibit 115.  The Fact Sheet, a two-
page document resembling a brochure, was produced by Andrew Copperman, and
answered a variety of questions about the Avellino & Bienes investment, such as the
following:

| | |
|---|---|
| What does it pay? | 13.5%.  The interest income is paid quarterly.  When the combined account size is $2 million, the rate will increase to 14%.  If you reinvest, 13.5% compounded quarterly is 14.1% annually. |
| Is it safe? | Yes. 100%.  At no time is a trade made that puts your money at risk.  In over 20 years there has never been a losing transaction. |

*          *          *

| | |
|---|---|
| How does it work? | The funds you send to Avellino & Bienes are treated as a 'loan' by them. All of these funds are send [sic] to a New York broker who invests same on behalf of Avellino & Bienes.  The underlying trades, made for the account of Avellino & Bienes are, in general, made as simultaneous purchases of convertible securities and its short sale of the common stock, locking in a profit. Other forms of riskless trading are also used.  The brokerage firm that makes these trades is a wholesale dealer that |

---

[16]  Andrew Cooperman was an investment adviser who referred over 100 investors to Avellino & Bienes
from 1989 to 1990, but after receiving a notice from the California Department of Corporations in October
1990 that he may have been acting as an unregistered broker-dealer, he ceased his referrals to Avellino &
Bienes and wrote a letter to each investor who he had referred to Avellino & Bienes indicating he would no
longer recommend or render any advice with respect to Avellino & Bienes' investments.  SEC Summary
Memorandum dated November 13, 1992, at p. 5, at Exhibit 114.

> makes the market in Big Board 250
> highest volume trading stocks.  In
> practice, the trades are handled by
> computer for speed and accuracy.

*Id.* at pgs. 1-2.

B.    SEC Contacted Avellino and Suspected that Avellino & Bienes Was
Selling Unregistered Securities and Running a Ponzi Scheme

After receiving the information from the Avellino & Bienes' customers, the then-
Acting Enforcement Branch Chief and former New York Enforcement Staff Attorney
contacted Frank Avellino.  Former New York Enforcement Staff Attorney June 24, 1992
Memorandum, at p. 1, at Exhibit 1.  Avellino stated that he borrowed "money from
friends, relatives, referrals and past clients of his CPA firm," "gave them 'demand
notes,'" and invested "the money in real estate and 'some securities.'"  *Id.*  The former
New York Enforcement Staff Attorney concluded that "it appears that Mr. Avellino and
Mr. Bines [sic] and the firm A&B have been engaged in selling securities to the public,
which are unregistered, in violation of Section 5(a) of the Securities Act of 1933."  *Id.*

The former New York Enforcement Staff Attorney stated that the SEC
investigators also initially believed that Avellino & Bienes was running a Ponzi scheme.
Former New York Enforcement Staff Attorney Interview Memorandum (May 18, 2009).
Others also recalled that the SEC was investigating Avellino & Bienes for a possible
Ponzi scheme.  Richard Walker, then-Regional Administrator of the SEC's New York
region, recalled a concern that Avellino & Bienes was engaged in a "Ponzi
scheme/fraud."  Walker Interview Tr. at p. 11.[17]  Former New York Enforcement Staff
Attorney #2, the Staff Attorney who eventually prepared the complaint brought against
Avellino & Bienes, recalled that "there was a concern that Avellino & Bienes was
operating a Ponzi scheme" that arose from "the returns that were being promised [by
Avellino & Bienes] combined with a lack of transparency about how the monies were
invested."  Former New York Enforcement Staff Attorney #2 Testimony Tr. at pgs. 11-
14.  The former Assistant Regional Administrator in charge of Investment Management
(IM) Inspection Branches in 1992, who consulted on the investigation, also recalled that
the Enforcement attorneys working on the case were concerned that Avellino & Bienes
was running a Ponzi scheme.  Former Assistant Regional Administrator Interview
Memorandum.

Assistant Director Robert Sollazzo, who oversaw the examination team, also
acknowledged concern "that there might have been a Ponzi scheme" in the Avellino &
Bienes investigation.  Sollazzo Testimony Tr. at p. 42.

---

[17]  Richard Walker also told *The Wall Street Journal* at that time that "we went into this thinking it could be
a major catastrophe."  Randall Smith, *Wall Street Mystery Features a Big Board Rival*, The Wall Street
Journal, December 16, 1992, at Exhibit 116.

    C.     Counsel for Avellino & Bienes Contacted the SEC and Avellino and
          Bienes Came in for Voluntary Joint Testimony

Shortly after the investigation began, the former New York Enforcement Staff
Attorney said he recalled, "Ike" Sorkin[18] counsel for Avellino and Bienes, "calling up
and saying, 'I represent Avellino and Bienes' and 'nothing inappropriate is going on here.
They are former IRS agents and I'll bring them in for testimony.'"  Former New York
Enforcement Staff Attorney Interview Memorandum (June 26, 2009) at p. 2.

On July 7, 1992, Frank Avellino and Michael Bienes came in for joint voluntary
testimony in which they answered the staff's questions together.  Transcript of Testimony
of Frank Avellino and Michael Bienes on July 7, 1992 (Avellino and Bienes July 7, 1992
Testimony Tr.), at Exhibit 117.  The former New York Enforcement Staff Attorney
reasoned that both Avellino and Bienes came in for testimony together because they were
represented by the same counsel.  Former New York Enforcement Staff Attorney
Interview Memorandum (June 26, 2009) at p. 2.  Ira Sorkin, Esq. and Dori Hanswirth,
Esq. of Squadron, Ellenoff, Plesent, & Lehrer represented both Frank Avellino and
Michael Bienes individually and the Avellino & Bienes partnership.  Avellino and Bienes
July 7, 1992 Testimony Tr. at p. 1, at Exhibit 117.

In the testimony, Avellino described the investment process, which he
characterized as "loans," as follows:

> I borrow money from a Mr. Smith for which I pay interest,
> the proceeds of the loan are put into my checking account.
> I now write a check from my checking account, send it to
> Bernard L. Madoff on behalf of Avellino & Bienes.  Like
> any other brokerage account, he takes the cash, gives me
> credit for it, goes out and executes whatever positions he
> has to.

*Id.* at pgs. 47-48.

Bienes described how at one time Avellino & Bienes had borrowed money from
Chemical Bank for investing, but in 1988, they paid off the loan because they "didn't
want to have to explain what [their] investment strategies were … [and] didn't want to
submit detailed, annual, personal and business financial statements."  *Id.* at pgs. 53-58.
Avellino also indicated that some investors were getting higher returns than others.  *Id.* at
p. 73.[19]

---

[18]  Ira "Ike" Sorkin currently represents Bernard L. Madoff in the criminal proceeding that arose out of
Madoff's December 2008 confession.  Madoff Interview Memorandum at p. 1.
[19]  The FTI Engagement Team noted that the fact that some investors were getting higher returns than
others could be indicative of a Ponzi scheme.

Avellino testified that Avellino & Bienes invested through Bernard L. Madoff & Co., and primarily dealt with Bernard L. Madoff. *Id.* at pgs. 37-38. Avellino indicated that they had 5 accounts with Madoff's firm. *Id.* at p. 38. Avellino stated that they solely invested money with Madoff's firm, buying securities through them. *Id.* at p. 39. Avellino testified that Madoff determined how the monies would be invested. *Id.* When asked if he ever made a business decision on what securities to purchase, Avellino replied, "Never." *Id.* at p. 40.

Avellino stated "all of the $400 million plus [that was 'loaned' to Avellino & Bienes in investments] is with Bernard L. Madoff, every single dollar, it is invested in long-term Fortune 500 securities, it is, to use the word 'protected' with hedges of Standard & Poor's index." *Id.* at p. 77.

Avellino also said the partnership of Avellino & Bienes had accounts with Madoff where Madoff makes all the investment decisions. *Id.* at pgs. 81-82. They acknowledged that in addition to the $400 million they had invested on behalf of investors, they were investing an additional $40 million of their personal partnership monies with Madoff. *Id.* at pgs. 82-85.

Avellino described his understanding of Madoff's strategy for buying securities for the Avellino & Bienes accounts, as follows:

> We sell short against the box, we use the hedges of the Standard & Poor's 500, Fortune 500…. Madoff uses the hedges basically as S&P's, puts and calls. Every security that we have in the long position has a hedge, every single one of them. We use what we call the hedge of the buying and selling, the buying of the convertible and the selling of the underlying common stock short, sometimes done the same two – sometimes done two days after the long position is bought, which we used to use years ago.

*Id.* at pgs. 40-41.

When asked if he had any input into how to employ the strategies, Avellino replied, "None at all." *Id.* at p. 41.

Avellino stated that Avellino & Bienes, [and its predecessor company] had invested with Madoff for 30 years, since 1962. *Id.* at p. 44.[20] He also stated, "I could honestly say, and you could check any record that you want with me from 1962 to today, in thousands of transactions, of which I call arbitrage [referring to Madoff's strategy], which is bona fide convertible buying and selling, there has never been a loss." *Id.* at p. 75.

---

[20] The FTI Engagement Team stated that such a long-standing relationship with no losses could raise the question as to whether Madoff may have been collaborating in a scheme with Avellino & Bienes.

The former New York Enforcement Staff Attorney stated that he did not find Avellino and Bienes' testimony altogether convincing, stating that he "didn't know if these guys were telling the truth or not," and thus, the SEC "needed to do further things" to investigate the matter. Former New York Enforcement Staff Attorney Interview Memorandum (June 26, 2009) at p. 3.

> **D.    The SEC Conducted a Brief, Limited Cause Examination of Madoff**
>
> **1.    The Examination was Conducted by a Relatively Inexperienced Team and Its Scope was Limited**

In the course of its investigation, the SEC sought and obtained documents from Avellino & Bienes, including their customer account statements for August, September and October of 1992. Memorandum dated November 16, 1992 regarding Madoff Cause Examination, (Madoff Cause Examination Report), at p. 2, at Exhibit 118. On November 16, 1992, as a "direct result" of the investigation of Avellino & Bienes, the SEC conducted a cause examination of Bernard Madoff "to verify certain security positions carried for the accounts of Avellino & Bienes." *Id.* at pgs. 1-2. The Madoff Cause Examination Report stated that the intent of the examination was "to verify [Madoff's] proper segregation, of [Avellino & Bienes'] October 1992 month end securities positions, in [Madoff's] segregated accounts at DTC." *Id.*

Branch Chief John Gentile, who had joined the SEC in 1987 as a securities compliance examiner and who had just been promoted to Branch Chief, assembled the examination team from the Broker-Dealer Enforcement group[21] for the examination. Gentile Interview Tr. at pgs. 5-6; 12. The examination team was composed of Demetrios (Taki) Vasilakis and Former Examiner #2. *Id.* at pgs. 5-6; 11-12. Vasilakis had joined the SEC right out of college and had been working as a compliance examiner for 2 years when the Madoff cause examination began. Vasilakis Interview Tr. at pgs. 4-6. Former Examiner #2 joined the SEC in June of 1990 right out of college as well and had been working with the SEC as an examiner for approximately 2 years at the time of the Madoff cause examination. Former Examiner #2 Interview Tr. at pgs. 3-4.

All the examination team members described the Madoff cause examination as brief and limited. Gentile stated it was a very brief examination and he did not recall if he ever went on site, although he believed he spoke with Bernard Madoff on the telephone. Gentile Interview Tr. at pgs. 12-13. Vasilakis stated the examination was very short, very limited and he did not believe it lasted more than two or three days. Vasilakis Interview Tr. at p. 11. Former Examiner #2 believed that it was a very limited exam and they were only at Madoff's firm for a day. *Id.* at p. 6.

Gentile did not recall being informed by the former New York Enforcement Staff Attorney that they were to look into the possibility of a Ponzi scheme, and had no

---

[21] Sollazzo explained that in the late 1980's and early 1990's, the Broker-Dealer group within the SEC had its own Enforcement group who worked closely with examiners on investigations. Sollazzo Testimony Tr. at pgs. 40-42.

recollection of working on a matter relating to a Ponzi scheme prior to that time period. Gentile Interview Tr. at pgs. 6, 15. Former Examiner #2 concurred that she did not believe they were supposed to be doing an examination relating to allegations of a Ponzi scheme. Former Examiner #2 Interview Tr. at pgs. 6-8. She also had never done a Ponzi scheme examination. *Id.* at p. 8.

> 2. A Net Capital Review was Performed and the SEC Examiners Sought DTC Records From Madoff, not from DTC directly

Vasilakis recalled conducting a net capital review to "check the financial stability of the broker-dealer" during the Madoff cause examination. Vasilakis Interview Tr. at p. 10. Gentile agreed that they were attempting to confirm representations made by Avellino & Bienes about their trading positions at Madoff. Gentile Interview Tr. at p. 17. According to the Madoff Cause Examination Report, "Madoff informed the staff that there was no activity in any of the [Avellino & Bienes] accounts in question since October 31, 1992." Madoff Cause Examination Report, at p. 2, at Exhibit 118. The Madoff Cause Examination Report further provided as follows:

> Madoff also furnished the staff with Madoff's stock record and [Depository Trust Company] DTC participant statement as of the previous days' close of business, November 12, 1992. The staff visited Madoff's firm on November 13. The staff traced all of A&B's positions to Madoff's stock record. All of the securities in A&B's accounts were listed on the November 12, 1992 stock record. The staff then traced all of Madoff's stock record positions to the DTC participant statement for November 12, 1992. The staff observed that Madoff's stock record exactly matched the participant statement. It was also noted that and all positions were segregated at DTC and not in any type of loan account.

*Id.*

According to the examination team, they would have received DTC statements from Madoff himself, rather than seeking those records directly from DTC. Gentile stated that he had no recollection of going to DTC and believed that they would have received the DTC records directly from Madoff. Gentile Interview Tr. at pgs. 17-18. Vasilakis recalled that when the SEC did examinations, it was common SEC practice to get the DTC statements from the firm, rather than directly from DTC, stating, "It would always be from the firm." Vasilakis Interview Tr. at p. 12. Former Examiner #2 noted that at that time when they would conduct a cause examination to determine whether a particular registrant's positions matched up with DTC, they would not go to DTC itself to get those records, but "would get them from the registrant." Former Examiner #2 Interview Tr. at p. 7.

Gentile stated that if Madoff provided fake DTC records,[22] "we would have relied on the fakes." Gentile Interview Tr. at p. 18. He further acknowledged that if they were real DTC records, they would tell the story of whether there was trading going on. *Id.* at pgs. 19-20.

Gentile characterized Avellino and Bienes' testimony that for a 30-yeard period there had never been a loss with respect to their investments with Madoff as "a red flag." *Id.* at p. 29. However, Gentile said in the cause examination, the focus was on whether Avellino & Bienes' positions were real, not on Bernard Madoff's positions. *Id.* at p. 24.

> 3.    The Examiners Never Looked into Where the Money That was Used to Pay Back Avellino & Bienes' Investors Came From

Gentile acknowledged that Madoff could have taken the money that was used to pay back Avellino & Bienes' investors as required by the SEC from anybody, including other customers, stating that "Absolutely could have been done." *Id.* at p. 35. He further acknowledged that in light of the evidence, someone "should have been aware of" the fact that the money used to pay back Avellino & Bienes' customers could have come from other investors, but there was no examination of where the money that was used to pay back the investors came from. *Id.* at pgs. 32-33. Gentile also did not recall the examiners attempting to independently verify Madoff's discretionary brokerage account balances for any clients other than Avellino & Bienes. *Id.* at p. 33. Therefore, Gentile stated that if Madoff had been liquidating other discretionary brokerage accounts in order to pay back Avellino & Bienes' customers, checking all of Madoff's discretionary brokerage account balances with DTC would have "showed positions being sold and cash[ed] out to a bank account that he controlled where he would then -- you can tie that into the millions of dollars paid back to the Avellino and Bienes' customers." *Id.* at p. 35. Gentile, however, admitted that no such effort was undertaken. *Id.* at pgs. 35-36.

Vasilakis also did not recall at any point in the Madoff cause examination any effort to trace where the money came from that was used to repay the investors of Avellino & Bienes. Vasilakis Interview Tr. at p. 19. Vasilakis noted that tracing the funds could have been done, and in fact, it would have been "common sense" to do that, given the allegations. *Id.* at pgs. 20-21.

Gentile also indicated that the representation made by Avellino & Bienes that they were providing an investment vehicle with no risk as stated in the King Arthur fact sheet was "a red flag for sure." Gentile Interview Tr. at p. 21. Gentile admitted the King Arthur fact sheet as a whole was "very suspicious." *Id.* However, Gentile recalled the cause examination did not look at the investment strategy and the returns "because we

---

[22] According to the August 11, 2009 SEC complaint filed against Frank DiPascali, Jr., "To address due diligence custody audits, Madoff directed DiPascali and others to create fake DTC reports" and specifically identified the Avellino & Bienes investigation as an occurrence when "Madoff scrambled to ... fabricate credible account records to corroborate the purported trading in the accounts." SEC v. Frank DiPascali, Jr., No. 09 Civ. 7085 (LLS) (S.D.N.Y. filed August 11, 2009) at ¶¶ 18-20, 60, at Exhibit 119.

were so focused on identifying the scope of the fraud, the investors, the dollars, where the assets custody" and the decision was made to "close this down and get the investors their money back." *Id.* at p. 29.

Vasilakis stated that other than this brief, limited examination of Madoff, he did not recall any other examination of Madoff or any other entity in connection with the Avellino & Bienes matter. Vasilakis Interview Tr. at p. 15. Vasilakis stated that he did not recall any discussion about the need to do a follow-up examination of Madoff that would focus on Madoff and not just his connection to Avellino & Bienes. *Id.* at p. 16.

4.      The Examiners Were Aware of Madoff's Stature

Gentile and Vasilakis became aware of Bernard Madoff's stature in the securities industry during the examination. Gentile stated that he was aware that Madoff's firm "was very prominent in developing third market particular automated trading." Gentile Interview Tr. at p. 10. Vasilakis stated he was made aware that Bernard Madoff served on various industry committees, was a well respected individual and noted that the SEC examiners used an NASD manual with Bernard Madoff's name in it. Vasilakis Interview Tr. at p. 27. In fact, when asked for his recollections of Bernard Madoff at that time, Vasilakis stated as follows:

> My personal conclusions [from the examination] were that [Bernard Madoff] was a pioneer in the industry, to use the term that's been thrown around now, but that he really used, you know, technology to bring trading to the next level. It was strictly -- when I walked out of there it was more along the lines of wow, this guy is a third market guy that does X percent of the volume on the exchange. This is where I actually learned about third market. I didn't even know the so called term that that's what it was called [prior to the examination].

*Id.* at p. 17.

Gentile stated that it was fair to say that because of Bernard Madoff's reputation at that time as a large broker-dealer, there may not have been any thought to look into Madoff's operation any further. Gentile Interview Tr. at p. 37.

E.      The SEC Filed a Complaint against Avellino & Bienes for Selling Unregistered Securities, But the Complaint Did Not Allege Fraud and Did Not Assert Any Claims Against Madoff.

On November 17, 1992, the SEC filed a Complaint for Preliminary and Permanent Injunctive and other Equitable Relief against defendants Avellino & Bienes, Avellino and Bienes in the United States District for the Southern District of New York, alleging that from 1962 until at least July 1992, the defendants had accepted funds for

investments from customers, and guaranteed those customers rates of returns ranging from 13.5% to 20%. Complaint for Preliminary and Permanent Injunctive and Other Equitable Relief dated November 17, 1992 in Case no. 92 Civ. 8314, at ¶ 1, at Exhibit 120. The Complaint further alleged that the defendants issued notes in return for the funds received by customers and invested those customer funds in securities. *Id.* The Complaint charged the defendants with operating Avellino & Bienes as an unregistered investment company and engaging in the unlawful sale of unregistered securities. *Id.*[23]

The Complaint further specified that the defendants invested the customer funds in discretionary trading accounts at a registered broker-dealer and the broker-dealer managed the accounts, determining which securities to buy and sell, although the Complaint did not name the broker-dealer as Bernard Madoff's firm and did not assert any allegations or claims against Madoff's firm, as the broker-dealer. *Id.* at ¶ 4. The Complaint also did not charge the defendants with fraud or give any indication that they were suspected of running a Ponzi scheme. *See generally id.*

The Complaint requested that the Court enter an order preliminarily and permanently enjoining the defendants from selling securities without a registration statement, making offers to sell or buy securities without a registration statement, and from acting as an investment adviser in violation of applicable law. *Id.* at pgs. 10-12. The Complaint also requested an order appointing a trustee to conduct an accounting of Avellino & Bienes' assets and liabilities, to direct the dissolution of Avellino & Bienes, to dispose of Avellino & Bienes' assets, return all investors' funds to the investors as well as orders directing the defendants to disgorge all unjust enrichment, and pay civil penalties. *Id.* at pgs. 12-13.

On November 18, 1992, upon submission by the SEC, the United States District Court for the Southern District of New York issued an Order of Preliminary Injunction and Other Equitable Relief on Consent which preliminarily enjoined the defendants from selling securities without a registration statement, making offers to sell or buy securities without a registration statement, and from acting as an investment adviser in violation of applicable law. Order of Preliminary Injunction and Other Equitable Relief on Consent dated November 18, 1992 in Case no. 92 Civ. 8314 (Preliminary Injunction Order), at pgs. I-III, at Exhibit 121. The Preliminary Injunction Order also ordered that Lee S. Richards, of the law firm of Richards Spears Kibbe & Orbe, be appointed Trustee for the purpose of taking control over the undistributed proceeds resulting from the liquidation of all brokerage accounts belonging to Avellino & Bienes, distributing the undistributed proceeds of the liquidation of Avellino & Bienes' brokerage accounts, reviewing the entire distribution of the proceeds of the liquidation of Avellino & Bienes' brokerage accounts in order to repay of all Avellino & Bienes' noteholders, overseeing an audit of Avellino & Bienes' financial statements from 1984 through November 1992, confirming the identity of Avellino & Bienes' current noteholders and the amounts invested, and

---

[23] According to the SEC's Summary Memorandum dated November 13, 1992, the SEC was alleging that Avellino & Bienes offered and sold securities to more than 1,000 individuals, raising in excess of $441 million, none of which were registered with the Commission. SEC Summary Memorandum dated November 13, 1992, at pgs. 10-11, at Exhibit 114.

reporting back to the Court, the SEC, and counsel to Avellino & Bienes.  *Id.* at pgs. 4-5.
All three defendants, Avellino & Bienes, Frank Avellino, and Michael Bienes separately
consented to the Order of Preliminary Injunction and waived any rights to challenge or
appeal the Order.  Consents of Avellino & Bienes, Frank Avellino, and Michael Bienes
dated November 17, 1992, at Exhibit 122.

Former New York Enforcement Staff Attorney #2 was assigned as the staff
attorney for the Avellino & Bienes matter after the investigation had been concluded and
the litigation was commenced.  Former New York Enforcement Staff Attorney #2
Testimony Tr. at pgs. 11-12.  Former New York Enforcement Staff Attorney #2 had been
with the Commission for only eight weeks when she was assigned to the Avellino &
Bienes case and had no prior experience in investigating or litigating any matter
involving a Ponzi scheme.  *Id.* at pgs. 16-17.

Former New York Enforcement Staff Attorney #2 recalled that "there was a
concern that Avellino and Bienes was operating a Ponzi scheme" that arose from "the
returns that were being promised [by Avellino & Bienes] combined with a lack of
transparency about how the monies were invested."  *Id.* at pgs. 13-14.  Former New York
Enforcement Staff Attorney #2 stated that by the time she was brought into the Avellino
& Bienes matter, it had been decided not to charge Avellino & Bienes with fraud, but
merely to charge them for selling unregistered securities.  *Id.* at p. 18.  She noted that it
was "unusual" that the SEC "would just be bringing a case solely on claims of not being
registered and that there was not a corollary fraud component," but she understood that
her superiors "were of the view that they had not found any fraud."  *Id.* at p. 20.

The former New York Enforcement Staff Attorney, who had joined the SEC right
out of law school two years earlier and worked as a staff attorney until 1992,[24] recalled
that in the investigation, they found that there was more money at the broker-dealer than
was owed to the investors.  Former New York Enforcement Staff Attorney Interview
Memorandum (June 26, 2009) at p. 2.  He indicated that if it was the other way around,
then they would have been more concerned that it was a Ponzi scheme.  *Id.* at p. 2.  The
former New York Enforcement Staff Attorney said the focus of the action was to stop
Avellino and Bienes from acting as unregistered investment advisers, but did not
specifically recall why Avellino & Bienes was not charged with fraud.  *Id.* at p. 3.

Former New York Enforcement Staff Attorney #2 acknowledged that she was
aware that Avellino and Bienes were stating that all the investment decisions were made
by Madoff.  Former New York Enforcement Staff Attorney #2 Testimony Tr. at p. 35.
However, former New York Enforcement Staff Attorney #2 stated that given that Madoff
was not "a defendant or a relief defendant" in the litigation, the particular focus in the
case was on Avellino & Bienes, not Madoff.  *Id.* at pgs. 36-37.  Former New York

---

[24]  Although the former Enforcement Assistant Regional Director was assigned to the Avellino and Bienes
matter and the former New York Enforcement Staff Attorney recalled she was "heavily involved as his
supervisor," she had no recollection of any substantive involvement in the case.  Former Enforcement
Assistant Regional Director Interview Memorandum; Former New York Enforcement Staff Attorney
Interview Memorandum (June 26, 2009) at p. 3.

52

Enforcement Staff Attorney #2 said "when Madoff was approached about liquidating the investments and returning the funds, that he was able to do so" and that "he was able indeed to liquidate the investments and get the cash available within a very short period of time … which would suggest that the money was where we would expect it to be." *Id.* at p. 39. Former New York Enforcement Staff Attorney #2 stated she did not recall any discussions at all that Madoff may have been running a Ponzi scheme. *Id.* at p. 39. She also said she was not aware of any analysis undertaken to determine how Madoff was able to achieve the returns he was promising for Avellino & Bienes' clients, although she acknowledged remembering that Avellino & Bienes had maintained that they never had a loss with their investments. *Id.* at pgs. 40, 42. Former New York Enforcement Staff Attorney specifically recalled, "There was no focus on Madoff in this investigation at all." *Id.* at p. 4.

F.    The Trustee Retained Price Waterhouse to Conduct an Audit of Avellino
      & Bienes' Financial Statements and Conducted Discovery But Its
      Jurisdiction was Limited

Immediately after the Preliminary Injunction Order, Lee Richards[25] retained Price Waterhouse to conduct an audit of Avellino & Bienes' financial statements from 1984 until November 1992, and express an opinion confirming the identity of all noteholders in Avellino & Bienes' notes and the amount of principal and accrued interest owed to each noteholder. Richards Interview Tr. at p. 11; Affidavit of Frederick M. Werblow, Partner at Price Waterhouse sworn to on January 15, 1993, at ¶ 1, at Exhibit 123.

On November 20, 1992, Linda Imes, Esq., of Richards Spears Kibee & Orbe, attorneys for the Trustee, took the sworn deposition of Frank Avellino. Transcript of Deposition of Frank Avellino on November 20, 1992, at Exhibit 124. Avellino testified in the deposition that the business of Avellino & Bienes was to invest in marketable securities through a brokerage house in New York named Bernard L. Madoff. *Id.* at pgs. 4-5. Avellino stated that a distribution was made from proceeds that were received from Bernard L. Madoff, upon liquidation of certain securities and earmarked for distribution in the amount of $113 million. *Id.* at pgs. 5-7. In the deposition, Imes stated that she obtained some documents from Madoff's office which were purported to be current statements for the various accounts held there and Avellino indicated that those were all the accounts of Avellino & Bienes held at Madoff. *Id.* at pgs. 20-23. Avellino identified personal accounts he and Bienes' wife had with Madoff, and Avellino confirmed that there were no other accounts at Madoff and that the funds in those accounts had been frozen. *Id.* at pgs. 23-24. In a continuation of Avellino's deposition that was held on November 24, 1992, Avellino identified another entity called Telfran Associates, which took money from individuals and gave the funds to Avellino & Bienes, which then in turn invested those funds with Madoff. Transcript of Continued Deposition of Frank Avellino on November 24, 1992, at pgs. 67-68, at Exhibit 125. Avellino provided Imes with

---

[25] Lee Richards served as Receiver and Trustee in the liquidation of Bernard L. Madoff Investment Securities, LLC after the December 2008 confession of Madoff for a period of time. Richards Interview Tr. at p. 22.

specific information concerning the principals of Telfran Associates[26] and their arrangement with Avellino & Bienes.  *Id.* at pgs.  68-76.

Although the trustee was conducting discovery and Price Waterhouse was examining Avellino & Bienes, their jurisdiction was limited.  Lee Richards understood the concern in the Avellino & Bienes litigation to be that "they were acting as unregistered investment advisers" and stated that he did not recall being informed that there was a concern about Avellino & Bienes running a Ponzi scheme.  Richards Interview Tr. at pgs. 5-6.  Lee Richards said he understood that the firm of Avellino & Bienes was being liquidated because "they had operated as an investment adviser without the proper licensing."  *Id.* at p. 7.  Lee Richards recalled that Avellino & Bienes "were achieving a fairly high rate of return for their investors," but he did not "recall anyone expressing concerns that they were fraudulent returns."  *Id.* at pgs. 7-8.  Lee Richards stated that he did not believe it was his role to look at whether Madoff could have misappropriated other customer funds in order to provide the capital needed to pay back the investors of Avellino & Bienes.  *Id.* at pgs. 10-11.  Lee Richards indicated that he was hired for the particular purpose of liquidating the accounts and ensuring that the investors were repaid.  *Id.* at p. 11.  He stated that he did not remember at any point in time anyone from the SEC suggesting that there was going to be an investigation of Bernard Madoff, and he did not remember ever talking with anyone at Price Waterhouse about the possibility of fraud at Madoff Securities.  *Id.* at pgs. 20-21.

Lee Richards noted that:

> [The trustee's] responsibility would be to independently verify account balances on the records of Madoff, but not to independently verify that the securities that Madoff were reporting actually existed.  In other words, we'd go as far as Madoff records, and as long as they were consistent with what we thought investors of Avellino and Bienes were owed and indeed we got the money and securities, then I think it would be my judgment and Price Waterhouse's judgment that we had done our job.

*Id.* at pgs. 17-18.  He reiterated as follows: "I don't recall that we investigated Madoff Securities in any way."  *Id.* at p. 9.

---

[26]  After obtaining this information, on November 25, 1992, the SEC brought a second, nearly identical action to the one brought against Avellino & Bienes, against Telfran Associates and its principals, Steven Mendelow and Edward Glantz, obtaining injunctive relief upon consent, and having a trustee appointed to oversee the liquidation of Telfran Associates's assets as well.  Complaint for Preliminary and Permanent Injunctive Relief and Other Equitable Relief; Order of Preliminary Injunction and Other Equitable Relief on Consent both dated November 25, 1992 in Case no. 92 Civ. 8564, at Exhibit 126.

G.    Price Waterhouse Experienced Great Difficulties in Conducting its Audit
of Avellino & Bienes' Financial Statements and a Request was made to
the Presiding Judge for Additional Time

In December 1992, Price Waterhouse reported back to Lee Richards and the SEC
that they were unable to perform the function that they were directed to perform because
of the lack of records maintained by Avellino & Bienes and their refusal to cooperate
with the audit.  Letter dated January 21, 1993 from Price Waterhouse to Lee Richards,
Trustee (Price Waterhouse Letter dated January 21, 1993), at p. 2, at Exhibit 127.
Although Price Waterhouse was directed in the Preliminary Injunction Order to audit
Avellino & Bienes' financial statements from the period of 1984 through November
1992, Price Waterhouse found that Avellino & Bienes had not prepared financial
statements for the period of 1984 through December 31, 1988, and the underlying
accounting records of Avellino & Bienes for that period of time were not available.  *Id.*
Because of this finding, it was agreed by the SEC, the Trustee and Price Waterhouse that
Price Waterhouse would limit its audit of Avellino & Bienes' financial statements to the
period of January 1, 1989 through November 16, 1992.  *Id.*

However, after Price Waterhouse performed substantial work to attempt to obtain
the information to conduct an audit of Avellino & Bienes' financial statements for that
limited period, including making requests for additional documentation from Frank
Avellino, Price Waterhouse reported that Frank Avellino "refus[ed] to prepare financial
statements," refused to provide requested documentation, and sent a letter to Price
Waterhouse instructing them that they "should 'not direct any further questions to a
[representative of an outside computer service bureau],'" which had maintained the
Avellino & Bienes' noteholders' ledger.  *Id.* at Exhibit A to Price Waterhouse Letter
dated January 21, 1993 at p. 10, at Exhibit 127.  Consequently, Price Waterhouse
indicated that it would be unable to render an opinion or audit Avellino & Bienes'
financial statements even for the limited period of January 1, 1989 through November
1992.  Price Waterhouse Letter dated January 21, 1993 at pgs. 2,5, at Exhibit 127.

On January 19, 1993, Lee Richards appeared before the Presiding Judge in the
Avellino & Bienes matter, the Honorable John E. Sprizzo, together with representatives
of the SEC and Ike Sorkin on behalf of Avellino & Bienes, requesting an additional
month for Price Waterhouse to complete its audit of Avellino & Bienes' financial
statements because of the absence of records necessary to render an opinion.  Transcript
of Court Conference in <u>SEC v. Avellino & Bienes, Avellino and Bienes</u>, 92 Civ. 8314
(January 19, 1993) at pgs. 2-3, 11-12, at Exhibit 128.  Sorkin "vehemently oppose[d]" the
request for additional time, noting that his clients have had their assets frozen during the
period of Price Waterhouse's audit.  *Id.* at p. 4.  Lee Richards and the former
Enforcement Assistant Regional Director, on behalf of the SEC, explained that the delay
was caused by the absence of documents that should have been provided by Avellino &
Bienes and that without those documents and the extension of time, Price Waterhouse
would not be able to render an opinion.  *Id.* at pgs. 13, 16-17.  Judge Sprizzo denied the
request for additional time, granting an extension of only 5 days, until January 24, 1993
for Price Waterhouse to complete the audit, and indicated that he would reconsider the

request if they could show evidence that Avellino & Bienes willfully obstructed Price Waterhouse's audit. *Id.* at p. 17.[27]

H.      After the Request for Additional Time was Denied, Price Waterhouse Issued its Report But was Unable to Render an Opinion on Avellino & Bienes' Financial Statements

On January 21, 1993, Price Waterhouse issued its final report to Lee Richards as Trustee, concluding that they were unable to render any opinion on Avellino & Bienes' financial statements because of the lack of records and cooperation from Avellino & Bienes. Price Waterhouse Letter dated January 21, 1993, at p. 2, at Exhibit 127. Price Waterhouse's report noted that even during the period from January 1989 until November 16, 1992, "records critical to the performance of an audit which one would expect a company that invested and borrowed over $400 million to have (such as security legers, security purchase and sales journals, monthly reconciliations of securities brokerage transactions and positions and investor/noteholder balances to Partnership records) were not maintained." *Id.* Price Waterhouse's report stated that when Frank Avellino was asked about the preparation of financial statements, he responded as follows: "My experience has taught me to not commit any figures to scrutiny when, as in this case, it can be construed as (bible) and subject to criticism." *Id.* at Exhibit A to Price Waterhouse Letter dated January 21, 1993 at p. 10 at Exhibit 127. Ira Sorkin, counsel for Avellino & Bienes, admitted later in an April 21, 1993 hearing on an objection to Price Waterhouse's fees, that Price Waterhouse "were auditing phantom books." Transcript of Hearing Before Hon. John E. Sprizzo in SEC v. Avellino & Bienes, Avellino and Bienes, 92 Civ. 8314 (April 21, 1993), at p. 7, at Exhibit 129.

Price Waterhouse's report did detail the distribution of over $329 million to Avellino & Bienes' noteholders, which included the review of noteholders' files, the confirmation of noteholders' addresses, and the arrangements for distribution of funds by federal express and wire transfer. Price Waterhouse Letter dated January 21, 1993, at Exhibit A at pgs. 1-6, at Exhibit 127.

Lee Richards recalled that he and Price Waterhouse "were frustrated by some lack of recordkeeping" and remembered generally that Price Waterhouse had difficulties during the audit with respect to books and records being missing and Avellino & Bienes not having financial statements. Richards Interview Tr. at pgs. 12-13. Lee Richards stated "not only were [Avellino & Bienes] not properly licensed, but they were not running the kind of operation that they should have been, notwithstanding the fact that the money seemed to be there and the securities seemed to be there." *Id.* at p. 16.

The former New York Enforcement Staff Attorney recalled that Price Waterhouse could not complete the audit and they "requested going back and doing the procedures or doing the books and records." Former New York Enforcement Staff Attorney Interview Memorandum (June 26, 2009) at p. 3. However, the former New York Enforcement

---

[27] The OIG has located no evidence that any such request to reconsider Judge Sprizzo's opinion was ever made.

Staff Attorney stated that "the Receiver/Trustee told us he got all the money, there was money left over," and he believed there were "no unresolved issues" in the case. *Id.* at p. 4.

Former New York Enforcement Staff Attorney #2 also recalled that Price Waterhouse was "unable to render an opinion as to certain parts of what they were looking at" in their role as trustee. Former New York Enforcement Staff Attorney #2 Testimony Tr. at p. 27. She said she remembered that those involved in the litigation "did think it was odd or curious that [Avellino and Bienes] had a lack of records, particularly for an accounting firm." *Id.* at. p. 28. When asked if given the difficulties that Price Waterhouse had with respect to rendering an opinion and in light of the lack of records on the part of Avellino & Bienes, whether there was any discussion about conducting further investigation, former New York Enforcement Staff Attorney #2 indicated that there was no such discussion since the focus of the action against Avellino & Bienes was to prevent them from continuing to sell unregistered securities or operating an unregistered investment company, and to have a comfort level that monies were returned to the investors who invested it with Avellino & Bienes. *Id.*

I.     The SEC Conducted Limited Discovery About Madoff But Avellino & Bienes Objected Aggressively and it is Unclear if the SEC Obtained any Relevant Information

In or before April 1993, the SEC conducted limited discovery in the Avellino & Bienes action, submitting a first set of interrogatories and requests for documents.[28] In the SEC's Interrogatories, interrogatory no. 3 requested as follows:

> The name and address of the registered broker dealer who managed the discretionary trading account, the name and account number of each discretionary account, the name of the account in which each investors' monies were held, and the individual at the broker-dealer who managed or directed the trading or investment of the monies in those accounts.

Defendants' Response to Plaintiff's First Set of Interrogatories and Request for Documents dated May 3, 1993, at p. 4, at Exhibit 131.

In the defendants' response to the SEC's interrogatory no. 3, submitted on May 4, 1993, defendants objected to the interrogatory on the grounds that it was "unduly burdensome, inconvenient and expensive to answer," and that the documentation needed to answer the interrogatory had already been made available to the SEC and the SEC had ample opportunity to obtain it. *Id.* Defendants' response did indicate that the documentation would be made available to the SEC. *Id.*

---

[28]  Defendants also submitted a first set of interrogatories and first request for the production of documents to the SEC on March 15, 1993 seeking responses by April 19, 1993. Defendant's First Request for the Production of Documents dated March 15, 1993 and Plaintiff's Response to Defendants' First Set of Interrogatories dated April 19, 1993, collectively at Exhibit 130.

In the SEC's request for documents, document request no. 5 sought "[a]ll documents relating to the broker-dealer," and document request no. 14 sought "[a]ll documents provided to [Avellino & Bienes] from the broker-dealer for the years 1962 to the present, inclusive." *Id.* at pgs. 13, 16. In defendants' responses to both of these requests for documents, defendants stated "[T]he documents responsive to the request currently within the custody and control of defendants are available for copying and inspection in Fort Lauderdale, Florida." *Id.*

None of the attorneys interviewed by the OIG recalled whether the SEC eventually received the information and documents concerning Bernard Madoff that it requested in discovery. However, with respect to discovery, former New York Enforcement Staff Attorney #2 stated that "this was a fairly contentious litigation, that, you know, defense counsel was very aggressive." Former New York Enforcement Staff Attorney #2 Testimony Tr. at p. 34. She did not recall if she "ultimately got the information [she] needed," but indicated that there were lots of objections to discovery requests and these many objections were "indicative of the tone in this litigation which was, you know, contentious." *Id.*

In an April 21, 1993 hearing before Judge Sprizzo relating to an objection from Avellino & Bienes to Price Waterhouse's fees, Ira Sorkin, counsel for Avellino & Bienes, acknowledged to Judge Sprizzo that Avellino & Bienes was able to avoid other remedies that would have resulted in additional discovery had they not consented to the audit. Transcript of Hearing Before Hon. John E. Sprizzo in SEC v. Avellino & Bienes, April 21, 1993, at p. 139, at Exhibit 129.[29]

J.    A Final Judgment of Permanent Injunction was Entered on Consent Against the Defendants, Penalties were Assessed and the Investigation was Closed

On June 4, 1993, defendants Frank Avellino and Michael Bienes consented to the Terms of a Final Judgment of Permanent Injunction and Other Equitable Relief, and on September 7, 1993, the Final Judgment was filed with the United States District Court for the Southern District of New York. Final Judgment of Permanent Injunction and Other Equitable Relief by Consent Against Avellino & Bienes, Frank J. Avellino, and Michael S. Bienes filed on September 7, 1993 in Case no. 92 Civ. 8314 (Final Judgment), at Exhibit 132. The Final Judgment ordered that the defendants be permanently enjoined from selling any securities without a registration statement, making offers to sell or buy securities without a registration statement, and acting as an investment company in violation of the Investment Company Act of 1940. *Id.* at pgs. 2-5. The Final Judgment

---

[29] Judge Sprizzo also indicated in the same hearing that he did not believe Avellino's testimony on the fee issues, stating, "I don't believe your client. I heard his testimony, I saw his demeanor, I heard his inconsistencies on direct and cross. I noted the inconsistency in the position he took in the letter and the position he took on trial. I don't believe him. So, to the extent there are credibility issues to resolve, I resolve them against your client." Transcript of Hearing Before Hon. John E. Sprizzo in SEC v. Avellino & Bienes, April 21, 1993, at p. 147, at Exhibit 129.

also ordered the defendants to pay a civil penalty in the amount of $250,000 for Avellino & Bienes, and $50,000 each for Frank Avellino and Michael Bienes within 10 business days of the entry of the Final Judgment. *Id.*

Because the Trustee arranged for Avellino & Bienes' customers to be refunded the funds they invested and penalties were assessed against the defendants, the SEC considered the result of the litigation to be a satisfactory one. The former New York Enforcement Staff Attorney stated that after the permanent injunction, everybody got their money back and "we were quite satisfied this was a very good result." Former New York Enforcement Staff Attorney Interview Memorandum (June 26, 2009) at p. 4. He stated that the Receiver/Trustee told us he got all the money, that there was money left over, and he believed there were "no unresolved issues" in the case. *Id.* at p. 4. The former New York Enforcement Staff Attorney recalled that the civil penalties imposed on Avellino & Bienes "were the highest penalties" ever imposed by the SEC at that time. *Id.* at p. 4.

Former New York Enforcement Staff Attorney #2 understood that the Avellino & Bienes litigation ended when "both defendants in the firm were permanently enjoined from the sale of unregistered securities and acting as an unregistered investment company and they had to pay fines" as well as the money having been returned through the trustee to the investors. Former New York Enforcement Staff Attorney #2 Testimony Tr. at p. 49.

On March 23, 1994, the former New York Enforcement Staff Attorney completed an SEC form to formally close the Avellino & Bienes investigation and it was approved by his supervisors on March 30, 1994. SEC Form 19A for Enforcement File Number NY-6066, "In the Matter of King Arthur" dated March 30, 1994 (closing report), at Exhibit 133. The closing report stated that the SEC alleged that Avellino & Bienes, Frank Avellino, and Michael Bienes operated as an unregistered investment company by selling unregistered securities in the form of demand notes. *Id.* at p. 3. The closing report further stated that on November 17, 1992, the U.S. District Court, SDNY, issued an Order of Preliminary Injunction and Other Equitable Relief on Consent which preliminarily enjoined the Defendants from engaging in further violations of the above provisions of the federal securities laws. *Id.* The closing report provided that the appointed Trustee redeemed all of the notes held by A&B and the appointed auditors uncovered no fraud. *Id.* The closing report indicated that, on September 7, 1993, the Defendants were permanently enjoined, by consent, from further securities law violations and ordered to pay $50,000 each individually and $250,000 from their partnership and confirmed that these penalties were paid. *Id.*

K.      Conclusion

In connection with its investigation of Avellino & Bienes in 1992, according to FTI, there were several red flags that should have triggered a wide-ranging investigation of the existence of a Ponzi scheme on the part of Avellino & Bienes and potentially Bernard Madoff. For example, Avellino & Bienes was offering "100%" safe

investments, which they characterized as loans, with high and extremely consistent rates of return over significant periods of time. Not everyone could invest with Avellino & Bienes, as this was a "special" and exclusive club and some even more special investors were getting higher returns than others.

As the SEC began investigating the matter, they learned that all of Avellino & Bienes' investments were conducted entirely through Madoff and according to Avellino, Madoff had achieved these consistent returns for them for numerous years without a single loss. According to FTI, such a long-standing relationship with no losses could raise the question as to whether or not Madoff might be collaborating in a scheme with Avellino & Bienes. Although the SEC suspected and purported to investigate Avellino & Bienes for running a Ponzi scheme, they seemed not to have considered the possibility that Madoff could have taken the money that was used to pay back Avellino & Bienes' customers from other clients for which Madoff may have had held discretionary brokerage accounts. While the SEC's relatively inexperienced examination team conducted a brief and very limited examination of Madoff, they made no effort to trace where the money that was used to repay Avellino & Bienes' investors came from, and relied upon DTC records from Madoff rather than going to DTC itself to verify if trading occurred. The Branch Chief on the examination team acknowledged that this was an area that was missed and should have been followed-up on. There is evidence that the examination team was well aware of Madoff's reputation and that this may have factored into their decision not to scrutinize Madoff's operation more carefully.

The SEC's investigative team, which was also relatively inexperienced, brought an action against Avellino & Bienes for selling unregistered securities, not fraud, and did not take further steps to inquire into Madoff's firm. The SEC lawyers working on the matter were aware of the questionable returns and the fact that all the investment decisions were made by Madoff, but the focus of the investigation was limited to whether Avellino & Bienes was selling unregistered securities or operating an unregistered investment firm. A trustee and accounting firm were retained to ensure full distribution of the assets but its jurisdiction was limited and they did not take any action to independently verify account balances and transaction activity included on the financial and accounting records of Madoff. Even after Price Waterhouse was unable to audit Avellino & Bienes' financial statements and uncovered additional red flags, such as Avellino & Bienes' failure to produce financial statements or have the records one would have expected from such a large operation, no further efforts were made to delve more deeply into either Avellino & Bienes' or Madoff's operations.

The former SEC Regional Administrator in 1992 for Northeast Region, Edward Nordlinger, acknowledged that given the circumstances, he did not believe that merely locating the funds would be sufficient to determining whether a Ponzi scheme had occurred, and that more evidence would have been necessary to investigate that matter. Nordlinger Interview Memorandum.

The FTI Engagement Team concluded that while the SEC did take appropriate steps to ensure that the funds were repaid and that Avellino & Bienes were barred from

further selling of unregistered securities and assessed significant penalties, no investigative actions taken to determine if the funds that Avellino & Bienes arranged to have repaid were taken from other customers as part of a larger Ponzi scheme engineered by Bernard Madoff. Thus, assuming that Bernard Madoff was running his Ponzi scheme in 1992,[30] the SEC missed an excellent opportunity to uncover this scheme by not undertaking a more thorough and comprehensive investigation.

## II.   SEC REVIEW OF 2000 AND 2001 MARKOPOLOS COMPLAINTS

### A.   Markopolos Approached the SEC's Boston Office in May 2000 with Evidence that Madoff was Operating a Ponzi Scheme

#### 1.   The 2000 Submission

In May 2000, Harry Markopolos made an eight-page submission (the "2000 submission") to the Boston District Office (BDO)[31] questioning the legitimacy of Madoff's reported returns. 2000 submission, at Exhibit 134. The 2000 submission posited the following two explanations for Madoff's unusually consistent returns: (1) that "[t]he returns are real, but they are coming from some process other than the one being advertised, in which case an investigation is in order;" or (2) "[t]he entire fund is nothing more than a Ponzi Scheme." *Id.* at p. MARK 0005. S*ee also* Markopolos Testimony Tr. at pgs. 16-17. At that time, Markopolos considered either scenario equally likely, but in either case he was certain that "something illegal was going on there." *Id.* at p. 17.

The 2000 submission explained that the magnitude and consistency of Madoff's returns, as well as the secrecy of Madoff's operations, suggested that Madoff was not operating legally. 2000 submission, at Exhibit 134. Specifically, the submission stated that Madoff's returns were unachievable using the trading strategy he claimed to

---

[30] In his sworn allocution given on March 12, 2009 as part of his guilty plea, Madoff stated that his fraud began in the early 1990's. Transcript of March 12, 2009 Allocution in the Matter entitled U.S. v. Madoff, Case No. 09 CR 213, U.S. District Court for the Southern District of New York (March 12, 2009 Allocution Testimony Tr.), at p. 25, at Exhibit 375. In an interview Madoff gave to the OIG, he denied that he had been operating a Ponzi scheme in 1992. Madoff Interview Memorandum at pgs. 7-8. However, according to the August 11, 2009 SEC complaint filed against Frank DiPascali, Jr., Madoff and DiPascali "fabricate[d] credible account records to corroborate the purported trading in the [Avellino & Bienes] accounts." SEC v. Frank DiPascali, Jr., No. 09 Civ. 7085 (LLS) (S.D.N.Y. filed August 11, 2009) at ¶¶ 18-20, at Exhibit 119.

[31] The Boston office of the SEC was elevated to a Regional Office on April 2, 2007. Since then, the Boston office has reported directly to the SEC's Home Office in Washington, DC. In 2000, the Boston office was a District Office that reported to the SEC Northeast Regional Office (NERO) in New York.

employ.[32]  *Id.* at p. MARK 0009; Markopolos Testimony Tr. at p. 16.  As Markopolos explained:

> Madoff claim[ed] to provide 80% of the market's return with only 1/3[rd] of the risk.  Madoff's number of losing months seems beyond the bounds of what is reasonable for such a strategy.

2000 submission at p. MARK 0007, at Exhibit 134.

In his testimony, Markopolos explained that if Madoff was using the trading strategy he claimed, Madoff's returns compared to the performance of the S&P 500 should have had "a correlation coefficient between 30 percent similarity and 60 percent similarity … hover[ing] around 50 percent similarity …"  Markopolos Testimony Tr. at p. 20.  However, Markopolos noted that there was only a six percent correlation between Madoff's returns and the S&P 500, which Markopolos considered "outside the bounds of rationality."  *Id.*; 2000 submission at p. MARK 0006, at Exhibit 134.  Markopolos elaborated on the reasons Madoff's claimed returns could not be real as follows:

> Only 3 down months vs. the market's down 26 months during the 87 month time period presented.… The Madoff hedge fund returns are inconsistent with a publicly traded mutual fund using a similar stated return methodology.

2000 submission at p. MARK 0007, at Exhibit 134.

The 2000 submission also compared the amount of money Madoff was thought to manage at the time, $3 billion to $7 billion, with the open option positions on the Chicago Board Options Exchange (CBOE), and concluded that the "hedging cannot be taking place as described. … [I]f only $3 billion are allocated to this strategy, then there still aren't enough options in open interest for this type of hedging to occur, since Madoff would be at least 1/3 of the open interest, and we know that's not the case."  *Id.* at p. MARK 0006.

---

[32]  Madoff's purported split-strike conversion investment strategy was described in a May 2001 *Barron's* article as follows:

> Madoff invests primarily in the largest stocks in the S&P 100 index – names like General Electric, Intel and Coca-Cola.  At the same time, he buys and sells options against those stocks.  For example, Madoff might purchase shares of GE and sell a call option on a comparable number of shares – that is, an option to buy the shares at a fixed price at a future date.  At the same time, he would buy a put option on the stock, which gives him the right to sell shares at a fixed price at a future date.

Erin Arvedlund, *Don't Ask, Don't Tell*, Barron's, May 7, 2001, at p. 2, at Exhibit 135.

Markopolos also identified in his 2000 submission other troubling indications that Madoff was operating a Ponzi scheme such as the following:

> **Madoff has perfect market-timing ability:**  One investor told me that Madoff went 100% to cash in July 1998 and December 1999, ahead of market declines.  He told me that he knows this because Madoff faxes his trade tickets to his firm and the custodial bank.  However, Madoff also owns the [broker-dealer] that generates the trade tickets, so that collusion between Madoff's [broker-dealer] and Madoff's hedge fund could take place.

> **Madoff does not allow outside performance audits:**  One London based fund of funds representing Arab money, during the due diligence process, asked to send in a team of Big Six accountants to verify performance.  They were told no, that only Madoff's brother is allowed to audit performance for reasons of secrecy.  Amazingly, this London based fund of funds invested over $200 million of their Arab client's money anyway, because the low volatility of returns was so attractive.

> …

> Combining the discrepancies I've noted in Exhibit 1, with the hearsay I've heard, seems to fit in with the patterns commonly found in Ponzi Schemes.  Having a broker/dealer subsidiary that is also an [Electronic Communication Network], which is then able to generate false trading tickets would also be a huge advantage.  Not allowing external auditors in to verify performance would also be something a Ponzi Scheme operator would do.

*Id.* at p. MARK 0009 (emphasis in original).

> 2.    Markopolos Met with Grant Ward, a Senior SEC Enforcement Official

Sometime shortly after Markopolos sent the 2000 submission to the SEC, he met with Ed Manion, Staff Accountant, and Grant Ward, BDO Assistant District Administrator, to discuss his concerns about Madoff.[33]  *See* Markopolos Testimony Tr. at

---

[33]  There are no clear records indicating the date of the meeting; however, SEC NRSI records indicate that someone in BDO searched "Madoff" on May 4, 2000, presumably in connection with the 2000 submission. Excerpt from the NRSI list of SEC employees who searched for "Madoff" at Exhibit 136.  In addition, the 2000 submission included data from April 2000 and Ward left the SEC in early July 2000; supporting an

pgs. 13-14; Manion Testimony Tr. at p. 15; Ward Testimony Tr. at p. 9.  Ward reported to Juan Marcelino, District Administrator, and to Jim Adelman, the Associate District Administrator.  *See* Ward Testimony Tr. at pgs. 14, 16.  Ed Manion was Markopolos' initial contact at BDO; Manion and Markopolos were acquaintances through their work with the Boston Security Analyst Society.  Markopolos Testimony Tr. at p. 12.

At the meeting, Markopolos explained the analysis presented in the 2000 submission and encouraged the SEC to investigate Madoff.  Markopolos Testimony Tr. at pgs. 14-17,  22.  Markopolos testified that since SEC staff "lacked industry expertise" and "were only lawyers," he "tried to make it as simple as possible to understand for the SEC staff."  *Id.* at pgs. 18-19.

Despite Markopolos' efforts to present the 2000 submission in a clear and straightforward manner, he left the meeting with the impression that Ward did not understand his concerns about Madoff, stating:

> [Ward] did not have an industry background that I was aware of.  He had zero comprehension of topics being discussed.  He seemed very ill-trained, uninformed about industry practices, did not understand financial instruments.  Didn't even have a basic understanding of finance.

*Id.* at pgs. 15-16.  Markopolos testified that he "walked out of the meeting feeling very dejected" and "didn't think [that Ward] had a clue." *Id.* at p. 23.  Manion left the meeting with a similar impression, stating, "When we walked out of the meeting … with Grant Ward, [Harry and I] looked at each other and we both said, 'He didn't understand a damn thing we said.'"  Manion Testimony Tr. at p. 23.  *See also* Markopolos Testimony Tr. at pgs. 23-24.

### 3.    Ward Decided Not to Pursue the 2000 Submission

Manion testified that based upon Markopolos' analysis, he was hoping that the May 2000 meeting with Ward would result in an investigation of Madoff's hedge fund operation.  Manion Testimony Tr. at p. 23.  Although Ward testified that he did not recall the meeting, he stated that if he had participated in such a meeting, "there should have been some post-meeting follow-up… [e]ven if we decided that there was nothing there …"  Ward Testimony Tr. at p. 33.

Manion testified that Ward told him in 2000 that he had referred Markopolos' 2000 submission to the SEC's Northeast Regional Office (NERO), stating:  "…Ward said, well, Madoff is headquartered in New York.  It's not our jurisdiction.  So I'm going

---

inference that the meeting occurred in May or June 2000.  2000 submission, at Exhibit 134; Ward Testimony Tr. at p. 8.

to refer it to New York."  Manion Testimony Tr. at p. 25.  Manion further stated that he recalled following up with Ward as follows:

> I went in there a few times afterwards to say, Grant, you know, how – how's New York doing with this thing, you know what I mean, and I think he – I think he did refer it to New York but I think once it left Boston, you know, he didn't care.

*Id.* at p. 26.  *See also Id.* (Manion testified, "…[Ward] told me he did [refer it to New York].").  Ward stated in his interview with the OIG that he might have referred the matter to New York, but did not recall whether, in fact, he had done so.  Ward Interview Memorandum.

However, the OIG has found no documentary evidence that Ward referred the matter to NERO[34] and, as discussed below, Marcelino's understanding from speaking with Ward was that Ward had "decided not to pursue it."  April 30, 2009 Adelman Interview Memorandum.  In any event, neither Manion nor Markopolos was contacted by NERO regarding the 2000 submission and no action was taken by the SEC with regard to the allegations contained therein.  Manion Testimony Tr. at p. 27; Markopolos Testimony Tr. at p. 24.

> 4.      Ward's Testimony Regarding the 2000 Submission is Suspect

As part of the OIG's investigation in this matter, on March 31, 2009, Ward testified under oath that he did not recall ever meeting with Markopolos, stating:

> A:      I have no memory of that [meeting with Markopolos].
>
> Q:      At all?
>
> A:      None.
>
> Q:      Do you have any memory of Harry Markopolos, period, ever meeting him, ever talking to him, ever being in his presence?
>
> A:      No.
>
> Q:      At all?

---

[34]  As part of its investigation, the OIG reviewed all e-mails produced by the Office of Internet Technology (OIT) from Ward's files for the relevant time period and, in addition, reviewed all relevant e-mails from NERO's files produced by OIT for the same period, and found no evidence that the 2000 submission was referred to NERO.

A:    At all.

Q:    You don't remember him as a person at all?

A:    When I saw his [testimony before Congress in 2009], I still didn't recall.  His face did not jog a memory.
…

Q:    Do you recall in the time – well, any time while you were at the SEC in Boston of looking at or discussing [a] referral about Bernie Madoff?

A:    No, no memory of that at all.

Q:    No memory of discussions with Ed Manion about that?

A:    No.  No.  I've been trying to wrack [sic] my brain to remember and I don't.

Ward Testimony Tr. at pgs. 25-26.

Ward and Marcelino each testified that they spoke with each other on February 4, 2009, following Markopolos' Congressional testimony.[35]  *Id.* at pgs. 48-49; Marcelino Testimony Tr. at p. 8.  However, their testimony about what Ward said during that conversation differs markedly.  Ward testified that Marcelino called to "lend his support" and stated that Ward "indicated to [Marcelino] at that time that I don't remember [meeting with Markopolos] and wish I had."  Ward Testimony Tr. at p. 49.  Ward was unequivocal during his testimony, stating:  "I volunteered that I didn't remember" and "I recall telling [Marcelino] I don't remember anything."  *Id.* at pgs. 49, 53.

Marcelino directly contradicted Ward's testimony.  Marcelino testified that during their February 4, 2009 conversation, "Ward indicated that he had met with Harry Markopolos [and] that [Ward] didn't think he did anything wrong."  Marcelino Testimony Tr. at p. 8.  Marcelino reiterated in his testimony that "[Ward] remembered meeting with Markopolos but that he didn't feel he did anything wrong."  *Id.* at p. 9.

Marcelino's recollection of his February 4, 2009 conversation with Ward was corroborated to some extent by Adelman.  Adelman told the OIG that he saw Marcelino at the SEC Speaks Conference held on February 6-7, 2009, two or three days after Marcelino's conversation with Ward.  April 30, 2009 Adelman Interview Memorandum.

---

[35]  Markopolos testified about his frustration with the SEC before Congress on February 4, 2009.  During that testimony, Ward was described in unflattering terms.  *See* February 4, 2009 Testimony of Harry Markopolos Before the U.S. House of Representatives, Committee on Financial Services Tr. at pgs. 11-12, at Exhibit 269.

According to Adelman, Marcelino told him that he had spoken recently with Ward and Ward had told Marcelino:  (1) that Ward remembered the Markopolos meeting in 2000; (2) that Ward said he had "decided not to pursue" the matter in 2000; and (3) that Ward had said he was "perfectly comfortable with how he had handled it."  *Id.*

Based on Marcelino's testimony and Adelman's corroborating statement, Ward's testimony to the OIG was not credible regarding:  (1) whether he recalled meeting with Markopolos or hearing concerns about Madoff's hedge fund in 2000; and (2) the substance of his February 4, 2009 conversation with Marcelino.  Accordingly, the OIG concludes that, based upon the preponderance of the evidence, Ward met with Markopolos in 2000 and told Manion that he had referred the complaint to NERO, but never actually did.

B.    Markopolos Made a Second Submission to the Boston Office in March 2001

1.    The 2001 Submission

Markopolos e-mailed a second submission to Manion in the Boston office about Madoff on March 1, 2001 (the "2001 submission").  E-mail dated March 1, 2001 from Markopolos to Manion, with attachments, at Exhibit 137.  The 2001 submission supplemented the 2000 submission with updated information and additional analysis*. Id.* At the time of the 2001 submission, Markopolos "put [Madoff's] assets under management in the $12 to $20 billion range."  Markopolos Testimony Tr. at p. 26.

Markopolos' 2001 submission added, *inter alia*, the following observations:

[Madoff purportedly] [e]arned over 15½% a year for over seven years with extremely low standard deviation of 4.3% versus the S&P 500 which earned over 19½% but with 12.9% annual standard deviation over the same period. This program earned 80% of the market's return with only one third of the risk.  Think about it!  Is this really possible, or is it too good to be true?  **(I have attached an excel spreadsheet comparing and contrasting Madoff's program to the S&P 500 index.)**

Only 3 down months vs. the market's down 26 months during the same period, with a worst down month of only -1.44% (April 1993) vs. the market's worst down month of -14.58% (August 1998).
…

These numbers really are too good to be true.  And every time I've thought a company's or a manager's numbers were "too good to be true," there has been fraud involved.

> Yes, access to order flow is worth something but this worth
> can be measured in pennies per share.
> …
>
> Yes, Madoff can make more intelligent short-term bets via
> their access to order flow.  However, short-term
> forecastability does not lead to long-term knowledge of
> where the stocks that he buys are headed.  Short-term he
> may know there are a lot of IBM shares to buy, but that
> doesn't lead to knowledge of where IBM will be trading
> next month.
>
> Madoff's out-of-the-money OEX index puts do offer
> protection against systemic market declines.  However, his
> 30-35 stock portfolio has individual company risk in it and
> should experience more frequent and more sizeable losses
> than what his performance record indicates.

E-mail dated March 1, 2001 from Markopolos to Manion, with attachments, at p. MARK
0024 (emphasis in original), at Exhibit 137.

     Markopolos' analysis was supported by the experience of two of his colleagues,
Neil Chelo and Frank Casey.  Markopolos Testimony Tr. at pgs. 26-27; Chelo Testimony
Tr. at p. 10.  Chelo was a chartered financial analyst, chartered investment analyst, and a
financial risk manager with substantial experience researching hedge funds.  Chelo
Testimony Tr. at p. 7.  Casey was a registered investment adviser with an options
specialization. Casey Testimony Tr. at p. 9.  Chelo's  research into Madoff convinced
him that Madoff's hedge fund was a fraud.  Chelo Testimony Tr. at p. 24.  Chelo
testified:

> A key part of kind of my experience … was to go out and
> find what I believe are the most talented investment or
> hedge fund managers in the world.  And … I've met, you
> know, probably a couple thousand hedge fund managers.
> So I have a very good idea of when someone is frankly
> trying to bull[****] me or the story doesn't make sense,
> because after you see and research a few thousand stories,
> you have a good idea of what smells fishy and what is
> really good.

Id. at pgs. 11-12.  Chelo described some of the investigative work he and Markopolos
performed as follows:

> [W]e called pretty much every broker we knew on the
> streets … and we asked like everyone:  Do you do business
> with Bernie Madoff?  Have you ever heard of Bernie

> Madoff?  And for the most part, people would be like:  I've
> heard of him.  I heard he's a big player in the options
> market, but we've never done a trade with him.

*Id.* at p. 18.

Chelo believed that Madoff's claimed returns were impossible to achieve using
Madoff's claimed split-strike conversion strategy, stating:

> I just don't know how you can produce these types of
> returns given the strategy that was outlined in the
> marketing material.  It was just, in my mind, impossible …
> Mainly the consistency because you'd have to have
> basically like perfect market timing every month or every
> year, depending on how he structures his split strike
> conversions.  It's like impossible.  No one has that ability
> to forecast market direction for such a long period and so
> consistently.
> …
>
> And if you did have that ability, you would do another
> strategy besides split strike conversion.  You would do like
> a levered future strategy.  You'd make way more money,
> and it just didn't make sense.  It just didn't make sense,
> period.

*Id.* at p. 16.

> We got pretty quantitative, not to sound geeky, but I
> remember putting together, you know, spreadsheets of, you
> know, literally trying to replicate the strategy of:  Hey, if I
> buy [sic] replicated basket of the OEX, what's my tracking
> error?  How much will it cost me to get, you know, into
> these stocks, like, big offer spread, commissions, what
> options can I write, looking at different strikes and figuring
> out, you know, quantitatively, hey, like, is there something
> we're missing?  Is – you know, is there a way that this can
> be done? … And, you know, the more I, you know, tried to
> put together something that would duplicate Madoff's
> returns, the more convinced I was that it was impossible.

*Id.* at p. 24.

Chelo was also suspicious of Madoff's reliance on feeder funds to raise money, stating:

> Another one that – another huge red flag in our mind was we heard that, you know, [Madoff] was raising all his money through these feeder funds. So my logical question was: Why would he give up the ability to charge 1 and 20 or 2 and 20 to clients and let all the feeder funds earn the bulk of the returns? That just made no sense to me at all. I mean, any legitimate businessman would have said: Hey, I'm going to cut out the middleman and do it myself.

*Id.* at p. 29.

Considering all of the red flags, Chelo believed that "common sense" indicated Madoff was a fraud, stating:

> So Harry and I, obviously, have a better background to understand this. We've been in the equity derivatives business and that was what we did at Rampart … Having said that, I think you could have just taken someone out of business school with some real common sense, and they would have looked at the picture and came [sic] to the conclusion that something – something is at least fishy and that you should stay away … You know, maybe not be able to prove or come to the analytical reasons of why it was fishy but, you know, there was [sic] a couple big red flags that were just common sense.

*Id.* at p. 44.

### 2.    Boston Forwarded the 2001 Submission to NERO

Manion discussed the 2001 submission with Silvestre Fontes, an Enforcement Branch Chief in the BDO. E-mail dated March 12, 2001 from Fontes to Manion, at Exhibit 138. On March 12, 2001, Fontes e-mailed Manion, subject line "Madoff": "Talked to Grant about this; I'll look for you and we can discuss." *Id.* Fontes explained that "Grant" most likely referred to Grant Ward, who the OIG found had met with Markopolos and Manion regarding Madoff the previous year. April 7, 2009 Fontes Interview Memo.

On April 2, 2001, Fontes e-mailed David Marder, BDO Assistant District Administrator, subject line "Madoff," stating:

> I'd like to talk to you at some point about this case. This is the one where you've got a Boston money manager

> basically squealing on a New York money manager –
> alleging that given the trading strategies that they each use,
> there is no way the New York money manager could be
> putting up the numbers that he's reporting (for certain
> hedge funds).

E-mail dated April 2, 2001 from Fontes to Marder, at Exhibit 139; Marder Interview Memorandum.

At the suggestion of Marder, Fontes forwarded the 2001 submission to Mark Schonfeld, NERO Regional Director for Enforcement.  E-mail dated April 3, 2001 from Fontes to Schonfeld, at Exhibit 140.  On April 3, 2001, Fontes e-mailed Schonfeld, subject line "Madoff": "I overnighted to you some documents on the case you, Marder and I discussed over the phone yesterday."  *Id.*

When interviewed in April 2009 by the OIG, Fontes recalled neither receiving the submission from Markopolos nor talking to Manion, Ward or Schonfeld about Madoff.  April 7, 2009 Fontes Interview Memorandum; April 10, 2009 Fontes Interview Memorandum.  Similarly, Marder did not recall discussing Madoff or the 2001 submission with Fontes or Schonfeld.  Marder Interview Memorandum.  However, after reviewing his e-mails to Manion, Marder and Schonfeld, Fontes did recall referring a matter to Schonfeld around the time of the 2001 submission, but did not recall the subject of that referral or whether it involved Madoff.  April 10, 2009 Fontes Interview Memorandum.

Additionally, Fontes recalled that Manion had been unhappy about the way things were being handled with respect to a particular matter, and also recalled that Manion had mentioned a friend of his in the industry that had been pursuing the matter.  *Id.*  Fontes did not recall, however, whether the matter was Madoff or whether Manion's friend was Markopolos.  *Id.*

Schonfeld testified that he did not recall the referral from Boston regarding Madoff, receiving Fontes' e-mails or the documents he overnighted regarding Madoff, or even seeing the 2001 submission prior to testimony.  Schonfeld Testimony Tr. at p. 15.

Thus, while the individuals involved had difficulty recollecting these events, the e-mails demonstrate that Fontes forwarded Markopolos' 2001 submission to Schonfeld.

3.   NERO Decided Not to Investigate Madoff Only One Day After Receiving the 2001 Submission

Upon receiving the 2001 submission from BDO, Schonfeld assigned the matter to Leslie Kazon, Assistant Regional Director of Enforcement in NERO, for initial inquiry.  E-mail dated April 3, 2001 from Schonfeld to Neuschaefer, at Exhibit 141.  *See also*

Schonfeld Testimony Tr. at p. 20; Kazon Testimony Tr. at p. 16.  On April 4, 2001, Kazon e-mailed Sandy Sadwin, a broker-dealer examiner in NERO, stating:

> The [Investment Adviser] people have been checking and Madoff does not appear to be registered as an [Investment Adviser] or [Investment Company].  So I would like to take a look at a copy of the most recent exam report for the [Broker-Dealer], Bernard L. Madoff Investment Securities, LLC, when you get the chance.[36]

E-mail dated April 4, 2001 from Kazon to Sadwin, at Exhibit 142; Kazon Testimony Tr. at p. 15.  Kazon subsequently e-mailed Sadwin, "The registrants I am aware of with whom Madoff might be associated are Broyhill Management and BMC Fund, Inc."[37] E-mail (undated) from Kazon to Sadwin, at Exhibit 143.  After reviewing the 2001 submission for only one day, Kazon sent an April 5, 2001 e-mail to Schonfeld, saying:

> As we discussed, after reviewing the complaint received (via the BDO) from Harry Markopol[o]s of Rampart Investments about purported performance claims for funds managed by Bernard Madoff, and some information about Madoff and others identified in the complaint, I don't think we should pursue this matter further.

E-mail dated April 5, 2001 from Kazon to Schonfeld, at Exhibit 144.

Kazon testified that she did not "remember having received a referral in or around April 2001 involving Madoff."  Kazon Testimony Tr. at p. 15.  She also did not recall sending the April 5, 2001 e-mail to Schonfeld stating her opinion that, "I don't think we should pursue this matter further."  *Id.* at p. 16.  In fact, Kazon stated that she did not recall ever seeing the 2001 submission and did not recall hearing the name "Markopolos" until December 2008.  *Id.* at pgs. 15-18.[38]  While Kazon did not recall the 2001 submission, she testified that:

> [I]n general, you know, when we get a complaint we would read it, we would try to figure out whether within the four

---

[36]  With respect to her April 4, 2001 request to see the most recent broker-dealer exam report on Madoff, Kazon explained that the 2001 submission discussed "the way he executes trades or how much money he's making or whether he's doing something improper about trading.  So, that would have been something that might have been discussed or illuminated by the examining board."  *Id.* at p. 23.

[37]  A Broyhill Management document describing the returns Broyhill earned with Madoff was included in the 2001 submission.  E-mail dated March 1, 2001 from Markopolos to Manion, with attachments, at Exhibit 137.  The same document was included in the 2000 submission.  2000 submission, at Exhibit 134.

[38]  On April 4, 2001, Sheryl Marcus, an examiner in NERO, conducted a search of the SEC's Name Relationship Search Index (NRSI) for "Madoff" in order to determine whether there were open investigations involving Madoff.  *See* Excerpt from the NRSI list of SEC employees who searched for "Madoff" at Exhibit 145.  Marcus stated that she did not recall performing the search.  Marcus Interview Memorandum.

> corners of it[,] it stated a possible violation of securities
> laws as opposed to a violation of something else. And then
> talk to – and usually I would talk to a supervisor about, you
> know, whether we should pursue it or how we should
> pursue it.

*Id*. at pgs. 18-19. Kazon described the 2001 submission as "more detailed than the average complaint in those days that came through." *Id*. at p. 25. Similarly, after reviewing the 2001 submission during his testimony, Schonfeld described it as "more detailed than the average [referral]." Schonfeld Testimony Tr. at p. 18.

Kazon testified further:

> My impressions are that this is a document that I probably
> would have needed to consult somebody about, I hope I
> consulted somebody. I honestly don't remember. I also
> would have thought that the author of this document was
> odd, to say the least, but I hope that would not have led me
> to dismiss this, but I just don't recall.

Kazon Testimony Tr. at pgs. 20-21.

Kazon acknowledged that she "would have needed to consult with somebody with greater [options] expertise to figure out the full extent to which [the 2001 submission] could be followed up on." *Id*. at p. 21. Kazon testified that, "probably the people I would have consulted with would have been in the [Investment Adviser] exam program or … Mark [Schonfeld]. Not because he's an expert in options, but just because he's a really smart guy." *Id*. at pgs. 21-22. Kazon stated that she did not know if she had ever investigated a Ponzi scheme at that point in her career. *Id*. at p. 24.

Finally, Kazon also acknowledged that the 2001 submission should have been reviewed for more than one day before a decision was made regarding its disposition:

> Q:    Putting that aside, putting aside the fact that Bernie
>        Madoff confessed to running a Ponzi scheme in
>        December of 2008. Just based on the [2001
>        submission], would it be fair to say that given the
>        complexity, there were some details in the
>        documents, that it would take some period of time,
>        weeks perhaps, at least, to mark [sic] a
>        determination as to whether the matter was
>        appropriate for investigation?

> A:    It should have in the hindsight. Again, I don't know
>        whether it was that I asked someone in the exam
>        program to review it, and just based on whatever

> that person told me or whether it was based on resources or priority, I just don't recall.

*Id.* at p. 29.

> 4.   Two Articles Were Published in May 2001 Questioning the Legitimacy of Madoff's Returns

In the month following NERO's decision not to investigate the claims raised by Markopolos, *MARHedge* and *Barron's* both published articles questioning Madoff's unusually consistent returns and secretive operations. The *MARHedge* article written by Michael Ocrant was entitled "Madoff Tops Charts; Skeptics Ask How," and published on May 1, 2001. It included the following:

> [M]ost of those who are aware of Madoff's status in the hedge fund world are baffled by the way the firm has obtained such consistent, nonvolatile returns month after month and year after year.
>
> …
>
> Throughout the entire period Madoff has managed the assets, the strategy, which claims to use [Over the Counter] OTC options almost entirely, has appeared to work with remarkable results. Again, take the Fairfield Sentry fund as the example. It has reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15.0%.
>
> …
>
> The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period.
>
> …
>
> Skeptics who express a mixture of amazement, fascination and curiosity about the program wonder, first, about the relative complete lack of volatility in the reported monthly returns. But among other things, they also marvel at the seemingly astonishing ability to time the market and move to cash in the underlying securities before market conditions turn negative; and the related ability to buy and sell the underlying stocks without noticeably affecting the market.

> In addition, experts ask why no one has been able to
> duplicate similar returns using the strategy and why other
> firms on Wall Street haven't become aware of the fund and
> its strategy and traded against it, as has happened so often
> in other cases. …

Michael Ocrant, *Madoff Tops Charts; Skeptics Ask How*, MARHedge, May 2001, at pgs.
1, 16, at Exhibit 146.

The *Barron's* article, written by Erin Arvedlund was entitled "Don't Ask, Don't
Tell," and was published on May 7, 2001.  It included the following:

### "Don't Ask, Don't Tell"

**Bernie Madoff might as well hang that sign on his
secretive hedge-fund empire. Even adoring investors
can't explain his enviably steady gains.**
…

[W]hat few on the Street know is that Bernie Madoff also
manages $6 billion-to-$7 billion for wealthy individuals.
That's enough to rank Madoff's operation among the
world's three largest hedge funds, according to a May 2001
report in *MARHedge*, a trade publication.

What's more, these private accounts, have produced
compound average annual returns of 15% for more than a
decade.  Remarkably, some of the larger, billion-dollar
Madoff-run funds have never had a down year.
…

Using this split-strike conversion strategy, Fairfield Sentry
Limited has had only four down months since inception in
1989.  In 1990, Fairfield Sentry was up 27%.  In the
ensuing decade, it returned no less than 11% in any year,
and sometimes as high as 18%.  Last year, Fairfield Sentry
returned 11.55% and so far in 2001, the fund is up 3.52%.
…

[S]ome on Wall Street remain skeptical about how Madoff
achieves such stunning double-digit returns using options
alone.  The recent *MARHedge* report, for example, cited
more than a dozen hedge fund professionals, including
current and former Madoff traders, who questioned why no
one had been able to duplicate Madoff's returns using this
strategy.  Likewise, three option strategists at major

investment banks told *Barron's* they couldn't understand
how Madoff churns out such numbers.  Adds a former
Madoff investor:  "Anybody who's a seasoned hedge-fund
investor knows the split-strike conversion is not the whole
story.  To take it at face value is a bit naïve."

…

The lessons of Long-Term Capital Management's collapse
are that investors need, or should want, transparency in
their money manager's investment strategy.  But Madoff's
investors rave about his performance – even though they
don't understand how he does it.  "Even knowledgeable
people can't really tell you what he's doing," one very
satisfied investor told *Barron's*.  "People who have all the
trade confirmations and statements still can't define it very
well.  The only thing I know is that he's often in cash"
when volatility levels get extreme.  This investor declined
to be quoted by name.  Why?  Because Madoff politely
requests that his investors not reveal that he runs their
money.

"What Madoff told us was, 'If you invest with me, you
must never tell anyone that you're invested with me.  It's
no one's business what goes on here,'" says an investment
manager who took over a pool of assets that included an
investment in a Madoff fund.  "When he couldn't explain
how they were up or down in a particular month," he
added, "I pulled the money out."

Erin Arvedlund, *Don't Ask, Don't Tell,* Barron's, May 7, 2001, at pgs. 1-3, at Exhibit
135.

> 5.     NERO Did Not Reconsider Its Decision Not to Investigate Madoff After
>        Publication of the Articles

On May 7, 2001, Fontes followed up with NERO regarding the 2001 submission
and the *Barron's* article with an e-mail to Schonfeld, stating:

There is a *Barron's* article dated today, 5/7, on this guy;
this is the referral we made to you a few weeks ago.  The
article discusses his trading strategy, which he says is
"proprietary" in nature and refuses to discuss with the
reporter.  Let me know if you can't immediately get a copy
of [the] article so that I can send a copy to you.

E-mail dated May 7, 2001 from Fontes to Schonfeld, at Exhibit 147.  The OIG found no

record of a response to this e-mail from Schonfeld.  Schonfeld testified that he did not recall receiving the e-mail or seeing the article.  Schonfeld Testimony Tr. at pgs. 24-25.

The SEC did not commence an investigation of Madoff after the publication of the *MARHedge* and *Barron's* articles.  Schonfeld acknowledged that *Barron's* is a "reputable publication"[39] and that "the fact that in addition to a complaint being provided to you that there were two newspaper articles providing similar information as the complaint," "would be [a] factor[] to consider in triaging, [which was the process utilized by NERO to determine if a complaint was worth pursuing.]"  *Id.* at pgs. 27-28.  However, Schonfeld testified that Kazon's decision "not to pursue it" was apparently not revisited after publication of the *Barron's* article, "[a]nd the article … came out later and, you know, arguably nobody went back and then reevaluated the original decision."  *Id.* at p. 30.  In fact, the OIG found no indication that any of the NERO Enforcement staff who considered opening up an investigation about Madoff even read the *Barron's* article until late 2005, after Markopolos made a third submission.

III.    SEC 2004 OCIE WASHINGTON DC CAUSE EXAMINATION OF MADOFF

A.    An Employee of a Registered Hedge Fund Provided the OCIE Investment Management Group With A Detailed Complaint About Madoff

During a 2002 examination sweep of hedge funds registered with the Commission, OCIE examiners from the Investment Management Group[40] requested that employees at the examined funds alert them to fraudulent or suspicious activity.  Kelly Testimony Tr. at p. 14; Hedge Fund Manager Testimony Tr. at pgs. 16-17.  In response to this request, a Managing Director and Chief Investment Officer (Hedge Fund Manager)[41] at a Commission registered fund of hedge funds contacted Edward Perkins, one of the sweep examiners.  E-mail dated May 13, 2003 from Perkins to Kelly, at Exhibit 149.  Perkins referred the Hedge Fund Manager to Mavis Kelly, who was then an OCIE Branch Chief in the Investment Management Group at the Commission's Washington, D.C. headquarters.[42]  *Id.*

Kelly had worked with the Hedge Fund Manager during the Commission's examination of his fund and adjudged him to be a "highly" credible source of information

---

[39]  Several other SEC officials acknowledged that *Barron's*, a Dow Jones publication, is reputable.  *See, e.g.,* Richards Testimony Tr. at p. 34; McCarthy Testimony Tr. at p. 43; Swanson Testimony Tr. at p. 46.  Richards opined further that the author of the *Barron's* article, Erin Arvedlund, "is very good" and has "written great articles." Richards Testimony Tr. at p. 34.

[40]  For purposes of this report, the terms Investment Management Group or Investment Management Examination Group are used to describe the Investment Adviser/Investment Company Examination program within OCIE.

[41]  When he submitted his complaint and attachments, the Hedge Fund Manager requested that his identity be kept confidential.  E-mail dated May 21, 2003, from the Hedge Fund Manager to Kelly, with attachments, at Exhibits 148.

[42]  Kelly was promoted to Assistant Director on May 2, 2004.

and his firm to be "a very thorough … very analytical, very experienced, very technically savvy firm." Kelly Testimony Tr. at pgs. 16-17, 49.

      1.      During Due Diligence of Madoff Feeder Funds, Fund Managers Identified Red Flags in Madoff's Representations

On May 20, 2003, Kelly and Snively, an OCIE Investment Management examiner, had a conference call with the Hedge Fund Manager who expressed concerns that "he couldn't understand how [Madoff] was maintaining his performance" and "he couldn't figure out how he was … earning returns." Kelly notes dated May 20, 2003 on conference call with Hedge Fund Manager, at Exhibit 150; Kelly Testimony Tr. at pgs. 16-17; Snively notes dated May 20, 2003 on conference call with Hedge Fund Manager, at Exhibit 151. In notes of the conversation, both Kelly and Snively commented that the Hedge Fund Manager's firm was "[n]ever able to understand nature of return." Kelly notes dated May 20, 2003 on conference call with Hedge Fund Manager, at Exhibit 150; *see also* Snively notes dated May 20, 2003 on conference call with Hedge Fund Manager, at Exhibit 151. Kelly signified in her notes that the following one piece of information the Hedge Fund Manager provided was of particular importance (by placing it in a box and drawing a star next to it): "For volume must see options on street yet never see them." Kelly notes dated May 20, 2003 on conference call with Hedge Fund Manager, at Exhibit 150; Kelly Testimony Tr. at p. 23.

On the following day, May 21, 2003, the Hedge Fund Manager sent Kelly a detailed complaint by e-mail, in which he laid out the red flags that his fund had identified about Madoff while performing due diligence on two Madoff feeder funds.[43]

---

[43] The registered fund of funds evaluated potential investments with Madoff feeder funds in 1998 and 2003. Hedge Fund Manager Testimony Tr. at pgs. 5-9. It considered an investment with Fairfield in 1998. *Id.* at pgs. 5-6. As part of their standard due diligence process, the Hedge Fund Manager and his unidentified CIO met with Madoff. *Id.* at 3. The CIO former options trader, pressed Madoff for information about his options trading. CIO of Fund of Funds Interview Tr. at pgs. 3-7. To the CIO's surprise, Madoff claimed to trade options through the Chicago Board of Options Exchange (CBOE). *Id.* at 7. The CIO stated: "Well I found something exceptionally odd about that …. [I]mmediately what I asked Madoff was: How are you doing that? Because I don't think there's enough volume on the Chicago Board of Options Exchange for you to get that sort of coverage for the amount that you're managing." *Id.* at 7.

The CIO's suspicions triggered, he called CBOE to find out how much daily volume traded on the exchange. He described his call to CBOE, as follows: "And the problem is … that the volume was never there for Madoff. So that was problem No. 1 for me. Problem No. 2 was … I called up buddies of mine around the street who were now running the equity derivatives departments of a number of firms, and I asked them all if they were trading with Madoff. And nobody was. Nobody was doing these OEX options. And in fact, the funny part about it was they all said, yeah. You know, I hear that he's doing all these trades but, you know, we don't see it anywhere … And so things just began to, you know, not match up. And so for me, the biggest issue was – the biggest issue was the fact that I couldn't reconcile a big part of that strategy. And the information that was being told to me on the surface seemed to be false." CIO of Fund of Funds Interview Tr. at pgs. 11-12. Because of the unanswered questions, they passed on the investment. Hedge Fund Manager Testimony Tr. at pgs. 8-9.

In 2003, the two managers again evaluated an investment with a Madoff feeder fund. By adding up feeder funds and Madoff clients they were aware of in the United States and Europe, they estimated Madoff was managing between 8 and 10 billion dollars. Hedge Fund Manager Testimony Tr. at pgs. 10, 39-40.

E-mail dated May 21, 2003 from the Hedge Fund Manager to Kelly, with attachements, at Exhibit 148; Hedge Fund Manager Testimony Tr. at pgs. 10-13, 17; OCIE Assistant Director Testimony Tr. at p. 27 (agreeing that the Hedge Fund Manager's complaint "Yes, absolutely" was a substantive, detailed complaint).  The Hedge Fund Manager attached four documents to his complaint, including performance statistics for three Madoff feeder funds and a May 2001 article published in *MARHedge* entitled "Madoff Tops Charts; Skeptics Ask How."[44]  E-mail dated May 21, 2003 from the Hedge Fund Manager to Kelly, with attachements, at Exhibit 148.

The Hedge Fund Manager estimated Madoff managed $8-10 billion in discretionary brokerage accounts at the Madoff firm using a split-strike conversion strategy,[45] which consisted of buying a basket of large cap stocks in the S&P 100 stock index (OEX), selling OEX call options and purchasing OEX put options.[46]  E-mail dated May 21, 2003 from the Hedge Fund Manager to Kelly, with attachements, at Exhibit 148.  The complaint stated BMIS charged only brokerage commissions as compensation.  *Id.*  BMIS's fee structure was notable because Madoff was foregoing the significant management and performance fees typically charged by asset managers.[47]  The complaint also described the following specific concerns about Madoff's strategy and purported returns:

> - according to [BMIS], the options are traded with a number of traders and crossed on CBOE.  With a 8-10 billion size, you must see the volume, but unfortunately you don't.  We actually checked with some of the largest brokers (UBS, Merril [sic], etc) which told us they never traded with them OEX options.  The question is do they really implement the full strategy.

---

This time, the feeder fund did not allow them access to Madoff during their due diligence process.  Hedge Fund Manager Testimony Tr. at p. 9.  Regardless, they quickly made several unsettling findings, including a potential conflict of interest with the auditor and the fact that Madoff's returns seemed to have continued unaffected by the bust of the dot-com bubble.  *Id.* at pgs. 10-13.  After a "week or two" of due diligence, the Hedge Fund Managers again rejected an investment with Madoff because "[t]here were too many holes."  Hedge Fund Manager Testimony Tr. at p. 31.

[44] MARHedge provided a semi-monthly publication that delivered news on global hedge fund markets.

[45] According to the FTI Engagement Team, a split-strike conversion strategy is normally considered a limited-risk, limited-reward strategy because downside risk and upside potential are somewhat limited by the call and put option contracts.  For the strategy to be particularly effective, the manager must be able to successfully time the purchase and sale of the securities, relative to movements in the market for such securities, on a consistent basis over an extended period of time.  The manager would also have to demonstrate excellent stock-selection skills over an extended period of time, since the split-strike conversion strategy utilized by the Madoff firm requires a subset of OEX stocks that will maintain a high correlation to that overall index.

[46] A call option is an agreement that gives an investor the right, but not the obligation, to buy a specified amount of an underlying security at a specified price within a specific time period.  http://www.investopedia.com/terms/c/calloption.asp.  A put option is an agreement that gives the owner the right, but not the obligation, to sell a specified amount of an underlying security at a specified price within a specified time period.  *Id.*

[47] According to the FTI Engagement Team, a typical management fee of 2% and a performance fee of 20% would have likely yielded the Madoff firm tens of millions, if not hundreds of millions in dollars of additional profits compared to the commissions Madoff was purportedly earning.

- the strategy is not duplicable by anyone else as far as we know.

- there is no correlation to the overall equity markets (in over 10 years).

- accounts are typically in cash at month end.

- since the accounts are at [BMIS], the investors (i.e. the feeders that have discretionary accts) receive [BMIS] brokerage statements.  There are no third party brokers involved in the process.  The auditor of the firm is a related party to the principal.

- finally, given the performance of the different accounts, [BMIS] never had to face redemption.  In fact given the fact that the different feeders are closed for new investments, there is always replacement capital (1/5 ration [sic] according to some people).

E-mail dated May 21, 2003 from the Hedge Fund Manager to Kelly, at Exhibit 148.

To Kelly, the complaint indicated "that there are areas that need to be answered, and we needed to look into them more."  Kelly Testimony Tr. at p. 37.  She also understood that the Hedge Fund Manager was implying that BMIS might be lying about its option trading, and "some of the issues" that the [Hedge Fund Manager] laid out in the complaint were "indicia of a Ponzi scheme."  *Id.* at pgs. 32, 36, 94-95.

The three attachments containing Madoff feeder fund performance results provided "backup for why [the Hedge Fund Manager] was questioning" Madoff's remarkable returns.  Kelly Testimony Tr. at p. 60.  The attached *MARHedge* article "Madoff Tops Charts; Skeptics Ask How" also raised concerns similar to and in support of those in Hedge Fund Manager's complaint.  Kelly Testimony Tr. at pgs. 46-47.  Kelly was familiar with *MARHedge* and found it to be a credible "long standing" publication, but not one that she believed the Commission usually received.  *Id.* at 46.

2.    MarHedge Article Raised Red Flags About Madoff's Returns

In addition to describing concerns similar to those provided by the Hedge Fund Manager's complaint, the *MARHedge* article, written by Michael Ocrant and entitled, "Madoff Tops Charts; Skeptics Ask How," contained the following additional red flags about the lack of volatility in Madoff's returns, his unbelievable ability to time the

market, the fact that his trading was not seen or felt in the market, and his unusual fee structure:[48]

> Skeptics who express a mixture of amazement, fascination and curiosity about the program wonder, first, about the relative complete lack of volatility in the reported monthly returns.

> But among other things, they also marvel at the seemingly astonishing ability to time the market and move to cash in the underlying securities before market conditions turn negative; and the related ability to buy and sell the underlying stocks without noticeably affecting the market.

> In addition, experts ask why no one has been able to duplicate similar returns using the strategy and why other firms on Wall Street haven't become aware of the fund and traded against it, as has happened so often in other cases; why Madoff Securities is willing to earn commissions off the trades but not set up a separate asset management division to offer hedge funds directly to investors and keep all the incentive fees for itself, or conversely, why it doesn't borrow money from creditors, who are generally willing to provide leverage to a fully hedged portfolio of up to seven to one against capital at an interest rate of Libor-plus, and manage the funds on a proprietary basis.

Michael Ocrant, *Madoff Tops Charts; Skeptics Ask How*, MARHedge, May 2001, at Exhibit 146.

---

[48] Ocrant, the author of the MARHedge article, stated that he intentionally did not accuse Madoff of falsifying customer returns or running a Ponzi scheme in his article because Ocrant "thought in the story it was more powerful, [to] just la[y] out … concerns people had about why whatever he said he was doing couldn't be what he's doing." Ocrant Interview Tr. at p. 26. The article posits that one possible explanation for Madoff's extraordinary purported performance could be his use of order flow information from the Madoff firm's market making business to benefit the discretionary brokerage accounts (such as by front-running). Michael Ocrant, *Madoff Tops Charts; Skeptics Ask How*, MARHedge, May 2001, at Exhibit 146. Others, including the Commission's Deputy Chief Economist, have testified that "front-running or other types of abuse of broker-dealer information could [not] generate returns on an asset base this large." Mayhew Testimony Tr. at pgs. 27-28, 36 ("If you are [front-running] with a huge base of billions and billions of dollars that would have an insignificant impact on your returns so you could not generate real returns that way"); Ocrant Testimony Tr. at p. 13 (stating that a quantitative analyst that analyzed Madoff's returns opined to him that if Madoff was managing between $7-9 million, then it would be impossible for Madoff to be front-running, and he would have to be running a Ponzi scheme).

3.    Investment Management Examiners Would have Validated
Madoff's Returns

According to Kelly, were Investment Management examiners to investigate the
allegations in the Hedge Fund Manager's complaint and attachments, "one of the things
we would look to validate is the performance returns."  Kelly Testimony Tr. at p. 53.
Kelly stated that to validate returns, Investment Management examiners would use a
number of methods:

> I would look for the misrepresentation of performance to see
> if he was just falsifying the performance; I would look for
> the individual accounts to see, is he using … a specific set of
> clients, and only those highly profitable accounts; … we do
> a client account review, we do a performance review.  And
> in doing the client account review, I would notice if the
> trades were there, any activities reported, who was the
> custodian …

Kelly Testimony Tr. at pgs. 52-54.  Moreover, the OCIE Assistant Director stated that the
complaint "appears to be dealing with performance … and that's something that is
checked on [in] every examination that I know of."  OCIE Assistant Director Testimony
Tr. at p. 28.

4.    Investment Management Examination Group Referred the
Complaint to the Broker-Dealer/Self-Regulatory Organization
Examination Group

Despite their expertise in this area, the Investment Management examiners never
investigated the Hedge Fund Manager's complaint or the allegations in the *MARHedge*
article.  Through at least February 2009, OCIE did not have formal policies and
procedures for handling complaints.  Gohlke Testimony Tr. at pgs. 10, 19.  In OCIE's
Investment Management Program, the informal uniform practice was to provide the
complaints to the OCIE Assistant Director, Kelly's supervisor in 2003.  Kelly Testimony
Tr. at pgs. 69, 71; OCIE Assistant Director Testimony Tr. at p. 10; Gohlke Testimony Tr.
at p. 11.  The OCIE Assistant Director typically logged the complaints into a spreadsheet
and distributed them to the appropriate regional office.  Kelly Testimony Tr. at p. 69;
OCIE Assistant Director Testimony Tr. at pgs. 10-11, 15.  The practice of OCIE's
Investment Management Group was to refer complaints about registered broker-dealers
to OCIE's Broker-Dealer/Self-Regulatory Organization Group (SRO Group) for
investigation even where the complaint raised Investment Management issues, such as
questions about hedge fund performance.  Gohlke Testimony Tr. at pgs. 28, 32; Kelly
Testimony Tr. at pgs. 62-63, 76-77; Snively Interview Tr., at pgs. 17-18.  If there was no
registered entity, then they would typically refer the complaint to the Division of
Enforcement.  Gohlke Testimony Tr. at p. 14; Snively Interview Tr. at p. 18.

According to Kelly, the OCIE Investment Management Group determined that, according to their group's procedure, they should refer the complaint to the OCIE SRO Group because BMIS was a registered broker-dealer, but Kelly also noted that the Investment Management Group could have provided assistance:[49]

> Since it says that they were discretionary accounts [in the complaint], we felt that they [SRO Group] could look at the trading activities in the brokerage accounts, and could validate the information from a brokerage level. … So I don't know that they needed to go to [the] management side, but if they weren't understanding how the returns were achieved, we are used to doing that.  That is something we could have done, because I don't know that on the broker-dealer side that they're really worried about performance.  That is a routine part of what we're doing.

Kelly Testimony Tr. at pgs. 83, 90; *see also* Gohlke Testimony Tr. at pgs. 18, 43 (Investment Management expertise probably would have been helpful to the SRO staff in investigating the Hedge Fund Manager's complaint).[50]

Kelly believes she likely spoke to Gene Gohlke about the complaint and researched some of the issues it raised before distributing it.  Kelly Testimony Tr. at pgs. 62-64.  Gohlke emphasized that it appears his group appropriately referred the matter to the SRO Group based on the nature of the accounts:

> …[J]ust observe that the trustee in Madoff right now is the SIPC trustee, and SIPC only pays for losses on broker dealer customer accounts, so SIPC must be of the opinion that these are broker dealer customer accounts, not advisory customer accounts.

Gohlke Testimony Tr. at p.42.

---

[49] "When OCIE was initially formed, it had one group devoted to conducting inspections of Self-Regulatory Organizations (SROs).  However, in 2000, recognizing the need for greater specialization, OCIE reorganized and divided its SRO inspection staff into two groups: "SRO 1" and "SRO 2."  The SRO 1 Group focuses on inspecting the SROs' programs for providing trading facilities and overseeing members' trading activities.  This specialization permits the group to develop and retain expertise in trading facilities and activities.  The SRO 2 Group, on the other hand, focuses on inspecting the SROs' programs for overseeing members' activities away from the trading markets.  This specialization permits the group to develop and retain expertise in member regulation, listings, arbitration, and the other areas subject to its review.  The SRO 1 Group is now known as OCIE's Office of Market Oversight (Market Oversight).  Market Oversight's primary focus remains on the SROs.  However, to assess the quality of SRO programs relating to trading activity, Market Oversight also conducts examinations of broker-dealers' trading activity."  Letter dated June 5, 2009 from Walsh to Kotz, at Exhibit 152.

[50] The FTI Engagement Team concluded that the SRO Group should have, at a minimum, sought Investment Management advice in investigating the Hedge Fund Manager's complaint because it included issues typically examined by investment adviser personnel, including verification of purported investment returns and account balances.  The SRO Group had no significant experience in these areas.  OCIE management acknowledged that its Investment Management Examination Group personnel would have known to look specifically at the investment returns and verify custody of the assets.  However, such personnel were not contacted for assistance.

The OCIE Assistant Director did not recall discussing the complaint, nor do his records show he logged the complaint into his spreadsheet. OCIE Assistant Director Testimony Tr. at pgs. 13-14, 42. However, the OCIE Assistant Director stated that if the determination was made to refer it to OCIE's SRO Group, he "would probably just forward it over to our broker-dealer people" without logging it in. OCIE Assistant Director Testimony Tr. at p. 23.

> 5.    SRO Group Received the Complaint No Later Than the Fall of 2003

No later than the fall of 2003, Kelly provided the complaint to the OCIE SRO 1 Group (SRO Group).[51] E-mail dated December 17, 2003 from Donohue to Walker, at Exhibit 153; Kelly Testimony Tr. at pgs. 63-64; Wood Testimony Tr. at p. 22; Donohue Testimony Tr. at p. 32. In 2003, OCIE's SRO Inspection Program was headed by Associate Director John McCarthy and Assistant Director Eric Swanson. McCarthy Testimony Tr. at p. 16; Sadowski Testimony Tr. at p. 48. Kelly circulated the complaint and attachments to the SRO Group in paper rather than by e-mail due to the Hedge Fund Manager's confidentiality concerns. Kelly Testimony Tr. at p. 97.

Kelly expected the SRO Group "would look into the trading volume question, … would get the information about the accounts, he would get the information necessary to understand whether the performance was falsified[,]" and would look at whether Madoff should be registered as an investment adviser. Kelly Testimony Tr. at p. 67. She understood that since all of the questionable activity was taking place in brokerage accounts, the Commission would have access to all books and records related to those accounts. *Id.* at pgs. 68, 76. Kelly's view was supported by other OCIE examiners. Matthew Daugherty, Senior Special Counsel in OCIE who had limited involvement in the Madoff examination, opined, "If it was all through the broker-dealer then you could get everything …." Daugherty Testimony Tr. at p. 93. Similarly, former OCIE examiner Wood stated, "We always ask for proprietary information whenever we did any exam and [] we received it."[52] Wood Testimony Tr. at p. 34.

---

[51] While Snively does not have a specific recollection of when the complaint was referred to the SRO Group, he believes that according to the standard practice of the Investment Management Examination Group, it was provided prior to the fall of 2003. Snively Interview Tr. at p. 21. Snively stated that his group typically researched and referred complaints "within a matter of a day or so … And I think the typical situation would be to send it along within a matter of days at the most." *Id.* The OIG has found no records indicating the exact date the complaint was referred.

[52] According to the FTI Engagement Team, Madoff's books and records were subject to examination whether or not he was registered as an investment adviser. As a registered broker-dealer, the Madoff firm's books and records (including e-mails) related to that business are subject to compliance examinations and review by the SEC staff under Section 17 of the Exchange Act. If the firm had been registered as an investment adviser at that time, the firm's books and records related to that business would have been subject to compliance examinations and review by the SEC staff under Section 204 of the Advisers Act. However, since Madoff was running the investment advisory business out of discretionary brokerage accounts at BMIS and it was a registered broker-dealer, those records were also subject to compliance examinations and review by the SEC staff under Section 17 of the Exchange Act.

6.    OCIE's SRO Examination Group Had No Policies or Procedures
for Handling Tips or Complaints

The OCIE SRO Group did not log tips or complaints, had no policies or
procedures for handling tips or complaints, nor did it have uniform informal procedures
of which Richards, McCarthy or other examiners were aware.  McCarthy Testimony Tr.
at pgs. 20-21; Daugherty Testimony Tr. at pgs. 39-40; Richards Testimony Tr. at p.10.

OCIE then-Director Lori Richards testified that "cause examinations are a
priority" and that she would expect the staff to begin a cause examination within "days,
hours, weeks perhaps" of receiving a complaint containing serious allegations.  Richards
Testimony Tr. at pgs. 15-16.  In other testimony given by Richards to the United States
Senate Committee on Banking, Housing and Urban Affairs on January 27, 2009,
Richards stated, "[Cause examinations] give the staff the ability to respond very quickly
to fast-breaking problems, once an indication of the possible problem becomes known."
Richards Testimony Before the United States Senate Committee on Banking, Housing
and Urban Affairs, *Madoff Investment Securities Fraud: Regulatory and Oversight
Concerns and the Need for Reform*, January 27, 2009, at p. 8, at Exhibit 154.  However, a
cause examination[53] of Madoff was not opened by OCIE's SRO Group until December
2003, approximately six months after OCIE received the Hedge Fund Manager's
complaint.

7.    OCIE Received Another Tip About Madoff in December 2003

It appears the SRO Group did not begin to examine the allegations in the Hedge
Fund Manager's complaint until another tip about Madoff was provided to Richards by
Steve Cutler, then-Director of the Division of Enforcement.[54]  McCarthy Testimony Tr.
at p. 67.  On December 10, 2003, Richards e-mailed John McCarthy about the tip and
asked him to follow-up:

Steve talked to the informant on canary . …  She said that there is bad behavior at
madoff, they're making a lot of money by front-running in their hedge fund, or
front-running trades by their hedge fund. Can we send them a letter?

_____

[53]  Lori Richards explained the different between "cause" and "routine" examinations:  "A cause
examination is conducted when the staff have 'cause' to believe there may be a problem or a violation.  A
cause exam is conducted when the staff learns of information from a press article, for example, a complaint
or a tip.  Other information comes to our attention that indicates there's a possible problem or violation and
the staff will go in and really focus discreetly on that issue.  Routine examination, we conduct routine
examinations of investment advisers and investment companies on a cycle.  And in those examinations
we're looking at the firm's compliance with the law in generally a specified number of areas.  They're
conducted based on the passage of time rather than based on a particular incident or complaint."  Richards
Testimony Tr. at 9-10.

[54]  The date of the initiation of the cause examination cannot be pinpointed because the OCIE SRO Group
did not log the examination into the Super Tracking and Reporting System ("STARS").  Richards testified
that all examinations should be logged into the STARS system, but she was aware the SRO Group
routinely did not log their examinations into the system. Richards Testimony Tr. at 21.

E-mail dated December 10, 2003 from Richards to McCarthy, at Exhibit 155; McCarthy Testimony Tr. at p. 16.

The next day, at McCarthy's request, Tina Barry sent McCarthy and Richards a May 7, 2001 article from Barron's entitled, "Don't Ask, Don't Tell." Barry Testimony Tr. at p. 26; E-mail dated December 11, 2003 from Barry to McCarthy and Richards, at Exhibit 156. The Barron's article, written by Erin Arvedlund, was first published in the same month Ocrant's *MARHedge* article was published – and raised concerns similar to those presented in *MARHedge*. Ocrant Interview Tr. at p. 23.

> 8.   It Appears Richards First Sent McCarthy the Barron's Article About Madoff in 2001

This was not the first time McCarthy had been given a copy of the *Barron's* article. It appears Lori Richards sent a hard copy of the *Barron's* article to McCarthy in 2001, approximately two years before OCIE received the Hedge Fund Manager's complaint. Erin Arvedlund, *Don't Ask, Don't Tell*, Barron's, May 7, 2001, at Exhibit 135. Across the top of the Barron's article Richards gave to McCarthy previously, she wrote:

> John, she [referring to Arvedlund] is very good. This is a great exam for us! Lori.

Richards' copy of Erin Arvedlund, *Don't Ask, Don't Tell*, Barron's, May 7, 2001, at Exhibit 157; Richards Testimony Tr. at pgs. 24-35. Although Richards and McCarthy cannot recall the date Richards sent the hard copy article to McCarthy, the article appears from the footer to have been retrieved from Dow Jones Interactive and printed on May 15, 2001. Richards Testimony Tr. at p. 35; McCarthy Testimony Tr. at p. 43; Richards' copy of Erin Arvedlund, *Don't Ask, Don't Tell*, Barron's, May 7, 2001, at Exhibit 157. McCarthy did not open an examination of Madoff in response to the article, and testified that he may not have read the article at the time Richards provided it to him. McCarthy Testimony Tr. at pgs. 43-45, 48.

On December 18, 2003, McCarthy sent an e-mail to Richards, with a copy to Eric Swanson,[55] informing her that a compliance officer had told Kelly he was concerned about Madoff's "impossible" returns. E-mail dated December 18, 2003 from McCarthy to Richards, at Exhibit 158. In the e-mail, McCarthy did not reveal that the Hedge Fund Manager had submitted the complaint to OCIE approximately seven months earlier and

---

[55]  The December 18, 2003 e-mail from McCarthy came from McCarthy's e-mail account but was signed "Eric," presumably for Eric Swanson, the OCIE Assistant Director who worked closely with McCarthy. McCarthy thought it was possible he and Swanson worked on the e-mail together and then McCarthy sent it to Richards. McCarthy Testimony Tr. at pgs. 51-52.

that the complaint had been sitting idle with the SRO Group for months, but stated as
follows:

> A compliance officer at an investment adviser notified Mavis
> [Kelly] that he was concerned about the returns Fairfield was
> posting.  He said that he was aware that Madoff was running
> Fairfield using a strategy called a split strike conversion or option
> something or other, that he was very familiar with that strategy,
> and that from his perspective, it would have been impossible for
> Madoff/Fairfield to post the returns they have using this strategy.
> We would like to contact this compliance officer and get a better
> understanding of how this strategy is supposed to work.

E-mail dated December 18, 2003 from McCarthy to Richards, at Exhibit 158.  Richards
provided her permission for the examiners to contact the Hedge Fund Manager, but
testified she was unaware that the Hedge Fund Manager had sent OCIE a detailed
complaint with attachments.  Richards Testimony Tr. at pgs. 45-46.

> 9.    Richards and McCarthy Called Madoff Prior to OCIE's
>       Examination

Later that day, McCarthy and Richards placed a phone call to Madoff.  E-mail
dated December 18, 2003 from Richards to McCarthy, at Exhibit 159; E-mail dated
December 19, 2003 from Donohue to Daugherty, at Exhibit 160.  Richards "recall[ed]
telephoning him in advance of an exam that we were going to perform to tell him that we
expected full cooperation of the firm."  Richards Testimony Tr. at p. 26.  Richards stated
that it was not atypical for her to call registrants prior to an examination and that "in
situations where it's important, where we want their cooperation and expect it promptly;"
she does "many of those calls."  Richards Testimony Tr. at p. 68.  McCarthy testified,
"It's not normal for Lori to be on a call with me … [b]ut … I'm sure it's happened many
times in the past."  McCarthy Testimony Tr. at p. 75.  Daugherty testified Richards has
"been involved in conversations with the registrants, particularly the heads of registrants,
on multiple occasions that I've been a part[y] to."  Daugherty Testimony Tr. at p. 65.
Another examiner testified that in his experience it was unusual for Richards to
personally call registrants at the start of an examination.  Donohue Testimony Tr. at p.
55.

Richards testified she did not recall having a substantive discussion with Madoff
on the December 18, 2003 call, stating, "I don't recall specifically.  I recall generally
saying what we would be looking at. … I don't recall specifically but it would likely have
been we're looking at allegations of front-running."[56]  Richards Testimony Tr. at p. 66.

---

[56]  Madoff recalled that two years before NERO examiners performed an examination at BMIS, he received
a phone call from Lori Richards, which he characterized as an inquiry for a hedge fund sweep.  Madoff
Interview Memorandum at p. 2.  He stated that while in the lobby of his building, his personal cell phone
rang and he had the following conversation with Richards:

McCarthy recalled they called Madoff "basically to verify that he had a hedge fund[,] … what that looked like, where the trades were executed, things like that. And to basically make sure that we could … then start conducting the exam." McCarthy Testimony Tr. at p. 73. Other documents from the examination indicate Richards and McCarthy had a substantive conversation with Madoff, and Madoff told them he was executing trades for four hedge funds using a split-strike conversion strategy. Draft letter dated December 2003 from Swanson to Madoff, at Exhibit 161; E-mails dated May 26, 2005 between Swanson, Donohue, and Nee, at Exhibit 162; Donohue Testimony Tr. at p. 60.

According to undated notes from the examination papers, it appears that McCarthy took notes of at least one conversation with Madoff.[57] Swanson notes, undated, on conversation with Madoff, at 4, at Exhibit 163; Swanson Testimony Tr. at p. 70. The notes reflect Madoff telling McCarthy about his operations and investment strategy. *Id.* The notes state, "Black Box Drives Model"; "4 Funds [are] offshore Funds"[58]; "no discretion = 10% return." Swanson notes, undated, on conversation with Madoff, at 4, at Exhibit 163.

---

| LR: | "Bernie, its Lori." |
| BM: | "Hi Lori." |
| LR: | "I need you to help me out. Can you tell me about your hedge funds?" |
| BM: | "I don't have a hedge fund." |
| LR: | "I didn't think so." |
| BM: | "I execute trades for hedge funds." |

*Id.* Madoff recollected the call lasting about 15 minutes, and stated that John McCarthy may have been on the call, but could not remember for sure. *Id.* He remembered Richards telling him that he'd probably get a call from McCarthy and that they may need more information from him. *Id.* Shortly thereafter, Madoff received a call from McCarthy, during which McCarthy told him, "You'll get a letter after the first of the year." *Id.* Madoff stated that when he got the letter, it was readily apparent to him that they were focused on front-running and thought it was part of a sweep that the SEC was doing on front-running. *Id.* He recalled the letter was seeking the names of hedge funds he did business with, a description of his split-strike conversion strategy, copies of "maybe" two years of statements from large hedge funds, and his P&L trading profit in those securities. *Id.*

[57] Alex Sadowski, an OCIE Branch Chief at the time, testified McCarthy told him that he had spoken to Madoff during the examination. Sadowski Testimony Tr. at p. 32.

[58] McCarthy testified Madoff told him he did his trading in London. McCarthy Testimony Tr. at pgs. 101-102. There is no evidence in the examination papers or from examiner testimony that Madoff told the OCIE examiners that he was executing trades in London. According to notes that have been identified as McCarthy's, Madoff may have told him the feeder funds (not the trade executions) were off shore. Swanson notes, undated, on conversation with Madoff, at 4, at Exhibit 163; Swanson Testimony Tr. at p. 70. McCarthy may also have developed his belief Madoff told him that he was trading off shore from news reports of what Madoff told NERO examiners in 2005.

B.    SRO Group Began Planning Its Examination of Madoff in December 2003

1.    The Madoff Examination Team Consisted Entirely of Attorneys

In December 2003, McCarthy, Swanson, and Donohue assembled a team from the SRO Group to work on the cause examination of Madoff.  The examination team included the following members, all of whom where attorneys:  John McCarthy, Associate Director; Eric Swanson, Assistant Director; Mark Donohue, Branch Chief and later Assistant Director; Jaqueline Wood, Staff Attorney; and Genevievette Walker, Staff Attorney.[59]  Draft Planning Memorandum dated December 16, 2003 from Donohue, Walker, and Wood to Swanson, at Exhibit 165.  Two other attorneys – Matthew Daugherty and a former OCIE Attorney Advisor – had limited involvement in the examination.  Former OCIE Attorney Advisor  Testimony Tr. at p. 29; Daugherty Testimony Tr. at p. 57; Donohue Testimony Tr. at p. 24.  Donohue stated that his role was to "run the examination."  Donohue Testimony Tr. at pgs. 21-22.

At the time of the Madoff examination, McCarthy had worked at the Commission for almost a decade.  McCarthy Testimony Tr. at p. 11.  He worked in the Division of Market Regulation until OCIE was established in 1995.  McCarthy Testimony Tr. at p. 11.  In OCIE, McCarthy worked on and supervised inspections of SROs until 1999, when he briefly left the Commission to work at Knight Securities.  McCarthy Testimony Tr. at pgs. 12-13.  After his return to the Commission, Richards promoted McCarthy to Associate Director.  McCarthy Testimony Tr. at pgs. 13-15.  As the Associate Director, he was responsible for "running the SRO Inspection Program" and supervised 10-25 people.  McCarthy Testimony Tr. at p. 16.

McCarthy worked closely with Swanson, his second-in-command.  Swanson Testimony Tr. at pgs. 12-13, 141.  Swanson graduated from law school in 1993 and practiced non-securities related law until he came to the Commission in August 1996.  Swanson Testimony Tr. at 10.  After working in the SRO Group for approximately two years, he was promoted to Branch Chief.  Swanson Testimony Tr. at p. 11.  In 2000, he was promoted to Senior Counsel.  Swanson Testimony Tr. at pgs. 11-12.  Within a few months of becoming Senior Counsel, Swanson was promoted again to Assistant Director in a "completely different" SRO Group (now known as "Market Oversight"), where he supervised approximately 8-18 employees.  Swanson Testimony Tr. at pgs. 11-12.

---

[59] Walker claimed that at the beginning of the examination, she was designated the lead examiner and that Donohue later removed her from that role.  Letter dated June 12, 2009 from Walker to Kotz, with attachments, at p. 2, at Exhibit 164.  While Wood testified that she did not act as lead on the examination, she did not testify that Walker was designated as the lead or that Donohue removed Walker from that role.  Wood Testimony Tr. at p. 112.  Donohue did not recall whether the Madoff examination had a lead examiner, and the examination papers do not indicate that the examination had a lead examiner.  Donohue Testimony Tr. at p. 28.

2.      OCIE Expanded Rapidly and Lacked Trained Examiners

It does not appear the Branch Chief and examiners were chosen to work on the Madoff examination due to any particular expertise or experience. At the time of the Madoff examination, OCIE "didn't have many experienced people at all. … we were expanding rapidly and had a lot of inexperienced people at the time. … I guess you could say we were all effectively inexperienced." Daugherty Testimony Tr. at p. 69. Wood had a similar recollection, stating that many OCIE examiners were relatively inexperienced in 2003. Wood Testimony Tr. at p. 129.

Donohue came to the Commission in 2000 after practicing general litigation for approximately five years. Donohue Testimony Tr. at pgs. 9-11. He began at the Commission as a staff attorney in SRO 1 Group (now known as Market Oversight). Donohue Testimony Tr. at pgs. 12-13. After approximately a year and a half, he was promoted to Branch Chief reporting to Eric Swanson, the position he held when the Madoff cause examination began. Donohue Testimony Tr. at p. 13. In February 2004, approximately a year after he became a Branch Chief, he was promoted to Assistant Director. Donohue Testimony Tr. at p. 14. After his promotion to Assistant Director, Donohue took Swanson's place as the Assistant Director on the Madoff examination. Swanson Testimony Tr. at p. 99; Donohue Testimony Tr. at pgs. 26-27.

Wood arrived at the Commission in September 2003 after practicing litigation at a law firm for almost five years. Wood Testimony Tr. at pgs. 10, 13. Wood explained, as follows, that she did not have formal securities training when she came to the Commission and had no training in identifying fraud:

> It's really on-the-job training. I mean, that was something that myself along with other individuals in the group wanted to have more formalized training. We thought it was very important to bring people on and do some type of formal training, but it just didn't happen for some reason. … I think back in 2003 when I came, it was a very young group and a group of people who wanted to be trained more and more and probably there should have been better training. And I think that for me, that was one of the issues that I had with the group. I think that could be part of the problem.

Wood Testimony Tr. at pgs. 91, 129.

Another OCIE examiner who joined the Commission in 2003 provided a similar description of OCIE training, stating as follows:

> Oh, there was no training. … And I was told that when I came in that this was a trial by fire kind of job that you get trained as you come in; and, frankly, I don't know how you trained somebody to do this side of the job. And I feel over time, luckily I had a

background in some trading activity, so I understood basic trading,
how it works, what the terminology is and that sort of thing, but …
there's a lot of people that weren't familiar with securities laws.

OCIE Staff Attorney Testimony Tr. at p. 49.

Walker, the other examiner on the team, also commented on the lack of
experience and training in OCIE.  She said she "observed many people who appeared to
be hired by the SEC more for their personal connections to other SEC employees than for
any substantive experience or knowledge they possessed.  It appeared that these
employees were supposed to learn on the job, which was difficult to do given the nature
of the SEC's work."  Letter dated June 12, 2009 from Walker to Kotz, with attachments,
at 8, at Exhibit 164.

Walker had approximately two years of securities experience before joining the
Commission in April 2001.  Letter dated June 12, 2009 from Walker to Kotz, with
attachments, at p. 9, at Exhibit 164.  Following her law school graduation in 1999, she
worked for approximately a year and eight months at the American Stock Exchange as a
Market Investigations Department Liaison.  *Id.*  At the American Stock Exchange, she
"[r]eviewed trading in AMEX equities and options for violations of exchange rules and
federal securities laws" and "[c]onducted numerous insider trading investigations and
other reviews of violative trading violations."  *Id.*  In law school, she spent three months
as a legal extern at the NASD Office of Dispute Resolution, where she assisted with
arbitration hearings and in the preparation of arbitration awards.  *Id.*

Walker's "'view' of the team assigned to the Madoff investigation was that they
did not have much experience in equity and options trading.  Rather, their experience was
in general litigation."  Letter dated June 12, 2009 from Walker to Kotz, with attachments,
at p. 8, at Exhibit 164.  Similarly, Wood expressed that the SEC "need[s] to make sure
you have people in the office who have industry experience who have been in the
industry and can spot these issues based on experience."  Wood Testimony Tr. at p. 128.

3.      SRO Group Chose Not To Include Investment Management
         Examiners on Examination Team

The SRO Group did not request investment adviser staff support for the
examination.  Wood Testimony Tr. at p. 39.  McCarthy testified that he could have
created an examination team that had examiners with Investment Management expertise
or could have separated the issues and had the OCIE Investment Management Group
examine the issues associated with the verification of certain trading activity.  McCarthy
Testimony Tr. at p. 62.  Swanson stated that if he were handling the complaint, he thinks
"there would have been some joint effort between the two disciplines within OCIE to – to
review it."  Swanson Testimony Tr. at pgs. 41-42.  Associate Director Gene Gohlke
explained that they could have had a combined SRO/Investment Management
examination team whether or not Madoff was registered as an investment adviser.
Gohlke Testimony Tr. at pgs. 46-48 (stating, "in this case, yet, if it is a registered broker-

dealer, and he had, what in retrospect appeared to be discretionary accounts, yes, those would be fair game for examination.").

Both examiners and examination supervisors testified that until recently, the two OCIE groups rarely collaborated on examinations. Sollazzo Testimony Tr. at pgs. 67-68 (stating "we rarely did joint exams" until recently); Nee Testimony Tr. at p. 48 (stating "I don't think we have ever, until maybe this year, sent examiners out together"); Ostrow Testimony Tr. at p. 57 (stating each of the examination programs was a "silo"); Snively Interview Tr. at p. 28 (testifying he cannot recall working on any joint examination in the ten years he has worked at the SEC); IM Staff Accountant Testimony Tr. at p. 13 (stating he cannot recall ever "doing a 100 [%] coordinated examination with the BD staff").

4.      Examination Planning Memorandum Stated Trading Data Would
be Sought From the NASD

In mid-December 2003, Wood and Walker drafted a "Planning Memorandum" for the Madoff cause examination. Draft Planning Memorandum dated December 16, 2003 from Donohue, Walker, and Wood to Swanson, at Exhibit 165. The Planning Memorandum was divided into four parts: (1) Background; (2) Scope of the Inspection; (3) Course of Action; (4) and Potential Issues, and it had one attachment – an "NASD Document Request Letter." *Id.*

The Background section of the Planning Memorandum stated that an "outside source" has provided information that Madoff "has been committing front-running violations" and "is allegedly effecting either equity or option security transactions via Madoff-managed hedge fund accounts based on inside market moving information regarding equity block trades effected through Madoff Securities and possibly other unknown broker-dealers." *Id.*

The "Scope of the Examination" section stated, "The staff intends to examine customer orders received by Madoff Securities for the time period of January 1, 2001 through December 31, 2002 in order to determine whether Madoff is front-running impending Madoff Securities block transactions through his Madoff-managed fund accounts." *Id.*

Under "Course of Action" subsection A, the Planning Memorandum indicated, "The Staff intends to send a letter to NASD requesting execution data for Madoff Securities for the time period of January 1, 2001 through December 31, 2002. The Staff will review and analyze the execution data produced by NASD to identify which trades or series of trades may have been utilized to commit the alleged front-running violations." *Id.*

Subsections B and C stated the staff intends to send a document request to BMIS requesting that he produce order execution data, a list of prime brokerage firms utilized in connection with Madoff's hedge fund accounts, and account opening documentation for proprietary accounts. *Id.* Subsection D stated as follows: "The Staff intends to send a

92

letter to those investment adviser firms that market Madoff-managed hedge funds. The Staff will request that each firm produce, among other things, a list of Madoff-managed hedge funds that the firm markets to its customers." *Id.* The examination team did not reference an intention to go on-site to review trading records at BMIS. *Id.*

In the final section of the Planning Memorandum, the Staff identified the following potential issues:

> A. Inability to obtain execution data from hedge funds[;] B. Inability to identify which securities comprise the hedge fund portfolios[;] C. Inability to identify the investors in the hedge funds[; and] D. Inability to determine the identity of both sides of the front-running strategy due to the inability to obtain the execution data from the hedge funds.

*Id.* There was no reference in the Planning Memorandum to any trade executions occurring in Europe or anticipated difficulties in obtaining trade data. *Id.*

5.    McCarthy Focused the Examination on Front-Running

The determination that the "Scope of the Examination" focus exclusively on front-running was made by McCarthy, in consultation with Swanson and Donohue.[60] McCarthy Testimony Tr. at pgs. 25, 56; Swanson Testimony Tr. at p. 49; Donohue Testimony Tr. at pgs. 22-24.[61] When determining the focus of the examination, it does not appear that McCarthy or Swanson closely reviewed or analyzed the allegations in the Hedge Fund Manager's complaint. McCarthy Testimony Tr. at pgs. 56-57; Swanson Testimony Tr. at p. 55-56. Although McCarthy and Swanson referenced the Hedge Fund Manager's complaint in an e-mail to Richards, neither recalled reviewing the complaint. Swanson Testimony Tr. at pgs. 34, 50-51; McCarthy Testimony Tr. at pgs. 56-60.

Issues raised by the Hedge Fund Manager's complaint and the two 2001 articles[62] other than front-running – such as auditor independence, Madoff's extraordinary returns, and lack of liquidity in the options market to support alleged trading – were not investigated at all in the examination. *Id.* at pgs. 57-61; Donohue Testimony Tr. at pgs. 43-44. When asked why the other issues in the Hedge Fund Manager's complaint and the two 2001 articles were not investigated, McCarthy stated he did not recall the allegations in the Hedge Fund Manager's complaint and focused on front-running because "my

---

[60] Generally, front-running is the illegal practice of a broker executing orders on a security for its own account while taking advantage of advance knowledge of pending orders from its customers.

[61] The staff examiners performed work as directed by Donohue, but asserted they were unaware of what had instigated the examination. Wood Testimony Tr at pgs. 24-26; Former OCIE Attorney Advisor Testimony Tr. at p. 15; Letter dated June 12, 2009 from Walker to Kotz, with attachments, at p. 6, at Exhibit 164.

[62] Madoff stated that when the *MARHedge* and *Barron's* articles came out, he expected the SEC to come follow up with him, and he was surprised the SEC did not. He also mentioned that Arvedlund did not know what she was talking about, and that it was obvious she was not familiar with the industry. Madoff Interview Memorandum at p. 8.

group was responsible for trading exams, so we focused on, in essence, the trading aspect of the allegation. … it could be mainly because that was the area of expertise for my crew." McCarthy Testimony Tr. at pgs. 54, 56. McCarthy stated he recalled telling "Lori [Richards] that there's allegations of front-running so I said that … would be an area that we could do an exam." *Id.* at p. 56.

McCarthy testified he did not make a mistake in focusing the examination on front-running "because that's where my area, my team's area of expertise led." *Id.* at p. 88. McCarthy stated his responsibility was only "to take information that's consistent with my program and to follow up on those complaints." *Id.* at p. 89.[63] He stated he would have expected OCIE's Investment Management Group "to follow up on those complaints that were consistent with their program." *Id.* at pgs. 89-90. McCarthy testified that he now believes that "the other allegations should have been brought to other people's attention." *Id.* at p. 88. In contrast to McCarthy's narrow view of the SRO Examination Program, Donohue stated the SRO Group worked on a wide variety of issues: "Our office focused on SROs, but we do broker-dealer work, investment adviser work. We focus on trading issues. Anything that I was directed to do or came in the door from our standpoint we would work on. It was a wide variety of information." Donohue Testimony Tr. at p. 14.

Swanson explained he was,

> focused predominantly on whether or not there was front-running going on [because] [i]t was just a theory that seemed to make sense to me, you know. … [M]y theory was, and I think I've since learned or come to understand that it's not a very good theory …[was that] it did seem likely to me that having access to that type of retail order flow could be valuable and that you could profitably trade ahead of it and make money.

Swanson Testimony Tr. at pgs. 48-49. Swanson further stated, "I can tell you that the idea of front-running seemed very plausible, based on information that I knew in the past, plus it was within my – much more in my rubric of what I understood about the securities world …" *Id.* at p. 45. He said, "I do recall in my mind settling on the issue, if there's something here, it's most likely front-running." *Id.* at p. 74. He did not recall ever speaking with the Hedge Fund Manager. *Id.* at p. 74.

---

[63] The FTI Engagement Team opined that to focus an exam based upon the expertise of a team rather than on the complaint itself is nonsensical. As a result of the decision to not request assistance from the Investment Management Examination Group, the FTI Engagement Team concluded the project was not properly staffed with the expertise needed to address the allegations raised in the complaint.

6.      Swanson Acknowledged in Testimony that If He Had Carefully
        Reviewed the Complaint, He Would Have Investigated Additional
        Red Flags That Were Raised

Swanson stated the Hedge Fund Manager's complaint and the 2001 articles mean
something different to him today than they did at the time of the examination in 2003-
2004, noting, "I didn't know anything, very little anyway, about hedge funds and mutual
funds and how they operated." *Id.* at p. 39.  Swanson admitted that to someone who
understood the hedge fund world, Madoff's failure to charge money management fees
"would probably be a little surprising." *Id.* at p. 37.  Swanson now reads the Hedge Fund
Manager's complaint to "indicate to me … [BMIS] may be not trading as much in
options as they're saying they're doing," and the red flag about the auditor to "signal
some level of a lack of independence with respect to the auditor." *Id.* at pgs. 37-38.

Swanson testified that if he had reviewed the complaint, he would have wanted to
look into the auditor issue.  Swanson Testimony Tr. at p. 50.  McCarthy and Donohue
also thought that the allegation that the auditor was a related party to the principal was
noteworthy and something that should have been followed up upon.  Donohue Testimony
Tr. at p. 42; McCarthy Testimony Tr. at p. 58.  As Donohue explained, "His statement
that the auditor of the firm is a related party to the principal would indicate that there are
potential conflicts with the firm and the auditor."  Donohue Testimony Tr. at p. 42.
However, during the course of the examination, the exam team did not examine whether
the auditor of the firm was a related party to the principal.[64] *Id.*

7.      Donohue Acknowledged Issues Raised in the Hedge Fund
        Manager's Complaint Other Than Front-running Should Have
        Been Investigated

Unlike McCarthy and Swanson, Donohue recalled reviewing the Hedge Fund
Manager's complaint and attachments during the course of the examination.  *Id.* at pgs.
32, 48; E-mail dated December 17, 2003 from Donohue to Walker, at Exhibit 153.
Donohue testified "[t]he whole document is a red flag of a problem.  He is asserting a
problem.  Every piece of information in here is his support of the problem."  Donohue

---

[64]  According to the FTI Engagement Team, the allegation regarding BMIS's auditor should have been
investigated because the lack of an independent auditor raises concerns as to whether or not the auditor is
unbiased, fair and impartial.  Without an independent auditor, there can be no assurance that the BMIS's
audits were properly conducted.  Such potential conflicts should heighten awareness of, and the need for,
verification that Madoff had internal controls in place that were designed to effectively prevent certain
inappropriate activities, such as misrepresentation of performance results and the safety of client assets
from misappropriation.  Typically, in conducting basic due diligence of the auditor, an examiner will
review the auditor's engagement letter, reports, and work papers.  After Madoff confessed to running a
Ponzi scheme, the New York Staff Attorney in the Division of Enforcement was assigned to investigate
Madoff's accountant, David Friehling.  Within a few hours of obtaining the work papers, the New York
Staff Attorney determined that no audit work had been done.  New York Staff Attorney Testimony Tr. at p.
10.  Immediately upon reviewing Friehling's work papers, the New York Staff Attorney testified, there
"were red flags for me as to the auditor. … I didn't see anything that resembles kind of formal work papers,
auditor work papers that would comply with generally accepted audit standards.  So, there was almost
nothing that indicated that any audit work had been done." *Id.* at 9-10.

Testimony Tr. at p. 41.  Donohue admitted, "I certainly wish I would have followed up on more stuff after the fact." *Id.* at p. 38.

The structure of Madoff's operation was also something Donohue said he would have expected OCIE to follow up on at the time of the examination. *Id.* at pgs. 34-35. The allegation that Madoff was managing $8-10 billion in discretionary broker-dealer accounts and not charging management fees "was not normal" and "something we would look at." *Id.*

Donohue agreed the Hedge Fund Manager's complaint implied that Madoff was misrepresenting his options trading. *Id.* at p. 37.  However, the OCIE examination team did not take any measures to verify whether or not Madoff was trading options on CBOE, and Donohue conceded that the examination did not engage in sufficient analysis or examination of options trading issues raised in the Hedge Fund Manager complaint. *Id.* at pgs. 39-40.  Donohue could not explain why the examination did not focus on the options trading issues. *Id.* at p. 38.

8.      The Examination Did Not Focus on Red Flags Raised in
        MarHedge Article About Madoff's Trades Not Being Seen in the
        Market

In addition, the team did not examine the market impact of Madoff's alleged equity trading.  The *MARHedge* article raised the issue of Madoff's "related ability to buy and sell the underlying stocks without noticeably affecting the market."  Michael Ocrant, *Madoff Tops Charts; Skeptics Ask How*, MARHedge, May 2001, at Exhibit 146. Donohue stated that one would expect $7-12 billion of buying and selling S&P 100 stocks to be noticed in the market, but "I do not remember us looking at the market impact of the trading strategy."  Donohue Testimony Tr. at p. 47.  With hindsight, Donohue agreed that the article implies that Madoff might not actually be trading. *Id.* at pgs. 47-48.

Moreover, Donohue agreed that the Hedge Fund Manager's complaint could be interpreted as alleging that BMIS was running a Ponzi scheme. *Id.* at p. 44.  In fact, in reaction to reading the Hedge Fund Manager's statement that "BMIS never had to face redemption … [and] given the fact that the different feeders are closed for new investments, there is always replacement capital," Donohue stated, "I think he is providing allegations of what he is alleging that could be interpreted as a Ponzi scheme." *Id.* at p. 44.

9.      Investment Management Examiners Did Not Read the Complaint's
        Main Focus to be Front-Running

Kelly did not understand why the SRO Group focused its examination on front-running, since she did not believe that the crux of the Hedge Fund Manager's complaint was front-running.  Kelly Testimony Tr. at pgs. 72, 74.  Likewise, OCIE Associate

Director Gohlke opined that front-running did not appear to be the focus of the complaint, stating:

> [T]his more or less doesn't say front-running in it. This … says that trades are done, but apparently information in the market didn't support the fact that those trades were being done. And so that doesn't necessarily mean front-running at all. … It means something else.

Gohlke Testimony Tr. at p. 49.

Swanson asserted that the OCIE Investment Management Group had more expertise than his group did to investigate the performance issues raised in the complaint, stating, "the Investment Adviser, Investment Company Examination group within OCIE … I think that would have been their area of expertise, certainly much more than the [M]arket [O]versight [Group]." Swanson Testimony Tr. at p. 41. Swanson testified that if the complaint was "deemed to be a high priority, I'm guessing that they [the Investment Management Group] would have looked at it." *Id.* at p. 42. However, the Investment Management examiners never had any involvement in the examination after referring it to the SRO Group.

C.      Conduct of the Examination

1.      Examination Team Did Not Send Draft Letter to NASD

As referenced in the Planning Memorandum, the staff prepared a draft letter to the NASD, dated December 17, 2003. Draft letter dated December 17, 2003 from Swanson to Luparello, at Exhibit 166. Examiners addressed the letter to Stephen Luparello of the NASD, and requested "Transaction data for all order executions effected by Madoff Securities" from "January 1, 2001 through December 15, 2003." *Id.* The letter was likely drafted because, as McCarthy testified, it would be good practice for the staff to request trade data from the NASD, in part because "it has a certain level of reliability" and was "easy to get." McCarthy Testimony Tr. at pgs. 64-65, 107.

Likewise, Swanson stated that "the NASD was oftentimes the best source to get accurate, timely sales data. So what we would have been doing is getting information about the market making trades that were reported to NASD from Madoff during that time period." Swanson Testimony Tr. at p. 53. Wood explained, "we wanted to see the data from a third-party, an outside source. … Just to make sure, compare it with what we received from the actual firm." Wood Testimony Tr. at p. 45. Daugherty testified, as follows, that given the type of allegations the team was looking at in this cause examination, it would not be out of the ordinary to seek data from a third-party: "well, it depends what stocks you thought he was disadvantaging. Because if it was New York listed stocks, you would go to New York [Stock Exchange]. If it was third market stocks like the Qs, or NASDAQ listed stocks like Microsoft, you would go to the NASD, or FINRA…." Daugherty Testimony Tr. at pgs. 78-79.

However, the letter to the NASD was never sent.  Nor did the staff request trade data from another independent third-party.[65]  Rather, the staff relied exclusively on trade data provided to them by Madoff.  Swanson testified that he was "perplexed" by the team not requesting data from the NASD because "I'm not sure how we would have done the review of – for front-running if we didn't have that."  Swanson Testimony Tr. at p. 62. Wood also stated she did not "know why this letter would not have gone out and I don't have a reason as to why it wouldn't go out because this would be data that we would ask for."  Wood Tr. at p. 47.  Donohue stated that the "execution data would certainly [have] been helpful," and he did not know why the letter to the NASD was never sent "other than we got information from the firm itself."  Donohue Testimony Tr. at p. 50.  Donohue explained, "I wish I would have gone to a bunch of different sources to get information." *Id.* at p. 50.  If the staff had requested audit trail information from the correct third-party, the examiners could have uncovered Madoff was not making the trades he claimed to be making, according to Donohue who stated, "I think that we would have been able to uncover that he was not trading there."  *Id.* at pgs. 51-52.

It appears that the letter to the NASD was not sent because it was less time-consuming for examiners to request and use data supplied by Madoff and because OCIE routinely relied on data provided by the subjects of examinations.  Donohue explained that detailed audit trail data can be "tremendously voluminous and difficult to deal with and is a huge resource issue for us."  *Id.* at p. 83.  Moreover, until Madoff's confession to running a Ponzi scheme in December 2008, it was not unusual for OCIE to rely exclusively on records and data produced by the registrant, even in instances in which the registrant was being examined for possible fraud.  McCarthy Testimony Tr. at pgs. 69-70, 72; Swanson Testimony Tr. at pgs. 54-55, 86; Wood Testimony Tr. at p. 53.  As Swanson stated, "We … routinely requested trading information from registrants directly."  Swanson Testimony Tr. at p. 54.  Richards testified that she did not know if "confirm[ing] the accuracy of particular trades" with third parties was a routine part of examinations, but asserted that "Going forward it's clearly going to be a part of examination protocol and already it is for investment adviser and broker-dealer exams."  Richards Testimony Tr. at p. 58.

    2.    OCIE Examiners Did Not Request Documents from Madoff
          Feeder Funds

In addition to the staff not requesting and reviewing trade data from the NASD as they had outlined in the Planning Memorandum under "Course of Action" subsection A, the staff did not pursue "Course of Action" subsection D, which stated, "The Staff intends to send a letter to those investment adviser firms that market Madoff-managed hedge funds… . [to] request that each firm produce, among other things, a list of Madoff-managed hedge funds that the firm markets to its customers."  Draft Planning Memorandum dated December 16, 2003 from Donohue, Walker, and Wood to Swanson, at Exhibit 165; Donohue Testimony Tr. at p. 53.  Donohue explained that he did not

---

[65]  Madoff recalled that Donohue looked at the right things for front-running, but only would have discovered it was a Ponzi scheme if he had gone to an independent third-party.  Madoff Interview Memorandum at p. 7.

know why the staff never sought the documents from the feeder funds, "other than the general decision – resources … I was likely involved in the drafting of it [Planning Memo], but I do not remember thinking about sending things out." Donohue Testimony Tr. at p. 53.

> 3.    Draft OCIE Document Request Referenced Madoff's Call with Richards and McCarthy

After completing the Planning Memorandum, the exam staff drafted a document and information request to Madoff. Madoff Document Request dated January 6, 2004, at Exhibit 167. A December 24, 2003 version of the request referenced Madoff's phone conversation with Richards and McCarthy. *Id.* Request 2 stated, "Describe in detail the hedging model or investment strategy identified as 'split-strike forward conversion' in the telephone conversation between Lori Richards, John McCarthy, and Bernie Madoff on **December 19, 2003??**." *Id.* (emphasis in original). Similarly, Request 3 directed Madoff to, "Identify the four hedge funds discussed in the telephone conversion [sic] between Lori Richards, John McCarthy and Bernard Madoff on **December 19, 2003??** …." *Id* (emphasis in original). Swanson, McCarthy, and Donohue provided revisions to the request. *Id.*; McCarthy Testimony Tr. at pgs. 80-81; Swanson Testimony Tr. at pgs. 59-60. The final version of the request did not reference Madoff's phone conversation with Richards and McCarthy. Madoff Document Request dated January 6, 2004, at Exhibit 167. Although no one could recall specifically, members of the examination team believe the references to the telephone call were taken out because they were not relevant to the document request. Donohue Testimony Tr. at p. 59; Swanson Testimony Tr. at pgs. 60-61. As Donohue explained, "I do not have any specific recollection of it. In drafting document requests we try to make them more generic than specific, therefore [] they can get more response." Donohue Testimony Tr. at p. 59.

> 4.    After Sending OCIE Document Request, Swanson Discussed Request with Madoff

The final version of the document and information request was dated January 6, 2004, addressed to Peter Madoff, and signed by Eric Swanson. Madoff Document Request dated January 6, 2004, at Exhibit 167. The request directed BMIS to provide information about its money management activities, such as "monthly profit and loss statements by security," "monthly commission revenues segregated by customer and by security," and "the identity of all institutional customers of Madoff Securities." *Id.* The request also directed BMIS to identify each private equity investment held by Madoff Securities, "to describe "the 'split-strike conversion' strategy used by some customers of Madoff securities, list the customers using that strategy, list all securities traded as part of that strategy, and explain how Madoff Securities is compensated for executing that strategy." *Id.*

In addition, the staff asked Madoff for "copies of all communications and disclosures from the customers using the strategy … since January 1, 2001." *Id.* Finally, the document request directed BMIS to "[i]dentify all hedge funds managed or advised

by any person or entity affiliated with Madoff securities, … [and] the investment objective and strategy of each fund since January 1, 2001." *Id.*  No request for audit trail data was in the initial information and document request.  McCarthy Testimony Tr. at p. 82; Donohue Testimony Tr. at p. 61.

Swanson recalled speaking with Madoff right before or soon after sending the initial document request.  Swanson Testimony Tr. at p. 66.  Swanson stated he does not believe he took notes of the conversation, as he did not typically take notes of telephone conversations with registrants.  *Id.*  Swanson recalled Madoff told him "there was a Chinese wall in place" and there was no basis for the Commission's concerns he was running a hedge fund.  *Id.* at p. 57.  Madoff explained to Swanson that BMIS only executed trades for hedge funds using a particular strategy and did not actually have a hedge fund.  *Id.*  Swanson recalled telling Madoff to send the Commission the data that they requested.  *Id.*

Swanson also recalled a subsequent call with Madoff and Lori Richards, but he did not recall any details about the conversation.  *Id.* at p. 58.  Richards only recalled having two conversations with Madoff:  a phone call at the outset of the examination and one brief conversation at a public industry conference.  Richards Tr. at pgs. 26-27.

> 5.  Documents and Information Madoff Produced Contradicted the 2001 Articles and the 2003 Complaint, But OCIE Did Not Seek to Verify the Accuracy of Madoff's Representations

On January 16, 2004, Madoff personally responded to the document request. Letter dated January 16, 2004 from Madoff to Swanson, at Exhibit 168.[66]  Madoff wrote in his response letter to Swanson, "Neither Madoff securities, nor any person or entity affiliated with Madoff Securities, manages or advises hedge funds," and "we have no interest in becoming a manager or adviser to hedge funds."  *Id.*  Instead, Madoff claimed BMIS only executed trades for institutional clients, stating, "As executing broker, Madoff Securities is compensated thru execution commissions derived from the Split Strike Conversion strategy transacted over our Institutional Department's Execution Trading Platform."  *Id.*

Madoff also claimed BMIS had "no communications or disclosures from customers using this strategy …."  *Id.*  Madoff attached several documents to his response, including a description of the split-strike forward conversion strategy; a

---

[66]  It is notable Madoff, rather than a compliance officer, responded to the staff's document requests. Although the staff's document requests were addressed to BMIS's Chief Compliance Officer, Peter Madoff, all BMIS responses in the examination came from Madoff.  It was atypical for the CEO of an entity the size of BMIS to personally respond to an information and document request.  Wood does not recall working on any other examination in which the CEO responded to an information and document request.  Wood Testimony Tr. at p. 100.  According to the FTI Engagement Team, examinations of small firms with few employees may necessarily involve significant participation from senior executives, but large firms (including Madoff) have compliance officers and other compliance staff that are typically involved in responding to SEC information requests.  The FTI Engagement Team believes that it was unusual for Madoff to serve as the primary contact during the examination.

description of "time slicing," which Madoff wrote was an automated methodology for
delivering average price executions; a list of 29 institutional customers, 16 of which he
claimed were executing trades through the Institutional Department for 4¢ per share on
equities and $1 per option contract; a list of securities he claimed were "Executed as Part
of Split Strike Conversion"; an index of excel files he provided, which purported to list
commissions BMIS earned by client; and an organization chart. *Id.*

On the organization chart, Madoff labeled one side of the chart "Institutional" and
designated only himself as an officer.[67] *Id.* On the other side of the chart, he designated
"Broker-Dealer/Wholesale," under which he listed his brother, Peter Madoff, and his
sons, Andrew and Mark. *Id.*

Madoff's response to the Document and Information Request contradicted the
Hedge Fund Manager's complaint and the two 2001 articles about Madoff which
indicated Madoff was managing money for hedge funds. Michael Ocrant, *Madoff Tops
Charts; Skeptics Ask How*, MARHedge, May 2001, at Exhibit 146; Swanson Testimony
Tr. at p. 65; Donohue Testimony Tr. at p. 63. Swanson and Wood did not recall the team
making any effort to determine whether statements Madoff made in his responses to their
document requests were accurate "and that he wasn't in fact managing money." Wood
Testimony Tr. at p. 59; Swanson Testimony Tr. at p. 65. As Swanson explained, "I
didn't test that. My concern was front-running." Swanson Testimony Tr. at p. 65.

Although Donohue could not recall whether Madoff's responses to the document
request raised questions and concerns for him at the time of the examination, he testified
that the responses, such as Madoff's claim to have no communications or disclosures
from customers, do in fact raise concerns. Donohue Testimony Tr. at 63. In contrast,
Swanson testified that learning that Madoff would not produce e-mail or other
documentation of communications with clients did not raise concerns for him, stating,
"given what I understood about what the firm was doing, I don't think I would have
expected direct communication between the executing broker and the clients of the hedge
funds." Swanson Testimony Tr. at p. 89. Wood did not recall Madoff's responses
raising concerns. Wood Testimony Tr. at p. 59. McCarthy testified he did not recall
Donohue or Swanson "highlighting concerns" about the documents Madoff produced or
the answers he provided to the staff. McCarthy Testimony Tr. at 83.

> 6.    Exam Team Spoke to the Hedge Fund Manager Who Submitted
>       the Complaint and Conveyed Concerns About Madoff, Including
>       Inexplicable Returns and Options Trading

On December 18, 2003, Richards gave McCarthy and Swanson permission to call
the Hedge Fund Manager who had submitted the detailed complaint about Madoff.
E-mail dated December 18, 2003 from Richards to McCarthy, at Exhibit 159. On
January 29, 2004, at least one senior member of the examination staff had a conference

---

[67] As discussed previously, the FTI Engagement Team opined that the Commission had authority to
examine all of the BMIS's books and records, whether they were related to market making or hedge fund
clients. *See supra* fn. 11.

call with the Hedge Fund Manager.  McCarthy notes undated, on call with Hedge Fund
Manager, at Exhibit 169.  Donohue recalled speaking with the Hedge Fund Manager and
took notes of the conversation.  Donohue notes dated January 29, 2004, on conference
call with Hedge Fund Manager, at Exhibit 170; Donohue Testimony Tr. at pgs. 67-68.  It
is unclear whether Swanson and McCarthy were also on the call; neither recalled
speaking with the Hedge Fund Manager.  Swanson Testimony Tr. at pgs. 70-71;
McCarthy Testimony Tr. at p. 87; Donohue Testimony Tr. at p. 68.

Donohue's notes of the conversation indicated that the Hedge Fund Manager
discussed several of the following concerns he raised in his complaint, including
Madoff's anomalous returns, inexplicable options trading, and unusual structure of
operation:

> -Returns are too consistently high for this strategy.

> -Funds use brokerage accts – concern

> -Speculate about the use of Market Making

> Not doing that strategy b/c option trading is not is [sic] high

> -entry and exit points of stocks

> -how does he trade the options

> -He [Hedge Fund Manager] doesn't understand how he
> consistently makes money off this strategy.

> -Perhaps he doesn't really use the strategy

> -he uses info from his mkt making

> He must have some knowledge about when to get in & out
> of positions

> -The vol. of options trading doesn't seem to be enough to
> protect the size of the equity trading.

> -Perhaps he trades options differently.

Donohue notes dated January 29, 2004, on conference call with Hedge Fund Manager, at
Exhibit 170; Donohue Testimony Tr. at pgs. 67-71.

After the call with the Hedge Fund Manager, however, the team did not look at
the market impact of Madoff's options or equity trading.  Donohue Testimony Tr. at p.

71.  The exam team continued to focus the examination exclusively on front-running.  *Id.*
at p. 72.

7.      Examination Team Analyzed Data and Detected Inconsistencies

In late January and early February 2004, the examination staff worked on trying
to understand the trading strategy Madoff claimed to be using and how Madoff was able
to generate his claimed returns.  Wood Testimony Tr. at pgs. 61-62.  Staff examiner
Walker raised the issue of Madoff's returns not appearing to fit his claimed strategy,
stating, "it has always been my understanding that 'collars' – (Madoff's strategy is a
variation of this) … is a more protective type of position (meaning protective of
underlying profits on the stock).  So, I don't think this should go in the short memo, but
perhaps we should explore it later???"  E-mail dated January 29, 2004 from Walker to
Donohue, at Exhibit 171; Donohue Testimony Tr. at p. 69.

Based on the documents and commission data provided by Madoff, Walker and
Wood drafted a summary memorandum.  E-mail dated January 29, 2004 from Walker to
Donohue, at Exhibit 171.  On February 3, 2004, Wood e-mailed Donohue (with a copy to
Walker) the final version of the memorandum, which summarized BMIS's purported
trading strategy, the commission revenues BMIS generated from its "institutional"
business, profits made from executing trades for the institutional business, and questions
the staff had after reviewing the documents produced by Madoff.  *Id.*

8.      Examiners Discovered Madoff was Making More Money from
Hedge Funds than Through Market Making

The memorandum described BMIS's compensation and states in the following
excerpt that Madoff made most of his revenue from only four clients:

> Madoff is compensated 4 cents per share 'commission equivalent'
> on equities and $1.00 per option contract.  Although 16 of
> Madoff's institutional clients utilize this trading strategy, since
> 2001, the vast majority of Madoff's commission revenues is
> derived from only four of its clients [identified as Kingate Global
> Fund, Thema Ltd, Fairfield Sentry Ltd, and Tremont – Broad
> Market Fund].

*Id.*

Notably, the examiners made the surprising discovery that BMIS's mysterious
institutional business was making significantly more money for BMIS than was BMIS's
well-known market making operation.  *Id.*  However, Wood and Walker did not identify
this finding as a cause for concern in the memorandum:

> The commission revenues generated from these four institutional
> clients account for the overwhelming majority of commission

revenues generated for the firm since 2001.  Obviously, this
trading strategy has yielded Madoff unbelievable profits, which
would explain why this strategy is well-guarded by Madoff. …
Moreover, the profits from Madoff's market making trades are
nominal compared to the commissions generated from those clients
utilizing the split-strike forward conversion strategy.

*Id.*

Donohue admitted the fact that the "overwhelming majority" of BMIS's profits
came from commission revenues from four hedge fund clients and not from market
making activities "was a concern" and "[t]he size of his profits were of concern."
Donohue Testimony Tr. at p. 73.  Wood testified none of the senior members of the
examination team (McCarthy, Swanson, and Donohue) told her the size of Madoff's
commissions from hedge funds was of concern. [68]  Wood Testimony Tr. at p. 71.

9.     Examination Team Contacted Madoff About Open Issues

Donohue recalled at this point in the examination, the team had significant
follow-up questions and stated, "We had concerns about what was happening and what
he was doing."  Donohue Testimony Tr. at p. 74.  Wood also recalled at that point in the
examination, there were numerous open questions.  Wood Testimony Tr. at pgs. 69-71.
The examination staff included in their memorandum a page and a half of additional
documents to request of Madoff, as well as questions to ask in a second document and
information request to BMIS.  Memorandum dated February 3, 2004 from Walker and
Wood to Donohue, at Exhibit 172.  The staff's questions included confirming Madoff had
only the 29 institutional clients he identified in his response to the staff's first request,
identifying the investment adviser for each of Madoff's clients, requesting detailed trade
execution information, and seeking all correspondence and e-mail between BMIS and its
clients relating to the split-strike conversion strategy.  *Id.*

The next day, on February 4, 2004, the examination team contacted Madoff to
discuss their open questions.[69]  Wood notes dated February 4, 2004, on conference call
with Madoff, at Exhibit 173.  Wood recalled, and her notes reflect, that the team focused
the call on understanding how his purported "black box" worked.  Wood Testimony Tr.
at pgs. 72-75; Wood notes dated February 4, 2004, on conference call with Madoff, at
Exhibit 173.  According to the following notes from Wood, Madoff once again claimed

---

[68]   The FTI Engagement Team believes that if a manager has specific concerns about an issue that arises
during an examination, it is the manager's responsibility to adequately resolve those concerns.  In this case,
the first logical step toward such a resolution would have included sharing any such concerns with the
examination staff.  Based on the disproportionately large amount of revenue and income derived from
Madoff's investment advisory clients, the examination staff should have recognized this as a red flag and
seriously considered investigating whether or not Madoff should have been registered as an investment
adviser.

[69]   Madoff recalled that during the examination, he called Dohonue and asked him if there was "something
going on here I should know about?"  Madoff Interview Memorandum at p. 7.  Madoff stated that Donohue
replied, "No, we're just trying to understand the business.  Sunlight is the best disinfectant."  *Id.*

not to act as an investment adviser:  "no discretion on the part of Madoff – everything is determined by the black box."  *Id.*

        10.      Examination was Expanded to Examine Whether Madoff was Acting as an Investment Adviser

Also on February 4, 2004, Walker sent Donohue and Wood an e-mail with the subject line, "Food for Thought re Madoff as an Investment Adviser."  E-mail dated February 4, 2004 from Walker to Donohue and Wood, at Exhibit 174.  Walker analyzed whether Madoff fell within the statutory definition of "Investment Adviser."  *Id.*  Walker noted that if he did fall within the definition and did not meet an exception from registration, Madoff would have to register with the Commission as an investment adviser and would be subject to investment adviser examinations.  *Id.*  Walker concluded, in the following e-mail, that Madoff may well have fallen within the definition of investment adviser:

> Bernie Madoff claims that he neither manages nor advises hedge funds.  However, pursuant to the Investment Advisers Act, he may fall under the definition of investment adviser.  Madoff's trading, on behalf of his hedge fund clients, is composed of two parts, the trading and the strategy.  According to the above-referenced definition, although the trading may not be considered advice, the strategy could be considered either advice or analyses of securities constituting advice, if it involves more than just executing the split-strike forward conversion stock and option combinations pursuant to the hedge fund's instructions.  For example, Madoff stated in his response to our request that he executes trades according to client-defined conditions.  Madoff has described these conditions in his response, however, it would be important to know *who* defines these conditions <u>and</u> is his description complete regarding the conditions. (NOTE: Does "client defined" mean that the fund specifies all of the conditions or does it mean that conditions for trading on behalf of clients, using the split-strike conversion strategy, are further specified, by client.  I would think that any advice provided by Madoff, in addition to the split-strike forward conversion strategy, would constitute advice and/or analyses of securities under the definition of an investment adviser, especially if he considers that information to be proprietary in nature.  Additionally, the fact that Madoff may have discretionary trading authority on behalf of the fund accounts may help to further determine whether or not he is acting as an adviser to the hedge funds. Lastly, if Madoff is in fact acting as an adviser, he may be receiving

compensation for his services in the form of "commission equivalent revenue", if we can show that the revenue includes something in addition to commissions for the actual trades.

Furthermore, the definition of an investment adviser excludes Madoff's activities _if_ he is performing services for the hedge fund clients, via Madoff Securities, that are solely incidental to Madoff's brokerage function _and_ he is not receiving special compensation.   Therefore, even if Madoff can prove that his trading on behalf of the hedge funds is solely incidental to Madoff's brokerage function, if he is receiving special compensation, pursuant to his receipt of "commission equivalent revenue", Madoff's activities would not fall under the exception for broker-dealer services.  (This is assuming that we can show that the "commission equivalent revenue" is not solely attributable commissions for the actual trading effected on behalf of the hedge funds.)

E-mail dated February 4, 2004 from Walker to Donohue and Wood, at Exhibit 175. Wood recalled the investment adviser issue "was something that Gen [Walker] was running with."  Wood Testimony Tr. at p. 81.

The Madoff cause examination was expanded to look at whether Madoff was acting as an investment adviser.  McCarthy Testimony Tr. at p. 94; Donohue Testimony Tr. at pgs. 64-66, 79.  It appeared to Donohue that Madoff was trying to avoid registration as an investment adviser.  Donohue Testimony Tr. at p. 79.  Although the investment adviser issues were outside the scope of the examination's original focus, as Donohue explained, "[t]he focus of an examination is an evolving topic.  We try to go whether the exam leads us."[70]  Donohue Testimony Tr. at p. 25.

On February 4, 2004, Walker responded to a question from Donohue by explaining in an e-mail, "Madoff needn't register as an IA [investment adviser] as long as "… during the course of the preceding 12 months [he] has had fewer than 15 clients and … [doesn't] hold[] himself out generally to the public as an investment adviser …."  E-mail dated February 4, 2004 from Walker to Donohue and Wood, at Exhibit 175.  Walker explained that Madoff had represented to the staff that he had 16 customers in 2003, 14 customers in 2002, and 13 customers in 2001.  _Id._  She reasoned it was unlikely that all of

---

[70]  The FTI Engagement Team agrees that the scope of an examination may not, and at times should not, remain static.  Newly discovered relevant information may necessitate a modification to the original scope of an examination.  For instance, in addition to the investment adviser registration issue discovered during the examination, several other issues that were raised in the Tip and reiterated in a subsequent call with OCIE should have been but were not included in the scope of the cause examination.  Such issues included the unusual fee structure; doubts expressed about replicating Madoff's strategy; concerns with regard to the lack of transparency in the options volume; and questions as to how Madoff was able to achieve his returns.

his institutional customers were hedge funds and that she was "sure he is well aware of the 15 client limitation on the exemption from registration." *Id.* Walker suggested, as follows, however, that they consider verifying Madoff's customer relationships:

> Nevertheless, we don't know the classification of all clients, when these entities became clients and when clients were dropped/added … we could verify the nature and duration of the customer relationships via their prime brokerage agreements with Madoff, if we felt that was necessary.

E-mail dated February 4, 2004 from Walker to Donohue and Wood, at Exhibit 175.

In addition to Walker's research on investment adviser registration, on February 27, 2004, Donohue asked Matthew Daugherty to research and write a memorandum for Dan Gray in the Division of Market Regulation about both broker-dealer and investment adviser issues related to Madoff. E-mail dated February 27, 2004 from Donohue to Daugherty, with attachment, at Exhibit 176. Daugherty described his involvement in the examination in the following testimony:

> My involvement in this cause exam I think was related to some research or maybe a memo I drafted on whether his investment advisory business should be registered with the Commission. … But I think Mark had asked me to do some research for him, particularly since I was kind of interested in that area, since at the time, I think the Commission was considering whether to have hedge funds register, so I had kind of been – kind of just doing a little research in that area for my own edification, and just Mark had asked me to give him some – a memo on it.

Tr. Daugherty at 57.

In March, Daugherty drafted two memoranda to Dan Gray from Lori Richards, John McCarthy, Eric Swanson, Mark Donohue and Matt Daugherty. Memorandum dated March 4, 2004 from Richards to Gray, at Exhibit 177; Memorandum dated March 11, 2004 from Richards to Gray, at Exhibit 178. McCarthy explained that "typically we'd send memos if we had questions of securities laws or interpretation or guidance, things like that." McCarthy Testimony Tr. at p. 94.

The first memorandum was dated March 4, 2004 and stated, "the Staff finds that Madoff may be misappropriating material nonpublic information relating to customer orders, and allowing the funds to profit from this order flow data in violation of various anti-fraud provisions of the Exchange Act as well as NASD rules." Memorandum dated March 4, 2004 from Richards to Gray, at Exhibit 177. The second memorandum, dated March 11, 2004, analyzed whether BMIS is a statutory investment adviser required to register with the Commission. Memorandum dated March 11, 2004 from Richards to

Gray, at Exhibit 178. The memorandum concluded that while it appeared that BMIS may fit the definition of investment adviser, the staff could not make a definitive conclusion as to whether BMIS fit an exception to registration "[u]ntil the Staff receives more information concerning the shareholders or clients to the funds." *Id.*

> 11.    Examination Team Never Resolved Question of Whether Madoff
>        Was Acting as an Investment Adviser

Although the issue was raised and the examination expanded, neither memorandum was ever sent to Dan Gray, and the examination team never resolved the issue of whether Madoff should register as an investment adviser. Memorandum dated March 4, 2004 from Richards to Gray, at Exhibit 177; Memorandum dated March 11, 2004 from Richards to Gray, at Exhibit 178.; Donohue Testimony Tr. at pgs. 79-80; Daugherty Testimony Tr. at pgs. 91-92.

> 12.    Examiners Did Not Request Audit Trail Data from Madoff in
>        Supplementary Document Request

On February 6, 2004, staff examiners Walker and Wood began to send drafts of a supplemental document request to Donohue for review. Memorandum dated March 11, 2004 from Richards to Gray, at Exhibit 178. By February 11, 2004, the staff had exchanged at least six drafts of the document request. Draft Supplemental Madoff Document Requests dated February 6, 2004, at Exhibit 179. Each of the six draft requests sought detailed audit trail data, including the date, time, and execution price for all of BMIS's trades in 2003. *Id.* The drafts also stated that Madoff should produce all of BMIS's communications with clients utilizing the split-strike forward conversion strategy and all agreements, new account opening documents and trading authorizations for Madoff clients using the trading strategy. *Id.*

On February 12, 2004, Donohue sent a draft of the document request to Swanson for final review. Memorandum dated March 11, 2004 from Richards to Gray, at Exhibit 178. The final version of the request letter, which was addressed to Peter Madoff, signed by Swanson and faxed to Madoff on February 18, 2004, did not contain a request for detailed audit trail data. Request letter dated February 18, 2004 from Swanson to Madoff, at Exhibit 180; McCarthy Testimony Tr. at pgs. 96-97. A draft of the document request in the examination work-papers showed the request for trade data crossed out with the phrase "save for next letter" written beside it.[71] In addition, the words "SEC Speaker" were written at the top of the letter near the recipient's name and address. Request letter draft, undated, from Swanson to Madoff, at Exhibit 181. Donohue testified the handwriting on the document appeared to be his. Donohue Testimony Tr. pgs. 81-82.

Donohue testified that although he believes he made the change eliminating the request for detailed audit trail data, he did not specifically recall why he decided not to request audit trail data. Donohue Testimony Tr. at p. 83. Donohue explained that one

---

[71] The OIG has found no evidence in the examination papers that the team sent any further letters to Madoff requesting documents or information.

reason why he might have decided not to request the audit trail data was because reviewing the data requires substantial resources, stating, "I can tell you we were always hesitant to get audit trail data because it can be tremendously voluminous and difficult to deal with and is a huge resource issue for us.  It takes us a ton of time."  *Id.* at pgs. 83-84.  Donohue did not recall why he wrote "SEC Speaker" on the document request.  *Id.* at p. 82.

Swanson had no explanation for why the request for detailed audit trail data would be eliminated, stating, "I can't account for this, but it would have been, frankly, asinine for us to not get the audit trail.  I don't understand that."  Swanson Testimony Tr. at p. 87.  McCarthy testified that he may have instructed Donohue to focus on pre-opening orders, but did not believe he told Donohue not to obtain the audit trail data, stating:

> … I do remember asking Mark to concentrate on the pre-open where you most likely would have market-moving information, the intraday trading.  The intraday trading I think was much more difficult to – much more difficult for that information to be front-ran.  So back to your question if you're looking at – if you have account statements which show you bought 10,000 shares on a certain day, I think that's, to me, enough information to know that that's unlikely to have front-ran retail customer orders because it's simply – there's no information in retail order flow to determine – to take advantage of that to get a better price for Exxon or Home Depot.… I mean, I definitely – like I said, the front-running – should have included trading data from retail side and from the proprietary side.  I don't recall and would certainly be surprised if I ever said, "Don't get the proprietary trading data."

McCarthy Testimony Tr. at pgs. 100-101.[72]

### 13.    Examination Team Failed to Request Data from Any Independent Third-Party

According to Donohue's undated notes from the examination, Donohue appears to have considered going to the NASD/FINRA for detailed audit trail data.  Donohue Examination Notes, undated, at Exhibit 182.  In his notes, Donohue wrote, "Mavis" and placed a box around it.  *Id.*  Beneath "Mavis," he wrote the following:

---

[72]  The FTI Engagement Team believes that detailed order and execution data would have provided the information necessary to examine whether or not Madoff was front-running its broker-dealer customers.  OATS data for instance, would have provided the time of each customer order from Madoff's market making business, which the examiners should have compared to the execution times of trades for the discretionary brokerage accounts.

Few stocks on a few days w/ critical

Get Oats from NASD & Act

all Madoff orders.

*Id*.

Donohue stated that although he did not recall a specific conversation, the only "Mavis" he knew was Mavis Kelly[73] and that the notes seemed to refer to the question of whether to request audit trail data from the NASD/FINRA.  Donohue Testimony Tr. at p. 77.  Swanson explained, as follows, why data from NASD/FINRA should have been sought:

> I think the A[CT] data would have been the most important data… .  There is a reason why you'd want OATS.  It's because it would show the time that the order arrived at Madoff, and … I don't believe the A[CT] data would have shown that.  So that is why we would have wanted to see the OATS data.

Swanson Testimony Tr. at p. 82.

Daugherty explained why one would request OATS and ACT data and stated that obtaining the data from the NASD/FINRA should not have been difficult:

> One reason would be to review the order entry information and the execution information from – that the NASD had stored regarding certain trades. … generally speaking, if you wanted to look at a limited sample of orders, it shouldn't even be a problem at all.  And even if it's a lot [of orders], we can always get it.  … But if I wanted some reasonable set from them of OATS and ACT data, it shouldn't be a problem at all.

Daugherty Testimony Tr. at p. 86-87.

Although requesting trade data from the NASD was considered and a draft letter to the NASD was written, the exam team neither requested OATS or ACT trade data

---

[73]  Donohue's notes may have been in reference to a call Mavis Kelly testified that she made to Donohue. Kelly Testimony Tr. at pgs. 72-73.  Mavis stated, "I called Mark at the time ... after market timing, and ... I was trying to impress upon them the importance of following up on this, because I found this to be a very credible source.  And, he said, you know, especially in light of what was happening at the time … they would take it very seriously." *Id.*

from the NASD, nor requested trade data from any other independent source.[74]  Donohue Testimony Tr. at p. 77.

>    14.    Donohue was Promoted to Assistant Director and Took Over
>            Primary Responsibility for the Examination

On February 22, 2004, Donohue was promoted to Assistant Director, reporting directly to McCarthy.[75]  Donohue Testimony Tr. at pgs. 14-16, 27.  When he was promoted to Assistant Director, Donohue took over the "day to day responsibility" for the Madoff examination.  Swanson Testimony Tr. at pgs. 71, 84.  As an Assistant Director, Donohue said his role on the Madoff examination did not change a great deal since a new Branch Chief was not assigned, but he had a larger number of examinations and less time to devote to the Madoff examination.  Donohue Testimony Tr. at pgs. 26-28.  Donohue stated that he believes that Swanson "stay[ed] in the loop" on the Madoff examination.  Donohue Testimony Tr. at 27.  Swanson testified that "sometime in the spring of 2004 [he] was no longer in the chain of command on the inquiry and had very limited, if any, involvement in the conduct of the inquiry or its resolution."  Letter dated June 19, 2009 from Michael Wolk, Counsel to Swanson, to IG Kotz, at p. 2, at Exhibit 183.

Donohue's testimony that Swanson remained "in the loop" on the Madoff examination is supported by correspondence, such as a March 11, 2004 e-mail from Swanson to Donohue regarding "Madoff."  *See* E-mail dated March 11, 2004 from Swanson to Donohue, at Exhibit 184.  In the following e-mail Swanson asked Donohue a question about Madoff's strategy and stated that he had suspicions about Madoff's trading:

>    Just a thought – do we know what the standard is for this strategy in terms of long, med, or short term.  Given that it is supposedly a fairly conservative strategy I would expect that it is designed to make money off of broad, med to long term mkt trends, which is clearly much diff tha[n] what [B]ernie is doing.  Doesn't prove anything, but it makes me more suspicious.

*Id.*

---

[74]  The FTI Engagement Team concluded that obtaining data from an independent third-party such as NASD/FINRA, NSCC or DTC would have assisted in independently verifying trading activity conducted at Madoff.  NASD/FINRA and NSCC data would have enabled the examination staff to verify trading volume whereas DTC data would have enabled the examination staff to verify overall position balances.

[75]  When Donohue was promoted to Assistant Director, he had worked at the Commission for approximately three years and had five years of general litigation experience.  Donohue Testimony Tr. at pgs. 9-14.  Swanson thought Donohue was capable but "no expert," while another examiner felt "that [Donohue's] level of expertise was not where it should be, given his – what position he was at the time, ultimately."  Swanson Testimony Tr. at p. 72; Former OCIE Attorney Advisor Testimony Tr. at p. 28.  In contrast, Wood found Donohue "very personable and knowledgeable, and [she] would work with him again today."  Wood Testimony Tr. at pgs. 84-85.

15.   Madoff's Responses to the Document Request Led to Additional
Questions and Concerns

On March 1, 2004, Madoff responded in writing to the staff's second document
request.  Letter dated March 1, 2004 from Madoff to Swanson, at Exhibit 185.  Madoff
stated BMIS had no communications or other correspondence with clients using the split-
strike forward conversion trading strategy and stated BMIS did not communicate with its
clients' investors.  *Id.*  Madoff included account opening documents, trading
authorizations, and client account statements for the clients he had disclosed.  Letter
dated March 1, 2004 from Madoff to Swanson, at Exhibit 185; BMIS account documents
for the period ending December 31, 2001, at Exhibit 186.  The client account statements
did not contain detailed audit trail information.  Donohue Testimony Tr. at pgs. 85-86;
McCarthy Testimony Tr. at p. 98.  They contained the date of the purported securities
transaction, the number of shares purchased or sold, the name of the security, the average
price of the security, and the amount debited or credited to a customer account.  BMIS
account documents for the period ending December 31, 2001, at Exhibit 186.  Although
the account statements included the date of each transaction, they did not contain the
execution times of those transactions.  *Id.*  The actual language of Madoff's response was
as follows:

> In response to your letter of February 18, 2004, we are
> providing copies of client account statements reflecting all
> the transaction data related to the accounts of those clients
> utilizing the split strike conversion strategy.  We have also
> enclosed copies of opening account documents, Trading
> Authorizations, Trading Authorization Directives (which
> also contain compensation disclosure relating to client
> commission and commission equivalents.)  We do not
> charge expenses or fees to clients, nor do we prepare any
> reports of client profit and loss or any other related
> information.  We do not issue or prepare reports or
> memorandum relating to trading strategies, investment
> strategies or research.  Bernard L. Madoff Investment
> Securities LLC (Madoff Securities) does not provide prime
> brokerage or full service brokerage to its clients.  We
> provide execution only services to a limited number of
> clients applying a technologically enhanced approach to a
> traditional trading strategy known as a split strike forward
> conversion.

> The enclosed Trading Authorizations and Trading Directive
> Agreements define the specific[] terms, conditions and
> obligations between Madoff Securities and those clients
> utilizing the strategy.[76]  Because of the limited scope of

---

[76]  The Trading Directive Agreement for Kingate Global Fund Limited had a BMIS header and stated that
the trades will be executed by BMIS.  *See* Undated "Trading Authorization Directive" for Kingate Global

> brokerage execution service we provide and the fully automated and electronic nature of our business, there are no other communications or correspondence between Madoff Securities and their clients utilizing the split strike forward conversion.  Madoff Securities does not communicate or correspond with the investors or owners of its clients.

Letter dated March 1, 2004 from Madoff to Swanson, at Exhibit 185.

Madoff's response to the second document request raised concerns with the staff. Donohue Testimony Tr. at p. 87.  As Donohue recalled, the exam staff was "concerned about [Madoff's] communications."  *Id.*  When asked whether the team thought it was odd that BMIS, a company known for its advanced technology, was claiming not to have e-mail communications with clients, Donohue agreed he had never seen anyone operate the way Madoff did, stating:

> What was going on was different than what I was used to. It was all a concern.  I do not mean to over generalize, but it was a concern.  We were trying to figure out what was going on.

*Id.*

McCarthy and Swanson did not recall reviewing Madoff's response to the second document request.  McCarthy Testimony Tr. at p. 97; Swanson Testimony Tr. at p. 88. However, on March 9, 2004, Wood sent Swanson (with a copy to Donohue) an e-mail entitled "List of Madoff's Institutional Clients (hedge funds) Utilizing the Split-Strike Conversion Strategy."  E-mail dated March 9, 2004 from Wood to Swanson, at Exhibit 188.  It appears that the e-mail was provided in response to a request from Swanson for a list of Madoff's clients.  *Id.*  In the e-mail, Wood listed the 16 institutional clients Madoff identified as using the split-strike conversion trading strategy.  *Id.*  Wood also noted that Madoff had identified "13 institutional clients who are NOT utilizing the Split-Strike Conversion Strategy" and stated, "Please let me know if you would like the names of those clients as well."  *Id.* (emphasis in original).

---

Fund Limited signed by Bernard Madoff, at Exhibit 187.  The footer of the trade directive stated, "Affiliated with:  Madoff Securities International Limited" and provided its London address.  *Id.*

The team did not contact the institutional clients Madoff identified, possibly due to concerns about disrupting Madoff's business.  Wood Testimony Tr. at p. 103.  Wood explained:

> You have to be really careful when you contact other people you don't want to scare clients… .  So once you go outside to the clients of the entity that you're examining, that could scare their clients, and that could cause business issues.

*Id.*[77]

After reviewing the information and documents provided by Madoff, the examination team had numerous unresolved questions.  On March 10, 2004, Walker sent Donohue a list of the following questions she had about the documents Madoff produced:

Here are my questions…

1. Are the dates settlement or trade dates?

2. If they are settlement dates, are they regular way, cash, etc.?

3. Can we obtain the actual trade dates?

4. Are the prices average prices?  (This would affect finding the trades on the audit trail.)

5. Do you hold any other form of brokerage account statements or accounting documents for these accounts?

6. Are these DVP/RVP accounts?

7. If so, do you have the prime brokerage or custodial banking agreements for these accounts?

8. What does "Assign" mean in the options portion of the statements?

9. How do assignments by OCC fit into the split strike conversion strategy?

---

[77]  Similar concerns about contacting customers were expressed by the Assistant Director and the Associate Director responsible for NERO's 2005 examination of Madoff.  Nee Testimony Tr. at pgs. 149-51 (stating that one has to be careful about contacting customers because it raises suspicions about the firm); Sollazzo Testimony Tr. at p. 124 (stating that when customers are contacted they become agitated and the calls may be reported to top SEC officials).  According to the FTI Engagement Team, there was no formal OCIE policy that prevented examiners from contacting customers in order to follow up on leads or to verify information during an examination.  In addition, a number of Madoff's clients were SEC-registered investment advisers, from which the SEC had authority to request additional information under Section 204 of the Advisers Act.

E-mail dated March 10, 2004 from Walker to Donohue, at Exhibit 189.  Walker asserted it was her "belief that the SEC did not have enough information to conduct the investigation."  Letter dated June 12, 2009 from Walker to Kotz, with attachments, at p. 2, at Exhibit 164.

> 16.    Follow-Up Call With Madoff Did Not Resolve Examination
>        Teams Open Questions

On March 18, 2004, Wood e-mailed Donohue with a list of the open questions she had after reviewing Madoff's responses to the staff's document and information requests. E-mail dated March 18, 2004 from Wood to Donohue, at Exhibit 190.  In her first question, Wood appeared to have been skeptical about Madoff's assertion he had no e-mail or other correspondence with his hedge fund clients.  Wood' s questions were as follows:

> 1.  Does Madoff provide anything to the hedge funds re: what they pay Madoff in commissions?  I find it hard to believe that the hedge funds would be in the dark about what they pay Madoff.
>
> 2.  Confirm that he has no e-mail communications whatsoever re: any of the requests.
>
> 3.  How does Madoff determine the time to execute the orders?  We know that the black box actually does the legwork in executing the orders, but it doesn't do anything until Madoff decides when.
>
> 4.  Madoff needs to give us more of an explanation as to the account statements.

*Id.*

Donohue also had open questions about Madoff's responses to the supplemental document request and drafted the following notes of his unresolved questions:

> Follow-up w/ Madoff re: inputs to <u>Black Box.</u> …
>
> <u>Questions</u>
> -Communications
>        - Who do you communicate with (Acct holders[arrow] feeder funds)
> -What about "client defined conditions"
> -e-mails
> -all electronic nature of business, means no communication

Reports of P/C
-Non[e] prepared; Nothing internal?  No tracking documents?
Who sells the stuff?  How do you get investors?
-Feeder funds (how do they get paid) …

Statements
-Execution date/settlement date/trade date?
-Can we get them electronically (scan them in)
-Individual trades?  (just avg price per day?)
-Direct tech line to funds?
-Do you have any other statements or acct docs
-Are they DVP/RVP accounts (delievery vs payment/receipt v. payment)
-"Assign" options?
-Wash trades?
-Prime Broker
-Net price or reflect commissions

Black Box
-Feed from Mkt mkg desk? (order flow)
-All sources of info

Donohue Examination Notes, undated, at Exhibit 182; Donohue Testimony Tr. at pgs. 76-78.

On March 18, 2004, the examination team had a conference call with Madoff to follow up on open questions.  E-mail dated March 18, 2004 from Wood to Donohue, at Exhibit 190.  It appears that Donohue, Wood, Walker, and Daugherty were on the call. *Id.*  According to the following notes taken by Wood of the conversation, the staff asked Madoff about his communications with clients and information on the account statements:

Authorized agent of client calls Madoff re: amt of $ to invest.  Acct statement -sent to the fund itself – only communication b/c based on trading directive, Madoff [indecipherable word] the criteria & enters into the box.

No profit/loss calculated by Madoff
settlement date on acct statements
-prices – average price stock trades

-average price at the end of the day.
-dvp [delivery versus payment]

Wood notes dated March 18, 2004 on conference call with Madoff, at Exhibit 191; Wood Testimony Tr. at p. 106. Wood stated that the conference call with Madoff answered some questions and created further questions requiring clarification. Wood Testimony Tr. at p. 107.

17.    Walker Raised Additional Questions About the Information
       Produced by Madoff

As Walker reviewed and analyzed the documents provided by Madoff, she had a number of questions about the data and information that Madoff had provided. Letter dated June 12, 2009 from Walker to Kotz, with attachments, at pgs. 1-4, 7, at Exhibit 164. On the evening of March 23, 2004, she sent Donohue (with a copy to Wood) the following e-mail highlighting the initial discrepancies she noticed between the data that Madoff provided and what he had told the examination team:

> In my review of the documents we have for Tremont (a large fund) and Sway (a smaller fund), I noticed some basic differences. Madoff stated to us that "The specific model used to execute the split strike conversion orders of…clients has client defined conditions that must exist at the time of execution. These conditions dictate **which securities** are executed and **the quantity** of each order.["] However, if it is a given that each client is utilizing the strategy in the same manner, as specified by Madoff, there are significant differences between the Tremont and Sway account transactions:

> 1. The trade dates vary. For example, the initial May 2002 transaction for Sway is settlement date May 3, 2002, but for Sway it is May 10, 2002. If these were T+3 transactions, the variation in transaction dates, April 30 and May 7, 2002, for a strategy that "activates" when the "Madoff-specific" conditions occur, does not make sense. Moreover, Tremont's settlement dates of May 3, May 6, May 9, May 10, May 20, May 21, and May 22 vary greatly from Sway's settlement dates of May 10, May 23 and May 24. (These are dates for the equity transactions only.)

> 2. Also, I noted that Tremont traded on 7 days versus Sway which traded on only 3 days. Shouldn't the trading be almost identical if trading in the accounts "activates" via the strategy conditions aligning?

> 3.  Why don't we see the corresponding equity activity/or
>     hedge restructuring when the options trades are assigned?

E-mails dated March 24, 2004 between Walker and Donohue, at p. 3, at Exhibit 192.
(emphasis in original.)

According to Walker, she,

> [T]old Donohue and Swanson that if the specific conditions
> mentioned by Madoff were a prerequisite for the 'split-
> strike conversion' strategy to activate, the trade and or
> settlement dates should not have varied for those accounts
> per her review of trading account documentation provided
> by Madoff.  Moreover, the trade dates versus settlement
> dates were inexplicably inconsistent and varied when
> compared to the securities industry standard of T+3 (trade
> date plus 3 days).  This led [her] to believe that either the
> strategy did not work as stated and/or the account
> statements and other documentation provided to the SEC
> were inaccurate.

Letter dated June 12, 2009 from Walker to Kotz, with attachments, at p. 2, at Exhibit 164.
Walker claimed to have "communicated her concerns to Donohue and Swanson directly"
and in e-mail.[78]

The following morning, Walker sent another e-mail to Donohue (with a copy to
Wood) further explaining why she found the documentation Madoff provided to be
atypical.  E-mails dated March 24, 2004 between Walker and Donohue, at Exhibit 192.
As follows, Walker recommended they perform independent analysis in addition to
asking Madoff additional questions:

> Based on what we discussed, I'm going to compare the
> largest feeder fund, by commission equivalent revenue, that
> uses the split-strike forward conversion strategy and the
> largest non-feeder fund, by commission equivalent revenue,
> that uses the strategy, for the months of May and June
> 2002.  Those funds are Fairfield Sentry (totaling
> $4,696,278) and Yeshaya (totaling $63,597), respectively.
>
> Also, just to follow-up about #3 in my e-mail from
> yesterday, in my experience, when securities are transferred
> from the executing brokerage account to another account of

---

[78] While there is some correspondence supporting Walker's rendition of the facts, it is difficult to assess
her credibility because she was the only person involved in the OCIE Madoff examination to refuse to
testify.  Instead, she had her attorney submit a letter containing her recollection of events.

the same accountholder, for example the account holder's
prime brokerage account, the notation is usually "Journal"
or "Transfer" and not "Assign". I interpret "assign" to
mean that the option was assigned by OCC and "Expire" to
mean that the option expired (hence my reference to the 3rd
Friday). Also, when securities are journalled or transferred,
the account to which the securities have been journalled is
also noted, for example, "Journal 7555", which would
mean that the securities were journalled to account 7555,
another account of the same account holder. Because the
account statement is used by the executing broker, prime
broker or custodial bank, account holder and regulatory
authorities to determine the account's position, accurately
reflect trading activity and commissions charged, etc., in
the case of securities being transferred/journalled from one
account to another, indication of where the securities have
been journalled or transferred is a record-
keeping/regulatory necessity.

Lastly, in my below-referenced trading activity
comparison, I focused on Tremont sub-acct #1-FR010-3-0
and Sway sub-account #1-FN043-3-0. However, as noted
by Madoff, some accounts have multiple (sub)-accounts
that are part of the fund management group. So, for
example, Tremont Broad Market Group has 8 sub-accounts
that comprise the Tremont fund (Madoff) client account
and Sway Pension Fund has 2 sub-accounts that comprise
the Sway fund (Madoff) client account. But, it is unclear
whether the strategy is executed individually in each of
these accounts or across the entire account, via the sub-
accounts, in some sort of weighted fashion?? I think we
need to determine that by either examining the trading in
each sub-account and then conducting an intra-fund trade
pattern comparison OR by just asking Madoff. I think it's
probably a good idea to do our own independent analysis,
as well as ask Madoff how the strategy is executed/how
trades executed using the strategy are apportioned among
the sub-accounts of each individual fund client.

*Id.* at p. 2. Donohue responded to Walker, "Gen, let's chat about this when you get a
chance."[79] *Id.*

---

[79] According to the FTI Engagement Team, the examiner noted some apparent inconsistencies in the
trading data and raised credible questions as to how Madoff executed his strategy. Although the examiner
suggested conducting an independent analysis to determine if the strategy was implemented for each sub-
account individually or universally across an entire account, the examiner did not suggest independent

18.     Hostility Arose Between Donohue and Walker

Walker asserted that "[a]t the same time that [she] was leading the Madoff investigation and providing her findings to Donohue and Swanson, she was meeting with resistance from them."  Letter dated June 12, 2009 from Walker to Kotz, with attachments, at p. 3, at Exhibit 164.  From her perspective, Donohue demoted her from lead examiner on the Madoff examination and "excluded [her] from meetings related to the Madoff investigation."[80]  *Id.*  Donohue and Walker's troubled working relationship culminated in Walker filing an EEOC complaint against the Commission, "alleging that Mark Donohue and a former OCIE Branch Chief, who was supervised by Donohue, were creating a hostile work environment for her."  *Id.* at pgs. 1, 3.

According to Walker, "In April 2004, [she] was removed from her position as the lead investigator" in the Madoff examination "shortly after she raised questions about the veracity and completeness of documents and explanations provided by Madoff regarding his trading activities."  *Id.* at 2.  Walker asserted that the first person to whom she "complained about this treatment was Eric Swanson, who did nothing to relieve her situation."  The Commission ultimately settled the EEOC suit with Walker.  *Id.* at p. 3.

Donohue stated he was unaware of the tension with Walker, he was surprised by the complaint she filed, and believed the complaint was without merit, stating:

> I thought the complaint had no merit.  It was a complaint alleging discrimination… .  I was utterly surprised when I heard about it.  Certainly I never felt that was something I would take into account or would ever do. … No.  I must say I was very surprised by the complaint.  I think she felt there were things going on and friction that I did not see. … I do not recall whether there was a lead, so to make co-leads I just do not know.  These are indications of her frustrations that I was not aware of.

Donohue Testimony Tr. at pgs. 104-106.

As for her work, Donohue felt that Walker's work was stronger on the technical side than the work ethic side, stating, "I think she could have strong abilities.  I think they did not always come through."  *Id.* at 104.

---

verification of activity from a third-party such as the NASD, NSCC or DTC.  The FTI Engagement Team concluded that independent verification of activity from the NASD, NSCC or DTC would have likely led to the discovery of the Ponzi scheme, or at the very least, the fictitious trades.

[80]  The OIG has found no evidence that Walker was demoted or received any other adverse employment action as a result of raising questions about Madoff.

McCarthy recalled that Walker had issues with Donohue but attributed them to Walker's inadequacy as an employee, stating:

> I do recall Genevievette [Walker], issues with Genevievette …we had trouble with documents that she was responsible for keeping. … Like sloppiness, things like that. I think [the] doors were locked and it was hard to get to them sometimes, just vague recollections. … I would say she was one of the weaker employees I've had in my career.

McCarthy Testimony Tr. at pgs. 114-115. In contrast, McCarthy recalled Wood as "probably one of the best [employees] I've ever had." *Id.* at 115. McCarthy did not believe that the difficulties between Donohue and Walker should have impacted the examination, asserting:

> I don't think it should have. I mean, it's unfortunate she was a weak member, but the data analysis could have done – been done by Jackie [Wood] at a high level, so – but it's certainly, you know, probably didn't help, obviously.

*Id.* at p. 116.

In the following exchange, Swanson recalled Donohue had problems with Walker's work effort and, possibly, with the competence of her work, but felt Donohue dealt with Walker too aggressively:

> A: … I do recall there were some issues, yeah. … I think Mark was dissatisfied with her performance and I think, if I recall correctly, he had confronted her at some point in a somewhat aggressive way, but I don't recall the specifics or the timing of that. … I don't remember exactly what was in the complaint. However, I -- I do recall that there were some performance issues with Genevievette and I also recall that Mark was definitely too aggressive, in my opinion, was too aggressive in dealing with her.
>
> Q: And the performance issues with Genevievette, were they more in terms of work effort or competence of work?
>
> A: I believe predominantly the former, although there may have been some of the latter, but I think it was mainly work effort.

Swanson Testimony Tr. at p. 69.

121

Other OCIE employees working on the OCIE examination were aware of the difficulties between Donohue and Walker. Wood testified, "I just don't think she was very happy working with Mark. … I love working with Mark. … But some people just don't get along, and I think that was just one instance." Wood Testimony Tr. at pgs. 84-85. The former OCIE Attorney Advisor stated, "at least my impression was there was a source of maybe tension, in the sense that there appeared to be some type of, some sort of – and this is just an observation, some type of favoritism with certain individuals within the group, within the department. And I think that there may – that may have created some tension." Former OCIE Attorney Advisor Testimony Tr. at p. 28.

The OCIE Staff Attorney, another OCIE examiner, also felt some OCIE hiring and promotion decisions were based on relationships, stating,

> There [were] definitely cliques. There were definitely like some sort of social hierarchy. … Probably, the primary inner circle was the circle around John [McCarthy], and that would be John [McCarthy], Eric [Swanson], and Alex [Sadowski], and sometimes maybe a few other people: Matt [Daugherty], in a way; and, there were certain people not in the circle but were trusted by the circle.

OCIE Staff Attorney Testimony Tr. at p. 37. The OCIE Staff Attorney also noted, "There is a bit of kind of self-replicating problems here wherein, you know, they promote people that are more because of personal relationships than because of any sort of professional background or anything like that." *Id.* at p. 52. The OCIE Staff Attorney stated, "It's just crazy stuff that goes on in this office. It was weird. It was like a sitcom or something. It didn't exist in the real world and it's hard to explain. It really is." *Id.* at 57.

19. After Donohue Reviewed the Data Madoff Produced, He Had Numerous Unanswered Questions

Also on March 24, 2004, in response to a request made during the March 18, 2004 conference call, Donohue received eight floppy discs from Madoff, which contained the monthly customer statements in electronic format. Letter dated March 23, 2004 from Madoff to Donohue, at Exhibit 193; *see also* E-mail dated March 24, 2004 from Donohue to Walker, at p. 4, at Exhibit 192 (stating, "We received the electronic versions of Madoff's 2003 account statements. I crudely converted them from text to excel and they now reside on the J drive").

The data Madoff produced left Donohue with unresolved questions. E-mails dated March 24, 2004 between Walker and Donohue, at pgs. 1-2, at Exhibit 192. On March 24, 2004, Donohue e-mailed himself the following draft analysis of the data, which indicates that Donohue was finding that the data did not add up:

Just a follow-up. The split-strike strategy, as I understand it, entails selling a covered call and buying an index put. Selling the call should be reflected by an inflow or credit to the client fund account, as well as the commission charged by Madoff for the trade itself, an outflow or debit from the account.

From Sway 1-FN043-3-0 and 1-FN043-4-0:

Leg 1 of the Collar:

5/8/02, (trade date 5/7), transaction 6006, -- Bought Received 13 S&P 100 Index May 520 Calls @ 23.3 and Madoff debited $30,290 from the account

5/8/02, (trade date 5/7) transaction 6006, --Sold Delivered 13 S&P 100 Index May 520 Calls @ ASSIGN and Madoff credited $30,290 to the account

Leg 2 of the Collar:

5/8/02, (trade date 5/7), transaction 17182, --Bought Received 13 S&P 100 Index May 520 Puts @ 8.5 and Madoff debited $11,063 from the account

5/8/02. (trade date 5/7), transaction 17182, Sold Delivered 13 S&P 100 Index May 520 Puts @ ASSIGN and Madoff credited $11,063 to the account

Leg 3 of the Collar:

There should be a purchase on 5/8/02, trade date 5/3/02, for 1300 shares of the S&P 100 Index or some composition thereof of the individual components, that totals 1300 shares. Again, I am assuming that the collar is completely put on the same trade date. However, a total of 18,551 shares were bought/received, way more than a 1:1 hedge.

Madoff stated in his letter that he charges $1 commission equivalent per option contract.

Just looking at the call leg of the collar transaction…

Selling Open 13 S&P 100 May 520 Calls @ 23.3=$30,290 credited to the fund client account. (So, I guess we can assume that the true average price is $22.3/contract + $1, totaling $23.3/contract.) But, I'm confused because, although Madoff should charge $1 for each contract purchased, a debit of $1300, the premium received from the

123

selling open of 13 S&P 100 May 520 calls, $28,990, should be a credit to the client account.

But, we see a debit **and** a credit for $30,290 for trades "in and out" of the S&P 100 May 520 Call position established on trade date 5/3/02 and settled on 5/8/02, instead of a $28,990 credit and a $1300 debit and then the same amounts again for a transfer of the position (and the premium received from the sell open) out of the account…why? Alternatively, an assignment of the position would mean that the fund client must sell 1300 shares of the S&P 100 @ 22.3, plus commission costs of $.04/share, which at $22.34/share equals $29,042, a credit to the account. So, we should see another credit to the fund client account for $29,042.

I think we should see a credit for $28,990 and a debit for $1300, for the opening transaction of the call, and then, in the case of a transfer of the position, a debit from the account of the premium received, $28,990, as well as a transfer fee, which could be $1 per option contract, which would be $1300.  So, maybe we should clarify what the commission equivalent is for transferring equity/option positions out of the fund accounts.

*Although Madoff executes the strategy, does that mean he also executes any assignments that may occur??  Would he consider these types of transactions part of his strategy??  I think we can assume in some instances that an option trade can be assigned after the position is transferred to the custodial bank account, right? (The trades in teh* [sic] *fund accounts seem to reflect* [sic] *that all executions are transferred to the custodial bank on settlement date. What broker would handle that assignment?*

*Id.* (emphasis in original).

20.     After Reviewing the Data Madoff Provided, Walker Also Had Additional Unanswered Questions

Just as Donohue had unanswered questions after reviewing the data Madoff produced, Walker's review of the electronic data left her with additional questions as well.  E-mail dated March 24, 2004 from Walker to Donohue, at Exhibit 195; E-mail dated March 25, 2004 from Walker to Donohue, at Exhibit 196.  It appeared from the data that Madoff was purchasing options on equity trades he had not yet executed, but

Walker found this illogical.  E-mail dated March 24, 2004 from Walker to Donohue, at Exhibit 195.  On March 24, 2004, Walker stated the following in an e-mail to Donohue:[81]

> It appears that Madoff does execute the strategy "equally" among the accounts, treating the sub-accounts of each fund as a separate account for purposes of executing the strategy. According to the strategy, he needs to sell an index call, buy an index put and buy components of the underlying index.  However, I'm unclear about how the "collar" works with this strategy because most of the option trades appear to precede the equity transactions.  Based on the dates, it looks like he's front-running the equities by executing the option portion of the collar *prior* to the equity trades. Logically speaking, if a trader wanted to put on a "collar" position, would he execute the option portion 2-4 days prior to the equity portion of the transaction?  Given the volatility factor of the trading involved, I would think not.

*Id.* (emphasis in original)

On March 26, 2004, Donohue e-mailed Walker (with a copy to Wood) about an additional potential issue with the data from Madoff.  E-mails dated March 26, 2004 between Donohue and Walker, at Exhibit 197.  Donohue indicated that one of the hedge funds appeared to use a different trading strategy from another fund, stating, "Ginco trades differently (at least in March), but it could be simply that the size of the fund only requires one day (instead of three) to buy and sell a position.  Look to see if that situation is similar for other funds?"  *Id.*  On March 31, 2004, Walker told Donohue that she would "look more closely at that account."  *Id.*

    D.       The Madoff Examination was Halted

           1.       Examiners Stopped Working on Madoff Examination to Focus on Mutual Fund Project

Despite their open questions, it does not appear Walker had an opportunity to "look more closely at that account" or that the team resolved the other issues they had identified in the data.  Work on the Madoff examination came to a halt as OCIE shifted its focus to other priorities.  Walker and Wood were directed by their supervisors to focus on a mutual fund revenue sharing sweep being conducted by OCIE.  Donohue Testimony Tr. at p. 93.  Richards stated in a letter submitted to the OIG that, "In early 2004, OCIE made it a priority to examine mutual funds' undisclosed payments to broker-dealers." Letter dated July 1, 2009 from Richards to Kotz, at p. 4, at Exhibit 198.

---

[81]  According to the FTI Engagement Team, Madoff's Trading Authorization Directives indicate that his split-strike forward conversion strategy will attempt to utilize broad-based index option positions "upon establishment of equity positions."  As a result, it appears illogical that the option positions would be taken prior to establishing the equity positions for any given account.

On April 6, 2004, Walker e-mailed Sadowski, an OCIE Branch Chief, about how to focus her priorities, stating, "I believe that those who are participating in the mutual fund project are supposed to make that project a priority. … But, I'm not sure where the hedge fund [Madoff] project falls on our list of priorities right now."  Sadowski responded, "Get the mutual fund work completed first."  E-mail dated April 6, 2004 from Sadowski to Walker, at Exhibit 199.

On the same day, Walker also e-mailed Donohue (with a copy to Wood) asking which project to prioritize, stating as follows:

> I'm not sure what you want Jackie and I to do concerning Madoff, but I'm focusing on the mutual fund project, as requested.
>
> Should we just focus on mutual funds and return to Madoff when we're done??

E-mails dated April 6, 2004 between Walker and Donohue, at Exhibit 200.  The following morning, Donohue responded, "Concentrate on mutual funds for the time being."  *Id.*

### 2.    Not Unusual to Shift Attention to High Priority Projects in OCIE and Leave Some Projects Incomplete

At the time, mutual fund work was a "very high priority" in OCIE.[82]  Swanson Testimony Tr. at pgs. 96-97.  Swanson was not surprised that the Madoff examination

---

[82]  Lori Richards provided a letter to the OIG dated July 1, 2009 to supplement her testimony.  In the letter, she explained as follows that the examination of mutual funds' undisclosed payments to broker-dealers was a priority for OCIE:

> As background, in this time period, OCIE's Office of Market Oversight, a group of about 20 staff, were juggling many examination matters (including the Madoff exam).  In early 2004, OCIE made it a priority to examine mutual funds' undisclosed payments to broker-dealers.  This priority status followed an examination sweep concluded in late 2003 that had revealed that 15 broker-dealer firms had received payments from mutual fund companies in exchange for recommending those funds to their retail customers.  Those examinations found that the broker-dealers had not disclosed these payments, and that the payments may have violated antifraud provisions of the securities laws.  As a result, in early 2004, working collaboratively with Enforcement and other agency staff, the Office of Market Oversight initiated an examination sweep of mutual fund companies to determine how the payments were made, whether they diminished shareholder returns, and whether they were disclosed to the funds' shareholders and to their boards of directors.  This was a large exam sweep (45 mutual fund companies) and approximately 16 examination staff, including the two staff examiners on the Madoff exam, were assigned from other

would be set aside for higher priority projects.  *Id.* at p. 98.  As another OCIE examiner explained, stopping work on incomplete projects in order to work on higher priority matters was not an unusual occurrence:

> John [McCarthy] had kind of a tendency to kind of go from project to project very quickly without really circling back. … [F]rankly, there was a lot of projects at the time that would just kind of die off.  I mean, you know, you do some initial review and you go up the chain.  And I think the superiors had determined, well, I got other things to worry about.  Those old projects just kind of languished; and I had a lot of projects like that.…I mean, we do our fact-finding, whatever, and say like okay, what do we do next.  And there just was never any further direction; or, we'd write a memo summarizing whatever we thought we had found [and we wouldn't get] further input.  So that was a pretty common occurrence.

OCIE Staff Attorney Testimony Tr. at p. 25.

Swanson agreed with the OCIE Staff Attorney's assessment, stating, "there were situations where we opened inquiries and, you know, to my knowledge, they may never have gotten completely resolved because we were busy with other more high-priority matters…" Swanson Testimony Tr. at p. 33.  Daugherty also recalled there were times when examinations were worked on but then the work was stopped as OCIE moved on to other priorities.  Daugherty Testimony Tr. at pgs. 117-118.  While he acknowledged some OCIE examinations could be put on the sidelines for several months while examiners worked on other projects, he found eleven months to be a particularly long time for an examination to be left inactive.  *Id.*

OCIE projects may have fallen through the cracks because examiners typically handled several open projects at any one time.  Wood estimated that she had 5-10 open matters at the time she worked on the Madoff examination and recalled some of the mutual fund work was given priority over other projects.  Wood Testimony Tr. at pgs. 42, 90.  Richards, offered a similar assessment, asserting that "Examiners generally work on a number of examination matters simultaneously, and seek to prioritize the highest-risk firms and issues that most warrant examination."  Letter dated July 1, 2009 from Richards to Kotz, at p. 2, at Exhibit 198.  She explained that given "the relatively small number of SEC staff examiners, the SEC does not conduct comprehensive examinations, and it does not examine all firms that are registered with the SEC."  *Id.*

---

examinations or asked to prioritize the mutual fund examinations in order to complete the examination sweep in a timely way.

Letter dated July 1, 2009 from Richards to Kotz, at p. 4, at Exhibit 198,

Tina Barry, a Branch Chief and later Assistant Director who reported to McCarthy, also recalled that from 2003-2005 "we did have a lot of projects going on" and it did happen from time to time where there were kind of old projects and things were not followed up with." Barry Testimony Tr. at pgs. 18-19. McCarthy disagreed that some examinations under his supervision were left unresolved, stating that if an examiner "felt things died there might have been reasons why they died and maybe he wasn't aware of." McCarthy Testimony Tr. at p. 41. He stated, "Tina Barry was for the – most of the years, responsible for keeping track of our open inspections" and that she should have a record of the inspections undertaken under McCarthy and their resolutions. *Id.* at p. 42.

Barry contradicted McCarthy's statement, testifying she did not have the responsibility for monitoring whether examinations were completed. Barry Testimony Tr. at p. 21. Although Barry maintained a "spreadsheet [that] listed out all the projects that were going on" and that she provided it to McCarthy "from time to time," the responsibility for ensuring that an examination was completed fell to the Branch Chief, the Assistant Director, and the Associate Director in charge of the project. *Id.* at 20-23.

3.    OCIE Performed Only 1½ More Days of Work on Madoff Examination

After Walker and Wood set aside the Madoff examination to work on the mutual fund project, the only examiner to perform any further work on the Madoff examination was the former OCIE Attorney Advisor, who joined OCIE in March 2004. Former OCIE Attorney Advisor Testimony Tr. at pgs. 7,9; Donohue Testimony Tr. at pgs. 95-96. Soon after the former OCIE Attorney Advisor joined the Commission, he spent one and a half days calculating Madoff's commissions on the securities and options trades Madoff claimed to have executed. Former OCIE Attorney Advisor Testimony Tr. at pgs. 15-16, 21; E-mail dated June 1, 2005 from the former OCIE Attorney Advisor to Donohue, with attachments, at Exhibit 201. After the former OCIE Attorney Advisor provided the spreadsheet of his calculations to Donohue, he performed no further work on the Madoff examination. Former OCIE Attorney Advisor Testimony Tr. at pgs. 16, 21. Donohue explained no further work was done on the Madoff examination because "At this time it was refocusing priorities… people were concentrating on mutual funds." Donohue Testimony Tr. at p. 95.

4.    Madoff Examination Put on the Backburner While Exam Team Still Had Unresolved Questions

Although the examination team may not have had found any evidence that Madoff was running a Ponzi scheme at the time the Madoff project was set aside, they did have many "lingering questions" about Madoff and his representations about his hedge fund business. *Id.* at 92. When these open questions were not easily resolved, there was no evidence that the answers to the questions were ever pursued.[83] Wood

---

[83]  Madoff recalled that communications from Donohue "just dropped off." Madoff Interview Memorandum at p. 7.

stated that the fact that Madoff was a well-known figure may have played a role in the decision to put it on the back burner because the exam supervisors may have thought it was unlikely he was engaging in fraud.  Wood Testimony Tr. at p. 127.

        5.      Swanson Told Kelly the Examination Was Ongoing After
             the Team Had Stopped Working on the Examination

On April 16, 2004, after the Madoff project had become inactive, Mavis followed-up with Eric Swanson about the examination.  "FYI – Bernie Madoff is speaking at 10:30.  I received my file back.  What ever happened with this?"  E-mails dated April 16, 2004 between Kelly and Swanson, at Exhibit 202.  In the following e-mail, Swanson responded to Kelly that the examination was "ongoing," despite the fact that the team had stopped working on the examination:

> The examination is ongoing, we are in the process of
> reviewing trading on the MM desk and comparing it
> against trades in the hedge funds.  Premarily [sic], we are
> fairly suspicious that something is going on simply
> because, although he is known in the industry as a MM, it
> is clear he makes the vast majority of his money form
> commissions earned on executing trades on behalf of the
> hedge funds.  We have reviewed the trading in the hedge
> funds, and we think he may be using info gleaned from
> order flow on the MM desk to predict broad market
> movements and then trigger investments by the hedge
> funds in certain S and P stocks.  We won't know for a few
> more weeks, however.  I'll keep you posted.

*Id.*

Swanson explained an examination would be considered "ongoing" even it were put on hold.  Swanson Testimony Tr. at p. 101.  Swanson stated in his testimony that he was not closely involved in the examination after Donohue became an Assistant Director, and in the e-mail to Kelly, he may have been exaggerating the SRO Group's progress:

> … I was somewhat out of the loop at this point because
> Mark was working on it, that I may not have known the
> exact status and probably didn't know the exact status of
> where things were going on the examination, and I would
> add that I very likely gave Madoff – Mavis a response that
> would please her a little bit, to let her know that, you know,
> it was still being looked at and – might have overstated my
> case a little bit.

*Id.* at pgs. 84, 103-104.

6.     Eleven Months After the Examination Was Set Aside, Swanson Asked Donohue About the Examination After Seeing Shana Madoff at a Conference; Donohue Said Examination Was "Deady"

No one on the team heard anything further about the Madoff examination until approximately eleven months after they had stopped working on it.  Wood Testimony Tr. at pgs. 121-22.  On March 16, 2005, Swanson and McCarthy attended a securities conference in St. Louis.  E-mails dated March 16, 2005 between Swanson and Donohue, at Exhibit 203.  The morning of the conference, they waited for Shana Madoff at the Hyatt in order to travel to the conference with her.  *Id.*  Later that day, Swanson e-mailed Donohue about the Madoff examination:

> [Swanson] What is the status of the madoff hedge fund thingy?"[sic]
>
> [Donohue] Deady.  We never found any real problems. Does it need to be revised?

E-mails dated March 16, 2005 between Swanson and S. Madoff, at Exhibit 204.

Swanson testified that "[i]t's likely" that seeing Shana Madoff at the conference triggered Swanson to check on the status of the examination; however, he stated "Shana never once asked [him] about the status of an exam," and he "Never talked to her about the status of the exam."  Swanson Testimony Tr. at pgs. 109-110.

Donohue explained he called the exam "Deady" because "I think we did not know what to do next. …  I imagine what this means is there was not much work being done on it right then."  Donohue Testimony Tr. at p. 96.  Donohue explained the phrase he used – "Does it need to be revised," – as meaning he was asking Swanson if the examination needed to be "revived [and] .… Do we need to concentrate on Madoff."  *Id.* at pgs. 96-97.

At the time Donohue sent the e-mail to Swanson, Donohue recalled the examination team had unresolved questions but that they had not identified violations of the law:

> I think there were open questions and I do not think we found problems.  There were questions that needed to be – that we could focus more time on to get answer to.  I do not think at that point we had said there were violations.

*Id.* at p. 97.[84]

---

[84]  According to the FTI Engagement Team, significant questions or concerns raised during a cause examination should not be left unresolved due to the seriousness and urgency associated with such cause examinations.  Significant delays or inactivity may allow for illegal activity to continue unimpaired for longer periods of time, resulting in potentially greater harm to consumers and investors.

7.      OCIE Examination Was Still Inactive When NERO Told OCIE
        They Had Also Been Conducting A Cause Examination of Madoff

The subject of the Madoff examination came up again two and a half months after
Swanson attended the conference with Shana Madoff and learned from Donohue that the
examination was "Deady." Nee, an Assistant Director in the NERO[85] examination
program, e-mailed McCarthy on May 26, 2005, and told him that they had been
conducting a cause examination of Madoff with regard to basically the same activity as
OCIE's examination. E-mails dated May 26, 2005 between Nee, McCarthy, Swanson,
and Donohue, at p. 2, at Exhibit 205. The NERO examination team learned of OCIE's
examination from Madoff, as is evidenced by the following e-mail from Nee to
McCarthy:

> We are currently conducting an exam at Madoff. Our
> major focus has been the possibility that Madoff is using
> his vast amounts of customer order flow to benefit the $6
> billion in hedge fund money that we believe he manages.
> In initial inquiries about managing outside money and
> supplying black box models (algorithms, etc.) to outside
> accounts he either denied it or was evasive.
>
> When he finally admitted to "executing trades" for billions
> of dollars in customers' (hedge funds) money using specific
> proprietary trading algorithm, he said we should know
> about this as he told Lori Richards and John McCarthy
> about this 1.5 years ago. We are hoping that if what he is
> saying has any truth at all to it that you might have some
> info related to his hedge fund related activities that you
> could send us.
>
> > Thanks,
>
> > John Nee
>
> P.S. See the attached article for our concerns. We also
> received some intelligence on a recent IA [NERO
> Investment Management Examination Group] exam
> questioning his hedge fund involvement and trading
> practices.

*Id.*

Soon after receiving the e-mail from Nee, McCarthy forwarded it to Swanson. *Id.*
Swanson then responded to Nee (copying McCarthy and Donohue), stating, "John – we

---

[85]  The SEC changed the name of the Northeast Regional Office ("NERO") to the New York Regional
Office ("NYRO") on March 30, 2007. *See* http://www.sec.gov/news/press/2007/2007-59.htm.

should discuss.  Ocie [sic] has an open exam of madoff on this issue.  I'm on road today, but am available tomorrow AM."  *Id.*

Swanson then e-mailed Donohue and asked him about the examination team's findings, in the following exchange:

> [Swanson] Can you refresh my recollection abt [sic] what we did with this exam?  I know we talked abt [sic] it the other month, but I forget."
>
> [Donohue] Nothing's happened since we last spoke.  I'll gather the stuff, and figure out what we have.  The article is from 2001, so they probably have the same intel we have."
>
> [Swanson] I thought we had formed some conclusions abt [sic] this?

*Id.*  When asked what the conclusions were that he thought he and Donohue had formed, Swanson stated, "I don't remember, but I'm guessing … that I'm referring back to the "deadie" e-mail. … So I'm guessing in this e-mail, I'm referring back to, you know, Mark having told me that they didn't – they had completed their review or some of the review and hadn't found anything."  Swanson Testimony Tr. at pgs. 115-116.

E.     OCIE and NERO Learned of Their Parallel Examinations From Madoff

1.     OCIE and NERO Had Been Unaware That Were Both Conducting Madoff Examinations

NERO was unaware that OCIE had been conducting a cause examination of Madoff of almost identical issues.  OCIE's BD/SRO Group did not enter their examinations into the examination tracking system, and McCarthy "remember[ed] being mildly upset" to find out that the SEC's New York office had been conducting an examination of Madoff at the same time their examination of Madoff was open "[b]ecause it meant that we probably didn't put our information into the tracking system like we're supposed to do."  McCarthy Testimony Tr. at p. 113.

Swanson agreed that "the group that I was in that John and I were running" did not log examinations into the STARS system, stating, "I never used STARS … – we did not log things into STARS."  Swanson Testimony Tr. at p. 114.  Richards explained that there should never be two examinations of the same entity being conducted at the same time without both teams being aware of the other's examination.  Richards Testimony Tr. at pgs. 23-24.  Richards explained the following process examiners should use before beginning an examination:

A:     The STAR[S] System.  They would log into the STARS System and identify past examination

history.  First they would identify whether it was a registered entity and then identify past examination history.  In addition, there's a geographical assumption that firms located in a particular region of the country are subject to examination by that regional office so that staff would likely call the exam leaders in the particular regional office and ask about any examination history.

Q:   So, there shouldn't be two cause exams that are going on at the same the same entity at the same time without two people – the two groups who are doing the exams talking to each other?

A:   Without knowledge – there should certainly be knowledge.

Richards Testimony Tr. at pgs. 23-24.

Richards was aware that the BD/SRO group did not log their examinations into the STARS system.  *Id.* at p. 21.  She believed the group did not log examinations into the system because "[w]hen they then shifted and began to do more broker-dealer exams, I think there was a lack of understanding of the STARS System."  *Id.*  When asked whether the group now logs their examinations into the system, Richards stated, "I don't know.  I hope so."  *Id.*

Swanson recalled, in the following testimony, that communication between Commission offices could be hindered due to competition among offices:

Again, there was no rule or policy about it, but I think the information-sharing at that level between offices was not always great. … I sometimes sensed at the SEC that there was a bit of eat what you kill kind of – a bit of competitiveness between the offices.  I'm sure we were that way and I know some of the regional offices were that way. So it felt a little bit like Corporate coming in when Washington would come in and do something without telling the regional offices, and I think, you know, I think on some level rightfully so, they didn't like it.  So should they have known?  I assume, but after this process you're going through, there may be a more formalized way that that information flows, but there wasn't back then.

Swanson Testimony Tr. at p. 113.

2.    OCIE Had Conference Calls with NERO About Madoff

After receiving the e-mail, McCarthy believed he asked Swanson and Donohue to speak with Nee in NERO and "deal with the fact that we have two ongoing exams of the same firm at the same time or in near terms."  McCarthy Testimony Tr. at p. 113.  McCarthy recalled that OCIE discussed the OCIE examination with NERO, stating, "I remember John Nee contacting us or me, but I don't recall me discussing it clearly.  I'm sure it was discussed with them."  *Id.*  Sadowski, who currently reports to McCarthy in private practice, testified McCarthy told him he had a conversation with Nee, as follows:

> John did mention [] this conversation he had with Nee about this. … Yes, yes, he is like, 'I remember talking with Nee about it, that they were doing an examination of Madoff,' and he was like that, 'We talked to him' because it is funny because he said that at first that Madoff didn't even admit or something because when he [Nee] says here, 'When he finally admitted to executing trades for billions of dollars in customers,' he kind of said that – John McCarthy told me that, 'I thought that was a red flag' in talking about it kind of now in the sense of why wouldn't Madoff admit, because apparently it took him – when John Nee spoke to him, it took him [Madoff] a long time to kind of I guess admit that he was executing trades for hedge funds.

Sadowski Testimony Tr. at pgs. 33-34.

Swanson recalled "having a couple of calls" with the NERO examination team to explain what the OCIE examination team had done and to let NERO know that OCIE was shipping their examination documents to them, stating:

> Well, I don't know if it was prompted by this particular e-mail or if John Nee was the person that I spoke to, but I do know that at some point around this time period I had a conversation with NERO, it could have been John Nee, at which point, you know, I told him about the review that we had – that we had done and that was open, and he told me that they were doing a review that touched on the same issues.  I – again, I don't remember if it was John Nee that I spoke to, but it – it could have been, and I remember – I remember having a discussion about whether he was a hedge fund or wasn't a hedge fund and, you know, what Bernie had told me way back when I had first spoken with him about how he was – had this black box and was an executing broker for these other hedge funds.  But I recall at some point, and whether it was this conversation or a

> subsequent one, but I recall, you know, telling him we'll send him all of our files, the ones that they haven't.
>
> …
>
> I remember having a couple of calls and, you know, one was – I think one was just to tell them what we have done or explain it a little bit and what we had or hadn't found, and then the next one, if there was another one, and I think there may have been, was just to tell them we were shipping all the documents up to New York. It's possible even that I had Mark make that call, but I – I don't recall.

Swanson Testimony Tr. at pgs. 111, 117.

While Donohue recalled in the following testimony that there were communications with NERO about OCIE's examination, he did not recall any specifics:

> I do not remember the specific communications themselves. I remember we forwarded everything to N[E]RO. I just do not remember. I do not remember verbal communications.
>
> …
>
> I know there was communication with N[E]RO regarding the examination. I do not remember the sequence of the communication and quite frankly whether I was involved in the communication other than the information in the documents.

Donohue Testimony Tr. at pgs. 100-101, 103.

> 3.    NERO Examiners Recalled OCIE Warned them Madoff Was a Powerful and Influential Person

The NERO examination team had a more specific recollection of the phone call with OCIE. As described in more detail in Section IV of this Report of Investigation, Nee and the examiners recalled that during the conference call, McCarthy, Swanson, or Donohue told them that Madoff was a powerful and well-connected individual. One of the NERO examiners interpreted the statement to raise a concern for OCIE about pushing too hard without having substantial evidence, while Nee interpreted the phone call to indicate that they might receive a phone call "from someone" influential, something that never occurred. Ostrow Testimony Tr. at pgs. 145-46; Nee Testimonmy Tr. at p. 104.

4.    When OCIE Sent Examination Documents to NERO in June 2005,
the Examination Was Unresolved

On May 31, 2005, Donohue contacted the Madoff examination team and asked
them to gather the documents to send to the New York Office.  Former OCIE Attorney
Advisor Testimony Tr. at p. 21; E-mail dated May 31, 2005 from Donohue to the Former
OCIE Attorney Advisor, Walker, and Daugherty, at Exhibit 206.  Donohue recalled it
was difficult to locate the Madoff documents to send them to NERO.  Donohue
Testimony Tr. at pgs. 97-98.  In an attempt to locate the documents, Wood e-mailed
Walker the following:

> Mark is looking for the Madoff junk and I remember giving
> them to you so that we could have all the Madoff stuff in
> one central location.  … NERO needs to see some things on
> what we previously did.

E-mail dated June 1, 2005 from Wood to Walker, at Exhibit 207.

Walker told Donohue she "saw some boxes marked Madoff in the hallway last
with some other items to be archived/stored."  E-mail dated June 2, 2005 from Walker to
Davis and Donohue, at Exhibit 208.  Walker implied she was surprised the examination
papers were going to storage without the examination reaching a resolution, stating:

> It was the top box/my eye level, which is why I noticed it.
> But they were boxes, not file folders.  I remember seeing
> them because I thought to myself, hmmm, 'I never heard
> anything more about that case, but it's going to storage.'

E-mail dated June 1, 2005 from Wood to Walker, at Exhibit 207.

Donohue was not surprised Walker could not recall what happened to the Madoff
examination because it was dormant for a significant period of time.  Donohue Testimony
Tr. at p. 100.  Like Walker, Wood also recalled the examination was unfinished when
they sent their examination materials to the New York office.  Wood Testimony Tr. at p.
62.  McCarthy opined that, "It's concerning" and "shows a certain level of inadequacy" if
the Madoff examination operating under his supervision sat dormant for almost a year
prior to the New York office contacting OCIE.  McCarthy Testimony Tr. at pgs. 112-114.

F.    The OCIE Examination Concluded Without a Closing Report

The examination team did not draft a closing report of the Madoff examination.
Swanson Testimony Tr. at p. 117; McCarthy Testimony Tr. at p. 84.  Swanson stated
drafting a closing report at the conclusion of an examination is "good practice."  Swanson
Testimony Tr. at p. 117.  McCarthy concurred, stating, "Typically, staff is supposed to –
when they finish an exam they're supposed to close it out and I think there should have
been a close-out memo is my understanding."  McCarthy Testimony Tr. at pgs. 84-85.

Swanson testified there may have been no report because no conclusions may have been formed in connection with the examination.  Swanson Testimony Tr. at p. 119.

Although the complaint was provided to the SEC in March 2003, after over two years had passed, the evidence shows that the OCIE never concluded the examination or resolved the many issues raised in the complaint.  The lack of a closing report and Swanson's e-mail to Nee copying McCarthy that "Ocie [sic] has an open exam of madoff on this issue" corroborate the fact that the examination was never concluded and contradict McCarthy's testimony that he believed the examination was concluded when "Mark said they did not find any indicia of front-running."  McCarthy Testimony Tr. at p. 84.

Moreover, even if examiners had concluded there was no front-running, the other issues raised in the Hedge Fund Manager's complaint had not been resolved.  Gohlke stated if he were doing the examination and did not find front-running, then likely he would have continued the examination.  Gohlke Testimony Tr. at p. 49.  Similarly, Kelly stated if front-running was looked for and not found, she "might try a different angle":

> … What we do from the investment adviser program is we follow the trades.  We look at the transactions, we follow the assets, custodial arrangements, we look at it from a portfolio manager perspective. … I would validate the performance – is this actually the performance derived.  … I would recreate the performance to see if it made sense, because at that point you would know, you know, were the trades real, would he have the ability to pay back cash.

Kelly Testimony Tr. at pgs. 78-79.

Donohue explained that there was no closing report because "from my mind, our exam was not closed. …We never completed the work."  Donohue Testimony Tr. at p. 101.  Although he thought it was unusual for an examination to lay dormant for as long as it did, Donohue stated that "I think it is usual for the staff to be refocused on different priorities all the time.  We had many things to do and not enough resources to do them all."  *Id.*

On June 9, 2005, OCIE sent two boxes of examination documents, including the complaint and attachments from the Hedge Fund Manager, to NERO.  Letter dated June 9, 2005 from Wood to Nee, at Exhibit 209.  The examination team did not recall OCIE drawing their attention to the complaint, which OCIE listed last in its list of enclosed documents.  Ostrow Testimony Tr. at pgs. 119-122; Lamore Testimony Tr. at pgs. 109-110.  Neither did NERO recall OCIE providing them with any substantive information, such as telling them of the open questions they had from their examination or the inconsistencies the examination team identified.  Lamore Testimony Tr. at pgs. 107-108; Ostrow Testimony Tr. at p. 122.  After the documents were sent to NERO, there is no

evidence of any further telephone calls or collaboration between OCIE and NERO on the Madoff examination.

G.      Summary of FTI Engagement Team Expert Analysis

The OIG retained the FTI Engagement Team to analyze the information that the OIG uncovered about the OCIE examination of Bernard Madoff's firm and express an expert opinion on the overall adequacy of the examination and the  question of whether OCIE should have uncovered the Ponzi scheme based upon the complaint and other information provided to them and the appropriate steps that should have been undertaken in an examination.  The FTI Engagement Team concluded that multiple red flags were missed or were not pursued by the examination team.  In addition, the FTI Engagement Team concluded that based upon issues raised in the complaint, had the examination been staffed and conducted appropriately, and basic steps taken to obtain third-party verifications, Madoff's Ponzi scheme should and would have been uncovered.

OCIE had no formal policies and procedures for handling tips and complaints. Such policies and procedures would have provided personnel with discrete guidelines to assist with the analysis and management of processing tips and complaints.  Such policies and procedures also would have allowed for appropriate personnel to monitor the status of the tips and could also have alerted personnel that additional action needed to be taken. The lack of these formal policies and procedures at least partially led to significant mistakes made by OCIE in its initial handling of the complaint.

1.      OCIE's Analysis of the Complaint Was Inadequate For a Number of Reasons

First, the content of the complaint directed that the SRO and Investment Management Groups should have collaborated on the analysis of the complaint and the conduct of the examination.  The fact that the two examination programs operated as silos was an initial and critical mistake in the conduct of the examination.

Second, despite that the complaint came from a credible source and that the Investment Management Group had emphasized that it should be taken seriously, the complaint was inadequately analyzed and the focus of the examination was chosen in error.  The Associate Director and the Assistant Director on the examination did not even recall reviewing the complaint and believed they never spoke to the Hedge Fund Manager who submitted the complaint.  These supervisors stated that they had chosen to focus on front-running, not because it was the subject of the complaint, but because it was the SRO Group's area of expertise.  In order to conduct an effective examination, the focus of the examination should be based on the allegations raised in the complaint rather than the expertise of a team.

Third, the complaint raised numerous issues outside of front-running that should have been considered significant red flags for the examiners to investigate, including the following:

(1) BMIS's unusual fee structure, in which it did not charge typical management and performance fees, leaving hundreds of millions of dollars of fees for his feeder funds that Madoff could have taken;

(2) the volume of Madoff's options trading was undetected in the market. Madoff had represented to the Hedge Fund Manager that he transacted options on CBOE, yet the daily option volume published by CBOE did not appear to reflect the options volume necessary to execute Madoff's strategy and options traders stated they did not see Madoff's volume;

(3) BMIS's returns were remarkable for the lack of negative returns and their consistency. Performance results provided for Kingate Global Fund, Ltd. and Fairfield Sentry Limited indicated consistently high returns over the past 12-15 years with unusually low volatility compared to the overall market. The extraordinary risk-adjusted returns and apparent superb market timing skills should have warranted further scrutiny by examiners and should have been included as an area of review during the examination;[86]

(4) BMIS's trading strategy was not duplicable by anyone the Hedge Fund Manager was aware of, which suggested that the examiners needed to determine whether the

_____

[86] One widely recognized industry metric used to measure risk-adjusted performance is the Sharpe Ratio. It is calculated by subtracting the risk-free rate (i.e., 10-year U.S. Treasury bond) from the rate of return for a portfolio and dividing the result by the standard deviation of the portfolio returns. Sharpe Ratio statistics associated with the performance returns of a Madoff client were contained in the supporting documentation included in the Hedge Fund Manager's complaint. The Sharpe Ratios provided show extraordinarily high risk-adjusted returns for two Madoff client funds when compared to the overall market, as indicated by the S&P 500 index. For an investment manager to so drastically and consistently outperform the overall market on a risk-adjusted basis, the manager would have to possess unusually superb stock picking and market timing skills over a consistently long period of time. For the time period covered by the performance statistics, this would include periods of economic recession (1990-1991, 2001) including numerous disruptions to the market caused by the collapse of the dot-com bubble, the September 11th attacks and massive accounting scandals involving Enron, WorldCom, etc. Even so, a fund marketing presentation provided with the Hedge Fund Manager's complaint describes how the underlying manager [Madoff] ranks in the "top 1% of all US securities firms," with "90% of months profitable," and "largest losing month [of only] -0.72%." Additional fund marketing materials further describes the manager's "edge" to include among other things, "An exquisite sense of timing, as to when to initiate and de-activate the strategy."

strategy was legitimate and therefore should have been included as an area of review during the cause examination;

(5) BMIS's long-term returns did not correlate to the overall equity market. Per the Trading Authorization Directive agreements between BMIS and its clients, the split strike conversion strategy explicitly requires a basket of stocks that have a very high correlation (95%) with the S&P 100 index (OEX). Stocks included in the OEX are generally among the largest and most established companies in the S&P 500 index. As such, the OEX generally provides a good measure of the market's overall performance. Based on the broad index utilized as the basis for BMIS's strategy, certain industry observers believed that BMIS's returns over time should generally be correlated to the overall equities market; however, they were not. The discrepancy between BMIS's returns and the returns of the overall equity markets is an issue that should have been included for consideration in the scope of the examination;

(6) BMIS accounts were typically in cash at month end. An examiner might reasonably suspect "churning"[87] of customer accounts. At the very least, accounts that are typically in cash at month end should raise the question as to why systematically converting assets under management of $10 billion into cash every month would be appropriate for the split-strike strategy. Therefore, the examination should have included a review to determine whether BMIS was churning its accounts and also should have determine if going to cash at month's end was appropriate for the split-strike strategy;

(7) BMIS used no independent brokers and generated its own account statements. These particular concerns identified serious conflicts of interest that put clients' assets at risk. Without an independent broker or custodian, there would be no independent "gatekeeper" in place to safeguard the clients' assets. These issues should have been investigated thoroughly by examiners and certainly

---

[87] "Churning" generally refers to the excessive buying and selling of securities in an account by a broker, for the purpose of generating commissions and without regard to the client's investment objectives. Churning can be a violation of SEC Rule 15c1-7 and other securities laws. For churning to occur, a broker must exercise control over the investment decisions in the account, either through a formal written discretionary agreement or otherwise. Madoff had such discretion in its discretionary brokerage accounts.

should have been included in the Planning Memorandum; and

(8) The auditor of BMIS was a related party.  The lack of an independent auditor further exacerbated the potential concerns with regard to the safety of clients' assets. Without an independent auditor, there could be no assurance that the audits of Madoff were properly conducted.  Such potential conflicts should have heightened the awareness of, and the need for, verification that BMIS had internal controls in place that are designed to effectively prevent certain inappropriate activities, such as misrepresentation of performance results and the safety of client assets from misappropriation. Based on the information provided in the complaint, such a review should have been included as an area for review during the cause examinations.

Fourth, the complaint should have been deemed especially credible because the *MARHedge* and *Barron's* articles substantiated many issues raised in the complaint.  For example, the articles discussed that the options volume needed to implement the split-strike conversion strategy for $8-$10 billion in assets under management should have been seen by industry professionals who attempted to identify it but it was not; there was doubt as to whether or not BMIS really was implementing the full strategy; no one had been able to duplicate BMIS' purported split-strike conversion strategy; there was no correlation to the overall equity markets (*i.e.*, lack of volatility); the accounts were typically "in cash at month end"; and there were questions as to why Madoff was willing to forego management or incentive fees.  The substantiated nature of the Hedge Fund Manager's concerns deserved thorough scrutiny by Commission examiners.

Overall, an adequate analysis of the complaint should have led to the cause examination focusing on the many other issues raised in the complaint in addition to front-running.  While there was no specific mention of a Ponzi scheme per se in the complaint, an examination based upon that complaint should have analyzed how Madoff could have achieved these types of returns, including the possibility that he did not actually conduct any trading.

2.     The Team Assembled for Cause Examination was Inadequately Experienced in Investment Management Issues

Another failing in the OCIE examination was in the inexperience of the team assembled for the examination. The complaint included issues typically examined by investment adviser personnel including verification of purported investment returns and account balances.  The SRO Group had no significant experience conducting examinations of these issues.  OCIE management acknowledged that its investment adviser personnel would have known to look specifically at the investment returns and

verify custody of the assets; yet such personnel were not contacted for assistance. Personnel should have been assigned with a strong background in Investment Management regulation and derivatives/options trading strategies, something no one on the team possessed.   In addition, personnel should have been assigned with a strong understanding of discretionary brokerage accounts and proper custodial procedures for such accounts.  Without properly skilled examiners, many of the issues that were raised in the complaint and the *Barron's* and *MARHedge* articles remained unresolved.

3. The Start of the Examination Should Not Have Been Delayed for Seven Months

In addition, given the severity of the allegations in the complaint, a cause examination should have started soon after the complaint was received.  A seven month delay from the time the complaint was received until the start of the examination was an unreasonably long period of time due to the urgent nature of the examination.  OCIE did not monitor the status of the complaint and no one within management took ownership or responsibility for timely resolution of the complaint.  As a result, the complaint was left inactive for months because there was no system to alert or remind staff that further action needed to be taken.

4. The Examination Should Have Been Logged Into the STARS System

The examination should have been logged into the Super Tracking and Reporting System (STARS), which is used to monitor the status of all examinations being conducted by OCIE.  However, OCIE's SRO Group failed to log their examination information into STARS and regularly did not log examination information into the system. Because the examination was not logged into STARS, the NERO office would not have known that OCIE had been conducting an almost identical examination to the one NERO initiated.  The failure to properly track the examination and coordinate among offices resulted in embarrassment and a waste of Commission resources as two examination teams from two different offices essentially conducted the same examination.

5. The Planning Memorandum Was Too Narrowly Focused and Not All Courses of Action Were Followed Through Upon

The Planning Memorandum was further evidence that the examination was too narrowly focused.  The Planning Memorandum failed to address several critical issues from the complaint, including the unusual fee structure; not seeing the volume of options; remarkable returns; trading strategy not duplicable; no correlation to actual equity markets; accounts in cash at months end; no third-party brokers; and that the auditor of firm is a related party.

Courses of action in the Planning Memorandum that involved going to third parties should have been followed through upon, but were not.  For example, the staff

drafted a letter to the NASD, which was critical to any adequate review of the complaint because the data and information from the NASD would have assisted in independently verifying trading activity conducted at BMIS.  It would also have allowed for the specific data necessary to examine whether or not BMIS was front-running its broker-dealer customers.  OATS data for instance, would have provided the time of each customer order, which was needed to compare to the execution times of trades for the discretionary brokerage accounts.  Had the letter been sent out and information received, the NASD would have provided order and execution data that would have indicated BMIS did not execute the significant volume of trades for the discretionary brokerage accounts that Madoff represented to the examiners that he executed and would have provided the information necessary to reveal the Ponzi scheme.

It was also a mistake not to send the letter to the hedge funds as outlined in the Planning Memorandum.  The Hedge Funds could have confirmed that BMIS had full discretion over their accounts as well as details regarding the implementation of the trading strategy for those accounts.  They could also have confirmed the number of accounts they had with BMIS in order to confirm whether Madoff was accurately reporting those accounts to OCIE staff.

6.    There Were Numerous Red Flags in the Course of the Examination that Were Not Pursued

During the course of the examination, the examination team obtained suspicious information and evidence, but failed to follow up on numerous "red flags."  The responses by Madoff to the document requests were suspicious and contradicted the complaint and the 2001 articles.  BMIS's response claimed "… Neither Madoff Securities, nor any person or entity affiliated with Madoff Securities, manages or advises hedge funds," yet the articles reported that Madoff was managing billions of dollars in assets.  BMIS further claimed, "Because of the limited scope of brokerage execution service we provide and the fully automated and electronic nature of our business, there are no other communications or other correspondence between Madoff Securities and their clients utilizing the split strike forward conversion. Madoff Securities does not communicate or correspond with the investors or owners of its clients."  OCIE examiners were suspicious about Madoff's response regarding such communications, especially since BMIS, a company known for its advanced technology, was claiming not to have e-mail communications with clients.  However, they did not follow up on these red flags.

In addition, the examination team spoke with the Hedge Fund Manger but did not follow up on issues raised in the call that were outside of front-running.  During the call, doubts were expressed about replicating BMIS's strategy and there were concerns with regard to the lack of transparency in the options volume, even though BMIS was reportedly managing $7-12 billion in assets under management.  Furthermore, the Hedge Fund Manager indicated that he was never able to understand the nature of the returns, a point that was also raised in the *MARHedge* and *Barron's* articles.  Such issues were not pursued.

Further, inconsistencies detected by the examiners during the examination raised even more suspicions. BMIS's claim to neither manage nor advise hedge funds was not believable because the accounts had the hallmarks of advisory accounts – the trading authorization directives for BMIS' discretionary accounts were not temporary and not limited to price, time or other parameters.

BMIS's responses to the second document request also should have raised suspicions because the information provided appeared incomplete and at times, inconsistent when compared to other information provided. For example, Madoff's account statements only included average prices during each day without the actual prices for each transaction. As a result, the information could not have allowed the examination team to thoroughly conduct a front-running examination. Based on the numerous questions raised by the examination team with regard to differing trade patterns for certain clients, there should have been significant suspicions as to whether or not Madoff was implementing the strategy as claimed.

Notwithstanding these red flags and unresolved issues, the examination was allowed to "fall through the cracks." Given the serious allegations in the complaint, and the suspicions that should have been aroused during then exam, this matter should have been given priority and not pushed aside in favor of other projects. Where there are significant unresolved questions, examinations should not be pushed aside for long periods of time and left unresolved.

7.      SEC Offices Failed to Communicate

The examination process was also hindered by a lack of communication between SEC offices. Two examinations were conducted by different offices simultaneously and independently without any sharing of resources and expertise. Moreover, when the two offices finally communicated with each other about their respective examinations, OCIE had only a few conversations with NERO about its examination, and should have provided significantly more information to NERO about the complaint that precipitated their examination, the work they did, the findings and inconsistencies.

In addition, the lack of a closing report or an understanding of what OCIE had concluded was a critical error because significant resources (time and personnel) were necessary in order to conduct the cause examinations. The lack of a closing report results in ambiguity and confusion when it is necessary at a later time to recall all activity conducted during an examination months or years later.

8.      The Investment Adviser Issue Was Never Resolved

Although the examination was expanded to consider whether Madoff was required to register as an investment adviser and examiner resources were spent researching the issue and drafting a memorandum, the issue was never fully pursued and never resolved. Madoff registered as an investment adviser in 2006, at least two years after the team considered the issue. If Madoff had been forced to register in 2004, it is

possible he would have been examined by investment adviser examiners and his Ponzi scheme discovered prior to December 2008.

9.      FTI Engagement Team Conclusion

A compelling and credible complaint was provided with several significant red flags.  However, the exam was not staffed appropriately, delayed in outset, focused too narrowly, conducted without obtaining critical independent data and undertaking basic steps needed to address obvious suspicions, not given adequate priority, closed with unresolved issues remaining, and conveyed to NERO without full information.  Because of these mistakes, an opportunity to uncover Madoff's Ponzi scheme was missed.

IV.     SEC 2005 NERO EXAMINATION OF MADOFF

A.      NERO Investment Adviser Examiner Discovered Renaissance Technologies E-mails Questioning Whether Madoff Was Involved in Illegal Activity

In April 2004, Thomas Thanasules, a securities compliance examiner in the Investment Management Examination Group[88] of the Northeast Regional Office (NERO),[89] conducted a routine examination of Renaissance Technologies LLC (Renaissance).  While reviewing internal Renaissance correspondence, he discovered e-mails from November and December 2003 that "rais[ed] questions" about whether Madoff was involved in illegal activity involving managed accounts.  Memorandum dated April 22, 2004 from Eschwie to Sollazzo, at Exhibit 210.

Thanasules e-mailed his Branch Chief, Diane Rodriguez,[90] about his findings, explaining that Renaissance had an indirect investment with Madoff through a "total return swap agreement with another entity ('HCH'[91])."  *Id.* at p. 3.  The underlying investment held by HCH was managed by Madoff.  *Id.*  Thanasules also sent Rodriguez the text of three of the Renaissance e-mails.  *Id.*

The first e-mail, dated November 13, 2003, was from Nat Simons, the portfolio manager for Renaissance's Meritage fund, a hedge fund of funds.  Meritage held the indirect investment with Madoff through a swap agreement with HCH.  Simons Interview Tr. at p. 5.  Simons expressed concern that they did not understand how Madoff was making money or why he used a fee structure that gave such a large percentage of profits

---

[88]  NERO Assistant Regional Director Dorothy Eschwie explained that although the NERO examination program is part of OCIE, "We don't call ourselves OCIE because … we are used to calling the Washington office OCIE.  But I think the whole examination inspection program is under the direction of L[ori] Richards, so we would all be part of that program.  It's just that in the regions we're separated [into] investment management and broker-dealer."  Eschwie Testimony Tr. at 8.

[89]  The SEC changed the name of the Northeast Regional Office (NERO) to the New York Regional Office (NYRO) on March 30, 2007.  *See* http://www.sec.gov/news/press/2007/2007-59.htm.

[90]  Ms. Rodriguez is deceased.  Eschwie Testimony Tr. at p. 37.

[91]  HCH appears to be a reference to HCH Capital Ltd., an affiliate of Khronos, LLC.  Simons Interview Tr. at p. 9.

to feeder funds.  E-mail dated November 13, 2003 from Nat Simons to Jim Simons et al, at Exhibit 211.  Simons also stated in the following e-mail that there were rumors from industry insiders that Madoff was cherry-picking trades and that a related party was his auditor:

> Committee members,
>
> We at Meritage are concerned about our HCH investment [Renaissance's indirect investment with Madoff].  First of all, we spoke to an ex-Madoff trader (who was applying for a position at Meritage) and he said that Madoff cherry-picks trades[92] and "takes them for the hedge fund."  He said that Madoff is pretty tight-lipped and therefore he didn't know much about it, but he didn't really know how they made money.  [A colleague] heard a similar story from a large hedge fund consultant who also interviewed an ex-trader.  The head of this well-respected group told us in confidence that he believes that Madoff will have a serious problem within a year.  We are going to be speaking to him in 11 days to see if we can get more specifics.
>
> Another point to make here is that not only are we unsure as to how HCH makes money for us, we are even more unsure as to how HCH makes money from us; i.e. why does [Madoff] let us make so much money?  Why doesn't he capture that for himself?  There could well be a legitimate reason, but I haven't heard any explanation we can be sure of.  Additionally, there is a $4 billion Madoff pass-through fund (Fairfield Sentry) that charges 0 and 20% and it's not clear why Madoff allows an outside group to make $100 million per year in fees for doing absolutely nothing (unless he gets a piece of that).  The point is that as we don't know why he does what he does we have no idea if there are conflicts in his business that could come to some regulator's attention. Throw in that his brother-in-law is his auditor and his son is also high up in the organization and you have the risk of some nasty allegations, the freezing of accounts, etc.  To put things in perspective, if HCH went to zero it would take out 80% of this year's profits.

---

[92] According to the FTI Engagement Team, cherry-picking is generally a scheme in which trades, once they are determined to be favorable, are allocated by a trader to a favored account at the expense of other accounts.  Former OCIE Director Lori Richards defined cherry-picking as "trading and then deciding which account to allocate the trade to after it's done.  After you know whether it's profitable then you decide which account gets it.  So, you cherry pick the profitable trades and put them in a favored account and leave other accounts with losing trades.  It's a violation of the law if it's not disclosed as such."  Richards Testimony Tr.  at 96.

Perhaps the best reason to get out is that we really don't expect to make an outsized return on this investment. Sure it's the best risk-adjusted fund in the portfolio, but on an absolute return basis it's not that compelling (12.16% average return over [the] last three years). If one assumes that there's more risk than the standard deviation would indicate, the investment loses it[]s luster in a hurry.

It's high season on money managers, and Madoff's head would look pretty good above Elliot Spitzer's mantle. I propose that unless we can figure out a way to get comfortable with the regulatory tail risk in a hurry, we get out. The risk-reward on this bet is not in our favor.

Please keep this confidential.

Nat [Simons]

*Id.*

The following day, Henry Laufer, a research scientist at Renaissance, responded to Simons' e-mail. Laufer stated that Renaissance had "independent evidence" that Madoff's executions were "highly unusual" and agreed with Simons' conclusion that if they could resolve their concerns, they should divest themselves of their Madoff-related investment:

I share the concern at Meritage about the HCH investment.

In Nat's note, I am most worried about the new information in the statement that "Madoff cherry-picks trades and 'takes them for the hedge fund'." We at Renaissance have totally independent evidence that Madoff's executions are highly unusual.

I do not know what to make of the consultant saying "Madoff will have a serious problem within a year."

In all, I very much agree with the sentiment[,] "It's high season on money managers, and Madoff's head would look pretty good above Elliott Spitzer's mantle. I propose that unless we can figure out a way to get comfortable with the regulatory tail risk in a hurry, we get out. The risk-reward on this bet is not in our favor."

A last quote, from Jim, I believe: "If you are going to panic, panic early."

Henry [Laufer]

E-mail dated November 14, 2003 from Laufer to Simons, at Exhibit 212.

In the final e-mail on November 21, 2003, Paul Broder, the risk manager at Renaissance, provided a step by step analysis of why he did not think that Madoff was actually trading options as indicated by Madoff's customer statements:

I have kept this note to a restricted circulation:

I had some further conversations with MRB on the Madoff data. I also looked at some daily volume data on and around the OEX option transaction dates as indicated by Madoff's statements.

I was specifically trying to address the question of how big a fund base can [M]adoff trade with this strategy by focusing on the option volume numbers.

1. Recall that Madoff's strategy involves a collar, that is a put and a call. The volume numbers provide total calls executed on the OEX and total puts. In the two independent set of statements which MRB analyzed the strikes were always the same for both accounts. Make the generous assumption that 50% of the volume was in the most liquid strike (it seems to average 25-25%)

By this measure Madoff could only do $750m. That is with him doing 100% of the option volume in his chosen strike (with the generous 50% assumption). Let's assume that he spreads it over 3 days – so we get to 2.1bln – still far short of the target numbers.

2. Another important point: In every case that MRB examined the options strike (call) is the one closest to the close in the underlying market. Of course the market is not known until the close!! Does this mean that all the options are done almost at the close?

3. The volume does seem to spike on the days that Madoff is executing by a factor of 3-4. This must produce a deterioration in execution prices – and for 15bln!

4. When we examined the issue before, we concluded that maybe he does the options in the OTC market.  We have spoken to several market makers in OTC equity options.  Recall that Raf stated that Madoff had said it was necessary to spread trades over several days – why if you are doing OTC?

5. Recall point 2.  This would indicate that the OTC options would also have to be done at the end of the day (to get a strike near the close).  Are we to believe that the market makers would take on $15bln of market risk at the close?  Of course they might (might!!!) be willing to take the options risk if Madoff provided the market hedge in the underlying (ie they did the whole package with Madoff) but we already know that the trades in the underlying, compared with the closing prices, would leave the OTC counterparty showing losses (as our account always shows gains).

6. Of course ALL of our trades are with Madoff as the principal – so our option positions are OTC with Madoff so he can choose to use any strike, and any total volume he chooses, but the risk must be covered somewhere if he is doing the trades at all?

So we need an OTC counterparty (not necessarily a bank) who is willing to do the basket of the options plus the underlying with Madoff at prices unfavorable for the OTC counterparty – in 10-15bln!!!

Any suggestions who that might be?

None of it seems to add up.

Paul [Broder]

E-mail dated November 21, 2003 from Broder to Simons, at Exhibit 213.

B.    Renaissance Employees Suspected Madoff Was Misrepresenting His Trading

1.    Madoff's Secrecy, Auditor, and Non-volatile Returns Were Significant Red Flags

At the outset, the rumors and mystery surrounding Madoff made some Renaissance employees uneasy.  Simons had heard Madoff kept a restricted floor at

BMIS.  Simons Interview Tr. at pgs. 44-45.  The secrecy of the floor coupled with the rumors about the lack of auditor independence was a red flag for Simons.  *Id*. at p. 45.  Similarly, the small size of Madoff's auditor was an issue for Broder because Madoff was reportedly managing billions of dollars for investors.  Broder Interview Tr. at p. 33.  But it was Madoff's steady, non-volatile returns that initially made Broder "suspicious."  *Id*. at p. 9.  As Broder explicated, "He should have more volatility in his returns than he actually stated. … It was just too steady."  *Id*. at pgs. 9-10.  Broder noted that no matter what happened in the market, no matter what crisis occurred, Madoff's returns remained almost the same.  *Id*. at p. 9.

> 2.      Madoff's Fee Structure Was a Significant Red Flag

Simons also found that "on its face," Madoff's fee structure was illogical.  Simons Interview Tr. at p. 18.  Simons did not understand why Madoff would allow feeder funds to take hundreds of millions of dollars in fees that Madoff could have kept for himself: "[W]hen you see a situation where it would appear that he's only making money off of his … brokerage fees, why is he letting the Fairfield Greenwiches of the world take 2 points?  I don't know."  *Id*. at pgs. 17-18.  Simons explained why he thought it was illogical for Madoff not to retain the fees for himself:

> [Madoff] supposedly has excess demand for his product and – you know, normally you see third party marketers in situations where there is [not] enough demand for the product. …They need the third party marketer to help them raise money.  … In Madoff's situation, when there … was plenty of pent-up demand for his product, which would mean that you just kind of hire a couple of guys and set them up in offices, and you could raise money all day.  And so why not just capture that for yourself, build your own … sales and marketing team in-house?  Why continue to outsource it to Fairfield.

*Id*. at pgs. 20-21.  Laufer estimated that Madoff could be foregoing $200 million a year in fees, something he and Broder found unusual.  Broder remarked, "[R]emember at the time he had a fantastic system but he didn't charge anybody any fees.  That seemed a little bit strange."  Laufer Interview Tr. at pgs. 42-43; Broder Interview Tr. at p. 10.  Simons' only possible explanation for Madoff's fee structure was to speculate that there might be "some underlying agreement between Fairfield and Madoff, and maybe some of that [fees] could come back to him. … Maybe he had an interest in Fairfield."  Simons Interview Tr. at p. 23.

3.    Renaissance Examined Madoff's Reported Equity and Options
Trading Using Widely Available Information

The unresolved questions about their Madoff-related investment led Renaissance to take a closer look.  Because they did not hold a direct investment with Madoff,[93] they had to perform due diligence using only publicly available information and customer statements provided to them by two other Madoff clients.  Laufer Interview Tr. at pgs. 15-16; Broder Interview Tr. at pgs. 13-14.  They had no communications with Madoff or BMIS.  Broder Interview Tr. at p. 14.

Simons explained that one reason they did not report their suspicions to the SEC directly was that they felt all of the information they were using in their analysis was readily available to the SEC:

> We did feel that despite the fact that we're kind of smart
> people, we were just looking at matters of public record.  I
> mean, you know, it wasn't hard to get these statements.
> These statements, you know, hundreds of – lots and lots
> and lots of people had Madoff statements.  So we didn't
> really feel that we were dealing with something which is
> proprietary, and therefore the conclusions that we came to
> were something that was – you know, other people were
> unlikely to come to.  And it's not like we needed a PhD in
> mathematics to do the … study on the OEX.[94]  Right?  I
> mean, this is just – just looking at the size of the market.

Simons Interview Tr. at p. 48.

4.    Madoff's Stock Predictions Were Too Good to Be True

As part of Renaissance's due diligence, they analyzed Madoff's reported trading and returns.  Madoff claimed to be using a split-strike forward conversion strategy, which was described in a 2001 article in *MarHedge* as consisting of "buying a basket of stocks closely correlated to an index, while concurrently selling out-of-the-money call options on the index and buying out-of-the money put options on the index."  Michael Ocrant, *Madoff Tops Charts; Skeptics Ask How*, MARHedge, May 2001, at Exhibit 146.  Madoff

---

[93]  Renaissance invested with Madoff indirectly because Madoff would not accept a direct investment from them.  Broder Interview Tr. at pgs. 6-7.  Broder speculated that the reason for Madoff's refusal was that Renaissance employees "were too smart."  *Id.* at p. 6.

[94]  The OEX is "[t]he ticker symbol for the Standard & Poor's 100 Index."  *See* http://www.investopedia.com/terms/o/oex.asp.  "The S&P 100 is a market-capitalization weighted index of 100 stocks from a broad range of industries."  *Id.*  According to the FTI Engagement Team, "stocks included in the OEX are generally among the largest and most established companies in the S&P 500 index.  As such, the OEX generally provides a good measure of the U.S. equity market's overall performance."

further claimed to trade baskets of stock "made up of 30-35 stocks most correlated to the S&P 100 index." *Id.*

To examine whether Madoff's stated investment strategy could be producing his reported results, Laufer, who specialized in equity trading, supervised an analysis of Madoff's purported stock trading while Broder analyzed the options trading. Laufer Interview Tr. at pgs. 13, 51. Laufer's team found Madoff was reporting on his customer statements that he had purchased stocks at extremely low prices and sold stocks at extremely high prices. *Id.* at p. 17. Laufer explained, "this was statistically almost impossible to do if you were trading in an ordinary way." *Id.* "[I]f you looked at those monthly statements and looked at the executions of the stock side, that the prices were just too good from any mode of execution that we were aware of that was legitimate." *Id.* at p. 44. "And we would have loved to figure out how he did it so we could do it ourselves. And so that was very suspicious." *Id.* at p. 28.

Simons and Broder shared Laufer's view of Madoff's claimed executions, stating, "[W]e observed that he got extraordinarily good fills[95]," and if the fills were legitimate, then Madoff's predictions for when to buy and sell stocks would have been much better than anyone else that Broder had ever seen. Simons Interview Tr. at p. 34; Broder Interview Tr. at pgs. 15-16. Broder stated, "Well, I knew it wasn't possible because of what we do." *Id.* at 16.

Renaissance also noticed that Madoff's predictions for when to stay out of the stock market were extraordinary. The customer statements showed that at certain points "his position would go to zero [go to cash]. It seemed to us that the quarters that he'd decide to go to zero were exceptionally good quarters to have no position. … It seemed to us that those quarters in which he decided to go into zero cash were quarters in which, if you blindly tried to do what he was doing, you would have lost money, it seemed to us. … We had no idea … how he managed to do that. … We didn't understand what he was doing. We didn't understand how he was doing what he was doing." Laufer Interview Tr. at pgs. 22-23.

5.     Cherry Picking Was an Unlikely Explanation for Madoff's Incredible Fills

Renaissance determined it was unlikely Madoff's incredible fills were the result of cherry picking the best trades for his institutional clients because of the large number of customers they estimated Madoff had. Renaissance made "estimates … about how large [Madoff] might be … based on some attempts to aggregate information that we had in terms of Fairfield and other feeder funds that we were aware of." Simons Interview Tr. at p. 29. "So for a small account, you could somehow manage to imagine that he has this whole big operation, and he picks off a few trades and he puts them in, and he could

---

[95] A "fill" is "the action of completing or satisfying an order for a security or commodity. It is the basic act in transacting stocks, bonds or any other type of security." *See* http://www.investopedia.com/terms/f/fill.asp. According to the FTI Engagement Team, "good fills" refer to favorable execution prices.

physically do it.  But you have to wonder whether he could do it for a large" operation.
Laufer Interview Tr. at p. 29.  "So it's a question of scale, of how many customers you
have versus how many you want to cherry-pick."  *Id.* at p. 31; *see also* E-mail dated
November 14, 2003 from Broder to Brown, at Exhibit 214 (e-mail questioning the
possibility of cherry picking).

6.    Madoff Was Misrepresenting His Options Trading

The most detailed reasoning for why Renaissance suspected Madoff was
misrepresenting his trading came from Broder's analysis of Madoff's claimed options
trades.  In his November 21, 2003 e-mail, Broder concluded Madoff could not be trading
on an exchange because of insufficient volume, and could not be trading options over the
counter because it was inconceivable that Madoff could find counterparties for the
trading.  Memorandum dated April 22, 2004 from Eschwie to Sollazzo, at pgs. 5-6, at
Exhibit 210; Broder Interview Tr. at p. 37.  Laufer further explained, "[W]e made
inquiries.  We didn't see anybody saying he did a lot of trading.  We didn't understand
why anybody in the business of options would take the other side. … [Y]ou ask yourself,
why would somebody do this?  Because he's going to lose money doing the trade, so far
as we know."  Laufer Interview Tr. at pgs. 25, 49.[96]

After concluding Madoff was not trading options, Renaissance had no reason to
come to a final conclusion that he was engaged in fraud.  The unanswered questions were
enough reason to begin divesting themselves of their investment with Madoff.  Simons
Interview Tr. at pgs. 37-38; Broder Interview Tr. at pgs. 34-35.  Broder explained their
reasoning, as follows:

> I came to the conclusion that we didn't understand what he
> was doing.  We had no idea how he was making his money.
> The numbers, the volume numbers that he suggested he
> was doing was not supported by any evidence we could
> find.  And, you know, that in itself should just mean we get
> out.

Broder Interview Tr. at p. 35.

7.    Renaissance Employees Felt the SEC Could Have Verified
Whether Madoff Was Trading Options By Taking Elementary
Steps

While Renaissance did not have the authority to force Madoff to reveal his trading
counterparties, Renaissance employees believed that regulators, such as the SEC, could
have verified whether Madoff was executing his purported options trades.  Broder

---

[96]  According to the FTI Engagement Team, a counterparty is a party to a contract that essentially serves as
the trading participant on one particular side of a trade.  If Madoff's options trades were always profitable
for Madoff, as indicated in the Renaissance e-mails, there is little or no incentive for a counterparty to
continuously take the other (i.e., unfavorable) side of those trades since they would lose money.

thought the first step a regulator reading the e-mails would have taken was to verify that Madoff was actually trading:

> But if you'd read the e-mails … you would have thought the question would come to mind, hey, these guys are debating whether he could possibly be doing this volume. Let's – the next step will be let's try to verify that he did this volume. … And the first time you checked a trade, you would have found it's not there.

*Id.* at pgs. 25-26.

Broder thought a regulator could have verified whether Madoff was trading by asking Madoff who his counterparty was and then verifying with the counterparty that the trade took place. *Id.* at pgs. 21-22, 38. Broder stated he would have performed the same verification process whether Madoff claimed his counterparty was in the United States or in Europe. *Id.* at p. 23. Broder explained, as follows, why he thought going to Madoff's alleged counterparties would have been a simple step for a regulator:

> [S]omewhere in the marketplace, either in an exchange-traded marketplace or an OTC marketplace, exactly those trades which were on the client account statement should exist on someone else's books, you know. … Somewhere in the marketplace, either OTC or exchange-traded, those trades were taking place. And it seems to me a very simple set of steps to verify that those volumes [existed]. … I don't see how that could have possibly been missed. I mean, this is a very simple verification. I mean this guy is trading – this is a cash account. So he's turning over $10 billion of stocks each particular month. I mean, you've got to be [able to see it] in the marketplace.

*Id.* at pgs. 25-26.

Laufer also felt that a regulator conducting a thorough review of the e-mails would have had to have asked, "Who took the other side of the trade? You don't have to deduce huge amounts. Just ask who took the other side of the trade, which of course we couldn't find that [out]." Laufer Interview Tr. at pgs. 27-28. Likewise, if Simons were investigating Madoff, he stated that he would have asked Madoff to "show me the other side of your trades" whether Madoff claimed to trade in the United States or Europe. Simons Interview Tr. at pgs. 36-37. As Simons explained, "I need to see the other side of those trades in Europe. If they're in Europe, that's fine, but you're doing them with someone. There's got to be somebody on the other side of the trade." *Id.*

Laufer asserted that someone at the SEC should have been able to do the same analysis and draw the same conclusions Broder did without determining whether or not Madoff was front-running:

> A:      …This is not rocket scientists.  This is not rocket science.

> Q:      Do you think that someone from the SEC should be able to figure this out?

> A:      Much more elementary than that.  Someone at the SEC could wander down, you know, to Goldman Sachs and wander over to their options department and ask them, how does somebody execute $10 billion of options, and find out it's very difficult.  This is not … proprietary Renaissance analysis here.  … Paul Broder would not claim to be a mathematician, and he's an expert of this, and he's very smart.  But you don't have to be as smart as Paul Broder is to do what he says here.

Laufer Interview Tr. at pgs. 49-50.

> 8.      The SEC Had the Expertise to Perform Broder's Analysis

Stewart Mayhew, the SEC's current Deputy Chief Economist,[97] reviewed Broder's options analysis and felt the SEC's Office of Economic Analysis (OEA) was capable of providing a similar analysis.  Mayhew provided a summary of Broder's analysis:

> This e-mail describes trading volume in the S&P 100 options, which are traded on the CBOE.  The document is indicating that the trading volume in that market is not high enough to be consistent with a claim that a market participant is following a split strike conversion strategy using S&P 100 options on a huge scale.

Mayhew Testimony Tr. at p. 37.

---

[97]  Mayhew first came to the SEC in 2002 as a Visiting Academic Scholar in the Office of Economic Analysis (OEA).  Mayhew Testimony Tr. at 7.  In 2004, he took a permanent position with the SEC as Assistant Chief Economist.  He was appointed Deputy Chief Economist in July 2008.  *Id.* at 7-8.

Mayhew could not confirm the accuracy of the analysis without verifying the numbers, but stated Broder's approach to his analysis appeared to be logical:

> I do agree it is something that makes sense to look at. If somebody is saying they are doing a certain strategy it would make sense to go out and look at the trading volume. If the scale of the strategy they are claiming to follow is significantly larger than the available liquidity of volume in that market, then that would be a red flag that they were not telling the truth.

*Id.* at pgs. 37-38.

When asked if this was a difficult analysis to perform, Mayhew indicated that it was not, and stated he could do it easily:

> No. It looks to me like all they are doing is looking at trading volumes on certain days. If I had specific information about what Madoff's purported strategy was, then I could have easily looked up the volume data to do this similar type of analysis.

*Id.* at p. 38.

Mayhew took Broder's analysis one step further. Mayhew asserted he did not believe Madoff could be making money following Madoff's stated strategy. *Id.* at p. 39. Mayhew further stated that if somehow Madoff did make money, then Mayhew agreed with Broder's analysis of the unlikelihood of finding an options counterparty, stating as follows:

> It presupposes the fact pattern that I do not think is likely to be possible. I do not think the strategy that he said he was following actually would make money. If somehow Madoff or some other trader was able stumble upon some really extremely profitable strategy and execute over the counter, then one of two things would happen as a result. Either the counter-party would lose money or the counter-party would have to be hedging. If the counter-party was not hedging, then I would suspect that they would be losing money and they would not want to continue doing those types of trades. I do not know enough about the specific business of these [counterparties] to know how much risk they are willing to bear. My intuition is they would prefer to hedge if possible and not bear the risk themselves.

*Id.*

9.      Front-Running Would Not Have Answered All of the
        Questions in the Renaissance E-mails

Renaissance employees stated that in 2002 or 2003, "the most common rumor that
was out there [about BMIS] was somehow the notion that they were actively front-
running their institutional clients on the brokerage side."  Simons Interview Tr. at p. 14;
Laufer Interview Tr. at pgs. 11, 23.  However, to Laufer, the questions raised in the
Renaissance e-mails about Madoff's options trading could not be explained by front-
running.  *Id.* at p. 34.  He felt the SEC did not need to determine whether or not he was
front-running to answer the open questions:

> If your SEC person had a small amount of expertise, it's
> clear you go to Madoff and you say, show me the – show
> me your volume.  Show me the counter parties.  And you
> see how he's managing to do these extraordinary things.
> … [Y]ou don't have to figure out if he's front-running or if
> he's doing something weird.  You ask him to show you
> what he's doing.

*Id.* at p. 51.  Moreover, if examiners ruled out the possibility of front-running, Simons
thought there were still unanswered questions in the Renaissance e-mails that needed to
be pursued, such as Madoff's purported "OEX option position" that Broder had called
into question.  Simons Interview Tr. at pgs. 43-44.

10.     Renaissance Relied on Prior SEC Examination in Making the
        Decision to Retain Part of Their Madoff Investment

After performing their due diligence, Laufer stated that "we were very worried"
about the investment with Madoff.  Laufer Interview Tr. at p. 33.  However, opinions
diverged at Renaissance about whether to entirely divest itself of the investment.  Simons
Interview Tr. at p. 28.  Broder and Simons wanted to get out of the investment.  Broder
Interview Tr. at p. 35; Simons Interview Tr. at p. 27.  But one piece of information
"helped to allay concerns" of other employees:  "[W]e were aware that … [Madoff] had
been investigated by the SEC."[98]  *Id.* at pgs. 17, 28.  Because of the competing
viewpoints, Renaissance stated they initially reduced their investment by approximately
one half and later got out of the investment entirely for unrelated reasons.  *Id.* at p. 28.

Simons cited their understanding that the SEC had looked at Madoff and given
him a "clean bill of health" as a reason Renaissance did not initially divest itself of its
Madoff-related investment.  *Id.* at p. 28.  Renaissance understood the SEC had examined
"the whole business."  *Id.* at p. 17.  Laufer agreed, "What was also on our minds … was
that Madoff had been investigated – and cleared" by the SEC.  Laufer Interview Tr. at
pgs. 35-36.

---

[98]  Renaissance appears to have been referring to the 1992 examination of Madoff that arose from the
SEC's investigation of Avellino & Bienes.

157

Renaissance also doubted Madoff could be engaged in fraud because he operated through highly-regulated brokerage accounts:

> [B]ecause of the nature of the fact that these were brokerage statements, and he had a big broker-dealer business and big market-maker and – you just assume that someone was paying attention to make sure that there was something on the other side of the trade. … I never, as the manager, entertained the thought that it was truly fraudulent.  And it again was because … it would have been so easy to prove that it was fraud if it was just managed accounts that were set up.  It would have been so – again, forgive me here, but you know, it would have been pretty straightforward.  We felt that he was sufficiently in the eye of the regulators that it was just hard for us to envision that that was the case.

Simons Interview Tr. at pgs. 28, 39-40.

No one from the SEC contacted Simons, Laufer, or Broder about their e-mails until the OIG conducted its investigation in 2009.  *Id.* at p. 27; Laufer Interview Tr. at p. 46; Broder Interview Tr. at p. 38.

C.    Renaissance E-mails Raised Significant Red Flags For Investment Management Examiners

Thanasules reviewed the substance of the e-mails and stated that "all the [e]-mails raised red flags at that time. … [T]he [e]-mails raised questions on our end and that's why I told my manager about them."  Thanasules Testimony Tr. at pgs. 8, 16-17. Thanasules testified the e-mail from Broder "raises a red flag as to whether Madoff is doing these trades at all."  *Id.* at p. 17.  After providing the e-mails that raised suspicions about Madoff's trading activity to Rodriguez, his Branch Chief, Thanasules had no further involvement investigating the content of the e-mails, and he did not recall ever being contacted to discuss his findings.[99]  *Id.* at pgs. 17-18.

Rodriguez then provided the e-mails to her supervisor, NERO Assistant Regional Director Dorothy Eschwie, and provided Eschwie with an oral briefing.  Eschwie Testimony Tr. at pgs. 11-12.  Eschwie recalled that Rodriguez told her the e-mails raised questions about Madoff being engaged in illegal activity, but Eschwie did not review the e-mails herself at the time Rodriguez provided them to her.  *Id.* at pgs. 11-12.

---

[99] When Thanasules sent the suspicious e-mail to Rodriguez, he told her that he "spoke to the compliance officer [at Renaissance] that informed me that they have reduced their investment in this vehicle but not due to anything referenced in the aforementioned e-mails.  At this point, I do not have any further details …."  E-mail dated April 20, 2004 from Thanasules to Rodriguez, at Exhibit 215.

After reviewing the Renaissance e-mails during her testimony, Eschwie testified that Simons' statement contained therein – "not only are we unsure as to how HCH makes money for us, we are even more unsure as to how HCH makes money from us, why does [Madoff] let us make so much money?" – was questioning "the fee structure or it sounds like the performance of the account." *Id.* at pgs. 16-17. She stated that if the investment management examiners were investigating the allegations in the e-mails, they would investigate the allegation of possible "conflicts in his business" and "that his brother-in-law is his auditor." *Id.* at pgs. 19-20. Eschwie agreed, as follows, that "whether it was a brother-in-law or not, the independence of the auditor would be something that would be important to look at" in the examination:

> Yes, I believe we would ask some additional questions as to why this particular person is the auditor and how long and what their, you know, what their expertise is or – I believe we would ask some additional questions if it was brought to our attention that somebody is somebody's brother-in-law. The same way we do with any other conflicts of interests. We ask additional questions in particular with relatives, that is a common question…. But as far as on the investment adviser side, we would definitely question whether somebody would be deemed independent.

*Id.* at pgs. 19-21. Eschwie stated the Investment Management Examination Group was well aware of auditor independence as a potential issue:

> And in particular on the investment adviser side over the years, the issue of custody of client accounts, assets, client assets, over the years before they amended the custody rule we had – there were areas where if an investment advisory firm had control or had custody of client assets, they could follow no action letters, so that they would not be deemed to have custody. And one of the things that they did, and this is numerous times we saw this, they would have an accountant view the disbursement from the account, and that accountant did have to be independent. So, we are, you know, aware of the independence issues with regard to an accountant.

*Id.* at pgs. 21-22.

If she were investigating the allegations in the e-mails, Eschwie stated she "would want to talk to the person who wrote the e-mail and ask them what are they referring to." *Id.* at p. 25. She did not think there would have been any reason that broker-dealer examiners could not have contacted the employees at Renaissance. *Id.*

Eschwie viewed the e-mails as indicating that employees at Renaissance were clearly "trying to find out where exactly the trades were taking place" and that the e-mails evidenced that "there's some suspicion as to whether Madoff is trading at all." Eschwie Testimony Tr. at pgs. 29-30.  She also believed that the e-mails showed Broder was "questioning whether anybody would want to be an OTC counterparty in this situation."  *Id.* at p. 31.

If the Investment Management Examination Group were to examine Madoff based on the Renaissance e-mails, Eschwie believed they would focus their cause examination on the allegations in the complaint:  "We would follow-up on whatever allegations were made.  We get complaints all the time.  And that's the focus on the cause exam, is the complaint or if there's suspicion of questionable activity, that's what the focus of the exam would be."  *Id.* at p. 36.  Based on the Renaissance e-mails, one allegation that Eschwie would follow-up on was "whether Madoff was actually trading." *Id.* at p. 37.

Eschwie also thought examiners could do what Renaissance did -- contact market makers [in] OTC options and find out if they were seeing the type of volume that Madoff claimed to be trading.  *Id.* at p. 33-34.  Eschwie noted, "I would think that firms probably have better resources th[a]n I would to know who to call to see what you see."  *Id.* at p. 34.  Eschwie explained that although they usually sought documentation from the firm rather than from third parties, they also followed up on that information:   "what we really do, we talk to people at the firms and we would follow-up and ask, where did you get that information, do you have documentation to show us, who did you speak to."  *Id.* at p. 35.

> D.    NERO Investment Adviser Examination Group Referred E-mails Implying Madoff is Involved in Illegal Activity to NERO Broker-Dealer Examination Group

Based on NERO's investment adviser examination of Renaissance, Thanasules and Eschwie viewed Renaissance as a "very sophisticated place" and a credible source of information.  Eschwie Testimony Tr. at p. 13; Thanasules Testimony Tr. at pgs. 9-10. Eschwie determined the allegations in the e-mails should be referred for investigation. Eschwie Testimony Tr. at p. 12.  Eschwie then referred the Renaissance e-mails to the NERO Broker-Dealer Examination Group for investigation for the same reason that the OCIE Investment Management Examination Group referred the 2003 Hedge Fund Manager's Complaint about Madoff to the OCIE Broker-Dealer Examination Group.  *Id.*; *see* Section IV of this Report of Investigation.  Eschwie explained that she referred the e-mails to the Broker-Dealer Examination Group -- despite that they included investment adviser issues -- because BMIS was registered as a broker-dealer and not as an investment adviser.[100]  Eschwie Testimony Tr. at p. 12.

---

[100]  According to the FTI Engagement Team, Madoff's books and records were subject to examination whether or not he was registered as an investment adviser.  As a registered broker-dealer, the Madoff firm's books and records (including e-mails) related to that business are subject to compliance examinations and review by the SEC staff under Section 17 of the Exchange Act.  If the firm had been registered as an

On April 22, 2004, Eschwie sent a cover letter with the three Renaissance e-mails described above[101] to the two Associate Regional Directors responsible for NERO's Broker-Dealer Examination Program, Robert (Bob) Sollazzo and Richard Lee.  *Id.* at pgs. 4, 12, 14; E-mail dated April 20, 2004 from Thanasules to Rodriguez, at Exhibit 215.

On May 11, 2004, Sollazzo responded to Eschwie.  E-mail dated May 11, 2004 from Sollazzo to Eschwie, at Exhibit 217.  Sollazzo stated the alleged conduct should be examined and that the NERO Broker-Dealer Examination Group would conduct a cause examination as soon as they had the resources, which included finding an examiner knowledgeable about options trading.  *Id.*  Sollazzo took note in his e-mail to Eschwie that Madoff's returns were suspicious:

> We believe this matter is worthy of an examination when resources permit.  Since the trading appears somewhat complex, we will have to assign an experienced examiner who has a sophisticated knowledge of options.  When the time is right we will strike.

> The story, especially the consistent high returns earned over an extended period, makes you wonder.

E-mail dated May 11, 2004 from Sollazzo to Eschwie, at Exhibit 217.

E.    Examination of Madoff Was Commenced

1.    Examination Team of Non-Attorneys Was Chosen

Eight months after Eschwie's April 22, 2004 referral to the NERO Broker-Dealer Examination Group and almost seven and a half months after Sollazzo's May 11, 2004 e-mail to Eschwie that "this matter was worthy of an examination when resources

---

investment adviser at that time, the firm's books and records related to that business would have been subject to compliance examinations and review by the SEC staff under Section 204 of the Advisers Act. However, since Madoff was running the investment advisory business out of discretionary brokerage accounts at BMIS and it was a registered broker-dealer, those records were also subject to compliance examinations and review by the SEC staff under Section 17 of the Exchange Act.  Therefore, OCIE examiners (whether in OCIE's Broker-Dealer or Investment Management Groups) had access to all of BMIS's books and records, including those relating to BMIS's advisory accounts.

[101]  There were additional e-mails referring to Madoff from the Renaissance examination that were not provided to the broker-dealer examiners with the referral.  Eschwie Testimony Tr. at pgs. 50-51.  The e-mails reiterated the concerns about Madoff expressed in the three e-mails provided to the broker-dealer examiners.  E-mails produced by Renaissance Technologies to the OIG, at Exhibit 216.  One e-mail of note questioned whether cherry-picking was the reason for Madoff's performance.  On November 14, 2003 Broder wrote the following in an e-mail, "Like background radiation my concern about Madoff has never really gone away. … But if cherry picking is the reason for the highly-favorable fills – who is taking the hit on the other side?"  E-mail dated November 14, 2003 from Broder to Brown, at Exhibit 214.  Ostrow testified that knowing about the additional Renaissance e-mails would have been helpful to the examination.  Ostrow Testimony Tr. at pgs. 47-48.

permit," Assistant Director John Nee e-mailed Eschwie to let her know the Broker-Dealer Examination Group would start an examination of Madoff in 2005. E-mail dated April 20, 2004 from Thanasules to Rodriguez, at Exhibit 215; E-mail dated May 11, 2004 from Sollazzo to Eschwie, at Exhibit 217. By late December 2004, Sollazzo and Nee had assembled a team for the examination. Sollazzo Testimony Tr. at p. 58; Nee Testimony Tr. at pgs. 26-27; E-mail dated December 22, 2004 from Nee to Ostrow and Lamore, at Exhibit 218. The team consisted of Sollazzo, Nee, and two examiners in the broker-dealer examination program – William Ostrow, a staff accountant, and Peter Lamore, a compliance examiner.

Nee did not assign a Branch Chief to the examination. Nee Testimony Tr. at p. 27. For the Madoff examination, Nee assigned the examination "directly to [him]self," and served in both Assistant Director and Branch Chief roles. *Id.* at p. 26. Nee acknowledged it was "unusual" to conduct an examination without a Branch Chief. *Id.* at pgs. 27-28. Ostrow and Lamore were able to recall only one other examination in which they did not have a Branch Chief. Ostrow Testimony Tr. at p. 27; Lamore Testimony Tr. at p. 27. Paul Pocress, a NERO examiner for over twenty years, stated that he has never done an examination without a branch chief. Pocress Testimony Tr. at pgs. 5, 11.

Unlike the OCIE examination team, all of the NERO team members had a background in accounting or finance, and none of the members was an attorney. Sollazzo graduated from college with a bachelor's degree in Accounting in 1978. Sollazzo Testimony Tr. at p. 8. He joined the SEC in 1981 after spending three years working as an auditor. *Id.* at p. 9. He has spent the rest of his career at the SEC, except for approximately two years when he worked as a public accountant and earned his CPA. *Id.* at p. 10. Sollazzo was promoted to Associate Director in approximately 1992. *Id.* at pgs. 10-11.

Nee received a bachelor's degree in Accounting in 1986, and a master's degree in Finance in 2003. Nee Testimony Tr. at pgs. 8-9. After college, he worked at Drexel Burnham Lambert as a mutual fund accountant for approximately three years, as an accounting supervisor for Fairchild for a year, and as an auditor in the Inspector General's Office at the U.S. Department of Housing and Urban Development for one year. *Id.* at pgs. 9-10. He began working at the SEC as an examiner in 1991 and was promoted to Assistant Director in approximately 1996. *Id.* at pgs. 10-11.

William Ostrow earned a bachelor's degree in Finance from New York Institute of Technology in 1999. *Id.* at p. 11. His first job after college was at the SEC as a Junior Compliance Examiner. *Id.* Ostrow was promoted to Staff Accountant in 2002. *See* Standard Form 52, "Request for Personnel Action," U.S. Office of Personnel Management (7/14/02), at Exhibit 219. Prior to the Madoff examination, Ostrow had over five years of examination experience. *Id.* at pgs. 11-12.

Peter Lamore graduated from the United States Coast Guard Academy with a degree in Management in 1993. Lamore Testimony Tr. at p. 12. For the following five years, he served in the U.S. Coast Guard and went to business school part-time,

graduating in 1999 from New York University with a master's degree in Business Administration. *Id.* In 1998, he became an Assistant Equity Trader at First New York Securities. *Id.* at p. 12-13. After a year, he became an Equity Trader where he "traded [his] own book for two years, and then the last two years, [at New York Securities, he] worked for a hedge fund … called Millennium Partners." *Id.* After leaving First New York Securities in 2003, he took trading positions at three other firms for brief periods of time before joining the SEC in November 2003. *Id.* at p. 14-15. While he was a trader, Lamore had some experience trading equity options. *Id.* at p. 15.

Lamore had worked on approximately four examinations before being assigned to the Madoff examination. Lamore Testimony Tr. at pgs. 19-20. Nee thought Lamore was qualified to work on the examination despite his lack of experience: "I think … Peter Lamore, based on his equity trading experience as a trader, probably would have been among one of the best choices of anyone in the broker-dealer program to work on this examination, in spite of the fact that he had not been an examiner for that long." Nee Testimony Tr. at pgs. 49, 50-51.

> 2.    Joint Examination with Investment Management Examiners Was
>        Not Considered

In creating an examination team, Sollazzo and Nee did not consider performing a joint examination with investment management examiners, despite the fact that the Renaissance e-mails raised suspicions about Madoff's performance. Sollazzo was asked why he did not assign a joint examination team, in the following exchange during his testimony:

> Q:    Did you think of assigning someone from the
>        investment adviser exam team to this exam since
>        you have these hedge fund issues and these return
>        issues that they specialize in?

> A:    Never did. Never did. … Never considered it. …
>        Well, part of the reason is we didn't work that many
>        joint exams, we rarely did joint exams at that time.
>        … We're a bit better now, and I've – frankly, I felt
>        also that if it related to broker-dealer trading
>        practices that we could figure it out. … We rarely
>        did joint exams at that time.

Sollazzo Testimony Tr. at pgs. 67-68. Similarly, in the following testimony, Nee stated that he did not recall the two examination programs jointly performing an examination until recently:

> That program [investment management examination
> program] is completely distinct. There are two separate –
> it's not organized the same way that it's organized in some

> other offices.  There are two associates or distinct
> associates, one on the investment advisor side, one on the
> broker-dealer side, and I don't think we have ever, until
> maybe this past year, sent examiners out together.  And,
> again, they are two separate examinations, so it just wasn't
> done.

Nee Testimony Tr. at p. 48.

Ostrow provided a description similar to Nee's, stating that each of the
examination programs in NERO was a "silo" and estimated that he had worked on only
one joint BD/IM examination in his ten years at the SEC.  Ostrow Testimony Tr. at p. 57.
Brian Snively, a Branch Chief in OCIE's Investment Management Group testified that he
could not recall working on any joint examinations in the ten years he has worked at the
SEC.  Snively Interview Tr. at p. 28.  Similarly, the IM Staff Accountant, a NERO
Branch Chief in the Investment Management Examination Group with nine years of SEC
examination experience, stated that he could not recall ever "doing a 100 [%] coordinated
examination with the BD staff."[102]  IM Staff Accountant Testimony Tr. at p. 13.

> 3.      Team Began Background Work in Preparation for On-site
>         Examination Ten Months After Referral

In late March 2005, approximately ten months after receiving the referral from the
NERO Investment Management Examination Group, the NERO Broker-Dealer
Examination Team began performing background research in preparation for an on-site
examination of Madoff to begin in April.  Sollazzo acknowledged that beginning the
examination almost a year after the referral was a long delay, stating, "I agree, I think that
is a pretty long period of time."  Sollazzo Testimony Tr. at p. 72.  He explained that he
"had trouble staffing the exam."  *Id.* at pgs. 71-72.  In part, they had been waiting for
Lamore, who Sollazzo chose for the examination team because he "had been a[n] equities
trader for hedge funds."  Nee Testimony Tr. at pgs. 26-27; Sollazzo Testimony Tr. at p.
58.

Nee stated the long delay was not necessarily unusual, especially where there was
no particular urgency to begin the examination.  Nee Testimony Tr. at p. 45.  In this case,
notwithstanding the red flags contained in the Renaissance e-mails, Nee stated, in the
following exchange, that he did not believe there was a particular urgency because he felt
it unlikely that a firm of BMIS's size and legitimacy would "rip people off":

> Q:      Was it unusual for an exam to start so long after a
>         referral came in?

---

[102]  Lamore appears to have had access to assistance from the IM Staff Accountant during the Madoff
examination, but did not request his assistance in conducting the examination.  IM Staff Accountant
Testimony Tr. at pgs. 12-13.

A:      Not – I would say not necessarily.  Although a year, that – a year may seem long, it depends on, again, I would think if there's some sort of immediate need where we had direct evidence or a customer complaint that their funds were somehow being converted against their will or something along that – along those lines.  So –

Q:      So there was – there wasn't a particular urgency in connection with the Eschwie referral in April 2004?

A:      I don't think – well, I don't think there was a particular urgency. …Which is not to say we did not appreciate the severity of the charges or of the allegation.  Again, in – but – and also keep in mind that we did know that Bernie Madoff was a – I'm talking about the firm because I don't know anything – I didn't know, at that time I don't think I knew anything about the individual – but we did know the firm was a fairly large firm, employed a lot of people, was a very big market-maker, had introduced the, sort of, third market issue to the market.  So it didn't seem to be – it didn't seem as if, you know, he was a fly-by-night operation that was out there to rip people off is I guess what I'm trying to get to.  So that may have tempered our decision to wait until the proper personnel would have been available. …I believe at that time we had a lot of exams going on, especially in my org code … So, [Sollazzo] may have been talking about waiting until I … got involved.  I don't know if he had anyone … specific in mind but I think he wanted to, you know, make sure that whoever was involved was a good examiner because we have different strata of examiners, some who we would send on a cause examination and some who we wouldn't.

*Id.* at pgs. 45-47.[103]

---

[103]  Similarly, in the 2004 OCIE cause examination of Madoff, there was an almost seven month delay between the receipt of the complaint and the initiation of the cause examination.  See Section III.

4.      No Planning Memorandum Was Drafted Describing Focus and
        Scope of the Examination

Unlike the OCIE examination team, the NERO examination team did not draft a
planning memorandum laying out the scope of the examination.  Lamore Testimony Tr.
at p. 161.  Lamore recalled that at the time of the examination, NERO might not have had
a practice of writing planning memoranda.  *Id.*  Ostrow agreed, explaining as follows,
that a formalized process was not in place for determining the focus of an examination:
"Only for the last year or so have I sent scope memos and had them reviewed and have
comments made.  Prior to a few years ago, it was really … just sort of as the exam
progressed, notes were taken and e-mails were exchanged."  Ostrow Testimony Tr. at p.
17.

Members of the examination team agreed the "cause" of the examination was the
Renaissance e-mails, and Sollazzo recalled he instructed Nee to perform "a cause exam
based on the information" in the Renaissance e-mails.  Lamore Testimony Tr. at pgs. 31-
32; Sollazzo Testimony Tr. at p. 58.  In addition to the e-mails, the examination team had
two articles about Madoff's operations from 2001.  E-mail dated April 25, 2005 from
Ostrow to Lamore, attaching *Barron's* article, at Exhibit 220; Lamore's copy of
*MARHedge* article with comments, at Exhibit 221.  One of the articles was published in
*MarHedge* and entitled, "Madoff tops Charts; Skeptics Ask How."  Michael Ocrant,
*Madoff Tops Charts; Skeptics Ask How*, MARHedge, May 2001, at Exhibit 146.  The
second article was from *Barron's* – "Don't Ask, Don't Tell"; Erin Arvedlund, *Don't Ask,
Don't Tell,* Barron's, May 7, 2001, at Exhibit 135.

It is unclear how much guidance examiners were given by Nee and Sollazzo at the
start of the examination.  Lamore testified the focus of the examination "was determined
for" him, and stated the following about the focus of the examination:

Q:      Okay.  How did you understand what the focus
        was?

A:      Well, we had been given – I believe we had been
        given a report or some e-mails that sort of alleged
        suspicious activities at the firm.

Lamore Testimony Tr. at pgs. 30-31.

Upon receiving the e-mails, Lamore recalled that he "definitely reviewed" them,
but did not recall discussing the e-mails with Nee or any other supervisor, stating, "I
think we sort of worked on our own."  *Id.* at pgs. 31-32, 42.  Ostrow stated he did not
focus on the Renaissance e-mails, and testified he was "not sure if [he] had read" all of
the Renaissance e-mails and may have just read "snippets" of them.  He recalled that in
developing the focus of the examination, the examination team "really used the Barron's
article and the *MarHedge* article as a starting point," rather than the e-mails.  Ostrow
Testimony Tr. at pgs. 28-29, 34.  Ostrow explained he did not focus on the e-mails

because he viewed tips skeptically, noting, although when you receive a tip "from an IA examiner," one should "take it serious[ly], but still [you] ha[ve] to take it with a grain of salt what the people are writing back and forth to each other." *Id.* at p. 38.[104]

5.     Nee Determined the Renaissance E-mails Only Raised Issues Related to Front-Running and Cherry Picking

When asked who chose the focus of the examination, Nee stated that the focus was a "foregone conclusion" he disseminated to the staff examiners:

> Well, I think it was a foregone conclusion that we would focus on the referral that was – that had been forwarded to me as something to conduct a cause examination.  So, I don't know exactly where you can say who made that decision.  I was given a referral to look into, so that was sort of, as I said a foregone conclusion.  If I'm given a referral to look into a specific matter, that specific matter was the focus of the examination.  I would have been the one to, I guess, disseminate it to the examination staff.

Nee Testimony Tr. at p. 28.

Unlike the Renaissance employees who drafted the e-mails and the SEC Investment Management examiners who initially reviewed them, Nee testified he did not see anything in the Renaissance e-mails upon which to focus an examination except for cherry picking and front-running. *Id.* at p. 40.  Nee stated, in the following testimony, that the "foregone conclusion" of the e-mails was to focus exclusively on whether Madoff was using his market making capability to cherry pick trades or to front run market making trades for the benefit of his hedge fund clients:

> Yeah, our focus was strictly to look at the trading to see … if there was any correlation between his trading for the hedge funds, if there was, in fact, trading for hedge funds being done, if he had hedge fund clients in some way, and compare that to, again, his market-making and his proprietary business.  … I think the overriding issue that's, you know, central to this whole thing is he – is he somehow using his order flow business and [] that's the inference that I had gotten from all the research.  I think that's sort of

---

[104]  The FTI Engagement Team concluded that in determining the focus of the examination, the examination team's analysis of the Renaissance e-mails was insufficient.  According to the FTI Engagement Team, all relevant information contained in tips and complaints from a credible source must be sufficiently vetted.  It may be the case, after a thorough review, that certain information is not entirely accurate or may even be biased to a certain extent, depending on the circumstances and context of the allegations.  However, the examiner must still review all of the allegations before any conclusions can be made with regard to the legitimacy of such allegations.

what the widely held belief from the referral from Dorothy
Eschwie.

*Id.* at pgs. 37-39.

> 6.    Madoff's Unusually Consistent Returns Were Not Focused on
>        In the Examination

Sollazzo's testified he was concerned with Madoff's high consistent returns,
stating, "Consistency every month, I agree, is very, very unusual." Sollazzo Testimony
Tr. at p. 109. However, he testified his "first read of these documents when we looked at
it, it just appeared more that there were execution issues and potential abuses in that
regard." *Id.* at p. 64. He explained he focused on abusive trading practices rather than
the other issues raised in the e-mail, in part, because order leakage was a prominent issue
at the time of the examination:

> In terms of the focus … the allegations here were
> something we were going to focus on … [T]his seemed to
> be abusive trading practices. And at the time I knew we
> had a lot of focus on order leakage, you know, leakage of
> information, customer order information, front-running, it
> was just a big issue that was – and it's still an issue in the
> marketplace now.

*Id.* at pgs. 57-58.

Sollazzo stated that from the e-mails "it looked like there was a possibility of
some sort of manipulation, fraud [] because of the high returns, consistent high returns"
and that he "was concerned about the returns." *Id.* at pgs. 65, 82. Sollazzo expressed his
concern about Madoff's returns in an e-mail to Eschwie in which he stated that Madoff's
"consistent high returns earned over an extended period, makes you wonder." E-mail
dated May 11, 2004 from Sollazzo to Eschwie, at Exhibit 217.

However, despite identifying Madoff's returns as an issue, Sollazzo testified he
did not necessarily have "an expectation" that the examiners would analyze Madoff's
returns because portfolio analysis was not a strength of broker-dealer examiners:[105]

> See, we do broker-dealer exams, you know, and outside –
> we're not expert in sort of portfolio trends and returns over
> time, you know, it's not something that we spend a huge

---

[105]  The FTI Engagement Team examined Sollazzo's statement that he was concerned about Madoff's
returns and his acknowledgement that the examiners from the broker-dealer group likely were not well-
suited to determine if those returns were legitimate. The FTI Engagement Team noted that instead of
requesting support from OCIE's investment advisory group, which was experienced and skilled at such
reviews, Sollazzo limited the composition of the examination team to include only broker-dealer staff. The
FTI Engagement Team concluded that as a result, the project was not properly staffed with the expertise
needed to address the allegations raised in the tip.

amount of time doing. … But, you know, what I'm getting at is we don't necessarily have the, you know, that sort of discipline in terms of doing comparatives to other portfolios.  It's not something that is ordinarily done in our exams."

Sollazzo Testimony Tr. at pgs. 65-66.

Although Sollazzo testified he did not expect the examination team to analyze Madoff's returns, he also stated he did expect them to determine the reason for the returns and to "[d]ig in and try to figure out what's happening."  *Id.* at p. 67.  Nee, however, did not believe the examination team needed to determine how Madoff was generating his returns, other than to determine if they were the result of cherry picking or front-running. Nee Testimony Tr. at pgs. 43-44.  Nee stated they had "no evidence … other than anecdotal evidence" and the two 2001 articles "of what the returns are or were."  *Id.* at p. 44.  Nee explained, in the following exchange, that he read Sollazzo's e-mail to Eschwie stating Madoff's "consistent high returns earned over an extended period, makes you wonder," to contain "the assumption … that those high returns are contingent upon the cherry picking" or front-running:

Q:    Okay, but doesn't it seem as though Bob Sollazzo's e-mail actually is a broader question?

A:    No.  I think he's saying, this story, if, you know, and the story would be we – someone thinks that Bernie Madoff is achieving high returns by cherry picking, obviously those high returns are – would be – the assumption would be that those high returns are contingent upon the cherry picking.  So first we would have to look for the cherry picking/front-running to determine if it exists, and if not then –

Q:    And would you ever get to the question of how he was able to obtain the consistent high returns earned over an extended period?

A:    Again, the focus was trading, you know, ahead of customers.  There are many people who would say, you know, "Bill Miller from Legg Mason beat the S&P market for 15 or 20 years," whatever he beat it, []How could he possibly do that??  You know, many learned people assume or are, you know, convinced you can't do that.  But – so the high returns – and then again, the high returns, we did – we had no evidence of – other than anecdotal

> evidence, of what the returns are or were. According to – supposed high returns – according to articles we read, he achieved outside returns. But that was not the focus of the examination. The examination was very focused and that's what I understood our role to be.

*Id.* at pgs. 44-45.

Nee acknowledged Madoff's timing was beyond exceptional, but stated his team did not focus on the incredible timing because, "We went in there to look at – specifically at the trading, it was sort of a front end review, we weren't there to really try to see if the returns he was reporting were correct." *Id.* at p. 132.

### 7.    Examiners Were Still Suspicious of Madoff's Unusually Consistent Returns at the End of the Examination

In contrast, Lamore and Ostrow recalled one of the issues looked at in the Madoff cause exam was how Madoff was able to generate his highly consistent returns. Lamore Testimony Tr. at pgs. 43-44; Ostrow Testimony Tr. at pgs. 43-44. The examiners were aware from the 2001 *MarHedge* article that questions had been raised about how Madoff could possibly achieve his stated returns using the split-strike conversion strategy. Ostrow Testimony Tr. at pgs. 64-65. Lamore had never seen such consistent returns over such a long period of time and thought the lack of volatility in the returns was something suspicious that should have been looked into. Lamore Testimony Tr. at pgs. 44.

Lamore and Ostrow recalled that they pursued the issue of Madoff's unusual returns only by looking at Madoff's trading to determine if the returns were the result of front-running. *Id.* at pgs. 36-37, Ostrow Testimony Tr. at p. 43. Ostrow recalled the examiners analyzed Madoff's trading and found "there were a lot of inconsistencies." Ostrow Testimony Tr. at p. 44. The examiners then asked Madoff about the inconsistencies they found. *Id.* at pgs. 44, 65. When asked if by the end of the examination, the examiners were satisfied that they had an explanation as to how Madoff was able to obtain these consistent high returns over an extended period of time, Ostrow explained, in the following testimony, that although by the end of the examination they were satisfied Madoff was not front-running, they were still suspicious about how he was earning his returns:

> We satisfied ourselves at the end of the exam knowing that he hadn't – wasn't front-running individual customers and order flow. We still knew and felt that it was highly suspicious and just odd and the whole story, there were inconsistencies, so, you know, that were unsettling, but, you know, there's only so much you can stress the point to your supervisors and, you know, before you [are] put on the next exam …

*Id.* at p. 45.

8.    Madoff's Options Trading Was Not A Focus of the Examination

The issue Broder raised regarding the unlikelihood that Madoff could be trading options was not a focus or even part of the initial scope of the examination. Nee stated the issue of who would write the OTC contract was not pursued because, "I don't think it was an issue that was the overriding theme of the examination." Nee Testimony Tr. at p. 65. However, according to the following testimony from Sollazzo, Broder's conclusion that Madoff could not find a counterparty with which to trade OTC options raised a red flag:

> Essentially, what they're saying is you need some sort of a counterparty who's willing to take on substantial risk at what would appear to be unfavorable OTC options prices. …It seems to be a red flag, yeah."

Sollazzo Testimony Tr. at p. 63.

In addition, looking at the Renaissance e-mails in hindsight, Sollazzo agreed the Broder e-mail implied that Madoff may not be executing trades at all. *Id.* at p. 64. However, Sollazzo did not know what if anything was done in the cause examination to look at this issue. *Id.* at p. 63.

At the time of the examination, Lamore appears to have recognized the options issue Broder raised. On a copy of the *MarHedge* article, Lamore made handwritten notes stating, "OTC Options – Who is writing these OTC contracts." Lamore's copy of *MARHedge* article with comments, at Exhibit 221. Lamore's notes seem to be a direct reference to the question Broder raised in his e-mail. *Id.* Lamore explained his interpretation of the Broder e-mail, as follows:

> He's saying that if somebody's going to take the opposite side, the counterparty to the options trading would either have to, you know, be exposed or have to hedge themselves, and he's saying that it's a lot of money to hedge.

Lamore Testimony Tr. at p. 41.

Lamore agreed that, in his November 21, 2003 e-mail, Renaissance's Broder questioned whether Madoff was actually trading the options he represented he was trading. *Id.* at p. 40. However, Lamore did not recall the team focusing on the options issue: "I don't recall focusing on the options. We were more focused on the equities." *Id.* Likewise, Ostrow testified that he did not recall the examiners investigating the issue raised in the Renaissance e-mails about the unlikelihood that Madoff could find an options counterparty. Ostrow Testimony Tr. at pgs. 41-42.

a.    Examiners Investigated Madoff's Options Trading Solely
By Relying on Madoff's Representation That He Stopped
Trading Options

Although it was not a focus of the examination, the examination team stated that
they looked into the general issue of Madoff's options trading solely by asking Madoff
about it.  Lamore Testimony Tr. at p. 42; Ostrow Testimony Tr. at pgs. 38-39.  However,
when Madoff said he was no longer using options as part of his strategy, they stopped
looking at the issue, despite the fact that Madoff's representation was inconsistent with
the Renaissance e-mails, the two 2001 articles, and the investment strategy Madoff
claimed to employ.[106]  Nee Testimony Tr. at p. 37; Ostrow Testimony Tr. at p. 39.
Ostrow stated as follows:

> Options in general we looked at and … we were told by
> Bernard Madoff during the exam that, I believe in January
> of '04, the firm stopped using options.  So once he tells us
> that, it made me at least think do the outside funds, like
> Kingate and FEMA, know that he's no longer using
> options, but it sort of removed the question of could he do
> this on an exchange where they don't trade that many
> options.

Ostrow Testimony Tr. at pgs. 38-39.

9.    Madoff's Fee Structure Was Not A Focus of the Examination

In his November 13, 2003 e-mail, Simons from Renaissance raised the issue of
Madoff's fee structure as a red flag.  E-mail dated November 13, 2003 from Nat Simons
to Jim Simons et al, at Exhibit 211.  Lamore explained he thought Renaissance was
"questioning why Bernard Madoff would not set up his own fund and collect the 20
percent profits himself."  Lamore Testimony Tr. at p. 34.  Lamore and Sollazzo stated
that they were concerned about Madoff's fee structure.  Sollazzo Testimony Tr. at p. 59;
Lamore Testimony Tr. at pgs. 34-35.

a.    The SEC Examined Madoff's Fee Structure Solely by
Asking Madoff About It and Relying on His Response

Nee stated the examination team looked into the issue of Madoff's fee structure
by asking Madoff about it, stating, "I believe it was looked into and the answer from

---

[106]  The FTI Engagement Team concluded that it was illogical to believe that Madoff was implementing the
split-strike forward conversion strategy without trading options.  According to the FTI Engagement Team,
Madoff's split-strike forward conversion strategy, as indicated in the Trading Authorization Directives,
consisted of buying a basket of large capitalization stocks in the S&P 100 stock index ("OEX"), selling
OEX call options and purchasing OEX put options.  As a result, the options were a critical component of
the strategy.

Bernie Madoff [was] that he was happy getting commission income on the trades." Nee
Testimony Tr. at p. 34.

The examiners explained they asked Madoff for an explanation and did not feel
they could do anything other than accept what he told them.  Lamore Testimony Tr. at
pgs. 34-35; Ostrow Testimony Tr. at p. 112.  In the following exchange, Lamore
described his conversation with Madoff about the fee structure:

> Q:    Okay.  So were there actions that were taken in the
> cause exam to look into this issue?
>
> A:    Yes. … I asked Bernard Madoff directly why he
> would do this, why doesn't he want to set up a fund
> and collect the fees himself. … His response was
> essentially, "A lot of people ask me that question.
> I'm not a marketing person.  I don't want to deal
> with customers.  I have no interest in doing that.
> I'm perfectly happy making my commission
> equivalent 4 cents per share."
>
> Q:    Okay.  And did you find his answer suspicious at
> all?
>
> A:    Most people on Wall Street are extremely greedy,
> so yeah.  I mean people don't typically – I mean –
> but, you know, it's hard to – to sort of rebut that.
> You know, at that point I wasn't sure what else I
> could say to him.
>
> Q:    Okay.  So there wasn't anything further on that
> point that was done?
>
> A:    Correct.

Lamore Testimony Tr. at pgs. 34-35.

10.    Madoff's Auditor Was Not Looked Into During the Examination

In his November 13, 2003 e-mail, Simons from Renaissance asserted there were
rumors that Madoff's auditor was a related party.  E-mail dated November 13, 2003 from
Nat Simons to Jim Simons et al, at Exhibit 211.  Sollazzo testified this allegation was
"certainly" something to be seriously considered, stating:

> Obviously the conflicts issue, you know, is a big
> consideration.  You have a brother-in-law who's an auditor,

> that's obviously an issue.  It's a family-run firm.  You
> know, there are red flags here.

Sollazzo Testimony Tr. at p. 60.  Nee agreed that if Madoff's brother-in-law was in fact the auditor, "It seems to be, on its face, a conflict."  Nee Testimony Tr. at p. 31.

However, the examination team did not look into the auditor issue to determine if there was a conflict of interest.  Sollazzo Testimony Tr. at pgs. 34, 60, 167; Nee Testimony Tr. at p. 31; Lamore Testimony Tr. at pgs. 36-37.  Ostrow explained, "I don't believe we looked into that.  I know we had a copy of the annual audit of the broker-dealer, I believe, in my files.  That's it."[107]  Ostrow Testimony Tr. at p. 34.

### 11.    The Examination Team Did Not Contact Renaissance

The examination team also did not contact Renaissance Technologies to follow up with them about the issues they raised in their e-mails.  Memorandum dated April 22, 2004 from Eschwie to Sollazzo, at Exhibit 210; Sollazzo Testimony Tr. at p. 61; Nee Testimony Tr. at p. 41; Ostrow Testimony Tr. at p. 35; Lamore Testimony Tr. at p. 38.  Laufer had stated in his November 14, 2003 e-mail, "We at Renaissance have totally independent evidence that Madoff's executions are highly unusual."  E-mail dated April 20, 2004 from Thanasules to Rodriguez, at Exhibit 215.  Nee explained that they did not follow up on the "entirely independent evidence" because it was just "a vague statement."  Nee Testimony Tr. at p. 42.  Nee and Ostrow stated that instead of asking Renaissance for its evidence, they would just go through Madoff's books and records on their own because "we were there to see if the executions were highly unusual ourselves."  *Id.* at pgs. 42, 51; Ostrow Testimony Tr. at p. 38.

Lamore, however, appears to have taken notice of Laufer's comment.  On his copy of the Renaissance e-mails, Lamore had starred Laufer's statement about their "totally independent evidence."  E-mail dated April 20, 2004 from Thanasules to Rodriguez, at Exhibit 215.  Lamore explained they did not follow-up with Renaissance because he understood they were not supposed to go to third parties:

---

[107]  The FTI Engagement Team concluded that if the examiners look into the auditor, they likely would have recognized significant red flags.  For instance, it is likely that the examiners would have had difficulty reconciling how such a small, unknown auditing firm located in a New York suburb was responsible for auditing such an established, well-known firm as BMIS, which generated $80 million in annual commission revenues from its discretionary brokerage accounts alone.  A review by the examiners of the auditor's engagement letter, reports and work papers would likely have raised serious doubts as to the scope of work actually performed.  A closer look to determine whether or not the accountant verified, by actual examination, client funds and securities held by Madoff would have uncovered Madoff's Ponzi scheme.  In fact, after Madoff confessed to running a Ponzi scheme, a New York Staff Attorney was assigned to investigate Madoff's accountant, David Friehling.  Within a few hours of obtaining the work papers, he determined that no audit work had been done.  New York Staff Attorney Testimony Tr. at p. 10.  Immediately upon reviewing Friehling's work papers, the New York Staff Attorney testified, there "were red flags for me as to the auditor. … I didn't see anything that resembles kind of formal work papers, auditor work papers that would comply with generally accepted audit standards. So, there was almost nothing that indicated that any audit work had been done."  *Id.* at pgs. 9-10.

> My understanding is that we really, as an agency don't do
> that and I mean it wasn't my call.  I didn't ask to, nor was I
> directed, but it's just an understanding that we sort of do
> our examinations and investigations without going to sort
> of third parties.[108]

Lamore Testimony Tr. at p. 38.

F.     Examiners Performed Pre-examination Work

1.     Examiners Reviewed Articles about Madoff's Stature in the
Industry

In late March 2005, Ostrow and Lamore performed background research on
Madoff and his firm.  *Id.* at pgs. 48-49.  The examiners exchanged articles describing
Madoff's significant achievements, including "serv[ing] as chairman of the board of
directors of the Nasdaq Stock Market as well as a member of the board of governors of
the NASD … [and] of the Securities Industry Association. … [and] a founding member
of the board of directors of the International Securities Clearing Corporation in London."
E-mail dated March 28, 2005 from Ostrow to Lamore, at Exhibit 222.  Another article
exchanged by the examiners was entitled, "The Madoff Dynasty."  E-mail dated March
30, 2005 from Lamore to Ostrow, at Exhibit 223.  The article described Madoff's family
members working at BMIS, including his brother Peter, Peter's daughter Shana, and
Madoff's two sons, Mark and Andrew.  *Id.*  The article also described how the Madoffs
"embrace[d] technology early on."  *Id.*

By the time the examination began, Ostrow and Lamore were aware that Madoff
was an important figure in the industry.  Ostrow Testimony Tr. at p. 19; Lamore
Testimony Tr. at p. 50.  However, Ostrow stated he did not think his knowledge of
Madoff's stature had much relevance to the examination.  Ostrow Testimony Tr. at p. 21.

2.     NASD Reports of BMIS Did Not Mention Madoff's Advisory
Accounts

As another part of their pre-examination work, examiners reviewed BMIS's most
recent NASD Exam Report and Focus Reports.[109]  E-mail dated December 22, 2004 from

---

[108]  The FTI Engagement team concluded that the examiners should have contacted Renaissance, especially
since Renaissance had been an SEC-registered investment adviser since January 1998 (IARD # 106661).
As a registered investment adviser, the firm's books and records (including e-mails) are subject to
compliance examinations and review by the SEC staff under Section 204 of the Advisers Act.  According
to the FTI Engagement Team, the record shows that the examiners needed third-party assistance in
conducting the examination.

[109]  According to the FTI Engagement Team, SEC Form X-17A-5, the Financial and Operational Combined
Uniform Single Report Form or "FOCUS" Report, includes information required of brokers and dealers
pursuant to SEC Rule 17a-5 pertaining to books and records.  Madoff's Trading Authorization Directive
states that BMIS charges a "commission equivalent" of four cents ($.04) per share on equity transactions
and a commission of one dollar ($1.00) per contract for option transactions in order to execute the split-

Nee to Ostrow and Lamore, at Exhibit 218. The NASD Exam Report indicated BMIS was a member of the NASD (now FINRA) and several clearing corporations, including the Depository Trust & Clearing Corporation (DTC), the National Securities Clearing Company (NSCC),[110] and the Options Clearing Corporation (OCC).[111] *Id.* The Exam Report also stated BMIS did not have an internal audit department. *Id*.

Although reviewing recent NASD/FINRA Exam Reports was a standard part of an examination,[112] members of the exam team stated they generally found NASD/FINRA Exam Reports to be "not very helpful." Sollazzo Testimony Tr. at p. 52; Lamore Testimony Tr. at p. 52. Ostrow stated, "…I don't think [the Report] had any reference to the hedge fund account. So we also take, you know, these reports with a grain of salt." Ostrow Testimony Tr. at p. 49. Ostrow explained that when he performed oversight examinations of NASD/FINRA examinations, he had found there were issues that "were completely missed." Ostrow Testimony Tr. at p. 51. He thought it was possible that the weaknesses in the NASD/FINRA Exam Reports were attributable to FINRA's connections to industry or examiner incompetence, but more likely the result of FINRA's examination procedures, which he described as "a check box system and they don't think outside the box." *Id.* at p. 50. Lamore had a similar view of the weaknesses of NASD/FINRA Exam Reports, stating, "Well, I think – in general I think the NASD exams are a little less in-depth. It's more … checklist-type reviews that they conduct. So they don't go into great detail about specific areas." Lamore Testimony Tr. at p. 161.[113]

---

strike forward conversion strategy. The practice of using a mark-up captured in the stock price (i.e., commission equivalent) instead of charging a commission is not unusual among market-makers such as BMIS. However, BMIS' annual, quarterly and monthly FOCUS Reports during 2004 do not include any reported commissions, even for the purported options trades, which are clearly commission-based. The FTI Engagement Team concluded that the lack of any commissions in BMIS' 2004 FOCUS reports should have raised questions within the examination team with regard to BMIS' fee structure and possibly it's trading activity.

[110] DTCC's "subsidiaries provide the infrastructure for clearing, settlement, and custody of most US securities transactions. DTCC was established in 1999 when operating companies The Depository Trust Company (DTC) and the National Securities Clearing Company (NSCC) … were combined under a single holding structure. DTC is the world's largest securities depository and a clearinghouse for trading settlement; NSCC processes most broker-to-broker equity, corporate, and municipal bond trades in the US." http://www.Hoovers.com /dtcc/--ID__104975--/free-cofactsheet.xhtml?cm_ven=Biz_Dev&cm_cat= Google&cm_pla=Free&cm_ite=Factsheet.

[111] OCC is "the world's largest equity derivatives clearinghouse. The OCC serves some 130 broker-dealers, futures commission merchants, and securities firms in the US and abroad. It is owned by options trading participants NYSE Alternext, Chicago Board Options Exchange, International Securities Exchange Holdings, and Nasdaq OMX PHLX." http://www.hoovers.com/options-clearing-corporation/--ID__118343--/free-cofactsheet.xhtml?cm_ven=Biz_Dev&cm cat=Google&cm_pla=Free&cm_ite=Factsheet.

[112] Paul Pocress, a staff accountant in the NERO examination program with over twenty years of experience, stated that prior to an examination he typically would contact FINRA to get "any thoughts about the firm that I can possibly have prior to going into a firm." Pocress Testimony Tr. at pgs. 15-16.

[113] As discussed in detail in Section VIII of this Report of Investigation, several witnesses criticized SEC examinations for using the same checklist approach Ostrow and Lamore critiqued in FINRA examinations. For example, one former examiner described what he viewed as the weaknesses in the examination program, by stating, "Typically when people come in, it is difficult if they are really not up to par to get rid of them. And there is a mentality sometimes … we have this checklist, right, so we need to go by this

The "Internal Audit" section of the NASD/FINRA report on BMIS stated that, "The firm does not have an Internal Audit Department." E-mail dated December 22, 2004 from Nee to Ostrow and Lamore, at p.13, at Exhibit 218. However, examiners did not identify the lack of an internal audit department at BMIS as a red flag. Ostrow Testimony Tr. at pgs. 48-49; Nee Testimony Tr. at p. 54.[114] Nee explained, as follows, that they relied on FINRA as the front line regulator of BMIS to identify concerns with BMIS's audit department (something that FINRA had not done that in this case) and that internal audit processes were not the focus of NERO's examination of Madoff:

> [T]he way the SEC exam program is structured, we rely
> [on] the SRO [FINRA], on our front line. It didn't seem to
> have been a concern for them, they had more experience
> with Bernard Madoff Securities, it didn't seem to have been
> a concern with them, I believe. So I would say in hindsight
> the answer may have been different, but it's not unusual for
> a firm not to have an internal audit department, they may
> just have a compliance function. … It was not our focus to
> do an examination of the internal audit function to see if
> they were in compliance with all regulatory provisions.

Nee Testimony Tr. at p. 54.

After the examination was completed, NERO did not share the information that they learned about Madoff with FINRA. *Id.* at p. 71.

3.    Examiners Accepted Madoff's Explanation for Relationship
      With Cohmad Securities

Cohmad Securities Corporation (Cohmad), a SEC-registered broker-dealer (CRD# 16307), was minority owned by Bernard Madoff. *See* SEC v. Cohmad Securities Corp., No. 09 Civ. 5680, Complaint, ¶ 14 (S.D.N.Y. filed June 22, 2009), at Exhibit 224. The annual audited report contained in Cohmad's June 30, 2005 FOCUS Report (Form X-17A-5 Part III) identified the existence of a related-party entity, owned by a minority shareholder that provided 90% of Cohmad's revenues, and that the entities shared office

---

checklist and if everything happens on this checklist, it is okay. There was not a lot of outside the box thinking. … The analogy that we use is that a typical SEC examiner walks into a room where there are a bunch of dead bodies lying around and they notice that the clocks are 10 minutes fast. And it really is. And, again, it is not meaning to be disparaging but it becomes difficult but you also have to factor in the restraints that you have." Sadowski Testimony Tr. at pgs. 102-103. Moreover, one fund adviser explained he did not think the SEC examinations he had been involved with were thorough, because "there is a lot of minutia, detail-oriented work that is done. I am not sure that the auditors actually relate that detail to the big picture of what is going on, what the firm does for a living, their strategy. You know, the bigger things in terms of the investment strategy, for hedge funds especially. But that actually requires a certain level of, I guess, technical knowledge of, you know, the different hedge fund strategies." Hedge Fund Manager Testimony Tr. at 35-36.

[114] The FTI Engagement Team concluded that the lack of an internal audit department at a relatively large and well-known firm as BMIS should generally have raised concerns with regard to the level and effectiveness of internal controls at the firm.

space, equipment and administrative support.  *See* Cohmad Form X-17A-5 Part III (June 30, 2005), at Exhibit 225.  Cohmad's FOCUS Report filings and BMIS' FOCUS Report filings indicated that both entities were located at 885 Third Avenue, NY New York 10022.  *Id.; See* 2004 and 2005 BMIS Form X-17A-5 Part III, at Exhibit 226.  However, the annual audited report, which contained BMIS' October 31, 2004 and October 31, 2005 FOCUS Reports (Form X-17A-5 Part III), failed to identify the related party relationship with Cohmad.[115]  *Id.*

Examiners saw substantial monthly checks going to Cohmad Securities, but Madoff was able to explain away the examiners' suspicions.  Ostrow Testimony Tr. at pgs. 54-55.  Ostrow explained, "I'm sure we brought it to John [Nee's] attention, the Cohmad relationship, but after we got the story that he's just helping them manage their bonds, you know, how much more can you, you know, keep going?"  *Id.* at p. 55.  Ostrow said that Madoff's explanation for why BMIS was paying Cohmad "seemed odd … but he gave us an answer. … You know, you try to take people's words for it, and … we thought it might be a good idea to do a follow-up exam one day."  *Id.* at p. 111.  Ostrow believes that in the past the examination program has taken the word of registrants too often without verifying it with an outside source.  *Id.*  Ostrow believes that the examination program is "going to start going to outside sources."  *Id.*

4.  Document Request Did Not Contain a Request for Trade Data

At the end of their pre-examination work, the examiners drafted a document request to send to BMIS.  E-mail dated March 24, 2005 from Ostrow to Nee, at Exhibit 227.  The staff requested general information about the organization, including BMIS's organizational charts and annual audited reports; documents relating to BMIS's net capital and financial reporting; documents related to BMIS's sales practices, including all sales and promotions literature for the firm and a list of all institutional and broker-dealer accounts; information related to internal audit procedures; information related to the firms contingency planning in the case of a disaster; and documents related to BMIS's Anti-Money Laundering Program.  *Id.*  The document request, however contained no request for trade data.  *Id.*

Ostrow explained they used a template to determine what documents and information to request:  "I basically work off a template for each of my firms' request list and tweak it accordingly to the type of firm."  Ostrow Testimony Tr. at p. 59.  Similarly, Lamore stated, "we have standard information that we request, and then based on the exam, you somewhat tailor it."  Lamore Testimony Tr. at pgs. 55-56.

Lamore did not know why there was no request for trade data in the document request.  *Id*. at p. 56.  He explained that in cause examinations they sometimes did not want to tip their hand about what they are looking at and "intentionally may[] not put

---

[115]  According to the FTI Engagement Team, lack of disclosure regarding related-party relationships may provide a signal that the examiner needs to closely review and discuss the relationship and any other related-party relationships with the firm and its auditor.  This is especially true when one party (i.e., BMIS) accounts for virtually all of the revenue of the other party (i.e., Cohmad).

things in." *Id.* Ostrow had a similar recollection, stating, "We do not ask for "the specific customer transactions, that we usually get into later. … very rarely do we in the initial document request come out with exactly what we know we're looking for, trying to find, trying to figure it out as we go along." Ostrow Testimony Tr. at p. 59.

The document request was dated April 1, 2005 and requested the documents by Monday April 4, 2005 because "[w]e plan to begin our examination on that date." E-mail dated March 24, 2005 from Ostrow to Nee, at Exhibit 227.

G.   NERO On-Site Examination Began Almost a Year After Referral was Made

1.   Bernard Madoff was the Examiners' Exclusive Contact at BMIS

When the examiners began their on-site examination of Madoff, on or around April 11, 2005,[116] they learned Bernard Madoff would be their primary contact.[117] Lamore Testimony Tr. at p. 28. As Lamore noted, "He was our primary – really exclusive contact for the firm." *Id.* at p. 28. Ostrow added that "we really didn't deal with anyone else at the firm, other than Bernie, and we tried to, you know, have conversations with Peter [Madoff] or have conversations with Shana [Madoff] and, you know, usually were thwarted or once in a blue moon were able to send an e-mail to Shana to request an e-mail or something." Ostrow Testimony Tr. at p. 33.

Ostrow described that they had contact with Bernard Madoff "almost every day" for the "two and a half months or so that I was onsite" at BMIS. *Id.* at pgs. 21-22. Both Lamore and Ostrow found their extensive contact with Bernard Madoff "odd" and unusual. Lamore Testimony Tr. at p. 28; Ostrow Testimony Tr. at p. 22. In his prior examinations, Ostrow had never had such extensive contact with the CEO of a firm the size of BMIS: "I usually have a contact person in the firm, like a compliance examiner. He [Bernie Madoff] was the contact person for myself and Peter [Lamore] throughout [] 95 percent of the exam." Ostrow Testimony Tr. at p. 22. Lamore felt similarly: "It just seemed odd to me that someone of his stature … would be dealing with us directly."[118] Lamore Testimony Tr. at p. 30.

Sollazzo also found their extensive contact with Bernard Madoff to be out of the ordinary, stating, "You know, it's unusual that he was dealing directly with the examiners. I don't know if I fully understood that he was the only one they were dealing

---

[116]   Lamore recalled that that the examination began on April 1, 2005, but an e-mail indicates that they may not have started their on-site examination until April 11. E-mail dated April 11, 2005 from Ostrow to Nee, at Exhibit 228.

[117]   Madoff recalled that with respect to the 2006 OCIE exam, "two young fellows," [Lamore and Ostrow] came in "under the guise of doing a routine exam." Madoff Interview Memorandum at p. 1. Madoff said that during that time period, sweeps were being done of hedge funds that focused on front-running, and that was why he believed Ostrow and Lamore were at BMIS. *Id.*

[118]   Former Examiner #1, testified that in approximately three years of conducting examinations, he only dealt directly with a CEO during one examination and that was at a "small firm" with "only five people in the firm." Former Examiner #1 Testimony Tr. at pgs. 12-13.

with." Sollazzo Testimony Tr. at p. 89. Nee thought it was odd that all the contact for the examination was with Bernard Madoff as well, and could not think of another instance in which an entity of BMIS's size had the CEO as the primary contact for an examination. Nee Testimony Tr. at pgs. 86-87. However, he did not identify Bernard Madoff being the point of contact as an issue or raising any concerns, stating, "it did seem odd, but again, on its face it seemed off but there was nothing inherently wrong with it … ." *Id.*

> 2. Madoff Attempted To Intimidate and Impress Examiners

From the beginning of the examination, Madoff told the examiners about influential people he knew inside and outside of the SEC. Ostrow recalled the following:

> All throughout the examination, Bernard Madoff would drop the names of high-up people in the SEC … he would always reference people in OCIE and Broker-Dealers sometimes. So he knew a lot of people. He even came in and told myself and Peter who the next chairman of the SEC was going to be a few weeks prior to us actually getting an e-mail at the SEC. So we were just pretty amazed by that …. We just first thought he was throwing out a lot of names and then came to realize he did know these people. [H]e had already pretty much well established that he knew everyone in OCIE, and named everyone, and already mentioned Lori Richards ….

Ostrow Testimony Tr. at pgs. 24-25, 142. Lamore had a similar recollection:

> Yes. I remember him throwing in a couple of names, actually, SEC employees. One was – one was the commissioner, Commissioner Annette Nazareth. He'd throw in – at one point, I believe an individual named Henry Kaufman who was formerly Salomon and Smith Brothers – Salomon Chief Economist. I think he was there one day. And I think he actually – at the time we conducted the exam was the time when Chairman Cox took over, and he seemed to have – he thought he had some insight as to who was going to get named. And I think he actually even named at one point in the past he was in the running to become commissioner of the SEC.

Lamore Testimony Tr. at p. 89. Sollazzo and Nee recalled that the examiners told them that Madoff said that in the past he was on the short list to be the next chairman of the SEC[119] and later told them who was chosen to be the new Chairman prior to the

---

[119]  On June 1, 2005, Lamore e-mailed Nee, "Bernie told us that he was on the 'short list' when Chairman Donaldson was selected. Maybe this time…" E-mail dated June 1, 2005 from Nee to Lamore, at Exhibit

information being made public.  Sollazzo Testimony Tr. at p. 102; Nee Testimony Tr. at p. 125; Lamore Testimony Tr. at pgs. 89, 23; E-mail dated June 1, 2005 from Nee to Lamore, at Exhibit 229.  Nee thought it was possible the examiners told him Madoff knew who the new Chairman of the SEC was before he was appointed, but Nee did not have a specific recollection.  Nee Testimony Tr. at p. 125.

Ostrow described Madoff as "charismatic" and "charming," "[e]xcept when he was angry with us."  Ostrow Testimony Tr. at p. 148.  Lamore recalled that while Madoff's stories were interesting, they tended to distract from work on the examination, stating as follows:

> [D]uring the course of the exam, [Madoff] made a point to tell us … and emphasize that his family had a dramatic influence on the securities industry.  … I think … clearly he's a wonderful storyteller, very captivating speaker, and he has an incredible or had an incredible background of knowledge in the industry.  So for me that was very interesting. I mean it became a little frustrating at times, though, because, you know, we obviously were there to conduct business, and so [he] can be sort of distracting.

Lamore Testimony Tr. at pgs. 50-51.

Examiners had the impression Madoff referenced his influential connections at the SEC and on Capitol Hill in an effort to both impress and intimidate them.  Ostrow Testimony Tr. at pgs. 24-25; Nee Testimony Tr. at pgs. 123; Lamore Testimony Tr. at p. 90.  Elaine Solomon, who worked as Peter Madoff's secretary from March 1997 until December 2008, stated that the SEC examiners who met with Madoff looked like they were "in awe" of him.  Solomon Testimony Tr. at p. 14.[120]

Nee believed Madoff's efforts to impress the examiners was unsuccessful and that the examiners just found Madoff to be a "bit of a blowhard."  Nee Testimony Tr. at p. 124.  Ostrow testified that Madoff's name dropping "didn't really impress us."  Ostrow Testimony Tr. at pgs. 24-25.

Sollazzo reflected that although the examiners were not highly experienced and may have been "overwhelmed by Bernie," they were a good fit for the examination,

---

229.  Nee responded, "Maybe you and William can be his aides."  *Id.*  Nee stated he was "trying to be facetious" in the e-mail.  Nee Testimony Tr. at p. 196.

[120] Solomon also stated that over the years, people from the SEC would ask about working at Madoff's firm and inquire whether they could drop off resumes, although she never actually saw any resumes provided.  Solomon Testimony Tr. at pgs. 14-15.  However, when asked specifically about the examiners who were at Madoff's firm during the 2005 examination, she stated she did not believe those examiners (likely Lamore and Ostrow) ever asked about jobs or a resume.  *Id.* at p. 14.  Both Ostrow and Lamore adamantly denied ever inquiring about employment at BMIS in any way.  Ostrow August 19, 2009 Testimony Tr. at pgs. 7-8; Lamore August 19, 2009 Testimony Tr. at pgs 6-7.  The OIG has discovered no evidence that Ostrow or Lamore sought employment with BMIS.

adding that they had Nee, who had substantial experience, to help them with the examination. Sollazzo stated the following:

> [S]omeone, you know, with that reputation and supposed world of knowledge could he overcome, stonewall examiners? It's a possibility, you know, it is a possibility. Obviously, you know, John was also – had some involvement with the exam. I know he attended at least some meetings and he was – you know, John was pretty – he is a pretty sophisticated guy, so we did have that knowledge as well, you know, working on the exam. … The examiners … didn't have a huge amount of experience, but someone – and Ostrow is a very skeptical guy, and I know he sort of thinks a little bit differently, it's outside the box and he's very good with analyzing e-mails. And Lamore was one of our strongest people in terms of knowledge of trading. … I think for the exam they were a reasonably good fit, they may have been outmatched a bit, you know, they probably were as it turns out, but we did have … someone like John [Nee] involved with the process also.

Sollazzo Testimony Tr. at pgs. 90-91.

Although Sollazzo stated the examiners had Nee upon which to rely, the examiners recalled that during the two and a half months of the examination, Nee was on-site at BMIS for only one afternoon. In addition, they did not recall Sollazzo coming on-site at all. Lamore Testimony Tr. at p. 28; Ostrow Testimony Tr. at p. 15. Nee acknowledged being on-site "no more than two to three times." Nee Testimony Tr. at p. 19.

3. Despite the Evidence, Madoff Would Not Admit To Managing Money for Hedge Funds

On April 13, 2005, the examiners and Nee met with Madoff. Madoff would not admit he had hedge fund clients for which he was managing money. Lamore Testimony Tr. at p. 71; Ostrow Testimony Tr. at p. 63. Ostrow explained that "According to Bernie there was no investment advisory business."[121] Ostrow Testimony Tr. at p. 70. Lamore commented that in the meeting, Madoff "has a story about everything," which caused the meeting to go on for hours. E-mail dated April 14, 2005 from Lamore to Libal, at Exhibit 230. Sollazzo recalled the examination team "having difficulty getting information on the underlying advisory clients" and Madoff not being "forthcoming with the client list or the number of clients." Sollazzo Testimony Tr. at p. 93. Sollazzo stated that Madoff's failure to provide the information "was definitely a concern." *Id.*

---

[121]  Madoff stated that he told Ostrow and Lamore, "I don't manage money." Madoff explained that, "At this time, I was trying to conceal." Madoff Interview Memorandum at p. 2.

The examiners were unaware that Madoff was using the 17th Floor of the Lipstick building for his investment advisory business. Ostrow Testimony Tr. at pgs. 69-70. Ostrow explained that although they were aware that Madoff had offices on the 17th Floor, "We didn't know that there were any customer accounts or anything, you know, being done there or anything like that, just that there was a back office, a few people sitting there, not related to an investment advisory business, because, according to Bernie, there was no investment advisory business."[122]  *Id.* at p. 70.

Because "the exam team was having a hard time getting Madoff to admit that he had any involvement with hedge funds," the day after the meeting, Nee asked the examiners to send him a list of the Madoff feeder funds they had been identified in news articles. Nee Testimony Tr. at p. 76; E-mail dated April 14, 2005 from Nee to Ostrow and Lamore, at Exhibit 231. Nee explained in an e-mail to Ostrow and Lamore that he "was thinking that it might be beneficial to us to send an info[rmation] request to some of the larger prime brokers to see if they deal with the hedge funds that some suppose are connected to Madoff." *Id.*  Later that day, Lamore e-mailed Nee the list of funds that Nee had requested. *Id.*

By April 20, 2005, the examiners had looked at BMIS's Profit and Loss (P&L) statements from the prior period and had a "walk through of the firm's e-mail system." E-mail dated April 20, 2005 from Ostrow to Nee and Lamore, at Exhibit 232. Ostrow noted Madoff had told them BMIS had started saving instant messages only since the beginning of the year. *Id.*[123]  They had also received some limited trading information from Madoff, but it was not in a usable format and they had requested it be converted to Microsoft Excel. *Id.*

4.     Madoff Became Difficult for Examiners to Deal With NERO Supervisors Did Not Push Back

Ostrow explained that the examiners "had a real difficult time dealing with" Madoff.[124]  Ostrow Testimony Tr. at p. 28. In his testimony, Ostrow described Madoff growing "increasingly upset" during the examination, and attempting to dictate to the examiners what to focus on in the examination and what documents they could review:[125]

---

[122]  After Madoff admitted to the NERO examiners that he had close to 15 advisory clients, the examiners never requested to see Madoff's 17th Floor or inspect the trading or back-office areas associated with Madoff's advisory business. Ostrow Testimony Tr. at p. 70. The examiners also did not request to speak with any other personnel that had primary responsibilities associated with the advisory business. *Id.*  As a result, the FTI Engagement Team concluded the examiners missed an opportunity to corroborate Madoff's representations about his advisory business with other personnel.

[123]  The FTI Engagement Team concluded that typically, such verbal statements by a respondent should be vetted by examination staff in order to determine whether a potential violation of the books and records requirements had occurred and whether staff needed to pursue the issue further.

[124]  Madoff viewed Ostrow, who he found "so cryptic," with disdain. Madoff Interview Memorandum at p. 1. He stated he "really got annoyed" with Ostrow for repeatedly asking BMIS to generate "computer runs" which required Madoff's computer programmer to reformat the material. *Id.*

[125]  Madoff asserted that he thought the examiners were asking for irrelevant documents. Madoff Interview Memorandum at p. 1. Madoff stated he did not understand what Lamore and Ostrow were looking for because they looked through bank reconciliations, expense accounts, canceled checks, and phone bills. *Id.*

> Bernard Madoff grew increasingly upset with the Exam
> staff or the Exam Program and I know multiple times Peter
> would e-mail back saying, you know, just talk to me,
> saying we shouldn't be looking at e-mails[126], we shouldn't
> be doing this, and you guys show know what time splicing
> is or slicing and what – that we're talking with OCIE ….

*Id*. at pgs. 28, 60.

On the afternoon of April 20, 2005, Ostrow e-mailed Nee about Madoff's attempts to dictate the examination, informing Nee of the following:

> Just to make you aware of the current situation.  Bernard
> Madoff is getting increasingly agitated regarding our
> examination.  He keeps on insisting in knowing exactly
> what we are looking for.  He repeatedly mentions front-
> running as something we should be looking for.  He thinks
> our request for order and execution data in three securities
> is outrageous.  We keep informing Bernard that this is an
> examination of his book and records and we are only
> requesting information that would apply to SEC and NASD
> Rules and Regulations.

E-mail dated April 20, 2005 from Ostrow to Nee, at Exhibit 233.

Lamore described, in the following testimony, Madoff's extreme anger, which precipitated Ostrow's e-mail to Nee:

> [W]e were asking for documents or something and he got –
> I mean I think this e-mail was sent because it was actually –
> it was sort of disconcerting how angry he became.  I mean
> his veins were popping out of his neck, and during that – it
> was a – I think his brother Peter might've been there, and
> he just repeatedly said, you know, "What are you looking
> for?"  And his voice level got increasingly loud and the
> veins were popping out, and one of us – I may have said
> something, you know, "What do you want us to look for?

---

Madoff stated he had "tons of capital," so he "didn't understand why they were looking at that stuff."  *Id.*  Madoff commented Ostrow spent a "huge amount of time looking at invoices for expenses."  *Id.*  Because of the documents that the examiners were focused upon, Madoff thought that Lamore and Ostrow were doing an examination sweep and were looking for wrongdoing pertaining to an industry issue concerning how firms paid independent contractors.  *Id.*

[126]  Madoff recalled that Ostrow and Lamore were at BMIS for two months, and that they "spent 90% of their time looking through e-mails."  Madoff Interview Memorandum at p. 1.  Madoff opined that this is "routine for the SEC now, they feel that's the way they find things."  *Id.*

> What do you think we're looking for?" And then he – that's when he said something like, you know, "Front-running. Aren't you looking for front-running," or something – something to that effect. … I think he was frustrated because he couldn't figure out exactly why we were there, and I think at this point, we had asked him about all of his businesses and he had not revealed his investment advisory business. So I think we were hinting around things, trying to get him to admit or acknowledge he was conducting this business, and I think that frustrated him.

Lamore Testimony Tr. at p. 71.

Lamore testified that Madoff attempted to take charge of the examination before the examiners had even gone on-site at BMIS. *Id.* at p. 68. Lamore explained that the examination team had broken with NERO's typical examination protocol for a firm of BMIS's size and told BMIS ahead of time that they would be conducting an examination. Id. at pgs. 68-69. According to Lamore, this advance notice gave Madoff time to prepare an offense against the examiners:

> [P]rior to doing – our normal course of business in New York is to not make the registrant aware of an exam before we go out and do it. We show up unannounced. In this case, for the larger firms, we typically announce ahead of times that we're going. Mr. Nee typically focuses on the larger firm exams. For this examination of Bernard Madoff, he called, I believe, Peter Madoff, the compliance officer, to let him know that we would be conducting an exam of Bernie Madoff and within, I believe – I believe I recall within five minutes or, you know, shortly thereafter, Bernard Madoff called Mr. Nee back and wanted to know essentially, "What's this about? Why you doing an exam," et cetera. So I think, you know, from the very beginning that we informed him that we were doing the exam, he was, you know, sort of agitated or just not easy to deal with. He was difficult. … [H]e got pretty agitated and, you know, he was pretty upset.

*Id.* Lamore explained they typically did not give a registrant notice they would be conducting a cause examination so that the registrant could not "[c]reate documents or destroy documents, things like that." *Id.* at p. 69.

After Ostrow informed Nee[127] that Madoff was angry with them and pushing back against their requests, the examiners did not recall Nee stepping in to keep Madoff in check, as evidenced by the following exchange during Lamore's testimony:

> Q:    Okay.  And so when Ostrow would report back to Nee that Madoff was getting agitated, do you know what the response was from Nee?
>
> A:    I don't think we got any response.
>          …
> Q:    All right.  And did -- were there ever any times where got Nee [got] involved because of the pushback or because he was getting agitated?
>
> A:    I don't recall any.

*Id.* at pgs. 72-73.  Ostrow had a similar recollection, as follows:

> Q:    When you received this pushback from Madoff, did you feel that, you know, need to push right back at – at Madoff?
>
> A:    Sort of that we were stuck in the middle and just being squeezed… We would go back and tell John what [had happened] and ask to push further and just told to, you know, relax or not and, you know, time to get out or, you know, you've been out there long enough or things like that.
>
> Q:    So John Nee discouraged you from pushing it further when Bernie Madoff would pushback?
>
> A:    Sometimes him, sometimes even Pete would say let's – let's wait and ask him this in the big meeting or I would say let's hold off and not put it in writing yet because he would get somewhat inflamed about it ….

Ostrow Testimony Tr. at pgs. 61-62.

---

[127] Sollazzo also recalled being aware that Madoff was uncooperative during the examination.  Sollazzo Testimony Tr. at pgs. 87-88.

5.      Examiners Noticed Madoff's Representations Contradicted News
Reports and Noted "Weird Descriptions" in Books and Records

On April 27, 2005, the examiners requested documents from Madoff relating to
the compensation of several BMIS employees and trading data for certain employee and
customer accounts, unrelated to Madoff's institutional accounts.  Document Request
dated April 27, 2005 from SEC to Madoff, at Exhibit 234; Lamore Testimony Tr. at p.
75.  The following day, examiners met with Madoff and other members of the
compliance department, including Peter Madoff.  E-mail dated April 28, 2005 from
Ostrow to Nee and Lamore, at Exhibit 235.

Ostrow e-mailed Nee about the April 27 meeting, explaining they had asked if
anyone at the firm had ever "managed money for an outsider [and] Bernie said, "Never."
*Id.*  The examiners recognized that Madoff's representations that he did not manage
money and that he no longer traded options[128] contradicted the news reports.  Ostrow
Testimony Tr. at p. 88; Michael Ocrant, *Madoff Tops Charts; Skeptics Ask How*,
MARHedge, May 2001, at Exhibit 146; Erin Arvedlund, *Don't Ask, Don't Tell,* Barron's,
May 7, 2001, at pgs. 1-3, at Exhibit 135.  Nee was unaware of whether or not Madoff was
ever asked how he could execute the split-strike forward conversion strategy without
trading options.  Nee Testimony Tr. at pgs. 151-152.

On May 3, 2005, Lamore e-mailed Nee, as follows, to let him know Barclays may
be acting as a prime broker for some of the feeder funds, to alert Nee to some strange
entries in BMIS's operating accounts, and to inform him that Madoff denied that BMIS's
London office managed money.  The e-mail stated the following:

> I know that you mentioned that Barclays may be
> conducting prime brokerage services for some of the funds
> and I think that you may be correct.  I came across multiple
> transactions in the firm's operating account with large
> dollar amounts that involved Barclays and I asked Bernie
> about them [there were no transactions with Lehman,
> Goldman, Merrill etc.]  After going to "consult with his
> staff," he stated that Barclays "clears for the brokers in
> London" delivery in the U.S. and paying them. [sic]
>
> Additionally, in the same operating account, I came across
> some weird descriptions that I asked Bernie to explain O/B

---

[128]  Other representations by Madoff also contradicted documents that Madoff produced to OCIE in 2004.
For instance, Madoff provided the 2004 OCIE examination team with paper-based customer account
statements for the month of January 2004 that included options and equities trading activity for 21 clients.
*See, e.g.* Tremont Customer Account Statement dated January 1, 2004 (showing option and equities trades),
at Exhibit 236.  In contrast, Madoff provided the 2005 examination team electronic customer account
statements for the same month that included only equities trading activity for 17 clients.  *See, e.g.* Tremont
Trade Data produced to NERO Examination Team dated January 2004 (showing only equities trades), at
Exhibit 237.  OCIE provided the customer account statements showing the options trading to NERO in
June 2005.  Letter dated June 9, 2005 from Wood to Nee, at Exhibit 209.

> Mellon Pit/ ($8.459M credit to the account), O/B Mellon
> Pit/ ($10.775M credit), O/B No Name Given ($5.548M
> credit). He stated that these transactions were also related
> to the Barclays clearing.
>
> Another weird description for some very large transactions
> is John/LDN. After consulting with his staff again, Bernie
> stated that this is John Bonventre who works in the cage
> deals with clearing and settlement issues. [John B is
> actually listed as operations on the directory that we were
> given.] As William mentioned yesterday, the LDN
> description leads me to believe that he is connected with
> the London office and Barclays…
>
> I specifically asked Bernie if the London office manages
> money for outside investors. Bernie said "it is my money."

E-mail dated May 3, 2005 from Lamore to Nee and Ostrow, at Exhibit 238. Lamore
thought Madoff was able to explain away many of the discrepancies the examiners had
identified. Lamore Testimony Tr. at pgs. 77-78.

> 6.    Nee Sent Document Request to Barclays, and Barclays Responded
>        There Was No Trading in Madoff's Account

Nee sent a document request to Barclays on the same day he received Lamore's e-
mail, requesting, "All trading done by or on behalf of … Fairfield Sentry Ltd.,"
"Kingate," and "[a]ny account over which Bernard Madoff (or any entity known to the
firm to be affiliated with Bernard Madoff or Madoff Securities has any direct or indirect
trading authority."[129] Letter dated May 3, 2005 from Nee to Barclays Capital, at Exhibit
239.

Also on May 3, 2005, Lamore and Nee had the following e-mail exchange in
which Lamore told Nee that he wanted to wait to confront Madoff until they received the
trading data they requested from BMIS and a response from Barclays:

> [Lamore]  I'm ready to call his bluff on his refusal to admit
> the money-management side of the business, so your
> document request is perfect timing.
>
> [Nee]  If you guys think the timing is right, question him
> about it whenever you want.
>
> [Lamore]  Ok. I'd like to get the e-mail and trading data
> that we've requested (in addition to the Barclays

---

[129]  Ostrow testified that the examiners "probably pushed hard to write a letter to Barclays, and [Nee] did
send the letter." Ostrow Testimony Tr. at p. 86.

> information from your request) before we confront him.
> Also, I think that it would be a good idea to be ready to
> speak with the funds as soon as possible after he denies
> involvement with them.  I suggest we shoot for Monday,
> May 24, 2005 to confront him as well as be ready to speak
> to all the funds."

E-mail dated May 3, 2005 from Lamore to Nee, at Exhibit 240.

On May 16, 2005, Barclays responded to Nee's information request, stating that
BMIS had recently opened an account at Barclays, but there was no transaction activity
in the account.  Letter dated May 16, 2005 from Barclays Capital to Nee, at Exhibit 241.
The letter from Barclays stated as follows:

> The enclosed responsive documents are limited to Know
> Your Customer and related account opening documentation
> for Bernard L. Madoff Investment Securities LLC.  This
> relationship was established on February 16, 2005; no
> relevant transaction activity occurred during the period
> March 1, 2005-March 31, 2005.  There were no other
> customer relationships identified at Barclays Capital Inc.
> for the other names provided in your inquiry letter.  It
> should be noted that a prime brokerage and trading
> relationship with a Madoff-affiliated entity exists with our
> UK affiliate, Barclays Capital Securities Ltd., an FSA-
> regulated institution.

*Id.*

The response from Barclays stating there was "no relevant transaction activity"
for Madoff did not raise a red flag for Nee.[130]  Nee inferred from the letter that Madoff
must have "executed trades through the foreign broker-dealer."  Nee Testimony Tr. at p.
78.  The examiners did not recall ever seeing a copy of the letter or Nee ever sharing it
with them.  Lamore Testimony Tr. at p. 81; Ostrow Testimony Tr. at p. 82.  Nee stated
that he did not follow-up with Barclays U.K affiliate because not long after he received
the response from Barclays, Madoff admitted to executing trades for hedge funds.  Nee
Testimony Tr. at pgs. 78-81.  Once Madoff admitted to having the clients, Nee planned to
have Madoff produce the trading data rather than seek the data from an independent
source, stating:

> Again, our whole goal was to just find trading where it was
> or to get – at this point I don't think he had admitted to us

---

[130]  The FTI Engagement Team concluded that the examination staff should have realized that the response
from Barclays did not verify Madoff's purported trading activity, and thus, was a major red flag that should
have raised concerns and led the staff to contact the U.K. affiliate of Barclays to further verify Madoff's
purported trading activity.

> that he was executing trades, and that seemed to be, you
> know, part of the battle. … once … he admitted that he had
> these clients, you know, then it became moot and we would
> get the trading directly from him.

*Id.* at pgs. 79-81.

Sollazzo concluded that the examination team did not reach out to U.K. affiliates
of Barclays "because of the difficulty at times reaching outside of the U.S.  It's not as
easy as going to a U.S. broker-dealer where, you know, we have open channels of
communication."  Sollazzo Testimony Tr. at p. 86.

> 7.   Madoff Continued to Press Examiners to Finish the  Examination
>      and Produced A Limited Amount of Trading Data

On May 24, 2005, the day before the meeting in which Madoff finally admitted to
executing trades for institutional clients, Madoff pressed Lamore to finish the
examination.  E-mail dated May 24, 2005 from Lamore to Ostrow, at Exhibit 242.
Lamore e-mailed Ostrow about his conversation with Madoff:

> He wants an idea of when we are going to finish the exam.
> He is getting more aggressive about trying to find out.  I
> told him that we would speak to him tomorrow and based
> upon our questions and requests he should have a better
> idea. … Again, be ready for his badgering about us leaving.

*Id.*

Also on May 24, 2005, BMIS produced 10 days of trading data for Madoff's
"market making business" in electronic format.  E-mail dated May 24, 2005 from Ostrow
to Lamore, at Exhibit 243; Lamore Testimony Tr. at pgs. 86, 88.  Lamore recalled that
they never received trading data in electronic format for Madoff's advisory accounts and
that data for the advisory accounts was produced in paper, stating, "My recollection is
that it was a huge document.  It was like a paper-based document for the trade blotter."
*Id.* at p. 87.  Lamore believes that they did receive the customer account statements for
the advisory clients in electronic format.[131]  *Id.*

---

[131]  The FTI Engagement Team reviewed various data found in the NERO examination team's work files
including electronic and paper-based customer account statements and paper-based Order Entry Execution
History reports related to Madoff's investment advisory business, as well as paper-based equity trade
execution data related to Madoff's market making business.  More specifically, the FTI Engagement Team
reviewed electronic monthly account statements for each month during January 2004 - April 2005 for 17
accounts that were found in the 2005 examinations team's work files.  There was no options information
included in those statements.  Madoff had also produced electronic customer statements for each month
during January 2003 - March 2003 and May 2003 – December 2003 for 21 accounts in OCIE's 2004
examination of Madoff.  These statements provided to the 2004 examination staff generally reflected
options trading.  OCIE sent NERO the 2003 electronic statements in June 2005.  Letter dated June 9, 2005

8.    Examination Team Did Not Go to an Independent Source for
       Trading Data

The examination team did not go to an independent source for trading data. Sollazzo and Nee stated the NERO examination program's standard procedure is to obtain trading data from the subject firm and not from an independent source, such as FINRA, unless there is a particular reason to do so.  Nee Testimony Tr. at pgs. 52-53; Sollazzo Testimony Tr. at p. 74.  Nee explained that "we get the trading data – unless we have reason to get it directly from NSCC it's sort of standard procedure to get it directly from a clearing firm – from the firm."  Nee Testimony Tr. at pgs. 52-53.  Sollazzo agreed, stating, "We generally don't go to these entities for trading data" because "it's not the front-end trading data, it's a lot of clearance settlement records."  Sollazzo Testimony Tr. at p. 74.

Sollazzo clarified that if an examiner was "doing a Ponzi review," then "you would go to DTC" and "very well may" go to OCC if "options were implicated." *Id.* at 75.  Lamore also testified that it was not normal practice in the exam program to reach out to entities like DTC, OCC, and NSCC, stating, "I haven't experienced ever reaching out to I don't think any of these entities."  Lamore Testimony Tr. at pgs. 52-53.

---

from Wood to Nee, at Exhibit 209.  The FTI Engagement Team also reviewed various paper-based monthly account statements during January 2001 - January 2004 for 21 accounts that were found in the 2004 examination team's work files.

The 2005 examination team's work papers also included paper-based Order Entry Execution History reports related to Madoff's split-strike forward conversion strategy, purportedly representing equity orders (shares, CUSIP, symbol, price, time) for January 20, 2005 during non-standard trading hours (i.e., not 9:00am -4:00pm EST).  There was no options information included in these reports.

Additional information was provided in the 2005 examination team's work papers that was not directly related to the split-strike forward conversion strategy.  The 2005 examination team's work papers included paper-based equity trade execution blotter data (trade date, settlement date, shares, CUSIP, price, net) primarily for shares of Exxon Mobil Corp. for trade dates January 20, 21, 24 and 25, 2005.  The 2005 examination team's work files also included electronic records representing a sample of 10 days of trading data during February and March 2005 and trading data for 4 particular stocks (Dynamic Materials Corporation; 8x8, Inc.; Ionatron, Inc.; Time Warner, Inc.) during March 2005.  In addition, the 2005 examination team's work papers included security position reports (symbol, market price, security, position, value) as of settlement date December 31, 2004, which were used by the NERO examiners to review the market making-business' net capital position.

Sollazzo stated that examiners go to FINRA to obtain an audit trail.[132]  Sollazzo
Testimony Tr. at p. 96.  Nee, however, was unaware whether obtaining the audit trail
from FINRA or the stock exchanges was standard practice in a front-running
examination.  Nee Testimony Tr. at pgs. 126-127.  Sollazzo recalled that Madoff told
examiners that he executed his trades in London after hours.  Sollazzo Testimony Tr. at p.
83.  Thus, Sollazzo did not think FINRA would have an audit trail for trades executed
outside the United States, [133] stating as follows:

> We were going to try to get the trade information from his
> internal records to see what existed.  We wouldn't be going
> to FINRA to get the trade information. … To get an audit
> trail you would go to FINRA.  If they are not executed in
> the U.S. I don't think it's going to [be] part of the FINRA
> audit trail."

*Id*. at pgs. 96-97.[134]

---

[132]  The FTI Engagement Team opined that FINRA execution and order audit trail data is extremely useful
in conducting a front-running examination.  Such data includes pertinent information regarding the order
and execution of a trade including: order date; order time; trade date; security symbol; time of execution;
size of the execution; price of the execution; executing firm; executing contra firm; executing firm
capacity; reporting firm; reporting contra firm; executing contra-firm capacity; and transaction type (i.e.,
buy, sell, sell short, etc.).  This data would have assisted in independently verifying trading activity
conducted at Madoff and would have included specific data necessary to examine whether or not Madoff
was front-running its broker-dealer customers.  Order Audit Trail System (OATS) data for instance, would
have provided the time of each customer order, which the examiners should have compared to the
execution times of trades for the discretionary brokerage accounts.

[133] The examination team never established where the trades were executed.  The FTI Engagement Team
believes that if Madoff had used an after-hours electronic communication network in the U.S., such activity
likely would have been reported to FINRA and cleared and settled through DTC/NSCC.  Even if Madoff
somehow executed the trades through his U.K. affiliate but not the U.S. broker-dealer, those trades likely
would have been reported to the London Stock Exchange ("LSE"), since Madoff's U.K. affiliate was a
member firm.  Further, if Madoff's U.K. affiliate cleared its trades through Barclays in London as was
suggested, then that institution or its affiliated clearing house (likely the London Clearing House) would
have records of such activity.  The FTI Engagement Team concluded that independent third-party audit
trail data should have existed for Madoff's trading whether or not he claimed to execute trades outside of
the United States and that audit trail data should have been requested and obtained.

[134]Unlike retail investors, a market maker like Madoff has access to after-hour trading facilities in the U.S.
such as Electronic Communication Networks ("ECNs") or other proprietary trading systems.  In fact,
NASDAQ accepts trade reporting from member firms from 8:00 a.m. in the morning, one-and-half hour
before the market opens, through 6:30 p.m. in the evening, two-and-half hours after the market closes.
Regardless of the venues, the after-hour markets are known to be illiquid when compared to regular hour
markets; most high-volume traders would avoid after-hour trading except when a company is releasing
material news that could impact the stock price.  Also, even with the time differential, the LSE is only
operating starting from 4:00 a.m. EST.  A U.S.-based market maker would be much more likely to use
ECNs or other proprietary systems to trade a large volume of U.S. listed securities after-hour (or trade
during the regular hours for that matter).  It is highly unlikely that a market maker would choose to move
significant positions on the LSE at 4:00 a.m. in the morning on an almost daily basis.  The FTI Engagement
Team concluded that Madoff's representations about executing his large-sized trades overseas and after
hours was not credible and should have alerted the examiners to dig deeper into their investigation of
Madoff's claimed oversea trading volume.

9.      Madoff Finally Confessed to Executing Trades for a Small
        Number of Institutional Clients

Lamore and Ostrow planned to confront Madoff about managing money for
hedge funds.  On the morning of May 25, 2005, Lamore e-mailed Nee and Ostrow,
stating, "I look forward to speaking to him regarding the hedge fund issue which he has
opportunistically failed to mention to us."  E-mail dated May 25, 2005 from Lamore to
Nee and Ostrow, at Exhibit 244.  Lamore also explained that Madoff "started to bash the
SEC exam program for not having a full understanding of" the firm's technology and for
"spending time reviewing e-mails."  *Id.*

Later that day Ostrow and Lamore had the meeting with Madoff that they had
been anticipating.  Madoff Interview conducted by Ostrow and Lamore on May 25, 2005
Memorandum, at Exhibit 245.  After raising the issue of the 2001 *MarHedge* and
*Barron's* articles, Madoff finally admitted to executing trades for a small number of
clients.  *Id.*  In a memorandum examiners provided to Nee on May 26, 2005, they
summarized their meeting with Madoff.  *Id.*

In the memorandum, the examiners described how Madoff had changed his story
several times.  *Id.*  For example, Madoff had said he had no advisory clients, then he had
claimed to have four, and then "closer to 15."  *Id.*; Lamore Testimony Tr. at p. 88.
Lamore testified that he suspected Madoff may have been providing the examiners with a
smaller number of clients than he actually had in order to stay below the threshold for
registering."  *Id.*  According to the examiner's memorandum, Madoff told the examiners
all of the clients were foreign investors and that the trading directive agreements were the
only correspondence he had with the clients.  Madoff Interview conducted by Ostrow and
Lamore on May 25, 2005 Memorandum, at Exhibit 245.  The memorandum stated the
following:

>   When the staff mentioned the Mar[H]edge and Barrons
>   articles, BMadoff stated "we do execute trades on behalf of
>   brokerage firms and institutions which include a number of
>   hedge funds.  They use a model (algorithm) that we
>   developed."  Initially, BMadoff stated there were four
>   hedge funds using the model including Fairfield Sentry,
>   Thema, Tremont, and Kingate Global.[135]  Subsequently,
>   BMadoff stated there were approximately 15 entities
>   including the four hedge funds and two corporate accounts
>   using the model.  *The Trading Directive agreements
>   between Madoff and these entities will be provided by the
>   firm.*[136]  BMadoff stated that all investors are foreign

---

[135] "According to BMadoff, Fairfield Sentry is affiliated with Citco, Tremont is affiliated with Bank of
America, and Thema and Kingate Global are affiliated with HSBC."  [Actual footnote from the examiners'
memorandum.]
[136] "BMadoff stated these agreements were the only written correspondence between Madoff and these
entities."  [Actual footnote from the examiners' memorandum.]

> investors and the accounts are all DVP/RVP.[137]  Madoff
> provides these entities with trade confirmations and month-
> end account statements which include all trading activity.
> *The staff will select a timeperiod and review the account
> statements generated during this timeperiod.*  According to
> BMadoff, he is not an investor in any of these entities and
> he does not use the model to trade the firm's capital.

*Id.* (emphasis in original).

Madoff told the examiners he alone executed trades on behalf of the entities using a computer model.  *Id.*  According to the examiners' memorandum, Madoff stated the model suggested when to enter and exit the market, but he "was adamant he also uses his 'gut feel' to make these decisions."  *Id.*  "According to Madoff, the shares are executed in Europe before the 9:30 opening of the U.S. equity markets using various brokerage firm's who bid or offer on the securities in the basket in an 'auction system' format."  *Id.*  The memorandum also contained the following passage, stating that Madoff told examiners he did not consider himself an investment adviser because he only charged brokerage commissions:

> According to BMadoff, there was approximately six to
> seven billion dollars allocated to the model by the 15
> entities in April, 2005.  The firm's compensation for
> conducting this business is four cents per share, which is
> incorporated in the execution price.[138]  The revenue
> generated from this business is reflected in the "Other
> Trading" line item of the firm's FOCUS Report.  BMadoff
> explained that due to the compensation structure of this
> business, he does not consider himself an Investment
> Advisor.  Therefore, he did not state that the firm managed
> outside money when previously questioned by the staff.

*Id.*

Nee recalled that the news reports at the time that discussed the number of Madoff feeder funds and the number of dollars invested with Madoff may not have reconciled with what Madoff told examiners.  Nee Testimony Tr. at pgs. 90-91.  Nee also was "aware that the examiners on the Madoff cause exam felt that they were lied to by Mr. Madoff on numerous occasions."  *Id.* at p. 85.  Nee stated he was not "overly concerned with" the discrepancies as long as Madoff disclosed "the bulk" of his trading, and disclosed "some of the bigger ones" like Fairfield.  *Id.* at pgs. 90-91.  Nee explained, as

---

[137]  DVP/RVP refers to delivery-versus-payment/receive-versus-payment.  Delivery-versus-payment, in relation to a purchase or sale of a security, means a service available to the buyer which allows him, her or it to pay for the security when the security is delivered at settlement.  Receive-versus-payment, in relation to a purchase or sale of a security, means a service available to the seller which allows him, her or it to deliver the security when payment is received at settlement.

[138]  "BMadoff stated that all entities are charged four cents per share."  [Footnote from the examiners' memorandum.]

follows, why Madoff's initial lie to the examination team about not having investment advisory clients "was suspicious" to him but not pursued:

> Oh, it was suspicious, but you know, it's hard to get inside someone's head about why they're saying what they're saying. But yes, it was suspicious but we knew that ultimately it was a books and records review. If we could get – if we could walk out of there, get the trading, look at it, compare it to the other side of his business, then we will have done what we were sent in to do.

*Id.* at 82-83.

H.     Examiners Learned from Madoff that OCIE Had Been Conducting Its Own Examination of Madoff

In the last line of the examiners' May 26, 2005 memorandum, the examiners noted that the existence of the hedge fund relationships, which had taken the examiners more than six weeks on-site to get Madoff to acknowledge, had already been revealed to OCIE a year and a half before during an examination conducted by OCIE.[139]  The last line of the memorandum stated the following:

> BMadoff was surprised that the staff was unaware that Madoff conducted this type of business since he had discussions regarding the firm's hedge fund relationships with SEC officials approximately one and one-half years earlier.

Madoff Interview conducted by Ostrow and Lamore on May 25, 2005 Memorandum, at Exhibit 245.

---

[139]  Madoff confirmed that NERO appeared unaware that OCIE had been conducting an examination of BMIS until he told them. Madoff Interview Memorandum at p. 2. Madoff explained that the NERO staff insisted it was a routine exam, and that "We haven't been here in ten years," to which Madoff replied, "You [DC OCIE staff] were just here." *Id.* Madoff recounted a conversation with Ostrow:

> Ostrow:  "So tell me about this article." (Madoff said Ostrow was referring to the MAR/Hedge article, leaning back with his hands behind his head "like Lieutenant Colombo.")
> BM:      "What about it?" (Madoff stated that Ostrow was "acting as if I didn't do this business.")
> BM:      "Lori Richards has a whole file I sent her with this info. They have it."
> WO:      "Well, it's a big organization; we don't talk to each other."

*Id.* Madoff stated that he thought Ostrow was acting "as if the left hand didn't know what the right hand was doing." *Id.*

On May 26, 2005, the day after meeting with Madoff, Lamore and Ostrow sent Nee their summary memorandum. *Id.* Nee forwarded the memorandum to Sollazzo, who responded with the following comment on Madoff's fee structure:

> Bernie's fessing up. I could only access part of the memo, but it sounds like we may have something to review (directed executions). You wonder what is his benefit beyond commissions.

E-mail dated May 26, 2005 from Sollazzo to Nee, at Exhibit 246. Sollazzo explained Madoff's failure to provide "information on the underlying advisory clients" was "definitely a concern" as was Madoff's frequently changing stories about the number of clients for which he executed trades. Sollazzo Testimony Tr. at pgs. 93, 95.

Later that day, Nee sent the following e-mail to McCarthy, with a copy to Sollazzo and the examiners, asking him if Madoff was correct and McCarthy and Richards were already aware that Madoff managed money for hedge funds:

> We are currently conducting an exam at Madoff. Our major focus has been the possibility that Madoff is using his vast amounts of customer order flow to benefit the $6 billion in hedge fund money that we believe he manages. In initial inquiries about managing outside money and supplying black box models (algorithms, etc.) to outside accounts he either denied it or was evasive.
>
> When he finally admitted to "executing trades" for billions in customers' (hedge funds) money using specific proprietary trading algorithm, he said we should know about this as he told Lori Richards and John McCarthy about this 1.5 years ago. We are hoping that if what he is saying has any truth at all to it that you might have some info related to his hedge fund related activities that you could send us.

E-mail dated May 26, 2005 from Nee to McCarthy, at Exhibit 247. McCarthy forwarded the e-mail to Swanson who responded that OCIE was already looking at the same issue:

> John – we should discuss. Ocie [sic] has an open exam of madoff on this issue. I'm on road today, but am available tomorrow AM.

*Id.*

NERO may not have known OCIE was conducting an examination of Madoff because OCIE had not entered the examination into the STARS tracking system.

McCarthy Testimony Tr. at p. 113; Swanson Testimony Tr. at p. 114.  However, even if the examination had been entered, it is not clear that NERO would have known OCIE was examining Madoff because examiners did not check the system when they started the examination.  Ostrow Testimony Tr. at pgs. 115-116.

The examination team found it embarrassing to learn from Madoff that another examination group at the SEC was conducting an examination of the same issue at the same entity without either group having any idea about the other.  Lamore Testimony Tr. at pgs. 102-103; Ostrow Testimony Tr. at p. 115; Nee Testimony Tr. at p. 108.  Sollazzo explained:

> It is embarrassing to find out that there's an open exam for a registrant, we should have full awareness of that.  You know, it – first going in and asking that question [whether another office of the SEC is also examining you] doesn't make any sense, that[] shows, like, you know, the right hand doesn't know what the left hand is doing.  Generally, I think we're much better than that.

Sollazzo Testimony Tr. at p. 158.  Lamore stated that Madoff used the opportunity to condescend to examiners:

> … I was sort of shocked that Washington had looked at this issue and also, it was – once he finally acknowledged it, he became – it was pretty condescending, I think, and because we didn't – weren't even aware of it, I think that was sort of the tone he took like when I didn't understand algorithmic trading.  So I think that's kind of what my thinking was at that point.  And then we asked, I think, who – you know, who did you deal with or speak with so we could follow up with them.

Lamore Testimony Tr. at p. 103.

Unlike Lamore and Sollazzo, Nee did not find the discovery of the OCIE examination to be surprising:  "Well, it's not unusual for people in OCIE to do their own examinations or inquiries.  I don't, you know, sometimes they might not even call them – you know, there might not even be a report issued."  Nee Testimony Tr. at p. 97.

Eric Swanson, an OCIE Assistant Director, recalled in the following testimony that communication between Commission offices could be hindered due to competition among offices:

> A:    Bob Sollazzo was particularly protective of, you know, his territory and – and was – was very political about how he would approach this if he

found out that we had some into New York and done a trading exam, but he really did want to know in advance when we had done it and we were not always good about – about telling him. … Again, there was no rule or policy about it, but I think the information-sharing at that level between offices was not always great. … I sometimes sensed at the SEC that there was a bit of eat what you kill kind of – a bit of competitiveness between the offices. I'm sure we were that way and I know some of the regional offices were that way. So it felt a little bit like Corporate coming in when Washington would come in and do something without telling the regional offices, and I think, you know, I think on some level rightfully so, they didn't like it. So should they have known? I assume, but after this process you're going through, there may be a more formalized way that that information flows, but there wasn't back then.

Q:   So given the culture at that time, you're not surprised that the New York office wouldn't know that you guys were doing the same exam as them?

A:   No, I'm not surprised.

Q:   Okay. And in fact, given the competitiveness, that information might not have been shared with the New York office?

A:   It wasn't – you know, my recollection, it – we wouldn't have just – we just wouldn't have even thought to call them, which is, I think, bad. I think they probably should have been made aware.

Swanson Testimony Tr. at pgs. 112-114.

I.   2003-2004 OCIE Examination Finished Without Conclusions

1.   OCIE and NERO Had a Conference Call

On May 31, 2005, Nee and the examiners had a conference call with OCIE. E-mail dated May 26, 2005 from Nee to McCarthy, at Exhibit 247. Examiners could not identify for certain who from OCIE was on the telephone call, but believed meeting participants included McCarthy, Swanson, and Donohue. Ostrow Testimony Tr. at pgs. 113-114 (recalled McCarthy, Swanson and possibly Donohue on the call); Nee

Testimony Tr. at p. 102 (recalled Swanson being on the call); Lamore Testimony Tr. at p. 105 (recalled Swanson and Donohue on the call).

From the conversation, Nee understood that although the OCIE examination had not concluded, "for all intents and purposes it was finished," stating, "[I]t was my understanding at the time that they were not actively working on the issue, it just so happened that it looked like they were working on the same issue that we were." Nee Testimony Tr. at pgs. 98-99. Despite the fact that the 2003-2004 OCIE examination had been open for a year and a half, Nee recalled that OCIE did not provide NERO with its conclusions or an examination report. *Id.* at 110-111. Lamore thought it was "strange" that OCIE had not written an examination report. Lamore Testimony Tr. at p. 107. Nee opined that in his group it would not be acceptable to have an examination that was not being actively worked on to remain open without conclusions or a final report being issued. Nee Testimony Tr. at p. 111.

### 2.      OCIE Told NERO that Madoff was Powerful and Well-Connected

During the conference call, Nee and the examiners recalled OCIE telling them Madoff was a powerful and well-connected individual:

> I don't know who said it, someone from OCIE basically, "He's a very powerful person, Bernie, and you know, just remember that.' … But basically just, "He is a very well-connected, powerful person."

Ostrow Testimony Tr. at pgs. 113-114. Ostrow interpreted the statement to raise a concern for them about pushing Madoff too hard without having substantial evidence. *Id.* at 145-146. Lamore had a similar recollection:

> I'm not sure if those were the exact words, but it struck me as odd at the time. It's what I remember from that call was – you know, we're always professional, of course, when we go do our exams, but that kind of elevates your sense of your need to be professional.

Lamore Testimony Tr. at pgs. 105-106. Lamore could not recall who from OCIE made the statement. *Id.* Tr. at 106.

Nee also recalled the statement, but did not interpret it to mean they should "tread lightly." Nee Testimony Tr. at p. 103. He thought the comment indicated "they might get a phone call from someone but we never did." *Id.* at p. 104.[140]

---

[140] Ostrow testified that this was an issue for the SEC generally, and that in past examinations unrelated to Madoff, supervisors at the SEC appear to have been reluctant to push issues against influential people: "Yes. I've seen it where, you know, maybe I've been told, 'Don't rock the boat so much there, because we

3.        OCIE Sent Their Examination Papers to NERO

On June 9, 2005 OCIE sent their examination papers to NERO.  Letter dated June 9, 2005 from Wood to Nee, at Exhibit 209.  Nine categories of documents were listed on the cover letter to the OCIE work papers, and the final category was described as "Work papers received from Mavis Kelly (IA/IC)."  *Id.*  This category included the Hedge Fund Manager's Complaint investigated in the OCIE examination, which questioned whether Madoff was misrepresenting his trading to his investors, stated that Madoff's returns were not correlated to the overall equity markets in over 10 years, and asserted that the auditor was a "related party to the principal."  Lamore Testimony Tr. at p. 109; E-mail dated May 21, 2003, from the Hedge Fund Manager to Kelly, at Exhibit 148.  OCIE also provided NERO with access to the BMIS customer account statements that Madoff had produced in electronic format.  *See* E-mail dated June 9, 2005 from Fentress to Slains, at Exhibit 248 (stating examination team had been given access to OCIE's Madoff folders).

Ostrow did not recall seeing the Hedge Fund Manager's Complaint at the time of the examination, and neither Ostrow nor Lamore recalled OCIE drawing any attention to it.  Ostrow Testimony Tr. at pgs. 119-121; Lamore Testimony Tr. at pgs. 109-110.  Lamore acknowledged he "may have glanced at it" and described his recollection as follows:

> I had conducted some sort of like cursory review of the
> documents, but it seemed so similar to what we were
> receiving in real time, that I didn't spend a lot of focus and
> I just – this didn't stick out to me at the time.

Lamore Testimony Tr. at p. 110.  Ostrow had a similar recollection.  He explained that by the time the OCIE documents arrived in NERO, they had already returned "from the field" and he did not "really remember doing much with OCIE's work papers."  Ostrow Testimony Tr. at pgs. 118-121.

Nee and Sollazzo did not recall seeing the Hedge Fund Manager's complaint during the examination.  Nee Testimony Tr. at pgs. 107-108; Sollazzo Testimony Tr. at 101.  Although it was not reviewed during NERO's examination, Sollazzo thought the examination team would have found the Hedge Fund Manager's complaint to be a relevant document.[141]  Sollazzo Testimony Tr. at p. 101.

---

have a good relationship with them,' and when we – and not Madoff-related, but you know, 'where we need to make a request for documents, they always gave it to us.  So let's try to go easy.'  You know, and I don't go easy, and I push hard, and I get pushback from staff members.  But, you know, at the end of the day it turns out, yes, it is an issue, or it should be an issue."  Ostrow Testimony Tr. at pgs. 163-164.

[141] According to the FTI Engagement Team, the Hedge Fund Manager's complaint was detailed, insightful and considered to be from a credible source.  The FTI Engagement Team concluded the complaint would have been particularly useful to the examination team because it included a number of serious allegations that needed further scrutiny, including:

1.   the unusual fee structure;

J.        NERO Examination Continued

1.        Madoff Failed to Produce Correspondence, E-mail and Other
Documents Requested by the Examination Team

Throughout the examination, Madoff failed to provide the team with requested
documents.  Ostrow Testimony Tr. at p. 126.



2.    whether or not there was enough market volume to support Madoff's trading strategy for $8-$10
billion of trading;
3.    whether or not the returns should have correlated to the overall equity markets;
4.    whether or not it was appropriate or feasible for accounts to move to cash at months end given the
strategy;
5.    whether or not the auditor was a related party;
6.    whether or not there was no independent custodian; and
7.    whether or not the purported returns were feasible given the strategy and amount of assets
purported to be under management.



*Id.* at p. 106.

Sollazzo was not aware that examiners had trouble obtaining e-mail, but "was aware they were having some difficulty getting some records … I had some awareness that they were having some difficulty getting some of the trading records and things of that nature." Sollazzo Testimony Tr. at p. 91.

2.      Questions About Trade Executions and Clearance Were Never
        Resolved

On the afternoon of May 26, 2005, Nee e-mailed Lamore and Ostrow in response
to the examiners' memorandum of their meeting with Madoff.  E-mail dated May 26,
2005 from Lamore to Nee, at Exhibit 251.  Nee e-mailed Lamore that he had told Ostrow
to nail down the details of how Madoff executed and cleared trades.  *Id.*  Lamore
responded, in the following e-mail exchange, that Madoff had been vague about trade
execution and clearance, and he would find out the information by the following week:

> [Nee] In talking to William I asked him to find out more
> about the actual execution and clearance of the trades -
> executing brokers? London exchange? Prime broker used (I
> think they use Barclays) show him the article; role of UK
> affiliate (in e-mails they seem to be involved with
> Barclay's.)  And what are the parameters, or at least the
> factors that his model uses?
>
> [Lamore]  Ok.  He just graced me with his presence for an
> hour plus and I was able to get a better understanding.
> However, he was somewhat vague regarding the actual
> execution and clearance of trades other than the basket is
> advertised and as equities in the basket are traded, the
> model adjusts how much capital can be put to work and
> still stay within the parameters of client agreement.  I'll
> find out this information by the time you come back on
> Tuesday.  Enjoy the super long weekend.

*Id.*

Nee did not "recall specifically" whether the details of Madoff's trade execution
were ever followed up on, stating, "I asked William to follow up, I don't know if he
followed up with more questions, but I don't think there was – I don't recall specifically."
Nee Testimony Tr. at p. 93.  Sollazzo admitted that that details of how Madoff executed
and cleared trades may never have been nailed down." [142]  Sollazzo Testimony Tr. at p.
98.

There is evidence that the examiners intended to draft a written request for
information in order to follow up on the trade execution and clearance issues.  Their
intention in submitting a written request was to have Madoff "acknowledge in writing

---

[142]  The FTI Engagement Team concluded that the staff should have recognized the need to independently
verify Madoff's verbal representations pertaining to how he executed, cleared and settled his trades.  The
FTI Engagement Team further concluded that Madoff's informing the NERO examiners that BMIS
functioned as an executing broker on a DVP/RVP basis by his U.K. affiliate should not have hindered their
ability to uncover the Ponzi scheme or at the very least, the fictitious trades.  *See* Section IV(M) for the FTI
Engagement Team's extended analysis.

that certain things didn't apply to him, rather than him just giving us a verbal response."
Lamore Testimony Tr. at p. 115; Ostrow Testimony Tr. at p. 127.  On the morning of
May 27, 2005, Ostrow and Lamore outlined questions to add to such a request, and
included the following:

1. Customer statements and confirmations in an electronic
   format for all 14/15 entities from January 2004 through
   April 2005.  (once we eyeball the statements we can
   than [sic] select specific accounts to request the trading
   activity for specific days)
2. All correspondence (i.e. Facsimiles, e-mail, instant
   messages) between the firm and any of the 14/15
   entities for the period of January 2004 through April
   2005.
3. What markets in London is Bernie using?  How does
   the security settle? (It would not be DTC or NSCC)
4. Provide a description of the algorithm used for the
   14/15 entities. What are the underlying assumptions?
   What factors feed into the model?  Do any order entry
   systems feed into the model?
5. What is Barclays role in facilitating the transactions of
   the 14/15 entities?  Any other roles?
6. What role does the UK office play in the 14/15 entities?

E-mail dated May 27, 2005 from Lamore to Ostrow, Re Meeting with Berine [sic], at
Exhibit 249.  Lamore added that he would draft the request after he completed his review
of the documents Madoff had produced, which appeared to Lamore to be incomplete.  *Id.*

Lamore stated that he did not recall putting together the request and did not
"recall receiving anything in writing" from Madoff at all.  Lamore Testimony Tr. at p.
115.  Ostrow was uncertain whether they submitted the request, and the OIG found no
evidence that such request was ever submitted.  Ostrow Testimony Tr. at p. 127.

3.    The Examiners Investigated How Madoff Executed and Cleared
      Trades by Asking Madoff and Relying on His Responses

The examiners believed that the issue of how Madoff executed and cleared trades
was discussed with Madoff and that examiners relied upon Madoff's verbal
representations.  Ostrow recalled they likely received "a vague answer" from Madoff.
Ostrow Testimony Tr. at pgs. 109-110.  Ostrow stated that Madoff had a habit of
providing answers that were "[v]ague or misleading, extremely misleading."  *Id.* at p.
110.  Lamore recalled asking Madoff about trade execution and clearance, but stated the
examiners did not confirm the information provided with any third parties:

A:    We asked – we asked Bernard about this.  My – my
      recollection is that Barclays – Barclays London

> served as the clearance and settlement for the
> account that conducted this business.  His – his
> London MSIO, his London affiliate served as a
> settlement agent.  Bernard said that in order to
> conduct securities trades in Europe, you had to have
> a settlement agent, and that's how it went.

> Q:      Did you do anything further beyond talking to
>          Bernie Madoff to resolve this issue?

> A:      No.

Lamore Testimony Tr. at p. 104; *See also* E-mail dated May 27, 2005 from Lamore to
Ostrow, Re Meeting with Berine [sic], at Exhibit 249.

After Lamore discussed the questions about trade execution and clearance with
Madoff, on May 27, 2005, Lamore e-mailed Ostrow, "Regarding the settlement and
clearance process, he [Madoff] stated that Barclays clears the trades and then delivers the
fund/shares to the customers.  There is no prime broker, Barclays clears the trades for
Madoff."  E-mail dated May 27, 2005 from Lamore to Ostrow, at Exhibit 252.  Ostrow
responded to Lamore's e-mail by raising the following additional questions that Madoff
had not answered:

> We also want to know how that basket of trades is
> submitted to the 50 brokers in London.  Maybe he just logs
> onto Barclays website and has an interface through them.
> How is the basket represented to these 50 brokers?  Is it
> shown as Madoff being the customer?  Is Barclays
> considered the customer?  Is the whole size shown at once?
> Does it get shown piecemeal if it is done over three days?
> Why does he use Barclays as opposed to his London
> affiliate?  What does Barclays charge per share?

*Id.*  Lamore responded to Ostrow, "I suggest we hold off on those questions until we
receive the statements and other information."  *Id.*

When asked if the examiners ever obtained answers to the questions Ostrow
raised in his e-mail, Ostrow responded, "we probably just verbally asked him, and it
came back to, again, that Barclays was being used as the clearing agent, clearing the
trades for London on behalf of these 16 hedge funds, and that's how it all worked."
Ostrow Testimony Tr. at p. 131.  Lamore also recalled that they only sought answers to
the questions Ostrow raised by "getting an explanation of how sort of the transaction

process worked" from Madoff "verbally."[143]  Lamore Testimony Tr. at p. 118.  Madoff never produced any documentation regarding custody of client assets.  *Id.* at p. 114.

> 4.      According to Associate Director Sollazzo, The Key to Uncovering
> the Ponzi Scheme Would Have Been Going to Third Parties

Sollazzo stated that he felt that the key to uncovering the Ponzi scheme was to reach out to third parties, such as the supposed options counterparties and the custodial agents.[144]  Sollazzo Testimony Tr. at p. 163.

Nee stated that if the investment adviser examination team had performed the examination, he believes that they would have looked at custody of assets and safety of client assets.  Nee Testimony Tr. at p. 56.  Sollazzo explained the SEC is currently attempting to improve its ability to obtain independent verification in examinations:

> I'm on a committee now actually, with the OCIE level
> coordinated with FINRA as well, trying to work through,
> raise some of the limitations here and have better policies
> for verification.  Because [] in the exam world, most of the
> time we do not send out confirmations and do asset
> verification, but clearly there has to be times where we do
> that and it'd have to be more effective.  So you know, that's
> some of [] what we're working on.

Sollazzo Testimony Tr. at p. 160.

Madoff stated that he thought "the jig was up" during the on-site OCIE examination because he thought it was routine for the SEC to check with an independent third-party.  Madoff Interview Memorandum, at p. 5.  Madoff stated that Ostrow and Lamore "never really got into books and records as related to stock records or DTC records."  *Id* at p. 3.  Madoff stated that "they never even looked at my stock records" or did a "box count."  *Id.*  He said he was "astonished" that they didn't ask for DTC records, and that only a regulator could get those records from DTC.[145]  *Id.*  Madoff emphasized,

---

[143]  According to the FTI Engagement Team, significant issues that are raised with registrants are typically done so in writing in order to memorialize the requests and responses.  As a result, the examination team will have a record of such correspondence, which may be used to further develop and resolve any outstanding issues.  Relying solely on verbal answers from the subject of a cause examination is not an appropriate method of examination.

[144]  According to the FTI Engagement Team, examination staff could also have contacted FINRA/NASD, a SRO regulated by the Commission, in order to independently verify equities trading activity purportedly conducted by Madoff.

[145]  Sollazzo and Nee testified that it was reasonable for the examination team not to go to DTC because they believe that Madoff had provided documents to the examiners that led them to believe the securities were delivered directly to the customers.  Sollazzo Testimony Tr. at p. 159; Nee Testimony Tr. at p. 153.  The FTI Engagement Team concluded that the lack of clarity the examiners had about how Madoff executed and cleared trades and the inconsistencies the examiners identified in Madoff's documents and representations should have caused the examination team to independently verify Madoff's verbal

the SEC would "have to go to DTC."[146] *Id.* Madoff added that DTC does not have separate accounts for each customer, but rather, provides a global report, but stated that if they went to DTC, they would've seen his market making position, and that it "would've been easy for them to see" the Ponzi scheme. [147] *Id.*

### 5.    Examiners Identified Additional Discrepancies

As the examination progressed, the examiners continued to find discrepancies in the information Madoff provided. For example, Ostrow recalled that the examiners identified, contrary to Madoff's representation, the documents that Madoff produced in fact showed some options trading:

> And I think in a few instances, I think we did see some
> options trading. It might have fallen into some of our
> review period, and it was odd that in one instance, I think
> the options were put on before the basket or something
> which seemed to be in … contradiction … with the trading
> authorization directive.

Ostrow Testimony Tr. at p. 65. Ostrow recalled that "there were a lot of inconsistencies in terms of data provided to us, why don't we see a trade on this day" and Madoff would explain the inconsistencies away. *Id.* at p. 44.

### 6.    Examiners Tested Madoff's Truthfulness

In addition to other information he was to provide to the examiners, Madoff was supposed to provide the names of the "14 or so companies" for which he admitted to

---

representations pertaining to how he executed and cleared trades. *See* Section  IV(M) for FTI's full analysis.

[146] During the Enforcement investigation of Madoff, Madoff told SEC Enforcement attorneys, in the presence of Lamore, that his trades cleared through DTC. *See* Section V**.** After Madoff confessed to running a Ponzi scheme, Friedman, a NERO Branch Chief in the Division of Enforcement, testified that it was his understanding that within a few days NERO confirmed through either a "DTC terminal" or a "a phone call … to DTC" that Madoff had not been placing trades for his clients. Friedman Testimony Tr. at pgs. 19-22.

[147] Based on the volume (i.e., billions) of dollars that Madoff managed for the advisory clients, the FTI Engagement Team concluded that the SEC could have determined there was a problem if it had directly contacted DTC. If Madoff's advisory account data was segregated from its market making data at DTC, those records should have shown significant positions coinciding with periods that Madoff reported holding significant positions in the split-strike forward conversion strategy. In addition, DTC's affiliate, NSCC, could have also provided transactional volume data regarding the advisory account activity that should have been consistent with the transactional activity reported in the monthly account statements and customer confirmations. If the advisory data was not segregated from the market making data reported to DTC/NSCC, the examiners could have still reviewed the DTC/NSCC information to see if it reasonably could have accounted for the combined activity from both the market making business and the advisory business. The FTI Engagement Team concluded that the examination staff should have contacted DTC/NSCC in order to verify what records may have been available to verify Madoff's purported trading activity, especially in light of the confusion among staff members with regard to how such trades were cleared and settled.

executing trades.  E-mail dated June 6, 2005 from Lamore to Nee, at Exhibit 253.
Ostrow determined, from research he conducted on Bloomberg, that Auriga International
Euro Limited (Auriga) was a Madoff feeder fund.  E-mail dated May 26, 2005 from
Ostrow to Lamore, at Exhibit 250.  Ostrow decided they should test the information
provided by Madoff by not telling Madoff they knew about Auriga to see if Madoff
would produce related documents.  *Id.*  When Madoff failed to produce the documents,
Ostrow told Lamore to ask Madoff about Auriga.  E-mail dated May 27, 2005 from
Ostrow to Lamore, at Exhibit 254.  On May 27, 2005, Lamore and Ostrow had the
following e-mail exchange about Madoff's puzzling response and then attempted to
explain away the discrepancy:

> [Lamore] He [Madoff] said that he is not familiar with
> Auriga International although they could be an investor
> through one of the feeder funds.

> [Ostrow] That's weird because Bloomberg reports Auriga
> has discretionary accounts with B. Madoff.  Maybe it was a
> few years ago or it could be a feeder fund.

*Id.*

In testimony, Ostrow recalled the Auriga discrepancy.  Lamore Testimony Tr. at
p. 135.  Nee did not have a specific recollection of this issue, but had a general
recollection that Madoff "was playing a semantics game" with the examiners, and "the
intent was sort of to deceive."  Nee Testimony Tr. at pgs. 120-122.

Also on May 27, 2005, examiners discussed, in the following e-mail exchange,
Madoff's failure to produce all of the requested documents, and identified additional
discrepancies in the documents he had produced:

> [Lamore]  Bernie failed to give me the account information
> for Thema US Equity Fund which I noted in yellow on the
> attached spreadsheet.

> [Ostrow]  Did he get you the RVP/DVP instruction sheet?
> Also we would like a list of corresponding contacts at each
> account.  Or who is the investment manager who is
> authorized to call on behalf of the fund and increase the
> trading limits?"

> [Lamore]  I'll ask him to provide the information.  I asked
> him to provide us with a copy of the information that he
> previously sent to the SEC.  He said the information
> included account statements and P&L information in paper
> format.  In our request today, we asked for a copy of all
> confirmations.  He stated that all confirmation information
> was contained in the account statements.  He asked if he

could provide a sample of confirmations to show that the
information is contained in the account statements.  I said
that would be ok for now.

[Ostrow]  Try to get a month or two of a big account like
Fairfield Sentry, Kingate or Tremont printed out today and
put in a geek bag just so we get a feel for what the rest
should look [like].  Otherwise he has three days to come up
with a sample.

E-mail dated May 27, 2005 from Lamore to Ostrow, Re Correction For Accounts Using
Bernie's Model, at Exhibit 255.  Nee had a "general recollection throughout the course of
the exam" that the examiners told him that Madoff was failing to provide requested
information.  Nee Testimony Tr. at p. 11.  However, Nee believed "ultimately we got the
bulk of what we requested in order to, you know, determine whether he was front-
running." *Id.* at p. 122.

Ostrow testified that in his e-mail to Lamore he suggested locking up documents
by putting them "in a geek bag" because he was suspicious Madoff was giving them only
select documents.[148]  E-mail dated May 27, 2005 from Lamore to Ostrow, Re Correction
For Accounts Using Bernie's Model, at Exhibit 255; Ostrow Testimony Tr. at p. 70.
Ostrow asked Lamore to request documents for same day production and then lock up the
documents "before the weekend because we didn't want to give Bernie a chance to …
cherry-pick or get us the best statement.   We want just a raw statement right off the press
and take it." *Id.*  The OIG has found no evidence that documents were locked up, and
Lamore did not recall discussing with Ostrow the possibility Madoff could be
"fabricating statements."  Lamore Testimony Tr. at p. 119.

7.      The Account Numbers Madoff Produced Were Suspicious to
        Examiners

Also on May 27, 2005, Ostrow noted another discrepancy with the information
Madoff provided to the SEC examiners.  Lamore stated Madoff told him BMIS had
provided a DVP/RVP instruction sheet listing "the custodian bank along with the
accounts number that I listed on the spreadsheet."  E-mail dated May 27, 2005 from
Lamore to Ostrow, Re Correction For Accounts Using Bernie's Model, at Exhibit 255.
Ostrow did not believe the account numbers provided were accurate, and stated, as
follows, that he would research record requirements for the accounts:

Wouldn't those account numbers you listed in the
spreadsheet correspond to the account at Barclays or the
Madoff Account number?  I can't believe that is the bank
account information for each of the 15 accounts.  I can't

---

[148]  Madoff stated that the examiners "never asked for DTC records" or other records that needed to be
prepared.  Madoff Interview Memorandum, at p. 2.  Thus, Madoff contends he did not provide false DTC
records to the SEC.  *Id.*

> believe that Bank of America and HSBC both have account
> ranges that start with 1FR.  I'll need to do a little research
> and see what kind of record requirements if any are
> required for DVP/RVP accounts.

*Id.*  Ostrow explained in testimony that the account numbers looked suspicious to him:

> Sure, it was strange.  …. You know, so we had suspicions
> about pretty much everything there, everything he said we
> wanted to try to figure out if it existed or it didn't exist.

Ostrow Testimony Tr. at p. 137.  To find our more information about these accounts,
Lamore reviewed BMIS's required Anti-Money Laundering submissions.  E-mail dated
May 27, 2005 from Lamore to Ostrow, Re Correction For Accounts Using Bernie's
Model, at Exhibit 255.  However, he did not find the submissions helpful because they
not list a contact person or state who the beneficial owners was of the foreign accounts at
issue.  *Id.*  The issue does not appear to have been resolved by examiners, as Ostrow
explained:

> I know we didn't send a letter to Bank of America and say,
> "Would you have an account 1FR." … Well, we did what
> we would do on a normal exam if they provided us a
> spreadsheet and we asked for the outside statements, which
> were statements he printed up, and we looked at it and
> compared it, and then if we had stuff received by OCIE, we
> usually wouldn't go the next step the same way an outside
> auditor doing the annual audit would maybe send a request
> letter, even though – we thought everything was weird, so
> we would have been sending letters out everywhere.

Ostrow Testimony Tr. at pgs. 137-138.[149]

> 8.    Examiners Were Skeptical of Madoff's Claim to Time the Market
>        Using His "Gut Feel"

As the examiners continued to review the documents Madoff produced, their
confusion grew.  On June 1, 2005, Lamore e-mailed Nee and Ostrow a summary of the
meeting he had with Madoff that morning.  E-mail dated June 1, 2005 from Lamore to
Ostrow, at Exhibit 256.  Madoff reiterated to Lamore that "Bernie's gut feel tells him
when to enter the market and exit the market.  His gut feel includes his observations of
the trading room here in NY, what his European contacts are telling him, [and] what he
reads in industry papers and publications."  *Id.*  According to Lamore's e-mail, Madoff
stated that he did not "track monthly performance data of his model," something Lamore
"highly doubt[ed]."  *Id.*  Lamore also informed Nee and Ostrow that he "did receive the

---

[149]  In testimony, Lamore stated he could not recall the issue of the suspicious account numbers.  Lamore
Testimony Tr. at p. 121.

list of brokers who execute for his model and 2005 monthly statements in paper format for Kingate Global and Kingate Euro.*" Id.*

Lamore testified that he was suspicious of Madoff's claim to enter and exit the market for billions of dollars of trades using his "gut feel," stating as follows:

> I asked him repeatedly, you know. I thought his gut feel was, you know, strange, suspicious. You know, I kept trying to press him. I thought there was something else. You know, I thought, you know, he was getting some sort of insight into the overall broad market that other people weren't getting. So I repeatedly sort of pressed him on that. I asked Bernie repeatedly over and over again, and at some point, I mean, I'm not sure what else to do.

Lamore Testimony Tr. at pgs. 126-127. Nee shared Lamore's feeling that Madoff's claim to be trading on "gut feel" was not credible. Nee Testimony Tr. at pgs. 128-129. Sollazzo recalled the examiners being "skeptical" of how Madoff was earning his returns. Sollazzo Testimony Tr. at pgs. 111-112. However, Sollazzo did not find that Madoff's claim to be trading on "gut feel" was "necessarily … ridiculous." *Id.* at pgs. 104-105.

Nee testified that despite the two 2001 articles raising the issue of Madoff's incredible timing and the examiners finding Madoff's timing to be "exceptional," he did not focus on Madoff's incredible timing because, "We went in there to look at – specifically at the trading, it was sort of a front end review, we weren't there to really try to see if the returns he was reporting were correct." Nee Testimony Tr. at p. 132. As discussed below, notwithstanding these suspicions, no efforts were taken in the NERO examination to analyze this issue.

9.    Madoff's Statement Were as "Clear as Mud" to Examiners

The monthly statements Madoff provided appear to have raised more questions for examiners than they answered. Lamore e-mailed Ostrow on June 1, 2005, stating, "I'm not quite sure what's going on with these statements. I'll show you later but it seems clear as mud to me." Ostrow responded, "That's a funny way but I'm sure appropriate way to put it." E-mail dated June 1, 2005 from Lamore to Ostrow, at Exhibit 256. Examiners noted that Madoff appeared to have "'timed' the market pretty well." *Id.*

10.    The Examiners Learned Madoff Was Required to Produce All Documents to the SEC

Because Madoff had been refusing the produce documents associated with his trade execution model, Nee had contacted Michael Macchiaroli from the Division of Trading and Markets, to ask him if the documents were subject to the books and records requirements. Lamore Testimony Tr. at pgs. 132-133; Ostrow Testimony Tr. at pgs. 67-68. Nee told the examiners that Macchiaroli agreed Madoff had to produce the

documents.  E-mail dated June 2, 2005 from Nee to Ostrow, at Exhibit 257.  Sollazzo was aware that Macchiaroli's general determination was that BMIS was a registered broker-dealer; and therefore, the SEC was entitled to all of Madoff's books and records, including information related to Madoff's trading strategy and institutional clients.[150] Sollazzo Testimony Tr. at pgs. 116.

However, the examiners never obtained documents about Madoff's "black box" model.  Ostrow Testimony Tr. at pgs. 152-153.  Ostrow explained that by this time, they were scheduled to end the on-site portion of their examination and they needed to tie up their conclusions, stating as follows:

> And this is in June already, so we're probably two or three days shy of coming back from the field.  And in terms of when you said did we follow up on those Barclay questions and the other questions, we were still trying to just still get to the black box, three months later, and only one week after finally officially being told that he was running money for six or seven customers.  So, you can see how our hands were tied from the whole – beginning, and we're trying to gather the information …
> We have to sort of tie our ends together and come up with the – you know, we had the violations of the market making side, which we were able to work on in the two and three-week – or the two-month downtime that we were waiting for Bernie to confess that he had these accounts under his control.

*Id.*

### 11.   Examiners Preliminarily Determined Madoff Was Not Front-Running

Once Lamore had a portion of the trading data from one of Madoff's largest hedge fund clients, he was finally able to determine whether or not he believed Madoff was front-running.  E-mail dated June 2, 2005 from Nee to Ostrow, at Exhibit 257.  On June 2, 2005, Lamore told Nee that they had made a preliminary determination that Madoff was not front-running.  *Id.*  Lamore noted that Madoff's timing for his purchases and sales "was excellent."  *Id.*  Lamore hypothesized in his e-mail to Nee and Ostrow that Madoff's incredible timing could be a result of his European connections.  Lamore Testimony Tr. at pgs. 134-135.

> We [the examiners] are still waiting for some documents from our last request.  After reviewing the Kingate account

---

[150]  The FTI Engagement Team found that since Madoff's advisory business consisted of discretionary brokerage accounts at a Commission-registered broker-dealer, the SEC was entitled to inspect such records under Section 17 of the Exchange Act.

statements for January through April 2005 (paper version),
I don't believe the retail customer order flow information
from Madoff's market-making business has anything to do
with his hedge fund model.  Essentially, he got long the
S&P 100 for the hedge funds January 20 through January
24, 2005 and sold the S&P 100 (flattened out) March 10
through March 15, 2005.  There was no activity in April
2005.  Granted, his purchase & subsequent sale timing was
excellent (buy low & sell high), but he held the basket for
approximately six weeks.  Therefore, I don't believe that he
is using any short-term signals that would come from his
retail order flow.  I suspect that he is extremely well
connected to European order flow information through his
brokers (and possibly the investors in his fund) and is
timing the market based upon that information rather than
his retail order flow information.

E-mail dated June 2, 2005 from Nee to Ostrow, at Exhibit 257.  Nee forwarded Lamore's
analysis to Sollazzo.  *Id.*

   12.  Examiners Did not Contact the Feeder Funds Madoff Disclosed

   On June 5, 2005, Ostrow e-mailed Lamore and Nee, indicating that BMIS had
given the examiners a disc of text files containing fifteen months of customer statements.
E-mail dated June 6, 2005 from Lamore to Nee, at Exhibit 253.  Lamore then e-mailed
Nee that although they received the statements, they "still have not received the hedge
fund contact list nor do the statements contain the address of the 15 entities."  *Id.*
Sollazzo testified that he was aware from either Nee or the examiners that they were
having trouble getting a hedge fund contact list from Madoff.  Sollazzo Testimony Tr. at
p. 115.

   When the examination team finally received the hedge fund contact list from
Madoff, Ostrow recalled that it contained names of funds and their foreign addresses.
Ostrow Testimony Tr. at pgs. 156-157.  The list that appears to the OIG to be the one
Madoff produced, also contained telephone numbers for the funds.  List of Madoff's
hedge fund contacts, at Exhibit 258.  The examination team did not contact any of the
funds on the list.[151]  *Id.*

---

[151] The FTI Engagement Team concluded that it would have been useful for the examination team to
contact the feeder funds in order to resolve a number of significant open issues including whether or not
Madoff had full discretion over the accounts; how Madoff implemented the trading strategy; what the
trading, clearing and settlement process was that was used and who was involved in that process; and the
number of accounts Madoff had at each fund in order to confirm whether Madoff was accurately reporting
those accounts to examination staff.

13.    The Examiners Learned that BMIS's Market Maker Would be
Losing Money Without the Hedge Fund Business

On June 07, 2005, Ostrow sent the following e-mail to Nee with a copy to Lamore, stating that they had reviewed Madoff's trading for hedge funds and that they discovered that without the hedge fund execution business, BMIS would be losing millions of dollars a year:

> We have been reviewing all of the basket trades conducted
> by the fifteen or so entities using Bernie's proprietary
> model.  For all of 2004, Madoff executed close to 2 billion
> shares of stock, which represents a commission equivalent
> of approximately $82 million (.04 cents a share).  It appears
> that without this commission equivalent business derived
> from the hedge funds, we estimate the firm would lose $10
> to $20 million per year.  We intend to obtain an expense
> breakdown for October 2004 December 2004 to get a better
> understanding of the commission equivalent business.

E-mail dated June 7, 2005 from Nee to Ostrow, at Exhibit 259.

The finding that the well-known BMIS market making business would be losing money without the secretive hedge fund execution business was a surprising discovery[152] for the entire team, one Sollazzo described as "a red flag."  Nee Testimony Tr. at p. 139; Sollazzo Testimony Tr. at p. 118; Lamore Testimony Tr. at pgs. 136-37.  Ostrow was surprised by the discovery because "here was the large market making firm, and he hasn't admitted to having any sort of accounts, but yet it makes up 80 or 90 percent, or … if anything, the investment adviser is smoothing out the earnings of the broker-dealer."  Ostrow Testimony Tr. at p. 158.  The FTI Engagement Team concluded the examination staff should have recognized this discovery as a red flag and seriously considered investigating whether or not Madoff should have been registered as an investment adviser.[153]  However, Nee ultimately made the determination that the examination team should not pursue the issue of whether Madoff should be registered as an investment adviser.

---

[152]  OCIE DC had also made the discovery regarding the profitability of Madoff's hedge fund-related business during its examination.  Memorandum dated February 3, 2004 from Walker and Wood to Donohue, at Exhibit 172.

[153]  According to the FTI Engagement Team, broker-dealers offering certain types of accounts and services may also be subject to regulation under the Investment Advisers Act.  Generally, a broker-dealer whose performance of advisory services is "solely incidental" to the conduct of its business as a broker-dealer and that receives no "special compensation" is excepted from the definition of investment adviser.  However, based on the disproportionately large amount of revenue and income derived from Madoff's investment advisory clients, the FTI Engagement Team concluded the examination staff should have recognized this as a red flag and seriously considered investigating whether or not Madoff should have been registered as an investment adviser.

14.    Issues Regarding the Status of BMIS's London Office and Whether Madoff Should Register as an Investment Adviser Were Not Resolved

In the same e-mail to Nee, Ostrow explained, as follows, that although Madoff's trading did not appear to be unusual, the examiners were researching two additional issues: (1) whether Madoff should be registered as an investment adviser due to his discretion over the hedge fund accounts; and (2) whether BMIS's London office should be deemed a branch or affiliate in order to determine whether or not its books and records were subject to examination by SEC staff:

> There does not appear to be anything unusual with the basket trading strategies employed. The trading appears to be in line with the trading directive. We are researching whether or not Bernie should be registered as an investment manager / advisor due to his entire discretion in trading these accounts.

> Another issue we have is with the London affiliated office of Madoff. Since the London Affiliate of Madoff serves as the settlement agent for the US office through Barclays, we will be researching whether the London office should be deemed a branch vs. an affiliate.

E-mail dated June 7, 2005 from Nee to Ostrow, at Exhibit 259.

Ostrow explained that he wanted a determination that BMIS's London office was a branch office for purposes of SEC examinations because his impression was that OCIE examiners had limited ability to investigate foreign affiliates. Ostrow Testimony Tr. at pgs. 85, 224. Ostrow explained, "I mean even making a long distance call or something is something that might be frowned upon or you need all these documents and stuff to say you're calling customers. You know, it's a lot of red tape to sometimes get stuff done." *Id.* at pgs. 85, 224; E-mail dated May 23, 2005 from Lamore to Nee, at Exhibit 260.

15.    Examiners Were Told To Keep Their "Eyes On The Prize"

The two issues the examiners raised about investment adviser registration and the status of Madoff's London office were not pursued or resolved. In response to the examiners' e-mail raising these issues, Nee told them to keep their focus on the front-running issue and to push aside the investment adviser registration issue and the foreign office status issue. E-mail dated June 7, 2005 from Nee to Ostrow, at Exhibit 259. On June 7, 2005, Nee sent the examiners the following e-mail:

> Be sure to keep your eyes on the prize. The branch vs. affiliate issue is a secondary (terciary ?) issue at best. I also don't think we'd get far with the IA issue as broker-dealers

> can, as you know, act in an advisory capacity (eg. Discretionary accounts, advice. Etc.)  Have you given him the written requests re: the model logic and IT feeds yet?

*Id.*  Ostrow was disappointed by Nee's response.  Ostrow Testimony Tr. at p. 159.  Ostrow stated, "I don't know what the prize what.  But yes, [Nee wanted us] to basically just stay focused on verifying that the – the front-running issue, that it wasn't happening."  *Id.* at p. 159.

Nee explained that when he told examiners to "keep your eyes on the prize," he was telling them "[t]o focus on the issue of front-running."  Nee Testimony Tr. at p. 140.  Nee thought Ostrow was trying to expand the examination, and Nee viewed the other issues Ostrow raised as secondary and "not nearly as important as the front-running."  *Id.* at pgs. 139-140, 143.  In the following testimony, Nee explained that he did not want examiners to spend time pursing the investment adviser registration issue because the examiners had already spent almost three months on the examination:

> Well, we don't have unlimited time to – and if there was a legitimate reason to think we would have if we found out, for instance,  you know, he was stealing customer money and we had evidence of that, obviously we would have moved in  that direction.  But the registration of his investment adviser, you know, that was more an issue for the IA side.  …  No, in my mind it wasn't an issue because I assumed – I was of the opinion that there's a good chance … he would probably be subject to the broker-dealer exemption.  And, you know, as I said before, our examinations cannot go on forever.  We, you know, this – by now it's already into – well into the exam timeframe.  So I – my message to William was, you know, we're here to look specifically at this issue.  To – in my mind this, him registering as an investment adviser, was not nearly as important as the front-running.  … Well, because it was focused on front-running, you know, we really didn't have the luxury to look at any conceivable area which might have a securities violation. … by now we're into July and, you know, we don't have an unlimited amount of time. …And, you know, for an examination that's been going on three months I don't know that that was, you know, something that we wanted to spend time on.

*Id.* at pgs. 140-43, 158-59.

The determination as to the status of Madoff's London office remained unresolved, as did the issue of whether or not Madoff needed to register as an investment

adviser.[154]  Ostrow Testimony Tr. at pgs. 98-99, 223-24; Nee Testimony Tr. at pgs. 141-143.  Moreover, the examination team did not refer the investment adviser registration issue to "the IA side."  Nee Testimony Tr. at p. 141.  Nee testified he did not refer the issue because "in my mind it wasn't an issue because I assumed – I was of the opinion that there's a good chance that [Madoff] … would probably be subject to the broker-dealer exemption" and not be required to register.[155]  *Id.* at p. 143.

> 16.    There was Pressure on the Examination Program to Complete a
> Large Number of Examinations Each Year

Sollazzo defended Nee's decision to focus on front-running and not to pursue the other red flags raised because of the pressure on Nee to complete examinations,[156] stating the following:

> In all fairness to … John, … someone like … me, is also
> looking at the exams, how long they're taking, all that.  So,
> you know, I think in the back of John's mind is, you know,
> how long we [have] been out here, you know, this is an
> important exam and all these issues, but we have an[] exam
> program we're running and, you know, that may be
> something in the back of someone's mind who's
> supervising this exam.

Sollazzo Testimony Tr. at p. 118-119.  Similarly, former OCIE Director Richards explained that the Assistant and Associate Directors of the examination program "are responsible for managing all examinations underway at any one time within the program and responsible for making sure that they're conducted appropriately and in a timely way."  Richards Testimony Tr. at p. 22.

---

[154] Nee was aware that Madoff ultimately registered as an investment adviser in 2006 as a result of an Enforcement Investigation. Nee Testimony Tr. at p. 143

[155] Nee also testified that he may have not referred the registration issue to the Investment Management Group because he may have believed that the OCIE Investment Management Group was already aware of the issue, since Mavis Kelly's name appeared on some of the documents OCIE sent to NERO.  Nee Testimony Tr. at p. 141.  However, Nee was uncertain if he knew of Kelly's involvement at the time of the NERO examination.  *Id.* at pgs. 141-142.  It does not appear likely from Nee's other testimony that he was aware of Kelly's involvement at the time of the NERO examination because Nee also testified that he had "no recollection" of reviewing the documents from OCIE, which included the complaint from the Hedge Fund Manager to Kelly.  *Id.* at p. 108.  Nee also testified that he had no recollection of OCIE telling NERO what precipitated OCIE's examination of Madoff.  *Id.* at p. 108.

[156] According to a current SEC employee who asked not to be identified, when he worked as an examiner for Bob Sollazzo, he found that Sollazzo was reluctant to even look for fraud in an examination.  Unidentified SEC Examiner Testimony Tr. at pgs. 19, 28.  This current SEC examiner recounted that one time in the course of an examination, he went to Sollazzo to inquire about following up on possible fraud and Sollazzo replied, "That's not us, that's not our job."  *Id.* at p. 10.

17.    Examiners Thought Madoff Had Lied to Them; Nee Played Down Madoff's Misrepresentations

A few hours after Nee told the examiners to keep their focus on front-running, Ostrow e-mailed Nee about believing he caught Madoff in yet another lie. E-mail dated June 7, 2005 from Ostrow to Nee, at Exhibit 261. Nee's response to Ostrow appears to have played down Ostrow's concerns. *Id.* In the following exchange, Ostrow responded to Nee by highlighting other instances in which Madoff made misrepresentations:

> [Ostrow]  On one of the days that we requested trades, Bernie was closing a basket. I asked why we did not have these trades on the CD with all trades entered between 2/28/05 and 3/11/05. Bernie stated that because the basket was originally entered into in January, there were not orders entered in March, only executions of orders placed previously. How can this be if a specific price is not known and you are relying on the fluctuation of 50 stocks in a basket? Lamore views it as a standing limit order (good till cancel). What is your take?

> [Nee]  What was the actual language we used in the request? It could be a matter of semantics.

> [Ostrow]  A large portion of this exam has come down to semantics. On April 27th, we asked for all orders received by the firm February 28, 2005 through March 11, 2005. On trade date March 11, 2005, Bernie begins selling shares from his basket. He basically said it was due to the order coming in two months earlier. We noticed that the trading directive states, "If the correlation variance still exceeds stated tolerance, the model's predetermined orders to reverse positions will be exposed." We requested an explanation for this on the request we submitted regarding all documents related to MA2.06 and MISS…..Bernie also signed off on May 30, 2005 that there is NO correspondence including facsimiles, e-mails, instant messages, etc. between the firm and any client associated with Model MA2.06 for the time period between January 2004 and April 2005. Semantics maybe?

E-mail dated June 7, 2005 from Ostrow to Nee, at Exhibit 261. Ostrow explained that he "had never seen something like that, where a trade can be entered, not executed until two months later because of a black box whether a trade is just sitting, and it just – it didn't seem right,[157] and we relayed those concerns." Ostrow Testimony Tr. at p. 84.

---

[157]  The FTI Engagement Team concluded that the confusion that resulted from these apparent incoherent explanations provided by Madoff when reviewing the order and trade data raised questions as to how

Ostrow found Nee's minimization of his concerns "frustrating," stating in the following exchange:

> A:     It's frustrating when you're out there for three
>        months, lied to every day, and you try relaying that,
>        and you try to get it across that, you know, how can
>        this be?  Or, I mean, some of these are gray areas,
>        some of them night not be.  But, you know, I guess
>        that's the frustration, in terms of – you know,
>        maybe he doesn't see it as that.
>
> Q:     So did you feel that John was kind of [pawning] this
>        off as semantics on some way?
>
> A:     Right, by asking, "How did you word the request?"
>        You know, we worded it, or we asked him
>        specifically, "Do you manage money?"  Like, we
>        asked it eight different ways and six different
>        languages, and you know, got the same "No," but
>        yet the *Barron's* article, the *MarHedge* article, you
>        know, we didn't know how to ask it.  And this is
>        already two or three months in, and we still can't --
>        ….

E-mail dated June 7, 2005 from Ostrow to Nee, at Exhibit 261.

Nee had a "general recollection" that Ostrow "expressed a lot of frustration about Madoff's responses."  Nee Testimony Tr. at p. 145.  In response to Ostrow's e-mail about Madoff's use of "semantics" throughout the examination, on June 7, 2005, Nee told the examiners to consider requesting e-mail from other BMIS employees who might have correspondence regarding Madoff's hedge fund customers.  E-mail dated June 7, 2005 from Ostrow to Nee, at Exhibit 261.  Ostrow responded the next morning that they would consider requesting the e-mail after they received from Madoff other documents they had requested, including a list of individuals and entities that interacted with Madoff's proprietary trading model.  *Id.*

        18.     Nee Did Not Allow the Examiners to Visit Feeder Funds

On June 15, 2005, Ostrow informed Nee that Madoff had produced the documents requested, and the following day they would ask for a limited amount of e-mail from a

---

Madoff actually implemented the strategy, which was a red flag.  First, unlike retail orders, large institutional orders are unlikely to be designated as "limit" with a firm price.  Instead, they are generally marked as "worked" or "not-held," which means that the price attached is only a suggestive price and the broker has the discretion to execute the orders.  Therefore, it is implausible that large institutional orders would just "stand in line" for two months without ever being executed, canceled or modified.  Second, even if those orders were strict limit orders, it is almost impossible that among a basket of 50 stocks, none of the 50 stocks' limit prices were ever traded through during a two-month time frame.

few employees.  E-mail dated June 15, 2005 from Ostrow to Nee, at Exhibit 262.  Ostrow
then told Nee that although the on-site portion of their examination was complete, they
still wanted to visit Madoff feeder funds to resolve open questions they had about
Madoff's hedge fund trading.  *Id.*  As evidenced by the following e-mail from Ostrow,
the examiners wanted to visit feeder funds, in part, because their research indicated that
some of the Madoff feeder funds claimed to use a strategy that required options trading,
yet Madoff had told examiners he no longer used options as part of his trading strategy:

> We would still like to visit some of the hedge funds (ex.
> Tremont in Rye, NY and Fairfield in CT or NY).  We want
> to gain an understanding from the hedge funds from their
> prospective of the strategy used by Madoff.  In addition to
> requesting marketing material from the hedge funds, we
> would also like to compare performance data of the funds.
>
> Recent Internet documents indicate a split strike conversion
> strategy being employed by some of the funds, specifically
> Tremont Broad Market Fund.  Option collars are no longer
> part of the strategy here at Madoff.  The hedge fund itself
> would have to put on the collar.  We hope to have a draft
> request list for the hedge funds by mid next week.  We will
> most likely be in the office full time starting Monday unless
> something else arises.

E-mail dated June 15, 2005 from Ostrow to Nee, at Exhibit 262.  Nee responded to
examiners that they should meet on June 16 to discuss the plan going forward.  *Id.*

> 19.    Examiners Were Not Allowed to Visit Feeder Funds, In Part Due
>        to Fear of Lawsuits

At the meeting on June 16, 2005, the examiners learned they would not be visiting
the hedge funds.  Ostrow Testimony Tr. at p. 39.  Nee expressed that it was time for the
examination to end and time for the examiners to write the examination report and move
on to their next examination.  *Id.* at p. 172.  The examiners explained that the primary
reasons Nee did not want them to contact the hedge funds was Nee's fear that they would
be sued[158] and his feeling that enough time had been spent on the Madoff examination.

---

[158]  Former examiner #1 recalled that fear of "being sued" also kept NERO from collecting documents from
Madoff customers.  Former Examiner #1 Testimony Tr. at pgs. 5-6, 9.  Prior to coming to the SEC, former
Examiner #1 worked for a private wealth management company that had an investment with Madoff.  *Id.* at
pgs. 7-8.  However, because of a confidentiality agreement former Examiner #1 had signed, Nee and
Lamore decided not to request customer statements from his former employer.  *Id.* at p. 8-10.  Former
Examiner #1 implied, in the following testimony, that part of the fear of a lawsuit came from knowing his
former employer adhered to Madoff's demands for secrecy out of a fear that Madoff would terminate their
relationship:

> Because Madoff from my experience with him it was always a good
> source of cash flow.  If we needed a million dollars for operations we

Lamore Testimony Tr. at pgs. 142-143; Ostrow Testimony Tr. at p. 165. Lamore explained what he recalled from the June 16 meeting with Nee in the following exchange:

> A:    When we went back to the office, we spoke to Mr. Nee. We had a discussion about visiting the hedge funds and Mr. Nee said essentially no, we could not do that. He was concerned about potentially being liable if the hedge funds turned around and pulled their assets from Bernard Madoff.
>
> Q:    Do you remember if he specifically said the SEC could get sued if you did that?
>
> A:    I don't recall specifically the SEC. He may have even thought personally he could be sued.
>
> Q:    Okay. Personally, meaning him, John Nee?
>
> A:    Yes.
>
> Q:    So he indicated that he might be sued personally if you went through this?
>
> A:    I think he said us, individually rather than the agency.
>
> Q:    Okay. And so basically, he made the determination not to go and he was the boss, so you didn't go?
>
> A:    Right.

Lamore Testimony Tr. at pgs. 142-143. Ostrow had a similar recollection "that meeting the next morning sort of put a kibosh to" the examiners' plans to visit the feeder funds. Ostrow Testimony Tr. at p. 165. Ostrow explained as follows:

> So, once we got back [to the office], then we wanted to continue on, at least in the sense of going to Fairfield Greenwich and following up and seeing where it would go from there. …"[W]e wanted to go to Fairfield Greenwich,

---

would be able to pull out money, but he always had a rule. Don't pull out too much money, you know, he started saying to use, you know, I'm not going to let you back in if you keep taking out money. And also, if you tell anybody on the outside that you're invested with me, you're going to be out.

*Id.*

> to see if the glossy material they're sending to investors reflects the same 1.5 percent [monthly returns]. … We wanted to verify outside. … We sent an e-mail to John Nee, I guess, informing him we were about to come back form the field, that we thought it would be good to go there to look at their marketing material, to look at their returns they were seeing, to make sure it was correlating with the returns that Bernie was earning, and also to point out to them because Bernie told us that it would be up to the fund to funds to put on the options trades themselves, but we were just trying to figure out how they know [what option collar to put on] if all of his information was proprietary and he doesn't release any of that information when he buys and sells, how could these funds know?  So we made that point and during a meeting, we were sort of told that this is a $7 billion customer [Fairfield] and if you go and raise red flags there and they go ahead and pull all of their money from Bernie and we're wrong, then we'll be sued personally or the SEC itself.

*Id.* at pgs. 39-40, 104, 139.

Nee did not recall fear of a lawsuit being a reason that he did not want the examiners to contact the hedge funds, stating:

> I imagine I probably would have said that, you know, you can't just go to customers of a firm, you know, lightly without raising suspicions of the firm. … I don't think I would ever say the SEC could be sued.  I may have said something along the lines that we have to be sensitive to going to customers.  And this is an issue with many exams, you know, you make a call to a customer about his broker, you can never get that call back. … [W]hat I'm trying to say is that absent any specific evidence of wrongdoing we'd have to be very careful about going to a hedge fund client.

Nee Testimony Tr. at pgs. 149-151.  Sollazzo explained that one of complications that arise when customers are contacted is that firms complain to top SEC officials:

> If we have – if we believe there's some sort of a fraud here we have to contact who we have to contact. … You know, we don't – you know, one of the challenges you have with contacting customers is that they become very agitated and disturbed.  And what happens is they call the firm right away and everyone's up in arms and then we get calls, the

> regional director gets calls.  And it doesn't happen every
> time, but it happens a fair amount of time.  But, you know,
> when it should be done, it should be done.

Sollazzo Testimony Tr. at p. 124.

### 20.    Time for the Madoff Examination Had Expired

According to the examiners, the other reason the examination was closed before all of the questions about Madoff's advisory business were answered was because the examiners had spent several months on the Madoff examination, and it was time to move on.  Ostrow Testimony Tr. at p. 104.  Nee explained, "There's no hard and fast rule about field work but you, know, field work cannot go on indefinitely because people have a hunch or they're following things." Nee Testimony Tr. at p. 147.  Nee stated, "[O]ne of my primary responsibilities" is "to make sure that the exams are moved on, work is completed, reports are issued and they move on to the next exam." *Id.* at p. 148.  Ostrow viewed the examination program as sometimes coming down to the number of examinations completed, stating:

> [U]nfortunately it comes down to, sometimes, numbers,
> and quantity, not quality, and … I guess your supervisor
> gets pressure from his supervisor who gets pressure from
> their supervisor, which is Bob, and then, ultimately, maybe
> he is getting pressure from OCIE to churn out certain
> numbers.

Ostrow Testimony Tr. at p. 103.

Ostrow recalled other situations, unrelated to Madoff, in which examiners pushed issues in examinations that their supervisors did not want them to pursue. *Id.* at p. 175. He recalled that "usually those exams get either shipped off to FINRA, to follow up on, or those exams sit and go nowhere." *Id.*  Ostrow's view was that it would be better to fully investigate all issues the examiners identify rather than running to the next examination, explaining as follows:

> And a lot of times the supervisor will say, "Well, okay, find
> two examples of this."  So you find two examples, and you
> think you got something worthwhile.  But then you're told,
> "All right.  Find this now."  Like, they send you on these
> goose chases and by the time you've found every piece of
> the puzzle, it's like, "Okay, wrap it up, we're done, let's
> stop."

*Id.* at p. 177.

K.    The Examination was Concluded

1.    The Examination Team Never Understood How Madoff Was Achieving His Returns

When the examination was closed, the examination team had determined that Madoff was not front-running, but they still did not understand how he was achieving his remarkable returns.  Sollazzo Testimony Tr. at pgs. 107-108, 110.  Sollazzo explained as follows:

> … I felt that – we did an exam, we found what we could, which was some slight errors, slight problems, you know, with the best execution in the market-making desk, but we didn't find the solution to those returns.  We never found [out] why he was making those returns. … But we didn't find any evidence of wrong-doing either, other than the FINRA, the NASD violation. … We never figured out how he was able to get those consistently high returns.

*Id.* at p. 132.

Nee did not believe it was necessary to understand how Madoff was achieving his returns in order to close the examination, stating that at the end of the exam "I didn't know how he was achieving his gains, but I did, based on the examination work that was done, have a feeling of comfort that he was [not] using individual customer information." Nee Testimony Tr. at p. 135.  Nee testified that at the time the examination was closed, he had not foreclosed the possibility Madoff was engaged in another illegal activity to achieve the returns:

> Well, at the end of any cause exam I don't know whether the registrant is doing something else illegally.  I just – if it's a cause exam and I'm looking at a specific allegation and I get comfort in that then I think I've done my job. … At the end of our examination I could not definitively say that he wasn't doing anything otherwise illegal to achieve his outside returns.  …  We deal with black and white.

*Id.* at pgs. 136, 138.

Nee explained he did not feel it would be practical to continuously expand cause examinations to determine whether other illegal activity was taking place and he thought that identifying other issues at BMIS was the NASD's/FINRA's responsibility, stating as follows:

> The general feeling was that if this firm was doing something outside of the law it had to do with this sort of

> trading ahead and front-running.  And I can say that there is
> some, at least, comfort in knowing that there have been
> other exams of this firm by the NASD over the years, that
> they are the primary regulator.  So it wouldn't be practical
> for us every time we go in to do a cause exam to keep
> expanding out and concentric circles indefinitely, again,
> because we'd never finish an examination.

*Id.* at p. 70.

      2.      When Examiners Finished the Examination, They Still Had Open
Questions About Madoff

Although the examiners were satisfied that Madoff was not front-running, they
still had many suspicions about Madoff at the end of the examination, as Ostrow
explained in his testimony:

> We still knew and felt that it was highly suspicious and just
> odd and the whole story, there were inconsistencies … that
> were unsettling, but, you know, before you put on the next
> exam ….  I think throughout the exam we wanted to do
> more, but there was a lot of questionable things in terms of
> – and just semantics in terms of the London office.  Is it a
> branch, is it an affiliate?  You know, Bernard Madoff liked
> to play with words. … So you know, there was frustration
> throughout the whole exam.

Ostrow Testimony Tr. at pgs. 45-46.

Madoff's claim not to use options as part of his strategy was Ostrow's primary
open question at the end of the examination.  *Id.* at p. 75.  Ostrow stated, "the biggest
thing in my mind was … not using the options any more, when … 50 percent of the gist
of it was having options as part of the strategy. … It wasn't … according to John [Nee],
the focus of the exam, and to just focus on, you know, proving these other points."  *Id.*

Ostrow explained that while the examination team had "some other ideas" related
to insider trading for how Madoff was achieving his returns, there was no discussion of
continuing the examination because the time period scheduled for the examination had
elapsed:  "By then we had already been there two-and-a-half months, and that's the time
we're given, and that's it.  You know, do me and Pete pass each other in the hall the
month after, three months later, and still shaking our heads about Madoff?  Sure, of
course."[159]  *Id.* at p. 172.

---

[159]  Former examiner #1 also confirmed there was "a great focus when you did the examinations previously
on timelines, getting them done in a specific period of time."  Former Examiner #1 Testimony Tr. at pgs.
11-12.

Sollazzo explained that one reason he believes the examination ended without a resolution or understanding of how Madoff was earning his returns was because Madoff claimed to trade in Europe:[160]

> Well, part of it is how far do you take an exam. Now the finger's pointing to Europe and, you know, where are we going to get the information? You know, where – what are the sources of the information? How do we find this out? I don't really have an idea even as we sit now know this is fictitious, but if it wasn't I'm not too sure how we'd figure that piece out.

Sollazzo Testimony Tr. at p. 114.

3.    Examination Report Recited Information Provided By Madoff

From approximately June 20 to August 8, 2005, Lamore and Ostrow drafted a report of their Madoff examination. The report, which was finalized on September 2, 2005, identified three minor violations of NASD/FINRA Rule 2320 for BMIS's failure to obtain best execution on customer limit order in one stock.[161]  Examination Report dated September 2, 2005, at Exhibit 263. The report was twelve pages and divided into seven sections. *Id.* The first section of the report summarized the findings and disposition of the examination. *Id.* at p. 1. The second section contained background information about the firm. *Id.* at pgs. 2-3. The third section, entitled "Examination Purpose and Scope" briefly summarized two of the Renaissance e-mails and the two 2001 articles from *Barron's* and *MarHedge*. *Id.* at pgs. 3-4. The third section contained no analysis of the e-mails or the articles. *Id.* The fourth section consisted of one paragraph and stated simply, "The staff was concerned that BMIS might be using customer order flow information to improve the returns of its IA and/or proprietary business by front-running customer orders or otherwise using customer's order flow information." *Id.* at p. 3.

The fifth section, entitled "Examination Findings," was eight pages and divided into two parts and several subsections. Examination Report dated September 2, 2005, at pgs. 3-5, at Exhibit 263. The first part of the fifth section concerned "BMIS's IA/'Hedge Fund' Business." *Id.* The first subsection contained extended summaries (without analysis) of the two 2001 articles. *Id.* The second and third subsections described Madoff's "IA Business Structure," and trading strategy. *Id.* at pgs.5-8. The information

---

[160] The FTI Engagement Team opined that in situations where the counterparty is not located in the United States, the examination staff should contact other SEC Offices, such as the SEC's Office of International Affairs, for additional assistance rather than not pursuing verification of trade activity.

[161]  Madoff viewed the three minor violations the examiners' cited as "nitpicky" and "incorrect." Madoff Interview Memorandum at p. 2. Madoff stated that two months after the examiners left, he received a letter citing him for "two ridiculous violations," that were incorrect. *Id.* Madoff went on to state that when BMIS submitted their response to the SEC letter and copied it to FINRA, FINRA responded, "What the heck? Are you nuts with this nitpicking?" *Id.* Madoff stated, "After two months, they found 2-3 nitpicky things, and they were wrong about those things." *Id.* Madoff asserted that "Everything the SEC did prior to 2006 [Enforcement Investigation] was a waste of time." *Id.*

in the two sections appeared to come entirely from Madoff because it was replete with sentences beginning with, "According to BMadoff." *Id.* at pgs. 6-7.

The fourth subsection of part one of section five consisted of one paragraph in which examiners described the customer statements they reviewed and their determination that Madoff was not front-running. *Id.* at p. 8. Part two of the fifth section concerned "Firm Trading and Marketing." *Id.* at pgs. 9-10. The first subsection of part two of section five contained background about BMIS's market making business and descriptions of its advanced technology. *Id.* According to the report, the majority of the information in the subsection was supplied by Madoff and BMIS. *Id.* The second subsection of part two of section five described the testing examiners performed to locate the Rule 2320 violations. *Id.* at pgs. 10-11. The sixth section consisted of two paragraphs describing the e-mail the examiners reviewed, and the seventh section stated that a violation letter would be sent to BMIS. *Id.* at pgs. 11-12.

Over half of the report is a recitation of information Madoff provided the examiners verbally and a summary of the 2001 *Barron's* and *MarHedge* articles. *Id.* Lamore explained that the report was primarily based on information and data from Madoff because "[h]e was our primary contact." Lamore Testimony Tr. at p. 158. Nee was untroubled that the information in the report was supplied by Madoff, stating, "but that's a usual thing, you know, for – to get trade data from – when you come down to it, all our examinations are books and records examinations. We rely on the firm to supply us with the required information and they do so under penalty of law if they don't." Nee Testimony Tr. at pgs. 162-63, 167.

    4.  Examination Report Did Not Describe Madoff's Misrepresentations to Examiners or The Issues That Remained Unresolved

In concluding the examination and writing the report, the examination team did not go back and examine the issues raised in the Renaissance e-mails to determine whether all of the issues identified in those e-mails had been resolved. Nee Testimony Tr. at p. 155. Neither did the report raise the numerous issues the examiners identified during the examination, including Madoff's efforts to conceal the existence of his investment advisory business from examiners, the difficulties the examiners had in getting Madoff to produce documents and information, the inconsistencies examiners found in the information and documents produced, the issue of whether Madoff should be registered as an investment adviser, the issue of whether BMIS's London office is an affiliate or a branch, and the inconsistencies between Madoff's representations that he has stopped trading options and the representations made by the feeder funds. Examination Report dated September 2, 2005, at Exhibit 263.

Concerning specific open questions, Lamore testified that he did not know why the issue of Madoff's highly consistent returns was not raised in the report. Lamore Testimony Tr. at p. 159. He explained that issues such as potential conflicts of interest at BMIS, lack of an independent custodian, and Shana Madoff's discretion to delete e-mail

may not have been included in the report because his supervisors did not feel these issues were a problem or because he have lacked the experience to determine whether or not these issues should be included in the report. *Id*. at pgs. 150-153. Ostrow explained the lack of an independent custodian was not in the report because Bernie told the examiners that he did not have control over the money, and the examination team did not verify Madoff's representation. Ostrow Testimony Tr. at pgs. 169-170.

Sollazzo felt that the report was well-written and did not find it unusual that the report did not contain the examiners' open questions, stating, "I don't know if we necessarily put every, you know, open item in the report, if it would go in there as a featured item." Sollazzo Testimony Tr. at pgs. 126, 130-131.

L.    Lamore is Promoted, In Part, Based on The Madoff Examination

On September 13, 2006, the New York Branch Chief (Lamore's Branch Chief) recommended in a letter to Jeffrey Risinger, Associate Executive Director of the Commission's Office of Human Resources, that Lamore be promoted based, in part, on his 2005 examination of Madoff. *See* Memorandum dated September 13, 2006 from New York Branch Chief to Risinger, at Exhibit 264. The letter stated:

> Mr. Lamore conducted an examination of Bernard L. Madoff Investments [sic] Securities LLC (Madoff), wherein he examined financial records for accuracy and compliance to generally accepted accounting standards. The existence of all material assets and liabilities, and the proper treatment of such items in the broker-dealer's net capital were verified. In addition to comparing income and expense items for significant fluctuations form comparative periods, Mr. Lamore conducted a detailed review of Madoff's Annual Audit. This Annual Audit review revealed a large source of the firm's revenues was being generated from a business division of the firm that was not disclosed to the staff at the outset of the examination. Mr. Lamore's finding led the staff to focus the examination on this business division.

*Id.* Also on September 13, 2006, the OCIE Assistant Regional Director recommended in a letter to Risinger that Lamore be promoted in part because of his work on the Madoff examination. The OCIE Assistant Regional Director's letter stated as follows:

> During his examination of Bernard L. Madoff Investment Securities (Madoff), Mr. Lamore reviewed all aspects of Madoff's unregistered institutional trading business. Two months after completing the examination, NERO's Division of Enforcement received a tip suggesting wrongdoing in Madoff's institutional trading business.

Two months after completing the examination, NERO's Division of Enforcement received a tip suggesting wrongdoing in Madoff's institutional trading business. As a result of this collaboration, significant differences were uncovered between what was communicated by Madoff during the examination versus the Enforcement staff's findings.

Memorandum dated September 13, 2006 from OCIE Assistant Regional Director to Risinger, at Exhibit 265. Lamore received the promotion to Staff Accountant effective November 12, 2006. Standard Form 52, "Request for Personnel Action," U.S. Office of Personnel Management (11/12/06), at Exhibit 266.

M.     Summary of FTI Engagement Team Expert Analysis

The FTI Engagement Team analyzed the information that the OIG uncovered about the NERO examination of Bernard Madoff's firm and concluded that multiple red flags were missed or were not pursued by the examination team. In addition, the FTI Engagement Team concluded that based upon issues raised in the Hedge Fund Manager's complaint, had the examination been staffed and conducted appropriately, and basic steps taken to obtain third-party verifications, Madoff's Ponzi scheme could have been uncovered.

1.     The Focus of the Exam Was Chosen In Error

The initial error the examination team made was in its analysis of the Renaissance e-mails that triggered the examination. The Renaissance e-mails described the red flags that Renaissance employees identified while performing due diligence (using widely available information) on their Madoff investment. The red flags Renaissance employees identified included (1) Madoff's incredible and highly unusual fills for equity trades; (2) Madoff's misrepresentation of his options trading; (3) Madoff's secrecy; (4) Madoff's auditor; (5) Madoff's unusually consistent non-volatile returns over several years; and (6) Madoff's fee structure.

Crucially, one of the Renaissance e-mails provided a step by step analysis of why Madoff must be misrepresenting his options trading. The e-mail explained that Madoff could not be trading on an options exchange because of insufficient volume and could not be trading options over-the-counter because it was inconceivable he could find a counterparty for the trading. For example, the e-mail explained that because customer statements showed that the options trades were always profitable for Madoff, there was no incentive for a counterparty to continuously take the other side of those trades since they would always lose money on the trades. These findings by Renaissance raised doubts that Madoff could be implementing his trading strategy.

Despite the numerous red flags raised in the Renaissance e-mails and the in-depth analysis of why Madoff must be misrepresenting his options trading, the examination was

limited to front-running and cherry picking. The focus of the examination was inadequate and did not reflect all of the issues in the Renaissance e-mails. In determining the focus of the examination, the examination team's analysis of the Renaissance e-mails was insufficient. All relevant information contained in tips and complaints from a credible source should have been sufficiently vetted.

The decision to focus exclusively on cherry picking and front-running was also erroneous because both of those activities were unlikely explanations for Madoff's purported returns. Madoff was alleged to be managing at least $10 billion in client assets at the time of the examination. BMIS's market making clients did not generate enough "winning" trades to allow Madoff to consistently cherry pick winning trades for all of his advisory clients. Moreover, front-running was an unlikely explanation for Madoff's purported returns because of the extraordinary volume of trading that Madoff needed in order to execute his split-strike forward conversion strategy.

Even if front-running and cherry picking had been an appropriate focus of the examination, it was a mistake for the team not to also focus on Madoff's unusually consistent returns because until the team had figured out how he was earning his returns, they could not rule out that Madoff was either achieving his returns illegally or misrepresenting his returns to investors. In addition, Renaissance's suspicions about Madoff's options trading should have been a focus of the examination because Broder's e-mail presented the staff with a thorough analysis of why Madoff must be misrepresenting his options trading. A basic step to investigating this allegation would have been to directly contact the counterparties in order to verify that the options trades took place. Moreover, the examiners should have been incredulous of Madoff's claim to have stopped trading options since the strategy he claimed to be using required options trading. In addition, if the examiners had closely reviewed OCIE's workpapers, they would have seen that the customer statements Madoff produced to OCIE included options trading during a month in which the customer statements Madoff had provided to NERO showed no options trading.

It was also a mistake for the examination team not to focus on the auditor. Renaissance suggested that Madoff utilized a non-independent auditor, which should have raised concerns for the auditors about whether or not the auditor was unbiased, fair, and impartial. Without an independent auditor, there can be no assurance that the BMIS's audits were properly conducted. Such potential conflicts should heighten awareness of, and the need for, verification that Madoff had internal controls in place that were designed to effectively prevent certain inappropriate activities, such as misrepresentation of performance results and misappropriation of client assets. Typically, in conducting basic due diligence of the auditor, an examiner will review the auditor's engagement letter, reports and work papers. This basic due diligence was not performed despite Renaissance's allegation.

2.      The Team Was Inadequately Staffed and Examination Should Not
        Have Been Delayed A Year

It was an error for the supervisors of the examination team not to staff the
examination with examiners experienced in investment adviser examinations.  Investment
Management expertise was necessary to the examination given the allegations in the
Renaissance e-mails because many of the allegations involved analyzing returns and
investment strategies, areas where the supervisor of the examination admitted broker-
dealer examiners are not skilled.  In addition, a Branch Chief should have been assigned
to the examination to provide supervision and support for the relatively inexperienced
examiners.  If a Branch Chief was not available, the Assistant Director should have come
on-site regularly to provide support to the examiners, especially after the examiners
communicated that they were not receiving cooperation from Madoff.

The Renaissance e-mails contained significant and specific concerns.  The e-mails
were written in 2003, referred to the broker-dealer examination program in 2004, but not
addressed until 2005.  Such a significant delay to begin a cause examination increases the
potential risk of harm to investors.

3.      The Conduct of the Examination Was Flawed

The examiners' document request to Madoff was flawed because much of the
request was geared toward a standard broker-dealer examination and did not specifically
address the allegations in the Renaissance e-mails.  Madoff's initial unwillingness to
admit to managing money for hedge funds when the fact was widely-known suggested
that he did not want to register as an investment adviser and be subjected to additional
examinations.  Madoff's evasiveness should have raised suspicions that Madoff was
involved in illegal activity.

Additional misgivings should have been raised by the numerous discrepancies in
the information and documents Madoff provided to examiners.  Almost the entire
examination was based on documents provided by and assertions made by Madoff.  The
discrepancies and contradictions should have alerted the examination team of the need to
independently verify Madoff's representations.

The response from Barclays also should have raised significant suspicions
because it did not verify any of Madoff's transactional activity associated with the
investment advisory business.  The examination team should have contacted Barclay's
U.K. affiliate in order to verify whether Madoff had a trading relationship with Barclay's
and to seek records of trading activity associated with the advisory clients.  If the
examination team did not understand how to request documents from a non-U.S. entity,
then they should have requested assistance with the SEC's Office of International Affairs.

The NERO examination staff had difficulty understanding how Madoff executed
and cleared his trades and, at times, believed that Madoff was deliberately misleading
them.  As a result, the FTI Engagement Team believes that the examination staff should

have recognized the need to independently verify Madoff's verbal representations as to how he executed and cleared his trades.  The FTI Engagement Team further believes that Madoff's informing the NERO examiners that BMIS functioned as an executing broker on a DVP/RVP basis by his U.K. affiliate should not have hindered their ability to uncover the Ponzi scheme, or at the very least, the fictitious trades.[162]

---

[162]  There are several reasons why the examination staff should have verified Madoff's execution, clearing and settlement.  First, even had there been a DVP/RVP arrangement with several European custodians, the examination staff could have contacted an independent source to verify the trading activity.  Madoff's U.K. affiliate was an FSA-registered entity and a member of the London Stock Exchange (LSE), which would have cleared its trades through the LCH Clearnet Group (LCH).  As a result, any trades conducted by Madoff's U.K. affiliate would have been reported to those institutions.  The SEC examiners could have, but did not, contact the FSA, the LSE or the LCH in order to verify any of the purported trading activity of Madoff associated with his advisory clients.

The questions raised by the examiners should have also caused them to contact purported custodians to directly verify the Madoff accounts held at the custodians, the account balances and any other arrangements that the custodians had with Madoff.  The customer statements that Madoff produced to the examiners, in many instances, purported to show where the customer assets were custodied.  For example, a customer statement for American Masters Broad Market Fund LP indicated that the custodian was Bank of America.  Lamore acknowledged in testimony that Madoff never produced "any documentation of these custody of asset issues, supposedly from the bank that was custodying the assets" and no efforts were made to seek such documentation.  Lamore Testimony Tr. at p. 114.  In truth, the custody of assets issue was only a peripheral issue for the examiners who testified that they never nailed down how Madoff executed and cleared trades.

The DVP/RVP agreements adopted by Madoff also purportedly used Barclays in London as a clearing broker to clear the trades for Madoff's U.K. affiliate.  The examiners could have contacted Barclays in London in order to verify Madoff's trading activity associated with the advisory clients.  Similarly, the examiners could have also contacted the European counterparties in order to verify Madoff's trading activity associated with his advisory clients.  If the examiners needed assistance contacting any of these European entities, they could have contacted the SEC's Office of International Affairs, which often provides guidance to OCIE and other offices with regard to contacting and obtaining information from foreign entities.

Second, Madoff's purported use of his U.K. affiliate to execute his strategy should have triggered additional suspicions and red flags about Madoff's trading.  The Trading Authorization Directives state that Bernard L. Madoff, as an agent, will implement the strategy on behalf of Bernard L. Madoff Investment Securities LLC, which was a member of NASD/FINRA.  This appears inconsistent with what Madoff told the examiners, which was that the strategy was executed solely by his U.K. affiliate.  This should have raised doubt as to how the strategy could have been transacted solely by Madoff's U.K. affiliate.

Third, the account statements and trade confirmations should have raised a suspicion by the examiners as to whether Madoff was merely a self-professed executing broker.  The information contained in the account statements and trade confirmations reviewed by the examiners included detail regarding securities positions, which is not normally captured by executing brokers.  In contrast, when an executing broker also manages or maintains custody of the assets in its discretionary brokerage accounts, that broker would typically provide trade activity as well as securities positions and cash balances to its customers.  The examination team did not fully resolve either of these issues.

Fourth, it is acknowledged that later in his testimony in connection with the Enforcement investigation, Madoff contradicted his assertion about a DVP/RVP arrangement by saying the trades for all his advisory accounts were cleared through his account at DTC.  Madoff May 19, 2006 Testimony Tr. at p. 87, at Exhibit 267.  Although Lamore was present when Madoff made this representation and identified

The fact that the examination team did not go to an independent source for trading data and other information was a major mistake because the Renaissance information included an in-depth analysis that credibly questioned whether or not Madoff could have been executing the transactions needed to implement his split-strike forward conversion strategy. The key to uncovering the Ponzi scheme depended on directly contacting third parties in order to verify critical information. A sample comparison of Madoff's purported trading activity in his account statements and customer confirmations against FINRA/NASD or DTC/NSCC data would have shown that Madoff did not execute the trades as he claimed. Similarly, if the examination staff had directly confirmed trading activity with those counterparties, they likely would have learned Madoff was not trading options. Third-party verification would have ultimately provided the information necessary to reveal the Ponzi scheme.

4.    There Was Little Communication Between Offices

Although OCIE sent its examination work papers to NERO, the fact that there was little communication between the two groups and little review by NERO of OCIE's work papers was problematic because a comparison of work papers and preliminary findings could have eliminated duplicative efforts and potentially identified inconsistencies in information provided separately to the examination teams. For instance, both examination teams spent considerable time concluding that Madoff managed billions of dollars for 17-21 funds, which suggested that Madoff should have been registered as an investment adviser. In addition, had NERO carefully reviewed OCIE's work papers, the NERO team would have found that Madoff had provided customer trade confirmations showing options transactions to OCIE during a month he represented in documents to NERO that he no longer traded options. Moreover, if the OCIE work papers had been reviewed, NERO may have noticed the number of funds in OCIE work papers was different from the number of funds Madoff disclosed to NERO. These discrepancies should have raised suspicions and required further inquiry.

Finally, the fact that OCIE did not bring the Hedge Fund Manager's complaint to NERO's attention and that NERO did not review or consider the complaint was a concern because the complaint was from a credible source and would have provided additional support for Renaissance's analysis. The FTI Engagement Team concluded the complaint would have been particularly useful to the examination team because it included a number of serious allegations that needed further scrutiny.

---

contradictions in Madoff's testimony, no effort was made to question Madoff about this contradiction and no inquiry was made with DTC at that time as well.

Fifth and finally, it should be noted that in the NERO examination, there is no evidence from the documents and testimony of examiners that NERO intended to go to DTC but determined not to take this step because of any representation by Madoff about a DVP/RVP arrangement. The examiners and their supervisors testified that it would have been an unusual step for OCIE to verify a registrant's representations with a third-party even in a cause examination.

5.      Red Flags That Arose in the Examination Were Not Pursued

The fact that several red flags that arose during the examination were simply not pursued was improper because these were significant issues related to the potential detection of Madoff's Ponzi scheme.  For example, Madoff's actions and statements suggested to examiners that Madoff was trying to avoid investment adviser registration.  If examiners had been allowed to pursue the issue, the examiners may have learned that Madoff had thousands of clients who he had not disclosed to the SEC.  In addition, examiners wanted to pursue the issue related to the status of BLM's London office.  Madoff's misrepresentation that the split-strike forward conversion strategy was traded or cleared through his London office may have been discovered by examiners if they had been allowed by their supervisors to pursue this open issue.

The instruction from Nee to the examiners to keep their "eyes on the prize" (e.g., front-running) in response from the examiners' request to pursue legitimate unanswered questions was in error.  The lack of flexibility in expanding the focus of the examination may have prevented the staff from discovering the Ponzi scheme.  For example, had the examiners been allowed to visit the feeder funds, they may have discovered that Madoff had custody of investor assets, contrary to his representations to examiners.

6.      The Examination Concluded with Unresolved Issues

The examination should never have been concluded without the staff understanding how Madoff was achieving his returns.  The staff never answered the basic red flag raised in the Renaissance e-mails and the two 2001 articles, which was that trading experts did not believe that Madoff could be earning his returns legitimately.  Although the staff had concluded that Madoff was not front-running, they had not determined that he was earning his returns legitimately.  The examination should not have been concluded with significant unanswered questions left open because of the gravity of such allegations and the potential harm to investors.  Moreover, the examination should not have concluded without examiners understanding and verifying Madoff's execution, clearing and settlement process, something they never were able to accomplish.

The final report was flawed because it relied heavily on information verbally provided by Madoff.  The examiners were conducting a cause examination based on allegations that BMIS was engaged in fraud, yet conducted their examination by relying exclusively on documents and information Madoff provided.  There was inadequate diligence with regard to testing and verifying statements and representations made by Madoff during the examination.

In addition, the final report should have included the open questions and other issues that arose with Madoff during the examination because such information would have accurately conveyed the scope of issues investigated, whether all of the issues were

resolved, how such issues were resolved and identification of any issues that were not resolved.

7.      FTI Engagement Team Conclusion

A compelling and credible complaint was provided with several significant red flags.  However, the examination was not staffed appropriately, delayed in outset, focused in error, conducted without obtaining critical independent data, examiners were not allowed to follow up on their suspicions, and it concluded with unresolved issues remaining and with a closing report that relied too heavily on the representations of Madoff.  Because of these mistakes, an opportunity to uncover Madoff's Ponzi scheme was missed.

V.      SEC 2006 INVESTIGATION OF MARKOPOLOS COMPLAINT

A.      Markopolos Made a Third Submission to the Boston Office in October 2005

As discussed above, in May 2000, Markopolos made an eight-page submission to the SEC's Boston District Office questioning the legitimacy of Madoff's reported returns. He subsequently met with Grant Ward from BDO, but Ward took no action with respect to the 2000 submission.  In March 2001, Markopolos made a second, similar submission to the BDO that was forwarded to the SEC's New York office.  In April 2001, after a one-day review of the 2001 submission, NERO decided to not investigate Madoff.  That decision was not revisited when *MARHedge* and *Barron's* published articles in May 2001 raising some of the same questions regarding Madoff's claimed returns as the 2001 submission.

1.      Markopolos and His Team Continued to Gather Information About Madoff

Markopolos and his team were incredulous when the SEC did not pursue the 2001 submission after the *MARHedge* and *Barron's* articles were published.  Markopolos testified, "[O]nce those articles hit in May, my team was convinced that Bernie Madoff would be shut down within days, that an SEC investigation team would be in there and shut him down."  Markopolos Testimony Tr. at p. 30.  *See also* Chelo Testimony Tr. at pgs. 47-48 (I would have sworn that after that article and especially after Harry's SEC submissions to that point, that something was going to happen.); Casey Testimony Tr. at p. 56 (We surely felt after the *Barron's* article [the SEC was] coming in.).

Although the SEC had shown little interest in Markopolos' information regarding Madoff, he and his team continued to gather information about Madoff's operations.  In June 2002, Markopolos travelled to England, France, and Switzerland on a business trip. Markopolos Testimony Tr. at pgs. 42, 46.  During that trip, Markopolos met several investors that "bragged about their Madoff exposure, that Mr. Madoff was their best

235

manager." *Id.* at p. 47.  Markopolos testified that what he heard about Madoff on this trip "increased the probability that Madoff was running a Ponzi [scheme]," stating:

> I was hearing information from these 14 managers that … Madoff was closed to new investors, he was not taking new money in, but that each of those 14 had a very special relationship and that Madoff would take their money and their money only… .  And when you hear the same thing once, you take it at face value.  When you hear it twice, you become suspicious.  After you have heard it 14 times, you become deeply suspicious… . And that fit with the Ponzi theory and it increased the probability that it was a Ponzi many fold… . If you are a Ponzi, you have a ferocious appetite for new cash because you have to pay off old investors.
>
> … .
>
> So you need ever increasing amounts of new money and new victims to come into your fund.  And that was fitting with the Ponzi scenario.  And you also have to have a series of lies.  And it was clearly a lie that Mr. Madoff was telling people that he was closed publicly, but in private, was telling these 14 managers that they had special access when, in fact, there was nothing special about their access. He would take new money from anybody.

*Id.* at pgs. 47-48.

Markopolos also testified that the investors he met with in Europe did not believe Madoff could achieve his returns using the claimed split-strike conversion strategy.  *Id.* at p. 50.  These investors believed Madoff was illegally using his broker-dealer operation to generate returns for the hedge fund, as Markopolos noted:

> When I heard these people … [had] funds that were invested in Madoff, they would, like, wink and – it was almost like a wink and a nod.  "Well, of course, we don't believe he really is using split-strike conversion."  A few of them said that.  "We think he has access to order flow," … And that is how they justified it.  They thought the [returns] were real, but they were generated through an illegal activity known as front-running.

*Id.*

In 2005, Casey learned of indications that Madoff was running short of cash as Markopolos testified:

> Frank Casey … had a meeting where it was clear that Mr.
> Madoff was trying to borrow funds from French and other
> European banks.  And that was the first warning sign – and
> this is what we were looking for – that he was running short
> of cash to keep the operation going … And we took that as
> a clear warning sign that he was in trouble and in danger of
> folding, but we had no inside information to that.

*Id*. at pgs. 53-54.

> 2.      The 2005 Submission

In October 2005, Markopolos made his third submission to the BDO entitled "The World's Largest Hedge Fund is a Fraud" (the "2005 submission").  2005 submission, at Exhibit 268.  The 2005 submission discussed numerous red flags concerning Madoff's operations.  *See Id.*  At that time, Walter Ricciardi was the District Administrator for BDO, and David Bergers was the Associate District Administrator for Enforcement. Ricciardi Testimony Tr. at p. 7; Bergers Testimony Tr. at p. 8.  Bergers testified that the BDO considered Markopolos credible, stating:

> I think when we talked to him, we felt like he was
> connected to the industry, that he may be making guesses
> about certain things, but that it was – it was worthwhile to
> take a look at or try to think it through.

*Id*. at p. 19.[163]  Michael Garrity, Branch Chief, Investment Adviser and Investment Company Examinations, also testified to Markopolos' credibility with BDO, stating:

> [C]learly other people in the – above me thought Harry
> [Markopolos] was credible, and I – if someone said "Harry
> is coming in to talk about something," then we're all ears
> because we wanted to hear what Harry had to say.

Garrity Testimony Tr. at p. 34.  Garrity also testified that: "the more I talked with [Markopolos], the more I thought he was, you know, knowledgeable and so it increased his credibility overall … the more I worked with him, the more credible he was."  *Id*. at p. 28.

Markopolos explained in his Congressional testimony why he made a third attempt to interest someone at the SEC in investigating Madoff:

> [Manion] felt that Mr. Garrity was a conscientious, hard-
> working Branch Chief who would give me a fair and

---

[163]  BDO had experience with Markopolos from other matters he had referred, including "market timing [at] several different [mutual] fund companies."  Bergers Testimony Tr. at p. 13.

> impartial hearing that might be what was needed to get this
> case re-submitted to the SEC's New York Office. Ed
> Manion scheduled an appointment for me with Mr. Garrity
> and I thought that perhaps the third time submitting this
> case would turn out to be the charm.

February 4, 2009 Testimony of Harry Markopolos Before the U.S. House of
Representatives, Committee on Financial Services Tr. at p. 14, at Exhibit 269.

On October 20 and 21, 2005, Garrity and Bergers arranged for Markopolos to
meet with Garrity; John Dugan, Assistant Director for Enforcement; and Andrew
Caverly, Branch Chief, Broker-Dealer Examinations. E-mail dated October 20, 2005
from Garrity to Bergers, at Exhibit 270. On October 25, 2005, Markopolos met with
these SEC representatives to discuss the 2005 submission. Markopolos Testimony Tr. at
p. 54; Garrity Testimony Tr. at pgs. 23, 35. *See also* E-mail dated October 20, 2005 from
Garrity to Bergers, at Exhibit 270.

The 2005 submission detailed approximately 30 red flags indicating that Madoff
was operating a Ponzi scheme, a scenario it described as "highly likely," or committing
some other violation of the federal securities laws. 2005 submission, at Exhibit 268. The
2005 submission discussed an alternative possibility – that Madoff was front-running –
but characterized that scenario as "unlikely." 2005 submission at pgs. MARK 0051-52,
at Exhibit 268. The red flags identified by Markopolos generally fell into one of three
categories: (1) Madoff's obsessive secrecy; (2) the impossibility of Madoff's returns,
particularly the consistency of those returns; and (3) the unrealistic volume of options
Madoff was supposedly trading. The following are examples of the red flags identified in
the 2005 submission:

- "Third party hedge funds and fund of funds that
  market this hedge fund strategy that invests in
  [Bernard Madoff] don't name and aren't allowed to
  name Bernie Madoff as the actual manager in their
  performance summaries or marketing literature."
  *Id.* at p. MARK 0054.

- Madoff did not allow independent outside
  performance audits. *Id.* at p. MARK 0059.

- "BM goes to 100% cash for every December 31[st]
  year-end." *Id.* at p. MARK 0061.

- "Several equity derivatives professionals will all tell
  you that the split-strike conversion strategy that BM
  runs is an outright fraud and cannot possibly
  achieve 12% average annual returns with only 7
  down months during a 14½ year time period."

Markopolos listed three individuals the SEC could contact who would support this contention.  *Id.*

- Madoff experienced very few down months:  "only one monthly loss of 6 basis points during 1997's Asian Currency Crises, the 1998 Russian & LTCM Crises and the market blood bath of 2000-2002." *Id.* at p. MARK 0055.

- "It is mathematically impossible for a strategy using stock, individual stock call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from."  Madoff experienced only seven "extremely small" losses in over 14 years.  *Id.* at p. MARK 0056.

- "Madoff has perfect market-timing ability" in that he went to 100% cash right before market declines in 1998 and 1999.  *Id.* at p. MARK 0059.

- Markopolos compared Madoff's return to the Gateway Option Income Fund (GATEX), "the one publicly traded option income fund with a history as long as Madoff's" and found that "[d]uring the 87 month span analyzed, Madoff was down only 3 months versus GATEX being down 26 months." *Id.*

- Madoff "would have to be over 100% of the total OEX put option contract open interest in order to hedge his stock holdings as depicted in the third party hedge funds marketing literature" based on Markopolos' estimate of the amount of assets Madoff managed.  *Id.* at p. MARK 0056.

- Madoff reportedly was relying on "over-the-counter options and trades exclusively through UBS and Merrill Lynch … [but] it seems implausible that a BD would trade $20-$50 billion worth of index put options per month over-the-counter through only 2 firms… . The counter-party credit exposures for UBS and Merrill would be too large for these firms' credit departments to approve."

*Id.*

Shortly after the October 25, 2005 meeting, Markopolos e-mailed Manion the 2001 *Barron's* article on Madoff and observed, "there are plenty of red flags in light of the many hedge funds that have blown up in the past 4½ years.  The similarities between Bernie Madoff and Bayou, Manhattan Fund, Wind River, the Blue Water Funds[164], and others is startling."  E-mail dated October 29, 2005 from Markopolos to Manion, at Exhibit 271.

        3.      The Boston and New York SEC Offices Reacted Very Differently to the 2005 Submission

              a.      The BDO Thought the 2005 Submission Warranted an Investigation

The BDO took the 2005 submission very seriously.  Ricciardi testified it was "much more detailed than your average tip.  It would clearly call for a follow up." Ricciardi Testimony Tr. at p. 27.  Garrity testified that the 2005 submission was notable in that it: "is unusual [] to have something of this breadth this detailed.  That is rare." Garrity Testimony Tr. at p. 69.  Caverly testified:

> [T]he detail that he had I thought was somewhat unusual. You know, because quite often you'll have people in and they'll have one nugget or one fact that they're, you know, throwing at you and you might have some questions about. But I think clearly, I mean he had spent a lot of work – you know, spent a lot of time on this, and it was a series of things that it wasn't somebody just happening to hear something and coming in and passing it along.

Caverly Testimony Tr. at p. 24.[165]

Garrity testified further that the allegations "seemed credible" and that "in the aggregate [the red flags] troubled me."  Garrity Testimony Tr. at pgs. 38, 42-43.  Garrity understood that the premise of Markopolos' referral – that Madoff's reported returns

---

[164] These are examples of significant hedge fund fraud cases from 2000 through 2005.

[165]  Additional SEC officials acknowledged that the 2005 submission was unusually detailed.  McCarthy characterized it as "exhaustive."  McCarthy Testimony Tr. at p. 137.  Sadowski described the 2005 submission as follows:

> It was detailed.  It was very – in my judgment, very methodical. It just gave you a road map.  It just gave you so many ways to – because that is what you need as an examiner, you need to say all right, I now have this so I can go ask this person for this piece of information.  And it is, it is a connecting of the dots.  That is what these types of things are and that was certainly something that led you to at least start connecting.

Sadowski Testimony Tr. at pgs. 101-102.

were impossible to achieve with his purported trading strategy – was incontrovertible, stating:

> [T]he thing that bugged me is when I came to understand, in a sort of primitive way, the split-strike conversion strategy, I couldn't imagine, and it goes back to what I spent time on after the meeting, this Fairfield document, I couldn't understand how if you were selling calls, how you could have a big upside.

*Id.* at p. 43.

Madoff's claim to have so few down months also concerned Garrity, as he noted: "It was just highly improbable, you know, unless you're in a CD, I don't know how you can do this over this period of time." *Id.* at p. 47. Reflecting on his 2005 meeting with the BDO, Markopolos said Garrity "understood it" and "saw the threat." Markopolos Testimony Tr. at p. 58. In his Congressional testimony, Markopolos described the October 25, 2005 meeting as follows:

> I met with Mr. Garrity for several hours and found him to be very patient and eager to master the details of the case. Unlike my disastrous May 2000 meeting with that office's Director of Enforcement, Attorney Grant Ward, I found Mr. Garrity to be interested and fully engaged in my telling of the scheme. Some of the derivatives math was difficult for him to understand, so I went to the white board and diagrammed out Madoff's purported strategy and its obvious failings until he understood it. A few of the more difficult concepts required repeated trips up to the white board but at the end of our meeting, it was clear that Mr. Garrity understood the scheme, it's size, and it's threat to the capital markets.

> Mr. Garrity promised to follow up and he was true to his word. About a week or so later, Mike Garrity called me back telling me that he did some investigating and found some irregularities but that he couldn't tell me what they were, only that he was in contact with the New York Regional Office and wanted to put me in touch with a Branch Chief there for follow on investigation.

February 4, 2009 Testimony of Harry Markopolos Before the U.S. House of Representatives, Committee on Financial Services Tr. at pgs. 14-15, at Exhibit 269.

        b.      The BDO Forwarded the 2005 Submission to NERO

While the BDO considered Markopolos' allegation that Madoff was operating a Ponzi scheme worthy of serious investigation, Ricciardi felt that it made more sense for the NERO office to conduct the investigation, stating:

> I wanted to send it to the office that was the most appropriate office to investigate this.  [NERO] had already begun an exam, and [Madoff] was in New York.  It did not make sense for our people to be using taxpayer money to be taking trains back and forth to New York to investigate something in New York.

Ricciardi Testimony Tr. at p. 59.

After deciding that NERO was the more appropriate office to conduct the investigation, Ricciardi e-mailed Dugan, Bergers, Garrity, and Caverly:  "Let's try to make sure that NERO recognizes the potential urgency of the situation."  E-mail dated October 25, 2005 from Dugan to Ricciardi, at Exhibit 272.  The day after the BDO met with Markopolos, Ricciardi e-mailed Schonfeld as follows:

> Mark, as outlined below, we met yesterday with an informant that raised some significant concerns about Bernard Madoff and his broker-dealer, Madoff Investment Securities.  Since Madoff is in New York, and NERO recently conducted an examination, we thought you might want to follow up on this.  Additional details are available from John Dugan.

E-mail dated October 26, 2005 from Ricciardi to Schonfeld, at Exhibit 273.  Ricciardi forwarded Schonfeld an e-mail from Dugan summarizing the meeting with Markopolos as follows:

> We met this morning with an informant who passed on information about Bernard L. Madoff and the registered broker-dealer entity that he operates, New York-based Madoff Investment Securities, LLC.
>
> In a nutshell, the informant believes that although Madoff holds himself out as a [broker-dealer], he actually manages money for hedge funds.  Various hedge funds apparently raise money from investors and hand it over to Madoff to manage, and they don't disclose this to the investors in writing (because Madoff does not want them to reveal that he is managing the money).  The hedge funds apparently want Madoff to manage the money because he purportedly

has some system that is extremely successful.  In fact, the informant believes that Madoff cannot possible [sic] be achieving the returns that the hedge funds claim he is getting.  The informant believes that Madoff may be running one giant Ponzi scheme, and there are signs that it may be close to crashing down on him.  According to the informant, if that happens, it would have widespread ramifications, as a lot of people have placed a lot of money with Madoff (including some Swiss banks and a lot of Europeans).  A few of the hedge funds that have apparently placed money with Madoff are Fairfield Sentry, Ltd.; Access International Advisors; and Broyhill All-Weather Fund, L.P.

… .

The informant passed along a lot of other information about this situation… . As an alternative to the Ponzi scheme theory, the informant believes that Madoff may actually be achieving the claimed returns, but is doing so by front-running.  Also, Madoff apparently will not allow any hedge fund to have an independent auditor look at his books… .

There are no open investigations of Madoff or the hedge fund entities I mentioned above that may have placed their money with him.  NERO apparently recently (in September 2005) conducted an exam of Madoff's broker-dealer entity, and the exam report that Andy [Caverly] obtained touches on some of the same issues that the informant was discussing.

Because Madoff is in New York and NERO may already be interested in this as a result of its exam, I recommend that we refer this to NERO for investigation.

*Id.*

According to Ricciardi, it was unusual that he e-mailed Schonfeld regarding the 2005 submission and he explained that he did so to ensure that NERO gave the 2005 submission serious attention:

I didn't want New York to think this was something that we just didn't think needed attention.  I wanted to make sure it was a high level, not just the standard referral

> process, but a high-level referral, so that it would be taken
> more seriously … .

Ricciardi Testimony Tr. at pgs. 21-22.  Garrity agreed that it was not standard practice for
the head of one office to contact the head of another office about a tip, and that
Ricciardi's actions in this instance signaled an "urgency to conduct an exam or conduct
an investigation."  Garrity Testimony Tr. at p. 53.

Following Ricciardi's direction to "make sure that NERO recognizes the potential
urgency of the situation," Dugan sent an e-mail on November 3, 2005 to all of the
Associate Directors for Enforcement at NERO (Helene Glotzer, David Rosenfeld and
Andrew Calamari), stating:

> I don't know if Mark [Schonfeld] forwarded [Ricciardi's e-
> mail to Schonfeld and Dugan's e-mail summarizing the
> meeting] to any of you, or if NERO is interested in
> investigating this, but the informant who brought this to us
> wants to come in and talk about it some more.  If NERO
> plans to investigate this, I would prefer to just hook the
> informant up with someone in your office.  Could you let
> me know either way?

E-mail dated October 26, 2005 from Ricciardi to Schonfeld, at Exhibit 273.  Calamari
responded to Dugan and referred the matter to Doria Bachenheimer, Assistant Director,
and Meaghan Cheung, Branch Chief.  *Id.*; E-mail dated November 3, 2005 from Garrity
to Dugan, at Exhibit 274.  After the matter was referred to NERO, BDO staff gave
Cheung's contact information to Markopolos.  *Id.*; E-mail dated November 4, 2005 from
Markopolos to Garrity, at Exhibit 275; Ricciardi Testimony Tr. at p. 50.  On November 4,
2005, Markopolos sent Cheung a copy of his 2005 submission.[166]  E-mail dated
November 4, 2005 from Markopolos to Cheung, at Exhibit 276; Cheung Testimony Tr. at
p. 31.

4.      NERO was Skeptical About the 2005 Submission

a.      The Matter was Assigned to a Relatively Inexperienced
Team, Particularly with Respect to Conducting Ponzi
Scheme Investigations

As discussed above, the 2005 submission was viewed by the BDO as significant
and credible.  It did not get the same reception from NERO.[167]  On November 3, 2005,

---

[166]  On November 7, 2005, Markopolos sent Cheung a second, slightly revised version of the 2005
submission.  November 7, 2005 Submission, at Exhibit 285.

[167]  One factor in NERO's reaction to the 2005 submission may have been a general attitude towards Ponzi
investigations that was expressed by Jason Gettinger, NERO Regional Litigation Counsel, in the context of
another matter.  In a January 14, 2004 e-mail discussing a different SEC Regional Office's action against a
Ponzi scheme, Gettinger opined, "[O]f course we should get out of the business of burning resources to
chase ponzi schemes …."  E-mail dated January 14, 2004 from Gettinger, at Exhibit 278.  Gettinger,

Calamari forwarded Dugan's October 25, 2005 e-mail to Doria Bachenheimer, Assistant Director of Enforcement.  E-mail dated November 3, 2005 from Calamari to Bachenheimer, at Exhibit 277.  At that time, Bachenheimer had never conducted a Ponzi scheme investigation.  Bachenheimer Testimony Tr. at p. 26.

Although Bachenheimer testified that she had been "concerned" about one significant indicia of a Ponzi scheme in the Madoff matter – the consistency of Madoff's returns – she had viewed this red flag through the lens of financial fraud cases with which she did have experience, stating:

> I thought he was – at this point, I was not thinking a Ponzi scheme.  I was thinking he's doing something to smooth earnings.  I was trying to come up with a theory of what he was doing, so I was thinking was this like an accounting case, is this like cookie cutter reserves, does he have some money somewhere else.  When he said he had these other accounts, I just thought let's get the records and see if there is some way he's smoothing earnings.  I don't even know if you can do that.  I was wondering.

*Id.* at p. 114.

On November 3, 2005, Bachenheimer sent an e-mail to Meaghan Cheung, an Enforcement Branch Chief, and Simona Suh, an Enforcement Staff Attorney, stating: "Here's a new case for Simona.  Do you want to come by and we'll call John Dugan to see what he can tell us?"  E-mail dated November 3, 2005 from Bachenheimer to Cheung, at Exhibit 279.[168]  At this time, Cheung also had never conducted a Ponzi scheme investigation.  Cheung Testimony Tr. at p. 22.  Cheung acknowledged that, during the Madoff investigation, "I don't think anybody ever said to me here's how you investigate a Ponzi scheme and here is what you should do here."  *Id.* at p. 59.  Cheung testified further that she did have experience with "boiler-room-type [cases]" and "some fair number of [those cases] could arguably be called Ponzi schemes."  *Id.* at p. 22.[169]

---

however, testified that he believed his view about using SEC resources to investigate Ponzi schemes was the "minority view" within the SEC's Division of Enforcement.  Gettinger Testimony Tr. at pgs. 26-27.
[168] It appears that Calamari was primarily responsible for assigning the Madoff referral to Suh.  On November 3, 2005, Calamari forwarded Dugan's October 25, 2005 e-mail that described BDO's meeting with Markopolos to Bachenheimer and asked, "What do you think of this as a case for Simona?"  Bachenheimer responded to Calamari, "Looks good – should I tell her and Meaghan?"  E-mail dated November 3, 2005 from Calamari to Bachenheimer, at Exhibit 277.
[169] Boiler room cases generally involve:

- lying about the firm's reputation and expertise, claiming it had a "research department" that analyzed stocks when it didn't,
- refusing to say *anything* negative about the stocks they pushed, including the "risk factors" discussed in the prospectus,
- making baseless price predictions, promising that certain stocks would double in price within a short time period,
- impersonating other salespeople at the firm, and

Suh also had never conducted a Ponzi scheme investigation when she was assigned the Madoff matter and "did not know at the time" the "particular steps that needed to be taken when you do a Ponzi scheme case investigation." Suh Testimony Tr. at p. 31.[170] Moreover, Suh was a relatively inexperienced staff attorney. Suh graduated from Fordham Law School in 2001 and clerked for two years before joining the law firm of Cravath, Swaine & Moore LLP in New York as an associate. *Id.* at pgs. 11-12. Suh described her experience at Cravath as follows:

> I did not stay there long. I was assigned to the Enron matter and being the most junior associate on the Enron matter was not very rewarding because I was tasked with basically – primarily even secretarial, not even paralegal tasks. And so I soon decided that I wanted to leave.

*Id.* Suh joined NERO in April 2004 as a staff attorney. *Id.* at p. 13. During her nineteen months at NERO before being assigned the Madoff case, Suh had not been the lead staff attorney on any investigation, and had been involved in very few investigations overall. *Id.* at p. 23. The Madoff assignment was also Suh's first real exposure to broker-dealer issues. *Id.* at pgs. 67-68. As she explained:

> You know, I had worked on Bear Stearns even – it was technically a broker-dealer case but it was really about [a] very idiosyncratic part of the operations and did not really deal with the mechanics of trading. The AIG matter was an accounting fraud case so that certainly did not involve trading. And I had never been inside a broker-dealer and a broker-dealer's office, so it's true, I was pretty unfamiliar with the trading aspects.

*Id.* at p. 68. However, in her nineteen months at NERO, Suh had established a reputation for being smart and hard-working. Bachenheimer Testimony Tr. at p. 29. Bachenheimer testified as to why Suh was assigned to the Madoff investigation, stating:

> The main reason she was given this case was because she was a superstar. She was one of the smartest lawyers I had

---

- discouraging customers from selling the stocks they recommended without regard to the customers' best interests.

*See* http://www.sec.gov/investor/links/toptips.htm, at Exhibit 280 (emphasis in original). Cheung explained that "a lot of [her] boiler room cases involved paying back earlier investors with proceeds from later investments." Cheung Testimony Tr. at p. 22. Cheung did not testify as to whether, or how, Ponzi schemes and boiler room cases should be investigated in a similar fashion.

[170]    Suh testified that she did not seek guidance during the Madoff investigation from anyone at the SEC who had conducted Ponzi scheme investigations. Suh Testimony Tr. at pgs. 68-69. Suh testified she has since learned to seek such guidance, "[T]his is what I now do whenever I have a new type of case, I – the first thing I do is I go to the people who have done this type of case and ask exactly the question, 'What evidence do you need to gather.'" *Id.* at p. 255.

> ever seen right out of the box.  This looked like – with the
> options trading strategy, quite frankly, Meaghan and I
> thought if there's anybody who is going to be able to
> understand this, it's going to be Simona.

*Id.*  Suh's immediate supervisor, Cheung, echoed Bachenheimer's sentiments, stating:  "I think that Simona is a terrific lawyer, and I think that Simona had worked on complicated cases.  She had worked on the Bear Stearns case, and I think she had a good understanding of complicated financial products."  Cheung Testimony Tr. at pgs. 24-25.

b.    The Enforcement Staff[171] Assigned to the Matter Gave Little Weight to the Evidence in the 2005 Submission that Madoff was Operating a Ponzi Scheme

(1)    The Enforcement Staff Considered the Evidence of Little Value Because Markopolos Was Not a Madoff Investor or an Individual Personally Involved in the Alleged Ponzi Scheme

Bachenheimer, Cheung and Suh all testified that they discounted the 2005 submission somewhat because Markopolos was neither a Madoff employee nor an investor.  Bachenheimer testified that:

> [Markopolos] was not working– he had no inside
> information – those are the wrong words to use – he was
> not an employee, and as far as I knew, received no
> information from Madoff directly.  I would have no way of
> knowing, and I actually would assume – I guess you might
> think it was a comprehensive and thorough statement of
> what he knew, but not what was going on with Madoff.

Bachenheimer Testimony Tr. at p. 40.  Bachenheimer also testified that she viewed the circumstantial evidence presented in the 2005 submission as only "theories," stating, "[the 2005 submission] wasn't evidence.  You know, it wasn't something we could take and bring a lawsuit with.  We had to substantiate it.  We had to test it and substantiate it.  It's theoretical."  *Id.* at p. 65.  Bachenheimer opined that in her view, "[i]t's very challenging to develop evidence [about a Ponzi scheme] until the thing actually falls apart," stating:

> It is very difficult to develop evidence, and the best way
> and often the only way we can develop evidence,
> particularly in a Ponzi scheme, is if we have somebody on
> the inside or if we have better documents than we had in

---

[171]  As used herein, "Enforcement staff" refers to the four NERO employees (Bachenheimer, Cheung, Suh and Lamore) who were assigned to work on the Division of Enforcement's 2005-2006 investigation of Bernard L. Madoff and Bernard L. Madoff Investment Securities LLC.

this case.  I can give you an example 

I'm not saying that you have to have that in every case, but a very challenging part of Ponzi schemes, especially where the investors are being paid, is they're happy and they're not going to talk to you and they're telling you to go away, and that happened not only here but it happened in any number of cases that I worked on.  It's very challenging to develop evidence that something is going wrong until the thing actually falls apart.

*Id.* at pgs. 65-66.  *See also id.* at p. 162 (Bachenheimer stated, "I still come back to we needed a search warrant. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉").[172]

Cheung was also skeptical of the 2005 submission because she did not consider Markopolos a "whistleblower," stating:

I remember thinking that after I spoke to him that he wasn't technically a whistleblower because it wasn't inside information so that was, I think, a distinction that I'm sure I made, because I think – I think that, you know, when you hear "whistleblower" or "informant," there's an assumption that it's somebody who's inside an operation and has – and has nonpublic information to give you.  And I remember realizing that he was not.

Cheung Testimony Tr. at pgs. 29-30.  In a written submission made by Cheung's attorney after her testimony, Cheung opined that "[c]onstraints on the operations of the SEC [E]nforcement staff … may make it difficult for it to identify Ponzi schemes when there are no investor complaints (or the inspections division does not raise a flag)." Submission on Behalf of Meaghan Cheung dated July 24, 2009, at p. 4, at Exhibit 281.

Suh echoed Cheung's view that Markopolos' 2005 submission was of limited value in the following exchange:

---

[172] It should be noted that although Bachenheimer had strong opinions on what was needed to bring a Ponzi scheme case, she acknowledged at that time, having had no prior experience conducting Ponzi scheme investigations.

Q:     But you didn't believe that Markopolos's complaint contains specific facts about the alleged Ponzi scheme?

A:     I – well, in the sense that it was an allegation that it was a Ponzi but there was no detail in terms of what exactly he does.

Q:     What specific facts would you have liked to have seen that weren't in Harry Markopolos's complaint?

A:     If – I think what was – what I was referring to mostly – what I was referring to was that he did not have first-hand personal knowledge of the fraud that he was alleging.

Suh Testimony Tr. at p. 118.

(2)     The Enforcement Staff Questioned Markopolos' Credibility because of his Perceived Self-Interest

Bachenheimer, Cheung and Suh were also skeptical of the 2005 submission because they were concerned about Markopolos' motives for approaching the SEC. Bachenheimer testified that she "had concerns that he was a competitor of Madoff's who had been criticized for not being able to meet Madoff's returns, and that he was looking for a bounty." Bachenheimer Testimony Tr. at p. 45. She further stated, "If the first thing I hear from someone is what's in it for me, then it raises my antenna a little bit." *Id.* at p. 47. However, Markopolos himself noted in the 2005 submission that he would **not** be eligible for a bounty in the event the SEC discovered Madoff was operating a Ponzi scheme, the scenario Markopolos described as "highly likely." 2005 Submission at p. MARK 0052, at Exhibit 268. *See also* Section 21A(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-l(e), at Exhibit 282.

Cheung expressed a similar opinion in a November 4, 2005 e-mail exchange between her and Suh. Suh e-mailed Cheung as follows:

Some prior statements from Harry Markopolos:  From Bloomberg, 8/16/04, article re:  Bush's prospects:  "If Iraqi cities go up in flames, so do Bush's re-election hopes," said Harry Markopolos, who oversees $900 million as chief investment officer at Rampart Investment Management in Boston.  "And if oil prices keep rising, so do Kerry's chances of winning."[173]

---

[173] Suh admitted that Markopolos's political views and comments should not have been relevant to the matter, stating:

E-mail dated November 4, 2005 from Suh to Cheung, attached hereto, at Exhibit 283. Cheung responded, "I have some qualms about a self-identified independent fraud analyst, but who knows." *Id.* Cheung elaborated on this e-mail in her testimony as follows:

> I meant that I was concerned that – that he might have an agenda, that – that identifying himself as a fraud analyst, although he also appeared to have worked at at least one investment advisory firm and one investment firm, I was concerned what his personal motivations might be, and I thought that was something – that was just a reaction that I had at the time.

Cheung Testimony Tr. at p. 35.

Cheung's initial concerns about an "independent fraud analyst" were not alleviated even when Bergers vouched for Markopolos' credibility. On December 5, 2005, Cheung called Bergers to find out more information about Markopolos. E-mail dated December 5, 2005 from Cheung to Bachenheimer, at Exhibit 284. After the call, she sent an e-mail to Bachenheimer and Suh summarizing the conversation, stating:

> I spoke to David Bergers in the Boston office about Harry Markopolus [sic] (the "informant"). They've worked with him before, as Markopolus [sic] keeps telling me, and find him to be generally reliable. Their past experience with him has been that Markopolus[sic] has very good sources, but he can be credulous and immediately believes what his sources tell him, even when they have biases. Some of his tips have panned out and have been very good cases, others have turned out to be nothing.

*Id.* According to Suh, Cheung remained skeptical of Markopolos throughout the investigation. Suh Testimony Tr. at pgs. 72-73. Suh suggested that Cheung's skepticism may have been more about a personal dislike for Markopolos than his credentials, as evidenced by the following exchange:

> Q:    Do you have any – do you know why it seems as though from the e-mails Harry Markopolos was kind of trying to meet with Meaghan but she didn't seem interested in meeting with him?

---

> No. That aspect was not really relevant. We were just trying find out who exactly he is and what he does and so on, just to get his background. And I remember not being able to find much and it looks like I just cut and pasted some things I found on the internet.

Suh Testimony Tr. at p. 33.

A:     I don't know what her reasons were.  I know her
       general impression of him was – she was skeptical
       of him, but I don't know what her reasons for not
       meeting with him were.

Q:     In what way was she skeptical of him?

A:     … I remember hearing that she thought he was kind
       of condescending to the SEC in terms of SEC
       expertise and knowledge …

*Id.* at p. 72.[174]  According to Bachenheimer, the relationship between Markopolos and
Cheung became "adversarial."  Bachenheimer Testimony Tr. at p. 64.

(3)   Several Other Sources Raised Similar Concerns That
      Madoff Was Operating a Ponzi Scheme

Setting aside their skepticism about Markopolos, the Enforcement staff knew of
several other sources that had raised the same or similar allegations about Madoff.  The
May 2001 *MARHedge* and *Barron's* articles discussed several of the red flags mentioned
in the 2005 submission.  However, Cheung testified that she did not believe these articles
bolstered the credibility of the 2005 submission, stating:

Q:     Did you find that significant at all that there was
       someone who wrote an article that seemed to
       provide the same viewpoint that Markopolos did?

A:     I think that that – that the Ocrant article and the
       *Barron's* article both raised concerns that were
       similar to Mr. Markopolos's concerns.

Q:     Okay.  But then the question is:  Did that add
       credibility to Markopolos's complaint?  I know that
       they raised the same concern.  My question to you
       was:  You have Markopolos coming in, he raises
       concerns.  Then you have two other people
       independently also raising that same concern.
       Would that add to the credibility of the concerns or
       would it have no effect?

---

[174]  A major reason behind Cheung's skepticism toward, and possible dislike for, Markopolos may have
been telephone exchanges between the two where Markopolos inquired about Cheung's understanding of
his 2005 submission, derivatives, and Madoff's fraud.  Specifically, Markopolos recalled asking Cheung
whether she understood derivatives, to which she responded, "Well, I did the Adelphia case."  Markopolos
Testimony Tr. at p. 64.  Markopolos responded:  "Well, that was just an accounting fraud.  That is much
easier to understand than a complex derivatives fraud, and it is a much smaller case.  [Madoff] is several
times the size of the Adelphia case."  *Id.*  According to Markopolos, "she seemed offended by that…" *Id.*
Markopolos had the impression that Cheung "wanted to get [him] off the phone."  *Id.* at p. 66.

A:      That's kind of hard to answer because they actually
        predate – you know, they're 2001 articles, so, you
        know, one way of looking at it could be that they
        said it and then Mr. Markopolos got some of his
        information from them and – and rewrote it.  I know
        that – so I think it probably just was another thing
        that I looked at again when I got it.

Cheung Testimony Tr. at pgs. 101-102.  In addition to Cheung not fully explaining why
the two articles raising similar issues to Markopolos' failed to enhance his credibility,
contrary to Cheung's testimony that Markopolos may have "got[ten] some of his
information from [the articles]" and "rewrote" them, the first sentence of the 2005
submission that Markopolos e-mailed Cheung on November 7, 2005, stated, "I am the
original source for the information presented herein having first presented my rationale,
both verbally and in writing, to the SEC's Boston office in May, 1999 before any public
information doubting Madoff Investment Securities, LLC appeared in the press."[175]
November 7, 2005 Submission, at p. SUHS 011991, at Exhibit 285.

        In contrast with Cheung, Suh acknowledged that the articles made Markopolos'
concerns about Madoff "more likely to be true," stating:

Q:      Okay.  And so would that lend some credibility to
        Harry Markopolos's allegations in that these other
        publications had raised the same questions?

A:      Well, I guess in the sense that other people – he was
        not alone in his thinking.  So to the extent that
        multiple people have the same view, and maybe that
        does make that view more likely to be true.

Q:      But in terms of, you know, the returns itself, the
        time period of which Madoff had the consistent
        returns and kind of industry professionals
        understanding that that was extremely unlikely that
        anyone could achieve those kinds of returns using
        the strategy that Madoff said; wouldn't that fact that
        the *Barron's* article and the *MARHedge* article
        made the same points, wouldn't that add credibility
        to that part of Markopolos's claim?

A:      Yes.  And the question was a question.  You know,
        this is the question that we were asked to
        investigate.

Suh Testimony Tr. at p. 75.

---

[175]    As discussed above, Markopolos made his first submission to the SEC in May 2000; not May 1999.

The Enforcement staff was also in possession of another tip that raised some of the issues presented in Markopolos' 2005 submission and should have added credibility to the 2005 submission. *See id.* (Suh testified, "So to the extent that multiple people have the same view, and maybe that does make that view more likely to be true."). As discussed in greater detail in section III of this Report of Investigation, the 2003 DC OCIE Examination was triggered by an April 2003 complaint about Madoff from a Hedge Fund Manager with the following concerns:

-according to BMS, the options are traded with a number of traders and crossed on the CBOE. With a 8-10 billion size, you must see the volume, but unfortunately you don't;

-the strategy is not duplicable by anyone else as far as we know.

-there is no correlation to the overall equity markets (in over 10 years).

-accounts are typically in cash at month end.

-since the accounts are at BMS, the investors (i.e. the feeders that have discretionary accts) receive BMS brokerage statements. There are no third party brokers involved in the process. The auditor of the firm is a related party to the principal.

-finally, given the performance of the different accounts, BMS never had to face redemption. …

E-mail dated May 21, 2003 from the Hedge Fund Manager to Kelly, at Exhibit 148. The Hedge Fund Manager's complaint was provided to the New York examination staff (including Peter Lamore) when the records of the DC OCIE examination were shipped to the New York examination staff on June 9, 2005. Letter dated June 9, 2005 from Wood to Nee, at Exhibit 209. Although the Hedge Fund Manager's complaint had information consistent with Markopolos' 2005 submission, Lamore was the only member of the New York examination staff to recall seeing the Hedge Fund Manager's complaint, and he testified that he only "glanced at it" but did not "focus" on it or "analyze" it. Lamore Testimony Tr. at pgs. 109-110. *See also* Nee Testimony Tr. at p. 108 ("no recollection" of the tip); Ostrow Testimony Tr. at p. 119 ("[I] don't believe I ever saw" the tip); Sollazzo Testimony Tr. at pgs. 100-101 ("I don't recall seeing" the tip).

Suh obtained the examination records from the DC OCIE Madoff examination, which included the Hedge Fund Manager's complaint, at the outset of the Enforcement investigation. E-mail dated November 4, 2005 from Sollazzo to Bachenheimer, at

Exhibit 286; Suh Testimony Tr. at pgs. 46-47.[176]  However, Suh never reviewed the complaint.  Suh Testimony Tr. at p. 250.  Suh acknowledged that the complaint would have been relevant for her investigation.  *Id.* at pgs. 48-49.

In addition, as discussed above, the 2005 NERO examination had been precipitated by the SEC's discovery of internal e-mails at Renaissance, a hedge fund with an indirect investment with Madoff, that candidly discussed several reasons why Madoff's purported trading and returns did not "add up."  E-mail dated November 21, 2003 from Broder to Simons, at Exhibit 213.  Among the issues that concerned the Renaissance officers were:  (1) they did not understand how Madoff's trading strategy generated the reported returns; (2) they did not understand why Madoff allowed the feeder funds to take such large fees; (3) Madoff did not have an independent auditor; and (4) the volume of options Madoff would have had to trade exceeded the volume of all exchange-traded options.  *Id.*; E-mail dated November 13, 2003 from Nat Simons to Jim Simons *et al*, at Exhibit 211.  Regarding the latter issue, a Renaissance officer stated:

> [M]aybe he does the options in the OTC market… . [B]ut we already know that the trades … would leave the OTC counterparty showing losses (as our account always shows gains).
> …
>
> [T]he risk must be covered somewhere if he is doing the trades at all?
>
> So we need an OTC counterparty (not necessarily a bank) who is willing to do the basket of the options plus the underlying with Madoff at prices unfavorable for the OTC counterparty – in 10-15bln!!!  Any suggestions who that might be?  None of it seems to add up.

E-mail dated November 21, 2003 from Broder to Simons, at Exhibit 213.

Suh testified that she was aware of the Renaissance e-mails, but did not attribute much significance to them:

> A:    I did see the e-mails that came out of [the Renaissance] exam that led to the exam of Madoff.
>
> Q:    Okay and did you have any impression of those e-mails?  Did the[y] seem consistent with what Harry Markopolos was saying?

---

[176]  The Hedge Fund Manager's original e-mail complaint with attachments were produced to the OIG as part of Suh's investigative file.

A:     Yes.  And I asked the examiners who worked on the Renaissance exam about, you know, what did they find out about those e-mails and they said that the author has basically backed away and said it was nothing specific, it was just rumors, and –

Q:     Really?

A:     Yeah.

Q:     Did you ever talk to anybody at Renaissance Technologies?

A:     I did not.

Suh Testimony Tr. at pgs. 47-48.

Thus, while the Enforcement staff thought they had reasons to be skeptical of Markopolos, that skepticism should have been overcome by the fact that a Hedge Fund Manager and several officers of another hedge fund had independently expressed the same concerns.

> (4)     NERO's Examination Staff Initially Misled Enforcement Staff Regarding the Scope of the Recent Exam

As discussed in detail in section IV of this Report of Investigation, NERO had submitted an examination report on Madoff in September 2005.  The OIG investigation found that the results of that exam and the examination staff's reaction to Markopolos' referral contributed to the Enforcement staff's skepticism regarding the 2005 submission. On November 3, 2005, Bachenheimer sent an e-mail to Bob Sollazzo, Associate Regional Director, Broker-Dealer Operations, NERO, attaching the referral and asking who had been involved in the 2005 exam.  E-mail dated November 3, 2005 from Bachenheimer to Sollazzo, at Exhibit 287.  Sollazzo responded to Bachenheimer and copied Assistant Director John Nee:

> These are basically some of the same issues we investigated and I recognize at least one of the hedge funds … Some of these comments are not new, I remember looking into a [sic] similar allegations back in the 90's at Madoff.  John Nee supervised the exam (he is not in on Friday), but I can get you a copy of the report.  You should definitely speak to John and the exam team before you move forward.[177]

*Id.*

___

[177] Sollazzo testified that his statement that he had "look[ed] into similar allegations back in the '90s at Madoff" was a reference to the 1992 investigation of Avellino & Bienes.  Sollazzo Testimony Tr. at p. 138. However, as discussed in greater detail in Section I of this Report of Investigation, in the 1992 investigation of Avellino & Bienes, the SEC did not investigate the possibility that Madoff was operating a Ponzi scheme.

Nee forwarded Bachenheimer and Sollazzo's e-mail exchange about the Enforcement staff looking at the allegations against Madoff to Lamore with the comment, "*Oh no!*" E-mail dated November 3, 2005 from Nee to Lamore, at Exhibit 288 (emphasis added). Lamore responded to Nee:

> Ironically, I thought of Madoff as I went to sleep last night. I would be more than happy to sit down with anyone to provide them with an understanding of Madoff's strategy and our findings.  Also, our files are still in my cube.  *I don't believe that we missed anything.*

*Id* (emphasis added).

On November 10, 2005, Cheung forwarded the 2005 submission to Lamore and Lamore forwarded it to Nee and Ostrow, explaining:

> I'm going to meet with Meaghan and Simona on Monday @ 3:00 to provide my input regarding these allegations.  In short, these are basically the same allegations we have heard before.  The author's motives are to make money by uncovering the alleged fraud.  I think he is on a fishing expedition and doesn't have the detailed understanding of Madoff's operations that we do which refutes most of his allegations….Any thoughts?

E-mail dated November 10, 2005 from Lamore to Nee, at Exhibit 290. Nee responded:

> No, Pete, I don't have anything to add.  I think the report speaks for itself.  There is still a little mystery as to what Madoff does but a Ponzi scheme or directly trading on immediate customer order flow doesn't [appear] likely from what we've seen.

E-mail dated November 7, 2005 from Markopolos to Cheung, at Exhibit 289.

Lamore responded, acknowledging:

> I must admit that [I] was a bit spooked when you first forwarded me the string of e-mails between the Boston and New York SEC offices (Ponzi scheme getting ready to crash), but after having just read the "informant's" analysis I feel much better that he is incorrect.

*Id*.

256

Nee and Lamore's reactions when they first learned that Enforcement was looking at allegations that Madoff was operating a Ponzi scheme shortly after the 2005 exam was completed, suggest that their concern may have been at least partially for their own reputations if Enforcement discovered a fraud that they had missed.

Alex Sadowski, former OCIE branch chief, testified that their reaction was probably a reflection of what, in his view, is a cultural problem at the SEC in the following exchange:

> Q:    But do you think that it is possible that there might have been examiners who were working on an examination, had suspicions but didn't find anything and then Enforcement is picking something up and so they were potentially worried that Enforcement would find something that would make them look [bad]?
>
> A:    I think that is a very valid theory in the sense that, and I think that potentially is one of the cultural problems with the SEC is that there is the culture [of] fear … .
>
> Q:    The culture being?
>
> A:    Of "I don't want to be proven to be incompetent and so we are going to kind of – not slide this under the rug but it is just if I have already looked at something and it is not there, it is not there because I am competent and you don't need to go and look and question my judgment."
>
> Q:    Right, so you might want to convince Enforcement that there isn't something there to prove that you were right in the first place?
>
> A:    I could certainly see people doing that because it is obviously poor but people worry about reputations, and I think that is probably one of the – again, from a cultural standpoint of the agency, that is probably a weakness in my judgment.

Sadowski Testimony Tr. at pgs. 104-105.[178]  Ostrow testified that Nee's "Oh no!" reaction indicated that Nee was "not so happy" "that Enforcement was looking at [the

---

[178]  Sadowski also testified about problems with the "mentality" of the "typical SEC examiner" who "walks into a room where there are a bunch of dead bodies lying around and [notices] that the clocks are 10 minutes fast."  Sadowski Testimony Tr. at pgs. 102-103.

Madoff] matter further." Ostrow Testimony Tr. at p. 188. Ostrow also acknowledged that "it could make [OCIE] look bad" if "[t]here was a Ponzi and we missed it." *Id*. at p. 189.

Subsequently, Lamore e-mailed Cheung and Suh on November 14, 2005, regarding the 2005 submission, stating:

> In general, the informant raises some valid questions, but I believe most of his allegations can be refuted based upon the examination that we conducted this year. However, in order to refute all of his allegations, we may need to request some documentation from one or more of the Fund of Funds (FOF).

E-mail dated November 14, 2005 from Lamore to Cheung, at Exhibit 291.

On November 22, 2005, Bachenheimer e-mailed Calamari about the Madoff matter, stating: "The exam team doesn't think that there's anything here." E-mail dated November 3, 2005 from Bachenheimer to Sollazzo, at Exhibit 287. Bachenheimer explained, "My recollection is the exam team was saying generally they don't think there's anything there with respect to [Markopolos'] allegations of false performance." Bachenheimer Testimony Tr. at p. 59.

Cheung testified that she also believed that because the SEC had conducted a recent examination of Madoff and had found only "technical violations," Madoff could not have been operating a Ponzi scheme, stating:

> [Madoff's firm] had certain technical violations. But yes, my overall – my overall impression was that the most scary of the potential things that could be wrong at Madoff Investment Securities [a Ponzi scheme] couldn't have been wrong if an exam team had been there and checked all the things that it appeared from the report were checked.

Cheung Testimony Tr. at p. 67. *See also id*. at p. 68. Similarly, Suh testified: "Certainly the fact that multiple exam teams had gone into the firm made the – made the Ponzi allegation less likely. It seemed like they were there, they're onsite, they see their operation, they are supposed to be industry experts." Suh Testimony Tr. at pgs. 54-55.

However, Lamore testified that in their examination, the examination staff didn't "look at the Ponzi scheme issue at all." Lamore Testimony Tr. at p. 164. Ostrow concurred that the examination team focused on front-running, not the possible existence of a Ponzi scheme in the examination. Ostrow Testimony Tr. at p. 187. *See also id*. at p. 188 (Ostrow testified that the allegations the examination staff had explored were not similar to the allegations in the Markopolos complaint). Sollazzo also acknowledged that the 2005 exam "did not refute" Markopolos' allegations regarding a possible Ponzi

scheme. Sollazzo Testimony Tr. at pgs. 140-141. Sollazzo admitted that, "The primary issue [during the 2005 exam] was the front-running and the trading issues, that was – those were the issues… . The Ponzi scheme aspect, it was not part – it was not the scope of the examination." *Id.* at pgs. 142-143. In addition, contrary to the statements in his response to Lamore, Nee acknowledged in his OIG testimony that the description of the 2005 submission as making "the same allegations we have heard before" was not true because the 2005 exam had not looked for evidence of a Ponzi scheme. Nee Testimony Tr. at pgs. 171-172. *See also id.* (Nee testified that the examination staff had not reviewed information that could have refuted Markopolos' allegations).

Even though the examiners agreed that the 2004-2005 NERO examination had not looked at the possibility that Madoff was operating a Ponzi scheme, Ostrow acknowledged that Sollazzo's November 3, 2005 response to Bachenheimer gave the impression that the examination staff had already analyzed the Ponzi scheme issue. Ostrow Testimony Tr. at p. 188. Similarly, Sollazzo acknowledged that it was "possible" that Enforcement lawyers would get the impression from Lamore's November 14, 2005 e-mail that the 2005 NERO examination had a greater focus than it did. Sollazzo Testimony Tr. at p. 141. Indeed, since the 2005 NERO examination had ruled out front-running, the NERO examiners should have encouraged the Enforcement staff to analyze Markopolos' more likely of the two scenarios, the Ponzi scheme.

(5)     Enforcement Staff Knew that, Irrespective of Their Initial Representations, the Examination Staff Had Not Looked for Evidence that Madoff Was Operating a Ponzi Scheme

However the examination staff characterized the scope of its recent examination to the Enforcement staff, the examination report itself, which was attached to Sollazzo's e-mail to Bachenheimer, stated, "The staff's examination consisted primarily of analyzing and comparing BLM's proprietary trading and IA trading to its customer order flow business for the purpose of identifying instances of front-running … ." Examination Report dated September 2, 2005, at p. 3, at Exhibit 292.[179]

Suh acknowledged that:

> [A]fter talking to Peter [I learned] that the focus of their exam was the front-running allegation, which was listed as the second allegation in the Markopolos report. I knew that

---

[179] Bachenheimer testified that she did not remember whether she read the exam report. Bachenheimer Testimony Tr. at p. 63. Cheung and Suh testified that they remembered reading the report. Cheung Testimony Tr. at p. 64; Suh Testimony Tr. at p. 51.

> their primary focus was front-running… . I did not believe
> that they focused on a Ponzi scheme allegation.

Suh Testimony Tr. at p. 27.  In fact, as discussed below, Suh believed the exam had
eliminated the possibility that Madoff was front-running, but that the possibility Madoff
was operating a Ponzi scheme still needed to be investigated.

In contrast to Suh, Bachenheimer and Cheung may have relied upon their
mistaken belief, that the SEC examination had looked for evidence that Madoff was
operating a Ponzi scheme to dismiss that possibility at the outset of the Enforcement
investigation.  Yet, as discussed below, they instead decided that front-running should be
a principal focus of the Enforcement investigation even though they also believed that the
exam had looked for, and not found, evidence of front-running.[180]  Cheung Testimony Tr.
at p. 65 (acknowledging that the examination staff investigated front-running allegations).

In addition, the Enforcement staff should have known that the examination staff's
work could not have eliminated the possibility that Madoff was operating a Ponzi
scheme, because the examiners had only reviewed evidence created by or represented by
Madoff.[181]  Suh acknowledged during testimony that she knew the examination staff had
relied solely on Madoff's representations:

> Q:   Did you ever read the exam report that Lamore did?
>
> A:   Yes.
>
> Q:   Did you notice that in the exam report nearly the
>      entire report recites what Bernie Madoff says?
>
> A:   I knew that, yes.
>
> Q:   Okay.  So a lot of the information that Lamore was
>      getting that he was telling you was just based on
>      what – something Bernie Madoff told him.
>
> A:   Yes.
>
> Q:   Okay and given that you were investigating Bernie
>      Madoff for essentially being a liar and a fraud,

---

[180]  The 2005 submission included the statement, "Fund of funds with whom I have spoken to that have BM
in their stable of funds continually brag about their returns and how they are generated thanks to BM's
access to his broker-dealer's access to order flow."  2005 submission at p. MARK 0057, at Exhibit 268.  In
Lamore's copy of the 2005 submission, he wrote "wrong" in the margin adjacent to that statement and
underlined "his broker-dealer's access to order flow."  Lamore's copy of the 2005 submission at p. 8, at
Exhibit 293.

[181]  In his allocution, Madoff acknowledged that the trading confirmations and account statements that he
provided to clients and the SEC had been fabricated.  Madoff Allocution Testimony Tr. at pgs. 27-28, at
Exhibit 375.

Q:    wouldn't you be very skeptical that any of this stuff was true?

A:    That's true and that makes sense to me now.  At the same time, I was told that Peter was an industry expert and I thought that if there were things that jumped out at him as things that didn't make sense, I deferred to his judgment on that point.

Suh Testimony Tr. at p. 51.

Finally, regardless of how dismissive the examination staff was when they first heard that Enforcement was planning on investigating the 2005 submission, once Lamore began working with the Enforcement staff, the OIG found that he accurately conveyed to Enforcement the limited scope of the 2005 exam and expressed serious concern about Madoff.  As Ostrow explained:

Q:    … . [D]o you think that perhaps John [Nee] or Bob Sollazzo sort of downplayed the allegations in Harry Markopolos's complaint to enforcement?

A:    It appears that way, but even then when enforcement took the next step and started bringing people in and Peter [Lamore] heard Bernie [Madoff] or Frank [DiPascali] or whoever blatantly lying again, there's only so much jumping up and down he can do and even with me confirming what he's saying it didn't help any.

Ostrow Testimony Tr. at pgs. 199-200.  *See also* Suh Testimony Tr. at p. 27 (Suh testified that "after talking to Peter … I did not believe that [the examination staff had] focused on a Ponzi scheme allegation"); E-mail dated December 28, 2005 from Lamore to Suh, at Exhibit 294 (describing his "major concern" as relating to where "the securities and money [are] held").

(6)    The Enforcement Staff Concluded that Madoff Did Not Fit the "Profile" of a Ponzi Scheme Operator

Another factor in the Enforcement staff's skepticism of Markopolos' allegation that Madoff was operating a Ponzi scheme was their view that Madoff did not fit the profile of a Ponzi scheme operator.  As Suh explained during testimony, "It's certainly true that [Madoff] didn't fit the profile of a Ponzi schemer, at least as we – in the world that we knew then."  Suh Testimony Tr. at pgs. 44-45.

While Cheung acknowledged that she "embarrassingly" had not heard of Madoff prior to the 2005 submission, she soon learned of his background and ties throughout the securities industry.  Cheung Testimony Tr. at p. 23.  Cheung testified:

> I don't think there was ever a conscious desire to make
> something go away or to ignore an allegation about Bernie
> Madoff.  Do I think that there's an inherent bias towards
> [the] sort of people who are seen as reputable members of
> society, there may be an inherent bias in that way.

*Id.* at p. 264.  Cheung was adamant, however, that Madoff's stature in the securities industry did not affect the Enforcement staff's investigation, stating:

> I think that we did not forego investigative steps because of
> who he was, and I don't think we were easier on him.  I
> have personally interviewed, requested documents, gotten
> tolling agreements, pushed from people who I view as – as
> sort of more powerful than Bernie Madoff without, I think,
> pulling a punch.

*Id.*  Suh expressed the same belief:

> And – but also, I never had a concern in terms of, you
> know, stepping on the wrong toe or anything like that, and I
> had no impression that anybody else did.

Suh Testimony Tr. at pgs. 44-45.[182]

> 5.    The Enforcement Staff Delayed Opening a Matter Under
>       Inquiry (MUI)

>       a.    The Madoff MUI was Not Opened Until January 2006

As discussed above, on November 3, 2005, Calamari forwarded the 2005 submission to Bachenheimer, suggesting that it would be a good case for Suh.  E-mail dated November 3, 2005 from Calamari to Bachenheimer, at Exhibit 277.  Bachenheimer replied and asked whether she should inform Suh and Cheung.  *Id.* Calamari immediately

---

[182] In fact, Cheung claimed that because of her doubts about Markopolos and the 2005 submission, she believed the Enforcement staff conducted a thorough investigation:

> Everything factored – everything factors into your overall sense of a
> person, but I actually think that in a lot of ways because of our concerns
> [about Markopolos], I think we looked awfully hard and awfully close.
> And I think we were – I was certainly conscious of making sure or
> trying to make sure that we didn't miss something that would come out
> in The Wall Street Journal.

Cheung Testimony Tr. at p. 36.

replied: "Sure, they should open a MUI." *Id.*[183]  However, the staff did not initiate the
process of opening a MUI until December 27, 2005, approximately 8 weeks later.[184]  The
MUI was officially opened on January 4, 2006.  E-mail dated January 4, 2006 from Case
Management System to Suh, at Exhibit 295.

Bachenheimer acknowledged that it was important to open a MUI so that staff is
informed of other relevant information that the SEC receives:

> Q:     Is one of the reasons why you would open a MUI is
>        if a complaint comes in separately that the person or
>        entity that gets the complaint could look up on
>        NRSI [the SEC's Name Relationship Search Index]
>        to see whether there's an open investigation or a
>        MUI?
>
> A:     Yes.

Bachenheimer Testimony Tr. at p. 82.  Bachenheimer acknowledged that the Madoff
MUI "should have been opened sooner." *Id.*  With respect to opening a MUI generally,
Suh acknowledged learning shortly after she joined the SEC that sometimes a MUI was
not opened if "it was clear so quickly that we did not – it wouldn't be something we
pursued." Suh Testimony Tr. at pgs. 95-96.  Suh testified that:

> [N]ow, with the benefit of more experience and sort of
> being more aware of the various information sources that
> we have with in the Commission, I do, myself, make a
> practice and I also talk to my branch members to make sure
> that the related names get loaded up as soon as we become
> aware of them for that very reason, so that if anybody else
> is looking at that person we learn about it right away.  I
> have to say at the time, I was – it was not an issue that was
> on my personal radar.

*Id.*

---

[183]  According to the SEC's Enforcement Manual, "Complaints that appear to be serious and substantial are
usually forwarded to staff in the home office or the appropriate regional office for more detailed review,
and may result in the opening of a MUI."  2008 SEC Enforcement Manual, at p. 8, at Exhibit 296.
[184]  Apparently, Suh believed she had requested the opening of a MUI in mid-December 2005.  E-mail
dated December 27, 2005 from Cheung to Calamari, at Exhibit 297.  On December 27, 2005, Cheung e-
mailed Calamari asking him to review Suh's MUI request.  *Id.*  Calamari responded, "I don't have the e-
mail, which means either that I approved it or never got it.  If I had not approved it for some reason, I
would have spoken to her.  Are you sure it's not open?"  *Id.*  Cheung speculated that there was a "glitch"
with the first attempt since NERO was "transitioning to [a] new system at that point…" Cheung Testimony
Tr. at p. 131.  In any event, Suh then submitted a MUI request on December 27, 2005.  E-mail dated
December 28, 2005 from Suh to Cheung, at Exhibit 298.

b.      As a Result of the Delay in Opening a MUI, The Enforcement Staff Never Learned of a Tip From a Madoff Investor Who Suspected That Madoff was Operating a Ponzi Scheme

Because of the two-month delay in opening the Madoff MUI, the NERO Enforcement staff never received a tip from a former Madoff investor who alleged Madoff was operating a Ponzi scheme. The SEC Office of Internet Enforcement (OIE) (within the Enforcement Division) received an October 1, 2005 e-mail from an anonymous informant who stated he had invested with Madoff in 1999 and was "deeply concerned that Madoff is running a very sophisticated fraudulent pyramid scheme" (the "October 2005 tip"). E-mail dated October 1, 2005 from *Nomen Nescio* to ENFORCEMENT, at Exhibit 299. The informant stated, "I know that Madoff [sic] company is very secretive about their operations and they refuse to disclose anything. If my suspicions are true, then they are running a highly sophisticated scheme on a massive scale. And they have been doing it for a long time." *Id.* The informant also stated, "After a short period of time, I decided to withdraw all my money (over $5 million)." *Id.*

On October 28, 2005, after reviewing the October 2005 tip, an Enforcement Staff Attorney, in OIE searched NRSI [the SEC's Name Relationship Search Index][185] for "Madoff" and found no record of the 2005 Markopolos submission or of an active Madoff investigation. Enforcement Staff Attorney Testimony Tr. at p. 31; Excerpt from the NRSI list of SEC employees who searched for "Madoff," at Exhibit 300. On November 18, 2005, the Enforcement Staff Attorney in OIE forwarded the tip to the Enforcement Senior Counsel in OIE, for her review, stating, "I did a little research on this one but I couldn't find anything on Madoff Financial." E-mail dated October 1, 2005 from *Nomen Nescio* to ENFORCEMENT, at Exhibit 299. On November 21, 2005, the Enforcement Senior Counsel searched NRSI for "Madoff" and also found no record of the 2005 submission or of a Madoff investigation in NERO. Enforcement Senior Counsel Testimony Tr. at pgs. 20-21; Excerpt from the NRSI list of SEC employees who searched for "Madoff," at Exhibit 300.

NERO had received the 2005 submission more than two weeks before the Enforcement Senior Counsel searched NRSI. The Enforcement Senior Counsel found no record of a Madoff investigation because NERO had not opened a MUI. The Enforcement Senior Counsel testified that the October 2005 tip would have been forwarded to NERO had her NRSI search revealed that NERO was investigating Madoff. *Id.* at pgs. 15-16, 22.[186] If she had forwarded the October 2005 tip to NERO, the Enforcement Senior Counsel testified that she would have forwarded it to Jason Gettinger. *Id.* at pgs. 12-13.

---

[185] NRSI is used by the SEC's Enforcement staff to research whether a person or entity is involved in an open investigation. Bachenheimer Testimony Tr. at p. 82.
[186] As discussed in the Enforcement Manual, "Complaints that relate to an existing MUI or investigation are generally forwarded to the staff assigned to the existing matter." 2008 SEC Enforcement Manual, at p. 8, at Exhibit 296.

OIE did not investigate the October 2005 tip and apparently it was not referred to NERO or anywhere else within Enforcement. *Id*. at pgs. 22-23; Enforcement Staff Attorney Testimony Tr. at p. 43. The OIG found no evidence in the SEC's e-mail records for the Enforcement Senior Counsel and the Enforcement Staff Attorney that either one referred the October 2005 tip or discussed it with anyone other than each other before December 11, 2008, and the Enforcement Senior Counsel testified that she did not discuss the October 2005 tip with anyone other than the Enforcement Staff Attorney prior to December 11, 2008. Enforcement Senior Counsel Testimony Tr. at p. 23.

On December 11, 2008, the day it was reported that Madoff had confessed to the Ponzi scheme, an Office of Internet Enforcement Official asked his staff to search OIE's archived records to determine whether OIE had ever received any complaints about Madoff. Office of Internet Enforcement Official Testimony Tr. at p. 33. That search revealed the October 2005 tip. *Id.* The Office of Internet Enforcement Official testified that he had not been aware of the October 2005 tip before that day. *Id*. at pgs. 32-33.

On December 11, 2008, the Enforcement Senior Counsel initially told the Office of Internet Enforcement Official that she thought she may have referred the October 2005 tip to someone else within Enforcement. *Id*. at p. 37. However, the Enforcement Senior Counsel testified that she had no recollection of referring the matter and, as noted, the OIG found that the October 2005 was not referred to anyone outside of OIE for possible investigation. Enforcement Senior Counsel Testimony Tr. at p. 22.

Both the Enforcement Senior Counsel and the Office of Internet Enforcement Official testified that the October 2005 tip should have been referred by OIE for investigation. Enforcement Senior Counsel Testimony Tr. at p. 25; Office of Internet Enforcement Official Testimony Tr. at p. 32. Bachenheimer and Cheung each testified that the October 2005 tip would have been relevant to the Madoff investigation. Cheung Testimony Tr. at pgs. 261-262; Bachenheimer Testimony Tr. at pgs. 158-159. In addition, as discussed above, Suh, Bachenheimer and Cheung all testified that a tip from a Madoff investor would have been more credible than the 2005 submission. Suh Testimony Tr. at p. 118; Cheung Testimony Tr. at pgs. 29-30; Bachenheimer Testimony Tr. at p. 40.

Had the MUI been opened when Calamari requested it, on November 3, 2005, the Enforcement Senior Counsel's NRSI search on November 21, 2005, would have resulted in the October 2005 tip being referred to the Enforcement staff. Enforcement Senior Counsel Testimony Tr. at p. 22. As a result of their delay in opening the MUI, the Enforcement staff was not aware of the October 2005 tip. However, it is unclear whether the tip would have made any difference in the conduct or the result of the 2006 investigation because, as discussed in detail below, when Suh later received another anonymous tip regarding Madoff, she dismissed it without any investigation because of her view that anonymous tips, "on [their] face" were not credible. Suh Testimony Tr. at p. 233.

6.    The Enforcement Staff Investigated Madoff, but Focused on Issues
Unrelated to a Ponzi Scheme Investigation

a.    The Focus of the Investigation Was on Whether Madoff
Should Register as an Investment Adviser and Disclosure
Issues

As discussed above, the 2005 submission primarily presented evidence that
Madoff was operating a Ponzi scheme; calling that scenario "highly likely."  However,
most of the Enforcement staff's efforts during the 2006 investigation were directed at
determining whether Madoff was front-running, whether Madoff should register as an
investment adviser, or whether Madoff's hedge fund investors' disclosures were
adequate.

Regarding her understanding of the Madoff investigation's focus, Bachenheimer
testified:

> My recollection of the investigation was we did start with
> whether it was a Ponzi scheme … we knew how much
> money Fairfield had given to Madoff, and it was accounted
> for, and given the size and the fact that it was accounted
> for, I remember thinking it was unlikely it was a Ponzi
> scheme.  Then I think we did focus on front running.

Bachenheimer Testimony Tr. at p. 36.  Bachenheimer later reiterated her understanding
of the investigation's focus:

> Q:    Why at that point were you not thinking Ponzi
> scheme?
>
> A:    Going back to what I testified to earlier about the
> Fairfield Century thing, that the money had been
> accounted for, and it was too big.  I thought it was
> more about performance.

*Id.* at p. 114.

Cheung testified that she did not believe the Ponzi scheme scenario was the
primary issue presented in the 2005 submission, despite Markopolos' characterization of
that scenario as "highly likely," stating:

> Q:    Okay.  Was there one particular aspect that you felt
> was kind of the primary focus? … Did you also get
> the sense from Markopolos' complaint or
> presentation that the primary issue that he was

          bringing to your attention was an allegation that
          Madoff Securities was a Ponzi scheme?

A:     I don't know if – I don't know if that's what I
          thought was primary.  I thought that was a real
          concern, but I thought the disclosure issues were
          also a real concern.  And I think also – I think also
          the front-running issue seemed like a real concern.
          I mean, I think – I think there was a lot in this for us
          to investigate.

Cheung Testimony Tr. at pgs. 32-33.

Stephen Johnson, a Branch Chief for broker-dealer examinations, also provided some insight regarding the focus of the Enforcement staff's Madoff investigation. Johnson Testimony Tr. at pgs. 18-19.  As discussed in greater detail below, Johnson was asked in May 2006 to assist with some of the preparation for Madoff's testimony and to attend that testimony because of his experience with market maker activity and front-running investigations.  *Id.* at pgs. 7-8, 10, and 17-18.  Johnson testified that the Enforcement staff had explained to him they were investigating Madoff for "operating as an investment adviser and he wasn't registered" and that "someone discuss[ed] the possibility of frontrunning customer orders." *Id.* at p. 18.  After Madoff's testimony, Johnson understood that the Enforcement staff ruled out the possibility that Madoff was front-running and focused exclusively on the investment adviser registration issue.  *Id.* at pgs. 55-56.  Johnson was never told that the Enforcement staff's Madoff investigation also involved the possibility of Madoff operating a Ponzi scheme.  *Id.* at pgs. 19 and 55-58.

Another indication of the focus of the Enforcement staff's Madoff investigation was the description of the investigation that Cheung gave Israel Friedman, a, SEC New York Regional Office Branch Chief, after Madoff confessed.  Friedman called Cheung only a "few hours" after opening the SEC's current Madoff investigation on December 11, 2008, the day after Madoff had confessed to the Ponzi scheme.  Friedman Testimony Tr. at p. 29.  Friedman called Cheung after learning that there had been a previous Enforcement investigation about Madoff.  *Id.*  Friedman testified that Cheung told him the Enforcement staff had "worked pretty hard and looked very hard for in particular front running type issues." *Id.*  Friedman testified that Cheung did not mention anything about looking for a Ponzi scheme.  *Id.* at p. 30.[187]

---

[187]   However, in a written submission made by Cheung's attorney after her testimony, Cheung claimed that she had "recognized the seriousness of the Ponzi scheme allegation made by Mr. Markopolos [and had] developed a plan to investigate those allegations by initially obtaining documents and testimony from Fairfield Greenwich – the main feeder fund to BLM – and from BLM and Madoff.  And that plan was implemented and followed.  It would be wrong and unfair to conclude that Ms. Cheung and her colleagues did not seriously investigate the Ponzi scheme allegations."  Submission on Behalf of Meaghan Cheung dated July 24, 2009, at pgs. 9-10, at Exhibit 281.

The OIG investigation found that there was significant confusion among the members of the Enforcement staff as to what the focus of the investigation was, or should have been in 2005.  Bachenheimer and Cheung believed that the Ponzi scheme scenario had been eliminated as a possibility by the examination staff.  *See* Bachenheimer Testimony Tr. at p. 59; Cheung Testimony Tr. at pgs. 66-68.

While Bachenheimer and Cheung believed that Suh was focused on the front-running scenario, Suh believed that "the front-running issue had kind of already been looked at [during the examination] so … [the] focus was … whether [Madoff] was operating a Ponzi scheme."  Suh Testimony Tr. at p. 37.  *See also id.* at p. 27 (Suh testified that "after [she talked] to Peter [she learned] that the focus of the[] exam [had been] the front-running allegation … and that [the examination staff had not] focused on a Ponzi scheme allegation.")  In a December 28, 2005 e-mail, Lamore described his and Suh's "major concern" as relating to where "the securities and money [are] held," which indicates that front-running was not Suh's and Lamore's "major concern."  E-mail dated December 27, 2005 from Suh to Cheung, at Exhibit 294.

However, on January 27, 2006, Suh remarked in an e-mail to Lamore that she did not think there was "any *real* reason to suspect some kind of wrongdoing …" (emphasis in original) and indicated that "all we suspect is disclosure problems."  E-mail dated January 27, 2006 from Lamore to Suh, at Exhibit 301.  Suh testified regarding this e-mail, "At that time I think the view was that there's probably nothing there and that this would be primarily a registration and disclosure case."  Suh Testimony Tr. at p. 130.

As discussed in greater detail below, the OIG investigation found that it was not until near the end of the investigation that the Enforcement staff made any effort to obtain documents that would have indicated whether or not Madoff was actually placing any trades with his investors' funds, and those efforts were halted before any of those documents were obtained.  Suh explained that the decision not to obtain those documents was made "very close to the end of the investigation, it was in July, and *the focus at that time was on the registration issue."  Id.* at p. 61 (emphasis added).

On August 10, 2006, Suh received an e-mail from Cheung stating that Madoff had agreed to register as an investment adviser.  She testified that "once I got that e-mail I kind of assumed we were done" because "registration was the goal at that point." *Id.* at p. 231.

          b.      The Investigation Focused on Reviewing Records Created by
                  Madoff Without Verifying Those Records Through
                  Independent Sources

              1.      In December 2005, the Enforcement Staff Reviewed
                      Documents Produced By Madoff's Largest Hedge Fund
                      Investor

The Enforcement staff's investigative plan primarily involved comparing documents and information that Madoff had provided to the examination staff (which he fabricated) with documents that Madoff had sent his investors (which he also fabricated). Suh began the investigation by sending a document request to Fairfield Greenwich Group (Fairfield) on November 18, 2005.[188] *See* Document Request dated November 18, 2005 from Suh to Fairfield, at Exhibit 302.[189]

Suh acknowledged in testimony that this plan was not helpful for ascertaining whether Madoff was operating a Ponzi scheme:

      Q:      What is the point of trying to verify that the
               information that … Madoff provided to Fairfield
               matches the information that Madoff gave to [the
               examination staff]?

      A:      Well, if it didn't match it certainly would be a
               huge red flag.

           …

---

[188]  The November 18, 2005 document request to Fairfield sought, *inter alia*:  (1) documents describing the investment strategies employed by all Fairfield hedge funds and the returns generated through those strategies and (2) account statements and trade confirmations for the hedge funds.  *See* Document Request dated November 18, 2005 from Suh to Fairfield, at Exhibit 302.  The Enforcement staff subsequently limited the request to include only the Fairfield hedge funds with assets managed by Madoff.  *See* Supplemental Document Request dated November 18, 2005 from Suh to Fairfield, at Exhibit 303.  On December 8, 2005, Fairfield produced documents responsive to the November 18, 2005 requests.  *See* Fairfield Production Letter dated December 8, 2005, at Exhibit 307.

[189]  In February 2006, the Enforcement staff sent Tremont Partners, Inc. (Tremont) a request for documents similar to the November 2005 Fairfield request.  Letter dated February 1, 2006 from Suh to Tremont, at Exhibit 304.  Tremont produced documents in response to that request initially on February 22, 2006, and throughout the month of March.  Tremont Production Index, at Exhibit 305.

      In April 2006, the Enforcement staff requested similar documents from Tremont relating to Kingate's accounts with Madoff.  *See* Letter dated May 5, 2006 from Tremont to Suh, at Exhibit 306. Those documents were produced on May 5, 2006.  *Id.*

> Q:      But it wouldn't really go to the Ponzi scheme issue, right?
>
> A:      That's right.

Suh Testimony Tr. at pgs. 65-66.[190]

On November 22, 2005, Bachenheimer explained the investigative plan in an e-mail to Calamari, as follows:

> The exam team doesn't think that there's anything here. Simona is going to seek information from some of the hedge funds on a voluntary basis to test some of the explanations that Madoff gave to the exam team.  If they work out we won't do anything.

E-mail dated November 3, 2005 from Bachenheimer to Sollazzo, at Exhibit 287.

On December 13, 2005, Suh e-mailed Cheung and Lamore to inform them of the contents of Fairfield's document production and her plan going forward, as follows:

> Fairfield Greenwich produced 11 binders of documents last Thursday.  Ten of those binders contain account statements and trade confirmations, one – general fund documents such as subscription materials, private placement memoranda, etc.  Fairfield Greenwich did *not* produce the monthly statements with performance data that the administrators of the two relevant funds (Citco Fund Services (Europe) B.V. for Fairfield Sentry Limited and GlobeOp Financial Services, LLC for Greenwich Sentry, L.P.) send directly to investors, but offered to request and produce them, if we ask.  Fairfield Greenwich *did* produce account statements and trade confirmations that it receives from Madoff.
> …
>
> Thus, with the data produced so far, it looks like we should be able to verify whether the information Madoff provided to Fairfield Greenwich matches the data Madoff gave to [Lamore] and his team, but we will need to make an additional request if we decide to try matching this data

---

[190]  However, in a written submission made by Cheung's attorney after her testimony, Cheung claimed that the Enforcement staff's investigative plan had been designed to investigate Madoff for a Ponzi scheme. Submission on Behalf of Meaghan Cheung dated July 24, 2009, at p. 9, at Exhibit 281 (Cheung "developed a plan to investigate [the Ponzi scheme] allegations by initially obtaining documents and testimony from Fairfield Greenwich – the main feeder fund to BLM – and from BLM and Madoff.  And that plan was implemented and followed.")

with the information that Fairfield Greenwich provides to its investors.

E-mail dated December 13, 2005 from Suh to Lamore, at Exhibit 308 (emphasis in original).

2.      The Documents from Fairfield Demonstrated that Madoff Had Lied to the Examination Staff

In her December 13, 2005 e-mail to Lamore and Cheung, Suh stated that she noticed an "odd discrepancy" between Fairfield's production and Madoff's previous representations to the examination staff, as follows:

> While I have not yet completed the review of the general binder, one odd discrepancy did catch my eye. As you know, Madoff told [Lamore] that he stopped using options as part of his trading strategy in January 2004. Yet the account statements and trade confirmations produced by Fairfield Greenwich show trading in S&P 100 Index options all through 2004 and up to October 2005, the last month for which data was produced … Moreover, the CD with account statements that Madoff produced to [Lamore] and his team does not include statements for three accounts and one sub-account in the Fairfield Greenwich production … Peter [Lamore], would you have time to take a look at the data to see if I am missing some obvious – and innocent – explanation for this?

*Id.*[191]

---

[191]   Suh also raised a "conflict of interest" issue with Lamore while she reviewed Fairfield's documents:

> Fairfield Sentry's private placement memorandum discloses the following "potential conflict of interest":
>
> The broker-dealer through which the Fund conducts its SSC Investment activities, in its role as a market-maker, may effect transactions in equity securities with the Fund as principal. This may provide such broker-dealer with the ability to use the Fund's assets to enhance its equities market making function.
>
> What is this about? (I am sure this is basic stuff, but I am still pretty new to all things b-d.) Thanks!"

E-mail dated December 14, 2005 from Suh to Lamore, at Exhibit 353.

On December 15, 2005, Cheung raised this "odd discrepancy" in an e-mail to Bachenheimer:

> Do you have a few minutes to talk about Madoff?  It may actually be something of concern since Madoff failed to produce a whole set of accounts to the examiners.  In those accounts he's using the option strategy that he told our examiners that he was no longer using.  He seems to have failed to disclose to the examiners several billion dollars worth of options accounts.

E-mail dated December 15, 2005 from Cheung to Bachenheimer, at Exhibit 309. Bachenheimer testified that she had a vague recollection of the discrepancy and "was concerned that [Madoff] had lied," stating:

> Q:  Do you remember this particular issue that Meaghan references here in this e-mail on Exhibit 14 that Madoff failed to produce a whole set of accounts to the examiners, and in those accounts, he's using the options strategy that he told our examiners he was no longer using?
>
> A:  You know, I just have a very vague sense of this, of learning this, but I really can't remember the specifics of it.
>
> Q:  Do you remember generally that Madoff had lied to the examiners on numerous occasions in the examination, that was the conclusion of the exam staff?
>
> A:  As I remember it, I don't think my thought was that he had lied numerous times.  I think he had lied.  I was concerned that he had lied.

Bachenheimer Testimony Tr. at p. 72.

Cheung testified that the discrepancy was "serious" and precipitated a phone call from Bachenheimer to Madoff "to impress on him the importance" of the issue, stating:

> Q:  Does this [December 15, 2005 e-mail from you to Bachenheimer] refresh your recollection about that options issue at all?
>
> A:  A little bit.  I still don't – I think that this – what it seems to be refreshing is that this is what kind of

> came out of – that this came out of Simona's initial e-mail to Peter about a discrepancy and then she and Peter met and then they met with me. And then I thought it was significant enough that we should be bringing it to Doria right away. That's what I remember.
>
> Q:    Okay. And do you remember what was decided about this issue or?
>
> A:    I – I remember we went back to Mr. Madoff for documents again. I believe at that point because we were disturbed about not – that things not being produced to the exam staff, that I believe that Doria was on the call to impress on him the importance of what we were – how serious this was to us.

Cheung Testimony Tr. at pgs. 98-99.

The "odd discrepancy" Suh noted should have been recognized as a critical development in the investigation. The Enforcement staff's first investigative step had revealed that Madoff had lied about a fundamental component of his claimed trading activity during the recent exam. Suh testified that she was still bothered by this discrepancy when the investigation was closed, stating:

> Q:    Okay. And this discrepancy, was that resolved by the end of the investigation?
>
> A:    We did confront Madoff with the discovery during his testimony. He attempted to portray this as a misunderstanding. It did bother me. I did not think it was resolved. I did believe that he was not forthright.
>
> Q:    So the explanation that Madoff gave in his testimony didn't convince you?
>
> A:    That's correct.

Suh Testimony Tr. at p. 67. *See also id.* at p. 223 (Suh testified, "I knew [Madoff] wasn't truthful and I knew he was not giving us full information.").

The fact that the Enforcement staff knew or suspected that Madoff was lying about this and other significant issues during the investigation is discussed in more detail below. Cheung acknowledged that "the issue of Madoff's honesty was relevant in terms of the investigation of him running a Ponzi scheme." Cheung Testimony Tr. at p. 222.

However, it is worth noting at this juncture that, despite having caught Madoff lying about his trading to the examination staff early in the investigation, the Enforcement staff did not reassess its investigative plan or expand the investigation's limited focus to include the possibility that Madoff was operating a Ponzi scheme.

> (3).    In December 2005, Enforcement Staff Did Not Demonstrate an Interest in Additional Information Offered by Markopolos

On December 16, 2005, Markopolos e-mailed Cheung that Michael Ocrant, the author of the 2001 *MARHedge* article, was willing to meet with the Enforcement staff and share his observations regarding Madoff's operations.  E-mail dated December 16, 2005 from Markopolos to Cheung, at Exhibit 310.  He also suggested that the staff contact John Wilke, a Senior Investigative Reporter at the *Wall Street Journal* who Markopolos said "will soon start working on this story."  *Id.*  In addition, Markopolos informed Cheung that he had "compiled several pages of contact information that might be useful to the SEC's investigation" and offered Cheung a "several inch thick file folder on Madoff that I would be happy to let you copy if the SEC has any interest."  *Id.*

Cheung did not pursue Markopolos' suggestion to talk either with Ocrant or Wilke and testified that Markopolos' suggestion to do so made her "nervous" because, as she explained:

> A:    [O]ne of the very last things that I would want to happen would be the beginnings of an investigation end up in the newspaper before we had even gotten anywhere on it. That's something I was very sensitive to because it had happened in the past.

> Q:    What would be the – why would you be concerned about that?

> A:    One of the things that had happened that was happening in this time frame and a little bit before, there had been some number of instances that the staff were aware of and some that I experienced where short sellers or people who would use the news of an investigation to depress a stock price and that was – was something that people were conscious of.  I had gotten – I had gotten a referral about accounting fraud that turned out to have come through short sellers.  We had – somebody had – there had been an investigation, a very short investigation into cookie jar accounting at a company, and luckily, we closed it very quickly because the next – very soon afterwards there was

> an article in the press about it.  So that was certainly
> something that I was – I was thinking about and was
> worried about.

Cheung Testimony Tr. at pgs. 34-35.[192]

Cheung also declined to obtain the materials Markopolos offered.  Cheung testified that, "If [Markopolos] offered information, I would take it.  I don't know that I ran him down and said 'wait a minute, is there more stuff.'"  *Id.* at p. 103.  However, when Markopolos offered a list of contact names[193] and a "several inch thick file folder on Madoff," Cheung apparently did not accept his offer to provide those materials.  On December 19, 2005, Cheung forwarded Markopolos' e-mail offer to Suh without comment.[194]  E-mail dated December 16, 2005 from Markopolos to Cheung, at Exhibit 310.  Suh testified that she never saw the file (Suh Testimony Tr. at pgs. 71-72) and Cheung acknowledged that she "would not have [received it and not given it to Simona]."  Cheung Testimony Tr. at pgs. 103-104.

In her testimony, Suh offered a possible explanation for why Cheung did not accept Markopolos' offer of additional information, stating:

> Q:    Do you have any – do you know why it seems as
>        though from the e-mails Harry Markopolos was
>        kind of trying to meet with Meaghan but she didn't
>        seem interested in meeting with him?

> A:    I don't know what her reasons were.  I know her
>        general impression of him was – she was skeptical
>        of him, but I don't know what her reasons for not
>        meeting with him were.

---

[192]  While Cheung may have been legitimately concerned about contacting reporters, her comparison of Markopolos's motives to those of "short sellers or people who would use the news of an investigation to depress a stock price" is misplaced.  There was no stock at issue whose price could be affected by the SEC's investigation.  Furthermore, Markopolos himself correctly noted in his 2005 submission that he would not be eligible for a bounty in the event the SEC discovered Madoff was operating a Ponzi scheme, the scenario Markopolos described as "highly likely."  2005 submission at p. MARK 0052, at Exhibit 268.

[193]  Bergers had previously vouched for Markopolos's credibility, telling Cheung in 2005 that Markopolos had "very good sources."  E-mail dated December 5, 2005 from Cheung to Bachenheimer, at Exhibit 284.

[194]  Suh started to draft an e-mail response to Cheung.  Suh's draft, which was apparently never completed or sent, stated:

> Do you think it makes sense to agree to meet with him and to look at
> his "inch thick file folder?"  I am not sure whether [sentence ends]
> Should we (and can we) do anything about the purported upcoming
> press interest?  It does not sound like anything will be published very
> soon [sentence ends without punctuation].

Draft e-mail dated December 19, 2005 from Suh to Cheung, at Exhibit 311.

> Q:    In what way was she skeptical of him?
>
> A:    … I remember hearing that she thought he was kind of condescending to the SEC in terms of SEC expertise and knowledge …

Suh Testimony Tr. at p. 72.

> (4).    In December 2005, the Enforcement Staff Interviewed an Executive from Fairfield and Became More Convinced that Madoff Had Lied to the Examination Staff

The Enforcement staff continued executing its investigative plan of comparing Madoff's representations to the examination staff with Madoff's representations to Fairfield by interviewing a Fairfield officer.  On December 21, 2005, Cheung, Suh, and Lamore interviewed Amit Vijayvergiya, then-Managing Director and Head of Risk Management of Fairfield.  E-mail dated December 22, 2005 from Suh to Lamore, at Exhibit 312.  In a December 22, 2005 e-mail to the OCIE Assistant Regional Director, Lamore referenced the fact that the interview with Vijayvergiya and Fairfield's document production had revealed that Madoff had lied to the examination staff:

> I'll be writing up my notes from the Madoff / [Fairfield] conference call that I participated in yesterday.  Also, I'm going to provide the attorneys with a list of differences (*lies*) from what we were told and provided during the Madoff exam vs. what we learned about Madoff's operation from various documents provided by [Fairfield] and during the conference call yesterday.

E-mail dated December 22, 2005 from OCIE Assistant Regional Director to Lamore, at Exhibit 313 (emphasis added).

Later that day, Lamore e-mailed Cheung and Suh as follows:







E-mail dated December 22, 2005 from Lamore to Cheung, at Exhibit 314 (emphasis added).  Suh responded to Lamore and Cheung as follows:



*Id.* (emphasis added).  Lamore's response to Suh also indicated that he did not understand "the back-office operations and trade execution process questions," and he wrote, "[I] will try to find out more about these areas from my colleagues in [the Broker-Dealer examination group]." *Id.*





E-mail dated December 22, 2005 from Suh to Lamore, at Exhibit 312.  Suh testified that she "knew that … whatever answers we were getting [from Vijayvergiya] had been vetted by [Madoff]" and "Madoff had prepped Vijayvergiya."  Suh Testimony Tr. at pgs. 78, 88.

The day after the Vijayvergiya interview, December 22, 2005, McKeefry called Suh and was "mostly concerned" about Madoff.  E-mail dated December 22, 2005 from Suh to Lamore, at Exhibit 315.  On the same day, Suh e-mailed Lamore a memorandum summarizing her call with McKeefry.  *Id*.  Suh's e-mail stated:

> For your reading pleasure.  He sounded very somber and concerned – and it sounded like he was mostly concerned about your friend Bernie.  I talked to Meaghan about this, and, while she found this annoying, she too agreed that there is not much else we can do about this.

*Id*.  The memorandum attached to Suh's e-mail stated:



*Id*.

Lamore responded on December 23, 2005, "Bernie can be very intimidating.  Do you know what McKeefry meant when he said 'our inquiry may have serious consequences for Madoff?'  If there is no problem with his activity, then why would there be serious consequences?"  *Id*.  Suh responded, "Well, I guess even if the fact that we are looking at Bernie gets out, it's a big deal for his reputation etc.  I wouldn't worry about this call too much …"[195]

---

[195]  On April 1, 2009, the Massachusetts Secretary of State filed a lawsuit against Fairfield for colluding with Madoff to "funnel[] billions of dollars into Bernard Madoff's Ponzi scheme."  The Massachusetts

On December 29, 2005, Bachenheimer e-mailed Sollazzo in reference to Madoff's falsehoods, as follows:

> The Madoff investigation took an interesting turn. Contrary to what Madoff told our exam team, he is trading options for at least one hedge fund.

E-mail dated December 29, 2005 from Bachenheimer to Sollazzo, at Exhibit 316.

> (5).   In January 2006, the Enforcement Staff Reviewed Documents Produced by Madoff

On December 27, 2005, Suh e-mailed Cheung and Lamore a draft voluntary document request to Madoff.  E-mail dated December 27, 2005 from Suh to Cheung, at Exhibit 294.  In her e-mail, Suh explained that she "picked the three customers specifically named in the draft – [Fairfield], Kingate and Tremont – because, *according to the data provided by Madoff*, these customers' accounts contain approximately 88% of all assets managed by Madoff."  *Id.* (emphasis added).  Suh also noted:

> [Lamore] has been analyzing the Fairfield account statements and has found that, in fact, the number of S&P 100 index options traded by Madoff, purportedly *over the counter*, is an order of magnitude greater than the total *exchange-traded* volume for these options.  This fact does not necessarily mean there is anything fishy going on, but it does, as [Lamore] pointed out, make it interesting to find out where and how these options are traded.

*Id.* (emphasis in original).

Lamore suggested that Suh also request, *inter alia*, (1) "[c]opies of the OTC Option Agreements with counterparties," and (2) "a written explanation of the entire trading process (including the clearing and settlement of securities and funds)."  E-mail dated December 27, 2005 from Suh to Cheung, at Exhibit 294.  Suh revised the document request incorporating Lamore's comments, and forwarded it to Cheung that same day.  *Id.*

---

lawsuit referenced a transcript of a phone call between Madoff, Vijayvergiya, and McKeefry during which Madoff coached Vijayvergiya for his upcoming SEC telephone interview.  *See* Svea Herbst-Baylis, "Massachusetts regulator sues Madoff feeder fund," Reuters, April 1, 2009, at Exhibit 317.

While the SEC did not have that transcript during the 2006 investigation, Suh's memoranda regarding the December 21, 2005 interview of Vijayvergiya and her December 22, 2005 call with McKeefry show that the Enforcement staff was fully aware in 2005 that Fairfield was "cooperating with Madoff" in connection with the 2006 investigation and that, as Suh testified, "Madoff had prepped Vijayvergiya."  E-mail dated December 22, 2005 from Suh to Lamore, at Exhibit 315; Suh Testimony Tr. at p. 88.

On December 28, 2005, Lamore e-mailed Suh additional comments regarding the document request, stating:

> I'm not certain how to phrase it, but I suggest that we ask [Madoff] directly about the money and securities issue. That is, are the securities and money held at BLM or Citco? We need to know the answer to this question to alleviate our major concern.

*Id.*[196]  Suh forwarded Lamore's e-mail to Cheung.  *Id.*  Cheung testified regarding the "major concern" referenced by Lamore, as follows:

> A:  Well, I think that is the concern about whether or not it was a Ponzi scheme, you know, so that we could see where the securities and money – I think that was something that would factor into the securities – where the securities were held and who had custody.
> …
>
> Q:  And so did you know that if you got information responsive that alleviated that major concern?
>
> A:  I don't remember now.

Cheung Testimony Tr. at pgs. 137-138.

After Suh and Cheung agreed to "add a request for documents sufficient to identify all persons who had custody of the assets in … all accounts covered by the request," Lamore responded as follows:

> Sounds good.  I'd sleep better with the answer to this question.
>
> On a side note, if Bernie calls me regarding the request list, I don't intend to speak to him about it.  I'll refer him to you.

E-mail dated December 27, 2005 from Suh to Cheung, at Exhibit 294.  Suh responded to Lamore's "side note" as follows:

---

[196]  Citco Fund Services B.V. (part of The Citco Group of Companies) was the fund administrator for some of the Fairfield's hedge funds.  *See* E-mail dated December 13, 2005 from Suh to Lamore, at Exhibit 308.

> I agree – at this point, he should deal with Enforcement (especially since, *technically, you could be a witness to his lying – whatever we end* [sic] *making of it in the end*).

*Id.* (emphasis added).

After learning that Madoff was trading options for his investors, Bachenheimer asked Sollazzo to have someone "particularly knowledgeable about options trading" assigned to the Madoff investigation, but Sollazzo offered no additional support.  E-mail dated December 29, 2005 from Bachenheimer to Sollazzo, at Exhibit 316.  Bachenheimer e-mailed Sollazzo on December 29, 2005 as follows:

> Contrary to what Madoff told our exam team, he is trading options for at least one hedge fund.  Peter is looking at the trading records for us (he's been very helpful) but I was wondering if you can direct us to someone in the office who is particularly knowledgeable about options trading.  Thanks.

*Id*.  Sollazzo responded:

> Peter is one of our most knowledgeable staffers in respect to trading practices.  We don't have anyone in the [Broker-Dealer group] who is particularly knowledgeable in options trading.  I would think that Peter should be able to work through and understand much of the activity.

*Id.*[197]

---

[197]  After receiving Sollazzo's e-mail, Bachenheimer e-mailed Cheung and Suh on December 29, 2005, and suggested contacting the Office of Economic Analysis (OEA) for assistance:

> When [Lamore] has finished his review of the trading, let's call Bill Dale in OEA – he may be able to give us general advice and he may also be able to help us find something by analyzing the trading.

E-mail dated December 29, 2005 from Bachenheimer to Sollazzo, at Exhibit 316.

However, while Bachenheimer's very suggestion to contact OEA was prompted by her recognition that Lamore and Suh lacked the requisite knowledge about options trading, apparently no one gave Lamore or Suh any guidance regarding what questions to ask OEA.  E-mail dated January 13, 2006 from Suh to Lamore, at Exhibit 322.  On January 13, 2006, Suh e-mailed Lamore:

> Doria has suggested that we talk to somebody in the Office of Economic Analysis about Bernie's trading.  To be honest, I am not entirely sure what questions we would want to ask them – so if you have any thoughts on what they can do for us, let me know.

*Id.*

On December 29, 2005, the Enforcement staff faxed a voluntary request to
Bernard L. Madoff Investment Securities LLC (BMIS) for certain documents related to
three of BMIS's hedge fund clients – Fairfield, Kingate, and Tremont – and for any other
accounts that "were traded …  pursuant to the [split strike conversion strategy]."
Document Request dated December 29, 2005 from Suh to BLM, at Exhibit 318.
Specifically, the staff requested, *inter alia*, account opening documents, trading
authorizations, account statements, trade confirmations, trade tickets, agreements
(including options agreements), correspondence, audio records of telephone
conversations, and documents sufficient to identify all persons who had custody of the
assets in the accounts identified in response to the request.[198]  *Id.*

That same day, Madoff called Suh to discuss the request.  E-mail dated December
29, 2005 from Suh to Cheung, at Exhibit 319.  Suh summarized the call for Lamore and
Cheung in an e-mail as follows:

> Bernie Madoff called me back to speak about the faxed
> request.  Surprisingly to me, he was very friendly and
> cooperative.  He did, of course, try the usual "what is this
> all about" question – to which I gave the usual "non-public
> inquiry/can't tell you more than what's in the document
> request" answer.  (He also mentioned that he knows that we
> spoke to Fairfield and that they also could not say what this
> is all about.) …

*Id.*  Suh testified that she had been surprised that Madoff was "very friendly and
cooperative" "[b]ecause of [Lamore's] experiences that it was very hard to get anything
out of him and because of the impression of him that [Lamore] conveyed to me."  Suh
Testimony Tr. at p. 106.

Although Suh noted Madoff had been friendly and cooperative in the previous
communication, she also expressed frustration in her December 29, 2005 e-mail that
Madoff did not have counsel, "Ugh … I wish he'd just get a lawyer – but he did make it
sound as though he was planning to handle the whole thing himself.  Bad idea for him
and a lot more hassle for us."  E-mail dated December 29, 2005 from Suh to Cheung, at
Exhibit 319.  Lamore responded, "Yes.  He will handle EVERYTHING himself – which
always seemed strange to us."  *Id.* (emphasis in original).

---

Suh contacted OEA in February 2006 and provided certain documents for OEA to analyze.  E-
mail dated February 6, 2006 from Suh to Anthony, at Exhibit 335.  As discussed below, after not receiving
a response for two months, Suh followed up with OEA, but did not obtain any helpful information or
analysis.

[198] On the same day that Suh sent Madoff the request for documents, Suh predicted, "I don't think we can
expect to be done with this case at least for another 2-3 months, even though I do not think that it will
require 100% of our time."  E-mail dated December 29, 2005 from Suh to Cheung, at Exhibit 319.

Lamore subsequently related the following experience with Madoff during the 2005 NERO examination:



E-mail dated January 27, 2006 from Lamore to Suh, at Exhibit 301. Suh responded to Lamore's anecdote, "Ugh… what a pain he is." *Id.* While Suh expressed annoyance at Madoff's behavior, she did not seem to appreciate that his behavior may also have been suspicious.

        (6).     The Enforcement Staff Was Not Suspicious When Madoff Did Not Produce Documents Related to His Claimed OTC Options Contracts

On January 13, 2006, the Enforcement staff received Madoff's document production from the December 29, 2005 voluntary request. Letter dated January 13, 2006 from Madoff to Suh, at Exhibit 320. The production included documents related to seventeen clients with twenty corresponding account numbers and a description of the split-strike conversion strategy. Suh Production Log, at Exhibit 321. Perhaps the most notable aspect of Madoff's document production to the Enforcement staff was what it did not include – OTC options contracts. As she reviewed Madoff's production, Suh prepared notes itemizing what Madoff had produced in response to the Enforcement staff's specific requests. *Id.* Regarding request 1(f) – "[a]ll documents concerning trading activity in all accounts of [Fairfield] at [Bernard L. Madoff] BLM … including … agreements (including options agreements)" – Suh noted:

        [Madoff's] Cover letter refers to documents responsive to 1(a) and 1(b)[199]

---

[199] Requests 1(a) and 1(b) asked for "account opening documents" and "trading authorizations." Document Request dated December 29, 2005 from Suh to BLM, at Exhibit 318.

> 1/23/06 call to BMadoff:  BMadoff says BLM *has no documentation of option contracts other than what was produced; e.g., no written contract between purchaser and counter-party.*

*Id.* (emphasis added.)

However, the Enforcement staff was not suspicious of Madoff's claim to have had billions of dollars invested in undocumented OTC options contracts.  Suh testified:

> Q:  But do you remember a specific request about the options agreements –
>
> A:  Yes.
>
> Q:  – as part of the overall request?
>
> A:  Right.  And I definitely know that there was a request for options agreements and that what he produced he claimed that that was all he has.
>
> Q:  Okay.  So he, literally, claimed he didn't have copies of the master derivatives contracts that he was trading with these counterparties on?
>
> A:  I think he said he has electronic versions and he did not produce them.  So I actually do think that I probably – I mean I overlooked that.
>
> Q:  Was there any – do you recall any discussion on whether to push him on that or –
>
> A:  No, I don't think that was discussed.

Suh Testimony Tr. at p. 149.  As Markopolos noted in the 2005 submission, "[e]xtensive and voluminous paperwork would be required to keep track of and clear each OTC trade."  2005 submission at p. MARK 0056, at Exhibit 268.

After her initial review of the documents, Suh e-mailed Lamore as follows:

> [I]t looks like [Madoff] is telling us now that he is, in fact, trading options.  The write-ups on the strategy and the list of customers look very similar to the ones he gave you, but I need to take a closer look at them to know for sure if there are any discrepancies.  What's annoying is that he clearly created special write-ups in response to our request, instead

> of producing existing documents.  The write-ups are
> helpful, but he should also be producing everything
> existing … Oh well – we'll see if we need to pursue this
> issue.
> … .
>
> [C]ould you go over your notes from the exam and find
> places where you made you made notes of conversations
> about Bernie no longer trading options? … [W]e just want
> to nail this down as specifically as we can at some point
> before we talk to Bernie himself.

E-mail dated January 13, 2006 from Suh to Lamore, at Exhibit 322.  Suh testified that "at
this point" in the investigation she believed "that [Madoff] had lied to Lamore [during the
exam]."  Suh Testimony Tr. at p. 112.

> On January 19, 2006, Suh e-mailed Lamore as follows:
>
> … I have been having trouble figuring out how to tell from
> the produced account statements the balances of assets
> managed for each customer … If you can take a look at the
> statements and try to figure out what these different
> numbers mean, that would be very helpful.

E-mail dated January 19, 2006 from Suh to Lamore, at Exhibit 323.  Lamore responded
to Suh on January 20, 2006:

> Unfortunately, after reviewing the accounts and speaking
> with my supervisor, I don't have clean answers to your
> questions.  However, I do believe your questions go back to
> the custody of assets issue.  Where are the assets held and
> how does [Bernard L. Madoff] BLM settle the trades
> (wiring instructions …).

*Id.*  Suh responded: "Thank you – I am glad I am not the only one confused.   :-)"  *Id.*
Lamore then responded: "Ha.  No problem.  It's very confusing to me as well."  *Id.*  The
Enforcement staff's confusion about Madoff's operations generally, and the custody of
assets specifically, adversely impacted the investigation until it was closed.

> (7).    The MUI Was Converted to an Informal Investigation in
> January 2006

At approximately the same time that Suh and Lamore were discussing their
confusion about "the custody of assets issue," Suh drafted a summary of the matter in

order to convert the MUI to an informal investigation.[200]  E-mail dated January 23, 2006 from Suh to Amy Lam, at Exhibit 324.  Suh described the investigation's status as of January 23, 2006 as follows:

> The staff received a complaint alleging that Bernard L. Madoff Investment Securities LLC, a registered broker-dealer in New York ("BLM"), operates an undisclosed multi-billion dollar investment advisory business, and that BLM operates this business as a Ponzi scheme.  The complaint did not contain specific facts about the alleged Ponzi scheme, and the complainant was neither a BLM insider nor an aggrieved investor.  Nevertheless, because of the substantial amounts at issue, the staff, in the abundance of caution, requested voluntary production of certain documents from BLM and two of its hedge fund customers … .

> The staff found, first, that neither BLM nor [the hedge funds] disclose to investors that the investment decisions for [the hedge funds] are made by BLM … and that, in substance, BLM acts as an undisclosed investment adviser to [the hedge funds].

> Second, the staff found that, during an SEC examination of BLM that was conducted earlier this year, BLM – and more specifically, its principal Bernard L. Madoff, – mislead [sic] the examination staff about the nature of the strategy implemented … and also withheld from the examination staff information about certain of these customers' accounts at BLM … .

> The staff is now seeking additional evidence, in the form of documents and witness testimony from BLM and its hedge fund customers, on the issues of BLM's role in those hedge funds' investment activities and the adequacy of related disclosures.  Additionally, the staff is trying to ascertain whether the complainant's allegation that BLM is operating a Ponzi scheme has any factual basis.

*Id.*

---

[200]  According to the 2008 Enforcement Manual, "The evaluation for whether to convert a MUI to an investigation…turns on whether, and to what extent, the investigation has the potential to address violative conduct."  2008 SEC Enforcement Manual, at pgs. 16-17, at Exhibit 296.  Converting a MUI to an investigation requires the assigned staff attorney to, among other things:  (1) consult with the Associate Director assigned to the matter; and (2) fill out an investigation opening form and forward it, along with an Opening Narrative Form, to the Associate Director for approval.  *Id.* at p. 19.

It is noteworthy that, on the one hand, Suh's narrative describes the investigation as taking seriously the allegation that Madoff was "operat[ing] an undisclosed multi-billion dollar investment advisory business," stating:

> The staff found, first, that neither BLM nor [the hedge funds] disclose to investors that the investment decisions for [the hedge funds] are made by BLM … and that, in substance, *BLM acts as an undisclosed investment adviser to [the hedge funds]*.

*Id.* (emphasis added).  On the other hand, the narrative expresses skepticism about the allegation that Madoff was operating a Ponzi scheme as follows:

> The complaint did not contain specific facts about the alleged Ponzi scheme, and the complainant was neither a BLM insider nor an aggrieved investor.  Nevertheless, because of the substantial amounts at issue, the staff, in the abundance of caution, requested voluntary production of certain documents from BLM and two of its hedge fund customers….

*Id.*

Suh acknowledged in her testimony that she "could see how one reading [the case narrative]" could think "there was some skepticism of [the Ponzi scheme allegations]." Suh Testimony Tr. at p. 121.  Suh also acknowledged that "Markopolos's complaint contained a lot of detailed facts," contrary to the statement in the case narrative stating that, "[t]he complaint did not contain specific facts about the alleged Ponzi scheme." *Id.* at p. 118; January 4, 2006 Case Opening Report for NY-07563, at Exhibit 325.  In sum, Suh's January 24, 2006 case narrative further demonstrates that the Enforcement staff was more focused on determining whether Madoff should be registered as an investment adviser than in pursuing the evidence that he was operating a Ponzi scheme.

The Enforcement staff's interest in the registration issue also is evidenced in the following January 25, 2006 e-mail in which Suh asked Lamore:

> When you have time, could you check if we have information on commission rates that BLM charges other, non-[Investment Adviser] IA customers?  Are the rates as uniform as in the IA business – same rate for everybody? Are they lower, higher than the IA business rates?  (No rush – we don't need to know this before the testimony tomorrow; my thought was that if the other customers'

> rates are markedly lower, we could say that the increment
> is a hidden advisory fee … .).[201]

E-mail dated January 25, 2006 from Suh to Lamore, at Exhibit 326.  Lamore responded
to this e-mail as follows:

> Good thought, but BLM's market-making (Non-IA
> business) is different.  Non-IA BLM customers are not
> charged any commissions.  The firm makes money by
> making a market (the spread between the bid and offer –
> buys at the bid and sells at the offer).

*Id.*  Suh responded, "Shows how much I know about the business … Thanks!"  *Id.*
Lamore then e-mailed Suh, "It's no reflection on you – don't feel bad.  Until I conducted
the [Madoff] exam, I also thought that they received commissions from [market making].
*Id.*

In her testimony, Suh explained why she had raised the issue of Madoff's
commissions:

> I think the reason I asked this particular question was, the
> question on our radar was is this an advisory business and
> so one indicator could have been that he's charging more
> than he would charge for just execution services.

Suh Testimony Tr. at p. 122.  After approximately two months of investigating Madoff,
the Enforcement staff was predominantly pursuing the issue of whether Madoff should
register as an investment adviser instead of conducting a Ponzi scheme investigation.

<blockquote>

(8).  Madoff's "Right-Hand Man" and a Founding Partner of
Fairfield Testified in January 2006, Raising More
Questions That Were Never Resolved

</blockquote>



---

[201]  As discussed in an April 10, 2006 memorandum that Suh prepared for the SEC's Division of
Investment Management (IM) in order for IM to opine on whether Madoff should have registered as an
investment adviser, the nature of Madoff's compensation was relevant for whether he was eligible for the
broker-dealer exemption from the registration requirement.  E-mail dated April 10, 2006 from Suh to
Chretien-Dar, at Exhibit 344.



*Id.*

The day after DiPascali's testimony, Lamore e-mailed Suh some "rambling thoughts regarding Madoff:"

> I meant to ask Frank [DiPascali] why the strategy is implemented only in Europe and during European trading hours and not New York time?  What if there is breaking news having a huge impact on the market such as 9/11? … .
>
> I am still puzzled that Bernie is able to always … find counterparties willing to trade options in the size that he

---

[202]  On August 11, 2009, the U.S. Attorney for the Southern District of New York filed a criminal information charging, *inter alia*, that DiPascali conspired with Madoff and others to mislead and deceive the Enforcement staff regarding Madoff's "relationship with the hedge fund industry."  U.S. v. Frank DiPascali, Jr., No. 09 Cr. 764 (RJS) (S.D.N.Y. filed August 11, 2009) at ¶ 27, at Exhibit 329.  With respect to the Enforcement staff's Madoff investigation, the charges against DiPascali are, in total, that he "oversaw the production by other co-conspirators of false trade blotters in anticipation of inquiries from the SEC" and lied in his SEC testimony "about the [split-strike conversion] strategy, the purported trades that resulted from the execution of that strategy, and the size of the IA business."  *Id.* at ¶¶ 27-28.

Also on August 11, 2009, the SEC filed a civil complaint in the U.S. District Court for the Southern District of New York against DiPascali asserting claims based on his role in Madoff's fraud.  With respect to the Enforcement staff's Madoff investigation, the SEC alleges that DiPascali "gave testimony that was fraught with false and misleading statements.  He lied about the number of client accounts and about the extent of assets under management.  He also testified that the trading was real and that he personally received and reviewed trade confirmations for the options trades, none of which was true."  SEC v. Frank DiPascali, Jr., No. 09 Civ. 7085 (LLS) (S.D.N.Y. filed August 11, 2009) at ¶ 61(f), at Exhibit 119.

As Branch Chief Caverly observed, "clearly if someone … has a Ponzi and they're stealing money, they're not going to hesitate to lie or create records. … And the only way to verify [whether the alleged Ponzi operator is actually trading] would be to – you know, some third party, some independent third party verification."  Caverly Testimony Tr. at pgs. 36-37.

> needs to for the strategy without freaking out the market. Talk about having difficulty finding liquidity – try calling a large broker-dealer in the U.S. with such a huge options order. I am confident that you would move (scare) the market. Maybe the counterparties are able to hedge themselves somehow, but I don't see how.

E-mail dated January 27, 2006 from Lamore to Suh, at Exhibit 301. Later in the day, Lamore was still puzzled by Madoff's claimed OTC option counterparties:

> Options issue – I don't know what I'm thinking, but it seems … weird to me that the counterparties aren't the [big investment banks] (Goldman, Merrill, Lehman …)[.] Instead, they are smaller/more obscure investment banks.

*Id.*[203]

> Suh responded to some of Lamore's concerns as follows:

> Excellent points. We can pursue them with Bernie, when we take his testimony.
> …
>
> On the options trading issue, we probably will not be able to get any help from the dealers, since they are all overseas.
> …

---

[203] Other issues that puzzled Lamore included:



> The [Wall Street] Journal's latest update on the state of the Madoff investigation added another name to the FBI's list of persons of interest: Joann "Jodi" Crupi. Like Frank DiPascali, Crupi, it appears, also had a hand in the creation of client reports, which were utterly fictitious.

Joe Wiesenthal, Why Did Madoff's Assistant Have Two Nevada LLCs?, The Business Insider, January 24, 2009, at p. 1, at Exhibit 330 (citing Kara Scannell and Amir Efrati, Probers Work Backward on Madoff –- Chief's Alleged Confession Forces Investigators to Go From Top Down, The Wall Street Journal, January 23, 2009, at p. 1, at Exhibit 331 ("Ms. Crupi and a more senior employee, Frank DiPascali, were part of a group that dealt with clients who deposited and redeemed funds from the firm. … The group also helped generate monthly and quarterly client statements that are now believed to be fraudulent.")).

> On the momentum tools issue, if we had any *real* (emphasis in original) reason to suspect some kind of wrongdoing in Bernie's market timing decisions, I would send a document request on the issue, but *I am not sure how much stress we want to put on him if all we suspect is disclosure problems* (emphasis added). I will talk to Meaghan about it. We can definitely question him about it.

*Id*. When asked whether she had understood Lamore's puzzlement "that Bernie is able to always find counterparties willing to trade options in the size that he needs to for the strategy," Suh testified:

> A:   … I think now I have greater reaction to it in terms of what it means as a suspicious – as a reason to be suspicious than I did then. I understood what he was saying. I did think that the only way to really dispel or answer that question would be to get the independent verification.

> Q:   Right. So is it fair to say you never got to the bottom of this point?

> A:   Yes.

Suh Testimony Tr. at pgs. 129-130.

When asked what she meant by "how much stress we want to put on [Madoff]," Suh testified:

> Well, I think – in retrospect, that's certainly not the best way to describe the situation. *At that time I think the view was that there's probably nothing there and that this would be primarily a registration and disclosure case.*

*Id*. at p. 130 (emphasis added). In the following exchange in testimony, Suh discussed her view that she had no "real reason to suspect" Madoff:

> Q:   You find out that he was lying to the examiners about the options issue, for example. The secrecy. You hadn't gotten to a point where you talked to Bernie, so he hadn't allayed your concerns. You hadn't gotten to a point where you talked to NASD and CBOE and try to make those efforts, DTC, et cetera. And yet is seems, based on what you have so far, is you don't think there's much – you know, I – "if we had any real reason to suspect some kind

of wrongdoing." It seems as though you don't think there's much chance of actual wrongdoing. And that's what I don't understand, how at that point in time, given the red flags, given that some of these red flags were validated, before you talk to Bernie even for him to explain it, how is it that you didn't feel there was likely [any] chance of wrongdoing?

A:   I don't remember why I wrote what I wrote, but I do know that we did not stop at this point and we kept going and we did take his testimony and we continued the investigation. So whatever – it's possible that there was skepticism that I was perceiving about the allegations and it did seem that ultimately it was unlikely that it was a Ponzi, but we did continue.

Q:   Did you think some of that skepticism was, you know, from above you?

A:   Well, I do know that at least Meaghan did not think that this was likely to lead to an enforcement action or this was likely to lead to anything.

Q:   Through the entire investigation?

A:   Unfortunately, I can't time it very precisely. I know that was definitely her view by the time of Bernard Madoff's testimony.

Q:   But it may have been earlier?

A:   It may have been earlier.

*Id.* at pgs. 131-32.

On January 30, 2006, the Enforcement staff took the testimony of Jeffrey Tucker, a founding partner of Fairfield. During testimony, the Enforcement staff focused primarily on Madoff's trading authority and commissions with respect to Fairfield accounts,[204] and on Fairfield's own disclosures.[205]

---

[204] As discussed below, these issues were relevant for whether Madoff was eligible for the broker-dealer exemption from the registration requirement.

[205] Tucker Testimony Tr. at p. 43 (limits on trading created by Madoff); pgs. 44-45 (terms and conditions for options trading); pgs. 45-46 (determination of commission rate); pgs. 46-50 (comparison of Madoff's rates to those of other managers); pgs. 63-64 (preparation of Fairfield offering materials); pgs. 68-72 (modification of Fairfield offering material description of Madoff's role); pgs. 73-76 (description of Madoff's role and strategy to new investors); pgs. 78-80 (disclosures to prospective investors regarding

(9).   In February 2006, Madoff Produced Documents Identifying Clearing Entities and Counterparties for His Purported Equities and Options Trades

On February 10, 2006, Suh sent a second voluntary request to BMIS [or BLM] for the following documents:

1.   Documents sufficient to identify all accounts through which BLM executed, cleared or settled any trades, including any option trades, for BLM Institutional Trading Accounts [defined as all accounts originally identified in response to NERO staff's December 29, 2005 voluntary document request, including those of [Fairfield], Kingate, and Tremont – and any other accounts traded pursuant to the split-strike conversion strategy ] during the Relevant Period [defined as January 1, 2005 through the date of the request].
…

2.   Documents sufficient to identify all brokers or dealers through which BLM executed any trades, including any option trades, for BLM Institutional Trading Accounts during the Relevant Period.

Voluntary Document Request dated February 10, 2006 from Suh to BLM, at p. SUHS 011807, at Exhibit 333.  In response to this request, Madoff produced a six-page list of entities on February 23, 2006.  Letter dated February 23, 2006 from Madoff to Suh, at Exhibit 334.  Madoff listed the following four entities as ones through which BMIS purportedly executed, cleared or settled trades for the Institutional Trading Accounts:

- BLM itself;

- DTCC;

- the Bank of New York; and

- Barclays Capital of London.

*Id.*[206]

---

Madoff's role and strategy); pgs. 81-87 (sentence by sentence analysis of accuracy of Fairfield offering materials); and pgs. 88-99 (removal of explicit references to Madoff in Fairfield offering materials), at Exhibit 332.
[206]  During testimony, Madoff explained to the Enforcement staff the purported roles of each entity.  With respect to BMIS, Madoff stated, "That's the account that the executions go through for the clients." Madoff May 19, 2006 Testimony Tr. at p. 87, at Exhibit 267.  Madoff claimed that DTCC was "the general

Madoff's response also listed forty-two overseas broker-dealers through which BMIS purportedly executed equity transactions for the Institutional Trading Accounts. *Id.* Thirty-six of these broker-dealers were in the United Kingdom; two were in Ireland; and one each in Belgium, Germany, the Netherlands, and Spain. *Id.*

Finally, Madoff's response listed twelve overseas entities through which BMIS purportedly executed options trades for the Institutional Trading Accounts. *Id.* These entities included UBS in Switzerland, the Royal Bank of Scotland (RBS), and the Bank of Bermuda in London. *Id.* The other nine entities were located in Germany (4), Switzerland (1), Austria (1), France (1), the Netherlands (1), and Spain (1). *Id.*

(10). In February 2006 and April 2006, Enforcement Staff Sought Assistance from the Office of Economic Analysis (OEA)

On February 6, 2006, Suh contacted William (Bill) Dale, OEA's Enforcement Liaison, regarding the 2006 investigation. E-mail dated February 6, 2006 from Suh to Anthony, at Exhibit 335. Suh contacted OEA at Bachenheimer's suggestion in the following e-mail:

> When [Lamore] has finished his review of the trading, let's call Bill Dale in OEA – he may be able to give us general advice and he may also be able to help us find something by analyzing the trading.

E-mail dated December 29, 2005 from Bachenheimer to Sollazzo, at Exhibit 316.

However, apparently no one gave Lamore or Suh any guidance regarding what questions to pose to OEA. E-mail dated January 13, 2006 from Suh to Lamore, at Exhibit 322. Two weeks after Bachenheimer suggested that OEA might "be able to give us general advice and … help us find something by analyzing the trading," Suh e-mailed Lamore:

> Doria has suggested that we talk to somebody in the Office of Economic Analysis about Bernie's trading. To be honest, I am not entirely sure what questions we would want to ask them – so if you have any thoughts on what they can do for us, let me know.

*Id.*

---

clearance account for the firm that handles all the settlements of transactions for the firm." *Id.* Madoff testified further that his Bank of New York account "work[ed] in conjunction with DTC" and that it was "a settlement account, where we settle our trades…." *Id.* at p. 89. Finally, Madoff described the function of his Barclays account as "clear[ing] and sell[ing] trades for Madoff London…." *Id.* at p. 90.

295

On February 6, 2006, after speaking with Dale and Vance Anthony, a Financial
Economist in OEA, Suh e-mailed Anthony:

> As we discussed earlier today, attached are the 2004-2005
> account statements for the four accounts of Fairfield Sentry
> Limited, a hedge fund, at Bernard L. Madoff Investment
> Securities LLC ("BLM"), a registered broker-dealer in New
> York.  The first two accounts, 1FN012 and 1FN045, are
> equities trading accounts; the other two accounts, 1FN069
> and 1FN070, are options trading accounts.  We would like
> to confirm, on a sample basis, that the trading reflected in
> these account statements generates the returns that Fairfield
> Sentry reports to its investors.

> Fairfield Sentry allocates at least 95% of its assets to the
> trading accounts at BLM.  In these accounts, BLM executes
> a trading strategy known as split strike conversion.  An
> "independent fraud investigator" contacted our office in
> November, claiming that Fairfield Sentry's reported returns
> were too good to be true and could not have been generated
> by this strategy.  Similar allegations had also been made in
> the financial press – specifically, in an article in *Barron's*
> in 2001, which is attached.  Although neither the
> "informant" nor the *Barron's* article provided any specific
> evidence of fraud, due to the high amounts at issue, we
> undertook a preliminary inquiry into BLM.  As a result, we
> discovered that BLM's principal, Bernard Madoff, mislead
> [sic] NERO examination staff earlier this year about the
> nature of his trading strategy.  Specifically, he told the
> examination staff that BLM no longer traded options as
> part of the strategy.  The attached account statements show
> that that is not the case.  Additionally, Madoff did not
> disclose to the examination staff some of the accounts in
> which he implemented this trading strategy.  Because of
> these misrepresentations, and also because of the high
> amounts at issue, we would like to obtain some
> independent verification of the reported returns.

> In addition to the account statements and the *Barron's*
> article, I am attaching to this e-mail Fairfield Sentry's
> reports on returns generated during the first half of 2005,
> the most recent time period for which we have complete
> data.

> We would greatly appreciate an opportunity to discuss with
> you and/or your colleagues what calculations, if any, from

the data in the account statements can help advance our inquiry.

E-mail dated February 6, 2006 from Suh to Anthony, at Exhibit 335.[207]  On February 8, 2006, Suh spoke to Dale and Anthony at length "to discuss … what calculations, if any, from the data in the account statements can help advance [the Enforcement staff's] inquiry."  *See* E-mail dated February 6, 2006 from Suh to Anthony, at Exhibit 335; February 8, 2006 and May 3, 2006 notes typed by Vance Anthony of phone calls with Suh, Cheung and Lamore (Anthony Notes), at Exhibit 336; Anthony Testimony Tr. at p. 15.  However, Anthony never reviewed the statements he received from Suh.  *Id.* at pgs. 16-17.

After not hearing back from OEA for two months, Suh e-mailed Anthony on April 12, 2006, asking for a status report:

> Van, Meaghan Cheung, Peter Lamore and I spoke to you and Bill Dale about this case in February.  Have you had a chance to take a closer look at it?  Thank you and best regards.

E-mail dated April 12, 2006 from Suh to Anthony, at Exhibit 337.

Anthony called Suh in late April 2006, in response to her e-mail.  E-mail dated April 28, 2006 from Suh to Lamore, at Exhibit 338.  Suh summarized the call for Lamore, "OEA finally responded that they want to talk next week.  Are you available? … From talking to Van Anthony last week, my impression is that they have not done any analysis yet, but have only found us an expert on options trading, Stuart [sic] Mayhew." *Id.* Lamore replied:  "OK, hilarious.  I wonder where they had to go to find this 'options expert' since it took them 3+ months?  :-)" *Id.*  Suh replied:  "I suspect that they had to go to the office next door. …" *Id.*

On May 3, 2006, Suh, Cheung and Lamore held a conference call with Dale and Anthony.  E-mail dated April 28, 2006 from Suh to Anthony, at Exhibit 339.  During this call, the Enforcement staff told OEA they thought Madoff was "running $9 billion to $15 billion" for his investors using the split-strike conversion strategy.  Anthony Notes, at Exhibit 336.[208]  On May 4, 2006, Suh responded by e-mail to certain questions OEA raised on the call and attached additional documents, stating:

> Thank you for speaking with us yesterday about Madoff. Unfortunately, we do not have the actual options contracts and thus cannot determine the settlement terms or the

---

[207]  The Enforcement staff never sent OEA a copy of Markopolos' 2005 submission.  Suh Testimony Tr. at p. 139.

[208]  Anthony's notes indicate that on the February 8, 2006 call, the Enforcement staff had indicated that Madoff had "about $15 billion under management."  Anthony Notes, at Exhibit 336.

options type.[209]  (Bernie Madoff has represented to us that he does not have any such contracts.)  We will get back to you shortly with a list of dates on which Madoff executed the strategy in 2004-2005.

Attached are several descriptions of the strategy and the trade execution process that Madoff produced to us.  Also attached are the two key contracts between Madoff and its institutional customers, the trading authorization directive covering the equities trading and the terms and conditions for the options trading.  These two documents are standard for all Madoff customers in the institutional trading program.

E-mail dated May 4, 2006 from Suh to Anthony, at Exhibit 342.  Dale responded to Suh on May 4, 2006 as follows: "Simona – Thanks very much for getting back to us.  We'll see what we can tell from this."  E-mail dated May 4, 2006 from Suh to Anthony, at Exhibit 342.

On May 9, 2006, Suh sent OEA additional information and stated:

Following up on our discussion last week, attached is a spreadsheet that Peter Lamore prepared based on the account statements Madoff provided to Fairfield Sentry Limited (FSL).  The spreadsheet indicates the dates when Madoff purchased and sold equities and options for the split strike conversion strategy as well as movements in [the] S&P100 on those days.  Also attached are FSL's monthly strategy reviews, which contain narratives describing the trading for each month.

E-mail dated May 9, 2006 from Suh to Anthony, at Exhibit 341.

Anthony testified that he never performed the analysis the Enforcement staff requested:

Q:    Okay.  But do you remember whether there was some independent verification [of reported returns] that was done by your office?

---

[209]  Although Madoff never produced "the actual options contracts" to the Enforcement staff, the Fairfield statements that Suh had sent Anthony on February 6, 2006, contained the information regarding settlement terms that OEA was apparently requesting,  *See, e.g.*, Account statement January 2004 for Fairfield Sentry account 1FN069, at Exhibit 340.  However, Anthony never reviewed the statements he received from Suh. Anthony Testimony Tr. at pgs. 16-17.

A:    I did not.  I can tell you that I did not do any verification.

…

Q:    Okay.  Do you remember whether you reviewed these attachments that Ms. Suh sent [with the February 6, 2006 e-mail]?

A:    I did not.  I know I – I'm sure that I clicked on them to look and see – saw what they were, but I didn't do anything else.  Didn't input them into any, you know, there are no [Statistical Analysis Software] programs in my Madoff file, so I did not analyze them in any way, no Excel files used to analyze them.

Q:    Okay.  So you recall there was [sic] these communications but you don't remember what happened after that?

A:    It's not so much [I] don't remember what happened after [that], I don't think I did anything after that.

Anthony Testimony Tr. at pgs. 16-17.  Anthony testified that he believed "Bill Dale had the lead on this" and that he did not "know whether Bill gave [the Madoff matter] to someone else."  *Id*. at p. 15.

However, a February 27, 2006 e-mail between Dale and Anthony with the subject line "hedge fund imagination" indicates that Anthony was responsible for assisting the Enforcement staff with its Madoff investigation.  E-mail dated February 27, 2006 from Dale to Anthony, at Exhibit 343.  Dale e-mailed, "Vance, Nonchu forget Madoff.  Bill."  *Id.*  Dale testified that his e-mail was "slang for don't forget Madoff."  Dale Testimony Tr. at p. 21.

Mayhew testified that he spoke to Dale and Anthony at some point about Madoff, but that he did not participate in the May 3, 2006 call.  Mayhew Testimony Tr. at p. 14.  Mayhew testified that he spent approximately 20 minutes reviewing certain documents that OEA received from the Enforcement staff.  *Id*. at p. 19.  On the basis of that review, he concluded that the split-strike conversion strategy "was not a strategy that would be expected to earn significant returns in excess of the market."  *Id*. at p. 15.  Mayhew testified that he thought Madoff might have been doing something illegal "involving his broker-dealer business":

… I thought that there was a chance that if Madoff was earning extremely high returns, that perhaps it was due to some other type of clever activity he may be doing

> involving his broker-dealer business. Perhaps illegal, but I did not have any specific ideas about what Madoff may be doing other than he may be doing something illegal or abusive that would channel money away from brokerage clients to investment clients.

*Id.* at p. 17.

However, Mayhew also testified that he had not known that Madoff managed approximately $15 billion. *Id.* at p. 27. Although the Enforcement staff had informed Dale and Anthony that Madoff was "running $9 billion to $15 billion" using the split-strike conversion strategy, apparently neither Dale nor Anthony passed that information on to Mayhew. Anthony Notes, at Exhibit 336. Mayhew testified that had he known that Madoff was managing that many assets, he would have realized that there was no way he could be using his broker-dealer to generate his claimed returns:

> If I had known [that Madoff was managing so many assets] then I would not have believed it possible to generate high returns on such a large asset base by pilfering assets away from the brokerage customers. I had presumed that it was a relatively small portfolio. If you have a really large broker-dealer operation and you abuse your customers and pilfer money away from them to benefit your asset clients, you could enhance your returns.
>
> If you are doing it with a huge base of billions and billions of dollars that would have an insignificant impact on your returns so you could not generate real returns that way.

Mayhew Testimony Tr. at p. 27. Mayhew testified that he informed Dale of his conclusions and "assume[d] that [Dale] passed on that opinion." *Id.* at pgs. 16-20.

In fact, there is no evidence that Dale ever passed along Mayhew's opinion to the Enforcement staff. Suh testified:

> Q:    Did OEA ever give you a sense of whether or not they had an opinion about whether the type of returns Bernie was reporting was theoretically possible, there could be a way he was legitimately achieving those returns?
>
> A:    They did not express a view.

Suh Testimony Tr. at p. 146. Dale did not recall hearing or conveying to the Enforcement staff Mayhew's assessment that Madoff could not have been using the split-

300

strike conversion strategy to generate his claimed returns.  Dale Testimony Tr. at pgs. 43-
44.

    After reviewing the e-mails the Enforcement staff and OEA had exchanged about
the Madoff matter, Dale was surprised that Enforcement staff had expected OEA to
perform an analysis:

> Q:    Do you know why enforcement may have had the
>       impression that you were going to – your office or
>       your group was going to do an analysis?
>
> A:    No.
>
> Q:    Okay.  You're surprised to see from these e-mails
>       that they might have expected something?
>
> A:    Yes.

Dale Testimony Tr. at p. 34.[210]  Ultimately, the Enforcement staff's effort to obtain useful
insight from OEA proved to be completely unsuccessful.

> (11)    In April 2006, Enforcement Staff Decided That Madoff
>         Should Register as an Investment Adviser

    On April 10, 2006, Suh sent an e-mail to Barbara Chretien-Dar of the IM seeking
advice on whether Madoff should register as an investment adviser.  E-mail dated April
10, 2006 from Suh to Chretien-Dar, at Exhibit 344.  The e-mail attached a memorandum
summarizing Suh's analysis of the registration issue.  *Id.*  Suh's e-mail stated:

> I would like to consult with your Division staff on another
> matter involving a broker-dealer functioning as an
> investment adviser with respect to discretionary accounts.

*Id.*

    Suh's e-mail described the Enforcement staff's Madoff investigation as follows:

> We initially began looking at BLM's institutional trading
> business because of *suggestions in the press* that the returns
> reported by BLM's customers were too good to be true and

---

[210]  On February 20, 2009, Dale sent the OIG an e-mail regarding the SEC's 2005 Enforcement
investigation of Madoff.  Dale stated, "Given the discussion we had with NERO, I was surprised that the
case was closed."  E-mail dated February 20, 2009 from Dale to Kotz, at Exhibit 345.  When Dale testified
on April 28, 2009, he did not elaborate on or explain the basis for his claimed surprise other than "the
[Enforcement] staff seemed to have suspicions about the trading that was going on at the firm and they said
there might be a problem getting records" and, therefore, he "thought it was the kind of thing they would
stick with."  Dale Testimony Tr. at pgs. 13-14.

> that BLM could be engaging in some improper conduct, *such as front-running or false reporting of returns. So far, we have not found evidence of any such wrongdoing.* It does appear to us, however, that BLM's institutional trading business is actually [an] investment advisory business and that BLM should be registered with the Commission as an investment adviser.

*Id.* (emphasis added).

Suh's e-mail concluded:

> Based on the Advisers Act Rule 202(a)(11)-1, it appears to us that Madoff's position [that he is not an investment adviser] is without merit and, because none of the exemptions from registration apply, BLM is violating Section 203 of the Advisers Act by failing to register as an investment adviser…. We would like to hear your thoughts on these issues.

*Id.*

The e-mail to IM described the origin of the investigation as "suggestions in the press," and made no mention of Markopolos or his 2005 submission. *Id.* The e-mail also made no reference to the possibility that Madoff was operating a Ponzi scheme. *Id.* On August 2, 2006, in preparation for a call with IM, Suh sent Bachenheimer the same description of the Madoff matter that she had sent IM on April 10, 2006. E-mail dated August 2, 2006 from Suh to Bachenheimer, at Exhibit 346. Bachenheimer testified regarding that description and its omissions as follows:

> Q:    I'm a little struck by the fact that I thought you initially began looking at it because of Harry Markopolos' complaint about a Ponzi scheme, not because of suggestions in the press that the returns were too good to be true or that BLM was engaging in improper conduct.

> A:    I think that's right.

> Q:    Is there any reason why Simona would have said something different in this outline?

> A:    No, I don't think it was really relevant to our discussion, you know, where the case came from was not really relevant to the discussion of why he

should register.  It wasn't a significant point to
focus on.

Q:      What about the fact that the allegation initially
        was a Ponzi scheme?

A:      Again, we were going to be talking to IM about
        whether or not he needed to register as an adviser,
        so it would not have been relevant to IM.  That
        would have no relevance to the issue of whether or
        not he should register as an adviser.

Q:      Wouldn't you nevertheless accurately portray why
        you began looking at the – initiating the
        investigation and what were the allegations?

A:      Sure.  I would always want to be accurate and I
        guess I made a mistake.  I don't know why.

Bachenheimer Testimony Tr. at pgs. 147-148.  The failure to mention Markopolos'
allegations that Madoff was operating a Ponzi scheme may have been due to the
Enforcement staff's focus on the registration issue at this stage of the investigation.

> (12).   In May 2006, Enforcement Staff Considered Verifying
>         Madoff's Trades with Third Parties

On May 8, 2006, Suh sent an e-mail to Cheung and Lamore regarding scheduling
Madoff's voluntary testimony for either May 18 or May 19, 2006.  E-mail dated May 8,
2006 from Suh to Cheung, at Exhibit 347.  In her e-mail, Suh queried whether it would be
better to wait and schedule Madoff's testimony for after the Enforcement staff received
additional information from certain third parties:

> What is your view on trying to schedule [Madoff's]
> testimony for the second half of next week – Thursday 5/18
> or Friday 5/19?  *The downside is that we will not yet have
> the account statements from The Bank of New York,
> Barclays or DTC,* and there will probably still be
> unreviewed portions of the Tremont productions.  On the
> other hand, if we wait to get and analyze those statements
> and to complete the document review, that could delay the
> testimony until mid-June.

*Id.* (emphasis added).  Cheung responded to Suh the same day, "At this point I would
lean towards getting him in sooner rather than later.  We could always ask him to come
back if anything shocking comes up in the documents."  *Id.*

According to her notes, Suh called Madoff on May 9, 2006, regarding:

> Questions re accounts produced in Feb:  DTC/NSCC, Bank
> of New York and Barclays – all three accounts are not
> solely for the institutional trading but for all BLM business.
> Requested [Madoff] to produce account statements for
> BLM account 290003 (per BMadoff, this one is solely for
> the institutional trading), Jan-Dec 2005.

Suh's Phone Log, at Exhibit 349.

On May 9, 2006, Suh drafted voluntary document requests to the Bank of New
York and Barclays Capital Inc. (Barclays) in order to "verify either the trading or the
assets." Suh Testimony Tr. at pgs. 153-154.  *See* Draft Voluntary Document Request
dated May 9, 2006 to Bank of New York, at Exhibit 348 and Draft Voluntary Document
Request dated May 9, 2006 from Suh to Barclays, at Exhibit 350.  The Bank of New
York draft request asked for voluntary production of "all account statements for all Bank
of New York accounts of Bernard L. Madoff Investment Securities LLC or Madoff
Securities International Limited, including account number 8661126621" for the time
period January 1, 2005 through the date of the request.  Draft Voluntary Document
Request dated May 9, 2006 from Suh to Bank of New York at p. SUHS 012959, at
Exhibit 348.  The Enforcement staff also requested "all account opening documents" and
"any documents evidencing the transfer of funds into or out of" the referenced accounts,
"including, without limitation, wire transfer instructions, instructions to transfer securities
and cancelled checks (front and back)." *Id.*  The Enforcement staff's draft request to
Barclays was similar to the Bank of New York request.  Draft Voluntary Document
Request dated May 9, 2006 from Suh to Barclays, at Exhibit 350.

On May 10, 2006, Suh e-mailed Cheung and asked, "Unless you disagree, we
will hold off on making requests to Bank of New York and Barclays until Bernie's
testimony, when we should be able to talk to him in more detail about the function of
those two accounts." E-mail dated May 10, 2006 from Suh to Cheung, at Exhibit 351.
Cheung responded, "This is terrific.  Thank you.  I think [holding off on the Bank of
New York and Barclays requests] makes sense." *Id.*

The OIG found no evidence that either the Barclays or Bank of New York
requests were ever sent and Suh testified that she believed they were not sent.  Suh
Testimony Tr. at p. 153.  The failure to send the requests before or after Madoff's
testimony may have been due to the fact, according to Suh, that Cheung had decided "by
the time of Madoff's testimony … that there would be nothing there," *Id.* at pgs. 110-
111.

One year before the Enforcement staff drafted a request for documents to
Barclays, the examination staff actually sent a similar request to Barclays.  E-mail dated
May 3, 2005 from Nee to Mansfield, at Exhibit 352.  Barclays had informed the
examination staff that it had account-opening documents for a Madoff account, but that

"no relevant transaction activity occurred during the [requested] period."  Letter dated
May 16, 2005 from Mansfield to Nee, at Exhibit 241 (emphasis added).

Suh testified that she had not known that the examination staff had previously
sent a request to Barclays for Madoff account information.  Suh Testimony Tr. at p. 155.
Suh also testified that had she known about the previous request and the response that no
records of actual trades were found, she would have followed up on the issue.  *Id.* at p.
156.[211]  Similarly, Cheung testified that she did not remember knowing about the 2005
Barclays request and its response to the examination staff and that it was something that
should have been pursued.  Cheung Testimony Tr. at pgs. 189-190.  Bachenheimer also
testified that she did not recall being aware of the 2005 Barclays request and its response
and that it "would have been of concern to me."  Bachenheimer Testimony Tr. at p. 109.

> (13).    Despite the Enforcement Staff's Confusion About Madoff's
>          Operations, They Never Sought Information or Assistance
>          from the SEC's Division of Market Regulation

Throughout the Enforcement staff's Madoff investigation, the Enforcement staff
was confused about certain critical and fundamental aspects of Madoff's operations.  For
example, Lamore testified:

> Q:    What was the particular expertise that you felt you
>       and Simona didn't have?
>
> A:    Well I think an understanding [of] the actual
>       strategy that he was – that he had claimed to do, not
>       just the split-strike conversion strategy but the
>       actual – the execution of the orders overseas, you
>       know, was that feasible, was that possible.  I think
>       that was a question that we didn't get answered that,
>       you know, would have been helpful.

Lamore Testimony Tr. at pgs. 195-196.  At various points in the investigation, Suh
expressed confusion about the custody of assets issue, *see* E-mail dated January 19, 2006
from Suh to Lamore, at Exhibit 323, and acknowledged that she was "new to all things"
broker-dealer related.  *See* E-mail dated December 14, 2005 from Suh to Lamore, at
Exhibit 353.  Suh also testified that during the Enforcement staff's Madoff investigation,
she did not understand "how the operation works in terms of the flow of the cash" and
thought that Madoff kept his investors' cash at his brokerage firm.  Suh Testimony Tr. at
pgs. 193-194.  Apparently, Suh did not understand that a bank must have been involved
in the movement of funds, and that bank records would have existed that would have
revealed Madoff's Ponzi scheme.  *Id.*

---

[211] There were indications that Suh had access to Lamore's workpapers, and Lamore testified he was aware
of the previous request made to Barclays and Barclay's response.  Lamore Testimony Tr. at pgs. 78-79.

Despite the Enforcement staff's confusion about Madoff's operations, they never consulted with the SEC's own experts on broker-dealer operations. The SEC's Division of Trading and Markets (formerly the Division of Market Regulation) "assists the Commission in executing its responsibility for maintaining fair, orderly, and efficient markets. The staff of the Division provide day-to-day oversight of the major securities market participants: the securities exchanges; securities firms; self-regulatory organizations (SROs) including the FINRA … [and] clearing agencies that help facilitate trade settlement …." The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates Capital Formation (Dec. 17, 2008) http://www.sec.gov/about/whatwedo.shtml, at Exhibit 356.

On May 16, 2006, three days before Madoff's testimony, Lamore sent Suh an e-mail asking, "Do you know if Rob [DeLeonardis, Assistant Regional Director, NERO] spoke to someone in Market Regulation (SEC)?" E-mail dated May 12, 2006 from Suh to Johnson, at Exhibit 355. Suh responded later that day, "I don't think Rob [DeLeonardis] spoke to Market Reg., and, to be honest, considering how unhelpful they usually are, I doubt it's worth the effort." *Id.* Suh testified that she did not contact anyone in the SEC's Division of Market Regulation because "by then I had some frustrating interactions with them." Suh Testimony Tr. at p. 165.

> (14).   Enforcement Staff Learned from NASD that Madoff Had Not Reported Holding Any Options Positions, but Failed to Pursue that Information

More than six months after the Enforcement staff received Markopolos' 2005 submission but just two weeks before Madoff's testimony, Cheung suggested that Suh and Lamore meet with Robert DeLeonardis, because he had a lot of industry contacts and could help the Enforcement staff decide what information they needed to get from outside institutions. *See* E-mail dated May 10, 2006 from Suh to Lamore, at Exhibit 354; Suh Testimony Tr. at p. 150. Suh summarized the meeting with DeLeonardis in a May 10, 2006 e-mail to Cheung:

> Peter and I spent about an hour talking to Rob DeLeonardis and Stephen Johnson, also a former trader in our office … Rob thinks both Peter and Steve should attend Bernie's testimony because of their trading experience[212] … Rob suggested that we talk to his contact at [Chicago Board Options Exchange] CBOE about the volume of Bernie's options trading … Peter will find out who examines [Depository Trust Company] DTC; hopefully, they will be able to give us more information about what data to ask for

---

[212]   Prior to joining the SEC, Stephen Johnson had worked as a market maker on the trading desk of Herzog, Heine, Geduld. Johnson Testimony Tr. at pgs. 7-8. Based on that experience and his understanding of front-running issues, Johnson was asked to attend Madoff's testimony. *Id.* at pgs. 17-18. After attending Madoff's testimony, Johnson had no role in the Enforcement staff's Madoff investigation. *Id.* at pgs. 56-57.

and in what format.  Rob will also talk to Joseph Cella, the
head of Market Surveillance in DC …

E-mail dated May 10, 2006 from Suh to Cheung, at Exhibit 351.[213]

After talking with DeLeonardis, Suh called Jordan Materna, a Director at the
Chicago Board Options Exchange (CBOE) in the Insider Trading Group and one of the
SEC contacts there.  Materna Testimony Tr. at p. 9, 22.  However, Suh learned that
CBOE did not have records for OTC options, which she relayed in a May 12, 2006 e-mail
to Johnson, Lamore, and Cheung:  "Jordan called back to say that he does not know
anything about OTC options trading and suggested that we talk to somebody at NASD."
E-mail dated May 12, 2006 from Suh to Johnson, at Exhibit 355.[214]

Lamore responded to the suggestion to call the National Association of Securities
Dealers (NASD), "I know that it is irrelevant, but keep in mind that the more people that
we speak to, the more likely it gets back to Bernie.  He is very well connected, especially
to the NASD."  *Id*.  Suh addressed Lamore's concern as follows:  "I don't think we
should worry about Bernie finding out to whom we speak:  (1) he already knows we are
looking at his trading; and (2) we are not telling anybody that we have found anything
improper (*except for his lies to us, of course*)."  *Id*. (emphasis added).  When asked about
this e-mail from Lamore, Suh testified:

> I think he was basically referring to the fact that Madoff
> had – let me see, this is before the testimony –Madoff
> definitely spoke about having served on committees and so
> on, during his testimony.  I probably knew about that
> before the testimony as well because I'm sure I had looked
> him up in, sort of, public sources; but I didn't give it much
> thought because at that time we had already contacted
> [Fairfield], Madoff knew that we were investigating him, so
> there was no concern about him finding out that we were
> investigating him.

Suh Testimony Tr. at pgs. 165-166.

On May 16, 2006, three days before Madoff's testimony, Suh called Susan Tibbs,
Director, Market Regulation Department, FINRA (formerly NASD).  E-mail dated May
16, 2006 from Suh to Johnson, at Exhibit 357.  Suh summarized her call with Tibbs in a
May 16, 2006 e-mail to Lamore and Johnson, copying Cheung:

> Susan called back:  they checked one of the dates Peter
> [Lamore] gave them and *found **no** reports of S&P 100*

---

[213]  As discussed below, the Enforcement staff did not contact DTC until after taking Madoff's testimony.
[214]  Materna testified that he did not recall a phone call with Suh, but confirmed that CBOE did not have
records of OTC options in 2006 and that he would have referred the SEC to NASDAQ for such records.
Materna Testimony Tr. at pgs. 20, 30.

> *index option positions*; the electronic search on the other
> dates will take about 24 hours – they will let us know what
> they find out.  Susan said that this is not necessarily a
> reporting violation – if the London affiliate is writing the
> contracts and holding the positions, then there is no
> violation.  I don't think that is the case, but we definitely
> will have to ask Bernie about that.  Susan suggested that,
> before talking to Bernie on Friday, we talk to Gene
> DeMaio, an NASD VP who runs the AmEx surveillance.
> She said he is a former options trader and also has
> previously consulted [the] SEC on options issues.

*Id.* (emphasis added).[215]

Tibbs had informed the Enforcement staff that there were "no reports" of Madoff
holding any options positions "on one of the dates" the staff asked Tibbs to check.  *Id.*
Tibbs had also explained to the staff that, unless Madoff's London affiliate held the
contracts, Madoff either held no options positions or was in violation of the reporting
requirement.  *Id.*

Madoff testified three days after the call with Tibbs that his London affiliate was
not involved with the OTC option contracts:

> Q:    And actually to be clear, the DTC accounts are in
>       the name of the New York office.
>
> A:    Right.
>
> Q:    Just to go back to the options issue, the options
>       positions, are they also in the name of the New
>       York –
>
> A:    Correct.

Madoff May 19, 2006 Testimony Tr. at p. 90, at Exhibit 267.

The Enforcement staff failed to appreciate the significance of this revelation that
NASD had no records of Madoff holding any of the OTC options positions he claimed.
In her testimony, Cheung stated that if the Enforcement staff had learned that the options
positions were purportedly held by Madoff's New York entity, an NASD member, and

---

[215]  During her testimony, Tibbs did not recall talking to Suh.  Tibbs Testimony Tr. at p. 13.  Tibbs testified
that in 2006, NASD Rule 2860 required NASD members to report options positions of 200 contracts or
more, including OTC contracts.  *Id.* at pgs. 7-8.

that there were no records of the positions at NASD, the Enforcement staff should have been suspicious and followed up with that information:

> Well, it could have indicated that he – it could indicate that he didn't have the options contracts or that he was not complying with NASD rules which would have been his own problem and would have been a separate SEC issue.

Cheung Testimony Tr. at p. 188.

However, that is exactly what the Enforcement staff learned from the May 16, 2006 call with Tibbs and Madoff's May 19, 2006 testimony.  Yet, after learning that Madoff either:  (1) did not hold the OTC options positions he claimed; or (2) was in violation of the NASD rule requiring that he report those positions, the Enforcement staff did not contact NASD again or follow-up in any other manner.  Suh testified:

> Q:    Okay.  So after his testimony was there any effort to follow up with the information Ms. Tibbs had given to determine whether or not he was, at a minimum, in violation of some NASD reporting requirement for his options?

> A:    There was not.

> Q:    Any discussion of doing that?

> A:    No.  I do think the focus became on – after his testimony the focus was on one side on the registration issue and then the second to – to the counterparties, and we did not follow up on this.

Suh Testimony Tr. at pgs. 171-172.

> (15).    Enforcement Staff Contacted an NASD Options Expert Who Advised them to Postpone Madoff's Testimony because of their Lack of Understanding about Options

Following Tibbs's suggestion, Suh contacted Gene DeMaio, Vice President and Deputy Director of the NASD Amex Regulation Division, on May 17, 2006, just two days before Madoff's testimony.  E-mail dated May 17, 2006 from Suh to Cheung, at Exhibit 358.  Suh testified that she did not remember the phone call (Suh Testimony Tr. at p. 173), but a May 17, 2006 e-mail from Suh to Cheung described the phone call as "surprisingly productive."  E-mail dated May 17, 2006 from Suh to Cheung, at Exhibit 358.

DeMaio testified that he remembered the phone call with the Enforcement staff regarding Madoff's options.  DeMaio Testimony Tr. at p. 10.  DeMaio testified that he answered "extremely basic questions" from the Enforcement staff about options trading.  *Id.* at pgs. 11, 14.  DeMaio also testified that, by the end of the call, he felt the Enforcement staff did not understand enough to take Madoff's testimony.  *Id.* at p. 13.

DeMaio recalled telling the Enforcement staff that they "needed to do a little bit more homework before they were ready to talk to [Madoff]," but that they said they were going to take Madoff's testimony as scheduled.  *Id.* at p. 14.  DeMaio testified that his colleague, Daniel Malito, was also on the call and that "when we hung up, we were both, sort of, shaking our heads, saying that, you know, it really seemed like some of these [options trading] strategies were over their heads."  *Id.* at p. 15.

Finally, DeMaio testified that he offered further assistance to the Enforcement staff but was never contacted again.  *Id.* at p. 16.  Notwithstanding DeMaio's advice, the Enforcement staff did not postpone Madoff's testimony.

<blockquote>c.    Madoff Testified on May 19, 2006</blockquote>

Madoff testified voluntarily and without counsel in the SEC investigation on Friday, May 19, 2006.  Madoff May 19, 2006 Testimony Tr. at p. 4, at Exhibit 267.[216]  At 9:03 a.m. the day of Madoff's testimony, Suh e-mailed Bachenheimer, "I have a couple of questions about the approach to his prior disclosures to the exam staff."  E-mail dated May 19, 2006 from Suh to Bachenheimer, at Exhibit 359.  Suh testified that the questions she posed to Bachenheimer approximately one hour before Madoff's testimony related to "how to confront him with the fact that he lied."  Suh Testimony Tr. at p. 178.

During Madoff's testimony, he provided evasive answers to important questions, provided some answers that contradicted his previous representations, and provided some information that could have been used to discover that he was operating a Ponzi scheme.  However, the Enforcement staff did not follow-up with respect to any of the information that was relevant to Madoff's Ponzi scheme.

<blockquote>(1).    Madoff Attributed His Consistently High Returns to His Personal "Feel" for Timing the Market</blockquote>

As discussed above, the foundation of Markopolos' 2005 submission was that it was impossible for Madoff to achieve his purported returns with the split-strike conversion strategy he claimed to use.  That view was shared by several other industry professionals, as reported in the May 2001 *Barron's* and *MARHedge* articles, as well as Garrity and many of Madoff's own investors.

During his testimony, Madoff was asked how he achieved his consistently high returns. Madoff May 19, 2006 Testimony Tr. at p. 76, at Exhibit 267.  Madoff never

---

[216] Bachenheimer, Cheung, Suh, Lamore, and Johnson attended Madoff's testimony.  Madoff May 19, 2006 Testimony Tr., at p. 2, at Exhibit 267.

answered the question with reference to his claimed trading strategy. *Id.* at pgs. 76-79. Instead, he attacked those who questioned his returns, particularly the author of the *Barron's* article. *Id.* at p. 77.[217]   Essentially, Madoff claimed his remarkable returns were due to his personal "feel" for when to get in and out of the market, stating: "Some people feel the market. Some people just understand how to analyze the numbers that they're looking at." *Id.* at p. 47.

When Suh reviewed Madoff's explanation for his returns during her OIG testimony, she acknowledged Madoff's response "doesn't answer the question." Suh Testimony Tr. at p. 185. Suh testified that, prior to Madoff's testimony, she "didn't know what to think" about the magnitude of Madoff's claimed returns and she "did not know enough about this industry to place that number." *Id.* at p. 41. Suh also testified that she "did not have a view about how likely or unlikely" "it was that one person could achieve such consistent returns over 14-and-a-half years with only seven down months." *Id.* at p. 42. Suh testified that, after Madoff's testimony, she "didn't know what to make of" Madoff's explanation for his returns. *Id.* at pgs. 127-129.

Bachenheimer and Cheung both took Madoff's explanation at face value. Cheung testified:

> Well, as I – as I read it and as I think I under – to me, it sounded like by not – by not reaching for astronomically high returns, he was reducing – part of it, he was reducing his risk of – of any particularly low down months and also that the variations in inter-day trading were things that he was able to take advantage of in his market – in his time when he put things on.

Cheung Testimony Tr. at pgs. 194-195. Bachenheimer testified, "I mean, what I understood him to be saying here is because he was hedged in both directions, you would not expect there to be a lot of volatility, and I think that is while not 100 percent responsive, not a perfect answer, it does answer the question." Bachenheimer Testimony Tr. at p. 115.

The Enforcement staff's inexperience and unfamiliarity with equity and options trading may have contributed to their belief that Madoff's explanation for his remarkable returns was satisfactory. In contrast, Garrity understood that the premise of Markopolos' referral – that Madoff's reported returns were impossible to achieve with his purported trading strategy – was incontrovertible. Garrity Testimony Tr. at pgs. 43, 47. That premise had also been the thesis of two industry publications. As a former Madoff investor quoted in the May 2001 *Barron's* article explained, "Anybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story. To take it at

---

[217]   Madoff testified, "There was an article written years ago about this strategy. I remember the lady that wrote it … [s]he did a number of stupid articles." Madoff May 19, 2006 Testimony Tr. at p. 77, at Exhibit 267.

face value is a bit naïve." Erin Arvedlund, *Don't Ask, Don't Tell*, Barron's, May 7, 2001 at p. 2., at Exhibit 135.

> (2).    Madoff Testified That All Equity Trades for His Advisory
> Investors Were Settled in His DTC Account

Madoff testified that the trades for all of his advisory accounts were cleared through his account at DTC.  Madoff May 19, 2006 Testimony Tr. at p. 87, at Exhibit 267.  Madoff testified further that his advisory account positions were segregated at DTC: "The institutional accounts are separate from the firm's accounts… . There are codes [at DTC] that are attached to the activity that say whether it's, whether it's held for the firm or whether it's held in seg." *Id.* at p. 88.  Madoff insisted that, "in the DTC account, the activity that's in the segregated account, that's solely institutional trading business and solely what's perceived as the strategy we've been discussing." *Id.* at p. 89.

As discussed below, when Suh subsequently spoke to a representative at DTC, she learned that Madoff's claimed advisory positions were not segregated in his DTC account.  However, Suh does not appear to have recognized that Madoff had lied during his testimony by claiming to have segregated positions at DTC and, more importantly, concluded incorrectly that the lack of segregation in Madoff's DTC account made it impractical to use DTC records to verify whether Madoff was placing any trades for his investors.  Suh Testimony Tr. at pgs. 58-59.  Cheung admitted that had the Enforcement staff obtained DTC records for Madoff's account after his testimony, the Enforcement staff most likely would have discovered his Ponzi scheme.  Cheung Testimony Tr. at pgs. 202-203.

During a recent interview with the OIG, Madoff stated that he had thought he was caught after his testimony about the DTC account:

> Madoff said it was "amazing to me" that he didn't get
> caught during the Enforcement investigation, because they
> specifically asked him, "Are these securities at DTC?"
> They further pressed, "What is your account number." He
> replied, "646." Madoff stated that it was "obvious they
> thought that something was amiss." He went on to say that
> when they asked for the DTC account number, "I thought it
> was the end game, over.  Monday morning they'll call DTC
> and this will be over … and it never happened." Madoff
> stated that when nothing happened, he thought, "After all
> this, I got away lucky." But he said he thought it was just
> "a matter of time," saying "that was the nightmare I lived
> with." When Enforcement did not follow up with DTC, "I
> was astonished."

Madoff Interview Memorandum at pgs. 3-4. Madoff's narrow escape, due to the Enforcement staff's failure to appreciate the significance of DTC verification, allowed the Ponzi scheme to continue for an additional 2 1/2 years.[218]

> (3).    Contrary to His Previous Representations, Madoff Testified That He Had Documents Related to His OTC Option Contracts, but Enforcement Staff Did Not Insist That He Produce Those Documents

As discussed above, on December 29, 2005, the Enforcement staff requested, *inter alia*, copies of Madoff's claimed OTC options contracts. When Madoff produced documents, he represented that he did not have supporting documentation for his OTC options contracts. Suh's Phone Log, at p. 1, at Exhibit 349; *See also* E-mail dated May 4, 2006 from Suh to Anthony, at Exhibit 342.

During testimony, the Enforcement staff asked Madoff if "there [was] any documentation generated" for his OTC option trades. Madoff claimed:

> A:    Yes, there's an affirmation that's generated electronically, and there's a master option agreement that's attached to that that's also electronic.

> Q:    And the electronic affirmation stores data for each trade with each particular dealer.

> A:    Correct.

> Q:    So if you wanted to find out with whom you bought these contracts on a particular day, that's where you would go.

---

[218]  On July 28, 2009, Joseph Cotchett, an attorney for certain of Madoff victims, interviewed Madoff. According to Cotchett, Madoff also admitted to him that he thought the SEC would discover his Ponzi scheme immediately after his SEC testimony. Cotchett stated in an interview with CNN:

> In [2006], the SEC sat down with him for a full day and grilled him. And he told me that when he left that meeting, late in the afternoon, four, five, whatever it was, he thought the following morning he would – excuse me, the following Monday he would be closed down. That was in [2006]. I asked him, I said Bernie, how much money did you have essentially in your fund at that time? I said, was it about $16 billion or $18 billion by our calculation? No. He said no, it was probably closer to 20. So in … 2006, when he sat down with the SEC, he thought on Monday, he would be closed down. Had he been closed down, $20 billion would have been saved of investors' money.

Transcript of July 29, 2009 CNN Interview with Joseph Cotchett at p. 16; available at: http://transcripts.cnn.com/TRANSCRIPTS/0907/29/ec.01.html., at Exhibit 360.

A:      Right.

Madoff May 19, 2006 Testimony Tr. at p. 67, at Exhibit 267.

     The Enforcement staff did not ask Madoff why these option-related documents had not been produced in response to the SEC's December 29, 2005 document request or why he had not mentioned them to Suh when she called him on January 13, 2006, to ask why he had not produced any option-related documents.  More importantly, the Enforcement staff did not request that Madoff produce the documents he referenced in his testimony.  Suh testified that the Enforcement staff never discussed pushing Madoff to produce those documents:

Q:      Okay.  But do you remember a specific request
        about the options agreements –

A:      Yes.

Q:      – as part of the overall request?

A:      Right.  And I definitely know that there was a
        request for options agreements and that what he
        produced he claimed that that was all he has.

Q:      Okay.  So he, literally, claimed he didn't have
        copies of the master derivatives contracts that he
        was trading with these counterparties on?

A:      I think he said he has electronic versions and he did
        not produce them.  So I actually do think that I
        probably – I mean I overlooked that.

Q:      Was there any – do you recall any discussion on
        whether to push him on that or –

A:      No, I don't think that was discussed.

Suh Testimony Tr. at p. 149.

     According to the SEC's Complaint against DiPascali, Madoff did not have the electronic, options-related documents that he claimed to have and which the Enforcement staff did not press him to produce.  *See* SEC v. Frank DiPascali, Jr., No. 09 Civ. 7085 (LLS) (S.D.N.Y. filed August 11, 2009) at ¶ 60(d), at Exhibit 119 (alleging that, "The advisory account records on [Madoff's computer] did not reflect any counterparty information (because none existed)."), at Exhibit 361.[219]

---

[219]  In his interview with the OIG, Madoff stated that he did not have fake options trading records prepared for the SEC and explained that "[y]ou can't replicate options records."  Madoff Interview Memorandum at

(4).    Madoff Contradicted his Representations to the
Examination Staff Regarding Where the Equity Trades
were Executed and Cleared

At different times, Madoff told the SEC staff different stories about where the
equity trades for his investors were executed and cleared.  Apparently, the staff did not
recognize or appreciate the significance of these contradictory statements.  During the
2005 NERO examination, Madoff informed the examination staff that his London
affiliate, Madoff Securities International Limited (MSIL), was settling the orders and
Barclays Capital in London was clearing the equity trades.  Examination Report dated
September 2, 2005, at p. 8, at Exhibit 263.  This representation was not verified by the
examination staff[220] but was presented in the final report:

> According to BMadoff, MSIL acts as the settlement agent
> for the orders and Barclays Capital serves as the clearing
> firm.  In addition, each of the 16 entities are provided with
> trade confirmations and end-of-month statements noting
> shares bought or sold, prices, and amount debited or
> credited to their account.

*Id.*  Lamore had relayed this information to Suh in a December 22, 2005 e-mail, "[A]ll
equity transactions occur in Europe (which we verified during the exam by reviewing the
trading blotters) and clear through Barclays Capital."  E-mail dated December 22, 2005
from Lamore to Cheung, at Exhibit 314.  Three days before Madoff's testimony, on May
16, 2006, Lamore e-mailed Suh and reiterated his understanding that MSIL was involved
in "the IA business trades":

> Hi Simona, I spoke to our DTC contact person in BD
> regarding our DTC questions.  However, I didn't get any
> clear answers.  *The only piece of advice was to find out if
> MSIL (which I believe clears the IA business trades)
> participates in DTC.*

E-mail dated May 16, 2006 from Lamore to Suh, at Exhibit 361 (emphasis added).
During Madoff's testimony, Suh asked:

---

p. 4.  Madoff also stated that he was surprised that the Enforcement staff never pressed for records of his
purported OTC options trades.  *Id.*
[220]  On May 3, 2005, Nee sent a document request to Barclays Capital, Inc. requesting, *inter alia*,
information on all trading done by or on behalf of "any account over which Bernard Madoff (or any entity
known to the firm to be affiliated with Bernard Madoff or Madoff Securities) has any direct or indirect
trading authority" for the period March 1 through March 31, 2005.  E-mail dated May 3, 2005 from Nee to
Mansfield, at Exhibit 352.  On May 16, 2005, Barclays Capital, Inc. responded that the only documents
responsive to Nee's request were account-opening documents for a BLM account that was opened *"on
February 16, 2005,"* and that *"no relevant transaction activity occurred during the period March 1, 2005 –
March 31, 2005.*  … It should be noted that a prime brokerage and trading relationship with a Madoff-
affiliated entity exists with our UK affiliate, Barclays Capital Securities Ltd., an FSA-regulated institution."
Letter dated from May 16, 2005 from Mansfield to Nee (emphasis added).  As discussed above in Section
IV, the examination staff did not follow-up on the information provided by Barclays Capital, Inc.

Q:     Now you said the firm has an affiliate firm in London –

A:     Yes.

Q:     Madoff Securities International Limited.  Correct?

A:     Correct.

Q:     What role does it play in the trading for the institutional –

A:     None.

Q:     None whatsoever?

A:     In the execution side?  No, because first of all they only trade foreign securities over there.  They only trade a couple of USA DRs, but basically they're trading foreign securities.

Madoff May 19, 2006 Testimony Tr. at p. 59, at Exhibit 267.  Lamore then asked:

Q:     From an administrative perspective, are they involved with the equities at all?

A:     They're the liaison on the selling side but not on the trading side, no.

Q:     And how are the equities' trades cleared?

A:     The equity trades are all cleared through us because they're U.S. securities.

Q:     So the firm –

A:     Right.

*Id.* at p. 59.

Contrary to his representations during the 2005 examination, in his testimony with the Enforcement staff, Madoff specifically stated that the trades cleared at DTC, not Barclays Capital:

> Q:    The account, Depository Trust Clearing Corporation, what is the function of this account?
>
> A.:    That's the general clearance account for the firm that handles all the settlements of transactions for the firm.
>
> Q:    So this account handles the clearings of all –
>
> A:    –all.

*Id.* at p. 87.  The Enforcement staff did not ask Madoff to explain his prior, contradictory statements to the examination staff.

> (5).    Madoff's Denial that he had Lied to the Examination Staff about his Purported Options Trading Activity was not Credible

As discussed above, Suh and Lamore believed that Madoff had lied during the 2005 NERO examination when he had claimed that, as of January 1, 2004, he no longer traded options for his investors.  Madoff's effort during his testimony to explain that his statements to the examination staff regarding this issue had been truthful was not credible.

When the Enforcement staff received statements from Fairfield, they learned that Madoff was representing to his investors that he did trade options in their accounts.  Suh confronted Madoff during his testimony with that "odd discrepancy."  Madoff May 19, 2006 Testimony Tr. at p. 103, at Exhibit 267.  Madoff denied having told the examination staff that he had ever stopped trading options for the advisory accounts, claiming that there must have been a miscommunication:

> Q:    Do you recall telling [Lamore] that as of January 1, 2004 you no longer incorporated options into the strategy for the institutional trading business?
>
> A:    I said [options are] not part of the model.  The options are not deemed to be part of the model.  I did not say, my recollection certainly is not that I said that the accounts don't use options any more to trade.  I said the options, that the options were taken

out of the model, and they're not part of the model any longer.

*Id.*  Suh asked Madoff about his statement to the examination staff that, since the change in January 2004, his investors may have been hedging themselves but did not receive guidance from him.  *Id.* at pgs. 104-105.  Madoff testified that he did not represent that to Lamore:

> Q:    Do you recall telling Mr. Lamore in substance that since that change, as of January 1, 2004, the clients may hedge the strategy themselves but that you did not discuss or provide any guidance to clients for hedging the strategy?
>
> A:    No.
>
> Q:    You do not recall making that statement?
>
> A:    I recall saying what I just said, that they were part of the model, that they were no longer part of the model, but I remember specifically saying that the options are still used to hedge the transactions.

*Id.*

Cheung testified that she accepted Madoff's explanation for his prior statements to the examination staff regarding whether he traded options for his investors, stating:

> Q:    Did you ever get a resolution to why Bernie Madoff previously said he wasn't using the options strategy and you found documents showing that he was?
>
> A:    I don't remember – I don't remember clearly what the answer was.  I remember that there was an answer, and I think that it was an answer that he – he was saying that the examiners asked it in a way that was different from the way that we had asked it.
>
> Q:    And you found that answer satisfactory?
>
> A:    I think we did.

Cheung Testimony Tr. at p. 100.

Suh, however, testified that she did not believe Madoff when he tried to portray the "odd discrepancy" she had pointed out in her December 13, 2005 e-mail[221] as a miscommunication:

> We did confront Madoff with the discovery during his testimony. He attempted to portray this as a misunderstanding. It did bother me. I did not think it was resolved. I did believe that he was not forthright.

Suh Testimony Tr. at p. 67. Suh testified further that, after testimony, it was clear Madoff had lied during the examination as well as the investigation: "I did credit [Lamore's] recollection and I did continue to think that Madoff was dishonest in that he was just basically trying to get out of being called a liar." *Id.* at pgs. 205-206. Lamore testified that he was "furious" during Madoff's testimony at Madoff's attempt to explain his prior statements to the examination staff about whether he traded options for his advisory clients. Lamore Testimony Tr. at p. 182.

(6).    During Madoff's Testimony, Enforcement Staff Caught Madoff Lying about the Number and Identity of his Investors

Early in the investigation, the Enforcement staff learned that Madoff had withheld account information from the examination staff. On December 13, 2005, Suh e-mailed Cheung and Lamore, stating, "[T]he CD with account statements that Madoff produced to [the examination staff] does not include a statement for three accounts and one sub-account in the [Fairfield] production." E-mail dated December 13, 2005 from Suh to Lamore, at Exhibit 308. On February 6, 2006, Suh e-mailed Anthony several Fairfield account statements and explained:

> [W]e discovered that BLM's principal, Bernard Madoff, mislead [sic] NERO examination staff earlier this year about the nature of his trading strategy. The attached account statements show that is not the case. Additionally, Madoff did not disclose to the examination staff some of the accounts in which he implemented this trading strategy. Because of these misrepresentations, and also because of the high amounts at issue, we would like to obtain some independent verification of the reported returns.

E-mail dated February 6, 2006 from Suh to Anthony, at Exhibit 335.

---

[221]  E-mail dated December 13, 2005 from Suh to Lamore, at Exhibit 308.

During his testimony, Madoff was asked repeatedly if he had disclosed all of his accounts:

Q:     And I just want to go back to the list of accounts that's on the second page of Exhibit 19 [and] Exhibit 20, are there any other accounts in the institutional trading business?

A:     No.

Q:     Are there any other accounts for which you trade the split strike conversion strategy that we've been discussing?

A:     No.

Q:     Are there any other accounts in addition to the ones listed in Exhibit 19 and the one pointed out in Exhibit 20 where you trade customers' funds pursuant to some trading strategy?

A:     I'm sorry, what?

Q:     Are there any other accounts, basically where the firm trades for that customer pursuant to that strategy?

A:     No.

Q:     Mr. Madoff, do you personally trade money for anybody else?

A:     What do you mean trade money for anybody else?

Q:     Is there anybody else who provides you capital to invest and you trade on their behalf, whether it be an individual, an entity, a partnership, a corporation, your neighbor, anything or anyone?

A:     We trade, as part of our market making strategy, we get non-held orders. That we trade. We have — there are some individual accounts, family accounts and friends that we trade as well. Is that what you mean?

Q:      Yes.  I don't mean — putting aside the market
        making business and putting aside the proprietary
        trading, but family, any kind of money that you
        trade pursuant to any strategy?

A:      Yes.  Not institutional funds.

Madoff May 19, 2006 Testimony Tr. at pgs. 101-102, at Exhibit 267.

During testimony, the Enforcement staff requested that Madoff produce a letter
with the names of all individuals or entities that Madoff or his firm traded on behalf of
that were not a part of his market making or proprietary business.  *Id.* at p. 102.  On June
7, 2006, Suh e-mailed Cheung, Lamore and Johnson, informing them that Madoff had
produced a list of 86 "previously undisclosed" accounts:

On Monday, Madoff produced the attached explanation for
the trades that Peter had pointed out during his review of
the account statements, as well as the attached list of
previously undisclosed accounts that Madoff trades
pursuant to the split strike conversion strategy.  In all, the
list includes 86 accounts, with total value as of 4/30/06 of
approximately $336.5M.  Most of the accounts are in the
names of various trusts and seem to belong to
approximately 10 families.
…
Also, because Madoff stated during his testimony that the
newly disclosed accounts are traded pursuant to the same
strategy as the accounts in the institutional trading program,
I was thinking of calling him and telling him that, in our
view, documents concerning these accounts are responsive
to our earlier document requests, and that he should
produce them.  Let me know if you disagree.

E-mail dated June 7, 2006 from Suh to Cheung, at Exhibit 362.  Suh testified she had
been "bothered" by the eleventh-hour discovery of these new accounts, "Well, it certainly
bothered me, and it – I did think he was – had not been truthful in examination and in the
testimony.  So it bothered me."  Suh Testimony Tr. at p. 220.

On June 8, 2006, Suh called Madoff to discuss the new disclosures.  E-mail dated
June 8, 2006 from Suh to Cheung, at Exhibit 363.  Suh summarized the phone call in an
e-mail to Cheung, Lamore and Johnson as follows:

I called Bernie to tell him that, in our view, the accounts he
produced on Monday were covered by our previous
document requests because, from what he told us in
testimony, we understand them to be traded pursuant to the

> same strategy as the institutional accounts. His response
> was: 1. Only 5 of those 86 accounts are in fact traded
> pursuant to the same strategy. (This seems to be correct:
> The options trading data shows allocations of options
> positions to only 5 of the newly disclosed accounts.) 2. He
> did not provide us with information about these 5 accounts
> earlier because Madoff does not view these accounts as
> discretionary…

E-mail dated June 8, 2006 from Suh to Cheung, at Exhibit 363. With respect to her June 8, 2006 call with Madoff, Suh testified that Madoff's story regarding his investors' accounts kept "changing" and "shifting." Suh Testimony Tr. at p. 221.

After Madoff produced some documents related to the five accounts he had referenced in the June 8, 2006 call, Suh summarized his production in a June 26, 2006 e-mail to Cheung, copying Lamore:

> On Friday, I received from Madoff documents concerning the
> mysterious "other accounts" that came up during Bernie's
> testimony. …On the other hand, when we ultimately do talk to
> Bernie about registration, it may be helpful to know if we
> should consider these accounts to be advisory accounts. For
> now, we can see what IM says on this issue.

E-mail dated June 26, 2006 from Suh to Cheung, at Exhibit 364. Cheung responded, "He has a Clintonian definition of discretionary." *Id.* Suh added, "Or of anything … it still is not clear to me on what grounds he did not disclose these accounts when we had that 'is there anything else' exchange of letters." *Id.* On June 26, 2006, Lamore drafted a response to Suh's e-mail regarding Madoff's production, stating, "I don't understand why these accounts were excluded during our exam when we asked for a list of all customers?" E-mail dated June 26, 2006 from Suh to Cheung, at Exhibit 364.

Suh testified that at this point in the investigation, it was clear that Madoff "wasn't truthful and I knew he was not giving us full information." Suh Testimony Tr. at p. 223. Similarly, Lamore testified, "I just remember sitting there in the testimony thinking he's lying during the testimony. It was just remarkable to me." Lamore Testimony Tr. at p. 250. Lamore explained also:

> I'm not sure why but I'm pretty sure that they emphasized
> that they needed to ask about additional accounts,
> because there's additional accounts. I don't remember how I knew,
> why I knew, but I said, "You need to ask that question." So
> in the testimony there was, "Are there additional
> accounts?" "No." "Are you sure there are [no] additional
> accounts?" "No." "Are you positively sure there are [no]

> additional accounts?"  "Well, there might be a few additional accounts."
>
> So I'm sitting there thinking, "You got to be kidding me, I mean, this is huge.  This guy just lied [in] on the record testimony to your face."

*Id.* at p. 249.

However, Lamore testified that he was unaware of any "consideration [by the Enforcement staff] in charging Madoff with perjury." *Id.*  Lamore also testified that he was not substantively involved in the investigation after Madoff's testimony.  *Id.*

Ostrow verified that Lamore was very agitated by Madoff's lies during testimony:

> Q:     Do you know if Peter told the enforcement attorneys that he heard the testimony of Bernie Madoff and it conflicted with what Bernie had told him and you in the exam?
>
> A:     I don't know, but I believe he did because I think he told me, "I was jumping up and down at the attorneys and letting them know about all of the discrepancies."

Ostrow Testimony Tr. at pgs. 212-213.  According to Ostrow, Lamore was "extremely upset that [the Enforcement attorneys] weren't taking seriously the fact that everything was a lie.  [T]here were so many contradictions to what Bernie said in testimony or [DiPascali] said to what we were told on our exam." *Id.* at p. 203.  Yet, there was no evidence of effective follow-up by the Enforcement staff on these contradictions.

> d.     Enforcement Staff Contacted DTC but Decided to Not Request Any Records

Several SEC officials testified that verifying trading was a fundamental step in an investigation of an alleged Ponzi scheme.  Garrity was asked how to conduct a Ponzi scheme investigation of Madoff.  Garrity explained:

> Q:     With respect to the Ponzi scheme allegations that Mr. Markopolos was making in this case, I think you probably know from either at the time or sources now that Mr. Madoff was a significant market maker in a lot of equities and that he also self-cleared.

A:      Yes, I know that now.  I didn't at the time.
        …

Q:      [H]ow would you address probing the allegations
        that Mr. Markopolos made in light of those two
        facts.  And let's first start with the Ponzi scheme
        scenario.

A:      Yes.

Q:      If he's not executing any trades at all for the money
        that he's managing, purportedly managing, but is
        executing trades in the broker/dealers market maker
        function, et cetera –

A:      Yes.

Q:      – he's self-clearing, so there's no clearing broker
        you can go to, what would be one of your first
        fundamental steps to take to go about confirming
        that he actually is executing trades on behalf of the
        money that he's managing?

A:      My goal would be to keep working my way back
        through the food chain to get to an independent
        source that could verify the existence of the assets.
        So that would be my objective.  So I would –
        presumably the next step up the food chain would
        be Depository Trust Company and its entity.
        …

Q:      If it turned out to be the case that with respect to the
        money that he was purportedly managing for hedge
        funds, he was executing no trades, how easy or
        difficult do you think it would have been to
        ascertain that fact from the DTC records?

A:      *I think if there [were] no trades at all, I think it
        would be fairly self-evident*.

Garrity Testimony Tr. at pgs. 90-93 (emphasis added).

Caverly observed that "clearly if someone … has a Ponzi and they're stealing money, they're not going to hesitate to lie or create records."  Caverly Testimony Tr. at pgs. 36-37.  Consequently, Caverly explained:

> And the only way to verify [whether the alleged Ponzi operator is actually trading] would be to obtain – you know, some third party, some independent third party verification… . I mean if they're trading stocks, you can go to DTC or someplace like that … and see what they have there.  You find out who the ultimate custodian is.

*Id.*

Kazon testified that obtaining "independent [trading] records" was required if a person was "seriously pursuing" a Ponzi scheme investigation:

> Q:    How would you go about investigating a Ponzi scheme case?
>
> A:    Typically you try to find out where is the trading that's supposedly being conducted, where is it going on, and you get records to confirm that … it is in fact going on.
>
> Q:    Would you try to get independent records other than from the entity that you're investigating?
>
> A:    Generally, ideally if I was seriously pursuing it, yes.

Kazon Testimony Tr. at p. 26.  Sollazzo also testified that, "if [he] were investigating … whether Madoff was running a Ponzi scheme, [he] would go to DTC."  Sollazzo Testimony Tr. at p. 45.

Bachenheimer, however, testified that, in her opinion, verifying trading activity from an independent source was not an "essential" part of a Ponzi scheme investigation, stating:

> Q:    … Generally, if one were to do an investigation involving a Ponzi scheme to determine whether there is trading going on, would any of the steps include going to any independent outside entities to confirm that there were trades?
>
> A:    That is certainly one thing you could do; absolutely.

> Q:    Would that be an essential part of what one were to
>        do to investigate of a Ponzi scheme?
>
> A:    I don't think you can say it's essential.  I think it
>        would be a good thing to do but I don't think you
>        can say it's essential.

Bachenheimer Testimony Tr. at p. 32.

On February 23, 2006, Madoff produced a document to the Enforcement staff representing that his trades cleared through, among other financial institutions, DTC, and identifying his DTC account number as "0646."  Letter dated February 23, 2006 from Madoff to Suh, at Exhibit 334.  Madoff confirmed his DTC account number during his testimony.  Madoff May 19, 2006 Testimony Tr. at p. 88, at Exhibit 267.

On May 10, 2006, nine days before taking Madoff's testimony, the Enforcement staff discussed obtaining records for Madoff's account at DTC to verify his claimed trading activity.  E-mail dated May 10, 2006 from Suh to Lamore, at Exhibit 354.  Specifically, Suh e-mailed Lamore, "Meaghan suggested that you and I talk to Rob DeLeonardis about the best way to get the information we want from DTC and possibly the other financial institutions."  *Id.*  Suh and Lamore then spent approximately one hour talking to DeLeonardis and Stephen Johnson about the best way to obtain the desired information.  E-mail dated May 10, 2006 from Suh to Cheung, at Exhibit 351.  During the meeting, it was decided that "[Lamore] will find out who examines DTC; hopefully, they will be able to give us more information about what data to ask for and in what format."  *Id.*  Lamore then e-mailed Suh on May 12, 2006, "Hi Simona, I've spoken to Ellen Hersh in our office regarding DTC.  She suggested that I speak to Sonam Varghese, a branch chief familiar with DTC.  I've left a message for Sonam to call me back."  E-mail dated May 10, 2006 from Suh to Cheung, at Exhibit 351.[222]

On May 16, 2006, Lamore e-mailed Suh:

> Hi Simona, I spoke to our DTC contact person in [the
> Broker-Dealer group] regarding our DTC questions.
> However, I didn't get any clear answers.  *The only piece of
> advice was to find out if MSIL (which I believe clears the
> IA business trades) participates in DTC.*  If you have a
> contact person in DTC, I will call them to find out the
> answers to our questions.  Also, we could ask Bernie to
> explain the processing of the IA business trades during

---

[222] Lamore and Suh testified that they did not recall whether Lamore spoke to Varghese about DTC. Lamore Testimony Tr. at p. 238; Suh Testimony Tr. at p. 160.  Similarly, Varghese did not recall such a conversation.  Varghese Interview Memorandum.

testimony and then go to DTC after the testimony.  Any
thoughts?

E-mail dated May 16, 2006 from Lamore to Suh, at Exhibit 361 (emphasis added).
Suh described the "DTC questions" referenced in Lamore's e-mail as follows:

> I think these were basic questions about what kind of
> records they keep and can those records help verify the
> trading that Madoff was reporting to the hedge funds … I
> think this was shortly before Madoff's testimony, so I think
> at the time I probably thought that it would be helpful to
> ask Madoff about how the firm keeps its accounts in DTC
> and then pursue further with DTC.

Suh Testimony Tr. at p. 161.

As Lamore suggested, the Enforcement staff waited to contact DTC until after
taking Madoff's testimony on May 19, 2006.  *Id*. at p. 162.  Sometime after testimony,
Simona contacted Susan Geigel, Director of Legal and Regulatory Compliance at DTC.
*Id*. at p. 159.[223]  Suh recalled:

> [T]he bottom line that came out of that conversation or
> those conversations, there may have been more than one,
> was that we concluded there was no feasible – it wasn't
> feasible to confirm the trading through DTC because there
> was no way to segregate the trading for the advisory

---

[223]  During her testimony, Suh did not initially recall the name of the person with whom she spoke at DTC.
Suh had produced to the OIG staff a list of contact names and telephone numbers from her investigative
file, and Geigel's name was the only one listed under "DTC."  After her recollection was refreshed with
that information, Suh testified that she had spoken to Geigel:

> A:    I knew that ultimately I may not have had the name at that
>       time, I know ultimately I did, and then we had a call with that
>       person.
>
> Q:    Is that Susan Geigel?
>
> A:    That's – I think that's right.  I mean, that name definitely is
>       one of the people – she's among the people we talked to
>       between DTC, NASD, and CBOE.  I don't – it sounds right
>       that it would be a DTC person.
>
> Q:    And this call was after Madoff's testimony?
>
> A:    Yes.

Suh Testimony Tr. at p. 162.

business into separate – the trading in any account from the trading of the Madoff firm.

*Id.* at p. 59.[224]  Suh testified that she probably had asked Geigel for information verifying specific, individual trades, which DTC did not have, but which was actually not necessary to see that Madoff was operating a Ponzi scheme:

> Q:    Let me ask a couple more questions about the DTC phone call, … everything we've seen up to now seems to be the focus was confirming audit trail type data for the reported trades, confirming that a trade occurred and it's at a stated time and stated price, et cetera.
>
> A:    Right.
>
> Q:    Is that a fair –
>
> A:    Right, right.
>
> Q:    – sort of what you guys were trying to confirm?
>
> A:    Right.
>
> Q:    It may be, and I don't know for sure, but it may be that DTC told you they couldn't give you that specific information, but they could have told you whether or not trades were actually occurring at all. Is that possible that your question to them was do they have data on specific trades, audit trail type data?
>
> A:    It's possible because I know that I was thinking in those terms.
>
> Q:    Okay.  But if you're investigating a Ponzi scheme there's no trades, right?
>
> A:    That's right.
>
> Q:    So you don't need that level of detail to determine whether it's a Ponzi scheme, you just need to know where any – as an initial matter, whether any trades are occurring, right?

---

[224]  Geigel does not recall the phone conversation with Suh.  Geigel Testimony Tr. at p. 12.

A:    That's right.

Q:    Do you think that wasn't what you asked DTC, whether they could confirm that any trades were occurring?

A:    I'm pretty sure I didn't ask it in those terms, but I – since I, unfortunately, I don't remember what the conversation was, so I'm speculating about it based on sort of what I think my thinking was and what the discussions were.  But I can't say.

*Id.* at pgs. 203-204.

Suh's recollection of the call is troubling.  Madoff had testified that his institutional accounts were segregated from his firm's accounts at DTC:

Q:    Is there any segregation of that account into sub-accounts or some other segregation where you separate the institutional trading transactions from other firm transactions?

A:    Yes.  The institutional accounts are separate from the firm's accounts.

Q:    So DTC, how is that segregated?  Under sub-accounts within 0646?

A:    No, it's just the one account for [the] benefit of clients.

Q:    I guess I'm having trouble understanding because my understanding is there is one account at DTC in the name of your firm.

A:    Right.

Q:    And it's Account 0646.

A:    Right.

Q:    And all kinds of transactions go through it.
      …

A:    There are codes that are attached to the activity that say whether it's, whether it's held for the firm or whether it's held in seg.

Q:    What do you mean when you say in seg?  You mean in segregated?

A:    Segregated.
…

Q:    Do you remember what these codes are?

A:    No.

Q:    But DTC would know.

A:    Yes.

Madoff May 19, 2006 Testimony Tr. at pgs. 87-89 at Exhibit 267.  Suh seemed to have ascribed no significance to the fact that she learned from DTC that Madoff had lied in his testimony about having segregated advisory positions at DTC:

Q:    So following Madoff telling you in the testimony that he had segregated accounts –

A:    Right.

Q:    – institutional accounts separate from the firms accounts, you didn't verify this with DTC?

A:    I don't know.  I don't know if we did.  I mean, I knew that there was a – to see after his testimony.

Q:    But did you seek any records from DTC after Madoff's testimony to verify this?

A:    No.

Suh Testimony Tr. at pgs. 199-200.

Garrity explained that learning from DTC that Madoff had lied about having segregated accounts at DTC was an important red flag:

Q:    [I]f it turns out that [Madoff has] represented to you that he does have two accounts at DTC or that he has a separate money management account, and it

330

turns out not to be the case, would that concern you
or be a red flag?

A:     Clearly.  Clearly.  Because that's a very
fundamental misrepresentation, and it would
concern me greatly, and I'd move pretty quickly.

Garrity Testimony Tr. at p. 95.

Irrespective of the concern that should have been raised by Madoff having made
such a "fundamental" misrepresentation, Garrity explained that the Enforcement staff
should have been concerned about Madoff's apparent commingling of assets:

Q:     If you find out that [Madoff has] just got one
account … And [Madoff] says, "Well, I just – I
never set up two accounts; I just commingle them."
What would be your concern about that response,
independent of the fact that he might have earlier
misrepresented the facts to you?

A:     Trying to divine out what accounts are for the
broker/dealer and the money manager would be –
would be opaque, and I'd also have – there's a
couple of other concerns I'd have.  One is if it was
an account in the name of the broker/dealer, my fear
would be somehow the broker/dealer itself would
become involved in litigation or some other action,
someone could reach and apply and in effect attach
that account where the beneficial interest was really
held for the money management clients, and it
would look like the firm's account, especially for a
market maker.  So I would be afraid that the money
management clients, even if all their money was in
there, was at risk.
…

Because it could get effectively attached.  And
that's why you segregate accounts, and that's why
it's for the benefit of the clients rather than for the
firm.  So it insulates them from litigation.  So that
would be my first concern.  My second concern
would be about the accuracy of it, that money was
getting siphoned off or, at a minimum, there's a
greater chance for negligence in the accounting of
who owns what, what does Harry, Fred, and Jane
own as part of that account.

> Q:     If the assets were commingled in that manner, …
>         would that be a violation of any kind of regulatory
>         requirement for broker/dealers that you know of?
>
> A:     I don't know about the broker/dealer regulator
>         requirement, but it would be for investment
>         advisers, if it was commingled like that, yes, it
>         would be a problem for the custody [rule].

*Id*. at pgs. 95-97.

Suh's only reaction upon learning about Madoff's apparent commingling of his investors' assets was to conclude that DTC records were of no use:

> [T]he bottom line that came out of that conversation or
> those conversations [with DTC], there may have been more
> than one, was that we concluded there was no feasible – it
> wasn't feasible to confirm the trading through DTC because
> *there was no way to segregate the trading for the advisory
> business into separate – the trading in any account from
> the trading of the Madoff firm.*

Suh Testimony Tr. at p. 59.  (emphasis added).

In addition to not understanding that Madoff's apparent commingling of assets was a serious red flag and a violation of the federal securities laws, Suh did not understand that DTC records would have quickly shown that Madoff was operating a Ponzi scheme.  Specifically, DTC records would have shown that, on any particular day that Madoff's records indicated that he held equities in his advisory accounts, Madoff did not hold billions of dollars of S&P 100 equities for his investors as he claimed.  Geigel Testimony Tr. at pgs. 23-24.

For example, a January 2005 statement for one Fairfield account alone indicated that it held approximately $2.5 billion of S&P 100 equities as of January 31, 2005.  *See* Account statement dated January 2005 for Fairfield Sentry account 1FN045, at Exhibit 366.  In fact, on January 31, 2005, DTC records show that Madoff held less than $18 million worth of S&P 100 equities in his DTC account.  Table of Madoff's S&P 100 Positions, at Exhibit 365.

On May 19, 2006, the day of Madoff's testimony with the Enforcement staff, DTC records show that he held less than $24 million worth of S&P 100 equities in his DTC account.[225]  *Id*.  Similarly, on August 10, 2006, the day Madoff agreed to register as an investment adviser and the Enforcement staff effectively ended the Madoff

---

[225]  These positions were associated with the firm's own account.  Geigel Testimony Tr. at pgs. 43-44.

investigation, DTC records showed the Madoff account held less than $28 million worth
of S&P 100 equities in his DTC account.  *Id.*

When Madoff's Ponzi scheme finally collapsed in 2008, Friedman testified that it
took only "a few days" and "a phone call … to DTC" to confirm that Madoff had not
placed any trades with his investors' funds.  Friedman Testimony Tr. at pgs. 21-22.
Friedman explained:

> Well, there was no – if a trade is purportedly being
> executed, then there would be some kind of back office
> function that would true up to the trade, and there was [sic]
> no such records to reflect that anywhere.  We have not been
> able to identify any records at DTC or elsewhere that would
> substantiate that any of those trades existed…. So, for
> example, when everything collapsed on December 11th, if
> all the 4,000 plus accounts had held all the assets that they
> purportedly held, then that would presumably be reflected
> in DTC that Madoff's security firm held all these records.
> But it's our understanding that there was no such record at
> DTC indicating, you know, very large positions in, you
> know, these pretty liquid securities that were purportedly
> being held according to the Madoff stock records.

*Id.* at pgs. 19-20.[226]

A combination of factors resulted in Enforcement staff's failure to examine DTC
records and uncover Madoff's Ponzi scheme relatively quickly.  Bachenheimer, who
testified that obtaining third-party verification was not an "essential" part of a Ponzi
scheme investigation, acknowledged that Enforcement staff could have pursued the 2005
submission by contacting DTC, but explained that they had "chose[n] to pursue a
different path":

> Q:    What I'm asking is based on the information that
>        Harry Markopolos provided in the Madoff case,
>        based on the abilities of the Enforcement Division,
>        without that inside information or more concrete
>        information, wouldn't it have been possible for
>        Enforcement to simply go to DTC and check the
>        records?

---

[226]  In his interview with the OIG, Madoff stated that reconciling records with DTC was something the
Enforcement staff "should've done in '06."  Madoff Interview Memorandum at p. 7.  Madoff stated further
that the SEC would have discovered his Ponzi scheme if it had gone to DTC.  *Id.*

> A:    I suppose it would have been possible for us to do
> that.  We chose to pursue a different path, and that
> was to reach out to some of his investors.

Bachenheimer Testimony Tr. at p. 69.

Cheung testified that she understood that DTC records were "a way of verifying whether or not trades were made" but, apparently, was unaware either that Suh had contacted DTC, or that Suh mistakenly believed after the DTC call that DTC records could not verify whether trading was occurring.  Cheung Testimony Tr. at p. 181. Finally, Suh did not understand that it was not necessary for Madoff's claimed advisory account positions to be segregated at DTC in order to see that he was operating a Ponzi scheme.  Similarly, Suh did not understand that it was not necessary to verify specific, individual trades in order to see that Madoff was not placing any trades at all.

> e.    Enforcement Staff Halted Efforts to Obtain Records From
> Madoff's Purported Option Counter-parties

As discussed above, Madoff represented to the Enforcement staff that the options component of his split-strike conversion strategy was implemented with OTC options contracts and that the counterparties to those contracts were various entities in Europe including, *inter alia*, UBS of Switzerland (UBS) and the Royal Bank of Scotland (RBS). Madoff May 19, 2006 Testimony Tr. at pgs. 64-65, at Exhibit 267; Letter dated February 23, 2006 from Madoff to Suh, at Exhibit 334.  In its Complaint filed on August 11, 2009, against DiPascali, the SEC discussed Madoff's misrepresentations regarding his purported options trades, alleging:

> **(d)    Shifting Counterparties**.  The advisory account records on
> [Madoff's computer] did not reflect any counterparty
> information (because none existed).  To respond to inquiries
> from regulators and auditors, however, DiPascali had to
> create credible trade blotters for the [Madoff] advisory
> business that included counterparty information.  *Including
> counterparties, however, created a risk of detection because
> the regulator or auditor might approach the counterparty for
> its corresponding records and compare the two*.  This risk
> was particularly acute for options trades because Madoff and
> DiPascali, when pressed about the volume or pricing of
> option positions, would explain that the option trading was
> not done on any exchange but directly with counterparties
> over-the-counter.  To alleviate this risk, DiPascali, at
> Madoffs direction, created a list of counterparties that were
> unlikely to be approached for verification.  …[W]hen

regulators and auditors in the U.S. asked for the information,
DiPascali provided a list of European financial institutions.

SEC v. Frank DiPascali, Jr., No. 09 Civ. 7085 (LLS) (S.D.N.Y. filed August 11, 2009) at
¶ 60 (d) (emphasis added), at Exhibit 119.

Early in the Enforcement investigation, on December 22, 2005, Lamore suggested
to Suh and Cheung that "we should find out more about the counterparties to these option
transactions and the agreements/arrangements between Madoff and the counterparties."
E-mail dated December 22, 2005 from Lamore to Cheung, at Exhibit 314. However, it
was not until relatively late in the Enforcement investigation, after taking Madoff's
testimony, that Enforcement staff made an effort to verify some of Madoff's purported
options trading with European counterparties.[227]

In order to verify trading activity directly with the entities that Madoff claimed
were his European OTC option counterparties, the Enforcement staff needed to involve
the SEC's Office of International Affairs (OIA), which the Enforcement staff was
strongly opposed to doing.  Consequently, the staff considered requesting documents for
two of those entities through their domestic affiliates.  E-mail dated June 16, 2006 from
Suh to Cheung, at Exhibit 368.

On June 16, 2006, Suh e-mailed Cheung a draft document request to UBS.
June 16, 2006 Document Request to UBS Financial Services, Inc., at Exhibit 367.  The
draft UBS document request sought, in relevant part, Madoff's account statements,
account opening documents, and "any documents evidencing the transfer of funds or
securities into or out of" Madoff's account from January 1, 2005 through the date of the
request.  *Id.*

After Cheung approved the draft, Suh asked, "We don't have to go through OIA
when we are sending the request to the domestic subsidiary, even if the account is with
the foreign subsidiary, correct?"  E-mail dated June 16, 2006 from Suh to Cheung, at
Exhibit 368.  Cheung answered, "No OIA for domestic subs.  Luckily enough for us."  *Id.*
Suh replied, "Great.  I will send a similar request to RBS Greenwich Capital – one of two
domestic [broker-dealer] subsidiaries of RBS."  *Id.*

Suh sent the document requests to UBS and RBS on June 16, 2006.  On June 20,
2006, Suh e-mailed Cheung regarding the UBS request:

I suspect that we may run into a problem with this request.
A guy from UBS called me this morning to get Madoff's
tax [ID] number.  He asked if we believe Madoff has
accounts at UBS; when I told him that we believe so, but
the account may have been opened with a foreign affiliate,

---

[227] Lamore was unaware that Suh had ever made any effort to obtain documents from the counterparties.
Lamore Testimony Tr. at p. 42.  Lamore testified that he was not "involved in the investigation post-
Madoff testimony."  *Id.* at pgs. 249-250.

> he said that they do not have access to that data from here and that we would have to approach the foreign affiliate directly. Of course, our request, as usual, defined UBS to include foreign affiliates, but I did not want to get into a big discussion with him without getting a clearer idea of what our ground rules are for this situation. Do you think this is something that warrants a consultation with OIA? Thanks.

E-mail dated June 20, 2006 from Suh to Cheung, at Exhibit 369.

Cheung forwarded Suh's e-mail to Jill Slansky, another Enforcement staff attorney Cheung supervised, for her thoughts on the issue. Slansky responded:

> I would call OIA but it seems to me that if it's a UBS affiliate they are required to produce it. The burden should be on them to get the info. Otherwise you are going to have to go through all of the OIA crap and it will take you forever to get the documents.

*Id.* Cheung replied, "I hate OIA – they are probably the slowest part of our bureaucracy, and that is saying a lot." *Id.*

Suh followed up on the document requests with several phone calls to UBS and RBS representatives. Suh summarized these conversations in a contemporaneous phone log. Suh's Phone Log, at Exhibit 349. Suh testified that UBS was able to provide documents involving a Madoff account, but the information was "completely different from what we were looking for, like [a] different account number … It seemed to be unrelated to the money-management business." Suh Testimony Tr. at p. 213. *See also* Letter dated June 28, 2006 from Zawacki to Suh, at Exhibit 370; letter dated June 30, 2006 from Rizzo to Suh, at Exhibit 371; Suh's UBS Production notes, at Exhibit 372. Suh was also in contact with the domestic entities at RBS and RBS Greenwich Capital. Both institutions informed Suh that they did not have any records for Madoff. Suh Testimony Tr. at pgs. 213-214.

Suh explained the difficulty she had encountered while attempting to obtain relevant documents from the European counterparties without involving OIA:

> We were trying to – RBS and UBS were, according to Madoff, counterparties of his options trade actions, so we were trying to go to the domestic subsidiaries to get records of those trades to confirm those trades. And they responded that because the accounts that we were interested in were with the foreign affiliates that are separate legal entities they can't help us and we have to go to those separate – to those entities directly.

Suh Testimony Tr. at p. 209.

During the OIG investigation, Bachenheimer, Cheung and Suh defended the decision not to involve OIA and seek verification of Madoff's options trades directly with the European counterparties that he identified. Bachenheimer testified that:

> I don't know that we would have ever been able to get the documents out of Europe because I always had great difficulty getting documents out of Europe and was only successful when I was working with the U.S. Attorneys Office. I don't know that we would have ultimately gotten the documents. I think it's not unreasonable for you to draw that conclusion, but I can't say with certainty that's right.

Bachenheimer Testimony Tr. at p. 162.

Cheung testified, "I found that OIA was very, very slow and that if we could find ways to – if we could find ways to get documents without involving OIA, we were better off." Cheung Testimony Tr. at p. 211. Suh testified, "I guess the reputation of – or the impression [I had was] that trying to get records from overseas going through OIA is always very lengthy and often unfruitful." Suh Testimony Tr. at p. 207.[228]

Notwithstanding the difficulties Suh encountered in trying to obtain relevant records without OIA's involvement, RBS did offer to provide its overseas account information if Madoff signed a consent form. Suh's Phone Log at pgs. 4-5, at Exhibit 349. RBS even drafted the consent letter for the SEC staff. *Id.* at p. 7; E-mail dated July 26, 2006 from RBS to Suh, at Exhibit 374. However, the staff decided to withdraw the request. Suh's Phone Log at p. 7, at Exhibit 349.

Suh's phone log indicates that on July 13, 2006, David Meisels, Senior Counsel of RBS, was in the process of drafting the consent letter asking Madoff's permission to send the Enforcement staff the documents from RBS's Edinburgh branch:

---

[228] At the OIG's request, OIA prepared a memorandum discussing the assistance that OIA could have provided the Enforcement staff during the Madoff investigation. July 20, 2009 Memorandum from OIA to the OIG Re: "Framework for Cooperation with United Kingdom Financial Services Authority," at Exhibit 373. As discussed above, most of the foreign broker-dealers and options counterparties that Madoff claimed to execute trades with for his investors were located in the United Kingdom. The 1991 Bilateral Memorandum of Understanding (1991 MOU) among the SEC, the United Kingdom's Department of Trade and Industry and the United Kingdom's Securities and Investments Board, provides that the SEC can request and obtain information about, *inter alia*: "[t]he conduct of investment businesses or securities processing businesses." *Id.* at p. 1. The SEC can, through OIA, request the United Kingdom's Financial Services Authority to provide, *inter alia*: "specified information and documents from persons in the UK." *Id.* at p. 2. Furthermore, through OIA and pursuant to the 1991 MOU, the SEC has requested in the past documentation that would have been key to establishing whether Madoff was trading with European counterparties, including trading instructions, trading authorizations, option agreements, and electronic trade runs indicating purchases, sales, and short sales of securities. *Id.* at pgs. 2-3.

> [Meisels] will send me [a] draft of their letter to Bernie
> asking for the permission to send us the documents from
> the Edinburgh branch.  I told him that at that point, we
> might call Bernie as a courtesy to let him know that he'll be
> getting the request.

*Id.* at p. 6.  The phone log also indicates that on July 27, 2006, Suh left a message for
Meisels, informing him that the Enforcement staff had decided not to pursue the request
at that time:

> Thank[ed] him for sending us [a] draft of [the] letter to
> Madoff, asking release of information; told him that we
> decided not to pursue the request at the moment and *asked
> him not to send the letter to Madoff unless he hears from us
> again.*

*Id.* at p. 7 (emphasis added).  The consent letter was never sent to Madoff, and Suh
testified that Cheung made the decision to not send it:

> And I spoke to Meaghan about it and asked whether we
> would pursue this and she said no.  And that was very close
> to the end of the investigation, it was in July, and the focus
> at that time was on the registration issue.  In retrospect I do
> think that that's an avenue we should have pursued.

Suh Testimony Tr. at p. 61.

Cheung testified, however, that she likely would not have made a decision
not to pursue getting Madoff's consent without consulting with Bachenheimer first:

> Q:    Now, just to be fair to you, if you had made this
>       decision not to pursue getting Madoff's consent
>       for the counterparties to send trading records to
>       you, would you have made that decision without
>       checking with Doria?
>
> A:    I don't think so.

Cheung Testimony Tr. at p. 217.  Cheung also testified that she did not "believe that I
unilaterally said 'stop it, we're done, that's enough.'"  *Id.* at p. 218.  Cheung did
acknowledge, however, that if the Enforcement staff had sent the consent letter and
received Madoff's permission to obtain his account information, she believed "we would
have" uncovered the Ponzi scheme.  *Id.* at pgs. 216-217.  Bachenheimer testified that she
had no recollection of Cheung raising the issue with her and said she could not think of
any reason not to follow up with the consent letter.  Bachenheimer Testimony Tr. at pgs.
135-136.

In a written submission made by Cheung's attorney after her testimony, Cheung asserted:

> We cannot be certain why the effort to obtain the foreign records was not pursued. One possible reason is that given the scarcity of resources and the difficulty of obtaining such records, it made more sense at the time to reach a settlement requiring Madoff to register as an Investment Adviser subject to additional exams rather than to persist in an investigation which thus far had not uncovered evidence of a Ponzi scheme.

July 24, 2009 Submission on Behalf of Meaghan Cheung at p. 15.

Suh reflected on the decision not to send Madoff the consent letter, and believed that had the letter been sent, "[Madoff ] may not have given a consent, but certainly if he – *had he refused it would have raised the suspicion level much higher.*" Suh Testimony Tr. at pgs. 86-87 (emphasis added). Suh also testified that if Madoff had withheld his consent, the Enforcement staff might have pursued obtaining a formal order from the Commission.[229] *Id.* at pgs. 217-218.

However, as Cheung acknowledged in testimony, as long as the Enforcement staff's investigative efforts were spent comparing documents Madoff produced to the

---

[229] The SEC's Enforcement Manual describes the purpose of a formal order of investigation and the process by which the staff requests that the Commission issue a formal order:

> The staff cannot issue investigative subpoenas to compel testimony or the production of documents unless the Commission issues a formal order of private investigation. … [The formal order] designates specific staff members as officers for the purposes of the investigation and empowers them to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of documents and other materials.
> …
> The staff may recommend that the Commission issue a formal order by presenting an action memorandum to the Commission:
> …
> [The staff should] keep the following considerations in mind when deciding whether to seek a formal order:
> …
> [I]s a subpoena needed to obtain bank or telephone records? Are there persons who will not agree to testify under oath or to provide documents unless subpoenaed?

2008 SEC Enforcement Manual, at pgs. 20-21, at Exhibit 296.

SEC with documents that Madoff had created for his investors, a formal order would not have been helpful:

> I think in every investigation there's a discussion about whether we need a formal order, but at this point in time, I think there were sort of two important answers here. And the first is that because Madoff Investment Securities was a registered broker-dealer, any written request from the enforcement staff or from anyone at the SEC has the same force of law as a subpoena. You know, registered – registered entities have to respond to written document requests and produce them. So a subpoena wouldn't be any stronger with Mr. Madoff than an enforcement document request is.

Cheung Testimony Tr. at p. 157. *See also* July 24, 2009 Submission on Behalf of Meaghan Cheung at p. 13 (stating that the Enforcement staff had "believed that they could obtain the documents and testimony needed to conduct the investigation without having the authority to issue a subpoena").

Ricciardi explained why having a formal order would not have helped the Enforcement staff obtain any more, or different, documents from Madoff, "If someone is going to lie to you about 'These are all of my books,' and not give you the second set in the drawer, I don't know that having the subpoena [would help]." Ricciardi Testimony Tr. at p. 48.

A formal order might have been helpful at this point in the investigation had the Enforcement staff wanted to pursue obtaining documents from Madoff's purported OTC option counterparties. Ricciardi testified regarding the value of a formal order in a Ponzi scheme investigation: "[T]he main reason for the subpoena is that there are some honest people who may be a counterparty, who can then give you information, and on an informal basis they really cannot give it necessarily." *Id.*

Cheung testified that obtaining a formal order at the time of the 2006 Madoff investigation was somewhat difficult, stating:

> [T]o get a formal order at that point in time with the Commission as it was constituted at that point, the threshold question was what have you asked for that you haven't gotten. And that's something that you'll see on the short form, formal order memorandum for insider trading. In particular, it means what document have you asked [for] that you have – what is the staff's need for a formal order here?

Cheung Testimony Tr. at p. 157. *See also* July 24, 2009 Submission on Behalf of Meaghan Cheung at p. 13 (stating that "the Commission as then constituted had made

clear to the Staff that it would not approve formal orders unless the Staff could demonstrate that they had been deprived of documents because they were not able to issue a subpoena").

Bachenheimer also referenced the Commission's resistance to issuing formal orders at that time when she testified that, in her view, seeking confirmation of the OTC options contracts with counterparties was "not something [she] would have done." Bachenheimer Testimony Tr. at pgs. 31-32:

> At this period of time, actually, that's something that probably would have been frowned upon by the Commission. It's not something that we did routinely and it's not something I would have done during this period of time….We certainly didn't have enough here to go to a counterparty to suggest that Mr. Madoff was doing anything wrong, and to raise that suggestion in this Commission in 2005 would have been viewed as the wrong way to go about this.

*Id.*[230]

Regardless of the Enforcement staff's perception of the difficulties in obtaining a formal order from the Commission, the OIG found no evidence that the staff's perception was a factor in its conduct of the 2006 Madoff investigation. A formal order was not necessary for the Enforcement staff to obtain documents from DTC or other independent third parties. Nor was one necessary for Enforcement staff to ask Madoff for his consent to have RBS produce account records. Suh testified that the decision not to pursue "Madoff's consent for the counterparties to send trading records to us directly … was the wrong call" and "the main call that I am frustrated about":

> A:    I do question some of the choices that were made and I particularly – it seems like the question of verifying the transactions with – from independent sources, it was on the radar throughout but it seems like it could have been made more central and we could have just focused on that question as opposed to spending more time trying to figure out how Madoff portrayed his trading to others. And the main question that, you know – as you can imagine I have been thinking a lot about what happened, and the main call that I am frustrated about is the call

---

[230]   Bachenheimer's testimony that seeking confirmation of the OTC options contracts with counterparties was "not something [she] would have done" because the Commission would not have approved that course of action is belied by the fact that the Enforcement staff did approach the counterparties about Madoff's trades; they just failed to follow through. Moreover, Bachenheimer contradicted her testimony on this point when she testified that she could not think of any reason not to send Madoff the RBS consent letter. Bachenheimer Testimony Tr. at pgs. 135-136.

> not to pursue further this getting Madoff's consent
> for the counterparties to send trading records to us
> directly.  And I do think that that was the wrong call
> and I wish it was a different call.
>
> …
>
> Q:    I just want to be clear, who in your mind or – made
>       that call?
>
> A:    Meaghan.

Suh Testimony Tr. at pgs. 86-87.[231]

   If the Enforcement staff had pursued RBS's offer to provide documents subject to
Madoff's consent, and Madoff had consented, the staff would have learned that Madoff
had no OTC contracts with RBS, which would have been a significant red flag that
Madoff was operating a Ponzi scheme.  If Madoff had refused to consent to the
production of documents from RBS, a formal order would have likely been pursued and
the information obtained through subpoena.

       f.    Enforcement Staff Never Thought to Trace the Movement of
           the Investors' Funds

   As discussed above, Madoff claimed to have purchased billions of dollars of S&P
100 equities from certain European securities dealers.  Had that been true, then Madoff
would have wired billions of dollars from a bank account to those dealers.  In his
allocution, Madoff explained how his investors' funds were actually handled:

> I never invested the[] funds in the securities, as I had
> promised.  Instead, those funds were deposited in a bank
> account at Chase Manhattan Bank.  When clients wished to
> receive the profits they believed they had earned with me or
> to redeem their principal, I used the money in the Chase
> Manhattan bank account that belonged to them or other
> clients to pay the requested funds. … Among other means,
> I obtained their funds through interstate wire transfers they

---

[231] *See also* Suh Testimony Tr. at p. 61:

> I believe it was UBS, one of the two suggested that we get Madoff's
> consent to get the records from the foreign affiliate and even provided
> the consent letter – or the draft consent letter.  And I spoke to Meaghan
> about it and asked whether we would pursue this and she said no.  And
> that was very close to the end of the investigation, it was in July, and
> the focus at that time was on the registration issue.  In retrospect I do
> think that that's an avenue we should have pursued.

> sent from [other] financial institutions … to the bank
> account of my investment advisory business….

March 12, 2009 Allocution Testimony Tr. at pgs. 24-25.

Michael Kress, a Broker-Dealer Examinations Branch Chief in NYRO, testified that tracing the movement of the investors' funds was a fundamental aspect of a Ponzi scheme investigation, stating:

> Q:    If I were doing a Ponzi review, what steps would I
>       take and what records would I seek?
>
> A:    You would need custodial records from the
>       custodian, you would need the bank accounts to see
>       the movement of funds coming in and out …

Kress Testimony Tr. at p. 25.

Bachenheimer acknowledged that verifying assets was something "you would normally look at in connection with investigating a Ponzi scheme." Bachenheimer Testimony Tr. at pgs. 123-124. However, she apparently did not consider it necessary to obtain bank records to verify the proper movement of funds, as evidenced by the following exchange in her testimony:

> Q:    Was there any request at any point made to Bernie
>       Madoff to show where the bank accounts were for
>       this very, very large investment adviser business,
>       show where the money was?
>
> A:    I thought Peter and Simona had looked at that, and I
>       thought they had seen where the money was, when
>       it went into cash in particular. I thought they had
>       seen that and knew where that was and it was all
>       there and accounted for.
>
> Q:    And Madoff had given them bank account
>       information?
>
> A:    I don't know.
>
> Q:    Is it possible that based on your understanding that
>       you had just seen internal records that Madoff kept
>       that reflected say at year end he was all in cash?
>
> A:    That is possible; yes.

Q:     That would be consistent with what your
       understanding was at the time, that they –

A:     I don't know.  I'm sorry to cut you off.  I don't
       remember what my understanding was at the time,
       but that is entirely possible that's what they saw.

*Id.* at pgs. 124-125.

In fact, the Enforcement staff never asked Madoff to produce any bank records
that evidenced the use of his investors' funds to purchase equities or OTC option
contracts.  Suh testified:

Q:     So, it looks like no one ever asked in his testimony,
       "Where do you maintain your bank account or
       accounts that handles [sic] this money?"  Is that
       correct?

A:     I think that's right as to the testimony.

Q:     And no one ever asked to see bank statements –

A:     Yes, that's right.

Suh Testimony Tr. at pgs. 195-196.[232]  Suh testified further that "the issue of getting bank
records was never raised, never suggested":

Q:     … That is different than the issue of custody as it
       relates to a Ponzi scheme investigation where



232

you're wanting to literally trace the money. Where's the money coming from? Where's it going to? For example, if he'd been placing trades with these counterparties in Europe, then wherever the bank account was the money would be being wired out to them, right?

A:      Right.
        …

Q:      And no one ever asked to see bank statements –

A:      Yes, that's right.
        …

Q:      And that was never discussed with Doria –

A:      Bank records, no, not at all.
        …

A:      … I have to say the issue of getting bank records was never raised, never suggested…

*Id.* at pgs. 195-197.

Cheung and Suh apparently did not understand that a financial institution would have to be involved in the movement of funds to and from Madoff's investors, securities dealers, and OTC option counterparties. Cheung testified:

Q:      I mean, this is a real critical issue in a Ponzi scheme case … where the money is. … Then the question is: Did anyone ever go to that financial institution to determine what the activity was?

A:      Well, I do think that Fairfield was asked. I do not know – I do not know whether the financial institutional – and I don't know whether there was a financial institution or it could go straight into the broker-dealer.

Q:      You think the broker-dealer could be set up with the Federal Reserve so that money could be wired directly to it and out of it?

A:    No, I don't.  I'm not sure.  I'm not sure how money got to the broker-dealer.  I don't remember at this point what I knew then.

…

Q:    Did you think about following up beyond Fairfield with some financial institution to see if there was money there?

A:    I don't know.  I thought that the money was at the broker-dealer.

Q:    The broker-dealer was like a bank?

A:    No.  That the broker-dealer was – was holding the money that it was using to purchase – to purchase securities.

Cheung Testimony Tr. at pgs. 151-153.  Suh testified:

Q:    Well the actual money, even if it's – even if he's his own custodian, has to be held at a financial institution, correct?  I mean, I assume your impression wasn't that he kept billions of dollars in a safe?

A:    Right.  I – actually, I don't know the answer to that.

Suh Testimony Tr. at p. 117.  Suh testified further:

A:    I can't say that I understood how the operation works in terms of the flow of the cash. ….

…

Q:    I mean, he has all this money that he's trading, right?

A:    Right.

Q:    Where did he keep it?

A:    My impression was that he kept it at the brokerage firm, but I don't have – my impression was basically between when he sells and when he buys again it stayed within the brokerage firm.

…

> Q:    But the brokerage firm has to have an account,
>        right?  I mean, when customers want to invest with
>        him they have to be able to wire money somewhere,
>        right?
>
> A:    Right.
>
> Q:    When they want to redeem monies it has to be
>        wired out of an account, right?
>
> A:    Right.
>
> Q:    And that account has to be at a financial institution,
>        a bank account, right?
>
> A:    I think that's right.  I don't think I thought about it
>        that –

*Id.* at pgs. 193-194.

Suh acknowledged that the Enforcement staff would have discovered Madoff's Ponzi scheme if they had examined the relevant bank records:

> Q:    If you had seen bank statements that showed that
>        there was no money going to – independent of what
>        the details of the trades, if you'd just seen bank
>        statements that showed there was no money going
>        to counterparties in Europe or dealers in Europe for
>        equity trades, wouldn't that have been a complete
>        confirmation that he was running a Ponzi scheme?
>
> A:    Probably.  I mean, I have to say the issue of getting
>        bank records was never raised, never suggested, so–
>
> Q:    I'm just asking you if it had been and if the bank
>        records had shown no monies going to
>        counterparties for options trades or dealers for
>        equity trades, in your opinion would that have been
>        just absolute evidence that he must be running a
>        Ponzi scheme?  …
>        …
>
> A:    I mean, of course.

*Id.* at pgs. 197-198.

On March 10, 2009, the U.S. Attorney for the Southern District of New York filed a criminal information charging, *inter alia*, that between 2002 and 2008, "[Madoff] caused more than $250 million of [his] investment advisory clients' funds to be directed, through a series of wire transfers … to accounts held by [his affiliate] in London, United Kingdom…."  March 10, 2009 Madoff Criminal Information at ¶ 11, at Exhibit 376. According to the criminal information, "Madoff directed these funds transfers, in part, to give the appearance that he was conducting securities transactions in Europe … when, in fact, he was not conducting such transactions."  *Id.*

In his allocution, Madoff admitted that, in an effort to conceal his fraud, he "wired money between the United States and the United Kingdom to make it appear as though there were actual securities transactions executed on behalf of [his] investment advisory clients."  March 12, 2009 Allocution Testimony Tr. at p. 28.  He admitted further that "…I caused money from the bank account of my fraudulent advisory business [in the U.S.] to be wire transferred to the London bank account of [affiliate] Madoff Securities International Limited."  *Id.* at p. 29.

Madoff's efforts to conceal his fraudulent activities, however, would not have withstood any real scrutiny.  A complete tracing of the investors' funds would not have ended at the London affiliate.  Unless Madoff could have demonstrated that the funds were transferred from the London affiliate to the securities dealers he had identified, his Ponzi scheme would have been revealed.  In fact, a complete tracing of the funds would have shown that after transferring funds to his London affiliate, Madoff transferred those funds back to his account in New York.  March 10, 2009 Madoff Criminal Information at ¶ 11, at Exhibit 376; March 12, 2009 Allocution Testimony Tr. at pgs. 28-29.

> g.    The Investigation Effectively Stopped in August 2006 After Madoff Agreed to Register as an Investment Adviser

As discussed above, the primary issue on which the Enforcement staff focused throughout 2006 was whether Madoff was required to register as an investment adviser. The Enforcement staff decided that Madoff was not eligible for the broker-dealer exemption of the Investment Advisers Act of 1940, because he managed more than fifteen discretionary accounts.[233]  Cheung Testimony Tr. at p. 226.  Madoff informed the Enforcement staff on July 21, 2006 that he had retained Brandon Becker from the law firm of WilmerHale to refute the SEC's interpretation of the rule.  E-mail dated July 21, 2006 from Suh to Cheung, at Exhibit 377.  Upon hearing the news, Suh e-mailed Cheung:

---

[233]  Although, IM assisted Enforcement with this issue, Suh expressed frustration with IM:

> Well, with IM, I have to say I had a very difficult time getting a response from them, myself, on this matter and also a matter that I had earlier, which, you know, the commission overcharge case.  So their answers ultimately were helpful and correct, but getting the answers was very difficult and took many phone calls and e-mails.

Suh Testimony Tr. at p. 228.

> Well, Bernie is one step ahead of us:  He just called me to
> say that he and his counsel do not agree with our
> interpretation of the rule and do not believe the accounts
> are advisory accounts.

*Id.*  Suh forwarded the news to Lamore on the same day, prompting him to respond on July 24, "Thanks for the update.  I suppose that if he has finally obtained counsel, then he believes there is an issue."  *Id.*

Two weeks later, on August 7, 2006, the Enforcement staff (along with "a whole bunch of people from IM") had a phone call with Madoff and Becker, who "fought hard" to keep Madoff from registering.  Suh Testimony Tr. at p. 231.  However, Becker called Cheung on August 10, 2006, and informed her that Madoff would register as an investment adviser.  E-mail dated August 10, 2006 from Cheung to Bachenheimer, at Exhibit 378.  Cheung e-mailed Bachenheimer, Suh and Lamore, "Brandon Becker … just called to say that Bernie has decided to register as an investment adviser."  *Id.* Cheung added in a subsequent e-mail, "Purely, I think, from Simona's persuasiveness on Monday's call."  *Id.*

Suh testified that after she received Cheung's August 10, 2006 e-mail, she considered the Madoff investigation finished:

> And a couple of days after [the August 7] call Meaghan e-
> mailed me saying that she heard from Becker and that
> Madoff will register.  In the weeks leading up to that call,
> you know, the instruction that I understood was registration
> was the goal at that point and so once I got that e-mail *I
> kind of assumed we were done.*

Suh Testimony Tr. at p. 231 (emphasis added).[234]

Bachenheimer testified that she had believed forcing Madoff to register as an investment adviser "would help the situation."  Bachenheimer Testimony Tr. at p. 37. She explained:

> [M]y thoughts on the investment adviser piece of this was it
> would help the situation – he was doing this without being
> – he was conducting this activity without being registered.
> Without being registered, he had no books and records'
> requirement as an investment adviser.  If we could get him
> to register, he would have to keep all the books and records
> that are required under Section 204 of the Advisers Act.

---

[234]  From the end of July 2006 until January 2007, Suh was out of the office on maternity leave.  Suh testified that no active work was done on the case after Madoff agreed to register in August 2006.  Suh Testimony Tr. at pgs. 230-232.

>He would have to have a compliance program, and he
>would be subject to an examination by our IA team.

*Id.*

Cheung testified that forcing Madoff to register as an investment adviser was a "good result" from the investigation:

>A:    … I think it was a good result.  I thought it would –
>I think it's also a way to expose him to more – to
>exams from the other set of examiners.

>Q:    More exams?

>A:    But – at the time that seemed like a beneficial
>result.  I think – I think it seemed very obvious that
>he needed at a minimum to register.

Cheung Testimony Tr. at p. 228.  Cheung added, "[O]ne of the reasons that registration felt really important to us was to – keep *opening him to extra regulatory scrutiny, you know, in case there was something that we just weren't able to find. Id.* at p. 257 (emphasis added).[235]  *See also* July 24, 2009 Submission on Behalf of Meaghan Cheung at p. 8, at Exhibit 281 (stating that Madoff's agreement to register as an investment adviser had been viewed by the Enforcement staff as "a positive development for law enforcement" because, *inter alia*, Madoff would "be subject to continued on-site inspections").

>h.    Enforcement Staff Officially Closed the Investigation in
>January 2008, Characterizing it as a "Fishing Expedition"

On January 3, 2008, more than two years after the Enforcement staff had received the 2005 submission, the Enforcement staff officially closed the Madoff investigation. Case Closing Report dated January 3, 2008, at Exhibit 379.  Between August 2006, when Madoff agreed to register as an investment adviser, and January 3, 2008, when the matter was officially closed, the investigation was inactive:

>A:    …And a couple of days after that call Meaghan e-
>mailed me saying that she heard from Becker …
>that Madoff will register.  In the weeks leading up
>to that call, you know, the instruction that I
>understood was registration was the goal at that
>point and so once I got that e-mail I kind of
>assumed we were done.

---

[235]  Despite Cheung's testimony that having Madoff register as an investment adviser was a meaningful result of the Madoff investigation, as discussed in more detail below, the SEC's investment adviser examination staff never conducted an examination of Madoff after he registered.

Q:     So it was just kind of wrapping it up?

A:     Right.

Q:     And then you were out on maternity leave so you waited to wrap it up until after you came back?

A:     Right.

Q:     Okay.  So there was no active work that you're aware of on the case while you were on maternity leave?

A:     That's right.

Suh Testimony Tr. at pgs. 231-232.  Suh also explained that the decision to close the investigation was made much earlier than January 2008:

A:     …Well, I should clarify that there often is and there was in this case, a substantial lag between when the decision to close and when actual closing happens.

Q:     How come?

A:     Because [officially closing an investigation is] not a high-priority task and people know that they're supposed to do it but it also requires organizing a lot of paper and it's unpleasant and not [a] high-priority task, so there is often [a] substantial lag.  So the decision to close was made much earlier than the closing happened.

*Id.* at p. 237.

In fact, on January 11, 2007, three days after Suh had returned from maternity leave, Suh e-mailed Lamore and Johnson asking them to bring her their files related to the Madoff investigation because she was "preparing [the] case for closing."  E-mail dated January 11, 2007 from Suh to Lamore, at Exhibit 380.  On January 16, 2007, Suh e-mailed Johnson a reminder about her request, adding, "Sorry to bother you again – *I guess I can't wait to lay this case to rest*."  *Id*. (emphasis added).

351

(1).    The Enforcement Staff Ignored Additional, Troubling
Information About Madoff While the Investigation Was
Inactive for 18 Months

During the 18 months that the investigation was inactive, the Enforcement staff received additional information regarding Madoff. On December 14, 2006, the SEC's Office of Investor Education and Advocacy (OIEA) forwarded to Suh a letter regarding Madoff from an anonymous "concerned citizen." The letter had been sent to Chairman Cox on December 6, 2006.[236] Forwarded Letter dated December 6, 2006 to Cox, at Exhibit 381. The letter stated:

> Your attention is directed to a scandal of major proportion which was executed by the investment firm Bernard L. Madoff … Assets well in excess of $10 Billion owned by the late Norman F. Levy, an ultra-wealthy long time client of the Madoff firm have been "co-mingled" with funds controlled by the Madoff company with gains thereon retained by Madoff.

*Id.*

The letter was sitting in Suh's office when she returned from maternity leave in January 2007. Suh Testimony Tr. at p. 232. Suh "checked the account list that [she] had for Madoff and … didn't see [the name Levy] among the accounts that [Madoff had provided]." *Id.* at p. 232. According to Suh's phone log, she called Brandon Becker on January 8, 2007, "to find out from Bernie whether he ever managed money for Norman F. Levy," the investor referenced in the anonymous letter. Suh's Phone Log, at p. 7, at Exhibit 349.[237]

On January 9, 2007, Suh e-mailed Cheung, "Brandon Becker has called me to report that Bernie says he has not managed money for Norman F. Levy, the investor referenced in the anonymous letter." E-mail dated January 9, 2007 from Suh to Cheung, at Exhibit 382. Cheung responded, "*Then I think we are done and do not have to worry any further.*" *Id.* (emphasis added). Exactly one week later, on January 16, 2007, the Enforcement staff began closing the investigation. *See* E-mail dated January 11, 2007 from Suh to Lamore, at Exhibit 380.

---

[236] Chairman Cox testified that he never saw this letter. Cox Testimony Tr. at p. 12. Cox explained letters such as this one were reviewed by the Chairman's Correspondence Unit within his office and assigned to various SEC staff persons for the appropriate action. *Id.* at p. 13. The letter was sent to Chairman Cox's office on December 6, 2006, but the letter indicated that the sender had addressed the letter to Cox once before, on April 26, 2006. Letter dated December 6, 2006 to Cox attached hereto as Exhibit 381. However, the OIG found no evidence that Cox's office, or any other part of the SEC, received the letter in April 2006.

[237] Suh's phone log also indicates that on July 24, 2006, she spoke with Becker and "[c]onfirmed that Wilmer Hale's representation of Madoff is limited to application of Rule 202(a)(11)-1 [dealing with the registration of investment advisers] and that we will continue to talk to Madoff directly on other issues; agreed to get a letter from Madoff confirming the scope." Suh's Phone Log at p. 7, at Exhibit 349.

When asked why the Enforcement staff dismissed the tip solely on the basis of Madoff's denial, which was communicated through counsel, Bachenheimer testified:

> Yeah, I think you have to look at the context of this, and that is once Mr. Madoff, I guess – Simona now viewed Brandon Becker to be representing Madoff. We would, of course, reach out to Madoff's counsel, you know, send him a document request, do whatever we would have to do. As a member of a top firm, as a member of the Bar, we would expect him to investigate and report back to us and rely on the answer.

Bachenheimer Testimony Tr. at p. 150. Likewise, Cheung explained why she had thought Becker's response was sufficient:

> A:   I can – I can at least say that coming through – it coming through – it coming through Brandon Becker gave it more weight in my mind and coming through a reputable counsel gave it more weight in my mind. And Mr. Madoff involving reputable counsel actually gave me some more comfort about answers.
>
> Q:   But don't you think Brandon Becker would have just gone to Bernie Madoff and asked him and taken his word for it? I mean, Brandon Becker certainly isn't responsible to go beyond talking to his client. That's something the SEC should do.
>
> A:   At the time, I took more comfort from the fact that there was a lawyer involved. I – I'm not disputing anything you guys are saying about wishing we had done things differently.

Cheung Testimony Tr. at p. 246. Suh testified that accepting Becker's representation without question was justified because, "the letter was anonymous and did not just – on its face it would not have been credible." Suh Testimony Tr. at p. 233.

It is extremely curious that when the staff received a tip that Madoff had stolen from Levy, they simply accepted Madoff's claim that he had not managed money for Levy as an explanation for the tip. An accused fraudster's unsubstantiated denial of wrongdoing is insufficient grounds for concluding that the accusation is without merit. In this instance, the staff also knew that Madoff had previously lied to them about several issues, including the number and identity of his clients.

Contrary to Madoff's representations through his counsel, when news of Madoff's Ponzi scheme broke, it became evident not only that Madoff managed Levy's money, but also that Levy was actually one of Madoff's largest investors. Levy's foundation JEHT – which stood for "Justice, Equality, Human Dignity and Tolerance" – was forced to close in January 2009 due to the millions of dollars it lost in Madoff's Ponzi scheme. *See* Philip Boroff, "Madoff Fraud Case Leads to Collapse of Justice-Reform Advocate," http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aj3r8k36.3Y8 (December 16, 2008), at Exhibit 384. Levy was not only an important investor, but also considered Madoff one of his closest confidants.[238]

On June 29, 2007, approximately six months after the Enforcement staff dismissed the Levy tip, Markopolos e-mailed Cheung:

> Hello Meaghan, Attached are some very troubling documents that show the Madoff fraud scheme is getting even more brazen…. Madoff couldn't possibly be managing the billions in this strategy unlevered, much less levered. I thought you would want to see these Wickford documents. *When Madoff finally does blow up, It's going to be spectacular, and lead to massive selling by hedge fund, fund of funds as they face investor redemptions.*

E-mail dated June 29, 2007 from Markopolos to Cheung, at Exhibit 383 (emphasis added).

Cheung acknowledged that when she received this e-mail from Markopolos, the Madoff investigation was "for all intents and purposes closed without the formalities." Cheung Testimony Tr. at pgs. 254-255. Cheung did not know whether Markopolos' e-mail and attachments were given "significant analysis." *Id.* at p. 255. On June 29, 2007, Cheung forwarded Markopolos' e-mail to Suh, but Suh did not recall receiving the e-mail. E-mail dated June 29, 2007 from Markopolos to Cheung, at Exhibit 383; Suh Testimony Tr. at p. 236. Suh explained that, "when I came back [to the SEC] in January [2007] I understood that we were done and [the Madoff investigation] would be closed without further steps."[239] *Id.* at p. 237.

Approximately four months after receiving and ignoring Markopolos' last e-mail, Cheung and Suh discussed an unrelated matter originating from a tip from someone with no first-hand knowledge of the misconduct they alleged. On October 24, 2007, Suh e-mailed Cheung regarding this other matter, "I have to say, *I am a bit concerned that this may be another fishing expedition a la Madoff… .*" E-mail dated October 24, 2007

---

[238] In a 2009 Vanity Fair article, the late Levy's girlfriend, Carmen Dell'Orefice, gave an interview about the Levy-Madoff friendship. The article described the relationship as follows: "'Norman said, innumerable times, 'He is my son,' she told me, meaning that Levy considered Madoff his surrogate son, a member of his family.'" Mark Seal, *Madoff's World*, Vanity Fair, April 2009, at 3, *available at* http://www.vanityfair.com/politics/features/2009/04/madoff200904, at Exhibit 385.

[239] When she reviewed Markopolos' June 29, 2007 e-mail during her OIG testimony, Suh opined that it did not provide any new information. Suh Testimony Tr. at pgs. 236-237.

from Suh to Cheung, at Exhibit 386 (emphasis added).  Cheung responded, "*I too have no interest in another Madoff*."  *Id.* (emphasis added).  During testimony, Suh explained her characterization of the Madoff investigation as a "fishing expedition:"

> Well, I think I meant that it didn't go anywhere in terms of bringing [an] enforcement action for fraud.  And the parallel that I saw between the tip about [the other matter] and [the] Markopolos report was that it was from a person who –without inside information and a person – well, in the [other matter] it was a person reporting only rumors, in Markopolos reported – information as well.

Suh Testimony Tr. at pgs. 238-239.  Cheung explained similarly:

> [W]e had spent a long time investigating the Madoff [matter] and not found anything of significance.  And that's – we – and it had taken up an extraordinary amount of staff resources and not found anything, and that's what I mean – meant.  I think Simona and I both meant about spending a lot of time investigating something and not finding anything.

Cheung Testimony Tr. at p. 256.  Bachenheimer also shared Suh's view of the Madoff investigation:  "[W]e all thought we had done a thorough investigation and there was nothing there and Markopolos was wrong, and this person who was calling us was another Markopolos." Bachenheimer Testimony Tr. at p. 153.

On November 20, 2007, the Enforcement staff sent Madoff a letter indicating that the investigation was being closed without an enforcement action.  Termination Letter dated November 20, 2007 from Doria Bachenheimer to Brandon Becker, at Exhibit 387. However, there was some last-minute concern expressed by the Enforcement staff regarding sending Madoff the letter.  On November 20, 2007, Suh e-mailed Cheung:

> Do you think it makes more sense to ask [Calamari's] permission NOT to send a termination letter to [Madoff]? *Given [Madoff's] capacity for "finessing" the reality*, I am a bit concerned about giving him anything in writing.

E-mail dated November 20, 2007 from Suh to Cheung Re: re-closing Madoff, at Exhibit 388 (emphasis added).  During testimony, Suh explained her concern about sending the termination letter to Madoff:

> Well, Madoff had been splitting hairs over language and not – was not – *we knew he was not truthful*, and so I – my thought was, you know, will he sort of make a big deal about getting a termination letter and basically use it as a

> seal of approval or, you know, just make more of it than it
> is, which basically is we're not recommending enforcement
> action against you at this time.  You know, so use it as a,
> like, claim that he got almost like an audit opinion or
> something like that.

Suh Testimony Tr. at pgs. 240-241.

> (2).    The Madoff Investigation Officially Closed in January
> 2008, Although Enforcement Staff Recognized that Madoff
> Had Lied About His Advisory Business

Suh began closing the Madoff investigation in January 2007, despite the fact, as discussed above, that the Enforcement staff knew Madoff had made numerous misrepresentations to the SEC during both the 2005 NERO examination and the 2006 Enforcement investigation.  E-mail dated January 11, 2007 from Suh to Lamore, at Exhibit 380.  Madoff had failed to fully disclose the number of clients he had and their identities; he had misrepresented to the examination staff that he no longer traded options (or at least represented to his investors that he did); and he had changed his story regarding where his purported trades were settling and clearing.

Suh e-mailed a two-page draft of a revised closing memorandum to Cheung on November 20, 2007.[240]  E-mail dated November 20, 2007 from Suh to Cheung, at Exhibit 389.  In that draft, Suh wrote:

> Second, in the course of a preliminary inquiry into these
> allegations, the staff learned that, during a recent
> examination of BLM by NERO's broker-dealer
> examination staff, *Bernard Madoff, the sole owner of BLM,
> misrepresented to the examination staff both the nature of
> the trading conducted in the hedge fund accounts and also
> the number of such accounts at BLM.*

*Id.* (emphasis added).  Cheung responded, "I would say that Bernie did not fully disclose to the exam staff rather than misrepresented to the exam staff."  *Id.*

Cheung testified that she "believed at the time that 'did not fully disclose' was more accurate than 'misrepresented.'" Cheung Testimony Tr. at pgs. 260-261.  Suh, however, testified that she "would [have] prefer[red] to go with 'misrepresented' because [Madoff] did affirmatively state that he did not trade options."  Suh Testimony Tr. at p. 244.

---

[240]  The closing memorandum is referred to as the "closing recommendation" in the SEC Enforcement Manual:  "The closing recommendation is a short memorandum and serves as the basic historical record summarizing what the staff did in the investigation and action."  2008 SEC Enforcement Manual, at p. 34, at Exhibit 296.

On November 21, 2007, Suh submitted the closing memorandum for review, with Cheung's changes. Case Closing Memorandum, at Exhibit 390. The Enforcement staff's closing of the Madoff investigation was approved on January 3, 2008 by Mark Schonfeld, Director of NERO.[241]  Case Closing Report dated January 3, 2008, at Exhibit 379.

While Suh testified that when the investigation closed, she did not suspect Madoff was operating a Ponzi scheme, Suh Testimony Tr. at p. 235, she acknowledged that she knew Madoff had lied to the Enforcement staff during the investigation and the exam, *Id.* at pgs. 205-206, and that the Enforcement staff had not verified that Madoff was placing any trades:

> I knew what we did and what we didn't do, so I knew that we ultimately did not get the confirmations with – from the counterparties. I relied on the judgment of my supervisors that we were done.

*Id.* at p. 235.

Enforcement staff not only closed the Madoff investigation without any enforcement action being taken, the investment adviser examination staff never conducted an examination of Madoff after he registered with the SEC as an investment adviser. *See* File Memorandum from John Walsh, currently OCIE Acting Director at p. 5 (identifying all SEC examination activity regarding Madoff since 1997), at Exhibit 391; Snively Interview Tr. at pgs. 23-24.

Brian Snively, a Branch Chief for investment adviser examinations, testified that when Madoff registered, he was classified as "medium risk." Snively Interview Tr. at pgs. 7, 24. Snively explained that a medium risk classification does not trigger an immediate exam. *Id.* at p. 24. However, Snively also testified that Madoff might have been subject to a "cause exam" immediately after he registered had the investment adviser examination staff been informed that Madoff had lied to the Enforcement staff or the broker-dealer examination staff. *Id.* at pgs. 26-27.

Despite the Enforcement staff's focus during the 2006 investigation on forcing Madoff to register as an investment adviser, and their stated belief that this was a "good result" because it would expose Madoff to "extra regulatory scrutiny" (*see* Cheung Testimony Tr. at pgs. 227-228), there is no indication that anyone on the Enforcement staff ever suggested that the investment adviser examination staff conduct an examination of Madoff.

---

[241]  Bachenheimer testified that the decision to close the Madoff investigation "was a joint decision, but I think it comes to me and based on the facts that the staff had presented to me, it didn't seem like there was anything else we could do." Bachenheimer Testimony Tr. at p. 151. Cheung described the decision as "collaborative." "Everybody agreed, but yes, it had to be approved at least [at the Bachenheimer] level and probably the [Calamari] level." Cheung Testimony Tr. at p. 248. When asked who decided to close the investigation, Suh testified, "Well, I asked – I mean, I got that direction from my supervisors. I – Meaghan and/or Doria both, they – I mean, I understood that after registration we're done, so – and that meant we're done." Suh Testimony Tr. at p. 235.

The SEC's failure to conduct an exam of Madoff's advisory accounts is particularly troubling given the fact that, as discussed in greater detail above, the Enforcement staff had learned from DTC that the billions of dollars of equities in his investment advisory accounts were commingled with each other and commingled with his broker-dealer proprietary account.  Suh Testimony Tr. at pgs. 199-200.  That apparent commingling should have been of serious concern to the SEC and would have been a violation of the custody rule for investment advisers.  Garrity Testimony Tr. at pgs. 95-97.

      B.      In March 2008, Enforcement Staff Received a Second Tip Regarding Norman Levy that may have Come From a Madoff Insider

As discussed in detail above, the Enforcement staff received the following anonymous tip in December 2006 from a "concerned citizen," advising the SEC to look into Madoff and his firm:

> Your attention is directed to a scandal of major proportion which was executed by the investment firm Bernard L. Madoff….Assets well in excess of $10 Billion owned by the late Norman F. Levy, an ultra-wealthy long time client of the Madoff firm have been "co-mingled" with funds controlled by the Madoff company with gains thereon retained by Madoff.

Letter dated December 6, 2006 to Cox, at p. 2, at Exhibit 381.  The Enforcement staff dismissed this tip after Madoff falsely represented, through his counsel, that he had never managed money for Norman F. Levy.  Suh's Phone Log, at p. 7, at Exhibit 349.; *see also* E-mail dated January 9, 2007 from Suh to Cheung, at Exhibit 382.

On March 31, 2008, almost three months after the Madoff investigation had been officially closed, the Chairman's office received another anonymous tip regarding Madoff's involvement with Levy's money from the same source.  Anonymous Tip dated March 31, 2008 Regarding Norman F. Levy, at Exhibit 392.  This tip was a copy of the previous tip sent in April 2006, with the addition of the following:

> It may be of interest to you to that Mr. Bernard Madoff keeps two (2) sets of records.[242]  The most interesting of which is on his computer which is always on his person.

---

[242]  On December 17, 2008, just days after Madoff confessed to the Ponzi scheme, the Securities Investor Protection Corporation told The Associated Press that "there are different sets of books that investigators are sorting through.  One set keeps track of the losses at Bernard L. Madoff Investment Securities LLC's investment advisory arm, while the other is what investors were shown."  Associated Press, *Madoff falsified books to hide losses, investigators say*, USA Today (Dec. 19, 2008), at Exhibit 394.

*Id.* The updated tip was forwarded to Suh by John McCreery, a Senior Counsel in OIEA, on April 7, 2008. *See* OIEA Referral Memorandum, at Exhibit 395. On the Referral Memorandum to Suh, McCreery noted, "Anonymous letter. The return address on the envelope appears to be for the New York public library." *Id.* On September 16, 2008, Suh informed McCreery that she was returning the referral without taking any action. E-mail dated September 16, 2008 from Suh to McCreery, at Exhibit 393. Suh explained in her e-mail:

> I received from you a referral concerning Madoff, the central character in the now closed investigation NY-7563. The referred letter appears to be a copy of a letter sent to us and reviewed by us in 2006. *As in 2006, because the letter is anonymous and lacks detail, we will not be pursuing the allegations in it.*

*Id.* (emphasis added).

Based on the substance of the tip (*i.e.* Madoff keeping two sets of books) and its place of origin (*i.e.* it was mailed from the New York Public Library in Manhattan),[243] the anonymous tipper may have been an insider with personal knowledge of Madoff's operations. As discussed in detail above, Bachenheimer, Cheung and Suh testified that they were skeptical of the allegation that Madoff was running a Ponzi scheme because Markopolos did not have any inside information to substantiate the allegation. However, Enforcement staff also ignored a serious tip that, on its face, appeared to come from an insider who was aware that Madoff was committing fraud. Moreover, if the tip was from an insider, it was understandable why the tipster would want to remain anonymous.

Short of re-opening its investigation of Madoff, the Enforcement staff could have suggested that the investment adviser examination staff conduct an examination to explore these new allegations. Snively Interview Tr. at pgs. 26-27. Cheung testified that forcing Madoff to register had been a "good result" because it would "expose [Madoff] to … exams from the [investment adviser] examiners." Cheung Testimony Tr. at p. 228. Yet, when the Enforcement staff received the tip that Madoff kept two sets of books, the matter was never referred to the examination staff. In fact, as discussed above, the investment adviser examination staff never conducted an exam of Madoff after he registered as an investment adviser.

That failure is also puzzling in light of Bachenheimer's testimony regarding the ████████████████████████████████████ of a model Ponzi scheme investigation. According to Bachenheimer, this model investigation involved: (1) an examination being conducted; (2)████████████████████████████

---

[243] The return address was 455 Fifth Avenue, New York, NY 10016. *See* OIEA Referral Memorandum, at p.2, at Exhibit 395.

that "the exam staff was in;" and (3) that ████████████████████████████████████████
████████████████████████████████████████:

I can give you an example ████████████████████████



████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1.    Suh and Cheung's Work on the Madoff Investigation Are Cited in their Evaluations

For the annual rating period ending April 30, 2007 (May 1, 2006 to April 30, 2007), Suh's supervisors gave her the highest rating: "made contributions of the highest quality."  Cheung's statement in support of that rating included the following:

> Simona's ability to understand and analyze the complex issues of the Madoff investigation is particularly impressive.  Madoff refused to register as an investment adviser, despite providing what appeared to be advisory services to certain hedge fund clients.  Madoff retained prominent counsel, including a former director of the Investment Management division.  Simona's command of the laws, regulations, and staff guidance was such that she was able to convince Madoff and his counsel that he needed to register.

Supervisor Contribution Statement for Simona Suh for the Period of May 1, 2006 – April 30, 2007 and Supervisory Transmittal Form, collectively at Exhibit 396.

Cheung's self-evaluation for the same rating period included the following:

> I have worked closely with my branch members on their investigations.  I have attempted to participate and assist in their investigations without taking over and have tailored my involvement to the needs of the particular case and the strengths of the individual attorney involved.
>
> …
>
> In Madoff, we investigated the asset management services provided by a broker-dealer specializing in hedge funds who was not registered as an investment adviser.  After our investigation, we conducted discussions among the staff, the Division of Investment Management, and Madoff's counsel.  We also held separate discussions with Madoff's largest hedge fund client.  As a result of those discussions, Madoff's firm registered with the Commission as an investment adviser, and his hedge fund client corrected its disclosure.

Contribution Statement of Meaghan Cheung, Rating Period May 1, 2006 – April 30, 2007, at Exhibit 397.

C.    In April 2008, Markopolos Attempted to Send a Version of the 2005 Submission to the SEC's Office of Risk Assessment, but it was Not Received

On April 2, 2008, Markopolos attempted to send his 2005 submission to Jonathan Sokobin, Director of the SEC's Office of Risk Assessment, but inadvertently sent the e-mail to a non-existent address.[244]  The e-mail composed and sent by Markopolos was

---

[244]  Markopolos' contact with Sokobin had been initiated by Sokobin a few days earlier.  Sokobin was appointed Director of the SEC's Office of Risk Assessment on February 28, 2008.  Sokobin Testimony Tr. at p. 9.  Shortly thereafter, Sokobin contacted Rudi Schadt, Director of Risk Management, Oppenheimer Funds, to discuss "what were emergent risks, what were things that the Commission wasn't focusing on that they should have."  *Id*. at p. 21.  Schadt recommended that Sokobin contact Markopolos.  *Id*. at p. 22.

On March 31, 2008, Sokobin e-mailed Markopolos, "Harry, Our mutual friend, Rudi Schadt has suggested that I contact you.  Rudi tells me that he has great respect for you and that I would do well to listen.  Please let me know when you might have some time to chat.  Thanks in advance."  E-mails between Sokobin and Markopolos, at Exhibit 399.  Markopolos responded the next day and suggested a call the following morning.  *Id*.

On April 2, 2008, Sokobin and Markopolos spoke by phone.  Sokobin Testimony Tr. at p. 23; June 4, 2009 Testimony of Harry Markopolos Before the U.S. House of Representatives, Committee on Financial Services Tr. at p. 22, at Exhibit 269.  Sokobin testified that he and Markopolos spoke for approximately 20 to 40 minutes.  Sokobin Testimony Tr. at p. 24.  Sokobin recalled Markopolos discussing

addressed to "sokobin@sec.gov", not to Sokobin's actual e-mail address, "sokobinj@sec.gov." E-mail dated April 2, 2008 from Markopolos to Sokobin@sec.gov, at Exhibit 398.

Markopolos assumed that Sokobin received his April 2, 2008 e-mail, and, in his Congressional testimony, discussed his frustration that Sokobin had not responded. February 4, 2009 Testimony of Harry Markopolos, Before the U.S. House of Representatives, Committee on Financial Services Tr. at pgs. 22-23. (Markopolos testified, "At this point I truly had given up on the [SEC's Madoff] investigation."). The *Wall Street Journal* reported on December 18, 2008, that:

> Early this year, Mr. Markopolos made one last major effort after receiving an e-mail from Jonathan Sokobin, an official in the SEC's Washington, D.C., office whose job was to search for big market risks. Mr. Sokobin had heard about Mr. Markopolos and asked him to give him a call, according to an e-mail exchange between them.
>
> With low expectations, Mr. Markopolos got in touch. "The way I figured it," he says, "if they didn't believe you at $5 billion, and not at $10 billion, they didn't believe you at $30 billion, then why would they believe you at $50 billion?"
>
> Mr. Markopolos also sent Mr. Sokobin an e-mail – with the stark subject line "$30 billion Equity Derivative Hedge Fund Fraud in New York" – saying an unnamed Wall Street pro recently pulled money from Mr. Madoff's firm after trying to confirm trades supposedly done in his account, but discovering that no such trades had been made.
>
> It was his last try. He never heard back about his allegations regarding Mr. Madoff.

Gregory Zuckerman and Kara Scannell, *Madoff Misled SEC in '06, Got Off*, The Wall Street Journal, December 18, 2008, at pgs. 3-4, at Exhibit 400.

---

"general concerns he had in the market" and "concerns he had with separately managed accounts" but did not recall any discussion regarding Madoff. *Id.*

Following the April 2, 2008 phone call, Markopolos composed his e-mail to Sokobin regarding Madoff. June 4, 2009 Testimony of Harry Markopolos Before the U.S. House of Representatives, Committee on Financial Services Tr. at pgs. 22-23, at Exhibit 269. As Markopolos explained, "After our call, I felt that I had established my bona fides as a risk expert and felt comfortable enough to send him my updated, 32-page, [2005 submission] along with a short 4 paragraph e-mail." *Id.*

However, Sokobin testified that he did not recall ever seeing Markopolos' April 2, 2008 e-mail or the attached version of the 2005 submission. Sokobin Testimony Tr. at p. 27. While Sokobin and Markopolos did exchange a few e-mails[245] and had at least one phone conversation, none of the e-mails that Sokobin received mentioned Madoff, and Sokobin testified that he did not recall Madoff being discussed during his phone conversation with Markopolos. *Id.* at p. 24.

As discussed above, Markopolos' April 2, 2008 e-mail to Sokobin was accidentally sent to a non-existent e-mail address. Moreover, OIT's e-mail tracking system shows no record of the e-mail having been received by the SEC. Consequently, the OIG found that Sokobin did not receive any information from Markopolos regarding Madoff.

D.    Enforcement Staff's Reflections

Bachenheimer, Cheung, and Suh all testified that when news of Madoff's Ponzi scheme broke on December 11, 2008, they were shocked. Suh testified, "Well, we had the allegation so I guess – I was shocked that the allegation turned out to be so true and that the scope was so much vaster than what we had thought." Suh Testimony Tr. at p. 251. Bachenheimer testified, "I was shocked. In fact, when I first heard the news that Madoff had been arrested, I didn't think it was in relation to this. I thought he had done something different, and it wasn't until the next day that I realized it was this." Bachenheimer Testimony Tr. at p. 163. Cheung testified that she "was more shocked [than someone who wasn't aware of the allegations] because I had investigated it. Cheung Testimony Tr. at p. 262.

Even Lamore, who had conducted the 2005 examination and aided the Enforcement staff with the investigation in 2006, was "just utterly shocked" that the allegations had turned out to be true. Lamore Testimony Tr. at pgs. 243-244. An e-mail sent to Michelle Trillhaase, a member of Enforcement in the New York Regional Office, just days after Madoff confessed, shows Lamore evaluating the SEC's performance: "It's been a tough couple of days for me. Although I gave the exam and follow-up investigation 110% we just didn't uncover it. I think we were very close, -- *probably only 1 or2 phone calls away from blowing it open*…" E-mail dated December 12, 2008 from Trillhaase to Lamore, at Exhibit 401 (emphasis added).

During testimony, Lamore explained what he meant by being "only 1 or 2 phone calls away," saying:

> You know, I think had we been able to *contact the
> counterparties* to the – equities or the options, I think that
> would have, you know, that *would have been the call that*

---

[245] *See* E-mails between Sokobin and Markopolos, at Exhibit 399.

> *would have revealed the entire Ponzi scheme* because there
> would have been no executions.

Lamore Testimony Tr. at pgs. 247-248 (emphasis added).

Bachenheimer testified that she and the other members of the Enforcement staff
thought they had conducted a thorough investigation and that "there was nothing there
and Markopolos was wrong…." Bachenheimer Testimony Tr. at p. 153.  To some extent,
Bachenheimer even blamed Lamore for not taking initiative when he supposedly knew
what steps to take:

> Q:    Peter Lamore testified and there's contemporaneous
>        documentation to the effect that if he had made one
>        or two phone calls, to either DTC or a counterparty,
>        he would have discovered the Ponzi scheme.  He
>        believed that it would have been relatively easy to
>        discover the Ponzi scheme had he made one or two
>        phone calls.
>
> A:    I don't know why Peter didn't do that.  I mean,
>        Peter sat in my office and told me that he had a
>        command of this and that he was pursuing it and he
>        wasn't finding anything.  I felt entitled to rely on
>        Peter.

*Id.* at p. 98.

Bachenheimer also attributed the SEC's failure to uncover Madoff's Ponzi
scheme to a lack of resources:

> The resource issues and the challenges that we were facing,
> everything.  Everything in that [GAO] report, I think I
> agree with.  We had to buy our own legal pads.  We had to
> buy our own pens.  It got to the point where we didn't have
> paper for the printers. There is a lot of metrics that were put
> into place that were very good metrics but the problem was
> you only had one person to be doing the same jobs. We had
> cases that had remained open for years.

*Id.* at p. 170.  Bachenheimer testified that "given the resources that we had available …
[the Enforcement staff's 2006 investigation of Madoff] was the best we could do":

> Q:    Looking back now after all the documents we've
>        shown you today, do you think there were sufficient
>        actions taken by the Enforcement staff to uncover

> [Madoff's] Ponzi scheme, to investigate the Ponzi
> scheme issue?

> A:    I think given the resources that we had available to
> us and given what else we all had to do at the time,
> this was the best we could do.

*Id.* at pgs. 162-163.  In a written submission made by Cheung's attorney after her
testimony, Cheung also claimed that the Enforcement staff had been "hamstrung by a
lack of resources and personnel and the lack of responsiveness of other offices within the
SEC that could have assisted in the [Madoff] investigation."  July 24, 2009 Submission
on Behalf of Meaghan Cheung, at p. 4, at Exhibit 281.

The fact is that the SEC could have discovered Madoff's Ponzi scheme with far
fewer resources than were actually spent on the Enforcement staff's Madoff
investigation.  As Cheung testified while explaining her comment that the Madoff
investigation had been a "fishing expedition":

> [W]e had spent a long time investigating the Madoff
> [matter] and not found anything of significance.  And that's
> – we – and it had taken up an extraordinary amount of staff
> resources and not found anything, and that's what I mean –
> meant.

Cheung Testimony Tr. at p. 256.  When Madoff's Ponzi scheme collapsed, Friedman
testified that it took only "a few days" and "a phone call … to DTC" to confirm that
Madoff had not placed any trades with his investors' funds."  Friedman Testimony Tr. at
pgs. 21-22.

Bachenheimer also connected the SEC's failure to discover Madoff's Ponzi
scheme to a lack of adequate training:

> The other point that I want to make that I think is really
> important is they stopped – when I got to the Commission,
> it was great, you actually had money for training, because I
> came from the Department of Justice, the U.S. Trustee's
> Office, we had no money for training.  When I got to the
> Commission, I thought this was the greatest thing in the
> world.  In 2005, and maybe before 2005, they shut down
> our money for training.

Bachenheimer Testimony Tr. at p. 171.  Bachenheimer also testified:

> I don't think it's a function of inexperience for Simona. I
> think it's a function of inexperience at an agency with some
> issues and a lack of resources.  I think we are lawyers and

> we have a fair amount of securities experience, and you
> tend to learn. You know, you have a background in
> securities, and you have a fair amount of knowledge, and
> then as you work in an area, you tend to get more and more
> – develop greater and greater knowledge in that area.  I
> think the fact that Simona didn't know more, that any of us
> didn't know more, related more to a lack of training and
> that no training is available for us on these issues, that we
> didn't have broker-dealer resources that we could go to,
> you know.  We asked for additional options help, and it
> wasn't there to be had.  I don't think it's her lack of
> experience.  I think it's a knowledge gap, absolutely.

*Id.* at pgs. 161-162.

Finally, Bachenheimer also identified administrative burdens that occupied much
of Cheung's time:

> You had to have people writing closing memos, which is of
> course, you should be shutting down your old cases, but
> that's what Meaghan spent a lot of her time doing, writing
> closing memos because she had inherited a branch where
> everybody had left and left these old cases in shambles, and
> you had to go back to the court records, pulling all these
> court files, and recreating files to close them.  Meaghan had
> tons of this stuff, much more than [the other Branch Chief
> in Bachenheimer's group].  It was crazy.  Then you had to
> have six month memos on cases, whether or not you should
> keep them open, memos to write. The joke that we had in
> the office was that you had to write a memorandum to get
> permission to write a memo.  You know, a lot of this was to
> make the performance measurable, which is great, and it
> should be measurable, but you have to provide people the
> resources to do it.

*Id.* at pgs. 170-171.

Cheung and Suh were more introspective about the SEC's failure to uncover
Madoff's Ponzi scheme.  Cheung testified:

> At the time, I thought it was a good investigation.  At this
> point, I see where there were flaws and there are things that
> I would like to have done differently.  And I see specific

> ones that came out today that I – if I could go back in time
> would do differently.

Cheung Testimony Tr. at p. 252.

Specifically, Cheung acknowledged that the Enforcement staff should have gone
to third parties to verify that Madoff was placing trades with the investors' funds:

> I think that in retrospect we should have gone to third – to
> more third party – to third parties. At the time that we did
> the investigation, I thought it was reasonable to rely on the
> fact that there had been an exam team in place to put aside
> the idea that trading wasn't happening. I – I put too much –
> I think – I think that I was sure – I put comfort too early on
> in the idea that there was trading and that it was less likely
> to be a Ponzi scheme because there had been an exam, that
> it was to be another problem, another type of problems.

*Id.* at p. 253.

In the final analysis, Suh provided the most revealing explanation for the failure
of the Enforcement investigation:

> [H]aving had more experience myself, I do question some
> of the choices that were made and I particularly – it seems
> like the question of verifying the transactions with – from
> independent sources, it was on the radar throughout but it
> seems like it could have been made more central and we
> could have just focused on that question as opposed to
> spending more time trying to figure out how Madoff
> portrayed his trading to others.   And the main question
> that, you know – as you can imagine I have been thinking a
> lot about what happened, and the main call that I am
> frustrated about is the call not to pursue further this getting
> Madoff's consent for the counterparties to send trading
> records to us directly. And I do think that that was the
> wrong call and I wish it was a different call.

Suh Testimony Tr. at p. 86. Suh continued:

> A:    I don't know. I – looking back at it I, you know,
>        it's hard to speculate what, sort of, my instincts
>        would have been had I had more experience. For
>        example, I know that had I had more experience I
>        may have taken more steps or different steps.

Q:      You think that if you had more experience or maybe
        had more support you would have had a better sense
        of just how unusual Madoff's returns were, not just,
        you know, that he does a good job picking or he has
        a – he's an experienced guy, but that, you know,
        what he was achieving wasn't able really to be
        replicated by anybody.

A:      That's probably true.  Certainly had I – certainly
        had I had Ponzi – had worked on Ponzi scheme
        cases I also probably would have been able to cut to
        the right steps.

*Id.* at pgs. 128-129.

E.      Factors in the SEC's Failure to Discover Madoff's Ponzi Scheme

From the outset of its investigation, the NERO Enforcement staff, unlike the
Boston District Office, failed to appreciate the significance of the evidence in the 2005
Markopolos submission.  As a result of this initial failure, the Enforcement staff never
really conducted an adequate and thorough investigation of Markopolos' claim that
Madoff was operating a Ponzi scheme.

Almost immediately after Markopolos' submission was brought to the
Enforcement staff's attention, they expressed skepticism and disbelief toward the
evidence contained in the submission.  The Enforcement staff claimed that Markopolos
was neither an insider nor an investor and, thus, immediately discounted his' evidence.
Bachenheimer testified that "often the only way [the SEC] can develop evidence … in a
Ponzi scheme, is if we have somebody on the inside … It's very challenging to develop
evidence [about a Ponzi scheme] until the thing actually falls apart."  Bachenheimer
Testimony Tr. at pgs. 65-66.  Yet, had the Enforcement staff simply sought documents
from DTC, Madoff's bank or his purported OTC option counterparties, they would have
been able to uncover the fraud without any such inside information.

The Enforcement staff also questioned Markopolos' motives, indicating concerns
that "he was a competitor of Madoff's" who "was looking for a bounty."  *Id.* at p. 45.
Bachenheimer further stated about Markopolos, "If the first thing I hear from someone is
what's in it for me, then it raises my antenna a little bit."  *Id.* at p. 47.  These concerns
were particularly curious because in the scenario Markopolos described as "highly likely"
in his 2005 submission, the "Ponzi scheme," he acknowledged that would *not* have been
eligible for a bounty.  2005 Submission at p. 2, at Exhibit 268.  Moreover, even after
Meaghan Cheung spoke with David Bergers, the Associate District Administrator for
Enforcement in Boston, who vouched for Markopolos' credibility, she remained skeptical
of him throughout the investigation.

Another factor that contributed to the Enforcement staff's failure to appreciate the "red flags" contained in Markopolos' 2005 submission was a lack of experience necessary for a fundamental understanding of equity and options trading.  Unlike Garrity and others in the Boston office, the NERO Enforcement staff did not appreciate Markopolos' observation that Madoff's "numbers really [were] too good to be true." E-mail dated March 1, 2001 from Markopolos to Manion, with attachments, at Exhibit 137.  As a former Madoff investor who was quoted in the 2001 *Barron's* article observed, "To take [Madoff's explanation for his returns] at face value is a bit naïve."  Erin Arvedlund, *Don't Ask, Don't Tell*, Barron's, May 7, 2001, at p. 2, at Exhibit 135.

However, each member of the Enforcement staff accepted as plausible Madoff's claim that his returns were due to his perfect "gut feel" for when the market would go up or down.  Suh testified that she "didn't know what to think at that time about [Madoff's claimed returns].  I did not know enough about this industry to place that number" and that she "did not have a view about how likely or unlikely" "it was that one person could achieve such consistent returns over 14-and-a-half years with only seven down months." Suh Testimony Tr. at pgs. 41-42.  Bachenheimer and Cheung both took Madoff's explanation at face value that "by not reaching for astronomically high returns," he could achieve such remarkable consistency, with Bachenheimer, noting that Madoff's explanation, "while not 100 percent responsive, not a perfect answer, it d[id] answer the question." Cheung Testimony Tr. at pgs. 194-195; Bachenheimer Testimony Tr. at p. 115.

The Enforcement staff's lack of experience not only contributed to their failure to understand that Madoff's returns could not be real, it also was a factor in their failure to conduct an effective investigation regarding how Madoff was creating those returns. According to NASD Vice President Gene DeMaio, the Enforcement staff did not understand the basics about options and "some of those [options trading] strategies were over their heads."  DeMaio Testimony Tr. at p. 15.  In addition, the Enforcement staff failed to recognize the significance of the issues they did not understand.  They rejected DeMaio's suggestion to postpone Madoff's testimony "to do a little bit more homework," and they did not accept his offer of further assistance.  *Id.* at pgs. 14-15.  Similarly, Cheung rejected offers from Markopolos to explain his observations and analyses regarding Madoff, or at least to provide additional information about Madoff.

Garrity met with Markopolos for several hours during which Markopolos made "repeated trips up to the white board" to explain the "derivatives math" and "a few of the more difficult concepts."  Division Exhibit 18 at pgs. 14-15.  As a result, Garrity "understood the scheme, its size, and its threat to the capital markets."  *Id.*  In contrast, Cheung was offended when Markopolos questioned whether she understood derivatives enough to understand some of the red flags in the 2005 submission.  Cheung rebuffed Markopolos' offer to help the Enforcement staff understand the 2005 submission as he had done in his meeting with the Boston office.

The Enforcement staff also did not understand critical aspects of Madoff's broker-dealer operations, but did not consult the SEC's Division of Market Regulation for

assistance in understanding those issues. Similarly, the staff did not seek help from the SEC's Office of International Affairs (OIA) regarding Madoff's purported trading activity in Europe. OIA may have been able to provide the "particular expertise" that Lamore acknowledged would have been "helpful":

> [T]he execution of the orders overseas, you know, was that feasible, was that possible. I think that was a question that we didn't get answered that, you know, would have been helpful.

Lamore Testimony Tr. at pgs. 195-196. If the Enforcement staff had simply sought assistance from OIA on matters within their area of expertise, they would have discovered that Madoff was not purchasing equities from foreign broker-dealers and that he did not have OTC options with European counterparties.

Moreover, the Enforcement staff's failure to verify Madoff's purported trading with any independent party is particularly troubling. This was due, in part, to a lack of experience with Ponzi scheme investigations. Despite that inexperience, the staff did not reach out to any of their SEC colleagues who had investigated Ponzi schemes for guidance on the proper investigative steps to follow. All of the SEC employees with such experience who testified during the OIG's investigation disagreed with Bachenheimer's view that independent verification of trading was not an "essential" part of a Ponzi scheme investigation.[246]

In addition, when the Enforcement staff began efforts to seek information from independent third parties, they failed to follow-up on those efforts even as they began to reveal that Madoff was not engaged in trading. On May 16, 2006, three days before Madoff's testimony, Suh called Susan Tibbs, Director of the Market Regulation Department at the NASD (now FINRA) and asked her to check a certain date on which Madoff had purportedly held S&P 100 index option positions. Tibbs reported back that they had found no reports of such option positions for that day. Yet, the Enforcement staff failed to follow up on this remarkable finding. The Enforcement staff also failed to follow-up on information obtained in the 2005 NERO cause examination when the examination staff had attempted to verify Madoff's claims of trading OTC options with Barclays and found that there was "no relevant transaction activity occurred during the period" requested. Letter dated May 16, 2005 from Mansfield to Nee, at Exhibit 241 (emphasis added). Finally, although Suh made several attempts to obtain documentation from European counterparties, and one of Madoff's purported counterparties was in the process of drafting a consent letter asking Madoff's permission to send the Enforcement

---

[246] Ironically, six days after Madoff's Ponzi scheme collapsed, Pauline Calande, Counsel to the Director and Deputy Director of Enforcement, sent an e-mail to Linda Thomsen, former Director of Enforcement, and others in the context of discussing her concern about the thoroughness of the trustee's work in the Avellino & Bienes investigation. The e-mail highlighted the trustee's failure to confirm whether the investor funds were really "all there" in 1992, asking if the trustee went "to the street name custodian of the fund's portfolio and inspected the securities," or to the "banks or firms allegedly holding cash or sweep funds," thus referencing the very steps that the NERO Enforcement staff should have, but failed to, take in their investigation. E-mail dated December 17, 2008 from Calande to Thomsen *et al*, at Exhibit 402.

staff the documents from its European account, the inexplicable decision was made not to send the letter and to abandon this effort.

In addition to a lack of experience, the investigation suffered from a lack of supervision. Suh certainly worked hard enough on the investigation to discover Madoff's Ponzi scheme, but her efforts were wasted on futile tasks (*e.g.*, comparing Madoff-generated client statements to documents Madoff created for the SEC) or chasing red herrings (*e.g.*, whether Madoff should register as an investment adviser).

Bachenheimer attributed the SEC's failure to discover Madoff's Ponzi scheme to a lack of resources, as evidenced by the following exchange:

> Q:    Looking back now after all the documents we've
>        shown you today, do you think there were sufficient
>        actions taken by the Enforcement staff to uncover
>        [Madoff's] Ponzi scheme, to investigate the Ponzi
>        scheme issue?

> A:    I think given the resources that we had available to
>        us and given what else we all had to do at the time,
>        this was the best we could do.

Bachenheimer Testimony Tr. at pgs. 162-163. The fact is, as Cheung testified while explaining her comment that the Madoff investigation had been a "fishing expedition":

> [W]e had spent a long time investigating the Madoff
> [matter] and not found anything of significance. And that's
> – we – and it had taken up an extraordinary amount of staff
> resources and not found anything, and that's what I mean –
> meant.

Cheung Testimony Tr. at p. 256. When Madoff's Ponzi scheme collapsed, Friedman testified that it took only "a few days" and "a phone call … to DTC" to confirm that Madoff had not placed any trades with his investors' funds." Friedman Testimony Tr. at pgs. 20-22.

Suh repeatedly lamented the lack of competent supervision when she reflected on the SEC's failure to discover Madoff's Ponzi scheme:

> Well, Peter was very helpful, and to the extent that I asked
> for his help he never shied away from it. But the help that
> – I did not – this was not a situation where there was an
> issue of volume of documents where you just needed an
> extra set of hands to go through things, it was more a

situation where I needed guidance about what to do and what steps to pursue.

Suh Testimony Tr. at p. 83.  Suh continued:

> [Cheung] answered questions that I posed to her.  At the time I had no reason to doubt her answers, subsequently, after I – in subsequent years I did become frustrated with sort of [a] lack of involvement from her part.  But I did not form that view or get that impression until later when I had had more opportunities to work with her.

*Id.* at p. 84.  Suh stated further:

> I guess my frustration was that I did not get sort of value added from her being my supervisor. … She did know the Commission processes so she was very helpful in terms of … who would be the right person in Washington to call …but in terms of daily activity I did not feel like I was getting much out of having her as a supervisor.

*Id.* at p. 85.

Finally, the Enforcement staff failed to discover Madoff's Ponzi scheme because they relied too heavily on Madoff's representations and documents created by him.  For example, Madoff lied several times about where the equity trades for his investors were executed and cleared.  Madoff first told the examination staff that the trades were executed by his London affiliate and cleared through Barclays.  During his investigative testimony, however, Madoff claimed that the London affiliate had nothing to do with either the equity or options trades for the advisory accounts and that those trades were executed by his New York office.  He also later testified that the equity trades were cleared through DTC.

Madoff also told the examination staff that he had stopped placing options trades for investors in 2004.  Yet, the account statements he was providing investors in 2005 and 2006 demonstrated that he was trading options on their behalf.  The Enforcement staff caught Madoff in this contradiction and Suh and Lamore were convinced that Madoff had lied during the exam and that he continued to lie about the issue throughout the investigation.  Yet, the Enforcement staff closed the investigation without ever scrutinizing this issue and what it meant in the context of the allegation that Madoff was operating a Ponzi scheme.

An SEC attorney currently working on the Madoff matter touched on that failure when she opined:

> I think people were too trusting. I don't mean this in a bad way. I think, you know, very often you hear these stories and the guy, you know, I didn't know his reputation, but he apparently did have a tremendous reputation. And I think people were trusting. I mean he gave testimony that was clearly, you know, a complete and utter fabrication. … I mean why didn't they talk to the European options, you know, the people on the other side of the option trade, I don't know.

New York Staff Attorney #2 Testimony Tr. at p. 28.

VI.    ALLEGATIONS OF IMPROPER INFLUENCE, INTERACTIONS BETWEEN MADOFF AND THE SEC AND THE EFFECT OF MADOFF'S STATURE AND REPUTATION ON SEC EXAMINATIONS AND INVESTIGATIONS

A.    The OIG Investigation Found No Evidence of Improper Influence by Senior SEC Officials Based upon Their Relationships with Madoff

The OIG investigation did not find any evidence that senior officials at the SEC directly attempted to influence examinations or investigations of Bernard Madoff and the Madoff firm, nor was there evidence that any senior SEC official interfered with the staff's ability to perform its work. During the course of the OIG investigation, the OIG reviewed millions of e-mails and took testimony of the SEC personnel who conducted the examinations and investigations of Madoff and found no evidence that the work of any SEC staffers involved in Madoff examinations or investigations was influenced by any senior SEC official.

We also took the testimony of or interviewed former Chairmen Christopher Cox, William Donaldson and Arthur Levitt, former Commissioner Annette Nazareth, current Commissioner Elisse Walter, former Chief of Staff Peter Uhlmann, former Director of Enforcement Linda Thomsen, and former Director of OCIE Lori Richards.[247] We found that none of these senior officials played any inappropriate role in the SEC's examinations and investigations of Madoff. We further found that while several of these SEC officials knew Bernard Madoff and met with him on occasion, these officials were generally unaware of the SEC's examinations and investigations of Madoff until he was arrested in December 2008.

---

[247] The OIG took the testimony of or interviewed the current or former senior-level SEC officials who we determined based upon the evidence were or could have been in a position to influence the examinations and investigations of Madoff that could have uncovered the Ponzi scheme.

Christopher Cox, who served as Chairman of the SEC from August 2005 until January 2009, stated that prior to December 2008, he had not been familiar with the name Bernie Madoff or his firm.  Cox Testimony Tr. at pgs. 7-8.  Cox also testified that he has never met any member of the Madoff family.  *Id.* at p. 8.[248]  Cox stated that he was not aware that there had been either an Enforcement investigation or OCIE examination of Bernard Madoff or his firm prior to December 2008.  *Id.* at pgs. 8-9.

When asked about a complaint letter addressed to him in December 2006 that conveyed concerns about Madoff's firm, Cox testified that he had never seen the letter and noted that all letters addressed to him would first go the Chairman's Correspondence unit, at which point a determination would be made as to where at the SEC the letter should be referred for appropriate response and handling.  *Id.* at pgs. 12-13.[249]

William Donaldson, who served as Chairman of the SEC from February 2003 until June 2005, stated that he met Bernie Madoff when Donaldson was Chairman of the New York Stock Exchange between 1991 and 1995.  Donaldson Testimony Tr. at pgs. 6-7.  Donaldson recalled that on one occasion, Bernie Madoff visited the SEC when he was Chairman and asked if he could stop by Donaldson's office, and he came in and said "hello."  *Id.* at p. 9.  Donaldson stated he never invested with Madoff, and never met with any other member of Madoff's family.  *Id.* at p. 10.  Donaldson said he was not aware that Madoff had a separate investment management business.  *Id.* at p. 11.  He also said he was not aware of any examinations or investigations of Madoff while he was Chairman, nor any complaints about Madoff or Congressional interest in Madoff.  *Id.* at pgs. 10-11.

Arthur Levitt, who served as the Chairman of the SEC from 1993 until 2001, stated that he met Bernard Madoff "on an infrequent basis" while he was Chairman of the SEC, mostly at seminars or outside functions.  Levitt Interview Memorandum at p. 1.  Levitt approximated that he saw Madoff once a year while he was the Chairman of the SEC.  *Id.*  Although Bernard Madoff, in his interview with the OIG, stated that he knew Levitt "very well," Levitt stated he did not have a personal friendship with Madoff, had never socialized with him, and did not know his family, other than having met Bernard Madoff's brother.  Madoff Interview Memorandum at p. 9; Levitt Interview Memorandum.  Levitt stated that while he was Chairman of the SEC, he was not aware of any examinations or investigations that the SEC was conducting of Madoff.  *Id.*

Levitt further stated that during his tenure as Chairman of the SEC, he was not aware that Madoff had been managing money for outsiders, and was only aware of Madoff's broker-dealer operation.  *Id.*  Levitt also said he didn't recall knowing anything

---

[248]  Bernie Madoff confirmed in his interview with the OIG that he had never met Christopher Cox. Madoff Interview Memorandum at p. 9.
[249]  At the request of the OIG, former Chief of Staff Peter Uhlmann conducted a search of the Chairman's correspondence system between 1992 and 2009 for any correspondence relating to any member of the Madoff family and identified only two versions of the December 2006 anonymous complaints that came in relating to Madoff's firm and no records of congressional correspondence relating to any examination or investigation of Madoff.  Uhlmann Testimony Tr. at pgs. 8, 15, 23-24.

about Madoff managing money for investors at any time before the story broke and Madoff turned himself in on December 11, 2008.  *Id.*

Annette Nazareth served for brief periods as Senior Counsel to Chairman Arthur Levitt and Interim Director of the Division of Investment Management beginning in August of 1998 and then as Director of the Division of Market Regulation from December 1999 until she was nominated as a Commissioner, a role she served in from August 2005 until January 2008.  Nazareth Testimony Tr. at p. 6.

Nazareth stated she first met Madoff in her capacity as Senior Counsel to former Chairman Levitt.  *Id.* at p. 7.  Bernard Madoff stated that he knew Nazareth "very well," and Nazareth acknowledged that she has had "in excess of ten" meetings with Madoff, but she did not believe she ever met with him one-on-one.  Madoff Interview Memorandum at p. 9; Nazareth Testomony Tr. at p. 7.  Nazareth stated she never invested with Madoff and was not even aware that Madoff's firm invested funds for individuals.  *Id.* at pgs. 12; 14.  Nazareth stated that she was not aware of any Enforcement investigations of Madoff and had not seen any complaints that were filed with the SEC about Madoff.  *Id.* at pgs. 14-15.  She stated that "she may have been aware of sweep efforts by the SEC examination unit of market participants that may have involved Madoff and others," but was clear that she "was not aware of any routine or cause examinations of Madoff in particular."  Nazareth Interview Memorandum.[250]

Elisse Walter served in various positions in the SEC Office of General Counsel and as Deputy Director of the SEC's Division of Corporation Finance between 1977 and 1994.  Walter Testimony Tr. at pgs. 6-7.  Then, after working for both the Commodity Futures Trading Commission (CFTC) and the National Association of Securities Dealers (NASD), she became an SEC Commissioner on July 9, 2008.  *Id.*  Walter testified that she was aware of Bernard Madoff's broker-dealer firm from her time at the NASD.  *Id.* at p. 7.

Walter stated she met Bernard Madoff approximately 10 times, but never had any one-on-one meetings with him, nor met with him on any social occasions.  *Id.* at p. 8.  Walter stated she also met Peter Madoff, Shana Madoff, and Mark Madoff at industry events or market regulation committees while she was at the NASD.  *Id.* at pgs. 8-9.  Walter stated she did not recall participating in any industry events with Madoff while she was with the SEC.  *Id.* at p. 9.  The OIG investigation did locate two pieces of correspondence from Madoff family members to Walter.[251]  The first was an undated handwritten letter from Bernie Madoff to Walter congratulating her on her appointment as a commissioner, stating, "Your knowledge and experience is so important in these complex times and your unique style of always listening to both sides of opposing

---

[250]  Nazareth was asked about a December 16, 2003 e-mail from Lori Richards in which Richards stated, "Remind me to tell you what we're looking at too with Madoff" and stated that she did not recall speaking with Richards about Madoff.  Nazareth Interview Memorandum.  Richards testified that she also could not recall any such conversation with Nazareth about Madoff.  Richards Testimony Tr. at pgs. 63-64.
[251]  The OIG also inquired of the records of current SEC Commissioners Paredes, Aguilar, Casey and Chairman Schapiro and found no documents in their correspondence files relating to Madoff.

arguments has served us so well.  We are lucky to have you."  Letter (undated) from Bernie Madoff to Walter, at Exhibit 403.  The second was a typed July 15, 2009 letter from Peter B. Madoff "[o]n behalf of the entire Madoff family" asking that she "accept [their] congratulations and best wishes" on her appointment as an SEC Commissioner. Letter dated July 15, 2009 from Peter Madoff to Walter at Exhibit 404.  Walter testified she was not aware of any additional correspondence between her and Madoff family members and stated that she did not have phone or other conversations with either Peter or Bernard Madoff after she received the letters.  Walter Testimony Tr. at p. 11.  Walter stated she received numerous letters of congratulations when she was nominated to be an SEC Commissioner in April 2009.  *Id.* at p. 12.

Walter also stated she never invested with Madoff and was not aware that Madoff had a separate investment business prior to December 2008.  *Id.* at p. 9. Walter testified that she was not aware of any SEC's examinations or investigations of Madoff or any complaints made with the SEC about Madoff before he was arrested in December 2008. *Id.* at p. 10.

Peter Uhlmann, who served as Senior Advisor to the Chairman and Chief of Staff to Chairman Cox from August 2005 until early 2009, testified that he had also not heard of Bernard Madoff or his firm prior to December 2008.  Uhlmann Testimony Tr. at pgs. 6-7.

Linda Thomsen, who served as the Director of the Enforcement Division from 2005 until February 2009 and served in other capacities in the Enforcement Division from 1995 until 2005, testified that she was generally aware of Madoff's firm but did not recall being aware that the Enforcement Division had received any tips or complaints about Bernard Madoff or Madoff's firm prior to December 2008.  Thomsen Testimony Tr. at pgs. 4-5.  Thomsen stated that she did not remember knowing Bernie Madoff and stated she has never had any social interactions with Madoff family members outside of an industry conference.  *Id.*[252]

Lori Richards, who began working for the SEC in 1985 and served as the Director of OCIE from 1995 until August 2009, stated that after Bernard Madoff was arrested in December 2008, she recused herself from all OCIE or other matters concerning Madoff because she had attended the wedding of Eric Swanson and Shana Madoff, and because Swanson had been in her chain of command.  Richards Testimony Tr. at pgs. 8, 116-117. Richards stated there was no other reason for her recusal.  *Id.* at pgs. 116-117.

Richards, whom Madoff stated he "does not know very well," said she recalled speaking to Bernie Madoff on only two occasions, once in connection with the 2003 OCIE examination and the second at an industry conference in which she had a brief conversation with him that lasted no more than 5 minutes.  Madoff Interview Memorandum at p. 9; Richards Testimony Tr. at pgs. 26-27.  Richards also stated she spoke on two occasions with Peter Madoff, once at an SEC Chief Compliance Officer (CCO) Outreach program and once at the wedding of Shana Madoff and Eric Swanson.

---

[252] Bernie Madoff confirmed that he did not know Thomsen well.  Madoff Interview Memorandum at p. 9.

*Id.* at pgs. 27-28.  Richards recalled speaking with Shana Madoff on approximately 5 or 6 occasions, at the same CCO Outreach program where she spoke to Peter Madoff, an SEC speaks event, a Securities Industry Association (SIA) committee meeting, a meeting of compliance officers at the SEC, and at Eric Swanson's wedding and going-away party. *Id.* at p. 29.  Richards stated she did not speak to either Peter or Shana Madoff about SEC examinations or investigations. *Id.* at pgs. 28-29.  She also stated that she never communicated to any examiner to back off of an examination relating to Madoff, and denied that Bernie Madoff received any special treatment because he was a well-known entity.  *Id.* at pgs. 117-118.  Richards noted that she had sent a hard copy of the *Barron's* article written by Erin Arvedlund, entitled "Don't Ask, Don't Tell" to OCIE Associate Director John McCarthy with a note that stated:

John, she [referring to Arvedlund] is very good.  This is a <u>great</u> exam for us! Lori.

*Id.* at pgs. 32-35; Richards' copy of Erin Arvedlund, *Don't Ask, Don't Tell*, Barron's, May 7, 2001, at Exhibit 157.

> B.   The OIG Found that Madoff Participated in SEC Panels and Events and Communicated with SEC Chairmen, and that SEC Officials Participated in Conferences Arranged by Shana Madoff

The OIG investigation found that Bernard Madoff participated on an SEC advisory committee and in public hearings.  We also found that Madoff communicated numerous times over the years with SEC Chairmen on a variety of matters.  We further found that SEC officials participated in industry events and conferences set up by Shana Madoff regarding SEC compliance issues.

On September 27, 2000, the SEC announced the members of an Advisory Committee on Market Information, which it was establishing to assist the SEC in evaluating issues relating to the public availability of market information in the equities and options markets. SEC Announcement, 2000-140 dated September 27, 2000, at Exhibit 405.  Bernard Madoff of Bernard L. Madoff Investment Securities was listed as a member of the newly formed Advisory Committee.  *Id.*  This committee met on several occasions at the SEC Office with Bernard Madoff in attendance, including on October 10, 2000, December 14, 2000, March 1, 2001, April 12, 2001, May 14, 2001 and July 19, 2001.  Minutes of October, 10, 2000, December 14, 2000, March 1, 2001, April 12, 2001, May 14, 2001 and July 19, 2001 Meeting of Advisory Committee on Market Information collectively, at Exhibit 406.  Reviewing the meeting minutes of this advisory committee, we found Madoff to be an active participant, and he was also listed on the final report provided by the committee to the SEC.  *Id.;* Report of the Advisory Committee on Market Information: A Blueprint for Responsible Change dated September 14, 2001, at Exhibit 407.

We also found that the Commission invited Madoff to provide opinions on matters that were the subject of public hearings.  On October 15, 2002, the SEC announced hearings to discuss issues relating to the structure of the U.S. equity securities

markets and invited Madoff as Principal in Bernard L. Madoff Investment Securities to
participate as a panelist.  2002 SEC News LEXIS 2305 (October 15, 2002), at Exhibit
408.  Madoff also participated in an October 29, 2002 session after remarks by several
senior-level SEC officials.  SEC News Digest, Issue 2002-208 (October 28, 2002), at
Exhibit 409.  In addition, on April 21, 2004, the SEC announced an agenda for a public
hearing on proposed regulation NMS which was intended to enhance and modernize the
regulatory structure of the U.S. equity markets.  SEC Press Release 2004-52 (April 15,
2004), at Exhibit 410.  William Donaldson, then-Chairman of the SEC, and Annette
Nazareth, then-Director of the Division of Market Regulation, both gave remarks at the
hearing and Bernard Madoff served as a participant on two panels – one panel regarding
trade-through proposal and another panel regarding market access proposal (linkage).  *Id.*

SEC officials also regularly participated in events that were set up by Bernie
Madoff's niece and Madoff's firm's compliance officer, Shana Madoff.  Ms. Madoff
served on the Executive Committee of the SIA's Compliance and Legal Division, and
routinely invited SEC officials such as OCIE Associate Director John McCarthy and
Assistant Director Eric Swanson to participate in SIA Breakfasts (SIABs).  For example,
Swanson participated in at least 17 SIABs during the period from October 2, 2003 until
November 1, 2006. Swanson Testimony Tr. at pgs 165-169.

Shana Madoff also invited and arranged for the participation of SEC officials in
other events, including the Washington, D.C. Compliance & Regulatory Forum, and
various events sponsored by The Securities Industry and Financial Markets Association
(SIFMA), such as the Washington, D.C. Regional Conference.  E-mail dated October 18,
2007 from Iris Delgado to Thomas Biolsi at Exhibit 411; E-mail dated October 10, 2007
from Iris Delgado to Mary Ann Gadziala, Thomas Biolsi at Exhibit 412; E-mail dated
September 20, 2007 from Iris Delgado to Thomas Biolsi at Exhibit 413.

The OIG investigation also identified 27 records of correspondence sent between
1994 and 2005 by Bernard Madoff or members of his family to the Chairman and/or
other SEC officials.  There were no records of any such correspondence between 2005
and 2009 or between 1992 and 1994.  Uhlmann Testimony Tr. at pgs. 15-20.  The
correspondence that could be located included the following:

(1)    January 5, 1995 letter from Bernard and Peter Madoff to then-Chairman
       Arthur Levitt, enclosing a copy of an announcement regarding Madoff's
       Nasdaq initiative.

(2)    November 14, 1995 letter from Bernie Madoff to then-Chairman Arthur
       Levitt, complimenting Chairman Levitt's speech regarding Madoff's
       recent efforts in price improvement and limit order exposure.

(3)    January 22, 1997 letter from Bernard Madoff on behalf of the SIA to then-
       Director of Market Regulation Richard Lindsey, with a copy to then-
       Chairman Arthur Levitt, regarding the SEC's approval of changes by the
       NASD relating to implementation of the SEC's order handling rules.

(4)     January 30, 1997 letter from Bernard Madoff to then-Director of Market Regulation Richard Lindsey, with a copy to then-Chairman Arthur Levitt, regarding the SIA's Trading Committee's monitoring of the SEC order handling rules.

(5)     April 28, 1997 letter from Bernard and Peter Madoff to then-Chairman Arthur Levitt, asking the Commission for the opportunity to compete for National Market System business.

(6)     March 20, 1998 letter from Bernie Madoff to then-Chairman Arthur Levitt, attaching a comment letter dealing with an NASD filing on its limit order book.

(7)     May 4, 1998 letter from Bernard Madoff to then-SEC Secretary Jonathan Katz, providing comments on behalf of the SIA Trading Committee to SEC rules regarding NASD proposed Integrated Order Delivery and Execution System.

(8)     May 26, 1999 letter from Peter Madoff to then-Chairman Arthur Levitt, informing him of a new enhancement to Madoff's order execution and price improvement services.

(9)     August 23, 2000 letter from Bernie and Peter Madoff to then-Chairman Arthur Levitt, providing information about Madoff's procedures for the handling of orders in the decimal environment.

(10)    November 1, 2002 letter from Bernard Madoff to then-Chairman Harvey Pitt, thanking him for giving him the opportunity to participate at a an SEC Roundtable.  *See* copies of letters collectively at Exhibit 414.

We also located an August 14, 2002 letter from former Chairman Harvey Pitt to Bernard and Peter Madoff, thanking them for their letter regarding SuperMontage and Nasdaq's exchange registration, and a January 29, 1996 letter from former Chairman Arthur Levitt to Peter Madoff, thanking him for the copy of Madoff's comment letter regarding the SEC's Order Execution Obligations Proposal.  *See* copies of letters collectively at Exhibit 414.

C.      The OIG Investigation Found that the SEC Secured an Exemption from a Short Sale rule for Bernard Madoff's firm

On February 9, 2001, Bernard L. Madoff sent the SEC's Division of Market Regulation a letter requesting an exemption for Madoff Securities from the short sale rule, Rule 10a-1, under the Securities Exchange Act of 1934 (Exchange Act).  Letter dated February 9, 2001 from Madoff to James Brigagliano, Assistant Director, Division

of Market Regulation, at Exhibit 415.[253]  Madoff's firm requested a limited exemption
pursuant to paragraph (f) of Rule 10a-1 for short sales effected in its capacity as a market
maker in New York Stock Exchange (NYSE) listed securities that are executed at the
National Best Offer price.  Id.

Madoff's firm represented in its letter that the advent of trading in decimal prices
had caused an increase "in the incidence of rapidly fluctuating quotation changes."  Id.
Madoff asserted that this increase had caused the number of proprietary short sales
prohibited by its automated system's programmed short sale rule protections to increase
from about 10-15 to about 400 orders per day.  Id.  Madoff requested that Madoff
Securities be exempted from the short sale rule when, "acting in its capacity as a market
maker, the broker-dealer effected proprietary short sales in order to passively provide
liquidity to customer orders at the current National Best Offer."  Id.  Madoff reasoned
that the requested exemption would allow the broker-dealer to satisfy its "best execution"
obligations, and asserted that "the executions effected pursuant to this limited exemption
would not be subject to the types of abuses underlying the intent of Rule 10a-1 [i.e. the
downward manipulation of the price of a security] and would facilitate market makers'
compliance with 'best execution.'"  Id.

In a no-action letter dated February 9, 2001, the SEC Division of Market
Regulation granted Madoff Securities' request for the limited exemption from Rule 10a-
1.  2001 SEC No-Act LEXIS 190, at Exhibit 417.  As the Market Regulation staff
described in its letter to Madoff, the so-called "tick" test of Rule 10a-1(a) prohibits the
short sale of a reportable security "at a price either: (1) below the last reported price of a
transaction reported in the consolidated transaction reporting system (minus tick); or
(2) at the last reported price if that price is lower than the last reported different price
(zero-minus tick)."  Id.

Without necessarily concurring in Madoff Securities' analysis, the Market
Regulation staff granted the exemption from the short sale rule allowing "registered
market makers and specialists that are publishing two-sided quotes in the security… to
sell short to facilitate customer market and marketable limit buy orders at the national
best offer."  Id.  The Market Regulation letter instructed that the market maker or
specialist must report all such sales as "sell short exempt."  Id.[254]

Nazareth recalled Madoff's firm's exemption request during her interview with
the OIG, and specifically recalled the fact that Commission granted Madoff's firm the
exemption it sought.  Nazareth Testimony Tr. at pgs. 9-11.  She also indicated she did not

---

[253]  Rule 10a-1(a)(1) provides that, subject to certain exceptions, a listed security may be sold short (A) at a
price above the price at which the immediately preceding sale was effected (plus tick), or (B) at the last sale
price if it is higher than the last different price (zero-plus tick.)  2006 SEC LEXIS 2850, * 18, at Exhibit
416.  Short sales are not permitted on minus ticks or zero-minus ticks, subject to narrow exceptions.  Id.
The operation of these provisions is commonly described as the "tick test."  Id.
[254]  We found that the exemption was commonly referred to as the "Madoff exemption."  Division of
Market Regulation: Responses to Frequently Asked Questions Concerning Rule 612 (Minimum Pricing
Increment) of Regulation NMS dated October 21, 2005, at Exhibit 418.

recall any other similar requests for exemptions made by any member of the Madoff family.  *Id.* at p. 9.

          D.      The OIG Investigation Found that on Occasion Over the Years, the SEC Visited Madoff's Firm's Offices as Part of Official SEC Events

The OIG investigation uncovered several instances in which the SEC staff visited the Bernard Madoff's offices in New York City as part of official SEC activities.  John Ehinger, who worked for the SEC in the Division of Market Regulation from 1999-2003, stated that on his first day at the SEC in 1999, he was informed that he would be joining other junior SEC attorneys on a "tour of all the various facilities" in New York.  Ehinger Testimony Tr. at pgs. 58, 60.  Ehinger noted that on the second day of the tour, the SEC junior attorneys went to visit Madoff Securities.  *Id.* at pgs. 60-61.  Ehinger said that during the tour, there "was definitely a sense that the -- that Madoff Securities was doing a favor for the staff, to let the junior attorneys come in and have a look at all the stuff on the trading screens and so on."  *Id.* at p. 63.  Ehinger stated that he thought "there was a general sense by the more senior staff that brought us, that they were appreciative of the efforts of the Madoff team in general."  *Id.* at p. 65.

The OIG also discovered that in June 2000, the SEC scheduled and paid for a trip for all students in the SEC Summer Honors Program to New York, NY that included tours of the New York Mercantile Exchange and the New York Stock Exchange and trips to the offices of Bernard L. Madoff Investment Securities and Merrill Lynch.  SEC Summer Honors Program Schedule of Events (June 22, 2000), at Exhibit 419; E-mail dated June 8, 2000 from Candyce Pare to Ahmad *et al*, at Exhibit 420.  Pursuant to the schedule of events, Mark Madoff was to provide the SEC Summer Honors Program students with an 1½ hour presentation at the firm's Third Avenue office on the 18th Floor regarding Bernard Madoff Investment Securities.  *Id.*

Former Chairman Arthur Levitt also stated that he had met Bernard Madoff's brother when he visited Madoff's offices with members of his staff (5 or 6 people from the Division of Market Regulation).  Levitt Interview Memorandum at p. 1.  He further stated that Madoff's firm was one of many that he had visited and that he routinely visited broker-dealers and exchanges while he was Chairman of the SEC.  *Id.*

Edward Nordlinger, who served as Deputy Regional Director for the Northeast region of the SEC from 1988 through 2005, recalled that when a new Commissioner (which he believed was Norman Johnson) first began as a Commissioner, Nordlinger accompanied the new Commissioner to Bernie Madoff's office so that Johnson could learn about the "over the counter market."  Nordlinger Interview Memorandum at p. 1.  He recalled the head of the New York office also accompanying him and the new Commissioner to meet with Bernard Madoff.  *Id.*

E.    The OIG Investigation Found no Evidence of Inappropriate
Financial or Other Relationships with Madoff, But Did Find that
Madoff Used His Stature in the Industry to Try to Intimidate the
SEC staffers and His Stature Played an Ancillary Role in the
Conduct of Their Examination and Investigatory Work.

1.    No Evidence of Improper Financial or Other Connections
Between Examiners and Investigators and Madoff

The OIG investigation did not find any evidence that any SEC personnel
who worked on an SEC examination or investigation of Bernard L. Madoff Investment
Securities had any financial or other inappropriate connection with Bernard Madoff or
Bernard Madoff's family that influenced the conduct of their examination or
investigatory work.[255]  During the course of the OIG investigation, the OIG reviewed
millions of e-mails and took testimony of the SEC personnel who conducted the
examinations and investigations of the Madoff firm and found no evidence that any SEC
personnel who participated in Madoff examinations or investigations invested with
Madoff, or had any financial or other tie to Madoff or his family.[256]

2.    Evidence of Awareness by Examiners and Investigators of
Madoff's Stature and Ancillary Role His Stature Played in their
Work

a.    Introduction

The OIG investigation did find that the examiners and investigators who worked
on Madoff-related matters were aware, or became aware, of Madoff's prominence in the
industry, and that Madoff used his stature and perceived connections to try to influence
examinations and investigations.  We also found that the examiners' and investigators'
awareness of Madoff's stature played an ancillary role in the conduct of their
examination and investigatory work.

---

[255]  Allegations that former OCIE Assistant Director Eric Swanson's relationship with Bernard Madoff's
niece, Shana Madoff, influenced the OCIE examinations in which Swanson participated are discussed in
detail in Section VII of this Report of Investigation.
[256]  Two of the SEC Office of Internet Enforcement Official's family members invested $1.5 million and
$500,000 respectively with Madoff, but we have found no evidence that the Office of Internet Enforcement
Official played any role in any Madoff examination or investigation.  Office of Internet Enforcement
Official Testimony Tr. at pgs. 25-27.  As discussed in greater detail in Section X of this Report of
Investigation, the Office of Internet Enforcement Official's office received a complaint about Madoff that
was not referred for investigation, but the OIG found no evidence that the Office of Internet Enforcement
Official himself saw the complaint prior to December 2008.  *Id.* at pgs. 20-22; Enforcement Senior Counsel
Testimony Tr. at p. 23.

b.    1992 Investigation of Avellino & Bienes

In connection with the 1992 investigation of Avellino & Bienes, an SEC examiner acknowledged that Madoff's stature and reputation in the industry may have influenced their decision not to further examine Madoff's operations while investigating Avellino & Bienes for a possible Ponzi scheme. SEC Branch Chief John Gentile stated that he was aware that Madoff's firm "was very prominent in developing third market particular automated trading." Gentile Interview Tr. at p. 10. Similarly, SEC examiner Demetrios Vasilakis stated that during the 1992 examination, he was "made aware" by Bernard Madoff himself that Madoff served in various industry committees, was a well respected individual and noted that the SEC examiners used an NASD manual with Bernard Madoff's name on it. Vasilakis Interview Tr. at pgs. 24, 27. In fact, when asked for his recollections of Bernard Madoff at the time of the examination, Vasilakis stated as follows:

> My personal conclusions [from the examination] were that
> [Bernard Madoff] was a pioneer in the industry, to use the
> term that's been thrown around now, but that he really
> used, you know, technology to bring trading to the next
> level. It was strictly -- when I walked out of there it was
> more along the lines of wow, this guy is a third market guy
> that does X percent of the volume on the exchange. This is
> where I actually learned about third market. I didn't even
> know the so called term that that's what
> it was called [prior to the examination.] *Id.* at p. 17.

Gentile stated that it was fair to say that because of Bernard Madoff's reputation at that time as a large broker-dealer, there may not have been any thought to look into Madoff's operation any further. Gentile Interview Tr. at p. 37. Gentile further acknowledged that in light of the evidence uncovered in the 1992 investigation, someone "should have been aware of" the fact that the money used to pay back Avellino and Bienes' customers could have come from other investors, but there was no examination of where the money that was used to pay back the investors came from. *Id.* at pgs. 32-33. Gentile also admitted that Madoff could have taken the money that was used to pay back Avellino and Bienes' investors from anybody, including other customers, stating that "absolutely could have been done," but no effort was undertaken to verify if that occurred. *Id.* at pgs. 35-36.

c.    2003 DC OCIE Examination

With respect to the 2003 OCIE examination in Washington, D.C, Associate Director John McCarthy stated he became aware of Madoff when he conducted an examination in the mid-90s. McCarthy Testimony Tr. at p. 18. McCarthy said he subsequently learned that Madoff's firm was one of the largest third market maker firms and that they had a very good reputation in terms of their execution quality of retail customer orders. *Id.* Assistant Director Eric Swanson also stated that in the later 1990's

he became aware of Madoff Securities as a large market maker in over-the-counter space. Swanson Testimony Tr. at pgs. 15-16. Then-Branch Chief Mark Donohue stated that he was also aware of Madoff's firm as a market maker prior to the 2003 examination. Donohue Testimony Tr. at p. 18.

Although McCarthy, Swanson, and Donohue were aware of Madoff's stature, there is no evidence that Madoff's prominence impacted their examination, and they denied that their examination was influenced by Madoff's reputation.  McCarthy Testimony Tr. at p. 140; Donohue Testimony Tr. at pgs. 82-83.  However, there is evidence that when McCarthy, Swanson, and Donohue discussed their examination with the NERO examiners, they made a point to inform the NERO examiners of Madoff's stature in the industry.

According to NERO examiner William Ostrow, during a conference call on May 31, 2005 with Swanson, McCarthy, and Donohue, he and fellow NERO examiner Peter Lamore were informed that Madoff was a powerful and well-connected individual, stating:

> I don't know who said it, someone from OCIE basically, "He's a very powerful person, Bernie, and you know, just remember that."  … But basically just, "He is a very well-connected, powerful person."

Ostrow Testimony Tr. at pgs. 113-14.  Ostrow interpreted the statement to raise a concern for them about pushing Madoff too hard without having substantial evidence.  *Id.* at 145-146.  Lamore had a similar recollection as follows:

> I'm not sure if those were the exact words, but it struck me as odd at the time.  It's what I remember from that call was -- you know, we're always professional, of course, when we go do our exams, but that kind of elevates your sense of your need to be professional.

Lamore Testimony Tr. at pgs. 105-106.

Assistant Director on the NERO examination John Nee also recalled the statement, although he did not interpret it to mean they should "tread lightly."  Nee Testimony Tr. at p. 103.  He thought the comment indicated "they might get a phone call from someone but we never did."  *Id.* at 104.

### d.    2005 NERO Examination

The OIG investigation uncovered evidence that Ostrow and Lamore were well aware of Madoff's stature in the industry, that Madoff attempted to intimidate and impress them with his perceived connections, and that the junior examiners were

overmatched in their interactions with Madoff making them unable to aggressively conduct the 2005 NERO examination.

Prior to beginning the examination, Ostrow stated he knew the name Bernie Madoff because Madoff was "a large market maker." Ostrow Testimony Tr. at p. 18. We also found that around the time of the examination, Ostrow and Lamore exchanged articles describing Madoff's significant achievements, including "serv[ing] as chairman of the board of directors of the Nasdaq Stock Market as well as a member of the board of governors of the NASD … [and] of the Securities Industry Association. … [and] a founding member of the board of directors of the International Securities Clearing Corporation in London." E-mail dated March 28, 2005 from Ostrow to Lamore, at Exhibit 222. Another article exchanged by the examiners was entitled, "The Madoff Dynasty" and described Madoff's family members. *Id.*

Lamore also testified that the name Madoff was familiar to him when he began the examination, stating he was aware that Madoff was "a pretty prominent maker." Lamore Testimony Tr. at p. 23. Lamore acknowledged that after researching Madoff prior to the examination, he concluded that Madoff was an impressive and influential figure in the industry. *Id.* at p. 50. Nee and Associate Director Sollazzo also recalled being aware of Madoff as a big market-maker when they began the cause examination. Sollazzo Testimony Tr. at p. 35; Nee Testimony Tr. at p. 18.

Lamore said Madoff made efforts to emphasize his role in the securities industry during the examination. Lamore Testimony Tr. at p. 50. Lamore characterized Madoff as "a wonderful storyteller" and "very captivating speaker" and noted that he had "an incredible background of knowledge in the industry." *Id.* at p. 51. Lamore said he found it "interesting" but also "distracting" because they were there "to conduct business." *Id.*

Ostrow indicated that there were efforts made by Madoff to impress and even intimidate the examiners. Ostrow stated that "[a]ll throughout the examination, Bernard Madoff would drop the names of high-up people in the SEC." Ostrow Testimony Tr. at p. 24. Ostrow reported that Madoff told him and Peter Lamore that Christopher Cox was going to be the next Chairman of the SEC a few weeks prior to Cox being officially named. *Id.* at pgs. 24; 141. Ostrow stated they "were pretty amazed" that Madoff knew this information and he felt that Madoff's intention was to both impress and intimidate them. *Id.* at p. 24. Ostrow said Madoff made clear that "he knew everybody in OCIE," and referenced his relationship with Lori Richards, Director of OCIE. *Id.* at pgs. 141-142.

Ostrow also reported that Madoff told them that Madoff himself "was on the short list" to be the next Chairman of the SEC. *Id.* at p. 142. Ostrow said they believed it was a possibility since he was very well known in the industry. *Id.* at p. 143. Ostrow also said because he was aware of Madoff's connections with NASDAQ during the examination, he did not feel comfortable calling an official at NASDAQ because "it was too clubby of a system." *Id.* at p. 144. However, Ostrow also stated that Madoff's name-dropping "didn't really impress us." *Id.* at pgs. 24-25.

Lamore also recalled that Madoff would drop the names of senior SEC officials, including referencing a meeting or rulemaking relating to Commissioner Annette Nazareth. Lamore Testimony Tr. at pgs. 89-90. Lamore stated that Madoff was trying to impress him with all his connections, and noted that dropping the name of a Commissioner of the SEC, "was a pretty big name … to mention." *Id.* at p. 90. Lamore also recalled Madoff saying that he was on the short list to be the next Chairman of the SEC. *Id.* at p. 123. In fact after the examiners received an e-mail from the Director of the SEC's New York office announcing that Chairman William Donaldson would be resigning, Lamore sent an e-mail to John Nee stating, "Bernie told us he was on the short list when Chairman Donaldson was selected. Maybe this time." E-mail dated June 1, 2005 between Lamore and Nee, at Exhibit 229. Nee responded to Lamore's e-mail, stating, "Maybe you and William can be his aides." *Id.* Nee stated that in his response on the e-mail about Lamore and Ostrow being Madoff's aides, he "was trying to be facetious." Nee Testimony Tr. at p. 196.

Lamore recalled one incident when he was asking Madoff for documents and Madoff became very angry, recalling that Madoff's "veins were popping out of his neck" and he was repeatedly saying, "What are you looking for?" and "his voice level got increasingly loud." Lamore Testimony Tr. at p. 71. Lamore responded to Madoff, "What do you want us to look for?" and "What do you think we're looking for?" and Madoff replied, "Front running. Aren't you looking for front running." *Id.*[257] Ostrow similarly described Madoff during the examination as being charming and charismatic at times, but that he got "angry" at the examiners when they asked him to produce certain documents or information. Ostrow Testimony Tr. at pgs. 148-150.

While Nee stated he did not believe that Ostrow was "star struck" when meeting Madoff, he did note that he later found out that Ostrow had his wife take pictures of Madoff when he was being arraigned. Nee Testimony Tr. at pgs. 197-198. Nee acknowledged that Madoff's intent was to impress and intimidate the examiners, but he thought these efforts were unsuccessful and the examiners found Madoff to be a "bit of a blowhard." *Id.* at pgs. 123-124. Sollazzo also acknowledged that given the frequent interaction between Madoff and the examiners, there was a possibility that Madoff's "reputation and supposed world of knowledge" that he could "overcome" or "stonewall examiners." Sollazzo Testimony Tr. at p. 89. He stated that they may have been "overwhelmed" by Madoff and "outmatched a bit." *Id.* at p. 90. Elaine Solomon, who worked as Peter Madoff's secretary from March 1997 until December 2008, stated that the SEC examiners who met with Madoff looked like they were "in awe" of him. Solomon Testimony Tr. at p. 16.[258]

---

[257] Lamore stated that when angry, Madoff "could belittle you to the point, where, you know, you feel pretty low." Lamore Testimony Tr. at p. 210.

[258] Solomon also stated that over the years, people from the SEC would ask about working at Madoff's firm and even if they could drop off resumes, although she never actually saw any resumes provided. Solomon Testimony Tr. at pgs. 14-15. However, when asked specifically about the examiners who were at Madoff's firm during the 2005 examination, she stated she did not believe those examiners (likely Lamore and Ostrow) ever asked about jobs or a resume. *Id.* at p. 14. Both Ostrow and Lamore adamantly denied ever making any comments about seeking jobs with Madoff, or dropping off any resumes. Ostrow Testimony Tr. (8/19/2009) at pgs. 7-8; Lamore Testimony Tr. (8/19/2009) at pgs. 6-7.

After Madoff confessed, Lamore reflected in an e-mail with an office colleague, an Enforcement Assistant Regional Director, about why they were unable to uncover the fraud, noting "that additional authority access would have possibly enabled us to detect it" and stated, "Our hesitancy toward rocking the boat also is something that should be reconsidered." Lamore Testimony Tr. at p. 244; E-mail dated December 13, 2008 from Lamore to Enforcement Assistant Regional Director at Exhibit 421. Lamore stated he was referring to the fact that the examiners do not reach out to industry or to third parties and that "sometimes the exam program … can sort of not be taken seriously at times." Lamore Testimony Tr. at p. 244. Lamore stated that in every exam, he feels like he is trying to "find some information out" and he is "really kind of at the behest of the registrant as to … whatever they tell" him. *Id.* at p. 245. Lamore stated that in his opinion, the exam program is not aggressive or assertive enough. *Id.* The Enforcement Assistant Regional Director stated Lamore's reference to "hesitance towards rocking the boat" referred to the fact that "there's a lot of players in the industry that are significant players and sometimes there's a tendency to take at face value what industry people are saying." Enforcement Assistant Regional Director Testimony Tr. at p. 12.

Lamore also acknowledged that at the senior levels of the SEC, the hesitancy towards rocking the boat may be even more pronounced with respect to someone like Bernie Madoff, who's a well-known person in industry, although Lamore noted that "he'd like to say that … we're sort of professional and treat everyone equally." Lamore Testimony Tr. at p. 245. Lamore noted that it is easier to be more aggressive when you are examining a "penny-stock firm" rather than, for instance, Goldman Sachs, noting that it would be "very difficult" for someone in his position "to tell Bernie Madoff that he's a liar." *Id.* at pgs. 245-246.

Ostrow also recalled that in past examinations unrelated to Madoff, supervisors at the Commission appear to have been reluctant to push issues against influential people, stating:

> Yes. I've seen it where, you know, maybe I've been told, "Don't rock the boat so much there, because we have a good relationship with them," and when we -- and not Madoff-related, but you know, "where we need to make a request for documents, they always gave it to us. So let's try to go easy." You know, and I don't go easy, and I push hard, and I get pushback from staff members. But, you know, at the end of the day it turns out, yes, it is an issue, or it should be an issue.

Ostrow Testimony Tr. at pgs. 163-164.

e.    2005-2006 Enforcement Investigation

In connection with the 2005-2006 Enforcement investigation, the OIG found that the Enforcement investigators were not aware of Madoff's stature before they began the investigation. Assistant Director Doria Bachenheimer stated that when she first learned of Markopolos' complaint, she had not heard the name Bernie Madoff or Madoff Securities. Bachenheimer Testimony Tr. at p. 52. Branch Chief Meaghan Cheung stated that she had "embarrassingly" not heard of Madoff or his firm before the Madoff case. Cheung Testimony Tr. at p. 23. Staff attorney Simona Suh similarly stated that prior to being assigned the case, she had never heard of Madoff or his firm. Suh Testimony Tr. at p. 25.

In addition, while the Enforcement investigators acknowledged becoming aware of Madoff's stature during the investigation, they denied that his prominence impacted the investigation, except to the extent that they were less likely to believe that Bernie Madoff had engaged in a Ponzi scheme. Cheung acknowledged that during the investigation, she learned that Madoff was an influential figure in the securities industry, and had a high-level position with the NASDAQ. Cheung Testimony Tr. at p. 263.[259] Moreover, when asked if once she learned of Madoff's reputation, she thought that the staff treated him differently, Cheung stated as follows:

> I don't think there was ever a conscious desire to make something go away or to ignore an allegation about Bernie Madoff. Do I think that there's an inherent bias towards the sort of people who are seen as reputable members of society, there may be an inherent bias in that way. I think that we did not forego investigative steps because of who he was, and I don't think we were easier on him. I have personally interviewed, requested documents, gotten tolling agreements, pushed from people who I view as -- as sort of more powerful than Bernie Madoff without, I think, pulling a punch.

*Id.* at p. 264.

Suh stated in testimony, "Madoff [did] sort of try to play up his prominence to some degree. He talked about, you know, being on panels of, I believe, NASD or something like that." Suh Testimony Tr. at p. 93. However, Suh stated, "It did not really matter much to me." *Id.* Suh, did, however, acknowledge, "It's certainly true that he didn't fit the profile of a Ponzi schemer, at least as we -- in the world that we knew then," however, "I never had a concern in terms of, you know, stepping on the wrong toe or anything like that, and I had no impression that anybody else did." *Id.* at pgs. 44-45.

---

[259]  Bachenheimer stated that shortly after she began the investigation, she "learned that people had been making allegations about Madoff for years and they hadn't stuck, and that's what I knew as far as his reputation." Bachenheimer Testimony Tr. at p. 52.

Cheung, however, denied that in her mind, it was "just inconceivable" that someone like Bernie Madoff would have run a Ponzi scheme, stating that the investigators significantly looked at and considered the issue of a potential Ponzi scheme even though he was Bernie Madoff.  Cheung Testimony Tr. at p. 264.

f.      Conclusion

In light of the foregoing, the OIG concludes that Madoff's stature played an ancillary role in the SEC's failure to uncover the fraud in their examinations and investigations.  In the 1992 investigation, we found evidence that in light of Madoff's reputation, the examiners did not think it necessary to look into Madoff's operation any further.  In the 2005 NERO examination, Madoff was able to use his stature and perceived connections to push back successfully against the junior examiners, who did not feel sufficiently confident to be more aggressive in their examination and who were informed by senior officials in Washington, D.C., as they were conducting the examination, of Madoff's reputation in the industry.  In the 2005-2006 Enforcement investigation, Madoff's prominence made it less likely for the SEC investigators to believe that he could be running a Ponzi scheme.

VII.   ALLEGATIONS OF CONFLICT OF INTEREST OR IMPROPER
       INFLUENCE ARISING FROM RELATIONSHIP BETWEEN ERIC
       SWANSON AND SHANA MADOFF

A.     Introduction

The OIG thoroughly investigated allegations that the relationship between OCIE Assistant Director Eric Swanson and Bernard Madoff's niece, Shana Madoff (Shana), constituted an improper conflict of interest and impacted the SEC examinations of Bernard Madoff, in which Swanson was involved.

The OIG took Swanson's testimony under oath, reviewed thousands of e-mails relating to Swanson's relationship with Shana, and took the testimony of or interviewed numerous other individuals in Swanson's life during the pertinent time period, including his former girlfriends and close friends.[260]  Because of the seriousness of the allegations, the OIG provides in detail the information it learned about Swanson's relationship with Shana, his other relationships while he was involved in the OCIE examination of Madoff, and the events that occurred after Swanson and Shana's relationship became public.

---

[260]  Through her counsel and Eric Swanson, the OIG made numerous requests to speak to Shana Madoff, but she declined to be interviewed.

B.    Swanson's Initial Contact with Shana Madoff

The OIG investigation found that Eric Swanson's initial contact with Shana occurred in April 2003, in connection with OCIE's Madoff QQQ examination.[261] Swanson Testimony Tr. at pgs. 23-24.  On April 8, 2003, Swanson sent out document requests for the QQQ examination, including a document request to Bernard Madoff Investment Securities (BMIS).  Letter dated April 8, 2003 from Swanson to Peter Madoff, at p. 1-2, at Exhibit 422.  On April 15, 2003, Swanson e-mailed Shana, in her role as compliance attorney at BMIS, regarding the OCIE document request for BMIS' trades in the QQQ examination.  E-mail dated April 15, 2003 from Swanson to Shana, at Exhibit 423; Swanson Testimony Tr. at p. 23.  Swanson's e-mail stated as follows:

> Shauna [sic]:
>
> These are the adjustments we have made to the information requested:
>
> 1.    Please disregard any limitation on size.  We would like the information for all orders.
>
> 2.    For the dates listed, we intend for you to include the requested audit trail all orders in the QQQ that were routed out to any other venue for execution, including proprietary trades (this may not have been clear from the request).
>
> I apologize you did not receive a phone call before now. Call with any questions.

E-mail dated April 15, 2003 from Swanson to Shana, at Exhibit 423.

This is the first written record the OIG has located of any contact between Swanson and Shana.  While Swanson did not specifically recall this first contact with Shana, he acknowledged he sent the e-mail to Shana clarifying the document request, and believed that it was the probably the first time he ever had any contact with Shana.  *Id.*; Swanson Testimony Tr. at p. 23.  Swanson described his recollections of this e-mail and his first contact with Shana in the following exchange:

> A:    I don't recall specifically having contact, but it seems likely, based on this e-mail, that there must have been something, a phone call or something, with the firm.
>
> Q:     Okay.  Do you think this e-mail, Exhibit 4, might have been the first contact you had with Shana Madoff?

---

[261]  A more detailed discussion of the Madoff QQQ examination is found in Section XI of this Report of Investigation.

A:   I'm reasonably certain, given the fact that I've misspelled her first name, and I -- I -- I didn't recall having had any contact with her prior to when I actually met her later that year.  So, yeah, this is probably it.

Q:   Okay.  So this would have been just an e-mail communication, not a meeting in person?

A:   Oh, no.  I know I didn't have a meeting in person.  It's possible that this was preceded by a telephone call.  The contacts, if this all there is by e-mail, it seems to suggest that there was some telephone contact.

*Id.* at pgs. 23-24.

On May 2, 2003, Shana e-mailed Swanson, stating that BMIS' response to the document request would be sent via Federal Express to the SEC the following week. E-mail dated May 2, 2003 from Shana to Swanson, at Exhibit 424.  The OIG investigation did not uncover evidence of any further contact between Swanson and Shana regarding this examination.  We found that on June 5, 2003, BMIS' Liz Weintrab sent an e-mail to Swanson containing BMIS' QQQ trading excel spreadsheets, and the BMIS spreadsheets were then forwarded to the lead attorney on the QQQ examination, Matt Daugherty.  E-mail dated June 5, 2003 from Weintraub to Swanson, at Exhibit 425; E-mail dated June 5, 2003 from Swanson to Daugherty, at Exhibit 426.

C.    Swanson's First in-Person Meeting with Shana Madoff

In August 2003, Shana contacted Swanson about whether OCIE Associate Director John McCarthy would be able to speak at a Securities Industry Association Breakfast (SIAB) conference in St. Louis for the Securities Industry Association's (SIA) Compliance and Legal Division.[262]  E-mail dated August 13, 2003 from Swanson to McCarthy, at Exhibit 427.  McCarthy asked Swanson to contact Shana on his behalf and inform her that he would like to speak at the meeting.  E-mail dated August 14, 2003 from McCarthy to Swanson, at Exhibit 428.

---

[262]  Shana Madoff served on the executive committee of the Securities Industry Association's Compliance and Legal Division.  In November, 2006, the Securities Industry Association (SIA) merged with the Bond Market Association to form the Securities Industry and Financial Markets Association (SIFMA).  *See* http://www.sifma.org/regulatory/litigation/utah_lawsuit/index.html.  Securities Industry Association Topical Breakfasts were seminars where regulators and industry met to discuss current areas of interest in the securities industry.  The SIA Compliance & Legal Division sponsored the breakfasts.  Shana Madoff, who was active on the Executive Committee of SIA's Compliance & Legal Division, planned the SIABs from August 2003 to October 2006.

SIA's invitations promoted that leading regulators from the SEC, NASD and NYSE will be discussing the examination agendas and current industry regulatory issues.  Regulators such as FINRA's Steve Luparello and Tom Gira, and NYSE's Mike Rufino, Grace Vogel and Susan Axelrod also participated as speakers for the seminars.

On August 18, 2003, Swanson e-mailed Shana, stating that "I can't seem to get through on your tele number, but wanted to let you know that John McCarthy would be willing to attend/speak at your breakfast mtg [sic] in St. Louis … I may come as well." E-mail dated August 18, 2003 from Swanson to Shana, at Exhibit 429.  Shana responded, indicating they were having problems with their phones, and thanked Swanson and McCarthy for agreeing to speak at the SIAB meeting in St. Louis.  E-mail dated August 18, 2003 from Shana to Swanson, at Exhibit 430.  Swanson forwarded Shana's e-mail to McCarthy.  E-mail dated August 18, 2003 from Swanson to McCarthy, at Exhibit 431.

Swanson recalled the breakfast meeting in St. Louis as the first time he met Shana in person in the following exchange with the OIG:

Q:    Okay.  Do you recall if this e-mail referenced this breakfast meeting which was the first time that you met Shana Madoff?

A:    Well, I don't -- I don't recall the e-mail, but it absolutely does reference that breakfast meeting.

Q:    Okay.  And that breakfast meeting would have been when?

A:    I have no independent recollection of exactly when it is, but I did have an opportunity to look at some of the documents that I think [my attorney] has sent over to you --

Q:    Okay.

A:    -- in the aftermath of when all this happened, and I want to know when that was.  So I believe it was in October of 2003.

Q:    Okay.  So you -- you had e-mail communication with Shana Madoff prior to that and perhaps phone calls, but you hadn't met her in person?

A:    That's correct.

Swanson Testimony Tr. at pgs. 25-26.

Later in his testimony, Swanson confirmed for a second time that he believed that the first time that he met Shana in person was "in October of 2003."  *Id.* at pgs. 125-126. There was no evidence of any further interaction between Swanson and Shana at the St. Louis breakfast after this initial meeting.

D.      Swanson's Further Contacts with Shana Madoff at SIAB Conferences

The OIG found that over the next couple of years, Swanson continued to communicate with Shana and attend the SIAB conferences she arranged even as he worked on an OCIE cause examination of Madoff that was initiated in late 2003.  On November 12, 2003, a month after Swanson first met Shana in person, Swanson saw Shana again at the Minneapolis SIAB conference.  Swanson Testimony Tr. at p. 166.  Approximately one month after the Minneapolis SIAB conference, on December 18, 2003, Swanson's supervisor, John McCarthy sent an e-mail to OCIE Director Lori Richards, with a copy to Swanson, informing her about the complaint from the Hedge Fund Manager that triggered the OCIE Madoff cause examination.[263]  E-mail dated December 18, 2003 from McCarthy to Richards, at Exhibit 158.

Later that day, Richards and McCarthy contacted Madoff to inform him that they were beginning an examination.  E-mail dated December 18, 2003 from Richards to McCarthy, at Exhibit 159; Richards Testimony Tr. at p. 26.  Shortly thereafter, an examination team was assembled and McCarthy, in consultation with Swanson and Branch Chief Mark Donohue, decided to limit the focus of the examination to front-running.  McCarthy Testimony Tr. at pgs. 25, 56; Swanson Testimony Tr. at pgs. 48-49; Donohue Testimony Tr. at pgs. 22-26.  On January 6, 2004, Swanson signed and sent a formal document request to Peter Madoff (Shana's father) on behalf of the SEC in connection with the OCIE cause examination.  Letter dated January 6, 2004 from Swanson to Peter Madoff, at Exhibit 432.

On January 13, 2004, Swanson communicated via e-mail with Shana regarding a potential upcoming SIAB conference in Boston.  E-mail dated January 13, 2004 from Shana to Swanson, at Exhibit 433.  Swanson, however, did not attend the SIAB in Boston.  Swanson Testimony Tr. at pgs. 165-168.  On February 18, 2004, Swanson signed and sent a second document request to Peter Madoff in connection with the OCIE cause examination.  Letter dated February 18, 2004 from Swanson to Peter Madoff, at Exhibit 434.  On February 22, 2004, Donohue was promoted to Assistant Director reporting directly to McCarthy and Donohue took over the "day to day responsibility" for the OCIE cause examination.  Swanson Testimony Tr. at pgs. 71, 84; Donohue Testimony Tr. at p. 14.

On April 7, 2004, the staff-level examiners on the OCIE cause examination of Madoff were told by Donohue to focus their priorities on a mutual fund project, and the Madoff cause examination was put on the backburner, even though there were unresolved questions.  E-mail dated April 7, 2004 from Donohue to Walker (with copy to Wood), at Exhibit 435; Donohue Testimony Tr. at p. 94.

On April 29, 2004, Swanson attended another SIAB conference organized by Shana in Atlanta.  Swanson testimony Tr. at p. 166.  After another SIAB conference in Seattle originally scheduled for June 2004 had been postponed, on August 12, 2004,

---

[263]  A more detailed discussion of the OCIE Madoff cause examination is found in Section III of this Report of Investigation.

Swanson e-mailed Shana about a possible SIAB in Dallas for October, stating to her, "We're in.  Its been too long – I'm starting to miss it."  E-mail dated August 12, 2004 from Swanson to Shana, at Exhibit 436.  Swanson also e-mailed Shana on August 12, 2004 asking for her assistance in preparing comments for a presentation he was giving on the role of the compliance professional in the regulatory environment.  E-mail dated August 12, 2004 from Swanson to Shana, at Exhibit 437.  In this August 12, 2004 e-mail, Swanson described how the compliance industry tended to gravitate toward industry standards, which he expressed concerns were too low, and noted that a compliance officer may face resistance to going beyond these low standards.  *Id.*  Swanson then stated in the e-mail, "The question is, and acknowledging that Madoff is the exception to the above [concern about compliance officers gravitating toward a low standard], do you think this theory is plausible?"  *Id.*  Shana responded the next day and scheduled a time for them "to chat about" the subject.  E-mail dated August 13, 2004 from Shana to Swanson, at Exhibit 438.

In October 2004, Swanson arranged for Donohue and OCIE Senior Special Counsel Tom Eidt to speak at Shana's SIAB conference in Dallas because Swanson had a conflict.  E-mail dated October 7, 2004 from Swanson to Shana, at Exhibit 439.  Shana thanked Swanson for arranging for Donohue and Eidt, and stated, "Eric, you are so great and no matter what you and John will always be my A-team players."  E-mail dated October 7, 2004 from Shana to Swanson, at Exhibit 440.

In December 2004, McCarthy asked Swanson to follow up on a best execution problem at Madoff's firm regarding a delay in the opening of a particular stock on the New York Stock Exchange.  E-mail dated December 17, 2004 from McCarthy to Swanson, at Exhibit 441.  There is no evidence that this concern led to any further examination of Madoff.

In January 2005, Swanson, Eidt, McCarthy and Steve Luparello from NASD, spoke at an SIAB conference in Seattle and had dinner with Shana.  E-mail dated January 25, 2005 from Shana to McCarthy, Swanson, Eidt, and Luparello, at Exhibit 442; E-mail dated January 26, 2005 from Luparello to Shana, McCarthy, Swanson, and Eidt, at Exhibit 443.

In March 2005, Swanson attended an SIAB conference in St. Louis.  Swanson Testimony Tr. at pgs. 107-108, 167.  On March 16, 2005, Swanson and Shana communicated via e-mail in an attempt to locate each other at the Hyatt Hotel.  *Id.* at p. 107-108; E-mail dated March 16, 2005 from Swanson to Shana Re: At Starbucks, at Exhibit 444.  Shana e-mailed Swanson that she was "in the mall."  E-mail dated March 16, 2005 from Shana to Swanson Re: At Starbucks, at Exhibit 445.  Swanson replied, "John [McCarthy] and I are in the lobby."  E-mail dated March 16, 2005 from Swanson to Shana, at Exhibit 446.  After several more e-mail exchanges, Swanson and Shana met in the Hyatt Hotel and went to the SIAB conference together.  E-mails dated March 16, 2005 from Shana to Swanson, at Exhibit 447.  Swanson Testimony Tr. at pgs. 107-109.

Several hours after meeting Shana in the hotel lobby, Swanson sent Donohue an e-mail asking, "What is the status of the MADF hedge fund thingy?" E-mail dated March 16, 2005 from Swanson to Donohue, at Exhibit 448; Swanson Testimony Tr. at pgs. 104-105. Donohue responded, "Deady. We never found any real problems. Does it need to be revised?" E-mail dated March 16, 2005 from Donohue to Swanson, at Exhibit 449; Swanson Testimony Tr. at p.104-105.

Swanson admitted in his testimony that seeing Shana at the St. Louis SIAB conference likely triggered his recollection of the Madoff examination and accordingly, he followed up with Donohue. Swanson Testimony Tr. at pgs. 106-109. However, Swanson denied ever speaking to Shana about the status of the Madoff examination and stated that he did not believe that Shana was ever aware of the Madoff examination, as demonstrated by the following exchange:

A:    I will tell you definitively right now I never once had a conversation with Shana Madoff about this review that was going on.

*                *                *

Q:    Okay. So did Shana ever ask you about the status of an examination?

A:    No. In fact, I don't believe she ever knew about this examination.

*                *                *

Q:    Okay. But it's possible that because you had just been with Shana Madoff at this conference, that triggered in your mind whatever happened with the Madoff hedge fund?

A:    It's likely.

Q:    Okay. But again, Shana never asked you about the status of the exam?

A:    Shana never once asked me about the status of an exam.

Q:    And you never talked to her about the status of the exam?

A:      Never talked to her about the status of the exam,
and I will add that I don't believe she even knew
about this particular examination.[264]

*Id.* at pgs. 107-110.[265]

Less than two months after seeing Shana in St. Louis, Swanson learned on May 26, 2005, that NERO examiners were conducting their own examination of Madoff. E-mail dated May 26, 2005 from McCarthy to Swanson, at Exhibit 450.  On May 31, 2005, a conference call took place with the NERO examiners, during which, one of Swanson, McCarthy or Donohue, stated to the NERO examiners that Madoff was a "very well-connected, powerful person."  E-mail dated May 31, 2005 from Nee to Swanson, at Exhibit 451; Ostrow Testimony Tr. at pgs. 113-14.  One of the NERO examiners on the telephone call interpreted the statement to raise a concern for them about pushing Madoff too hard in their examination without having substantial evidence.  *Id.* at pgs. 145-146. On June 9, 2005, the OCIE examination team packed up their examination workpapers and sent them to NERO.  Letter dated June 9, 2005 from Wood to Nee, at Exhibit 209.[266]

After his sworn testimony on June 19, 2009, Swanson provided supplemental information to the Office of the Inspector General, stating that he had a vague recollection that, "prior to 2005, he and Mr. McCarthy discussed the appropriateness of working on matters involving Madoff in light of their participation in the compliance breakfasts, and that neither he nor McCarthy determined that they should be recused." Letter dated June 19, 2009 from Michael Wolk, Counsel to Swanson, to IG Kotz, at p. 2, at Exhibit 183.  Swanson also stated that he "took comfort in the fact that Lori Richards, Director, Office of Compliance Inspections and Examinations, was aware that the breakfasts were sponsored by the Securities Industry Association (SIA)."  *Id.*

In addition, McCarthy testified OCIE Director Lori Richards encouraged her staff to participate in these SIAB conferences.  McCarthy Testimony Tr. at p. 119.  Richards confirmed that her staff spoke at these events and she encouraged their participation. Richards Testimony Tr. at p. 110.  It is noteworthy that Swanson's résumé under "Public Speaking" stated as the first entry: "Frequent speaker at Securities Industry Association meetings around the country."  Résumé of Eric J. Swanson, at Exhibit 452.

---

[264]  While there is no specific evidence that Shana knew about the OCIE examination supervised by Swanson, it is likely given her role as a Compliance Officer that she was aware at least generally about the SEC examination.

[265]  In later testimony, Swanson stated he did tell Shana Madoff about the front-running examination of Madoff, but only after he left the SEC, stating, "I think she made a comment but you've never done an exam of us and I said, 'no I did.  I sent the letter on the front-running thing.'"  Swanson Testimony Tr. at p. 157.  He denied he ever shared with her anything he learned during the Madoff examination at any time. *Id.*

[266]  Eric Swanson also attended additional SIAB conferences in Charlotte on September 29, 2005, in Richmond on November 2, 2005, in Miami on January 30, 2006, in St. Louis on March 10, 2006, in New Orleans on May 18, 2006, in Greenwich on June 8, 2006, and again in Minneapolis on July 21, 2006. Swanson Testimony Tr. at pgs. 165-168.

E.    Swanson's Romantic Relationships Between 2003 and 2005

Between December 2003 and May 2005, as discussed above, Swanson worked in various capacities on the OCIE cause examination of Madoff.  While as the above describes, there was a professional relationship between Swanson and Shana during this time period, the OIG investigation has found no evidence that Swanson had or developed a romantic relationship with Shana in 2003, 2004 or 2005.

In fact, the OIG confirmed the existence and extent of Swanson's romantic relationships with other women during this time period.  Swanson confirmed that between 2003 and 2004, he had an "on-again/off-again relationship" with an attorney in Washington, D.C., who asked not to be identified in our Report of Investigation. Swanson Testimony Tr. at p. 131.  The OIG contacted this attorney who we will refer to as "Swanson's former girlfriend" and she confirmed the relationship.  Unidentified former girlfriend of Eric Swanson Interview Memorandum, at p. 1.  Swanson's former girlfriend stated she met Swanson when they both lived in Richmond, Virginia.  *Id.* According to Swanson's former girlfriend, they started dating in October 1996 and continued to date during that time period until January 2005 when Swanson became involved with another woman, referred to as "Jane Doe" in this ROI.  *Id.*  She also recalled Swanson dating a third woman during that time period and did not believe that Swanson was involved with any women other than her and the third woman from October 1996 to January 2005.  *Id.*

The OIG investigation further found that in late 2004 or early 2005, Swanson began "a very serious relationship" with Jane Doe.  Swanson Testimony Tr. at p. 131-132.  Swanson recalled the relationship beginning in "late '04," while Jane Doe stated she met Swanson in January 2005 and they "immediately" developed a romantic relationship. *Id.* at p. 132; Jane Doe Testimony Tr. at p. 6.  Jane Doe also confirmed that Swanson had a serious relationship before her with a former girlfriend whom she identified in testimony.  *Id.* at pgs. 9-10.

Jane Doe testified that "maybe about two months" after beginning her relationship with Swanson, by March or April 2005, she moved in with him and they became engaged to be married.  *Id.* at p. 6.  These facts were also confirmed by an OCIE Staff Accountant who lived in Swanson's basement from 2001 to August 2006.  OCIE Staff Accountant Testimony Tr. at pgs. 17-18.  The OCIE Staff Accountant stated Swanson confided in him about his relationships.  *Id.* at p. 17.  According to the OCIE Staff Accountant, Swanson was in a serious relationship with Jane Doe "for about a year before things dissolved.  But after four or five months, she did move in … She was living upstairs."  *Id.*

Swanson and Jane Doe set their wedding date for October 2005 and planned to marry in Florida.  Swanson Testimony Tr. at p. 132; Jane Doe Testimony Tr. at p. 7. However, Swanson and Jane Doe's wedding never took place.  *Id.*  According to several sources including Alex Sadowski, who worked for and developed a "good personal relationship" with Swanson at that time, the weekend of their wedding, Hurricane Wilma

hit Florida and caused the wedding to be cancelled.[267]  *Id.* at p. 7; Sadowski Testimony
Tr. at p. 46; OCIE Staff Accountant Testimony Tr. at pgs. 17-18.

In early November 2005, the couple's relationship ended, and Jane Doe moved
out of Swanson's home.  Swanson Testimony Tr. at pgs. 132; Jane Doe Testimony Tr. at
p. 7; Sadowski Testimony Tr. at p. 46; OCIE Staff Accountant Testimony Tr. at pgs. 17-
18.  Jane Doe stated they were both devastated after their break-up.  Jane Doe Testimony
Tr. at p. 14.  Sadowski confirmed that Swanson was "pretty distraught" about his
relationship with Jane Doe ending.  Sadowski Testimony Tr. at p. 46.

Jane Doe testified she moved to Florida shortly thereafter, and she and Swanson
did not keep in contact.  Jane Doe Testimony Tr. at p. 7.  Swanson testified that although
he had friendly communications with Shana during that time, he did not have any
romantic interest in her in 2004 or 2005, as he was involved with other women.  Swanson
Testimony Tr. at pgs. 131-132.  Swanson also testified that the end of his engagement to
Jane Doe had nothing to do with Shana.  *Id.* at p. 133.  This assertion was confirmed by
Jane Doe herself, as well as by the OCIE Staff Accountant.  OCIE Staff Accountant
Testimony Tr. at pgs. 17-19; Jane Doe Testimony Tr. at pgs. 9, 14.  Jane Doe also stated
she would have known if Swanson was interested in someone else while they were
involved because they spent all their time together.  Jane Doe Testimony Tr. at p. 9.  Jane
Doe was asked specifically in testimony if Swanson could have been involved with
Shana when they were together, and stated as follows:

> Absolutely not.  I knew exactly where he was and we spent
> all of our time together except for his trips here and there.
> And even then I knew where he was.  I don't think he was
> doing anything shady.  I think a woman probably knows
> when someone she's seeing is seeing someone else.  And
> especially because our relationship was so new and really
> didn't have any issues until the latter part of the
> relationship.

Jane Doe Testimony Tr. at p. 14.

The OCIE Staff Accountant testified he was not aware of Swanson dating anyone
else while he was involved with Jane Doe or immediately after his break-up with her,
stating, "Swanson is a – he's not the type of guy that plays the field.  He's a relationship
guy.  When he gets in a relationship, you know, he kind of -- just kind of sets the tone.
But he also gets very involved very quickly, you know."  OCIE Staff Accountant
Testimony Tr. at pgs. 22-23.  Swanson's former girlfriend, who kept in touch with
Swanson after they broke up, also stated she did not believe Swanson dated anyone from
the end of his engagement to Jane Doe to when he started his relationship with Shana in
April 2006.  Swanson's former girlfriend Interview Memorandum.

---

[267]  Swanson and Jane Doe were to be married in Naples, Florida.  Hurricane Wilma hit Southern Florida
on October 23-24, 2005.  *See* http://www.nws.noaa.gov/storms/wilma.

The OCIE Staff Accountant also stated that although he was aware Swanson and McCarthy were participating in various SIAB conferences, Swanson had never mentioned Shana's name until he started dating her in the Spring of 2006. OCIE Staff Accountant Testimony Tr. at p. 19. The OCIE Staff Accountant recalled that after the break-up with Jane Doe, Swanson went "through a mourning period" for several months, stating that Swanson "kind of bemoaned his relationship with [Jane Doe] for a period of time, to the point to where I was almost kind of like, hey, Eric, you know, you've been broken up with her almost as long as you were with her…." *Id.* at p. 22. The OCIE Staff Accountant stated that Swanson had confided to him that he and Shana "had known each other through the [industry events], but that it was never anything more than a working relationship for most of that time." *Id.* at p. 20. The OCIE Staff Accountant stated he "absolutely" would have known, given his relationship with Swanson, if Swanson had feelings for Shana previously, in the 2004 and 2005 time frame. *Id.*

F.    In February 2006, Swanson Learned About the Enforcement Investigation and Was Asked to "Put the Squeeze on Shana"

On February 28, 2006, Swanson learned in an e-mail from Assistant Director John Nee that the SEC's New York Regional Office was investigating Harry Markopolos' complaint that Bernard Madoff may be running "the biggest Ponzi scheme ever." E-mail dated February 28, 2006 from Swanson to McCarthy, at Exhibit 453. Swanson then forwarded Nee's e-mail to John McCarthy. *Id.* Swanson stated that he did not recall receiving the February 28, 2006 e-mail from Nee, and that he "[a]bsolutely [didn't] recall being aware that there was this complaint" alleging Madoff was running a Ponzi scheme. Swanson Testimony Tr. at pgs. 120-121. However, the next day after receiving Nee's e-mail telling him Madoff was being investigated for running a Ponzi scheme, McCarthy e-mailed Swanson to "put the squeeze on" Shana, as follows:

2 things.

1. put the squeeze on shana

2. Cutler gave lori a tip we shld [sic] follow up on.[268]

E-mail dated March 1, 2006 from McCarthy to Swanson, at Exhibit 454. Swanson informed McCarthy he would call her the next day and asked, "What's the tip?" E-mail dated March 1, 2006 from Swanson to McCarthy, at Exhibit 455.

McCarthy testified the reference to putting "the squeeze on Shana" had nothing to do with learning about Enforcement's investigation of a possible Ponzi scheme and the tip referred to in the e-mail had nothing to do with Madoff. McCarthy Testimony Tr. at p. 119. McCarthy explained, in the following testimony, that the e-mail was a reference

---

[268] McCarthy was not sure, but thought the tip was about Cutler "want[ing] us to look into possible – possibility of insider trading in CDs and that's about the right period of time." McCarthy Testimony Tr. at p. 119. The OIG did not find evidence that the tip referred to in this e-mail related to Madoff.

to him wanting Swanson to put pressure on Shana to get him on a panel at a securities conference:

> I think it has to do with the conference that was coming up, if I recall correctly … a big annual conference, I think I was getting pressure at that time.  You know, [OCIE Director] Lori [Richards] was really encouraging senior staff to participate in conferences and [Shana] was -- if I recall correctly, like, you know, the emcee of the conference in Florida so I wanted -- you know, I asked [Shana] previously, and this is a follow up to that, whether she could get me on a panel. … Probably just asking Eric to because he communicated with her more than I did so I just, you know, when you're talking to her, you know, remind her if she's had any luck with getting me on a panel.

*Id.* at pgs. 118-119.

Swanson's recollection of why he was "to put the squeeze on Shana" was consistent with McCarthy's, as follows:

> John -- John wanted me to get him on a panel … and I don't know if I had reached out to Shana prior to this or not, but Shana was the avenue to get him on that panel. …

> \*                    \*                    \*

> You know, John had asked me to help him get on the panel and I was trying to be helpful to him.  So I don't recall, you know, the timing of this.  I don't recall being -- having a heightened concern about a Ponzi scheme at Bernie Madoff.  It just doesn't -- I just don't recall it.

Swanson Testimony Tr. at pgs. 122,124.

Swanson further testified as follows: "I swear to you, I mean I know I'm already under oath, but I'll swear it under oath again, there is no way that that put the squeeze on Shana and the tip comment are connected.  The 'put the squeeze' on was to get John on a panel." *Id.* at p. 135.

The OIG investigation found that Swanson did e-mail Shana about getting "John on the equity institutional panel" on February 28, 2006, the same day he received the e-mail from Nee about the Enforcement investigation.  E-mail dated February 28, 2006 from Shana to Swanson, at Exhibit 456.  On March 3, 2006, two days after McCarthy sent the "put the squeeze on Shana e-mail," Swanson followed-up with Shana about

getting McCarthy on the panel.  E-mail dated March 3, 2006 from Shana to Swanson, at
Exhibit 457.  Shana looked into it and informed Swanson that she got McCarthy on the
panel.  *Id.*   Further, the OIG found no evidence to contradict Swanson and McCarthy's
accounts of the e-mail or that Swanson was providing any information about the
Enforcement investigation to Shana.

> G.     Swanson and Shana Madoff Became Romantically Involved in Early 2006

The OIG investigation found that Swanson and Shana's relationship did not
became romantic until March 2006.  On March 3-4, 2006, the 2006 SEC Speaks program,
a conference during which SEC officials discussed their initiatives and priorities for the
year ahead, was held in Washington, DC.  SEC Speaks 2006 Program Brochure, at
Exhibit 458; Swanson Testimony Tr. at pgs. 133-136.  On March 3, 2006, Shana
e-mailed Swanson to ask him if he was going to attend.  E-mail dated March 3, 2006
from Swanson to Shana, at Exhibit 459.  She stated she would be taking the New York
shuttle to Washington, DC and that she hoped to see him.  *Id.*  Swanson replied, he would
see her "at Speaks – at least for the reception." *Id.*

At the end of the program, several SEC Speaks attendees went to a bar, including
Swanson and Shana.  Swanson Testimony Tr. at p. 134.  Swanson described SEC Speaks
as "a fairly social event in terms of … shaking hands and small talk with people, and
Shana and I continued to talk throughout the evening." *Id.*

Swanson further stated:

> I had a sense from that night that – and I was having a good
> time hanging out with her.  I found her to be a lot funnier
> than I had – than I thought she was and we were out with a
> big group of people and we went from SEC Speaks to a bar
> across the street to yet another bar … and I got the distinct
> sense that she was kind of flirting with me that night.  But,
> you know, I also felt like if I had wanted to take it further
> that night, I could have, but I didn't.

*Id.*

The e-mails sent between Swanson and Shana during the 2006 SEC Speaks
confirmed that they were becoming more friendly.  On March 4, 2006, at 2:00 a.m.,
Shana e-mailed Swanson, stating, "Made it home … hope u r having fun.  Thanks again,
S."  E-mail dated March 4, 2006 from Swanson to Shana, at Exhibit 460.  At 2:45 a.m.
Swanson responded, "Home now - long night for me!  But, had a great time.  See you
thursday." *Id.*

On March 4, 2006 at 10:00 a.m., Swanson e-mailed Sadowski, asking him how he
was feeling.  E-mail dated March 4, 2006 from Swanson to Sadowski, at Exhibit 461.
Sadowski responded via e-mail, "Whoo boy. Shana madoff just leave?" *Id.*  Swanson

e-mailed back, "I understand why you wouldn't remember, but let me refresh your brain – she left on her own well before we did. There was an option- I took a pass. Caught an earful from MS last night re: Madoff- apparently I'm a sycophant." *Id.* Swanson explained that the "MS" referred to in his e-mail was an OCIE Branch Chief, who Swanson said was giving him a hard time because he "was being maybe a little too nice to Shana." Swanson Testimony Tr. at p. 134.

One month later, on or about April 4, 2006, Swanson's romantic relationship with Shana progressed. Swanson Testimony Tr. at p. 146-147. While Swanson was in New York, Shana e-mailed him to come meet her out. E-mail dated April 4, 2006 from Swanson to Shana, at Exhibit 462. Swanson informed her he couldn't, stating, "We're having margaritas at some place called Zarella. Next time." *Id.* Shana then e-mailed Swanson asking him to come to where she was. *Id.* Swanson responded, "You're dangerous. Let me see what we're doing here." *Id.* Shana replied, "You are leaving" to meet us. *Id.* Swanson replied he would "be there in 5 [minutes]." *Id.* Swanson met up with Shana and stated that he believed his romantic relationship with Shana began that night on April 4, 2006. Swanson Testimony Tr. at pgs. 146-147.

The OCIE Staff Accountant stated that he "had a front-row seat with [Swanson] and Shana as their relationship grew" and confirmed that he first starting hearing about Shana in the late spring of 2006. OCIE Staff Accountant Testimony Tr. at pgs. 19-20. Sadowski also concurred that he believed Shana and Swanson became romantically involved in March or April of 2006, and remembered seeing Swanson and Shana spending time talking together during the 2006 SEC Speaks. Sadowski Testimony Tr. at pgs. 56-57. Sadowski specifically recalled Swanson telling him that Shana was "an easy person to talk to" and "got the sense … maybe something [was] going to happen here." *Id.* at p. 56.

H.    Swanson's Supervisor, John McCarthy, Opposed the Relationship and Swanson Kept it a Secret

Swanson's supervisor, McCarthy, became aware of Swanson's night with Shana and did not approve of the relationship. McCarthy Testimony Tr. at p. 124. On April 6, 2006, McCarthy asked Sadowski to send Swanson an e-mail stating, "I guess we won't be inspecting Madoff anytime soon." E-mail dated April 6, 2006 from McCarthy to Sadowski, at Exhibit 463. McCarthy testified that he was upset about the relationship when he sent this e-mail, and that a more accurate description would probably be that Swanson would not be inspecting Madoff anytime soon because of Swanson's personal relationship with Shana. McCarthy Testimony Tr. at pgs. 128-129. As discussed in greater detail below, however, McCarthy's objection was not related to the fact that Shana worked for a registrant.

On April 7, 2006, Swanson e-mailed Shana that "John [McCarthy']s upset. Very" about the relationship. E-mail dated April 7, 2006 from Swanson to Shana Madoff, at Exhibit 464. Shortly thereafter, according to Swanson, McCarthy "indicat[ed] some

fairly extreme displeasure with me dating Shana … and he explain[ed] to me that he's worried about me." Swanson Testimony Tr. at p. 138.

According to Swanson, McCarthy told him he did not believe Shana was "a good person on some level" and confided in Swanson a story about a woman from a past relationship he likened to Shana who broke his heart. *Id.* Swanson thought McCarthy was being "fairly paternalistic" towards him, which was not an unusual aspect of their relationship. *Id.* Swanson believed he and McCarthy were very close and, in some ways, Swanson sometimes felt it was like a father-and-son relationship. *Id.* at pgs. 138-139. Swanson said McCarthy did not want Swanson dating Shana. *Id.* at pgs. 141, 149. Swanson "got fairly upset about it because … I found somebody that I really liked and I wanted her to be accepted by John [McCarthy]." *Id.* at p. 139. Swanson described his working relationship with McCarthy as "intense," which "carried over into [their] personal lives" and testified that McCarthy was fairly protective of him. *Id.* at p. 141. Swanson felt his relationship with McCarthy became strained because he got involved with Shana and also because he was getting ready to leave the SEC and McCarthy "was not happy about that." *Id.*

McCarthy made clear that his opposition to Swanson's relationship with Shana was not related to the fact that Shana worked for a registered broker-dealer. McCarthy Testimony Tr. at pgs. 124-125. At the time, he did not view BMIS as "a company that was doing illegal things," despite the fact that there were still open questions about Madoff's returns and he had received an e-mail stating that the New York Office of the SEC was investigating a complaint that Madoff may have been engaged in a Ponzi scheme. *Id.* at pgs. 125-126. McCarthy stated that the fact that Swanson might be regulating the entity Shana worked for was "irrelevant or would have played a minor role" in his thinking. *Id.* at p. 125. According to McCarthy, the reason he did not want Swanson dating Shana "was more personal than kind of the fact that she worked at a broker-dealer"; it was just that he did not like her. *Id.* at p. 124, 126.

Swanson testified that, in his capacity as his boss, McCarthy never directly raised a concern that he was dating somebody who was involved in the industry. Swanson Testimony Tr. at p. 142. Swanson did not recall any conversation where McCarthy expressed concerns about Shana in terms of the company she worked for had been examined, there was an open investigation, or about being involved with someone whose company may be involved in doing illegal things. *Id.* at p. 144. Swanson testified that what McCarthy expressed to him was "all very much of a personal nature." *Id.* at p. 142.

Swanson continued to see Shana, although he kept the relationship a secret from McCarthy. *Id.* at pgs. 142-143. Swanson made a conscious decision not to talk about the relationship with McCarthy, stating:

> I made the decision that … the day to day around the office was tense and if John -- John had this reputation … if he didn't like you, it was like you didn't exist and for someone like me who … had worked so hard to gain his approval

> and … wanted that, and knowing that I was going to be
> leaving the SEC in a few months, I wanted to continue and
> have a peaceful exit from the SEC.

*Id.*

While he stated he did not explicitly hide the relationship, Swanson stated he was not "completely forthright" with McCarthy for some time while seeing Shana. *Id.* at p. 140. He explained that McCarthy never asked him about the relationship and, had McCarthy asked him, he would have told him: "I mean, he -- he -- he didn't need to know all the details. It was personal and it clearly was upsetting him." *Id.* at p. 143.

McCarthy acknowledged that he "was very much against him having a relationship with her and [he] made it clear early on and … at some point…[Swanson] saw [Shana] without … telling him." McCarthy Testimony Tr. at p. 124. McCarthy recalled an incident when he saw Shana at Swanson's apartment when Swanson's roommate, the OCIE Staff Accountant, was there. *Id.* at pgs. 126-127. He was surprised and upset that Swanson was still seeing Shana. *Id.* at p. 127.

After McCarthy learned that Swanson was still seeing Shana, the record shows that McCarthy became so opposed to Swanson's and Shana's relationship that Swanson felt that if he did not end the relationship, he would lose McCarthy as a friend. Swanson Testimony Tr. at p. 149. Swanson e-mailed Sadowski about his conversation with McCarthy: "I came clean … He went nuts. He came over abt [sic] 10 and we had a really bad night. Bottom line, I need to cut it off or lose my relationship with john, which I may have done already." E-mail dated April 22, 2006 from Swanson to Sadowski, at Exhibit 465. McCarthy testified that Swanson's description was consistent with the way he felt. McCarthy Testimony Tr. at p. 127. Sadowski confirmed Swanson's relationship with Shana caused a strain on Swanson's friendship with McCarthy. Sadowski Testimony Tr. at p. 77.

I.     Swanson's Recusal from Madoff Matters

According to Swanson, his relationship with Shana was entirely appropriate because he was not working on anything related to Madoff and, if he had been, he would have recused himself. Swanson Testimony Tr. at p. 145. Swanson was not aware of the SEC's formal recusal process, but he considered himself recused from all Madoff-related matters. *Id.* Swanson testified that if somebody asked him to work on anything related to Madoff, he would have said he could not. *Id.*

McCarthy testified that in his typical experience people in romantic relationships did not proactively recuse themselves, stating that if a matter came up certainly one should be recused. McCarthy Testimony Tr. at p. 130. McCarthy testified that he was not that familiar with the process, but acknowledged that if Swanson was interviewing for a position with Madoff's firm, he was supposed to alert somebody, but there were no

rules he was aware of regarding an SEC employee who got involved in a romantic relationship with someone who worked for a registrant.  *Id.*

McCarthy testified that if "an inspection of Madoff was in the offing," Swanson would not have been a part of it, but Swanson's relationship with Shana would not have factored into his group's decisions whether it would be involved in a Madoff inspection. *Id.* at p. 129.  McCarthy felt the group could have conducted a Madoff inspection without Swanson.  *Id.*

McCarthy testified that there was a point at which a relationship between SEC examiners and registrants could cross a line, such as when an examiner was married to a person at a broker-dealer and that it was simply a matter of judgment where that line was. *Id.* at pgs. 132-133.  McCarthy stated that it certainly could create an appearance problem when there was too much fraternization or interaction between examiners and registrants at social functions.  *Id.* at p. 133.

Former OCIE Director Richards stated there are ethics policies regarding relationships between SEC employees and registrants and noted, "Generally, if there could be an appearance of impropriety or bias we would encourage employees to communicate with the ethics office about whether they should recuse themselves from any ongoing examination."  Richards Testimony Transcript at pgs. 112.

Richards stated if an examiner became romantically involved with an employee of a registrant, "you would communicate with the ethics office and get specific guidance about the situation."  *Id.* at p. 113.  She thought there was "no general disclosure obligation to disclose people you're dating to your supervisor.  But, certainly, if it was a firm that the examiner was going to examine or was examining, that would be very clear that in that situation you could -- you should not have a personal relationship with someone you're examining."  *Id.*

J.      McCarthy Cancelled April 2006 Greenwich SIAB Conference

Despite the strain on his friendship with McCarthy, Swanson did not end his relationship with Shana.  While McCarthy and Swanson were on a trip to New York, Swanson asked McCarthy to go with him to a karaoke bar and meet Shana.  *Id.* at p. 123.  According to McCarthy, "the karaoke bar turned out to be a … high-end strip club, and I was extremely upset.  But they were kind of having – looked like they were having fun at my expense, so I think it became a big deal between Eric and myself."  *Id.*

After that night**,** McCarthy told Swanson to cancel their participation in the Greenwich SIAB conference scheduled for April 27, 2006.[269]  *Id.* at 131.  McCarthy

---

[269]  The Greenwich SIAB conference appears to have been about a new rule the SEC had recently issued requiring hedge funds to register with the SEC by February 1, 2006.  *See* http://www.sec.gov/rules/final/ia-2333.htm.  The SIA wanted guidance from the SEC regarding the requirements under the rule.  In June 2006, the United States Court of Appeals for the District of Columbia Circuit vacated the SEC's hedge fund rule.  Goldstein v. SEC, 451 F.3d 873 (DC Cir. 2006), at Exhibit 466.

wanted to limit his interactions with Shana, and he felt that Swanson was comporting himself in a way that he never did in the past.  McCarthy Testimony Tr. at p. 131.  McCarthy stated:

> I'm not sure on the dates but I think after the karaoke thing I made the decision I don't -- you know, want to basically limit my interactions with Shana, so I was asking her to -- I told Eric to cancel the breakfast.

*Id.*

On April 22, 2006, McCarthy e-mailed Shana that the SEC contingent was going to have to back out of the Greenwich SIAB conference.  E-mail dated April 22, 2006 from McCarthy to Swanson, at Exhibit 467.  McCarthy stated in the e-mail, "Obviously you all can proceed without us but, given the unique aspects of this breakfast, I understand that it creates difficulties without SEC involvement." *Id.*  After the conference was cancelled, McCarthy changed his mind and decided to participate in the conference, stating, "The hedge fund one I felt was actually relatively important, the one up in Greenwich, so I think we -- Eric was kind -- I put him in probably an awkward situation of canceling it then kind of rescheduling it is my recollection."  McCarthy Testimony Tr. at p. 134.  On April 27, 2006, Swanson e-mailed Shana apologizing for the cancelation of their participation in the Greenwich SIAB conference and asked her about having the conference rescheduled.  E-mail dated April 27, 2006 from Swanson to Shana, at Exhibit 468.

Swanson stated he did not believe McCarthy cancelled their participation in the Greenwich SIAB conference because of his relationship with Shana.  Swanson Testimony Tr. at pgs. 150-151.  He acknowledged McCarthy "might have been a little less comfortable going to do them, but we still did them.  I think we did two or three after -- after all this." *Id.* at p. 151.  Swanson and McCarthy did attend the New Orleans, the rescheduled Greenwich, and the Minneapolis SIAB conferences.[270] *Id.* at pgs. 150-151, 166, 168.

K.    Swanson and Shana's Relationship Continued and Swanson Left the SEC

Partly because of the tension with McCarthy, Swanson decided to leave the SEC.  Swanson testified that he started thinking about leaving the SEC in 2005, and that his decision was a personal one; however, he added that "tension" in his relationship with McCarthy played a role as well. *Id.* at pgs. 155-156.  Swanson claimed he was "frustrated and restless" at the SEC, and wanted to "sell [his] house, leave D.C. and do something completely different." *Id.* at p. 156.  By June 2006, Swanson was actively looking to leave the SEC. *Id.* at p. 152; E-mail dated June 6, 2006 from Swanson to Pinetumpartners, at Exhibit 470.  On June 6, 2006, Swanson contacted a headhunter

---

[270]  The April 2006 Greenwich SIAB conference, after being initially cancelled by McCarthy, was eventually rescheduled to June 8, 2009.  E-mail dated June 6, 2006 from Buchmueller to Rufino, Swanson, McCarthy, Luparello and Malitzis, at Exhibit 469.

Shana referred him to about his plans to leave the SEC.  Swanson Testimony Tr. at p.
152; E-mail dated June 6, 2006 from Pinetumpartners to Swanson, at Exhibit 470.  The
headhunter arranged an interview for Swanson with Bridgewater Associates, Inc., a
hedge fund, on June 15, 2006.  E-mail dated June 13, 2006 from Pinetumpartners to
Swanson, at Exhibit 471.

In July 2006, Swanson informed former OCIE Director Lori Richards that he
planned to leave the SEC, stating in an e-mail to Shana: "I just had a long talk with Lori
[Richards] abt [sic] everything.  She is not happy abt [sic] me leaving and is trying to
give me incentives to stay.  She is v[e]ry happy about us, however."  E-mail dated July
17, 2006 from Swanson to Shana, at Exhibit 472.

On July 18, 2006, Swanson received a job offer from Bridgewater Associates.
E-mail dated July 18, 2006 from Woodhouse (Bridgewater) to Swanson, at Exhibit 473;
E-mail dated July 18, 2006 from Pinetumpartners to Swanson, at Exhibit 474; Swanson
Testimony Tr. at 152.  On July 21, 2006, Swanson and Shana attended a Minneapolis
SIAB, and Swanson had an initial interview with Ameriprise Financial, a broker-dealer
and financial services company.  E-mail dated July 24, 2006 from Swanson to Kokinda,
at Exhibit 475; E-mail dated July 7, 2006 from Buchmueller to Rufino, Swanson,
McCarthy and Luparello, at Exhibit 476.  Over the next two weeks, Swanson had
additional interviews with Ameriprise in Minneapolis and in New York.  Swanson
Itinerary dated July 25, 2006 to July 26, 2006, at Exhibit 477; E-mail dated July 28, 2006
from Junek (Ameriprise) to Swanson, at Exhibit 478.  On August 1, 2006, Ameriprise
offered Swanson a position, and the next day, he accepted the offer, as he stated in an
e-mail to Shana, "Call me when you can babe - I have accepted the Ameriprise offer."
E-mail dated August 1, 2006 from Junek (Ameriprise) to Swanson, at Exhibit 479;
E-mail dated August 2, 2006 from Swanson to Shana, at Exhibit 480; Swanson
Testimony Tr. at p. 155.

McCarthy testified that over time, he was "getting mellower" about the
relationship and in September 2006, actually hosted a going away party for Swanson that
Shana attended.  McCarthy Testimony Tr. at pgs. 134-135.  Shana and several former and
present SEC employees attended the party.  *Id.*  September 15, 2006 was Swanson's
official last day at the SEC.  Standard Form (SF) 50, Notification of Personnel Action, at
Exhibit 481.

In December 2006, Swanson and Shana became engaged and were married on
September 29, 2007.  Swanson Testimony Tr. at p. 151.  Wedding guests included
Bernard Madoff, John McCarthy, Lori Richards, Alex Sadowski and an OCIE Staff
Accountant.  McCarthy Testimony Tr. at pgs. 20, 140; Richards Testimony Tr. at p. 28;
Sadowski Testimony Tr. at p. 95; OCIE Staff Accountant Testimony Tr. at pgs. 41, 46.

L.    Swanson's Reaction to Learning Madoff Confessed to Ponzi Scheme

Swanson described his initial reaction to hearing that Bernard Madoff had confessed to running a Ponzi scheme:

> Well, my -- my initial reaction and really reaction that has stuck with me is that, you know, I knew that we had looked at some aspect of this in terms of front-running but not at whether or not it was a Ponzi scheme and then it was only after I, you know, started getting access to documents that had been leaked to the Wall Street Journal in the days and weeks after Bernie was arrested that I saw the full scope of what NERO had done and I thought it's a major problem here.

Swanson Testimony Tr. at pgs. 157-158.

Swanson was surprised that NERO did so much looking into Madoff's operations, but never found the Ponzi scheme.  *Id.* at p. 158.  He further stated he did not learn anything by virtue of marrying into the family that would have provided any information about how the SEC missed this Ponzi scheme "beyond sort of what I've read in the paper. I mean, I kind of have a better understanding of who Bernie is and the way he kind of manipulates people and information, but I didn't learn that by virtue of being married into the family."  *Id.* at p. 164.

M.    Conclusion

After conducting a thorough investigation, the OIG did not find evidence that Swanson's romantic relationship with Shana influenced the conduct of the SEC examinations of Bernard Madoff and his firms.  We found that during the period of time that Swanson was conducting the OCIE cause examination of Madoff, Swanson was involved with other women, including a very serious relationship with a woman he almost married.  We did not uncover any evidence that Swanson had any romantic involvement with Shana during this time frame and found that Swanson and Shana's romantic relationship did not begin until March of 2006, nearly a year after the OCIE examination he had conducted had been completed in June of 2005.[271]  We also found no evidence that Swanson shared information regarding SEC examinations or investigations of Madoff with Shana while Swanson was at the SEC.

We did, however, find that Swanson's initial contact with Shana occurred as a result of an OCIE QQQ examination of Madoff, and that he communicated with her and attended SIAB conferences she arranged, even as he worked on a second OCIE

---

[271]  Moreover, as discussed above, the record shows that Donohue had taken over Swanson's day-to-day monitoring of the OCIE cause examination of Madoff as of February 2004, and the cause examination was put on the "backburner" in April 2004 and thus, the romantic relationship did not begin until more than two years after Swanson's active involvement in the cause examination.

examination of Madoff, creating the appearance of a potential improper conflict of interest. The sequence of events is as follows. In November 2003, Swanson saw Shana at the Minneapolis SIAB conference. In December 2003, Swanson was involved in reviewing a complaint from a Hedge Fund Manager about Madoff that triggered the OCIE Madoff cause examination. Shortly thereafter, an examination team for the Madoff cause examination was assembled and Swanson participated in the decision to limit the focus of the Madoff examination to front-running. In early January 2004, Swanson signed and sent a formal document request to Peter Madoff (Shana's father) on behalf of the SEC in connection with the OCIE cause examination. One week after Swanson sent the formal document request to Peter Madoff, Swanson communicated with Shana via e-mail regarding a potential upcoming SIAB conference in Boston, although he did not attend the Boston SIAB conference.

Swanson continued to have primary responsibility for the OCIE cause examination, until late February 2004, when Donohue took over the "day to day responsibility" for the examination. In early April 2004, the OCIE cause examination of Madoff was put on the backburner even though there were unresolved questions. In late April 2004, Swanson attended another SIAB conference organized by Shana in Atlanta. Swanson continued to communicate with Shana and in August 2004, he asked for her assistance in preparing comments for a presentation he was giving on the role of the compliance professional in the regulatory environment. In December 2004, McCarthy asked Swanson to follow up on a best execution problem at Madoff's firm regarding a delay in the opening of a particular stock on the New York Stock Exchange. In January 2005, Swanson and other SEC officials spoke at an SIAB conference in Seattle and had dinner with Shana.

In March 2005, Swanson's attendance at an SIAB conference in St. Louis triggered his recollection about the dormant OCIE cause examination of Madoff and he followed up with Donohue about its status. In May 2005, Swanson learned that NERO examiners were conducting their own examination of Madoff and shortly before OCIE's documents were shipped to NERO, he participated in a conference call where one of three OCIE officials on that call (which included him) stated that Madoff was a "very well-connected, powerful person." One of the NERO examiners on the telephone call, interpreted the statement to raise a concern for OCIE about pushing Madoff too hard in their examination without having substantial evidence.

In late February 2006, Swanson learned in an e-mail that the SEC's Enforcement Division was investigating Harry Markopolos' tip that Bernard Madoff may be running "the biggest Ponzi scheme ever" and after forwarding the e-mail to McCarthy, the next day, McCarthy e-mailed Swanson to "put the squeeze on" Shana. While the OIG found that the reference to putting the "squeeze" on Shana was related to an industry conference and not the investigation of Madoff, the timing of this e-mail as well as the sequence of events described above created an appearance concern.

We conclude that Swanson's communication with and attendance at events sponsored by Shana during the period of time he was engaged in a cause examination of

her uncle and father's firm, created the appearance of a potential conflict of interest. While there is no evidence that any information about the examination was imparted to Shana during these communications, the level of interaction with a registrant while Swanson was supervising a cause examination of the firm could have created the appearance that the examination was impacted by their personal relationship.

We also found that although Swanson did not participate in any Madoff-related matters after his relationship with Shana began, he did not take any proactive steps to inform anyone, including the Ethics office, about his relationship with Shana, and for other reasons, kept the fact that he was continuing to see Shana a secret from his supervisor, John McCarthy, who disapproved of the relationship for "personal reasons." When McCarthy found out that Swanson was still involved with Shana, McCarthy cancelled the SEC's participation at an industry breakfast sponsored by Shana, although the breakfast was eventually rescheduled.

The OIG did not find that Swanson violated any ethics rules during the period of time that Swanson was romantically involved with Shana and hiding it from McCarthy. Indeed, there was no obligation for Swanson to recuse himself before a matter involving the Madoff family was brought to his attention. However, McCarthy's reaction to his learning about Swanson's continued relationship with Shana in cancelling the SEC's participation in the industry event, demonstrates the potential predicaments and dilemmas that may ensue from this type of relationship. The decision for SEC officials to attend or not attend an industry breakfast should be made based upon the business interests of OCIE, not because of personal matters involving a relationship between an SEC official and a representative of a registrant. There are also questions about the level of fraternization that is appropriate at these industry events between SEC officials and representatives of companies that the SEC regulates. We found that SEC officials and representatives of registrants went out on more than one occasion drinking the night before the conference day ended. As OCIE's Ethics Rules for the Exam Program state, "staff must avoid situations involving not only a conflict of interest, but also the *appearance* of a conflict," and as John McCarthy acknowledged, an increased level of fraternization between SEC officials and registrants, could create an "appearance" problem.[272]

OCIE should look carefully at these industry events and determine what guidelines should be put in place to ensure that even the appearance of a conflict is avoided and establish clear rules concerning attendance at events sponsored by registrants while examinations are ongoing.[273]

---

[272] Memorandum dated September 8, 1997 from Lori Richards, Director, John Walsh, Senior Advisor and Susan Walters, Special Counsel, re: "The Commission's Ethics Rules and The Exam Program: Frequently Asked Questions," at p. 1, at Exhibit 482.

[273] The OIG is also issuing a separate report containing recommendations to improve OCIE's examination program as a result of findings made in the OIG's Madoff investigation.

VIII.   PRIVATE ENTITIES' DUE DILIGENCE EFFORTS REVEALED
SUSPICIOUS ACTIVITY AND RED FLAGS ABOUT MADOFF'S
OPERATIONS

A.   Introduction

Many private sector firms conducted their own due diligence of Madoff's
operations while considering whether to invest with Madoff or Madoff feeder funds.
While these firms did not have the authority that a regulator like the SEC has to compel
the production of documents and information, in numerous cases their due diligence
efforts were sufficient for the private entities to determine that investing with the Madoff
firm was too risky, even with the limited information they were able to obtain.[274]

As described in further detail below, many of the firms that conducted due
diligence were already aware of suspicions in the industry about Madoff, even before
they began their analyses of Madoff's operations.  Using ordinary due diligence methods,
such as voluntarily requesting basic documents like financial statements, and asking
pointed questions of Madoff or Madoff feeder funds, they determined that an investment
would be unwise.  Specifically, Madoff's description of both his equity and options
trading practices immediately led to suspicions about Madoff's operations.  With respect
to his split-strike conversion strategy, many simply did not believe that it was possible for
Madoff to achieve his returns using a strategy described by some industry leaders as
common and unsophisticated.  In addition, there was a great deal of suspicion about
Madoff's purported options trading, with several entities not believing that Madoff could
be trading options in such high volumes where there was no evidence of any
counterparties which had been trading options with Madoff.

In addition, these entities had suspicions concerning many of the same "red flags"
that were discussed in the SEC examinations but which ultimately were not analyzed or
were dismissed by the SEC, such as Madoff's fee structure and the small size of Madoff's
auditor.  Further, although some of these entities only had opportunities for a few brief
conversations with Madoff or representatives of the feeder funds, they felt Madoff and
his representatives simply did not provide satisfactory answers to their questions and left
the meetings even more suspicious of Madoff's operations.

B.   There Were Rumors and Suspicion about Madoff in the Industry Even
Before Due Diligence was Initiated

The OIG investigation found that even before entities began performing due
diligence, their efforts were influenced by the overall concerns and questions in the
industry about Madoff's operations and how he was able to achieve the returns he was

---

[274] The OIG did not conduct a comprehensive analysis of all private entity due diligence efforts made with
respect to Madoff or Madoff feeder funds, and acknowledges that many sophisticated investors gave
significant funds to Madoff.  However, it is instructive to analyze the due diligence methods utilized by the
private entities that decided to pass on a Madoff-related investment and compare those efforts with the
steps taken by the SEC in its examinations and investigations.

claiming.  James Hedges, IV, whose investment advisory firm was asked to approve investments with Madoff for a variety of clients, stated that "there was a preponderance of suspicion among hedge fund industry insiders that something was awry at Madoff Securities," although not necessarily that Madoff was running a $50 billion Ponzi scheme.  Hedges Interview Tr. at pgs. 19-21.

Nat Simons, the portfolio manager for Renaissance's Meritage fund, a hedge fund of funds, whose e-mails triggered the 2005 NERO examination (as described in detail in Section IV above), stated that there were rumors from industry insiders that Madoff was cherry-picking trades and that a related party was his auditor.  E-mail dated November 13, 2003 from Simons at Exhibit 211

Michael Ocrant, a financial journalist who authored the *MarHedge* article about Madoff in May 2001 entitled, "Madoff tops Charts; Skeptics Ask How," stated that he spoke to a former senior executive at one of the futures exchanges, who, in referring to Madoff, told him, "everyone knows this isn't real," and "everybody knows he can't possibly be producing these kinds of returns."  Ocrant Interview Tr. at p. 15.

C.      Due Diligence Efforts of Private Entities Revealed Greater Suspicions and Numerous Red Flags

1.      Basic Due Diligence Activities

The OIG investigation found that basic due diligence work by several private entities of Madoff or Madoff feeder funds revealed numerous and significant red flags and concerns that convinced these private entities not to invest with Madoff.  The private entities that conducted an initial review of Madoff's operations focused on basic documents which were voluntarily-produced, such as financial statements and trading records.  In general, they did not use a checklist-type approach, but looked at larger issues such as independence and transparency, as well as conducted analyses of Madoff's trading.  In some cases, they met with Madoff and simply asked Madoff to explain his split-strike conversion strategy, while others were never able to even meet with him at all.

Hedges stated he utilized a due diligence questionnaire, which sought basic information about the firm, the principals and the assets under management that the firm had.  Hedges Interview Tr. at p. 5.  Hedges explained that he looked at the inception of the business, the product lines, the different types of funds or separate accounts or other investment vehicles that were offered, the stated investment philosophy as well as the peer group and competition.  *Id.* at p. 6.  Hedges also stated that he looked at the business strategy, not just the investment strategy, including associated entities, and the various directors, officers, staff, their respective backgrounds, tenures and responsibilities.  *Id.*  Hedges stressed that his due diligence was "an iterative multi-phased process" to be contrasted with what he termed "a box-checking consultant" that asks "question 1, 2, 3, down to question 653, and then get all the answers and then have a yes or no answer on making an investment."  *Id.* at pgs. 15-16.  Hedges also explained the necessity of speaking with "people throughout all aspects of the organization," noting

that "meeting CFOs, back office people, traders, analysts, et. cetera [are important], because they give you perspective on the business that you don't get from just meeting the boss." *Id.* at pgs. 17-18.

An independent hedge fund research and advisory firm (the research firm), who asked not to be identified in the OIG Report of Investigation, researched a Madoff feeder fund as an investment vehicle for a client in the late 1990's or early 2000's. CEO of Research Firm Interview Tr. at p. 5. The CEO of the research firm stated that they started the process by requesting that the Madoff feeder fund voluntarily produce basic documents such as financial statements. *Id.* at pgs. 7-8. The research firm then requested a meeting to have a explanation of Madoff's split-strike strategy. *Id.* at p. 20. The research firm also asked about the counterparties for Madoff's options trading and requested trading records. *Id.* at pgs. 20-21.

Because of the structure of the investment, Renaissance's Meritage fund had to perform due diligence using only publicly available information and customer statements provided to them by other Madoff clients. Laufer Interview Tr. at pgs. 15-16. They had no communications with Madoff or Madoff's firm. Broder Interview Tr. at p. 14. As part of their due diligence, the Renaissance team analyzed Madoff's reported trading and returns. Laufer Interview Tr. at pgs. 13, 51. To examine whether Madoff's stated investment strategy could be producing his reported results, Laufer, who specialized in equity trading, supervised an analysis of Madoff's purported stock trading while Broder analyzed the options trading. *Id.* at p. 14.

A large investment bank, who asked not to be identified in the OIG Report of Investigation and who was considering an investment with Madoff, indicated that they did not use a specific checklist when performing due diligence, but did look at certain basic items, such as independence criteria and transparency. Investment Bank Due Diligence Team Interview Memorandum at pgs. 2-3. Specifically, "they want to see what the [trade] positions are and want to have an independent custodian holding the assets so they can see how much money is under management." *Id.* at p. 3. The due diligence team then attempted to elicit Madoff's trading strategy by obtaining Madoff's trade records from a Madoff feeder fund. *Id.*

2.    There Were Immediate Questions about Madoff's Trading
Strategy

The investment professionals interviewed by the OIG, who conducted due diligence immediately had significant questions about Madoff's trading strategy. Hedges stated that a "substantial red flag" was the "consistency of [Madoff's] returns that was not in keeping with the type of strategy that we understood him to be implementing because we felt that there were -- that the track record did not correlate to what we saw as either market factors, volatility factors, or other exogenous factors that would have otherwise affected the track record one way or another." Hedges Interview Tr. at p. 10. The CEO of the research firm stated immediately he was "cynical" because, "The returns were

impossible. Absolutely impossible in my opinion. No financial strategy could produce those sort of returns." CEO of Research Firm Interview Tr. at p. 3.[275]

The Chief Executive Officer of a company with a fund of funds business, who asked not to be identified in the OIG's Report of Investigation, stated that the first thing he noted "was that the description of what [Madoff] was doing seemed to be [was] inconsistent with what he knew about what you could achieve in a strategy like that." CEO of Fund of Funds Firm Interview Tr. at p. 4.

The CEO explained that Madoff's strategy was:

> … described as being long a bucket of -- of pretty common variety listed stocks and writing options and trading options around that kind of bucket and that's a strategy that will make money most of the time, but it's going to lose money if there's exposure and volatility. It's going to lose money if there's big market moves. It won't produce the kind of pattern of returns that was the -- was the Madoff pattern.

*Id.* at pgs. 4-5.

The CEO explained that with options "you can lose money," and "his track record at that point was a very, very long track record." *Id.* at pgs. 5-6. The CEO noted when it came to Madoff, "[m]arket's down, markets didn't really matter," explaining that "[y]ou can construct a strategy like that where you'll make money most of the time but you cannot construct a strategy where you make money all the time." *Id.* at p. 6. The CEO said he had seen consistent strategies before, but "every once in a while, they trip up," while Madoff "didn't have that every once in a while." *Id.*

The CEO was suspicious and obtained copies of an investor's last few account statements from Madoff Securities, and compared a sample of trades on the statements with what was actually going on in the markets on the day Madoff was trading. *Id.* at p. 8. The CEO stated he found this "pattern which really seemed weird where the -- where the purchases were all at or close to the lows of the day and the sales were at or close to the highs of the day," noting that "of course, nobody can do that." *Id.* His "suspicion was that the fact pattern that [he] had seen seemed consistent with a Ponzi scheme." *Id.* at p. 14. The CEO said he "didn't conclude that that was the case, but [he] certainly thought there was enough of a risk that that was the case that, you know, [he] certainly wouldn't touch it with a 10-foot pole." *Id.*

---

[275] The CEO of the research firm also was suspicious when the research firm asked to see Madoff's trading records and although they expected to see a computer screen, they were given a "binder about this thick that had just zillions of [hard copy] trade tickets in this binder, noting that he had "never in his life seen [hard copy] ticker trade tickets in this industry." CEO of Research Firm Interview Tr. at p. 21. The research firm said this "was highly unusual" as usually you can see trade confirmations electronically as it happens. *Id.* at p. 22.

Renaissance's risk manager, Paul Broder, found Madoff's steady, non-volatile returns initially to be "suspicious," as Broder stated, "He should have more volatility in his returns than he actually stated.… It was just too steady."  Broder Interview Tr. at pgs. 9-10.  Broder noted that no matter what happened in the market, no matter what crisis occurred, Madoff's returns remained almost the same.  *Id.* at p. 9.

The Renaissance team then analyzed Madoff's reported trading and returns. Laufer Interview Tr. at pgs. 13, 51.  Laufer's team found Madoff was reporting on his customer statements that he had purchased stocks at extremely low prices and sold stocks at extremely high prices.  *Id.* at p. 17.  Laufer explained, "this was statistically almost impossible to do if you were trading in an ordinary way."  *Id.*  Laufer stated, "if you looked at those monthly statements and looked at the executions of the stock side, that the prices were just too good from any mode of execution that we were aware of that was legitimate."  *Id.* at p. 44.  He noted that "we would have loved to figure out how he did it so we could do it ourselves … [a]nd so that was very suspicious."  *Id.* at p. 28.

Simons and Broder shared Laufer's view of Madoff's claimed executions, stating, "we observed that he got extraordinarily good fills," and if the fills were legitimate, then Madoff's predictions for when to buy and sell stocks would have been much better than anyone else that Broder had ever seen.  Simons Interview Tr. at p. 34; Broder Interview Tr. at pgs. 15-16.  Broder stated, "I knew it wasn't possible because of what we do."  *Id.* at p. 16.

Renaissance also noticed that Madoff's predictions for when to stay out of the stock market were extraordinary.  Laufer explained that the customer statements showed that at certain points:

> [Madoff']s position would go to zero [go to cash].  It
> seemed to us that the quarters that he'd decide to go to zero
> were exceptionally good quarters to have no position. … It
> seemed to us that those quarters in which he decided to go
> into zero cash were quarters in which, if you blindly tried to
> do what he was doing, you would have lost money, it
> seemed to us … We had no idea … how he managed to do
> that … We didn't understand what he was doing.  We
> didn't understand how he was doing what he was doing.

Laufer Interview Tr. at pgs. 21-23.

The investment bank who conducted due diligence also analyzed Madoff's returns and concluded the returns were impossible, especially considering that the technology bubble burst during this time.  Investment Bank Due Diligence Team Interview Memorandum at p. 3.  They determined that particularly in the years 2000, 2001 and 2002, there was no way Madoff's performance could be that good, saying it was "readily apparent" that the returns were not possible (noting that Madoff's returns in the years

2000-2003 were in the neighborhood of 8% which was not conceivable in that type of down market.) *Id.*

Ocrant was also suspicious about Madoff's strategy, stating that to "be that successful at managing that kind of capital, and in doing what he was doing, also, you know, you would have had to be right on picking the stocks themselves about, you know, 90-95 percent of the time. Again, people said it's not possible. You can't be that good." Ocrant Interview Tr. at p. 12. Ocrant's source was particularly suspicious of Madoff's returns, saying it was "impossible" and "you could be the greatest computer genius in the world and have access to all the super computers in the world and the market just won't let you perform like that." *Id.* at p. 11.

Ocrant stated that he followed up and remarked that he:

> gave the terms and strategies [utilized by Madoff] to a guy who ran a quantitative analysis with a Japanese bank for a Fund to funds they ran and I said can you take this data and can you -- have you crunch it and let me know what you think and I didn't give any further information and I said this is the strategy. He got back to me like a week to 10 days later and he said, "Well, the team came back and they said this could be done by a market-maker, probably have to use front money to do it," and I said, "Oh, that's interesting," and I said, "What would you say if I told you this guy was managing maybe $5-6-7 billion?" He said, "Impossible. It has to be a Ponzi scheme."

*Id.* at p. 13.

Ocrant also noted that the fact that no one was able to duplicate Madoff's strategy was suspicious, saying "if he's figured something out, others don't even have to look at the black box, a lot of smart people will look at -- figure out, especially these things -- they would have figured out." *Id.* He discovered that "other big financial services firms who knew about this [strategy] have tried to duplicate it because they were curious themselves and they wanted to see, you know, can this work and they just couldn't do it." *Id.*

Gregory Stahl, a fund of funds manager whose firm considered a Madoff feeder fund in 2005 for a possible investment, stated that he found it odd that the strategy that the Madoff feeder fund described "was a relatively common strategy." Stahl Interview Tr. at p. 8. According to Stahl, the split-strike conversion strategy Madoff purportedly was using "usually produces a pretty consistent return," but in Madoff's case, the "level of consistency exhibited by [Madoff's] strategy relative to other strategies we knew that did similar things was much, much better." *Id.* Stahl said that strategy worked well for several years, but in 2004 and 2005, because the "volatility levels in the market had fallen off so dramatically" the returns from that strategy fell off. *Id.* at pgs. 8-9. Stahl said

Madoff's "strategy has been around forever" and he knew of a mutual fund that adopted the same strategy, but while that mutual fund's returns got weaker as the overall market got weaker, Madoff's returns "remained very high." *Id.* at p. 9.

A Hedge Fund Manager, who eventually informed the SEC about his suspicions, triggering the 2003 OCIE examination (described in detail in section III above) but who asked not to be identified in the OIG's Report of Investigation, also analyzed Madoff's purported equity-based strategy and noted that this type of strategy "get[s] hurt when there is a severe dislocation, which we saw actually in '02." Hedge Fund Manager Interview Tr. at p. 11. But the hedge fund manager discovered that Madoff's strategy was not affected at all. *Id.* at pgs. 10-11.

3.    There Were also Significant Suspicions About the Levels of Madoff's Purported Options Trading

The research firm was very suspicious about Madoff's purported options trading, noting that the market for "[S&P] 100 options [was] nowhere near deep enough to trade $13 billion dollars, and that "[t]he liquidity of listed S&P 100 options could not handle 1/20th of that size." CEO of Research Firm Interview Tr. at p. 35. Michael Ocrant's source similarly commented on Madoff's options trading that "[y]ou don't see the volume," or "market impact," posing the question that even if options are traded over-the-counter, "you have counterparties, you know, where are they" and noting that the trading volume "just doesn't exist." Ocrant Interview Tr. at p. 11.

Renaissance suspected Madoff was misrepresenting his trading after conducting an analysis of Madoff's claimed options trades. Renaissance concluded Madoff could not be trading on an exchange because of insufficient volume and could not be trading options over the counter because he would not be able to find a counterparty for the trading. Broder Interview Tr. at pgs. 35-37. Laufer explained their reasoning: "[W]e made inquiries. We didn't see anybody saying he did a lot of trading. We didn't understand why anybody in the business of options would take the other side.… [Y]ou ask yourself, why would somebody do this? Because he's going to lose money doing the trade, so far as we know." Laufer Interview Tr. at pgs. 25, 49.

A former co-chief Information Officer (CIO) for a fund of hedge fund who considered an investment with Madoff in late 1997 or early 1998 and who asked not to be identified in the OIG's Report of Investigation, reported that Madoff described his options strategy in a meeting with him, and that Madoff stated the assets under management with Madoff Securities in this strategy were about $3 billion. CIO of Fund of Funds Interview Tr. at pgs. 4-5. The CIO stated that he asked Madoff "who [was he] trading these options with?" *Id.* According to the CIO, Madoff replied that "none of the options were being traded over the counter … the options are traded through the Chicago Board of Options Exchange so that [they] have the clearinghouse of the options exchange as [their] counter party." *Id.* at p. 6. The CIO stated that he found this answer "exceptionally odd" because in his experience, he knew that the Chicago Board of Options Exchange "was not a very deep market," noting that it was "something that we

would call a retail market." *Id.* at p. 7. The CIO immediately determined that there simply was not "enough volume on the Chicago Board of Options Exchange … to get that sort of coverage for … 3 billion," noting that "on any given day, there's not enough volume." *Id.* The CIO explained that you can look at a Bloomberg terminal and "in a heartbeat" know the volume trading on CBOE for a particular day and there were not enough options for Madoff to conducting his trading. *Id.* at p. 8.

The CIO stated after his meeting with Madoff, he called people he knew at CBOE asking them to help him get a feel for how much volume trades on a daily basis. *Id.* at p. 10. The CIO explained that you could download off of Boomberg or the CBOE website the daily call and put volume for the OEX picks. *Id.* at p. 11. The CIO found that "the volume was never there for Madoff." *Id.* The CIO said he also inquired with folks who were running equity derivatives departments at a few firms, and all of them reported to him that they "hear that [Madoff's] doing all these trades" but they "don't see it anywhere." *Id.* The CIO found that "nobody did these options" and noted that he "could never find anybody who remotely even knew who was doing the options." *Id.* at p. 13.

4.    There Were Also Questions About Madoff's Fee Structure

The CEO of the fund of funds firm who conducted due diligence of Madoff, thought it was "very unusual for somebody who could generate those kind of returns to not create their own hedge funds." CEO of Fund of Funds Firm Interview Tr. at p. 16. He noted that if Madoff's firm "created their own hedge fund, then their auditor would be looking at individual positions." *Id.* at pgs. 16-17. The CEO also said the fee structure "was extremely unusual," explaining that he could not "think of anybody else really who's running a large fund account, large hedge fund money in managed account format." *Id.* at p. 17.

Similarly, the research firm was suspicious about Madoff's fee structure because they could not understand why Madoff only charged commissions. CEO of Research Firm Interview Tr. at p. 36. If he had collected hedge fund fees, he could have earned $1 billion a year, instead of the $200 million he collected from commissions. *Id.*

Renaissance also found that "on its face" Madoff's fee structure was illogical. Simons Interview Tr. at p. 18. Simons did not understand why Madoff would allow feeder funds to take hundreds of millions of dollars in fees that Madoff could have kept for himself, stating: "[W]hen you see a situation where it would appear that he's only making money off of his … brokerage fees, why is he letting the Fairfield Greenwiches of the world take 2 points? I don't know." *Id.* at p. 18. Simons explained why he thought it was illogical for Madoff to not retain the fees for himself, as follows:

> [Madoff] supposedly has excess demand for his product and – you know, normally you see third party marketers in situations where there is [not] enough demand for the product.…They need the third party marketer to help them raise money. … In Madoff's situation, when there … was

> plenty of pent-up demand for his product, which would
> mean that you just kind of hire a couple of guys and set
> them up in offices, and you could raise money all day.  And
> so why not just capture that for yourself, build your own …
> sales and marketing team in-house?  Why continue to
> outsource it to Fairfield.

*Id.* at pgs. 19, 21.

Broder estimated that Madoff could be foregoing as much as $200 million a year in fees, something he and Broder found unusual, stating:  "[R]emember at the time he had a fantastic system but he didn't charge anybody any fees.  That seemed a little bit strange."  Broder Interview Tr. at p. 10; Laufer Interview Tr. at pgs. 42-43;

Ocrant's source also could not understand why Madoff would "structure himself in this weird way and give up tens of millions in fees?  Why would you possibly do that?"  Ocrant Interview Tr. at p. 12.

### 5.      The Identity of Madoff's Auditor Was Also a Concern

The CEO of the fund of funds firm also noticed on Madoff's Securities balance sheet that Madoff was "audited by a firm in New City, NY," which he had never heard of and thus, had to be "some suburban little shopping mall kind of accounting firm."  CEO of Fund of Funds Firm Interview Tr. at pgs. 10-11.

Similarly, the research firm was suspicious when they found out that Madoff's auditor was a firm named Friehling and Horowitz, who they had never heard of even though they had been in the industry for a long time.  CEO of Research Firm Interview Tr. at p. 44.  The research firm said that they "had never seen them before in [their] entire existence and it [was] very, very, very rare that [they would] run across an accountant that [they had] never seen in [their] years."  *Id.*  They asked around and "googled" the accounting firm and no one had heard of them and they found very little information about them.  *Id.* at pgs. 44-45.  The research firm then hired a private investigator to find out more about the auditor and discovered that the firm had three employees, Friehling, Horowitz, and a secretary, and that Jerome Horowitz was 78 years old and lived in Florida.  *Id.* at p.  47.

Similarly, the small size of Madoff's auditor was an issue for Renaissance, particularly because Madoff was reportedly managing billions of dollars for investors.  Broder Interview Tr. at p. 33.

6.    When They Met with Madoff, They Were not Impressed with
his Answers to Their Questions

Several of the private entities conducting due diligence indicated that when they
confronted Madoff or his feeder fund with their questions and suspicions, they did not get
satisfactory answers and decided to forgo the investment entirely.  According to Hedges,
after the initial meeting with Madoff, he realized that the investment was too risky,
stating that his meeting with Madoff "led to [his] hitting a roadblock in so many instances
that [he] had no interest in continuing to ask about this business strategy or … whatever
other issues might have come up later."  Hedges Interview Tr. at p. 16.  Hedges stated
Madoff's explanation of how made money simply did not make sense to him.  *Id.* at p.
17.

The research firm also described a meeting with Madoff where they asked him
about his split-strike conversion strategy and Madoff explained that "he has got this
wonderful feel for when to enter the market, when to get out, and which subset of the
S&P 100 stocks to trade," which they simply did not believe.  CEO of Research Firm
Interview Tr. at p. 20.

The CIO of the fund of funds met with Bernard Madoff in late 1997 or early
1998, and asked Madoff about his options strategy, specifically, "who [was he] trading
these options with?" CIO of Fund of Funds Interview Tr. at pgs. 4-6.  According to the
CIO, Madoff replied that all of the options were being traded over the counter through the
Chicago Board of Options Exchange.  *Id.* at p. 6.  The CIO stated that he found this
answer "exceptionally odd" and after he called industry colleagues to check out Madoff's
answer, he became even more suspicious and declined to go forward with the investment.
*Id.* at p. 13.[276]

Gregory Stahl stated that when he asked the Madoff feeder fund for an
explanation and more information about their strategy, the feeder fund replied that the
information was proprietary and they would not answer Stahl's questions.  Stahl
Interview Tr. at p. 10.

D.    Comments on the SEC's Ability to Uncover Fraud and Inadequacy of SEC
Examinations

Many of the private entities that conducted due diligence of Madoff and declined
to invest with him because of significant red flags that arose during the routine review of
his operations felt that the SEC could have uncovered the fraud.  Renaissance thought a
regulator could have verified whether Madoff was trading by asking Madoff who his
counterparty was and then verifying with the counterparty that the trade took place.
Broder Interview Tr. at pgs. 21-22, 38.  Broder would have performed the same

---

[276] Another potential investor, Laura Goldman, noted that when she met with Madoff and began asking him
questions, "he started shuffling" and "didn't really answer questions."  Laura Goldman Interview Tr. at p.
14.

verification process whether Madoff claimed his counterparty was in the United States or in Europe. *Id.* at p. 23.

Broder explained his reasoning as follows:

> [S]omewhere in the marketplace, either in an exchange-traded marketplace or an OTC marketplace, exactly those trades which were on the client account statement should exist on someone else's books, you know… Somewhere in the marketplace, either OTC or exchange-traded, those trades were taking place. And it seems to me a very simple set of steps to verify that those volumes [existed]. … I don't see how that could have possibly been missed. I mean, this is a very simple verification. I mean this guy is trading – this is a cash account. So he's turning over $10 billion of stocks each particular month. I mean, you've got to be [able to see it] in the marketplace.

*Id.* at pgs. 25-26.

Laufer also felt that a regulator conducting a thorough review of the Renaissance e-mails that led to the 2005 NERO cause examination would have had to have asked, "Who took the other side of the trade? You don't have to deduce huge amounts. Just ask who took the other side of the trade, which of course we couldn't find that [out]." Laufer Interview Tr. at pgs. 27-28. Likewise, if Simons were investigating Madoff, he stated that he would have asked Madoff to show me the other side of your trades whether he claimed to trade in the United States or Europe: "I need to see the other side of those trades in Europe. If they're in Europe, that's fine, but you're doing them with someone. There's got to be somebody on the other side of the trade." Simons Interview Tr. at pgs. 36-37.

Laufer asserted that someone at the SEC should have been able to do the same analysis and draw the same conclusions Broder did without determining whether or not Madoff was front-running, stating, "This is not rocket science." Laufer Interview Tr. at p. 49. When asked if he thought someone from the SEC should have been able to figure it out, Laufer replied, "Much more elementary than that. Someone at the SEC could wander down, you know, to Goldman Sachs and wander over to their options department and ask them, how does somebody execute $10 billion of options, and find out it's very difficult," noting, "you don't have to be as smart as Paul Broder" to figure this out. *Id.* at pgs 49-50.

James Hedges stated that it was "fair to say that there [were] enough red flags that I came across that would even alert the lay person to the potential for the Madoff track record being too good to be true." Hedges Interview Tr. at p. 12.

When asked why the SEC was unable to uncover Madoff's fraud or even appreciate the suspicions and "red flags" that the private entities focused on, the reasons provided were that SEC examinations were conducted by less experienced personnel and the examinations were too formulaic and "checklist-oriented." Hedges noted that "the SEC and the self-regulating organizations are, by and large, staffed with traditionally junior people conducting investigations," and "a certain degree of -- of education and credentialing and breadth of understanding of strategies would be helpful." *Id.* at pgs. 23-24. His experience with examiners was they were "working off of a rote formulaic process that [they] did not understand because if [they] had understood the process, [they] would not have asked the questions they asked]." *Id.* at p. 24.

The research firm also stated that SEC examinations lacked the ability to be "able to look at the forest and not the trees," noting that "these guys come in with a checklist and they are trying to get through this checklist and it is all about the checklist." CEO of Research Firm Interview Tr. at pgs. 76-77.

Ocrant described what he called "an open secret on Wall Street" about the inspections and examinations that the SEC and other regulatory agencies conduct:

> Those who do inspections usually are relatively young attorneys who come with an attorney mindset which means they have a rule book and a checklist. They look at the rule book. They look at the checklist. They say, well, I have Rule A and I have Checklist A. Okay. They're complying with Rule A, so I can check that box off, and they go through and they check off the boxes and they may find a violation, say okay, here's a violation, you have to do this or you have to pay a fine, something like that, but they don't come in with a mindset of, you know, guys I talk to, you know, capital markets experience, with financial trading experience, with a real understanding of what's possible and not possible in any given market or any given strategy. They don't really know to ask those questions even if they somehow came upon it or thought they had something because they don't have the experience to do so.

Ocrant Interview Tr. at pgs. 46-47.

The hedge fund manager explained, based upon his direct experience with examinations, that he did not think the Commission examinations were thorough, stating:

> [T]here is a lot of minutia, detail-oriented work that is done. I am not sure that the auditors actually relate that detail to the big picture of what is going on, what the firm does for a living, their strategy. You know, the bigger things in terms of the investment strategy, for hedge funds especially. But that actually requires a certain level of, I

> guess, technical knowledge of, you know, the different
> hedge fund strategies.

Hedge Fund Manager Interview Tr. at pgs. 35-36.

Two former SEC examiners stated that they became frustrated with the "checklist-oriented" approach that was utilized while they were at the SEC. A former securities compliance examiner with the SEC who worked on investment adviser examinations stated that he became frustrated in performing SEC examinations because "the focus was kind of lost off of the initial, I guess, what as I saw as the mission, which was protecting investors and watching out for money, and that sort of stuff, And it became more of checking the box and it was just writing reports, and more administrative aspects of it, as opposed to, you know, the field work aspect in really protecting the investors." Former Securities Compliance Examiner Interview Tr. at p. 5.

The former Securities Compliance Examiner also stated that he did not think that examiners at the SEC "had the competency level, the education, and the knowledge to follow up on a question. Like if you asked them, I don't know what the question was, something about the guy's investment strategy, and he answered the question, I felt like half the people didn't really understand what his answer to the question was, and they couldn't really follow up that question because they didn't really understand what he was saying." *Id.* at p. 29. The former Securities Compliance Examiner also indicated that examiners "were so focused on the checklist" that they would often "miss the forest for the trees." *Id.*

The former Securities Compliance Examiner was also frustrated by working with the Enforcement Division, stating that the "big problem with enforcement" was that although "they know the procedures of law and how it works, motions and all that sort of stuff," they "have to get trained on what each particular case is about" and can get "swamped." *Id.* at pgs. 10-11. The former Securities Compliance Examiner recalled that in one large matter, the Enforcement staff "didn't really understand fully the topic that we were dealing with, and they just had … too much on their plate, and didn't have enough assistance from people who did really understand, you know, the case, and the investment side of it, if you will" and the case, which the former Securities Compliance Examiner thought was strong, was never made. *Id.* at pgs. 11-12. The former Securities Compliance Examiner said in general, he felt that the Enforcement attorneys were not well-versed enough in investment adviser issues, stating "they do not really grasp investment" theories and "how the investment system works." *Id.* at p. 15.

Former OCIE examiner Alex Sadowski described what he viewed as the weaknesses in the examination program:

> And there is a mentality sometimes … we have this
> checklist, right, so we need to go by this checklist and if
> everything happens on this checklist, it is okay. There was
> not a lot of outside the box thinking. … The analogy that

> we use is that a typical SEC examiner walks into a room where there are a bunch of dead bodies lying around and they notice that the clocks are 10 minutes fast. And it really is. And, again, it is not meaning to be disparaging but it becomes difficult but you also have to factor in the restraints that you have.

Sadowski Testimony Tr. at pg. 102-103.

E.    Conclusion

Numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was simply too risky. These decisions were made based upon the same "red flags" in Madoff's operations that the SEC considered in its examinations and investigations, but ultimately dismissed.

An explanation of why these private entities were able to understand and appreciate the suspicious aspects of Madoff's strategies and operations may be related to the differing approaches utilized by these private sector individuals conducting the analysis as compared to SEC examinations. The private entities generally described an "iterative" approach to due diligence, focusing on basic items, such as independence and transparency, while many faulted the SEC examinations for being too "checklist-oriented." Through this "iterative" approach, the private entities were able to better understand the matters they were analyzing, such as the improbability of Madoff achieving his returns using his split-strike conversion strategy and the fact that Madoff could not be trading options in such high volumes without affecting the market or having counterparties that could be located. In addition, private entities who conducted due diligence appreciated the "red flags" that the SEC personnel dismissed because they had a greater experience and knowledge base in the industry than many SEC examiners have.

The SEC examination program should analyze the approaches utilized by private entities who conducted due diligence of Madoff's operations and apply these methods to strengthen their program. They should also seek to learn from these private entities through training mechanisms and in fact, several private entities informed the OIG that they would be willing to conduct training of SEC examiners in their due diligence approaches. Learning from private sector efforts would improve the SEC's ability to conduct meaningful and comprehensive examinations and detect potential fraud.[277]

---

[277] The OIG is also issuing a separate report containing recommendations to improve OCIE's examination program as a result of findings made in the OIG's Madoff investigation.

IX.    THERE IS EVIDENCE THAT POTENTIAL INVESTORS RELIED UPON
       THE FACT THAT THE SEC HAD EXAMINED AND INVESTIGATED
       MADOFF IN MAKING DECISIONS TO INVEST WITH HIM

During the course of the OIG investigation, we found that investors who may
have been uncertain about whether to invest with Bernard Madoff were reassured by the
fact that the SEC had investigated and/or examined Madoff, or entities that did business
with Madoff, and found no evidence of fraud.  Moreover, we found that Bernard Madoff
proactively informed potential investors that the SEC had examined his operations as a
method to establish credibility and allay suspicions or investor doubts that may have
arisen while due diligence was being conducted.

After the SEC brought its action against Avellino & Bienes in 1992, the *Wall
Street Journal* reported that the SEC had charged Avellino & Bienes with operating an
unregistered investment company, as they had failed to register promissory notes given to
their investors, which purported to deliver annual returns of 13.5% to 20.0%.  Randall
Smith, *SEC Breaks up Investment Company that Paid Off But Didn't Register*, The Wall
Street Journal, December 1, 1992, at Exhibit 483.  The *Wall Street Journal* article further
stated that Avellino and Bienes had returned $441 million to investors as a result of the
SEC complaint.  *Id.*  SEC Senior Associate Regional Administrator Martin Kuperberg
was quoted in this December 1, 1992 *Wall Street Journal* article, stating that the returns
appeared to have been generated legitimately and that "[r]ight now, there's nothing to
indicate fraud."  *Id.*

It was later reported by the *Wall Street Journal* that the broker who managed the
money and generated the high returns was "Bernard L. Madoff."  Randall Smith, *Wall
Street Mystery Features a Big Board Rival*, The Wall Street Journal, December 16, 1992,
at Exhibit 116.

The OIG obtained 25 affidavits from individuals who invested with Madoff who
reported that they "knew of and relied upon the SEC's 1992 public statement that there
was nothing to indicate fraud" in deciding to invest with Madoff.  25 affidavits
collectively, at Exhibit 484.  Many of these investors, who had funds returned to them
because of the SEC's action against Avellino & Bienes, re-invested the funds with
Bernard Madoff directly after the SEC action.  One investor, Angelina Sandolo, stated in
her sworn affidavit that:

> My initial investment was with Avellino & Bienes until
> they were forced by the SEC to shut down.  I then moved
> my investment directly to Bernard L. Madoff Investment
> Securities relying on the SEC's 1992 statement that there
> was no indication of fraud.

Affidavit of Angelina Sandolo, sworn to on July 2, 2009, at Exhibit 484.

Another Madoff investor, Shirley K. Stone, stated similarly as follows:

> We gave a big sigh of relief when we read & heard that a government agency called SEC said that there was no fraud.  Since we were so sure that all was well if our government had checked we went directly into Madoff Investment Co. from Avellino & Bienes. … My generation (born 1922) was taught respect & trust for our government."

Affidavit of Shirley K. Stone (undated), at Exhibit 484.

Judith Welling, another Madoff investor, relied upon the representation in the *Wall Street Journal* article, stating:

> My widowed mother had a small amount of money invested with Avellino and Bienes.  When they were shut down by the SEC in 1992 she invested the proceeds from Avellino and Bienes with Madoff because of the SEC's favorable report. She kept a copy of the Wall Street Journal article reporting the SEC's giving Madoff a clean bill of health in her files.  When I joined her Madoff account in 1994, my husband referred to that report as a key part of our research.  The original WSJ article remains in our files.

Affidavit of Judith Welling, sworn to on July 1, 2009, at Exhibit 484.

Susanne Marshall, who also invested with Madoff, relied upon a letter she received from the SEC after the SEC forced Avellino & Bienes to close its operations, stating:

> I began my account with A&B in or about 1990.  I received a letter in 1992 stating A&B was closing and returning my money with the gains I had made.  The letter explained that the SEC had found A&B & their firm [sic] of no wrong doing, but they were being fined for an error in registration. I remember discussing this with my parents as an article also came out in a newspaper about the situation.  A few months later I reinvested with Mr. Madoff as did all of my family.  Mr. Madoff called my parents & we knew he had worked with A&B, so we considered it to be safe since the SEC investigated A&B.

Affidavit of Susanne Marshall, sworn to on July 10, 2009, at Exhibit 484

A Certified Public Accounting firm, Abelson & Company analyzed statistics relating to the losses suffered by 16 of the above affiants who suffered losses after relying upon SEC's statements regarding Madoff.  Abelson & Company reported total losses of $70,105,580.62, with an average loss of $4,381,598.79.  Abelson & Company report at Exhibit 485.[278]

In addition, private entities who conducted due diligence stated that Madoff represented to them that the SEC had examined his operations when they raised issues with him about his strategy and returns.  Nat Simons, the portfolio manager for Renaissance's Meritage fund, a hedge fund of funds, who held a Madoff managed investment in 2003 and whose e-mails triggered the 2005 NERO examination (as described in detail in Section IV above), cited their understanding that the SEC had looked at Madoff and given him a clean bill of health as a reason they did not initially divest themselves of their Madoff-related investment.  Simons Testimony Tr. at p. 28.  Renaissance understood from Madoff that the SEC had examined "the whole business." *Id.* at p. 17.  Renaissance research scientist Henry Laufer agreed, "What was also on our minds … was that Madoff had been investigated – and cleared" by the SEC.  Laufer Testimony Tr. at pgs. 35-36.

Renaissance also doubted Madoff could be engaged in fraud because he operated through highly regulated brokerage accounts, stating:

> [B]ecause of the nature of the fact that these were brokerage statements, and he had a big broker dealer business and big market-maker and – you just assume that someone was paying attention to make sure that there was something on the other side of the trade.  … I never, as the manager, entertained the thought that it was truly fraudulent.  And it again was because … it would have been so easy to prove that it was fraud if it was just managed accounts that were set up.  It would have been so – again, forgive me here, but you know, it would have been pretty straightforward.  We felt that he was sufficiently in the eye of the regulators that it was just hard for us to envision that that was the case.

Simons Testimony Tr. at pgs. 28, 39-40.

Simons further explained that one reason they did not report their suspicions to the Commission directly was that they felt all of the information they were using in their analysis was readily available to the Commission:

---

[278] The Ableson & Company report and the 25 affidavits were provided to the OIG in their investigation by Gaytri Kachroo, Esq., counsel for Harry Markopoulos, and compiled by Lawrence R. Velvel, Dean, Massachusetts School of Law.

We did feel that despite the fact that we're kind of smart
people, we were just looking at matters of public record.  I
mean, you know, it wasn't hard to get these statements.
These statements, you know, hundreds of – lots and lots
and lots of people had Madoff statements.  So we didn't
really feel that we were dealing with something which is
proprietary, and therefore the conclusion that we came to
were something that was – you know, other people were
unlikely to come to.  And it's not like we needed a PhD in
mathematics to do the … study on the OEX.  Right?  I
mean, this is just – just looking at the size of the market.

*Id.* at p. 48.

An independent hedge fund research and advisory firm (research firm), who
researched a Madoff feeder fund as an investment vehicle for two clients in the late
1990's or early 2000's and asked not to be identified in the OIG's Report of
Investigation, also confirmed that Madoff raised the SEC examinations while they were
conducting due diligence.  CEO of Research Firm Interview Tr. at pgs. 55-56.  The Chief
Executive Officer (CEO) of the research firm, described a meeting he had with Madoff
where Madoff spoke about his split-strike conversion strategy and his business for about
an hour.  *Id.* at pgs. 2-3.  The CEO reported that Madoff made a point of telling them that
as a result of an SEC visit, Madoff registered as an investment adviser, in order to convey
to them that he had been examined and got a clean bill of health.  *Id.* at pgs. 55-56.  The
research firm also specifically recalled the Madoff feeder funds telling them "about [how]
the SEC was just in there and they did not find anything."  *Id.* at p. 58.

The CEO indicated that the research firm did not believe that Madoff was
operating a Ponzi scheme because they found out that the SEC had received a copy of
Harry Markopolos's letter and "presumed" with the detailed information contained in
Markopolos's letter that "somebody at the SEC must have checked with DTCC."  *Id.* at p.
51.  They stated that after reading Markopolos's letter, "there [was] no way in hell the
SEC did not take a hard look at this thing."  *Id.* at p. 55.

The research firm agreed that they had another potential investor become aware
"that the SEC was there in 2005 and found only minor things and the fact that there was
the Markopolos complaint out there and it seemed liked the SEC must have looked at it,"
it would have "provide[d] some assurances to people."  *Id.* at pgs. 57-58.  However, the
research firm decided in the end not to invest with Madoff because of the numerous red
flags that they had uncovered during the course of their own due diligence.  *Id.* at p. 4.

Bernard Madoff himself acknowledged in his interview that he would inform potential investors about SEC examinations in order to provide them with a level of comfort, stating that "it lent to the credibility of his firm that he had passed examinations by the SEC." Madoff Interview Memorandum at p. 6.

Accordingly, we found that not only was the SEC unable to uncover Madoff's fraud in the several investigations and examinations it conducted over a period of years, the fact that they had conducted examinations and investigations and did not detect the fraud, lent credibility to Madoff's operations and had the effect of encouraging additional individuals and entities to invest with him.

X.   ADDITIONAL COMPLAINTS RECEIVED BY THE SEC REGARDING MADOFF

A.   Introduction

In addition to the complaints previously discussed at length in Sections I, II, III, IV and V of this Report of Investigation, the SEC received additional tips and complaints about Bernard Madoff and/or his firm, Bernard L. Madoff Investment Securities LLC over the years. Many of those tips and complaints were directly provided to or internally referred to the SEC's Office of Investor Education and Advocacy (OIEA). OIEA serves individual investors who complain to the SEC about investment fraud or the mishandling of their investments by securities professionals. *See* http://intranet.sec.gov/divisions_ offices/hqo/oiea/OIEAHome.html, at Exhibit 486. OIEA routinely refers tips and complaints to other offices and divisions with the SEC as well as to other regulatory agencies.

OIEA retains paper records of customer complaints for four years before they are destroyed. Letter dated December 19, 2008 from Kristin Kaepplein, Director OIEA, to Kotz, at Exhibit 487. OIEA's ACTS+ database includes approximately the last six years of electronic records. *Id.* Through requests made to OIEA and a search of OIEA's ACTS+ complaint database and its archives, the OIG identified six complaints that were handled by OIEA prior to Madoff's December 11, 2008 arrest determined to be "Relevant to [the OIG's] Madoff Investigation." Table 1, "Investor Complaints Received by OIEA through 12/15/2008," at Exhibit 488.[279]

---

[279] OIEA also identified eight complaints related to Madoff or BMIS that were determined to be "Not Relevant to Madoff Investigation." Table 2, "Investor Complaints Received by OIEA Prior to 12/11/2008," at Exhibit 490. These complaints appear to be unrelated to Madoff's investment advisory business.

B.    Complaints Identified as Relevant to the OIG's Madoff Investigation

1.    Anonymous Complaint about Manipulation of Securities, Prices or Markets

The first complaint that OIG identified as relevant to the Madoff investigation was a letter submitted anonymously to the SEC's Washington, DC headquarters on August 8, 2002.  OIEA File HO372641, at p. 1, at Exhibit 489.  The actual letter submitted was destroyed as per OIEA's customary record retention practice.  Table 1, "Investor Complaints Received by OIEA through 12/15/2008" at p. 1, at Exhibit 488; OIEA Branch Chief Testimony Tr. at pgs. 27-28.  OIEA records from the ACTS+ database show that the complaint concerned Madoff Securities and described Madoff Securities as "Mutual fund—general."  OIEA File HO372641, at p. 1, at Exhibit 489. The OIEA code used to describe the letter was "081-Manipulation of securities, prices or markets."  *Id.*  No other information about the substance of the complaint was contained in OIEA records.  *Id.*  The complaint was closed on August 9, 2002 without being referred to any other SEC Division or Office or elsewhere.  *Id.*

2.    Anonymous Complaint Unrelated to Madoff's Investment Advisory Business Referred to the NASD

A second complaint identified by the OIG was sent by an anonymous investor to the SEC's Northeast Regional Office (NERO) on February 16, 2005.  OIEA ACTS+ database records show that the complaint consisted of a letter alleging that "Pilla directed customer order flow … to specific firms in return for gifts in excess of $100."  BMIS is among three firms that are listed as possibly involved in the practice.  OIEA File NERO1066, at p. 1, at Exhibit 491.  The complaint did not appear to concern allegations related to Madoff's investment advisory business.  OIEA referred the complaint to the NASD.  *Id.*

3.    Investor Complaint Unrelated to Madoff's Investment Advisory Business Was Referred to NERO Examiners Conducting a Cause Examination at BMIS; Examiners Did Not Document Results of Complaint Investigation

A third complaint was also received by NERO.  On April 13, 2005, a letter was submitted by James Tucker, an investor who stated that he had executed trades through Fidelity that were then routed through BMIS.  OIEA File NERO1072975, at p. 1, at Exhibit 492.  Tucker claimed that he did not receive the correct price on his trades.  *Id.* The complaint did not concern allegations related to Madoff's investment advisory business.

Because NERO examiners William Ostrow and Peter Lamore were on-site at BMIS performing an examination during the time period this complaint was received by OIEA, the complaint was referred to them on May 18, 2005.  *Id.*; E-mail dated May 18, 2005 from Ostrow to Lamore, at Exhibit 493.  However, Lamore did not recall receiving

the complaint or investigating it.  Lamore Testimony Tr. at pgs. 84-85.  Ostrow recalled reviewing the customer complaint and acting on the complaint immediately by either requesting trade data or following up on the complaint with BMIS.  Ostrow Testimony Tr. at pgs.  94-95.  However, Ostrow could not recall how the complaint was resolved and did not recall documenting the results of the investigation of the complaint.  *Id.*  When asked if he went back to the Investor Assistance Specialist who had referred the complaint to inform her of the results of their investigation of the complaint, Ostrow stated that he did not, in the following exchange:

> Q:     Would you have gone back to [the Investor
>         Assistance Specialist] to let her know how this
>         complaint was resolved, or your findings?

> A:     No, that's probably a weakness of the SEC, in
>         general, just in terms of -- you know, sometimes
>         tips or complaints come in, but what is the way to
>         handle it afterwards?  You know, it was great that
>         we got it while we were there on site.  But, I mean,
>         it wasn't something to the point where we thought
>         we needed to contact the customer who was writing
>         in, or it was something that – you know, the nature
>         of it was not as severe, or just – I  don't recall.  … I
>         don't know what exactly happened to resolve that.

*Id.* at pgs. 94-97.

On July 25, 2005, Tucker sent a second letter to NERO, stating that he had not received an acceptable explanation from Fidelity Group about why his trades were routed through BMIS and asking the SEC to look again at Fidelity's trading practices.  Letter dated July 25, 2005 from James H. Tucker to Donna Smith, Investor Assistance Specialist in NERO, at Exhibit 494.  On September 9, 2005, the SEC Investor Assistance Specialist who had previously handled Tucker's complaint sent him a response.  Letter dated September 9, 2005 letter from Smith to Tucker, at Exhibit 495.  The letter informed Tucker that his complaint had been referred but that the SEC "cannot provide you with updates on the status of your complaint or of any pending SEC investigation."  *Id.*

> 4.     Anonymous, Generalized Complaint about Madoff's Investment
>         Advisory Business Was Not Referred to Enforcement

The fourth complaint was submitted anonymously on November 24, 2006 to OIEA in the SEC's Washington, DC headquarters.  The complaint was an anonymous letter, stating the following:

> While I have no specific information/evidence of
> wrongdoing, I would be interested if I were you in
> investigating the combined activities of Bernard L. Madoff

> Investment Securities LLC (money manager and market
> maker) and the hedge funds managed by Fairfield
> Greenwich Group.  No down months and low volatility all
> the time just doesn't add up.

OIEA File HO1190190, at p. 3, at Exhibit 496.

The OIEA Acts+ database shows that the complaint was assigned to an OIEA
Senior Counsel[280] and was not referred for investigation.  *Id.* at p. 1.  Under "Comment,"
the OIEA Senior Counsel wrote, "complaint that hedge funds have not have [sic] losses
and low volatility.  No other information."  *Id.*  The decision to not refer the complaint
was approved by the OIEA Senior Counsel's supervisor, a former OIEA Branch Chief.
*Id.*; Former OIEA Branch Chief Testimony Tr. at p. 39.  Although the former OIEA
Branch Chief did not have a specific recollection of the complaint, he explained that the
complaint was likely not referred because it was "general" and "the broadest of
allegations," making it difficult to know how to conduct the investigation and requiring a
great deal of resources."  *Id.* at pgs. 34, 38-39; OIEA Branch Chief Testimony Tr. at p.
31.  The former OIEA Branch Chief stated that prior to Madoff's confession in December
2008, he did not believe resources were devoted to cases dealing with generalized
allegations about unusual investment returns.  Former OIEA Branch Chief Testimony Tr.
at pgs. 34-35.  Moreover, the former OIEA Branch Chief stated that because the
complaint was anonymous, the staff could not follow up with the complainant to seek out
more specific information.  *Id.* at p. 32.

An additional reason the former OIEA Branch Chief and a fellow OIEA Branch
Chief testified that an OIEA staff member might be reluctant to refer a generalized,
anonymous complaint to NERO was because Regional Litigation Counsel, Jason
Gettinger, who was the "main person" responsible for handling tips or complaints
provided to NERO, was known to often reject "general allegations."  *Id.* at pgs. 20-23;
OIEA Branch Chief Testimony Tr. at pgs. 42-44; Gettinger Testimony Tr. at pgs. 7-8.
According to the former OIEA Branch Chief and the OIEA Branch Chief, Gettinger
repeatedly sent "harsh" e-mails back to the OIEA staff members, rejecting their
complaints and copying their supervisors.  Former OIEA Branch Chief Testimony Tr. at
pgs. 20-23; OIEA Branch Chief Testimony Tr. at pgs. 42-44.  The former OIEA Branch
Chief described Gettinger "as the highest hurdle we ever had in the time I was with
OIEA" and stated that the November 28, 2006 complaint would be the type of allegation
that Gettinger would disfavor.  Former OIEA Branch Chief Testimony Tr. at pgs. 20, 32.

When asked how specific he required a complaint to be in order for it to be
investigated, Gettinger indicated, in the following testimony, that generalized,
anonymous complaints were unlikely to meet his criteria:  "If the complaint cannot tell us
that there's more than one victim, if the complaint can't tell us who, what, when, where,

---

[280] After the OIG issued the ROI to the Chairman of the SEC, at the SEC's request, the OIG prepared a
modified public version of the ROI which redacted the identities of certain individuals because of privacy
concerns as well as additional language at the request of the U.S. Department of Justice.

particularly if it's anonymous, it's probably not enough for us [to] go on."  Gettinger
Testimony Tr. at pgs.15-16.

Gettinger was of the opinion that the SEC was not the appropriate agency to
pursue Ponzi schemes that did not involve entities registered with the SEC because they
were resource intensive and "were essentially criminal matters" that "should be chased by
the FBI, local prosecutors."  *Id.* at pgs. 25-26, 33-34.  Gettinger stated that within the
Enforcement Division he "was in a minority of thinking that we would be hurting our
overall effort if we spent too much resources on localized Ponzi schemes that weren't
connected to what's now called off market Ponzi schemes."  *Id.* at p. 26.

As part of the standard OIEA process, when an employee is assigned a complaint
to handle, he is supposed to search the NRSI database to find out if an investigation is
being conducted of the person or entity that is the subject of the complaint.  Former
OIEA Branch Chief Testimony Tr. at p. 37.  If there is an investigation, then the
complaint is supposed to be referred regardless of whether the complaint would normally
meet the criteria for referral.  *Id.*  At the time the November 28, 2006 complaint was
received, the Enforcement Division of NERO had an open investigation of Madoff,
which meant that the complaint should have been referred despite its general nature.  *Id.*
It does not appear from NRSI records that the OIEA Senior Counsel checked the NRSI
system.[281]  NRSI Search List on Madoff, Bernard, at Exhibit 497; Former OIEA Branch
Chief Testimony Tr. at p. 38.

The OIEA Senior Counsel did not recall whether he checked the NRSI system,
but recalled that he checked to see if BMIS was registered as a hedge fund, and it was
not.  OIEA Senior Counsel Interview Memorandum.  The OIEA Senior Counsel stated
that he believes he did not refer the complaint because there were no specific allegations,
it was anonymous, and BMIS was not a registered investment adviser.  *Id.*  He stated that
in his experience, the Enforcement Division would not do anything with anonymous,
general allegations.  *Id.*

     5.    Anonymous Complaint About Madoff's Investment Advisory
             Business Referred to Enforcement, Which Relied on Madoff's
             Representation that the Complaint Was False

The fifth and sixth complaints were from an anonymous "concerned citizen" who
sent two letters to Chairman Christopher Cox – one received by Chairman's
Correspondence Unit on December 11, 2006 and one on March 20, 2008.  Letter dated
December 6, 2006 and stamped December 11, 2006 from a Concerned Citizen to the
Honorable Christopher Cox, at Exhibit 498; Letter dated December 6, 2006 and stamped
March 31, 2008 from a Concerned Citizen to the Honorable Christopher Cox from a

---

[281]  The NRSI records do not appear to record every search.  The name of another OIEA employee who
referred a complaint about Madoff after checking the NRSI system was not contained in the NRSI record of
employees who checked the NRSI system that was produced to the OIG by OIEA.  Former OIEA Branch
Chief Exh. 3; Former OIEA Branch Chief Testimony Tr. at pgs. 41-43; OIEA Branch Chief Testimony Tr.
at pgs. 44-45.

Concerned Citizen, at Exhibit 499.  The letters were identical except for an additional paragraph added to the bottom of the second letter.  Both letters stated the following:

> Your attention is directed to a scandal of major proportion which was executed by the investment firm Bernard L. Madoff … Assets well in excess of $10 Billion owned by the late Norman F. Levy, an ultra-wealthy long time client of the Madoff firm have been "co-mingled" with funds controlled by the Madoff company with gains thereon retained by Madoff.
>
> The action may have been taken with the knowledge and consent of the late Norman F. Levy in an effort to "take it with him" by avoiding the Federal and State estate taxes on these billions of dollars.
>
> This is an extreme example of uncontrolable [sic] greed which should be investigated by the proper authorities.

Letter dated December 6, 2006 and stamped December 11, 2006 from a Concerned Citizen to the Honorable Christopher Cox.  The letter received in 2008 added the following paragraph to the letter above:

> Dear Sir:
> It may be of interest to you to know that Mr. Bernard Madoff keeps two (2) sets of records.  The most interesting of which is on his computer which is always on his person.

Letter dated December 6, 2006 and stamped March 31, 2008 from a Concerned Citizen to the Honorable Christopher Cox from a Concerned Citizen.

Both letters were referred by the Chairman's Correspondence Unit to OIEA.[282] Table 1, "Investor Complaints Received by OIEA through 12/15/2008," at pgs. 3-4. David Powers of OIEA handled the complaint.  Powers searched NRSI and found that NERO had an "active" investigation of BMIS.   NRSI Printout for Enforcement Investigation NY-07563-A dated December 14, 2006, at Exhibit 500.  On December 14, 2006, Powers referred the complaint to Simona Suh, the staff attorney responsible for the investigation.  OIEA Referral dated December 14, 2006 from David Powers to Suh dated December 14, 2006, at Exhibit 501.

---

[282] Chairman Cox testified that he has never seen any version of the Levy letter and that his Correspondence Unit handled the initial review of his correspondence.  Cox Testimony Tr. at pgs. 12-13. Peter Uhlmann, Chief of Staff to Chairman Cox from 2006 to 2009, corroborated Cox's testimony, stating that Chairman Cox did not personally review most of the correspondence addressed to him.  Uhlmann Testimony Tr. at pgs. 18-19.

NERO investigated the complaint by calling Brandon Becker, Madoff's counsel, on January 8, 2007 and having Becker ask Madoff if he managed money for Norman F. Levy. Suh Telephone Log of Miscellaneous calls, at Exhibit 349. When Becker relayed that Madoff said he did not manage money for Levy, the complaint was not pursued further.[283] E-mail dated January 9, 2007 from Cheung to Suh, at Exhibit 382.

On April 7, 2008, OIEA referred the second letter regarding Levy to Suh. Because the Enforcement Investigation had been closed, John McCreery of OIEA sent the letter to Suh as an "FYI referral." OIEA File H01270413, at pg. 1, at Exhibit 502. In an e-mail dated September 16, 2008, Suh explained to McCreery that Enforcement would not pursue the allegations in the tip:

> I received from you a referral concerning Madoff, the central character in the now closed investigation NY-7563. The referred letter appears to be a copy of a letter sent to us and reviewed by us in 2006. *As in 2006, because the letter is anonymous and lacks detail, we will not be pursuing the allegations in it.*

E-mail dated September 16, 2008 from Suh to McCreery (emphasis added), at Exhibit 393.

C.     Conclusion

In all but one instance, tips or complaints that were received by OIEA appear to have been referred appropriately for investigation. In the one instance in which a generalized complaint should have been referred to NERO according to OIEA procedures, it does not appear that NERO would have followed up on the complaint because of the non-specific and anonymous nature of the complaint.

However, procedures should be considered for documenting the investigations of complaints following referral from OIEA. When an investor complaint was referred to NERO examiners, they did not appear to have documented their investigation of the complaint. Moreover, Enforcement guidelines for investigating complaints should be strengthened. When two specific complaints were referred to NERO Enforcement, they were not adequately investigated. As discussed at greater length in Section V of this Report of Investigation, accepting the word of a registrant who is alleged to be engaged in a specific instance of fraud is an inadequate investigation.

---

[283]   A detailed discussion of the Enforcement's handling of the Levy complaints can be found in Section V of the Report of Investigation.

XI.    ADDITIONAL EXAMINATIONS AND INSPECTIONS OF BERNARD
        MADOFF'S FIRMS CONDUCTED BY THE SEC

A.    1993-1994 Special Purpose Inspection of Bernard Madoff Securities[284]

1.    Summary of Inspection

In July 1993, the Division of Market Regulation[285] conducted a special purpose inspection of Bernard Madoff Investment Securities (BMIS) and the Instinet Corporation (Instinet).  Special Purpose Inspections Memorandum dated July 19, 1994 at Exhibit 505.  The purpose of the inspection was to address areas of market performance that may not have been covered in the National Association of Securities Dealers, Inc.'s (NASD's) examination process of third market makers, because these entities were regulated primarily as broker-dealers.  *Id.* at p. 1.  During the inspection, SEC staff requested BMIS' trading data for 22 securities for trade dates from June 21, 1993 to July 2, 1993.  Special Purpose Inspection of BMIS Report (undated), at p. 1, at Exhibit 506.  The SEC Division of Market Regulation staff also spent one week onsite at BMIS to review and better understand the firm's automated systems, procedures and trading practices.  *Id.*

On July 19, 1994, Division of Market Regulation Associate Director Mark Fitterman and Senior Adviser Mary Ann Gadziala issued a memorandum to the Division's Director, Brandon Becker, and Deputy Director, Bob Colby, that summarized the special purpose inspection.  Special Purpose Inspections Memorandum dated July 19, 1994 at Exhibit 505.  According to the memorandum, the SEC reviewed several areas of BMIS and Instinet's businesses, including their payment for order flow, order execution procedures, market order price improvement procedures, market maker performance, surveillance of automated execution systems, Intermarket Trading System (ITS)[286] trading procedures, and audit trail of broker-dealer trading systems.  *Id.* at p. 1.

---

[284] The OIG identified two other OCIE examinations of BMIS conducted in 1990 and 1993, respectively.  In interviews with the SEC examination staff, the OIG learned that they were likely routine broker-dealer examinations, which would have involved checking BMIS' sales practices and books and records.  New York Examiner Interview Memo.  Moreover, one examiner believed that these examinations were part of the normal three-year examination cycle for broker-dealers.  *Id.*  No one could recall any particular findings of either examination.  *Id.*; Liebl Interview Memorandum; Vasilakis Interview Memorandum.  The OIG found that the workpapers for the 1990 examination were destroyed in accordance with the 13-year records retention schedule maintained by the SEC Records Management Office, and the workpapers for the 1993 examination were destroyed during the September 11, 2001 terrorist attack.  Memorandum dated June 4, 2009 from John Walsh to H. David Kotz, Inspector General, at pgs. 2-3 at Exhibit 503.  There is no evidence that these examinations should or could have uncovered Madoff's fraudulent activity since they related solely to Madoff's broker-dealer operations.

[285] In 1995, the Division of Market Regulation and the Division of Investment Management's examination functions were transferred to a newly created Office of Compliance Inspections and Examinations.  1995 SEC Annual Report at p. v, at Exhibit 504 .

[286] ITS links all exchange specialists and third market makers for the purpose of assuring a fair and orderly national market system.  Special Purpose Inspection of BMIS Report (undated), at Exhibit 506 at p. 2.  As a member of the Cincinnati Stock Exchange (CSE), BMIS was able to participate in ITS via the CSE's linkage to ITS.  *Id.*  As an NASD registered market maker, BMIS was also able to utilize the NASD's Computer Assisted Execution System (CAES) as a linkage to ITS.  *Id.*  Trades executed through CAES, the

The memorandum's overall findings indicated that SEC staff found BMIS' automated execution systems were functioning as represented. *Id.* at p. 2; Special Purpose Inspection of BMIS Report (undated), at p. 19, at Exhibit 506. The staff, however, did identify certain deficiencies that may have existed in BMIS' market order price improvement sub-systems. *Id.* In addition, while the inspection found that the NASD's oversight examinations were adequate for surveillance of a typical market maker on the NASDAQ, it also concluded that BMIS operated more as an integrated market center and that NASD oversight examinations should be revised to include certain market structure issues not included in the routine broker-dealer examination conducted by NASD. *Id.* The memorandum suggested that NASD oversight examinations be revised to include automated trading or execution systems, ITS trading and quotation activities and payment for order flow. *Id.*

The Special Purpose Inspection of BMIS Report further noted:

> [BMIS] manages the risk of its business in a firm-wide and security specific basis. The firm-wide risk management is the direct responsibility of Bernard Madoff.
>
> \*                    \*                    \*
>
> None of the firm's periodic risk management evaluations are documented.

*Id.* at p. 16.

As a result of the inspection, the SEC proposed Rule 17a-23, which sought to establish a uniform comprehensive recordkeeping and reporting structure for broker-dealers sponsors of "broker-dealer trading systems."[287] Special Purpose Inspections Memorandum dated July 19, 1994 at pgs. 2-3, at Exhibit 505. In addition, the SEC recommended that the NASD develop a comprehensive program for examining third market activity and submit it to the Commission. *Id.* at p. 3.

2.      Conclusion

The 1993-1994 Special Inspection of BMIS was limited in scope and unrelated to the investment advisory business of Bernard Madoff's firm. Thus, there is no evidence that this examination should or could have uncovered Madoff's fraudulent activity since account data and trading records of discretionary brokerage accounts and investment advisory accounts were not the subject of the review.

However, the FTI Engagement Team noted that the inspection did find that none of the firm's periodic risk management evaluations were documented, and although the

---

CSE, or BMIS' system are reported automatically to the Securities Industry Automatic Corporation (SIAC) or NASDAQ and the respective parties' clearing corporations. *Id.*

[287] Release No. 34-33605 (February 18, 1994), 59 FR 8368, at Exhibit 507.

failure to maintain risk management evaluation documentation does not necessarily indicate evidence of wrongdoing or fraud, it typically would be considered a deficiency that required remediation or improvement.

      B.     1994-1995 Oversight Examination of NASD Examination of Bernard Madoff Securities

          1.     Summary of Examination

In 1994-1995, the SEC's Northeast Regional Office (NERO)[288] conducted an oversight examination of the NASD's most recent examination on BMIS, which had been conducted in February 1993. The oversight examination was conducted for the purpose of reviewing BMIS' financial condition, books and records and sales practice activities. BMIS Examination Report dated January 26, 1995, at p. 1, at Exhibit 509. In addition, the SEC's oversight examination served as a "training vehicle" for a NERO broker-dealer examiner. *Id.* NERO assigned two examiners to the BMIS oversight examination. OCIE Appendix A: List of Examinations and Staff, at p. 2, at Exhibit 510.

On January 26, 1995, NERO Broker-Dealer Examination staff issued an oversight examination report that included background information of BMIS, prior oversight findings and comments, current period findings, and a discussion regarding the sales practice review that was conducted during the oversight examination. *Id.* The oversight examination report concluded that BMIS was in substantial compliance and did not disclose any relevant findings. *Id.* at p. 4. As a result, the staff concluded that no further action would be taken. *Id.*

The January 26, 1995 BMIS Examination Report included the following information regarding BMIS' required annual audit:

> A review of [BMIS'] certified annual audit report, dated October 31, 1993, indicated that the report has been filed in a complete and timely manner, in accordance with Rule 17a-5(d), and that it disclosed no material deficiencies in the registrant's system of internal control.

*Id.* at p. 4.

The report also specifically noted the following:

> [BMIS] has eliminated the need to produce physical order tickets, through its modernized computer system. The system enables the firm to readily retrieve trade data. The Trade Reconciliation Report includes information, such as cusip, symbol, broker-dealer, type trade, sell order, but

---

[288]  NYRO was referred to as the Northeast Regional Office ("NERO") until March 30, 2007. SEC Press Release 2007-59 (http://www.sec.gov/news/press/2007/2007-59.htm), at Exhibit 508.

> order, price, limit price, agency fee, principal fee,
> commission, and time.  The staff requested to see a Trade
> Reconciliation Report for a specific date, and the report
> was generated immediately by the firm employees.

*Id.* at p. 3.

### 2.    Conclusion

The 1994-1995 oversight examination of BMIS was limited in scope and focused solely on the market making activities at BMIS.  The oversight examination was unrelated to the investment advisory business of Bernard Madoff's firm and thus, there is no evidence that this examination should or could have uncovered Madoff's fraudulent activity.

However, the FTI Engagement Team noted that there was no indication that any due diligence was performed by the examiners with regard to a review of BMIS' auditor's work performed during its audit.  Such due diligence could have included a review of BMIS' auditor's engagement letter, reports and work papers and may have uncovered information that would have verified whether the auditor was truly independent and was providing the services that it purportedly performed.

The FTI Engagement Team further noted that the oversight examination's finding about BMIS' ability to electronically disseminate account records contrasted sharply with the paper-based records associated with the investment advisory business at BMIS. While this was not a significant finding for examiners during this 1994-1995 oversight examination, it should have raised some questions during the later cause examinations at BMIS.

### C.    1997-1998 Inspection of Third Market Firms

### 1.    Summary of Inspection

In 1997-1998, OCIE conducted an inspection of eight third market firms "to evaluate the execution quality of retail orders in the third market" as a result of the Commission's recently issued "order handling rules emphasizing the duty of best execution."[289]  Information Memorandum dated February 9, 1998, at Exhibit 512.  The SEC primarily reviewed the third market firms BMIS, Hull Liquidity Fund L.P., Tradetech Securities L.P., Phoenix Third Market Corp., The Third Market Corp., Westfalia Investments, Inc. and Peters Securities Co.[290]  *Id.* at p. 1.  The review focused

---

[289] Securities Exchange Act Release No. 37619 (August 29, 1996), 61 FR 48290 (September 12, 1996) ("Order Handling Rules Release"), at Exhibit 511.
[290] "Third market firms are NASD member firms that execute exchange-listed securities orders for broker-dealers' retail order flow ("order-routing firms")."  Information Memorandum dated February 9, 1998, at p. 1, at Exhibit 512.  The Staff reviewed limited information from Trimark Securities, Inc., but did not examine the firm because the Division of Enforcement had a pending matter under investigation related to certain third market activities conducted by the firm.  *Id.* at p. 1.

on these firms' execution quality, including price improvement, executions inferior to the national best bid or offer (NBBO), trading ahead of customer market orders and trade reporting practices. *Id.* On February 9, 1998, OCIE issued to the Commission an inspection memorandum that summarized the inspection of the eight third market firms and provided findings on the execution quality of retail-sized orders in the third market. *Id.*

The inspection found that BMIS was deficient in its obligations under the order handling rules. *Id.* On February 6, 1998, the SEC issued a deficiency letter to BMIS concluding that BMIS executed "six orders (less than 0.5% of the orders reviewed) at prices inferior to the national best bid or offer [NBBO] at order entry time" and BMIS executed "110 market orders (2.0% of the orders reviewed) at prices inferior to NBBO at order execution time." Letter dated February 6, 1998 from Richards to BMIS, at p. 1, at Exhibit 513. The deficiency letter further stated, "This usually occurred at your firm because an order was manually executed. *Id.* In addition, the SEC concluded that because manually executed orders at BMIS were priced at the NBBO at order entry and not execution time, BMIS should "explicitly inform [its] broker-dealer customers that orders are executed at prices that reference the NBBO at receipt time, notwithstanding the fact that the NBBO may be superior at order execution time." *Id.*

      2.      Conclusion

The 1997-1998 Inspection of Third Markets was limited in scope and unrelated to the investment advisory business of Bernard Madoff's firm. Thus, there is no evidence that this examination should or could have uncovered Madoff's fraudulent activity since account data and trading records for discretionary brokerage accounts and investment advisory accounts were not the subject of the review.

      D.      1999 Special Purpose Examination Limit Order Display Rule

      1.      Summary of Examination

In 1999, after conducting examinations of several Self-Regulatory Organizations (SRO's) compliance with the Display Rule, OCIE determined it was necessary to examine a third market making firm[291] to evaluate third market makers' compliance with the Display Rule, "as well as to complete an industry-wide evaluation of the Display Rule compliance and oversight." Planning Memorandum dated October 20, 1999 from Barry to Gadziala, McCarthy and Moore, at p. 1, at Exhibit 514. According to the Planning Memorandum, OCIE selected BMIS because it was "one of the largest and most well-known third market makers." *Id.*

In October 1999, OCIE-DC initiated a "narrowly focused inspection of BMIS compliance with SEC Rule 11Ac1-4 (Display Rule)." Inspection Scope Memorandum dated October 20, 1999 from McCarthy, Moore and Barry to Gadziala, at p. 1, at Exhibit

---

[291] Third market makers make markets and trade listed securities over-the-counter. Planning Memorandum dated October 20, 1999 from Barry to Gadziala, McCarthy and Moore, at p. 1, at Exhibit 514.

515.  The inspection was to examine the systems, policies and procedures that BMIS has implemented in order to comply with the Display Rule.  *Id.*  The Display Rule generally requires Over-the-Counter (OTC) market makers and exchange specialists to display the price and full size of customer limit orders when these orders are priced better than the OTC market maker's or specialist's quote.  BMIS Examination Report dated August 3, 2000, at p. 1, attached at Exhibit 516.

During the examination, OCIE reviewed 643 Madoff customer limit orders for trade dates October 11, 12 and 25, 1999.  *Id.* at p. 2; Letter dated January 4, 2000 from Barry to BMIS, at Exhibit 517.  The staff found that 169 customer orders appeared to have not been displayed in accordance with the Display Rule and requested BMIS provide a written explanation why the trades were not in compliance.  *Id.*

On August 3, 2000, OCIE issued an examination report of BMIS' compliance with the Display Rule.  BMIS Examination Report dated August 3, 2000, at Exhibit 516. The report concluded that BMIS did not fully comply with the Display Rule.  *Id.* at p. 2. Specifically, the staff found that BMIS "designed its internal control order routing, display, and execution system with certain parameters that result[ed] in non-compliance with the Display Rule."  *Id.*  In addition, the staff found BMIS "had notice that some parameters would prevent certain customer limit orders from being displayed in compliance with the rule," but "nevertheless failed to take further action to improve the compliance of its system."  *Id.*  Based on the examination findings, the staff recommended referring the violations to the Division of Enforcement for further action. *Id.*

As a result, OCIE Director Lori Richards and Associate Director John McCarthy sent an enforcement referral to the Division of Enforcement's Director Richard Walker and Deputy Director Stephen Cutler outlining BMIS' violations of the Display Rule.  The staff stated they believed BMIS warranted enforcement action for the following reasons:

- The Staff's review of a sample of eligible customer limit orders revealed that approximately 18% [119 of the 643] of the orders were not displayed in compliance with the Display Rule.
- [BMIS] designed its internal order handling system with certain parameters that result in noncompliance with the Display Rule.
- In June 1999, [BMIS] represented to NASD Regulation, Inc., in response to violations of the Display Rule, that it made the appropriate curative systems modifications. However, the staff found similar violations in October 1999, indicating that the systems modifications were not effective.

OCIE Enforcement Referral Memorandum dated August 3, 2000, at p. 1, at Exhibit 518. In addition, Richards included two other firms, Schwab Capital Markets (Schwab) and

J.B. Oxford & Company (J.B. Oxford), in the enforcement referral for similar violations of the Display Rule. *Id.* at p. 2.

On December 20, 2000, Lori Richards sent a deficiency letter to BMIS stating the staff found 119 (approximately 18%) of the 643 orders reviewed were improperly displayed for 30 seconds or longer when required by the Display Rule. Letter dated December 20, 2000 letter from Richards to BMIS, at p. 1, at Exhibit 519. The letter requested BMIS to respond in writing as to the specific procedures that BMIS had or would put into effect to prevent further violations of the law. *Id.* Richards also sent deficiency letters to Schwab Capital Markets and J.B. Oxford & Company and asked them to respond in writing to the questions presented in the letters. Memorandum dated March 8, 2001 from McCarthy to Richardson, at Exhibit 520.

In January 2001, BMIS responded to the deficiency letter, stating it had corrected a number of issues that caused non-compliance and that it continued to improve its systems and procedures to detect and prevent problems in the future. Letter dated January 19, 2001 from BMIS to Richards, at Exhibit 521. Two months later, John McCarthy forwarded BMIS, Schwab, and J.B. Oxford's responses to the deficiency letters to the Division of Enforcement. Memorandum dated March 8, 2001 from McCarthy to Richardson, at Exhibit 520.

On April 4, 2001, the Division of Enforcement opened a Matter Under Inquiry (MUI) regarding the three firms Display Rule violations.[292] NRSI Enforcement MUI MLA-02469, at Exhibit 522. However, the Enforcement staff decided not to pursue the referral on BMIS and Schwab because BMIS and Schwab "provided detailed responses about their problems and the steps they were taking to correct them." E-mail dated August 7, 2001 from Former Enforcement Staff Attorney #2 to Bowers and Hyatt, at Exhibit 523.

The Enforcement staff did, however, conduct a second examination of J.B. Oxford because its Display Rule violations "appeared the most egregious." *Id.* The Enforcement staff's second examination of J.B. Oxford found "that J.B. Oxford is currently complying with the Display Rule and has adequately revised its Display Rule policies." Memorandum dated July 19, 2001 from frmer Enforcement Staff Attorney #2 to Cutler, at p. 2, at Exhibit 524. In July 2001, the frmer Enforcement Staff Attorney #2 sent a memorandum to Steve Cutler stating: "Given that [J.B. Oxford's] systems problems that caused the January 2000 violations of the Display Rule appeared to be resolved, the staff did not believe the violations would be appropriate for enforcement action." *Id.* The frmer Enforcement Staff Attorney #2 concurred in her interview with

---

[292] MUIs are preliminary in nature and typically involve incomplete information. The threshold determination for opening a MUI is low because the purpose of a MUI is to gather additional facts to help evaluate whether an investigation would be an appropriate use of resources. 2008 SEC Enforcement Manual, at p. 13, at Exhibit 296.

the OIG that she believed that the greater concern was with J.B. Oxford's violations. Former Enforcement Staff Attorney #2 Interview Memo.[293]

The next month, Associate Regional Director Sandra Harris sent Steve Cutler an e-mail stating, "the focus of the investigation has been J.B. Oxford … Because we are not recommending action against Oxford, it does not seem appropriate to do so against Schwab and Madoff, both of whom were taking steps to correct systems problems discovered during the exam." E-mail dated August 7, 2001 from Harris to Cutler, at Exhibit 525. In November 2001, the staff closed the MUI as being inappropriate for enforcement action because "the systems problems that resulted in [the three firms] Display Rule violations appear resolved." November 15, 2001 CATS 2000 Data Entry Form Matter Under Inquiry, at Exhibit 526.

2.      Conclusion

The 1999 Special Purpose Examination of BMIS was limited to the market making function of its broker-dealer business and unrelated to the investment advisory business of Madoff's firm. Thus, there is no evidence that this examination should or could have uncovered Madoff's fraudulent activity, since account data and trading records for discretionary brokerage accounts and investment advisory accounts were not the subject of the review. While the results of the examination demonstrated violations on the part of BMIS, and the violations were referred to the Enforcement Division, the Enforcement staff determined that the BMIS violations were inappropriate for Enforcement action because the systems problems that resulted in BMIS' October 1999 Display Rule violations appeared to be resolved.

E.      2003 OCIE QQQ Examination

1.      Introduction

In March 2003, the Office of Compliance Inspections and Examinations (OCIE) initiated examinations of certain SROs and market-makers, including BMIS, regarding "policies and procedures with respect to order handling and execution in the Nasdaq 100 Index Exchange Traded Fund, or "QQQ", during periods of abnormal market conditions, *i.e.,* when the market is locked or crossed."[294] Planning Memorandum dated March 3, 2003 from McCarthy, Swanson, and Daugherty to Richards, at p. 1, at Exhibit 527. The staff was concerned that "when the market is locked or crossed, Market Makers and Exchange Specialists may be handling customer orders in violation of their fiduciary best execution obligations." *Id.* The QQQ is an exchange traded fund, which allows investors

---

[293] The OIG also interviewed former Deputy Assistant Regional Director Clifford Hyatt, although he could not recall specifics about the investigation. Hyatt Interview Memo.
[294] Organizations selected for review by OCIE-DC included the Chicago Stock Exchange ("CHX"), the American Stock Exchange ("AMEX"), the Boston Stock Exchange ("BSE"), Knight Securities, L.P. ("Knight") and BMIS. Planning Memorandum dated March 3, 2003, at Exhibit 527.

to essentially invest in all of the stocks that make up the Nasdaq 100 in a single security.[295]

### 2.   March 3, 2003 Planning Memorandum

On March 3, 2003, OCIE Associate Director John McCarthy, Assistant Director Eric Swanson and Branch Chief Matt Daugherty drafted a Planning Memorandum to OCIE Director Lori Richards for the "Inspection of Self Regulatory Organizations and Market Makers with Respect to Trading in the Nasdaq 100 Exchange Traded Index Fund in the Nasdaq Intermarket During Periods of Abnormal Market Conditions."  Planning Memorandum dated March 3, 2003, at Exhibit 527.

The March 3, 2005 Planning Memorandum was divided into four sections: Introduction, Inspection Scope, Background and Inspection Issues.  *Id.*

The Introduction stated as follows:

> Staff from the Office of Compliance Inspections and Examinations ("Staff") will conduct inspections of certain Self Regulatory Organizations ("SROs") and Market Makers. … The purpose of these inspections is to examine the aforementioned [entities] regarding policies and procedures with respect to order handling and execution in the Nasdaq 100 Index Exchange Traded Fund, or "QQQ", during periods of abnormal market conditions, i.e, when the market is locked or crossed.  The staff is concerned that when the market is locked or crossed, Market Makers and Exchange Specialists may be handling customer orders in violation of their fiduciary best execution obligations.  The staff selected the QQQ security for their review because it is the most actively traded security and is frequently locked or crossed.

*Id.* at p. 1.[296]

---

[295] Barron's Finance & Investment Handbook at p. 720 (6th ed. 2003); http://financial-dictionary.thefree dictionary.com/QQQ, at Exhibit 528.

[296] OCIE also generally reviewed whether each organization executed orders in compliance with their own order handling procedures and whether organizations traded ahead of customer orders.  Planning Memorandum dated March 3, 2003, at Exhibit 527.  Trading ahead of a customer order generally occurs when an exchange specialist or market maker fills a customer order at an inferior price through the firm's proprietary account while a matchable customer order was present on the opposite side of the market.  As a result, the executed customer order receives an inferior price compared to the price it would have received if it was matched with the order on the opposite side of the market.  SEC Press Release 2009-42, at p. 2, at Exhibit 529 ; Planning Memorandum dated March 3, 2003, at Exhibit 527.

The Inspection Scope stated that the inspection would "examine the following aspects of Exchange and Market Maker operations:"

- Order executions in the QQQ during periods of locked or crossed markets.
- Exchange and Market Maker procedures for order handling and execution when the market is locked or crossed.
- The status, use, and procedures for Exchange and Market Maker automatic execution systems, specifically at time when the market is locked or crossed.
- Exchange and Market Maker internal controls and compliance procedures relation to best execution obligations.
- Exchange and Market Maker internal controls and compliance procedures relating to the display of limit orders that would lock or cross the market.

*Id.*

The Background section was divided into two sections: Best Execution and Locked/Crossed Markets.  *Id.* at p. 2.  The section provided descriptions of a broker-dealer's duty of Best Execution and Locked and Crossed Markets, as follows:

The duty of best execution requires that a broker-dealer seek to obtain for its customer orders the most favorable terms reasonably available under the circumstances.  In addition to price, other terms are also relevant to best execution, and must be taken into consideration by the broker dealer.  These include order size, the trading characteristics of the security, execution speed, clearing costs, and the cost and difficulty of factors including: abnormal market conditions; common industry practices such as internalization of order flow; and the automatic execution of customer orders – coupled with potentially inadequate order handling systems and guidelines for Market Makers and Exchanges – is causing best execution violations. [Footnotes omitted]

A locked market occurs when a market participant's bid equals the lowest offer of another market participant.  A crossed market occurs when a market participant's bid exceeds the lowest offer of another market participant. Market Makers and Exchanges consider instances when the market is locked or crossed as "non-normal" or "abnormal"

> market conditions. During these times, Market Makers and
> Exchanges often deviate from their routine order handling
> procedures. As explained below, Market Makers and
> Exchanges will "turnoff" their automatic execution systems
> during these periods. [Footnotes omitted].

*Id.* at p. 2.

The Inspection Issues section, stated, in pertinent part, as follows:

> The Staff is concerned that Market Makers and Exchange
> Specialists may not be honoring their quoted market during
> a locked or crossed market, and may not be fulfilling
> fiduciary obligations to obtain best execution for customer
> orders. Further retail customers and order entry firms may
> not be aware that a majority of the trades in the most
> frequently traded security will not be aware that a majority
> of the of the trades in the most frequently traded security
> will not be automatically executed at the current NBBO as
> per their agreements, but instead manually handled and
> possibly executed outside the current NBBO on a delayed
> basis by the Market Maker or Specialist.

*Id.* at pgs. 2-3.

3.      Staff Involvement in and Recollections of Madoff QQQ
        Examination

According to testimony, Swanson, Daugherty, and the OCIE Staff Attorney were
involved in the review of BMIS' trading in the QQQ examination. Swanson Testimony
Tr. at pgs. 22, 29; Daugherty Testimony Tr. at p. 35; OCIE Staff Attorney Testimony Tr.
at p. 10. Daugherty testified that three other OCIE attorneys, Chris Chase, Shauna
Sappington, and Tom Stickley, may have also reviewed some trading data related to the
overall QQQ examination, although their involvement appeared to have been minor.
Daugherty Testimony Tr. at pgs. 31, 37-38.

OCIE Associate Director John McCarthy did not recall much about the 2003
Madoff QQQ examination. McCarthy stated he had a "vague recollection" of the
examination, but did not recall that he had a role. McCarthy Testimony Tr. at pgs. 31,
34. When asked if he recalled that OCIE decided to investigate trading in the security
based on the fact that the market for QQQ was often locked or crossed and that market-
makers and specialists were violating their duty at best execution on customer trades,
McCarthy stated, "Yes, that's a fair sentence." *Id.* at pgs. 33-34. McCarthy also said he
"was apprised that, that, if I recall, that -- I often encouraged my staff to come up with
ideas, I think [the OCIE Staff Attorney] came up with this, I'm not sure. And so my role
would have simply said, "Sure, go ahead and do that." *Id.* at p. 34.

McCarthy stated that he would "[r]ely on Eric [Swanson] and Mark [Donohue] to basically manage the day-to-day part of the exams." *Id.* When asked if he would follow up to make sure that they were being worked on, he stated, "I mean, where I felt – I would ask questions and see how things were going, sure." *Id.* at p. 35. He did not recall that he was on any phone calls with anyone from Madoff's firm during this examination. *Id.* at pgs. 35-36.

Swanson recalled working on the QQQ examination, but stated in his role, "I likely wouldn't have been involved in the day to day review of any files related to this, just getting updates on the status from -- probably from Matt or maybe directly from [the Staff Attorney], if he was the staff attorney that was working it." Swanson Testimony Tr. at p. 23. Although he did not specifically recall being involved in the drafting of the Madoff QQQ planning memorandum, he stated, "I'm sure I would have been." Planning Memorandum dated March 3, 2003, at Exhibit 527; Tr. Swanson Testimony at p. 20. He also did not recall being involved in the drafting of the April 8, 2003 document request to Peter Madoff, even though he was the signatory, but stated that "it makes sense that I would have been, and I believe this was part of the sweep of more than one firm, but I don't know that for certain." *Id.*; letter dated April 8, 2003 from Swanson to BMIS at Exhibit 422. While he did not recall why OCIE was conducting an examination of the QQQ, he stated, "I do know generally what we would have been concerned about here" and further explained as follows:

> A lot of the exchanges and the firms that conducted market-making would have auto execution guarantees that would trade at the NBB[O] or perhaps at a price slightly improved over the NBB[O]. Those auto-ex systems would tend to shut down if a market was locked or crossed. So if the bid crossed the ask, they wouldn't auto-ex because they wouldn't know exactly what price to give it and so they would manually handle the order for execution.

> And I think what we were concerned about, and this goes back to a time period where we were generally concerned, and this is pre-Regulation NMS, we were generally concerned about the frequency of locked and crossed markets and -- and trades that would trade through a better price on an away market.

> The Qs was, if not the most actively-traded security, one of the most actively-traded security. So that's probably why we focused on the Qs and I think what we were concerned about is, okay, there's – it's not obvious from the way the systems are programmed and what they would generally guarantee to their customers how they would trade during a locked and crossed market, so let's find out in fact what they are doing because there are ways that someone who is

trading proprietarily against customer order flow could gain
the scenario when a locked and crossed market occurred  to
do an arbitrage and profit which, you know, would not be
considered in my view giving best execution to a client.

So -- but I – I'm going – I'm not going off my specific
recollection of what we were doing here, but that just
makes sense to me, given the time frame and what we were
asking for.

*Id.* at pgs. 21-22.

Swanson testified that he did not specifically recall having contact with anyone at
Madoff Securities. *Id.* at p. 23.  However, he acknowledged sending an April 15, 2003
e-mail to Shana Madoff, a Madoff compliance attorney.  E-mail dated April 15, 2003
from Swanson to Shana, at Exhibit 423; Swanson Testimony Tr. at p. 23.  Swanson
further testified that "it seems likely, based on this e-mail, that there must have been
something, a phone call or something, with the firm" prior to sending the document
request.  Swanson Testimony Tr. at pgs. 23-24; E-mail dated April 15, 2003 from
Swanson to Shana Madoff at Exhibit 423.  He did not recall being on any other calls with
anyone at the Madoff firm regarding this examination.  Swanson Testimony Tr. at pgs.
24-25.

Matt Daugherty was the lead attorney on the 2003 Madoff QQQ examination
when it began, and worked directly for Eric Swanson and John McCarthy on the
examination.  Daugherty Testimony Tr. at pgs. 30-31.  Daugherty said his role as lead
attorney "was to sort of lead the inspection and the examinations, so just conduct the day
to day activities of examining them, to go on site, to review the documents after the staff
had had a chance to evaluate them, that type of thing." *Id.* at p. 31.

Daugherty characterized the 2003 Madoff QQQ examination as a cause
examination, which he described as an examination where, "you have an idea of
something that may be occurring, and you're going in to look for that specific thing.  So
you got a tip from somebody or, you know, you read a newspaper article in the *Wall
Street Journal*, or you would go look for something on a cause basis by focusing on that
specific thing at the registrant." *Id.* at pgs. 19, 26.  Daugherty recalled OCIE conducted
this cause examination of Madoff because:

[A]t the time the market in -- for the Qs, as they call them,
QQQ, was very fragmented and hectic, and that there were
potential, I guess, thoughts or concerns.  I'm not sure
exactly what the genesis of them were, whether it was, sort
of, known in the industry, or thought in the industry, or
there was a tip in the Wall Street Journal, or whatever.  I
can't remember exactly, sort of, if there was a tipping point
or a specific impetus for looking at this, other than the sort

> of general concerns that I knew about, that there was
> potential for illicit trading, if you will, in the triple Qs,
> particularly during periods where the market in the
> securities quote unquote locked or crossed.
>
> So I believe what we determined to do was to initiate what
> I guess now would be referred to as a sweep inspection --
> I'm not even sure if we used the term back then -- of some
> market makers and exchanges, to look at their trading in the
> Qs, and see if we could ascertain whether there may or may
> not be any, sort of, illicit trading, sort of, best execution
> trading or trading ahead, or any of those potentialities…"

Daugherty Testimony Tr. at pgs. 26-27

4.    Conduct of the OCIE QQQ Examination

As part of the QQQ examination, OCIE sent document requests to two market makers and three SROs to look at trading in the triple Qs. *Id.* at p. 28. Daugherty stated that the intent was "to obtain trading data, to review it in order to determine whether we could identify instances in which they failed to properly execute customer orders for -- in sum." *Id.* at pgs. 28-29. The two market makers were Bernard Madoff Investment Securities and Knight Securities. *Id.* at p. 29. Daugherty stated, at the time, these two firms were the biggest market makers in exchange listed securities over the counter. *Id.* at pgs. 29-30. They looked at these two firms because they were the two most likely to have potentially committed these violations. *Id.* at p. 30. Daugherty added, "I don't believe that there was any evidence that we had that they were committing violations. It was more we wanted to look at the big players, because we figured that's the best place to start with this type of thing." *Id.*

Daugherty drafted the planning memorandum, sent the document request, and had some conversations with the registrants, including Shana Madoff about obtaining documents. *Id.* at pgs. 33-34. Daugherty recalled that BMIS was "one of the firms, or maybe one of the only firms that sent the information in in paper, so I think we had talked to them about getting it electronically…." *Id.* at p. 34. When asked if this was odd, Daugherty stated as follows:

> So at the time it -- some people had the ability to put stuff
> in electronic format, and some didn't. So I wouldn't say at
> that time it was unusual that it was only paper, and I'm not
> even sure we didn't get it electronically. So it wasn't like
> shocking that I got it that way. But obviously now it would
> be a little different, than again, only six years -- five or six
> years ago.

*Id.* at p. 35.

449

Daugherty stated that he was never on-site for the Madoff examination and he did not know if any of the staff was ever on site. *Id.* at p. 36.

> 5.    Daugherty, the Lead Attorney on the Madoff QQQ Examination, Was Put on Another Project

Daugherty stated he was lead attorney on the Madoff examination until a cause examination of the New York Stock Exchange was initiated in May or June 2003 at which point he was taken off the Madoff examination. *Id.* at p. 32. Daugherty explained:

> If you note the date on here, March 3, 2003, this was probably two months before the Wall Street Journal picked up the story about Dick Grasso and trading, and [inter]-positioning and trading ahead on the New York Stock Exchange.
>
> When -- when you talk about prioritizing -- when that hit, I was one of the only people in the office that really had any, sort of, trade devaluation experience because of my time at the NASD, so I was actually taking -- taken off this project and put onto the New York Stock Exchange project as the lead of that inspection.

*Id.*

Daugherty noted that at that time, "there [were] a lot of projects that I was -- that were sort of taken off my plate, and eventually, in, like, May or June -- obviously there was some sort of transition period -- I was taken off this [Madoff] project to work almost exclusively on New York." *Id.*

Daugherty believed staff attorneys Chris Chase and Shauna Sappington initially replaced him on the Madoff examination when he was reassigned to the New York Stock Exchange. *Id.* at p. 35. However, he was "not sure that they, were even the staffers that continued on this project. I think they got staffed up on other things." *Id.* He recalled Tom Stickley started working on the Chicago Stock Exchange examination, "if not on more than them, and had done some work, and identified some potential trades by the specialist, where I believe he might have been trading ahead." *Id.* He also thought the OCIE Staff Attorney may have been involved in the exam. *Id.* at p. 36. Daugherty noted that he was not the only busy one at that time in the office, and that they "literally were swamped." *Id.* at p. 35. Daugherty testified he did not know what happened to the Madoff QQQ exam. *Id.* at p. 37.

The OCIE Staff Attorney testified he did not remember anyone else working on the 2003 QQQ Madoff exam after Daugherty left. OCIE Staff Attorney Testimony Tr. at p. 12. The OCIE Staff Attorney recalled that he had two phone calls with BMIS during the examination. *Id.* at pgs. 11-13, 17; E-mail dated August 27, 2003 from the OCIE

Staff Attorney to Daugherty and Eidt, at Exhibit 530. He stated the calls were with Shana Madoff, a Madoff "compliance person." *Id.* at p. 11. He did not recall if anyone else was on the call with him and Shana Madoff. *Id.* at p. 12. He never went on-site at BMIS and did not think anyone from OCIE did either. *Id.* at pgs. 39-40.[297]

      6.     September 12, 2003 Memorandum Finding Madoff Violated Duty of Best Execution

After conducting an analysis of the Madoff QQQ trading data, the OCIE Staff Attorney drafted a September 12, 2003 memorandum to Senior Special Counsel Tom Eidt on Madoff trading activity in the QQQ. Memorandum dated September 12, 2003 from the OCIE Staff Attorney to Eidt, at Exhibit 532. In the memorandum, the OCIE Staff Attorney stated, "I have investigated the trading activity of he Nasdaq market maker Bernard L. Madoff Investment Securities, LLC (MADF) in the Nasdaq 100 Exchange Traded Fund (QQQ) for the days of January 6, 2003 to January 10, 2003…. [and] I have come to the conclusion that MADF specifically has violated their duty of best execution for a number of trades although perhaps not with the frequency that was expected." *Id.* at p. 1. The memorandum included a description of the firm's order handling policies and a description of 29 specific trades that appeared to be problematic. *Id.* at pgs. 1-8.

On October 20, 2003, the OCIE Staff Attorney e-mailed Swanson his September 12, 2004 memorandum. E-mail dated October 20, 2003 from the OCIE Staff Attorney to Swanson, at Exhibit 533. On October 31, 2003, the OCIE Staff Attorney e-mailed Swanson and asked him if he had a chance to review the September 12, 2003 memorandum he wrote and whether he should "look again at Madoff concentrating on best [ex]." E-mail dated October 31, 2003 from the OCIE Staff Attorney to Swanson, at Exhibit 534. The OCIE Staff Attorney explained, "BestEx is generally the obligation of a broker to provide the Best Execution for his client." OCIE Staff Attorney Testimony Tr. at p. 27. Swanson responded, "I assume what you're asking is whether to look at Madoff's trades against the quotes? The answer is yes." E-mail dated October 31, 2003 from the OCIE Staff Attorney to Swanson, at Exhibit 534. The OCIE Staff Attorney explained:

> When I first looked at Madoff, I was just looking at did the clients send in their order and did Madoff front-run that order or trade ahead of that order. And probably what was happening was that [with the *Philadelphia Stock Exchange (PHLX)]* I was noticing a lot of orders where PHLX was executing at one price, but really the market was saying it

---

[297] On May 29, 2003, Matt Daugherty sent Tina Barry an e-mail, which copied Chris Chase and Shauna Sappington and attached the March 3, 2003 planning memorandum and Madoff document request. E-mail dated May 29, 2003 Daugherty to Barry, at Exhibit 531. Barry thought the reason Daugherty sent the documents to her was because "being a branch chief in the office…a lot of times you're just consulted generally on hey, can you take a look at this. Let me know what you think. Barry Testimony Tr. at p. 16. Branch Chief Tina Barry testified she was aware of the Madoff QQQ examination, although she was not involved in the examination. Barry Testimony Tr. at pgs. 15-16.

was a much better price; and they weren't price improving those clients.

So probably in the course of doing that was like wow, you know what? I never did this with Madoff. I should probably ask Eric if he wants that sort of analysis done too.

I did. He said [yes]….

OCIE Staff Attorney Testimony Tr. at p. 28.

The OCIE Staff Attorney did not remember whether Swanson gave him additional feedback on this memorandum. *Id.* at p. 25.

> 7.    November 10, 2003 Memorandum Recommending that a Deficiency Letter be Issued to Madoff

In November 2003, the OCIE Staff Attorney drafted another Madoff QQQ examination memorandum, which provided the following additional examination conclusions: "the Staff has found numerous and consistent instances of bad executions by [Madoff], resulting in some loss to the customers involved." Memorandum dated November 10, 2003 from the OCIE Staff Attorney to Swanson, at Exhibit 535

The memorandum concluded as follows:

> [T]he Staff believes that there is a best execution problem with MADF. The staff further believes that MADF and its broker customers have thus far failed to adequately monitor this behavior. Based on these conclusions, the Staff recommends a deficiency letter be sent outlining the problem areas as well as recommending that MADF execute customer orders at ECNs when it is able to do so rather than proprietarily taking that price while executing the customer at a worse ITS price.

*Id.*

The memorandum included a description of the firm's order handling policies, a summary indicating that 359 of 2,806 customer orders reviewed were executed at a price worse than the inside bid or ask at the time of execution, a summary of the amount of losses to customers and the amount of gains to the firm, and two charts showing summary statistics of the data reviewed. *Id.*

The OCIE Staff Attorney explained that the November 10, 2003 memorandum was based on a different analysis of the trading data he reviewed in the September 12, 2003 memorandum. OCIE Staff Attorney Testimony Tr. at pgs. 28, 31-32. This

memorandum focused on Madoff's execution quality and what clients were getting versus what the market was offering. *Id.* at p. 31. The OCIE Staff Attorney testified his conclusion "looks like, basically, I believe, that this was significant activity" and noted that his memorandum recommended that a deficiency letter be sent out. *Id.* at p. 32. He also did not receive any feedback on this memorandum. *Id.* at p. 25.

8.     There is no Record of a Deficiency Letter being Issued to Madoff

The OCIE Staff Attorney stated that, although his November 10, 2003 memorandum recommended that a deficiency letter be issued, he did not believe any deficiency letter was ever sent, stating, "At least I don't remember drafting one. I honestly think that this just kind of got sucked into that black hole wherein some of these exams just went." *Id.* at p. 33. He never received any further direction on the examination, which he stated was not uncommon, noting:

> we do our fact-finding…and say like okay, what do we do next. And there just was never any further direction; or, we'd write a memo summarizing whatever we thought we had found when the wind gained further input. So that was a pretty common occurrence. I don't know if I ever heard back from [Swanson]. He may have given more feedback. I don't know.

*Id.* at p. 25-26.

The OCIE Staff Attorney testified that in OCIE new matters would get prioritized over old matters and noted: "there was a lot of projects at the time that would just kind of die off. I mean, you know, you do some initial review and you go up the chain. And I think the superiors had determined, well, I got other things to worry about. Those old projects just kind of languished; and, I had a lot of projects like that." *Id.* at p. 26.

Daugherty did not recall what the staff found during the Madoff examination, saying he was "out of the loop" at that point. Daugherty Testimony Tr. at p. 53. He did acknowledge after reviewing the November 10, 2003 memorandum that "they had -- potentially have some issues with execution quality, and some gains," and "based on the activity outlined in this memo, the staff believes that there is a best execution problem with Madoff." *Id.*

Swanson testified that he did not know if Madoff was sent a deficiency letter. Swanson Testimony Tr. at p. 32. Echoing the OCIE Staff Attorney, Swanson testified there were a lot of matters going on and it might have gotten lost in the shuffle, stating:

> Well, I -- yeah. I definitely -- I agree with that -- with that testimony, and I don't know whether a deficiency letter was sent on this, and, frankly, I -- I can tell you that since I have -- I don't recall even this document. It -- it's likely to me

> that we were inundated with a lot of projects.  This is over the same period of time when we were pushing hard on the exchange trading ahead cases and so I was very distracted by that at the time.
>
> So I don't know, you know, the extent to which this died on the vine, as it were, but there were situations where we opened inquiries and, you know, to my knowledge, they may never have gotten completely resolved because we were busy with other more high-priority matters and this – it's very possible that this is one of those situations.

*Id.* at pgs. 33-34.

McCarthy did not recall that the "staff had found numerous inconsistent instances of bad executions by Madoff resulting in some loss to the customers involved," but agreed that the staff "believed that there's a best execution problem with Madoff." McCarthy Testimony Tr. at pgs. 37-38.  McCarthy also did not recall that the staff recommended a deficiency letter be sent out to Madoff in connection with the QQQ examination or if a deficiency letter was ever sent to Madoff, but acknowledged that was the staff's recommendation.  *Id.* at pgs. 38-39.  McCarthy stated if a deficiency letter was sent out, "It should be in the work papers, yes."  *Id.* at p. 40.  In connection with the Madoff investigation, the Office of the Inspector General reviewed OCIE's 2003 Madoff QQQ examination work papers and did not find a deficiency letter for this examination.

McCarthy disagreed with the OCIE Staff Attorney's characterization that projects would "die off,"  and stated, "Well, I mean, he's – that's his perception of what was going on at the time, but – above him, but I would disagree with that description."  *Id.* at p. 41.

On June 19, 2009, after his testimony, Swanson provided supplemental information to the OIG about the QQQ examination.  Despite the fact that during his testimony, Swanson stated that he had no recollection of whether or why a deficiency letter was not sent to BMIS, Swanson provided, in his supplemental filing, the following:

> Mr. Swanson does not have access to the memorandum recommending that a deficiency letter be issued to BMIS regarding trading in the QQQs so he is not 100% certain of all the underlying facts or legal theories underlying the recommendation.  Mr. Swanson, however, does have a specific recollection that the matter involved an attempt by the staff to apply the NASD's Manning Rule (NASD Rule 2110) to market orders as well as the application of the NASD's best execution rule (NASD Rule 2320).  Further, Mr. Swanson has a specific recollection of discussions at that time with the NASD regarding the scope of these rules.

Mr. Swanson recalls that at that time, the NASD's Manning Rule only prevented brokers from trading ahead of limit orders, and the scope of the NASD's best execution rule was limited to transactions directly with "customers." The scope of the best execution rule did not include transactions with other broker-dealers even if those transactions were for the account of a "customer." While Mr. Swanson does not recall all the specifics of the BMIS QQQ matter, he does believe that the decision not to issue a deficiency letter was made because the recommended deficiencies would have either required application of Manning to market orders, which was not possible, or they would have required application of the NASD's best execution rule to executions by BMIS on behalf of broker-dealer clients of BMIS, not on behalf of "customers" as defined in the NASD rule, which again was not possible. Mr. Swanson further believes, based on his recollection, that the QQQ memorandum provided to him did not clearly highlight the full scope of these jurisdictional difficulties. The NASD since amended its rules such that there a now a Manning Rule for market orders and such that the best execution rule applies to transactions with other broker-dealers if the transactions are for the benefit of "customers."…

Letter dated June 19, 2009 from Michael Wolk, Counsel to Swanson, to IG Kotz, at pgs 1-2, at Exhibit 183.

The OIG investigation found that at the time of the QQQ examination, the SEC believed that it did not have a basis to issue a deficiency letter for the violations as outlined in the Madoff QQQ examination report memorandum. During that time period, the SEC had determined the NASD did not have rules that explicitly prohibited: 1) market makers from trading ahead of customer market orders in Nasdaq or Bulletin Board securities; or 2) third-market market makers from trading ahead of market or limit orders in other OTC securities. Action Memorandum dated September 22, 2004 from OCIE to The Commission, at pgs. 19-20, at Exhibit 536. As a result, the SEC was not issuing deficiency letters or recommending enforcement action against market makers because they traded ahead of customer market orders in Nasdaq securities or third market makers that traded ahead of market or limit orders in OTC securities. *Id.* at p. 20.

In addition, the OIG investigation found that at the time of the QQQ examination, the NASD's best execution rule was not applicable to market makers for orders received from other broker-dealers. *Id.* at p. 23. The NASD's best execution rule required market makers to use reasonable diligence to obtain a price most favorable price for "customer" orders as possible under prevailing market conditions. *Id.* However, NASD rule 0120(g) excluded brokers-dealers from the definition of a "customer."[298] *Id.* at pgs. 24-25. Thus,

_____

[298] NASD Rule 0120(g) states: "The term 'customer' shall not include a broker or dealer." *Id.* at p. 24.

the staff determined NASD's best execution rule was not applicable to trades a market maker received from another broker-dealer, even though the trades were ultimately for the benefit of the other broker-dealer's customers.

9.    Conclusion

The QQQ examination of BMIS was limited in scope and unrelated to the investment advisory business of Bernard Madoff's firm.  Thus, there is no evidence that this examination should or could have uncovered Madoff's Ponzi scheme since investment advisory account data and trading records were not the subject of the review.

However, there are significant concerns about the conduct of the QQQ examination, including the fact that apparent violations were discovered and a deficiency letter was recommended, but was never sent out.  Even if it were the case that the SEC did not have a basis to issue a deficiency letter against Madoff, there should have been some record of this determination in the examination files.  In addition, it is noteworthy that one of the staff attorneys involved in the examination stated that it was not uncommon for projects to just "die off" without coming to an appropriate conclusion and stated he often did not get any feedback or direction on his work.  This apparent weakness in the examination process would reappear during the 2004 OCIE Cause Examination and seemed to demonstrate a systemic flaw in the OCIE examination process.[299]

## **Conclusion**

The OIG investigation found that the SEC received numerous substantive complaints since 1992 that raised significant red flags concerning Madoff's hedge fund operations and should have led to questions about whether Madoff was actually engaged in trading and should have led to a thorough examination and/or investigation of the possibility that Madoff was operating a Ponzi scheme.  However, the OIG found that although the SEC conducted five examinations and investigations of Madoff based upon these substantive complaints, they never took the necessary and basic steps to determine if Madoff was misrepresenting his trading.  We also found that had these efforts been made with appropriate follow-up, the SEC could have uncovered the Ponzi scheme well before Madoff confessed.

---

[299] It is also worth noting that this QQQ examination was occurring at the same time that the initial complaint was received by OCIE from the hedge fund manager (in May 2003) that triggered the 2004 OCIE Cause Examination of Madoff, and thus, OCIE lost an opportunity to respond to the hedge fund manager's complaint in a much more timely fashion.

The OIG found that the conduct of the examinations and investigations was similar in that they were generally conducted by inexperienced personnel, not planned adequately, and were too limited in scope.  While examiners and investigators discovered suspicious information and evidence and caught Madoff in contradictions and inconsistencies, they either disregarded these concerns or relied inappropriately upon Madoff's representations and documentation in dismissing them.  Further, the SEC examiners and investigators failed to understand the complexities of Madoff's trading and the importance of verifying his returns with independent third-parties.

The OIG did not find that the failure of the SEC to uncover Madoff's Ponzi scheme was related to the misconduct of a particular individual or individuals, and found no inappropriate influence from senior-level officials.  We also did not find that any improper professional, social or financial relationship on the part of any former or current SEC employee impacted the examinations or investigations.

Rather, there were systematic breakdowns in the manner in which the SEC conducted its examinations and investigations, and for that reason, the OIG is issuing under separate cover two audit reports providing the SEC with specific and concrete recommendations to improve the operations of both OCIE and Enforcement.

The OIG also recommends that the Chairman carefully review this ROI and share with OCIE and Enforcement management, the portions of this ROI that relate to the performance failures by those employees who still work at the SEC, so that appropriate action (which may include performance-based action, as appropriate) is taken, on an employee-by-employee basis, to ensure that future examinations and investigations are conducted in a more appropriate manner and the mistakes and failures outlined in this ROI are not repeated.

Submitted: _____   Date: Aug. 31, 2009
H. David Kotz, Inspector General