**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Robyn M. Feldstein
Email: rfeldstein@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                Plaintiff-Applicant,<br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                Defendant. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br>(Substantively Consolidated)<br><br><br>**THE TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>                Plaintiff,<br>    v.<br>STEVEN B. MENDELOW, NANCY MENDELOW, CARA MENDELOW, PAMELA CHRISTIAN, C&P ASSOCIATES, LTD., and C&P ASSOCIATES, INC.,<br><br>                Defendants. | Adv. Pro. No. 10-04283 (SMB) |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................1

STATEMENT OF FACTS ..........................................................................4

    I.     Mendelow Participated in the Fraud Early On by Soliciting and
          Directing Investors Into One of the First BLMIS Feeder Funds ............................4

          A.     Mendelow Operated Telfran, a Subfeeder Into A&B, by
                  Promising Guaranteed Rates of Return.........................................4

          B.     Post-Telfran, Mendelow Opened Several BLMIS Accounts for
                  His Family and Entities that He Controlled....................................6

    II.    After the SEC Shut Down Telfran, Mendelow Received Fraudulent
          Side Payments and a Guaranteed Rate of Return in Exchange for
          Directing Investors Back to BLMIS ........................................7

    III.   Mendelow Closely Tracked his BLMIS Accounts to Monitor His
          Fraudulent Side Payments and Guaranteed Rate of Return and
          Directed BLMIS to Increase the Balances of Certain Accounts When
          BLMIS Failed to Meet the Pre-Determined "Vig" .........................9

PROCEDURAL HISTORY..........................................................................10

ARGUMENT ..........................................................................................12

    I.     THE STANDARD GOVERNING RULE 12(c) MOTIONS ...............................12

    II.    THE SECTION 546(e) SAFE HARBOR DOES NOT PROTECT THE
          DEFENDANTS ..........................................................................13

          A.     The Section 546(e) Safe Harbor Only Protects Innocent
                  Investors Who Did Not Have Actual Knowledge of Madoff's
                  Fraud ..........................................................................15

          B.     The Specific Factual Allegations in the Mendelow Complaint
                  Control Whether the Trustee has Pled Actual Knowledge ..................18

          C.     The Trustee Has Alleged More Than Sufficient Evidence of
                  Mendelow's Actual Knowledge of Madoff's Fraud.........................18

               1.    Telfran's Pre-Determined Guaranteed Rate of Return
                        Demonstrated to Mendelow that Madoff was a Fraud..................19

                2.    The Fraudulent Side Payments ....................................20

                3.    Mendelow Knew that the BLMIS Guaranteed Rate of
                        Return Was Impossible ...............................................22

**TABLE OF CONTENTS**
**(continued)**

                                                                                        **Page**

    4.    Mendelow Tracked the Fraudulent Trading Activity in His BLMIS Accounts and Demanded His Pre-Determined Amount in Fake Trades When Madoff Fell Short ......................................................................................22

    5.    This Court Should Draw an Adverse Inference from Mendelow's Invocation of His Fifth Amendment Rights..............23

  D.    The Allegations of Knowledge and Participation in the Fraud Against Mendelow Are Stronger Than Those Alleged in Merkin ..........................................................................................23

  E.    Defendants Cannot Rely on the "Good Faith" Defense of Section 548(c) ................................................................................25

III.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT THE TRUSTEE LEAVE TO AMEND THE COMPLAINT ........................................25

CONCLUSION ...................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*In re Alstom SA Sec. Litig.*,
454 F. Supp. 2d 187 (S.D.N.Y. 2006)........................................................................23

*Anderson News, LLC. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)......................................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................12, 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................12

*In re Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011)......................................................................................15

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013).......................................................................................21

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*,
726 F.3d 62 (2d Cir. 2013)........................................................................................12

*Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*,
304 F.R.D. 170 (S.D.N.Y 2014)................................................................................25

*Greco v. Trauner, Cohen & Thomas, L.L.P.*,
412 F.3d 360 (2d Cir. 2005)......................................................................................12

*Ida Fishman, Picard v. Ida Fishman Revocable Trust*,
773 F.3d 411 (2d Cir. 2014)................................................................................14, 26

*Kirschner v. Bennett (In re Refco Secs. Litig.)*,
759 F. Supp. 2d 301 (S.D.N.Y. 2010).......................................................................13

*Monahan v. New York City Dep't of Corr.*,
214 F.3d 275 (2d Cir. 2000)......................................................................................28

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)..................................................................................................21

*Nogbou v. Mayrose*,
400 F. App'x 617 (2d Cir. 2010)...............................................................................12

*O'Connell v. Penson Financial Servs. Inc. (In re Arbco Cap. Mgmt., LLP)*,
498 B.R. 32 (Bankr. S.D.N.Y. 2013).................................................................16, 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Picard v. ABN AMRO Bank (Ireland) Ltd.* (*Secs. Investor Prot. Corp. v. Bernard
    L. Madoff Inv. Secs. LLC*),
    505 B.R. 135 (S.D.N.Y. 2013).................................................................................16

*Picard v. Chais (In re BLMIS)*,
    445 B.R. 206 (Bankr. S.D.N.Y. 2011) ...................................................................18

*Picard v. Grieff*,
    476 B.R.715 (S.D.N.Y. 2012)..................................................................11, 15, 16

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)....................................................................... *passim*

*Picard v. Merkin (In re BLMIS)*,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010) ...................................................................18

*Picard v. Merkin (In re BLMIS)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) (*"Merkin II"*)..................................... *passim*

*Ruotolo v. City of New York*,
    514 F.3d 184 (2d Cir. 2008)....................................................................................28

*SEC v. Berry*,
    No. C-07-04431 RMW, 2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ................23

*Silverman v. A-Z Rx, LLC (In re Allou Distribs., Inc.)*,
    No. 04-8369-ESS, 2012 WL 6012149 (Bankr. E.D.N.Y. Dec 3, 2012).................13

*Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs,
    Inc.)*,
    446 B.R. 32 (Bankr. E.D.N.Y. 2011).....................................................................13

*SIPC v. BLMIS*,
    No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. 2013) .......................... *passim*

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ...............................................................................21

*In re Tiligent, Inc.*,
    346 B.R. 73 (Bankr. S.D.N.Y. 2006)......................................................................28

**Statutes**

11 U.S.C. § 544 ...............................................................................................................10

11 U.S.C. § 546(e) ................................................................................................. *passim*

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

11 U.S.C. § 548 ...............................................................................................................10

11 U.S.C. § 548(a)(1)(A) ...........................................................................................14, 15

11 U.S.C. § 548(c) ..........................................................................................3, 10, 24, 25

11 U.S.C. § 550(a) ..........................................................................................................10

11 U.S.C. § 551 ...............................................................................................................10

15 U.S.C. §§ 78aaa, *et seq.* .............................................................................................1

N.Y. Debt. & Cred. §§ 273-279 ......................................................................................10

**Rules**

Fed. R. Bankr. 2004 .............................................................................................3, 10, 23

Fed. R. Civ. P. 9(b) .........................................................................................................18

Fed. R. Civ. P. 12(b)(6).......................................................................................12, 21, 27

Fed. R. Civ. P. 12(c) .......................................................................................................12

Fed. R. Civ. P. 15 ............................................................................................................26

Fed. R. Civ. P. 15(a) .......................................................................................................26

Fed. R. Civ. P. 15(a)(1)(B) .............................................................................................26

Fed. R. Civ. P. 15(a)(2)....................................................................................................25

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of

Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C.

§§ 78aaa, *et seq*., by and through his undersigned counsel, respectfully submits this

Memorandum of Law in Opposition to the Defendants' Motion for Judgment on the Pleadings.

