**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | (Substantively Consolidated) |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05394 (SMB) |
| Plaintiff, | |
| v. | |
| RICHARD M. GLANTZ, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE TRUSTEE'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ..........................................................................................................4

A.    Glantz and Edward Glantz Participated Early on in the Madoff Fraud by Soliciting and Steering Investors into the Avellino & Bienes Feeder Fund........................................................................................4

B.    After the SEC Shut Down Their Sub-Feeder Funds, Glantz and Edward Glantz Opened New BLMIS Accounts that They Managed and Monitored on Behalf of Various Investment Vehicles....................................................................................................7

C.    Glantz and Edward Glantz Were Rewarded by Madoff in the Form of Fake Options Trades .....................................................................8

D.    Glantz and Edward Glantz Were Aware Their BLMIS Accounts Received Guaranteed, Impossibly Consistent, Rates of Return .................................................................................................11

E.    Glantz and Edward Glantz Were Aware of Other Indicia of Fraud ..............................................................................................13

F.    Glantz Assumed Fiduciary Duties to His Investors, Including the Duty to Undertake Diligence on Madoff .............................................14

G.    Glantz Assisted Madoff by Deflecting Scrutiny by Actual and Prospective Investors .................................................................15

H.    Asserting the Fifth Amendment, Glantz Refused to Testify as to Any Facts Concerning Madoff, the Fraud or His BLMIS Accounts ..............................................................................................17

ARGUMENT.............................................................................................................................17

I.    STANDARDS GOVERNING RULE 12(b)(6) MOTIONS...................................17

II.    DEFENDANTS CANNOT INVOKE THE SECTION 546(e) SAFE HARBOR ....................................................................................................19

A.    The Section 546(e) Safe Harbor Only Protects Innocent Investors Who Did Not Have Actual Knowledge of Madoff's Fraud .................................................................................................20

B.    The Trustee Adequately Alleges Glantz's and Edward Glantz's Actual Knowledge of, and Participation in, Fraud at BLMIS ..................22

# TABLE OF CONTENTS
## (continued)

**Page**

1. The Fraudulent Side Payments Demonstrate that Glantz and Edward Glantz Knew that BLMIS Was Making Fake Trades ....................................................................................24

2. Glantz and Edward Glantz Knew that the Guaranteed Rates of Return Were Impossible ...................................................27

3. Negative Account Balances Demonstrated to Glantz and Edward Glantz that the Account Statements were Fraudulent .....................................................................................28

4. Glantz and Edward Glantz Knew that BLMIS's Strip Mall Auditor Was Incapable of Auditing the Billions in Assets Under Management at BLMIS ...........................................29

5. Glantz Knowingly Facilitated Madoff's Fraud by Shielding BLMIS from Scrutiny....................................................30

C. The Allegations of Actual Knowledge Against Glantz and Edward Glantz are Different From Those Alleged in *Merkin II* ...............32

III. DEFENDANTS CANNOT INVOKE THE § 548(c) DEFENSE........................33

A. The Fraudulent Side Payments Are Not Compensation for Value ......................................................................................33

B. Defendants Did Not Receive Transfers In Good Faith.............................35

1. At a Minimum, Glantz and Edward Glantz were Willfully Blind to Madoff's Fraud.................................................35

2. Glantz Had a Duty to Investigate BLMIS......................................36

3. Glantz's and Edward Glantz's Profit Motive Provided Every Incentive to Turn a Blind Eye .............................................37

IV. GLANTZ'S AND EDWARD GLANTZ'S ACTUAL KNOWLEDGE AND WILLFUL BLINDNESS SHOULD BE IMPUTED TO THE OTHER DEFENDANTS ....................................................................................39

V. THE TRUSTEE HAS PROPERLY PLED HIS SUBSEQUENT TRANSFEREE CLAIM .....................................................................................42

VI. THIS COURT HAS ALREADY REJECTED A NUMBER OF DEFENDANTS' ARGUMENTS .........................................................................45

# TABLE OF CONTENTS
## (continued)

**Page**

A.  The Trustee Can Avoid Transfers From Before BLMIS was Formed as an LLC in 2001 ........................................................................45

B.  The Ponzi Scheme Presumption is Applicable In This Case ....................47

C.  The Current Value of the Customer Fund Has No Impact on the Trustee's Ability To Bring Avoidance Actions ...................................47

D.  Defendants' Request For A Stay Of This Action, Pending Sufficient Recoveries In Other Actions, Should Be Rejected ..................49

E.  California and New York Law Do Not Prevent the Trustee From Avoiding Transfers From BLMIS Accounts Held in the Name of IRAs ...........................................................................................51

F.  The Bankruptcy Court Has Jurisdiction Even If Defendants Demand A Jury Trial ................................................................................52

VII.  DEFENDANTS' REMAINING ARGUMENTS FAIL ........................................53

A.  The Complaint Properly Alleges A Constructive Fraudulent Transfer Claim Because It Adequately Pleads Lack of Good Faith .......................................................................................................53

B.  The Court Has Jurisdiction Over Merlin, Enhancement, G-O Trust I, G-O Trust II, ERG Trust and TG Trust.........................................54

C.  Claims Against the Estate of Edward Glantz Are Not Time Barred......................................................................................................55

D.  The Count for General Partnership Liability Was Properly Pled .............57

E.  Defendants Are Limited to Arguments Made In Their Motion to Dismiss...............................................................................................58

CONCLUSION....................................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Alstom SA Sec. Litig.*,
  454 F. Supp. 2d 187 (S.D.N.Y. 2006) ...................................................................19

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
  351 F. Supp. 2d 79 (S.D.N.Y. 2004) .....................................................................19

*Anderson News, LLC. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ...........................................................................18, 24

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010) ...................................................................38

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................18, 30

*Balaber-Strauss v. Lawrence*,
  264 B.R. 303 (S.D.N.Y. 2001) .............................................................................35

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
  256 B.R. 664 (Bankr. S.D.N.Y. 2000) .............................................................34, 35

*BCS Investments, Inc. v. Lorenz*,
  No. D061999, 2013 WL 5862763 (Cal. Ct. App. Oct. 31, 2013) ..........................56

*In re Beiny*,
  No. Civ. A. 621-M/2002, 2009 WL 1050727 (N.Y. Sur. 2009) .............................55

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................................17

*Bigio v. Coca-Cola Co.*,
  675 F.3d 163 (2d Cir. 2012) ..........................................................17, 29, 30, 31

*Braswell v. United States*,
  487 U.S. 99 (1988) .............................................................................................30

*Budget Rent a Car Corp. v. Coregis Ins. Co.*,
  No. H032480, 2011 WL 1236142 (Cal. Ct. App. Apr. 4, 2011) ............................55

*Cement Kiln Recycling Coal v. E.P.A.*,
  55 F.3d 855 (D.C. Cir. 2001) ................................................................................59

*Center v. Hampton Affiliates, Inc.*,
  488 N.E.2d 828 (N.Y. 1985) ................................................................................39

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) .................................................54

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011)..................................................20

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013).............................................18, 24

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*,
726 F.3d 62 (2d Cir. 2013)..................................................17

*Fisher v. Sellis (In re Lake States Commodities, Inc.)*,
253 B.R. 866 (Bankr. N.D. Ill. 2000) ......................................54

*Golden Gate Bridge, Highway & Transp. v. Golden Gate Bridge, Highway &
Transp. Dist.*,
No. 13-CV-02862-JST, 2014 WL 6706827 (N.D. Cal. Nov. 24, 2014)................56

*Gowan v. Patriot Grp., LLC (In re Dreier LLP)*,
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ......................................18

*Greb v. Diamond Int'l Corp.*,
56 Cal. 4th 243 (2013) ....................................................55

*Harte v. United Benefit Life Ins. Co.*,
66 Cal.2d 148 (1967) ......................................................41

*In re Hedged–Invs. Assocs., Inc.*,
84 F.3d 1286 (10th Cir. 1996) .............................................54

*JMM Props., LLC v. Erie Ins. Co.*,
No. 5:08–CV–1382, 2013 WL 149457 (N.D.N.Y. Jan. 14, 2013) .........................41

*Kappel v. Comfort*,
914 F. Supp. 1056 (S.D.N.Y. 1996)..........................................50

*Kirschner v. Agoglia*,
476 B.R. 75 (S.D.N.Y. 2012)................................................52

*Kirschner v. Bennett (In re Refco Secs. Litig.)*,
759 F. Supp. 2d 301 (S.D.N.Y. 2010).......................................18

*Kirschner v. KPMG LLP*,
938 N.E.2d 941 (N.Y. 2010)..............................................40, 41

*Laguna Heights Dev. Co. v. Union Bank of Calif.*,
No. G028962, 2002 WL 31667939 (Cal. Ct. App. 2002).........................40

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Mfrs. Hanover Trust Co. v. Jayhawk Assoc's.*,
   766 F. Supp. 124 (S.D.N.Y. 1991)...................................................................40, 42

*Miller v. Humphrey (In re Waterford Funding, LLC)*,
   No. 10-02889, 2012 WL 380773 (Bankr. D. Utah Feb. 6, 2012) ...........................34

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984)...............................................................................................18

*O'Connell v. Penson Fin. Servs., Inc. (In re Arbco Capital Mgmt., LLP)*,
   498 B.R. 32 (Bankr. S.D.N.Y. 2013) ...............................................................21, 31

*In re Phillips Petroleum Sec. Lit.*,
   738 F. Supp. 825 (D. Del. 1990)...........................................................................40

*Picard v. Avellino*,
   469 B.R. 408 (S.D.N.Y. 2012)...............................................................................36

*Picard v. Ceretti (In re BLMIS)*,
   No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015)................ *passim*

*Picard v. Chais*,
   445 B.R. 206 (Bankr. S.D.N.Y. 2011)...............................................................22, 47

*Picard v. Charles Ellerin Revocable Trust (In re BLMIS)*,
   No. 08-01789 (SMB), 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012).........................43

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
   454 B.R. 317 (Bankr. S.D.N.Y. 2011)..........................................................34, 35, 47

*Picard v. Conn. Gen. Life Ins. Co.*,
   11 Civ. 7174 (JSR), 2012 WL 1981486 (S.D.N.Y. May 30, 2012) .......................53

*Picard v. JPMorgan Chase & Co. (In re BLMIS)*,
   721 F.3d 54 (2d. Cir. 2012)....................................................................................51

*Picard v. Katz*,
   462 B.R. 447 (S.D.N.Y. 2011)...................................................................... *passim*

*Picard v. Merkin (In re BLMIS)*,
   440 B.R. 243 (Bankr. S.D.N.Y. 2010)..........................................................22, 39, 47

*Picard v. Merkin*,
   No. 11 MC 0012 (KMW), 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011)..............47

*Picard v. Merkin (In re BLMIS)*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............................. *passim*

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Picard v. Peter Madoff (In re BLMIS)*,
458 B.R. 87 (Bankr. S.D.N.Y. 2011) ........................................................................47

*S. Carolina v. Catawba Indian Tribe, Inc.*,
476 U.S. 498 (1986) ..................................................................................................56

*SEC v. Ballesteros Franco*,
253 F. Supp. 2d 720 (S.D.N.Y. 2003) ................................................................40, 41

*SEC v. Berry*,
No. C-07-04431 RMW, 2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ..................19

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Tech. Ltd.)*,
337 B.R. 791 (Bankr. S.D.N.Y. 2005) ...............................................................34, 53

*SIPC v. BLMIS*,
476 B.R. 715 (S.D.N.Y. 2012) .................................................................20, 51, 52

*SIPC v. BLMIS (In re BLMIS)*,
499 B.R. 416 (S.D.N.Y. 2013) ................................................................................34

*SIPC v. BLMIS (In re Madoff Sec.)*,
516 B.R. 18, 21 (S.D.N.Y. 2014) ............................................................................36

*SIPC v. BLMIS (In re Madoff)*,
522 B.R. 41 (Bankr. S.D.N.Y. 2014) ................................................................45, 46

*SIPC v. BLMIS (In re BLMIS)*,
No. 08-01789 (SMB), 2015 WL 3465752 (Bankr. S.D.N.Y. June 2, 2015) .................. *passim*

*SIPC v. BLMIS (In re BLMIS)*,
No. 12-MC-00115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013).................... *passim*

*SIPC v. BLMIS (In re Madoff Sec.)*,
490 B.R. 46 (S.D.N.Y. 2013).................................................................................52

*Snook v. Netherby*,
124 Cal. App. 2d 797 (Cal. Dist. Ct. App. 1954).................................................42

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ..........................................................................18, 24

*Syntex Corp. v. Lowsley-Williams & Cos.*,
79 Cal.Rptr.2d 371 (Cal.App. 1 Dist. 1998) .....................................................42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................................18, 31

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*U.S. Bank Nat'l Assoc. v. Perlmutter (In re Southside House, LLC)*,
    470 B.R. 659 (E.D.N.Y. 2012) ..................................................................50

*U.S. v. Tailwind Sports Corp.*,
    51 F. Supp.3d 9, 53 (D.D.C. 2014) ...........................................................59

*Uni-Rty Corp v. Guangdong Bldg. Inc. (In re Uni-Rty Corp.)*,
    1998 WL 299941 (S.D.N.Y. 1998)............................................................50

*Wyle v. C.H. Rider & Family (In re United Energy Corp.)*,
    944 F.2d 589 (9th Cir. 1991) ....................................................................53

**Statutes**

11 U.S.C § 546(e) ................................................................................... *passim*

11 U.S.C § 548.................................................................................................56

11 U.S.C. § 548(a)(1)(A)............................................................................20, 45

11 U.S.C. § 548(a)(1)(B) .................................................................................45

11 U.S.C. § 548(a)(2)......................................................................................54

11 U.S.C. § 548(c) ................................................................................... *passim*

11 U.S.C. § 550...............................................................................................56

11 U.S.C. § 550(b)...........................................................................................44

15 U.S.C. §§ 78aaa, *et seq.* ...........................................................................1, 46

15 U.S.C. § 78ccc(a)(2)(A)..............................................................................46

15 U.S.C. § 78eee(a)(3) ...................................................................................46

15 U.S.C. § 78fff-2(c)(1) .................................................................................48

15 U.S.C. § 78fff-2(c)(3) ............................................................................48, 49

15 U.S.C. § 78lll(5).........................................................................................46

15 U.S.C. § 78o(b)...........................................................................................46

Cal. Code § 366.2.......................................................................................56, 57

Cal Code § 703.110(a) .....................................................................................52

Cal. Code § 704.115.........................................................................................51

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Cal. Corp. Code § 2011 .................................................................................................55

Cal. Corp. Code § 16102(f) ...........................................................................................40

Cal. Corp. Code § 16306(a)...........................................................................................58

Del. Code Ann. tit. 6 §§ 15-102 .....................................................................................40

Del. Code Ann. tit. 6 § 17-403(b) ..................................................................................58

**Rules**

CPLR § 5205.................................................................................................................51

CPLR § 5205(c) ............................................................................................................52

CPLR § 5205(c)(1) ..................................................................................................51, 52

CPLR § 5205(c)(5) ........................................................................................................52

Fed. R. Civ. P. 9(b) .......................................................................................................22

Fed. R. Civ. P. 12(b)(6)..............................................................................17, 24, 48, 53

Fed. R. Civ. P. 17(b)(2).................................................................................................55

Fed. R. Civ. P. 17(b)(3).................................................................................................56

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq*., and the estate of Bernard L.

