**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br> v. <br><br> LEGACY CAPITAL LTD. and KHRONOS LLC, <br><br> Defendants. | Adv. Pro. No. 10-05286 (SMB) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO**
**DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTS ........................................................................................................................3

I.  Legacy Capital ...............................................................................................3

II.  Khronos ..........................................................................................................3

III.  Renaissance and Meritage .............................................................................4

IV.  Renaissance Identifies Red Flags at BLMIS and Shares Results with Rafael
Mayer .............................................................................................................4

V.  Meritage Oversight Committee Members Exchange Emails Demonstrating
Their Knowledge of Lack of Legitimate Trades at BLMIS ...................................5

VI.  Legacy Capital Retains Khronos as Its Agent to Perform Rigorous Analysis
of Legacy Capital's BLMIS Portfolio.......................................................................9

VII.  Defendants Knew of Impossible Trading Activity at BLMIS ..............................10

A.  Legacy Capital's Returns Were Impossibly Consistent Over Many
Years ...............................................................................................10

B.  The Legacy Capital Account Statements Reflected Impossible
Options Volume Trading ..........................................................................11

C.  BLMIS Purported to Sell Equities and Options Outside of the Daily
Reported Price Ranges..............................................................................12

D.  Madoff's Purported Execution of Trades Was Statistically Impossible....12

VIII.  The Badges of Fraud Reflected in the BLMIS Account Statements ....................13

A.  BLMIS Avoided SEC Reporting Requirements by Constantly
Claiming to Be Out of the Market at Quarter–End and Year–End
Even Though Such Investment Behavior Was Inconsistent With the
SSC Strategy ...............................................................................................13

B.  Madoff's Purported Options Trades Were Inconsistent with the SSC
Strategy ...............................................................................................13

C.  The Dividend Activity Shown on Customer Statements Was
Inconsistent With the Dividend Activity Sophisticated Investors
Would Expect............................................................................................14

# TABLE OF CONTENTS
## (continued)

**Page**

D.    The Legacy Capital Account Statements Reflected Illegal Margin Trades ..................................................................................................15

IX.    The Badges of Fraud Indicated from Other Sources .............................................15

A.    Lack of Scalability .......................................................................................15

B.    Purported Options Contracts Entered into by Legacy Capital Did Not Identify Counterparties ...............................................................................16

C.    BLMIS Lacked Independent Oversight and Customary Internal Controls......................................................................................................16

D.    Warnings of Fraudulent Activity at BLMIS Raised by Third Parties .......17

E.    BLMIS, Known as a High–Tech Firm, Provided Only Time-Delayed Paper Statements ..........................................................................................18

F.    Madoff's "Strip Mall" Auditor Was Not Qualified or Capable of Auditing a Global Investment Management Company with Billions of Dollars Under Management .......................................................................18

G.    Contrary to Standard Industry Practice, Madoff Charged No Management Fees ........................................................................................19

ARGUMENT ......................................................................................................................20

I.    STANDARD OF REVIEW ..................................................................................20

II.    THE TRUSTEE HAS SUFFICIENTLY PLEADED THAT DEFENDANTS HAD KNOWLEDGE OF MADOFF'S FRAUD ...................................................21

A.    Section 546(e) Does Not Protect the Transfers at Issue in This Adversary Proceeding ...................................................................................22

B.    The Trustee Has Met and Exceeded the Willful Blindness Standard ........25

1.    The Trustee Has Sufficiently Pleaded That Defendants Subjectively Believed That There Was a High Probability of Fraud at BLMIS ................................................................................26

2.    The Trustee Has Sufficiently Pleaded That the Defendants Took Deliberate Steps to Avoid Learning the Truth About the Fraud ..................................................................................................32

III.    THE TRUSTEE HAS ADEQUATELY PLEADED CLAIMS FOR RECOVERY OF SUBSEQUENT TRANSFERS AGAINST KHRONOS ..........33

# TABLE OF CONTENTS
## (continued)

<strong><u>Page</u></strong>

A.    The Trustee Has Pleaded the "Necessary Vital Statistics" of the Transfers Sufficient to Apprise Khronos of the Trustee's Claims Against It .................................................................................. 33

B.    The Trustee Has Pleaded that the Transfers Originate with BLMIS ......... 37

IV.    DISMISSAL IS INAPPROPRIATE WHERE DEFENDANTS SEEK DISMISSAL ON TRIABLE ISSUES OF FACT .................................................. 38

A.    Defendants' Knowledge is a Factual Issue to Be Determined at Trial ...... 38

B.    Rule 2004 Is No Substitute for Discovery under the Federal Rules .......... 39

CONCLUSION ............................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2435 Plainfield Ave., Inc.,*
223 B.R. 440 (Bankr. D.N.J. 1998) ......................................................................39

*Anwar v. Fairfield Greenwich Ltd.,*
728 F. Supp. 2d 372 (S.D.N.Y. 2010)..............................................................27, 29

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...............................................................................................20

*In re Beacon Assocs. Litig.,*
745 F. Supp. 2d 386 (S.D.N.Y. 2010)...................................................................28

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..........................................................................................20, 35

*In re Bennett Funding Grp., Inc.,*
203 B.R. 24 (Bankr. N.D.N.Y. 1996) ...................................................................39

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M.
Fabrikant & Sons, Inc.),*
480 B.R. 480 (S.D.N.Y. 2012)..........................................................................35, 37

*Cargo Partner AG v Albatrans, Inc.,*
352 F.3d 41 (2d Cir. 2003)....................................................................................20

*In re Drexel Burnham Lambert Grp., Inc.,*
123 B.R. 702 (Bankr. S.D.N.Y. 1991) ..................................................................39

*In re Enron Corp.,*
281 B.R. 836 (Bankr. S.D.N.Y. 2002) ..................................................................39

*Global-Tech Appliances, Inc. v. SEB S.A.,*
131 S. Ct. 2060 (2011)...........................................................................................26

*Gowan v. Amaranth LLC (In re Dreier LLP),*
452 B.R. 451 (Bankr. S.D.N.Y. 2011) .............................................................35, 37

*Gowan v. Novator Credit Mgmt. (In re Dreier LLP),*
452 B.R. 467 (Bankr. S.D.N.Y. 2011) .........................................................35, 36, 37

*In re J.P. Jeanneret Assoc., Inc.,*
769 F. Supp. 2d 340 (S.D.N.Y. 2011)...................................................................20

*Newman v. Family Mgmt. Corp.,*
748 F. Supp. 2d 299 (2d Cir. 2010) ......................................................................27

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Nisselson v. Drew Indus. Inc. (In re White Metal Rolling & Stamping Corp.)*,
    222 B.R. 417 (Bankr. S.D.N.Y. 1998) ......................................................................21

*Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*,
    No. 08-99000 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ................ *passim*

*Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ....................................................20, 21, 28

*Picard v. Greiff (In re Madoff Sec.)*,
    476 B.R. 715 (S.D.N.Y. 2012) ..........................................................................26

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011) .......................................................................21, 39

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*,
    458 B.R. 87 (Bankr. S.D.N.Y. 2011) ...........................................................33, 35, 36

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010) ...............................................20, 21, 33, 37

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............................................................ *passim*

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) ................................................................................20

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015) .........................................................33, 34, 35, 37

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    No. 12-MC-115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ....................22, 25, 39

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    516 B.R. 18 (S.D.N.Y. 2014) ........................................................................21, 26, 40

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) .......................................................21, 33, 34

*SEC v. Cohmad Sec. Corp.*,
    No. 09 Civ. 5680 (LLS), 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) .......................28

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
    379 B.R. 5 (Bankr. E.D.N.Y. 2007) ...........................................................34, 35, 36

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Stephenson v. Citco Grp. Ltd.*,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010)......................................................................28

*United States v. Bailey*,
    955 F.2d 28 (8th Cir. 1992) ....................................................................................31

*United States v. Ferguson*,
    676 F.3d 260 (2d Cir. 2011)....................................................................................28

*United States v. Joly*,
    493 F.2d 672 (2d Cir. 1974)....................................................................................30

*United States v. Nektalov*,
    461 F.3d 309 (2d Cir. 2006)....................................................................................30

*United States v. Perez-Padilla*,
    846 F.2d 1182 (9th Cir. 1988) ................................................................................30

**Statutes**

11 U.S.C. § 546..............................................................................................1, 2, 22, 25

11 U.S.C. § 548.................................................................................................... *passim*

11 U.S.C. § 550.................................................................................................26, 33, 34

15 U.S.C. §§ 78aaa–*lll* ...........................................................................................1

**Rules**

Fed. R. Bankr. P. 2004...........................................................................................39, 40

Fed. R. Bankr. P. 7012..................................................................................................20

Fed. R. Civ. P. 8...................................................................................20, 33, 34, 37

Fed. R. Civ. P. 9(b) ......................................................................................................37

Fed. R. Civ. P. 12(b)(6)................................................................................................20

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa–*lll*, and the estate of Bernard L. Madoff,

by and through his undersigned counsel, respectfully submits this memorandum of law in

opposition to the motions to dismiss the amended complaint (the "Amended Complaint") filed

by defendants Legacy Capital Ltd. ("Legacy Capital") and Khronos LLC ("Khronos," and with

Legacy Capital, the "Defendants").

## <u>PRELIMINARY STATEMENT</u>

This case is simple.  It presents neither a complex web of entities nor concerns over the

extraterritorial application of SIPA.  It is a straightforward avoidance and recovery action against

a BLMIS account holder—Legacy Capital—and a related company that acted as its service

provider—Khronos.

Defendants argue that the Trustee's claims (other than those under section 548(a)(1)(A))

are barred by section 546(e) of the Bankruptcy Code.  But section 546(e) protects only the

"reasonable expectations of legitimate [BLMIS] investors," not an investor that knew of

BLMIS's fraud or knew BLMIS was not trading securities for its account.  The facts alleged in

the Trustee's Amended Complaint show Defendants had such knowledge and Legacy Capital

was not a "legitimate investor."

Legacy Capital and its predecessor funds (and primary investors) were run by Jimmy

Mayer and his two sons, Rafael and David.  Rafael Mayer was also a member of the investment

committee for one of Legacy Capital's ultimate investors, Meritage, a fund controlled by

Renaissance Technologies, LLC ("Renaissance").  In various communications to Rafael Mayer

and among each other, Renaissance personnel challenged Madoff's legitimacy.  In 2003 those

individuals informed Rafael Mayer that they found that there were not enough options in the

entire market to support Madoff's purported trading, that Madoff bought and sold equities at

impossible prices (i.e., buying below the daily lows and selling above the daily highs ), that

Madoff's strategy could not be duplicated, and that Madoff's purported trading inexplicably

created no "footprint" in the market.

