Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - x

4   SECURITIES INVESTOR PROTECTION

5   CORPORATION

6   v.                              CASE NO. 08-01789-smb

7   BERNARD L. MADOFF INVESTMENT

8   SECURITIES, LLC, et al,

9        Debtors.

10  - - - - - - - - - - - - - - - x

11  IRVING H. PICARD, TRUSTEE FOR THE

12  LIQUIDATION OF

13  v.                              CASE NO. 10-05421-smb

14  FRANK J. AVELLINO

15  - - - - - - - - - - - - - - - x

16  IRVING H. PICARD, TRUSTEE FOR THE

17  LIQUIDATION OF

18  v.                              CASE NO. 11-02732-smb

19  BUREAU OF LABOR INSURANCE

20  - - - - - - - - - - - - - - - x

21                    U.S. Bankruptcy Court

22                    One Bowling Green

23                    New York, New York

24                    July 29, 2015

25                    10:05 AM

1    B E F O R E :

2    HON. STUART M. BERNSTEIN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:   UNKNOWN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    HEARING Matter:  Madoff Hearing Date

2

3    HEARING Matter:  Motion to Allow - Trustees Motion and

4    Memorandum to Affirm His Determinations Denying claims of

5    Claimants Holding Interests in Partners Investment Co.,

6    Northeast Investment Club, and Martin R. Harnick & Steven P.

7    Norton, Partners

8

9    HEARING Matter:  Motion to Dismiss

10

11    HEARING Matter:  BLI's Motion for Judgment on the Pleadings

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms

Page 4

```
 1   A P P E A R A N C E S :

 2   BAKER HOSTETLER

 3        Attorneys for BLMIS and Trustee Irving Picard

 4        45 Rockefeller Plaza

 5        New York, NY  10111

 6

 7   BY:  KATHRYN M. ZUNNO, ESQ.

 8        LAUREN M. HILSHEIMER, ESQ.

 9        CATHERINE E. WOLTERING, ESQ.

10        AMY E. VANDERWAL, ESQ.

11        JIMMY FOKAS, ESQ.

12        THOMAS L. LONG, ESQ.

13

14   HAILE SHAW & PFAFFENBERGER

15        Attorneys for Avellino Defendants

16        660 U.S. Highway One

17        Third Floor

18        N. Palm Beach, FL  33408

19

20   BY:  GARY WOODFIELD, ESQ.

21

22

23

24

25
```

1   LOWENSTEIN SANDLER LLP

2        Attorneys for Bureau of Labor Insurance

3        1251 Avenue of the Americas

4        New York, NY  10020

5

6   BY:  AMIAD M. KUSHNER, ESQ.

7

8   TELEPHONIC APPEARANCES:

9   KENT COLLIER, REORG RESEARCH, INC.

10  KEVIN H. BELL, SIPC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                      P R O C E E D I N G S

2            THE COURT:  Madoff.  Who represents the trustee?

3            MR. FOKAS:  Good morning, Your Honor, Jimmy Fokas,

4    Baker Hostetler, and with me, Kathryn Zunno.

5            MS. ZUNNO:  Good morning, Your Honor.

6            THE COURT:  Why don't we do the motion to allow

7    and confirm trustee's determination first.

8            MR. FOKAS:  That's be my colleague, Ms. Vanderwal.

9            MS. VANDERWAL:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MS. VANDERWAL:  Your Honor, Amy Vanderwal for the

12   trustee.

13           We're here this morning on the trustee's motion to

14   affirm his determination of the 61 plan, which are filed by

15   claimants who invested in three New York partnerships.  The

16   partnerships were the Northeast Investment Club, Partners

17   Investments Co., and Martin R. Harnick and Steven P. Norton,

18   Partners.

19           The investing claimants invested in these

20   partnerships, which invested in turn in BLMIS.  They

21   themselves did not have any direct financial relationship

22   with BLMIS.  And they did not own the assets that were

23   entrusted to BLMIS for the purposes of trading securities.

24           So the totality of claims as consistent with prior

25   decisions in these proceedings, including the Second

Page 7

1    Circuit's decision in Kraus (ph) and as well the Second

2    Circuit's (indiscernible) decision.

3           No objections to the relief sought by another

4    trustee have been filed, so unless you have any questions,

5    we would ask that the motion be granted.

6           THE COURT:  Is there anyone who wants to be heard

7    in connection with this motion?

8       (No response)

9           THE COURT:  The record should reflect there's no

10   response.  I'll grant the motion.  Claimants are essentially

11   investors in feeder funds, they had no customer accounts

12   with BLMIS.  The funds in which they invested had the

13   accounts, and under the decisions of the Second Circuit, the

14   District Court, and this Court, they're not customers within

15   the meaning of SIPA, so their claims will be (indiscernible)

16   the trustee's determination would be allowed.  You can

17   submit an order.  Thank you.

18          MS. VANDERWAL:  Thank you very much, Your Honor.

19          THE COURT:  Next up here, the BLI matter.

20      (Pause)

21          THE COURT:  Who represents the movant?

22          MR. KUSHNER:  Good morning, Your Honor.  My name

23   is Amiad Kushner from the Law Firm of Lowenstein Sandler.

24   I'm here with my colleague, Lauren Garcia.  We represent

25   Bureau of Labor Insurance.

Page 8

1                THE COURT:  All right.

2                MR. LONG:  Good morning, Your Honor, Thomas Long,

3       Baker & Hostetler on behalf of the trustee.  Along with me

4       is Catherine Woltering from Baker Hostetler.

