**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------x
In re:

BERNARD L. MADOFF INVESTMENT SECURITIES
LLC,

                    Debtor.


IRVING H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,

                    Plaintiff,

    - against -

STEVEN B. MENDELOW, NTC & Co. LLP, as former
custodian of an Individual Retirement Account for the
benefit of STEVEN B. MENDELOW, NANCY
MENDELOW, NTC & Co. LLP as former custodian of
an Individual Retirement Account for the benefit of
NANCY MENDELOW, CARA MENDELOW, PAMELA
CHRISTIAN, C&P ASSOCIATES, LTD.,
and C&P ASSOCIATES, INC.,

                    Defendants.
----------------------------------------------------------------------x

**Hearing Date:  Oct. 28, 2015**
**(10:00 a.m. EST)**
**Objection Deadline: Oct. 20, 2015**
**(5:00 p.m. EST)**

SIPA LIQUIDATION

Index No. 08-01789 (SMB)

Adv. Pro. No. 10-04283 (SMB)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**MOTION FOR JUDGMENT ON THE PLEADINGS FILED BY DEFENDANTS**
**STEVEN B. MENDELOW, NANCY MENDELOW, CARA MENDELOW,**
**PAMELA CHRISTIAN, C&P ASSOCIATES, LTD., AND C&P ASSOCIATES, INC.**

Stanley S. Arkin (SA-1373)
Lisa C. Solbakken (LS-8910)
Alex Reisen (AR-5432)
ARKIN SOLBAKKEN LLP
750 Lexington Avenue, 25th Floor
New York, New York 10022
*Attorneys for Defendants Steven B.*
*Mendelow, Nancy Mendelow, Cara*
*Mendelow, Pamela Christian, C&P*
*Associates, Ltd., and C&P Associates, Inc.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT ............................................................................................................................... 2

I.     THE TRUSTEE IDENTIFIES NO FACTUAL ALLEGATIONS ESTABLISHING
       MENDELOW'S "ACTUAL KNOWLEDGE" OF BLMIS's FRAUD ............................ 4

      A.     The Trustee Identifies Nothing About the Referral Fees
             Evidencing the Fraud at BLMIS, or Mendelow's Knowledge Thereof ................. 5

      B.     An Alleged "Guaranteed Rate of Return" Is Insufficient to Establish
             "Actual Knowledge" That BLMIS Never Engaged in Securities Transactions ..... 7

      C.     Mendelow's Invocation of His Fifth Amendment  Rights Does Not Raise
             Inference of "Actual Knowledge" ........................................................................ 8

      D.     Allegations That Mendelow "Monitored" His Account Do Not
             Raise an Inference That He Actually Knew of (Much Less
             "Directly Participated in") the Workings of BLMIS's Fraud .............................. 10

           1.     The Complaint Nowhere Alleges That Mendelow "Directed"
                 BLMIS to Use "Fake Trades" to Make up Shortfalls in His Account ...... 10

            2.     The Complaint Nowhere Alleges That Mendelow Actually
                 Recognized Evidence of Fraud in His BLMIS Account Statements ........ 12

      E.     The Trustee's Case Law Does Not Compel a Different Conclusion ................... 16

           1.     *Cohmad II* ................................................................................................ 16

           2.     *Merkin* .................................................................................................... 17

II.    LEAVE TO AMEND SHOULD BE DENIED ............................................................... 18

CONCLUSION .......................................................................................................................... 20

## TABLE OF AUTHORITIES

### Cases

*Cal. Pub. Emples. Ret. Sys. v. Ebbers (In re Worldcom, Inc. Sec. Litig.)*,,
    308 F. Supp. 2d 214 (S.D.N.Y. 2004)................................................................ 19

*Clark v. Kitt*,
    2014 U.S. Dist. LEXIS 113494 (S.D.N.Y. Aug. 15, 2014) ...................................... 6

*Goodman v. Port Auth. of N.Y. & N.J.*,
    850 F. Supp. 2d 363 (S.D.N.Y. 2012)................................................................ 3, 12

*In re Alstrom SA Sec. Litig.*,
    454 F. Supp. 2d 187 (S.D.N.Y. 2006)................................................................ 9, 11

*In re Crude Oil Commodity Litig.*,
    2007 U.S. Dist. LEXIS 66208 (S.D.N.Y. Sept. 7, 2007)............................... 18, 19, 20

*K.D. v. White Plains Sch. Dist.*,
    921 F. Supp. 2d 197 (S.D.N.Y. 2013)................................................................ 3, 12

*Kirschner v. Bennett*,
    759 F. Supp. 2d 301 (S.D.N.Y. 2010)................................................................ 4

*O'Connell v. Pension Fin. Servs.*,
    498 B.R. 32 (Bankr. S.D.N.Y. 2013) ................................................................ 4

*Pelt v. City of N.Y.*,
    2013 U.S. Dist. LEXIS 122848 (E.D.N.Y. Aug. 28, 2013)................................... 3, 10

*Picard v. Ceretti*,
    2015 Bankr. LEXIS 2674 (Bankr. S.D.N.Y. Aug. 11, 2015) ........................... passim

*Picard v. Ida Fishman Revocable Trust*,
    773 F.3d 411 (2d Cir. 2014)................................................................ 3, 19

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)................................................................ 3

*Picard v. Merkin*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ................................................... passim

*Picard v. Schneiderman*,
    491 B.R. 27, 2013 WL 1609154 (S.D.N.Y. 2013) ........................................... 6, 13

*Prickett v. N.Y. Life Ins. Co.*,
    896 F. Supp. 2d 236 (S.D.N.Y. 2012)................................................................ 8, 9

*SEC v. Barry*
    2008 U.S. Dist. LEXIS 65914 (N.D. Cal. Aug. 27, 2008).................................................... 9, 10

*SEC v. Cohmad Sec. Corp. ("Cohmad I")*,
    2010 U.S. Dist. LEXIS 8597 (S.D.N.Y. Feb. 1, 2010)........................................................ 5, 10

*Silverman v. A-Z Rx LLC (In re Allou Distribs.)*,
    2012 Bankr. LEXIS 5607 (Bankr. E.D.N.Y. Dec. 3, 2012) ................................................ 4, 9

*Silverman v United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs.)*,
    446 B.R. 32 (Bankr. E.D.N.Y. 2011).......................................................................................... 4

*SIPC v. BLMIS*,
    516 B.R. 18, 24 (S.D.N.Y. 2014)................................................................................... 4, 7, 12

*SIPC v. BLMIS ("Cohmad II")*,
    2013 U.S. Dist. LEXIS 56042 (S.D.N.Y. Apr. 15, 2013)................................................. passim

Defendants respectfully submit this reply memorandum of law in further support of their Motion for Judgment on the Pleadings.

