QUINN EMANUEL URQUHART & SULLIVAN, LLP
Susheel Kirpalani
Robert S. Loigman
Rex Lee
Lindsay M. Weber
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Telecopier:  (212) 849-7100

*Counsel to Joint Liquidators of Kingate Global
Fund Ltd. and Kingate Euro Fund Ltd.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 09-1161 (SMB) |
| FEDERICO CERETTI, *et al.* | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO APPEAL THE AUGUST 21, 2015 ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS KINGATE GLOBAL FUND LTD. AND KINGATE EURO FUND LTD.'S MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

PROCEDURAL BACKGROUND................................................................................5

    A.    The Funds Were Victims of Madoff .......................................................5

    B.    The Trustee Seeks to Claw Back Innocent Investors' Money ................7

    C.    The Bankruptcy Court's Decision on the Motion to Dismiss................8

STATEMENT OF QUESTIONS PRESENTED............................................................9

ARGUMENT ............................................................................................................10

I.     LEAVE TO APPEAL SHOULD BE GRANTED AS TO THE BANKRUPTCY
      COURT'S RULING ON IMPUTATION..........................................................11

    A.    The Bankruptcy Court's Ruling on Imputation Was Incorrect.............12

    B.    The Bankruptcy Court's Ruling on Imputation Also Satisfies the Standard
        of Section 1292(b)................................................................................15

II.    LEAVE TO APPEAL SHOULD BE GRANTED AS TO THE BANKRUPTCY
      COURT'S INTERPRETATION OF *COHMAD* .............................................18

    A.    The Bankruptcy Court's Interpretation of *Cohmad* Was Incorrect .....19

    B.    The Bankruptcy Court's Ruling on the *Cohmad* Actual Knowledge
        Standard Also Satisfies the Standard of Section 1292(b) .....................21

III.   EXCEPTIONAL CIRCUMSTANCES JUSTIFY LEAVE TO APPEAL .........23

CONCLUSION.........................................................................................................24

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Adelphia Commc'ns Corp.*,
    333 B.R. 649 (S.D.N.Y. 2005)..............................................................................17

*In re Air Crash off Long Island, N.Y., on July 17, 1996,*
    27 F. Supp. 2d 431 (S.D.N.Y. 1998)..............................................................16, 22

*Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*,
    265 F. Supp. 2d 240 (S.D.N.Y. 2003)................................................................16

*Atl. City Elec. Go. v. Gen. Elec. Co.*,
    207 F. Supp. 613 (S.D.N.Y. 1962) ....................................................................18

*Bilello v. JPMorgan Chase Retirement Plan*,
    603 F. Supp. 2d 590 (S.D.N.Y. 2009)................................................................18

*Buckley v. Deloitte & Touche USA LLP*,
    No. 06 Civ. 3291 (SHS), 2007 WL 1491403 (S.D.N.Y. May 22, 2007)................12

*Center v. Hampton Affiliates, Inc.*,
    66 N.Y.2d 782 (1985) ...........................................................................12, 13, 14

*Enron Corp. v. Springfield Assocs., LLC*,
    No. M-47 (SAS), 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006)......................10, 23

*Gibson v. Kassover (In re Kassover)*,
    343 F.3d 91 (2d Cir. 2003)................................................................................10

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (N.Y. 2010) .............................................................13, 14, 15, 17

*Klinghoffer v. S.N.C. Achille Lauro*,
    921 F.2d 21 (2d Cir. 1990)................................................................................16

*Krys v. Sugrue (In re Refco Secs. Litig.)*,
    779 F. Supp. 2d 372 (S.D.N.Y. 2011)................................................................13

*LNC Invs., Inc. v. First Fid. Bank*,
    No. 92 Civ. 7584 (CSH), 2000 WL 461612 (S.D.N.Y. Apr. 18, 2000) ................16

*In re Lloyd's Am. Trust Funds Litig.*,
    No. 96 Civ. 1262 (RWS), 1997 WL 458739 (S.D.N.Y. Aug. 12, 1997)................17

*Mishkin v. Ageloff*,
    220 B.R. 784 (S.D.N.Y. 1998)...........................................................................11

*O'Leary v. Maxum Marine (In re Orange Boat Sales)*,
    239 B.R. 471 (S.D.N.Y. 1999)...........................................................................11

*In re Petrobras Secs. Litig.,*
    No. 14 Civ. 9662 (JSR), 2015 WL 4557364 (S.D.N.Y. July 30, 2015) ................................14

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),*
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ..............................................................................8, 17

*Primavera Familienstifung v. Askin,*
    139 F. Supp. 2d 567 (S.D.N.Y. 2001) ....................................................................................18

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
    No. 11 MC 285 (RPP), 2011 WL 6057927 (S.D.N.Y. Dec. 6, 2011) ..............................17, 18

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
    No. 12 Misc. 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)........................ passim

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC,*
    476 B.R. 715 (S.D.N.Y. 2012) .........................................................................................13, 21

*Williams v. United States (In re Williams),*
    215 B.R. 289 (D.R.I. 1997) ....................................................................................................11

## Statutes and Rules

28 U.S.C. § 158(a)(3) .........................................................................................................1, 10, 11

28 U.S.C. § 1292(b) ............................................................................10, 11, 15, 18, 22, 23

United States Bankruptcy Code § 544 ..............................................................................7

United States Bankruptcy Code § 546(e)............................................................... passim

United States Bankruptcy Code § 547(b) ........................................................................7

United States Bankruptcy Code § 548(a)(1)(A) ..............................................................7

United States Bankruptcy Code § 548(c)....................................................................8, 16

Fed. R. Bankr. P. 8001(b) ..................................................................................................1

Fed. R. Bankr. P. 8003 ......................................................................................................1

Pursuant to 28 U.S.C. § 158(a)(3) and Rules 8001(b) and 8003 of the Federal Rules of

Bankruptcy Procedure, the Joint Liquidators for defendants Kingate Global Fund Limited

("Kingate Global") and Kingate Euro Fund Limited ("Kingate Euro" and, together with Kingate

Global, the "Kingate Funds" or "Funds") respectfully move for leave to appeal portions of the

August 21, 2015 Order (the "Order") of the United States Bankruptcy Court for the Southern

District of New York (the "Bankruptcy Court") denying in certain respects the Kingate Funds'

motion to dismiss claims brought by plaintiff Irving Picard, the Trustee for the Liquidation of

Bernard L. Madoff Investment Securities LLC (the "Trustee"). The Order incorporates the

Bankruptcy Court's memorandum decision of August 11, 2015 (the "Decision"), which sets forth

the Bankruptcy Court's reasoning.[1]

## PRELIMINARY STATEMENT

The Kingate Funds respectfully request leave to appeal two threshold legal issues decided

in the Bankruptcy Court's Order that will have significant impact on the ultimate resolution of

this proceeding and potentially many other Madoff cases.

