**Baker & Hostetler LLP**

45 Rockefeller Plaza

New York, New York 10111

Telephone: (212) 589-4200

Facsimile: (212) 589-4201

David J. Sheehan

Seanna R. Brown

Nicholas J. Cremona

Jorian L. Rose

Amy E. Vanderwal

George Klidonas

Stephanie A. Ackerman

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

Hearing Date:  October 28, 2015

Hearing Time:  10:00 AM (EST)

Objection Deadline:  September 29, 2015

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**TRUSTEE'S MOTION AND MEMORANDUM TO AFFIRM HIS
DETERMINATIONS DENYING CLAIMS OF CLAIMANTS HOLDING
INTERESTS IN 1973 MASTERS VACATION FUND, BULL MARKET FUND, AND
STRATTHAM PARTNERS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 2

    A.    THE COMMENCEMENT OF THE SIPA PROCEEDING ................................ 2

    B.    THE PARTNERSHIPS' STRUCTURE, BLMIS ACCOUNTS, AND
           CLAIMS ............................................................................................................ 3

           1.    1973 Masters Vacation Fund ................................................................... 3

           2.    Bull Market Fund .................................................................................... 7

           3.    Strattham Partners ................................................................................... 9

    C.    THE BLMIS ACCOUNT RECORDS ............................................................... 11

    D.    THE CLAIMS .................................................................................................... 12

    E.    THE CUSTOMER DECISIONS ....................................................................... 12

           1.    The Initial Feeder Fund Motion .............................................................. 13

           2.    The ERISA Motion ................................................................................. 14

           3.    Other Customer Motions ......................................................................... 15

ARGUMENT ............................................................................................................................ 17

CONCLUSION ......................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adler, Coleman Clearing Corp.*,
    216 B.R. 719 (Bankr. S.D.N.Y. 1998) ...................................................................... 18

*Aozora Bank Ltd. v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec.
    LLC)*,
    480 B.R. 117 (S.D.N.Y. 2012) .............................................................................. 13

*Appleton v. First Nat'l Bank of Ohio*,
    62 F.3d 791 (6th Cir. 1995) .................................................................................. 18

*In re Beacon Assocs. Litig.*,
    745 F. Supp. 2d 386 (S.D.N.Y. 2010) ..................................................................... 2

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011) ............................................................... 2, 14, 18, 20

*In re Klein, Maus & Shire, Inc.*,
    301 B.R. 408 (Bankr. S.D.N.Y. 2003) .................................................................. 23

*Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    708 F.3d 422 (2d Cir. 2013) ......................................................................... *passim*

*La Russo v. Paladino*,
    109 N.Y.S.2d 627 (N.Y. Sup. Ct. 1951) ............................................................... 21

*In re Lehman Bros. Inc.*,
    462 B.R. 53 (Bankr. S.D.N.Y. 2011) .................................................................... 18

*In re Lehman Bros., Inc.*,
    791 F.3d 277 (2d Cir. 2015) ................................................................................ 18

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002) .............................................................. 3, 23

*Sec. Investor Prot. Corp. v. 2427 Parent Corp. (In re Bernard L. Madoff Inv. Sec.
    LLC)*,
    779 F.3d 74 (2d Cir. 2015) ............................................................................ 21, 22

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
    Madoff)*,
    515 B.R. 161 (Bankr. S.D.N.Y. 2014) ...................................................... 16, 20, 23

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
    Madoff Inv. Sec. LLC)*,
    454 B.R. 285 (Bankr. S.D.N.Y. 2011) .............................................................. 13, 23

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*,
    Nos. 12 Civ. 1039 (DLC), 12 Civ. 1139 (DLC), 2012 WL 3042986 (S.D.N.Y.
    July 25, 2012)........................................................................................................................15

*SEC v. Madoff*,
    No. 1:08-cv-10791-LLS, 2008 WL 5197070 (S.D.N.Y. filed Dec. 11, 2008) ........................2

*Securities Investor Protec. Corp. v. Morgan, Kennedy & Co., Inc.*,
    533 F.2d 1314 (2d Cir. 1976)..............................................................................14, 18, 19, 22

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*,
    463 F.3d 125 (2d Cir. 2006).........................................................................................13, 18, 23

*Weisinger v. Rae*,
    188 N.Y.S.2d 10 (N.Y. Sup. Ct. 1959) ..................................................................................21

**Statutes**

11 U.S.C. § 502(d) ............................................................................................................................11

15 U.S.C. § 78 *lll*(11) ......................................................................................................................22

15 U.S.C. § 78aaa *et seq.* ..................................................................................................................1

15 U.S.C. § 78eee(a)(4) ......................................................................................................................2

15 U.S.C. § 78eee(b)(3) ......................................................................................................................2

15 U.S.C. § 78eee(b)(4) ......................................................................................................................2

15 U.S.C. § 78fff-1(a) ........................................................................................................................2

15 U.S.C. § 78fff-2(b) ......................................................................................................................18

15 U.S.C. § 78fff-3(a) ........................................................................................................................3

15 U.S.C. § 78*lll*(2).............................................................................................................. *passim*

15 U.S.C. § 78*lll*(4) ............................................................................................................................3

15 U.S.C. § 78*lll*(11) ..........................................................................................................................3

Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L.
    No. 111-203, § 983(b), 124 Stat. 1931 (2010)........................................................................18

FLA. STAT. ANN. § 620.8204..........................................................................................................20

FLA. STAT. ANN. § 620.8501..........................................................................................................20

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

N.Y. PARTNERSHIP LAW § 12 .................................................................................................20

N.Y. PARTNERSHIP LAW § 51(2)(a)........................................................................................20

N.Y. PARTNERSHIP LAW § 51(2)(b)........................................................................................21

**Rules**

Fed. R. Civ. P. 36(a)(3)..................................................................................................7, 8, 22

**Other Authorities**

1–12 *Collier on Bankruptcy* ¶ 12.12 (16th ed. 2012) ...................................................................14

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and the estate of Bernard L. Madoff

("Madoff"), respectfully submits this combined motion and memorandum of law (the "Motion")

to affirm the denial of forty-eight (48) claims filed by claimants (the "Objecting Claimants") who

objected to the Trustee's determinations and who had partnership interests in one of the

following: Strattham Partners (a Florida general partnership), as well as Bull Market Fund and

1973 Masters Vacation Fund (New York general partnerships) (all three collectively, the

"Partnerships").    The Objecting Claimants are specifically identified in Exhibit 2 to the

Declaration of Vineet Sehgal ("Sehgal Decl.") filed herewith.  This Motion is based upon the law

set forth below as well as the facts set forth in the accompanying Sehgal Declaration and the

declaration of Stephanie Ackerman ("Ackerman Decl.").

