**DICKSTEIN SHAPIRO LLP**
1633 Broadway
New York, New York  10019-6708
Eric B. Fisher
Barry N. Seidel
Lindsay A. Bush
(212) 277-6500
(212) 277-6501 (fax)
fishere@docksteinshapiro.com
seidelb@docksteinshapiro.com
bushl@docksteinshapiro.com

*Attorneys for Khronos LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | SIPA LIQUIDATION |
| Plaintiff-Applicant, | No.  08-01789 (SMB) |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

          Debtor,

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05286 (SMB) |
| Plaintiff, | |
| v. | |
| LEGACY CAPITAL LTD. and KHRONOS LLC, | |
| Defendants. | |

**KHRONOS LLC'S**
**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION**
**TO DISMISS THE AMENDED COMPLAINT UNDER BANKRUPTCY**
**RULE 7012(b) AND FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ................................................................1

ARGUMENT .............................................................................................4

    I.    THE TRUSTEE HAS FAILED TO PLEAD KHRONOS IS A
         SUBSEQUENT TRANSFEREE OF AN INITIAL TRANSFER ..........................4

    II.    THE CLAIM AGAINST KHRONOS SHOULD BE DISMISSED
         BECAUSE THE TRUSTEE HAS FAILED TO PLEAD KHRONOS' LACK
         OF GOOD FAITH ...............................................................................8

         A.    THE ALLEGATIONS IN THE AMENDED COMPLAINT DO NOT
              SUPPORT THE INFERENCES URGED BY THE TRUSTEE ................9

         B.    THE TRUSTEE HAS FAILED TO PLEAD WILLFUL BLINDNESS
              AND KHRONOS' GOOD FAITH IS A COMPLETE DEFENSE TO
              THE FRAUDULENT TRANSFER CLAIMS..........................................13

              1.    The Trustee Has Failed To Meet His Burden Of Pleading
                     Khronos Subjectively Believed Madoff Was Operating A
                     Ponzi Scheme ...........................................................................13

              2.    The Trustee Has Failed To Plead That Khronos Took
                     Deliberate Steps To Avoid Learning Of Madoff's Scheme
                     And Concedes That Khronos Undertook Extensive Diligence
                     Efforts In Response To Red Flags That Were Raised ..................18

    III.    THE TRUSTEE HAS FAILED TO PLEAD THAT KHRONOS HAD
          ACTUAL KNOWLEDGE OF THE PONZI SCHEME......................................20

CONCLUSION...........................................................................................21

DOCSNY-591655

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Anti-Monopoly, Inc. v. Hasbro, Inc.*,
    958 F. Supp. 895 (S.D.N.Y. 1997), *aff'd*, 130 F.3d 1101 (2d Cir. 1997) ................................4

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010).....................................................................................14

*Comfort Inn Oceanside v. Hertz Corp.*,
    No. 11-CV-1534, 2011 WL 5238658 (E.D.N.Y. Nov. 1, 2011).............................................12

*Gorfinkel v. Ralf Vayntrub, Invar Consulting Ltd.*,
    No. 13-CV-3093 (PKC), 2014 WL 4175914 (E.D.N.Y. Aug. 20, 2014) ................................4

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014)......................16

*In re Beacon Assocs. Litig.*,
    745 F. Supp. 2d 386 (S.D.N.Y. 2010).....................................................................................14

*Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
    740 F.3d 81 (2d Cir. 2014)......................................................................................................13

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)...........................................................................................18, 19

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010).....................................................................................18

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014)........................................................................... passim

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015)...................................................................................5, 6

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    516 B.R. 18 (S.D.N.Y. 2014).............................................................................13, 18, 19, 20

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ...................................17

*United States v. Bailey*,
    955 F.2d 28 (8th Cir. 1992) .....................................................................................................18

*United States v. Ferguson,*
    676 F.3d 260 (2d Cir. 2011).........................................................................18

*United States v. Joly,*
    493 F.2d 672 (2d Cir. 1974).........................................................................18

*United States v. Nektalov,*
    461 F.3d 309 (2d Cir. 2006).........................................................................17

*United States v. Perez-Padilla,*
    846 F.2d 1182 (2d Cir. 1988).......................................................................18

## STATUTES

11 U.S.C. § 546(e) ...........................................................................................20

11 U.S.C. § 550(a) .............................................................................................5

## OTHER AUTHORITIES

*2003 Mutual Fund Scandal*, Wikipedia (April 11, 2015, 16:18),
    http://www.wikipedia.org/wiki/2003_mutual_fund_scandal ................................15

Landon Thomas Jr., *S.E.C. Putting Mutual Funds Under Scrutiny On Late
    Trading, N.Y. Times* (Sept. 5, 2003), available at
    http://www.nytimes.com/2003/09/05/business/sec-putting-mutual-funds-
    under-scrutiny-on-late-trading.html.................................................................15

DOCSNY-591655

Khronos LLC ("**Khronos**") respectfully submits this reply memorandum of law in further support of its motion to dismiss the amended complaint filed by Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("**BLMIS**") (the "**Trustee**") on July 2, 2015, ECF No. 112 (the "**Amended Complaint**").

