**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Oren J. Warshavsky
Timothy S. Pfeifer
Keith R. Murphy
Geraldine Ponto
Michelle R. Kaplan

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>            Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>            Defendant. | No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>            Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>            Plaintiff,<br><br>v.<br><br>FEDERICO CERETTI, CARLO GROSSO, KINGATE GLOBAL FUND, LTD., KINGATE EURO FUND, LTD., KINGATE MANAGEMENT | Adv. Pro. No. 09-1161 (BRL)<br><br>**THIRD AMENDED COMPLAINT** |

LIMITED, FIM ADVISERS LLP, FIM LIMITED,
CITI HEDGE FUND SERVICES LIMITED,
FIRST PENINSULA INDIVIDUALLY AND AS
TRUSTEES OF THE ASHBY TRUST, THE
ASHBY TRUST, ASHBY INVESTMENT
SERVICES LIMITED INDIVIDUALLY AND AS
TRUSTEES OF THE ASHBY TRUST, ALPINE
TRUSTEES LIMITED INDIVIDUALLY AND AS
TRUSTEES OF THE EL PRELA TRUST, PORT
OF HERCULES LTD. INDIVIDUALLY AND AS
TRUSTEE OF THE EL PRELA TRUST, EL
PRELA TRUST, EL PRELA GROUP HOLDING
SERVICES, ASHBY HOLDING SERVICES
LIMITED, AND EL PRELA TRADING
INVESTMENTS LIMITED AND HSBC BANK
BERMUDA LIMITED,

                    Defendants.

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated

estate of Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act, 15 U.S.C.

§§ 78aaa, *et seq*. ("SIPA"), by his undersigned counsel, under Rule 15 of the Federal Rules of

Civil Procedure for his Third Amended Complaint, states as follows:

## I.    FEDERICO CERETTI AND CARLO GROSSO FEED BLMIS THROUGH KINGATE

### Madoff's Ponzi Scheme

1.      As is now well-known, Madoff masterminded a Ponzi scheme of breathtaking

scale, scope, and duration.  For at least two decades before he confessed on December 11, 2008

(the "Filing Date"), Madoff stole approximately $20 billion from the customers of his fraudulent

brokerage BLMIS.

2.      Madoff did not invest any of the $20 billion that he stole.  Rather, he gave old

"investors" some of the money that new "investors" injected into his Ponzi scheme.

3.      By the Filing Date, BLMIS fabricated account statements for its nearly 4,900

customer accounts that purported to show approximately $65 billion invested with BLMIS.

These customer accounts, however, had not accrued any real profits because no investments had

ever been made.

4.    All Ponzi schemes must collapse eventually.  The world's supply of money is

finite.  Madoff, however, sustained his Ponzi scheme for so long with capital from around the

globe.  Madoff could not and did not accomplish this alone.

5.    The Trustee has identified a complex web of interconnected people and financial

institutions that solicited billions of dollars for BLMIS in Europe, Russia, the Middle East, and

elsewhere.  Defendants Federico Ceretti ("Ceretti") and Carlo Grosso ("Grosso"), Italian

nationals operating from England and reaching into continental Europe, were an important part

of Madoff's de facto global sales force.

6.    Both Ceretti and Grosso had close and long-lasting business and personal

relationships with Madoff.  Both regularly met with Madoff in New York and elsewhere for over

a decade.  Moreover, Ceretti and Grosso worked together with the principals of certain other

BLMIS "feeder funds" that also fed hundreds of millions into BLMIS.

7.    Like any sales force that sells only one product, Ceretti and Grosso fought with

these other feeder funds over territory and over what they earned off of Madoff's victims.

**Ceretti and Grosso**

8.    Ceretti and Grosso established and operated two large feeder funds that together

fed approximately $1.7 billion of other people's money into BLMIS:  Defendants Kingate Global

Fund, Ltd. ("Kingate Global") beginning in 1994, and its offshoot Kingate Euro Fund, Ltd.

("Kingate Euro") beginning in 2000 (together, the "Kingate Funds").  The Kingate Funds were

both 100 percent invested in BLMIS.

9.    As alleged fully herein, Ceretti and Grosso shielded the Kingate Funds from

outside scrutiny and, consistent with Madoff's pattern of secrecy, permitted no genuine due diligence.

10.    Since their inception, the Kingate Funds redeemed nearly a billion dollars from BLMIS under circumstances that put Ceretti, Grosso, the Kingate Funds (and, as set forth fully herein, certain of the other Defendants) on notice of fraudulent activity at BLMIS. These avoidable transfers to the Kingate Funds are Customer Property that must be returned to the estate.[1]

### Ceretti and Grosso Work with Tremont to Exploit European Capital

11.    In the early 1990s, Ceretti and Grosso were introduced to Madoff by Sandra Manzke ("Manzke"), a hedge fund manager then affiliated with Tremont (Bermuda) Limited ("Tremont") and a key player in feeding primarily U.S.-based capital into BLMIS.[2]

12.    Ceretti and Grosso sought to establish a BLMIS feeder fund that targeted primarily European investors. With the assistance of Manzke and Tremont, Ceretti and Grosso formed Kingate Global in 1994.

13.    Around the same time, Ceretti and Grosso created Kingate Management Limited ("Kingate Management") to act as "co-manager" of Kingate Global with Tremont. Manzke also acted as a vice-president of Kingate Global.

14.    Kingate Management, in fact, had only three employees who, as alleged fully herein, were unclear about the scope of their duties.

15.    Neither Kingate Management nor Tremont "managed" anything about the

---

[1] Under SIPA § 78*lll*, "The term 'customer property' means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account from a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."
[2] The Trustee has filed a separate action in this Court against Manzke and Tremont in adversary proceeding No. 10-5310.

Kingate Funds.

16.    Rather, Kingate Management and Tremont began taking fees for feeding

hundreds of millions of dollars of other people's money into BLMIS through the Kingate Funds.

17.    Initially, Ceretti and Grosso received a fee of 1 percent of the assets that they

introduced to the Kingate Funds.  Tremont would receive a 0.5 percent fee on these same assets.

Reciprocally, if Tremont introduced the assets to the Kingate Funds, it would receive the 1

percent fee and Kingate Management would receive the 0.5 percent fee.  This lucrative

arrangement lasted in several configurations for over a decade until the day Madoff confessed,

although Tremont's role diminished over time.

**Ceretti and Grosso Contrive to Insulate BLMIS and the Kingate Funds from Scrutiny**

18.    Ceretti and Grosso enriched themselves on the back of the Kingate Funds'

investors through Kingate Management and their other companies, Defendants FIM Limited and

its affiliate FIM Advisers LLP ("FIM Advisers" and together "FIM").

19.    Kingate Management and FIM (together, the "Management Defendants"), owned

(directly or beneficially) and controlled by Ceretti and Grosso, purported to "advise," "consult,"

and "manage" the Kingate Funds and received millions of dollars in management and consulting

fees simply for feeding money into BLMIS.

20.    The Management Defendants further purported to conduct "due diligence" on the

Kingate Funds, but no genuine due diligence took place.  Moreover, Ceretti and Grosso took

active measures to prevent any due diligence on BLMIS and the Kingate Funds.  Ceretti and

Grosso repeatedly and staunchly suppressed the concerns of investors (and even FIM employees)

regarding the lack of transparency of the Kingate Funds and BLMIS.  Ceretti and Grosso

expressly directed that no such diligence be performed.

21.    The Management Defendants collected hundreds of millions of dollars in fees

from investors in the Kingate Funds who were, of course, 100 percent invested in BLMIS.  Most

of this money went to Ceretti and Grosso personally.

### Citi Hedge Fails to Properly Examine BLMIS and the Kingate Funds

22.    Citi Hedge Fund Services Limited ("Citi Hedge") acted as the administrator for

the Kingate Funds.  Despite its commitment to do so, Citi Hedge failed to independently verify

the pricing information provided by Madoff.  Rather, it relied solely on information provided by

Madoff to calculate and disseminate the Kingate Funds' Net Asset Value ("NAV").

23.    Ceretti and Grosso, the Management Defendants, and Citi Hedge did not perform

any meaningful, substantive, or reasonable due diligence on the Kingate Funds or BLMIS's

operations, its returns, or the basis for its consistency.  As alleged fully herein, Ceretti, Grosso,

and the Management Defendants knowingly and purposely ignored countless red flags of

fraudulent activity at BLMIS.

24.    Ceretti, Grosso, the Management Defendants, and Citi Hedge consistently

disregarded the red flags raised by the BLMIS account statements, trade confirmations, market

activity, and external and internal sources that indicated BLMIS's fraudulent activity.  In fact,

many of the account statements and trade confirmations reviewed by Ceretti, Grosso, the

Management Defendants, and Citi Hedge reflected trades that were facially impossible.

25.    Every dollar received by Ceretti, Grosso, the Management Defendants, and Citi

Hedge is Customer Property and must be returned to the estate for equitable distribution.

### Ceretti and Grosso's Shell Companies

26.    Ceretti and Grosso also established and controlled a complex network of trusts

and shell companies to ensure that Ceretti and Grosso were the ultimate beneficiaries of the

monies collected by Kingate Management.

## Ceretti's Shell Companies

27.    Ceretti is the ultimate beneficiary of Defendant El Prela Trust ("El Prela Trust").

Ceretti set up and acted as principal for Defendant El Prela Trading Investments Limited, as

Trustee of El Prela Trust ("El Prela Trading"), Defendant Port of Hercules Trustees Ltd., as

Trustee of El Prela Trust ("Port of Hercules"), and Defendant Alpine Trustees Limited, as

Trustee of El Prela Trust ("Alpine Trustees").  Ceretti also created Defendant El Prela Group

Holding Services ("El Prela Group") as the holding company for these Ceretti entities.

28.    At least $87 million was transferred from Kingate Management into, and among,

bank accounts belonging to these entities since at least 2001.  These entities, on behalf of Ceretti

and Grosso, also actively bought and sold securities, including self-dealing in shares of Kingate

Global.

## Grosso's Shell Companies

29.    Grosso is the ultimate beneficiary of Defendant Ashby Trust ("Ashby Trust").

Grosso set up and acted as principal for Defendant First Peninsula, as Trustee of the Ashby Trust

("First Peninsula") and Defendant Ashby Investments, as Trustee of the Ashby Trust ("Ashby

Investments").  Grosso also created Defendant Ashby Holding Services Limited ("Ashby

Holding") as the holding company for these Grosso entities.

30.    At least $87 million was transferred from Kingate Management into, and among,

bank accounts belonging to these entities since at least 2001.  These entities, on behalf of Ceretti

and Grosso, also actively bought and sold securities.

31.    Together, the Ashby Trust, First Peninsula, Ashby Investments, Alpine Trustees,

Port of Hercules, El Prela Trading, El Prela Trust, El Prela Group, and Ashby Holding shall be

referred to as the "Ceretti and Grosso Shell Company Defendants."

32.    An organizational chart depicting the network of entities and shell companies

Ceretti and Grosso used to funnel funds from BLMIS to themselves is attached hereto as Exhibit C.

## II.    NATURE OF PROCEEDING

33.    BLMIS made avoidable and recoverable initial transfers to, or for the benefit of, the Kingate Funds in the amount of at least $975,541,729. A number of defendants received subsequent transfers in the form of fees, which are recoverable subsequent transfers. This action is brought to recover these avoidable transfers so that this Customer Property can be equitably distributed by the Trustee in accordance with his statutory authority.

34.    The Trustee brings this adversary proceeding under the statutory authority afforded to him by SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 502(d), 510(c), 544, 547, 548(a), 550(a), and 551 of Title 11, United States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270, et seq. (McKinney 2001)) ("DCL"), NY C.P.L.R. § § 203(g) and 213(8), and other applicable law, for avoidance and recovery of preferential transfers and fraudulent transfers, recovery of subsequent transfers, disallowance of customer claims, equitable subordination, unjust enrichment, conversion, and money had and received.

## III.    JURISDICTION AND VENUE

35.    This is an adversary proceeding commenced before the same Court before which the main underlying SIPA Proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al., No. 08-CV-10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

36.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).

37.    Venue in this district is proper under 28 U.S.C. § 1409.

IV.    **BACKGROUND**

38.    On the Filing Date, Madoff was arrested by federal agents for violation of the criminal securities laws, including, inter alia, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced a District Court Proceeding against Madoff and BLMIS.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.  The District Court Proceeding remains pending.

39.    On December 12, 2008 The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

40.    On December 15, 2008 under section 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of SIPC.  Thereafter, under section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

41.    Also on December 15, 2008 Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

      a.    appointed the Trustee for the liquidation of the business of BLMIS under SIPA section 78eee(b)(3);

      b.    appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA section 78eee(b)(3); and

      c.    removed the case to this Bankruptcy Court under section 78eee(b)(4) of SIPA.

By this protective Decree, the Receiver was removed as Receiver for BLMIS.

42.     By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

43.     At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned

United States v. Madoff, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No.

50), Madoff pleaded guilty to an eleven-count criminal information filed against him by the

United States Attorney's Office for the Southern District of New York.  At the Plea Hearing,

Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of

[BLMIS]."  Id. at 23.  Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I

was doing [was] wrong, indeed criminal."  Id.  On June 29, 2009 Madoff was sentenced to 150

years in prison.

44.     On August 11, 2009 a former BLMIS employee, Frank DiPascali, pled guilty to

participating in and conspiring to perpetuate the Ponzi scheme.  At a plea hearing on August 11,

2009 in the case entitled United States v. DiPascali, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug.

11, 2009), DiPascali pleaded guilty to a ten-count criminal information.  Among other things,

DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

Id. at 46.

## V.     THE TRUSTEE'S POWER AND STANDING

45.     As Trustee appointed under SIPA, the Trustee is charged with recovering and

paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other

assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process of

marshalling BLMIS's assets, and this liquidation is well underway.  However, the estate's

present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars

they invested with BLMIS over the years.  Consequently, the Trustee must use his broad

authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and fraudulent transfers to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

46.    Under SIPA section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under section 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

47.    Under SIPA sections 78fff(b) and 78lll(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

48.    The Trustee has standing to bring these claims under section 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because, among other reasons:

     a.    the Defendants received Customer Property;

     b.    BLMIS incurred losses as a result of the claims set forth herein;

     c.    BLMIS customers were injured as a result of the conduct detailed herein;

     d.    SIPC has not reimbursed, and statutorily cannot fully reimburse, all customers for their losses;

     e.    the Trustee will not be able to fully satisfy all claims;

     f.    the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

     g.    the Trustee is the assignee of claims paid, and to be paid, to customers of

BLMIS who have filed claim in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").  As of this date, the Trustee has received multiple, express unconditional assignments of applicable Accountholders' causes of action, which actions could have been asserted against Defendants.  As assignee, the Trustee stands in the shoes of persons who have suffered injury in fact and a distinct loss for which the Trustee is entitled to reimbursement in the form of monetary damages; the Trustee brings this action on behalf of, among others, those defrauded customers of BLMIS who invested more money in BLMIS than they withdrew;

h.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.    the Trustee has the power and authority to avoid and recover transfers under §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## VI.    **DEFENDANTS**

### A.    *The Masterminds*

49.    **Federico Ceretti:**  Ceretti is a resident of the United Kingdom and maintains an address at 37 Queens Gate Gardens, London, SW7 5RR, United Kingdom.

