# Exhibit A

IN THE SUPREME COURT OF BERMUDA

CIVIL JURISDICTION

COMMERCIAL LIST

2010: 454

BETWEEN:

(1)  KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)

(2)  KINGATE EURO FUND LIMITED (IN LIQUIDATION)

**Plaintiffs**

and

(1)  KINGATE MANAGEMENT LIMITED

(2)  FIM LIMITED

(3)  FIM ADVISERS LLP

(4)  FIRST PENINSULA TRUSTEES LIMITED (AS TRUSTEE OF THE ASHBY TRUST)

(5)  PORT OF HERCULES TRUSTEES LIMITED (AS TRUSTEE OF THE EL PRELA TRUST)

(6)  ASHBY HOLDINGS SERVICES LIMITED

(7)  EL PRELA GROUP HOLDING SERVICES LIMITED

(8)  MR CARLO GROSSO

(9)  MR FEDERICO CERETTI

(10)    ASHBY INVESTMENT SERVICES LIMITED

(11)    EL PRELA TRADING INVESTMENTS LIMITED

(12)    ALPINE TRUSTEES LIMITED

**Defendants**

RE-RE-RE-AMENDED STATEMENT OF CLAIM

**PARTIES**

1       The Plaintiffs ("**Kingate Global**" and "**Kingate Euro**", together, "**the Funds**") were companies
incorporated in the British Virgin Islands which at all material times carried on business as open-
ended investment companies.

1

2      The First Defendant ("**Kingate Management**") is a company incorporated in Bermuda which at all material times acted as manager or co-manager of the Funds.

3      The Second Defendant ("**FIM Ltd**") is a company incorporated in England and Wales which at all material times until July 2005 acted as consultant to Kingate Management and the Funds.

4      The Third Defendant ("**FIM Advisers**") is a limited liability partnership incorporated in England and Wales which at all material times since July 2005 acted as consultant to Kingate Management and the Funds.  In this re-re-re-amended statement of claim, FIM Ltd and FIM Advisers are referred to collectively as "**FIM**".

5      The Fourth Defendant ("**Ashby**") was at all material times before 1 April 2008 a direct 50% shareholder of Kingate Management, and is and was at all material times ~~after~~ from 1 April 2008, through its 100% subsidiary, the Sixth Defendant, an indirect shareholder of Kingate Management.  Ashby is and was at all material times the trustee of the Ashby Trust, holding those shares on trust for the Eighth Defendant (and members of his family).

6      The Fifth Defendant ("**El Prela**") was at all material times ~~before~~ between 17 August 2006 and 1 April 2008 a direct 50% shareholder of Kingate Management, and is and was at all material times ~~after~~ from 1 April 2008, through its 100% subsidiary, the Seventh Defendant, an indirect 50% shareholder of Kingate Management.  El Prela is and was at all material times after 17 August 2006 the trustee of the El Prela Trust, holding those shares on trust for the Ninth Defendant (and members of his family).  In this re-re-re-amended statement of claim, Ashby and El Prela and Alpine Trustees (as defined in paragraph 10C below) are referred to collectively as "**the Trustees**".

7      The Sixth Defendant ("**Ashby Holding Services**") is and was at all material times ~~after~~ from 1 April 2008 a direct 50% shareholder of Kingate Management.  Ashby Holding Services ~~in~~ is and was at all material times 100% owned by Ashby.

8      The Seventh Defendant ("**El Prela Holdings Services**") is and was at all material times after April 2008 a direct 50% shareholder of Kingate Management.  El Prela Holding Services is and was at all material times 100% ~~onwed~~ owned by El Prela.  In this re-re-re-amended statement of claim, Ashby Holdings Services and El Prela~~, and Ashby~~ Holding Services ~~and El Prela Holding Services~~ are referred to collectively as "**the Holding Companies**" and the Trustees and the Holding Companies are referred to collectively as "**the Shareholders**".

9      The Eighth Defendant ("**Mr Grosso**") is and was at all material times a director and controlling shareholder of FIM Ltd and a principal of FIM Advisers, and, through the Ashby Trust, ultimate beneficial owner of 50% of the shares in Kingate Management.

10    The Ninth Defendant ("**Mr Ceretti**") is and was at all material times a director and controlling shareholder of FIM Ltd and a principal of FIM Advisers, and, through the El Prela Trust, ultimate beneficial owner of 50% of the shares in Kingate Management.

10A.    The Tenth Defendant ("**Ashby Investment Services**") is and was at all material times from 1 April 2008 an investment company 100% owned by Ashby.

10B.    The Eleventh Defendant ("**El Prela Trading Investments**") is and was at all material times from 1 April 2008 an investment company 100% owned by El Prela. In this re-re-re-amended statement of claim, Ashby Investment Services and El Prela Investments are referred to collectively as "**the Investment Companies**".

10C.    The Twelfth Defendant ("**Alpine Trustees**") was the trustee of the El Prela Trust from the settlement of that trust until 17 August 2006. Alpine Trustees was at all material times before 17 August 2006 a direct 50% shareholder of Kingate Management. As the trustee of the El Prela Trust, Alpine Trustees held those shares on trust for the Ninth Defendant (and members of his family).

11    Other relevant parties are as follows:

11.1    Tremont Bermuda Limited ("Tremont Bermuda") is a company incorporated in Bermuda which at all material times until 31 December 2005 acted as co-manager of Kingate Global.

11.2    Tremont Partners Inc ("Tremont Partners") is a company incorporated in Connecticut, USA which at all material times was the parent company of Tremont Bermuda.

11.3    Bernard L. Madoff Investment Securities LLC ("BLMIS") was a limited liability company incorporated in New York which at all material times acted as investment adviser to the Funds.

11.4    Bernard Madoff ("Mr Madoff") was at all material times the founder, chairman, chief executive officer and the sole shareholder of BLMIS.

## SUMMARY OF THE CLAIM

12    The Funds were established for the purpose of investing with BLMIS monies raised from investors. The same individuals, Mr Grosso and Mr Ceretti, were behind the establishment of the Funds and its key service providers, Kingate Management and FIM.

13    From their establishment until November 2008, the Funds transferred billions of US dollars to BLMIS for investment.  Some of these monies were returned by BLMIS, for the payment of redemptions to investors.

14    In December 2008, it emerged that Mr. Madoff had for many years been operating a fraudulent 'Ponzi' scheme on a massive scale. In fact, BLMIS had invested none of the Funds' monies in assets. Instead, they had been used to pay redemptions to other investors and for the benefit of Mr Madoff and his associates.

15    At no stage before December 2008 did either Kingate Management or FIM alert the Funds to the possibility of this fraud. As a result, the Funds have lost many hundreds of millions of US dollars.

16    In addition, from their establishment until November 2008, the Funds paid Kingate Management hundreds of millions of US dollars in fees. The fees were calculated by reference to the Funds' net asset values. Because of Mr Madoff's fraud, at all material times, the Funds' only significant asset was their money at the bank. Accordingly, the Funds' net asset values were massively overstated, and the fees mistakenly overpaid.

17    The Funds's claim is:

17.1    in unjust enrichment on the ground of mistake, for the recovery of the overpaid fees from Kingate Management and/or the Shareholders and/or the Investment Companies, as ultimate recipients of the fees, and/or Mr Grosso and Mr Ceretti, as ultimate recipients of the fees and/or ultimate beneficial owners of the shares in Kingate Management;

17.2    alternatively, for orders based on the Funds' retention of legal title to the overpaid fees and/or their traceable proceeds;

17.3    alternatively, for declarations that Kingate Management and/or the Shareholders and/or the Investment Companies and/or Mr Grosso and Mr Ceretti hold the overpaid fees, together with their traceable proceeds, on trust for the Funds;

17.4    for damages for breach of contractual and tortious duties of care and/or negligent misstatement, against Kingate Management;

17.5    for damages for breach of tortious duties of care and/or negligent misstatement, against FIM ; and/or

17.6    for damages for breach of tortious duties of care and/or negligent misstatement against Mr Grosso and Mr Ceretti.

**FACTUAL BACKGROUND**

**Establishment of Kingate Global**

18      In the early 1990s, Mr Grosso and Mr Ceretti, as a development of the business of FIM, decided to set up a fund of hedge funds.

19      They took advice from Tremont Partners and, in particular, its president, Sandra Manzke ("Ms Manzke") who introduced them to various service providers in the United States and Bermuda.

20      On 11 February 1994, Kingate Global was incorporated in the British Virgin Islands as a fund of hedge funds having one class of shares denominated in US dollars. The directors of the company included Christopher Wetherill ("Mr Wetherill") (with effect from 1995) and Mrs Manzke.

21      Soon afterwards, on 24 February 1994, Kingate Management was incorporated in Bermuda.  Its directors also included Mr Wetherill.

22      By an agreement dated on or around 1 November which is undated but bears the year 1994, Kingate Management was appointed as manager of Kingate Global. Kingate Management and Kingate Global entered into a further agreement entitled "First Amendment to the Kingate Global Fund, Ltd. Management Agreement" dated as of 1 March 1995, which was said to amend a Management Agreement between Kingate Management and Kingate Global dated "as of November 1994".

23      By further an agreement dated as of 1 November 1994, FIM Ltd was appointed as consultant to Kingate Management.  Tremont Bermuda had already been retained as a consultant by an agreement dated 204 February 1994.

24      In February or March 1995, a second class of shares in Kingate Global, also denominated in US dollars, was created and named 'Class B' shares.  The original class of shares was re-named 'Class A'.

25      According to an Information Memorandum dated 1 March 1995 issued by Kingate Global in respect of the Class B shares, By an agreement dated 1 March 1995, each of Kingate Management and Tremont Bermuda was appointed as co-manager of the Class B shares pursuant to a Co-Manager Agreement "as amended, effective March 1, 1995". This agreement was amended and restated effective 1 May 2000. Although a draft Co-Manager Agreement bearing the year 1995 between Kingate Management, Tremont Bermuda and Kingate Global exists, no such agreement was executed by the parties. In respect of the Class A shares, Kingate Management continued as manager and FIM Ltd and Tremont Bermuda continued as consultants.

26    In or about January 1996, a third class of shares in Kingate Global, denominated in Deutsche Marks, was created and named 'DM Class' shares.

27    ~~By an agreement dated 1 December 1995, each of Kingate Management and Tremont Bermuda was appointed as co-manager of DM Class shares.~~ According to an Information Memorandum dated 1 December 1995 issued by Kingate Global in respect of the DM Class shares, each of Kingate Management and Tremont Bermuda was appointed as co-manager of the DM Class shares pursuant to a Co-Manager Agreement "as amended, effective December 1, 1995". As stated in paragraph 25 above, although a draft Co-Manager Agreement bearing the year 1995 between Kingate Management, Tremont Bermuda and Kingate Global exists, no such agreement was executed by the parties.

28    By further an agreement dated 1 December 1995, FIM Ltd was appointed as consultant to Kingate Management in respect of all three classes of shares in Kingate Global.  This agreement was amended in late 1998 ~~and further amended effective 1 May 2000~~.

29    By ~~late 1999 or early 1997~~ 31 December 1998, the Class A shares in Kingate Global had been wound down, leaving only the Class B shares and the DM Class shares.

**Establishment of Kingate Euro**

30    In late 1999, Mr Grosso and Mr Ceretti, as a further development of the business of FIM, decided to spin-off the DM Class shares in Kingate Global into a separate entity. The Class B shares, the only remaining class of shares in Kingate Global, were redesignated 'USD Shares'.

31    Accordingly, on 19 April 2000 Kingate Euro was incorporated in the British Virgin Islands.  Its directors were the same as the directors of Kingate Global (save the Ms Manzke was not a director of Kingate Euro).

32    By an agreement dated 1 May 2000 ("the Kingate Euro Manager Agreement"), Kingate Management was appointed as manager of Kingate Euro.

33    FIM was again retained as a consultant.

**Further agreements**

34    By an agreement dated 23 April 2001 said to be "operative with effect on and from" 1 May 2000 ("the Kingate Global Consulting Services Agreement"), the appoint of FIM Ltd as consultant to Kingate Management in respect of the remaining class of shares in Kingate Global was restated and amended.

35    By a further agreement of the same date, also said to be "operative with effect on and from" 1 May 2000.  ("the Kingate Euro Consulting Services Agreement"), FIM Ltd was formally appointed as consultant to Kingate Management in respect of Kingate Euro.

36    In addition, by distribution agreements dated 23 April 2001, but said "to have taken effect on and from" 1 June 2000, FIM Ltd was appointed as non-exclusive distributor for the sale of shares in both Funds.

37    The Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement were amended by a further agreement letters dated 7 June 2001.

38    In late 2004 or early 2005, Kingate Global entered into further, separate Two documents described as Co-Manager Agreements, which were signed on behalf of Kingate Global, with Mingate Kingate Management and Tremont Bermuda, which agreements purportedly amended and restated the earlier Manager and Co-Manager Agreements to more precisely reflect each co-manager's activities based on actual experience. However, these documents are not dated.

