**Cleary Gottlieb Steen & Hamilton LLP**
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for the BNP Paribas Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
| -against- | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | Applicable to Adv. Pro. Nos. 10-04457 (SMB), 10-05120 (SMB), 11-02796 (SMB) & 12-01576 (SMB) |
| BERNARD L. MADOFF, | |
| Debtor. | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF THE BNP PARIBAS**
**DEFENDANTS' MOTION TO DISMISS BASED ON EXTRATERRITORIALITY**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................... 4

    I.       FACTUAL ALLEGATIONS REGARDING ENTITIES ..................................... 4

        A.     The Feeder Funds.................................................................... 4

        B.     The BNPP Defendants ............................................................ 6

    II.      FACTUAL ALLEGATIONS REGARDING TRANSFERS ................................ 8

ARGUMENT .......................................................................................................... 9

    I.       THE PROFFERED ALLEGATIONS ARE INAPPOSITE TO THE
QUESTION OF WHETHER THE RELEVANT SUBSEQUENT
TRANSFERS OCCURRED DOMESTICALLY ................................................ 10

        A.     The District Court Has Already Ruled That The Trustee's
Allegations Related To BLMIS And The Feeder Funds'
Relationship With BLMIS Are Inconsequential To The
Extraterritoriality Inquiry ....................................................... 11

        B.     The Trustee's Allegations Related To The Feeder Funds' Activities
Are Irrelevant To The Location Of The Transfers.................................. 12

        C.     The Trustee's Allegations Regarding The Conduct Of BNPP
Defendants Similarly Do Not Demonstrate That The Subsequent
Transfers Are Domestic ........................................................... 16

    II.      THE COMPLAINTS SHOULD BE DISMISSED BASED ON
INTERNATIONAL COMITY ......................................................................... 26

    III.    NEW TRANSFERS ALLEGED IN THE PROFFER FOR THE FIRST
TIME ARE BARRED BY THE RELEVANT STATUTE OF
LIMITATIONS ............................................................................................... 28

CONCLUSION ...................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

N.Y. Bus. Corp. Law § 1301 .......................................................................................... 18

**Cases**

Absolute Activist Value Master Fund Ltd. v. Ficeto,
677 F.3d 60 (2d Cir. 2012)............................................................................................ passim

Animalfeeds Int'l Inc. v. Banco Espirito Santo e Comercial de Lisboa,
420 N.Y.S.2d 954 (Sup. Ct. 1979).................................................................................. 18

Boarding Sch. Review, LLC v. Delta Career Educ. Corp.,
No. 11 Civ. 8921 (DAB), 2013 WL 6670584 (S.D.N.Y. Mar. 29, 2013) ........................ 16

Concord Assocs., L.P. v. Entm't Props. Tr.,
No. 12-cv-1667, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) ........................................... 3

Daimler AG v. Bauman,
134 S. Ct. 746 (2014)..................................................................................................... 19

EEOC v. Arabian Am. Oil Co.,
499 U.S. 244 (1991)....................................................................................................... 15

Gesualdi v. Gen. Concrete, Inc.,
No. 11 CV 1866 (CBA) (JO), 2013 WL 1192967 (E.D.N.Y. Feb. 1, 2013) ...................... 18

Hotel Emps. & Rest. Emps. Union, Local 100 of N.Y., N.Y. & Vicinity, AFL-CIO v.
City of N.Y. Dep't of Parks & Recreation,
311 F.3d 534 (2d Cir. 2002)........................................................................................... 18

In re Bank of New York Mellon Corp. Forex Transactions Litig.,
991 F. Supp. 2d 479 (S.D.N.Y. 2014).............................................................................. 3

In re Bernard L. Madoff Inv. Sec. LLC,
525 B.R. 871 (Bankr. S.D.N.Y. 2015).............................................................................. 25

In re Falchi,
Bankr. No. 97-B-43080 (JLG), 1998 WL 274679 (Bankr. S.D.N.Y. May 27, 1998) ........ 9

In re Greenwald,
107 B.R. 28 (Bankr. S.D.N.Y. 1989)............................................................................... 9

In re Maxwell Commc'n Corp,
186 B.R. 807 (S.D.N.Y. 1995)........................................................................................ 26

In re Perry H. Koplik & Sons, Inc.,
Adv. Pro. No. 04-02490 (REG), 2007 WL 3076921 (Bankr. S.D.N.Y. Oct. 18, 2007) ..... 9

In re Regency Holdings (Cayman), Inc.,
216 B.R. 371 (Bankr. S.D.N.Y. 1998) ................................................................................. 3

In re Richartz, Fliss, Clark & Pope, Inc.,
Bankr. No. 08-13919 (MG), 2010 WL 4502038 (Bankr. S.D.N.Y. Nov. 1, 2010) ........... 16, 17

Loginovskaya v. Batratchenko,
764 F.3d 266 (2d Cir. 2014) ........................................................................................ passim

Mori v. Saito,
No. 10 Civ. 6465 (KBF), 2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013) ......................... 20

Morrison v. Nat'l Austl. Bank Ltd.,
130 S. Ct. 2689 (2010) ................................................................................................ 18, 20

Norex Petroleum Ltd. v. Access Indus., Inc.,
631 F.3d 29 (2d Cir. 2010) ........................................................................................... 26

Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,
753 F. Supp. 2d 166 (S.D.N.Y. 2010) ......................................................................... 20, 23

Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,
466 F.3d 88 (2d Cir. 2006) ........................................................................................... 28

Ruotolo v. City of N.Y.,
514 F.3d 184 (2d Cir. 2008) ......................................................................................... 9

Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
513 B.R. 222 (S.D.N.Y. 2014) ................................................................................... passim

Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
480 B.R. 501 (Bankr. S.D.N.Y. 2012) ........................................................................ 29

Vera v. Republic of Cuba,
No. 12 Civ. 1596(AKH), 2015 WL 1244050 (S.D.N.Y. Mar. 17, 2015) ....................... 18

**Other Authorities**

Corp. & Bus. Entity Database, N.Y. Dep't of State, State Records & UCC ..................... 18

Foreign Branches, New York State Department of Financial Services ............................. 18

Nicolas Matthews, Harley International (Cayman) Limited (In Official Liquidation:
Report of the Joint Official Liquidators ........................................................................... 16

Defendants BNP Paribas S.A. ("BNPP SA"), BNP Paribas Arbitrage SNC ("BNPP

Arbitrage"), BNP Paribas Securities Services S.A. ("BNPP SS"), BNP Paribas Bank & Trust

(Cayman) Limited ("BNPP Cayman"), BNP Paribas (Suisse) S.A. ("BNPP Suisse"), and BGL

BNP Paribas Luxembourg S.A. ("BGL BNPP") (collectively, the "BNPP Defendants")

respectfully submit this reply memorandum in further support of their motions to dismiss in Adv.

Pro. Nos. 10-04457 (SMB), 10-05120 (SMB), 11-02796 (SMB), and 12-01576 (SMB), and to

deny as futile the Trustee's request for leave to amend the complaints in those actions to

incorporate the allegations contained in his Addendum and Proffered Allegations against BNP

Paribas Defendants ("Proffer").  The BNPP Defendants fully incorporate the arguments set out in

the Consolidated Brief.[1]  This reply should be read in conjunction with, and as a supplement to,

the Consolidated Brief.  Because the Trustee, in an apparent effort to cumulate the scant U.S.

contacts pleaded in the four complaints, has addressed the four adversary proceedings in a single

Proffer and brief, the BNPP Defendants have done the same in this reply brief, as the Trustee's

factual averments fall far short of meeting his burden, whether they are read separately or

together.

## PRELIMINARY STATEMENT

The central inquiry regarding whether a transfer is subject to avoidance in these

proceedings, laid out in Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 513 B.R. 222

(S.D.N.Y. 2014) ("Extraterritoriality Decision"), is simple: whether there is a plausible inference

that the transfers from Madoff feeder funds to subsequent transferees occurred within the United

States.  In a decision that is the law of the case, Judge Rakoff made clear that where, as here, the

---

[1]      The term "Consolidated Brief" refers to the Consolidated Supplemental Reply Memorandum of Law in
Further Support of the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality and in Opposition to
the Trustee's Motion for Leave to Amend His Complaints filed on September  30, 2015 in the proceeding captioned
Sec. Inv. Prot. Corp v. Bernard L. Madoff Investment Securities LLC, Adv. Pro. No. 08-01789.

parties to a subsequent transfer are foreign entities and the transfers occurred abroad, the transfers are not subject to clawback under SIPA § 78fff-2(c)(3), unless the Trustee presents clear allegations that the relevant transfers are domestic. The Trustee utterly fails to make such a presentation regarding the transfers involving the BNPP Defendants.

