**Cleary Gottlieb Steen & Hamilton LLP**
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for the BNP Paribas Defendants*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>                 Plaintiff-Applicant, <br><br>     -against- <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>            Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>           Debtor. | Applicable to Adv. Pro. Nos. 10-04457 (SMB), 10-05120 (SMB), 11-02796 (SMB) & 12-01576 (SMB) |

## DECLARATION OF ANDREW JANET IN SUPPORT OF THE REPLY MEMORANDUM IN FURTHER SUPPORT OF THE BNP PARIBAS DEFENDANTS' MOTION TO DISMISS BASED ON EXTRATERRITORIALITY

I, Andrew Janet, declare as follows:

1.    I am a member of the bar of this Court and a partner at Cleary Gottlieb

Steen & Hamilton LLP, counsel for the defendants BNP Paribas S.A., BNP Paribas Arbitrage

SNC, BNP Paribas Securities Services S.A., BNP Paribas Bank & Trust (Cayman) Limited, BNP

Paribas (Suisse) S.A., and BGL BNP Paribas Luxembourg S.A. in the above-captioned actions. I

respectfully submit this declaration in support of the Reply Memorandum in Further Support of

the BNP Paribas Defendants' Motion to Dismiss Based on Extraterritoriality (the "Reply

Memorandum").

2.    Annexed hereto, at the letter tab indicated, is a true and correct copy of the

following documents referred to in the Reply Memorandum:

**Exhibit A**    Offering Memorandum for Harley International (Cayman) Ltd. (Nov. 2006)

**Exhibit B**    Offering Memorandum for Equity Trading Portfolio Ltd. (Jan. 2006)

**Exhibit C**    Subscription Agreement for Kingate Global Fund Ltd. (Aug. 30, 2007)

3.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2015, in New York, New York.

Andrew Janet

# EXHIBIT A

**CONFIDENTIAL EXPLANATORY MEMORANDUM**

**REDEEMABLE PREFERRED SHARES**

**OF**

# HARLEY INTERNATIONAL (CAYMAN) LIMITED

An Exempted Company organized in accordance with the laws of
the Cayman Islands

November 2006

THIS CONFIDENTIAL EXPLANATORY MEMORANDUM (THE "MEMORANDUM") IS SUBMITTED TO
YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN
INVESTMENT IN REDEEMABLE PREFERRED SHARES OF HARLEY INTERNATIONAL (CAYMAN)
LIMITED (THE "FUND"), A CAYMAN ISLANDS COMPANY.  DUE TO THE CONFIDENTIAL NATURE OF
THIS MEMORANDUM, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL
CONSEQUENCES.  CONSEQUENTLY, THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE
OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON (OTHER THAN YOUR FINANCIAL
ADVISOR) WITHOUT THE PRIOR WRITTEN CONSENT OF THE FUND'S DIRECTORS.

Memorandum Copy Number: _____

Offer for sale of Redeemable Preferred shares, par value $0.01 (U.S.) per share (the "Redeemable Preferred Shares"), of HARLEY INTERNATIONAL (CAYMAN) LIMITED, an investment company organized under the laws of the Cayman Islands (the "Fund").  The minimum subscription is $1,000,000 (U.S.) subject to increase or decrease at the discretion of the Fund, provided that no investment shall be for an amount less than $50,000 (U.S.).

Price:      Offered at the Offering Price (as defined herein) per Redeemable Preferred Share.

The Redeemable Preferred Shares of the Fund are speculative securities intended for a limited number of experienced and sophisticated investors.  The Redeemable Preferred Shares will be offered primarily to persons who are neither citizens nor residents of the United States and to a limited number of United States investors, consisting primarily of pension and profit sharing trusts, charities and other tax-exempt entities.  The Redeemable Preferred Shares will not be offered to persons who are members of the public in the Cayman Islands.

THIS MEMORANDUM HAS BEEN PREPARED IN CONNECTION WITH THE OFFER AND SALE OUTSIDE OF THE UNITED STATES, ITS TERRITORIES OR POSSESSIONS, OF REDEEMABLE PREFERRED SHARES OF THE FUND TO PERSONS WHO ARE NOT MEMBERS OF THE PUBLIC IN THE CAYMAN ISLANDS AND WHO ARE NEITHER CITIZENS NOR RESIDENTS OF THE UNITED STATES OF AMERICA.  IT IS ALSO OFFERED WITHIN THE UNITED STATES TO A LIMITED NUMBER OF UNITED STATES INVESTORS CONSISTING PRIMARILY OF TAX-EXEMPT ENTITIES. THIS MEMORANDUM MAY NOT BE REPRODUCED.

NO REGISTRATION STATEMENT HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES AUTHORITY WITH RESPECT TO THIS OFFERING.  THE REDEEMABLE PREFERRED SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED DIRECTLY OR INDIRECTLY TO ANY UNITED STATES CITIZEN OR RESIDENT OR TO ANY CORPORATION, FUND, TRUST OR OTHER ENTITY CHARTERED OR ORGANIZED UNDER THE LAWS OF ANY JURISDICTION IN THE UNITED STATES OF AMERICA, ITS TERRITORIES OR POSSESSIONS OTHER THAN A LIMITED NUMBER OF UNITED STATES TAX-EXEMPT INVESTORS.

THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER AND SALE OF THE REDEEMABLE PREFERRED SHARES IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW.   THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY REDEEMABLE PREFERRED SHARES IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER IN ANY JURISDICTION.  NO ACTION HAS BEEN OR WILL BE TAKEN TO PERMIT A PUBLIC OFFERING IN ANY JURISDICTION WHERE ACTION WOULD BE REQUIRED FOR THAT PURPOSE.  ACCORDINGLY, THE REDEEMABLE PREFERRED SHARES MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND THIS MEMORANDUM MAY NOT BE DISTRIBUTED, IN ANY JURISDICTION, EXCEPT IN ACCORDANCE WITH THE LEGAL REQUIREMENTS APPLICABLE IN SUCH JURISDICTION.   PURCHASERS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS WITHIN THEIR OWN COUNTRIES FOR THE PURCHASE OF REDEEMABLE PREFERRED SHARES AND TO ANY TAXATION OR EXCHANGE CONTROL LEGISLATION APPLICABLE TO THEM.

AN INVESTMENT IN THE FUND MAY BE DEEMED SPECULATIVE AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM.   IT IS DESIGNED ONLY FOR EXPERIENCED AND SOPHISTICATED PERSONS WHO ARE ABLE TO BEAR THE RISK OF THE SUBSTANTIAL IMPAIRMENT OR LOSS OF THEIR INVESTMENT IN THE FUND.   THE PRICE OF UNITS OR SHARES MAY GO DOWN AS WELL AS UP.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, INVESTMENT OR TAX ADVICE.  IF YOU ARE IN ANY DOUBT ABOUT THE CONTENTS OF THIS OFFERING DOCUMENT, EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS PERSONAL COUNSEL, ACCOUNTANTS AND OTHER ADVISORS AS TO THE LEGAL, TAX,

ECONOMIC AND RELATED ASPECTS OF THE INVESTMENT DESCRIBED HEREIN AND AS TO ITS
SUITABILITY FOR SUCH INVESTOR.

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO PURCHASE ANY OF
THE REDEEMABLE PREFERRED SHARES.  REDEEMABLE PREFERRED SHARES MAY NOT BE
SOLD OR TRANSFERRED TO ANY RESIDENTS OF THE CAYMAN ISLANDS UNLESS THE FUND IS
FIRST LISTED ON THE CAYMAN ISLANDS STOCK EXCHANGE, EXCEPT TO AN EXEMPTED OR
ORDINARY NON-RESIDENT COMPANY INCORPORATED IN THE CAYMAN ISLANDS.

THE REDEEMABLE PREFERRED SHARES ARE OFFERED ONLY ON THE BASIS OF THE
INFORMATION CONTAINED IN THIS MEMORANDUM.  ANY FURTHER INFORMATION OR
REPRESENTATIONS GIVEN OR MADE BY ANY DEALER, BROKER OR OTHER PERSON SHOULD
BE DISREGARDED AND ACCORDINGLY SHOULD NOT BE RELIED UPON.  NO PERSON HAS BEEN
AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION IN
CONNECTION WITH THE OFFERING OF THE REDEEMABLE PREFERRED SHARES OTHER THAN
THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR
REPRESENTATIONS MUST NOT BE RELIED ON AS HAVING BEEN AUTHORIZED BY THE FUND,
THE DIRECTORS, THE INVESTMENT MANAGER, THE CUSTODIAN OR THE ADMINISTRATOR.
NEITHER THE DELIVERY OF THIS MEMORANDUM NOR THE ISSUE OF REDEEMABLE
PREFERRED SHARES SHALL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION OR
CONSTITUTE ANY REPRESENTATION THAT THE AFFAIRS OF THE FUND HAVE NOT CHANGED
SINCE THE DATE HEREOF.

THE DIRECTORS OF THE FUND WHOSE NAMES APPEAR IN THIS MEMORANDUM ACCEPT
RESPONSIBILITY FOR THE INFORMATION CONTAINED IN THIS DOCUMENT.  TO THE BEST OF
THE KNOWLEDGE AND BELIEF OF THE DIRECTORS (WHO HAVE TAKEN ALL REASONABLE
CARE TO ENSURE THAT SUCH IS THE CASE), THE INFORMATION CONTAINED IN THIS
DOCUMENT IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO
AFFECT THE IMPORT OF SUCH INFORMATION.  THE DIRECTORS ACCEPT RESPONSIBILITY
ACCORDINGLY.

HARLEY INTERNATIONAL (CAYMAN) LIMITED IS NOT SUBJECT TO ANY FORM OF REGULATION
AND IS NOT THE SUBJECT OF ANY STATUTORY COMPENSATION SCHEME IN THE ISLE OF MAN.

## SUMMARY OF TERMS

The following is a summary of the Confidential Explanatory Memorandum (the "Memorandum") and other documents relating to the Fund and is qualified in its entirety by reference to the Memorandum and related agreements. The Memorandum and related agreements should be reviewed carefully for more information with respect to the Fund.

| | |
|---|---|
| **The Fund** | HARLEY INTERNATIONAL (CAYMAN) LIMITED, an exempted company incorporated in the Cayman Islands (the "Fund"), will offer Redeemable Preferred shares ("Redeemable Preferred Shares") to persons who are neither citizens nor residents of the United States and to a limited number of United States investors, consisting primarily of pension and profit sharing trusts, charities and other tax-exempt entities. Redeemable Preferred Shares will not be offered to persons who are members of the public in the Cayman Islands. The authorized Redeemable Preferred Shares of the Fund consist of 4,900,000 Redeemable Preferred Shares having a par value of $.01 (U.S.) per share, which Redeemable Preferred Shares may be designated as either Class A Redeemable Preferred Shares (the "Class A shares"), Class C Redeemable Preferred Shares (the "Class C shares"), or Class J Redeemable Preferred Shares (the "Class J shares"). |
| **Investment Objective** | The investment objective of the Fund is to achieve capital appreciation by investing the assets of the Fund with one money manager, either directly by way of a managed account or by investing in an investment vehicle managed by such money manager. Fund assets will typically be invested either directly or indirectly in a large number (20-50) U.S. equity securities and equity index related options. The Fund will not use leverage. |
| **The Investment Manager** | The Investment Manager of the Fund is Euro-Dutch Management Limited ("Euro-Dutch"). The principals of Euro-Dutch have considerable experience related to the establishment, operation, and allocation of investment products. |
| **The Sub- Advisor** | Aspen International Investment Limited, a company existing and operating under the laws of Bermuda, has been appointed as sub-advisor. |
| **Administrator** | The Fund has entered into an administration agreement with Fortis Prime Fund Solutions (IOM) Limited (the "Administrator"). The Fund will pay the Administrator a fee based on the net assets of the Fund for services as provided for in the Administration Agreement. |
| **Management Fee** | Class J Redeemable Preferred Shares will be charged an annual management fee (the "Management Fee") of one percent (1.00%) calculated monthly on the net assets of such Class on the last day of each month, prior to deduction of the Incentive Fee, if any. These fees will be shared by the Investment Manager and the Sub-Advisor according to agreement between them, which will be communicated to the |

Directors of the Fund.  No Management Fees shall be charged in respect of the Class A or Class C Shares.

**Incentive Fee**

The Investment Manager will receive a monthly incentive fee (the "Incentive Fee") equal to 10% of the net profits (including unrealized gains and losses), if any, allocable to the Class A Redeemable Preferred Shares and the Class J Redeemable Preferred Shares.   Each is subject to a loss carryforward provision. No Incentive Fees will be charged in respect of Class C Shares. The Incentive Fee is assessed and payable monthly.   The Investment Manager may, however, elect to defer receipt of all or a part of the Incentive Fee.

**Expenses**

The Investment Manager will render the services set forth in the Investment Management Agreement between the Investment Manager and the Fund, and will be responsible for the payment of all overhead expenses associated with rendering such services, including all general overhead expenses.  The Fund will pay all other expenses, including the fees paid to the Investment Manager and the Administrator, custody fees, accounting, audit and legal expenses, organizational expenses; investment expenses such as commissions, research fees and expenses (including research-related travel fees and expenses); interest on margin accounts and other indebtedness; borrowing charges on securities sold short; custodial fees; and any other expenses reasonably related to the purchase, sale or transmittal of Fund assets.

**Risk Factors**

An investment in the Fund involves significant risks and is suitable only for those persons who can bear the economic risk of the loss of their investment and who have limited need for liquidity in their investment.  There can be no assurance that the Fund will achieve its investment objective.  An investment in the Fund carries with it the inherent risks associated with investments in securities and other instruments. See "Risk Factors" below.  Each prospective investor should carefully review this Memorandum and the agreements referred to herein before deciding to invest in the Fund.

**The Offering**

The minimum investment in the Fund is $1,000,000 (U.S.), subject to change at the discretion of the Fund, provided that no investment shall be for an amount less than $50,000 (U.S.).   Subscriptions are permitted monthly on the first business day of each calendar month (and at such other times as are permitted by the Fund's Directors). Redeemable Preferred Shares of the Fund are speculative securities intended for persons who are experienced and sophisticated investors.  For purposes of this Memorandum, a "business day" shall mean any day that banks are open for business in New York, the Cayman Islands and the Isle of Man.

**Redemptions**

Any holder of Redeemable Preferred Shares has the right, in accordance with and subject to the applicable provisions of the Articles of Association of the Fund, to have all or a portion of his shares redeemed as of the last business day of each

|  | |
|---|---|
| | calendar month pursuant to written notice which must be received by the Administrator on behalf of the Fund at least 30 days (or such shorter notice period as the Fund's Directors shall, in their discretion, permit) prior to such redemption date. |
| **Valuation** | Fund investments will be marked-to-market and will include realized and unrealized gains and losses. Fund investments will generally be valued at their last sales price, provided, however, that to the extent deemed appropriate, valuations may be based on quotes from independent dealers or other pricing services. |
| **Reports** | Each investor will receive unaudited performance information of the Fund monthly, and will receive audited year-end financial statements annually. |
| **Board of Directors** | The Directors of the Fund consist of Mr. Anthony L.M. Inder Rieden and Mrs. Dawn E. Davies. Mr. Inder Rieden and Mrs. Davies are also Directors of the Investment Manager. |
| **Tax Status** | The Fund will not be subject to any income, withholding or capital gains taxes in the Cayman Islands. The Fund is not expected to be subject to any United States income taxes (other than United States withholding taxes on dividends and certain interest income derived from United States sources). Shareholders of the Fund who are not otherwise subject to United States taxation by reason of their residence, nationality or other particular circumstances should not become subject to any such taxation by reason of the ownership, transfer or redemption of Redeemable Preferred Shares. Shareholders should consult their own advisors as to the tax consequences to them of an investment in the Fund. |
| **Purchase of Shares** | Any investor desiring to subscribe for Redeemable Preferred Shares of the Fund will be asked to sign two copies of a "Subscription Agreement" in the form furnished by the Fund, to purchase a specified dollar amount of Redeemable Preferred Shares, and to send two such signed copies by facsimile and by mail, to: HARLEY INTERNATIONAL (CAYMAN) LIMITED, c/o Fortis Prime Fund Solutions (IOM) Limited, PO Box 156, 18 – 20 North Quay, Douglas, Isle of Man, IM99 1NR. ) Subscriptions are pursuant to receipt of cleared funds and written notice which must be received by the Administrator on behalf of the Fund at least 5 business days (or such shorter notice period as the Fund's Directors shall, in their discretion, permit) prior to such subscription date. Payment in the amount of the subscription in United States dollars should be made in accordance with the terms of the Subscription Agreement. |
| **Auditors** | Ernst & Young, Georgetown, Cayman Islands. |

## DIRECTORY

| | |
|---|---|
| Registered Office: | **HARLEY INTERNATIONAL (CAYMAN) LIMITED**<br>Grand Pavilion Commercial Centre<br>P.O. Box 2003<br>802 West Bay Road<br>Grand Cayman KY1-1104<br>Cayman Islands<br>B.W.I. |
| Investment Manager: | **EURO-DUTCH MANAGEMENT LIMITED**<br>Grand Pavilion Commercial Centre<br>P.O. Box 2003<br>802 West Bay Road<br>Grand Cayman KY1-1104<br>Cayman Islands<br>B.W.I. |
| Sub-Advisor: | **ASPEN INTERNATIONAL INVESTMENT LIMITED**<br>Clarendon House<br>2 Church Street<br>Hamilton<br>Bermuda |
| Administrator: | **FORTIS PRIME FUND SOLUTIONS (IOM) LIMITED**<br>P O Box 156<br>18 – 20 North Quay<br>Douglas<br>Isle of Man<br>IM99 1NR<br><br>Phone:  44 (0) 1624 688300<br>Fax:     44 (0) 1624 688334 |
| Banker | **FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED**<br>Plaza 2,<br>Custom House Plaza,<br>International Financial Services Centre,<br>Dublin 1<br>Ireland |
| Auditors | **ERNST & YOUNG**<br>P.O. Box 510<br>2nd Floor, Leeward 4<br>Regatta Office Park<br>West Bay Road<br>Grand Cayman KY1-1106<br>Cayman Islands<br>British West Indies |

**TABLE OF CONTENTS**

|     |                                              | Page |
|-----|----------------------------------------------|------|
|     | Summary of Terms                             | 4    |
|     | Directory                                    | 7    |
| 1.  | The Fund                                     | 9    |
| 2.  | Investment Objective and Investment Program  | 9    |
| 3.  | Investment Management                        | 10   |
| 4.  | Investment Management Agreement              | 10   |
| 5.  | Risk Factors                                 | 12   |
| 6.  | Description of Redeemable Preferred Shares   | 14   |
| 7.  | Offering of Redeemable Preferred Shares      | 14   |
| 8.  | Redemptions                                  | 15   |
| 9.  | Net Asset Value                              | 16   |
| 10. | Taxation and ERISA Matters                   | 17   |
| 11. | Fund Administrator                           | 20   |
| 12. | Board of Directors                           | 21   |
| 13. | Banker                                       | 22   |
| 14. | Other Terms of the Fund                      | 22   |
| 15. | Anti Money Laundering Procedures             | 24   |
| 16. | Data Protection                              | 24   |
| 17. | Termination of the Fund                      | 25   |
| 18. | Cayman Islands Mutual Funds Law              | 25   |

## 1.    THE FUND

HARLEY INTERNATIONAL (CAYMAN) LIMITED (formally Harley International Limited, the "Fund") was formed as an "open-ended" investment company under the laws of the Bahamas with limited liability on September 1, 1992. During 2003 the Fund transferred its domicile, administrator and investment manager to the Cayman Islands. The Fund was incorporated as an exempted company in the Cayman Islands on August 7, 2003, at the same time the Fund changed its name to Harley International (Cayman) Limited. The registered address of the Fund is Grand Pavilion Commercial Centre, P.O. Box 2003, 802 West Bay Road, Grand Cayman KY1-1104, Cayman Islands, B.W.I. The Fund will invest in a broad range of financial instruments and other investments. Euro-Dutch Management Limited, the Fund's Investment Manager, is a Cayman Islands incorporated company (the "Investment Manager").  The Fund's new Administrator, Fortis Prime Fund Solutions (IOM) Limited, a company registered in the Isle of Man, has an Investment Business Licence issued under Section 3 of the Isle of Man Investment Business Act 1981.

