# EXHIBIT 1

Exhibit 58

# FairfieldGreenwichGroup

**Fairfield Sentry Limited**

**Due Diligence Questionnaire**

October 2007

This document does not constitute an offer to sell, or the solicitation of an offer to buy interests in the Fund. Such an offer or solicitation may only be made by delivery of the Fund's confidential offering memorandum, a copy of which is available from the Investment Manager. An investment in the Fund is highly speculative and entails substantial risk of loss. There can be no assurance that the Fund's investment objectives will be achieved. Past performance is no guarantee of future results.

Please contact FGG for additional information about its funds, including information about investor qualification standards, by visiting our website at www.fggus.com or e-mailing us at main@fggus.com.

FAIRFIELD SENTRY LIMITED

## BACKGROUND INFORMATION

Contact Information:

| Company name: | Fairfield Greenwich Group |
|---|---|
| Address: | 55 East 52nd Street 33rd Floor, New York, NY 10055 |
| Telephone: | 1-(212) 319-6060 |
| Fax: | 1-(212) 319-0450 |
| E-mail: | mami@fggus.com |
| Name of contacts: | Mami Hidaka |
| Title of contacts: | Managing Director |
| Telephone of contacts: | 1 (212) 319-6060 |
| E-mail of contacts: | mami@fggus.com |
| Internet/website: | www.fggus.com |

Company:

| Give a brief history of the company: | In 1983, Walter M. Noel, Jr. established a consulting firm to advise offshore clients in connection with their investments in U.S. based alternative assets. Mr. Noel had previously completed stints in the management consulting business with Arthur D. Little & Co. and the international private banking business with Citibank and Chemical Bank. At Chemical, he created the international private banking group in 1977 and helped establish a network of asset management offices throughout the world, until his departure in 1983. Following the establishment of his consulting business, Mr. Noel developed a number of relationships with investment managers, e.g. Martin Zweig, Tweedy, Brown & Co., Morgans, Waterfalls & Vintiadis, who he determined had the capital preservation, low volatility characteristics appropriate for his client base. In 1987, Fred Kolber and Jeffrey Tucker, tenants in Mr. Noel's office space, launched the Greenwich Options Fund ("GOF"), a domestic hedge fund. Mr. Kolber had built a successful business during the prior 25 years managing his own money in a variety of hedge and arbitrage strategies. GOF marked Mr. Kolber's entry into the money management business as he sought to extend to passive investors the opportunity to participate in his trading activities, then focused on market-making in equity and equity index options using a market neutral posture in most positions. Mr. Tucker had previously been engaged in the practice of law for 17 years, and Mr. Kolber was a client of his firm. In 1987, Tucker joined Kolber as a minority partner of the fund management business, providing assistance in the administration and marketing of GOF. In 1988, Messrs. Noel, Kolber and Tucker created Fairfield Investment Fund, Ltd. ("FIL"), an offshore counterpart of GOF. The precipitous growth of assets in the funds and the changes being experienced in the equity options markets, i.e. declining liquidity and the increasing influence of the professionals, necessitated a reduction of assets in GOF and FIL. Consequently, Noel, Kolber and Tucker sought and received a mandate from their clients to outsource the management of a portion of the funds. Thereafter, Noel and Tucker embarked upon an effort to identify managers meeting their capital preservation, low volatility approach to investing. Contemporaneous with this effort, they formed Fairfield Greenwich Group ("FGG"). In 1997, the firm was merged with Littlestone Associates of New York City. Following the merger, Littlestone's principal, Andres Piedrahita, established a London office for the UK subsidiary, and became the third partner in the Fairfield Greenwich Group, in addition to Walter Noel and Jeffrey Tucker. Today, FGG has: over 100 employees; offices in New York, London, Bermuda, representative offices in the U.S., Europe, Latin America, and Asia, and a joint venture in Singapore; client and firm assets under management of over USD $15 billion as of August 31, 2007. |
|---|---|

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728809

FAIRFIELD SENTRY LIMITED

| Type of company/entity: | "Fairfield Greenwich Group" is the marketing name for the securities and investment advisory businesses of Fairfield Greenwich Limited and its subsidiaries worldwide. In the United States, securities are offered through Fairfield Heathcliff Capital LLC, a broker-dealer and member NASD and SIPC. Investment advisory services are offered by Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd. In the EU, securities and investment advisory services are offered through Fairfield Greenwich (UK) Limited, which is authorized and regulated by the Financial Services Authority (FSA). In Singapore, securities and investment advisory services are offered through Lion Fairfield Capital Management Ltd., which holds a capital markets services license issued by the Monetary Authority of Singapore under the provisions of the Securities and Futures Act (Cap 289). Other FGG member companies include Fairfield Greenwich Realty Partners LLC and FGG Lugano SA. |
|---|---|

| Subsidiaries, branch offices or other locations, if any: | Bermuda<br>12 Church Street<br>Suite 606<br>Hamilton HM 11<br>Bermuda<br>(441) 292-5401<br>F: (441) 292-5413<br><br>Greenwich<br>2 Soundview Drive<br>Greenwich, CT 06830<br>United States<br>(203) 629-8494<br>F: (203) 629-1395<br><br>New York<br>55 East 52nd Street, 33rd Floor<br>New York, NY 10055<br>(212) 319-6060<br>F: (212) 319 0450<br><br>London<br>Pollen House<br>10-12 Cork Street<br>London W1S 3NP<br>United Kingdom<br>(44 207) 534-9244<br>F: (44 207) 534-9245<br><br>Lugano<br>CH-6900 Via Maderno 6<br>H-6900 Lugano<br>Switzerland<br>(41 91) 912-1069<br>F: (41 91) 912-1066 | Madrid (Representative Office)<br>Fairfield Greenwich (UK) Ltd. Branch Office<br>c/ Serrano, 26 - 8° Izda.<br>28001 Madrid Spain<br>(34 91) 577-5751<br>F: (34 91) 575-9231<br><br>Miami<br>1001 Brickell Bay Drive<br>Suite 2406<br>Miami, FL 33131<br>United States<br>(786) 425-2511<br>F: (786) 425-2428<br><br>Rotterdam (Representative Office)<br>Westplein 5<br>3016 BM. Rotterdam<br>The Netherlands<br>(31 10) 436-3634<br>F: (31 10) 436-0095<br><br>Singapore (Joint Venture)<br>Lion Fairfield Capital Management Limited<br>18 Cross Street #09-03A<br>Marsh & McLennan Centre<br>Singapore 048423 |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE00072881C

