# EXHIBIT 2

**EXECUTION COPY**

**SHAREHOLDER AND VOTING AGREEMENT FOR**
**FAIRFIELD GREENWICH LIMITED,**
a company incorporated under the laws of
the Cayman Islands

EXECUTION COPY

# TABLE OF CONTENTS

Page

Article I.    Definitions.................................................................... 1
  1.1.    Defined Terms ................................................. 1
  1.2.    Cross Referenced Terms .................................... 7

Article II.    Formation.................................................................. 7
  2.1.    FGL....................................................................... 7
  2.2.    FGA...................................................................... 7

Article III.    Management of the Companies ............................... 8
  3.1.    Companies Management.................................... 8
  3.2.    Voting .............................................................. 8
  3.3.    Election and Action of Directors ..................... 8
  3.4.    Management Committee .................................... 8
  3.5.    Budgets. ............................................................ 8
  3.6.    Compensation ................................................... 9
  3.7.    Meetings............................................................ 9

Article IV.    Capital Contributions and Capital Accounts.......... 9
  4.1.    Capital Contributions and Interests................. 9
  4.2.    Rights to the Shares ......................................... 9
  4.3.    Capital Accounts............................................... 10
  4.4.    Interest on Capital Account ............................. 12

Article V.    Allocations and Distributions; Accounting and Reports ..................... 12
  5.1.    Distributions of Net Cash Flow ....................... 12
  5.2.    Distributions of Net Capital Event Proceeds ..... 12
  5.3.    Allocation of Profits and Losses Generally ..... 13
  5.4.    Allocation of Profits or Losses arising from a Capital Event ..... 14
  5.5.    Tax and Regulatory Allocations and Requirements ..... 15
  5.6.    Distributions....................................................... 19
  5.7.    Limitation upon Distributions........................... 19
  5.8.    Accounting Principles ....................................... 19
  5.9.    Accounting Period ............................................. 19
  5.10.    Records and Reports ......................................... 19
  5.11.    Financial Statements and Other Document Deliveries ..... 20
  5.12.    Returns and Other Elections ............................. 20
  5.13.    Tax Matters Partner........................................... 21
  5.14.    Examples............................................................ 21

# TABLE OF CONTENTS
## (continued)

Page

Article VI.     Transferability ............................................................................. 21
6.1.            Transferability ............................................................................. 21
6.2.            Death or Disability of a Shareholder ......................................... 21

Article VII.    Issuance of Class N Shares and Bonus Pool Grants .................... 22
7.1.            Issuance of Class N Shares ......................................................... 22
7.2.            Tranche 2 Issuances .................................................................... 22
7.3.            Tranche 3 Issuances .................................................................... 23
7.4.            Service Agreement ...................................................................... 23
7.5.            Profits Interests .......................................................................... 23
7.6.            Bonus Pool Grants ...................................................................... 23
7.7.            Class N Representation ............................................................... 24
7.8.            Criteria for Issuance ................................................................... 24
7.9.            Subsequent Issuances of Class N Shares ................................... 24
7.10.           Information ................................................................................. 25

Article VIII.   Termination, Cancellation and Earnout ...................................... 25
8.1.            Termination and Distributions .................................................... 25
8.2.            Termination within One Year ..................................................... 26
8.3.            Termination for Cause ................................................................ 26
8.4.            Capital Event .............................................................................. 27
8.5.            Tax Treatment ............................................................................. 27
8.6.            Non Competition ........................................................................ 27
8.7.            Deferred Fees ............................................................................. 29

Article IX.     Retirement of Class E Shareholders ........................................... 29
9.1.            Retirement of Class E Shareholders ........................................... 29
9.2.            Adjustment of Interest ................................................................ 30
9.3.            Retirement Percentage – First Retirement ................................. 30
9.4.            Retirement Percentage – Second Retirement ............................. 30
9.5.            Retirement Percentage – Final Retirement ................................. 30
9.6.            Retired Partner Payout Distribution ........................................... 30
9.7.            Retired Partner – Capital Event .................................................. 31
9.8.            Retired Partner Deferred Fees .................................................... 31

Article X.      Special Adjustments .................................................................... 31
10.1.           Class E Minimum Percentage Interests ...................................... 31
10.2.           Additional Share Issuances or Cancellations ............................. 31

Article XI.     Dissolution and Termination ....................................................... 31
11.1.           Dissolution .................................................................................. 31
11.2.           Winding Up, Liquidation and Distribution of Assets ................. 32
11.3.           Articles of Dissolution ............................................................... 33
11.4.           [Intentionally Left Blank] ........................................................... 33

-ii-

# TABLE OF CONTENTS
## (continued)

|  |  | Page |
|---|---|---|
| 11.5. | Return of Contribution Nonrecourse to Other Shareholders | 33 |
| 11.6. | Major Capital Event | 33 |
| Article XII. | Miscellaneous Provisions | 33 |
| 12.1. | Notices | 33 |
| 12.2. | Party in Interest Transaction | 34 |
| 12.3. | Application of New York Law | 35 |
| 12.4. | No Partnership | 35 |
| 12.5. | Amendments | 35 |
| 12.6. | Future Amendments | 35 |
| 12.7. | Construction | 35 |
| 12.8. | Headings | 35 |
| 12.9. | Waivers | 35 |
| 12.10. | Rights and Remedies Cumulative | 35 |
| 12.11. | Severability | 36 |
| 12.12. | Heirs, Successors and Assigns | 36 |
| 12.13. | Third Parties | 36 |
| 12.14. | Counterparts | 36 |
| 12.15. | Entire Agreement | 36 |
| 12.16. | Arbitration | 36 |
| 12.17. | Ownership of Class N Shareholders | 37 |

**<u>Exhibits</u>**

Exhibit A       Service Agreements
Exhibit B       Examples
Exhibit C       Class N Shareholders Notice Addresses

## SHAREHOLDER AND VOTING AGREEMENT FOR
## FAIRFIELD GREENWICH LIMITED

**THIS SHAREHOLDER AND VOTING AGREEMENT** (this "Agreement") of Fairfield Greenwich Limited, an Exempted Company with Limited Liability incorporated under the laws of the Cayman Islands ("FGL") and its wholly-owned limited liability company, Fairfield Greenwich Advisors, a Delaware limited liability company ("FGA") (FGL and FGA together are sometimes referred to for purposes of this Agreement as the "Companies"), is made and entered into as of the 1st day of January, 2002, by and among the Companies and Fairfield International Managers Inc., a Delaware corporation, Fairfield Greenwich Capital Partners, Inc., a Delaware corporation, Safehand Investments, a company organized under the laws of the Cayman Islands ("Safehand"), those shareholders listed on the signature page hereto, those shareholders who shall receive Class N Shares after the date hereof and agree to be bound by the terms hereof and, for purposes of Section 8.6, those persons who control certain shareholders and are listed on the signature page hereto. Capitalized terms used herein are defined or cross-referenced in Article I.

**WHEREAS,** FGL is organized as a company limited by shares in the Cayman Islands, and

**WHEREAS,** FGL has elected to be taxed as a partnership for United States federal income tax purposes pursuant to Treasury Regulation Section 301.7701-3, and

**WHEREAS,** the parties hereto wish to provide for the issuance and ownership of the Shares and the allocation and distribution of the profits and losses of FGL among the owners of FGL, and

**WHEREAS,** the parties hereto wish to provide for the voting of the Shares of FGL,

**WHEREAS,** FGL desires to be able to issue "profits interests" to employees and others within the meaning of Revenue Procedure 93-27, and

**WHEREAS**, it is intended that the terms of this Agreement will be incorporated in the Articles of Association of FGL.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### Article I.

### Definitions

1.1.    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

Act.  The Companies Law Revised of the Cayman Islands.

Adjusted Deficit Capital Account. "Adjusted Deficit Capital Account" shall mean, with respect to any Shareholder, the deficit balance, if any, in such Shareholder's Capital Account as of the end of the taxable year, after giving effect to the following adjustments: (a) the credit to such Capital Account of any amount which such Shareholder is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentences of Section 1.704-2(g)(1) and Section 1.704-2(i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations) and (b) the debit to such Capital Account of the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations. This definition of Adjusted Deficit Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) and Section 1.704-2 of the Treasury Regulations, and will be interpreted consistently with those provisions.

Agreed Value. The fair market value of an asset or, where applicable, the Interest of a Shareholder, which fair market value shall be determined by Required Consent or, in the absence of such Required Consent, by an independent appraiser selected by the Management Committee.

Articles. The Memorandum and Articles of Association of FGL, including any amendments thereto.

Bonus Pool Grants. Bonus Pool Grants means the one-time grant of a bonus to a Key Employee of either of the Companies or to an entity controlled by a Key Employee of either of the Companies entitling the Key Employee to a cash bonus in an amount equal to a specific percentage of Profits for that Fiscal Year or for the period beginning with the day of the year the Bonus Pool Grant becomes available for grant and ending the last day of such Fiscal Year. Bonus Pool Grants are (i) discretionary and (ii) reallocated from year-to-year. Bonus Pool Grants do not make a recipient a Shareholder, do not confer any voting rights, and do not entitle the recipient to any sales proceeds upon a Capital Event or any payment upon termination. Bonus Pool Grants are determined as provided in Sections 7.6 and 7.8.

Capital Account. As of any given date, the Capital Account established for each Shareholder, pursuant to Article IV hereof, as adjusted up to such date pursuant to this Agreement.

Capital Contributions. All contributions of cash or property by a Shareholder to the capital of FGL, whenever made.

Capital Event. Capital Event means the sale, lease, assignment, transfer or disposition of a portion of assets of the Companies or the Shares of FGL (not including a redemption, repurchase or retirement of Shares), other than in the ordinary course of business.

Cause. Cause means (i) commitment of a felony or the engaging in fraudulent or illegal activity, (ii) failure to follow the rules, procedures or customary practices of either of the Companies upon notice and failure to cure such failure within 14 days of such notice, (iii) deceitful behavior which is demonstrably and materially injurious to either of the Companies

or its clients, monetarily or otherwise, (iv) a material breach of the terms of any Service Agreement or (v) a material breach of this Agreement.

Class E Guaranteed Payments. Compensation paid by either of the Companies to a Class E Shareholder or its affiliates for services rendered pursuant to a Service Agreement, or otherwise, but excluding distributions pursuant to Sections 5.1 or 5.2.

Class E Percentage Interest. For any Class E Shareholder, the relative interest in the Profits and Losses of FGL held by such Class E Shareholder, expressed as a percentage, calculated as the quotient of the number of Class E Shares held by such Shareholder divided by the total number of Class E Shares issued and outstanding which percentage shall be adjusted from time to time to reflect changes in the Shares outstanding from time to time.

Class E Shareholder. Fairfield International Managers Inc., Fairfield Greenwich Capital Partners, Inc., and Safehand Investments, in respect of the Class E Shares held by them.

Class E Shares. The Shares held by the Class E Shareholders and designated as Class E Shares.

Class N Percentage Interest. For any Class N Shareholder, the relative interest in the Profits and Losses of FGL held by such Class N Shareholder, expressed as a percentage, calculated as the quotient of the number of Class N Shares held by such Shareholder divided by the total number of Class N Shares issued and outstanding, which shall be adjusted from time to time to reflect changes in the Class N Shares outstanding from time to time.

Class N Shareholder. Any shareholder other than a Class E Shareholder, in respect of the Class N Shares held by it effective upon its admission as a Shareholder.

Class N Shares. The Shares held by the Class N Shareholders and designated as Class N Shares as of the date hereof, as such Shares may hereafter be issued or assigned, subject to and in accordance with the terms hereof.

Code. The Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent superseding federal revenue laws.

Control. The ownership of 51% or more of the voting stock of an entity. The terms, controlled by, controlling or controls shall have correlative meanings.

Deferred Fees. Any amount of fees payable to the Companies by investment funds (the "Funds") pursuant to the investment management agreements between the Companies and the Funds, the receipt of which is deferred pursuant to a Deferred Fee Agreement between the Companies and a Fund under which the Companies elects to defer all or a portion of such fees reduced by any expenses reasonably allocated thereto by the Management Committee.

Deferred Income Allocation Plan. The Companies' Deferred Income Allocation Plan, pursuant to which Shareholders may elect to defer the receipt of all or a portion of the fees from a Fund to which the Companies may be entitled.

3

Disability. The inability of a Shareholder or of a person that controls a Shareholder to render the customary services to the Companies or the Shareholder because of a medically determinable physical or mental impairment expected to result either in death or to be of long, continued and indefinite duration, and for such reason the Management Committee shall have determined to terminate his or the Shareholder's employment with the Companies; provided, however, (1) the Management Committee shall not terminate such employment unless such disability shall have continued for a continuous period of six (6) months, and (2) if the Shareholder or person that controls a Shareholder shall object to any determination of disability such disability must be conclusively determined by a physician selected in good faith by the Management Committee for such purpose and whose determination shall be final and conclusive on the parties hereto. A continuous period of disability shall not be deemed interrupted until the Shareholder or person that controls a Shareholder returns to substantially full time work for a period of at least thirty (30) business days out of forty (40) business days.

Family Member. The Shareholder's spouse, ancestors and descendants or any entity controlled by the Shareholder or any of the foregoing.

FGA. Fairfield Greenwich Advisors, a Delaware limited liability company, all the membership shares of which are owned by FGL.

Guaranteed Payments. Compensation paid to Shareholders or affiliates of Shareholders for services pursuant to Section 3.6.

Interest. A Shareholder's entire interest in the Shares of FGL and the rights embodied therein as governed by the Articles and this Agreement (but with any Class E Shares and any Class N Shares held by the same Shareholder being considered separately), including such Shareholder's Capital Account, share of FGL's Profits, Losses, distributions of FGL's assets, and allocations made pursuant to this Agreement, together with the right to participate in the management of the business and affairs of the Companies (to the extent granted pursuant to the terms of this Agreement and the Articles), including (to the extent granted pursuant to the terms of this Agreement and the Articles) the right to vote on, consent to, or otherwise participate in any decision or action of FGL granted pursuant to this Agreement.

Investment Accounts. Collective pools, funds, side-by-side accounts and alternative structures, including without limitation principal protected notes, swap structures and options participating in any such funds.

