# EXHIBIT 5

# Exhibit 45

# FAIRFIELD GREENWICH GROUP

# Fairfield Sentry Fund Ltd. (B Shares)

## Client Contact:

John Wartman
Fairfield Greenwich Group
919 Third Avenue, 11th Floor
New York, NY 10022
Tel:    1.212.319.6060
E-mail:  john@fggus.com

Amit Vijayvergiya
12 Church Street
Suite 606
Hamilton, Bermuda HM 11
Tel: 1 (441) 292-5401
Fax: 1 (441) 292-5413
E-mail: main@fggbm.com

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE000112038

# TABLE OF CONTENTS

1)     **General Organizational Information   3**
   A)   ADDRESS AND CONTACT INFORMATION ............................................................... 3
   B)   OWNERSHIP, EMPLOYEES AND COMPENSATION ............................................ 5
   C)   REGISTRATIONS, DOCUMENTS AND LEGAL PROCEEDINGS ........................ 10
   D)   RECENT ORGANIZATIONAL CHANGES ............................................................ 11
   E)   CLIENT PROFILE ................................................................................................... 13
   F)   MARKETING, CLIENT SERVICE AND REPORTING ........................................ 15
2)     **Investment Strategy and Risk Control 16**
   A)   INVESTMENT STRATEGY ....................................................................................... 16
   B)   RISK CONTROL AND PORTFOLIO CONSTRUCTION ........................................ 19
   C)   MARGIN DEBT, COUNTERPARTIES AND SECURITIES LENDING .................. 23
   D)   USE OF DERIVATIVES ............................................................................................. 24
   E)   USE OF PRIVATE SECURITIES .............................................................................. 24
3)     **Performance, Valuation and Fees   25**
   A)   INVESTMENT PERFORMANCE ................................................................................ 25
   B)   VALUATION AND PRICING .................................................................................... 27
   C)   FEES .......................................................................................................................... 28
4)     **Trading, Operations, Technology and Compliance    29**
   A)   TRADING AND COMMISSIONS ............................................................................. 29
   B)   OPERATIONS (BACK OFFICE) ............................................................................. 30
   C)   ADMINISTRATION .................................................................................................. 31
   D)   TECHNOLOGY ......................................................................................................... 32
   E)   COMPLIANCE ........................................................................................................... 33
   F)   PERSONAL TRADING .............................................................................................. 34
5)     **Authentication              34**

**FGG** | **FAIRFIELD GREENWICH GROUP**

2

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE00011203g

## 1) General Organizational Information

### A) Address and Contact Information

1. Manager Name:     Fairfield Greenwich (Bermuda) Ltd. - FGBL
   (Affiliate of the Fairfield Greenwich Group, FGG)

2. Primary Address:     12 Church Street
   Suite 606
   Hamilton, Bermuda HM 11

3. Telephone Number:     1-(441) 292-5401

4. Fax Number:     1-(441) 292-5413

5. E-mail:     main@fggus.com

6. Internet address:     www.fggus.com

7. Primary Marketing/Client Contact:
   John Wartman

8. Telephone Number:
   1 (212) 319-6060

9. Primary Investment Management Contact:
   Amit Vijayvergiya

10. Telephone Number:
    1 (441) 292-5401

11. Name of person filling in questionnaire:
    Amit Vijayvergiya

12. Telephone Number:
    1 (212) 319-6060

13. Fairfield Greenwich Group Total Assets:
    $5.8 Billion (100% of assets are invested in hedge funds)

14. Fairfield Greenwich (Bermuda) Ltd. Assets:
    $4.2 Billion

15. Number of employees at Firm:
    FGG has 55 employees



**FGG**     FAIRFIELD GREENWICH GROUP

3

16.  Firm's branch offices :

Fairfield Greenwich (Bermuda) Ltd.(FGBL) is an affiliate of the Fairfield
Greenwich Group (FGG). FGG maintains its principal office in New York, with
a significant presence in London an Bermuda. FGG also has representation in
Greenwich, CT, Florida, Switzerland, Spain, Brazil, and the Netherlands.

17.  Contact information for the Manager, the Administrator, the Custodian, Legal
Counsel, and the Auditor.

INVESTMENT MANAGER

Fairfield Greenwich (Bermuda) Ltd.
12 Church Street
Suite 606
Hamilton, Bermuda HM 11
Telephone: 1 (441) 292 - 5401
Facsimile:  1 (441) 292 – 5413

ADMINISTRATOR/CUSTODIAN/REGISTRAR/TRANSFER AGENT

Citco Fund Services (Europe) B.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BW Amsterdam
P.O. Box 7241  1007 JE Amsterdam
The Netherlands
Telephone:  (31-20) 572-2100
Facsimile:  (31-20) 572-2610

U.S. COUNSEL

Law Offices of Andrew E. Goldstein
488 Madison Avenue, 16th Floor
New York, New York 10022
USA

BRITISH VIRGIN ISLANDS COUNSEL
Conyers Dill & Pearman
Romasco Place, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands

AUDITOR

PriceWaterhouseCoopers
Marten Meesweg 25
3068 AV Rotterdam
The Netherlands

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112041

## *B) Ownership, Employees and Compensation*

1.   Please provide a brief history of the organization.

In 1983 Walter M. Noel, Jr. established a consulting firm to advise offshore clients in connection with their investments in U.S. based alternative assets. Mr. Noel had previously completed stints in the management consulting business with Arthur D. Little & Co. and the international private banking business with Citibank and Chemical Bank. At Chemical, he created the international private banking group in 1977 and helped establish a network of asset management offices throughout the world, until his departure in 1983.

Following the establishment of his consulting business, Mr. Noel developed a number of relationships with investment managers, e.g. Martin Zweig, Tweedy, Brown & Co., Morgans, Waterfalls & Vintiadis, who he determined had the capital preservation, low volatility characteristics appropriate for his client base.

In 1987, Fred Kolber and Jeffrey Tucker, tenants in Mr. Noel's office space, launched the Greenwich Options Fund ("GOF"), a domestic hedge fund. Mr. Kolber had built a successful business during the prior 25 years managing his own money in a variety of hedge and arbitrage strategies. GOF marked Mr. Kolber's entry into the money management business as he sought to extend to passive investors the opportunity to participate in his trading activities, then focused on market-making in equity and equity index options using a market neutral posture in most positions.

Mr. Tucker had previously been engaged in the practice of law for 17 years, and Mr. Kolber was a client of his firm. In 1987 Tucker joined Kolber as a minority partner of the fund management business, providing assistance in the administration and marketing of GOF.

In 1988 Messrs. Noel, Kolber and Tucker created Fairfield Investment Fund, Ltd. ("FIL"), an offshore counterpart of GOF. The precipitous growth of assets in the funds and the changes being experienced in the equity options markets, i.e. declining liquidity and the increasing influence of the professionals, necessitated a reduction of assets in GOF and FIL. Consequently, Noel, Kolber and Tucker sought and received a mandate from their clients to outsource the management of a portion of the funds. Thereafter, Noel and Tucker embarked upon an effort to identify managers meeting their capital preservation, low volatility approach to investing. Contemporaneous with this effort, the three formed Fairfield Greenwich Group (FGG).

