# EXHIBIT 6

For the Exclusive Use of: _____    Copy No. _____


*Confidential Private Placement Memorandum*


### *FAIRFIELD SIGMA LIMITED*
*A British Virgin Islands International Business Company*

*Securities Offered:  Redeemable Voting Shares*

*Minimum Investment per Subscriber: 200,000 EUR*

*Purchase Price per Share: Net Asset Value per Share*

***Investment Manager:***
*Fairfield Greenwich (Bermuda) Ltd.*

***Administrator:***
*Citco Fund Services (Europe) B.V.*

*THE DIRECT OR INDIRECT SALE OF SHARES OF FAIRFIELD SIGMA LIMITED TO CITIZENS, NATIONALS OR RESIDENTS OF, OR INSTITUTIONS OR OTHER ENTITIES ORGANIZED, CHARTERED OR RESIDENT IN THE UNITED STATES OF AMERICA IS EXPRESSLY PROHIBITED.*

*THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK.  THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS.  THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.*

*This Private Placement Memorandum is dated as of February 16, 2006*

***Fairfield Greenwich (Bermuda) Ltd.***

**COMMODITY POOL OPERATOR EXEMPTION**

THE INVESTMENT MANAGER HAS FILED A CLAIM OF EXEMPTION FROM REGISTRATION AS A COMMODITY POOL OPERATOR ("CPO") WITH THE UNITED STATES COMMODITY FUTURES TRADING COMMISSION ("CFTC") IN CONNECTION WITH PRIVATE INVESTMENT FUNDS WHOSE PARTICIPANTS ARE ACCREDITED INVESTORS, AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933, CERTAIN FAMILY TRUSTS AND CERTAIN PERSONS AFFILIATED WITH THE INVESTMENT MANAGER.  AT ALL TIMES, THE FUND WILL UTILIZE FUTURES SUCH THAT EITHER (1) NO MORE THAN 5% OF ITS ASSETS ARE USED TO ESTABLISH COMMODITY INTEREST POSITIONS OR (2) THE NOTIONAL VALUE OF ITS COMMODITY INTEREST POSITIONS DOES NOT EXCEED 100% OF THE FUND'S LIQUIDATION VALUE.

UNLIKE A REGISTERED CPO, THE INVESTMENT MANAGER IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO PARTICIPANTS IN THE FUND.  THE CFTC HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY DISCLOSURE DOCUMENT FOR THE FUND.

## CERTAIN SUMMARY INFORMATION

The voting redeemable shares offered hereby (the "Shares") will be issued only on the basis of the information in this Confidential Private Placement Memorandum and any attachments hereto (the "Memorandum").  No other information about Fairfield Sigma Limited (the "Fund") has been authorized.  Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk.  The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions.  Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed.  No Shares may be transferred without the prior written consent of the Fund's Directors.

The distribution of this Memorandum may be restricted by law in certain countries.  You must inform yourself of and observe any such restrictions.  You should review the Country-Specific Notices contained in the Memorandum for any applicable notices for your countries of residence or domicile.  This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors.  This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice.  You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations.  Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator or Investment Manager (Fairfield Greenwich (Bermuda) Ltd.) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands.  The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI") which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and on the basis that the initial investment in the Fund by each of its shareholders is not less than U.S. $100,000.   A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund, or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000 or its equivalent in any other currency and that he consents to being treated as a professional investor.

This is a private offering, made only on delivery of this Memorandum to the prospective investor whose name appears on the cover hereof.  This Memorandum may not be reproduced or used for any other purpose.  Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized.  By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

# FUND DIRECTORY

| | |
|---|---|
| *THE FUND* | Fairfield Sigma Limited |
| | c/o Codan Trust Company (B.V.I.) Ltd. |
| | P.O. Box 3140 |
| | Romasco Place, Wickhams Cay |
| | Road Town, Tortola |
| | British Virgin Islands |
| | |
| *INVESTMENT MANAGER* | Fairfield Greenwich (Bermuda) Limited |
| | 12 Church Street |
| | Suit 606 |
| | Hamilton, Bermuda |
| | Telephone:  441-292-5401 |
| | Facsimile:  441-292-5413 |
| | |
| *ADMINISTRATOR; REGISTRAR* | Citco Fund Services (Europe) B.V. |
| *AND TRANSFER AGENT* | Telestone 8 - Teleport |
| | Naritaweg 165 |
| | 1043 BW  Amsterdam |
| | The Netherlands |
| | Telephone: (31-20) 572-2850 |
| | Facsimile:  (31-20) 572-2610 |
| | |
| *U.S. COUNSEL* | Law Offices of Andrew E. Goldstein |
| | 488 Madison Avenue, 16th Floor |
| | New York, New York 10022 |
| | |
| *BRITISH VIRGIN ISLANDS COUNSEL* | Conyers Dill & Pearman |
| | Romasco Place, Wickhams Cay 1 |
| | P.O. Box 3140 |
| | Road Town, Tortola |
| | British Virgin Islands |
| | |
| *AUDITORS* | PriceWaterhouseCoopers |
| | Marten Meesweg 25 |
| | 3068 AV Rotterdam |
| | The Netherlands |
| | |
| *PAYMENT BANK* | Citco Bank Nederland, N.V. Dublin Branch |
| | Custom House Plaza, Block 6 |
| | International Financial Services Centre |
| | P.O. Box 6639 |
| | Dublin 1 |
| | Ireland |
| | Telephone: 353 (0) 1 636 7100 |
| | Facsimile: 353 (0) 1 636 7102 |

*CUSTODIAN*                                    Citco Global Custody N.V.
                                              Telestone 8 – Teleport
                                              Naritaweg 165
                                              1043 BV Amsterdam
                                              The Netherlands
                                              Telephone: (31-20) 572-2200
                                              Facsimile: (31-20) 572-2625

## TABLE OF CONTENTS

FUND DIRECTORY ........................................................................................................................ vii

SUMMARY ................................................................................................................................... 1

THE FUND ..................................................................................................................................... 9

MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS ........................................ 10

INVESTMENT POLICIES ........................................................................................................ 17

OFFERING OF THE SHARES .................................................................................................. 22

FEES, COMPENSATION AND EXPENSES ........................................................................... 30

CUSTODIAN AND BROKERAGE ......................................................................................... 32

ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT ................................................ 35

RISK FACTORS ....................................................................................................................... 36

POTENTIAL CONFLICTS OF INTEREST ............................................................................ 47

DESCRIPTION OF SHARES ................................................................................................... 49

DIVIDEND POLICY ................................................................................................................ 50

TRANSFERS, REDEMPTIONS AND TERMINATION ......................................................... 50

ANTI-MONEY LAUNDERING REGULATIONS .................................................................. 53

ANTI MONEY-LAUNDERING POLICIES ............................................................................ 54

TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA ................................ 58

LEGAL MATTERS .................................................................................................................. 61

MISCELLANEOUS ................................................................................................................. 61

# SUMMARY

The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Confidential Private Placement Memorandum and, accordingly, should be read in conjunction with such detailed information.

## The Offering

| | |
|---|---|
| Issuer | Fairfield Sigma Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands (the "BVI"). The registered office of the Fund is located in the BVI. |
| Securities Offered | The Fund's redeemable voting shares, denominated in Euros (the "Shares"), are being offered hereby at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of such issuance (generally the first business day of every month). |
| | The Shares will be offered to subscribers who desire to invest in Fairfield Sentry Limited and to hedge the currency exposure to the Euro resulting from the Fund holding assets (i.e., shares in Fairfield Sentry Limited) denominated in U.S. dollars. |
| Offerees | Purchasers who are not citizens, nationals or residents of, or institutions or other entities organized, chartered or resident in, the United States. See "OFFERING OF THE SHARES." |
| Minimum Subscription | The minimum initial subscription per investor is 200,000 EUR, unless the Fund deems it advisable to permit subscriptions for a lesser amount provided that such lesser amount shall at all times be no less than the EUR equivalent of US $100,000. Following his initial investment, a shareholder may make additional investments in amounts of not less than 75,000 EUR. |
| Maximum Capitalization | The Fund will not accept a subscription tendered for Shares at a time when the number of its outstanding Shares is 5,000,000. |
| Subscription Procedures | It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will ordinarily be accepted, subject to the discretion of the Manager, as of the first business day of the following month, i.e., subscriptions received between March 1 and March 25 will be accepted as of April 1. Subscriptions will become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund. |
| Solicitation | There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by |

1

| | |
|---|---|
| of Subscriptions | the Fund or through the assistance of unaffiliated placement agents and money managers. Such unaffiliated placement agents and money managers may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), as Investment Manager, which they may rebate to their clients. FGBL or an affiliate may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent or FGBL and such amounts will not constitute part of the assets of the Fund. |
| Business Objective of the Fund | The Fund will seek to achieve capital appreciation of its assets by purchasing shares in Fairfield Sentry Limited ("FSL"), a British Virgin Islands international business company, which principally utilizes an options trading strategy described as "split strike conversion". FSL is an affiliate of the Fund and the investment manager, Fairfield Greenwich (Bermuda) Ltd. |
| | The Fund will allocate a small portion of its assets to a nonaffiliated bank (the "Bank") to provide a currency overlay program designed to hedge the currency exposure of its Shareholders resulting from the Fund holding assets denominated in U.S. Dollars. The Fund's obligations to the Bank with respect to the currency hedging activities may be collateralized from time to time through a pledge of the assets underlying the Shares (i.e., the Fund's shares in FSL). In order to perfect this pledge of assets, the Fund's shares in FSL may be held in the name of the Bank. In that event, the Bank will be permitted to take any and all appropriate action with respect to these FSL shares at any time in the event of a default on the part of the Fund with respect to its obligations to the Bank. |
| Investment Manager | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager and is the Investment Manager of FSL. It is the wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL"), an exempted company organized under the laws of the Cayman Islands, which previously served as the investment manager of the Fund. FGL's main principals are Walter M. Noel, Jr., Jeffrey H. Tucker, and Andres Piedrahita. Mr. Noel is also a Director of the Fund (see "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS"). FGBL expects to register as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940 in early 2006. The Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that |

would otherwise be applicable absent such an exemption.

| | |
|---|---|
| Directors | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund.  They are also the Directors of FSL. |
| Citco | Citco Fund Services (Europe) B.V., an affiliate of The Citco Group Ltd., acts as administrator, registrar and transfer agent for the Fund. |
| Dividend Policy | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

## Sale, Redemption and Exchange Of Shares

| | |
|---|---|
| Redemption at the Option of a Shareholder | A shareholder of the Fund, on fifteen (15) calendar days' notice, may cause his Shares to be redeemed as of the last business day of any month.  A shareholder is not required to hold his Shares for any minimum period of time in order to exercise his redemption privilege. |
| Compulsory Redemption | The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or for no reason. |
| Sales | The Fund will offer its Shares on a continuous basis.  Subscriptions received during any calendar month prior to the fifth to the last business day of the month will ordinarily be accepted, subject to the discretion of the Manager, as of the first business day of the following month, i.e., subscriptions received between March 1 and March 25  will be accepted as of April 1.  Subscriptions will become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund. |

## Compensation and Expenses

| | |
|---|---|
| Expenses | The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; and all expenses in maintaining the Fund's office  and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities.  Transactional costs will be included in FSL's calculation of profit and loss and therefore will be indirectly borne by the Fund. The costs incident to the currency hedging program will be borne by the Fund.  Fairfield Greenwich Advisors LLC, an affiliate of the Manager, will receive an annual expense reimbursement from the Fund, payable quarterly, in an amount equal to 0.0375% of the Fund's Net Asset Value (0.15% on an annual basis) as of the last day of each calendar quarter, for providing certain administrative |

3

services and back-office support to the Fund.

| | |
|---|---|
| Management Fee | The Fund does not directly pay the Manager a management fee. However, as investment manager of FSL (in which substantially all of the Fund's assets are invested), the Manager will receive from FSL a monthly management fee in an amount equal to one-twelfth of one percent (1.0% per annum) of FSL's Net Asset Value before the FSL Performance Fee (as defined), as calculated at the opening of the first day of each calendar month, which will include subscriptions for shares accepted by FSL as of the first day of the month. This fee is payable monthly in arrears. |
| Performance Fee | The Fund does not directly pay the Manager a performance fee. However, as investment manager of FSL (in which substantially all of the Fund's assets are invested), the Manager will receive from FSL, for each calendar quarter, a performance fee (the "FSL Performance Fee") with respect to each share outstanding during such calendar quarter in an aggregate amount equal to 20% of any new high net profit, i.e., new appreciation, allocable to its shares, subject to reduction in connection with certain offsets with respect to each share. FSL shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a FSL Performance Fee only for the portion of the calendar quarter during which such shares were outstanding. The FSL Performance Fee will only be paid on "new appreciation" in FSL's Net Asset Value allocable to the shares. |

## THE FUND

<u>Description</u>

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business company on March 19, 1997. The registered office of the Fund is c/o Codan Trust Company (B.V.I.) Ltd., P.O. Box 3140, Romasco Place, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their voting shares (the "Shares"), or purchase additional Shares, on a monthly basis (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

<u>The Fund</u>

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, any officers of the Fund and other

persons or entities with management or administrative responsibilities to the Fund. None of the Fund's Directors own an equity interest in the Fund.

