# EXHIBIT 8

*For the Exclusive Use of:* _____    *Copy No.* _____

***Confidential Private Placement Memorandum***

***FAIRFIELD INVESTMENT FUND LTD.***
*A British Virgin Islands Business Company*

***CLASS A, SERIES A-1 SHARES***

*Securities Offered:  Redeemable, Voting Shares*

*Minimum Investment per Subscriber: U.S. $100,000*

*Purchase Price per Share: Net Asset Value per Share*

***Investment Manager:***
*Fairfield Greenwich Advisors LLC*

***Administrator:***
*Citco Fund Services (Europe) B.V.*

***Placement Agent:***
*Fairfield Greenwich Limited*

THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK.  THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS.  THE SHARES ARE SUBJECT TO RESTRICTION ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION.  THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.

The date of this Confidential Private Placement Memorandum is March 2008

***Fairfield Greenwich Advisors LLC***

## Certain General Information

The redeemable, voting Class A, Series A-1 Shares offered hereby (the "Shares") will be issued only on the basis of the information in this Confidential Private Placement Memorandum and any attachments hereto (the "Memorandum").  No other information about Fairfield Investment Fund Ltd. (the "Fund") has been authorized.  Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk.  The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

Prospective investors should inform themselves of the legal requirements and tax consequences within the countries of their residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions.  Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed. No Shares may be transferred without the prior written consent the Board of Directors of the Fund (the "Board").

The distribution of this Memorandum may be restricted by law in certain countries. Prospective investors must inform themselves of and observe any such restrictions.  Prospective investors should review the Country-Specific Notices listed in Appendix A hereof for any applicable notices for their countries of residence or domicile.  This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Board.  This Memorandum supersedes any written or verbal information relating to the Fund.

Prospective investors should not construe this Memorandum as legal or investment advice.  Prospective investors should consult their own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations.  Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

Prospective investors and their investment representatives are invited to ask questions of and to obtain additional information from the Administrator, Investment Manager (Fairfield Greenwich Advisors LLC) or Placement Agent (Fairfield Greenwich Limited) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

All references herein to $ are to United States dollars.

The Fund exists as a business company under the BVI Business Companies Act, 2004. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as

amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio constitution of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI") which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein.  There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, who is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled or made subject to conditions if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound-up or dissolved.

Because the Fund is a professional fund under the BVI Act, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and on the basis that the initial investment in the Fund by each of a majority of its shareholders is not less than $100,000.  A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund, or who has signed a declaration that he, whether individually or jointly with his spouse has a net worth in excess of $1,000,000 or its equivalent in any other currency and that he consents to being treated as a professional investor.

This is a private offering, made only by delivery of this Memorandum to the prospective investor whose name appears on the cover hereof.  This Memorandum may not be reproduced or used for any other purpose.  Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized.  By accepting delivery of this Memorandum, prospective investors agree to return it to the Fund if they do not invest.

THE SHARES ARE SUITABLE FOR SOPHISTICATED INVESTORS THAT DO NOT REQUIRE IMMEDIATE LIQUIDITY FOR THEIR INVESTMENTS, FOR WHICH AN INVESTMENT IN THE FUND DOES NOT CONSTITUTE A COMPLETE INVESTMENT PROGRAM AND THAT FULLY UNDERSTAND AND ARE WILLING TO ASSUME THE RISKS INVOLVED IN THE FUND'S INVESTMENT PROGRAM.  SUBSCRIBERS FOR SHARES MUST REPRESENT, AMONG OTHER THINGS, THAT THEY ARE ACQUIRING THE SHARES FOR INVESTMENT.  THE TRANSFER OF SHARES IS SUBJECT TO LIMITATIONS IMPOSED BY THE MEMORANDUM OF ASSOCIATION AND ARTICLES OF ASSOCIATION OF THE FUND, DETAILS OF WHICH ARE SET FORTH HEREIN UNDER "SUITABILITY REQUIREMENTS; LIMITATIONS ON TRANSFERABILITY."  NO OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY IS BEING MADE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL.

THE SHARES HAVE NOT BEEN REGISTERED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS.  THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER APPLICABLE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  THERE IS NO PUBLIC OR OTHER MARKET FOR THE SHARES, NOR IS IT LIKELY THAT ANY SUCH MARKET WILL DEVELOP.

WHILE THE FUND MAY TRADE COMMODITY FUTURES AND/OR COMMODITY OPTIONS CONTRACTS, OR OTHER COMMODITY INTERESTS, THE INVESTMENT MANAGER IS EXEMPT FROM REGISTRATION AS A COMMODITY POOL OPERATOR ("CPO") WITH THE US COMMODITY FUTURES TRADING COMMISSION ("CFTC") PURSUANT TO CFTC RULE 4.13(a)(4).  THEREFORE, UNLIKE A REGISTERED CPO, THE INVESTMENT MANAGER IS NOT REQUIRED TO DELIVER A CFTC DISCLOSURE DOCUMENT TO PROSPECTIVE INVESTORS, NOR IS IT REQUIRED TO PROVIDE SHAREHOLDERS WITH CERTIFIED ANNUAL REPORTS THAT SATISFY THE REQUIREMENTS OF CFTC RULES APPLICABLE TO REGISTERED CPOs.

THE INVESTMENT MANAGER QUALIFIES FOR THE EXEMPTION UNDER CFTC RULE 4.13(a)(4) ON THE BASIS THAT, AMONG OTHER THINGS, (I) EACH SHAREHOLDER IS EITHER (A) A NATURAL PERSON WHO IS A "QUALIFIED ELIGIBLE PERSON" AS DEFINED IN CFTC RULE 4.7(a)(2) OR (B) A NON-NATURAL PERSON THAT IS EITHER AN "ACCREDITED INVESTOR" AS DEFINED UNDER US SECURITIES AND EXCHANGE COMMISSION RULES OR A "QUALIFIED ELIGIBLE PERSON" AS DEFINED UNDER CFTC RULE 4.7; AND (II) SHARES ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND OFFERED AND SOLD WITHOUT MARKETING TO THE PUBLIC IN THE UNITED STATES.

# TABLE OF CONTENTS

**Page**

Certain General Information ........................................................................................................... ii

Fund Directory ............................................................................................................................... vi

§ 1.    INTRODUCTION .............................................................................................. 1

§ 2.    SPECIAL CONSIDERATIONS AND RISK FACTORS ................................. 8

§ 3.    MANAGEMENT OF THE FUND AND CERTAIN RELATIONSHIPS ..................... 15

§ 4.    INVESTMENT STRATEGY ........................................................................... 18

§ 5.    THE OFFERING ............................................................................................... 20

§ 6.    FEES AND EXPENSES .................................................................................... 21

§ 7.    DETERMINATION OF OFFERING PRICE .............................................. 23

§ 8.    NET ASSET VALUE ....................................................................................... 27

§ 9.    CAPITALIZATION OF THE FUND; THE SHARES ................................. 29

§ 10.   REDEMPTIONS AND TRANSFERS ............................................................ 29

§ 11.   THE DIRECTORS............................................................................................. 31

§ 12.   THE ADMINISTRATOR AND THE CUSTODIAN ..................................... 32

§ 13.   POTENTIAL CONFLICTS OF INTEREST .................................................. 33

§ 14.   MEMORANDUM AND ARTICLES OF ASSOCIATION.......................... 36

§ 15.   BROKERAGE ................................................................................................... 38

§ 16.   ANTI-MONEY LAUNDERING REGULATIONS....................................... 39

§ 17.   ANTI-MONEY LAUNDERING POLICIES ................................................. 40

§ 18.   TAXATION........................................................................................................ 42

§ 19.   BENEFIT PLAN INVESTORS....................................................................... 44

§ 20.   MISCELLANEOUS ......................................................................................... 44

Country-Specific Notices.................................................................................Appendix A

Manager's Form ADV Part II..........................................................................Appendix B

## Fund Directory

*THE FUND*

Fairfield Investment Fund Ltd.
c/o Codan Trust Company (B.V.I.) Ltd.
Romasco Place, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands
Telephone: (284) 852-1010
Facsimile:  (284) 852-1011

*INVESTMENT MANAGER*

Fairfield Greenwich Advisors LLC
55 East 52nd Street, 33rd Floor
New York, New York 10055
Telephone:  (212) 319-6060
Facsimile:   (212) 319-0450

*PLACEMENT AGENT*

Fairfield Greenwich Limited
Registered Office:
c/o Offices of Charles Adams, Ritchie & Duckworth
Second Floor, Zephyr House, Mary Street
P.O. Box 709
George Town, Grand Cayman
Cayman Islands, B.W.I.

Address for Correspondence:
55 East 52nd Street, 33rd Floor
New York, New York 10055
Telephone: (212) 319-6060
Facsimile:  (212) 319-0450

*ADMINISTRATOR; REGISTRAR AND TRANSFER AGENT*

Citco Fund Services (Europe) B.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2850
Facsimile:  (31-20) 572-2610

*U.S. COUNSEL*

Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
United States of America

*B.V.I. COUNSEL*

Conyers Dill & Pearman
Romasco Place, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands

*AUDITORS*

PricewaterhouseCoopers
Fascinatio Boulevard 350
P.O. Box 8800
3065 AV Rotterdam
The Netherlands

*PAYMENT BANK*

Citco Bank Nederland, N.V. Dublin Branch
No. 3 Customs House Plaza
Harbourmaster Place
Dublin 1
Ireland
Tel:  (353 1) 636 7100
Fax:  (353 1) 636 7101

*CUSTODIAN*

Citco Global Custody N.V.
c/o Citco Bank Nederland, N.V. Dublin Branch
No. 3 Customs House Plaza
Harbourmaster Place
Dublin 1
Ireland
Tel:  (353 1) 636 7100
Fax:  (353 1) 636 7101

# § 1.    INTRODUCTION

This section of the Confidential Private Placement Memorandum (the "Memorandum") provides an overview of various features of Fairfield Investment Fund Ltd. (the "Fund").  Certain of the features addressed in this Introduction are discussed in more detail in the other sections of this Memorandum.  This Introduction is qualified in its entirety by those other sections, and the entire Memorandum is qualified by the full text of the Fund's governing documents and contractual agreements, copies of which are available on request from the Administrator.

General

| | |
|---|---|
| The Fund | Fairfield Investment Fund Ltd. (the "Fund"), a business company incorporated on July 27, 2000 under the laws of the British Virgin Islands ("BVI"). |
| Fund Business | Investing in and trading securities and other financial instruments, through the Fund's allocation of its assets to various professional investment managers (the "Sub-Managers").  See §4.  The Fund accesses the Sub-Managers by participating in private investment funds (the "Sub-Funds") that are operated by the Sub-Managers.  The Investment Manager (defined below) selects the Sub-Managers and the Fund's allocations to the Sub-Funds.  The Investment Manager may from time to time add or remove Sub-Funds or change the Fund's allocations to the Sub-Funds.  The Fund may invest in Sub-Funds managed by the Investment Manager, the Placement Agent (as defined below) or their affiliates, as well as in vehicles and accounts managed by unaffiliated parties.  In addition, the Fund may, under certain circumstances, also invest or trade, on margin or otherwise, directly in securities and financial instruments primarily for hedging purposes. |
| Investment Objective | To provide a superior risk-adjusted rate of return, with a focus on capital preservation. |
| Investment Manager | Fairfield Greenwich Advisors, LLC ("FGA" or the "Investment Manager"), a limited liability company organized under the laws of Delaware on December 12, 2001, provides managerial and operational services to the Fund.  FGA is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").  FGA is a wholly owned subsidiary of Fairfield Greenwich Limited ("FGL" or the "Placement Agent"), the Fund's placement agent.  FGL oversees the marketing of the Shares (as defined below).  FGL and FGA are member companies of the Fairfield Greenwich Group ("FGG"), which was established in 1983 and had, as of March 1, 2008, more than $16 billion employed in alternative asset management funds.  Throughout its history, FGG has internally managed its own alternative asset |

|  |  |
|---|---|
|  | funds and selectively identified external managers for affiliations where it serves as a managerial and distribution partner. |
| Governing Documents | Copies of the Fund's Memorandum and Articles of Association are available from the Administrator.  See §14 for a summary of these documents. |

## Services Providers to the Fund

|  |  |
|---|---|
| Placement Agent | Fairfield Greenwich Limited, an exempted company incorporated under the laws of the Cayman Islands, is the Placement Agent. FGL oversees the marketing of the Fund's shares and is an affiliate of the Investment Manager. |
| Administrator, Registrar and Transfer Agent | The Fund has entered into an administration agreement with Citco Fund Services (Europe) B.V. (the "Administrator") pursuant to which the Administrator or one or more of its affiliates performs administrative, accounting, registrar and transfer agency services. The Administrator will receive customary fees based upon the nature and extent of the services provided by the Administrator to the Fund.  The Administrator is also reimbursed for all out-of-pocket expenses. |
| Directors | The Fund is governed by its Board of Directors (the "Board"), which consists of Walter Noel and Jeffrey Tucker of the Investment Manager and Placement Agent and InterCaribbean Services Ltd. |
| Auditors | PricewaterhouseCoopers. |
| Legal Counsel | Seward & Kissel LLP has acted as counsel to the Fund, the Investment Manager and its affiliates in connection with this offering of Shares.  Conyers Dill & Pearman has acted as British Virgin Islands counsel to the Fund.  In connection with this offering of Shares and subsequent advice to the Fund, the Investment Manager and its affiliates, neither Seward & Kissel LLP nor Conyers Dill & Pearman, will be representing the shareholders.  No independent counsel has been engaged by the Fund to represent the shareholders. |

## Offering of the Fund's Shares

|  |  |
|---|---|
| The Shares | The Fund is offering redeemable, voting Class A, Series A-1 Shares, par value $0.01 per Share (the "Shares").  The Fund also offers redeemable, voting Class A, Series A-2 Shares, par value $0.01, which have a different fee structure than the Series A-1 Shares.  The Board may amend the Fund's constitutional |

documents so as to establish different classes of shares, or series of shares within a class, in their discretion.

| | |
|---|---|
| Share Purchase Dates | The first business day of each month. |
| Minimum Investment per Subscriber | $100,000. |
| Purchase Price per Share | The Fund's net asset value ("NAV") per Share as of the date of issue.  See §8 for how the Fund's NAV and NAV per Share are calculated. |
| Placement Commission | The Fund may use the assistance of affiliated or unaffiliated placement agents and money managers, including FGL, to place the Shares.  Such placement agents may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance.  Placement agents may also share in the fees payable to FGL and its affiliates by the Fund, which they may rebate to their clients. |
| Subscription Procedure | Persons interested in subscribing for Shares will be furnished with the Fund's subscription agreement and revocable proxy (the "Subscription Agreement") to be completed by them and returned to the Administrator at the address listed thereon. |

<u>Redemption and Transfer of the Shares</u>

| | |
|---|---|
| Redemption | Subject to the limitations set forth below, a shareholder may, upon at least 45 days' prior written notice, redeem its Shares as of the last business day of any month; provided, however, that the Fund may limit a shareholder's redemption to 5% of the NAV of its Shares (calculated as of the date of redemption) (the "Share Limit") as of the last business day of the first month and of the second month of any quarter.  The Fund reserves the right to waive the Share Limit with respect to any redemption. |

In the event that as of the last business day of a calendar quarter the Fund receives redemption requests for shares that represent in the aggregate more than 15% of the total shares of the Fund then in issue (calculated as of such redemption date) (the "Redemption Limit"), the Fund is entitled to reduce the requests ratably and pro rata amongst all shareholders seeking to redeem shares on such redemption date and to carry out only sufficient redemptions which, in aggregate, amount to 15% of the shares of the Fund then in issue.  Shares that are not redeemed due to the Redemption Limit (the "Deferred Shares") may be redeemed on the last business day of the following month, subject to a shareholder's Share Limit.  If all of a shareholder's Deferred Shares have not

been redeemed as of the last business day of the subsequent calendar quarter and the Redemption Limit is again in effect, the Deferred Shares will be given priority over any other shares for which redemption requests have been received.

Notwithstanding the Share Limit and the Redemption Limit, a shareholder that submits a request to redeem all of its Shares from the Fund will be paid its redemption proceeds in full within thirteen months after the first applicable redemption date.

With respect to Shares purchased on or after May 1, 2008, (i) any shareholder that redeems such Shares prior to the six-month anniversary of the purchase of such Shares will be subject to a redemption fee of 3% of the redemption proceeds, and (ii) any shareholder that redeems such Shares after the six-month anniversary but before the one-year anniversary of the purchase of such Shares, will be subject to a redemption fee of 1% of the redemption proceeds.  All redemption fees shall be payable to the Fund.

If a shareholder requests a partial redemption and the aggregate value of its remaining Shares would be less than $100,000, the Board has discretion to require such shareholder to redeem all of its Shares.

| | |
|---|---|
| Payment of Redemption Proceeds | Shares will be redeemed at a per Share price based upon the NAV per Share (after calculation of any redemption fee, Performance Fee and Management Fee, each as defined below) as of the applicable redemption date (or at such other times as the Board of Directors may determine).  Redemption proceeds will be paid generally, within 30 days after the effective date of the redemption. The Board has discretion to pay redemption proceeds in marketable securities as well as cash, but it expects that all redemption proceeds will be paid in cash. |
| Suspension of Redemption Rights | The Board has discretion to (a) suspend Share redemption rights in certain market emergency situations, or (b) limit the payment of redemption proceeds to the amounts received from those Sub-Funds from which the Fund is able to withdraw its capital in order to fund the redemption.  In the latter case, the redeeming shareholder would effectively continue to have an indirect pro-rata interest in any Sub-Fund from which the Fund was unable to withdraw its capital, and the Fund would pay such redeeming shareholder, at a later date, its pro-rata share of the proceeds from such Sub-Fund as they were received by the Fund. |

Compulsory Redemption

The Board has discretion to require any shareholder to redeem any or all of its Shares, at the NAV per Share, as of any month-end where the holding of such Shares would result in regulatory, pecuniary, legal, taxation or material administrative disadvantage to the Fund or its shareholders as a whole, or to maintain a minimum investment holding.

Transfer

Shareholders may transfer their Shares with the Board's consent, which it may withhold in its discretion.

## Fees and Other Expenses

Management Fee and Performance Fee

The Fund pays the Placement Agent a quarterly management fee (the "Management Fee") calculated as of the beginning of each month at a rate equal to 0.3125% (1.25% per annum) of the NAV of the Class A, Series A-1 Shares prior to any accruals for, or the payment of, the Performance Fee (defined below).    The Management Fee is payable promptly after the end of each calendar quarter.    The Placement Agent may, in its sole and exclusive discretion, rebate all or any portion of the Management Fee for certain investors, which may be made in the form of the issuance of additional Shares to such investors.

The Fund also pays a performance fee (the "Performance Fee"), calculated monthly and payable generally as of the end of each calendar quarter, in an aggregate amount equal to 10% of the net realized and net unrealized appreciation in the NAV of each Share in such calendar quarter ("Net Profits"), if any; provided, however, that if a Share has a loss chargeable to it during any calendar quarter ("Unrecouped Loss"), and during any succeeding calendar quarter there are Net Profits allocable to the Share, there will be no Performance Fee payable with respect to such Share until the amount of any Unrecouped Loss allocated to such Share has been recouped.  If Shares are redeemed during a calendar quarter, the Unrecouped Loss relating to such Shares will be reduced in the same proportion as the reduction in the NAV of such Shares caused by such redemption.  The Fund may, in its sole and exclusive discretion, rebate all or any portion of the Performance Fee for certain investors, which may be made in the form of the issuance of additional Shares to such investors.

If Shares are purchased during a calendar quarter, the Performance Fee with respect to such Shares for such calendar quarter will be calculated commencing on the date of purchase.  If Shares are redeemed prior to a calendar quarter–end, the Performance Fee with respect to such redeemed Shares will be determined and paid as of the applicable redemption date as if such redemption date

were the last day of a calendar quarter.  The Management Fee with respect to Shares purchased or redeemed other than as of the beginning or end of a month, respectively, will be appropriately prorated.  See §6 and §7.

