# EXHIBIT 16

GRAND CT.                    WALKER INTL. V. OLEARIUS LTD.

## [2003 CILR 457]

# WALKER INTERNATIONAL HOLDINGS LIMITED and AF-CAP INCORPORATED v. OLEARIUS LIMITED, SOCIÉTÉ NATIONALE DES PETROLES DU CONGO, CAISSE CONGOLAISE D'AMORTISSEMENT and REPUBLIC OF CONGO

GRAND COURT (Smellie, C.J.): October 14th, 2003

*Conflict of Laws—recognition of foreign proceedings—enforcement of judgment debt—final and conclusive judgment for definite sum enforceable at common law—arbitral award made in country party to Convention on Recognition and Enforcement of Foreign Arbitral Awards enforceable in Cayman Islands under Foreign Arbitration Awards Enforcement Law (1997 Revision), s.5 and Arbitration Law (2001 Revision), s.22*

*Companies—corporate identity—lifting corporate veil—close super-visory relationship between corporate defendants not necessarily sham or façade, allowing assets of one to be treated as assets of other—no lifting of veil if creation of separate company as special purpose vehicle for lenders' security not exceptional*

*Civil Procedure—joinder of parties—necessary and proper parties—company beneficially owned and controlled by defendant properly joined in enforcement of defendant's judgment debts—assets may be made available to satisfy defendant's debts and may be safeguarded by Mareva injunction against joined party as ancillary to cause of action against defendant*

The plaintiffs applied to enforce a French arbitral award and an English High Court judgment against the third and fourth defendants and sought declarations that the first and second defendants' assets were to be available to satisfy those judgment debts.

The plaintiffs were judgment creditors of the Republic of Congo and its debt management agency, respectively the fourth and third defendants. In separate proceedings, a French appeal court ruled that the first plaintiff was entitled to seize the assets of the second defendant, the Congolese state-owned oil company, in satisfaction of the debt on the grounds that the second defendant was an "*emanation d'Etat*" of the Republic. The second defendant marketed oil on behalf of the Republic, which held its

457

entire capital. The French court found that it had no operational autonomy or activities separate from the Republic.

The plaintiffs became aware of a financial arrangement in the Cayman Islands involving the defendants and applied to enforce their judgments here. This arrangement was a structured finance arrangement for the sale of oil, facilitated by the first defendant—a special purpose vehicle incorporated in the Cayman Islands—to which a loan facility had been granted by a group of banks. The loan stipulated that the first defendant was to be the "vehicle through which funds were to be made available to the second defendant" and it was repayable from oil sales. The account from which the lenders were repaid was thus not in the name of the producer of the oil, the Republic, to avoid attachment by other creditors. The loan was guaranteed by the Republic, which had also assigned its oil rights to the first defendant.

In 2002, the Grand Court granted an injunction against the first defendant, restraining it from passing to the second defendant any funds except those required to service the loan. This constituted an event of default under the terms of the loan and the lenders subsequently demanded payment from the first defendant of all proceeds and intended to do so until fully repaid.

The plaintiffs submitted that (a) they were entitled to enforce the foreign judgments in the Cayman Islands by statute and at common law; (b) the second defendant's assets ought to be available in satisfaction of the debts, as held by the French court, as it was an alter ego of the Republic, a mere sham or façade, or because it held the Republic's assets beneficially; (c) similarly, they were entitled to pursue the first defendant, as any distinction between it, the second defendant and the Republic was a sham; (d) the financial arrangement was merely a cloak to protect the Republic's funds from its legitimate creditors and therefore the corporate veil ought to be lifted; and (e) an injunction should be granted against the second to fourth defendants and that existing against the first defendant continued, and furthermore, a receiver should be appointed over the first and second defendants' assets.

The first defendant submitted that the allegations of sham were unfounded and that in fact its incorporation as a Cayman special purpose vehicle was part of a *bona fide*, arm's-length commercial transaction, inspired by the entirely legitimate concern of the lenders to maximize their security, rather than to defraud the Republic's creditors.

The intervener submitted that (a) the proposed receivership order over the assets of the second to fourth defendants would not fulfil the plaintiff's expectations, as the lenders had demanded full repayment of the loan and it was unlikely that any excess funds would pass to the defendants; (b) furthermore, a receivership order would prejudice the lenders as they were merely third parties and were unprotected; (c) nor should the current *Mareva* injunction against the first defendant be continued, as it froze the mechanisms by which the lenders were repaid; and (d) if the injunction against the first defendant were to be discharged,

it would not exercise its discretion to pass excess funds to the second defendant, and they would instead be available to satisfy the judgment debts.

**Held,** making the following rulings:

(1) The plaintiffs were entitled to enforce their judgments against the third defendant and the Republic at common law and by statute. They were enforceable at common law as they were for definite sums and were final and conclusive. In addition, the arbitral award was made pursuant to an arbitration agreement in France, a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and could therefore also be enforced under the Foreign Arbitral Awards Enforcement Law (1997 Revision), s.5 and the Arbitration Law (2001 Revision), s.22 (paras. 19–22).

(2) It did not necessarily follow, however, that the second defendant's funds could be used to help satisfy those judgments. Although the second defendant was closely supervised by the Republic, it was not an "*emanation*" of the Republic amounting to a sham or façade which justified lifting the corporate veil so as to treat its assets as those of the Republic. The motive behind the oil-financing arrangements in creating a separate company with assets distinct from those of the Republic was relevant, and the aim of enabling the lenders to obtain better security by lending to the first defendant rather than to the producer of the oil was also legitimate. There was nothing inherently exceptionable in the creation and use of the first defendant as a pre-payment facility (paras. 42–43; paras. 49–55).

(3) Nevertheless, as the second defendant was designed to hold assets which belonged beneficially to the Republic, it was a necessary and proper party to be joined to the proceedings. It was beneficially owned and controlled by the Republic and its assets were consequently to be regarded as the Republic's and available to satisfy its debts. A *Mareva* injunction would therefore be granted against the second to fourth defendants, since it would be incidental or ancillary to the action against the Republic. Further, the appointment of a receiver over the second defendant's assets would be denied, and instead an irrevocable designation of the account of the Grand Court would be required, the moneys to be received into that account to be held for the benefit of the plaintiffs (paras. 56–59; para. 66).

(4) The action against the first defendant would be discontinued and the *Mareva* injunction discharged, as it unjustifiably prevented the lenders under the oil-financing arrangement from recovering their investments. The court was guided by what was just and convenient and exercised caution in relation to injunctions, taking great care not to be oppressive to those affected, either in business or the conduct of everyday life. Furthermore, given the nature of the oil-financing arrangement, an injunction was inappropriate, as there would not have been any assets to

be restrained were the Republic to cut off the oil supply. The intervener's representation not to exercise its discretion to make payments to the second defendant in excess of that required to service the loan would be accepted, so that surplus funds would become available to pay the plaintiffs (para. 59; paras. 73–76).