## PRELIMINARY STATEMENT

Madoff's unprecedented Ponzi scheme could not have lasted as long as it did without the

assistance of a close circle of individuals who provided him with a steady flow of capital into

BLMIS. Defendant Steven Mendelow was one of those individuals.[1]  He knowingly profited

from Madoff's fraudulent activities for almost twenty years.  From the late 1980's until he was

forced to close his operations by the SEC in 1992, Mendelow solicited approximately 800

individuals and entities to invest tens of millions of dollars in BLMIS through Telfran

Associates, Ltd. (Compl. ¶¶ 4-5, 74).  Mendelow promised these investors guaranteed rates of

return and then funneled their money through Avellino & Bienes ("A&B"), one of Madoff's first

and oldest sources of capital, founded by Frank Avellino and Michael Bienes. (Compl. ¶¶ 4-5,

59, 61).  Mendelow made hundreds of thousands of dollars a year by retaining the difference

between the returns he promised to his investors and the set returns Telfran received from A&B.

(Compl. ¶¶ 4, 63).  Undeterred by the SEC's sanctions, Mendelow later redirected innocent

former Telfran investors into accounts directly with BLMIS, and was handsomely rewarded by

Madoff for his efforts. (Compl. ¶¶74-75).  Mendelow's investment accounts at BLMIS received

---

[1] Defined terms herein have the same meaning as in the complaint filed in this action (the "Complaint"). (DKT. No. 1).

an agreed upon double benefit—a pre-determined guaranteed rate of return and annual increases in account balances by an agreed-upon amount through the use of fake securities transactions in those accounts (the "Fraudulent Side Payments"). (Compl. ¶ 73).

Mendelow managed multiple accounts at BLMIS, including accounts for an IRA in his own name, an IRA in his wife, Nancy Mendelow's, name, an entity he owned and controlled named C&P Associates, and his two daughters Cara Mendelow and Pamela Mendelow. Over the life of their accounts, Mendelow and the other Defendants collectively withdrew over $20 million from BLMIS, including over $11 million in non-existent profits purportedly earned in those accounts. (Compl. ¶ 8).

Notwithstanding these non-conclusory factual allegations establishing Mendelow's actual knowledge and participation in Madoff's fraud, Defendants have now filed this Motion for Judgment on the Pleadings ("Motion") claiming that the Trustee has failed to plead sufficiently Mendelow's actual knowledge of fraud or lack of good faith in order to avoid and recover fraudulent transfers outside the two year period prior to filing date. The Motion should be denied in its entirety.

The Trustee's allegations against Mendelow, which must be accepted as true for the purposes of this Motion, and the reasonable inferences drawn from those allegations, establish that Mendelow not only knew that Madoff was committing fraud but personally participated in the fabrication of securities transactions by BLMIS so that he could reap the rewards. Among other things, the Complaint alleges that Mendelow managed and operated the Telfran feeder that promised investors, in the form of "loans" that were designed to avoid regulatory scrutiny, an impossible guaranteed rate of return. (Compl. ¶¶ 3-4). After the SEC shut down Telfran's operation, Madoff rewarded Mendelow with the annual Fraudulent Side Payments for ensuring

that $62 million of former Telfran funds were reinvested directly into BLMIS. (Compl. ¶¶ 74-75).  Certain accounts designated by Mendelow received these Fraudulent Side Payments like clockwork every December in the form of fake options transactions that yielded the agreed upon amounts. (Compl. ¶ 91).  Mendelow also received a pre-determined guaranteed rate of return, as high as 17%, in his BLMIS accounts. (Compl. ¶ 88).  Mendelow paid close attention to the activity in his accounts and specifically monitored whether Madoff was providing the agreed upon rates of return and Fraudulent Side Payments. (Compl. ¶ 94).  He reconciled his actual account balances with his own calculations of the expected rates of return and Fraudulent Side Payments and directed BLMIS to increase the value of his accounts when he noticed a shortfall. (Compl. ¶¶ 94-95).  Unsurprisingly, Mendelow asserted his Fifth Amendment right against self-incrimination at the Trustee's Rule 2004 Examination of Mendelow and refused to answer questions about Telfran, A&B, the Fraudulent Side Payments and the guaranteed rates of return. (Compl. ¶ 97).  Mendelow, thus, knew that BLMIS was a fraud.

Accordingly, Mendelow can find no solace in the "safe harbor" of section 546(e) of the Bankruptcy Code, which only protects innocent investors who did not have actual knowledge of Madoff's fraud.  Mendelow knowingly participated and profited in the scheme and stands in a different posture from the innocent transferees protected by the safe harbor.  For the same reason, Mendelow cannot claim a good faith defense under section 548(c) of the Bankruptcy Code.  Therefore, the Motion should be denied, or in the alternative, the Trustee should be granted leave to file an amended complaint.

## STATEMENT OF FACTS

**I.    Mendelow Participated in the Fraud Early On by Soliciting and Directing Investors Into One of the First BLMIS Feeder Funds**

Mendelow was a sophisticated investor with a longstanding relationship with Madoff. (Compl. ¶ 2, 11).  Trained as an accountant, Mendelow was a "principal" at the accounting firm Konigsberg Wolf for more than 25 years. (Compl. ¶ 2).  Mendelow specialized in "unique transactions, family wealth building and generational matters, and financial restructuring." (*Id.*) He also served on the boards of directors of numerous public companies, even serving on the audit committee of some of those companies. (*Id.*)

Mendelow's relationship with Madoff dates back to the early 1970s, through his relationship with Frank Avellino and Michael Bienes, the owners of A&B. (Compl. ¶3, 57-58). Additionally, Konigsberg Wolf, where Mendelow worked for over 25 years, had numerous significant links to BLMIS and Madoff. (Compl. ¶ 2).  In 1989, Mendelow, along with his business partner Edward Glantz, modeled their own fund, Telfran, after A&B. (Compl. ¶¶ 3, 62). Mendelow had special access to BLMIS, its employees and Madoff, allowing him, among other things, to contact Madoff directly in order to help prospective clients open accounts with the secretive BLMIS. (Compl. ¶ 2).

**A.    Mendelow Operated Telfran, a Subfeeder Into A&B, by Promising Guaranteed Rates of Return.**

Mendelow helped perpetuate the fraud at BLMIS for approximately twenty years by pooling money and funneling it into BLMIS through various investment vehicles. (Compl. ¶ 3). As early as the late 1970s, Mendelow invested with the BLMIS feeder fund A&B[2] in his name

---

[2] Avellino & Bienes, Frank Avellino, Michael Bienes and related entities and individuals are the subject of a separate suit brought by the Trustee styled *Picard v. Avellino, et al.*, Adv. Pro. No. 10-05421 (SMB). The Trustee filed his opposition to a motion to dismiss in that case on May 21, 2015 (Dkt. No. 99), and the Court heard oral argument on that motion on July 29, 2015 (Dkt. No. 91).

and his wife's name. (Compl. ¶¶ 58-59).  Building off the success of A&B, Mendelow, and

others, founded Telfran. (Compl. ¶¶ 3, 57, 62).  From 1989 to 1992, Telfran operated as an

unregistered investment company, selling unregistered securities to the public. (Compl. ¶ 4).

Telfran solicited approximately 800 clients by promising a guaranteed rate of return. (Compl. ¶

4).  Through Telfran, Mendelow and his partners began feeding money into BLMIS by giving

that money to A&B to "invest" in BLMIS. (Compl. ¶ 4).  A&B, and subsequently Telfran,

structured their clients' investments as "loans" in order to avoid scrutiny from regulators.