Madoff ("Madoff"), by and through his undersigned counsel, respectfully submits this

Memorandum of Law in Opposition to the Motion to Dismiss the Amended Complaint (the

"Motion") filed by Defendants in this action.[1]

## PRELIMINARY STATEMENT

Madoff's unprecedented Ponzi scheme was not a one-man operation. In addition to

various BLMIS employees who helped orchestrate the fraud, Madoff was aided by a select group

of individuals who solicited investors and directed funds to BLMIS. Closely associated with

Madoff and his family since the 1960s, Richard Glantz ("Glantz") and his late father, Edward

Glantz, were in this small circle of insiders. They raised tens of millions of dollars from

hundreds of innocent investors in the late 1980s and early 1990s, and, through entities they

formed, directed this money to one of BLMIS's first feeder funds, Avellino & Bienes ("A&B"),

which was operated by Frank Avellino and Michael Bienes. (¶¶ 92, 110).[2] Glantz and Edward

Glantz promised their investors guaranteed rates of return, and profited by retaining the

difference between the returns they promised and the larger returns their "sub-feeder funds"

received from A&B. (¶ 106).

---

[1] Defendants are: Richard Glantz, EJS Associates, L.P. ("EJS"); Jelris & Associates, L.P. ("Jelris"); Grace & Company ("Grace"); The Richard M. Glantz 1991 Living Trust ("RMG Trust"); The Glantz Family Foundation, Inc. ("GFF"); The Edward R. Glantz Living Trust ("ERG Trust"); the Estate of Edward R. Glantz; Lakeview Investment, LP ("Lakeview"); Vista Management Co. ("Vista"); The Thelma Glantz Living Trust ("TG Trust"); The Estate of Thelma Glantz; The Glantz-Ostrin ("G-O") Trust I; The Glantz-Ostrin Trust II; Elaine Ostrin; Austin Bosarge ("Bosarge"); Merlin & Associates ("Merlin"); and Enhancement Group ("Enhancement"). To the extent they are not otherwise defined, all capitalized defined terms herein have the same meaning as in the Amended Complaint, ECF No. 62.

[2] All references herein to paragraph numbers are to the Amended Complaint, dated January 9, 2015.

After the Securities and Exchange Commission ("SEC") shut down the Glantz and Edward Glantz sub-feeders along with A&B in 1992, Madoff handsomely rewarded these defendants for redirecting many of their former investors back into BLMIS. (¶¶ 167, 171-172). Madoff provided their accounts an agreed-upon double benefit—a predetermined guaranteed rate of return as high as 17%, and annual increases in account balances in predetermined amounts through the use of fake securities transactions (the "Fraudulent Side Payments"). (¶¶ 168, 214). Undeterred by the SEC shutdown, Glantz and Edward Glantz went on to establish a web of interconnected entities and BLMIS accounts to continue to profit from the fraud, receiving over $113 million in fraudulent transfers from BLMIS, including more than $40 million in fictitious profits. (¶¶ 139-162, 277, 283, 351).

Contrary to Defendants' Motion, the non-conclusory factual allegations of the Amended Complaint—which must be credited as true at this stage—demonstrate Glantz's and Edward Glantz's knowledge of fraud at BLMIS. Glantz and those under his supervision closely tracked and monitored activity in his accounts, including calculating expected and purported returns, monitoring purported transactions, and identifying apparent discrepancies. (¶¶ 163-165). Glantz and Edward Glantz knew that the Fraudulent Side Payments were the product of fake trades, and were an artificial means for boosting account balances by predetermined amounts. (¶¶ 168, 180). The Fraudulent Side Payments appeared like clockwork every December, and they appeared only in the BLMIS accounts that Glantz and Edward Glantz had designated. (¶¶ 178, 181). Edward Glantz shared his knowledge of these fraudulent transactions with one of his business partners, Joel Levey, in 1992 and 2001, and in 1992 told him to expect an "extra payment" in his personal BLMIS accounts. (¶¶ 174-176).

But Defendants' knowledge of fraud at BLMIS does not end with the Fraudulent Side Payments. They knew that it was impossible for BLMIS to guarantee a specific rate of return on investments in securities markets. (¶ 216). Nevertheless, they relied on the guarantee to profit from their sub-feeders. (¶ 106). Glantz later exploited the guaranteed rates of return from BLMIS by, in turn, promising guaranteed annual returns to investors in a BLMIS account he controlled, Ostrin Family Account ("OFA"). (¶ 215). In addition, on over 150 occasions, Glantz and Edward Glantz withdrew cash from their BLMIS accounts that exceeded, sometimes by hundreds of thousands of dollars, the amounts of cash purportedly available in the accounts, leaving a negative balance. (¶¶ 245, 253, 259, 263, 265). They were able to withdraw this cash on demand, despite the fact that the accounts were purportedly invested in securities at the time, and without paying any margin interest. (¶¶ 247-249). Finally, as an experienced Certified Public Accountant and an experienced attorney (¶¶ 4, 273), respectively, Edward Glantz and Glantz knew that the strip-mall Friehling & Horowitz firm was incapable of auditing an operation the size and scope of BLMIS. (¶ 274).

Glantz's knowledge of the fraud is confirmed by his repeated actions to shield BLMIS from scrutiny by investors. Among other actions, Glantz omitted Madoff's name from communications with investors; he warned a prospective BLMIS investor that if he sought to conduct due diligence on Madoff, he would lose the ability to invest with Madoff; he told another investor that "the rules imposed by Bernie" precluded managers of investment funds that invested with BLMIS from disclosing that the money would be invested with Madoff; and he flatly rejected the Dutch bank ABN AMRO's attempt to conduct direct due diligence on BLMIS. (¶¶ 313-322, 325). Unsurprisingly, Glantz asserted his Fifth Amendment right against self-incrimination at the Trustee's Rule 2004 Examination and refused to answer questions regarding

3

issues including the A&B sub-feeder funds and the guaranteed rates of return; his own violations

of the federal securities laws; the impossible consistent rates of return; the Fraudulent Side

Payments; and, broadly, his knowledge of Madoff's fraudulent scheme.  (¶ 328).

Accordingly, Defendants' Motion should be denied in its entirety.  Glantz and Edward

Glantz can find no solace in the "safe harbor" of § 546(e) of the Bankruptcy Code, which

protects only innocent investors who did not have actual knowledge of Madoff's fraud.  For the

same reason, Glantz and Edward Glantz cannot claim a good faith defense under § 548(c) of the

Bankruptcy Code.  Defendants' kitchen sink of remaining arguments are for the most part either

premature as factual issues best reserved for after the close of discovery, *e.g.*, Defendants'

assertion of a value defense under § 548(c), or have been squarely rejected by this Court before,

*e.g.*, application of the Ponzi scheme presumption.

## STATEMENT OF FACTS

### A.    Glantz and Edward Glantz Participated Early on in the Madoff Fraud by Soliciting and Steering Investors into the Avellino & Bienes Feeder Fund

Glantz and Edward Glantz were sophisticated professionals with close ties to Madoff.

(¶¶ 76-77, 84).  Glantz began as a practicing attorney in 1970 and has experience in law,

securities-related matters, and accounting—including working in the SEC's Division of

Corporation Finance.  (¶ 76).  By the time BLMIS collapsed in December 2008, Glantz had over

30 years' experience establishing investment partnerships and corporations, structuring complex

transactions, and communicating and transacting with investors and major financial institutions.

(¶ 85).  Edward Glantz, who died in February 2007, was a Certified Public Accountant and the

principal of his own accounting firm for over 40 years.  (¶¶ 35, 77).

Glantz and Edward Glantz had decades-long close ties to Madoff.  Their relationship with

Madoff grew out of their respective associations with the Alpern & Heller accounting firm,

founded by Madoff's father-in-law, Saul Alpern. (¶ 78).  Edward Glantz's accounting firm

shared office space with Alpern & Heller in the mid-1960s, where Glantz himself worked as a

summer intern accountant.  (¶¶ 81-82).  By the late 1960s and early 1970s, Edward Glantz and

Glantz had used these connections to begin investing with Madoff, and thereafter they created

some of the earliest vehicles for collecting money from investors and placing it with BLMIS. (¶¶

83, 89, 92-93, 101-102).

Glantz and Edward Glantz also enjoyed special access to Madoff.  Madoff's personal

phone book contained handwritten entries of the telephone numbers of both Glantz and Edward

Glantz.  (¶ 84).  Glantz advised at least one person involved in a potential transaction relating to

BLMIS that the deal would work only because of Glantz's "extraordinary" access to Madoff.

(*Id.*)

Glantz and Edward Glantz formed investment vehicles to pool money from investors and

direct that money to A&B, one of the first BLMIS feeder funds.  (¶¶ 89, 92).[3]  Glantz formed the

first of these "sub-feeder funds" in 1976.  (¶ 93).  Glantz dissolved that sub-feeder fund in late

1984 or early 1985 and went on to establish two new sub-feeder funds, called Merlin and

Enhancement, also for the purpose of pooling money and directing it to BLMIS through A&B.

(¶¶ 94-98).  For the funds he created, Glantz was the primary or sole decision maker and

managed day-to-day operations, including communicating with investors, determining the

interest to be paid, and tracking investments and withdrawals.  (¶ 99).  From 1985 through 1992,

through Merlin and Enhancement, Glantz raised approximately $30 million from approximately

345 individuals and entities that was ultimately invested with BLMIS.  (¶ 110).

---

[3] Avellino, Bienes and related entities and individuals are the subject of a separate suit brought by the Trustee styled
*Picard v. Avellino, et al.*, Adv. Pro. No. 10-05421 (SMB).

Edward Glantz formed his BLMIS sub-feeder fund, Telfran, in 1982, with longtime accounting colleagues Steven Mendelow and Aaron Levey.  (¶ 101).[4]  As Glantz had done, Edward Glantz formed Telfran to pool money and direct it to BLMIS through A&B.  (¶ 102).  From 1982 through 1992, Telfran raised many millions of dollars from approximately 800 individuals and entities that were ultimately invested with BLMIS.  (¶ 116).

In return for money that Glantz and Edward Glantz pooled and directed to BLMIS through A&B, A&B provided a guaranteed rate of return on those funds.  (¶ 106).  Glantz and Edward Glantz provided their investors a guaranteed, but smaller, "interest" rate on invested money.  (¶¶ 106, 108, 113).  By retaining the difference between the rates they received from A&B and the rates they paid to investors, Glantz and Edward Glantz were able ensure a guaranteed profit merely by funneling money used to support the Ponzi scheme.  (¶¶ 109, 115).  Until their funds shut down in 1992 as a result of SEC investigations, Glantz and Edward Glantz received, at a minimum, several hundred thousand dollars in profits in return for funneling money into BLMIS through A&B.  (¶ 118).

In 1992, the SEC commenced a series of investigations into A&B and the Glantz and Edward Glantz sub-feeders that led to enforcement actions filed by the SEC in federal court.  (¶ 119).  The SEC investigations revealed that Glantz, Edward Glantz, and their entities violated the Securities Act of 1933 and the Investment Company Act of 1940 by offering to sell and by selling unregistered securities in connection with their raising of money from investors, and by operating the entities as investment companies without the entities being registered as such.  (¶¶ 120-124, 128-129).  Pursuant to consent judgments, Glantz, Edward Glantz, and their entities collectively paid $600,000 in monetary penalties, and Glantz and Edward Glantz were

---

[4] Steven Mendelow is the subject of a separate suit brought by the Trustee styled *Picard v. Mendelow, et al.*, Adv. Pro. No. 10-04283 (SMB).  Aaron Levey is deceased.

permanently enjoined from further violations of the federal securities laws.  (¶¶ 131-132).  The

SEC actions also led to the closing of A&B, Merlin, Enhancement, and Telfran, and the return of

hundreds of millions of dollars to investors in A&B and Glantz's and Edward Glantz's sub-

feeders.  (¶¶ 133, 135, 138).

> **B.    After the SEC Shut Down Their Sub-Feeder Funds, Glantz and Edward Glantz Opened New BLMIS Accounts that They Managed and Monitored on Behalf of Various Investment Vehicles**

Glantz and Edward Glantz thereafter continued and expanded their participation in

Madoff's fraud by opening accounts directly with BLMIS, rather than through A&B.  Beginning

in late 1992, Glantz and Edward Glantz controlled at least eight new IA accounts, including

partnership accounts held in the name of Taj Family (later called Grace), EJS, OFA, and Jelris.

(¶¶ 140-162).  Glantz was a general partner of each of these partnerships, each of which served

to pool money and funnel it to BLMIS.  (*Id.*)  Through his role as general partner, Glantz served

as a fiduciary to individuals and entities that invested through the vehicles.  (¶ 87).  Glantz and

Edward Glantz also opened accounts with BLMIS for their Individual Retirement Accounts, and

a BLMIS account was opened for Glantz's personal trust.  (¶¶ 148, 150, 152).

For the IA accounts they controlled, Glantz and Edward Glantz received and reviewed

monthly account statements and trade confirmations, and corresponded with BLMIS regarding

the accounts.  (¶¶ 141-162).  For the IA accounts that he controlled, Glantz and those under his

supervision closely tracked and monitored performance, including both overall account

performance (such as commenting on purported account balances, calculating expected and

purported returns, accounting for and allocating purported gain among investors, calculating

investors' quarterly returns, and issuing end-of-year tax statements to investors) and individual

transactions (such as identifying apparent discrepancies and marking individual line items on the

monthly account statements.  (¶¶ 163-164).  Glantz and those under his supervision routinely

annotated monthly account statements with check marks or statements of "ok" next to purported

transactions or balances, as well as handwritten calculations verifying or double-checking

purported monthly ending balances.  (¶ 165).

### C.    Glantz and Edward Glantz Were Rewarded by Madoff in the Form of Fake Options Trades

Glantz facilitated the return of many of his former investors, and their cash, back into

BLMIS by telling investors they could open direct investment accounts at BLMIS and providing

investors with names and contact information for BLMIS employees who could help open

accounts.  (¶ 172).  Between November 1992 and March 1993, investors whom BLMIS

attributed to Glantz (primarily or entirely former Merlin and Enhancement investors) re-invested

approximately $10 million with BLMIS.  (¶ 189).  In that same period, investors whom BLMIS

attributed to Edward Glantz and his former Telfran colleagues re-invested approximately $62

million with BLMIS.  (¶ 200).  Madoff rewarded Glantz and Edward Glantz for these re-

investments of money by making the Fraudulent Side Payments into BLMIS accounts under

their control.  (¶¶ 195-197, 206-208).  BLMIS employees generated these Fraudulent Side

Payments through a process referred to internally at BLMIS as the "Shtup" or "Schupt."  (¶ 170).

The Amended Complaint uses the phrase "Fraudulent Side Payments" as shorthand for

these fictitious transactions and the millions of dollars of added fake boosts in account values

they purported to generate.  The Fraudulent Side Payments did not actually appear as payments

on the pertinent account statements, such as purported transfers of cash into the accounts.  (¶

177).  Rather, the account statements reflected the Fraudulent Side Payments as purported

transactions in which certain option contracts were purchased (funded by the existing purported

assets in the accounts), followed shortly thereafter by the sale of those same option contracts,

consistently resulting in gains matching the predetermined amounts of benefits to be granted to Glantz and Edward Glantz. (*Id.*)

The purported speculative options transactions by which the Fraudulent Side Payments were made were consistently and hugely profitable. (¶ 179). For over a decade, from 1996 through 2007, BLMIS always recorded these fictitious transactions in the month of December. (¶ 181). As a result, each December, the statements for the accounts that received the Fraudulent Side Payments for Glantz and Edward Glantz showed greater percentage gains than the statements for other BLMIS accounts managed by Glantz and Edward Glantz. (¶ 182). This purported outperformance by certain accounts each December starkly contrasted with the virtually uniform performance across all the accounts managed by Glantz and Edward Glantz for each of the other eleven months of the year. (*Id.*)

These fictitious option transactions were also inconsistent with the trading strategy that Madoff purported to follow with regard to other option transactions appearing in Glantz's and Edward Glantz's BLMIS accounts. (¶¶ 183, 186). That trading strategy—the "split-strike conversion" ("SSC") strategy—purportedly used the purchase and sale of option contracts as a hedge to control risk. (*Id.*) Glantz was well aware of the prevailing SSC strategy, and he included a description of it in offering materials he distributed. (¶¶ 184-185).