Finding no legitimate explanations for these trading impossibilities, all of the Meritage

Oversight Committee members, except Rafael Mayer, voted to withdraw Meritage's Madoff

investment.  Rafael Mayer made various attempts to convince Meritage to maintain its Madoff

investment, but was ultimately unsuccessful.  And once he found another source of capital—

BNP Paribas ("BNP")—Meritage fully redeemed its investment.

In early 2004, Legacy Capital hired Khronos, a company managed by Rafael and David

Mayer, to undertake an ongoing, sophisticated analysis of Legacy Capital's BLMIS Account.

Through detailed monthly analyses of Legacy Capital's BLMIS customer account statements and

trade confirmations, Defendants knew those consistent returns were based on impossible and,

therefore, non-existent securities trades.  Rather than take steps to divest itself of Madoff,

Khronos responded by preventing anyone other than Rafael and David Mayer from reviewing

the BLMIS account statements and confirmations.

Based on the evidence in the Amended Complaint, as further discussed below,

Defendants clearly had no reasonable expectation that Legacy Capital's BLMIS account was

engaged in legitimate trading activity, or that withdrawals from BLMIS would be protected

under section 546(e).  Likewise, Defendants cannot challenge that the same evidence is sufficient

to satisfy the Trustee's pleading burden under section 548(a)(1)(A).

Seeking to evade this mountain of evidence, Defendants claim that the Trustee's

allegations are made in hindsight and that certain Renaissance emails questioning BLMIS's

legitimacy were either "jokes" or were misconstrued by the Trustee.  But the truth is more

prosaic: Renaissance recognized Madoff's fraud for what it was, and advised Rafael Mayer that

Madoff's trades were not legitimate.  Renaissance withdrew its money.  As a result of Khronos's

diligence, Defendants then saw, in glaring detail, the same impossibilities and markers of

Madoff's fraud that Renaissance previously identified.

Defendants knew of BLMIS's fraud.  Their motion to dismiss should be denied.

## FACTS

### I.    Legacy Capital

In September 2000, Legacy Capital commenced operations, investing solely in its newly

opened BLMIS IA account, Account No. 1FR071 (the "Legacy Capital Account").  (Am. Compl.

¶ 33.)  Rafael Mayer was an officer of Legacy Capital.  (*Id*.)  Jimmy Mayer was a director and

had signatory authority over and controlled the Legacy Capital Account.  (*Id.*)

The Legacy Capital Account was funded by transfers from two other BLMIS accounts—

one owned by HCH Management Company Ltd. ("HCH") (Account No. 1FR055), and the other

by Montpellier International LDC ("Montpellier") (Account No. 1FN027).  (*Id.* ¶ 34.)  These

predecessor entities were also run and/or controlled by the Mayers.  (*Id.* ¶¶ 34, 35.)

The Trustee's complaint seeks to avoid and recover the following sums BLMIS

fraudulently transferred to or for the benefit of Legacy Capital:

Transfers within six years:    $212,800,000 (*Id.* ¶ 143.)

Transfers within two years:    $174,000,000 (*Id.* ¶ 144.)

### II.    Khronos

Khronos is a New York company co-founded by Rafael Mayer and David Mayer.  (Am.

Compl. ¶¶ 30-31.)  Rafael and David Mayer jointly served as Khronos's managing directors.  (*Id.*

¶ 31.)  Khronos provided various services to HCH and Montpellier Resources, Montpellier's

3

investor. (*Id.* ¶ 35.) Beginning on January 1, 2004, Legacy Capital hired Khronos to monitor and analyze BLMIS's trading activity in the Legacy Capital Account. (*Id.* ¶¶ 2, 35, 52.) Khronos received approximately $6,601,079 in fees from Legacy Capital and Montpellier Resources. (*Id.* ¶¶ 148-151.)

## III.    Renaissance and Meritage

Renaissance is a group of hedge funds. One of Renaissance's funds, the Meritage Fund, was a Legacy Capital investor through HCH. (Am. Compl. ¶¶ 38, 39.) The Mayers invested in Meritage, as well as other Renaissance funds. (*Id.* ¶ 39.) The Meritage Oversight Committee oversaw Meritage's investments and was comprised of various Renaissance and Meritage principals and employees, including James Simons, Paul Broder, Peter Brown, Henry Laufer, and Nathaniel Simons. (*Id.* ¶ 40.) Rafael Mayer was also a Meritage Oversight Committee member and participated in its investment decisions until late 2004. (*Id.* ¶ 41.)

## IV.    Renaissance Identifies Red Flags at BLMIS and Shares Results with Rafael Mayer

In 2003, Renaissance became suspicious of the lack of correlation between BLMIS's returns and the market's returns. (Am. Compl. ¶¶ 45, 46.) Utilizing the Legacy Capital Account statements, Renaissance analyzed BLMIS's trading activity. (*Id.* ¶ 46.) On October 6, 2003, Renaissance provided the results of its analysis in a document titled "Madoff – Proposal" (the "Renaissance Proposal"). The Renaissance Proposal, shared with the Meritage Oversight Committee, including Rafael Mayer, found that: "(i) the market could not support the options volume Madoff purported to trade; (ii) a very high percentage of BLMIS's purported equity trades were bought below the daily closing price and sold above the daily closing price; (iii) Renaissance's simulation of Madoff's strategy put him in the market on days the account statements showed he was out; and (iv) Madoff's ability to trade billions of dollars without

4

leaving a footprint was an unsolved mystery." (*Id.* ¶ 47.)  Each finding led to the inexorable

conclusion that Madoff could not be trading as the Legacy Capital Account statements purported.

## V.    Meritage Oversight Committee Members Exchange Emails Demonstrating Their Knowledge of Lack of Legitimate Trades at BLMIS

Not surprisingly, the Renaissance Proposal sparked further questioning of BLMIS's

operations, resulting in a November 2003 email exchange among the Meritage Oversight

Committee, including Rafael Mayer, expressing the committee's disquiet about Madoff.   (Am.

Compl. ¶ 48.)

On November 13, 2003, Nathaniel Simons wrote:

> Committee member,
>
> We at Meritage are concerned about our HCH investment.  First of all, we spoke to an ex-Madoff trader (who was applying for a position at Meritage) and he said that Madoff cherry-picks trades and "takes them for the hedge fund".  He said Madoff is pretty tight-lipped and therefore he didn't know much about it, but he didn't really know how they made money.  David Zierk heard a similar story from a large hedge fund consultant who also interviewed an ex-trader.  The head of this well-respected group told us in confidence that he believes that Madoff will have a serious problem within a year.  We are going to be speaking to him in 11 days to see if we can get more specifics.
>
> Another point to make here is that not only are we unsure as to how HCH makes money for us, we are even more unsure as to how HCH makes money from us; i.e. why does he let us make so much money?  Why doesn't he capture that for himself?  There could well be a legitimate reason, but I haven't heard any explanation we can be sure of.  Additionally, there is a $4 billion Madoff pass-through fund (Fairfield Sentry) that charges 0 and 20% and it's not clear why Madoff allows an outside group to make $100 million per year in fees for doing absolutely nothing (unless he gets a piece of that).  The point is that as we don't know why he does what he does we have no idea if there are conflicts in his business that could come to some regulator's attention.  Throw in that his brother-in-law is his auditor and his son is also high up in the organization (imagine that!) and you have the risk of some nasty allegations, the freezing of accounts, etc., etc.  To put things in

> perspective, if HCH went to zero it would take out 80% of this
> year's profits.
>
> . . . .
>
> It's high season on money managers, and Madoff's head would
> look pretty good above Elliot Spitzer's mantle. I propose that
> unless we can figure out a way to get comfortable with the
> regulatory tail risk in a hurry, we get out. The risk-reward on this
> bet is not in our favor.

(*Id.* ¶¶ 50, 85, 87, 105, 110.)[1]

In response, Paul Broder wrote:

> Like background radiation my concern about Madoff has never
> really gone away. My concern increased once the Mutual Fund
> story broke – why? The "totally independent evidence" which
> Henry refer's [sic] to is 100% consistent with the story from the
> ex-trader. But if cherry picking is the reason for highly-favourable
> fills – who is taking the hit on the other side? It can only be a pool
> of money whose managers[] are not compensated by performance
> but by some other criteria, such as size of assets. It would not be a
> surprise to me to see a link exposed to the current Spitzer/SEC
> investigation.
>
> I am in favour of redemption.

(*Id.* ¶ 49; Kajon Dec. Ex. E; Fisher Dec. Ex. F.)

James Simons concluded: "I am also in favor of redemption. . . . Unless one of you can

give a compelling reason to stay I will ask Nat to withdraw the funds next week." (Am. Compl.

¶ 51.)

After this exchange, Broder consulted with Mark Rhodes-Brown ("MRB"), a

Renaissance analyst who authored the Renaissance Proposal, to better understand the options

volume necessary to execute Madoff's strategy. (*See* Kajon Dec. Ex. C; Fisher Dec. Ex. D.) On

---

[1] *See also* Exhibit E, as attached to the Declaration of Nicholas F. Kajon in Support of Legacy Capital's
Motion to Dismiss the Amended Complaint (hereinafter, the "Kajon Dec."); *see also* Exhibit F, as
attached to the Declaration of Eric B. Fisher in Support of Khronos's Motion to Dismiss the Amended
Complaint (hereinafter, the "Fisher Dec.")

November 21, 2003, Broder explained to the Meritage Oversight Committee that, even if Madoff

traded every option available for a particular security, the volume of the entire market would be

insufficient to execute Madoff's strategy:

> 1. Recall that Madoff's strategy involves a collar, that is a put and a call. The volume numbers provide total calls executed on the OEX and total puts. In the two independent set[s] of statements which MRB analy[z]ed the strikes were always the same for both accounts. Make the generous assumption that 50% of the volume was in the most liquid strike (it seems to average 25-25%).