5                THE COURT:  Good morning.

6                Mr. Kushner, what I'm principally interested in is

7       why I should hear this motion.  Stand up.

8                MR. KUSHNER:  Sure.

9                THE COURT:  You made a motion before Judge

10      Lifland, he denied the motion, you preserved your record for

11      purposes of appeal, so why should I hear the motion?  Why

12      should I grant differently?

13               MR. KUSHNER:  Well, you have an intervening change

14      in law in that Judge Rakoff issued his decision on what we

15      call the extraterritoriality order.  You also have an

16      ongoing process in this court and hundreds of other

17      adversary proceedings, in which the very same issue that we

18      present on this motion is being adjudicated.  That is the

19      issue that whether under Section 550 of the Bankruptcy Code,

20      the trustee can void a transfer from a non-U.S. feeder fund

21      to a transferee located outside the United States.

22               THE COURT:  But you've litigated that issue.  And

23      you lost it.  I mean, why shouldn't you just be limited to

24      your appellate rights?

25               MR. KUSHNER:  Well, we have the right to file a

Page 9

1    motion for judgment on the pleadings.  It's --

2              THE COURT:  But isn't really just a motion for

3    reargument?  Judge Rakoff decided the matter differently

4    from Judge Lifland, but wasn't he just exercising the same

5    jurisdiction that Judge Lifland exercised when he decided

6    the motion against you?  In other words, why don't they just

7    cool it in the courts?

8              MR. KUSHNER:  Well, we've cited cases, Pilgrim's

9    Pride which holds that a decision of a District Court on a

10   motion to withdraw the reference should be considered as the

11   law in the case in the entire bankruptcy proceeding, all

12   adversary proceedings.

13             THE COURT:  Well, why wasn't Judge Lifland's

14   decision law of the case, if we take the results in the

15   withdrawn actions?

16             MR. KUSHNER:  Well, at that time, in 2012, it was

17   (indiscernible) case.  What we've said here is now it's

18   different, now it's 2015, the trustee's conceded to this

19   Court that Rakoff's decision changed the pleading standard

20   under Section 550.  You have hundreds of --

21             THE COURT:  Certainly in the withdrawn actions.

22   Well, certainly it did, and it's certainly mandatory

23   authority in the withdrawn actions.  Because you agree with

24   her, the matter with specific directions to apply the

25   decision.  But it's persuasive authority, very persuasive

Page 10

1    authority, but it's just persuasive authority in all the

2    other matters in this case, isn't it?

3              MR. KUSHNER:  We agree that it is persuasive.

4    But, you know, I think separate from the BLI adversary

5    proceeding, you have cases in which the reference was not

6    withdrawn, which are being joined in the extraterritoriality

7    proceedings pending in front of this Court.

8              And as we pointed out in our briefing, the trustee

9    actually took the position on the antecedent debt motion

10   that was pending before this court that even if somebody did

11   not move to withdraw the reference in the district court,

12   the district court decision is the law of the case, and is

13   binding on that party.  So BLI is similarly situated.  Yes -

14   -

15             THE COURT:  But isn't the same thing true of Judge

16   Lifland's decision, it's law of the case?

17             MR. KUSHNER:  It was law in the case at that time.

18   But now, you have an intervening change in law.  It is no

19   longer the law of the case when you have a higher court

20   changes the law, when you have --

21             THE COURT:  But that's the question I have, was it

22   a higher court, or was it simply a court that withdrew the

23   reference and was exercising the same bankruptcy

24   jurisdiction that Judge Lifland exercised when he decided

25   the case?

Page 11

1          MR. KUSHNER:  We would submit that --

2          THE COURT:  In other words, it wasn't an appellate

3    court.  It wasn't acting as an appellate court.

4          MR. KUSHNER:  It clearly was not an appellate

5    court, we acknowledge that in our briefing, but it

6    nevertheless is binding.  And the only case that we find

7    that's directly on point, Pilgrim's Pride, addressed what we

8    think is exactly the same situation.

9          You had a district court that decided an issue on

10   a motion to withdraw the reference, and then the bankruptcy

11   court in a separate adversary proceeding treated the

12   district court decision as the law of the case in that

13   separate adversary.

14         THE COURT:  Did that decision allow any claimants

15   who had separately litigated the issue about a different

16   result, relitigate that?  That's the question I have.  I

17   understand the chronology, and I understand what happened,

18   but you litigated this action, you chose not to participate

19   or your client chose not to participate in the withdrawn

20   proceedings.  And you litigated it and you lost.

21         MR. KUSHNER:  It's correct that --

22         THE COURT:  And, yes, there's another case, and

23   maybe there will be another case three months from now from

24   a different district court judge who wrote an appellate

25   decision, I don't know.  But how many times do you get to

Page 12

1    litigate this?

2             MR. KUSHNER:  Well, this is only the second time

3    respectfully.  And, Your Honor --

4             THE COURT:  It sounds like one too many, doesn't

5    it?

6             MR. KUSHNER:  It's been three years, and we have -

7    - not only is it an intervening change in law, but you have

8    the trustee conceding that the Rakoff decision changed the

9    law, and you have the specter of inconsistent rulings.

10            THE COURT:  Well, we already had that, though.

11            MR. KUSHNER:  But now you have the chance to

12   correct that.  Now, you have the chance to apply the same

13   rule for the entire bankruptcy case.  And as a matter of

14   judicial economy, it just doesn't make sense to have a

15   decision by Judge Lifland stand on this motion, when the

16   Court is simultaneously going to address the exact same

17   issues, and maybe to a different conclusion, and you've just

18   said --

19            THE COURT:  So you think it's economical for me to

20   decide your motion and then maybe four or five months from

21   now decide the motion, the bigger motion?