## PRELIMINARY STATEMENT

In their moving papers, Defendants established that the Complaint fails to plead facts raising an inference that Mendelow had "actual knowledge" of the fraud underlying BLMIS. In response, the Trustee concedes that a lack of actual knowledge precludes all claims except those asserted under Section 548(a)(1)(A) – but insists that actual knowledge may be established by (i) *new* allegations suggesting (frivolously and for the first time) that Mendelow "participated" in the fraud; and (ii) the existence of so-called "red flags" that should have been apparent to him.

This, however, is not the law. First, it is well-established that a plaintiff may not use its opposition papers to cure deficiencies in its pleading, or to assert new facts and theories for the first time. Thus, belated assertions that Mendelow "directed" BLMIS to engage in fake trades – *allegations that appear nowhere in the Complaint itself* – do not provide a basis to deny Defendants' motion. Second (as the BLMIS case law makes clear), the mere existence of red flags does not establish actual knowledge. Rather, the Complaint must allege facts establishing not only that the defendant was actually aware of these red flags, but also that he *subjectively knew – at a minimum – that BLMIS engaged in no actual securities trading*.

In this, the Complaint wholly fails. As the Trustee's opposition brief confirms, the only so-called "actual knowledge" allegations in the Complaint consist, in their entirety, of (i) Mendelow's receipt of referral fees for investments referred to BLMIS in or around 1993; (ii) an allegedly guaranteed return rate for a period in the early 1990s; (iii) the fact that he checked his account statements to ensure he received the expected fees; (iv) his prior invocation of the Fifth Amendment; and (v) the same "red flags" that this Court has repeatedly deemed

insufficient to raise an inference of "actual knowledge."

These allegations are deficient, as a matter of law, on their face. As recent BLMIS developments confirm, the payment of fees for investments referred by Mendelow does nothing to suggest that he knew of Madoff's Ponzi scheme. Nor does a "guaranteed" return raise an inference that Mendelow *actually knew* Madoff never traded any securities – as confirmed by BLMIS case law finding "actual knowledge" insufficiently pled by virtually identical allegations. Further, while the Trustee argues that Mendelow so rigorously studied BLMIS's trading activity that he *must* have known it was fraudulent, the Complaint never actually alleges as much – instead stating only that Mendelow looked at his account statements to (i) check his balances and (ii) ensure he was receiving his promised fees. Finally, it has already been held, in the BLMIS context, that a defendant's invocation of the Fifth Amendment does not raise a "plausible inference" that he knew of Madoff's fraud (whether via an adverse inference or otherwise).

In short, the Trustee's opposition papers do nothing to revive its failed claims against Defendants. The Complaint fails to plead that Mendelow suspected the fraud underlying BLMIS – much less that he *actually knew* that BLMIS was a Ponzi scheme involving no real securities transactions. For all these reasons, Section 546(e) requires dismissal of Counts Two through Ten. Further, because Mendelow has offered judgment on the sole remaining claim, this case should be dismissed in its entirety.

## <u>ARGUMENT</u>

While the basic standards for a Rule 12(c) motion have already been set forth, a few additional principles warrant emphasis here.

First, on a motion for judgment on the pleadings, a plaintiff cannot cure defects in its complaint "by asserting *new facts or theories* for the first time in opposition to Defendants'

motion." *K.D. v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013)

(emphasis added); *Goodman v. Port Auth. of N.Y. & N.J.*, 850 F. Supp. 2d 363, 374, 380-81

(S.D.N.Y. 2012) (brief in opposition to Rule 12(c) motion "cannot be used to cure a defective

complaint"). Rather, the court "must limit itself to facts stated in the complaint." *Id.*

This principle is of particular import here, given the Trustee's belated efforts to assert

"new facts [and] theories" in hopes of evading application of the Section 546(e) safe harbor.

That is, Section 546(e) precludes all clawback claims except those asserted under Section

548(a)(1)(A). *See Picard v. Katz*, 462 B.R. 447, 451-452 (S.D.N.Y. 2011); *Picard v. Ida

Fishman Revocable Trust*, 773 F.3d 411 (2d Cir. 2014). The Trustee may avoid this safe harbor

only if it can demonstrate that the transferee had "*actual knowledge of Madoff's Ponzi scheme*, or

more generally, '*actual knowledge that there were no actual securities transactions being

conducted*.'" *Picard v. Ceretti*, 2015 Bankr. LEXIS 2674, at *37 (Bankr. S.D.N.Y. Aug. 11,

2015) (emphasis added); *SIPC v. BLMIS ("Cohmad II")*, 2013 U.S. Dist. LEXIS 56042, at *31-

32 (S.D.N.Y. Apr. 15, 2013). Thus, Section 546(e) would not protect "full-fledged participants"

in BLMIS's Ponzi scheme, or defendants with "actual knowledge" that their BLMIS accounts

never involved "a transaction for the 'purchase, sale, or loan of a security.'" *Id.* at *30-33.

But where – as here – the Complaint alleges no facts raising an inference of such "actual

knowledge" or "full-fledged participa[tion]," the Trustee may not use its opposition papers to

cure such defects. *See K.D.*, 921 F. Supp. 2d at 209 n.8; *Goodman*, 850 F. Supp. 2d at 374, 380-

81; *Pelt v. City of N.Y.*, 2013 U.S. Dist. LEXIS 122848, at *28-33 (E.D.N.Y. Aug. 28, 2013).

Rather, to survive a motion on the pleadings, the Complaint itself must allege facts showing, "***at

a minimum, that [Defendants] had actual knowledge that there were no actual securities

transactions being conducted***." *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *32.

3

Second, in determining whether "actual knowledge" has been pled, allegations suggesting

a "strong suspicion" are not enough. *Picard v. Merkin*, 515 B.R. 117, 140-41 (Bankr. S.D.N.Y.