The Kingate Funds—and, through the Funds, their investors—are massive net losers,

having lost close to $800 million as the result of Madoff's fraud and the collapse of Bernard L.

Madoff Investment Securities LLC ("BLMIS"). The Funds did not profit from Madoff's Ponzi

scheme; they were victims of it. Because of the losses they suffered from the fraud, the Funds

are now in liquidation. Despite these undisputed facts, the Trustee seeks to increase the Funds'

losses by bringing this case to claw back $900 million in "safe harbored" redemptions the Funds

withdrew from BLMIS and to subordinate the Funds' claims against the Estate. Until this

---

[1] For ease of reference, this Motion refers to the Court's Decision and Order collectively as the "Order." When citing specific page numbers in the Decision, this Motion references the Decision. The Order and Decision are attached as Exhibits A and B, respectively, to the Declaration of Robert S. Loigman, dated September 4, 2015 (the "Loigman Decl.").

1

lawsuit is resolved, the Funds will be unable to wind up their affairs or make distributions to their investors (who the Department of Justice has recognized are victims of BLMIS).

On the Funds' motion to dismiss, the Bankruptcy Court ruled that the "safe harbor" protections of section 546(e) of the Bankruptcy Code were unavailable at this stage because, in its view, the Trustee had satisfied the strict standard set forth in this Court's decision in *Cohmad*[2] of alleging that the Kingate Funds had "actual knowledge" that BLMIS did not perform any real trades. To reach that conclusion, the Bankruptcy Court imputed the knowledge of the Funds' investment managers (or the "Non-Fund Defendants") to the Funds, since the Trustee does not allege a single fact regarding the Funds' own knowledge.

This Motion addresses two important questions of law raised by the Bankruptcy Court's Order. The first is whether the knowledge or misconduct of the investment managers retained by the Kingate Funds should be imputed to the Funds, even though, as the Trustee alleges, the Funds (a) did not receive a dime from Madoff's fraud, (b) served only as conduits between BLMIS and the Funds' innocent investors, and (c) were utterly victimized by those managers' having looted hundreds of millions of dollars in fees from them. The second is whether the Trustee has satisfied *Cohmad*'s demanding requirement of alleging that the Kingate Funds' managers had "actual knowledge" that BLMIS did not trade securities, when his complaint at most alleges that the Funds should have done more to investigate various "impossible trades" that were reported over the 14 years in which the Funds invested in BLMIS. The Bankruptcy Court's legal conclusions were wrong on both counts.

*First*, as to imputation, the Bankruptcy Court incorrectly interpreted the "adverse interest" exception under New York law. That exception should have applied to preclude

---

[2]    *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 Misc. 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").

2

imputation because, if the Funds' managers perpetuated Madoff's fraud (and that is a big "if"),
then they did so for their sole benefit at the direct expense of the Funds.  According to the
Trustee's own allegations, the Funds invested all of their money with BLMIS, and did not
benefit at all from those investments.  Like all other "net loser" direct investors, the more they
invested, the more they lost.  At the same time, the Funds paid hundreds of millions of dollars to
the investment managers in the form of annual management fees.  As a result, if those managers
knew of Madoff's fraud, then they were directing the Kingate Funds to invest in Madoff *solely* to
continue looting hundreds of millions of dollars in fees *from* the Funds and, derivatively, the
Funds' innocent investors.  This is a quintessential example of actions *adverse* to the Funds.
Under those circumstances, holding the Funds and their investors responsible for the knowledge
of the managers who were *stealing* from them would be just the same as imputing Bernard
Madoff's knowledge to investors who hired BLMIS to manage their money.

The Bankruptcy Court nonetheless determined that the Non-Fund Defendants were not
completely adverse to the Funds because, according to the Bankruptcy Court, their misconduct
bestowed on the Funds an "aura of profitability" that enabled the Funds to attract more investors.
The mere appearance of profitability, however, is not a one-size-fits-all benefit to every
corporate entity, and, as alleged, only harmed the Kingate Funds by facilitating the managers'
looting.  In giving effect to imputation, the Order thus conflicts with well-established New York
law, which instructs that the "crucial distinction" is between conduct that defrauds others and
conduct that defrauds the company.  According to the Trustee's allegations, this case falls into
the latter category, meaning that the adverse interest exception applies as a matter of law.

*Second*, as to the ruling on the Non-Fund Defendants' actual knowledge, the Bankruptcy
Court strayed materially from this Court's decision in *Cohmad*.  That decision requires a

3

defendant to have the specific knowledge that BLMIS did not perform real trades. That sort of particularized knowledge can be shown at the pleading stage only by alleging that, like the *Cohmad* defendants, the defendant at issue had access to Madoff's true customer information or some similar basis for *knowing* that BLMIS did not conduct real transactions. As the Court held in *Cohmad*, suspicions that Madoff was scheming are not sufficient.

Here, the Trustee does not allege that the Kingate Funds are anything like the *Cohmad* defendants. He does not allege that the Funds maintained records reflecting the true and fictitious balances of the Funds created by Madoff's Ponzi scheme. Nor does he allege that the Non-Fund Defendants had some unique access to BLMIS that would have allowed them to learn the truth. The Kingate Funds are investors that lost hundreds of millions of dollars investing in BLMIS pursuant to their account agreements. Cohmad, in stark contrast, was *not* a net loser. The Trustee sued Cohmad for *commissions* paid to Cohmad for referring investors to BLMIS, and for false *profits* the Cohmad family made on its investments. The Trustee's allegations against the Funds are thus nothing like those against Cohmad.