## PRELIMINARY STATEMENT

The Objecting Claimants seek customer status in this SIPA proceeding, despite

acknowledging through discovery that they did not have accounts in their name and had no direct

financial relationship with BLMIS.  Instead, they invested in the Partnerships, each of which had

a BLMIS account, invested partnership assets with BLMIS, and filed its own claim with the

Trustee.[2]  The case is governed by the Second Circuit decision *Kruse v. Sec. Investor Prot. Corp.*

*(In re Bernard L. Madoff Inv. Sec. LLC)*, 708 F.3d 422 (2d Cir. 2013) and the many related

decisions in this SIPA proceeding, referenced in Section E *infra*, involving the question of who

---

[1] *See* 15 U.S.C. § 78aaa *et seq.* (West 2009).  For convenience, subsequent references to sections of the Securities
Investor Protection Act shall be denoted simply as "SIPA § __."

[2] The Partnerships have been grouped together in this Motion because the Trustee believes that they represent all of
the remaining Florida and New York general partnership BLMIS account holders of which a number of investors or
partners also claim "customer" status.

is a "customer" under SIPA.  The current Motion seeks to apply these decisions to the Objecting

Claimants through entry of an order affirming the Trustee's denial of their claims as listed in

Exhibit 2 to the Declaration of Vineet Sehgal, disallowing their claims, and overruling the related

claims objections on the grounds that Claimants are not "customers" as such term is used at

SIPA § 78*lll*(2).[3]

## BACKGROUND

### A.    THE COMMENCEMENT OF THE SIPA PROCEEDING

The basic facts of the BLMIS fraud are widely known and have been recounted in

numerous decisions.  *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 231 (2d

Cir. 2011); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 393–94 (S.D.N.Y. 2010).   On

December 11, 2008, the Securities and Exchange Commission ("SEC") filed a complaint in the

District Court against Madoff and BLMIS, captioned *SEC v. Madoff*, No. 1:08-cv-10791-LLS,

2008 WL 5197070 (S.D.N.Y. filed Dec. 11, 2008), alleging fraud through the investment advisor

activities of BLMIS.  The SEC consented to the consolidation of its case with an application of

the Securities Investor Protection Corporation ("SIPC").  Thereafter, SIPC filed an application

under SIPA § 78eee(a)(4) alleging that because of its insolvency, BLMIS needed SIPA

protection.  The District Court appointed the Trustee under SIPA § 78eee(b)(3) and removed the

proceeding to this Court under SIPA § 78eee(b)(4).

Under SIPA, the Trustee is responsible, among other things, for recovering and

distributing customer property to a broker's customers, assessing claims, and liquidating other

assets of the firm for the benefit of the estate and its creditors.  A SIPA trustee has the general

powers of a bankruptcy trustee, in addition to the powers granted by SIPA.  SIPA § 78fff-1(a).

---

[3] The Trustee reserves all other bases for objections to the claims that are the subject of the Motion.

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that "customers," as defined in SIPA § 78*lll*(2), share pro rata in "customer property," defined in SIPA § 78*lll*(4), to the extent of their "net equity," defined in SIPA § 78*lll*(11).  For each customer with a valid net equity claim, if the customer's share of customer property does not make her whole, SIPC advances funds to the SIPA trustee up to the amount of the customer's net equity, not to exceed $500,000 (the amount applicable to this case).  SIPA § 78fff-3(a).  It is the customer's burden to demonstrate he or she is entitled to customer status.  *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002) ("[I]t is well-established in the Second Circuit that a claimant bears the burden of proving that he or she is a 'customer' under SIPA.").

On December 23, 2008, this Court entered a Claims Procedures Order.  *See* ECF No. 12. Pursuant to that order, the Trustee determines claims eligible for customer protection under SIPA, claimants may object to the Trustee's determination of a claim by filing an objection in this Court, and the Trustee requests a hearing date for the objection and notifies the objecting claimant thereof.  *Id.*

**B.    THE PARTNERSHIPS' STRUCTURE, BLMIS ACCOUNTS, AND CLAIMS**

The Objecting Claimants invested into one or more of the Partnerships.  Eight (8) claims were filed by partners of the 1973 Masters Vacation Fund, thirty-four (34) claims were filed by partners of the Bull Market Fund, and six (6) claims were filed by partners of the Strattham Partners.  *See* Sehgal Decl., ¶11, Ex. 2.  The claims of the Partnerships themselves are not at issue in this Motion.

**1.    1973 Masters Vacation Fund**

BLMIS Account No. 1M0114 is an account held in the name of the 1973 Masters Vacation Fund c/o Jerome Horowitz.  Sehgal Decl., Ex. 5, AMF00300508.  Doris Horowitz and

Eleanor Gold indicated to BLMIS that they are the general partners,[4] who instructed BLMIS to direct notices to David G. Friehling, CPA. *Id.*, AMF00300506. Jerome Horowitz was also designated a partner. *Id.*, AMF00300509. According to the customer file, virtually all of the correspondence between BLMIS and the accountholder was with the general partners, *i.e.*, Doris Horowitz or Jerome Horowitz. *See generally id.*, AMF00300370-500. Occasionally, David G. Friehling (or his wife Robin Friehling) corresponded with BLMIS as a representative of the accountholder, 1973 Masters Vacation Fund. *See generally id.*, AMF00300370-489.

A number of partners stated in their objections that 1973 Masters Vacation Fund was a partnership and that they were partners. *See* ECF Nos. 3638, 3639, 3643. For example, Loretta Keane, George G. and Linda G. Pallis, and George and Teresa Lawrence indicated that 1973 Masters Vacation Fund was a partnership that was formed by Jerome Horowitz. *See* ECF No. 3644. A letter to investors of 1973 Masters Vacation Fund from "Jerry" Horowitz also shows that it was a partnership. Sehgal Decl., Ex. 6, MWPTAP00104659. While the 1973 Masters Vacation Fund did not produce any governance documents to the Trustee, there is evidence that it is a New York partnership. For example, Peter Barbato, an Objecting Claimant of the 1973 Masters Vacation Fund filed a claim with the Trustee, attaching a Schedule K-1 tax form on which, in the "Information About the Partner" section, the box labeled "General partner or LLC member-manager" was checked. Sehgal Decl., Ex. 6, MWPTAP00104663-666; *see also* Sehgal Decl., Ex. 7, MWPTAP00198433-450; Sehgal Decl., Ex. 8, MWPTAP00215928; Sehgal Decl., Ex. 9, MWPTAP00223085.