## PRELIMINARY STATEMENT

There is a simple basis on which this Court should dismiss the claim against Khronos that does not require the Court to sort through the issues of actual knowledge or willful blindness: the Amended Complaint utterly fails, as a matter of law, to identify the subsequent transfers at issue with the specificity required.  The Trustee concedes that he must plead the "vital statistics" of the transfers and that he must trace the transfers to BLMIS customer property.   In the Trustee's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint (the "**Opposition**"), he claims to have met that standard, but it is clear that he has not. The Amended Complaint fails to identify any specific transfer to Khronos on any specific date in any specific amount and makes absolutely no effort to indicate the account from which any such transfer was made or to otherwise tie any such transfer to BLMIS customer property.  Further, the Trustee's Opposition skates over the fact that there is no excuse for this lack of specificity given that he subpoenaed and received documents from Khronos in 2010, in connection with his drafting of the initial complaint in this action.  On the basis of this argument alone, the claim against Khronos should be dismissed.

In the event that the Court proceeds beyond that point to consider the actual knowledge and willful blindness issues, analysis of those issues also leads to the same result: dismissal of the claim against Khronos.  In key respects, the Amended Complaint is not supported – indeed, is contradicted – by the very documents on which the Trustee purports to rely.  The Trustee's Opposition then further obscures the facts, because it takes off into flights of conclusory

characterizations that are untethered to specific, factual allegations in the Amended Complaint. The Court's task on this motion to dismiss is first to trim back all of the overgrowth, such that all that remains for consideration are the factual allegations of the Amended Complaint that are not contradicted by the documents relied on by the Trustee.  And then, looking at those factual allegations alone, the key question before the Court is whether those allegations are enough to support a plausible inference that Khronos actually knew of, or was willfully blind to, the BLMIS Ponzi scheme.  In answering those questions, this Court's decisions in *Merkin II* and *Kingate* (the latter decided after Khronos filed its motion to dismiss) are instructive and lead easily to the conclusion that the factual allegations at issue are insufficient to plausibly support the inferences of actual knowledge and willful blindness urged by the Trustee.

Key allegations in the Amended Complaint are contradicted by facts contained in the very documents purportedly relied on by the Trustee in drafting his complaint.  For example, the overarching theme of the Trustee's Amended Complaint is that Khronos must have known of the BLMIS Ponzi scheme because Renaissance supposedly knew of the scheme, and Rafael Mayer of Khronos sat on the investment committee for Meritage, a Renaissance fund.  But, as explained in Khronos' opening brief, the facts do not support the inference that Renaissance knew of the Ponzi scheme (let alone Khronos), and Renaissance itself told the SEC, on numerous occasions in transcripts from interviews selectively relied on by the Trustee, that it did not know BLMIS was a fraud.  In his Opposition, the Trustee does not dispute that this is what Renaissance itself said about its own state of knowledge.  Rather, the Trustee calls Renaissance's credibility into question, contending that Renaissance's statements to the SEC about its lack of knowledge were self-serving, after-the-fact mischaracterizations.  Opp'n 29-30.  In other words, the Trustee's attempt to draw inferences against Khronos requires the Trustee to attack the credibility of the

2

very evidence on which he relies and to argue that Renaissance did not mean what it told the SEC. *See, e.g.*, Am. Compl. ¶¶ 76-78. This picking and choosing, stretching and twisting of the underlying facts show that the Trustee cannot plausibly support his claim against Khronos. Similarly, the Trustee's throw-everything-against-the-wall-to-see-what-sticks approach shows his failure to sort through the facts to see what legitimately can be tied to Khronos. For example, an email that is critical to the Trustee's allegations was never sent to Rafael Mayer or to anyone else alleged to be affiliated with Khronos or Legacy. The Trustee's Opposition simply ignores this point made in Khronos' opening brief.

Had the Amended Complaint accurately summarized the relevant facts, the true picture that would emerge is a familiar one: in response to questions about BLMIS that were raised at certain Renaissance meetings attended by Rafael Mayer in his capacity as a member of the investment committee for a Renaissance fund, Khronos engaged in a due diligence process that led it to the view that BLMIS was operating a legitimate and highly regulated securities business and that fraud was not a concern. Khronos had no special relationship with or access to Mr. Madoff or BLMIS (and the Trustee does not contend that it did). Following Khronos' due diligence efforts on behalf of Legacy, which were necessarily limited by Khronos' lack of access to BLMIS information, Legacy, like so many other victims of the BLMIS fraud, decided to remain invested in BLMIS and, ultimately, in December 2008, learned that it was a victim of that fraud.

The purpose of this motion to dismiss, of course, is not to determine what version of events is ultimately true. Rather, it is to put the Trustee to the test at the threshold of the case, before more legal fees are expended and heavier discovery burdens imposed. Because the Trustee has failed to plausibly support his claim against Khronos, the claim should be dismissed

3

with prejudice, and Khronos should not be further subjected to the serious burdens and reputational harm caused by the cloud of this pending litigation.[1]

## ARGUMENT

## I.    THE TRUSTEE HAS FAILED TO PLEAD KHRONOS IS A SUBSEQUENT TRANSFEREE OF AN INITIAL TRANSFER

The Amended Complaint simply fails to allege sufficient facts to state a claim against Khronos as a subsequent transferee.   The Trustee's attempt to differentiate his barebones allegations against Khronos in the Amended Complaint from allegations that were found to be deficient in cases cited in Khronos' motion to dismiss (Opp'n 35-36) is undermined by a simple comparison of the allegations in those cases and those here.   Contrary to the Trustee's contention that those cases are inapposite, those cases, in fact, make clear that this Court should dismiss the Trustee's subsequent transfer claim for failing to allege the required "vital statistics."