50.    **Carlo Grosso:**  Grosso is a resident of the United Kingdom and maintains an address at 22 Cathcart Road, London SW10 9NN, United Kingdom.

51.    Grosso founded FIM Limited in 1981 and remains its Executive Chairman.

52.    Ceretti and Grosso established the Kingate Funds in 1994 and 2000 and created Kingate Management in 1994.

53.    Ceretti and Grosso co-founded FIM Advisers in 2004.  Grosso is acting Executive Chairman and Chief Investment Officer while Ceretti holds the position of Chief Executive Officer.

54.    Ceretti and Grosso have operating authority over Kingate Management, and FIM's business operations, and had operating authority over the Kingate Funds, including the

Kingate Funds' investments with BLMIS in New York.

55.    On information and belief, Ceretti and Grosso controlled and dominated all aspects of the Kingate Funds' business operations and Kingate Management and FIM, including the transfer of millions of dollars in fees collected by Kingate Management for "managing" the Kingate Funds to Ceretti and Grosso's Shell Company Defendants, ultimately for their own benefit.

56.    Ceretti and Gross communicated regularly with persons in New York regarding BLMIS.

**B.    *The BLMIS Feeder Funds***

57.    **Kingate Global:**  Kingate Global is an international business company organized under the laws of the British Virgin Islands with a registered address at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

58.    Ceretti and Grosso commenced Kingate Global operations in 1994 and shares in Kingate Global were first sold on March 1, 1995.  Since its inception, all or substantially all of Kingate Global's assets were invested through BLMIS.

59.    According to BLMIS's records, Kingate Global maintained an account with BLMIS designated 1FN061 (the "Kingate Global Account").  The Kingate Global Account was opened on or about March 2, 1994 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Kingate Global Account Opening Documents") were executed and delivered to BLMIS at its headquarters at 885 Third Avenue, New York, New York.  This account was still open when Madoff was arrested on December 11, 2008.

60.    Kingate Global used New York banks to transfer funds into BLMIS, transferring investor funds to, as well as receiving monies and receipts from, the BLMIS account at

JPMorgan Chase & Co., Account #xxxxxxxxxxxx703 ("the 703 Account").

61.    **Kingate Euro:**  Defendant Kingate Euro is an international business company organized under the laws of the British Virgin Islands with a registered address at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

62.    According to BLMIS's records, Kingate Euro maintained an account with BLMIS designated 1FN086 (the "Kingate Euro Account").  The account that came to be known as the Kingate Euro Account was opened originally on or about January 4, 1996 for a sub-fund of Kingate Global created to handle investments that were made in Deutsche Marks.  In May 2000, that sub-fund became a separate legal entity, Kingate Euro, which handled investments denominated in Euros and assumed the rights to the old sub-fund's account at BLMIS.  A Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Kingate Euro Account Opening Documents") were executed and delivered on behalf of Kingate Euro to BLMIS at its headquarters at 885 Third Avenue, New York, New York.

63.    Kingate Euro used New York banks to transfer funds into BLMIS, transferring investor funds to, as well as receiving monies and receipts from, the 703 Account.

64.    The Kingate Funds are currently in liquidation.  On June 4, 2009 the Eastern Caribbean Supreme Court in the High Court of Justice of the Virgin Islands appointed Joint Liquidators of the Kingate Funds.  On October 5, 2009 the Supreme Court of Bermuda appointed the same Joint Liquidators.  The Joint Liquidators have filed several actions in Bermuda, including an action against HSBC Bank Bermuda Limited f/k/a Bank Bermuda Limited ("Bank Bermuda") seeking the release of the proceeds of the transfers at issue in this action which are held in the Kingate Funds' accounts.

C.    *The Management Defendants*

65.    **Kingate Management**:  Defendant Kingate Management is a corporation organized, controlled, and beneficially owned by Ceretti and Grosso under the laws of Bermuda on February 24, 1994 with a registered address at 2 Reid Street, Hamilton HM11, Bermuda.

66.    Kingate Management's purported purpose was to manage the Kingate Funds.  Its duties included selecting the Kingate Funds' sole investment adviser (BLMIS) and arranging accounting and administrative services for the Kingate Funds.

67.    As manager of the Kingate Funds, Kingate Management directed that the Kingate Funds transact and conduct business in New York, by inter alia, investing all of the assets of the Kingate Funds through BLMIS in New York.

68.    **FIM Limited**:  FIM Limited is an asset management company incorporated by Grosso under the laws of the United Kingdom with a registered address at Buchanan House, 1st Floor, 3 St. James's Square, London, SW1Y4JU, United Kingdom.  Ceretti and Grosso control and beneficially own FIM Limited.

69.    FIM Limited provided consultancy services to Kingate Management from 1995 until 2005, when Ceretti and Grosso created FIM Advisers, an affiliate which assumed the contract for consultancy services for Kingate Management.  Kingate Management paid fees to FIM Limited at its account with Brown Brothers Harriman & Co. in New York, New York.

70.    **FIM Advisers**:  FIM Advisers is a limited liability partnership formed, controlled, and beneficially owned by Ceretti and Grosso under the laws of the United Kingdom with a registered address at 20 St. James Square, London, SW1A 1ES, United Kingdom.

71.    FIM Advisers entered into a contract with Kingate Management on August 1, 2005 whereby FIM Advisers would render consulting advice and services for the Kingate Funds.

72.    FIM Advisers and its New York affiliate, FIM (USA), Inc. ("FIM (USA)"),

actively marketed FIM Advisers' services in the United States.  FIM (USA) also performed

research functions in New York on behalf and under the direction of FIM Advisers, FIM

Limited, Kingate Management, and Ceretti and Grosso.

> ### D.     The Administrator

73.    **Citi Hedge**:  Citi Hedge, formerly known as BISYS Hedge Fund Services

Limited and previously known as Hemisphere Management Limited ("Hemisphere"), is

incorporated under the laws of Bermuda with a registered address at 9 Church Street, PO Box

HM 951, Hamilton HM11, Bermuda.

74.    Citi Hedge is an affiliate of Citigroup, Inc. and Citi Hedge Fund Services, Inc., a

Delaware corporation registered to do business in New York with a registered address at 3435

Stelzer Road, Columbus, OH 43219.  The Kingate Funds paid Citi Hedge via accounts at J.P.

Morgan Chase in New York.

> ### E.     The Ceretti and Grosso Shell Companies

75.    Ceretti and Grosso moved hundreds of millions of dollars in fraudulent transfers

from the Kingate Funds through Kingate Management to shell companies that they owned and

controlled.

76.    The Ceretti and Grosso Shell Company Defendants routinely received funds

originating from New York and derived substantial revenue from the receipt of these funds.

77.    **Ashby Holding**:  Ashby Holding is a limited liability company organized under

the laws of the British Virgin Islands with a registered address at Palm Grove House, P.O. Box

3186, Road Town, Tortola, British Virgin Islands and its registered agent is Moore Stephens

International Services (BVI) Limited.  It also has an administrative office located at c/o Moore

Stephens Services SAM, L'Estoril, Bloc C, 31 Avenue Princess Grace, MC 38000 Monaco.

Ashby Holding received tens of millions of dollars in fraudulent transfers from Kingate

Management from April to December 2008. At all material times, Ashby Holding was the owner of 50 percent of the issued share capital in Kingate Management.

78.   **First Peninsula**:  First Peninsula is a limited liability company incorporated under the laws of Liberia with a registered address of 80 Broad Street, Monrovia, Liberia. First Peninsula received tens of millions of dollars in fraudulent transfers from Kingate Management from 2001 to 2008. First Peninsula was a registered holder of the issued share capital in Ashby Holding, which it held in trust for the beneficiaries of the Ashby Trust, including Grosso.

79.   **Ashby Investment**:  Ashby Investment is a limited liability company incorporated under the laws of the British Virgin Islands with a registered address at Palm Grove House, P.O. Box 3186, Road Town, Tortola, British Virgin Islands and its registered agent is Moore Stephens International Services (BVI) Limited. It also has an administrative office located at c/o Moore Stephens Services SAM, L'Estoril, Bloc C, 31 Avenue Princess Grace, MC 38000 Monaco. Ashby Investment received millions of dollars in fraudulent transfers from Kingate Management in 2008. Ashby Investment was a registered holder of the issued share capital in Ashby Holding, which it held in trust for the beneficiaries of the Ashby Trust, including Grosso.

80.   **Ashby Trust:**  On information and belief, Ashby Trust is a trust company formed in either Tortola, British Virgin Islands or Monrovia, Liberia and hundreds of millions of dollars in fraudulent transfers were funneled from Kingate Management through certain of the Ceretti and Grosso Shell Company Defendants and into the Ashby Trust for its beneficiaries, including Grosso.

81.   **El Prela Group**:  El Prela Group is a limited liability company incorporated under the laws of the British Virgin Islands with a registered address at Palm Grove House, P.O. Box 3186, Road Town, Tortola, British Virgin Islands and its registered agent is Moore Stephens

International Services (BVI) Limited.  It also has an administrative office located at c/o Moore

Stephens Services SAM, L'Estoril, Bloc C, 31 Avenue Princess Grace, MC 38000 Monaco.  El

Prela Group received millions of dollars in fraudulent transfers from Kingate Management from

April to December 2008.  At all material times, El Prela Group was the owner of 50 percent of

the issued share capital in Kingate Management.

82.    **Alpine Trustees**:  Alpine Trustees is a limited liability company incorporated

under the laws of Liberia with a registered address at 80 Broad Street, Monrovia, Liberia.

Alpine Trustee received tens of millions of dollars in fraudulent transfers from Kingate

Management from 2001 to 2008.  At all material times, Alpine was a registered holder of the

issued share capital in El Prela Group.

83.    **Port of Hercules**:  Port of Hercules is a limited liability company incorporated

under the laws of the British Virgin Islands with a registered address at Palm Grove House, P.O.

Box 3186, Road Town, Tortola, British Virgin Islands and its registered agent is Moore Stephens

International Services (BVI) Limited.  Port of Hercules received millions of dollars in fraudulent

transfers from Kingate Management from 2001 to 2008.  At all material times, Port of Hercules

was a registered holder of the issued share capital in El Prela Group, which it held in trust for the

beneficiaries of El Prela Trust, including Ceretti.

84.    **El Prela Trading**:  El Prela Trading is a limited liability company organized

under the laws of the British Virgin Islands with a registered address located at Palm Grove

House, P.O. Box 3186, Road Town, Tortola, British Virgin Islands and its registered agent is

Moore Stephens International Services (BVI) Limited.  It also has an administrative office

located at c/o Moore Stephens Services SAM, L'Estoril, Bloc C, 31 Avenue Princess Grace, MC

38000 Monaco.  El Prela Trading received tens of millions of dollars in fraudulent transfers from

Kingate Management during 2008.  At all material times, El Prela Trading was a registered

holder of the issued share capital in El Prela Group, which it held in trust for the beneficiaries of

the El Prela Trust, including Ceretti.

85.    **El Prela Trust:**  On information and belief, El Prela Trust is a trust company

formed in either Tortola, British Virgin Islands or Monrovia, Liberia and hundreds of millions of

dollars in fraudulent transfers were funneled from Kingate Management through certain of the

Ceretti and Grosso Shell Company Defendants and into the El Prela Trust for its beneficiaries,

including Ceretti.

86.    On information and belief, the Ceretti and Grosso Shell Company Defendants

transferred funds to New York bank accounts at the request of and for the benefit of Ceretti and

Grosso.  For example, on or about March 31, 2008, Ashby Holding transferred $5 million to a

bank account in New York at the request of Grosso.

### F.    The Custodian

87.    **Bank Bermuda:**  Bank Bermuda is a banking institution with a registered address

at 9 Bermudiana Road, Compass Point, 5th Floor, Pembroke, Bermuda.

88.    On March 1, 1994 and May 1, 2000, Kingate Global and Kingate Euro,

respectively, entered into Custodian Agreements with Bank Bermuda whereby Bank Bermuda

would serve as custodian for the Kingate Funds as the repository for the assets of the Kingate

Funds.

89.    Bank Bermuda used New York banks to transfer funds into BLMIS, transferring

investor funds into, and receiving monies and receipts from, the 703 Account.

### G.    This Court Has Personal Jurisdiction Over All Defendants

90.    This Court has personal jurisdiction over all defendants named herein under New

York Civil Practice Law Rule 302 and Bankruptcy Rule 7004 because each defendant has

intentionally taken full advantage of the rights, benefits and privileges of conducting business

and/or transactions in the State of New York, purposely availed itself of the laws of the State of

New York by undertaking significant commercial activities in New York, and by receiving

Customer Property to its benefit, derived significant revenue from New York and maintained

minimum contacts with New York in connection with the claims alleged herein.  Additionally,

the defendants have committed tortious acts both within and without New York, causing injury

in New York and to customers and creditors of BLMIS, derived substantial revenue from direct

or indirect investments with BLMIS and Madoff and expect or should reasonably expect that

their conduct would have consequences in New York.

## VII.    THE PONZI SCHEME

91.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated

from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as

founder, chairman, chief executive officer, and sole owner, operated BLMIS together with

several of his friends and family members.  BLMIS was registered with the SEC as a securities

broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).

By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three business units:

market making, proprietary trading, and investment advisery (the "IA Business").

92.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-

called split-strike conversion strategy ("SSC Strategy").  Under that strategy, Madoff purported

to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's

100 Index ("S&P 100") – a collection of the 100 largest publicly traded companies.  Madoff

claimed that his basket of stocks would mimic the movement of the S&P 100.  He also asserted

that he would carefully time purchases and sales to maximize value, and BLMIS customers'

funds would, intermittently, be out of the equity markets.

93.    The second part of the SSC Strategy was the hedge of Madoff's stock purchases

with options contracts.  Those option contracts acted as a "collar" to limit both the potential

gains and losses on the basket of stocks.  Madoff purported to use proceeds from the sale of S&P

100 call options to finance the cost of purchasing S&P 100 put options.  Madoff told BLMIS

customers that when he exited the market, he would close out all equity and option positions and

invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury

bills.  Madoff also told customers, including Ceretti and Grosso and certain of the other

Defendants named herein, that these "round-trips" into the market would occur between six and

ten times each year.