39    By a notice dated 16 January 2006, which took effect as of 31 December 2005, Tremont Bermuda resigned as co-manager of the Class B shares in Kingate Global.

40    Accordingly, by an agreement dated as of 1 January 2006 ("the Kingate Global Manager Agreement"), the appointment of Kingate Management as manager of Kingate Global was restated and amended.

**Relevant provisions of the agreements**

*Kingate Global Manager Agreement*

41    By the Kingate Global Manager Agreement, by way of example, Kingate Management agreed to provide various services to Kingate Global and, in return, Kingate Global agreed to pay Kingate Management a monthly management fee.  In particular:

41.1    By clause 1.1, Kingate Management agreed to perform, or obtain the performance of:

41.1.1    the investment management services described in Part II of the agreement;

41.1.2    the administrative services described in Part III; and

41.1.3    the services, relating to the sale of shares Kingate Global, described in Part IV.

41.2    By clauses 2.1 and 2.2, the investment management services included:

41.2.1    effecting the investment strategy for the investment of the assets of Kingate Global;

41.2.2    evaluating and selecting potential investments which were consistent with that strategy, including managing the investments and reinvestments of Kingate Global, in such manner as Kingate Management considered appropriate based on its past practices.

41.3   By clause 3.1, the administrative services included assisting Kingate Global, in a manner consistent with existing practice, in the performance of those administrative duties which were agreed by the parties from time to time.

41.4   By clauses 4.1, 4.2, 4.3 and 4.4, the services in respect of the sale of shares in Kingate Global included:

41.4.1   all duties and functions in connection with the sale of any shares in Kingate Global;

41.4.2   advising Kingate Global on general matters affecting the marketing of the shares, including advising the directors as to:

41.4.2.1      soliciting and introducing prospective investors; and

41.4.2.2      maintaining regular contact and updating existing and prospective investors to keep them informed of investment results and other information with regard to Kingate Global;

41.4.3   seeking to procure applications to purchase shares by eligible investors;

41.4.4   appointing consultants, agents, securities dealers and other financial institutions as authorised dealers to solicit application to purchase shares in Kingate Global and entering into compensation agreements with such authorised dealers; and

41.4.5   arranging for the delivery to each person to whom shares in Kingate Global were offered a copy of the fund's most recently published information memorandum and annual report.

41.5   By clause 5.9(a), Kingate Management was authorised was authorised to delegate as appropriate, or its discretion, any of the duties or obligations under the agreement to one or more other persons or entities, whether affiliated with or independent of Kingate Management.

41.6   By clause 5.2, Kingate Global agreed to pay Kingate Management a monthly management fee at an annual rate of 1.5% of the net asset value ("NAV") of the funds determined as at each valuation date of each calendar month. 'NAV' and 'valuation date' were to have the meanings respectively assigned to them in Kingate Global's information memorandum.

41.7   Further:

41.7.1   Clause 5.4 purported to exclude any liability of Kingate Management to Kingate Global for loss etc occasioned by Kingate Management in the performance of its services under the agreement, other than as a result of gross negligence, bad faith, wilful or reckless malfeasance or disregard of any obligations under the agreement; and

41.7.2   Clause 5.5 purported to oblige Kingate Global to indemnify Kingate Management and hold it harmless against loss etc arising out of any claim asserted in connection with Kingate Management's services under the agreement, save where the loss etc was caused by Kingate Management's gross negligence, bad faith, wilful or reckless malfeasance or disregard of its obligations under the agreement.

*Kingate Euro Manager Agreement*

42   Similarly, by the Kingate Euro Manager Agreement, Kingate Management agreed to provide various services to Kingate Euro and, in return, Kingate Euro agreed to pay Kingate Management a monthly management fee and a monthly administration fee.  In particular:

42.1   By clause 2.1, Kingate Management agreed to develop, update and affect an overall investment strategy for the investment of the assets of Kingate Euro, as well as evaluate and select potential investments which were consistent with that strategy.

42.2   By clause 3.1, Kingate Management agreed to be responsible for performing, or procuring the performance of, all duties and functions necessary or appropriate in connection with the placement of shares in Kingate Euro outside of the United States, and for advising Kingate Euro on general matters affecting its structure and operations, including advising the directors as to:

42.2.1   the suitability of Kingate Euro's structure and operating procedures in light of the expectations of prospective investors;

42.2.2   steps which could be taken to enhance the marketability of Kingate Euro's shares and to improve investor relations;

42.2.3   the identification and evaluation of candidates to serve as directors of Kingate Eurol;

42.2.4   general economic and financial developments in international securities and capital markets affecting Kingate Euro's investment program; and

42.2.5   in general, all aspects relating to Kingate Euro's administrative, accounting, legal and operational matters.

42.3   By clause 3.3, Kingate Management agreed to act as the placement agent for Kingate Euro's shares outside the United States, including using its best efforts to procure applications to purchase shares from eligible investors.

42.4   By clause 3.5, Kingate Management agreed to arrange for the delivery to each person to whom shares in Kingate Euro were offered a copy of the fund's most recently published information memorandum.

42.5    By clause 4.8, Kingate Management was authorised to delegate as appropriate, in its discretion, any of the duties or obligations imposed upon it under the agreement to one or more persons or entities, whether affiliated with or independent of Kingate Management.

42.6    By clause 4.1(a) and (b) Kingate Management was entitled to

42.6.1    a fixed monthly asset based fee, as defined in Kingate Euro's information memorandum; and

42.6.2    a fixed monthly asset based administration fee, also so defined.

42.7    Further:

42.7.1    clause 4.3 purported to exclude the liability of Kingate Management to Kingate Euro for loss etc suffered in connection with Kingate Management's services in the absence of gross negligence wilful default, fraud or dishonesty in the performance or non-performance of Kingate Management's obligations or duties; and

42.7.2    clause 4.4 purported to oblige Kingate Euro to indemnify Kingate Management and hold it harmless against loss etc arising out of any claim asserted in connection with Kingate Management servicing or having served in good faith pursuant to the agreement, save where the loss etc was caused by Kingate Management's gross negligence, bad faith, breach of fiduciary duty, wilful or reckless malfeasance or disregard of any of its obligations under the agreement.

*Kingate Global Consulting Services Agreement and Kingate Euro Consulting Services Agreement*

43    The Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement are in materially identical terms.  By both agreements, FIM Ltd agreed to provide various services to Kingate Management and, in return, FIM Ltd was entitled to be paid a consultancy fee.  In particular:

43.1    By clause 2.2 of both agreements, FIM Ltd agreed to act as consultant to Kingate Management to provide such advice and recommendations as Kingate Management required from time to time, in connection with its management of the assets of the Funds and in the implementation of the investment objectives and policies of the Funds.

43.2    By clause 3 of both agreements, the services to be provided by FIM Ltd to Kingate Management included:

43.2.1    reviewing the structure and operating procedures of the Funds;

43.2.2    preparing such analyses and reports as Kingate Management and the Funds required;

43.2.3  providing Kingate Management with assistance and support on such matters relating to investor relations as Kingate Management and the Funds required;

43.2.4  liaising directly with Kingate Management on such matters relating to the investment programs of the Funds as might be required to enable FIM Ltd to properly perform its duties under the agreements; and

43.2.5  in general, providing advice to and assisting Kingate Management on such aspects of the operational, administrative and legal matters of the Funds as Kingate Management and the Funds required.

43.3  By clause 3 of the Kingate Euro Consulting Services Agreement, FIM Ltd also agree to provide Kingate Management with advice regarding Kingate Euro's hedging activities, in order to reduce the currency risk between the Euro and the US dollar, and to oversee the execution of its recommendations.

43.4  By clause 8 of both agreements, FIM Ltd agreed to:

43.4.1  provide such assistance, information and reports as Kingate Management and the auditors of the Funds required from time to time, in connection with:

43.4.1.1  the preparation of valuations in respect of the Funds and periodic reports by Kingate Management to the Funds; and

43.4.1.2  the provision of annual, semi-annual and other reports for the benefit of investors;

43.4.2  provide such representatives as Kingate Management requested from time to time to attend board meetings of the Funds with Kingate Management; and

43.4.3  report to and discuss with the directors of the Funds their performance and other matters related to the management of their assets.

43.5  By Schedule 1 to both agreements, Kingate Management agreed to pay FIM Ltd a fixed monthly fee equal to US$30,000. Schedule 1 also provided that, for administrative convenience, Kingate Management could arrange to have the Funds pay this fee directly to FIM Ltd.

43.6  Further, clause 13.1 of both agreements purported to exclude the liability of FIM Ltd to Kingate Management and the Funds for any loss etc, in the absence of gross negligence, fraud or wilful default on the part of FIM Ltd, or failure to comply with Kingate Management's instructions.

44      On 1 August 2005, FIM Advisers took over the business of FIM Ltd. Accordingly, by deeds of novation dated 29 July 2005, FIM Advisers was substituted for FIM Ltd under both the Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement.

44A     At trial, the Funds will rely on each of the above agreements for their full terms and effect.

**The business of the Funds**

45      As open-ended investment companies, the Funds raised monies from investors through private offerings of their shares. Investors would subscribe for redeemable shares in the Funds in accordance with each fund's information memorandum and subscription agreement. In particular:

45.1    Redeemable shares could only be purchased on the first business day of a month.

45.2    Investors would make an offer for subscription by submitting completed subscription forms to the Funds' administrator.

45.3    The minimum initial investment in redeemable shares was US$250,000 and the minimum subsequent investment was US$100,000.

45.4    The purchase price of the redeemable shares varied from time to time and was equal to the fund's NAV per share as at the last business day of the previous calendar month.

45.5    If an investor's offer to subscribe was accepted, redeemable shares were allocated to the investor which thereby became a shareholder of the fund in question.

46      An investor could recover its investment in the Funds by redeeming its shares in accordance with each fund's information memorandum and articles of association. In particular:

46.1    Shares could only be redeemed on the last business day of a month.

46.2    The redemption price was the fund's NAV per share as at the redemption date.

**BLMIS**

47      Subject to amounts retained for the payment of redemptions, professional fees and operating costs, all the monies raised by Kingate Global from such share allotments, since ~~at least late 1996 or early 1997~~ about 31 December 1998 when the Class A shares were wound down, were transferred to BLMIS. Further, all such monies raised by Kingate Euro since its establishment were also transferred to BLMIS.

48      From the outset, Kingate Management delegated responsibility for all investment advisory activities
in respect of both Kingate Global and Kingate Euro to BLMIS.  Kingate Management also delegated
responsibility for custody services in respect of the Funds to BLMIS.  In particular:

48.1    BLMIS opened brokerage accounts for both Funds.

48.2    By a customer agreement, an option agreement, a trading authorization limited to purchases and sales
of securities and options, and a trading authorization directive, each fund authorized BLMIS to
manage its portfolio on a discretionary basis.

48.3    The trading authorization directive gave BLMIS investment guidelines, restricting BLMIS to so-
called 'split-strike conversion' investments.

49      Accordingly, at all material times:

49.1    All the monies raised by the Funds were invested and managed by BLMIS.

49.2    The Funds did not carry out their own investment activity.

49.3    BLMIS acted as the Funds' investment adviser.

49.4    The Funds had no investment adviser other than BLMIS.

49.5    The Funds' business was to invest with BLMIS.

50      BLMIS purportedly employed the split-strike conversion investment strategy and reported excellent
returns year after year.  In particular:

50.1    In respect of both Funds, Kingate Management received (inter alia) monthly statements from BLMIS
which purported to show the portfolio of assets in which BLMIS had invested the Funds' monies, and
their values ("**Monthly Statements**").

50.2    Kingate Management passed these statements to FIM.  On the basis of the statements, FIM produced
regular reports on the Funds' investment performance.

**Monies transferred to BLMIS**

51      When an investor subscribed for redeemable shares in either of the Funds, the purchase price for the
shares would be paid into the fund's account at the Bank of Bermuda Limited ("**the Bank**"), before
being transferred to BLMIS.

52     Similarly, when an investor requested to redeem its shares in either of the Funds, BLMIS would transfer to the fund's account at the Bank sufficient monies to meet the redemption request. However, the Funds would often meet redemption requests from subscription monies then standing to the credit of their accounts at the Bank.

53     By the end of November 2008:

53.1     Kingate Global had transferred to BLMIS subscription monies in the following amounts: of US$987,860,000 and

     53.1.1     US$977,660,000 in respect of the Class B Shares; and

     53.1.2     US$184,440.000 in respect of the DM Class Shares.

53.1A     BLMIS had transferred to Kingate Global redemption monies in the following amount s: of US$400,254,792.

     53.1.A.1     US$390,000,000 in respect of the Class B Shares; and

     53.1.A.2     US$21,000.000 in respect of the DM Class Shares.