Indeed, the Trustee's allegations in the four complaints, even as supplemented by the Proffer, fall far short of supporting a plausible inference that the transfers at issue were made domestically. Rather, they focus exclusively on supposed facts that have been deemed legally insufficient and irrelevant to the extraterritoriality inquiry. Specifically, the Proffer advances only facts, such as the locations where correspondent bank accounts were held, where due diligence was conducted, and where the feeder funds were marketed, that are irrelevant under the Extraterritoriality Decision and controlling Second Circuit precedent. Apparently aware that his allegations fall far short of the mark, the Trustee's strategy has been to enumerate all of the supposed contacts between the entities involved and the United States (including contacts by non-parties to these four actions), rather than pleading facts relevant to the specific transfers that the Trustee seeks to avoid and recover (as required under the Extraterritoriality Decision). The District Court's ruling applies to all transfers to each of the six separate BNPP Defendants that the Trustee is seeking to avoid, and the Trustee does not make the requisite presentation concerning these transfers.

Significantly, the Trustee chose to file four separate adversary proceedings involving BNPP Defendants. Yet, he has lumped together, in a single, consolidated Proffer, facts supposedly relating to nine separate feeder funds that allegedly made transfers to six separate BNPP Defendants—all of which, by the Trustee's own admission, are incorporated under the laws of foreign jurisdictions. In so doing, the Trustee seeks to obscure his lack of allegations

2

relating to each entity and the transfers. This group pleading strategy not only is impermissible, but also, more importantly, highlights the Trustee's inability to demonstrate that each of the alleged transfers occurred domestically.[2]  Indeed, generalized allegations regarding BNPP as a whole cannot be imputed to specific BNPP Defendants, especially given that the Trustee makes no attempt to argue that the BNPP Defendants are alter egos of one another or that the corporate veil must be pierced with respect to certain BNPP Defendants.[3]  Nevertheless, even if the allegations are considered for all BNPP Defendants, which they should not be, all of the supposed U.S. touch points proffered by the Trustee are irrelevant to the sole pertinent issue of whether the specific transfers at issue are plausibly alleged to have occurred within the United States, an issue that the Extraterritoriality Decision resolves decisively in the BNPP Defendants' favor.

Since the Trustee does not argue (nor could he) that the four pending complaints against the BNPP Defendants satisfy the pleading requirements laid out in the Extraterritoriality Decision, the only question before the Court is whether leave to amend these four complaints should be granted in order to incorporate the allegations contained in the Proffer. As noted below, the Proffer does not remedy the woefully inadequate allegations concerning the locale of the transfers.

---

[2]     See In re Bank of New York Mellon Corp. Forex Transactions Litig., 991 F. Supp. 2d 479, 501 (S.D.N.Y. 2014) ("Plaintiffs may not evade their obligation to plead specific claims against specific defendants by generalized pleading."); Concord Assocs., L.P. v. Entm't Props. Tr., No. 12-cv-1667, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014) ("Group pleading, by which allegations are made against families of affiliated entities[,] is simply insufficient to withstand review on a motion to dismiss.").

[3]     The Trustee does not demonstrate that his Proffer is an exception to the "rule" that "parent and subsidiary corporations are separate entities" and, accordingly, "[a] party seeking to overcome the presumption of separateness must pierce the corporate veil, or prove that the two entities should be substantively consolidated." In re Regency Holdings (Cayman), Inc., 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998).

At bottom, the four complaints seek an impermissible extraterritorial application of SIPA. Accordingly, for the reasons stated below and in the Consolidated Brief, the Court should deny the Trustee's request to amend as futile and dismiss the actions.

## STATEMENT OF FACTS

The Proffer alleges that the BNPP Defendants received $1.25 billion in avoidable transfers from various feeder funds that invested almost all their capital exclusively in Bernard L. Madoff Investment Securities LLC ("BLMIS"), including Equity Trading Portfolio Ltd. ("Equity"), Fairfield Sentry Ltd. ("Fairfield Sentry"), Harley International (Cayman) Ltd. ("Harley"), Kingate Euro Fund Ltd. ("Kingate Euro"), Kingate Global Fund Ltd. ("Kingate Global"), Oreades SICAV ("Oreades"), Rye Select Broad Market Insurance Portfolio LDC ("Insurance Portfolio"), Rye Select Broad Market Portfolio Ltd. ("Portfolio Limited"), Rye Select Broad Market XL Fund L.P. ("XL LP"), and Rye Select Broad Market XL Portfolio Ltd. ("XL Portfolio," and collectively, the "Feeder Funds").[4]

## I.    FACTUAL ALLEGATIONS REGARDING ENTITIES

### A.    The Feeder Funds

With the lone exception of XL LP (which was incorporated in Delaware) (Fairfield, Kingate, Rye Compl. ¶ 3), all of the Feeder Funds were incorporated in foreign jurisdictions.  In particular, Harley was organized under the laws of the Cayman Islands and is currently in liquidation there (Arbitrage Compl. ¶ 2).  Portfolio Limited, XL Portfolio, and Insurance

---

[4]        The Trustee also alleges, for the first time in the Proffer, that BNPP received transfers from Ascot Partners L.P., Groupement Financiere Ltd., and Luxalpha SICAV.  Because he makes no attempt to show that these transfers occurred domestically, the three funds have not been included in the Statement of Facts.  See also infra Part III (showing that the allegations with respect to Fairfield Sigma Ltd. are barred by the statute of limitations under 11 U.S.C. § 550(f)).  Further, the Trustee alleges that the BNPP Defendants received transfers from Legacy Capital Ltd. However, these transfers have been included in adversary proceeding captioned Picard v. Legacy Capital Ltd. et al., Adv. Pro. No. 10-5286, which is not a part of these consolidated proceedings on the extraterritoriality defense and in which the Trustee and other parties to the proceeding stipulated to an amended complaint that has effectively dismissed the BNPP subsequent transferee in that proceeding.

4

Portfolio (with XL LP, the "Tremont Funds") were also incorporated in the Cayman Islands (Fairfield, Kingate, Rye Compl. ¶ 3; Proffer ¶ 68). Fairfield Sentry in turn was incorporated in the British Virgin Islands ("BVI") and is currently in liquidation there (Fairfield, Kingate, Rye Compl. ¶ 3). Kingate Global and Kingate Euro (collectively, the "Kingate Funds") are also BVI funds that are currently in liquidation in the BVI (id.). Equity was, similarly, incorporated in the BVI (Equity Compl. ¶ 11; Proffer ¶ 148). Finally, Oreades was incorporated in Luxembourg (Oreades Compl. ¶ 11).

Without explaining how it bears upon the location of the *transfers* at issue, the Trustee claims that some investment management or custodial functions for certain of the offshore Feeder Funds were performed by U.S.-based entities. Specifically, the Trustee claims that Euro-Dutch Trust Company (Bahamas) Limited and Euro-Dutch Management Limited (a Cayman Islands company) acted as Harley's purported investment managers, but they delegated these duties to BLMIS (Proffer ¶¶ 25–26). He also alleges that, for certain activities related to the BLMIS investments, Harley acted principally through Fix Asset Management Ltd., a New York corporation (id. ¶¶ 36–37). The Trustee likewise claims that Fairfield Sentry and Fairfield Sigma (collectively, the "Fairfield Funds") were managed by New York-based Fairfield Greenwich Group (id. ¶ 96). XL Portfolio allegedly was managed by Tremont Partners, Inc. ("Tremont Partners"), a Connecticut investment advisor that operated in Rye, New York (id. ¶¶ 68, 70), and Insurance Portfolio and Portfolio Limited were managed by Tremont (Bermuda) Limited, which supposedly delegated its management duties to Tremont Partners (id. ¶ 70). Like Insurance Portfolio and Portfolio Limited, the Kingate Funds were purportedly co-managed by Tremont (Bermuda) Limited, which was in turn managed from New York by Tremont Partners (id. ¶ 120). The Kingate Funds were also allegedly co-managed by Kingate Management Limited, which

5

operated through New York agents (id. ¶ 132). The Trustee alleges that Essex Asset

Management acted as Equity's investment manager and that these responsibilities were carried

out in New York (id. ¶¶ 155–56). (Oreades's investment manager—Inter Investissements

S.A.—is not alleged to be a U.S.-based entity.)