An investment in the Fund may be deemed speculative and is not intended as a complete investment program.  It is designed only for experienced and sophisticated persons who are able to bear the risk of the substantial impairment or loss of their investment in the Fund.  Redeemable Preferred Shares of the Fund will be offered to persons who are neither citizens nor residents of the United States and to a limited number of United States investors, consisting primarily of pension and profit sharing trusts, charities and other tax-exempt entities.  Redeemable Preferred Shares will not be offered to persons who are members of the public resident in the Cayman Islands.

All shareholders are entitled to the benefit of, are bound by and are deemed to have notice of the provisions of the Memorandum and Articles of Association of the Fund, which include, *inter alia*, the following provisions:  any amendments to the provisions of the Memorandum and Articles of Association require a special resolution of shareholders, except for certain amendments in relation to alterations of the share capital, which require an ordinary resolution of the shareholders.

Resolutions of directors or shareholders which are passed as written resolutions must be unanimous; the liquidation of the Fund or its transfer by way of continuation to another jurisdiction each require a special resolution of shareholders; the rights attaching to any class of shares (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the Fund is being wound up, be varied with the consent in writing of the holders by a majority (two-thirds) of the issued shares of that class, or with the sanction of a resolution passed by a majority (two-thirds) of the holders of the issued shares of that class at a separate meeting of the holders of the shares of that class.

## 2.    INVESTMENT OBJECTIVE AND INVESTMENT PROGRAM

**Investment Objective**

The investment objective of the Fund is capital appreciation and to be profitable both in rising and in declining markets.

There can be no assurances that the Fund's investment objective will be achieved.

**Investment Program**

The Fund invests its assets with a single money manager.  The manager invests primarily in a basket of S&P 100 stocks.  The manager also employs an index option overlay as a hedge against adverse market movements and to preserve existing investor capital.  The strategy is quantitative in nature and seeks to achieve consistent mid-teen annual returns over a long-term horizon.

The foregoing description is general and is not intended to be exhaustive.  Investors must recognize that there are inherent limitations on all descriptions of trading methods due to the complexity, confidentiality and, in the case of the discretionary features of such approaches, the indefinite nature of such methods. In addition, the description of trading strategies must be qualified by the fact that trading approaches are continually changing, as are the markets traded by the Fund.

GCM_BTLG-58302-29

THE FUND MAY BE DEEMED TO BE A HIGHLY SPECULATIVE INVESTMENT AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM.  IT IS DESIGNED ONLY FOR SOPHISTICATED PERSONS WHO CAN BEAR THE ECONOMIC RISK OF THE LOSS OF THEIR INVESTMENT IN THE FUND AND WHO HAVE LIMITED NEED FOR LIQUIDITY.  PAST INVESTMENT PERFORMANCE IS NOT AN INDICATION OF THE FUND'S FUTURE PERFORMANCE.  THERE CAN BE NO ASSURANCES THAT THE FUND WILL ACHIEVE ITS INVESTMENT OBJECTIVE.

## 3.    INVESTMENT MANAGEMENT

The Investment Manager of the Fund is Euro-Dutch Management Limited, a company formed under the laws of the Cayman Islands.  The Investment Manager will be responsible for the allocation of the assets of the Fund to the money manager.  The directors of the Investment Manager are Mr. Anthony L.M. Inder Rieden and Mrs. Dawn E. Davies.

Mr. Anthony L. M. Inder Rieden.  Mr. Inder Rieden has been Managing Director of Euro-Dutch Trust Company (Bahamas) Limited, the Fund's previous investment manager, a Bahamian licensed trust company, since 1975.  From September 1996 to April 2002, he also served as a Director of Fortis Fund Services (Bahamas) Limited, the Fund's previous administrator.  From 1973 to 1975, he was legal counsel to Property Resources Ltd., a Bahamian company engaged in real estate investments.  From 1967 to 1973, he was Managing Director of Curacao International Trust Company (Citco).  Mr. Inder Rieden holds a law degree from the University of Leiden in the Netherlands.

Mrs. Dawn E. Davies.  Mrs. Davies retired as Deputy Managing Director of the Fund's previous administrator, Fortis Fund Services (Bahamas) Limited in September 2000, an office she held from 1996. From 1987 to 1996, she was Executive Vice President of Euro-Dutch Trust Company (Bahamas) Limited. From 1983 to 1987 she worked at S.F.E. Bank and Trust (Bahamas) Limited, serving as a Director and Vice President responsible for the operation of the Bank's Trust Department from 1986, and prior to that as Assistant Vice President.  From 1977 to 1983 she was Assistant Manager, Secretary and Treasurer of Allied Bank and Trust Company (Bahamas) Limited.  From 1967 to 1977 Mrs. Davies worked at Bahamas Commonwealth Bank Limited.  She is a graduate of the University of Strathclyde in Scotland and obtained her M.B.A. from the University of Miami, Florida.  Currently, Mrs. Davies serves as a Director of Euro-Dutch Trust Company (Bahamas) Limited and a number of investment companies.

The Investment Manager will use its best efforts in connection with the purposes and objectives of the Fund and will devote as much of its time and effort to the affairs of the Fund as may, in its judgment, be necessary to accomplish the purposes of the Fund.  The Investment Management Agreement specifically provides that the Investment Manager (or any of its members, officers, employees and affiliates) may conduct any other business including any business within the securities industry whether or not such business is in competition with the Fund.  Without limiting the generality of the foregoing, the Investment Manager (or any of its members, officers, employees and affiliates) may act as investment advisor or investment manager for others, may manage funds or capital for others, may have, make and maintain investments in its own name or through other entities and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms.

Aspen International Investment Limited. ("Aspen"), a company existing and operating under the laws of Bermuda, has been appointed as sub-advisor.  Aspen will act as sub-advisor to Euro-Dutch in connection with Euro-Dutch's management of the Fund.  Aspen shall be compensated solely from Euro-Dutch's investment management fees.  Aspen shall have no discretionary authority or control over investment management decisions of the Fund.  The directors of Aspen are Walter Stresemann and Gregory Elias.

## 4.    INVESTMENT MANAGEMENT AGREEMENT

Under the Investment Management Agreement between the Investment Manager and the Fund (the "Investment Management Agreement"), the Investment Manager allocates the assets of the Fund in accordance with the objectives and policies of the Fund set forth above.  Under the terms of the

Investment Management Agreement, the Fund pays to the Investment Manager, for its services as an investment manager, a "Management Fee" and an "Incentive Fee" as described below.

## Management Fee

The Investment Manager will receive an annual Management Fee on the Class J Redeemable Preferred Shares equal to one percent (1.0%) of the net assets of such Class. This fee will be calculated monthly on the last day of each month, prior to deduction of the Incentive Fee, if any.  The Management Fee will be deducted in computing the net profit or net loss of the Fund.  No Management Fees will be charged in respect of the Class A or Class C Shares.

## Incentive Fee

The Incentive Fee is payable to the Investment Manager.  The Incentive Fee on the Class A and Class J Redeemable Preferred Shares for any month is an amount equal to ten percent (10%) of the net profits (including net unrealized gains), if any, allocable to the Class A Redeemable Preferred Shares and the Class J Redeemable Preferred Shares during such month. The Incentive Fee is subject to a losscarryforward provision.   No Incentive Fees will be charged in respect of Class C Shares. Notwithstanding the foregoing, certain shareholders that are affiliated with the Investment Manager, the Sub-Advisor or certain large or strategic Fund investors may, upon the consent of the Investment Manager, receive an annual return in the form of additional Redeemable Preferred Shares or cash payment of the portion of the Incentive Fee indirectly borne by them but waived by the Investment Manager in its sole discretion.

The Investment Management Agreement provides, unless the Investment Manager elects to defer receipt of the Incentive Fee as further described below, that the Investment Manager will be paid the Incentive Fee monthly.  In the event that the Investment Management Agreement is terminated or shares are redeemed prior to the last day of a month, the Incentive Fee will be computed as though such date were the last day of the month.

## Deferral of Fees

The Investment Manager and/or the Sub-Advisor may elect to defer payment of all or any portion of any Management Fee or Incentive Fee payable to them.  Upon such election by the Investment Manager or Sub- Advisor, the payment of any deferral amount to each of them will be automatically deferred until the earlier of such future dates as the recipient of each deferred amount may specify in its notice to the Fund or (b) the dissolution of the Fund.  As long as the payment of fees is deferred, they constitute a "phantom share class", which appreciates or depreciates in parallel with the net asset value of Class C Shares.

## Other Terms of the Investment Management Agreement

The Investment Management Agreement provides that it shall remain in effect indefinitely except that the Investment Manager or the Fund may terminate the Investment Management Agreement by giving the other party not less than 90 days prior written notice.   The Fund may terminate the Investment Management Agreement only if such termination is approved by the unanimous vote of all the outstanding Ordinary Shares of the Fund.

The Investment Management Agreement recognizes that the Investment Manager, its members, officers, employees and affiliates may be or become associated with other investment entities and engage in investment management for others, see Section 5 "Risk Factors - Potential Conflicts of Interest."  Except to the extent necessary to perform its obligations under the Investment Management Agreement, the Investment Manager, its members, officers, employees and affiliates are not limited or restricted from engaging in or devoting time and attention to the management of any other business, whether of a similar or dissimilar nature, or to render services of any kind to any other corporation, firm, individual or association.

Under the Investment Management Agreement, the Fund will indemnify the Investment Manager, its members, officers, employees and affiliates, against all expenses, including legal fees, and against all

judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings, except that the Investment Manager, its members, officers, employees and affiliates will not be indemnified against any liability to which they would otherwise be subject by reason of their willful misfeasance, bad faith or gross negligence in the performance of their duties, or reckless disregard of their obligations and duties under the Investment Management Agreement. To the extent legally permissible, the Fund shall, at the request of the Investment Manager, advance amounts and/or pay expenses as incurred in connection with its indemnification obligation; provided, however, that if it is later determined that any amounts advanced or paid by the Fund should not have been advanced or paid, then the indemnified party shall promptly return any such amounts to the Fund.

## 5.    RISK FACTORS

The Fund may be deemed to be a highly speculative investment and is not intended as a complete investment program. It is designed only for sophisticated investors who are able to bear the economic risk of the loss of their investment in the Fund and who have limited need for liquidity. The following risks should be carefully evaluated before making an investment in the Fund:

**General Trading Risks**. Substantial risks are involved in trading in U.S. securities and the various other financial instruments and investments which the Fund trades. The prices of these investments are volatile, market movements are difficult to predict and financing sources and related interest and exchange rates are subject to rapid change. One or more markets in which the Fund trades may move against the positions held by it, thereby causing substantial losses.

**Concentration**. The Fund is not subject to any material concentration or diversification restrictions and may hold a limited number of investment positions.

**Portfolio Turnover**. The investment strategy of the Fund may involve the taking of frequent trading positions, and, as a result, turnover and brokerage commission expenses of the Fund may significantly exceed those of other investment entities of comparable size.

**Options**. Purchasing put and call options, as well as writing such options, are highly specialized activities and entail greater than ordinary investment risks.

**Short Sales.** Short sales can, in certain circumstances, substantially increase the impact of adverse price movements on the Fund's portfolio. A short sale involves the risk of a theoretically unlimited increase in the market price of the particular investment sold short, which could result in an inability to cover the short position and a theoretically unlimited loss. There can be no assurance that securities necessary to cover a short position will be available for purchase.

**Counterparty Risks.** Options transactions effected on behalf of the Fund may be executed in the over-the-counter market. Trading equity and index options in the over-the-counter market is subject to counterparty credit risk and is without the protections afforded by transactions effected through the Options Clearing Corporation, a registered clearing facility.

**Custody Risk**. Brokerage firms, banks and dealers will have custody of the Fund's assets and may hold such assets in "street name". Bankruptcy or fraud at one of these entities could impair the operational capabilities or the capital position of the Fund.

**Growth in Assets Under Management**. The assets under management by the money manager may grow substantially in the future. There can be no assurance that the money manager will be able to provide returns consistent with the Fund's past performance or objectives given such increases in assets under management.

**Valuation of Fund Investments**. Valuation of the Fund's securities and other investments (which will determine the amount of the Incentive Fee) may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the shareholders could be adversely affected.

GCM_BTLG-58302-212

Independent pricing information may not at times be available with respect to certain of the Fund's securities and other investments. Accordingly, while best efforts will be made to value all investments in the Fund fairly, certain investments may be difficult to value and may be subject to varying interpretations of value.

**Reliance on the Money Manager**. The Fund relies exclusively on the money manager for the management of its investment portfolio. There could be adverse consequences to the Fund in the event that the money manager ceases to be available to the Fund. The success of the Fund is therefore expected to be significantly dependent upon the expertise and efforts of the money manager.

**Illiquidity of Investment in the Fund**. Because of the limitation on redemption rights and the fact that shares are not tradeable, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. An investment in the Fund should be considered only by persons financially able to maintain their investment and who can afford the loss of all or a substantial part of such investment.

**Charges to the Fund**. The Fund is obligated to pay brokerage commissions, custody fees, "dealer spreads," other costs associated with the acquisition and disposition of investments, certain operating costs, and Management Fees regardless of whether it realizes profits. In addition, increases in net profits are subject to an Incentive Fee to the Investment Manager.

**Incentive Fee**. The Incentive Fee to the Investment Manager may create an incentive for the Investment Manager to cause the Fund to make investments that are riskier or more speculative than would be the case in the absence of a fee based on the performance of the Fund. Since the Incentive Fee is calculated on a basis which includes unrealized appreciation of the Fund's assets, such Incentive Fee may be greater than if it were based solely on realized appreciation.

**Potential Conflicts of Interest**. The Investment Manager, its members, officers, employees and affiliates engage in a wide variety of investment activities and will continue to do so in the future, including conducting investment activities for their own accounts and for other entities and accounts. Such other entities or accounts may have investment objectives or may implement investment strategies similar to those of the Fund. In addition, the Investment Manager, its members, officers, employees and affiliates may have investments in their own names and in certain of the entities managed by the Investment Manager. As a result of the foregoing, the Investment Manager, its members, officers, employees and affiliates may have conflicts of interest in allocating their time and activity between the Fund and other entities, in allocating investments among the Fund and other entities and in effecting transactions between the Fund and other entities, including ones in which the Investment Manager, its officers, employees and affiliates may have a greater financial interest.

The Investment Manager, its members, officers, employees and affiliates may give advice or take action with respect to such other entities or accounts that differs from the advice given with respect to the Fund. To the extent a particular investment is suitable for both the Fund and other clients of the Investment Manager, its members, officers, employees and affiliates, such investments will be allocated between the Fund and the other clients pro rata based on assets under management or in some other manner which the Investment Manager determines is fair and equitable under the circumstances to all clients, including the Fund. From the standpoint of the Fund, simultaneous identical portfolio transactions for the Fund and the other clients may tend to decrease the prices received, and increase the prices required to be paid, by the Fund for its portfolio sales and purchases.

## 6.    DESCRIPTION OF REDEEMABLE PREFERRED SHARES

The authorized Redeemable Preferred Shares of the Fund consist of 4,900,000 Redeemable Preferred Shares having a par value of $.01 (U.S.) per share, which Redeemable Preferred Shares may be designated as either Class A Redeemable Preferred Shares (the "Class A shares"), Class C Redeemable Preferred Shares (the "Class C shares"), or Class J Redeemable Preferred Shares (the "Class J shares"). The Class A, Class C, and Class J shares are collectively referred to herein as "Redeemable Preferred Shares".  Class A shares and Class J shares may only be purchased by direct investors, and Class C shares may only be purchased by funds of funds or by managed accounts advised or managed by managers with which the Sub-Advisor of the Fund is affiliated.  Class A, Class C, and Class J shares have equal dividend, distribution and liquidation rights.

The Fund's Redeemable Preferred Shares have no voting rights.  All voting rights are vested in the holders of the 100,000 authorized Ordinary Shares owned by Aspen International Investment Limited. Ordinary Shares voting for the election of Directors will elect all of the Directors.

From time to time, the Fund, by an ordinary resolution of the holder of Ordinary Shares, may increase the authorized Redeemable Preferred Shares in order to have a substantial number of Redeemable Preferred Shares available at all times for issuance.  The Board of Directors also reserves the right to issue other classes of shares.