FAIRFIELD SENTRY LIMITED

| Which regulatory authority is the company registered with?<br>• Name(s) of regulatory bodies:<br>• Date of registration:<br>• Registration number:<br>• Scope of registered activities: | SEC, FSA, CFTC, NFA, NASD, MAS<br><br>FAIRFIELD GREENWICH (UK) LIMITED ("FGUK") IS LICENSED BY THE FINANCIAL<br>SERVICES AUTHORITY (FSA). FGUK WAS AUTHORIZED AND REGULATED FROM OCTOBER<br>1998 UNDER IMRO, INVESTMENT MANAGEMENT REGULATORY ORGANIZATION, WHICH<br>WAS MERGED IN DECEMBER 2001 INTO THE FINANCIAL SERVICES AUTHORITY. (FSA)<br>FAIRFIELD HEATHCLIFF CAPITAL LLC ("FHC"), A WHOLLY OWNED SUBSIDIARY OF FGL, IS<br>REGISTERED WITH THE SEC AS A BROKER-DEALER AND IS A MEMBER OF THE NASD<br>(APRIL 2001).<br>FAIRFIELD GREENWICH LIMITED ("FGL") IS REGISTERED WITH THE CFTC AS A COMMODDITY<br>POOL OPERATOR<br>FAIRFIELD GREENWICH ADVISORS LLC REGISTERED WITH THE SEC AS AN INVESTMENT<br>ADVISER IN 2004.<br>FAIRFIELD GREENWICH (BERMUDA) LTD. REGISTERED WITH THE SEC AS AN INVESTMENT<br>ADVISOR IN 2006. |

| Date of the most recent regulatory inspection if any: | The NASD conducted a routine exam of the Company's affiliate during the Summer of 2006. |

| Total assets under management by the company across its different categories of client including the fund: | Fairfield Greenwich Group Total Assets: $15 billion as of 8.31.07<br>Fairfield Greenwich (Bermuda) Ltd. Assets: $7 billion as of 8.31.07 |

Organization:

| Describe the group ownership structure: | Approximately 60% of the partnership is controlled by three shareholders while 14 shareholders control the rest of the shares. |

| How many full-time employees are there? | 114 full-time individuals.<br>There are 17 partners among the 110 employees. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728811

FAIRFIELD SENTRY LIMITED

| Provide a short background of principals (education, career background, etc.): | **Walter Noel**, a **Founding Partner** of FGG in 1983, continues with his long-time partners, Jeffrey Tucker and Andres Piedrahita, to oversee all of the firm's activities. He is a Non-Executive Director of FGG's Executive Committee, a co-founder of Fairfield Greenwich Limited, serves as a Director for many FGG funds and management company entities, and has focused on marketing and the client side of the business. Prior to FGG, he was a Senior Vice President for seven years at Chemical Bank where he headed the International Private Banking Department. He worked as a Vice President in a similar area at Citibank from 1974 to 1977. He began his international private banking career as President from 1972 to 1974 of Bahag Banking, Lausanne, Switzerland. Earlier, for twelve years, Mr. Noel was a consultant in the Management Services Division of Arthur D. Little, Inc. He received a Bachelor of Arts degree from Vanderbilt University in 1952, a Master of Arts in Economics from the Harvard Graduate School in 1953, and an LL.B from the Harvard Law School in 1959. He is based in the Greenwich office.

**Jeffrey Tucker** is a **Founding Partner** of FGG and is a Non-Executive Director of FGG's Executive Committee, directing the firm's business and operations activity. He is a co-founder of Fairfield Greenwich Limited and also serves as a Director for many FGG funds and management company entities. Prior to FGG, he was a General Partner of Fred Kolber & Co. L.P. ("FKC"), a broker-dealer that merged with FGG in 1989, where he helped develop an options trading fund. From 1978 to 1987, he was a Partner in the law firm of Tucker, Globerman & Feinsand P.C., where he specialized in advising on direct participation offerings and limited partnership interests. Mr. Tucker began his career in the Securities and Exchange Commission's Division of Enforcement in 1970 and became Assistant Regional Administrator of the New York Regional Office in 1975. Mr. Tucker received his Bachelor of Arts degree from Syracuse University in 1966 and his Juris Doctor degree from Brooklyn Law School in 1969. He is based in the New York office.

**Andrés Piedrahita** is a **Founding Partner** of FGG with over 23 years experience in the investment business. He is also a member of FGG's Executive Committee, and serves as a Director for many FGG funds and management company entities. He founded Littlestone Associates in 1991 where he was owner and CEO. In 1997 Littlestone merged with Fairfield Greenwich Group, where Mr. Piedrahita has remained. He is currently responsible for FGG's European and Latin American activities and is based in London and Madrid. Prior to Littlestone, Mr. Piedrahita worked as a Financial Consultant at Prudential Bache Securities Inc. (1981 to 1987). He was then Vice President of Shearson Lehman Hutton from 1987 to 1990. Mr. Piedrahita received his Bachelor's Degree from the Boston University School of Communications.

**Richard Landsberger, Director of Fairfield Greenwich (UK) Ltd., Partner**, is responsible for business development and general management issues in Europe and Asia and directly markets products to a global institutional client base. He is also a member of FGG's Executive Committee and a Director of Lion Fairfield Capital Management Ltd., the Singapore-based joint venture of FGG and Straits Lion Asset Management Limited. He has over 20 years of experience in capital markets. Prior to joining FGG in 2001, Mr. Landsberger was Managing Director of Fixed Income Sales at PaineWebber (1993 to 2000). He was previously Managing Director and Head of Fixed Income Government Trading & Sales at Citicorp Securities (1989 to 1992). Mr. Landsberger received his Bachelor of Arts degree from Boston University and his Master of Business Administration Degree from Cornell University. He is based in the London office.

**Daniel Lipton, Partner**, serves as **FGG's Chief Financial Officer**; he also assists in managing FGG's operations. He joined FGG in 2002 after nine years at Ernst & Young, where he was a Senior Manager in the Financial Services Assurance and Advisory Business Services Department, in charge of auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds. Mr. Lipton has also taught seminars on financial products and hedge funds. He received his Bachelor of Arts degree in Economics from Tufts University and his Master of Business Administration dual degrees in Accounting and Finance from New York University's Stern School of Business; he is also a Certified Public Accountant.