Key Employee. For purposes of this Agreement, Key Employee means any individual or entity performing services for either of the Companies as a consultant pursuant to a Service Agreement or as an employee.

Loss arising from a Capital Event. The loss resulting from a Capital Event or Major Capital Event.

Major Capital Event. The sale, lease, assignment, transfer or disposition of all or substantially all of the assets of the Companies or Shares of FGL.

4

Management Committee. A committee comprised of all the Class E Shareholders and three Class N Shareholders or, in each case, their designated representatives. The Class N Shareholders on the Management Committee shall be selected, and may be removed, by holders of a majority of the Class N Percentage Interests; provided, however, that the Class E Shareholders acting by Required Consent may veto any such selection or removal. The initial selection of the Class N Shareholders shall be made within thirty days of the execution of this Agreement.

Net Capital Event Proceeds. The net proceeds from a Capital Event or Major Capital Event, less the sum of: (i) all loans which the Management Committee determines should be repaid; and (ii) such cash reserves which have been determined by the Management Committee or which are required by a third party lender; provided, however, that if such cash reserves are later distributed, they shall retain their character as net proceeds from a Capital Event or Major Capital Event and be distributed in accordance with the provisions of Section 5.2.

Net Cash Flow. For any fiscal period, all cash (including amounts released or expended from reserves), received by FGL from all sources during such fiscal period, other than Net Capital Event Proceeds, less the sum of the following to the extent paid or set aside by the Management Committee during such period: (i) all principal and interest payments on indebtedness of the Companies and all other sums paid to lenders; (ii) all cash expenditures incurred in the normal operation of the Companies' business, including compensation paid to Class E or Class N Shareholders or any affiliates of Class E or Class N Shareholders, capital expenditures or capital improvements, other than those paid from Net Capital Event Proceeds; (iii) amounts used to repay a Shareholder's Tax Basis Capital Account pursuant to Article VIII or IX; and (iv) such reserves for obligations or the operation of the Companies' business which have been determined by the Management Committee (excluding those cash reserves that are carried over from a prior year and including those cash reserves funded from the current year's revenue).

Non-Sentry AUM. As of the measurement date, the total net asset value in U.S. Dollars, of all Investment Accounts other than Investment Accounts which constitute, directly or indirectly, Sentry AUM, from which the Companies or any affiliate of the Companies is receiving compensation.

Percentage Interest. For any Shareholder, the relative interest in the Profits and Losses of FGL held by such Shareholder, expressed as a percentage calculated as the quotient of the number of Shares held by such shareholder and the total number of shares of FGL issued and outstanding, in comparison to the interests of all Shareholders, which shall be adjusted from time to time to reflect changes in the Shares outstanding from time to time.

Permitted Transferee. A Family Member or a trust for the sole benefit of the Shareholder and/or one or more Family Member, the trustee of which is the Shareholder, or an entity which is controlled by the Shareholder and all of the owners of which are the Shareholder and/or one or more Family Members.

Profits and Losses. The income, gain, loss, deductions and credits of FGL as determined in accordance with Section 4.3(e).

Profits arising from a Capital Event. The gain resulting from a Capital Event or a Major Capital Event as determined in accordance with Section 4.3(e)(iii).

Required Consent. The consent of Class E Shareholders holding at least sixty-six and two-thirds percent (66-2/3%) of the Class E Percentage Interests held by all Class E Shareholders.

Required Profit Allocation. The amount of Profits arising from a Capital Event required to bring the balances in the Capital Account of all Shareholders in the same ratio to one another as their Percentage Interests.

Retired Capital Account. A suspense account which consists of the sum of (i) the aggregate amount of the balances, if any, in the Capital Account of each Terminated Shareholder and retired Class E Shareholder transferred to the Retired Capital Account upon the termination of their Interests in accordance with Section 8.1 and Section 9.6, respectively, and (ii) the aggregate amount transferred to the Retired Capital Account pursuant to Section 5.4(a)(ii)(A) or (B), such sum to be reduced by any transfers out of the Retired Capital Account pursuant to Sections 4.3(c) or 5.4. The balance of the Retired Capital Account is not allocable to any Shareholder except as provided in 4.3(c) or 5.4.

Retirement. The voluntary or involuntary termination of employment of Walter Noel or Jeffrey Tucker or of the services of FGG Services, a Cayman Company, with either of the Companies or any affiliate of the Companies for any reason. The retirement of the first of Walter Noel or Jeffrey Tucker shall be deemed to be the retirement of one-half of the Class E Shares owned by Fairfield Greenwich Capital Partners, Inc. and Fairfield International Managers Inc. and the remainder shall be deemed retired on the retirement of the second of Walter Noel or Jeffrey Tucker. The retirement of FGG Services shall be deemed the retirement of Safehand Investments.

Sentry AUM. As of any measurement date, the total net asset value in U.S. Dollars, of all Investment Accounts managed on a discretionary brokerage account basis, directly or indirectly, by the Bernard L. Madoff organization utilizing a split strike conversion investment strategy and for which the Companies or any affiliate of the Companies is investment manager.

Service Agreements. Service Agreements mean those certain Service and Confidentiality Agreements to be entered into by those Key Employees who receive Class N Shares or by those entities that receive Class N Shares and that are controlled by Key Employees, substantially in the form attached hereto as Exhibit A.

Share. Shares of stock of FGL issued and outstanding.

Shareholder. Any person or entity other than the Companies who owns any Shares of FGL.

Tranche 2 Goal. The date on which the Companies' non-Sentry AUM reaches $2 billion.

Tranche 3 Goal. The date on which the Companies' non-Sentry AUM reaches $3 billion.

Treasury Regulations. The regulations promulgated by the U.S. Treasury Department under the Code.

1.2.    Cross Referenced Terms. The following terms are defined, and shall have the meaning set forth, in the respective Sections of this Agreement indicated below or if not defined herein as defined in the Articles:

| | |
|---|---|
| Allocable Sum | Section 5.4(a)(ii)(A) |
| Class E Retirement Percentage | Section 9.3 |
| Competing Enterprise | Section 8.6(c) |
| Company Group | Section 8.6(g) |
| Deemed Balance | Section 5.4(a)(ii)(B) |
| Fiscal Year | Section 5.9 |
| Initial Tranche 1 Issuance | Section 7.1(a) |
| Minimum Amount | Section 3.6 |
| Revaluation | Section 4.3(c) |
| Subsequent Tranche 1 Issuances | Section 7.1(a) |
| Tax Basis Capital Account | Section 8.1 |
| Termination | Section 8.1 |
| Terminated Shareholder | Section 8.1 |
| Tranche 1 Amount | Section 7.1(a) |
| Tranche 2 Amount | Section 7.2(a) |
| Tranche 3 Amount | Section 7.3(a) |
| Tranche 2 Date | Section 7.2 |
| Tranche 3 Date | Section 7.3 |

## Article II.

### Formation

2.1.    FGL. FGL was organized as an Exempted Company with Limited Liability as of October 24, 2001, in accordance with and pursuant to the Act. FGL shall be operated under the name of "Fairfield Greenwich Limited" or such other name as may be determined by Required Consent. The outstanding and issued Shares of FGL shall be designated as Class E or Class N Shares and shall be issued and designated in one or more series as the Management Committee shall determine, subject to the terms of this Agreement. All Shares issued shall bear a legend that they are subject to the terms of this Agreement.

2.2.    FGA. FGA was organized as a limited liability company under the Delaware Limited Liability Company Act. The sole member of FGA is FGL.

## Article III.

### Management of the Companies

3.1.   Companies Management. FGL shall be managed in accordance with the terms of its Articles, subject to the terms of this Agreement.   The Shareholders by executing this Agreement irrevocably delegate such matters as set forth herein to the Management Committee. The directors by executing this Agreement in their capacity as directors irrevocably delegate such matters as set forth herein to the Management Committee.

3.2.   Voting. The Class E Shares of FGL shall be voting shares. Class N Shares shall have no voting rights with respect to any matter, other than a Major Capital Event, a material investment in or acquisition of, or material joint venture with, another person or a material investment in the Companies, directly or indirectly, or the nomination of directors as provided in Section 3.3. On any such matter submitted to a vote of Class N Shareholders, each Shareholder shall vote in respect of its Percentage Interest. Except as otherwise specifically provided herein, Class E Shareholders shall vote their shares on all matters submitted to a vote of Shareholders in accordance with their Class E Percentages with approval requiring Required Consent. Matters on which both the Class E and Class N Shareholders may vote must be approved by Shareholders holding 66 2/3$^{rds}$ of the Percentage Interests voting as a single class, other than as limited herein. Those transactions requiring a Shareholder vote as provided herein shall be voted on only by the Shareholders and not the directors, and with respect to the matters described in Section 3.2, the directors will act only as directed by the Shareholders.

3.3.   Election and Action of Directors. The initial directors shall be Jeffrey Tucker and Walter Noel. Subsequent directors are to be elected by Shares voted by Class E Shareholders in accordance with their Class E Percentage Interests.

Upon Retirement of either Walter Noel or Jeffrey Tucker the number of directors shall be increased to three with the Class N Shareholders having the right to direct the voting of the Shares with respect to one of the directors by a vote of a majority of the Class N Percentage Interests.

3.4.   Management Committee. The Management Committee has responsibility for (i) allocating and issuing Class N Shares, (ii) allocating and granting Bonus Pool Grants and (iii) such other matters as shall be described in this Agreement. No member of the Management Committee may vote on any matter regarding the issuance of Interests or payment from the Bonus Pool to such member or to any entity that such member controls. Each member of the Management Committee shall have one vote on all matters presented to the Management Committee, and the act of a majority of the members of the Management Committee shall be the act of the Management Committee; provided, however, that in the event of a tie vote among the members of the Management Committee, the act of the Class E Shareholders acting by Required Consent shall be the act of the Management Committee.

3.5.   Budgets. A budget for each year, including compensation, shall be approved by the Management Committee by the end of January of each year.

8

3.6.    Compensation.  The Class E Shareholders shall determine compensation for all Class N and Class E Shareholders which shall be deducted in determining Profits and Losses. The compensation paid to each Class N Shareholder for any Fiscal Year shall be no less than an amount (the "Minimum Amount") equal to the product of (a) the aggregate amount of the Class E Guaranteed Payments for the Fiscal Year and (b) a fraction the numerator of which is such Class N Shareholder's Percentage Interest and the denominator of which is the aggregate Percentage Interests of the Class E Shareholders for the Fiscal Year.  If the Percentage Interests held by the Class N Shareholders or Class E Shareholders shall change during the Fiscal Year, the Minimum Amount will be calculated taking into account the varying Percentage Interests held during the Fiscal Year by using the weighted average of the Percentage Interests held during such Fiscal Year.

3.7.    Meetings.  FGL shall hold an Annual General Meeting every January after approval of the budget, unless the Directors shall by resolution provide that no meeting be held. An Extraordinary General Meeting may be called by requisition as provided in the Articles.

## Article IV.

### Capital Contributions and Capital Accounts

4.1.    Capital Contributions and Interests.

(a)    The Class E Shareholders have previously contributed assets to FGL constituting, along with the assets derived from operations, the assets of the business. The Agreed Value of the assets at the date hereof is $119,000,000 and the Capital Contribution of each Class E Shareholder as of the date hereof shall be deemed to be his percentage share of such Agreed Value.  Each Class N Shareholder shall contribute $1,000, and such amount shall be the balance in his Capital Account as of the date hereof.

(b)    Each Class E Shareholder and Class N Shareholder shall receive a schedule from the Management Committee setting forth such Shareholder's Class E or Class N Percentage Interest.  Each such Shareholder shall receive an updated schedule in the event such Shareholder's Percentage Interest changes.

4.2.    Rights to the Shares.

No Shareholder shall have any preemptive rights with respect to the Shares.  The Shareholders rights to the Shares or any of the Companies' assets are limited in accordance with and are subject to the terms of this Agreement.  A Shareholder shall only be entitled to the allocations and distributions with respect to his Shares as determined in accordance with this Agreement.  In the event that there is a conflict between the terms of this Agreement and the Articles or Shares of FGL the parties to this Agreement agree to reallocate such allocations and distributions among themselves so that they shall be in accordance with this Agreement as set forth herein and to make such amendments to the Articles as may be necessary to conform the Articles to this Agreement.

9

4.3.    Capital Accounts.

(a)    A separate Capital Account will be maintained for each Shareholder, with respect to the Shares he owns. Each Shareholder's Capital Account will be increased by (1) the amount of money contributed by such Shareholder to FGL; (2) the Agreed Value of property contributed or deemed to be contributed pursuant to Section 4.1 by such Shareholder to FGL (net of liabilities secured by such contributed property that FGL is considered to assume or take subject to under Code Section 752); and (3) allocations to such Shareholder of Profits.  Each Shareholder's Capital Account will be decreased by (1) the amount of money distributed to such Shareholder by FGL; (2) the Agreed Value of property distributed to such Shareholder by FGL (net of liabilities secured by such distributed property that such Shareholder is considered to assume or take subject to under Code Section 752); and (3) allocations to the account of such Shareholder of Loss as set forth in the Treasury Regulations.

(b)    In the event of a permitted sale, exchange or transfer of Shares in FGL, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Shares in accordance with the terms of the sale, assignment or transfer.  Any Capital Account not so transferred remains allocable to the Shares retained by the transferor.

(c)    The Management Committee, upon the redemption (which shall not include a redemption or repurchase of Shares in connection with a Termination or Retirement pursuant to Article VIII or Article IX) of all or a non-de minimis part of a Shareholder's Interest by FGL, upon one or more non-de minimis contributions of additional capital to FGL causing restatement of the Shareholders' respective Percentage Interests, upon admission of a new Shareholder or upon the issuance of additional Class N Interests (except issuances of Class N Interests pursuant to Section 7.9(e)), shall cause the Shareholders' Capital Accounts and the assets of the Companies to be restated to reflect a new Agreed Value of the Companies' assets as of the date of such event (a "Revaluation.")  Upon a Revaluation, the Companies shall be deemed to sell their assets for the Agreed Value immediately before the event that gives rise to the Revaluation. The Capital Accounts shall be adjusted to reflect the allocation of Profits or Losses arising from a Capital Event and items thereof from the deemed sale that would be made to each Shareholder under Section 5.4 immediately before the event that gives rise to the Revaluation.  The then balance in the Retired Capital Account shall be transferred from the Retired Capital Account and allocated in the same manner as Profits arising from a Capital Event, except that for purposes of a restatement no transfers will be made to the Retired Capital Account pursuant to Sections 5.4(a)(ii)(A) or (B).  In the event of the admission of a new Shareholder, the Management Committee shall make a record of the Agreed Value and tax bases of the Companies' assets as of the date of such Shareholder's admission (but prior to giving effect to such admission), and the tax effect of any built in gain or loss with respect to such assets shall be borne exclusively by (and specially allocated to) Shareholders (or their transferees) owning Interests immediately prior to admission of the new Shareholder, consistent with the principles of Section 704(b) and Section 704(c) of the Code.  The Capital Account attributable to any newly issued Class

10

N Shares shall be the amount that such Class N Shareholder contributes at the date of issuance.