In 1989, FGG became acquainted with the split strike conversion strategy. As the strategy employed "tight" stops (put and call strikes fairly close together) it appeared appropriate for FGG clients. In April 1989, FGG started its relationship with Bernard L. Madoff Investment Securities, Inc., and it incorporated the strategy into a multi-strategy fund. And, in December 1990 the Fairfield Sentry Limited Fund was officially launched as a single-strategy fund employing the split-strike conversion strategy.



5

In 1997 the firm was merged with Littlestone Associates of New York City. Following the merger, Littlestone's principal, Andres Piedrahita, established a London office for the UK subsidiary, and became the third partner in the Fairfield Greenwich Group, in addition to Walter Noel and Jeffrey Tucker.

Today the firm's personnel are deployed in New York, Greenwich, London, Miami, Madrid, Rio de Janeiro, Lugano, Bermuda, and Holland. The New York office of the firm is responsible for the review and monitoring of the portfolios of the existing managers, for the identification of possible additional managers, and the marketing the firm's investment products. The Fairfield Greenwich Group (FGG) manages more than $5.8 billion for over 700 holders of record representing over 10,000 investors worldwide. FGG offers single as well as multi-strategy funds.

2.    What is the current legal and ownership structure of the managing organization ?

Fairfield Greenwich (Bermuda) Ltd. is a corporation organized under the laws of Bermuda. It is a wholly owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands. The Fairfield Sentry Limited Fund is domiciled in the BVI, having been incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands since it was launched in 1990.

3.    List all related entities and the role of each one:

The manager and its affiliates currently serve as investment or administrative manager to numerous funds, and have exclusive distribution arrangements with several others. The following entities are wholly owned subsidiaries of Fairfield Greenwich Limited:

- Fairfield Greenwich (UK) Limited is licensed by the Financial Services Authority (FSA)
- Fairfield Greenwich Advisors LLC is seeking registration with the SEC as an investment advisor during 2003
- Heathcliff Capital Corp., an affiliate of FGL, is registered as a broker dealer in US
- FGL is registered with the CFTC (as a Commodity Pool Operator) and the NFA.

4.    List all key employees, and the role of each one:

Investment idea generation/Research :
Walter Noel, Andres Piedrahita, Jeffrey Tucker, Harold Greisman, Richard Landsberger

Trading :

The Manager has established a non-discretionary account for the Fund at Bernard L. Madoff Investment Securities, Inc. (sometimes referred to as "BLM"), a registered broker-dealer in New York, who utilizes a strategy described as "split strike conversion", to which it allocates the predominant portion of the Fund's

 **FGG** | FAIRFIELD GREENWICH GROUP

8

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112043

assets. This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established.

Risk Control:
Harold Greisman, John Wartman, Amit Vijayvergiya

Finance and Operations :
Rob Blum, Dan Lipton, Gordon McKenzie

Legal :
Mark McKeefry

5.    Provide brief biographies (education and prior employment) of key personnel, including all those listed in being in charge of an area.

**Walter Noel**

Mr. Noel has over 30 years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management-consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its offshore private banking business. Since founding FGG, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983, Mr. Noel has been a Director or General Partner for a variety of its funds, directing marketing activity, and originating various of FGG's business opportunities. Mr. Noel graduated from Vanderbilt University in 1952, received a Master of Arts in Economics from Harvard University in 1953, and graduated from Harvard Law School in 1959.

**Andres Piedrahita**

Mr. Piedrahita is a director of the Investment Manager, founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs FGGs European and Latin American activities. Mr. Piedrahita has over fifteen years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.



FGG | **FAIRFIELD GREENWICH GROUP**

7

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112044

**Jeffrey Tucker**

Mr. Tucker has over twenty years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a registered broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.has been one of the principals of the Fairfield Greenwich Group since 1988.

**Robert Blum**

Mr. Blum oversees or assists in all aspects of FGG's activities, and focuses on product creation as well as operational and related matters. Mr. Blum has over fifteen years of directly relevant operational and legal experience in the alternative asset management arena. He previously worked at CIBC Oppenheimer Corp. (1989-1999) where he was a Managing Director, a member of the firm's Management and Operating Committees, and served in various roles during his career, including Deputy General Counsel. At CIBC Oppenheimer, Mr. Blum had extensive business responsibility (including management and operational roles) and legal involvement in the development of a wide range of transactions and businesses in the alternative and conventional asset management areas. Mr. Blum began his career as an associate in the law firm of Fulbright & Jaworski (1984-1989). Mr. Blum received his Bachelor of Arts degree from the University of Pennsylvania and his JD from the University of Chicago Law.

**Harold Greisman**

Mr. Greisman is the Chief Investment Officer of FGG, focusing on manager selection and risk oversight. Mr. Greisman has over fifteen years of experience in the investment business. Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984-1985) and then worked for DNB Capital Corporation (1985-1990), a proprietary private equity and venture capital operation controlled by Den Norske Bank. Mr. Greisman began his career at Johnson & Higgins, a large industrial insurance brokerage (1978-1982). Mr. Greisman received his Bachelor of Arts degree from



8

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112045

Tufts University and his MBA degree from the Stern School of Business at New York University.

**Richard Landsberger**

Mr. Landsberger has over 20 years of experience in mapital markets. Prior to joining FGG in 2001, Mr. Landsberger was Managing Director of Fixed Income Sales at PaineWebber (1993-2000). Mr. Landsberger previously was Managing Director and Head of Fixed Income Government Trading & Sales at Citicorp Securities (1989-1992). Mr. Landsberger received his Bachelor of Arts degree from Boston University and his MBA from Cornell University.

**Mark McKeefry**

Mr. McKeefry is General Counsel for the Group. He joined FGG in 2003 after eight years in private practice in New York and California, specializing in regulatory and compliance issues for onshore and offshore funds. He is the author of several articles on hedge fund compliance issues and investment advisor trading practices. Mr. McKeefry received his Bachelor of Science from Carnegie Mellon University in 1984 and his *Juris Doctor* from Fordham University in 1997, where he was a member of the Law Review. He was admitted to the Bar in California and New York and is based in the New York office.

**John Wartman**

Mr. Wartman focuses on quantitative research and risk management. Mr. Wartman has over 20 years experience in capital markets and risk management. Prior to joining FGG, he was Director of Risk Management at InvestorForce. From 1996 to 2000, he was a Principal at American Management Systems where he worked on enterprise-wide risk management consulting. From 1984 to 1996, he was a Senior Vice President at Prudential Securities where his business focused on derivatives and risk management. From 1980 to 1984, Mr. Wartman worked at money center banks as a currency trader and corporate advisor to Fortune 100 corporations. Mr. Wartman holds a MIM degree from the American Graduate School of International Management and an AB from Brown University.