The Directors of the Fund are as follows:

**Walter M. Noel, Jr.**, over 30 years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its international private banking business. Since founding The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983, Mr. Noel has been a director or general partner of a variety of its funds, including Fairfield Sentry Limited, directing marketing activity, and originating various of The Fairfield Greenwich Group's business opportunities. Mr. Noel graduated from Vanderbilt University in 1952, received a Master of Arts in Economics from Harvard University in 1953, and graduated from Harvard Law School in 1959.

**Jan R. Naess**, received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989. In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development company, which merged with Northern Navigation International Limited ("NNI") in 1991. Mr. Naess is a Vice-President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets. He serves as a Director of several funds with which The Fairfield Greenwich Group is affiliated, including Fairfield Sentry Limited.

**Peter P. Schmid**, received a Swiss Federal Certificate of Capacity in 1968. Mr. Schmid was employed by Credit Suisse from 1968 to 1986. From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich. After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the Bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva. Mr. Schmid has been an independent investment adviser since April 1986. He is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A., Rock Ltd. and Armor S.A. Mr. Schmid is a Director of several funds with which The Fairfield Greenwich Group is affiliated, including Fairfield Sentry Limited.

<u>The Investment Manager</u>

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd. ("FGBL or the "Manager"), a corporation organized in Bermuda, which was incorporated on June 13, 2003. It is responsible for managing the Funds' investment activities, monitoring its investments and maintaining the relationship between the Fund and Fairfield Sentry Limited and with its escrow agent, custodian, administrator and transfer agent. The Manager is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands

("FGL"), which previously served as the investment manager of the Fund and Fairfield Sentry Limited.

The Fairfield Greenwich Group ("FGG"), of which the Manager is an affiliate, was established in 1983 and has approximately $9 billion employed in alternative asset management funds. Throughout its history, the firm has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a marketing and distribution partner, and obtains underlying portfolio information for monitoring and client communication purposes.

The Manager and its affiliates currently serve as investment or administrative manager to approximately twenty funds, and have exclusive distribution arrangements with several others. FGG maintains its offices in New York, with a significant presence in London. Marketing and client support offices are located elsewhere in the United States, Europe, and Latin America. FGG's London entity is licensed and subject to the supervision of FSA, and another FGG affiliated entity is registered as a broker-dealer in the United States.

The Manager expects to register as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940 in early 2006. In addition, the Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel Jr.** His background is summarized under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS -The Fund".

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs the Group's European and Latin American activities. Mr. Piedrahita has over 15 years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over 30 years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. (Limited Partnership) ("Kolber"), a registered broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's affiliated private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been

6

responsible for directing its business and operational development and has been a director or general partner of a variety of its investment funds. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

**Harold Greisman** is the Chief Investment Officer of FGG, focusing on manager selection and risk oversight. Mr. Greisman has over fifteen years of experience in the investment business. Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984-1985) and then worked for DNB Capital Corporation (1985-1990), a proprietary private equity and venture capital operation controlled by Den Norske Bank. Mr. Greisman began his career at Johnson & Higgins, a large industrial insurance brokerage (1978-1982). Mr. Greisman received his Bachelor of Arts degree from Tufts University and his MBA degree from the Stern School of Business at New York University.

The backgrounds of the Directors and key officers of the Manager are set forth below:

**Andres Piedrahita** is a Director and the President of the Manager. His background is set forth above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS-The Investment Manager".

**Brian Francoeur** is a Director of the Manager. Mr. Francoeur joined Citco Fund Services (Bermuda) Limited in 2001 and currently serves as its Managing Director. From 1999 until joining Citco, he was the Chief Financial Officer of CCS Group Limited, a computer cabling and network company based in Hamilton, Bermuda, and from 1997 to 1999 was a Senior Portfolio Manager with Olympia Capital (Bermuda) Limited, a fund administration company in Bermuda. Mr. Francoeur qualified as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995 to 1997.

**Amit Vijayvergiya** is Vice President and the Risk Manager of the Manager and focuses on manager selection and risk management for the Fund. He has been employed by the Manager since 2003. Mr. Vijayvergiya has over 9 years of experience in asset management, risk management and operations research. Prior to joining the Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

The Manager will not have any beneficial interest in the Fund, although FGL and certain of its principals have beneficial interests in Fairfield Sentry Limited, with which the Fund will invest.

Pursuant to the Investment Management Agreement between the Fund and the Manager, the Manager is not liable for any error of judgment or for any loss suffered by the Fund unless such loss resulted from the Manager's willful misfeasance, bad faith, gross negligence or reckless disregard of its obligations and duties.  (See "RISK FACTORS").

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets by primarily investing in Fairfield Sentry Limited, a British Virgin Islands corporation ("FSL").  FSL principally utilizes a nontraditional options trading strategy described as "split strike conversion".  This strategy has defined risk and profit parameters which may be ascertained when a particular position is established.  Set forth below is a description of the "split strike conversion" strategy.

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the sale of out of the money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out of the money S&P 100 Index put options.  An index call option is out of the money when its strike price is greater than the current price of the stock; an index put option is out of the money when the strike price is lower than the current price of the index.  The basket typically consists of approximately 35 to 40 stocks in the S&P 100.

The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price.  The purchase of an out of the money put, funded with part or all of the call premium, protects the equity position from downside risk.

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 Index puts and calls.  The further away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy.  However, the dollar value underlying the put options always approximates the value of the basket of stocks.

The options transactions executed for the benefit of FSL, and indirectly, the Fund, may be effected in the over-the-counter market or on a registered options exchange.  (See "POTENTIAL CONFLICTS OF INTEREST").

The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities ("BLM") through accounts maintained at that firm.  The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the capitalization weightings of each security in the basket, the minimum correlation of the basket against the S&P100 Index, and the permissible range of option strike prices.  Subject to the foregoing guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account.   The services of BLM and its personnel are essential to the continued operation of the Fund, and its profitability, if any.

Currency Hedge

In an effort to manage the U.S. Dollar exposure of the Fund's shareholders, the Manager has established an account at a nonaffiliated bank (the "Bank") to hedge the currency exposure of the

shareholders resulting from the Fund holding assets denominated in U.S. Dollars. Generally, the Manager will apply a passive strategy designed to immunize investors against U.S. Dollar declines by seeking to continuously hedge the currency exposure utilizing foreign exchange instruments. The Fund may hedge its currency exposure through the purchase or sale of any foreign exchange instrument including forward contracts, currency option transactions and other derivatives. Obligations owed to the Bank may be collateralized from time to time by a pledge of the assets underlying the Shares (i.e., the Fund's FSL shares). The cost incident to managing the currency exposure of the shareholders will be reflected in the Net Asset Value of the Shares.

<u>Other Investments</u>

The Manager, as the investment manager of FSL, may in its sole and exclusive discretion allocate a portion of FSL's assets (never to exceed, in the aggregate, 5% of FSL's assets at the time of investment) to alternative investment opportunities other than FSL (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines or for cause. The Manager and FSL generally share in fees received by portfolio managers of Non-SSC Investments from investors other than FSL. FSL will pay fees with respect to the Non-SSC Investments at a rate that will not exceed FSL's rate of fees (in certain cases, this may be accomplished by the Manager subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers).

In certain circumstances, the performance fee paid at the FSL level may be reduced for particular calendar quarters for certain Non-SSC Investment Losses, as defined below. See "POTENTIAL CONFLICTS OF INTEREST" and "FEES, COMPENSATION AND EXPENSES-Performance and Management Fees".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL."

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL."

**Investment Restrictions**

With the exception of the Fund's investment in FSL, which will be on an unrestricted basis, the Fund will observe the investment restrictions set forth in the articles of association which are summarized here:

a) no more than 10% of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

b) the Fund may not hold more than 10% of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

c) no more than 10% of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

d) no more than 10% of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

e) the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Manager collectively own in excess of 5% of such securities;

f) the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

g) the Fund will adhere to the general principle of diversification in respect of all of its assets;

h) the Fund will not invest directly in real property;

i) the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

j) no more that 10% of the Net Asset Value of the Fund will be invested in physical commodities.

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.


## OFFERING OF THE SHARES

The Fund is offering up to 5,000,000 voting shares, denominated in Euros (the "Shares"), at a price equal to the Net Asset Value per Share (as defined) as calculated as of the opening of business on the date of issuance (generally the first business day of every month). The Fund initially sold what are now its Shares in December 1999 at an initial offering price of 100 EUR.

The Shares may not be sold directly or indirectly to (i) natural persons who are citizens, nationals, or residents of, or institutions or other entities organized, created, formed, chartered or

10

resident in, the United States of America, (ii) entities as to which any person or entity described in (i) above is, directly, or indirectly, a beneficiary, fiduciary, grantor or decedent, or (iii) institutions or other entities owned, in whole or in part, directly or indirectly by the persons or entities described in (i) or (ii) above ("U.S. persons"). No Shares may be subject to an option held by a U.S. person. Any transfer of Shares to a U.S. person is prohibited and will be subject to immediate and compulsory redemption by the Fund. (See "TRANSFERS, REDEMPTIONS AND TERMINATION - Transfers").

The minimum initial purchase by each subscriber is 200,000 EUR, unless the Fund deems it advisable to permit subscriptions for a lesser amount provided that such lesser amount shall at all times be no less than the EUR equivalent of US $100,000. The Fund may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into segregated interest bearing accounts in the Fund's name at the Fund's bank, Citco Bank Nederland N.V. Dublin Branch.

After the initial closing, the Fund will offer its Shares on a continuous basis at a price equal to the Net Asset Value per Share as calculated as of the opening of business on the date of issuance of such Shares. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will be accepted, in the sole discretion of the Manager, as of the first business day of the following month. Thus, for example, subscriptions received between January 1 and January 25 will be accepted as of February 1, assuming the 29th-31st are business days. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day. Subscriptions shall become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund.

There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents and money managers, who may charge a placement fee of up to 5% of the total amount of the subscriptions for Shares sold, and/or share in the fees earned by the Manager, which they may rebate to their clients. FGBL or an affiliate thereof may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the Fund's assets.

<u>Net Asset Value Defined</u>

The Net Asset Value of the Shares is the value of the Fund's assets as calculated in accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund.

Notwithstanding the foregoing:

(i) in the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Directors shall determine; and

(ii) the amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

11

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The difference between the Net Asset Value of the Fund and the Net Asset Value of FSL will be directly related to the results of, and charges incident to, the currency hedging trading account maintained with respect to the Fund's Shares.

The Net Asset Value of the Fund will be calculated on a monthly basis by the Fund's administrator, Citco Fund Services (Europe) B.V.