The Placement Agent pays over a fixed portion of the Management Fee and the Performance Fee to the Investment Manager as compensation for its services to the Fund.  The Investment Manager does not receive any management or incentive fees directly from the Fund, and bears all of its expenses relating to the operation of the Fund and making investment and trading decisions for the Fund, such as expenses associated with researching and monitoring Sub-Managers.  The Investment Manager, however, receives an expense reimbursement charge from the Fund equal to 15 basis points per year, payable quarterly in arrears, of the Fund's NAV, calculated as of the beginning of each month, for bearing certain accounting and operational costs in connection with the Fund's activities.  The Placement Agent bears all of the expenses relating to its duties on behalf of the Fund. See §6.

| | |
|---|---|
| Sub-Fund Expenses | The Fund will bear its *pro-rata* share of the expenses of the Sub-Funds in which it invests, including their operating, administrative and transaction expenses and the management fees and incentive compensation payable to their Sub-Managers.  In certain cases, the Investment Manager, the Placement Agent or their affiliates may be Sub-Managers.  See §6. |
| Administrator's Fees | The Fund pays the Administrator an administration fee customary for the type of services provided by the Administrator. |
| Administrative Expenses | The Fund bears its administrative expenses, such as professional fees and regulatory costs. |

<u>Other</u>

| | |
|---|---|
| Risk Factors | An investment in the Fund involves various risks.  See §2.  For example, the Fund will have significant direct and indirect expenses; there are likely to be periods during which the prices of the financial instruments traded by the Sub-Managers are volatile and the markets for some of these instruments are illiquid; some or all of the Sub-Managers may use leverage in their investing and trading; and the Fund is relatively unregulated. |
| Reports | The Fund will provide shareholders with monthly performance summaries and annual audited financial statements. |
| Fiscal Year | January 1-December 31. |

| | |
|---|---|
| Taxation | The Fund does not expect to be subject to tax in any jurisdiction. See §18. |
| Potential Conflicts of Interest | The Investment Manager, the Placement Agent and their affiliates are subject to certain potential conflicts of interest.  See §13. |
| Dividends | The Board does not expect to declare any dividends or other distributions, but investors will have the Share redemption rights discussed herein. |
| Contracts | The Fund has entered into various contracts (some of which shareholders may inspect), such as the Placement Agent - Investment Management Agreement with the Placement Agent and Investment Manager and the Administration Agreement with the Administrator. |
| Additional Information | Please contact the Placement Agent for additional information about the Fund.  For example, the Placement Agent will provide shareholders with a copy of the placement memorandum of any of the Sub-Funds, and with a copy of any option or swap contract the Fund may enter into to participate in a Sub-Fund. |
| BVI Status | The Fund is a "professional" fund under the BVI Act.  As such, the Shares may be held only by "professional investors" as defined in the Subscription Agreement.  See §5. |

## § 2.    SPECIAL CONSIDERATIONS AND RISK FACTORS

THE FUND MAY BE DEEMED TO BE A SPECULATIVE INVESTMENT AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM.  INVESTMENT IN THE FUND IS SUITABLE ONLY FOR PERSONS WHO CAN BEAR THE ECONOMIC RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT, WHO HAVE LIMITED NEED FOR LIQUIDITY IN THEIR INVESTMENT AND WHO MEET THE CONDITIONS SET FORTH IN THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENT.  THERE CAN BE NO ASSURANCES THAT THE FUND WILL ACHIEVE ITS INVESTMENT OBJECTIVE. INVESTMENT IN THE FUND INVOLVES SIGNIFICANT RISKS AND WHILE THE FOLLOWING SUMMARY OF CERTAIN OF THESE RISKS SHOULD BE CAREFULLY EVALUATED BEFORE MAKING AN INVESTMENT IN THE FUND, THE FOLLOWING DOES NOT INTEND TO DESCRIBE ALL POSSIBLE RISKS OF SUCH AN INVESTMENT:

**Market Risk**

Economic Conditions.  The success of any investment activity is affected by general economic conditions, which may affect the level and volatility of interest rates and the extent and timing of investor participation in the equities and interest-rate markets.  Unexpected volatility or illiquidity in the markets in which the Sub-Managers hold positions could impair their ability to carry out their objectives or cause them to incur losses.

Volatility of Securities Markets.  Securities prices may be volatile, and securities price movements are influenced by many unpredictable factors, such as market sentiment, inflation rates, interest rate movements and general economic and political conditions.

Lack of Liquidity in Markets.  Despite the generally heavy volume of trading in most of the instruments traded by the Sub-Managers, the markets for some of those instruments may have limited liquidity and depth.  This lack of depth could be a disadvantage to the Fund, both in the realization of the prices which are quoted and in the execution of orders at desired prices.

Suspensions of Trading.  Securities and futures exchanges typically can suspend or limit trading in any instrument traded on the exchange.  A suspension could render it impossible for a Sub-Manager to liquidate positions and thereby expose one or more Sub-Managers, and thus the Fund, to substantial losses.

**Strategy Risk**

Inadvertent Concentration.  Some Sub-Managers may have overlapping strategies and thus could accumulate large positions in the same or related instruments, without the Investment Manager's knowledge.  Even if known, the Investment Manager's ability to avoid such concentration would depend on its ability to reallocate Fund capital among existing or new Sub-Managers.  This might not be feasible for several months until withdrawals and contributions are permitted by the Sub-Funds.

New Strategies.  Investment strategies used by the Sub-Managers may not have been in existence during periods of major market stress, disruption or decline of the type that may be experienced in the future.  As a result, it is not known how these strategies will perform in adverse market conditions.

Leverage.  While the use of margin borrowing can substantially improve the return on invested capital, such use may also increase the adverse impact to which the Fund may be subject.  Borrowings will usually be from securities brokers and dealers and will typically be secured by the Fund's securities and other assets.  Under certain circumstances, such a broker-dealer may demand an increase in the collateral that secures the Fund's or the Sub-Fund's obligations and if the Fund or Sub-Funds were unable to provide additional collateral, the broker-dealer could liquidate assets held in the account to satisfy the Fund's or Sub-Fund's obligations to the broker-dealer.  Liquidation in that manner could have extremely adverse consequences.  In addition, the amount of the Fund's or Sub-Fund's borrowings and the interest rates on those borrowings, which will fluctuate, will have a significant effect on the Fund's profitability.

The Fund may enter into borrowing arrangements on a short-term basis, including through the use of a line of credit. Such borrowing may result in the borrower taking custody of, or placing liens on, the assets of the Fund.

Hedging and Arbitrage.  The use by some Sub-Managers of "hedged" or arbitrage strategies does not necessarily mean these strategies are relatively low risk.  Substantial losses may be recognized on hedge or arbitrage positions, and illiquidity and default on one side of a position can effectively result in the position being transformed into an outright speculation. Every hedge or arbitrage strategy involves exposure to some second order risk of the markets, such as the implied volatility in convertible bonds or warrants, the yield spread between similar term government bonds or the price spread between different classes of stock for the same issuer. Further, there are few examples of "pure" hedge or arbitrage Sub-Managers.  Many such Sub-Managers probably employ limited directional strategies which expose them to market risk. Among the risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction.   Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination.  Consequently, a substantial favorable price movement may be required before a profit can be realized.

Short Selling.  Sub-Managers may sell securities short, which exposes the seller to theoretically unlimited risk due to the lack of an upper limit on the price to which the security may rise.  Short selling also involves the sale of borrowed stock, and thus if the stock loan is called the short seller may be forced to buy the stock at a loss.  In addition, some traders may attempt to profit by forcing short sellers to incur a loss, or may make large purchases of a stock that has been sold short with the intent to drive up the stock price and cause the short sellers to incur losses.  Such traders hope the short sellers will limit their losses by buying the stock and thus force the stock price even higher.

Below "Investment Grade" Securities. Sub-Managers may invest in bonds or other fixed income securities, including, "high yield" (and, therefore, high risk) debt securities.  These securities may be below "investment grade" and are subject to uncertainties and exposure to adverse business, financial or market conditions which could lead to the issuer's inability to make timely interest and principal payments.  The market values of these securities tend to be more sensitive to individual corporate developments and general economic conditions than do higher rated securities.

<u>Distressed Investing</u>. Sub-Managers may invest in securities and private claims and obligations of entities that are experiencing significant financial or business difficulties. The investing Sub-Fund may lose all or a substantial portion of its investment in such distressed companies or may be required to accept cash or securities with a market value of less than the initial investment. One of the risks of investing in distressed entities is the difficulty of obtaining information as to the true condition of such issuers. Distressed company investments may also be adversely affected by state and federal laws relating to fraudulent conveyances, voidable preferences, lender liability and a court's discretionary power to disallow, subordinate or disenfranchise particular claims. The market prices of such securities are also subject to erratic changes and above-average price volatility, and the spread between the bid and asked prices of such securities may be greater than normally expected.

<u>Derivatives</u>. Sub-Managers may use derivatives, such as options, futures and swaps. The derivatives market is, in general, a relatively new market and there are uncertainties as to how it will perform during periods of unusual price volatility or instability, market illiquidity or credit distress. Substantial risks are also involved in borrowing and lending against derivatives. Derivatives prices can be volatile, market movements are difficult to predict and financing sources and related interest rates are subject to rapid change. One or more markets may move against the derivatives positions held by a Sub-Manager, thereby causing substantial losses. Many of these instruments are not traded on exchanges but rather through an informal network of banks and dealers who have no obligation to make markets in them and can apply essentially discretionary margin and credit requirements (and thus in effect force a Sub-Manager to close out positions). In addition, some derivatives carry the additional risk of failure to perform by the counterparty to the transaction. Many unforeseeable events, such as government policies, can have profound effects on interest and exchange rates, which in turn can have large and sudden effects on prices of derivative instruments.

<u>Futures</u>. Sub-Managers may use commodity futures in their trading. Futures prices can be highly volatile. Because of the low margin deposits normally required in futures trading, an extremely high degree of leverage is typical of a futures trading account. As a result, a relatively small price movement in a futures contract may result in substantial losses to the trader. Like other leveraged investments, a futures transaction may result in losses in excess of the amount invested.

<u>Options</u>. Sub-Managers may buy and sell options, and there are various risks inherent in such trading. For example, the seller (writer) of a covered call option (e.g., the writer has a long position in the underlying security) assumes the risk of a decline in the market price of the underlying security to a level below the purchase price of the security, less the premium received on the call option. The writer of a covered call option also gives up the opportunity for gain on the underlying security above the exercise price of the call. The writer of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying security above the exercise price of the option. The buyer of a call option assumes the risk of losing the premium invested in the option. The seller (writer) of a covered put option (e.g., the writer has a short position in the underlying security) assumes the risk of an increase in the market price of the underlying security above the sales price (in establishing the short position) of the underlying security plus the premium received, and gives up the opportunity for gain on the underlying security below the exercise price of the option less the premium received on the put option. The seller of an uncovered put option assumes the risk of a decline in the market

price of the underlying security below the exercise price of the option. The buyer of a put option assumes the risk of losing the premium it paid to purchase the put option. The options markets have the authority to prohibit the exercise of particular options, which if imposed when trading in the option has also been halted, would lock holders and writers of that option into their positions until one of the two restrictions has been lifted.

Combination Transactions. Sub-Managers may engage in spreads or other combination options transactions involving the purchase and sale of related options and futures contracts. These transactions are considerably more complex than the purchase or writing of a single option. They involve the risk that executing simultaneously two or more buy or sell orders at the desired prices may be difficult or impossible, the possibility that a loss could be incurred on both sides of a multiple options transaction, and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding. Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination.

Straddles. In straddle writing, where the investor writes both a put and a call on the same underlying interest at the same exercise price in exchange for a combined premium on the two writing transactions, the potential risk of loss is unlimited. To the extent the price of the underlying interest is either above or below the exercise price by more than the combined premium, the writer of a straddle will incur a loss when one of the options is exercised. If the writer is assigned an exercise on one option position in the straddle and fails to close out the other position, subsequent fluctuations in the price of the underlying interest could cause the other option to be exercised as well, causing a loss on both writing positions.

Trend Following. Sub-Managers may use computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm. In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends. Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analysis, or that trades dictated by the analysis may not be executed in time to take advantage of the price disparities. This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts. In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur. Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow. Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

Counterparty and Credit Risk. Although the Sub-Managers will invest primarily in securities, some may invest in various futures-related instruments and privately arranged investment vehicles (such as swaps). Defaults by the Sub-Funds' counterparties in these types of transactions could cause major losses to the Sub-Funds.

Offshore Sub-Funds and Instruments. The Sub-Funds will generally be domiciled outside the U.S., and some Sub-Funds may invest substantial portions of their assets in non-U.S.

instruments.  Investment in such Sub-Funds and in non-U.S. instruments may involve greater risk than investment in U.S. Sub-Funds and instruments, due to such factors as political and economic instability, fluctuations in currency prices, less liquid markets, imposition of non-US taxes, expropriation, higher transaction costs, less government supervision of exchanges, brokers and issuers, difficulty in enforcing contractual obligations and lack of uniform accounting and auditing standards.  In addition, some foreign exchanges are "principal" markets which means that the obligations entered into by participants on those markets remain the obligations of the parties to the transaction and do not become obligations of any centralized clearing entity which creates additional counterparty risk that such participants will be unable to fulfill their obligations to the Sub-Fund.

Fluctuations in Exchange Rates.  Some of the Sub-Funds' investments will likely be denominated in currencies other than the U.S. dollar.  Such investments are subject to the risk that the value of a particular currency will change in relation to one or more other currencies.  Among the factors that may affect currency values are trade balances, the level of short-term interest rates, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments.

**Sub-Manager Risk**

Lack of Regulation.  While the Fund and the Sub-Funds may be considered similar to an investment company, they do not intend to register as such under the U.S. Investment Company Act of 1940, as amended, in reliance upon an exemption available to privately offered investment companies, and, accordingly, the provisions of that Act (which, among other matters, require investment companies to have disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and regulate the relationship between the adviser and the investment company) will not be afforded to the Fund, the Sub-Funds or the shareholders of the Fund.

Lack of Investment Guidelines.  The Articles impose no restrictions on the Investment Manager's investing for the Fund.  The Investment Manager is free to cause the Fund to invest in any Sub-Fund, to use any degree of leverage, and to alter its investment strategies (although the Investment Manager intends to invest in the manner summarized herein).

Access to Information from Sub-Managers.  The Investment Manager may request detailed portfolio information on a continuing basis from each Sub-Manager retained on behalf of the Fund.  However, the Investment Manager may not always be provided with such information because certain of this information may be considered proprietary information by the particular Sub-Manager.  This lack of access to information may make it more difficult for the Investment Manager to select, allocate among, and evaluate Sub-Managers.

Competition.  The Sub-Managers will engage in investment and trading activities which are highly competitive with other investment and trading programs including those of mutual funds and other financial institutions, investment banks, broker-dealers, commercial banks, insurance companies and pension funds, as well as private investors, all of whom may have investment objectives similar to those of the Sub-Managers.  These competitors may have substantially greater resources and substantially greater experience than the Sub-Managers.

Possibility of Misconduct by Sub-Managers.  Because the Fund may not have custody or control over the assets it invests in the Sub-Funds, a Sub-Manager could divert or abscond with a Sub-Fund's assets, fail to follow its stated investment strategies, issue false reports or engage in other misconduct.

Key Principal Sub-Managers.  The Sub-Managers are likely to be dependent on the services of one or a few individuals.  The loss (through death, disability, retirement or leaving the employ of a Sub-Manager) of a key principal's services could cause a Sub-Fund to incur losses.

Litigation Risk.  A Sub-Fund could become involved in shareholder, insider trading or other litigation as a result of its investment activities, which could adversely affect the Sub-Fund.

Conflicts of Interest.  The Sub-Funds and their Sub-Managers could be subject to various conflicts of interest, which could be resolved to the detriment of the Sub-Fund.  For example, a Sub-Manager might favor its proprietary trading over its trading for the Sub-Fund.

Increase in Managed Assets.  The Fund may invest with Sub-Managers who are experiencing a major increase in the assets they manage, which may impair the ability of their strategies and operations to perform up to historical levels.  Such Sub-Managers may divert from stated strategies into strategies or markets with which they could have little or no experience.  This could result in serious losses to the Sub-Funds and thus the Fund.

Valuation.  The Fund's calculation of its NAV will be based largely or entirely on the valuations the Fund receives from the Sub-Funds.  There is no assurance these valuations will be accurate.  In some cases they may be based in part on the Sub-Fund's valuation of instruments that are not actively traded, and thus partly subjective.  A Sub-Fund may, after it has provided the Fund with a month-end or quarter-end NAV calculation, later revise the calculation, thus requiring the Fund to adjust its calculation of its own NAV for that period.  This could result in the Fund's overpayment or underpayment of investors who withdrew from the Fund as of the end of the period, which could adversely affect remaining investors.

**Fund Structure Risk**

Lack of Operating History.  Some Sub-Funds may be new or relatively new ventures and have little or no operating history upon which their performance can be evaluated.  In addition, certain Sub-Managers may have experience trading for themselves or managed accounts but may not have previously operated an investment fund.

Dependence on Investment Manager.  Because the Investment Manager has complete discretion in investing the Fund's assets, the success of the Fund depends to a great extent on the Investment Manager's abilities.  If the Investment Manager lost the services of certain of its principals, its ability to operate the Fund might be impaired.

Multiple Sub-Managers.  Because each Sub-Manager will trade independently of the others, the trading losses of some Sub-Managers could offset trading profits achieved by the profitable Sub-Managers.  The profitable Sub-Managers would earn incentive fees even though the Fund as a whole may not be profitable.  Different Sub-Managers might compete for the same

investment positions. Conversely, some Sub-Managers may take offsetting positions which would result in transaction costs for the Fund without the possibility of profits.

Sub-Fund or Allocation Changes. The Investment Manager may from time to time add or remove Sub-Funds and the asset allocations among them. The Fund's success will depend on the Sub-Manager selection and allocation abilities of the Investment Manager.

Limited Liquidity of the Shares. The Shares are not freely transferable and a shareholder's right to redeem Shares is subject to substantial restrictions. There will be no market for the Shares. Accordingly, an investment in the Fund is a relatively illiquid investment. Moreover, if a substantial number of shareholders were to redeem and the Fund did not have a sufficient amount of cash, the Fund might have to meet such redemptions through distributions of illiquid securities. Finally, transfers of shares will be permitted only with the written consent of the Directors. As a result, the Fund should be regarded as a long-term investment.

Sub-Funds' Limitations on Withdrawals. The Sub-Funds may not permit withdrawals at the same intervals or on the same notice. For this reason, the Investment Manager has authority to restrict investors' redemption rights, on a pari passu basis among all investors, if and to the extent the Fund is unable to obtain sufficient funds to honor redemption requests by withdrawing from the Sub-Funds, through borrowings, or otherwise. An investor requesting redemption thus may experience delays in receiving redemption payments.

Institutional and Counterparty Risk. To the extent that Sub-Funds invest in swaps, "synthetic" or derivative instruments, repurchase agreements, certain types of options or other customized financial instruments, or, in certain circumstances, non-U.S. securities, the Sub-Funds take the risk of non-performance by the other party to the contract. This risk may include credit risk of the counterparty and the risk of settlement default. This risk may differ materially from those entailed in exchange-traded transactions that generally are supported by guarantees of clearing organizations, daily marking-to-market and settlement, and segregation and minimum capital requirements applicable to intermediaries. Transactions entered directly between two counterparties generally do not benefit from such protections and expose the parties to the risk of counterparty default.

In addition, there are risks involved in dealing with the custodians or brokers who settle the Sub-Funds' trades particularly with respect to non-U.S. investments. It is expected that all securities and other assets deposited with custodians or brokers will be clearly identified as being assets of the Sub-Funds and hence the Fund should not be exposed to a credit risk with respect to such parties. However, it may not always be possible to achieve this segregation and there may be practical or timing problems associated with enforcing the Sub-Funds' rights to their assets in the case of an insolvency of any such party.

Expenses. As a "fund of funds," the Fund will have two levels of expenses, which may cause the Fund to have a higher expense to assets ratio than other investment entities.