**Cases cited:**
(1) *Adams* v. *Cape Indus. PLC*, [1990] Ch. 433; [1991] 1 All E.R. 929, *dicta* of Slade, L.J. applied.
(2) *Jones* v. *Lipman*, [1962] 1 W.L.R. 832; [1962] 1 All E.R. 442, referred to.
(3) *S.C.F. Finance Ltd.* v. *Masri*, [1985] 1 W.L.R. 876; [1985] 2 All E.R. 747; [1985] 2 Lloyd's Rep. 206; (1985), 129 Sol. Jo. 450, *dicta* of Lloyd, L.J. applied.
(4) *Siskina* v. *Distos Cia. Naviera S.A.*, *The Siskina*, [1979] A.C. 210; [1977] 3 All E.R. 803; *sub nom. Shanker (Ibrahim) & Co.* v. *Distos Cia. Naviera S.A.*, [1978] 1 Lloyd's Rep. 1, *dicta* of Lord Diplock distinguished.
(5) *T.S.B. Private Bank Intl. S.A.* v. *Chabra*, [1992] 1 W.L.R. 231; [1992] 2 All E.R. 245, *dicta* of Mummery, J. applied.
(6) *Woolfson* v. *Strathclyde Regional Council*, [1978] SLT 59, *dicta* of Lord Keith applied.
(7) *Yukong Line Ltd.* v. *Rendsburg Invs. Corp.*, [2001] 2 Lloyd's Rep. 113, referred to.

**Legislation construed:**
Arbitration Law (2001 Revision) (Law 2 of 1974, revised 2001), s.22: The relevant terms of this section are set out at para. 21.

Foreign Arbitral Awards Enforcement Law (1997 Revision) (Law 30 of 1975, revised 1997), s.5: The relevant terms of this section are set out at para. 20.

*J.P. Walton* for the plaintiffs;
*M.W. Imrie* for the first defendant;
*M. Todd, Q.C.* and *D.T. McGrath* for the intervener;
The second, third and fourth defendants did not appear.

1   **SMELLIE, C.J.:** On July 17th, 2003, I granted the plaintiffs' application for summary judgment against the second defendant and made ancillary orders involving the first defendant. These are the reasons.

2   The plaintiffs brought this enforcement action as judgment creditors of 30m. and US$10m. respectively, against the fourth defendant, the Republic of Congo ("ROC"), its debt management agency, Caisse Congelaise D'Amortissement ("CCA"), the third defendant, and the state-owned oil company, Société Nationale Des Petroles Du Congo ("SNPC"), the second defendant (together "the Congolese defendants").

GRAND CT.          WALKER INTL. V. OLEARIUS LTD. (Smellie, C.J.)

3   The judgments obtained in Paris, France, to be enforced arise out of
an arbitral award and a judgment on a writ action taken in London,
England. The plaintiffs sue upon those judgment debts.

**Background**

4   The plaintiffs, as judgment creditors, have been pursuing the second
to fourth defendants in a number of jurisdictions around the world
seeking the seizure of assets against which to enforce and satisfy their
judgment debts. A number of these proceedings have involved SNPC, a
state-owned company which markets oil on behalf of ROC. ROC's chief
national asset is said to be oil.

5   Proceedings were brought in Paris, France, by the first plaintiff
against accounts held by SNPC at certain banks there. The first plaintiff
was successful before the Paris Court of First Instance on January 29th,
2002 in its claim that it had a right to seize SNPC's assets in satisfaction
of ROC's debts, on the basis that SNPC was an "*emanation d'Etat*" of
ROC. The defendants appealed.

6   While the matter was in the French Court of Appeal, the existence of
an arrangement involving this jurisdiction came to light. This is an
arrangement involving the second and fourth defendants, established for
the express purpose of providing a commercial loan to the first defendant,
Olearius Ltd. ("Olearius"). In May 2002, a US$210m. loan facility was
granted to Olearius, a special purpose vehicle ("SPV"), incorporated in
the Cayman Islands. This was a four-year pre-payment facility (the
"facility") and by the summary terms and conditions of the facility
Olearius is said to be "the vehicle through which funds are made
available to SNPC." The loan was repayable out of the proceeds of
forward oil sales by SNPC, as agent for Olearius. By the arrangement
ROC had assigned all its oil rights to Olearius.

7   The plaintiffs brought an action before this court in July 2002 seeking
injunctive relief against Olearius. On August 13th, 2002 this court
granted an injunction, the effect of which was to restrain Olearius from
passing back to SNPC any funds generated from oil sales in excess of
those required to service the loan. It was found by Graham, J., in a ruling
delivered on August 13th, 2002, that "*prima facie* there are assets in the
jurisdiction which can be attached in satisfaction of the two judgments."
These two judgments referred to by Graham, J. are those already
described as giving rise to the debts owed to the plaintiffs and are further
described below.

8   On January 23rd, 2003, the Court of Appeal in Paris delivered its
judgment, concluding that SNPC is indeed an "*emanation*" of ROC such
that its assets should be treated as those of ROC and upholding the

461

attachment order against those assets known to be within the French jurisdiction.

9    The first plaintiff now seeks leave to enforce the final award (the "award") made in France by the ICC International Court of Arbitration (Case 10030/AC/DB) against the third and fourth defendants. Without delving unnecessarily into the details, this award is said to arise from loans advanced to those defendants to fund their oil-production business, which were not repaid.

10    The award has also become the subject of a judgment enforcing it in the English High Court. The award/judgment sum is in excess of  30m. plus interest.

11    Thus the first plaintiff sues in this jurisdiction upon the award and the judgment both as a matter of statute—the Foreign Arbitral Awards Enforcement Law (1997 Revision)—and at common law. The second plaintiff obtained an English judgment (1996 Folio No. 1309) on November 15th, 1996, in the amount of US$10m. plus interest and costs. It sues upon that judgment at common law seeking its enforcement.

**The present applications by the plaintiffs**

12    The plaintiffs seek summary judgment against the second, third and fourth defendants. They seek a declaration that the second defendant (SNPC) is the alter ego of the fourth defendant. Alternatively, that the second defendant is a mere sham and façade; alternatively a bare trustee or agent, holding assets for the benefit of the fourth defendant; in the further alternative, that the assets of the second defendant are to be regarded as assets of the fourth defendant and available for execution in satisfaction of judgments obtained against the fourth defendant. The plaintiffs argue that as the Paris Court of Appeal ruled definitively on the issue that SNPC is as a matter of fact the alter ego of ROC, this creates a *res judicata* and an issue estoppel against SNPC, and invite the court to uphold that ruling and apply it here.

13    As regards the first defendant, the plaintiffs seek a declaration against it in the same terms as that against the second defendant. Having obtained enforcement of their judgments against the Congolese defendants, the plaintiffs' next step will be to seek an injunction. In so doing, it is also their intention to argue that Olearius is the alter ego of the Congolese defendants.

14    In addition to post-judgment injunctive relief, the plaintiffs seek relief by way of the appointment of a receiver over the assets of the second to fourth defendants. A *Mareva* injunction is sought in order to prevent the second to fourth defendants from circumventing the whole Olearius financing structure, while the receiver is intended to recover any

sums due solely in respect of Olearius and the forward purchase agreement, explained below. The plaintiffs ask that the injunction granted pre-judgment is continued post-judgment, except that the plaintiffs be released from any cross-undertakings in damages and that those already in place be discharged.