(Compl. ¶¶ 4, 60).

To entice new investors into his Ponzi scheme, Madoff promised A&B a certain rate of

return, A&B, in turn, guaranteed a certain return to Telfran, and Telfran paid a lesser rate of

return to its "investors." (Compl. ¶ 60-62).  Mendelow and his partners retained the difference

between the rate of return paid by A&B and the returns paid to the underlying Telfran investors,

thereby ensuring a profit simply by funneling money into BLMIS. (Compl. ¶¶ 61-62).

Mendelow received his share of the profits through Teledata Financial ("Teledata"), a privately

held company partly owned by Mendelow that was created for this purpose. (Compl. ¶ 63).

Teledata made approximately $200,000 - $400,000 per year from this operation until

1993 when the SEC shut down A&B, and subsequently Telfran. (Compl. ¶ 63-66).  The SEC

investigations found that Mendelow and his entities violated the Securities Act of 1933 and the

Investment Company Act of 1940 by offering to sell and by selling unregistered securities as an

unregistered investment advisor. (*Id.*)  As a result, Mendelow, Telfran and others entered into a

consent decree with the SEC which enjoined them from further violations of the Securities Act

of 1933 (selling unregistered securities) and the Investment Company Act of 1940 (operating as

an unregistered investment advisory company). (Compl. ¶66).  The SEC consent decree required

Mendelow and Telfran to pay $50,000 and $250,000 in fines, respectively. (*Id.*)

As a result of the SEC action, BLMIS agreed to "return" money to A&B, which, in turn,

returned the money to Telfran's investors. (Compl. ¶¶ 67).  To create the appearance of sufficient

value in the BLMIS accounts to cover the money that needed to be returned to the A&B/Telfran

investors, Madoff recorded fraudulent trading activity in the relevant customer statements.

(Compl. ¶ 67-68).  Fictitious accounts were created and filled with blatantly backdated trades, in

order to generate the appearance of the millions of dollars that would be returned. (Compl. ¶ 68).

Even a cursory analysis of these fictitious account statements would have revealed that these

trades could not have possibly occurred. (Compl. ¶ 69).

### B.    Post-Telfran, Mendelow Opened Several BLMIS Accounts for His Family and Entities that He Controlled.

After Telfran was forced to close, Mendelow continued to invest his own money and pool

other investors' money for BLMIS. (Compl. ¶¶ 2, 5-6).  He did so through accounts for himself,

his wife, Nancy, his daughters Cara and Pamela, and the entities C&P Associates and FGLS

Equity, LLC. (Compl. ¶¶ 6, 9).  Mendelow formed the limited partnership C&P Associates, Ltd.

and the corporation C&P Associates, Inc., both under Florida law, in January 1988. (Compl. ¶

22).  C&P Associates, Inc. is a general partner of C&P Associates, Ltd.  Mendelow and Nancy

Mendelow are the only officers of C&P Associates Inc.  *Id.*  Its principal place of business was

Mendelow's office at Konigsberg Wolf. (*Id.*)  C&P Associates opened a BLMIS account by

early 1993. (*Id.*)  Mendelow also created FGLS in 2002 in order to further participate in and

benefit from Madoff's fraud. (Compl. ¶ 9).  FGLS was another investment vehicle operated by

Mendelow through which he invested other people's money in BLMIS. (Compl. ¶ 9).  Mendelow

controlled all of the BLMIS accounts of his wife, his daughters and C&P Associates. (Compl. ¶ 6).

## II.   After the SEC Shut Down Telfran, Mendelow Received Fraudulent Side Payments and a Guaranteed Rate of Return in Exchange for Directing Investors Back to BLMIS

After the SEC shutdown Telfran, Mendelow encouraged former Telfran investors to reinvest their money directly with BLMIS, convincing them to reinvest approximately $62 million with BLMIS. (Compl. ¶¶ 74-75).   In exchange for redirecting tens of millions in investments back into BLMIS, Madoff rewarded Mendelow through annual Fraudulent Side Payments - i.e. fictitious options transactions in certain designated BLMIS investment accounts - based upon the amount of money re-invested by former Telfran investors. (Compl. ¶¶ 75-79).

BLMIS employees created these Fraudulent Side Payments through fictitious uncovered options transactions in the designated accounts each December, so that each year those accounts would incur gains by an agreed upon, pre-determined amount. (Compl. ¶¶ 80-87, 90-91). BLMIS employees created handwritten schedules that showed the amount of fictitious gains needed to bring the account at issue to the promised rate of return and the calculation of the Fraudulent Side Payment (hereinafter "Schupt Schedule" or "Schupt Process"). (Compl. ¶ 80). For example, around December 2003, the Schupt Schedule has entries for account 1ZR179, one of Mendelow's accounts, indicating the account "NEED[ED]" $215,000, an amount that was consistent with the predetermined Fraudulent Side Payment. (Compl. ¶ 84).   The Schupt schedule further indicated that the same account was "REQ" to "purchase" units that would have a resulting profit of $215,860. (Compl. ¶ 84).   The December 2003 account statement from Mendelow's 1ZR179 account then reflects the purchase and sale of 215 "S&P 100 Index – January 500 Call" and 430 "S&P 100 Index – January 555 Call" contracts, generating $215,860 in proceeds, the exact amount indicated as "REQ" on the Schupt schedule. (Compl. ¶¶ 84-86).

7

Such blatantly fraudulent transaction activity was common in certain of Mendelow's accounts. (Compl. ¶ 90).  The purported uncovered options transactions, by which the Fraudulent Side Payments were created, claimed to create gains each year that were virtually identical to the needed amounts of the Fraudulent Side Payments to be credited to Mendelow's accounts. (Compl. ¶¶ 81-85).  These Fraudulent Side Payments ensured that Mendelow received far greater returns than ordinary BLMIS investors. (Compl. ¶ 87).

From 1993 through 2001, Mendelow and his business associates received combined Fraudulent Side Payments of 1% of the amount reinvested with BLMIS that was attributable to them. Mendelow received a 37.5% share of the Telfran-related Fraudulent Side Payment, approximately $232,000, and an additional $200,000 referred to as  "FA+MB contrib." (Compl. ¶¶ 77-78).  In 2002, the Telfran-related Fraudulent Side Payment was reduced from 1% to .5% and remained at this level until the Ponzi scheme collapsed. (Compl. ¶ 79).  As a result, Mendelow received $432,000 per year from 1993-2001, and approximately $5,116,000 in total Fraudulent Side Payments throughout the life of the his BLMIS accounts. (Compl. ¶¶ 78, 87). BLMIS tracked these payments with handwritten schedules showing the amount of fictitious gains necessary to bring the given Mendelow accounts in line with the promised Fraudulent Side Payments.

In addition to the Fraudulent Side Payments, from at least 1993 through 1996, Mendelow also received a guaranteed rate of return of 17% on his personal accounts. (Compl. ¶ 88-90). This guaranteed return replaced the fixed profits Mendelow received when he operated Telfran. (Compl. ¶ 5).  BLMIS's handwritten schedules also tracked these guaranteed rates of return to ensure that Mendelow received his pre-determined amount. (Compl. ¶ 80).

Not only did Mendelow receive a guaranteed rate of return on some accounts, but all of the Defendants' accounts received different, but consistently high, rates of return that were inconsistent with legitimate trading activity. (Compl. ¶¶ 10, 89).  While some of the Defendants' accounts had rates of return as high as 43%, others had returns of 10.4% and 14.5% in the same period. (Compl ¶ 10).  Mendelow managed BLMIS accounts for all of the Defendants and therefore knew that the rates of return among the accounts differed. (Compl. ¶ 6).  As an accountant and sophisticated investor, Mendelow knew that if two accounts were invested in the same strategy, over the same period of time, they must have identical, or nearly identical, returns.