The Fraudulent Side Payments were hugely profitable for Glantz and Edward Glantz. From 1996 through 2001, Glantz received Fraudulent Side Payments of 2% of the amount reinvested with BLMIS that was attributable to former Merlin and Enhancement investors. (¶¶ 189-191). In 2002, Glantz's Fraudulent Side Payment was reduced from 2% to 1%, and it remained at this level through 2007. (¶ 192). Glantz also received other Fraudulent Side Payments in 1994 and 1995. (¶ 193). As a result, Glantz received approximately $196,000 per

year from 1996-2001, approximately $98,000 per year from 2002 until the fraud was exposed, and approximately $2,233,506 in total Fraudulent Side Payments throughout the life of his BLMIS accounts.  (¶¶ 191-194).

Edward Glantz initially received approximately $232,500 per year in Fraudulent Side Payments.  (¶¶ 200-202).  Edward Glantz's figure was also cut in half beginning in 2002, after which he received approximately $116,250 per year until the fraud was exposed.  (¶ 203). Edward Glantz received approximately $2,539,778 in total Fraudulent Side Payments throughout the life of his BLMIS accounts.  (¶ 205).

These Fraudulent Side Payments appeared only in certain of the accounts controlled by Glantz and Edward Glantz.  (¶ 168).  For BLMIS to be able to make the Fraudulent Side Payments, Glantz and Edward Glantz had to instruct BLMIS personnel which of their various accounts would reflect the fake transactions.  (¶ 178).  Glantz and Edward Glantz participated in this fraudulent process by providing those instructions to BLMIS.  (*Id.*)  As a result, BLMIS placed Glantz's Fraudulent Side Payments in the account held in the name of Grace in 1994 and 1995, and from 1996 to 2007 in the account held by Glantz's personal IRA.  (¶¶ 196-197).  For Edward Glantz, BLMIS placed the fictitious transactions in the account held in the name of EJS in 1994 and 1995, and from 1996 to 2007 in the account held by Jelris.  (¶¶ 207-208).  Edward Glantz controlled or was a beneficial owner of both EJS and Jelris.  (¶ 206).

In conversations with Joel Levey—one of the owners of Telfran and the son of Edward Glantz's late accounting partner Aaron Levey—Edward Glantz conveyed his advance knowledge of the Fraudulent Side Payments.  (¶¶ 174-176).  In late 1992, before the system of Fraudulent Side Payments took effect, Edward Glantz told Joel Levey that, merely by opening a BLMIS account, Levey would receive annually an extra payment, on top of whatever other return he

10

received, based on the amount of money that former Telfran investors reinvested with BLMIS.

(*Id.*)  Later, in 2001, Edward Glantz told Joel Levey that the annual payments would be cut in

half, and in 2002 they were.  (¶ 176).

> **D.      Glantz and Edward Glantz Were Aware Their BLMIS Accounts Received Guaranteed, Impossibly Consistent, Rates of Return**

In addition to receiving Fraudulent Side Payments in specially designated accounts,

Glantz and Edward Glantz received a second benefit from Madoff for their participation in the

fraud.  (¶ 213).  This second benefit was guaranteed annual rates of return in accounts they

opened and controlled following the SEC actions and the closing of Merlin, Enhancement, and

Telfran.  (¶¶ 213-214).  Six accounts controlled by Glantz and Edward Glantz initially received a

guarantee of annual gains of at least approximately 17%, and this percentage was reduced in the

ensuing years.  (¶ 215).  The purported annual returns in the Glantz and Edward Glantz accounts

reflect a periodic reduction of the guaranteed returns, with these accounts receiving guaranteed

rates of return of at least approximately 17% from 1995 through 1999; at least approximately

14% from 2000 through 2002; and at least approximately 10% from 2003 through 2007.  (¶ 240).

Glantz knew that BLMIS accounts under his and his father's control were promised and received

these guaranteed rates of return, even though guaranteed rates of return are irreconcilable with

the nature of an investment advisory account invested in the securities markets.  (¶¶ 215-216).

In reliance on the guaranteed returns, Glantz created and issued promissory notes to

investors in OFA.  (¶ 215).  The promissory notes guaranteed OFA investors a specific "interest"

rate for the following year.  (¶ 219).  Without advance knowledge of the guaranteed rates of

return from BLMIS, Glantz could not have in turn guaranteed returns to the investors in OFA.  (¶

227).

In addition to the *guaranteed* nature of the returns promised to their accounts, Glantz and Edward Glantz knew that their BLMIS accounts were receiving impossibly *consistent* positive double-digit annual returns. (¶ 230). Glantz understood that from the 1990s forward, Madoff purported to use the SSC strategy for the IA accounts. (¶ 216). But Glantz knew that the SSC strategy was a collared investment strategy designed to track, in a tempered manner, the S&P 100 Index. (¶ 231). If Madoff actually followed this strategy, it would have reduced volatility but it would not eliminate it or enable an account to achieve a guaranteed level of performance. (¶ 231). Instead, gains or losses would have remained correlated to the performance of the S&P 100 Index. (¶ 232). It would have been impossible for this strategy to have produced gains when the S&P 100 was significantly down or for the strategy to outperform the S&P 100 when the market was significantly up. (¶¶ 232-233).

Nonetheless, the various accounts monitored and controlled by Glantz and Edward Glantz received consistent double-digit positive annual returns, regardless of general market fluctuations or periods of extreme volatility. (¶¶ 236-239). In particular, in the 13 years from 1995 through 2007, the BLMIS accounts held by EJS, Jelris, Grace, GFF, the Glantz IRA and the Edward Glantz IRA reflected purported positive returns of no less than approximately 10% every single year. (¶ 239). In contrast, the S&P 100 Index recorded an annual gain in nine of those years, but an annual loss in four of the years, including three that exceeded 10%. (¶ 238). Through his management and oversight of these accounts, including review of BLMIS account statements, Glantz was aware that these accounts posted purported annual results that were impossibly consistent and irreconcilable with actual securities trading in the marketplace consistent with the SSC strategy. (¶ 241).

### E.    Glantz and Edward Glantz Were Aware of Other Indicia of Fraud

On at least 153 occasions, Glantz and Edward Glantz made withdrawals from accounts they controlled in which the withdrawals exceeded the amounts of cash available in the account. (¶¶ 244-245).  Nonetheless, in each instance, according to the account statements received and reviewed by Glantz and Edward Glantz, BLMIS provided the cash withdrawal without liquidating securities held in the account sufficient to fund the withdrawal.  (¶ 248).  Further, in each instance BLMIS did not charge the account any margin interest for the unfunded cash payment.  (¶ 249).  Instead, BLMIS provided the accounts with interest-free loans lasting until the accounts were returned to a positive cash balance. (*Id.*)

For example, in early June 1999 Glantz requested a $400,000 withdrawal from EJS and BLMIS issued a check in that amount on June 9, 1999.  (¶¶ 250-251).  However, EJS's BLMIS account statements indicate that, at the time the check was issued, the account had a reported cash balance of approximately $1,000, meaning that the withdrawal amounted to an unfunded payment from BLMIS to EJS of approximately $399,000.  (¶¶ 252-253).  No cash deposits or purported securities sales sufficient to fund the $400,000 withdrawal took place until at least June 16, 1999.  (¶ 254).  Other instances of cash withdrawals that exceeded the amount of cash available occurred in eight BLMIS accounts monitored and managed by Glantz and Edward Glantz: Grace, EJS, the Glantz Family Foundation, Jelris, the Glantz IRA, the Edward Glantz IRA, OFA, and another account managed by Glantz, Ostrin Family Partnership ("OFP").  (¶¶ 245-246, 256-267).  The provision of cash by BLMIS in these instances upon request and without liquidating securities demonstrated that the account statements were fraudulent, in that the accounts were not, as represented, fully or almost fully invested in securities.  (¶ 269).

BLMIS's auditor was Friehling & Horowitz, a small accounting firm that had only three employees, one of whom was an administrative assistant and one of whom was semi-retired.  (¶

272).  Glantz knew that BLMIS held out Friehling & Horowitz as its auditor, as Glantz

maintained in his file the annual audited report for BLMIS for the year ended October 31, 2000,

which indicated Friehling & Horowitz as auditor.  (*Id.*)  Glantz and Edward Glantz had

substantial knowledge about public accounting and the resources needed to conduct audits of

organizations of the size and scope of BLMIS, knew that Friehling & Horowitz was incapable of

auditing BLMIS, and recognized that BLMIS's retention of Friehling & Horowitz further

demonstrated fraud at BLMIS.  (¶¶ 273-274, 276).

**F.    Glantz Assumed Fiduciary Duties to His Investors, Including the Duty to Undertake Diligence on Madoff**

Starting in approximately 2004, Glantz expanded his participation in the fraud at BLMIS

by forming a number of new partnerships through which he could further profit.  (¶ 277).  Glantz

recruited additional investors for these partnerships through social, spiritual, educational, and

philanthropic connections and thereby raised additional funds to funnel to BLMIS.  (¶ 278).

Glantz established Vista, a corporation of which he was the sole owner, as the general partner or

unregistered investment adviser to these partnerships.  (¶¶ 279-281).  In particular, in 2004,

Glantz established Fern Creek Limited Partnership ("Fern Creek"), with Vista as its general

partner; in 2006, Glantz formed Lakeview, with Vista as its general partner; and, in 2007, Glantz

formed Glantz Family Partners ("GFP"), with Vista as its purported investment adviser.  (¶¶ 286-

287, 295, 304, 307).  As its compensation for these roles, Vista took "management fees" or

"special profit allocations" from each of these partnerships.  (¶¶ 282, 299-300, 310-311).

Through his role as control person of Vista, Glantz served as a fiduciary to individuals

and entities that invested through Fern Creek, Lakeview, and GFP.  (¶ 87).  Glantz understood,

acknowledged and represented his fiduciary duties to these investors, including the duties to be

informed about, monitor, and perform due diligence on, prospective and ongoing investments

with BLMIS.  (*Id.*)  For example, a Confidential Offering Circular for Fern Creek provided that

Vista, as the general partner, assumed the duty to "exercise good faith and integrity in handling

partnership affairs," and represented that Vista was "responsible for selecting, monitoring, and

evaluating" the brokers, investment advisers or portfolio managers that would manage Fern

Creek's assets.  (¶¶ 291-292).

In this way Glantz, through Vista, undertook responsibility for management, operations,

and investment decisions with respect to Fern Creek investors' funds, including a duty to

perform due diligence on Fern Creek's investment performance, opportunities and risks, and in

particular on Madoff.  (¶¶ 293-294).  Likewise, through Vista, Glantz assumed responsibility for

management, operations, and investment decisions with respect to Lakeview and GFP investors'

funds, including a duty to perform due diligence on their investment performance, opportunities

and risks, and on any money managers Glantz employed (*i.e.*, Madoff).  (¶¶ 298, 309).  In

connection with these roles, Glantz monitored the investments and performed due diligence on

BLMIS.  (¶¶ 87-88).

### G.    Glantz Assisted Madoff by Deflecting Scrutiny by Actual and Prospective Investors

For decades, Glantz rebuffed requests by prospective and actual investors for information

about Madoff or for access that could enable them to engage in due diligence regarding BLMIS

and its operations.  (¶ 312).  For example, beginning in the 1980s, Glantz frequently

communicated with investors in a way that specifically did not identify Madoff, but instead

referred to him as "a wholesale broker," despite questions by investors in Merlin and

Enhancement about how their money was invested.  (¶ 313).  Similarly, with respect to Fern

Creek, Glantz simply referred to Madoff as the "Manager" and refused to identify him despite

repeated investor requests.  (¶¶ 314-315).

In another instance, after a prospective GFP investor stated that he wanted to conduct due diligence on Madoff, Glantz instructed the investor that doing so would foreclose the ability to invest with Madoff. (¶ 316). Glantz also emphasized Madoff's insistence on secrecy to other prospective investors. (¶¶ 324-325). Specifically, in a February 2007 email exchange with other individuals contemplating a BLMIS-related transaction, Glantz emphasized that he spoke to Madoff and "Bernie simply said no [to allowing due diligence]. He does not do this. . . ." (¶ 324). Likewise, in another episode later that year, Glantz informed the manager of an investment fund that anyone who raised money for investment with Madoff was prohibited from disclosing to investors in writing that money raised would be invested with Madoff, as those were "the rules imposed by Bernie." (¶ 325).

Glantz engaged in a similar exchange when he informed ABN AMRO that conducting direct due diligence on Madoff would not be allowed. (¶ 318). At the time, ABN AMRO was considering a potential investment with BLMIS through Lakeview or a transaction with Vista, but the bank first wanted to undertake due diligence on BLMIS. (¶ 317). Representatives of the bank's structured products group told Glantz that the ability to perform direct due diligence was a critical issue. (¶ 319). But Glantz nevertheless worked to dissuade ABN AMRO from pursuing such due diligence. (¶¶ 319-320, 322). Glantz told ABN AMRO that Madoff was "in this way difficult and problematic" and that he would not have "a direct relationship with any bank on any account." (¶ 320). Glantz rebuffed ABN AMRO's further request, telling the bank's representatives, "[t]he question of access is not open." (¶ 322). Glantz thus recognized that Madoff would sooner jeopardize a potential investment than permit due diligence that might expose his fraud. (*Id.*) Glantz assisted Madoff in this effort by deflecting possible scrutiny, by both individual and institutional investors. (¶ 323).

16

### H. Asserting the Fifth Amendment, Glantz Refused to Testify as to Any Facts Concerning Madoff, the Fraud or His BLMIS Accounts

On September 30, 2010, when Glantz appeared for questioning under oath pursuant to

Fed. R. Bankr. P. 2004, he asserted his Fifth Amendment rights against self-incrimination and

refused to answer questions relating to his involvement with Madoff. (¶ 328). Most notably,

Glantz refused to answer whether he knew that Madoff was engaged in a massive scheme or

other illegal activity. (*Id.*) Glantz also refused to testify regarding these issues, among others:

whether he had solicited and raised funds that were invested with BLMIS through A&B; whether

he engaged in a fund-raising scheme involving the receipt of guaranteed rates of return from

A&B and the payment of lower guaranteed rates of return to investors; whether he had violated

the federal securities laws in connection with this scheme; whether, following the SEC's action,

he maintained accounts at BLMIS into which he received hundreds of thousands of dollars in the

form of fictitious option trades; and whether his purpose with regard to establishing new entities

was to reap additional profits for himself from Madoff's scheme. (*Id.*)

## ARGUMENT

## I. STANDARDS GOVERNING RULE 12(b)(6) MOTIONS

The standards governing a motion to dismiss made pursuant to Fed. R. Civ. P. 12(b)(6)

are well settled. The Court must "accept[] all well-pleaded allegations in the complaint as true

and draw[] all reasonable inferences in the plaintiff's favor." *Bigio v. Coca-Cola Co.*, 675 F.3d

163, 169 (2d Cir. 2012) (internal marks omitted). "To survive a motion to dismiss, the complaint

must plead 'enough facts to state a claim for relief that is plausible on its face.'" *Fed. Treasury

Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013) (quoting *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible where "the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Determining

whether a claim is plausible is 'a context-specific task that requires the reviewing court to draw

on its judicial experience and common sense.'"