> Now look at two days volume numbers, the day the options were put on, and the day they were taken off. As the notional size of the trade has to be the same for each leg, and for both the puts and calls, take the lowest of 4 volume numbers (day_on_P: day_on_C: day_off_P: day_off_C). Multiply this number by 50,000 (size of contract in dollars) and then multiply by 50% (point above).

> By this measure Madoff could only do $750m. That is with him doing 100% of the option volume in his chosen strike (with the generous 50% assumption). Lets assume that he spreads it over 3 days - so we get to 2.1bln - still far short of the target numbers.

> 2. Another important point: In every case that MRB examined the option strike (call) is the one closest to the close in the underlying market. Of course the market close is not known until the close!! Does this mean that all the options are done almost at the close?

> 3. The volume does seem to spike on the days that Madoff is executing, on the days we examine by a factor of 3-4. This must produce a deterioration in execution prices - and for 15bln!

> 4. When we examined this issue before, we concluded that maybe he does the options in the [over-the counter ("OTC")] market. We have spoken to several market makers in OTC equity options, none of them claim to see any significant volume in OEX options. Recall that Raf[ael Mayer] stated that Madoff had said it was necessary to spread trades over several days - why if you are doing OTC?

> 5. Recall point 2. This would indicate that the OTC options would also have to be done at the end of the day (to get a strike near the close). Are we to believe that the market makers would take on $15bln of market risk at the close? Of course they might (might!!!) be willing to take the option risk if Madoff provided the market hedge in the underlying (ie they did the whole package with

Madoff) but we already know that the trades in the underlying, compared with the closing prices, would leave the OTC counterparty showing losses (as our account always shows gains).

6. Of course ALL of our trades are with Madoff as the principal - so our option positions are OTC with Madoff so he can choose to use any strike, and any total volume he chooses, but the risk must be covered somewhere *if he is doing these trades at all*?

So we need an OTC counterparty (not necessarily a bank) who is willing to do the basket of the options plus the underlying with Madoff at prices unfavourable for the OTC counterparty - in 10-15bln!!!

Any suggestions who that might be[?]

None of it seems to add up.

(Am. Compl. ¶¶ 62-64; Kajon Dec. Ex. C; Fisher Dec. Ex. D (emphasis added).)

Responding to Broder's analysis, Rafael Mayer sent an email listing concerns requiring Madoff's explanation.  (Am. Compl. ¶ 59.)  Broder replied to Rafael Mayer and helped draft a script for Mayer to confront Madoff about trading impossibilities and red flags.  Broder's analysis and sarcasm evidence his belief that Madoff could not provide legitimate responses:

First ask [Madoff how he would hedge out the other side of the trade]. To which we strongly expect an answer that he does this OTC. Then ask (in innocent amazement!): So you can do this kind of volume on OEX OTC Options?!?! . . . Gee, what kind of banks are big enough to [trade with you] (more animated amazement!!!)

. . .

Do you do the underlying hedge with the same counterparty??

We have noticed that the strike on the OTC options trade we do with you always seems to be close to the closing price of the underlying – is this for convenience purposes (try to look as though this is a really serious question).

Does this mean that you execute your OTC trades (assuming this was his claim earlier) towards the end of the day (I really want to hear that the OTC counterparty does $15bln trades almost at the close.)

(*Id*. ¶¶ 59, 60).

In early 2004, the Meritage Oversight Committee voted to redeem its investment from

BLMIS.  (*Id.* ¶ 138).  Rafael Mayer was the only committee member to vote against redemption.

(*Id.*)  Rafael Mayer persuaded the committee to delay redeeming half of Meritage's investment

in order to give him time to find a replacement.  (*Id.* ¶ 139.)  Soon thereafter, Rafael Mayer

secured a commitment of funds from BNP and Meritage divested completely of BLMIS.  (*Id.*)

## VI.    Legacy Capital Retains Khronos as Its Agent to Perform Rigorous Analysis of Legacy Capital's BLMIS Portfolio

In January 2004, Legacy Capital retained Khronos to conduct an ongoing quantitative

analysis of the Legacy Capital Account statements and trade confirmations.  (Am. Compl. ¶¶ 2,

35, 52.)  Khronos received copies of Legacy Capital's trade tickets from BLMIS and developed

technology to track BLMIS's "pricing and volume statistics," which included valuing options

according to either exchange or dealer provided prices.  (*Id.* ¶¶ 2, 126.)

Khronos also developed technology to track the volume-weighted average price, or

"VWAP," of securities purportedly traded in the Legacy Capital Account.  (*Id.* ¶ 80.)  Khronos

was tasked with screening investments "on a quantitative basis to evaluate [their] overall fit with

the portfolio on a risk, return and market correlation basis."  (*Id.* ¶ 95.)  This analysis included,

among other things, "return, volatility, market correlation, sharpe, alpha, beta and draw-down

analysis."  (*Id.*)

Khronos also was responsible for:

- qualitatively evaluating BLMIS's "adequacy of accounting and back-office

  processes; the types and applications of internal controls; adherence to

  compliance, tax, and legal guidelines; integrity of key personnel; . . . and any

  potential for conflicts of interest"  (*Id.* ¶ 104);

- valuing securities daily according to prices reported by the relevant exchange (*id.* ¶ 111);

- "proactively monitoring [BLMIS's] investment performance, [which] consist[ed] of an ongoing reapplication of all its qualitative and quantitative analysis" (*id.*);

- and valuing and verifying Legacy Capital's portfolio based on information contained in Legacy Capital trade tickets provided by BLMIS.  (*Id.* ¶ 126.)

For these services, Legacy Capital paid Khronos monthly, with a large lump sum payment in 2004 for a historical analysis.  (*Id.* ¶ 150.)  Through these analyses, the impossibilities and hallmarks of fraud described below were evident to Defendants.

## VII.    Defendants Knew of Impossible Trading Activity at BLMIS

### A.    Legacy Capital's Returns Were Impossibly Consistent Over Many Years

Legacy Capital's returns were impossibly consistent, notwithstanding the volatility of the market.  (Am. Compl. ¶¶ 94, 96-99.)  Despite the supposed correlation to the S&P 100, Legacy Capital reported positive returns at times when the S&P 100 plunged, including during "the 'dot com' bubble bursting in 2000, the 2000-2002 bear market, and the recession of 2008."  (*Id.* ¶ 97.) Specifically, from October 2000 to November 2008, Legacy Capital's annual returns with BLMIS averaged 11.32%.  (*Id.* ¶ 96.)  BLMIS purported to achieve these results with only four months of negative returns during a 98-month period, while the S&P 100 experienced 46 months of negative returns over the same period.  (*Id.*)  BLMIS continued to generate positive returns even during the last 14 months of its existence, when the S&P 100 fell no less than 39.4%.  (*Id.* ¶ 97.)  Khronos observed and documented this impossible consistency though its analysis of BLMIS's strategy and its "return, volatility, market correlation, sharpe, alpha, beta and draw-down analysis."  (*Id.* ¶ 95.)

10

**B.    The Legacy Capital Account Statements Reflected Impossible Options Volume Trading**

Khronos reviewed and analyzed Legacy Capital's BLMIS account statements and trade confirmations.  All of the BLMIS trade confirmations included identification numbers assigned by the Committee on Uniform Security Identification Procedures ("CUSIP")—meaning they could only have been traded over the exchange, not OTC.  (*Id.* ¶ 57.)  According to the account statements and confirmations analyzed by Khronos, over 26% of the options trades for the Legacy Capital Account exceeded the total number of S&P 100 Index options contracts ("OEX options") traded on the Chicago Board Options Exchange ("CBOE") for contracts with the same purchase date, strike price, and expiration date.  (*Id.* ¶ 66.)  This was impossible and defied a credible explanation.

The Renaissance Proposal identified this impossibility—that the market does not support the amount of put and call options required to execute Madoff's strategy.  (*Id.* ¶ 58.)  As stated above, this was Broder's primary concern, which he not only shared with Rafael Mayer, but also outlined in detail in his November 21 and December 11, 2003 emails.  *See supra* p. 5-7.

There were 210 instances in which the Legacy Capital Account statements purported to trade above the volume of the entire market.  In one such instance, on January 17, 2003, BLMIS purportedly sold 2,799 OEX call options (with a February expiration and strike price of 465) for Legacy Capital when the total volume traded on the CBOE for all such contracts that day was only 348.  (*Id.* ¶ 68.)  It was impossible for BLMIS's trade volume to exceed that of the entire market, much less trade 804% of the market volume for Legacy Capital alone.  (*Id.* ¶ 69.)  Based on Khronos's review of the trade confirmations, monthly statements, and options valuation, Defendants knew BLMIS was not engaged in the options trading it reported.  (*Id.* ¶ 71.)  And the Renaissance Proposal already alerted Defendants to this precise impossibility.  (*Id.*)

11

### C.    BLMIS Purported to Sell Equities and Options Outside of the Daily Reported Price Ranges

The BLMIS account statements and trade confirmations Khronos analyzed showed the prices for every purported purchase and sale of stocks and options.  (Am. Compl. ¶ 111.)  Legacy Capital's trade confirmations routinely reported equity trades that reflected prices outside of the daily price range.  (*Id.* ¶ 112.)  For example, Legacy Capital's trade confirmations reported a purchase of 87,472 shares of Intel Corporation ("INTC") on October 2, 2003 for $27.63 per share.  (*Id.* ¶ 113.)  But the actual daily price range for INTC stock purchased and sold on October 2, 2003 ranged from a low of $28.41 to a high of $28.95.  (*Id.*)  In total, BLMIS reported to Legacy Capital 138 equity trades that were impossibly priced.  (*Id.* ¶ 115.)  Each of those trades was impossible, and Khronos's analytics would have highlighted each such impossibility.

### D.    Madoff's Purported Execution of Trades Was Statistically Impossible

Madoff represented that BLMIS was time slicing (i.e., entering the market for a particular stock at different times throughout a trading day) and that the prices reported reflected an average price.  (Am. Compl. ¶ 72.)  Yet the Legacy Capital statements showed BLMIS consistently purchased near daily lows and sold near daily highs.  (*Id.*)  The average price at which a security is traded throughout a trading day is measured by a metric called volume weighted average price, or "VWAP."  (*Id.* ¶ 73.)  Consistently buying below VWAP and selling above VWAP is statistically impossible—but Legacy Capital's customer statements reflected this result on almost all reported trades.  (*Id.*)  Indeed, when Renaissance examined BLMIS's purported equities trades, it found that an extremely high percentage of the purported equity purchases were bought below or at the daily closing price and sold above the daily closing price.  (*Id.* ¶ 74.)