22            MR. KUSHNER:  Well, respectfully, Your Honor, you

23   may recall that in November when we were in front of you, we

24   had asked to be joined in that briefing, for that exact

25   reason.  We said it's not economical for there to be two

Page 13

1    different proceedings on the same issue.  We asked for

2    permission to be joined in that proceeding.  The trustee

3    declined, and that's why we had to bring this motion.  We

4    would prefer respectfully to be joined in that process.  We

5    do agree that that is the most efficient way to proceed.

6           We don't think it's efficient for you to have to

7    deal with duplicative briefings.  We don't think it's

8    efficient for you to deal with the same issue two different

9    cases.  So we would respectfully renew our request to be

10   joined in the extraterritoriality briefing that's pending in

11   this court.

12          THE COURT:  Let me ask you one other question.

13   There were a lot of facts discussed by Judge Lifland, of

14   course, there was also motion relating to personal

15   jurisdiction, which allowed affidavits to come in.  And a

16   lot of those (indiscernible) discussed what I will call

17   (indiscernible) connections, New York and also Fairfield

18   Centuries (ph) connections here.  Can I consider that on a

19   motion for judgment on the pleadings?

20          MR. KUSHNER:  We would submit you can't, and in

21   fact, we would submit that Judge Lifland considered those

22   facts for purposes of the subject matter jurisdiction issue

23   in that case.  It was a completely different legal standard.

24          THE COURT:  Well, the only thing he considered the

25   facts on were that the transferred depleting property of the

Page 14

1    debtor.

2         MR. KUSHNER:  Well, let me just clarify.  I'm

3    talking about extrinsic facts.

4         THE COURT:  I know, yeah, I know.

5         MR. KUSHNER:  So the only reason he considered

6    facts outside the pleadings was for purposes of determining

7    whether the bankruptcy court had subject matter

8    jurisdiction.  So, no, on this motion, under, you know,

9    12(c) you can't, in our view, look to facts that are not

10   pled, merely because on a separate motion Judge Lifland was

11   faced with the subject matter jurisdiction issue and he

12   looked at facts not in the pleadings.  It doesn't mean on

13   this motion, you know, you can look outside the complaints

14   pled.  You still have the complaint.  They've said to you,

15   they don't want to amend, they're not amending.

16        THE COURT:  What they wanted to cure is a motion

17   for summary judgment if I don't dismiss it.

18        MR. KUSHNER:  Well, we would contend, it's totally

19   improper to convert this motion to a motion for summary

20   judgment, discovery hasn't even begun.  We didn't put in

21   facts outside of the pleadings in our opening brief, just

22   because they improperly submitted hundreds of pages of

23   evidence in opposition to a motion to dismiss doesn't mean

24   you convert it into a motion for summary judgment.

25        So we would submit the proper course is actually

1    to dismiss the complaint.  If they want to move to leave to

2    amend now that's the proper course, but they've chosen to

3    stand on their complaint, to the extent Your Honor believes

4    that Judge Rakoff's decision is persuasive, and as a change

5    in law, you should grant our motion.  To the extent Your

6    Honor believes it would be more efficient to combine this

7    case, at least for briefing purposes, with the

8    extraterritoriality briefing that's currently pending, we

9    think that's also an efficient way to proceed.

10                But what's not efficient is to deny our motion and

11    to allow a decision that everybody agrees is -- no longer

12    represents the law, just to throw a --

13                THE COURT:  I'm not sure the trustee agrees.  But

14    we'll hear from the trustee.

15                MR. KUSHNER:  Okay.

16                THE COURT:  All right.  Thanks.

17                MR. LONG:  Thank you, Your Honor.  When I was

18    preparing for this argument, I decided there were going to

19    be two preliminary issues that we would have to get into

20    before we get to the merits, and the first one was the law

21    of the case issue.

22                THE COURT:  Well, it makes no sense to hear the

23    merits twice.  So if I'm going to hear the merits, when I

24    hear the omnibus motion.

25                MR. LONG:  My point was, Your Honor, dealing with

Page 16

1    the law of the case.  We stand by the arguments set forth in

2    the brief, that clearly Judge Lifland's decision is the law

3    of the case in this particular matter.  The law of the case

4    is a doctrine that dictates to courts how to reconsider

5    prior decisions of the court, and there are two elements of

6    it.  Obviously you pointed this out, just a moment ago, the

7    counsel for BLI which is that if you have an appellate court

8    that remands, it's mandatory, that the Court follow that.

9           But in this particular instance, there was no

10   remand in this case.  So what we have is a situation where

11   this Court has previously ruled, the Court under the law of

12   the case doctrine can reconsider its decision if, in fact,

13   there's been new evidence, there's a clear error, prevent

14   manifest injustice, and if there's a change in the

15   controlling law.

16          Our point, Your Honor, is we stand by the fact

17   that Judge Lifland's decision remains the law of the case,

18   but even if this Court were to consider Judge Rakoff's

19   decision as the new standard, the outcome remains the same.

20          Because if you apply Judge Rakoff's standards to

21   the facts involved in this case, you'll come to the same

22   conclusion that they're not entitled to a dismissal of their

23   complaint.

24          THE COURT:  Well, certainly your complaint doesn't

25   plead those facts.