2014). Nor is "actual knowledge" pled by allegations that "red flags" exist, *id.* – much less by

vague suggestions that defendant lacked the "reasonable expectations" or "innocence" of

ordinary investors. *Compare* Opp. at 14 (mischaracterizing Section 546(e) pleading standards),

*with Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *32; *see also Merkin*, 515 B.R. at 137

(complaint fails if it pleads facts that are *"merely consistent"* with defendants' liability). Rather,

the Trustee must allege particularized facts showing defendant's *"direct and clear knowledge, as*

*distinguished from constructive knowledge," that no actual securities transactions took place*.

*Merkin*, 515 B.R. at 139-40; *SIPC v. BLMIS*, 516 B.R. 18, 24 (S.D.N.Y. 2014) ("*Good Faith*

*Decision*") (applying particularity requirement to transferee's state of mind).[1]

## I.    THE TRUSTEE IDENTIFIES NO FACTUAL ALLEGATIONS ESTABLISHING MENDELOW'S "ACTUAL KNOWLEDGE" OF BLMIS'S FRAUD

In their opening papers, Defendants highlighted the Complaint's failure to allege *any*

facts suggesting that Mendelow had "actual knowledge" of BLMIS's Ponzi scheme, or of the

fact that BLMIS conducted no actual securities transactions. Open. at 13-19. Among other

things, the Complaint expressly frames its allegations as a matter of inquiry notice (alleging that

---

[1]      Not one of the Trustee's cases is to the contrary – as (i) none of these cases involved the rigorous standards
set forth in the BLMIS matter for alleging actual knowledge under Section 546(e); (ii) the cases all emphasize that,
even where state of mind is established by circumstantial evidence, such evidence must show **actual knowledge** as
opposed to **constructive knowledge**; and (iii) one case relies on a "motive" theory that has not been held to apply in
this context. *Silverman v. A-Z Rx LLC (In re Allou Distribs.)*, 2012 Bankr. LEXIS 5607, at *44-46 (Bankr.
E.D.N.Y. Dec. 3, 2012) (in summary judgment decision on "aiding and abetting fraud" claim, emphasizing that,
although circumstantial evidence may be used to show knowledge, it must show "*actual knowledge* …, not simply
that the defendant *should have known*"); *Silverman v United Talmudical Acad. Torah Vyirah, Inc. (In re Allou
Distribs.)*, 446 B.R. 32, 51-52 (Bankr. E.D.N.Y. 2011) (same; emphasizing distinction between "actual knowledge"
and "recklessness or conscious disregard"); *Kirschner v. Bennett*, 759 F. Supp. 2d 301, 335 (S.D.N.Y. 2010) (same).

Finally, the Trustee misleadingly cites one case for the proposition that "willful blindness" is sufficient to
overcome Section 546(e) – *a notion that has been soundly rejected in the BLMIS context*. *Compare* Opp. at 16
(citing *O'Connell v. Pension Fin. Servs.*, 498 BR 32 (Bankr. S.D.N.Y. 2013)), *with, e.g., Cohmad II*, 2013 U.S.
Dist. LEXIS 56042, at *33 n.2 (willful blindness does *not* constitute actual knowledge for Section 546(e) purposes).

various red flags "should have" alerted Mendelow to the fraud) and ***provides no facts suggesting***

***Mendelow actually knew that no securities transactions occurred***. *Id.* Counts Two through

Ten should be dismissed on this basis alone. *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *32.

In response, the Trustee concedes that a lack of actual knowledge *precludes all claims*

*except those asserted under Section 548(a)(1)(A)*, but doubles down on its facially deficient

allegations – again citing the existence of red flags, and Mendelow's earlier invocation of his

Fifth Amendment rights, as evidence that he "actually knew" that no securities transactions ever

occurred. Thus, the Trustee insists that the requisite "actual knowledge" is shown by allegations

that Mendelow (i) received referral fees for investments referred to BLMIS in or around 1993;

(ii) received a guaranteed rate of return in the early 1990s; (iii) invoked the Fifth Amendment;

and (iv) checked his BLMIS statements to ensure he received his promised fees. (On this last

point, the Trustee now goes one step further – attempting to argue, *for the first time and without*

*basis in the Complaint*, that Mendelow actually "directed" BLMIS to engage in fake transactions

and therefore actively participated in the workings of Madoff's fraud. (Opp. at 22-24.))

These allegations are, as set forth below, deficient *on their face*.

###    A.    The Trustee Identifies Nothing About the Referral Fees
     Evidencing the Fraud at BLMIS, or Mendelow's Knowledge Thereof

As this District has stated in the BLMIS context, "*[t]here is nothing inherently*

*fraudulent about referring customers to an investment adviser for fees*." *SEC v. Cohmad Sec.*

*Corp. ("Cohmad I")*, 2010 U.S. Dist. LEXIS 8597, at *3 (S.D.N.Y. Feb. 1, 2010). Nor does a

defendant's receipt of such fees prove his knowledge of an underlying Ponzi scheme. *See id.*;

*see also* Preet Bharara Letter to the Court, 10-cr-228, Dkt #1389, at ¶ 2 ("Bharara Letter")

(statement by U.S. Attorney that Paul Konigsberg was unaware of Madoff's Ponzi scheme

despite receipt of "annual commission payments for recruiting other investors to [BLMIS]").[2]

Here, despite its inflammatory use of the term "fraudulent side payments," the Trustee alleges not one fact suggesting that referral fees received by Mendelow reflect his knowledge of BLMIS's Ponzi scheme.  To the contrary:  the Complaint alleges only that these payments represented referral fees for Telfran clients whom Mendelow referred to Madoff.  (Compl. ¶¶ 75-77.)  As these fees were calculated as a fixed percentage of "reinvested amounts attributable to [Mendelow]," they did not fluctuate based on BLMIS's trading results.  (*Id.*)  Accordingly, Mendelow's expectation of payment in no way suggests that he knew that fake trades were generated to satisfy these fees – much less that he "directed" BLMIS to engage in such activities.  (*Compare id.* ¶¶ 75-77, *with id.* ¶¶ 94-96.)