Instead, the Trustee's principal allegations against the Funds concern how the Non-Fund Defendants, like other investors, received account statements from BLMIS reflecting the trades that were purportedly conducted for the Funds. He then alleges that these statements showed trades that were outside of market norms and thus had to be "impossible." Viewing the Trustee's complaint most favorably to him, he also claims that the Non-Fund Defendants deflected investor inquiries regarding Madoff and were concerned about what Madoff was doing behind closed doors.

All this amounts to is the claim that the Non-Fund Defendants "should have" done more to ferret out the fraud. But "should have known" allegations do not satisfy the *Cohmad* standard

4

for rendering the statutory safe harbors ineffective. As a result, by upholding the Trustee's claims, the Bankruptcy Court departed from the requirement that, to avoid application of the section 546(e) safe harbor, the Trustee must allege actual knowledge that BLMIS did not conduct any real trading.

Both of these issues—imputation and actual knowledge—warrant an interlocutory appeal. They both involve threshold legal questions, for which a reversal of the Order would immediately result in the dismissal of all the Trustee's claims (in the case of imputation) or all but two of them (in the case of actual knowledge). On both issues, the Order conflicts with governing authority, one of which is law of this case.[3] Because the Order raises questions regarding the controlling legal standards that are pertinent not only to this case but to many other Madoff cases as well, it is important to clarify how those standards should be applied to the Trustee's allegations. Moreover, a swift resolution of this lawsuit is particularly important to the Funds because they are currently in court-supervised liquidation proceedings as a result of the massive losses they suffered from BLMIS's collapse, and they cannot wind up their affairs or make distributions to their innocent investors until this case is resolved. Accordingly, leave to appeal the Order's rulings on imputation and actual knowledge should be granted.

## PROCEDURAL BACKGROUND

### A.    The Funds Were Victims of Madoff

Among those who suffered greatly in Madoff's Ponzi scheme were the Kingate Funds and their investors. Kingate Global was formed in the British Virgin Islands in 1994. 4th Am. Complaint ¶ 2 (attached as Exhibit C to the Loigman Declaration). Kingate Euro was created as a sub-fund of Kingate Global in January 1996. *Id.* at ¶ 41. Kingate Euro later became its own

---

[3]    The Court's decision in *Cohmad* is law of this case. The Kingate Funds were parties to the consolidated proceedings that were addressed by this Court in *Cohmad*.

5

entity in April 2000.  *Id.*  Following their formation, the Kingate Funds sold subscriptions to investors, using the proceeds of those subscriptions to invest exclusively in BLMIS.  *Id.* at ¶ 2. Over the period of their investment, the Kingate Funds added and withdrew principal, ultimately depositing approximately $1.7 billion with BLMIS and withdrawing approximately $900 million. *Id.* at ¶¶ 3 & 8.

From the outset, the Funds retained the Non-Fund Defendants to manage their investors' money and paid them an annual fee equal to 1.5% of the Funds' reported net assets.  *Id.* at ¶¶ 107-110.  In particular, the Funds entered into management agreements with defendant Kingate Management Limited ("KML"), under which KML was responsible for, among other things, providing management services to the Funds, arranging for accounting and administrative services, and deciding the timing and manner of the Funds' investment transactions.  *See id.* ¶¶ 106, 115 & 116.  KML in turn retained defendant FIM Limited and later defendant FIM Advisers LLP (collectively, with FIM Limited, "FIM") to provide consulting and advisory services in connection with the Funds.  *Id.* at ¶ 5, 110.  KML and FIM were created, beneficially owned, or managed by defendants Federico Ceretti ("Ceretti") and Carlo Grosso ("Grosso").  *Id.* at ¶¶ 32-37 & 44-45.

The collapse of BLMIS forced the Kingate Funds into liquidation proceedings.  *Id.* at ¶ 43.  Applying the Trustee's "net equity" methodology (i.e., subtracting out total withdrawals from the total investments in BLMIS), the Funds were significant "net losers," having lost approximately $800 million, or nearly half, of the total principal that they invested with BLMIS. *See id.* at ¶ 3.  In connection with their liquidation proceedings, the British Virgin Islands and Bermuda courts appointed liquidators, who are charged with gathering assets for distribution to the Kingate Funds' creditors, including, most notably, their investors whose hope of recovering a

6

portion of their investments depends in large part on the Kingate Funds' ability to recover the net
unpaid sums invested with BLMIS. On July 2, 2009, court-appointed liquidators filed customer
claims on behalf of the Kingate Funds seeking to recover in the aggregate approximately $800
million in losses from the BLMIS estate. The Trustee has yet to determine those claims.

### B.    The Trustee Seeks to Claw Back Innocent Investors' Money

The Trustee commenced this adversary proceeding against the Kingate Funds on April 17,
2009. The operative complaint is the Trustee's Fourth Amended Complaint, filed on March 17,
2014. In that complaint, the Trustee asserted 11 causes of action against the Kingate Funds
seeking to avoid and recover alleged transfers made to the Funds under various sections of the
Bankruptcy Code and New York Debtor and Creditor Law, and to disallow and equitably
subordinate the customer claims filed by the Funds. Specifically, the Trustee brought one claim
for preferential transfer under section 547(b) of the Bankruptcy Code (Count I); two claims for
intentional fraudulent transfer under sections 544 and 548(a)(1)(A) of the Bankruptcy Code and
applicable state law (Counts II and IV); and five claims for constructive fraudulent transfer under
sections 544 and 548(a)(1)(B) of the Bankruptcy Code and applicable state law (Counts III, V-
VIII). The Trustee also sought to equitably subordinate and disallow the Kingate Funds'
customer claims (Counts X-XII), and to recover from the Kingate Funds' investment managers
and advisors as subsequent transferees (Count IX).