---

[4] Although the documents in the customer file reflect that the 1973 Masters Vacation Fund is a general partnership, a handful of Objecting Claimants indicate that 1973 Masters Vacation Fund is a limited partnership. *See* ECF No. 3638, 3639, and 3643. The Motion, however, is still appropriate in either case because the Objecting Claimants were not customers of BLMIS for the same reasons as set forth below.

Only a handful of the 1973 Masters Vacation Fund Objecting Claimants responded to discovery. For example, Dr. Anthony Russo provided a Schedule K-1 tax document reflecting that 1973 Masters Vacation Fund was a "General partner or LLC member-manager." Ackerman Decl., Ex. 7, MCMDP_00000972-985. In addition, Dr. Russo conceded in his responses to the Trustee's interrogatories that "[t]he only persons [he] had communications with in regards to BLMIS were the accounts [*sic*] Friehling and Horowitz." Ackerman Decl., Ex. 2, MCMDR_00000084, ROG No. 6. Dr. Russo also indicated that he lacked control over the account. Ackerman Decl., Ex. 2, MCMDR_00000084, ROG No. 7 (stating that "[t]he only person who had control over the account holder and the authority to exercise descresion [*sic*] was Bernard L. Madoff. He was the sole control and manager of the investments I had made. This was made clear to me by the accountants Friehling and Horowitz"). In response to the Trustee's requests for admission, Dr. Russo indicated that he "deposited securities directly with BLMIS" yet the documents provided to support this assertion indicate that all funds went through Friehling & Horowitz, on behalf of the 1973 Masters Vacation Fund, to be deposited into the accountholder's account.[5] Ackerman Decl., Ex. 2, MCMDR_00000082, RFA No. 4; *see also* Ackerman Decl., Ex. 7, MCMDP_00000946-47 (providing a $350,000 check to David G. Friehling, C.P.A. "to invest in the 1973 Masters Vacation Fund"); *see also* Ackerman Decl., Ex. 7, MCMDP_00000948-50 (providing a $200,000 check to David G. Friehling, C.P.A. "to be invested in the 1973 Masters Vacation Fund"). In fact, Dr. Russo relies on documents that further indicate that his relationship was with the 1973 Masters Vacation Fund and not BLMIS. Ackerman Decl., Ex. 7, MCMDP_00000951 (corresponding with Jerome Horowitz); Ackerman

---

[5] Although some of the Objecting Claimants' productions reflect checks made out to BLMIS, it is important to note that no withdrawals were made from BLMIS, the accounts were not held in the Objecting Claimants' names, and almost all correspondence and transactions went through the accountholder, and not directly to BLMIS.

Decl., Ex. 7, MCMDP_00000953 (corresponding with Friehling & Horowitz and requesting to "arrange a quarterly pay-out of $30,000").  George & Linda Pallis also produced documents to the Trustee, which indicated that checks were sent to Friehling & Horowitz directly, in connection with the 1973 Masters Vacation Fund.  Ackerman Decl., Ex. 8, MCMDP_00001629-230.

Loretta Keane also responded to the Trustee's discovery requests.  Notably, Mrs. Keane admitted that the subject BLMIS account was not titled in her name, and that she did not have an account in her name, never received correspondence directly from BLMIS, never deposited cash or securities with BLMIS, did not receive investment statements in her name, did not receive tax statements from BLMIS in her name, never entered into any contracts in her name at BLMIS, did not have any control, investment discretion or decision-making power over any investments at BLMIS, and the only relationship to BLMIS existed by way of her relationship to the Partnership.  Ackerman Decl., Ex. 3, MCMDR_00000215-216; *see also* Ackerman Decl., Ex. 4, MCMDR_00000161-162 (George and Linda Pallis also admitted to all of the above-mentioned requests for admission, except indicating that they received correspondence and tax statements from Friehling & Horowitz, which is defined as "BLMIS" by the Trustee).[6]  The remaining partners of 1973 Masters Vacation Fund failed to respond to the Trustee's discovery.  By failing

---

[6] Some of the 1973 Masters Vacation Fund Objecting Claimants indicate that the Trustee defined "BLMIS to include Friehling & Horowitz", *see, e.g.*, Ackerman Decl. Exhibit 1, in discovery requests served on counsel. However, at no time has the Trustee argued that Friehling & Horowitz is the alter ego of BLMIS or that the two entities should be treated as the same.  The definition read as follows:

> "BLMIS" means Bernard L. Madoff Investment Securities LLC, Madoff Securities International Ltd. ("MSIL"), Madoff Securities International LLC, Bernard L. Madoff, Ruth Madoff, and all affiliated Persons and entities, including, but not limited to, any officers, directors, agents, representatives, employees, partners, parent companies, subsidiaries, predecessor or successor and related entities, and affiliates of the above specifically identified Persons and entities.

This definition was merely for definitional discovery purposes.

to respond to the requests for admissions, each of them made the above-mentioned admissions made by Loretta Keane.  *See generally* Ackerman Decl., ¶¶ 20, 22 Ex. 9;[7] *see also* Fed. R. Civ. P. 36(a)(3).

The 1973 Masters Vacation Fund failed to file a customer claim.  The account was a "net loser" in the amount of $16,000.

### 2.    Bull Market Fund

BLMIS Account No. 1B0081 is an account held in the name of the Bull Market Fund. Sehgal Decl., Ex. 11, AMF00150318.  Edward Blumenfeld signed the account opening documents on August 15, 1995.  *Id.*, AMF00150628.  Mr. Blumenfeld also signed a "Partnership Account Agreement" that the Bull Market Fund was a "duly organized partnership" indicating that Edward Blumenfeld was the general partner.  *Id.*, AMF00150629.  The BLMIS customer files reflect that all transactions with BLMIS were undertaken by either Mr. Blumenfeld, or Harvey Cohen, controller of the Blumenfeld Development Group on behalf of the Bull Market Fund.  *See generally* Sehgal Decl., Ex. 11.