The Amended Complaint contains a mere five paragraphs setting forth factual allegations regarding supposed subsequent transfers to Khronos, all of which fail to provide the vital statistics required to put Khronos on notice of which transfers are the subject of the claim:

> 147.    Upon information and belief, a portion of the Transfers was subsequently transferred either directly or indirectly to Khronos ("the Subsequent Transfers").

> 148.    From at least 2004, Khronos served as investment manager for Montpellier Resources, a fund that placed investments into Legacy Capital, and received a monthly fee equal to 1.2% of Montpellier

---

[1]    The Trustee fails to offer any response to Khronos' argument that the claims in the Amended Complaint should be dismissed with prejudice.  Accordingly, the Trustee has waived that point.  *See, e.g., Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997), *aff'd*, 130 F.3d 1101 (2d Cir. 1997) ("[U]nder New York state law, the failure to provide argument on a point at issue constitutes abandonment of the issue."); *Gorfinkel v. Ralf Vayntrub, Invar Consulting Ltd.*, No. 13-CV-3093 (PKC), 2014 WL 4175914, at *4 (E.D.N.Y. Aug. 20, 2014) ("Plaintiff . . . waived any opposition with respect to [defendants'] argument [for dismissal] by failing to oppose the . . . motion [to dismiss] on that basis.").

DOCSNY-591655

Resources' net asset value, which it shared with HCH Capital.

149.    From 2004 to 2005, Khronos also received a performance fee of 5% of Montpellier Resources' new net investment profits.    Between 2006 and 2008, Khronos received a performance fee equal to 10% of Montpellier Resources' new net investment profits.

150.    For performing accounting services on behalf of Legacy Capital, Khronos received an annual fee of at least $42,000, paid monthly. Khronos also provided historical pricing services to Legacy Capital, for which it received one-time fees.    As of the end of 2004, Khronos received fees from Legacy Capital totaling $154,690.    Upon information and belief, Legacy Capital paid a total of $319,190 to Khronos for providing accounting services.

151.    The Subsequent Transfers, or the value thereof, were and remain Customer Property and are recoverable from Khronos under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).    Based on the Trustee's investigation, the Subsequent Transfers total, upon information and belief, approximately $6,601,079.

Am. Compl. ¶¶ 147-151.  Rather than alleging the "who, what, where, and when" of any alleged transfers, the Amended Complaint vaguely alleges that "a portion of the Transfers" were subsequently transferred to Khronos and that Khronos received a series of fees from Legacy Capital and Montpellier Resources – without specifying how many such transfers allegedly occurred, when such transfers were made, the amount of any individual transfer, or from what account any transfers were made.  *Id.* ¶ 147.

As in *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC* (*In re Bernard L. Madoff*), 531 B.R. 439 (Bankr. S.D.N.Y. 2015), the allegations of subsequent transfers are deficient.  In that case, the Trustee alleged that three defendants were co-owners of two initial transferees, and "'[o]n information and belief, some or all of the Transfers were subsequently transferred by [the initial transferees] to [the three individual defendants].'" *Id.* at 473.  The claims were summarily dismissed as insufficient because they

5

lacked the "vital statistics" necessary to put defendants on notice of the what, where, and when of any specific transfer. Similarly, the Amended Complaint alleges that "[u]pon information and belief, a portion of the Transfers was subsequently transferred either directly or indirectly to Khronos" and fails to further specify *what* portion of the transfers was subsequently transferred to Khronos, *when* such transfers occurred, and the *amount* of such transfers. Am. Compl. ¶ 147. This is precisely the deficiency that led to dismissal in *In re Bernard L. Madoff*, 531 B.R. 439.

On the other hand, the Court's holding in *Picard v. Merkin (In re Bernard L. Madoff Investment Securities LLC)*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin II*") – where the Trustee's allegations about subsequent transfers were sufficient – further emphasizes the inadequacies of the Amended Complaint. In *Merkin II*, the Trustee listed the alleged subsequent transfers in two tables attached as exhibits to the complaint. *Merkin II*, 515 B.R. at 150. The exhibits set forth specific transfers, the date of such transfers, the amount of each transfer, and to whom the funds were transferred. *Id.* This information not only enabled the court (and defendants) to ascertain the "who, what, where, and when" of the alleged subsequent transfers, but it further enabled the court to reasonably infer that the subsequent transfers were related to the initial transfer of BLMIS funds. *Id.* at 149-50. Alleging the date and amount of each subsequent transfer, as well as the dates and amounts of the initial transfers, allowed the court to infer that the short time between initial transfer and subsequent transfer evidenced a link between them. *Id.* at 150. On that basis, the court ruled that the Trustee had pled his claim. *Id.*

Here, in contrast, the Trustee's pleading of the alleged subsequent transfers is deficient in all respects. He has not pled the dates of each alleged subsequent transfer. He has not pled the amount of such transfers. And he has not pled sufficient facts to link the supposed, unidentified subsequent transfers to BLMIS funds. Instead, the Trustee has alleged only that Khronos

6

received certain fees from Legacy Capital and Montpellier Resources over the course of six years and further alleged, in a conclusory manner, that such fees are BLMIS customer property, without even explaining to which transfers the Trustee is referring.  Am. Compl ¶¶ 147-150.