94.    BLMIS's IA Business customers received fabricated monthly or quarterly

statements showing that securities were held in, or had been traded through, their accounts.  The

securities purchases and sales shown in the account statements never occurred, and the profits

reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never made the

investments he promised clients, who believed they were invested with him in the split strike

conversion strategy.  He further admitted that he never purchased any of the securities he

claimed to have purchased for IA Business' customer accounts.  In fact, there is no record of

BLMIS having cleared a single purchase or sale of securities in connection with the SSC

Strategy on any trading platform on which BLMIS reasonably could have traded securities.

Instead, investors' funds were principally deposited into the 703 Account.

95.    Prior to his arrest, Madoff assured clients and regulators that he purchased and

sold the put and call options on the over-the-counter ("OTC") market after hours, rather than

through any listed exchange.  Based on the Trustee's investigation to date, there is no evidence

that the IA Business ever entered into any OTC options trades on behalf of IA Business account

holders.

96.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme.

The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

97.     The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS Accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers. Almost <u>ten percent</u> of this stolen principal was fed into the Ponzi scheme by Ceretti and Grosso's Kingate Funds.

98.     It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

99.     In an effort to hinder, delay or defraud authorities from detecting the fraud, BLMIS did not register as an investment adviser until August 2006. In or about January 2008, BLMIS filed with the SEC an amended Uniform Application for Investment Adviser Registration. The application represented, <u>inter alia</u>, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $65 billion under management.

100.    Madoff's scheme continued until December 2008 when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

101.    Based upon the Trustee's ongoing investigation, there were more than 8,000

customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS

generated account statements for its approximately 4,900 open customer accounts. When added

together, these statements purportedly showed that BLMIS customers had approximately $65

billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of

that amount. Customer accounts had not accrued any real profits because virtually no

investments were ever made. By the time the Ponzi scheme came to light on December 11,

2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

102.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars

greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value

of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the

transfers, BLMIS was left with insufficient capital.

## VIII.    THE KINGATE FUNDS AND DEFENDANTS' ROLE IN PERPETUATING THE FRAUD

### A.    *Ceretti and Grosso Create The Kingate Funds*

103.    With over 60 years of experience in the financial industry between them, Ceretti

and Grosso used their expertise to induce investors to hand over millions of dollars to BLMIS

through the Kingate Funds, all the while collecting staggering "fees" from management and

consulting companies specifically instructed to turn a blind eye.

104.    Ceretti and Grosso orchestrated a complex network of funds, fund managers, and

shell companies to launder the money they siphoned from the Kingate Funds' investors.

105.    Manzke, a U.S. hedge fund manager then affiliated with Tremont and a key player

in funneling billions of dollars into the Ponzi scheme, personally introduced Grosso and Ceretti

to Madoff in the early 1990s.

106.    Following a 1993 investigation of BLMIS by the SEC, Madoff informed fund

managers, including Manzke, that going forward BLMIS would only accept funds for its IA

Business, rather than individual accounts.  Manzke proceeded to form a domestic fund, the

Tremont Broad Market Fund, and Ceretti and Grosso joined with Manzke to create Kingate

Global as the foreign fund counterpart.

107.    Ceretti and Grosso were the founders of Kingate Global and Manzke was a

director of Kingate Global.  Ceretti, Grosso, and Manzke used the Kingate Funds as vehicles to

funnel investments directly and exclusively into BLMIS.

108.    Around the same time, Ceretti and Grosso created Kingate Management,

incorporated in Bermuda in 1994.  Ceretti and Grosso formed Kingate Management to act as co-

manager of Kingate Global with Tremont.  Kingate Management and Tremont executed a Co-

Manager Agreement with Kingate Global on or about December 1, 1995.

109.    Under these agreements, Kingate Management and Tremont were to evaluate and

monitor the "Investment Adviser" (i.e., BLMIS) and to provide all necessary management

services to the funds.  Kingate Management and Tremont set up a fee structure whereby each co-

manager divided the fees earned and calculated based on the NAV of the Kingate Funds.

110.    Thereafter, Kingate Management and Tremont began placing hundreds of

millions, if not billions of dollars, with BLMIS through Kingate Global.

111.    Unlike other BLMIS feeder funds, Kingate Global did not charge performance

fees.  This enticed even those already invested with BLMIS through other funds.  In fact, Madoff

himself instructed Manzke that Kingate Global could no longer accept investors already invested

with the BLMIS feeder fund Fairfield Sentry.[3]  Fairfield Sentry was managed by Madoff's

friend, Walter Noel, who was losing fees to Kingate Global.

_____

[3] The Trustee has filed a separate action in this Court against Fairfield Sentry in adversary proceeding No. 09-1239.

112.    Still, Ceretti and Grosso were not content to share the millions of dollars in fees coming in from the Kingate Funds.  Ceretti and Grosso forced Manzke to resign as director of Kingate Global and terminated the co-manager relationship with Tremont.  Tremont, however, continued to earn fees from Kingate Management pursuant to a 2006 consulting agreement.

113.    In 2000, Ceretti and Grosso created as a separate entity the Euro-denominated Kingate Euro, which had previously been a sub-fund of Kingate Global.  Ceretti and Grosso operated this fund identically to Kingate Global and Kingate Management executed a Manager Agreement with Kingate Euro on or about May 1, 2000.

**B.    *Ceretti and Grosso Honor Madoff's Request for Secrecy***

114.    Ceretti and Grosso maintained strong personal relationships with Madoff.  Grosso also held face-to-face meetings with Madoff in New York and London about twice per year and spoke to him frequently by telephone.  During these meetings and telephone conversations, Grosso spoke to Madoff about his SSC Strategy and the performance of BLMIS and the Kingate Funds.  Ceretti and Grosso also frequently met with Madoff for dinners in London, accompanied by their wives.  On information and belief, Ceretti and Grosso relied on Madoff for information concerning his performance on behalf of the Kingate Funds.

115.    Madoff refused to be publicly associated with the Kingate Funds.  Neither Kingate Global nor Kingate Euro identified BLMIS or Madoff by name in their Information Memoranda.  Instead, they referred to BLMIS as a "New York based NASD registered broker-dealer."  Ceretti and Grosso allowed Madoff to maintain his charade.

116.    The Kingate Funds' Information Memoranda stated that they were "open-ended" investment companies that sought long-term capital growth by allocating their shares to a selected investment adviser (i.e., BLMIS) to execute the Kingate Funds' investment objectives. The Kingate Funds' investment objectives were to obtain capital appreciation through a non-

traditional stock/options trading strategy.

117.    Ceretti and Grosso recruited investors for their scheme primarily from continental
Europe with a particular concentration in Italy and Switzerland.  Major financial institutions such
as HSBC, Grupo BBVA, Banque Privee Edmond de Rothschild, and Anglo Irish Bank invested
with BLMIS through the Kingate Funds.

### C.    *FIM Managed the Kingate Funds While Kingate Management Collected the Bulk of the Fees*

118.    Kingate Management operated as an alter ego of Ceretti and Grosso.  It was
simply a shell company with only three employees, yet it collected hundreds of millions in fees
from the Kingate Funds, its sole source of revenue.

119.    Kingate Management's contracts with the Kingate Funds specified that it was to
be paid 1.5 percent of the Kingate Funds' NAV annually.  This fee was calculated and paid to
Kingate Management on a monthly basis.  The NAV was, of course, calculated based upon the
false statements of the accounts prepared by BLMIS.  For example, Kingate Global paid Kingate
Management over $38 million in 2007, and Kingate Euro paid Kingate Management over €9
million for the same year.  These fees were based on an "asset value" that did not exist.

120.    The Information Memoranda for both Kingate Funds stated that Kingate
Management would make all decisions related to the general management of the Kingate Funds
and would have complete authority and discretion in the management and control of the business
of each fund.  In fact, Kingate Management played a minimal role in managing the Kingate
Funds.

121.    Even though Kingate Management received the bulk of the fees from the Kingate
Funds, Ceretti and Grosso enlisted FIM to perform the work of a typical fund manager.
Critically, however, Ceretti and Grosso prevented FIM from undertaking genuine due diligence

on BLMIS or the Kingate Funds.

122.     In place of such diligence, Ceretti and Grosso "vouched" for Madoff.

123.     On December 1, 1995 Kingate Management signed a Consulting Services

Agreement with FIM Limited.  FIM Limited was retained to provide consulting advice with

respect to Kingate Management's financial and operational decisions related to the Kingate

Funds.  Under the Consulting Services Agreements, FIM Limited's fees were paid by Kingate

Management out of the fees Kingate Management received from the Kingate Funds.

124.     On August 1, 2005 FIM Limited was replaced as the consultant for Kingate

Management by FIM Advisers under two Consulting Services Agreements between FIM

Advisers, Kingate Management, and the Kingate Funds.  It has been recently reported that

Ceretti and Grosso intend to close FIM Advisers and FIM Limited.

125.     Among other things, FIM Limited identified and solicited investors for the

Kingate Funds, prepared marketing materials, and reviewed the funds' structure and operating

procedures.

126.     According to the Kingate Global Information Memorandum, FIM Advisers

"renders consulting advice to [Kingate Management] with respect to certain aspects of the

Fund's operational, administrative, marketing, accounting and legal matters."  FIM Advisers'

website, before it was taken down within the past year, stated that FIM Advisers is:

> a leading alternative investment company specializing in the creation and
> management of portfolios of hedge funds for institutional and private clients.  The
> company has more than twenty five years of experience in asset management,
> with almost fifteen years of advising and managing portfolios of hedge funds.
> Today, FIM has 30 employees based in London and Bermuda.

The website further stated that:

> FIM's investment model is based upon a disciplined and structured approach to
> research, portfolio management, and risk management.  The model gives FIM a
> clear edge in the sourcing of new managers, in conducting in-depth due-diligence,

and in structuring portfolios. At the foundation of the company's approach to investment is a highly experienced team of investment professionals, who have operated in a variety of market cycles and environments.

127.   Despite these statements about expertise, disciplined and structured research, and clear fund management duties made by Kingate Management and FIM, neither company actually performed any meaningful research or due diligence on the Kingate Funds or BLMIS.

128.   In fact, an email exchange between two FIM employees shows how even FIM employees were unclear about the structure of FIM and Kingate Management and the role they played vis-à-vis the Kingate Funds.

129.   In November 2008, Eric Lazear ("Lazear"), FIM's Head of Operational Due Diligence, instructs FIM employee, Jose Verde, to contact Shazieh Salahuddin, Director of Kingate Management, for issues regarding the Kingate Funds. Verde responds, "But isn't she working for FIM in the Bermuda office? I am a bit Confused." Lazear responds, "Yes, but she handles all kingate [sic] questions."

### D.   *Ceretti and Grosso Conceal Their Profits*

130.   Ceretti and Grosso set up an intricate network of shell companies to conceal that they personally received the fees collected on the Kingate Funds' investments with BLMIS. Various bank accounts were set up in each of the Ceretti and Grosso Shell Company Defendants' names to facilitate these transfers.

131.   El Prela Group, whose beneficial owner is Ceretti, received millions of dollars in transfers from the Kingate Funds during 2008. El Prela Group received approximately $18 million in transfers from Kingate Management from April through December 2008. Using those funds, El Prela Group transferred out at least $18 million to Port of Hercules.

132.   Port of Hercules, whose beneficial owner is Ceretti, received millions of dollars in transfers from the Kingate Funds since 2001. For example, from 2006 through 2008, Port of

Hercules' HSBC account received approximately $60 million in transfers from Kingate

Management, El Prela Group, and El Prela Trading.  Using some of those funds, Port of Hercules

transferred out at least $50 million to Ceretti's personal bank account, El Prela Trading, and

other accounts held by Port of Hercules at Fortis Bank.

133.    Alpine Investments, whose beneficial owner is Ceretti, received millions of

dollars in transfers from the Kingate Funds since 2001.  For example, from 2006 through 2008,

Alpine Investments received approximately $16 million in transfers from Kingate Management.

Using those funds, El Prela transferred out at least $7 million to Ceretti's personal bank account.

134.    El Prela Trading, whose beneficial owner is Ceretti, received millions of dollars in

transfers from Port of Hercules during 2008.  El Prela Trading received approximately $3 million

in transfers from Port of Hercules.  Using those funds, El Prela Trading transferred out at least $3

million back to Port of Hercules.

135.    Upon information and belief, El Prela Trust, whose beneficial owner is Ceretti,

received millions of dollars in transfers ultimately originating from Kingate Management.

136.    Ashby Holding, whose beneficial owner is Grosso, received millions of dollars in

transfers from the Kingate Funds during 2008.  Ashby Holding received approximately $18

million in transfers from Kingate Management from April through December 2008.  Using those

funds, Ashby Holding transferred out at least $18 million to First Peninsula.

137.    First Peninsula, whose beneficial owner is Grosso, received millions of dollars in

transfers from the Kingate Funds since 2001.  For example, from 2006 through 2008, First

Peninsula's HSBC account received approximately $61 million in transfers from Kingate

Management, Ashby Investment, and Ashby Holding.  Using some of those funds, First

Peninsula transferred out at least $23 million to other accounts held by First Peninsula at Fortis

Bank.

138.    Ashby Investment, whose beneficial owner is Grosso, received millions of dollars in transfers from the Kingate Funds during 2008.  Ashby Investment transferred approximately $7 million between its own bank accounts in October 2008.  Using those funds, Ashby Investments transferred out at least $7 million to First Peninsula.

139.    Upon information and belief, Ashby Trust, whose beneficial owner is Grosso, received millions of dollars in transfers ultimately originating from Kingate Management.

### E.    *Citi Hedge Failed to Perform Its Duties as an Administrator*

140.    Citi Hedge and its predecessors served as the purported administrator of the Kingate Funds at all relevant times.  Specifically, from the inception of the Kingate Funds through 2002, the administrator was Bermuda-based Hemisphere.  In 2003, BISYS Group, Inc. (BISYS's parent) acquired Hemisphere and renamed it BISYS Hedge Fund Services Ltd. (Bermuda).  In 2007,  Citigroup acquired BISYS Group, Inc. and gave the administrator its present name, Citi Hedge.

141.    Citi Hedge was purportedly responsible for performing day-to-day administrative services for the Kingate Funds, including preparing and distributing monthly reports to the investors setting forth their NAV, the amounts of any distributions from the funds, accounting and legal fees, and all other fees and expenses of the Kingate Funds.