53.2     Kingate Euro had transferred to BLMIS subscription monies in the amount of US$767,440,000 US$564,000,000 and BLMIS had transferred to Kingate Euro redemption monies in the amount of US$545,000,000 US$505,000,000.

     See the tables attached to this re-re-re-amended statement of claim as Annex A, which set out, in respect of each fund, the payments made to and received from BLMIS and the dates of payment.

**Mr Madoff's fraud**

54     In December 2008, it emerged that Mr Madoff, through BLMIS, had for many years been operating a fraudulent 'Ponzi' scheme on a massive scale. Media reports suggest that investors who transferred monies to BLMIS collectively stand to lose tens of billions of dollars. In particular:

54.1     BLMIS did not in fact invest any of the monies transferred by investors, including the Funds. BLMIS did not purchase or sell a single security or option with these monies.

54.2     The trades, assets and returns reported in the monthly statements which BLMIS provided to investors, including the Funds, were entirely fictitious.

54.3     Instead, BLMIS used the monies transferred from new investors to pay existing investors who requested withdrawals or redemptions.

54.4    In short, the monies transferred to BLMIS by investors, including the Funds, were used to keep the fraudulent scheme going, and for the benefit of Mr Madoff and his associates, until such time as the requests for withdrawals and redemptions overwhelmed the new investments, causing the collapse of the scheme.

55    Mr Madoff's fraudulent scheme remained undetected until its collapse despite the existence of numerous 'red flags' surrounding the operation of BLMIS. These included the following:

55.1    Mr Madoff and his family controlled key positions at BLMIS, limiting third party involvement.

55.2    Rather than trading through an independent broker, or using a third party custodian, BLMIS acted as its own broker and custodian.

55.3    BLMIS' auditor was a very small, unknown auditing firm which had represented to its regulatory body that it did not conduct audits.

55.4    BLMIS' fee structure was highly unusual, potentially depriving it of tens of millions of dollars each year.

55.5    BLMIS did not provide investors with electronic real-time access to their accounts. Instead, BLMIS reported trades using only paper confirmations, created after the fact, which stated average and not exact times and prices of trades.

55.6    BLMIS reported securities trades at non-existent prices and options trades at unrealistic volumes.

55.7    BLMIS refused to identify the counterparties with whom it purportedly traded securities and options.

55.8    Mr Madoff was consistently vague when responding to questions about BLMIS' operations and strategy.

55.9    At the end of each quarter and/or year, BLMIS reported to investors that it had converted all their assets into Treasury Bills or cash.

55.10    BLMIS' purported returns were too good to be true, with extremely rare losses and an incredible absence of volatility, which could not be replicated by others using the same split-strike conversion investment strategy. Further, although in theory that strategy could reduce volatility, it could not produce gains in a declining market, yet BLMIS' returns purported to do so.

55.11    Several private financial institutions, having conducted routine due diligence, refused to invest with BLMIS.

55.12    Several articles were published in the financial press raising concerns about BLMIS.

55.13    Several regulatory actions were commenced against BLMIS.

56    On 11 December 2008, Mr Madoff was arrested and charged with various violations of United States criminal securities law.

57    On 15 December 2008, BLMIS was placed in bankruptcy.  Mr Irving Picard ("**the Trustee**") was appointed as trustee to oversee the liquidation.

58    Prior to this, neither Kingate Global nor Kingate Euro had any knowledge or information that Mr Madoff was operating a fraudulent scheme.

**Aftermath of the discovery of Mr Madoff's fraud**

59    Because almost all of the Funds' assets (other than monies held in their accounts at the Bank) were invested with BLMIS, Mr Madoff's arrest and the bankruptcy of BLMIS had a devastating effect on the Funds.

60    On 12 December 2008, the Funds suspended determination of their NAV, as well as the redemption and issue of shares.

61    In January 2009, the Bank froze both Funds' accounts.  The position remains that the Funds have access to the monies in those accounts only for the purpose of paying their ordinary and necessary expenses of the liquidation.

62    On 17 April 2009, the Trustee commenced proceedings in the Bankruptcy Court for the Southern District of New York, claiming the return of $100 million which BLMIS paid to Kingate Global in the 90 days preceding 11 December 2008.

63    Accordingly:

63.1    On 8 May 2009, both Funds applied to the High Court of the Virgin Islands for the appointment of liquidators.  By orders dated 4 June 2009, the court appointed liquidators and wound up both Funds.

63.2    On 7 August 2009, both Funds presented petitions for winding up to the Supreme Court of Bermuda. By orders dated 4 September 2009, the court wound up both Funds.

**CLAIMS IN UNJUST ENRICHMENT**

**Payment of fees to Kingate Management**

64    As set out in paragraphs 41.6 and 42.6 above, under the Kingate Global Manager Agreement (and its predecessors) and the Kingate Euro Manager Agreement (together, "**the Manager Agreements**"), the Funds were obliged to pay monthly fees to Kingate Management.

65      The fees payable by each of the Funds were calculated by reference to their NAVs.  In particular, as set out in paragraphs 41.6 and 42.6 above:

65.1    Under the Kingate Global Manager Agreement, read with Kingate Global's information memorandum (as amended and restated from time to time), the monthly management fee payable by Kingate Global to Kingate Management was 1.5% of Kingate Global's NAV (excluding the NAV attributable to the DM Class Shares) at each month end.

65.1A   Prior to the incorporation of Kingate Euro, under the Kingate Global Manager Agreement, read with Kingate Global's information memorandum (as amended and restated from time to time), the following fees were payable by Kingate Global to Kingate Management in respect of the DM Class Shares:

65.1A.1          a monthly management fee of 1.5% of Kingate Global's NAV attributable to the DM Class Shares; and

65.1A.2          a monthly administration fee of 0.1% of Kingate Global's NAV attributable to the DM Class Shares.

65.2    Under the Kingate Euro Manager Agreement, read with Kingate Euro's information memorandum (as amended and restated from time to time):

65.2.1   the monthly management fee payable by Kingate Euro to Kingate Management was 1.5% of Kingate Euro's NAV at each month end; and

65.2.2   the monthly administration fee payable by Kingate Euro to Kingate Management was 0.1% of Kingate Euro's NAV at each month end.

66      Certain of tThe Manager Agreements provided that the meaning of NAV and its method of calculation were as described in the Funds' respective information memoranda.

67      The information memoranda of both Funds (as amended and restated from time to time) made materially identical provision in respect of NAV.  In particular, each information memorandum (as most recently amended and restated as at 6 October 2008) provided that:

67.1    The NAV of the fund was the market value of the fund's total assets less all accrued debts and liabilities.

67.2    The fund's administrator was to determine the fund's NAV as at the close of business on the last business day of each calendar month.

67.3    The fund's assets included:

67.3.1    all cash and cash equivalent, including bank deposits and interest bearing obligations;

67.3.2    all securities positions; and

67.3.3    all options positions.

67.4    Cash and cash equivalent was to be valued at cost plus accrued interest and discount.

67.5    Securities and options were to be valued at the last sale price reported on the principal securities exchange or market on which they were traded.  In the absence of reported sale prices on the valuation date, securities and options were generally to be valued at the last reported bid quotation.

67.6    In the absence of current quotations, or if the administrator concluded that such quotations were not indicative of value, the valuation of the assets was to be their fair value as determined in good faith by the administrator.

67.7    Further, if the administrator determined that market prices or quotations did not fairly represent the value of particular assets, the administrator was authorised to assign a value to those assets which differed from the market prices or quotations.

67.8    The administrator was to verify the prices attributed to the securities held by the fund by reference to pricing sources independent of BLMIS whenever reasonably possible.

67.9    In the absence of bad faith or manifest error, the NAV calculation made by the administrator was binding on investors in the fund.

68    In so providing, the information memorandum of each fund partially replicated provisions in the Funds' articles of association, in particular, in respect of Kingate Global, articles 55 to 57 and, in respect of Kingate Euro, articles 55, 56 and 58.

69    In accordance with these provisions, or their predecessors, or purportedly so, each of the Funds paid fees to Kingate Management, at the end of each month from their establishment until November 2008. In particular:

69.1    from 1 ~~January~~ March 1995 to November 2008, Kingate Global paid to Kingate Management management fees in the amount of US$297,972,812 and administrative fees in the amount of US$342,869 ~~US$294,312,278~~; and

69.2    from 1 ~~January~~ May 2000 to November 2008, Kingate Euro paid to Kingate Management management fees in the amount of 58,406,263 Euros and administrative fees in the amount of 3,902,060 Euros ~~US$76,125,017~~.

See the table attached to this re-re-re-amended statement of claim as Annex C~~Annex B~~, which sets out the payments made by each fund in each year and the total paid.

70    It is understood that after receipt of these payments, Kingate Management paid on a significant percentage of the fees to the Shareholders in the form of dividends.  In particular, by the end of November 2008, Kingate Management had paid to the Shareholders dividends totalling US$293,902,730.  See the table attached to this re-re-re-amended statement of claim as Annex B, which sets out the dividends paid in each year from 1995 to 2008 (inclusive).

71    It is also understood that: after receipt of these dividends, the Shareholders paid on a percentage of them to Mr Grosso and Mr Ceretti in the form of distributions of trust property.

71.1    on or around 31 March 2008, the Trustees sold to the Investment Companies investments they had made with the dividends paid to them by Kingate Management.

71.2    from time to time from 1 April 2008, the Holding Companies loaned monies (constituted by dividends received from Kingate Management) to the Investment Companies, for the purposes of investment by the Investment Companies; and

71.3    from time to time, the Trustees made to Mr Grosso and Mr Ceretti distributions of trust property (constituted by dividends received from Kingate Management and income from investment of those dividends by the Trustees and/or the Investment Companies).

**Mistaken overpayment of fees to Kingate Management**

72    By mistake, at the end of each month from their establishment until November 2008, each of the Funds overpaid fees to Kingate Management.  In particular:

72.1    As set out in paragraph 54 above, as a result of Mr Madoff's fraud:

72.1.1    none of the monies transferred by the Funds to BLMIS were invested in assets;

72.1.2    none of the assets reported in BLMIS' Monthly Statements ever existed;

72.1.3    instead, all of the monies transferred by the Funds to BLMIS were used to keep the fraudulent scheme going, and for the benefit of Mr Madoff and his associates; and

72.1.4    at all material times, BLMIS was hopelessly balance sheet insolvent.

72.2    Accordingly:

72.2.1 all of the monies transferred by the Funds to BLMIS must be treated as having been lost by the Funds at the date of transfer, and as having nil value; and

72.2.2 at the date of each payment of fees by the Funds to Kingate Management, the Funds' only significant assets were the monies held in their accounts at the Bank.

72.3 However, in calculating the Funds' NAVs at each month end, the Funds' administrator relied on BLMIS' Monthly Statements and assumed that the assets reported there existed.

72.4 As a result, as at the date of each payment of fees by the Funds to Kingate Management, the Funds' NAVs were vastly overstated and incorrect.

72.5 As at those dates, and at all times until the discovery of Mr Madoff's fraud in December 2008, the Funds believed that the NAVs were correct.

72.6 As set out in paragraph 69 above, the Funds overpaid fees to Kingate Management on the basis of this mistaken belief and as a result of it.

See the table attached to this re-re-re-amended statement of claim as Annex C, which sets out in respect of each fund, at the date of each payment of fees by the fund to Kingate Management, the fund's correct NAV, accordingly, the fees which should have been paid, the fees actually paid and the amount overpaid.

73 For the avoidance of doubt, and if necessary, the Funds aver that the overpaid fees were not due to Kingate Management under the Manager Agreements (or otherwise).

**Claim in unjust enrichment against Kingate Management**

74 Kingate Management was enriched, on receipt, in the amount of the overpaid fees.

75 The enrichment was at the expense of the Funds, Kingate Management having received the overpaid fees directly from the Funds.

76 Accordingly, given the Funds' mistake, Kingate Management has been unjustly enriched at the expense of the Funds and is liable to make restitution to the Funds in the amount of the overpaid fees. In particular, as set out in the table attached as Annex C to this re-re-re-amended statement of claim, Kingate Management is liable to make restitution:

76.1 to Kingate Global, in the amount of US$254,478,999.69 US$290,030,847, alternatively $284,720,411 (the difference representing overpayments by Kingate Global prior to 1 May 2000 in the amount of US$5,310,436 which were referable to the NAV of Kingate Global's DM Class shares ("**the DM**

overpayments"), recovery of which would be held by Kingate Global on behalf of Kingate Euro,
unless Kingate Euro itself has the right of recovery); and

76.2    to Kingate Euro, in the amount of 57,984,681 Euros, alternatively the amount of 57,984,681 Euros
plus the amount of US$5,310,436 56,226,531.48 Euros (in the event that Kingate Euro, rather than
Kingate Global, has the right of recovery of the DM overpayments, following the Transfer,
Assignment and Assumption Agreement dated 1 May 2000 ("**the Transfer Agreement**")).