### B.    The BNPP Defendants

The Trustee concedes, as he must, that all of the BNPP Defendants were incorporated in

foreign jurisdictions. Thus, BNPP SA is a *société anonyme* incorporated and organized under

the laws of France (Fairfield, Kingate, Rye Compl. ¶ 25). It is alleged to have a New York office

(id.; Proffer ¶ 4). BNPP Arbitrage is a French *société en nom collectif* located in France, and a

wholly-owned subsidiary of BNPP SA (Arbitrage Compl. ¶¶ 3, 20; Equity Compl. ¶ 13;

Fairfield, Kingate, Rye Compl. ¶ 27). BNPP SS is a *société anonyme* incorporated and

organized under the laws of France and located in France (Fairfield, Kingate, Rye Compl. ¶ 31;

Oreades Compl. ¶ 15; Proffer ¶ 6). Although BNPP Arbitrage and BNPP SS are alleged to have

New York offices (Proffer ¶¶ 5–6), the Trustee does not allege that either of them is registered to

do business in New York with the New York Secretary of State or registered with the New York

State Department of Financial Services as the local office of a foreign bank. BNPP Suisse is a

*société anonyme* incorporated and organized under the laws of Switzerland and located in

Switzerland (Fairfield, Kingate, Rye Compl. ¶ 26). BNPP Cayman is a corporation incorporated

and organized under the laws of the Cayman Islands and located in the Cayman Islands (id. ¶

29). BGL BNPP is a *société anonyme* incorporated and organized under the laws of

Luxembourg and located in Luxembourg (id. ¶ 30; Oreades Compl. ¶ 14).

The Trustee does not allege that the BNPP Defendants received transfers directly from

BLMIS, but rather, he claims that they received transfers from the offshore Feeder Funds in

connection with structured products, credit facilities, and custodial services offered to clients.  In

broad brush strokes, because the value of the structured products was linked to the performance

of the offshore Feeder Funds, BNPP SA, BNPP Arbitrage, BNPP Cayman, and BNPP SS are

alleged to have invested in, and received transfers from, the offshore Feeder Funds to hedge their

risk (Proffer ¶¶ 83, 113, 159).  The credit facilities involved the extension of credit to clients who

desired to invest in Harley and the Tremont Funds, and BNPP Arbitrage and BNPP SA are

alleged to have received transfers from the offshore Feeder Funds as a convenient means of

paying interest on the loans (id. ¶¶ 56, 83).  The custodial services involved the performance of

custodian and administrator functions by BGL BNPP and BNPP SS with regard to Feeder Fund

securities pledged by clients as collateral, which supposedly also entailed the receipt of certain

transfers from the offshore Feeder Funds solely for the benefit of such clients (id. ¶ 117).

Finally, even if there is some relevance to the location of certain management activities

conducted by the BNPP Defendants before and after the relevant transfers, certain BNPP

Defendants are not even alleged to have engaged in these activities.  For example, with respect to

the Fairfield Funds, the Trustee does not contend that BNPP SS, BNPP Suisse, BNPP Cayman,

or BGL BNPP each engaged in any such activities themselves (see id. ¶¶ 106–14).  Similarly, he

does not allege that BNPP SS, BNPP Suisse, or BNPP Cayman performed any management

activities involving the Kingate Funds (see id. ¶¶ 144–146), and his sole allegation regarding

BGL BNPP with respect to the Kingate Funds was that BGL BNPP asked the funds to send

materials to an e-mail address that includes the word "americas" (id. ¶ 145).  And, with respect to

subsequent transfers received by BNPP Arbitrage from Equity Trading, the Trustee focuses his

attention on the activities allegedly performed by BNPP SA rather than the actual subsequent

transferee who received the relevant payments. (id. ¶¶ 159–164).  Additionally, the Trustee does

7

not and cannot establish that BNPP SS, BNPP Suisse, BNPP Cayman, or BGL BNPP are members of the Fund Derivatives Group, which allegedly engaged in transactions that supposedly eventually gave rise to the subsequent transfers to the BNPP Defendants (id. ¶ 13). Instead, by the Trustee's own admission, these four defendants are alleged to be members of two different groups, the Asset Management Group and the Securities Services Group (id. ¶¶ 8–11), that are nowhere alleged to bear a relationship to the Fund Derivatives Group.

## II.    FACTUAL ALLEGATIONS REGARDING TRANSFERS

The Trustee claims that: (i) BNPP SA received transfers totaling $55 million, including transfers of $8 million from Fairfield Sentry, $39 million from Insurance Portfolio, $4 million from Kingate Global, and $300,000 from Kingate Euro (id. ¶¶ 4, 67, 95, 116–17); (ii) BNPP Arbitrage received transfers totaling $1.021 billion, including transfers of $15 million from Equity, $20 million from Fairfield Sentry, $975 million from Harley, $5 million from Kingate Global, $15 million from Kingate Euro, and $6 million from XL Portfolio (id. ¶¶ 5, 19, 67, 95, 116–17, 147); (iii) BNPP SS received transfers totaling $107 million, including transfers of $39 million from Fairfield Sentry, $7 million from Fairfield Sigma, $500,000 from Harley, $34 million from Kingate Global, $1 million from Kingate Euro, $1.5 million from Oreades, and $24 million from Portfolio Limited (id. ¶¶ 6, 19, 67, 95, 116, 117, 166); (iv) BNPP Suisse received transfers totaling $6.075 million, including transfers of $1 million from Fairfield Sentry, $5 million from Kingate Global, and $75,000 from Kingate Euro (id. ¶¶ 8, 95, 116–17); (v) BNPP Cayman received transfers totaling $33 million, including transfers of $13 million from Fairfield Sentry, $4 million from Kingate Global, $11 million from Portfolio Limited, $3 million from XL LP, and $2 million from XL Portfolio (id. ¶¶ 7, 67, 95, 116); and (vi) BGL BNPP received transfers totaling $24.8 million, including transfers of $300,000 from Fairfield Sentry, $1 million

from Fairfield Sigma, $17 million from Kingate Global, $6 million from Kingate Euro, and $500,000 from Oreades (id. ¶¶ 9, 95, 116–17, 166).

Nowhere in the complaints or the Proffer does the Trustee allege that the bank accounts he references are domestic New York bank accounts in which the relevant moneys remained. Nor does the Trustee allege that the moneys transferred from the offshore Feeder Funds to the foreign BNPP Defendants stayed in New York, as opposed to merely being cleared through U.S. bank accounts (as are all U.S.-dollar denominated transfers in the first instance). Instead, the Trustee merely lists dates and amounts of money for the subsequent transfers, without providing information from which reasonable inferences could be drawn that the transfers occurred within the United States.

## ARGUMENT

The Trustee nowhere argues that the four complaints currently pending against the BNPP Defendants plausibly plead domestic transfers under the standard articulated in the Extraterritoriality Decision. Accordingly, the only question before the Court is whether leave to amend should be granted in order to permit the Trustee to incorporate into the complaints the allegations laid out in the Proffer. Because, for the reasons set forth below, the allegations advanced in the Proffer do not plausibly plead domestic transfers, leave to amend should be denied as futile and the four proceedings should be dismissed on the basis of the Extraterritoriality Decision. Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (holding that leave to amend may be properly denied due to futility); see also In re Perry H. Koplik & Sons, Inc., Adv. Pro. No. 04-02490 (REG), 2007 WL 3076921, at *4 (Bankr. S.D.N.Y. Oct. 18, 2007); In re Falchi, Bankr. No. 97-B-43080 (JLG), 1998 WL 274679, at *11–12 (Bankr. S.D.N.Y. May 27, 1998); In re Greenwald, 107 B.R. 28, 30 (Bankr. S.D.N.Y. 1989).

I.     **THE PROFFERED ALLEGATIONS ARE INAPPOSITE TO THE QUESTION OF WHETHER THE RELEVANT SUBSEQUENT TRANSFERS OCCURRED DOMESTICALLY**

In the Extraterritoriality Decision, Judge Rakoff made clear that where, as here, "both the transferor and the transferee reside outside of the United States, there is no plausible inference that the transfer occurred domestically," thereby setting a high bar for the Trustee to meet. Extraterritoriality Decision, 513 B.R. at 233 n.4 (quoting Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 69 (2d Cir. 2012)).  The Proffer falls far short of clearing that high bar in these cases.

As set forth more fully in the Consolidated Brief, the extraterritoriality inquiry must focus on the conduct that is the target of the relevant statute.  The relevant conduct under Section 550 is the "transfer" that the Trustee seeks to avoid and recover.[5]  Therefore, as Judge Rakoff directed in the Extraterritoriality Decision, the extraterritoriality inquiry must focus on facts relating to where that "transfer" occurred.

Despite this clear directive, in the Proffer, the Trustee fails to allege facts concerning the location of the specific transfers he seeks to avoid and recover.  Nowhere in the Proffer (or complaints) does the Trustee plead that the bank accounts used for any of the alleged transfers are both located in the United States and any different from the correspondent bank accounts held to be irrelevant by Judge Rakoff.  Extraterritoriality Decision, 513 B.R. at 228 n.1.  Nor does the Trustee allege that the moneys transferred from the offshore Feeder Funds to the foreign BNPP Defendants remained in New York, as opposed to merely being cleared through U.S. bank accounts (as are all U.S.-dollar denominated transfers in the first instance).

---

[5]       In construing Section 10(b) of the Securities Exchange Act, the Second Circuit focused on the place where "irrevocable liability" was incurred because the relevant conduct was the "purchase or sale" of a security.  Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 68 (2d Cir. 2012).