## 7.    OFFERING OF REDEEMABLE PREFERRED SHARES

The Fund will be conducting an offering of its Redeemable Preferred Shares to a number of investors who meet the requirements set forth in the "Subscription Agreement".  The minimum subscription for each investor is $1,000,000 (U.S.), subject to increase or decrease at the discretion of the Fund, provided that no investment shall be for an amount less than $50,000 (U.S.).  Subscriptions for Redeemable Preferred Shares may be made in cash or, at the discretion of the Board of Directors, in securities acceptable to the Board of Directors.  In general, Redeemable Preferred Shares may be purchased monthly on the first business day of each calendar month (or at such other times designated by the Board of Directors).  The proper documentation necessary to purchase Redeemable Preferred Shares must be received by the Administrator on behalf of the Fund at least five business days prior to the purchase date unless waived by the Fund.

Where subscription funds are received in the account of the Fund which is operated by the Administrator prior to the first business day of each calendar month, the Administrator must, upon the instructions of the Directors or the Investment Manager, transfer the subscription funds to an account of the Fund at one of its brokers.  In the event that the Administrator makes such transfer, the Administrator shall be fully indemnified by the Fund and shall attract no liability in respect of any losses arising from this transfer of subscription funds prior to the issue of Redeemable Preferred Shares.

Redeemable Preferred Shares will be offered solely to qualified investors.  Investors interested in subscribing for Redeemable Preferred Shares should follow the procedures set forth in the Subscription Agreement attached hereto.

Persons interested in purchasing Redeemable Preferred Shares of the Fund should inform themselves as to (i) the legal requirements within their own countries for the purchase of such shares and (ii) any foreign exchange restrictions which they might encounter.

The Investment Manager may pay (or cause to be paid) fees to persons (whether or not affiliated with the Investment Manager) who are instrumental in the sale of Redeemable Preferred Shares.  Any such fees will in no event be payable by or chargeable to the Fund or any shareholder or prospective shareholder.

**Offering Price**

Redeemable Preferred Shares are offered at the net asset value as of the close of business on the last day of the immediately preceding month (the "Valuation Date").

## 8.   REDEMPTIONS

Any holder of Redeemable Preferred Shares has the right, in accordance with and subject to the applicable provisions of the Articles of Association of the Fund, to have all or a portion of his shares redeemed as of the last business day of any calendar month.   The shareholder must request such redemption in writing, which request must be received by the Administrator on behalf of the Fund at least 30 days (or such shorter notice period as the Fund's Directors shall, in their discretion, permit) prior to such redemption date.

Redeemable Preferred Shares will be redeemed at the Redemption Price (as described below) as of the close of business on such redemption date (as determined in accordance with the applicable redemption provisions set forth in the Articles of Association).  The Redemption Price is computed after deduction of the accrued Incentive Fee payable to the Investment Manager attributable to the Redeemable Preferred Shares redeemed.  Redemptions shall be paid in cash (in U.S. dollars) or, in the sole discretion of the Board of Directors (in consultation with the Investment Manager), in securities, or partly in cash and partly in securities.  A partially redeeming shareholder will generally be paid within 30 days; provided, however, that if a shareholder redeems at least 90% of its Redeemable Preferred Shares, it shall be paid the redemption amount thereon in the same manner as a completely redeeming shareholder.  At redemption, shareholders will be paid the net asset value of the Redeemable Preferred Shares on the date of redemption.

Redemption requests must be made by mail and facsimile.  If the request is made by facsimile, the original redemption request must be received by the Administrator prior to disbursement of proceeds.  If by mail, the shareholder's request should be made by letter addressed to HARLEY INTERNATIONAL (CAYMAN) LIMITED, c/o Fortis Prime Fund Solutions (IOM) Limited, P O Box 156, 18 – 20 North Quay, Douglas, Isle of Man, IM99 1NR .. If by facsimile, the original redemption request must be received by the Administrator prior to disbursement of proceeds.  Payment of the Redemption Price to a shareholder upon complete redemption will be made as soon as practicable.  The shareholder will receive 90% of the Redemption Price no later than thirty days following the date of redemption.  Promptly after the Fund has determined the net asset value of the Redeemable Preferred Shares as of the date of redemption (which in the Fund's discretion may be after the Fund's independent public accountants have completed their examination of the Fund's annual financial statements), the Fund will pay to such shareholder the balance, if any, of the amount to which such shareholder is entitled, or such shareholder will be obligated to repay the Fund the excess, if any, of the amount previously paid over the amount to which such shareholder is entitled, in each case together with interest thereon, to the extent permitted by applicable law.  Such interest shall accrue from the date of such redemption to the date of the payment of such excess at an annual rate equal to the then-existing federal funds rate.  The Fund has the right to make payment of such redemption in securities owned by the Fund.  The payment of the Redemption Price to a shareholder who is redeeming all of his shares shall be subject to the retention of a reserve for Fund liabilities in such amount as shall be determined by the Fund in its discretion.  If the reserve (or portion thereof) is later determined to have been in excess of the amount required, the proportionate amount of the excess shall be returned to the redeemed shareholder with interest thereon at the then-existing federal funds rate.

**Compulsory Redemption**

If the Board of Directors determine that a possible tax benefit to the Fund or any shareholder might be lost, or that it is in the best interests of the Fund, or that any of the representations given by a holder of shares was not true or has ceased to be true, as to such facts, as the directors shall from time to time decide that it shall be desirable to ascertain in order to avoid the loss of a contemplated tax benefit to the Fund or any shareholder thereof and in order to ascertain that no violation shall occur of any securities law of the United States or any other relevant jurisdiction including the Securities Act of 1933, the

Investment Company Act of 1940 and the Investment Advisers Act of 1940, the Fund (to the extent it lawfully can do so) may redeem any or all of the shares of such shareholder by giving not less than 30 days notice to the holder of the shares involved.

Notwithstanding the above, the Board of Directors in their absolute discretion, with or without cause, may at any time redeem any or all of the shares of such shareholder on any redemption date by giving not less than 30 days notice in writing to the holder of the shares involved.

## Suspension of Redemption Rights

The Board of Directors may suspend the right of the shareholders of the Fund to require the Fund to redeem Redeemable Preferred Shares during any period when:

(a)  any market, which is the principal market on which a material part of the Fund's investments at the time are quoted, is closed, other than for ordinary holidays or has substantially restricted or suspended dealings;

(b)  there exists any state of affairs which constitutes a state of emergency as a result of which disposal of a substantial part of the investments of the Fund would not be reasonably practical and might seriously prejudice the shareholders of the Fund or it is not reasonably practicable for the Fund fairly to determine the value of its net assets;

(c)  for any reason, including a breakdown in the means of communication normally employed in determining the value of the Fund's investments, such value cannot be promptly and accurately ascertained; or

(d)  remittance of monies which will or may be involved in the realization of any of the Fund's investments is not possible.

## 9.   NET ASSET VALUE

The net asset value of a share of the Fund's Redeemable Preferred Shares at any date shall be the total net assets of the relevant class of the Fund divided by the number of Redeemable Preferred Shares of the relevant class then outstanding.  The total net assets of the relevant class of the Fund at any date shall be determined using International Accounting Standards as a guideline, unless otherwise deemed appropriate at the discretion of the Fund, and in accordance with the following:

(a)  no value will be assigned to goodwill;

(b)  accrued investment management and incentive fees and other fees will be treated as liabilities;

(c)  dividends payable on the Redeemable Preferred Shares after the date as of which the total net assets are being determined to shareholders of record prior to such date will be treated as liabilities;

(d)  the market value of positions in securities shall be as follows:  securities that are listed on a stock exchange and are freely transferable shall be valued at their last sales price on the date of determination on the stock exchange which is the principal exchange for such securities, or, if no sales occurred on such day, at the "bid" price on such exchange at the close of business on such day if held long and at the "asked" price at the close of business on such day if sold short. Securities traded over the counter which are freely transferable shall be valued at the last sales price on the date of determination, or, if no sales occurred on such day, at the "bid" price at the close of business on such day if held long and at the "asked" price at the close of business on such day if sold short.  Notwithstanding

the foregoing, if in the reasonable judgment of the Board of Directors at its discretion, the listed price for any security held by the Fund does not accurately reflect the value of such security, the Board of Directors may value such security at a price which is greater or less than the quoted market price for such security;

(e)    the market value of a future, forward or similar contract or any option on any such instrument traded on an exchange shall be the most recent available closing quotation on such exchange; provided that if the Board of Directors determines that such closing price does not accurately reflect market value due to price limit constraints, such contract or option shall be valued at fair market value as determined by the Board of Directors;

(f)    in valuing the Fund's investments in other investment entities, the Fund  shall be entitled to rely on the last unaudited or audited financial statement or performance report of any such investment entity, unless the Fund  determines in its sole discretion that some other valuation is appropriate;

(g)    all other assets and liabilities of the Fund shall be valued in the manner determined by the Board of Directors of the Fund to reflect their fair market value.

(h)    The Administrator, in calculating the net asset value of the Fund and the Redeemable Preferred Shares of the Fund, shall rely without further enquiry upon prices and valuations supplied to it in accordance with the foregoing and shall have no liability to the Fund nor any shareholder in respect of such reliance.

In connection with the determination of the net asset value of shares, the Board of Directors may consult with and is entitled to rely upon the advice of the Fund's custodians or Investment Manager.  In no event and under no circumstances shall the Board of Directors, the Administrator, the custodians or the Investment Manager incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith.

The determination of net asset value may be suspended whenever Fund redemptions are suspended.

## 10.    TAXATION AND ERISA MATTERS

The tax status of the Fund and its shareholders under the tax laws of the Cayman Islands and the United States is summarized below.   The summary is based on the assumption that the Fund is owned, managed and operated as contemplated.   The summary is considered to be a correct interpretation of existing laws as applied at the date of this Memorandum, but no representation is made or intended by the Fund (i) that changes in such laws or their application or interpretation will not be made in the future or (ii) that the United States Internal Revenue Service will agree with the interpretation as applied to the method of operation of the Fund.   Persons interested in subscribing for the Fund's Redeemable Preferred Shares should consult their own tax advisors with respect to the tax consequences, including the income tax consequences, if any, to them of the purchase, holding, redemption, sale or transfer of the Redeemable Preferred Shares.

<u>Cayman Islands Taxes</u>

<u>Fund Level</u>.  There are at present no corporation, income, capital gains, profits or other taxes in the Cayman Islands which would apply to the profits of the Fund.   Nor are there gift, estate or inheritance taxes in the Cayman Islands.   The Fund has received from the Governor-in-Council of the Cayman Islands an undertaking that for a period of 20 years from the date of that undertaking:

(a) No law which is thereafter enacted in the Cayman Islands imposing any tax to be levied on the profits, income, gains or appreciations shall apply to the Fund or its operations; and

(b) No such tax nor any tax in the nature of estate duty or inheritance tax will be payable by the Fund: (i) on or in respect of the shares, debentures or other obligations of the Fund; or (ii) by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision) of the Cayman Islands.

Shareholder Level.  Shareholders will not be subject to any income, withholding or capital gains taxes in the Cayman Islands, with respect to the Redeemable Preferred Shares of the Fund owned by them and dividends received on such Redeemable Preferred Shares, nor will they be subject to any estate or inheritance taxes in the Cayman Islands.

## U.S. Federal Income Taxes

Taxation of the Fund.  A non-U.S. corporation that is engaged (directly or through a partnership) in the conduct of a trade or business within the U.S. (a "**U.S. Business**") generally is subject to federal income tax on a net basis with respect to income it derives that is treated as "effectively connected" with such U.S. Business (as well as a branch profits tax on its effectively connected earnings and profits deemed withdrawn from the U.S. Business).  However, the Code contains a statutory "safe harbor" that provides that trading in stocks, securities, and certain commodities by a taxpayer for its own account (whether by the taxpayer, its employees, or its agents) will not be considered to be a U.S. Business provided that the taxpayer is not a "dealer" in such stocks, securities or commodities.  All activities of the Fund are generally intended to constitute, or be incidental to, the trading in stocks, securities, or such commodities interests for the Fund's own account.  The Fund also believes that the activities of the investment vehicles in which it will invest that are treated as partnerships for U.S. federal income tax purposes will generally constitute trading in stocks, securities or such commodities interests for the investment vehicles' own accounts.

Thus, the Fund believes that its activities, as well as those of the investment vehicles in which it will invest that are treated as partnerships for U.S. federal income tax purposes, should generally qualify for the safe harbor described above, and consequently income earned by the Fund from its trading activities should generally not be subject to U.S. federal income tax on a net basis.  The foregoing principles applicable to the Fund will generally apply to the investment vehicles in which it invests that are treated as foreign corporations for U.S. federal income tax purposes.

A non-U.S. corporation also can be subject to a 30% U.S. federal withholding tax ("**federal withholding tax**") imposed on certain types of U.S. source income (*e.g.*, certain interest or dividends).  However, interest from certain debt instruments is exempt from federal withholding tax (*e.g.*, certain "portfolio interest" obligations or certain original interest discount obligations with an original maturity of 183 days or less).  The Fund and the investment vehicles in which it invests may receive U.S.-source dividends with respect to the securities they hold and may receive other payments that will be subject to the 30% withholding tax.

The Fund (or any investment vehicle in which it invests) will be subject to U.S. federal income tax on gain realized on the disposition of any interest in U.S. real property or any interest (other than solely as a creditor) in a U.S. corporation that is a "U.S. real property holding corporation" ("**USRPHC**"), i.e., a corporation generally at least 50% of whose real estate and trade or business assets, measured by fair market value, constitute U.S. real property.  The Fund does not expect to invest in U.S. real property or USRPHCs.

The Fund expects to be treated, for federal income tax purposes, as a passive foreign investment company (a "**PFIC**").

Taxation of Non-U.S. Shareholders.  A shareholder that is not a U.S. person within the meaning of Section 7701(a)(30) of the Code (a "**U.S. Tax Person**") should not be subject to U.S. federal income tax with respect to gains derived from the sale or exchange (including a redemption) of, or any dividends received in respect of, Redeemable Preferred Shares, provided that such shareholder does not have certain present or former connections with the U.S. (e.g., holding the Redeemable Preferred Shares in connection with the conduct of a U.S. Business, or, in the case of gains, an individual shareholder's being

present in the U.S. for 183 days or more during the taxable year of sale or exchange), which connections will not exist solely by reason of investing in the Fund.

<u>Taxation of Tax-Exempt U.S. Shareholders.</u> The Code provides for a tax on the unrelated business taxable income (**"UBTI"**) of a tax-exempt entity. While interest, dividends and gains from the sale, exchange or other disposition of property (other than "dealer" property) are generally not treated as UBTI, this is not true to the extent such income is derived from "debt-financed property." Because the Fund may, and the investment vehicles in which it invests will, utilize leverage in their investment programs, if a tax-exempt U.S. shareholder were to invest directly in the underlying portfolio, a portion of the income derived from its investment would include UBTI. However, since the Fund will be treated as a corporation for U.S. federal income tax purposes, distributions from the Fund and gains from the sale or exchange, or redemption, of Redeemable Preferred Shares should not be treated as income from debt-financed property, assuming that the shareholder did not incur indebtedness to acquire its Redeemable Preferred Shares. Moreover, a tax-exempt U.S. shareholder will not be subject to the special tax imposed by Section 1291 upon excess distributions received by shareholders of a PFIC unless a dividend from the PFIC would be subject to tax as UBTI (i.e., if it were debt-financed income).

Accordingly, a tax-exempt U.S. shareholder should not be subject to U.S. federal income tax on distributions from the Fund or on gains from the sale or exchange, or redemption, of Redeemable Preferred Shares, assuming that the shareholder did not incur indebtedness to acquire its Redeemable Preferred Shares.

<u>Taxation of Taxable U.S. Shareholders.</u> Since the Fund will be a PFIC and may invest in PFICs, a U.S. Tax Person that is a shareholder or, in certain cases, a direct or indirect owner of a shareholder, will be subject to the adverse tax consequences of investing in a PFIC (and, to the extent the hedge funds in which the Fund invests are PFICs, the additional adverse tax consequences arising therefrom). Accordingly, the Fund has determined that Redeemable Preferred Shares are not a suitable investment for U.S. persons who are subject to tax.

## Other Taxation

The manner and rate at which income of the Fund would be subject to tax in the countries in which the investment vehicles in which the Fund invests are resident or invest will be a factor evaluated by the Advisor. In general, the Fund anticipates that the income of the Fund will be taxable, if at all, in countries in which the issuers of securities acquired by the Fund (or acquired by the investment vehicles in which the Fund invests) are resident only by way of withholding. The rate at which taxes are withheld on interest, dividends and capital gains will vary by jurisdiction. Any withholding of tax suffered by the Fund will have the effect of reducing the investment return on Redeemable Preferred Shares. Prospective investors should consult their own tax advisors regarding the impact of withholding and any other taxes imposed directly or indirectly on their investment in the Fund.

*The foregoing is only a brief and general summary of certain income tax considerations with respect to the purchase, holding and disposition of the Redeemable Preferred Shares. Investors are urged to consult their own tax advisors to gain a full understanding of any state, local and foreign tax considerations that would apply as a result of their individual situations.*

*Any discussion of the United States federal tax issues set forth in this Confidential Explanatory Memorandum was written to support the promotion and marketing of the transactions described herein. Such discussion was not intended or written to be used, and it cannot be used, by any person for the purpose of avoiding any tax penalties that may be imposed on such person. Each investor should seek advice based on its particular circumstances from an independent tax advisor.*

## ERISA Matters

Before purchasing any class of Redeemable Preferred Shares, a fiduciary of a prospective investor that is an employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (an "ERISA Plan") should determine whether an investment in class of Redeemable Preferred

Shares is consistent with the fiduciary requirements of Section 404 of ERISA, and in particular whether the investment is prudent and whether the investment would result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

In determining whether an investment in class of Redeemable Preferred Shares would satisfy the fiduciary requirements of ERISA or result in a prohibited transaction, the fiduciary should consider whether the assets of the Fund will be considered "plan assets" within the meaning of United States Department of Labor Regulation 29 C.F.R. § 2510.3-101 (the "Plan Asset Regulation"). Under the Plan Asset Regulation, the assets of an entity in which an ERISA Plan acquires an "equity interest" that is neither a "publicly offered" security nor a security issued by an investment company registered under the Investment Company Act of 1940, as amended, are considered to be assets of the ERISA Plan for purposes of the fiduciary requirements and prohibited transaction rules unless the entity is an "operating company," or investments in each class of equity interests in the entity by ERISA Plans and other "benefit plan investors" ("Benefit Plan Investors") are not "significant." Benefit Plan Investors include (i) employee benefit plans (as defined in Section 3(3) of ERISA) whether or not subject to Title I of ERISA, (ii) plans described in Section 4975(e)(1) of the Code (*e.g.*, IRAs), and (iii) entities whose underlying assets include plan assets by reason of an employee benefit plan's or a plan's investment in such entities. Investments by Benefit Plan Investors in a class of equity interests will generally not be deemed "significant" if less than 25% of such class is held by such investors (the "25% Test"). In addition, the 25% Test is applied by disregarding the value of any equity interests held by a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person.