**Mark McKeefry, Partner**, is **General Counsel** for FGG. He is also a member of FGG's Executive Committee and a Director of Lion Fairfield Capital Management Ltd., the Singapore-based joint venture of FGG and Straits Lion Asset Management Limited. He joined FGG in 2003, after eight years in private practice in New York and California, where he advised broker-dealers and investment advisors on regulatory and compliance issues for onshore and offshore funds. He is the author of several articles on hedge fund compliance issues and investment advisor trading practices. Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional engineer, licensed by the State of California as a civil engineer. Mr. McKeefry is admitted to the bars of California and New York. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED                    FGGE000728812

**Maria Teresa Pulido Mendoza**, Partner, is FGG's Head of Global Sales. She has over 17 years of experience in private banking, investment banking, and management consulting. Prior to joining FGG in 2007, from 2003 to 2007, Ms. Pulido Mendoza was Managing Director and Global Market Manager at Citi Private Bank with management responsibilities for the Iberia and Northern European regions. Prior to Citi, from 2000 to 2003, she focused on developing the Global Wealth Management group for Deutsche Bank in Europe and managing the integration of Bankers Trust with Deutsche Bank. From 1996 to 2000, Ms. Pulido Mendoza managed the New York sales force and supported the business strategy for the U.S. business at Banker's Trust and later at Deutsche Bank. Before her experience in wealth management, she worked from 1994 to 1996 in investment banking at James D. Wolfensohn Inc. and in management consulting at McKinsey & Company from 1989 to 1994, working on various strategy and operational performance projects in the U.S. and in Venezuela. Ms. Pulido Mendoza received her M.B.A., Magna Cum Laude, from MIT Sloan School of Management in 1989 and her Bachelor of Arts in Economics, Cum-Laude, from Columbia University in 1988. She is a member of the Dean's Advisory Council of the MIT Sloan School of Management. Ms. Pulido Mendoza also has strong interests in philanthropic efforts and is a Board Member of the Mendoza Foundation in Venezuela. She is based in the Madrid office.

**Charles Murphy, Partner**, is a member of FGG's Executive Committee and is responsible for strategy and capital markets business for the firm. He has over 20 years of banking experience, most recently from 2005 to 2007 as co-Head of the European Financial Institutions Group at Credit Suisse. From 2001 to 2005 he was at Deutsche Bank as Head of European Financial Institutions. From 2000 to 2001, he was a founder and CFO of Artfactory, an Internet incubator. Mr. Murphy was with Morgan Stanley through the 1990's, having moved from New York to London in 1993, as Head of the European Financial Institutions Group until 2000. He started his career in 1985 as an Associate in Corporate Finance at Goldman Sachs in New York, joining their financial institutions group in 1987. Mr. Murphy has a JD degree from Harvard Law School (1985), an MBA from MIT's Sloan School (1984), and a BA from Columbia College (1981). He is based in the New York office.

**Andrew Smith, Partner**, is the **Portfolio Manager** and oversees all operations for Chester Global Strategy Fund, Irongate Global Strategy Fund, and Chester Horizons Fund for FGG. He is also a member of FGG's Executive Committee. He has over 15 years experience in finance, asset management, private equity, and real estate. Prior to joining FGG, Mr. Smith was a partner at Chester Investments (unaffiliated), a private investment firm/family office, where he was responsible for alternative investments including hedge funds, private equity, income-producing real estate, and real estate development in the U.S. and in Europe. Mr. Smith also was responsible for corporate strategy and business development. Prior to Chester, Mr. Smith worked in the private client group at CIBC World Markets. Mr. Smith coheaded a group responsible for advising high-net worth clients' portfolios within CIBC Oppenheimer. Prior to CIBC, Mr. Smith founded and built a private consumer services and real estate company to over 3,000 employees and $110 million in annual revenues. Prior to founding that company, Mr. Smith spent three years with Cantor Fitzgerald in New York as an Associate. Mr. Smith is a graduate of Dartmouth College.

**Philip Toub, Partner**, markets FGG's offshore funds and assists in the development of new products. He is also a member of FGG's Executive Committee. He is responsible for business development in Brazil and the Middle East. He has over 15 years of investment experience. Prior to joining FGG in 1997, Mr. Toub worked at Moore Capital (1995 to 1997) primarily on the Asian and European Trading desk. He previously worked at Goldman Sachs and Bear Stearns & Co. (1987 to 1989) on the brokerage side. Mr. Toub received his Bachelor of Arts degree from Middlebury College and is based in the New York office.

**Amit Vijayvergiya, Partner**, is **Chief Risk Officer** of Fairfield Greenwich (Bermuda) Ltd. and focuses on the Fairfield Sentry Fund and risk management for FGG. Mr. Vijayvergiya has over 13 years of experience in asset management, risk management, finance, and operations research. Prior to joining FGG, from 2000 to 2003 Mr. Vijayvergiya managed a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), and managed several multi-investor funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba, and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728813

**FAIRFIELD SENTRY LIMITED**

| Who are the key principals and how are the key-man issues addressed and managed? | The following Partners serve on FGG's Executive Committee: Andrés Piedrahita, Richard Landsberger, Mark McKeefry, Charles Murphy, Andrew Smith, Philip Toub. Fairfield Sentry Limited's investment strategy is not dependent on any one individual or group of individuals at FGG. |
|---|---|

| What has been the turnover rate among the company's personnel? | |
|---|---|

| SUMMARY TOTALS* | New Hires | Departures | Total Personnel | Turnover Rate |
|---|---|---|---|---|
| 2007 | 12 | 2 | 114 | 4.0% |
| 2006 | 27 | 11 | 94 | 11.7% |
| 2005 | 16 | 4 | 78 | 5.1% |
| 2004 | 17 | 5 | 66 | 7.6% |
| 2003 | 16 | 5 | 54 | 9.3% |
| 2002 | 15 | 5 | 43 | 11.6% |
| 2001 | 12 | 3 | 33 | 9.1% |
| 2000 | | | 24 | |
| | | | Avg. Rate: | 8.3% |

* 2000-2006 year end; 2007 annualized

Table data as of Oct. 1, 2007.

| Provide details of the appointed legal counsel and auditors? | **Legal Adviser**<br>Schulte, Roth and Zabel<br>919 Third Avenue<br>New York, NY 10022<br>(212) 756-2000 (Phone)<br>(212) 593-5955 (Fax)<br>wwwmail@srz.com<br>www.srz.com<br><br>**Auditors**<br>Rothstein Kass<br>1350 Ave. of the Americas, New York, NY 10019<br>212.997.0500<br>www.rkco.com<br><br>BDO Seidman/BDO Stoy Hayward LLP<br>8 Baker Street<br>London<br>W1U 3LL<br>United Kingdom<br>44 0870 567 5678<br>http://www.bdo.co.uk |
|---|---|

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728814

FAIRFIELD SENTRY LIMITED

| | |
|---|---|
| Are there or have there in the last 10 years, been any criminal, civil, regulatory or administrative proceedings against (i) the Investment Manager or any of its principals or (ii) the Investment Product or any of its directors any similar such matters including reparations, arbitrations and negotiated settlements? If so, please provide details: | No. |