      (d)     No Shareholder shall have any liability to restore all or any portion of a deficit balance in such Shareholder's Capital Account.

      (e)     For purposes of maintaining the Capital Accounts, "Profits" and "Losses" mean, for each Fiscal Year, an amount equal to FGL's taxable income or loss (including any amounts of FGL's gross income, loss, gain or deduction which may be specifically allocated pursuant to the provisions of Section 5.5) for such year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

          (i)     Any income of FGL that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 4.3(e) shall be added to such taxable income or loss;

          (ii)     Any expenditures of FGL described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section 4.3(e), shall be subtracted from such taxable income or loss;

          (iii)     Gain or loss resulting from any disposition of FGL property which is carried on the books of FGL at its Agreed Value, with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Agreed Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Agreed Value;

          (iv)     If any FGL property is carried on the books of FGL at its Agreed Value and such Agreed Value differs from such property's adjusted tax basis, then in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such Fiscal Year or other period, based on the Agreed Value;

          (v)     To the extent an adjustment to the adjusted tax basis of any Companies asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Shareholder's interest in FGL, the amount

11

of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

4.4.   Interest on Capital Account.   No Shareholder shall be entitled to interest on its Capital Account.

## Article V.

### Allocations and Distributions; Accounting and Reports

5.1.   Distributions of Net Cash Flow.

(a)   Subject to Sections 5.1(b) and 5.3(c), Net Cash Flow shall be allocated and distributed to the Shareholders including, but not limited to, Terminated Shareholders and retired Class E Shareholders receiving payments pursuant to Articles VIII and IX, respectively as follows;

(i)   First all amounts of Net Cash Flow attributable to the receipt of Deferred Fees shall be allocated and distributed to the Shareholders including Terminated Shareholders or retired Class E Shareholders who are entitled to such Deferred Fees in accordance with the Deferred Income Allocation Plan.

(ii)   Then, an amount of Net Cash Flow equal to the allocable share of Profits payable to any Terminated Shareholder or retired Class E Shareholder pursuant to Article VIII or IX not distributed pursuant to (i) above shall be distributed to such Terminated or retired Class E Shareholders,

(iii)   Then the balance of Net Cash Flow shall be distributed to the remaining Shareholders in accordance with their relative Percentage Interests in effect for the year to which the Net Cash Flow relates, such Percentage Interests to be appropriately adjusted to take into account any amount of Deferred Fees the receipt of which is deferred by a Shareholder under the Deferred Income Allocation Plan.

(b)   FGL shall make distributions of Net Cash Flow as reasonably determined by the Management Committee, but not less frequently than once each quarter to the extent of Net Cash Flow.

5.2.   Distributions of Net Capital Event Proceeds.   Net Capital Event Proceeds shall be distributed to Shareholders, including, but not limited to, Terminated Shareholders and retired Class E Shareholders receiving payments pursuant to Articles VIII and IX, respectively, in accordance with the relative balances in their Capital Accounts after all allocations of (i) Profits

and Losses for the Fiscal Year up to the date of the Capital Event, (ii) distribution of Net Cash Flow for the Fiscal Year up to the date of the Capital Event, (iii) the Profits or Losses arising from the Capital Event and (iv) any transfers to or from the Retired Capital Account.  The Shareholders agree that the allocation of proceeds from a sale of all or substantially all of the Interests shall be treated as if the Shares were sold.

5.3.    Allocation of Profits and Losses Generally.

(a)    Profits for each Fiscal Year, other than arising from a Capital Event, and subject to the provisions of Section 5.5, shall be allocated among the Shareholders including, but not limited to, Terminated Shareholders and retired Class E Shareholders receiving payments pursuant to Articles VIII and IX as follows:

(i)    First, to the Shareholders, including Terminated Shareholders or retired Class E Shareholders, receiving payments pursuant to Section 5.1(a)(i) attributable to Deferred Fees in the same amounts and the same proportions that such Net Cash Flow for such Fiscal Year is distributed to such Shareholders;

(ii)    Second, to the extent that the cumulative amount of Losses previously allocated to a Shareholder pursuant to Section 5.3(b) exceeds the cumulative amount of Profits allocated to such Shareholder pursuant to this Section 5.3(a)(ii) ("Excess Loss"), to each such Shareholder in proportion to such Shareholder's Excess Loss until the Excess Loss for each such Shareholder has been reduced to zero; and

(iii)    Third, to the Shareholders, including the Terminated Shareholders or retired Class E Shareholders, in accordance with their Percentage Interests, such Percentage Interests to be appropriately adjusted to take into account any amount of Deferred Fees, the receipt of which is deferred by a Shareholder under the Deferred Income Allocation Plan.

(b)    Losses for each Fiscal Year, other than arising from a Capital Event, and subject to the provisions of Section 5.5, shall be allocated among the Shareholders, including, but not limited to Terminated Shareholders and retired Class E Shareholders receiving payments pursuant to Articles VIII and IX as follows:

(i)    First, to those Shareholders with positive balances in their Capital Accounts, in proportion to such respective positive balances, until the balances of all such Capital Accounts have been reduced to zero; and

(ii)    Second, to the Shareholders in accordance with their Percentage Interests.

13

(c)    If the Percentage Interest of a Shareholder changes during FGL's Fiscal Year, its share of Profits or Losses and distributions of Net Cash Flow during such Fiscal Year shall be determined taking into account the varying Percentage Interests by using the weighted average of the Percentage Interests held during the FGL's Fiscal Year assuming Profits and Losses and Net Cash Flow are earned or incurred prorata throughout such year.

5.4.    Allocation of Profits or Losses arising from a Capital Event.

(a)    Subject to Section 5.5, any Profits arising from a Capital Event shall be allocated after the allocation of Profits and Losses for the Fiscal Year up to the date of the Capital Event and the distribution of any Net Cash Flow for the Fiscal Year up to the date of the Capital Event among the Shareholders, including, but not limited to, Terminated Shareholders and retired Class E Shareholders receiving payments pursuant to Articles VIII and IX, respectively, as follows:

(i)    First, to those Shareholders with Adjusted Deficit Capital Accounts, in proportion to the respective negative balances of such Adjusted Deficit Capital Accounts, until the balances of all such Adjusted Deficit Capital Accounts have been increased to zero;

(ii)    Second,

(A)    If the sum (the "Allocable Sum") of (i) the Profits arising from a Capital Event and (ii) the balance in the Retired Capital Account before application of this section is at least equal to the Required Profit Allocation, then the Allocable Sum shall be allocated among the Shareholders so that the balances in their Capital Accounts shall be in the same ratio to one another as their Percentage Interests and then among the Shareholders in accordance with their Percentage Interests. After such allocation an amount equal to the lesser of (1) the balance in the Capital Account of each Terminated Shareholder and each retired Class E Shareholder and (2) the aggregate amounts distributed to each such Terminated Shareholder or retired Class E Shareholder pursuant to Sections 8.1 and 9.6 shall be transferred from such Shareholder's Capital Account to the Retired Capital Account. This new balance in the Retired Capital Account shall then be allocated to all Shareholders other than Terminated Shareholders or retired Class E Shareholders in accordance with the Shareholders' relative Percentage Interests.

(B)    If the Allocable Sum is not at least equal to the Required Profit Allocation, then the Allocable Sum shall be allocated as follows: The balance that would be in each Shareholder's Capital Account if the Allocable Sum were equal to the Required Profit Allocation shall be determined (the "Deemed Balance"). Then the

amount of profits from a Capital Event that would have to be allocated to each Shareholder to obtain the Deemed Balance shall be determined. The Allocable Sum shall then be allocated to the Class E Shareholders and the Class N Shareholders in proportion to the amount of gain that would have been allocated to each of them if the Allocable Sum equaled the Required Profit Allocation. After such allocation an amount equal to the lesser of (1) the balance in the Capital Account of each Terminated Shareholder and each Retired Class E Shareholder and (2) the aggregate amounts distributed to each such Terminated Shareholder or retired Class E Shareholder pursuant to Sections 8.1 and 9.6 shall be transferred to the Retired Capital Account from such Shareholder's Capital Account. The new balance in the Retired Capital Account shall then be allocated among the Shareholders other than the Terminated Shareholders and the retired Class E Shareholders in the same manner as if it were additional gain from a Capital Event. If the additional amount to be allocated pursuant to the previous sentence is in excess of the amount required to bring the Capital Accounts of the Shareholders other than the Terminated Shareholders or retired Class E Shareholders into the same ratio as the Percentage Interest, such excess will be allocated in accordance with the Shareholders' Percentage Interests.

(b)    After the allocation of all amounts required to be allocated pursuant to Section 5.3, and subject to Section 5.5, any Losses arising from a Capital Event shall be allocated as follows:

(i)    First, to those Shareholders with positive balances in their Capital Accounts in proportion to such respective positive balances, until the balances of all such Capital Accounts have been reduced to zero; and

(ii)    Second, to the Shareholders in accordance with their Percentage Interests.

(c)    In those instances where Profits or Losses from a Capital Event or Major Capital Event are to be allocated among the Shareholders in accordance with their relative Percentage Interests, it shall be in accordance with the Percentage Interests held by the Shareholders on the date of the Capital Event or Major Capital Event which gives rise to such Profits or Losses.

5.5.    <u>Tax and Regulatory Allocations and Requirements</u>.

(a)    <u>Tax Allocations</u>. Income, gain and loss as determined for federal income tax purposes (and the items thereof to the extent required to be separately stated and allocated) shall be allocated in accordance with Sections 5.3 and 5.4, subject to the provisions of this Section 5.5.

(b)    Special Allocations of Taxable Gain Arising from a Capital Event. If the allocation of Profits arising from a Capital Event to a Terminated Shareholder or a retired Class E Shareholder pursuant to Section 5.4 creates or increases the balance of such Shareholders Capital Account which is transferred to the Retired Capital Account, the taxable gain attributable to such allocation of Profit arising from a Capital Event shall be allocated equitably among the other Shareholders as shall be determined by the Tax Matters Partner.

(c)    State Taxes.

(i)    For any period in which a State or other taxing authority in which FGL is subject to tax imposes an entity level income tax upon the income of FGL, and if FGL is entitled to a credit or deduction in computing that tax for income allocable to one or more (but fewer than all) Shareholders who are separately subject to such entity level tax, the Shareholders' respective allocable shares of FGL's Profits or Losses shall be computed first without taking FGL's tax liability into account, and FGL's tax liability shall then be specially allocated to those Shareholders who are not separately subject to the entity level tax and for whom no credit or deduction was available to FGL. For purposes of Sections 5.1, 5.2 and 5.6 (but not Section 4.3), the amount of tax so allocated to a Shareholder shall be considered as a distribution of cash to such Shareholder.

(ii)    Notwithstanding anything to the contrary in this Agreement, any State or local taxes which are paid by FGL with respect to the receipt by a particular Shareholder of Net Cash Flow attributable to Deferred Fees shall be specially allocated to that Shareholder to reflect equitably such Shareholder's proportionate share of such Deferred Fees.

(d)    Withholding Taxes. FGL shall withhold any taxes as required by law with respect to a Shareholder's allocable share of Profits or distributions.  Any such withholding shall be treated as a distribution to such Shareholder and shall be taken into account in making distributions under Sections 5.1 and 5.2 as the case may be.  Each Shareholder agrees to indemnify FGL and its predecessor and each other Shareholder and its affiliates for any withholding taxes due with respect to any allocation or distribution to such Shareholder or its affiliates whether such allocation or distribution was made prior to or subsequent to the date of this Agreement.

(e)    Excess Losses.  No allocations of Losses shall be allocated to any Shareholder if such allocation would cause such Shareholder to have an Adjusted Deficit Capital Account or increase the deficit in such Shareholder's Adjusted Deficit Capital Account. The amount of the Losses (made up pro rata of amounts of loss, deduction and/or Section 705(a)(2)(B) expenditures making up such Losses) which would have caused a Shareholder to have an Adjusted Deficit Capital Account shall instead be

16

charged to the Capital Account of any Shareholders which would not have an Adjusted Deficit Capital Account as a result of the allocation, in proportion to the respective amounts of their Capital Accounts to the extent such allocation will not create an Adjusted Deficit Capital Account, or, if no such Shareholders exist, then to the Shareholders in accordance with their Percentage Interests.

(f)     Qualified Income Offset.    In the event any Shareholder unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), (6) of the Treasury Regulations, which create or increase an Adjusted Deficit Capital Account of such Shareholder, then items of FGL income and gain (consisting of a pro rata portion of each item of FGL income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Shareholder in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Deficit Capital Account so created as quickly as possible. It is the intent that this subsection be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(g)     Minimum Gain Chargeback.    If there is a net decrease in FGL's minimum gain as defined in Section 1.704-2(d) of the Treasury Regulations during a taxable year of FGL, then, the Capital Account of each Shareholder shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Shareholder's share of the net decrease in FGL minimum gain. The items so allocated shall be determined in accordance with Section 1.704-2(j)(2)(i) of the Treasury Regulations. This subsection is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith. If in any taxable year that FGL has a net decrease in FGL's minimum gain, and the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Shareholders and it is not expected that FGL will have sufficient other income to correct that distortion, the Shareholders may in their discretion seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Section 1.704-2(f)(4) of the Treasury Regulations.