**Daniel Lipton**

Mr. Lipton is a Certified Public Accountant. Prior to joining FGG in January 2002, Dan was a senior manager at Ernst and Young, LLP where he primarily audited, consulted and analyzed numerous hedge fund clients. Mr. Lipton received his Bachelor of Arts degree in Economics from Tufts University and his M.B.A. degrees in Accounting and Finance from the Stern School of Business at New York University.

**Amit Vijayvergiya**



9

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE00011204€

Mr. Vijayvergiya is Vice President and the Risk Manager of the Investment Manager and focuses on manager selection and risk management for the Fund. He has been employed by the Manager since 2003. Mr. Vijayvergiya has over 9 years of experience in asset management, risk management and operations research. Prior to joining the Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

6.     Are all employees potentially eligible to become owners/partners? What determines eligibility for ownership/partnership?

Yes. The criteria are subjective, but based upon individuals' demonstrated ability to enhance enterprise value. Currently, 13 employees are shareholders.

7.     Do any of the owners or employees invest their personal capital in the firm's investments?

In general, 70% of Partners' liquid net worth is invested in the FGG funds.

8.     Do any of the firm's principals have other business involvements? If so, what fraction of their professional time is allocated to the firm?

No.

## C) Registrations, Documents and Legal Proceedings



10

1. Which regulatory agencies (i.e. SEC, IMRO) has the organization registered with? What is the date of registration for each ?

   - Fairfield Greenwich (UK) Limited is licensed by the Financial Services Authority (FSA) (FGGUK was authorised and regulated from October 1998 under IMRO, Investment Management Regulatory Organisation, which was merged in December 2001 into the Financial Services Authority. (FSA)
   - Heathcliff Capital Corp. is registered as a broker-dealer with the SEC and NASD (April 2001)
   - Fairfield Greenwich Advisors LLC is seeking registration with the SEC during 2003.

2. Does the company have any other registration?

   Yes, FGL is registered with the CFTC as a Commodity Pool Operator.  It is also registered with the National Futures Association.

3. Is any material, criminal, civil or administrative proceeding pending or threatened against the firm, its funds, or any of its principals? If so, please provide a detailed explanation.

   No.

4. Has any material, criminal, civil or administrative proceeding been settled by the firm, its funds, or any of its principals in the past ? If so, please provide a detailed explanation.

   No

5. Please provide the following documentation.

   a) Offering Memorandum
   b) Subscription Document
   c) Audited Financial Statements, Auditors Reports and Management Letter
   d) Form ADV (all parts) if applicable
       - Not yet SEC registered
   e) Organizational Chart – see FGG brochure.
   f) Written policies regarding insider trading – see appendix.
   g) Insurance (Fidelity, D&O, Errors and Omissions).  List amounts and carrier (AIG, XL, Travelers, HCC - $5MN each)

## D) Recent Organizational Changes

1. Have you had any significant changes to your organization over the past year such as a merger, a strategic alliance, or an internal reorganization?

   Fairfield Sentry Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"). The registered office of the Fund is located in the BVI. There are three signifcant



11

changes over the past year :

a)  Shares of the Fund's Class B Common Stock (the "Shares") are being offered at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of issuance. The Fund initially sold Shares on February 1, 2003, at an initial offering price of U.S. $1,000 per Share.
The Fund also issues Class A Shares, which utilize the same investment strategy as the Class B Shares, but have a different fee structure. The Fund initially sold what are now its Class A Shares on November 30, 1990 at an initial offering price of $200 per share.

b)  As of July 1, 2003, Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager. It is the wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL"), an exempted company organized under the laws of the Cayman Islands, which previously served as the investment manager of the Fund. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main principals of FGL. Mr. Noel is also a Director of the Fund. FGBL expects to make application with the Bermuda Monetary Authority to become licensed as an investment provider and has made a claim for no-action relief from registration as a commodity pool operator with the U.S. Commodity Futures Trading Commission.

c)  The Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than the account at Bernard L.Madoff Securities ("the "Non-BLM Investments") as part of a new manager seeding initiative. It is anticipated that the Non-BLM Investments will be allocated among several managers, with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. The Fund will pay fees with respect to the Non-BLM Investments at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by the Manager subsidizing, from its own moneys, the fees charged on these assets by Non-BLM Investment managers). The Manager and its affiliates may separately benefit from these Non-BLM Investment arrangements.

2.  List the names and responsibilities of employees who have joined or departed the fund over the past twelve months.


No departures of professional staff this year. Hired within the last 12 months :

| | |
|---|---|
| Mark McKeefrey | General Counsel |
| Patrick Blake | Risk Analyst |
| Amit Vijayvergiya | Finance/Accounting |
| Gordon McKenzie | Finance/Accounting |
| Kathleen Barker | Administrative/Client Service |



12

| Agnes Loteta Dimandja | Administrative |
| Andrew Ludwig | Communications/Reporting |
| Jason Elizaitis | Technology/Infrastructure |
| Lauren Ross | Marketing Support |
| Annie Hudson | Marketing Support |
| Mami Hidaka | Marketing |
| Marko Musciacco | Marketing |
| Stephan Muuls | Marketing |
| Kim Perry | Marketing |
| Ron Thomann | Marketing |

Summarize the gains and losses of employees over the past five years in the table.

|  | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| Employees Added | 15 | 15 | 7 | 5 |  |
| Employees Lost | 0 | 1 | 0 | 0 | 0 |
| Total Number | 55 | 40 | 26 | 19 | 14 |

3.  Plans for expansion in the near future (next two years):

    As AUM grow and FGG adds managers and rolls out new product offerings, analysts, accounting, performance reporting, and client services personnel may be added.

## E) Client Profile

1.  Do you have domestic qualified plan (ERISA or similar) investors in your offshore funds?

    No.

2.  Do you accept money in your offshore funds from domestic (i.e. onshore) funds of funds that are composed entirely of qualified plan (ERISA or similar) investors?

    No.

3.  Summarize your client base.

    FGG has more than 700 holders of record representing private and commercial banks, insurance companies, government authorities, financial advisors, family offices, and other institutional investors. An estimated 1/3 are institutional investors.

4.  Do you manage separate accounts?

    FGG does manage separate accounts for various non-Sentry funds. To justify the time and effort, account minimum is usually U.S.$50 million.


FGG    FAIRFIELD GREENWICH GROUP

13

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED                FGGE00011205C

5.  Are separate account investors allowed to choose a custodian/prime broker? If yes, which prime brokers are you most comfortable working with?

   Yes.