Pursuant to the Fund's Article of Association, the Fund may suspend the calculation of its Net Asset Value for the whole or any part of any period:

(a)     during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

(b)     when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to the shareholders; or

(c)     when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d)     during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorized under the Fund's Articles of Association shall exist.  Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Fund and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive.  Whenever the Directors shall declare a suspension of the

determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all shareholders stating that such declaration has been made.  At the end of any period of suspension as aforementioned the Directors shall give notice to all shareholders stating that the period of suspension has ended.

Who Should Purchase/Subscription Procedure

This offering is limited to non-U.S. persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition.  The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he is not a U.S. person.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a certified copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity.  Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant.  In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

In order to subscribe for Shares, subscribers must complete and sign the Share Application Form included in the Subscription Documents which accompany this Memorandum, and indicate the EUR amount of Shares that are being purchased and mail them to Fairfield Sigma Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8 - Teleport, Naritaweg 165, 1043BW Amsterdam, The Netherlands; fax no.: (31-20) 572-2610.

Subscription funds of investors purchasing Shares should be wire transferred to the Fund's account at:

***Intermediary Bank – SWIFT Field 56***
KBC Bank N.V., Brussels
BIC: KREDBEBB

***Account with Institution - SWIFT Field 57***
Account Name: Citco Bank Nederland N.V. Dublin Branch

International Bank Account Number (IBAN): BE96 4809 5884 4705
BIC: CITCIE2D

***Beneficiary Customer -SWIFT Field 59***
Beneficiary Account Name: Fairfield Sigma Limited
Beneficiary  IBAN**:** IE98 CITC 0000 0035 8108 01

***Reference – SWIFT Field 70***: Name and Full Address Subscriber:

## FEES, COMPENSATION AND EXPENSES

Expenses

      The Fund bears all of the continuing offering costs and all other expenses incurred in the operation of the Fund, if any, including the ordinary and necessary expenses directly related to its investment and trading activities (including the costs incident to the currency trading hedging account), all administration fees, all insurance expenses and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund.  Transactional costs will be included in FSL's compensation of profit and loss and will, accordingly, be indirectly borne by the Fund.  The Fund pays Fairfield Greenwich Advisors LLC, an affiliate of the Manager, an annual expense reimbursement charge of 0.15% of the Fund's Net Asset Value, payable quarterly in an amount equal to 0.0375% of the Fund's Net Asset Value as of the last day of each calendar quarter, for providing certain administrative services and back-office support  to the Fund.

Performance and Management Fees

      The Manager does not receive either a management fee or a performance fee from the Fund.  The Manager does receive a monthly management fee from FSL (in which substantially all of the Fund's assets are invested) in an amount equal to one-twelfth of one percent (1.0% per annum) of FSL's net asset value before the FSL Performance Fee (as defined), as calculated at the opening of business on the first business day of each calendar month, which will include subscriptions for shares accepted by FSL as of the first business day of the month.  This fee is payable monthly in arrears.

      In addition, the Manager  receives a quarterly performance fee from FSL in an amount equal to twenty percent (20%) of the amount of any new high net profits, i.e., new appreciation, earned by FSL (the "FSL Performance Fee").  In the event that, as at the end of any calendar quarter, the aggregate amount of original investments in Non-SSC Investment vehicles exceeds the aggregate net asset value of FSL's interests in Non-SSC Investment vehicles (before deduction of FSL's share of fees payable by the Non-SSC Investment vehicles ) (such excess being referred to as the "Non-SSC Investment Loss"),  the Manager will reduce the amount of the FSL Performance Fee payable at subsequent quarter end by an amount equal to the Non-SSC Investment Loss.  The portion of the FSL Performance Fee that is reduced to cover the Non-SSC Investment Loss will be carried forward. In the event the Non-SSC Investment Loss is, in whole or in part, subsequently recouped by Non-SSC Investment vehicles, FSL will pay the Manager such portion of the FSL Performance Fee that was previously reduced to cover the Non-SSC Investment Losses, in addition to the FSL Performance Fee otherwise payable in any quarter.

14

Salaries and Other Personnel Expenses

Mr. Noel will not be compensated for serving as a director of the Fund, but he and representatives of the Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders.  The directors not affiliated with the Manager, of which there are two at the present time, will each be paid a fee of $5,000 per annum by the Fund together with their out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

## CUSTODIAN AND BROKERAGE

### Custodian

Citco Global Custody N.V. has been appointed as Custodian by the Fund.

The Custodian will be entrusted with the safe custody of certain financial investments of the Fund pursuant to a custody agreement made and entered into between the Fund and the Custodian. The Custodian shall exercise only custody functions on behalf of the investments of the Fund. It does not act as sponsor of the Fund or assume special controlling duties other than those related to its custody functions. The Custodian does not warrant the contents of this Memorandum, nor is it involved in the management, administration or Net Asset Value calculation of the Fund. The Custodian may make use of sub-custodian and depositories in the exercise of its functions. The Fund may appoint other custodians to provide custody services to the Fund. The services of the Custodian to the Fund may be terminated by either the Fund or the Custodian, inter alia, at any time, subject to 90 days prior written notice.

The Custodian shall have no responsibility to initiate, appear in, prosecute or defend any legal or equitable proceedings relating to the stocks, bonds, other securities or property held by the Custodian on behalf of the Fund under the custody agreement. The Custodian shall have no responsibility to initiate any proceeding or engage the services of any third party for the collection of overdue amounts owing to the Fund in connection with any stocks, bonds or other property held by the Custodian under the custody agreement. If, at the request of the Fund, the Custodian agrees to appear in, prosecute or defend any such legal or equitable proceedings, either in the Custodian's name or in the name of its nominee, the Custodian shall first be indemnified to its satisfaction against damages and expenses (including attorney's fees) which may be sustained or incurred by the Custodian in so acting.

Where sub-custodians are appointed, the Custodian must exercise reasonable skill, care and diligence in the selection of sub-custodians and is responsible to the Fund for the duration of the appointment of each sub-custodian, for satisfying itself as to the ongoing suitability of the sub-custodians to provide custodial services to the Fund. In addition, the Custodian must maintain an appropriate level of supervision over the sub-custodians and make appropriate enquiries, from time to time, to confirm that the obligations of the sub-custodians continue to be completely discharged.

**Brokerage**

It is expected that the Manager and the Non-SSC Investment managers will generally allocate brokerage business on the basis of best available execution and in consideration of such brokers' provision of brokerage and research services. The Manager and the Non-SSC Investment managers may also utilize brokers with which the Non-SSC Investment managers are affiliated.

In selecting brokers or dealers to execute transactions, the Manager and the Non-SSC Investment managers typically will not solicit competitive bids and will not have an obligation to seek the lowest available commission cost. It generally will not be the practice of the Manager or the Non-SSC Investment managers to negotiate "execution only" commission rates, and thus the Fund may be deemed to be paying for research and other services provided by the broker which are included in the commission rate. Research furnished by brokers may include, but is not limited to, written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; financial publications; statistic and pricing services, as well as discussions with research personnel, along with hardware, software, data bases and other technical and telecommunication services and equipment utilized in the investment management process. Research services obtained by the use of commissions arising from such transactions may be used by the Manager or the Non-SSC Investment managers in their other investment activities.

The Manager and the Non-SSC Investment managers may also be paying for services other than research that are included in the commission rate. These other services may include, without limitation, office space, facilities and equipment; administrative and accounting support; supplies and stationery; telephone lines, usage and equipment and other items which might otherwise be treated as an expense of the Manager or the Non-SSC Investment managers. To the extent the Manager or the Non-SSC Investment managers utilizes commissions to obtain items which would otherwise be an expense of the Manager or the Non-SSC Investment managers, such use of commissions in effect constitutes additional compensation to the Manager or Non-SSC Investment managers. Certain of the foregoing commission arrangements are outside the parameters of Section 28(e) of the Securities Exchange Act of 1934 which permits the use of commissions or "soft dollars" to obtain "research and execution" services. Finally, since commission rates are generally negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may result in higher transaction costs than would otherwise be obtainable.

## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an agreement between Citco Fund Services (Europe) BV ("Citco" or the "Administrator") and the Fund, Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors. As administrator, Citco has the responsibility for furnishing the day to day administrative services which the Fund may require, such as: accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

16

Pursuant to the Administration Agreement, dated as of February 20, 2003, between the Fund and Citco, the Fund has agreed to indemnify Citco its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under the Administration Agreement, against any and all liabilities, obligations, losses, judgments and expenses of any kind or nature whatsoever (collectively, the "Claims" and, individually, a "Claim") which may be imposed on, incurred by or asserted against any of them arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of Citco or such other indemnified party) out of the provision of services under the Administration Agreement.  Similarly, Citco will indemnify the Fund from and against any Claim which arises directly out of the negligence, bad faith, fraud or dishonesty of its obligations on the part of Citco in connection with its provision of services under the Administration Agreement.  The Administration Agreement may be terminated by either party on 90 days' prior written notice; provided, however, that the Administration Agreement may be terminated forthwith by notice in writing by either party if the other party (a) commits a material breach of the Administration Agreement and fails to cure such breach within 30 days after notice from the non-defaulting party; or (b) enters into involuntary liquidation or if a receiver is appointed over any of its assets.

## RISK FACTORS

Among the substantial risk factors involved in a purchase of Shares in the Fund are the following:

1.    **Trading Risks**.  Substantial risks are involved in the trading of equity securities and options.  Market movements can be volatile and are difficult to predict.  U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affects securities and options prices, as well as the liquidity of such markets.  Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities and options.  A variety of possible actions by various government agencies also can inhibit the profitability of the Fund's business or can result in losses.  Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategies utilized on behalf of the Fund.  The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution.  Thus, substantial risk remains that the techniques employed on behalf of the Fund by FSL and the Non-SSC Investment managers cannot always be implemented or effective in reducing losses.  At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile.  The volume and volatility of trading in these markets depends in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by marketmakers and specialists.  The liquidity of the market may also be affected by a halt in trading on a particular futures or securities exchange or exchanges.  Illiquid markets may make it difficult to get an order executed at a desired price.

2.    **Dependence Upon Principals and Key Employees of the Manager and BLM**.  The services of the Manager's principals and key employees and BLM are essential to the continued operations of FSL and the Fund.  If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund. The key employees of the Manager will allocate a small

17

portion of FSL's assets between and among the Non-SSC Investment managers. The Fund will be dependent on the continued presence of these key employees in connection with identification of the recipients of these allocations and the monitoring of the Non-SSC Investments.

3.    **Conflicts of Interest**.  The Manager and the Non-SSC Investment managers receiving allocations of FSL's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund.  They may also make investments in securities for their own accounts.  In addition, the Manager functions as the investment manager for unregistered foreign investment companies in addition to the Fund.  Such activities could detract from the time that the Manager and its principals allocate to the affairs of FSL and the Fund.  The Manager will obtain certain business and financial benefits from FSL's investments in the Non-SSC Investments which may result in a conflict of interest between the Manager and FSL in the selection of, and allocation of assets between and among the Non-SSC Investments.  See "POTENTIAL CONFLICTS OF INTEREST".

4.    **Conflicts of Interest-Transaction Executions**.  The broker-dealer through which FSL conducts its "split strike conversion" transactions, in its role as a market maker, may effect transactions in equity securities with the Fund as principal. This may provide such broker-dealer with the ability to use the Fund's assets to enhance its equities market-making function.

5.    **Competition**.  The securities industry, including market-making activities and transactions effected in connection therewith, is very competitive.  Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies.  Many such competing persons or entities are better capitalized and have more experience in trading than the Fund. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund.

6.    **Regulated Industries**.  The securities and commodities industries are highly regulated. The Fund will not be directly subject to regulation by the SEC, national securities exchanges, the CFTC or the Federal Reserve Board.  However, the SEC and CFTC regularly review the practices and procedures of the securities and commodities industries, and the marketplace in general, and from time to time revise rules and regulations pertaining thereto.  The exchanges engage in similar reviews and at times revise their rules.  There can be no assurance whatsoever that any rules and regulations promulgated by the SEC, the CFTC, the Federal Reserve Board, or the various securities exchanges or statutory amendments to the Securities Exchange Act of 1934 or the Commodity Exchange Act will not adversely impact the Fund.