Incentive Compensation. The Sub-Managers will be entitled to receive incentive fees or allocations from their Sub-Funds based on the realized as well as unrealized gains. These arrangements may give the Sub-Managers an incentive to make riskier or more aggressive investments than they would otherwise make. The Sub-Managers will generally carry losses forward in calculating their incentive payments, but the Fund will lose the benefit of this carry-

forward if it terminates a Sub-Manager during a carry-forward period.  Although the amount of unrealized gains will generally be readily determinable and will be included in NAV, there can be no assurance that the unrealized gains will, in fact, ever be realized.  Because incentive payments will be based on each Sub-Fund's performance, the Fund itself may in effect make incentive payments during periods when the Fund is not profitable on an overall basis (because the losses of the unprofitable Sub-Funds and the Fund's expenses exceed the profits of the profitable Sub-Funds).

Contingent Liabilities.  The Articles give the Board discretion to establish reserves for unknown or contingent liabilities, and governing agreements of the Sub-Funds are likely to contain similar provisions, as well as provisions authorizing the Sub-Funds to require an investor (including a former investor) to return amounts previously redeemed to cover his share of Sub-Fund liabilities or expenditures that were not quantified at the time they arose.  These provisions could be invoked, for example, if a Sub-Fund was involved in litigation or subject to tax audit.

Liability and Indemnification.  The Placement Agent - Investment Management Agreement provides that neither the Placement Agent nor the Investment Manager shall be liable to the Fund except for acts or omissions that constitute gross negligence, fraud, willful misfeasance or a reckless disregard of its duties under the Placement Agent - Investment Management Agreement, and requires the Fund to indemnify the Placement Agent and the Investment Manager against any loss, liability or expense they may incur in overseeing the marketing of the Fund's Shares or managing the Fund, unless such loss, liability or expenses was the result of gross negligence, fraud, willful misfeasance or a reckless disregard of its duties under the Placement Agent - Investment Management Agreement.

Taxation.  An investment in the Fund involves various tax-related risks.  See §18.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Although the Fund intends to invest substantially all of its assets with Sub-Managers, to the extent the Fund invests directly, these risks may apply to the Fund's direct investments as well as the investments made by the Sub-Managers.  Prospective investors should read this entire Memorandum and consult with their own advisers before deciding to invest in the Fund.**

## § 3.    MANAGEMENT OF THE FUND AND CERTAIN RELATIONSHIPS

### The Fund

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund.  None of the Fund's Directors own a direct equity interest in the Fund.

The Directors of the Fund are Walter Noel, Jeffrey Tucker and Inter Caribbean Services Ltd.  Biographies for Mr. Noel and Mr. Tucker can be found in this section under the heading "The Investment Manager." A description of Inter Caribbean Services Ltd. is below.

**Inter Caribbean Services Ltd.** is part of the Citco Group of companies and is an affiliates of Citco Fund Services (Europe) B.V., the Administrator of the Company. The Citco Group of companies is a major international group of companies providing management, trust, fiduciary and accounting services to financial companies and mutual funds. The group provides full administrative services to over 500 international investment funds worldwide, totaling in excess of US $75 billion in net assets.

## The Investment Manager

The Investment Manager manages all of the Fund's investment activities. Its parent, the Placement Agent, oversees the marketing of the Fund. These activities are carried on pursuant to the Placement Agent - Investment Management Agreement between and among the Placement Agent, the Investment Manager and the Fund.

Fairfield Greenwich Advisors, LLC ("FGA" or the "Investment Manager"), a limited liability company organized under the laws of Delaware on December 12, 2001, provides managerial and operational services to the Fund. FGA is registered as an investment adviser under the Investment Advisers Act of 1940, as amended. The Investment Manager has claimed an exemption under CFTC Rule 4.13(a)(4) from registration with the CFTC as a CPO and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption. The Investment Manager is also exempt from registration with the CFTC as a CTA.

FGA, a wholly owned subsidiary of Fairfield Greenwich Limited ("FGL"), is the Fund's placement agent. FGL oversees the marketing of the Shares. FGL and FGA are member companies of the Fairfield Greenwich Group ("FGG"), which was established in 1983 and had, as of March 1, 2008, more than $16 billion employed in alternative asset management funds. Throughout its history, FGG has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a managerial and distribution partner.

The Fund may use the assistance of affiliated or unaffiliated placement agents and money managers, including FGL, to place the Shares. Such placement agents may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance. Placement agents may also share in the fees payable to FGL and its affiliates by the Fund, which they may rebate to their clients.

Affiliates of FGG currently serve as investment or administrative manager to more than 20 funds, and have exclusive distribution arrangements with several others. FGG maintains its principal office in New York, with a significant presence in London and Bermuda. Marketing and client support offices exist in other locations in the United States, Europe and Latin America. FGG's London entity is licensed and subject to the supervision of the United Kingdom Financial Services Authority. An affiliate of FGG is registered as a broker-dealer in the United States.

The following is biographical information on the founders and principal officers of FGG and its affiliates:

**Walter Noel**, Non-executive Director, co-founded FGG in 1983. Mr. Noel has over 30 years of experience in the investment business. From 1959 to 1972, he was associated with the

Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm.  From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland.  In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank.  Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its offshore private banking business.  Since founding FGG in 1983, Mr. Noel has been a director or general partner for a variety of its funds, directing marketing activity, and originating various of FGG's business opportunities.  Mr. Noel graduated from Vanderbilt University in 1952, received an MA in Economics from Harvard University in 1953, and graduated from Harvard Law School in 1959.

**Andres Piedrahita**, Executive Director and Chairman, founded Littlestone Associates in 1991, which merged with FGG in 1997.  Mr. Piedrahita directs the Group's European and Latin American activities.  Mr. Piedrahita has over 15 years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997).  He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990).  Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987).  He received his BA from Boston University's School of Communications.

**Jeffrey Tucker**, Non-executive Director, is a co-founder of FGG.  He has over 30 years of experience in investment related businesses.  Mr. Tucker was an attorney with the SEC from 1970 to 1978.  From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program.  Mr. Tucker entered private practice in 1978 as a partner at the law firm Tucker, Globerman & Feinsand, where he remained until 1987.  He specialized in securities and transactional matters, with a principal focus on limited partnership offerings.  Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a broker dealer.  At Kolber, Mr. Tucker was responsible for the development and administration of the firm's options company.  FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities.  Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds.  In 1989, Mr. Tucker introduced the Madoff Securities relationship to FGG, which became the basis for FGG's Fairfield Sentry Fund.  Mr. Tucker received his BA from Syracuse University and his Juris Doctor degree from Brooklyn Law School.

**Richard Landsberger**, Executive Director, is Head of Sales.  Mr. Landsberger is responsible for business development and general management issues in Europe, Asia and the Middle East, and directly markets products to a global institutional client base.  He has over 20 years of experience in capital markets.  Prior to joining FGG in 2001, Mr. Landsberger was Managing Director of Fixed Income Sales at PaineWebber (1993-2000).  He was previously Managing Director and Head of Fixed Income Government Trading & Sales at Citicorp Securities (1989-1992).  Mr. Landsberger received his BA from Boston University in 1976 and his Master in Business Administration from Cornell University in 1979.

**Mark McKeefry**, Executive Director, is Chief Operating Officer and General Counsel of FGG. Mr. McKeefry joined FGG in 2003, after eight years in private practice in New York and California, where he advised broker-dealers and investment advisers on regulatory and compliance issues for onshore and offshore funds. He is the author of several articles on hedge fund compliance issues and investment adviser trading practices. Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional civil engineer, licensed by the State of California. Mr. McKeefry is admitted to the bars of California and New York.

**Charles Murphy**, Executive Director, is responsible for strategy and capital markets business. Mr. Murphy has over 20 years of banking experience, most recently from 2005 to 2007 as co-Head of the European Financial Institutions Group at Credit Suisse. From 2001 to 2005 he was at Deutsche Bank as Head of European Financial Institutions. From 2000 to 2001, he was a founder and CFO of Antfactory, an Internet incubator. Mr. Murphy was with Morgan Stanley through the 1990's, having moved from New York to London in 1993, as Head of the European Financial Institutions Group until 2000. He started his career in 1985 as an Associate in Corporate Finance at Goldman Sachs in New York, joining their financial institutions group in 1987. Mr. Murphy has a JD degree from Harvard Law School (1985), an MBA from MIT's Sloan School (1984), and a BA from Columbia College (1981).

**Andrew Smith**, Executive Director, is the Portfolio Manager who oversees all operations for the Chester Global Strategy Funds, Irongate Global Strategy Fund, and Chester Horizons Fund for FGG. He is also a member of FGG's Investment Committee. He has over 15 years experience in finance, asset management, private equity, and real estate. Prior to joining FGG, Mr. Smith was a Partner at Chester Investments (unaffiliated), a private investment firm/family office, where he was responsible for alternative investments including hedge funds, private equity, income-producing real estate, and real estate development in the U.S. and in Europe. Mr. Smith also was responsible for corporate strategy and business development. Prior to Chester, Mr. Smith worked in the private client group at CIBC World Markets. Mr. Smith co-headed a group responsible for advising high-net worth clients' portfolios within CIBC Oppenheimer. Prior to CIBC, Mr. Smith founded and built a private consumer services and real estate company to over 3,000 employees and $110 million in annual revenues. Prior to founding that company, Mr. Smith spent three years with Cantor Fitzgerald in New York as an Associate. Mr. Smith is a graduate of Dartmouth College.

**Philip Toub**, Executive Director, markets FGG's offshore funds and assists in the development of new products. He is responsible for business development in Brazil and the Middle East. He has over 15 years of investment experience. Prior to joining FGG in 1997, Mr. Toub worked at Moore Capital (1995-1997) primarily on the Asian and European Trading desk. He previously worked at Goldman Sachs and Bear Stearns & Co. (1987-1989) on the brokerage side. Mr. Toub received his Bachelor of Arts degree from Middlebury College and is based in the New York office.

## § 4. INVESTMENT STRATEGY

The Fund's investment objective is to provide a superior risk-adjusted rate of return, with a focus on capital preservation. The Fund seeks to accomplish its investment objective by

investing in and trading financial instruments pursuant to strategies offered through various Sub-Funds, some of which are advised by the Investment Manager, the Placement Agent or their affiliates. Consequently, the investment methods of the Fund will include those of the Sub-Funds, which may include investments in securities which are listed or unlisted or rated or unrated. The Fund itself may achieve some diversification by holding interests in several Sub-Funds. In seeking a risk/return mix more likely, in the Investment Manager's estimation, to attain the Fund's investment objective, the Investment Manager may periodically rebalance the allocation of the Fund's investments among the existing Sub-Funds. In addition, the Fund may, under certain circumstances, also invest or trade, on margin or otherwise, directly in securities and financial instruments primarily for hedging purposes. The Fund may utilize leverage in connection with the acquisition of interests in Sub-Funds. The Fund may also obtain a line of credit to bridge redemptions and reallocations among the Sub-Funds. The Investment Manager may add or remove Sub-Funds from the Fund's portfolio at any time. The selection of and allocation among Sub-Funds is entirely within the Investment Manager's discretion. There can be no assurance the Fund will attain its investment objective.

Each Sub-Fund's placement memoranda and certain other agreements and documents are available from the Administrator.

Some of the investment strategies that may be utilized by the Sub-Managers include the following.

- **Convertible Arbitrage** involves purchasing a portfolio of convertible securities, generally convertible bonds, and hedging a portion of the equity risk by selling short the underlying common stock.

- **Equity Hedge** typically consists of a core holding of long equities hedged with short sales of stocks or stock index options.

- **Fixed Income Arbitrage** seeks to profit by exploiting pricing inefficiencies between related fixed income securities while neutralizing exposure to interest rate risk. Fixed Income Arbitrage is a generic description of a variety of strategies involving investment in fixed income instruments, and weighted in an attempt to eliminate or reduce exposure to changes in the yield curve. Such Sub-Managers attempt to exploit relative mispricing between related sets of fixed income securities. The generic types of fixed income hedging trades include yield-curve arbitrage, corporate versus Treasury yield spreads, municipal bond versus Treasury yield spreads and cash versus futures.

- **Merger Arbitrage**, sometimes called Risk Arbitrage, involves investment in event-driven situations such as leveraged buy-outs, mergers and hostile takeovers. Normally, the stock of an acquisition target appreciates while the acquiring company's stock decreases in value. These strategies seek to generate returns by purchasing stock of the company being acquired, and in some instances, selling short the stock of the acquiring company.

- **Relative Value Arbitrage** attempts to take advantage of relative pricing discrepancies between related instruments including equities, debt, options and

futures. Such Sub-Managers may use mathematical, fundamental, or technical analysis to determine misvaluations. Instruments may be mispriced relative to the underlying instrument, related instruments, groups of instruments, or the overall market. Arbitrage strategies include convertible arbitrage, merger arbitrage, dividend arbitrage, pairs trading, options arbitrage and yield curve trading.

- **Distressed Securities** strategies invest in, and may sell short, the securities of companies where the security's price has been, or is expected to be, affected by a distressed situation. This may involve reorganizations, bankruptcies, distressed sales and other corporate restructurings. Depending on the Sub-Manager's style, investments may be made in bank debt, corporate debt, trade claims, common stock, preferred stock and warrants. Strategies may be sub-categorized as "high-yield" or "orphan equities."

- **Event-Driven** involves investing in opportunities created by significant transactional events, such as spin-offs, mergers and acquisitions, bankruptcy reorganizations, recapitalizations and share buybacks. The portfolio of some event-driven Sub-Managers may shift in majority weighting between risk arbitrage and distressed securities, while others may take a broader scope. Instruments include long and short common and preferred stocks, as well as debt securities and options.

- **Short Selling** involves the sale of a security not owned by the seller; a technique used to take advantage of an anticipated price decline. To effect a short sale, the seller borrows securities from a third party in order to make delivery to the purchaser. The seller returns the borrowed securities to the lender by purchasing the securities in the open market. If the seller can buy that stock back at a lower price, a profit results. If the price rises, however, a loss results. A short seller must generally pledge other securities or cash with the lender in an amount equal to the market price of the borrowed securities. This deposit may be increased or decreased in response to changes in the market price of the borrowed securities.

## § 5.    THE OFFERING

The Shares are generally offered on the first business day of each month. The Board may accept subscriptions at other times in its discretion and may terminate the offering of the Shares at any time. The Board may in its discretion decline to accept any Share subscription.

The purchase price per Share is equal to the NAV per Share as of the date of issue. The Shares were initially issued on November 1, 2000 at a price of $100 a Share. The minimum investment per subscriber is $100,000. Fractional Shares will be issued to represent the difference between the U.S. dollar amount subscribed and the number of full Shares purchasable with that amount. The Board may increase the minimum subscription at any time and may reject the subscription of any subscriber for any reason.

The Shares are offered on a private, best efforts basis, by the Placement Agent and, in the Board's discretion, placement agents that are not affiliated with the Placement Agent or the Investment Manager. Such unaffiliated agents may charge their clients a placement fee of up to 5% of the client's subscription amount, or they may receive from the Placement Agent a portion

of the fees paid by the Fund to the Placement Agent (as described below) with respect to the investor's investment in the Fund.  The agent may in turn remit all or a portion of such payment to its client.

A subscriber for Shares must be a "Professional Investor" under BVI law.  This term is defined in the Subscription Agreement.  In addition, any U.S. resident investing in the Fund must be an "Accredited Investor" under SEC Regulation D under the Securities Act of 1933, as amended and a "qualified purchaser" under Section 2(a)(51) of the Investment Company Act of 1940, as amended.  Investors that are "benefit plans" (see §19) may not own 25% or more of any Class of Shares.

In order to invest, subscribers must submit to the Administrator a completed and signed Subscription Agreement and remit their subscription funds to the Administrator as directed in the Subscription Agreement.

## § 6.    FEES AND EXPENSES

The Fund bears all the expenses of its operation, including investment expenses, the Management Fee (see below), the Performance Fee (see below), the Administrator's fees, audit, accounting and legal fees, administration and client support fees and expenses, Share offering costs, custodial and escrow fees, insurance expenses, any taxes that might be assessed to the Fund, and fees of any consultants the Fund might retain.  The Investment Manager does not receive any management or incentive fees directly from the Fund, but receives a fixed portion of the Management Fee and the Performance Fee from the Placement Agent, and bears all of its expenses relating to operation of the Fund and making investment and trading decisions for the Fund, including research, due diligence and ongoing monitoring of Sub-Managers and Sub-Funds, services to Fund investors, and internal legal and accounting relating to the Fund.  The Investment Manager, however, receives an expense reimbursement charge from the Fund equal to 15 basis points per year, payable quarterly in arrears, of the Fund's NAV, calculated as of the beginning of each month, for bearing certain internal accounting and operational costs in connection with the Fund's activities.  The Placement Agent bears all of its expenses relating to its duties on behalf of the Fund.

<u>Management Fee and Performance Fee</u>

The Fund pays the Placement Agent a quarterly management fee (the "Management Fee") calculated as of the beginning of each month at a rate equal to 0.3125% (1.25% per annum) of the NAV of the Class A, Series A-1 Shares prior to any accruals for, or the payment of, the Performance Fee (defined below).  The Management Fee accrues monthly and is payable quarterly in arrears.  The Management Fee is payable promptly after the end of each calendar quarter.  The Placement Agent may, in its sole and exclusive discretion, rebate all or any portion of the Management Fee for certain investors, which may be made in the form of the issuance of additional Shares to such investors.

The Fund also pays a performance fee (the "Performance Fee"), calculated monthly and payable generally as of the end of each calendar quarter in an aggregate amount equal to 10% of the net realized and net unrealized appreciation in the NAV of each Share in such calendar quarter ("Net Profits"), if any; provided, however, that if a Share has a loss chargeable to it during any calendar quarter ("Unrecouped Loss"), and during any succeeding calendar quarter

there are Net Profits allocable to the Share, there will be no Performance Fee payable with respect to such Share until the amount of the Unrecouped Loss allocated to such Share has been recouped.  If Shares are redeemed during a calendar quarter, the Unrecouped Loss relating to such Shares will be reduced in the same proportion as the reduction in the NAV of such Shares caused by such redemption.  The Placement Agent may, in its sole and exclusive discretion, rebate all or any portion of the Management Fee for certain investors, which may be made in the form of the issuance of additional Shares to such investors.  For a description of the manner in which the Performance Fee is borne by each Share and the time of payment, see §7.  All or a portion of the Performance Fee allocable to a shareholder's Shares may be paid by a redemption of a portion of that shareholder's Shares.

If Shares are purchased during a calendar quarter, the Performance Fee with respect to such Shares for such calendar quarter will be calculated commencing on the date of purchase.  If Shares are redeemed prior to a calendar quarter–end, the Performance Fee with respect to such redeemed Shares will be determined and paid as of the applicable Redemption Date (as defined below) as if such Redemption Date were the last day of a calendar quarter.  The Management Fee with respect to Shares purchased or redeemed other than as of the beginning or end, respectively, of a month will be appropriately prorated.

<u>Sub-Fund Fees and Expenses</u>

The Fund will indirectly pay management fees and incentive fees to the Sub-Managers (which may include the Investment Manager, the Placement Agent or any of their affiliates acting as a Sub-Manager to one or more Sub-Funds) as an investor in each of the Sub-Funds. The Fund expects the management fees paid to the Sub-Managers will typically average 1.25% to 1.75% of the respective Sub-Funds' net assets on an annual basis.  Each Sub-Fund will pay its respective Sub-Manager an incentive fee, which will generally equal 20% of any net new profits in the Sub-Fund as of the end of a fiscal period.  Net new profits are typically any amount by which the Sub-Fund's NAV as of the period-end exceeds its "high water mark", which is the NAV of the Sub-Fund immediately after the assessment of the most recent incentive fee deducting the amount of any withdrawals or redemptions made by the Fund since such assessment or, if the Sub-Fund has never been assessed an incentive fee, the NAV of the Sub-Fund when it was initially established.  In some instances the Sub-Funds may not have a "high water mark", in which case the Sub-Manager will receive an incentive fee even if the Sub-Fund has Unrecouped Losses from a prior period.  Any redemption proceeds paid on a shareholder's Shares may include an adjustment for the accrual of estimated incentive fees payable to Sub-Managers.  To the extent the Investment Manager or Placement Agent receives any management fees or incentive fees at the Sub-Fund level such fees will be rebated to the Fund.

The Fund, as an investor in the Sub-Funds, will also bear its pro-rata share of the Sub-Funds' other expenses, which consist primarily of brokerage commissions and related transaction costs; management and incentive fees; organizational expenses; operating and administrative expenses (including accounting, audit and legal fees, and expenses for insurance); interest expense relating to any borrowing to purchase and hold securities and financial instruments, and any administration fees.