15   Standard Chartered Bank ("SCB"), as intervener, became concerned that the orders being sought by the plaintiffs would, if granted, have a serious, damaging effect on the syndicated lenders, of which it is one, and also on third parties. Effectively, any injunction against Olearius would freeze the mechanism by which the lenders are repaid through Olearius.

16   For the reasons explained below, I find that this is the proper forum for the presentation of the plaintiffs' claims against the defendants, and that the proper form of relief is that which I will give.

**The court's jurisdiction at common law**

17   According to Dicey & Morris on *The Conflict of Laws*, 13th ed., at 474–475 (2000), Rule 35(1) and (2) dealing with enforcement and recognition of judgments at common law provides:

"(1) Subject to the Exceptions hereinafter mentioned and to Rule 55 (international conventions), a foreign judgment *in personam* given by the court of a foreign country with jurisdiction to give that judgment in accordance with the principles set out in Rules 36 to 39, and which is not impeachable under any of Rules 42 to 45, may be enforced by a claim or counterclaim for the amount due under it if the judgment is

   (a)   for a debt, or definite sum of money (not being a sum payable in respect of taxes or other charges of a like nature or in respect of a fine or other penalty); and

   (b)   final and conclusive,

but not otherwise.

Provided that a foreign judgment may be final and conclusive, though it is subject to an appeal, and though an appeal against it is actually pending in the foreign country where it was given.

(2) A foreign judgment given by the court of a foreign country with jurisdiction to give that judgment in accordance with the principles set out in Rules 36 to 39, which is not impeachable under any of Rules 42 to 45 and which is final and conclusive on the merits, is entitled to recognition at common law and may be relied on in proceedings in England."

18   The first and second plaintiffs are, by virtue of these principles of

private international law and judicial comity, entitled to enforce the
judgments at common law as the judgments are for debts or definite sums
of money and are final and conclusive, albeit that they are default
judgments.

## The arbitral award

19    The award was made pursuant to an arbitration agreement in Paris,
France, France being a party to the New York Convention on the
Recognition and Enforcement of Foreign Arbitral Awards (1958). As
such, it qualifies for enforcement under s.5 of the Foreign Arbitral
Awards Enforcement Law (1997 Revision) and s.22 of the Arbitration
Law (2001 Revision).

20    Section 5 of the Foreign Arbitral Awards Enforcement Law (1997
Revision) provides:

"A Convention award shall, subject to this Law, be enforceable in
the Grand Court in the same manner as an award under section 22 of
the Arbitration Law (1996 Revision) and shall be treated as binding
for all purposes on the persons between whom it was made and may
accordingly be relied upon by any of those persons by way of
defence, set off or otherwise in any legal proceedings in the Islands
and any reference in this Law to enforcing a Convention award shall
be construed as including references to relying upon such award."

21    Section 22 of the Arbitration Law (2001 Revision) provides: "An
award on an arbitration agreement may, by leave of the Court, be
enforced in the same manner as a judgment or order to the same effect,
and where leave is so given, judgment may be entered in terms of the
award." It is therefore clear that the Grand Court has jurisdiction to
enforce the award against the third and fourth defendants.

22    Having established that the court has jurisdiction at common law
and by statute to enforce the award and judgments, the question remains
whether the first and second defendants may be labelled "alter-egos" of
ROC such that the plaintiffs may recover against them.

23    I have in mind of course that at this stage enforcement is only sought
against the second defendant, with the declaratory relief against the first
defendant, Olearius, to be sought later. Nonetheless, having regard to the
general applicability of the principles of law to which I will refer below, I
intend to reflect also upon the proposed basis for pursuing Olearius.

## The first defendant/SPV scheme

24    The first defendant, Olearius, was, according to the summary terms
and condition sheet (term sheet), expressly created as "the vehicle

GRAND CT.                WALKER INTL. V. OLEARIUS LTD. (Smellie, C.J.)

through which funds are made available to SNPC." Certain banks—
namely KBC Bank NV, RMB International (Dublin) Ltd., Standard
Chartered Bank and the original lenders—have made the amount of
US$210m. available to Olearius. It is to purchase and sell crude oil and
enter into financing arrangements in connection therewith pursuant to the
terms of the facility agreement, the forward purchase agreement and the
other facility documents.

25   On or about May 31st, 2002, US$150m. was drawn by Olearius at
the request of SNPC to, *inter alia*, fund the SPV scheme and discharge
some of the liabilities of SNPC. A further US$60m. remains to be drawn.

26   In summary, the SPV scheme operates as follows. The banks first
make the funds available to Olearius. These funds are used to buy oil
from SNPC under the forward purchase agreement. Some of the oil that
Olearius purchases is for sale on to Vitol S.A. and other buyers. The oil
sold by SNPC to Olearius is the property of ROC. Cash proceeds of the
sales under the forward purchase agreement are credited directly to the
collection account, from which payment on the loan facility is made to
the lenders by Olearius. Excess proceeds in that account are passed by
Olearius on to, or to the order of, SNPC. SNPC is also responsible for the
repayment of bridge financing, facility fees, expenses, hedge premise and
the funding of the debt service reserve account (DSRA). An additional
element of the scheme is that ROC has guaranteed the loan on behalf of
Olearius and has also assigned rights to Olearius to receive oil. The entire
arrangement is known as the hedged crude oil pre-payment facility.

27   The plaintiffs argue that any distinction between ROC, SNPC and
Olearius is a complete sham. They argue that Olearius entered into the
SPV scheme, executed the facility documents, and has enjoyed the
benefit of the facility as an alter ego, alternatively as a mere sham and
façade, alternatively as a bare trustee or agent of SNPC and/or ROC.

28   Under s.2 of the facility agreement, the stated purpose of the loan is
as follows:

"The borrowings made hereunder shall be applied: first, to pay in
full all outstanding amounts under the US$50m. bridge finance
facility agreement dated December 18th, 2001 (as amended and
restated as of January 25th, 2002 and (if such further amendment
shall occur) further amended on or after the date of this agreement to
address arrangements to permit SNPC to have access to the proceeds
of the first cargo delivered under the crude oil contract referred to in
such bridge finance facility agreement) between RMB International
(Dublin) Limited and SNPC; second, to fund the required balance of
the debt service reserve account; third, to finance interest fees,
expenses and other amounts due under any finance document;

465

THE CAYMAN ISLANDS LAW REPORTS                                    2003 CILR

> fourth, to finance any premium payable under the terms of any
> hedging agreement; fifth, to finance (i) expenses payable in respect
> of the corporate administration of the borrower, (ii) amounts payable
> under the corporate administration documents, (iii) legal fees
> payable by the borrower in connection with the establishment of the
> borrower and its entry into the relevant documents to which it is a
> party; sixth, in the case of the primary syndication lender
> utilizations, to pay an amount equal to the amount set out in para. 1
> of the syndication notice to the credit of the charged account (which
> amount shall not be in excess of US$60m.) less the amounts set
> forth in paras. 1(b) and 3(b) of the fee letter to the extent such
> amounts are deducted by the agent from the first primary
> syndication lender utilization in accordance with the terms thereof;
> and seventh, to fund all payments to be made to SNPC under the
> forward purchase agreement, including without limitation, the
> forward purchase price due under cl. 8 thereof."