### III.    Mendelow Closely Tracked his BLMIS Accounts to Monitor His Fraudulent Side Payments and Guaranteed Rate of Return and Directed BLMIS to Increase the Balances of Certain Accounts When BLMIS Failed to Meet the Pre-Determined "Vig"

Mendelow closely tracked his accounts to ensure that he received the guaranteed rate of return and Fraudulent Side Payments he was promised, and to which he felt entitled for his assistance in continuing the fraud at BLMIS. (Compl. ¶ 93).  Mendelow calculated the amount he understood he was owed and then compared that calculation to his monthly BLMIS account documents. (Compl. ¶ 94).  When Mendelow's calculations demonstrated a discrepancy between his account documents and his promised returns, he contacted BLMIS and directed that his account balances receive additional profits to match what he had calculated. (*Id.*)  These "corrections" typically occurred at the end of each year through fictitious option transactions. (Compl. ¶ 94).

As a result of the Fraudulent Side Payments and any "corrections," Mendelow's accounts had unusually high rates of return every December. (Compl. ¶¶ 84-85, 91).  This consistent spike in returns every December was apparent on the face of Mendelow's, Nancy Mendelow's and C&P Associates' BLMIS statements. (Compl. ¶ 91; Ex. C).  For example, in November 2003,

the monthly rate of return on Mendelow's BLMIS Account 1ZR179 was almost 0%, but in December 2003 the monthly rate of return on that same account was approximately 18%. (Compl. Ex. C at 2).   In January 2004, the monthly rate of return went back down to approximately 1%.  In Nancy Mendelow's account the December rate of return reached as high as 26%. (Compl. Ex. C at 3).  As Mendelow received and analyzed these documents, he was clearly aware of these consistent spikes in the rate of return on his accounts. (Compl. ¶ 91).

When tracking his returns, Mendelow referred to the Fraudulent Side Payments as either a "vig" or "fee." (Compl. ¶ 95).  The term "vig" or "vigorish" is commonly used by individuals involved with organized crime to describe the interest on an usurious loan. (*Id.*).  Mendelow's use of the word "vig" demonstrates his knowledge that illegal activity was occurring at BLMIS. (*Id.*).

Given this context, it is no surprise that Mendelow asserted his Fifth Amendment rights and refused to answer questions during a Rule 2004 examination conducted prior to the commencement of this Adversary Proceeding. (Compl. ¶97).  Among other things, Mendelow invoked his Fifth Amendment rights when asked about his involvement in Telfran, his relationship with A&B, and his receipt of Fraudulent Side Payments and a guaranteed rate of return. (*Id.*)

## **PROCEDURAL HISTORY**

The Trustee filed the Complaint on November 23, 2010.  In the Complaint, the Trustee seeks to avoid and recover $20,250,720 in fraudulent transfers and subsequent transfers made since 1993 to or for the benefit of the Defendants under sections 544, 548, 550(a) and 551 of title 11 of the Bankruptcy Code and sections 273-279 of New York Debtor and Creditor Law. (Compl. ¶¶ 8, 12, Ex. B).  Of this total, more than $11,435,809 constituted transfers of fictitious profits from the Ponzi scheme. (Compl. ¶¶ 8, 106).

At the time the Complaint was filed, the section 548(c) good faith defense against the avoidance of two year transfers was an affirmative defense that required only "inquiry notice" to demonstrate bad faith. *Picard v. Merkin (In re BLMIS),* 515 B.R. 117, 138 (Bankr. S.D.N.Y. 2014) *("Merkin II"); Picard v. Katz,* 462 B.R. 447, 455 (S.D.N.Y. 2011) ("*Katz*"). In accordance with the law at the time, the Trustee drafted the Complaint with language keyed to the inquiry notice standard. Since then, a trio of decisions changed the relevant legal standards to require the Trustee to prove willful blindness to avoid and recover two-year transfers of principal, and actual knowledge of the fraud to avoid and recover transfers made more than two years after the filing date.[3] Relying in part on one of those decisions—*Picard v. Katz*—the Defendants filed a Motion to Withdraw the Reference on October 27, 2011. (Dkt. Nos. 31-33). On April 15, 2013, Judge Rakoff entered the *Cohmad* decision elaborating on the actual knowledge of fraud exception to Section 546(e)'s safe harbor for post two year transfers and returned this case, among others, to the Bankruptcy Court for proceedings consistent with that opinion. *Cohmad*, 2013 WL 1609154.

After the Trustee granted Defendants' twenty-two extensions of time to respond to the Complaint,[4] the Defendants finally answered the Complaint on November 14, 2014 (Dkt. Nos. 60-65), and the parties entered into a Case Management Plan soon thereafter on January 23, 2015. (Dkt. Not 69 at 3). The Case Management Plan stated that "[t]he Parties contemplate that discovery will be needed on all liability and damages issues, and that fact and expert discovery will be needed." Case Management Plan at 3. The parties exchanged initial disclosures on January 30, 2015. On May 14, 2015, Defendants filed this Motion. No legal or factual

---

[3] *See Picard v. Katz*, 462 B.R. 447, 451-455 (S.D.N.Y. 2011) ("*Katz*"); *Grieff*, 476 B.R.715 at 719-722 (S.D.N.Y. 2012) ("*Grieff*"); *SIPC v. BLMIS*, No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. 2013) ("Cohmad").

[4] *See* Dkt. Nos. 3, 10, 18, 22, 25, 26, 28, 35, 41, 42, 45, 46, 47, 48, 49, 50, 51, 52, 54, 57, 58, 59.

circumstances had changed in the time between Defendants filing their Answer and filing this Motion.

## ARGUMENT

### I.     THE STANDARD GOVERNING RULE 12(c) MOTIONS

The standard governing a motion for judgment on the pleadings made pursuant to Federal Rule of Civil Procedure ("FRCP") 12(c) is the same as the standard that is applicable to a motion to dismiss made pursuant to FRCP 12(b)(6). *Nogbou v. Mayrose*, 400 F. App'x 617, 619 (2d Cir. 2010) (citation omitted).  When faced with a motion for judgment on the pleadings under FRCP 12(c), "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant, and deny the motion unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (*Id.*) (citation and internal quotation marks omitted); *see also Greco v. Trauner, Cohen & Thomas, L.L.P.,* 412 F.3d 360, 363 (2d Cir. 2005) (citation and internal quotation marks omitted) ("a complaint should not be dismissed under Rule 12(c) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

"'To survive a motion to dismiss, the complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Determining whether a claim is plausible is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Merkin II,*  515 B.R. 117, 137 (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility

requirement is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 768.  Whereas legal conclusions "are not entitled to the assumption of truth," the "court should give all 'well-pleaded factual allegations' an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief." *Id*. at 137 (quoting *Iqbal*, 556 U.S. at 679).

It is particularly important for the Court to draw reasonable inferences from well-pleaded facts in favor of the plaintiff with respect to a defendant's knowledge or state of mind, as such elements are rarely proven by direct evidence:

> To be sure a defendant's admission of actual knowledge of the underlying fraud is likely to be rare.  But such direct evidence of actual knowledge is not necessary to establish this element of the claim.    Rather, actual knowledge may be inferred from circumstantial evidence, provided that the central inquiry remains whether the evidence permits a reasonable finder of fact to infer that the defendant *actually* knew of the underlying fraud.