Where the facts alleged raise plausible inferences in favor of the plaintiff, it is improper

for the Court at this stage to weigh a defendant's proffered inferences, which is a function for the

ultimate fact-finder. *Anderson News, LLC. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)

(citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 766 n.11 (1984)); *see also*

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) ("It is not for

the court to decide, at the pleading stage, which inferences are more plausible than other

competing inferences, since those questions are properly left to the factfinder." (citing *Monsanto*

*Corp.*, 465 U.S. at 766 n.11)). Accordingly, a defendant's theories or explanations for the facts

alleged carry no weight at this stage. To the extent a defendant advances "alternate

explanations" for the conduct alleged, the motion to dismiss must be denied. *Starr v. Baca*, 652

F.3d 1202, 1216 (9th Cir. 2011).

In ruling on a motion to dismiss, "courts must consider the complaint in its entirety."

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Actual knowledge of

fraud may be inferred from circumstantial evidence. *See Kirschner v. Bennett (In re Refco Secs.*

*Litig.)*, 759 F. Supp. 2d 301, 335 (S.D.N.Y. 2010) (denying motion to dismiss fraud claim

against defendants based on circumstantial evidence). In addition, whether Defendants are

entitled to the good faith defense provided by § 548(c) is a fact question properly left for the jury

and should not be decided on a motion to dismiss. *See, e.g.*, *Gowan v. Patriot Grp., LLC (In re*

*Dreier LLP)*, 452 B.R. 391, 427 (Bankr. S.D.N.Y. 2011) (denying motion to dismiss avoidance

action based on the § 548(c) good faith defense, in part, because good faith determination "is a

18

factual inquiry that is inappropriate at the motion to dismiss stage"); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 107 (S.D.N.Y. 2004).

Finally, this Court can and should draw adverse inferences concerning Glantz's knowledge of the fraud in favor of the Trustee based on Glantz's invocation of the Fifth Amendment at his Rule 2004 examination. *See SIPC v. BLMIS (In re BLMIS)*, No. 12-MC-00115 (JSR), 2013 WL 1609154, at *6 n.4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*") (adverse inference can be drawn in civil case from defendant's invoking the Fifth Amendment); *see also In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 208 n.17 (S.D.N.Y. 2006) (noting that the court is permitted to draw adverse inference from defendants' invocation of Fifth Amendment in considering and ultimately denying motion to dismiss fraud claims); *SEC v. Berry*, No. C-07-04431 RMW, 2008 WL 4065865, at *5 (N.D. Cal. Aug. 27, 2008) (holding that, because a court on a motion to dismiss must draw all inferences in favor of the plaintiff, defendant's invocation of the Fifth Amendment "requires the court to deny her motion" as to the issues about which she refused to testify).

## II.    DEFENDANTS CANNOT INVOKE THE SECTION 546(e) SAFE HARBOR

Defendants move to dismiss Counts II through VII of the Amended Complaint by claiming that they may avail themselves of protection under the "safe harbor" provision of § 546(e).  But Glantz and Edward Glantz are precisely the type of defendants the safe harbor is *not* intended to protect: customers who knew of—and indeed participated in—the fraud at BLMIS. Glantz and Edward Glantz knew their securities contracts with BLMIS were not legitimate and that any payments from BLMIS were not *bona fide* settlement payments.  Defendants, therefore, cannot claim the protection of § 546(e).

A.     **The Section 546(e) Safe Harbor Only Protects Innocent Investors Who Did Not Have Actual Knowledge of Madoff's Fraud**

The § 546(e) safe harbor prevents a trustee from avoiding "settlement payment[s] . . . in connection with a securities contract," except in cases of actual fraud under § 548(a)(1)(A).  *See Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 138 (Bankr. S.D.N.Y. 2014) ("*Merkin II*") (citing *Cohmad*, 2013 WL 1609157, at *6).  The safe harbor is intended to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries."  *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011).  The District Court has held that, "in the context of the Madoff Securities' fraud, that goal is best achieved by protecting the *reasonable expectations of investors who believed they were signing a securities contract*." *Cohmad*, 2013 WL 1609154, at *4 (emphasis added); *see also SIPC v. BLMIS*, 476 B.R. 715, 720 (S.D.N.Y. 2012) ("*Greiff*").

Applying the safe harbor in a trilogy of cases, the District Court held that investors who reasonably believed that BLMIS was trading securities on their behalf had agreements with BLMIS that were securities contracts.  *See Picard v. Katz*, 462 B.R. 447, 451-52 (S.D.N.Y. 2011) ("*Katz*"); *Greiff*, 476 B.R. at 719-20; *Cohmad*, 2013 WL 1609154, at *4.  The District Court further held that transfers from BLMIS to those customers were settlement payments in connection with those securities contracts and thus fell within the safe harbor of § 546(e).  *Katz*, 462 B.R. at 452; *Greiff*, 476 B.R. at 719-20.

Investors with no such belief, but who instead had "actual knowledge of Madoff's Ponzi scheme, or more generally, 'actual knowledge that there were no actual securities transactions being conducted,'"—like Defendants here—cannot avail themselves of the safe harbor.  *See Picard v. Ceretti (In re BLMIS)*, No. 09-01161 (SMB), 2015 WL 4734749, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*") (quoting *Cohmad*, 2013 WL 1609154, at *4).  Such an

20

investor "stands in a different posture from an innocent transferee, even as concerns the application of Section 546(e)." *Cohmad*, 2013 WL 1609154, at \*4. As the District Court explained, "neither law nor equity permits such a person to profit from a safe harbor intended to promote the legitimate workings of the securities markets and the reasonable expectations of legitimate investors." *Id.*; *see also O'Connell v. Penson Fin. Servs., Inc. (In re Arbco Capital Mgmt., LLP)*, 498 B.R. 32, 43 (Bankr. S.D.N.Y. 2013) ("*Arbco*") ("[t]ransferees who participated in a fraud, and those with actual knowledge of a fraud . . . stand in a different posture from innocent transferees and are not entitled to invoke the protections of the Safe Harbor Rule.").[5]

As this Court recently summarized:

> The safe harbor was intended, among other things, to promote the reasonable expectations of legitimate investors. If an investor knew that BLMIS was a Ponzi scheme, he had no reasonable expectation that he was signing a securities contract with BLMIS for the purpose of trading securities for his account. In that event, the Trustee may avoid and recover preferences and actual and constructive fraudulent transfers to the full extent permitted under state and federal bankruptcy law.

*Kingate*, 2015 WL 4734749, at \*12 (internal citation omitted).

Under this standard, the Trustee can defeat the safe harbor by establishing Defendants' actual knowledge of Madoff's fraud, or Madoff's scheme, or Madoff's Ponzi, or that no actual

---

[5] As this Court has recognized, many courts in this district and circuit have found that allegations of willful blindness or conscious avoidance satisfy the requirement to plead the element of actual knowledge to support a claim for aiding and abetting the primary wrong. *See Kingate*, 2015 WL 4734749, at \*13 (collecting cases). This principle is particularly applicable where the defendant had a fiduciary or other relationship that obligated the defendant to monitor or perform due diligence on a broker. *See Arbco* at 44; *see also Cohmad*, 2013 WL 1609154 at \*4 n.2 (explaining that "willful blindness" may be sufficient to substitute for "actual knowledge" when a customer has a "duty to inquire into its broker's bona fides."). As alleged in the Amended Complaint, such a relationship was present between Glantz and his investors. (¶ 87). However, the Trustee acknowledges that this Court is bound by the District Court's rejection of willful blindness as a substitute for actual knowledge for purposes of the § 546(e) safe harbor in the context of the Trustee's adversary proceedings. *Kingate*, 2015 WL 4734749, at \*12, 12 n.9 (citing *Cohmad*, 2013 WL 1609154, at \*4 n.2). In any event, the allegations in the Amended Complaint satisfy the more stringent actual knowledge standard.

securities were being transacted. *See Kingate*, 2015 WL 4734749, at \*13 (holding that

defendants could not avail themselves of the safe harbor because the complaint plausibly alleged

that defendants "knew that Madoff was not engaging in the securities transactions he reported,

and that many of the entries in the statements and trade confirmations depicted trades that could

not have taken place"); *see also Cohmad*, 2013 WL 1609154, at \*6 (finding actual knowledge of

fraud sufficient to defeat the safe harbor without specific allegations that defendants knew that

BLMIS was a "Ponzi scheme").

**B.     The Trustee Adequately Alleges Glantz's and Edward Glantz's Actual
        Knowledge of, and Participation in, Fraud at BLMIS**

In the Amended Complaint, the Trustee not only alleges that Glantz and Edward Glantz

knew that Madoff was operating a fraud and that the transfers they received were not a result of

the trading Madoff purported to engage in, but also that they participated in and assisted

Madoff's fraud for decades.[6]  This involvement included periods both before and after their

original funds were shut down by the SEC.  (¶¶ 89, 217, 281).  In this way, Glantz and Edward

Glantz—both sophisticated professionals with extensive experience in law and accounting,

respectively—exploited their access to BLMIS to reap tremendous personal rewards from the

scheme.  (¶¶ 76-77, 118, 194, 205, 369, 372).  Indeed, Glantz's access to Madoff was, by his

own description, "extraordinary"—a term he used when bragging that a potential deal would go

through specifically because of his access—and is evidenced by Glantz's and Edward Glantz's

inclusion in Madoff's personal phone book.  (¶ 84).  More importantly, as discussed in detail

below, they knew the funds withdrawn from their IA Accounts were not legitimate "settlement

---

[6] Defendants note that Fed. R. Civ. P. 9(b) requires that, in alleging fraud, a party must state with particularity the circumstances constituting the fraud.  (Mem. at 14).  However, this Court has found that "fraudulent intent may be plead generally under Rule 9(b)." *Picard v. Chais (In re BLMIS)*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011). *See also Picard v. Merkin (In re BLMIS)*, 440 B.R. 243, 254 (Bankr. S.D.N.Y. 2010) ("*2010 Merkin Decision*") ("[m]alice, intent, knowledge, and other conditions of a person's mind" may be pleaded generally) (quoting Fed. R. Civ. P. 9(b)).

payments" and could not have been made in connection with an actual bona fide securities contract.  Given the totality of the allegations in the Amended Complaint, taken as true, it is more than plausible—and a finder of fact could reasonably infer and conclude—that Glantz and Edward Glantz knew of, participated in, and took full advantage of BLMIS's fraud.

Defendants repeatedly assert that there are no non-conclusory allegations that Glantz and Edward Glantz were actually aware of and understood the fraudulent conduct associated with the Fraudulent Side Payments and the other transactions purportedly occurring in their IA accounts., But this ignores the many specific allegations in the Amended Complaint demonstrating Glantz's and Edward Glantz's actual knowledge of and participation in the fraud.  Defendants also ignore that, on a motion to dismiss, the plaintiff is entitled to all reasonable inferences based on the non-conclusory allegations in the complaint.

Contrary to Defendants' contentions, and as detailed below, the Amended Complaint specifically alleges that Glantz and Edward Glantz were aware of the fraudulent activity in their accounts.  They knew that they were receiving the benefit of patently fictitious Fraudulent Side Payments and impossible guaranteed returns; they closely monitored their accounts by, among other things, receiving and reviewing monthly account statements.  In particular, the Amended Complaint alleges that Glantz and those under his supervision tracked and monitored account performance, thoroughly reviewed BLMIS statements, identified apparent discrepancies, and annotated account statements.  The Amended Complaint more than adequately alleges that Glantz and Edward Glantz were well aware of what their statements contained.

Faced with these facts, a significant portion of Defendants' Memorandum of Law in support of their Motion ("Mem.") focuses on attempting to provide an alternate explanation for the conduct alleged or to explain away the Trustee's well-pled facts:

- "*From Glantz's and Edward Glantz's perspective*, they were simply being paid their commission/referral fees from 'the proceeds of a securities transaction[.]'" (Mem. at 24).

- "These are not circumstances that would have been viewed and understood by them . . . ." (Mem. at 26).

- "*From their perspective*, the payments were simply payments of commission/referral fees that BLMIS had agreed to make and was making." (*Id.*)

Proffering, or considering, such alternate allegedly plausible explanations in Defendants' favor turns the proper analysis on a motion to dismiss on its head, and should be rejected. "If there are two alternate explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr*, 652 F.3d at 1216; *see also Anderson News*, 680 F.3d at 184; *Evergreen Partnering Grp*, 720 F.3d at 45.

### 1.    The Fraudulent Side Payments Demonstrate that Glantz and Edward Glantz Knew that BLMIS Was Making Fake Trades

Glantz helped facilitate the re-investment of millions of dollars back into BLMIS after the A&B feeder fund, along with the sub-feeders, were shut down by the SEC. (¶ 172). The amounts of the annual Fraudulent Side Payments for Glantz and Edward Glantz were determined primarily based on the amount of money that had been invested with A&B through their sub-feeders that was reinvested with BLMIS after the funds were shut down. (¶ 173). The Fraudulent Side Payments were part of a broader system at BLMIS—the Schupt process—reserved for specially favored BLMIS customers. (¶¶ 167, 170). While Defendants are attempting now to characterize the over $4.7 million that Glantz and Edward Glantz received in Fraudulent Side Payments as simple "commission/referral fees" (Mem. at 15-17, 26), the fraudulent method by which they were provided belies any legitimacy. Indeed, they were

nothing more than artificial boosts to designated accounts accomplished through impossible and fictitious transactions.  (¶ 168).

The totality of the non-conclusory allegations concerning the Fraudulent Side Payments and the reasonable inferences drawn therefrom demonstrate that Glantz and Edward Glantz knew that "Madoff was not engaging in the securities transactions he reported, and that many of the entries in the statements . . . depicted trades that could not have taken place."  *See Kingate*, 2015 WL 4734749, at *13.  As alleged in the Amended Complaint:

- The Fraudulent Side Payments were not credited to Glantz's and Edward Glantz's accounts by a deposit, check, or purported transfer of funds.  Instead, they were accomplished through purported transactions that generated consistently and hugely profitable gains, virtually matching the predetermined amounts.  (¶¶ 177, 179).

- The fictitious speculative options transactions were always recorded in December of every year for more than a decade, and only in certain accounts.  (¶ 181).

- Glantz and Edward Glantz were fully aware that Madoff purported to use the SSC trading strategy, and the fictitious options transactions were inconsistent with that strategy.  (¶¶ 183-185).

- Edward Glantz knew in advance that his accounts would receive this "extra payment" that was not dependent on actual securities trading, as evidenced by his conversations with Joel Levey.  (¶¶ 174-176).

These facts were readily apparent on the face of the statements for the accounts that received the Fraudulent Side Payments, the very statements that Glantz and Edward Glantz received and closely reviewed.  (¶¶ 163-165, 169).  These account statements confirmed for Glantz and Edward Glantz the patently fraudulent nature of these "payments":  they were not consistent with normal business practices for the payment of legitimate commissions or referral fees; BLMIS purported to be able to reach a predetermined amount, on demand, at the end of every year completely independent of market conditions; the unhedged options were not used under other circumstances; and the gains were virtually identical year after year.

25

(¶¶ 177, 180-181, 183).

Indeed, Glantz and Edward Glantz participated with BLMIS personnel by instructing them as to which of their accounts were to receive the Fraudulent Side Payments.  (¶¶ 198, 209).  They knew in advance that their designated accounts were to receive the special, but fraudulent, treatment and then observed and benefited from its execution.  The account statements also revealed another aspect of the Fraudulent Side Payment's fictitious nature, namely that, due to the additional fictitious gains, certain accounts showed greater percentage gains than other BLMIS accounts managed and monitored by Glantz and Edward Glantz.  (¶182).  This contrast further demonstrated BLMIS's fraud to Glantz and Edward Glantz, because certain accounts received preferential treatment despite the fact that all accounts purportedly engaged in the same investment strategy.  (¶¶ 178, 182).