Aware of this significant issue, Khronos developed technology to track "pricing and volume statistics," including "VWAP," for the Legacy Capital Account. (*Id.* ¶ 80.) Legacy Capital's account statements and trade confirmations indicate that over the life of the BLMIS account 81.79% of 5,776 equity buys were below the VWAP and 76.27% of 5,315 equity sales were above the VWAP. (*Id.* ¶ 79.) Defendants knew that these purported trades were statistically impossible. (*Id.* ¶ 80.)

**VIII.   The Badges of Fraud Reflected in the BLMIS Account Statements**

> **A.   BLMIS Avoided SEC Reporting Requirements by Constantly Claiming to Be Out of the Market at Quarter–End and Year–End Even Though Such Investment Behavior Was Inconsistent With the SSC Strategy**

BLMIS claimed to exit the market at the end of the quarter and at year-end to evade certain SEC reporting requirements. (Am. Compl. ¶ 99.) Madoff purported to liquidate all investments at those times and invest the proceeds in Treasury Bills. (*Id.*) The commitment to exiting the market at quarter- and year-end meant BLMIS would be stuck with prevailing market conditions, regardless of whether they were favorable. (*Id.*) Yet the results for Legacy Capital were almost always favorable—the Legacy Capital Account reported only four down months over eight of the most volatile years in recent financial history. (*Id.*) Obviously, Defendants knew that Madoff's "explanation" was an admission that he sought to evade SEC scrutiny. Defendants also knew that this practice constituted a departure from the stated goal of the SSC Strategy— emulating the S&P 100—which was an obvious hallmark of fraud. (*Id.* ¶ 101.)

> **B.   Madoff's Purported Options Trades Were Inconsistent with the SSC Strategy**

Part of the SSC strategy involved selling call options and buying put options on the S&P 100 to create what is commonly referred to as a "collar," a strategy that controls the downside risk of price changes in a basket of stocks correlated to the performance of the S&P 100. (Am.

Compl. ¶ 20.)  Defendants understood that Madoff's purported options trading was not designed

to generate profit, but rather to control risk and protect against volatility.  (*Id.* ¶ 119.)  Yet,

Legacy Capital's account statements show that on at least ten separate occasions, purported

options transactions were used solely to generate profit and not to hedge an equities transaction.

(*Id.* ¶ 120.)  In total, these speculative options transactions created $8,094,580 in profit in trading

conditions at odds with the SSC strategy and exposed Legacy Capital to significant risk.  (*Id.*)

        In addition, the SSC Strategy required that the put and call "collar" be adjusted to reflect

changes in the basket of equities if any underlying equities were sold before liquidation of the

entire basket.  (*Id.* ¶ 127.)  However, Legacy Capital's account statements show that on 23

separate occasions BLMIS did not change the corresponding hedge when an equity was

purportedly sold before the rest of the basket.  (*Id.* ¶ 129.)  By leaving these hedges unbalanced,

it was evident that BLMIS was not trading in accordance with the SSC strategy.  (*Id.*)  These

speculative and unbalanced trades were obvious from the face of the BLMIS account statements

and trade confirmations.

### C.    The Dividend Activity Shown on Customer Statements Was Inconsistent With the Dividend Activity Sophisticated Investors Would Expect

        Over 97% of the dividend payments reported on Legacy Capital's account statements

were impossible.  (Am. Compl. ¶ 118.)  Of 159 dividend payments reported in Legacy Capital's

account statements, 155 were reported to have been made on a date that did not match the

dividend dates reported by the money market fund.  (*Id.*)  The BLMIS statements also showed

numerous instances in which the same money market fund paid multiple dividends in the same

month.  (*Id.* ¶ 117.)  In addition, the BLMIS statements continued to show transactions with the

Fidelity Spartan U.S. Treasury Money Market Fund notwithstanding the fact that this fund

changed its name in August 2005.  (*Id.* ¶ 116.)  Once again, these impossibilities all were

14

obvious on the Legacy Capital Account statements and trade confirmations that Khronos was analyzing for Legacy Capital—every "market correlation" Khronos performed unmistakably highlighted these impossibilities.

### D.    The Legacy Capital Account Statements Reflected Illegal Margin Trades

Legacy Capital did not have a margin account with BLMIS and could not have traded on margin, but its account still reflected negative balances on at least 68 occasions.  (Am. Compl. ¶ 131.)  This means there were 68 occasions on which any trades BLMIS purported to execute on Legacy Capital's behalf could not have been legally executed.  (*Id.*)  Not only were these purported illegal margin trades obvious from the statements, BLMIS never charged Legacy Capital any margin interest for these trades.  (*Id.* ¶ 132.)  By doing so, BLMIS effectively gave Legacy Capital millions of dollars in interest-free loans, yet another obvious indication of fraud. (*Id.*)

### IX.    The Badges of Fraud Indicated from Other Sources

### A.    Lack of Scalability

Defendants knew BLMIS's strategy was not scalable—BLMIS could not execute the SSC strategy given the size of the assets it purported to manage.  Renaissance estimated that BLMIS had between $5 and $15 billion under management.  (Am. Compl. ¶ 62.)  However, Broder noted in his November 21 email that even if Madoff traded all of the options available on the exchange, he could only hedge about $750 million in equities.  Using an assumption of $6 billion, the Renaissance Proposal noted that Madoff "would need approximately 133000 put or call contracts for the collar [and that d]aily volume figures for the exchange traded OEX options do not support anything like this trade size."  (*Id.* ¶ 58.)  Both of these conclusions were communicated to Rafael Mayer.

**B.    Purported Options Contracts Entered into by Legacy Capital Did Not Identify Counterparties**

Trading OTC options would have required Madoff to enter into private, individually negotiated contracts with willing counterparties.  (Am. Compl. ¶ 65.)  The CBOE did not support the options traded in the Legacy Capital Account (let alone all of BLMIS's accounts), and thus the only alternative (albeit insufficient) explanation would have been that BLMIS traded options OTC.  The CUSIP numbers on the trade confirmations would undercut such a conclusion.  Further, none of the options trade confirmations sent to Defendants identified counterparties.  (*Id.*)  In a November 2003 email, Broder wrote that he did not understand how a counterparty would enter into consistently unfavorable transactions, especially at the volumes at which Madoff purported to trade.  (*Id.* ¶ 64.)  He wrote:

> Are we to believe that the market makers would take on $15bln of market risk at the close?  Of course they might (might!!!) be willing to take the option risk if Madoff provided the market hedge in the underlying (ie they did the whole package with Madoff) but we already know that the trades in the underlying, compared with the closing prices, would leave the OTC counterparty showing losses (as our account always shows gains). . . . None of it seems to add up.

(*Id.*)  Not only did Defendants know that BLMIS did not identify counterparties, Defendants also knew that no counterparty would be willing to be on the other side of the trade with BLMIS.

**C.    BLMIS Lacked Independent Oversight and Customary Internal Controls**

Madoff and BLMIS operated with little to no transparency.  (*Id.* ¶ 102.)  As previously noted, Khronos was responsible for qualitatively evaluating the "adequacy of accounting and back-office processes" as well as "the types and applications of internal controls" at BLMIS.  (*Id.* ¶ 104.)  Defendants knew Madoff held positions at BLMIS that would normally be occupied by three separate entities: he was the investment adviser, custodian, and the broker-dealer who initiated and executed the phantom trades.  (*Id.* ¶ 102.)  This meant there was neither an

16

independent custodian to assure the proper segregation of assets nor an independent third party to verify the existence and value of BLMIS's investments or transactions. (*Id.*) This "self-custody" structure eliminated critical internal controls—widely recognized as basic in both the brokerage and investment management industry—that prevent fraud by having an independent custodian hold and confirm the existence of securities. (*Id.*)

Furthermore, BLMIS's publicly available regulatory filings revealed that it lacked the necessary number of employees to manage the billions of dollars of assets under management. (*Id.* ¶ 103.) BLMIS reported that it had between one and five employees to perform its investment advisory functions, including research. (*Id.*) Khronos was responsible for qualitatively evaluating BLMIS's "adequacy of accounting and back-office processes; the types and applications of internal controls; adherence to compliance, tax, and legal guidelines; integrity of key personnel . . . and any potential for conflicts of interest." (*Id.* ¶ 104.) Defendants therefore knew BLMIS's reported staff of one to five employees was insufficient to conduct research on the investment opportunities, execute the purported trades in the IA Business, and manage billions of dollars of assets. (*Id.* ¶¶ 104-105.)

### D.   Warnings of Fraudulent Activity at BLMIS Raised by Third Parties

Renaissance analyzed Legacy Capital's account statements and trade confirmations and attempted to replicate Madoff's strategy, which culminated in the Renaissance Proposal. The Renaissance Proposal: (i) found that the market could not support the volume of options BLMIS purported to trade; (ii) detailed a failed attempt to replicate Madoff's strategy; and (iii) questioned the legitimacy of Madoff's purported market timing and his ability to trade billions of dollars without leaving a market footprint. (*Id.* ¶¶ 47-48, 58, 61, 74.) The Renaissance Proposal was shared with the Meritage Oversight Committee, including Rafael Mayer, which resulted in the termination of Meritage's investment with BLMIS. (*Id.* ¶ 138.) Members of the Meritage

Oversight Committee further corresponded with Rafael Mayer setting forth additional concerns

about Madoff's inexplicable trading activity.  And although Rafael Mayer understood these

concerns, he chose to continue Legacy Capital's relationship with BLMIS.  (*Id.* ¶¶ 59-64, 138-

139.)

### E.    BLMIS, Known as a High–Tech Firm, Provided Only Time-Delayed Paper Statements

Real-time electronic access to accounts was industry practice by 2000. (Am. Compl. ¶

133.)  Even though Defendants knew and relied upon Madoff's reputation as a technology

pioneer, BLMIS did not provide its customers with real-time electronic access to their accounts

and only mailed paper account statements and confirmations, three or four days after the

purported trades occurred.  (*Id.* ¶¶ 135-136.)  BLMIS's printed account statements, which

Defendants reviewed and verified, provided opportunities for fraud, particularly the

manufacturing of fictitious trades, and the manipulation of reported prices.  (*Id.* ¶ 137.)