1            MR. LONG:  Well, Your Honor, our complaint pleads

2     the following.  We not only have the complaint, but we had

3     certain documents that were referenced in the complaint, and

4     that's what I was going to talk about as a second issue.

5            What are the particular pieces of evidence that

6     are to be considered here?  Your Honor, fully understand, we

7     have submitted an affidavit, a declaration as part of this

8     procedure to have it converted into a motion for summary

9     judgment.  I'll come to that in just a second.

10           Let's go back to the facts considered in the

11    complaint are incorporated by reference.  In the complaint,

12    there are references to the subscription agreement, which

13    the Bureau of Labor Insurance executed in order to become a

14    subscriber and shareholder of Fairfield Century.

15           As part of that, the private placement memorandum

16    is part of that subscription agreement.  If you look at the

17    terms of the subscription agreement, part of the defined

18    terms you have to reference back to the private placement

19    memo, as well as the fact that they reference the fact that

20    they have read, understood, and that's part of their

21    agreement.

22           In addition, we incorporated by reference the

23    original or I shouldn't say the original, the Fairfield

24    amended complaint in the exhibits attached to it.  It is

25    based upon those facts which are all considered under the

Page 18

1   law to be part of the complaint, the basis for us proceeding

2   in this case.

3           Because if you take into account just that

4   evidence, we have possibly set forth a complaint that allows

5   us to proceed.

6           THE COURT:  You're saying it's the issue that's

7   going to be argued in connection with the omnibus motion?

8           MR. LONG:  Certainly, Your Honor, if --

9           THE COURT:  I assume that your allegations are

10  relevant to Fairfield, are they the same in every one?

11          MR. LONG:  I would say this, Your Honor, I was

12  going to move forward on that affidavit that we'd convert

13  this to a motion for summary judgment, and by the way Rule

14  12 --

15          THE COURT:  I wouldn't do that today, so.

16          MR. LONG:  I --

17          THE COURT:  He's entitled to notice and an

18  opportunity to respond.

19          MR. LONG:  Well, he was.  They did not contest one

20  single --

21          THE COURT:  No, no, the Court first has to say

22  that it's going to be treated as a motion for summary

23  judgment, and then they get an opportunity to respond.

24          MR. LONG:  My point is, on that affidavit, what we

25  simply have included -- I'm sorry, Your Honor, back in Ohio

Page 19

```
 1    we call them affidavits, here it's declarations.  In that
 2    declaration --
 3                THE COURT:  Well, we have affidavits also.
 4                MR. LONG:  Yeah.  In the declaration, all it does
 5    is pretty much supplement the allegations there, by
 6    providing BLI's own documents to prove that.  There were
 7    only minor differences in those facts, such as the fact that
 8    Fairfield Century had no offices in the BBI, it had no
 9    employees in the BBI, but even in the complaint and the
10    documents attached to it, we make it clear that the FTG
11    Group, which Judge Morero in the Anwar case has held to be a
12    de facto New York partnership, they controlled and operated
13    Fairfield here from New York City.
14                And, in fact, if you look at the original BLMIS
15    customer agreement that was given for Fairfield Century,
16    which again was part of the Fairfield complaint that was
17    referenced -- incorporated by reference, they listed
18    Fairfield Century's address as in the United States, not in
19    the BBI.
20                THE COURT:  Can I ask you a question, putting the
21    merits aside?  Suppose I agree with you and simply deny the
22    motion because they've had their bite at the apple.  And
23    then in the course of determining the omnibus motion, I
24    agree with Judge Rakoff, should they then have the right to
25    come back?
```

1          MR. LONG:  Your Honor, what I'm saying is, even if

2     you agree with Judge Rakoff's standards and apply it in this

3     case as it stands now --

4          THE COURT:  Listen, I don't want to hear an

5     argument for summary judgment today because as I said, even

6     if I convert the case, they still have a right to respond.

7          MR. LONG:  My point is, Your Honor, I believe

8     there's sufficient evidence without going to that

9     declaration to apply Judge Rakoff's decision in this case

10    and deny the motion.

11         THE COURT:  So you want me to decide the motion?

12         MR. LONG:  Yes, Your Honor.

13         THE COURT:  On the merits?

14         MR. LONG:  Yes.

15         THE COURT:  All right.  Then I'll reserve decision

16    on the motion.  I'll probably decide it in connection with

17    the omnibus motion since it's the same issue.  All right.

18         MR. LONG:  Thank you, Your Honor.

19         THE COURT:  Now, I'll hear the motion to dismiss.

20         Who represents the movant?

21         MR. FOKAS:  Good morning, Your Honor, Jimmy Fokas,

22    Baker Hostetler, Kathryn Zunno, Baker Hostetler also.

23         MR. WOODFIELD:  Good morning, Your Honor, Gary

24    Woodfield from Haile Shaw.  I represent what have been

25    referred to as -- collectively as the Avellino defendants.

Page 21

1           THE COURT:  Go ahead, Mr. Woodfield.

2           MR. WOODFIELD:  Thank you, Your Honor.

3           Your Honor, our memo and responding memos dealt

4    with a number of issues there.  There are only several I'd

5    like to sort of either amplify or clear up this morning in

6    this argument.

7           The first, though, is the most significant

8    argument I believe, and that is our contention that the

9    complaint fails to allege allegations of evidencing actual

10   knowledge.

11          THE COURT:  Yeah, but the complaint has several

12   allegations that, I'll say the defendants, there are a lot

13   of defendants, but that the defendants participated with

14   Madoff in the creation of false statements.

15          MR. WOODFIELD:  Correct.  To deceive the SEC.

16          THE COURT:  But they would have had to know that

17   the trades and the holdings depicted in those statements did

18   not reflect actual trades, right?