So, too, with the alleged use of the term "vig" to refer to such payments.  As the Trustee defines it (and accepting such inflammatory definition as true), "vig" allegedly "describe[s] the interest, 'take, or 'juice' on a usurious loan."  (Compl. ¶ 95.)  The term thus plainly implies an underlying transaction – albeit one subject to inflated interest or overhead.  (*Id.*)  In no way does it suggest "actual knowledge that there were no actual securities transactions being conducted" at all.  Opp. at 17 (erroneously citing "*Cohmad*, 2013 WL 1609154" for this quotation).[3]

Finally, the Trustee simply misses the mark with its argument about the "alternative explanation" purportedly offered by Defendants as to these referral fees.  (Opp. at 21.)  It is the Trustee who has the burden of pleading facts sufficient to raise a "reasonable inference" that

---

[2]     This Court may take judicial notice of the Bharara Letter for the limited purpose of establishing that the government took this position.  *See, e.g.*, *Clark v. Kitt*, 2014 U.S. Dist. LEXIS 113494, at *20-24 (S.D.N.Y. Aug. 15, 2014) (taking judicial notice of documents in other cases "for the fact that the statements were made").

[3]     Although "*Cohmad*, 2013 WL 1609154" appears throughout the Opposition Brief (indeed, it is the citation on which the Trustee relies most heavily), there exists no such case.  Rather, 2013 WL 1609154 refers to a *different* BLMIS decision, unrelated to *Cohmad* or Section 546(e).  *Picard v. Schneiderman*, 491 B.R. 27, 2013 WL 1609154 (S.D.N.Y. 2013).  Defendants assume the Trustee's references to *Cohmad* are intended to refer to *SIPC v. BLMIS*, 2013 U.S. Dist. LEXIS 56042, 2013 WL 1562352 (S.D.N.Y. Apr. 15, 2013) – cited herein as "*Cohmad II.*"

Mendelow actually knew of BLMIS's fraud. *Merkin*, 515 B.R. at 137. Because the allegations

as to these referral fees plainly fail to plead such knowledge, there are no competing inferences

from which to choose.

> **B.      An Alleged "Guaranteed Rate of Return" Is Insufficient to Establish
>          "Actual Knowledge" That BLMIS Never Engaged in Securities Transactions**

The Trustee next makes much of the allegation that, from 1989 to 1992, Telfran received

a guaranteed rate of return from Avellino & Bienes (a feeder fund for BLMIS); and that, from

1993 to 1996, Mendelow's BLMIS accounts also received a guaranteed rate of return. (Opp. at

19, 22.)  The Trustee argues that Mendelow should have known that "if legitimate trading

activity was taking place, a rate of return could never be guaranteed."  (*Id.*)

Once again, however, these allegations are expressly pled by the Complaint as a matter of

*inquiry notice*, and raise – at best – an inference that Mendelow should inquired further into

BLMIS's operations.  (Compl. ¶¶ 88-89 (guaranteed rate of return "*should have put Mendelow*

*on inquiry notice* that Madoff was engaged in fraudulent trading practices" (emphasis added).)

This is, as a matter of law, insufficient to establish "actual knowledge" of the fraud.  *See Merkin*,

515 B.R. at 139-40 (inquiry notice does not amount to willful blindness, and willful blindness

does not amount to actual knowledge); *Good Faith Decision*, 516 B.R. at 21-22 (same).[4]

Further, in the BLMIS context, the receipt of "guaranteed specific rates of investment

returns" does not raise an inference that defendant actually knew of BLMIS's fraud.  *See* Bharara

Letter, at ¶ 2 (statement by U.S. Attorney that Mendelow's colleague, Konigsberg, was unaware

of BLMIS's fraud notwithstanding – among other red flags – *guaranteed rates of return*).  Courts

have similarly declined to find "actual knowledge" pled by allegations that returns were

---

[4]      Indeed, if "guaranteed" returns were sufficient to establish "actual knowledge," then presumably the SEC
had "actual knowledge" of BLMIS's fraud in 1992 and 1993 – when it cited the guaranteed rates of returns in its
investigations of Avellino & Bienes and Telfran.  *See, e.g.*, Compl. ¶¶ 64-66 (citing SEC investigations).

impossibly high and consistent.  *See, e.g., Merkin*, 515 B.R. at 129-30, 131-31, 141 (claims

barred by Section 546(e) where complaint "fails to plausibly allege that [defendant] had actual

knowledge" of BLMIS's fraud, even though he acknowledged BLMIS's returns were impossibly

consistent); *Ceretti*, 2015 Bankr. LEXIS 2674, at *46-47 (explaining why these allegations in

*Merkin* did not plead "actual knowledge"); *Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236,

243, 246-47 (S.D.N.Y. 2012) ("abnormally high and consistent returns" did not raise inference

that defendants "willfully or recklessly ignored" signs of fraud at BLMIS absent facts suggesting

that they "*translated those red flags into a suspicion of fraud*" (emphasis added)).

### C.    Mendelow's Invocation of His Fifth Amendment Rights Does Not Raise Inference of "Actual Knowledge"

The Trustee also notes that Mendelow invoked the Fifth Amendment during a Rule 2004

examination before the start of this action, and asks this Court to infer therefrom "that Mendelow

had actual knowledge" of BLMIS's fraud.  (Opp. at 23.)  But the Trustee cites no authority for

the notion that such a substantial inference – one that can be satisfied only by particularized

allegations of "direct and clear knowledge" – may be premised on such invocation.

First, it has already been held in the BLMIS context that a defendant's invocation of his

Fifth Amendment rights does *not* raise a "plausible inference" that he knew of Madoff's fraud.

*Cohmad I*, 2010 U.S. Dist. LEXIS 8597, at *5-6, 15-16 & n.2.  In *Cohmad I*, as in this case, the

question was whether plaintiff had alleged facts giving rise to a "plausible inference" that

defendant knew of the fraud at BLMIS.  *Id.* at 5-6, 15.  There, as in this case, plaintiff argued that

defendant's "assertion of his Fifth Amendment privilege" gave rise to an inference of such

knowledge, and thus "provide[d] a *sufficient and independent reason* for denying his motion to

dismiss in its entirety."  *Id.* at 15-16 n.2 (emphasis added).  The court rejected this argument:

> The adverse inference that may be drawn from Jaffe's invocation of his Fifth
> Amendment privilege is weak.  Given the numerous criminal investigations

8

> arising from Madoff's fraud, there is a justifiable concern for anyone who did business with BMIS's investment advisory unit, as did Jaffe, that he or she will be hauled into the criminal probe.

*Id.* As the SEC had "failed to allege facts giving rise to a plausible inference" that Jaffe "knew of, or recklessly disregarded, Madoff's fraud," the court dismissed the complaint. *Id.* at 5-6, 15.