The Fourth Amended Complaint does not contain a single factual allegation concerning
conduct by, or the knowledge of, the Kingate Funds themselves. Rather, the Trustee's
allegations of knowledge relate solely to the Non-Fund Defendants. And with respect to the
Non-Fund Defendants, the Trustee alleges at most that they were aware of suspicious trading
activity and conduct at BLMIS, and thus that they should have discerned Madoff's fraud. The
Trustee identifies, for example, excessive trading volumes and improbable trading prices (4th

7

Am. Compl. ¶¶ 147-182), as well as atypical trading activities, such as selling off securities at

quarter- and year-end (*id.* at ¶¶ 183-85). He also alleges generally that the Non-Fund Defendants

deflected investor inquiries regarding Madoff and were concerned about Madoff's activities. *See,*

*e.g.*, *id.* at ¶¶ 120, 134-36, 219.

The Kingate Funds moved to dismiss the Fourth Amended Complaint on July 18, 2014.

The Trustee filed his opposition to the motion to dismiss on October 14, 2014, and the Kingate

Funds replied on November 25, 2014. Oral argument was held on December 17, 2014.

### C.    The Bankruptcy Court's Decision on the Motion to Dismiss

On August 11, 2015, the Bankruptcy Court issued its Decision, which was incorporated

into the August 21, 2015 Order, dismissing Counts X and XII, which sought to equitably

disallow the Kingate Funds' customer claims. The Bankruptcy Court sustained the balance of

the Trustee's claims, and in doing so, made several threshold legal determinations. Two of those

determinations, each of which presents a controlling question of law that is appropriate for

immediate appeal, are at issue in this Motion.

*First*, the Bankruptcy Court rejected the Funds' section 546(e) safe harbor and section

548(c) good faith defenses to the avoidance claims based on its determination that the Trustee

had adequately alleged the Funds' "actual knowledge" of Madoff's fraud, a determination that

was possible only by imputing the alleged knowledge of the Funds' investment managers to the

Funds' themselves. In giving effect to such imputation, the Bankruptcy Court declined to apply

the adverse interest exception under New York law. Relying on its decision in *Picard v. Merkin*

(*In re Bernard L. Madoff Inv. Sec. LLC*), 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin*"), the

Bankruptcy Court stated that the managers' actions conferred a benefit to the Funds merely

because "the value of the investments in the Kingate Funds continued to grow" (Decision at 34),

even though the growth was entirely illusory and never enjoyed by the Kingate Funds. *See id.*

8

(recognizing that "the Kingate Funds were fully invested in BLMIS and did not use increased investments or fictitious profits to make other potentially profitable investments.").

*Second*, in ruling that section 546(e) of the Bankruptcy Code did not warrant dismissal of the Trustee's preference and constructive fraudulent transfer claims, the Bankruptcy Court stated that "the Trustee had plausibly alleged that the Non-Fund Defendants, particularly Ceretti and Grosso, knew that Madoff was not engaging in the securities transactions he reported, and that many of the entries in the statements and trade confirmations depicted trades that could not have taken place." *Id.* at 29.  In reaching its conclusion, the Bankruptcy Court emphasized the Trustee's allegations that (i) Ceretti and Grosso received internal warning that BLMIS had not been subjected to the managers' "rigorous due diligence standards"; (ii) the Non-Fund Defendants monitored the performance of BLMIS, and their review "disclosed" various trades that must have been impossible because they were outside of market norms or contrary to industry practice; (iii) Ceretti and Grosso "took steps to deflect inquiries directed at Madoff implying that they feared what might be discovered"; (iv) Ceretti and Grosso fabricated stories to placate the Funds' investors; and (v) Grosso was anxious about what the Funds' auditor might discover from a possible inquiry into BLMIS. *Id.* at 29-31.  The Bankruptcy Court, however, did not conclude that the Kingate Funds were alleged to have known that their account agreements with BLMIS never led to a transaction for the purchase, sale, or loan of a security or that any transfers to them would not have been made in connection with an actual securities contract.

## STATEMENT OF QUESTIONS PRESENTED[4]

1.    Did the Bankruptcy Court err by concluding that the investment managers' knowledge should be imputed to the Kingate Funds, even if the investment managers actually

---

[4]    The Kingate Funds reserve their right to appeal other aspects of Judge Bernstein's Order at a later time, as well as the issues raised here in the event this Motion is denied.

knew about Madoff's fraud, where the Kingate Funds would have been victims of the managers' misconduct and would not have derived any benefit from having invested in BLMIS?

2.    Did the Bankruptcy Court err by concluding that the Trustee had alleged that the Kingate Funds "had actual knowledge that there were no actual securities transactions being conducted by Madoff," as required by this Court's *Cohmad* decision to preclude the application of section 546(e) of the Bankruptcy Code?

## ARGUMENT

This Court has discretion to grant the Kingate Funds leave to appeal the Bankruptcy Court's interlocutory Order.  *See* 28 U.S.C. § 158(a)(3); *Gibson v. Kassover* (*In re Kassover*), 343 F.3d 91, 94 (2d Cir. 2003) ("a district court has discretionary appellate jurisdiction over an interlocutory order of a bankruptcy court.").   Because neither section 158(a)(3) nor the Bankruptcy Code expressly provides the criteria to apply in deciding whether to grant leave to appeal interlocutory orders of the Bankruptcy Court, courts in this Circuit generally incorporate the standard under 28 U.S.C. § 1292(b), which governs interlocutory appeals of District Court decisions to the Courts of Appeals.  *Enron Corp. v. Springfield Assocs., LLC*, No. M-47 (SAS), 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006).   Under that standard, an appeal should be certified when: (i) the order in question "involve[s] a controlling question of law;" (ii) the order contains "substantial ground for difference of opinion;" and (iii) an immediate appeal from the order "would materially advance the ultimate termination of the litigation."  *Id.* (quoting 28 U.S.C. § 1292(b)) (internal quotation marks omitted).   In addition, leave to appeal should be limited to exceptional circumstances, such as where "review might avoid protracted and expensive litigation."  *Id.* at *5 (omitting citation and internal quotation marks).