The Bull Market Fund was a general partnership organized in the State of New York in 1986.  *See* ECF Nos. 1327, 1393, 1395, 1397, & 1399, p. 2.  The Schedule K-1 of the Bull Market Fund section, the "Information About the Partner," states that the Partnership is a "General partner or LLC member-manager."  *See, e.g.,* ECF No. 1393 at 35.  A number of Objecting Claimants who submitted documents to the Trustee along with their claim also included tax documents indicating that Bull Market Fund is a general partnership.  Sehgal Decl., Ex. 12, MWPTAP00351289.

---

[7] The 1973 Masters Vacation Fund Requests for Admissions, Ackerman Decl., Exs. ___, (hereafter, "1973 Masters Vacation Fund RFA ___").

The Bull Market Fund was governed by its partnership agreement, Sehgal Decl., Ex. 13, MWPTAP00509964-992, and by New York partnership law. Under Section 1 of the agreement, the partnership was formed for the "purpose of buying, selling and otherwise dealing with stocks, bonds, options and other securities of any kind and description . . . ." *Id.*, MWPTAP00509964. Under Section 5, each partner owns "one Partnership Unit for each $1,000 in such Partner's capital account" and an "individual capital account shall be maintained for each Partner." *Id.* Under Section 6, net profits and losses were allocated or charged by the partners in relation to their capital accounts and the managing partner determined "whether and to what extent Partnership profits shall be transferred to the capital accounts of Partners." *Id.*, MWPTAP00509965. Edward Blumenfeld, as managing partner, had exclusive "control of the day-to-day operations of the Partnership and the maintenance of the property of the Partnership" under Section 7(a). *Id.* Moreover, under Section 7(d)(i) "Property owned by the Partnership shall be held in the name of the Partnership or in nominee name." *Id.*, MWPTAP00509966.

None of the Bull Market Fund Objecting Claimants responded to discovery. By failing to respond to the requests for admissions, each of them admitted (among other things) that they did not have an account in their name at BLMIS, they never deposited cash or securities with BLMIS, did not receive investment statements, correspondence or tax statements from BLMIS, did not have any control, investment discretion or decision-making power over any investments at BLMIS, and the only relationship to BLMIS existed by way of their relationship to the Partnership. *See generally* Ackerman Decl. ¶¶20, 21, 23 Ex. 7;[8] *see also* Fed. R. Civ. P. 36(a)(3).

---

[8] Bull Market Fund Partners Requests for Admissions, Ackerman Decl., Exs. __, (hereafter, "Bull Market Fund Partners RFA ___").

The Bull Market Fund filed a customer claim for the entire account. The Trustee denied the claim in its entirety because based on the Trustee's analysis, the amount of money that the Bull Market Fund withdrew from the account was greater than the amount that was deposited, making the account a "net winner." Thus, a determination letter was sent to the Bull Market Fund denying its customer claim. *See* Sehgal Decl. ¶14. Although Bull Market Fund filed an objection to the Trustee's determination, it ultimately withdrew that objection. *See* ECF Nos. 3097, 8792.

### 3.    Strattham Partners

BLMIS Account No. 1ZB262 is an account held in the name of Strattham c/o Thomas Avellino. Sehgal Decl., Ex. 15, AMF00055717. The BLMIS customer files reflect that most transactions with BLMIS were undertaken by Thomas Avellino on behalf of the Strattham Partners. *Id.*, AMF00055682-711; *see also* Sehgal Decl., Ex. 16, MWPTAP00370281 ("Strattham's Managing Partner is Thomas Avellino").[9]

A number of Objecting Claimants produced documents showing Strattham Partners is a Florida partnership. For example, Christopher and Marie Altieri filed a claim with the Trustee, attaching a Schedule K-1 tax form on which, in the "Information About the Partner" section, the box labeled "General partner or LLC member-manager" was checked. Sehgal Decl., Ex. 17, MWPTAP00170605, MWPTAP00170612.[10] Correspondence from Strattham Partners' accounting firm to Arlene Mortimer, an Objecting Claimant, also indicates that Strattham Partners is a partnership. Sehgal Decl., Ex. 19, MWPTAP00346796, MWPTAP00346800.

---

[9] A number of letters were sent from Frank J. Avellino to BLMIS, however, they were sent on behalf of another account for the purposes of effectuating an inter-account transfer to Strattham Partners. Sehgal Decl., Ex. 15, AMF00055686, AMF00055689, AMF00055701, AMF00055705, AMF00055712- AMF00055716

[10] The Altieris also argue that they are customers through their investments through Seven Out Partners, but Seven Out Partners was also a partner in Strattham Partners. *See, e.g.,* ECF No. 1179, p. 1. In fact, Seven Out Partners filed a customer claim, as "a member of Strattham Partners." *See* Sehgal Decl., Ex. 18, MWPTAP00331835.

The Strattham Partners were governed by their "general partnership agreement."  Sehgal Decl., Ex. 18, MWPTAP00331844-861.    The partnership was formed under Florida law, specifically the Florida Uniform Partnership Act.  *Id.*, MWPTAP00331844.  The purpose of the partnership was "to invest, in cash or on margin, in all types of marketplace securities . . . ."  . *Id.*, MWPTAP00331846.    Strattham Partners' funds were to be deposited in bank accounts designated by the Managing Partner, and all withdrawals were to be authorized by the Managing Partner or his or her agents.  *Id.*, MWPTAP00331850.  Section 13 of the agreement stated that all funds were to be held in the name of Strattham Partners, and not the partners themselves.  .  *Id.* Partners were also restricted in their capacities as partners; they did not have the authority to do the following on behalf of Strattham Partners: (i) borrow or lend money; (ii) make, deliver or accept any commercial paper; (iii) execute any mortgage, security agreement, bond or lease; or (iv) purchase or sell any property for or of the partnership.  *Id.*   The only individual authorized to act on behalf of Strattham Partners was the Managing Partner.  *Id.*, MWPTAP00331852. Under section 19/05, the partners were only able to "look solely to the assets of the Partnership for all distributions with respect to the Partnership and their Capital Contribution . . . ."  *Id.*, MWPTAP00331858 - 859.