While all of the alleged subsequent transfers are insufficiently pled, the Amended Complaint's defects are even more glaring when it comes to those transfers allegedly made from Montpellier Resources to Khronos.  The Amended Complaint does not tie any alleged fee received by Khronos to BLMIS funds, and makes no effort to allege what percentage of Montpellier's overall investment portfolio, which relied upon a "diversified portfolio of alternative investment strategies," was invested with Legacy.  *See* Declaration of Eric B. Fisher in Support of Khronos LLC's Motion to Dismiss the Amended Complaint under Bankruptcy Rule 7012(b) and Federal Rule of Civil Procedure 12(b)(6), dated July 30, 2015 (the "Fisher Declaration") Ex. B, at 1.  Thus the Trustee's allegation that Khronos received fees based upon a percentage of Montpellier Resources' total portfolio cannot possibly support a subsequent transfer claim due to the Trustee's failure to even attempt to tie some portion of those fees to BLMIS customer property.

Similarly, with respect to the alleged transfers from Legacy to Khronos, the Amended Complaint pleads no facts whatsoever about the source of funds from which Legacy paid the accounting services fee to Khronos.  For example, the Amended Complaint acknowledges that Legacy Capital entered into a credit agreement with BNP Paribas – Dublin Branch ("**BNP**") for a $100 million line of credit secured by the Legacy Capital Account.  Am. Compl. ¶ 140.  Yet, the Amended Complaint fails to plead, as it must, that the source of funds was BLMIS customer property, as opposed to, for example, money loaned to Legacy by BNP.

7

In his Opposition, the Trustee attempts to excuse and justify these pleading deficiencies by claiming that the allegations of the Amended Complaint are similar to those in *Merkin II*, and that it is unnecessary, at the pleading stage, to "connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS . . . ." Opp'n 37-38 (quoting *Merkin II*, 515 B.R. at 150). But the Trustee's argument misses the mark. As discussed above, *Merkin II* set forth detailed allegations regarding each individual transfer and related subsequent transfer. *Merkin II*, 515 B.R. at 149-50. From this, the court plausibly linked the initial transfers of BLMIS funds to the subsequent transfers made shortly after. *Id.* ("Given the short amount of time between the first and second transfers, it is reasonable to infer in considering a motion to dismiss that some portion of the first transfer formed part of the second transfer.") Here, however, the Court can make no such link, not only because the Amended Complaint fails to allege the "who, what, where, and when" of the subsequent transfers, but also because the Amended Complaint does not tie any portion of the alleged transfers from Legacy or Montpellier Resources to BLMIS funds.

## II.  THE CLAIM AGAINST KHRONOS SHOULD BE DISMISSED BECAUSE THE TRUSTEE HAS FAILED TO PLEAD KHRONOS' LACK OF GOOD FAITH

In the event that this Court goes beyond the independently sufficient argument set forth in Point I above to consider the issues of willful blindness, it is clear that the claim against Khronos also should be dismissed for the additional reason that the Trustee has failed to plead that Khronos lacked good faith. Indeed, the Trustee concedes that for the claim against Khronos to survive, "the Trustee must plead that Defendants willfully blinded themselves to Madoff's fraud" and further acknowledges that this represents a "heightened burden for pleading the defendants' lack of good faith." Opp'n at 21, 26 (citing the *Good Faith Decision* at 24). The Trustee has failed to satisfy this pleading standard.

8

### A.    THE ALLEGATIONS IN THE AMENDED COMPLAINT DO NOT SUPPORT THE INFERENCES URGED BY THE TRUSTEE

The Amended Complaint fails to offer a plausible account to support the baseless contention that Khronos knew of, or was willfully blind to, the BLMIS fraud.  In setting up Renaissance as the narrative foil to Khronos, the Amended Complaint essentially contends that Renaissance knew BLMIS was a fraud and got out of the investment for that reason; while Khronos, supposedly based on the same information, knew that BLMIS was a fraud, but maintained its investment.  The Trustee's effort to state a claim breaks down completely when one tries to tie that story to the facts actually alleged in the Amended Complaint and contained in documents relied on by the Trustee in drafting the Amended Complaint.

First, Renaissance itself has said on numerous occasions that it did not know that BLMIS was a fraud.  Seven instances in which Renaissance personnel stated that they did not know that BLMIS was a fraud are set forth at pages 9-10 of Khronos' opening brief.  The Trustee's Opposition barely addresses those statements by Renaissance, except to superficially dismiss them notwithstanding that the Trustee relies on other portions of those same SEC transcripts in the Amended Complaint.  Am. Compl. ¶¶ 76-78.

Second, Renaissance did not get out of the BLMIS investment because it was a fraud. The Trustee's causal inference does not make temporal sense, because, as alleged in the Amended Complaint, Renaissance withdrew its investment in stages and many months after allegedly discovering that BLMIS was a fraud.  Am. Compl. ¶¶ 138-139.  As Nathaniel Simons of Renaissance told the SEC: if you "think that there's a possibility of fraud. . . . [Y]ou don't leave half your capital at risk."  Fisher Decl. Ex. E, at 41:17-19 (RE00000197).  In other words, Renaissance did not conclude that BLMIS was a fraud.  Moreover, Renaissance itself has expressly stated that its reasons for withdrawing from BLMIS had nothing to do with any

DOCSNY-591655

supposed discovery that it was a fraud. *Id.* Ex. G at 157 ("Renaissance stated they initially reduced their investment by approximately one half and later got out of the investment entirely for unrelated reasons."). The Trustee's Opposition altogether fails to even grapple with these facts.