142.    Citi Hedge, however, failed to:  (i) take reasonable, industry-standard steps to calculate the Kingate Funds' NAV; (ii) independently confirm and verify the pricing information provided by Madoff; (iii) reconcile information provided by Madoff as the Kingate Funds' prime broker with information provided by the Kingate Funds' managers; (iv) prepare the monthly financial statements in accordance with generally accepted accounting principles; or (v) relay accurate information to investors.

143.    As administrator, Citi Hedge was subject to the Administration Agreement, as

amended and restated effective June 1, 2007 (the "Administration Agreement"), and the

Registrar Agreement, as amended and restated effective January 1, 2002.

144.    Under these agreements, one of Citi Hedge's critical responsibilities included the

calculation of the Kingate Funds' NAV:

> The Administrator will determine the net asset value of the Fund's portfolio assets
> attributable to the USD shares of the close of business on the last Business Day of
> each calendar month.  The Administrator verifies the prices attributed to the
> securities held by the USD shares of the Fund by reference to pricing sources
> independent of the Investment Adviser whenever reasonably possible.

145.    The information Memoranda further explained that the NAV "is the market value

of the Fund[s'] total assets, calculated as described below, less all accrued debts and liabilities . .

.  The Fund[s'] total assets include:  (i) all cash and cash equivalent, including bank deposits and

interest bearing obligations; (ii) all securities positions; and (iii) all options positions."

146.    Although the securities and options positions were reported and purportedly

custodied by Madoff, Citi Hedge failed to independently verify the pricing information provided

by Madoff.  Rather, Citi Hedge relied solely on information provided by Madoff to calculate and

disseminate the Kingate Funds' NAV.

147.    Citi Hedge failed to verify the prices provided by Madoff in at least 185 separate

instances where the prices were not possible based on market prices.  In all instances, the

information necessary for Citi Hedge to verify the prices of the securities traded by Madoff –

consisting of S&P 100 stocks – was readily available through private financial services, such as

Bloomberg, as well as on the Internet.  Citi Hedge either did not verify Madoff's reported prices

or ignored the inconsistencies with market prices.

148.    Citi Hedge received millions of dollars in fees for its failed duties as administrator

to the Kingate Funds.  Between 2000 and 2007, Citi Hedge received $4,177,479 for serving as

the administrator to Kingate Global.  Between 2000 and 2007, Citi Hedge received €926,640 for

serving as the administrator to Kingate Euro. These payments were based on the illusory NAV

of the Kingate Funds, as calculated by Citi Hedge itself.

### F.    Bank Bermuda as Custodian

149.    Bank Bermuda served as the custodian for the Kingate Funds from 1994 through

2008. As such, over $975,541,729 was improperly transferred from BLMIS to the Kingate

Funds through Bank Bermuda.

150.    The Kingate Funds maintain at least three accounts at Bank Bermuda, including

Account # 010-503324-511, Account # 010-5033324-512, and Account # 010-424174-561

(collectively, the "Bank Bermuda Accounts").

151.    Bank Bermuda currently holds the remainder of monies not paid out to the

Kingate Funds in the Bank Bermuda Accounts. The Bank Bermuda Account statements

collectively reflect ending balances of approximately $133 million as of December 2008, of

which approximately $108 million originated from BLMIS.[4]

### G.    The Kingate Funds as a Gateway to Madoff

152.    Ceretti and Grosso further profited from the Kingate Funds by offering them to

other fund managers as a gateway to BLMIS. Certain of the Kingate Fund's investors invested

with BLMIS through multiple channels.

153.    For example, Reliance Management (BVI) Limited, which was the manager of

Defender Fund,[5] first gained access to BLMIS in 1999 through investments it was managing in

Kingate Global for its flagship fund, Reliance Multi-Adviser Fund Limited.

154.    The Kingate Funds also provided another avenue for fund managers such as

Pioneer Alternative Investments Ltd. ("Pioneer") to reach BLMIS. Pioneer is owned by

UniCredit S.p.A. (which also owns Bank Austria and Sonja Kohn's Bank Medici)[6].  Pioneer,

through at least nine of the funds within its Momentum Group funds, was a substantial investor

in Kingate from 2000 through 2008.  Pioneer also invested in BLMIS through Fairfield Sentry

and certain Bank Medici related funds.

## IX.   CERETTI, GROSSO, AND THE MANAGEMENT DEFENDANTS REPEATEDLY FAILED TO CONDUCT DUE DILIGENCE ON BLMIS AND THE KINGATE FUNDS

155.    FIM Limited and its successor, FIM Advisers, were paid due diligence experts.

When it came to Madoff, however, FIM did nothing at all.  Rather than perform meaningful,

independent, and reasonable due diligence, FIM, directed by Ceretti and Grosso (and Kingate

Management), turned a knowing blind eye to all the indicia of fraud at BLMIS.

### A.    Contrary to Its Practice and Policy, FIM Conducted No Meaningful Due Diligence on BLMIS or the Kingate Funds

156.    Ceretti and Grosso enlisted their own Management Defendants to pretend that

they performed due diligence on their own Kingate Funds.  This structure avoided all

independence and allowed Ceretti and Grosso to maintain the façade of a legitimate investment

fund.

157.    FIM claimed that it undertook extensive due diligence by regular reviews of

markets, strategies, managers, and peer groups and that research specialists conducted in-depth

analysis into every aspect of every potential investment.  Moreover, FIM stated that each

portfolio is subject to continuous analysis to ensure all risk factors are identified and controlled

and all internal and external management portfolio policies are followed.  Additionally, FIM

---

[4] Approximately $15 million in subscription money that came into the Bank Bermuda Accounts in December 2008 was returned to the subscribers as a result of an order of the Supreme Court of Bermuda.
[5] The Trustee has filed a separate action in this Court against Defender in adversary proceeding No. 10-05229.
[6] The Trustee has filed a separate action in this Court against Kohn, Pioneer, and HSBC in adversary proceeding No. 09-1364 and against Sonja Kohn and Pioneer in adversary proceeding No. 10-5411.

claimed that the Kingate Funds were actively monitored by research teams, the investment

committee, and risk management to ensure accuracy.

158.    Grosso claimed in November 2008 that FIM had "transparency" with respect to

BLMIS and its operations.  Ceretti, Grosso, and the Management Defendants routinely

represented that they would exercise the proper care in selecting and monitoring the investment

adviser (i.e., BLMIS).

159.    Grosso admitted that the requisite due diligence was not performed on the Kingate

Funds, writing in November 2008 that "[w]e have never done much [due diligence on Kingate],

as it will be impossible to go inside Madoff to do a proper D[ue]D[iligence]."  He went on to

claim, however, that he "knew enough about Madoff" to suffice as due diligence.

160.    No genuine due diligence on BLMIS or the Kingate Funds ever took place.  When

confronted in 2005 by an investor asking that a due diligence questionnaire be completed on

Kingate Global, Grosso responded that due to Kingate Global's uniqueness, it "has never

completed a due diligence questionnaire."  Grosso continued that he would not be able to give

her all the information she wants but the information she will get represents "all the information

that will be available."  Grosso knew enough not to share.

161.    Ceretti and Grosso directed that FIM's due diligence procedures should not be

applied to BLMIS or the Kingate Funds and FIM obeyed.

162.    FIM recognized the disparate treatment given to BLMIS and the Kingate Funds

when it came to due diligence.  In an email to Grosso after news of the fraud broke, Lazear

stated:

> I know we have to do what is right for FIM, but we need to be cognizant of how
> this portrays our (FIM) process.  [Kingate] is not a fund that went through our
> normal diligence process and I think it should not be depicted as if it had.  We all
> worked hard to build our process to be the best in the industry, which I think it is,
> and I do not want it to get out there that one slipped past us when it did not.

163.    Ceretti, Grosso, and the Management Defendants treated the Kingate Funds with the kid gloves that Madoff demanded and conducted no proper due diligence.

**B.    *Certain FIM Employees Actively Suppressed Investigations by Other FIM Employees***

164.    As early as 2004, senior FIM employees knew of serious fraud risks at BLMIS.

165.    In January 2004, Brendan Robertson ("Robertson") joined FIM as director in the research and investment department.

166.    Scott Dragoo ("Dragoo") joined FIM as its head of research in January 2005.

167.    Prior to their employment with FIM, both Dragoo and Robertson worked for Ivy Asset Management ("Ivy"), a fund manager.  Dragoo worked for Ivy as a research analyst while Robertson was a senior research analyst.[7]

168.    By 2002, Ivy had developed such strong suspicions about BLMIS and Madoff that it instituted a company policy of refusing to invest with BLMIS.  On information and belief, Dragoo and Robertson, by virtue of their employment at Ivy, were aware of the basis for Ivy's policy.

169.    A February 2008 email from Dragoo to another FIM employee demonstrates that Dragoo nonetheless actively dissuaded investigation into the Kingate Funds.  In response to the FIM employee's statement that he could try to get information from Madoff about Kingate at a dinner event, Dragoo made his fellow employee "promise not to push Bernie for any information."  When the employee questioned whether he could "even mention FIM or Carlo [Grosso]," Dragoo directed that the employee discuss the matter with him in person.

170.    On information and belief, based on their prior employment, these senior FIM

---

[7] The Trustee has filed a separate action in this Court against Ivy in adversary proceeding No. 10-05356.

officers had actual or constructive knowledge of indicia of fraudulent activity at BLMIS. FIM
nonetheless ignored these and other red flags and continued to actively solicit and oversee the
investment of hundreds of millions of dollars with BLMIS.

> ### C. *Ceretti and Grosso Suppressed Their Employee's Concerns and Requests to Conduct Proper Due Diligence on BLMIS and the Kingate Funds*

171.    Certain FIM personnel urged Ceretti and Grosso to allow FIM to conduct
extensive and independent due diligence into BLMIS. Instead of acting on these
recommendations, Ceretti and Grosso expressly directed FIM due diligence personnel to refrain
from conducting any due diligence on BLMIS.

172.    In June 2008, HSBC issued a warning on the Kingate Funds due to the lack of
communication and information coming from Madoff. Grosso suppressed these warnings and
dismissed the HSBC analyst as a "junior guy" and a "joker" for "rehashing old arguments"
against Madoff. Grosso admitted that such concerns about Madoff were "not new" and that
"[t]his has been going on for 20 years."

173.    In November 2008, another analyst's caution regarding the Kingate Funds was
passed along to Grosso. The analyst cited BLMIS's lack of transparency, Madoff's possible
conflict of interest, and other due diligence concerns. Grosso attacked the analyst's
professionalism and experience and dismissed the analyst's concerns stating that it was "quite
evident that he [the analyst] has only a very limited knowledge of options strategies, as well as a
very imperfect understanding of the Kingate structure, and possibly a poor understanding of the
U.S. broker-dealer industry, its structure, functioning, and regulation."

174.    When discussing Madoff's remarkably consistent returns with one of his own
analysts, Grosso rejected the analyst's conclusion that Madoff's returns were underlined impossible.

175.    Lazear repeatedly tried to convince Ceretti and Grosso that the Kingate Funds

should have nothing to do with BLMIS.  In e-mails sent from Lazear in the aftermath of

Madoff's arrest, he expressed great frustration that his analysis and recommendations had been

rejected despite their merit.  Lazear stated that he had believed BLMIS was a "scam" and had

emailed Grosso "all the details" to support his beliefs <u>before</u> Madoff confessed.  He recounted

telling Grosso that if Grosso did not own FIM and the Kingate Funds, Lazear would "veto"

FIM's involvement with Madoff.

176.    Additionally, as FIM prepared communications to the Kingate Funds investors in

early 2009, Lazear expressed concerns over how FIM's due diligence process was presented.

Lazear was concerned that FIM represented to investors that it had conducted the standard due

diligence for the Kingate Funds when in fact, it had not.

177.    Thus, Ceretti and Grosso prevented the  Management Defendants and their

employees from conducting any meaningful due diligence into the Kingate Funds or BLMIS.

### D.    Grosso and FIM Rationalized BLMIS's Remarkably Consistent Performance as a Result of Illegal Front-Running

178.    In 2001, an investment industry analyst published an article that called into

question the legitimacy of BLMIS's operations.  A May 2001 MAR/Hedge newsletter entitled

"Madoff Tops Charts; Skeptics Ask How" reported on Fairfield Sentry's consistent returns and

stated that experts were bewildered how Madoff achieved such returns so consistently and for so

long.  The article observed that "others who use or used the strategy are known to have had

nowhere near the same degree of success."

179.    In response to the article, Grosso prepared a "question and answer" document for

FIM employees marked "INTERNAL NOTE – NOT FOR DISTRIBUTION" purporting to

explain the numerous "red flags" raised in the article, including the following:

> (i) "How can there be such a relative complete lack of volatility in reported monthly returns?"

(ii) "How can Madoff have the ability to time the market and to turn to cash before market conditions become negative?"

(iii) "How can Madoff have the ability to buy and sell stocks without noticeably affecting the market?"

(iv) "Why has no-one been able to duplicate similar results?"

(v) "How come other Wall Street firms have not become aware of the strategy and traded against it?"

(vi) "Why is Madoff willing to earn commissions on trades, but not set up a separate asset management division to offer hedge funds directly to investors?" and

(vii) "Why doesn't Madoff borrow money and manage funds on a proprietary basis?"

180.    Grosso's stated explanation to his own employees was that Madoff was illegally front running his own market-making business.  In response to "[h]ow can Madoff have the ability to time the market and turn to cash before market conditions become negative," Grosso wrote that "Madoff benefits from unique market intelligence derived from the massive amount of order flow it handles daily."

181.    In response to "Why has no one been able to duplicate similar results," Grosso wrote that "[b]eing such a large market maker (Madoff currently accounts for about 15 percent of all equity transactions in the United States), he sees the flows."

182.    Remarkably, Grosso was stating that Madoff saw the pending orders that were due to be executed by the market-making department of BLMIS and was able to generate high returns for feeder funds by taking advantage of this insider knowledge.  This illegal insider trading relies on material, non-public information that is acted on for the benefit of one of his clients to the detriment of his other Madoff client.

183.    In this case, Grosso's justification for Madoff's readily apparent fraudulent activity simply substituted another kind of illegal activity.

> E.    *Ceretti, Grosso, the Kingate Funds, and the Management Defendants Exploited PricewaterhouseCoopers' Deficient Audits*

184.    Grosso and Kingate Management knew that PricewaterhouseCoopers ("PwC") relied heavily on reports from Madoff's auditors and did not perform any independent verification of the money flowing in and out of BLMIS's accounts.  In fact, Grosso knew that all PwC did was check "the testing at Madoff" against the Kingate Funds' records (also provided by BLMIS) and found no need to "double audit."