76A    The overpaid fees pleaded in paragraph 76.1 are referred to hereafter as "**the Kingate Global
Overpaid Fees**". The overpaid fees pleaded in paragraph 76.2 are referred to hereafter as "**the
Kingate Euro Overpaid Fees**".

**Remedy against Kingate Management**

77    By reason of the claim set out in paragraphs 74-76 above, the Funds are entitled to an order that
Kingate Management pay:

77.1    to Kingate Global, the amount of the Kingate Global Overpaid FeesUS$254,478,999.69; and

77.2    to Kingate Euro, the amount of the Kingate Euro Overpaid Fees56,226,531.48 Euros.

**Further or alternative claim in unjust enrichment against the Shareholders**

78    The relevant factual background to the claims against the Shareholders is as follows:

78.1    Kingate Management and the Shareholders are not and were never independent or arms' length
parties.

78.2    The Shareholders are the sole owners and controllers of Kingate Management.

78.3    As set out in paragraphs 20-21 above, Kingate Management and Kingate Global were established at
the same time so as to create a structure for a hedge fund business which consisted of raising monies
from investors for investment exclusively with BLMIS and earning fees from the investments.

78.4    In particular, Kingate Management was established and used as a corporate vehicle to receives fees
from Kingate Global and, later, Kingate Euro, for payment on to the Shareholders.

79    The Shareholders were unjustly enriched on receipt of the overpaid fees by Kingate Management, and
in that amount. This enrichment was at the expense of the Funds, which made the payments, and arose
in the following alternative circumstances.

80      First, as sole owners of the entirety of the shares of Kingate Management, alternatively as the alter ego of Kingate Management, the Shareholders were automatically enriched by the receipt by Kingate Management of all overpaid fees.

81      Second, on receipt of the overpaid fees by Kingate Management, Kingate Management's assets were increased and the Shareholders were enriched by the corresponding increase in the value of their shareholdings in Kingate Management:

81.1    The value of the increase must be treated as equal to the amount of the overpaid fees received by Kingate Management.

81.2    The increase was a realised and/or realisable financial benefit and, accordingly, an incontrovertible benefit.  Alternatively, the Shareholders freely accepted the increase.

82      Third, the Shareholders were enriched upon the receipt of overpaid fees by Kingate Management, as Kingate Management did not receive for its own benefit but merely as a channel or conduit pipe to the Shareholders, alternatively as nominee on behalf of the Shareholders.

83      Fourth, the role of Kingate Management in the circumstances was or was analogous to that of agent on behalf of the Shareholders. Accordingly, on the basis of, or by analogy with the principle that the receipt of a gain by an agent is to be treated as a receipt by his principal, the Shareholders must be treated as having been enriched upon the receipt by Kingate Management of the overpaid fees.

84      Fifth, by reason of the matters pleaded above, the corporate veil of Kingate Management falls to be pierced, so as to reflect the reality that the Shareholders were enriched upon the receipt of overpaid fees by Kingate Management.

85      In the alternative to the foregoing, the Shareholders were unjustly enriched on receipt by them of dividends paid by Kingate Management out of the overpaid fees and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof). Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection and nexus between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividends to the Shareholders. Each declaration of dividends formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

85A.    In the further alternative:

85A.1   Kingate Management made distributions to the Shareholders utilising the fees paid to it by the Funds, as pleaded above.

85A.2   Those fees were not (in the hands of Kingate Management) distributable profits, but liable to be repaid to the Funds for the reasons pleaded herein. Further, Kingate Management declared and paid the dividends to the Shareholders under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to it based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

85A.3   Accordingly, Kingate Management is entitled to recover from the Shareholders by way of restitution the sums paid to them by it as dividends. If (contrary to the Funds' primary case) Kingate Management has a defence to the Funds' claims in restitution against it, the Funds are entitled to be subrogated to such restitutionary claims of Kingate Management against the Shareholders.

86      Further or alternatively, when the overpaid fees were received from the Funds by Kingate Management, they constituted the Funds' property and/or its traceable proceeds.  In particular:

86.1    The Funds' mistake, as set out in paragraph 72 above, was a fundamental mistake as to the quantity of fees paid and/or as to the obligation to pay fees.  That fundamental mistake so vitiated the Funds' intention to transfer the overpaid fees to Kingate Management as to prevent legal title to the overpaid fees passing from the Funds to Kingate Management.  Instead, legal title to the overpaid fees remained with the Funds.

86.2    Alternatively, even if legal title to the overpaid fees did pass from the Funds to Kingate Management, because of the Funds' mistake, Kingate Management held the overpaid fees on constructive trusts for the Funds, from the moment of receipt.

86.3    Alternatively, even if legal title to the overpaid fees did pass from the Funds to Kingate Management, the Funds' mistake was sufficiently serious to vitiate their intention to benefit Kingate Management by the transfer of the overpaid fees.  Accordingly, the presumption of resulting trust, namely, that, in the circumstances, the transferor did not intend to benefit the transferee, could not be rebutted and Kingate Management held the overpaid fees on resulting trusts for the Funds, from the moment of receipt.

87      As a result, when Kingate Management paid on the overpaid fees and/or their traceable proceeds to the Shareholders, the Shareholders also received the Funds' property and/or its traceable proceeds. The Shareholders must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

88      In all the premises pleaded above, given the Funds' mistake, the Shareholders have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees, alternatively, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders.

89      The Funds repeat paragraphs 76.1 and 76.2 above.

**Remedy against the Shareholders**

90      By reason of the claim set out in paragraphs 78-89 above, the Funds are entitled to an order that the Shareholders pay:

90.1    to Kingate Global, the amount of the Kingate Global Overpaid Fees US$254,478,999.69, alternatively, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders; and

90.2    to Kingate Euro, the amount of the Kingate Euro Overpaid Fees 56,226,531.48 Euros, alternatively, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders.

**Further or alternative claim in unjust enrichment against the Investment Companies**

90A.    Further or in the alternative to the above, the Investment Companies were enriched on receipt by them of:

90A.1   investments, made by the Trustees with dividends paid to the Trustees by Kingate Management out of the overpaid fees and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof) and then transferred to the Investment Companies by the Trustees; and

90A.2   such dividends, paid to the Holding Companies by Kingate Management and then transferred to the Investment Companies by the Holding Companies for the purposes of investment.

90B.    Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividend to the Shareholders, and the subsequent transfer of those dividends, and investments made with those dividends, to the Investment Companies for the purposes of investment. Each transfer formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

90C.    In the further alternative:

90C.1    The Trustees and the Holding Companies paid the sums referred to in paragraphs 90A.1 and 90A.2 above to the Investment Companies, which sums were derived from the fees paid to Kingate Management by the Funds, as pleaded above.

90C.2    Those sums were (in the hands of the Trustees and the Holding Companies) liable to be repaid to the Funds or Kingate Management for the reasons pleaded herein. Further, the Trustees and the Holding Companies made the transfers to the Investment Companies under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to Kingate Management, and by Kingate Management to them, based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

90C.3    Accordingly, the Trustees and the Holding Companies are entitled to recover from the Investment Companies by way of restitution the sums paid to them. If (contrary to the Funds' primary case) the Trustees and/or the Holding Companies have a defence to the Funds' claims in restitution against them, the Funds are entitled to be subrogated or sub-subrogated (via Kingate Management's restitutionary claim against the Trustees and the Holding Companies pleaded in paragraph 85A above) to such restitutionary claims of the Trustees and/or the Holding Companies against the Investment Companies.

90D.    Further or alternatively, for the reasons pleaded above, all such transfers to the Investment Companies constituted the Funds' property and/or the traceable proceeds thereof.  The Investment Companies must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

90E.    In all the premises pleaded above, given the Funds' mistake, the Investment Companies have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders and then by the Shareholders to the Investment Companies.

**Remedy against the Investment Companies**

90E.    By reason of the claim set out in paragraphs 90A – 90D above, the Funds are entitled to an order that the Investment Companies pay:

90E.1    to Kingate Global, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies; and

90E.2   to Kingate Euro, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies.

**Further or alternative claim in unjust enrichment against Mr Grosso and Mr Ceretti**

91      Further or in the alternative to the above, and on the basis that Mr Grosso and Mr Ceretti were in substance and reality the ultimate beneficial owners of the Shareholders, and hence KML, then Mr Grosso and Mr Ceretti were unjustly enriched at the expense of the Funds to the same extent and in the same circumstances as were the Shareholders, as pleaded above.

92      Further or in the alternative, Mr Grosso and Mr Ceretti were unjustly enriched on receipt by them of distributions by the Shareholders of trust property out of dividends paid by Kingate Management and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof). Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection and nexus between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividends to the Shareholders, and the subsequent distribution of trust property to Mr Grosso and Mr Ceretti. Each distribution of trust property formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

92A.    In the further alternative:

92A.1   The Shareholders paid the sums referred to in paragraphs 92 above to Mr Grosso and Mr Ceretti, which sums were derived from the fees paid to Kingate Management by the Funds, as pleaded above.

92A.2   Those sums were (in the hands of the Shareholders) liable to be repaid to the Funds or Kingate Management for the reasons pleaded herein. Further, the Shareholders made the transfers to Mr Grosso and Mr Ceretti under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to Kingate Management, and by Kingate Management to them, based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

92A.3   Accordingly, the Shareholders are entitled to recover from Mr Grosso and Mr Ceretti by way of restitution the sums paid to them. If (contrary to the Funds' primary case) the Shareholders have a defence to the Funds' claims in restitution against them, the Funds are entitled to be subrogated or sub-subrogated (via Kingate Management's restitutionary claim against the Shareholders pleaded above) to such restitutionary claims of the Shareholders against Mr Grosso and Mr Ceretti.

93    Further or alternatively, for the reasons pleaded above, all such distributions to Mr Grosso and Mr Ceretti constituted the Fund's property and/or the traceable proceeds thereof. Mr Grosso and Mr Ceretti must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

94    In all the premises pleaded above, given the Funds' mistake, Mr Grosso and Mr Ceretti have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees, alternatively, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders and then paid by the Shareholders to Mr Grosso and Mr Ceretti by way of distributions of trust property.

95    The Funds repeat paragraphs 76.1 and 76.2 above.

**Remedy against Mr Grosso and Mr Ceretti**

96    By reason of the claim set out in paragraphs 91-95 above, the Funds are entitled to an order that Mr Grosso and Mr Ceretti pay:

96.1    to Kingate Global, the amount of <u>the Kingate Global Overpaid Fees</u>US$254,478,999.69, alternatively, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti; and

96.2    to Kingate Euro, the amount of <u>the Kingate Euro Overpaid Fees</u>56,226,531.48 Euros, alternatively, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti.

**CLAIMS BASED ON RETENTION OF LEGAL TITLE**

97    As set out in paragraph 86.1, the Funds' mistake was a fundamental mistake as to the quantity of the fees paid and/or as to the obligation to pay fees, which so vitiated the Funds' intention to transfer the overpaid fees to Kingate Management as to prevent legal title to those fees from passing from the Funds to Kingate Management.

98    As a result:

98.1.1    when the overpaid fees were received from the Funds by Kingate Management, they constituted property to which the Funds retained legal title and/or its traceable proceeds;

98.1.2   when Kingate Management paid on the overpaid fees and/or their traceable proceeds to the Shareholders, in the form of dividends, the Shareholders also received property to which the Funds retained legal title and/or its traceable proceeds; ~~and~~

98.1.2A  when the Shareholders paid on the overpaid fees and/or their traceable proceeds to the Investment Companies, for the purposes of investment, the Investment Companies also received property to which the Funds retained legal title and/or its traceable proceeds; and/or

98.1.3   when the Shareholders paid on the overpaid fees and/or their traceable proceeds to Mr Grosso and Mr Ceretti, in the form of distributions of trust property, Mr Grosso and Mr Ceretti also received property to which the Funds retained legal title and/or its traceable proceeds.