Instead, as shown below, the Proffer regurgitates facts that Judge Rakoff already has determined are inconsequential to the extraterritoriality inquiry, and otherwise engages in an irrelevant survey of each and every activity, conduct, or fleeting graze that the Feeder Funds or BNPP Defendants may have had with the United States.  Such facts remain insufficient to establish that the transfers were domestic.  See Extraterritoriality Decision, 513 B.R. at 227 ("It cannot be that any connection to a domestic debtor, no matter how remote, automatically transforms every use of the various provisions of the Bankruptcy Code in a SIPA bankruptcy into purely domestic applications of those provisions.").

A.    **The District Court Has Already Ruled That The Trustee's Allegations Related To BLMIS And The Feeder Funds' Relationship With BLMIS[6] Are Inconsequential To The Extraterritoriality Inquiry**

The Proffer advances a cluster of facts involving the activities of BLMIS and the relationship between the Feeder Funds and BLMIS.  But none of these facts aids the Trustee in meeting his burden to plead facts showing that the s*ubsequent* transfers occurred domestically, not whether BLMIS and the Feeder Funds had domestic contacts.  Extraterritoriality Decision, 513 B.R. at 228 ("It is the recovery of those *subsequent transfers*—transfers made abroad between a foreign transferor and a foreign transferee— that is the subject of the instant consolidated proceeding" (emphasis added)).  Therefore, the Proffer's various allegations about the U.S.-based operations and investment focus of BLMIS (id. ¶¶ 24, 124, 149, 174), the Feeder Funds' substantial investment in BLMIS (id. ¶¶ 18, 93), and the Feeder Funds' "[seeking] out the United States as a place to do business" (id. ¶ 24) are irrelevant.  In fact, confronted with similar

---

[6]    This group of allegations comprises a total of four duplicative allegations, reflected in Exhibits 2-A and 2-B to the Trustee's Opposition ("Trustee's Exhibits"), on which the Trustee purports to rely to sustain his Proffer— namely, that the BNPP Defendants: (i) knew that assets were placed with a U.S. investment adviser (Column 4); (ii) knew that assets used to make the transfers or form the basis of the transactions were custodied in the United States (Column 5); (iii) knew that assets used to make the transfers or form the basis of the transactions were managed, custodied, and/or invested by BLMIS (Column 6); and (iv) knew that assets used to make the transfers or form the basis of the transactions were purportedly invested in U.S. equities, options, and/or Treasuries (Column 7).

allegations in the CACEIS Complaint (Complaint ¶ 6–7, <u>Picard v. CACEIS Bank Luxembourg</u>,

Adv. Pro. No. 11-2758 (S.D.N.Y. Oct. 6, 2011) (hereinafter, "CACEIS Compl.")), the District

Court admonished that the extraterritoriality inquiry must be trained on "the transfer of property

to a *subsequent transferee*, not the relationship of that property to a perhaps-distant debtor."

<u>Extraterritoriality Decision</u>, 513 B.R. at 227 (emphasis added).

   The Trustee's allegations that the Feeder Funds had customer agreements with BLMIS

containing U.S. arbitration choice of venue provisions or N.Y. choice of law provisions (Proffer

¶ 21–22, 75, 99, 124, 150) are likewise beside the point, given that the Trustee fails to articulate

how these provisions from contracts between *BLMIS* and the *Feeder Funds* have any bearing on

where the *subsequent* transfers occurred.  <u>See</u> Consolidated Br. at 3, 24.  Notably, Judge Rakoff

dismissed similar contract provisions as inconsequential, *even* where the contract (unlike the

contracts between BLMIS and the Feeder Funds) involved the parties to the transfer subject to

clawback.  <u>See</u> CACEIS Compl. ¶ 7 (alleging that CACEIS defendants "entered into subscription

agreements with Sentry under which they submitted to New York jurisdiction").

### B. The Trustee's Allegations Related To The Feeder Funds' Activities[7] Are Irrelevant To The Location Of The Transfers

   Likewise, the Trustee's various allegations regarding the domestic operations and

principal place of business of the Feeder Funds also cannot help the Trustee meet his pleading

burden.  Judge Rakoff considered and rejected as irrelevant nearly all of these allegations in his

review of the CACEIS complaint, in which the Trustee explicitly incorporated by reference his

---

[7] This group of allegations is composed of a total of four allegations reflected in the Trustee's Exhibits—namely, that the BNPP Defendants and/or Feeder Funds: (i) received transfers from feeder funds with principal operations in the United States (Column 1); (ii) had agreements governing transactions that provided for U.S. choice of law (Column 2); (iii) had agreements containing a provision that provided for a U.S. venue (Column 3); and (iv) had a relationship with feeder funds' U.S. office, employees, or other representatives (Column 13).

complaints against Fairfield and Harley (CACEIS Compl. ¶¶ 38, 52).[8]  Accordingly, the

Trustee's claim that the Feeder Funds undertook certain activities in New York relevant to their

investments in BLMIS, such as signing and delivering to BLMIS customer agreements (Proffer

¶¶ 22, 124, 149, 173–74) and performing due diligence (id. ¶¶ 42, 52–53, 69), do not bear upon

the place where the Feeder Funds' alleged subsequent transfers to the BNPP Defendants

occurred.

Critically, Judge Rakoff encountered similar allegations in the CACEIS complaint and

properly rejected them as off the mark.  See CACEIS Compl. ¶ 7 (alleging that "Fairfield

Greenwich Group ('FGG') managed" Fairfield Sentry and that CACEIS Defendants entered, or

caused their agent to enter, into subscription agreements with Fairfield Sentry under which they

submitted to New York jurisdiction, sent copies of the agreements to FGG's New York City

office."); Amended Complaint ¶ 34, Picard v. Fairfield Sentry Ltd., Adv. Pro. No. 09-1239

(S.D.N.Y. July 20, 2010) (hereinafter, "Fairfield Compl.") ("Fairfield Sentry . . . routinely

conducted business in New York, New York and entered into agreements in New York, New

York including agreements relating to its BLMIS accounts, which it delivered to BLMIS

headquarters in New York, New York."); id. ¶ 36 (noting a representation that "FGG

professionals actively monitored FGG's investments through Madoff and conducted due

diligence both in Bermuda and New York").  As Judge Rakoff held, even if "a significant portion

of the fraudulent conduct" leading up to a transfer "occurred in the United States," there is no

warrant on that basis to conclude that the transfer itself happened in the United States.

Extraterritoriality Decision, 513 B.R. at 228; see also Loginovskaya v. Batratchenko, 764 F.3d

266, 275 (2d Cir. 2014) (discarding as irrelevant the location of "actions needed to carry out the

---

[8]       Significantly, the very same allegations incorporated by reference into the CACEIS complaint and rejected
by Judge Rakoff as insufficient are also incorporated by reference against the BNPP Defendants (Arbitrage Compl. ¶
33; Fairfield, Kingate, Rye Compl. ¶ 46).

transactions, *and not the transactions themselves*" (emphasis added)).  Similarly, the Trustee's

allegation that certain of the Feeder Funds utilized a U.S. agent (Proffer ¶¶ 132, 168) are

inconsequential to the extraterritoriality analysis, because the agent itself is alleged to engage in

the same irrelevant conduct discussed above.  And, more importantly, the Trustee never alleges

that the U.S. agent itself was the initial transferee from whom the BNPP Defendants' subsequent

transfers—the actual subject of these proceedings—originated.

In addition, the Trustee's attempt to cast the Feeder Funds as U.S.-based or resident

entities by virtue of the activities or principal place of business of certain affiliates cannot

support the conclusion that the subsequent transfers at issue occurred within the United States.

To start, Judge Rakoff has already reviewed and deemed insignificant the Trustee's contention

(see Proffer ¶¶ 34–37, 127, 156–157) that the Feeder Funds were managed from the United

States.  See CACEIS Compl. ¶ 7 (noting that Fairfield Sentry was a "Fairfield Greenwich Group

('FGG') managed Madoff feeder fund" and that CACEIS sent "subscription agreements to

FGG's New York City office").  In fact, the Trustee represented to Judge Rakoff in the

complaint against Fairfield that several entities affiliated with Fairfield Sentry and Sigma not

only conducted certain business activities in the United States, but also had their offices in the

United States.  See Fairfield Compl. ¶ 36 (noting a representation by Fairfield that "FGG

professionals *actively monitored FGG's investments through* Madoff and *conducted due*

*diligence. . . in . . . New York*") (emphasis added); id. ¶ 124 (alleging that FGG investment

management firm FGB "filed Form 13Fs with the SEC . . . [which] were signed by . . . FGB's

general counsel[] from FGG's New York offices"); id. ¶¶ 136, 146, 148, 191 (alleging that

various management and administrative entities connected to Fairfield Sigma and Fairfield

Sentry were "licensed" or "registered" "to do business in the State of New York," "maintained

[their] principal executive office[s] in New York, New York," were "managed out of FGG's

New York City office," or otherwise "routinely conducted business in New York, New York").