The Fund intends to limit purchases of each class of Redeemable Preferred Shares by Benefit Plan Investors, transfers of Redeemable Preferred Shares to Benefit Plan Investors and redemptions of Redeemable Preferred Shares so that the 25% Test is satisfied. Assuming that the Fund at all times limits investments by Benefit Plan Investors and redemptions in compliance with the 25% Test, the assets of the Fund will not be considered to be assets of any investor which is an ERISA Plan for purposes of the fiduciary responsibility or prohibited transaction provisions of ERISA or the Code.

Employee benefit plans that are governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA) are not subject to the fiduciary responsibility or prohibited transaction provisions of ERISA or the Code but may be subject to restrictions under state or local law.

*The above discussion is a summary of some of the material ERISA considerations applicable to prospective investors that are ERISA Plans. It is not intended to be a complete discussion nor is be construed as legal advice or a legal opinion. Prospective investors should consult their own counsel on these matters.*


## 11.    FUND ADMINISTRATOR

Fortis Prime Fund Solutions (IOM) Limited (the "Administrator") has been retained by the Fund to perform administrative services and to act as registrar and transfer agent for the Fund. Pursuant to an administration agreement entered into between the Fund and the Administrator (as amended from time to time, the "Administration Agreement"), the Administrator is responsible for, among other things: (i) maintaining the register of shareholders of the Fund and generally performing all actions related to the issuance and transfer of shares of the Company (ii) reviewing and accepting subscriptions for shares and accepting payment therefore (iii) publishing and furnishing the net asset value of the Fund's shares, (iv) performing all acts related to redemption of shares, (v) keeping the accounts of the Fund and such financial books and records as are required by law or otherwise for the proper conduct of the financial affairs of the Fund, (vi) providing secretarial services to the Fund and ancillary services and (vii) performing all other matters necessary in connection with the administration of the Fund as directed by the Directors of the Fund.

The Administration Agreement provides for exculpation of liability of the Administrator in that the Administrator shall not be liable to the Fund for any loss or damage whatsoever suffered or incurred by the

Fund as a consequence of any services rendered by the Administrator to the Fund, provided that, the Administrator shall be liable to the Fund for any and all losses, damages, liabilities or expenses arising out of the gross negligence or willful breach of duty of the Administrator, its directors, servants, agents or delegates. The Fund shall, out of the assets of the Fund, indemnify the Administrator to the fullest extent permitted by law against any and all actions, costs, claims, damages, demands or expenses (including but without limitation any reasonable attorneys' fees) suffered or incurred by the Administrator in its capacity as the administrator of the Fund, except to the extent that such actions, costs, claims, damages, demands or expenses result from gross negligence or willful breach of duty on the part of the Administrator. Further, the Fund has agreed to indemnify and hold harmless the Administrator against any liability, actions, proceedings, claims, demands, costs or expenses whatsoever, which the Administrator may incur or be subject to, solely in consequence of relying upon prices, fair values and any other information relating to the net asset value of the Fund or of whatever nature, provided to the Administrator by the Investment Manager, the Fund, the custodian, any manager of underlying fund investments or discretionary managed accounts, Bloomberg or a similar financial data provider, or any other person, firm or corporation.

The Administration Agreement provides that the Fund will pay the Administrator an administration fee, as agreed between the Fund and the Administrator, from time to time. In addition, all reasonable out-of-pocket expenses incurred by the Administrator on behalf of the Fund will be reimbursed to the Administrator on a quarterly basis. The Administration Agreement may be terminated at any time without penalty by either of the parties upon not less than 90 days' notice (or such shorter period as may be agreed by both parties). The Administration Agreement may be amended with the written consent of the parties.

The Administrator is a company registered in the Isle of Man and has an Investment Business Licence issued under Section 3 of the Investment Business Act 1981 of the Isle of Man. The Administrator is a part of the Fortis Group.

The Administrator is a service provider to the Fund and, as such, bears no responsibility for the content of this Memorandum, the investments of the Fund, the performance of the Fund or any underlying funds nor any matter other than as specified in the Administration Agreement.

The Administrator and its directors, officers, employees, agents and nominees and their respective personal representatives, successors in title and estates shall be indemnified and held harmless by the Fund against all liability, loss, damage, claims, actions, accounts, proceedings, and demands and any costs and expenses whatsoever which may be incurred or suffered by the Administrator arising out of its appointment EXCEPT where same shall arise through the dishonesty, willful default, fraud or gross negligence of the Administrator.

## 12.   BOARD OF DIRECTORS

The Board of Directors of the Fund consists of Anthony L.M. Inder Rieden and Dawn E. Davies.

Anthony L. M. Inder Rieden.   Mr. Inder Rieden has been Managing Director of Euro-Dutch Trust Company (Bahamas) Limited, a Bahamian licensed trust company, since 1975. From September 1996 to April 2002, he also served as a Director of Fortis Fund Services (Bahamas) Limited, the Fund's previous Administrator. From 1973 to 1975, he was legal counsel to Property Resources Ltd., a Bahamian company engaged in real estate investments. From 1967 to 1973, he was Managing Director of Curacao International Trust Company (Citco). Mr. Inder Rieden holds a law degree from the University of Leiden in the Netherlands.

Dawn E. Davies.   Mrs. Davies retired as Deputy Managing Director of Fortis Fund Services (Bahamas) Limited in September 2000, an office she held from 1996. From 1987 to 1996 she was Executive Vice President of Euro-Dutch Trust Company (Bahamas) Limited. From 1983 to 1987 she worked at S.F.E. Bank and Trust (Bahamas) Limited, serving as a Director and Vice President responsible for the operation of the Bank's Trust Department from 1986, and prior to that as Assistant Vice President. From

1977 to 1983 she was Assistant Manager, Secretary and Treasurer of Allied Bank and Trust Company (Bahamas) Limited.  From 1967 to 1977 Mrs. Davies worked at Bahamas Commonwealth Bank Limited. She is a graduate of the University of Strathclyde in Scotland and obtained her M.B.A. from the University of Miami, Florida.  Currently, Mrs. Davies serves as a Director of Euro-Dutch Trust Company (Bahamas) Limited and a number of investment companies.

The Directors shall remove the Administrator if:

- the Administrator goes into liquidation, becomes bankrupt or has a receiver appointed over its assets;

- for good and sufficient reason, the Directors are of the opinion and so state in writing that a change of Administrator is desirable in the interests of the shareholders;

- where holders in value of at least fifty percent of the Ordinary Shareholders deliver to the Directors a written request to dismiss the Administrator.

The Board of Directors may from time to time and at any time by agreement under hand or seal appoint any one or more company, firm or person or any body of persons, whether nominated directly or indirectly by the Board of Directors to be an investment manager or investment advisor for the Fund upon such terms and conditions as the Board of Directors in its absolute discretion determines.

The Board of Directors may delegate to the Investment Manager and/or the Sub-Advisor, without being liable for any consequential loss, discretion to manage the Fund's investments or any part thereof pursuant to the terms of the appointment.

The Board of Directors shall be under no duty to keep themselves informed concerning the business or affairs of any Investment Manager and/or the Sub-Advisor or to interfere in the management, administration, operation or activities of any Investment Manager and/or the Sub-Advisor provided the Board of Director shall not have any knowledge of any wrongdoing or impropriety by the Investment Manager and/or the Sub-Advisor .

The Articles of Association do not stipulate a retirement age for the Directors and do not provide for retirement of the Directors by rotation.  There is no shareholding qualification for the Directors.  The Directors are empowered to exercise all of the borrowing powers of the Fund.


## 13.    BANKER

Fortis Prime Fund Solutions Bank (Ireland) Limited provides banking services on behalf of The Fund.  To the extent deemed desirable, the Fund may appoint or redirect custodial services to other institutions which are international, reputable and creditworthy financial institutions and which are paid fees at normal commercial rates.  Assets placed with money managers through discretionary investment accounts shall remain in the custody of the money manager's selected custodian.  Such manager shall undertake such procedures as it deems necessary to ensure the safekeeping of those assets.

Cash forming part of the property of the Fund may be placed as deposits with the custodian or their connected persons (being a bank) so long as that bank pays interest thereon at no lower rate than is, in accordance with normal banking practice, the commercial rate for deposits of this kind, size and for the term of the deposit in question negotiated at arm's length.


## 14.    OTHER TERMS OF THE FUND

**Expenses**.  The Investment Manager will render the services set forth in the Investment Management Agreement between the Investment Manager and the Fund, and will be responsible for the payment of all overhead expenses associated with rendering such services, including all general overhead expenses. The Fund will pay all other expenses, including the fees paid to the Investment Manager and the Administrator, accounting, audit and legal expenses, custody fees (estimated to be less than 0.50% per

GCM_BTLG-58302-222

annum), organizational expenses; investment expenses such as commissions, research fees and expenses (research-related travel fees and expenses); interest on margin accounts and other indebtedness; borrowing charges on securities sold short; custodial fees; and any other expenses reasonably related to the purchase, sale or transmittal of Fund assets.

**Fiscal Year and Fiscal Periods**.  The fiscal year of the Fund ends on December 31 of each year.  Since Redeemable Preferred Shares may be sold and redeemed by the Fund during the course of a fiscal year, the Fund's Articles of Association provide for fiscal periods, which are portions of a fiscal year, for the purpose of allocating net profits and net losses to the Redeemable Preferred Shares.  A new fiscal period will commence on the date next following the date of any redemption of Redeemable Preferred Shares and the date of any sale of Redeemable Preferred Shares (i.e., the date of any capital contribution), and the prior fiscal period will terminate on the date immediately preceding the first day of a new fiscal period.

**Financial Statements**.  Each year, shareholders will be sent audited financial statements within four months of the end of the fiscal year-end.  Monthly, the Fund sends an unaudited report to each shareholder setting forth the net asset value of its shares.

**Auditors**.  Ernst & Young have been appointed as auditors for the Fund.  The Fund may change the auditors without further notice to shareholders.

**Transferability of Redeemable Preferred Shares.**  Redeemable Preferred Shares may be transferred only if the proposed transferee of the Redeemable Preferred Shares obtains the prior written approval of the Fund.  In this regard, the proposed transferee will be required to make the representations and warranties required of a subscriber in form and substance satisfactory to the Fund.  The Fund will have full discretion to approve or disapprove any proposed transferee (primarily to ensure that taxable U.S. persons do not become shareholders).  No proposed transfer will be recognized until the documents relating to it have been approved by the Fund.  The Fund need not approve any transfer that is not or may not be consistent with any representation or warranty that the transferor of the Redeemable Preferred Shares may have given to the Fund.

**Indemnification**.  Among other things, the Articles of Association provide certain rights of indemnification in favor of directors, officers, employees and agents of the Fund against legal liability and expenses if such persons have acted in accordance with certain standards of conduct and, in connection with the matter giving rise to a particular claim, did not engage in willful misfeasance, bad faith or gross negligence.

Every Director, alternate Director, officer or liquidator of the Fund and their respective personal representatives, successors in title and estates (together "Indemnitee") shall be indemnified and held harmless by the Fund against all liability, loss, damage, claims, actions, accounts, proceedings and demands and any costs and expenses whatsoever which may be incurred or suffered by the Indemnitee arising out of its appointment EXCEPT where same shall arise through the dishonesty, willful default, fraud or gross negligence of the Indemnitee.

No Director, alternate Director or officer shall be liable for the acts, receipts, neglects, or defaults of any other Director, alternate Director or officer, or for joining in any receipt or other act for conformity, or for any loss or expense incurred by the Fund as a result of the insufficiency or deficiency of title to any property acquired by order of the Directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be advanced or invested, or for any loss or damage arising out of the bankruptcy, insolvency or tortious or criminal act or omission of any person with whom any money, securities or effects shall be deposited, or for any loss occasioned by an error of judgment, omission, default, or oversight on his part, or for any other loss, damage or misfortune whatever which shall happen in the execution of his office or in relation thereto, except the same shall happen through his own dishonesty.

## 15.    ANTI MONEY LAUNDERING PROCEDURES

As part of the Fund's responsibility for the prevention of money laundering, the Fund or the Administrator on the Fund's behalf may require detailed verification of a subscriber's identity and source of payment.

The Fund or the Administrator on the Fund's behalf reserve the right to request such information as they deem necessary (having regard to the applicable laws and in particular, the anti-money laundering legislation of the Cayman Islands and the Isle of Man) to verify the identity of a subscriber.  In the event of delay or failure by a subscriber to produce any information required for verification purposes, the Fund or the Administrator on the Fund's behalf may refuse to accept the subscription and the subscription monies relating thereto, or require mandatory redemption of the subscriber's shares.

The Fund or the Administrator on the Fund's behalf also reserve the right to refuse to make any redemption payment to a subscriber if the Fund or the Administrator suspect or are advised that the payment of redemption proceeds to such subscriber might result in a breach of applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund with any such laws or regulations in any relevant jurisdiction.

If any person who is resident in the Cayman Islands (including the Fund and the Administratror) knows or suspects that another person is engaged in money laundering, such person is required to report such knowledge or suspicion pursuant to The Proceeds of Criminal Conduct Law (2005 Revision) of the Cayman Islands and such report shall not be treated as a breach of any restriction upon the disclosure of information imposed by any enactment or otherwise.

**Complete Description**.  All shareholders are entitled to the benefit of, are bound by and are deemed to have notice of, the provisions of the Memorandum and Articles of Association of the Fund.

This Memorandum does not purport to be and should not be construed as a complete description of the Memorandum and Articles of Association of the Fund, the Investment Management Agreement or the Administration Agreement, copies of which may be inspected free of charge at, or purchased from, the Fund's registered office.

## 16.    DATA PROTECTION

In accordance with the Isle of Man Data Protection Act 2002, it should be noted that the Administrator may hold and process information comprising "personal data" obtained from or about investors in relation to their investments in the Fund. (In this context "investors" includes individual Directors, Officers, Authorised Signatories and Beneficial Owners of Corporate investors; individual Trustees, Settlors, Protectors and Beneficiaries of Trust investors; individual Limited Partners and General Partners of Limited Partnerships and any other person whose personal data is provided to the Administrator in connection with an investment in the Fund).

This personal data may be utilised by the Administrator: (a) to properly identify the investor in accordance with Anti-Money Laundering regulatory requirements; (b) to properly record the investor's interest in the Fund in accordance with relevant corporate laws and regulations; (c) to advise the investor of matters relative to his/her investment in the Fund, including current values and changes to Fund documentation etc; (d) unless the investor notifies the Administrator otherwise, to advise the investor of other investment opportunities that may be or become available from the Fund's sponsors. Telephone calls to Fortis Prime Fund Solutions (IOM) Limited may be monitored or recorded for security, confirmation and/or training purposes.

By agreeing to invest in the Fund, investors acknowledge and accept that the Administrator may hold and process personal data for the purposes outlined above and further acknowledge and accept that the Administrator may, in order to fulfil its duties to the Fund and comply with regulatory requirements: (i) retain such personal data for prescribed periods after the investor has redeemed his/her holding in the Fund; (ii) transfer such personal data, by any method including electronically, to the Fund's registered

agent in its country of incorporation, including countries which may not have enacted data protection legislation equivalent to that in the Isle of Man; (iii) transfer such information to the Directors, Investment Manager or Sub-Advisor, legal advisor or any other agent of the Fund entitled to receive such information; (iv) transfer such personal data to any person or entity to which the Administrator has a legal obligation to disclose such information; (v) maintain such information on proprietary Fortis Group computer systems which may be based or maintained in countries which have not enacted data protection legislation equivalent to that in the Isle of Man.

## 17.   TERMINATION OF THE FUND

The Fund shall be wound up on the passing by the shareholders of a special resolution by a two-thirds majority to wind up the Fund.

## 18.   CAYMAN ISLANDS MUTUAL FUNDS LAW

The Fund will fall within the definition of a "mutual fund" in terms of the Mutual Funds Law (2003 Revision) of the Cayman Islands (the "Law") and accordingly will be regulated in terms of that Law.  However the Fund is not required to be licensed or to employ a licensed mutual fund administrator since the minimum interest purchasable by a prospective investor in the Fund exceeds CI$40,000 (US$50,000) or its equivalent in any other currency.  Accordingly the obligations of the Fund are (a) to register the Fund with the Cayman Islands Monetary Authority (the "Monetary Authority") appointed in terms of the Law, (b) to file with the Monetary Authority prescribed details of this Memorandum and any changes to it, (c) to file annually with the Monetary Authority accounts audited by an approved auditor and (d) to pay a prescribed registration fee.

As a regulated mutual fund, the Fund will be subject to the supervision of the Monetary Authority and the Monetary Authority may at any time instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies.  In addition the Monetary Authority may ask the Directors to give the Monetary Authority such information or such explanation in respect of the Fund as the Monetary Authority may reasonably require to enable him to carry out its duty under the Law.

The Directors must give the Monetary Authority access to or provide at any reasonable time all records relating to the Fund and the Monetary Authority may copy or take an extract of a record it is given access to.  Failure to comply with these requests by the Monetary Authority may result in substantial fines being imposed on the Directors and may result in the Monetary Authority applying to the court to have the Fund wound up.

The Monetary Authority is prohibited by the Law from disclosing any information relating to the affairs of a mutual fund other than disclosure required for the effective regulation of a mutual fund or when required to by law or by the court.

The Monetary Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.  The powers of the Monetary Authority include inter alia the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund.  There are other remedies available to the Monetary Authority including the ability to apply to the court for approval of other actions.