Compliance:

| | |
|---|---|
| Who is responsible for compliance in the company? | Anthony Dell'Arena (Chief Compliance Officer) and the FGG Compliance Committee |

| | |
|---|---|
| Does a dedicated compliance team exist? Does the company maintain a written compliance manual? If yes, please provide details: | Yes. The CCO works on a daily basis with a full-time New York based Compliance Analyst, as well as a Paralegal who devotes some of his time to the Compliance effort. Further, the Company retains a part-time Compliance Consultant in its London office. Yes. The Company does maintain Compliance manuals, each drafted specifically to the needs of its various legal entities. |

| | |
|---|---|
| When was the manual last updated? | January 2007. |

| | |
|---|---|
| Describe any current or potential conflict of interest or any relationships which may affect its trading, trading flexibility: | Potential conflicts of interests are disclosed in Form ADV Part II of Fairfield Greenwich Advisors and FG Bermuda LTD which are available upon request and in the Private Placement Memoranda of various FGG funds. |

| | |
|---|---|
| What are the company's employees' own account dealing procedures? | With very few exceptions (e.g., certain clerical personnel) all employees of the Company must disclose brokerage accounts held at third-party broker dealers. The Company then makes arrangements with those broker-dealers to receive copies of all confirms and statements generated by those accounts. Certain individuals must receive pre-clearance from the Compliance department before they can make a trade, while the others are subject to post-trade review. |

| | |
|---|---|
| Does the company have regular compliance monitoring programs? | Yes. Besides monitoring personal trading, the Compliance department monitors email, sales literature, outside business activities, gifts, advertising, registration, and certain third-party service providers. |

| | |
|---|---|
| Has the firm ever settled any insurance claim? | No |

| | |
|---|---|
| Has the company or its principals ever been the subject of any action or warnings from a regulatory body? | No |

| | |
|---|---|
| Has any application to a regulatory body on behalf of the company ever been withdrawn? If so, please give details: | No. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728815

FAIRFIELD SENTRY LIMITED

Anti-Money Laundering:

| | |
|---|---|
| Confirm that the company has established Anti-money Laundering (AML) procedures: | The Company has AML/KYC procedures in place. |

| | |
|---|---|
| Advise which jurisdiction's regulations you comply with: | The Company's procedures can reasonably be expected to detect and cause the reporting of transactions required under 31 U.S.C. 5318(g) and the implementing regulations there under. |

| | |
|---|---|
| Who is the AML officer? | The CCO. |

| | |
|---|---|
| Elaborate on the procedure to ensure compliance with AML policies including details of any training provided to employees: | The Company's procedures contain a customer identification program and the Company treats as "customers" investors who purchase interests in funds for which the Company serves as a placement agent. The United States funds for which the Company serves as placement agent are offered pursuant to Regulation D. The Company offers these interests only to investors with whom the Company has a prior existing relationship sufficient to take the Company's activities out of the general solicitation prohibition of Regulation D. Nevertheless, as part of the subscription procedures, the Company, on behalf of the fund, requires investors to submit copies of government-issued identification documents. In the case of the U.S. funds, their respective administrator, the Citco Group ("CGL"), has assumed anti-money laundering compliance vis-à-vis the funds. With regard to the offshore funds for which the Company serves as placement agent, CGL has also assumed anti-money laundering compliance responsibility. The Company is the beneficiary of an agreement between CGL and the Company pursuant to which the Company may rely on CGL's assumption of anti-money laundering compliance responsibility with regard to the funds for which it serves as administrator. The Company makes visits to CGL on short notice in order to perform ongoing monitoring of CGL's work. With regard to the training of employees, the Company conducts its own in-house training program with respect to anti-money laundering, which includes training to identify red flags indicating suspicious activity. The Company also utilizes the on-line anti-money laundering training program provided by the NASD and requires all of its employees to complete this module. |

| | |
|---|---|
| Provide a summary of your AML procedures. | The Company's procedures contain a customer identification program and the Company treats as "customers" investors who purchase interests in funds for which the Company serves as a placement agent. The United States funds for which the Company serves as placement agent are offered pursuant to Regulation D. The Company offers these interests only to investors with whom the Company has a prior existing relationship sufficient to take the Company's activities out of the general solicitation prohibition of Regulation D. Nevertheless, as part of the subscription procedures, the Company, on behalf of the fund, requires investors to submit copies of government-issued identification documents. In the case of the U.S. funds, their respective administrator, the Citco Group ("CGL"), has assumed anti-money laundering compliance vis-à-vis the funds. With regard to the offshore funds for which the Company serves as placement agent, CGL has also assumed anti-money laundering compliance responsibility. The Company is the beneficiary of an agreement between CGL and the Company pursuant to which the Company may rely on CGL's assumption of anti-money laundering compliance responsibility with regard to the funds for which it serves as administrator. The Company makes visits to CGL on short notice in order to perform ongoing monitoring of CGL's work. With regard to the training of employees, the Company conducts its own in-house training program with respect to anti-money laundering, which includes training to identify red flags indicating suspicious activity. The Company also utilizes the on-line anti-money laundering training program provided by the NASD and requires all of its employees to complete this module. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728816

**FAIRFIELD SENTRY LIMITED**

Insurance:

| Do you currently hold insurance for the following:<br><br>• **Directors' & Officers' Liability?**<br> a) For the funds<br> b) For the management companies<br>• **Professional Indemnity or Errors and Omissions?**<br>• **Crime (Employee fidelity/third party fraud)?**<br>• **Key Person Insurance?**<br><br>*N.B.: if you are not restricted from disclosing such information under your policy(ies)* | Fairfield Greenwich Limited carries a USD 25 million umbrella investment advisor policy, which includes directors and officers liability insurance, fidelity insurance, employee fraud and theft coverage, among other coverages. |
|---|---|

Business Continuity:

| Does the company have a formal business continuity management plan? | Fairfield Greenwich Group (FGG) is increasingly depends on business functions, computer-supported information processing and telecommunications to conduct its daily business with its customers.  This increasing dependency poses the risk that a lengthy loss of these capabilities could seriously affect the overall daily operations of FGG.<br><br>To address this Risk FGG has prepared a comprehensive Business Continuity Plan.  These plans follow the AIMA guidelines and cover the recommended key topics;  Identification of risk, Identification of systems, processes and the other information that make up the enterprise, Definition of recovery requirements, Development of recovery plans, Testing and providing the plans to ensure they work, Maintenance and updating of the plan.<br><br>Having a comprehensive business continuity plan in place will reduce the potential impact to FGG and our Clients.  FGG's Business Continuity Plan is designed to reduce the risk to an acceptable level by ensuring the restoration of Critical Business Functions within 1 hour, and all Essential Business Functions within two days of the outage.<br><br>The Plan identifies the critical functions of FGG and the resources required to support them. The Plan provides guidelines for ensuring that needed personnel and resources are available for both disaster preparation and response and that the proper steps will be carried out to permit the timely restoration of services.<br><br>The Business Continuity Plan specifies the responsibilities of the Business Continuity Management Team, whose mission is to establish procedures to ensure the continuity of FGG's business functions.<br><br>In the event of a disaster affecting any of the functional areas, the Business Continuity Management Team serves as liaison between the functional area(s) affected and other departments providing major services. These services include the support provided by the Finance Group, Information Technology, Sales Administration, and Customer Relations. |
|---|---|

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED                    FGGE000728817