(h)     Partner Nonrecourse Debt Minimum Gain Chargeback.    Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Article V, if there is a net decrease in partner nonrecourse debt minimum gain as determined under Section 1.704-2(i)(3) of the Treasury Regulations attributable to a partner nonrecourse debt as defined in Section 1.704(2)(b)(4) of the Treasury Regulations during any Fiscal Year, each Shareholder who has a share of the partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specifically allocated items of Profits and Losses for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Shareholder's share of the net decrease in partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Shareholder pursuant thereto.

17

The items to be so allocated shall be determined in accordance with Section 1.704-2(j)(4) and Section 1.704-2(j)(2)(ii) of the Treasury Regulations. This subsection is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(i)    Partner Nonrecourse Debt. Items of FGL loss and deduction (including non-deductible expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of FGL and are characterized as partner (Shareholder) nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations) shall be allocated to the Shareholders' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

(j)    Nonrecourse Deductions. Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Shareholders in accordance with, and as a part of, the allocations of FGL Profits or Losses for such period.

(k)    Recapture Income. All recapture of income tax deductions resulting from the sale or disposition of FGL property shall be allocated to the Shareholders to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Shareholder is allocated any gain from the sale or other disposition of such property.

(l)    Compensating Adjustments. Any special allocations to the Shareholders pursuant to Sections 5.5(e) through 5.5(h) above shall be taken into account in computing allocations of Profits and Losses pursuant to Sections 5.3 and 5.4 so that to the extent possible the Capital Account of each Shareholder will have the balance such Capital Account would have had if the special allocations required by Sections 5.6(b) through 5.6(h) had not been made.

(m)    Disposition of Certain Assets. Notwithstanding anything herein to the contrary and consistent with Section 704(c) of the Code, upon the sale or disposition by FGL of any asset previously contributed by a Shareholder, or any asset owned by FGL whose Agreed Value has been restated at any time, taxable gain or loss will be allocated among the Shareholders in accordance with the principles of Section 704(c) of the Code so as to take account of any variation between the adjusted basis of such property to FGL and its Agreed Value, and depreciation or amortization deductions with respect to such property shall be allocated for tax purposes as required under Section 704(c) of the Code under such method as is allowed in the Treasury Regulations under Section 704(c) of the Code as is elected in accordance with Section 5.12.

(n)    Certain Distributions as Advances. Notwithstanding Sections 5.1 and 5.2 hereof, to the extent that a Shareholder would be distributed, pursuant to either such Section during any Fiscal Year, an amount in excess of the maximum amount which could be distributed to such Shareholder without creating a deficit balance in its Capital Account in excess of the sum of (a) the amount he is obligated to restore (pursuant to the terms of this Agreement or otherwise) and (b) the amount he is deemed obligated to

restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, then such distribution shall be, to the extent possible, an advance or draw (as described in Treasury Regulations Section 1.731-1(a)(1)(ii)) against such Shareholder's allocations of Profits and items of income and gain for FGL's taxable year in which such distribution is made.

5.6.    Distributions.  The Shareholders shall not have any right to demand or receive any distribution in a form other than cash.  All distributions of cash or other property shall be made to the Shareholders in accordance with Sections 5.1 and 5.2, reflecting the Shareholders' Percentage Interests on the record date of such distribution and taking into account any deemed distributions under Section 5.5(c). All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Shareholders from FGL shall be treated as amounts distributed to the relevant Shareholder or Shareholders pursuant to this Section 5.6.

5.7.    Limitation upon Distributions.

(a)    No distributions shall be made and paid if such distribution would be in violation of the Act or if, after the distribution is made, the liabilities of FGL (other than liabilities to Shareholders on account of their Interests, and liabilities for which the recourse of creditors is limited to specified property of the FGL) exceed the fair value of the assets of FGL, provided that the fair value of property that is subject to a liability for which the recourse of creditors is limited, shall be included in the assets of FGL only to the extent that the fair value of that property exceeds that liability.

(b)    A Shareholder who receives a distribution in violation of this Section, and who knew at the time of the distribution that the distribution violated this Section, shall be liable to FGL for the amount of the distribution.  A Shareholder who receives a distribution in violation of this Section, and who did not know at the time of the distribution that the distribution violated this Section, shall not be liable for the amount of the distribution.

5.8.    Accounting Principles.  FGL shall maintain books and records which shall include quarterly statements of Profits and Losses and Capital Accounts determined in accordance with this Agreement and the cash method of accounting for tax purposes. FGL shall also maintain on an annual basis a Tax Basis Capital Account for each Shareholder.

5.9.    Accounting Period.    FGL's accounting period shall be from January 1 to December 31 (the "Fiscal Year").

5.10.    Records and Reports.  FGL shall maintain records and accounts of the operations and expenditures of the Companies. At a minimum, FGL shall keep at its principal place of business the following records:

(a)    True and full information regarding the status of the business and financial condition of the Companies;

19

(b)     Promptly after becoming available, a copy of FGL's federal, state and local income tax returns for each year;

(c)     A copy of this Agreement and the FGL's Certificate of Formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which this Agreement and any certificate and all amendments thereto have been executed;

(d)     True and full information regarding the amount of cash and a description and statement of the Agreed Value of any other property or services contributed by each Shareholder and which each Shareholder has agreed to contribute in the future, and the date on which each became a Shareholder; and

(e)     Any other records required to be maintained under the Act.

5.11.   Financial Statements and Other Document Deliveries.  Within 45 days after the end of each quarter FGL shall prepare and deliver to each Shareholder the quarterly reports described in Section 5.8.  Within seventy-five (75) days after the end of each Fiscal Year, FGL shall prepare and deliver to each Shareholder a financial statement which shall include a balance sheet and statements of Profits and Losses, Profits and Losses arising from a Capital Event, Net Cash Flow and Net Capital Event Proceeds (collectively the "Company's Results") and the aggregate Capital Accounts of FGL.  Each Shareholder shall receive a statement of his or her share of the Company's Results and his Capital Account balance for such period.  The annual statements shall be reviewed by the accountants of FGL.  The Shareholders shall have the right to review with the accountants the accounting methods and procedures to be used.  However, in connection with such accounting methods, all decisions as to accounting principles, including any elections to be made by or for FGL under the provisions of the Code or other applicable tax law, shall be determined by Required Consent.  In addition, FGL shall also deliver as promptly as reasonably practicable annual budgets (referred to in Section 3.5), notice of transfers of Class N Interests to Permitted Transferees and notice of the hiring by the Companies of persons in senior management or executive positions.  Shareholders shall have no right to inspect any of the books and records of the Companies except as set forth herein.

5.12.   Returns and Other Elections.

(a)     FGL shall cause the preparation and timely filing of all tax returns to be filed by FGL pursuant to the Code and all other tax returns deemed necessary in each jurisdiction in which FGL does business or is subject to taxation.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Shareholders within a reasonable time after the end of FGL's Fiscal Year upon the Shareholders' written request.  All elections permitted to be made by FGL under federal or state laws shall be determined by Required Consent.

(b)     Each Shareholder acknowledges that FGL shall be treated as a partnership for United States federal and state income tax purposes, and hereby agrees not to elect under Code Section 761 or applicable state law to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar state statute

20

applicable to FGL and all allocations and other items shall be governed by this Agreement for such purpose.

(c)     No Shareholder, manager, officer, agent or employee of FGL is authorized to, or may, file Internal Revenue Service Form 8832 (or such alternative or successor form) to elect to have FGL be classified as a corporation for federal income tax purposes, in accordance with Treasury Regulations Section 301.7701-3. FGL also agrees to take such other action as may be necessary or required (and permitted under the terms of this Agreement) to maintain the status of FGL as a partnership for federal income tax purposes.

5.13.    Tax Matters Partner. Fairfield International Managers, Inc. is designated the "Tax Matters Partner" (as defined in Code Section 6231), and is authorized and required to represent FGL (at FGL's expense) in connection with all examinations of FGL's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend FGL funds for professional services and costs associated therewith. The Shareholders agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

5.14.    Examples. Attached to this Agreement as Exhibit B are a series of examples of allocations based on various assumptions, which examples are made a part of this Agreement.

## Article VI.

### Transferability

6.1.    Transferability.

(a)     Class N Shares may not be transferred, assigned, pledged, hypothecated or otherwise disposed of, other than (i) to a Permitted Transferee with the written consent of the Management Committee which consent shall not be unreasonably withheld or (ii) to a non-Permitted Transferee with the written consent of the Management Committee within its absolute discretion. Any such transfer of Shares shall specify the Shares to be transferred and the amount, if any, of the Shareholder's Capital Account to be allocated to the transferred Shares. The transferee shall be bound by the terms of this Agreement.

(b)     Notwithstanding anything to the contrary, no Shares may be transferred if such transfer would require FGL to use the accrual method of accounting, terminate for federal income tax purposes under Section 708 of the Code or be subject to U.S. federal income tax as a corporation.

6.2.    Death or Disability of a Shareholder. The death or Disability of a Shareholder shall be treated as the Termination or Retirement of such Shareholder with the Shareholder or his representative receiving the payments provided in Articles VIII and IX. Death of a person controlling a Shareholder shall constitute death of the Shareholder and be treated as a Termination as provided in this Section 6.2.

## Article VII.

### Issuance of Class N Shares and Bonus Pool Grants

7.1.    <u>Issuance of Class N Shares</u>.  FGL agrees to issue Class N Shares to certain Key Employees.  The Class N Shares will be subject to redemption and cancellation by FGL upon the terms and subject to the conditions set forth in Article VIII.  No person shall become a Shareholder without consenting to the terms of and executing this Agreement.

(a)    The Class N Shares to be issued effective on January 1, 2002 shall be entitled to receive in the aggregate an interest of the FGL's Profits in the amount of 13.4% (the "Initial Tranche 1 Issuance").  Up to 6.6% of the FGL's Profits shall be available for grant as Bonus Pool Grants pursuant to Section 7.6 or issuance pursuant to Section 7.9, from time to time after January 1, 2002 (the "Subsequent Tranche 1 Issuances") (the Initial Tranche 1 Issuance together with the Subsequent Tranche 1 Issuances, which together shall equal an interest of 20% of the FGL's Profits, shall be referred to as the "Tranche 1 Amount").

(b)    To the extent that Class N Shares entitled to receive less than 20% in the aggregate of FGL's Profits are issued from the Tranche 1 Amount, the unallocated portion of the Tranche 1 Amount must be granted as Bonus Pool Grants pursuant to Section 7.6 or issued as Class N Shares pursuant to Section 7.9 to Class N Shareholders, Key Employees, and to the extent they significantly and materially contribute to FGL achieving its Tranche 2 or Tranche 3 Goals, the Class E Shareholders upon reaching the Tranche 3 Goal pursuant to Section 7.3.

(c)    Those Key Employees who shall receive Class N Shares from the Subsequent Tranche 1 Issuances and the number of Shares to be issued to each shall be determined by the Class E Shareholders.

7.2.    <u>Tranche 2 Issuances</u>.  FGL agrees to issue Class N Shares or make Bonus Pool Grants to Key Employees and/or Class N Shareholders from and after the first day of the calendar quarter immediately following the calendar quarter during which FGL reaches the Tranche 2 Goal ("Tranche 2 Date").  The Class N Shares will be subject to redemption and cancellation by FGL upon the terms and subject to the conditions set forth in Article VIII.

(a)    The Class N Shares to be issued from time to time after reaching the Tranche 2 Goal shall be entitled to receive in the aggregate 10% of FGL's Profits (the "Tranche 2 Amount") less any Class N Interests from the Tranche 2 Amount that have been issued pursuant to Section 7.9(c).

(b)    To the extent that Class N Shares entitled to receive less than 10% in the aggregate of FGL's Profits are issued from the Tranche 2 Amount, the unallocated portion of the Tranche 2 Amount must be issued as Bonus Pool Grants pursuant to Section 7.6.

(c)    Those Key Employees or Class N Shareholders who shall receive Class N Shares from the Tranche 2 Amount from time to time after reaching the Tranche 2 Goal

22

shall be determined by the Management Committee. Each Class N Share issued as part of the Tranche 2 Amount shall be entitled to the Class N Percentage Interest as the Management Committee shall determine.

7.3.    Tranche 3 Issuances. FGL agrees to issue Class N Shares or make Bonus Pool Grants to Key Employees and/or Class N Shareholders from and after the first day of the calendar quarter immediately following the calendar quarter during which FGL reaches the Tranche 3 Goal ("Tranche 3 Date"). The Class N Shares will be subject to redemption and cancellation by FGL upon the terms and subject to the conditions set forth in Article VIII.

    (a)    The Class N Shares to be issued from time to time after reaching the Tranche 3 Goal shall be entitled to receive in the aggregate 10% of FGL's Profits (the "Tranche 3 Amount") less any Class N Shares from the Tranche 3 Amount that are issued pursuant to Section 7.9(c).

    (b)    To the extent that Class N Shares entitled to receive less than 10% in the aggregate of FGL's Profits are issued from the Tranche 3 Amount, the unallocated portion of Tranche 3 Amount must be issued as Bonus Pool Grants pursuant to Section 7.6.

    (c)    Those Key Employees or Class N Shareholders who shall receive Class N Shares from the Tranche 3 Amount from time to time after reaching the Tranche 3 Goal shall be determined by the Management Committee. The Class N Shares issued as part of the Tranche 3 Amount shall be entitled to the Class N Percentage Interest as the Management Committee shall determine.

7.4.    Service Agreement. It is a condition to any issuance of Class N Shares pursuant to this Article VII that each Key Employee enters into or is otherwise bound by a Service Agreement.

7.5.    Profits Interests. The Class N Shares are intended to be "profits interests" when issued within the meaning of Revenue Procedure 97-23.

7.6.    Bonus Pool Grants. To the extent Class N Shares are not issued as part of the Subsequent Tranche 1 Issuances, FGL may make Bonus Pool Grants to Key Employees or Class N Shareholders under this Section 7.6, and must make Bonus Pool Grants to Key Employees and Class N Shareholders from and after the Tranche 3 Date. To the extent that Class N Shares representing less than 10% of FGL's Profits are issued from the Tranche 2 or Tranche 3 Amounts, on or after the Tranche 2 Date or the Tranche 3 Date, as the case may be, FGL must make Bonus Pool Grants to Key Employees or Class N Shareholders in an amount equal to in the aggregate the unallocated portion of the Tranche 2 and Tranche 3 Amounts.