6.  List the amount of firm assets gained/lost over the past 5 years:

| Year | Total Assets |
|------|--------------|
| 2003* | 5.8 Billion |
| 2002 | 5.2 Billion |
| 2001 | 4.3 Billion |
| 2000 | 3.17 Billion |
| 1999 | 2.48 Billion |
| 1998 | 1.65 Billion |
| * A/O 8/31/2003 | |

The Fairfield Greenwich Group in its underlying funds has over 700 holders of record representing banks, family offices, government authorities, and institutional investors. These relationships may represent over 8,000 individual investors.

7.  List the number of clients and the amount of assets gained/lost over the past 5 years for the specific product being considered, Fairfield Sentry Fund. Specify the reasons for each loss.

| | AUM | | # of Clients* |
|------|------|------|------|
| 2003 | | | |
| Q3 | $ 4.2 | BN | |
| Q2 | $ 4.2 | BN | |
| Q1 | $ 4.1 | BN | |
| 2002 | | | 603 |
| Q4 | $ 4.0 | BN | |
| Q3 | $ 3.9 | BN | |
| Q2 | $ 3.7 | BN | |



**FGG** | FAIRFIELD GREENWICH GROUP

14

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112051

| Q1 | $ | 3.6 | BN | |
| 2001 | | | | 585 |
| Q4 | $ | 3.5 | BN | |
| Q3 | $ | 3.4 | BN | |
| Q2 | $ | 3.4 | BN | |
| Q1 | $ | 3.3 | BN | |

| | AUM | | | |
| --- | --- | --- | --- | --- |
| 2000 | | | | 527 |
| Q4 | $ | 3.1 | BN | |
| Q3 | $ | 2.9 | BN | |
| Q2 | $ | 2.7 | BN | |
| Q1 | $ | 2.5 | BN | |
| 1999 | | | | 449 |
| Q4 | $ | 2.4 | BN | |
| Q3 | $ | 2.3 | BN | |
| Q2 | $ | 2.1 | BN | |
| Q1 | $ | 1.9 | BN | |
| 1998 | | | | 359 |
| Q4 | $ | 1.6 | BN | |

\* class A shares, class B shares were initiated in February 2003.

## F) Marketing, Client Service and Reporting

1. How are the funds marketed? Are any third party marketers used to market the funds? How are they reimbursed?

   The Fairfield Greenwich Group has been marketing the offshore fund. While the fund may engage a placement agent to market the fund, due to the limited capacity of this fund, third party sales have become limited. Each month, redemptions are replaced with new investments. Retrocessions are paid to outside sales agents.

2. List all reports and correspondence that are sent routinely to clients. How often are they sent?

   Weekly NAV Estimates (generated in-house by Fairfield Greenwich Bermuda Ltd.)
   Monthly NAV (provided by CITCO)
   Monthly Value at Risk reports
   Monthly Tear Sheets

 **FGG** | **FAIRFIELD GREENWICH GROUP**

15

Annual Report
Annual Audit

3.  What level of transparency is routinely offered to clients?

Full risk transparency is provided to meet the clients' needs, with some
restrictions determined on a case-by-case basis.

4.  Will you offer complete transparency on a monthly basis to a fund of funds to
facilitate aggregation for the purposes of risk profiling if the fund of funds reveals
only its aggregate long and short positions to clients with a delay?

Will be considered on a case-by case basis.

5.  Additional services?

Additional material is often sent to clients during periods of unusual market
conditions.

## 2)    Investment Strategy and Risk Control

### A)    *Investment Strategy*

1.  Do you employ a single investment strategy or is your fund a multi-strategy fund?
Explain your strategy.

The Fund is a single investment strategy that seeks to obtain capital appreciation of
its assets principally through the utilization of a non-traditional options trading
strategy described as a modified "split strike conversion", to which the Fund allocates
the predominant portion of its assets. This strategy has defined risk and profit
parameters, which may be ascertained when a particular position is established. Set
forth below is a description of the "split strike conversion" strategies ("SSC
Investments").

The establishment of a typical position entails (i) the purchase of a group or basket of
equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the
sale of out-of-the-money S&P 100 Index call options in an equivalent contract value
dollar amount to the basket of equity securities, and (iii) the purchase of an
equivalent number of out-of-the-money S&P 100 Index put options. An index call
option is out-of-the-money when its strike price is greater than the current price of
the index; an index put option is out-of-the-money when the strike price is lower than
the current price of the index. The basket typically consists of approximately 35 to
45 stocks in the S&P 100.

The logic of this strategy is that once a long stock position has been established,
selling a call against such long position will increase the standstill rate of return,
while allowing upward movement to the short call strike price. The purchase of an
out-of-the-money put, funded with part or all of the call premium, protects the equity
position from downside risk.



**FGG**    **FAIRFIELD GREENWICH GROUP**                                    16

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112053

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls. The further away the strike prices are from the price of the S&P 100, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

The options transactions executed for the benefit of the Fund may be effected in the over-the-counter market or on a registered options exchange.

The Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than its modified "split strike conversion" investments (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. FGBL and the Fund generally share in fees received by portfolio managers of Non-SSC Investments from investors other than the Fund. The Fund will pay fees with respect to the Non-SSC Investments at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by FGBL subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers).

2. Are the market inefficiencies you exploit present continuously or do they appear sporadically? What market environments favor or hinder the availability of investment opportunities?

This strategy performs best in a market with an upward bias with moderate volatility. The strategy requires modest market volatility for opportunistic implementation in a tactical sense.

A relatively unfavorable situation would be a stagnant market with no volatility. Also, extreme downside market leaves little opportunity for success for this strategy. However, in such cases, the manager can raise cash levels and wait for more favorable market conditions.

3. How are investment ideas generated and how are they implemented? What are your primary sources of research? What securities and instruments are used to implement your views?

The Fund's investment process is not driven by research, but rather market timing. A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls. The further away the strike prices are from the price of the S&P 100, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

4. Do you use any external investment sub-advisors? If you do, identify them, describe their contribution to your investment process, and describe how their performance and compliance with your investment guidelines are monitored.

**FGG** | **FAIRFIELD GREENWICH GROUP**

17

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED                    FGGE000112054

No sub-advisors on the split strike conversion strategy which is 95% of the fund, however, the fund may seed new managers with 5% of the funds assets not to exceed $50 million per manager. These managers undergo an extensive due diligence process and investment parameters are jointly developed with the manager and these are closely monitored on an ongoing basis by the risk team. As a requirement of the seeding agreement, these managers must provide full position transparency.

5. Describe your criteria for a new investment. Are your investment criteria purely objective (i.e. all investments that meet a fixed set of criteria are entered into) or are they partially or wholly subjective (i.e. investment criteria are not entirely pre-determined and/or each investment is considered on its own merits possibly using its own unique set of criteria)

The manager will remain in cash if an opportunity does not appear. A fixed set of criteria and investment parameters are in place and a non-discretionary brokerage account is open with Bernard L. Madoff Securities who has timing implementation authority for the execution of the strategy.