7.    **Clearing Firm Loss or Insolvency**.  If a clearing firm utilized in connection with accounts maintained on behalf of FSL was to become insolvent, the Fund could have some or all of these positions closed out without its consent.  All of FSL's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions.  Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place.  Such widespread insolvency could result in substantial losses to the Fund.

8.    **Over-the-Counter Options Transactions**.  A portion of the options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution.  Trading index options in the over-the-counter market is subject to counter-party risk and is without the protections

afforded by transactions effected through the Options Clearing Corporation, a registered options exchange.

9.    **Option Buyer's Risk of Loss of Entire Investment**.  An option is a wasting asset which becomes worthless when the option expires.  As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration.  This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

10.    **Arbitrage Transactions**.  Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction.  Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination.  Consequently, a substantial favorable price movement may be required before a profit can be realized.

11.    **Combination Transactions**.  At various times, the Fund, through its investments in FSL and the Non-SSC Investments, may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations.  Such transactions are considerably more complex than the purchase or writing of a single option.  The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding.  Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination.  This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

12.    **Trading Decisions Based on Trend Analysis**.  Certain of the trading decisions made on behalf of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm.  In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends.  Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities.  This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts.  In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur.  Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow.  Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

13.    **Assignment of Puts or Calls**.  Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position.  Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes.  Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses.  The same would be true given an illiquid market such as that of October 1987.

14.    **Prohibition of Exercise Rights**.  The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

15.    **Compensation Arrangements of Non-SSC Investments**.  The Non-SSC Investment managers will generally be compensated through incentive arrangements.  Under these arrangements, the Non-SSC Investment manager may benefit from appreciation, including unrealized appreciation in the value of the Non-SSC Investment, but may not be similarly penalized for decreases in the value of such investment vehicle.  Such fee arrangements may create an incentive for the Non-SSC Investment managers to make purchases that are unduly risky or speculative.  In most cases, however, the Fund anticipates that FSL will invest in Non-SSC Investments where the manager is required to recoup prior losses before any performance-type fee is payable in respect of current gains. To the extent that an accrual for an incentive fee is reflected in the net asset value of shares of a Non-SSC Investment vehicle, then, if such accrual is reversed by the Non-SSC Investment vehicle as a result of subsequent depreciation in the value of such investment, all of the shares of FSL and, accordingly, the Fund, will benefit from the reversal of the accrual, including Shares purchased after the Non-SSC Investment vehicle made the accrual.  Further, to the extent that the FSL Performance Fee is reduced by the Non-SSC Investment Loss amount, then if such reduction is repaid in part or in whole by FSL due to recoupment of losses by Non-SSC Investment vehicles, the net asset value of all shares of FSL and, accordingly, the Fund then outstanding will be reduced, including Shares purchased after the reduction of the FSL Performance Fee.

16.    **Risks of Leverage**.  The Non-SSC Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies.  A particular Non-SSC Investment vehicle may not be subject to any limitation in the amount of its borrowings, and the amount of borrowings that the Non-SSC Investment vehicle may have outstanding at any time may be large in comparison to its capital.

The use of leverage may provide the Non-SSC Investment vehicle with the opportunity for greater capital appreciation, but at the same time will increase the Non-SSC Investment vehicle's, and indirectly the Fund's, exposure to capital risk and higher current expenses. Moreover, if the assets of the Non-SSC Investment vehicle are not sufficient to pay the principal of, and interest on, the Non-SSC Investments vehicle's debt when due, the Fund could sustain a total loss of its investment in the Non-SSC Investment vehicle.

In addition, the Fund may enter into borrowing arrangements on a short-term basis, including through the use of a line of credit. Such borrowing may result in the borrower taking custody of, or placing liens on, the assets of the Fund.

17.    **Possibility of Misappropriation of Assets**.  When FSL invests with Bernard L. Madoff Investment Securities or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested.  Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

18.    **Sole Proprietor Non-SSC Investment Managers**.  Some of the Non-SSC Investment vehicles to which FSL may allocate capital will consist of investment operations with only one principal. In such cases, if that individual's services became unavailable to the Non-SSC Investment vehicle, the Fund might sustain losses.

19.    **Experience of Non-SSC Investment Managers**.    While certain of the Non-SSC Investment managers have had extensive experience in trading securities generally and with their specific investment strategies, they have had little experience in investing and trading on behalf of a pooled investment vehicle, in utilizing certain of the investment strategies to be employed on behalf of the Fund or in managing an account as large as that anticipated for the Non-SSC Investments.  In that regard, as the assets of the Non-SSC Investment vehicles increase, it is not known what effect, if any, this will have on the trading strategies utilized on their behalf or their investment results.

20.    **Emerging Managers**.  As the Non-SSC Investment vehicles generally will be in an early stage of formation or operation, this can pose a number of operational and other issues.  For example, in its early stages the Non-SSC Investment manager may have little capital available to cover expenses and, accordingly, may have difficulty attracting qualified personnel. Competing investment managers have a larger number of qualified management and technical personnel and benefit from a larger capital base.

21.    **Lack of Liquidity**.    Certain of the investments in the Non-SSC Investments will be subject to lock-up provisions which will limit the ability of FSL to withdraw capital from such investment.  While such lock-up period may be subject to early release for breach of risk control or performance guidelines or for cause, there can be no assurance that FSL, and therefore the Fund, will not sustain additional losses while such lock-up period remains in effect.

22.    **Exchange Rate Risk**.  The Fund will maintain its assets in U.S. dollars.  The Fund has established an account which will effect transactions in the currency market in an effort to hedge against such risks as they pertain to the Euro, which is the functional currency of the Fund.  There can be no assurance that such transactions will be successful in protecting the shareholders against this exchange rate risk.  In addition, a hedge may be established in anticipation of new subscriptions. In the event such new subscriptions are not made, the hedge positions will be unwound and the transaction costs will be borne by the existing shareholders.

23.    **Forward Trading in Currencies**.  The Fund may engage in a substantial amount of trading in forward contracts, swaps and other similar instruments with respect to currencies ("Forward Contracts").  Forward Contracts are not traded on exchanges; rather, banks and dealers act as principals in these markets.  Forward trading is substantially unregulated; there is no limitation on the daily price movements of Forward Contracts.  The principals who deal in the forward markets are not required to continue to make markets in the Forward Contracts they trade.  There have been periods during which certain participants in the forward markets have refused to quote prices for Forward Contracts or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.  The Fund will trade Forward Contracts through a limited number of entities, and as a result liquidity problems might be greater in the Fund's forward trades than they would be were trades to be placed through a larger number of forward market participants.  The imposition of credit controls by governmental authorities might also limit such forward trading to less than that which the manager of the account would otherwise recommend, to the possible detriment of the Fund.

In respect of its forward trading, the Fund is subject to the risk of the inability or refusal to perform with respect to such contracts on the part of the principals or agents with or through which the Fund trades.  Any such failure or refusal, whether due to insolvency, bankruptcy or other causes, could subject the Fund to substantial losses.  The Fund will not be excused from the performance of any Forward Contracts into which it has entered due to the default of third parties in respect of other forward trades which in the Fund's trading strategy were to have substantially offset such contracts.

Currency forwards prices are volatile.  Price movements of these contracts are influenced by, among other things:  government trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates. Governments from time to time intervene in the currency markets with the specific intent of influencing prices directly.

24.    **Currency Account.**  The Bank managing the Fund's currency hedging account may, from time to time, receive a pledge of the assets underlying the Shares as collateral for the Fund's obligation in the currency hedging account.  In the event such a pledge is in effect and the Fund is unable to pay all or a portion of its obligations to the Bank in connection with the currency hedging account, all or a portion of the assets underlying the Shares (i.e., the Fund's FSL shares) may be forfeited.

## POTENTIAL CONFLICTS OF INTEREST

The Manager, and its principals may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) in the future with substantially the same or different objectives as those of the Fund.  They may also make investments in securities for their own accounts.  Such activities could detract from the time they allocate to the affairs of the Fund.  Similarly, Messrs. Naess and Schmid, the non-affiliated directors, have other business interests and will not devote their entire time to the Fund's affairs.  See also "RISK FACTORS".  In connection with FSL's Non-SSC Investments, the Manager and its affiliates may obtain financial and business benefits, including but not limited to:  (i) additional investment capacity in Non-SSC Investment strategies, which may be made available to other clients of the Manager, (ii) compensation from Emerging Managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (FSL and non-FSL related) of such Emerging Managers.  The Manager or an affiliate thereof will share with FSL, through FSL Performance Fee offset, an amount equal to the greater of (i) 50% of cash flows generated by equity held by the Manager or an affiliate thereof in the businesses of Emerging Managers and (ii) 10% of all revenues accruing to the Manager or an affiliate thereof directly from its association with Non-SSC Investment Vehicles (the "Shared Cash Flow Amount").  Despite this sharing, the arrangements described in this paragraph may result in a conflict of interest between the Manager and the Fund.

Because FSL and the Fund were organized by the Manager, the fees paid by the Fund to the Manager were not the result of arms-length negotiation.

The Fund may engage placement agents to market the Fund.  If you are introduced to the Fund by an agent, you should expect it to be paid by the Manager for the introduction, out of the fees the Manager receives from the Fund.  You should also expect the agent to have an incentive to recommend that you remain an investor in the Fund, since the agent will likely be paid a portion of the Manager's fees each year that you remain an investor.

Because Mr. Noel is a principal of the Manager as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Manager over the Fund.

Citco Fund Services (Europe) B.V., Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V. are affiliates.

Each service provider to the Fund shall pay regard to its obligation to act in the best interest of the Fund and the Directors of the Fund will ensure that all potential conflicts of interest are resolved fairly and in the interest of the shareholders.  When allocating investment opportunities, the Manager will ensure that all such investments are allocated in a fair and equitable manner.

## DESCRIPTION OF SHARES

The Fund is authorized to issue up to 5,000,000 shares in one class, with a par value of .01 EUR (the "Fund Shares").  The Fund has an authorized share capital of 50,000 EUR.  The Fund Shares will be issued in book entry form, unless delivery of the Fund Shares in registered form is requested.  Fund Shares will not be issued in bearer form.  Each Fund Share, when issued, will be fully paid and nonassessable.

Holders of Fund Shares are entitled to one vote per share and will participate on a pro rata basis in the assets of the Fund on liquidation and in dividends and other distributions as declared.

## DIVIDEND POLICY

Since the business objective of the Fund is directed toward achieving capital appreciation, it is anticipated that the Fund will not declare any dividends or make any distributions to its shareholders.  Subject to the foregoing and to applicable law, the Fund's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any.

## TRANSFERS, REDEMPTIONS AND TERMINATION

<u>Transfers</u>

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE FUND'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST BUSINESS DAY OF EACH CALENDAR MONTH OF EACH YEAR ON 15 CALENDAR DAYS' NOTICE TO THE FUND.

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Fund for consent and will not be effective until such consent is given by the Fund.  Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Fund and any attempt to do so without first obtaining the Fund's consent, which may be withheld in the sole and exclusive discretion of the Fund, will constitute grounds for compulsory redemption of the Shares concerned as of the next permissible redemption date (as described below) and the imposition of a processing charge of 2% of the Net Asset Value with respect to such redemption.  Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Fund within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per share of 2% of the Net Asset Value per Share.  The processing charge will be retained by the Fund.