**Salaries and Other Personnel Expenses**

The Directors not affiliated with the Investment Manager, of which there is at the present time one, will be paid a fee of $5,000 per annum by the Fund, together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.  The Directors affiliated with the Investment Manager will not receive any compensation from the Fund for serving as directors, but they will be reimbursed for any out-of-pocket expenses.

## § 7.    DETERMINATION OF OFFERING PRICE

When Shares are subscribed for at the beginning of a calendar quarter ("Period Beginning") or at any time other than a Period Beginning ("Interim Purchases") when there is a Loss Carryover (as defined below), certain adjustments to the amount of money paid for the purchase of Shares are necessary.  This is done so that (i) the Performance Fee is charged only to those Shares which have appreciated in value since their acquisition, (ii) all shareholders will have the same amount per Share at risk and (iii) all Shares will have the same NAV.  "Loss Carryover" will mean, at any time, the aggregate Unrecouped Loss attributable to an outstanding Share.

The number of Shares to be purchased will be based on the offering price per Share (the "Offering Price") as defined below.  The Offering Price for each Share is calculated in the following manner:

(1)    For Shares purchased at the Period Beginning, the Offering Price is the Period Beginning NAV ("Beginning Value") plus a depreciation deposit ("Depreciation Deposit") equal to 10% of the Loss Carryover, if any, at Period Beginning.  The Depreciation Deposit is invested and paid out as described in Section 2(a) below.

(2)    For Interim Purchases:

(a)    When the NAV per Share is less than the sum of (i) the Beginning Value and (ii) the Loss Carryover at Period Beginning, the Offering Price is the NAV per Share; however such Offering Price includes the "Depreciation Deposit."  The Depreciation Deposit is 10% of the amount by which (i) and (ii) above exceed the NAV per Share at the date of purchase.  The Depreciation Deposit is invested in the Fund and may, in certain circumstances, be returned to the shareholder at the time of redemption of the Shares.  It is included in the Offering Price to permit the Shares purchased on the date of purchase to be charged the 10% Performance Fee with respect to any increase in NAV up to Beginning Value and with respect to any benefit received by reason of the existence of a Loss Carryover.  If at the end of any calendar quarter (or at any time during the calendar quarter when the Shares of a shareholder are redeemed), the losses which gave rise to the Depreciation Deposit are recouped, then, to the extent that the losses which gave rise to all or a portion of the Depreciation Deposit are recouped, the Depreciation Deposit will be paid by the Fund as a part of the Performance Fee.  Any portion of the Depreciation Deposit not paid by the Fund will be paid to the shareholder upon redemption.

(b)    When the NAV per Share is more than the sum of (i) Beginning Value and (ii) the Loss Carryover at Period Beginning, the Offering Price is the NAV per Share;

however, such Offering Price includes the "Equalization Factor" as defined below. The term "Equalization Factor" means an amount which the Shares outstanding since Period Beginning should be charged (i.e., 10% of the increase in NAV since Period Beginning in excess of the Loss Carryover at Period Beginning), and which the Shares subscribed for at the date of the Interim Purchase ("Interim Purchase Date") should not be charged. To the extent that the increase in value of the Shares that cause the payment of the Equalization Factor is not lost in the current calendar quarter, the Equalization Factor attributable to such increase becomes payable to the shareholder at the end of the current calendar quarter. To the extent that the increase in value of the Shares that cause the payment of the Equalization Factor is lost in the year the Shares are purchased but is recovered in a subsequent calendar quarter, the Equalization Factor attributable to such recovery will become payable to the shareholder at the end of the calendar quarter in which the recovery occurs. Upon redemption by a shareholder of his Shares, the same amount of the Equalization Factor will be paid to him as if the date of redemption were the last day of the calendar quarter in which the Shares are redeemed. Any Equalization Factor, or portion thereof, which is due to a shareholder not redeeming his Shares will be used to purchase additional full Shares on behalf of such shareholder as of the first day of the next succeeding calendar quarter.

The tables on the following pages have been provided to illustrate the manner in which the adjustments set forth above operate. Table I illustrates the manner in which the adjustments described above operate with respect to Shares subscribed for at the beginning and during a hypothetical calendar quarter where there is no Loss Carryover at the beginning of the calendar quarter. Table II illustrates the manner in which the adjustments described above operate with respect to Shares subscribed for, prior to, at the beginning and during a hypothetical calendar quarter where there is a Loss Carryover of $20 per Share at the end of the first calendar quarter.

**TABLE I**

| Shareholder | Shareholder Subscribes for Shares at | NAV on Date of Purchase | Equalization Factor Paid | Depreciation Deposit Amount Paid | Offering Price | NAV at calendar quarter end (before 10% Performance Fee) | Regular 10% Performance Fee Accrued at calendar quarter end | Depreciation on Deposit Paid by Fund | Equalization Factor Returned to Shareholder | NAV at calendar quarter end (after 10% Performance Fee) |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Period Beginning July 1 NAV= $100 | $100 | $0 | $0 | $100 | $140 | $4 | $0 | $0 | $136 |
| B | Interim Purchase Date August 1 NAV = $80 | 80 | 0 | 2 | 82* | 140 | 4 | 2 | 0 | 136 |
| C | Interim Purchase Date Sept. 1 NAV = $120 (before 10% Performance Fee) | 118 | 2 | 0 | 120** | 140** | 4 | 0 | 2 | 136 |

\*       Includes Depreciation Deposit
\*\*      Includes Equalization Factor

**TABLE II**

| Shareholder | Shareholder Subscribes for Shares at | NAV on Date of Purchase | Equalization Factor Paid | Depreciation Deposit Paid | Offering Price | NAV at calendar quarter 2 end (before 10% Performance Fee) | 10% Performance Fee Accrued at calendar quarter end | Depreciation Deposit Paid by Fund | Equalization Factor Returned to Shareholder | NAV at calendar quarter 2 end (after 10% Performance Fee) |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Beginning of calendar quarter 1 NAV = $100 | $100 | $0 | $0 | $100 | $115 | $1.50 | $0 | $0 | $113.50 |
| B | Beginning of calendar quarter 2 NAV = $80 | 80 | 0 | 2 | 82* | 115 | 1.50 | 2 | 0 | 113.50 |
| C | Interim Purchase Date May 1 NAV = $110 (before Performance Fee) | 109 | 1 | 0 | 110** | 115** | 1.50 | 0 | 1 | 113.50 |

*      Includes Depreciation Deposit
**    Includes Equalization Factor

Shareholder B in Table 1, purchasing Shares on an Interim Purchase date when the NAV has decreased since Period Beginning, pays an Offering Price of $82 per Share (which includes a Depreciation Deposit of $2) since the Performance Fee which would accrue to his Shares would be $2 more than the Performance Fee which would accrue for Shares purchased by Shareholder A at Period Beginning.

Shareholder C in Table 1, purchasing Shares on an Interim Purchase date when the NAV has increased since Period Beginning, pays an Offering Price of $120 per Share (which includes an Equalization Factor of $2). The Equalization Factor is returned to him at end of the calendar quarter and applied to the purchase of additional Shares since the Performance Fee which would accrue to his Shares would be $2 less than the Performance Fee which would accrue to the Shares purchased by Shareholder A.

Shareholder B in Table II, purchasing Shares at the beginning of calendar quarter 2 when the NAV has decreased since the beginning of calendar quarter 1, pays an Offering Price of $82 per Share (which includes a Depreciation Deposit of $2) since the Performance Fee which would accrue to his Shares would be $2 more than the Performance Fee which would accrue for Shares purchased by Shareholder A at calendar quarter 1. The Depreciation Deposit is paid at the end of calendar quarter 2 when the NAV for Shareholder B's Shares has increased by more than the loss carryover.

Shareholder C in Table II, purchasing Shares on an Interim Purchase date during calendar quarter 2 when the NAV has increased since the beginning of calendar quarter 1, pays an Offering Price of $110 per Share (which includes an Equalization Factor of $1) since the amount of funds he would otherwise have at risk would be $1 less than the amount of funds at risk of Shareholder A. The Equalization Factor is returned to him and applied to the purchase of additional Shares at the end of calendar quarter 2 since the Performance Fee which would accrue to his Shares would be $1 less than the Performance Fee which accrues to Shareholder A.

## § 8.    NET ASSET VALUE

As provided in the Fund's Articles of Association, the NAV per Share of each series within a class of Shares shall be determined by the Board as at the close of business on the last business day of each month, and/or such other day or days in addition thereto or in substitution thereof as from time to time be determined by the Board so that there shall be at least one valuation day in each month. The calculation of the NAV has been delegated by the Board to the Administrator. The NAV shall be calculated by the Administrator on each valuation day with respect to each series of Shares based on the value of the net assets of the Fund apportioned between each separate series by reference to the percentage that the NAV of each series of Shares as at the previous valuation day bore to the aggregate NAV of all series of Shares within a particular class as at the previous valuation day, as adjusted for subscriptions and redemptions. The NAV per Share shall be calculated at the time of each determination by dividing the NAV of each series of Shares by the number of outstanding Shares of that series then in issue or deemed to be in issue, all determined and calculated as provided in the Fund's Articles of Association.

The Fund's assets are expected to consist primarily of its interests in the Sub-Funds in which it invests (and any option or swap contracts it enters into for the purpose of participating

in the performance of Sub-Funds in lieu of investing in such Sub-Funds); provided, however, the Fund may, under certain circumstances, also invest or trade, on margin or otherwise, directly in securities and financial instruments primarily for hedging purposes. For purposes of determining the Fund's NAV, the Fund will ordinarily rely on the values of its interests in Sub-Funds provided by the Sub-Managers or administrators of such Sub-Funds.  If the Sub-Manager or administrator of a particular Sub-Fund does not provide the Fund with the value of the Fund's interest in such Sub-Fund, the Board, in consultation with the Investment Manager, may exercise its reasonable judgment in the best interest of the Fund and its investors to determine the value of such interest.

Assets held directly by the Fund will be valued in accordance with the following principles:

(A)     any security (including a share or unit in a closed-ended Sub-Fund but not in an open-ended Sub-Fund) which is listed or quoted on a securities exchange or similar electronic system and regularly traded thereon will be valued at its last closing price on the relevant valuation day or, if no trades occurred on such day, at the last available closing price, and as adjusted in such manner as the Directors, in their sole discretion, think fit, having regard to the size of the holding, and where prices are available on more than one exchange for a particular security the Directors will in their sole discretion determine which of those prices shall apply;

(B)     any security which is not listed or quoted on any securities exchange or similar electronic system or, if being so listed or quoted, is not regularly traded thereon or in respect of which no prices as described above are available will be valued at its fair value as determined by the Directors having regard to its cost price, the price at which any recent transaction in the security may have been effected, the size of the holding having regard to the total amount of such security in issue, and such other factors as the Directors in their sole discretion deem relevant in considering a positive or negative adjustment to the valuation;

(C)     deposits will be valued at their cost and money market instruments at their face value, plus accrued interest; and

(D)     any value (whether of an investment or cash) otherwise than in US Dollars will be converted into US Dollars at the rate (whether official or otherwise) which the Directors in their absolute discretion deem applicable as at close of business on the relevant valuation day, having regard, among other things, to any premium or discount which they consider may be relevant and to costs of exchange.

    In determining the NAV of the Fund, the Administrator will follow the valuation policies and procedures adopted by the Fund as set out above.  For the purpose of calculating the NAV of the Fund, the Administrator shall, and shall be entitled to, rely on, and will not be responsible for the accuracy of, financial data furnished to it by the Fund's custodian and/or the Investment Manager.  The Administrator may also use and rely on industry standard financial models in pricing any of the Fund's securities or other assets.  If and to the extent that the Investment Manager is responsible for or otherwise involved in the pricing of any of the Fund's securities or other assets, the Administrator may accept, use and rely on such prices in determining the NAV

of the Fund and shall not be liable to the Fund, any investor in the Fund, the Board of Directors, the Investment Manager or any other person in so doing.

The Directors may, at their discretion, permit any other method of valuation to be used if they consider that such method of valuation better reflects value and is in accordance with good accounting practice. To the extent feasible, expenses, fees and liabilities will be accrued in accordance with international financial reporting standards ("IFRS") or US generally accepted accounting principles ("US GAAP"), as determined by the Board of Directors. Reserves (whether or not in accordance with IFRS or US GAAP) may be taken for estimated or accrued expenses, liabilities or contingencies. The Fund will prepare its annual financial statements in accordance with the IFRS or, if the Directors so determine, US GAAP. Investors should note that the above valuation policies may not necessarily comply with the IFRS or US GAAP. To the extent that the valuation basis adopted by the Fund as detailed above deviates from IFRS or US GAAP, the Directors may be required to make adjustments in the annual financial statements of the Fund for the annual financial statements to comply with the IFRS or US GAAP. Non-compliance with IFRS or US GAAP may result in the auditors issuing a qualified or an adverse opinion on the annual financial statements depending on the nature and level of materiality of the non-compliance.

## § 9.    CAPITALIZATION OF THE FUND; THE SHARES

The Fund's share capital consists of 30,000,000 Class A Shares, divided between the Series A-1 Shares (15,000,000 shares) and the Series A-2 Shares (15,000,000 shares), and 1,000,000 Class C Shares, with a par value of $0.01 each (collectively, the "Fund Shares"). Holders of the Fund Shares will be entitled to receive both dividends and other distributions as declared and a pro-rated portion of the Fund's NAV on a winding up of the Fund. The Fund Shares will be redeemable at the NAV on the effective date of redemption. When issued, all Fund Shares will be fully paid and non-assessable. No Fund Shares shall have preference, pre-emptive, conversion or exchange rights, although the Series A-2 Shares have a different fee structure (the Class C Shares are unissued). There are no outstanding options or any special rights relating to any Fund Shares. The Fund may refuse to issue, register or consent to the transfer of Fund Shares for any reason.

The Fund Shares will normally be held in book-entry form. Share certificates may be issued upon written request. Fund Shares may be issued only in registered form and not as bearer shares. The Administrator is the registrar and transfer agent for the Fund Shares.

## § 10.    REDEMPTIONS AND TRANSFERS

Subject to the limitations set forth below, a shareholder may, upon at least 45 days' prior written notice, redeem its Shares as of the last business day of any month; provided, however, that the Fund may limit a shareholder's redemption to 5% of the NAV of its Shares (calculated as of the date of redemption) (the "Share Limit") as of the last business day of the first month and of the second month of any quarter. The Fund reserves the right to waive the Share Limit with respect to any redemption.

In the event that as of the last business day of a calendar quarter the Fund receives redemption requests for shares that represent in the aggregate more than 15% of the shares of the

Fund then in issue (calculated as of such redemption date) (the "Redemption Limit"), the Fund is entitled to reduce the requests ratably and pro rata amongst all shareholders seeking to redeem shares on such redemption date and to carry out only sufficient redemptions which, in aggregate, amount to 15% of the shares of the Fund then in issue. Shares that are not redeemed due to the Redemption Limit (the "Deferred Shares") may be redeemed on the last business day of the following month, subject to a shareholder's Share Limit. If all of a shareholder's Deferred Shares have not been redeemed as of the last business day of the subsequent calendar quarter and the Redemption Limit is again in effect, the Deferred Shares will be given priority over any other Shares of that Class for which redemption requests have been received.

Notwithstanding the Share Limit and the Redemption Limit, a shareholder that submits a request to redeem all of its Shares from the Fund will be paid its redemption proceeds in full within thirteen months after the first applicable redemption date.

If a shareholder redeems Shares in the Fund, the shareholder acknowledges that the initial payment of redemption proceeds may be based on an estimate of the Fund's NAV as of such redemption date. In the event that the Fund's final NAV as of such redemption date is less than the estimate and therefore results in an overpayment of redemption proceeds to the shareholder, the Fund will send the shareholder an invoice for the overpayment. The shareholder agrees to repay the Fund the amount of any overpayment within 30 days after receipt of the invoice. The shareholder agrees that its obligation to make the repayment in the event of an overpayment as described herein will endure notwithstanding the performance by it of all other obligations under the Subscription Agreement.

With respect to Shares purchased on or after May 1, 2008; (i) any shareholder that redeems such Shares prior to the six-month anniversary of the purchase of such Shares will be subject to a redemption fee of 3% of the redemption proceeds, and (ii) any shareholder that redeems such Shares after the six-month anniversary but before the one-year anniversary of the purchase of such Shares, will be subject to a redemption fee of 1% of the redemption proceeds. All redemption fees shall be payable to the Fund. With respect to any redemption that is subject to a redemption fee, the shareholder agrees that the Fund may (in its discretion) either reduce the shareholder's redemption proceeds by the amount of the redemption fee or submit an invoice to the shareholder for the amount of the redemption fee. If an invoice is submitted, the shareholder agrees to pay the redemption fee to the Fund within 30 days of receipt of the invoice.

Shares will be redeemed at a per Share price based upon the NAV per Share (after calculation of any redemption fee, Performance Fee and Management Fee) as of the applicable redemption date (or at such other times as the Board may determine). Generally, the Fund will pay a redeeming shareholder its redemption proceeds within 30 days of the effective date of its redemption. Redemption proceeds will normally be paid in cash, but the Board has discretion to pay redemption proceeds in marketable securities as well as cash. If a shareholder requests a partial redemption and the aggregate value of its remaining Shares would be less than $100,000, the Board has discretion to require such shareholder to redeem all of its Shares.

Subject to the following sentence, any notice provided by a shareholder to the Fund in connection with a redemption of Shares will be deemed irrevocable. The Board of Directors may, in its sole discretion, elect to waive any notice period or allow a notice to be revoked. A

shareholder may also redeem Shares at such other times, and upon such other terms, as may be determined by the Board of Directors, in its discretion, after consultation with the Investment Manager.

**Compulsory Redemptions**

The Board may require any shareholder to redeem any or all of its Shares at their then current NAV per Share as of the end of any month.  Shares may be transferred only with the prior written consent of the Board and in compliance with any applicable laws.

**Suspension of Redemptions**

The Board has discretion to (a) suspend Share redemption rights in certain emergency situations such as when the markets on which a substantial portion of the Sub-Funds' assets are traded are closed (other than for weekends or holidays) or if the Fund is unable to reliably value its interests in the Sub-Funds due to a communication breakdown, or (b) limit the payment of redemption proceeds to the amounts received from those Sub-Funds from which the Fund is able to withdraw its capital in order to fund the redemption.  In the latter case, the redeeming shareholder would effectively continue to have an indirect *pro-rata* interest in any Sub-Fund from which the Fund was unable to withdraw its capital, and the Fund would pay the redeeming shareholder at a later date its pro-rata share of the proceeds of the liquidation of such Sub-Fund.

## § 11.   THE DIRECTORS

The Fund is managed by its Board, which consists of Messrs. Noel and Tucker (who are each principals of the Investment Manager), and InterCaribbean Services Ltd.  Under the Fund's Articles of Association, the Board may delegate certain of its functions.

The Fund's Articles of Association provide that the Board and any alternate Directors may be paid all traveling, hotel and other expenses properly incurred by them in attending and returning from meetings of the Board or any other meetings in connection with the business of the Fund.  The Board has not entered into a service contract as Directors with the Fund, nor is any such contract proposed.  A Director may be a party to, or otherwise interested in, any transaction or arrangement with the Fund or in which the Fund is interested, provided that he has disclosed to the Board prior to the conclusion of any such transaction or arrangement the nature and extent of any interest of his therein.  A Director may vote in respect of any contract or arrangement or any proposal whatsoever in respect of which he has an interest, having first disclosed such interest.  The Directors may, by resolution of the Directors, fix the emoluments of the Directors with respect to services to be rendered in any capacity to the Fund.  There is no retirement age for the Directors.  At the date of this Memorandum, and save as disclosed herein, the Board do not have any interest, beneficial or otherwise, in the share capital of the Fund or any interest in the Fund or in any agreement or arrangement with the Fund.