29  In the first affidavit of Donald S. Schwarzkopf, para. 23, filed on
behalf of the plaintiffs and describing the relationship between ROC,
SNPC and Olearius, he stated as follows:

> "(a) All borrowings disbursed to Olearius, but for the ultimate
> benefit of SNPC, are unconditionally guaranteed by ROC.
>
> (b) If funds in Olearius are inadequate to repay the borrowings,
> SNPC must deliver sufficient additional oil, which belongs to ROC,
> to do so.
>
> (c) SNPC is the exclusive marketing agent for Olearius, as well as
> ROC.
>
> (d) Amounts already disbursed under the facility, which rightly
> belong to the ROC for the sale of its oil under the forward purchase
> agreement, have largely been used by the SNPC for 'general
> corporate purposes.' There are no provisions in the term sheet for
> payment to ROC for the sale of oil.
>
> (e) The additional amount to be raised in general syndication will
> be provided to and used by either SNPC, ROC or Olearius, without
> distinguishing which entity actually owns the funds.
>
> (f) Olearius must obtain the approval of SNPC to make any early
> reimbursements of the facility.
>
> (g) 'Breakage costs' incurred by Olearius are the responsibility of
> SNPC.
>
> (h) Earnings by Olearius in excess of the debt service may not be
> retained, but rather must be paid to SNPC.

GRAND CT.          WALKER INTL. V. OLEARIUS LTD. (Smellie, C.J.)

(i) ROC must assign to Olearius, for no apparent consideration, its rights to receive crude oil under production-sharing and concession agreements, which in fact represent ROC's primary source of commercial income.

(j) The amount of up to US$60m. to be raised under the facility is to be used to cover potential litigation debts of SNPC/ROC."

30   The plaintiffs further argue that the fundamental reason for having such an elaborate legal structure for these financings is to cloak them in a legal veil of legitimacy. They say that in reality, the oil pre-financing transactions represent a sophisticated effort to shelter the proceeds of ROC financings from legitimate creditors of ROC (para. 24 of Schwarzkopf's first affidavit). The plaintiffs believe that they should be granted leave to execute the award and judgment directly upon Olearius, as an alter ego and nominee of ROC, particularly in view of para. 28 of Schwarzkopf's first affidavit:

"(a) the unambiguous assignment of the primary income-producing commercial assets of ROC to Olearius; and (b) the central role of Olearius in selling and receiving payments for such assets under the unmistakable control and direction of ROC and SNPC."

31   In the first affidavit of Mr. Akeem Khan of SCB, filed on behalf of the first defendant, he states that the allegations of sham are entirely inaccurate. At para. 5(i) he says that—

"the central allegations made by Mr. Schwarzkopf (on behalf of the plaintiffs) appear to be that Olearius is an alter-ego of the Republic of Congo ('ROC'), and indeed that the whole structure of the financing is a sham representing 'a sophisticated effort to shelter the proceeds of ROC financings from legitimate creditors of ROC' (para. 24). These allegations are entirely inaccurate. The structure of the financing is described in more detail below but, in summary, the reality is that Olearius was incorporated as a Cayman special purpose vehicle at the suggestion of the mandated arrangers, as part of a *bona fide*, arm's-length commercial transaction relating to the financing of shipments of oil. Neither ROC nor SNPC have any direct or indirect shareholding in Olearius, nor representation on the board of directors. It is neither legally nor beneficially owned by ROC or SNPC. It is an 'orphan' vehicle, with directors appointed by HSBC [Hong Kong Shangai Banking Corp., one of the lenders]. The financing structure was inspired by entirely legitimate commercial concerns on the part of the mandated arrangers, and was absolutely not inspired (as is implied by Mr. Schwarzkopf) by a desire to defraud ROC's creditors. The facility has been arranged by three well-known and respected trade finance banks, and involves the

467

world's largest independent oil-trading company (Vitol S.A.). A further 10 leading international banks and banking institutions have undertaken to participate in it."

32   Mr. Khan then described other financing structures which were considered by SNPC and the lenders, and continues at para. 10:

"Since SNPC wished to retain the ability to sell at least some of the oil on the spot market throughout the term of the financing, the mandated arrangers proposed what is known as a pre-payment financing structure. The critical feature of these structures (*i.e.* 'basic pre-payment structure' and 'pre-payment structure with SPV')—which maximizes the security of the lenders over the cash flows receivable for crude oil deliveries made to off-takers and ensures that the structure is capable of being syndicated in the international banking market—is that there should be no collection account in the name of the producer of the commodity (here, SNPC [*sic*]). This means that the funds flowing into that account would not be available for attachment by creditors of the producer. That is a perfectly legitimate objective for lenders who are concerned to maximize their security. In the 'basic pre-payment structure,' the collection account is in the name of the single off-taker. Given that it was contemplated that there would be multiple off-takers under the arrangement with SNPC, the mandated arrangers proposed a 'pre-payment structure with SPV,' pursuant to which the collection account into which each of the off-takers would make their payments would be in the name of the SPV."

This financing arrangement will be returned to later in these reasons for judgment.

### The second defendant

33   SNPC was created by the Republic of Congo as a public industrial and commercial company whose capital is held entirely by ROC. The Republic of Congo is a former French colony, whose chief national asset is said to be oil. Those assets are marketed through SNPC and used to obtain finance in the international market. The plaintiffs argue that SNPC is an "*emanation*" of the Republic of Congo, an expression which is not a term of art in English or Cayman law. They say that the company has no operational autonomy and no activities separate from the Congolese state, that it was established to manage the rights, holdings and assets of the state in the field of hydrocarbons, whose capital is wholly-owned by the state, completely administered by it, whose role is to serve it, having no independent assets, the merger of assets being patent, serving to finance the state and its officials, to make loans to the state, without transparent accounting.

468

GRAND CT.             WALKER INTL. V. OLEARIUS LTD. (Smellie, C.J.)

34   As already referred to in October 2001, attachment proceedings were brought in France against bank accounts held in the name of SNPC at BNP-Paribas and Société Génerale. In January 2002 in those proceedings the plaintiffs were successful at first instance in establishing their right to seize SNPC's assets in satisfaction of ROC's debts, on the ground that SNPC is an "*emanation d'Etat*".

35   SNPC appealed against the decision to the Court of Appeal in Paris. On July 3rd, 2003, the Court of Appeal delivered its judgment, concluding that SNPC is an "*emanation*" of ROC such that its assets should be treated as those of ROC, and upholding the attachments against it.