*Silverman v. A-Z Rx, LLC (In re Allou Distribs., Inc.)*, No. 04-8369-ESS, 2012 WL 6012149, at *16 (Bankr. E.D.N.Y. Dec 3, 2012) (quoting *Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs, Inc.)*, 446 B.R. 32, 51-52 (Bankr. E.D.N.Y. 2011)); *see also Kirschner v. Bennett (In re Refco Secs. Litig.)*, 759 F. Supp. 2d 301, 335 (S.D.N.Y. 2010) ("Refco") ("actual knowledge may be also be implied from a strong inference of fraudulent intent" and "a "motive can provide a part of the inference") (internal marks omitted). Furthermore, at the pleading stage it is particularly appropriate to infer actual knowledge of fraud from circumstantial evidence. *See Refco,* 759 F.Supp. 2d at 335.

## II.     THE SECTION 546(e) SAFE HARBOR DOES NOT PROTECT THE DEFENDANTS

The Complaint seeks to avoid all fraudulent transfers received by the Defendants from BLMIS over the life of their accounts pursuant to the Bankruptcy Code and New York Debtor

and Creditor Law.  In their Memorandum of Law in Support of Motion for Judgment on the Pleadings ("Mem."), the Defendants erroneously contend that the so-called "safe harbor" provision contained in Section 546(e) of the Bankruptcy Code prohibits all of the Trustee's claims, "as a matter of law," except for Count One of the Complaint which seeks to avoid actual fraudulent transfers to Defendants C&P Associates and Cara Mendelow under Section 548(a)(1)(a). (Mem. at 11 (citing *Ida Fishman, Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411, 415-23 (2d Cir. 2014))).   Specifically, the Defendants argue that "claims alleging constructive fraud, all claims under New York's Debtor & Creditor Law, and all claims based on transfers outside the relevant two-year period must be dismissed for failure to state a claim." *Id.*

The Defendants confuse the legal standards applicable to the Trustee's avoidance claims. In particular, they fail to recognize the "actual knowledge" exception to Section 546(e) as adopted by Judge Rakoff in *Cohmad* and applied by this Court in *Merkin II.* (Mem. at 9-10). The "safe harbor" of Section 546(e) does not automatically mandate dismissal of all claims in the Complaint seeking transfers outside the two year period.  Rather, as this Court and the District Court have made clear, the safe harbor does not protect individuals, such as the Defendants, who did not have the reasonable expectations of legitimate investors that Madoff was trading securities on their behalf. *Cohmad*, 2013 WL 1609154 at *4.   As the facts alleged in the Complaint demonstrate, Mendelow was not an innocent investor because he knew of the fraud at BLMIS and participated in the execution of fraudulent transactions for his own personal benefit. He is exactly the type of individual the 546(e) safe harbor does *not* protect.   Therefore the Defendants, cannot claim the protection of Section 546(e). [5]

---

[5] Relying on basic tenets of agency, Mendelow's knowledge of the fraudulent trading activity at BLMIS and the Trustee's allegations concerning that knowledge are imputed to the other defendants in this action. (Compl. ¶ 23). Defendants motion for judgment on the pleadings does not challenge such imputation.

Defendants similarly misconstrue the applicability of the 548(c) good faith defense. (Mem. at 12-19). In this case, the Trustee is not seeking to avoid under section 548(a)(1)(A) any fraudulent transfers of principal within the two year period. (Compl. at Ex. B). Rather all the transfers to the Defendants in that period constituted fictitious profits, which the Defendants concede may be recovered by the Trustee based upon the allegations in the Complaint. Furthermore, because the Complaint establishes the Defendants' "actual knowledge" of fraud, the Trustee has sufficiently pled the requisite "lack of good faith" to survive a motion to dismiss. The 548(c) good faith defense is inapplicable here.

A.  **The Section 546(e) Safe Harbor Only Protects Innocent Investors Who Did Not Have Actual Knowledge of Madoff's Fraud**

The section 546(e) safe harbor prevents a trustee from avoiding "a transfer that is…[a] settlement payment" or "a transfer made by…[a] stockbroker…in connection with a securities contract," except in cases of actual fraud under 11 U.S.C. § 548(a)(1)(A). *See Merkin II*, 515 B.R. at 138 (citing *Cohmad*, 2013 WL 1609154 at *6). The safe harbor is intended to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *In re Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011) (citations omitted). The District Court has held that "[in] the context of Madoff Securities' fraud, that goal is best achieved by protecting the *reasonable expectations of investors who believed they were signing a securities contract*." *Cohmad*, 2013 WL 1609154 at *4 (emphasis added).

Applying the safe harbor in a trilogy of cases, the District Court held that investors who understood BLMIS to be acting as their stockbroker had agreements with BLMIS that were securities contracts. *Katz*, 462 B.R. at 451-52*; Grieff*, 476 B.R. at 720; *Cohmad*, 2013 WL 1609154 at *2-3. The District Court further held that transfers from BLMIS to those customers

15

were settlement payments in connection with those securities contracts and thus fell within the

safe harbor of section 546(e). *Grieff*, 476 B.R. at 720-21; *Katz*, 462 B.R. at 452; *Cohmad*, 2013

WL 1609154 at *3.    Under the District Court's reasoning, the safe harbor protects legitimate

investors who reasonably believed that BLMIS was trading securities on their behalf.    *Katz*, 462

B.R. at 452 n.3; *Grieff*, 476 B.R. at 720; *Cohmad*, 2013 WL 1609154 at *4.    But an investor with

no such belief, like the Defendants, who "had actual knowledge of Madoff's scheme[,]…stands

in a different posture from an innocent transferee, even as concerns the application of Section

546(e)." *Cohmad*, 2013 WL 1609154 at *4.    As the District Court explained:

> [A] transferee who had actual knowledge of the Madoff "Ponzi"
> scheme did not have any such expectations, but was simply
> obtaining moneys while he could.    Neither law nor equity permits
> such a person to profit from a safe harbor intended to promote the
> legitimate workings of the securities markets and the reasonable
> expectations of legitimate investors.

*Cohmad*, 2013 WL 1609154  at *4; *see also O'Connell v. Penson Financial Servs. Inc. (In re

Arbco Cap. Mgmt., LLP)*, 498 B.R. 32, 43-44 (Bankr. S.D.N.Y. 2013) ("*Arbco*") (holding that a

Chapter 7 trustee had adequately pled defendant's willful blindness, sufficient to overcome the

section 546(e) safe harbor).

The section 546(e) safe harbor inquiry, therefore, "turn[s] on the investors' understanding

of what they had contracted for." *Picard v. ABN AMRO Bank (Ireland) Ltd. (Secs. Investor Prot.

Corp. v. Bernard L. Madoff Inv. Secs. LLC)*, 505 B.R. 135, 142 n.6 (S.D.N.Y. 2013).    The safe

harbor does not protect "actual participants in the fraud" or those "who had actual knowledge of

its workings (and thereby effectively participated in it by taking advantage of its workings)"

because "unlike innocent customers, they would not have believed that the settlement payments

were entirely bona fide." *Cohmad*, 2013 WL 1609154 at *4 (quoting *Katz*, 462 B.R. at 452 n.3).

16

Further, an investor with "actual knowledge that there were no actual securities transactions being conducted" at BLMIS could also not have expected that his securities contracts with BLMIS were "entirely bona fide." *Cohmad*, 2013 WL 1609154 at *4. A transferee may have lacked insight into the exact nature of Madoff's fraud, but may have known that there were no actual securities being traded in his or her account. In this scenario, the investor cannot avail himself of section 546(e) because he had no legitimate expectations that the transfers received from BLMIS were "settlement payments" or "transfers" made "in connection with a securities contract." 11 U.S.C. § 546(e); *Cohmad*, 2013 WL 1609154 at *4. Indeed, it would be an absurd and inequitable result to allow an investor who actually knew his "securities contracts" with, and "settlement payments" from, BLMIS were premised on fraud to be granted refuge in a safe harbor reserved for innocent customers.