Finally, Edward Glantz explained the Fraudulent Side Payments to Joel Levey in 1992.  (¶ 174).  In that conversation, he told Levey that the transactions were intended as an extra payment above and beyond any other return in the account.  (¶ 175).  Edward Glantz did not simply inform Levey of possible commission/referral fees, as Defendants suggest.  (Mem. at 6 n.3).  Rather, Edward Glantz described artificial premiums that certain favored investors received from BLMIS.  This is particularly significant because this conversation took place before the first of the Fraudulent Side Payments was awarded.  (¶ 175).  This demonstrates not only that Edward Glantz was aware of the existence of the Fraudulent Side Payments, but also that he knew about them in advance, and about Madoff's intent to manipulate accounts that were opened by certain select individuals, such as himself and Joel Levey.  *See, e.g., Cohmad*, 2013 WL 1609154, at *7.

26

### 2. Glantz and Edward Glantz Knew that the Guaranteed Rates of Return Were Impossible

In addition to the Fraudulent Side Payments, Glantz and Edward Glantz received impossible guaranteed rates of return in their IA accounts. (¶ 214). From 1995 through 1999, the Glantzes were promised and received a guaranteed rate of return of at least approximately 17%. (¶¶ 214, 240). From 2000 through 2002, they were promised and received a guaranteed rate of return of at least approximately 14%. (¶ 240). And from 2003 through 2007, they were promised and received a guaranteed rate of return of at least approximately 10%. (*Id*.) Glantz doubled down on his guaranteed returns by relying on them to issue promissory notes to OFA investors. (¶¶ 220-221, 227).

That the rate was guaranteed, not merely consistent or high, is a significant fact and further demonstrates Glantz's and Edward Glantz's knowledge of fraud. Indeed, Glantz knew that guaranteed rates of return are irreconcilable with the inherently volatile securities markets. (¶ 216). In particular, he knew that Madoff purported to use the SSC strategy for IA Accounts which, if employed, would tend to limit volatility, but not eliminate it or enable an investment advisory account to achieve a guaranteed level of performance. (¶¶ 216, 231). The contradiction between the receipt of guaranteed returns and the SSC strategy demonstrated that BLMIS was not conducting, and could not possibly be conducting, the securities transactions it purported to be executing. (¶¶ 228, 241-242). *See Kingate*, 2015 WL 4734749, at *7 (account statements reflected option trades that generated substantial gains inconsistent with SSC strategy). The only conclusion for Glantz to draw, therefore, was that BLMIS was engaged in a fraud. *See id.*, at *15 (finding actual knowledge where the "totality of the allegations . . . paint a picture" that defendants "knew that Madoff was reporting fictitious transactions"); *Cohmad*, 2013 WL 1609154 at *6 (drawing inference of actual knowledge from factual allegations of participation

in fraud).  Moreover, even the consistent rates of return, which Glantz monitored and which

confirmed his understanding of the guaranteed rates of return, standing alone establish Glantz's

actual knowledge of no real securities trading in his accounts.  *See Kingate*, 2015 WL 4734749,

at *6 (defendants' funds were "impossibly consistent notwithstanding the volatility of the

market," with positive returns even during times when financial markets plunged).

### 3.    Negative Account Balances Demonstrated to Glantz and Edward Glantz that the Account Statements were Fraudulent

The Amended Complaint alleges 153 instances of cash withdrawals that exceeded the

amounts of cash purportedly available in Glantz's and Edward Glantz's IA accounts and without

a corresponding liquidation of securities sufficient to fund the withdrawal.  (¶¶ 245-248).  In

each instance, BLMIS did not charge margin interest for the unfunded cash payments and thus

the withdrawals were effectively interest-free loans.  (¶ 249).  The Amended Complaint details

multiple examples of such withdrawals, such as when EJS's BLMIS account received an

unfunded payment of approximately $399,000.  (¶¶ 250-253).  At that time, no cash deposits or

purported securities sales sufficient to fund the withdrawal took place for seven days, although

no margin interest was charged for the unfunded cash payment.  (¶¶ 254-255).  The Amended

Complaint details similar examples in the BLMIS accounts for Grace and the Glantz Family

Foundation.  (¶¶ 256-267).  Indeed, as described in the Amended Complaint, each of the Grace,

EJS, GFF, Jelris, Glantz IRA, Edward Glantz IRA, OFA, and OFP accounts received cash

withdrawals in excess of cash purportedly available between 1995 and 2008.  (¶¶ 245-246).

Glantz and Edward Glantz were aware of these unfunded cash payments and knew that

no legitimate investment manager or broker-dealer would repeatedly advance cash payments to

customers without charging interest.  (¶ 268).  Without a corresponding liquidation of securities,

and without the occurrence of margin interest, the statements could not have been true, *i.e.*, the

accounts were not, as represented, fully or almost fully invested in securities. (¶ 269). The reasonable inference to be drawn in the Trustee's favor is that Glantz and Edward Glantz knew that Madoff was not engaging in the purported securities transactions. *Bigio*, 675 F.3d at 169 (requiring all inferences to be drawn in plaintiff's favor). As in *Kingate*, the purported grant by BLMIS of interest-free loans "evidenced fraudulent activity, or at least a high probability of fraud." *See Kingate*, 2015 WL 4734749, at *8.

### 4.    Glantz and Edward Glantz Knew that BLMIS's Strip Mall Auditor Was Incapable of Auditing the Billions in Assets Under Management at BLMIS

As alleged in the Amended Complaint, Glantz and Edward Glantz were aware that Friehling & Horowitz was purported to be BLMIS's auditor. (¶¶ 271-276). Indeed, this was not only disclosed on publicly available SEC forms, but was also indicated on documents maintained in Glantz's own files. (¶ 272). Given their substantial knowledge about public accounting— including Glantz's education and experience with accounting and Edward Glantz's occupation as a CPA—Glantz and Edward Glantz knew that Friehling & Horowitz was clearly incapable of actually performing such a job. (¶ 273).

Edward Glantz further knew that all accounting firms that perform audit work must enroll in the AICPA peer review program. (¶ 275). However, Friehling & Horowitz never appeared on the list because they did not perform audits. (*Id*.) Their specialized knowledge with respect to accounting and their knowledge that BLMIS purported to use a wholly unqualified auditor is additional evidence demonstrating that Glantz and Edward Glantz had actual knowledge of fraud at BLMIS. The reasonable inferences to be drawn from these non-conclusory factual allegations is that Glantz and Edward Glantz concluded that BLMIS was not audited at all.

Defendants' attempt to cast this as merely a "publicly available red flag" is incorrect. The Amended Complaint alleges that this information was known to Glantz not because of its

publicly available nature but because it was specifically contained in Glantz's own files.[7] (¶ 272).

A fact being publicly available is one thing, that Glantz and Edward Glantz saw and appreciated

that fact is quite another.  As such, the allegations with respect to Friehling & Horowitz add

further support to the Trustee's reasonable inferences when all of the facts in the Amended

Complaint are viewed in their totality.  *Bigio*, 675 F.3d at 169;  *see also Kingate*, 2015 WL

4734749, at *9 (noting that Madoff's use of Friehling and Horowitz was a "badge of fraud").

### 5.    Glantz Knowingly Facilitated Madoff's Fraud by Shielding BLMIS from Scrutiny

Glantz systematically and actively limited possible scrutiny by institutional investors and

industry professionals.  In other words, he took the highly active role of gatekeeper for Madoff.

(¶ 312).  Defendants improperly raise issues of fact by arguing that "Glantz himself did not

prevent or obstruct anyone from conducting due diligence on Madoff.  Rather, when an investor

or potential investor asked to conduct due diligence, he duly passed on the request to BLMIS."

(Mem. at 36).  A motion to dismiss is not the proper vehicle for determining such factual

disputes.  Rather, the sole issue is the sufficiency of the Trustee's allegations, which are to be

taken as true.

For decades, Glantz rebuffed various investor requests for access to or information about

Madoff and its operations.  Specifically, over the course of more than two decades, Glantz

avoided using the Madoff or BLMIS name when communicating with feeder investors.  (¶¶ 313-

316). When ABN AMRO, a large international bank, wanted to conduct due diligence on Madoff

---

[7] Defendants erroneously contend that "it cannot be inferred from the fact that Glantz's files contained a document bearing that information that he was actually aware of that information." (Mem. at 29). *Cf. Iqbal*, 129 S. Ct. at 1950 ("[D]etermining whether a complaint states a plausible claim" is "a context-specific task that requires the reviewing court to draw on its judicial experience and *common sense*.") (emphasis added).  Contrary to Defendants' assertion, it is appropriate to infer Glantz's knowledge of information contained in his own files. *See, e.g., Braswell v. United States*, 487 U.S. 99, 108 (1988) (finding appropriate that production of documents leads to the reasonable inference of "possession of the documents or knowledge of their contents").

in connection with a potential investment in Lakeview or Vista, Glantz ran interference for

Madoff. (¶¶ 317-323). Stating that "Bernie is in this way difficult and problematic," Glantz

made it plain that the "question of access is not open." (¶¶ 320, 322). This exchange with ABN

AMRO demonstrates the lengths to which Glantz went in dissuading potential investors from

attempting to perform diligence on Madoff. Notably, the issue arose when Glantz was trying to

consummate a deal with the bank. (¶ 317). By supporting Madoff's refusal to allow due

diligence and his insistence on secrecy, Glantz jeopardized the deal even though the result was

financially detrimental to him. (¶ 322). The plausible inference, to which the Trustee is entitled,

as to why Glantz would sacrifice such a transaction, is that Glantz knew about the fraud and was

seeking to preserve his own lucrative, albeit improper, benefits. *See Kingate*, 2015 WL

4734749, at *14 (finding of actual knowledge supported by steps defendants took to deflect

inquiries directed at Madoff, "implying that they feared what might be discovered"); *Bigio*, 675

F.3d at 169.

In sum, the Trustee has pled facts showing that Glantz and Edward Glantz had no

reasonable expectations that BLMIS was actually executing securities transactions based on

legitimate "securities contracts" or that they were receiving bona fide "settlement payments"

from BLMIS. This is confirmed not only by Glantz's and Edward Glantz's active participation

in the fraud, but also by Glantz's invocation of the Fifth Amendment and refusal to answer any

questions related to his knowledge of Madoff's fraud. (¶ 328). Accordingly, when the Amended

Complaint is viewed "in its entirety," *Tellabs, Inc.*, 551 U.S. at 322, the Trustee has sufficiently

alleged Glantz's and Edward Glantz's actual knowledge of the fraud thereby negating the

applicability of § 546(e). *See Cohmad*, 2013 WL 1609154 at *4; *Katz*, 462 B.R. at 252 n.3;

*Arbco*, 498 B.R. at 43; *Kingate*, 2015 WL 4734749, at *15.

31

C.    **The Allegations of Actual Knowledge Against Glantz and Edward Glantz are
Different From Those Alleged in *Merkin II***

Defendants' erroneous assertion that "*Merkin II* is instructive and dispositive of the issue

[of actual knowledge] here" is merely an attempt to sidestep the well-pled allegations in the

Amended Complaint.  (Mem. at 15-16).  Rather than addressing the numerous, compelling

factual allegations that are unique to Glantz and Edward Glantz, Defendants merely seek to

improperly recast the Trustee's allegations in the mold of *Merkin II*.  However, this approach

fails to appreciate that the Trustee's allegations in this action stand on their own, as they do in

each of the Trustee's avoidance actions.

The Amended Complaint is replete with allegations evidencing Glantz's and Edward

Glantz's knowledge of, and participation in, fraud at BLMIS, that were not present in *Merkin II*:

- Glantz and Edward Glantz were knowing recipients of the annual Fraudulent Side Payments. Statement of Facts § C.

- The Fraudulent Side Payments rewarded Glantz and Edward Glantz for the return of investor money.  *Id.*

- Glantz and Edward Glantz knowingly received impossible guaranteed rates of return. Statement of Facts § D.

- Glantz deflected scrutiny by investors who wanted to perform due diligence. Statement of Facts § G.

- When Glantz appeared for questioning under oath he asserted his Fifth Amendment rights against self-incrimination and refused to answer the questions. Statement of Facts § H.

This Court recently contrasted the allegations in *Merkin* with those in *Kingate*, and held

that the *Kingate* complaint plausibly alleged knowledge on the part of certain defendants "that

Madoff was not engaging in the securities transactions he reported, and that many of the entries

in the statements and trade confirmations depicted trades that could not have taken place."

*Kingate*, 2015 WL 4734749, at *13.  Similarly, the allegations in the Amended Complaint, as

32

discussed above, detail Glantz's and Edward Glantz's knowledge of the fake options trades and other impossible transactions, and Glantz's actions to deflect investors' scrutiny of Madoff. Like the complaint in *Kingate*, the Amended Complaint sufficiently alleges actual knowledge on the part of Glantz and Edward Glantz.

## III.   DEFENDANTS CANNOT INVOKE THE § 548(c) DEFENSE

Defendants have no defense against the avoidance of approximately $30 million in fictitious profits withdrawn from BLMIS in the two years before December 11, 2008. Nonetheless, Defendants seek dismissal of Counts I and II of the Amended Complaint "to the extent the transfers that the Trustee is seeking to avoid consist of principal or commission/referral fees paid to Glantz and Edward Glantz." (Mem. at 20).

Section 548(c) of the Bankruptcy Code provides a defense to a fraudulent transfer claim only to the extent that a transferee takes for value *and* in good faith. This is a two-pronged inquiry and a transferee must satisfy both requirements. Defendants' argument satisfies neither.

### A.   The Fraudulent Side Payments Are Not Compensation for Value

The Fraudulent Side Payments were not legitimate commissions paid for services of value to BLMIS. Rather, they are indistinguishable from any other fictitious profits. As the Amended Complaint alleges, they were *not* provided by BLMIS through a deposit or check or even as a transfer of funds or securities from another account. (¶ 177). Instead, the Amended Complaint alleges in great detail how these illicit payments were orchestrated through the use of fictitious non-hedged options transactions in certain IA accounts designated by Glantz and Edward Glantz. (¶¶ 173-188). The proceeds from these fake trades were no different than the proceeds from any other fake trades and constituted nothing but another form of fictitious profits. As such, they were merely purported additions to certain account statements that were then available to be (and were) withdrawn from the Ponzi scheme. The Court should not be

sidetracked by the specious claim that Glantz and Edward Glantz somehow provided value for the fictitious profits they received through the overtly fabricated Fraudulent Side Payments.

The District Court has already ruled on this issue and held that a "customer may only seek the protections of § 548(c) to the extent of investments of principal, and federal and state law claims cannot be used to increase the amount to which a customer is entitled from the customer property estate." *SIPC v. BLMIS* (*In re BLMIS*), 499 B.R. 416, 426 (S.D.N.Y. 2013). In other words, fictitious profits—which include the Fraudulent Side Payments—are not subject to the protections of § 548(c). *Id.*

In any event, referring investors to a Ponzi scheme does not, and cannot, constitute value. *See, e.g.*, *Miller v. Humphrey (In re Waterford Funding, LLC)*, No. 10-02889, 2012 WL 380773, at *5 (Bankr. D. Utah Feb. 6, 2012) ("By soliciting and bringing in new investors, Humphrey provided no value . . . and Humphrey should not benefit for his efforts to keep the Ponzi scheme afloat."). In addition, a value defense is a highly fact-based inquiry that is not properly before the Court on a motion to dismiss. *See, e.g.*, *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 334-37 (Bankr. S.D.N.Y. 2011) ("*2011 Cohmad Decision*") (finding value analysis for payments defendants received for referring investors to BLMIS inappropriate at the motion to dismiss stage); *Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Tech. Ltd.)*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005) (same).