### F.    Madoff's "Strip Mall" Auditor Was Not Qualified or Capable of Auditing a Global Investment Management Company with Billions of Dollars Under Management

BLMIS employed Friehling & Horowitz, a three-person accounting firm located in a strip

mall in Rockland County, New York.  (Am. Compl. ¶ 28.)  Of the three employees at the firm,

one employee was an administrative assistant and one was a semi-retired accountant living in

Florida.  (*Id.*)  All accountants performing audit work must enroll in the annual peer review

program conducted by the American Institute of Certified Public Accountants ("AICPA").  (*Id.* ¶

109.)  Though it was an AICPA member, Friehling & Horowitz had not been peer reviewed

since 1993 and avoided the requirement by stating, in writing, it did not perform auditing work.

(*Id.*)  Rafael Mayer received Nathaniel Simons' November 13, 2003 email indicating concerns

about BLMIS's lack of a sufficiently independent auditor.  (*Id.* ¶ 110.)  The email restated the

widespread rumor that Friehling & Horowitz was run by Madoff's brother-in-law, which,

although not true, highlighted Renaissance's misgivings about the auditor's lack of qualifications

and independence.  (*Id.*)

### G.   Contrary to Standard Industry Practice, Madoff Charged No Management Fees

Madoff's investment advisory fee structure made no sense: he did not charge

management fees.  (Am. Compl. ¶ 82.)  As a result, Madoff inexplicably walked away from

hundreds of millions of dollars in fees that would normally be expected.  (*Id.* ¶ 81.)  Instead of

charging a 1% to 2% management fee and a 10% to 20% performance fee, BLMIS only charged

a customary fee for its role as primary broker, which was a $0.04 commission per share and $1

per option contract.  (*Id.* ¶ 82.)  In addition, while Madoff purportedly charged a commission of

$.04 per equity trade, the BLMIS trade confirmations sent to Khronos did not report BLMIS's

commissions.  (*Id.* ¶ 83.)

Khronos was aware that under a 1%/10% system, Madoff would have earned anywhere

from $12 million to $36 million in fees from Legacy Capital.  (*Id.*  ¶¶ 82, 84, 86.)  The 2%/20%

structure prevalent in the industry would obviously yield double that fee.  With BLMIS walking

away from these fees, Legacy Capital and Khronos could charge them instead.  In December

2003, Rafael Mayer noted Madoff's fee structure required further investigation, and that Madoff

should be asked: "1) How [Madoff] make[s] money from [Legacy Capital] since he does not

charge commissions? 2) Why bother with this? Why doesn't he go to conventional financing and

keep more upside for him?"  (*Id.* ¶ 84.)  Defendants knew Madoff's fee structure was

unconventional and contrary to industry practices.

## ARGUMENT

### I.    STANDARD OF REVIEW

The standard of review for a motion to dismiss under Fed. R. Civ. P. 12(b)(6), as

applicable under Fed. R. Bankr. P. 7012, is well known: the Court "must liberally construe all

claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences"

in the Trustee's favor. *In re J.P. Jeanneret Assoc., Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y.

2011) (citing *Cargo Partner AG v Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *Roth v.

Jennings*, 489 F.3d 499, 510 (2d Cir. 2007)).

A pleading must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and its allegations need only meet the

"plausibility" standard, such that they "'nudge[]" the claims "across the line from conceivable to

plausible.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2e009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)).  A claim is facially plausible where "the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* at 678.

Though allegations of fraud are held to a higher pleading standard, for fraudulent transfer

claims under Bankruptcy Code section 548(a)(1)(A), that burden is met by pleading the

fraudulent intent of the transferor—in this case BLMIS.  This is adequately "met by virtue of the

Ponzi scheme presumption." *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec.

LLC)*, 454 B.R. 317, 331 (Bankr. S.D.N.Y. 2011), *Picard v. Merkin (In re Bernard L. Madoff

Inv. Sec. LLC)*, 440 B.R. 243, 255 (Bankr. S.D.N.Y. 2010) ("*Merkin I*").

Furthermore, courts, including this one, have acknowledged that "'[g]reater liberality in

the pleading of fraud is particularly appropriate in bankruptcy cases, because . . . it is often the

trustee, a third party outsider to the fraudulent transaction, that must plead the fraud on

secondhand knowledge for the benefit of the estate and all of its creditors.'"   *Merkin I*, 440 B.R.

at 254 (quoting *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr.

S.D.N.Y. 1999)); *see also Nisselson v. Drew Indus. Inc. (In re White Metal Rolling & Stamping

Corp.)*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998) (same).   Where, as here, "'the trustee's lack

of personal knowledge is compounded with complicated issues and transactions [that] extend

over lengthy periods of time, the trustee's handicap increases,' and 'even greater latitude' should

be afforded" to his pleading.   *Cohmad*, 454 B.R. at 329 (quoting *Stratton Oakmont*, 234 B.R. at

310).

The Trustee's Amended Complaint pleads specific factual allegations as to the fraud at

BLMIS, Defendants' misconduct, the grounds upon which the Trustee seeks to avoid and

recover fraudulent transfers made to Legacy Capital, and information concerning the subsequent

transfers made to Khronos.   The Trustee has therefore met his pleading burden and Defendants'

motion to dismiss should be denied.

## II.   THE TRUSTEE HAS SUFFICIENTLY PLEADED THAT DEFENDANTS HAD KNOWLEDGE OF MADOFF'S FRAUD

For Counts II through VII of the Amended Complaint to survive Defendants' motion to

dismiss, the Trustee must allege that Defendants knew BLMIS was not engaged in legitimate

securities trading.   For Count I of the Amended Complaint, brought under Bankruptcy Code

section 548(a)(1)(A), to survive, the Trustee must plead that Defendants willfully blinded

themselves to Madoff's fraud.   *See Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*,

No. 08-99000 (SMB), 2015 WL 4734749, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate

Decision*"); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,

516 B.R. 18, 23-24 (S.D.N.Y. 2014) ("*Good Faith Decision*"); *Picard v. Katz*, 462 B.R. 447,

454-56 (S.D.N.Y. 2011).  Because the allegations in the Amended Complaint meet the higher

"actual knowledge" standard, the motion to dismiss should be denied.

A.    **Section 546(e) Does Not Protect the Transfers at Issue in This Adversary Proceeding**

Section 546(e) limits the Trustee's avoidance powers to those provided by section

548(a)(1)(A), unless the Trustee pleads Defendants had "actual knowledge that there were no

actual securities transactions being conducted."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff*

*Inv. Sec. LLC (In re Madoff),* No. 12-MC-115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr.

15, 2013) ("*Actual Knowledge Decision*").  Finding that the 546(e) safe harbor aims to protect

securities markets and "the reasonable expectations of legitimate participants in these markets,"

the District Court held the safe harbor does not apply when the customer possessed knowledge

defeating any reasonable expectation that BLMIS was engaged in legitimate securities trading on

its behalf.  *Id.* at *4.  On August 11, 2015, the Bankruptcy Court issued the *Kingate Decision,*

reiterating this standard.  2015 WL 4734749, at *12 ("The safe harbor was intended, among

other things, to promote the reasonable expectations of legitimate investors.").  Notably, neither

the *Actual Knowledge Decision* nor the *Kingate Decision* requires that the Trustee plead actual

knowledge of all the details of Madoff's the Ponzi scheme to avoid the application of section

546(e)—pleading Defendants' knowledge of a lack of legitimate securities transactions is

sufficient.

To demonstrate Defendants' actual knowledge, the Trustee must allege that they had a

"'high level of certainty and absence of any substantial doubt'" regarding the lack of legitimate

trading at BLMIS.  *Kingate Decision*, 2015 WL 4734749, at *13 (quoting *Picard v. Merkin (In*

*re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014) ("*Merkin II*")).

Defendants contend that *Merkin II* "is illustrative of how high the pleading standard is for actual

knowledge," suggesting that if the Court did not find actual knowledge in *Merkin II*, it could not do so here. (Legacy Capital Br. at 13; Khronos Br. at 23.) However, the facts in *Merkin II* are neither better nor worse than those here—they are simply different. *Merkin II* does not create the relevant standard; it only applies the facts at issue in that case to the legal standard articulated by the District Court. And in doing so, the Court found that, unlike in *Kingate*, the facts of *Merkin II* "painted a picture of someone who saw the red flags and ignored them." *Kingate Decision*, 2015 WL 4734749, at \*15. But here, Defendants themselves admit they did so much more: they "made efforts to try to understand the BLMIS trading strategy," including tracking pricing and volume statistics, screening investments to evaluate fit with the portfolio, evaluating the adequacy of BLMIS's accounting and back-office practices, and reviewing trade confirmations and monthly account statements corresponding to Legacy Capital's BLMIS account. (Legacy Capital Br. at 21 (*citing* Am. Compl. ¶¶ 2, 80, 95, 104, 111, 118, 126); Khronos Br. at 21-22 (same).) The facts here do not present a "picture of someone who saw red flags and ignored them," but rather a picture of individuals and entities who took steps to analyze and understand every fictitious trade.

In *Kingate,* the Trustee also alleged that the *Kingate* defendants "actively reviewed the impossible transactions reported by Madoff in the Funds' accounts . . . ." *Kingate Decision*, 2015 WL 4734749, at \*15. For example, much like Khronos, a company the Mayers founded, Kingate retained FIM and Kingate Management, companies founded by Frederico Ceretti and Carlo Grosso, to "evaluate and monitor" BLMIS and review its activity "to ensure that it complies with [Kingate Funds'] investment guidelines," and provide "consulting advice . . . with respect to certain aspects of [Kingate Funds'] operational, administrative, marketing, accounting and legal matters." *Id.* at \*3. And much like Rafael Mayer, who treated Legacy Capital's

23

BLMIS investment differently than other funds Khronos serviced by preventing anyone at Khronos other than he and his brother David from having access to BLMIS data (Am. Compl. ¶ 52), FIM also treated Kingate's BLMIS investment differently by failing to subject it to the rigorous due diligence standards it normally employed. *Kingate Decision,* 2015 WL 4734749, at *4. This Court concluded that, when considered together, "the totality of the allegations in the [Kingate complaint] paint[ed] a picture of sophisticated financial professionals who knew that Madoff was reporting fictitious transactions." *Id.* at *15.