19          MR. WOODFIELD:  In those manufactured statements.

20          THE COURT:  So at least as to some of the

21   statements they had, they knew it didn't actually reflect

22   trading securities.

23          MR. WOODFIELD:  They knew that those statements

24   that Madoff manufactured for purposes, and taking the facts

25   obviously as true --

Page 22

1            THE COURT:  Right.

2            MR. WOODFIELD:  -- in those question, the

3    allegations are egregious in that they permitted and

4    assisted Madoff in creating statements to deceive the SEC to

5    cover a financial shortfall.

6            THE COURT:  Now, I realize that doesn't

7    necessarily mean that every -- they knew that every single

8    statement that Madoff produced didn't actually reflect the

9    purchase and sale of securities.  But why isn't that enough

10   to survive a motion to dismiss?  They at least knew that

11   some of the statements were false.

12           MR. WOODFIELD:  Well, those manufactured

13   statements are false and that allegation establishes it.

14   But as we -- I can go on to argue, and of course, Your

15   Honor's intimately familiar with this, having decided Merkin

16   (ph) and comparing the facts I think Merkin 2 and here.

17           THE COURT:  But Merkin was never alleged to be a

18   participant in the creation of false financial records.  And

19   that's what this complaint alleges, at least in 1992 and,

20   you know, maybe thereafter where (indiscernible) and

21   fraudulent payments, but the compensation, I'll call them

22   the finder's fees are paid through the creation of gold's

23   option trades attributed to certain accounts.

24           MR. WOODFIELD:  And there's no clear allegations

25   that Madoff -- I'm sorry, that Avellino had any particular

Page 23

1    expertise or knowledge in financial transactions, and knew

2    or participated in the generation of those trades.

3              Other than -- and Your Honor obviously hit on the

4    most significant issue, and that is, these manufactured

5    statements.  But if you go through all the other allegations

6    and compare them to the Merkin allegations, they don't stand

7    up.  Everything else, I mean, the fact that thereafter,

8    after they were shut down in '92 that they invested,

9    continued to invest with Madoff, two closely held family

10   businesses that were created for estate planning purposes is

11   just as plausible as some other deception that they're

12   attempting to attribute to those.

13             Your Honor's reference to the fact that they

14   referred to the fact that Avellino referred A and B clients

15   who wanted to continue to invest, for which they received,

16   plaintiff sensationalizes those as fraudulent side payments,

17   and Your Honor's I think more accurate description is

18   referral fees, and that's what they are.

19             Again, those kinds of acts don't evidence the

20   actual knowledge that Avellino had that Madoff was

21   participating in a Ponzi scheme.  And again, the specific

22   allegations that Your Honor found in Merkin of specific

23   conduct of Merkin, other than just generic -- here's an

24   example.

25             Your Honor ticked off in Merkin several facts that

Page 24

1    evidenced the close personal relationship, and they were

2    specific facts, not just a generic, they had a close

3    personal relationship.

4            Here, we have nothing other than a one generic

5    reference in paragraph 119 that says, "Avellino Corp enjoyed

6    direct access."  There isn't anything else evidencing the

7    close personal relationship.

8            And again, in Merkin, you've got specific --

9            THE COURT:  Wasn't one of these guys a partner of

10   Madoff's father?

11           MR. WOODFIELD:  In an accounting firm.  No, in

12   Madoff's wife's father, Ruth, yes, he graduated from City

13   College and went to work in the accounting firm.

14           THE COURT:  And he worked at their office, right?

15           MR. WOODFIELD:  Sorry?

16           THE COURT:  Madoff worked out of their office?

17           MR. WOODFIELD:  For a short period of time when he

18   started his business, he started in their office, yes.

19           But again, the contrast I draw is the fact that in

20   Merkin you've got specific instances, such as Merkin was

21   told by one of his money managers that couldn't possibly

22   exist, and he made specific references.  And he had

23   documents in his possession that attributed actual knowledge

24   on behalf of Merkin.  And those same kind of allegations in

25   a more generic form are here.  But as Your Honor and other

Page 25

1    courts have found, those kinds of facts, such as lack of

2    transparency and consistent returns, you know, should have

3    raised some duty to investigate.

4              THE COURT:  Well, his returns weren't only

5    consistent, he was pre-promised 17 percent returns.  How do

6    you do that?

7              MR. WOODFIELD:  Promised a return --

8              THE COURT:  Of 17 percent.

9              MR. WOODFIELD:  -- and then thereafter reduced

10   out, because that was the referral fee that he was receiving

11   for having put the A & B customer into Madoff.

12             THE COURT:  I thought this was on their own

13   investments, the 17 percent.

14             MR. WOODFIELD:  The 17 percent constituted the

15   referral that they were receiving.

16             THE COURT:  Oh, all right.

17             MR. WOODFIELD:  Your Honor, I can go through this

18   point, obviously you're well versed in it.  I do see a

19   dramatic contrast between the facts here and the facts in

20   Merkin.  Again, the only significant fact I see here is the

21   -- as Your Honor indicated, the clear participation in

22   generating false statements for purposes of deceiving the

23   SEC.  I contend that that standing alone does not evidence

24   actual knowledge of a Ponzi scheme.

25             Your Honor, just several of the points I'd just

Page 26

1    like to --

2            THE COURT:  Does it have to be a Ponzi scheme, or

3    just knowledge the securities weren't being traded?  I know

4    that we've used shorthand methods to refer to a lot of this,

5    but the essence of the safe harbor was that, you know,

6    securities aren't being traded.