The same result follows here. Indeed, any "adverse inference" to be drawn in this case would arguably carry even *less* weight than in *Cohmad I*, as the standards for pleading "actual knowledge" for purposes of Section 546(e) are more rigorous than the standards for pleading recklessness in the securities context. *See, e.g.*, *Merkin*, 515 B.R. at 139-41, 143-44. Thus, even if an adverse inference were drawn from Mendelow's invocation of the Fifth Amendment, such inference would be "weak" – and would be insufficient to satisfy the pleading requirements that this Court has previously articulated. *See id.* at 140-41; *Ceretti*, 2015 Bankr. LEXIS 2674, at *39-40, 46-47; *see also Silverman v. A-Z Rx LLC (In re Allou Distribs.)*, 2012 Bankr. LEXIS 5607, at *36-42, *43-49 (Bankr. E.D.N.Y. Dec. 3, 2012) (on summary judgment motion, holding that any adverse inference arising from invocation of Fifth Amendment "may not be the sole basis for a finding of liability," and that such *"testimonial silence does not close the gap" as to defendants' "actual knowledge" of the underlying fraud* (citation omitted)).

None of the Trustee's citations is to the contrary. Two of these cases note only that an adverse inference *may* be drawn from invocation of the Fifth Amendment – but do not suggest that it is alone sufficient to raise an inference of "actual knowledge." *In re Alstrom SA Sec. Litig.*, 454 F. Supp. 2d 187, 208 n.17 (S.D.N.Y. 2006) (an adverse inference is "not forbid[den]," but is just one of numerous factors to be considered); *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *34 (same). *SEC v. Barry*, in turn, involved only the most limited use of an adverse inference – using defendant's silence to a specific question to fill in a specific gap in otherwise well-pleaded, particularized allegations. 2008 U.S. Dist. LEXIS 65914, at *15 n.5 (N.D. Cal. Aug.

9

27, 2008) (where SEC pled false statement with particularity and sole question was whether

defendant participated in making that statement, her refusal to testify as to her participation

permitted inference that she had done so). Here, in contrast, the Trustee seeks to use Mendelow's

invocation of the Fifth Amendment to satisfy the considerable burden of alleging "actual

knowledge" – *the crux of the entire Complaint*.   In the context of BLMIS, this is insufficient to

raise such a conclusive inference. *Cohmad I*, 2010 U.S. Dist. LEXIS 8597, at *15-16 n.2.

**D.      Allegations That Mendelow "Monitored" His Account Do Not
Raise an Inference That He Actually Knew of (Much Less
"Directly Participated in") the Workings of BLMIS's Fraud**

As set forth in the Opening Brief, allegations that Mendelow "monitored" his account and

insisted on receiving the full amount of his expected fees do not raise an inference that he knew

BLMIS engaged in no actual securities transactions. (Open. at 13-15.)  Section 546(e) therefore

bars most of the claims against him. *See supra* at 3-5; *see also infra* at 12-18.

1.      The Complaint Nowhere Alleges That Mendelow "Directed"
BLMIS to Use "Fake Trades" to Make up Shortfalls in His Account

Having apparently "recogniz[ed] the deficiency in his own pleading," the Trustee now

seeks to revive its claims by the assertion of "new facts [and] theories" in opposition to this

motion. *Pelt v. City of N.Y.*, 2013 U.S. Dist. LEXIS 122848, at *28-33 (E.D.N.Y. Aug. 28,

2013) (citation omitted).  Thus, the Trustee suggests (for the first time) that Mendelow actually

*instructed* BLMIS to engage in fictitious transactions to make up shortfalls in his fees, and was

therefore an active "participa[nt] in the workings of [Madoff's] fraud."  (Opp. at 22-24.)

***But no such facts are ever alleged in the Complaint.***  Rather, the Complaint alleges only

that Mendelow (i) calculated how much his referral fees should be (an easy task, given that it

was a fixed percentage of amounts originally invested in 1993); (ii) looked at his BLMIS account

statements to ensure that he was receiving this sum; and (iii) reminded BLMIS to make up any

"shortfall" in such payment.[5]  (Compl. ¶ 94-95.)  ***Nowhere does the Complaint allege (as the Trustee now suggests) that Mendelow knew that BLMIS manufactured "fictitious options transactions" in order to make such payments – much less that he directed BLMIS to do so.*** (*Compare* Opp. at 22 (claiming for the first time that Mendelow "demanded his pre-determined amount in fake trades when Madoff fell short"), *with* Compl. ¶¶ 80-86, 94 (alleging that Mendelow expected the full amount of his referral fees, but providing no facts suggesting he knew that this was achieved via fictitious transactions).[6]

To the contrary, the Complaint makes clear that BLMIS manufactured these "fictitious transactions" *independently and covertly* – using internal "handwritten schedules" to track and create the gains needed to ensure expected returns and side payments for "dozens of different customers." (Compl. ¶¶ 80-86). The Complaint never alleges that Mendelow knew of these schedules or of any fictitious trades; and certainly never alleges that he "directed" any such activities. (*Id.*)  Indeed, the notion that Mendelow knowingly participated in the "workings" of the fraud is contradicted by the Complaint itself:  which expressly states only that BLMIS's consistent returns "*should have been apparent*" to him from his account statements, and that (at best) he was "*on notice*" of a possible underlying fraud.  (*Id.* ¶¶ 91, 96; Opp. at 20-21.)

In short, nothing in the Complaint suggests that Mendelow knew how his fees and returns were actually generated – much less that he "directed" BLMIS to use fictitious transactions to

---

[5]  The Complaint also suggests, in passing, that Mendelow insisted on receiving his full "guaranteed returns" each year. (*Id.* ¶ 93.)  In addition to being insufficient to plead actual knowledge (*see supra* at 7-8), the Complaint is conspicuously vague on this point – to the point of failing to meet either Rule 9(b) or the basic notice requirements of Rule 8(a).  That is, these allegations (which seem to focus on the referral fees rather than the alleged returns) provide no means of assessing when such "demands" may have occurred.  (*Id.* ¶¶ 93-96.)  For example, while the Complaint is drafted so as to suggest this was an ongoing process, it elsewhere makes clear that the alleged "guaranteed returns" occurred only in the early 1990s.  (*Id.* ¶¶ 88-89.)