Despite looking to section 1292(b) for guidance, "courts have recognized the limitations of this analysis" to appeals from interlocutory bankruptcy court orders and "have adopted a more

flexible approach." *O'Leary v. Maxum Marine* (*In re Orange Boat Sales*), 239 B.R. 471, 474 (S.D.N.Y. 1999); *see Williams v. United States* (*In re Williams*), 215 B.R. 289, 298 n.6 (D.R.I. 1997) ("§ 158(a)(3) obviously vests broader discretion in the district courts [than § 1292(b)] to permit interlocutory appeals, including circumstances where serious, perhaps irreparable consequence[s] are threatened which can be effectually challenged only by immediate appeal.") (omitting citation and internal quotation marks). Courts thus may exercise their discretion to hear appeals from the Bankruptcy Court even if the elements of section 1292(b) are not satisfied. *See, e.g.*, *Mishkin v. Ageloff*, 220 B.R. 784, 791 (S.D.N.Y. 1998) (declining to "rely upon the criteria set forth in section 1292(b)" and reasoning that "a flexible approach to the concept of finality in the bankruptcy context supports a similarly flexible approach to the standard for granting interlocutory appeals from interlocutory orders of a bankruptcy court."). Here, even under section 1292(b), leave to appeal should be granted as to the two questions presented.

I.     **LEAVE TO APPEAL SHOULD BE GRANTED AS TO THE BANKRUPTCY COURT'S RULING ON IMPUTATION**

As the Bankruptcy Court recognized in its Order, the Trustee's claims against the Kingate Funds depend on imputing the knowledge of the Non-Fund Defendants to the Funds. *See* Decision at 32. This is so because, even if the Trustee has alleged knowledge or misconduct, his allegations pertain exclusively to the managers hired by the Funds to oversee their investments, and not the Funds themselves. The Bankruptcy Court, however, was wrong not to apply the adverse interest exception in deciding that the managers' knowledge could be imputed to the Kingate Funds. The Bankruptcy Court's Order thus presents a threshold legal question that will materially affect, if not outright resolve, the Trustee's claims in this case.

11

### A.    The Bankruptcy Court's Ruling on Imputation Was Incorrect

Assuming the Trustee's own allegations are true, the Non-Fund Defendants' misconduct provided no benefit whatsoever to the Funds but instead victimized them.

As the Trustee alleges in his complaint, the Funds gained nothing from placing their investors' money in BLMIS.  The Funds never earned a profit for themselves because they "fully invested in BLMIS and [did not use] increased investments or fictitious profits to make other potentially profitable investments."  Decision at 34.  Nor did they obtain performance fees from their investors; rather, they *paid* management fees (amounting to over $360 million) to the Non-Fund Defendants based on a percentage of the Funds' net asset value.[5]  4th Am. Compl. ¶¶ 107-110, 254-56.

The only ones who would have benefitted from the managers' corruption, had they known of Madoff's fraud, would have been *the managers* themselves.  According to the Trustee, the goal of the managers' misconduct was to attract more investors to the Funds.  Because having more investors did nothing for the Funds, but only increased the amount of fees they had to pay their managers, if the managers were in on the fraud, then they were acting solely to *fraudulently loot more fees from the Kingate Funds*.  Their conduct would have been the equivalent of embezzling $360 million from the Kingate Funds, and is a classic example of agents acting adversely to their principals.  This gives rise to the adverse interest exception and precludes the imputation of the managers' knowledge, if any, to the Funds.  *See Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784-85 (1985) (knowledge will not be imputed if the agent has "totally abandoned his principal's interests," and acted "entirely for his own or another's purposes."); *Buckley v. Deloitte & Touche USA LLP*, No. 06 Civ. 3291 (SHS), 2007

---

[5]    In fact, the Joint Liquidators of the Kingate Funds have sued certain of the Non-Fund Defendants for the management fees these defendants collected from the Funds.

WL 1491403, at *6-7 (S.D.N.Y. May 22, 2007) (holding that where an agent is not acting for the principal's benefit and is adverse to it, the agent's knowledge cannot be imputed to the principal).

To illustrate by analogy, because the Funds (which were simply aggregated pools of their investors' money) hired the Non-Fund Defendants to manage that money, the Funds are no different from direct investors in BLMIS, who hired Madoff to manage their money.  Just as there is no basis to impute Madoff's knowledge of the fraud (which is beyond dispute) to the clients he advised, there is no basis to impute the investment managers' knowledge of the fraud (if any) to the clients they advised.  *See Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC* ("*Greiff*"), 476 B.R. 715, 721 n.9 (S.D.N.Y. 2012) ("[B]ecause the Trustee's allegations describe in detail how Madoff Securities 'engaged in a scheme to defraud' these defendants, the Trustee cannot impute Madoff Securities' bad faith to them.").

As the New York Court of Appeals made clear in *Kirschner v. KPMG LLP*, 15 N.Y.3d 446 (N.Y. 2010), it is imperative to distinguish "conduct that defrauds others for the corporation's benefit" (which is not the case here) from "conduct that defrauds the corporation" (which is precisely what the Trustee alleges).  *Id.* at 467-68.  Because imputation is based on the legal presumption that agents will disclose what they know to their principals, knowledge will not be imputed where the agent "'cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose.'"  *Krys v. Sugrue* (*In re Refco Secs. Litig.*), 779 F. Supp. 2d 372, 376 (S.D.N.Y. 2011) (quoting *Center*, 66 N.Y.2d at 784).

The Bankruptcy Court's ruling on imputation was inconsistent with these principles.  According to the Bankruptcy Court, even if the Trustee's complaint arguably alleged that the Funds "did not derive any benefit from their shareholders' investments," the Trustee's allegations were "nonetheless sufficient to support the inference that the Funds benefitted from

13

the actions of their agents ….." Decision at 34.  Principally, the Bankruptcy Court pointed to the

"growth" of the Funds and their "aura of profitability that enabled [them] to attract more

investors." *Id.*  But the Bankruptcy Court did not identify what the Funds had received by virtue

of having more investors, recognizing that the "Kingate Funds were fully invested in BLMIS and

did not use increased investments or fictitious profits to make other potentially profitable

investments." *Id.*  The take away from the Bankruptcy Court's ruling is that the Funds' mere

growth was the benefit itself.