The Trustee served discovery on each of the Strattham Partners Objecting Claimants seeking to determine their basis for claiming customer status, and inquiring into deposits, payments, communications, account openings, and their relationship with the account holder. Few of the Strattham Partners Objecting Claimants responded.[11]   Based upon their responses, each of them admitted (among other things) that they did not have an account in their name at BLMIS, they never deposited cash or securities with BLMIS, did not receive investment

---

[11] Strattham Partners Requests for Admissions, Ackerman Decl., Exs. 2, 5, 8, (hereafter, "Strattham Partners RFA ___").

statements or tax statements from BLMIS, did not have any control, investment discretion or decision-making power over any investments at BLMIS, and the only relationship to BLMIS existed by way of their relationship to the Partnership. *See* Ackerman Decl. Ex. 2.

Strattham Partners filed a customer claim for the entire account. Its claim is currently "deemed determined" because of outstanding litigation to recover transfers under section 502(d) of the Bankruptcy Code. Strattham's claim is not before the Court on this motion.

*       *       *       *       *       *

As discussed *infra*, by Florida and New York law, the Partnerships were treated as entities that owned their own property. Each had a BLMIS account in its name, according to the books and records of BLMIS and entrusted its property with BLMIS for the purposes of purchasing securities. None of the Partnerships was a bank, broker, or dealer.

## C.    THE BLMIS ACCOUNT RECORDS

The Partnerships each maintained an account in its own name (the "Accounts," and each, an "Account") with BLMIS. The Objecting Claimants did not. Sehgal Decl., ¶¶6, 9-14, Exs. 1-3. The records of BLMIS reflect money deposited or withdrawn by and on behalf of the Partnerships, and not by the Objecting Claimants individually. *See* Sehgal Decl., Exs. 5, 11, 15. Almost all of the Objecting Claimants admit that BLMIS sent Account statements and related communications to the Partnerships, not the Objecting Claimants. The BLMIS customer files for these Accounts do not reference the particular interests held by Objecting Claimants in the Partnerships. *See id.*

Because the Partnerships each maintained an Account at BLMIS, and made deposits into and withdrawals from that Account, the books and records of BLMIS reflect the amounts owing and owed by the BLMIS estate for that Account. The books and records of BLMIS do not, in contrast, reflect deposits or withdrawals directly to or from BLMIS by the individual Objecting

11

Claimants with regard to any Partnership's BLMIS Account. They also do not show what amounts individual Objecting Claimants invested in, or withdrew from, the Partnerships. *See* Sehgal Decl. Exs. 5,11,15. It was each Partnership that had the right to demand, on behalf of the Partnership, return of the property entrusted to its Account, and each Partnership that is accordingly entitled to a customer claim to the extent of its net equity.

## D.    THE CLAIMS

The claims at issue in this Motion involve investments into the Partnerships. Sehgal Decl. ¶¶ 8 -12, Exs. 1-3. The Objecting Claimants, the forty-eight (48) claims filed by them, and the objections to determination of those claims, are specifically identified in Exhibits 2 and 3 to the Sehgal Declaration. The Trustee denied their claims because they lacked BLMIS accounts and were not customers of BLMIS. Sehgal Decl. ¶11. Collectively, the Objecting Claimants filed forty-seven (47) docketed objections to the Trustee's determination of their claims. Sehgal Decl. ¶¶8-12, Exs. 1-3. This Motion addresses all objections regarding the specified claims by Objecting Claimants who are identified on Exhibit 2 of the Sehgal Decl.

Since receiving the forty-seven (47) docketed objections to the claims determinations, the Trustee served discovery on each of the Objecting Claimants seeking to determine their basis for claiming customer status, and inquiring into deposits, payments, communications, account openings, and their relationship with the account holder. Few of the Objecting Claimants responded, and even those that did provided no persuasive evidence of their entitlement to customer status under SIPA. *See* Ackerman Decl., Exs. 2-8.

## E.    THE CUSTOMER DECISIONS

There have been eleven prior decisions in this proceeding dealing with whether investors in BLMIS accountholders could be treated as "customers" under SIPA; all of the decisions said they could not.

1.    __The Initial Feeder Fund Motion__

The Trustee's first motion regarding the definition of "customer" under SIPA was the Trustee's Motion To Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts In Their Names, Namely, Investors in Feeder Funds, filed on June 11, 2010, ECF No. 2416 (the "Initial Feeder Fund Motion").   On June 28, 2011, this Court issued its memorandum decision and order affirming the Trustee's denial of the claims.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank Ltd. v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 480 B.R. 117 (S.D.N.Y. 2012), *aff'd sub nom. Kruse v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC),* 708 F.3d 422 (2d Cir. 2013).

The Court found that, in light of the plain language of SIPA and relevant case law, the claimants in the Initial Feeder Fund Motion did not qualify as "customers" under SIPA.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 454 B.R. at 290.  The Court held that the claimants invested in, not through, those feeder funds, and had no individual accounts at BLMIS.  *Id.* at 297.  It was the feeder funds that entrusted their monies with BLMIS for the purpose of trading or investing in securities—the touchstone of "customer" status—whereas the claimants purchased interests in the feeder funds. *Id.* at 299.  The Court held that absent a direct relationship with BLMIS, the claimants sought a definition of "customer" that stretched the term beyond its limits.  *Id.* at 302.

After the District Court affirmed, *Aozora Bank Ltd.*, 480 B.R. 117 (S.D.N.Y. 2012), the claimants appealed to the Second Circuit, which also affirmed.  The Second Circuit confirmed that "[j]udicial interpretations of 'customer' status support a narrow interpretation of the SIPA's provisions."  *Kruse v. Sec. Investor Prot. Corp.*, 708 F.3d at 426 (quoting *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006)), explaining that "the critical

aspect of the 'customer' definition" was "the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." *Kruse*, 708 F.3d at 426 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236). The claimants failed to meet this fundamental requirement because the money sent to BLMIS belonged to the accountholders, not to the individual claimants, and the individual claimants therefore failed to establish that they had entrusted cash or securities to BLMIS. *Id.* at 427. The Second Circuit also found that the individual claimants did not exhibit other indicia of customer status in their dealings (or lack of dealings) with BLMIS, including that they did not exert any control over the accounts at issue and that they were not reflected in BLMIS records. *Id.* at 426-27.