Third, contrary to the Trustee's contention, Khronos was not privy to all of Renaissance's communications about BLMIS. For example, in his Opposition, the Trustee quotes from a November 21, 2003 Renaissance email at even greater length than he does in the Amended Complaint. Yet, as is clear from the email and as Khronos pointed out in its opening brief, Rafael Mayer of Khronos did not receive this email; nor did anyone else alleged to be affiliated with Khronos or Legacy. The Opposition fails to address this point.

Fourth, the Amended Complaint does not plead any facts to support the conclusion that Khronos subjectively believed BLMIS to be a Ponzi scheme. The Trustee's only attempt to even suggest that Legacy or Khronos behaved in some way that exhibits subjective awareness of wrongdoing by BLMIS is the unsupported allegation that Rafael Mayer and David Mayer restricted access to Legacy's account statements. In the Amended Complaint, this assertion is irresponsibly pled "upon information and belief," and, in its Opposition, the Trustee provides no support for the allegation whatsoever. This unsupported allegation should not be credited by the Court for purposes of deciding this motion because it is contradicted by the Amended Complaint itself, which acknowledges that Legacy supplied its account statements to Renaissance to assist Renaissance with its analysis of BLMIS. *See* Am. Compl. ¶ 71. Further, as an audited entity, Legacy's account statements were supplied to its auditors, established accounting firms with hundreds of offices worldwide, as well as to its bankers at one of the world's largest banks. And, in connection with BNP's decision to lend against Legacy's account statements, obviously BNP

10

reviewed those statements. Thus, the notion that Khronos maintained secrecy around Legacy's account statements is nonsense and is not a fact that this Court should accept for purposes of deciding this Motion. In any event, even if the allegation were to be treated as true for purposes of this Motion only, this vague, attenuated allegation hardly demonstrates that Legacy or Khronos subjectively believed that BLMIS was a Ponzi scheme.

The Amended Complaint (and the Trustee's Opposition) contain a litany of red flags that have become well known to the public in retrospect, well after Madoff's fraud was exposed. Throughout, the Amended Complaint recites these now well-known red flags and then concludes that Khronos knew of these red flags, and thus knew BLMIS was a Ponzi scheme, in 2003-2004 because Khronos analyzed Legacy's account statements at that time. But the Trustee utterly fails to plead any facts (as opposed to mere conclusions) to show that any analysis conducted by Khronos actually led Khronos to the view that BLMIS was a Ponzi scheme. With the benefit of hindsight, many BLMIS investors could now scrutinize their historic statements and note these same red flags. The point is that, at the time, most investors and investment managers, like Khronos, did not understand these red flags to indicate that BLMIS was a Ponzi scheme. Other than unsupported conclusions, the Amended Complaint, when scrutinized carefully, fails to allege any facts to plausibly support an inference that Khronos connected the dots between any red flags and the fact that BLMIS was a Ponzi scheme.[2]

Finally, the Trustee fails to make any plausible sense of his notion that Legacy would remain in the BLMIS investment after Khronos supposedly discovered the BLMIS fraud.

---

[2]    The Trustee's Opposition provides a laundry list of these red flags at pages 10 through 19 of his Opposition. While this list adds pages to the Trustee's Opposition, his failure to tie these red flags to any subjective conclusion by Khronos that Madoff was a Ponzi scheme renders them irrelevant to the claim against Khronos.

DOCSNY-591655

According to the Amended Complaint, Khronos supposedly discovered the BLMIS fraud back in late 2003 or early 2004 as the result of allegedly extensive due diligence efforts – not due to any kind of special access to BLMIS, Madoff or any of his co-conspirators. There is no contention that Khronos received enhanced fees or had any other kind of special incentive to maintain investments with BLMIS. Why in the world then would Khronos advise funds to stay invested with BLMIS, if it had managed to ferret out that BLMIS was really a Ponzi scheme? The Amended Complaint does not even attempt to offer a plausible answer to this basic question. It makes no sense to assert, as the Trustee does, that Khronos would continue to expose investors to the extraordinary risks of investing in a fraudulent scheme, when it had no incentive to do so. *See, e.g., Comfort Inn Oceanside v. Hertz Corp.*, No. 11-CV-1534, 2011 WL 5238658, at *4 (E.D.N.Y. Nov. 1, 2011) (noting that in deciding a motion to dismiss, a "court should draw on its 'judicial experience and common sense' in evaluating sufficiency of pleadings") (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)).

Considering only the facts alleged and those found in documents relied on by the Trustee a competing, compelling narrative emerges: Khronos became aware of certain of the red flag concerns identified by Renaissance. It followed up on those red flags, concluded, like so many other victims, that BLMIS was a highly regulated, SEC-registered broker-dealer engaged in a legitimate securities business, and, accordingly, maintained Legacy's investment in BLMIS. Khronos' conclusions about BLMIS were reinforced by BNP's decision to lend to Legacy with only Legacy's BLMIS account as collateral for the loan. BNP's willingness to lend against the BLMIS account was significant to Khronos because BNP, due to its size and sophistication, had far superior access to information about BLMIS.

12

In sum, the case against Khronos is not special. Khronos is just another BLMIS victim that was deceived into believing that such a highly regulated and well regarded lion of Wall Street could not possibly be engaged in an undetected fraud on such a massive scale. This competing narrative is plausible -- indeed, it is what happened. In contrast, the tale spun by the Trustee in the Amended Complaint rests on implausible inferences from factual distortions.