185.    Further, as Grosso stated in an email in February 2008, Grosso was cautious about how the Kingate Funds portrayed PwC's auditing to investors fearing that PwC might actually "start to ask all sort of questions next time they visit Madoff."

## X.    CERETTI, GROSSO, THE KINGATE FUNDS, THE MANAGEMENT DEFENDANTS, AND CITI HEDGE WERE ON NOTICE OF INDICIA OF FRAUDULENT ACTIVITY AT BLMIS

186.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge are sophisticated investors and/or financial institutions that had regular access to the trade confirmations and account statements for the Kingate Funds' BLMIS accounts.  Also, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge accepted fees in consideration for the independent, meaningful, and reasonable due diligence they were expected to exercise, but did not, in selecting and monitoring BLMIS as their investment manager.

187.    Not only did Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge fail to inquire further, Ceretti, Grosso, and certain FIM employees suppressed any attempt by FIM to do so.

188.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge each regularly received false account statements and trade confirmations from BLMIS that demonstrated (among other things):

a.    The Kingate Funds' returns were consistent over too many years;

b.    Impossible options volume trading;

c.    Numerous instances where BLMIS reported selling securities outside the daily price ranges;

d.    BLMIS traded more equities than were available on the relevant exchanges;

e.    The Kingate Funds frequently had a negative cash balance;

f.    BLMIS purchased Treasurys before selling the securities from which the cash for the purchases originated;

g.    The options trades could not have been conducted in the Over-The-Counter Market;

h.    Madoff's options trades were inconsistent with the SSC strategy; and

i.    Settlement anomalies in options transactions.

189.    Moreover, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge were on inquiry notice of BLMIS's fraud based on knowledge that:

j.    Purported excessive trading volumes never impacted the market;

k.    Madoff had supernatural timing when buying and selling stocks;

l.    The Kingate Funds entered into risky options contracts with unidentified counterparties;

m.    The structure of BLMIS was opaque, secretive, and lacked independent oversight and customary internal controls;

n.    BLMIS, known as high-technology firm, provided only paper statements;

o.    A capable auditor was absent; and

p.    BLMIS did not charge management fees.

### The Kingate Funds Account Statements Reflected Substantial Quantitative Evidence of Fraud

190.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge had access to vast amounts of information about BLMIS that was not available to the public.

They received account statements and trade confirmations that demonstrated (among many other things):  (1) impossibly consistent rates of returns that seemed to have no correlation to the S&P 100; (2) the inexplicable volume of trades of stocks, and options that BLMIS was allegedly executing; and (3) options trades that had no relation to the SSC Strategy.

### A.    *The Kingate Funds' Returns Were Consistent over Too Many Years*

191.    Ceretti, Grosso, the Kingate Funds, and the Management Defendants promoted the Kingate Funds by highlighting their number of positive months of returns and their rare draw-downs.  Like BLMIS, the Kingate Funds did not report unconscionably high returns but instead relied on their steady performance regardless of volatility in the market.

192.    Both the Kingate Funds and BLMIS were effectively immune from any number of market catastrophes, enjoying steady rates of return at times when the rest of the market was experiencing financial crises.  For example, from 2000 until 2008, the Kingate Funds averaged annual returns with BLMIS of approximately 11.7 percent.  BLMIS purported to achieve these results with only four months of negative returns during a 98 month period from October 2000 through November 2008, while the S&P 100 experienced 46 months of negative returns over the same period.

193.    The Kingate Funds and BLMIS maintained suspiciously and consistently positive rates of return during events that otherwise devastated financial markets such as:  (i) the burst of the "dot com" bubble in 2000; (ii) the 2000-2002 bear market, including the disastrous market impact of the 2001 September 11th tragedy; and (iii) the dramatic recession and housing crisis of 2008.  BLMIS continued to generate positive returns even during the last 14 months of BLMIS's existence, when the S&P fell no less than 39.4 percent.  Madoff's SSC strategy purported to track the performance of the S&P 100 and its results were not credible.  Such consistently positive returns have no correlation with the historical fluctuations of the S&P 100 Index, on

which BLMIS's trading activity was purportedly based.

**Figure 1**
**Kingate Funds Rates of Return v. S&P Rates of Return**
**2000-2008**

| YEAR | KINGATE EURO RATE OF RETURN | KINGATE GLOBAL RATE OF RETURN | S&P 100 RATE OF RETURN |
|------|------|------|------|
| 2000 | 14.8% | 14.6% | (13.4%) |
| 2001 | 13.7% | 13.7% | (14.9%) |
| 2002 | 12.1% | 12.2% | (23.9%) |
| 2003 | 10.9% | 10.8% | 23.8% |
| 2004 | 9.9% | 10.0% | 4.5% |
| 2005 | 10.3% | 10.5% | (0.9%) |
| 2006 | 13.4% | 13.2% | 15.9% |
| 2007 | 10.8% | 10.9% | 3.8% |
| 2008[8] | 9.3% | 9.4% | (36.9%) |

194.    Despite the Kingate Funds' abnormally consistent positive returns, Ceretti,

Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge took no meaningful,

reasonable or independent action to inquire further as to how such results could be achieved in

accordance with Madoff's SSC Strategy.

**B.    The Kingate Funds' Account Statements from BLMIS Reflected Impossible Options Volume Trading**

195.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge

frequently reviewed the Kingate Funds' BLMIS account statements and trade confirmations.

These account statements and trade confirmations demonstrated that Madoff was claiming to

engage in impossible option transactions.  BLMIS would have had to execute massive numbers

of options trades to implement its purported SSC strategy.  To implement this strategy, BLMIS

pretended to trade S&P 100  ("OEX") options to hedge the investment in a representative basket

---

[8] The 2008 numbers are as of November 30, 2008 because that is the last date for which BLMIS generated customer account statements.

of stocks.  On many occasions, through the Kingate Funds' history of investment with BLMIS,

the options volume BLMIS reported to have engaged in on behalf of the Kingate Funds exceeded

the total number of OEX options traded on the Chicago Board Options Exchange ("CBOE") for

that contract on that day.  The following charts demonstrates this point with respect to the call

options BLMIS purported traded for the Kingate Funds over the last two years of its existence:

**Call Options Traded on Behalf of the Kingate Funds in 2007-2008**



196.    In fact, since 2001, BLMIS had reported volumes for the Kingate Funds' calls

options that were many times over the total number of call options executed on the CBOE, with

the same purchase date, strike price, and expiration date.  The following chart illustrates this

point:



197.    For a specific example, on June 15, 2001 BLMIS purportedly bought on Kingate

Global's behalf a total of 6,271 OEX put options (with July expiration and a strike price of 625),

when the total volume traded on the CBOE for those OEX put options for that day was 1,149.

Similarly, on the same day, BLMIS purportedly sold on Kingate Global's behalf a total of 6,271

OEX call options (with July expiration and a strike price of 630), when the total volume traded

on the CBOE for those OEX call options for that day was 490.  It would have been impossible

for BLMIS's volume to exceed that of the CBOE for the identical contract on the same day.

198.    The same results are demonstrated by looking at the put option volume

purportedly traded by the Kingate Funds compared to the CBOE.  Specifically, the last two years

of the Kingate Funds' existence is demonstrated below:

**Put Options Traded on Behalf of the Kingate Funds in 2007-2008**



199.    Similarly, since 2001, BLMIS had reported volumes for the put options that were many times over the total number of put options executed on the CBOE with the same purchase date, strike price, and expiration date.  The following chart illustrates this point:



200.    As a specific example, on January 16, 2004 BLMIS purportedly bought on

Kingate Euro's behalf a total of 9,088 OEX put options (with February expiration and a strike

price of 560), when the total volume traded on the CBOE for those OEX put options for that day

was 2,324.  Also on that day, BLMIS purportedly sold on Kingate Euro's behalf a total of 9,088

OEX call options (with February expiration and a strike price of 570) when the total volume

traded on the CBOE for those OEX call options for that day was 1,515.  Ceretti, Grosso, the

Management Defendants, and Citi Hedge knew or should have known that these option trading

volumes reported by BLMIS were impossible if exchange traded.

201.    In total, there were at least 1,162 instances of option trades exceeding the volume

traded on the CBOE on the Kingate Funds Accounts.

C.    *Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi
Hedge Ignored Numerous Instances Where BLMIS Reported Selling Securities
Outside the Daily Price Ranges*

202.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge

told the Kingate Funds' investors that they reviewed the BLMIS trade confirmations on a

monthly basis. This "analysis" included reviewing the price paid or received on the purchase or

sale of stocks and options to ensure that such price was within the range of prices for such stocks

and options on the date of the trade.

203.    FIM knew that Madoff's trading activity often reflected average trade values that

were outside the daily range of prices for such securities. Spreadsheets prepared by FIM

identified whether a given BLMIS trade was "within range" (i.e., whether the trade was within

the daily price range for the high and low that day). FIM knew that a significant number of

BLMIS's purported trades were impossible. FIM identified these "out of range" trades in a

spreadsheet. In review of BLMIS records, BLMIS purported to make at least 320 "out of range"

equity and options trades on behalf of the Kingate Funds from 1998 to 2008.

204.    For example, the Kingate Funds' account statements for October 2003 reported

purchases of 984,137 shares and 240,240 shares respectively for Intel Corporation (INTC), with

a settlement date of October 7, 2003. BLMIS's records indicate these stocks were purchased on

October 2, 2003 for $27.63 per share. However, the daily price range for Intel Corporation stock

purchased on October 2, 2003 ranged from a low of $28.41 to a high of $28.95. Ceretti, Grosso,

the Management Defendants, and Citi Hedge supposedly reviewed these confirmations and took

no action in response to this anomaly.

205.    In an illustration of another purported sale, the Kingate Funds' account statements

for December 2006 reported sales of 233,281 shares and 60,449 shares, respectively, for Merck

(MRK) with a settlement date of December 28, 2006. BLMIS's records and the Kingate Funds'

trade confirmations reflect that these stocks were sold on December 22, 2006 for $44.61.  This

purported trade was not possible.  The price range for Merck stock sold on December 22, 2006

was between $42.78 and $43.42.

206.    The sales and purchases of securities and options outside the publicly-reported

trading ranges was a huge red flag, requiring further independent inquiry.  Even though Ceretti,

Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew of these facially

impossible anomalies and specifically identified them as red flags, they chose to ignore them.

### D.    BLMIS Traded More Equities Than Were Available on the Relevant Exchanges

207.    As sophisticated financial professionals, Ceretti, Grosso, the Kingate Funds, the

Management Defendants, and Citi Hedge were, or should have been, on notice that the volume

of shares being traded on behalf of the Kingate Funds was impossible as compared to the total

assets under management by BLMIS and the total shares available on the market.

208.    In 2006, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and

Citi Hedge could have easily deduced that BLMIS was trading in impossible volumes.  When

BLMIS was forced to register as an investment adviser in August 2006, it represented in the

ADV Form filed with the SEC that BLMIS had approximately $11.7 billion of assets under

management at the end of July 2006.  Later filings stated that BLMIS managed $13.2 billion at

the end of 2006.  The Kingate Funds' account statements from BLMIS reported balances of

approximately $2.8 billion as of July 2006 and $3.0 billion as of December 2006.  Hence,

Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that the

Kingate Funds comprised about 23 percent of the publicly disclosed BLMIS assets under

management.

209.    Between 2006 and 2008, despite knowing that the Kingate Funds constituted

approximately 23 percent of the investments under management by BLMIS, Ceretti, Grosso, the

Kingate Funds, the Management Defendants, and Citi Hedge completely ignored at least five separate transactions where BLMIS alone purportedly represented over 50 percent of the market trading for a particular security on that day.

210.    The Kingate Funds' account statements regularly indicated that BLMIS's trades in a particular stock accounted for more than 10 percent of that stock's trading on the entire composite tape, which includes all listed and unlisted market volumes.  On information and belief, from 1998 through 2008, individual stock trades for just the Kingate Funds exceeded 10 percent of the market at least 236 times.

211.    For example, on September 22, 2006 the Kingate Funds purportedly traded 618,792 shares of Wells Fargo & Company, which made up 17.4 percent of the shares of that security traded on the whole composite tape, which includes all listed and unlisted market volumes for that day.  As such, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew or should have known that BLMIS alone was purportedly trading over 70 percent of the shares of Wells Fargo & Company traded that day – an implausible percentage for one manager to be trading.

### E.    *The Kingate Funds Frequently Had a Negative Cash Balance with BLMIS*

212.    Between 1998 and 2008, the Kingate Funds' cash accounts with BLMIS had a negative balance on 225 separate occasions for a total of approximately 724 days.  Certain of the negative balances resulted from either the purchase of equities that exceeded the value of the Treasurys sold to fund the purchase, the purchase of put options prior to selling the call options they were meant to fund, or cash being withdrawn prior to the sale of equities to fund the withdrawal.  Normally, when a customer purchases assets prior to the funds being available in the customer's account, the customer is buying on "margin."

213.    The Kingate Funds did not have a margin account with BLMIS and could not

have traded on margin.  The fact that the Kingate Funds had a negative cash balance with

BLMIS on 255 separate occasions put Ceretti, Grosso, the Kingate Funds, the Management

Defendants, and Citi Hedge on inquiry notice of fraudulent activity at BLMIS.

214.    Even if BLMIS was buying on margin with the permission of the Kingate Funds,

Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew or should

have known that BLMIS was acting in a suspiciously irregular if not unlawful manner.  When

buying on margin, customers incur and are generally charged margin interest because buying on

margin is effectively buying the underlying security with a loan from the investment

adviser/broker dealer.  On information and belief, BLMIS never charged the Kingate Funds any

margin interest for this extension of credit, effectively giving millions of dollars to the Kingate

Funds as a tax-free gift.  These extensions of credit were not trivial.

215.    The table below illustrates a sample of the numerous of instances the Kingate

Funds had negative cash balances.

**Figure 2**
**Kingate Funds Negative Cash Balances**
**2000-2008**

| DATE | KINGATE GLOBAL AVERAGE BALANCE | KINGATE EURO AVERAGE BALANCE | NUMBER OF DAYS |
|---|---|---|---|
| 7/19/1999 | (28,421,606) | (5,272,252) | 2 |
| 6/14/2000 | (1,449,661) | (286,613) | 2 |
| 7/25/2002 | (5,082,198) | (1,051,713) | 6 |
| 6/3/2004 | (13,815,039) | (3,742,508) | 6 |
| 5/22/2008 | (23,015,541) | (7,848,209) | 1 |

F.    **BLMIS Purchased Treasurys Before Selling the Securities from Which the Cash for the Purchases Originated**

216.    As part of the SSC Strategy, Madoff would allegedly move the Kingate Funds'

money into Treasurys when it was no longer advantageous to be in the market.  When market

conditions improved, Madoff would sell the Treasurys and use the proceeds to purchase a new

basket of stocks.