99       Accordingly, the Funds are entitled:

99.1     against Kingate Management, to:

99.1.1   an order that Kingate Management pay:

99.1.1.1  Kingate Global the amount of the Kingate Global Overpaid Fees ~~US$254,478,999.69~~; and

99.1.1.2  Kingate Euro the amount of the Kingate Euro Overpaid Fees~~56,226,531.48 Euros~~;

99.1.2   alternatively:

99.1.2.1  a declaration that overpaid fees in the amount of the Kingate Global Overpaid Fees~~US$254,478,999.69~~ and/or their traceable proceeds constituted property to which Kingate Global retained legal title and/or its traceable proceeds, together with an order that Kingate Management return those fees and/or their traceable proceeds to Kingate Global; and

99.1.2.2  a declaration that overpaid fees in the amount of the Kingate Euro Overpaid Fees~~56,226,531.48 Euros~~ and/or their traceable proceeds constituted property to which Kingate Euro retained legal title and/or its traceable proceeds, together with an order that Kingate Management return those fees and/or their traceable proceeds to Kingate Euro;

99.2     further or alternatively, against the Shareholders, to:

99.2.1   an order that the Shareholders pay the Funds the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders;

99.2.2    alternatively, a declaration that the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders constituted property to which the Funds retained legal title and/or its traceable proceeds, together with an order that the Shareholders return those fees and/or their traceable proceeds to the Funds;

99.2A    Further or alternatively, against the Investment Companies, to:

99.2A.1    an order that the Investment Companies pay the Funds the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies;

99.2A.2    alternatively, a declaration that the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies constituted property to which the Funds retained legal title and/or its traceable proceeds, together with an order that the Investment Companies return those fees and/or their traceable proceeds to the Funds;

99.3    further or alternatively, against Mr Grosso and Mr Ceretti, to:

99.3.1    an order that Mr Grosso and Mr Ceretti pay the Funds the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti;

99.3.2    alternatively, a declaration that the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti constituted property to which the Funds retained legal title and/or its traceable proceeds, together with an order that Mr Grosso and Mr Ceretti return those fees and/or their traceable proceeds to the Funds.


**EQUITABLE PROPRIETARY CLAIMS**

100    As set out in paragraphs 86.2 and 86.3, even if legal title to the overpaid fees and/or their traceable proceeds did pass from the Funds to Kingate Management, they constituted property in which the Funds had an equitable proprietary interest and/or its traceable proceeds when:

100.1    received from the Funds by Kingate Management;

100.2    paid on by Kingate Management to the Shareholders in the form of dividends; and

100.2A paid on by the Shareholders to the Investment Companies for the purposes of investment; and/or

100.3    paid on by the Shareholders to Mr Grosso and Mr Ceretti in the form of distributions of trust property.

101    Further or alternatively:

101.1    The retention by the Shareholders of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders, after the date on which they learned of the Funds' mistake or the circumstances giving rise to it, being (at the latest) the date of Mr Madoff's arrest, constituted unconscionable conduct.

101.2    As a result, from that date, the Shareholders held those fees and/or their traceable proceeds on constructive trusts for the Funds.

101A.    Further or alternatively:

101A.1    The retention by the Investment Companies of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies, after the date on which they learned of the Funds' mistake or the circumstances giving rise to it, being (at the latest) the date of Mr Madoff's arrest, constituted unconscionable conduct.

101A.2    As a result, from that date, the Investment Companies held those fees and/or their traceable proceeds on constructive trusts for the Funds.

102    Further or alternatively:

102.1    The retention by Mr Grosso and Mr Ceretti of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti, after the date on which they learned of the Funds' mistake or the circumstances giving rise to it, being (at the latest) the date of Mr Madoff's arrest, constituted unconscionable conduct.

102.2    As a result, from that date, Mr Grosso and Mr Ceretti held those fees and/or their traceable proceeds on constructive trusts for the Funds

103    Accordingly, the Funds are entitled:

103.1    against Kingate Management, to:

103.1.1    a declaration that Kingate Management held overpaid fees and/or their traceable proceeds in the amount of the Kingate Global Overpaid Fees~~US$254,478,999.69~~ on resulting, alternatively constructive trusts for Kingate Global from the moment of receipt, together with an order that Kingate Management account to Kingate Global in respect of those fees and/or their proceeds; and

103.1.2 a declaration that Kingate Management held overpaid fees and/or their traceable proceeds in the amount of the Kingate Euro Overpaid Fees56,226,531.48 Euros on resulting, alternatively constructive trusts for Kingate Euro from the moment of receipt, alternatively from the date of the Transfer Agreement, together with an order that Kingate Management account to Kingate Euro in respect of those fees and/or their proceeds;

103.2    further or alternatively, against the Shareholders, to a declaration that the Shareholders held on resulting, alternatively constructive trusts for the Funds, from the moment of receipt or subsequently, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders, together with an order that the Shareholders account to the Funds in respect of those fees and/or their proceeds;

103.2A  further or alternatively, against the Investment Companies, to a declaration that the Investment Companies held on resulting, alternatively constructive trusts for the Funds, from the moment of receipt of subsequently, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies, together with an order that the Investment Companies account to the Funds in respect of those fees and/or their proceeds;

103.3    further or alternatively, against Mr Grosso and Mr Ceretti, to a declaration that Mr Grosso and Mr Ceretti held on resulting, alternatively constructive trusts for the Funds, from the moment of receipt or subsequently, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti, together with an order that Mr Grosso and Mr Ceretti account to the Funds in respect of those fees and/or their proceeds.

**FAULT BASED CLAIMS**

**Claim against Kingate Management for breach of contractual and/or tortious duties of care and/or negligent misstatement**

104     It was an implied term of each of the Manager Agreements that, in the performance of its services under the agreement and/or in the delegation of the performance of any of those services to others, including the necessary monitoring of such delegation, Kingate Management would exercise reasonable skill and care, in particular, that degree of skill, care and diligence to be expected of a reasonably competent and prudent hedge fund manager.

105     Further or alternatively, by reason of the following facts and matters, Kingate Management owed to the Funds a duty of care in tort in like terms to the contractual duty set out in paragraph 104 above:

105.1   The Funds relied on Kingate Management to take care in the performance and/or delegation of the performance of its services under the agreements.

105.2   That reliance was reasonable, given:

105.2.1 the direct contractual relationship between the Funds and Kingate Management;

105.2.2 that, by contracting with the Funds and, in particular, agreeing to act as the Funds' manager, Kingate Management held itself out as having relevant skill and experience;

105.2.3 that Kingate Management (together with its delegates and/or FIM) had control over the Funds' investments; and

105.2.4 that, as Kingate Management was aware, the Funds' received no independent advice in respect of their investments from persons other than Kingate Management and/or its delegates and/or FIM.

105.3   Kingate Management knew, or ought to have known of this reliance.

105.4   Accordingly, Kingate Management assumed a responsibility to the Funds to take care in the performance and/or delegation of the performance of its services under the agreements.

105.5   Further or alternatively, given the direct contractual relationship between the Funds and Kingate Management, and in all the circumstances:

105.5.1 it was reasonably foreseeable that if Kingate Management did not take care in the performance and/or delegation of the performance of its services under the agreements, the Funds would suffer loss and damage;

105.5.2 there was a relationship of proximity between the Funds and Kingate Management; and

105.5.3 it is fair, just and reasonable that the law should impose such a duty on Kingate Management.

106    In performing and/or delegating the performance of its services under the agreements, Kingate Management breached these contractual and tortious duties. In particular:

106.1    On or around the establishment of each fund (and/or, in the case of Kingate Global, from the winding down of the Class A shares in late 1996 or early 1997 at the latest on or about 31 December 1998) Kingate Management decided on an investment strategy for both Funds of investing all monies raised from investors exclusively with BLMIS, alternatively, wholly delegated the performance of its investment advisory services to BLMIS, without first conducting any, or any adequate due diligence on BLMIS. In particular, before doing so:

106.1.1 Kingate Management failed to give any, or any adequate consideration to the numerous 'red flags' surrounding the operations of BLMIS which were matters of public information, and of which Kingate Management accordingly must have been aware. For example:

106.1.1.1    several regulatory actions had been commenced against BLMIS;

106.1.1.2    several articles had been published in the financial press raising concerns about BLMIS; and

106.1.1.3    several private financial institutions, having conducted routine due diligence, refused to invest with BLMIS.

106.1.2 Kingate Management also failed to give any, or any adequate consideration to the numerous 'red flags' surrounding the operations of BLMIS which, even if not matters of public information, could reasonably have been discovered, and of which Kingate Management accordingly should have been aware. For example:

106.1.2.1    Mr Madoff and his family controlled key positions at BLMIS;

106.1.2.2    BLMIS acted as its own broker and custodian;

106.1.2.3    BLMIS' auditor was very small and unknown;

106.1.2.4    BLMIS' fee structure was highly unusual;

106.1.2.5    BLMIS reported trades using only paper confirmations; and

106.1.2.6    BLMIS' purported returns were too good to be true.

106.1.3 Kingate Management unreasonably relied on due diligence of BLMIS conducted by third parties, including Tremont.

106.1.4 Kingate Management failed to conduct any, or any adequate due diligence on BLMIS of its own. In particular:

106.1.4.1 Kingate Management failed, adequately or at all, to visit BLMIS' premises, inspect BLMIS' operations (including BLMIS' information technology systems), interview Mr Madoff/his associates, review relevant documentation, communicate with BLMIS' auditors and/or review any audit reports prepared for BLMIS, so as to properly understand BLMIS' practices and procedures, and internal controls.

106.1.4.2 Kingate Management failed, adequately or at all, to investigate BLMIS' auditor, or to confirm that it was capable of such a large-scale audit – for example, by checking the public peer review list maintained by the American Institute of Certified Public Accountants.

106.1.4.3 Alternatively, Kingate Management failed, adequately or at all, to critically assess or independently verify anything which it was shown, told or learned.

106.2 Further or alternatively, Kingate Management failed to conduct any, or any adequate on-going due diligence on BLMIS and/or monitoring of BLMIS' performance of the investment advisory services which Kingate Management had delegated to BLMIS. In particular:

106.2.1 The Funds repeat paragraphs 106.1.1-106.1.2 above.

106.2.2 The Funds also repeat paragraphs 106.1.3-106.1.4 above.

106.2.3 Kingate Management failed, adequately or at all, to assess critically or independently to verify the regular reports and other documentation produced by BLMIS in respect of the Funds, including trade confirmations and the Monthly Statements. In particular, Kingate Management failed, adequately or at all:

106.2.3.1 independently to verify the existence and value of the assets in which BLMIS had purportedly invested the Funds' monies, as described in those reports – for example, by requesting any certificate of title from an independent third party;

106.2.3.2 independently to verify that the trades by which BLMIS had purportedly invested the Funds' monies, as described in the reports, had actually taken place, at the reported prices – for example, by comparing the reported prices of the purported

trades with the range in prices actually traded in the market on the day/s in question;

106.2.3.3    critically to assess or independently verify the volumes of those trades, including how they could be accomplished without impacting the market; and/or

106.2.3.4    critically to assess or independently verify the existence of the counter-parties to those trades, or their ability to perform their obligations.

106.2.4    Kingate Management failed, adequately or at all to investigate the number of traders at BLMIS responsible for executing the split-strike conversion strategy, and/or their identity.

106.2.5    Kingate Management failed, adequately or at all, critically to assess the question why BLMIS' split-strike conversion strategy, which was based (in part) on market timing, involved pulling out of the market at the end of each quarter and/or year.

106.2.6    Kingate Management failed, adequately or at all, critically to assess the question how BLMIS' returns could be lawfully achieved, given that basic, industry standard, statistical analysis indicated that those returns (especially their lack of volatility) were highly improbable.

106.3    Further or alternatively, it is not accepted that Kingate Management delegated or properly delegated to FIM any responsibility for conducting on-going due diligence on BLMIS and/or monitoring of BLMIS' performance of its investment advisory services. However, if and to the extent that it did so, Kingate Management failed to take any, or any adequate steps to review and/or monitor FIM's discharge of that responsibility and/or to ensure that FIM did so with reasonable skill and care.

106.4    Further or alternatively, if and insofar as FIM made negligent misstatements to the Funds or otherwise acted in breach of its duty of care (see below), it was caused or permitted to do so by Kingate Management in the performance or purported performance by Kingate Management of its duties to the Funds. In such circumstances, Kingate Management is liable as accessory for such negligent misstatements and/or negligence. Alternatively, Kingate Management is liable as a joint tortfeasor for the negligent misstatements and/or negligence of FIM as its agent.

106.5    Further or alternatively, Kingate Management failed, adequately or at all, to disclose to the Funds, at the outset or subsequently:

106.5.1    the existence of any of the 'red flags' surrounding the operations of BLMIS of which it was, or should have been aware;

106.5.2 any particular on-going risks in relation to BLMIS, and the Funds' investment strategy of investing all monies raised from investors exclusively with BLMIS, of which it was, or should (if it had conducted adequate due diligence on BLMIS) have been aware.

107 For the avoidance of doubt, and if necessary, the Funds aver that these breaches of duty, individually or collectively, amounted to "gross negligence" by Kingate Management, within the terms of the purported exclusionary provisions in the Manager Agreements.

108 By reason of these breaches of duty, the Funds have suffered loss and damage. In particular:

108.1 But for these breaches of duty, the Funds would not have invested any, alternatively, any further monies with BLMIS. Accordingly:

108.1.1 The Funds would not have transferred any, alternatively, any further subscription monies to BLMIS for investment. As a result, the Funds have lost all, alternatively, part of those monies which, since their establishment, they have transferred to BLMIS. As to these losses, see Annex A to this re-re-re-amended statement of claim.