But such allegations were not enough to establish that transfers involving the foreign feeder

funds were domestic.  See Extraterritoriality Decision, 513 B.R. at 227–28 (referring to "foreign

feeder funds" and "thoroughly foreign subsequent transfers").  The Second Circuit has similarly

deemed the U.S. activities of management affiliates irrelevant to the extraterritoriality inquiry.

See Loginovskaya, 764 F.3d at 268 (holding that the transactions at issue were not domestic,

even where "[t]he Thor Group, an international financial services organization based in New

York, manage[d] investment programs" that the plaintiff contended engaged in fraudulent

activity).  Further, the Trustee's parallel attempt to minimize the Feeder Funds' presence in the

jurisdiction under whose laws they are incorporated (Proffer ¶¶ 30–31, 76–79, 97, 100, 119, 168)

provides no further basis to infer that the subsequent transfers at issue occurred within the United

States, rather than abroad.

Most importantly, even if the Trustee includes certain factual detail in his Proffer

regarding the citizenship or residence of BNPP Defendants that were not present in the CACEIS

complaint, it is indisputable that the U.S. citizenship or residence of a party to a transaction is

insufficient to render that transaction domestic.  Absolute Activist, 677 F.3d at 70 (noting that

"the fact that two of the defendants resided in California does not lead to the plausible inference

that the Funds became irrevocably bound to purchase U.S. Penny Stocks in the United States");

Loginovskaya, 764 F.3d at 268 (dismissing a claim on extraterritoriality even though the claim

was based on investments in entities all "based in New York"); EEOC v. Arabian Am. Oil Co.,

499 U.S. 244 (1991) (dismissing a discrimination action on extraterritoriality grounds despite the

fact that the plaintiff, defendants, and the defendants' principal place of business were all located

in the United States).  The Trustee provides no basis to depart from this well-established legal

principle.[9]

    **C.**    **The Trustee's Allegations Regarding The Conduct Of BNPP Defendants Similarly Do Not Demonstrate That The Subsequent Transfers Are Domestic**

Beyond general facts relating to BLMIS and the Feeder Funds, the Proffer also advances

a bevy of irrelevant factual allegations concerning the alleged ties of the BNPP Defendants to the

U.S. forum.  At bottom, the Trustee simply re-alleges against the BNPP Defendants the same

types of conduct determined to be inconsequential by Judge Rakoff in the Extraterritoriality

Decision when performed by Harley and Fairfield (see supra Part I.B).  The relevant inquiry

must focus on where the subsequent transfers occurred—something the Trustee has studiously

ignored—not on where activities that may have indirectly set the stage for those transfers

---

[9]    Although the Trustee's general allegations regarding the Feeder Funds' domestic ties are irrelevant to the location of the alleged subsequent transfers to BNPP Defendants, it nonetheless bears mention that many of these allegations are controverted by the Trustee's own allegations or by documents incorporated within the Trustee's complaints or otherwise subject to judicial notice.  While the Proffer contends (irrelevantly) that Harley's investment manager and administrators were New York-based (Proffer ¶¶ 35–38, 48–50), which supposedly bestows a New York principal place of business upon Harley (id. ¶¶ 36-37), (i) the Trustee himself has pleaded that Harley's principal place of business was Isle of Man (See Harley Compl. ¶ 31); (ii) the Harley Offering Memorandum lists a directory of relevant entities, all foreign, including an investment manager (Euro-Dutch Management Limited, in the Caymans), a sub-advisor (Aspen International Investment Limited, in Bermuda), an administrator (Fortis Prime Fund Solutions (IOM) Limited, in the Isle of Man), a banker (Fortis Prime Fund Solutions Bank (Ireland) Limited, in Ireland), and auditors (Ernst & Young, in the Caymans) (See November 2006 Confidential Explanatory Memorandum of Redeemable Preferred Shares of Harley International (Cayman) Limited attached to Janet Decl. as Exhibit A ("Harley Offering Memorandum"), and (iii) the Harley liquidators' report identifies no Harley assets located within the United States, indicating that, at the time Harley filed for liquidation in the BVI on March 31, 2009, its only assets were BLMIS shares and an Irish bank account, see Nicolas Matthews, Harley International (Cayman) Limited (In Official Liquidation): Report of the Joint Official Liquidators, Kinetic Partners ¶ 3.2 (May 22, 2009), http://www.kinetic-partners.com/wp-content/uploads/1-09-05-22-JOLs-Report.pdf. The Court may take judicial notice of such documents.  See Boarding Sch. Review, LLC v. Delta Career Educ. Corp., No. 11 Civ. 8921 (DAB), 2013 WL 6670584, at *1 n.1 (S.D.N.Y. Mar. 29, 2013).  Note that the Trustee himself has also acknowledged that it is appropriate for this Court to take judicial notice of documents incorporated by reference in submissions to the Court.  See Tr. Suppl. Mem. of Law in Opp. to Certain Defs.' Mot. to Dismiss Based on Extraterritoriality, Picard v. Ceretti, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. June 26, 2015), at 2 n.13 (citing In re Lyondell Chem. Co., 505 B.R. 409, 418 (S.D.N.Y. 2014)).

    The allegations relating to the Fairfield Funds similarly contradict the alleged domestic orientation of these funds.  See Consolidated Br. at 24.  The Court, of course, need not accept allegations that contradict themselves or documents incorporated by reference into the pleadings, see In re Richartz, Fliss, Clark & Pope, Inc., Adv. Pro. No. 10-03317 (MG), 2010 WL 4502038, at *3 (Bankr. S.D.N.Y. Nov. 1, 2010), though in the instant case such allegations are irrelevant to the extraterritoriality inquiry.  Thus, the result should be the same if they are considered or not.

occurred. See Loginovskaya, 764 F.3d at 275 (indicating that location of "actions needed to carry out the transactions" is not the location of "the transactions themselves" and such a location is therefore irrelevant to extraterritoriality inquiry). Nowhere does the Trustee explain why these facts should assume relevance if performed by the BNPP Defendants. Therefore, as shown below, these allegations are both irrelevant as a matter of law and factually deficient.[10]

### (1) Residences of BNPP SA, BNPP Arbitrage, and BNPP SS[11]

The Trustee's allegations that certain of the BNPP Defendants are U.S. residents cannot support the conclusion that the relevant transfers occurred within the United States. After all, U.S. residents often enter into transfers abroad, especially when investing in foreign investment funds. Loginovskaya, 764 F.3d at 269.

Furthermore, even if the residence of the BNPP Defendants were significant, the allegations that BNPP Arbitrage and BNPP SS are New York residents (Proffer ¶¶ 4–6, 82, 105) are implausible and conclusory, and thus not entitled to any weight. In re Richartz, Fliss, Clark & Pope, Inc., Adv. Pro. No. 10-03317 (MG), 2010 WL 4502038, at *3 (Bankr. S.D.N.Y. Nov. 1, 2010). To start, the various Feeder Fund offering memoranda incorporated by reference into the Trustee's complaints make plain that the Feeder Funds' shares "may not be directly or indirectly offered or sold in the United States of America or to or for the benefit of any United States Person." Harley Offering Memorandum at 2; Equity Trading Portfolio Limited Offering Memorandum at 2 (Jan. 2006), attached to Janet Decl. as Exhibit B. Therefore, none of the relevant BNPP Defendants were permitted to invest in the Feeder Funds unless they were non-

---

[10]    Indeed, for certain of the BNPP Defendants with respect to certain of the relevant Feeder Funds, the Trustee does not allege that these defendants engaged in activities in the United States. See supra Part I.C.2. For example, although the Trustee alleges that BNPP Suisse received $7 million of transfers from three different Feeder Funds, he fails to allege any other facts related specifically to this entity, including the locations of any of its activities (Proffer ¶ 8).

[11]    These allegations are identical to the allegation reflected in the Trustee's Exhibits that BNPP SA, BNPP SS, and BNPP Arbitrage used a U.S. office in connection with transactions (Column 19).

U.S. residents. The Proffer contains no allegations addressing this prohibition or claiming that

the BNPP Defendants violated it. Additionally, the Proffer does not even allege that BNPP

Arbitrage and BNPP SS are licensed with the New York Secretary of State[12] or registered with

the New York State Department of Financial Services as a foreign branch licensed to do business

in New York.[13] See N.Y. Bus. Corp. Law § 1301 (requiring a foreign corporation to register

with the NYDOS in order to "do business in this state"); see also Vera v. Republic of Cuba, No.

12 Civ. 1596 (AKH), 2015 WL 1244050, at *7 (S.D.N.Y. Mar. 17, 2015) (stating that a "foreign

bank must register with and obtain a license from the Superintendent of the Department of

Financial Services" "[i]n order to benefit from the advantages of transacting business in this

forum . . . ."); Animalfeeds Int'l Inc. v. Banco Espirito Santo e Comercial de Lisboa, 420

N.Y.S.2d 954, 959 (Sup. Ct. 1979) ("[F]oreign banks are required to be licensed in this state as a

prerequisite for transacting business here . . . .").