# EXHIBIT B

# EQUITY TRADING PORTFOLIO LIMITED

An investment company organised
as a Business Company
under and in accordance with the laws of
the British Virgin Islands

## OFFERING MEMORANDUM

## INVESTMENT MANAGER
Essex Asset Management Ltd.
c/o Citco Fund Services (Bermuda) Ltd.
Washington Mall West, 2nd Floor
7 Reid Street
Hamilton HM11
Bermuda

## ADMINISTRATOR,
## REGISTRAR AND TRANSFER AGENT
Citco Fund Services (Europe) B.V.
Telestone 8 – Teleport
Naritaweg 165
P.O. Box 7241
1007 JE
Amsterdam
The Netherlands

## AUDITORS

KPMG Accountants N.V.
Burgemeester Rijnderslaan 20
1185 MC Amsterdam
Netherlands

## REGISTERED OFFICE
Citco Building
P.O. Box 662
Road Town, Tortola
British Virgin Islands

January 2006

Equity Trading Portfolio Limited (the "Company") is a Business Company established in accordance with the laws of the British Virgin Islands. The Company will employ one investment advisor Bernard L. Madoff Investment Securities LLC ("Advisor") who will attempt to achieve substantial long-term capital appreciation with low volatility.
The Advisor will be accessed directly through a managed account.

The Directors of the Company have appointed Essex Asset Management Ltd. to be the Company's Investment Manager.

Citco Fund Services (Europe) BV has been appointed as the Company's Administrator, Registrar and Transfer Agent.

This document contains particulars relative to Equity Trading Portfolio Limited for the purpose of giving information in connection with the invitation to subscribe for Investor Shares.

Investors should read this Offering Memorandum (the "Memorandum") in its entirety and rely only upon statements made herein. The Investor Shares described herein are offered solely on the basis of the information contained in this Memorandum, and any further information given or representations made by any person may not be considered as having been authorised by the Company. The delivery of this Memorandum and the offer, allotment or issue of Investor Shares do not constitute a representation that every item of information contained herein is correct subsequent to the date of this Memorandum. The Directors of the Company have taken all reasonable care to ensure that the facts stated herein are true and correct in all material respect and that there are no other material facts, the omission of which would make misleading any statement herein whether of fact or opinion. All Directors accept responsibility accordingly.

Law restricts the circulation and distribution of this Memorandum in certain countries. This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation. Any person in possession of this Memorandum is required to observe and inquire of any such restrictions.

In particular, the Investor Shares have not been and will not be registered under the United States Securities Act of 1933 and may not be directly or indirectly offered or sold in the United States of America or to or for the benefit of any United States Person.

The Company has applied to be recognized as a **"Professional Fund"** within the meaning of the British Virgin Islands Mutual Funds Act, 1996 (as amended) ("the Act"). A Professional Fund is a BVI mutual fund, the shares of which are only available to professional investors where the majority of initial investments are not less than US$100,000 or which is designated as such by regulations under the Act. A professional investor is a person whose business involves dealing in the same kind of property as that of the Company or one who has declared net worth in excess of US$1 million and consents to being treated as a professional investor.

The contents of this Memorandum should not be construed as investment, legal or tax advice. Investors are urged to seek independent investment, legal and tax advice concerning the

2

consequences of investing in the Company.

If you are in any doubt about the contents of this Memorandum, you should consult your stockbroker, bank manager, counsel and attorney, accountant or other financial adviser. The price of Investor Shares may go down as well as up.

# TABLE OF CONTENTS

Directory 1
Securities Offered 2
Investment Factors 2
The Investment Manager 3
Investment Strategy 3
Risk Factors 3
Management of the Company 3
Net Asset Value and Net Asset Value per Share 4
Subscription Procedure 5
Redemption Procedure 7
Dividend Policy 8
Fees and Expenses 8
Taxation 8
Governmental Regulation 9
Auditors 9
Administrator, Registrar and Transfer Agent 9
Material Contracts 10
Reports to Shareholders 11
Miscellaneous 11
Full Disclosure 12

## SECURITIES OFFERED

Equity Trading Portfolio Limited is an investment company organised on 30th November, 2005 under and in accordance with the laws of the British Virgin Islands as a Business Company.

The Company is offering, in accordance with the terms of this Offering Memorandum, 25,000 Class D participating non-voting shares ("the Investor Shares" or "Shares") at the Net Asset Value per Share determined as of the last business day of each month (a "Valuation Date"). The minimum initial subscription is $250,000. Lesser amounts may be accepted by decision of the Directors. Additional investments by existing Shareholders may be made in such amounts, as the Directors shall determine to be acceptable.

Shares will be sold on behalf of the Company by certain of its Directors or by the Investment Manager on a best-efforts, self-underwritten basis or by firms qualified to make such sales in the jurisdiction(s) where Investor Shares are offered. Investor Shares may be subscribed, redeemed or transferred only as of the last business day of each month. The Directors, however, may select other or additional dates for the consideration of applications to subscribe for Investor Shares and requests to redeem or transfer Investor Shares.

Investor Shares are transferable only by entry upon the Register maintained for the Company. Transfers are subject to approval of the Company's Directors who may refuse to record any transfer deemed not to be in the Company's best interest.

Investor Shares being offered by the Company hereunder have no voting rights. Control of the Company is held by Essex Asset Management Ltd., the Company's Investment Manager, which holds all the Class C voting, non-participating shares ("the Management Shares") of the Company. Only the Management Shares have voting rights.

## INVESTMENT FACTORS

The Company offers Investors the opportunity to achieve substantial profits by participating in the strategy of the Advisor, accessed by investing in a managed account.

**Favourable Tax Treatment**

Under existing legislation in the British Virgin Islands, there are no income, capital gains or withholding taxes payable by the Company or by its Shareholders, nor are there any British Virgin Islands estate, succession or inheritance taxes payable by Shareholders with respect to their Shares.

The Company and its Shareholders should similarly be exempt from all United States taxation, provided Shareholders are not otherwise engaged in a "trade or business" in the United States, which they should not be deemed to be solely on the basis of their having made an investment in Investor Shares of the Company.

2

## THE INVESTMENT MANAGER

The Directors have appointed Essex Asset Management Ltd. ("EAM") to serve as the Company's Investment Manager. EAM is engaged in the creation and management of a variety of individual and pooled investment products and conducts research designed to identify leading money managers and those firms engaged in providing specialised services to the international financial community. EAM has considerable experience related to the establishment, operation and allocation of investment products. The Investment Manager is responsible for all investment decisions and will continuously monitor and analyse the performance and trading characteristics of the Advisor.

## INVESTMENT STRATEGY

The Company will invest exclusively into one of the Adviser's managed accounts held at Madoff Securities. All subscriptions received by the Company (less an amount set aside to pay administration fees and general expenses) will be invested into this managed account in accordance with the investment strategy specified herein. The Advisor utilises his own proprietary non-traditional trading strategy to obtain long term capital appreciation with low volatility and low correlation to the U.S equity market.

## RISK FACTORS

An investment in Investor Shares in the Company is considered to be speculative and involves a high degree of risk. Set forth below are certain factors which should be taken into consideration before making a decision to subscribe to Shares. While the Company's Directors believe the following to be comprehensive, it is not intended to include all of the factors related to the risks which may be encountered.

Volatility

The Advisor selected might have a certain degree of volatility as price movements of the investment instruments are influenced by, among other things, changing supply and demand relationships, governmental trade, monetary, fiscal and exchange control programmes and policies, national and international political and economic events, and changes in interest rates.

## MANAGEMENT OF THE COMPANY

The business of the Company is controlled and operated by its Directors. These are also Directors and/or Senior Officers of the Company's Investment Manager. The Directors of the Company will not receive any direct compensation from the Company for serving in such capacity.

3

Directors of the Company

## ESSEX ASSET MANAGEMENT LIMITED

Essex Asset Management Limited was incorporated in Bermuda in September 2001 as an exempted company with limited liability. It provides investment management and advisory services to various funds registered in the Cayman Islands and the British Virgin Islands. Essex Asset Management Limited also serves as the Investment Manager of the Company.

## CFS CORPORATE MANAGEMENT LTD.

CFS Corporate Management Ltd is a company established under the laws of the British Virgin Islands affiliated with the Administrator. The Company provides corporate director services to an international client base. The services of CFS Corporate Management Ltd are provided on a non-executive basis.

## NET ASSET VALUE AND
## NET ASSET VALUE PER SHARE

### Valuation of the Company's Assets

Assets of the Company will be valued in accordance with the following policies and principles:

(A)    any security which is listed or quoted on any securities exchange or similar electronic system and regularly traded thereon will be valued at its last traded price on the relevant Valuation Date or, if no trades occurred on such day, at the closing bid price if held long by the Company and at the closing offer price if sold short by the Company, as at the relevant Valuation Date, and as adjusted in such manner as the Directors, in their sole discretion, think fit, having regard to the size of the holding, and where prices are available on more than one exchange or system for a particular security the price will be the last traded price or closing bid or offer price, as the case may be, on the exchange which constitutes the main market for such security or the one which the Directors in their sole discretion determine provides the fairest criteria in ascribing a value to such security;

(B)    investments, other than securities, which are dealt in or traded through a clearing firm or an exchange or through a financial institution will be valued by reference to the most recent official settlement price quoted by that clearing house, exchange or financial institution. If there is no such price, then the average will be taken between the lowest offer price and the highest bid price at the close of business on any market on which such investments are or can be dealt in or traded, provided that where such investments are dealt in or traded on more than one market, the Directors may determine at their discretion which market shall prevail;

4

(C)     any security which is not listed or quoted on any securities exchange or similar electronic system or if, being so listed or quoted, is not regularly traded thereon or in respect of which no prices as described above are available, will be valued at its probable realisation value as determined by the Directors in good faith having regard to its cost price, the price at which any recent transaction in the security may have been effected, the size of the holding having regard to the total amount of such security in issue, and such other factors as the Directors in their sole discretion deem relevant in considering a positive or negative adjustment to the valuation;

(D)     investments, other than securities, which are not dealt in or traded through a clearing firm or an exchange or through a financial institution will be valued on the basis of the latest available valuation provided by the relevant counterparty;

(E)     deposits will be valued at their cost plus accrued interest;

(F)     any value (whether of an investment or cash) otherwise than in U.S Dollars will be converted into U.S Dollars at the rate (whether official or otherwise) which the Directors in their absolute discretion deem applicable as at close of business on the relevant Valuation Date, having regard, among other things, to any premium or discount which they considers may be relevant and to costs of exchange.

The Directors may, at their discretion, permit any other method of valuation to be used if they considers that such method of valuation better reflects value and is in accordance with good accounting practice.

The Directors have has delegated to the Administrator the determination of the Net Asset Value of the Company and the Net Asset Value per Share of each Class.  In determining the Net Asset Value of the Company and the Net Asset Value per Share of each Class, the Administrator will follow the valuation policies and procedures adopted by the Company as set out above. If and to the extent that the Investment Manager is responsible for or otherwise involved in the pricing of any of the Company's portfolio securities or other assets, the Administrator may accept, use and rely on such prices in determining the Net Asset Value of the Company and shall not be liable to the Company, any investor in the Company, the Investment Manager or any other person in so doing.

## SUBSCRIPTION PROCEDURE

The Company is offering, in accordance with the terms of this Memorandum, Investor Shares for subscription at an initial offering price of US$1,000 per share until January [ ], 2006 ("the Initial Offering Period") and thereafter for subscription at the Net Asset Value per Share, following receipt of a duly completed form of Subscription Agreement and funds in respect of such subscription. The Directors have undertaken the responsibility of distributing Investor Shares of the Company. Only Investor Shares which do not have the right to vote at meetings of Members of the Company are offered hereunder.

Following the Initial Offering Period, Shares are offered for sale as of the last business day of each month (a "Valuation Date") at the Net Asset Value per Share determined on such date. The

Company must receive "cleared" funds on or before the Valuation Date as of which subscription is intended or the application will not be considered for acceptance at that Valuation Date. Application for Shares should be made on the form of Subscription Agreement which accompanies this Memorandum. Following the calculation of the Net Asset Value per Share, the Company will issue whole and fractional Shares, the number of which Shares shall be determined by dividing the full amount of subscription funds by the Net Asset Value per Share.

The minimum initial subscription shall be $250,000 and the minimum amount of additional investment by existing Shareholders shall be in such amounts as the Directors shall deem to be acceptable.

The Directors propose not to issue certificates in respect of Shares subscribed. Shareholders will receive written acknowledgement of their subscription and written confirmation of the acceptance thereof directly from Citco Fund Services (Europe) B.V., the Company's Administrator, Registrar and Transfer Agent.

THE SHARES OFFERED HEREUNDER HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 AND ALL AMENDMENTS THERETO.
CONSEQUENTLY, SHARES IN EQUITY TRADING PORTFOLIO LIMITED MAY NOT BE OFFERED, SOLD OR DELIVERED, DIRECUY OR INDIRECTLY, IN THE UNITED STATES OR TO A "UNITED STATES PERSON", AS THAT TERM IS DEFINED IN THE COMPANY'S ARTICLES OF ASSOCATION.

**The direct or indirect sale of Shares of the Company to or for the benefit of a United States Person, as that term is defined in the Articles of Association of the Company, is expressly prohibited. Similarly, the transfer of Shares to or for the benefit of a United States Person is expressly prohibited. The Articles of Association of the Company empower the Directors to compulsorily redeem Shares which have been determined to have been purchased by, transferred to or otherwise acquired by a United States Person to deduct from the proceeds of such redemption, the costs of expenses of making such determination and in remitting such proceeds.**

Following the conclusion of the Initial Offering Period, the Company will offer additional Shares as of the last business day of each month at the then current Net Asset Value per Share. Funds in respect of the subscription should be transferred by bank wire for value on or before the last business day of the month of subscription. Following the calculation of the Net Asset Value per Share, the Company will issue whole and fractional shares at Net Asset Value per Share. The minimum initial subscription during the continuous offering (the period following the conclusion of the Initial Offering Period) shall be $250,000. Additions to existing accounts may be in such amounts as may be determined by the Directors to be acceptable.

The Company's directors have the right to reject, in whole or in part, any application for Shares and need not give a reason for such rejection. Funds in respect of applications which have been rejected by the directors will be returned promptly, and neither the Company nor the subscriber shall thereafter have any obligations or rights as regards the Shares.

The Directors have no plans or intentions to list the Shares offering hereunder on any securities exchange and no public market for the Shares is likely to develop.

## REDEMPTION PROCEDURE

The Shares may be redeemed on the last business day of every month ('the Redemption Date') with five (5) days notice period.
The Directors may provide for other or additional Redemption Dates. Shares will be redeemed on a Redemption Date at the Redemption Price prevailing on such Redemption Date. "Redemption Price" means the Net Asset Value of the Company divided by the number of Shares in issue at the relevant Redemption Date.

Any registered holder of Shares may cause the redemption of any or all of his Shares by completing and delivering a form of Request for Redemption of Shares. The duly-completed form of Request for Redemption of Shares must be received by the Company's Administrator not later than (5) five days prior to the end of the month. In the event that a redemption request is not received in a timely manner, as herein provided, the directors reserve the right to refuse to process the redemption until the following Redemption Date. In the event the Directors refuse to accept a redemption request for failure to have been given timely notice, the Directors shall so notify the Shareholder immediately and the Shareholder shall have the right, until the twentieth business day prior to the next Redemption Date, to withdraw his redemption request.

No redemption will be allowed, however, if following the redemption the value of the residual Shareholding in the Company shall be less than $250,000 at the then current Net Asset Value per Share.
A request for redemption as a result of which the Shareholder's residual holding will be less than $250,000 may be deemed to be a request for complete redemption. The Directors may modify above minimum.

The Articles of Association of the Company empower the Directors to compulsorily redeem as of any Redemption Date any shares that, in the opinion of the Directors, have been acquired in breach of any laws of any country or governmental agency or if such compulsory redemption would in any way best serve the interests of the Company or of its Shareholders or would eliminate or reduce the exposure of the Company or its Shareholders to adverse tax or regulatory consequences under the laws of any country. The Directors may compulsory redeem for other reasons as well, without being obliged to reveal these reasons.

Under special circumstances which include, without limitation, default or delay in payments due to the Company from banks, brokers and others, the Company may in turn delay payments to Shareholders who have requested redemption to the extent that the delayed portion of the payment due to the Company bears to the approximate Net Asset Value of the Company. The right to receive proceeds in respect of the redemption of all or a part of Shares tendered for redemption is contingent upon the Company having sufficient liquidity to discharge its liabilities on the date of the redemption. The Company may also defer payment of proceeds of a redemption if, in the judgement of the Directors, liquidating positions in order to raise sufficient

7

funds to pay said proceeds will be, as determined in good faith, unduly burdensome to the Company and detrimental to the interests of the Shareholders.

## DIVIDEND POLICY

The Company's objective is capital appreciation. The Directors of the Company have no present intention to declare dividends on the Shares. it is possible, however, that the Company will achieve substantial profitability and, in such case, it may be advantageous, in the opinion of its directors, for the Company to distribute some portion of these profits.

## FEES AND EXPENSES

**Management**

The Company will not be charged any fees by the Investment Manager or the Adviser

**Administration** –
The Company is obligated to pay all of its ordinary, recurring legal expenses, if any, the costs of audits and the on-going expenses of administration. The Company's Directors, who are also directors of the Investment Manager, will not receive any fees for serving in such capacity.

## TAXATION

Under existing legislation in the British Virgin Islands there are no income, capital gains or withholding taxes payable by the Company or by its Shareholders, nor are there any British Virgin Islands estate, succession or inheritance taxes payable by Shareholders with respect to their Shares.

The Company and its Shareholders should also be exempt from all US taxation, provided Shareholders are not otherwise engaged in a trade or business in the US (which they should not be deemed to be solely on the basis of their having made an investment in Shares of the Company) and further provided that the
Company confines its US source interest income to those instruments the income from which is specifically exempt from US withholding tax.

THIS OFFERING MEMORANDUM DOES NOT CONSTITUE TAX ADVICE TO ANY SHAREHOLDER OR TO ANY GROUP OF SHAREHOLDERS. WHILE THE DIRECTORS BELIEVE THEY HAVE BEEN PRUDENT AND THOROUGH IN DETERMINING CERTAIN TAX IMPLICATIONS, PROSPECTIVE PURCHASERS ARE URGED TO CONSULT LEGAL AND TAX ADVICE IN THEIR COUNTRIES OF CITIZENSHIP, RESIDENCE AND DOMICILE TO DETERMINE THE TAX AND OTHER CONSEQUENCES OF PURCHASING, HOLDING AND REDEEMING SHARES UNDER THE LAWS OF THEIR RESPECTIVE JURISDICTIONS.