**FAIRFIELD SENTRY LIMITED**

| | |
|---|---|
| What contingency plans do you have in terms of:<br>• Computer system fault?<br>• Incapacitated investment decision makers?<br>• Technical failure at prime broker's location?<br>• Presence of in-house computer technician?<br>• Back-up systems?<br>• Viral outbreaks? | FGG has a formal disaster recovery and business continuity plan that meets the requirements of NASD Rule 3500. All employees are able to access the FGG network from any place where they have an Internet connection (including dial-up) and key New York office personnel are able to work from the Greenwich, Connecticut office. FGG employs a full-time Chief Technology Officer and five full-time computer technologists in support roles. FGG's computer systems and all critical data are replicated and backed up to its live data storage site London on a daily basis, and the entire system is regularly tested. FGG relies on the various back-up capabilities of the prime brokers from which it receives data feeds. Investment decisions are made by FGG's Investment Committee, thus mitigating the risk of any single decision maker being incapacitated. |

| | |
|---|---|
| How often are computer systems backed up? Are backup tapes maintained off-site? | All fund accounting and agent payment systems are housed at Citco Fund Services, which has its own extensive disaster recovery procedures audited by PricewaterhouseCoopers. For internal systems, FGG has a data centre located in New York and a back-up data centre in London. Data is replicated between the two sites at no greater than 15 minute intervals. Additionally, FGG deploys backup systems at both locations. Data is stored monthly at Iron Mountain Inc. All e-mail is archived as received according to SEC Rule 17a. All remote sites connect directly into one of the two FGG data centres. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728818

## INVESTMENT MANAGER INFORMATION:

Contact Information:

| Company name: | Fairfield Greenwich (Bermuda) Ltd. – FGBL (a member company of the Fairfield Greenwich Group ("FGG")) |
|---|---|
| Mailing Address: | 12 Church Street, Suite 606, Hamilton, Bermuda HM 11 |
| Telephone: | 1-(441) 292-5401 |
| Fax: | 1-(441) 292-5413 |
| E-mail: | main@fggbm.com |
| Name of contacts: | Gordon McKenzie, CPA; Disha Attavar |
| Title of contacts: | Director, Controller –FGBL (Bermuda); Analyst |
| Telephone of contacts: | 1 (441) 292-5401 |
| E-mail of contacts: | gordon@fggbm.com ; dattavar@fggbm.com |
| Internet/website: | www.fggbm.com |

Company:

| Who is responsible for managing the portfolio and how are decisions made (unanimous, majority, individual)? | Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), a member company of the Fairfield Greenwich Group, is the Investment Manager of Fairfield Sentry Limited. FGBL has established limited-discretionary accounts for Fairfield Sentry Limited with Bernard L. Madoff Investment Securities LLC ("BLM"). The split strike conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC, a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Fund at that firm. |
|---|---|
| | These accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices.  Subject to the guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. |
| | Furthermore, FGBL is responsible for reviewing and approving the parameters and operating guidelines of the SSC strategy, conducting investment oversight, evaluating market risk and monitoring investment compliance to the guidelines. |

| Date and place of incorporation and registered number: | The Company was incorporated on June 13, 2003 in Bermuda.  The registration number is 33278. |
|---|---|

| Domicile: | The Company is domiciled in Bermuda. |
|---|---|

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE000728819

FAIRFIELD SENTRY LIMITED

## FUND INFORMATION:

| List share classes and denominations of each share class | Fairfield Sentry Limited - USD<br>Fairfield Sigma Limited – EUR<br>Fairfield Lambda Limited – CHF |
|---|---|

| Date of inception: | December 1990. |
|---|---|

| Is the fund regulated? If so, please provide details (including where and by who) and explain any requirements for regulation: | The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized as a "professional fund" under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI"), which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund. As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act. |
|---|---|

| Describe the fund's ownership structure? | Because the Fund is a professional fund under the BVI Act, whose shares are listed on the Irish Stock Exchange, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and the Irish Stock Exchange, and on the basis that the initial investment in the Fund by each of its shareholders is not less than $100,000. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund (in this case, investment instruments), or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000, or, if an institution, $5,000,000 or its equivalent in any other currency, and that he consents to being treated as a professional investor. In addition, in order to comply with rules of the Irish Stock Exchange, an investor will have to represent that he has knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in the Fund, that he is aware of such risks and can bear the loss of the entire investment. |
|---|---|

| Is the fund listed on any exchange(s)? | Irish Stock Exchange<br>www.ise.ie |
|---|---|

Fees:

| Management fee: | 1% |
|---|---|

| Incentive fee (or performance allocation, preferential dividend, etc.): | Performance Fee: 20% |
|---|---|

| Hurdle rate/high water mark: | None/Yes |
|---|---|

| When does a client pay management fees and performance fees? | Management and performance fees are paid on a quarterly basis. |
|---|---|

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE00072882C

FAIRFIELD SENTRY LIMITED

| Are your fees calculated and charged in terms of equalisation structure by:<br><br>• Issuing a different series of shares every time shareholders subscribe?<br>• The Equalisation Share method?<br>• The Equalisation and Depreciation Deposit method?<br>• The Equalisation-Adjustment method?<br>• Others? (Please describe): | No equalization for Fairfield Sentry. Manager only receives fees above a High Water Mark for the fund. Shareholders would receive "free rides" if they came in during a time of a negative performance. The Fund does not use the equalization or series method for accounting purposes. |
|---|---|

| Redemption fee: | None |
|---|---|

| Disclose any soft dollar/soft commission agreement(s): | None. |
|---|---|

Investment/Redemption/Lock-up:

| Minimum initial investment: | $100,000 |
|---|---|

| Minimum subsequent investment: | Amounts of not less than U.S. $50,000. |
|---|---|

| Subscription frequency (when): | Monthly |
|---|---|

| Redemption frequency (when): | Monthly |
|---|---|

| Redemption notice period: | 15 calendar days notice |
|---|---|

| Redemption cash proceeds time period: | Redemptions are usually paid within 48 hours of the finalization of the NAV by Citco (which normally occurs by the 10th business day of each month). |
|---|---|

| Does the fund have any lock-up period or any other liquidity constraints (e.g. suspension of redemptions and gates)? | There are no lock ups. However, the domestic funds may in the future adopt a lock-up policy. |
|---|---|

| Is there a "gate" and how is that computed (on an aggregate basis or investor by investor basis) and how is the amount in excess of the gate treated? | None. |
|---|---|

| After a shareholder has given the fund administrator the minimum required notice for redemption, please state the maximum number of days it will take to receive the redemption proceeds, including all possible restrictions (e.g. gate provisions etc). | Payment on redemptions will be made within 30 days after the redemption date. |
|---|---|

1/10/2008

14

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728821

**FAIRFIELD SENTRY LIMITED**

Fund Directors/Board:

| How often does the board meet? | The board meets at least annually. |
|---|---|

| Please provide roles and responsibilities of the Directors. | The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. |
|---|---|

| List the number of directors, their names, directors' fees paid: | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. They are paid $25,000 per annum plus expenses for their services. |
|---|---|