    (a)    Bonus Pool Grants under this Section 7.6 are to be determined on an annual basis.

    (b)    Bonus Pool Grants under this Section 7.6 do not entitle the recipient to any distribution of Net Capital Event Proceeds upon a Capital Event pursuant to Section 5.2 or any payment upon termination under Article VIII.

23

(c)     If Class N Shares representing the unallocated portion of the Tranche 1, Tranche 2 and/or Tranche 3 Amounts are subsequently issued, those amounts shall no longer be available for Bonus Pool Grants.

(d)     Those Key Employees who shall receive Bonus Pool Grants pursuant to this Section 7.6 and the amount of those grants expressed as a percentage of profits shall be determined by the Management Committee.

(e)     The amount of a Bonus Pool Grant shall be determined by multiplying the percentage interest determined by the Management Committee by the Profits of FGL before deduction of Guaranteed Payments, the product of which will be reduced by any compensation paid to the Bonus Pool Grant recipient, provided such grantee is not a Class N Shareholder.

7.7.     Class N Representation.  Within 24 months (the exact date to be determined by the Class E Shareholders in their discretion) of FGL reaching its Tranche 3 Goal, the determination of the Key Employees or Class N Shareholders who shall receive Bonus Pool Grants or Class N Shares pursuant to Sections 7.1, 7.2, 7.3 and 7.9 shall be made by representatives of the Class N Shareholders upon consultation with the unretired Class E Shareholders.  The representatives of the Class N Shareholders to make the determination under this Section 7.7 shall be selected annually by Class N Shareholders holding a majority of the Class N Percentage Interests.

7.8.     Criteria for Issuance.  The criteria to be considered in determining the recipients of the Class N Shares and Bonus Pool Grants shall include success in the development and maintenance of client relationships; the quality of client service; the profitability of client relationships; teamwork in business development; and overall leadership, cooperation and support in executing the Companies' strategic growth and business objectives, including the building of a firm infrastructure to support the same.

7.9.     Subsequent Issuances of Class N Shares.

(a)     The issuance of any Class N Shares or Bonus Pool Grants after those issuances made effective January 1, 2002, and prior to reaching the Tranche 2 and Tranche 3 Goals, shall first come from the unallocated Tranche 1 Amount, if any.

(b)     To the extent that Class N Shares constituting the full Tranche 1 Amount are issued, and the Tranche 2 and Tranche 3 Goals have not been met, Class N Shares or Bonus Pool Grants may be issued to Key Employees or Class N Shareholders from the Class E Retirement Percentage, if any.

(c)     To the extent that Class N Shares constituting the full Tranche 1 Amount are issued and there is no available Class E Retirement Percentage, then notwithstanding that the Tranche 2 and Tranche 3 Goals have not been achieved, Class N Shares or Bonus Pool Grants may be issued to Key Employees or Class N Shareholders from the Tranche 2 and Tranche 3 Amounts.

24

(d)    If there is no Class E Retirement Percentage, Class N Percentage Interest, Tranche 1, Tranche 2 or Tranche 3 Amounts available for issue, then:

(i)    prior to reaching the Tranche 3 Goal, FGL may issue Class N Shares to Key Employees or Class N Shareholders and the Class N Percentage Interest of the then existing Class N Shareholders as a class and each individually shall be adjusted;

(ii)    after reaching the Tranche 3 Goal, FGL may issue Class N Shares to Key Employees or Class N Shareholders and the Class E Percentage Interest and Class N Percentage Interest shall be adjusted as a single class; provided, however, that the Class E Percentage Interest shall never be adjusted to less than 51% of the Percentage Interest of FGL after giving effect to issuances of Class N Shares and the Class E Retirement Percentage, without the consent of the Class E Shareholders as a class, as follows:

(A)    Consent prior to the complete allocation of any Class E Retirement Percentage shall be evidenced by Required Consent,

(B)    Consent after the complete allocation of any Class E Retirement Percentage must be unanimous.

(e)    Notwithstanding anything contained in this Agreement to the contrary, all unallocated Class N Shares available for issuance as Class N Shares or grant as Bonus Pool Grants under Articles VII, VIII or IX shall be allocated by the Management Committee only to the Class N Shareholders or other employees of the Companies, except for any unallocated Tranche 1 Units which may also be allocated to Class E Shareholders as provided in Section 7.1(b), immediately prior to a Major Capital Event.

7.10.    Information.    The Management Committee shall be under no obligation to identify subsequent recipients of Class N Shares.

## Article VIII.

### Termination, Cancellation and Earnout

8.1.    Termination and Distributions.    Upon the voluntary or involuntary termination of employment with, or of the performance of services for, either of the Companies or any affiliate of either of the Companies ("Termination") of a Class N Shareholder or any person that controls a Class N Shareholder (the "Terminated Shareholder"), other than for Cause, the Terminated Shareholder shall receive a distribution of the amount of his Capital Account determined on a tax basis without consideration of any Revaluations ("Tax Basis Capital Account") and a distribution of such Shareholder's allocable share of Profits pursuant to Section 5.3(a)(iii) other than Profits arising from a Capital Event for a five year period, commencing with the first distribution immediately following the Termination during the calendar year in which the Termination occurs and ending with the last distribution made prior to the fifth anniversary of such first distribution, based upon the Class N Percentage Interest that such Terminated Shareholder had on the date of

termination, subject to dilution as provided in Section 7.9(d) and subject to Section 8.4. For purposes of this Section 8.1, Profits shall be determined before deduction of Guaranteed Payments and before any deduction for Bonus Pool Grants. After the fifth anniversary of such first distribution, or such later date as provided below, the Terminated Shareholder shall be entitled to no more distributions of Profits, its Interest in FGL, including but not limited to any rights to its Capital Account, shall be extinguished, its Shares in FGL shall be redeemed for par value and cancelled, and its Class N Percentage Interest shall be available for grant to Key Employees or Class N Shareholders as Class N Shares or Bonus Pool Grants. The balance, if any, in such terminated Shareholder's Capital Account shall be transferred to the Retired Capital Account upon the conclusion of the payments made pursuant to this Section. A Terminated Shareholder shall receive additional distributions of Profits based on years of service with the Companies, including service with the Companies' predecessor, Littlestone Associates, Inc. and the Companies' affiliates, including Fairfield International Managers Inc. and Fairfield Greenwich Capital Partners, Inc. For each 5 years of service, a Terminated Shareholder shall receive one year's additional distributions of Profits paid quarterly based upon the Class N Percentage Interest that such Terminated Shareholder had on the date of termination, subject to adjustment as provided in Section 7.9(d) and subject to Section 8.4.

   8.2.    Termination within One Year. Notwithstanding Section 8.1, upon the voluntary or involuntary termination of employment with, or of the performance of services for, either of the Companies or any affiliate of the Companies of a Terminated Shareholder, prior to the one year anniversary of the issuance of the Class N Shares to such Shareholder, there will be no distributions pursuant to Section 8.1 except for the amount of his Tax Basis Capital Account. Distributions of such Shareholder's allocable share of Profits will be made in accordance with the provisions of Section 8.3, and the Terminated Shareholder shall be entitled to no more distributions of Profits, its Interest in FGL including but not limited to any rights to its Capital Account, shall be terminated, its Shares redeemed for par value and cancelled and its Class N Percentage Interest shall be available for grant to Key Employees or Class N Shareholders as Class N Shares or Bonus Pool Grants. The balance, if any, in such terminated Shareholder's Capital Account shall be transferred to the Retired Capital Account upon the conclusion of the payment pursuant to this Article VIII.

   8.3.    Termination for Cause. In the event of the termination of employment with, or of the performance of services for, either of the Companies or any affiliate of the Companies of a Terminated Shareholder for Cause, there will be no distributions pursuant to Section 8.1 except for the amount of his Tax Basis Capital Account. The Terminated Shareholder shall receive a distribution of such Shareholder's allocable share of Profits for the calendar quarter pursuant to Section 5.3(a)(iii) in which the termination for Cause occurs based upon the Class N Percentage Interest that such Terminated Shareholder had on the date of termination together with any amounts such Terminated Shareholder may be entitled to under Section 8.7, and the Terminated Shareholder shall be entitled to no more distributions of Profits, its interest in FGL, including but not limited to any rights to its Capital Account, shall be terminated, its Shares in FGL shall be redeemed for par value and cancelled, and its Class N Percentage Interest shall be available for grant to Key Employees or Class N Shareholders as Class N Shares or Bonus Pool Grants. The balance, if any, in such terminated Shareholder's Capital Account shall be transferred to the Retired Capital Account.

8.4.   Capital Event. Upon a Capital Event or a Major Capital Event, a Terminated Shareholder (other than an employee terminated for Cause or who is subject to Section 8.2) who has not received a distribution of Profits for a 5 year period or such longer period provided in Section 8.1 shall be treated as a Class N Shareholder for purposes of allocation of Profits arising from a Capital Event and the distribution of Net Capital Event Proceeds shall be determined in accordance with Section 5.2.

8.5.   Tax Treatment. Payments made to a Terminated Shareholder pursuant to this Article VIII, other than distributions of the Tax Basis Capital Account, shall be payments to a retired partner under Section 736(a)(1) of the Code and treated as a distributive share of FGL's income. It is intended that for purposes of Section 736 each Shareholder shall be treated as a general partner. Distributions of a Terminated Shareholder's Tax Basis Capital Account shall be treated as a distribution chargeable against the Retired Shareholder's Capital Account in accordance with Section 4.3.

8.6.   Non Competition. Each Class N Shareholder and each person that controls a Class N Shareholder acknowledges that the industry in which the Companies and its affiliates are engaged is a highly competitive business and, as a result of his or her senior position within the Companies the Class N Shareholder or each person that controls a Class N Shareholder, as the case may be, has acquired or will acquire extensive background and knowledge of the business of the Company Group (defined below) and the industry in which it operates. Accordingly, each Class N Shareholder and each person that controls a Class N Shareholder agrees as follows:

(a)   Except as may be required by the lawful order of a court of competent jurisdiction, or except to the extent that the Class N Shareholder, each person that controls a Class N Shareholder or, if applicable, a Terminated Shareholder has express authorization from FGL, he or she will keep secret and confidential indefinitely all non-public information concerning the Companies and their affiliates which was acquired by or disclosed to him or her during the course of employment with the Companies, and not to disclose the same, directly or indirectly, to any other person, firm or business entity, or to use it in any way; provided, however, nothing in this paragraph shall be construed so as to prevent such Class N Shareholder, each person that controls a Class N Shareholder or a Terminated Shareholder from using, in connection with employment for himself or herself or an employer other than the Companies or their affiliates, knowledge which was acquired by the Class N Shareholder during the course of his or her employment with the Companies and their affiliates, and which is generally known to persons of his or her experience in other companies in the same industry.

(b)   Unless waived in writing by the Management Committee, which waiver may be granted or withheld in the Management Committee's sole discretion, prior to termination of employment with either of the Companies and their affiliates and for a period of one year after such termination date, each Class N Shareholder and each person that controls a Class N Shareholder agree that he or she will not directly or indirectly, whether for himself or herself or for any other person and whether as proprietor, principal, stockholder, partner, agent, director, officer, employee, consultant, independent contractor or in any other capacity:

27

(i)    engage in, or have any interest in any Competing Enterprise (as defined below), or solicit or attempt to solicit the business of any person or entity who is an investor in any Investment Accounts operated or managed by the Company Group or any person or entity who has been such an investor in the 24 month period prior to the Class N Shareholder's termination of employment or the person that controls a Class N Shareholder's termination of employment with either of the Companies and their affiliates or any person or entity who was an investment prospect of the Company Group with whom the Company Group has had contact as set forth on a list to be prepared by FGL on the date of termination of employment in the 12 month period prior to the Class N Shareholder's termination of employment or the person that controls a Class N Shareholder's termination of employment with either of the Companies and their affiliates;

(ii)   solicit the employment of or employ any of the employees or consultants of the Company Group or Class N Shareholders who were so employed on the date of such termination of employment or within the 12 month period immediately prior to such termination date (other than those employees whose employment with the Company Group was involuntarily terminated);

(iii)  participate in any business that allocates investors' assets to alternative investment managers or markets investment products that allocate their assets to multiple alternative investment managers, such as alternative manager funds of funds, or that otherwise place investment assets with alternative investment managers; or

(iv)   Notwithstanding anything to the contrary in this Subsection 8.6(b) if a Class N Shareholder or person that controls a Class N Shareholder is terminated for Cause under clause (ii) of the definition of Cause, the restriction set forth in this Subsection 8.6(b) shall not apply from and after such Class N Shareholders' termination or after the termination of such person that controls a Class N Shareholder.

(c)    For purposes of this Section 8.6, "Competing Enterprise" means any person or entity which engages in any business that is competitive with any business that the Company Group is engaged in at the time of determination and in the same geographic location as the Company Group.

(d)    The parties acknowledge that they have attempted to limit a Class N Shareholder's (or a person that controls a Class N Shareholder's) and Terminated Shareholder's rights to compete only to the extent necessary to protect the Company Group from unfair competition.

28

(e)     If, at any time, a court of competent jurisdiction holds that any of the restrictions stated in this Section 8.6 are unreasonable under circumstances now or then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under the circumstances will be substituted for the stated period, scope or area.

(f)     Nothing in this Section 8.6 shall prevent a Class N Shareholder, a person that controls a Class N Shareholder or Terminated Shareholder from owning a 5% or less equity interest in any corporation listed on the New York or American Stock Exchange or included in the National Association of Securities Dealers Automated Quotation System.

(g)     For purposes of this Section 8.6, "Company Group" means FGL, its direct and indirect subsidiaries, its shareholders and any other entity in which FGL directly or indirectly owns a 51% equity interest, or which directly or indirectly owns a 51% equity interest in FGL.

(h)     In the event that a Class N Shareholder, a person that controls a Class N Shareholder or a Terminated Shareholder violates the confidentiality provisions of Section 8.6(a) or engages in competition in violation of Section 8.6(b), then there shall be no distributions pursuant to Section 8.1, and, if applicable, such Terminated Shareholder shall be required to repay any distributions made pursuant to Section 8.1 prior to the date of such violation.   This amount shall be in addition to any remedies which may be available to the Companies under Section 8.6(i) and is not intended to represent liquidated damages in lieu thereof.