6. Are new investments considered in isolation (i.e. purely as a good long holding) or as part of a hedged basket (e.g. as one leg of a market neutral pair)?

If a basket of stocks is purchased, an equivalent number of puts with the same notional value as the basket of stocks must be purchases at the same time. One is never considered in isolation of the other. The sale of the calls to finance the purchase of the puts and to enhance the "stand still" rate of return of the overall strategy may be delayed depending on the relative bullishness at the time of execution. The manager tries to take advantage of each investment opportunity with this structure.

7. What is the expected return of the portfolio? How do you arrive at this number?

For most FGG funds, the return objective is two to three times the risk free rate. The risk free rate is a good indicator of the current risk/reward ratio for any given investment period.

8. How and when are existing positions in the portfolio closed out?

The positions are usually held until expiration of the options when the total strategy is closed. If the manager remains bullish on the market, new option positions may be established at new strike prices while keeping the underlying basket of stocks. The stocks at all times will be covered with protective puts. If the manager determines no opportunity exist for further appreciation of the portfolio, the manager may go completely into cash until further opportunities develop.

9. What level of turnover do you experience? What is your average holding period?

The portfolio may turnover as much as once per month due to the fact that usually the options have a one-month time horizon.



18

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112055

However, in general the strategy is implemented about 6-7 times each year, staying invested in T-Bills the remaining time.

10. What fraction of a day's trading volume do you limit your positions and trades to?

There is no stated limit because trades are only made in very liquid securities being S&P 100 stocks.

11. What is the capacity of your strategy, and what is the primary determinant of this? At what level of assets will the fund be closed to new investors? At what level of assets will the fund be closed to existing investors?

The Fairfield Sentry strategy has been closed for direct investment for two years. Direct investment has only been allowed up to the amount of redemptions from the strategy.

In February 2003, FGG introduced a new class of shares, Fairfield Sentry Class B. In the event that capacity in the Fund now opens up through redemptions by current investors, FGG can accommodate new investments into the Fund through the Class B shares. The Class B shares have a 1% management fee.

However, the fund has continued to be accessible through our multi-strategy products.

12. Do you hold any illiquid securities such as 144a stock?

No.

13. What is the minimum, average and maximum exposure to cash? How is cash managed?

This strategy calls for being 100% in U.S. Treasury bills with less than 9 months to maturity if the strategy is not being implemented.

14. What are your borrowing costs and what do you earn from your short rebate?

Not applicable in this strategy.

The Investment Manager of the Fairfield Sentry Fund has established non-discretionary trading accounts for the Fund at Bernard. L. Madoff Investment Securities, Inc. ("BLM"). These cash accounts do not permit the use of margin or borrowings against assets in the accounts and are ring-fenced from other non-Sentry accounts at BLM (i.e. no co-mingling of assets).

## B)    *Risk Control and Portfolio Construction*

1. How do you view risk and how is it controlled? Do you have a risk manager? Do you use quantitative tools for risk control? If so, how are they used?



FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED            FGGE00011205€

Due to the collar used in this modified split strike conversion strategy, the portfolio has defined risk/reward parameters. The portfolio is not subject to extreme market movements due to the nature of the long protective put and the short call position. However, risk is measured and monitored in an exhaustive qualitative as well as quantitative manner by FGG, who uses an outside third party vendor, to calculate VaR analysis and stress tests on the portfolios. The risk team monitors positions and this risk data to determine that the portfolio is within investment guidelines. Investment risk is monitored for all FGG moderate return, low volatility strategies. To that end, FGG oversight determines that all investments are within pre-determined investment guidelines.

This holds true for all non-SSC managers in the fund as well. Extensive due diligence is performed on these managers due to the strategic alliances formed between them and FGG, allowing for full transparency and disclosure of investment, business and operating risk. Additionally, they have operating guidelines that provide a peak to trough drawdown limit of 10%.

Also, should the Fairfield Sentry Fund's aggregate position in all non-SSC managers be in deficit, at the end of any annual period, against their original investment amount, Fairfield Greenwich Limited will temporarily forego receipt of all performance fees that it would otherwise receive on the overall appreciation of the Fairfield Sentry Fund in subsequent fee periods until such time as the Fairfield Sentry Fund's initial investment level in those non-SCC funds is recovered from fees foregone by FGL and/or subsequent aggregate Non-SCC fund investment appreciation. FGL will recapture the previously delayed performance fees to the extent that there is subsequent aggregate Non-SCC fund investment appreciation.

2.  Do you calculate VaR and do you Stress Test the portfolio?

    Yes. Every month, FGG performs Monte Carlo VaR calculations with a 95% confidence interval and a one-month time horizon. In addition, to determine the portfolios sensitivity to extreme market events , FGG applies 4 stress tests to the portfolio.  The report can then be set up to slice the portfolio by a number of dimensions so that the FGG risk group can aggregate and disaggregate the risk to analyze the sources of risk in the portfolio. Risk numbers are also tracked over time to determine a "risk profile" for each manager and compare the risk number to the return.

3.  Do you have risk limits for market risk?

    No we do not have a defined limit, but we do monitor the risk profile of the portfolio over time through many calculations. FGG's main concern is not with a particular risk number as much as a major variation in the profile of the fund. A variation in the risk profile of the fund can be caused by a market event, such as increased volatility or by the manager deviating from their established trading and investment profile.



FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112057

4. How do you view diversification and how is your view reflected in your portfolio?

Diversification can be observed in the Fund's investment restrictions:

  i. no more than 10 percent of the Net Asset Value of the Fund will be invested in the equity or debt securities of any one issuer (other than any government or governmental agency);

  ii. the Fund may not hold more than 10 percent of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

  iii. no more than 10 percent of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty, in each case calculated at the time of investment;

  iv. no more than 10 percent of the Net Asset Value of the Fund may be invested in securities whose prices are not quoted;

  v. no more than 10 percent of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

  vi. the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Manager collectively own in excess of 5 percent of such securities;

  vii. the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

  viii. the Fund will adhere to the general principle of diversification in respect of all of its assets;

  ix. the Fund will not invest directly in real property;

  x. the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) except with the consent of the custodian of the Fund's assets; and

  xi. no more that 10 percent of the Net Asset Value of the Fund will be invested in physical commodities.

5. What is the minimum number of long and short positions in the portfolio? How many long and short positions are currently in the portfolio?

This portfolio is made up of long stock, long put options, and short call options. The fund will hold a basket of stocks, between 40 and 50, to replicate the S&P 100 index.



21

6.  How are hedges constructed?  Does each long position have a corresponding short position or do you view the portfolio as a long basket offset by a short basket?

The hedging of the portfolio of long only stocks is created with a collar of OEX, S&P 100 index options.  When a basket of stocks is purchased, a protective collar is always purchased, with the notional value of the long put options equivalent to the market value of the underlying basket.  The sale of an out of the money call finances the purchase of the protective put and enhances the stand still rate of return.