THE DISPOSITION OF SHARES TO U.S. PERSONS (AS DEFINED UNDER "OFFERING OF SHARES") WITHOUT THE PRIOR WRITTEN APPROVAL OF THE FUND IS EXPRESSLY PROHIBITED, AND THE FUND SHALL HAVE THE RIGHT COMPULSORILY

AND IMMEDIATELY TO REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

Redemptions at the Option of the Shareholders

A shareholder may cause part or all of his Shares to be redeemed as of the last business day (i.e., being any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America) of each calendar month of each year, provided that the Fund shall be in receipt of written notice of redemption for at least fifteen (15) calendar days prior to such redemption date. In the Fund's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Fund to cancel the redemption. A Shareholder is not required to hold his Shares for any minimum period of time to exercise his redemption privilege.

Compulsory Redemption

The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or no reason. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

Redemptions - General Information

Redemptions will be at the Net Asset Value per Share calculated as of the last business day of the month of redemption, subject to any applicable processing charge, as described above. If notice of intent to voluntarily redeem is not received by the Fund within the prescribed period of time, then in the Fund's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Fund to cancel the redemption and the Directors consent to such cancellation. Except in the case of extraordinary circumstances, such as an inability to liquidate existing positions, or the default or delay in payments due the Fund from brokers, banks or other persons, payment on redemptions will be made within 30 days after the redemption date. The Fund will not pay interest to the redeeming shareholder on any payment.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date. In addition, the Fund may temporarily suspend any redemption during any period that the Fund has suspended the calculation of its Net Asset Value (see "OFFERING OF THE SHARES-Net Asset Value Defined"). Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Memorandum.

Termination

The shareholders may, by a majority vote, elect to wind up and dissolve the Fund at any time. If the Fund's Board of Directors determines that it would be in the best interests of the Fund to wind up and dissolve the Fund at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's responsibility for the prevention of money laundering, the Manager and its affiliates, subsidiaries or associates may require a detailed verification of a shareholder's identity, any beneficial owner underlying the normal ownership of the Shares and the source of the payment for the Shares.

The Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a shareholder's Shares in the Fund.  In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Manager may refuse to accept a subscription or may cause the redemption of any such shareholder from the Fund.  The Fund, without notice, may suspend the redemption rights of such shareholder if the Fund or the Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

Each subscriber and shareholder shall be required to make such representations to the Fund as the Fund and the Manager shall require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that such subscriber or shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs.  Such shareholder shall also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly the proceeds of criminal conduct or derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## ANTI MONEY-LAUNDERING POLICIES

To ensure compliance with statutory and other generally accepted principles aimed at the prevention of money-laundering, the Fund and/or the Administrator may require a detailed verification of a prospective investor's identity.  Although the Fund and/or the Administrator reserve the right to request a detailed verification of a prospective investor's identity, a detailed verification should not be necessary if:

- the prospective investor makes a subscription payment from an account held in their own name at a Qualified Financial Institution (a "QFI"); or

- the prospective investor is introduced by a QFI and that QFI provides written assurance to the Fund and/or the Administrator that it has established the identity of the prospective investor and holds evidence of that identity.

A QFI is defined as a financial institution which is:

- established in a European Union (EU) member state and subject to the EU Money Laundering Directives; or

- established in one of the countries which make up the Financial Action Task Force and/or is subject to regulation which complies with the FATF Recommendations. Such countries are Argentina Australia, Austria, Belgium, Brazil Canada, Denmark,

Finland, France, Germany, Greece, Hong Kong, Ireland, Italy, Japan, Luxembourg, Mexico, the Netherlands, New Zealand, Norway, Portugal, Russian Federation, Singapore, South Africa, Spain, Sweden Switzerland, Turkey, the United Kingdom, and the United States.

Prospective investors who DO NOT make the subscription payment from an account held in their own name at a QFI and who are NOT introduced by a QFI will be required to provide the following documentation, as relevant to their status.

**Individual Investors** will be required to provide the following information:

- full name;

- permanent address;

- a certified copy of their passport or national identity card;

- a bank reference letter; and

- verification of address.

**Partnerships** will be required to provide the following information:

- a mandate from the partnership authorizing the subscription and conferring authority on those persons executing the subscription agreement; and

- the identities of at least two partners and of all those authorized to issue instructions.

**Corporate entities** that are quoted on a stock exchange in an EU member country or in one of the QFI prescribed countries or that are known to be the subsidiary of such a quoted company will be required to provide the following information:

- the original or certified copy of the certificate of incorporation or similar document;

- a list of the directors' names, occupations, addresses and dates of birth; and

- properly authorized mandate of directors authorizing the subscription and conferring authority on those persons executing the subscription form.

Where the prospective investor to the transaction is a corporation that is a private company, the following additional information will need to be provided:

- certified  passport copies or national identity card copies of at least two directors; and

- a list of names and addresses of shareholders holding 10% or more of the issued share capital of the company and in the case of individual shareholders, their occupations and dates of birth.

26

When a significant shareholder of a private company (25% or more) is a body corporate, information will need to be provided from the company regarding the ultimate beneficial ownership of that particular body corporate. If the ultimate beneficial owner(s) of that particular body corporate is (are) individual(s), such individual(s) will need to provide the information that is required from individual investors and outlined above.

Furthermore, subscriptions will be cross checked against lists held by various international agencies in order to establish that the persons or entities subscribing have not been blacklisted or wanted in connection with a criminal investigation. Such international agencies include the Bahamas Financial Intelligence Unit, the Central Bank of Ireland, the FBI, the Bank of England and the US Treasury Department's Office of Foreign Assets Control (OFAC). Other agencies will be consulted as and when appropriate.

Finally, it should be noted that redemption payments will only be paid to a bank account held in the name of the registered owner of the Shares and that any transferee will have to furnish the same information (and enter into a subscription agreement) which would be required in connection with a direct subscription in order for a transfer application to be considered by the Administrator.

Pending the provision of evidence satisfactory to the Administrator as to the identity of any prospective investor, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If, within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited. Alternatively, if the Fund has issued Shares to an investor prior to all identification documentation being provided, such investor will not be able to redeem any Shares so issued until it has provided all required identification documents.

Financial institutions which have been duly qualified and authorized to exercise their activity in their respective countries as a bank and which are subject to internationally recognized anti money-laundering legislation may subscribe for Shares on behalf of their clients.

## TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA

### Tax Considerations and Exchange Control

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the British Virgin Islands, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the BVI. Capital gains realized with respect to any shares, debt obligation or other securities of the Fund by persons who are not resident in the BVI are also exempt from the provisions of the Income Tax Act of the British Virgin Islands. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the BVI with respect to any shares, debt obligations or other securities of the Fund.

There are no exchange control restrictions in the BVI. Accordingly, the Fund will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

The Fund's gains from its trading in stocks, options or other investments should not be subject to United States federal income, branch or withholding taxes because the Fund expects that it

will not be engaged (or treated as engaged) in a "trade or business" in the United States, or treated as a personal holding company, for United States federal income tax purposes. Any dividend income received by the Fund from U.S. corporations generally will be subject to United States federal withholding taxes. Although substantially all of the interest earned by the Fund from sources within the United States is expected to be of the type which will not be subject to United States federal income, branch or withholding taxes, the Fund may earn interest from time to time that could be subject to United States federal income, branch or withholding taxes (although it is not expected that the amount of such taxes would be material). In addition, with respect to Shares held by non-U.S. persons who are not engaged in a "trade or business" in the United States (as defined under the Internal Revenue Code, the "Code"), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund. The Fund expects that it will not be subject to state and local taxes in the United States on its income or capital. Because of the absence of full guidance under state and local law, however, this result is not entirely clear. The conclusions in this paragraph are based on the Code and existing laws, judicial decisions and administrative regulations, rulings and practice in the United States, all of which are subject to change.

Prospective subscribers should consult their professional advisors on the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

### ERISA

The Fund may accept subscriptions from individual retirement accounts ("IRAs"), Keogh plans, pension or profit-sharing plans, governmental plans, entities that invest the assets of such accounts or plans and/or other benefit plan investors (all such entities are herein referred to as "Benefit Plan Investors"). The Fund does not anticipate that its assets will be subject to ERISA because it intends to limit the investments in the Fund by Benefit Plan Investors (both U.S. and non-U.S.) to less than 25% of the value of any class of equity interests of the Fund, excluding from this calculation any non-Benefit Plan Investor interest of that class held by the Manager, persons affiliated with the Manager or their employees. No subscriptions for Shares made by Benefit Plan Investors will be accepted and no transfers of Shares will be permitted to the extent that the investment or transfer would result in the Fund exceeding this 25% limit. In addition, because the 25% limit is to be calculated upon every subscription to or redemption from the Fund, the Fund has the authority to require the redemption of all or some of the Shares held by any Benefit Plan Investor if the continued holding of such Shares, in the opinion of the Directors, could result in the Fund being subject to ERISA.

### LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Fund in the United States by Andrew E. Goldstein, Esq., 488 Madison Avenue, 16th Floor, New York, New York 10022, and in the British Virgin Islands by Conyers Dill & Pearman, Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

## MISCELLANEOUS

<u>Reports and Financial Statements</u>

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund commences to wind up and dissolve. The Fund will keep its books on an accrual basis. Audited financial statements of the Fund will be mailed to shareholders at their registered addresses, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Fund, which will include the Net Asset Value of the Fund and the Net Asset Value per Share at the end of the year, and such other information as the Fund, in its discretion, determines to be necessary or appropriate. Shareholders also will receive unaudited quarterly letters with respect to the Fund's financial performance.

1) **General**

   a) No Share or loan capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option.

   b) Shares in the Fund are in registered form. Temporary documents of title will not be issued.

   c) Except of their ownership of Shares, none of the Directors or any connected person has any interest in the Share or loan capital of the fund, the existence of which is known to, or could with reasonable diligence be ascertained by, the relevant Director.

   d) None of the Directors has a service contract with the Fund and no such contract is proposed, although, Walter M. Noel, Jr. is a principal of the Manager.

   e) No loan or guarantee has been granted or provided by the Fund to or for the benefit of any Director.

   f) None of the Directors or any member of their respective immediate families has or has any interest in any transaction or transactions which are or were unusual in their nature or conditions or significant in the business of the Fund and which have been effected by the Fund since its incorporation.

   g) As of the date of this Confidential Private Placement Memorandum, the Shares have commenced operations, but no dividends have been declared.

   h) The Fund has no loan capital outstanding, no loan capital created but unissued, no loans or any other borrowing or indebtedness or any contingent liabilities, nor has it given any guarantees.

2) **Litigation and Arbitration**

   The Fund is not engaged in any legal or arbitration proceedings and no legal or arbitration proceedings are known to the Directors to be threatened by or against the Fund.

3) **Memorandum and Articles of Association**

   Pursuant to Paragraph 4 of the Fund's Memorandum of Association, the Fund may engage in any act or activity that is not prohibited under any law for the time being in the BVI. As such,

the Fund may carry on business as an investment company. The Fund's Memorandum and Articles of Association may be amended by a resolution of Directors or a resolution of shareholders.

The Memorandum and Articles of Association of the Fund provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or act for conformity, or for any loss or expense happening to the Fund through the insufficiency of deficiency of title to any property acquired by order of the directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

The Memorandum and Articles of Association of the Fund further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the directors out of the funds of the Fund to pay all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

## 4) **Directors**

a) The number of Directors shall not be less than one (1) or more than twenty (20).

b) The remuneration of Directors shall be fixed from time to time by the Board.   Currently the director who is affiliated with the Manager does not receive compensation as a Director.  The two Directors not affiliated with the Manager are each paid $25,000 per annum.

c) None of the Directors has a service contract, existing or proposed with the Fund, although Walter M. Noel, Jr. is a principal of the Manager.

d) There is no retirement age for Directors.

e) The Directors may vote on any transaction in which they have a material interest if they first disclose the nature of their interest to the Fund.

f) The Directors may, by resolution of Directors, fix the emoluments of the Directors with respect to services to be rendered in any capacity to the Fund.

g) The Directors may exercise the powers of the Fund to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and offer securities whenever money is borrowed as security for any debt, liability or obligation of the Fund.

h) No Director has

- any unspent convictions in relation to indictable offenses;

- been adjudged a bankrupt, entered into a voluntary arrangement with creditors or had a receiver appointed to oversee any asset of such Director;

- been the director of any company which, while he was a director with an executive function or after 12 months after he ceased to be director with an executive function, had a receiver appointed or went into compulsory liquidation, creditors voluntary liquidation, administration or company voluntary arrangements, or made a composition or arrangements with its creditors generally or with any class of its creditors;

- been a partner of any partnership which, while he was partner or within 12 months after he ceased to be a partner, went into compulsory liquidation, administration or partnership voluntary arrangement or had a receiver appointed to oversee any partnership asset;

- had any public criticism by statutory or regulatory authorities (including recognized professional bodies); or

- been disqualified by court from acting as a director or from acting in the management or affairs of any company.