No Director has

- any unspent convictions in relation to indictable offenses;

- been adjudged a bankrupt, entered into a voluntary arrangement with creditors or had a receiver appointed to oversee any asset of such Director;

- been the director of any company which, while he was a director with an executive function or after 12 months after he ceased to be director with an executive function, had a receiver appointed or went into compulsory liquidation, creditors voluntary liquidation, administration or company voluntary arrangements, or made a composition or arrangements with its creditors generally or with any class of its creditors;

- been a partner of any partnership which, while he was partner or within 12 months after he ceased to be a partner, went into compulsory liquidation, administration or partnership voluntary arrangement or had a receiver appointed to oversee any partnership asset;

- had any public criticism by statutory or regulatory authorities (including recognized professional bodies); or

- been disqualified by a court from acting as a director or from acting in the management or affairs of any company.

## § 12.   THE ADMINISTRATOR AND THE CUSTODIAN

The Fund has engaged Citco Fund Services (Europe) B.V., (the "Administrator"), to provide certain financial, accounting, administrative and other services to the Fund. The Administrator provides, subject to the overall direction of the Fund's Board, administrative services and registrar and transfer agent services.  Pursuant to an Administration Agreement (the "Administration Agreement") dated February 20, 2003 between the Administrator and the Fund, the Administrator will be responsible, inter alia, for the following matters under the general supervision of the Board: communicating with shareholders; maintaining the register of Shares; processing subscriptions and redemptions; preparing and maintaining the Fund's financial and accounting records and statements; determining the NAV of Shares (on a monthly basis); preparing financial statements; arranging for the provision of accounting, clerical and administrative services; maintaining corporate records; disbursing payments of fees and salaries, if any.

The Administrator will be indemnified out of the assets of the Fund against all liabilities, actions, proceedings, claims, costs, demands and expenses (other than out-of-pocket expenses) arising out of its proper performance under the Administration Agreement except for negligence, bad faith, fraud, dishonesty or a material breach by the Administrator.   The Administrator will not provide any investment advisory or management services to the Fund and therefore will not be in any way responsible for the Fund's performance.

Citco Global Custody N.V. ("Custodian") has been appointed as custodian of the Fund's assets pursuant to a Custodian Agreement, dated October 25, 2002, made and entered into between the Fund and the Custodian. The Custodian shall keep the accounts of the Fund and exercise only custody functions on behalf of the Fund. It does not act as sponsor of the Fund or

assume special controlling duties other than those related to its custody functions. The Custodian does not warrant the contents of this Memorandum, nor is it involved in the management, administration or NAV calculation of the Fund. The Custodian may make use of sub-custodians and depositories in the exercise of its functions. The Custodian shall exercise reasonable skill, care and diligence in the selection of a suitable sub-custodian and shall be responsible to the Fund for the duration of the sub-custody agreement for satisfying itself as to the ongoing suitability of the sub-custodians to provide custodial services to the Fund.  The Custodian will also maintain an appropriate level of supervision over the sub-custodians and will make appropriate inquiries periodically to confirm that the obligations of the sub-custodians continue to be competently discharged.  Any sub-custodian appointed will be paid at normal commercial rates.

The Fund may appoint other custodians, subject to prior approval of the Custodian. The services of the Custodian to the Fund may inter alia be terminated by either the Fund or the Custodian at any time, subject to 90 days prior written notice subject to the aforementioned Custodian Agreement.

The Custodian shall have no responsibility to initiate, appear in, prosecute or defend any legal or equitable proceedings relating to the stocks, bonds, other securities or property held by the Custodian under the Custodian Agreement with the Fund. The Custodian shall have no responsibility to initiate any proceeding or engage the services of any third party for the collection of overdue amounts owing to the Fund in connection with any stocks, bonds or other property held by the Custodian under the Custodian Agreement. If, at the request of the Fund, the Custodian agrees to appear in, prosecute or defend any such legal or equitable proceedings, either in the Custodian's name or in the name of its nominee, the Custodian shall first be indemnified to its satisfaction against damages and expenses (including attorney's fees) which may be sustained or incurred by the Custodian in so acting.

The Custodian shall be required to use its best efforts and judgment and due or reasonable care in performing its obligations and duties under the Custodian Agreement; provided, however, that the custodian shall not be liable for any loss suffered by the Fund in connection with the services performed by the Custodian unless such loss arises form the Custodian's willful misfeasance, fraud, bad faith or negligence in the performance of its duties under the Custodian Agreement or its reckless disregard of its duties and obligations thereunder.

The Fund shall be required to indemnify and hold the Custodian harmless from and against any losses, expenses, liabilities, obligations, damages or costs howsoever imposed on, asserted against or incurred by the Custodian in the performance of its obligations under the Custodian Agreement; provided that the Custodian shall not be indemnified for its willful misfeasance, fraud, bad faith, negligence or reckless disregard.

## § 13.   POTENTIAL CONFLICTS OF INTEREST

Because of the Placement Agent's role as sponsor and organizer of the Fund, the Fund's selection of the Investment Manager (an affiliate of the Placement Agent) to serve as the Fund's investment manager, as well as the terms of the Fund's governing documents and the Placement Agent – Investment Management Agreement, were not the result of arms-length negotiation

between the Investment Manager and Placement Agent, on the one hand, and the Fund, on the other hand.

In addition, the Placement Agent, the Investment Manager and their related persons will be subject to significant conflicts of interest in managing the business and affairs of the Fund and in making investment and trading decisions for the Fund. Certain of these conflicts are described elsewhere in this Memorandum and will not be repeated here. Others are described below.

The Fund's governing documents and the Placement Agent – Investment Management Agreement do not require the Investment Manager to devote its full time or any material portion of its time to the Fund. The Investment Manager and its related persons are currently involved in, and may in the future become involved in, other business ventures, including other investment funds whose investment objectives, strategies and policies are the same as or similar to those of the Fund. The Fund will not share in the risks or rewards of such other ventures, and such other ventures will compete with the Fund for the time and attention of the Investment Manager and its related persons and might create additional conflicts of interest, as described below.

The Investment Manager and its related persons invest and trade and may continue to invest and trade in securities and other financial instruments for the accounts of clients other than the Fund and for their own accounts, even if such securities and other financial instruments are the same as or similar to those in which the Fund invests and trades, and even if such trades compete with, occur ahead of or are opposite those of the Fund. They will not, however, knowingly trade for the accounts of clients other than the Fund or for their own accounts in a manner that is detrimental to the Fund or that would unfairly prejudice the shareholders of the Fund, nor will they seek to profit from their knowledge that the Fund intends to engage in particular transactions.

The Investment Manager might have an incentive to favor one or more of its other clients over the Fund, for example with regard to the selection of Sub-Managers for those clients because those clients might pay the Investment Manager more for its services than the Fund, or with regard to the allocation of investment opportunities to the Fund in Sub-Funds that may have limited investment capacity. The Investment Manager and its related persons will act in a fair and reasonable manner in allocating suitable investment opportunities among their client and proprietary accounts. No assurance can be given, however, that (i) the Fund will participate in all investment opportunities in which other client or proprietary accounts of such persons participate, (ii) particular investment opportunities allocated to client or proprietary accounts other than the Fund will not outperform investment opportunities allocated to the Fund, or (iii) equality of treatment between the Fund, on the one hand, and other client and proprietary accounts of such persons, on the other hand, will otherwise be assured.

Subject to the considerations set forth above, in investing and trading for client and proprietary accounts other than the Fund, the Investment Manager and its related persons may make use of information obtained by them in the course of investing and trading for the Fund, and they will have no obligation to compensate the Fund in any respect for their receipt of such information or to account to the Fund for any profits earned from their use of such information.

The trading records of the Investment Manager and its related persons will not be available for inspection by shareholders.

The Investment Manager or its related persons might receive benefits, such as research services or the referral of prospective investors in the Fund, from the brokerage firms through which the Sub-Funds conduct their trading. This may create an incentive for the Investment Manager to allocate Fund assets to Sub-Funds that use such brokerage firms.

The Fund has engaged the Placement Agent, and may engage other placement agents from time to time, to market Shares. If an investor acquires Shares through an agent engaged by the Fund, such investor should not view any recommendation of such agent as being disinterested, as the agent will be paid for the introduction. In the case of the Placement Agent, such fee will be paid by the Fund, as described herein. In the case of other placement agents, such fee will be paid by the investor and/or by the Placement Agent or Investment Manager. Also, investors should regard such an agent as having an incentive to recommend that the investor remain invested in the Fund, since the agent may receive compensation for all periods during which such investor remains invested.

The Investment Manager has fiduciary duties to the Fund to exercise good faith and fairness in all its dealings with it and will take such duties into account in dealing with all actual and potential conflicts of interest. If a shareholder believes that the Investment Manager has violated its fiduciary duties, it may seek legal relief under applicable law, for itself and other similarly situated shareholders or on behalf of the Fund. However, it may be difficult for shareholders to obtain relief because of the changing nature of the law in this area, the vagueness of standards defining required conduct, the broad discretion given the Investment Manager under the Placement Agent - Investment Management Agreement, and the exculpatory and indemnification provisions therein.

The Sub-Managers of Sub-Funds in which the Fund invests are likely to be subject to many of the same or similar conflicts of interest to which the Investment Manager and its related persons are subject in connection with managing the business and affairs of the Fund and making investment decisions for it. For example, Sub-Managers may select brokerage firms to effect transactions for Sub-Funds based on the benefits that the firms provide to the Sub-Managers. Also, the Sub-Managers may engage in the same trading for their own accounts that they engage in for their Sub-Funds, and have an incentive to favor their personal trading over their trading for their Sub-Funds.

The Investment Manager may assist the Administrator in the calculation of the Fund's NAV. Because the management fees and the performance fees are based on the Shares' NAV, the Investment Manager may have an incentive to seek to over-value the NAV in order to increase those fees.

Because Messrs. Noel and Tucker are principals of the Placement Agent (which is the parent of the Investment Manager), as well as Directors of the Fund, they may have an incentive to take actions as a Director that favor the interests of the Investment Manager and the Placement Agent over those of the Fund.

The legal counsel to the Fund were retained by the Fund and do not represent the interests of the investors in the Fund.

## § 14.  MEMORANDUM AND ARTICLES OF ASSOCIATION

The Fund is governed by its Memorandum and Articles of Association.  Following is a summary of certain provisions of those documents.

Pursuant to Paragraph 4 of the Fund's Memorandum of Association, the Fund may engage in any act or activity that is not prohibited under any law for the time being in force in the BVI.  As such, the Fund may carry on business as an investment company.

In determining the amount of the Fund's liabilities, the Board may calculate administrative and other expenses of a recurring nature on an estimated figure for yearly or other periods in advance and accrue the expense in equal proportions over the period.

If redemption is suspended, any pending redemptions shall occur on the first business day following the termination of the suspension period.  A business day is any day that the New York Federal Reserve Bank is open for business.

Redemption proceeds shall generally be paid in U.S. dollars, by wire transfer upon the shareholder's request.  However, the Board has discretion to pay redemption proceeds in kind to the extent that any Sub-Funds distribute marketable securities to the Fund.

Each Fund Share is entitled to one vote on all matters subject to shareholder vote pursuant to the Fund's Memorandum of Association and Articles of Association, to share pro-rata in the assets of the Fund in the event of its liquidation, and to participate in any dividends or distributions as declared by the Board.

A general meeting may be called upon the written requisition of any shareholder or shareholders entitled to attend and vote at general meetings of the Fund who holds not less than 10% of the paid up voting share capital of the Fund.  For the purposes of calculating if the shareholders have the requisite 10% required to call the meeting, the Board shall calculate the percentage on a six month rolling period, such that a general meeting shall be held if in any period of six consecutive months the total number of Shares held by such shareholders requisitioning a general meeting is equal to or greater than 10% in aggregate provided once a meeting has been held the shares relating to such requisition shall not be used in future calculations unless a further requisition is received by that shareholder.  Such determination shall at all times be in the absolute discretion of the Board.

A quorum shall consist of 50% of the Shares entitled to vote on the matter to be considered at the meeting.  If a quorum is present, shareholders' resolution shall be approved upon the affirmative vote of a simple majority of the votes of the Shares entitled to vote that were present at the meeting and not abstained. Notwithstanding the above, a simple majority of unaffiliated shareholders will be required to appoint and/or remove a director. An unaffiliated shareholder is a shareholder which is not an entity "controlling", "controlled by" or "under common control with" or acting on behalf of the Placement Agent.  "Controlled by", "controlling" and "under common control with" means possession, directly or indirectly, of the

power to direct or cause the direction of management on policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of a person, and include principal owners and management and their families.

An action that may be taken at a meeting may also be taken by a shareholders' resolution consented to in writing.

There shall be not less than one or more than seven Directors. A Director may be removed from office, with or without cause, by the shareholders. The Board shall manage the Fund's business and affairs. The Board may by resolution exercise all of the Fund's powers to borrow money, mortgage or charge its property, issue debentures, etc. A Board resolution shall be approved by the affirmative vote of a simple majority of the Board present at the meeting who voted and did not abstain.

The Board may create and issue different classes of Shares and may determine the NAV of each class solely by reference to the Fund assets and liabilities allocable to the class. The issuance of a new class of Shares may not vary the rights attached to any existing class without the consent of the holders of 75% of the shares of that class.

The Fund may, by a resolution of the Board, amend the Memorandum and Articles of Association to increase or reduce its authorized capital.

The Memorandum and Articles of Association of the Fund provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or other act for conformity, or for any loss or expense happening to the Fund through the insufficiency or deficiency of title to any property acquired by order of the Board for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

The Memorandum and Articles of Association of the Fund further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the Board out of the funds of the Fund to pay all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if any such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

## § 15.  BROKERAGE

It is expected that the Sub-Managers will generally allocate brokerage business on the basis of best available execution and in consideration of such brokers' provision of brokerage and research services.  The Sub-Managers may also utilize brokers with which the Sub-Managers are affiliated.  The Fund and the Investment Manager will have no control over the Sub-Managers' selection of brokers.  Sub-Managers may also be paying for services other than research that are included in the commission rate.  These other services may include, without limitation, office space, facilities and equipment; administrative and accounting support; supplies and stationery; telephone lines, usage and equipment and other items which might otherwise be treated as an expense of the Sub-Manager.  To the extent a Sub-Manager utilizes commissions to obtain items which would otherwise be an expense of the Sub-Manager, such use of commissions in effect constitutes additional compensation to the Sub-Manager.  Certain of the foregoing commission arrangements are outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as further described below.  Finally, since commission rates are generally negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may result in higher transaction costs than would otherwise be obtainable.

To the extent the Fund invests directly, the Investment Manager is authorized to determine the broker or dealer to be used for each securities transaction for the Fund.  In selecting brokers or dealers to execute transactions, the Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost.  It is not the Investment Manager's practice to negotiate "execution only" commission rates, thus the Fund may be deemed to be paying for research, brokerage or other services provided by the broker which are included in the commission rate.

Section 28(e) of the Securities Exchange Act of 1934, as amended, is a "safe harbor" that permits an investment manager to use commissions or "soft dollars" to obtain research and brokerage services that provide lawful and appropriate assistance in the investment decision-making process.  Except for services that would be a Fund expense or as otherwise described below, the Investment Manager will limit the use of "soft dollars" to obtain research and brokerage services to services which constitute research and brokerage within the meaning of Section 28(e).  Research services within Section 28(e) may include, but are not limited to, research reports (including market research); certain financial newsletters and trade journals; software providing analysis of securities portfolios; corporate governance research and rating services; attendance at certain seminars and conferences; discussions with research analysts; meetings with corporate executives; consultants' advice on portfolio strategy; data services (including services providing market data, company financial data and economic data); advice from brokers on order execution; and certain proxy services.  Brokerage services within Section 28(e) may include, but are not limited to, services related to the execution, clearing and settlement of securities transactions and functions incidental thereto (i.e., connectivity services between an investment manager and a broker-dealer and other relevant parties such as custodians); trading software operated by a broker-dealer to route orders; software that provides trade analytics and trading strategies; software used to transmit orders; clearance and settlement in connection with a trade; electronic communication of allocation instructions; routing settlement instructions; post trade matching of trade information; and services required by the SEC or a self regulatory organization such as comparison services, electronic confirms or trade

affirmations.  The use of commissions arising from the Fund's investment transactions for services other than research and brokerage will be limited by the Investment Manager to services that would otherwise be a Fund expense.  The use of commissions to obtain such other services would be outside the parameters of Section 28(e).

In some instances, the Investment Manager may receive a product or service that may be used only partially for functions within Section 28(e) (e.g. an order management system, trade analytical software or proxy services).  In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the product or service used to assist the Investment Manager in carrying out its investment decision-making responsibilities and the relative proportion used for administrative or other purposes outside Section 28(e).  The proportion of the product or service attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities will be paid through brokerage commissions generated by client transactions and the proportion attributable to administrative or other purposes outside Section 28(e) will be paid for by the Investment Manager from its own resources.

Research and brokerage services obtained by the use of commissions arising from the Fund's portfolio transactions may be used by the Investment Manager in its other investment activities and thus, the Fund may not necessarily, in any particular instance, be the direct or indirect beneficiary of the research or brokerage services provided.

Although the Investment Manager will make a good faith determination that the amount of commissions paid is reasonable in light of the products or services provided by a broker, commission rates are generally negotiable and thus, selecting brokers on the basis of considerations that are not limited to the applicable commission rates may result in higher transaction costs than would otherwise be obtainable.  The receipt of such products or services and the determination of the appropriate allocation in the case of "mixed use" products or services creates a potential conflict of interest between the Investment Manager and its clients.

In selecting brokers and negotiating commission rates, the Investment Manager may take into account the financial stability and reputation of brokerage firms, and the research, brokerage or other services provided by such brokers.

When appropriate, the Investment Manager may, but is not required to, aggregate client orders to achieve more efficient execution or to provide for equitable treatment among accounts.  Clients participating in aggregated trades will be allocated securities based on the average price achieved for such trades.

The Fund reserves the right, in its sole discretion, to change the brokerage and custodial arrangements without prior notice to shareholders.

## § 16.   ANTI-MONEY LAUNDERING REGULATIONS

As part of the Administrator's responsibility for preventing money laundering, the Administrator, its affiliates, subsidiaries or associates may require a detailed verification of an investor's identity and the source of payment.  Depending on the circumstances of each application, a detailed verification might not be required where: (i) the investor makes the

payment by wire transfer from an account held in the investor's name at a recognized financial institution and the investor's details (name and account number) appear in the confirmation of the wire payment received by the bank at which the Fund's subscription account is maintained; or (ii) the application is made through a recognized intermediary.

These exceptions will only apply if the financial institution or intermediary is within a country recognized as having sufficient anti-money laundering regulations.  In the case of (i) above, to avoid any delays, the investor should ensure that its remitting bank includes his full name and account number in any confirmation sent.  In any case, individual investors will be required to provide a copy of their passport.

If verification is required, an individual may be required to produce a certified copy of a passport or identification card duly certified by a public authority such as a notary public, together with evidence of his address, such as a utility bill or bank statement, and date of birth. In the case of corporate investors, the Administrator may require, among other things, production of a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or equivalent), and the names, occupations, dates of birth and residential and business addresses of all directors and beneficial owners.  The Administrator may also request any information that is necessary to verify the identity of an investor.  In the event of delay or failure by the investor to produce such information, the Administrator may refuse to accept its application and all subscription monies relating thereto, or may refuse to honor a redemption request until proper information has been provided.

## § 17.  ANTI-MONEY LAUNDERING POLICIES

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering and terrorist financing, the Fund, the Investment Manager, the Administrator, the Placement Agent and their affiliates, subsidiaries or associates may require a detailed verification of the identity of a person or entity applying for Shares, any underlying beneficial owner and the source of the payment.  Depending on the circumstances of each application, a detailed verification might not be required where the applicant makes the payment from an account held in the applicant's name at a "qualified financial institution."[2]

The Fund, the Investment Manager, the Administrator, or the Placement Agent reserve the right to request such information as is necessary to verify the identity of an applicant and any underlying beneficial owner of the applicant.   The Fund, the Investment Manager or the Administrator also reserves the right to request such identification evidence in respect of a transferee of shares in the Fund.  In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Board of Directors of the Fund or the Administrator may refuse to accept  or delay the acceptance of a subscription or (as the case may be) to register the relevant transfer of Shares, and (in the case of a subscription of

---

[2]    A "qualified financial institution" is a regulated financial institution, i.e., bank or broker-dealer, in an approved country that is either (i) established in an European Union (EU) member state (as at 1st January 2004) and subject to the EU Money Laundering Directives; or, (ii) an approved member of Financial Action Task Force on Money Laundering ("FATF") and/or is subject to regulation which complies with the FATF Recommendations.  As of the date hereof, approved countries are: Australia, Austria, Belgium, Canada, Denmark, Finland, France, Germany, Greece, Hong Kong, Iceland, Ireland, Italy, Japan, Luxembourg, Kingdom of the Netherlands, New Zealand, Norway, Portugal, Singapore, Spain, Sweden, Switzerland, Turkey, United Kingdom and the United States.