36   After a review of the principal documents establishing and governing the operations of SNPC, the court, in Appeal No. 2002/03185, summarized as follows:

"*The status of Société Nationale des Petroles du Congo with respect to the Republic of Congo*

Whereas SNPC, established by the law of April 23rd, 1998, is defined as a public industrial and commercial establishment taking the form of a company with legal personality and financial autonomy, with its entire capital being held by the government, according to its articles/by-laws dated April 9th, 1999, this company:

Has as its purpose action on behalf of the government, directly, through its subsidiaries, or in partnership with foreign partners, in any operation relative to the production, processing, transformation, exploitation, and transporting of liquid or gas hydrocarbons on Congolese territory or in other countries; in particular, to undertake or participate in any operation relating to the above-mentioned mission, to undertake the necessary investment operations, to sell products, hold and manage on behalf of the government the assets and rights belonging to it directly or through an intermediate company and in general to perform the public-service mission of valorizing, exploiting and selling Congolese hydrocarbons;

Has stock capital of 900,000,000 FCFA, consisting chiefly of mining deeds and rights and assets initially held by the government, directly or through Hydro-Congo, in all activities relative to the search for, exploitation of, processing of, and transformation of hydrocarbons and derivative or related substances;

Has resources consisting chiefly of government subsidies, proceeds from the activities of the company itself, and proceeds from borrowings, repayment of advances, and income from interests in other companies;

469

Has an operating budget and an investment budget, and maintains its own accounting records under the supervision of an accountant, with fiscal-year balance-sheet, operating statement, and statement of profit and loss, according to the accounting plan in effect, under the supervision of an auditor;

Is managed by a board of directors that establishes the general policy of the company, resolves on important matters, particularly budget matters, by majority vote, and approves the financial statements, and by a general manager in charge of day-to-day management of the company;

Formalized its relations with the government in an agreement dated June 2001 (*i.e.* prior to the attachments in question), which establishes among other matters the compensation payable to the company in consideration for the mandate received, namely, 1.6% of the gross price of each cargo paid for by purchasers of commercialized hydrocarbons, which said compensation it deducts directly from the proceeds of sale prior to remittance of said proceeds to the government (art. 6);

But whereas by reason of its public service mission:

The members of the board of directors are chiefly representatives of the government agencies involved in this mission, and are appointed by decree issued in the Council of Ministers;

The company is supervised by the ministry in charge of hydrocarbons, which has 'permanent power of orientation and supervision of the enterprise,' in particular to ensure application of government guidelines and the laws and regulations, approve investment programs and monitor their execution, supervise the allocation of profits and supervise personnel policy, which is governed by the hydrocarbons collective bargaining agreement, as well as investments in other companies and the establishment of agencies and branches;

The company is under the economic and financial supervision of the government and the government accounting office;

Whereas the outcome of this close supervision is that SNPC does not have sufficient statutory operating independence to make autonomous decisions in its own interest and to be considered as enjoying *de jure* and *de facto* autonomy with respect to the Congolese Government; it is not even master of its future through an individual investment policy, or of its organizational structure; its accounting does not clearly show the existence and scope of a company sales activity apart from its public service mission;

GRAND CT.            WALKER INTL. V. OLEARIUS LTD. (Smellie, C.J.)

according to its financial statements for the year 2000, the company
had a theoretical net profit of $58.5m., but it is noted that 'taking
into account repayments of government commitments to certain
operators by deduction of output equivalent to SNPC oil profit,
representing a claim by the company upon the Government, leads to
total absorption of the entire profit;' therefore, lacking true
autonomy, the company can merely invoke a claim upon the
government, it cannot truly create a development policy based on
self-financing;

Whereas while ordinarily government supervision or even control of
a legal entity, exercised through its managers, and the public service
mission devolved upon it do not suffice to warrant considering it an
emanation of the state implying its equating with the government, in
the instant situation the Congolese Government has reserved for
itself, with respect to the SNPC, not a simple supervisory power but
rather a genuine power of orientation and approval constituting a
genuine intervention that totally nullifies any reality of an autonomy
of the SNPC that could arise out of its status as a company
registered in the register of economic performers; SNPC constitutes
a legal entity that is fictitious and, consequently, an emanation of the
Republic of Congo."

37    Counsel on behalf of the second defendant contends that—

"SNPC was created as a public commercial and industrial entity
endowed with financial autonomy and the status of a legal person;
SNPC undertakes its own commercial activity; it owns and sells oil
to third parties on its own account; SNPC has accounts which are
independent from the accounts of ROC; SNPC pays taxes to ROC;
SNPC is the parent company of several commercial entities, in the
Republic of Congo and elsewhere. In addition to its own
commercial activity, and pursuant to its by-laws and to the
Convention, SNPC sells oil belonging to ROC and SNPC's day-to-
day business is not controlled by ROC . . ."

**Should this court follow the French court and declare SNPC a mere
façade, as the basis for granting the plaintiffs' application for
summary judgment against it?**

38    I am cognizant of the principle that the corporate veil is only very
rarely lifted. In *Adams* v. *Cape Indus. PLC* (1) their Lordships confirmed
([1991] 1 All E.R. at 1022, *per* Slade, L.J.), that—

"quite apart from cases where statute or contract permits a broad
interpretation to be given to references to members of a group of
companies, there is one well-recognised exception to the rule
prohibiting the piercing of 'the corporate veil.'"

THE CAYMAN ISLANDS LAW REPORTS                                  2003 CILR

So that only in exceptional cases is the corporate veil ever lifted.

39    Referring to the opinion of Lord Keith in *Woolfson* v. *Strathclyde Regional Council* (6), they pointed out that that exception is ([1978] SLT at 161) ". . . only where special circumstances exist indicating that it is a mere façade concealing the true facts."

40    The facts as found by the Paris Court of Appeal are summarized below:

(1) the entire capital of SNPC is held by ROC, it was responsible for the marketing of ROC's oil production;

(2) members of the board of directors are chiefly representatives of the Government and are appointed by decree issued in the Council of Ministers;

(3) the company is under the economic and financial supervision of the Government Accounting Office;

(4) the ministry has permanent power of orientation and supervision of the enterprise; and

(5) the company's mission is to undertake any necessary investment operation on behalf of ROC and to hold and manage on behalf of the Government the assets and rights belonging to the Government.

41    The Paris Court of Appeal ultimately came to the conclusion that because the Congolese Government had reserved to itself "not a simple supervisory power but a rather genuine power of orientation" that that had nullified any reality that SNPC was an autonomous company.

42    I am unable to agree that the close supervisory nature of the relationship between SNPC and ROC is enough to declare SNPC to be a sham or façade. I am not persuaded that SNPC should be regarded as the alter ego of ROC or as a mere fiction, façade or sham, although I take no issue with the five findings of fact upon which the Paris court decided the case.

43    What gives this court pause is the need to take the leap from the finding that SNPC is closely supervised, to the conclusion that it is therefore an "*emanation*" of ROC to the extent, as a matter of English common law, that that connotes a fiction, a mere sham or façade. Even if this court accepts all five of the French court's findings of fact, that does not lead *ipso facto* to the conclusion that SNPC is fictional. Again, that conclusion may be a matter of French law, having no corresponding basis in English law.

44    The approach taken by the French court may be criticized as flawed to the extent that it implies a fiction or mere sham, in that every state is at

GRAND CT.            WALKER INTL. V. OLEARIUS LTD. (Smellie, C.J.)

liberty to set up government bodies and agencies which are lawful under their governmental systems for perfectly legitimate purposes such as those expressly forming the *raison d'être* of SNPC. Moreover, there are obvious and troubling concerns of international comity which arise from arriving too readily at such conclusions.