Under this standard, as established by the three District Court cases summarized above, the Trustee can defeat the safe harbor by establishing the Defendants' actual knowledge of Madoff's fraud, or Madoff's scheme, or Madoff's Ponzi, or that no actual securities were being traded. If the Defendants had knowledge of any one of these, they had no reasonable expectation their securities contracts or transfers were bona fide, and they cannot invoke the safe harbor defense.

The detailed, non-conclusory allegations in the Complaint satisfy all articulations of the applicable standard. They establish Mendelow's actual knowledge of BLMIS's fraud, the fact that no actual securities transactions were taking place in the Defendants' accounts, Mendelow's coordination with Madoff to continue the fraud, and his actual participation in the scheme itself. The totality of these allegations "provide [more than] enough detail to get the Trustee to trial." *Arbco*, 498 B.R. 32 at 44.

**B.    The Specific Factual Allegations in the Mendelow Complaint Control Whether the Trustee has Pled Actual Knowledge**

Defendants fault the Trustee for framing the allegations in the Complaint as a matter of "inquiry notice" rather than "direct and clear knowledge" of Madoff's fraud. (Mem. at 13, citing *Merkin II*, 515 B.R. at 139).  However, a complaint's sufficiency depends on the non-conclusory facts alleged and the reasonable inferences drawn therefrom, not the express inclusion of certain words in conclusory allegations.  The District Court in *Cohmad* had no trouble drawing the inference of the defendants' actual knowledge of Madoff's fraud despite the absence of any explicit allegations in the complaint that the defendants actually knew Madoff was conducting a "Ponzi scheme." *Cohmad*, 2013 WL 1609154, at *6 (identifying factual allegations supporting actual knowledge).

Lastly, the Defendants themselves acknowledge that the Complaint alleges "that Mendelow 'knew or should have known' that BLMIS was not a legitimate securities trading operation'" and that it is the facts alleged, not the specific words used, which are at issue. (*See* Mem. at 13, 19).  Regardless of the terminology used, the totality of the facts alleged in the Complaint show Mendelow's actual knowledge of the fraud at BLMIS.

**C.    The Trustee Has Alleged More Than Sufficient Evidence of Mendelow's Actual Knowledge of Madoff's Fraud**

In the Complaint, the Trustee alleges facts demonstrating that Mendelow, and by imputation all of the Defendants, knew that they were profiting from fraud at BLMIS and that Mendelow helped to keep the Ponzi scheme afloat by funneling money into BLMIS for almost twenty years.[6] (Compl. ¶¶ 10, 73-77).  The Defendants' attempts to belittle those allegations as

---

[6] Defendants note that FRCP. 9(b) requires that in alleging fraud a party must state with particularity the circumstances constituting the fraud. (Mem. at 14.).  However, with respect to the heightened pleading standard required by Rule 9(b), this Court has found that a complaint must state facts concerning the property transferred with particularity, but "fraudulent intent may be plead generally under Rule 9(b)." *Picard v. Chais (In re BLMIS),* 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011); *see also Picard v. Merkin (In re BLMIS),* 440 B.R. 243, 254 (Bankr.

"speculative and conclusory *on their face*" and "without reference to any supporting facts" are meritless. (Mem. at 14). As explained below, from the detailed factual allegations of the Complaint, taken as true for the purposes of the Motion, it is more than plausible—indeed a finder of fact could reasonably infer and conclude—that Mendelow knew of and took full advantage of BLMIS's fraud. Mendelow knew that the transfers Defendants received from their BLMIS accounts were not legitimate "settlement payments" and could not have been made in connection with an actual bona fide securities contract. Mendelow's conduct reveals that he had "actual knowledge of [the fraud's] workings (and thereby effectively participated in it by taking advantage of its workings)." *Cohmad*, 2013 WL 1609154, at *4.

> **1.    Telfran's Pre-Determined Guaranteed Rate of Return Demonstrated to Mendelow that Madoff was a Fraud**

The Complaint specifically alleges that Mendelow began profiting from BLMIS as early as the late 1970s when he invested in A&B. (Compl. ¶ 58). After understanding how A&B profited by raising money for BLMIS, Mendelow and his business associates, including Glantz, founded Telfran to make money from the BLMIS Ponzi scheme. (Compl. ¶¶ 58, 62). A&B provided Telfran a guaranteed rate of return on the funds it deposited, and, in turn, Telfran provided its investors a guaranteed, but smaller, rate of return. (Compl. ¶¶ 4, 60-62). This "ability" to guarantee a rate of return on a market-based securities investment is impossible. As an accountant and sophisticated investor, Mendelow knew that if legitimate trading activity was taking place, a rate of return could never be guaranteed. The fact that Mendelow relied on this guaranteed rate of return when setting the interest rate he promised to Telfran investors demonstrates his knowledge that fraudulent trading activity was occurring at BLMIS.

---

S.D.N.Y. 2010) ("[m]alice, intent, knowledge, and other conditions of a person's mind" may be pleaded generally) (quoting FRCP. 9(b)).

## 2.    The Fraudulent Side Payments

Mendelow demanded and received from Madoff annual Fraudulent Side Payments based on a percentage of the approximate total of $62 million that former Telfran clients reinvested directly with BLMIS after the SEC shut down A&B and Telfran. (Compl. ¶¶ 74-79).  While the Defendants attempt to characterize the over $5.1 million the Defendants received in Fraudulent Side Payments as "essentially commissions" (Mem. at 5), the method by which they were created belies any legitimacy and, indeed, they were merely artificial boosts to the balances of certain designated accounts. (Compl. ¶¶ 80-87).

Mendelow received the Fraudulent Side Payments in certain BLMIS accounts via the Schupt Process, which was limited to specially favored BLMIS investors. (Compl. ¶ 80).  The purported options transactions used to generate the amounts of the Fraudulent Side Payments could not have occurred every year at the precise amounts Mendelow was promised "without the benefit of hindsight, backdating and fraud." (Compl. ¶¶ 83, 86).  In or around December of each year, highly profitable options transactions would magically appear on certain designated account statements that approximated the precise value of the Fraudulent Side Payments due. (Compl. ¶¶ 91-92).  Thus, BLMIS purported to be able to reach the predetermined amount on demand and at a specific time, independent of market conditions. (*Id.*)  This made the fraudulent character of the purported option transactions readily apparent on the face of Mendelow's statements. (*Id.*)

Mendelow knew that he was receiving these Fraudulent Side Payments in this manner as evidenced by the fact that he closely monitored his accounts and checked his statements to make sure that he received the full amount he had been promised by Madoff. (Compl. ¶ 93).  Indeed,

Mendelow referred to the Fraudulent Side Payments as a "vig." (Compl. ¶ 95).[7] Mendelow's use

of this term to describe the Fraudulent Side Payments demonstrates his knowledge that he was

profiting from the corrupt and illegal trading practices at BLMIS. (*Id.*) Mendelow only received

the Fraudulent Side Payments in three of the BLMIS accounts under his control – his IRA

account, his wife's IRA account, and C&P Associates' account.[8] (Compl. ¶ 90).