Defendants' reliance on *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000), to bolster the theory that their purported "commission/referral fees" from BLMIS were for value is misplaced. (Mem. at 22-23). The *Churchill* trustee sought to recover commissions paid to good faith brokers employed as independent contractors of an alleged Ponzi scheme. *Id.* at 667. In that specific case, there was

no claim that the brokers had knowledge of the Ponzi scheme or that their own activities were

unlawful or wrong in any respect.  *Id.* at 673-74.  Indeed, the *Churchill* trustee acknowledged

that the brokers did nothing wrong, and conceded that the services rendered in each specific

broker transaction at issue were equivalent to the commissions received and the commissions

were paid in the form of actual transfers pursuant to contractual obligations.  *Id.* at 675.

Similarly, on appeal, the District Court held that brokers provided value in part because they

acted "with no knowledge of any wrongdoing."  *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 308

(S.D.N.Y. 2001); *see also 2011 Cohmad Decision*, 454 B.R. at 334-35 (stating that the

defendants "ignore that the *Churchill* court explicitly limited its holding to undisputedly

'innocent' brokers").  Contrary to that case, and as addressed at length here, the Amended

Complaint has numerous allegations that Defendants participated in the fraud to enrich

themselves at the expense of others.

### B.      Defendants Did Not Receive Transfers In Good Faith

Even if Defendants could prevail at this stage on the factual issue of whether they

provided value for the Fraudulent Side Payments, a successful § 548(c) affirmative defense

requires that a transferee also take in good faith.  To establish a "good faith" defense, Defendants

must show they did not know of the fraud and were not "willfully blind" to the high probability

of fraud at BLMIS. *See Katz*, 462 B.R. at 455.  As an initial matter, as detailed above, the

Trustee has adequately pled that Glantz and Edward Glantz knew of Madoff's fraud.  This alone

precludes Defendants from relying on the good faith defense under § 548(c).  *Id.*

### 1.      At a Minimum, Glantz and Edward Glantz were Willfully Blind to Madoff's Fraud

Willful blindness precludes Defendants from relying on the good faith defense under §

548(c), as willful blindness is tantamount to a lack of good faith.  *Id.*  The District Court has

defined willful blindness as choosing to blind oneself to the "red flags" that suggest a high probability of fraud. *SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 21 (S.D.N.Y. 2014) (citing *Katz*, 462 B.R. at 455). In *Merkin II*, this Court found that the Trustee's allegations of numerous "red flags"—which Merkin "saw . . . understood . . . and purposely ignored"—established Merkin's willful blindness to BLMIS's fraud. *Merkin II*, at \*17. The Trustee has alleged here that Glantz and Edward Glantz saw, understood, and purposely ignored significant evidence of fraud. Indeed, as detailed above, they variously: (i) received the Fraudulent Side Payments with full awareness of their fraudulent nature; (ii) were aware of the not only impossibly consistent, but guaranteed double-digit rates of return; (iii) observed numerous instances of negative account balances without being charged margin interest; and (iv) knew that BLMIS's purported auditor was incapable of performing its job. In addition, Glantz helped Madoff maintain a veil of secrecy and actively helped prevent due diligence on BLMIS that might reveal the fraud. The Amended Complaint sufficiently "alleges facts showing that the defendant[s] were aware of the 'red flags' and the probability that Madoff was running a fraudulent scheme" and thus the motion to dismiss on an argument of good faith must fail. *Id.*

### 2.    Glantz Had a Duty to Investigate BLMIS

Defendants repeatedly emphasize that "the securities laws do not ordinarily impose any duty on investors to investigate their brokers," (*see, e.g.,* Mem. at 21 (citing *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012)), and that the failure to "investigate the matter further" cannot equate to willful blindness. (Mem. at 24). Glantz and Edward Glantz were not, however, mere investors. The Court's examination in *Merkin II* is informative:

> Furthermore, the fact that the Government and other investors missed the same red flags does not mean that Merkin did too. Although an investor is not under a duty to investigate his broker, *see Avellino*, 469 B.R. at 412; *Katz*, 462 B.R. at 455, Merkin was not a mere investor; he was a general partner or officer of the

> Remaining Funds and owed a separate duty of care in selecting
> their outside money-managers and their investments. . . . In short,
> the visibility of 'red flags' depends on who is standing sentry, and
> Merkin agreed to keep a sharp lookout for fraud.

515 B.R. at 145.

In a manner similar to that discussed in *Merkin II*, Glantz and Edward Glantz held

numerous accounts with BLMIS and had separate, fiduciary duties to other investors. (¶ 87).

Glantz, in particular, founded the management entity Vista. (¶279). Vista, and Glantz, assumed

various fiduciary duties to investors in Fern Creek, Lakeview, and GFP, including the duty to

exercise good faith. (¶¶ 291, 298, 309). In this role, Glantz assumed a separate duty of care in

selecting, and by extension, monitoring and investigating BLMIS. (¶¶ 292-294, 298, 309).

Glantz also had self-described "extraordinary" access to Madoff which gave him an opportunity

to ask the appropriate questions of Madoff, should he have elected to do so. (¶ 84). In short,

Glantz promised to keep a sharp lookout for fraud, *see Merkin II*, 515 B.R. at 145, and at

minimum willful blindness is properly inferred from the information he had and the duty he

assumed. *Katz*, 462 B.R. 455 (a defendant's belief may be inferred from what the totality of the

circumstances would convince someone of in the defendant's position, with a comparable level

of sophistication and expertise in financial matters).

### 3. Glantz's and Edward Glantz's Profit Motive Provided Every Incentive to Turn a Blind Eye

Defendants argue that it "is important to note here Glantz's and Edward Glantz's

significant personal exposure to Madoff's fraud" and that "they invested substantial sums of their

own personal money and the money of their close relatives . . . at BLMIS." (Mem. at 37). While

Defendants assert this "significant personal exposure render even more implausible any

allegation that they were willfully blind to Madoff's fraud," *id.*, this position misrepresents the

factual allegations in the Amended Complaint.

This action seeks more than $40 million in fictitious profits alone.  In other words, their involvement with BLMIS was hugely profitable to Glantz and Edward Glantz.  Indeed, as early as 1998 (in the case of Grace and EJS) and certainly by late 2000 and early 2001 (in the case of Jelris, and their IRA accounts), Glantz and Edward Glantz had already fully drawn down the principal they invested.  *See* Am. Compl., Ex. B, p. 3-12.  Effectively "playing with house money" from then on, Glantz's and Edward Glantz's continued involvement in the fraud was insulated from real economic losses.  The allegations of the Amended Complaint make it clear that Glantz and Edward Glantz, far from bearing actual personal exposure, were simply "obtaining moneys while [they] could," *Cohmad*, 2013 WL 1609154, at *4, and explain why they would turn a blind eye to the fraud.

In *Merkin II*, the Court examined and rejected a similar contention:

> Merkin contends that his 'undisputed' personal exposure of more than $110 million invested with Madoff renders implausible allegations that he knew BLMIS was a Ponzi scheme. . . . the Merkin Defendants earned substantial management and incentive fees keyed to the net asset value of the Defendant Funds' investments and the fictitious profits generated by BLMIS increased his fees. . . . These substantial fees can explain why they would turn a blind eye to a fraud. *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 410 (S.D.N.Y. 2010) (defendant feeder fund managers' 'finer faculties were overcome by the fees they earned and that they turned a blind eye to obvious signs of fraud').

515 B.R. at 143.

Given the totality of the objective and subjective indicia of fraud, coupled with Glantz's and Edward Glantz's fiduciary duty to monitor Madoff or BLMIS, and the Trustee's allegations establishing their actual knowledge, the Amended Complaint presents far more facts than necessary to plead willful blindness.

IV.    **GLANTZ'S AND EDWARD GLANTZ'S ACTUAL KNOWLEDGE AND
WILLFUL BLINDNESS SHOULD BE IMPUTED TO THE OTHER
DEFENDANTS**

The Amended Complaint alleges a sufficient basis to establish that Glantz's actual

knowledge and willful blindness are properly imputed to Merlin, Enhancement, EJS, Grace,

Jelris, Vista, Lakeview, ERG Trust, ERG Estate, TG Trust, and Elaine Ostrin; and that the actual

knowledge and willful blindness of both Glantz and Edward Glantz are properly imputed to The

Glantz Family Foundation.  Defendants contend, without any support, that imputed states of

mind "cannot equate with" the "subjective states of mind" necessary to overcome the § 546(e)

safe harbor and § 548(c) defense (Mem. at 39).  Defendants' contention is an erroneous

statement of the law and contrary to the principles underlying imputation.

As an initial matter, as this Court has stated, "[a]t the motion to dismiss stage, where the

Trustee has not had the opportunity to conduct discovery concerning the relationships between

the Moving Defendants, the question is not whether the Trustee has proved the existence of an

agency relationship, merely whether he should have the chance to do so."  *2010 Merkin*

*Decision*, 440 B.R. at 260 (citation and marks omitted).  The imputation allegations in the

Amended Complaint are clearly sufficient at this stage of the proceeding.

 "Under well-established principles of agency law, 'the acts of agents, and the knowledge

they acquire while acting within the scope of their authority are presumptively imputed to their

principals.'"  *Merkin II*, 515 B.R. at 146 (quoting *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950

(N.Y. 2010)).  "The general rule is that knowledge acquired by an agent acting within the scope

of his agency is imputed to his principal and the latter is bound by such knowledge although the

information is never actually communicated to it." *Center v. Hampton Affiliates, Inc.*, 488

N.E.2d 828, 829 (N.Y. 1985).  Similarly, "[w]here an individual so dominates or controls the

activities of some entity such as [a] trust, the entity may also be held responsible for the same

acts committed by the individual." *SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 729

(S.D.N.Y. 2003). Furthermore, the knowledge of a general partner is properly imputed to the

partnership, whether it is a limited partnership or a general partnership, as well as to other

general partners. *See Laguna Heights Dev. Co. v. Union Bank of Calif.*, No. G028962, 2002 WL

31667939, at *1 n.1 (Cal. Ct. App. 2002) (citing Cal. Corp. Code § 16102(f)) ("[a] partner's

knowledge . . . relating to [the] partnership is effective . . . as knowledge by the partnership");

DEL. CODE ANN. tit. 6 §§ 15-102, 17-403 (same); *In re Phillips Petroleum Sec. Lit.*, 738 F. Supp.

825, 837 (D. Del. 1990) ("knowledge and actions of one partner are imputed to all others");

*Mfrs. Hanover Trust Co. v. Jayhawk Assoc's.,* 766 F. Supp. 124, 127 (S.D.N.Y. 1991)

(knowledge of partner in a general partnership "is imputed to all the partners").

    The Amended Complaint sufficiently alleges that Glantz was the agent and primary

decision maker of, and dominated and controlled, Merlin, Enhancement, EJS, Grace, Jelris,

Vista, Lakeview, RMG Trust, G-O Trust I, G-O Trust II, ERG Trust, ERG Estate and TG Trust.

(¶¶ 330-335, 339-347). The Amended Complaint sufficiently alleges that Glantz and Edward

Glantz were the agents and primary decision makers of, and dominated and controlled, Glantz

Family Foundation. (¶¶ 336-338). The Amended Complaint also sufficiently alleges that Glantz

was a general partner of EJS, Grace, and Jelris; and that RMG Trust, TG Trust, ERG Trust and

Elaine Ostrin were general partners with Glantz in EJS and Jelris. (¶¶ 335, 347-348). Defendants

do not challenge the general sufficiency of these agency, domination and control, and partnership

allegations.

    Defendants assert that imputed knowledge is insufficient with respect to § 546(e) and §

548(c), but they cite no cases supporting that conclusion. To the contrary, this Court has already

upheld the imputation of actual knowledge and willful blindness in other Madoff adversary

proceedings.  See *Kingate*, 2015 WL 4734749, at *15 (holding that the Trustee pled "sufficient facts to permit imputation of the Non-Fund Defendants' knowledge to the Funds."); *Merkin II*, 515 B.R. at 146-49 (holding that the Trustee properly stated a claim for imputing Merkin's willful blindness to certain corporations and partnerships).

Defendants' contention is not only unsupported by relevant authority, it is also implausible and unworkable because of the reality that corporations, partnerships and other entities of necessity act through individuals.  *See Kirschner*, 938 N.E.2d at 950 ("Corporations are not natural persons.  Of necessity, they must act solely through the instrumentality of their officers or other duly authorized agents.") (internal citations and quotations omitted); *JMM Props., LLC v. Erie Ins. Co.*, No. 5:08-CV-1382 (GTS/ATB), 2013 WL 149457, at *6 (N.D.N.Y. Jan. 14, 2013) ("[O]ne characteristic of both corporations and partnerships is that the acts of the principals are imputed to the business entity."); *Ballesteros Franco*, 253 F. Supp. 2d at 730 (treating trusts like corporations for imputation analysis).  If entity defendants could not be imputed to have the level of knowledge, including actual knowledge and willful blindness, of their agents, principals, control persons and general partners with respect to § 546(e) and § 548(c), transferees organized in such forms would always be eligible to invoke these provisions, and would therefore be unduly advantaged, while natural person transferees would be unfairly disadvantaged.

Indeed, while none of the cases cited by Defendants involved § 546(e) or § 548(c), most of the cases Defendants cite involve the imputation of knowledge from an agent to a natural person, rather than from individuals to entities he dominates and controls and for which he acts as agent.  As explained in *Syntex Corp. v. Lowsley-Williams & Cos.*, 79 Cal.Rptr.2d 371 (Cal.App. 1 Dist. 1998), which distinguished two of the cases cited by Defendants (*Harte v.*

*United Benefit Life Ins. Co.*, 66 Cal.2d 148 (1967) and *Snook v. Netherby*, 124 Cal. App. 2d 797

(Cal. Dist. Ct. App. 1954)), imputed actual knowledge is necessary in the case of a corporation

because a corporation can only "know" what is imputed to it through its agents. *Syntex Corp.*, 79

Cal.Rptr.2d. at 387.

Finally, Defendants' contention that the Trustee may not impute Glantz's actual

knowledge and willful blindness to Elaine Ostrin fails because it ignores general partnership law.

The Amended Complaint alleges that Elaine Ostrin was a general partner with Glantz in EJS

from 1993 to 1998, and with Glantz in Jelris from 1993 to 1995, during which times Glantz and

Edward Glantz, among other activities, received patently Fraudulent Side Payments and

guaranteed rates of return.  Indeed, the Fraudulent Side Payments were paid into EJS's BLMIS

account in 1994 and 1995.  As stated above, the knowledge of one general partner in a general

partnership is imputed to all the other general partners.  *See Mfrs. Hanover Trust*, 766 F. Supp. at

127.  Therefore, Glantz's knowledge is properly imputed to Elaine Ostrin.

## V.    THE TRUSTEE HAS PROPERLY PLED HIS SUBSEQUENT TRANSFEREE CLAIM

Defendants present four arguments as to why Count VIII of the Amended Complaint

seeking subsequent transfers should be dismissed.  Each fails to provide any basis for dismissal.

First, Defendants contend that the Amended Complaint fails to state a claim for relief

because it fails to identify the initial transfers from which the recoverable subsequent transfers

were made.  (Mem. at 52).  However, the Motion overlooks both the detailed listing on Exhibit B

of initial transfers that the Trustee seeks to avoid, as well as the detailed listing on Exhibit C of

subsequent transfers that the Trustee seeks to recover.  These allegations more than meet the

Trustee's burden at the pleading stage.