Here, much like allegations this Court found sufficient to sustain the Trustee's avoidance claims in the *Kingate Decision*, the Trustee has demonstrated Defendants "knew that Madoff was not engaging in the securities transactions he reported, and that many entries in the statements and trade confirmations depicted trades that could not have taken place." *Id.* at *13. Starting with the Renaissance Proposal that identified red flags, the concerns of the Meritage Oversight Committee members snowballed, culminating in a consensus that they terminate their investment with BLMIS. After the email exchanges with Broder identifying Madoff's impossible trading, Rafael Mayer was the only Meritage Oversight Committee member to vote in favor of continued investment with BLMIS. Legacy Capital then engaged a company run by Rafael Mayer—Khronos—to analyze Legacy Capital's BLMIS customer statements, and restricted access to those statements to only Rafael and David Mayer. Khronos found, among other things, that Madoff traded more options than were available on the market, that almost all of the dividend payments reported were impossible, and that the rate at which Madoff bought securities at daily lows and sold them at daily highs was statistically impossible. The so-called "VWAP" analysis was specifically conducted by Khronos for Legacy Capital. These impossibilities were not only readily apparent from the BLMIS customer statements and trade confirmations that Khronos

reviewed and analyzed, but also these statements came after Mayer was provided with an instruction manual—the Renaissance Proposal and the further correspondence among the Meritage Oversight Committee members—to Madoff's fraud.

Guided by this Court's application of the actual knowledge standard in the *Kingate Decision*, the only plausible inference from the facts alleged in the Amended Complaint is that Defendants here had actual knowledge that securities were not traded at BLMIS. There is no other plausible explanation for Madoff buying phantom securities (e.g. non-existent options), trading at impossible prices (whether outside the daily range or at impossible VWAP levels), reaping impossible dividends, investing in a mutual fund that ceased operating under the name BLMIS reported, and engaging in other clearly fraudulent activity which Khronos analyzed. At this early procedural stage, even under the most restrictive reading of the *Actual Knowledge Decision*, the Trustee has sufficiently pleaded facts showing Defendants could not possibly have expected that the securities transactions reported on Legacy Capital's BLMIS customer account statements were legitimate. Accordingly, they should not be protected by section 546(e)'s safe harbor.

### B. The Trustee Has Met and Exceeded the Willful Blindness Standard

Although the Trustee has pleaded Defendants' actual knowledge sufficiently to defeat a motion to dismiss, if this Court were to find otherwise, the Amended Complaint contains sufficient allegations to support the Trustee's alternative contention that Defendants were, at the very least, willfully blind to Madoff's fraud.[2]

---

[2] This section deals only with the Trustee's claim to avoid and recover the principal transferred to Legacy and Khronos, as Defendants acknowledge that the Trustee has adequately pleaded his claim to avoid and recover the fictitious profits Defendants received. (*See* Legacy Br. at 1, 22.)

On April 27, 2014, the District Court issued the Good Faith Decision, imposing on the

Trustee a new, heightened burden for pleading the defendants' lack of good faith—"willful

blindness." *Good Faith Decision* at 24.  Although the District Court acknowledged that good

faith is an affirmative defense under Bankruptcy Code sections 548 and 550, it held that the

Trustee must nonetheless plead the absence of good faith on the part of the defendants as part of

his *prima facie* case to overcome these affirmative defenses.  *Id.* at 23-24 (citing *Picard v. Greiff*

*(In re Madoff Sec.)*, 476 B.R. 715, 723 (S.D.N.Y. 2012)).  Accordingly, to prevail on his section

548(a)(1)(A) claim to avoid the transfers of principal to Legacy Capital, and on his section

550(a) claim to recover subsequent transfers from Khronos, the Trustee must demonstrate that

Defendants "willfully blinded [themselves] to circumstances indicating a high probability of

[Madoff's] fraud." *Good Faith Decision* at 23.

In *Merkin II*, this Court explained that willful blindness involves two elements: "(1) the

defendant must subjectively believe that there is a high probability that a fact exists and (2) the

defendant must take deliberate actions to avoid learning of that fact."  515 B.R. at 139 (quoting

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)).  Thus, "willful

blindness connotes strong suspicion but *some* level of doubt or uncertainty of the existence of a

fact and the deliberate failure to acquire actual knowledge of its existence."  *Id.* at 139-140; *see*

*also Kingate Decision*, 2015 WL 4734749, at *13.

1.    The Trustee Has Sufficiently Pleaded That Defendants Subjectively
Believed That There Was a High Probability of Fraud at BLMIS

The Trustee identified facts he believes demonstrate Defendants' actual knowledge of

Madoff's lack of legitimate trading.  Those facts demonstrate Defendants' "strong suspicion" of

illegitimate trading, even if they had "some level of doubt."  The Renaissance Proposal found

that the market could not support the volume of options BLMIS purported to trade, detailed a

failed attempt to replicate Madoff's strategy, and questioned the legitimacy of Madoff's

purported market timing and impossible pricing, as well as his ability to trade billions of dollars

without leaving a market footprint. (Am. Compl. ¶¶ 47-48, 58,61, 74.) Rafael Mayer's

December 2003 email to the Meritage Oversight Committee identified numerous trading and

operational anomalies that required Madoff's explanation. Among the operational anomalies

listed in the email, Mayer included the inexplicable volume of options BLMIS purportedly

traded, its market timing and unusual fee structure, as well as that BLMIS's trading had no

impact on the market despite purporting to regularly move between five and fifteen billion

dollars in and out of the market. (*Id.* ¶¶ 59, 75, 84, 91.)

As discussed above, Khronos also independently observed these hallmarks of fraud, as

they were evident from the Legacy Capital Account statements. The objective impossibilities

and indicia of fraud alleged by the Trustee in the Amended Complaint are evident from the face

of the account statements and trade confirmations reviewed and analyzed by Khronos. *See, e.g.*,

*Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 411 (S.D.N.Y. 2010) (finding a fair

inference that defendants blinded themselves to fraud where they "ignored not only what was

handed to them but that what they were given was readily suspicious to any reasonable person

exercising ordinary prudence"). There is no legitimate explanation for any of this evidence, let

alone all of it.

Defendants argue that allegations identifying red flags are inadequate to plead they were

willfully blind to BLMIS's fraud. Defendants misunderstand the law. The Trustee has identified

specific red flags and impossibilities known to Defendants. In the cases Defendants cite, unlike

here, the underlying complaints failed to plead that the defendants were aware of the red flags

identified in those complaints. *See, e.g.*, *Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299,

310 (2d Cir. 2010) ("Plaintiffs cursorily allege the FMC Defendants must have known of the red

flags because they were detected by many investment professionals in the industry, and were

'equally available to each' Defendant."); *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599,

621-22 (S.D.N.Y. 2010) (The complaint alleged PWC's "failure to investigate B[L]MIS despite

the existence of red flags that, if discovered, should have raised suspicions about its operations,"

but did not allege that PWC was "actually . . . aware of the red flags").

Defendants also rely on *SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL

363844 (S.D.N.Y. Feb. 2, 2010), for the proposition that the SEC's allegations in that proceeding

"were insufficient where they were based on Madoff's request for secrecy . . . ." (Legacy Capital

Br. at 18; Khronos Br. at 18-19.)  Neither that decision nor the SEC's allegations concerning

secrecy bears any relationship to the facts at hand.  Defendants ignore that the Trustee's

simultaneous action against the same defendants to avoid and recover fraudulent transfers

resulted in a finding of actual knowledge of BLMIS's fraud.  *See Cohmad*, 454 B.R. 317.  The

Trustee's action presented different claims (the SEC's case involved securities fraud claims), and

many of the allegations in the Trustee's complaint "were not presented to the District Court in

the SEC Action."  *Id.* at 336 n.16.

Here, the Trustee has pleaded red flags and Defendant's awareness of those red flags,

which courts consistently find support a conclusion of knowledge and/or willful blindness.  *See,

e.g.*, *Merkin II*, 515 B.R. at 144-45 ("Where the complaint alleges facts showing that the

defendant was aware of the 'red flags' and the probability that Madoff was running a fraudulent

scheme, it sufficiently pleads scienter."); *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir.

2011) ("Red flags about the legitimacy of a transaction can be used to show both actual

knowledge and conscious avoidance."); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 405

28

(S.D.N.Y. 2010) (allegations of scienter sufficient where the complaint alleged that defendants

knew of certain red flags); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 408–10

(S.D.N.Y.2010) (allegations of scienter adequate where complaint alleged that defendants were

aware of Madoff's unwillingness to provide electronic records of trade confirmations, and the

suspicious firm that audited Madoff's business).

Defendants also suggest that Nathaniel Simons' statement to the Meritage Oversight

Committee—"It's high season on money managers, and Madoff's head would look pretty good

above Elliot Spitzer's mantle"—was a joke.  Defendants cite the SEC's 2009 interview of

Nathaniel Simons as evidence of the email's humor.  (Legacy Br. at 10; Khronos Br. 11.)

Though the discussion of Elliot Spitzer's mantle might be a "joke," the November 13-14, 2003

correspondence among the Meritage Oversight Committee members was anything but humorous;

it showed a very real fear of investing with Madoff.  First, in the same email, immediately after

the Elliot Spitzer comment, Nat Simons remarked: "I propose that unless we can figure out a

way to get comfortable with the regulatory tail risk in a hurry, we get out.  The risk-reward on

this bet is not in our favor."  (Am. Compl. ¶ 50; Kajon Dec. Ex. E; Fisher Dec. Ex. F.)  Second,

Paul Broder responded to that email, stating "[i]t would not be a surprise to me to see a link

exposed to the current Spitzer/SEC investigation."  (Kajon Dec. Ex. E; Fisher Dec. Ex. F.)

These statements were serious and unambiguous: Renaissance wanted to cut ties with Madoff.