7            MR. WOODFIELD:  Well, the cases are all over the

8    place on that, and I think the allegations are that this is

9    a Ponzi scheme.  I think the actual knowledge has to be --

10           THE COURT:  Well, Madoff admitted to that in his

11   allocution.

12           MR. WOODFIELD:  Yeah, but my client hasn't.

13           THE COURT:  Well, okay.  You can try that issue.

14           MR. WOODFIELD:  I'd rather not.

15           THE COURT:  Okay.

16           MR. WOODFIELD:  That's why I'm here.

17           THE COURT:  Okay.

18           MR. WOODFIELD:  Judge, just several other points

19   if I may touch upon that I think -- well, two of them got

20   somewhat muddled in our briefing, and I'd like to just clear

21   up --

22           THE COURT:  Can I ask you a question?

23           MR. WOODFIELD:  Please.

24           THE COURT:  Do you think the trustee has alleged

25   enough to allege willful blindness?

Page 27

1        MR. WOODFIELD:  Well, I hate to ever make an

2   admission, but if I compare it to Merkin, I believe that is

3   the case.

4        THE COURT:  Okay.  So at a minimum, the trustee's

5   entitled to recover the two year fraudulent or potential

6   fraudulent transfers, or at least it's perceived, not

7   necessarily recovered.  I understand you may have --

8        MR. WOODFIELD:  That's Your Honor's -- yes, I mean

9   if Your Honor is going to be consistent in your findings --

10        THE COURT:  Well --

11        MR. WOODFIELD:  -- as in Merkin --

12        THE COURT:  -- there's something to be consistent.

13        MR. WOODFIELD:  Well, I'm not urging you to do

14   that.

15        THE COURT:  Even if it's foolish consistency,

16   right?

17        MR. WOODFIELD:  Well, I wasn't going to say that,

18   Your Honor.

19        THE COURT:  All right.  Well, I said it, so you

20   don't have to.

21        MR. WOODFIELD:  Your Honor, may I just touch on a

22   couple of other points?

23        THE COURT:  Sure.

24        MR. WOODFIELD:  One, like you say, I think the

25   briefs got somewhat muddled on issues of piercing the

Page 28

1    corporate veil and imputing knowledge.  I mean --

2          THE COURT:  I didn't understand one of your

3    implication arguments.  I understand you're saying you --

4    from one agent to another, but my understanding of the

5    trustee's argument is, that those -- the individual

6    implication issues were a principal agent issue, not an

7    agent/agent issue, that in other words, that Avellino was

8    acting for I guess Ms. Avellino, and they weren't co-agents,

9    she was essentially the principal and he was her agent.

10         MR. WOODFIELD:  And I don't believe there's

11    sufficient facts to evidence that agent relationship.  But

12    backing up just a second, I think there's not a dispute as

13    to the law, I don't believe, but I think it, as I say, got

14    somewhat muddled in the brief.  And that is, I believe the

15    complaint is riddled with allegations of imputing knowledge

16    and piercing the corporate veil.

17         The points I wanted to make with regard to

18    imputation is, sure, we don't dispute the fact that a

19    corporation can only act through its agents or officers and

20    consequently you can impute knowledge to the corporation.

21    But you can't impute knowledge to the principals or non-

22    owners of that entity, and I believe the complaint has that

23    throughout.

24         THE COURT:  Well, what about if the non-owners are

25    the principals?

1          MR. WOODFIELD:  Well, they may be liable on --

2     assuming there's a general partnership, let's say, and

3     they're jointly and severally liable for the obligations of

4     the partnership, they may have exposure on another theory.

5     But you can't impute the knowledge from an individual to

6     other individuals who are not owners of that entity.

7          THE COURT:  Okay.  You were going to talk about

8     piercing the corporate veil?

9          MR. WOODFIELD:  Well, again, yes, just on that

10    point, Judge.  Our point is, again it's somewhat similar to

11    the imputation.  That is, you can't impose -- if you pierce

12    the corporate veil, you can't impose liability on others

13    than that entity, any other individuals, other than the

14    owners of that entity.  And again, I think the way the

15    complaint is read, they're making that argument, although

16    it's hard to tell because it's combined quite often with

17    various allegations of agency relationship.

18          But, you know, a legal entity can be held liable

19    under piercing the corporate veil, or the principals of an

20    entity, but not others.  The only other point I want to

21    touch on, Judge, and it's a point that you raised in your

22    June 2nd decision, and that is with regard to the subsequent

23    transfer claim.  And here, as Your Honor sue sponte

24    recognized there, those -- that complaint is defective

25    because it alleges both direct -- that the subsequent

Page 30

1    transfers were made directly to or for the benefit of, and

2    that's clearly a defect that needs to be corrected.

3              Do you have any questions of me, Your Honor?

4              THE COURT:  No, thank you.

5              MR. WOODFIELD:  Thank you.

6              MR. FOKAS:  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              MR. FOKAS:  I think Your Honor seized exactly on

9    what the issue is here and the facts that's alleged in this

10   complaint show, that these defendants, Avellino, Bienes

11   (ph), Thomas Avellino knew that there were no securities

12   transactions.  And why did they know that --

13             THE COURT:  At least with respect to the ill-

14   advised statements.

15             MR. FOKAS:  That's right.  And let's talk about

16   those advised statements.  There's really two instances in

17   1992, where there were revised statements.  There was the

18   initial instance when internal records of BLMIS did not

19   match the records of Avellino and Bienes and revealed a $50

20   million shortfall.