[6]  Nor are these assertions inferable from the allegations in the Complaint.  In *Cohmad I*, for example, the complaint alleged that defendant could request specific rates of return from BLMIS, but – as in this case – alleged no facts suggesting he knew (or directed) that such returns would be generated by fake trades.  2010 U.S. Dist. LEXIS 8597, at *14-15.  Accordingly, the court held that such allegations did not raise a "plausible inference" that defendant knew of BLMIS's fraud.  *Id.*

shore up his accounts, or otherwise "directly participated in the workings of [BLMIS's] fraud." (Opp. at 22-23.) *Rather, this is a new theory of liability that the Trustee asserts for the first time in its brief – even as it seeks to convince the Court that the Complaint itself alleges as much.* This is wholly misleading and procedurally improper, and cannot serve to revive a failed claim. *K.D.*, 921 F. Supp. 2d at 209 n.8 ("Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss."); *Goodman*, 850 F. Supp. 2d at 380 (opposition papers "cannot be used to cure a defective complaint").

2. The Complaint Nowhere Alleges That Mendelow Actually Recognized Evidence of Fraud in His BLMIS Account Statements

The Trustee also insists (apparently in the alternative) that Mendelow so rigorously studied BLMIS's trading activity that he must have recognized the transactions as fraudulent. (Opp. at 20.) But this, too, fails to raise an inference of "actual knowledge."

Specifically, although the Complaint alleges that Mendelow "monitored" his accounts by checking his BLMIS account statements, *it never alleges that he actually recognized any evidence of fraud in those statements*. Rather, the Complaint expressly frames these allegations as a matter of inquiry notice – alleging only that Mendelow "would have seen [BLMIS's] implausible options activity" on his BLMIS statements, which "put him on notice of Madoff's fraudulent trading activities." (Compl. ¶ 96.) As already discussed, allegations of such "inquiry notice" or "constructive knowledge" do not satisfy the "actual knowledge" requirement. *See, e.g.*, *Merkin*, 515 B.R. at 139-40; *Good Faith Decision*, 516 B.R. at 21-22.

Indeed, this Court's recent decision in *Picard v. Ceretti* clearly illustrates this distinction. *Ceretti* involved certain feeder funds (the "Kingate Funds") that received transfers aggregating $825 million from BLMIS within six years of the BLMIS filing date. *Ceretti*, 2015 Bankr. LEXIS 2674, at *1-2. The funds were formed by defendants Frederico Ceretti and Carlo Grosso,

12

who were part of Madoff's inner circle – enjoying social outings with their respective spouses, meeting regularly with Madoff, and engaging in hundreds of conversations in the four years preceding Madoff's arrest. *Id.* at *6-8. At Madoff's invitation, Ceretti and Grosso even visited the 17th floor of BLMIS (off-limits to nearly everyone else), which contained "antiquated computers that were not connected to the BLMIS network and were used by BLMIS employees to execute billions of dollars of trades on a monthly or even daily basis." *Id.*

As in this case, the Trustee's complaint in *Ceretti* included numerous allegations as to certain "red flags" or "badges of fraud" that should have been apparent to the Ceretti defendants: impossibly consistent returns, impossible options trading volumes, BLMIS's lack of independent oversight, BLMIS's unusual fee structure, and its use of an unqualified "strip mall" auditor. *Id.* at *25-31 (describing "badges of fraud"). These red flags included not only discrepancies indicated by "other sources" (such as a "lack of scalability"), but anomalies reflected in the BLMIS account statements provided to defendants.[7] *Id.*

*But, as this Court was careful to point out, the existence of these red flags (and defendants' apparent awareness thereof) was not enough to allege "actual knowledge" of BLMIS's fraud so as to defeat the Section 546(e) safe harbor.* *Id.* at *46-47. Rather, the Ceretti complaint set forth specific facts (including documents authored by defendants) establishing that defendants actually *discovered and acknowledged* that Madoff was reporting fictitious transactions and *actively took steps to prevent any inquiry* into such fraud. *Id.* at *13-22, 41-47. Among other things, the Ceretti defendants

---

[7]    Indeed, one of the most substantial "badges of fraud" alleged against the Ceretti defendants (unlike in Mendelow's case) was specific to the Kingate Funds – most notably, the fact that Kingate carried "negative balances on 220 occasions between 1998 and 2008," including (for one eleven day period) a negative balance averaging ***over $25 million***. *Id.* at *24-25. Not only did these negative balances indicate illegal margin trades, but BLMIS never charged Kingate margin interest. *Id.* "The grant of interest free loans of tens if not hundreds of millions of dollars evidenced fraudulent activity, or at least a high probability of fraud." *Id.*

- received specific "warnings of fraudulent activity at BLMIS raised by third parties";
- specifically "reviewed and verified" at least five facially impossible transactions;
- knowingly exempted their BLMIS-invested funds (alone out of 31 holdings) from their rigorous due diligence policies;
- acknowledged to each other the likelihood that BLMIS was a "scam," and their concern that Kingate's auditor would discover as much;
- repeatedly "fabricated stories" to placate the Funds' shareholders regarding concerns raised about BLMIS; *and*
- used threats and "*ad hominem* attacks" to discredit and silence outside analysts who raised concerns over BLMIS;

*Id.* It was *this* set of allegations that established defendants' "actual knowledge" of the fraud – as distinguished from allegations that they were merely aware of "red flags." As this Court stated:

> The allegations regarding the *actual knowledge* of the [Ceretti] Defendants stand in sharp contrast to those in *Merkin* where the Court concluded the complaint failed to plead actual knowledge. The *Merkin* complaint referred to Merkin's speculations that BLMIS might be a Ponzi scheme, and the warnings by . . . a money manager[] that BLMIS'[s] returns were not possible. In addition, the complaint alleged that Merkin was aware of several of the red flags, including the lack of correlation between the performance of BLMIS and the S&P 500 and the excessive volume of option trading. *Still, the complaint did not imply that Merkin actually believed that BLMIS was a Ponzi scheme, and at most, indicated that he had a strong suspicion*. . . . Nor did the complaint allege that he conducted an analysis other than maintaining a single folder containing documents and analyses relating to the lack of correlation between BLMIS'[s] performance and the performance of the S&P 500. *Instead, the complaint painted a picture of someone who saw the red flags and ignored them. In contrast, the [Ceretti] Defendants actively reviewed the impossible transactions reported by Madoff in the Funds' accounts, deflected any inquiry into Madoff and feared what PwC might uncover.*

*Id.* at *46-47 (emphasis added).