This result, however, ignores the "crucial distinction" articulated by *Kirschner* between

"conduct that defrauds others for the corporation's benefit" and "conduct that defrauds the

corporation." *Kirschner*, 15 N.Y.3d at 467-68.  Indeed, the Bankruptcy Court's suggestion that

this case falls into the former category of "conduct that defrauds others for the corporation's

benefit" cannot be squared with the Trustee's acknowledgement that the Funds themselves paid

any inflated fees to the investment managers and thus did not benefit from the growth of the

Funds.  *Cf. In re Petrobras Secs. Litig.*, No. 14 Civ. 9662 (JSR), 2015 WL 4557364, at *12

(S.D.N.Y. July 30, 2015) (knowledge imputed where insiders' fraud benefitted the company by

allowing it to complete corporate projects and remain "in favor with its political patrons.").

Moreover, the imputation doctrine "reflects the recognition that principals, rather than

third parties, are best suited to police their chosen agents and to make sure they do not take

actions that ultimately do more harm than good." *Kirschner*, 15 N.Y.3d at 468.  Applying

imputation here would *not* advance the goal of having principals "police" their agents because,

as the Trustee alleges, the Kingate Funds were merely investment vehicles and were deceived by

the allegedly corrupt managers that they hired to provide that kind of supervision.  As increasing

the size of the Funds only further victimized them—and the Trustee does not allege anything to

14

the contrary—the Bankruptcy Court's application of imputation, and corresponding rejection of the adverse interest exception, was erroneous as a matter of law.

The Bankruptcy Court's remaining grounds for imputation are equally incorrect. The Bankruptcy Court stated that the apparent profitability of the Funds also benefitted their investors who withdrew money from the Funds before Madoff's fraud was discovered. *See* Decision at 34. But that is beside the point. However much the Funds' withdrew from BLMIS, it was more than $800 million *less* than what they had invested. The Funds were net losers from day one, as they never withdrew more than they invested with BLMIS. Even if some investors in the Funds benefited from withdrawals, there can be no dispute that the Funds themselves— and thus the body of the Funds' investors as a whole—enjoyed no benefit (only great loss) by investing in BLMIS. The Bankruptcy Court also stated that the payment of management fees to the Non-Fund Defendants did not harm the Kingate Funds because the Funds would have had to make those payments anyway. *Id.* at 35. That, too, is incorrect. In no scenario that can be conceived by the Trustee would the Funds have been legitimately required to pay fees to their managers if they were being defrauded by them. And, by increasing the size of the Kingate Funds, the managers increased the amount of fees that were looted.

Accordingly, in denying the Kingate Funds' motion to dismiss, the Bankruptcy Court erred in imputing the Non-Fund Defendants' knowledge to the Funds.

**B.     The Bankruptcy Court's Ruling on Imputation Also Satisfies the Standard of Section 1292(b)**

An immediate appeal of the Bankruptcy Court's Order on imputation also satisfies the conditions for leave to appeal articulated in section 1292(b).

*First*, the Order presents a controlling question of law. A question of law is "controlling" for purposes of section 1292(b) if "reversal of the … court's opinion … even though not

15

resulting in dismissal, could significantly affect the conduct of the action." *Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*, 265 F. Supp. 2d 240, 249-50 (S.D.N.Y. 2003). Leave to appeal may still be warranted even if the decision on appeal does not have the potential to resolve the litigation in its entirety. *See Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990) ("[A]n issue need not necessarily terminate an action in order to be 'controlling.'"). Rather, it is sufficient to demonstrate that the resolution of the issue presented on appeal could "*materially affect* the outcome of litigation." *LNC Invs., Inc. v. First Fid. Bank*, No. 92 Civ. 7584 (CSH), 2000 WL 461612, at *3 (S.D.N.Y. Apr. 18, 2000) (internal quotation marks omitted) (emphasis in original). In addition, a question of law is controlling where, as here, the "underlying motion raises a purely legal question about which there are no triable issues of fact." *In re Air Crash off Long Island, N.Y., on July 17, 1996*, 27 F. Supp. 2d 431, 435 (S.D.N.Y. 1998).

There can be no dispute that the Order presents a controlling question of law because reversal of the Bankruptcy Court's ruling will result in dismissal of all the Trustee's remaining claims. In particular, the Trustee asserts seven avoidance claims (Counts I, III-VIII) that fall squarely within the "safe harbor" of section 546(e) of the Bankruptcy Code; one claim for actual fraudulent transfer (Count II) regarding transfers received in "good faith" and "for value" that are subject to section 548(c) of the Bankruptcy Code; and one claim for equitable subordination (Count XI) based on the Funds' allegedly inequitable conduct and harm to other creditors.[6] All of these claims depend on the Trustee's showing that the Funds had varying levels of knowledge about Madoff's fraud. The specific level of knowledge required for each claim is irrelevant for purposes of granting leave to appeal the Bankruptcy Court's ruling on imputation because,

---

[6] Among other issues that the Funds have not raised in this Motion, but will raise later if necessary, is the Bankruptcy Court's conclusion that the Funds—which lost nearly a billion dollars to Madoff—somehow harmed other investors in BLMIS by investing in BLMIS.

16

without imputation, the Trustee has no claims at all. The complaint does not include a single factual allegation concerning conduct by, or the knowledge of, the Kingate Funds themselves.

This issue also raises a purely legal question as to whether the Bankruptcy Court's ruling on imputation was consistent with *Kirschner* and New York law. It can be decided "quickly and cleanly without having to study the record," *In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 658 (S.D.N.Y. 2005) (citation omitted), because this Court need not weigh competing sets of facts; the Court need only accept the Trustee's allegations on this issue as true and determine whether, as a matter of law, they show "conduct that defrauds others for the corporation's benefit" or "conduct that defrauds the corporation." *Kirschner*, 15 N.Y.3d at 467-68.