The Second Circuit held that the interests "sold by the Feeder Funds to investors . . . did not confer an ownership interest in money that the Feeder Funds ultimately invested in BLMIS." Thus, "regardless of their intent, appellants never entrusted their cash or securities to BLMIS and, thus, fail to satisfy this 'critical aspect of the "customer" definition.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236 (internal quotation marks omitted); *see Morgan, Kennedy*, 533 F.2d at 1318; *see also Kruse,* 708 F.3d at 427-28 (citing 1–12 *Collier on Bankruptcy* ¶ 12.12 (16th ed. 2012) ("[A] claimant will not be entitled to customer protection under SIPA unless the debtor actually receives the claimant's cash or securities; the debtor must actually have come into possession or control.")).

## 2.    The ERISA Motion

While the appeals of the Feeder Fund Decision were pending, the Trustee also filed a motion (the "ERISA Motion") to address arguments that were raised by claimants without BLMIS accounts who were benefit plans or benefit plan participants and who sought to use the

Employee Retirement Income Security Act ("ERISA") as a basis for determining their customer status.[12] *See* ECF No. 4521. The District Court withdrew the reference and granted the motion.

The District Court noted that the first two of the three ways to qualify as a "customer" under SIPA § 78*lll*(2), "presume that a customer must have a securities account with the debtor," and that the claimants also did not qualify under the third method of having "deposited cash with the debtor for the purpose of purchasing securities." *Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, Nos. 12 Civ. 1039 (DLC), 12 Civ. 1139 (DLC), 2012 WL 3042986 *3 (S.D.N.Y. July 25, 2012). That was so because none of the claimants "owned any cash deposited with BLMIS. Rather, . . . in each case this cash was owned by the third-party entity in which the claimant invested, and which had a BLMIS account in its name." *Id.* at *5. The District Court also rejected arguments that fiduciary responsibilities could suffice to create a "customer" relationship. *Id.* at *12.

### 3.    Other Customer Motions

Further SIPA "customer" motions followed, each of which was determined in favor of the Trustee. On August 21, 2013, the Court issued its Bench Memorandum Granting Trustee's Second Motion to Affirm Trustee's Determinations Denying Claims of Claimants Who Invested in Certain Feeder Funds and Did Not Have BLMIS Accounts in Their Names, ECF No. 5450 ("the Second Feeder Fund Decision"). Noting that prior decisions established that the burden is on the claimant to established that he is a "customer" entitled to SIPA protection, and that such showing is not easily met, this Court concluded that the claimants had failed to establish their "customer" status. The Court noted that "they had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property

---

[12] Prior to the hearing on the Initial Feeder Fund Motion, the Court had removed from the scope of the motion the question of whether ERISA affects "customer" status under SIPA.

interest in any feeder fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment discretion over feeder fund assets invested with BLMIS, received no accounts statements or other communications from BLMIS and had no transactions reflected on the books and records at BLMIS." Second Feeder Fund Decision at 4.

On August 22, 2014, this Court issued its Memorandum Decision Granting Motion To Affirm Trustee's Determinations Denying Claims Of Claimants Who Invested In Certain ERISA Plans. *See generally Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 515 B.R. 161 (Bankr. S.D.N.Y. 2014) ("ERISA Claimant Decision"). Again holding that the burden is on the claimant to establish that he is a customer, this Court concluded that a claimant who wished to qualify as a person who has deposited cash with the debtor for the purposes of purchasing securities must show that she entrusted her "own assets directly through an account maintained in her own name rather than indirectly through a fund that then entrusted the fund's assets through an account maintained in the fund's name." *Id.* at 168 (internal citations omitted). This Court further noted that "not every victim of a broker-dealer's fraud is a "customer" and that even the fact that a claimant exercised some control over her own investments in the fund or the fund's investments in BLMIS was not sufficient to meet "the narrow definition of customer under SIPA." *Id.*

On February 25, 2015, this Court read into the record a decision ("S&P Decision") granting Trustee's Motion And Memorandum To Affirm His Determinations Denying Claims Of Claimants Holding Interests In S&P or P&S Associates, General Partnerships. This Court explained that the indicia of customer status are: (i) a direct financial relationship with BLMIS; (ii) a property interest in the funds invested directly with BLMIS; (iii) securities accounts with BLMIS; (iv) control over the account holders' investments with BLMIS; and (v) identification of

16

the alleged customer in BLMIS's books and records.  Hr'g. Transcript, *S&P Decision*, at p. 30,

Ackerman Decl. Ex. 11.  The Court held that the objecting partners failed to sustain their burden

of proving that they are customers of BLMIS and an order granting the Trustee's motion was

entered.  *Id.* at 36; *see also* ECF No. 9450.  Since the S&P Decision, there have been five more

unopposed motions to the Trustee's determination each of which was granted by the Court.[13]

## ARGUMENT

To be a "customer" under SIPA, an investor must have "a claim on account of securities

received, acquired, or held by the debtor in the ordinary course of its business as a broker or

dealer from or for the securities accounts of such person," including "any person who has

deposited cash with the debtor for the purpose of purchasing securities." SIPA § 78*lll*(2).[14]

---

[13] *See* Order Approving Trustee's Motion To Affirm His Determinations Denying Claims of Claimants Holding Interests In Peerstate Equity Fund, L.P., ECF No. 9883 (Apr. 27, 2015); *see* Order Approving Trustee's Motion And To Affirm His Determinations Denying Claims Of Claimants Holding Interests In The Lazarus-Schy Family Partnership, The Schy Family Partnership, Or The Lazarus Investment Group, ECF No. 10010 (May 18, 2015); Order Approving Trustees Motion To Affirm His Determinations Denying Claims Of Claimants Holding Interests In Epic Ventures, LLC, ECF No. 10267 (June 25, 2015); Order Approving Trustees Motion To Affirm His Determinations Denying Claims Of Claimants Holding Interests Partners Investment Co., Northeast Investment Club, And Martin R. Harnick & Steven P. Norton, Partners, ECF No. 10894 (July 29, 2015); Order Approving Trustees Motion To Affirm His Determinations Denying Claims Of Claimants Holding Interests The Whitman Partnership, The Lucky Company, The Petito Investment Group, And The Harwood Family Partnership, ECF No. 11145 (August 26, 2015).