**B.    THE TRUSTEE HAS FAILED TO PLEAD WILLFUL BLINDNESS AND KHRONOS' GOOD FAITH IS A COMPLETE DEFENSE TO THE FRAUDULENT TRANSFER CLAIMS**

Willful blindness requires two elements: (1) Khronos' subjective belief that there is a high probability of the BLMIS Ponzi scheme; and (2) deliberate actions by Khronos to avoid learning of the BLMIS fraud. *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 516 B.R. 18, 21 (S.D.N.Y. 2014); *Merkin II*, 515 B.R. at 139 (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)). The Trustee has failed to meet both elements of the willful blindness heightened pleading standard, and, accordingly, the Trustee has not pled Khronos' lack of good faith, as it is required to do.[3]

**1.    The Trustee Has Failed To Meet His Burden Of Pleading Khronos Subjectively Believed Madoff Was Operating A Ponzi Scheme**

In order for the Trustee to plead Khronos' lack of good faith, he must do so pursuant to a *subjective* standard – rather than an objective one – "because the securities laws do not ordinarily impose any duty on investors to investigate their brokers, [and] those laws foreclose any interpretation of 'good faith' that creates liability for a negligent failure to so inquire." *Merkin*

---

[3]    The good faith defense for a subsequent transferee also requires that the transfer be taken "for value." *See Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 90 (2d Cir. 2014); *see also* Mot. Dismiss at 17. In his Opposition, the Trustee does not contest, and thus appears to concede that Khronos gave value for the subsequent transfers it purportedly received based on its role as investment manager to Montpellier and pursuant to the Accounting Services Agreement between Khronos and Legacy.

13

*II*, 515 B.R. at 138 (quoting *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012)).   The

Trustee attempts to dilute the applicable standard by discussing, at length, "[t]he objective

impossibilities and indicia of fraud alleged by the Trustee" in the Amended Complaint (Opp'n

27), but the Trustee's hindsight analysis of these "impossibilities," without more, simply cannot

– and does not – meet this subjective standard.[4]

As an initial matter, in determining whether the Trustee has met this purely "subjective"

test, it is crucial to distill what information was – and was not – communicated to Rafael Mayer

and Khronos.  For example, the Trustee cites to a November 21, 2003 email from Renaissance

employee Paul Broder, discussing unexplained options trading by BLMIS; but in the email,

Broder specifically states that he has "kept this note to a restricted circulation," and neither

Rafael Mayer nor Khronos received that email.  *See* Fisher Decl. Ex. D (RE00000240); Am.

Compl. ¶¶ 62-64.  Not surprisingly, the Trustee failed to address this issue in his Opposition;

instead the Trustee baldly states that "[b]oth of [the] conclusions [in the November 21 email]

were communicated to Rafael Mayer" – but *fails to cite to anything* in the Amended Complaint,

or any other document, to support the statement in his Opposition.  Opp'n 15; *see also id.* at 8

(falsely stating, with no support, that Rafael Mayer sent an email "[r]esponding to Broder's

[November 21, 2003] analysis").

---

[4]     Not surprisingly the Trustee attempts to rely on cases outside of the BLMIS context to loosen the standard; but this ignores the *Good Faith Decision* and other BLMIS cases decided thereafter that have set forth the appropriate standard for this Court to consider.  Opp'n 28-29; *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 404-05 (S.D.N.Y. 2010) (discussing the standard for proving scienter in a federal securities fraud case through "conscious recklessness"); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 408-10 (S.D.N.Y. 2010)(discussing scienter in a federal securities fraud action and specifically noting, as to one defendant, that his "passive role" in being "a recipient of emails written by others demonstrating a disturbing lack of information" was "not enough to cross over the threshold into scienter").

14

Further, the Amended Complaint lacks any specific allegations concerning Khronos'

subjective belief that Madoff was running a Ponzi scheme, nor does the Trustee point to facts

known by Khronos that raised a "high probability that BLMIS was a fraudulent operation." *See,*

*e.g.*, *Merkin II*, 515 B.R., at 141. Instead, the Trustee has pled facts indicating Renaissance's –

but not Khronos' – concerns over BLMIS. In the first instance, it is important to isolate exactly

what Renaissance was concerned about because, as the documents make clear, the concerns had

nothing to do with whether Madoff's operation was a Ponzi scheme. For example, the Trustee

cites a November 13, 2003 email from Nathaniel Simons, in which Renaissance questions

various aspects of the BLMIS strategy; however, the email expresses an underlying belief that

there are, in fact, trades taking place at BLMIS. Indeed, a key source of this information is from

an ex-Madoff *trader*, who was applying for a job at Meritage, and said that Madoff "cherry-picks

trades" – clearly implying that trading was taking place, not that Madoff was running a Ponzi

scheme, or was a fraudulent operation with no trading activity. In addition, the Trustee

repeatedly quotes the portion of the email regarding the statement that "Madoff's head would

look pretty good above Elliott Spitzer's mantle" (*see, e.g.*, Am. Compl. ¶ 110; *see also* Fisher

Decl. Ex. F), but fails to place this comment in its proper context. The email specifically

referenced the "Mutual Fund story" that broke and heightened Broder's concerns; the "Mutual

Fund story," which broke in September 2003, involved "late trading," or the purchase of mutual

fund shares after the markets had closed, at the closing price for that day.[5] Moreover, the email

---

[5]      *See* Landon Thomas Jr., *S.E.C. Putting Mutual Funds Under Scrutiny On Late Trading, N.Y. Times* (Sept. 5, 2003), available at http://www.nytimes.com/2003/09/05/business/sec-putting-mutual-funds-under-scrutiny-on-late-trading.html; *2003 Mutual Fund Scandal*, Wikipedia (April 11, 2015, 16:18), http://www.wikipedia.org/wiki/2003_mutual_fund_scandal (describing then New York Attorney General Eliot Spitzer's investigation into mutual fund timing scandal). The Court can take judicial notice of "press coverage establishing what information existed in the public domain during periods relevant to

15

is completely silent as to Rafael Mayer's or Khronos' subjective view of this information from a "potentially disgruntled," former Madoff trader.