217.    In reviewing the Kingate Funds' account statements, Ceretti, Grosso, the Kingate

Funds, the Management Defendants, and Citi Hedge should have noted the impossible

transactions ostensibly taking place with regard to BLMIS's purported SSC Strategy.  The

account statements reflected occasions where BLMIS purchased securities before selling the

Treasurys, an implausible scenario since the Kingate Funds' cash was supposedly tied up in

Treasurys with no cash available to settle the equities purchases.  Likewise, the trading

confirmations would show a move from equities back into Treasurys before the Kingate Funds

would have obtained cash from the sale of the equities.

218.    Despite these clear indicia of fraudulent activity at BLMIS, Ceretti, Grosso, the

Kingate Funds, the Management Defendants, and Citi Hedge made no further inquiry and took

no action.

### G.    *The Options Trades Could Not Have Been Conducted in the Over-The-Counter Market*

219.    At times, when questioned about the availability of sufficient exchange traded

options for the SSC Strategy, Madoff often responded that he traded in the OTC Market.  This

claim was facially implausible, as the options purportedly traded on the Kingate Funds' behalf

could not have been sold in the OTC market.  Trading options in the OTC market would have

been more expensive than trading on the CBOE, yet on information and belief, those costs were

not incurred by BLMIS or passed on to its investors.  The absence of such costs, together with

BLMIS's representation that it was trading in the OTC market, should have prompted

sophisticated investors like Ceretti, Grosso, the Kingate Funds, the Management Defendants, and

Citi Hedge to request verification of the trades and demand more concrete information about the

operations of BLMIS.

220.    Also, in the OTC market, option counterparties are typically expressly identified on trade confirmations.  On information and belief, as was typical for all BLMIS accounts, none of the options trade confirmations sent on behalf of the Kingate Funds ever identified the counterparty.

221.    Finally, options traded on the CBOE have a unique identifier known as a "CUSIP" number that allows traders to quickly access electronic information regarding a particular transaction.  OTC options are not assigned a CUSIP number.  Despite this fundamental difference, the Madoff confirmations reviewed by Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge included a CUSIP number, even though the ostensible trades were private OTC transactions.

### H.    *Madoff's Options Trades Were Inconsistent with the SSC Strategy*

222.    As part of the SSC Strategy, BLMIS claimed to buy puts and write calls to hedge gains and losses of the underlying equities.  Upon information and belief, on a number of occasions, account statements purported to show gains on behalf of the Kingate Funds, resulting from transactions inconsistent with the SSC Strategy.  Certain of these transactions involved short term option trading that resulted in substantial gains for the Kingate Funds.  For example, in 2008, Kingate Global and Kingate Euro each participated in two of these trades, which generated gains of approximately $25.5 million and $8.8 million, respectively.  These transactions represented approximately 11% of the total return for Kingate Global and Kingate Euro in 2008.  These gains were purportedly achieved through speculation in the options market, which would contradict the premise of the SSC Strategy.  Between 1996 and 2008, Kingate Global and Kingate Euro benefitted in excess of $136 million and $33 million, respectively, from such trades.

223.    Additionally, the SSC Strategy required that the hedge be adjusted to reflect a

change in the equities being hedged if some of the underlying equities were sold early. BLMIS, however, often sold out of an equity prior to liquidation of the entire basket and did not adjust the hedge for that partial sale of the underlying equities. Between January 2000 and November 2008, the underlying equities for the Kingate Funds changed without a corresponding adjustment to the hedge approximately 79 times.

224.    All of these occurrences should have pointed Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge to the fact that BLMIS's options trades were inconsistent with Madoff's SSC Strategy and served as an indicia of fraud. Yet, despite Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge's sophistication, no investigation was conducted.

### I.    The Kingate Funds' Trade Confirmations Frequently Contained Settlement Anomalies in Options Transactions

225.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge ignored options transactions made on behalf of the Kingate Funds that settled in a time range outside of industry norms. According to industry standards, the settlement date for listed options is the business day following the trade date, referred to as T+1. However, BLMIS's statements for the Kingate Funds showed that a high percentage of options contracts settled as late as three days after the trade date.

226.    Demonstrably, at least 555 out of the 2,149 total options contracts transacted on behalf of the Kingate Funds settled outside the normal period of T+1. Therefore, almost 26 percent of all purported options activity in the Kingate Funds' BLMIS accounts did not comply with standard trading practices.

227.    Anyone performing verification or monitoring should have raised this settlement date anomaly as a red flag. Ceretti, Grosso, the Kingate Funds, the Management Defendants,

and Citi Hedge were either aware of these irregularities and ignored them, or failed to reasonably and meaningfully investigate them on behalf of their investors.

**Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge Were on Inquiry Notice of Fraudulent Activity at BLMIS**

### J.    *The Purported Excessive Trading Volumes Never Impacted the Market*

228.    Madoff told Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge that the SSC Strategy involved moving all assets into the market over the span of a few days.  Then, when Madoff's computer model so indicated, BLMIS purportedly sold those securities over a similar period.  Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that BLMIS had over $13.6 billion under management as of 2006.

229.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge, therefore, understood that BLMIS purported to move over $13 billion into and out of the market over the course of just a few days numerous times every year.  This enormous volume should have caused significant market reactions and price displacement.  Such displacement was never observed because the trading did not occur.  Based on the lack of observable market reaction, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew or should have known that Madoff's trades were not happening as he claimed.

### K.    *Madoff's Supernatural Timing When Buying and Selling Stocks*

230.    Pricing reflected on the Kingate Funds' trade confirmations and account statements further demonstrated the implausibility of Madoff's trades, which almost always occurred at precisely the right time of the day.  With remarkable consistency, when Madoff was purchasing shares, the reported average price was in the lower half of the daily trade range, and when selling shares, the sale price was in the upper half of the daily trade range.

231.    Madoff's success rate alone was a red flag.  Madoff also represented to investors

that he was time-slicing (entering the market at specific intervals over the course of a trading

day), and thus the reported price was an average.  In purchasing or selling a stock several times

during the trading day, Madoff's reported prices should have gravitated toward the daily

midpoint.  Instead, they gravitated toward Madoff's optimal price point—a statistical

impossibility.

232.    For example, the Kingate Funds' account statements and trade confirmations

indicate that, from 1998 to 2008, 77 percent of equity buys occurred in the lower half of the daily

price range and 70 percent of equity sells occurred in the upper half of the daily price range.  For

example, the Kingate Global March 2000 BLMIS account statement indicated that 42 of 66

purported equity sells occurred in the upper half of the daily price range.

233.    As further example, BLMIS reported that on March 3, 2000, it bought for the

Kingate Funds 68,244 shares of Texas Instruments at a price of $178.50.  The low for Texas

Instruments that day was $178 while the high was $188.13.  The Volume Weighted Average

Price was $182.32.  Considering that the Kingate Funds share alone would have been roughly 10

percent of the market transactions that day for Texas Instruments (6,605,600 shares were bought

and sold that day), it would not have been possible for BLMIS to have purchased that many

shares of Texas Instruments on that day for that extremely low average price.

234.    Because Ceretti, Grosso, the Kingate Funds, the Management Defendants, and

Citi Hedge are sophisticated financial professionals and had access to the Kingate Funds'

account statements and trade confirmations, they should have known that these purported trades

were statistically impossible.  Ceretti, Grosso, the Kingate Funds, the Management Defendants,

and Citi Hedge accepted that BLMIS's purported trading activity defied laws of supply and

demand, common sense and industry practice.

      *L.*       *The Kingate Funds Entered Into Risky Options Contracts with Unidentified*
             *Counterparties*

      235.     Trading OTC options would have required BLMIS to enter into private,

individually negotiated contracts with willing counterparties.  The Kingate Funds executed a

Master Agreement for OTC Options.  Under the agreement, BLMIS served as the agent to the

Kingate Funds in entering into any options trades.  Those trades are private contracts between the

Kingate Funds and the counterparty.  If the counterparty failed to perform, it was the Kingate

Funds, not BLMIS, that were exposed.

      236.     BLMIS was supposed to act only as an agent for the Kingate Funds.  Indeed, the

Master Agreement explicitly states that the Kingate Funds could not seek recourse from BLMIS

if the counterparty failed to perform.  On information and belief, BLMIS refused to identify

these counterparties to its clients.  The fact that the Kingate Funds' options contracts contained

unidentified counterparties put Ceretti, Grosso, the Kingate Funds, the Management Defendants,

and Citi Hedge on inquiry notice of fraudulent activity at BLMIS.

      237.     Madoff claimed the options counterparties entered into agreements identical to

ones executed by BLMIS's investors.  Ceretti, Grosso, the Kingate Funds, the Management

Defendants, and Citi Hedge never reviewed such an agreement, undoubtedly because such an

agreement is likely impossible.  Because BLMIS allegedly traded options in large blocks,

dividing contracts proportionally among its investors, an options counterparty would not know

which party it was relying on to perform the agreement.  Options dealers handling the volumes

claimed by BLMIS do not expose themselves to such credit risks without knowing the other

party.

      238.     Madoff knew that such lack of transparency would concern investors in BLMIS

and its feeder funds.  Thus he claimed to force the options counterparties to deposit Treasurys to

ensure performance.  Despite Madoff's claim, Ceretti, Grosso, the Kingate Funds, the

Management Defendants, and Citi Hedge never received any evidence of where and how these

imaginary Treasurys were posted.

239.    Madoff also claimed that because the investors were holding the basket of stocks,

the counterparty used the stocks as collateral.  Such a claim leads to further inconsistencies.

First, Madoff claimed the option counterparty could not seize the investors' equities, which

would make the entire "collateral" claim illusory.  Second, there was no restriction on Madoff's

investors closing out or partially withdrawing from their accounts, creating the possibility that an

account could quickly become null and again leave no collateral for an option trader.  Again,

despite this flawed logic, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and

Citi Hedge blindly accepted Madoff's explanation.

240.    On information and belief, Ceretti, Grosso, the Kingate Funds, the Management

Defendants, and Citi Hedge never questioned Madoff about these matters.  Nor did they perform

any independent due diligence.  Sophisticated financial professionals like Ceretti, Grosso, the

Kingate Funds, the Management Defendants, and Citi Hedge should have easily detected the

flawed structure and recognized it as yet another indicia of fraudulent activity at BLMIS.

### M.    The Structure of BLMIS Was Opaque, Secretive, and Lacked Independent Oversight and Customary Internal Controls

241.    Madoff purportedly held positions at BLMIS that would normally be occupied by

four separate entities – he was the investment adviser, custodian, and administrator of the 703

Account, as well as the broker-dealer who initiated and executed the phantom trades.  This meant

that there was neither an independent custodian to assure the proper segregation of assets, nor

was there an independent third-party to verify the existence and value of BLMIS's investments

or transactions.  This "self-custody" structure eliminated a critical internal control, widely

recognized as basic in both the brokerage and investment management industry, that prevents

fraud by having an independent custodian hold and confirm the actual existence of securities for

investors.

242.    In 2006, Grosso asked that certain statements in the Kingate Funds' disclosure to

investors regarding such conflicts of interests be removed because he claimed it would "bother"

investors.

243.    On information and belief, Ceretti, Grosso, the Kingate Funds, the Management

Defendants, and Citi Hedge did not reasonably or independently verify that the securities

purportedly bought, sold, or held for the Kingate Funds existed.  On information and belief,

Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge accepted

Madoff's explanation for this facially suspicious practice.  Ceretti, Grosso, the Kingate Funds,

the Management Defendants, and Citi Hedge did not perform any independent, meaningful, or

reasonable due diligence despite being on notice of this red flag.

### N.    *BLMIS, Known as High-Technology Firm, Provided Only Paper Statements*

244.    Despite being a technological pioneer of electronic trading, Madoff did not

provide his customers with real-time electronic access to their accounts, which was and is

customary in the industry for hedge fund and fund of fund investors.  Indeed, BLMIS used

outmoded technology and provided only printed account statements and paper trading

confirmations that were sent via U.S. mail, three to four days after the trades occurred, a practice

that enabled Madoff and BLMIS to pick trades for the statements using hindsight.

245.    Even though Ceretti, Grosso, the Kingate Funds, the Management Defendants,

and Citi Hedge knew that Madoff and BLMIS were technologically savvy and Grosso himself

called Madoff a "technology addict," Ceretti, Grosso, the Kingate Funds, the Management

Defendants, and Citi Hedge accepted without protest paper copies of Kingate Funds' trade

confirmations.  This was a practice plainly rife with the risk of fraud.

### O.    *Absence of a Capable Auditor*

246.    Even the one institutional check on the IA Business's activities – the fact that it was audited by an independent auditor – was itself a major warning sign for investors.  BLMIS ostensibly had tens of billions of dollars under management, yet was audited by Friehling & Horowitz C.P.A. P.C. ("F&H"), an accounting firm with only two accountants, one of whom was semi-retired and living Florida.  The firm's offices were located in a strip mall and FIM knew that the BLMIS auditor for BLMIS was a "small one in Rockland county [sic] NY."

247.    On November 3, 2009, David Friehling pleaded guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC, all in connection with Madoff and BLMIS.

248.    On information and belief, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge did not independently confirm whether F&H was adequately staffed, technically equipped, or professionally qualified, or even capable of performing large scale domestic and international auditing services at a time when Madoff was reporting over $13 billion under management.

249.    The size and lack of professional qualification of F&H and the nature of the services they provided were readily accessible to Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge.  All accounting firms that perform audit work must enroll in the peer review program of the American Institute of Certified Public Accountants' ("AICPA").  This program involves the assessment by experienced auditors of a firm's audit quality.  F&H, while a member of the AICPA, had not been peer reviewed since 1993.  The firm avoided the requirement by stating, in writing, that it did not actually perform any auditing work.  The results of these peer reviews are a matter of public record and on file with the AICPA.

250.    That BLMIS, with billions of dollars under management, relied on an auditor like

F&H, should have been a red flag to Ceretti, Grosso, the Kingate Funds, the Management

Defendants, and Citi Hedge.  Instead, Ceretti, Grosso, the Kingate Funds, the Management

Defendants, and Citi Hedge ignored this red flag, did not inquire further, and continued to

develop their relationships with BLMIS.