108.1.2 The Funds would not have paid any, alternatively, any further redemption monies to redeeming investors. As a result, the Funds have lost all, alternatively, part of those monies which, since their establishment, they have paid to redeeming investors. See the table attached to this re-re-re-amended statement of claim as Annex D, which sets out the payments made to redeeming investors by each fund in each year and the total paid.

108.1.3 The Funds would not have paid to Kingate Management any, alternatively, any further fees in respect of their investments with BLMIS. As a result, the Funds have lost all, alternatively, part of these fees which, since their establishment, they have paid to Kingate Management. As to these losses, see Annex C ~~Annex B~~ to this re-re-re-amended statement of claim.

108.1.4 The Funds would not have paid any, alternatively, any further fees to other parties which provided services to the Funds in respect of their investments with BLMIS, including:

108.1.4.1    Tremont Bermuda, as co-manager of Kingate Global, from its establishment until 31 December 2005;

108.1.4.2    each fund's administrator; or

108.1.4.3    the Bank, as each fund's custodian.

As a result, the Funds have lost all, alternatively, part of these fees which, since their establishment, they have paid to these parties. In particular:

108.1.4.4     between 1 January 1995 and 19 November 2008, Kingate Global paid:

108.1.4.4.1     Tremont Bermuda, as co-manager, fees in the amount of US$36,720,777.50;

108.1.4.4.2     its administrator fees in the amount of US$4,522,919.54;

108.1.4.4.3     the Bank, as custodian, fees in the amount of US$186,235; and

108.1.4.5     between 1 January 2000 and 19 November 2008, Kingate Euro paid its administrator fees in the amount of US$1,132,198.67.

108.1.5 The arrest of Mr Madoff and the bankruptcy of BLMIS would not have had any, alternatively, as devastating an effect on the Funds, and the Funds would not have been wound up. As a result, the Funds have lost all the costs and expenses of and associated with their liquidation.

108.2     In assessing the loss and damage suffered by the Funds:

108.2.1 The Funds accept that credit must be given for all redemption monies transferred by BLMIS to the Funds. As to these amounts, see Annex A to this re-re-re-amended statement of claim.

108.2.2 The Funds accept that credit must also be given for any subscription monies received from subscribing investors which were not transferred to BLMIS for investment or otherwise paid on by the Funds.

108.2.3 The Funds aver that any amount for which credit is given must be reduced by any amount/s which the Funds are subsequently found liable to pay to the Trustee in the proceedings commenced in the Bankruptcy Court for the Southern District of New York on 17 April 2009 (or any other proceedings), or which the Funds subsequently agree to pay to the Trustee.

**Remedy against Kingate Management for breach of contractual and/or tortious duties of care and/or negligent misstatement**

109     By reason of the claim set out in paragraphs 104-108 above, the Funds are entitled to damages against Kingate Management, to be assessed.

**Claim against FIM for breach of tortious duty of care**

110    By reason of the following facts and matters, FIM owed to the Funds a tortious duty to exercise reasonable skill and care, in particular, that degree of skill, care and diligence to be expected of a reasonably competent and prudent hedge fund consultant, in the performance of its services under the Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement (and their predecessors) ("**the Consulting Services Agreements**"):

110.1    The Funds were aware of the performance of the services set out in the Consulting Services Agreements by FIM. Accordingly, the Funds relied on FIM to take care in the performance of those services.

110.2    That reliance was reasonable, given that:

110.2.1 although there was (for most of the time) no direct contractual relationship between the Funds and FIM, there was at all material times direct and substantial contact between them. Notwithstanding that the Funds were not parties to the Consulting Services Agreements, their interests were directly and substantially affected by them, as:

110.2.1.1   the services which FIM agreed to provide to Kingate Management under the agreements were in respect of the Funds and for their benefit; and

110.2.1.2   the agreements purported to bind the Funds. As set out in paragraph 43.6 above, clause 13 of both agreements purports to exclude the liability of FIM for any loss etc, in the absence of (inter alia) gross negligence, to the Funds as well as Kingate Management. For the avoidance of doubt, the Funds make no admissions as to the efficacy of such clauses as against them;

110.2.2 FIM was not an arms' length party, independent of Kingate Management. As set out in paragraphs 9-10 above, at all material times, the controlling shareholders of FIM Ltd, and the principals of FIM Advisers, were Mr Grosso and Mr Ceretti. These same individuals were behind the establishment of Kingate Management (and both Funds). Accordingly, the corporate and contractual structure did not reflect reality but was merely a structure of convenience for the benefit of Mr Grosso and Mr Ceretti. In the circumstances, it cannot be treated as creating a relationship of liability between FIM and Kingate Management but excluding any such relationship between FIM and the Funds;

110.2.3 by entering into the Consulting Services Agreements, FIM held itself out as having the skills and experience to perform the services which it thereby agreed to provide;

110.2.4 to the extent of those services, FIM had control over the Funds' investments; and

110.2.5 in respect of those services, as FIM was aware, the Funds' received no independent advice.

110.3    FIM knew, or ought to have known of this reliance.

110.4    Accordingly, FIM assumed a responsibility to the Funds to take care in the performance of its services under the Consulting Services Agreements.

110.5    Further or alternatively, in all the circumstances:

110.5.1 it was reasonably foreseeable that if FIM did not take care in the performance of its services under the Consulting Services Agreements, the Funds would suffer loss and damage;

110.5.2 there was a relationship of proximity between the Funds and FIM; and

110.5.3 it is fair, just and reasonable that the law should impose such a duty on FIM.

111    In performing its services under the Consulting Services Agreements, FIM breached this tortious duty. In particular:

111.1    On or around the establishment of each fund (and/or, in the case of Kingate Global, from the winding down of the Class A shares in late 1996 or early 1997 at the latest on or about 31 December 1998) FIM decided on and/or recommended to Kingate Management an investment strategy for both Funds of investing all monies raised from investors exclusively with BLMIS, without first conducting any, or any adequate due diligence on BLMIS. In particular, before doing so:

111.1.1 FIM failed to give any, or any adequate consideration to the numerous 'red flags' surrounding the operations of BLMIS which were matters of public information, and of which FIM accordingly must have been aware. For example:

111.1.1.1    several regulatory actions had been commenced against BLMIS;

111.1.1.2    several articles had been published in the financial press raising concerns about BLMIS; and

111.1.1.3    several private financial institutions, having conducted routine due diligence, refused to invest with BLMIS.

111.1.2 FIM also failed to give any, or any adequate consideration to the numerous 'red flags' surrounding the operations of BLMIS which, even if not matters of public information, could reasonably have been discovered, and of which Kingate Management accordingly should have been aware. For example:

111.1.2.1    Mr Madoff and his family controlled key positions at BLMIS;

111.2.1.2   BLMIS acted as its own broker and custodian;

111.2.1.3   BLMIS' auditor was very small and unknown;

111.2.1.4   BLMIS' fee structure was highly unusual;

111.2.1.5   BLMIS reported trades using only paper confirmations; and

111.2.1.6   BLMIS' purported returns were too good to be true.

111.1.3 FIM unreasonably relied on due diligence of BLMIS conducted by third parties, including Tremont.

111.1.4 FIM failed to conduct any, or any adequate due diligence on BLMIS of its own.  In particular:

111.1.4.1   FIM failed, adequately or at all, to visit BLMIS' premises, inspect BLMIS' operations (including BLMIS' information technology systems), interview Mr Madoff/his associates, review relevant documentation, communicate with BLMIS' auditors and/or review any audit reports prepared for BLMIS, so as to properly understand BLMIS' practices and procedures, and internal controls.

111.1.4.2   FIM failed, adequately or at all, to investigate BLMIS' auditor, or to confirm that it was capable of such a large-scale audit – for example, by checking the public peer review list maintained by the American Institute of Certified Public Accountants.

111.1.4.3 Alternatively, FIM failed, adequately or at all, to critically assess or independently verify anything which it was shown, told or learned.

111.2   Further or alternatively, FIM failed to conduct any, or any adequate on-going due diligence on BLMIS and/or monitoring of BLMIS' performance of the investment advisory services which Kingate Management had delegated to BLMIS.  In particular:

111.2.1 The Funds repeat paragraphs 106.1.1-106.1.2 above.

111.2.2 The Funds also repeat paragraphs 106.1.3-106.1.4 above.

111.2.3 FIM failed, adequately or at all, to assess critically or independently to verify the regular reports and other documentation produced by BLMIS in respect of the Funds, including trade confirmations and the Monthly Statements.  In particular, FIM failed, adequately or at all:

111.2.3.1 independently to verify the existence and value of the assets in which BLMIS had purportedly invested the Funds' monies, as described in those reports – for example, by requesting any certificate of title from an independent third party;

111.2.3.2 independently to verify that the trades by which BLMIS had purportedly invested the Funds' monies, as described in the reports, had actually taken place, at the reported prices – for example, by comparing the reported prices of the purported trades with the range in prices actually traded in the market on the day/s in question;

111.2.3.3 critically to assess or independently to verify the volumes of those trades, including how they could be accomplished without impacting the market; and/or

111.2.3.4 critically to assess or independently to verify the existence of the counter-parties to those trades, or their ability to perform their obligations.

111.2.4 FIM failed, adequately or at all to investigate the number of traders at BLMIS responsible for executing the split-strike conversion strategy, and/or their identity.

111.2.5 FIM failed, adequately or at all, critically to assess the question why BLMIS' split-strike conversion strategy, which was based (in part) on market timing, involved pulling out of the market at the end of each quarter and/or year.

111.2.6 FIM failed, adequately or at all, to critically assess the question how BLMIS' returns could be lawfully achieved, given that basic, industry standard, statistical analysis indicated that those returns (especially their lack of volatility) were highly improbable.

111.3 Further or alternatively, FIM failed, adequately or at all, to disclose to Kingate Management or the Funds:

111.3.1 the existence of any of the 'red flags' surrounding the operations of BLMIS of which it was, or should have been aware;

111.3.2 any particular on-going risks in relation to BLMIS, and the Funds' investment strategy of investing all monies raised from investors exclusively with BLMIS, of which it was, or should (if it had conducted adequate due diligence on BLMIS) have been aware.

112 For the avoidance of doubt, and if necessary, the Funds aver that these breaches of duty, individually or collectively, amounted to "gross negligence" by FIM, within the terms of the purported exclusionary provisions in the Consulting Services Agreements.

113    By reason of these breaches of duty, the Funds have suffered loss and damage.  The Funds repeat paragraph 108 above.

**Claim against FIM for negligent misstatement**

114    Further or alternatively, as set out in paragraph 43 above, under the Consulting Services Agreements, the services to be provided by FIM included the provision of advice on various matters and the preparation of various reports.  In particular, by clause 8 of the agreements, FIM agreed:

114.1    to provide such assistance, information and reports as Kingate Management and the auditors of the Funds required, in connection with:

114.1.1    the preparation of valuations in respect of the Funds;

114.1.2    the preparation by Kingate Management of periodic reports for submission to the Funds; and

114.1.3    the provision of annual, semi-annual and other reports for the benefit of investors and prospective investors in the Funds, whether published by the Funds or Kingate Management; and

114.2    to report to the boards of the Funds the performance of the Funds and other matters related to the management of their assets.

115    Pursuant to these obligations, FIM did produce various reports including, in respect of each Fund:

115.1    monthly performance summaries (**"Performance Summaries"**); and

115.2    quarterly reports to the board of Kingate Management (**"Board Reports"**).

116    FIM prepared the Performance Summaries and the Board Reports on the basis of information provided by BLMIS, including the Monthly Statements.

117    The Performance Summaries:

117.1    were provided by FIM to Kingate Management;

117.2    in turn, were distributed by Kingate Management to investors in the Funds:

117.2.1    prior to May 2008, with the wording *"This document has been prepared by [FIM]"*; and

117.2.2    since May 2008, with the wording "This document has been prepared by [Kingate Management]";

117.3    set out (inter alia):

117.3.1 the fund's net return for the month in question;

117.3.2 the fund's year-to-date return and annual returns since establishment; and

117.3.3 since May 2008, in general terms:

117.3.3.1   the investments in assets made by the fund during the month in question; and

117.3.3.2   the performance of the different classes of assets, during that month.  For example, the Performance Summary for May 2008 for Kingate Global stated:

*"Kingate USD started the month approximately 33% invested in the typical basket of S&P 100 Index stocks, long the related S&P 100 Index puts and short S&P 100 index calls, with the rest of the portfolio invested in Treasury Bills.  At the beginning of May a further basket of stocks (with related put and call options) was purchased.  By the end of the month, all stocks were sold and the corresponding S&P 100 Index options positions were closed down.  At month end the portfolio was fully invested in Treasury Bonds.*

*In May, options provided the majority of the gain in the portfolio, with dividends also contributing modestly.  In contrast to April, the basket of common stocks and Treasury Bills detracted slightly from the overall performance".*

118    The Board Reports:

118.1    were provided by FIM to the board of Kingate Management;

118.2    were also provided by FIM to the boards of the Funds; and

118.3    set out (inter alia), in more detail than the Performance Summaries:

118.3.1 the fund's net return for each month of the quarter in question;

118.3.2 the investment in assets, namely, equities, options and Treasury Bills, made by the fund during each month;

118.3.3 the performance of the different classes of assets during that month;

118.3.4 the fund's total assets at the end of the quarter in question; and

118.3.5 since the fourth quarter 2006, the year to date profit for the fund.