    Therefore, the residency allegations boil down to the claim that the BNPP Defendants are

part of a group that has a New York office, which is of course not enough to prove domesticity

under either the Extraterritoriality Decision (see CACEIS Complaint ¶ 7), or Morrison itself.

Morrison v. Nat'l Austl. Bank Ltd., 130 S. Ct. 2689, 2875–76 (2010) (holding that the

---

[12]     A review of the public website of the New York Department of State ("NYDOS") for entities that contain the words "BNP Paribas" did not return BNPP Arbitrage or BNPP SS. See Corp. & Bus. Entity Database, N.Y. Dep't of State, State Records & UCC, http://www.dos.ny.gov/corps/bus_entity_search.html (obtained Aug. 17, 2015). As other courts in this Circuit have done, this Court can take judicial notice of the websites of state regulatory agencies. See, e.g., Hotel Emps. & Rest. Emps. Union, Local 100 of N.Y., N.Y. & Vicinity, AFL-CIO v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 549 (2d Cir. 2002) (taking judicial notice of a New York state agency's website); Gesualdi v. Gen. Concrete, Inc., No. 11-CV-1866 (CBA) (JO), 2013 WL 1192967, at *8 (E.D.N.Y. Feb. 1, 2013) (same).

[13]     A review of the public web site of the New York State Department of Financial Services does not reveal BNPP Arbitrage or BNPP SS. See Foreign Branches, New York State Department of Financial Services, http://www.dfs.ny.gov/about/whowesupervise/sifbranc.htm (last updated Sept. 3, 2015); see also supra note 12.

transaction was extraterritorial, even where the defendants' wholly-owned subsidiary was

headquartered in the United States).[14]

### (2) BNPP's Management Activities Related to the Feeder Funds[15]

Likewise, the Trustee's allegations about management activities that BNPP supposedly

performed in the United States—such as: due diligence, monitoring, and research (Proffer ¶¶ 61,

86, 182); communications of various sorts (id. ¶¶ 62, 88, 92, 109, 114, 145, 160–61); marketing

and sales activities (id. ¶¶ 83, 159); performing or reviewing calculations (id. ¶ 86, 91, 112–13);

signing redemption requests (id. ¶ 62); or other tasks vaguely described as "operational support"

(id. ¶¶ 61, 86)—taken individually or collectively, do not support an inference that the

subsequent transfers were domestic.

First, the performance of due diligence or other ancillary activities (like monitoring or

research) within the United States in connection with investments in BLMIS or the offshore

Feeder Funds does not support the conclusion that a subsequent transfer relating to those

investments occurred in the United States.  See supra Part I.B.  Indeed, Judge Rakoff necessarily

considered and rejected the significance of such allegations in determining that the transfers

alleged in the CACEIS complaint involved foreign parties and occurred abroad, even though

---

[14]    Further, Trustee fails to explain how the alleged existence of a New York office for certain of the BNPP
Defendants could bear upon their citizenship, especially in light of the Supreme Court's decision in Daimler AG v.
Bauman, 134 S. Ct. 746, 760 (2014) (holding that general jurisdiction exists only where a defendant corporation
itself has jurisdictionally sufficient contacts with the forum state and, accordingly, in-state contacts by mere
affiliates or subsidiaries of a defendant corporation are insufficient).

[15]    This group of allegations comprises a total of eight allegations reflected in the Trustee's Exhibits, including
that the BNPP Defendants: (i) conducted due diligence in the United States regarding transactions (Column 8); (ii)
conducted due diligence on BLMIS (Column 9); (iii) used a U.S. affiliate in connection with the transaction
(Column 10); (iv) used a U.S. agent in connection with a transaction (Column 11); (v) had a relationship with a
feeder fund that had significant U.S. connections by virtue of defendant's communications with specific feeder fund
offices, sales representatives, agents, employees, and/or other representatives located in the United States (Column
13); (vi) received fees based on BLMIS's performance and/or paid from BLMIS customer property (Column 14);
(vii) received fees from feeder funds as incentives to invest with specific feeder funds or to solicit others to invest in
the feeder fund (Column 15); and (viii) participated in feeder fund management, and/or is an entity created by, or for
the benefit of feeder fund management (Column 16).

Fairfield was alleged to have conducted diligence in New York.  Fairfield Compl. ¶ 36 (alleging

that "FGG [ ] professionals actively monitored FGG's investments through Madoff and

conducted due diligence both in Bermuda and New York[]").  Relatedly, the occurrence within

the United States of communications concerning investments in BLMIS or the offshore Feeder

Funds does not support the inference that subsequent transfers relating to those investments

happened in the United States, since Judge Rakoff considered and rejected similar allegations.

See CACEIS Compl. ¶ 7 ("[T]he CACEIS Defendants . . . sent copies of the agreements to

FGG's New York City office[.]); Fairfield Compl ¶ 34 ("Fairfield Sentry . . . delivered

[agreements] to BLMIS headquarters in New York[.]"); see also Mori v. Saito, No. 10 Civ. 6465

(KBF), 2013 WL 1736527, at *7 (S.D.N.Y. Apr. 19, 2013) (determining that "the location where

bank statements were mailed" was irrelevant to where the transactions occurred); Morrison, 130

S.Ct. at 2883–84 (holding the transaction to be foreign even while noting that plaintiffs had

alleged that defendants communicated various "misleading public statements" from Florida).

Second, the case law makes clear that marketing and sales activities within the United

States are similarly irrelevant, as is the alleged performance and review of calculations in the

United States.  See Absolute Activist, 677 F.3d at 70 (finding allegations about heavy marketing

within the United States inconsequential).  Nor does the naked assertion that BNPP Arbitrage

had a New York employee sign a redemption request (Proffer ¶¶ 62, 86, 91, 112–13) provide any

support for the conclusion that the related transfer happened domestically.  See Plumbers' Union

Local No. 12 Pension Fund v. Swiss Reinsurance Co., 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010)

(holding that the location where an investor places the purchase or sell order for securities is

immaterial to the location of the transfer).  Indeed, the Trustee does not identify which transfer

(if any) of the many he seeks to avoid resulted from the alleged redemption request, nor does he

specify the bank accounts used for that transfer or provide any reason to believe they were

located in United States.  Even if one transfer resulted from a redemption request signed by a

New York employee, that says nothing of the other transfers sought by the Trustee.  Such general

allegations, even if relevant, are not sufficient.  And, of course, the catchall reference to certain

"operational support" allegedly performed by the BNPP Defendants in New York also provides

no basis to infer that the specific transfers at issue occurred within the United States.

In addition, the Trustee's claims that BNPP SA acquired New York-based ZCM in 2003

(Proffer ¶ 57) and thereafter operated a New York-based Fund Derivatives Group (id. ¶ 13), do

not aid in pleading domestic subsequent transfers.  In particular, the Trustee fails to articulate

any connection whatsoever between these alleged facts and the location of the subsequent

transfers that he now seeks to avoid and recover from the BNPP Defendants.  See Absolute

Activist, 677 F.3d at 68 (holding that extraterritoriality inquiry focuses on location where

irrevocable liability was incurred or title transferred, not identity or characteristics of parties to

transaction); Loginovskaya, 764 F.3d at 274 (similar).[16]  Importantly, the Trustee does not allege

that either the Fund Derivatives Group itself, any of its alleged members, or ZCM are the

recipients of the relevant transfers.  Rather, the Trustee seeks to substitute the allegations that

certain BNPP affiliates were involved in the investments in Feeder Funds for actual evidence that

the transfers which he seeks to claw back were domestic.  But, the effort cannot bear fruit, since

---

[16]    We note that the Trustee's Addendum misleadingly distorts the allegations set out in his Proffer.
Specifically, although the Trustee argues in the Addendum that "BNP and BNP Securities Corp. employees in New
York . . . signed" various subscription agreements (Addendum at 8), the Proffer instead discusses New York
employees engaging in ancillary activities related to those agreements, including especially tangential
communications in the United States occasioned by the convenience of having employees in the same city and time
zone as BLMIS.  Compare Addendum at 8 (citing Proffer ¶ 109 to suggest that New York employees signed BNPP
Defendants' subscription agreements with Fairfield), with Proffer ¶ 109 ("In the subscription agreements, each
Defendant directed communications to BNP's offices in New York, listing New York mailing addresses, New York
telephone and facsimile numbers, and U.S. email addresses."); compare Addendum at 8 (citing Proffer ¶ 145 in
arguing that New York employees signed BNPP Defendants' subscription agreements with Kingate), with Proffer ¶
145 (alleging solely that BNPP Defendants utilized e-mail addresses containing the word "americas" for receipt
confirmations, trade confirmations, and due diligence materials).