## GOVERNMENTAL REGULATION

**British Virgin Islands Mutual Fund Act.**

The Company has applied to be recognized as a **"Professional Fund"** within the meaning of the British Virgin Islands Mutual Funds Act, 1996 (as amended) ("the Act"). A Professional Fund is a BVI mutual fund, the shares of which are only available to professional investors where the majority of initial investments are not less than US$100,000 or which is designated as such by regulations under the Act. A professional investor is a person whose business involves dealing in the same kind of property as that of the Company or one who has declared net worth in excess of US$1 million and consents to being treated as a professional investor. As a Professional Fund, the Company is required to be recognized under the Act and is required to pay an annual recognition fee of $350.00.

As an entity regulated under the Act, the Company will be subject to the supervision of the BVI Financial Services Commission and more particularly the Director of Investment Business, who is authorized by the Act to direct the Company to furnish information or provide access to any records, books or other documents which she deems necessary to ascertain compliance with the Act or any regulations made under the Act. The Act provides that any information, material or documents furnished to or filed with the Director of Investment Business is privileged from disclosure, except by order of a court of competent jurisdiction in criminal proceedings and in certain other cases.

The Act provides that the Company's Certificate of Recognition may be cancelled or made subject to conditions if, *inter alia*, the Company has breached the Act or any subsidiary legislation or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound-up or dissolved.

There are no exchange control regulations in force in the British Virgin Islands.

## AUDITORS

The auditors chosen for Equity Trading Portfolio Limited are KPMG Accountants N.V.

## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

The Company has engaged Citco Fund Services (Europe) B.V., (the "Administrator"), to provide certain financial, accounting, administrative and other services to the Company. The Administrator provides, subject to the overall direction of the Company's Directors, administrative services and registrar and transfer agent services.

Pursuant to an Administration Agreement effective 1st February 2006 (the "Administration Agreement") between the Administrator and the Company, the Administrator will be responsible, inter alia, for the following matters under the general supervision of the Board of

9

Directors:

- communicating with Shareholders;
- maintaining the register of Shares;
- processing subscriptions and redemptions;
- preparing and maintaining the Company's financial and accounting records and statements;
- determining the Net Asset Value of Shares (on a monthly basis);
- preparing financial statements;
- arranging for the provision of accounting, clerical and administrative services; `maintaining corporate records; disbursing payments of fees and salaries, if any.

The Administrator will be indemnified out of the assets of the Company against all liabilities, actions, proceedings, claims, costs, demands and expenses (other than out-of-pocket expenses) arising out of its proper performance under the Administration Agreement except for gross negligence, bad faith, fraud, dishonesty or a material breach by the Administrator.

THE ADMINISTRATOR WILL NOT PROVIDE ANY INVESTMENT ADVISORY OR MANAGEMENT SERVICE TO THE COMPANY AND THEREFORE WILL NOT BE IN ANY WAY RESPONSIBLE FOR THE COMPANY'S PERFORMANCE.    THE ADMINISTRATOR WILL NOT BE RESPONSIBLE FOR MONITORING ANY INVESTMENT RESTRICTIONS OR COMPLIANCE WITH THE INVESTMENT RESTRICTIONS AND THEREFORE WILL NOT BE LIABLE FOR ANY BREACH THEREOF.

## MATERIAL CONTRACTS

The Company has entered into an agreement with Essex Asset Management Ltd. pursuant to which Essex Asset Management Ltd. will serve as the Company's Investment Manager and will select the Advisor and monitor his performance.

The Company has entered into agreements with the Advisor, which has been recommended by the Investment Manager.

The Company has entered into an agreement with Citco Fund Services (Europe) B.V. pursuant to which Citco Fund Services (Europe) B.V. will provide administrative, accounting, valuation, registrar and transfer agency services.

Other than these agreements, the Company has not entered into, nor does it contemplate entering into, any other contracts or agreements of a material nature, other than those in the ordinary course of business.

## REPORTS TO SHAREHOLDERS

Additionally, Shareholders will receive a copy of the Company's audited financial report within one hundred and twenty (120) days of the close of its fiscal year.

## MISCELLANEOUS

### Indemnification

The Company has undertaken to indemnify a person who becomes a party to, or is threatened to be made a party to, any threatened or pending proceeding (whether civil, criminal, administrative or investigative), provided that person is or was a Director or an Officer of the Company, or acted in a comparable capacity, and further provided that said person acted honestly and in good faith and with the intention of best serving the Company. In the case of a criminal proceeding, the person must not have had reasonable cause to believe that his conduct was unlawful. Indemnification may extend to all expenses, including legal fees, and all judgements, fines and amounts paid in settlement or reasonably incurred in connection with a proceeding.

There have been no criminal, civil, administrative or investigative proceedings involving the Company, its Directors or Officers, the Investment Manager, or the Administrator.

### Voting Rights

Investor Shares (Class D) to be issued by the Company will not have voting rights. Only Management Shares (Class C) issued by the Company, all of which have been subscribed for and issued to the Company's Investment Manager, will have voting rights.

### Directors

The members of the Board of Directors will be elected by the holders of the Management Shares.

### Fiscal Year

The Directors of the Company have determined that the Company's fiscal year shall end on 31st December.

### Additional Information

The Company will make available to each prospective Shareholder, prior to the consummation of the transactions contemplated herein, the opportunity to ask questions concerning the terms and conditions of this offering, and to obtain any additional information appropriate for their consideration, to the extent that the Company possesses such information or can obtain it without unreasonable effort or expense, as necessary to verify the accuracy of the information set forth herein. In addition to any documents appended to the Offering Memorandum, certain additional documents will be made available to prospective Shareholders upon written requests. Such documents include copies of material contracts. For all information dealing with Equity Trading

11

Portfolio Limited one may contact either the Company's Administrator, Citco Fund Services (Europe) B.V., Tel 31 0 20 572 2850.

**Currency**

All references herein to currency are to the currency of the United States of America.

## FULL DISCLOSURE

The foregoing constitutes full, true and plain disclosures of all material facts in respect of the offering of Shares in the Company. In the opinion of the Company's Directors, there are no other facts of a material nature which should have been disclosed to enable prospective investors to fully evaluate the offering described herein.

THE REMAINDER OF THIS PAGE
HAS BEEN LEFT BLANK
INTENTIONALLY

12

# EQUITY TRADING PORTFOLIO, LTD.

## Subscriber Information Form

Each Subscriber for shares of EQUITY TRADING PORTFOLIO LIMITED (the "Company") is requested to furnish the

following information (please print or type):

**1.      Identity of Subscriber**

Name:

_____

Mailing Address: _____

Telephone:

Telecopier:

2.      Non-United States Person

The Subscriber represents and agrees that none of the shares of the Company being acquired by the Subscriber (the "Shares") (nor any interest therein) is being acquired or will at any time be held, directly or indirectly, for the account or benefit of any "United States Person" (as defined in Annex A hereto). The Subscriber represents and agrees that none of the Shares may be transferred to any person who has failed to supply a similar representation.

3.      Supplemental Data For Entities

If the Subscriber is not a natural person, furnish the following supplemental data:

(a)      Legal                            form                            of entity:_____

(b)      Jurisdiction of organization:

(c)      Year of organization:

(d)      Briefly        identify        the        Subscriber's        primary business:_____

4.    Citizenship

Country of citizenship (natural persons only):

The Subscriber agrees to notify the Company of any change with respect to the foregoing information and to provide such further information as the Company may reasonably require.
Dated:                        , 200

_____
                                        Signature


                                        Name and title or
                                        representative capacity, if applicable

# EQUITY TRADING PORTFOLIO LIMITED

## Subscription Agreement

Equity Trading Portfolio Limited
c/o Citco Fund Services BV
Telestone 8 – Teleport
Naritaweg 165
P.O. Box 7241
1007 JE
Amsterdam
The Netherlands

Fax:   +31 205 722 610

Dear Sirs:

Reference is made to the Offering Memorandum dated December, 2005 of Equity Trading Portfolio Limited, a business company incorporated under the laws of British Virgin Islands (the "Company"), and any supplements thereto (the "Offering Memorandum"), with respect to the offering of the shares of the Company (the "Shares").

The undersigned hereby acknowledges receipt of a copy of the Offering Memorandum and represents and warrants that the undersigned has carefully read the same.

The undersigned hereby offers to purchase from the Company and irrevocably subscribes for as many Shares as can be purchased for the sum of U.S.$_____ at a subscription price equal to U.S.$1000 per Share prior to the commencement of the Company's operations and thereafter, at the Net Asset Value per Share as of the effective date on which the subscription is accepted by the Company.

The undersigned hereby agrees that all representations agreements, acknowledgements and understandings are continuous and will govern all further subscriptions for Shares; and further agrees to advise the Company promptly of any changes to any such representations. (In the case of joint investors or signatories, each such investor or signatory is deemed to make each statement and representation herein contained.)

The undersigned hereby represents and warrants that (i) the undersigned (if an individual) is of legal age; (ii) the undersigned (or the beneficial owner if other than the undersigned) is not a "United States Person", as defined in Annex A to the Subscriber Information Form); and (iii) the undersigned has not and will not acquire any of the Shares within the United States, or transfer or assign any of the Shares to any United States Person.

The undersigned understands that the Shares subscribed for hereunder have not been and will not be registered under the United States Securities Act of 1933, as amended, or arty other

law of the United States or any state or any other jurisdiction thereof.

The undersigned declares that they are a "professional investor" as defined in the Mutual Funds Act,1996 (as amended) of the British Virgin Islands, which is a person whose normal business involves dealing in investments of the same kind as those of the Company or, if an individual, that the undersigned [if married individual, jointly with undersigned's spouse] has a total net worth in excess of one million United States dollars or its equivalent thereof in any other lawfully recognised currency and consents to being treated as a professional investor for the purposes of investment in the Company.

The undersigned hereby represents and warrants that the undersigned is acquiring the Shares subscribed for herein for investment and is not acquiring the Shares with a view to or for sale in connection with any distribution of the Shares. The information set forth in the accompanying Subscriber Information Form is accurate and complete as of the date hereof and the undersigned will promptly notify the Company of any change in such information.

The undersigned has such knowledge and experience in financial and business matters that the undersigned is capable of evaluating the merits and risks of the undersigned's investment in the Shares and is able to bear such risks, and has obtained, in the undersigned's judgment, sufficient information from the Company or its authorized representatives to evaluate the merits and risks of such investment.

The undersigned has consulted with the undersigned's own advisers and is fully informed as to the legal and tax requirements within the undersigned's own country regarding a purchase of the Shares.

The undersigned understands that the transfer by the undersigned of Shares of the Company is subject to approval by its Board of Directors which may, in its sole discretion, decline to issue any Shares to, or register Shares in the name of, any person.

The undersigned understands that the Company's Directors reserve the right to redeem the Shares of any shareholder whose continued ownership they believe not to be in the interest of shareholders as a whole.

The undersigned understands that the Board of Directors of the Company reserves the right, in its sole discretion, to refuse any subscription for Shares, in whole or in part, and to return this Agreement and any payment received to the sender without interest.

The undersigned is duly authorized and empowered to legally represent and bind the principal, person, trust, partnership, corporation or other entity, in any, named as the holders of Shares.

The execution, delivery and performance by the undersigned of this Agreement are within the powers of the undersigned and have been duly authorized by all necessary action.

The undersigned acknowledges that under the laws of British Virgin Islands and the Company's Articles of Association each Director and Officer of the Fund *is* entitled to be

indemnified out of the assets of the Company against all expenses (including legal fees and disbursements), losses, liabilities, judgments or fines which such Director or Officer may sustain or incur in or about the execution of the duties of such office or otherwise in relation thereto, if in the determination of the Board of Directors, such Director or Officer acted honestly and in good faith with a view to the best interest of the Company and had no reasonable cause to believe that his conduct was unlawful; and that the determination of the Board of Directors is conclusive for purposes of indemnification.

The undersigned irrevocably authorises the Company and/or the Administrator to disclose, at any time, any information held by the Company or Administrator in relation to the Applicant or his holding to the Investment Manager and the Adviser or any affiliate of the Administrator, the Investment Manager or the Adviser.

The undersigned understands and approves the method of compensation of the Company's Investment Manager, as described in the Information Memorandum.

The undersigned hereby agrees to indemnify and hold harmless the Company, the Investment Manager, the Administrator and their respective shareholders, partners, officers and directors and agents from and against any and all loss, damage or liabilities (including attorney's fees) due to or arising out of a breach of any representation, warranty or agreement of the undersigned contained in this Agreement.

The Shares to be purchased are to be registered in the name of:

Name: _____

Address:_____

2

[NOTE: WE ALWAYS SEND]

Dated:_____

[NOTE: IT IS NOT OUR PRACTICE TO HAVE THE SUBSCRIPTION AGT COUNTERSIGNED]

**3**

**EQUITY TRADING PORTFOLIO LIMITED**

Subscription Instructions

Please complete the following steps:

(1)    Send funds to Equity Trading Portfolio Limited (the "Company") in accordance with the payment information hereunder; all payments must be made in United States dollars (payments may only be made by wire transfer):

> USD
> *Intermediary Bank – Field 56*
> HSBC Bank, New York
> BIC:  MRMDUS33
> Fed Wire:  021001088
> *Account with institution – Field 57*
> Account Name:  Citco Bank Nederland N.V. Dublin Branch
> Account Number:  000306487
> BIC:  CITCIE2D
> *Beneficiary Customer – Field 59*
> Beneficiary International Bank Account number (IBAN):
> IE22CITC00000021280501
> Beneficiary Account Name and Full Address:  Equity Trading Portfolio Limited
> Reference SWIFT Field 70:  (name of subscriber)

(2)    Complete and sign the attached Subscriber Information Form and Subscription Agreement and fax all pages to Investor Relations Group, Citco Fund Services (Europe) B.V. (fax number +31 205 722 610).

(3)    Make a copy of the Subscriber Information Form and Subscription Agreement for your records.

*(4)*    Send the completed original Subscriber Information Form and Subscription Agreement to:

> Equity Trading Portfolio Limited
> c/o CITCO Fund Services (Europe) B.V.
> Telestone 8 – Teleport
> Naritaweg 165
> P.O. Box 7241

6

1007 JE
Amsterdam
The Netherlands

Upon acceptance of the subscription, a photocopy of the Subscription Agreement will be returned to your mailing address.

The Subscriber Information Form and the Subscription Agreement, as well as payment in good funds for the Shares subscribed for, must be received on or before the last day of any calendar month but prior notice of intention to invest should be faxed to the Company at the fax number in Paragraph 2 above.

If you have any questions, please call Investor Relations Group, Citco Fund Services (Europe) B.V., at +3120 572 2850.

### ANNEX A

Definition of "United States Person"

For purposes of the applicable prohibitions against ownership and transfer of Company shares, the term "United States Person" means:

(1)    a resident or citizen of the United States;

(2)    a partnership or corporation organized under the laws of the United States;

(3)    any entity not organized under the laws of the United States:

    (a)    that has its principal office or place of business in the United States;

    (b)    (i)    in which citizens or residents of or entities organized under the laws of or existing in the United States directly or indirectly hold in the aggregate *50* percent or more of the beneficial interests; and

        (ii)    that will own directly or indirectly, either alone or together with affiliated persons and with any direct or indirect owners of 10 percent of the beneficial interests in the entity, an aggregate of more than 2 percent of the Fund's outstanding Shares; or

    (c)    (i)    that is organized principally for passive investment (such as an investment company, a commodity pool or other similar vehicle); and in which the amount of units of participation held by United States persons represents in the aggregate 10 percent or more of the beneficial interest in the entity;

(4)    an estate or trust:

    (a)    of which an executor, administrator or trustee is a United States person, unless:

7

    (i)  an executor, administrator or trustee who is not a United States Person has sole or shared investment discretion with respect to the assets of the estate or trust; and

    (ii)  (A)  in the case of an estate it is governed by non-U.S. law; or

       (B)  in the case of a trust, no beneficiary (and no settlor if the trust is revocable) is a United States Person; or

       (C)  the income of which is subject to United States income tax regardless of source;

(5)  any agency or branch of a foreign entity located in the United States;

(6)  any non-discretionary account or similar account (other than an estate or trust) held for the benefit or account of one or more United States persons; and

(7)  any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States, unless it is held by a dealer or other professional fiduciary exclusively for the benefit or account of one or more non-United States Persons.

  For purposes of the foregoing, the term "United States" means the United States of America, its territories and possessions, any state of the United States, and the District of Columbia. Persons requiring details regarding other terms used in the foregoing definition should contact the Company's principal office.

# EXHIBIT C



To:        Kingate Global, Ltd.-USD Shares
           c/o BISYS Hedge Fund Services
           Limited
           9 Church Street
           P.O. Box HM 951
           Hamilton, Bermuda HM DX

Tel:       441-295-9166

Fax:       441-296-8227

From:      Natalia Sindonen

Date:      August 30, 2007

HFT #      202076

Fund Name:   Kingate Global Fund, Ltd.-Class USD

Registration:  BNP Paribas Arbitrage SNC

Trade Type:  Subscription

Amount: $ 285,000.00

Valuation Date:   August 31, 2007


Please confirm receipt of funds and documents to:

BNP Paribas Arbitrage SNC
Attn: Back Office Tresorerie Reconciliation
8 Rue de Sofia
75018 Paris
France

Tel : +331-4014-3486
Fax : +331-4014-3015
E-mail : fundcontact@bnpparibas.com

# KINGATE GLOBAL FUND, LTD.
# USD SHARES

## SUBSCRIPTION AGREEMENT
### (for non-U.S. Investors)

Kingate Global Fund, Ltd. – USD Shares
c/o BISYS Hedge Fund Services Limited
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Fax No.: (+ 1-441) 296-8227
Attn: Shareholder Services Unit

Dear Sirs:

The undersigned subscriber (the "Subscriber") acknowledges having received, reviewed and understood the Amended and Restated Information Memorandum dated as of August 1, 2007 as may be further amended and restated (the "Information Memorandum") for the offering of USD Participating Common Shares (the "Shares") of Kingate Global Fund, Ltd. (the "Fund") and hereby subscribes for as many Shares as may be purchased for the amount indicated below on the terms of the Information Memorandum and subject to the provisions of the Memorandum and Articles of Association of the Fund.