Fund Administrators:

| Details:<br>• Name:<br>• Address:<br><br><br><br><br>• Telephone:<br>• Fax:<br>• E-mail:<br>• Name of contact:<br>• Telephone of contact:<br>• E-mail of contact: | CITCO FUND SERVICES (EUROPE) B.V.<br>TELESTONE 8 – TELEPORT<br>NARITAWEG 165<br>1043 BW AMSTERDAM<br>P.O. BOX 7241  1007 JE AMSTERDAM<br>THE NETHERLANDS<br><br>TELEPHONE: (31-20) 572-2100<br>FACSIMILE:  (31-20) 675-0881<br><br>CITCO (CANADA) INC.<br>2 BLOOR STREET EAST, SUITE 2700<br>TORONTO, ON M4W 1A8<br>CANADA<br>SUTHA FERGUSON<br>SENIOR ACCOUNT MANAGER<br>SUTHA FERGUSON<br>SENIOR ACCOUNT MANAGER<br>SSUBRAMANIAM@CITCO.COM<br>P: 416-969-3631<br>F: 416-288-3278 |
|---|---|

| Has the administrator been changed within the past 3 years? If so, why and please give name of previous provider? | Citco (Europe) contracted sub-administration from Amsterdam to Toronto as a business decision for Citco in Q1 2006. We therefore transferred administration with Citco (Europe) to Citco Toronto. Since the books and records are now in Toronto we switched the location of the audit from the Netherlands to Toronto, but maintained the auditors as PwC. |
|---|---|

Fund Pricing:

| Where assets are valued in-house, please provide a summary of the controls in place to ensure accuracy. | Citco serves as the Fund's Administrator and independently calculates the final monthly NAV of the Fund.  The assets of the SSC Strategy are invested in liquid instruments. S&P 100 stocks make up over 95% of the portfolio. The portfolio is priced daily by the broker and the Investment Manager (FGBL).  The Finance Group of the Investment Manager also calculates weekly estimated NAVs for the Fund. The NAV is also reviewed and verified each month by the Finance Group at FGBL. |
|---|---|

| Who is responsible for obtaining valuations and how are any difficult-to-price assets or instruments priced? | The investments of the SSC strategy are very liquid and can be readily priced.<br>Citco has a pricing unit that prices all securities independently.  They utilize three pricing sources: Reuters, Bloomberg, and IDC.  These prices are reconciled with the broker and investment manager and verified by the finance group at FGBL. |
|---|---|

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728822

**FAIRFIELD SENTRY LIMITED**

| Does the fund hold investments in which the underlying market has limited liquidity? | More than 95% of the Fund's assets are invested in extremely liquid instruments. Seedling managers may invest in illiquid securities. |
|---|---|

Prime Broker:

| Who is the prime broker? | Bernard L. Madoff Investment Securities LLC, a broker-dealer registered with the Securities and Exchange Commission and regulated by the NASD, acts as the executing broker for at least 95% of the Fund's assets that are invested in the split-strike conversion ("SSC") strategy.  Each non-SSC manager may select their own prime broker. |
|---|---|
| Are the assets held in the name of the fund? If not, please explain: | Yes. |
| Do you use multiple prime brokers? If so, please give details: | The small portion of the Fund's assets that are not invested in the SSC strategy will use other prime brokers. |
| How is cash held at the prime broker? | The proceeds from the liquidation of the SSC positions are immediately invested in US Treasuries. |
| Does the company or any affiliate ever take "custody" of client assets? | Citco Global Custody serves as the custodian of the Fund. Pursuant to a sub-agreement, BLM serves as a sub-custodian of the assets of the SSC strategy. |
| Have ongoing due diligence visits been conducted? If so, by whom and of what frequency? | Yes, regular on-site visits are conducted by a number of senior members of FGG's legal, operations, and risk teams. PWC, the Fund's Auditor, has also conducted periodic on-site checks. |

Custodian:

| Who is the custodian? | Citco Bank Nederland N.V. Dublin Branch<br>Custom House Plaza Block 6<br>International Financial Services Centre<br>Dublin 1<br>Ireland |
|---|---|
| How are sub-custodians treated?  Are you provided with notice when the custodian transfers assets to a sub-custodian? | Bernard L. Madoff Investment Securities LLC, a broker-dealer registered with the Securities and Exchange Commission is the Fund's primary sub-custodian.<br><br>Yes, we receive notice when the assets are transferred to the sub-custodian. |
| Have ongoing due diligence visits been conducted? If so, by whom and of what frequency? | The CFO has accompanied PwC's auditors on a bi-annual basis to review BLM's internal accounts for the Sentry fund. |

Auditor:

| Details:<br><br>• **Name:**<br>• **Address:**<br><br>• **Telephone:**<br>• **Fax:**<br>• **E-mail:** | PricewaterhouseCoopers<br>77 King Street, RT Tower<br>Toronto, Ontario<br>M5K 1G8<br>Canada |
|---|---|

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728823

**FAIRFIELD SENTRY LIMITED**

| | |
|---|---|
| Have ongoing due diligence visits been conducted? If so, by whom and of what frequency? | Yes. The last due diligence visit with PwC was March 7-8, 2007 by Dorothy Sanford, Partner PwC Toronto and Robin Taylor, Director, PwC Toronto. |

Legal Advisor:

| Details: | |
|---|---|
| • Name: <br> • Address: <br> • Telephone: <br> • Fax: | **U.S. COUNSEL TO THE FUND** <br> DLA Piper US LLP <br> 1251 Avenue of the Americas <br> New York, New York 10020 <br><br> **U.S. COUNSEL TO THE INVESTMENT MANAGER** <br> Schulte Roth & Zabel LLP <br> 919 Third Avenue <br> New York, NY 10022 <br> USA <br><br> Gardner Carton & Douglas LLP <br> 191 North Wacker Drive <br> Suite 3700 <br> Chicago, Illinois 60606-1698 <br> USA <br><br> **BRITISH VIRGIN ISLANDS COUNSEL TO THE FUND AND THE INVESTMENT MANAGER** <br> Conyers Dill & Pearman <br> Romasco Place, Wickhams Cay 1 <br> P.O. Box 3140 <br> Road Town, Tortola <br> British Virgin Islands |

| | |
|---|---|
| Has legal counsel been changed within the past 3 years? If so, why and please give name of previous provider? | Andy Goldstein, of DLA Piper US LLP, has been a legal adviser for over twenty years. <br><br> Conyers Dill and Pearman have been British Virgin Islands Counsel to the Fund and the Investment Manager since 2003. |