(i)     The Companies and Class N Shareholder or person that controls a Class N Shareholder agree that money damages would be inadequate for any breaches of Sections 8.6(a) or (b).  Therefore, notwithstanding the provisions of Section 12.16 in the event of a breach or threatened breach of Sections 8.6(a) or (b), the Companies, or its successors or assigns may, in addition to other rights and remedies existing in its favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief, in order to enforce, or prevent any violation of, the provisions hereof.

8.7.     Deferred Fees.  In accordance with Section 5.1(a)(i), amounts of Net Cash Flow attributable to the receipt of Deferred Fees shall be allocated and distributed to the Terminated Shareholders who are entitled to such Deferred Fees in accordance with the Deferred Income Allocation Plan.

## Article IX.

### Retirement of Class E Shareholders

9.1.     Retirement of Class E Shareholders.  For purposes of this Article and Articles 4 and 5, upon the Retirement of either Walter Noel or Jeffrey Tucker, the Class E Shares held by each of Fairfield Greenwich Capital Partners, Inc. and Fairfield International Managers, Inc., shall each be deemed to be held 50% by Walter Noel and 50% by Jeffrey Tucker.  Upon the retirement of Walter Noel or Jeffrey Tucker, the Class E Shares owned by Fairfield Greenwich

29

Capital Partners, Inc. and Fairfield International Managers Inc. shall be treated and adjusted as set forth herein (including but not limited to for purposes of determining the Capital Account allocable to the retired Class E Shares) as if held directly by Walter Noel or Jeffrey Tucker as the case may be, provided that payments on account of such retired Class E Shares shall be made to Fairfield Greenwich Capital Partners, Inc. and Fairfield International Managers Inc.

9.2.    Adjustment of Interest.   Upon the Retirement of a Class E Shareholder, the Percentage Interest to which such Class E Shareholder shall be entitled shall be reduced to 17% and sufficient Shares to reduce his Percentage shall be repurchased at par value and cancelled, provided his Capital Account shall remain allocable to his outstanding Shares.

9.3.    Retirement Percentage – First Retirement.   Upon the Retirement of the first Class E Shareholder to retire, the difference between the Percentage Interest such Class E Shareholder was receiving prior to Retirement and a Percentage Interest equal to 17% of Profits (the "Class E Retirement Percentage") shall be allocated as follows:

(a)    50% to non-retired Class E Shareholders in accordance with their Class E Percentage Interests; and

(b)    50% to Class N Shareholders or Key Employees, such amounts to be allocated within 30 days of such Retirement by the majority decision of the Class E Shareholders.

9.4.    Retirement Percentage – Second Retirement.   Upon the Retirement of the second Class E Shareholder to retire, the Class E Retirement Percentage shall be allocated as follows:

(a)    25% to the non-retired Class E Shareholder; and

(b)    75% to Class N Shareholders or Key Employees, within 30 days of Retirement, by the majority decision of the Class E Shareholders.

9.5.    Retirement Percentage – Final Retirement.   Upon the Retirement of the final Class E Shareholder to retire, the Class E Retirement Percentage shall be allocated, within 30 days of such Retirement, by the majority decision of the Class E Shareholders, to Class N Shareholders or Key Employees and shall become Class N Shares.

9.6.    Retired Partner Payout Distribution.   Following the Retirement of a Class E Shareholder, the Class E Shareholder (or his designee) shall be entitled to be paid the amount of his Tax Basis Capital Account and distributions of such Shareholder's allocable share of Profits in accordance with Section 5.3(a)(iii) other than profits from Capital Events based upon his Class E Percentage Interest as provided in Section 9.2 for a period of 20 years after his Retirement, subject to dilution as provided in Section 7.9(d)(ii) and subject to Section 9.7. For purposes of this Section, profits shall be determined before deduction of Guaranteed Payments and any compensation paid to Bonus Pool Grant recipients. After the 20th anniversary, the retired Class E Shareholder shall be entitled to no more distributions of Profits, its Interest in FGL, including but not limited to any rights to its Capital Account, shall be extinguished, its Shares repurchased at par value and cancelled and its Class E Percentage Interest shall be available for grant to Key Employees or Class N Shareholders as Class N Shares or Bonus Pool Grants. At the end of such

period, the balance, if any, in such retired Class E Shareholder's Capital Account shall be transferred to the Retired Capital Account. Payments, made to a retired Class E Shareholder as provided in this Section 9.6, other than distributions of the Retired Shareholder's Tax Basis Capital Account, shall be payments to a retired partner pursuant to Section 736(a)(1) and treated as a distributive share of FGL's income. It is intended that for purposes of Section 736 each Shareholder shall be treated as a general partner. Distributions of a terminated Shareholder's Tax Basis Capital Account shall be treated as a distribution chargeable against the Retired Shareholder's Capital Account in accordance with Section 4.3

9.7.    Retired Partner – Capital Event.  Upon a Capital Event or a Major Capital Event, a Class E Shareholder who has retired, but who has not received a distribution of profits for a 20 year period, shall be treated as a Class E Shareholder for purposes of allocation of Profits arising from a Capital Event and the distribution of Net Capital Event Proceeds shall be determined in accordance with Section 5.2.

9.8.    Retired Partner Deferred Fees.  In accordance with Section 5.1(a)(i), amounts of Net Cash Flow attributable to the receipt of Deferred Fees shall be allocated and distributed to the retired Class E Shareholders who are entitled to such Deferred Fees in accordance with the Deferred Income Allocation Plan.

## Article X.

### Special Adjustments

10.1.    Class E Minimum Percentage Interests.    Notwithstanding anything in this Agreement to the contrary, the Shares held by the Class E Shareholders shall not represent less than 51% of the Percentage Interests of FGL until the first Class E Shareholder to retire has been completely paid out pursuant to Section 9.6 unless the Class E Shareholders consent by a majority of the Class E Percentage Interests.

10.2.    Additional Share Issuances or Cancellations.    Whenever necessary to reflect changes in the Percentage Interests, Class E Percentage Interest or Class N Percentage Interest, FGL shall issue or cancel such Class E or Class N Shares as are necessary to have the Percentage Interests, Class E Percentage Interests or Class N Percentage Interests be in accordance with terms of this Agreement. Issuance of such Shares shall not affect the Capital Account allocable to the Shares held by a Shareholder in accordance with this Agreement.

## Article XI.

### Dissolution and Termination

11.1.    Dissolution.    FGL shall be dissolved upon (i) the written agreement of all Shareholders or (ii) a Major Capital Event, unless the Shareholders acting upon the approval of holders of 66 2/3% of the Percentage Interests elect to continue FGL.

31

11.2.   Winding Up, Liquidation and Distribution of Assets.

(a)   Upon dissolution, an accounting shall be made by FGL's independent accountants of the accounts of FGL and of FGL's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Shareholders shall immediately proceed to wind up the affairs of FGL.

(b)   If the Company is dissolved and its affairs are to be wound up, the Shareholders shall:

(i)   Sell or otherwise liquidate all of FGL's assets as promptly as practicable (except to the extent the Shareholders may decide to distribute any assets to the Shareholders in kind);

(ii)   Allocate any Profits or Losses resulting from such sales to the Shareholders' Capital Accounts in accordance with Section 5.4;

(iii)   Discharge, or make reasonable provision to discharge, all claims, liabilities or obligations of FGL, including liabilities to Shareholders who are creditors, to the extent otherwise permitted by law (other than claims, liabilities or obligations to Shareholders for distributions), and establish such reserves as may be reasonably necessary to provide for the discharge of all contingent, conditional or unmatured claims, liabilities or obligations of FGL (for purposes of determining the Capital Accounts of the Shareholders, the amounts of such reserves shall be deemed to be an expense of FGL); and

(iv)   Distribute the remaining assets in accordance with Section 5.2.

If any assets of FGL are to be distributed in kind, such assets shall be deemed to have been sold as of the date of dissolution for their Agreed Value, and the Capital Accounts of the Shareholders shall be adjusted to reflect such deemed sale.

(c)   Notwithstanding anything to the contrary contained herein, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Shareholder has an Adjusted Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Shareholder shall have no obligation to make any Capital Contribution, and the negative balance of such Shareholder's Adjusted Deficit Capital Account shall not be considered a debt owed by such Shareholder to FGL or to any other person for any purpose whatsoever.

(d)   Upon completion of the winding up, liquidation and distribution of the assets, FGL shall be deemed terminated.

(e)   The Shareholders shall comply with all requirements of applicable law pertaining to the winding up of the affairs of FGL and the final distribution of its assets.

11.3.   <u>Articles of Dissolution</u>.  When all debts, liabilities and obligations of FGL have been paid and discharged or adequate provisions have been made therefor, and all of the remaining property and assets of FGL have been distributed to the Shareholders in accordance with Section 11.2, FGL shall follow the dissolution procedure required by the Act.

11.4.   [Intentionally Left Blank].

11.5.   <u>Return of Contribution Nonrecourse to Other Shareholders</u>.  Except as provided by law, or by separate agreement between the parties, upon dissolution, each Shareholder shall look solely to the assets of FGL for the return of its Capital Contribution.  If FGL's property remaining after the payment or discharge of the debts and liabilities of FGL is insufficient to return the Capital Contribution of one or more Shareholders, such Shareholders shall have no recourse against any other Shareholder, except as otherwise provided by law.

11.6.   <u>Major Capital Event</u>.  If a Major Capital Event consisting of a sale of all of the Shares is approved in accordance with Section 3.2, all Shareholders agree that they will sell their Shares in accordance with the terms of the transaction so approved.  The Shareholders agree that the Net Capital Event Proceeds from such transaction shall be distributed among the Shareholders in the same manner as if the assets of FGL were sold for the same consideration.

## **Article XII.**

### Miscellaneous Provisions

12.1.   <u>Notices</u>.  Any notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be by hand delivery, certified or registered mail, return receipt requested, telecopier, or commercial overnight courier to the parties at the respective addresses set forth below (or at such other addresses as the parties may specify by notice delivered pursuant hereto).  Such notices shall be deemed to have been given: when personally delivered, if delivered by hand; five (5) business days after deposit in the mail, if sent by certified or registered mail; on the date telecopied (with confirmation of receipt), if telecopied (provided a copy shall also be sent by regular U.S. mail); or on the next business day after delivery to the courier, if sent by overnight courier.

If to Fairfield Greenwich Limited:

Zephyr House, Mary Street
P.O. Box 709GT, Georgetown
Grand Cayman, Cayman Islands, B.W.I.
Facsimile: 345-949-8460

With a copy to:

Gardner, Carton & Douglas
321 N. Clark Street
Chicago, IL 60610-4795
Attention: Dennis J. Carlin
Facsimile: 312-644-3381

If to Fairfield Greenwich Capital Partners, Inc.:

399 Park Avenue – 36th Floor
New York, NY 10022
Attention: Jeffrey Tucker
Facsimile: 212-319-0450

If to Fairfield International Managers Inc.:

2 Soundview Drive
Greenwich, CT 06830
Attention: Walter Noel
Facsimile: 203-629-1395

If to Safehand Investments:

Zephyr House, Mary Street
P.O. Box 709GT, Georgetown
Grand Cayman, Cayman Islands, B.W.I.
Attention: Andres Piedrahita
Facsimile: 011-44-207-409-3090

If to the holders of Class N Shares:

to the addresses listed on Exhibit C

With a copy to:

Schulte Roth & Zabel
900 Third Ave.
New York, NY 10022
Attention: Dan Shapiro
Facsimile: 212-593-5955

    12.2.    Party in Interest Transaction.  Any transaction other than employment between the Companies and a Shareholder or affiliate of a Shareholder is expressly authorized provided that the terms of such transactions are generally no less favorable to the Companies than the

34

terms that would be made available to the Companies in arm's length transactions with independent third parties.

12.3. <u>Application of New York Law</u>. This Agreement shall be governed by the laws of the State of New York.

12.4. <u>No Partnership</u>. This Agreement shall not constitute a partnership or joint venture among the parties or under state, local or foreign law.

12.5. <u>Amendments</u>. This Agreement may be amended by the approval of Class E and Class N Shareholders holding 66-2/3% of the Percentage Interests, voting as a single class. Notwithstanding the foregoing, no amendment to Article V that disproportionately affects any Shareholder or any class of Shareholders nor any other amendment that disproportionately and materially adversely affects any Shareholder or any class of Shareholder shall be made without the written consent of all Shareholders so affected, and no amendment to Articles VII, VIII or IX that materially and adversely affects the economic interests of the Class N Shareholders shall be made unless it receives the approval of Class N Shareholders holding 66-2/3% of the Class N Percentage Interests voting separately as a class.

12.6. <u>Future Amendments</u>. The Class E Shareholders and Class N Shareholders understand and acknowledge that in the event the ratio of non-Sentry AUM revenues to Sentry revenues undertakes a significant shift and/or at some point in time after the Tranche 3 Goal is achieved and all Class E Shareholders are retired, the parties will explore various realignments in the control arrangements set forth in Section 6, which may include abolition of Class E Shareholder veto rights, call provisions and drag-alongs on Capital Events approved by the Class N Shareholders and/or creation of a supplemental bonus pool prior to any allocation of profit to Class E and Class N shareholders.

12.7. <u>Construction</u>. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa. All references to Sections, Exhibits, Schedules and the like shall refer to this Agreement, unless specified otherwise.

12.8. <u>Headings</u>. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

12.9. <u>Waivers</u>. No failure or delay on the part of any Shareholder in exercising any power or right under this Agreement or the Act shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right. Any waiver hereunder must be express and in writing by the party agreeing to waive any right hereunder.

12.10. <u>Rights and Remedies Cumulative</u>. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

12.11. Severability. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

12.12. Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and permitted assigns.

12.13. Third Parties. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Companies or any other third party.

12.14. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

12.15. Entire Agreement. This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to the subject matter hereof.

12.16. Arbitration.

(a)     Any controversy or claim arising out of or relating to the Articles, this Agreement or the breach hereof other than a breach of Section 8.6 for which either of the Company seeks a remedy under Section 8.6(i) shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

(b)     Within fifteen (15) days after the commencement of arbitration, each Shareholder who is a party to the dispute shall select one person to act as arbitrator and the arbitrators selected shall select another arbitrator within ten (10) days of their appointment. If the arbitrators selected by the parties are unable or fail to agree upon the additional arbitrator, the additional arbitrator shall be selected by the American Arbitration Association.