7.  How many positions (long/short) does the portfolio hold, what is the range of permissible gross exposure (minimum/maximum/historical average) to a single security?

Please refer to investment restrictions listed in question 4.  Gross exposure to a single security will not exceed 10% of the NAV.  Generally, the basket of stocks resembling the S&P 100 is generally composed of around 40-50 stocks.

8.  What is the range of permissible gross exposure to a single industry or sector?

The basket of stocks consists of U.S. equities represented on the S&P100 index.  These equities exhibit an overall correlation in excess of 95% to the S&P100 index at the time of trade completion and represent a market capitalization of at least 75% of the total market capitalization, as measured by Standard & Poors, of the S&P100 index components at the time of trade completion.  The portfolio typically exceeds these guidelines and exhibits a correlation to the index of over 99%.

Given these correlation and market capitalization requirements, both industry and sector exposure resemble that of the S&P 100 Index.

9.  Is the portfolio beta neutral in each sector? If not, is there an allowable range of sector betas?

The portfolio does not aim to be beta neutral in each sector.

10.  What is the allowable range for the net market exposure (minimum/maximum/historical average) of the portfolio?

Gross exposure of the fund ranges from 0% to 100%, as the fund is either in cash or fully invested. However, the fund is not subject to extreme market movements due to the nature of the option coverage.

11.  What level of leverage (minimum/maximum/historical average) do you employ? How do you define leverage? Does it include off balance sheet items?

No leverage is on the modified split strike conversion strategy portion of the fund (95%+). However, non-SSC managers to which the fund may allocate up to 5% of its capital may use leverage. The non-SCC investment vehicles in which the fund


**FAIRFIELD GREENWICH GROUP**

22

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112059

invests may borrow funds in connection with their investment strategies. However, all FGG managers must still adhere to the FGG leverage limits that are low relative to competitors.

12. What is the volatility (minimum/maximum/historical average, measured by annualized standard deviation) of the portfolio?

The standard deviation of the fund is under 3% for the over 13 year record of the Fund.

13. Approximately, how long does it take to sell all portfolio securities for redemption request?

The portfolio operates in extremely liquid markets, the S&P 100 stocks. Redemptions require a 15-calander day notice period and can be accommodated in an orderly manner with no disruption expected to the fund or other investors. In addition, because there are over 600 holders of record representing thousands of investors, the likelihood that the entire portfolio would be redeemed is extremely low.

14. Maximum Drawdown?

Fairfield Sentry Class B, adjusted for the 1 and 20 fee structure, strategy's largest drawdown has been 64 basis points since 1990. Recovery took only two months.

15. How often is the portfolio rebalanced?

The portfolio is reviewed daily, particularly, in order to maintain the correlation of the basket of stocks to resemble the S&P 100.

## C)    *Margin Debt, Counterparties and Securities Lending*

1. Who are your lenders for margin, and what relationship if any do they have to the firm, its principals, or any of the firm's funds? Do you have multiple prime brokers?

Bernard L. Madoff Investment Securities acts as the prime broker for at least 95+% of the assets. Goldman/Morgan Stanley/Refco are prime brokers for the remaining assets, since October 1, 2002. Each seeded manager may select their own prime brokers. As of October, 1, 2003, about 2% of the fund has been allocated to seedling managers.

2. Do you use exchange traded instruments or OTC? List a breakdown of which instruments are exchange traded or OTC.

The strategy employs S&P 100 stocks and OTC options.

3. How do you evaluate counterparties and how do you monitor counterparty risks? Do your counterparties have trading limits? How often are counterparties reviewed?



FGG | **FAIRFIELD GREENWICH GROUP**

23

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE00011206C

For the OTC options, there is a list of approved counterparties. Only well capitalized investment banks are used as counterparties. There are counterparty trading limits and the bank's creditworthiness is reviewed regularly.

4. Do you engage in securities lending? If so, please provide us with a written set of lending guidelines. What fraction of the portfolio's return can be attributed to securities lending?

No.

### D)    Use of Derivatives

1. Do you use derivatives to implement your investment decisions?

Fairfield Sentry uses OTC S&P 100 index options as an integral part of its strategy.

2. If you do use derivatives, do you maintain a written derivatives policy statement?

The use of S&P 100 options is an integral part of the strategy and strict but simple guidelines dictate the use of these options. When the basket of stocks is purchased, out of the money S&P index put options must be purchased in equal amounts. Out of the money calls are sold to finance the purchase of the puts and to increase the stand still rate of return of the portfolio.

3. Please list all derivative instruments that are used and explain why are they used instead of physicals. Can you quantify the benefit of using derivatives instead of physicals?

A collaring strategy is used to hedge the portfolio by overlaying the basket of stocks with an S&P 100 index collar. (Sale of out of the money OEX calls, purchase of out of the money OEX puts.)
The put options, funded in part with the proceeds of the sale of the calls and any dividend stream, protect the equity position from downside risk. The dollar value underlying these option positions always approximates the value of the basket of stocks.

4. If futures are used, are they used expressly for hedging or are they used to generate unhedged returns as well? Furthermore, is the aggregate open interest monitored?

No other derivatives are used.

### E)    Use of Private Securities



24

1. Do you invest in private securities or private placements of public securities? Do you invest in such securities only when no public equivalent exists?

   The SSC portion of the fund invests only in liquid public securities. The non-SSC portion has managers who may invest in a very small amount of private securities.

2. If you invest in private securities, estimate the expected advantage to the portfolio relative to holding a similar public security.

   N/A

3. What is the range of permissible gross exposure (minimum/maximum/historical average) to private securities?

   N/A

4. Where are private securities held?

   N/A

5. How are private securities valued and how is their risk estimated?

   N/A

6. What is the average holding period for private securities and what exit strategies are used to dispose of them?

   N/A

## 3)  Performance, Valuation and Fees

### A)  *Investment Performance*

1. Please provide the monthly performance history for the product, from inception, net of all fees and expenses.

   Please see current tear sheet.



25

2. Does the performance history represent actual investment results? Is any portion of it simulated?

Actual strategy performance is indicated, which provides the track record for Fairfield Sentry Fund, A Shares. The actual performance net of fees and expenses for Fairfield Sentry Fund, B Shares, starts with the inception of the fund in February, 2003.

3. Was any portion of the performance history generated at a prior employer? If so, can the track record be substantiated?

No.

4. Do the performance records reflect the investment decisions of a single individual or a team? If an individual made the decisions, identify that individual. If made by a team, identify the team. If there have been changes to the individual or the team over the course of the track record, attribute the track record appropriately.

The investment committee mentioned earlier makes investment decisions.

5. Are your returns AIMR compliant? If the returns are AIMR compliant, are they compliant at Level I or Level II?

No.

6. Who computes the performance and the NAVs for the funds? If you manage separate accounts, who computes the performance of the composite?