## 5) __Borrowing Powers__

The Board may exercise all the powers of the Fund to borrow money, give guarantees and to mortgage, pledge or charge all or part of its undertaking, property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Fund.

## __Documents Available for Inspection__

Copies of the following documents will be available for inspection at the Fund's registered office in the British Virgin Islands during usual business hours on any weekday (Saturdays, Sundays and holidays excepted):

a) the Memorandum and Articles of Association of the Fund;

b) the material contracts of the Fund with service providers;

c) the British Virgin Islands Mutual Funds Act, 1996;

d) when available, the latest financial statement of the Fund;

e) audited accounts as of the close of the last immediately fiscal year;

f) Auditors letter of consent; and a list of all past and present directorships and partnerships held by each director over the past five years.

# COUNTRY-SPECIFIC NOTICES

<u>Australia</u>.  No offer for subscription or purchase of the Shares offered hereby, nor any invitation to subscribe for or buy such Shares, has been made or issued in Australia, otherwise than by means of an excluded issue, excluded offer or excluded invitation within the meaning of Section 66(2) or 66(3) of the Corporations Law.  Accordingly, the Memorandum has not been lodged with the Australian Securities Commission.  Further, the Shares offered hereby may not be resold in Australia within a period of six (6) months after the date of issue otherwise than by means of an excluded offer or excluded invitation as described above.

<u>Bahamas</u>.  The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

<u>Belgium</u>.  The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991).  Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

<u>Brazil</u>.  The Shares have not been, and will not be, registered with the Comissão de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

<u>British Columbia and Ontario, Canada</u>.  The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities. The Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada.  No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense.  If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary in order to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, purchasers in British Columbia and Ontario to whom the Memorandum was sent or delivered and who purchase Shares shall have a right of action against the Fund for rescission (while still the owner of such shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to the date of purchase, provided that the Fund will not be liable: (a) if the purchaser purchased such Shares with knowledge of the Misrepresentation; (b) for all or any portion of any damages that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; and (c) for amounts in excess of the price at which such Shares were sold to the purchaser.  The foregoing summary is subject to the express provisions of either the Securities Act (British Columbia) or the Securities Act (Ontario), whichever the case may be, and reference is made to the complete text of such provisions.

<u>British Virgin Islands</u>.  The Shares offered hereby may not be sold to or purchased by persons resident in the British Virgin Islands, but may be sold to British Virgin Islands international business companies.

<u>Cayman Islands</u>.   No invitation may be made to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands stock exchange.  Cayman Islands exempted and ordinary non-resident companies and certain other persons engaged in offshore business, however, may be permitted to acquire Shares.

<u>Chile</u>.  The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

<u>Republic of China</u>.  No invitation to offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China.  The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund. Business entities incorporated under the laws of China (excluding foreign investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares.  Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain the prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

<u>Costa Rica</u>.   The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

<u>Ecuador</u>.   The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations.  This communication is for informative purposes only; it does not constitute a public offering of any kind.

<u>France</u>.   "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse.   Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute facon en France.  Les investisseurs doivent agir pour leur propre compte.  Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant."  This Memorandum has not been submitted to the Commission des Operations de Bourse in France.  Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France.  The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

<u>Germany</u>.  Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany. Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any

other offering materials relating to the Shares may be distributed or made available to the public in Germany. Individual sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece. The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong. No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland. It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man. The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act. Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations"). Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel. The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent. Israeli residents, other than those considered "exemption holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy. This Memorandum may not be distributed to members of the public in Italy. The Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law. With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other than the Prospective Buyer and the Prospective Buyer's authorized agents. This Memorandum may not be copied in whole or in part. The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

Japan.  Under Article 23-14 Paragraph 1 of the Securities Exchange Law (the "SEL"), the purchase of Shares cannot be made unless the purchaser agrees to the condition that it will not make an assignment of the Shares to any person other than a non-resident of Japan (having the same meanings as defined in Article 6, Paragraph 1(6) of the Foreign Exchange and Foreign Trade Control Laws), except for the case that all the Shares (excluding the Shares assigned to non-residents of Japan) are assigned to one person.  Furthermore, disclosure under the SEL has not been made.  The Shares will not be registered under the SEL.  The offer and sale of the Shares in Japan may be made only in accordance with an exemption available under the SEL and with all other applicable laws and regulations of Japan.

Jersey.  The Memorandum relates to a private placement and does not constitute an offer to the public of Jersey to subscribe for the Shares offered hereby.  No regulatory approval has been sought to the offer in Jersey. The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such person.  The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

Korea.  The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea.   Neither the Fund nor the investment manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder.  The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

Liechtenstein.  The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Luxembourg.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Netherlands.  The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands.  In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the

general prohibition as provided for in the Investments Institutions Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

New Zealand.  The Memorandum has been prepared solely for and the offer made in it is made solely to habitual investors (being persons defined in Section 3(2)(a)(ii) of the New Zealand Securities Act 1978).

Norway.    The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty potential investors in Norway.

Oman.  The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund.  Application for the Shares made by or on behalf of investors not having an existing relationship with the investment manager will not be accepted.  Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama.  The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia.  The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore.  The Memorandum has not been registered with the Registrar of Companies in Singapore and the Shares will be offered in Singapore pursuant to an exemption invoked under Sections 106c and 106d of the Companies Act, Chapter 50 of Singapore ("Singapore Act"). Accordingly, the Shares may not be offered or sold, nor may the Memorandum or any other offering document or material relating to the Shares be circulated or distributed, directly or indirectly, to the public or any member of the public other than (1) to an institutional investor or other body or person specified in Section 106c of the Singapore Act, or (2) to a sophisticated investor specified in Section 106d of the Singapore Act, or (3) otherwise pursuant to, and in accordance with the conditions of, Section 106e(2) of the Singapore Act or any other applicable exemption invoked under Division 5a of Part IV of the Singapore Act.

South Africa.  The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

Spain.  This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

Switzerland.  This Memorandum has been prepared for private information purposes of interested investors only.  It may not be used for and shall not be deemed a public offering of Shares.

No application has been made under Swiss law to publicly market the Fund in or out of Switzerland. The Shares are not subject to the Swiss Investment Fund Act and are therefore not subject to supervision by the Federal Banking Commission and, accordingly, may not be advertised publicly. Therefore, no public offer of the Shares or public distribution of this Memorandum may be made in or out of Switzerland.  This Memorandum is strictly for private use by its holders and may not be passed on to third parties.

United Kingdom.  The Fund is an unrecognized collective investment scheme for the purposes of the Financial Services and Markets Act of 2000 of the United Kingdom (the "Act").  The promotion of the Fund and the distribution of this Prospectus in the United Kingdom is accordingly restricted by law.

The content of this Prospectus has not been approved by an authorized person and such approval is, save where this Prospectus is directed at or issued to the types of person referred to above, required by Section 21 of the Act.  Acquiring Shares may expose an investor to a significant risk of losing all of the amount invested.  The Fund is a limited liability company and any person who acquires Shares will not thereby be exposed to any significant risk of incurring additional liability.  Any person who is in any doubt about investing in the Fund should consult an authorized person specializing in advising on such investments.

Uruguay.  The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

37

**FORM ADV**

## Uniform Application For Investment Adviser Registration

**Part II - Page 1**

| OMB APPROVAL | |
| --- | --- |
| OMB Number | 3235-0049 |
| Expires: | July 31 2008 |
| Estimated average burden hours per response: | 9.402 |

| Name of Investment Adviser: |
| --- |
| **Fairfield Greenwich (Bermuda) Ltd.** |

| **Address:**     (Number and Street)     (City)     (State)     (Zip Code) | **Area  Code:**     Telephone Number: |
| --- | --- |
| **Armoury Bldng.  37 Reid St., Fl 1, Hamilton, Bermuda HM12** | **(441) 292-5401** |

**This part of Form ADV gives information about the investment adviser and its business for the use of clients.**
**The information has not been approved or verified by any governmental authority.**

### Table of Contents

| Item Number | Item | Page |
| --- | --- | --- |
| 1 | Advisory Services and Fees | 2 |
| 2 | Types of Clients | 2 |
| 3. | Types of Investments | 3 |
| 4. | Methods of Analysis, Sources of Information and Investment Strategies | 3 |
| 5. | Education and Business Standards | 4 |
| 6. | Education and Business Background | 4 |
| 7. | Other Business Activities | 4 |
| 8. | Other Financial Industry Activities of Affiliations | 4 |
| 9. | Participation or Interest in Client Transactions | 5 |
| 10. | Conditions for Managing Accounts | 5 |
| 11. | Review of Accounts | 5 |
| 12. | Investment or Brokerage Discretion | 6 |
| 13. | Additional Compensation | 6 |
| 14. | Balance Sheet | 6 |
| | Continuation Sheet | Schedule F |
| | Balance Sheet, if required | Schedule G |

**(Schedules A, B. C. D and E are included with Part I of this Form, for the use of regulatory bodies, and are not distributed to clients.)**

**Potential persons who are to respond to the collection of information contained in this form are not
required to respond unless the form displays a currently valid OMB control number.**

| FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| **Part II - Page 2** | **Fairfield Greenwich (Bermuda) Ltd.** | **801-139882** | **March 21, 2007** |

**1.  A.  Advisory Services and Fees.**  (check the applicable boxes)

For each type of service provided, state the approximate % of total advisory billings from that service.  (See instruction below.)

Applicant:

☒  (1)   Provides investment supervisory services ................................................................................................  **100** %

☐  (2)   Manages investment advisory accounts not involving investment supervisory services ..........................  _____ %

☐  (3)   Furnishes investment advice through consultations not included in either service described above ...........  _____ %

☐  (4)   Issues periodicals about securities by subscription ..................................................................................  _____ %

☐  (5)   Issues special reports about securities not included in any service described above ...............................  _____ %

☐  (6)   Issues, not as part of any service described above, any charts, graphs, formulas, or other devices which clients may use to evaluate securities ................................................................................................................  _____ %

☐  (7)   On more than an occasional basis, furnishes advice to clients on matters not involving securities ...........  _____ %

☐  (8)   Provides a timing service ..........................................................................................................................  _____ %

☐  (9)   Furnishes advice about securities in any manner not described above....................................................  _____ %

(Percentages should be based on applicant's last fiscal year.  If applicant has not completed its first fiscal year, provide estimates of advisory billings for that year and state that the percentages are estimates.)