Shares) may cause the redemption of any such shareholder from the Fund and any funds received will be returned without interest to the account from which the monies were originally debited.

The Fund or the Administrator also reserves the right to refuse to make any redemption payment or distribution to a shareholder, if any of the Directors or the Administrator suspects or is advised that the payment of any redemption or distribution monies to such shareholder might result in a breach or violation of any applicable anti-money laundering laws or the laws, regulations, and Executive Orders administered by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), or other laws or regulations in any relevant jurisdiction (collectively, "AML/OFAC obligations").

Each subscriber and shareholder will be required to make such representations to the Fund as the Fund, the Investment Manager or the Administrator will require in connection with applicable AML/OFAC obligations, including, without limitation, representations to the Fund that such subscriber or shareholder is not an individual or entity (i) named on any available lists of known or suspected terrorists, terrorist organizations or of other sanctioned persons issued by the United States government and the government(s) of any jurisdiction(s) in which the Fund is doing business, including the List of Specially Designated Nationals and Blocked Persons administered by OFAC as such list may be amended from time to time, or (ii) from a country or territory prohibited by the OFAC sanctions programs.

Such subscriber or shareholder will also be required to represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly derived from activities that may contravene U.S. Federal, state or international laws and regulations, including, without limitation, any applicable anti-money laundering laws and regulations. Further, such subscriber or shareholder must disclose to the Fund whether such subscriber or shareholder, or any of its affiliates, is a current or former senior foreign political figure[1], or an immediate family member or close associate of such an individual, or a prohibited foreign shell bank[2].

Each subscriber and shareholder agrees to notify the Fund promptly in writing should it become aware of any change in the information set forth in its representations. The subscriber or shareholder is advised that, by law, the Fund may be obligated to "freeze the account" of such subscriber or shareholder, either by prohibiting additional investments from the subscriber or shareholder, declining any withdrawal requests from the subscriber or shareholder, suspending the payment of withdrawal proceeds payable to the subscriber or shareholder, and/or segregating the assets in the account in compliance with governmental regulations. The Fund may also be

---

[1] A "senior foreign political figure" is defined as (a) a current or former senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a current or former senior official of a major non-U.S. political party, or a current or former senior executive of a non-U.S. government-owned commercial enterprise; (b) a corporation, business, or other entity that has been formed by, or for the benefit of, any such individual; (c) an immediate family member of any such individual; and (d) a person who is widely and publicly known (or is actually known) to be a close associate of such individual. For purposes of this definition, a "senior official" or "senior executive" means an individual with substantial authority over policy, operations, or the use of government-owned resources; and "immediate family member" means a spouse, parents, siblings, children and spouse's parents or siblings.
[2] A "prohibited foreign shell bank" is a foreign bank that does not have a physical presence in any country, and is not a "regulated affiliate," *i.e.*, an affiliate of a depository institution, credit union, or foreign bank that (i) maintains a physical presence in the U.S. or a foreign country, and (ii) is subject to banking supervision in the country regulating the affiliated depository institution, credit union, or foreign bank.

required to report such action and to disclose the subscriber's or shareholder's identity to OFAC or other applicable governmental and regulatory authorities.

Subscription monies must be wired from a bank account in the name of the subscriber. Redemption payments will only be made to a bank account held in the name of the registered owner of the Shares and any transferee will be required to furnish the same information (and enter into a subscription agreement) which would be required in connection with a direct subscription in order for a transfer request to be considered by the Fund.

## § 18.  TAXATION

**BVI.**   At the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the British Virgin Islands, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the British Virgin Islands.  Capital gains realized with respect to any shares, debt obligations or other securities of the Fund by persons who are not persons resident in the British Virgin Islands are also exempt from all provisions of the Income Tax Act of the British Virgin Islands.  No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the British Virgin Islands with respect to any shares, debt obligations or other securities of the Fund.

**United States.**   The following discussion addresses some of the U.S. federal income tax consequences applicable to U.S. shareholders based on the Internal Revenue Code of 1986, as amended (the "Code"), and the regulations, rulings, and judicial decisions thereunder as of the date hereof, any of which could be changed at any time (possibly on a retroactive basis).  This discussion is for the purpose of providing general assistance only, is not intended to be a substitute for the advice of a shareholder's own tax or other advisers and should not be interpreted as tax or other advice.  Prospective investors should consult with and must depend on their own tax advisor regarding the tax consequences, if any, of the purchase, holding, redemption, sale or transfer of Shares.  This discussion does not address the U.S. federal income tax consequences of investing in the Fund which may be applicable to non-U.S. persons.

Pursuant to United States Internal Revenue Service ("IRS") regulations, the Fund and its tax advisors hereby inform you that: (i) any tax advice contained herein is not intended and was not written to be used, and cannot be used by any taxpayer, for the purposes of avoiding penalties that may be imposed on the taxpayer; (ii) any such advice was written to support the promotion or marketing of the Shares described in this Memorandum; and (iii) each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

*U.S. Taxation of the Fund.*   The Fund intends to be classified as a corporation for U.S. federal income tax purposes.  A non-U.S. corporation can be subject to U.S. federal income tax if it is engaged in the conduct of a trade or business within the United States.  Statutory "safe harbor" provisions can prevent a non-U.S. corporation engaged in certain stock and securities trading for its own account from being treated as engaged in a U.S. trade or business.  The Fund intends to conduct its affairs in conformity with such "safe harbors" so that it will not, for such purposes, be treated as engaged in a U.S. trade or business.  So long as the Fund is not engaged

in a U.S. trade or business, the Fund will not be subject to U.S. federal income tax. However, any U.S. source dividends paid to or derived by the Fund will be (and certain other U.S. source income, such as certain interest income, may be) subject to U.S. federal withholding tax at a rate of 30%. Distributions made by the Fund in respect of Shares will not be subject to U.S. withholding tax.

*U.S. Taxation of Shareholders.* Shares in the Fund may be sold to a limited number of U.S. investors which are pension and profit sharing trusts or other tax-exempt organizations ("U.S. Exempt shareholders"). The Fund is a "passive foreign investment company" ("PFIC") as defined in Code Section 1297. It is noted that the Fund does not furnish information necessary for a U.S. person to treat the Fund as a "qualified electing fund" in the event that a U.S. person that is not a U.S. Exempt Shareholder is considered to own Shares in the fund under the constructive ownership rules of Code Section 1298.

While the Fund may purchase securities on margin, borrow money and otherwise utilize leverage in connection with its investment, under present law that leverage should not be attributed to U.S. Exempt Shareholders in the Fund. Accordingly, assuming a U.S. Exempt Shareholder does not borrow money or otherwise utilize leverage in connection with its acquisition of Shares in the Fund, any gain on the sale or redemption of Common Shares should not constitute "unrelated debt-financed income" as defined in Code Section 514 or "unrelated business taxable income" as defined in Code Section 512 to the U.S. Exempt Shareholder and should not be subject to U.S. federal income tax under the PFIC provisions of the Code.

The Fund will monitor its shareholders in an attempt to ensure that all times the ownership of the Fund by U.S. Exempt Shareholders is below the threshold amounts set forth in Code Section 957 and therefore that the Fund will not be classified as a "controlled foreign corporation" as defined in Code Section 957, although there can be no assurance that the Fund will be able to do so.

U.S. Exempt Shareholders may be subject to IRS filing requirements. For example, pursuant to Code Section 6038B, a United States person which transfers property (including cash) to a foreign corporation in exchange for stock in the corporation is in some cases required to file an information return wit the IRS with respect to such transfer. Accordingly, a U.S. Exempt Shareholder may be required to file an information return with respect to its investment in the Fund. Additional reporting requirements may be imposed on a U.S. Exempt Shareholder that acquires Shares with a value equal to at least 10% of the aggregate value of all of the Shares. Shareholders should consult their own tax advisers with respect to any applicable filing requirements.

*Prospective investors should consult their own professional advisor on the possible tax implications of buying, holding, transferring or selling any of the shares under the laws of their countries of citizenship, residence and domicile. No warranty is given or implied regarding the applicability or interpretation of the tax laws in any jurisdiction.*

## § 19.   BENEFIT PLAN INVESTORS

The following is a summary of certain aspects of the U.S. federal laws and regulations applicable to retirement plan investments as in existence on the date hereof, all of which are subject to change.  This summary is general in nature and does not address every issue that may be applicable to the Fund or a particular investor.

The Fund may accept subscriptions from pension and profit-sharing plans maintained by U.S. corporations and/or unions, individual retirement accounts and Keogh plans, entities that invest the assets of such accounts or plans and other entities investing plan assets (all such entities are herein referred to as "Benefit Plan Investors").  The Investment Manager does not anticipate that the Fund's assets will be subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), because the Investment Manager intends to limit the investments in the Fund by Benefit Plan Investors.  Under ERISA and the regulations thereunder, the Fund's assets will not be deemed to be plan assets subject to Title I of ERISA or Section 4975 of the Code if less than 25% of the value of each class of the Fund's Shares is held by Benefit Plan Investors, excluding from this calculation any non-Benefit Plan Investor interests held by the Investment Manager and certain affiliated persons or entities.  The Fund will not knowingly accept subscriptions for Shares or permit transfers of Shares to the extent that such investment or transfer would subject the Fund's assets to Title I of ERISA or Section 4975 of the Code.  In addition, because the 25% limit is determined after every subscription to or redemption from the Fund, the Fund has the authority to require the redemption of all or some of the Shares held by any Benefit Plan Investor if the continued holding of such Shares, in the opinion of the Board of Directors, could result in the Fund being subject to Title I of ERISA or Section 4975 of the Code.

Certain duties, obligations and responsibilities are imposed on persons who serve as fiduciaries with respect to employee benefit plans or accounts ("Plans"); for example, ERISA and the Code prohibit acts of fiduciary self-dealing and certain transactions between Plans and "parties-in-interest" or "disqualified persons" (as such terms are defined in ERISA and the Code).  In the Fund's Subscription Agreement, each Plan investor will be required to represent that its fiduciary has independently made the decision to invest in the Fund and has not relied on any advice from the Fund, the Investment Manager, any placement agent associated with the Fund, or any of their affiliates with respect to the investment in the Fund.  Accordingly, fiduciaries of Plans should consult their own investment advisors and their own legal counsel regarding the investment in the Fund and its consequences under applicable law, including ERISA and the Code.

## § 20.   MISCELLANEOUS

### Reports and Financial Statements

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund commences to wind up and dissolve.  The Fund will keep its books on an accrual basis.  Audited financial statements of the Fund and unaudited interim reports with respect to the Fund's financial performance will be provided to shareholders.

PricewaterhouseCoopers have given and not withdrawn their written consent to the issue of this document and the inclusion of their report and references to their name in the form and context in which the same appear.

## General

a) No Share or loan capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option.

b) None of the Directors or any connected person has any interest in the Share or loan capital of the Fund, the existence of which is known to, or could with reasonable diligence be ascertained by, the relevant Director.

c) None of the Directors has a service contract with the Fund and no such contract is proposed.

d) No loan or guarantee has been granted or provided by the Fund to or for the benefit of any Director.

e) None of the Directors or any member of their respective immediate families has or have any interest in any transaction or transactions which are or were unusual in their nature or conditions or significant in the business of the Fund and which have been effected by the Fund since its incorporation.

f) As of the date of this Memorandum, the Fund has commenced operations, but no dividends have been declared on any Shares of the Fund.  Since the date of the audited financial statements as at 31 December 2006 there has been no significant change in the financial or trading position of the Fund.

## Litigation and Arbitration

The Fund is not engaged in any legal or arbitration proceedings and no legal or arbitration proceedings are known to the Directors to be threatened by or against the Fund.

## Documents Available for Inspection

Copies of the following documents will be available for inspection at the offices of the Fund's registered office in the British Virgin Islands during usual business hours on any weekday (Saturdays, Sundays and holidays excepted):

a) the Memorandum and Articles of Association of the Fund;

b) the material contracts of the Fund with service providers;

c) the British Virgin Islands Mutual Funds Act, 1996;

d) the BVI Business Companies Act, 2004;

e) when available, the latest financial statements of the Fund;

f) audited accounts as of the close of the immediately last fiscal year;

g) auditors letter of consent; and

h) a list of all past and present directorships and partnerships held by each director over the past five years.

*Fairfield Investment Fund Ltd.*

**Appendix A**

## Country-Specific Notices

<u>Australia</u>.  No offer for subscription or purchase of the Shares offered hereby, nor any invitation to subscribe for or buy such Shares has been made or issued in Australia, otherwise than by means of an excluded issue, excluded offer or excluded invitation within the meaning of Section 66(2) or 66(3) of the Corporations Law.  Accordingly, the Memorandum has not been lodged with the Australian Securities Commission.  Further, the Shares offered hereby may not be resold in Australia within a period of six (6) months after the date of issue otherwise than by means of an excluded offer or excluded invitation as described above.

<u>Bahamas</u>.  The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

<u>Belgium</u>.  The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991).  Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

<u>Brazil</u>.  The Shares have not been, and will not be, registered with the Comissao de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

<u>British Columbia and Ontario, Canada</u>.  The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities.  The Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada.  No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense.

Each purchaser of Shares in Canada will be deemed to have represented that they (a) are resident in British Columbia or Ontario and are an "accredited investor" as defined in National Instrument 45-106 ("NI 45-106"), are not a person created or being used solely to purchase or hold securities as an accredited investor and, if in Ontario, are not an individual unless purchasing from a fully registered dealer within the meaning of Section 204 of the Regulation to the Securities Act (Ontario) and (b) are purchasing Shares as principal for their own account, or are deemed to be purchasing Shares as principal for their own account by virtue of being either

(i) a trust company or trust corporation as further described in subsection (p) of the "accredited investor" definition of NI 45-106; or (ii) a person acting on behalf of a fully managed account managed by that person as further described in subsection (q) of the "accredited investor" definition of NI 45-106.  If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary in order to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, prospective purchasers in  Ontario to whom the Memorandum was sent or delivered and who purchase Shares shall have a statutory right of action against the Fund for rescission (while still the owner of such shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to the date of purchase, provided that the Fund will have no right of action for damages, or, while still the owner of the securities, for rescission (in which case, if the purchaser elects to exercise the right of rescission, the purchaser will have no right of action for damages) provided that:  (a) no action shall be commenced more than, in the case of an action for rescission, 180 days after the date of the transaction that gave rise to the cause of action; or, in the case of any other action, the earlier of: (i) 180 days after the plaintiff first had knowledge of the facts giving rise to the cause of action, or (ii) three years after the date of the transaction that gave rise to the cause of action; (b) if the purchaser purchased such Shares with knowledge of the Misrepresentation; (c) for all or any portion of any damages that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; (d) for amounts in excess of the price at which such Shares were sold to the purchaser; and (e) the statutory right of action for rescission or damages is in addition to and does not derogate from any other rights or remedies the purchaser may have at law.   The foregoing summary is subject to the express provisions of the Securities Act (Ontario) and reference is made to the complete text of such provisions.

The statutory right of action referred to above is applicable to any investor to whom securities are distributed in reliance upon the "accredited investor" prospectus exemption in Section 2.3 of NI 45-106, unless the prospective purchaser is:

(a)    a Canadian financial institution, meaning either:

(i)    an association governed by the Cooperative Credit Associations Act (Canada) or a central cooperative credit society for which an order has been made under section 473(1) of that Act; or

(ii)    a bank, loan corporation, trust company, trust corporation, insurance company, treasury branch, credit union, caisse populaire, financial services corporation, or league that, in each case, is authorized by an enactment of Canada or a jurisdiction of Canada to carry on business in Canada or a jurisdiction in Canada;

(b)    a Schedule III bank, meaning an authorized foreign bank named in Schedule III of the Bank Act (Canada),

(c)    The Business Development Bank of Canada incorporated under the Business Development Bank of Canada Act (Canada), or

(d)      a subsidiary of any person referred to in paragraphs (a), (b) or (c), if the person owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by the directors of the subsidiary.

The distribution of the Shares in Canada is being made on a private placement basis. Accordingly, any resale of the securities must be made: (i) through an appropriately registered dealer or pursuant to an exemption from the dealer registration requirements of applicable provincial securities laws; and (ii) in accordance with, or pursuant to an exemption from, the prospectus requirements of applicable provincial securities laws.  These resale restrictions may in some circumstances apply to resales made outside of Canada.  Purchasers of Shares in Canada are advised to seek legal advice prior to any resale of the Shares.

This Memorandum does not address the Canadian tax consequences of ownership of the Shares.  Prospective purchasers of Shares should consult their own tax advisors with respect to the Canadian and other tax considerations applicable to them.

By purchasing these Shares, the purchaser acknowledges that personal information such as the purchaser's name will be delivered to the Ontario Securities Commission ("OSC") and that such personal information is being collected indirectly by the OSC under the authority granted to it in securities legislation for the purposes of the administration and enforcement of the securities legislation of Ontario.  By purchasing these Shares, the purchaser shall be deemed to have authorized such indirect collection of personal information by the OSC.  Questions about such indirect collection of personal information should be directed to the OSC's Administrative Assistant to the Director of Corporate Finance, Suite 1903, Box 5520 Queen Street West, Toronto, Ontario M5H 3S8 or to the following telephone number: (416) 593-8086.

<u>British Virgin Islands</u>.  The Shares offered hereby may only be sold to "professional investors" as define din the Mutual Funds Act, 1996 including BVI business companies.

<u>Cayman Islands</u>.  No invitation may be made to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands stock exchange. Cayman Islands exempted and ordinary non-resident companies and certain other persons engaged in offshore business, however, may be permitted to acquire Shares.

<u>Chile</u>.  The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

<u>Republic of China</u>.  No invitation to offer for, or offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China.  The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund.  Business entities incorporated under the laws of China (excluding foreign investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares.  Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain the prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

Costa Rica.  The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

Ecuador.  The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations.  This communication is for informative purposes only; it does not constitute a public offering of any kind.

France.  "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse.  Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute facon en France.  Les investisseurs doivent agir pour leur propre compte.  Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant."  This Memorandum has not been submitted to the Commission des Operations de Bourse in France.  Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France,  investors should act for their own account.   The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

Germany.  Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany.  Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any other offering materials relating to the Shares may be distributed or made available to the public in Germany.  Individual sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece.  The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong.  No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland.  It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man.  The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act.  Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations").  Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.  Israeli residents, other than those considered "exemption holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy.  This Memorandum may not be distributed to members of the public in Italy, the Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law.  With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other that the Prospective Buyer and the Prospective Buyer's authorized agents.  This Memorandum may not be copied in whole or in part.  The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

Japan.  Shares have not been and will not be registered under Article 4, Paragraph 1 of the Financial Instruments and Exchange Law of Japan ("FIEL"), by virtue of the fact that the Shares are being offered in accordance with Article 2, Paragraph 3, Item 2(B) of the FIEL. Accordingly, no Shares may be offered or sold, directly or indirectly, in Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the FIEL and any other applicable law, regulations and ministerial guidelines of Japan.  Specifically, the Shares are being offered in Japan pursuant to the small number private placement exemption from the registration requirements (as set forth in Article 2, Paragraph 3, Item 2(B) of the FIEL). Accordingly, no solicitation of orders for subscriptions for the Shares or offer for sale of the Shares may be made to 50 or more persons in Japan; provided, however, that qualified institutional investors (as defined in Article 10 of the Cabinet Ordinance Concerning Definitions under Article 2 of the FIEL) (the "QIIs") shall not be counted for the purpose of calculating such 50 persons, on the condition that all of the requirements (as set forth in Article 1-4, Item 1 of the Enforcement Order of the FIEL) are satisfied.

Jersey.  The Memorandum relates to a private placement and does not constitute an offer to the public of Jersey to subscribe for the Shares offered hereby.  No regulatory approval has been sought to the offer in Jersey. The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such person.  The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

Korea.  The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea.  Neither the Fund nor the investment manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder.  The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

Liechtenstein.  The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Luxembourg.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Netherlands.  The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands.  In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the general prohibition as provided for in the Investments Institutions Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

New Zealand.  The Memorandum has been prepared solely for and the offer made in it is made solely to habitual investors (being persons defined in Section 3(2)(a)(ii) of the New Zealand Securities Act 1978).