45   As to Olearius, the only allegation of a façade or sham in the plaintiffs' pleadings was that the formation and use of Olearius in the alternative marketing arrangement was a device or sham ostensibly to retain the Congolese defendants' assets, by structuring their affairs in such a way as to prevent execution against them. The plaintiffs point out that the facility was so structured that there would be no collection account in the name of the producer of the commodity, that being ROC. As a result of this, that account would be unavailable for attachment by creditors of the producer.

46   I have already described, from the lenders' point of view, the *raison d'être* of Olearius, which, by its name, conveys the metaphoric derivatives of its oil-bearing purpose.

47   In *Adams* v. *Cape Indus. PLC* (1), their Lordships addressed the question whether motive was a necessary element of a finding of sham. Referring to Scott, J.'s statement, Slade, L.J. said ([1991] 1 All E.R. at 1022–1023):

> "If and so far as the judge intended to say that the motive behind the new arrangements was irrelevant as a matter of law, we would respectfully differ from him. In our judgment, as Mr. Morrison submitted, whenever a device or sham or cloak is alleged in cases such as this, the motive of the alleged perpetrator must be legally relevant, and indeed this no doubt is the reason why the question of motive was examined extensively at the trial. The decision in *Jones* v. *Lipman* [1962] 1 All E.R. 442, [1962] 1 W.L.R. 832 referred to below was one case where the proven motive of the individual defendant clearly had a significant effect on the decision of Russell, J.
>
>    The judge's finding of fact quoted above as to the motives of Cape behind the new arrangements is accepted (no doubt welcomed) by the plaintiffs, so far as it goes. They submit, rightly in our judgment, that any such motives are relevant to the 'corporate veil' point."

48   Further reference was made to *Jones* v. *Lipman* (2). Slade, L.J. said (*ibid.*, at 1024):

> "In that case the first defendant had agreed to sell to the plaintiffs some land. Pending completion the first defendant sold and transferred the land to the defendant company. The evidence showed

473

that this company was at all material times under the complete
control of the first defendant. It also showed that the acquisition by
him of the company and the transfer of the land to the company had
been carried through solely for the purpose of defeating the
plaintiff's right to specific performance. Russell, J. made an order
for specific performance against both defendants. He held that
specific performance cannot be resisted by a vendor who, by his
absolute ownership and control of a limited company in which the
property is vested, is in a position to cause the contract to be
completed. As to the defendant company, he described it as being
'the creature of the first defendant, a device and a sham, a mask
which he holds before his face in an attempt to avoid recognition by
the eye of equity': see [1962] 1 All E.R. 442, at 445; [1962] 1
W.L.R. 832, at 836. Following *Jones* v. *Lipman*, we agree with Mr.
Morrison that, contrary to the judge's view, where a façade is
alleged, the motive of the perpetrator may be highly material."

49   The issue of law becomes whether the question of motive behind the
financial arrangement between Olearius, SNPC and ROC is enough to
justify lifting the corporate veil such that the assets of the first and second
defendants are to be regarded as the assets of ROC and therefore
available to satisfy the plaintiffs' debts.

50   The financial relationship between Olearius, SNPC and ROC has
already been summarized above. The inference which I draw from all the
evidence is that the special purpose vehicle was to be used strictly as a
pre-payment facility. The ultimate beneficiary of the facility as stated in
the summary terms and conditions is nonetheless SNPC.

51   Their Lordships in *Adams* v. *Cape Indus. PLC* (1) ultimately
decided that while an arrangement might not attract moral approval, there
was nothing illegal in the arrangement made. Slade, L.J. said (*ibid.*, at
1026):

". . . [W]e do not accept as a matter of law that the court is entitled
to lift the corporate veil as against a defendant company which is the
member of a corporate group merely because the corporate structure
has been used so as to ensure that the legal liability (if any) in
respect of particular future activities of the group (and
correspondingly the risk of enforcement of that liability) will fall on
another member of the group rather than the defendant company.
Whether or not this is desirable, the right to use a corporate structure
in this manner is inherent in our corporate law."

52   The same can be said for the use of the SPV scheme. There is
nothing inherently exceptionable in the use of SPVs as financial vehicles.
SPVs are used extensively throughout the world for the structuring of

GRAND CT.          WALKER INTL. V. OLEARIUS LTD. (Smellie, C.J.)

financial transactions for many different reasons. Olearius, as a Cayman
SPV, is by no means unique in that regard.

53   The lenders contend that the facility negotiated with SNPC was for
the legitimate commercial purpose of the provision of a commercial loan
to be repaid from and secured by the production and sale of oil.

54   I accept without reservation, that the transaction evidenced by the
facility documents is a legitimate structured finance arrangement which
enables the mandated arrangers to seek to obtain better security by
lending to an SPV rather than to the producer of the oil.

55   Based on all the foregoing, this court declines the plaintiffs'
invitation to declare SNPC the alter ego of ROC, or a mere sham or
façade. The court also expresses reservations about the propriety of any
such relief against Olearius.

### Jurisdiction to attach a party whose assets are beneficially owned by the defendant

56   Notwithstanding the foregoing, I am, however, satisfied that SNPC
is a necessary and proper party whose assets, because of the nature of its
relationship with ROC, should be made available to satisfy ROC's
judgment debts.

57   In *T.S.B. Private Bank Intl.* v. *Chabra* (5), a *Mareva* injunction was
granted for the purposes of restraining the first defendant, who had given
a guarantee to the plaintiff, from removing its assets from the jurisdiction.
A second defendant was added by the court of its own motion and an
injunction in similar terms was granted against it, the court having found
that the second defendant held assets beneficially owned by the first
defendant, in particular the ownership of 5 Beverley Drive. On an
application by the second defendant to have the injunction discharged on
the ground that no cause of action was disclosed, the court found that
since the second defendant was a necessary party to ensure that all
matters in dispute were effectively dealt with (and its position fell within
RSC, O.15, r.6(2)(b)(ii)—similar in terms to G.C.R. O.15, r.6(2)(b)(ii))—
it followed that the second defendant was a proper party to the
proceedings even though there was no cause of action against it on the
guarantee, and therefore it should not be struck off the writ.

58   The court went on to say ([1992] 1 W.L.R. at 238):

"In this state of uncertainty about the ownership of 5, Beverley
Drive I am of the view that I should not strike out the company as a
party to these proceedings. As I have said, I made the order for its
joinder of my own motion pursuant to R.S.C., Ord. 15, r.6. I
considered that the presence of that company before the court was

necessary to ensure that all matters in dispute in the cause or matter might be effectually and completely determined and adjudicated upon by adding the company as a party. I also considered that the position of the company fell within the broad provisions of Ord. 15, r.6(2)(*b*)(ii), namely that there could be joined as a party

> 'any person between whom and any party to the cause or matter there may exist a question or issue arising out of or relating to or connected with any relief or remedy claimed in the cause or matter which in the opinion of the court it would be just and convenient to determine as between him and that party as well as between the parties to the cause or matter.'"

59    These very same considerations give this court the jurisdiction to consider SNPC and Olearius proper parties to these proceedings. However, the court is not of the view that an injunction against Olearius would serve a proper purpose at this time because of the nature of the financial structure. There simply would be nothing to bite upon if the flow of oil from ROC were to be cut off and even if the injunction were continued, it would serve unjustifiably to prevent the lenders from recovering what is due to them.