The Defendants have offered an alternative explanation for Mendelow's "concerns"

about receiving the Fraudulent Side Payments, (Mem. at 5 n.3; 15), but that theory carries no

weight at this stage. The Defendants do not dispute that the Complaint sufficiently alleges that

Mendelow knowingly received the Fraudulent Side Payments, they only argue that his concerns

regarding "any impropriety" in those payments were not related to knowledge of fraud, but

rather to complying with the SEC consent decree in the Telfran matter. (Mem. at 14-15). Even if

the Defendants' theory were plausible, which it is not, it should be disregarded. "If there are two

alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of

which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."

*Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also Anderson News, LLC. v. Am. Media,*

*Inc.,* 680 F.3d 162, 184 (2d Cir. 2012) ) ("The choice between or among plausible inferences or

scenarios is one for the fact-finder.") (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S.

752, 766 n. 11 (1984)); *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st

Cir. 2013) ("It is not for the court to decide, at the pleading stage, which inferences are more

---

[7] Defendants argue that there are uses outside of the criminal context for the term "vig" (Mot. at 14, n.6); however, on a Motion for Judgment on the Pleadings it is not appropriate to consider facts submitted by the Defendants which are outside of the Complaint. For purposes of this motion "vig" is a term commonly used in a criminal context. (Compl. ¶ 95)

[8] Mendelow and Nancy Mendelow are the only officers of C&P Associates and it is an entity they owned, formed, funded, dominated, and controlled. (Compl. ¶ 25).

plausible than other competing inferences, since those questions are properly left to the factfinder." (citing *Monsanto,* 465 U.S. at 766 n. 11)).

### 3.  Mendelow Knew that the BLMIS Guaranteed Rate of Return Was Impossible

In addition to the Fraudulent Side Payments, Mendelow also received a second benefit in the form of the guaranteed returns in his BLMIS accounts. (Compl. ¶ 88).  At a rate of 17% from at least 1993 through 1996, these guaranteed returns were effectively a continuation of the profits that Mendelow had received through A&B prior to the SEC actions. (Compl. ¶¶ 60-63, 88).  Mendelow knew that he was receiving these guaranteed returns as evidenced by the fact that he monitored his accounts to ensure that he received them every year. (Compl. ¶ 93).  Mendelow's receipt of a guaranteed rate—not merely consistent or high rates—highlights his knowledge that BLMIS was not engaged in legitimate trading practices. (Compl. ¶ 89).  Such guaranteed results are impossible to achieve through investments in the securities markets. (Compl. ¶ 89).

### 4.  Mendelow Tracked the Fraudulent Trading Activity in His BLMIS Accounts and Demanded His Pre-Determined Amount in Fake Trades When Madoff Fell Short

Mendelow not only reviewed and monitored his BLMIS account statements but directed BLMIS to increase the value of his accounts through fictitious options transactions when he perceived a shortfall. (Compl. ¶¶ 94, 96).  Mendelow independently calculated the value of his BLMIS account balances based upon the guaranteed rate of return and Fraudulent Side Payments that Madoff had promised to him. (Compl. ¶ 94).  He compared this expected value with the actual amounts stated on the reports he received from BLMIS.  In instances where he discovered that he had not received the full value of the guaranteed returns and Fraudulent Side Payments, he "instructed BLMIS to make up any shortfall." (Compl. ¶¶ 94-96).  BLMIS complied with his demands by purporting to enter into fictitious options transactions at the end of each calendar

year which provided exactly the amount of additional returns necessary to correct the balances of Mendelow's accounts. (Compl. ¶ 96).  Thus, Mendelow not only knew that BLMIS was engaged in fraudulent trading practices, but was directly involved in the fabrication of options transactions in his accounts for his own personal benefit.

### 5.    This Court Should Draw an Adverse Inference from Mendelow's Invocation of His Fifth Amendment Rights

During a Rule 2004 examination conducted prior to the commencement of this Adversary Proceeding, Mendelow invoked his Fifth Amendment right against self-incrimination and refused to answer questions regarding his involvement in Telfran, his relationship with A&B, his receipt of Fraudulent Side Payments and his receipt of guaranteed rates of return. (Compl. ¶ 97). As a result, this Court should draw an adverse inference from these assertions that Mendelow had actual knowledge of BLMIS's fraud, just as the District Court suggested in *Cohmad* with respect to a defendant who had invoked his Fifth Amendment rights when asked about Madoff and BLMIS. *See Cohmad,* 2013 WL 1609154, at *6, n.4; *see also In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 208 n.17 (S.D.N.Y. 2006) (noting that the court is permitted to draw an adverse inference from defendants' invocation of Fifth Amendment in considering and ultimately denying motion to dismiss fraud claims) (citations omitted); *SEC v. Berry*, No. C-07-04431 RMW, 2008 WL 4065865, at *5 (N.D. Cal. Aug. 27, 2008) (holding that defendant's invocation of the Fifth Amendment permitted the court to draw an unfavorable inference and required denial of her motion to dismiss fraud claim).

### D.    The Allegations of Knowledge and Participation in the Fraud Against Mendelow Are Stronger Than Those Alleged in Merkin

The Defendants ask the Court to compare the allegations in the Complaint with those alleged against J. Ezra Merkin ("Merkin"). (Mem. at 15-17).  The Defendants list several factual allegations from the Merkin Third Amended Complaint ("Merkin TAC") that they claim are

23

more "specific and direct" than those in the Mendelow complaint. (Mem. at 15). In doing so, the Defendants fail to recognize that the Trustee's allegations in this case stand on their own, as they do in each of the Trustee's avoidance actions.

Indeed, the facts detailed in the Mendelow Complaint demonstrate an even greater knowledge of, and participation in, BLMIS's fraud than those alleged in the Merkin TAC. Mendelow was involved in the perpetuation of the fraud at BLMIS for over 20 years. Even when Telfran was shut down by the SEC Mendelow was undeterred and encouraged former Telfran investors to reinvest with Madoff. Mendelow received a rate of return that was more than merely consistent, it was guaranteed—an impossible result for securities trading. Mendelow also knowingly received the annual Fraudulent Side Payments. As discussed above, this artificial inflation to designated account balances, accomplished through fictitious options transactions, was fraudulent on its face. Most tellingly, Mendelow monitored whether he received the full amount of the guaranteed return and Fraudulent Side Payments and directed BLMIS to make up any shortfall through additional fraudulent options transactions in his accounts. Thus, Mendelow directly participated in the workings of the fraud for his own personal benefit. Finally, when questioned about each of these facts, Mendelow asserted his Fifth Amendment rights and refused to answer. None of these facts were alleged against Merkin.

The Court should ignore the Defendants' attempt to cherry-pick allegations from *Merkin II*, and then jump to the conclusion that because the Court did not find a basis for actual knowledge against Merkin, there is none here. Although certain basic facts may be similar in both cases, the differences are material. When the Trustee's factual allegations in the Complaint are read in their totality, it is readily apparent that Mendelow had actual knowledge of the fraud at BLMIS, and *Merkin II* does not preclude that finding at this early stage.

### E.    Defendants Cannot Rely on the "Good Faith" Defense of Section 548(c)

A substantial portion of the Defendants' Memorandum of Law concerns their argument that the affirmative defense set forth in Section 548(c) of the Bankruptcy Code defeats certain of the Trustee's claims. (Mem. 12-19).  However, Section 548(c) is entirely irrelevant to this case. As Defendants concede, Section 548(c) provides no defense to the approximately $825,000 in "fictitious profits" transferred to C&P Associates and Cara Mendelow in the two-year period prior to the Filing Date. (Mem. at 12).  Since the Complaint does not seek to avoid any transfers of principal within the two-year period, Section 548(c) provides no defense to Count One. Furthermore, as set forth above, the allegations in the Complaint establish that the Defendants knew of BLMIS's fraud.  Thus the Complaint more than satisfies the Trustee's burden to plead the Defendants' lack of good faith. *See Katz*, 462 B.R. at 454-55 (To establish a good faith defense, the Defendants must show that they did not know of the fraud or were not "willfully blind" to the high probability of fraud at BLMIS.)   Accordingly, Section 548(c) does not preclude any of the Trustee's claims.