This Court has ruled that the Trustee's "burden at this stage is not so onerous as to require dollar-for-dollar accounting of the exact funds at issue." *SIPC v. BLMIS (In re BLMIS)*, No. 08-01789 (SMB), 2015 WL 3465752, at *23 (Bankr. S.D.N.Y. June 2, 2015) ("*Omnibus Motion To Dismiss Decision*"); *Picard v. Charles Ellerin Revocable Trust (In re BLMIS)*, No. 08-01789 (SMB), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012). "Rather, the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferees]," *Charles Ellerin Revocable Trust*, 2012 WL 892514, at *3, together with "the necessary vital statistics—the who, when, and how much of the purported transfers," *Omnibus Motion To Dismiss Decision*, 2015 WL 3465752 at *23 (internal citations omitted).

The Trustee has met this burden. On Exhibit B to the Amended Complaint, the Trustee alleges the date and amount of each transfer to each Initial Transferee Defendant, and on Exhibit C to the Amended Complaint, the Trustee alleges the date, transferor, and amount of each subsequent transfer to each Subsequent Transferee Defendant. This Court has repeatedly upheld the sufficiency of similarly structured allegations, *see, e.g.*, *Charles Ellerin Revocable Trust*, 2012 WL 892514, at *3; *Omnibus Motion To Dismiss Decision*, 2015 WL 3465752 at *23, and it should do so in this case as well.

Second, Defendants contend that the Court must dismiss the Trustee's subsequent transfer count to the extent that it seeks recovery of subsequent transfers of initial transfers that are not subject to avoidance. (Mem. at 52). Defendants' contention is unavailing for two reasons. First, for the reasons set forth above, all the initial transfers are avoidable. Second, while Defendants rely on the District Court's decision in *Cohmad*, that decision provides an important exception: "to the extent that an innocent customer transferred funds to a subsequent

43

transferee who had actual knowledge of Madoff Securities' fraud, that subsequent transferee cannot prevail on a motion to dismiss on the basis of § 546(e)'s safe harbor." *SIPC v. BLMIS*, No. 12 MC 115 JSR, 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013). Therefore, even if the Court dismisses any of the Trustee's initial transferee claims based on § 546(e), the Trustee may still recover those transfers from any subsequent transferees deemed to have had actual knowledge of Madoff's fraud. *Id.*

Third, Defendants state that the Amended Complaint does not allege the lack of good faith of TG Estate and Austin Bosarge, two of the subsequent transferees. (Mem. at 53-54). But this is not a sufficient basis for dismissing the Trustee's claims against these Defendants. As this Court explained in *Merkin II*, "[a] subsequent transferee can defend by proving that it took in good faith and without knowledge of the avoidability of the initial transfer but only to the extent it paid value. 11 U.S.C. § 550(b). Thus, good faith alone is not enough." 515 B.R. at 117. This Court rejected subsequent transferee defendants' motion to dismiss in *Merkin II*, finding no support in the pleadings for a value defense on the part of defendants. *Id.* There is likewise no support in the pleadings in this case for any claim that TG Estate or Austin Bosarge provided value for the subsequent transfers they received. Accordingly, this aspect of Defendants' motion to dismiss should be denied.

Finally, Defendants contend that § 546(e)'s safe harbor provision bars the Trustee's subsequent transfer claim. (Mem. at. 54-55). However, § 546(e) does not apply to defendants who have actual knowledge of Madoff's fraud and does not apply to any transfers avoidable under § 548(a)(1)(A), § 548(a)(1)(B), or the New York Debtor and Creditor Law ("NYDCL"). As discussed above, the Trustee has sufficiently pled Glantz's and Edward Glantz's knowledge of Madoff's fraud and that knowledge is properly imputed to other Defendants as discussed

44

above.  Further, Count VIII seeks recovery of numerous transfers avoidable under §

548(a)(1)(A).  Therefore, § 546(e) does not apply to the Trustee's subsequent transfer claim.

## VI.    THIS COURT HAS ALREADY REJECTED A NUMBER OF DEFENDANTS' ARGUMENTS

Defendants incorporated numerous arguments into the Motion that previously had been

rejected by the Court, and they were again definitively rejected by the Court in its recent June 2,

2015 omnibus decision on various motions to dismiss filed in other adversary proceedings.

*Omnibus Motion To Dismiss Decision*, 2015 WL 3465752.  These arguments are addressed

below, and should, in keeping with the Court's prior rulings, be summarily denied.

### A.    The Trustee Can Avoid Transfers From Before BLMIS was Formed as an LLC in 2001

Defendants contend that the Amended Complaint should be dismissed to the extent it

seeks to avoid and recover transfers made prior to 2001, when BLMIS was converted from a sole

proprietorship into a limited liability company.  This Court already rejected this argument twice

because the change of corporate form was purely formalistic and "nothing has changed since

1960 except for the business form that Madoff used to conduct his Ponzi scheme."  *See SIPC v.*

*BLMIS (In re Madoff)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014); *Omnibus Motion To Dismiss*

*Decision*, 2015 WL 3465752 at *33.  In any event, the Trustee is authorized to recover all

transfers made by BLMIS, including those made prior to 2001 when it converted from a sole

proprietorship to a limited liability company.

First, the District Court Order commencing this proceeding expressly authorized the

Trustee to act on behalf of the "debtor."  "Debtor" has a special meaning under SIPA: "a member

of SIPC with respect to whom an application for a protective decree has been filed under section

78eee(a)(3) of this title."  SIPA § 78lll(5).  The "members" of SIPC include "all persons

registered as broker-dealers" with the SEC under section 78o(b) of Title 15.  SIPA §

78ccc(a)(2)(A).  This Court has previously found that the SIPC "member" at issue in this liquidation proceeding—BLMIS—was continually the same registered broker-dealer notwithstanding the change in corporate form.  *See In re Madoff*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014); *Omnibus Motion To Dismiss Decision*, 2015 WL 3465752 at *33.  Indeed, the Form-BD Application for Broker-Dealer Registration submitted to the SEC by Madoff in connection with the change in business form of BLMIS in 2001 expressly identified that it was an amendment to an existing broker-dealer's registration—and not a new application of a separate broker-dealer seeking to register with the SEC.  *Id.*; (¶ 63) ("BLMIS had been continually registered with the SEC, and remained a SIPC member since SIPC's formation in late 1970.").

Second, this Court's Order substantively consolidating the individual chapter 7 estate of Bernard L. Madoff into this liquidation proceeding of BLMIS under SIPA authorized the Trustee to recover transfers made by BLMIS prior to its formation as a limited liability company.  The Court found that substantive consolidation of the two estates was particularly appropriate given the fact that creditors dealt with Madoff and BLMIS as a single economic unit, as well as the intertwined nature of financial affairs between Madoff and BLMIS.  Consent Order Substantively Consolidating the Estate of Bernard L. Madoff Into the SIPA Proceeding of Bernard L. Madoff Investment Securities LLC and Expressly Preserving All Rights, Claims and Powers of Both Estates."  *SIPC v. BLMIS*, 08-civ-10791 No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252 (the "Substantive Consolidation Order"), ¶¶ L and M.  The Substantive Consolidation Order expressly authorized the Trustee on behalf of the consolidated estates to avoid all fraudulent transfers made in the course of the Ponzi scheme.  Substantive Consolidation Order ¶¶ 4 and 7.  The recovery of these transfers is not limited to those made

while the entity was organized as an LLC as opposed to those made while a sole

proprietorship.  *See generally Picard v. Avellino (In re BLMIS)*, Case No. 10-05421 (SMB), ECF

No. 102, Letter from Jimmy Fokas to the Hon. Stuart M. Bernstein (Aug. 8, 2015).

**B.    The Ponzi Scheme Presumption is Applicable In This Case**

Defendants assert that the facts here do not support application of "the Ponzi scheme

label" to BLMIS.  (Mem. at 41, 43).  This Court and the District Court have rejected this

argument on numerous occasions.  The breadth and depth of the Madoff Ponzi scheme leave no

basis for disputing the application of the Ponzi scheme presumption to the facts of this case,

particularly because, as alleged in the Amended Complaint, Madoff admitted to all of the

elements of a Ponzi scheme in his plea allocution.  *See e.g., Omnibus Good Faith Decision*, 2015

WL 3465752, at *21-23; *Chais*, 445 B.R. 206; *2011 Cohmad Decision*, 454 B.R. 317; *Picard v.

Peter Madoff (In re BLMIS)*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011); *2010 Merkin Decision*, 440

B.R. at 243; *see also Katz*, 462 B.R. 447 (S.D.N.Y. 2011); *Picard v. Merkin*, No. 11 MC 0012

(KMW), 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011).[8]

**C.    The Current Value of the Customer Fund Has No Impact on the Trustee's
Ability To Bring Avoidance Actions**

Section 78fff-2(c)(3) of SIPA allows the Trustee to "recover any property transferred by

the debtor which, except for such transfer, would have been customer property if and to the

extent that such transfer is voidable or void under the provisions of title 11" whenever "customer

property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of

paragraph (1)."  This Court recently considered and rejected on multiple grounds an argument

based on § 78fff-2(c)(3) that is practically identical to an argument Defendants made in their

---

[8] Further, Defendants rely on documents outside of the four corners of the complaint, including a declaration in
another adversary proceeding, a Wall Street Journal report, and the Trustee's First Interim Report, in support of their
argument.  Arguments premised on these documents are improperly interposed on a motion to dismiss pursuant to
Fed. R. Civ. P. 12(b)(6).

Motion—that the Trustee has recovered sufficient customer property to pay all the customer claims and therefore does not have standing under § 78fff-2(c)(3).  (Mem. at 10).

This Court held in the *Omnibus Motion to Dismiss Decision* that the Trustee has standing under § 78fff-2(c)(3) if he adequately pleads the insufficiency of the customer property fund. 2015 WL 3465752, at *7.  Here, the Trustee has met this pleading requirement, as the Trustee pled that he "will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1)."  (¶ 60).

Even though this Court in the *Omnibus Motion to Dismiss Decision* noted that the Trustee's adequate pleading of the insufficiency of the customer property fund should "end the inquiry for the present," this Court nonetheless considered and rejected arguments that were nearly indistinguishable from those made by Defendants.  2015 WL 3465752, at *7.  First, this Court held that it was premature to consider the value of the customer property fund at this stage of the adversary proceeding.  *Id.*  Second, this Court determined that standing under § 78fff-2(c)(3) should be determined based on the value of the customer property fund on the Filing Date.  *Id.* at *5-7.  It cannot be disputed that on the Filing Date the customer property fund was not sufficient to pay customer claims in full.  Thus, in addition to being outside of the four corners of the Amended Complaint, the current value of the Trustee's customer property fund is irrelevant to the Trustee's standing to bring this action under § 78fff-2(c)(3).  Further, this Court held that money in the United States Department of Justice's Madoff Victim Fund is not to be included with money in the customer property estate for purposes of determining standing under § 78fff-2(c)(3), because it does not meet the definition of "customer property."  *Id.*  This Court also noted that the beneficiaries of the Madoff Victim Fund are not limited to SIPA customers,

and thus the money in the fund "will not come close" to covering any shortfall in the customer

property fund due to the number and amount of non-SIPA claims against it.

Therefore, because the Trustee sufficiently pled the insufficiency of the customer

property fund, and for all the additional reasons set forth above, this Court should reject

Defendants' contention that the Trustee lacks standing.

### D.      Defendants' Request For A Stay Of This Action, Pending Sufficient Recoveries In Other Actions, Should Be Rejected

Defendants' related request to stay this action should likewise be rejected.  This Court

recently declined to issue a stay as to various BLMIS adversary proceedings in response to a

number of arguments, including those made by Defendants.  *Omnibus Motion to Dismiss*

*Decision*, 2015 WL 3465752, at *4 n.7.

Defendants assert that the action should be stayed "because it cannot be determined"

whether the assets recovered by the Trustee and the Justice Department are sufficient to pay all

claims, but they contradict their own argument by incorrectly asserting that the Trustee and

Justice Department have "already recovered more than enough assets."  (Mem. at 56-58).  Thus,

their argument collapses under its own weight.  In any event, as discussed above in Section

VI(c), the customer property fund is, in fact, currently insufficient.  To the extent Defendants'

request is based on any potential future recoveries by the Trustee in other adversary proceedings,

it should be rejected for the reasons discussed above.  Defendants also assert without authority

that a stay is appropriate because any additional litigation in this proceeding would prejudice the

general estate, as SIPC "may" ultimately seek to recover funds advanced to the Trustee to cover

legal costs.  (Mem. at 57).  This Court rejected this same argument in the *Omnibus Motion to*

*Dismiss* decision, 2015 WL 3465752, at *8, and it should do likewise here.

As a general matter, a party seeking a stay "bears the burden of demonstrating the wisdom and justice of a stay." *U.S. Bank Nat'l Assoc. v. Perlmutter (In re Southside House, LLC)*, 470 B.R. 659, 684 (E.D.N.Y. 2012) (quoting *Uni-Rty Corp v. Guangdong Bldg. Inc. (In re Uni-Rty Corp.)*, 1998 WL 299941, at *7 (S.D.N.Y. 1998)). Courts typically consider five factors in determining whether to grant a stay: (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest. *Id.* (quoting *Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996)).

These factors weigh in favor of the Trustee. First, the Trustee would be prejudiced if this action is stayed, because a stay would delay and hinder the Trustee's avoidance and recovery for Madoff's victims, and would make it more likely that additional evidence could be lost. Already, Edward Glantz and Thelma Glantz, individuals with first-hand knowledge as to the Trustee's claims, passed away in 2007 and 2010, respectively (¶¶ 35, 43), and other individuals that could have served as witnesses in this action have died in the almost five years since it was initiated.

As for the other factors, neither Defendants nor this Court will be burdened if this action proceeds. Defendants assert that litigating this action would require Defendants and this Court to expend resources (Mem. at 57), but that is not a reason to stay this proceeding while others continue. With regard to the interests of persons not party to this proceeding, Defendants assert that third parties will be burdened in this case by discovery demands. (Mem. at 58). But this argument is speculative and not a reason why the Trustee's hundreds of other adversary

proceedings should proceed, the majority being cases where the good faith of the defendants is not at issue, while this action is indefinitely stayed.

A SIPA liquidation is supposed to be "an expeditious alternative to a traditional bankruptcy proceeding." *Picard v. JPMorgan Chase & Co. (In re BLMIS)*, 721 F.3d 54, 59 (2d. Cir. 2012). This Court should allow this action to move forward without delay.

### E.    California and New York Law Do Not Prevent the Trustee From Avoiding Transfers From BLMIS Accounts Held in the Name of IRAs

Citing New York Civil Practice Law & Rules ("CPLR") § 5205 and California Code of Civil Procedure ("California Code") §704.115, Defendants contend that Glantz's and Edward Glantz's IRA accounts are exempt from the claims of judgment creditors and therefore protected from the Trustee's claims. (Mem. at 49-51). This Court, however, has already rejected a similar argument regarding exempt trust accounts, and it should do the same here.

Both states' provisions protect certain trusts and plans, such as individual retirement accounts, but that protection relates to judgment *execution* on claims unrelated to the trust or plan. For example, CPLR § 5205(c)(1) provides that "property while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor, is exempt from application to *the satisfaction of a money judgment*" (emphasis added). *See also* California Code §703.110(a). These state provisions do not protect trusts or plans from claims alleging that they received fraudulent transfers. Indeed, CPLR § 5205(c)(5) explicitly excludes from its protection any additions to a qualifying trust or plan that are deemed to be fraudulent conveyances.