And Meritage acted on its concerns—over the sole objection of Legacy Capital and Khronos

officer Rafael Mayer—by withdrawing its investment.[3]

---

[3] In addition to being contradicted by statements made at the time (including his own contemporaneous
statements), Mr. Simons' after-the-fact statement is also inadmissible hearsay.  Even if the self-serving
statements that Defendants cite were admissible, Defendants should not be permitted to cite contradictory
evidence in an attempt to somehow undermine or cast doubt upon the allegations in the Trustee's
complaint.   In contrast to the statements cited by the Defendants, the documents cited by the Trustee are

Arguments proffered by Defendants contradict their contention that they were not willfully blind to BLMIS's fraud. Attempting to show they did not believe Madoff was running a Ponzi scheme, Defendants cite SEC interviews of Henry Laufer ("Well, the suspicions that I had—I don't want to speak for other people—were questions of, you know, front-running," (Legacy Capital Br. at 8; Khronos Br. at 9)) and Nathaniel Simons ("We were thinking, again, maybe [Madoff]'s doing something illegal because he's front-running his clients and giving his clients bad prices," (Legacy Capital Br. at 10; Khronos Br. at 11)) to demonstrate that they instead believed Madoff was front running. But while front running might have explained certain concerns (such as market timing), it could not have explained them all (e.g., impossible options volume, impossible pricing, no market footprint, etc.). Furthermore, there is nothing pleaded which could somehow demonstrate that these after-the-fact explanations were known by Rafael Mayer or anyone else at Legacy Capital or Khronos. Finally, and most important, in connection with a willful blindness analysis, even if Defendants "only" believed BLMIS was engaged in illegal front-running, that would still be dispositive evidence that Defendants were willfully blind to facts suggesting a high probability of fraud at BLMIS.

As the Second Circuit has noted, "[t]he culpability of the willfully blind defendant lies in his averting his eyes to what he thinks he sees, not in the objective accuracy of his vision." *United States v. Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006). Thus, closing one's eyes to facts suggesting one type of wrongdoing constitutes willful blindness even if another type of wrongdoing was actually taking place. *See, e.g.*, *United States v. Joly*, 493 F.2d 672 (2d Cir. 1974) (finding willful blindness where defendant did not know he was transporting drugs, but only that he thought he was doing something wrong); *United States v. Perez-Padilla*, 846 F.2d

---

admissions against interest and/or not offered for the truth of the matter asserted (i.e., whether Madoff was legitimate), but rather for the fact of the statement being made.

1182 (9th Cir. 1988) (defendant found deliberately ignorant where he did not know he was transporting cocaine, but admitted he knew he was "doing something illegal"); *United States v. Bailey*, 955 F.2d 28 (8th Cir. 1992) (defendant found guilty of conscious avoidance of learning the fact that he was transporting drugs, when he thought he was transporting counterfeit money). Here, even if Defendants thought Madoff was front-running (of which there is no evidence, as Defendants have pointed only to transcripts of interviews with Renaissance personnel), or engaging in some other illegal practice, they clearly would be deemed willfully blind to Madoff's fraud.

Any mistaken belief on Defendants' part that Madoff was front-running does not absolve them of their responsibility to have further investigated the evidence of impossible options trading, impossible market timing, BLMIS's lack of a market footprint, a fee structure that made no sense, the lack of an independent auditor, and other trading impossibilities and indicia of fraud evident from the face of the account statements and trade confirmations they reviewed and analyzed. In fact, front running does not explain any of these red flags or impossibilities, casting further doubt as to whether anyone actually believed it. Defendants cannot escape the Trustee's claim by arguing—without pointing to anything in the Trustee's pleading—that they thought they were profiting from a different illegal scheme.

Defendants argue that the Trustee is "using the benefit of hindsight to second-guess" Defendants' conduct. (Legacy Capital Br. at 3.) But the Trustee has cited to documentary evidence which was created in 2003 and 2004. The observations contained in that evidence are unequivocal evidence of observations made about Madoff's fraud at the time. Defendants, however, cite to excerpts of 2009 SEC interviews of Renaissance employees that contain nothing but self-serving, after-the-fact rationalizations that are inconsistent with their conclusions in 2003

31

and 2004, which evidences their belief that Madoff's trading was illegitimate.  As a threshold matter, the Renaissance employees were not cross-examined during their interviews with the SEC.  More importantly, however, Defendants have put forth no evidence—admissible or otherwise—that the Renaissance employees' after-the-fact explanations of their subjective beliefs were ever communicated to or relied upon by Defendants.  The objective manifestations of Renaissance's subjective belief about the events described in the Amended Complaint were created and documented in 2003 and 2004.  They include the Renaissance Proposal, the emails Rafael Mayer drafted and received, the script drafted by Broder and Rafael Mayer, and Meritage's decision to divest itself of Madoff.  None discusses front-running.  Rather, they all unequivocally illustrate a real-time understanding of Madoff's impossible trading activity and express additional concerns about Madoff's legitimacy.

> 2.  The Trustee Has Sufficiently Pleaded That the Defendants Took Deliberate Steps to Avoid Learning the Truth About the Fraud

Defendants knew about Madoff's illegitimate trading practices.  At best, Defendants took deliberate steps to avoid confirming their knowledge.  The Renaissance Proposal and subsequent emails were road maps that accurately delineated Madoff's fraud.  In the face of this evidence, Rafael Mayer voted against Meritage's redemption and convinced Meritage to remain partially invested until Legacy Capital could find another investor to replace Meritage's capital. Furthermore, Rafael Mayer controlled the company that performed Legacy Capital's due diligence pertaining to BLMIS, and prevented anyone other than his brother, David Mayer, from accessing Legacy Capital's BLMIS records.  The diligence performed by Khronos identified BLMIS's impossible trades.

In response to Meritage's stated fears and desire to cut ties with Madoff, Rafael Mayer simply replaced Meritage's investment with a loan from BNP.  Neither the Renaissance Proposal

nor the Meritage Oversight Committee's subsequent findings were disclosed to BNP when Legacy sought to secure its funding. Defendants knew and understood that Madoff was running a fraud; there were no plausible alternatives to the manifold impossibilities and indicia of fraud.

## III.  THE TRUSTEE HAS ADEQUATELY PLEADED CLAIMS FOR RECOVERY OF SUBSEQUENT TRANSFERS AGAINST KHRONOS

Khronos contends that the allegations in Count VIII of the Amended Complaint do not support the Trustee's claims to avoid and recover the subsequent transfers it received from Legacy Capital. Khronos argues that the Trustee's allegations are too "vague" to provide Khronos with fair notice of the Trustee's claims. (Khronos Br. at 13, 14.) Khronos's contentions lack merit. The Amended Complaint exceeds the current pleading standard for subsequent transfers by alleging fees and commissions that Khronos received as a result of (and based upon) Legacy Capital's investment in BLMIS.

### A.  The Trustee Has Pleaded the "Necessary Vital Statistics" of the Transfers Sufficient to Apprise Khronos of the Trustee's Claims Against It

Subsections 550(a)(1) and (2) of the Bankruptcy Code allow the Trustee to recover transfers made to "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(1), (a)(2). The Court need only apply a Rule 8 analysis to determine "whether a claim to recover fraudulent transfers from a subsequent transferee is adequately pled." *Merkin I,* 440 B.R. at 269; *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.)*, 531 B.R. 439, 473 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*") ("Rule 8(a) governs the portion of a claim to recover the subsequent transfer"); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec.)*, 458 B.R. 87, 119 (Bankr. S.D.N.Y. 2011) ("*Madoff Family Decision*"); *Stratton Oakmont,* 234 B.R. at 317–18.

To meet a Rule 8 pleading standard for a section 550(a) claim, the Trustee must only

plead the "necessary vital statistics" of the transfers—"the who, when, and how much"—to

establish an entity as a subsequent transferee of the funds in dispute. *Omnibus Good Faith

Decision*, 531 B.R. at 473; *see also Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.,

Inc.)*, 379 B.R. 5, 32 (Bankr. E.D.N.Y. 2007); *Stratton Oakmont*, 234 B.R. at 318.  Khronos does

not dispute this standard.  (*See* Khronos Br. at 13-14.)

The Trustee has plainly and sufficiently pleaded a cause of action under section 550(a)

against Khronos.  First, the Amended Complaint pleads the transfers Legacy made to Khronos

for accounting services with specificity:

> For performing accounting services on behalf of Legacy Capital,
> Khronos received an annual fee of at least $42,000, paid monthly.
> Khronos also provided historical pricing services to Legacy
> Capital, for which it received one-time fees. As of the end of 2004,
> Khronos received fees from Legacy Capital totaling $154,690.
> Upon information and belief, Legacy Capital paid a total of
> $319,190 to Khronos for providing accounting services.

(Am. Compl. ¶ 150.)  There is no question this includes "the necessary vital statistics": the

"who"—Legacy Capital, a BLMIS accountholder, to Khronos, its service provider; the

"when"—starting in 2004, $42,000 per year, paid monthly, with a lump sum paid in 2004 for

historical pricing services; and the "how much"—$154,690 in 2004, then $42,000 per year for a

total of $319,190.  Therefore, based on these transfers alone, Count VIII should stand.

The Amended Complaint also alleges that: (i) Legacy Capital received transfers of

property from BLMIS (Am. Compl. ¶ 142); (ii) Montpellier Resources was a Legacy Capital

investor (*id.* ¶¶ 35, 148); (iii) from at least 2004, Khronos was Montpellier Resources'

investment manager (*id.* ¶ 148); (iv) Khronos received a monthly fee of 1.2% of Montpellier

Resources' net asset value, which it shared with a related company, HCH Capital (*id.*); and (v)

between 2004 and 2005, Khronos received a 5% performance fee of Montpellier Resources' new

net investment profits, and between 2006 and 2008, Khronos received a 10% performance fee of

Montpellier Resources' new net investment profits.  (*Id.* ¶ 149.)  Based upon these percentages

and Montpellier Resources' net asset value attributable to its Legacy Capital investment, the

Trustee pleaded, upon information and belief, that Khronos was paid approximately $6,281,889

($6,601,079 minus the $319,190 attributable to accounting services).  (*Id.* ¶¶ 150-51.)  Though

this is not a "dollar-for-dollar accounting," Khronos itself concedes (*see* Khronos' Br. at 15) such

specificity is not necessary.  *See Allou Distribs.*, 379 B.R. at 30.  The information the Trustee

provided is more than sufficient to put Khronos on "fair notice of what the . . . claim is and the

grounds upon which it rests."  *Twombly*, 550 U.S. at 555.

Defendants rely on four recent decisions to argue that the Trustee's subsequent transfer

claims are inadequate:  *Omnibus Good Faith Decision*, 531 B.R. 439; *Madoff Family Decision*,

458 B.R. 87; *Gowan v. Novator Credit Mgmt. LLC (In re Dreier LLP)*, 452 B.R. 467 (Bankr.

S.D.N.Y. 2011)[4]; and *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M.