21             Their response to that, and the response to the

22   SEC was about to take Avellino and Bienes' testimony was to

23   create the phony, what we call the A&B IA account.  In fact,

24   they -- three years of fictitious account history that, you

25   know, in no way, shape or form could represent any

Page 31

1    legitimate securities transactions.

2           Thereafter, Avellino and Bienes testified to the

3    value of their accounts.  It was consistent with what was on

4    these revised statements that had these transactions.  But

5    it didn't end there.  Not more than a month later, as the

6    SEC and the court appointed receiver continued to press for

7    more information from Avellino and Bienes, and as we allege

8    in the complaint, Madoff realized that there were going to

9    be other shortfalls revealed in other years, in other

10   statements.

11          So what was the response to that?  The response

12   then was to ask Avellino and Bienes to return their

13   historical account statements, to return.  And that's what

14   we alleged in great level of detail in the amended

15   complaint, that Avellino and Bienes actually did.  They went

16   back, they gathered up the account statements for at least a

17   three year period, returned those back to Madoff, who then,

18   you know, magically created a new set of account statements

19   that closed the shortfalls in the prior years, and continued

20   to fall.

21          And so we, based on these allegations, Your Honor,

22   there really is no other plausible inference that should be

23   drawn at this stage of the proceeding, other than that they

24   knew there were no securities transactions, they knew they

25   were not receiving transfers in connection with securities

Page 32

1    contracts, and they're not entitled to the 546(e) safe

2    harbor.

3            And, you know, one other point to be made is,

4    beyond their actual participation in what we allege to be a

5    conspiracy with Madoff to conceal this, they also provided

6    internal accounting records, to make the job a little easier

7    for Mr. Madoff to create these backdated statements.

8            And what they did was, they provided as we allege

9    in the complaint, ledgers, general ledgers that revealed

10   what the balances were on the Avellino and Bienes, the

11   accounting firm, the Peter (ph) Funds records.  And provided

12   those, so that the statements could match.  So the story

13   that was going to be told to the SEC and that was told to

14   the SEC at that time, and the court appointed receiver was

15   consistent with sufficient assets being on hand, and that

16   there was a broker who was actually conducting securities

17   transactions.

18           There's just simply no way and no good reason for

19   your broker, your purportedly legitimate broker to ask you

20   to return your historical account statements, and replace

21   them with different transactions that purported to occur

22   many years earlier.

23           And the last thing we allege on that point, Your

24   Honor, in the complaint, is that the exact documents that

25   were produced to the court-appointed receiver and to the SEC

Page 33

1    were at least three years of revised statements that Madoff

2    concocted after Avellino and Bienes returned those

3    statements back to them.

4            So putting this altogether in that time period,

5    leads you to the conclusion at this stage, again at the

6    pleading that it had to have known that there were no actual

7    securities transactions, and therefore, they have the actual

8    knowledge and the trustee has alleged sufficiently at this

9    stage that they had the actual knowledge of that, denies

10   them the safe harbor of Section 546(e).

11           And, you know, talking about what Your Honor's

12   referred to as the finder's fees, and what we, the trustee,

13   referred to as fraudulent side payments, there we used that

14   term just to highlight the blatantly fraudulent --

15           THE COURT:  I know why you used the term.

16           MR. FOKAS:  Right.  Well then, you'll save me a

17   few sentences.  But there, is yet another example of why,

18   you know, we believed these defendants had actual knowledge.

19           THE COURT:  That's why your complaint is 145 pages

20   I guess.

21           MR. FOKAS:  Well, the exhibits -- we -- you know,

22   while it may not be a short statement, Your Honor, we hope

23   it's plain.

24           THE COURT:  I can't agree with you on that one,

25   Mr. Kushner.

Page 34

1              MR. FOKAS:  Well, but the point being that, you

2     know, these are -- you can't unlearn actual knowledge.  So

3     the moment they knew there were no securities transactions,

4     they can't go back, and then say, well, these were finder's

5     fees and the way they were paid were -- made no difference

6     to us.  Again, it just compounds that.

7              Years after, it continued, and they knew that

8     there were no securities transaction.  They're not entitled

9     to the safe harbor, and we believe that the plaintiffs

10    allege to the applicable standard.

11             THE COURT:  I have a question that was raised in

12    the movant's papers, the entity that's the subject with the

13    SIPA proceeding came into being in 2000.  I'm going to ask a

14    different question than you think I'm going to ask you.

15             Assuming you can get past the statute of

16    limitations problems, you're seeking to recover transfers

17    made by an entity that is not the subject of the SIPA

18    proceeding.  How can you do that?

19             MR. FOKAS:  Well, I think as Your Honor's, you

20    know, previously decided and recently in the omnibus good

21    faith decision and was decided in the inter-account

22    (indiscernible) decision, I think where there's really no

23    distinction between the two entities.

24             THE COURT:  But that was for purposes, at least

25    the inter account transfer, it was for the purposes of

Page 35

1    computing net equity, and in the more recent decision for

2    the purposes of computing potential liability I guess.  But

3    you're actually seeking to recover transfers at this point,

4    made by an entity that's not an entity -- that's not the

5    entity which is the debtor in the SIPA proceeding.  Isn't

6    Mr. Picard limited to recovering the transfers by the entity

7    that's the entity in the SIPA proceeding?