Mendelow, in contrast, is not alleged to have recognized (or received warnings of) any of these red flags. Indeed, wholly lacking from the Complaint are any facts suggesting that he reviewed specific BLMIS transactions, compared BLMIS results against independent pricing data for those days, or otherwise *actually noticed or recognized* any impossible trades or badges of fraud. (Compl. ¶¶ 94-96.) To the contrary: the Trustee alleges only that Mendelow checked his account balances to ensure he was receiving his promised referral fees – and asks the Court to

14

infer, on this basis, that Mendelow (i) *must* have noticed the discrepancies between BLMIS's

reported results and the market as a whole, (ii) *must* have identified the implausible patterns in

BLMIS's purported trading history, and (iii) *must* have realized that such discrepancies meant

that BLMIS was not actually engaged in any securities trading.  *In short, the Trustee asks this*

*Court to find – contrary to all applicable case law – that "inquiry notice" may replace "actual*

*knowledge" for purposes of the Section 546(e) safe harbor.*  But this is not the law.  *Ceretti*,

2015 Bankr. LEXIS 2674, at *13-22, 41-47; *Merkin*, 515 B.R. at 139-40.[8]

The federal government's recent filing in the Paul Konigsberg matter compels a similar

conclusion – underscoring the critical distinction between *the existence of "red flags"* and *actual*

*knowledge.  See* Bharara Letter, at ¶ 2.  Konigsberg is a founder of the accounting firm where

Mendelow worked, and has since pled guilty to conspiracy and falsification of records.  *See id.*

On July 2, 2015, the government filed a letter to the court in favor of leniency for Konigsberg,

stating unequivocally that he "was unaware of the Ponzi scheme being run out of Madoff

Securities."  Bharara Letter, at ¶ 2.  In this letter, the government stated that Konigsberg had no

subjective awareness of the Ponzi scheme *notwithstanding red flags identical to (and in some*

*instances greater than) those alleged in the Complaint against Mendelow*:

- "glaringly fraudulent transactions";
- "guaranteed specific rates of investment returns";
- "annual commission payments for recruiting other investors to [BLMIS]"; *and*
- "backdated transactions they referred to as 'schtup' trades, in most cases
  purportedly executed in the last month of the year, to generate promised returns."

*Id.*  In fact, Konigsberg was deemed "unaware" of BMLIS's fraud despite his *actual knowledge*

*of the fraudulently backdated trades – knowledge that Mendelow is not alleged to have had.  See*

---

[8]    As the allegations against Mendelow are considerably weaker than those against Merkin, it is plain that – as
in *Merkin* – the Complaint fails to raise a plausible inference that Mendelow actually knew of the fraud at BLMIS.
*See Ceretti*, 2015 Bankr. LEXIS 2674, at *46-47; *Merkin*, 515 B.R. at 139-40; Open. at 15-16.

Wall Street Journal, "Bernard Madoff's Former Accountant Pleads Guilty" (June 24, 2014). As

the Complaint comes nowhere close to alleging Mendelow knew more than Konigsberg, it is

beyond dispute that the heightened "actual knowledge" standard is not met here.

### E.    The Trustee's Case Law Does Not Compel a Different Conclusion

Finally, while the Trustee insists that its allegations against Mendelow are stronger than

those in *Merkin* (where actual knowledge was inadequately alleged) and at least on par with its

allegations in *Cohmad II*, this statement finds no support in the Complaint or those cases.

### 1.    *Cohmad II*

Throughout its Opposition Brief, the Trustee relies on a 2013 decision in the *Cohmad*

*Securities* matter – apparently *Cohmad II*, 2013 U.S. Dist. LEXIS 56042.  (*See supra* at 6 n.3.)

The Trustee argues that, as in *Cohmad II,* its Complaint against Mendelow sets forth his "actual

knowledge" of BLMIS's fraud and the fact that "no actual securities transactions were taking

place in Defendants' accounts." (Opp. at 17.)  Indeed, the Trustee insists, the Complaint

establishes Mendelow's "actual participation in the scheme itself."  (*Id.*)

This is simply incorrect – as the Complaint nowhere alleges any such facts.  *See supra* at

10-15.  It is thus a far cry from the Trustee's allegations against the Cohmad defendants – who

were alleged (i) not only to have been inextricably "intertwined" with BLMIS and its most secret

operations; (ii) but also to have maintained specific information showing *the magnitude of fraud*

*in each client account*.  *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *34-38.

To begin with, the *Cohmad II* complaint painted a picture of a company with no

meaningful professional, personal, or financial separation from BLMIS:

- Madoff co-founded Cohmad with his friend "Sonny" Cohn; members of both families
served as Cohmad's officers and directors; and the two companies and families were

"closely intertwined both personally and professionally" for over 20 years;[9]

- Cohmad shared BLMIS's office space and computer network;
- Cohmad and BLMIS were "understood to be the same entity by many [BLMIS] investors," and Cohmad representatives frequently presented themselves as BLMIS representatives; *and*
- Over the course of about 10 years, BLMIS paid nearly $100 million to Cohmad upon request – sometimes for "no reason at all."

*Id.*  Further, as in *Ceretti*, Cohmad officers ("unlike most [BLMIS] employees") had regular

access to the closely guarded seventeenth floor where BLMIS's fraud took place.  *Id.*

Even more damningly, the complaint alleged facts establishing that Cohmad ***actively***

***monitored the degree of fraud reflected in its customer accounts***.  Among other things, Cohmad

maintained a database showing the *"actual cash value* of each referred account without

considering the fictitious profits."  *Id.* at *37-38 (emphasis added).  As the complaint alleged:

> "Importantly, in situations where [BLMIS] customer statements showed a positive balance due to fictitious profits, but the account was actually in a negative position . . . , the Cohmad Cash Database showed the negative account balance of the [BLMIS] customer account." [Complaint] ¶ 74.

*Id.*  Commissions for Cohmad representatives were calculated using the *true balances* in these

accounts, irrespective of fake profits.  *Id.* (noting they never objected to this method).

In short, the Trustee's allegations in *Cohmad II* not only paints a picture of a company

with complete access to the inner workings of BLMIS, but also set forth specific facts showing

defendants' *actual knowledge* that their client accounts contained fictitious profits resulting from

a massive fraud. *Id.*  The Complaint against Mendelow, by contrast, asserts no such facts.

2.      *Merkin*

The Trustee also claims that its allegations of Mendelow's "knowledge and participation

in the fraud" are stronger than those alleged in *Merkin*.  (Opp. at 23-24.)