*Second*, there is a substantial ground for difference of opinion. Such a difference of opinion exists when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *In re Lloyd's Am. Trust Funds Litig.*, No. 96 Civ. 1262 (RWS), 1997 WL 458739, at *5 (S.D.N.Y. Aug. 12, 1997). Even "some precedent that bears on the matter, however thin, may establish a substantial ground for dispute." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 11 MC 285 (RPP), 2011 WL 6057927, at *5 (S.D.N.Y. Dec. 6, 2011) ("*Peskin*"). Here, the governing authority that conflicts with the Order is more than "thin" and comes from the New York Court of Appeals' decision in *Kirschner*. In imputing the Non-Fund Defendants' knowledge to the Kingate Funds, the Bankruptcy Court relied on its decision in *Merkin* and characterized the managers' alleged misconduct as having conferred a benefit on the Funds. In doing so, the Order focused on the Non-Fund Defendants' alleged misconduct instead of who was actually victimized by it, namely the Kingate Funds. This approach conflicts with *Kirschner*, which held that the "crucial" question in assessing the adverse interest exception is whether the allegedly corrupt managers

17

were defrauding others for the company's benefit or just plain defrauding the company.   The

answer here is the latter.

Third, granting leave to appeal may significantly expedite the resolution of the litigation.

See Primavera Familienstifung v. Askin, 139 F. Supp. 2d 567, 570 (S.D.N.Y. 2001).   "An

immediate appeal of an interlocutory order materially advances the ultimate termination of the

litigation if it promises to advance the time … or to shorten the time required for [litigation] …

or has the potential for substantial acceleration of the disposition of the litigation." Peskin, 2011

WL 6057927, at *4 (omitting citations and internal quotation marks).   Complex cases are

particularly well-suited to streamlining and simplification through interlocutory appeal.  See Atl.

City Elec. Go. v. Gen. Elec. Co., 207 F. Supp. 613, 620 (S.D.N.Y. 1962) (certifying an

interlocutory ruling in complex antitrust litigation on the grounds that the question "affects the

scope of discovery procedure, the length and complexity of ultimate trial, and the expenditure of

time, money and effort which these cases will engender").   As shown above, reversal of the

Order's ruling on imputation will decide a threshold legal question that will bring an end to this

litigation as to the Kingate Funds and thus save judicial and party resources.  See Bilello v.

JPMorgan Chase Retirement Plan, 603 F. Supp. 2d 590, 592-93 (S.D.N.Y. 2009) (finding that

interlocutory appeal would "materially advance the ultimate termination of the litigation" by

eliminating claims).   Accordingly, leave to appeal the Bankruptcy Court's Order on imputation

satisfies the conditions articulated in section 1292(b) and should be granted.

## II.    LEAVE TO APPEAL SHOULD BE GRANTED AS TO THE BANKRUPTCY COURT'S INTERPRETATION OF *COHMAD*

Similar to the Order's ruling on imputation, the Bankruptcy Court's interpretation of

*Cohmad* in denying the Kingate Funds' motion to dismiss on safe harbor grounds presents a

threshold legal ruling that conflicts with existing precedent and materially affects all but one of the Trustee's avoidance claims.

### A. The Bankruptcy Court's Interpretation of *Cohmad* Was Incorrect

In ruling that the Trustee sufficiently alleged the Non-Fund Defendants' "actual knowledge" to avoid application of section 546(e)'s safe harbor defense, the Bankruptcy Court materially departed from the strict standard set by this Court in its *Cohmad* decision. As the Court explained in *Cohmad*, the safe harbor for settlement payments or transfers made in connection with a securities contract between BLMIS and its customer applies unless, at the time of the transfer, the customer actually knew that BLMIS was a Ponzi scheme and was not conducting any actual securities transactions. *Cohmad*, 2013 WL 1609154, at *3-4. Thus, for the Trustee to avoid application of section 546(e)'s safe harbor, "the burden is on the Trustee" to show specifically that the Kingate Funds "had *actual knowledge* that there were no *actual securities transactions* being conducted" by BLMIS. *Id.* at *4 (emphasis added).

*Cohmad* also identified the types of facts that could show actual knowledge that BLMIS was not conducting real trades. In particular, the Court's conclusion there was based on the fact that, unlike here, the *Cohmad* defendants maintained a cash database that had been developed by BLMIS and that tracked the true balances of its customers. *Cohmad*, 2013 WL 1609154, at *6. Nothing remotely like that is alleged here. Many of the other facts in *Cohmad* also cannot be alleged (and have not been alleged) in this case, such as (i) Cohmad was co-formed by Madoff himself (indeed, the "mad" in Cohmad referred to *Mad*off); (ii) members of Madoff's family served as Cohmad's officers and directors; (iii) Cohmad used BLMIS for administration of its benefits plans; (iv) Cohmad shared office space with BLMIS, and nothing suggested that the two companies were distinct; (v) Cohmad's co-owner had not merely seen the 17th floor but had regular and independent access to it; (vi) Madoff investors understood Cohmad and BLMIS to be

one and the same; (vii) Madoff paid millions of dollars directly to Cohmad's co-founder; (viii)

BLMIS made payments of over $100 million to Cohmad, sometimes for no reason at all; and (ix)

another co-owner of Cohmad had a sham arrangement with Madoff under which he received

undocumented, fictitious payments based on, among other things, back-dated trades. *Id.* at *5-6.

 This case is nothing like *Cohmad*.  The Trustee does not allege that the Kingate Funds

had actual access to true BLMIS customer information, directed Madoff to report false trades, or

shared office space with BLMIS.  Nor does the Trustee allege facts to support the type of insider

relationship alleged against the *Cohmad* defendants.  Instead, the Trustee relies primarily on

allegations that the Kingate Funds saw trades that, with analysis and comparison to the market,

appeared to have been "impossible."  For example, the Trustee alleges that the Funds' returns

from BLMIS were too consistent over the years, that the Funds purportedly engaged in greater

than normal options and equity trading, and that BLMIS supposedly transacted in equities and

options at better than market prices.  4th Am. Compl. ¶¶ 147-182.  None of these allegations

even remotely places the Kingate Funds in the same category as the *Cohmad* defendants because

they do not describe what the Funds knew about BLMIS's internal workings, only that the Funds

should have done more investigation.