[14] The definition applicable to this SIPA proceeding is:

(2) CUSTOMER

The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the  purpose of purchasing securities, but does not include—

(A) any person to the extent that the claim of such  person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

Thus, to be a "customer" an investor must have entrusted cash or securities with the debtor for the purpose of trading or investing in securities. In *Kruse*, the Second Circuit found that investors who bought interests in a limited partnership that invested partnership funds via the partnership's own BLMIS account "never entrusted *their* cash or securities to BLMIS and, thus, fail to satisfy this 'critical aspect of the "customer" definition'" regardless of their intent. 708 F.3d at 427 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236). Similarly, the Second Circuit in *In re New Times Securities. Services, Inc.* held that "the critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." 463 F.3d at 128 (quoting *Appleton v. First Nat'l Bank of Ohio,* 62 F.3d 791, 801 (6th Cir. 1995)); *see also In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 724-25 (Bankr. S.D.N.Y. 1998) ("The term [customer] refers to those who entrust cash or securities to broker-dealers for the purpose of trading and investing in the securities market."). The Second Circuit recently further upheld this principle in *In re Lehman Bros., Inc.*, 791 F.3d 277 (2d Cir. 2015), concluding that the "critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." *Id.* at *4 (quoting *In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d at 236). The Trustee is responsible for discharging obligations of the debtor to customers with such claims "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b).

The Objecting Claimants' investments in the Partnerships do not meet the requirements for "customer" status outlined in the seminal Second Circuit decision *Securities Investor Protec.*

---

SIPA § 78*lll*(2), *see* 15 U.S.C. § 78*lll*(2) (West 2009). After the start of this case, the "customer" definition was slightly reorganized and amended in a manner irrelevant to the present issues by the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. No. 111-203, § 983(b), 124 Stat. 1931 (2010); *see In re Lehman Bros. Inc.*, 462 B.R. 53, n.9 (Bankr. S.D.N.Y. 2011).

*Corp. v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314, 1318 (2d Cir. 1976), and reaffirmed in *Kruse*, 708 F.3d at 427. In *Morgan Kennedy*, the Second Circuit rejected the argument that the beneficial owners of the account holder were the "customers" under SIPA, citing the facts that: (1) title to the trust assets was held by the account holder, not the beneficiaries; (2) the securities account with the debtor was in the name of the account holder, not the beneficiaries; (3) the account holder had the exclusive power to entrust the assets to the debtor; (4) the beneficiaries were unknown to the broker; and (5) the beneficiaries had no legal capacity in which they could deal with the debtor. 533 F.2d at 1318.

The Objecting Claimants' circumstances are little different than those of the claimants in *Morgan Kennedy*, and do not show the hallmarks of customer status discussed in this Court's *S&P* decision. Hr'g. Transcript, *S&P Decision*, at p. 30, Ackerman Decl. Ex. 11. The Objecting Claimants entrusted their money to the Partnerships, not BLMIS. The Objecting Claimants lacked a direct financial relationship with BLMIS. The money entrusted to BLMIS was the property of the Partnerships, not the Objecting Claimants. The BLMIS Accounts were in the names of the Partnerships, not in the individual names of Objecting Claimants.

The individual interests of Objecting Claimants were not identified in BLMIS' books and records, and the names of most of them did not appear in the customer files. The partners who dealt with BLMIS were like the trustees who acted for the trust account in *Morgan Kennedy*, and were no more customers in their individual capacity than the trustees were. *Morgan Kennedy*, 533 F.2d at 1318, 1320-21 (notwithstanding that the trust account was in the name of the trustees, "[a]ny suggestion that each of the three Trustees has a separate customer claim against the debtor is untenable" because the Trustees together managed for the trust, "which was the true customer of the broker-dealer . . . ."; similarly, noting that under the SIPA Rules, individual

coverage for multiple people who each own some portion of, or interest in, an account is "explicitly forbidden".)

Only the Partnerships, not the Objecting Claimants, entrusted their cash or securities to BLMIS, and the Objecting Claimants thus fail to satisfy this "critical aspect of the 'customer' definition." *Kruse*, 708 F.3d at 426-27 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236); *accord ERISA Claimant Decision,* 515 B.R. at 169. Whether the Objecting Claimants intended the Partnerships to invest with BLMIS is irrelevant under SIPA. *See Kruse*, 708 F.3d at 426-27; *ERISA Claimant Decision*, 515 B.R. at 169-70. The funds that the Objecting Claimants contributed to the Partnerships, and anything that the Partnerships purchased with those funds, belongs to the relevant Partnership and not to the Objecting Claimants. *See* FLA. STAT. ANN. § 620.8204;[15] *see also* N.Y. PARTNERSHIP LAW § 12.[16] Like the objecting claimants dealt with by

---

[15] When property is partnership property in Florida:

> (1) Property is partnership property if acquired in the name of:(a) The partnership; or(b) One or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership but without an indication of the name of the partnership.(2) Property is acquired in the name of the partnership by a transfer to:(a) The partnership in its name; or(b) One or more partners in their capacity as partners in the partnership, if the name of the partnership is indicated in the instrument transferring title to the property.(3) Property is presumed to be partnership property if purchased with partnership assets, even if not acquired in the name of the partnership or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership.(4) Property acquired in the name of one or more of the partners, without an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership and without use of partnership assets, is presumed to be separate property, even if used for partnership purposes.

FLA. STAT. ANN. § 620.8204. Similarly, FLA. STAT. ANN. § 620.8501, titled "Partner not coowner of partnership property" provides, "Partnership property is owned by the partnership as an entity, not by the partners as co-owners. A partner has no interest that can be transferred . . . in specific partnership property."

[16] "All property originally brought into the partnership stock or subsequently acquired . . . on account of the partnership is partnership property" and allowing for title, even of real property, to be acquired and passed in the partnership name. N.Y. PARTNERSHIP LAW § 12; *see also* N.Y. PARTNERSHIP LAW § 51(2)(a) ("A partner, subject to

prior Customer Opinions, the Objecting Claimants do not individually own the assets that the

Partnerships invested with BLMIS.    Instead, the assets are collectively owned by the

Partnerships themselves.

It was the Partnerships, not the Objecting Claimants, that entrusted assets to BLMIS for

the purpose of purchasing securities.  Each Partnership, through its management, had the right to

direct the investment of those assets on behalf of the Partnership, and to withdraw property from

its Account on behalf of the Partnership.  Each Partnership, not the Objecting Claimants, was the

customer for its respective Account under SIPA.