Similarly, the Trustee's overreaching conclusion that the Renaissance Proposal "led to the inexorable conclusion that Madoff could not be trading as the Legacy Capital Account statements purported" is unsupported by the actual document. Opp'n 5. The Renaissance Proposal summarized Madoff's strategy as follows:

> Madoff makes a third of his money buying a basket of stocks that are very strongly correlated with the OEX index at a great fill price (relative to the close price) and then putting on a collar with a small spread at essentially no cost. Additional profit comes from the stocks gain between the bought put and sold call strike price or possible mispricing between the stock basket and options. Finally, good sell prices (relative to the close) and TBills make up the rest of the returns.

Fisher Decl. Ex. C (RE00004139). The "proposal" involved trying to replicate the perceived BLMIS strategy through "a combined research and production experiment where we actually trade a modest portfolio" to "further understand the Madoff strategy." *Id.* at RE00004180. This document is far from an "inexorable conclusion" that Madoff was a fraud and was not trading as reflected in the Legacy account statements. Indeed, the very premise of the Renaissance Proposal is that BLMIS was actually involved in trading securities.

Finally the Trustee's reliance on a December 2003 e-mail from Rafael Mayer "listing concerns" regarding Madoff also does not manifest any "red flags" of a possible Ponzi scheme. *See* Am. Compl. ¶ 59; Opp'n 8-9. Rather, the email, which involves sarcastic interpolations by a

---

[a party's] claims." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

16

Renaissance employee and is thus hard to follow, discusses "open issues for research" and largely focuses on anomalies regarding the volume and pricing of Madoff's option strategies.

The Trustee – faced with suspicions that do not rise to the level of "red flags" that "suggest a high probability of fraud" – attempts to turn the willful blindness standard on its head by suggesting that "even if Defendants 'only' believed BLMIS was engaged in illegal front-running," that would still be enough to satisfy the willful blindness standard in this case. Opp'n 30. The appropriate analysis, however, is whether Khronos had actual knowledge of, or was willfully blind to a *fact*. *See, e.g.*, *Merkin II*, 515 B.R. at 139 ("[t]he line between 'actual knowledge' and 'willful blindness' is difficult to draw. 'Knowledge' is '[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact,' or 'the fact or condition of knowing something with a considerable degree of familiarity gained through experience of or contact or association with the individual or thing so known.'" (internal citations omitted). We all now know that the Madoff fraud was a Ponzi scheme. The fraud did not involve front running or illegal market timing. Thus, even if Khronos had suspicions of "front running" (which we certainly do not concede it did), Khronos cannot be held liable for being "willfully blind" to a fact that is not true. *See generally Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC (In re Madoff Securities)*, No. 12 MC 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) (the "*Actual Knowledge Decision*") (issue is whether defendant knew that "there were no actual securities transactions being conducted" by BLMIS).[6]

---

[6]     In support of his argument, the Trustee relies on a string of criminal cases addressing the "conscious avoidance" doctrine, which applies when "knowledge of the existence of a particular fact is an element of" a criminal offense. Opp'n 28, 30-31. The cases he relies on are inapposite, ignore the appropriate standard articulated with respect to SEC-registered brokers, like BLMIS, and have no application to this Motion. *See, e.g.*, *United States v. Nektalov*, 461 F.3d 309, 315-16 (2d Cir. 2006) (jury

17

In order for the Trustee to prevail, he must plead and "prov[e] that [Khronos] willfully blinded [itself] to Madoff Securities' fraud." *Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y. 2011); see also *Good Faith Decision*, 516 B.R. at 23. The Trustee has failed to plead that Khronos lacked good faith due to a subjective belief that Madoff was running a Ponzi scheme; accordingly, the claim against Khronos should be dismissed.

> **2.      The Trustee Has Failed To Plead That Khronos Took Deliberate Steps To Avoid Learning Of Madoff's Scheme And Concedes That Khronos Undertook Extensive Diligence Efforts In Response To Red Flags That Were Raised**

In addition to its failure to plead facts regarding Khronos' subjective understanding of the alleged "red flags," the Amended Complaint should also be dismissed because the Trustee has not pled the second element of willful blindness: that Khronos took "deliberate actions to avoid learning of [the] fact" of Madoff's fraudulent scheme. *Merkin II*, 515 B.R. at 139.[7] The Trustee alleges that "[i]n January 2004, Legacy Capital retained Khronos to conduct an ongoing

---

instruction on the doctrine of conscious avoidance was appropriate in a money laundering sting operation where defendant was taped in conversations being told that some "product," or "stuff" was being brought into this country from Colombia and sold "in the streets," but claimed he did not know this referred to drug trafficking); *United States v. Joly*, 493 F.2d 672, 674 (2d Cir. 1974) (conscious avoidance jury instruction was appropriate where the defendant was convicted of importing cocaine and possessing it illegally, arrived at customs with a "bulge" in his waistline, but claimed that "he thought he was doing something wrong but he really didn't know what it was"); *United States v. Perez-Padilla*, 846 F.2d 1182, 1183 (2d Cir. 1988) (conscious avoidance instruction warranted where defendant testified that he knew the package in his suitcase contained something illegal "but thought it was jewelry or a weapon, not drugs"); *United States v. Bailey*, 955 F.2d 28, 29 (8th Cir. 1992) (conscious avoidance instruction appropriate where defendant claimed that he wrongly believes he was carrying a package containing counterfeit money, not drugs, and the package contained "large, hard objects, hardly similar to stacks of currency"); *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) (conscious avoidance instruction appropriate where illegality of a transaction was evident from, *inter alia*, "the secret side agreements, the fake offer letter, [and] the accounting pretext for the reinsurance transaction.").