### P.    Management Fees

251.    BLMIS gave Ceretti, Grosso, the Kingate Funds, the Management Defendants,

and Citi Hedge a powerful incentive to turn a blind eye to its numerous indicia of fraud.  Madoff,

contrary to industry standards, agreed to a compensation structure that left hundreds of millions,

if not billions, of dollars on the table.  Madoff purported to be satisfied with simply earning a

trading commission of four-cents per share and one dollar per option contract.  The standard

investment advisery fee charged by a hedge fund manager ranges from 1 percent to 2 percent of

assets under management plus a performance fee of 10 percent to 20 percent of any profits

earned by the investment.  Fees normally run higher for investment advisers with a history of

success.  By contrast, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi

Hedge, whose only role was to feed money to BLMIS, received substantial management and

administrative fees and a share of the profits that would normally go to the entity in the position

of BLMIS.

## XI.    THE TRANSFERS

252.    According to BLMIS's records, Kingate Global and Kingate Euro maintained

accounts 1FN061 and 1FN086, respectively, with BLMIS set forth on Exhibit A (the

"Accounts").  For their respective accounts, Kingate Global and Kingate Euro executed a

Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to

Purchases and Sales of Securities and Options (collectively, the "Account Agreements"), and

delivered such documents to BLMIS at its headquarters at 885 Third Avenue, New York, New York.

253.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Accounts were held in New York, New York, and Kingate Global and Kingate Euro sent funds to BLMIS in New York, New York for application to the Accounts and for the purported conducting of trading activities.

254.    Prior to the Filing Date, BLMIS transferred at least $975,541,729 to, or for the benefit of, Kingate Global and Kingate Euro in the form of withdrawals from their accounts (the "Transfers"), as set forth in Exhibit B, under circumstances that should have put Kingate Global and Kingate Euro on actual or inquiry notice that the purported account activity was inconsistent with legitimate trading activity and credible returns, that Ceretti, Grosso, the Kingate Funds, the Management Defendants, the Ceretti and Grosso Shell Company Defendants, and Citi Hedge were benefitting from fraudulent transactions in the Kingate Global and Kingate Euro accounts, that the IA Business was predicated on fraudulent activities, and/or that the transfers were fraudulent.

255.    Of the Transfers, avoidable and recoverable initial transfers in the approximate total amount of $437,501,112 were transferred to, or for the benefit of, Kingate Global (the "Kingate Global Transfers").  See Exhibit B, Column 5.  Of the Transfers, avoidable and recoverable initial transfers in the total amount of $538,040,617 were transferred to, or for the benefit of, Kingate Euro (the "Kingate Euro Transfers").  See Exhibit B, Column 5.  Kingate Global and Kingate Euro were initial transferees of the avoidable transfers set forth above.

256.    The Kingate Global Transfers and the Kingate Euro Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are avoidable and

recoverable under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable

provisions of SIPA, particularly section 78fff-2(c)(3), and applicable provisions of N.Y. CPLR

203(g) and 213(8) (McKinney 2001) and DCL sections 273 – 279 (McKinney 2001).

257.   Of the Transfers, BLMIS made payments or other transfers to, or for the benefit

of, Kingate Global totaling at least $101,753,145 during the 90 days prior to the Filing Date (the

"Kingate Global Preference Period Transfers").  See Exhibit B, Column 9.

258.   Of the Transfers, BLMIS made payments or other transfers to, or for the benefit

of, Kingate Euro totaling at least $155,606,833 during the 90 days prior to the Filing Date (the

"Kingate Euro Preference Period Transfers").  See Exhibit B, Column 9.

259.   The Kingate Global Preference Period Transfers and Kingate Euro Preference

Period Transfers were and continue to be Customer Property within the meaning of section

78lll(4) of SIPA, and are avoidable and recoverable under sections 547, 550(a) and 551 of the

Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

260.   Of the Transfers, BLMIS made transfers to, or for the benefit of, Kingate Global

totaling at least $163,447,509 during the two years prior to the Filing Date (the "Kingate Global

Two-Year Transfers").  See Exhibit B, Column 10.

261.   Of the Transfers, BLMIS made transfers to, or for the benefit of, Kingate Euro

totaling at least $248,979,674 during the two years prior to the Filing Date (the "Kingate Euro

Two-Year Transfers").  See Exhibit B, Column 10.

262.   The Kingate Global Two-Year Transfers and the Kingate Euro Two-Year

Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of

SIPA, and are avoidable and recoverable under sections 548, 550(a) and 551 of the Bankruptcy

Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

263.   Of the Transfers, BLMIS made transfers to Kingate Global totaling at least

$398,704,065 during the six years prior to the Filing Date (the "Kingate Global Six-Year

Transfers). See Exhibit B, Column 11.

264.    Of the Transfers, BLMIS made transfers to, or for the benefit of, Kingate Euro

totaling at least $475,485,759 during the six years prior to the Filing Date (the "Kingate Euro

Six-Year Transfers"). See Exhibit B, Column 11.

265.    The Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers

were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and

are avoidable and recoverable under sections 544, 550(a) and 551 of the Bankruptcy Code,

applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of DCL

sections 273 – 279.

266.    On information and belief, the Management Defendants received subsequent

transfers of the avoidable transfers in the form of fees from Kingate Euro and Kingate Global,

which are recoverable under section 550(a) of the Bankruptcy Code (the "Management

Defendants Subsequent Transfers").

267.    On information and belief, the Ceretti and Grosso Shell Company Defendants

received subsequent transfers of avoidable and recoverable transfers in the form of fees from the

Management Defendants, which are recoverable under section 550(a) of the Bankruptcy Code

(the "Ceretti and Grosso Shell Company Defendant Subsequent Transfers").

268.    On information and belief, Ceretti and Grosso received subsequent transfers of

avoidable and recoverable transfers in the form of fees from the Ceretti and Grosso Shell

Company Defendants and/or the Management Defendants, which are recoverable under section

550(a) of the Bankruptcy Code (the "Ceretti and Grosso Subsequent Transfers").

269.    On information and belief, Citi Hedge received subsequent transfers of the

avoidable and recoverable transfers in the form of fees from Kingate Euro and Kingate Global,

which are recoverable under section 550(a) of the Bankruptcy Code (the "Citi Hedge Subsequent

Transfers").

270.    The Management Defendants Subsequent Transfers, the Ceretti and Grosso Shell

Company Defendant Subsequent Transfers, Ceretti and Grosso Subsequent Transfers, and Citi

Hedge Subsequent Transfers (collectively the "Subsequent Transfers") were made to, or for the

benefit of, the Management Defendants, the Ceretti and Grosso Shell Company Defendants,

Cerretti, Grosso, and Citi Hedge (collectively the "Subsequent Transferee Defendants").

271.    The Subsequent Transfers, or the value thereof, are recoverable from the

Subsequent Transferee Defendants under section 550(a) of the Bankruptcy Code.

272.    To the extent that any of the recovery counts may be inconsistent with each other,

they are to be treated as being pleaded in the alternative.

273.    The Trustee's investigation is ongoing and the Trustee reserves the right to:  (i)

supplement the information regarding the Transfers and any additional transfers; and (ii) seek

recovery of such additional transfers.

## CUSTOMER CLAIMS

274.    Kingate Global filed Customer Claim No. 15359 on or about July 2, 2009 and

Kingate Euro filed Customer Claim No. 15358 on or about July 2, 2009, (collectively, the

"Customer Claims").  To date, the Trustee has yet to determine the Customer Claims.

275.    On December 23, 2008, this Court entered an Order on Application for Entry of

an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying

Procedures for Filing, Determination, and Adjudication of Claim, and Providing Other Relief

("Claims Procedures Order"; Docket No. 12).  The Claims Procedures Order includes a process

for determination and allowance of claims under which the Trustee has been operating.  The

Trustee intends to pursue resolution of the Customer Claims, their objections and any other

related objections to the Trustee's determination of such claims through a separate hearing as

contemplated by the Claims Procedures Order.

**COUNT ONE**
**PREFERENTIAL TRANSFERS**
**11 U.S.C. §§ 547(b), 550(a), AND 551**

***(Against Kingate Global and Kingate Euro)***

276.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

277.    At the time of each of the Kingate Global Preference Period Transfers and

Kingate Euro Preference Period Transfers, Kingate Global and Kingate Euro were "creditors" of

BLMIS within the meaning of section 101(10) of the Bankruptcy Code and under SIPA § 78fff-

2(c)(3).

278.    Each of the Kingate Global Preference Period Transfers and Kingate Euro

Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the

meaning of section 101(54) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

279.    Each of the Kingate Global Preference Period Transfers and Kingate Euro

Preference Period Transfers was to, or for the benefit of, Kingate Global and Kingate Euro.

280.    Each of the Kingate Global Preference Period Transfers and Kingate Euro

Preference Period Transfers was made for, or on account of, an antecedent debt owed by BLMIS

before such transfer was made.

281.    Each of the Kingate Global Preference Period Transfers and Kingate Euro

Preference Period Transfers was made while BLMIS was insolvent.

282.    Each of the Kingate Global Preference Period Transfers and Kingate Euro

Preference Period Transfers was made during the 90-day preference period under section

547(b)(4) of the Bankruptcy Code.

283.    Each of the Kingate Global Preference Period Transfers and Kingate Euro

Preference Period Transfers enabled Kingate Global and Kingate Euro to receive more than

Kingate Global or Kingate Euro would receive if:  (i) this case was a case under chapter 7 of the

Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferee received

payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

284.    Each of the Kingate Global Preference Period Transfers and Kingate Euro

Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee under

section 547(b) of the Bankruptcy Code and recoverable from Kingate Global and Kingate Euro

as initial transferees or the entities for whose benefit such transfers were made under section

550(a) of the Bankruptcy Code.

285.    As a result of the foregoing, under sections 547(b), 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (i) avoiding

and preserving the Kingate Global Preference Period Transfers and the Kingate Euro Preference

Period Transfers; (ii) directing that the Kingate Global Preference Period Transfers and Kingate

Euro Preference Period Transfers be set aside; and (iii) recovering the Kingate Global Preference

Period Transfers and the Kingate Euro Preference Period Transfers, or the value thereof, from

Kingate Global and Kingate Euro for the benefit of the estate of BLMIS.

## COUNT TWO
## ACTUAL FRAUDULENT TRANSFER
## 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

### *(Against Kingate Global and Kingate Euro)*

286.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

287.    Each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers was made on or within two years before the Filing Date.

288.    Each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

289.    Each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers to, or for the benefit of, Kingate Global and Kingate Euro in furtherance of a fraudulent investment scheme.

290.    Each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers constitute a fraudulent transfer avoidable by the Trustee under section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Kingate Global and Kingate Euro under section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

291.    As a result of the foregoing, under sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment:  (i) avoiding and preserving the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers; (ii) directing that the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers be set aside; and (iii) recovering the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers, or the value thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS.

## COUNT THREE
## CONSTRUCTIVE FRAUDULENT TRANSFER
## 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

### *(Against Kingate Global and Kingate Euro)*

292.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

293.     Each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers was made on or within two years before the Filing Date.

294.     Each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

295.     BLMIS received less than a reasonably equivalent value in exchange for each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers.

296.     At the time of each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers.

297.     At the time of each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

298.     At the time of each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

299.     Each of the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers constitute fraudulent transfers avoidable by the Trustee under section 548(a)(1)(B) of

the Bankruptcy Code and recoverable from Kingate Global and Kingate Euro under section

550(a) and SIPA § 78fff-(2)(c)(3).

300.    As a result of the foregoing, under sections 548(a)(1)(B), 550(a), and 551 of the

Bankruptcy Code, the Trustee is entitled to a judgment against Kingate Global and Kingate Euro:

(i) avoiding and preserving the Kingate Global Two-Year Transfers and the Kingate Euro Two-

Year Transfers; (ii) directing that the Kingate Global Two-Year Transfers and the Kingate Euro

Two-Year Transfers; and (iii) recovering the Two-Year Transfers, or the value thereof, from

Kingate Global and Kingate Euro for the benefit of the estate of BLMIS.

### COUNT FOUR
### ACTUAL FRAUDULENT TRANSFER –
### NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

*(Against Kingate Global and Kingate Euro)*

301.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

302.    At all times relevant to the Kingate Global Transfers and the Kingate Euro

Transfers, there have been one or more creditors who have held and still hold matured or

unmatured unsecured claims against BLMIS that are allowable under section 502 of the

Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

303.    Each of the Kingate Global Six-Year Transfers and Kingate Euro Six-Year

Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

304.    Each of the Kingate Global Six-Year Transfers and Kingate Euro Six-Year

Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of

BLMIS.  BLMIS made the Kingate Global Six-Year Transfers and Kingate Euro Six-Year

Transfers to or for the benefit of Kingate Global and Kingate Euro in furtherance of a fraudulent

investment scheme.

305.    Each of the Kingate Global Six-Year Transfers and Kingate Euro Six-Year
Transfers was received by Kingate Global and Kingate Euro with actual intent to hinder, delay or
defraud creditors of BLMIS at the time of each of the Kingate Global Six-Year Transfers and
Kingate Euro Six-Year Transfers, and/or future creditors of BLMIS.

306.    As a result of the foregoing, under DCL sections 276, 276-a, 278, and/or 279,
sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee
is entitled to a judgment against Kingate Global and Kingate Euro:  (i) avoiding and preserving
the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers; (ii) directing that
the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers be set aside; (iii)
recovering the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers, or the
value thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS; and
(iv) recovering attorneys' fees from Kingate Global and Kingate Euro.

## COUNT FIVE
## CONSTRUCTIVE FRAUDULENT TRANSFER –
## NEW YORK DEBTOR AND CREDITOR LAW
## §§ 273 AND 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *(Against Kingate Global and Kingate Euro)*

307.    The Trustee incorporates by reference the allegations contained in the previous
paragraphs of the Complaint as if fully rewritten herein.

308.    At all relevant times there was and is at least one or more creditors who held and
hold matured or unmatured unsecured claims against BLMIS that were and are allowable under
section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e)
of the Bankruptcy Code.

309.    Each of the Kingate Global Six-Year Transfers and Kingate Euro Six-Year

Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

310.    BLMIS did not receive fair consideration for the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers.

311.    BLMIS was insolvent at the time it made each of the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers.

312.    As a result of the foregoing, under DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Kingate Global and Kingate Euro:  (i) avoiding and preserving the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers; (ii) directing that the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers be set aside; and (iii) recovering the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers, or the value thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS.

## COUNT SIX
### CONSTRUCTIVE FRAUDULENT TRANSFER –
### NEW YORK DEBTOR AND CREDITOR LAW
### §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *(Against Kingate Global and Kingate Euro)*

313.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

314.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

315.    Each of the Kingate Global Six-Year Transfers and Kingate Euro Six-Year

Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

316.    BLMIS did not receive fair consideration for the Kingate Global Six-Year

Transfers and Kingate Euro Six-Year Transfers.