119     By reason of the following facts and matters, FIM owed to the Funds a tortious duty to take reasonable care to ensure that the statements made in the Performance Summaries and/or the Board Reports were true:

119.1   FIM knew, or ought to have known, or intended that the Funds would, or would be likely to rely on the statements made in the Performance Summaries and/or the Board Reports.  In particular, FIM knew, or ought to have known, or intended that:

119.1.1 the Performance Summaries were  distributed by Kingate Management to investors in the Funds;

119.1.2 the Board Reports were provided by FIM to the boards of the Funds; and

119.1.3 Kingate Management would, or was likely to rely on the statements made in the Performance Summaries and/or the Board Reports in the performance and/or delegation of the performance of its services under the Manager Agreements, which would have a direct and substantial effect on the Funds.

119.2   Given this, and in all the circumstances, FIM assumed a responsibility to the Funds to take reasonable care to ensure that the statements made in the Performance Summaries and/or the Board Reports were true.

120     The Funds in fact relied on the statements made in the Performance Summaries and/or the Board Reports by:

120.1   not questioning with Kingate Management (or its delegates or FIM) the investment strategy decided upon by Kingate Management (and/or FIM), of investing all monies raised from investors exclusively with BLMIS; and

120.2   continuing to transfer all such monies to BLMIS for investment.

121     The Performance Summaries and/or the Board Reports contained material misstatements.  In particular:

121.1   As set out in paragraph 54 above, as a result of Mr Madoff's fraud:

121.1.1 none of the monies transferred by the Funds to BLMIS were invested in assets;

121.1.2 none of the assets reported in BLMIS' Monthly Statements existed; and

121.1.3 no returns were produced by either fund.

121.2    Accordingly, the statements in the Performance Summaries and/or the Board Reports in respect of the assets in which each fund had invested, and their returns, were false.

122    In breach of the duty set out in paragraph 119 above, FIM failed to take reasonable care to ensure that the statements made in the Performance Summaries and/or the Board Reports were true.  In particular:

122.1    FIM failed, adequately or at all, to assess critically or independently to verify the information provided by BLMIS, including the Monthly Statements, on the basis of which FIM prepared the Performance Summaries and/or the Board Reports.  In particular, FIM failed, adequately or at all:

122.1.1    independently to verify the existence or value of the assets in which BLMIS had purportedly invested the Funds' monies – for example, by requesting any certificate of title from an independent third party;

122.1.2    independently to verify that the trades by which BLMIS had purportedly invested the Funds' monies had actually taken place, at the reported prices – for example, by comparing the reported prices of the purported trades with the range in prices actually traded in the market on the day/s in question;

122.1.3    critically to assess or independently to verify the volumes of those trades, including how they could be accomplished without impacting the market; and/or

122.1.4    critically to assess or independently to verify the existence of the counter-parties to those trades, or their ability to perform their obligations.

122.2    More generally:

122.2.1    FIM failed to conduct any, or any adequate on-going due diligence on ~~BMLIS~~ BLMIS and/or monitoring of BLMIS' performance of the investment advisory services which Kingate Management had delegated to BLMIS.  The Funds repeat paragraph 111.2 above.

122.2.2    FIM failed, adequately or at all, to disclose to the Funds:

122.2.2.1    the existence of any 'red flags' surrounding the operations of BLMIS of which it was aware, or should have been aware;

122.2.2.2    any particular on-going risks in relation to BLMIS, and the Funds' investment strategy of investing all monies raised from investors exclusively with BLMIS, of which it was, or should (if it had conducted reasonable due diligence) have been aware.

123    For the avoidance of doubt, and if necessary, the Funds aver that these breaches of duty, individually or collectively, amounted to "gross negligence" by FIM, within the terms of the purported exclusionary provisions in the Consulting Services Agreements.

124    By reason of these breaches of duty, the Funds have suffered loss and damage. The Funds repeat paragraph 108 above.

**Remedy against FIM for breach of tortious duty of care and/or negligent misstatement**

125    By reason of the claims set out in paragraphs 110-113 and 114-124 above, the Funds are entitled to damages against FIM, to be assessed.

**Claim against Mr Grosso and Mr Ceretti for breach of tortious duty of care**

126    By reason of the following facts and matters, Mr Grosso and Mr Ceretti personally, as directors of FIM Ltd, and principals of FIM Advisers, owed to the Funds a tortious duty to exercise reasonable skill and care in their dealings with and in relation to the Funds:

126.1    Mr Grosso and Mr Ceretti assumed a personal responsibility to the Funds to take care in their dealings with and in relation to the Funds. In particular:

126.1.1    As set out in paragraphs 3-10, 18-21, 30-31, 78 and 110.2.2 above:

126.1.1.1    Mr Grosso and Mr Ceretti were the individuals behind the establishment of the Funds and, at the same time, Kingate Management;

126.1.1.2    Mr Grosso and Mr Ceretti are, and were at all material times, the ultimate beneficial owners of the shares in Kingate Management;

126.1.1.3    Mr Grosso and Mr Ceretti are, and were at all material times, the directors and controlling shareholders of FIM Ltd, and the principals of FIM Advisers;

126.1.1.4    Kingate Management and FIM were the corporate vehicles of Mr Grosso and Mr Ceretti, for the receipt of fees from the Funds;

126.1.1.5    accordingly, the corporate and contractual structure, which purported to create separate legal personalities and relationships of liability, did not reflect reality but was a structure of convenience for the benefit of Mr Grosso and Mr Ceretti.

126.1.2    As directors (and controlling shareholders) of FIM Ltd, Mr Grosso and Mr Ceretti were together the directing mind and will of FIM Ltd, and the company was their alter ego. In the same way, as principals of FIM Advisers, Mr Grosso and Mr Ceretti were together the

directing mind and will of FIM Advisers and the limited liability partnership was their alter ego.

126.1.3 As directors (and controlling shareholders) of FIM Ltd, and principals of FIM Advisers, Mr Grosso and Mr Ceretti:

126.1.3.1 had some dealings with BLMIS and/or Mr Madoff and/or his associates, both before the establishment of the Funds and afterwards, in connection with the performance of FIM's services under the Consulting Services Agreements;

126.1.3.2 had regular dealings with Kingate Management, in connection with the performance of FIM's services under the Consulting Services Agreements; and

126.1.3.3 had regular dealings with the Funds in that connection, including personal exchanges with the boards of the Funds and investors.

126.1.4 As a result, at all material times, there was direct and substantial contact between Mr Grosso and Mr Ceretti and the Funds.

126.1.5 These facts and matters, taken together, were sufficient to convey to the Funds that Mr Grosso and Mr Ceretti were each willing to assume a personal responsibility to the Funds.

126.2 Accordingly (and notwithstanding the corporate and contractual structure), the Funds in fact relied on Mr Grosso and Mr Ceretti to take care in their dealings with and in relation to the Funds.

126.3 In all the circumstances, that reliance was reasonable. In particular:

126.3.1 The Funds repeat paragraphs 126.1.1-126.1.5 above.

126.3.2 As a result of their dealings with and in relation to the Funds, Mr Grosso and Mr Ceretti held themselves out as having appropriate skills and experience.

126.3.3 As a result of the reality behind the corporate and contractual structure, Mr Grosso and Mr Ceretti had control over the Funds' investments.

126.3.4 As Mr Grosso and Mr Ceretti were aware, the Funds received no advice in respect of their investments, save from FIM/Kingate Management/BLMIS, which advice was not independent.

126.4 In all the circumstances, Mr Grosso and Mr Ceretti knew or ought to have known of this reliance.

127 In their dealings with and in relation to the Funds, Mr Grosso and Mr Ceretti breached this tortious duty. In particular:

127.1    Mr Grosso and Mr Ceretti failed to conduct any, or any adequate on-going due diligence on BLMIS
and/or monitoring of BLMIS' performance of the investment advisory services which Kingate
Management had delegated to BLMIS.  In particular:

127.1.1 Mr Grosso and Mr Ceretti failed to give any, or any adequate consideration to the numerous
'red flags' surrounding the operations of BLMIS which:

127.1.1.1  were matters of public information, and of which Mr Grosso and Mr Ceretti
accordingly must have been aware; or

127.1.1.2  even if not matters of public information, could reasonably have been discovered,
and of which Mr Grosso and Mr Ceretti accordingly should have been aware.

127.1.2 Mr Grosso and Mr Ceretti unreasonably relied on due diligence of BLMIS conducted by third
parties, including Tremont.

127.1.3 Mr Grosso and Mr Ceretti failed to conduct any, or any adequate due diligence on BLMIS of
their own.  In particular:

127.1.3.1  Mr Grosso and Mr Ceretti failed, adequately or at all, to visit BLMIS' premises,
inspect BLMIS' operations (including BLMIS' information technology systems),
interview Mr Madoff/his associates, review relevant documentation, communicate
with BLMIS' auditors and/or review any audit reports prepared for BLMIS, so as
to properly understand BLMIS' practices and procedures, and internal controls.

127.1.3.2  Mr Grosso and Mr Ceretti failed, adequately or at all, to investigate BLMIS'
auditor, or to confirm that it was capable of such a large-scale audit – for example,
by checking the public peer review list maintained by the American Institute of
Certified Public Accountants.

127.1.3.3  Alternatively, Mr Grosso and Mr Ceretti failed, adequately or at all, critically to
assess or independently to verify anything which they were shown, told or learned.

127.1.4 Mr Grosso and Mr Ceretti failed, adequately or at all, critically to assess or independently
verify the regular reports and other documentation produced by BLMIS in respect of the
Funds, including trade confirmations and the Monthly Statements.  In particular, they failed,
adequately or at all:

127.1.4.1  independently to verify the existence and value of the assets in which BLMIS had
purportedly invested the Funds' monies, as described in those reports – for
example, by requesting any certificate of title from an independent third party;

127.1.4.2 independently to verify that the trades by which BLMIS had purportedly invested the Funds' monies, as described in the reports, had actually taken place, at the reported prices – for example, by comparing the reported prices of the purported trades with the range in prices actually traded in the market on the day/s in question;

127.1.4.3 critically to assess or independently to verify the volumes of those trades, including how they could be accomplished without impacting the market; and/or

127.1.4.4 critically to assess or independently to verify the existence of the counter-parties to those trades, or their ability to perform their obligations.

127.1.5 Mr Grosso and Mr Ceretti failed, adequately or at all to investigate the number of traders at BLMIS responsible for executing the split-strike conversion strategy, and/or their identity.

127.1.6 Mr Grosso and Mr Ceretti failed, adequately or at all, critically to assess the question why BLMIS' split-strike conversion strategy, which was based (in part) on market timing, involved pulling out of the market at the end of each quarter and/or year.

127.1.7 Mr Grosso and Mr Ceretti failed, adequately or at all, critically to assess the question how BLMIS' returns could be lawfully achieved, given that basic, industry standard, statistical analysis indicated that those returns (especially their lack of volatility) were highly improbable.

127.2 Further or alternatively, Mr Grosso and Mr Ceretti failed, adequately or at all, to disclose to Kingate Management or the Funds:

127.2.1 the existence of any of the 'red flags' surrounding the operations of BLMIS of which they were, or should have been aware;

127.2.2 any particular on-going risks in relation to BLMIS, and the Funds' investment strategy of investing all monies raised from investors exclusively with BLMIS, of which they were, or should (if they had conducted adequate due diligence on BLMIS) have been aware.

127.3 Further or alternatively, Mr Grosso and Mr Ceretti failed, adequately or at all, to ensure that FIM took any of the steps set out in paragraphs 127.1-127.2 above.

128 By reason of these breaches of duty, the Funds have suffered loss and damage. The Funds repeat paragraph 108 above.

**Claim against Mr Grosso and Mr Ceretti for negligent misstatement**

129    By reason of the following facts and matters, Mr Grosso and Mr Ceretti personally, as directors of FIM Ltd, and principals of FIM Advisers, owed to the Funds a tortious duty to take reasonable care to ensure that the statements made in the Performance Summaries and/or the Board Reports were true:

129.1    Mr Grosso and Mr Ceretti assumed a personal responsibility to the Funds to take reasonable care to ensure that the statements made in the Performance Summaries and/or the Board Reports were true. In particular:

129.1.1 The Funds repeat paragraphs 126.1.1-126.1.5 above.

129.1.2 Mr Grosso and Mr Ceretti were personally involved in the preparation of the Performance Summaries and/or the Board Reports. For example, weekly faxes from BLMIS setting out the purported market value of each fund's investments (which must have been used, among other materials, in the preparation of the Performance Summaries and/or the Board Reports) were sent to the attention of Mr Ceretti.