Judge Rakoff already considered U.S.-based management of a feeder fund and considered such operations irrelevant to the extraterritoriality inquiry.  See supra Part I.B.

Moreover, certain BNPP Defendants are not even alleged to have engaged in these management activities that occurred prior to or after the subsequent transfers.  For example, with respect to the Fairfield Funds, the Trustee does not contend that BNPP SS, BNPP Suisse, BNPP Cayman, or BGL BNPP each engaged in any such activities themselves (see id. ¶¶ 106–14).  Similarly, he does not allege that BNPP SS, BNPP Suisse, or BNPP Cayman performed any management activities involving the Kingate Funds (see id. ¶¶ 144–146), and his sole allegation regarding BGL BNPP with respect to the Kingate Funds was that BGL BNPP asked the funds to send materials to an e-mail address that includes the word "americas" (id. ¶ 145).  In addition, the Trustee does not and cannot establish that BNPP SS, BNPP Suisse, BNPP Cayman, or BGL BNPP are members of the Fund Derivatives Group, which allegedly engaged in transactions that supposedly eventually gave rise to the subsequent transfers to the BNPP Defendants (id. ¶ 13).  Instead, by the Trustee's own admission, these four defendants are alleged to be members of two different groups, the Asset Management Group and the Securities Services Group (id. ¶¶ 8–11), that are nowhere alleged to bear a relationship to the Fund Derivatives Group.  Further, with respect to subsequent transfers received by BNPP Arbitrage from Equity Trading, the Trustee focuses his attention on the activities allegedly performed by BNPP SA rather than the actual subsequent transferee who received the relevant payments (id. ¶¶ 159–164).

### (3) BNPP Defendants' Purported Use of an Agent in the United States[17]

The Trustee's allegations relating to non-party BNPP Sec. Corp.'s supposed service as an agent for its foreign affiliates in New York (id. ¶¶ 12, 85–86, 89–92, 144) do not support a

---

[17]    This group of allegations is identical to the two allegations laid out in the Trustee's Exhibits that the BNPP Defendants used a U.S. affiliate or U.S. agent in connection with the transactions (Columns 10 and 11).

plausible inference that the subsequent transfers were domestic.  Most importantly, BNPP Sec.

Corp. is not alleged to have received any of the supposed subsequent transfers at issue, let alone

to have received them in New York.  Moreover, although the Trustee claims that BNPP Sec.

Corp. signed redemption requests and subscription agreements on behalf of certain of the BNPP

Defendants (id. ¶¶ 62, 92), the Trustee does not specify which (if any) of the subsequent transfers

he seeks to avoid and recover relate to any purchase orders BNPP Sec. Corp. may have placed.[18]

Furthermore, the location where a purchase order may be placed is, in any event, not relevant to

where a subsequent transfer upon redemption happens.  Plumbers' Union, 753 F. Supp. 2d at 179

("[T]he country in which an investor happened to be located at the time that it placed its

purchase order is immaterial.").

Likewise, the Trustee's claim that BNPP Sec. Corp. entered into an option agreement and

a swap agreement to provide leverage to Tremont (Proffer ¶¶ 89–91) does not support the

conclusion that subsequent transfers made to other BNPP Defendants, most of which had nothing

to do with the Tremont option or swap, occurred in the United States.  Again, the Trustee fails to

specify any particular subsequent transfers that were made in connection with the option or swap

that BNPP Sec. Corp. supposedly entered into with Tremont.  Moreover, even if the Trustee had

specified such subsequent transfers, BNPP Sec. Corp.'s entry into an option and swap with

Tremont are at most "actions needed to carry out the transactions, and not the transactions

themselves," and thus they are not relevant to the extraterritoriality inquiry.  Loginovskaya, 764

F.3d at 275.

---

[18]    Similarly, the Trustee claims that BNPP Arbitrage granted BNPP SA power of attorney to place purchase orders and did not specify which of the alleged subsequent transfers relate to such purchase orders. (Proffer ¶ 144)

### (4) Domestic Choice of Law and Choice of Venue Clauses[19]

The Trustee claims that the BNPP Defendants entered into agreements that were subject to New York choice of law or choice of venue provisions (Proffer ¶¶ 87, 91, 107). However, the choice of law or venue provisions are inconsequential to the extraterritoriality analysis. Critically, these very same allegations were present in the CACEIS complaint before Judge Rakoff, and yet he properly concluded that the complaint involved transfers between foreign parties occurring abroad. CACEIS Compl. ¶ 7. Simply put, a choice of law provision in a credit agreement or subscription agreement does not determine where a transfer related to that agreement occurred. See Absolute Activist, 677 F.3d at 68 (focusing on place where irrevocable liability was incurred or title transferred); Loginovskaya, 764 F.3d at 274 (similar).

### (5) The Alleged Use of U.S. Bank Accounts[20]

Although the Trustee's Proffer claims that offshore Feeder Funds and BNPP Defendants received redemption payments into New York bank accounts (Proffer ¶¶ 63–64, 110–11, 146, 162, 181, 187), these allegations do not plausibly plead the domestic locus of the subsequent transfers. Indeed, the CACEIS complaint considered by Judge Rakoff alleged that CACEIS had received transfers from Fairfield, which was alleged to have "utilized New York banks both in redeeming funds" from BLMIS and in investing additional funds with BLMIS. Fairfield Compl. ¶ 35. Recognizing the basic fact that dollar-denominated transfers are cleared through U.S. bank accounts, Judge Rakoff held that the use of "correspondent banks in the United States to process dollar-denominated transfers" is insufficient to make the transfers domestic. Extraterritoriality Decision, 513 B.R. at 228 n.1.

---

[19]   This group of allegations is identical to the two allegations laid out in the Trustee's Exhibits contending that the BNPP Defendants had agreements governing the transactions that included a U.S. choice of law or venue provision (Columns 2 and 3).

[20]   These allegations are identical to the allegation laid out in the Trustee's Exhibits that BNPP Defendants used a U.S. bank account with respect to the transactions (Column 12).

The Trustee does not plead that the bank accounts employed to carry out the subsequent

transfers involved in these proceedings were not correspondent bank accounts.  In fact, although

the Trustee has had some seven years to develop these facts, the Proffer contains no allegations

indicating the bank accounts used for the transfers in question maintained the relevant moneys in

New York, choosing instead to include in the Proffer only a litany of irrelevant facts concerning

the supposed residency and general operations in the United States of BLMIS, the offshore

Feeder Funds, and the BNPP Defendants.  Based on the scant allegations in the Proffer, there is

no factual support for the conclusion that the bank accounts—if they were indeed in New

York—were anything other than correspondent bank accounts like those considered by Judge

Rakoff in the CACEIS case.  All BNPP Defendants are, by the Trustee's own admission,

incorporated in foreign countries, and thus they all require—and used—domestic accounts to

process transfers in U.S. dollars.  See In re Bernard L. Madoff Inv. Sec. LLC, 525 B.R. 871, 886

n. 17 (Bankr. S.D.N.Y. 2015) (defining "correspondent bank accounts" as "accounts in domestic

banks held in the name of foreign financial institutions" to allow them to process dollar-

denominated transfers (quoting Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 56 n. 3 (2d

Cir. 2012)).  Furthermore, the documents incorporated by reference in the Trustee's proffered

allegations show that some of the New York-based accounts to which the Trustee apparently

refers are correspondent accounts, including the BNP Paribas New York account listed as one of

BNPP Arbitrage's correspondent banks in the Kingate Global subscription agreement referenced

at Proffer ¶ 146.[21]  And, in any event, the law is clear that the transfer of funds to a defendant's

New York bank account does not render the transfer domestic under the extraterritoriality

analysis.  In re Maxwell Commc'n Corp, 186 B.R. 807, 817 n.5 (S.D.N.Y. 1995) (transfers to

---

[21]       Specifically, it is listed on a BNPP Arbitrage "List of Correspondent Bank [sic]," with "Cur."—as in, the
currency that the correspondent bank can process—listed as "USD."  Kingate Global Subscription Agreement 23
(Aug. 2007), attached to Janet Decl. as Exhibit C.

Barclays were extraterritorial even though they were made to the Barclays' New York branch); see also Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 33 (2d Cir. 2010) (using the term "slim contacts" to refer to, *inter alia*, the fact that defendant wired funds that were used for the allegedly illegal activity through U.S. banks).  This is especially the case here, where the Trustee has made no effort to plead that the transfers in question remained in New York (if they were ever there), as opposed to continuing abroad after being cleared in New York.