*__Entity Subscriber__*

**Date and Jurisdiction of Incorporation:**            April 1994        French Jurisdiction

**Tax ID Number:**            394 895 833

*__Natural Person Subscribers__*

**Date and Place of Birth:**

**Social Security Number:**

**Nationality:**

*__All Subscribers__*

**Subscription Date:**            August 31, 2007

**Amount of Subscription:**            285,000.00

---

*Kingate Global Fund, Ltd. – USD Shares*

**Name and Address of Subscriber(s):**

BNP Paribas Arbitrage SNC
Attn: Back Office Tresorerie Reconciliation
8 Rue de Sofia
75018 Paris
France

| | |
|---|---|
| **Telephone Number:** | +33.1.40.14.34.86 |
| **Fax Number:** | +33.1.40.14.30.15 |
| **E-Mail:** | fundcontact@bnpparibas.com *(for questions)*, mo-fund@bnpparibas.com *(for estimated performance reports)*, fundinfo@americas.bnpparibas.com *(for statements only)* |

**Name and Address for Share Registration (if different):**

**Postal Address (if other than address of registration):**

**Name, Address and Account Number of Financial Institution
Remitting Payment for Subscriber's Account***:**

see "List of Bank Correspondent" enclosed below

---
\* Such account details will be used to remit proceeds on redemption of Shares unless otherwise instructed in writing of
alternative instructions.

*Kingate Global Fund, Ltd. – USD Shares*

**Payment Date:** _August 27th, 2007_

The Subscriber agrees that all or any funds payable to the Subscriber (including redemption proceeds) may be wire transferred to the Subscriber in accordance with the following instructions, until further written notice, signed by one or more of the following individuals authorized to act on behalf of the Subscriber, and delivered to the Administrator (*).

Bank Name:        see "List of Bank Correspondent" enclosed below

Bank Address:

ABA or CHIPS No:

Account Name:

Account No:

For Further credit:

Number of beneficial owners represented by Subscriber (if Subscriber is acting in any sort of nominee or fiduciary capacity)

Is the Subscriber, or an affiliate of the Subscriber, a pension profit-sharing, annuity, or employee benefit plan (whether private, governmental, or charitable)?

[ ] Yes  [x] No    *(Initial one)*

The undersigned Subscriber is *(tick one and refer to the Subscription Instructions for the documentation to enclose for different categories of investors)*:

  ☐    An Individual Investor from a FATF Jurisdiction

  ☐    An Individual Investor from a non-FATF Jurisdiction

  ☑    An Entity Investor from a FATF Jurisdiction

  ☐    An Entity Investor from a non-FATF Jurisdiction

  ☐    An Entity Investor from a non-FATF Jurisdiction – privately held

  ☐    An Entity Investor from a non-FATF Jurisdiction – trust

  ☐    A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a FATF Jurisdiction

  ☐    A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge Funds, etc.) from a non-FATF Jurisdiction

*Kingate Global Fund, Ltd. – USD Shares*

S-6

□    A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge
Funds, etc.) from a non-FATF Jurisdiction – privately held

□    A Fund of Funds or Other Entity Investing on Behalf of Others (Nominee Banks, Hedge
Funds, etc.) from a non-FATF Jurisdiction – trust

**Authorized Signatories:**

Set forth below are the names of persons authorized by the Subscriber to give and receive
instructions between the Fund (or its Administrator) and the Subscriber, together with their respective
signatures.    Such persons are the only persons so authorized until further written notice to the
Administrator signed by one or more of such persons.

(please attach additional pages if needed)

| Name | Signatures |
|---|---|
| see "Power of Signatory" enclosed below | |
| | |
| | |
| | |
| | |
| | |
| | |

## PROFESSIONAL INVESTOR REPRESENTATIONS AND WARRANTIES

The Subscriber represents and warrants that:

(a)    The Subscriber is subscribing for, or acquiring, Shares herein with a value of at least U.S.$250,000;

(b)    It is (i) an institution whose ordinary business or professional activity includes the buying and selling of investments, whether as principal or agent; (ii) in the case of a natural person, his/her individual net worth, or joint net worth with his/her spouse, exceeds U.S.$1 million; or (iii) an institution with a minimum amount of assets under discretionary management of U.S.$5 million; and

(c)    It (i) has the knowledge, expertise and experience in financial matters to evaluate the risks of investing in the Fund; (ii) is aware of the risks inherent in investing in the assets proposed to be acquired by the Fund and the method by which the assets of the Fund are held and/or traded; and (iii) can bear the risk of loss of its/his/her entire investment.

## SUBSCRIBER REPRESENTATIONS AND WARRANTIES

The Subscriber represents and agrees that none of the Shares (nor any interest therein) is being acquired or will at any time be held, directly or indirectly, for the account or benefit of any "Restricted Person" (as defined in the Information Memorandum), and further agrees that none of the Shares will be transferred to any person who has failed to supply a similar representation. The Subscriber represents and warrants that:

(a)    **Reliance on Information Memorandum.** The Subscriber acknowledges that the Fund has delivered to the Subscriber the Information Memorandum. The Subscriber has not relied on any representations or other information purported to be given on behalf of the Fund except as set forth in the Information Memorandum or the published, financial accounts of the Fund.

(b)    **No Resale.** The Subscriber is acquiring the Shares for its own account, or on behalf of a third party or third parties for investment and not with a view to resale, transfer or other disposition in whole or in part.

(c)    **No Need for Liquidity.** The undersigned understands that the Shares have not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or under the laws of any other jurisdiction, and that the Fund does not contemplate and is under no obligation to so register the Shares. The undersigned understands and agrees that the Shares must be held indefinitely unless they are subsequently registered under the Securities Act and, where required, under the laws of other jurisdictions or unless an exemption from registration is available. Even if such exemption is available, the undersigned agrees that the assignment and transferability of the Shares will be governed by the Memorandum and Articles of Association of the Fund (the "Memorandum and Articles of Association"). The Memorandum and Articles of Association require that Shares in the Fund shall not be transferred without the prior consent of the Fund. The undersigned recognizes that there will be no established trading market for the Shares and it is extremely unlikely that any public market for the Shares will develop. The undersigned has no need for liquidity in connection with its purchase of Shares.

(d)    **Legality and Validity of Consents**. All consents required to be obtained and all legal requirements necessary to be complied with or observed in order for this Agreement or the issuance of the

Shares to be lawful and valid under the laws of any jurisdiction to which the Subscriber is subject have been obtained, complied with or observed.

(e)     **Anti-Money Laundering**.  The Subscriber acknowledges that due to money laundering requirements, the Fund, the Manager, the Investment Advisor and/or the Administrator may require certain identification and/or other information of the Subscriber before the application can be processed.

(f)     **Subscriber Knowledge**.  The Subscriber possesses requisite knowledge and experience in financial matters such that it is capable of evaluating the merits and risks of an investment in the Fund (including without limitation, the ability to suffer a complete loss of the investment and need to hold the Shares for an indefinite period of time).

(g)     **Transfer Request Form**.  Subscriber agrees to complete and submit to the Board of Directors the Transfer Request Form (annexed hereto) and any other documents requested by the Board of Directors in the event the Subscriber seeks to transfer its Shares, in whole or in part.  No transfer shall be effective without the express consent of the Board of Directors.

(h)     **No Performance Guarantees**.  No guarantees have been made to the Subscriber about future performance or financial results of the Fund.

(i)     **Ability to Bear Risks**. The Subscriber is and will be able to bear the economic risks of its investment in the Shares.

(j)     **Suitability**.  The Subscriber has read carefully and understands the Information Memorandum and has consulted its own attorney, accountant or investment advisor with respect to the investment contemplated hereby and its suitability for the Subscriber and Subscriber consents to every provision therein.

(k)     **Opportunity to Verify Information**.  The Subscriber acknowledges that the representatives of the Fund, the Manager, Investment Advisor, Administrator and Consultant have made available to the Subscriber, during the course of this transaction and prior to the purchase of any Shares, the opportunity to ask questions of and receive answers from them concerning the terms and conditions of the offering described in the Information Memorandum, and to obtain any additional information necessary to verify the information contained in the Information Memorandum or otherwise relevant to the suitability of the proposed investment and to the proposed activities of the Fund.

(l)     **Investment Objectives**.  The purchase of the Shares by the Subscriber is consistent with the general investment objectives of the Subscriber.

(m)     **No Borrowings**.  The Subscriber has not borrowed any portion of its contribution to the Fund, either directly or indirectly, from the Fund, the Manager, Investment Advisor, Administrator, or any affiliate of the foregoing.

(n)     **Conflicts of Interest; Fund Counsel Does Not Represent Investors**.  The Subscriber understands and acknowledges the various conflicts of interest that are set forth in the Information Memorandum.  The Subscriber understands and acknowledges that Tannenbaum Helpern Syracuse & Hirschtritt LLP and O'Neal Webster O'Neal represent only the Fund and the Manager and not the Subscriber, in connection with the offer and sale of the Shares.  The Subscriber has had the opportunity to consult with legal counsel of its own choosing.

(o)   **Amendments**.   Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except with the written consent of the Fund's Board of Directors.

(p)   **Change in Information**.   The Subscriber agrees to notify the Board of Directors immediately if any of the information provided herein by the Subscriber changes or becomes inaccurate.

(q)   **Authorization**. The Subscriber acknowledges that it has the legal capacity and authority and is permitted by applicable law to execute and deliver this Agreement and is authorized to purchase Shares and to perform its obligations pursuant to the provisions hereof and pursuant to the Memorandum and Articles and of Association and such Subscriber has not been formed for the specific purpose of acquiring an interest in the Fund.

(r)   **Broker Dealer Arrangements**. The Subscriber acknowledges that the Fund and/or the Investment Advisor have the power to enter into agreements pursuant to which a registered broker-dealer affiliate of the Fund or any member of the Investment Advisor, splits commissions earned from any trades in respect of Fund assets with any other registered broker-dealer on such terms as the Fund or the Investment Advisor (as the case may be) in their sole discretion deem advisable and proper.

(s)   **Restricted Person**.   The Subscriber certifies that it is not now, and for as long as it owns the Shares, a Restricted Person, nor a custodian, nominee or trustee of such a person. The Subscriber further certifies that it is not acquiring the Shares for and will not hold the Shares on behalf of or transfer Shares to any person or entity that is a Restricted Person.   The Subscriber agrees that it will promptly notify the Fund at any time when it becomes a Restricted Person, and the Subscriber agrees that in such event the Fund shall be entitled to (but shall not be obliged to) repurchase or to require the Subscriber to redeem or sell the Shares to a person designated by the Fund at a price equal to the Net Asset Value per Share as calculated by the Administrator as at the date of the repurchase or sale or as at the date of any unauthorised transfer giving rise to such repurchase or sale.

(t)   **Legal Entity**.   Where the Subscriber is a company, trust or partnership, it agrees to produce a certified copy or copies of the certificate of incorporation (and any change of name), bye-laws (or other document evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity and any other relevant documentation as requested by the Fund.

(u)   **Subscriptions**.   The Subscriber acknowledges that the Fund reserves the right to reject in its absolute discretion this and any other subscription for Shares in whole or in part, in any order, at any time prior to a Subscription Date (as defined in the Information Memorandum), notwithstanding prior receipt by the Subscriber of notice of acceptance of the subscription. If the Shares are oversubscribed, the Fund will determine in its sole discretion which subscriptions shall be accepted.   If this subscription is rejected or if the sale of the Shares is not completed for any reason (in which event this subscription shall be deemed to be rejected), the Fund shall as soon as practicable return any funds transferred by the Subscriber (without interest) along with this Agreement and any other documents delivered by the Subscriber.

(v)   **Entire Agreement**.   This Agreement represents the entire agreement of the parties in respect of the subscription for Shares and may not be changed or terminated orally.

---

*Kingate Global Fund, Ltd. – USD Shares*

S-10

(w)    **Waiver**.  No waiver by any party of any breach of any term of this Agreement shall be construed as a waiver of any subsequent breach of that term or any other term of the same or of a different nature.

(x)    **Legal Actions**. If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they may be entitled.

(y)    **Waiver of Statute of Limitations**.  Each investor in the Fund agrees to have waived, to the maximum extent permissible under law, the right to bring any legal claim, action or other proceeding against the Fund, its Board of Directors and other officers unless such claim, action or proceeding is commenced within six (6) months from the date of the first to occur of (i) the original occurrence allegedly giving rise to such claim, action or proceeding or (ii) the Shareholder's redemption of any Shares.

(z)    **Governing Law**.  The Subscriber agrees when entering into the Agreement to be bound by the laws of the BVI and in addition to the non-exclusive jurisdiction of the relevant courts therein subject to which laws this Agreement shall be governed and interpreted.

(aa)    **Facsimile Instructions**.    The Subscriber acknowledges that the Fund and the Administrator are entitled to act upon facsimile instructions from or purported to be from the Subscriber and that all such instructions, where accepted by the Fund or the Administrator, will be final and binding upon the Subscriber. The Subscriber agrees to indemnify the Fund or Administrator against any and all claims, demands, liabilities, costs, charges, damages and expenses that the Fund or the Administrator may incur by reason of any act or failure to act on the part of the Fund with regard to all facsimile instructions so provided by the Subscriber.

(bb)    **Survival of Representations**.    The representations, warranties, agreements and indemnification obligations of the Subscriber contained in this Agreement shall survive the execution of this Agreement and the purchase of the Shares.

(cc)    **General**.    This Agreement shall be binding upon the Subscriber and the legal representatives, successors and assigns of the Subscriber, and shall, if the Subscriber consists of more than one person, be the joint and several obligation of all such persons.  Two or more duplicate counterparts of this Agreement may be executed by the Subscriber and accepted by the Fund, each of which shall be an original, but all of which together shall constitute one and the same instrument.

**BENEFIT PLAN INVESTOR STATUS**

*Please respond yes or no to the following questions:*

(1)  The Subscriber is not a, and is not using to acquire the Shares the assets of any, "benefit plan investor" as defined in 29 C.F.R. 2510.3-101(f)(2) (as modified by Section 3(42) of ERISA) (the "Plan Asset Regulation").  For purposes of illustration, "benefit plan investors" include pension plans, profit-sharing plans, or other "employee benefit plans" subject to part 4 of subtitle B of Title I of ERISA, and plans subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"). "Benefit plan investors" also include simplified employee pension plans, KEOGH plans and individual retirement accounts.  "Benefit plan investors" also include entities

     **JFM**
     *(Initial)*

---

*Kingate Global Fund, Ltd. – USD Shares*

deemed under Department of Labor regulations to hold "plan assets" due to investments made in the entity by such employee benefit plans and other plans.

If the Subscriber is an entity, the Subscriber certifies that less than 25% of the value of each class of equity interests in the Subscriber (excluding any equity interests held by an individual or entity with discretionary authority or control over the equity interests of the Subscriber) is held by "benefit plan investors".

*Or*

(2)  The Subscriber, an affiliate of the Subscriber, or the person or entity for which the Subscriber is acting is a "benefit plan investor" as defined in the Plan Asset Regulation.

_____
*(Initial)*

If the Subscriber is a "benefit plan investor," please indicate whether the Subscriber is a plan defined in Section 4975 of the Code (e.g., an individual retirement account, Coverdell account, ERISA Plans, etc.):

_____          _____
Yes                No

(3) The Subscriber is a life insurance company acquiring the Shares with the assets of the Subscriber's general account.

_____
*(Initial)*

If so, the portion of such general account assets which represents "plan assets" within the meaning of the Plan Asset Regulation will not exceed the following percentage during the period the Subscriber holds the Shares:

_____ %

(4)  The Subscriber is a person who has discretionary authority or control with respect to the assets of the Fund or provides investment advice to the Fund for a fee, direct or indirect, with respect to such assets or any affiliate of any such person (a "Controlling Person").

_____
*(Initial)*

(5)  The Subscriber is an entity whose underlying assets are deemed to include "plan assets" by reason of an employee benefit plan or other plan's investment in the Subscriber.  If so, the percentage of equity interests of the Subscriber held by employee benefit plans subject to part 4 of subtitle B of Title I of ERISA or plans subject to Section 4975 of the Code will not exceed the following percentage during the period the Subscriber holds the Shares:

_____
*(Initial)*

_____ %

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

**The Subscriber understands and agrees that the information supplied above will be utilized to determine whether benefit plan investors own less than 25% of the value of the Shares, as determined under the Plan Asset Regulation, both upon the original issuance of Shares and upon subsequent transfer of Shares.**

## TRUSTEE, AGENT, REPRESENTATIVE, NOMINEE OR OTHER THIRD PARTIES

If the Subscriber is acting as trustee, agent, representative or nominee for an investor (a "Beneficial Owner"), the Subscriber understands and acknowledges that the representations, warranties and agreements made herein are made by the Subscriber with respect to the Subscriber *and* with respect to the Beneficial Owner. The Subscriber further represents and warrants that it has all requisite power and authority from said Beneficial Owner to execute and perform the obligations under this Subscription Agreement. The Subscriber also agrees to indemnify the Fund, the Manager, the Investment Advisor, the Consultant and the Administrator and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein, or the assertion of the Subscriber's lack of proper authorization from the Beneficial Owner to enter into this Subscription Agreement or perform the obligations hereof.

If the Subscriber enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Fund (the "Swap") with a third party (a "Third Party"), the Subscriber represents and warrants that with respect to a Third Party entering into a Swap: (a) the Third Party is authorized under its constitutional documents (e.g., certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Fund; (b) the Third Party has received and reviewed a copy of the Information Memorandum, the U.S. Supplement and the Subscription Agreement; (c) the Third Party acknowledges that the Fund and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Subscriber is not an agent of the Fund; and (d) the Third Party is an "eligible contract participant" under the U.S. Commodity Exchange Act, as amended and, as necessary, an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended. The Subscriber also agrees to indemnify the Fund, the Manager, the Investment Advisor and the Consultant and the Administrator and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein. Nothing herein constitutes an agreement or statement by the Fund as to the legality of a Swap or the suitability of a Swap for the Third Party.

## ANTI-MONEY LAUNDERING REPRESENTATIONS

(a)     The Subscriber represents that all evidence of identity provided in connection with the Subscription Agreement is true and correct and all related information furnished is genuine and accurate.

(b)     The Subscriber agrees to provide any information deemed necessary by the Fund in its sole discretion to comply with its anti-money laundering program and related responsibilities from time to

time. In the event of delay or failure by the Subscriber to produce any information requested in this Subscription Agreement or required for verification purposes, the Fund may refuse to accept the subscription.

(c)    The Subscriber represents and covenants that neither it, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is an individual, organization, or entity listed on the List of Specially Designated Nationals and Blocked Persons (the "OFAC Control List") maintained by the US Office of Foreign Assets Control ("OFAC"), and that it is not investing and will not invest in the Fund on behalf of or for the benefit of any individual, organization, or entity listed on the OFAC Control List.