Fund Assets:

| | |
|---|---|
| List the size of the fund's net assets: | $7 billion as at August 31, 2007 |

| | |
|---|---|
| What was the historical peak of assets under management? | Current |

| | |
|---|---|
| What is the maximum capacity of your fund? | The Investment Manager believes that the Fund can continue to grow organically from current levels for the foreseeable future. |

| | |
|---|---|
| Will new money be accepted after capacity is reached? | Redemptions will be replaced with subscriptions either from current or new clients. |

| | |
|---|---|
| How will front/back-office operations be affected in the event of significant increase in assets under management, and what measures will be taken? | Back and mid-office operations are highly automated and have been built to be scalable. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED              FGGE000728824

**FAIRFIELD SENTRY LIMITED**

| | |
|---|---|
| What is the total amount invested by the principals/management in the fund and other investment vehicles managed pari passu with the fund? | In excess of 25mm by FGG principals/management. |

Investor Base:

| | |
|---|---|
| Please provide details of investor type. | Private Bank/Advisory 55%<br>Individuals 8%<br>FOF 18%<br>Pensions, Foundations, Endowments, Trusts 10%<br>Insurance 7%<br>Prop Accts 2% |

Investment Strategy:

| | |
|---|---|
| Describe your strategy (in as much detail as possible): | The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a non-traditional options trading strategy described as "split strike conversion," to which the Fund allocates the predominant portion of its assets. Set forth below is a description of the SSC Strategy ("SSC Investments").<br><br>The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of basket of equity securities. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of between 35 to 50 stocks in the S&P 100 Index.<br><br>The primary purpose of the long put options is to limit the market risk of the stock basket at the strike price of the long puts. The primary purpose of the short call options is to largely finance the cost of the put hedge and to increase the stand-still rate of return.<br><br>This position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.<br><br>The SSC Strategy is implemented by Bernard L. Madoff Investment Securities LLC ("BLM"), a broker-dealer registered with the Securities and Exchange Commission and regulated by the NASD, through accounts maintained by the Fund at that firm. The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices. Subject to the guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. The services of BLM and its personnel are essential to the continued operation of the Fund, and its profitability, if any.<br><br>The options transactions executed for the benefit of the Fund may be effected in the over-the-counter market or on a registered options exchange.<br><br>**Other Investments**<br>The Investment Manager, in its sole discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's net asset value, measured at the time of investment) to alternative investment opportunities other than its "split strike conversion" investments (the "Non-SSC Investments").<br><br>These Non-SSC investments may include investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million, measured at the time of investment. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. FGBL and the Fund generally share in fees received by Emerging Managers from investors other than the Fund. The Fund will pay fees with respect to the Emerging Managers at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by FGBL subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers). Non-SSC Investments may also include strategic allocations to experienced managers in established funds. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE000728825

**FAIRFIELD SENTRY LIMITED**

| | |
|---|---|
| List the instrument types you use by percentage: | Within the SSC strategy:<br>Stocks: 0%-99% of market value<br>Options: 0%-1% of market value<br>Treasuries: 0%-100% of market value |
| Do you carry out IPO or PIPE trading or hold illiquid securities on behalf of the fund? | We do not carry out IPO or PIPE trading or hold any illiquid securities in the 95% of the assets invested in the SSC strategy. |
| Do you believe that there are persistent structural inefficiencies in the area you invest in? | Yes |

| In which markets do you believe your strategy performs best/worst? (Give examples of time periods):<br><br>• Volatility:<br>• Trends:<br>• Range trading | **Best**<br>Volatility:    Normal range<br>Trends:    Positive trending market<br>Range:    Positive trending market | **Worst**<br>Very low or very erratic/high<br>Directionless; persistently downward market<br>Directionless; persistently downward market |
|---|---|---|

| | |
|---|---|
| How are investment ideas generated? | The SSC strategy's investment process is not driven by fundamental research, but rather utilizes a systematic approach to identify periods of positive momentum in large cap US equities. |
| To what extent is the portfolio construction dependent on computer models? | The split-strike conversion strategy relies on a series of algorithms and models that suggest opportune times to activate and de-activate the strategy. These models incorporate a vast amount of data which is used to assess the market conditions for US Equities. |
| Describe the external sub-advisors used with respect to the non-SSC investments. Describe how their performance and compliance with your investment guidelines are monitored. | The Fund may allocate up to 5% of the Fund's assets (measured at the time of investment) to Non-SSC investments. It is not anticipated that these investments would exceed $100 million per investment). These investments undergo an extensive due diligence process and, in the case of Emerging Managers, investment parameters are jointly developed with the Investment Manager. These parameters are closely monitored on an ongoing basis by the Risk Team at FGG. As a requirement of the investment, Emerging Managers must provide full daily position transparency. |
| What investment criteria must new positions meet? | For an activation of the SSC strategy to occur, there must be an expectation of near term positive movement in the valuation of large cap stocks. When a decision is made to implement the SSC strategy, the stock basket and put options are purchased concurrently. One is never purchased in isolation of the other. The purpose of the short call transaction is to largely finance the put hedge and to enhance the "stand still" rate of return of the overall strategy. The calls are normally sold at the same time as the stocks and puts are purchased. |
| How and when are existing positions in the portfolio closed out? | If at some time subsequent to an implementation of the SSC strategy, it was determined that little or no opportunity existed for further appreciation of the portfolio, the stock and options positions would be unwound and the proceeds would be invested in a laddered portfolio of short-dated U.S. Treasuries. Additionally, excess cash is invested in an overnight deposit account at Citco. A cash position would be maintained until the next entry opportunity was identified whereupon another implementation cycle would be implemented. |
| What is the average holding period? | The typical implementation cycle of the SSC strategy will range from two weeks to two months. |
| What is the minimum/maximum exposure to cash? Explain how cash is managed. | The SSC strategy can be invested up to 100% in cash when not invested in the split-strike conversions. This can be for a significant portion of time while the Fund protects capital during unfavourable market conditions. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE00072882€

FAIRFIELD SENTRY LIMITED

| What are your borrowing costs and what do you earn from your short rebate? | Not applicable to this strategy. |
|---|---|

Risk:

| How do you view risk and how is it controlled? | The portfolio has defined risk/reward parameters which can be ascertained at the time a position is constructed. The SSC strategy is executed under a set of strict operating guidelines which serves to limit the market risk at the strike price of the put options

The portfolio would not normally be subject to extreme market movements due to the nature of the near out-of-the-money options collar consisting of long protective put and short call options. Market risk is, however, measured and monitored both qualitatively and quantitatively using a number of in-house and third party risk tools. The Risk Team monitors the portfolio and performs checks to monitor the investment compliance to operating guidelines.