(c)     The place of arbitration shall be New York, New York.

(d)     Any Shareholder may apply to the arbitrators seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Any Shareholder also may, without waiving any remedy under this Agreement, seek from any court having jurisdiction any interim or provisional equitable relief that is necessary to protect the rights or property of that Shareholder, pending the establishment of the arbitral tribunal or pending the arbitral tribunal's determination of the merits of the controversy.

(e)     Consistent with the expedited nature of arbitration, each Shareholder who is a party to the dispute will, upon the written request of the other party(ies), promptly provide the other(s) with copies of documents relevant to the issues raised by any claim

36

or counterclaim.  Any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the arbitrators, which determination shall be conclusive.  All discovery shall be completed within forty-five (45) days following the appointment of the arbitrators.

12.17.  Ownership of Class N Shareholders.  Ownership interests in Class N Shareholders that are entities may only be transferred to (i) a Permitted Transferee with the written consent of the Management Committee which consent shall not be unreasonably withheld; provided, however, that ownership of Class N Shareholders that are entities shall never be less than 51% (as measured by voting stock) owned by the person controlling the entity on the date such entity becomes a party to this Agreement, or (ii) to a non-Permitted Transferee with the written consent of the Management Committee within its absolute discretion.  Each Class N Shareholder that is an entity represents and warrants to FGL that the owners of its voting stock are as set forth on a schedule provided to FGL by such Class N Shareholder.

**[signature page follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

Fairfield Greenwich Limited

By: _____
Title: _____

Fairfield Greenwich Advisors

By: _____  ROBERT A. BLUM
Title: _____VICE PRESIDENT_____

Fairfield International Managers Inc.,
a Delaware corporation

By: _____
Title: _____

Fairfield Greenwich Capital Partners, Inc.,
a Delaware corporation

By: _____
Title: _____

Safehand Investments

By: _____
Title: _____

Fortuna Asset Management, Inc.

By: _____
Title: _____

Selecta Financial Corporation

By: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

Fairfield Greenwich Limited

By:_____
Title:_____


Fairfield Greenwich Advisors

By:_____
Title:_____


Fairfield International Managers Inc.,
a Delaware corporation

By:_____
Title:_____


Fairfield Greenwich Capital Partners, Inc.,
a Delaware corporation

By:_____
Title:_____


Safehand Investments

By: *Farook Abdulla*        *John Pickles*
Title: Director              Director


Fortuna Asset Management, Inc.

By:_____
Title:_____


Selecta Financial Corporation

By:_____
Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

Fairfield Greenwich Limited

By:_____
Title:_____

Fairfield Greenwich Advisors

By:_____
Title:_____

Fairfield International Managers Inc.,
a Delaware corporation

By:_____
Title:_____

Fairfield Greenwich Capital Partners, Inc.,
a Delaware corporation

By:_____
Title:_____

Safehand Investments

By:_____
Title:_____

Fortuna Asset Management, Inc.

By:_____
Title:_____PRESIDENT_____

Selecta Financial Corporation

By:_____
Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

Fairfield Greenwich Limited

By:_____
Title:_____

Fairfield Greenwich Advisors

By:_____
Title:_____

Fairfield International Managers Inc.,
a Delaware corporation

By:_____
Title:_____

Fairfield Greenwich Capital Partners, Inc.,
a Delaware corporation

By:_____
Title:_____

Safehand Investments

By:_____
Title:_____

Fortuna Asset Management, Inc.

By:_____
Title:_____

Selecta Financial Corporation

By:_____
Title:_____

Barreneche Inc.

By: _Barreneche Inc_

Title: _Pr._

_____

Jeffrey Tucker, a director

_____

Walter Noel, a director

_____

Robert Blum

_____

Greg Bowes

_____

Harold Greisman

_____

Jacqueline Harary

_____

Richard Landsberger

_____

Corina Piedrahita

_____

Philip Toub

Barreneche Inc.

By:_____
Title:_____

Jeffrey Tucker, a director

Walter Noel, a director

Robert Blum

_____
Greg Bowes

_____
Harold Greisman

_____
Jacqueline Harary

_____
Richard Landsberger

_____
Corina Piedrahita

_____
Philip Toub

Barreneche Inc.

By:_____
Title:_____


_____
Jeffrey Tucker, a director


_____
Walter Noel, a director


_____
Robert Blum


_____
Greg Bowes


_____
Harold Greisman


_____
Jacqueline Harary


_____
Richard Landsberger


_____
Corina Piedrahita


_____
Philip Toub

Barreneche Inc.

By:_____
Title:_____


_____
Jeffrey Tucker, a director


_____
Walter Noel, a director


_____
Robert Blum


_____
Greg Bowes


_____
Harold Greisman


_____
Jacqueline Harary


_____
Richard Landsberger


_____
Corina Piedrahita


_____
Philip Toub

Barreneche Inc.

By:_____
Title:_____


_____
Jeffrey Tucker, a director


_____
Walter Noel, a director


_____
Robert Blum


_____
Greg Bowes


_____
Harold Greisman


_____
Jacqueline Harary


_____
Richard Landsberger


_____
Corina Piedrahita


_____
Philip Toub

Barreneche Inc.

By:_____
Title:_____


_____
Jeffrey Tucker, a director


_____
Walter Noel, a director


_____
Robert Blum


_____
Greg Bowes


_____
Harold Greisman


_____
Jacqueline Harary


_____
Richard Landsberger


_____
Corina Piedrahita


_____
Philip Toub

Barreneche Inc.

By:_____
Title:_____


_____
Jeffrey Tucker, a director


_____
Walter Noel, a director


_____
Robert Blum


_____
Greg Bowes


_____
Harold Greisman


_____
Jacqueline Harary


_____
Richard Landsberger


_____
Corina Piedrahita


_____
Philip Toub

Barreneche Inc.

By:_____
Title:_____


_____
Jeffrey Tucker, a director


_____
Walter Noel, a director


_____
Robert Blum


_____
Greg Bowes


_____
Harold Greisman


_____
Jacqueline Harary


_____
Richard Landsberger


_____
Corina Piedrahita


_____
Philip Toub

FOR PURPOSES OF AGREEING TO BE BOUND
BY THE PROVISIONS OF SECTION 8.6

_____
Lourdes Barreneche

_____
P. Cornelis Boele

_____
Santiago Reyes

FOR PURPOSES OF AGREEING TO BE BOUND
BY THE PROVISIONS OF SECTION 8.6

_____
Lourdes Barreneche

_____
P. Cornelis Boele

_____
Santiago Reyes

FOR PURPOSES OF AGREEING TO BE BOUND
BY THE PROVISIONS OF SECTION 8.6

_____
Lourdes Barreneche

_____
P. Cornelis Boele

_____
Santiago Reyes

**EXHIBIT A**

SERVICES AGREEMENT

THIS AGREEMENT, made and entered into as of January 1, 2002 by and between Fairfield Greenwich Advisors, a Delaware limited liability company (the "Company") and _____ ("Employee");

WITNESSETH THAT:

WHEREAS, the Company is wholly-owned by Fairfield Greenwich Limited, a Cayman Islands company ("Fairfield");

WHEREAS, Fairfield is in the business of managing and marketing hedge fund investments and has entered into management and other service contracts with various hedge funds;

WHEREAS, Fairfield has no employees capable of servicing such contracts;

WHEREAS, the Company has been retained to provide such services;

WHEREAS, Employee's services are critical to the provision of services by the Company to Fairfield;

WHEREAS, the parties desire to enter into this Agreement pertaining to Employee's provision of services to the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, it is hereby covenanted and agreed by Employee and the Company as follows:

1.    Performance of Services.  Employee agrees to provide the services described below as an employee in furtherance of the business of the Company.  Employee's duties under this Agreement shall include:

  (a)    business development,

  (b)    review and oversight of product creation,

  (c)    review and oversight of fund administration and support services (including shareholder communications),

  (d)    review and oversight of the finances of the Company,

  (e)    oversight of compliance with all applicable laws, rules and regulations;

A-1

(f)     review and oversight of the employees of each other fund managed by the Company; and

(g)     marketing of funds.

Employee agrees to devote such time to the Company as is reasonably necessary to perform the foregoing duties; provided, however, nothing in this Agreement shall be construed as preventing Employee from engaging in charitable, civic or other similar activities, to the extent that such activities do not interfere with his duties under this Agreement.

2.     <u>Compensation</u>. Subject to the terms of this Agreement, while Employee is employed by the Company, the Company shall compensate him for his services at a rate of $_____$ U.S. per calendar year ("Compensation"), payable in substantially equal installments within 45 business days following the end of each calendar quarter.

3.     <u>Other Benefits</u>. While Employee is employed by the Company, he shall be eligible to participate in plans maintained by the Company from time to time to provide benefits for its employees generally in accordance with their terms.

4.     <u>Expenses</u>. The Company shall reimburse Employee for all reasonable expenses incurred in performing his obligations under this Agreement, subject to his presentation of documentation reasonably acceptable to the Company.

5.     <u>Termination</u>. This Agreement may be terminated by the Company or Employee at any time by giving 30-day advance written notice to the other party. Upon termination of this Agreement for any reason, Employee shall be entitled to the following:

(a)     Compensation for the period ending on the date of his termination of employment. For this purpose, Compensation shall be deemed to be earned on a pro rata basis during the calendar year.

(b)     Any payments or benefits to which Employee may be entitled under any benefit plans or arrangements maintained by the Company, determined solely in accordance with the terms of such plans or arrangements.

(c)     Any payments to be provided to Employee for periods after his termination of employment under that certain agreement entitled Shareholder and Voting Agreement for Fairfield Greenwich Limited dated of even date herewith, subject to the terms of such agreement including the noncompetition restriction in Section 8.6. For purposes of Section 8.1 of such Agreement, as of the date hereof Employee has had \_\_\_\_\_ years of service with the Company, its predecessors and affiliates.

6.     <u>Confidential Information</u>. Employee agrees that, except as may be required by the lawful order of a court of competent jurisdiction, or except to the extent that he has express

A-2

authorization from the Company, he will keep secret and confidential indefinitely all non-public information concerning the Company and its affiliates which was acquired by or disclosed to him during the course of his employment with the Company, and not to disclose the same, directly or indirectly, to any other person, firm or business entity, or to use it in any way; provided, however, nothing in this paragraph shall be construed so as to prevent Employee from using, in connection with his employment for himself or an employer other than the Company or its affiliates, knowledge which was acquired by him during the course of his employment with the Company and its affiliates, and which is generally known to persons of his experience in other companies in the same industry.

7.  **Successors.** This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business.

8.  **Notices.** Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid, or sent by facsimile or prepaid overnight courier to the parties at the addresses set forth below (or such other addresses as shall be specified by the parties by like notice):

if to the Company:

Fairfield Greenwich Limited
Zephyr House, Mary Street
P.O. Box 709GT, George Town
Grand Cayman, Cayman Island, B.W.I.

With a copy to:

Fairfield Greenwich Advisors
399 Park Avenue, 36th Floor
New York, New York  10022
Attn:  Jeffrey Tucker

if to Employee

_____

_____

_____

9.  **Waiver of Breach.** No waiver by either party of a breach of this Agreement by the other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent

A-3

breach by such other party or any similar or dissimilar provisions or conditions at the same or any prior or subsequent time. The failure of any party to take any action by reason of such breach will not deprive such party of the right to take action at any time while such breach continues.

10.    Entire Agreement. Except as otherwise noted herein, this Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior and contemporaneous agreements, if any, between the parties relating to the subject matter hereof.

11.    Governing Law. This Agreement shall be construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, Employee has hereunto set his hand, and the Company has caused these presents to be executed in its name and on its behalf, all as of the day and year first above written.

_____
Employee.

FAIRFIELD GREENWICH ADVISORS,
a Delaware limited liability company

By_____
Its_____

A-4

**EXHIBIT B**

**Example 1A**

**Examples for Allocations and Revaluations**

1.    Assumptions, January 1, 2002

Value of Company is $100,000,000 and Class N ("N[1]") Interests of 10% are issued

On January 1, 2002 Class E have 90% of Profits and Class N has 10% of profits

Capital Accounts are:

Class E                    $100,000,000
Class N*                            0

Profits & losses for the year are allocated 90-10 among the Class E and Class N after all expenses including Guaranteed Payments

2.    Assume on January 1, 2003 another 10% of Class N ("N[2]") interests are issued and the Company is now valued at $125,000,000

Immediately before the issuance, the Company is revalued and deemed to sell its assets for $125,000,000 resulting in $25,000,000 gain[**]

Pursuant to Section 5.4(a) this revaluation gain is allocated as follows:

The first $11,111,111 of gain is allocated to the existing Class N Shareholders to bring the Class E and Class N[1] Capital Accounts into a 90-10 ratio. The balance of gain ($13,888,889) is allocated 90% to the Class E ($12,500,000) and 10% to the existing Class N[1]s ($1,388,888.9).

---

* ignoring for this purpose the $1,000 cash contributions to be made by each Class Partner

** Gain is book gain and not tax gain. Tax gain will have to be equitably allocated to take into account book tax differences.

B-1

Upon issuance on January 1, 2003 of the $N^2$ interests, the capital accounts will be:

|  | Beginning Capital | Gain Allocation | Revalued Capital | Profit% |
|---|---|---|---|---|
| Class E | $100,000,000 | $12,500,000 | $112,500,000 | 80% |
| Class $N^1$ |  | $12,500,000 | $12,500,000 | 10% |
| Class $N^2$ | ---- | $12,500,000 | 0 | 10% |
| Total | $100,000,000 | $25,000,000 | $125,000,000 | 100% |

3.    Assume on January 1, 2004 another 10% of Class N ($N^3$) interests are issued and the company is valued at $130,000,000. There is only $5,000,000 of "deemed" gain to be allocated in the revaluation. Since that is not enough gain to bring the accounts into balance the gain is allocated as follows:

First, the amount of gain that would be required to get the Capital Accounts of the Class E, Class $N^1$ and Class $N^2$ shareholders to an 80-10-10 ratio is $15,625,000 which would give the Class E a capital account of $112,500,000 the Class $N^1$ $14,062,500 and Class $N^2$ $14,062,500. The required gain was determined by dividing the Class E capital account by .80 to determine that 100% of the Capital Accounts should be $140,625,000 which requires $15,625,000 of gain.