FGG employs a common fund administrator, CITCO. CITCO independently computes monthly performance and NAVs for FGG funds as well as separate accounts. However, weekly estimated NAV numbers are calculated by the Finance Group at FGG.

7. What index is the portfolio benchmarked to, and what are the expected and realized tracking errors relative to the benchmark?

Fairfield Sentry is an absolute return strategy whose target return is 2 to 3 times the risk free rate.

8. What caused the three highest monthly returns and the three largest drawdowns?

The strategy is a market timing strategy. Class B is identical to Class A in every respect except for the 1.00% management fee. The performance record of Class B is the actual Class A returns back to December 1990 adjusted for the 1% management fee. The three highest returns for Class B were 3.29%, 3.01%, and 2.79% and the largest drawdowns were 0.64%, 0.44% and 0.24%. There are only 11 monthly drawdowns in this entire period.

The return is dependant on catching a market upturn. In the best months, the returns were allowed to run by adjusting the strike price of the written calls. In the down



26

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112063

months, although the losses were minimal, the market move did not cover the cost of implementing the option coverage or the stock basket never reached a profitable position during the month.

## B.    *Valuation and Pricing*

1.  What is the frequency of valuation for liquid instruments? Is pricing performed using an independent source? If so, please indicate the source. Is pricing corroborated by independent sources (e.g. administrator and prime broker)?

    Liquid instruments, S&P 100 stocks, make up over 95% of the portfolio. The seedling manager trade in liquid securities as well by mandate. The portfolio is priced daily by the prime broker and the manager. Weekly estimate NAVs are calculated by FGG. Pricing is independently verified by the fund administrator, CITCO, who issues an NAV, monthly.

2.  How are individual securities valued (i.e. bid, ask, midpoint, primary exchange closing price, composite closing price)?

    S&P 100 stock prices are readily available and are priced at the exchange closing prices.

3.  How is collateral valued?

    Usually cash.

4.  How is the dealer priced portion of the portfolio substantiated? Who substantiates it, and how are discrepancies in estimated value resolved? Is the value recorded at the bid, the ask or the mid-point?

    N/A.

5.  What is the average bid/ask spread for dealer-valued securities in your portfolio?

    N/A

6.  What is the frequency of valuation for illiquid instruments? Please describe your procedure for valuing them. Are these valuations adjusted to reflect for the cost of trading the security?

    N/A. The fund does not invest in illiquid securities.



27

7. How are ratings assigned to unrated securities? How are these ratings reviews?

N/A

## C.  Fees

1. What are the minimum and maximum levels of investment in your funds for an institutional (ERISA) investor?

Minimum investment in the Fairfield Sentry Fund is $100,000. Currently there are no ERISA investors.

2. Describe all fee arrangements with existing clients in your onshore funds, offshore funds and separate accounts. Include management fees, performance fees (including any hurdle rates and/or high water marks), subscription and redemption fees and any other fees that apply, and the corresponding frequency at which they are paid. Does a minimum level of fees apply?

Subscribers to Fairfield Sentry Fund, Ltd., B Shares, pay the following fees:

Management Fee:    1%
Performance Fee:    20%
Subscription and Redemption Fees:  No
High Water Mark:   Yes
Hurdle Rate:        No

3. When does a client pay management fees and performance fees?

Management and performance fees are paid on a quarterly basis.

4. Do all clients pay the same level of fees or do some have special negotiated fee arrangements? If negotiated fee arrangements exist, does the fund obtain any goods or services in return?

All clients pay the same fees in Class B shares.

5. Describe your withdrawal and lock-up policies. Are they different for your domestic and offshore funds.

FGG funds offer monthly redemptions and subscriptions. There are no lock ups.

 **FGG** | **FAIRFIELD GREENWICH GROUP**

28

## 4)  Trading, Operations, Technology and Compliance

### *A)  Trading and Commissions*

1.  Who among the Firm's employees can authorize a trade? Who among the firm's employees can actually execute a trade?

    Amit Vijayvergiya, Andres Piedrahita, Jeffrey Tucker, Rob Blum, Dan Lipton

2.  How are authorized trades communicated to the trader? What instructions are given, and how are unauthorized trades prevented and/or detected?

    Trades require two signatures. The manager maintains a non-discretionary brokerage account with Bernard L. Madoff Securities that has strict trading parameters outlined. BLM Securities has timing execution discretion. Trade confirms are reconciled immediately.

3.  How are the primary back office functions (trading, accounting, settlement and custody) segregated among the back office staff? How do you ensure that back office professionals cannot execute jobs that they are not authorized to perform (e.g. a trader settling a trade)?

    Trading is not considered a "back office function." Settlement, accounting and custody are segregated functions by design.

4.  What sources of liquidity are used to execute a trade?

    Since the split strike conversion portfolio is comprised of extremely liquid securities, liquidity is not much of a concern. However, the trading staff always works the orders in a manner as to minimize market impact. Many execution systems are used both electronic and traditional.

5.  How are trades communicated to the custodian/prime broker? If you have more than one prime broker, you have a tri-party agreement in place? How and why are trades allocated between prime brokers?

    In the hedge fund community the prime broker is usually the custodian. In this case the manager does not use separate executing brokers and executes all trades at the prime broker.

6.  What are your brokerage policies? Do you have a preferred list of brokers? What is your average level of commission?

    Trades are made through Bernard L. Madoff Investment Securities, Inc., a registered broker-dealer in New York. Brokerage commissions are 4 cents per share.

7.  Do you ever share in commissions by accepting a rebate?

    No.



29

8. Do you use soft dollars? If so, what do you use them for? Are all your soft dollar expenses permissible under Section 28-E's safe harbor ruling?

No.

9. Do you allow clients to direct brokerage?

No.

## B)   *Operations (Back Office)*

1. Are trades confirmed by your firm or by your prime broker? Who receives telephone confirmation of fills? Are written confirms reviewed manually, and if so how?

With regard to this fund, prime broker and executing broker are the same. Trades are confirmed back to the manager. All written confirms are reviewed manually by back office staff.

1. How are fills at a single broker and at a single price allocated between accounts?

Fills will be split electronically amongst accounts.

2. How are partial fills and multiple partial fills at different prices allocated among accounts?

These types of fills are averaged electronically and allocated equally among accounts.

3. What controls are in place to ensure that none of your funds or accounts is treated preferentially?

Equal treatment is ensured through computer driven allocations among accounts.

4. How often are portfolio holdings reconciled? What software, if any, is used to perform reconciliations?

Portfolio holdings are reconciled daily. Proprietary software is used.

5. How often are accrued interest, dividends and short interest rebates reconciled?

Accrued interest, dividends and short interest rebates are reconciled weekly by the manager and monthly by the administrator.

6. Is the daily trade blotter reconciled with the prime broker's daily activity statement? What checks are in place to ensure that trade information is recorded in the accounting system?



FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112067

Yes the daily trade blotter is reconciled with the prime broker's daily report. The prime broker reports daily and reconciles with the administrator as well as the manager.