B.   Does applicant call any of the services it checked above financial planning or some similar term?

Yes ☐   No ☒

C.   Applicant offers investment advisory services for:  (check all that apply)

☒  (1)  A percentage of assets under management         ☐  (4)  Subscription fees

☐  (2)  Hourly charges                                                    ☐  (5)  Commissions

☒  (3)  Fixed fees (not including subscription fees)         ☒  (6)  Other

D.   For each checked box in A above, describe on Schedule F:

- the services provided, including the name of any publication or report issued by the adviser on a subscription basis or for a fee

- applicant's basic fee schedule, how fees are charged and whether its fees are negotiable

- when compensation is payable, and if compensation is payable before service is provided, how a client may get a refund or may terminate an investment advisory contract before its expiration date

**2.   Types of Clients.**  Applicant generally provides investment advice to:  (check those that apply)

☐  A. Individuals                                              ☐  E. Trusts, estates, or charitable organizations
☐  B. Banks or thrift institutions                       ☐  F. Corporations or business entities other than those listed above
☐  C. Investment companies                            ☒  G. Other (Describe on Schedule F)
☐  D. Pension and profit sharing plans

| **FORM ADV** | Applicant: | | SEC File Number: | Date: |
|---|---|---|---|---|
| **Part II - Page 3** | **Fairfield Greenwich (Bermuda) Ltd.** | | **801-139882** | **March 21, 2007** |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**3.**   **Types of Investments.**  Applicant offers advice on the following: (check those that apply) –

A.   Equity securities
☒   (1)  exchange-listed securities
☒   (2)  securities traded over-the-counter
☒   (3)  foreign issuers

☒   B.   Warrants

☒   C.   Corporate debt securities
        (other than commercial paper)

☒   D.   Commercial paper

☒   E.   Certificates of deposit

☐   F.   Municipal securities

G.   Investment company securities:
☐   (1)  variable life insurance
☐   (2)  variable annuities
☒   (3)  mutual fund shares

☒   H.   United States government securities

I.   Options contracts on:
☒   (1)  securities
☒   (2)  commodities

J.   Futures contracts on:
☒   (1)  tangibles
☒   (2)  intangibles

K.   Interests in partnerships investing in:
☐   (1)  real estate
☐   (2)  oil and gas interests
☐   (3)  other (explain on Schedule F)

☒   L.   Other (explain on Schedule F)

---

**4.**   **Methods of Analysis, Sources of Information, and Investment Strategies.**

A.   Applicant's security analysis methods include: (check those that apply)

(1)  ☐ Charting

(2)  ☐ Fundamental

(3)  ☐ Technical

(4)  ☐ Cyclical

(5)  ☒ Other (explain on Schedule F)

---

B.   The main sources of information applicant uses include:  (check those that apply)

(1)  ☐ Financial newspaper and magazines

(2)  ☐ Inspections of corporate activities

(3)  ☐ Research materials prepared by others

(4)  ☐ Corporate rating services

(5)  ☐ Timing services

(6)  ☐ Annual reports, prospectuses, filings with the Securities and Exchange Commission

(7)  ☐ Company press releases

(8)  ☒ Other (explain on Schedule F)

---

C.   The investment strategies used to implement any investment advice given to clients include:  (check those that apply)

(1)  ☐ Long term purchases
        (securities held at least a year)

(2)  ☐ Short term purchases
        (securities sold within a year)

(3)  ☐ Trading (securities sold within 30 days)

(4)  ☐ Short sales

(5)  ☐ Margin transactions

(6)  ☐ Option writing, including covered options, uncovered options or spreading strategies

(7)  ☒ Other (explain on Schedule F)

---

| **FORM ADV** | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| **Part II - Page 4** | **Fairfield Greenwich (Bermuda) Ltd.** | **801-139882** | **March 21, 2007** |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

**5.    Education and Business Standards.**

Are there any general standards of education or business experience that applicant requires of those involved in determining    Yes    No
or giving investment advice to clients? ...........................................................................................................................................    ☒    ☐

(If yes, describe these standards on Schedule F.)

**6.    Education and Business Background.**

For:
- each member of the investment committee or group that determines general investment advice to be given to clients, or
- if the applicant has no investment committee or group, each individual who determines general investment advice given to clients (if more than five, respond only for their supervisors)
- each principal executive officer of applicant or each person with similar status or performing similar functions.

On Schedule F, give the:
- name
- year of birth
- formal education after high school
- business background for the preceding five years

**7.    Other Business Activities.**  (Check those that apply)

☐    A.    Applicant is actively engaged in a business other than giving investment advice.

☒    B.    Applicant sells products or services other than investment advice to clients.

☐    C.    The principal business of applicant or its principal executive officers involves something other than providing investment advice.

(For each checked box describe the other activities, including the time spent on them, on Schedule F.)

**8.    Other Financial Industry Activities or Affiliations.**  (check those that apply)

☐    A.    Applicant is registered (or has an application pending) as a securities broker/dealer.

☐    B.    Applicant is registered (or has an application pending) as a futures commission merchant, commodity pool operator or commodity trading adviser.

☐    C.    Applicant has arrangements that are material to its advisory business or its clients with a related person who is a:

☒    (1)    broker-dealer                                    ☐    (7)    accounting firm

☐    (2)    investment company                          ☐    (8)    law firm

☒    (3)    other investment adviser                    ☐    (9)    insurance company or agency

☐    (4)    financial planning firm                       ☐    (10)   pension consultant

☒    (5)    commodity pool operator, commodity trading    ☐    (11)   real estate broker or dealer
                    adviser or futures commission merchant

                                                                        ☐    (12)   entity that creates or packages
☐    (6)    banking or thrift institution                                        limited partnerships

(For each checked box in C, on Schedule F identify the related person and describe the relationship and the arrangements.)

                                                                                    Yes    No
☐    D.    Is applicant or a related person a general partner in any partnership in which clients are solicited to invest?    ☒    ☐

(If yes, describe on Schedule F the partnerships and what they invest in)

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

| FORM ADV<br>Part II - Page 5 | Applicant:<br><br>**Fairfield Greenwich (Bermuda) Ltd.** | SEC File Number:<br><br>**801-139882** | Date:<br><br>**March 21, 2007** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**9.**   **Participation or Interest in Client Transactions.**

Applicant or a related person: (check those that apply)

☐   A.   As principal, buys securities for itself from or sells securities it owns to any client.

☐   B.   As broker or agent effects securities transactions for compensation for any client.

☐   C.   As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

☒   D.   Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

☒   E.   Buys or sells for itself securities that it also recommends to clients.

(For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

Describe, on Schedule F, your code of ethics, and state that you will provide a copy of your code of ethics to any client or prospective client upon request.

---

**10.**   **Conditions for Managing Accounts.**  Does the applicant provide investment supervisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other conditions for starting or maintaining an account?

Yes   No
☒    ☐

(If yes, describe on Schedule F.)

---

**11.**   **Review of Accounts.**   If applicant provides investment supervisory services, manages investment advisory accounts, or holds itself out as providing financial planning or some similarly termed services:

A.   Describe below the reviews and reviewers of the accounts.  **For reviews**, include their frequency, different levels, and triggering factors.
**For reviewers**, include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

## See Schedule F.

B.   Describe below the nature and frequency of regular reports to clients on their accounts.

## See Schedule F.

---

| FORM ADV | Applicant: | | SEC File Number: | Date: |
|---|---|---|---|---|
| Part II - Page 6 | Fairfield Greenwich (Bermuda) Ltd. | | 801-139882 | March 21, 2007 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

**12.     Investment or Brokerage Discretion.**

A.   Does applicant or any related person have authority to determine, without obtaining specific client consent, the:

(1)   securities to be bought or sold? ........................................................................................................  Yes ☒  No ☐

(2)   amount of the securities to be bought or sold? ...............................................................................  Yes ☒  No ☐

(3)   broker or dealer to be used? ............................................................................................................  Yes ☒  No ☐

(4)   commission rates paid? ....................................................................................................................  Yes ☒  No ☐

B.   Does applicant or a related person suggest brokers to clients? ..............................................................  Yes ☒  No ☐

For each yes answer to A describe on Schedule F any limitations on the authority.  For each yes to A(3), A(4) or B, describe on Schedule F the factors considered in selecting brokers and determining the reasonableness of their commissions.  If the value of products, research and services given to the applicant or a related person is a factor, describe:

- the products, research and services

- whether clients may pay commissions higher than those obtainable from other brokers in return for those products and services

- whether research is used to service all of applicant's accounts or just those accounts paying for it; and

- any procedures the applicant used during the last fiscal year to direct client transactions to a particular broker in return for products and research services received.

**13.   Additional Compensation.**

Does the applicant or a related person have any arrangements, oral or in writing, where it:

A.   is paid cash by or receives some economic benefit (including commissions, equipment or non-research services) from a non-client in connection with giving advice to clients? ....................................................  Yes ☒  No ☐

B.   directly or indirectly compensates any person for client referrals? ......................................................  Yes ☒  No ☐

(For each yes, describe the arrangements on Schedule F.)

**14.   Balance Sheet**.  Applicant must provide a balance sheet for the most recent fiscal year on Schedule G if applicant:

- has custody of client funds or securities (unless applicant is registered or registering only with the Securities and Exchange Commission); or

- requires prepayment of more than $500 in fees per client and 6 or more months in advance

     Has applicant provided a Schedule G balance sheet? ..........................................................................  Yes ☐  No ☒

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br><br>Fairfield Greenwich (Bermuda) Ltd. | SEC File Number:<br><br>801-139882 | Date:<br><br>March 21, 2007 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br><br>**Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| **Items 1.D. and 2.G.** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or "Applicant"), an exempted company incorporated under the laws of Bermuda on June 13, 2003, provides managerial and/or administrative services to three (3) private investment funds established in the British Virgin Islands (the "Offshore Funds"), and serves as the general partner to two (2) private investment funds established in the U.S., (the "Onshore Funds"), (collectively, the "FGBL Funds").<br><br>FGBL is a wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL", collectively with other affiliates listed in Schedule F, Item 8, Fairfield Greenwich Group, or "FGG") an exempted company incorporated in the Cayman Islands on October 24, 2001. FGL serves as placement agent for the Offshore Funds and generally is paid by the applicable Offshore Fund (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) a performance fee of 20% of the net annual profits subject to adjustment for unrecouped losses.<br><br>Another wholly-owned subsidiary of FGL, Fairfield Heathcliff Capital LLC ("FHC"), a limited liability company incorporated in the state of Delaware, and an affiliate of FGBL, serves as placement agent for the Onshore Funds. FGBL does not provide tailored investment advice to individual investors for a fee.<br><br>Similar to the Offshore Funds, FGBL generally is paid by the Onshore Funds (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) an incentive allocation of 20% of net annual profits, subject to adjustment for unrecouped losses.   Some or all of such fees can be waived at the discretion of the general partner.<br><br>Investors in the FGBL Funds generally have the right to redeem all or a portion of their investment in an FGBL Fund at the end of any month, subject to applicable advance notice requirements. If an investor redeems or withdraws from an FGBL Fund, the investor will be entitled to any unearned, prepaid portion of the management fee. To the extent required under the Investment Advisers Act, performance-based compensation payable to FGBL, or any of its affiliates, will be in compliance with Rule 205-3 under such Act. |
| **Item 3.L.** | The establishment of a typical position in the FGBL Funds entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities (i.e., the "Split-Strike Conversion strategy"). The Offshore Funds also utilize a small portion of their assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse types of investments. |
| **Items 4.A.(5) and 4.B.(8)** | FGG's Risk Management team conducts both the pre- and post-investment quantitative analyses of hedge fund managers, monitors the market risk and investment compliance of these managers, and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds. The risk infrastructure at FGG supporting these activities incorporates a number of systems and tools – including internally developed systems, off the shelf vendor solutions, and some customized applications built to meet FGG's business needs. An important component of the FGG product platform is the full position level transparency that we receive from all single managers which are included in our multi-strategy funds. FGG generally receives full daily portfolio transparency via independent access to the managers' prime brokerage or administrator accounts. Position information is transmitted via secure channels to our systems.<br><br>FGG's core risk management engine utilizes the flexible ASP version of the RiskManager product from |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br><br>Fairfield Greenwich (Bermuda) Ltd. | SEC File Number:<br><br>801-139882 | Date:<br><br>March 21, 2007 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br><br>**Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| | RiskMetrics. This system is populated by detailed position information collected directly from the prime brokers used by FGG's underlying single managers and further supplemented by an extensive market and terms and conditions database. The Risk Management team at FGG regularly evaluates the market risk of its single and multi-strategy funds by producing strategy and fund specific risk reports. These reports are customizable to present risk measures and tests most appropriate to each portfolio's strategy. The FGG Risk Management team prepares a monthly suite of reports using RiskManager that are carefully reviewed and discussed by FGG's Investment Group at a formal monthly risk meeting. The reports organized along the following dimensions: Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis and Attribution Analysis. The review includes the full suite of VaR analytics (including marginal, incremental and relative VaR) and careful evaluation of the sensitivity of our managers to important risk factors (such as increasing or decreasing equity markets, volatilities, interest rate shocks/twists, FX movements and other factors).<br><br>FGG utilizes a variety of tools and resources to conduct daily portfolio monitoring and investment compliance. The compliance process is structured to complement the more sophisticated monthly risk analyses conducted by the Risk Management team with intra-month, daily portfolio analyses. On a daily basis the investment team can inspect key portfolio statistics, exposures at different levels of aggregation (for example, gross, long, short, net by instrument type, market cap, sector etc.), and monitor portfolio composition and activity against pre-agreed yellow and red limit levels. The overall objective is to spot potentially worrisome trends regarding exposures, liquidity, concentrations, or other important deviations from the parameters agreed to for each fund. |
| **Item 4.C.(7)** | FGBL's core product business model is the investment management and oversight of the split strike conversion strategy, implemented through an Offshore Fund (with two currency feeder funds), and two Onshore Funds.  The Offshore Fund also utilizes a small portion of its assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse investment methodologies.  Working with one of its affiliates, FGBL conducts a detailed manager selection and due diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risks. At the conclusion of the manager selection process, allocation of assets from the Offshore Fund to a successful hedge fund manager candidate will be determined based on a qualitative and quantitative analysis of each manager's potential for long-term risk-adjusted performance, relationship with other manager's previously seeded, and expected contribution to the targeted risk/return profile. |
| **Item 5** | FGBL generally requires a college degree and preferably an advanced degree for its professional personnel. Along with these educational requirements, FGBL prefers relevant securities industry experience. |
| **Item 6** | Anthony Dell'Arena<br>Chief Compliance Officer<br>YOB: 1964 | Business Background for Past 5 Years:<br>Mr. Dell'Arena joined FGG in 2005.  Prior to such, he was employed by JPMorgan Chase & Co.'s Private Banking division, where he was a Vice President and Assistant General Counsel from 2002 to 2005.<br><br>Education:<br>Mr. Dell'Arena was awarded his Juris Doctor degree from the University of Arkansas School of Law, and holds Master's and Bachelor's degrees in History from Rutgers University. He is admitted to the bar of New Jersey, and is based in the New York office.   Mr. Dell'Arena is a member of National Society of Compliance Professionals. |