Norway.  The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty potential investors in Norway.

Oman.  The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund. Application for the Shares made by or on behalf of investors not having an existing relationship with the investment manager will not be accepted.  Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama.  The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia.  The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore.  The Memorandum has not been registered with the Registrar of Companies in Singapore and the Shares will be offered in Singapore pursuant to an exemption invoked under Sections 106c and 106d of the Companies Act, Chapter 50 of Singapore ("Singapore Act"). Accordingly, the Shares may not be offered or sold, nor may the Memorandum or any other offering document or material relating to the Shares be circulated or distributed, directly or indirectly, to the public or any member of the public other than (1) to an institutional investor or other body or person specified in Section 106c of the Singapore Act, or (2) to a sophisticated investor specified in Section 106d of the Singapore Act, or (3) otherwise pursuant to, and in accordance with the conditions of, Section 106e(2) of the Singapore Act or any other applicable exemption invoked under Division 5a of Part IV of the Singapore Act.

South Africa.  The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

Spain.  This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

Switzerland.  This Memorandum is provided to persons who: (a) have declared to be qualified investors pursuant to art. 10 par. 3 of the Collective Investment Schemes Act ("CISA"); or (b) have declared to accept it exclusively on behalf of one or more qualified investors whom

this Memorandum is exclusively meant for.  In particular, the person being represented is a wealthy private person pursuant to art. 10 par. 3 letter (e) of the CISA, or is a qualified investor according to art. 10 par. 3 letter (f) CISA or to art. 6 par. 2 of the Collective Investment Scheme Ordinance. For no reason whatsoever, therefore, is this Memorandum intended for unqualified investors according to the CISA.

United Kingdom.  The Fund is an unregulated collective investment scheme as defined in the Financial Services UK Act of 1986 of the United Kingdom (the "UK Act").  The promotion of the Fund in the United Kingdom is restricted by Section 76 of the UK Act.  The Fund has not been authorized or otherwise approved by the Securities and Investments Board and, as an unregulated scheme, it accordingly cannot be marketed in the United Kingdom to the general public.  Shares in the Fund may not be offered or sold by an authorized person, as defined under the UK Act, in the United Kingdom by means of this Memorandum other than to persons authorized to carry on investment business under the UK Act, persons whose ordinary business involves the acquisition and disposal of property of the same kind as the property or a substantial part of the property in which the Fund invests and persons permitted to receive this Memorandum under the Financial Services (Promotion of Unregulated Schemes) Regulations 1991.  The Fund has not authorized any offer to the public of Shares in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995.  The Shares may not be offered or sold to persons within the United Kingdom except in circumstances which do not result in an offer to the public in the United Kingdom within the meaning of such regulations or otherwise in compliance with all applicable provisions of such regulations.  The Fund is not regulated by the Securities and Investment Board or any other United Kingdom self-regulatory organization and investors will not have the benefit of the Investors Compensation Scheme and other protection afforded by United Kingdom legislation.

United States.  In making an investment decision, investors must rely on their own examination of the issuer and the terms of the offering, including the merits and risks involved.  The Shares have not been recommended, approved or disapproved by the U.S. Securities and Exchange Commission ("SEC"), any state securities commission or any other regulatory authority.  None of the foregoing authorities have passed upon, or endorsed the merits of, this offering or the accuracy or adequacy of the Memorandum.  Any representation to the contrary is a criminal offense.  The Shares have not been registered with the SEC under the U.S. Securities Act of 1933 (the "1933 Act"), or under the securities laws of any states, and are being offered and sold in reliance on exemptions from the registration requirements of the 1933 Act and such state laws.  The Shares are subject to restrictions on transferability and resale, and may not be transferred or resold except as permitted under the 1933 Act and such applicable state securities laws, pursuant to registration or exemption thereunder.  There is no public or other market for the Shares, nor is it likely that any such market will develop.  Therefore, investors must expect to be required to retain ownership of the Shares and bear the financial risks of this investment for an indefinite period.

Uruguay.  The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

SPECIAL NOTICE TO FLORIDA, U.S.A. INVESTORS**:**

THE FOLLOWING NOTICE IS PROVIDED TO SATISFY THE NOTIFICATION REQUIREMENT SET FORTH IN SUBSECTION 11(A)(5) OF SECTION 517.061 OF THE FLORIDA STATUTES, 1987, AS AMENDED:

UPON THE ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF AN INTEREST TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE FLORIDA INVESTOR, WHICHEVER OCCURS LATER.

**Exhibit A**


**Form ADV Part II of Fairfield Greenwich Advisors LLC**

SK 25528 0016 870596 v2

*Fairfield Investment Fund, Ltd.*

**FORM ADV**

## Uniform Application For Investment Adviser Registration

**Part II - Page 1**

| OMB APPROVAL | |
|---|---|
| OMB Number | 3235-0049 |
| Expires: | July 31 2008 |
| Estimated average burden hours per response: | 9.402 |

| Name of Investment Adviser: | |
|---|---|
| **Fairfield Greenwich Advisors LLC** | |

| **Address:**    (Number and Street)    (City)    (State)    (Zip Code) | **Area  Code:**    Telephone Number: |
|---|---|
| **55 E. 52nd Street, 33rd Floor, New York, NY 10055** | **(212) 319-6060** |

**This part of Form ADV gives information about the investment adviser and its business for the use of clients. The information has not been approved or verified by any governmental authority.**

### Table of Contents

| Item Number | Item | Page |
|---|---|---|
| 1 | Advisory Services and Fees | 2 |
| 2 | Types of Clients | 2 |
| 3. | Types of Investments | 3 |
| 4. | Methods of Analysis, Sources of Information and Investment Strategies | 3 |
| 5. | Education and Business Standards | 4 |
| 6. | Education and Business Background | 4 |
| 7. | Other Business Activities | 4 |
| 8. | Other Financial Industry Activities of Affiliations | 4 |
| 9. | Participation or Interest in Client Transactions | 5 |
| 10. | Conditions for Managing Accounts | 5 |
| 11. | Review of Accounts | 5 |
| 12. | Investment or Brokerage Discretion | 6 |
| 13. | Additional Compensation | 6 |
| 14. | Balance Sheet | 6 |
| | Continuation Sheet | Schedule F |
| | Balance Sheet, if required | Schedule G |

**(Schedules A, B. C. D and E are included with Part I of this Form, for the use of regulatory bodies, and are not distributed to clients.)**

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

| FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| **Part II - Page 2** | **Fairfield Greenwich Advisors LLC** | **801-62504** | **March 27, 2008** |

**1.  A.   Advisory Services and Fees.**  (check the applicable boxes)

For each type of service provided, state the approximate % of total advisory billings from that service.  (See instruction below.)

Applicant:

☒  (1)  Provides investment supervisory services ......................................................................................... **100** %

☐  (2)  Manages investment advisory accounts not involving investment supervisory services ........................ _____ %

☐  (3)  Furnishes investment advice through consultations not included in either service described above ............ _____ %

☐  (4)  Issues periodicals about securities by subscription .......................................................................... _____ %

☐  (5)  Issues special reports about securities not included in any service described above ............................ _____ %

☐  (6)  Issues, not as part of any service described above, any charts, graphs, formulas, or other devices which clients may use to evaluate securities .......................................................................................................................... _____ %

☐  (7)  On more than an occasional basis, furnishes advice to clients on matters not involving securities ............ _____ %

☐  (8)  Provides a timing service ............................................................................................................ _____ %

☐  (9)  Furnishes advice about securities in any manner not described above.................................................. _____ %

(Percentages should be based on applicant's last fiscal year.  If applicant has not completed its first fiscal year, provide estimates of advisory billings for that year and state that the percentages are estimates.)

**B.   Does applicant call any of the services it checked above financial planning or some similar term?**

Yes ☐   No ☒

**C.   Applicant offers investment advisory services for:  (check all that apply)**

☒  (1) A percentage of assets under management          ☐  (4) Subscription fees

☐  (2) Hourly charges                                                         ☐  (5) Commissions

☒  (3) Fixed fees (not including subscription fees)          ☒  (6) Other

**D.   For each checked box in A above, describe on Schedule F:**

• the services provided, including the name of any publication or report issued by the adviser on a subscription basis or for a fee

• applicant's basic fee schedule, how fees are charged and whether its fees are negotiable

• when compensation is payable, and if compensation is payable before service is provided, how a client may get a refund or may terminate an investment advisory contract before its expiration date

**2.   Types of Clients.**  Applicant generally provides investment advice to:  (check those that apply)

☐  A. Individuals                                                  ☐  E. Trusts, estates, or charitable organizations

☐  B. Banks or thrift institutions                         ☐  F. Corporations or business entities other than those listed above

☐  C. Investment companies                                ☒  G. Other (Describe on Schedule F)

☐  D. Pension and profit sharing plans

| FORM ADV<br>Part II - Page 3 | Applicant:<br><br>**Fairfield Greenwich Advisors LLC** | SEC File Number:<br><br>**801-62504** | Date:<br><br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**3.** **Types of Investments.** Applicant offers advice on the following: (check those that apply) –

A. Equity securities
☒ (1) exchange-listed securities
☒ (2) securities traded over-the-counter
☒ (3) foreign issuers

☒ B. Warrants

☒ C. Corporate debt securities
(other than commercial paper)

☒ D. Commercial paper

☐ E. Certificates of deposit

☒ F. Municipal securities

G. Investment company securities:
☐ (1) variable life insurance
☐ (2) variable annuities
☒ (3) mutual fund shares

☒ H. United States government securities

I. Options contracts on:
☒ (1) securities
☒ (2) commodities

J. Futures contracts on:
☒ (1) tangibles
☒ (2) intangibles

K. Interests in partnerships investing in:
☐ (1) real estate
☐ (2) oil and gas interests
☐ (3) other (explain on Schedule F)

☒ L. Other (explain on Schedule F)

---

**4.** **Methods of Analysis, Sources of Information, and Investment Strategies.**

A. Applicant's security analysis methods include: (check those that apply)

(1) ☐ Charting
(2) ☒ Fundamental
(3) ☒ Technical

(4) ☐ Cyclical
(5) ☐ Other (explain on Schedule F)

---

B. The main sources of information applicant uses include:  (check those that apply)

(1) ☒ Financial newspaper and magazines
(2) ☐ Inspections of corporate activities
(3) ☒ Research materials prepared by others
(4) ☒ Corporate rating services

(5) ☐ Timing services
(6) ☒ Annual reports, prospectuses, filings with the Securities and Exchange Commission
(7) ☒ Company press releases
(8) ☒ Other (explain on Schedule F)

---

C. The investment strategies used to implement any investment advice given to clients include:  (check those that apply)

(1) ☒ Long term purchases
(securities held at least a year)
(2) ☒ Short term purchases
(securities sold within a year)
(3) ☒ Trading (securities sold within 30 days)
(4) ☒ Short sales

(5) ☒ Margin transactions
(6) ☒ Option writing, including covered options, uncovered options or spreading strategies
(7) ☒ Other (explain on Schedule F)

---

| FORM ADV<br>Part II - Page 4 | Applicant:<br><br>**Fairfield Greenwich Advisors LLC** | SEC File Number:<br><br>**801-62504** | Date:<br><br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

**5.   Education and Business Standards.**

Are there any general standards of education or business experience that applicant requires of those involved in determining
or giving investment advice to clients? ..................................................................................................................................   Yes ☒   No ☐

(If yes, describe these standards on Schedule F.)

**6.   Education and Business Background.**

For:

- each member of the investment committee or group that determines general investment advice to be given to clients, or

- if the applicant has no investment committee or group, each individual who determines general investment advice given to clients (if more than five, respond only for their supervisors)

- each principal executive officer of applicant or each person with similar status or performing similar functions.

On Schedule F, give the:

- name
- year of birth

- formal education after high school
- business background for the preceding five years

**7.   Other Business Activities.**  (Check those that apply)

☐   A.   Applicant is actively engaged in a business other than giving investment advice.

☒   B.   Applicant sells products or services other than investment advice to clients.

☐   C.   The principal business of applicant or its principal executive officers involves something other than providing investment advice.

(For each checked box describe the other activities, including the time spent on them, on Schedule F.)

**8.   Other Financial Industry Activities or Affiliations.**  (check those that apply)

☐   A.   Applicant is registered (or has an application pending) as a securities broker/dealer.

☐   B.   Applicant is registered (or has an application pending) as a futures commission merchant, commodity pool operator or commodity trading adviser.

C.   Applicant has arrangements that are material to its advisory business or its clients with a related person who is a:

☒   (1)   broker-dealer

☐   (2)   investment company

☒   (3)   other investment adviser

☐   (4)   financial planning firm

☒   (5)   commodity pool operator, commodity trading adviser or futures commission merchant

☐   (6)   banking or thrift institution

☐   (7)   accounting firm

☐   (8)   law firm

☐   (9)   insurance company or agency

☐   (10)   pension consultant

☐   (11)   real estate broker or dealer

☐   (12)   entity that creates or packages limited partnerships

(For each checked box in C, on Schedule F identify the related person and describe the relationship and the arrangements.)

D.   Is applicant or a related person a general partner in any partnership in which clients are solicited to invest?   Yes ☒   No ☐

(If yes, describe on Schedule F the partnerships and what they invest in)

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

| FORM ADV<br>Part II - Page 5 | Applicant:<br><br>**Fairfield Greenwich Advisors LLC** | SEC File Number:<br><br>**801-62504** | Date:<br><br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

**9.**   **Participation or Interest in Client Transactions.**

Applicant or a related person: (check those that apply)

☒   A.   As principal, buys securities for itself from or sells securities it owns to any client.

☐   B.   As broker or agent effects securities transactions for compensation for any client.

☐   C.   As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

☒   D.   Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

☒   E.   Buys or sells for itself securities that it also recommends to clients.

(For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

Describe, on Schedule F, your code of ethics, and state that you will provide a copy of your code of ethics to any client or prospective client upon request.

**10.**   **Conditions for Managing Accounts**.  Does the applicant provide investment supervisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other conditions for starting or maintaining an account?

Yes   No
☒   ☐

(If yes, describe on Schedule F.)

**11.**   **Review of Accounts.**   If applicant provides investment supervisory services, manages investment advisory accounts, or holds itself out as providing financial planning or some similarly termed services:

A.   Describe below the reviews and reviewers of the accounts.  **For reviews**, include their frequency, different levels, and triggering factors. **For reviewers**, include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

## See Schedule F.

B.   Describe below the nature and frequency of regular reports to clients on their accounts.

## See Schedule F.

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

| FORM ADV<br>Part II - Page 6 | Applicant:<br>**Fairfield Greenwich Advisors LLC** | SEC File Number:<br>**801-62504** | Date:<br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

**12.    Investment or Brokerage Discretion.**

A.    Does applicant or any related person have authority to determine, without obtaining specific client consent, the:

    (1)    securities to be bought or sold? .............................................................................................................................    Yes ☒  No ☐

    (2)    amount of the securities to be bought or sold? ......................................................................................................    Yes ☒  No ☐

    (3)    broker or dealer to be used? .................................................................................................................................    Yes ☒  No ☐

    (4)    commission rates paid? .........................................................................................................................................    Yes ☒  No ☐

B.    Does applicant or a related person suggest brokers to clients? ......................................................................................    Yes ☒  No ☐

For each yes answer to A describe on Schedule F any limitations on the authority.  For each yes to A(3), A(4) or B, describe on Schedule F the factors considered in selecting brokers and determining the reasonableness of their commissions.  If the value of products, research and services given to the applicant or a related person is a factor, describe:

- the products, research and services

- whether clients may pay commissions higher than those obtainable from other brokers in return for those products and services

- whether research is used to service all of applicant's accounts or just those accounts paying for it; and

- any procedures the applicant used during the last fiscal year to direct client transactions to a particular broker in return for products and research services received.

**13.    Additional Compensation.**

Does the applicant or a related person have any arrangements, oral or in writing, where it:

A.    is paid cash by or receives some economic benefit (including commissions, equipment or non-research services)<br>from a non-client in connection with giving advice to clients? .........................................................................................    Yes ☒  No ☐

B.    directly or indirectly compensates any person for client referrals? ...............................................................................    Yes ☒  No ☐

(For each yes, describe the arrangements on Schedule F.)

**14.    Balance Sheet**.  Applicant must provide a balance sheet for the most recent fiscal year on Schedule G if applicant:

- has custody of client funds or securities (unless applicant is registered or registering only with the Securities and Exchange Commission); or

- requires prepayment of more than $500 in fees per client and 6 or more months in advance

    Has applicant provided a Schedule G balance sheet? ......................................................................................................    Yes ☐  No ☒

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br><br>**Fairfield Greenwich Advisors LLC** | SEC File Number:<br><br>**801-62504** | Date:<br><br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br><br>**Fairfield Greenwich Advisors LLC** | IRS Empl. Ident. No.:<br><br>**26-0001345** |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| **Items 1.D. and 2.G.** | Fairfield Greenwich Advisors, LLC ("FGA"), a limited liability company organized under the laws of Delaware on December 12, 2001, provides managerial and administrative services to approximately twenty-eight (28) private investment funds established in the Cayman Islands, Spain, Australia, and the British Virgin Islands (the "Offshore Funds") as of March 27, 2008.<br><br>FGA is a wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL" collectively with other affiliates listed in Schedule F, Item 8, Fairfield Greenwich Group, or "FGG"), an exempted company incorporated in the Cayman Islands on October 24, 2001. FGL serves as placement agent for the Offshore Funds and generally is paid by the applicable Offshore Fund (i) an annual management fee of up to 2% of net assets, payable quarterly, and (ii) a performance fee of 20% of the net profits, charged quarterly or annually subject to adjustment for unrecouped losses.<br><br>FGL pays FGA a fixed fee for providing managerial services to the Offshore Funds.  In many cases, a percentage of the management fee and performance fee otherwise payable to FGL is paid to one of a select group of investment advisers (the "Portfolio Managers") for providing portfolio management services to the applicable Offshore Fund pursuant to a joint venture or similar arrangement. In such cases, the portions of the management fee and performance fee may vary between Portfolio Managers, depending upon a number of factors including the experience of the Portfolio Manager, as well as the anticipated capacity and target return of the applicable Offshore Fund.<br><br>FGA also serves as the general partner or the investment manager to five (5) private investment funds established in the U.S. (the "US Funds", and together with the Offshore Funds, the "FGG Funds") as of March 27, 2008. An affiliate of FGA, Fairfield Greenwich GP, LLC serves as the general partner to one of the US Funds. FGA and certain related persons organize limited partnerships and serve as general partners, managers, or investment managers to the respective partnership. The partnerships are themselves FGA's clients.<br><br>FGA generally is paid by the applicable US Funds (i) an annual management fee of up to 2% of net assets, payable quarterly, and (ii) an incentive allocation of up to 20% of net profits, charged quarterly or annually subject to adjustment for unrecouped losses. Similar to the Offshore Funds, a portion of the management fee and performance fee otherwise payable to FGA may be paid to Portfolio Managers.  In addition, FGA generally is entitled to receive from each FGG Fund an expense reimbursement charge of 10 to 15 basis points per year, payable quarterly, of the applicable FGG Funds' net asset value for the preceding quarter, in consideration for bearing certain internal accounting and operational costs in connection with such FGG Fund's activities.  With respect to multi-strategy funds or fund of funds, certain Portfolio Managers to whom FGA allocates assets may also charge up to a 2% management fee and a 20% performance fee.<br><br>Investors in the FGG Funds generally have the right to redeem all or a portion of their investment in an FGG Fund at least quarterly, subject to applicable advance notice requirements and/or extended lock-up periods, including a redemption fee payable to the applicable fund. If an investor redeems or withdraws from an FGG Fund, the investor will be entitled to any unearned, prepaid portion of the management fee. To the extent required under the Investment Advisers Act, performance-based compensation payable to FGL, or FGA, will be in compliance with Rule 205-3 under such Act.<br><br>FGA may also form and manage other single manager, single strategy investment entities in which it has no securities level transparency of the underlying portfolio. |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br><br>**Fairfield Greenwich Advisors LLC** | SEC File Number:<br><br>**801-62504** | Date:<br><br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br><br>**Fairfield Greenwich Advisors LLC** | IRS Empl. Ident. No.:<br><br>**26-0001345** |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| **Item 3.L.** | FGA offers advice to certain of the FGG Funds (the "Multi-Strategy Funds") on the allocation of assets to other unregistered investment companies, including funds managed by outside Portfolio Managers as well as by FGA or an affiliate (collectively, the "Single Manager Funds"). The Single Manager Funds invest in a variety of markets and their assets may be deployed in whatever investment strategies are deemed appropriate under prevailing economic and market conditions. The FGG Funds' assets, therefore, may be invested in (either directly or by allocation to a Single Manager Fund), among other things, domestic and foreign equity securities and equity-related instruments, fixed income and other debt-related instruments (including convertible debt), options, warrants, futures and other commodities, currencies, over-the-counter derivative instruments and other financial instruments. Excess cash may be invested directly by FGA on behalf of the FGG Funds in money market investments, including U.S. government securities and money market funds. FGA also serves as Investment Manager to a Fund-of-Funds, performing due diligence and advising on the selection of Portfolio Managers. Like the Single Manager Funds, the Portfolio Managers which comprise the Fund-of-Funds may employ any investment strategy or invest in any of the types of investments noted under Item 3. Certain of the Portfolio Managers may be managed by an affiliate of FGA. |
| **Item 4.B.(8)** | FGG's risk management team, Fairfield Risk Services Ltd. ("FRS"), an affiliate of FGA, conducts both the pre- and post-investment quantitative risk analyses of hedge fund managers, and provides the quantitative analyses supporting the asset allocation decisions across the firm's Single Manager Funds. The risk infrastructure at FRS supporting these activities incorporates a number of systems and tools – including internally developed systems, off the shelf vendor solutions, and some customized applications built to meet FGG's business needs. An important component of the FGG product platform is the full position level transparency that we receive from most Single Manager Funds.  Position information is transmitted via secure channels to our systems.