**Can the court grant an injunction against SNPC?**

60    In *Chabra* (5), Mummery, J. said (*ibid.*, at 240):

> "If the court has power to make an order against the company, the available evidence points strongly, in my view, to the need for an injunction against it. There is a good arguable case that some of the assets held in its name are the beneficial assets of Mr. Chabra either on the basis that the company holds them on trust for or as nominee for him, or on the basis that the company is nothing more than a convenient repository for Mr. Chabra's assets."

61    On the question whether or not the court had jurisdiction to make an injunction against the company, as the plaintiff had no cause of action against it, the court said (*ibid.*, at 241):

> "In considering this submission I bear in mind four preliminary but important points. I first take note of the wide terms of section 37(1) of the Supreme Court Act 1981 which empowers the court to grant an injunction in all cases where it appears to the court to be just and convenient to do so. Secondly, the whole basis of the *Mareva* jurisdiction is that, where a plaintiff has shown a good arguable case, the court, in order to protect the plaintiff's interests, has jurisdiction in a proper case to grant an interlocutory injunction restraining a defendant from disposing of or dissipating his assets, where the refusal of such an injunction would involve a real risk that

GRAND CT.          WALKER INTL. v. OLEARIUS LTD. (Smellie, C.J.)

a judgment obtained by the plaintiff would be stultified and remain unsatisfied.

Thirdly, the jurisdiction of the court should be exercised with caution and great care should be taken not to be oppressive to the persons restrained, either in the carrying on of a business or in the conduct of everyday life.

Fourthly, the practice of the court on the grant of *Mareva* injunctions is an evolving one which has to remain flexible and adaptable to meet new situations as and when they arise."

62    In order to bolster their argument that an injunction can only be granted against a defendant against whom the plaintiff has a cause of action, the defence in *Chabra* (5) quoted from the decision of the House of Lords in *Siskina* v. *Distos Cia. Naviera S.A.* (4), where Lord Diplock said in his speech ([1979] A.C. at 256):

"A right to obtain an interlocutory injunction is not a cause of action. It cannot stand on its own. It is dependent upon there being a pre-existing cause of action against the defendant arising out of an invasion, actual or threatened by him, of a legal or equitable right of the plaintiff for the enforcement of which the defendant is amenable to the jurisdiction of the court. The right to obtain an interlocutory injunction is merely ancillary and incidental to the pre-existing cause of action."

63    But the court in *Chabra* went on to point out ([1992] 1 W.L.R. at 241) that—

"in that case there was only one defendant and it was held that, as there was no cause of action against the sole defendant which was justiciable in the High Court and enforceable by final judgment, the court had no jurisdiction to make an interlocutory injunction against the defendant restraining the removal of assets in England: see also *Steamship Mutual Underwriting Association (Bermuda) Ltd.* v. *Thakur Shipping Co. Ltd. (Note)* [1986] 2 Lloyd's Rep. 439."

64    And (*ibid.*, at 241–242):

"In the present case there are two defendants. There is one defendant, Mr. Chabra, against whom the plaintiff undoubtedly has a good arguable cause of action: the claim on the guarantee. This is justiciable in the English court; Mr. Chabra is amenable to the jurisdiction of the English court to make a final judgment against him on the guarantee. The claim for an injunction to restrain disposal of assets by Mr. Chabra is ancillary and incidental to that cause of action. In my judgment, the claim to a similar injunction against the company is also ancillary and incidental to the claim

477

against Mr. Chabra and the court has power to grant such an injunction in an appropriate case. *It does not follow that, because the court has no jurisdiction to grant a Mareva injunction against the company, if it were the sole defendant, the court has no jurisdiction to grant an injunction against the company as ancillary to, or incidental to, the cause of action against Mr. Chabra: see for example, Vereker v. Choi [1985] 4 N.S.W.L.R. 277, 283. I agree that such a course is an exceptional one, but I do not accept that it is one that the court has no jurisdiction to make.*" [Emphasis supplied.]

65   There can be no argument in this case that the second, third and fourth defendants are amenable to the jurisdiction of this court and that judgment has already been entered against ROC for sums owed to the first and second plaintiffs. Following the principle laid down in *Chabra* and most recently followed in *Yukong Line Ltd.* v. *Rendsburg Invs. Corp.* (7), the claim for an injunction against SNPC is ancillary and incidental to the enforcement of the debt owing to the plaintiffs.

66   Without the need to declare SNPC anything other than what it is as a matter of Congolese law, there is evidence that assets belonging to or which might come into the possession of SNPC are, or will in fact be, assets of ROC. It is therefore appropriate to grant this injunction in support of the plaintiffs' legal right to collect their debt owing to them by ROC.

**Appointment of a receiver**

67   With respect to the plaintiffs' application to appoint a receiver in respect of the Congolese defendants' interests in the forward purchase agreement, it appears that the only benefit that would be collected would be any additional purchase price payment, which is payable by Olearius to SNPC pursuant to cl. 12 of the forward purchase price. However, as made clear in the third affidavit of Mr. Aleem Khan of SCB, there may possibly be no moneys to collect.

68   By letter dated August 13th, 2002, SCB in its capacity as agent bank, notified SCB in its capacity as account bank that an event of default had occurred and was continuing as a result of the order for a *Mareva* injunction made by Graham, J. against Olearius on the same date. SCB also stated that it was exercising its right pursuant to cl. 9.8.1 of the facility agreement to become sole signatory on the project accounts with immediate effect. By a letter of the same date, Olearius was advised by SCB that the order had caused an event of default, which was continuing. By letter dated August 15th, 2002, Olearius informed SCB and SNPC that an event of default had occurred. Clause 9.8.2 of the facility agreement provides that—

GRAND CT.         WALKER INTL. V. OLEARIUS LTD. (Smellie, C.J.)

"after delivery of a notice under para. 9.8.1 above (and until the account bank is notified by the agent that such event of default has been remedied or waived by the majority lenders), no amount will be payable to the borrower [Olearius] or may be withdrawn by the borrower, with respect to the project accounts."

69    By cl. 6.2, "Withdrawals by borrower from collection account," after stating priority in terms of withdrawals, the clause continues:

". . . [T]he borrower shall not be entitled to make any such withdrawal under paras. 6.2.7, 6.2.8 or 6.2.10 above if a potential event of default is continuing which, in the absolute discretion of the agent might be expected to have a material adverse effect . . ."

70    Importantly, it is cl. 6.2.10 that provides for payment to SNPC. It is clear that with the event of default arising out of the *Mareva* injunction of August 13th, 2002, SNPC would have no further entitlement to any additional price payments from Olearius. Additionally, by letter dated August 14th, 2002, the lenders informed Olearius that the entire loan under the facility agreement fell to be repayable by Olearius on demand. The lenders have thus far demanded payment from Olearius of all the proceeds of the sale of oil which Olearius has received (less a buffer which has been left in the DSRA to cover future interest payments and costs) and intend to do so until fully repaid.