## III.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT THE TRUSTEE LEAVE TO AMEND THE COMPLAINT

The detailed non-conclusory allegations in the Complaint, and the reasonable inferences to be drawn from them, are more than sufficient to establish Mendelow's actual knowledge of the fraud and the avoidability of each of the transfers identified in the Complaint.  However, to the extent that the Court finds that the Complaint fails to state a claim for relief with respect to transfers beyond the two year period, the Trustee should be granted the opportunity to amend the Complaint.

Pursuant to FRCP 15(a)(2), "[t]he court should freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2).  It is well-settled that motions to amend

should be denied only for "good reason," such as "undue delay, bad faith, futility of amendment, or undue prejudice to the opposing party." *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.,* 304 F.R.D. 170, 174, 176-78 (S.D.N.Y 2014) (citations omitted) (granting leave to amend where the case was early in the discovery process and would not cause undue prejudice or burden); *see also* 1 Steven S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary § 15 at 307 (2014 ed.) (Federal Rules adopt a liberal amendment policy and practice courts may deny leave to make pretrial amendments under Rule 15(a) only for good reason, such as futility or prejudicial delay).  In this case, granting the Trustee leave to amend the Complaint is both fair and equitable because of the change in the law and Defendants' transparent gamesmanship which caused the Trustee to forego his opportunity to amend the Complaint as a matter of course. Fed. Rule of Civ. Pro. 15(a)(1)(B).

As discussed above, the Trustee filed his Complaint against the Defendants in 2010, and the Defendants answered approximately four years later.  The Defendants filed their Answers with full awareness of the series of district court decisions that had applied the Section 546(e) safe harbor to limit the Trustee's ability to avoid and recover transfers past the two year period – *e.g. Katz, Grieff,*[9] *Cohmad*, and this Court's decision in *Merkin II*, on which the Motion is premised.  Relying explicitly on *Katz*, the Defendants filed a Motion to Withdraw the Bankruptcy Reference in 2011 arguing, among other things, that in, *Katz*, "this Court recently dismissed nearly all of the Trustee's claims, holding that the 'safe-harbor' exception of § 546(e) of the Code essentially bars the Trustee from bringing claims other than those alleging actual fraud."  Defendants Memorandum of Law In Support of Their Motion to Withdraw the Reference at 7, Dkt. No. 32 (Bankr. S.D.N.Y. 2011).  Thus, by the time the case was remanded

---

[9] The decision in *Greiff* was affirmed on appeal under the caption *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411 (2d Cir. 2014).  Defendants rely on this Second Circuit decision throughout their memorandum of law.

back to the Bankruptcy Court consistent with the District Court's 546(e) *Cohmad* opinion in
April 2013, the Defendants were well aware of the applicable law.

At any point prior to answering, the Defendants could have filed a Rule 12(b)(6) motion
to dismiss on section 546(e) grounds consistent with their motion to withdraw the reference.
They chose not to.  Instead, they not only answered the Complaint, but then shortly thereafter
agreed to a Case Management Plan in January 2015. (Dkt. No.  69).  In the Case Management
Plan, the parties agreed that "discovery will be needed on all liability and damages issues, and
that fact and expert discovery will be needed." *See* Case Management Plan at 1.  In addition, the
parties represented to the Court that they were not "aware of any other matter that may add to the
just and expeditious disposition of this matter." (*Id.*)  In light of this agreement to proceed with
discovery on the merits, and the fact that Defendants had answered the Complaint, the parties
represented to the Court at that time, that they did "not contemplate any amendments to the
pleadings or joinder of additional parties." *See* Case Management Plan at 2.

It was not until six months after they answered, and after the exchange of initial
disclosures, that Defendants filed this motion for judgment on the pleadings based on Section
546(e).  The Defendants' lengthy and unexplained delay in filing their motion effectively caused
the Trustee to forego his right to amend the Complaint, and appears to have been pure
gamesmanship.  Under these circumstances, where the Defendants are challenging the Complaint
based on grounds they had available over a year ago, it would be inequitable and unfair to deny
the Trustee leave to amend the Complaint, in the event the Court were to find the Complaint
lacking in any way.

Defendants' argument that the Trustee has unduly delayed by not previously amending
the Complaint turns the relevant procedural history on its head.  Defendants repeatedly asked for

and received twenty-two extensions of time to respond to the Complaint.  Thus, the purported

five-year delay was solely due to the Defendants' actions, not the Trustee's.  Defendants only

answered the Complaint on November 14, 2014, and even then, they caused more delay by

waiting six additional months before filing a motion for judgment on the pleadings, despite the

fact that there had been no intervening changes to the legal standards affecting the case, nor to

the facts at issue.  Under these circumstances, it can hardly be said that the Trustee acted in "bad

faith" with a "dilatory motive" and caused "undue delay." (Mem. at 20) (citing *In re Tiligent,

Inc.,* 346 B.R. 73, 76 (Bankr. S.D.N.Y. 2006) (internal quotations omitted)).  To the contrary, to

the extent the Trustee would seek leave to amend at this time, the Trustee's actions are a

reasonable and timely response to the dilatory tactics employed by the Defendants themselves.

Similarly any amendment by the Trustee of the Complaint would not prejudice the

Defendants.  "In determining what constitutes prejudice, [courts] generally consider whether the

assertion of the new claim or defense would (i) require the opponent to expend significant

additional resources to conduct discovery and prepare for trial; (ii) significantly delay the

resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another

jurisdiction."  *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000)

(citation omitted); see also *Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008) ("Undue

prejudice arises when an amendment comes on the eve of trial and would result in new problems

of proof"). (citation and internal quotation marks omitted).  Here there would be no new claim or

defenses, just additional facts and therefore no prejudice.  In addition, discovery has only

recently commenced and an amendment would not significantly delay the resolution of the

dispute.  Because an amended complaint would seek to avoid the same transfers and would not

28

add any additional causes of action, it would not change the scope of discovery, and would have little, if any, effect on preparing for trial.

Defendants' only claim of potential prejudice rests on a nonsensical distinction. Defendants argue that they would suffer prejudice from an amendment because "the proof needed to disprove allegations of *subjective willful blindness* would be entirely different from the evidence required for allegations of *objective inquiry notice*." (Mem. at 21). Their argument misses the mark.  It is never the Defendants' burden to disprove the allegations, it is the Trustee's burden to prove his allegations and meet the applicable legal standard.  Furthermore, in the event the Court grants the Trustee leave to amend, the legal standard the Trustee is required to meet would not change.  Defendants would not be prejudiced by any amendment because they would not be required to expend any additional resources and it would not delay resolution of this dispute.

## CONCLUSION

The Complaint more than sufficiently alleges facts, which, if taken as true, establish Mendelow's knowledge of, and involvement with, Madoff's fraud.  For these reasons, and all the reasons set forth above, the Trustee respectfully requests that the Motion be denied in its entirety, or in the alternative, that the Trustee be granted leave to amend the Complaint.


Date:  New York, New York
   August 6, 2015

Respectfully submitted,

*/s/ Jonathan B. New*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Robyn M. Feldstein
Email:  rfeldstein@bakerlaw.com


*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Estate of Bernard L. Madoff*