For these reasons, this Court, in the *Omnibus Motion To Dismiss Decision,* held that the CPLR provision does not apply where a trust or plan that qualifies under CPLR § 5205(c) received a fraudulent transfer. 2015 WL 3465752 at *31 (citing *Greiff*, 476 B.R. at 729 n. 13

(S.D.N.Y. 2012)).  Rather, this Court held, CPLR § 5205(c)(1) relates only to exempting property from judgment execution, not the avoidance of fraudulent transfers.  *Id*  This Court's analysis of CPLR § 5205(c) applies with equal force to IRAs as well as to trusts, and it should likewise apply to the corresponding California statute.

### F.     The Bankruptcy Court Has Jurisdiction Even If Defendants Demand A Jury Trial

Defendants state that they "do not presently consent to this Court conducting the jury trial in this action" but "respectfully reserve their right to reconsider their position on this issue at a later stage of this case."  (Mem. at 56 n.24).  Defendants contend that, because they may wish to proceed by way of jury trial, and because a bankruptcy court may not have the authority to finally determine certain avoidance actions, the Trustee's Amended Complaint in this proceeding should be dismissed.  However, once again, this contention has been rejected by multiple prior decisions of the District Court and this Court in this SIPA proceeding.  *See, e.g.*, *Omnibus Motion To Dismiss Decision*, 2015 WL 3465752, at *9.

Regardless of whether a bankruptcy court can exercise the judicial power necessary to finally decide the action, it may nonetheless hear the case in the first instance and recommend proposed findings of fact and conclusions of law.  *SIPC v. BLMIS (In re Madoff Sec.)*, 490 B.R. 46, 49 (S.D.N.Y. 2013); s*ee also Kirschner v. Agoglia*, 476 B.R. 75, 81-82 (S.D.N.Y. 2012).  Amended Standing Order of Reference, *In the Matter of Standing Order of Reference Re: Title 11*, 12 Misc. 32 (S.D.N.Y. Feb. 1, 2012).  A right to a jury trial does not equate with a right to dismissal of an entire action.  *See generally In re Madoff Sec.*, 490 B.R. at 46.  Instead of dismissal, as the District Court held in another adversary proceeding in this liquidation, a party may seek withdrawal of its case to the District Court based on the right to a jury trial but "only much later in the case," at a point where only issues of fact remain to be determined.  *Picard v.*

*Conn. Gen. Life Ins. Co. (In re Madoff Sec.)*, 11 Civ. 7174 (JSR), 2012 WL 1981486, at *1 n.1

(S.D.N.Y. May 30, 2012).  In any event, Defendants' motion to dismiss on jurisdictional grounds

has no basis and should be denied.

## VII.    DEFENDANTS' REMAINING ARGUMENTS FAIL

### A.    The Complaint Properly Alleges A Constructive Fraudulent Transfer Claim Because It Adequately Pleads Lack of Good Faith

Defendants next argue that the Trustee fails to properly allege the lack of "reasonably

equivalent value" or "fair consideration" in connection with the constructive fraudulent transfer

claims under the Bankruptcy Code and the NYDCL with respect to Defendants' withdrawals of

principal.  (Mem. at 44-45).  As an initial matter, this argument is fact-based and improperly

interposed on a motion to dismiss pursuant to Rule 12(b)(6).  *See Silverman v. Actrade Cap., Inc.*

*(In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005) ("[T]he question of

'reasonably equivalent value' . . . is fact intensive, and usually cannot be determined on the

pleadings").

Defendants' argument under the Bankruptcy Code is faulty because it relies on the

premise that Defendants acted in good faith.  Defendants claim that their redemptions up to the

amount of their principal constitute value to the debtor.[9]  However, only good faith investors

have provided value to the debtor.  *See, e.g., Wyle v. C.H. Rider & Family (In re United Energy*

*Corp.)*,  944 F.2d 589, 596 n.7 (9th Cir. 1991) ("If investments were made with culpable

knowledge, all subsequent payments made to such investors within one year of the debtors'

bankruptcy would be avoidable under section 548(a)(2), regardless of the amount invested,

because the debtors would not have exchanged a reasonably equivalent value for the

---

[9]  Defendants' claim that their "services in soliciting and procuring investors for BLMIS constitutes fair
consideration for finders' fees or commissions and thus constitutes 'value' given to the debtor" (Mem. at 44), must
be rejected outright for the reasons set forth in III(a), *supra*.

payments."); *Donell v. Kowell,* 533 F.3d 762, 772 (9th Cir. 2008); *In re Hedged–Invs. Assocs., Inc.*, 84 F.3d 1286, 1289–90 (10th Cir. 1996); *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000).  As discussed above, Defendants cannot rely on their principal to constitute value because the Trustee has sufficiently pled their actual knowledge of Madoff's fraud.  Thus, Defendants' motion to dismiss the Trustee's constructive fraudulent transfer claim under the Bankruptcy Code must be denied.

Defendants' additional argument that their principal constituted "fair consideration" under the NYDCL is groundless.  They concede that "'fair consideration' under the NYDCL also requires a showing of 'good faith.'"  (Mem. at 45 n.16).  As discussed above, the Trustee sufficiently alleges that Glantz and Edward Glantz actually knew of Madoff's fraud and that knowledge is properly imputed to other Defendants.  Therefore, Defendants' motion to dismiss for failure to properly plead a constructive fraudulent transfer claim under the NYDCL should be denied.

### B.    The Court Has Jurisdiction Over Merlin, Enhancement, G-O Trust I, G-O Trust II, ERG Trust and TG Trust

Defendants further argue that the Amended Complaint must be dismissed as against Defendants Merlin, Enhancement, G-O Trust I, G-O Trust II, ERG Trust, and TG Trust for lack of personal jurisdiction.[10]  In fact, each of these Defendants is subject to this Court's jurisdiction, for the reasons discussed below.

With regard to Merlin and Enhancement, under Fed. R. Civ. P. 17(b)(2), a corporation's capacity to be sued is determined by the law under which it was organized.  Merlin and

---

[10] To the extent Defendants question whether these entities and trusts were properly served, the Trustee filed affidavits of service with the Complaint and Amended Complaint that have not been challenged.  (Dkt. Nos. 5, 63). The Trustee served Glantz, the trustee of all of these trusts and the registered agent of Merlin and Enhancement.  (¶ 16); CAL. SEC'Y OF STATE BUSINESS SEARCH, http://kepler.sos.ca.gov/ (last visited Aug. 14, 2015).

Enhancement were incorporated under California law (¶¶ 47-48), which permits a party to sue a dissolved corporation. *See* Cal. Corp. Code § 2011 ("Causes of action against a dissolved corporation, whether arising before or after the dissolution of the corporation, may be enforced against any of the following: (A) Against the dissolved corporation, to the extent of its undistributed assets. . . ."); *Greb v. Diamond Int'l Corp.*, 56 Cal. 4th 243, 247 (2013) ("Like the law in a few other states, the section sets no time limitation for suing a dissolved corporation for injuries arising from its predissolution conduct; the sole temporal limitation to such a suit is found in the applicable statute of limitations relating to each cause of action."); *Budget Rent a Car Corp. v. Coregis Ins. Co.*, No. H032480, 2011 WL 1236142, at *7 (Cal. Ct. App. Apr. 4, 2011) (holding that a dissolved corporation may still be sued even if it has no assets from which a judgment may be satisfied). This Court has jurisdiction over Merlin and Enhancement and their motion to dismiss the Amended Complaint should be denied.

With regard to the trusts, under Fed. R. Civ. P. 17(b)(3), the capacity of a trust or a trustee to be sued is determined by the law where the court is located, which in this case is New York. In New York, a party may sue a trust by naming its trustee as a defendant. *In re Beiny*, No. Civ. A. 621-M/2002, 2009 WL 1050727, *3 (N.Y. Sur. 2009) (Slip. Op.). There is no provision in New York law that constrains the ability to sue a trust, whether active or not, aside from the applicable statute of limitations for the asserted cause of action. The cases cited by Defendants concern corporations, not trusts, and are therefore inapplicable. This Court therefore has jurisdiction over G-O Trust I, G-O Trust II, ERG Trust, and TG Trust, and the motion to dismiss the Amended Complaint as to them should be denied.

### C.      Claims Against the Estate of Edward Glantz Are Not Time Barred

Defendants next argue that the Trustee's claims against the ERG Estate are time barred based on California Code § 366.2, which provides for a one year statute of limitations after the

date of an individual's death.  For the reasons set forth below, the motion to dismiss ERG Estate

should be denied.

First, § 366.2 is a state statute of limitations, and it is well established that a state statute

of limitations applies only if there is no applicable federal statute of limitations and no conflict

with federal policy.  *See Golden Gate Bridge, Highway & Transp. v. Golden Gate Bridge,*

*Highway & Transp. Dist.*, No. 13-CV-02862-JST, 2014 WL 6706827, at *3 (N.D. Cal. Nov. 24,

2014) (citing *S. Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 507 (1986) (holding that

California Code § 366.2 does not apply to claims brought under federal maritime law)).  The

Trustee's claims against ERG Estate include claims brought under § 548 of the Bankruptcy

Code, which provides for a two year limitations period from the date of the bankruptcy filing for

initial transfers, and § 550 of the Bankruptcy Code, which provides for a one year limitations

period for subsequent transfers from the date of the avoidance of the transfer on account of

which recovery is sought.  Both of these federal statutes set forth specific limitations periods that

override state law.  Therefore, California Code § 366.2 does not apply to those of the Trustee's

claims that were brought under these sections, and Defendants' motion to dismiss these claims

should be denied.  *See Golden Gate Bridge*, 2014 WL 6706827, at *3.

Defendants' Motion also fails because California Code of Civil Procedure § 366.2 does

not apply to claims arising after the decedent's death.  Edward Glantz died on or about February

9, 2007, and the Trustee's claims against ERG Estate include a claim for an initial transfer of

$265,000 on January 3, 2008, and a subsequent transfer of $5,000 on February 14, 2007.  *See*

*BCS Investments, Inc. v. Lorenz*, No. D061999, 2013 WL 5862763, at *6 (Cal. Ct. App. Oct. 31,

2013), review denied (Jan. 21, 2014) (holding that "[s]ection 366.2 will not apply when the debt

was not enforceable against the decedent during his or her life").

56

For these reasons, Defendants' motion to dismiss the Trustee's claims against the ERG

Estate should be denied.

### D.    The Count for General Partnership Liability Was Properly Pled

Defendants imprecisely argue that Count IX should be dismissed "for all the reasons set

forth above," without articulating any particular basis for dismissal.  As such, their attempt to

dismiss Count IX should be rejected.  In fact, Count IX is well-pled and establishes the joint and

several liability of the general partners of Jelris, EJS, Grace, and Lakeview for the debts of these

partnerships.

Jelris, EJS, and Lakeview are all limited partnerships that were formed under the laws of

Delaware, with EJS and Jelris originally operating as general partnerships for a period in the

1990s.  (¶¶ 18, 23, 36). [11]  Grace, which had its principal place of business in California, operated

as a general partnership at all relevant times.  (¶¶ 28, 30).  Glantz has been a general partner of

EJS, Jelris, and Grace at all relevant times.  (¶ 16).  Elaine Ostrin, RMG Trust, ERG Trust, and

TG Trust were also general partners of EJS and Jelris when they operated as general

partnerships.  (¶¶ 20, 25).  Vista has been Lakeview's sole general partner at all relevant times.

(¶ 36).  The Trustee's allegations as to these partnerships' structures are summarized as follows:

| Partnership | Type of Partnership | General Partner(s) | State of Formation | Principal Place of Business |
|---|---|---|---|---|
| Jelris | General Partnership from October 1993 until it reorganized as a Limited Partnership in | - Glantz (all relevant times)<br>- Elaine Ostrin, RMG Trust, ERG Trust, TG Trust (when Jelris operated as a general | Delaware (as a limited partnership) | California |

---

[11] Jelris and EJS were originally formed as general partnerships on October 15, 1993, and then reorganized as limited partnerships under the laws of Delaware on March 28, 1995, and January 1, 1998, respectively.  (¶¶ 18, 23). They maintained their principal place of business in California.  (¶¶ 22, 27).  Lakeview has always operated as a limited partnership.  (¶ 36).

| Partnership | Type of Partnership | General Partner(s) | State of Formation | Principal Place of Business |
|---|---|---|---|---|
| | March 1995 | partnership) | | |
| EJS | General Partnership from October 1993 until it reorganized as a Limited Partnership in January 1998 | - Glantz (all relevant times) - Elaine Ostrin, RMG Trust, ERG Trust, TG Trust (when EJS operated as a general partnership) | Delaware (as a limited partnership) | California |
| Grace | General Partnership | Glantz (all relevant times) | N/A | California |
| Lakeview | Limited Partnership | Vista (all relevant times) | Delaware (2007) | California |

This Court has already held that under Delaware law "a general partner of a limited partnership is personally liable for the debts of the limited partnership." *Merkin II*, 515 B.R. at 153 (citing DEL. CODE ANN. tit. 6 § 17-403(b)). Further, the law is well settled that the general partners of a general partnership are liable for the debts of the general partnership. *See* CAL. CORP. CODE § 16306(a) (West 2015) (stating that "all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."). Defendants do not cite any authority to the contrary. Thus, Glantz is liable for Grace's, EJS's, and Jelris's debts; Vista is liable for Lakeview's debts; and Elaine Ostrin, RMG Trust, ERG Trust, and TG are liable for EJS's and Jelris's debts relating to or arising from transfers or subsequent transfers that they received when they operated as general partnerships.

### E.    Defendants Are Limited to Arguments Made In Their Motion to Dismiss

Defendants' empty request that they adopt by reference any argument made in other motions to dismiss filed by "similarly-situated defendants" (Mem. at 58) should be disregarded by the Court. *See, e.g. U.S. v. Tailwind Sports Corp.*, 51 F. Supp.3d 9, 53 (D.D.C. 2014) (rejecting the request of a defendant to incorporate the arguments of a co-party where the

argument was not developed with any specificity as to the defendant) (citing *Cement Kiln Recycling Coal v. E.P.A.*, 55 F.3d 855, 869 (D.C. Cir. 2001)) ("A litigant does not properly raise an issue by addressing it in a cursory fashion with only bare-bones arguments.").

As detailed above, Defendants incorporated in the Motion numerous arguments that were made by defendants in motions to dismiss in other unrelated adversary proceedings, including many arguments that this Court has already rejected.  Permitting Defendants to incorporate additional arguments without identifying them would inject unnecessary and unjustified confusion into this litigation.  The Trustee should not be put in the position where he would have to guess as to which arguments are at issue.  Accordingly, the Court should not consider any arguments that Defendants did not specifically raise and support in the Motion.

<u>**CONCLUSION**</u>

The Amended Complaint more than sufficiently alleges facts which, taken as true, establish Glantz's and Edward Glantz's knowledge of, and participation in, Madoff's fraud. Further, the Amended Complaint more than sufficiently alleges facts which, taken as true, establish Defendants' liability under each of the Amended Complaint's counts.  For these reasons, and all of the reasons set forth above, the Trustee respectfully requests that the motion to dismiss be denied in its entirety.

Date:  August 14, 2015
       New York, NY

By: */s/ David J. Sheehan*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Fernando A. Bohorquez
Email: fbohorquez@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com
Benjamin D. Pergament

Email: bpergament@bakerlaw.com
Andrew W. Reich
Email: areich@bakerlaw.com
Kendall E. Wangsgard
Email: kwangsgard@bakerlaw.com
Joshua B. Rog
Email: jrog@bakerlaw.com
C. Zachary Rosenberg
Email: crosenberg@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and the estate of Bernard L. Madoff*