Fabrikant & Sons, Inc.)*, 480 B.R. 480 (S.D.N.Y. 2012).  All four decisions are inapposite and/or

distinguishable.

The first three decisions address complaints that pleaded far less than what is pleaded in

the Amended Complaint.  For instance, in the *Omnibus Good Faith Decision*, the subsequent

transfer claims were dismissed where the Trustee only pleaded "[o]n information and belief,

some or all of the Transfers were subsequently transferred by the [initial transferees] to

[subsequent transferees]."  531 B.R. at 473.  The Court found that the mere fact of the

subsequent transferees' ownership of the initial transferee entity was insufficient to show that

transfers were made to them.  *Id.*

---

[4] Khronos mistakenly cites *Gowan v. Amaranth LLC*, a related case decided on the same day; but the quoted language defendants rely upon is found in *Gowan v. Novator Credit Mgmt.*

The complaint in the *Madoff Family Decision* was similarly deficient.  There, the initial

complaint "merely allege[d] that '[o]n information and belief, some or all the transfers were

subsequently transferred by one or more [of the Defendants] to another Family Defendant, either

directly or indirectly' without providing any sort of estimate of the amount of the purported

Subsequent Transfer, or when or how such Transfer occurred."  *Madoff Family Decision,* 458

B.R. at 119-120.[5]  Importantly, this Court stated that "a Complaint's failure to indicate specific

amounts does not in and of itself warrant dismissal of the Subsequent Transfer claims . . . ."  *Id.*

at 120 (citing *Allou Distribs.*, 379 B.R. at 30-31 (finding a subsequent transfer claim adequately

pleaded where the complaint stated, "at least tens of millions of dollars were fraudulently

diverted from [debtor] to [initial transferees] . . . [and] a portion of these fraudulently diverted

funds was transferred from the [initial transferees] to, or for the benefit of, the [subsequent

transferees]")).  The Court found, however, that unlike the Amended Complaint here, the *Madoff*

*Family* complaint "fail[ed] to provide even a modicum of specificity with respect to the

Subsequent Transfers so as to put the Defendants on notice as to which ones the Trustee seeks to

recover . . . ."  *Id.*

The complaint in *Dreier* suffered the same fate.  There "[t]he closest the Trustee g[ot] to

stating a claim against any of the five . . . subsequent transferees is the allegation that certain

trading advisors to the Transferee Defendants may have received 'profits and revenues' by virtue

of their positions in the fund structure."  *Dreier*, 452 B.R. at 480.  These allegations did not

provide the Court with enough information to conclude "that the [subsequent transferee]

Defendants ever received 'profits or revenues,'" nor was there any indication "whether the

---

[5] The allegations related to the *Picard v. Madoff*, Adv. Pro No. 09-1503, have since been amended and
expanded.

[subsequent transferees] were supposed to receive any commissions or fees from the [initial

transferees]." *Id.*

 In contrast, in *Merkin I*, the complaint satisfied the Rule 8(a) pleading requirement,

where, exactly as the Trustee has done here, the Trustee alleged that the initial transfers were

transferred "to [the subsequent transferee defendants] in the form of payment of commissions or

fees" and "such commissions or fees were paid in the predetermined amounts, as described in

the Funds' Offering Memoranda, of 1% of the net asset value, and 20% of the increase in value

. . . of the net asset value of [the fund]." 440 B.R. at 269-270.  The Court found that pleading

subsequent transfers as derived from the commission percentages based on the funds' offering

memoranda "adequately apprises the . . . the alleged recipients of these fees, of which

transactions are claimed to be fraudulent and why, when they took place, how they were

executed and by whom." *Id.* at 270 (internal quotations omitted); *see also Gowan v. Amaranth

LLC (In re Dreier LLP)*, 452 B.R. 451, 465 (Bankr. S.D.N.Y. 2011).

 Finally, Khronos's reliance on *Fabrikant* is misplaced.  The *Fabrikant* Court analyzed a

debtor's intentional fraudulent conveyance of the transfers under a Rule 9(b) standard.  *See

Fabrikant*, 480 B.R. at 491.  As reiterated most recently by this Court in the *Omnibus Good

Faith Decision*, "Rule 9(b) of the Federal Rules of Civil Procedure governs the portion of a claim

to avoid an initial intentional fraudulent transfer, and Rule 8(a) governs the portion of a claim to

recover the subsequent transfer." 531 B.R. at 472-73 (internal citations omitted).  The Trustee

has exceeded that burden here.

### B. The Trustee Has Pleaded that the Transfers Originate with BLMIS

 Relying on *Merkin II*, Khronos argues that the Trustee has not demonstrated that the

subsequent transfers he seeks to recover from Khronos "'originated with [BLMIS].'"  (Khronos

Br. at 15 (citing *Merkin II*, 515 B.R. at 149-51).)  But in *Merkin II*, the Court found it

unnecessary, at the pleading stage, to "connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS, or a prior subsequent transfer originating with the initial transfer." 515 B.R. at 150. Here, the Trustee pleaded that Legacy Capital withdrew from BLMIS $38,800,000 in March 2004; $50,000,000 in September 2007, $27,000,000 in October 2007 and $10,000,000 in June 2008. (Am. Compl. Ex. A.) The Trustee also pleaded that Khronos received $6,601,079 during various times between 2004 and 2008, either directly from Legacy or as a service provider of Montpellier Resources, a Legacy investor. (*Id.* ¶¶ 148-51.) Although the Trustee has not "trace[d] the fees Khronos received from Montpellier back to BLMIS" (Khronos Br. at 16), such tracing would be virtually impossible at the pleading stage. Recognizing the import of discovery beyond the pleading stage, the *Merkin II* Court sustained the subsequent transfer claims, noting such claims "must ultimately be proved through the books and records of the *defendant*[]." *Merkin II*, 515 B.R. at 151 (emphasis added).

The Trustee has met his burden with respect to the subsequent transfers Khronos received. The Trustee has pleaded the fees Legacy and Montpellier Resources were contractually obligated to pay Khronos as a dollar amount, or as a percentage of net asset value attributed to the funds' BLMIS investment. The Trustee has also pleaded the time periods of those transfers and their frequency. Accordingly, Khronos has been given "fair notice" of the Trustee's claims and the subsequent transfers he seeks to recover and Khronos' motion to dismiss Count VIII of the Amended Complaint should therefore be denied.

## IV.   DISMISSAL IS INAPPROPRIATE WHERE DEFENDANTS SEEK DISMISSAL ON TRIABLE ISSUES OF FACT

### A.   Defendants' Knowledge is a Factual Issue to Be Determined at Trial

The central issue of Defendants' liability—their state of mind—is an issue of fact that should not only survive these motions to dismiss, but also merits close examination at trial.

38

Indeed, this Court has repeatedly indicated that it will not determine factual issues such as

knowledge of fraud on summary judgment, let alone on any motion to dismiss. *See e.g.*, Tr. of

Hearing Re: Trustee's Motion to Direct Entry of Final Judgment and to Certify Judgment for

Immediate Appeal at 31:5-19; 41:8-42:2, *Picard v. Merkin*, Adv. Pro. No. 09-01182 (SMB)

(Bankr. S.D.N.Y. Oct. 2, 2014); Tr. of Hearing Re: Status Conference at 7:4-11, *Picard v.

Merkin*, Adv. Pro. No. 09-01182 (SMB) (Bankr. S.D.N.Y. May 7, 2015).  The Trustee has

alleged enough concerning Defendants' subjective knowledge of Madoff's fraud to overcome a

motion to dismiss.

### B.    Rule 2004 Is No Substitute for Discovery under the Federal Rules

Defendants claim that the Trustee "has now had more than ample opportunity to try to

plead a viable claim" against them given that the Trustee already "sought and received extensive

pre-complaint discovery from both Khronos and Renaissance under Rule 2004 of the Bankruptcy

Rules." (Legacy Capital Br. at 3-4; Khronos Br. at 3.)  However, the limited discovery the

Trustee sought under Rule 2004 was in connection with his general duty to uncover and pursue

all possible claims for the benefit of creditors of the estate, *In re Drexel Burnham Lambert Grp.,

Inc.*, 123 B.R. 702, 708 (Bankr. S.D.N.Y. 1991), not in connection with this case.  In fact, Rule

2004 is unavailable "once an adversary proceeding or contested matter has been commenced."

*In re Bennett Funding Grp., Inc.,* 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996); *see also In re Enron

Corp.,* 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)*; In re 2435 Plainfield Ave., Inc.*, 223 B.R.

440, 455–56 (Bankr. D.N.J. 1998) (collecting cases).

It was not until 2011 that the District Court first articulated that a claim under

548(a)(1)(A) in a SIPA proceeding required the consideration of whether a defendant was

willfully blind to BLMIS's fraud.  *Katz*, 462 B.R. at 455-56.  It was not until 2013 that the

District Court issued the *Actual Knowledge Decision*.  Finally, it was not until April 2014 that

the District Court altered the pleading burden and standards required for the Trustee's complaints to be facially sufficient.  *See Good Faith Decision* at 24.  The *Good Faith Decision* was issued more than five years after the Trustee began his investigation into Madoff's wide-reaching fraudulent scheme, and more than three years after this case commenced, well after employing Rule 2004 to identify every viable cause of action under the pleading standards then in place. Therefore, Defendants' arguments concerning Rule 2004 are unavailing.  The Trustee has met his pleading burden and is entitled to plenary discovery under the Federal Rules to prove his case.

## **CONCLUSION**

For the reasons set forth above, the Trustee respectfully requests that Defendants' motions to dismiss be denied in their entirety.

Dated: New York, New York
      August 27, 2015

Respectfully submitted,

BAKER & HOSTETLER LLP

By:   */s/ David J. Sheehan*
      David J. Sheehan
      dsheehan@bakerlaw.com
      Oren J. Warshavsky
      owarshavsky@bakerlaw.com
      Jason S. Oliver
      joliver@bakerlaw.com

      45 Rockefeller Plaza, 14th Floor
      New York, NY  10111
      Telephone:   212.589.4200
      Facsimile:    212.589.4201

      *Attorneys for Irving H. Picard,*
      *Trustee for the Substantively Consolidated*
      *SIPA Liquidation of Bernard L. Madoff*
      *Investment Securities LLC and the estate of*
      *Bernard L. Madoff*