8            MR. FOKAS:  And I think they're essentially one in

9    the same.  The change in business form did not change the

10   underlying membership in SIPA.  In SIPC, that BLMIS was a

11   member of since 1970.  And it's that membership that allows

12   that and forces that SIPA to apply, and once SIPA applies,

13   you'll have -- the trustee has all the authority and power

14   under SIPA to avoid and recover those transfers.

15           And we think it would be almost arbitrary at that

16   point, where the fraudster decided to change from the sole

17   proprietorship to an LLC to somehow foreclose the trustee's

18   ability to recover those transfers.

19           THE COURT:  Is there any SIPC case law on that

20   point?

21           MR. FOKAS:  Your Honor, I don't believe there's --

22   the case law we rely on is primarily how this decision --

23   how this issue's been decided in the --

24           THE COURT:  How about bankruptcy case law, where a

25   trustee can go and recover non-debtor property -- transfers

Page 36

1    that not what appears to be non-debtor property on the

2    theory that the non-debtor was really under some theory an

3    alter ego of the debtor.

4          Is there any authority to that proposition?

5          MR. FOKAS:  Your Honor, I'm not familiar with any

6    authority on that position.

7          THE COURT:  All right.

8          MR. FOKAS:  And just if I can make just a couple

9    of more points on the -- you know, on the imputation issue

10   that counsel raised.

11         It's just -- imputation here is pretty simple,

12   Your Honor.  It's most of the entities and just about all of

13   the entities that held BIA accounts here at issue were

14   general partnerships.  We've alleged that Avellino and

15   Bienes and in some instances, Thomas Avellino were general

16   partners of those entities, and therefore, they were acting

17   on -- when they acted on behalf of those general

18   partnerships, their actual knowledge is imputed to the

19   general partnership.

20         I think it's a separate issue, whether you can

21   impute to the individual partners, I think you can.  I think

22   there's no difference there, but on that issue it's really

23   simple.  With respect to individual imputation, in the few

24   instances where that happens, where there was individual

25   accounts, and I believe there was one account for Diane

1    Bienes, Mr. Bienes' wife, we've adequately alleged there

2    that Mr. Bienes and Mr. Avellino also acted as an agent, in

3    that sense, as Your Honor noted, it's just a simple agent

4    acting on behalf of an individual principal where they

5    controlled the account, they made the decisions, they opened

6    the account, they made decisions on financing the account,

7    withdrawing the money, so on and so forth.

8              So there's really no basis to depart.  It's pretty

9    black letter law that the, you know, the actions of a

10   partner imputed to a partnership.

11             And the last point on veil piercing that counsel

12   raised, I think it did get a little -- it may have gotten a

13   little muddled in the brief, but again I think this is very

14   simple here.

15             We've alleged that all the entity defendants that

16   held BIA accounts were general partners, or a de facto

17   general partnership.  And so in term, veil piercing is

18   treated liability here, quote individuals liable, which you

19   know, assuming we've avoided the transfer at issue, you

20   know, it becomes an issue for recovery of those transfers.

21             And we think we've alleged, to the extent we need

22   to, pled in the alternative primarily to the extent it's

23   required, that we've met all the factors you need and it's

24   sufficiently alleged to pierce the veil to the extent we

25   need to.  We don't believe that we will, since these are

Page 38

1    general partnerships if we proceed to that

2    level.

3              And one last thing, I promise this is the last

4    point on willful blindness that Your Honor --

5              THE COURT:  Well, he's conceded it, so you --

6              MR. FOKAS:  Right, he's conceded --

7              THE COURT:  You can sit down at this point.

8              MR. FOKAS:  It's just that there's $17 million at

9    issue on the two years.

10             THE COURT:  Okay.  Thank you.

11             MR. WOODFIELD:  I have nothing further, thank you.

12             THE COURT:  I'll reserve decision.  I'll -- I'd be

13   curious if there's any authority on the issue I raised about

14   the ability to recover transfers by an ostensible non-debtor

15   under some theory of alter ego, which I assume -- I'm

16   assuming, that Mr. Picard has at least the same rights as a

17   trustee in that respect.

18             So I'll give you two weeks to provide, you can do

19   it in the form of letter briefs, short memoranda on that

20   issue.  If you can find SIPC cases, fine, but I guess

21   general bankruptcy cases are also relevant.

22             MR. FOKAS:  Thank you, Your Honor.

23             THE COURT:  Thank you very much.  Have a good

24   trip.

25             UNIDENTIFIED:  Thank you, Your Honor.

Page 39

1    (Proceedings concluded at 10:47 AM)

2                                    * * * * *

3

4

5

6

7

8                              I N D E X

9

10                          R U L I N G S

11   IDENTIFICATION                                        PAGE

12   Motion to Allow - Trustees Motion and                 7

13   Memorandum to Affirm His Determinations Denying

14   Claims of Claimants Holding Interests in Partners

15   Investment Co., Northeast Investment Club, and

16   Martin R. Harnick & Steven P. Norton, Partners

17

18   Motion to Dismiss                                     38

19

20   BLI's Motion for Judgment on the Pleadings            20

21

22

23

24

25

1                        CERTIFICATE

2    I, Sheila G. Orms, certify that the foregoing is a true and

3    accurate transcript from the official electronic sound

4    recording.

5    Sheila Orms    Digitally signed by Sheila Orms
                    DN: cn=Sheila Orms, o, ou,
                    email=digital1@veritext.com, c=US
6    _____    Date: 2015.07.30 15:08:15 -04'00'

7    SHEILA ORMS, APPROVED TRANSCRIBER

8

9    DATED:   July 22, 2015

10

11

12

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501