This argument may be quickly addressed.  The Trustee first argues that "even after

---

[9]     By contrast, as to Mendelow's purported "special access" to BLMIS, the Trustee alleges only that Mendelow could contact Madoff "in order to help prospective clients open accounts."  (Opp. at 4.)

Telfran was shut down by the SEC," Mendelow "encouraged former Telfran investors to reinvest

with Madoff." (*Id.* at 24.)  The Trustee does not explain, however, how the SEC investigation

(which did not suggest a fraud at BLMIS) raises any inference that Mendelow knew that no

securities were being traded.  (*Id.*)  Similarly, the Complaint alleges nothing "fraudulent" about

Mendelow's referral fees, and sets forth no facts suggesting that he "participated in the workings

of the fraud."  *See supra* at 4-7, 10-15.  Finally, a defendant's invocation of his Fifth Amendment

rights in the BLMIS context leads, at best, to only a "weak" adverse inference.  *Supra* at 8-10.

Simply put, nothing in the present Complaint even approaches the allegations against

Merkin – who was alleged to have maintained a file of evidence suggesting BLMIS to be a fraud,

openly admitted that it appeared to be a massive Ponzi scheme, and specifically acknowledged

his awareness of numerous badges of fraud.  (Open. at 15-16.)

## II.    LEAVE TO AMEND SHOULD BE DENIED

Although the Trustee notes that leave to amend shall be "freely given when justice so

requires," the courts are clear that "Rule 15(a) is not without limits."  *In re Crude Oil Commodity

Litig.*, 2007 U.S. Dist. LEXIS 66208, at *10-11 (S.D.N.Y. Sept. 7, 2007).  In particular, "denial

of leave to amend is appropriate where there is a reason to do so" – such as where a party has

been given "full notice of the deficiencies in [its complaint]" but has declined prior opportunities

to amend.  *See id.* at *10-15.

The bulk of the Trustee's argument for leave to amend is that it is *Defendants* who are to

blame for the Trustee's delay in amending.  Specifically, while the Trustee concedes that the

courts long ago made clear that Section 546(e) barred most of its clawback claims, it insists that

the burden was on *Defendants* to act.  "At any point prior to answering," the Trustee insists,

"Defendants could have filed a Rule 12(b)(6) motion to dismiss on section 546(e) grounds."

(Opp. at 26-27.)  By failing to do so, the Trustee complains, Defendants "effectively caused the

Trustee to forego his right to amend the Complaint." (*Id.* at 27.)

This is, respectfully, nonsense.[10] The burden is not on Defendants to notify the Trustee of the need to act. It is the Trustee's burden to plead its case – to allege facts raising an inference of "actual knowledge" sufficient to avoid the Section 546(e) safe harbor. Further, while the Trustee complains that Defendants filed their Answers with "full awareness" of decisions such as *Katz* and *Merkin*, clearly the Trustee – ***as the Plaintiff in each of those cases*** – was equally aware of those decisions and their implications for its other clawback actions. (Opp. at 26-27 (citing cases).) Indeed, through these decisions, the Trustee had "full notice of the deficiencies in [its Complaint against Mendelow]"– but failed to amend accordingly. *In re Crude Oil*, 2007 U.S. Dist. LEXIS 66208, at *13-14. Leave to amend should therefore be denied. *See id.* at 10-15.[11]

Finally, issues of futility and lack of good faith are raised by the Trustee's failure to provide a proposed amended complaint or to give "any indication as to what information or allegations [it] would add." *Id.* at *11; *Cal. Pub. Emples. Ret. Sys. v. Ebbers (In re Worldcom, Inc. Sec. Litig.)*, 308 F. Supp. 2d 214, 233-34 (S.D.N.Y. 2004) (such failure "may indicate a lack of diligence and good faith" (citation omitted)). "Where plaintiffs fail to disclose what additional allegations they would make which might result in a viable complaint . . . , we may assume amendment would be futile and need not grant leave to amend." *In re Crude Oil*, 2007 U.S. Dist. LEXIS 66208, at *11-12 (absent such information, court is "forced to rule on a

---

[10]        Defendants filed their Answers on November 14, 2014, prior to the Second Circuit's affirmance of the applicable 546(e) rule in *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411 (2d Cir. December 8, 2014). Following that decision and efforts by the parties to settle this matter, Defendants filed this motion.

[11]        The Trustee's response to Defendants' prejudice argument is a straw man. (*Compare* Open. at 21, *with* Opp. at 29.) While the burden is certainly on the Trustee to prove its allegations in the first instance, surely it does not suggest that Defendants may sit idly back in the meantime. To the contrary, in any litigation, the defendant is required to make strategic choices based on plaintiff's claims, and to collect evidence to defend against them.

hypothetical amended complaint neither the Court nor defendants have seen").[12]

Clearly the Trustee knew how to allege a defendant's participation in (or actual knowledge of) the workings of BLMIS's fraud *when it had a basis for doing so*. *See, e.g.*, *Cohmad II,* 2013 U.S. Dist. LEXIS 56042, at *34-38; *Ceretti*, 2015 Bankr. LEXIS 2674, at *41-47. But it opted not to do so in this case – despite ample investigation, the innumerable documents in its possession, and the years since it learned of the precise deficiencies in its Complaint. This ongoing failure speaks volumes about whether the Trustee can *non-frivolously* amend its Complaint so as to cure those deficiencies now.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion for Judgment on the Pleadings so as to dismiss Counts Two through Ten, and to dismiss Count One to the extent it seeks the return of amounts beyond the alleged $825,000 in fictitious profits, as well as any different or additional relief that is just and proper. Defendants further respectfully request that such dismissal be with prejudice and without leave to amend.

Dated:  New York, New York
       September 4, 2015

                ARKIN SOLBAKKEN LLP

                By: */s/ Stanley S. Arkin*
                Stanley S. Arkin (SA-1373)
                Lisa C. Solbakken (LS-8910)
                Alex Reisen (AR-5432)
                Arkin Solbakken LLP
                750 Lexington Avenue – 25th Floor
                New York, New York 10022
                (212) 333-0200
                *Attorneys for Defendants*

---

[12]    This principle applies either upon a motion for leave to amend, or where (as here) leave to amend is sought in opposition to a motion. *See, e.g.*, *In re Crude Oil*, 2007 U.S. Dist. LEXIS 66208, at *10-15.