 Further, even if the Non-Fund Defendants "deflected any inquiry into Madoff," and

"feared what [the Funds' auditor] might uncover," as claimed in the other allegations the

Bankruptcy Court credited, that at most alleges that they should have been aware that Madoff

was engaged in some form of unspecified misconduct.  This still falls far short of alleging the

specific type of knowledge required by *Cohmad*.  *See Cohmad*, 2013 WL 1609154, at *3

(holding that there is no "illegal conduct" or "fraud" exception to section 546(e)'s safe harbor);

*Greiff*, 476 B.R. at 721 (same).  *Cohmad* is explicit.  The Trustee must plead with particularity

that the Funds actually knew of the specific fraud at issue—that BLMIS was a Ponzi scheme that was not trading securities.  *Cohmad*, 2013 WL 1609154, at *4.  Indeed, the Trustee himself alleges that the Non-Fund Defendants believed that at least some trading occurred at BLMIS.  4th Am. Compl. ¶¶ 137-141.  This alone undermines the Trustee's assertion that the Funds knew no trading occurred at all.

Moreover, as explained by the Court in *Cohmad*, the "goal" of section 546(e) in the context of the Madoff fraud is "protecting the reasonable expectations of investors who believed they were signing a securities contract."  *Cohmad*, 2013 WL 1609154, at *4.  The Kingate Funds—unlike the *Cohmad* defendants—were actual investors in BLMIS that lost hundreds of millions of dollars, harming the Funds and the innocent investors whose money constituted the Funds.  The Funds deposited and withdrew money from BLMIS pursuant to their securities contracts.  The *Cohmad* defendants, in stark contrast, made money from BLMIS, both in the form of commissions and fictitious profits.

The Bankruptcy Court's ruling was legally erroneous because it inferred actual knowledge from allegations that, unlike in *Cohmad*, concerned what the Non-Fund Defendants may have failed to do.  The Bankruptcy Court thus departed from *Cohmad*'s plain requirements and applied a lower standard of the type specifically rejected by this Court.  Accordingly, in holding that section 546(e) does not provide a safe harbor for most of the challenged transfers, the Bankruptcy Court erred by concluding that the Trustee had alleged the requisite actual knowledge.

### B.    The Bankruptcy Court's Ruling on the *Cohmad* Actual Knowledge Standard Also Satisfies the Standard of Section 1292(b)

As before, an immediate appeal of the Bankruptcy Court's Order on the issue of actual knowledge under *Cohmad* also satisfies the conditions articulated in section 1292(b).

21

*First*, this is a controlling question of law because a correct application of *Cohmad* to this case will result in dismissal of seven out of the Trustee's remaining nine claims pursuant to section 546(e)'s safe harbor. *See In re Air Crash off Long Island, N.Y., on July 17, 1996*, 27 F. Supp. 2d at 435 ("The [ ] litigation will proceed, of course, whatever is determined on appeal …. However, a ruling on the Opinion will still 'significantly affect the conduct of the action.'") (omitting internal citation). Moreover, the Order's interpretation of *Cohmad* is a purely legal issue. There are no factual disputes; the Court need only address the adequacy of the Trustee's allegations at this stage.

*Second*, there is a substantial ground for difference of opinion because there is "conflicting authority on this issue," namely this Court's decision in *Cohmad*. The Bankruptcy Court effectively has created a conflict between the controlling legal standard set forth in *Cohmad* and the application of that standard in the Madoff cases. The Bankruptcy Court will no doubt be called upon to apply the standard again, which makes it imperative that this Court clarify and reaffirm how the standard should be applied.

*Third*, granting leave to appeal may significantly expedite the resolution of the litigation. Six of the seven claims that would be dismissed if the Order were reversed on this issue seek to claw back transfers made up to six years before BLMIS's SIPA filing. By comparison, the Trustee's lone claim for actual fraudulent transfer under section 548(a)(1)(A) is limited to transfers made within two years of the filing. As a result, even if the two-year claim remains, resolving the threshold legal question presented by the Order's interpretation of *Cohmad* may limit the relevant time period for discovery, result in less motion practice (to the extent needed), and enable a substantially shorter trial. Accordingly, leave to appeal the Bankruptcy Court's

22

Order with respect to its adjudication of actual knowledge satisfies the conditions articulated in section 1292(b) and should be granted.

## III.    EXCEPTIONAL CIRCUMSTANCES JUSTIFY LEAVE TO APPEAL

Finally, exceptional circumstances justify an interlocutory appeal that can bring complete resolution to the Trustee's claims against the Kingate Funds. The Kingate Funds are currently in liquidation, being conducted by court-appointed and court-supervised liquidators. Resolving the issues identified in this Motion could prevent the need for "'protracted and expensive litigation,'" which alone can be considered exceptional circumstances. *Enron*, 2006 WL 2548592, at *5. Avoiding protracted proceedings when the parties to this case—on both sides— are court-appointed fiduciaries administering liquidating estates is especially important. With respect to the Kingate Funds, which suffered massive losses at the hands of Madoff, this case has both (a) cast a cloud over the Funds' ability to wind up their affairs efficiently and completely, and (b) prevented the Funds from collecting on their most valuable assets (i.e., their claims against the BLMIS estate for the losses they suffered) and making distributions to the innocent investors in the Funds. The Funds lost hundreds of millions of dollars to BLMIS, but have yet to recover a single penny of their "net losses."

Equally important, this case has been pending for over *six years*, and the Trustee has had access to extensive discovery during this time, including from the Non-Fund Defendants. The current complaint is the Trustee's fifth against the Kingate Funds, and he prepared it specifically to respond to this Court's "actual knowledge" rulings in *Cohmad*. The Kingate Funds will be harmed if they are required to wait until the end of trial, possibly years from now—and in the process spend even more money that could be used to compensate their innocent investors—in order to challenge the Bankruptcy Court's decisions on threshold legal questions, the reversal of which could immediately dispose of most, if not all, of the Trustee's claims against them.

23

## <u>CONCLUSION</u>

Leave to appeal the Order's rulings on imputation and actual knowledge should be granted.

Dated: New York, New York
       September 4, 2015

                                   QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP

                          By:      /s/ Robert S. Loigman
                                   Susheel Kirpalani
                                   Robert S. Loigman
                                   Rex Lee
                                   Lindsay M. Weber

                                   51 Madison Avenue, 22nd Floor
                                   New York, New York  10010
                                   (212) 849-7000

                                   *Counsel to Joint Liquidators of Kingate
                                   Global Ltd. and Kingate Euro Ltd.*