Because BLMIS did not perform a custodial function on behalf of the individual

Objecting Claimants, the Objecting Claimants have neither "customer" claims nor individual net

equity. The purpose of SIPA, a statute intended to deal with broker insolvency, is "to expedite

the return of customer property" by "protecting the *custody* function of brokers," according to a

recent Second Circuit decision that declined to permit interest or time-based damages for

customer claims under SIPA.  *Sec. Investor Prot. Corp. v. 2427 Parent Corp. (In re Bernard L.*

*Madoff Inv. Sec. LLC)*, 779 F.3d 74, 80 (2d Cir. 2015).  Customers share in the fund of customer

property ratably, according to each customer's "net equity." *Id*. at 77, 81.  The definition of net

---

. . . any agreement between the partners, has an equal right with his partners to possess specific partnership property
for partnership purposes; but he has no right to possess such property for any other purpose without the consent of
his partners."); N.Y. PARTNERSHIP LAW § 51(2)(b) ("A partner's right in specific partnership property is not
assignable except in connection with the assignment of the rights of all the partners in the same property."); *see also
La Russo v. Paladino*, 109 N.Y.S.2d 627, 630 (N.Y. Sup. Ct. 1951) ("[A] partner has no personal right in any
specific partnership property" and on the partnership's dissolution by the death of a partner, "the only property right
which the survivor of such partner possesses is a claim for an accounting."), *Weisinger v. Rae*, 188 N.Y.S.2d 10, 19-
20 (N.Y. Sup. Ct. 1959) ("A partner has no personal right in any specific partnership property," therefore,
"partnership property is not subject to attachment or levy by a creditor of an individual partner.").

equity is limited by the fundamental SIPA design "to return customer property to customers," *id.* at 77, whether in cash or in actual securities. *Id.* at 80.[17]

The Second Circuit stated in *2427 Parent Corp.*, "[w]e . . . previously concluded that in [the BLMIS] case net equity . . . should be determined based on customers' actual deposits and withdrawals. These deposits, net withdrawals, constitute customer property here." *Id.* at 81 (citations omitted). The books and records of BLMIS show that Objecting Claimants made no individual deposits in or withdrawals from BLMIS, and those who interacted with BLMIS as to the Accounts did so solely on the Partnerships' behalf. Sehgal Decl., Exs. 5,11,15. The Objecting Claimants accordingly have no net equity and are not "customers" within the meaning of SIPA.

Each of the Objecting Claimants was served with requests for admission, interrogatories, and requests for production. All of the 1973 Masters Vacation Objecting Claimants responded. Likewise, two of the Strattham Partners Objecting Claimants responded. None of the Bull Market Fund Objecting Claimants responded. Those Objecting Claimants who failed to respond to the requests for admission admitted them. Fed. R. Civ. P. 36(a)(3). The admissions, both deemed and actual, show that Objecting Claimants lack any relationship with BLMIS that fits the *Morgan Kennedy* criteria and that their claims of "customer" status are baseless. They admitted that: (i) the relevant Account was not titled in their name;[18] (ii) that they never received investment statements or tax statements in their names from BLMIS;[19] (iii) that they never paid

---

[17] The definition of Net Equity at SIPA § 78 *lll*(11)begins, "The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by—

> (A) Calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated . . . on the filing date, all securities positions of such customer . . . ."

[18] 1973 Masters Vacation Fund RFA ¶1; Bull Market Fund RFA ¶1; Strattham Partners RFA ¶1.

[19] 1973 Masters Vacation Fund RFA ¶¶8,9; Bull Market Fund RFA ¶¶8,9; Strattham Partners RFA ¶¶8,9.

cash directly to BLMIS for credit to an account in their names;[20] (iv) never deposited securities

directly with BLMIS;[21] (v) that they never directly withdrew or received funds from BLMIS;[22]

(vi) that their only relationship to BLMIS existed by way of their relationship to the Account

holder;[23] (vii) that they never entered into any contracts in their names with BLMIS;[24] and (viii)

that they did not have any control, investment discretion or decision-making power over any

investment assets at BLMIS.[25]

As the Second Circuit has explained, "[j]udicial interpretations of 'customer' status

support a narrow interpretation of the SIPA's provisions." *Kruse*, 708 F.3d at 426 (citing *In re

New Times Sec. Servs., Inc.,* 463 F.3d at 127).    Customer status under SIPA is narrowly

construed and is the burden of the claimant to establish.    *See ERISA Claimant Decision,* 515 B.R.

at 166 ("The burden is on the claimant to establish he is a 'customer' entitled to SIPA protection,

and such a showing 'is not easily met.'"); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv.

Sec. LLC*, 454 B.R. at 294 (citing *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 418 (Bankr.

S.D.N.Y. 2003)); *see also Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R.

520, 557 (Bankr. S.D.N.Y. 2002) ("[I]it is well-established in the Second Circuit that a claimant

bears the burden of proving that he or she is a 'customer' under SIPA.").    The Objecting

Claimants have not met this burden. Thus, under Second Circuit precedent, the Objecting

Claimants are not SIPA customers.

---

[20] 1973 Masters Vacation Fund RFA ¶5; Bull Market Fund RFA ¶¶5,4; Strattham Partners RFA ¶5.

[21] 1973 Masters Vacation Fund RFA ¶4; Bull Market Fund RFA ¶4,5; Strattham Partners RFA ¶4.

[22] 1973 Masters Vacation Fund RFA ¶¶6,7; Bull Market Fund RFA ¶¶6,7; Strattham Partners RFA ¶¶6,7.

[23] 1973 Masters Vacation Fund RFA ¶11; Bull Market Fund RFA ¶11; Strattham Partners RFA ¶11.

[24] 1973 Masters Vacation Fund RFA ¶10; Bull Market Fund RFA ¶10; Strattham Partners RFA ¶10.

[25] 1973 Masters Vacation Fund RFA ¶12; Bull Market Fund RFA ¶12; Strattham Partners RFA ¶12.

## **<u>CONCLUSION</u>**

For all of the foregoing reasons, the Court should affirm the Trustee's determination denying the claims of the Objecting Claimants, overrule their objections, expunge the claims, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York        Respectfully submitted,
       September 15, 2015

*/s/ David J. Sheehan*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Jorian L. Rose
Email: jrose@bakerlaw.com
Amy E. Vanderwal
Email : avanderwal@bakerlaw.com
George Klidonas
Email : gklidonas@bakerlaw.com
Stephanie A. Ackerman
Email : sackerman@bakerlaw.com
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201

Brian A. Bash
Email: bbash@bakerlaw.com
**Baker & Hostetler LLP**
1900 E. 9th St Suite 3200
Cleveland, Ohio  44114
Tel: (216) 621-0200
Fax: (216) 696-0740

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*