[7]      The decisions in *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010) ("*Merkin I*") and *Merkin II* are readily distinguishable from the facts of this case. For example, the Trustee alleged that Merkin "completely dominated" the investment advisor defendant, GCC, and was the sole general partner of Gabriel and Ariel, the two funds with BLMIS accounts. *Merkin I*, 440 B.R. at 251. Further, Merkin and Madoff enjoyed an "unusually close business and social relationship." *Id.* at 253*; see also Merkin II*, 515 B.R. at 128. The Amended Complaint makes no similar allegations with regard to Rafael Mayer, Khronos or Legacy.

18

quantitative analysis of the Legacy Capital Account statements and trade confirmations."  Opp'n

9.  Indeed, the Trustee concedes that, unlike *Merkin II*, here, the Defendants "'made efforts to try

and understand the BLMIS trading strategy,' including tracking pricing and volume statistics,

screening investments to evaluate fit [sic] with the portfolio, evaluating the adequacy of

BLMIS's accounting and back-office practices, and reviewing trade confirmations and monthly

account statements corresponding to Legacy Capital's BLMIS account.  The facts here do not

present a 'picture of someone who saw red flags and ignored them,' but rather a picture of

individuals and entities who took steps to analyze and understand every fictitious trade."  *Id.* at

23.  On this basis alone, Count I of the Amended Complaint should be dismissed for failure to

allege willful blindness.

In arguing that, notwithstanding Khronos' due diligence efforts, Khronos was willfully

blind because "there were no plausible alternatives to the manifold impossibilities and indicia of

fraud" (Opp'n 33), the Trustee is blatantly attempting to revert back to the "inquiry notice

approach" that has been soundly rejected, numerous times, in prior decisions by the district court

as "unfair" and "unworkable."  *Good Faith Decision*, 516 B.R. at 22; *see also Picard v. Katz*,

462 B.R. at 455.  Indeed, in adopting the willful blindness standard, "this Court rejected the

Trustee's alternative 'inquiry notice approach,' under which a transferee may be found to lack

good faith 'when the information the transferee learned would have caused a reasonable person

in the transferee's position to investigate the matter further."  *Good Faith Decision*, 516 B.R. at

21.  While under the "inquiry notice approach," a "failure to further investigate constitutes lack

of good faith unless even diligent inquiry would not have unearthed the fraud" – this is *not* the

"willful blindness" test by which Khronos' diligence efforts must be measured.  *See Picard v.*

*Katz*, 462 B.R. at 455.  In rejecting the Trustee's inquiry notice approach, the court recognized

DOCSNY-591655

that such an approach would "impose a burden of investigation on investors totally at odds with the investor confidence and securities market stability that SIPA is designed to enhance." *Good Faith Decision*, 516 B.R. at 22.

The Trustee concedes that, in the face of "red flags," Khronos did *not*, as was alleged in *Merkin II*, take "deliberate actions to avoid learning the truth about BLMIS," but rather launched an investigation to try and delve into the concerns that had been raised. These facts cannot possibly support an inference of "willful blindness."

## III.  THE TRUSTEE HAS FAILED TO PLEAD THAT KHRONOS HAD ACTUAL KNOWLEDGE OF THE PONZI SCHEME

As set forth above in Section I, the vital statistics of the alleged unidentified subsequent transfers to Khronos are so poorly pled that it is impossible to discern from the Amended Complaint whether any such transfers occurred more than two years before the Filing Date. However, one thing *is* exceedingly clear from the Amended Complaint: the Trustee has failed to plead that Khronos had "actual knowledge" of Madoff's Ponzi scheme and thus should be barred from recovering any subsequent transfers that occurred more than two years before the Filing Date, pursuant to the safe harbor in section 546(e) of the Bankruptcy Code. The conclusion that the Trustee has failed to plead actual knowledge of the Ponzi scheme follows *a fortiori* from the Trustee's failure to satisfy the somewhat lesser standard of willful blindness. Khronos incorporates by reference, as if fully set forth herein, the argument set forth in Legacy Capital Ltd.'s Reply Memorandum of Law in Further Support of its Motion to Dismiss the Amended Complaint Under Bankruptcy Rule 7012(b) and Federal Rule of Civil Procedure 12(b)(6), at 8-11.

20

## CONCLUSION

For the foregoing reasons, Khronos respectfully requests that the Court dismiss the claim

against Khronos, with prejudice, and grant such other and further relief as is just and proper.

Dated: New York, New York
        September 18, 2015

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

By: /s/ Eric B. Fisher
        Eric B. Fisher
        Barry N. Seidel
        Lindsay A. Bush
1633 Broadway
New York, New York 10019-6708
(212) 277-6500
(212) 277-6501 (fax)
fishere@dicksteinshapiro.com
seidelb@dicksteinshapiro.com
*Attorneys for Defendant Khronos LLC*

21