317.    At the time BLMIS made each of the Kingate Global Six-Year Transfers and

Kingate Euro Six-Year Transfers, BLMIS was engaged or was about to engage in a business or

transaction for which the property remaining in its hands after each of the Kingate Global Six-

Year Transfers and Kingate Euro Six-Year Transfers was an unreasonably small capital.

318.    As a result of the foregoing, under DCL sections 274, 278, and/or 279, sections

544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled

to a judgment against Kingate Global and Kingate Euro:  (i) avoiding and preserving the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers; (ii) directing that the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers be set aside; and (iii) recovering

the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers, or the value

thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS.

### COUNT SEVEN
### CONSTRUCTIVE FRAUDULENT TRANSFER –
### NEW YORK DEBTOR AND CREDITOR LAW
### §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

*(Against Kingate Global and Kingate Euro)*

319.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

320.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that are allowable under section

502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the

Bankruptcy Code.

321.    Each of the Kingate Global Six-Year Transfers and Kingate Euro Six-Year

Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

322.    BLMIS did not receive fair consideration for the Kingate Global Six-Year

Transfers and Kingate Euro Six-Year Transfers.

323.    At the time BLMIS made each of the Kingate Global Six-Year Transfers and

Kingate Euro Six-Year Transfers, BLMIS had incurred, was intending to incur, or believed that

it would incur debts beyond its ability to pay them as the debts matured.

324.    As a result of the foregoing, under DCL sections 275, 278, and/or 279, sections

544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled

to a judgment against Kingate Global and Kingate Euro:  (i) avoiding and preserving the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers; (ii) directing that the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers be set aside; and (iii) recovering

the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers, or the value

thereof, from the Kingate Global and Kingate Euro for the benefit of the estate of BLMIS.

## COUNT EIGHT
### RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8) AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, 11 U.S.C. §§ 544, 550(a), AND 551

**(*Against Kingate Global and Kingate Euro*)**

325.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

326.    At all times relevant to the Kingate Global Transfers and the Kingate Euro

Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at

least one unsecured creditor of BLMIS.

327.   Each of the Kingate Global Transfers and Kingate Euro Transfers constituted a

conveyance by BLMIS as defined under DCL section 270.

328.   Each of the Kingate Global Transfers and the Kingate Euro Transfers was made

by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS

made the Transfers to or for the benefit of Kingate Global and Kingate Euro in furtherance of a

fraudulent investment scheme.

329.   Each of the Kingate Global Transfers and the Kingate Euro Transfers was

received by Kingate Global and Kingate Euro with actual intent to hinder, delay or defraud

creditors of BLMIS at the time of each of the Kingate Global Transfers and the Kingate Euro

Transfers, and/or future creditors of BLMIS.

330.   As a result of the foregoing, under NY CPLR 203(g), 213(8), DCL sections 276,

276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA §

78fff-2(c)(3), the Trustee is entitled to a judgment against Kingate Global and Kingate Euro:  (i)

avoiding and preserving the Kingate Global Transfers and the Kingate Euro Transfers; (ii)

directing that the Kingate Global Transfers and the Kingate Euro Transfers be set aside; (iii)

recovering the Kingate Global Transfers and the Kingate Euro Transfers, or the value thereof,

from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS; and (iv)

recovering attorneys' fees from Kingate Global and Kingate Euro.

## COUNT NINE
## RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR AND
## CREDITOR LAW §§ 273 – 279 AND 11 U.S.C. §§ 544, 547(b), 548, 550(a), AND 551

### (Against the Subsequent Transferee Defendants)

331.   The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

332.   Each of the Kingate Global Transfers and Kingate Euro Transfers is avoidable

under section 78fff-2(c)(3) of SIPA, DCL sections 273, 274, 275, 276, 276-a, 277, 278 and/or

279, and sections 544, 547, 548(a), 550(a), and 551 of the Bankruptcy Code and constitutes a

transfer of an interest of BLMIS in property within the meaning of section 101(54) of the

Bankruptcy Code and under SIPA § 78fff-2(c)(3).

333.    On information and belief, the Subsequent Transferee Defendants received

Subsequent Transfers, which are recoverable under section 550(a) of the Bankruptcy Code.

334.    The Subsequent Transferee Defendants were immediate or mediate transferees of

some or all of the Kingate Global Transfers and Kingate Euro Transfers under section 550(a) of

the Bankruptcy Code.

335.    Each of the Subsequent Transfers was made directly or indirectly to, or for the

benefit of, the Subsequent Transferee Defendants.

336.    Each of the Subsequent Transfers was received by the Subsequent Transferee

Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each

of the Subsequent Transfers, and/or future creditors of BLMIS.

337.    As a result of the foregoing and the avoidance of the within Transfers, pursuant to

DCL sections 273 - 279, sections 544, 547(b), 548(a), 550(a), and 551 of the Bankruptcy Code

and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee

Defendants recovering the Subsequent Transfers, or the value thereof, from the Subsequent

Transferee Defendants for the benefit of the estate of BLMIS and recovering attorneys' fees from

the Subsequent Transferee Defendants.

## COUNT TEN
## DISALLOWANCE OF CUSTOMER CLAIMS

### (Against Kingate Global and Kingate Euro)

338.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

339.    Kingate Global and Kingate Euro filed Customer Claims, which have not yet been

determined.

340.    Such Customer Claims should not be allowed pursuant to section 502(d) of the

Bankruptcy Code, as Kingate Global and Kingate Euro, who filed the Customer Claims are the

recipient(s) of transfers of BLMIS's property which are avoidable and recoverable under sections

544, 547, 548 and/or 550(a) of the Bankruptcy Code, DCL sections 273, 274, 275 and 276 and

section 78fff-2(c)(3) as set forth above, and Kingate Global and Kingate Euro have not returned

the transfers to the Trustee.

341.    The Claims Procedures Order includes a process for determination and allowance

of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee

intends to resolve the Customer Claims of Kingate Global and Kingate Euro, the Claims

Objections, and any related objections through the mechanisms contemplated by the Claims

Procedures Order.

## COUNT ELEVEN
## EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS

### (Against Kingate Global and Kingate Euro)

342.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

343.    Kingate Global and Kingate Euro, engaged in inequitable conduct, including

behavior described in this Complaint, that has resulted in injury to the customers and creditors of

the estate and has conferred an unfair advantage on Kingate Global and Kingate Euro.

344.    Based on the inequitable conduct of Kingate Global and Kingate Euro, the

customers of BLMIS have been misled as to the true financial condition of the debtor, customers

have been induced to invest without knowledge of the actual facts regarding BLMIS's financial

condition, and/or customers and creditors are less likely to recover the full amounts due to them

because of the conduct of Kingate Global and Kingate Euro.

345.    The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by

Kingate Global and Kingate Euro directly or indirectly against the estate – and only to the extent

such claims are allowed –  are subordinated for distribution purposes pursuant to sections

510(c)(1) and 105(a) of the Bankruptcy Code.

346.    Equitable subordination as requested herein is consistent with the provisions and

purposes of the Bankruptcy Code.

## COUNT TWELVE
## UNJUST ENRICHMENT

*(Against Ceretti, Grosso, the Management Defendants, the  Ceretti and Grosso Shell Company Defendants, and Citi Hedge)*

347.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

348.    Ceretti, Grosso, the Management Defendants, the Ceretti and Grosso Shell

Company Defendants, and Citi Hedge have been unjustly enriched by profiting from Madoff's

Ponzi scheme.  They have wrongfully and unconscionably benefited from the receipt of

Customer Property from BLMIS, for which they did not, in good faith, provide fair value.

349.    These proceeds took the form of, among other things, retrocession fees,

management fees, consulting fees, advisery fees, incentive fees, and interest payments.  None of

this money has been returned to the Trustee for distribution in the liquidation of the BLMIS

estate.

350.    Accordingly, equity and good conscience require full restitution of all proceeds of

the illegal scheme, all of which should rightfully be returned to the Trustee for distribution in the liquidation of the BLMIS estate.

## COUNT THIRTEEN
## CONVERSION

***(Against Ceretti, Grosso, the Management Defendants, the Ceretti and Grosso Shell Company Defendants, and Citi Hedge)***

351.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

352.    BLMIS customers have the possessory right to and interest in the billions of dollars they personally invested with BLMIS.

353.    Ceretti, Grosso, the Management Defendants, the Ceretti and Grosso Shell Company Defendants, and Citi Hedge have intentionally exercised dominion and control over Customer Property in a manner inconsistent with and in willful disregard of the solvency of the BLMIS estate.  These Defendants are therefore liable for having wrongfully converted these monies and are now obligated to return all such monies to the Trustee for distribution in the liquidation of the BLMIS estate.

## COUNT FOURTEEN
## MONEY HAD AND RECEIVED

***(Against All Defendants)***

354.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

355.    The Defendants are currently in possession of, or have control over, Customer Property.  These monies belong to the customer fund under the Trustee's control.  The Defendants have no lawful or equitable right to these monies, having obtained the monies through fraud, deceit, or mistake.

356.   In equity and good conscience, the Defendants may not retain possession or control of these monies, which rightfully belong to the customer fund under the Trustee's control.  The Defendants are obligated to return all such monies to the Trustee for distribution in the liquidation of the BLMIS estate.

## COUNT FIFTEEN
## DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

### *(Against Bank Bermuda)*

357.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

358.   Bank Bermuda is currently in possession of, or has control over, Customer Property.

359.   The specific monies currently remaining in the Bank Bermuda Accounts constitute improper transfers to those accounts by BLMIS.  These monies belong to the customer fund under the Trustee's control.  The Trustee is entitled to a judgment pursuant to 28 U.S.C. § 2201 declaring that Bank Bermuda is obligated to return all remaining monies to the Trustee for distribution in the liquidation of the BLMIS estate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants as follows:

i.   On the First Count, under sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (i) avoiding and preserving the Kingate Global Preference Period Transfers and the Kingate Euro Preference Period Transfers; (ii) directing that the Kingate Global Preference Period Transfers and Kingate Euro Preference Period Transfers be set aside; and (iii) recovering the Kingate Global Preference Period Transfers and the Kingate Euro Preference Period Transfers, or the value thereof, from

Kingate Global and Kingate Euro for the benefit of the estate of BLMIS;

 ii. On the Second Count, under sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment:  (i) avoiding and preserving the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers; (ii) directing that the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers be set aside; and (iii) recovering the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers, or the value thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS;

 iii. On the Third Count, under sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Kingate Global and Kingate Euro: (i) avoiding and preserving the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers; (ii) directing that the Kingate Global Two-Year Transfers and the Kingate Euro Two-Year Transfers; and (iii) recovering the Two-Year Transfers, or the value thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS;

 iv. On the Fourth Count, under DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Kingate Global and Kingate Euro:  (i) avoiding and preserving the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers; (ii) directing that the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers be set aside; (iii) recovering the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers, or the value thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS; and (iv) recovering attorneys' fees from Kingate Global and Kingate Euro;

 v. On the Fifth Count, under DCL sections 273, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment against Kingate Global and Kingate Euro:  (i) avoiding and preserving the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers; (ii) directing that the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers be set aside; and (iii) recovering

the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers, or the value

thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS;

vi.    On the Sixth Count, under DCL sections 274, 278 and/or 279, sections 544(b),

550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment against Kingate Global and Kingate Euro:  (i) avoiding and preserving the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers; (ii) directing that the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers be set aside; and (iii) recovering

the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers, or the value

thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS;

vii.    On the Seventh Count, under DCL sections 275, 278 and/or 279, sections 544(b),

550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment against Kingate Global and Kingate Euro:  (i) avoiding and preserving the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers; (ii) directing that the Kingate

Global Six-Year Transfers and Kingate Euro Six-Year Transfers be set aside; and (iii) recovering

the Kingate Global Six-Year Transfers and Kingate Euro Six-Year Transfers, or the value

thereof, from the Kingate Global and Kingate Euro for the benefit of the estate of BLMIS;

viii.    On the Eighth Count, under NY CPLR 203(g), 213(8), DCL sections 276, 276-a,

278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-

2(c)(3), the Trustee is entitled to a judgment against Kingate Global and Kingate Euro:  (i)

avoiding and preserving the Kingate Global Transfers and the Kingate Euro Transfers; (ii)

directing that the Kingate Global Transfers and the Kingate Euro Transfers be set aside; (iii)

recovering the Kingate Global Transfers and the Kingate Euro Transfers, or the value thereof, from Kingate Global and Kingate Euro for the benefit of the estate of BLMIS; and (iv) recovering attorneys' fees from Kingate Global and Kingate Euro;

ix.    On the Ninth Count, under DCL sections 273 - 279, 544, 547(b), 548(a), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS and recovery attorneys' fees from the Subsequent Transferee Defendants;

x.    On the Tenth Count, that the Customer Claims shall be disallowed pursuant to section 502(d) of the Bankruptcy Code;

xi.    On the Eleventh Count, that the Customer Claims, to the extent allowed, shall be subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

xii.    On the Twelfth Count, that defendants to this count be found liable for unlawfully converting the investors' assets and be held liable for the restitution of such assets;

xiii.    On the Thirteenth Count, that defendants to this count return and all monies received as a result from any and all of their business associated with the Kingate Funds;

xiv.    On the Fourteenth Count, such compensatory, consequential, general, and punitive damages in an amount to be determined at trial;

xv.    On the Fifteenth Count, a declaratory judgment pursuant to 28 U.S.C. § 2201 that Bank Bermuda shall return all monies remaining in the Bank Bermuda Accounts to the Trustee for the benefit of the customer fund.

xvi.    On all Counts, under federal common law and N.Y. CPLR 5001, 5004, awarding the Trustee prejudgment interest from the date on which the Initial or Subsequent Transfers were

received by Defendants;

      xvii.    On all Counts, establishment of a constructive trust over the proceeds of the Initial and Subsequent Transfers in favor of the Trustee for the benefit of BLMIS's estate;

      xviii.    On all Counts, assignment of Defendants' right to seek refunds from the government for federal, state, and local taxes paid on fictitious profits during the course of the scheme;

      xix.    Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

      xx.    Granting Plaintiff such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: May 20, 2011

/s/ David J. Sheehan
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Oren J. Warshavsky
Timothy S. Pfeifer
Keith R. Murphy
Geraldine Ponto
Michelle R. Kaplan

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

Of Counsel:

Frederick W. Chockley, III
John J. Burke
Loura L. Alaverdi
Adam J. Smith

EXHIBIT C