129.1.3 The Board Reports were orally presented, by telephone, to the board of Kingate Management and the boards of the Funds by Mr Grosso.

129.2    The Funds in fact relied on Mr Grosso and Mr Ceretti to take reasonable care to ensure that the statements made in the Performance Summaries and/or the Board Reports were true, and on the statements made, by:

129.2.1 not questioning with Kingate Management (or its delegates or FIM) the investment strategy decided upon by Kingate Management and/or FIM, of investing all monies raised from investors exclusively with BLMIS; and

129.2.2 continuing to transfer all such monies to BLMIS for investment.

129.3    In all the circumstances, that reliance was reasonable. The Funds repeat paragraph 126.3 above.

129.4    In all the circumstances, Mr Grosso and Mr Ceretti knew, or ought to have known, or intended that the Funds would, or would be likely to rely on the statements made in the Performance Summaries and/or the Board Reports. In particular, Mr Grosso and Mr Ceretti knew, or ought to have known, or intended that:

129.4.1 the Performance Summaries were distributed by Kingate Management to investors in the Funds;

129.4.2 the Board Reports were provided by FIM to the boards of the Funds; and

129.4.3 Kingate Management would, or was likely to rely on the statements made in the Performance Summaries and/or the Board Reports in the performance and/or delegation of the performance of its services under the Manager Agreements, which would have a direct and substantial effect on the Funds.

129.5 The Performance Summaries and/or the Board Reports contained material misstatements. The Funds repeat paragraph 121 above.

130 In breach of the duty set out in paragraph 129 above, Mr Grosso and Mr Ceretti failed to take reasonable care to ensure that the statements made in the Performance Summaries and/or the Board Reports were true. In particular:

130.1 Mr Grosso and Mr Ceretti failed, adequately or at all, critically to assess or independently to verify the information provided by BLMIS, including the Monthly Statements, on the basis of which FIM prepared the Performance Summaries and/or the Board Reports. In particular, Mr Grosso and Mr Ceretti failed, adequately or at all:

130.1.1 independently to verify the existence or value of the assets in which BLMIS had purportedly invested the Funds' monies – for example, by requesting any certificate of title from an independent third party;

130.1.2 independently to verify that the trades by which BLMIS had purportedly invested the Funds' monies had actually taken place, at the reported prices – for example, by comparing the reported prices of the purported trades with the range in prices actually traded in the market on the day/s in question;

130.1.3 critically to assess or independently to verify the volumes of those trades, including how they could be accomplished without impacting the market; and/or

130.1.4 critically to assess or independently to verify the existence of the counter-parties to those trades, or their ability to perform their obligations.

130.2 More generally:

130.2.1 Mr Grosso and Mr Ceretti failed to conduct any, or any adequate on-going due diligence on BMLIS and/or monitoring of BLMIS' performance of the investment advisory services which Kingate Management had delegated to BLMIS. The Funds repeat paragraph 127.1 above.

130.2.2 Mr Grosso and Mr Ceretti failed, adequately or at all, to disclose to the Funds:

130.2.2.1 the existence of any 'red flags' surrounding the operations of BLMIS of which they were aware, or should have been aware;

51

130.2.2.2 any particular on-going risks in relation to BLMIS, and the Funds' investment strategy of investing all monies raised from investors exclusively with BLMIS, of which they were, or should (if they had conducted reasonable due diligence) have been aware.

130.3 Further or alternatively, Mr Grosso and Mr Ceretti failed, adequately or at all, to ensure that FIM took any of the steps set out in paragraphs 130.1-130.2 above.

131 By reason of these breaches of duty, the Funds have suffered loss and damage. The Funds repeat paragraph 108 above.

**Remedy against Mr Grosso and Mr Ceretti for breach of tortious duty of care and/or negligent misstatement**

132 By reason of the claims set out in paragraphs 126-128 and 129-131 above, the Funds are entitled to damages against Mr Grosso and Mr Ceretti, to be assessed.

**INTEREST**

133 The Funds seek an order that the Defendants and each of them should pay:

133.1 compound interest on all amounts due to the Funds, as damages and/or a restitutionary remedy pursuant to the common law and/or equitable jurisdiction of the Court, at such rate, for such periods and compounded at such periodic rests as the Court considers appropriate;

133.2 alternatively, interest on all amounts due to the Funds pursuant to statute, at such rate and for such periods as the Court considers appropriate.

**AND THE CLAIMANTS CLAIM:**

**Against Kingate Management**

(1) Orders for restitution, as follows:

(a) an order that Kingate Management pay to Kingate Global the amount of the Kingate Global Overpaid Fees~~US$254,478,999.69~~; and

(b) an order that Kingate Management pay to Kingate Euro, the amount of the Kingate Euro Overpaid Fees~~56,226,531.48 Euros~~.

(2) Alternatively:

(a) an order that Kingate Management pay:

    (i)   Kingate Global the amount of ~~the Kingate Global Overpaid Fees~~US$254,478,999.69; and

    (ii)  Kingate Euro the amount of ~~the Kingate Euro Overpaid Fees~~56,226,531.48 Euros;

(b)  alternatively:

    (i)   a declaration that overpaid fees in the amount of ~~the Kingate Global Overpaid Fees~~US$254,478,999.69 and/or their traceable proceeds constituted property to which Kingate Global retained legal title and/or its traceable proceeds, together with an order that Kingate Management return those fees and/or their traceable proceeds to Kingate Global; and

    (ii)  a declaration that overpaid fees in the amount of ~~the Kingate Euro Overpaid Fees~~56,226,531.48 Euros and/or their traceable proceeds constituted property to which Kingate Euro retained legal title and/or its traceable proceeds, together with an order that Kingate Management return those fees and/or their traceable proceeds to Kingate Euro.

(3)  Alternatively:

(a)  a declaration that Kingate Management held overpaid fees and/or their traceable proceeds in the amount of ~~the Kingate Global Overpaid Fees~~US$254,478,999.69 on resulting, alternatively constructive trusts for Kingate Global from the moment of receipt, together with an order that Kingate Management account to Kingate Global in respect of those fees and/or their proceeds; and

(b)  a declaration that Kingate Management held overpaid fees and/or their traceable proceeds in the amount of ~~the Kingate Euro Overpaid Fees~~56,226,531.48 Euros on resulting, alternatively constructive trusts for Kingate Euro from the moment of receipt, together with an order that Kingate Management account to Kingate Euro in respect of those fees and/or their proceeds.

(4)  Damages for breach of contractual and/or tortious duties of care and/or negligent misstatement, to be assessed.

**Against FIM**

(1)  Damages for breach of tortious duty of care and/or negligent misstatement, to be assessed

**Against the Shareholders**

(1)  Orders for restitution, as follows:

(a)  an order that the Shareholders pay to Kingate Global, the amount of ~~the Kingate Global Overpaid Fees~~ US$254,478,999.69, alternatively, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders; and

(b)   an order that the Shareholders pay to Kingate Euro, the amount of the Kingate Euro Overpaid Fees56,226,531.48 Euros, alternatively, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders; and.

(c)   if and to the extent necessary by way of separate order, an order for restitution of the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders and to which the Funds are entitled by reason of their right to be subrogated to Kingate Management's claims against the Shareholders.

(2)   Alternatively:

(a)   an order that the Shareholders pay the Funds the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders;

(b)   alternatively, a declaration that the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders constituted property to which the Funds retained legal title and/or its traceable proceeds, together with an order that the Shareholders return those fees and/or their traceable proceeds to the Funds.

(3)   Alternatively, a declaration that the Shareholders held on resulting, alternatively constructive trusts for the Funds, from the moment of receipt or subsequently, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders, together with an order that the Shareholders account to the Funds in respect of those fees and their proceeds.

**Against Mr Grosso and Mr Ceretti**

(1)   Orders for restitution, as follows:

(a)   an order that Mr Grosso and Mr Ceretti pay to Kingate Global the amount of the Kingate Global Overpaid FeesUS$254,478,999.69, alternatively, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds which were paid on by Kingate Management and then  by the Shareholders to Mr Grosso and Mr Ceretti; and

(b)   an order that Mr Grosso and Mr Ceretti pay to Kingate Euro, the amount of the Kingate Euro Overpaid Fees56,226,531.48 Euros, alternatively, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti; and.

(c)   if and to the extent necessary by way of separate order, an order for restitution of the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Ceretti and to which the Funds are entitled by reason of

their right to be subrogated or sub-subrogated to the Shareholders' claims against Mr Grosso and/or Mr Ceretti.

(2)  Alternatively:

(a)  an order that Mr Grosso and Mr Ceretti pay the Funds the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti;

(b)  alternatively, a declaration that the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti constituted property to which the Funds retained legal title and/or its traceable proceeds, together with an order that Mr Grosso and Mr Ceretti return those fees and/or their traceable proceeds to the Funds.

(3)  Alternatively, a declaration that Mr Grosso and Mr Ceretti held on resulting, alternatively constructive trusts for the Funds, from the moment of receipt or subsequently, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti, together with an order that Mr Grosso and Mr Ceretti account to the Funds in respect of those fees and their proceeds.

(4)  Damages for breach of tortious duty of care and/or negligent misstatement, to be assessed

**Against the Investment Companies**

(1)  Orders for restitution, as follows:

(a)  an order that the Investment Companies pay to Kingate Global the amount of the fees overpaid by Kingate Global and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies; and

(b)  an order that the Investment Companies pay to Kingate Euro the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies.

(2)  Alternatively,

(a)  an order that the Investment Companies pay to the Funds the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies;

(b)  alternatively, a declaration that the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholder to the Investment Companies constituted property to which the Funds retained legal title and/or its traceable proceeds, together with an order that the Investment Companies return those fees and/or their traceable proceeds to the Funds.

(3) Alternatively, a declaration that the Investment Companies held on resulting, alternatively constructive trusts for the Funds, from the moment of receipt or subsequently, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies, together with an order that the Investment Companies account to the Funds in respect of those fees and their proceeds.

Against all Defendants

(1)  Interest

DATED this 20th day of January 2011

_____

SEDGWICK CHUDLEIGH
Attorneys for the Plaintiffs

Amended the 13th day of February, 2012, under RSC, Order 20, Rule 3.

DATED this _____ day of _____ 2012

_____

SEDGWICK CHUDLEIGH
Attorneys for the Plaintiffs

Amended pursuant to the Consent Order of Mr. Justice Hellman dated 12th November 2013.

DATED this 14th day of November 2013

_____

SEDGWICK CHUDLEIGH
Attorneys for the Plaintiffs

Amended pursuant to the Consent Order of Mr. Justice Hellman dated 28th February 2014.

DATED this 5th day of February 2014.

_____

SEDGWICK CHUDLEIGH  LTD
Attorneys for the Plaintiffs

Amended pursuant to the Order of Mr. Justice Hellman dated 17th April 2015

DATED this 17th day of April 2015.

SEDGWICK CHUDLEIGH LTD
Attorneys for the Plaintiffs

IN THE SUPREME COURT OF BERMUDA

CIVIL JURISDICTION

COMMERCIAL LIST

2010: 454

BETWEEN:

(1)  KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)

(2)  KINGATE EURO FUND LIMITED (IN LIQUIDATION)

<u>Plaintiffs</u>

and

(1) KINGATE MANAGEMENT LIMITED

(2) FIM LIMITED

(3) FIM ADVISERS LLP

(4) FIRST PENINSULA TRUSTEES LIMITED (AS TRUSTEE OF
THE ASHBY TRUST)

(5) PORT OF HERCULES TRUSTEES LIMITED (AS TRUSTEE OF
THE EL PRELA TRUST)

(6) ASHBY HOLDINGS SERVICES LIMITED

(7) EL PRELA GROUP HOLDING SERVICES LIMITED

(8) MR CARLO GROSSO

(9) MR FEDERICO CERETTI

(10) <u>ASHBY INVESTMENT SERVICES LIMITED</u>

(11) <u>EL PRELA TRADING INVESTMENTS LIMITED</u>

(12) <u>ALPINE TRUSTEES LIMITED</u>

<u>Defendants</u>

---

RE-RE-RE-AMENDED STATEMENT OF CLAIM

---

 

SEDGWICK CHUDLEIGH LTD
E.W. Pearman Building
20 Brunswick Street
Hamilton, HM 10
Bermuda

(Attorneys for the First and Second Plaintiffs)