## II.    THE COMPLAINTS SHOULD BE DISMISSED BASED ON INTERNATIONAL COMITY

Alternatively, comity provides an independent bar to the Trustee's ability to avoid the relevant subsequent transfers and requires this Court to deny the Trustee's motion to amend and dismiss these four proceedings.  See Extraterritoriality Decision, 513 B.R. at 231 ("[E]ven if the presumption against extraterritoriality were rebutted, the Trustee's use of section 550(a) to reach these foreign transfers would be precluded by concerns of international comity.").  As laid out in the Consolidated Brief, the Extraterritoriality Decision correctly rests on the comity of nations (driven by a respect for the laws of other nations), rather than the comity of courts (driven by deference to conflicting foreign litigation proceedings).  See Consolidated Br. at 38–40. Although not strictly necessary, the presence of foreign liquidation proceedings may bolster a claim based on the comity of nations, providing additional reason to conclude that a U.S.-based adversary proceeding may infringe upon the law of other nations.  Id. at 35–36.

Here, the Court may take judicial notice that most of the relevant Feeder Funds involved in these actions are subject to foreign liquidation proceedings that will adjudicate the avoidability of transfers they have made.  Specifically, Harley, Fairfield Sentry, Fairfield Sigma, Kingate Global, and Kingate Euro are in liquidation in the BVI; and Insurance Portfolio and XL Portfolio

are in liquidation in the Cayman Islands.[22]  Approximately $1.2 billion out of the $1.25 billion of

the alleged transfers to the BNPP Defendants that the Trustee is seeking to avoid emanated from

these seven funds, including $975.5 million in alleged transfers from Harley (Proffer ¶ 19); $39

million in transfers from Insurance Portfolio (id. ¶ 67); $8 million from XL Portfolio (id.); $81.3

million from Fairfield Sentry, (id. ¶ 95); $8 million from Fairfield Sigma (id.); $69 million from

Kingate Global (id. ¶ 116); $22.375 million from Kingate Euro (id. ¶ 117); and $2 million from

Oreades (id. ¶ 166).[23]  As Judge Rakoff correctly held, these foreign liquidation proceedings

create conflicts that implicate prohibitive comity concerns,[24] noting that "many of the feeder

funds are currently involved in their own liquidation proceedings in their home countries," and

citing by way of example that "the BVI courts have already determined that Fairfield Sentry

could not reclaim transfers made to its customers under certain common-law theories—a

determination in conflict with what the Trustee seeks to accomplish here." Extraterritoriality

Decision, 513 B.R. at 232.  Indeed, the Trustee's claim that he is not party to or bound by these

foreign proceedings (Tr. Mem. at 35) reinforces the conflict, as the Trustee apparently intends to

---

[22]    Extraterritoriality Decision, 513 B.R. at 232 ("Fairfield Sentry and Harley . . . are currently involved in their own liquidation proceedings in their home countries."); Fairfield Compl. ¶ 22 ("Sigma [is] subject to liquidation proceedings in the British Virgin Islands."); Compl. ¶ 3, Picard v. BNP Paribas S.A., Adv. Pro. No. 12-01576 (SMB) (S.D.N.Y. May 4, 2012), ECF No. 1 ("Fairfield Sentry, Kingate Global, and Kingate Euro are British Virgin Islands ('BVI') companies that are in liquidation in the BVI."); Compl. ¶ 40, Picard v. ABN AMRO Bank N.V., Adv. Pro. No. 10-05354 (SMB) (S.D.N.Y. Aug. 8, 2012) ("Rye Select Broad Market Insurance Portfolio, LDC . . . . is in liquidation in the Cayman Islands."); Notice of Pendency of Class Action, Mot. for Final Approval of Proposed Settlement of the Insurance Action, Hr'g on Proposed Settlement and Mot. for Attorneys' Fees and Expenses, In re Tremont Sec. Law, State Law & Ins. Litig., No. 08 Civ. 11117 (TPG), at 2 n. 5 (S.D.N.Y. 2011) ("[T]he liquidation of Rye Select Broad Market Insurance Portfolio LDC [and] Rye Select Broad Market XL Portfolio Limited [are] pending in the Grand Court of the Cayman Islands . . . ."); Compl. ¶ 12, Picard v. Oreades SICAV, Adv. Pro. No. 10-05120 (SMB) (S.D.N.Y. Dec. 2, 2010) (noting that Inter put Oreades into liquidation).

[23]    The Trustee has alleged $35 million in transfers from Portfolio Limited (Proffer ¶ 67); $3 million from XL LP (id.); and $15 million from Equity Portfolio (id. ¶ 147).  The total amount of transfers from these funds is $53 million, less than five percent of the total amount.

[24]    Certain BNPP Defendants are currently defendants in pending actions by the Fairfield liquidator. See, e.g., Fairfield Sentry Ltd., et al. v. BNP Paribas Arbitrage SNC, et al., Adv. Pro. No. 10-04098 (SMB) (Bankr. S.D.N.Y.); Fairfield Sentry Ltd., et al. v. BNP Paribas Securities Services Luxembourg, et al., Adv. Pro. No. 10-03267 (SMB) (Bankr. S.D.N.Y.); Fairfield Sentry Ltd., et al. v. BNP Paribas Private Bank & Trust Cayman Ltd., et al., Adv. Pro. No. 10-04099 (SMB) (Bankr. S.D.N.Y.).

pursue his planned course of action, regardless of whether it is at odds with the insolvency law of

these foreign nations.  In this respect, the very case that the Trustee most relies upon in opposing

dismissal on the basis of comity supports the dismiss of these actions.  See Royal & Sun Alliance

Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 92–93 (2d Cir. 2006) (referencing

the well-settled, general rule that "one discrete category of foreign litigation . . . generally

requires the dismissal of parallel district court actions—foreign bankruptcy proceedings.").

These foreign liquidation proceedings are the proper forum to determine the avoidability of

transfers to the BNPP Defendants.

    For all of the reasons set out above and in the Consolidated Brief, these cases should be

dismissed on the independent basis of international comity.

### III.    NEW TRANSFERS ALLEGED IN THE PROFFER FOR THE FIRST TIME ARE BARRED BY THE RELEVANT STATUTE OF LIMITATIONS

    The Trustee raises for the first time—three to five years after filing the initial complaints

in the four actions—a host of new transfers.[25]  Not only are these transfers not avoidable under

Section 550 for the reasons set forth above and in the Consolidated Brief, certain of these

transfers are clearly barred under the statute of limitations.  Indeed, because the New Transfers

arise from initial transfers to Feeder Funds (including Harley, Fairfield Sigma, and Insurance

Portfolio) that were avoided more than one year ago, the Trustee is barred from seeking their

recovery from the BNPP Defendants under Section 550(f) of the U.S. Bankruptcy Code, which

requires that the Trustee initiate recovery actions within "one year after the avoidance of the

---

[25]    Specifically, the Trustee references a $500,000 alleged transfer from Harley to BNPP SS (Proffer ¶ 19); various transfers from Fairfield Sentry to Arbitrage, BNPP SS, BNPP Cayman, and BGL BNPP, (id. ¶ 95); and two transfers from Fairfield Sigma to BNPP SS and BGL BNPP, (id.) (collectively, the "New Transfers").

transfer." Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 480 B.R. 501, 522 (Bankr. S.D.N.Y. 2012).

Here, a default judgment was entered against Harley on November 10, 2010, meaning that the last date to bring a new recovery action for subsequent transfers from Harley was November 10, 2011. See Order Granting Entry of Summary and Default Judgments Against Harley International (Cayman) Limited, Picard v. Harley International (Cayman) Ltd., Adv. Pro. No. 09-1187 (SMB) (Bankr. S.D.N.Y. Nov. 10, 2010). Fairfield Sigma and Insurance Portfolio settled the actions. See Order Approving Settlements Between Debtors and BLMIS Trustee, Picard v. Fairfield Sentry Ltd et al., Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y. July 8, 2011) (discussing the Fairfield settlement); Notice of Dismissal with Prejudice, Picard v. Tremont Group Holdings et al., Adv. Pro. 10-05310 (BRL) (Bankr. S.D.N.Y. Feb. 28, 2013) (dismissing Insurance Portfolio from the adversary proceeding). In connection with the approval of the settlements, the initial transfers were avoided well over a year ago. See Sec. Investor Prot. Corp., 480 B.R. at 523 (acknowledging that the Trustee successfully avoids a claim where a settlement has been approved).

Accordingly, the Trustee has run out of time to pursue the New Transfers and his belated attempt to add them to the actions at this late stage must be rejected.

## <u>CONCLUSION</u>

For the foregoing reasons, the Trustee's motion to amend his pending complaints against the BNPP Defendants must be denied as futile, as the Proffer fails to plead domestic subsequent transfers, and the complaints in Adv. Pro. Nos. 10-04457 (SMB), 10-05120 (SMB), 11-02796 (SMB), and 12-01576 (SMB), should be dismissed with prejudice.

Dated: New York, New York
September 30, 2015

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: ___*/s/ Breon S. Peace*_____

Breon S. Peace
Ari D. MacKinnon
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for the BNP Paribas Defendants*