(d)    The Subscriber represents that (i) the amounts contributed by it to the Fund were not and are not directly or indirectly derived from activities that contravene U.S. federal or state laws or regulations and international laws and regulations, including anti-money laundering laws and regulations, and (ii) the proceeds from the Subscriber's investment in the Fund will not be used to finance any illegal activities.

(e)    The Subscriber acknowledges (i) that additional subscriptions by the Subscriber may be refused and/or (ii) that requests for withdrawals may be delayed or declined if the Manager reasonably believes it does not have satisfactory evidence of the Subscriber's identity.

(f)    The Subscriber acknowledges that, if, following its subscription in the Fund, the Manager and/or the Administrator reasonably believes that the Subscriber is listed on the OFAC Control List or has otherwise breached its representations and covenants as to its identity, the Manager and/or the Administrator may be obligated to block the Subscriber's investment in accordance with applicable law, and the Subscriber shall have no claim against the Manager and/or the Administrator for any form of damages as a result of blocking the investment.

(g)    If the Subscriber is a "fund of funds" or an entity that invests on behalf of others, the Subscriber, in addition to and not by way of limiting the foregoing, represents and certifies that it is aware of the requirements of the USA PATRIOT Act of 2001, and rules and regulations promulgated thereunder and other applicable anti-money laundering measures in any jurisdiction (collectively, the "AML Rules") and that it has adopted anti-money laundering policies and procedures in place reasonably designed to verify the identity of its beneficial owners or underlying investors, as the case may be, and their respective sources of funds. Such policies and procedures are properly enforced and are consistent with such AML Rules. The Subscriber represents and certifies that to the best of its knowledge, the beneficial owners or investors, as the case may be, are not individuals, entities, or countries that may subject the Fund or any of its affiliates to criminal or civil violations of any AML Rules. The Subscriber acknowledges that it is to furnish a copy of its anti-money laundering policies and procedures to the Fund when requested. Among its other obligations hereunder, the Subscriber agrees to promptly notify the Fund if the foregoing representation and certification becomes inaccurate.

(h)    Subscriber represents that:

(1)    it is not a Senior Foreign Political Figure‡, a member of a Senior Foreign Political Figure's Immediate Family§, and/or any Close Associate** of a Senior

---

‡ The term "senior foreign political figure" is defined to mean a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation.
§ The term "immediate family" is defined to mean the parents, siblings, spouse, children and in-laws of a senior foreign political figure.

Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated by the US Treasury as warranting special measures due to money laundering concerns;

(2)     it is not a former Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated as warranting special measures due to money laundering concerns;

(3)     it is not resident in, or organized or chartered under the laws of a jurisdiction that has been designated by the US Secretary of Treasury under Sections 311 and 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns;

(4)     it is not a Foreign Shell Bank as the term is defined in the USA PATRIOT Act; and

(5)     its subscription funds do not originate from, nor will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or charted under the laws of a jurisdiction deemed to be a non-cooperative country or territory ("NCCT")[††].

## STANDING PROXY

Subscriber hereby designates and appoints Kingate Management Limited, or any successor thereof, with full powers of substitution, as Subscriber's true and lawful Proxy for the purpose of voting any Shares issued pursuant to this Agreement (or such portion thereof from time to time owned by Subscriber) as said Proxy may determine on any and all matters arising at any meeting of the Fund or any Class meeting upon which such Shares could be voted by Subscriber (or the person in whose name the Shares hereby subscribed are registered at Subscriber's direction) if present in person at the meeting. This proxy may be revoked by Subscriber (or his registered nominee) either personally or by presentation of a subsequently executed form of proxy at any meeting of the Fund or by written notice to Kingate Management Limited received by Kingate Management Limited prior to any such meeting provided however that such revocation may lead to the compulsory redemption of such Subscriber's Shares

## POWER OF ATTORNEY

The Subscriber hereby irrevocably constitutes and appoints Kingate Management Limited, with full power of substitution, as the Subscriber's true and lawful attorney-in-fact with full power and authority for the Subscriber, and in the Subscriber's name, place and stead and either personally or by attorney-in-fact, to execute, deliver, acknowledge, publish, file and record and swear to the execution, delivery, acknowledgment, filing and/or recording of:

(a)     The Information Memorandum, the Memorandum and Articles of Association and all amendments thereto required or permitted by law or the provisions of the Memorandum and Articles of Association and all instruments that the attorney-in-fact deems appropriate to reflect any change or

---

[**]   The term close associate" is defined to mean a person who is widely and publicly known to maintain an unusually close relationship with s senior foreign political figure.
[††]   The Financial Action Task Force on Money Laundering ("FATF") has designated certain countries or territories as NCCTs. The list of countries or territories deemed to be NCCTs is available at: http://www1.oecd.org/fatf.

modification of the Information Memorandum and the Memorandum and Articles of Association in accordance with the Memorandum and Articles of Association;

(b)     all such other agreements, applications, instruments, documents, certifications, certificates and reports which may from time to time be required by the laws of any jurisdiction in which the Fund shall determine to do business, or any political subdivision or agency thereof, or any regulator to effectuate, implement and continue the valid and subsisting existence of the Fund;

(c)     all conveyances and other instruments which the Board of Directors deems appropriate to reflect the dissolution and termination of the Fund; and

(d)     all certificates and other instruments deemed necessary or advisable by the Board of Directors to carry out the provisions of the Information Memorandum and the Memorandum and Articles of Association.

The Power of Attorney granted hereby is coupled with an interest and is irrevocable and shall (i) continue in full force and effect notwithstanding the subsequent death, incapacity, dissolution, termination or bankruptcy of the Subscriber or the transfer of all or any portion of the Subscriber's Shares in the Fund and (ii) extend to the Subscriber's successors, assigns and legal representatives. The Subscriber agrees to be bound by any representation made by the attorney-in-fact acting in good faith pursuant to this Power of Attorney, and hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the attorney-in-fact taken in good faith under this Power of Attorney.

In the event of any conflict between the provisions of the Memorandum and Articles of Association and any document executed or filed by the attorney-in-fact pursuant to this Power of Attorney, the Memorandum and Articles of Association shall govern.

## INDEMNIFICATION

The Subscriber acknowledges that the Subscriber understands the meaning and legal consequences of the representations and warranties contained in this Agreement and agrees to indemnify and hold harmless the Fund, the Manager, Investment Advisor, Consultant and Administrator, and their respective affiliates, employees, officers, directors and agents and each other Subscriber from and against any and all loss, damage, liability or expense, including, without limitation, legal fees, due to or arising out of a breach of any representation or warranty of the Subscriber contained in any document furnished by the Subscriber in connection with the offering and sale of the Shares, including, without limitation, this Agreement, the Information Memorandum and the Memorandum and Articles of Association, and all schedules, appendices and exhibits hereto or thereto, submitted by the Subscriber, or failure by the Subscriber to comply with any covenant or agreement by the Subscriber herein or in any other document furnished by the Subscriber to any of the foregoing in connection with this transaction. The indemnified parties shall be entitled to advances with regard to the indemnification made hereunder provided that such indemnified party deliver to the indemnifying party an undertaking pursuant to which it promises to return such advanced amount if the indemnity is ultimately found to be inapplicable.

**INDIVIDUALS**                                **ENTITIES**

_____                        _BNP Paribas Arbitrage SNC_____
Signature                                      Print Name of Entity

                                               By: _____
_____                            Authorized Signature(s)
Print Name

                                               Jean-Frederic MARSAC, Head of Middle Office
_____                        _____
Additional Investor Signature                  Print Name(s) and Title(s)


_____
Print Name


_____                        _August 30th, 2007_____
Date                                           Date


I/We enclose *(tick as appropriate)*:

☑    Exhibit A – Form of Incumbency Certificate

☑    Exhibit B – Anti Money Laundering ("AML") Certificate

☐    Exhibit C – Letter of Reference

☐    Exhibit D – Beneficial Ownership Information (Entities)

☐    Exhibit E – Trust Beneficiaries' Information (Trusts)

_____

The foregoing Subscription Agreement is hereby accepted by the undersigned as of the date set forth below:

Amount Accepted          USD_____

Kingate Global Fund, Ltd.
By:                      _____
                         Name:
                         Title:

Date of Acceptance:      _____

_____

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

# EXHIBIT A

### FORM OF INCUMBENCY CERTIFICATE

The undersigned        Jean-Frederic MARSAC
                       _____
                       *Insert Name*

Being the              Head of Middle Office
                       _____
                       *Insert Title*

Of                     *BNP Paribas Arbitrage SNC*
                       _____
                       *Insert Name of Entity*

A                      Corporate and Investment Bank
                       _____
                       *Insert Type of Entity*

Organized under the laws of   France
                       _____
                       *Insert Jurisdiction of Entity*

(the "Company"), does hereby certify on behalf of the Company that the persons named below are directors and/or officers of the Company and that the signature at the right of said name, respectively, is the genuine signature of said person and that the persons listed below are each an authorized signatory for the Company.

| Name | Title | Signature |
|------|-------|-----------|
| see "Power of Signatory" enclosed below | | |
| | | |
| | | |

IN WITNESS WHEREOF, the undersigned has hereunto set his hand as of the _30th_ day of

_____ August _____ , 200_7_ .

_____
Name: Jean-Frederic MARSAC,
Title:  Head of Middle Office

_____ *Kingate Global Fund, Ltd. – USD Shares* _____

S-18

The undersigned          _____
                         *Insert Name*

a Duly Authorized        _____ of the Company
                         *Insert Title*

does hereby certify that _____
                         *Insert Name of First Signatory*


is a duly authorized Officer of _____
                                *Insert Name of Company*

and that the signature set forth above is [his][her] true and correct signature.


      IN WITNESS WHEREOF, the undersigned has executed this certificate as of the _____ day
of _____, 200__.


_____
Name:
Title:

# EXHIBIT B

**By Using This Form, the Undersigned Represents that it is Located in a FATF Jurisdiction**

**AML CERTIFICATION FORM FOR FUND OF FUNDS OR ENTITIES THAT INVEST ON BEHALF OF THIRD PARTIES**

The undersigned, being the    Head of Middle Office
                                     *Insert Title*

of                               *BNP Paribas Arbitrage SNC*
                                       *Insert Name of Entity*

a                                Corporate and Investment Bank
                                       *Insert Type of Entity*

organized under the laws of    France
                                     *Insert Jurisdiction of Entity*

(the "Investor"), does hereby certify that it is aware of the requirements of the USA PATRIOT Act of 2001, the regulations administered by the U.S. Department of Treasury's Office of Foreign Assets Control, and other applicable U.S. federal, state or non-U.S. anti-money laundering laws and regulations (collectively, the "anti-money laundering/OFAC laws"). As an entity regulated by Autorités des Marchés Financiers      (*Insert Appropriate Regulatory Agency*) in the French Jurisdiction      (*Insert Jurisdiction*) (a FATF member jurisdiction) the Investor has/have anti-money laundering policies and procedures in place reasonably designed to verify the identity of its [beneficial holders] [underlying investors] and, to the extent required, their sources of funds. Such policies and procedures are properly enforced by the Investor.

        After due inquiry, the Investor hereby represents to Kingate Global Fund, Ltd. that, to the best of its knowledge, the Investor's [beneficial holders(s)] [underlying investor(s)] are not individuals, entities or countries that are identified on the list maintained by the U.S. Office of Foreign Assets Control[‡].

Date: *August 30th, 2007*     By: _____    Jean-Frederic MARSAC,
                                                      Head of Middle Office

---

[1] The list may be found at http://www.ustreas.gov/ofac/t11/sdn.pdf

*Kingate Global Fund, Ltd. – USD Shares*

# EXHIBIT C

### FORM LETTER OF REFERENCE

**[TO BE PRINTED ON THE LETTERHEAD OF LOCAL OFFICE OF FATF MEMBER BANKING INSTITUTION OR BROKERAGE FIRM]**

Kingate Global Fund, Ltd.
c/o BISYS Hedge Fund Services Limited
9 Church Street
P.O. Box HM 951
Hamilton, Bermuda HM DX
Attn: Shareholder Services Unit

To Whom It May Concern:

I, _____, the _____ of _____, do hereby
       *Name*            *Title*            *Name of Institution*

certify that _____ has maintained an account at our institution for _____
       *Name of Investor*                                 *Insert Period*

years and, during this period, nothing has occurred that would give our institution cause to be

concerned regarding the integrity of _____.
                                    *Name of Investor*

Do not hesitate to contact me at _____ if you have any further questions.
                            *Insert Telephone Number*

                                    Very truly yours,

                                    _____

                                    Name:

                                    Title:

# EXHIBIT D

## BENEFICIAL OWNERSHIP INFORMATION

### To Be Completed By Entity Subscribers That Are Privately Held Entities

**Instructions:  Please complete and return this Exhibit D and provide the name of every person who is directly, or indirectly through intermediaries, the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the Investor.  If the intermediary's shareholders or partners are not individuals, continue up the chain of ownership listing their 25% or more equity interest holders until individuals are listed.  If there are no 25% beneficial owners, please write none.**

| Full Name | If Shareholder is an Individual, Insert Name and Address of Principal Employer and Position | Citizenship (for Individuals) or Principal Place of Business (for Entities) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

# EXHIBIT E

**TRUST OWNERSHIP INFORMATION**

**To Be Completed By Entity Subscribers That Are Trusts**

**Instructions:  Please complete and return this <u>Exhibit E</u> and provide the name of: i) every current beneficiary that has, directly or indirectly, an interest of 25% or more in the trust; ii) every person who contributed assets to the trust (settlors or grantors); and iii) every trustee.  If there are intermediaries that are not individuals, continue up the chain of ownership listing their 25% or more equity interest holders until individuals are listed.**

| Full Name and Address | Status (Beneficiary/Settlor/ Trustee) | Citizenship (for Individuals) or Principal Place of Business (for Entities) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |



# ANY QUERY ON THE FOLLOWING ORDER

PLEASE CONTACT BNP PARIBAS ARBITRAGE AT
fundcontact@bnpparibas.com

Jihade NAIR +331 55 77 69 74
Natalia SINDONEN +331 40 14 34 86
Julien MORISSET +331 40 14 23 27

⇨ For Settlement matter
paris.fund.bo@bnpparibas.com

Aurélie Boyer or Stephane Prevost +331 55 77 35 89



LIST OF CORRESPONDENT BANK

BNP PARIBAS ARBITRAGE
(SWIFT CODE : **BNABFRPPFND**)

Send a credit advice one day before value date to paris_fund_bo@bnpparibas.com

| CUR. | BANK | BIC CODE | ACCOUNT NUMBER |
|------|------|----------|----------------|
| AUD | NATIONAL AUSTRALIA BANK | NATAAU33 | 1803-082449-500 |
| CAD | BNP MONTREAL | BNPACAMM | 00011012425001 |
| GBP | BNP LONDRES GBP<br>Sort code 23 46 35 | BNPAGB22 | 26076010 |
| EUR | BNP PARIBAS PARIS | BNPAFRPPXXX | FR7630004008970000018027726 |
| USD | BNP PARIBAS NEW YORK<br>ABA 02007689 | BNPAUS3NXXX | 20010133300231 |
| CHF | BNP GENEVE | BPPBCHGG | 2578961G |
| JPY | BNP PARIBAS TOKYO | BNPAJPJT | 0000 100 388 800 185 |

For USD
BNP Paribas S.A., New York
Bank Code: ABA02007689
SWIFT Code: BNPAUS3N
Account: 20010133300231
Beneficiary: BNABFRPPFND

For EUR
BNP Paribas S.A., Paris
SWIFT Code: BNPAFRPP
Account: FR76 3000 4008 9700 0001 8027 726
Beneficiary: BNABFRPPFND

BNP PARIBAS ARBITRAGE S.N.C.
Samira KHARBICHI
Responsable Back Office Trésorerie

BNP PARIBAS ARBITRAGE
Alban MALE
Securities Back Office
Head of Listed Operations



**BNP PARIBAS**
*ARBITRAGE*



This document cancels and supersedes
all previous ones*

TO                :   ALL, INTERNAL AND EXTERNAL

## Authorised signatures to represent BNPPA to execute any orders of fund shares held by BNPPA

N°:            **BNPPA_31c**

Mr Yann GERARDIN,

Acting as Permanent Representative of BNP PARIBAS S.A., Manager of BNP PARIBAS ARBITRAGE, a French « Société en Nom Collectif » (i.e. SNC), with a share capital of Euros 185,000,000, whose registered office is located at 8 rue de Sofia, 75018 Paris, registered with the Registrar's Office of Paris under the number B 394 895 833,

Hereby authorises,

The following persons whose names are listed in the attached appendix, to execute on behalf of BNP PARIBAS ARBITRAGE any orders related to purchases, sales and transfers of fund shares held by of BNP PARIBAS ARBITRAGE.

To act alone and without the facility to further delegate.

* This Power of Attorney could be read in conjunction with the Power of Attorney named BNPPA_31(NY branch).

Signed in Paris on 16 July 2007

Mr Yann Gérardin

*Permanent Representative of the Manager*

Power of Attorney / BNPPA_31c

## APPENDIX

Signature Specimen of the persons authorised on behalf of BNP PARIBAS ARBITRAGE, to execute any orders related to purchases, sales and transfers of fund shares held by of BNP PARIBAS ARBITRAGE.

This Power of Attorney could be read in conjunction with the Power of Attorney named BNPPA_31(NY branch).

| | |
|---|---|
| **Maryline CHEDAL-ANGLAY** | |
| **Samira KHARBICHI** | |
| **Jerome LAGAYE** | |
| **Jean-Frédéric MARSAC** | |
| **Pierre VINCENT** | |

Signed in Paris on 16 July 2007

Mr Yann Gérardin
*Permanent Representative of the Manager*

BNP Paribas Arbitrage

2



Dear all,

Please send all estimated performance reports to  **mo-fund@bnpparibas.com**

And all statements to **fundinfo@americas.bnpparibas.com**

All queries regarding subscription/redemption orders address to **fundcontact@bnpparibas.com**.

Due to internal issues, we have to monitor these operations as close as possible.

Thanks in advance for your support,

Regards,

**Jerome LAGAYE**
MO-FUND - MO Hedge & Mutual Funds
BNP Paribas Arbitrage
20 bd des Italiens
75009 PARIS
tel : +33 (0) 1 55 77 65 57
fax : +33 (0) 1 40 14 31 80

=