Market risk is monitored for FGG's single manager and multi-manager strategies, including all Emerging Managers included in the Non-SSC investments. FGG conducts extensive due diligence on Non-SSC investments prior to allocating capital; this includes a comprehensive review of investment, risk management and operational controls and processes. FGG receives full position level transparency from these managers and this is used in conducting ongoing risk oversight and investment compliance checks. Additionally, Non-SSC investments are typically subject to operating guidelines that provide a peak to trough drawdown limit of 10%. |
|---|---|
| Do you calculate VaR and Stress Test the portfolio? | FGG calculates VaR using a number of risk settings (Monte Carlo, 95% and 99% confidence intervals, 1-day and 1-month horizons, under various decay factors). In addition, to determine sensitivity of the portfolio to extreme market events, FGG applies a number of stress tests to the portfolio. These reports are calculated at several levels of aggregation in order to develop a comprehensive understanding of the sources of risk in the portfolio. Risk numbers are also tracked over time to determine a "risk profile" for each FGG manager and to evaluate risk results against realized returns. |
| Do you have risk limits for market risk? | Although the Fund is not subject to a specific VaR limit, the market risk of the portfolio is monitored over time using a number of risk measures. Conceptually, the market risk of the SCC strategy is defined by the distance between the cash value of the S&P 100 Index at the time the stock basket is constructed and the strike price of the long protective put options. Since the operating guidelines of the SSC strategy prescribe that the long put options approximately notionally protect the value of the stock basket at the time of implementation and that they are purchased near out of the money, it is expected that the downside market risk would be reasonably well contained. |
| How is the portfolio hedged? | The hedging of the portfolio of long-only stocks is created with an options collar. When a basket of stocks is purchased, a protective collar is always purchased, with the notional value of the long put options that approximates the market value of the underlying basket. The sale of out of the money call often largely finances the purchase of the protective put and enhances the "stand still" rate of return. |
| What is the range of permissible gross exposure to a single industry or sector? | The basket of stocks consists of U.S. equities represented on the S&P 100 index, and is constructed in such a manner to replicate the performance of the Index with minimal tracking error. |
| Is the portfolio beta neutral in each sector? | The portfolio does not aim to be beta neutral in each sector. |
| What is the allowable range of net market exposure for the portfolio? | Although no specific hard limit on net exposure has been set on the portion of the assets invested in the SSC strategy, net delta-adjusted exposure is typically less than 15% due to the purchase of protective S&P100 Index put options. Gross exposure of the SSC assets will range from 0% to about 100% as the SCC alternates between periods of activation and deactivation. However, the SSC strategy is not normally subject to extreme market movements due to the nature of the option coverage. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728827

**FAIRFIELD SENTRY LIMITED**

| Discuss your leverage exposure policy and its management over different market cycles | No balance sheet leverage is used on the portion of the Fund's assets invested in the SSC Strategy which comprise 95%+ of the Fund's assets. Leverage may, however, be employed in the Non-SSC investment to which the Fund may allocate up to 5% of its capital. The Non-SCC investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies. |
|---|---|
| What is the average volatility of the portfolio? | The standard deviation of the Fund from inception to date is under 3%. |
| What is the liquidity of the underlying assets and what is the appropriate time period to liquidate? | The SSC strategy trades in highly liquid, large cap stocks, all of which are members of the S&P 100 Index. These stocks are amongst the most liquid issues in US equity markets. We estimate that currently 100% of the assets of the SSC strategy can be liquidated with little to no price impact over four trading days. |
| Maximum drawdown? | In November 1994, the Fund incurred its largest drawdown of -0.64%. Recovery took 1 month. |
| How do you ensure there is no style drift? | The Investment Manager seeks to protect against style drift through strict risk management, risk limits and daily compliance monitoring. |

Use of Derivatives:

| Do you use derivatives to implement your investment strategy? | The use of options is an integral part of the SCC strategy and strict but simple guidelines dictate the use of these options. When the basket of stocks is purchased, out of the money put options must be purchased with a notional value that approximates the market value of the long stock basket. Out of the money calls are sold to largely finance the purchase of the puts and to increase the "stand still" rate of return of the portfolio. |
|---|---|
| | The SSC strategy is essentially a collaring strategy that is used to hedge the portfolio by overlaying the basket of stocks with long put options and short call options. The put options, funded in part with the proceeds of the sale of the calls and any dividend stream, protect the equity position from downside risk beyond the strike price of the puts. The dollar value underlying these option positions approximates the market value of the basket of stocks at the time of trade completion. |
| Do you use exchange traded instruments or OTC? | The SSC strategy employs S&P 100 stocks and either exchanged traded or OTC options. |
| How do you evaluate counterparties and how do you monitor counterparty risk? Do your counterparties have trading limits? | For the OTC options, there is a list of approved counterparties. Only well capitalized international banks are used as counterparties. |

Operations:

| Who among the Firm's employees can authorize the movement of cash into and out of the accounts at BLM? | The Investment Manager employs cash control procedures that require review and approval of two signatories from List A and List B: Amit Vijayvergiya, Andres Piedrahita, Jeffrey Tucker, Dan Lipton. This function is completely independent of reconciliation. |
|---|---|
| Are trades confirmed by your firm or by your prime broker? | With regard to the Fund, prime broker and executing broker are the same. Trades are confirmed back to the Investment Manager by the broker. All written confirms are reviewed manually. |
| What controls are in place to ensure that none of your funds or accounts are treated preferentially? | The Investment Manager does not currently offer investors separate account access to the SSC strategy. All of our investors therefore gain access to the strategy only via an investment in the Fund. |
| How often are portfolio holdings reconciled? | Portfolio holdings are reconciled daily. Proprietary software is used. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000728828

**FAIRFIELD SENTRY LIMITED**

| How often are accrued interest, dividends and short interest rebates reconciled? | Daily and weekly by the Investment Manager<br>Monthly by the Administrator |
|---|---|
| Are monthly broker statements reconciled with custodial records before monthly performance calculations are performed? | The Investment Manager and Administrator review and reconcile the monthly broker statements prior to the calculation of the official NAV by CITCO. |
| What mechanisms are in place to facilitate the availability of funds for redemptions? | Due largely to the liquidity of the portfolio, the Investment Manager is able to raise significant amounts of cash for redemptions. |

Marketing/Client Service/Reporting:

| How are the funds marketed? | Fairfield Greenwich Group has been marketing this Fund.  While the Fund may engage a placement agent to market the Fund, due to the limited capacity of this Fund, third party sales have become limited. |
|---|---|
| List all reports and correspondence that are sent routinely to clients? How often are they sent? | Weekly NAV Estimates (produced by Fairfield Greenwich (Bermuda) Ltd.)<br>Monthly NAV (provided by Citco)<br>Monthly aggregated risk reports (confidentiality agreement must be signed)<br>Monthly Tear Sheets<br>Monthly Strategy Review<br>Annual and semi-annual Report with audited financial statements<br>Semi-annual investor letter |
| What level of transparency is routinely offered to clients? | Aggregated risk transparency is provided to meet the clients' needs, with some restrictions determined on a case-by-case basis.  A confidentiality agreement must be signed first. |
| Additional services? | Additional analyses and periodic communications are sent to clients as required |

1/10/2008

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE00072882S