Since we have only $5,000,000 of gain it is allocated:

To Class $N^1$    $\dfrac{\$1,562,500^{***}}{\$15,625,000}$    X  $5,000,000 = $500,000

and Class $N^2$    $4,500,000

Capital Accounts at January 1, 2004

|  | Beginning Capital | Gain Allocation | Ending Capital | Profit% |
|---|---|---|---|---|
| Class E | $112,500,000 | 0 | $112,500,000 | 70% |
| Class $N^1$ | $12,500,000 | $500,000 | $13,000,000 | 10% |
| Class $N^2$ | 0 | $4,500,000 | $4,500,000 | 10% |
| Class $N^3$ | ---- |  | 0 | 10% |
| Total | $25,000,000 | $5,000,000 | $130,000,000 | 100% |

--------

*** The amount available for allocation is allocated based on the ratio of the individual shareholder's required gain to the total required gain

B-2

Assume on January 1, 2005 another 10% Class N Interest ("$N^4$")is issued and now the Company is worth $170,000,000. The "deemed" gain to be allocated in the revaluation immediately prior to the issuance is $40,000,000 so that the capital accounts are:

|  | Beginning Capital | Gain Allocation | Ending Capital | Profit% |
|---|---|---|---|---|
| Class E | $112,500,000 | $6,500,000 | $119,000,000 | 60% |
| Class $N^1$ | $13,000,000 | $4,000,000 | $17,000,000 | 10% |
| Class $N^2$ | $4,500,000 | $12,500,000 | $17,000,000 | 10% |
| Class $N^3$ | 0 | $17,000,000 | $17,000,000 | 10% |
| Class $N^4$ | 0 |  |  | 10% |
| Total | $130,000,000 | $40,000,000 | $170,000,000 | 100% |

Assume on December 31, 2007, the Company is sold for $200,000,000. The gain is $30,000,000.

The gain is allocated so that capital accounts are in accordance with percentages:

|  | Beginning Capital | Gain Allocation | Ending Capital | Profit% |
|---|---|---|---|---|
| Class E | $119,000,000 | $1,000,000 | $120,000,000 | 60% |
| Class $N^1$ | $17,000,000 | $3,000,000 | $20,000,000 | 10% |
| Class $N^2$ | $17,000,000 | $3,000,000 | $20,000,000 | 10% |
| Class $N^3$ | $17,000,000 | $3,000,000 | $20,000,000 | 10% |
| Class $N^4$ | 0 | $20,000,000 | $20,000,000 | 10% |
| Total | $130,000,000 | $30,000,000 | $200,000,000 | 100% |

B-3

### Example 1B

Assume the same Facts as above Except:

1.    No additional units are issued on January 1, 2005;

2.    When the Company is sold on December 31, 2007, the N interests in the aggregate have a percentage interest of 30%

3.    Under Section 7.9(e) of the Agreement, the Company is required to issue an additional Class N Interests ($N^4$) of 10% immediately prior to the sale.

The gain on sale is allocated as follows:

The gain is $70,000,000 because the last revaluation was $130,000,000 at January 1, 2004 and pursuant to Section 4.3(c) of the Agreement there is no revaluation on the issuance of the Class $N^4$ Interests because they are being issued immediately prior to a Capital Event.

Capital Accounts at December 31, 2007

|  | Beginning Capital | Gain Allocation | Ending Capital | Profit% |
|---|---|---|---|---|
| Class E | $112,500,000 | $7,500,000 | $120,000,000 | 60% |
| Class $N^1$ | $13,000,000 | $7,000,000 | $20,000,000 | 10% |
| Class $N^2$ | $4,500,000 | $15,500,000 | $20,000,000 | 10% |
| Class $N^3$ | 0 | $20,000,000 | $20,000,000 | 10% |
| Class $N^{4*}$ | 0 | $20,000,000 | $20,000,000 | 10% |
| Total | $130,000,000 | $70,000,000 | $200,000,000 | 100% |

---

* The Class $N^4$ Interest would not be issues as profits interests and the value would be subject to tax to the recipients as ordinary income.

### Example 1C

Assume same facts as in 1B except the company is sold for $175,000,000. There is only $45,000,000 gain. Because since that is not enough gain to bring the capital accounts into balance the gain is allocated as follows:

The gain that would be required to get the capital accounts of the Class E, Class $N^1$, $N^2$, $N^3$, and $N^4$ into a 60, 10,10, 10 ratio is $57,500,000 which would give the Class E shareholder a capital account of $112,500,000 and each Class N shareholder a capital account of 18,750,000. That required gain was determined by dividing the Class E capital account by .60[**] to determine that 100% of the Capital Account should be $187,500,000 which requires $57,500,000 of gain. As there is only $45,000,000 gain it is allocated as follows:

$$\text{To Class } N^1 \quad \frac{\$5,750,000}{\$57,500,000} \text{ X } \$45,000,000 = \$4,500,000$$

$$\text{To Class } N^2 \quad \frac{\$14,250,000}{\$57,500,000} \text{ X } \$45,000,000 = \$11,152,173$$

$$\text{To Class } N^{3\,\&\,4} \quad \frac{\$18,750,000}{\$57,500,000} \text{ X } \$45,000,000 = \$14,674,000$$

Capital Accounts at December 31, 2007

| | Beginning Capital | Gain Allocation | Ending Capital |
|---|---|---|---|
| Class E | $112,500,000 | $ 0 | $112,500,000 |
| Class $N^1$ | $13,000,000 | $4,500,000 | $17,500,000 |
| Class $N^2$ | $4,500,000 | $11,152,000 | $15,652,000 |
| Class $N^3$ | 0 | $14,674,000 | $14,674,000 |
| Class $N^4$ | 0 | $14,674,000 | $14,674,000 |
| | 130,000,000 | | $175,000,000 |

---

[**] We use .60 instead of .7 because the $N^4$ units are issued without a revaluation and is to have a full 10% of the sales if possible

B-5

## Example 2

### Retirement of a Partner

Assume the following capital accounts and that the value is $150,000,000 on December 31, 2008.

|  | CAPITAL ACCOUNTS | Profit Percentages |
|---|---|---|
| CLASS E[1] | $30,000,000 | 20% |
| CLASS E[2] | $30,000,000 | 20% |
| CLASS E[3] | $30,000,000 | 20% |
| CLASS N | $60,000,000 | 40% |

CLASS E[1] retires on December 31, 2008. His capital account does not change and his class E% drops to 17% and the remaining Class E will be adjusted to 20.75% each. Class N goes to 41½ %. The retired Class E will get paid for 20 years. Assume further that through December 31, 2015 he has received a total of $60,000,000 in retirement payments pursuant to Article 9 of the Agreement.

Assume that the company is sold on December 31, 2015 for $250,000,000 the $100,000,000 gain will be allocated as follows:

### STEP 1

|  | BEGINNING CAPITAL ACCOUNT | PROFIT % | GAIN ALLOCATION | ENDING CAPITAL ACCOUNT BEFORE RETIREMENT CAP ACCOUNT ALLOCATION |
|---|---|---|---|---|
| CLASS E[1] | $30,000,000 | 17% | $17,000,000 | $47,000,000 |
| CLASS E[2] | $30,000,000 | 20.75% | $20,750,000 | $50,750,000 |
| CLASS E[3] | $30,000,000 | 20.75% | $20,750,000 | $50,750,000 |
| CLASS N | $60,000,000 | 41.5% | $41,500,000 | $101,500,000 |
| TOTAL | $150,000,000 | 100% | $100,000,000 | $250,000,000 |

### STEP 2

Since the balance of E[1]'s capital account is less than the $60,000,000 in retirement payments E[1] received, he will receive no distributions from a sale. In essence he has been paid for his interest through the retirement payments. His capital account of $47,000,000 is transferred to the retired capital account and then to the other shareholders based their relative percentage interests.

20.75/83 to each Class E

B-6

41.5/83 to the Class N

The final distribution is

|  |  |  | FROM RETIRED CAPITAL ACCOUNT | ENDING CAPITAL ACCOUNT |
|---|---|---|---|---|
| CLASS E[1] | 0 |  | 0 | 0 |
| CLASS E[2] | $50,750,000 | + | $11,750,000 | $62,500,000 |
| CLASS E[3] | $50,750,000 | + | $11,750,000 | $62,500,000 |
| CLASS N | $101,500,000 | + | $23,500,000 | $125,000,000 |
| **TOTALS** | $203,000,000 |  | $47,000,000 | $250,000,000 |

## **Example 2A**

Assume the same facts as above except the retirement payments to $E^1$ have been only $30,000,000.

In that case $E^1$ is not entitled to a distribution of his entire capital account of $47,000,000. It is reduced by the $30,000,000 he has received as retirement payments and he receives $17,000,000 as a distribution from the sale. The balance of his capital account, $30,000,000, is transferred to the retired capital account and then to the other shareholders.

The table above is modified as follows:

|  |  | FROM RETIRED CAPITAL ACCOUNT | ENDING CAPITAL ACCOUNT |
|---|---|---|---|
| CLASS E[1] | $17,000,000 |  | $17,000,000 |
| CLASS E[2] | $50,750,000 | $7,500,000 | $58,250,000 |
| CLASS E[3] | $50,750,000 | $7,500,000 | $58,250,000 |
| CLASS N | $101,500,000 | $15,000,000 | $116,500,000 |
| **TOTALS** | $220,000,000 | $30,000,000 | $250,000,000 |

## Example 3A

**Guaranteed Payments, &**
**Issuance of Bonus Grants**

ASSUMPTIONS
Fiscal Year 2003
Profits Before Guaranteed Payments          $60,000,000
Class E Guaranteed Payment                  $20,000,000
Class E % 90
Class N % 7
Bonus Grant % 3 (assume to Non Class N Shareholders who receive salary in the aggregate of $500,000)

Allocation
    Minimum Class N Guaranteed Payment
    20,000,000 X 7/90 = $1,555,556

Allocation of Profit
    Bonus Grant          $60,000,000 X .03 = $1,800,000 - $500,000[1] = $1,300,000

    Profit Allocation to Class E & Class N

| | | |
|---|---|---|
| Profits | $60,000,000 | |
| | $- 1,300,000 | less bonus units |
| | $- 21,355,556 | less Guaranteed Payments |
| | $37,144,444 | |
| Class E | $34,463,917 | 90/97 |
| Class N | $2,680,526 | 7/97 |

TOTAL CLASS E    $54,463,917
CLASS N          $4,236,086
BONUS GRANT      $ 1,300,000
TOTAL            60,000,000

---

[1] Assumes that share of profits to Non N Shareholder is reduced by Salary. If the profits share was given on top of salary recipient would receive more than 3% of profits. (Salary is not included in profits.)

B-8

## Example 3B

Same as E except assume that the 3% Bonus Grants go to persons who already are Class N Shareholders

| | |
|---|---|
| Profits Before Guaranteed Payments | $60,000,000 |
| Class E Guaranteed Payment | $20,000,000 |
| Minimum Class N Guaranteed Payment | $1,555,556 |

Bonus Grant 3%                                $1,800,000 − 0 = $1,800,000[2]

Allocation

|  | 60,000,000 | |
|---|---|---|
| | - 1,800,000 | less bonus grant |
| | - 21,556,000 | less Guaranteed Payments |
| | 36,644,000 | |
| Class E | $33,999,587 | 90/97 | 34,000,000 |
| Class N | $2,644,412 | 7/97 | 2,644,412 |

TOTALS                        Corrected for Rounding

| | | |
|---|---|---|
| CLASS E | 53,999,587 | 54,000,000 |
| CLASS N | 4,199,968 | 4,200,000 |
| BONUS GRANT TO CLASS N SHAREHOLDERS | 1,800,000 | 1,800,000 |
| | | 60,000,000 |

---

[2] Assumes that there is no reduction for compensation paid to Class N Bonus Grantees as this is additional participation above their share and guaranteed payment

### Example 3C

**Bonus Pool & Retired Partners**

Assume same as 3A but 2% of Class N are retired

| | |
|---|---|
| Guaranteed Payments | $60,000,000 Profit |
| Class E (90%) | $20,000,000 |
| Class N (7%) (5% active) 2% retired and no<br>    guaranteed payment) | $1,111,111 |
|     (minimum guaranteed payment 5/90 X 20,000,000) | |
| Class N Retired (2%) | 0 |
| Bonus Grants (3%) | 0 |

Profit Allocation for Retired      60,000,000 X .02 = 1,200,000
    Bonus Grant      $60,000,000 X .03 = $1,800,000 - $500,000 = $1,300,000


Allocation to Class E and Active N

| | | |
|---|---|---|
| | $60,000,000 | |
| | $- 1,200,000 | Retired Allocation |
| | $- 1,300,000 | Bonus |
| | $- 21,111,111 | less Guaranteed Payments |
| | $36,388,889 | |


| | |
|---|---|
| Class E  90/95 | $34,473,684 + $20,000,000 = $54,473,684 |
| Class N   5/95 | $1,915,205 +  $1,111,111 =  $3,026,316 |

B-10

## EXHIBIT C

### Class N Shareholders Notice Addresses

Barreneche Inc.
c/o Lourdes Barreneche
18 E. 69th Street
New York, NY 10021

Robert A. Blum
5 Sherman Avenue
White Plains, NY 10605

Fortuna Asset Management, Inc.
c/o Cornelis Boele
250 E. 65th Street, Apt. 13C
New York, NY 10021

Gregory Bowes
4352 Forest Lane
Washington, DC 20007

Harold Greisman
1160 Park Avenue
Apt. 4C
New York, NY 10128

Jackie Harary
245 East 58th Street
Apt. 7A
New York, NY 10022

Richard Landsberger
5 Wilton Place
London SW1-X8RH

Corina Piedrahita
63 Chester Square
London SW1W 9EA
UK

Selecta Financial Corporation
c/o Santiago Reyes
480 N. Mashta Drive
Key Biscayne, FL 33149

Philip J. Toub
Avenida del Fim Moreira, 316
Leblon, Rio de Janeiro
Brazil

CH01/12194912.26

C-1