7. Are monthly broker statements reconciled with custodial records before monthly performance calculations are performed? How are unreconciled items dealt with?

Yes, with regard to Fairfield Sentry, the executing broker and the prime broker are the same and reconcile with the manager and the administrator daily.

8. What records of order placement are maintained and for how long?

Records are maintained indefinitely.

9. Who authorizes the movement of cash and securities? Is this done completely independently of the reconciliation function?

Andres Piedrahita or Amit Vijayvergiya have authorization. This function is completely independent of reconciliation. Secondary authority rests with Dan Lipton, rob Blum and Jeffrey Tucker.

10. What mechanisms are in place to facilitate the availability of funds for redemption?

Due largely to the liquidity of the portfolio, the manager is able to raise significant amounts of cash for redemptions.

## C) *Administration*

1. Do you administer your funds internally or do you have an administrator?

CITCO is the fund administrator.

2. If you administer your funds internally

   a) Are your accounting practices consistent with industry norms
   N/A

   b) What software platform do you use?
   N/A

3. If you use an administrator

   a) Do they independently compute the NAV? How do they get values for dealer priced and illiquid securities? Do they work with one or more prime brokers to verify valuations for dealer priced and illiquid securities?

   CITCO is the common fund administrator across all FGG managers. CITCO has a unit that prices all securities independently. The portfolios are in liquid securities, which are generally easier to price.



**FGG**    **FAIRFIELD GREENWICH GROUP**

31

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112068

CITCO rechecks all dealer prices using three pricing sources: Reuters, Bloomberg and IBC. CITCO's prices are the final prices used in calculation of the NAV.

b) What software platform do they use?

Citco uses an internally developed platform developed in conjunction with Paul Tudor Jones.

4. Are accounts maintained on a cash or accrual basis?

Accrual basis.

5. How many days after the end of each month is an NAV or a performance report available?

By the 20th of the following month, the NAV is available. Estimates are also available on a weekly basis.

## D)    *Technology*

1. Does the investment process require computer technology to allow its implementation or can it be performed manually in large part?

It can be performed manually.

2. How often do you backup your computer systems? Are backup tapes maintained off-site? Do you have a formal disaster recovery plan?

All data is stored at FGG's main locations: NY and London. NY and London have identical data centers, with full network functionality available in either location. The data is replicated between NY and London, with redundant Internet connections in both locations. All operational data is replicated between our New York and London sites every 1/2 hour. Daily backups are taken at both locations. Weekly backup tapes are taken off site, and monthly backup tapes are exchanged between the two locations.
A plan and facilities are in place in case of emergency. Essential US personnel relocate to the Greenwich, Connecticut office, while remaining personnel worldwide work from home. All personnel are trained to connect remotely to either the NY or London site in the event of a loss at the other. All other fund accounting and agent payment systems are housed at CITCO Fund Services, which is subject to its own extensive disaster recovery procedures audited by PricewaterhouseCoopers.

3. Are your computer systems maintained by an in-house IT staff or is this function outsourced?

Daily maintenance and operations are performed by an in-house staff. The staff is responsible for all global satellite offices and coordinating local outsourcers for direct



FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE00011206⁹

support. Additional support and 24-hour global network monitoring are supplied by Omega Network Services.

## E)    Compliance

1.  Who is responsible for regulatory compliance?

    Rob Blum, Mark McKeefry, John Donachie are responsible for legal and compliance issues regarding the Fairfield Greenwich Group.

2.  What procedures are in place to ensure regulatory compliance?

    At the portfolio level, compliance issues are procedural in nature and all regulatory filings have been made. One of our principal partners, Jeffery Tucker, was an SEC lawyer for a number of years and Rob Blum was a general counsel at an alternative investment firm for over 10 years.

3.  How are compliance violations handled?

    We have not encountered any violations largely because of the close monitoring by our compliance group. However, if we were to encounter a situation, we would correct the situation immediately.

4.  Have you been the subject of any investigations, public or private, by the SEC, NASD, CFTC, NFA, any exchange, or any state, federal or foreign authority?

    No.

5.  Have you had any correspondence with the SEC, NASD, CFTC, NFA, any exchange, or any state, federal or foreign authority other than routine registration correspondence?

    No.

6.  Have you ever been audited by the SEC, NASD, CFTC, NFA, any exchange, or any state, federal or foreign authority?

    No.

7.  Has any regulatory action ever been taken against the firm?

    No.

8.  Has the firm ever settled any insurance claims?

    No.

9.  Have all relevant Blue Sky filings been made?



33

Yes.

### F)    *Personal Trading*

1. Do principals and employees trade for their own accounts? Is this monitored and are records maintained?

   Yes, personal accounts are permitted. However, monthly statements from outside brokerage firms need to be reported monthly to ensure compliance.

2. Are any proprietary (i.e. house) or employee orders placed along with client orders?

   No.

3. Do you have policies that govern personal and proprietary trading? If so, describe them or attach a copy of a document containing them.

   Yes, see appendix.

## 5)    Authentication

I certify that all the statements made above are true to the best of my knowledge.

Signature of person who filled this form:  Amit Vijayvergiya

Name of person who filled this form:    Amit Vijayvergiya



*Appendix:    Insider Trading; Personal Account Trading section from FGG Employee Manual*

A critical extension of the confidentiality policies discussed above (within the FGG Employee Manual) involves the knowledge and trading use of material inside information regarding a public company, also known as insider trading. Insider trading is a matter of paramount importance to regulators and the credibility of the capital markets. Use of inside information can result in criminal and civil penalties to both you and the firm and are grounds for immediate dismissal. The problem of insider trading is often attributable to intentional or negligent leaks of confidential information to market participants and their agents (lawyers, accountants, etc.). Material non-public information generally takes two forms: (1) information about events or circumstances relating to a public company's business, assets, revenues or earning power or plans which is known only to corporate management and its confidants, and which can reasonably be

**FGG**    FAIRFIELD GREENWICH GROUP

34

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE000112071

expected to impact materially the market price of the company's securities ("inside information"), and (2) information about events or circumstances which affect the company or its market but which emanates from sources or events outside of the company, i.e. significant block transactions, tender offers, etc...("market information").

Generally, information with respect to earnings, losses, lawsuits, mergers, tenders, market transactions and substantial financing has been considered material. Additionally, front running (see Section 2.1, above) is a prohibited activity that, in certain instances, may be analogous to insider trading. Any employee or consultant who believes that he/she may have acquired material inside information cannot use such information and should promptly disclose it to appropriate FGG senior management personnel.

In addition to these principles, you should be mindful of other personal trading limitations or conditions that may have been separately communicated to you by the Company including, for FSA-regulated employees, manager pre-approval of personal trades, and for NASD-regulated employees, providing copies of brokerage account statements.

---

**FGG** | **FAIRFIELD GREENWICH GROUP**

35