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: Fairfield Greenwich (Bermuda) Ltd. | SEC File Number: 801-139882 | Date: March 21, 2007 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| Daniel E. Lipton<br>Asst Secretary and Chief Financial Officer<br>YOB: 1971 | Business Background for Past 5 Years:<br>Mr. Lipton joined FGG in 2002 after nine years at Ernst & Young, where he was a Senior Manager in the Financial Services Assurance and Advisory Business Services Department, in charge of auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds.<br><br>Education:<br>Mr. Lipton received his Bachelor of Arts degree in Economics from Tufts University and his Master of Business Administration dual degrees in Accounting and Finance from New York University's Stern School of Business; he is also a Certified Public Accountant. |
| Mark J. McKeefry<br>Director, Asst Secretary and Chief Legal Officer<br>YOB: 1961 | Business Background For Past 5 Years:<br>Mr. McKeefry joined FGG in 2003. Prior, he was an Associate at Buchalter Nemer, where he advised broker-dealers and investment advisors on regulatory and compliance issues for onshore and offshore funds.<br><br>Education:<br>Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional engineer, licensed by the State of California as a civil engineer. Mr. McKeefry is admitted to the bars of California and New York. |
| Andrés Piedrahita<br>Director and President<br>YOB: 1959 | Business Background for Past 5 Years:<br>Mr. Piedrahita has been with FGBL since 1997.<br><br>Education:<br>Mr. Piedrahita received his Bachelor's Degree from the Boston University School of Communications. |
| Amit Vijayvergiya<br>Director, Vice President and Chief Risk Officer<br>YOB: 1969 | Business Background for Past 5 Years:<br>Mr. Vijayvergiya has over 12 years of experience in asset management, risk management, finance, and operations research. Prior to joining FGBL, from 2000 to 2003 Mr. Vijayvergiya managed a family office investing in traditional and alternative investment managers.<br><br>Education:<br>Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba, and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification. |
| **Item 7.B.** | FGBL serves as the manager of Chester Horizons Fund Limited and Irongate Global Strategy Fund Limited on a non-discretionary basis, providing risk, accounting and back office support to such funds. FGBL also provides such services to other funds being managed by its affiliates. |

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: Fairfield Greenwich (Bermuda) Ltd. | SEC File Number: 801-139882 | Date: March 21, 2007 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| **Item 8.C.(1) and 8.D.** | An affiliate of FGBL, Fairfield Heathcliff Capital LLC ("FHC"), is registered with the Securities and Exchange Commission as a broker-dealer and is a member of the National Association of Securities Dealers, Inc. FHC's license is limited to selling limited partnership interests. FHC serves as U.S. placement agent for FGBL's Onshore Fund, and certain other onshore funds of affiliates of FGBL, and will bear its costs associated with such activities. |
| **Item 8.C.(3) and 8.D.** | FGBL, Fairfield Greenwich (UK) Limited ("FGUK"), and Fairfield Greenwich Advisors LLC ("FGA"), are each wholly-owned subsidiaries of Fairfield Greenwich Limited ("FGL", and collectively, FGG). FGA is based in the U.S. and is registered with the Securities and Exchange Commission as a registered investment adviser (SEC File No. 801-62504).  FGUK is authorized and regulated by the Financial Services Authority, and serves as investment manager to a Luxembourg-registered SICAV and offshore fund-of-funds.  FGG has also entered into a joint venture with Lion Capital Management Limited to create Lion Fairfield Capital Management Limited ("LFC"), a hedge fund management and client servicing platform in Asia.  LFC holds a capital markets services license issued by the Monetary Authority of Singapore under the provisions of the Securities and Futures Act (Cap 289). |
| **Item 8.C.(5)** | FGL is registered with the Commodity Futures Trading Commission as a commodity pool operator and is a member of the National Futures Association. |
| **Item 9.D.** | FGBL and its affiliates may solicit clients to invest in the FGBL Funds, or those funds of FGBL's affiliates (collectively, the "FGG Funds").  In the event of limited capacity n a particular FGG Fund, FGBL and its affiliates are committed to allocating investment opportunities and dispositions in the particular FGG Fund fairly among clients or vehicles.  FGBL and certain of its affiliates and their officers may have financial interests as general partners, limited partners, shareholders, investment managers, administrative manager, investment adviser or otherwise in such FGG Funds. Management and/or performance fees for such individuals and their spouse may be waived in certain instances. |
| **Item 9.E.** | FGBL and its affiliates may purchase or sell shares or interests of a Single Manager Fund for the accounts of Multi-Strategy Funds on the FGG platform. FGBL and certain of its affiliates and other Multi-Strategy Funds may have a position in such Single Manager Fund. With respect to Single Manager Funds where investment decisions are made by the officers or employees of FGBL or its affiliates, such persons are prohibited from trading in a particular security if trades of that security are being considered for the account of such Single Manager Fund until all orders or positions of such security have been completed. Further, such persons are required to provide FGG with personal securities account information and are thus required to provide FGG with duplicate copies of confirmations and statements of any personal trading activity.  Moreover, certain persons are not free to trade without having pre-cleared trades with FGG. In all cases, FGG will attempt to resolve any conflicts of interest by exercising the good faith required of fiduciaries.

With respect to standards of professional conduct, a Code of Ethics (the "Code") has been adopted by the FGBL in order to comply with Rule 204A-1 (the "Rule") promulgated under the Investment Advisers Act of 1940, as amended. Rule 204A-1 requires every Investment Adviser registered with the Securities and Exchange Commission to adopt and enforce a written code of ethics applicable to its supervised persons. The Rule was designed to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel. The Code contains a provision reminding employees of their obligations to clients as well as a provision requiring the reporting of personal securities transactions and holdings.  In order to ensure that FGBL's employees are made aware of its standards, the Rule requires FGBL to obtain (and keep) a written acknowledgement from each employee confirming that he or she received a copy of the Code and any amendments. |

**Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).**

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br><br>**Fairfield Greenwich (Bermuda) Ltd.** | SEC File Number:<br><br>**801-139882** | Date:<br><br>**March 21, 2007** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| | Further, pursuant to the Rule, FGBL has deemed certain of its employees to be "Access Persons." An "Access Person" is an employee of the FGBL who has access to nonpublic information regarding any clients' purchase or sale of securities, or nonpublic information regarding the portfolio holdings of any reportable fund, or who is involved in making securities recommendations to clients, or who has access to such recommendation that are nonpublic.  FGBL reviews the personal investment activities of its Access Persons to ensure that the following general fiduciary principles are met:<br><br>(a) the duty at all times to place the interests of clients of  FGBL first;<br>(b) the duty to prevent the misuse of material nonpublic information which includes client securities holdings and transactions;<br>(c) the requirement that all personal securities transactions be conducted in such a manner as to avoid any actual or potential conflict of interest or any abuse of an individual's position of trust and responsibility; and<br>(d) the fundamental standard that FGBL personnel may not take inappropriate advantage of their position.<br><br>Investors may request a copy of the Code by contacting FGBL at the address or telephone number listed on the first page of this document. |
| **Item 10** | The FGBL Funds impose various initial minimum investment amounts, ranging between US$100,000 and US$1,000,000, and in equivalent amounts in different currencies including Euro and Swiss Franc. The FGG Funds may accept investment in lesser amounts. Generally, investors are required to have a net worth of at least US$1,500,000. |
| **Item 11.A.** | Accounts are reviewed at the individual security level in Bermuda and discussed among members of FGBL's team several times each month.  FGBL, along with its affiliate FGA, also utilizes a number of independent, sophisticated quantitative measurement tools to monitor the performance of its accounts (as well as those accounts managed by an affiliated New York-based registered adviser), compliance with investment guidelines, and risk analysis.  FGBL's personnel review changes in a variety of factors, including changes in organization, investment process, the manager's view of the relevant markets, and their portfolio's position with respect to those views.  The findings are discussed at regular investment committee meetings. |
| **Item 11.B.** | Investors will receive audited financial statements of the applicable Fund annually, and unaudited performance reports at least monthly.  In addition, investors may also receive quarterly or semi-annual letters regarding their investments.<br><br>FGA is committed to maintaining the privacy of our clients and to the safeguarding of their personal information.  Our privacy policy is distributed to clients in accordance with Regulation S-P on an initial and annual basis, to help clients understand what personal information we collect, how that information is protected, and why, in certain cases, the information may be shared. |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br>**Fairfield Greenwich (Bermuda) Ltd.** | SEC File Number:<br>**801-139882** | Date:<br>**March 21, 2007** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| **Item 12** | For certain of the FGG Funds, FGBL or an affiliate has full discretion and authority to make all investment decisions with respect to the types of securities to be bought and sold, and the amount of securities to be bought or sought for such Fund, and there are no limitations as to which broker dealer is used or as to the commission rates paid.  However, portfolio transactions will be allocated to brokers on the basis of best execution and in consideration of brokerage and research services (e.g., research ideas, investment strategies, special execution and block positioning capabilities, clearance, settlement and custodial services), financial stability, reputation and efficiency of such broker-dealers.  Broker-dealers providing such services may be paid commissions in excess of those that other broker-dealers not providing such services might charge. |
| **Item 13.A.** | A related person of FGBL receives unsolicited research reports from various brokers, but neither the related person nor FGBL currently have any "soft dollar" arrangements outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended, in effect. |
| **Item 13.B.** | From time to time, FGL, or a subsidiary, may enter into agreements to compensate third party and/or certain internal agents, providing for cash compensation for securing clients which may be in the form of a placement fee or participation in the sharing of the management and/or performance fees. |

**Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).**