FRS's core risk management engine utilizes the flexible ASP version of the RiskManager product from RiskMetrics. This system is populated by detailed position information collected directly from the prime brokers used by FGG's underlying Single Manager Funds and further supplemented by an extensive market and terms and conditions database. FRS regularly evaluates the market risk of FGG's Single Manager Funds by producing strategy and fund specific risk reports. These reports are customizable to present risk measures and tests most appropriate to each portfolio's strategy. FRS prepares a monthly suite of reports using RiskManager that are carefully reviewed and discussed by FGA's Investment Committee at a formal monthly risk meeting. The reports organized along the following dimensions: Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis and Attribution Analysis. The review includes the full suite of VaR analytics (including marginal, incremental and relative VaR) and careful evaluation of the sensitivity of our managers to important risk factors (such as increasing or decreasing equity markets, volatilities, interest rate shocks/twists, FX movements and other factors).

FGA also uses both outside vendor and proprietarily developed software solutions to maintain its database of managers, conduct selected quantitative analyses of historical performance, and run portfolio simulations.  Peer group universes are also built and maintained enabling FGA to monitor managers against relevant indices and peers. Additional capabilities include return-based style analysis and Monte-Carlo simulation to perform portfolio stress testing. FGA subscribes to a number of hedge fund databases and indices and maintains its own proprietary database of tracked managers.

In addition, a number of in-house models are used to analyze the historical performance of managers. The analyses conducted include examinations of manager value-added alpha vs. beta, risk factor decomposition, performance persistence, style fidelity, peer group and index comparisons, liquidity and leverage, and risk attribution.  FGA then reviews portfolio analysis, attribution, and risk and stress testing reports. |

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: **Fairfield Greenwich Advisors LLC** | SEC File Number: 801-62504 | Date: **March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: **Fairfield Greenwich Advisors LLC** | IRS Empl. Ident. No.: **26-0001345** |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| **Item 4.C.(7)** | FGA's core product business model involves the development of a limited number of close relationships with hedge fund managers (e.g., Portfolio Managers) of varying investment methodologies, either internal or external to FGG. FGA conducts a detailed manager selection and due diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risks. At the conclusion of the manager selection process, allocation of assets from a multi-strategy fund to a successful hedge fund manager candidate (a new Single Manager Fund) will be determined based on a qualitative and quantitative analysis of each Single Manager Fund's potential for long-term performance, correlation with other Single Manager Funds in the Multi-Strategy Fund's portfolio and expected contribution to the targeted risk/return profile. |
| **Item 5** | FGA generally requires a college degree and preferably an advanced degree for its professional personnel. Along with these educational requirements, FGA prefers relevant securities industry experience. |
| **Item 6** | **Investment Committee:** |
| | Patrick Blake<br>Managing Director<br>YOB: 1964 | **Business Background for Past 5 Years**:<br><br>Prior to joining FGG in 2003, Mr. Blake ran his own financial services and consulting firm, Clapboard Capital. Previously, Mr. Blake was an Executive Vice-President in charge of fixed-income derivatives proprietary trading at Daiwa Securities America (2000-2002).<br><br>**Education**:<br><br>Mr. Blake received his Bachelor of Arts degree in economics from Princeton University. |
| | Charles Murphy<br>Partner<br>YOB: 1961 | **Business Background for Past 5 Years**:<br><br>Charles Murphy joined FGG in 2007 and is a member of FGG's Executive Committee. He is responsible for strategy and capital markets business for the firm. He has over 20 years of banking experience, most recently from 2005 to 2007 as co-Head of the European Financial Institutions Group at Credit Suisse. From 2001 to 2005 he was at Deutsche Bank as Head of European Financial Institutions. From 2000 to 2001, he was a founder and CFO of Antfactory, an Internet incubator. Mr. Murphy was with Morgan Stanley through the 1990's, having moved from New York to London in 1993, as Head of the European Financial Institutions Group until 2000. He started his career in 1985 as an Associate in Corporate Finance at Goldman Sachs in New York, joining their financial institutions group in 1987.<br><br>**Education**:<br><br>Mr. Murphy has a JD degree from Harvard Law School (1985), an MBA from MIT's Sloan School (1984), and a BA from Columbia College (1981). |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: Fairfield Greenwich Advisors LLC | SEC File Number: 801-62504 | Date: March 27, 2008 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: **Fairfield Greenwich Advisors LLC** | IRS Empl. Ident. No.: **26-0001345** |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| | **Jennifer Keeney** Managing Director YOB: 1972 — **Business Background for Past 5 Years**: Prior to joining FGG in 2004, Ms. Keeney was employed by Alpha Investment Management, LLC, from 1997 to 2004, where she served as a Senior Research Analyst for Equity Hedge strategies and, most recently, as the Head of Due Diligence. **Education**: Ms. Keeney received her Bachelor of Arts degree from Boston University and her Masters degree in International Affairs, concentrating on International Finance and Business, from Columbia University. She has also studied at Beijing National Teachers College and at National Chengchi University in Taiwan. Ms. Keeney is a member of the New York Society of Security Analysts and active on their Alternative Investments Committee. |
| | **Douglas Reid** Managing Director YOB: 1968 — **Business Background for Past 5 Years**: Prior to joining FGG, from 2005 to 2006, Mr. Reid was a Portfolio Manager, Director of Research, and co-founder of Alstra Capital Management, LLC, an investment advisor that was spun out from Moore Capital Management, LLC, where Mr. Reid was a Principal, and Portfolio Manager and Co-Director of Research of its Fund Investment Group from 2002 to 2005. |
| | **Andrew Smith** Partner, Vice President and Co-Head of Fund-of-Funds YOB: 1971 — **Business Background for Past 5 Years**: Prior to joining FGG in 2003, Mr. Smith was a partner at Chester Investments, a private investment firm/family office, where he was responsible for alternative investments including hedge funds, private equity, income-producing real estate, and real estate development in the U.S. and in Europe. Mr. Smith also was responsible for corporate strategy and business development. **Education**: Mr. Smith is a graduate of Dartmouth College. |
| | **Amit Vijayvergiya** Partner and Head of Risk YOB: 1969 — **Business Background for Past 5 Years**: Mr. Vijayvergiya has over 12 years of experience in asset management, risk management, finance, and operations research. From 2000 to 2003 Mr. Vijayvergiya managed a family office investing in traditional and alternative investment managers. **Education**: Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba, and a Bachelors of Arts in |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br><br>**Fairfield Greenwich Advisors LLC** | SEC File Number:<br><br>801-62504 | Date:<br><br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich Advisors LLC** | 26-0001345 |

| Item of Form (identify) | Answer |
|---|---|
| | Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification. |

**Executive Officers:**

| Anthony Dell'Arena<br>Chief Compliance Officer<br>YOB: 1964 | **Business Background for Past 5 Years**:<br><br>Mr. Dell'Arena joined FGG in 2005. Prior to such, he was employed by JPMorgan Chase & Co.'s Private Banking division, where he was a Vice President and Assistant General Counsel from 2002 to 2005.<br><br>**Education**:<br><br>Mr. Dell'Arena was awarded his Juris Doctor degree from the University of Arkansas School of Law, and holds Master's and Bachelor's degrees in History from Rutgers University. He is admitted to the bar of New Jersey, and is based in the New York office. Mr. Dell'Arena is a member of National Society of Compliance Professionals and holds FINRA licenses 7, 24, 63, and 65. |
|---|---|
| Daniel E. Lipton<br>Vice President and Chief Financial Officer<br>YOB: 1971 | **Business Background for Past 5 Years**:<br><br>Mr. Lipton joined FGA in 2002 after nine years at Ernst & Young, where he was a Senior Manager in the Financial Services Assurance and Advisory Business Services Department, in charge of auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds.<br><br>**Education**:<br><br>Mr. Lipton received his Bachelor of Arts degree in Economics from Tufts University and his Master of Business Administration dual degrees in Accounting and Finance from New York University's Stern School of Business; he is also a Certified Public Accountant. |
| Mark McKeefry<br>President and Chief Legal Officer<br>YOB: 1961 | **Business Background for Past 5 Years**:<br><br>Mr. McKeefry joined FGA in 2003. Prior, he was an Associate at Buchalter Nemer, where he advised broker-dealers and investment advisors on regulatory and compliance issues for onshore and offshore funds.<br><br>**Education**:<br><br>Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional engineer, licensed by the State of California as a civil engineer. Mr. McKeefry is admitted to the bars of California and New York. |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: **Fairfield Greenwich Advisors LLC** | SEC File Number: **801-62504** | Date: **March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: **Fairfield Greenwich Advisors LLC** | IRS Empl. Ident. No.: **26-0001345** |
|---|---|---|

| Item of Form (identify) | Answer | |
|---|---|---|
| | | Mr. McKeefry holds FINRA licenses 3, 7, 24, 63, and 65. |
| | Andrew Smith | See Above. |
| **Item 7.B.** | FGA is generally entitled to receive from each FGG Fund an expense reimbursement charge of 15 basis points per year, payable quarterly, of the applicable FGG Funds' net asset value for the preceding quarter, in consideration for bearing certain internal accounting and operational costs in connection with such FGG Fund's activities. | |
| **Item 8.C.(1)** | An affiliate of FGA, Fairfield Heathcliff Capital LLC ("FHC"), is registered with the Securities and Exchange Commission as a broker-dealer and is a member of the Financial Industry Regulatory Authority. It does not have a trading desk, nor does it open broker-dealer accounts or custody cash or securities. FHC's license is limited to selling limited partnership interests.   FHC serves as U.S. placement agent for the FGG Funds and will bear its costs associated with such activities. | |
| **Items 8.C.(3) and 8.D.** | FGA, Fairfield Greenwich (UK) Limited ("FGUK"), and Fairfield Greenwich (Bermuda), Ltd. ("FGBL"), are each wholly-owned subsidiaries of Fairfield Greenwich Limited ("FGL", and collectively, "FGG"). FGBL is a registered investment adviser with the SEC (SEC File No. 801-66439).  FGUK is authorized and regulated by the Financial Services Authority, and serves as investment manager to a Luxembourg-registered SICAV and offshore fund-of-funds. FGL has consummated a joint venture with Lion Capital Management Limited to create Lion Fairfield Capital Management Limited ("LFC"), a hedge fund management and client servicing platform in Asia.   LFC holds a capital markets services license issued by the Monetary Authority of Singapore under the provisions of the Securities and Futures Act (Cap 289). FGA is the general partner of four (4) Delaware limited partnerships. No fund on the FGG platform is solicited to invest in any of them. FGBL is the general partner of two (2) Delaware limited partnerships. Certain other FGG funds have been solicited to invest in them. | |
| **Item 8.C.(5)** | FGL is registered with the Commodity Futures Trading Commission as a commodity pool operator and is a member of the National Futures Association. | |
| **Item 9.A.** | FGA does not maintain a trading desk where it internally manages hedge funds at the individual securities level. Instead it engages principally in forming funds (mostly offshore) and hiring sub-advisers (as noted above, Portfolio Managers), many of whom are SEC registrants, to trade the portfolios of those funds it has formed on behalf of investors it has introduced to the funds. Also as described above, it also manages traditional fund-of-funds, where it again engages in due diligence and manager selection. So in the normal course of its business, it does not engage in principal transactions. A related person of FGA, an affiliate, Fairfield Greenwich (UK) Limited ("FGUK"), as Investment Manager of the Chester Global Strategy Fund Limited (the "Chester Fund"), has in February 2008 transferred certain securities held by the Chester Fund (i.e., interests in underlying hedge funds) to the Banif Fairfield Impala Fund (the "Banif Fund"), which is domiciled in Spain. FGA serves as the Banif Fund's Manager. To establish the Banif Fund, FGA arranged for the parent of both it and FGUK, Fairfield Greenwich Limited ("FGL"), to contribute approximately half of the Banif Fund's initial capital, approximately $5 million Euro. The remaining initial seed money of $5 million Euro was contributed by Banco Banif S.A. As a result of this proprietary ownership, (i) the Banif Fund is deemed a principal account for certain U.S. regulatory purposes, (ii) FGUK is deemed to have acted as principal when selling the Assets from the Chester Fund to the Banif Fund and (iii) FGUK had to obtain consent from the Chester Fund in connection with the proposed transfer of Assets. In order to mitigate the conflict of interest inherent in the principal transaction, and to address the potential for self dealing, the consent of the Chester Fund shareholders was obtained prior to settlement of the transactions, who determined that the transactions served their best interest. Should FGA seek to engage in a principal | |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br><br>**Fairfield Greenwich Advisors LLC** | SEC File Number:<br><br>**801-62504** | Date:<br><br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br><br>**Fairfield Greenwich Advisors LLC** | IRS Empl. Ident. No.:<br><br>**26-0001345** |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| | transaction, this same methodology would be followed. |
| **Item 9.D.** | FGA and its affiliates may solicit clients to invest in the FGG Funds. In the event of limited capacity in a particular FGG Fund, FGA and its affiliates are committed to allocating investment opportunities and dispositions in the particular FGG Fund fairly among all clients or vehicles. FGA and certain of its affiliates and their officers may have financial interests as general partners, limited partners, shareholders, investment managers, administrative manager, investment adviser or otherwise in such FGG Funds. Management and/or performance fees for such individuals and their family members may be waived in certain instances.<br><br>Additionally, FGA and/or the Board of Directors of the relevant FGG Fund, in accordance with its discretionary authority as noted in the offering documents, has entered into agreements with certain shareholders of certain funds which modify or waive all or a portion of certain terms listed in the offering documents including redemption terms, redemption charges, management fees and/or performance fees, and transparency. |
| **Item 9.E.** | FGA and its affiliates may purchase or sell shares or interest of a Single Manager Fund for the accounts of Multi-Strategy Funds. FGA and certain of its affiliates and other Multi-Strategy Funds may have a position in such Single Manager Fund.<br><br>With respect to standards of professional conduct, a Code of Ethics (the "Code") has been adopted by FGA in order to comply with Rule 204A-1 (the "Rule") promulgated under the Investment Advisers Act of 1940, as amended. Rule 204A-1 requires every Investment Adviser registered with the Securities and Exchange Commission to adopt and enforce a written code of ethics applicable to its supervised persons. The Rule was designed to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel. The Code contains a provision reminding employees of their obligations to clients as well as a provision requiring the reporting of personal securities transactions and holdings. In order to ensure that FGA's employees are made aware of its standards, the Rule requires FGA to obtain (and keep) a written acknowledgement from each employee confirming that he or she received a copy of the Code and any amendments.<br><br>Further, pursuant to the Rule, FGA has deemed certain of its employees to be "Access Persons." An "Access Person" is an employee of FGA who has access to nonpublic information regarding any clients' purchase or sale of securities, or nonpublic information regarding the portfolio holdings of any reportable fund, or who is involved in making securities recommendations to clients, or who has access to such recommendation that are nonpublic. FGA Access Persons are required to provide FGA with personal (which includes household) securities account information and FGA thus arranges for the delivery to its office for its review duplicate copies of confirmations and statements of any personal trading activity. FGA Access Persons are not free to trade without having first pre-cleared trades with FGA. In all cases, FGA will attempt of resolve any conflicts of interest by exercising the good faith required of fiduciaries. FGA reviews the personal investment activities of its Access Persons to ensure that the following general fiduciary principles are met:<br><br>    (a)  the duty at all times to place the interests of clients of FGA first;<br>    (b)  the duty to prevent the misuse of material nonpublic information which includes client securities holdings and transactions;<br>    (c)  the requirement that all personal securities transactions be conducted in such a manner as to |

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:  Fairfield Greenwich Advisors LLC | SEC File Number:  801-62504 | Date:  March 27, 2008 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:  **Fairfield Greenwich Advisors LLC** | IRS Empl. Ident. No.:  **26-0001345** |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
|  | avoid any actual or potential conflict of interest or any abuse of an individual's position of trust and responsibility; and<br><br>(d) the fundamental standard that FGA personnel may not take inappropriate advantage of their position.<br><br>Investors may request a copy of the Code by contacting FGA at the address or telephone number listed on the first page of this document. |
| **Item 10** | The FGG Funds impose various initial minimum investment amounts, ranging between US$100,000,000 and US$100,000, and in equivalent amounts in different currencies, including AUD, Euro and Swiss Franc.  The Funds may accept investment in lesser amounts.  Generally, investors are required to have a net worth of at least US$1,500,000. |
| **Item 11.A.** | Single Manager Fund portfolios are reviewed at the individual security level (see Schedule F, Item 4.B.8) from independent sources and discussed amongst members of FGA's Investment Team and with each of the manager's personnel several times each month.  FGA, along with its affiliate, Fairfield Risk Services Ltd., also utilizes a number of independent, sophisticated quantitative measurement tools to monitor the performance of its managers. FGA's personnel review changes in a variety of factors, including changes in organization, investment process, the manager's view of the relevant markets, and their portfolio's position with respect to those views.  The findings are discussed at regular meetings. |
| **Item 11.B.** | Clients will receive audited financial statements of the applicable Fund annually, and unaudited performance reports at least monthly.  In addition, clients may also receive monthly commentary and quarterly letters for certain of the FGG Funds.<br><br>FGA is committed to maintaining the privacy of our clients and to the safeguarding of their personal information. Our privacy policy is distributed to clients in accordance with Regulation S-P on an initial and annual basis, to help clients understand what personal information we collect, how that information is protected, and why, in certain cases, the information may be shared. |
| **Item 12** | For certain of the FGG Funds, FGA, or an affiliate, has full discretion and authority to make all investment decisions with respect to the types of securities to be bought and sold, and the amount of securities to be bought or sought for such Fund, and there are no limitations as to which broker dealer is used or as to the commission rates paid. However, portfolio transactions will be allocated to brokers on the basis of best execution and in consideration of brokerage and research services (e.g., research ideas, investment strategies, special execution and block positioning capabilities, clearance, settlement and custodial services), financial stability, reputation and efficiency of such broker-dealers. Broker-dealers providing such services may be paid commissions in excess of those that other broker-dealers not providing such services might charge. |
| **Item 13.A.** | FGA receives unsolicited research reports from various brokers, but currently does not have any "soft dollar" arrangements outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended, in effect. |
| **Item 13.B.** | From time to time, FGL may enter into agreements to compensate third party and/or internal agents, providing for cash compensation for securing clients which may be in the form of a placement fee or participation in the sharing of the management and/or performance fees. |