71    It is of course possible that if the lenders revoke their declaration of an event of default, there may eventually be a surplus for payment by Olearius to SNPC. However, this would be a decision requiring the unanimous support of the lenders and is unlikely. The interveners argue that a proposed receivership order would not therefore fulfil the expectations of the plaintiffs but instead would prejudice the lenders in that, as third parties, they have no meaningful degree of protection by way of security for the plaintiffs' cross-undertaking in damages. They therefore argue that the possibility of the plaintiffs obtaining any surplus could be maintained by an order freezing it in the hands of Olearius or, alternatively, directing Olearius to pay it into an account in the name of the plaintiffs.

72    The latter suggestion seems to me to be the most pragmatic. In *S.C.F. Finance Co. Ltd.* v. *Masri* (3), a case where third party interests were affected by a *Mareva* injunction and a dispute arose as to whether the third party assets were in fact the property of the defendant against whom an injunction had been made, Lloyd, L.J. said ([1985] 1 W.L.R. at 884):

"(i) Where a plaintiff invites the court to include within the scope of a *Mareva* injunction assets which appear on their face to belong to a third party, e.g. a bank account in the name of a third party, the court

479

should not accede to the invitation without good reason for supposing that the assets are in truth the assets of the defendant. (ii) Where the defendant asserts that the assets belong to a third party, the court is not obliged to accept that assertion without inquiry, but may do so depending on the circumstances. The same applies where it is the third party who makes the assertion, on an application to intervene. (iii) In deciding whether to accept the assertion of a defendant or a third party, without further enquiry, the court will be guided by what is just and convenient, not only between the plaintiff and the defendant, but also between the plaintiff, the defendant and the third party."

73   While the court has been guided by the above procedure, and it is a fact that Olearius holds funds or might come into funds that are the property of SNPC, I must ultimately be guided by what is just and convenient. I do not accept the proposition that the *Mareva* injunction against the first defendant granted by Graham, J. remains proper, nor am I of the view that it is necessary to appoint a receiver. Even if the injunction were proper, as the interveners have pointed out, the plaintiffs will have nothing to collect if the injunction is continued or a receiver appointed.

74   SCB has already informed the borrower that an event of default has occurred and become the sole signatory to the facility, in accordance with cl. 9.8.1. Clause 9.8.1 reads as follows:

"If the agent notifies the account bank that an event of default has occurred and is continuing and in such notice invokes this clause, the agent shall be entitled (but not obliged) without prior notice to, or the consent of, the borrower to be the sole signatory on the project accounts; and apply all amounts in the relevant project accounts in or towards reduction (as and when they fall due) of amounts outstanding under the finance documents and such other payments and obligations as the agent may agree (in such order and from such project accounts as the agent reasonably thinks fit)."

75   So any relief granted to the plaintiffs here will only make sense if the parties can come to some kind of agreement regarding the excess funds held by Olearius and payable to SNPC, or to its order. I am reminded of the third point made by Mummery, J. in *Chabra* (5), where the court in referring to its jurisdiction to grant a *Mareva* injunction said ([1992] 1 W.L.R. at 241)—". . . the jurisdiction of the court should be exercised with caution and great care should be taken not to be oppressive to the persons restrained, either in the carrying on of a business or in the conduct of everyday life."

76   The intervener, SCB, has here represented to this court that in the event that the *Mareva* injunction is discharged, it will not exercise such

GRAND CT.        WALKER INTL. V. OLEARIUS LTD. (Smellie, C.J.)

discretion as it has under cl. 9.8.1(B) of the facility agreement, dated May
17th, 2002 or otherwise under the relevant documents, to make payments
to SNPC or at its direction, except for those payments to be made to a
relevant designated account. I will accept their representation by way of
undertaking another pragmatic way of ensuring that any surplus funds to
be paid to SNPC are available to satisfy the judgment debts of the
plaintiffs. The details of the above are to be agreed between the parties
and presented to the court.

77    As far as the first defendant is concerned, the injunction granted by
Graham, J., dated August 13th, 2002, is hereby discharged and the plaintiffs
are released from the undertakings and the guarantee and charge for the
cross-undertakings to be released and returned. The plaintiffs also have
leave to discontinue this action against the first defendant. No order is made
as to costs between the plaintiffs, the first defendant and the intervener.

**Summary of orders made**

*As against the third and fourth defendants*

78    Pursuant to s.5 of the Foreign Arbitral Awards Enforcement Law
(1997 Revision), s.22 of the Arbitration Law (2001 Revision) and the
judgment of the International Court of Arbitration (Case 10030/AC/DB),
the first plaintiff is to be paid all sums owing in the amount of
30,645,655.38 inclusive of interest as of the judgment date. Additional
interest is due at a rate of 5.75% pursuant to s.34 of the Judicature Law
(2002 Revision) until payment is made.

*As against the fourth defendant*

79    The fourth defendant is to pay the second plaintiff all sums owing
together with interest in the amount of US$15,910,413.52 as of the date
of judgment. Additional interest is due at a rate of 4.5% pursuant to s.34
of the Judicature Law (2002 Revision).

*As against the second defendant*

80    A declaration is granted that having regard to the true nature of the
relationship between the second and fourth defendants, the second
defendant is beneficially owned and controlled by the fourth defendant
and is properly joined in these proceedings against the fourth defendant.
As such, the assets of the second defendant are to be regarded as the
assets of the fourth defendant and are available for execution in
satisfaction of judgments obtained against the fourth defendant.

81    The second defendant is to pay all sums found due from the fourth
defendant to the plaintiffs as of the judgment date. Additional interest is
due under s.34 of the Judicature Law until payment is made.

481

82   The appointment of a receiver over the assets of the second defendant is denied. Instead, an irrevocable designation by the second defendant of the general account of the Grand Court for the purposes of cl. 9.9 of the facility agreement of May 17th, 2002 (between the first defendant, KBC Bank NV, RMB International (Dublin) Limited, the intervener and the original lenders) is required. Moneys so received are to be held to the benefit of the plaintiffs to the extent that the judgment of this court on July 16th, 2003 remains unsatisfied. Any dealings with such funds to await further order of this court. Any excess is to be for the benefit of the second to fourth defendants. Liberty to apply in relation to the implementation of this order is granted.

### As against the second to fourth defendants

83   A *Mareva* injunction is hereby granted against the second to fourth defendants prohibiting the defendants from dealing with their assets up to the amount of US$51m. Uncharged free assets in cash beneficially owned by the defendants and held by the first defendant in the amount of US$51m. must not be charged, pledged, mortgaged or assigned.

84   The plaintiffs are at liberty to seek further relief against the second to fourth defendants. Costs of this action are granted against the defendants, to be taxed if not agreed.

### As to the first defendant

85   The action against the first defendant is to be discontinued. The August 13th, 2002 *Mareva* injunction against the first defendant is discharged. The plaintiffs are released from the undertakings given to the court and the guarantee and charges executed and served in connection with their cross-undertakings in damages are to be released and returned.

86   I record that the plaintiffs agree not to pursue either the first defendant or the intervener and *vice versa*, in relation to any costs orders made in these proceedings. There is no order as to costs of this action as between the plaintiffs, the first defendant and the intervener.

87   I record that formal orders were presented to the court and approved in final settlement of the action on July 17th, 2003.

*Order accordingly.*

Attorneys: *Hunter & Hunter* for the plaintiffs; *Maples & Calder* for the first defendant; *Quin & Hampson* for the intervener.

————————————